# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

FRANK CARBONE, ANDREW CORZO, SAVANNAH ROSE EKLUND, SIA HENRY, ALEXANDER LEO-GUERRA, MICHAEL MAERLANDER, BRANDON PIYEVSKY, KARA SAFFRIN, and BRITTANY TATIANA WEAVER, individually and on behalf of all others similarly situated,

        Plaintiffs,

    v.

BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, THE JOHNS HOPKINS UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY,

        Defendants.

Case No.  1:22-cv-00125

Judge Matthew F. Kennelly

Magistrate Gabriel A. Fuentes

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

BACKGROUND ................................................................................................................3

    A.    Need-Based Financial Aid And The Consensus Methodology ...............................3

    B.    The Origins And Repeated Renewals Of Section 568............................................5

    C.    Plaintiffs' Antitrust Claim....................................................................................8

ARGUMENT ......................................................................................................................8

I.    The Alleged Conduct Is Exempt From Antitrust Scrutiny ...........................................8

    A.    Plaintiffs Rely On A Legally Deficient Reading Of The Term "Need-Blind"........................................................................................................................9

        1.    Admissions Decisions That Do Not Disfavor Applicants Because They Need Financial Aid Are "Need-Blind" Under Section 568..............10

        2.    Plaintiffs' Contrary Reading Has No Contextual Support And Would Impede Congress's Clear Objectives ...............................................12

        3.    Plaintiffs' Allegations As To Purported Donor Preferences At Duke, Brown, MIT, And Georgetown Are Insufficient To Deprive These Schools Of Section 568's Protections ...............................14

    B.    Plaintiffs' Other Allegations As To Purported Non-Need-Blind Practices Are Conclusory And Implausible ..........................................................15

        1.    Plaintiffs' Contrived Definition Of "Enrollment Management" Fails To Plausibly Allege That Any Defendant Is Not Need-Blind ..........16

        2.    Plaintiffs Fail To Plausibly Allege That Any Defendant Is Not Need-Blind As To Transfer Or Waitlisted Applicants .............................17

        3.    Plaintiffs Fail To Plausibly Allege That Admissions To Columbia's School of General Studies Are Not Need-Blind ...................19

    C.    The Section 568 Exemption Protects Need-Blind Schools That Lack Actual Knowledge That Any Other Participating School Is Not Need-Blind........................................................................................................................20

II.    Plaintiffs Have Not Plausibly Alleged An Antitrust Violation...........................................22

    A.    Plaintiffs Have Not Alleged A Plausible *Per Se* Violation....................................23

        1.    Congress And The Third Circuit Have Found That Similar Conduct Is Not Obviously Anticompetitive ...............................................23

        2.    The Consensus Methodology Does Not Have Obvious Anticompetitive Effects Justifying *Per Se* Condemnation ........................25

        3.    The Consensus Methodology Has Credible Procompetitive Benefits That *Per Se* Condemnation Would Ignore ................................28

   B.  The Amended Complaint Fails To State A Claim Under The Rule Of
      Reason Because Plaintiffs Have Not Pleaded A Plausible Relevant Market ........29

III.  Plaintiffs Fail To Plausibly Allege Antitrust Injury And Antitrust Standing ....................35

IV.  The Statute Of Limitations Bars The Claims Of Seven Of The Nine Plaintiffs................37

CONCLUSION ...........................................................................................................................39

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*1-800 Contacts, Inc. v. FTC,*
    1 F.4th 102 (2d Cir. 2021) ................................................................29

*42nd Parallel North v. E Street Denim Co.,*
    286 F.3d 401 (7th Cir. 2002) ...........................................................33

*Abramski v. United States,*
    573 U.S. 169 (2014).....................................................................10, 21

*Allied Tube & Conduit Corp. v. Indian Head, Inc.,*
    486 U.S. 492 (1988).........................................................................27

*American Ad Management, Inc. v. General Telephone Co. of California*
    190 F.3d 1051 (9th Cir. 1999) .........................................................36

*Associated General Contractors of California, Inc. v. California State Council of Carpenters,*
    459 U.S. 519 (1983).........................................................................36

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007)...............................................................9, 15, 17

*Boim v. Holy Land Foundation for Relief & Development,*
    549 F.3d 685 (7th Cir. 2008) (en banc) ...........................................22

*Bond v. United States,*
    572 U.S. 844 (2014).............................................................10, 12, 13

*Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,*
    441 U.S. 1 (1979).......................................................................23-24

*Bunker Ramo Corp. v. United Business Forms, Inc.,*
    713 F.2d 1272 (7th Cir. 1983) .........................................................24

*California Dental Ass'n v. FTC,*
    526 U.S. 756 (1999).........................................................................26

*Cascade Health Solutions v. PeaceHealth,*
    515 F.3d 883 (9th Cir. 2008) ...........................................................22

*Deppe v. National Collegiate Athletic Ass'n,*
    893 F.3d 498 (7th Cir. 2018) ......................................................22, 29

*FIMCO, Inc. v. Funk*,
    748 F. App'x 716 (8th Cir. 2019) ...................................................................18

*Freeman v. City of Crown Point*,
    2014 WL 545511 (N.D. Ind. Feb. 11, 2014)............................................... 14-15

*FTC v. Indiana Federation of Dentists*,
    476 U.S. 447 (1986)........................................................................................28

*Gabelli v. SEC*,
    568 U.S. 442 (2013)........................................................................................37

*Gordon v. Softech Int'l, Inc.*,
    726 F.3d 42 (2d Cir. 2013)..............................................................................22

*Greater Rockford Energy & Technology Corp. v. Shell Oil Co.*,
    998 F.2d 391 (7th Cir. 1993) ..........................................................................35

*Grutter v. Bollinger*,
    539 U.S. 306 (2003)........................................................................................13

*Heard v. Becton, Dickinson & Co.*,
    440 F. Supp. 3d 960 (N.D. Ill. 2020) ..............................................................18

*In re Brand Name Prescription Drugs Antitrust Litigation*,
    1999 WL 33889 (N.D. Ill. Jan. 19, 1999) ......................................................21

*In re Copper Antitrust Litigation*,
    436 F.3d 782 (7th Cir. 2006) ..........................................................................37

*In re Dairy Farmers of America, Inc. Cheese Antitrust Litigation*,
    2013 WL 4506000 (N.D. Ill. Aug. 23, 2013) .................................................35

*In re Humira (Adalimumab) Antitrust Litigation*,
    465 F. Supp. 3d 811 (N.D. Ill. 2020) .......................................................29, 35

*In re McKesson HBOC, Inc. Securities Litigation*,
    126 F. Supp. 2d 1248 (N.D. Cal. 2000) ..................................................... 20-21

*In re Sulfuric Acid Antitrust Litigation*,
    703 F.3d 1004 (7th Cir. 2012) ...........................................................23, 28, 37

*Jefferson v. United States*,
    546 F.3d 477 (7th Cir. 2008) ..........................................................................13

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997)..................................................................................38, 39

*Loeb Indus., Inc. v. Sumitomo Corp.*,
    306 F.3d 469 (7th Cir. 2002) ..................................................36

*Mabry v. City of East Chicago*,
    2021 WL 1123808 (N.D. Ind. Mar. 24, 2021) ....................................18

*Marion Healthcare, LLC v. Becton, Dickinson & Co.*,
    952 F.3d 832 (7th Cir. 2020) ..................................................21

*Maui Jim, Inc. v. SmartBuy Guru Enterprises*,
    386 F. Supp. 3d 926 (N.D. Ill. 2019) ..........................................33

*McGarry & McGarry, LLC v. Bankruptcy Management Solutions, Inc.*,
    937 F.3d 1056 (7th Cir. 2019) .................................................35

*Mid-America Regional Bargaining Ass'n v. Will County Carpenters District Council*,
    675 F.2d 881 (7th Cir. 1982) .............................................9, 21

*National Black Expo v. Clear Channel Broadcasting, Inc.*,
    2007 WL 495307 (N.D. Ill. Feb. 8, 2007) ......................................38

*Nucap Indus., Inc. v. Robert Bosch LLC*,
    273 F. Supp. 3d 986 (N.D. Ill. 2017) ..........................................30

*Ohio v. American Express Co.*,
    138 S. Ct. 2274 (2018).................................................28, 29, 30

*Olson v. Champaign County*,
    784 F.3d 1093 (7th Cir. 2015) ..................................................3

*Phillips v. Prudential Insurance Co. of America*,
    714 F.3d 1017 (7th Cir. 2013) .................................................16

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997).................................................30

*Reapers Hockey Ass'n, Inc. v. Amateur Hockey Ass'n Illinois, Inc.*,
    412 F. Supp. 3d 941 (N.D. Ill. 2019) ..........................................29

*Republic Tobacco Co. v. North Atlantic Trading Co.*,
    381 F.3d 717 (7th Cir. 2004) .................................................29

*Rotkiske v. Klemm*,
    140 S. Ct. 355 (2019)........................................................37

*Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*,
    950 F.3d 911 (7th Cir. 2020) .................................................30

*Stephan v. Goldinger*,
325 F.3d 874 (7th Cir. 2003) ...................................................38

*Texaco Inc. v. Dagher*,
547 U.S. 1 (2006)....................................................................23

*Tomlinson v. Goldman, Sachs & Co.*,
682 F. Supp. 2d 845 (N.D. Ill. 2009) ......................................37

*United States v. Brown University*,
5 F.3d 658 (3d Cir. 1993)................................................ *passim*

*United States v. Brown University*,
805 F. Supp. 288 (E.D. Pa. 1992) .......................................5, 11

*United States v. E. I. du Pont de Nemours & Co.*,
351 U.S. 377 (1956)................................................................30

*United States v. U.S. Gypsum Co.*,
438 U.S. 422 (1978)................................................................27

*USS-POSCO Indus. v. Contra Costa Cty Building & Constr. Trades Council, AFL-CIO*,
31 F.3d 800 (9th Cir. 1994) ......................................................9

*Varner v. Peterson Farms*,
371 F.3d 1011 (8th Cir. 2004) ................................................39

*Vogel v. American Society of Appraisers*,
744 F.2d 598 (7th Cir. 1984) ............................................27, 28

*Yates v. United States*,
574 U.S. 528 (2015)................................................................11

*Yousef v. Cty. of Westchester*,
2020 WL 2037177 (S.D.N.Y. Apr. 28, 2020)..........................15

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
401 U.S. 321 (1971)................................................................37

**Statutes, Codes & Regulations**

15 U.S.C. § 1 note................................................................ *passim*

15 U.S.C. § 15b.......................................................................37

Pub. L. No. 102-325, 106 Stat. 448 (1992).........................4, 6

Pub. L. No. 103-382, 108 Stat. 3518 (1994).........................1, 6

Pub. L. No. 105-43, 111 Stat. 1140 (1997)........................................................6

Pub. L. No. 107-72, 115 Stat. 648 (2001)......................................................6, 7

Pub. L. No. 110-327, 122 Stat. 3566 (2008)....................................................6

Pub. L. No. 114-44, 129 Stat. 472 (2015)........................................................6

**Other Authorities**

147 Cong. Rec. H1360 (daily ed. Apr. 3, 2001) (Statement of Rep. Smith) ................19

154 Cong. Rec. H2922 (daily ed. Apr. 30, 2008) (Statement of Rep. Delahunt).........12

*568 Group Member Institutions*, https://www.568group.org/home/?q=node/24 .........27

*America's Top Colleges*, FORBES, https://www.forbes.com/top-colleges .....................30

*Best National University Rankings*, U.S. NEWS & WORLD REP.,
    https://www.usnews.com/best-colleges/rankings/national-universities .....................30, 31, 34

*Best Undergraduate Computer Science Programs Rankings*, U.S. NEWS &
    WORLD REP, https://www.usnews.com/best-colleges/rankings/computer-
    science-overall ............................................................................................34

*Best Value Schools*, U.S. NEWS & WORLD REP., https://www.usnews.com/best-
    colleges/rankings/national-universities/best-value ...............................................26

Brooks, *Econometric Modeling of Enrollment Behavior*, 26 J. STUDENT FIN. AID 7 (1996) ........17

Brooks, *Using Campus-Based Financial Aid Strategically*, in HANDBOOK OF
    STRATEGIC ENROLLMENT MANAGEMENT (Hossler & Bontrager eds., 2014) .........17

*Building on Excellence: The University Plan*, DUKE UNIV. (Feb. 23, 2001),
    https://dukespace.lib.duke.edu/dspace/bitstream/handle/
    10161/65/UA2006_0037%20Strategic%20Plan.pdf?sequence=1&isAllowed=y.................33

Cockrum & Weber, *Notre Dame, SMC communities evaluate opportunities,
    efforts for low socioeconomic students*, THE OBSERVER (Apr. 30, 2018),
    https://ndsmcobserver.com/2018/04/efforts-low-socioeconomic-students/ ...........16

*Consensus Methodology*, https://www.568group.org/home/?q=node/15 .......................5

*Consortium of Financing Higher Education*, COFHE, https://web.mit.edu/cofhe/ ....................32

*Cost & Aid*, PRINCETON UNIV., https://admission.princeton.edu/cost-aid ....................10

Crowley, *Confessions of a Former MIT Admissions Director*, BOSTON GLOBE
    (Mar. 13, 2019) ............................................................................................15

DARTMOUTH COLL., https://home.dartmouth.edu/........................................................32

DUKE UNIV., https://admissions.duke.edu/academic-possibilities/................................32

Golden, THE PRICE OF ADMISSION (2006) ...............................................................14

Hossler, *Origins of Strategic Enrollment Management*, in HANDBOOK OF
    STRATEGIC ENROLLMENT MANAGEMENT (Hossler & Bontrager eds., 2014) .........................16

*How U.S. News Calculated the 2022 Best Colleges Rankings*, U.S. NEWS & WORLD REP.,
    https://www.usnews.com/education/best-colleges/articles/how-us-news-calculated-the-
    rankings.......................................................................................................30, 31

H.R. Conf. Rep. No. 103-761 (1994).................................................................... *passim*

H.R. Rep. No. 105-144 (1997).....................................................................5, 6, 7, 24

H.R. Rep. No. 107-32 (2001)...............................................................................4, 36

H.R. Rep. No. 114-224 (2015)............................................................................ *passim*

*Institutional Methodology*, https://professionals.collegeboard.org/higher-
    ed/financial-aid/im ............................................................................................4

Kingsbury, *Dirty Secrets of College Waitlists*, THE DAILY BEAST (July 14, 2017,
    11:43AM), https://www.thedailybeast.com/dirty-secrets-of-college-waitlists.......................18

Lee, *Public Health professor Lisa Rosen-Metsch appointed dean of General Studies*,
    COLUMBIA SPECTOR, https://www.columbiaspectator.com/news/2017/11/14/public-
    health-professor-lisa-rosen-metsch-appointed-dean-of-general-studies (Editor's
    Note, Feb. 16, 2022) ........................................................................................20

MIT Standards of Conduct,
    https://www.568group.org/home/sites/default/files/mitsoc.pdf.............................6, 12, 19, 25

NCAA Directory, Division III Institutions,
    https://web3.ncaa.org/directory/memberList?type=12&division=III ....................................32

*Office of Student Aid*, BOWDOIN COLL., https://www.bowdoin.edu/student-aid/ ..........................10

*Press Release*, Sen. Chuck Grassley (July 28, 2015),
    https://www.grassley.senate.gov/news/news-releases/congress-passes-bill-
    allowing-universities-collaborate-financial-aid-best ............................................................7

*Press Release*, Rep. Hank Johnson (June 2, 2015),
    https://hankjohnson.house.gov/media-center/press-releases/legislation-
    introduced-senate-house-allow-universities-collaborate-best....................................................7

PRINCETON UNIV., https://admission.princeton.edu/academics/what-does-liberal-arts-mean .......32

Sara Haberson, LINKEDIN, https://www.linkedin.com/in/saraharberson;......................................18

Simon, *Simon '16: Pimp My University*, BROWN BROWN DAILY HERALD (Oct. 21, 2015).........15

U.S. Gov't Accountability Off., GAO-06-963, (Sept. 2006),
    https://www.gao.gov/assets/gao-06-963.pdf.................................................................. *passim*

*WSJ/The 2022 College Rankings List*, WALL STREET JOURNAL,
    https://www.wsj.com/articles/college-rankings-list-2022-11632246093 ...............................30

Wan, *Schapiro, administrators talk research efforts, campus inclusion at
    'Conversations with the President'*, The Daily Northwestern (Apr. 12, 2018),
    https://dailynorthwestern.com/2018/04/12/campus/214612/....................................................33

*Writing in the Disciplines*, https://www.usnews.com/best-colleges/rankings/writing-
    programs ...........................................................................................................................................34

YALE COLL., https://yalecollege.yale.edu/academics ..................................................................31

# INTRODUCTION

Congress long ago recognized that students benefit when colleges and universities collaborate on standards for assessing need for financial aid. Such collaboration improves the accuracy of need determinations and promotes the fair and efficient allocation of aid, which in turn makes higher education more accessible. Congress actively encourages this collaboration through a statutory antitrust exemption for agreements among schools to develop "common principles of analysis" for financial aid. *See* 15 U.S.C. § 1 note; Pub. L. No. 103-382, title V, § 568, 108 Stat. 3518, 4060 (1994). The exemption ensures that schools engaged in this collaboration do not face the threat and expense of antitrust litigation, which might otherwise deter the conduct Congress sought to encourage. Over the last three decades, Congress has repeatedly reauthorized and extended the "Section 568" exemption, recognizing that it often results in *increased* amounts of need-based aid for students and does not adversely affect the affordability of higher education.

Starting in the early 2000s, and consistent with the exemption, the 568 Presidents Group has developed a "Consensus Methodology" of voluntary general recommendations for assessing student need. This methodology does not operate in a vacuum. Rather, it builds on other common methodologies used by the federal government and colleges and universities throughout the country. The 568 Group pools its members' expertise to develop additional thoughtful and data-driven responses to nuanced questions about need that those other methodologies do not answer. Members regularly certify that they meet the prerequisite for the statutory exemption: they admit students "on a need-blind basis." *See* 15 U.S.C. § 1 note.

Now, nearly two decades after the Consensus Methodology was developed, Plaintiffs have sued 17 private, non-profit universities that are a subset of the institutions that have been members of the 568 Group at some point over the past 15 years. Plaintiffs allege that Defendants are not

exempt under Section 568 because certain of their undergraduate admissions decisions do not satisfy Plaintiffs' overbroad and counterfactual interpretation of "need-blind," claim that the Consensus Methodology violates Section 1 of the Sherman Act, and assert vague and speculative injuries dating back to 2003. Plaintiffs' claim must be dismissed for the following reasons:

*First*, Section 568 exempts the challenged collaboration from the antitrust laws. Plaintiffs' argument to the contrary rests on a misreading of the exemption's need-blind requirement. Under Plaintiffs' reading, admissions decisions are not "need-blind" if they involve *any* consideration of *any* financial circumstances, regardless of whether or how the circumstances relate to need for financial aid. That interpretation ignores the common understanding of the term "need-blind" and disregards the statute's structure, history, and purpose. These factors make clear that considering financial circumstances in admissions decisions implicates Section 568 only if it disfavors particular applicants *because* they need financial aid. Plaintiffs also fail to allege the facts their theory requires. For nearly half of Defendants, Plaintiffs make no specific factual allegations about non-need-blind admissions. For the rest, Plaintiffs offer only general and conclusory allegations, often refuted by their own cited sources. Moreover, Plaintiffs are wrong that need-blind schools lose the exemption if, unbeknownst to them, another member of the Group was not need-blind.

*Second*, Plaintiffs fail to plausibly allege a violation of the Sherman Act. Their contention that the Consensus Methodology is anticompetitive *per se* is untenable. Congress has repeatedly recognized the Methodology's procompetitive benefits, and the only court of appeals to have considered the legality of collaborations among institutions of higher education relating to financial aid has flatly rejected *per se* treatment. *See United States v. Brown Univ.*, 5 F.3d 658, 661 (3d Cir. 1993). Plaintiffs' claim fails under a "rule-of-reason" analysis because they have not plausibly pleaded that Defendants have actionable market power in any properly defined market.

Their claimed product market—private national universities with an average *U.S. News & World Report* ranking of 25 or higher from 2003 through 2021—is nonsensical. It is cherry-picked from a magazine's rankings that say nothing about competition, and it implausibly disregards all public universities, all liberal arts colleges, and private universities that fall below the arbitrary top-25 ranking. Many of these schools obviously compete with Defendants for student enrollment.

*Third*, Plaintiffs' alleged injuries are too speculative to satisfy antitrust injury and standing requirements. Plaintiffs allege few facts about their own financial circumstances and the aid they received, and no facts at all about the effect the Consensus Methodology had on their individual awards. Plaintiffs thus simply speculate that they would have received more grant-based aid but for the Consensus Methodology. Their speculation is insufficient as a matter of law.

*Finally*, the claims of the seven Plaintiffs who matriculated before January 2018 all plainly accrued outside the Sherman Act's four-year limitations period, and no tolling doctrine applies. At a minimum, those claims are time-barred on their face and should be dismissed.

Plaintiffs' claim rests on a series of legal errors and conclusory, implausible allegations. With so many fatal flaws, another amendment would be futile. Dismissal should be with prejudice.

## BACKGROUND

### A.     Need-Based Financial Aid And The Consensus Methodology

Many non-profit institutions of higher education help students by providing financial aid in the form of work-study programs, loans that must be repaid, or scholarships and grants based on applicants' need or merit. *See* GAO Report at 7 & n.6.[1] While loans and work-study help

---

[1] U.S. Gov't Accountability Off., GAO-06-963, Higher Education: Schools' Use of the Antitrust Exemption Has Not Significantly Affected College Affordability or Likelihood of Student Enrollment to Date (Sept. 2006), https://www.gao.gov/assets/gao-06-963.pdf ("GAO Report"). Courts "may take judicial notice of public records not attached to the complaint in ruling on a motion to dismiss under Rule 12(b)(6)." *Olson v. Champaign Cty.*, 784 F.3d 1093, 1097 n.1 (7th Cir. 2015). All websites were last visited April 15, 2022.

students afford the cost of attendance, they do not affect the "net price," which is the "gross tuition plus fees for room and board, less institutional grant aid." Am. Compl. ¶ 5.

Providing need-based aid naturally requires first determining how much aid a student needs, which is derived from a calculation of how much she is expected to contribute. Colleges and universities have multiple resources available to help them make those determinations. The "Federal Methodology" is outlined by statute and governs federally funded aid, *see* Pub. L. No. 102-325, 106 Stat. 448 (1992), although some institutions use it to inform their own institutional aid, GAO Report at 8. College Board, a not-for-profit association whose membership includes numerous leading educational institutions, developed the "Institutional Methodology," a set of recommendations for calculating financial aid provided by the college or university. *Id.* at 8 & n.7.[2] The "Consensus Methodology" is a further resource that schools can consider.

The Consensus Methodology was developed by the 568 Presidents Group, an affiliation of colleges and universities formed in 1998. *See* Am. Compl. ¶¶ 5, 96, 114. It builds on the Institutional Methodology by offering additional voluntary recommendations for less common financial profiles, such as "expected contributions from non-custodial parents, treatment of depreciation expenses which may reduce apparent income, valuation of rental properties, and unusually high medical expenses." H.R. Rep. No. 107-32, at 3 (2001). As Congress has recognized, this "common set of principles … is not binding on those that participate, nor are there prescribed financial aid amounts that are predetermined. Indeed, universities using the [Consensus Methodology] offer different, and competitive, financial aid packages to the same student." H.R. Rep. No. 114-224, at 3 (2015). Further, the Consensus Methodology "does not address issues

---

[2] *See also Institutional Methodology*, https://professionals.collegeboard.org/higher-ed/financial-aid/im.

associated with the mix of grant, loan, and work components of financial aid awards," or "non-need based aid, often called merit awards, whether academic or athletic."[3]

## B.     The Origins And Repeated Renewals Of Section 568

The 568 Group is named after Section 568 of the Improving America's Schools Act of 1994. *See* 15 U.S.C. § 1 note. Section 568 is a statutory exemption from the antitrust laws. It authorizes "2 or more institutions of higher education at which all students admitted are admitted on a need-blind basis, to agree or attempt to agree," among other things, "to use common principles of analysis for determining the need of such students for financial aid," as long as the agreement "does not restrict financial aid officers at such institutions in their exercising independent professional judgment with respect to individual applicants for such financial aid." *Id.* Section 568 defines "on a need-blind basis" to mean "without regard to the financial circumstances of the student involved or the student's family." *Id.*

Section 568 was Congress's response to litigation challenging the so-called "Overlap" agreement. *See* H.R. Rep. No. 105-144, at 2-3 (1997). There, certain schools agreed to award financial aid based solely on financial need, to calculate need using the same formula, and to agree on virtually identical need-based aid packages for individual students at "an annual 'Ivy Overlap' meeting." *United States v. Brown Univ.*, 805 F. Supp. 288, 293 (E.D. Pa. 1992), *rev'd*, 5 F.3d 658 (3d Cir. 1993). The Department of Justice filed suit under the Sherman Act, and the district court found antitrust violations under a "quick look" analysis. *See* 5 F.3d at 664-65. The Third Circuit reversed. It held that "a full scale rule of reason analysis" was necessary given the procompetitive benefits of the agreement, including that it plausibly "improved the quality of the education offered by the schools and therefore enhanced the consumer appeal of an Overlap education." *Id.* at 674,

---

[3] *Consensus Methodology*, https://www.568group.org/home/?q=node/15.

679.  On remand, the government settled with MIT (the only school that chose to defend the case), creating the "MIT Standards of Conduct"—a "safe harbor agreement" whereby "schools operating within the Standards of Conduct will not be challenged by the DOJ."  MIT Standards of Conduct at n.1.[4]  Those standards precluded agreements about individual expected contributions or aid awards, *id.* §§ 8-9, but permitted schools to "jointly discuss and agree on principles of need analysis," provided that they "practice need-blind admissions," *id.* §§ 1(a), 3.

Seeking to preserve the benefits of this type of collaboration, Congress passed a temporary antitrust exemption in 1992, protecting schools that "discuss[ed] and voluntarily adopt[ed] defined principles of professional judgment for determining student financial need for aid."  Pub. L. No. 102-325 § 1544, 106 Stat. 448, 837 (1992).  Section 568 followed two years later.  *See* Pub. L. No. 103-382, 108 Stat. 3518 (1994).  It protected additional types of financial aid agreements and added the need-blind provision, all of which were "based on language in the 'standards of conduct' adopted in the MIT settlement."  H.R. Conf. Rep. No. 103-761, at 911 (1994).

Congress also included a sunset provision, explaining that, "[u]pon the expiration of this extension, those who support extending the exemption must meet the burden of demonstrating that it is truly needed in order to enhance the generally pro-competitive goal of enhancing access by needy students to higher education."  *Id.* at 912.  Congress went on to extend Section 568 four times, in 1997, 2001, 2008, and 2015.[5]  With each extension, Congress reaffirmed that this beneficial collaboration should not be deterred by the threat of antitrust suit.  "The use of common principles for determining need increases the sophistication of the analysis and helps the schools to determine need more accurately in cases of unusual financial profiles.  That … leads to a fairer

---

[4] *See* https://www.568group.org/home/sites/default/files/mitsoc.pdf (quoted in Am. Compl. ¶ 187).
[5] *See* Pub. L. No. 105-43, 111 Stat. 1140 (1997); Pub. L. No. 107-72, 115 Stat. 648 (2001); Pub. L. No. 110-327, 122 Stat. 3566 (2008); Pub. L. No. 114-44, 129 Stat. 472 (2015).

distribution of need-based aid." H.R. Rep. No. 105-144, at 3. In the words of a sponsor of the most recent renewal, Section 568 "allows colleges and universities to continue working together, free from the threat of antitrust litigation,"[6] and "prevents needless and costly litigation … and increases access to higher education, without causing harm to competition."[7]

In 2001, Congress commissioned the Government Accountability Office to analyze the exemption's effect on competition. *See* Pub. L. No. 107-72, 115 Stat. 648. The GAO Report, released in 2006, found that the "consensus approach resulted in higher amounts of need-based grant aid awarded to some student groups" and that "grant aid awards shifted from non-need-based aid … to aid based on a student's financial need." GAO Report at 1. The GAO further found that the Consensus Methodology "modified elements already in the College Board's institutional methodology," including by reducing the impact of home equity; expecting students to contribute less of their individual assets; considering relatively higher costs of living by location; excluding income that was not received on an annual basis, such as unemployment income; and including allowances for debt payments on other school loans. *Id.* at 12-13. Notably, "students accepted to schools using the exemption and comparable schools not using the exemption experienced similar variation in the amount they were expected to pay," in part because "[n]ot all schools using the consensus approach chose to adopt all the elements of the methodology," and some in the 568 Group were not "using the consensus approach" at all. *Id.* at 1. As Congress summarized in renewing Section 568 in 2015, the GAO Report confirmed "that the antitrust exemption did not adversely impact the affordability of colleges and universities." H.R. Rep. No. 114-224, at 3.

---

[6] *Press Release*, Sen. Chuck Grassley (July 28, 2015), https://www.grassley.senate.gov/news/news-releases/congress-passes-bill-allowing-universities-collaborate-financial-aid-best.
[7] *Press Release*, Rep. Hank Johnson (June 2, 2015), https://hankjohnson.house.gov/media-center/press-releases/legislation-introduced-senate-house-allow-universities-collaborate-best (quoting Sen. Grassley).

### C. Plaintiffs' Antitrust Claim

Plaintiffs concede, as they must, that the Consensus Methodology provides a set of "common principles of analysis for determining the need of … students for financial aid," which is covered by Section 568. *See* 15 U.S.C. § 1 note. They nonetheless attack the Consensus Methodology based on the unsubstantiated premise that Defendants are not "need-blind" as the exemption requires. Am. Compl. ¶ 3. Plaintiffs contend that the Consensus Methodology is "per se anticompetitive" or, alternatively, unlawful under the rule of reason in their supposed "Market for Elite, Private Universities." *Id.* ¶¶ 240-42. Plaintiffs do not allege that Defendants agreed on overall tuition or the amount of financial aid offered collectively or to any individual student. Nor do they allege that members made any agreement as to the form of need-based aid packages (*i.e.*, grants, loans, work-study), or the availability, form, or amount of merit awards. In addition, Plaintiffs do not allege how those Defendants that use all or part of the Consensus Methodology would otherwise calculate need, much less any facts suggesting that the Consensus Methodology's recommendations led to higher expected family out-of-pocket contributions or decreased institutional grants for students generally or Plaintiffs in particular.

## ARGUMENT

### I. The Alleged Conduct Is Exempt From Antitrust Scrutiny

Plaintiffs' claim fails at the outset because the collaboration they challenge is exempt from the antitrust laws. Plaintiffs' assertion that Defendants have lost Section 568's protection rests on (A) a legally deficient interpretation of the term "need-blind"; (B) implausible and conclusory allegations as to purported non-need-blind practices, often contradicted by sources referenced in the complaint; and (C) the faulty argument that every school somehow loses Section 568's protection if any school in the Group has non-need-blind practices.

Contrary to Plaintiffs' suggestion, *see* Am. Compl. ¶ 267, they must plausibly allege the exemption's inapplicability. *See Mid-Am. Reg'l Bargaining Ass'n v. Will Cty. Carpenters Dist. Council*, 675 F.2d 881, 886 (7th Cir. 1982) (construing statutory labor exemption); *USS-POSCO Indus. v. Contra Costa Cty. Bldg. & Constr. Trades Council, AFL-CIO*, 31 F.3d 800, 805 n.3 (9th Cir. 1994) (same). Section 568, which is appended to Section 1 of the Sherman Act itself, provides that agreements to "use common principles of analysis for determining the need of … students for financial aid" are "not … unlawful under the antitrust laws" when participating schools admit students "on a need-blind basis." 15 U.S.C. § 1 note. Plausible, specific allegations of non-need-blind admissions are thus essential to Plaintiffs' affirmative case. As an initial matter, for seven Defendants—Caltech, Chicago, Cornell, Emory, Johns Hopkins, Rice, and Yale—the complaint includes no specific factual allegations of *any* non-need-blind admissions. That alone is sufficient to dismiss the allegations against these schools. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The allegations regarding the remaining Defendants are implausible and conclusory and therefore also insufficient as a matter of law.[8]

## A. Plaintiffs Rely On A Legally Deficient Reading Of The Term "Need-Blind"

For a school to qualify as "need-blind" under Section 568, its admissions personnel cannot disfavor applicants because they need financial aid. The statutory definition clarifies that admissions officers cannot disfavor applicants who need financial aid either by looking to their financial aid applications or by using "the financial circumstances of the student involved or the student's family" as a proxy for whether the student will need financial aid. 15 U.S.C. § 1 note. Resisting this straightforward interpretation, Plaintiffs contend that schools are not need-blind if

---

[8] While the exemption applies, it is unnecessary here because Plaintiffs fail to plead a plausible market and because, as Congress and the GAO recognized, *see supra* 4, 7, the Consensus Methodology is not binding and not all Group members adopted it. Plaintiffs fail to plead facts establishing otherwise. *See infra* Pt. II.

they consider *any* aspect of applicants' financial circumstances, even for reasons entirely unrelated to applicants' need for financial aid. Plaintiffs thus object to purported preferences for applicants because of their ties to potential donors, a wholly separate issue from their need for financial aid. *See, e.g.*, Am. Compl. ¶¶ 134, 163-67. Untethering need-blindness from the need for financial aid is contrary to the common meaning of the term and to the statutory history and context, and it would have perverse results neither intended by Congress nor required by the statutory language.

### 1. Admissions Decisions That Do Not Disfavor Applicants Because They Need Financial Aid Are "Need-Blind" Under Section 568

The "ordinary meaning of a defined term" is key evidence of the term's statutory meaning. *See Bond v. United States*, 572 U.S. 844, 861 (2014). "Need-blind" has a well-established ordinary meaning: A school is "blind" to an applicant's "need" when it does not disfavor the applicant because she needs financial aid. As numerous admissions offices explain, "need-blind" means "there is no disadvantage in the admission process for financial aid applicants,"[9] and "ability to pay is not a barrier to admission."[10] *See also* Am. Compl. ¶¶ 202-07 (quoting certain Defendants' websites using the term the same way). The "need" in "need-blind" is the need *for financial aid*.

Moreover, Section 568 must be construed "not in a vacuum, but with reference to the statutory context, 'structure, history, and purpose.'" *Abramski v. United States*, 573 U.S. 169, 179 (2014). Every agreement in Section 568 involves need-based financial aid. It permits agreements to award only need-based financial aid, to use common principles to determine need for aid, and to employ common aid applications. *See* 15 U.S.C. § 1 note. The agreements to which Section 568 expressly does not apply *also* deal strictly with need-based aid. *Id.* Section 568 is concerned with need-based financial aid—a fact that must inform the Court's reading of "need-blind."

---

[9] *Cost & Aid*, PRINCETON UNIV., https://admission.princeton.edu/cost-aid.
[10] *Office of Student Aid*, BOWDOIN COLL., https://www.bowdoin.edu/student-aid/.

The legislative history confirms that "need-blind" in Section 568 carries its ordinary meaning. The 1994 Committee Report provided guidance to "schools wishing to make use of this provision." H.R. Conf. Rep. No. 103-761, at 912. That report did not advise schools to avoid considering applicants' economic background *at all*. Rather, it advised admissions personnel to avoid "information relating to a student's financial circumstances that is derived from such student's *financial aid application form*, or from any other document or record obtained for the purpose of ascertaining *such* financial circumstances." *Id.* (emphases added). The report also advised schools to "insulate their admissions process … from *such student financial aid information*, until after the admissions process is complete." *Id.* (emphasis added). These "financial circumstances" in the report describing the statutory definition are perforce the same "financial circumstances" in the definition itself—that the applicant may need financial aid.

Furthermore, Section 568 was a product of the Overlap litigation, and the admissions policies of the schools involved there were "need-blind" in the ordinary sense. *See Yates v. United States*, 574 U.S. 528, 535-36 (2015) (construing statute in light of events giving rise to its passage). One goal of the Overlap agreement was to preserve school resources to help students who required need-based aid. *See Brown*, 5 F.3d at 674-75. That was particularly important because almost all participating schools adopted a "need-blind admissions system under which all admission decisions are based entirely on merit *without consideration of an applicant's ability to pay tuition*." *Id.* at 661 (emphasis added). MIT's need-blind policy was central to its defense. *See, e.g.*, *Brown*, 805 F. Supp. at 306 (MIT "relentlessly emphasized, at each stage of this case, the benefits fostered by the policies of need-blind admissions"). Everyone involved in the Overlap litigation consistently described this admissions policy—that need for financial aid would not harm applicants' chances of admission—as "need-blind." This understanding of the term carried

through to the MIT Standards of Conduct and shortly thereafter to Section 568. The MIT Standards of Conduct required that schools entering into covered financial aid agreements "practice need-blind admissions." MIT Standards of Conduct § 1(a). Congress, in turn, "based" the definition of "need-blind" in Section 568 "on language in the 'standards of conduct' adopted in the MIT settlement." H.R. Conf. Rep. No. 103-761, at 911.

Neither Congress nor those involved in the Overlap litigation and DOJ safe harbor agreement ever used "need-blind" to describe admissions decisions that ignored applicants' *entire* economic background. To the contrary, the only financial circumstance ever referenced was the need for financial aid. *See, e.g.*, GAO Report at 1 (the exemption "can only be used by schools that admit students without regard to ability to pay"); 154 Cong. Rec. H2922, H2923 (daily ed. Apr. 30, 2008) (Statement of Rep. Delahunt) (explaining that renewal of Section 568 would "extend the current antitrust exemption for colleges and universities that admit all students on a need-blind basis, without regard to a student's ability to pay"). This historical context confirms that Section 568 simply requires schools to follow MIT's approach from the Overlap litigation by making admissions decisions without disfavoring applicants because they need financial aid.

### 2. Plaintiffs' Contrary Reading Has No Contextual Support And Would Impede Congress's Clear Objectives

Contrary to the ordinary meaning of "need-blind," Plaintiffs insist that "need-blind" admissions policies cannot consider *any* aspect of an applicant's financial circumstances. Specifically, Plaintiffs allege that some Defendants are not "need-blind" because they purportedly give admissions preferences to some applicants who are related to potential donors. *See, e.g.*, Am. Compl. ¶ 165. But "no speaker in natural parlance" uses "need-blind" in the way Plaintiffs contend. *Bond*, 572 U.S. at 861. It would be quite strange to use a narrow phrase that refers only to the need for financial aid to impose a sweeping ban on considering applicants' entire economic

background for any reason at all. Congress's intent to define the term "need-blind" in a manner contrary to its ordinary meaning must therefore be "utterly clear" after considering both "the context from which the statute arose" and the consequences of Plaintiffs' "sweeping reading of the statute." *Id.* at 865-66. These considerations foreclose Plaintiffs' reading here.

The legislative history does not support a complete prohibition on consideration of any financial circumstances for any reason. Plaintiffs cite a committee report explaining that students should not "be denied" admission "because of the financial situation of his or her family" and a sponsor statement that need-blind schools should admit students "based on their ability to do the work." Am. Compl. ¶¶ 190-91. Plaintiffs ignore these statements' simplest and most obvious reading: These legislators intended that capable applicants should not be disfavored because they need financial aid. Plaintiffs would not have to resort to such strained inferences if Congress intended to condition Section 568's protection on a radical, wholesale ban on consideration of *any* financial circumstances for *any* reason. Someone would have said so. But no one ever did.

Importantly, requiring "need-blind" schools to ignore all financial circumstances for any reason would "frustrate the overall purpose of the statutory scheme, lead to absurd results, [and] contravene clearly expressed legislative intent." *Jefferson v. United States*, 546 F.3d 477, 483 (7th Cir. 2008). It would greatly hinder schools' ability to understand and holistically evaluate each individual applicant. It would also prohibit participating schools from recognizing the comparative strength of applicants who overcome less privileged backgrounds to achieve academic success, flatly contrary to Congress's intent to "enhanc[e] access by needy students." H.R. Conf. Rep. No. 103-761, at 912. And it would inhibit schools' efforts to shape economically diverse classes for the benefit of the entire student body. *Cf. Grutter v. Bollinger*, 539 U.S. 306, 328 (2003) (affirming the "compelling interest in attaining a diverse student body"). Plaintiffs' position would force

schools to choose between receiving the protections of Section 568 and recognizing the unique potential of applicants from less financially fortunate families.

The Court should reject Plaintiffs' perverse interpretation and give the term "need-blind" its ordinary meaning. Schools that do not disfavor applicants based on their need for financial aid are "need-blind," and their admissions decisions are made "without regard" to the relevant "financial circumstances." 15 U.S.C. § 1 note. Consideration of applicants' economic background for reasons unrelated to their need for financial aid, including purported consideration of applicants' relationship to potential donors, is irrelevant under Section 568.

### 3. Plaintiffs' Allegations As To Purported Donor Preferences At Duke, Brown, MIT, And Georgetown Are Insufficient To Deprive These Schools Of Section 568's Protections

Although giving preferences to relatives of potential donors would be consistent with the statutory plain meaning of "need-blind," Plaintiffs also fail to adequately allege facts supporting their assertion that Duke, Brown, MIT, or Georgetown actually preferred any applicants because of their relationship with a potential donor within the relevant time period. Thus, even on Plaintiffs' overbroad reading, Plaintiffs have failed to meet their burden to allege facts plausibly demonstrating that these Defendants are not entitled to the protections of Section 568.

As to Duke, Plaintiffs cherry-pick a handful of quotes from 2006 publications, *see* Am. Compl. ¶¶ 172-73, and even highlight research from the "late 1990s," Golden, THE PRICE OF ADMISSION 57 (2006) (referenced in Am. Compl. ¶ 172 & n.70). These allegations far predate the 2018-2021 admission cycles—the only relevant cycles under the four-year statute of limitations. *See infra* Pt. IV. Such outdated information is inadequate to plausibly support the allegation that Duke was not need-blind during the limitations period. *See Freeman v. City of Crown Point*, 2014 WL 545511, at *11 (N.D. Ind. Feb. 11, 2014) (news articles from 1997 and 2002 were "too remote in time" to "demonstrate the plausibility" of allegations about 2013 conduct); *Yousef v. Cty. of*

*Westchester*, 2020 WL 2037177, at *12 (S.D.N.Y. Apr. 28, 2020) ("The DOJ Report is from 2009, which is too far removed in time for an inference that conditions were the same in 2017.").

Plaintiffs' allegations against Brown and MIT are infirm for similar reasons. The *only* substantive allegations against Brown in the complaint rely on statements about recruitment from a professor who Plaintiffs concede left in 2008, Am. Compl. ¶ 168, and sarcastic speculation from a 2015 opinion piece in a student newspaper about a student recruited by a *different* school, *id.* ¶ 171 (referencing Simon, *Simon '16: Pimp My University*, BROWN DAILY HERALD (Oct. 21, 2015)). Moreover, the first allegation far predates the limitations period while the latter post-dates Brown's 2012 withdrawal from the 568 Group. *See* Am. Compl. ¶ 194 n.83. As to MIT, Plaintiffs rely only on statements of a former admissions counselor who left MIT around 2012. *See id.* ¶ 177 (referencing Crowley, *Confessions of a Former MIT Admissions Director*, BOSTON GLOBE (Mar. 13, 2019), which says the author worked at MIT for "nearly a dozen" years after graduating around 2000). And those statements, made while he worked as an independent admissions counselor, *id.*, do not relate to any specific practices at MIT; at most, they relate to college admissions generically.

As to Georgetown, Plaintiffs rely on 2007 and 2015 interviews in which the Dean of Admissions discussed legacy applicants and candidates with "development potential," neither of which constitutes admitting students based on their need for financial aid. *Id.* ¶¶ 174-76. As Plaintiffs note, development is about "opportunities" more broadly, and "not all those special cases end up being people who give a lot of money." *Id.* ¶ 174.

## B. Plaintiffs' Other Allegations As To Purported Non-Need-Blind Practices Are Conclusory And Implausible

Plaintiffs' remaining allegations as to Section 568 consist of "labels and conclusions," *Twombly*, 550 U.S. at 555; stale, out-of-context quotes; and allegations that must be disregarded

because they are contradicted by the very sources on which they themselves rely, *see Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013).

1. **Plaintiffs' Contrived Definition Of "Enrollment Management" Fails To Plausibly Allege That Any Defendant Is Not Need-Blind**

Plaintiffs' "enrollment management" allegations are inadequate. "Enrollment management" refers broadly to any set of practices that help schools "shape their enrollments." Am. Compl. ¶ 154.[11] Unsubstantiated speculation by third parties aside, *see id.* ¶¶ 157-58, the complaint has no well-pleaded factual allegations that any Defendant manages its enrollment by considering individual applicants' financial circumstances to "limit the number of financial-aid-eligible applicants who are admitted," *id.* ¶ 155. Rather, the complaint only alleges enrollment management practices that are perfectly consistent with Defendants' commitment to need-blind admissions decisions, such as broad recruitment strategies to encourage applications or post-admission strategies to encourage admitted students to enroll. *See id.* ¶¶ 158-61.

Where Plaintiffs purport to offer specifics, their own sources refute them. For example, the "enrollment management model" at Notre Dame, *id.* ¶ 161, did not involve admissions decisions at all, much less disadvantaging applicants because they need aid. It was instead an effort "to recruit a more diverse pool of applicants," placing "a high priority on low-income" students.[12] As to Columbia and Penn, Plaintiffs point to two essays authored by a consultant who includes those universities (among many others) on his client list. *Id.* ¶ 156 & nn.47-48. Those essays never mention Columbia or Penn. Nor do they suggest that the term "enrollment

---

[11] Plaintiffs rely on Hossler, *Origins of Strategic Enrollment Management*, in HANDBOOK OF STRATEGIC ENROLLMENT MANAGEMENT 4 (Hossler & Bontrager eds., 2014), which lists, among other factors relevant to enrollment management practices, the "[c]haracteristics of the institution and the world around it."

[12] Cockrum & Weber, *Notre Dame, SMC communities evaluate opportunities, efforts for low socioeconomic students*, THE OBSERVER (Apr. 30, 2018), https://ndsmcobserver.com/2018/04/efforts-low-socioeconomic-students/ (cited in Am. Compl. ¶ 161 & n.57).

management" necessarily involves considering financial aid in admissions. To the contrary, the essays focus on using financial aid to incentivize *already admitted* students to enroll.[13]

As to Dartmouth, Plaintiffs allege only that a college official with the words "enrollment management" (previously) in his title worked in the past at Tufts University, which is not a need-blind institution. *Id.* ¶ 159. But Tufts is not a Defendant, has never been a member of the 568 Group, and its practices are irrelevant. Moreover, Dartmouth's intent to use "newly available data to identify and recruit prospective students" to apply to the College, *id.*, is fully consistent with a need-blind *admissions* policy. As to Northwestern, Plaintiffs allege only that it "has employed enrollment management" to shape its classes "through recruitment, aid, early admission, waiting lists and other variables." *Id.* ¶ 160. Once again, Plaintiffs nowhere allege these practices include making individual admissions decisions that disfavor applicants because they need financial aid.

### 2. Plaintiffs Fail To Plausibly Allege That Any Defendant Is Not Need-Blind As To Transfer Or Waitlisted Applicants

Plaintiffs allege no specific facts suggesting that any Defendant considers the financial need of transfer applicants in making admissions decisions, *see* Am. Compl. ¶¶ 144-45, and only attempt to make factual allegations as to Penn's and Vanderbilt's waitlist practices, *id.* ¶¶ 138-42. Even assuming that non-standard admissions decisions must be need-blind under Section 568, Plaintiffs' few specific allegations are implausible, and the remaining conclusory allegations do not "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 545.

---

[13] *See* Brooks, *Econometric Modeling of Enrollment Behavior*, 26 J. STUDENT FIN. AID 7 (1996) (the "paper describes using econometric modeling techniques to analyze the enrollment behavior of admitted students"); Brooks, *Using Campus-Based Financial Aid Strategically*, in HANDBOOK OF STRATEGIC ENROLLMENT MANAGEMENT 222-23, 225-26 (discussing econometric modeling to calculate "the independent effect on *yield* of each student characteristic," and "the effect on *matriculation probabilities* of changes in institutional aid," and encouraging schools to "learn more about the enrollment behavior of the *admitted* applicants") (emphases added).

All of Plaintiffs' allegations as to admission of transfer students, and almost all of their allegations as to admissions from the waitlist, are based solely "on information and belief," with no facts alleged to indicate why this supposed belief is plausible. *See* Am. Compl. ¶¶ 138, 144. "If [a plaintiff] has a legitimate reason to suspect" wrongdoing, then he "surely possesses information of some kind that triggered [that] suspicion" and must present it in the complaint. *Heard v. Becton, Dickinson & Co.*, 440 F. Supp. 3d 960, 969 (N.D. Ill. 2020). A complaint does not state a claim where the plaintiffs are "merely guessing" about key issues. *Mabry v. City of E. Chi.*, 2021 WL 1123808, at *6 (N.D. Ind. Mar. 24, 2021).

Plaintiffs' allegations as to Penn's waitlist practices are too little, too late. Plaintiffs cite a 2009 list of tips for students hoping to be admitted from a generic waitlist. Am. Compl. ¶ 139. Karen Crowley, a "consultant for … a national education-consulting firm, and former admissions officer at the University of Pennsylvania," provided one such tip, suggesting that it "never hurts to remind schools … you will be a full-paying student, especially this year" because the "rules even change at need-blind schools when it comes to the waitlist," and admissions officers "know endowments are down and cost-cutting is essential."[14] Nothing in this quote suggests *Penn* was ever not need-blind, that Crowley was even talking about Penn, or that she learned about this purported practice from her time at Penn. And this discussion of the Great Recession is from long before the four-year period at issue here. *See infra* Pt. IV. Plaintiffs also rely on an opinion piece by Sara Harberson, purportedly discussing Penn's admissions practices from "[w]hen [she] worked … at Penn." Am. Compl. ¶ 140. Harberson stopped working at Penn in June 2008.[15] Her

---

[14] Kingsbury, *Dirty Secrets of College Waitlists*, THE DAILY BEAST (July 14, 2017, 11:43AM), https://www.thedailybeast.com/dirty-secrets-of-college-waitlists (cited in Am. Compl. ¶ 139).

[15] *See* https://www.linkedin.com/in/saraharberson; *FIMCO, Inc. v. Funk*, 748 F. App'x 716, 718 n.2 (8th Cir. 2019) (taking judicial notice of a party's employment on his publicly available LinkedIn page).

conclusory statements do not plausibly reflect Penn's policies since January 2018, and in any event are not "facts" creditable under *Twombly*.

Plaintiffs' allegations as to Vanderbilt fare no better. Plaintiffs cite only statements on its website in 2013, 2014, and 2018, to the effect that it "reserve[s] the right to be need aware when admitting students from the wait list." Am. Compl. ¶¶ 141-42. These reservations of rights, two of which are outside the limitations period, are insufficient to plausibly plead that Vanderbilt disadvantaged any individual waitlisted student based on her need for financial aid. *See id.* ¶ 142 (conceding that Vanderbilt has never "stated" that it "in fact … has made need-aware decisions").[16]

### 3. Plaintiffs Fail To Plausibly Allege That Admissions To Columbia's School of General Studies Are Not Need-Blind

Plaintiffs' only basis for alleging that Columbia is not need-blind as to its School of General Studies is a student journalist's unsupported assertion in a student newspaper. Am. Compl. ¶ 149 & n.41.[17] Contrary to Plaintiffs' allegation, Columbia did not "concede[]" in this article that those admissions are not need-blind. *Id.* ¶ 149. The student author simply asserted as much, citing no source at all.[18] This single unsupported and conclusory statement by a student in a newspaper does not render Plaintiffs' allegation plausible. *Cf. In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp.

---

[16] Although Plaintiffs' insufficient allegations decide the issue, Plaintiffs also are wrong that the statutory exemption speaks to the issue of need-blindness in the context of waitlist admissions. The Section 568 exemption arose out of the settlement with MIT in the Overlap case, which did not squarely concern waitlist admissions. The MIT settlement expressly did not require that MIT be "need blind" regarding the waitlist. *See* MIT Standards of Conduct ¶ 1(a). Congress "modeled" Section 568 on the MIT settlement to "codif[y]" that settlement. *See* H.R. Rep. No. 114-224, at 2; 147 Cong. Rec. H1360, H1361 (daily ed. Apr. 3, 2001) (Statement of Rep. Smith). And Congress has reauthorized Section 568 repeatedly and without material alteration, notwithstanding the above-noted public statements Plaintiffs say evince non-compliant approaches to waitlist applicants.

[17] The School of General Studies (SGS), the only Columbia school named in the complaint, caters to nontraditional students, and is distinct from other undergraduate schools. *See, e.g.*, https://gs.columbia.edu/ columbia/schools. SGS does not participate in the 568 Group or employ the Consensus Methodology.

[18] The archived version of this news article, showing the student author's unsupported statement, is available at https://web.archive.org/web/20201109031622/https://www.columbiaspectator.com/news/ 2017/11/14/public-health-professor-lisa-rosen-metsch-appointed-dean-of-general-studies/.

2d 1248, 1272 (N.D. Cal. 2000) ("newspaper articles should be credited only to the extent that other factual allegations would be" and "[c]onclusory allegations of wrongdoing are no more sufficient if they come from a newspaper article than from plaintiff's counsel"). In fact, the newspaper has since issued a correction to this unsubstantiated misstatement.[19]

In summary, Plaintiffs allege no facts at all as to the admissions practices of Caltech, Chicago, Cornell, Emory, Johns Hopkins, Rice, or Yale. The only facts alleged as to Brown, Duke, Georgetown, and MIT are that they favor applications from students related to potential donors, which is legally irrelevant, and those allegations are based on untimely material. Plaintiffs' "enrollment management" allegations baselessly presume that the practice necessarily entails consideration of need for financial aid in admissions decisions. Together with the legal insufficiency of the donor-preference allegations, that means Plaintiffs fail to plausibly allege that Dartmouth, Northwestern, or Notre Dame were not need-blind. Plaintiffs' waitlist allegations against Penn and Vanderbilt are stale and conclusory, and their allegation about Columbia's School of General Studies parrots an unsupported, since-corrected statement in a student newspaper, which the Court should disregard. Accordingly, Plaintiffs have not plausibly alleged that any Defendant is not need-blind, and they fail to state a claim.

### C. The Section 568 Exemption Protects Need-Blind Schools That Lack Actual Knowledge That Any Other Participating School Is Not Need-Blind

Plaintiffs' claim should also be dismissed insofar as Plaintiffs incorrectly assert that every Defendant loses the protection of Section 568 if just one acted on a non-need-blind basis. Am. Compl. ¶ 8. Plaintiffs' position would subject fully compliant schools to the risk of treble-damages

---

[19] The Lee, *Public Health professor Lisa Rosen-Metsch appointed dean of General Studies*, COLUMBIA SPECTOR, https://www.columbiaspectator.com/news/2017/11/14/public-health-professor-lisa-rosen-metsch-appointed-dean-of-general-studies (Editor's Note, Feb. 16, 2022, clarifying that "General Studies does not offer full-need financial aid" and retracting prior statement that "admissions are not need-blind") (cited in Am. Compl. ¶ 149).

liability because of other schools' alleged independent conduct.  But Section 568 is not a trap for the unwary.  Rather, need-blind schools retain Section 568's protection where, as here, they are not plausibly alleged to have actual knowledge that other member schools are not need-blind.  Even if Plaintiffs have plausibly alleged that some Defendants were not need-blind during the relevant period (they have not), the Court should dismiss Plaintiffs' claims against every other Defendant.

*First*, Section 568 must be read together with the "antitrust laws" to which it is appended as a note.  "[T]o show an antitrust conspiracy," Plaintiffs must plead that each Defendant "had a conscious commitment to a common scheme designed to achieve an unlawful objective."  *Marion Healthcare, LLC v. Becton, Dickinson & Co.*, 952 F.3d 832, 841 (7th Cir. 2020).  When a 568 Group member is need-blind as to its own admissions and lacks actual knowledge that any other member is not, its only conscious commitment is to enter an agreement that is expressly "*not … unlawful under the antitrust laws.*"  15 U.S.C. § 1 note; *see also In re Brand Name Prescription Drugs Antitrust Litig.*, 1999 WL 33889, at *15 (N.D. Ill. Jan. 19, 1999) ("There is no such thing as an 'unwitting conspirator.'"), *aff'd in relevant part*, 186 F.3d 781 (7th Cir. 1999).

*Second*, courts should construe laws to "allow[] them to accomplish their manifest objects" rather than "deny effect to the regulatory scheme."  *Abramski*, 573 U.S. at 183.  For example, agreements between labor unions and non-union entities only lose the protection of the statutory labor exemption when *all* parties share a "concerted anticompetitive purpose."  *See Mid-Am. Reg'l Bargaining Ass'n*, 675 F.2d at 889.  As the Seventh Circuit explained, "[a] rule of law requiring a lower level of intent than purpose would open the way to disastrous incursions upon Congressionally-sanctified … activity."  *Id.* at 889 n.21.  So too here.  Plaintiffs' draconian reading would inevitably deter need-blind schools from the collaboration that Congress sought to promote.  Maintaining the exemption would require scrupulously monitoring the admissions practices of

every other member.  *Cf. Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 907-08 (9th Cir. 2008) (rejecting an antitrust safe-harbor standard that would require a company to "fret over and predict or determine its rivals' cost structure").  Such continuous, intrusive oversight would be practically impossible and could itself expose schools to the threat of antitrust suit.  Congress did not enact an exemption that no rational school would ever use.

*Third*, laws should be construed to avoid strict liability—here, strict and vicarious liability as to loss of the exemption—unless Congress clearly provides otherwise.  *See, e.g.*, *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 692 (7th Cir. 2008) (en banc) (assuming a statute "require[s] proof of intentional misconduct" because of "automatic trebling of damages"); *Gordon v. Softech Int'l, Inc.*, 726 F.3d 42, 50 (2d Cir. 2013) (refusing "to write strict liability into [a statute] absent a clear indication in the text or the legislative history").  Congress provided no such indication in Section 568.  This Court should reject Plaintiffs' attempt to subvert the practical availability of Section 568 and dismiss claims against schools that adhered to its requirements.

## II.     Plaintiffs Have Not Plausibly Alleged An Antitrust Violation

Even if Section 568 did not exempt the challenged collaboration, the complaint must be dismissed because Plaintiffs have failed to state a claim for violation of Section 1 of the Sherman Act.  Plaintiffs have not plausibly alleged that the Consensus Methodology is so obviously anticompetitive that the Court can condemn it as *per se* unlawful.  Nor have Plaintiffs plausibly alleged facts showing that the Consensus Methodology is an "unreasonable restraint of trade" under the rule of reason.  *Deppe v. Nat'l Collegiate Athletic Ass'n*, 893 F.3d 498, 501 (7th Cir. 2018).  Plaintiffs' contrived market definition, which relies on just some parts of a magazine ranking, is implausibly narrow, artificially magnifying Defendants' alleged market power by excluding numerous obvious competitors.  Accordingly, the complaint fails to state a claim.

### A. Plaintiffs Have Not Alleged A Plausible *Per Se* Violation

Plaintiffs assert that the Consensus Methodology must be condemned as *per se* illegal. *See* Am. Compl ¶ 240. That is manifestly wrong. When assessing an alleged agreement's effect on competition, courts "presumptively appl[y] rule of reason analysis, under which antitrust plaintiffs must demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive before it will be found unlawful." *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006). "The per se rule is designed for cases in which experience has convinced the judiciary that a particular type of business practice has no (or trivial) redeeming benefits ever." *In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1011-12 (7th Cir. 2012). Full rule-of-reason analysis is required when effects on competition are unclear or there are plausible procompetitive benefits. *See id.*

Plaintiffs fail to plead facts making *per se* treatment plausibly appropriate. Congress has approved of arrangements like the Consensus Methodology, and the Third Circuit has held that full rule-of-reason analysis was required for the Overlap agreement, which involved explicit agreement on individual net prices. That alone precludes *per se* review. Moreover, the Consensus Methodology plausibly lowers many expected contributions, preserves competition over financial aid, and has obvious potential procompetitive benefits. *Per se* treatment is improper as a matter of law, and Plaintiffs must plausibly plead facts sufficient to satisfy full rule-of-reason analysis.

### 1. Congress And The Third Circuit Have Found That Similar Conduct Is Not Obviously Anticompetitive

The Supreme Court has held that *per se* treatment is inappropriate where Congress has recognized the procompetitive benefits of the challenged conduct. "In these circumstances, we have a unique indicator that the challenged practice may have redeeming competitive virtues and that the search for those values is not almost sure to be in vain." *Broadcast Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 13 (1979). That is the case even when the relevant statutes "are not

directly controlling," but "do reflect an opinion" that the challenged conduct is "economically beneficial in at least some circumstances." *Id.* at 16.

Congress has authorized the type of collaboration challenged here, finding that it "leads to a fairer distribution of need-based aid." H.R. Rep. No. 105-144, at 3. Indeed, Congress has gone out of its way to consider the competitive effects of agreements under Section 568, both by including sunset provisions so it can periodically consider anew whether the statute still serves "the generally pro-competitive goal of enhancing access by needy students to higher education," H.R. Conf. Rep. No. 103-761, at 912, and also by instructing the GAO to investigate the competitive effects of those agreements. Congress has extended Section 568 four times, twice with the benefit of the GAO's conclusion that "the antitrust exemption did not adversely impact the affordability of colleges and universities." H.R. Rep. No. 114-224, at 3.[20]

Judicial experience also confirms that *per se* treatment is inappropriate as a matter of law. "A particular course of conduct will not be termed a per se violation of the Sherman Antitrust Act until the courts have had considerable experience with that type of conduct and application of the rule of reason has inevitably resulted in a finding of anticompetitive effects." *Bunker Ramo Corp. v. United Bus. Forms, Inc.*, 713 F.2d 1272, 1284 (7th Cir. 1983). As the Third Circuit squarely held in *Brown*, the Overlap agreement had plausible procompetitive benefits and was subject to the rule of reason, even though it prohibited merit-based aid, ensured that disparities between individual financial aid awards did not exceed $500, and involved "retaliatory sanctions" such that "noncompliance was rare and quickly remedied." *Brown*, 5 F.3d at 662-63, 675.

---

[20] That Congress limited the categorical antitrust exemption in Section 568 to need-blind schools is irrelevant on this point. Section 1 is concerned with whether these methodologies for calculating student contributions have unreasonable anticompetitive effects—that does not depend in any way on the entirely unrelated issue of whether or not the schools' admissions policies are need-blind.

The case against *per se* treatment here is even stronger. Plaintiffs do not allege that any Defendants ever agreed on any student's expected contribution or aid award. The Consensus Methodology does not even address "what combination of grants, loans, or work-study a student would receive," GAO Report at 12, or whether to award merit-based aid. Nor do Plaintiffs allege an enforcement mechanism—just a certificate of compliance that each participating school is "comply[ing] with the rules of Section 568 regarding 'need-blind admission practices.'" Am. Compl. ¶¶ 121, 209. In fact, Plaintiffs concede that many schools never joined the 568 Group and others freely left. *See id.* ¶¶ 102, 124-25, 194 n.83. The GAO also found that many members of the 568 Group adopted only some of the Consensus Methodology's recommendations, GAO Report at 14, and Congress has recognized that it "is not binding" and that schools in the 568 Group "offer different, and competitive, financial aid packages," H.R. Rep. No. 114-224, at 3.

The MIT Standards of Conduct, which predated Section 568, prohibited many aspects of the Overlap agreement that are not present here, including agreements as to individual contributions and the "mix of grants and self-help to be awarded [to] individual aid applicants." MIT Standards of Conduct §§ 8-9. But the Department of Justice created a safe harbor for schools to "jointly discuss and agree on principles of need analysis," *id.* § 3, as Plaintiffs allege Defendants have done here. *Per se* treatment is thus even less appropriate in this case than in *Brown*, which, again, held that rule-of-reason treatment was warranted. The views of Congress and the Third Circuit suffice by themselves to establish that *per se* treatment is inappropriate as a matter of law.

### 2. The Consensus Methodology Does Not Have Obvious Anticompetitive Effects Justifying *Per Se* Condemnation

In any event, Plaintiffs have not plausibly alleged that the Consensus Methodology so obviously results in higher prices that the Court need not examine its real-world effects. Pooling institutional expertise to develop a set of optional best practices plausibly results in *lower* expected

contributions for many students, which *per se* analysis would ignore. The 568 Group can identify errors or gaps in other methodologies that lead other schools to find that many students should contribute more than they can afford. Fixing those problems leads to lower expected contributions under the Consensus Methodology. Indeed, the GAO found that many of the Group's additions or changes to the Institutional Methodology did just that. *See* GAO Report at 12-13.

Plaintiffs do not allege that the Consensus Methodology recommends higher contributions than the Institutional or Federal Methodologies—not even in the aggregate, much less in every instance. Nor do they allege an agreement to engage in coordinated price increases.[21] Rather, Plaintiffs ask the Court blankly to infer from the Consensus Methodology's mere existence that it must be anticompetitive. *See, e.g.*, Am. Compl. ¶ 128. But as the Third Circuit correctly recognized, that assumption does not hold in the context of non-profit universities that provide financial aid. *See Brown*, 5 F.3d at 672 (that MIT "deviates … from the profit-maximizing prototype … prompts us to give careful scrutiny to the nature of Overlap, and to refrain from declaring Overlap per se unreasonable"). The Supreme Court favorably described *Brown* as "finding full rule-of-reason analysis required where universities sought to provide financial aid to needy students" and the challenged agreements did not "embod[y] a strong economic self-interest of the parties to them." *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770-71 (1999).

Moreover, as alleged, the Consensus Methodology leaves ample room for competition. Plaintiffs never allege that schools in the 568 Group are required to adopt every recommendation from the Consensus Methodology or cannot adjust their own institutional models to lower expected contributions. *See* GAO Report at 1 (describing variations in the methodology's implementation).

---

[21] In fact, there is a wide range of average net cost of attendance among Defendants. *See Best Value Schools*, U.S. NEWS & WORLD REP., https://www.usnews.com/best-colleges/rankings/national-universities/best-value (ranging from under $20,000 to over $41,000).

And as to specific students, schools are free to further reduce the effective price by providing need-based aid through grants rather than loans and by offering non-need-based merit awards.

The large number of schools that are not in the 568 Group also calls into question any alleged anticompetitive effect on price. About half the schools that make up Plaintiffs' (implausibly narrow) alleged relevant market are not members of the 568 Group.[22] Several other colleges and universities that are members of the 568 Group are not in Plaintiffs' proposed market, and necessarily have many other competitors outside the Group. Plaintiffs allege no facts plausibly explaining how the Consensus Methodology could obviously raise prices given the myriad conceded competitors that are not alleged to have participated in the challenged collaboration.

The challenged collaboration on a methodology for calculating need is thus much more analogous to setting standards, establishing best practices, or sharing information than to any *per se* antitrust violation. In fact, some of the challenged conduct *is* an information exchange. *See, e.g.*, Am. Compl. ¶ 7. Information-sharing is generally judged under the rule of reason because it "does not invariably have anticompetitive effects" and "can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978). Likewise, given the potential for "significant procompetitive" benefits, standard-setting is typically evaluated under the rule of reason. *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 501 (1988). Leveraging non-profits' expertise to better assess financial need "is more likely a praiseworthy effort at self-regulation than a device for facilitating supracompetitive pricing." *Vogel v. Am. Soc'y of Appraisers*, 744 F.2d 598, 603 (7th Cir. 1984). At a minimum, the complaint does not plausibly allege that this is so obviously not the case that *per se* invalidity is justified.

---

[22] *See 568 Group Member Institutions*, https://www.568group.org/home/?q=node/24.

### 3. The Consensus Methodology Has Credible Procompetitive Benefits That *Per Se* Condemnation Would Ignore

Rule-of-reason analysis is also required because the challenged collaboration, on its face, has procompetitive benefits. *See FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 459 (1986) (rule-of-reason analysis required unless there is "[n]o credible argument" the conduct "has any … procompetitive effect"). Further, "even price fixing"—which Plaintiffs fail to allege here—is "governed by the rule of reason, rather than being *per se* illegal," if it could be "believed to promote 'enterprise and productivity.'" *In re Sulfuric Acid*, 703 F.3d at 1010-11. Given the Consensus Methodology's commonsense procompetitive benefits, the Court should reject Plaintiffs' invitation to "shut[] off the information flow before it begins, by prematurely adopting a rule of blanket illegality." *Vogel*, 744 F.2d at 604.

As the Third Circuit has recognized, collaboration that makes a broader range of higher education options more readily available is procompetitive. *See Brown*, 5 F.3d at 677. As discussed above, the Consensus Methodology plausibly results in lower expected contributions for at least some students, which could lead to lower effective prices depending on how grant aid is distributed. Even if the Consensus Methodology might theoretically result in higher contributions for some other students, the additional contributions should not foreclose those students' access to the school and can in turn "increas[e] the financial aid available to needy students," further expanding the pool of students who can access an education at a high-quality university. *Id.* at 674-75. Plaintiffs must plead plausible anticompetitive effects in the "market as a whole," not just an artificial subset. *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2287 (2018).[23]

---

[23] Plaintiffs allege that schools could reallocate their existing resources to provide need-based aid. *See* Am. Compl. ¶¶ 255-57. But deciding whether "the plaintiff [can] demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means" is the *final* step of full rule-of-reason analysis. *Am. Express Co.*, 138 S. Ct. at 2284. That complex issue is not even reached under the rule of reason absent a plausible relevant market. *Id.*

By making higher education more accessible, the Consensus Methodology plausibly improves both the quality and the range of the educational opportunities offered to prospective students. *See Brown*, 5 F.3d at 674 (highlighting the Overlap agreement's potential to "promot[e] socio-economic diversity"). Accurately determining financial need and efficiently directing aid helps schools maximize the benefits of a rigorous education at a socioeconomically diverse institution. The Consensus Methodology plausibly facilitates those determinations, and so facilitates their procompetitive benefits. *Per se* treatment would impermissibly ignore them.

### B.     The Amended Complaint Fails To State A Claim Under The Rule Of Reason Because Plaintiffs Have Not Pleaded A Plausible Relevant Market

Because Plaintiffs fail to allege a *per se* antitrust violation, the only way they can proceed under the Sherman Act is to state a claim under the rule of reason. *See, e.g.*, *In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d 811, 836-42 (N.D. Ill. 2020). That requires plausibly alleging either direct, measurable anticompetitive effects and the "rough contours of a relevant market," *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 737 (7th Cir. 2004), or facts to support (1) a plausible definition of the relevant product market, (2) the defendants' market power, and (3) likely anticompetitive effects from the restraint within that market, *see Deppe*, 893 F.3d at 501; *Reapers Hockey Ass'n, Inc. v. Amateur Hockey Ass'n Ill., Inc.*, 412 F. Supp. 3d 941, 952 (N.D. Ill. 2019). Plaintiffs have not attempted to plead direct anticompetitive effects under the rule of reason. *See* Am. Compl. ¶¶ 240-41. Nor could they, particularly given the complaint's failure to plausibly allege an agreement to actually use the Consensus Methodology. *See* GAO Report at 1; *cf. 1-800 Contacts, Inc. v. FTC*, 1 F.4th 102, 118 (2d Cir. 2021) ("theoretical and anecdotal" evidence insufficient to show direct anticompetitive effect). Nor have they identified even the general contours of a plausible market in which Defendants have sufficient power to harm competition.

Without a plausible relevant market, "there is no way to measure" whether Defendants have sufficient power to harm competition or that competition was harmed. *Am. Express Co.*, 138 S. Ct. at 2285. Product markets consist of products that compete because they are "reasonably interchangeable." *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956). If a plaintiff "alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997); *see also Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 917-18 (7th Cir. 2020) (dismissing complaint on this basis); *Nucap Indus., Inc. v. Robert Bosch LLC*, 273 F. Supp. 3d 986, 1012 (N.D. Ill. 2017) (same).

Plaintiffs fail to allege a plausible market here. Their proposed market consists of "private national universities with an average ranking of 25 or higher in the *U.S. News & World Report* ("USNWR") rankings from 2003 through 2021." Am. Compl. ¶ 241.[24] This "market" relies not on economic analysis but on a single magazine's rankings. Plaintiffs do not even incorporate other publications' rankings, such as Forbes or the Wall Street Journal.[25] Worse, Plaintiffs cherry-pick from that single source, excluding public universities, which USNWR ranks together with private universities, and all schools with an even slightly lower average ranking, for no reason whatsoever. And Plaintiffs collapse nearly twenty years of rankings into a single artificial number that ignores any shifts over that lengthy period. Such a lazily defined market is facially implausible.

---

[24] The current USNWR national university rankings are available at https://www.usnews.com/best-colleges/rankings/national-universities ("USNWR Rankings Website"), and the method for how USNWR calculated those and other rankings is available at https://www.usnews.com/education/best-colleges/articles/how-us-news-calculated-the-rankings ("USNWR Calculation Website").

[25] *See* https://www.forbes.com/top-colleges/; https://www.wsj.com/articles/college-rankings-list-2022-11632246093 (each ranking public and private universities together with liberal arts colleges).

This proposed market crumbles under even the lightest scrutiny. Thousands of colleges and universities compete for students across many different dimensions, including selectivity and prestige, post-graduation opportunities, breadth and depth of academic specializations, facilities, extracurricular activities, location, culture, student body and faculty diversity, and graduation requirements. Prospective students have a wide range of differently weighted preferences as to each variable. Plaintiffs arbitrarily focus on just a few of the many variables that affect applicants' decisions, rely on others that are relatively unimportant, and exclude many obvious competitors.

Most egregiously, Plaintiffs exclude liberal arts colleges and public universities. The exact same factors that led USNWR to rank the schools in Plaintiffs' proposed market so highly also led it to highly rank numerous liberal arts colleges and public universities. *See* USNWR Calculation Website (displaying identical "weight" of identical "ranking factor[s]" for "national universities and liberal arts colleges"); USNWR Rankings Website (ranking public and private universities together). Plaintiffs cannot simply pick and choose those aspects of the rankings they wish. And while each school is unique, these rankings show that selective liberal arts colleges, public universities, and private universities all provide rigorous educational experiences, prestigious degrees and faculties, and plentiful post-graduate opportunities. It is not plausible that these highly regarded schools do not compete with Defendants for student enrollment.

Indeed, the admissions websites of the schools in Plaintiffs' proposed market advertise the "liberal arts" educations they offer.[26] Plaintiffs note that liberal arts colleges generally have "a smaller student body, smaller and less competitive athletic programs, fewer graduate programs, …

---

[26] For example, at Dartmouth, the "liberal arts imperative informs every field of study." https://home. dartmouth.edu/. Yale College "offers a liberal arts education." https://yalecollege.yale.edu/academics. "Every Duke undergraduate student takes classes in Trinity College—it serves as Duke's liberal arts core." https://admissions.duke.edu/academic-possibilities/. And Princeton "provide[s] a liberal arts education to all of [its] undergraduates." https://admission.princeton.edu/academics/what-does-liberal-arts-mean.

less emphasis on research," and slightly higher admissions and lower yield rates. Am. Compl. ¶¶ 242, 245-46. But they suggest no reason why undergraduate applicants' decisions would be materially affected by *graduate* programs, research not conducted by undergraduate students, or an average difference in admissions rates of just seven percentage points. As to size, there is far greater variation *within* Plaintiffs' purported market than between those schools and liberal arts colleges.[27] As to athletics, many schools in the proposed market play in the Ivy League and so do not offer athletic scholarships, and several are in Division III, just like liberal arts colleges.[28] Others play against public universities, which Plaintiffs also exclude. To the extent these differences matter, they are just a few variables that might affect some students' choices among schools in the same market, rather than attributes that plausibly define separate markets.

Demonstrating just how thin their theory is, Plaintiffs rely on a newspaper's summary of a 2018 speech by the President of Northwestern, which reports that he referenced "remain[ing] competitive against top COFHE universities." Am. Compl. ¶ 251. COFHE, the Consortium on Financing Higher Education, includes more than a dozen liberal arts colleges.[29] Plaintiffs allege that the President "carefully distinguish[ed] between universities and colleges," implying that Northwestern does not compete with the latter. *Id.* But the complaint's quoted language is from the *journalist*. And the article uses "universities" to refer to all institutions of higher education, as it also describes the President's challenge to the "'myth' that implies *universities* must compromise

---

[27] Cornell and Penn, for example, had undergraduate enrollments of 14,743 and 9,872 in fall 2020, while Dartmouth and Caltech had respective enrollments of 4,170, and 901. *See* UNSWR Rankings Website.
[28] *See* NCAA Directory, Division III Institutions, https://web3.ncaa.org/directory/memberList?type=12&division=III (listing Caltech, Chicago, Emory, Johns Hopkins, and MIT).
[29] Those colleges are Amherst, Barnard, Bowdoin, Bryn Mawr, Carleton, Haverford, Macalester, Middlebury, Mount Holyoke, Oberlin, Pomona, Smith, Swarthmore, Trinity, Vassar, Wellesley, and Williams. *See Consortium of Financing Higher Education*, COFHE, https://web.mit.edu/cofhe/.

between achieving academic excellence and campus diversity."[30]  Read in its entirety, this article

cuts against the plausibility of a market that excludes COFHE liberal arts colleges.

Plaintiffs likewise cannot plausibly exclude public universities with "national rankings and

selectivity comparable to that of the elite, private universities."  Am. Compl. ¶ 247.  Plaintiffs do

not allege that public universities' educational programs are ineffective substitutes for those

offered by schools in Plaintiffs' proposed market.[31]  They simply allege that "[p]ublic, national

universities generally charge a high average net price to out-of-state students" because of "laws

and political pressures that private institutions do not face."  *Id.* ¶¶ 247, 249.  Higher prices to out-

of-state students would only matter here if the effective prices were so radically different that price

increases at private universities would not push students to comparable public universities.  *See*

*Maui Jim, Inc. v. SmartBuy Guru Enters.*, 386 F. Supp. 3d 926, 945-46 (N.D. Ill. 2019) (relevant

product market is defined with reference to cross-elasticity of demand, meaning the extent to which

a price increase for one good results in consumers shifting to another).  That is facially implausible.

That one product's sticker price is higher than another's does not mean they are in separate

markets, as consumer preferences may shift at any number of price points.  *Cf. 42nd Parallel N. v.*

*E St. Denim Co.*, 286 F.3d 401, 405-06 (7th Cir. 2002).  Even if an applicant's second-choice

private university remains effectively cheaper with the benefit of higher grant aid, a price increase

at that private university could easily drive the student back to her first-choice public university.

---

[30] *See* Wan, *Schapiro, administrators talk research efforts, campus inclusion at 'Conversations with the President'*, The Daily Northwestern (Apr. 12, 2018), https://dailynorthwestern.com/2018/04/12/campus/214612/ (emphasis added).

[31] Plaintiffs quote Duke's 2001 University Plan, which highlights some distinctions between private and public universities.  Am. Compl. ¶ 248.  More tellingly, it also notes that, while only some schools "are nationally and internationally preeminent[,] … [t]here are institutions of this caliber among the great state universities, and some of our liberal arts colleges are truly distinguished."  *Building on Excellence: The University Plan*, DUKE UNIV. 5 (Feb. 23, 2001), https://dukespace.lib.duke.edu/dspace/bitstream/handle/10161/65/UA2006_0037%20Strategic%20Plan.pdf?sequence=1&isAllowed=y.

In any event, effective prices at public universities are often comparable to or lower than effective prices at their private competitors. USNWR considers "graduate indebtedness" in creating its rankings, *see* USNWR Calculations Website, and the public universities that Plaintiffs wish to exclude because they offer less financial aid (and so are purportedly more expensive) are intermingled with the schools in Plaintiffs' proposed market. That is unsurprising. Private universities may meet need with loans, which does not reduce the effective price. *See* Am. Compl. ¶ 5. Many students have access to a selective public university in their home state, where they would receive financial aid. And even out-of-state tuition at public universities is often lower than at private universities.[32] Higher prices at an applicant's first-choice private university thus might easily push her to a less expensive or comparably priced second-choice public university.

Discovery is unnecessary to know that a student who wants to stay near her family in North Carolina might choose among Duke, UNC-Chapel Hill, Davidson, and Wake Forest, while a student near Philadelphia might choose among Penn, Haverford, and Swarthmore. A student looking for a prestigious school with a strong athletics culture might choose between Notre Dame and Michigan. Students interested in writing across disciplines might pick among the top 12 schools in the USNWR's ranking on that metric, which include Brown, Duke, Yale, Carleton, Amherst, and Hamilton,[33] while budding computer scientists might choose among Caltech, MIT, Berkeley, and Georgia Tech.[34] Other students might ignore these rankings entirely. It is not plausible that the schools in Plaintiffs' proposed market do not compete with many others,

---

[32] *See, e.g.*, USNWR Rankings Website (out of state tuition at UCLA and UNC-Chapel Hill is $43,022 and $36,776 while tuition at Columbia and Yale is $63,530 and $59,950).
[33] *Writing in the Disciplines*, https://www.usnews.com/best-colleges/rankings/writing-programs.
[34] *Best Undergraduate Computer Science Programs Rankings*, https://www.usnews.com/best-colleges/rankings/computer-science-overall.

particularly with the liberal arts colleges and public universities that USNWR also ranks highly. This failure to plead a plausible relevant market is fatal to Plaintiffs' rule-of-reason claim.

## III. Plaintiffs Fail To Plausibly Allege Antitrust Injury And Antitrust Standing

Plaintiffs' claim also fails because their allegations of antitrust injury and antitrust standing are inadequate. *See McGarry & McGarry, LLC v. Bankr. Mgmt. Sols., Inc.*, 937 F.3d 1056, 1064-65 (7th Cir. 2019); *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 2013 WL 4506000, at *9 (N.D. Ill. Aug. 23, 2013). Plaintiffs' conclusory allegations that their net price of attendance would have been lower but for the Consensus Methodology rely on a series of unsupported and implausible inferences, rendering the causal connection between their alleged injuries and the alleged anticompetitive conduct overly speculative as a matter of law.

A private antitrust plaintiff must plausibly allege an antitrust injury, meaning that "its injury flows from that which makes the defendants' acts unlawful—that 'but for' the violation, the injury would not have occurred." *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 395 (7th Cir. 1993) (cleaned up). Dismissal is appropriate if the "complaint requires drawing a conclusion that rests on too many inferences and reveals a theory of antitrust injury that is speculative as a matter of law." *In re Humira*, 465 F. Supp. 3d at 846.

Plaintiffs have not plausibly alleged that they suffered an antitrust injury on the ground that the effective prices they paid would be lower but for the Consensus Methodology. This failure is glaring. It is speculative what methodology each Defendant would use absent the Consensus Methodology, and doubly speculative whether that methodology would be better, worse, or the same for any given student. For example, the expected contribution calculated under the Institutional Methodology will, for many students, be the same as under the Consensus Methodology's recommendations, or even higher. *See* GAO Report at 12-13 (listing modifications to the Institutional Methodology). That is precisely why Congress established the exemption—

without the best practices it facilitated, some applicants would receive less aid "than their demonstrated need or none at all" while others would receive more. H.R. Rep. No. 107-32, at 3. The but-for world is thus one in which aid tracks need less accurately and many students are worse off. Moreover, even lower expected contributions would not translate to a lower net price for all students, as Plaintiffs allege no facts suggesting that lower expected contributions in the but-for world would be met with additional grant aid rather than with additional loans that must be repaid.

To allege an antitrust injury, Plaintiffs must allege facts plausibly suggesting that their expected contributions were higher under the Consensus Methodology, rather than lower or unaffected, and that they in turn received less grant aid. But they allege no meaningful facts about their financial background, expected contributions, or aid awards, despite surely possessing such information. And they allege no facts at all suggesting how their expected contribution would have been calculated but for the Consensus Methodology, much less why it would have been lower. They thus have not alleged facts suggesting they would have paid a lower net price if their expected contribution were for some reason lower under the Consensus Methodology.

Plaintiffs fail to meet the distinct requirement of antitrust standing for similar reasons. *See, e.g.*, *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 485 (7th Cir. 2002) (no antitrust standing where "the exact nature of the damages [plaintiffs] have suffered is speculative"). Plaintiffs have also provided no facts to suggest how a factfinder could begin to find an injury or calculate damages. *See Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 543-44 (1983) (finding no standing in part because of speculative and complex measures of damages); *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1054 (9th Cir. 1999) (courts consider "the complexity in apportioning damages" in antitrust standing inquiry).

## IV. The Statute Of Limitations Bars The Claims Of Seven Of The Nine Plaintiffs

Plaintiffs' claims that accrued before January 9, 2018—four years before Plaintiffs filed suit—are time-barred on their face. The antitrust statute of limitations runs for four years "after the cause of action accrued." 15 U.S.C. § 15b. Accrual occurs when "a defendant commits an act that injures" a plaintiff. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971). Plaintiffs allege they were injured by "receiving artificially suppressed financial aid and paying artificially inflated net prices of attendance." Am. Compl. ¶ 235. But three Plaintiffs graduated more than four years ago: Weaver in 2007, Henry in 2011, and Piyevsky in 2017. *Id.* ¶¶ 20, 23, 25. Three others—Carbone, Corzo, and Saffrin—graduated "in the spring of 2018." *Id.* ¶¶ 17-18, 24. These Plaintiffs may have finished their final semesters or quarters within the limitations period, but the complaint does not allege any overt act after January 9, 2018.

Plaintiffs attempt to salvage these untimely claims by asserting that they could not have discovered them "[u]ntil the last two years." *See id.* ¶¶ 195-96. Plaintiffs never indicate what happened two years ago, but it hardly matters. The Supreme Court held in *Rotkiske v. Klemm*, 140 S. Ct. 355, 360-61 (2019), that a discovery rule delaying accrual until the plaintiff knew or should have known of his claim "cannot be supplied by the courts," as it is "Congress's decision to include a … discovery provision." And in *Gabelli v. SEC*, 568 U.S. 442, 448-49 (2013), the Court held that "the most natural reading" of the statutory term "accrued" is that it means when a claim "comes into existence," *not* when it is "discovered." This precedent abrogates the Seventh Circuit's prior holding that the Sherman Act's statute of limitations is atextually qualified by a default discovery rule. *See In re Copper Antitrust Litig.*, 436 F.3d 782, 789 (7th Cir. 2006).

In any event, "the discovery rule requires diligence." *In re Sulfuric Acid*, 703 F.3d at 1014; *see also Tomlinson v. Goldman, Sachs & Co.*, 682 F. Supp. 2d 845, 847-48 (N.D. Ill. 2009) (discovery rule did not apply when relevant information was in news reports). Plaintiffs cite five

sources purportedly showing that the Consensus Methodology was anticompetitive *per se*, all of which were publicly available well over four years ago. *See* Am. Compl. ¶¶ 114-15, 123-29, 240. Their allegations regarding potential donors rely on a book from 2006; news articles from 2006, 2007, 2015, and 2017; a Wiki Leaks page from 2014; and blog posts from 2014 and 2016. *Id*. ¶¶ 149, 169-70, 172-76, 181-82. Their waitlist allegations rely on a 2009 news article and blog posts from 2013 and 2014. *Id*. ¶¶ 139, 142. And their enrollment management allegations rely on 1996 and 2014 journals; articles from 1996, 2005, 2010, 2011, and 2014; and news alerts in 2015 and 2016. *Id*. ¶¶ 156-61. Plaintiffs who matriculated more than four years ago could have relied on all this same information to sue well before January 9, 2018.

Plaintiffs also do not sufficiently plead any claim of fraudulent concealment, much less with the particularity required under Rule 9(b). *See Nat'l Black Expo v. Clear Channel Broad., Inc.*, 2007 WL 495307, at *6 (N.D. Ill. Feb. 8, 2007). Fraudulent concealment requires that a defendant acted affirmatively to conceal an offense and that the plaintiff "neither knew nor, in the exercise of due diligence, could reasonably have known of the offense." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 194-95 (1997). Plaintiffs were not diligent, as their reliance on decade-old sources proves. Moreover, their assertions about purported affirmative concealment effectively allege only that Defendants deny (and did not disclose) any wrongdoing. *See* Am. Compl. ¶¶ 199-219. Such denials of liability are not a basis for fraudulent concealment. *Stephan v. Goldinger*, 325 F.3d 874, 877 (7th Cir. 2003). Plaintiffs also fail to allege when (or even if) they discovered the purported misrepresentations, "let alone that [they] relied … on them." *Id.*

Finally, the continuing violation doctrine does not save Plaintiffs' untimely claims. That doctrine permits recovery for new injuries caused by new overt acts *within* the limitations period; "the commission of a separate new overt act generally does not permit the plaintiff to recover for

the injury caused by old overt acts outside the limitations period." *Klehr*, 521 U.S. at 189. There could be no injury or overt act within the limitations period as to the six Plaintiffs who received no financial aid award after January 9, 2018. Maerlender—who allegedly enrolled in 2015 and graduated in 2019, Am. Compl. ¶ 22—is the only Plaintiff for whom this doctrine is even potentially relevant. But his claim, if any, accrued when he matriculated. *See id.* ¶¶ 131, 234, 237 (attacking purported lack of price competition for students who have not yet chosen which school to attend). Later awards are "'unabated inertial consequences' of a single act"—the initial financial aid offer—that "do not restart the statute of limitations." *Varner v. Peterson Farms*, 371 F.3d 1011, 1019 (8th Cir. 2004). Maerlander's claim is thus also untimely and should be dismissed.

## **CONCLUSION**

For the reasons above, the Court should grant Defendants' motion to dismiss.

By: */s Kenneth Kliebard*
Kenneth Kliebard
MORGAN, LEWIS & BOCKIUS LLP
110 North Wacker Drive
Suite 2800
Chicago, IL 60606-1511
Tel: 312-324-1000
kenneth.kliebard@morganlewis.com

Jon R. Roellke
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004-2541
Tel: 202-739-5754
jon.roellke@morganlewis.com

Sujal Shah
MORGAN, LEWIS & BOCKIUS LLP
One Market, Spear Street Tower, 28th Floor
San Francisco, CA 94105-1596
Tel: 415-442-1386
sujal.shah@morganlewis.com

Noah J. Kaufman
MORGAN, LEWIS & BOCKIUS LLP
One Federal Street
Boston, MA 02110
Tel: 617-341-7590
noah.kaufman@morganlewis.com

*Counsel for Defendant Brown University*

By: */s Deepti Bansal*
Deepti Bansal
COOLEY LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC  20004-2400
Tel: 202-728-7027
dbansal@cooley.com

Alex Kasner
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304
Tel.: 650-843-5770
akasner@cooley.com

Matthew Kutcher
COOLEY LLP
444 W Lake Street
Suite 1700
Chicago, IL  60606
Tel: 312-881-6500
mkutcher@cooley.com

*Counsel for Defendant California Institute of Technology*

By: */s James L. Cooper*
James L. Cooper
Michael Rubin
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave, NW
Washington, DC  20001-3743
Tel: 202-942-5014
james.cooper@arnoldporter.com
michael.rubin@arnoldporter.com

Leah Harrell
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
Tel.: 212-836-7767
Leah.Harrell@arnoldporter.com

Valarie Hays
ARNOLD & PORTER KAYE SCHOLER LLP
70 W Madison Street
Suite 4200
Chicago, IL 60602
Tel.: 312-583-2440
valarie.hays@arnoldporter.com

*Counsel for Defendant University of Chicago*

By: _/s Patrick Fitzgerald_
Patrick Fitzgerald
Amy Van Gelder
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
155 N. Wacker Drive
Chicago, IL 60606-1720
Tel: 312-407-0508
patrick.fitzgerald@skadden.com
amy.vangelder@skadden.com

Karen Hoffman Lent
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
One Manhattan West
Room 40-216
New York, NY 10001-8602
Tel: 212-735-3276
karen.lent@skadden.com

_Counsel for Defendant The Trustees of_
_Columbia University in the City of New York_

By: _/s Norm Armstrong_
Norm Armstrong
Christopher C. Yook
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Suite 200
Washington, D.C.  20006
Tel.: 202-737-0500
narmstrong@kslaw.com
cyook@kslaw.com

Emily T. Chen
KING & SPALDING LLP
1185 Avenue of the Americas
34th Floor
New York, NY 10036
Tel: 212-556-2100
echen@kslaw.com

Zachary T. Fardon
KING & SPALDING LLP
110 N Wacker Drive
Suite 3800
Chicago, IL 60606
Tel: 312-995-6333
zfardon@kslaw.com

_Counsel for Defendant Cornell University and_
_William Marsh Rice University_

By: _/s Terri L. Mascherin_
Terri L. Mascherin
Reid J. Schar
JENNER & BLOCK LLP
353 N. Clark Street,
Chicago, IL 60654-3456
Tel: 312-222-9350
tmascherin@jenner.com
rschar@jenner.com

Ishan K. Bhabha
Douglas E. Litvack
Lauren J. Hartz
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001-4412
Tel: 202-637-6327
ibhabha@jenner.com
dlitvack@jenner.com
lhartz@jenner.com

_Counsel for Defendant Trustees of Dartmouth_
_College_

By: _/s Derek Ludwin_
Derek Ludwin
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Tel: 202-662-6000
dludwin@cov.com

Christopher D. Dusseault (*pro hac* pending)
GIBSON DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Tel: 213-229-7000
cdusseault@gibsondunn.com

Casey T. Grabenstein
SAUL EWING ARNSTEIN & LEHR
161 North Clark, Suite 4200
Chicago, IL 60601
Charlotte, NC 28202
Tel.: 312-876-7100
casey.grabenstein@saul.com

*Counsel for Defendant Duke University*

By: */s Tina M. Tabacchi*
Tina M. Tabacchi
JONES DAY
77 West Wacker Drive
Suite 3500
Chicago, IL 60601-1692
Tel.: 312-782-3939
tmtabacchi@jonesday.com

Craig A. Waldman
Hashim M. Mooppan
Christopher N. Thatch
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001-2113
Tel.: 202-879-3877
cwaldman@jonesday.com
hmmooppan@jonesday.com
cthatch@jonesday.com

*Counsel for Defendant Emory University*

By: */s Britt M. Miller*
Britt M. Miller
Jed W. Glickstein
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Tel: 312-782-0600

bmiller@mayerbrown.com
jglickstein@mayerbrown.com
Stephen M. Medlock
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006-1101
Tel: 202-263-3000
smedlock@mayerbrown.com

*Counsel for Defendant Georgetown University*

By: */s Jeffrey J. Bushofsky*
Jeffrey J. Bushofsky
ROPES & GRAY LLP
191 North Wacker Drive 32nd Floor
Chicago, IL 60606-4302
Tel: 312-845-1200
jeffrey.bushofsky@ropesgray.com

Chong S. Park
Samer M. Musallam
ROPES & GRAY LLP
2099 Pennsylvania Avenue, NW
Washington, DC 20006-6807
Tel: 202-508-4600
chong.park@ropesgray.com
samer.musallam@ropesgray.com

*Counsel for Defendant Johns Hopkins University*

By: */s Eric Mahr*
Eric Mahr
Jan Rybnicek
Daphne Lin
FRESHFIELDS BRUCKHAUS DERINGER
700 13th Street, NW
Washington, DC 20005
Tel: 202-777-4500
eric.mahr@freshfields.com
jan.rybnicek@freshfields.com
daphne.lin@freshfields.com

Rami Fakhouri
Jennifer L. Greenblatt
GOLDMAN ISMAIL TOMASELLI
BRENNAN & BAUM LLP
200 South Wacker Drive, Floor 22
Chicago, IL 60604
Tel: (312) 681-6000
rfakhouri@goldmanismail.com
jgreenblatt@goldmanismail.com

*Counsel for Massachusetts Institute of
Technology*

By: */s Scott D. Stein*
Scott D. Stein
Benjamin R. Brunner
Kelsey Annu-Essuman
SIDLEY AUSTIN LLP
1 South Dearborn Street
Chicago, IL 60603
Tel.: 312-853-7000
sstein@sidley.com
bbrunner@sidley.com
kannuessuman@sidley.com

*Counsel for Northwestern University*

By: */s Robert A. Van Kirk*
Robert A. Van Kirk
Jonathan Pitt
Sarah F. Kirkpatrick
Matthew D. Heins
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Tel: 202-434-500
rvankirk@wc.com
jpitt@wc.com
skirkpatrick@wc.com
mheins@wc.com

James Peter Fieweger
MICHAEL BEST & FRIEDRICH LLP
444 West Lake Street
Suite 3200
Chicago, IL 60606
Tel.: 312-222-0800
jpfieweger@michaelbest.com

*Counsel for University of Notre Dame du Lac*

By: */s Seth Waxman*
Seth Waxman
WILMER CUTLER PICKERING HALE AND
    DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
Tel: 202-663-6800
seth.waxman@wilmerhale.com

David Gringer
Alan Schoenfeld
WILMER CUTLER PICKERING HALE AND
    DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel: 212-937-7294
david.gringer@wilmerhale.com
alan.schoenfeld@wilmerhale.com

Edward W. Feldman
Daniel Martin Feeney
MILLER SHAKMAN LEVINE & FELDMAN
LLP
180 North LaSalle Street
Suite 3600
Chicago, IL 60601
Tel.: 312-263-3700
dfeeney@millershakman.com
efeldman@millershakman.com

*Counsel for The Trustees of the University of
Pennsylvania*

By: */s J. Mark Gidley*
J. Mark Gidley
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005-3807
Tel: 202-626-3600
mgidley@whitecase.com

Robert A. Milne
David H. Suggs
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020-1095
Tel: 212-819-8200
rmilne@whitecase.com
dsuggs@whitecase.com

*Counsel for Vanderbilt University*

By: */s/ Charles A. Loughlin*
Charles A. Loughlin
Benjamin F. Holt
Jamie Lee
Molly Pallman
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004-1109
Tel: 202-637-5600
chuck.loughlin@hoganlovells.com
benjamin.holt@hoganlovells.com
jamie.lee@hoganlovells.com
molly.pallman@hoganlovells.com

Stephen Novack (ARDC #2067587)
Stephen J. Siegel (ARDC #6209054)
Serena G. Rabie (ARDC #6336601)
NOVACK AND MACEY LLP
100 North Riverside Plaza, 15th Floor
Chicago, IL 60606-1501
Tel.: 312-419-6900
snovack@novackmacey.com
ssiegel@novackmacey.com
srabie@novackmacey.com

*Counsel for Yale University*