**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| FRANK CARBONE, ANDREW CORZO, SAVAN-NAH ROSE EKLUND, SIA HENRY, ALEXANDER LEO-GUERRA, MICHAEL MAERLENDER, BRAN-DON PIYEVSKY, KARA SAFFRIN, and BRITTANY TATIANA WEAVER, individually and on behalf of all others similarly situated,<br><br>       Plaintiffs,<br><br>       v.<br><br>BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVER-SITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, THE JOHNS HOP-KINS UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVER-SITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENN-SYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVER-SITY,<br><br>       Defendants. | **Case No. 1:22-cv-00125**<br><br>**Hon. Matthew F. Kennelly<br>Magistrate Gabriel A. Fuentes**<br><br>**JURY TRIAL DEMANDED** |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... iii

INTRODUCTION ................................................................................................................ 1

LEGAL STANDARDS ......................................................................................................... 5

ARGUMENT ....................................................................................................................... 6

I.    PLAINTIFFS PLAUSIBLY ALLEGE INJURY FROM DEFENDANTS' AGREEMENT AND CONSPIRACY IN RESTRAINT OF TRADE ................................. 6

    A.   Plaintiffs Plausibly Allege an Agreement in Restraint of Trade ...................................... 6

    B.   Plaintiffs Plausibly Allege Antitrust Injury and Standing ............................................... 9

        1.   Plaintiffs Plausibly Plead "Antitrust Injury" ............................................................ 9

        2.   Plaintiffs Plausibly Demonstrate "Antitrust Standing" ........................................... 11

II.    THE EXEMPTION IS NO BASIS FOR DISMISSING PLAINTIFFS' CLAIMS ............. 11

    A.   As an Affirmative Defense, the Exemption Is No Basis for Dismissal ........................ 12

    B.   Under Its Plain Meaning, the Exemption Does Not Apply to Defendants ................... 13

        1.   There Is No Ambiguity in the Statutory Definition and Meaning of "Need-Blind" ...................................................................................................... 15

        2.   There Is No Ambiguity in Whether the Students at Each Participating School Are Among "All" Students ...................................................................................... 18

        3.   There Is No Ambiguity in Whether Waitlisted Students Are Among "All" Students ................................................................................................................. 21

        4.   The Legislative History Is Unnecessary and, by Its Own Terms, Does Not Support Defendants' Interpretation ........................................................................ 21

    C.   Plaintiffs Plausibly Allege That All Defendants Have Been Need-Aware in Admitting Waitlisted and Transfer Students ............................................................... 22

    D.   Defendants' Arguments About Their Other Admissions Practices Are No Basis for Dismissal .................................................................................................... 23

III.   PLAINTIFFS STATE A *PER SE* CLAIM UNDER THE SHERMAN ACT ................... 25

    A.   With No Exemption, the *Per Se* Rule Applies .......................................................... 25

B.   The Third Circuit's *Brown* Decision Does Not Preclude *Per Se* Treatment ................. 27

C.   No Other Precedent Precludes *Per Se* Treatment in This Case ...................................... 29

IV.  IN THE ALTERNATIVE, PLAINTIFFS STATE A CLAIM UNDER THE "QUICK LOOK" OR RULE OF REASON ANALYSIS ..................................................................... 31

A.   Plaintiffs State a Claim Under the "Quick Look" Analysis........................................... 31

B.   Plaintiffs State a Claim Under the Rule of Reason Analysis......................................... 33

    1.   Plaintiffs Plausibly Allege Anticompetitive Effects ................................................. 33

    2.   Defendants Cannot Show Procompetitive Effects..................................................... 37

V.   THE DEFENDANT-SPECIFIC ARGUMENTS ARE NO BASIS FOR DISMISSAL........ 38

A.   Brown, Chicago, and Emory's "Withdrawal" Argument Fails ..................................... 38

B.   JHU's Particular Arguments Are No Basis for Dismissal .............................................. 40

C.   Yale's Particular Arguments Are No Basis for Dismissal.............................................. 43

VI.  PLAINTIFFS' CLAIMS ARE TIMELY ............................................................................. 45

A.   The Discovery Rule Applies .......................................................................................... 45

B.   Plaintiffs' Claims Are Timely Under the Discovery Rule............................................. 46

C.   Plaintiffs Allege Continuing Violations......................................................................... 50

CONCLUSION.................................................................................................................................. 50

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Allen v. GreatBanc Tr. Co.*,
   835 F.3d 670 (7th Cir. 2016) ......................................................................... 32, 39

*Always Towing & Recovery, Inc. v. City of Milwaukee*,
   2 F.4th 695 (7th Cir. 2021) .............................................................................. 9, 25

*Am. Ad. Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
   190 F.3d 1051 (9th Cir. 1999) ............................................................................. 11

*Am. Column & Lumber Co. v. United States*,
   257 U.S. 377 (1921)............................................................................................. 34

*Am. Needle, Inc. v. NFL*,
   560 U.S. 183 (2010)....................................................................................... 26, 32

*Am. Steel Erectors, Inc. v. Loc. Union No. 7*,
   536 F.3d 68 (1st Cir. 2008) ................................................................................. 13

*Arizona v. Maricopa Cnty. Med. Soc'y*,
   457 U.S. 332 (1982)....................................................................................... 29, 30

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)............................................................................................... 5

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
   459 U.S. 519 (1983)............................................................................................. 11

*Atl. Richfield Co. v. USA Petrol. Co.*,
   495 U.S. 328 (1990)............................................................................................... 6

*Avenet, Inc. v. FTC*,
   511 F.2d 70 (7th Cir. 1975) ................................................................................. 36

*Barnhart v. Sigmon Coal Co.*,
   534 U.S. 438 (2002)............................................................................... 13, 14, 16

*BedRoc Ltd., LLC v. United States*,
   541 U.S. 176 (2004)............................................................................................. 14

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)............................................................................................... 5

*Bloyer v. St. Clair Cnty. Ill.*,
   2016 WL 6804471 (S.D. Ill. Nov. 17, 2016) ...................................................... 47

*Boim v. Holy Land Found. for Relief & Dev.*,
   549 F.3d 685 (7th Cir. 2008) ................................................................. 13

*Bond v. United States*,
   572 U.S. 844 (2014) ................................................................... 15, 16

*Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*,
   441 U.S. 1 (1979) ............................................................................. 26

*Brown v. Cook Cnty.*,
   2018 WL 3122174 (N.D. Ill. June 26, 2018) ................................... 6

*Brown v. Weltman, Weinberg & Reis Co., L.P.A.*,
   2021 WL 3910748 (N.D. Ill. Sept. 1, 2021) ................................... 5

*Brownmark Films, LLC v. Comedy Partners*,
   682 F.3d 687 (7th Cir. 2012) ........................................................... 6

*Bunker Ramo Corp. v. United Business Forms, Inc.*,
   713 F.2d 1272 (7th Cir. 1983) ....................................................... 30

*Burke v. 401 N. Wabash Venture, LLC*,
   2011 WL 2565896 (N.D. Ill. June 28, 2011) ................................. 24

*Burke v. 401 N. Wabash Venture, LLC*,
   714 F.3d 501 (7th Cir. 2013) ......................................................... 24

*Butler v. Jimmy John's Franchise, LLC*,
   331 F. Supp. 3d 786 (S.D. Ill. 2018) ....................................... 32, 37

*Cal. Dental Ass'n v. FTC*,
   526 U.S. 756 (1999) ................................................. 28, 30, 31, 32

*Catalano, Inc. v. Target Sales, Inc.*,
   446 U.S. 643 (1980) ......................................................................... 7

*City of Rockford v. Mallinckrodt ARD, Inc.*,
   360 F. Supp. 3d 730 (N.D. Ill. 2019) ............................................. 6

*Clark v. City of Braidwood*,
   318 F.3d 764 (7th Cir. 2003) ......................................................... 47

*Conn. Nat'l Bank v. Germain*,
   503 U.S. 249 (1992) ....................................................................... 21

*Connell Constr. Co. v. Plumbers & Steamfitters Loc. Union No. 100*,
   421 U.S. 616 (1975) ....................................................................... 13

*Cook Inc. v. Boston Sci. Corp.*,
  2002 WL 335314 (N.D. Ill. Feb. 28, 2002) ........................................................... 37

*Davis v. Ind. State Police*,
  541 F.3d 760 (7th Cir. 2008) ................................................................................ 12

*Dennis v. Andersons Inc.*,
  2021 WL 3403528 (N.D. Ill. July 9, 2021) ........................................................... 46

*Digital Realty Tr., Inc. v. Somers*,
  138 S. Ct. 767 (2018) ........................................................................................... 13

*Doe v. Ariz. Hosp. & Healthcare*,
  2009 WL 1423378 (D. Ariz. Mar. 19, 2009) ......................................................... 29

*Dunn v. United States*,
  570 U.S. 901 (2013) .............................................................................................. 40

*Edmond v. City of Chicago*,
  2018 WL 5994929 (N.D. Ill. Nov. 15, 2018) ......................................................... 24

*FirstMerit Bank, N.A. v. Ferrari*,
  71 F. Supp. 3d 751 (N.D. Ill. 2014) ...................................................................... 23

*Fleischman v. Albany Med. Ctr.*,
  728 F. Supp. 2d 130 (N.D.N.Y. 2010) ................................................................... 29

*Fond du Lac Bumper Exch., Inc. v. Jui Li Enter. Co.*,
  85 F. Supp. 3d 1007 (E.D. Wis. 2015) .................................................................. 47

*Freeman v. San Diego Ass'n of Realtors*,
  322 F.3d 1133 (9th Cir. 2003) ................................................................................ 7

*FTC v. Credit Bureau Ctr., LLC*,
  284 F. Supp. 3d 907 (N.D. Ill. 2018) .................................................................... 46

*FTC v. Ind. Fed'n of Dentists*,
  476 U.S. 447 (1986) .............................................................................................. 33

*FTC v. Staples, Inc.*,
  970 F. Supp. 1066 (D.D.C. 1997) ................................................................... 36, 37

*FTC v. Superior Ct. Trial Lawyers Ass'n*,
  493 U.S. 411 (1990) ................................................................................... 8, 26, 29

*Gabelli v. SEC*,
  568 U.S. 442 (2013) .............................................................................................. 45

*Gelboim v. Bank of Am. Corp.*,
  823 F.3d 759 (2d Cir. 2018)......................................................................... 8

*Goldfarb v. Va. State Bar*,
  421 U.S. 773 (1975)................................................................................... 29

*Gordon v. Softech Int'l, Inc.*,
  726 F.3d 42 (2d Cir. 2013)........................................................................ 13

*Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*,
  998 F.2d 391 (7th Cir. 1993)....................................................................... 9

*Green v. Beth*,
  663 F. App'x 471 (7th Cir. 2016) ............................................................. 23

*Greene v. Will*,
  2013 WL 11233976 (N.D. Ind. Apr. 16, 2013) ....................................... 41

*Grp. Life & Health Ins. Co. v. Royal Drug Co.*,
  440 U.S. 205 (1979)................................................................................... 14

*Hakim v. Accenture U.S. Pension Plan*,
  2009 WL 10740578 (N.D. Ill. Feb. 4, 2009) ........................................... 24

*Havoco of America, Ltd. v. Shell Oil Co.*,
  626 F.2d 549 (7th Cir. 1980)..................................................................... 41

*Hawk v. Perillo*,
  642 F. Supp. 380 (N.D. Ill. 1986) ............................................................ 40

*Healey v. Int'l Bhd. of Elec. Workers, Loc. Union No. 134*,
  2012 WL 3835094 (N.D. Ill. Sept. 4, 2012) .............................................. 6

*Heard v. Becton, Dickinson & Co.*,
  440 F. Supp. 3d 960 (N.D. Ill. 2020) ....................................................... 23

*Heritage Guitar, Inc. v. Gibson Brands, Inc.*,
  2022 WL 1954361 (W.D. Mich. June 6, 2022) ........................................ 36

*Hunter v. WPD Mgmt. LLC*,
  476 F. Supp. 3d 731 (N.D. Ill. 2020) ......................................................... 5

*Hyson USA, Inc. v. Hyson 2U, Ltd.*,
  821 F.3d 935 (7th Cir. 2016) ...................................................................... 6

*Illinois v. McGraw-Hill Cos.*,
  2013 WL 1874279 (N.D. Ill. May 2, 2013) ............................................. 12

*In re Broiler Chicken Antitrust Litig.*,
290 F. Supp. 3d 772 (N.D. Ill. 2017) ................................................................... passim

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
738 F. Supp. 2d 1011 (N.D. Cal. 2010) ...................................................................... 8

*In re Copper Antitrust Litig.*,
436 F.3d 782 (7th Cir. 2006) ............................................................................... 45, 49

*In re Crude Oil Commodity Futures Litig.*,
913 F. Supp. 2d 41 (S.D.N.Y. 2012) ....................................................................... 36

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
360 F. Supp. 3d 788 (N.D. Ill. 2019) ...................................................................... 37

*In re Delta Dental Antitrust Litig.*,
484 F. Supp. 3d 627 (N.D. Ill. 2020) ................................................................. 12, 25

*In re Diisocyanates Antitrust Litig.*,
2020 WL 1140244 (W.D. Pa. Mar. 9, 2020) ........................................................... 8

*In re Evanston Nw. Healthcare Corp. Antitrust Litig.*,
2016 WL 4720014 (N.D. Ill. Sept. 9, 2016) ...................................................... 46, 48

*In re Flat Glass Antitrust Litig.*,
385 F.3d 350 (3d Cir. 2004) .................................................................................... 33

*In re Fresh and Process Potatoes Antitrust Litig.*,
834 F. Supp. 2d 1141 (D. Idaho 2011) .................................................................... 12

*In re Humira (Adalimumab) Antitrust Litig.*,
465 F. Supp. 3d 811 (N.D. Ill. 2020) ...................................................................... 9

*In re Local TV Advert. Antitrust Litig.*,
2020 WL 6557665 (N.D. Ill. Nov. 20, 2020) ......................................................... 36

*In re McKesson HBOC, Inc. Sec. Litig.*,
126 F. Supp. 2d 1248 (N.D. Cal. 2000) ................................................................... 24

*In re Mercedes-Benz Anti-Trust Litig.*,
157 F. Supp. 2d 355 (D.N.J. 2001) ........................................................................... 8

*In re Mushroom Direct Purchaser Antitrust Litig.*,
621 F. Supp. 2d 274 (E.D. Pa. 2009) ....................................................................... 20

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
169 F.R.D. 493 (S.D.N.Y. 1996) ............................................................................. 41

*In re Opana ER Antitrust Litig.*,
  162 F. Supp. 3d 704 (N.D. Ill. 2016) ................................................. 42

*In re Packaged Seafood Prod. Antitrust Litig.*,
  242 F. Supp. 3d 1033 (S.D. Cal. 2017) ............................................. 49

*In re Pre-Filled Propane Tank Antitrust Litig.*,
  860 F.3d 1059 (8th Cir. 2017) .......................................................... 50

*In re Sulfuric Acid Antitrust Litig.*,
  703 F.3d 1004 (7th Cir. 2012) .......................................................... 46

*In re Sulfuric Acid Antitrust Litig.*,
  743 F. Supp. 2d 827 (N.D. Ill. 2010) ................................. 46, 47, 48

*In re Text Messaging Antitrust Litig.*,
  2010 WL 1782006 (N.D. Ill. Apr. 30, 2010) ..................................... 5

*In re Text Messaging Antitrust Litig.*,
  630 F.3d 622 (7th Cir. 2011) .............................................................. 5

*In re Wheat Rail Freight Rate Antitrust Litig.*,
  579 F. Supp. 517 (N.D. Ill. 1984) .................................................... 20

*In re Wheat Rail Freight Rate Antitrust Litig.*,
  759 F.2d 1305 (7th Cir. 1985) .......................................................... 20

*Indust. Bldg. Materials, Inc. v. Interchemical Corp.*,
  437 F.2d 1336 (9th Cir. 1970) .......................................................... 41

*Jamsports & Entmt. LLC v. Paradam Prod'ns*,
  2003 WL 1873563 (N.D. Ill. Apr. 15, 2003) ................................... 36

*Johnson-Morris v. Santander Consumer USA, Inc.*,
  194 F. Supp. 3d 757 (N.D. Ill. 2016) ............................................... 49

*Keith v. Ferring Pharms., Inc.*,
  2016 WL 5391224 (N.D. Ill. Sept. 27, 2016) .................................. 13

*Khan v. United States*,
  808 F.3d 1169 (7th Cir. 2015) .......................................................... 13

*Klehr v. A.O. Smith Corp.*,
  521 U.S. 179 (1997) .......................................................................... 50

*Krause v. Perryman*,
  827 F.2d 346 (8th Cir. 1987) ............................................................ 39

*L.J. Zucca, Inc. v. Allen Bros. Wholesale Distribs., Inc.*,
  2008 WL 2937253 (D. Del. July 29, 2008) .......................................................... 8

*Loeb Indus., Inc. v. Sumitomo Corp.*,
  306 F.3d 469 (7th Cir. 2002) ............................................................................. 11

*Marion Healthcare, LLC v. Becton Dickinson & Co.*,
  952 F.3d 832, 839 (7th Cir. 2020) ..................................................................... 44

*McGarry & McGarry, LLC v. Bankr. Management Solutions, Inc.*,
  937 F.3d 1056 (7th Cir. 2019) ........................................................................... 39

*Meacham v. Knolls Atomic Power Lab.*,
  554 U.S. 84 (2008) .............................................................................................. 12

*Menzel v. Scholastic, Inc.*,
  2020 WL 1308346 (N.D. Cal. Jan. 17, 2020) .................................................... 45

*Meyer v. Kalanick*,
  174 F. Supp. 3d 817 (S.D.N.Y. 2016) ................................................................ 36

*Moehrl v. Nat'l Ass'n of Realtors*,
  492 F. Supp. 3d 768 (N.D. Ill. 2020) ...................................................... 8, 37, 44

*Munguia v. Illinois*,
  2010 WL 3172740 (N.D. Ill. Aug. 11, 2010) ................................................. 5, 34

*Nat'l Broiler Mktg. Ass'n v. United States*,
  436 U.S. 816 (1978) ...................................................................................... 19, 20

*Nat'l Soc'y of Prof'l Eng'rs v. United States*,
  435 U.S. 679 (1978) .............................................................................................. 3

*Navarro v. Procter & Gamble Co.*,
  515 F. Supp. 3d 718 (S.D. Ohio 2021) .............................................................. 45

*NCAA v. Alston*,
  141 S. Ct. 2141 (2021) .......................................................................................... 3

*NCAA v. Bd. of Regents of Univ. of Okla.*,
  468 U.S. 85 (1984) .................................................................................. 30, 32, 48

*New York ex rel. Spitzer v. St. Francis Hosp.*,
  94 F. Supp. 399 (S.D.N.Y. 2000) ....................................................................... 29

*NewSpin Sports, LLC v. Arrow Elecs., Inc.*,
  910 F.3d 293 (7th Cir. 2018) ............................................................................... 6

*Ohio v. Am. Express Co.*,
    138 S. Ct. 2274 (2018).................................................................................. 25, 37

*Olean Wholesale Grocery Coop., Inc. v. Agri Stats, Inc.*,
    2020 WL 6134982 (N.D. Ill. Oct. 19, 2020)................................................. 36

*P & M Distribs., Inc. v. Prairie Farms Dairy, Inc.*,
    2013 WL 5509191 (C.D. Ill. Oct. 4, 2013).................................................. 32

*Palmer v. BRG of Ga., Inc.*,
    498 U.S. 46 (1990)........................................................................................ 8

*Papazoglou v. Holder*,
    725 F.3d 790 (7th Cir. 2013) ....................................................................... 16

*Payne v. Cty. of Cook*,
    2016 WL 1086527 (N.D. Ill. Mar. 21, 2016)............................................... 24

*Peoria Day Surgery Ctr. v. OSF Healthcare Sys.*,
    2009 WL 5217344 (C.D. Ill. Dec. 30, 2009) .............................................. 32

*Photovest Corp. v. Fotomat Corp.*,
    606 F.2d 704 (7th Cir. 1979) ....................................................................... 36

*Republic Tobacco v. N. Atl. Trading*,
    381 F.3d 717 (7th Cir. 2004) ........................................................... 32, 33, 34

*Rock v. NCAA*,
    2013 WL 4479815 (S.D. Ind. Aug. 16, 2013) ............................................ 32

*Rotkiske v. Klemm*,
    140 S. Ct. 355 (2019)................................................................................... 45

*Scott v. Chuhak & Tecson*,
    725 F.3d 772 (7th Cir. 2013) ....................................................................... 40

*Shuffle Tech Int'l, LLC v. Sci. Games Corp.*,
    2015 WL 5934834 (N.D. Ill. Oct. 12, 2015)............................................... 46

*Sidney Hillman Health Ctr. of Rochester v. Abbott Labs., Inc.*,
    782 F.3d 922 (7th Cir. 2015) ....................................................................... 45

*Smith v. United States*,
    568 U.S. 106 (2013)......................................................................... 38, 39, 44

*Snyder v. U.S. Bank N.A.*,
    387 F. Supp. 3d 867 (N.D. Ill. 2019) .......................................................... 42

x

*Sohm v. Scholastic Inc.*,
  959 F.3d 39 (2d Cir. 2020) ............................................................................. 45

*Stenberg v. Carhart*,
  530 U.S. 914 (2000) ......................................................................................... 13

*Tamayo v. Blagojevich*,
  526 F.3d 1074 (7th Cir. 2008) ........................................................................ 40

*Tamburo v. Dworkin*,
  601 F.3d 693 (7th Cir. 2010) ............................................................................ 9

*Tavistock Rest. Grp., LLC v. Zurich Am. Ins. Co.*,
  2021 WL 1614519 (N.D. Ill. Apr. 26, 2021) ................................................. 18

*TCS John Huxley Am., Inc. v. Sci. Games Corp.*,
  2021 WL 4264403 (N.D. Ill. Sept. 20, 2021) ................................................ 46

*Texaco Inc. v. Dagher*,
  547 U.S. 1 (2006) .............................................................................................. 26

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001) ............................................................................ 35

*Tomlinson v. Goldman, Sachs & Co.*,
  682 F. Supp. 2d 845 (N.D. Ill. 2009) ............................................................. 47

*Turner v. McDonald's USA, LLC*,
  2020 WL 3044086 (N.D. Ill. Apr. 24, 2020) ................................................. 50

*United States v. Bafia*,
  949 F.2d 1465 (7th Cir. 1991) ........................................................................ 39

*United States v. Bengis*,
  783 F.3d 407 (2d Cir. 2015) ............................................................................ 40

*United States v. Brown University*,
  5 F.3d 658 (3d Cir. 1993) ......................................................................... passim

*United States v. Capitol Serv., Inc.*,
  756 F.2d 502 (7th Cir. 1985) ............................................................................ 8

*United States v. Cerrito*,
  413 F.2d 1270 (7th Cir. 1969) ........................................................................ 40

*United States v. Container Corp.*,
  393 U.S. 333 (1969) ......................................................................................... 33

*United States v. Coscia,*
    866 F.3d 782 (7th Cir. 2017) ........................................................... 21

*United States v. First City Nat'l Bank of Houston,*
    386 U.S. 361 (1967) ........................................................................ 13

*United States v. Gonzales,*
    520 U.S. 1 (1997) ........................................................................... 21

*United States v. Hayes,*
    391 F.3d 958 (8th Cir. 2004) ........................................................... 40

*United States v. Joyce,*
    895 F.3d 673 (9th Cir. 2018) ........................................................... 30

*United States v. McKesson,*
    351 U.S. 305 (1956) .................................................................. 20, 25

*United States v. Morales,*
    655 F.3d 608 (7th Cir. 2011) ........................................................... 44

*United States v. Nagelvoort,*
    856 F.3d 1117 (7th Cir. 2017) ......................................................... 39

*United States v. Nationwide Trailer Rental Sys., Inc.,*
    156 F. Supp. 800 (D. Kan. 1957) .................................................. 8, 44

*United States v. Nationwide Trailer Rental Sys., Inc.,*
    355 U.S. 10 (1957) ........................................................................... 8

*United States v. Newman,*
    755 F.3d 543 (7th Cir. 2014) ........................................................... 44

*United States v. Paramount Pictures,*
    334 U.S. 131 (1948) ................................................................... 7, 44

*United States v. Ras,*
    713 F.2d 311 (7th Cir. 1983) ...................................................... 20, 41

*United States v. Read,*
    658 F.2d 1225 (7th Cir. 1981) ......................................................... 44

*United States v. Sandoval-Curiel,*
    50 F.3d 1389 (7th Cir. 1995) ...................................................... 20, 41

*United States v. Sax,*
    39 F.3d 1380 (7th Cir. 1994) ........................................................... 39

*United States v. Socony-Vacuum Oil Co.*,
  310 U.S. 150, 222 (1940)..................................................................... 8, 10, 43

*United States v. Vallone*,
  698 F.3d 416 (7th Cir. 2012) ....................................................................... 40

*United Steelworkers of Am., AFL-CIO-CLC v. Weber*,
  443 U.S. 193 (1979)...................................................................................... 17

*Valero Energy Corp. v. United States*,
  569 F.3d 626 (7th Cir. 2009) ................................................................. 13, 21

*Varner v. Peterson Farms*,
  371 F.3d 1011 (8th Cir. 2004) ...................................................................... 50

*Wacker Drive Exec. Suites, LLC v. Jones Lang LaSalle Ams. (Ill.), LP*,
  2019 WL 2270000 (N.D. Ill. May 28, 2019) ............................................... 43

*Watson Carpet & Floor Covering, Inc. v. Mohawk Indus.*,
  648 F.3d 452 (6th Cir. 2011) ........................................................................ 39

*Wilk v. Am. Med. Ass'n*,
  895 F.2d 352 (7th Cir. 1990) .................................................................. 31, 33

*Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop.*,
  2021 WL 409982 (E.D. Pa. Feb. 5, 2021) .................................................... 39

*Wolf v. City of Chicago Heights*,
  828 F. Supp. 520 (N.D. Ill. 1993) ................................................................ 39

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
  401 U.S. 321 (1971)...................................................................................... 46

## Other Authorities

15 U.S.C. § 1 ........................................................................................... 1, 11

1994 U.S.C.C.A.N. 2901, 3242-43 ................................................................ 22

A REPORT ON THE STATE OF FINANCIAL AID AT BROWN 5 (Apr. 2, 2012),
  https://www.academia.edu/5101402/A_Report_on_the_State_of_Financial_Aid_
  at_Brown....................................................................................................... 23

Collin Hong, *Need-Blind Admissions Advantages Wealthy Applicants*,
  VANDERBILT POLITICAL REVIEW (Jan. 1, 2018) ....................................... 16

Eli Lee, *Public Health professor Lisa Rosen-Metsch appointed dean of General Studies*,
  COLUMBIA SPECTATOR (Nov. 14, 2017) .................................................. 24

Geoffrey Kabaservice, *The Guardians: Kingman Brewster, His Circle, and the Rise of the Liberal Establishment* 264 (2004) ........................................................................ 16

H.R. Conf. Rep. 103-761, 911-12 ............................................................................. 22

H.R. Rep. 114-224 (2015) ......................................................................................... 43

John J. DeGioia, *Student Town Hall Meeting on the Implications of the Financial Crisis* (Mar. 2, 2009) ........................................................................................................... 36

NACUBO, *U.S. Educational Endowments Report 5.3 Percent Average Return in FY 2019* (Jan. 30, 2020), https://www.nacubo.org/Press-Releases/2020/US-Educational-Endowments-Report-5-3-Percent-Average-Return-in-FY19 ...................................... 38

*Need-Blind Admissions and the Drive to Increase Endowed Scholarships* (Oct. 13, 1999) ........ 36

NEWBERG ON CLASS ACTIONS § 2:3 (2020) ............................................................ 41

Peter Mladina, Charles Grant, and Abdul Nimeri, *Illuminating the Returns of Elite Investors* (Apr. 2014), https://www.northerntrust.com/documents/commentary/investment-commentary/illuminating-returns-elite-investors.pdf. ............................................ 38

Thomas J. Philipson & Richard Posner, *Antitrust in the Not-for-Profit Sector*, 52 J. L. & Econ. 1 (Feb. 2009) ................................................................................... 29

*Understanding College and University Endowments* 13 (2021), https://www.acenet.edu/Documents/Understanding-College-and-University-Endowments.pdf. ...................................................................................................... 38

## <u>INTRODUCTION</u>

Plaintiffs bring suit on behalf of a proposed class of the more than 200,000 people (the "Class") who since 2003 have been victims of Defendants' horizontal agreement to fix the "net price" of attending their academic institutions—tuition, room, and board, less institutional grant aid. Defendants did so by, among other acts, agreeing that students should pay the maximum amount the conspirators decide their families can afford to pay, and by agreeing on a common formula, the "Consensus Methodology" ("CM"), to determine the family's contribution. Defendants took these steps through their participation in what they call the Presidents 568 Group (the "Cartel"). Plaintiffs allege, in their Amended Complaint ("AC"), that this conspiracy has caused the members of the Class to pay "artificially inflated net prices of attendance." AC ¶ 235.

Defendants move to dismiss based on arguments that are: premature; ignore the plain language of the statutory exemption they invoke as an affirmative defense; misconstrue the controlling precedent; and assume it should have been clear to Class members since 2003 that Defendants have been artificially inflating net prices—which Defendants simultaneously insist they have *not* been inflating. Defendants also rely heavily, and improperly on a motion to dismiss, on a Government Accounting Office ("GAO") report published sixteen years ago (the "2006 GAO Rpt.")— which included only one year of use of the CM and disclaims serving the very purpose for which Defendants cite it. Defendants' motions fail for the following reasons:

*First*, Defendants' reliance on Section 568 of the Improving America's Schools Act of 1994, 15 U.S.C. § 1 note 1 (the "Exemption"), is no basis for dismissal. Not only is a statutory antitrust exemption an affirmative defense, making it ill-suited for resolution on the pleadings, but such exemptions are to be read narrowly. The Exemption applies to an agreement between "2 or more institutions of higher education" that admit "all" students "on a need-blind basis," which the statute defines as "without regard to the financial circumstances of the student involved or the

student's family." By its plain and unambiguous terms, the Exemption would thus apply to any Cartel member *only if* (a) *all* of them (b) admitted *all* their students "without regard to the financial circumstances" of the student or family. That is, the Exemption does not protect an institution that does admit all students on a need-blind basis if it conspires with an institution that does not admit all students on a need-blind basis. Plaintiffs plausibly allege that Defendants have not satisfied these conditions.

Defendants' main argument, in defending their practices of favoring the wealthy in admissions, is that the Exemption applies unless they (a) disfavor financial-aid applicants by (b) looking to their aid applications or using their financial circumstances as a proxy for their need for aid. As threshold matters, Defendants' motion fails even under their misinterpretation: with a finite number of seats for undergraduates, any admissions practice that awards spots to the wealthy *logically does* disfavor those applying for aid; and for their waitlisted and transfer applicants, Defendants *specifically* disfavor financial-aid applicants. Defendants' misinterpretation is baseless: they ignore the unambiguous *definition* of "need-blind" *that Congress included in the statute*, improperly relying on a supposed "ordinary meaning" of "need-blind" that the statutory definition makes moot (and that is not the phrase's ordinary meaning). In addition, Defendants' misinterpretation would allow them to collude on financial aid even if each of them filled nearly all of their slots with wealthy applicants. This is the type of absurd result that the plain-language interpretation of the Exemption does not create.

*Second*, Defendants set forth no basis for resolving *on the pleadings* whether their Cartel is illegal under the Sherman Act. The Cartel is a classic *per se* violation that does not fall into any of the narrow exceptions the courts have created. At a minimum, Plaintiffs' allegations implicate

industry and marketplace-related facts that, as the federal courts have cautioned, require fact discovery *before* resolving whether the *per se* rule applies. The same is true of Defendants' argument that, contrary to their own admissions, they do not compete in the same market or possess market power. More fundamentally, Plaintiffs have plausibly alleged direct proof of the Cartel's anticompetitive impact, making any precise market definition unnecessary.

Defendants similarly assert no basis for dismissing the alternative claim that the Cartel is illegal under Quick Look or Rule of Reason analysis. Defendants merely assert (at 28) that the Cartel "makes higher education more accessible" and increases aid for some while "theoretically" reducing it for others. This speculative argument purports to balance anticompetitive effects (such as less aid for those in need) against supposed societal benefits, reducing to the proposition that "competition is bad," an argument the Supreme Court has rejected. *NCAA v. Alston*, 141 S. Ct. 2141, 2159 (2021); *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 695 (1978). In relying on *United States v. Brown University*, 5 F.3d 658 (3d Cir. 1993), for the proposition that a horizontal agreement like the Cartel theoretically "can" increase financial aid, Defendants invoke an analysis based on a different set of facts and assumptions made thirty years ago and never tested, because *Brown* settled before the district court could address the issues on remand.

Defendants' argument also ignores the Supreme Court's recent admonition to account for changed "market realities" in analyzing the Sherman Act, *Alston*, 141 S. Ct. at 2158, and Plaintiffs' allegations of such changes here. Since *Brown* was decided, for example, Defendants' endowments have skyrocketed by *more than 1000 percent,* to more than $233 billion in 2021. With such resources, if Defendants had not colluded, they would have awarded more scholarship aid and thus reduced the net price of attendance for *all financial aid students*, AC ¶ 257, as universities such as

Yale and Harvard have effectively admitted. *Id*. ¶¶ 123-25. Contrary to Defendants' implicit assumption that each university can award only a fixed amount of financial aid, true competition on aid would drive Defendants to spend *more* on it. Plaintiffs show how, with modestly increased aid spending from their unrestricted endowments, and while still growing them, 9 of the 17 Defendants could make attending their universities *free* for students currently on financial aid, while reducing the net price by an average of almost $12,000 annually at the other 8 schools.

*Third*, the Defendants who contend they quit the conspiracy (Brown, Chicago, Emory) ("BCE") or joined after the other conspirators' misconduct (JHU) have the law wrong. In order to withdraw, a defendant must take *affirmative acts to disavow* the conspiracy and its goals. Plaintiffs do not allege that BCE did so, and BCE cannot prove on the pleadings that they did. JHU's argument is contrary to well-established law that one who joins an existing conspiracy becomes as liable for it as the originators of the conspiracy, including for actions taken before joining. And Yale's assertion that it has not used the CM for the past four years, even though it is in the Cartel, is contradicted by Plaintiffs' plausible allegations, including Yale's own admission that the Cartel has "one needs-analysis formula that *everyone* has to sign onto." *Id*. ¶ 124 (emphasis added).

*Fourth*, Defendants set forth no basis for dismissing any claims as untimely. In addition to the statute of limitations being an affirmative defense, under the "discovery rule" that applies in this Circuit, whether a reasonably diligent person knew or should have known she had been injured is a fact-intensive question inappropriate for resolution on a motion to dismiss. A reasonably diligent person would have not known the Cartel was causing artificially inflated net prices for students receiving financial aid. Indeed, the outdated 2006 GAO Report, which Defendants repeatedly cite (and includes only one year of CM use, flawed methodologies, and data from only 6 of the 17 Defendants), concluded that the Cartel did not increase net prices. Plaintiffs have adequately

pled that a reasonably diligent plaintiff would not have discovered injury from the Cartel until two years before the Complaint was filed, because it required uncovering, assembling, and combining the full array and effects of Defendants' unlawful conduct.

## LEGAL STANDARDS

The plaintiff must allege sufficient facts "to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The allegations need only "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "An otherwise 'well pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that recovery is very remote and unlikely.'" *In re Text Messaging Antitrust Litig.*, 2010 WL 1782006, at *4 (N.D. Ill. Apr. 30, 2010) (Kennelly, J.) (quotations omitted), *aff'd*, 630 F.3d 622 (7th Cir. 2011) (Posner, J.) (price-fixing allegations established "a nonnegligible probability that the claim is valid"). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Hunter v. WPD Mgmt. LLC*, 476 F. Supp. 3d 731, 734 (N.D. Ill. 2020) (Kennelly, J.) (quotations omitted).

In considering a plaintiff's allegations, the Court "takes them as true and evaluates their sufficiency to sustain plaintiffs' claim." *Text Messaging*, 2010 WL 1782006, at *3. The materials Defendants cite, as shown below, do not fall into the narrow category of "matters of public record" whose accuracy "reasonably cannot be questioned." *Brown v. Weltman, Weinberg & Reis Co., L.P.A.*, 2021 WL 3910748, at *2 (N.D. Ill. Sept. 1, 2021). Courts will not take judicial notice of a public document, such as the 2006 GAO Report, where "references to these documents [are] intended to disprove facts which are properly pled in the Complaint" or where the facts involved are "subject to reasonable dispute." *Munguia v. Illinois*, 2010 WL 3172740, at *4-5 (N.D. Ill. Aug. 11, 2010). In opposing a motion to dismiss, in contrast, the plaintiff may cite evidence

outside of but consistent with the complaint. *See Brown v. Cook Cnty.*, 2018 WL 3122174, at *12 n.6 (N.D. Ill. June 26, 2018) (Kennelly, J.); *Healey v. Int'l Bhd. of Elec. Workers, Loc. Union No. 134*, 2012 WL 3835094, at *3 (N.D. Ill. Sept. 4, 2012) (Kennelly, J.).

A plaintiff is "not required to plead elements in his or her complaint that overcome affirmative defenses, such as statute-of-limitations defenses." *NewSpin Sports, LLC v. Arrow Elecs., Inc.*, 910 F.3d 293, 299 (7th Cir. 2018). Affirmative defenses "typically turn on facts not before the court at that stage in the proceedings," *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012), and generally should be litigated later in the proceedings, *City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 747 (N.D. Ill. 2019). Dismissal on affirmative defenses "is appropriate *only* when the factual allegations in the complaint unambiguously establish all the elements of the defense." *Hyson USA, Inc. v. Hyson 2U, Ltd.*, 821 F.3d 935, 939 (7th Cir. 2016) (emphasis in original).

## ARGUMENT

## I. PLAINTIFFS PLAUSIBLY ALLEGE INJURY FROM DEFENDANTS' AGREEMENT AND CONSPIRACY IN RESTRAINT OF TRADE

### A. Plaintiffs Plausibly Allege an Agreement in Restraint of Trade

Defendants are horizontal competitors that agreed to develop, use, and enforce a common formula or common principles, the CM, for calculating financial aid. AC ¶¶ 6, 115-18. Horizontal price fixing is "perhaps the paradigm of an unreasonable restraint of trade." *Atl. Richfield Co. v. USA Petrol. Co.*, 495 U.S. 328, 344 (1990). In their own words, Defendants jointly agreed to "'ask the family to contribute *the maximum that they are capable of, according to that formula*.'" *Id*. ¶ 129 (emphasis added). The CM "assesses the income and assets of given financial-aid applicants and their families to determine the applicants' ability to pay and thus the financial contribution that the applicant and their family is expected to make." *Id*. ¶ 117. "The applicants'

6

assessed ability to pay therefore is a key determinant in the net price of attendance." *Id*. ¶ 118. Defendants thereby determine, through the CM, the net price of attendance. *Id*. ¶¶ 6, 115-18.[1]

Defendants' conspiratorial acts are wide-ranging. "Defendants have met—and continue to meet—to devise, agree upon, and collectively implement" the CM. AC ¶ 6. They have agreed on a "data exchange program" to "share information about admissions and financial aid methodology." *Id*. ¶ 117. The Cartel "uses the shared, competitively sensitive information about enrollment, costs, and other data relating to Defendants' available resources for financial aid to arrive at a common and agreed formula for setting ability to pay." *Id*. Defendants "monitor[] and enforce[]" their conspiracy by "requiring each participating institution to submit a "'Certificate of Compliance'" with the Exemption, "requiring university professionals at each institution to receive "training . . . in the application of the Methodology [CM]," and "imposing a 'common calendar for the collection of data from families.'" *Id*. ¶ 121.

Defendants' assertion (at 25) that the CM is "not binding" on Cartel members merely disputes Plaintiffs' allegations,[2] and is refuted by the Yale and Harvard admissions that the Cartel required them to limit financial aid to students. In addition, it has long been true that "acquiescence in an illegal scheme is as much a violation of the Sherman Act as the creation and promotion of one." *United States v. Paramount Pictures*, 334 U.S. 131, 161 (1948); *see Moehrl v. Nat'l Ass'n*

---

[1] That is, financial aid is a discount off the sticker price, and agreements as to discounts are as much a form of price-fixing as are agreements on the price itself. *See e.g.*, *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 648 (1980) (agreements not to offer discounts and to standardize credit terms constitutes a per se violation of the Sherman Act, as those terms are "inseparable" from the price); *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1146 (9th Cir. 2003). A key holding in the Overlap Group case, *United States v. Brown University*, 5 F.3d 658 (3d Cir. 1993), discussed further below, was that the provision of financial aid is in effect a discount in a commercial transaction. *Id*. at 666-68.

[2] The argument also cries out for discovery. Defendants do not say whether "not binding" means that, contrary to Yale's admission, AC ¶ 124, Cartel members do not have to use the CM; or they must use the formula, as Yale admitted, but can then somehow choose to tweak the results of the formula; or they must use the formula elements but can add other formulaic elements.

*of Realtors*, 492 F. Supp. 3d 768, 780 (N.D. Ill. 2020) (collecting cases). Deviations from an agreement, or the absence of discrete agreement on each step of implementing it, do not preclude liability under Section 1.[3] With respect to one group's use of uniform lease terms and recommended price lists, for example, one court sensibly concluded it was "unable to find that the list was circulated for no purpose at all." *United States v. Nationwide Trailer Rental Sys., Inc.*, 156 F. Supp. 800, 804-05 (D. Kan. 1957), *aff'd per curiam*, 355 U.S. 10 (1957).

Defendants are also wrong in arguing (at 8) that Plaintiffs would have to show an agreement to fix financial-aid awards for specific students. Defendants agreed on a *formula*, which resulted in the suppression of financial aid to all students (not merely specific students). AC ¶¶ 133, 237-39. It is illegal for competitors to agree to a common pricing formula. *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 222, 224 n.59 (1940) (citing the critical role of the "formula underlying price policies").[4] If some competition (at a depressed level) continued despite the Cartel, the alleged misconduct would still be illegal because agreements in restraint of trade need not "'be aimed at complete elimination of price competition.'" *FTC v. Superior Ct. Trial Lawyers Ass'n*, 493 U.S. 411, 435, (1990) (quoting *Socony-Vacuum*, 310 U.S. at 224 n.59, 225-26). Plaintiffs allege more than enough facts, in this "complex" antitrust case, to "plausibly suggest" that each Defendant joined the Cartel. *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1019 (N.D. Cal. 2010); *see also Diisocyanates*, 2020 WL 1140244, at *2.

---

[3] *See Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 48 (1990); *United States v. Capitol Serv., Inc.*, 756 F.2d 502, 506 (7th Cir. 1985); *see also In re Diisocyanates Antitrust Litig.*, 2020 WL 1140244, at *2 (W.D. Pa. Mar. 9, 2020) ("Antitrust plaintiffs are not required to state in specific detail each defendant's involvement in the alleged conspiracy.").

[4] *Accord Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 774 (2d Cir. 2018); *L.J. Zucca, Inc. v. Allen Bros. Wholesale Distribs., Inc.*, 2008 WL 2937253, at *2 (D. Del. July 29, 2008); *In re Mercedes-Benz Anti-Trust Litig.*, 157 F. Supp. 2d 355, 360 (D.N.J. 2001).

B.     **Plaintiffs Plausibly Allege Antitrust Injury and Standing**

1.     **Plaintiffs Plausibly Plead "Antitrust Injury"**

Plaintiffs plausibly make "factual allegations suggesting that the claimed injuries are of the type the antitrust laws were intended to prevent and reflect the anticompetitive effect of either the violation or of anticompetitive acts made possible by the violation." *Tamburo v. Dworkin*, 601 F.3d 693, 699 (7th Cir. 2010) (quotations omitted). Specifically, "the Sherman Act is designed to protect consumers from injury that results from diminished competition, and therefore a claim brought under the Act must allege both injury to [the plaintiff] and to the market." *Always Towing & Recovery, Inc. v. City of Milwaukee*, 2 F.4th 695, 703 (7th Cir. 2021) (cleaned up). Plaintiffs plausibly allege such injuries. Defendants' conspiracy has "depriv[ed] Plaintiffs and the other Class Members of a competitive marketplace," AC ¶ 234; "Plaintiffs and the other Class Members were injured in the form of receiving artificially suppressed financial aid and paying artificially inflated net prices of attendance," *id*. ¶ 235; and students paid "more for attendance at Defendants than they would have paid and will pay but for the combination and conspiracy," *id*. ¶ 266.

The precedent Defendants cite (at 35) regarding antitrust injury is inapposite. Defendants argue that *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 395 (7th Cir. 1993), requires a showing of "but for" causation, which Plaintiffs allege: the Cartel has caused net prices to be "artificially" high. AC ¶¶ 1, 6, 14, 118, 130, 132, 193-94, 235-38, 255-60. *Rockford*, which was decided on summary judgment, shows that the Court may consider any arguments on "but for" causation at that point. In *In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d 811 (N.D. Ill. 2020), the plaintiffs alleged that, but for defendant's violation, certain alternative facts *could* have occurred, which the court concluded "falls short of plausible." *Id*. at 844. But there is nothing unusual about alleging, as Plaintiffs have done here, that in the absence of collu-

9

sion, the Defendant universities would compete for students, and that that competition would produce better results for consumers. AC ¶¶ 237-38. These effects follow from bedrock antitrust principles. *See Socony-Vacuum*, 310 U.S. at 221 (any horizontal price-fixing conspiracy "which tampers with price structures is engaged in an unlawful activity" and is "directly interfering with the free play of market forces"). The method by which Plaintiffs will calculate this damage will require expert analysis; this issue is for class certification and trial, not a motion to dismiss.

Yet Defendants contend (at 35) that "Plaintiffs have not plausibly alleged that they suffered an antitrust injury on the ground that the effective prices they paid would be lower but for the Consensus Methodology" because Plaintiffs do not cite an alternative methodology that would have yielded lower net prices. Defendants here create a false choice between the CM and some other methodology; no such choice is required. Indeed, any university with the means could choose to compete for students on price—and Plaintiffs plausibly allege in the but-for world all Defendants *would have* so competed, AC ¶ 237—by devising its own pricing policies. *See Brown*, 5 F.3d at 679 (alluding to "the free market coupled with MIT's institutional resolve").

Contrary to Defendants' arguments (at 35), there is nothing speculative about Plaintiffs' allegations regarding the injuries to them and the Class for years. The Cartel has injured them "in the form of receiving artificially suppressed financial aid and paying artificially inflated net prices of attendance." *Id*. ¶ 235. Yale assertedly left the Cartel in 2008, for example, because if it remained bound by the CM, it could not implement its then new financial aid policy, which was "more generous." *Id*. ¶¶ 123-24. Similarly, Harvard explained it "never joined the Cartel because its [the Cartel's] financial-aid formula would have yielded financial-aid packages that were smaller than what Harvard wanted to award." *Id*. ¶ 125. In addition, the Cartel uses phrasing, such as "reduce much of the variance," "consistent manner," and "diminish or eliminate divergent results,"

10

clearly evidencing the Cartel's concerted effort to eliminate "competition over financial-aid offers" to coalesce around a lower level of aid to *all* prospective students. *Id*. ¶ 127.

### 2.    Plaintiffs Plausibly Demonstrate "Antitrust Standing"

Defendants also argue (at 36) that "Plaintiffs fail to meet the distinct requirement of antitrust standing," citing cases addressing "speculative" damages. *See Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 485 (7th Cir. 2002); *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 543-44 (1983); *Am. Ad. Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1054 (9th Cir. 1999). These cases discuss plaintiffs who did not purchase directly from the conspirators and so were claiming injuries from "independent factors." *Gen. Contractors*, 459 U.S. at 542; *cf. Loeb*, 306 F.3d at 485 (direct purchasers from price-fixing conspiracy have standing); *Am. Ad. Mgmt.*, 190 F.3d at 1054 (holding the plaintiff had standing as a direct target of the conspiracy). Plaintiffs here are direct purchasers, asserting direct injuries. AC ¶ 260.

## II.    THE EXEMPTION IS NO BASIS FOR DISMISSING PLAINTIFFS' CLAIMS

Defendants' claim that they are immune from antitrust scrutiny is wrong. The Exemption allows "2 or more institutions of higher education *at which all students admitted are admitted on a need-blind basis*, to agree or attempt to agree . . . to use common principles of analysis for determining the need of such students." 15 U.S.C. § 1 note 1 (emphasis added). The statute defines "need-blind basis" to mean "*without regard to the financial circumstances* of the student involved or the student's family." *Id*. (emphasis added).

Defendants have pervasively failed to meet these preconditions, through wealth favoritism for potential and past donors; enrollment management; need awareness for the waitlist and transfer students; and at Columbia, a special "school" for a large percentage of the undergraduate student body. AC ¶¶ 134, 138, 143-44, 173, 177, 183. Plaintiffs allege over some fifty paragraphs, *id*. ¶¶ 134-84, that *no* Defendant satisfies the Exemption. These allegations easily satisfy *Iqbal* and

*Twombly*, neither of which requires a plaintiff to plead that each conspirator undertook the exact same conduct, or all of the ways in which any affirmative defenses will fail.

Plaintiffs further show below that Defendants' various arguments with respect to the interpretation of the Exemption fail, in four main ways. First, invoking the Exemption is an affirmative defense, which the Court cannot resolve on Defendants' motion. Second, Defendants' reading of the Exemption's need-blind requirement contradicts the statute's plain and unambiguous language. Third, even under Defendants' misinterpretation of the "need-blind" definition—applying only to students seeking or needing *financial aid*—Plaintiffs have alleged that *none* of the Defendants meets this definition with respect to transfers and waitlisted students. Accordingly, none of the Defendants, even under their own definition, admits "*all* students" on a need-blind basis, as the Exemption requires. Fourth, all the several school-specific defenses are without merit.

### A.    As an Affirmative Defense, the Exemption Is No Basis for Dismissal

Defendants cannot invoke the Exemption based on Plaintiffs' allegations. "The burden of proving justification or exemption under a special exception to the prohibitions of a statute generally rests on one who claims its benefits." *Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84, 91 (2008) (quotations omitted); *accord Davis v. Ind. State Police*, 541 F.3d 760, 764-65 (7th Cir. 2008) (reversing and remanding). A statutory exemption "is an affirmative defense to liability, not something that a plaintiff must prove." *Illinois v. McGraw-Hill Cos.*, 2013 WL 1874279, at *5 (N.D. Ill. May 2, 2013) (Kennelly, J.). This is particularly clear where, as here, the statute explicitly labels an exception an "exemption." *Ho v. Donovan*, 569 F.3d 677, 682 (7th Cir. 2009).

Under the antitrust laws, this framework has been applied in analogous circumstances, such as with respect to the Capper-Volstead exemption, *In re Fresh and Process Potatoes Antitrust Litig.*, 834 F. Supp. 2d 1141, 1154 n.8 (D. Idaho 2011) (collecting authority); the McCarron-Ferguson Act, *In re Delta Dental Antitrust Litig.*, 484 F. Supp. 3d 627, 643 n.5 (N.D. Ill. 2020); and

the Bank Merger Act, *United States v. First City Nat'l Bank of Houston*, 386 U.S. 361, 366 (1967).[5]

Such statutory exemptions are "not normally appropriate for a Rule 12(b)(6) motion." *Keith v.*

*Ferring Pharms., Inc.*, 2016 WL 5391224, at *11 (N.D. Ill. Sept. 27, 2016) (quotations and citation

omitted). This is not a case in which the plaintiffs' complaint *admits* the elements of the affirmative

defense; Plaintiffs *dispute* them. *Cf. Khan v. United States*, 808 F.3d 1169, 1172 (7th Cir. 2015).

In addition, as shown below, Defendants misinterpret the Exemption.

### B.  Under Its Plain Meaning, the Exemption Does Not Apply to Defendants

All statutory interpretation "begin[s] with the language of the statute . . . to determine

whether the language at issue has a plain and unambiguous meaning." *Barnhart v. Sigmon Coal*

*Co.*, 534 U.S. 438, 450 (2002). "When a statute includes an explicit definition, [the court] must

follow that definition, even if it varies from a term's ordinary meaning." *Digital Realty Tr., Inc. v.*

*Somers*, 138 S. Ct. 767, 776 (2018); *see also Stenberg v. Carhart*, 530 U.S. 914, 942 (2000). As

the Seventh Circuit has explained, "it is not our place to tinker with the unambiguous definition

provided by Congress." *Valero Energy Corp. v. United States*, 569 F.3d 626, 632 (7th Cir. 2009).

"Where a law is plain and unambiguous, whether it be expressed in general or limited

terms, the legislature should be intended to mean what they have plainly expressed, and conse-

quently no room is left for construction." *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 187

---

[5] Defendants' citation (at 9) to cases treating a labor antitrust exemption as an element of a claim does not help them. First, as discussed, antitrust exemptions are defenses. Second, courts treated that labor exemption differently because it concerned a particular public policy against discouraging amicable resolution of labor disputes, where "the accommodation between federal labor and antitrust policy is delicate." *Connell Constr. Co. v. Plumbers & Steamfitters Loc. Union No. 100*, 421 U.S. 616, 636 (1975). In addition, other courts regard the labor exemption as an affirmative defense. *See, e.g.*, *Am. Steel Erectors, Inc. v. Loc. Union No. 7*, 536 F.3d 68, 75 (1st Cir. 2008). The other cases Defendants cite (at 22) are no more helpful. *See Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 692 (7th Cir. 2008) (*en banc*); *Gordon v. Softech Int'l, Inc.*, 726 F.3d 42, 50 (2d Cir. 2013). Neither case even addresses antitrust law. *Boim* addressed whether the defendant committed an offense in the first place (support of terrorist organizations), rather than whether an exemption applied. *Gordon* was an appeal from summary judgment.

n.8 (2004). Where "the statutory language is unambiguous," the "inquiry ceases." *Barnhart*, 534 U.S. at 450. Only if the statute's plain language leads to an absurd result does the court resort to legislative history. *Id*. at 459. Any such absurdity would have to be "so gross as to shock the general moral or common sense." *Id*. at 450.

In addition, antitrust exemptions are to be narrowly construed—that is, against the defendant. *See Grp. Life & Health Ins. Co. v. Royal Drug Co*., 440 U.S. 205, 231 (1979). "[A]ny exemptions from the antitrust laws are to be construed narrowly, 'with beady eyes and green eyeshades.'" *Greater Rockford*, 998 F.2d at 399 (quoting *Chicago Prof'l Sports Ltd. P'ship v. NBA*, 961 F.2d 667, 672 (7th Cir. 1992)).

Plaintiffs show below that Defendants commit the same two basic interpretative errors as to each aspect of the Exemption's plain and unambiguous language at issue here: they first *ignore* the language that *is* in the statute, and then they propose to *add* language that is *not* in the statute. Defendants thus repeatedly torture the statute to justify their unlawful behavior.

*First*, as to "need-blind," Defendants begin by ignoring the statutory definition, arguing that the supposed "ordinary meaning" of "need-blind" controls. They are wrong about that meaning, but more fundamentally, the definition's language controls. Defendant then *change* the statutory definition, which reads "financial circumstances," into "financial need." The statute does not say this. Defendants then *manufacture* a short list of sources that admissions officers supposedly could not view. The statute does not say this either. *See* Part II.B.1, below.

*Second*, as to the meaning of "2 or more institutions" and "all students," Defendants first *eliminate* these words from the statute. Defendants *manufacture* a supposed requirement of actual knowledge whereby one institution, among the "2 or more institutions," can invoke the Exemption unless it knew the *other* institutions were not need-blind. The statute contains *no* such language.

The term "all students" is unambiguous: If some Defendants are not admitting "all students" on a need-blind basis, then none can claim the exemption. *See* Part II.B.2, below.

*Third*, not content with having read the word "all" out of the statute once already, Defendants *eliminate* waitlisted students from among the meaning of "all" students. The statute's plain and unambiguous language says otherwise. Defendants thus *manufacture* a supposed exception, arguing in effect that the Court should transpose onto the Exemption a "waitlist" exception that existed in a settlement agreement negotiated before the Exemption was enacted. The statute contains *no* such exception. *See* Part II.B.3, below.

### 1. There Is No Ambiguity in the Statutory Definition and Meaning of "Need-Blind"

Defendants are trying to define a term using words *other than the very definition* Congress provided. They argue (at 12) that "need-blind" is limited to "disfavoring applicants because they need financial aid." As a threshold matter, given a finite number of undergraduate seats at each Defendant, the premise that favoring wealthy students does not necessarily involve disfavoring less wealthy students is logically nonsensical: every student admitted with regard to wealth is one fewer spot for a student in need. *See, e.g.*, AC ¶¶ 164, 167, 190. Defendants' motion thus fails under their own misinterpretation of the statute.

Defendants' reading of the Exemption is also contrary to its plain meaning. Under the statute's explicit definition of "need-blind," which controls, "need-blind" means "without regard to the financial circumstances of the student involved or the student's family." These are not peculiar or ambiguous terms.[6] A school is acting in a "need-blind" manner with respect to a student if and

---

[6] Defendants' citation (at 10, 12, 13) to *Bond v. United States*, 572 U.S. 844 (2014), does not help them. The *Bond* Court determined that a statutory definition was ambiguous, and created an absurd result, and thus looked to the term's "ordinary meaning" to resolve the ambiguity. *Id.* at 859-62. The Court stated

only if, in deciding whether to admit the student, the school does not give any attention or consideration to the "financial circumstances" of the student or the student's family.

Ignoring this definition, Defendants (at 10-12) simply *change* the term "financial circumstances" to "financial need." Defendants then argue (at 14), without any basis in the statute's terms, that "giving preferences to relatives of potential donors would be consistent with the statutory plain meaning of 'need-blind.'" Defendants argue *as if* Congress had required them to admit only "all *financial aid* students" without regard to their financial circumstances—but Congress plainly did not say that. Congress did not permit collaborating universities to admit students with regard to their or their family's *favorable* "financial circumstances." Defendants' reading cannot stand under the rules of interpretation. "We will not interpret a statute in a manner that renders part of it irrelevant, particularly where, as here, the statute has an unambiguous meaning if we simply apply the definition provided in the statute itself." *Papazoglou v. Holder*, 725 F.3d 790, 794 (7th Cir. 2013).[7]

_____

that "it is not unusual to consider the ordinary meaning of a defined term, *particularly when there is dissonance between that ordinary meaning and the reach of the definition*." *Id.* at 861 (emphasis added). Where the plain language is unambiguous, as here, the "inquiry ceases," and evaluation of a term's ordinary meaning is not appropriate. *Barnhart*, 534 U.S. at 439.

[7] Defendants are also wrong about the supposedly ordinary or common meaning of "need-blind." Former Yale president Kingman Brewster, for example, described Yale's pre-Cartel "need-blind" policy as one in which "*the pocketbook was no longer relevant to admission*"—"*the privileged took pride in the feeling that [they] had made it on the merits rather than on the basis of something ambiguously called 'background.'*" Geoffrey Kabaservice, *The Guardians: Kingman Brewster, His Circle, and the Rise of the Liberal Establishment* 264 (2004) (emphasis added). Similarly, in *Brown*, the court described MIT's "need-blind admissions system" as one where admissions are "*based entirely on merit*, without consideration of an applicant's ability to pay tuition," where "*financial status is irrelevant*." 5 F.3d at 661-62 (emphasis added). And as just one recent example among *many*, in January 2018, an industry commentator stated: "Elite universities have increasingly adopted need-blind admissions, which is the practice of disregarding economic factors when looking at prospective applicants," thus excluding "giving preference to students with higher family income even if they are less qualified." Collin Hong, *Need-Blind Admissions Advantages Wealthy Applicants*, VANDERBILT POLITICAL REVIEW (Jan. 1, 2018). Defendants are also wrong in arguing that the 2006 GAO Report uses their definition of "need-blind." The report describes the Exemption as applying to "schools that admit students without regard to ability to pay." 2006 GAO Rpt. at 1. The assessment of a student's "ability to pay" includes the consideration of their monetary and pecuniary resources, regardless of whether they seek financial aid. "Ability to pay" means wealth. So here again Defendants take the plain

Defendants then *manufacture* (at 9) a short list of sources that admissions officers supposedly cannot view, and the supposed state of mind that such officers must avoid, if their university is claiming the Exemption: that the only materials such officers cannot review are "financial aid applications or by using 'the financial circumstances of the student involved or the student's family' as a proxy for whether the student will need financial aid." These supposed categories of documents, and this supposed actual-knowledge requirement, are not found *anywhere* in *any* statutory text. Defendants' phrasing is entirely their own creation.

The statutory definition of "need-blind" does not lead to any "absurd" result. Defendants argue otherwise (at 13) on the premise that, under the Exemption's plain language, they cannot recognize "the comparative strength of applicants who overcome less privileged backgrounds to achieve academic success." Defendants here overlook that Congress has used the same "without regard to" language for decades in anti-discrimination laws and policies. These statutes require that decisions be made "without regard to" factors of race, ethnicity, sex, and other classifications. Courts have allowed consideration of those factors to effectuate statutory protection of a *disadvantaged* group (here, lower-income students), but found it impermissible to use that classification to favor an *advantaged* group (here, wealthy students).[8] In line with these well-established usages,

---

language and give it their own meaning—they want "without regard to ability to pay" to mean "without regard to *inability* to pay." The report did not say that.

[8] *Compare, e.g., United Steelworkers of Am., AFL-CIO-CLC v. Weber*, 443 U.S. 193, 208 (1979) (finding Title VII's prohibition against racial discrimination, which requires employment decisions to be made "*without regard to* race, color, religion, sex, sexual orientation, gender identity, or national origin," permits "private, voluntary, race-conscious" plans to correct a racial imbalance, in accordance with Congress's intent) *with, e.g.*, Executive Order 10925 (signed by President Kennedy on March 6, 1961) (requiring that government contractors "take affirmative action to ensure that applicants are employed, and employees are treated during employment, *without regard to* their race, creed, color, or national origin").

the words "without regard to" clearly mean the Exemption allows Defendants to *help* applicants with lesser "financial circumstances" but not *favor* the financially privileged.[9]

Defendants' interpretation of "need-blind," in contrast, *does* lead to absurd results. Defendants insist (at 14) that they must disregard *only* what *they* consider to be "*relevant* 'financial circumstances,'" and that their "[c]onsideration of applicants' economic background for reasons unrelated to their need for financial aid . . . is irrelevant under Section 568." Defendants receive thousands of qualified applicants every year and could fill every freshman class with qualified, full-paying students. *See Brown*, 5 F.3d at 661. If "need-blind" permitted Defendants to favor financially advantaged students, then Defendants could receive the protection of the Exemption while admitting a class comprised almost entirely of students whose financial circumstances allow them to pay full tuition. *See id*. ("MIT could fill its entire entering class with students able to pay the full tuition."). They would be flipping the Exemption's protection of "all students" on its head without providing financial aid to those with lesser financial circumstances.

### 2. There Is No Ambiguity in Whether the Students at Each Participating School Are Among "All" Students

Defendants unreasonably argue (at 19-22) that the Exemption protects "need-blind schools that lack actual knowledge that any other participating school is not need-blind." For one thing, each Defendant always knew *it* was never need blind. Moreover, Defendants did know that *other* participants were not need-blind. The Cartel meets at least twice a year. AC ¶ 113; *see also id*. ¶¶ 7, 121, 264. Defendants claimed to be monitoring the activities of Cartel members by obtaining

---

[9] Defendants' argument also fails on its own terms. "The absurdity bar is high, as it should be. The result must be *preposterous*, one that no reasonable person could intend." *Tavistock Rest. Grp., LLC v. Zurich Am. Ins. Co.*, 2021 WL 1614519, at *3 (N.D. Ill. Apr. 26, 2021) (quotations omitted) (emphasis added). As to Defendants' interpretation, it would not be "preposterous" for Congress to bar any consideration of financial circumstances. This language, however, does not bar universities from considering applicants' strengths in overcoming adversity or helping others overcome adversity, such as homelessness, poverty, substance abuse, gun violence, or other forms of family or community trauma.

annual "Certifications of Compliance." (It turns out this was window-dressing; they knew the certifications of compliance were false. *Id.* ¶¶ 157, 173, 177, 183.) Defendants joined the Cartel on the premise that each member was need-blind, and thus reasonably assumed a duty to ensure compliance, *Nat'l Broiler Mktg. Ass'n v. United States*, 436 U.S. 816, 828-29 (1978), or else accept the consequences of non-compliance. This result is no different from the well-established law holding a defendant liable for the acts of even those co-conspirators whose conduct the defendant did not direct or specifically know was happening. *See* Parts V.B & C, below.

In addition, Defendants' interpretation again *invents* requirements that do not exist in the Exemption's language and *ignores* the statute's express use of the word "all." (It also *ignores*, as shown below, the allegations that Defendants possessed such knowledge.) Defendants have no reasonable basis to complain (at 21-22) that "the exemption would require scrupulously monitoring the admissions practices of every other member." By its plain terms, the Exemption applies *only* to an agreement between "2 or more institutions of higher education" that admit "all" students on a need-blind basis. Where these conditions are unmet, the plain and unambiguous language thus does not protect *any* institutions that have formed the agreement. The Exemption is inapplicable here because the Cartel includes universities that have *not* admitted all of their students on a need-blind basis; and, in fact, *not one* Defendant has admitted *all* of its own students on a need-blind basis. *See, e.g.*, AC ¶¶ 130, 134, 138, 143, 144-45, 157, 173, 177, 183. This interpretation does not lead to any "absurd" result.

*First*, it certainly would not be absurd to allow a member of a conspiracy of purportedly need-blind schools to benefit from the Exemption only if *all* the conspirators were need-blind. This serves to *maximize* the extent to which the benefiting schools are engaged in need-blind admissions. Indeed, there is another antitrust exemption that operates just this way. The Capper-Volstead

19

Act grants an exemption for agricultural cooperatives to agree on pricing and other matters, but only for cooperatives composed exclusively of qualifying "farmers." The exemption does not apply if a cooperative has admitted non-farmers, *"even one of them." Nat'l Broiler*, 436 U.S. at 828-29 (emphasis added); *accord In re Mushroom Direct Purchaser Antitrust Litig.*, 621 F. Supp. 2d 274, 285 (E.D. Pa. 2009). So it is here: *no* Defendant is exempt from antitrust liability if *even one* of the Cartel members failed to meet the statute's qualifications. There is no reason why an exemption in the Capper-Volstead Act may cover "unwitting conspirators," as Defendants say, but an exemption in the Sherman Act may not. The participation of even one non-need-blind university is conduct "Congress clearly did not intend to protect." *Nat'l Broiler*, 436 U.S. at 828.

*Second*, without any requirement of actual knowledge, Defendants are subject to liability. There is "no basis for supposing" that Congress intended any change in the antitrust doctrine that would apply if the Exemption did *not* apply. *United States v. McKesson*, 351 U.S. 305, 310-11 (1956); *accord In re Wheat Rail Freight Rate Antitrust Litig.*, 579 F. Supp. 517, 539-40 (N.D. Ill. 1984), *aff'd*, 759 F.2d 1305 (7th Cir. 1985). Instead, "Congress has marked the limitations beyond which price fixing cannot go," such that the Court is "not only bound by those limitations," but also "bound to construe them strictly." *McKesson*, 351 U.S. at 316. Congress did not "create a category of agreements which are outside the exemption . . . but should nevertheless be spared from application of the per se rule." *Id*. at 311. Under antitrust doctrine, to state a claim Plaintiffs need not allege that each Defendant knew about any failure to make need-blind admissions; Plaintiffs must allege, as they do, only that each Defendants entered into an agreement to fix prices. *See* Part III, below; *see also United States v. Sandoval-Curiel*, 50 F.3d 1389, 1392 (7th Cir. 1995) (co-conspirators liable as the result of acts of their co-conspirators, even if they lacked actual knowledge of those acts); *United States v. Ras*, 713 F.2d 311, 314 (7th Cir. 1983) (same).

### 3. There Is No Ambiguity in Whether Waitlisted Students Are Among "All" Students

Defendants argue, in a footnote (at 19 n.16), that the Exemption must be interpreted to create a carveout for the many thousands of waitlisted students at these universities each year. This again is not a reasonable interpretation of the word "all" in the Exemption. Defendants point to the statement of a single Congressman (Rep. Lamar Smith) that the statutory language was "modeled" on the Standards of Conduct negotiated between MIT and the Justice Department, which *permitted* waitlisted students to be admitted on a need-aware basis. AC ¶ 137. Those Standards of Conduct include "all" students "other than admitted from a wait list." The plain language of the Exemption, however, does *not* include that "other than" language. Where Congress knew of the MIT Standards (as reflected in the legislative history that Defendants cite), Congress clearly decided *not* to include any waitlist exception. Defendants' implied suggestion that Congress made a mistake is unreasonable because "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992). This interpretation does not lead to any "absurd" result, and Defendants do not appear to argue that it does. The decision to require universities to admit waitlisted students on a need-blind basis furthers—and, compared to the Standards of Conduct, *maximizes*—the extent to which any university invoking the Exemption must make need-blind admissions decisions.[10]

### 4. The Legislative History Is Unnecessary and, by Its Own Terms, Does Not Support Defendants' Interpretation

Where the Exemption is unambiguous, as shown above, any arguments about legislative history "are irrelevant." *United States v. Coscia*, 866 F.3d 782, 793 (7th Cir. 2017); *accord United States v. Gonzales*, 520 U.S. 1, 6 (1997); *Valero*, 569 F.3d at 634. With respect to the Exemption,

---

[10] If Defendants were correct, the waitlist exception could swallow the entire need-blind requirement; universities could change their admissions practices to rely much more heavily on waitlists.

moreover, the legislative history explicitly circles back to the statutory text. That is, the 1994 House Conference Report states: "The managers have decided against elaborating on the need-blind admissions standard in the statutory text." H.R. Conf. Rep. 103-761, 911-12, 1994 U.S.C.C.A.N. 2901, 3242-43. Congress deliberately short-circuited, through the legislative record, any attempt to reinterpret the statutory definition of "need blind basis."

### C.    Plaintiffs Plausibly Allege That All Defendants Have Been Need-Aware in Admitting Waitlisted and Transfer Students

Plaintiffs plausibly allege that Defendants have failed to conduct "need-blind" admissions—even under Defendants' misinterpretation—in admitting waitlisted and transfer students. *See* AC ¶¶ 138-44. Defendants misapply the pleading standards in arguing (at 17-19) that these allegations are insufficient or implausible. Such admissions decisions affect thousands of students each year. *See id.* ¶¶ 138, 144. One former Penn admissions officer stated that "admissions officers give a preference to full-paying student[s]" on the waitlist over those who need financial aid," a policy reflective of Penn's own admissions practices, *id.* ¶ 139; and another former Penn admissions officer, Sara Harberson, has stated that "[m]any need-blind universities are not open about their policies when it comes to whom they admit off the waitlist," *id.* ¶ 140. Plaintiffs also cite multiple statements by former Vanderbilt employees and on its website indicating that the school "reserved the right to be need aware" as to waitlisted students. *Id.* ¶¶ 141-42.

These waitlist admissions policies are pled as representative of those of the other Defendants. *Id.* ¶ 143. The reasonable inference is that these institutions still *do* practice need-aware admissions for waitlisted applicants. Indeed, Ms. Harberson made her statement regarding Penn in 2021, and it applied to "many need-blind universities," *id.* ¶ 140, and the reference to the Vanderbilt website is current, *id.* ¶ 141. Plaintiffs will also rely on substantial additional evidence that

Defendants make need-aware decisions for waitlisted and transfer applicants.[11]

The allegation that Defendants are engaged in need-aware admissions of waitlisted and transfer students is thus both specific and plausible. Defendants criticize Plaintiffs' "information and belief" pleading, citing *Heard v. Becton, Dickinson & Co.*, 440 F. Supp. 3d 960 (N.D. Ill. 2020), but that decision holds that the "*Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant." 440 F. Supp. 3d at 969; *accord Green v. Beth*, 663 F. App'x 471, 474 (7th Cir. 2016); *FirstMerit Bank, N.A. v. Ferrari*, 71 F. Supp. 3d 751, 757 (N.D. Ill. 2014). That is the case here, where the full extent to which Defendants make need-aware admissions of waitlisted and transfer students is within only their control.

### D. Defendants' Arguments About Their Other Admissions Practices Are No Basis for Dismissal

Defendants argue (at 16-17) that enrollment management ("EM") has nothing to do with admissions. Plaintiffs allege otherwise. Schools commonly use EM to base admissions decisions on a range of data, including students' finances. AC ¶¶ 154-55. Institutions use EM in part so they can "limit the number of financial-aid-eligible applicants who are admitted to the institution to achieve financial and budgetary objectives." *Id.* ¶ 155. A higher-education consultant to Columbia and Penn confirmed this use of EM. *Id.* ¶ 156. An enrollment manager interviewed in *The Atlantic* colorfully stated that "need-blind" institutions routinely use ability to pay as a driver in their admissions decisions and that their claims to the contrary are "bullshit." *Id.* ¶ 157. Plaintiffs have

---

[11] *See, e.g.*, A REPORT ON THE STATE OF FINANCIAL AID AT BROWN 5 (Apr. 2, 2012), https://www.academia.edu/5101402/A_Report_on_the_State_of_Financial_Aid_at_Brown (Brown is need-aware for transfer applicants, and Brown's program for students who delayed college (Resumed Undergraduate Education) "is need-blind only for the applicants who are admitted as freshmen").

23

adduced additional evidence that at least five Defendants' use of EM takes into consideration financial factors. *Id*. ¶¶ 156-62. These are more-than-plausible allegations.

Defendants also quibble with Plaintiffs' allegation that Columbia's School of General Studies does not practice need-blind admissions, which Plaintiffs support by citing an article in Columbia's student newspaper (the *Columbia Spectator*) published on November 14, 2017. *Id*. ¶¶ 146-49. Defendants' argument (at 19) is that the *article* is conclusory and unsupported, but this is not summary judgment; Defendants' argument does not make Plaintiffs' allegation *implausible*. In citing a case about pleading scienter under the securities laws, *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248 (N.D. Cal. 2000), Defendants invoke a standard that has no application here. In this Court, newspaper articles can support the plausibility of a plaintiff's allegation. *See, e.g.*, *Edmond v. City of Chicago*, 2018 WL 5994929, at *14 (N.D. Ill. Nov. 15, 2018); *Payne v. Cty. of Cook*, 2016 WL 1086527, at *16 (N.D. Ill. Mar. 21, 2016). Continuing to rely on a summary judgment-type standard, Defendants (at 19-20) import extrinsic evidence to argue that Plaintiffs' allegation about Columbia is wrong: a February 16, 2022, post-litigation purported "correction" to the 2017 article. To say the least, Plaintiffs are entitled to discovery on this "correction."[12]

Defendants further argue (at 20), incorrectly, that "Plaintiffs allege no facts at all as to the admissions practices of Caltech, Chicago, Cornell, Emory, Johns Hopkins or Yale." *All* Defendants "failed to conduct their admissions practices on a need-blind basis because *all* of them made

---

[12] The *Spectator's* article was corrected only after Plaintiffs filed their Complaint, and with an Editor's Note, not by the original author. The "correction" itself is unclear because it concedes that "General Studies does not offer full-need financial aid." Eli Lee, *Public Health professor Lisa Rosen-Metsch appointed dean of General Studies*, COLUMBIA SPECTATOR (Nov. 14, 2017) (updated Feb. 16, 2022). The "correction" is extrinsic evidence in defense, not suited for consideration on a motion to dismiss. *See Hakim v. Accenture U.S. Pension Plan*, 2009 WL 10740578, at *2 (N.D. Ill. Feb. 4, 2009); *Burke v. 401 N. Wabash Venture, LLC*, 2011 WL 2565896, at *4 (N.D. Ill. June 28, 2011), *aff'd*, 714 F.3d 501 (7th Cir. 2013).

admissions decisions taking into account the financial circumstances of applicants and their families, through policies and practices that favored the wealthy and disfavored those needing aid." AC ¶ 134. Plaintiffs point to evidence these practices exist at every university, for every year, including for waitlisted and transfer students. *See id.* ¶¶ 130, 134, 138, 143-45, 157, 173, 177, 183.

## III. PLAINTIFFS STATE A *PER SE* CLAIM UNDER THE SHERMAN ACT

The resolution of which mode of analysis to apply to a Section 1 claim—*per se* treatment, the "Quick Look" analysis, or the Rule of Reason—is a fact-intensive question unsuited for a motion to dismiss. *See Delta Dental*, 484 F. Supp. 3d at 634-35. Defendants' heavy, misplaced reliance on *Brown* highlights that the appeal in that case was based on the detailed factual record of *a ten-day bench trial*, and then remanded for still further fact-finding *See* 5 F.3d at 664. The question now is whether Plaintiffs have plausibly alleged facts under which the *per se* rule could apply. *See id*. They have.

### A. With No Exemption, the *Per Se* Rule Applies

Defendants argue (at 23-24) that "Congress has approved of arrangements like the Consensus Methodology," but it did so only in connection with *creating* the Exemption. "[C]onduct which does *not* satisfy the provision creating immunity should be analyzed according to traditional antitrust principles." *Wheat Rail*, 579 F. Supp. at 540 (emphasis added); *accord McKesson*, 351 U.S. at 310-11. "Per se illegal conduct remains per se illegal in the context of a regulatory scheme which creates an express exemption." *Wheat Rail*, 579 F. Supp. at 539. Without protection of the Exemption, Defendants' conduct falls under the rule that horizontal restraints are "unreasonable *per se*." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283-84 (2018) (quotations omitted); *accord Always Towing*, 2 F.4th at 704-05; *Delta Dental*, 484 F. Supp. 3d at 634-35.

Defendants argue (at 23-24) that "*per se* treatment is inappropriate where Congress has recognized the procompetitive benefits of the challenged conduct," citing *Broadcast Music, Inc.*

25

*v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 13 (1979). But Congress never suggested that a price-fixing conspiracy among *non-need-blind* institutions had any redeeming competitive virtues. *Broadcast Music* involved the creation of a blanket license, which was an entirely new product that could not exist without pricing agreements. There is no similar new product here. Even more to the point, the blanket license in *Broadcast Music* conformed to a consent decree; the CM does not conform to the Exemption precisely because it is not exclusively among need-blind institutions that admit all students on a need-blind basis.

Defendants also claim (at 26) that their use of the CM "leaves ample room for competition." However, "it was settled shortly after the Sherman Act was passed that it is no excuse that the prices fixed are themselves reasonable," *Trial Lawyers*, 493 U.S. at 424 (quotations omitted), and, as shown above, it is *per se* unlawful for horizontal competitors to agree to apply a "formula" by which they set prices. This precedent defeats Defendants' suggestion (at 26) that Plaintiffs would have to show "an agreement to engage in coordinated price increases." The Cartel's use of the CM raises, fixes, pegs, or stabilizes prices for financial-aid packages, AC ¶¶ 123, 124, 129, and seeks to "reduce variance" and "diminish or eliminate divergent results," *id*. ¶¶ 126-28. In their own words, Defendants have agreed to "'ask the family to contribute *the maximum that they are capable of, according to that formula*.'" *Id*. ¶ 129 (emphasis added). Defendants ignore (as at 25) that this joint agreement creates a price floor, which is an artificial restriction on competition.[13]

---

[13] In addition, Defendants do not claim any exception to the *per se* rule. Plaintiffs do not allege, and it would be untrue, that their horizontal agreement is *essential* for Defendants even to offer their educational services, *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 203 (2010); that Defendants would somehow be *unable* to negotiate financial-aid packages with admitted students on an individual basis, *see Broad. Music*, 441 U.S. at 22-23; or that Defendants jointly participate in the marketplace as a *single* competitor and *financial investors* in the Cartel, *Am. Needle*, 560 U.S. at 195-99; *Texaco Inc. v. Dagher*, 547 U.S. 1, 5-6 (2006). Plaintiffs do not allege that Defendants have pooled their profit, shared any risk of loss, or provided a joint product, in competition with some *other* product. *Cf. Dagher*, 547 U.S. at 6.

## B.     The Third Circuit's *Brown* Decision Does Not Preclude *Per Se* Treatment

Defendants (at 23-29) mainly argue against the *per se* rule by citing *Brown*. This decision is no basis for rejecting the *per se* rule here, let alone as a matter of law.

*First*, Plaintiffs plausibly allege facts that are the *opposite* of the rationale for the holding in *Brown*. The Third Circuit treated the Overlap Group as a charitable organization and, in that regard, stated it would not conclude that "commercially motivated conduct of such organizations should be immune from *per se* treatment"; the "*alleged* pure altruistic motive and *alleged* absence of a revenue maximizing purpose" led the court to remand for factual analysis under the Rule of Reason. *Brown*, 5 F.3d at 672 (emphasis added). That analysis never happened, because the case settled. Here, Plaintiffs allege that Defendants engage in "commercially motivated conduct," do *not* behave with "pure altruistic" motives, and *do* act with a "revenue maximizing purpose." AC ¶¶ 129, 131, 134-84, 255-57.

Defendants' agreement to make students and families pay the *maximum* they can afford to pay is commercially motivated, not "altruistic," and is "revenue maximizing." *Id*. ¶¶ 129, 138-38. The same is true for Defendants' efforts to enroll the highest academic performers and student-athletes to maintain the schools' prestige and influence, and thereby attract donations and increase their endowments. *Id*. ¶ 131. Unlike the Overlap Group, the Cartel does not have a collective "policy of allocating financial aid solely on the basis of demonstrated need." *Brown*, 5 F.3d at 674-75; *see also* AC ¶ 254. Instead, at least several Defendants award millions of dollars in athletic and merit scholarships every year. *Id*. ¶ 254. And because Defendants "generated or have the ability to generate revenue that well exceeds expenses on an annual basis," they would have been able to devote more resources for financial aid if they had competed rather than colluded. *Id*. ¶ 257. The same is true of Defendants' use of EM, which has the effect of limiting "the number of financial-

aid-eligible applicants who are admitted to the institution to achieve financial and budgetary objectives." *Id.* ¶¶ 153-63. Defendants' decisions to shield and grow their endowments, rather than provide more scholarship aid or lower prices, further show that they are not driven by a "pure altruistic motive" and that they are "revenue maximizing." *Id.* ¶¶ 258-59. In short, accepting *Brown*'s analysis, under the fact alleged here, counsels in *favor* of the *per se* rule.

*Second*, "[w]hether an antitrust violation exists necessarily depends on a careful analysis of market realities. *If those market realities change, so may the legal analysis*." *Alston*, 141 S. Ct. at 2158 (citations omitted) (emphasis added). Plaintiffs allege that the "market realities" since *Brown* have changed *substantially*. *Cf. id.* ("When it comes to college sports, there can be little doubt that the market realities have changed significantly since 1984."). Defendants cannot reasonably bemoan that they face "the unfortunate fact that financial aid resources are limited," *Brown*, 5 F.3d at 677, where they now have more than *$233 billion* in assets under management. AC Appendix A, at 72-74. For those Defendants for which operating expense data are publicly available, the growth in the schools' endowments has far outpaced the growth in the schools' annual operating expenses, leaving the endowments an "increasingly ample financial resource for the schools to use to meet the financial needs of their students." AC ¶¶ 255-57. Defendants' lack of a "pure altruistic motive," and successful efforts to be "revenue maximizing," are changed "market realities" that further support application of the *per se* rule.

*Third*, the Third Circuit erred in its analysis of the *per se* rule.[14] The Overlap Group's purported altruism was no basis for avoiding antitrust liability for price fixing: "No matter how

---

[14] Defendants argue (at 26) that the Supreme Court has "favorably described *Brown*," but the Court did no more than cite the case as distinguishing Supreme Court holdings regarding professional associations, *see Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770-71 (1999), and on grounds that do not apply to Defendants, who do act out of strong economic self-interest.

altruistic the motives of respondents may have been, it is undisputed that their immediate objective was to increase the price that they would be paid for their services." *Trial Lawyers*, 493 U.S. at 427. The Third Circuit nevertheless concluded that "when bona fide, non-profit professional associations adopt a restraint which they claim is motivated by public service or ethical norms," then "it is proper to entertain and weigh procompetitive justifications." *Brown*, 5 F.3d at 672. The first flaw in this logic is that the court did not even conclude that the Overlap Group was a "professional association," and it was not. Instead, the court analyzed MIT as a charitable "organization," *id.*, but as the court itself acknowledged, *id.*, there is no antitrust immunity for non-profit entities. *See Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 349-52 (1982); *Goldfarb v. Va. State Bar*, 421 U.S. 773, 786-87 (1975).[15] Nor did the court find that the Overlap Group possessed any of the critical characteristics of professional associations. Here, Defendants do not even claim that the Cartel is a "professional association." Plaintiffs are not aware of any case since *Brown* holding that the *per se* rule does not apply to "charitable" or "altruistic" defendants. To the contrary, for example, the courts regularly apply the rule to non-profit hospitals.[16]

## C.   No Other Precedent Precludes *Per Se* Treatment in This Case

Defendants argue (at 31) that the courts lack significant experience in this area, but the Supreme Court has rejected the notion that the *per se* rule "must be rejustified for every industry

---

[15] The "main efficiency rationale" for applying the antitrust laws to for-profit firms applies equally to non-profit firms. Thomas J. Philipson & Richard Posner, *Antitrust in the Not-for-Profit Sector*, 52 J. L. & Econ. 1, 18 (Feb. 2009). Citing collusion among universities in particular, the authors conclude: "Because promoting competition turns out to be socially valuable *regardless of the particular objectives of producers,* the fact that antitrust law does not distinguish between the two sectors is efficient." *Id.* (emphasis added).

[16] *See, e.g.*, *Fleischman v. Albany Med. Ctr.*, 728 F. Supp. 2d 130, 162 (N.D.N.Y. 2010); *Doe v. Ariz. Hosp. & Healthcare*, 2009 WL 1423378, at *3 (D. Ariz. Mar. 19, 2009); *New York ex rel. Spitzer v. St. Francis Hosp.*, 94 F. Supp. 399, 413 (S.D.N.Y. 2000).

that has not been subject to significant antitrust litigation." *Maricopa*, 457 U.S. at 350-51 (quotations omitted). Defendants' argument "ignores the rationale for *per se* rules, which in part is to avoid the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable." *Id*.; *accord United States v. Joyce*, 895 F.3d 673, 678 (9th Cir. 2018). This case is about price fixing, and whatever "peculiar problems and characteristics" may inform a given marketplace, "the Sherman Act, so far as price-fixing agreements are concerned, establishes one uniform rule applicable to all industries alike." *Maricopa*, 457 U.S. at 349.[17]

### D. Plaintiffs' Per Se Claim, At A Minimum, Raises Critical Fact Issues

"*Per se* rules may require considerable inquiry into market conditions before *the evidence* justifies a presumption of anticompetitive conduct." *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 104 n.26 (1984) (emphasis added). The ten-day trial in *Brown*, as noted, illustrates this principle; and even that wasn't enough, as there was a remand for more fact-finding. *See* 5 F.3d at 664. This Court has thus declined to dismiss *per se* claims where discovery would bear on the propriety of applying the rule. *See Delta Dental*, 484 F. Supp. 3d at 634-36. The Court thus need not resolve now which mode of analysis applies. *See City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 754 (N.D. Ill. 2019) (collecting authority). Where Defendants dispute the relevant allegations, Plaintiffs should be permitted discovery on whether and how Defendants

---

[17] Defendants (at 24) cite *Bunker Ramo Corp. v. United Business Forms, Inc*., 713 F.2d 1272 (7th Cir. 1983), for a contrary proposition, but this decision did not concern any scheme to set, peg, or stabilize prices, and thus the court did not even apply the Sherman Act. *See id*. at 1284. In addition, since that decision, the Third Circuit decided *Brown*, which did not rule out the *per se* rule based on any lack of judicial experience. Defendants' reliance (at 26) on *Cal. Dental*, 526 U.S. at 770-71, is similarly misplaced. That case concerned advertising restrictions intended to prevent consumer fraud and distinguished such provisions from the types of direct agreements to fix prices or discounts at issue here

could have been applying their price-fixing formula from a "pure altruistic motive" and in the "absence of a revenue maximizing purpose," *Brown*, 5 F.3d at 672, given their increasingly massive revenue generation and longstanding practices of need-aware admissions.[18]

## IV. IN THE ALTERNATIVE, PLAINTIFFS STATE A CLAIM UNDER THE "QUICK LOOK" OR RULE OF REASON ANALYSIS

### A. Plaintiffs State a Claim Under the "Quick Look" Analysis

Plaintiffs' claims, in the alternative, satisfy the "quick look" approach because Defendants' conduct is clearly anticompetitive. In that situation, the court considers whether the defendants have proffered "plausible" procompetitive effects. *Cal. Dental*, 526 U.S. at 770-71 (under "quick look," there is "no elaborate industry analysis" when "the great likelihood of anticompetitive effects can easily be ascertained); *see also Chicago Prof'l Sports*, 961 F.2d at 674-676 (finding quick-look analysis applicable after rejecting logic of proffered procompetitive justifications).

*First*, Plaintiffs sufficiently allege the Cartel, like nearly all cartels, has significant anticompetitive effects. In addition to the law on the effects of horizontal price-fixing agreements, as shown above, the Cartel *admits* that it reduces variance in prices. AC ¶¶ 126-27. This is plainly anticompetitive. *See, e.g.*, *Wilk v. Am. Med. Ass'n*, 895 F.2d 352, 360 (7th Cir. 1990). Yale has acknowledged the Cartel's harmful effects on prices, AC ¶ 124, and Plaintiffs plausibly allege the Cartel has had substantial anticompetitive effects for all students on financial aid. *Id.* ¶¶ 237-39. In citing (at 27) the existence of schools outside the Cartel, Defendants overlook that Plaintiffs

---

[18] It is readily apparent from Defendants' annual reports, which Plaintiffs will cite in support of their claims, that Defendants are business conglomerates, engaged in multiple lines of business: educational services; medical care (true of nearly all Defendants); government and business supported research; monetization of research through patent royalties and sales; commercial real estate operations; and, through their endowments, private equity, and venture capital.

31

need allege only "the rough contours of a relevant market," not "a precisely defined relevant market." *Republic Tobacco v. N. Atl. Trading*, 381 F.3d 717, 737 (7th Cir. 2004).[19]

*Second*, the notion that Defendants' price fixing is entitled to any procompetitive presumption is wrong; such a presumption arises for horizontal competitors only where they collectively offer a product that *would not even exist* without collusion. *See Am. Needle*, 560 U.S. at 203. Nor is there any suggestion in *Brown* that when competing universities engage in price fixing, they are *presumed* to be creating procompetitive effects. *Cf. Brown*, 5 F.3d at 664, 674. Defendants cite the 2006 GAO Report, for example, which disclaims that it was "not intended to address whether or not conduct may be taking place that might violate the antitrust laws in the absence of the exemption." 2006 GAO Rpt. at 3. In the report, moreover, the Cartel itself disclaimed that increasing access and affordability was even the point of the Exemption.[20]

*Third*, the Defendants have the burden to show procompetitive effects. They can only meet this burden by providing *empirical evidence*. *Cal. Dental*, 526 U.S. at 775 n.12 (the "quick look" analysis shifts "to a defendant the burden to show empirical evidence of procompetitive effects"); *see also NCCA*, 468 U.S. at 86. Moreover, a district court cannot resolve the sufficiency of any such evidence on a motion to dismiss. *See, e.g.*, *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 676 (7th Cir. 2016); *Butler v. Jimmy John's Franchise, LLC*, 331 F. Supp. 3d 786, 797 (S.D. Ill. 2018).

---

[19] *Accord P & M Distribs., Inc. v. Prairie Farms Dairy, Inc.*, 2013 WL 5509191, at *3 (C.D. Ill. Oct. 4, 2013); *Rock v. NCAA*, 2013 WL 4479815, at *10 (S.D. Ind. Aug. 16, 2013); *Peoria Day Surgery Ctr. v. OSF Healthcare Sys.*, 2009 WL 5217344, at *5 (C.D. Ill. Dec. 30, 2009).

[20] Allowed to comment, and unable to dispute the GAO's finding that the Cartel had no pro-competitive effects, the Cartel wrote: "[W]e did not interpret Congressional intent to have focused on making college more affordable for low-income students or other under-represented groups." 2006 GAO Rpt. at 81.

### B. Plaintiffs State a Claim Under the Rule of Reason Analysis

#### 1. Plaintiffs Plausibly Allege Anticompetitive Effects

If the Rule of Reason applies, Plaintiffs have met their pleading burden because they have alleged anticompetitive effects, both through direct effects on competition and through Defendants' exercise of market power. *See FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 461 (1986); *Republic Tobacco*, 381 F.3d at 737. In *Brown,* for example, neither the Third Circuit nor the district court required any formal market definition in assessing competitive effects. Plaintiffs plausibly allege both direct and indirect anticompetitive effects.

**Direct Anticompetitive Effects**. The Cartel has agreed on and jointly implemented and enforced the CM, which has fixed, increased, maintained, and stabilized net prices of attendance at "artificially high, non-competitive levels." AC ¶ 265. This has caused Plaintiffs to pay "more for attendance at Defendants than they would have paid and will pay but for the combination and conspiracy." *Id.* ¶ 266. The Cartel's website itself shows Defendants have eliminated competition in financial-aid offers to coalesce "around a uniform and lower level of aid to all prospective students." *Id*. ¶¶ 125, 127. Yale, Harvard, and Georgetown have all admitted that the Cartel operates to limit the financial aid that the Cartel would otherwise award. *See id*. ¶¶ 124-25, 129. These are directly anticompetitive effects. *See, e.g.*, *Wilk*, 895 F.2d at 360.

Plaintiffs also allege that direct anticompetitive effects resulted in part from Defendants' exchange of confidential and sensitive financial information, which Defendants admit (at 27) occurred. AC ¶¶ 7, 117, 193. Indeed, members of price-fixing arrangements frequently exchange information to police their agreements. *See, e.g. In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 368-69 (3d Cir. 2004). The exchange of price information and other competitive data by horizontal competitors can of itself significantly impair competition and constitute an unreasonable restraint of trade. *See, e.g.*, *United States v. Container Corp.*, 393 U.S. 333, 337-38 (1969); *Am. Column &*

*Lumber Co. v. United States*, 257 U.S. 377, 411-12 (1921); *Broiler Chicken*, 290 F. Supp. 3d 772, 781 (N.D. Ill. 2017) (motion to dismiss denied where plaintiffs' price-fixing allegation based, in part, on allegation that defendant chicken producers shared an "unusual" amount of information).

In citing (at 24) the finding in the 2006 GAO Report that "the antitrust exemption did not adversely impact the affordability of colleges and universities," Defendants present extrinsic evidence, which cannot support a motion to dismiss. In addition, the report sheds no light on the anticompetitive impact of the CM over the nearly *two-decade* period at issue here. One, the report was preliminary and covered only a single academic year (2004-05) of CM use. As a result, the report itself admitted that these limitations could "mask" the effects of the CM. 2006 GAO Rpt. at 71. Two, due to data limitations, the report was limited to only six of the Defendants (Cornell, Duke, Georgetown, Notre Dame, Vanderbilt, and Yale). Three, because Congress mandated the report, the Cartel knew it focused on only one year of CM use, which allowed them to account for that fact in making their financial-aid decisions. Four, the report states it was "*not intended to address whether or not conduct may be taking place that might violate the antitrust laws in the absence of the exemption.*" 2006 GAO Rpt. at 3 (emphasis added). Defendants thus address facts that, at minimum, *are* "subject to reasonable dispute." *Munguia*, 2010 WL 3172740 at *5.

Where Plaintiffs have thus plausibly alleged direct anticompetitive effects, they must allege only "the rough contours of a relevant market, and show that the defendant commands a substantial share of the market." *Republic Tobacco*, 381 F.3d at 737; *see also* Part IV.A, above. Plaintiffs show below that they do define a plausible, conventional market, and Defendants' substantial share of it, but at minimum they have plausibly alleged the "rough contours" of a relevant market.

**Indirect Anticompetitive Effects**. Plaintiffs have plausibly pleaded a relevant market for "undergraduate education at private national universities with an average ranking of 25 or higher

in the U.S. News & World Report rankings from 2003 through 2021 (the most recent year in which Class Members applied to any of Defendants)." AC ¶ 241. Defendants' argument (at 3) that the market must include public universities and liberal arts colleges lacks merit and is premature. On a substantial trial record, for example, *Brown* rejected this argument, holding plaintiffs had demonstrated a relevant market for higher educational consisting of what is commonly referred to as the "Ivy Plus." *Brown*, 5 F.3d at 673. Indeed, the court did *not* require the district court to conduct a detailed market analysis, because the "Overlap Agreement aims to restrain competitive bidding and deprive prospective students of the ability to utilize and compare prices in selecting among schools, it is anticompetitive on its face." *Id*. (quotations omitted). *Brown* further held, without any detailed market analysis, that the Overlap Group, paralleling the Cartel, collectively exerted market power. *Id*. at 666 n.7. These holdings alone show Plaintiffs' relevant market is plausible.

Plaintiffs further allege that two highly respected classification systems, the *Carnegie Classification* and *U.S. News*, classify universities and liberal arts colleges separately. AC ¶ 242.[21] Moreover, *Defendants themselves* acknowledge that they compete within the relevant market. *Id*. ¶ 251. Northwestern and Duke identify their competitors and market in a strikingly similar manner as Plaintiffs. *Id*. ¶¶ 248, 251. Indeed, the President of Northwestern identifies as competitors 24 of the 25 universities in the relevant market here. *Id*. ¶ 251. "Industry recognition is well established as a factor that courts consider in defining a market. . . . It is significant because we assume that the economic actors usually have accurate perceptions of economic realities." *Todd v. Exxon Corp.*, 275 F.3d 191, 205 (2d Cir. 2001) (quotations omitted). In addition, Elite, Private Universities possess characteristics, including admission and yield rates, differentiating them from other

---

[21] Defendants cite a website indicating that *U.S. News* considers the same factors in the weighting of both national universities and liberal arts colleges, https://www.usnews.com/education/best-colleges/articles/how-us-news-calculated-the-rankings, but *U.S. News* then conspicuously ranks them *separately*.

types of schools. AC ¶¶ 244-47, 249. Plaintiffs will also rely on substantial additional evidence supporting their market definition—including Defendants' further *admissions*.[22]

On Defendants' argument that non-market schools are substitutes, the relevant question, and a "deeply fact-intensive" one, *Olean Wholesale Grocery Coop., Inc. v. Agri Stats, Inc.*, 2020 WL 6134982, at *7 (N.D. Ill. Oct. 19, 2020), is whether there is "*sufficient* cross-elasticity of demand." *Todd*, 275 F.3d at 201 (emphasis added). That is, the existence of "some cross-elasticity of demand" between products does not mean they are sold in the same market. *Jamsports & Entmt. LLC v. Paradam Prod'ns*, 2003 WL 1873563, at *7 (N.D. Ill. Apr. 15, 2003) (Kennelly, J.). The analysis and resolution of these distinctions do not turn on intuition or mere defense arguments; they turn on discovery.[23] They require discovery. *See Olean*, 2020 WL 6134982, at *7; *Jamsports*, 2003 WL 1873563, at *6; *see also In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 54 (S.D.N.Y. 2012) (finding alleged market plausible and explaining that extent of substitutability between products at issue is among the "fruitful areas for discovery").

In *FTC v. Staples, Inc.*, 970 F. Supp. 1066 (D.D.C. 1997), for example, the court recognized a market of "office supply superstores" despite the existence of competing office supply catalogs, Walmart, and other national and local office supply stores that sell similar products. *See id.* at

---

[22] *See, e.g.*, John J. DeGioia, *Student Town Hall Meeting on the Implications of the Financial Crisis* (Mar. 2, 2009) (Georgetown competes "among the top 25 universities in the nation"); *Need-Blind Admissions and the Drive to Increase Endowed Scholarships* (Oct. 13, 1999) (former Penn President Judith Rodin explains that Penn's peer group in providing financial aid is the "Ivy-plus cohort").

[23] *See Heritage Guitar, Inc. v. Gibson Brands, Inc*., 2022 WL 1954361, at *4-5 (W.D. Mich. June 6, 2022) (plausible market for "premium" solid-body single and double "cutaway" electric guitars; whether the market should be broadened to include other guitars "need not be determined on the pleadings"); *see, e.g.*, *Photovest Corp. v. Fotomat Corp*., 606 F.2d 704, 713-14 (7th Cir. 1979) (drive-through photo processing distinct from photo processing generally); *Avenet, Inc. v. FTC*, 511 F.2d 70, 77 (7th Cir. 1975) (new parts distinct from rebuilt parts); *In re Local TV Advert. Antitrust Litig.*, 2020 WL 6557665, at *12 (N.D. Ill. Nov. 6, 2020) (broadcast television spot advertisements distinct from other forms of advertisement); *Olean*, 2020 WL 6134982, at *7 (turkey-meat consumption in the United States distinct from consuming many other foods); *see also Meyer v. Kalanick*, 174 F. Supp. 3d 817, 827-28 (S.D.N.Y. 2016) (app-generated ride-share services distinct from taxis and car services).

1079-80. The defendants' own documents regarding competitive strategy "focus[ed] primarily on competition from other superstores." Plaintiffs similarly allege Defendants' strategies focus on other Elite, Private Universities. AC ¶ 251. Whatever theoretical degree of competition Defendants allege they face from liberal arts colleges or public universities, students accepted to both Elite, Private Universities and colleges or public universities opt to attend the Elite, Private Universities. Plaintiffs thus plausibly allege, as the FTC showed for the market in *Staples*, 970 F. Supp. at 1079-80, that a small but significant non-transitory price increase would not lead prospected or admitted students to choose substitutes. AC ¶¶ 243-46.

### 2. Defendants Cannot Show Procompetitive Effects

Defendants insist (at 1, 24, 29) their use of the CM is procompetitive because it leads to "fairer" results and makes education more accessible. This is essentially the same argument that MIT asserted in *Brown*, and that the Third Circuit remanded for factual development on the premise that horizontal agreement *may* "increase[e] financial aid for needy students." 5 F.3d at 674 (emphasis added). These arguments are no basis for dismissing Plaintiffs' claims.

*First*, as shown above, an affirmative defense does not resolve a motion to dismiss. Where anticompetitive effects exist, the "burden shifts to the defendant to show a procompetitive rationale for the restraint." *Am. Express*, 138 S. Ct. at 2284. The courts do not balance those alleged effects at this stage.[24] Indeed, *Brown* did not make findings regarding procompetitive justifications, but instead remanded for further fact-finding.

---

[24] *See, e.g.*, *Moehrl*, 492 F. Supp. 3d at 782-83 (where defendants argue their alleged actions "have a procompetitive effect on balance, the Court will not consider such arguments at this stage"); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 360 F. Supp. 3d 788, 803 (N.D. Ill. 2019) (same); *Cook Inc. v. Boston Sci. Corp.*, 2002 WL 335314, at *4 (N.D. Ill. Feb. 28, 2002) (same); *see also Butler,* 331 F. Supp. 3d at 797 (holding "the Court cannot decide at this early stage in the proceedings which rule will apply," where discovery would bear on whether defendant "carries its burden under the quick look approach" to show procompetitive effects).

*Second*, any procompetitive effect would not warrant *dismissal*, even if (unlike here) it had been "proven" with "evidence," *Alston*, 141 S. Ct. at 2162, where Defendants could have achieved such benefits through "substantially less restrictive means." *Id*. Plaintiffs plausibly allege that free competition among Defendants was "a reasonable and less restrictive alternative." AC ¶ 258. In claiming (at 1) to improve the "fair and efficient *allocation of aid*" (emphasis added), Defendants assume that their financial-aid budgets were, and still are, *immutably fixed.* That would *not* be the case if Defendants truly competed on price. *See Brown*, 5 F.3d at 679 (less restrictive means include "the free market coupled with MIT's institutional resolve"). Based on public information, if Defendants increased their annual spending rate from their unrestricted endowments from the current 4.5 percent annually to 6.5 percent,[25] then 9 of the 17 Defendants need not charge *anything at all* to their current students on financial aid, while the net price at the 8 others would fall by an average of almost $12,000 annually. (Litan Decl. Ex. F.) Defendants could do all this and *still grow their endowments*, since their long-run annual rate of return is between 8.4 and 10 percent.[26]

## V.     THE DEFENDANT-SPECIFIC ARGUMENTS ARE NO BASIS FOR DISMISSAL

### A.     Brown, Chicago, and Emory's "Withdrawal" Argument Fails

BCE argue (at 1-3) they "withdrew" from the Cartel more than four years before the Complaint, making the claims against them untimely. This argument fails. *First*, withdrawal from a conspiracy is an affirmative defense, *Smith v. United States*, 568 U.S. 106, 112 (2013), and the

---

[25] The 4.5 percent spending average is for schools with endowments of $1 billion or more, from American Council on Education, *Understanding College and University Endowments* 13 (2021), https://www.acenet.edu/Documents/Understanding-College-and-University-Endowments.pdf.

[26] The 8.4 percent figure is the 10-year average for 774 colleges, universities, and affiliated foundations from 2011 through 2020. NACUBO, *U.S. Educational Endowments Report 5.3 Percent Average Return in FY 2019* (Jan. 30, 2020), https://www.nacubo.org/Press-Releases/2020/US-Educational-Endowments-Report-5-3-Percent-Average-Return-in-FY19. Ivy league endowments earned a 10.9 percent rate of return from 1992 through 2013. Peter Mladina, Charles Grant, and Abdul Nimeri, *Illuminating the Returns of Elite Investors* (Apr. 2014), https://www.northerntrust.com/documents/commentary/investment-commentary/illuminating-returns-elite-investors.pdf.

disposition of an affirmative defense is not a proper subject on a motion to dismiss. *Allen*, 835 F.3d at 676. Whether a conspirator has withdrawn is a classic issue of fact. *See, e.g.*, *Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop.*, 2021 WL 409982, at *4-5 (E.D. Pa. Feb. 5, 2021) (summary judgment); *see also United States v. Bafia*, 949 F.2d 1465, 1480 (7th Cir. 1991); *Wolf v. City of Chicago Heights*, 828 F. Supp. 520, 523 (N.D. Ill. 1993).

*Second*, BCE bear the burden of proving they acted to defeat or disavow the purpose of the conspiracy. *Smith*, 586 U.S. at 113-14; *Watson Carpet & Floor Covering, Inc. v. Mohawk Indus.*, 648 F.3d 452, 457-58 (6th Cir. 2011). BCE attempt to distinguish *Smith* by contending withdrawal is an affirmative defense only for criminal conspiracies. They cite no case law for this distinction; there is none. The Sixth Circuit rejected this argument in *Watson Carpet*, reasoning that requiring a criminal defendant to bear the burden of proof of withdrawal is equally sensible for a civil defendant. *See* 648 F.3d at 457-58; *see also Winn-Dixie*, 2021 WL 409982, at *4-5.[27]

*Third*, BCE have not met their burden. BCE cite extrinsic evidence the Cartel's website stopped listing them, but even if that signaled the end of their involvement in the conspiracy, it is not "withdrawal." *United States v. Sax*, 39 F.3d 1380, 1386 (7th Cir. 1994). The conspirator must *also* perform an affirmative act to defeat or disavow the unlawful goal of the conspiracy. *United States v. Nagelvoort*, 856 F.3d 1117, 1128-29 (7th Cir. 2017). That act must be either alerting government authorities about the unlawful conduct or communicating to each of the other conspirators that the member has disavowed the conspiracy and its goals. *Sax*, 39 F.3d at 1386; *see*

---

[27] BCE's reliance on *McGarry & McGarry, LLC v. Bankr. Management Solutions, Inc.*, 937 F.3d 1056 (7th Cir. 2019), is misplaced. The court was not discussing antitrust injury as an element of the cause of action but rather whether the plaintiff had antitrust standing. BCE's citation to *Krause v. Perryman*, 827 F.2d 346 (8th Cir. 1987), also is inapplicable, because the court was not discussing the elements of a Section 1 claim.

also *United States v. Vallone*, 698 F.3d 416, 494 (7th Cir. 2012), *vacated on other grounds sub nom., Dunn v. United States*, 570 U.S. 901 (2013). BCE have not cited any such evidence.

Instead, BCE argue that Plaintiffs originally alleged that BCE "evidently" withdrew, but Plaintiffs did *not* allege—because it would have been untrue—that BCE had either alerted government authorities about the unlawful conduct or communicated to each of the other conspirators that they had abandoned the conspiracy and its goal. BCE also overlook the reasonable inference that Plaintiffs concluded for its controlling pleading that BCE had *not* withdrawn. On a motion to dismiss, the court gives effect to the current pleading. *Scott v. Chuhak & Tecson*, 725 F.3d 772, 782-83 (7th Cir. 2013).[28] If BCE did proffer any evidence of their withdrawal and disavowal, moreover, Plaintiffs would be entitled to discovery on the issue.

### B.     JHU's Particular Arguments Are No Basis for Dismissal

In the BCEJ brief, JHU argues (at 5) that it cannot be liable for the Cartel's acts before it joined, and that Plaintiffs cannot pursue their claims against it because no named Plaintiff was or is a student at JHU. These arguments fail.

*First*, one who joins an existing conspiracy becomes as liable for its misconduct as the existing members. *See United States v. Bengis,* 783 F.3d 407, 413 (2d Cir. 2015); *United States v. Cerrito*, 413 F.2d 1270, 1272 (7th Cir. 1969). The new conspirator becomes a party to and responsible for the other conspirators' prior and subsequent acts. *United States v. Hayes*, 391 F.3d 958, 963 (8th Cir. 2004) (a person who knowingly, voluntarily and intentionally joins an existing conspiracy is responsible for all of the conduct of the co-conspirators from the beginning of the conspiracy); *Hawk v. Perillo*, 642 F. Supp. 380, 387 (N.D. Ill. 1986).

---

[28] BCE cite *Tamayo v. Blagojevich*, 526 F.3d 1074 (7th Cir. 2008), but the court held only that the plaintiff's deletion of certain facts from the original complaint did not save the amended complaint from dismissal because *both* versions of the complaint failed to plead the requisite elements of the claim. *Id.* at 1083-92.

JHU wrongly argues (at 5) that to be held liable for the prior acts of the co-conspirators, it would have had to have actual knowledge that those acts were *unlawful* and cites to *Havoco of America, Ltd. v. Shell Oil Co.*, 626 F.2d 549 (7th Cir. 1980). *Havoco* instead held that "a co-conspirator who joins a conspiracy *with knowledge of what has gone on before and with an intent to pursue the same objectives* may, in the antitrust context, be charged with the preceding acts of its co-conspirators." *Id*. at 554 (emphasis added). This standard concerns knowledge of what the conspiracy was doing, not whether its acts were unlawful. Indeed, *Havoco* cites *Industrial Building Materials, Inc. v. Interchemical Corp.*, 437 F.2d 1336, 1343 (9th Cir. 1970), which held that the plaintiff had the right to prove at trial the agreement by the late-comer to become part of the conspiracy and, if proven, that defendant would be *retroactively liable* for the damages flowing from that conspiracy. Further, it is not essential for conspirators to have actual knowledge of the specific acts or the unlawfulness of the acts of their co-conspirators. *Sandoval-Curiel*, 50 F.3d at 1392; *Ras*, 713 F.2d at 314. In addition, Plaintiffs plausibly allege that JHU was aware of the Cartel and its purposes and intended to pursue the same ends. AC ¶¶ 102, 193.

*Second*, Plaintiffs are entitled to sue JHU, even if none of the named Plaintiffs are enrolled at JHU, because the Cartel members are jointly and severally liable. This makes JHU liable to the unnamed class members enrolled at JHU and to those enrolled at any of the Cartel members as of class certification. *See id*. ¶ 220; *see, e.g.*, *Greene v. Will*, 2013 WL 11233976, at *2 (N.D. Ind. Apr. 16, 2013) (a class period defined "to the present date" ends on "the particular date the formal class certification order is issued"). "Because antitrust liability is joint and several, a Plaintiff injured by one Defendant as a result of the conspiracy has standing to represent a class of individuals injured by any of the Defendant's co-conspirators." *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 508 (S.D.N.Y. 1996); *accord* NEWBERG ON CLASS ACTIONS § 2:3 (2020).

41

JHU is also wrong to suggest (at 5) that Plaintiffs claim injuries arising solely out of aid given to students during their first year. Plaintiffs seek damages for students who received financial aid and paid tuition to any Defendant at any time during the relevant period. The class members' injuries plausibly extend throughout their entire enrollment during which they receive financial aid, as the CM was used to calculate the financial aid awards given to the students during each year of their enrollment. *See* AC ¶ 266. In addition, two named Plaintiffs, Savannah Rose Eklund and Alexander Leo-Guerra, are enrolled at and expect to graduate from Columbia and Duke, respectively, in 2023. *Id*. ¶¶ 19, 21. These Plaintiffs may recover against JHU because the awards they received, and will continue to receive since JHU joined, are suppressed as a result of the conspiratorial acts for which JHU is jointly and severally liable.

*Third*, where there is a common scheme subject to common proof, or a "juridical link," the named plaintiffs' standing to sue all the defendants is an issue for class certification. *Snyder v. U.S. Bank N.A.*, 387 F. Supp. 3d 867, 873 (N.D. Ill. 2019) (Kennelly, J.); *see also In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d 704, 722 (N.D. Ill. 2016) (analyzing whether the named plaintiffs may assert the rights of absent class members under Rule 23). If certification is granted, the court may then analyze standing against particular defendants. *Snyder*, 387 F. Supp. 3d at 873. With respect to prospective certification, moreover, JHU has harmed all Class members who received financial aid in 2021-22 and 2022-23, and thus is properly a defendant on that basis alone. Class members who enrolled at JHU (or another Defendant) beginning in 2021-22 or 2022-23 do not have interests at odds with other class members—and JHU does not argue that they do.[29]

---

[29] JHU cannot mean that the named Plaintiffs must be current students to seek damages; that would lead to the absurd result that Defendants could avoid liability if the case were not resolved before the named Plaintiffs graduated. Even as to injunctive relief, "when the claim on the merits is capable of repetition, yet evading review, the named plaintiff may litigate the class certification issue despite loss of his personal stake in the outcome of the litigation." *Wacker Drive Exec. Suites, LLC v. Jones Lang LaSalle Ams. (Ill.)*,

### C. Yale's Particular Arguments Are No Basis for Dismissal

Yale argues in own brief (at 1-2) that because it stopped using the CM in 2008 or 2009, and because Plaintiffs supposedly have not alleged that Yale resumed using the CM, Yale cannot be liable for the damages the Cartel has caused. This is wrong on all counts.

*First*, as a factual matter, although Yale claims it has not been using the CM, its prior public statements are to the contrary, AC ¶¶ 123-24, as Plaintiffs repeatedly point out. Yale described the CM as a "one needs-analysis formula that *everyone* has to sign on to." *Id*. ¶ 124 (emphasis added). The reasonable inferences are that Yale had used the CM, knew the Cartel's purpose, and intended to advance that purpose. In addition, Yale admits it has been in the Cartel since 2018, *id*. ¶¶ 123-24, which means it continued to understand and advance the Cartel's objectives. *See also id*. ¶¶ 115, 128 (through their membership, all members of the 568 Group use the CM).[30] At the very least, the extent to which Yale continued to use the CM after 2018, and furthered the Cartel, are issues for discovery.[31]

*Second*, once a conspiracy is established, each member of the conspiracy is jointly and severally liable for the acts of the other conspirators. *Socony-Vacuum*, 310 U.S. at 253-54; *Marion*

---

*LP*, 2019 WL 2270000, at *4 (N.D. Ill. May 28, 2019) (quotations omitted). If on class certification the Court deems it necessary for a named Plaintiff to be enrolled at JHU, Plaintiffs would add such a plaintiff.

[30] Yale asserts Plaintiffs cannot allege its continuing use of the CM consistent with Rule 11, but Plaintiffs allege Yale's own words and actions. If Yale wants to claim a violation of that Rule, it has not followed proper procedure; a threat in a brief is, of course, not part of that procedure.

[31] Yale (at 1-2) cites H.R. Rep. 114-224 (2015) for the proposition that Congress found that some members of the 568 Group do not use the CM. This is wrong. There is nothing in the Committee Report that supports this statement, which Yale's own public statement contradicts. Indeed, there is no reference to any congressional fact-finding or investigation that led to any of the statements, on page 3 of the Report, that Yale cites; and nowhere in that Report is any statement that members of the 568 Group do not use a common formula. This contrasts with Plaintiffs' detailed allegations that all members of the Cartel have been using the CM. *See, e.g.*, AC ¶¶ 5-7, 115-18, 126-29. This is another issue for discovery.

*Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 839 (7th Cir. 2020). Yale has acknowledged it has been a member of the Cartel since at least 2018. Inasmuch as the other Defendants have used the CM and engaged in other conspiratorial acts, which damaged the Plaintiffs, their acts are attributable to all conspirators, including Yale. *See United States v. Newman*, 755 F.3d 543, 545 (7th Cir. 2014); *United States v. Read*, 658 F.2d 1225, 1230 (7th Cir. 1981).

This liability would attach, moreover, even if Yale did not actively use the CM. *See Smith*, 568 U.S. at 114 (defendant's responsibility for acts of conspiracy endure even if he is inactive after joining it). Moreover, the Cartel's conspiracy is far broader than use of the CM and includes: a "data-exchange program" and agreement to share information about admissions; the sharing of competitively sensitive information about enrollment, cost, and other data relating to Defendants' available resources for financial aid; imposing a common calendar for collecting data from families; compliance enforcement; and attendance at semi-annual meetings. AC ¶¶ 117-18, 121. Yale thereby helped the other Cartel members develop, refine, use, and enforce the CM. Thus, even if (contrary to Plaintiffs' allegations) Yale did not itself implement the CM on its own applicants, Yale would be just as culpable for its participation in the Cartel's other activities. Yale's "acquiescence in an illegal scheme is as much a violation of the Sherman Act as the creation and promotion of one." *Paramount*, 334 U.S. at 161; *Moehrl*, 492 F. Supp. 3d at 780 (collecting cases). Yale's alleged deviations from the agreement to use the CM would not make it any less of an unlawful agreement. *Nationwide Trailer*, 156 F. Supp. at 804. And this would be true even if Yale had formally withdrawn from the conspiracy in 2009, which Yale does not contend happened, and then rejoined in 2018. *See, e.g.*, *United States v. Morales*, 655 F.3d 608, 640-41 (7th Cir. 2011) (defendant had not fully withdrawn from the conspiracy, either because the initial withdrawal was not effective or, even if it were, the defendant subsequently rejoined the conspiracy).

44

## VI.    PLAINTIFFS' CLAIMS ARE TIMELY

The statute of limitations does not bar any of Plaintiffs' claims. "Dismissing a complaint as untimely at the pleading stage is an unusual step, since a complaint need not anticipate and overcome affirmative defenses, such as the statute of limitations." *Sidney Hillman Health Ctr. of Rochester v. Abbott Labs., Inc.*, 782 F.3d 922, 928 (7th Cir. 2015). "As long as there is a conceivable set of facts, consistent with the complaint, that would defeat a statute-of-limitations defense, questions of timeliness are left for summary judgment (or ultimately trial)." *Id.* The "face of the complaint" would have to establish that it is hopelessly time-barred." *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 806 (N.D. Ill. 2017) (quoting *Cancer Found., Inc. v. Cerberus Capital Mgmt., LP*, 559 F.3d 671, 674 (7th Cir. 2009)) (alterations omitted). Plaintiffs do not allege any facts making Plaintiffs' claims time-barred, let alone "hopelessly."

### A.    The Discovery Rule Applies

The discovery rule applies here. *See In re Copper Antitrust Litig.*, 436 F.3d 782, 789 (7th Cir. 2006). In citing *Rotkiske v. Klemm*, 140 S. Ct. 355 (2019), and *Gabelli v. SEC*, 568 U.S. 442 (2013), to argue against the discovery rule under the Sherman Act, Defendants cite materially different statutes with materially different language. *Rotkiske* addressed the FDCPA's limitations statute, which is keyed off the "date on which the violation occurs." 140 S. Ct. at 358 (quoting 15 U.S.C. § 1692k(d)). The decision "is not applicable" to limitations statutes, like the Sherman Act, keyed off the date the claim "accrued." *Navarro v. Procter & Gamble Co.*, 515 F. Supp. 3d 718, 759-60 (S.D. Ohio 2021); *accord Sohm v. Scholastic Inc.*, 959 F.3d 39, 50 n.2 (2d Cir. 2020); *Menzel v. Scholastic, Inc.*, 2020 WL 1308346, at *1 (N.D. Cal. Jan. 17, 2020). *Gabelli*, in contrast to *Copper*, addressed whether the *government* could invoke the discovery rule in *SEC enforcement actions*; the Court concluded there were "good reasons why the fraud discovery rule has not been extended to Government enforcement actions for civil penalties." 568 U.S. at 449-51. Accordingly,

neither *Rotkiske* nor *Gabelli* "abrogates" *Copper*. Instead, citing *Copper*, the courts in this Circuit continue to apply the discovery rule in antitrust cases, including after *Rotkiske* was decided.[32]

Defendants cite (at 37) *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971), for the proposition that "when a defendant commits an act that injure a plaintiff." The Seventh Circuit has expressly held, however, that under the discovery rule, *Zenith* does not apply to injuries that the plaintiffs later discovered. *See In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1014 (7th Cir. 2012). The plaintiff in *Zenith*, moreover, suffered no provable injury at the time of the defendants' conduct, and the court deemed future damages to be too speculative. *See* 401 U.S. at 338. *Zenith* does not apply here, where Plaintiffs allege they suffered injuries *simultaneously with Defendants' conduct*, and where those injuries were unknown to reasonably diligent Plaintiffs until two years (at most) prior to the filing of this lawsuit.

## B.    Plaintiffs' Claims Are Timely Under the Discovery Rule

Under the discovery rule, "a plaintiff's claim accrues not when the conduct or injury occurs, but when the plaintiff, through the exercise of due diligence, discovers that he has been *injured* and who has *caused* the injury." *In re Sulfuric Acid Antitrust Litig.*, 743 F. Supp. 2d 827, 854 (N.D. Ill. 2010) (emphasis in original). Defendants have the burden to "conclusively establish that a prudent plaintiff would have discovered" their claims more than four years ago. *Dennis v. Andersons Inc.*, 2021 WL 3403528, at *6 (N.D. Ill. July 9, 2021). On a motion to dismiss, the "'right question' is not whether the plaintiff has alleged 'facts that tend to defeat affirmative defenses,' but 'whether it is possible to imagine proof of the critical facts consistent with the allegations in

---

[32] *See, e.g.*, *TCS John Huxley Am., Inc. v. Sci. Games Corp.*, 2021 WL 4264403, at *3 (N.D. Ill. Sept. 20, 2021); *FTC v. Credit Bureau Ctr., LLC*, 284 F. Supp. 3d 907, 909 (N.D. Ill. 2018); *In re Evanston Nw. Healthcare Corp. Antitrust Litig.*, 2016 WL 4720014, at *7 (N.D. Ill. Sept. 9, 2016); *Shuffle Tech Int'l, LLC v. Sci. Games Corp.*, 2015 WL 5934834, at *13 (N.D. Ill. Oct. 12, 2015) (Kennelly, J.).

the complaint' that would fall within the period of limitations." *Broiler Chicken*, 290 F. Supp. 3d at 806 (quoting *U.S. Gypsum Co. v. Ind. Gas Co.*, 350 F.3d 623, 628 (7th Cir. 2003)).

Plaintiffs plausibly allege they did not discover their injury until two years before the Complaint, and a person exercising reasonable diligence would not have discovered the injury any earlier. AC ¶¶ 195-96. These allegations are taken as true at this stage. *See Clark v. City of Braidwood*, 318 F.3d 764, 767-68 (7th Cir. 2003); *Bloyer v. St. Clair Cnty. Ill.*, 2016 WL 6804471, at *2 (S.D. Ill. Nov. 17, 2016). And where public information requires a plaintiff to draw conclusions or inferences before plaintiff can "discover" its injury, it is a question of fact whether this would have been possible. *Broiler Chicken*, 290 F. Supp. 3d at 807-08. Defendants cannot evade this rule, which they decline even to acknowledge, by citing various public statements from their representatives and information from trade publications. The courts do not charge plaintiffs with knowledge of this kind of information. *See id.* at 808 (executives' public statements insufficient); *Sulfuric Acid*, 743 F. Supp. 2d at 856 (industry publications insufficient); *cf. Fond du Lac Bumper Exch., Inc. v. Jui Li Enter. Co.*, 85 F. Supp. 3d 1007, 1011 (E.D. Wis. 2015) ("Information in the public domain, however, does not necessarily put a plaintiff on constructive notice of its injuries.").

In citing such sources, moreover, Defendants have not established *as a matter of law* that a reasonably diligent person should have known of the injury here. *Compare Broiler Chicken*, 290 F. Supp. 3d at 808 (defendants did "not convincingly argue that any one piece of Plaintiffs' allegations would have sufficiently alerted them to a potential conspiracy") *with Tomlinson v. Goldman, Sachs & Co.*, 682 F. Supp. 2d 845, 847 (N.D. Ill. 2009) (SEC had issued Wells notice and defendant had publicly addressed allegations). Given the complexity of financial aid, AC ¶ 197, it is more than plausible a reasonably diligent person did not discover her injury until "much later"

47

than it occurred. *See Evanston*, 2016 WL 4720014, at *9-10 (discovery of overcharge was "probably much later" than when it occurred, where defendant touted benefits of merger and market was "particularly complex"). The question of how *much* later is "for a juror to decide." *Sulfuric Acid*, 743 F. Supp. 2d at 856; *see Sci. Games*, 2021 WL 4264403, at *4-5 (concluding that the "current, disputed record" precludes *summary judgment* on discovery of "antitrust injury").

In this case, discovery of the injury the Cartel caused would require a person to fit together multiple pieces of information like a jigsaw puzzle. Without understanding the CM and the backdrop of the Cartel's history, as well as the universities' sources for providing financial aid, as well as the "considerable inquiry into market conditions" that can be required to determine whether even *per se* unlawful conduct has caused injury, *NCAA*, 468 U.S. at 104 n.26, a reasonably diligent person would not understand the Cartel is engaged in price fixing, including through price floors, and thereby artificially inflating net tuition prices. The "puzzle pieces" include not only the requisite knowledge of market conditions, but also the knowledge that (1) Defendants were coordinating on a financial-aid formula restricting their individual judgment; (2) the coordination raised net prices for financial-aid students; (3) the collusion did not merely redistribute a fixed pool of aid from one group of students to another, but instead suppressed the total aid dollars available to students; and (4) it was not other economic factors that caused such injury.

A reasonably diligent person could not have discovered the injury until they were able to combine these puzzle pieces to conclude that Defendants' use of the CM harmed Class members, AC ¶¶ 195-96, and to have some basis to disagree with Defendants' public representations that their conspiracy has *helped* students and that *other* factors caused the net price of attendance to rise, *id*. ¶¶ 199-219. Indeed, Defendants (at 24) cite the 2006 GAO Report for the proposition that

48

the conspiracy "did not adversely impact the affordability of colleges and universities." Defendants offer no explanation why a reasonably diligent person would have disagreed with this conclusion; such a person would not even have understood the report's flaws. *Cf. Copper*, 436 F.3d at 789-90 (reversing where the district court "never explained what facts the plaintiffs' diligent inquiries would have revealed"). The 2006 GAO Report is wrong, *see* Part IV.B.1, above, but even as to a reasonably diligent person who knew of its existence, nothing about the report or the facts it analyzed meant that such person would or should have *known* its conclusions were wrong.[33] Given these "factual issues," that Plaintiffs have alleged facts bearing on the discovery rule is no basis for resolving the affirmative defense of untimeliness on a motion to dismiss. *Johnson-Morris v. Santander Consumer USA, Inc.*, 194 F. Supp. 3d 757, 763 (N.D. Ill. 2016).

The "puzzle" that plaintiffs would have had to put together here is analogous to the facts in *Broiler Chicken*, where defendants pointed to multiple pieces of public information but failed to "convincingly argue that any one piece of Plaintiffs' allegations would have sufficiently alerted them to a potential conspiracy." 290 F. Supp. 3d at 808; *see also In re Packaged Seafood Prod. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1099 (S.D. Cal. 2017) (quoted by *Broiler Chicken* and explaining that "a lone puzzle piece may, in isolation, give no further indication as to the larger picture into which it fits, and yet at the same time be an integral component of the final product once all corresponding pieces are assembled"). *Broiler Chicken* itself similarly noted that while it "may be true that it was *possible* for Plaintiffs to have discovered" publicly available information

---

[33] Indeed, Defendants (at 37-38) cite *Tomlinson*, 682 F. Supp. 2d 845, a case in which government investigations and allegations of wrongdoing were made public, putting plaintiffs on notice of their injuries, and in which defendants' market manipulation influenced the market beyond the traditional market forces at play. *Id.* at 846. Moreover, while plaintiffs in *Tomlinson* argued that, despite knowledge of injury, they did not have the necessary information for each element of their claim. Here, the opposite situation exists, because *discovery of the injury*—that Plaintiffs paid artificially inflated net prices of attendance at one of the Cartel universities, AC ¶ 235—would require a plaintiff to fit together multiple pieces of information like a jigsaw puzzle to know of the injury.

when it was published, the Court has been "unwilling to hold that Plaintiffs should be charged with a level of diligence requiring them to follow [public statements] such that they were immediately aware of these statements." 290 F.3d at 808.

### C. Plaintiffs Allege Continuing Violations

Defendants are also wrong in arguing (at 38-39) that the continuing-violations doctrine does not apply. Plaintiffs Maerlender, Carbone, Corzo, and Saffrin enrolled at Defendant universities prior to, but continuing into, the four-year period preceding this litigation; each of them received need-based financial aid every year. *See* AC ¶¶ 17-18, 22, 24. Plaintiffs Eklund and Leo-Guerra are currently enrolled students. *Id.* ¶¶ 19, 21. Defendants suggest the continuing-violation doctrine could apply only to Maerlender's claim, but there is no basis to conclude it would not apply to Carbone, Corzo, and Saffrin, when the relevant graduate dates were in spring 2018. *See id.* ¶¶ 17-18, 24. The Supreme Court has identified "each sale to the plaintiff" pursuant to a "price-fixing conspiracy" as an "overt act" that "starts the statutory period running again." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997); *see also Turner v. McDonald's USA, LLC*, 2020 WL 3044086, at *4 (N.D. Ill. Apr. 24, 2020) (holding that "each time plaintiff was paid a depressed wage for her labor" as a result of horizontal conspiracy, "she was injured and the four-year statute of limitations for that injury began"). Defendants' out-of-circuit precedent, *Varner v. Peterson Farms*, 371 F.3d 1011, 1019 (8th Cir. 2004), has no application in the price-fixing context. *See In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1067 (8th Cir. 2017) (en banc) (distinguishing *Varner* as "about a tying arrangement, not a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years") (quotations omitted).

### CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motions to dismiss.

50

Dated: June 10, 2022

/s/ Robert D. Gilbert
Robert D. Gilbert
Elpidio Villarreal
**GILBERT LITIGATORS & COUNSE-
LORS, P.C.**
11 Broadway, Suite 615
New York, NY 10004
Phone: 646-448-5269
rgilbert@gilbertlitigators.com
pdvillarreal@gilbertlitigators.com

/s/ Eric L. Cramer
Eric L. Cramer
Caitlin Coslett
Hope Brinn
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Phone: (215) 875-3000
ecramer@bm.net
ccoslett@bm.net
hbrinn@bm.net

Robert E. Litan
Daniel J. Walker
**BERGER MONTAGUE PC**
2001 Pennsylvania Avenue, NW
Suite 300
Washington, DC 20006
Phone: (202) 559-9745
rlitan@bm.net
dwalker@bm.net

/s/ Kyle W. Roche
Kyle W. Roche
Edward Normand
Peter Bach-y-Rita
**ROCHE FREEDMAN LLP**
99 Park Avenue, 19th Floor
New York, NY 10016
Phone: (646) 350-0527
kyle@rochefreedman.com
tnormand@rochefreedman.com
pbachyrita@rochefreedman.com

/s/ Elizabeth A. Fegan
Elizabeth A. Fegan
**FEGAN SCOTT LLC**
150 S. Wacker Dr., 24th floor
Chicago, IL 60606
Phone: (312) 741-1019
beth@feganscott.com