**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| FRANK CARBONE, ANDREW CORZO, SAVANNAH ROSE EKLUND, SIA HENRY, ALEXANDER LEO-GUERRA, MICHAEL MAERLANDER, BRANDON PIYEVSKY, KARA SAFFRIN, and BRITTANY TATIANA WEAVER, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, THE JOHNS HOPKINS UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY,<br><br>    Defendants. | Case No. 1:22-cv-00125<br><br>Judge Kennelly |

**STATEMENT OF INTEREST OF THE UNITED STATES**

JONATHAN S. KANTER
*Assistant Attorney General*

DOHA G. MEKKI
*Principal Deputy Assistant Attorney General*

ERIC D. DUNN
*Attorney Advisor to the Assistant Attorney General*

RYAN S. STRUVE
NICHOLAS S. CHEOLAS
*Attorneys*

U.S. Department of Justice, Antitrust Division
950 Pennsylvania Avenue, NW, Room 3224
Washington, DC 20530
Telephone: 202-431-6727
E-mail: eric.dunn@usdoj.gov
*Attorneys for the United States of America*

# TABLE OF CONTENTS

INTEREST OF THE UNITED STATES ................................................................. 1

BACKGROUND ................................................................................................... 2

I.   Statutory Background ................................................................................... 2

II.  Factual Background ...................................................................................... 4

ARGUMENT ........................................................................................................ 5

I.   The 568 Exemption Does Not Immunize Agreements With A School That
     Does Not Admit All Students On A Need-Blind Basis ................................. 6

A.   Like All Exemptions From The Antitrust Laws, The 568 Exemption Should
     Be Strictly Construed .................................................................................. 6

B.   Neither The 568 Exemption Nor The Sherman Act Requires Institutions To
     Have "Actual Knowledge" That Another Institution Is Not Need-Blind ............ 8

II.  Plaintiffs Allege A Violation Of The Sherman Act Under The Per Se Rule Or The
     Rule Of Reason ............................................................................................ 11

# TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*Addyston Pipe & Steel Co. v. United States*
175 U.S. 211 (1899) .......................................................................................... 14

*American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.*,
456 U.S. 556 (1982) .......................................................................................... 15

*Arizona v. Maricopa County Medical Society*,
457 U.S. 332 (1982) ..................................................................................... 14, 15

*Blackburn v. Sweeney*,
53 F.3d 825 (7th Cir. 1995) ............................................................................. 14

*Broadcast Music, Inc. v. Columbia Broadcast System, Inc.*,
441 U.S. 1 (1979) .............................................................................................. 14

*Catalano, Inc. v. Target Sales, Inc.*,
446 U.S. 643 (1980) .......................................................................................... 13

*Chicago Professional Sports Ltd. Partnership v. National Basketball Ass'n*,
961 F.2d 667 (7th Cir. 1992) ............................................................................. 6

*City of Rockford v. Mallinckrodt ARD, Inc.*,
360 F. Supp. 3d 730 (N.D. Ill. 2019) ................................................................. 5

*Dean v. United States*,
556 U.S. 568 (2009) ............................................................................................ 9

*Federal Maritime Commission v. Seatrain Lines, Inc.*,
411 U.S. 726 (1973) ............................................................................................ 6

*FTC v. Indiana Federation of Dentists*,
476 U.S. 447 (1986) ..................................................................................... 15, 16

*FTC v. Superior Court Trial Lawyers Ass'n*,
493 U.S. 411 (1990) ................................................................................ 13, 14, 16

*Gelboim v. Bank of America Corp.*,
823 F.3d 759 (2d Cir. 2016) ............................................................................. 12

*Group Life & Health Insurance Co. v. Royal Drug Co.*,
440 U.S. 205 (1979) ............................................................................................ 6

*In re Dealer Mangement System Antitrust Litigation*,
362 F. Supp. 3d 477 (N.D. Ill. 2019) ........................................................... 11, 16

*In re Fresh & Process Potatoes Antitrust Litigation,*
834 F. Supp. 2d 1141 (D. Idaho 2011) ................................................................ 7

*In re High Fructose Corn Syrup Antitrust Litigation,*
295 F.3d 651 (7th Cir. 2002) ..................................................................... 11, 13

*In re Mushroom Direct Purchaser Antitrust Litigation,*
54 F. Supp. 3d 382 (E.D. Pa. 2014) ................................................................ 9

*In re Sulfuric Acid Antitrust Litigation,*
703 F.3d 1004 (7th Cir. 2012) .................................................................... 15

*In re Text Messaging Antitrust Litigation,*
46 F. Supp. 3d 788 (N.D. Ill. 2014) .......................................................... 10, 11

*In re Wheat Rail Freight Rate Antitrust Litigation,*
579 F. Supp. 517 (N.D. Ill. 1984) ................................................................ 12

*Matter of Wheat Rail Freight Rate Antitrust Litigation,*
759 F.2d 1305 (7th Cir. 1985) ..................................................................... 13

*In re: EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices & Antitrust Litigation,*
336 F.Supp.3d 1256 (D. Kan. 2018) .............................................................. 17

*In re: Processed Egg Prod. Antitrust Litigation,*
No. 08-md-2002, 2016 WL 5539592 (E.D. Pa. Sept. 28, 2016) ........................ 9

*Marion Healthcare, LLC v. Becton, Dickinson & Co.,*
952 F.3d 832 (7th Cir. 2020) ...................................................................... 10

*Monsanto Co. v. Spray-Rite Service Corp.,*
465 U.S. 752 (1984) ................................................................................ 10

*National Broiler Marketing Ass'n v. United States,*
436 U.S. 816 (1978) ................................................................................ 7

*National Society of Professional Engineers v. United States,*
435 U.S. 679 (1978) ................................................................................ 12

*NCAA v. Alston,*
141 S. Ct. 2141 (2021) ............................................................................ 11

*NCAA v. Board of Regents of University of Oklahoma,*
468 U.S. 85 (1984) ......................................................................... 5, 11, 16

*Northern Pacific Railway Co. v. United States,*
356 U.S. 1 (1958) ................................................................................... 6

*Ohio v. American Express Co.*,
  138 S. Ct. 2274 (2018) .................................................................................................5, 11

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
  792 F.2d 210 (D.C. Cir. 1986) ...........................................................................................14

*Standard Oil Co. v. United States*,
  221 U.S. 1 (1911) ...............................................................................................................11

*Texaco Inc. v. Dagher*,
  547 U.S. 1 (2006) ...............................................................................................................14

*Union Labor Life Ins. Co. v. Pireno*,
  458 U.S. 119 (1982) .............................................................................................................8

*United States v. Addyston Pipe & Steel Co.*,
  85 F. 271 (6th Cir. 1898) ...................................................................................................14

*United States v. Aiyer*,
  33 F.4th 97 (2d Cir. 2022) .................................................................................................14

*United States v. Ambrose*,
  792 F. Supp. 2d 968 (N.D. Ill. 2010) ................................................................................10

*United States v. Brighton Building & Maintenance Co.*,
  598 F.2d 1101 (7th Cir. 1979) ...........................................................................................10

*United States v. Brown University in Providence in State of Rhode Island*,
  No. CIV. A. 91-3274, 1991 WL 536896 (E.D. Pa. Sept. 20, 1991) .....................................3

*United States v. Brown University in Providence in State of Rhode Island*,
  5 F.3d 658 (3d Cir. 1993) ................................................................................. 2, 3, 12, 16

*United States v. eBay, Inc.*,
  968 F. Supp. 2d 1030 (N.D. Cal. 2013) ...............................................................................5

*United States v. Head*,
  552 F.3d 640 (7th Cir. 2009) ...............................................................................................9

*United States v. Socony-Vacuum Oil Co.*,
  310 U.S. 150 (1940)............................................................................................... 12, 13, 14

*United States v. U.S. Gypsum Co.*,
  438 U.S. 422 (1978)............................................................................................................10

*Viamedia, Inc. v. Comcast Corp.*,
  951 F.3d 429 (7th Cir. 2020) .............................................................................6, 11, 16, 17

**Statutes**

7 U.S.C. § 291 ....................................................................................................... 7

15 U.S.C. § 1 ................................................................................................... passim

15 U.S.C. § 1012 ................................................................................................... 7

28 U.S.C. § 517 ................................................................................................... 1

**Legislative Materials**

H.R. Rep. No. 105-144 ......................................................................................... 3

Pub. L. No. 103-382 ............................................................................................. 1

Pub. L. No. 114-44 ............................................................................................... 3

**Regulations**

Federal Need Analysis Methodology for the 2022-23 Award Year-Federal Pell Grant, Federal Work-Study, Federal Supplemental Educational Opportunity Grant, William D. Ford Federal Direct Loan, Iraq and Afghanistan Service Grant, and TEACH Grant Programs, 86 Fed. Reg. 38067 ............................................................................................. 2

**Other Authorities**

Jennifer Ma, *Education Pays 2019*, College Board (2019) ...................................... 4

National Center for Education Statistics, *Sources of Financial Aid* (May 2022) ......................... 2

## INTEREST OF THE UNITED STATES

The United States respectfully submits this statement pursuant to 28 U.S.C. § 517, which permits the Attorney General to direct any officer of the Department of Justice "to attend to the interests of the United States" in any case pending in federal or state court. The Antitrust Division of the Department of Justice enforces the federal antitrust laws and has a strong interest in their correct application, including the proper scope of exemptions from the antitrust laws.

The United States files this Statement of Interest to address two issues. *First*, while certain agreements between "institutions of higher education at which all students admitted are admitted on a need-blind basis" are exempt from the antitrust laws under the "568 Exemption," 15 U.S.C. § 1 note (Application of Antitrust Laws to Award of Need-Based Educational Aid); Improving America's Schools Act of 1994, Pub. L. No. 103-382, title V, § 568, 108 Stat. 3518, 4060 (1994), an agreement between schools that admit all students on a need-blind basis and schools that do not is beyond the scope of the 568 Exemption. Thus, to the extent that at least some of the Defendants do not admit all students on a need-blind basis, the 568 Exemption would not apply here. *Second*, horizontal agreements on prices or discounts—including pricing or discount formulas—normally are per se unlawful under Section 1 of the Sherman Act (15 U.S.C. § 1). The Court need not decide whether Defendants' agreement on a common method for calculating need-based financial aid is per se unlawful at this stage, however, because Plaintiffs have adequately alleged that the agreement violates the Sherman Act under the per se rule or the rule of reason.

1

## BACKGROUND

### I.     Statutory Background

The vast majority of students rely on financial aid from their school to help pay for college. *See, e.g.*, National Center for Education Statistics, *Sources of Financial Aid* (May 2022), https://nces.ed.gov/programs/coe/indicator/cuc/financial-aid-sources (90% for private nonprofit schools among first-time, full-time undergraduate students attending 4-year universities during the 2019-2020 academic year).

One form of financial aid—need-based financial aid—is determined by a student's financial need and how much a school will expect a student or their family to pay even if they receive some financial aid (an "expected family contribution"). For example, under the Federal Need Analysis Methodology, used for certain federal need-based financial aid programs, an expected family contribution is calculated using a student's and/or their family's income and assets subject to certain exclusions and offsets. *See* Federal Need Analysis Methodology for the 2022-23 Award Year-Federal Pell Grant, Federal Work-Study, Federal Supplemental Educational Opportunity Grant, William D. Ford Federal Direct Loan, Iraq and Afghanistan Service Grant, and TEACH Grant Programs, 86 Fed. Reg. 38067 (Jul. 19, 2021).

In 1989, the Department of Justice filed an antitrust lawsuit against a group of colleges—called the "Ivy Overlap Group"—alleging that the schools "collectively determine[d] the amount of financial assistance to award to commonly admitted students" by "employ[ing] the same analysis to compute family contributions." *United States v. Brown University in Providence in State of R.I.*, 5 F.3d 658, 662-63 (3d Cir. 1993). In response, all of the colleges, except one, immediately entered into a consent decree with the United States requiring them, among other things, not to "agree[] directly or indirectly with any other college or university on how Family

2

or Parental Contribution will be calculated." *Brown*, No. CIV. A. 91-3274, 1991 WL 536896, at *1 (E.D. Pa. Sept. 20, 1991). After trial and a subsequent appeal, *see Brown*, 5 F.3d at 663–64, the remaining college—MIT—agreed to a settlement as well.

Following the *Brown* litigation, Congress adopted the 568 Exemption to allow agreements among certain schools "to use common principles of professional judgment for determining need." H.R. Rep. No. 105–144, at 2-3 (1997).[1] As relevant here, the 568 Exemption provides that "institutions of higher education at which all students admitted are admitted on a need-blind basis" may agree on "common principles of analysis for determining the need of . . . students . . . if the agreement . . . does not restrict financial aid officers at such institutions in their exercising independent professional judgment with respect to individual applicants for such financial aid." 15 U.S.C. § 1 note (Application of Antitrust Laws to Award of Need-Based Educational Aid). The statute further defines "on a need-blind basis" as "without regard to the financial circumstances of the student involved or the student's family." *Id*. This statutory language "in most respects mirrors the settlement reached in 1993" between the Department of Justice and MIT, H.R. Rep. No. 105-144 at 3, with a few important differences. For example, the 568 Exemption specifically requires schools to admit "*all* students . . . on a need-blind basis," i.e., regardless of whether they are admitted from a waitlist or through a transfer process. 15 U.S.C. § 1 note (Application of Antitrust Laws to Award of Need-Based Educational Aid) (emphasis added).

While the 568 Exemption allows need-blind schools to agree on certain common principles for calculating financial need, schools can still compete to offer students financial aid packages, including more need-based aid or more grants and fewer loans. That competition can

---

[1] The 568 Exemption was initially adopted in 1992 on a temporary basis but Congress has extended the sunset provision several times since then, most recently in 2015. Pub. L. No. 114-44, 129 Stat. 472 (2015); *see* MTD at 6.

drive down the price students pay to attend school and thus make college more affordable. *See, e.g.*, Am. Compl. ¶¶ 122–24. This has extraordinary benefits for students, their families, their communities, and the United States. *See, e.g.*, Jennifer Ma, *Education Pays 2019*, College Board (2019), https://research.collegeboard.org/media/pdf/education-pays-2019-full-report.pdf.

## II.     Factual Background

The Complaint alleges the following: Defendants are nonprofit universities that are or have been members of the so-called "568 Presidents Group," meaning they have agreed to follow the "Consensus Methodology" in calculating an applicant's expected family contribution in the context of need-based financial aid awards. Am. Compl. ¶¶ 1, 5. This agreement effectively eliminates competition between Defendants over need-based financial aid awards and results in "artificially high, noncompetitive" prices for students, *id.* ¶ 265, because an "applicants' assessed ability to pay . . . is a key determinant in the net price of attendance," i.e., the cost of tuition, room and board, and other fees less any financial aid or grant a student might receive, *id.* ¶ 118. Some universities have even left or declined to join the 568 Presidents Group in order to offer more generous need-based financial aid than the Consensus Methodology allows. *See, e.g.*, *id.* ¶¶ 122–25.

Based on these allegations, Plaintiffs argue that Defendants' agreement to use the Consensus Methodology is a price-fixing conspiracy that is unlawful under Section 1 of the Sherman Act. *Id.* ¶¶ 115, 269. Plaintiffs also contend that Defendants cannot benefit from the 568 Exemption because Defendants do not admit all students—including transfer and waitlisted students—on a need-blind basis. Pls.' Opp'n at 11 (citing Am. Compl. ¶¶ 134–84).

On April 15, 2022, Defendants moved to dismiss the Amended Complaint, arguing that their admissions processes are need-blind; that collaboration among universities about need-

based financial aid does not violate the Sherman Act; that Plaintiffs lack antitrust standing; and that many claims are barred by the applicable statute of limitations. *See* Mem. in Supp. of Defs. Mot. to Dismiss ("MTD"). Plaintiffs oppose the motion, and the United States hereby submits this Statement of Interest to address the scope of the 568 Exemption and the application of the per se rule.[2]

## ARGUMENT

The 568 Exemption immunizes agreements regarding common principles for calculating need-based financial aid only so long as each school that is part of the agreement admits all students on a need-blind basis. An agreement that does not qualify for the 568 Exemption is subject to Section 1 of the Sherman Act, 15 U.S.C. § 1, and is unlawful if it unreasonably restrains trade, *see NCAA v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 98 (1984). "Restraints can be unreasonable in one of two ways"—either because they are "unreasonable per se" or because they violate the "rule of reason." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283 (2018) ("*Amex*"). Because Plaintiffs have adequately alleged that Defendants' conduct would violate the Sherman Act under either standard, however, the Court need not decide which standard to apply in resolving the motion to dismiss. *See, e.g., City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 754 (N.D. Ill. 2019) (collecting cases); *see also United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1040 (N.D. Cal. 2013).

## I.    The 568 Exemption Does Not Immunize Agreements With A School That Does Not Admit All Students On A Need-Blind Basis

Defendants argue that the 568 Exemption immunizes their agreement on common principles for determining need-based financial aid because they admit all students on a need-

---

[2] The United States offers no view on Plaintiffs' antitrust standing, their factual claims, the proper definition of "need-blind," the application of any applicable statute of limitations, or the separate motions to dismiss filed by Defendant Yale or Defendants Brown, Emory, Johns Hopkins, and the University of Chicago.

blind basis or because, even if some of them are not need-blind, they lack "actual knowledge" that "other member schools are not need-blind." MTD at 20–22.

Defendants' arguments rest on two legal errors.[3] First, the 568 Exemption, like other antitrust exemptions, does not immunize agreements between entities that fulfill the Exemption's prerequisites and those that do not. Second, Defendants "actual knowledge" of their co-conspirators' admissions policies is not relevant to whether the 568 Exemption applies or whether their conduct violates the Sherman Act.

### A. Like All Exemptions From The Antitrust Laws, The 568 Exemption Should Be Strictly Construed

The Sherman Act "unequivocally laid down" a policy that competition "yield[s] the best allocation of economic resources, the lowest prices, the highest quality and the greatest material progress." *N. Pac. Ry. Co.* v. *United States*, 356 U.S. 1, 4 (1958). Exemptions from the Sherman Act are thus "strictly construed." *Fed. Mar. Comm'n v. Seatrain Lines, Inc.*, 411 U.S. 726, 733 (1973). That includes statutory exemptions like the 568 Exemption. *See Grp. Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 231 (1979) ("that exemptions from the antitrust laws are to be narrowly construed . . . applies with equal force to express statutory exemptions"); *see also Chicago Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 961 F.2d 667, 671–72 (7th Cir. 1992) ("courts read exceptions to the antitrust laws narrowly, with beady eyes and green eyeshades").

---

[3] Plaintiffs also argue that they have alleged that all Defendants were not need-blind and that Defendants knew that other members of the 568 Presidents Group were not need-blind. Pls.' Opp'n at 18-19; *see also* Am. Compl. ¶¶ 113, 121, 130, 134, 138, 143, 144–45. On a motion to dismiss, Plaintiffs' allegations must be taken as true, with all reasonable inferences drawn in favor of the pleader. *See, e.g.*, *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 453–54 (7th Cir. 2020).

By its terms, the 568 Exemption covers agreements between "2 or more institutions of higher education at which all students admitted are admitted on a need-blind basis," i.e., "without regard to the financial circumstances of the student involved or the student's family." 15 U.S.C. § 1 note (Application of Antitrust Laws to Award of Need-Based Educational Aid); MTD at 5; Pls.' Opp'n at 1–2. An agreement that includes an institution that is not need-blind does not qualify as an agreement between institutions "at which all students admitted are admitted on a need-blind basis." It therefore would fall outside the scope of the 568 Exemption.

This interpretation is consistent with how courts have interpreted other antitrust exemptions. For example, the Capper-Volstead Act immunizes certain associations between "[p]ersons engaged in the production of agricultural products as farmers, planters, ranchmen, dairymen, nut or fruit growers" from antitrust scrutiny. 7 U.S.C. § 291. The Supreme Court has held that this exemption does not cover associations where any member is not engaged in the production of agricultural products. *See Nat'l Broiler Mktg. Ass'n v. United States,* 436 U.S. 816, 827–29 (1978) ("We hold that [certain association members] are not 'farmers,' as that term is used in the [Capper-Volstead] Act, and that a cooperative organization that includes them—or even one of them—as members is not entitled to the limited protection of the Capper-Volstead Act."); *see also In re Fresh & Process Potatoes Antitrust Litig.*, 834 F. Supp. 2d 1141, 1152–53 (D. Idaho 2011) ("[F]or a defendant to be exempt from antitrust liability pursuant to Capper–Volstead, the defendant must establish that both itself, and all entities with which it conspired, qualify under the Act." (citing *Nat'l Boiler*, 436 U.S. at 822–23)). Likewise, the McCarran-Ferguson Act exempts the "business of insurance" from liability under the antitrust laws. *See* 15 U.S.C. § 1012. Again, though, the Court has explained that the McCarran-Ferguson Act generally does not extend to collaborations between insurance and non-insurance entities.

*See, e.g.*, *Union Lab. Life Ins. Co. v. Pireno*, 458 U.S. 119, 132 (1982) (peer-review committee "involv[ing] third parties wholly outside the insurance industry" not covered by the McCarran-Ferguson Act). The same principles apply here: the 568 Exemption does not extend antitrust immunity to agreements that include schools that do not admit all students on a need-blind basis.

### B. Neither The 568 Exemption Nor The Sherman Act Requires Institutions To Have "Actual Knowledge" That Another Institution Is Not Need-Blind

Defendants' argument that the 568 Exemption protects "unwitting conspirators" who lack "actual knowledge that other member schools are not need-blind" stretches the 568 Exemption beyond its text and erroneously superimposes an intent requirement on the application of the Exemption. MTD at 20–22.

First, Defendants' "actual knowledge" argument accepts that an agreement involving a non-need-blind school is not protected by the text of the 568 Exemption. Defendants nevertheless insist that need-blind schools that are parties to a non-exempt agreement should still be protected from antitrust liability if "they are not plausibly alleged to have actual knowledge that other member schools are not need-blind." *Id.* at 21. But Defendants' interpretation is atextual. As Defendants acknowledge, the 568 Exemption covers certain "agreements," not certain *defendants*. *See, e.g.*, *id.* at 9 ("Section 568 . . . provides that *agreements* to 'use common principles of analysis for determining the need of . . . students for financial aid' are 'not . . . unlawful under the antitrust laws'" (emphasis added, ellipses in original)); *see also* 15 U.S.C. § 1 note (Application of Antitrust Laws to Award of Need-Based Educational Aid) (exemption does not apply to "any *contract, combination, or conspiracy* with respect to the amount or terms of any prospective financial aid award to a specific individual" (emphasis added)). An agreement either qualifies for the exemption or it does not. The 568 Exemption contains no language suggesting immunity depends on whether a need-blind school knows the

agreement it has entered into is non-exempt. Courts, of course, "ordinarily resist reading words or elements into a statute that do not appear on its face." *Dean v. United States*, 556 U.S. 568, 572 (2009) (declining to read intent requirement into statute that contained no such "words of limitation").

Second, courts have rejected similar arguments in applying other antitrust exemptions. In *In re Mushroom Direct Purchaser Antitrust Litig.*, 54 F. Supp. 3d 382 (E.D. Pa. 2014), for example, the court rejected defendants' "good faith . . . defense against losing Capper–Volstead Act's limited immunity" because "a violation of the Sherman Act does not require proof of specific intent." *Id.* at 392; *see also In re: Processed Egg Prod. Antitrust Litig.*, No. 08-md-2002, 2016 WL 5539592, at *12–13 (E.D. Pa. Sept. 28, 2016) (reaching a similar result, citing *In re Mushroom*).

Third, Defendants' justifications for reading an "actual knowledge" requirement into the statute are unavailing. *See* MTD at 21–22. In particular, Defendants' arguments about whether the text of the 568 Exemption deters desirable collaboration is best directed to Congress, not this Court. *See, e.g.*, *Processed Egg Prod.*, No. 08-md-2002, 2016 WL 5539592, at *13 ("[I]mplicit in the Defendants' argument is the somewhat obvious counter-position that Congress's failure to expressly provide a good faith exception given the apparent risks to farmers as well as other instances of congressional action in the area, supports an inference that no such exception was intended."). Moreover, as noted above, there is no "actual knowledge" requirement under the Capper-Volstead Act, *id.*, and yet farmers still can and do take advantage of the exemption. Imposing a similar rule for universities is not so absurd as to justify rewriting the statute. *See United States v. Head*, 552 F.3d 640, 644 (7th Cir. 2009) ("applying the statute as written does not lead to a result that is so bizarre or shocking as to allow the district court the discretion to fix

9

it"). In fact, under Defendants' reading, schools would be discouraged from being transparent about their need-based financial aid policies—precisely the opposite of what Congress intended here.

Finally, Defendants suggest that plaintiffs cannot establish a Sherman Act violation unless Defendants have "actual knowledge" that their conduct was unlawful. MTD at 21. But that is not the law. A Section 1 plaintiff is neither required to prove nor plead that a defendant knew its conduct was *illegal*.[4] "[A] civil violation can be established by proof of either an unlawful purpose or an anticompetitive effect." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 436 n.13 (1978). By alleging the various ways Defendants have agreed "to reduce or eliminate, and in fact succeeded in reducing or eliminating, price competition among its members," Am. Compl. ¶ 7; *see also id.* ¶¶ 122–31, the complaint alleges a "conscious commitment to a common scheme designed to achieve an unlawful objective," *Marion Healthcare, LLC v. Becton, Dickinson & Co.*, 952 F.3d 832, 841 (7th Cir. 2020).[5] Nothing more is required. *See, e.g.*, *In re Text Messaging Antitrust Litig.*, 46 F. Supp. 3d 788, 803 (N.D. Ill. 2014) ("Direct evidence of a conspiracy to fix prices is sufficient for an antitrust plaintiff to

---

[4] Even in the criminal context, a defendant need only intend to "effectuate the object of the conspiracy"—say, to fix prices—and need not have actual knowledge that their conduct is *unlawful*. *See United States v. U.S. Gypsum Co.*, 438 U.S. 422, 444–446 (1978) ("A requirement of *proof . . . of a conscious desire . . . to violate the law* would seem . . . both unnecessarily cumulative and unduly burdensome." (emphasis added)); *United States v. Brighton Bldg. & Maint. Co.*, 598 F.2d 1101, 1105 (7th Cir. 1979) (defendants have "knowingly [done] an act which the law forbids"); *see also United States v. Ambrose*, 792 F. Supp. 2d 968, 977 (N.D. Ill. 2010) (to establish criminal liability, a jury is not required to find that a defendant "knew his act violated the law").

[5] Defendants misread *Marion Healthcare*, and the case on which it relies—*Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 764 (1984). *See* MTD at 21. These cases do not address the scope of antitrust exemptions. Rather, *Marion Healthcare* and *Monsanto* were both about the existence of concerted action—a prerequisite for a Section 1 claim. *Monsanto*, 465 U.S. at 763–64; *Marion Healthcare*, 952 F.3d at 841–42. Both decisions considered whether and how to infer the existence of an agreement based on circumstantial evidence. Here, Plaintiffs have alleged direct evidence that Defendants entered into an agreement, "admit[ed] on their own website," to use "common principles of analysis for determining the financial need of undergraduate financial aid applicants." Am. Compl. ¶ 115. That agreement, by itself, would constitute concerted action under Section 1. Finally, contrary to Defendants' suggestion, neither *Marion Healthcare* nor *Monsanto* held that a "conscious commitment to a common scheme" must include awareness of a scheme's unlawful nature. MTD at 21. In *Monsanto*, the Court held that the evidence of agreement in that case was sufficient because it supported an inference of "a meeting of minds" to maintain retail prices. 465 U.S. at 765. *Marion Healthcare* does not suggest more is required.

withstand summary judgment. . . . 'Because price fixing is a per se violation of the Sherman Act, an admission by the defendants that they agreed to fix their prices is all the proof a plaintiff needs.'" (quoting *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 654 (7th Cir. 2002))).

## II.    Plaintiffs Allege A Violation Of The Sherman Act Under The Per Se Rule Or The Rule Of Reason

Section 1 of the Sherman Act prohibits every "contract, combination . . . or conspiracy" that unreasonably restrains trade. 15 U.S.C. § 1. Restraints of trade can be unreasonable under one of two standards. *Amex*, 138 S. Ct. at 2283–84. Congress condemned some restraints as per se unreasonable based on their inherently anticompetitive "nature and character." *Standard Oil Co. v. United States*, 221 U.S. 1, 64–65 (1911). Restraints that are not per se unreasonable are judged under the rule of reason, *Amex*, 138 S. Ct. at 2284, which typically involves a detailed, multi-step inquiry into a restraint's impact on competition, *NCAA v. Alston*, 141 S. Ct. 2141, 2160 (2021).[6] In some rule-of-reason cases, however, a restraint's anticompetitive potential may be apparent without a detailed market inquiry. *Id.* at 2155; *see also Brown*, 5 F.3d at 673–74.

Plaintiffs allege that Defendants agreed among themselves on how to calculate need-based financial aid "to reduce or eliminate . . . price competition" between members of the 568 Presidents Group, Am. Compl. ¶ 7, and ensure families pay "the maximum that they are capable of paying," *id.* ¶ 129 (internal quotation marks omitted). The 568 Presidents' Group own

---

[6] At the first step, "the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect." *Amex*, 138 S. Ct. at 2284. At the second step, the defendant must "competitively justif[y]" their restraint and its "apparent deviation from the operations of a free market." *Bd. of Regents*, 468 U.S. at 113. If they do so, "then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Amex*, 138 S. Ct. at 2284. If there is no less restrictive alternative, however, courts must weigh the procompetitive benefits and harms to determine if a restraint is reasonable on balance. *See In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 477, 495 (N.D. Ill. 2019) ("whether challenged conduct has a procompetitive effect on balance so as to survive scrutiny under a rule-of-reason analysis is a factual issue for trial"); *see also Viamedia*, 951 F.3d at 464 n.14 (courts apply a "'balancing approach' in rule of reason cases, whether alleged under § 1 or § 2").

website—quoted in the Amended Complaint—explains that the Consensus Methodology aims to "diminish or eliminate . . . divergent results" in how a student's expected family contribution, and thus need-based financial aid and net price, is ultimately determined. *Id.* ¶ 126; *see also id.* ¶ 119 (alleging that expected family contribution "is a key determinant in the net price of attendance"); *id.* ¶ 128 (alleging that in the absence of an agreement schools would be individually "incentivized to increase aid and reduce net prices of attendance to compete for students").

These allegations suffice to plead a per se claim under Section 1 of the Sherman Act. "[A]n agreement that interferes with the setting of price by free market forces" among horizontal competitors is normally per se illegal under Section 1 of the Sherman Act. *Nat'l Soc. of Pro. Eng'rs v. United States*, 435 U.S. 679, 692 (1978) (internal quotation marks and brackets omitted). That includes agreements over how competitors set prices, not just agreements over the prices themselves. *See, e.g.*, *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223, 224 n.59 (1940) (price-fixing includes any "combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity," including agreement on "the formula underlying price policies"); *see also id.* at 222 ("Hence prices are fixed . . . if the prices paid or charged are to be at a certain level or on ascending or descending scales, if they are to be uniform, or if by various formulae they are related to the market prices."); *In re Wheat Rail Freight Rate Antitrust Litig.*, 579 F. Supp. 517, 538 (N.D. Ill. 1984) ("an agreement on how rates are to be calculated effectively fixes prices"), *aff'd sub nom. Matter of Wheat Rail Freight Rate Antitrust Litig.*, 759 F.2d 1305 (7th Cir. 1985); *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 771 (2d Cir. 2016) ("LIBOR forms a component of the return from various LIBOR-denominated financial instruments, and the fixing of a component of price

12

violates the antitrust laws."). Agreements among competitors on how much to discount prices are per se illegal as well. *See, e.g.*, *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 648 (1980) ("an agreement to eliminate discounts . . . falls squarely within the traditional per se rule against price fixing").

It is not hard to see why schools agreeing on how to determine need-based financial aid should be treated similarly. For example, if schools agree to a common method that results in an expected family contribution of $20,000 for a particular student, they can charge that student a net price of $20,000 without fear that the student will pick a rival school based on a more generous need-based financial aid offer. An agreement on the methodology used to calculate need-based financial aid offers therefore eliminates an important dimension of price competition among schools—whether the offers are identical or the differences are simply narrowed—in the same way that an agreement on the minimum net price of attendance eliminates price competition. *See Socony-Vacuum*, 310 U.S. at 221 ("The [Sherman] Act places all such schemes beyond the pale and protects that vital part of our economy against any degree of interference."); *see also High Fructose Corn Syrup*, 295 F.3d at 656 ("An agreement to fix list prices is . . . a per se violation of the Sherman Act even if most or for that matter all transactions occur at lower prices.").

Defendants insist, however, that *their* price-fixing agreement should not be governed by the per se rule because it supposedly "promote[s] 'enterprise and productivity.'" MTD at 28. That argument is foreclosed by Supreme Court precedent. "Whatever economic justification particular price-fixing agreements may be thought to have, the law does not permit an inquiry into their reasonableness. They are all banned because of their actual or potential threat to the central nervous system of the economy." *FTC v. Super. Ct. Trial Laws. Ass'n*, 493 U.S. 411, 435

(1990) (quoting *Socony-Vacuum*, 310 U.S. at 224 n.59); *Arizona v. Maricopa Cnty. Med. Soc.*, 457 U.S. 332, 351 (1982) ("The anticompetitive potential inherent in all price-fixing agreements justifies their facial invalidation even if procompetitive justifications are offered for some."); *see also United States v. Aiyer*, 33 F.4th 97, 119–120 (2d Cir. 2022) (district court properly "refus[ed] to assess" whether price-fixing agreement "promotes productivity" because doing so would "cause the per se rule to lose all the benefits of being per se" (internal quotation marks and brackets omitted)).

Courts have recognized limited exceptions to the per se rule, but Defendants do not seem to invoke them here. For example, ancillary restraints—agreements collateral to a separate, legitimate collaboration and reasonably necessary to accomplish its procompetitive purposes— are exempt from per se scrutiny. *See Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 224 (D.C. Cir. 1986). But Defendants have not argued that agreeing on how to calculate need-based financial aid is ancillary to some *other* efficiency-enhancing collaboration and it is their burden to do so.[7] *See United States v. Addyston Pipe & Steel Co.*, 85 F. 271, 281– 91 (6th Cir. 1898) (Taft, J.), *aff'd*, 175 U.S. 211 (1899); *Blackburn v. Sweeney*, 53 F.3d 825, 828–29 (7th Cir. 1995). Courts have also recognized a limited exception for agreements that are "necessary to market [a] product at all." *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 23 (1979) ("*BMI*"). For example, in *BMI*, ASCAP and BMI created "blanket licenses" that allowed licensees to license several different copyrighted works in a single package that was

---

[7] The Supreme Court has also suggested that restraints "core" to an integrated joint venture are not subject to the per se rule. *See Texaco Inc. v. Dagher*, 547 U.S. 1, 6 (2006) ("Texaco and Shell Oil formed a joint venture, Equilon, to consolidate their operations in the western United States, thereby ending competition between the two companies in the domestic refining and marketing of gasoline"). But Defendants have not entered into an integrated joint venture as in *Dagher*. Instead, Defendants continue to compete with each other in other ways to attract students and so the "core restraints" doctrine is likewise inapplicable. *See id.* at 6–7 (contrasting core restraints among joint venturers who "d[o] not compete with one another in the relevant market" with "a pricing agreement between competing entities").

"different from anything any individual [copyright owner] could issue." *Id*. But Defendants have not argued that they cannot offer need-based financial aid to students without agreeing on how it is calculated.

*In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004 (7th Cir. 2012), on which Defendants rely (MTD at 28), does not support Defendants either. There, several manufacturers of sulfuric acid entered into "shutdown agreements" to limit their own production of sulfuric acid and instead distribute sulfuric acid produced in Canada. *Id*. at 1011. Because these agreements were necessary to facilitate entry by the Canadian firms, the Seventh Circuit concluded that they should be analyzed under the rule of reason—similar to other ancillary restraints. *Id*. (noting that "the shutdown agreements could be regarded as enabling or assisting in enabling a new product in the U.S. economy, namely Canadian smelter acid").[8] These cases are inapposite, however, because Defendants can offer need-based financial aid to students without agreeing among themselves on how much aid to offer. Many colleges do just that. *See, e.g.*, Am. Compl. ¶¶ 122–25.

Moreover, the fact that Defendants are nonprofits or educational institutions does not mean they are categorically exempt from per se rules. *See, e.g.*, *Am. Soc. of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 576 (1982) ("ASME contends it should not bear the risk of loss for antitrust violations committed by its agents acting with apparent authority because it is a nonprofit organization, not a business seeking profit. But it is beyond debate that nonprofit organizations can be held liable under the antitrust laws."); *Maricopa*, 457 U.S. at 351 ("the argument that the per se rule must be rejustified for every industry that has not been subject to

---

[8] In *Indiana Federation of Dentists*, another case on which Defendants rely (MTD at 28), the Federal Trade Commission did not argue that the conduct at issue should be analyzed under the per se rule. *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 459 (1986) ("[A]s did the FTC, we evaluate the restraint at issue in this case under the Rule of Reason rather than a rule of per se illegality.").

significant antitrust litigation ignores the rationale for per se rules . . . ."). Nor should it. Whether an entity is a "nonprofit" or a "university," it can still be organized to maximize the revenue it collects from consumers or other trading partners. *Bd. of Regents*, 468 U.S. at 101 n.22 ("Since the District Court found that the NCAA and its member institutions are in fact organized to maximize revenues, it is unclear why petitioner is less likely to restrict output in order to raise revenues above those that could be realized in a competitive market than would be a for-profit entity." (internal citation omitted)); *see also Trial Laws. Ass'n*, 493 U.S. at 427 ("No matter how altruistic the motives of respondents may have been, it is undisputed that their immediate objective was to increase the price that they would be paid for their services.").

Defendants maintain that under *Brown* their agreement must be analyzed under a "full rule-of-reason analysis." MTD at 23. But even if this Court follows *Brown* and applies the rule of reason, Plaintiffs have adequately alleged a Section 1 violation. Indeed, *Brown* held the agreement there—similar in many respects to the agreement here—was "anticompetitive on its face" and "a price fixing mechanism impeding the ordinary functioning of the free market," which sufficed to satisfy the plaintiff's initial burden under the rule or reason. 5 F.3d at 673–74 (internal quotation marks omitted). Thus, the Third Circuit held, "the Overlap [Agreement] initially 'requires some competitive justification even in the absence of a detailed market analysis.'" *Id.* (quoting *Indiana Fed'n of Dentists*, 476 U.S. at 460)). The court remanded that issue for further analysis since "the district court was obliged to more fully investigate the procompetitive and noneconomic justifications proffered by MIT" than it had after the 10-day trial before. *Id.* at 678. Whether Defendants might have a sufficient procompetitive justification here—if the rule of reason applies—"is a factual issue for trial," not a basis to dismiss. *In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d at 495; *see also Viamedia*, 951 F.3d at

16

462 ("[T]he calculation of procompetitive benefits net of anticompetitive harms does not easily lend itself to a *pleading* standard." (emphasis in original)).

Because Plaintiffs have sufficiently alleged both a per se and a rule of reason claim, the Court need not resolve which mode of analysis applies at this stage. *See, e.g.*, *In re: EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, 336 F.Supp.3d 1256, 1297 n.8 (D. Kan. 2018) ("In ruling [on a motion to dismiss], the court just needs to determine whether the class plaintiffs have alleged a plausible conspiracy under the antitrust laws.").

\*  \*  \*

Respectfully submitted,

JONATHAN S. KANTER
*Assistant Attorney General*

DOHA G. MEKKI
*Principal Deputy Assistant Attorney General*

ERIC D. DUNN
*Attorney Advisor to the Assistant Attorney General*

RYAN S. STRUVE
NICHOLAS S. CHEOLAS
*Attorneys*

Dated: July 8, 2022        /s/ Eric D. Dunn
ERIC D. DUNN

Attorneys for the United States of America

## CERTIFICATE OF SERVICE

I hereby certify that on July 8, 2022, I electronically filed the foregoing brief by using the CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

/s/ Eric D. Dunn
ERIC D. DUNN