# EXHIBIT A

2022 WL 2582368
Only the Westlaw citation is currently available.
United States Court of Appeals, Seventh Circuit.

Ricardo **VASQUEZ**, Plaintiff-Appellant,
v.
**INDIANA** UNIVERSITY HEALTH,
INC., et al., Defendants-Appellees.

No. 21-3109
|
Argued April 8, 2022
|
Decided July 8, 2022

Appeal from the United States Court for the Southern District of Indiana, Indianapolis Division. No. 21-cv-1693 — **Jane Magnus-Stinson**, *Judge.*

**Attorneys and Law Firms**

Katharine M. O'Connor, Attorney, McDermott, Will & Emery LLP, Chicago, IL, Sarah P. Hogarth, Attorney, McDermott, Will & Emery, Washington, DC, for Plaintiff-Appellant.

Brian K. Grube, Attorney, Jones Day, Cleveland, OH, Angela M. Rinehart, Attorney, Stoll Keenon Ogden PLLC (SKO), Indianapolis, IN, Arthur T. O'Reilly, Attorney, Jones Day, Detroit, MI, for Defendants-Appellees.

Before Wood, Hamilton, and Jackson-Akiwumi, Circuit Judges.

**Opinion**

Wood, Circuit Judge.

 **\*1** Dr. Ricardo Vasquez is a vascular surgeon; he has practiced in Bloomington, Indiana, since 2006. Vasquez alleges that in the time since he opened up shop, Indiana University Health (IU Health) has amassed considerable market power in the region's medical industry. Vasquez sued IU Health, claiming antitrust violations under the Sherman Act, 🚩15 U.S.C. §§ 1–7, and the Clayton Act, *id.* §§ 12–27. IU Health moved to dismiss, arguing that neither the Sherman Act nor the Clayton Act claims were premised on a plausible geographic market, and that the Clayton Act claims also were time-barred. The district court agreed on both points and dismissed the suit. But Vasquez's allegations passed muster for the pleading stage, and so we reverse.

**I**

We begin with a few more details about Bloomington and the surrounding region, Vasquez's practice, IU Health's history in the market, and the complaint's allegations. At this stage, we accept all well-pleaded facts as true and draw all reasonable inferences in Vasquez's favor. *Mashallah, Inc. v. West Bend Mut. Ins. Co.*, 20 F.4th 311, 317 (7th Cir. 2021).

Bloomington is a city in Monroe County, Indiana, with a population of about 90,000. The surrounding metropolitan statistical area has a population of about 200,000. Bloomington is the largest metro area in its corner of southwestern Indiana. From Bloomington, one can drive an hour and ten minutes northeast to Indianapolis (population 865,000); two hours southwest to Evansville (population 120,000); two hours southeast to Louisville, Kentucky (population 620,000); or two and a half hours east to Cincinnati, Ohio (population 300,000). Most of the region bounded by those larger cities is rural, albeit spotted with small cities and large towns.

Vasquez arrived in Bloomington in 2006 and soon after opened an independent vascular-surgery practice. Many vascular-surgery patients require treatment with specialized equipment in a hospital setting, and so Vasquez sought and obtained admitting privileges at three different area hospitals: Bloomington Hospital, Monroe Hospital, and the Indiana Specialty Surgery Center. Vasquez performed the lion's share of his inpatient procedures (over 95%) at Bloomington Hospital, which had the best equipment.

IU Health entered the Bloomington market in 2010 when it acquired Bloomington Hospital. (At the time, IU Health was known as Clarian Health Partners; it rebranded in 2011. Clarian was formed by the merger of three Indianapolis-area hospitals in 1997.) In May 2017, IU Health expanded its footprint in southwestern Indiana by acquiring Premier Healthcare, an independent physician group based in Bloomington. At the time of the acquisition, Premier employed many of the region's doctors, especially primary-care providers (PCPs). Vasquez alleges that, as a consequence of the Premier acquisition, IU Health now employs 97% of PCPs in Bloomington and over 80% of PCPs in the wider region.

Vasquez v. Indiana University Health, Inc., --- F.4th ---- (2022)

Vasquez's alleged problems with IU Health began shortly after the Premier acquisition. At this early stage, little turns on the details, so we can be brief. Vasquez contends that in "[a]pproximately 2017," around the time of the acquisition, IU Health launched "a systematic and targeted scheme" to ruin his reputation and practice. The scheme was motivated by Vasquez's commitment to independent practice. IU Health preferred to employ the region's doctors directly, an agenda which Vasquez resisted. In June 2018, IU Health threatened to revoke Vasquez's privileges at Bloomington Hospital, and its employees began to cast aspersions on his reputation—alleging, for example, that he had been sued with unusual frequency. Needless to say, Vasquez disputes the factual accuracy of these claims. In April 2019, IU Health followed through on its threat, revoking Vasquez's Bloomington admitting privileges.

 **\*2** In June 2021, Vasquez filed this lawsuit. IU Health moved, successfully, to dismiss, and Vasquez now appeals.

**II**

Vasquez's appeal raises three issues: (1) the dismissal of his claims under Sherman Act section 2, 15 U.S.C. § 2, and Clayton Act section 7, *id.* § 18, for failure to allege a proper geographic market; (2) the dismissal of the Clayton Act claims on timeliness grounds; and (3) the decision not to give him one opportunity to amend his complaint before dismissing with prejudice. We review the first two issues *de novo,* *Warciak v. Subway Restaurants, Inc.*, 949 F.3d 354, 356 (7th Cir. 2020), and the third for abuse of discretion.

**A**

We begin with the geographic-market analysis. Vasquez's complaint needed to allege only one plausible geographic market to survive a motion to dismiss. See *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A rational jury could find that Bloomington is such a market, as we now explain.

In *FTC v. Advocate Health Care Network*, 841 F.3d 460 (7th Cir. 2016) ("*Advocate*"), a case concerning a hospital merger, we endorsed the use of the "hypothetical monopolist test" to analyze geographic healthcare markets.

As a general matter, that test asks "what would happen if a single firm became the only seller in a candidate geographic region." *Id.* at 468. "If that hypothetical monopolist could profitably raise prices above competitive levels, the region is a relevant geographic market." *Id.* But if, instead, "customers would defeat the attempted price increase by buying from outside the region, it is not a relevant market; the test should be rerun using a larger candidate region." *Id.* In this sense, the inquiry "is iterative, meaning it should be repeated with ever-larger candidates until it identifies a relevant geographic market." *Id.* Importantly, the determination of the area of effective competition poses a question of fact, not one of law. See *Fishman v. Estate of Wirtz*, 807 F.2d 520, 531 (7th Cir. 1986).

We see no reason to break with *Advocate* here. The hypothetical-monopolist test remains the best approach to geographic-market analysis in the healthcare context. It focuses courts' attention on the crucial question whether it is possible, within a given defined geographic area, for a hypothetical single firm to engage in anticompetitive practices (*i.e.*, raising price or reducing output, or otherwise harming consumer welfare). With that in mind, we turn to Vasquez's arguments.

Vasquez first posits that the vascular-surgery market in Bloomington is inherently local. This is because "vascular surgery patients need ongoing care, oftentimes lifetime care." So, Vasquez reasons, if a Bloomington patient "is sent to Indianapolis, that patient must continue to travel for a lifetime if he or she wants continuity of care." And because most patients would consider that a bad deal—as *Advocate* recognized, see 841 F.3d at 470—insurers (the most directly affected buyers here) face pressure to provide vascular surgery in or near Bloomington. [1] An insurer that does not provide such care risks being outcompeted by other insurers within Bloomington. It follows that a hypothetical monopolist over vascular surgery in Bloomington would be able to abuse its market power considerably by jacking up payor prices and freezing out potential competitors. In particular, because much vascular surgery is performed in a hospital setting with special equipment, a hypothetical vertically integrated monopolist that controlled the hospital, the equipment, and most of the surgeons would be well-positioned to engage in anticompetitive practices.

**\*3** Vasquez also alleges that vascular surgeons' reliance on referrals makes Bloomington an appropriate geographic market in a second sense. The idea is that while Bloomington residents may be willing to travel to Indianapolis for some categories of specialist care, they will not be willing to drive an hour or more for routine primary care. Bloomington, after all, has two hospitals, a medical-school campus, and a metro population that ought to be more than adequate to support a healthy, competitive primary-care practice market. All agree that vascular surgeons, who are specialists, get most patients by referral from primary-care providers. Thus, a hypothetical monopolist over primary-care services in Bloomington would control not only that market but also the flow of patients to vascular surgeons. By cutting off the flow of new patients to its vascular-surgery competitors, the monopolist could capture the entire market, thereby positioning itself to raise payor prices without repercussion.

Both stories are plausible accounts of how a hypothetical monopolist could wield anticompetitive power in Bloomington's vascular-surgery market. We could stop there; at the pleading stage, a plausible scenario is all we require to establish the geographic market. But as it happens, Vasquez goes considerably further. He alleges not only that a hypothetical monopolist *could* dominate the Bloomington market in the two ways he suggests but also that IU Health already does so. With regard to vascular surgery itself, Vasquez contends that IU Health controls the hospital with the most advanced equipment and, other than him, all the vascular surgeons. And regarding upstream referrals, he alleges without contradiction that IU Health employs 97% of the primary-care physicians in Bloomington, meaning that virtually every patient sees an IU Health PCP. (That is one reason why the existence of other hospitals in the Bloomington area does not necessarily defeat Vasquez's claim.) To repeat: these contentions are by no means necessary in order adequately to plead a geographic market. But they are sufficient. The hypothetical-monopolist test concerns hypotheticals, as it says on the label, not realities. But the detailed allegations about the on-the-ground realities in Bloomington drive home the key point: Vasquez's allegations easily clear the plausibility bar.

This is not the time to evaluate the merits of Vasquez's allegations, and that in any event is a task that requires expert testimony. The motion-to-dismiss stage does not lend itself to rigorous hypothetical-monopolist analysis. Normally, the way that analysis is conducted is by survey. Experts canvass a representative sample of local market participants, asking

about both their actual behavior in the market as it is and how it would change if certain hypothetical conditions came to pass. Here, for instance, an expert might try to determine at what price point an insurer would stop paying for vascular-surgery services in Bloomington, opting instead to cover only patients who went to specialists in Indianapolis. It may turn out that Indianapolis providers are close enough to act as a market check on any and all price increases. If so, Bloomington would not be a geographic market. But for present purposes, we cannot substitute our own speculations for the requisite analysis. [2]

It is worth recalling at this juncture what is required in a pleading. As the Supreme Court put it in *Twombly*, "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations .... " 550 U.S. at 555, 127 S.Ct. 1955. Indeed, the allegations do not even need to establish the probability of the plaintiff's recovery. *Id.* at 556, 127 S.Ct. 1955. They need only present "enough fact to raise a reasonable expectation that discovery will reveal evidence" of illegal acts. *Id.* So too in this case, we need not decide whether Vasquez's story is probable; we are assessing only its plausibility.

**\*4** The district court found Vasquez's complaint wanting for two reasons. First, it thought that Vasquez's geographic-market allegations were contradictory. The purported contradiction was between two factual claims in the complaint: (1) that patients "prefer to stay within Bloomington to receive care," and (2) that "many of the patients who arrive at Bloomington Hospital for care travel from rural areas, some of them up to two hours away." The district court saw an inconsistency between the two claims, and it thought that clash undermined the Bloomington market's plausibility.

We see several problems with this reasoning. First, Federal Rule of Civil Procedure 8(d)(3) specifically permits contradictory pleadings, and so this criticism was misplaced. And in any event, our own examination of the allegations persuades us that they are not contradictory at all. They concern two different groups of people—urban and rural patients—with different expectations, motivations, and market behaviors. Bloomington is a regional hub, home to a major university and substantial medical infrastructure. Patients who reside there no doubt expect to get most medical care close to home. Patients in surrounding rural

communities, in contrast, realistically expect to travel to hospitals in large cities when the alternative is getting sick or dying, though they may otherwise prefer to purchase services at home in Loogootee (population 2,751) or French Lick (population 1,841). Both allegations could be true; indeed, both *are* true in many places. On top of that, the allegation about two-hour travel is hardly the linchpin of Vasquez's theory of the geographic market. It comprises two clauses buried thirty pages into the complaint, in the context of a tangential discussion of the impacts IU Health's alleged monopoly has on patients. And even assuming some level of tension between Vasquez's allegations, a final problem is that the district court did not attempt to situate that tension in any antitrust market-analysis doctrine. A contradiction could undermine a market's plausibility if it showed that the alleged market failed the hypothetical-monopolist test. But we do not see how that could be true here.

The district court also reasoned that Bloomington could not be "the appropriate geographic market" if "a significant portion of [IU Health's] patients regularly travel substantial distances to get to Bloomington." But this confuses two different sorts of market. The geographic market for an antitrust claim need not—and very often will not—correspond to the comprehensive market that the alleged monopolist serves. See

⚑ *United States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586, 593, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957) (explaining that "the bounds of a relevant market for the purposes of [a] case" need not be "coextensive with the total market"). At the fringes, even a monopolist is likely to face competition.

Under ⚑ *Advocate*, 841 F.3d at 476, the appropriate object of the geographic-market analysis is the smallest market a hypothetical monopolist *could* dominate. Patient flows may help to define the borders of that market, but such flows are just one piece of data in the broader picture—they are not likely to be dispositive. To hold otherwise would be to carve a large loophole into antitrust law; realistically, some fuzziness about market boundaries will occur in most cases.

To sum up: Either of Vasquez's accounts of how a hypothetical monopolist could dominate Bloomington's vascular-surgery market suffice for the pleading stage. Dismissal was thus not warranted.

B

The district court also gave a second reason for dismissing Vasquez's Clayton Act claims (but not his Sherman Act claims): timeliness. The Clayton Act's statute of limitations requires a damages action to be "commenced within four years after the cause of action accrued." 15 U.S.C. § 15b. The district court understood that requirement to bar Vasquez's Clayton Act damages claim, and by analogy applied the equitable doctrine of laches to bar his injunctive claims. (Like the district court, we treat the laches defense at issue here as rising or falling with the statute of limitations defense, though it need not in every case.)

**\*5** Timeliness is an affirmative defense. "An antitrust cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business."

⚑ *In re Copper Antitrust Litig.*, 436 F.3d 782, 789 (7th Cir. 2006) (cleaned up). That rule "is qualified by the discovery rule, which postpones the beginning of the limitations period from the date when the plaintiff is wronged to the date when he discovers he has been injured." ⚑ *Id.* (cleaned up). We have applied a demanding standard to dismissals on timeliness grounds at the pleading stage of antitrust cases, asking whether "the plaintiff pleads itself out of court."

⚑ *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 902 (7th Cir. 2004).

Vasquez did not. To be sure, he filed suit four years and one month after IU Health acquired Premier. So, if that acquisition started the clock, Vasquez missed his window by a month. But to affirm the dismissal, we would need to be sure that the undisputed facts show that the operative injury both occurred and was discovered at the moment of acquisition (or at the latest, during the following month). But the complaint does not paint such a one-sided picture.

The earliest potential injury the complaint identifies is its allegation of a "systematic and targeted scheme to ruin Dr. Vasquez's reputation and practice" in "approximately 2017, around the time that IU Health acquired Premier." But "[a]round the time" plausibly could mean "six weeks after," which would be enough to save the Clayton Act claims for now. Nor do we have enough information, at this stage, to ascertain exactly when Vasquez *learned* of the purported scheme, which is what really matters. Another plausible measuring stick occurred a year later, in June 2018, when IU Health's anti-Vasquez vendetta is alleged to have started in earnest. That is when, for instance, IU Health employees began to suggest that Vasquez had often

been sued and to threaten termination of privileges. A third plausible measuring stick is the actual revocation of Vasquez's privileges in April 2019—the event that one assumes would have had the most concrete impact on Vasquez's income. Until IU Health took that step, Vasquez reasonably may have thought that an accommodation was possible.

Without discovery, choosing among these alternatives is difficult, if not impossible. What matters is that the complaint presents a plausible account under which his suit is timely. We note as well that timeliness is an affirmative defense and thus normally (and here) is not properly resolved at the Rule 12(b)(6) stage.

### III

Given our disposition of Vasquez's principal arguments, we have no need to discuss his request to file an amended complaint. The district court's grant of IU Health's motion to dismiss is REVERSED and the case is REMANDED for further proceedings consistent with this opinion.

**All Citations**

--- F.4th ----, 2022 WL 2582368

### Footnotes

1    We note in this connection that the antitrust laws confer a right of action on "any person ... injured in his business or property," see ⚑15 U.S.C. § 15, and that the Supreme Court has confirmed that both consumers, such as the insurers here, and competitors, such as Vasquez, fall within the scope of the law. See ⚑*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 538, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) ("[T]he Sherman Act was enacted to assure customers the benefits of price competition, and [the Court's] prior cases have emphasized the central interest in protecting the economic freedom of participants in the relevant market").

2    We note, in this connection, that Vasquez alleges an alternative market, "Southern Indiana," which he defines to include Morgan, Owen, Monroe, Brown, Greene, Daviess, Martin, Lawrence, Orange, and Washington counties. For present purposes, we focus on Bloomington, both because it is the smallest plausible market alleged and because the alternative market includes it. That said, the Southern Indiana market may turn out to be the best object of analysis as this litigation progresses and further facts emerge. Our present attention to the Bloomington market should in no way be taken to limit the parties to arguments about that market.

**End of Document**                                                     © 2022 Thomson Reuters. No claim to original U.S. Government Works.