# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| FRANK CARBONE, ANDREW CORZO, SAVAN-NAH ROSE EKLUND, SIA HENRY, ALEXAN-DER LEO-GUERRA, MICHAEL MAERLANDER, BRANDON PIYEVSKY, KARA SAFFRIN, and BRITTANY TATIANA WEAVER, individually and on behalf of all others similarly situated,<br>　　　　　　　　　　Plaintiffs,<br><br>　　　v.<br><br>BROWN UNIVERSITY, CALIFORNIA INSTI-TUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DART-MOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNI-VERSITY, THE JOHNS HOPKINS UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOL-OGY, NORTHWESTERN UNIVERSITY, UNI-VERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENN-SYLVANIA, WILLIAM MARSH RICE UNIVER-SITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY,<br>　　　　　　　　　　Defendants. | Case No.　1:22-cv-00125<br><br><br>Judge Matthew F. Kennelly<br><br>Magistrate Gabriel A. Fuentes |

## REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................1

ARGUMENT ......................................................................................................3

I.    Plaintiffs Fail To Plausibly Allege That Section 568's Protection Does Not Apply .............................................................................................................3

    A.    Plaintiffs Must Plausibly Allege Non-Need-Blind Practices To State A Claim ...........................................................................................3

    B.    Plaintiffs' Interpretation Of "Need-Blind" Is Untenable .............................5

    C.    Plaintiffs' Allegations Of Non-Need-Blind Admissions Are Insufficient ..............................................................................................7

    D.    Plaintiffs Fail To Justify Exposing To Liability Schools That Lack Actual Knowledge That Another Participating School Is Not Need-Blind..............................................................................................9

II.    Plaintiffs Have Not Plausibly Alleged An Unreasonable Restraint Of Trade ...........................................................................................................11

    A.    Plaintiffs Have Not Alleged An Agreement Plausibly Subject To Automatic Condemnation Under The Per Se Rule Or Quick Look Test..........................................................................................11

        1.    Plaintiffs Have Not Alleged A Naked Price-Fixing Agreement ..........................................................................12

        2.    The Consensus Methodology's Plausible Procompetitive Benefits Preclude Per Se Or Quick Look Condemnation..............16

        3.    Congress, DOJ, And The Third Circuit Have All Found That Similar Conduct Is Not Obviously Anticompetitive .............19

    B.    Plaintiffs' Claim Fails As A Matter Of Law Under The Rule Of Reason ..........................................................................................21

        1.    Plaintiffs Have Not Plausibly Alleged Direct Anticompetitive Effects ...........................................................21

        2.    Plaintiffs Fail To Allege A Plausible Relevant Product Market And So Fail To State A Claim............................................22

III.    Plaintiffs Fail to Allege Antitrust Injury Or Standing ...........................................24

IV.    Plaintiffs Fail To Refute The Plain Untimeliness Of Most Of Their Claims ........25

CONCLUSION...................................................................................................27

## **TABLE OF AUTHORITIES**

Page(s)

### CASES

*1-800 Contacts, Inc. v. FTC,*
    1 F.4th 102 (2d Cir. 2021) ........................................................................20, 22

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)...............................................................................................9

*Associated General Contractors of California, Inc. v. California State Council of Carpenters,*
    459 U.S. 519 (1983)...........................................................................................24

*Bank of America v. Knight,*
    725 F.3d 815 (7th Cir. 2013) .......................................................................8, 10

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007)...........................................................................................8, 22

*Bond v. United States,*
    572 U.S. 844 (2014)...........................................................................................5, 6

*Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,*
    441 U.S. 1 (1979)...........................................................................................1, 16, 19

*Business Electronics Corp. v. Sharp Electronics Corp.,*
    485 U.S. 717 (1988)...........................................................................................11

*Car Carriers, Inc. v. Ford Motor Co.,*
    745 F.2d 1101 (7th Cir. 1984) ........................................................................12

*Catalano, Inc. v. Target Sales, Inc.,*
    446 U.S. 643 (1980)...........................................................................................12

*Chisholm Brothers Farm Equipment Co. v. International Harvester Co.,*
    498 F.2d 1137 (9th Cir. 1974) ........................................................................12

*Edmond v. City of Chicago,*
    2018 WL 5994929 (N.D. Ill. Nov. 15, 2018) ...............................................8

*Finkelstein v. Aetna Health Plans of New York, Inc.,*
    1997 WL 419211 (S.D.N.Y. July 25, 1997), *aff'd,* 152 F.3d 917 (2d Cir. 1998)..............21

*Food Marketing Institute v. Argus Leader Media,*
    139 S. Ct. 2356 (2019)......................................................................................7

*FTC v. Indiana Federation of Dentists,*
    476 U.S. 447 (1986)...........................................................................................11

*Gabelli v. SEC*,
    568 U.S. 442 (2013)................................................................................25

*Gelboim v. Bank of America Corp.*,
    823 F.3d 759 (2d Cir. 2016)..................................................................14

*Gerlinger v. Amazon.Com, Inc.*,
    311 F. Supp. 2d 838 (N.D. Cal. 2004) ...................................................16

*Greater Rockford Energy & Technology Corp. v. Shell Oil Co.*,
    998 F.2d 391 (7th Cir. 1993) .................................................................24

*H. A. Artists & Associates v. Actors' Equity Ass'n*,
    451 U.S. 704 (1981)..................................................................................3

*In re AIG Workers Compensation Insurance Policyholder Litigation*,
    2015 WL 1992723 (N.D. Ill. Apr. 27, 2015) .......................................26

*In re Broiler Chicken Antitrust Litigation*,
    290 F. Supp. 3d 772 (N.D. Ill. 2017) ...................................................26

*In re High Fructose Corn Syrup Antitrust Litigation*,
    295 F.3d 651 (7th Cir. 2002) .................................................................13

*In re Wheat Rail Freight Rate Antitrust Litigation*,
    579 F. Supp. 517 (N.D. Ill. 1984) ..................................................14, 19

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007)............................................................................4, 11

*Loeb Indus., Inc. v. Sumitomo Corp.*,
    306 F.3d 469 (7th Cir. 2002) .................................................................24

*Major League Baseball Properties, Inc. v. Salvino, Inc.*,
    542 F.3d 290 (2d Cir. 2008)..................................................................12

*Marion Healthcare, LLC v. Becton, Dickinson & Co.*,
    952 F.3d 832 (7th Cir. 2020) .................................................................10

*McGarry & McGarry, LLC v. Bankruptcy Management Solutions, Inc.*,
    937 F.3d 1056 (7th Cir. 2019) ...............................................................24

*Meacham v. Knolls Atomic Power Laboratory*,
    554 U.S. 84 (2008)....................................................................................4

*Mid-America Regional Bargaining Ass'n v. Will County Carpenters District Council*,
    675 F.2d 881 (7th Cir. 1982) ...................................................................4

*National Broiler Marketing Ass'n v. United States*,
    436 U.S. 816 (1978)...........................................................................................10

*NCAA v. Alston*,
    141 S. Ct. 2141 (2021).....................................................................................20

*NCAA v. Board of Regents of University of Oklahoma*,
    468 U.S. 85 (1984)...........................................................................................26

*Northwest Wholesale Stationers, Inc. v. Pacific Stationary & Printing Co.*,
    472 U.S. 284 (1985).........................................................................................21

*Ohio v. American Express Co.*,
    138 S. Ct. 2274 (2018).................................................................................20, 21

*Payne v. County of Cook*,
    2016 WL 1086527 (N.D. Ill. Mar. 21, 2016).....................................................8

*Polk Brothers v. Forest City Enterprises, Inc.*,
    776 F.2d 185 (7th Cir. 1985) ..........................................................................16

*Reapers Hockey Ass'n, Inc. v. Amateur Hockey Ass'n Illinois, Inc.*,
    412 F. Supp. 3d 941 (N.D. Ill. 2019) ..............................................................24

*Republic Tobacco Co. v. North Atlantic Trading Co.*,
    381 F.3d 717 (7th Cir. 2004) ..........................................................................23

*Rotkiske v. Klemm*,
    140 S. Ct. 355 (2019).......................................................................................25

*Siva v. American Board of Radiology*,
    2022 WL 2311259 (7th Cir. June 28, 2022) ......................................................1

*Spinelli v. National Football League*,
    903 F.3d 185 (2d Cir. 2018).............................................................................21

*United States v. Brown*,
    5 F.3d 658 (3d Cir. 1993)...............................................................6, 18, 19, 23

*United States v. First City National Bank of Houston*,
    386 U.S. 361 (1967)...........................................................................................4

*United States v. Lewis*,
    411 F.3d 838 (7th Cir. 2005) ..........................................................................25

*United States v. Logan*,
    2004 WL 417341 (N.D. Ill. Feb. 2, 2004) .......................................................25

*United States v. McKesson & Robbins, Inc.*,
    351 U.S. 305 (1956)........................................................................................19

*United States v. Socony-Vacuum Oil Co.*,
    310 U.S. 150 (1940)........................................................................................14

*United States v. Standard Oil Co.*,
    316 F.2d 884 (7th Cir. 1963) .........................................................................11

*United Steelworkers of America, AFL-CIO-CLC v. Weber*,
    443 U.S. 193 (1979)..........................................................................................7

*Vasquez v. Indiana University Health, Inc.*,
    2022 WL 2582368 (7th Cir. July 8, 2022).....................................23, 25, 26

*Viamedia, Inc. v. Comcast Corp.*,
    951 F.3d 429 (7th Cir. 2020), *cert. denied*, 141 S. Ct. 2877 (2021)................7

*Vogel v. American Society of Appraisers*,
    744 F.2d 598 (7th Cir. 1984) .............................................................12, 17, 18

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    401 U.S. 321 (1971)..................................................................................25, 27

## STATUTES, RULES, AND REGULATIONS

12 U.S.C. § 1828(c)(5)(B) ......................................................................................4

15 U.S.C.
    § 1, note.......................................................................................................4, 10
    § 15b................................................................................................................25
    § 17..................................................................................................................4

## OTHER AUTHORITIES

1 Areeda & Hovenkamp, Antitrust Law § 1509c ....................................................12

147 Cong. Rec. S10252 (daily ed. Oct. 3, 2001) ...................................................17

Connor Jones, *On the Record with President DeGoia*, GEORGETOWN VOICE (Mar. 6, 2014),
    https://georgetownvoice.com/2014/03/06/record-president-degioia/ ................15

H.R. Conf. Rep. No. 103-761 (1994)........................................................................9

H.R. Rep. No. 103-761 (1994)..................................................................................5

H.R. Rep. No. 105-144 (1997)................................................................................17

H.R. Rep. No. 114-224 (2015)................................................................................13

*History of the 568 Presidents Group*, 568 Presidents Grp.,
http://www.568group.org/home/?q=node/3...................................................................13

Oxford English Dictionary..............................................................................................5

## **INTRODUCTION**

Plaintiffs' opposition cannot overcome the incurable defects of their amended complaint. They claim that conduct Congress has expressly encouraged is so obviously anticompetitive that this Court should declare it *per se* illegal. They also fail to plausibly allege a product market in which Defendants have sufficient power to harm consumers. Plaintiffs also fail to allege antitrust injury and standing, and their complaint makes clear that most of the Plaintiffs brought their claim years too late.

*First*, Plaintiffs fail to allege a Section 1 violation because they did not plead facts removing the alleged agreement from Section 568's ambit. A school is "need-blind" if its admissions decisions are "blind" to applicants' "need" *for financial aid*. Plaintiffs assert, however, that the statute requires schools to ignore *all* of an applicant's financial circumstances. That would read the word "need" out of the law, ignore statutory and historical context, and lead to litigation over admissions policies wholly unrelated to need for financial aid. It also would bar recognition of the unique attributes of low-income applicants and benefits of socioeconomic diversity—an untenable result Plaintiffs try to avoid with a contrived gloss on the text that only shows the statute is not unambiguous. The proper construction is fatal to Plaintiffs' claim. They allege no facts about the admissions policies of nearly half of Defendants, and their remaining allegations rely on their flawed statutory interpretation or are conclusory, stale, or implausible.

*Second*, exemption aside, Plaintiffs have not plausibly alleged an agreement that unreasonably restrains trade. They repeatedly assert that the Consensus Methodology is a naked price-fixing agreement subject to *per se* condemnation. But as the Seventh Circuit recently explained, "[i]n antitrust law, 'easy labels do not always supply ready answers.'" *Siva v. Am. Bd. of Radiology*, 2022 WL 2311259, at *1 (7th Cir. June 28, 2022) (quoting *Broad. Music, Inc. v. Columbia*

*Broad. Sys., Inc.* (*BMI*), 441 U.S. 1, 8 (1979)). Here, Congress expressly sought to encourage collaboration like the Consensus Methodology. Likewise, the Department of Justice (DOJ) previously determined that such collaboration is *not* anticompetitive, as reflected in the MIT Settlement in which it blessed the collaboration of schools on a common approach to determining need. And the Third Circuit found an agreement with similar benefits did not warrant *per se* treatment. Moreover, even at face value, the *facts* alleged do not amount to price-fixing. They charge at most an agreement to develop an additional methodology to calculate a single data point—students' need for financial aid as determined by the Consensus Methodology—not an agreement to use that data point to determine prices or suppress financial aid. To so allege, Plaintiffs would have to allege that the Consensus Methodology constrained the amount and type of student aid offered, and impacted the tuition price schools set. Neither is alleged. Instead, as DOJ (at 3) explains, schools "compete to offer students financial aid packages, including more need-based aid or more grants and fewer loans." Plaintiffs also have not plausibly alleged that the Consensus Methodology lacks any possible procompetitive justification. Nor could they, given the facial plausibility that use of the methodology in whole or in part increases accuracy and results in *more* financial aid and broader access to higher education.

Plaintiffs argue at such length for *per se* treatment because their claim fails under the rule of reason. Given the absence of direct anticompetitive effects from which Defendants' market power can be inferred, Plaintiffs must plead a plausible relevant market in which Defendants have substantial pricing power. They do not. Instead, Plaintiffs offer a litigation construct masquerading as a relevant market that flies in the face of common sense and commercial reality.

*Third*, Plaintiffs offer no persuasive rebuttal to Defendants' antitrust injury and standing arguments. They point to no facts plausibly suggesting that their expected contributions would

have been lower absent the Consensus Methodology—much less that any hypothetical need would have been met with additional grants, which reduce the effective price, instead of loans, which do not. Plaintiffs simply speculate that they would have received higher grant aid. That does not suffice.

*Last*, the claims of the seven Plaintiffs who matriculated before 2018 are time-barred. Supreme Court precedent forecloses the discovery rule on which Plaintiffs rely, and in any event Plaintiffs' claim relies entirely on alleged facts that were all publicly available before 2018.

## ARGUMENT

I. **Plaintiffs Fail To Plausibly Allege That Section 568's Protection Does Not Apply**

Plaintiffs' opposition misstates their pleading obligations with respect to Section 568, misinterprets its meaning, fails to allege facts taking the challenged collaboration outside of its protections, and adopts a reading that is contrary to black-letter law.

### A. **Plaintiffs Must Plausibly Allege Non-Need-Blind Practices To State A Claim**

Plaintiffs begin by wrongly asserting that Section 568 is an affirmative defense. This argument—which DOJ does not join—erroneously reads the statute in isolation. Like the statutory labor exemption, Section 568 imposes elements that a plaintiff must plead and prove to overcome it. Plaintiffs (at 13 n.5) seek to distinguish the labor exemption as grounded in a "public policy against discouraging amicable resolution of labor disputes." That is no distinction. Just as the labor exemption is a "statement of congressional policy that the courts must not use the antitrust laws as a vehicle to interfere in labor disputes," *H. A. Artists & Assocs. v. Actors' Equity Ass'n*, 451 U.S. 704, 714 (1981), so too Section 568 reflects "congressional policy" that the antitrust laws must not interfere with collaboration to better assess student need and expand access to higher education. Making the exemption essentially inapplicable on a motion to dismiss would invite precisely the sort of onerous litigation Congress sought to avert. *See* Defs. Br. 6-7.

The text precludes this result. Section 1 of the Sherman Act has long been construed to "outlaw only unreasonable restraints" of trade. *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007). Section 568 provides that "[i]t shall not be unlawful under the antitrust laws" for need-blind institutions to use common analysis to calculate need. 15 U.S.C. § 1, note. Congress thus established that covered agreements are reasonable as a matter of law. To plead an illegal agreement, then, Plaintiffs must plausibly allege facts that would establish that the participants are not need-blind. The Clayton Act works just this way for certain labor agreements. 15 U.S.C. § 17. Hence, complaints that fail "to plead a conspiracy that would remove the alleged agreement from the coverage of the labor exemption" are dismissed. *Mid-Am. Reg'l Bargaining Ass'n v. Will Cnty. Carpenters Dist. Council*, 675 F.2d 881, 886 (7th Cir. 1982). So too here.

Plaintiffs (at 12) cite inapposite exemptions that are affirmative defenses because they permit conduct that otherwise is illegal. As the Supreme Court emphasized, the exemptions in the Age Discrimination in Employment Act explicitly note that covered conduct is "otherwise prohibited" discrimination. *Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84, 93-95 (2008). Likewise, the Bank Merger Act permits some mergers even if they may "lessen competition," "create a monopoly," or "be in restraint of trade," which are outcomes the antitrust laws prohibit. *United States v. First City Nat'l Bank of Hous.*, 386 U.S. 361, 364 (1967) (quoting 12 U.S.C. § 1828(c)(5)(B)). By contrast, Section 568 expressly provides that the covered conduct is "not … unlawful under the antitrust laws," meaning covered agreements are reasonable as a matter of law under Section 1. Accordingly, Plaintiffs must allege that the agreement is *not* covered. By failing to plead facts plausibly removing the alleged conspiracy from Section 568's ambit, Plaintiffs thus fail to state a claim under Section 1.

**B.     Plaintiffs' Interpretation Of "Need-Blind" Is Untenable**

Plaintiffs' core legal contention (at 15-16) is that Section 568 is inapplicable because a school is assertedly not "need-blind" if it considers, in admitting students, any information that could in some way be said to bear on an applicant's (or her family's) "financial circumstances." DOJ does not support that reading and for good reason.  The "need" in "need-blind" is *the need for financial aid*.  As the statutory definition clarifies, need-blind schools cannot hold information in financial aid applications against applicants or use other financial circumstances as a proxy for whether they will need financial aid and hold the need for financial aid against applicants.  *See also* H.R. Rep. No. 103-761, at 912 (1994); Defs. Br. at 11.  Contrary to Plaintiffs' suggestion (at 15, 18), Defendants do not argue that need-blind schools can *favor* applicants because they will *not* need financial aid.  Schools can, however, adopt other preferences related to applicants' financial circumstances, so long as they are not pretexts to disadvantage applicants *because* they need financial aid.  Plaintiffs allege no such pretexts here.  For example, a school remains need-blind if it credits some applicants who excel despite economic challenges or, in exceptional cases, considers that others' admission might increase the likelihood of donations unrelated to tuition.

Both the ordinary meaning of the "term … being defined" and the historical and statutory context, *Bond v. United States*, 572 U.S. 844, 860 (2014), support Defendants' interpretation.  The Oxford English Dictionary defines "need-blind" to mean "not taking account of any (financial) need; (spec. of a university admissions policy) assessing applicants solely on their merits, without regard to their ability to pay for tuition."  That is consistent with how the phrase was used in *Brown* and in the legislative history.  Defs. Br. 11-12.  Section 568's focus on need-based financial aid, *id.* at 10, further confirms that "need-blind" in the statute refers to that same need for financial aid.

The text of the statute certainly does not compel Plaintiffs' contrary interpretation, as it nowhere requires need-blind schools to ignore "every" or "all" financial circumstance(s).  It is

telling that Plaintiffs (at 16 n.7) do not point to anyone who has ever used the phrase in the indiscriminate way they insist it is used in Section 568. They cite a discussion from *Brown* that, like the dictionary, describes MIT's "need-blind" admissions as being "*based entirely on merit*, without consideration of an applicant's ability to pay tuition." Opp. 16 n.7 (quoting *United States v. Brown*, 5 F.3d 658, 661 (3d Cir. 1993), but adding emphasis). Plaintiffs cannot lop off half the definition. The references to merit do not stand alone; they contrast with admissions policies that consider "ability to pay for tuition." And Plaintiffs offer nothing from "the context from which the statute arose" that supports their reading. *Bond*, 572 U.S. at 860. *Brown*, the resulting settlement, or the legislation based on that settlement never even suggested that the analysis turned on whether a school considered any circumstances other than the need for financial aid.

Plaintiffs' reading would also give the statute an untenably "broad reach" with "deeply serious consequences." *Id*. It would give rise to litigation about policies that have nothing to do with students' need for financial aid—are an applicant's zip code, parents' occupations, or attendance at a private school "financial circumstances" that admissions officers cannot consider for any reason? And if need-blind schools cannot consider any of a student's financial circumstances for any reason, then schools lose the exemption if they recognize, for example, the distinct strength of applicants who overcome poverty. A sweeping prohibition on considering any financial circumstance is implausibly broader than being "blind" to any "need."

Despite insisting that the text is entirely clear, Plaintiffs (at 17-18 & n.8) seek to avoid this absurd result they have created by carving out an entirely atextual exception to their otherwise sweeping reading: According to Plaintiffs, "the words 'without regard to'" in the statutory definition "mean the Exemption allows Defendants to *help* applicants with lesser 'financial circumstances.'" But all they muster in support is that Title VII uses the phrase "without regard to" and

the Supreme Court held in 1979 that Title VII permits private affirmative action. *See United Steel-workers of Am., AFL-CIO-CLC v. Weber*, 443 U.S. 193, 208 (1979). *Weber*'s holding, however, relied on the "legislative history of Title VII and the historical context from which the Act arose," 443 U.S. at 201; the words "without regard to" do not even appear in the Court's opinion.

Plaintiffs (at 14) ultimately rely on the platitude that antitrust exemptions should "be narrowly construed." But courts "have no license to give statutory exemptions anything but a fair reading" because they are just "as much a part of [the statute's] purposes and policies." *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2366 (2019) (cleaned up). It is unfair to interpret "need-blind" to prohibit decisions that do not consider need, and it is unfair to distort the words "without regard to" to avoid the simplest, logical reading of the statute.

### C. Plaintiffs' Allegations Of Non-Need-Blind Admissions Are Insufficient

Plaintiffs' allegations that certain schools considered applicants' relationship to potential donors remain legally irrelevant. Students who benefit from such consideration may be less likely to need financial aid, but that possible correlation is irrelevant to whether admissions decisions are made *because of* a student's need for aid.

Moreover, even if Plaintiffs' legal theory were correct, Plaintiffs' opposition never addresses the many reasons their complaint's conclusory allegations are insufficient. *See* Defs. Br. 16-20. DOJ takes no position on whether Plaintiffs have sufficiently pled that any Defendant is not need-blind. DOJ (at 6 n.3) does, however, erroneously state that "Plaintiffs' allegations must be taken as true." In fact, as the very case DOJ cites confirms, only "well-pleaded facts" must be taken as true. *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 454 (7th Cir. 2020), *cert. denied*, 141 S. Ct. 2877 (2021). That distinction makes all the difference.

*First*, Plaintiffs allege *no* facts as to admissions at Caltech, Chicago, Cornell, Emory, Johns Hopkins, Rice, or Yale. Plaintiffs (at 22) assert that Penn's and Vanderbilt's purported waitlist

policies are "representative of those of the other Defendants," but that concedes the pleading failure. "A complaint based on a theory of collective responsibility must be dismissed. That is true even for allegations of conspiracy." *Bank of Am. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013).

*Second*, Plaintiffs do not even address Defendants' argument that their allegations of donor preferences at Duke, Brown, MIT, and Georgetown are inadequately pled. Defs. Br. 14-15.

*Third*, the plausibility of Plaintiffs' "enrollment management" allegations turn entirely on their *ipse dixit* (at 23) that those words necessarily entail considering ability to pay tuition. But Plaintiffs allege no *facts* supporting that definition, and their sources contradict it. *See* Defs. Br. 16-17 & nn.11-13. References to enrollment management thus do not "plausibly suggest" non-need-blind practices. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). These and the legally irrelevant donor allegations are the only ones as to Notre Dame, Dartmouth, and Northwestern.

*Fourth*, Plaintiffs argue that a student newspaper article nudges their allegations about Columbia's School of General Studies "from conceivable to plausible." *Id.* at 570. But a conclusory statement in a newspaper is no better than one in a complaint. Plaintiffs (at 24) rely on two cases where the cited articles reported the defendants' *own statements*. *See Payne v. Cnty. of Cook*, 2016 WL 1086527, at *16 (N.D. Ill. Mar. 21, 2016); *Edmond v. City of Chicago*, 2018 WL 5994929, at *14 (N.D. Ill. Nov. 15, 2018). Plaintiffs' article has no such indicia of plausibility; in fact, it was later corrected. Defs. Br. 19-20. This is the only other allegation against Columbia.

*Fifth*, the allegations about Penn's and Vanderbilt's waitlist policies fare no better. Plaintiffs barely defend their reliance on a 2009 statement from a former Penn employee that nowhere referenced Penn, Am. Compl. ¶ 139, and another from a consultant they concede left Penn a decade before the relevant period, *id.* ¶ 140. And Vanderbilt's mere "reservation of rights" is insufficient

to plead that it considered any waitlisted student's relative need for aid.[1]

*Finally*, Plaintiffs allege no facts suggesting that *any* Defendant is not need-blind for transfer applicants. They offer (at 21-23) only "information and belief" and promises of later support. Neither magic words nor speculation about what evidence Defendants might possess excuses Plaintiffs' pleading failures. *See Ashcroft v. Iqbal*, 556 U.S. 662, 681, 683 (2009) (rejecting "conclusory" allegations of defendants' "state of mind").

### D. Plaintiffs Fail To Justify Exposing To Liability Schools That Lack Actual Knowledge That Another Participating School Is Not Need-Blind

Plaintiffs (at 19-20) and DOJ (at 8-11) argue that need-blind schools can be liable for a Section 1 conspiracy even when those schools do not know that any other participant is not need-blind. That interpretation would render Section 568 a nullity. Plaintiffs never explain how schools could protect themselves from the threat of litigation without an ongoing audit of the particulars of every admissions decision at every participating school. No school would avail itself of the exemption if doing so required performing regular and detailed investigations of other schools' admissions and financial aid decisions for particular students, or undergoing such investigations themselves, all of which would raise its own set of antitrust risks. *See* Defs. Br. 21-22. Congress cannot have intended to create an exemption no school would ever use.

In arguing that the text supports a reading that would render the exemption useless, Plaintiffs and DOJ erroneously read the exemption in isolation. The protection for need-blind schools stems not from Section 568 standing alone, but from the interaction between Section 1 and Section

---

[1] Plaintiffs (at 21) and DOJ (at 3) contend that need-blind schools cannot consider ability to pay as to waitlist admissions. But they identify nothing in the legislative history indicating that Section 568's definition of need-blind admissions departed in this manner from the MIT settlement, a telling omission because Congress repeatedly stated that Section 568 was designed to "codif[y]" that settlement. *See* Defs. Br. 19 n.16; *see also* H.R. Conf. Rep. No. 103-761, at 911 (1994) (definition of need-blind "based on" standards of conduct in MIT settlement).

568. Joining a Section 1 "conspiracy" requires "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Marion Healthcare, LLC v. Becton, Dickinson & Co.*, 952 F.3d 832, 841 (7th Cir. 2020) (citation omitted). A school lacks that conspiratorial objective if the factual conduct to which it agreed would have been lawful under Section 568 had the other schools adhered to that agreement. Far from imposing an atextual requirement on Section 568, that reasoning reflects traditional principles of conspiracy law and the text of Section 1.[2]

DOJ (at 10-11) misconstrues this argument. A *mistake of law* about, for example, whether the agreement unreasonably restrained trade may not be a defense, but this is not Defendants' argument. However, a *mistake of fact* about the substance of the agreement negates conspiratorial intent if the conduct to which the defendant actually agreed is not illegal. An agreement for need-blind schools to use common principles of analysis" is "not … unlawful." 15 U.S.C. § 1, note. A school that made a lawful agreement is not suddenly liable for making an illegal agreement if, unbeknownst to it, another school denies admission to a student based upon his need for aid.

Nothing in Section 568 suggests normal conspiracy law does not govern. It certainly does not, as Plaintiffs (at 19) claim, impose "a duty to ensure compliance" by every other participant.[3] Nor does *National Broiler Marketing Ass'n v. United States*, 436 U.S. 816 (1978). That case held only that an institutional cooperative could not invoke the Capper-Volstead exemption when the conduct of some of its members rendered the exemption inapplicable. *Id.* at 827-29. It did not address whether individual members could be liable even when they lacked knowledge of the facts of other members' problematic conduct. That question was not even presented because the government sued the cooperative, not individual members. *Id.* at 818.

---

[2] Plaintiffs' reliance (at 20) on co-conspirator liability thus misses the mark. "Although every conspirator is responsible for others' acts within the scope of the agreement, it remains essential to show that a particular defendant joined the conspiracy and knew of its scope." *Knight*, 725 F.3d at 818.
[3] Tellingly, Plaintiffs (and DOJ) say nothing about how such a duty could be enforced.

Plaintiffs and DOJ also disregard the principle that Congress must speak clearly when subjecting parties to strict liability—here, strict and vicarious liability as to loss of the protections of Section 568. Plaintiffs (at 13 n.5) criticize the cases Defendants cite because they do not "address[] antitrust law," but they never explain why that canon does not apply in the antitrust context. If anything, it applies with special force to Section 1, as there is no such thing as an "unwitting conspirator," *United States v. Standard Oil Co.*, 316 F.2d 884, 890 (7th Cir. 1963), and to the conduct permitted by Section 568, which Congress clearly wanted schools to engage in.

Finally, nothing in the complaint supports Plaintiffs' alternative assertion (at 18-19) that each Defendant knew "that *other* participants were not need-blind" and "the certifications of compliance were false." The operative complaint never makes that allegation, much less provides any plausible factual support for it. Indeed, Plaintiffs removed that allegation from their original complaint. *Compare* Compl. ¶ 7, *with* Am. Compl. ¶ 8. Dismissal is warranted for Defendants whose need-blind admissions have not been plausibly contested.

## II. Plaintiffs Have Not Plausibly Alleged An Unreasonable Restraint Of Trade

### A. Plaintiffs Have Not Alleged An Agreement Plausibly Subject To Automatic Condemnation Under The *Per Se* Rule Or Quick Look Test

The Supreme Court has made clear "that there is a presumption in favor of a rule-of-reason standard." *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 726 (1988). *Per se* treatment is "confined to restraints … that would always or almost always tend to restrict competition and decrease output" and "lack any redeeming virtue." *Leegin*, 551 U.S. at 886 (cleaned up). Quick-look is appropriate only when there is "[n]o credible argument" that the challenged conduct "has any … procompetitive effect." *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 459 (1986). The alleged agreement to produce a more accurate methodology for assessing need, with Congress's encouragement and DOJ's prior blessing, does not remotely fall within this narrow set of cases.

-11-

### 1.      Plaintiffs Have Not Alleged A Naked Price-Fixing Agreement

Plaintiffs' and DOJ's argument for *per se* condemnation turns on the complaint's repeated incantation of the words "price fixing."[4]  But conclusory allegations and legal conclusions are not treated as true, so "the plaintiffs' attachment of the *per se* label is simply inadequate in itself to sustain the complaint." *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1108 (7th Cir. 1984).

"The fact that a practice may have a tangential relationship to the price of the commodity in question does not mean that a court should dispense with a full rule-of-reason analysis." *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 317 (2d Cir. 2008).  Rather, the "crux of any price-fixing agreement is the relinquishment by a trader … of the freedom to set prices in accordance with his own judgment." *Chisholm Bros. Farm Equip. Co. v. Int'l Harvester Co.*, 498 F.2d 1137, 1142 (9th Cir. 1974).  Fixing prices, whether directly or by setting the price of inseparable price components, is generally a *per se* violation because courts can confidently assume lower prices but for such agreements.

That assumption does not hold if an agreement leaves the parties free to price their products as they wish, particularly if it is independently justified for reasons that have nothing to do with the parties leveraging joint power to make excess profits.  *See, e.g.*, *Vogel v. Am. Soc'y of Appraisers*, 744 F.2d 598, 602 (7th Cir. 1984) (rejecting price-fixing label for a professional standard governing appraisers' "pricing system[s]" that likely resulted in lower prices); Areeda & Hovenkamp, Antitrust Law § 1509c (*per se* treatment appropriate only for "naked restraints," meaning those that "lack redeeming social benefits").[5]  Perhaps in some circumstances such

---

[4] In the case of DOJ, its argument appears skewed by its mistaken view that *any* allegation made of *any* kind must be taken as true.  *See supra* 7.  Of course, if that were true, any plaintiff could invoke the *per se* rule merely upon their own say-so.

[5] Several price-fixing cases DOJ cites (at 13) are distinguishable on this basis.  *See Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 649 (1980) (agreement to eliminate short term trade credit has "no apparent

agreements might have anticompetitive effects in a reasonably defined product market. But courts cannot confidently assume as much without further investigation, which requires allegations that state a claim under the rule of reason.

Plaintiffs have not alleged an agreement to set price floors or ceilings, or even as they now claim, an agreement to adopt a common pricing formula for an agreed-upon or inseparable price input. The *facts* alleged amount to only an agreement to collaborate on developing an improved methodology for measuring students' ability to pay for college education, Am. Compl. ¶¶ 115-117—a single data point that schools may or may not use when determining what a student might pay, but not one the alleged agreement requires, nor even one plausibly alleged to have been used in determining the Plaintiffs' respective financial aid packages.[6] Plaintiffs never allege that any Defendants agreed to require students to pay the full amount they or their families can contribute according to the Consensus Methodology or to refrain from offering students more aid than necessary to meet their need as calculated using the Consensus Methodology. Nor do Plaintiffs allege that ability to pay is an inseparable part of price, as opposed to a factor that schools are free to consider when making independent pricing decisions. In fact, Plaintiffs (at 27) concede that participants can (and do) offer merit-based aid in whatever amounts the schools choose. *See also* Am. Compl. ¶ 254.

---

potentially redeeming value"); *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 656 (7th Cir. 2002) ("only useful purpose" for agreeing on list prices is "as a guide to likely transaction prices" that might anchor consumers and lead to higher prices).

[6] Plaintiffs' conclusory allegations that 568 Group participants were *required* to implement the Consensus Methodology are inconsistent with material incorporated into the complaint. *See, e.g.*, *History of the 568 Presidents Group*, 568 Presidents Grp., http://www.568group.org/home/?q=node/3 (group's "recommendations" provide "guidelines" for dealing with, for example, "treatment of certain business or real estate expenses"). Congress recognized that the Consensus Methodology "is not binding" and that schools in the 568 Group "offer different, and competitive, financial aid packages," H.R. Rep. No. 114-224, at 3 (2015).

-13-

With respect to need-based aid, Plaintiffs allege no well-pled facts that there is any agreement to meet the full amount of students' need as calculated under the Consensus Methodology, nor do they allege an agreement as to whether or in what proportion such aid would be awarded as grants rather than loans. As DOJ (at 3) explains, schools that "agree on certain common principles for calculating financial need … can still compete to offer students financial aid packages, including more need-based aid or more grants and fewer loans." Thus, nothing in the challenged collaboration alters any school's ability to offer a full scholarship or no aid at all to any given student, or indeed their ability to reduce *every* student's tuition to zero or charge *every* student the full cost of their degree. The data point addressed by the Consensus Methodology is not an inseparable or agreed-upon pricing input, and participants retain full pricing discretion.[7]

Consider DOJ's hypothetical family (at 13) for whom the Consensus Methodology results in a $20,000 expected family contribution. Nothing in the alleged agreement prevents participating schools from offering additional need-based aid to lower the $20,000 payment. Plaintiffs certainly allege no agreement that would prevent schools from also offering merit aid based on athletic or academic achievement; scholarships based on the student's particular background or academic interests; or unqualified aid simply to lure that student from a competitor. Those economic assumptions may not always hold, but that is a question for the usual rule-of-reason analysis. Higher prices cannot be presumed.

---

[7] DOJ (at 12) relies on inapposite cases involving agreements to use an agreed-upon method to set prices or where the agreed-upon item was an inherently necessary price component. *See, e.g.*, *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 771 (2d Cir. 2016) (alleged conspiracy to depress LIBOR stated a *per se* claim to fix the price of "LIBOR-based financial instruments" because LIBOR was allegedly "an inseparable part of the price"); *In re Wheat Rail Freight Rate Antitrust Litig.*, 579 F. Supp. 517, 522-23 (N.D. Ill. 1984) (agreement that "all transit shipments … were to be charged a flat rate and all nontransit shipments, a proportional rate"); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223, 224 n.59 (1940) (agreement to purchase "at the fair going market price," which "place[d] a floor under the market").

None of Plaintiffs' other arguments overcomes the central shortcoming that they have not alleged an agreement to charge students what the Consensus Methodology says they can afford to pay. Plaintiffs (at 3-4, 27-28, 38) argue that Defendants can afford to provide more aid than is necessary to meet students' need under the Consensus Methodology. Taken as true, that assertion does not plausibly suggest that any student—let alone *all* students—would receive more grant aid in the "but-for" world. Nothing in the challenged collaboration prevents schools from using their resources to offer more aid to applicants than the Consensus Methodology suggests they need, whether through merit scholarships, higher use of grants rather than loans, a baseline tuition below what the family can afford per the methodology, or otherwise. The markedly different average prices to students who receive need-based aid in Plaintiffs' Exhibit F underscores the point. *See* ECF No. 165-1.

Plaintiffs (at 10) assert that Yale left the 568 Group and Harvard never joined because those schools purportedly wanted to provide more need-based aid than necessary to meet students' need as calculated under the Consensus Methodology. Even if true, that would just show that those schools wanted to use a different methodology to assess need, not that the Consensus Methodology fixes prices. Nothing alleged prevented Harvard or Yale from charging lower prices had they wished as members of the 568 Group, whether by offering more aid, by lowering tuition, or through other means. Again, Plaintiffs' Exhibit F makes that clear.

The quote from Georgetown President John DeGioia on which Plaintiffs (at 6, 26-27) and DOJ (at 11) rely is even less relevant. DeGioia describes how *Georgetown* uses the Consensus Methodology: "We ask the family to contribute the maximum that they are capable of, according to that formula. We then ask that they borrow, we ask that they apply for work-study, whatever is

left over, we pay the difference. The borrowing that we expect is only [$]17,500."[8] The "we" is clearly Georgetown. This does not suggest an agreement with other schools to do anything.

In sum, even accepting all of Plaintiffs' adequately pled allegations as true, the Consensus Methodology does not constrain participants' pricing decisions. Rather, each school retains full independent judgment and discretion as to how to maximize college affordability for the greatest number of students at that institution. An agreement that leaves participants with "unfettered discretion to choose a price … does not constitute *per se* price fixing." *Gerlinger v. Amazon.Com, Inc.*, 311 F. Supp. 2d 838, 848 (N.D. Cal. 2004).

### 2.     The Consensus Methodology's Plausible Procompetitive Benefits Preclude *Per Se* Or Quick Look Condemnation

Far from naked price-fixing, the alleged agreement is analogous to information-sharing or at most standard-setting, practices subject to the rule of reason because they have plausible procompetitive benefits. *See* Defs. Br. 27. Likewise, rather than "always or almost always tend[ing] to restrict competition and decrease output," the Consensus Methodology is at least plausibly "designed to increase economic efficiency and render markets more, rather than less, competitive." *BMI*, 441 U.S. at 19-20; *see also Polk Bros. v. Forest City Enters., Inc.*, 776 F.2d 185, 189 (7th Cir. 1985) (reversing application of the *per se* rule to a case involving a horizontal restriction because "a court must be very sure that a category of acts is anti-competitive before condemning the category *per se*"). Plaintiffs' allegations are a far cry from establishing with certainty that the Consensus Methodology is anticompetitive. Instead, potential procompetitive benefits are plain from the face of the complaint. Specifically, jointly establishing recommended best practices for measuring need increases the accuracy of ability-to-pay determinations and so leads to broader

---

[8] Connor Jones, *On the Record with President DeGoia*, GEORGETOWN VOICE (Mar. 6, 2014), https://georgetownvoice.com/2014/03/06/record-president-degioia/ (cleaned up).

access to higher education and are thus output expanding.  Under *BMI*, this is precisely the circumstance that demands analysis via the rule of reason, as DOJ acknowledges (at 11, 14-15).[9]

The amount students' families can afford to contribute to the cost of their education is a useful data point for schools trying to maximize the number of qualified students who can afford to attend.  But that calculation is complex.  What role should home equity play?  Hometown cost of living?  Income of stepparents?  Assets jointly owned with unrelated persons?  Siloed attempts to answer these questions led to "variance in need analysis results."  Am. Compl. ¶ 126.  Some of these "divergent" approaches, *id.*, necessarily overstated students' ability to pay.

The Consensus Methodology is thus plausibly a set of best practices, developed with a broad pool of expertise, in some cases correcting errors that led to higher expected contributions. *See, e.g.*, 147 Cong. Rec. S10252 (daily ed. Oct. 3, 2001) (Sen. Kohl) ("The exemption provides protection for … schools to cooperatively develop a methodology for determining financial need in order to best assess a family's ability to pay the costs of attendance."); H.R. Rep. No. 105-144, at 3 (1997) (the "use of common principles … helps the schools to determine need more accurately in cases of unusual financial profiles").  For example, the GAO found that the same family would have an expected contribution of $42,449 under the Consensus Methodology's treatment of home equity but $58,243 "if a school chose not to implement the home equity option in the consensus approach."  GAO Report at 19.  The Consensus Methodology thus resulted in a $15,794 *reduction* in that family's expected contribution.  This quintessential procompetitive effect precludes *per se* or quick look condemnation.  *See, e.g.*, *Vogel*, 744 F.2d at 602.

---

[9] As discussed *supra* 11-12, these facially plausible justifications for the alleged agreement, which do not depend on market power and have nothing to do with increasing prices, also preclude treating the alleged agreement as *per se* price fixing.  While Defendants' status as non-profits of course does not immunize them from *per se* treatment, it does support the plausibility of these separate justifications for price-related agreements that do not fix prices or any necessary pricing input and do not turn on increasing profits.

Plaintiffs (at 10) nonetheless contend that the Consensus Methodology must raise prices because competition would result in the lowest sustainable expected contributions. But Plaintiffs (at 18) acknowledge that these schools do not operate in anything near a perfectly competitive market, most obviously because they "could fill every freshman class with qualified, full-paying students." *See also* Am. Compl. ¶ 253 (alleging this and other barriers to competition). *Per se* and quick-look condemnation apply only to narrow circumstances where familiar economic presumptions can be easily applied and trusted. Those presumptions do not apply here in light of the market dynamics alleged and because it cannot be plausibly argued that the Consensus Methodology is a well-known "device for facilitating supracompetitive pricing." *Vogel*, 744 F.2d at 603.

The Consensus Methodology also has plausible procompetitive results even if for some students it leads to higher calculated family contributions—though Plaintiffs have not, in fact, made such an allegation as to any actual student or any provision of the methodology. By correcting instances where schools undercalculated certain students' ability to pay, the Methodology tends to naturally increase resources available for students who otherwise could not afford to attend. The result, then, is greater diversity to the benefit of all. *See Brown*, 5 F.3d at 674-75. Such an expansion of the pool of consumers and improvement on product quality are procompetitive benefits, each precluding *per se* condemnation.

Defendants do not ask the Court to resolve now whether the Consensus Methodology in fact has these benefits. Nor, contrary to Plaintiffs' suggestion (at 34), need the Court accept the truth of the GAO's or Congress's conclusions or find that they necessarily held true during the years relevant here. The facial plausibility of these benefits—underscored by the *existence* of these findings—means the Consensus Methodology cannot be condemned without inquiry into its effects. *Per se* and quick-look condemnation are thus inappropriate as a matter of law.

### 3. Congress, DOJ, And The Third Circuit Have All Found That Similar Conduct Is Not Obviously Anticompetitive

Plaintiffs (at 25-26) insist that the Court should ignore Congress's findings about the benefits of the challenged collaboration if the exemption is inapplicable. But whether *admissions* practices are need-blind says nothing about the benefits of collaborating on a methodology for assessing the need of *admitted* students. Plaintiffs never argue otherwise. Moreover, the Supreme Court has made clear that *per se* treatment is inapplicable when statutes "reflect an opinion" that the challenged conduct is "economically beneficial in at least some circumstances," even if the statutes "are not directly controlling." *BMI*, 441 U.S. at 13.[10] DOJ likewise offers no reason why Congress might have thought collaboration on need analysis was procompetitive only when accompanied by need-blind admissions. Nor could it. DOJ conspicuously ignores its own agreement in the MIT settlement, which permitted joint development of methodologies to measure need even if schools were not need-blind as to students from the waitlist. *See* MIT Standards of Conduct § 1(a). DOJ could not have entered into that agreement if it permitted a *per se* antitrust violation.

Plaintiffs (at 27-29) also ask the Court to disregard *Brown*, the only judicial experience in this area. This case involves facially plausible benefits similar to those that triggered application of the full rule of reason in *Brown*. *See* 5 F.3d at 674-75, 678 (Overlap might provide "students who otherwise would not have been able to afford an Overlap education the opportunity to have one" and "promot[e] socio-economic diversity"). And, contrary to DOJ's argument (at 16-17), this case presents a far *weaker* candidate for automatic censure than *Brown*. There, "merit-based aid was prohibited," participating schools attended a "two-day Spring Overlap conference" where they "compared their family contribution figures for each commonly admitted student" and arrived

---

[10] Plaintiffs (at 20) contest this point with inapt cases involving clear price-fixing. *See United States v. McKesson & Robbins, Inc.*, 351 U.S. 305, 307-08 (1956); *In re Wheat Rail*, 579 F. Supp. at 522-23.

at "agreed-upon figures" for each, and "failing to comply with the Overlap Agreement would result in retaliatory sanctions." *Id.* at 662-63. Plaintiffs do not and could not allege any of that here: no agreements as to individual students or how or whether to meet need or provide aid beyond need, or any enforcement mechanism. This Court also now has the benefit of Congress's input with Section 568 and the MIT-DOJ settlement, which of course did not exist when *Brown* was decided.

Plaintiffs disregard all this, claiming that because endowments are larger than they were in the 1980s, the Court should ignore *Brown* altogether. But the size of an endowment is irrelevant to the effects of the Consensus Methodology. In any event, whether schools could achieve such benefits through less restrictive means is the final step of rule-of-reason analysis, reached only *if* and *after* a plaintiff has established an anticompetitive effect in a relevant market. *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018). The inquiry ends if a plaintiff does not even allege a plausible relevant market.

Even absent *Brown*, Plaintiffs could not invoke *per se* or quick-look review, which courts apply only after they have "considerable experience with the type of restraint at issue" such that they "can predict with confidence that it would be invalidated in all or almost all instances." *NCAA v. Alston*, 141 S. Ct. 2141, 2156 (2021) (cleaned up); *see also 1-800 Contacts, Inc. v. FTC*, 1 F.4th 102, 117 (2d Cir. 2021) ("When, as here, not only are there cognizable procompetitive justifications but also the type of restraint has not been widely condemned in our judicial experience, more is required." (cleaned up)). No such experience exists here.

Finally, Plaintiffs' request for discovery (at 30-31) is misplaced. They want evidence solely on the issue of whether Defendants participated in the 568 Group with "a 'pure altruistic motive' and in the 'absence of a revenue maximizing purpose.'" But whether a defendant acted with "anticompetitive animus" or objectively plausible "procompetitive purposes" is

"appropriately evaluated under the rule-of-reason analysis." *Nw. Wholesale Stationers, Inc. v. Pac. Stationary & Printing Co.*, 472 U.S. 284, 296 n.7 (1985). And regardless, abridged treatment of the Consensus Methodology is inappropriate no matter the answer to that limited question.

### B. Plaintiffs' Claim Fails As A Matter Of Law Under The Rule Of Reason

Plaintiffs (at 32, 34) contend they need allege only the "rough contours" of a market, either under quick-look review, or because they have alleged direct anticompetitive effects. As just shown, quick-look review is improper as a matter of law. And Plaintiffs rely on mere conclusory assertions and misquotes rather than pleading any actual anticompetitive effects. Thus, Plaintiffs must allege a plausible relevant market under the rule of reason. Plaintiffs have not done so.[11]

### 1. Plaintiffs Have Not Plausibly Alleged Direct Anticompetitive Effects

Plaintiffs (at 33) contend that the Consensus Methodology has "fixed, increased, maintained, and stabilized" net prices of attendance at "artificially high, non-competitive levels." But "they cite no examples, data, or other facts to support their assertion, and a conclusory allegation that prices have increased will not suffice to state anticompetitive effect." *Spinelli v. Nat'l Football League*, 903 F.3d 185, 212-13 (2d Cir. 2018). The lack of factual allegations is especially glaring because Plaintiffs allege a conspiracy that purportedly lasted 25 years, with changing membership and many non-participant competitors. *See Finkelstein v. Aetna Health Plans of N.Y., Inc.*, 1997 WL 419211, at *6 (S.D.N.Y. July 25, 1997) ("[S]ince this is entirely an historical action for damages, it is particularly telling that the plaintiffs have not alleged that there ever was an adverse effect[.]"), *aff'd*, 152 F.3d 917 (2d Cir. 1998).

---

[11] For its part, DOJ (at 16-17) cites to *Brown*'s remand for further fact-finding as to the procompetitive justifications of the Overlap Agreement. But as discussed *supra* at 20, the Overlap Agreement did not leave participating schools with *any* pricing discretion, much less the full discretion they have under the agreement alleged here. Plaintiffs thus carry "the initial burden to prove that the challenged restraint has a substantial anticompetitive effect." *Am. Express Co.*, 138 S. Ct. at 2284.

Instead of actual direct anticompetitive effects, Plaintiffs (at 33) offer only misleading and irrelevant quotes. The 568 Group's goal to reduce "variance" and "divergent results" in need calculations, for example, is not evidence of higher prices. *See supra* 12-15. In addition, the alleged statements by Yale, Harvard, and Georgetown do not suggest that the Consensus Methodology restricted their pricing discretion and certainly not that it directly increased prices. *See supra* 15-16. This does not suffice. *1-800 Contacts*, 1 F.4th at 118 ("When an antitrust plaintiff [proceeds] based on direct evidence in the form of increased prices, the question is [if] it can show an actual anticompetitive change in prices.").

Plaintiffs' bare assertion (at 33) that the "exchange of price information and other competitive data by horizontal competitors can of itself significantly impair competition" fares no better. Mere possibility ("can") is insufficient. So are unsupported conclusory statements. *See, e.g.*, Am. Compl. ¶ 118. Factual allegations must make such assertions plausible. *See Twombly*, 550 U.S. at 557. Plaintiffs offer none, and so have failed to adequately plead direct anticompetitive effects.

### 2. Plaintiffs Fail To Allege A Plausible Relevant Product Market And So Fail To State A Claim

Because Plaintiffs have not alleged an agreement that is subject to quick-look analysis or that has any direct anticompetitive effects, their complaint cannot survive absent a plausibly alleged, detailed relevant market in which Defendants have sufficient market power to detrimentally affect prices. But Plaintiffs' alleged product market for "Elite Private Universities" ignores commercial reality in favor of a gerrymandered subset of schools in an arbitrary, averaged top-25 from a single magazine's rankings. Plaintiffs (at 35) parrot the complaint's reference to "characteristics" that supposedly "differentiat[e]" schools in the alleged product market, but never explain how those differences plausibly overcome the commonsense observation that (a) liberal arts colleges compete with universities offering liberal arts educations, (b) selective public research universities

compete with selective private research universities, and (c) schools outside and within the top-25 cutoff compete with each other. *See* Defs. Br. 31-34. Plaintiffs (at 35) also point to alleged statements from Northwestern and Duke, but never address the reasons that the cited materials *confirm* that the proposed market is artificially narrow and thus not plausible. *See* Defs. Br. 32-33 & n.31.[12]

*Brown* is no help to Plaintiffs. Contrary to their assertions (at 35), *Brown* did not recognize an "Ivy Plus" market or find "that the Overlap Group … collectively exerted market power." The Third Circuit expressly did not recognize any product market, and it vacated the district court's quick-look holding on alternative grounds. *See* 5 F.3d at 673, 678. The words "Ivy Plus" appear nowhere in its decision. And even if *Brown* had recognized an "Ivy Plus" market, that would not help Plaintiffs plausibly allege a market with at least 16 more schools, 30 years later.

Plaintiffs' market is also unsupported by *Vasquez v. Indiana University Health, Inc.*, 2022 WL 2582368 (7th Cir. July 8, 2022), which is discussed at length in Plaintiffs' "notice" (ECF No. 173). *Vasquez* left undisturbed the rule that to survive a motion to dismiss, a proposed relevant market must be "plausible." *Id.* at *2; *see also* Defs. Br. 29-30 (citing cases). That the candidate geographic market in that case, which *was* supported by detailed factual allegations, sufficed, does nothing to help the plausibility of Plaintiffs' litigation construct. Plaintiffs may not cherry-pick portions of a single magazine's rankings to support the fundamentally implausible contention at the heart of their case: that price increases at Georgetown and Johns Hopkins, Brown and Dartmouth, Columbia and Cornell, or Caltech and MIT would not push students who need financial aid to UVA or George Washington, Amherst or Williams, NYU or Hamilton, or Georgia Tech or Berkeley. The "complaint fails as a matter of law because it defines the relevant market in terms

---

[12] Even if a quick look were appropriate or Plaintiffs had alleged direct anticompetitive effects, they still must plausibly plead "the rough contours of a relevant market" of which "the defendant[s] command[] a substantial share." *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 737 (7th Cir. 2004). They cannot.

of a label that" a single magazine has "elected to attach to a particular type of" school, rather than on any semblance of economic analysis. *Reapers Hockey Ass'n, Inc. v. Amateur Hockey Ass'n Ill., Inc.*, 412 F. Supp. 3d 941, 952-53 (N.D. Ill. 2019).

## III. Plaintiffs Fail to Allege Antitrust Injury Or Standing

Plaintiffs' claim also fails for an independent reason: Lacking plausible allegations that the 568 Group's coordination caused any non-speculative harm, Plaintiffs cannot establish that they have suffered antitrust injury or have antitrust standing. The Consensus Methodology is but one of several widely used methodologies, any of which might result in a higher or lower expected contribution depending on a given student's unique financial circumstances. *See supra* 12-15; Defs. Br. 3-4. Plaintiffs allege no facts plausibly suggesting their grant-based aid would have increased absent the Consensus Methodology. The notion (at 9-10) that *all* financial aid applicants would have received more grant aid but for the 568 Group is unsupported and unsupportable.

Plaintiffs (at 9) urge the Court to defer deciding this issue, citing *Greater Rockford Energy & Technology Corp. v. Shell Oil Co.*, 998 F.2d 391 (7th Cir. 1993). But dismissal is appropriate when, as here, Plaintiffs' claim facially rests "on some abstract conception or speculative measure of harm." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 543 (1983); *see also, e.g.*, *McGarry & McGarry, LLC v. Bankr. Mgmt. Sols., Inc.*, 937 F.3d 1056, 1061 (7th Cir. 2019) (upholding dismissal on antitrust-injury grounds).

The inherently speculative nature of Plaintiffs' claimed injuries and damages also explains why they lack antitrust standing. *See* Defs. Br. 36. Contrary to Plaintiffs' argument (at 11), whether a plaintiff's damages are too speculative is a distinct inquiry from whether the indirect-purchaser bar applies. *See, e.g.*, *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 484-85 (7th Cir. 2002) (analyzing these issues separately and finding each independently supported dismissal). The only plausible inference from the facts Plaintiffs have alleged is that each Plaintiff—about

whom the complaint says virtually nothing specific—might have received more, less, or the same amount of grant-based aid in the but-for world. That fails to establish antitrust standing. *Id.*

## IV. Plaintiffs Fail To Refute The Plain Untimeliness Of Most Of Their Claims

The complaint establishes that the claims of seven of the nine Plaintiffs accrued outside the four-year limitations period because they matriculated before 2018. Defs. Br. 37-39. The so-called "discovery rule" and "continuing violations" doctrines do not save their claims.

The antitrust statute of limitations runs from when "the cause of action accrued" regardless of when the claim was discovered. 15 U.S.C. § 15b. Plaintiffs (at 45-46) cannot avoid recent Supreme Court precedent compelling adherence to that command. They note that *Rotkiske v. Klemm*, 140 S. Ct. 355 (2019), involved the FDCPA, but that was immaterial to the relevant holding: A discovery rule "cannot be supplied by the courts," because whether to include such a provision is "Congress's decision." *Id.* at 360-61. That decision "effectively undermined" the circuit precedent on which Plaintiffs rely. *United States v. Logan*, 2004 WL 417341, at *5 (N.D. Ill. Feb. 2, 2004). Similarly, while Plaintiffs observe that *Gabelli v. SEC*, 568 U.S. 442 (2013), involved government enforcement actions under a securities statute, they ignore *Gabelli*'s textual analysis that "the most natural reading" of the term "accrued" is when a claim "comes into existence," not when it is discovered. *Id.* at 448; *see also Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971).[13]

Even if the discovery rule applied, Plaintiffs' complaint "set[s] forth everything necessary" to "plainly reveal[] that [their] action is untimely." *United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005). For years, the supposed conspirators maintained a public website describing the collaboration. Plaintiffs do not dispute that the sources the complaint invokes to challenge

---

[13] Although the Seventh Circuit cited its discovery-rule caselaw in *Vasquez*, 2022 WL 2582368, at *5, it did so in dicta and without addressing *Rotkiske* or *Gabelli*.

Defendants' collaboration and admissions practices were readily accessible in the public domain for many years before 2018.  Defs. Br. 37-38.  Indeed, Plaintiffs (at 49 n.33) appear to concede that they had knowledge of the alleged *violation* pre-2018, arguing solely that they could not have discovered their alleged *injuries*.

Plaintiffs (at 48-49) argue that discovering their alleged injuries involved "puzzle" pieces that could not be put together until some unspecified event two years ago.  This is untenable:  Not only do they purport to claim a *per se* violation—*i.e.*, a practice that "always or almost always tend[s] to restrict competition," *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 100 (1984)—but they "fail[] to allege any new information that has come to light since [2018] that somehow alerted plaintiffs to their injuries," *In re AIG Workers Comp. Ins. Policyholder Litig.*, 2015 WL 1992723, at *5 (N.D. Ill. Apr. 27, 2015).  Unlike in cases where critical information first became reasonably discoverable during the limitations period, *see In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 808-09 (N.D. Ill. 2017); *Vasquez*, 2022 WL 2582368, at *5, the *only facts* supporting Plaintiffs' injury allegations come from sources that were publicly available years before 2018, *see* Am. Compl. ¶¶ 122-33, 233-39.  Plaintiffs are "presumed to have information available in the public domain" after a reasonable period.  *In re AIG Workers Comp.*, 2015 WL 1992723, at *5.  Plaintiffs here had ample time to find these sources over four years ago.

Finally, Plaintiffs fare no better with the "continuing violations" doctrine.  They do not dispute that this doctrine requires a new injury *from a new overt act* within the limitations period.  Defs. Br. 38-39; Opp. 50.  And they tacitly concede that the doctrine is thus inapplicable to the three students who graduated before 2018 (Weaver, Henry, and Piyevsky).  They contend that the doctrine applies to the three students who graduated in spring 2018 (Carbone, Corzo, and Saffrin), but the last arguable overt act that could have injured them was when their schools offered their

senior-year aid awards, no later than fall 2017.  Moreover, even if their schools made a post-2018 "sale" to those three and to a fourth who graduated in 2019 (Maerlender), it would not be a new overt act given that Plaintiffs alleged a conspiracy to restrain competition for only the initial award to *admitted applicants*, Am. Compl. ¶¶ 131, 234, 237.  Plaintiffs did not and could not allege a conspiracy to restrain competition over awards to *already-enrolled* students.  And any alleged effect that the initial aid award may have had on subsequent awards was a foreseeable future harm that accrued when the student first matriculated.  *See Zenith Radio Corp.*, 401 U.S. at 338-39.

## **<u>CONCLUSION</u>**

The Court should grant Defendants' motion to dismiss with prejudice.

By: */s Kenneth M. Kliebard*
Kenneth M. Kliebard
MORGAN, LEWIS & BOCKIUS LLP
110 North Wacker Drive
Suite 2800
Chicago, IL 60606-1511
Tel: 312-324-1000
kenneth.kliebard@morganlewis.com

Jon R. Roellke
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004-2541
Tel: 202-739-5754
jon.roellke@morganlewis.com

Sujal Shah
MORGAN, LEWIS & BOCKIUS LLP
One Market, Spear Street Tower, 28th Floor
San Francisco, CA 94105-1596
Tel: 415-442-1386
sujal.shah@morganlewis.com

Noah J. Kaufman
MORGAN, LEWIS & BOCKIUS LLP
One Federal Street
Boston, MA 02110
Tel: 617-341-7590
noah.kaufman@morganlewis.com

*Counsel for Defendant Brown University*

By: */s Deepti Bansal*
Deepti Bansal
Alexander J. Kasner
COOLEY LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004-2400
Tel: 202-728-7027
dbansal@cooley.com
akasner@cooley.com

Matthew Kutcher
COOLEY LLP
110 North Wacker Drive
Suite 4200
Chicago, IL 60606
Tel: 312-881-6500
mkutcher@cooley.com

*Counsel for Defendant California Institute of Technology*

By: */s James L. Cooper*
James L. Cooper
Michael Rubin
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave, NW
Washington, DC 20001-3743
Tel: 202-942-5014
james.cooper@arnoldporter.com
michael.rubin@arnoldporter.com

Leah Harrell
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
Tel.: 212-836-7767
Leah.Harrell@arnoldporter.com

Valarie Hays
ARNOLD & PORTER KAYE SCHOLER LLP
70 W Madison Street
Suite 4200
Chicago, IL 60602
Tel.: 312-583-2440
valarie.hays@arnoldporter.com

*Counsel for Defendant University of Chicago*

By: */s Patrick Fitzgerald*
Patrick Fitzgerald
Amy Van Gelder
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
155 N. Wacker Drive
Chicago, IL 60606-1720
Tel: 312-407-0508
patrick.fitzgerald@skadden.com
amy.vangelder@skadden.com

Karen Hoffman Lent
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
One Manhattan West
Room 40-216
New York, NY 10001-8602
Tel: 212-735-3276
karen.lent@skadden.com

*Counsel for Defendant The Trustees of Columbia University in the City of New York*

By: */s Norm Armstrong*
Norm Armstrong
Christopher C. Yook
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Suite 200
Washington, D.C. 20006
Tel.: 202-737-0500
narmstrong@kslaw.com
cyook@kslaw.com

Emily T. Chen
KING & SPALDING LLP
1185 Avenue of the Americas
34th Floor
New York, NY 10036
Tel: 212-556-2100
echen@kslaw.com

Zachary T. Fardon
KING & SPALDING LLP
110 N Wacker Drive
Suite 3800
Chicago, IL 60606
Tel: 312-995-6333
zfardon@kslaw.com

*Counsel for Defendant Cornell University and William Marsh Rice University*

By: */s Terri L. Mascherin*
Terri L. Mascherin
Reid J. Schar
JENNER & BLOCK LLP
353 N. Clark Street,
Chicago, IL 60654-3456
Tel: 312-222-9350
tmascherin@jenner.com
rschar@jenner.com

Ishan K. Bhabha
Douglas E. Litvack
Lauren J. Hartz
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001-4412
Tel: 202-637-6327
ibhabha@jenner.com
dlitvack@jenner.com
lhartz@jenner.com

*Counsel for Defendant Trustees of Dartmouth College*

By: */s Derek Ludwin*
Derek Ludwin
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Tel: 202-662-6000
dludwin@cov.com

Christopher D. Dusseault
Rachel S. Brass
Jacqueline Sesia
GIBSON DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Tel: 213-229-7000
cdusseault@gibsondunn.com
rbrass@gibsondunn.com
jsesia@gibsondunn.com

Casey T. Grabenstein
SAUL EWING ARNSTEIN & LEHR
161 North Clark, Suite 4200
Chicago, IL 60601
Charlotte, NC 28202
Tel.: 312-876-7100
casey.grabenstein@saul.com

*Counsel for Defendant Duke University*

By: */s Tina M. Tabacchi*
Tina M. Tabacchi
JONES DAY
110 N. Wacker Dr.
Suite 4800
Chicago, IL 60601-1692
Tel.: 312-782-3939
tmtabacchi@jonesday.com

Craig A. Waldman
Hashim M. Mooppan
Christopher N. Thatch
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001-2113
Tel.: 202-879-3877
cwaldman@jonesday.com
hmmooppan@jonesday.com
cthatch@jonesday.com

*Counsel for Defendant Emory University*

By: */s Britt M. Miller*
Britt M. Miller
Jed W. Glickstein
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Tel: 312-782-0600
bmiller@mayerbrown.com
jglickstein@mayerbrown.com

Stephen M. Medlock
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006-1101
Tel: 202-263-3000
smedlock@mayerbrown.com

*Counsel for Defendant Georgetown University*

By: */s Jeffrey J. Bushofsky*
Jeffrey J. Bushofsky
ROPES & GRAY LLP
191 North Wacker Drive 32nd Floor
Chicago, IL 60606-4302
Tel: 312-845-1200
jeffrey.bushofsky@ropesgray.com

Chong S. Park
Samer M. Musallam
ROPES & GRAY LLP
2099 Pennsylvania Avenue, NW
Washington, DC 20006-6807
Tel: 202-508-4600
chong.park@ropesgray.com
samer.musallam@ropesgray.com

*Counsel for Defendant Johns Hopkins University*

By: */s Eric Mahr*
Eric Mahr
Jan Rybnicek
Daphne Lin
FRESHFIELDS BRUCKHAUS DERINGER
US LLP
700 13th Street, NW
Washington, DC 20005
Tel: 202-777-4500
eric.mahr@freshfields.com
jan.rybnicek@freshfields.com
daphne.lin@freshfields.com

Rami Fakhouri
Jennifer L. Greenblatt
GOLDMAN ISMAIL TOMASELLI
BRENNAN & BAUM LLP
200 South Wacker Drive, Floor 22
Chicago, IL 60604
Tel: (312) 681-6000
rfakhouri@goldmanismail.com
jgreenblatt@goldmanismail.com

*Counsel for Massachusetts Institute of Technology*

By: */s Scott D. Stein*
Scott D. Stein
Benjamin R. Brunner
Kelsey Annu-Essuman
SIDLEY AUSTIN LLP
1 South Dearborn Street
Chicago, IL 60603
Tel.: 312-853-7000
sstein@sidley.com
bbrunner@sidley.com
kannuessuman@sidley.com

*Counsel for Northwestern University*

By: */s Robert A. Van Kirk*
Robert A. Van Kirk
Jonathan Pitt
Sarah F. Kirkpatrick
Matthew D. Heins
WILLIAMS& CONNOLLY LLP
680 Maine Avenue SW
Washington, D.C. 20024
Tel: 202-434-5000
rvankirk@wc.com
jpitt@wc.com
skirkpatrick@wc.com
mheins@wc.com

James Peter Fieweger
MICHAEL BEST & FRIEDRICH LLP
444 West Lake Street
Suite 3200
Chicago, IL 60606
Tel.: 312-222-0800
jpfieweger@michaelbest.com

*Counsel for University of Notre Dame du Lac*

By: */s Seth Waxman*
Seth Waxman
WILMER CUTLER PICKERING HALE AND
    DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
Tel: 202-663-6800
seth.waxman@wilmerhale.com

David Gringer
Alan Schoenfeld
WILMER CUTLER PICKERING HALE AND
    DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel: 212-937-7294
david.gringer@wilmerhale.com
alan.schoenfeld@wilmerhale.com

Edward W. Feldman
Daniel Martin Feeney
MILLER SHAKMAN LEVINE & FELDMAN
LLP
180 North LaSalle Street
Suite 3600
Chicago, IL 60601
Tel.: 312-263-3700
dfeeney@millershakman.com
efeldman@millershakman.com

*Counsel for The Trustees of the University of
Pennsylvania*

By: */s J. Mark Gidley*
J. Mark Gidley
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005-3807
Tel: 202-626-3600
mgidley@whitecase.com

Robert A. Milne
David H. Suggs
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020-1095
Tel: 212-819-8200
rmilne@whitecase.com
dsuggs@whitecase.com

*Counsel for Vanderbilt University*
By: */s/ Charles A. Loughlin*
Charles A. Loughlin
Benjamin F. Holt
Jamie Lee
Molly Pallman
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004-1109
Tel: 202-637-5600
chuck.loughlin@hoganlovells.com
benjamin.holt@hoganlovells.com
jamie.lee@hoganlovells.com
molly.pallman@hoganlovells.com

Stephen Novack (ARDC #2067587)
Stephen J. Siegel (ARDC #6209054)
Serena G. Rabie (ARDC #6336601)
NOVACK AND MACEY LLP
100 North Riverside Plaza, 15th Floor
Chicago, IL 60606-1501
Tel.: 312-419-6900
snovack@novackmacey.com
ssiegel@novackmacey.com
srabie@novackmacey.com

*Counsel for Yale University*