1

1    UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF ILLINOIS
2              EASTERN DIVISION

3   SIA HENRY, et al.,           )
                                 )
4            Plaintiffs,         )
                                 )
5        vs.                     ) No. 22 C 125
                                 )
6   BROWN UNIVERSITY, et al.,    ) Chicago, Illinois
                                 ) August 2, 2022
7            Defendants.         ) 11:02 a.m.

8

         TRANSCRIPT OF PROCEEDINGS - MOTION HEARING
9
          BEFORE THE HONORABLE MATTHEW F. KENNELLY
10
    APPEARANCES:
11
    For the Plaintiffs:   ROCHE FREEDMAN LLP
12                        BY:  MR. EDWARD J. NORMAND
                               MR. KYLE ROCHE
13                        99 Park Avenue, Suite 1910
                          New York, New York 10016
14                        (646) 970-7513

15                        GILBERT LITIGATORS & COUNSELORS
                          BY:  MR. ROBERT D. GILBERT
16                        11 Broadway, Suite 615
                          New York, New York 10004
17                        (646) 448-5269

18                        BERGER MONTAGUE PC
                          BY:  MR. ERIC L. CRAMER
19                        1818 Market Street, Suite 3600
                          Philadelphia, Pennsylvania 19103
20                        (215) 875-3009

21                        FEGAN SCOTT, LLC
                          BY:  MS. ELIZABETH A. FEGAN
22                        150 South Wacker Drive, 24th Floor
                          Chicago, Illinois 60606
23                        (312) 741-1019

24

25

```
 1    APPEARANCES:   (Continued)

 2    For the Plaintiffs: HELLRING LINDEMAN
                         GOLDSTEIN & SIEGAL LLP
 3                       BY:  MR. ROBERT S. RAYMAR
                         One Gateway Center
 4                       Newark, New Jersey 07102
                         (973) 621-9020
 5
      For the Defendants:
 6    Brown University:      MORGAN, LEWIS & BOCKIUS, LLP
                             BY:  MR. KENNETH M. KLIEBARD
 7                           110 North Wacker Drive, Suite 2800
                             Chicago, Illinois 60606
 8                           (312) 324-1000

 9    California Institute
      of Technology:         COOLEY LLP
10                           BY:  MR. MATTHEW L. KUTCHER
                             110 North Wacker Drive, Suite 4200
11                           Chicago, Illinois 60606
                             (312) 881-6500
12
      University of
13    Chicago:               ARNOLD & PORTER
                             BY:  MR. JAMES L. COOPER
14                           555 Twelfth Street, N.W.
                             Washington, DC 20004
15                           (202) 942-5000

16    Columbia University:   SKADDEN, ARPS, SLATE,
                             MEAGHER & FLOM LLP
17                           BY:  MR. PATRICK J. FITZGERALD
                                  MS. AMY VAN GELDER
18                           155 North Wacker Drive, Suite 2700
                             Chicago, Illinois 60606
19                           (312) 407-0508

20    Cornell University:    KING & SPALDING, LLP
                             BY:  MR. NORMAN ARMSTRONG, JR.
21                                MR. ZACHARY T. FARDON
                             1700 Pennsylvania AVenue, NW, Suite 200
22                           Washington, DC 20006
                             (202) 626-8979

23

24

25
```

```
 1   APPEARANCES:   (Continued)

 2   Dartmouth College:      JENNER & BLOCK LLP
                             BY:  MS. TERRI L. MASCHERIN
 3                           353 North Clark Street
                             Chicago, Illinois 60654
 4                           312-222-9350

 5   Duke University:        GIBSON, DUNN & CRUTCHER LLP
                             BY:  MR. CHRISTOPHER D. DUSSEAULT
 6                           333 South Grand Avenue
                             Los Angeles, California 90071
 7                           (213) 229-7855

 8   Emory University:       JONES DAY
                             BY:  MS. TINA M. TABACCHI
 9                           110 North Wacker Drive, Suite 4800
                             Chicago, Illinois 60606
10                           (312) 782-3939

11                           JONES DAY
                             BY:  MR. HASHIM M. MOOPPAN
12                           51 Louisiana Avenue, N.W.
                             Washington, DC 20001 (202) 879-3939
13
     Georgetown University:
14                           MAYER BROWN LLP
                             BY:  MS. BRITT M. MILLER
15                           71 South Wacker Drive
                             Chicago, Illinois 60606
16                           (312) 782-0600

17   Massachusetts Institute
     of Technology:          FRESHFIELDS BRUCKHAUS DERINGER
18                           BY:   JAN RYBNICEK
                                   DAPHNE LIN
19                           700 13th Street NW, 10th Floor
                             Washington, DC 20005
20                           (202) 777-4500

21                           GOLDMAN ISMAIL TOMASELLI
                             BRENNAN & BAUM LLP
22                           BY:  RAMI N. FAKHOURI
                             200 South Wacker Drive, 22nd Floor
23                           Chicago, Illinois 60606
                             (312) 881-5964
24

25
```

```
 1   APPEARANCES:   (Continued)

 2   Northwestern
     University:              SIDLEY AUSTIN LLP
 3                            BY:   MR. SCOTT D. STEIN
                              One North Dearborn Street
 4                            Chicago, Illinois 60603
                              (312) 853-7000
 5
     University of
 6   Notre Dame:              WILLIAMS & CONNOLLY LLP
                              BY:   MR. MATTHEW D. HEINS
 7                                  MR. JONATHAN PITT
                              680 Maine Avenue, SW
 8                            Washington, DC 20024
                              (202) 434-5073
 9
     University of
10   Pennsylvania:            WILMER CUTLER PICKERING
                              HALE and DORR LLP
11                            BY:   MR. SETH P. WAXMAN
                              1875 Pennsylvania Avenue, NW
12                            Washington, DC 20006
                              (202) 663-6000
13
                              WILMER CUTLER PICKERING
14                            HALE and DORR LLP
                              BY:   MR. DAVID GRINGER
15                            7 World Trade Center
                              New York, New York 10007
16                            (212) 230-8864

17                            MILLER SHAKMAN
                              LEVINE & FELDMAN LLP
18                            BY:   MR. EDWARD W. FELDMAN
                              180 North LaSalle Street, Suite 3600
19                            Chicago, Illinois 60601
                              (312) 263-3700
20
     The Johns Hopkins
21   University:              ROPES & GRAY LLP
                              BY:   MR. JEFFREY J. BUSHOFSKY
22                            191 North Wacker Drive, 32nd Floor
                              Chicago, Illinois 60606
23                            (312) 845-1200

24

25
```

```
 1   APPEARANCES:   (Continued)

 2   United States of
     America:                UNITED STATES DEPARTMENT OF JUSTICE
 3                           ANTITRUST DIVISION
                             BY:  MR. ERIC DUNN
 4                           950 Pennsylvania Avenue, NW Room 3415
                             Washington, DC 20530
 5                           (202) 431-6727

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22
     Court Reporter:         Brenda S. Tannehill, CSR, RMR, CRR
23                           Official Court Reporter
                             219 South Dearborn Street, Suite 1928
24                           Chicago, Illinois 60604
                             (312) 554-8931
25                           brenda_tannehill@ilnd.uscourts.gov
```

1    (Proceedings heard in open court:)

2         THE CLERK:  Case 22 C 125, Henry versus Brown

3    University.

4         THE COURT:  Okay.  So somebody gave me a list of

5    counsel who are here for the defendants.  I am hoping what

6    that means is that not all 27 people or however many it is

7    feel the need to get up your give your names and we can just

8    kind of put this into the record.

9         Does that sound right to everybody?

10        A VOICE:  That was the intent, Your Honor.

11        THE COURT:  Everybody's nodding.  All right.  So I

12   don't know what the count is on the plaintiffs' side.

13        MR. NORMAND:  In terms of who's speaking, Your Honor?

14        THE COURT:  No.  In terms of how many people are

15   here.

16        MR. NORMAND:  Probably 10 or 12.

17        THE COURT:  Okay.  Maybe if you guys could put

18   together -- it can be handwritten -- a list, we can put that

19   all in there and then just have the people who are talking

20   give your names.

21        And so the protocol is going to be that if you're

22   arguing, you can take your face mask off.  And I kind of hope

23   you will because it will be a little bit easier to hear.

24   Otherwise, keep it on.

25        If somebody can let me know what the plan is here, is

1    it going to be divided up on the defense side?  And if so, can

2    somebody tell me how?

3              MR. WAXMAN:  Yes, Your Honor.

4              THE COURT:  It's better if you're talking into a mic,

5    so it's okay to stay sitting.  Just pretend you're trying a

6    case in South Carolina or something.

7              MR. WAXMAN:  For all these years, I find it

8    incredibly --

9              THE COURT:  I'm with you, you know.

10             MR. WAXMAN:  Your Honor, my name is Seth Waxman.

11   I'll be presenting the argument for all 17 defendants with

12   respect to the omnibus motion to dismiss that's been filed for

13   everybody.

14             Hashim Mooppan, who is the third one at this table,

15   will be presenting argument if the Court wishes to hear

16   argument with respect to Brown, Chicago, and Emory, the

17   so-called withdrawn schools.

18             THE COURT:  Okay.

19             MR. WAXMAN:  And in the event that the Court might

20   wish to hear from him, I'd like to allocate two minutes of my

21   20.

22             THE COURT:  That's about right because I think I

23   might have, like, one question for him which he probably can

24   anticipate because it has to do with who's got the burden on

25   withdrawal.  If he can anticipate it, now he knows what it is

1   so he can plan it for the next 18 minutes.

2           And you want to save some time for rebuttal, too?

3           MR. WAXMAN:  Yes, please.  If the Court would permit,

4   I'd like to save five minutes.

5           THE COURT:  Okay.  Fine.

6           And on the plaintiffs' side, is one person going to

7   do everything, or are you going to divide it up, or what?

8           MR. NORMAND:  That's right, Your Honor.

9           Ted Normand.

10          THE COURT:  As far as when you argue -- and I don't

11  know how these podiums got moved -- or maybe it's podia -- how

12  they got moved all the way over here or whatever.  How the

13  mics work, if you prefer to stand up, go for it.

14          Mr. Waxman, you've got the floor.

15          MR. NORMAND:  Your Honor, I'm sorry to interrupt.

16  It's Ted Normand.

17          We do have the government here, and we had a call

18  with Your Honor last week.

19          THE COURT:  Yeah.  He's going to be on your side.

20          MR. NORMAND:  I just wanted to understand the order,

21  Your Honor.

22          THE COURT:  Yeah.  That person can give his or her

23  name when they get up.

24          Mr. Waxman, you can go ahead.

25          MR. WAXMAN:  Your Honor did say I could remove this?

1          THE COURT:  Yes, please do.

2          MR. WAXMAN:  May it please the Court.

3          For over 30 years, with the express encouragement of

4   both Congress and the Department of Justice, universities

5   practicing need-blind admissions have collaborated on a census

6   methodology to more accurately determine what an applicant's

7   family can reasonably afford to pay.

8          This lawsuit imperils that important encouraged

9   collaboration by arguing first that defendants are not

10  entitled to the 568 exemption; and second, that their conduct

11  is price fixing that is per se illegal.  And in any event,

12  that at unreasonable -- it is in any event an unreasonable

13  restraint of trade in a relevant market.

14         Both positions are wrong as a matter of law.  In

15  addition, the plaintiffs have also failed to plausibly allege

16  any antitrust injury which is independent grounds for a

17  dismissal.

18         Now, as to the exemption, under any reasonable

19  reading of the text, history, context, and heretofore uniform

20  understanding of the meaning of 568, plaintiffs'

21  interpretation of "need blind" is wrong.

22         THE COURT:  Can I interrupt you?  What do you mean by

23  "heretofore uniform understanding"?

24         MR. WAXMAN:  So what I mean is that they have not

25  cited a single instance, and we have not found one, in which

1   anyone referred to "need blind" as an insistence that the

2   financial circumstances of the applicant cannot be taken into

3   account by admissions people for any reason whatsoever even

4   having nothing to do with the need for financial aid.

5           THE COURT:  Has the 568 exemption ever been litigated

6   before?

7           MR. WAXMAN:  568 -- no, it has not.

8           THE COURT:  Why would you expect somebody to have

9   found an instance if it hasn't been litigated?

10          MR. WAXMAN:  Oh, I'm not talking about in court, but,

11  for example, in all of the so-called overlap litigation that

12  culminated in *Brown v. MIT* -- I'm sorry -- *United States v.*

13  *Brown and MIT*, in all of the congressional debates -- not

14  debates but all the legislative history that we've cited in

15  our brief in which Congress in reports accompanying the

16  enactment and reenactment and reenactment, there's not the

17  slightest indication that a school is ineligible to

18  participate in Section 568 if, for example, it considers

19  financial circumstances for purposes of giving a tip to

20  applicants from low socioeconomic backgrounds.

21          THE COURT:  I want to come back that to specific

22  example in a second, but I want to go back to the general

23  point.  So I guess my question is:  Why does anybody get past

24  the language of the statute?

25          I mean, this is a case in which there's a statute.

1     It has words in it that have meaning, and it has a specific

2     definition of "need blind."  So first of all, 568(a) says all

3     students admitted are admitted on a need-blind basis.  It

4     doesn't say "some," it doesn't say "most," it doesn't say

5     "everybody except the people on the wait list."  And then it

6     defines "need blind" in specific words without regard to the

7     financial circumstances of the student involved or the

8     student's family.

9              And I guess it seems to me the principal argument on

10    this exception is whether it actually means those words or

11    whether it means something else.  And the plaintiffs are

12    arguing -- you guys are arguing for something other than the

13    plain meaning.

14             MR. WAXMAN:  So first of all, the words "financial

15    circumstances," which is what this argument is all about, is

16    an undefined term.  But this case is really controlled by

17    United *States v. Bond*, the Supreme Court's decision involving

18    the chemical weapons -- the statute that enacted domestically

19    the chemical weapons ban.

20             The Court then said that even where a dictionary

21    definition of a term reads a particular way, when context,

22    history, and common sense show that the financial

23    circumstances that can't be considered are the need for

24    financial aid, that governs.

25             Financial aid is what this statute is all about.

1    It's mentioned in every subsection of 568.

2             THE COURT:  Okay.  So I want to make sure I'm

3    completely getting this.  So the term that's undefined, as you

4    said, is the term "financial circumstances" as it appears in

5    the definition of "need-blind basis."  Am I right so far?

6             MR. WAXMAN:  Yes.

7             THE COURT:  And you're saying that that use of the

8    term "financial circumstances" means what exactly as it

9    relates to this case?

10            MR. WAXMAN:  Yes.  So what it means is any

11   information that is in the application for financial aid or

12   any information about financial circumstances that is used as

13   a proxy for the need for financial aid.  And it can't mean

14   anything more than that consistent with the context of the

15   statute and, frankly, with the structure --

16            THE COURT:  So what you're basically saying -- I

17   mean, and I know you've said other things, obviously, but what

18   you're basically saying here is that the statute can't mean

19   that I as an admissions officer can't look at Jane Jones, an

20   applicant who comes from a disadvantaged background, and say,

21   "I can't consider that at all, period, that she's

22   disadvantaged financially" because that would be considering

23   financial circumstances.

24            MR. WAXMAN:  Yes.

25            THE COURT:  That's the point you're making right now?

1          MR. WAXMAN:  That's our --

2          THE COURT:  Basically, what you're saying is that

3  that would be an absurd result because it would be contrary to

4  the whole purpose of the statue which is to expand financial

5  aid, if you will?

6          MR. WAXMAN:  Well, not only expand financial aid but

7  to encourage schools to give a tip for low-income students

8  whether they get financial aid or not.

9          I mean, to read "financial circumstances" the way

10  that the plaintiffs are reading it actually renders the word

11  "need" surplusage; and therefore, even thinking about this on

12  textual terms only, it can't be the right reading.

13          THE COURT:  So how do we get there, though?  I mean,

14  if that's the right result, what's the route to get there?  If

15  the right result is don't read "financial circumstances" to

16  mean I can't consider anything about the person's or their

17  family's finances, what's the analytical route to get there?

18          MR. WAXMAN:  So I think the analytical route to get

19  there is -- just thinking about the context of this statute

20  is -- and all of the discussions about it and its predecessor

21  that was governed by the MIT standards of conduct that the

22  Justice Department endorsed was all about the need for

23  financial aid.

24          There's no indication that anybody ever thought that

25  schools couldn't consider anything involving financial

1   circumstances for any other purpose with respect to an

2   admissions decision.  It's only if it is financial

3   circumstances that bear on them insofar as they bear on the

4   need for financial aid.

5        And the legislative history of this which we've cited

6   is Congress makes clear this means that to be eligible, you

7   cannot consider information from the financial aid

8   application, --

9        THE COURT:  Right.

10       MR. WAXMAN:  -- and you cannot consider other

11  financial circumstances and use it as a proxy for what might

12  be.

13       THE COURT:  So let me ask you what I think then is

14  the next logical follow-up.  Let's say I'm with you so far.

15  I'm not saying that, but let's just say hypothetically that

16  I'm with you so far and that the statute can't be read to

17  preclude an institution from considering, let's say, the

18  adverse financial circumstances of an applicant.

19       That's not what the plaintiffs are suing about in

20  this case, right?  They're suing about kind of the opposite

21  end of that.  They're suing about considering -- at least part

22  of what they're suing about is considering the nonadverse or

23  opposite of adverse financial circumstances.

24       So let's say you're right about the definition.  How

25  does that mean that you win on this motion, I guess?

1          MR. WAXMAN:  Well, for one thing, their resort to

2   that interpretation demonstrates that even they don't really

3   believe that a literalist reading of the text explains what it

4   really means.

5          Their point, as I understand it, is, well, there are

6   some schools, we understand, that in some instances will

7   consider during the admissions process whether an applicant's

8   family has been, you know, enormously supportive in donations

9   or otherwise; and therefore, they may take into account that

10  accepting this applicant would produce a very substantial

11  contribution of some sort to the school.

12         Now, I don't think that that can possibly be what

13  Congress ever intended because a school is need aware only if

14  it considers financial circumstances in the context of the

15  need for financial aid, not in a separate context like the

16  ability to support the missions of the school.

17         And I think one way that's helped me think about this

18  is donor preferences would exist even if a school offered no

19  financial aid or if the school gave every applicant a free

20  ride or every applicant that needed any assistance a complete

21  free ride.  So donor preference is not about the need for

22  financial aid.  It's not with respect to the need for

23  financial aid.

24         In the context of a potential large donation, no one

25  is saying, "Wow, that's great.  She won't need financial aid."

1          That's my best shot.

2          THE COURT:  Okay.  But aren't the plaintiffs alleging

3     that exactly that's what's happening, "Oh, that's great.  She

4     won't need financial aid.  Let's let her in"?

5          MR. WAXMAN:  I mean, I don't understand anything in

6     their complaint to allege that, and I'd be really surprised.

7          I mean, the fact of the matter is that in between

8     students who need financial aid and the few students or

9     applicants, rather, whose admission may result in a

10    substantial contribution is the vast middle of people,

11    applicants who don't need financial aid but are not in a

12    position to give an outsized donation.

13         THE COURT:  I'm not sure who that is, but whatever.

14    That's the people in between the billionaires and the people

15    who have no money which --

16         MR. WAXMAN:  No.  I actually --

17         THE COURT:  I don't know what it costs to go to

18    college these days.  I'm kind of out of the

19    sending-people-to-college business.

20         MR. WAXMAN:  If you look at Exhibit F to the

21    plaintiffs' amended complaint which was attached to a revised

22    or supplemental declaration of Mr. Litan, you will see what

23    the net price is that the schools charged in 2021 and the

24    incredible variation between the amount of financial aid they

25    gave and the net price to students.

1          THE COURT:  Let me go about this in a little bit of a

2    different way, and I think I probably asked a question

3    inartfully.

4          So your previous point was that the plaintiffs'

5    allegedly literal reading of the exemption can't be right

6    because it leads to this absurd result.  Okay.  And so

7    therefore, what?  What's the right reading then?

8          How do we get from there -- in other words, the

9    literal reading would lead to an absurd result because of this

10   one thing that eliminates being able to consider somebody's

11   adverse financial circumstances.  How do we get from there to

12   basically, I mean, their characterization is blowing the doors

13   open and you can consider anything you want about finances?

14         MR. WAXMAN:  I mean, I think you get there by reading

15   the statute the way that Congress understood the statute when

16   it adopted it which is "need blind" means that you may not

17   consider in the admissions process any information in the

18   financial aid application, and you can't have an end run

19   around it by considering financial circumstances that

20   otherwise might appear.

21         And Congress actually said, "Look, we therefore

22   encourage schools to not allow admissions officers in the

23   admissions process to view the financial aid application."

24         THE COURT:  So how am I supposed to know that that's

25   how Congress understood it?

1      I mean, is the assumption that they were only

2  attacking this prior arrangement that was sued about in *US v.*

3  *Brown and MIT*, or how do I know that that's how Congress

4  understood it?  I guess that's my question.

5      MR. WAXMAN:  I think that you can understand it in a

6  variety of ways, one from the reports accompanying the

7  enactment and reenactment of 568 including the text that I

8  just paraphrased for Your Honor.

9      You also can understand it because as *Bond* teaches,

10  even if a particular term has a dictionary definition -- and

11  here, it is an undefined term, but even if it did, you don't

12  adopt that dictionary meaning if it is inconsistent with the

13  context and history and common sense of the statute.

14      THE COURT:  If you're going to talk about something

15  other than 568, probably time to do that.

16      MR. WAXMAN:  I would very much like to talk about the

17  Sherman Act and also antitrust injury.

18      THE COURT:  Yeah.  Let's focus on the better of those

19  two points or the one that you want to talk about the most.

20  As you know, 15 minutes gets wiped out pretty fast.

21      MR. WAXMAN:  Okay.

22      THE COURT:  We're getting there.

23      MR. WAXMAN:  Okay.  So let me make the following

24  points.

25      Exemption aside, the complaint doesn't plausibly

1   allege price fixing pursuant to per se treatment.

2           The plaintiffs don't and can't dispute and Congress

3   has repeatedly found and the Justice Department

4   acknowledges -- and the plaintiffs do as well in paragraph 254

5   of their complaint -- that schools compete vigorously on price

6   because notwithstanding an agreement to not only develop the

7   consensus methodology which is, in fact, what these schools do

8   but also, as alleged, to, quote, use the methodology as the

9   means to determine the amount that a family can afford to pay,

10  the schools are entirely free to set tuition at an amount of

11  their choosing, to offer merit, athletic, or other types of

12  aid, to determine whether the aid will be in the form of a

13  grant, loan, or work study, and to offer additional need-based

14  aid.

15          Schools are entirely free either to say, "Okay.  I

16  know what the consensus methodology shows, but I'm going to

17  give this applicant a full ride" or "I'm going to give this

18  applicant -- the net price will not be tuition, room and board

19  minus the consensus methodology number.  I'm going to give

20  them additional aid."  Or the school can basically say, "Okay.

21  I recognize that the family needs this.  I'll provide it in

22  the form of a loan which it does not lower the net price."

23          And so there really --

24          THE COURT:  It doesn't lower the net price, but, I

25  mean, nobody's suggesting, I would assume, that there's no

1   difference between pay me $10,000 in the tuition bill you're

2   going to get at the beginning of the first semester versus pay

3   the bank 10 years from now over time.

4        MR. WAXMAN:  I'm not arguing that there's no

5   difference.  I, in fact, was a beneficiary of financial aid in

6   the form of loans only.

7        The point is that the plaintiffs haven't alleged that

8   these schools don't compete vigorously on the net price that

9   they charge admitted students.

10       Indeed, as I said, their statement in paragraph 254

11  which says, "Unlike the overlap group, the 568 group does not

12  agree to allocate aid solely based on financial need."

13       And the Justice Department in its statement of

14  interest says right up front the schools using the consensus

15  methodology compete vigorously on price charged.

16       And so the notion that this is price fixing at all,

17  much less price fixing that is subject to per se

18  determination -- per se treatment -- is wrong.  And --

19       THE COURT:  Even if there's some competition over

20  price, if what a group does is kind of sets boundaries on that

21  and says, "You can compete within the boundaries but not

22  outside the boundaries," wouldn't that be problematic under

23  the Sherman Act anyway?

24       MR. WAXMAN:  Yes.  And it also would be

25  extraordinarily different from this case because schools using

1    the consensus methodology -- two schools using the consensus

2    methodology looking at a common applicant, one school could

3    decide, "Look, we really, really want this kid, so we're going

4    to give her a full ride" or "We're going to double the amount

5    of aid, grant aid that the consensus methodology indicates."

6    Or a school can say, "We're not going to offer any aid at

7    all."  There's no dispute about that.

8              And there is an additional point on --

9              THE COURT:  If you do your additional point, then

10   he's not going to get to talk.  And I don't want to harm him

11   because you're at about 20 minutes right now.  So save it for

12   rebuttal.

13             This other gentleman, come on up.  Just give your

14   name for the record so the court reporter can get it down.

15             MR. MOOPPAN:  Hashim Mooppan.

16             THE COURT:  All right.  You heard my question.

17             MR. MOOPPAN:  I did.  Before, Your Honor, if I could

18   just mention that I was passed a note.  Apparently, the audio

19   link is not working for people outside of the court.

20             THE COURT:  Oh, my.  Okay.

21             Melissa, we were supposed to do that?

22             Unfortunately, we're not going to be able to fix

23   that.

24             MR. MOOPPAN:  As to your question, Your Honor, we

25   think that the burden of pleading continued membership in the

1   conspiracy at the time of the injuries asserted is part of

2   plaintiffs' element of --

3         THE COURT:  So pretty much every case except a case

4   out of circuit says otherwise, right?  And granted that

5   they're mostly criminal cases, but --

6         MR. MOOPPAN:  So I think that the criminal-civil

7   distinction is fundamental here.  The reason it's an

8   affirmative defense on the criminal side is because as the

9   Supreme Court explained in *Smith*, the criminal offense is

10  complete upon the agreement.  But in the civil context, the

11  critical difference is that the central element of a civil

12  antitrust suit is that the injury is caused by the defendants'

13  challenged conduct.  That's what differentiates a criminal

14  suit from a civil suit.

15        THE COURT:  Why would that mean that the burden of

16  proof gets shifted for this particular issue?

17        MR. MOOPPAN:  Because as the Eighth Circuit

18  explained, if they need to prove injury caused by the

19  defendant's challenged conduct, if the defendant wasn't a

20  member of the conspiracy at the time of the injury they're

21  complaining about, they can't show that the defendant's

22  challenged conduct injured them.

23        THE COURT:  Well, time out.

24        I mean, if I'm suing a bunch of conspirators, I don't

25  have to prove that each one of them injured me, do I?  Don't I

1    have to prove that somebody acting pursuant to the conspiracy

2    injured me?

3              MR. MOOPPAN:  That's right, because the defendant's

4    challenged conduct of joining the conspiracy makes them

5    responsible for the acts of their co-conspirators that are in

6    furtherance of the conspiracy.  But that logic breaks down

7    once the defendant is no longer a part of the conspiracy.

8    That's the central point that the Eighth Circuit recognized in

9    *Krause*.

10             And they, I don't think, have cited any cases --

11             THE COURT:  Let me ask you a different question.

12             So aren't there allegations in the complaint that

13   these particular defendants didn't really withdraw?

14             MR. MOOPPAN:  I'm sorry.  I didn't hear that.

15             THE COURT:  Aren't there allegations in the complaint

16   to the effect that these particular defendants didn't actually

17   withdraw?

18             MR. MOOPPAN:  To the contrary, Your Honor.  The

19   complaint says -- the amended complaint says that they claimed

20   to withdraw, and they don't --

21             THE COURT:  Right.

22             MR. MOOPPAN:  And then the complaint doesn't have any

23   allegations to the contrary, none.  In fact, it's the exact

24   opposite.  It incorporates the website, and the website's

25   membership lists make perfectly clear that Brown, Chicago, and

1     Emory all did withdraw by no later than --

2              THE COURT:  Well, it just means they're not declared

3     members, right?  It doesn't necessarily mean they're not still

4     doing it?

5              MR. MOOPPAN:  So the withdrawal standard is whether

6     there's a cessation of participation and an affirmative act

7     communicating the cessation to the other members.  I think

8     that is established by the fact that the --

9              THE COURT:  Pause right there, and I'm going to have

10    to move on to the plaintiffs' side on this.

11             So you're saying that it's enough to withdraw and

12    then communicate your withdrawal, period?  That's it?  You

13    don't have to do anything to repudiate it or anything like

14    that?

15             MR. MOOPPAN:  That's correct, Your Honor.

16             The cases that they've cited where there's a

17    suggestion that merely communicating withdrawal is not

18    disavowal or all cases where there's a removal from employment

19    but not a removal from the conspiracy, here, the group is the

20    conspiracy.

21             And I would point Your Honor --

22             THE COURT:  In the standard jury instructions that we

23    give to juries in criminal cases about withdrawal talk about

24    repudiation.  You're saying that's not the requirement in this

25    context?

1          MR. MOOPPAN:  No, I agree that the standard is

2     repudiation.  My point is that when the conspiracy that is

3     alleged is the very thing that the defendant says that they're

4     withdrawing from, that is a repudiation.  And I think the best

5     case for that is actually a case that they cite.  It's the

6     *Winn-Dixie* case.

7          THE COURT:  Well, you know if what you just said was

8     right, Mr. Nagelvoort who was tried in this courtroom would

9     have won.

10         MR. MOOPPAN:  Well, no, Your Honor.  So I think

11    *Nagelvoort* is different because *Nagelvoort*, the withdrawal was

12    from employment.  He never actually said, "I withdraw from the

13    underlying conspiracy involving Medicaid kickbacks" or

14    whatever it was in that case.

15         THE COURT:  Okay.  Thanks.

16         So I think the plan on the plaintiffs' side is I said

17    the government is going to go first and use its time, which

18    I'm going to protect the other folks and I'm going to hold you

19    to exactly five minutes.

20         So just for anybody who comes up over here, you're

21    going to have to give your name as you come up.

22         So go ahead.

23         MR. DUNN:  Your Honor, Eric Dunn on behalf of the

24    United States.

25         THE COURT:  All right.  Go for it.

1          MR. DUNN:  Thank you, Your Honor.  I appreciate the

2     opportunity to be at the hearing today.

3          I'd like to explain why the United States filed the

4     statement of interest in this case and address two arguments

5     from defendants' reply:  The incorrect assertion that there is

6     an actual knowledge or conspiratorial intent requirement under

7     the Sherman Act or the 568 exemption and the incorrect

8     argument that an agreement on how to calculate financial aid

9     cannot be per se unlawful.

10          The United States has a significant interest in this

11     case because a decision on how the per se rule applies here

12     may affect the legal standard in other cases brought by

13     government enforcers in this area or others.  And a decision

14     on the scope of the 568 exemption may affect how courts

15     interpret other exemptions like Capper-Volstead and

16     McCarran-Ferguson.

17          I'd like to address the two points from defendants'

18     reply.  First, nothing in the text of the 568 exemption or the

19     antitrust laws justifies creating an actual knowledge or

20     conspiratorial intent requirement; and creating such a

21     requirement could have significant impacts beyond this case.

22          Defendants are asking the Court to write this

23     requirement into the statute by confusing the legal principles

24     related to three distinct issues:  First, whether the

25     defendants entered into an agreement; second, whether each

1   defendant is liable as a co-conspirator as part of that

2   agreement; and third, whether conduct is covered by the 568

3   exemption.  But defendants' knowledge of whether their

4   agreement was illegal is not relevant to any of those issues.

5          THE COURT:  So you're basically saying that knowledge

6   is relevant on issue one but not on issue three?

7          MR. DUNN:  Well, it --

8          THE COURT:  You have to knowingly enter into an

9   agreement, right?

10         MR. DUNN:  You have to knowingly enter into an

11  agreement, but whether you know that agreement is unlawful is

12  not relevant.

13         THE COURT:  I get that, but you can't accidentally

14  enter into an agreement.

15         MR. DUNN:  Knowledge and intent can be relevant in

16  what -- I think where defendants are confusing the issues is

17  what knowledge and intent matters.

18         THE COURT:  Okay.

19         MR. DUNN:  So defendants cite cases like *Marion* which

20  talk about a conscious commitment to a common scheme.  But

21  that's the standard for using circumstantial evidence to infer

22  the existence of an agreement, and it's not relevant here; and

23  it does not mean that plaintiffs must show that defendants

24  knew their conduct was illegal.

25         The same is true for the unwitting conspirator

1   language defendants cite in their brief.

2          In determining whether a particular university is

3   liable as a member of the conspiracy, knowledge and intent can

4   be relevant to whether that university joined the conspiracy

5   knowing its knowledge and scope -- knowing its nature and

6   scope, but that is not the same thing as knowing their conduct

7   was illegal.

8          The only mistake of fact relevant to joining an

9   agreement would be a mistake about the nature and scope of the

10  conduct involved in the agreement, not whether the agreement

11  itself was illegal or whether any other member of

12  the conspir --

13          THE COURT:  So what you're basically talking about

14  here is this whole issue about whether University A has to

15  know exactly what University B is doing, right?

16          MR. DUNN:  Correct.

17          THE COURT:  Okay.  I just wanted to make sure I got

18  it.  Go ahead.

19          MR. DUNN:  Finally, there is no knowledge or intent

20  requirement under the 568 exemption.  Defendants have not

21  identified any statutory text or case supporting such a

22  requirement.  And writing that requirement into the statute is

23  contrary to the well-established principle that antitrust

24  exemptions should be interpreted narrowly in favor of

25  promoting competition.  And courts have rejected the exact

1    argument that defendants are making here in the context of the

2    Capper-Volstead Act and other exemptions.

3          Second, contrary to defendants' reply, an agreement

4    to use a common methodology for calculating financial aid can

5    be per se unlawful.

6          As the Supreme Court has made clear, price is the

7    central nervous system of our economy.  An agreement that

8    interferes with the setting of price by free market forces,

9    including agreements to stabilize or eliminate price

10   competition, are per se illegal under the antitrust laws.  And

11   that is true whether the agreement is an outright agreement

12   over prices or a component of prices, including pricing

13   formulas.

14         The defendants' response is to say that their

15   agreement has a tangential relationship to the price students

16   pay for college, and so it shouldn't fall within the per se

17   rule against price fixing.  But that is contrary to

18   *Sacony-Vacuum*.

19         Defendants have also argued that because they still

20   compete on some aspects of price, their agreement cannot be

21   per se illegal.  Again, that is inconsistent with

22   *Sacony-Vacuum* and cases from this circuit like *High Fructose*

23   *Corn Syrup* where the Court said that even though no one

24   actually pays the list price, an agreement fixing the list

25   price is still per se unlawful.

1    THE COURT:  The aspect of this that you're arguing,

2  does it touch on whether I even have to get to the per se

3  ruling, in other words, whether there's enough here, assuming

4  the rule of reason applies?

5    MR. DUNN:  The argument I'm making is just focused on

6  the per se rule.

7    THE COURT:  So I'll leave that for the other folks.

8    MR. DUNN:  In closing, apart from those two issues,

9  defendants incorrectly suggest in this argument and in their

10  brief that because the United States didn't address certain

11  issues in our statement of interest, we agree with the

12  defendants on those issues.  No inference should be --

13    THE COURT:  I wouldn't have assumed that.

14    MR. DUNN:  I'm just encouraging the Court not to draw

15  that inference.

16    Unless the Court has further questions, I'll sit

17  down.

18    THE COURT:  Thanks.

19    MR. DUNN:  Thank you.

20    THE COURT:  Okay.

21    MR. NORMAND:  May it please the Court.

22    THE COURT:  Your name?

23    MR. NORMAND:  Ted Normand.  With my co-counsel, I

24  represent the plaintiffs.

25    The parties are disputing a lot of issues,

1   Your Honor.

2          THE COURT:  Here's where I want you to start, and

3   it's really with the example, I guess, that Mr. Waxman talked

4   about which seems to me to be to the extent you have a weak

5   point on the interpretation of the 568 exemption, it's that.

6          In other words, it's this proposition that, wait a

7   second, if the plaintiffs are right, a university can't even

8   look at the fact that a person, just generally speaking, has

9   poor financial circumstances and take that into account as

10  kind of a plus factor.

11         In the response brief, you basically say, yeah,

12  that's okay to consider that because that doesn't really count

13  as financial circumstances.  Or at least I think that's the

14  argument, but I need you to flush it out for me.

15         MR. NORMAND:  Well, it's our secondary argument, is

16  the first thing I would say.

17         The primary point which the defendants have ignored

18  and Mr. Waxman ignored is that even under their interpretation

19  of "need blind," we have stated a claim, and the exemption

20  doesn't apply.

21         As he said, the definition of "need blind" that they

22  adopt -- we disagree with it -- is are you considering whether

23  a student needs financial aid.  And we specifically allege

24  with respect to wait list and transfer students who constitute

25  thousands of students every year at these schools that these

1    schools do consider whether those students need financial aid.

2           So that falls directly under the statute.  It's a

3    specific plausible factual allegation.  It's the factual

4    content of our complaint.  As Your Honor said in *Hunter*,

5    what's the factual content.  The factual content is -- and we

6    give many examples in the complaint -- that these schools do

7    consider whether those students need financial aid.

8           So our view is that satisfied the statute, and the

9    Court may never have to resolve the secondary issue that you

10   raised for me.  It may never have to resolve that in this

11   case.

12          If the schools had not admitted all students on a

13   need-blind basis, the exemption goes away.  And we allege that

14   as to each school.

15          The only argument, as I understand it, Your Honor, on

16   this issue is the argument that the standards of conduct that

17   preceded the exemption had an exception for wait list

18   students.

19          They don't make any argument that there was ever an

20   exemption for transfer students.  Their argument is, well, the

21   standards of conduct on which the exemption is based had an

22   exception for wait list students.  But the exemption doesn't.

23          The only reasonable inference -- and the Supreme

24   Court said this in 1992 in *Germane* -- is to assume that

25   Congress didn't make a mistake.  And even the underlying

1   legislative history aspect of that argument holds no water.

2   It's clear that the exemption is not based in whole or part on

3   the standards of conduct.

4         THE COURT:  You don't really have to spend much time

5   on that argument.  Why don't you get to the --

6         MR. NORMAND:  As to the secondary issue, Your Honor,

7   as I understand it --

8         THE COURT:  Yes.

9         MR. NORMAND:  As I understand the spirit of

10   Your Honor's question, it's twofold.  First of all, it would

11   have to be, as the courts have said, preposterous to think

12   that Congress when it used the phrase "financial

13   circumstances" meant financial circumstances.  It's not

14   preposterous.

15         Just as fundamental, the courts have always

16   interpreted "without regard to" to mean that there can be

17   consideration of a disadvantaged class.  The Foreign Services

18   Act, the Federal Highway Act, the Office of Contract

19   Compliance for federal affirmative action programs, the City

20   of Chicago's affirmative action programs, all of these

21   statutes and starting with President Johnson's 1965 executive

22   order on federal contractors, all of these statutes say two

23   things at the same time:  One, you can't make a decision on

24   hiring or other activity with regard to race; but two, there

25   can be affirmative action.

1          THE COURT:  I just have to tell you, I would not in

2     the summer of 2022 want to put all my eggs in the affirmative

3     action --

4          MR. NORMAND:  Understood, Your Honor.  Understood.

5     With the Supreme Court --

6          THE COURT:  Just saying -- I don't know about that,

7     but I'm just saying I'm not sure I'd want to put all my eggs

8     in that basket.  But, you know, that aside, I mean, I guess

9     just from a standpoint of, you know, arguing the plain

10    language, once you say that the plain language doesn't really

11    mean the plain language, in other words, "financial

12    circumstances" means "financial circumstances" for all of this

13    but not for this one thing, I mean, I'm not -- I guess I'm

14    struggling a little bit with the idea of why doesn't that mean

15    that we just don't look at plain language.

16         MR. NORMAND:  Let's keep in mind what the framework

17    for statutory interpretation would be here, and let's then

18    talk about whether that would be an unreasonable result.

19         So the framework in *Digital Realty* from the Supreme

20    Court is you look to the specific statutory definition.  The

21    Supreme Court said the same thing in *Tanzin* a year later.  You

22    look to the specific statutory definition.  And you do that,

23    Justice Thomas said in *Tanzin*, even if there are plausible

24    arguments for why the ordinary meaning of the defined term

25    should be given that meaning.  You overlook that.  You look to

1    the specific statutory definition.  That's what we do here.

2           And then in *Van Buren*, the Supreme Court said just

3    last year you look for the best reading, what is the reading

4    that best fits on balance.

5           Under all those interpretative frameworks and the

6    standard that if you consider financial circumstances and you

7    take it in the most literal way, as Your Honor has said, that

8    wouldn't be a preposterous result.

9           We have the far better reading of the statute.  Our

10   reading doesn't lead to any absurd results.  Their reading

11   leads to a truly absurd result which is they could nearly fill

12   their classes with high-income individuals.  They could

13   consider financial circumstances, and in a statute whose

14   entire purpose, as is clear from the plain language, is

15   designed to benefit people who need financial aid, they could

16   ignore those who need financial aid.

17          This goes back -- I know Your Honor says that the

18   legislative history or the background of the standards of

19   conduct is sort of secondary, but the standards of conduct

20   said these schools would have to meet the full need of any

21   students who were applying for financial aid.  The exemption

22   doesn't say that.

23          And if you were to ask these defendants, "Are you

24   obligated to provide full need for students who need financial

25   aid," they'd say, "No, we're not, and the reason we're not is

1    because it's not in the exemption."

2          So we know that the plain language of the exemption

3    in critical respects does control, Your Honor.

4          I know my time is short, so I would move to injury.

5          Again, the framework, the Supreme Court said 30 years

6    ago in the *FTC* case, "For a per se claim, the plaintiff does

7    not have to allege that competition is eliminated."

8          And it is not a fair reading of our complaint to say

9    that we failed to allege that competition has been reduced.

10   We repeatedly allege --

11         THE COURT:  That's basically my point about putting a

12   boundary.  We're going to compete inside the boundary, but you

13   can't go outside.  That's still a violation.

14         MR. NORMAND:  As the government said 30 years ago, it

15   creates a price floor.  There's an agreement to make students

16   and their families pay the maximum that they're able to pay.

17   That threshold decision is itself anticompetitive.

18         It's not at all self-evident that competitors

19   offering a product for sale would agree that the consumer

20   should have to pay as much as they can afford to pay.  So that

21   threshold decision is anticompetitive.

22         But I took Mr. Waxman's point to be that there's

23   somehow a failure in the pleading, and we repeatedly allege

24   that competition is being reduced and that it's the natural

25   inference to draw from the horizontal agreement.

1          The Supreme Court has explained that, and the Second

2    Circuit has agreed.  And this district in *Wheat Rail* agreed

3    that if you --

4          THE COURT:  I have to give a shout out to whatever

5    found that case.  Somebody did their research.  That's all I'm

6    going to say.  You'll figure it out.

7          MR. NORMAND:  It's on point.  It was affirmed by the

8    Seventh Circuit, and as you know, I guess --

9          THE COURT:  I'm just saying.  Somebody did their bio

10   pretty well.

11         MR. NORMAND:  That case says an agreement on how to

12   set rates is anticompetitive.

13         The Second Circuit said in *Gelboim* an agreement on a

14   component of price is anticompetitive; it's a per se problem.

15         So we clearly allege, we submit, Your Honor, injury.

16         There's two further issues that were raised, statute

17   of limitations and this issue of withdrawal.  I raise both of

18   those together because they're both affirmative defenses.

19         THE COURT:  Yeah.  So talk about that since the

20   gentleman talked about it a little bit.  So, I mean, his

21   argument is that it's different from criminal, the burden is

22   on you in this situation, not on them because it's a

23   different -- what has to be proven for criminal liability

24   versus civil liability is different.

25         Can you talk about that a little bit?

1           MR. NORMAND:  Yes.

2           So the Supreme Court said in *Smith* in 2013 it's an

3   affirmative defense.  There's no indication in any aspect of

4   the Supreme Court's reasoning that it was specific to criminal

5   versus civil.

6           We've got a series of cases that --

7           THE COURT:  When you say "it," what's the "it"?

8           MR. NORMAND:  The question of the burden of proof and

9   what to show for purposes of withdrawal.

10          This Court in *Sulfuric Acid* in 2010 in footnote 12

11  specifically says in a civil antitrust conspiracy, the burden

12  of proof, denying summary judgment in that case, is on the

13  defendant.

14          We've seen just this year from other courts, federal

15  courts, applying *Smith* in the context of civil antitrust

16  conspiracies.  The *GN* case in the District of Maryland just a

17  few weeks ago and the *Seafood Packaging* case in the Southern

18  District of California in March, both of those cases saying

19  it's an affirmative defense, civil antitrust, and it's for the

20  burden to prove, and it's fact intensive.

21          THE COURT:  What about the argument that, okay, it's

22  pleaded in the complaint incorporating the website or whatever

23  it is?  Because you say that they've said they withdrew, and

24  then if you look at the website, they're not on it anymore.

25  And that is enough, I think, was at least part of the

1    argument.

2           MR. NORMAND:  The only facts that we allege is that

3    they don't identify themselves as part of the conspiracy.

4           They say, "You should infer from that that we decided

5    not to be in the conspiracy."  First of all, that's not the

6    only inference, but even if you were to infer that, even if

7    you were to infer that we allege that they're not in the

8    conspiracy any longer, the Seventh Circuit has specifically

9    and twice rejected the argument that was made.

10          In *Nagelvoort*, the Seventh Circuit looked at the way

11   other circuits had addressed withdrawal, where in other

12   circuits, it's enough to say that you stopped participating.

13   And the Seventh Circuit said that's not enough.

14          In *Vallone*, the Seventh Circuit specifically looked

15   at a prior Seventh Circuit case in *Wilson* and clarified the

16   holding in *Wilson* and said it is not enough to say that you

17   just stopped participating.

18          So I think the standard is wrong.  I think it's clear

19   that in this district, you have to allege an affirmative act,

20   a disavowal.

21          And so the point on the motion to dismiss,

22   Your Honor, is we don't allege those facts.  In order to have

23   pleaded ourselves out of withdrawal, we would have had to have

24   alleged something like Brown, Chicago, and Emory disavowed and

25   stopped participating.  And in the language of these civil

1    antitrust cases from this year, *GN* says you have to show that

2    you stopped benefitting from the conspiracy, and *Seafood*

3    *Packaging* says you have to have severed all ties with the

4    conspiracy.

5        We don't know as a matter of fact whether that

6    happened, and we certainly don't allege, Your Honor, that it

7    happened.

8        Same thing with respect to statute of limitations and

9    the exemption itself.  These are affirmative defenses.

10       As an example, Your Honor, we've pled around the

11   need-blind matter in the affirmative defense of the exemption,

12   but there's other language in the exemption that it is going

13   to be defendants' burden to prove.  They have to prove that

14   they exercised independent professional judgment with respect

15   to individual applicants.  That's their burden on an

16   affirmative defense.

17       And the same holds true for statute of limitations.

18   I know it wasn't addressed, but I wanted to use my time to

19   address it.  That's an affirmative defense.

20       THE COURT:  Oh, there's one question I want to ask

21   you about that.  So I don't remember if it's in the opening

22   brief or in the reply.  The defendants say, "Well, you don't

23   read discovery rules into federal statute of limitations

24   anymore.  You read them" -- it's based on that.  I think it's

25   a, I think, fair debt collection practices case that was

1    decided a few years ago.

2           Anyway, my question for you is this.  So I think it's

3    still the law.  In fact, I'm pretty sure it's still the law

4    that equitable tolling is still read into the federal statute

5    of limitations.  It's presumed, in other words, unless it's

6    refuted.

7           I would assume that at least in this circuit, a

8    person doesn't have to plead around statute of limitations by

9    affirmatively alleging the bases for equitable tolling.

10          MR. NORMAND:  That's correct, Your Honor.  A

11   plaintiff doesn't have to plead around the statute of

12   limitations at all.  It's an affirmative defense.

13          THE COURT:  Let's just say hypothetically -- and

14   let's just step away from the complaint for a second.  Let's

15   just say I was looking at equitable tolling here.  And so

16   generally speaking, what equitable tolling is is that the

17   plaintiff exercised due diligence and there was some unusual

18   or extraordinary circumstance that prevented them from

19   discovering the claim.  Is that something down the road that

20   is going to be able to be shown in this case?

21          MR. NORMAND:  I don't think it's going to be

22   necessary for us to show that.  And with respect to a class,

23   because the way Your Honor described --

24          THE COURT:  I'm talking about individual plaintiffs

25   might be chopped out but the class as a whole would not.

1            MR. NORMAND:  That is not the standard on the

2    discovery rule.  So I know it's not lost on the Court, but the

3    Second Circuit has made clear, including just a few weeks ago

4    in *Vasquez*, the discovery rule does apply to the Sherman Act

5    in this circuit.

6            And the Seventh Circuit in reversing *Sidney Hillman*

7    in 2015 made the point that it is only if there is no

8    conceivable set of facts under which the plaintiff didn't

9    discover.

10           THE COURT:  I say that to defendants on motions to

11   dismiss probably twice a week.

12           MR. NORMAND:  And finally, Your Honor, in *In re

13   Broiler*, this district made the point that the question on the

14   discovery rule is not, in fact, whether a plaintiff exercised

15   due diligence but rather the abstract question of whether a

16   reasonable person in the plaintiffs' position would have

17   discovered the injury sooner.  That's the standard that's

18   amenable to class certification.  The courts have done that

19   repeatedly.

20           And the last thought there, Your Honor, as well on

21   the statute of limitations, the Seventh Circuit has said in

22   *Fish* in 2014 if there is an obviously applicable affirmative

23   defense, it's a Rule 11 problem to bring a claim.

24           So the definition and whether these schools were need

25   blind was part of the calculus as to whether plaintiffs could,

 1   without running into trouble, bring a lawsuit and when they

 2   could have brought that lawsuit.

 3         Thank you, Your Honor.

 4         THE COURT:  Thanks.

 5         All right, Mr. Waxman, you've got five minutes.

 6         MR. WAXMAN:  Thank you, Your Honor.  I think I want

 7   to -- sorry.

 8         THE COURT:  It works for me either way.  I can hear a

 9   little bit better with it off.

10         MR. WAXMAN:  It works a lot better for me to not try

11   and breathe through an N95 mask.

12         So I have five points that I'd like to make.  The

13   first is with respect to whether this is a per se violation.

14   Independent of why this is not remotely price fixing, much

15   less price fixing that is subject to per se treatment, there's

16   an independent point.  Through multiple reenactments, Congress

17   has found that the collaboration has procompetitive benefits.

18         The Department of Justice in its standards of conduct

19   expressly provided a safe harbor for collaborating schools,

20   which means the department -- which it has not withdrawn --

21   which means the Department of Justice doesn't think that this

22   collaboration is an antitrust violation, much less a per se

23   antitrust violation.

24         And there is only one court that has ever examined a

25   claim like this, and the court in *Brown* insisted on full rule

1   of reason treatment.  And those three facts independent of

2   anything else under the Supreme Court's decision in *BMI*, they

3   preclude per se treatment.

4        My second point is that the plaintiffs' rule of

5   reason argument fails because their candidate market is an

6   implausible litigation construct.

7        There's no reason to think -- and they allege no

8   facts to think -- that schools, many, many schools outside

9   this artificial litigation construct based on an 18-year

10  average of ratings of certain schools by one defunct magazine

11  actually in the real world --

12       THE COURT:  Wait a second.  Which is the defunct

13  magazine?

14       MR. WAXMAN:  "US News and World" --

15       THE COURT:  They're defunct?  I did not know that.

16  It was the thing, right?

17       MR. WAXMAN:  It used to be a thing.

18       THE COURT:  Okay.

19       MR. WAXMAN:  Now it's a rating.

20       THE COURT:  It's a new thing I learned today.

21       MR. WAXMAN:  Now it's one of many rating services.

22       I mean, they allege no facts to -- that the *US News*

23  average top 25 university ranking is a relevant market, given

24  that it gerrymanders out competition from a whole variety of

25  schools that obviously are competitors.  NYU, for example,

1   which is ranked 27 would surely be surprised to know that it

2   is not competing with Columbia for students.

3         My third point is even if none of this were correct,

4   the complaint must be dismissed because not a single named

5   plaintiff has plausibly pled antitrust injury.

6         Even assuming that the challenged collaboration might

7   have some anticompetitive effect at some schools for some

8   student, it's entirely speculative whether any of these

9   plaintiffs suffered any injury at all, in other words, whether

10  in the but-for world they would have received more, less, or

11  the same amount of financial aid, because they don't plead

12  anything about their particular financial or admission

13  circumstances.

14        The fourth point goes to the point that the Justice

15  Department began with which is essentially the argument that

16  for purposes of the exemption, if one school turns out not to

17  be need blind, that is one school.  Notwithstanding annual

18  certifications that they are, one school admits one student

19  taking, I don't know, need into account, the lack of need into

20  account, all of these schools lose their ability to -- lose

21  the safe harbor of the exemption.

22        That interpretation, Your Honor -- under that

23  interpretation, no school could ever join this conspiracy,

24  this --

25        THE COURT:  It would be too risky, basically.

1       MR. WAXMAN:  Not only is it too risky, but schools

2   are -- it's simply impossible for each one of these schools to

3   have a continuous audit of each admissions decision made and

4   the financial aid offered with respect to all of their

5   students to make sure that it was really need blind.  It's, A,

6   impossible.  And because it's impossible, it means that in

7   enacting 568, Congress created a null set.  It created an

8   exemption which no schools would ever agree.

9       THE COURT:  What's your fifth point?

10      MR. WAXMAN:  My fifth point relates to the comments

11  that Mr. Normand made, you know, that somehow, the exemption

12  is an affirmative defense.

13      If the exemption is an affirmative defense, reading

14  it to be an affirmative defense would impose on schools the

15  exact litigation costs and burdens that Congress said was the

16  reason it was creating the exemption.  That is the whole

17  purpose of the exemption is to allow schools that are

18  practicing need-blind admissions within 568 not to undergo

19  litigation.

20      And the plaintiffs' argument is yes, they can prove

21  that as an affirmative defense sometime along the way in

22  either a summary judgment or trial.  That frustrates Congress'

23  purpose.  And moreover, this is not written as an affirmative

24  defense.

25      This is a case -- this exemption is worded very, very

1   analogous to the statutory labor exemption that was at issue

2   in the Seventh Circuit in the Mid-America Regional Bargaining

3   Association.

4           THE COURT:  I have to tell you, I think that point is

5   adequately covered in the brief, so I'm going to cut you off.

6   I'm going to do one more thing, though.

7           So I just totaled up the time.  You guys have had

8   collectively 29 minutes, and the plaintiffs had 20, and there

9   were two questions I forgot to ask the plaintiffs.  So I'm

10  going to ask them those two questions.  So if plaintiffs'

11  counsel could come up.

12          One has to do with what I'll call the "How could you

13  possibly police this exemption issue," in other words, the

14  thing about intent.

15          The point was made -- I think it was made by

16  Mr. Waxman, I think, originally and then again in rebuttal

17  that you can't rationally interpret the exemption to say that

18  it's effectively -- I'm going to use a phrase not exactly in

19  the right way -- strict liability.  In other words, if you

20  read it to say that it doesn't matter whether University A

21  knows that University B is complying, it would be

22  effectively -- the exemption would be a dead letter.

23          So that's one of the two points.  I've now forgotten

24  the other point, so while you're talking about that, I'll

25  remember what the first one is.

 1          MR. NORMAND:  Thank you, Your Honor.  And if I could

 2     respond to Mr. Waxman's comments as well.

 3          There's no knowledge requirement set forth in the

 4     statute, so the plain language of the statute controls.

 5     There's no difference or distance between this statute and --

 6          THE COURT:  No, I get that, but, I mean, I think the

 7     argument is that you've got to read -- you've got to read some

 8     sort of knowledge requirement into it because otherwise, it

 9     would effectively be a dead letter because no rational

10     university would ever go along with the -- you know, with the

11     common scheme or whatever it is.

12          MR. NORMAND:  Well, to the extent they're making a

13     prediction of how facts would unfold --

14          THE COURT:  Everybody would have to be the insurer of

15     everybody else, in other words.

16          MR. NORMAND:  But that's exactly the risk on the

17     federal statutes that work the same way.  That's the risk

18     under Capper-Volstead; that's the risk under McCarran-Ferguson

19     with regard to insurance companies.

20          THE COURT:  McCarran is pretty easy.  You've just got

21     to make sure there's nobody that's not a farmer in there.

22     This is much harder because you have to dig into what each

23     other school is doing.

24          MR. NORMAND:  Well, I'm sure you've read the case,

25     but if you read *National Broiler*, it was a pretty close call

1   as to whether that person was most of the time a farmer or

2   not.

3          So this is an example of how it's a function of the

4   narrow and strict interpretation of antitrust exemptions.  And

5   there's nothing unusual about the operation of the statute

6   where if you know you're -- as with any conspiracy, if you

7   understand you're entering into a conspiracy, then you run a

8   risk.

9          THE COURT:  Before I forget it again, the other thing

10  I wanted to ask you about was this market definition issue.

11  In other words, if I forego at this point, at least initially,

12  assessing per se yes or no, their argument is that you fail

13  under the real reason, one of the reasons being is that the

14  market, as you've defined it, makes no sense.

15         MR. NORMAND:  Well, we'd allege direct

16  anticompetitive effects.  And so when you do that, first of

17  all, in the Seventh Circuit, all you have to show is the rough

18  contours of the market.

19         We've alleged in detail that these defendants

20  themselves regard the market we've defined as essentially the

21  market in which they compete.  So there's no reasonable

22  inference that the market that we've described isn't at least

23  the rough contours of the market at issue.

24         THE COURT:  And the market as you've defined it is

25  what?  It's top 25?

1    MR. NORMAND:  The top 25 private national
2  universities.  And as --
3    THE COURT:  The fact that you haven't sued all of
4  them doesn't really matter because you don't have to control
5  the entire market in order for there to be an antitrust
6  violation?
7    MR. NORMAND:  That's correct.
8    THE COURT:  Yeah.
9    MR. NORMAND:  That's correct, Your Honor.
10    The *BMI* case that Mr. Waxman cited, that's not
11  applicable because there's no -- we don't allege, as was the
12  case in *BMI*, that these defendants would be unable to
13  negotiate individualized financial aid offers.  We don't
14  allege that they have to get together in order to make this
15  even work.
16    THE COURT:  So you've got one or two final points.
17  Just go ahead and make them, and then we're going to stop.
18    MR. NORMAND:  Well, Your Honor, the only thing I
19  would say to your question earlier about the consideration of
20  financial circumstances, as we note in our opposition
21  brief, -- this is at Note 9 -- is that this language about
22  consideration of financial circumstances doesn't bar the
23  schools from considering, as we say, applicant strengths in
24  overcoming adversity or helping others overcome adversity such
25  as homelessness, poverty, substance abuse, gun violence, other

1  forms of trauma.  That's different from considering financial

2  circumstances as such as the sole factor in whether to admit

3  someone.

4      So they're permitted to undertake a holistic analysis

5  in the case of people whose financial circumstances have left

6  them having to overcome other elements.  The consideration of

7  those other elements can still be appropriate under our

8  interpretation of the statute.

9      Thank you, Your Honor.

10      THE COURT:  The motions are taken under advisement.

11  I appreciate everybody's arguments.  And the briefs are all

12  really well done, obviously, and all very helpful.

13      Take care.

14      (Proceedings adjourned at 11:59 a.m.)

15                                    * * * * *

16

17

18

19

20

21

22

23

24

25

1                           C E R T I F I C A T E

2

3

4          I, Brenda S. Tannehill, certify that the foregoing is

5    a complete, true, and accurate transcript from the record of

6    proceedings on August 2, 2022, before the HONORABLE

7    MATTHEW F. KENNELLY in the above-entitled matter.

8

9

10   */s/Brenda S. Tannehill, CSR, RMR, CRR*          8/2/2022

11        Official Court Reporter                    Date
          United States District Court
12        Northern District of Illinois
          Eastern Division
13

14

15

16

17

18

19

20

21

22

23

24

25