**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **FRANK CARBONE, ANDREW CORZO, SAVANNAH ROSE EKLUND, SIA HENRY, ALEXANDER LEO-GUERRA, MICHAEL MAERLANDER, BRANDON PIYEVSKY, KARA SAFFRIN, and BRITTANY TATIANA WEAVER, individually and on behalf of all others similarly situated,** | ) ) ) ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **vs.** | ) ) | **Case No. 22 C 125** |
| **BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, THE JOHNS HOPKINS UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY,** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| **Defendants.** | ) ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

MATTHEW F. KENNELLY, District Judge:

Frank Carbone, Andrew Corzo, Savannah Rose Eklund, Sia Henry, Alexander

Leo-Guerra, Michael Maerlander, Brandon Piyevsky, Kara Saffrin, and Brittany Tatiana

Weaver, on behalf of themselves and all others similarly situated, have sued seventeen private universities for antitrust violations under section 1 of the Sherman Act. The defendants include Brown University (Brown), California Institute of Technology (CalTech), University of Chicago (Chicago), the Trustees of Columbia University in the City of New York (Columbia), Cornell University (Cornell), Trustees of Dartmouth College (Dartmouth), Duke University (Duke), Emory University (Emory), Georgetown University (Georgetown), the Johns Hopkins University (Johns Hopkins), Massachusetts Institute of Technology (MIT), Northwestern University (Northwestern), University of Notre Dame Du Lac (Notre Dame), the Trustees of the University of Pennsylvania (Penn), William Marsh Rice University (Rice), Vanderbilt University (Vanderbilt), and Yale University (Yale).

This opinion concerns three motions to dismiss filed by the defendants: (1) a motion joined by all of the defendants; (2) a motion by Brown, Chicago, Emory, and Johns Hopkins; and (3) a motion by Yale. For the reasons below, the Court denies the defendants' motions.

## Background

The defendants are private universities that have been consistently ranked by the *U.S. News & World Report* as among the top twenty-five of such schools in the nation. On January 9, 2022, the plaintiffs filed suit against the defendants, who they allege have "participated and are participating in a price-fixing cartel that is designed to reduce or eliminate financial aid as a locus of competition, and that in fact has artificially inflated the net price of attendance for students receiving financial aid." Am. Compl. ¶ 1. The plaintiffs seek class certification under Federal Rules of Civil Procedure 23(a),

(b)(2), and (b)(3); a permanent injunction prohibiting the defendants from "continuing to illegally conspire regarding their pricing and financial-aid policies"; and damages in the form of actual damages or restitution. *Id.* at 70.

Each defendant is alleged to be or have been a member of the 568 Presidents Group (the 568 Group). According to its website, the 568 Group "is an affiliation of colleges and universities . . . [that] works together in an effort to maintain a need-based financial aid system that is understandable and fair and will bring greater clarity, simplicity, and equity to the process of assessing each family's ability to pay for college." 568 Presidents Group, http://www.568group.org/home/. In line with this goal, members of the 568 Group develop, adopt, and implement the Consensus Approach (CM), a set of common standards for determining a family's ability to pay for college. The plaintiffs allege that "[u]nder the Consensus Methodology, an applicant's ability to pay is a substantial determinant of the net price . . . charged to the applicant for attendance." *Id.* ¶ 5. They further allege that, by developing and adopting the CM, "the 568 [Group] has intended to reduce or eliminate, and in fact succeeded in reducing or eliminating, price competition among its members." *Id.* ¶ 7.

## Discussion

This opinion concerns three motions to dismiss the plaintiffs' amended complaint: one filed by the defendants collectively; one filed by Brown, Chicago, Emory, and Johns Hopkins; and one filed by Yale. To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the complaint must state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court must view the complaint "in the light most favorable to the plaintiff, taking as true all well-pleaded factual

3

allegations and making all possible inferences from the allegations in the plaintiff's favor." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). Even so, the plaintiff must provide "some specific facts to support the legal claims asserted" and cannot rely on conclusory allegations to make his claim. *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011).

## A. The joint motion to dismiss

The defendants have collectively moved to dismiss the plaintiffs' claims, arguing that (1) their actions fall within an antitrust exemption in section 568 of the Improving America's Schools Act of 1994 (the 568 Exemption); (2) the plaintiffs fail to plausibly allege a violation of the Sherman Act; (3) the plaintiffs' alleged injuries are too speculative to satisfy the antitrust injury and antitrust standing requirements; and (4) several of the plaintiffs' claims are time-barred under the four-year antitrust statute of limitations.

### 1. The 568 Exemption

The defendants claim that their actions are exempt from antitrust liability under the 568 Exemption, which covers agreements between "2 or more institutions of higher education at which all students are admitted on a need-blind basis." 15 U.S.C. § 1 note. The plaintiffs dispute that the Exemption applies because, they allege, the defendants do not admit all of their students on a need-blind basis.

The parties discuss several issues related to the 568 Exemption. First, the parties dispute who has the burden of persuasion and, accordingly, whether the Exemption is a proper basis for dismissal for failure to state a claim. Second, the parties dispute the proper interpretation of the term "need-blind"—namely, whether the

4

term prohibits consideration of all financial circumstances or prohibits only consideration of an applicant's need for financial aid. Lastly, the parties dispute whether the plaintiffs have sufficiently alleged that the defendants do not admit all their students on a need-blind basis.

Resolution of this dispute does not require addressing all of these issues. The Court finds that, even taking the defendants' position on the first two issues, the plaintiffs have sufficiently alleged that the defendants are not covered by the 568 Exemption and thus denies the defendants' motion on this basis. Although the Court declines to rule on the other two points of contention, it discusses those points briefly.

### a.    Basis for motion to dismiss

The plaintiffs contend that applicability of the 568 Exemption is not an appropriate basis for a motion to dismiss because the burden is on the defendant to prove. The defendants disagree, arguing that "Section 568 imposes elements that a plaintiff must plead and prove to overcome it." Defs.' Reply at 3. Although the Court declines to rule on the issue, the Court notes that the defendants' interpretation runs contrary to the "general rule of statutory construction that the burden of proving justification or exemption under a special exception to the prohibitions of a statute generally rests on one who claims its benefits." *NLRB v. Ky. River Cmty. Care, Inc.*, 532 U.S. 706, 711 (2001) (quoting *FTC v. Morton Salt Co.*, 334 U.S. 37, 44–45 (1948)). This rule has been restated and applied numerous times by the Seventh Circuit. *See EEOC v. Chicago Club*, 86 F.3d 1423, 1429 (7th Cir. 1996) (collecting cases). Although it may be that the present case is an exception to the general rule, as in the defendants' cited cases, the defendants carry the heavier burden here to convince the Court that a

5

departure from the general rule is warranted.  *See, e.g., Mid-Am. Reg'l Bargaining Ass'n v. Will Cnty. Carpenters Dist. Council*, 675 F.2d 881, 886 (7th Cir. 1982) (concluding that the plaintiffs needed to plead around the statutory labor exemption to state an antitrust claim).

### b.    Meaning of "need-blind"

Under the statute, "on a need-blind basis means without regard to the financial circumstances of the student involved or the student's family."  15 U.S.C. § 1 note (internal quotation marks omitted).  The defendants contend that the term "financial circumstances" in this definition refers only to financial information in a student's financial aid application or other proxies for a student's need for financial aid.  The plaintiffs argue, in contrast, that the exemption applies only to universities who do not consider *any* aspect of an applicant's financial circumstances.

As stated above, the Court need not rule on this issue at this time.  The Court does, however, make one note regarding an argument on which the defendants heavily rely.  The defendants contend that the Court must adopt their proposed interpretation of the term, otherwise schools would be forced "to choose between receiving the protections of Section 568 and recognizing the unique potential of applicants from less financially fortunate families."  Defs.' Mem. at 14.  In other words, the defendants contend that the plaintiffs' interpretation would prohibit schools from considering an applicant's financial hardship in a positive way, thus "inhibit[ing] schools' efforts to shape economically diverse classes for the benefit of the entire student body."  *Id.* at 13.  The defendants say that because this would lead to an absurd result, the Court should adopt their position instead.

The Court finds this argument unpersuasive. Courts give statutes their plain meaning "where the disposition required by the text is not absurd." *Sebelius v. Cloer*, 569 U.S. 369, 381 (2013) (citation omitted). The absurdity doctrine allows courts to make "modest adjustments to texts that do not parse," but it does not give courts license to make "substantive changes designed to make the law 'better.'" *Soppet v. Enhanced Recovery Co.*, 679 F.3d 637, 642 (7th Cir. 2012). In other words, the absurdity doctrine is confined to "linguistic, as opposed to substantive, absurdity." *United States v. Stands Alone*, 11 F.4th 532, 536 (7th Cir. 2021); *see also United States v. Logan*, 453 F.3d 804, 806 (7th Cir. 2006) (stating that the absurdity doctrine "is limited to solving problems in exposition, as opposed to the harshness that a well-written but poorly conceived statute may produce").

The defendants do not show that the plaintiffs' interpretation of the statute is linguistically absurd. Their argument does not actually fit the absurdity doctrine: they contend that the plaintiffs' reading of the 568 Exemption would discourage schools from considering an applicant's disadvantaged financial background in a positive way. If that's right, it arguably might make for bad policy, but it wouldn't render the 568 Exemption absurd. Whether a statute is bad policy, and thus ought to be modified, is not for courts to decide. "That would give the judiciary entirely too much law-making power." *Soppet*, 679 F.3d at 642.

### c.    Sufficiency of the allegations

The Court concludes that, regardless of which interpretation of "need-blind" it adopts, the plaintiffs have plausibly alleged that the defendants do not admit *all* students on a need-blind basis. For purposes of this section, the Court adopts the narrower

7

definition of need-blind provided by the defendants: that is, to show that the defendants are not protected under the 568 Exemption, the plaintiffs must plausibly allege that the defendants consider some applicants' need for financial aid in their admissions decisions. The plaintiffs have met this burden.

The amended complaint contains several categories of allegations that support the plaintiffs' contention that the defendants do not admit all students on a need-blind basis. In summary, the plaintiffs allege:

> [A]ll Defendants have considered the financial circumstances of students and their families in deciding whether to admit waitlisted and transfer students; at least several Defendants maintain admissions systems that favor the children of wealthy past or potential future donors; at least several Defendants preference wealthy applicants through the largely secretive process known as "enrollment management"; and Columbia considers the financial circumstances of students and families in making admission decisions for its School of General Studies.

Am. Compl. ¶ 8. The defendants take issue with each of the above statements, disputing the sufficiency of the plaintiffs' allegations.

First, the plaintiffs allege that all the defendants consider the financial need of students and their families in deciding whether to admit waitlisted or transfer students. With respect to the former, the defendants criticize the evidence cited by the plaintiffs as too general or too old to support the contention that the defendants admitted waitlisted students on a need-aware basis during the relevant time period. These arguments do not fly on a motion to dismiss. The defendants' criticisms go to the weight of the plaintiffs' evidence; they arguably provide reasons to discredit the evidence but not a basis to find the plaintiffs' allegations implausible. At summary judgment and trial, the plaintiffs may need to present additional evidence to prevail. At this stage, however, the allegations in the amended complaint are sufficient; the plaintiffs' allegations on this

point are plausible.

The defendants also contend that the plaintiffs' allegations concerning transfer students are insufficient because "[a]ll of Plaintiffs' allegations . . . are based solely 'on information and belief,' with no facts alleged to indicate why this supposed belief is plausible." Defs.' Mem. at 18. The Court disagrees. The plaintiffs are permitted to make allegations "on information and belief." *Frerck v. Pearson Educ., Inc.*, No. 11 C 5319, 2012 WL 1280771, at *2 (N.D. Ill. Apr. 16, 2012) (collecting cases). This is especially true where, as in this case, the "pleadings concern matters peculiarly within the knowledge of the defendants." *Huon v. Denton*, 841 F.3d 733, 743 (7th Cir. 2016). And the allegations in the complaint, taken as true as required on a Rule 12(b)(6) motion, are sufficient to allege plausibly that the defendants consider financial need when admitting transfer students.

The defendants also contend, in a footnote, that the need-blind requirement does not apply to waitlisted students. The Court rejects this argument because it is inconsistent with the language of the exemption, which expressly states that "all" students must be admitted on a need-blind basis. Additionally, as the plaintiffs point out, the legislative history of the 568 Exemption suggests that the need-blind requirement applies to waitlisted students. The language of the Exemption was modeled on the Standards of Conduct negotiated between MIT and the Justice Department in 1993. *See* H.R. Conf. Rep. 103–761, 911–12; H.R. Rep. 105-144 ("Section 568 in most respects mirrors the settlement reached in 1993."). The Standards of Conduct expressly excluded waitlisted students from the need-blind requirement, but this language was removed during the drafting of the 568 Exemption.

9

This omission suggests that Congress intended for the need-blind requirement to apply to waitlisted students.

The amended complaint also contains allegations that at least several of the defendants favor children of wealthy past or potential future donors in their admissions decisions. As with the allegations regarding waitlist admissions, the defendants contend that the plaintiffs' evidence is too old or too general to support their allegations. As previously stated, these arguments are inappropriate bases for dismissal under Rule 12(b)(6).

The defendants further contend that, even if the plaintiffs' allegations are plausible, they are irrelevant because the preferential treatment of children of wealthy donors does not amount to consideration of an applicant's need for financial aid.[1] According to the defendants, such preferential treatment is based on the increased likelihood that the school will receive a donation, not on the decreased likelihood that the student will require financial aid. Not so. The amended complaint alleges that the defendants adopt these policies for both reasons: "Such Defendants understand that these applicants . . . have no need for financial aid *and* that their admission could generate a substantial financial return for the university." Am. Compl. ¶ 163 (emphasis added). These alleged facts thus support the plaintiffs' contention that the defendants are not need-blind.

Third, the plaintiffs allege that at least several of the defendants consider the

---

[1] The Court also notes that the defendants' contention here depends upon acceptance of their proposed reading of the 568 Exemption's use of the term "need-blind." If they are wrong about that, they are wrong about this too, as a family's wealth certainly falls within "the financial circumstances of the student involved *or the student's family*." 15 U.S.C. § 1 note (emphasis added).

financial need of applicants through a process known as "enrollment management." According to the amended complaint, "[e]nrollment management is the systematic integration of the functions of admissions, the relationship between tuition and fees (pricing) and financial aid, and student retention, along with the use of research to inform institutional policies and practices." *Id.* ¶ 154 (citation and internal quotation marks omitted). The plaintiffs allege that "[o]ne of the key purposes of enrollment management is to limit the number of financial-aid-eligible applicants who are admitted to the institution to achieve financial and budgetary objectives." *Id.* ¶ 155. In support of these allegations, they point to statements and other evidence that suggests that the defendants consider financial need and purposefully "maintain a shroud of secrecy over" their enrollment management practices to avoid legal scrutiny. *Id.* ¶¶ 157–58.

The evidence the plaintiffs cite is more than sufficient to make plausible their allegation that the defendants engage in enrollment management strategies that consider financial need in admissions decisions. The defendants attempt to criticize each individual item of evidence, but their arguments do not make the plaintiffs' allegations implausible. Taking all of the plaintiffs' allegations together, there is more than enough to plausibly allege that the various enrollment management strategies described in the amended complaint violate the requirements of the 568 Exemption.[2]

---

[2] The plaintiffs also allege that Columbia considers financial need when making admissions decisions for its School of General Studies. The only specific fact pleaded with respect to this allegation is a quotation from the undergraduate student newspaper stating that "General Studies admissions are not need-blind." Am. Compl. ¶ 149. The defendants argue that this is a conclusory statement that cannot support the plaintiffs' allegations on a motion to dismiss. This specific point may have some merit, but the Court need not adjudicate this definitively, as it has found that the plaintiffs have otherwise plausibly alleged the non-applicability of the 568 Exemption.

The defendants also argue that the plaintiffs have failed to make specific allegations with respect to seven of the defendants—CalTech, Chicago, Cornell, Emory, Johns Hopkins, Rice, and Yale—and that the plaintiffs' general allegations are insufficient to meet the plaintiffs' burden on a motion to dismiss. The Court disagrees. The plaintiffs are not required to cite evidence specific to each defendant in their complaint. They must, of course, state a claim against each defendant, but that does not require citing specific evidence regarding each defendant. The plaintiffs have alleged—plausibly—that all of the defendants engage in non-need-blind admissions decisions, and they have cited evidence specific to certain schools as examples. Taking all of their allegations together, the plaintiffs have plausibly alleged that each defendant fails to meet the requirements of the 568 Exemption.

But even if this were not the case, the fact that at least one member of the conspiracy is plausibly alleged not to be, or not to have been, need-blind means that the plaintiffs have plausibly alleged that none of the schools are protected under the 568 Exemption. The Exemption applies only when all schools in an agreement admit all students on a need-blind basis. Under antitrust law, courts are required to strictly construe Sherman Act exemptions. *See Fed. Mar. Comm'n v. Seatrain Lines, Inc.*, 411 U.S. 726, 733 (1973). The language of the statute is clear: "It shall not be unlawful under the antitrust laws for 2 or more institutions of higher education at which *all students* are admitted on a need-blind basis to agree or attempt to agree . . . ." 15 U.S.C. § 1 note (emphasis added). The statute applies to agreements among schools. Only agreements among schools where "all students are admitted on a need-blind basis" are protected. Therefore, because the plaintiffs plausibly allege that at least one

(and possibly all) of the defendants admitted students on a need-aware basis, they plausibly allege that none of the defendants are protected under the 568 Exemption.

The defendants' arguments to the contrary are unavailing. First, they argue that the Court must read the 568 Exemption in conjunction with the proposition that section 1 requires a conscious commitment to enter an agreement that is expressly unlawful. *See Marion Healthcare, LLC v. Becton, Dickinson & Co.*, 952 F.3d 832, 841 (7th Cir. 2020) (stating that, to show an antitrust conspiracy, the plaintiffs must plead that each defendant "had a conscious commitment to a common scheme designed to achieve an unlawful objective"). Under the defendants' interpretation, even if there are non-need-blind schools that are parties to the agreement, need-blind schools are protected if they lack actual knowledge that other schools are not need-blind. The Court rejects this argument; it adds an actual knowledge requirement that does not exist in the text of the statute. *See Dean v. United States*, 556 U.S. 568, 572 (2009) (noting that courts "ordinarily resist reading words or elements into a statute that do not appear on its face) (citation omitted).

Second, the defendants argue that the plaintiffs' interpretation would deter need-blind schools from entering into such agreements. Specifically, they contend that the need to ensure that all other schools in the agreement are need-blind would be so onerous that schools would be discouraged from entering such agreements. There are two ways to understand the defendants' argument. Both are unavailing. If the defendants' argument is that the result of the plaintiffs' interpretation is so absurd as to make it unlikely that it was Congress's intention in passing the statute, the Court disagrees. As the plaintiffs point out, Congress has made similar policy judgments

13

regarding other antitrust exemptions. *See National Broiler Mktg. Ass'n v. United States*, 436 U.S. 816, 827–29 (1978) ("[T]o enjoy the limited exemption of the Capper-Volstead Act . . . *all* its members must be qualified to act collectively.") (emphasis in original). If the defendants' argument is instead that the plaintiffs' interpretation represents bad policy, then their argument is better directed towards Congress, not the Court. Even if a statute represents bad policy, it is the role of the Court to effectuate the text of the statute, at least when it is unambiguous. *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002).

Lastly, the defendants argue that the plaintiffs' interpretation contravenes the courts' practice of construing laws to avoid imposing strict liability. *See Gordon v. Softech Int'l, Inc.*, 726 F.3d 42, 50 (2d Cir. 2013) (refusing "to write strict liability into [the statute] absent a clear indication in the text or the legislative history"). But this principle applies only when the language of the statute is unclear. Here, the text of the 568 Exemption does not include or suggest a knowledge requirement. The Court thus overrules the defendants' argument.

## 2. Antitrust violation

The defendants contend that the plaintiffs fail to state a claim for a violation of section 1 of the Sherman Act. Under section 1, "[a] restraint is unreasonable if it falls within the category of restraints held to be *per se* unreasonable, or if it violates what is known as the 'Rule of Reason.'" *Wilk v. Am. Med. Ass'n*, 895 F.2d 352, 358 (7th Cir. 1990). An antitrust plaintiff can also state a claim under the "Quick Look" framework, a standard that applies when "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an

14

anticompetitive effect on customers and markets." *California Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999).

The parties spill much ink disputing the proper framework for evaluating the plaintiffs' claims. The defendants argue that the Rule of Reason applies; the plaintiffs argue that their claims should be given *per se* treatment. At this point, the Court finds it unnecessary to resolve this issue. Because it concludes that the plaintiffs state a claim for a section 1 violation even if the Rule of Reason applies, it defers the question of which framework to use for later in the litigation.

"Under a Rule of Reason analysis, the plaintiff carries the burden of showing that an agreement or contract has an anticompetitive effect on a given market within a given geographic area." *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012). This requires the plaintiffs to "identify a relevant product and geographic market in which [the defendants] have or were dangerously likely to obtain monopoly power." *Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 916 (7th Cir. 2020). Under the Sherman Act, a relevant market consists of "commodities reasonably interchangeable by consumers for the same purposes." *Id.*

The plaintiffs' alleged market is the "Market for Elite, Private Universities," which they define as the market "for undergraduate education at private national universities with an average ranking of 25 or higher in the *U.S. News & World Report* rankings from 2003 through 2021." Am. Compl. ¶ 241. The alleged market does not include liberal arts colleges, which the plaintiffs contend "are generally regarded as having different characteristics and services." *Id.* ¶ 242. Additionally, the market as alleged by the plaintiffs excludes public universities because the "[c]ompetition between public

15

universities and elite, private institutions . . . is limited in the national market for students seeking financial aid." *Id.* ¶ 247.

The defendants argue that the plaintiffs' alleged relevant market is not plausible. They criticize the fact that the plaintiffs use only one publication's rankings; their alleged market excludes public universities and liberal arts colleges; and it excludes schools with even slightly lower average rankings. These may be fair criticisms, but they do not provide a basis for dismissal of the complaint under Rule 12(b)(6). Although the defendants' arguments suggest that the proper relevant market may differ from what the plaintiffs propose, they do not suggest that there is *no* plausible relevant market. All that is required, on a motion to dismiss, is for the plaintiffs to plead sufficient factual allegations that, when taken as true, make plausible the existence of a relevant market. *See Vasquez v. Ind. Univ. Health, Inc.*, 40 F.4th 582, 585 (7th Cir. 2022) (discussing the motion to dismiss standard in the context of pleading a geographic market).

That the plaintiffs have done. Nothing on the face of the amended complaint suggests that the *U.S. World & News Report* ranking is not an adequate approximation of a university's elite status. And the plaintiffs have plausibly alleged that public universities and liberal arts schools are sufficiently different from the schools in the alleged market that they are not interchangeable. Lastly, it is plausible that the top-25-ranked schools constitute a separate market from lower-ranked schools. Although there is always some arbitrariness involved in any act of line-drawing, it is not implausible that consistently higher-ranked schools are not interchangeable with consistently lower-ranked schools. The defendants are not entitled to dismissal on this basis.

Because the Court concludes that the plaintiffs have sufficiently plead a relevant

market, it need not address the plaintiffs' argument that they have sufficiently alleged direct anticompetitive effects. *See Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 736 (7th Cir. 2004) (noting that "there are some circumstances where to establish a violation of antitrust laws it is unnecessary to prove that defendant wielded market power in a properly defined product and geographic market, and may rely instead on direct evidence of anticompetitive effects").

### 3. Antitrust injury and standing

"[C]ourts have developed the doctrine of 'antitrust standing' and the subsidiary doctrine of 'antitrust injury' in order to assure efficient use of the resources of the courts towards achieving these goals." *Kochert v. Greater Lafayette Health Servs., Inc.*, 463 F.3d 710, 715 (7th Cir. 2006) (citation omitted). To show that they have suffered an antirust injury, the plaintiffs must demonstrate that their injuries are "of the type the antitrust laws were intended to prevent" and "reflect the anticompetitive effect of either the violation or of anticompetitive acts made possible by the violation." *Id.* at 716 (citations omitted). To establish antitrust standing, the plaintiffs must show that they are the parties "who can most efficiently vindicate the purposes of the antitrust laws." *Id.* at 718 (citation omitted).

The defendants argue that the plaintiffs do not plausibly allege an antitrust injury or antitrust standing. Specifically, they contend that the "Plaintiffs' conclusory allegations that their net price of attendance would have been lower but for the Consensus Methodology rely on a series of unsupported and implausible inferences, rendering the causal connection between their alleged injuries and the alleged anticompetitive conduct overly speculative as a matter of law." Defs.' Mem. at 35. The

17

Court disagrees.  The plaintiffs' allegations are not too speculative to support an antitrust injury or antitrust standing.  The amended complaint alleges that the claimed conspiracy decreased competition in the relevant market by allowing the defendants to work together to provide the same aid awards.  Am. Compl. ¶ 234.  Without the conspiracy, the plaintiffs allege, the defendants would have competed for students by providing more competitive aid packages.  *Id.* ¶ 237.  This is supported by evidence cited in the amended complaint from Yale and Harvard that suggests that these schools left or declined to join the 568 Group because they concluded that doing so would hinder their ability to provide larger aid awards.  *Id.* ¶¶ 123–25.  For these reasons, the Court overrules the defendants' arguments concerning antitrust injury and antitrust standing.

### 4.    Statute of limitations

The defendants argue that the plaintiffs' claims that accrued before January 9, 2018 are time-barred under the four-year antitrust statute of limitations.  15 U.S.C. § 15b.  Under Seventh Circuit law, "a complaint need not anticipate and overcome affirmative defenses, such as the statute of limitations."  *Sidney Hillman Health Ctr. of Rochester v. Abbott Labs., Inc.*, 782 F.3d 922, 928 (7th Cir. 2015).  "As long as there is a conceivable set of facts, consistent with the complaint, that would defeat a statute-of-limitations defense, questions of timeliness are left for summary judgment (or ultimately trial)."  *Id.*

The Court rejects the defendants' argument as a basis for dismissal because there is a conceivable (and plausible) set of facts in this case under which the fraudulent concealment exception to the statute of limitations would apply.  Fraudulent

18

concealment requires that a defendant acted affirmatively to conceal an offense and that the plaintiff "neither knew nor, in the exercise of due diligence, could reasonably have known of the offense." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 194–95 (1997). The defendants argue that the plaintiffs "do not sufficiently plead any claim of fraudulent concealment, much less with the particularity required under Rule 9(b)." Defs.' Mem. at 38. This argument misunderstands the law. The plaintiffs do not have the burden of pleading that an exception to a possible affirmative defense applies; rather, the defendants have the burden, on a Rule 12(b)(6) motion, to show that there is no "conceivable set of facts, consistent with the complaint" in which the defense would apply. The defendants have not met this burden. Judging solely from the allegations of the complaint, the Court has no basis to conclude that the doctrine of fraudulent concealment could not apply.

The parties also dispute whether two other doctrines relating to the statute of limitations apply. First, the plaintiffs invoke the discovery rule, "which postpones the beginning of the limitations period from the date when the plaintiff is wronged to the date when he discovers he has been injured." *Vasquez*, 40 F.4th at 588. The defendants argue that recent Supreme Court "precedent abrogates the Seventh Circuit's prior holding that the Sherman Act's statute of limitations is atextually qualified by a default discovery rule." Defs.' Mem. at 37 (citing *In re Copper Antitrust Litig.*, 436 F.3d 782, 789 (7th Cir. 2006)). Specifically, the defendants cite *Rotkiske v. Klemm*, 140 S. Ct. 355, 360–61 (2019), where the Court held that it is "Congress's decision [not the courts'] to include a . . . discovery provision." They also cite *Gabelli v. SEC*, 568 U.S. 442, 448–49 (2013), for the proposition that the statutory term "accrued" means when a claim "comes

19

into existence," not when it is "discovered."

Neither *Rotkiske* nor *Gabelli* control here. In *Rotkiske*, the Supreme Court addressed the Fair Debt Collection Practices Act's (FDCPA) limitations statute which "clearly states that an FDCPA action 'may be brought . . . within one year from the date on which the violation occurs.'" *Rotkiske*, 140 S. Ct. at 360. This language expressly states that the limitations period begins on the date the violation *occurs*, making the discovery rule inconsistent with the text of the statute. In contrast, the antitrust statute of limitations runs for four years "after the cause of action *accrued*." 15 U.S.C. § 15b (emphasis added). This difference in the language of the statutes distinguishes this case from *Rotkiske*.

Next, *Gabelli* does not control here because it concerned whether the government could invoke the discovery rule in SEC enforcement actions. *Gabelli*, 568 U.S. at 449–51. Thus although *Gabelli* addresses the proper term, "accrued," it does not address the term in the relevant context. Whether a plaintiff can invoke the discovery rule in a civil action is an entirely separate issue from whether the government can invoke the rule in an enforcement action. The Court further notes that the Seventh Circuit has continued to apply the discovery rule in antitrust cases as recently as this year. *See Vasquez*, 40 F.4th at 588.

The discovery rule provides a second reason to reject the defendants' statute of limitations arguments. Taking the plaintiffs' allegations as true as required, the Court finds it conceivable (and plausible) that the claims were not discoverable until two years ago and are thus not time barred. The plaintiffs allege that the complexity of financial aid, combined with the fact that the information publicly available had to be pieced

together "like a jigsaw puzzle," made it such that a reasonably diligent person would not have been able to discover the injury until a date within the limitations period.  Pls.' Resp. at 48.  The defendants have not provided any basis to reach a conclusion, on a Rule 12(b)(6) motion, that this is not conceivable or plausible.

The parties also dispute the applicability of the continuing violation doctrine, which "allows a plaintiff to get relief for a time-barred act by linking it with an act that is within the limitations period."  *Selan v. Kiley*, 969 F.2d 560, 565 (7th Cir. 1992).  The defendants argue that the doctrine is inapplicable to each and every one of the plaintiffs, with possible exception of Maerlander, who is alleged to have graduated in 2019.  The plaintiffs contend that the doctrine applies to Maerlander, Carbone, Corzo, and Saffrin, all of whom are alleged to have enrolled in one of the defendant universities prior to and continuing into the four-year period.

The Court agrees with plaintiffs that the continuing violation doctrine conceivably and plausibly could apply to Maerlander, Carbone, Corzo, and Saffrin.  The defendants contend that there is no overt act within the limitations period with respect to these plaintiffs because the alleged conspiracy is "to restrain competition for only the initial award to *admitted applicants*" and none of the plaintiffs are alleged to have received their initial award within the limitations period.  Defs.' Reply at 27 (emphasis in original). This is incorrect.  The amended complaint alleges a conspiracy to fix financial aid awards generally.  *See* Am. Compl. ¶¶ 262–69.  Although it occasionally references awards given to newly admitted students specifically, it is clear that the plaintiffs' claims are directed to financial aid awards generally.  The defendants also argue that the doctrine cannot apply to Carbone, Corzo, and Saffrin because they received their last

aid award no later than the fall of 2017, outside the applicable limitations period. But this fact is not stated in the amended complaint. As such, the Court finds that it is conceivable—and plausible—that the continuing violation doctrine applies to these three plaintiffs.

**B.     The nonmember defendants' motion**

Four of the universities—Brown, Emory, Chicago, and Johns Hopkins (collectively, the "nonmember defendants")—have filed a separate motion contending that the claims against them should be dismissed because the plaintiffs have failed to plausibly allege that they were members of the conspiracy during the relevant time period. According to the nonmember defendants, the plaintiffs concede that Brown, Emory, and Chicago withdrew from the 568 Group in either 2012 or 2014, and the claims against these schools are time-barred because the statute of limitations lapsed four years from the date of withdrawal. The defendants also contend that the plaintiffs concede that Johns Hopkins joined the 568 Group in 2021, and they argue that Johns Hopkins cannot be held liable for the prior acts of its coconspirators.

**1.     Brown, Emory, and Chicago**

The parties dispute who has the burden to show withdrawal. The plaintiffs contend that, as in criminal conspiracy cases, withdrawal is an affirmative defense that must be proved by the defendant. In contrast, the nonmember defendants cite *Krause v. Perryman*, 827 F.2d 346, 350 n. 5 (8th Cir. 1987), for the proposition that in civil antitrust cases it is the burden of the plaintiff to show that the defendant did not withdraw. The Court in *Krause* reasoned that, because antitrust plaintiffs must show that their injury was a result of the defendant's actions, it is the burden of the antitrust

22

plaintiff to show that the defendant was part of the alleged conspiracy.

The Court disagrees. It is inappropriate to use the requirements of antitrust standing to shift what is typically a defendant's burden onto the plaintiff. Under the reasoning of the court in *Krause*, every affirmative defense would be the burden of the antitrust plaintiff to disprove—even in the plaintiff's complaint—as the plaintiff would be unable to establish that the defendant caused his injury without first disproving the application of any possible affirmative defense. This cannot be so. The Court concludes that the burden to show withdrawal in civil antitrust cases is the same as in criminal cases—on the defendant.

The Court concludes that Brown, Emory, and Chicago are not entitled to dismissal of the claims against them, as the complaint does not establish their withdrawal from the claimed conspiracy. The amended complaint states that some of the defendants have *claimed to withdraw*, but this does not amount to a concession that they did, in fact, withdraw. *See* Am. Compl. ¶ 107 ("Certain Defendants claim to have stopped participating in the 568 Cartel at various points in time since 2003, but Plaintiffs are unaware of any evidence that any Defendant has in fact withdrawn from the conspiracy alleged herein."). All that the plaintiffs concede—if anything—is that these defendants are claiming a withdrawal defense. They do not allege that the defendants have done what is required under Seventh Circuit law to actually withdraw. *See United States v. Nagelvoort*, 856 F.3d 1117, 1128–29 (7th Cir. 2017) (noting that a withdrawal defense requires the conspirator to both inform co-conspirators of his withdrawal and disavow the criminal objectives of the conspiracy).

### 2. Johns Hopkins

Johns Hopkins argues that the claims against it should be dismissed because it is alleged to have joined the 568 Group in 2021, after all of the alleged illegal acts occurred in this case. As a matter of conspiracy law, however, "[i]t is well recognized that a co-conspirator who joins a conspiracy with knowledge of what has gone on before and with an intent to pursue the same objectives may, in the antitrust context, be charged with the preceding acts of its co-conspirators." *Havoco of Am., Ltd. v. Shell Oil Co.*, 626 F.2d 549, 554 (7th Cir. 1980).

The parties dispute the meaning of the requirement that a defendant have "knowledge of what has gone on before." The nonmember defendants contend that the defendant must know that its coconspirators' prior actions were illegal; the plaintiffs contend that the defendant need only know what prior acts its coconspirators engaged in, even if it did not know that those acts were illegal.

The Court finds it unnecessary to resolve this dispute at this time. Even under the defendants' interpretation, the plaintiffs plausibly meet the requirement. The amended complaint contains sufficient allegations to make plausible a contention that Johns Hopkins had actual knowledge of the illegal conduct of the 568 Group when it joined. The plaintiffs allege that the members of the 568 Group monitored the actions of other members through Certificates of Compliance and that the defendants knew that not all members were need-blind. At the very least, the plaintiffs allege that Johns Hopkins itself did not admit all students on a need-blind basis, suggesting that it knew that the 568 Group did not meet the requirements of the 568 Exemption and was thus subject to antitrust liability.

24

### C.     Yale's motion

Yale has also filed a separate motion to dismiss, contending that the claims against it should be dismissed because the plaintiffs concede that Yale does not use the disputed Consensus Methodology in determining a student's need for financial aid.  The Court disagrees.  The amended complaint alleges that "Yale claims not to have participated in the 568 Cartel from 2008 until 2018" and that it implemented a new financial aid policy in early 2009.  Am. Compl. ¶ 123.  Contrary to Yale's contentions, these allegations do not amount to a concession that Yale does not use the CM.  In fact, the plaintiffs allege that Yale is currently a member of the 568 Group and that all members of the 568 Group are required to adopt the CM.  *See id.* ¶ 124 (alleging that "Yale understood that active members of the 568 Cartel were required to agree to and impose the Consensus Methodology").

In addition, even if the amended complaint was understood to allege that Yale stopped using the CM in 2008, it can still be held liable for the acts of its alleged coconspirators.  *Marion Healthcare*, 952 F.3d at 839.  The amended complaint alleges that Yale joined the 568 Group in 1998.  Yale contends that the plaintiffs concede that Yale withdrew from the conspiracy in 2008, but this is inaccurate.  As with Brown, Chicago, and Emory, the amended complaint states that Yale *claims* to have withdrawn from the conspiracy, but it does not concede that Yale actually withdrew.  The Court thus denies Yale's motion to dismiss.

### Conclusion

For the foregoing reasons, the Court denies the defendants' motions to dismiss [dkt. nos. 145, 146 & 148].  The defendants are directed to answer the amended

complaint by no later than September 9, 2022. The parties are directed to promptly confer regarding a discovery and pretrial schedule, and they are to file by August 26, 2022 a joint status report with an agreed proposal, or alternative proposals if they cannot agree. The case is set for a telephonic status hearing on September 2, 2022 at 9:10 a.m., using call-in number 888-684-8852, access code 746-1053. The Court reserves the right to vacate the hearing if it determines a hearing is not needed.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: August 15, 2022