## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| FRANK CARBONE, ANDREW CORZO, SAVANNAH ROSE EKLUND, SIA HENRY, ALEXANDER LEO-GUERRA, MICHAEL MAERLENDER, BRANDON PIYEVSKY, KARA SAFFRIN, and BRITTANY TATIANA WEAVER, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>  v.<br><br>BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, THE JOHNS HOPKINS UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY,<br><br>        Defendants. | Case No. 1:22-cv-00125<br><br>Honorable Matthew F. Kennelly<br><br>Honorable Gabriel A. Fuentes<br><br>Jury Trial Demanded |

## DEFENDANT MASSACHUSETTS INSTITUTE OF TECHNOLOGY'S ANSWER TO AMENDED COMPLAINT AND AFFIRMATIVE DEFENSES

Defendant Massachusetts Institute of Technology ("MIT") answers Plaintiffs' Amended Class Action Complaint ("Amended Complaint") as set forth below.

## PRELIMINARY STATEMENT

MIT categorically denies the "conspiracy" claimed in the Plaintiffs' Amended Complaint. MIT further denies that the 568 Presidents Group is a "cartel" or that it in any way constrains MIT from exercising its independent judgment as to the award of financial aid to MIT students. MIT is one of only seven colleges in the United States that is need-blind and full-need

for all of its undergraduate students, domestic and international. In other words, MIT has committed to meeting 100% of demonstrated financial need with its aid. About six out of every ten MIT students receive MIT need-based aid. The average annual price paid by an MIT student who received financial aid was $19,599 for the 2021–2022 academic year. And for most MIT students with family incomes under $140,000 a year (and typical assets), MIT ensures that scholarship funding will allow them to attend MIT tuition-free. MIT plans to award $161.8 million in MIT need-based scholarships in 2022–2023, compared to the $143.8 million awarded in 2021–2022. Roughly 33% of MIT undergraduates received scholarships and grants equal to or greater than tuition. For families with incomes less than or equal to $90,000 in 2021–2022, reliance on student loans averaged $429 per student.

Except to the extent specifically admitted herein, MIT denies each and every allegation contained in the Amended Complaint, including all allegations contained in headings, footnotes, or otherwise not contained in one of the Amended Complaint's 270 numbered paragraphs. The section headings and footnotes in the Amended Complaint do not require a response. To the extent that the section headings or footnotes contain allegations requiring a response, MIT denies all such allegations. Unless otherwise defined, capitalized terms refer to the capitalized terms defined in the Amended Complaint, but any such use is not an acknowledgement or admission of any characterization the Plaintiffs may ascribe to the terms in the Amended Complaint. MIT generally denies the legal claims asserted in the Amended Complaint and responds to the Amended Complaint's numbered paragraphs as follows.

**RESPONSES TO NUMBERED PARAGRAPHS**

# I.   INTRODUCTION

1.      Defendants are private, national universities that have long been in the top 25 of the *U.S. News & World Report* rankings for such schools. These elite institutions occupy a place of privilege and importance in American society. And yet these same Defendants, by their own admission, have participated and are participating in a price-fixing cartel that is designed to reduce or eliminate financial aid as a locus of competition, and that in fact has artificially inflated the net price of attendance for students receiving financial aid.

**ANSWER:**  MIT admits that it is a private university that had been ranked in the top 25 of the

*U.S. News & World Report* rankings for "National Universities" during certain years. MIT further

admits that, upon information and belief, other Defendants also have been ranked in the top 25 of

the *U.S. News & World Report* rankings for "National Universities" during certain years. MIT

denies the allegations in Paragraph 1 in all other respects.

2.      Defendants have participated in this cartel while claiming the protection of Section 568 of the Improving America's Schools Act of 1994 (the "568 Exemption"). This exemption from the antitrust laws, laws which otherwise prohibit conspiracies among competitors relating to price, offers antitrust immunity only to two or more institutions of higher education at which "*all* students admitted are admitted on a need-blind basis." (Emphasis added.) Section 568 defines "on a need-blind basis" to mean "without regard to the financial circumstances of the student involved or the student's family." 15 U.S.C. § 1 note.

**ANSWER:**  MIT admits that Section 568 of the Improving America's Schools Act of 1994 is a

statutory exemption from the antitrust laws. The remaining allegations contained in Paragraph 2

are legal conclusions to which no response is required. To the extent a response is required, MIT

denies the allegations in Paragraph 2 in all other respects.

3.      Defendants are not entitled to the 568 Exemption. Under a legally compliant need-blind admissions system, all students must be admitted without regard to their or their families' financial circumstances. Far from adhering to this statutory requirement, all Defendants have considered the financial circumstances of students or their families in deciding whether to admit students.

**ANSWER:**  MIT denies the allegations in Paragraph 3.

4.      Defendants have thus made admissions decisions *with regard to* the financial circumstances of students and their families, thereby disfavoring students who need financial aid. All Defendants, in turn, have conspired to reduce the amount of financial aid they provide to

3

admitted students. This conspiracy, which has existed (with only slightly varying membership) for many years, thus falls outside any potentially applicable antitrust exemption.

**ANSWER:** MIT denies the allegations in Paragraph 4.

5.      Defendants are and have been members of the so-called "568 Presidents Group," in which the members have agreed on "a set of common standards for determining the family's ability to pay for college," which the members describe as the "Consensus Approach." Based on the Consensus Approach, in approximately 2003, the 568 Presidents Group (the "568 Cartel") devised the Consensus Methodology, which is a common formula for determining an applicant's ability to pay. Under the Consensus Methodology, an applicant's ability to pay is a substantial determinant of the net price, which is the institution's gross tuition plus fees for room and board, less institutional grant aid, charged to the applicant for attendance.

**ANSWER:** MIT admits that is a member of the "568 Presidents Group," which developed a

Consensus Methodology of voluntary general recommendations for assessing student need. MIT

denies the allegations in Paragraph 5 in all other respects.

6.      Since its inception, the goal of the 568 Cartel has been, in the words of the Cartel members, to determine "whether it is possible to reach agreement on common standards for determining financial need at the institutional level." Defendants in fact so determined and so agreed. Defendants have met—and continue to meet—to devise, agree upon, and collectively implement common principles and a uniform method for analyzing, offering, and providing financial aid to admitted students.

**ANSWER:** MIT admits that it attended meetings of the 568 Presidents Group. MIT lacks

knowledge or information sufficient to form a belief as to the truth of the allegations in

Paragraph 6 regarding whether the other Defendants continuously attended meetings of the 568

Presidents Group and on that basis denies those allegations. MIT denies the allegations in

Paragraph 6 in all other respects.

7.      In collectively sharing confidential data and information about admissions and financial aid, adopting this methodology, and regularly meeting to implement this methodology jointly, the 568 Cartel has intended to reduce or eliminate, and in fact succeeded in reducing or eliminating, price competition among its members. As a result, the net price of attendance for financial-aid recipients at Defendants' schools—included among the members of the proposed Class here—has been artificially inflated. In short, due to the conduct challenged herein, over almost two decades, Defendants have overcharged over 200,000 financial-aid recipients by at least hundreds of millions of dollars collectively, in violation of Section 1 of the Sherman Act.

**ANSWER:** MIT denies the allegations in Paragraph 7.

8.      This longstanding conspiracy would be immune from the antitrust laws only if all the conspirators have been complying with the 568 Exemption. In fact, all Defendants have been members of the 568 Cartel, and none has qualified for the 568 Exemption. Instead, all Defendants have considered the financial circumstances of students and their families in deciding whether to admit waitlisted and transfer students; at least several Defendants maintain admissions systems that favor the children of wealthy past or potential future donors; at least several Defendants preference wealthy applicants through the largely secretive process known as "enrollment management"; and Columbia considers the financial circumstances of students and families in making admission decisions for its School of General Studies.

**ANSWER:** MIT denies the allegations in Paragraph 8.

9.      In critical respects, elite, private universities like Defendants are gatekeepers to the American Dream. Defendants' misconduct is particularly egregious because it has narrowed a critical pathway to upward mobility that admission to their institutions represents. The burden of the 568 Cartel's overcharges falls especially on low- and middle-income families struggling to afford the cost of a university education and to achieve success for their children. In addition, unlike prior admissions scandals, such as Varsity Blues[1], the 568 Cartel's systematic suppression of financial aid, resulting in the artificial inflation of the net price of attendance, is the official policy of its participants. As Defendants have succinctly admitted, the purpose of their Cartel has been—in these specific terms—to "discuss *and agree upon* common principles of analysis for determining the financial need of undergraduate financial aid applicants."

**ANSWER:** MIT denies the allegations in Paragraph 9.

10.     The 568 Cartel has thus caused substantial injury to Plaintiffs and the other members of the proposed Class (defined below). Plaintiffs bring this lawsuit to end Defendants' conspiratorial conduct and to prevent future students from suffering the injury the ongoing conspiracy has inflicted. Plaintiffs do so without having known until recently that they had been injured in violation of the 568 Exemption, and under circumstances in which a reasonable person would have been unaware of the harm resulting from Defendants' use of the Consensus Methodology in violation of the 568 Exemption.

**ANSWER:** MIT denies the allegations in Paragraph 10.

11.     Plaintiffs also seek compensation for themselves and a proposed Class of all U.S. citizens or permanent residents, and purchasers of tuition, room, or board on their behalf, who have (a) enrolled in one or more of Defendants' full-time undergraduate programs, (b) received need-based financial aid from one or more Defendants, (c) paid to one of more Defendants tuition, room, or board not fully covered by such financial aid, and (d) first enrolled in one of

---

[1] "Varsity Blues" is law enforcement's code name for the investigation and prosecution of the college admissions bribery scandal, which involved allegations that certain universities gave admissions preference to the children of wealthy parents in exchange for bribes.

Defendants' full-time undergraduate programs during the relevant times (defined below) from January 1, 2003 until the effects of Defendants' continuing conduct ceases. Members of this "Class" shall be called "Class Members."

**ANSWER:** MIT admits that Plaintiffs purport to seek compensation for themselves and on behalf of a purported "Class" consisting of "Class Members." MIT denies that Plaintiffs have established or can establish the prerequisites to certification and/or maintenance of the alleged "Class" pursuant to Rule 23 of the Federal Rules of Civil Procedure, and therefore denies the remaining allegations in Paragraph 11.

12.     Parents, legal guardians, and other family members commonly pay or help to pay the cost of a student's tuition, room, and board. The proposed Class therefore includes both students and those who pay or commit to pay on behalf of students.

**ANSWER:** MIT admits that parents, legal guardians, and other family members may sometimes pay or help to pay the cost of a student's tuition, room, and board. MIT denies that Plaintiffs have established or can establish the prerequisites to certification and/or maintenance of the alleged "Class" pursuant to Rule 23 of the Federal Rules of Civil Procedure, and therefore denies the remaining allegations in Paragraph 12.

## II.     JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. §§ 1331, 1332(d)(2), and 1337.

**ANSWER:** The allegation in Paragraph 13 is a legal conclusion to which no response is required. To the extent a response is required, MIT does not contest that this Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1332(d)(2), and 1337.

14.     This Court has personal jurisdiction over each Defendant on multiple bases, including that each Defendant has: (1) transacted business in the United States and in this District, including by recruiting, and advertising for, students residing in this District; (2) transacted business with Class Members throughout the United States, including those residing in this District; and (3) committed substantial acts in furtherance of an unlawful scheme in the United States, including in this District. Each Defendant has recruited, accepted, enrolled, and charged artificially high net prices of attendance to, and thus injured, individuals residing within this

District. In addition, Defendants have held at least one meeting of the 568 Cartel in Rosemont, Illinois, which is within this District.

**ANSWER:** The allegations in Paragraph 14 are legal conclusions to which no response is required. To the extent a response is required, MIT does not contest that this Court has personal jurisdiction over MIT for purposes of this action.

15.     Venue is proper in this District under 15 U.S.C. §§ 15, 22 and 26, and 28 U.S.C. § 1391(b), (c), and (d), because each Defendant transacted business, was found, had agents, and/or resided in this District; a substantial part of the events giving rise to Plaintiffs' claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

**ANSWER:** The allegations in Paragraph 15 are legal conclusions to which no response is required.  To the extent a response is required, MIT does not contest that venue is proper in the Northern District of Illinois for purposes of this particular action under 15 U.S.C. §§ 15, 22 and 26, and 28 U.S.C. § 1391(b), (c), and (d).

16.     Defendants' conduct has had a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States and in this District. Defendants' conduct affects admitted students around the country, including through transactions with parties residing in different states. Defendants do business across state lines.

**ANSWER:** The allegations contained in this paragraph are legal conclusions to which no response is required. To the extent a response is required, MIT denies the allegations in Paragraph 16.

### III.     THE PARTIES

#### A.     Plaintiffs

17.      Plaintiff Frank Carbone is the father of Dominique Carbone, who attended Vanderbilt from the fall of 2014 until she graduated in the spring of 2018. For each of these four years, she received financial aid from Vanderbilt, but Mr. Carbone paid out-of-pocket or took loans to pay some of the costs of tuition, room, and board that this financial aid did not cover. Dominique is a software engineer and resides in Boulder, Colorado. Mr. Carbone resides in Irvine, California.

**ANSWER:** MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 17 and on that basis denies those allegations.

18.     Plaintiff Andrew Corzo attended the University of Chicago as a full-time undergraduate student from the fall of 2014 until he graduated in the spring of 2018. For each of these four years, he received need-based financial aid from Chicago, but also paid to Chicago some costs of tuition, room (in his first year), and board, taking out substantial loans in the process. He resides in Chicago, Illinois.

**ANSWER:**  MIT lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 18 and on that basis denies those allegations.

19.     Plaintiff Savannah Rose Eklund is attending Columbia's School of General Studies as a full-time undergraduate student. She enrolled in the spring of 2019 and expects to graduate in the spring of 2023. For each of the first three years she has attended, she received some need-based aid from Columbia, but also paid to Columbia some of the costs of tuition, room, and board, taking out substantial loans in the process. She resides in New York, New York.

**ANSWER:**  MIT lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 19 and on that basis denies those allegations.

20.     Plaintiff Sia Henry attended Duke as a full-time undergraduate student from the fall of 2007 until she graduated in the spring of 2011. For each of these four years, she paid to Duke some of the costs of tuition, room, and board. She received need-based financial aid from Duke in at least two of her four years of attendance. Since graduating from Duke, and subsequently from Harvard Law School, Ms. Henry has dedicated her career to advocacy on behalf of prisoners, most recently as a Senior Program Specialist at Impact Justice. She resides in Atlanta, Georgia.

**ANSWER:**  MIT lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 20 and on that basis denies those allegations.

21.     Plaintiff Alexander Leo-Guerra is attending Duke as a full-time undergraduate student. He enrolled in August 2019 and expects to graduate in the spring of 2023. For each of the first two years he has attended, he received some need-based financial aid from Duke, but also paid to Duke some of the costs of tuition, room, and board, taking out loans in the process. He resides in Draper, Utah.

**ANSWER:**  MIT lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 21 and on that basis denies those allegations.

22.     Plaintiff Michael Maerlender attended Vanderbilt as a full-time undergraduate student from the fall of 2015 until he graduated in the spring of 2019. For each of these four years, he received need-based financial aid from Vanderbilt and paid for some of the costs of tuition, room, and board. He resides in New York, New York.

**ANSWER:** MIT lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 22 and on that basis denies those allegations.

23.     Plaintiff Brandon Piyevsky attended Northwestern as a full-time undergraduate student from the fall of 2013 until he graduated in the spring of 2017. For each of these four years, he received need-based financial aid from Northwestern and paid for some of the costs of tuition, room, and board, taking out loans in the process. He resides in Toledo, Ohio.

**ANSWER:** MIT lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 23 and on that basis denies those allegations.

24.     Plaintiff Kara Saffrin attended Northwestern as a full-time undergraduate student from the fall of 2014 until she graduated in the spring of 2018. For each of these four years, she received need-based financial aid from Northwestern and paid for some of the costs of tuition, room, and board. She resides in Chicago, Illinois.

**ANSWER:** MIT lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 24 and on that basis denies those allegations.

25.     Plaintiff Brittany Tatiana Weaver attended Vanderbilt as a full-time undergraduate student from 2003 until she graduated in 2007. For each of these four years, she received need-based financial aid from Vanderbilt and paid for some of the costs of tuition, room, and board, taking out substantial loans in the process. She resides in Farmington Hills, Michigan.

**ANSWER:** MIT lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 25 and on that basis denies those allegations.

      **B.     Defendants**

26.     Defendants are private, national universities that have been members of the 568 Cartel (most since 2003, and some not continuously) and have been continuously ranked in the top 25 of the *U.S. News & World Report* rankings for national universities since 2003.

**ANSWER:** MIT admits that it is a private university that had been ranked in the top 25 of the

*U.S. News & World Report* rankings for "National Universities" for certain years. MIT further

admits that, upon information and belief, other Defendants also have been ranked in the top 25 of

the *U.S. News & World Report* rankings for "National Universities" during certain years. MIT

admits that it has been a member of the 568 Presidents Group since at least 2003. MIT admits that,

9

upon information and belief, other Defendants have at some point been members of the 568 Presidents Group. MIT lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 26 and on that basis denies those allegations.

27.     Each Defendant acted as the agent or joint venturer of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein. All Defendants are jointly and severally liable for the acts of all members of the 568 Cartel.

**ANSWER:** The allegations contained in Paragraph 27 are legal conclusions to which no response is required. To the extent a response is required, MIT denies the allegations in Paragraph 27.

28.     Under the rule of joint and several liability, each Defendant is liable for all acts undertaken and all damages caused in furtherance of the conspiracy alleged herein, even those committed before the Defendant joined the 568 Cartel; any Defendant that claims to have left the Cartel but later rejoined it, assuming that any such Defendant actually took sufficient steps to fully and formally withdraw, remains jointly and severally liable for all of the conspirators' conduct; and any Defendant that did not fully and formally withdraw from the Cartel remains jointly and several liable for all of the conspirators' continuing conduct as alleged herein.

**ANSWER:** The allegations contained in Paragraph 28 are legal conclusions to which no response is required. To the extent a response is required, MIT denies the allegations in Paragraph 28.

29.     Since the enactment of Section 568, in 1994, Defendants' endowments have all increased enormously, and with respect to those Defendants for which the information is publicly available, the growth of their endowments have substantially outpaced the growth in their annual operating expenses. *See* Appendix A.[2]

**ANSWER:** MIT admits that Section 568 was enacted in 1994 and that MIT has an endowment. MIT further admits that the allegations in Paragraph 29 and in Appendix A purport to describe information from MIT's consolidated financial statements. MIT denies any allegations in Paragraph 29 and Appendix A that are inconsistent with MIT's consolidated financial statements. MIT denies the remaining allegations in Paragraph 29 as they relate to MIT. MIT lacks knowledge

---

[2] Appendix A compares, for those Defendants for which such information is publicly available, the growth of the Defendant's annual operating expenses versus the growth of the Defendant's endowment from 1994 to 2021. Appendix A also identifies the rate of growth of every Defendant's endowment from 1994 to 2021.

or information sufficient to form a belief as to the truth of the allegations in Paragraph 29 as they relate to the other Defendants and on that basis denies those allegations. MIT denies the allegations in Paragraph 29 in all other respects.

### Brown

30.     Brown University is a private, non-profit institution with its principal place of business in Providence, Rhode Island.

**ANSWER:**  MIT admits that, upon information and belief, Brown University is a private, non-profit institution with its principal place of business in Providence, Rhode Island.

31.     Brown was established by a charter, approved by the Rhode Island legislature, as "College of Rhode Island" in 1764. The school was the third college in New England and seventh in America. The school's name was changed to Brown in 1804. Brown is a member of the Ivy League, a consortium of eight elite universities.

**ANSWER:**  MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 31 and on that basis denies those allegations.

32.     Brown's undergraduate student body is generally wealthy and privileged. The median family income of undergraduates is $204,200; 19% of undergraduates come from the top 1% of the country's income distribution, and 70% come from the top 20%; and only 4.1% come from the bottom 20% of the income distribution.[3]

**ANSWER:**  MIT admits the existence of a *New York Times* website that currently contains the statistics stated in Paragraph 32, to which website MIT refers the Court for a complete and accurate statement of its contents. MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 32 and on that basis denies those allegations in all other respects.

---

[3] *Economic Diversity and Student Outcomes at Brown University*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/brown-university.

33.     Brown had an endowment of approximately $608 million in 1994, which has grown to approximately $6.9 billion in 2021. *See* Appendix A.[4]

**ANSWER:**  MIT lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 33 and on that basis denies those allegations.

### Caltech

34.     The California Institute of Technology is a private, non-profit institution with its principal place of business in Pasadena, California.

**ANSWER:**  MIT admits that, upon information and belief, the California Institute of Technology

is a private, non-profit institution with its principal place of business in Pasadena, California.

35.     CalTech is one of the nation's leading research universities.

**ANSWER:**  MIT lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 35 and on that basis denies those allegations.

36.     CalTech's undergraduate student body is generally wealthy and privileged. The median family income of undergraduates is $146,300; 3% of undergraduates come from the top 1% of the country's income distribution, and 69% come from the top 20%; and only 2.9% come from the bottom 20% of the income distribution.[5]

**ANSWER:**  MIT admits the existence of a *New York Times* website that currently contains the

statistics stated in Paragraph 36, to which website MIT refers the Court for a complete and accurate

statement of its contents. MIT lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 36 and on that basis denies those allegations in all other

respects.

37.     CalTech had an endowment of approximately $592 million in 1994, which has grown to approximately $3.8 billion in 2021. *See* Appendix A.

---

[4] *See also* Michael Nitezel, *Elite University Endowments Soar as Higher Ed Divide Grows*, FORBES (Oct. 15, 2021), https://www.forbes.com/sites/michaeltnietzel/2021/10/15/elite-university-endowments-soar-to-record-highs/?sh=724aa8932d5f.
[5] *Economic Diversity and Student Outcomes at the University of California Institute of Technology*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/california-institute-of-technology.

**ANSWER:**  MIT lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 37 and on that basis denies those allegations.

### Chicago

38.      The University of Chicago is a private, non-profit institution with its principal place of
business in Chicago, Illinois.

**ANSWER:**  MIT admits that, upon information and belief, the University of Chicago is a private,

non-profit institution with its principal place of business in Chicago, Illinois.

39.      Chicago was founded in 1890 by the American Baptist Education Society and oil
magnate John D. Rockefeller, who later described the school as "the best investment I ever
made."

**ANSWER:**  MIT lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 39 and on that basis denies those allegations.

40.      Chicago's undergraduate study body is generally wealthy and privileged. The median
family income of undergraduates is $134,500; 10% of undergraduates come from the top 1% of
the country's income distribution, and 58% come from the top 20%; and only 5.5% come from
the bottom 20% of the income distribution.[6]

**ANSWER:**  MIT admits the existence of a *New York Times* website that currently contains the

statistics stated in Paragraph 40, to which website MIT refers the Court for a complete and accurate

statement of its contents. MIT lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 40 and on that basis denies those allegations in all other

respects.

41.      Chicago had an endowment of approximately $1.2 billion in 1994, which has grown to
approximately $11 billion in 2021. *See* Appendix A.

**ANSWER:**  MIT lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 41 and on that basis denies those allegations.

---

[6] *Economic Diversity and Student Outcomes at the University of Chicago*, N.Y. TIMES,
https://www.nytimes.com/interactive/projects/college-mobility/university-of-chicago.

## Columbia

42.     Trustees of Columbia University in the City of New York is a private, non-profit institution with its principal place of business in New York, New York.

**ANSWER:**  MIT admits that, upon information and belief, Columbia University is a private, non-profit institution with its principal place of business in New York, New York.

43.     Columbia was established as King's College by royal charter of King George II of Great Britain in 1754. It was renamed Columbia College in 1784. In 1896, the campus was moved to its current location in Morningside Heights and renamed Columbia University. According to its website, "Columbia University is one of the world's most important centers of research." Columbia is a member of the Ivy League.

**ANSWER:**  MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 43 and on that basis denies those allegations.

44.     Columbia's undergraduate student body, with the exception of its School of General Studies, discussed below, is generally wealthy and privileged. The median family income of undergraduates is $150,900; 13% of undergraduates come from the top 1% of the country's income distribution, and 62% come from the top 20%; and only 5.1% come from the bottom 20% of the income distribution.[7]

**ANSWER:**  MIT admits the existence of a *New York Times* website that currently contains the statistics stated in Paragraph 44, to which website MIT refers the Court for a complete and accurate statement of its contents. MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 44 and on that basis denies those allegations in all other respects.

45.     Columbia had an endowment of approximately $2 billion in 1994, which has grown to approximately $14.4 billion in 2021. *See* Appendix A.

**ANSWER:**  MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 45 and on that basis denies those allegations.

---

[7] *Economic Diversity and Student Outcomes at Columbia University*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/columbia-university.

## Cornell

46.     Cornell is a private, non-profit institution with its principal place of business in Ithaca, New York.

**ANSWER:**  MIT admits that, upon information and belief, Cornell is a private, non-profit institution with its principal place of business in Ithaca, New York.

47.     Cornell was founded in 1865, as a private, land-grant institution of New York State. According to its website, Cornell has been described as "the first *truly* American university because of its founders' revolutionary egalitarian and practical vision of higher education." (Emphasis in original.) Cornell is a member of the Ivy League.

**ANSWER:**  MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 47 and on that basis denies those allegations.

48.     Cornell's undergraduate student body is generally wealthy and privileged. The median family income of undergraduates is $151,600; 10% of undergraduates come from the top 1% of the country's income distribution, and 64% come from the top 20%; and only 3.8% come from the bottom 20% of the income distribution. [8]

**ANSWER:**  MIT admits the existence of a *New York Times* website that currently contains the statistics stated in Paragraph 48, to which website MIT refers the Court for a complete and accurate statement of its contents. MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 48 and on that basis denies those allegations in all other respects.

49.     Cornell had an endowment of approximately $898 million in 1994, which has grown to approximately $10 billion in 2021. *See* Appendix A.

**ANSWER:**  MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 49 and on that basis denies those allegations.

## Dartmouth

---

[8] *Economic Diversity and Student Outcomes at Cornell University*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/cornell-university.

50.     Trustees of Dartmouth College is a private, non-profit institution with its principal place of business in Hanover, New Hampshire.

**ANSWER:**  MIT admits that, upon information and belief, Dartmouth is a private, non-profit institution with its principal place of business in Hanover, New Hampshire.

51.     According to Dartmouth's website: "Founded in 1769, Dartmouth is a member of the Ivy League and consistently ranks among the world's greatest academic institutions." Dartmouth's website also claims that "Dartmouth College educates the most promising students."

**ANSWER:**  MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 51 and on that basis denies those allegations.

52.     Dartmouth's undergraduate student body is generally wealthy and privileged. The median family income of undergraduates is $200,400; 21% of undergraduates come from the top 1% of the country's income distribution, and 69% come from the top 20%; and only 2.6% come from the bottom 20% of the income distribution.[9]

**ANSWER:**  MIT admits the existence of a *New York Times* website that currently contains the statistics stated in Paragraph 52, to which website MIT refers the Court for a complete and accurate statement of its contents. MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 52 and on that basis denies those allegations in all other respects.

53.     Dartmouth had an endowment of approximately $870 million in 1994, which has grown to approximately $8.5 billion in 2021. *See* Appendix A.

**ANSWER:**  MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 53 and on that basis denies those allegations.

## Duke

54.     Duke University is a private, non-profit institution with its principal place of business in Durham, North Carolina.

---

[9] *Economic Diversity and Student Outcomes at Dartmouth College*, N.Y. TIMES
https://www.nytimes.com/interactive/projects/college-mobility/dartmouth-college.

**ANSWER:** MIT admits that, upon information and belief, Duke University is a private, non-profit institution with its principal place of business in Durham, North Carolina.

55. Duke's undergraduate student body is generally wealthy and privileged. The median family income of undergraduates is $186,700; 19% of undergraduates come from the top 1% of the country's income distribution, and 69% come from the top 20%; and only 3.9% come from the bottom 20% of the income distribution.[10]

**ANSWER:** MIT admits the existence of a *New York Times* website that currently contains the statistics stated in Paragraph 55, to which website MIT refers the Court for a complete and accurate statement of its contents. MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 55 and on that basis denies those allegations in all other respects.

56. Duke had an endowment of approximately $699 million in 1994, which has grown to approximately $12.7 billion in 2021. *See* Appendix A.

**ANSWER:** MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 56 and on that basis denies those allegations.

**Emory**

57. Emory University is a private, non-profit institution with its principal place of business in Atlanta, Georgia.

**ANSWER:** MIT admits that, upon information and belief, Emory University is a private, non-profit institution with its principal place of business in Atlanta, Georgia.

58. Emory was established by charter of the Georgia legislature in 1836.

**ANSWER:** MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 58 and on that basis denies those allegations.

59. Emory's undergraduate student body is generally wealthy and privileged. The median family income of undergraduates is $139,800; 15% of undergraduates come from the top 1% of

---

[10] *Economic Diversity and Student Outcomes at Emory University* N.Y. TIMES
https://www.nytimes.com/interactive/projects/college-mobility/duke-university.

the country's income distribution, and 58% come from the top 20%; and only 6% come from the bottom 20% of the income distribution.[11]

**ANSWER:** MIT admits the existence of a *New York Times* website that currently contains the statistics stated in Paragraph 59, to which website MIT refers the Court for a complete and accurate statement of its contents. MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 59 and on that basis denies those allegations in all other respects.

60.     Emory had an endowment of approximately $1.6 billion in 1994, which has grown to approximately $8 billion in 2021. *See* Appendix A.

**ANSWER:** MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 60 and on that basis denies those allegations.

### Georgetown

61.     Georgetown University is a private, non-profit institution with its principal place of business in Washington, District of Columbia.

**ANSWER:** MIT admits that, upon information and belief, Georgetown University is a private, non-profit institution with its principal place of business in Washington, District of Columbia.

62.     According to its website: "Georgetown University is the oldest Catholic and Jesuit institution of higher learning in the United States.

**ANSWER:** MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 62 and on that basis denies those allegations.

63.     Georgetown's undergraduate student body is generally wealthy and privileged. The median family income of undergraduate students is $229,100; 21% of undergraduates come from the top 1% of the country's income distribution, and 74% come from the top 20%; and only 3.1% come from the bottom 20% of the income distribution.[12]

---

[11] *Economic Diversity and Student Outcomes at Emory University* N.Y. TIMES
https://www.nytimes.com/interactive/projects/college-mobility/emory-university.
[12] *Economic Diversity and Students Outcomes at Georgetown University*, N.Y. TIMES,
https://www.nytimes.com/interactive/projects/college-mobility/georgetown-university.

**ANSWER:** MIT admits the existence of a *New York Times* website that currently contains the statistics stated in Paragraph 63, to which website MIT refers the Court for a complete and accurate statement of its contents. MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 63 and on that basis denies those allegations in all other respects.

64. Georgetown had an endowment of approximately $343 million in 1994, which has grown to approximately $2.6 billion in 2021. *See* Appendix A.

**ANSWER:** MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 64 and on that basis denies those allegations.

<u>**Johns Hopkins**</u>

65. The Johns Hopkins University is a private, non-profit institution with its principal place of business in Baltimore, Maryland.

**ANSWER:** MIT admits that, upon information and belief, Johns Hopkins University is a private, non-profit institution with its principal place of business in Baltimore, Maryland.

66. Johns Hopkins, the oldest research university in the United States, was founded in 1876 and named after the American philanthropist and entrepreneur Johns Hopkins.

**ANSWER:** MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 66 and on that basis denies those allegations.

67. Johns Hopkins' undergraduate student body is generally wealthy and privileged. The median family income of undergraduate students is $177,300; 11% of the undergraduates come from the top 1% of the country's income distribution, and 72% come from the top 20%; and only 2.9% come from the bottom 20% of the income distribution.[13]

**ANSWER:** MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 67 and on that basis denies those allegations.

---

[13] *Economic Diversity and Students Outcomes at Johns Hopkins University*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/georgetown-university.

68.     Johns Hopkins had an endowment of approximately $747 million in 1994, which has grown to approximately $9.3 billion in 2021. *See* Appendix A.

**ANSWER:**  MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 68 and on that basis denies those allegations.

<u>**MIT**</u>

69.     The Massachusetts Institute of Technology is a private, non-profit institution with its principal place of business in Cambridge, Massachusetts.

**ANSWER:**  MIT admits that it is a private, non-profit institution with its principal place of business in Cambridge, Massachusetts.

70.     MIT is regularly ranked in the top five in international rankings of the world's best research universities.

**ANSWER:**  MIT admits that it was ranked in the top 5 of the *U.S. News & World Report* rankings for "National Universities" for certain years. MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations for the remainder of the allegations in Paragraph 70 and on that basis denies those allegations.

71.     MIT's undergraduate student body is generally wealthy and privileged. The median family income of undergraduates is $137,400; 5.7% of undergraduates come from the top 1% of the income distribution, and 61% come from the top 20%; and only 6.2% come from the bottom 20% of the income distribution. [14]

**ANSWER:**  MIT admits the existence of a *New York Times* website that currently contains the statistics stated in the second sentence of Paragraph 71, to which website MIT refers the Court for a complete and accurate statement of its contents. MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations for the remainder of the allegations in Paragraph 71 and on that basis denies those allegations in all other respects.

---

[14] *Economic Diversity and Student Outcomes at Massachusetts Institute of Technology*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/massachusetts-institute-of-technology.

72.     MIT had an endowment of approximately $1.8 billion in 1994, which has grown to approximately $27.4 billion in 2021. *See* Appendix A.

**ANSWER:** MIT admits that the allegations in Paragraph 72 and Appendix A purport to describe information from MIT's consolidated financial statements. MIT denies any allegations in Paragraph 72 and Appendix A that are inconsistent with MIT's consolidated financial statements.

### Northwestern

73.     Northwestern University is a private, non-profit institution with its principal place of business in Evanston, Illinois. Northwestern was founded in 1853.

**ANSWER:** MIT admits that, upon information and belief, Northwestern University is a private, non-profit institution with its principal place of business in Evanston, Illinois.

74.     Northwestern's undergraduate student body is generally wealthy and privileged. The median family income of Northwestern's undergraduates is $171,200; 14% of undergraduates come from the top 1% of the income distribution, and 66% come from the top 20%; and only 3.7% come from the bottom 20% of the income distribution.[15]

**ANSWER:** MIT admits the existence of a *New York Times* website that currently contains the statistics stated in Paragraph 74, to which website MIT refers the Court for a complete and accurate statement of its contents. MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 74 and on that basis denies those allegations in all other respects.

75.     Northwestern had an endowment of approximately $1.3 billion in 1994, which has grown to approximately $14.9 billion in 2021. *See* Appendix A.

**ANSWER:** MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 75 and on that basis denies those allegations.

### Notre Dame

---

[15] *Economic Diversity and Student Outcomes at Northwestern University*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/northwestern-university.

76.     The University of Notre Dame du Lac is a private, non-profit institution with its principal place of business in South Bend, Indiana.

**ANSWER:**  MIT admits that, upon information and belief, Notre Dame is a private, non-profit

institution with its principal place of business in South Bend, Indiana.

77.     Notre Dame was founded in 1842. According to its website, Notre Dame is "[o]ne of America's leading undergraduate teaching institutions."

**ANSWER:**  MIT lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 77 and on that basis denies those allegations.

78.     Notre Dame's undergraduate student body is generally wealthy and privileged. The median family income of undergraduates is $191,400; 15% of undergraduates come from the top 1% of the income distribution, and 75% come from the top 20%; and only 1.6% come from the bottom 20% of the income distribution.[16]

**ANSWER:**  MIT admits the existence of a *New York Times* website that currently contains the

statistics stated in Paragraph 78, to which website MIT refers the Court for a complete and accurate

statement of its contents. MIT lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 78 and on that basis denies those allegations in all other

respects.

79.     Notre Dame had an endowment of approximately $879 million in 1994, which has grown to approximately $22.5 billion in 2021. *See* Appendix A.

**ANSWER:**  MIT lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 79 and on that basis denies those allegations.

**Penn**

80.     The Trustees of the University of Pennsylvania is a private, non-profit institution with its principal place of business in Philadelphia, Pennsylvania.

---

[16] *Economic Diversity and Student Outcomes at Notre Dame*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/notre-dame.

**ANSWER:** MIT admits that, upon information and belief, the University of Pennsylvania is a private, non-profit institution with its principal place of business in Philadelphia, Pennsylvania.

81. Penn was founded in 1740 by Benjamin Franklin. As of 2014, Penn had 25 undergraduate alumni that were billionaires, more than any other university in the world.[17] Penn is a member of the Ivy League.

**ANSWER:** MIT admits the existence of a *CNN* article that currently contains the statistic stated in the second sentence of Paragraph 81, to which article MIT refers the Court for a complete and accurate statement of its contents. MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 81 and on that basis denies those allegations in all other respects.

82. Penn's undergraduate student body is generally wealthy and privileged. The median family income of undergraduates is $195,500; 19% of undergraduates come from the top 1% of the income distribution, and 71% come from the top 20%; and only 3.3% come from the bottom 20% of the income distribution.[18]

**ANSWER:** MIT admits the existence of a *New York Times* website that currently contains the statistics stated in Paragraph 82, to which website MIT refers the Court for a complete and accurate statement of its contents. MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 82 and on that basis denies those allegations in all other respects.

83. Penn had an endowment of approximately $1.5 billion in 1994, which has grown to approximately $20.5 billion in 2021. *See* Appendix A.

**ANSWER:** MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 83 and on that basis denies those allegations.

---

[17] Emily Jane Fox, *Top 20 Colleges with Most Billionaire Alumni*, CNN (Sept. 17, 2014), https://money.cnn.com/2014/09/16/luxury/top-colleges-with-billionaire-undergraduates/.
[18] *Economic Diversity and Student Outcomes at the University of Pennsylvania*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/university-of-pennsylvania.

## Rice

84.     The William Marsh Rice University is a private, non-profit institution with its principal place of business in Houston, Texas.

**ANSWER:** MIT admits that, upon information and belief, Rice University is a private, non-profit institution with its principal place of business in Houston, Texas.

85.     Rice was founded in 1891 by Houston businessman William Marsh Rice.

**ANSWER:** MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 85 and on that basis denies those allegations.

86.     Rice's undergraduate student body is generally wealthy and privileged. The median family income of undergraduates is $160,800; 9.8% of undergraduates come from the top 1% of the income distribution, and 64% come from the top 20%; and only 4.9% come from the bottom 20% of the income distribution. [19]

**ANSWER:** MIT admits the existence of a *New York Times* website that currently contains the statistics stated in Paragraph 86, to which website MIT refers the Court for a complete and accurate statement of its contents. MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 86 and on that basis denies those allegations in all other respects.

87.     Rice had an endowment of approximately $1.3 billion in 1994, which has grown to approximately $8.1 billion in 2021. *See* Appendix A.

**ANSWER:** MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 87 and on that basis denies those allegations.

## Vanderbilt

88.     Vanderbilt University is a private, non-profit institution with its principal place of business in Nashville, Tennessee.

---

[19] *Economic Diversity and Student Outcomes at Rice University*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/rice-university.

**ANSWER:** MIT admits that, upon information and belief, Vanderbilt University is a private, non-profit institution with its principal place of business in Nashville, Tennessee.

89.     Vanderbilt was founded in 1873 and named in honor of Cornelius Vanderbilt, who donated a founding gift. According to Vanderbilt's website, "the university's prominent alumni base includes Nobel Prize winners, members of Congress, governors, ambassadors, judges, admirals, CEOs, university presidents, physicians and attorneys, as well as professional sports figures playing in the NFL, NBA, Major League Baseball, the PGA and LPGA."

**ANSWER:** MIT admits the existence of a website that currently contains the quoted language stated in Paragraph 89, to which website MIT refers the Court for a complete and accurate statement of its contents. MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 89 and on that basis denies those allegations in all other respects.

90.     Vanderbilt's undergraduate student body is generally wealthy and privileged. The median family income of undergraduates is $204,500; 23% of undergraduates come from the top 1% of the income distribution, and 70% come from the top 20%; and only 1.9% come from the bottom 20% of the income distribution.[20]

**ANSWER:** MIT admits the existence of a *New York Times* website that currently contains the statistics stated in Paragraph 90, to which website MIT refers the Court for a complete and accurate statement of its contents. MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 90 and on that basis denies those allegations in all other respects.

91.     Vanderbilt had an endowment of approximately $860 million in 1994, which has grown to approximately $10.9 billion in 2021. *See* Appendix A.

**ANSWER:** MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 91 and on that basis denies those allegations.

---

[20] *Economic Diversity and Student Outcomes at Vanderbilt University*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/vanderbilt-university.

## Yale

92.     Yale University is a private, non-profit institution with its principal place of business in New Haven, Connecticut.

**ANSWER:**  MIT admits that, upon information and belief, Yale University is a private, non-profit

institution with its principal place of business in New Haven, Connecticut.

93.     Originally chartered by the legislature of Connecticut as the Collegiate School in 1701 in multiple locations, the school was moved to New Haven in 1716 and renamed Yale in 1718, after a wealthy British merchant and philanthropist, Elihu Yale. It is the third-oldest university in the United States. Yale is a member of the Ivy League.

**ANSWER:**  MIT lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 93 and on that basis denies those allegations.

94.     Yale's undergraduate study body is generally wealthy and privileged. The median family income of undergraduates is $192,600; 19% of undergraduates come from the top 1% of the income distribution, and 69% come from the top 20%; and only 2.1% come from the bottom 20% of the income distribution.[21]

**ANSWER:**  MIT admits the existence of a *New York Times* website that currently contains the

statistics stated in Paragraph 94, to which website MIT refers the Court for a complete and accurate

statement of its contents. MIT lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 94 and on that basis denies those allegations in all other

respects.

95.     Yale had an endowment of approximately $3.5 billion in 1994, which has grown to approximately $42.3 billion in 2021. *See* Appendix A. This is the second-highest endowment of any university in the United States.

**ANSWER:**  MIT lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 95 and on that basis denies those allegations.

---

[21] *Economic Diversity and Student Outcomes at Yale University*, N.Y. TIMES,
https://www.nytimes.com/interactive/projects/college-mobility/yale-university.

## IV.    DEFENDANTS' MEMBERSHIP IN THE 568 CARTEL

96.    The 568 Cartel was formed in 1998. Columbia, Cornell, Duke, Georgetown, MIT, Northwestern, and Notre Dame have been members of the 568 Cartel since 1998 and first implemented the Consensus Methodology in 2003.

**ANSWER:** MIT admits that, upon information and belief, the 568 Presidents Group was formed in 1998. MIT admits that it has been a member of the 568 Presidents Group since 1998. MIT further admits that the 568 Presidents Group developed a Consensus Methodology of voluntary general recommendations for assessing student need. MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 96 as they relate to other Defendants and on that basis denies those allegations. MIT denies Paragraph 96 in all other respects.

97.    Brown joined the 568 Cartel in 1998 and first implemented the Consensus Methodology in 2004.

**ANSWER:** MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 97 and on that basis denies those allegations.

98.    CalTech joined the 568 Cartel in 2019 and first implemented the Consensus Methodology the same year.

**ANSWER:** MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 98 and on that basis denies those allegations.

99.    Chicago joined the 568 Cartel in 1998 and first implemented the Consensus Methodology in 2003.

**ANSWER:** MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 99 and on that basis denies those allegations.

100.    Dartmouth joined the 568 Cartel in 1998 and first implemented the Consensus Methodology in 2004.

**ANSWER:** MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 100 and on that basis denies those allegations.

101.    Emory joined the 568 Cartel in 1998 and first implemented the Consensus Methodology in 2003.

**ANSWER:** MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 101 and on that basis denies those allegations.

102.    Johns Hopkins joined the 568 Cartel in 2021, has taken overt steps in furtherance of the conspiracy alleged herein (including meeting with Defendants and discussing the Consensus Methodology with them), and first implemented the Consensus Methodology with respect to Early Decision applicants in or around November 2021.

**ANSWER:** MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 102 and on that basis denies those allegations.

103.    Rice joined the 568 Cartel in 1998 and first implemented the Consensus Methodology in 2003.

**ANSWER:** MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 103 and on that basis denies those allegations.

104.    Penn joined the 568 Cartel in 1998 and first implemented the Consensus Methodology in 2003.

**ANSWER:** MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 104 and on that basis denies those allegations.

105.    Vanderbilt joined the 568 Cartel in 1998 and first implemented the Consensus Methodology in 2003.

**ANSWER:** MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 105 and on that basis denies those allegations.

106.    Yale joined the 568 Cartel in 1998 and first implemented the Consensus Methodology in 2003.

**ANSWER:** MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 106 and on that basis denies those allegations.

107.     Certain Defendants claim to have stopped participating in the 568 Cartel at various points in time since 2003, but Plaintiffs are unaware of any evidence that any Defendant has in fact withdrawn from the conspiracy alleged herein. Accordingly, since 2003, the determinants of the net price of attending Defendants' schools have been established through the conspiracy.

**ANSWER:** MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 107 and on that basis denies those allegations. MIT denies the allegations in Paragraph 107 in all other respects.

## V.     DEFENDANTS' VIOLATION OF THE FEDERAL ANTITRUST LAWS

### A.     Defendants Have Colluded on Their Financial-Aid Practices

108.     Defendants are purported competitors in enrolling highly selective undergraduate student bodies and providing an undergraduate education. People throughout the United States apply for admission to Defendants' undergraduate programs.

**ANSWER:** MIT admits that, upon information and belief, there are people who apply for admission to MIT who may also apply for admission to the other Defendant schools, among many other schools, in any given year. MIT admits that people throughout the United States and the world apply for admission to MIT's undergraduate programs. MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 108 as they relate to other Defendants and on that basis denies those allegations. MIT denies the allegations in Paragraph 108 in all other respects.

109.     Each Defendant annually sends out thousands of solicitations and mailings and receives thousands of admission applications that cross state lines, including thousands of applications from Class Members. Out-of-state students, including thousands of Class Members, make up a substantial percentage of each Defendant's undergraduate population.

**ANSWER:** MIT admits that it communicates with applicants throughout the United States and receives applications from prospective students throughout the United States. MIT denies that

Plaintiffs have established or can establish the prerequisites to certification and/or maintenance of

the alleged "Class" pursuant to Rule 23 of the Federal Rules of Civil Procedure, and therefore

denies that any of the Defendants receive applications from Class Members. MIT denies the

remaining allegations in Paragraph 109 as they relate to MIT. MIT lacks knowledge or information

sufficient to form a belief as to the truth of the remaining allegations in Paragraph 109 and on that

basis denies those allegations.

110.     Each Defendant annually receives millions of dollars that flow across state lines in
tuition payments, grants, donations, and athletic ticket sales and sponsorships. Each Defendant
markets its undergraduate programs and tickets for athletic events to the public across state lines.

**ANSWER:**  MIT admits that it receives tuition payments and donations. MIT lacks knowledge or

information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 110

and on that basis denies those allegations.

111.     Defendants have engaged in a continuing conspiracy in unreasonable restraint of
interstate trade and commerce in violation of Section 1 of the Sherman Act. This violation is
likely to continue unless the relief sought herein is granted.

**ANSWER:**  MIT denies the allegations in Paragraph 111.

112.     This conspiracy consists of an agreement, understanding, and concert of action among
Defendants, and each of them, the substantial terms of which are to restrain price competition
relating to their provision of financial aid for students, and thereby to increase the net price of
attending these institutions ("the net price of attendance").

**ANSWER:**  MIT denies the allegations in Paragraph 112.

113.     The 568 Cartel generally meets in person as a group at least twice each year. In October
2017, for example, the 568 Cartel held one of its official biannual meetings at the Hilton
Rosemont, in Rosemont, Illinois, near O'Hare International Airport. On information and belief,
568 Cartel members communicate with each other about matters related to the conspiracy
through other means as well, such as telephone calls, video calls, emails, and messaging.

**ANSWER:**  MIT admits that the 568 Presidents Group periodically met in person and sometimes

communicated by other means but denies that those meetings and communications were done in

furtherance of any conspiracy. MIT admits that the 568 Presidents Group met in October 2017 at

30

the Hilton Rosemont, in Rosemont, Illinois. MIT denies the allegations in Paragraph 113 in all

other respects.

114.     Defendants maintain a website for purpose of representing the 568 Cartel and its
purposes to the public. The website states: "This site serves as a resource . . . for visitors seeking
to learn more about the Group."[22] The website explains that the "568 Presidents Group is an
affiliation of colleges and universities, all of which must admit students on a need-blind basis."
An FAQ section on the website adds: "It is referred to as a 'Presidents' group because it was
formed by a group of 28 college and university presidents from need-blind schools in 1998." The
website also contains the form of a certificate of compliance whereby a member of the group can
certify that "its admission and financial aid practices currently comply with the rules of Section
568 regarding 'need-blind admission practices.'" These statements on the website mislead the
public by representing that the 568 Cartel members' practices are compliant with Section 568.
The truth, as alleged further below, is the opposite.

**ANSWER:**  MIT admits that the 568 Presidents Group has a website. MIT admits the 568

Presidents Group website currently contains the quoted language, to which website MIT refers the

Court for a complete and accurate statement of its contents. MIT denies the allegations in

Paragraph 114 in all other respects.

115.     The 568 Cartel fixes prices through a formula that is based on a "set of common
standards for determining the family's ability to pay for college." The 568 Cartel calls this
formula the "Consensus Methodology." Defendants admit on their own website that the
"purposes" of the 568 Cartel include, collectively, to "Discuss and agree upon common
principles of analysis for determining the financial need of undergraduate financial aid
applicants"; to "Build, maintain, and revise, as appropriate, a Consensus Approach need analysis
methodology that is consistent with these principles"; and to "Explore ways of developing a data
exchange program."

**ANSWER:**  MIT admits that the 568 Presidents Group developed the Consensus Methodology of

voluntary general recommendations for assessing student need. MIT admits the existence of a

document currently containing the quoted language, to which document MIT refers the Court for

a complete and accurate statement of its contents. MIT denies the allegations in Paragraph 115 in

all other respects.

---

[22] 568 PRESIDENTS GROUP, http://www.568group.org/home/.

116.     Defendants further concede that the "Consensus Methodology" would, in their own words, contain "certain key components, including: 1) common elements of need analysis . . .; 2) a common calendar for the collection of data from families; 3) a means of training aid professionals in the application of the Methodology; and 4) an oversight 568 Group to review and modify the methodology as needed over time."

**ANSWER:**  MIT admits the existence of a document currently containing the quoted language, to

which document MIT refers the Court for a complete and accurate statement of its contents. MIT

denies the allegations in Paragraph 116 in all other respects.

117.     Critical components of the 568 Cartel have therefore been the development of a "data exchange program" and the agreement to share information about admissions and financial-aid methodology, and then to meet regularly to discuss this data and information, to enable the Cartel members to agree to use a common methodology for determining financial-aid awards for the purposes of coordinating financial-aid awards among Cartel members. The common methodology assesses the income and assets of given financial-aid applicants and their families to determine the applicants' ability to pay and thus the financial contribution that the applicant and their family is expected to make.

**ANSWER:**  MIT denies the allegations in Paragraph 117.

118.     The applicants' assessed ability to pay therefore is a key determinant in the net price of attendance. The 568 Cartel uses the shared, competitively sensitive information about enrollment, costs, and other data relating to Defendants' available resources for financial aid to arrive at a common and agreed formula for setting ability to pay, which results in artificially inflated net prices of attendance.

**ANSWER:**  MIT denies the allegations in Paragraph 118.

119.     Members of the 568 Cartel began meeting sometime after the enactment of Section 568 in 1994. The 568 Cartel was officially formed in 1998.

**ANSWER:**  MIT admits, upon information and belief, that members of the 568 Presidents Group

began meeting sometime after Section 568 was enacted in 1994 and that the 568 Presidents Group

was formed in 1998. MIT denies the allegations in Paragraph 119 in all other respects.

120.     As of July 2001, Dartmouth had not joined the 568 Cartel. According to Dartmouth's then-Dean of Admissions and Financial Aid, Karl Furstenberg, as of 2001 Dartmouth had a "need analysis methodology that [was] perhaps more enlightened, more generous and more flexible than" that of the 568 Cartel, and Dartmouth was "actually doing more than this new

methodology would allow."[23] Not long after Mr. Furstenberg made these statements, however, Dartmouth decided to join the 568 Cartel, implemented the Consensus Methodology, and took other steps in furtherance of the conspiracy as alleged herein.

**ANSWER:** MIT admits the existence of a website that currently contains the quoted language in

Paragraph 120, to which website MIT refers the Court for a complete and accurate statement of its

contents. MIT lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 120 and on that basis denies those allegations in all other respects.

121.     The 568 Cartel monitors and enforces its combination and conspiracy in several ways, according to the Cartel's website, including (but not limited to) such steps as (a) requiring each participating institution to submit a "Certificate of Compliance," (b) requiring university professionals at each institution to receive "training . . . in the application of the Methodology," (c) imposing a "common calendar for the collection of data from families," and (d) conducting an annual or biannual meeting every year since 2007.

**ANSWER:** MIT admits the existence of a document and a website currently containing the quoted

language, to which document and website MIT refers the Court for a complete and accurate

statement of their contents. MIT denies the allegations in Paragraph 121 in all other respects.

## VI.     DEFENDANTS' ANTICOMPETITIVE CONDUCT HAS RAISED NET PRICES

122.     As higher-education insiders—including employees and officers of the institutions in the 568 Cartel—have acknowledged, the Cartel limits competition in financial-aid offers from supposedly competing schools, driving down aid packages and thereby driving up the net price of attendance for aid-eligible students.

**ANSWER:** MIT denies the allegations in Paragraph 122.

123.     Yale claims not to have participated in the 568 Cartel from 2008 until 2018. Yale claims it left the Cartel because it determined that membership in the Cartel had restricted the amount of financial aid that Yale could provide to students. That is, Yale's decision to increase financial-aid awards to eligible students prompted it to want to no longer participate. In so doing, referring to a new policy to be implemented in early 2009, Yale stated that its "new, more generous aid policy in January means the University can no longer follow the consensus methodology."[24]

---

[23] Shevani Jaisingh, *28 Colleges Alter Financial Aid Packages*, THE DARTMOUTH (July 17, 2001), https://www.thedartmouth.com/article/2001/07/28-colleges-alter-fin-aid-packages.

[24] Caitlin Roman, *University Leaves Financial Aid Group*, YALE DAILY NEWS (Sept. 26, 2008), https://yaledailynews.com/blog/2008/09/26/university-leaves-financial-aid-group/.

**ANSWER:** MIT admits the existence of a website that currently contains some of the quoted language in Paragraph 123, to which website MIT refers the Court for a complete and accurate statement of its contents. MIT lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 123 and on that basis denies those allegations in all other respects.

124.     Yale's then-Director of Student Financial Services, Caesar Storlazzi, concluded: "By leaving the 568 Group, Yale is now free to give families more aid than they would have gotten under the consensus methodology."[25] Storlazzi stated that what is "not good" about the Cartel's approach is that it has "one needs-analysis formula that everyone has to sign on to."[26] The connection between Yale's withdrawal and the effect on net prices was explicit: "In other words, the percentage of a family's income and assets that Yale takes as a parental contribution is now lower than the percentage taken by 568 schools."[27] (Yale evidently rejoined the Cartel in 2018, without fanfare.) In other words, Yale understood that active members of the 568 Cartel were required to agree to and impose the Consensus Methodology, which had the effect of suppressing the amount of financial aid it could offer to all its students systematically. Only by attempting to pull out of the Cartel could Yale or any Cartel member be free to offer competitively better financial-aid offers, and charge lower net prices for attendance, to all Class Members.

**ANSWER:** MIT admits the existence of a website that currently contains the quoted language in Paragraph 124, to which website MIT refers the Court for a complete and accurate statement of its contents. MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first five sentences of Paragraph 124 and on that basis denies those allegations. MIT denies the allegations in Paragraph 124 in all other respects.

125.     Other universities have similarly declined to participate in the 568 Cartel because it would limit the financial aid they could provide. Harvard's then-Director of Financial Aid, Sally Donahue, said in 2008 that Harvard never joined the 568 Cartel because its financial-aid formula would have yielded financial-aid packages that were smaller than what Harvard wanted to award.[28] In 2015, one anonymous university president who refused to participate in the 568 Cartel described it as "an insider's game" that belonged to a "bygone era." Observing that some

---

[25] *Id.*
[26] *Id.*
[27] *Id.*
[28] *Id.*

schools had left the 568 Cartel to offer more financial aid, this anonymous president opined that "the notion of a collective that would constrain money is counter to public policy.[29]

**ANSWER:**  MIT admits the existence of a website that currently contains the quoted language in the last sentence of Paragraph 125, to which website MIT refers the Court for a complete and accurate statement of its contents. MIT lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 125 and on that basis denies those allegations in all other respects.

126.     Indeed, the website of the 568 Presidents Group states in relevant part: "The Consensus Approach . . . seeks to reduce much of the variance in need analysis results that has been experienced in recent years." The website goes on to state that the "participating institutions believe that the Consensus Approach, when applied in a consistent manner, serves to diminish or eliminate . . . divergent results."

**ANSWER:**  MIT admits the existence of a website currently containing the quoted language, to which website MIT refers the Court for a complete and accurate statement of its contents. MIT denies the allegations in Paragraph 126 in all other respects.

127.     The phrases "reduce much of the variance," "consistent manner," and "diminish or eliminate divergent results," in the opaque world of higher-education pricing, are code words meaning that the purpose of the 568 Cartel is to reduce or eliminate competition between Cartel members over offers of financial aid to prospective students. And elimination of competition over financial-aid offers is simply a means of coalescing around a uniform and lower level of aid to all prospective students. The result of the 568 Cartel is thus not only to reduce the amount of total aid offered by each school, but also to reduce the total amount of aid offered to each prospective student at each Defendant school.

**ANSWER:**  MIT denies the allegations in Paragraph 127.

128.     In addition, to diminish variance in prices, according to the 568 Cartel's own website, the members "discuss and agree" on how to determine financial need. Under antitrust principles, the fact that members of the 568 Cartel agree to share confidential and competitively sensitive information and data on admissions and their respective applicants, and then further agree to impose a common methodology for determining financial-aid awards, are themselves evidence that the Cartel reduced such aid. If Defendants were truly competing, they would not engage in such behavior and reach such agreements because they would be incentivized to increase aid and

---

[29] The Education Conservancy, *Financial Aid: Examining the Thinking Behind the Policy* (June 2015), https://www.educationconservancy.org/PresidentialThinking.pdf.

reduce net prices of attendance to compete for students. In the absence of the anticompetitive conduct challenged herein, that would mean the awarding of more financial aid and reduction of net prices of attendance for all students in the proposed Class.

**ANSWER:** MIT denies the allegations in Paragraph 128.

129.     Indeed, in a March 2014 interview with *The Georgetown Voice*, John DeGioia, who has been both the President of Georgetown and the President of the 568 Cartel for several years, was clear about the purpose of the Cartel: "I actually chair that group, called the 568 group. The 568 refers to a passage in Higher Reauthorization Bill about a decade ago. . . . *What it enables us to do is develop a common formula* by which we would access the need of the student. *We ask the family to contribute the maximum that they are capable of, according to that formula*."[30] The 568 Cartel—whose member schools have enormous endowments, which have been growing substantially for decades—thus develops a "common formula" to extract from working- and middle-class families "the maximum that they are capable of" paying.

**ANSWER:** MIT admits the existence of a website that currently contains the quoted language in

Paragraph 129, to which website MIT refers the Court for a complete and accurate statement of its

contents. MIT lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in the first two sentences of Paragraph 129 and on that basis denies those allegations.

MIT admits that it has an endowment and refers the Court to its consolidated financial statements

for a complete and accurate representation of its contents. MIT denies the allegations in Paragraph

129 in all other respects.

130.     The 568 Exemption allowed the 568 Cartel members not compete (*sic*) in certain ways only if all the members admitted all students on a need-blind basis. Plaintiffs show herein, however, that by their own actions, Defendants did not satisfy this provision and thus none is entitled to the exemption. Accordingly, Defendants are all liable for the reduced aid and artificially high net prices of attendance for Class Members that resulted from their agreement and related conspiratorial misconduct.

**ANSWER:** MIT denies the allegations in Paragraph 130.

131.     Absent the alleged collusion, Defendants would compete, or compete more aggressively, on price for the students they have decided to admit because these are the students the admissions department has decided would satisfy the goals of the admissions process—among other things, to generate a diverse student body of high academic performers and student-

---

[30] Connor Jones, *On the Record with President DeGioia*, THE GEORGETOWN VOICE (Mar. 6, 2014) (emphasis added), https://georgetownvoice.com/2014/03/06/record-president-degioia/.

36

athletes. Defendants view enrolling such students as critical to maintaining their prestige and influence and continuing to attract donations.

**ANSWER:** MIT admits that one of its goals is to enroll a talented and diverse student body. MIT

denies the allegations in Paragraph 131 in all other respects.

132.    Given that a large percentage of families cannot afford an elite university education for their children without financial assistance, the 568 Cartel has enabled Defendants to maintain artificially inflated net prices of attendance, through artificially reduced financial aid, without losing admitted students to competitor schools.

**ANSWER:** MIT denies the allegations in Paragraph 132.

133.    In short, Defendants' anticompetitive conduct has produced overcharges in the net prices of attendance for all Class Members.

**ANSWER:** MIT denies the allegations in Paragraph 133.

## VII.    ALLEGATIONS RELATED TO DEFENDANTS' ANTICIPATED DEFENSES

134.    While participating in the conspiracy alleged herein, Defendants have failed to conduct their admissions practices on a need-blind basis because all of them made admissions decisions taking into account the financial circumstances of applicants and their families, through policies and practices that favored the wealthy and disfavored those needing aid, including but not limited to those described below.

**ANSWER:** MIT denies the allegations in Paragraph 134.

135.    Section 568 defines "on a need-blind basis" to mean "without regard to the financial circumstances of the student involved or the student's family."

**ANSWER:** MIT admits that Section 568 is a statutory exemption from the antitrust laws. The

remaining allegations in Paragraph 135 are legal conclusions to which no response is required. To

the extent a response is required, MIT denies the allegations in Paragraph 135.

136.    An admissions practice can be described as "need-aware," as some admissions offices have used the phrase, if the institution considers an applicant's inability or ability to afford the full price of tuition, room, and board as a factor weighing against acceptance in at least some admissions decisions.

**ANSWER:** The allegations contained in this paragraph are legal conclusions to which no response

is required. To the extent a response is required, MIT denies the allegations in Paragraph 136.

37

### A. Defendants Do Not Employ "Need-Blind" Admissions Policies in Deciding Whether to Admit Waitlisted and Transfer Applicants

137.     The language of Section 568, as well as its legislative history, makes clear that to qualify for the exemption, a school must follow need-blind admissions with respect to all applicants, including those on the waitlist. Section 568 is modeled on the settlement reached between MIT and the Department of Justice in a case against the predecessor to the 568 Cartel, which operated for decades until the early 1990s. It was known as the Overlap Group. The MIT settlement defined "need-blind admissions" to mean "admit[ting] all United States citizens to its undergraduate programs without regard to family financial circumstances, *other than admitted from a wait list*." (Emphasis added.) In enacting Section 568, Congress generally followed the terms of MIT's settlement, but it *omitted* the exception for waitlisted students.

**ANSWER:**  The first and fifth sentences of Paragraph 137 are legal conclusions to which no response is required. To the extent a response is required, MIT admits that Section 568 is a statutory exemption from the antitrust laws, but denies the allegations in the first and fifth sentences of Paragraph 137 in all other respects. As to the second sentence of Paragraph 137, MIT admits that Section 568 is modeled on the settlement reached between MIT and the Department of Justice ("MIT Standards of Conduct") to resolve the "Overlap" financial aid case, but denies the allegations in the second sentence of Paragraph 137 in all other respects. As to the fourth sentence of Paragraph 137, MIT admits that the MIT Standards of Conduct states that "Non-profit institutions of higher education may participate in the cooperative financial aid arrangements set forth below ("Participating Schools"), provided that they: a) practice need-blind admissions; that is, admit all United States citizens to its undergraduate programs without regard to family financial circumstances, other than admitted from a wait list; and b) provide financial aid sufficient to meet the full need of all such students." The remaining allegations in Paragraph 137 are legal conclusions to which no response is required. To the extent a response is required, MIT denies the allegations in Paragraph 137.

138.     All Defendants, on information and belief, have considered the financial need of waitlisted applicants—both in deciding whether to put them on the waitlist and deciding whether

38

to admit them—despite Section 568's requirement that "all students admitted" be admitted on a need-blind basis. The precise number of affected students varies from Defendant to Defendant, but each school places at least over 1,000 students on its waitlist each year, admitting from as few as only several students to as many as several hundred.

**ANSWER:** MIT admits that it places some students on a waitlist and that the number of students admitted from the waitlist varies each year. MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 138 concerning the practices of other schools other than MIT and on that basis denies those allegations. The remaining allegations in Paragraph 138 are legal conclusions to which no response is required. To the extent a response is required, MIT denies the allegations in Paragraph 138.

139.    With respect to Penn, for example, a former Penn admissions officer, Karen Crowley, conceded in 2009 that although it is "not an official practice," admissions officers give preference to "full-paying student[s]" on the waitlist over those who need financial aid, especially when "endowments are down and cost-cutting is essential." "If a full-paying student says he'll definitely come, letting him in can be a relief."[31] On information and belief, Crowley's concession was reflective of Penn's own admissions practices.

**ANSWER:** MIT admits the existence of a website that currently contains the quoted language in Paragraph 139, to which website MIT refers the Court for a complete and accurate statement of its contents. MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 139 and on that basis denies those allegations in all other respects.

140.    In May 2021, a college admissions consultant and former Associate Dean of Admissions at Penn until June 2008, Sara Harberson, acknowledged: "When I worked as the associate dean of admissions at the University of Pennsylvania, a need-blind institution, the office was not forthright about the fact that needing financial aid kept a student from being considered or admitted from the waitlist. Many need-blind universities are not open about their policies when it comes to whom they admit off the waitlist." On information and belief, Crowley's concession was reflective of Penn's own admissions practices.[32]

---

[31] Kathleen Kingsbury, *Dirty Secrets of College Waitlists*, THE DAILY BEAST (Mar. 30, 2009, updated July 14, 2017), https://www.thedailybeast.com/dirty-secrets-of-college-waitlists.
[32] Sara Harberson, *How Colleges Play the Waitlist Game*, COURIER TIMES (May 17, 2021), https://www.buckscountycouriertimes.com/story/opinion/2021/05/17/op-ed-how-colleges-play-waitlist-game-students-detriment/5071470001/.

**ANSWER:** MIT admits the existence of a website that currently contains the quoted language in Paragraph 140, to which website MIT refers the Court for a complete and accurate statement of its contents. MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 140 and on that basis denies those allegations in all other respects.

141. Vanderbilt, as a further example, has indicated being need-aware with respect to waitlisted applicants through statements by its admissions officers. Vanderbilt has stated on its website, for example, that it "reserve[s] the right to be need aware when admitting waitlisted students."[33] This concession was posted on April 13, 2018, by Kim Struglinski, who joined the Vanderbilt office of undergraduate admissions in 2015 and thus was a Vanderbilt employee at the time of the statement.

**ANSWER:** MIT admits the existence of a website that currently contains the quoted language in Paragraph 141, to which website MIT refers the Court for a complete and accurate statement of its contents. MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 141 and on that basis denies those allegations in all other respects.

142. Vanderbilt has indicated it is need-aware for waitlisted applicants on other occasions. In 2013, a Vanderbilt employee named Carolyn Pippen stated that "we do reserve the right to be need-aware when admitting waitlisted students."[34] And in 2014, a Vanderbilt employee named Jay Watson addressed whether Vanderbilt would be need-aware for waitlisted students that year: "We do reserve the right to be need aware when admitting students from the wait list."[35] Vanderbilt has never publicly stated, however, if in fact it has made need-aware decisions in admitting students from the waitlist.

**ANSWER:** MIT admits the existence of websites that currently contain the quoted language in Paragraph 142, to which websites MIT refers the Court for a complete and accurate statement of

---

[33] Kim Struglinski, *Waitlist FAQ 2018*, VANDERBILT UNIVERSITY UNDERGRADUATE ADMISSIONS (Apr. 13, 2018), https://admissions.vanderbilt.edu/vandybloggers/2018/04/waitlist-faqs-2018/.

[34] Carolyn Pippen, *I'm On the Wait List – Now What*, VANDERBILT UNIVERSITY UNDERGRADUATE ADMISSIONS (Apr. 12, 2013), https://admissions.vanderbilt.edu/vandybloggers/2013/04/im-on-the-wait-list-now-what-2/.

[35] Jay Watson, *Vanderbilt Admissions AMA*, VANDERBILT UNIVERSITY UNDERGRADUATE ADMISSIONS (Mar. 31, 2014), https://admissions.vanderbilt.edu/vandybloggers/2014/03/vanderbilt-admissions-ama/.

their contents. MIT lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 142 and on that basis denies those allegations in all other respects.

143.    Penn's and Vanderbilt's practices are representative of all the other Defendants' practices with respect to the consideration of waitlisted applicants. On this basis alone, at each Defendant school, each year, each Defendant has considered the financial circumstances of many hundreds of students in deciding whether to put them on the waitlist and in deciding whether to admit them from the waitlist. In failing to conduct need-blind admissions as to waitlisted applicants, all Defendants fail to satisfy the requirements of the 568 Exemption, and thus are subject to liability under the antitrust laws.

**ANSWER:**  MIT denies that any other school's practices are "representative" of its own. MIT

denies that it has considered students' financial circumstances in deciding whether to put them on

the waitlist or in deciding whether to admit them from the waitlist. MIT lacks knowledge or

information sufficient to form a belief as to the truth of the allegations in Paragraph 143 concerning

the practices of other schools other than MIT and on that basis denies those allegations. The

remaining allegations in Paragraph 143 are legal conclusions to which no response is required. To

the extent a response is required, MIT denies the allegations in Paragraph 143.

144.    All Defendants, on information and belief, have also considered the financial need of transfer applicants in deciding whether to admit them, despite Section 568's requirement that "all students admitted" be admitted on a need-blind basis. Each Defendant receives at least hundreds (and sometimes over a thousand) transfer applications each year, admitting from as few as only several students to as many as several hundred.

**ANSWER:**  MIT admits that it receives transfer applications each year and that the number of

transfer applicants admitted varies. MIT lacks knowledge or information sufficient to form a belief

about the truth of the allegations in Paragraph 144 concerning the practices of other schools other

than MIT and on that basis denies those allegations. The remaining allegations in Paragraph 144

are legal conclusions to which no response is required. To the extent a response is required, MIT

denies the allegations in Paragraph 144.

145.     On this basis, at each school, each year, each Defendant has considered the financial circumstances of many hundreds of students seeking to transfer to the school in deciding whether to admit them. In failing to conduct need-blind admissions as to transfer applicants, no Defendant qualifies for the 568 Exemption.

**ANSWER:**  MIT denies that it has considered the financial circumstances of students seeking to

transfer to MIT in deciding whether to admit them. MIT denies that it has failed to conduct need-

blind admissions as to transfer applicants. MIT lacks knowledge or information sufficient to form

a belief about the truth of the allegations in Paragraph 145 concerning schools other than MIT and

on that basis denies those allegations. The remaining allegations in Paragraph 145 are legal

conclusions to which no response is required. To the extent a response is required, MIT denies the

allegations in Paragraph 145.

      **B.**     **Columbia Does Not Employ "Need-Blind" Admissions Policies in Deciding Whether to Admit Applicants to Its School of General Studies**

146.     Columbia further engages in need-aware admissions practices that relate to applicants to its School of General Studies, which is an undergraduate program of Columbia. The School of General Studies is under the governance of Columbia's President, Provost, Trustees, and Faculty of Arts and Sciences, just like Columbia College and equivalent to the School of Engineering and Applied Science.[36] This governance structure contrasts with Barnard College, which is independent of, but affiliated with, Columbia.[37]

**ANSWER:**  MIT lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 146 and on that basis denies those allegations.

147.     Columbia's School of General Studies offers an undergraduate degree program for "nontraditional students" who have had a break of one or more year in their studies and for dual- or joint-degree students, who split their time as students between Columbia and other institutions, such as Sciences Po in Paris and Trinity College Dublin.[38] Students in the School of General Studies take the same courses with the same faculty and undertake the same majors as

---

[36] *Compare* COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CHARTERS AND STATUTES (2017), art. XXII (Faculty of General Studies), *with* art. XI (Columbia College), art. XIV (Faculty of Engineering and Applied Science).

[37] *See id.*, art. XXIII.

[38] Columbia School of General Studies, *Dual and Joint Degree Programs*, https://gs.columbia.edu/content/dual-and-joint-degree-programs.

other undergraduates at Columbia. They receive a diploma from Columbia like other undergraduates.

**ANSWER:** MIT lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 147 and on that basis denies those allegations.

148. According to Columbia's website, the School of General Studies comprises more than 2,500 undergraduate students, which is approximately 30% of Columbia's undergraduate student population.[39] In addition, 68% of undergraduates enrolled in the School of General Studies take classes on a full-time basis.[40]

**ANSWER:** MIT lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 148 and on that basis denies those allegations.

149. Columbia concedes that "General Studies admissions are not need-blind."[41] In fact, Columbia has used General Studies to generate revenue that supports other university initiatives, like campus expansions and new scientific research centers. Columbia's Faculty of Arts & Sciences pays a nine-figure "common-cost tax" to the university.[42] But General Studies recruits and enrolls a less wealthy, more socioeconomically diverse student body than Columbia's other undergraduate programs.[43] The burden of supporting Columbia's preservation of prestige and financial accumulation therefore falls on those who can least afford it.

**ANSWER:** MIT lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 149 and on that basis denies those allegations.

150. Accordingly, in failing to conduct need-blind admissions as to applicants for the School of General Studies, Columbia does not qualify for the 568 Exemption.

---

[39] Columbia University, *Fall Headcount Enrollment by School, 2010-2019* (Jan. 13, 2020), https://opir.columbia.edu/sites/default/files/content/Statistical%20Abstract/opir_enrollment_history.pdf.
[40] Columbia School of General Studies, *Statistics and Facts*, https://gs.columbia.edu/content/ statistics-and-facts.
[41] Eli Lee, *Public Health Professor Lisa Rosen-Metsch Appointed Dean of General Studies*, COLUMBIA SPECTATOR (Nov. 14, 2017), https://www.columbiaspectator.com/news/2017/11/14/public-health-professor-lisa-rosen-metsch-appointed-dean-of-general-studies/.
[42] .Michael Ouimette, *Unfunded Mandate: Columbia College, Arts and Sciences, and the Bollinger Era*, COLUMBIA SPECTATOR (May 5, 2016), https://www.columbiaspectator.com/lead/2016/05/05/unfunded-mandate-columbia-college-arts-and-sciences-and-bollinger-era/.
[43] Jessica Spitz, *At a crossroads; The future of GS*, COLUMBIA SPECTATOR (Apr. 20, 2017), https://www.columbiaspectator.com/news/2017/04/20/at-a-crossroads-the-future-of-gs/ ("[T]he population skews older and many are juggling jobs, raising families, and often do not have parents to rely on for tuition money.").

**ANSWER:** MIT lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 150 and on that basis denies those allegations.

151.    In sum, during the period of the conspiracy alleged herein, all Defendants have considered the financial need of waitlisted and transfer applicants, and Columbia has considered the financial need of students applying to the School of General Studies, in deciding whether to admit such students to attend their undergraduate programs on a full-time basis. This conduct extinguishes the 568 Exemption for all members of the 568 Cartel.

**ANSWER:** MIT lacks knowledge or information sufficient to form a belief as to the truth of

allegations in Paragraph 151 regarding Columbia University's School of General Studies and, on

that basis, denies the allegations. MIT denies the remaining allegations in Paragraph 151.

152.    In addition, if any Defendant has not considered the financial circumstances of applicants or their families in making admissions decisions, the fact that other Defendants have done so—and thus that the Cartel includes non-exempt schools with whom otherwise hypothetically compliant schools collude—extinguishes the 568 Exemption for all members of the 568 Cartel. Quite simply, no school is entitled to protection under the Exemption if it colludes or has colluded with any non-need-blind schools.

**ANSWER:** The allegations of Paragraph 152 are legal conclusions to which no response is

required. To the extent a response is required, MIT denies the allegations in Paragraph 152.

### C.    Certain Defendants' Enrollment Management Practices Are Not "Need-Blind"

153.    Among Defendants, at least Dartmouth, Columbia, Northwestern, Notre Dame, and Penn engage in need-aware admissions through "enrollment management."

**ANSWER:** MIT lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 153 and on that basis denies those allegations.

154.    Enrollment management is "the systematic integration of the functions of admissions, the relationship between tuition and fees (pricing) and financial aid, and student retention, along with the use of research to inform institutional policies and practices."[44] It is a "managerial paradigm" that brings together admissions and other institutional functions "into a

---

[44] Don Hossler, *Origins of Strategic Enrollment Management*, in HANDBOOK OF STRATEGIC ENROLLMENT MANAGEMENT 5 (Don Hossler and Bob Bontrager, eds., 2014).

comprehensive institutional approach designed to enable college and university administrators to exert greater influence over the factors that shape their enrollments."[45]

**ANSWER:** MIT admits the existence of a document that currently contains the quoted language

in Paragraph 154, to which document MIT refers the Court for a complete and accurate statement

of its contents. MIT lacks knowledge or information sufficient to form a belief as to the truth of

the allegations in Paragraph 154 and on that basis denies those allegations in all other respects.

155.    One of the key purposes of enrollment management is to limit the number of financial-aid-eligible applicants who are admitted to the institution to achieve financial and budgetary objectives. The effect of these practices is to disadvantage applicants based on their need for institutional financial aid.

**ANSWER:** MIT lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 155 and on that basis denies those allegations.

156.    Econometric modeling is central to enrollment management. As explained by Stephen Brooks, a higher-education consultant whose client list includes Columbia and Penn,[46] models draw on standard elements of college applications—academic ability, geography, demographics, interests, whether the student has requested aid, and more—to assess an applicant's likelihood of enrolling if offered admission.[47] These yield models, in turn, permit schools to forecast the revenue and cost implications of their admissions and financial-aid decisions.[48]

**ANSWER:** MIT lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 156 and on that basis denies those allegations.

157.    One anonymous enrollment manager has said: "Good luck getting any institution to tell you exactly how they handle ability to pay as a driver in their admit decision. . . . What they will say is 'We're need blind.' That's bullshit. They would never tell you exactly how they do it, but they do it all the time."[49]

---

[45] *Id.* at 4, 7-8.

[46] *Our Clients*, SHBrooks, https://www.shbrooks.com/clients.

[47] Stephen H. Brooks, *Using Campus-Based Financial Aid Strategically*, in HANDBOOK OF STRATEGIC ENROLLMENT MANAGEMENT 223-26 (Don Hossler and Bob Bontrager, eds., 2014); Stephen H. Brooks, *Econometric Modeling of Enrollment Behavior*, 26 J. Student Fin. Aid 7, 9-10 (1996).

[48] Brooks, *Using Campus-Based Financial Aid Strategically*, at 226; Brooks, *Econometric Modeling of Enrollment Behavior*, at 16-17.

[49] Matthew Quirk, *The Best Class Money Can Buy*, THE ATLANTIC (Nov. 2005) https://www.theatlantic.com/magazine/archive/2005/11/the-best-class-money-can-buy/304307/.

**ANSWER:** MIT admits the existence of a website that currently contains the quoted language in Paragraph 157, to which website MIT refers the Court for a complete and accurate statement of its contents. MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 157 and on that basis denies those allegations in all other respects.

158.     Indeed, these institutions know their practices are legally problematic, and thus they maintain a shroud of secrecy over them. For instance, author Jeff Selingo asked two dozen colleges or universities for access to their admissions practices. Nearly all refused, some because they were "worried about exposing how they shaped their class based on the financial need of applicants."[50] Selingo also wrote: "Even at need-blind schools, admission eventually can come down to money. Those colleges control how much they spend on financial aid by recruiting heavily in rich high schools and admitting in early decision a significant proportion of students who tend to be wealthier. And even when schools are need-blind, admissions officers still see the zip codes and the occupations of parents when reviewing applications."[51]

**ANSWER:** MIT denies the allegations in the first sentence of Paragraph 158 as they relate to MIT. MIT admits the existence of a document that currently contains the quoted language in Paragraph 158, to which document MIT refers the Court for a complete and accurate statement of its contents. MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 158 and on that basis denies those allegations in all other respects.

159.     In 2015, Dartmouth created the position of Vice Provost for Enrollment Management, announcing that it would permit the university "to use a wealth of newly available data to identify and recruit prospective students."[52] In 2016, Dartmouth announced its hiring of Lee Coffin from Tufts University, a need-aware school.[53] At Tufts, Coffin operated under strict budgetary limits.[54] He shaped the cohort of admitted students to bring revenues and costs in line.

---

[50] Jeffrey Selingo, WHO GETS IN AND WHY: A YEAR INSIDE COLLEGE ADMISSIONS 13 (2020).
[51] *Id.* at 212.
[52] Dartmouth University, Office of Communication, *Search Has Begun for Undergraduate Admissions Leader* (Oct. 29, 2015), https://news.dartmouth.edu/news/2015/10/search-has-begun-undergraduate-admissions-leader.
[53] Bill Platt, *Lee Coffin to Lead Enrollment, Admissions, and Financial Aid*, DARTMOUTH NEWS (Feb. 4, 2016), https://news.dartmouth.edu/news/2016/02/lee-coffin-lead-enrollment-admissions-and-financial-aid.
[54] Carly Olson, *Crunching the Numbers*, TUFTS OBSERVER (Apr. 25, 2016), https://tuftsobserver.org/crunching-the-numbers/ ("My responsibility as Dean is that I can't spend more dollars than Tufts has. They give me a checkbook every year and they say spend all of it, but don't spend

His admissions office sent tentative acceptances to the financial-aid office, which modeled the revenue and cost implications so that the admissions office would meet the university's budgetary goals. As Coffin has acknowledged, "Shifting things at the end . . . happens every year."[55]

**ANSWER:**  MIT admits the existence of websites that currently contain the quoted language in Paragraph 159, to which websites MIT refers the Court for a complete and accurate statement of their contents. MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 159 and on that basis denies those allegations in all other respects.

160.    The President of Northwestern since 2009, Morton Schapiro, has been described as "a dean of 'enrollment management,' the art of shaping an incoming class through recruitment, aid, early admission, waiting lists and other variables."[56] During President Schapiro's tenure, at least, Northwestern has employed enrollment management.

**ANSWER:**  MIT admits the existence of a website that currently contains the quoted language in Paragraph 160, to which website MIT refers the Court for a complete and accurate statement of its contents. MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 160 and on that basis denies those allegations in all other respects.

161.    Notre Dame also employs an "enrollment management model."[57] Announcing in 2010 the hire of its associate vice-president for undergraduate enrollment, Don Bishop, Notre Dame praised his "innovative marketing and financial aid strategies" in prior enrollment-management jobs.[58] Announcing a new Dean of Admissions in 2019, Notre Dame touted her status as "a featured presenter at national enrollment management conferences and events."[59] In addition,

---

more than that."); *see also id.* ("This year, Coffin said admissions had $19.7 million and 1,325 spots to consider when making their decisions.").

[55] *Id.*

[56] Daniel de Vise, *Northwestern now a first choice to many, its president says*, THE WASHINGTON POST (Apr. 14, 2011), https://www.washingtonpost.com/blogs/college-inc/post/schapiro-northwestern-now-a-first-choice-to-many/2011/04/13/AFSXTacD_blog.html.

[57] Jordan Cockrum and Natalie Weber, *Notre Dame, SMC communities evaluate opportunities, efforts for low socioeconomic students*, THE OBSERVER (Apr. 30, 2018), https://ndsmcobserver.com/2018/04/efforts-low-socioeconomic-students/.

[58] Dennis Brown, *Notre Dame alumnus Bishop appointed associate VP for undergraduate enrollment*, NOTRE DAME NEWS (Sept. 15, 2010), https://news.nd.edu/news/notre-dame-alumnus-bishop-appointed-associate-vp-for-undergraduate-enrollment/.

[59] Joyce Lance, *Christy Pratt appointed director of admissions*, NOTRE DAME NEWS (July 1, 2019), https://news.nd.edu/news/christy-pratt-appointed-director-of-admissions/.

Notre Dame has a partnership with a software company that develops data-visualization tools, touting "improved scenario analyses on all data associated with an applicant or prospective enrollee."[60] Notre Dame is thus using data analysis to shape need-aware admissions decisions.

**ANSWER:** MIT lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 161 and on that basis denies those allegations.

162.     Columbia's, Dartmouth's, Northwestern's, Notre Dame's, and Penn's use of enrollment management thus involves the resolution of admissions decisions with regard to the financial circumstances of the applicant or their family, in that such management (i) identifies relatively wealthy students, for the benefits (direct and indirect) that the school expects from their admission, and (ii) identifies relatively less wealthy students in order to limit the total amount of financial aid—and then acts upon that information to meet budgetary goals.

**ANSWER:** MIT lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 162 and on that basis denies those allegations.

> **D.     Many Defendants Consider Family Financial Circumstances in Giving Preference to the Children of Wealthy Past or Potential Donors, and Thus Do Not Adhere to a Need-Blind Admissions Policy**

163.     Many Defendants consider applicants' "financial circumstances" through admissions preferences given to the children of wealthy past or potential donors, such that their chances of admission increase significantly. Such Defendants understand that these applicants— commonly known as "development cases" or "development admits"—have no need for financial aid and that their admission could generate a substantial financial return for the university.

**ANSWER:** MIT denies the allegations in Paragraph 163 as they relate to MIT. MIT lacks

knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph

163 as they relate to any other Defendant and on that basis denies those allegations. MIT denies

the allegations in Paragraph 163 in all other respects.

164.     Consequently, the development offices of such Defendants analyze and monitor these applicants and coordinate with the university presidents or admissions offices during the admissions cycle. In short, awarding special treatment to the children of wealthy prior and

---

[60] Leila Meyer, *U Notre Dame, SynGlyphX Partner on Enrollment Data Visualization Tool*, CAMPUS TECH. (Jan. 13, 2016), https://campustechnology.com/articles/2016/01/13/u-notre-dame-synglyphx-partner-on-enrollment-data-visualization-tool.aspx?admgarea=news.

potential donors necessarily means some less privileged applicants are not admitted on account of their financial circumstances to make room for the wealthy.

**ANSWER:**  MIT denies the allegations in Paragraph 164 as they relate to MIT. MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 164 as they relate to any other Defendant and on that basis denies those allegations. MIT denies the allegations in Paragraph 164 in all other respects.

165.     Many Defendants also consider large donations, and even financial capacity in the absence of any donation history, as plus factors for admission. Assessing potential donations of an applicant's family necessarily involves considering the income, assets, and other financial circumstances of that family. Similarly, considering a family's past donations, pursuant to the agreement of the 568 Cartel, constitutes the consideration of family financial circumstances.

**ANSWER:**  MIT denies the allegations in Paragraph 165 as they relate to MIT. MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 165 as they relate to any other Defendant and on that basis denies those allegations. MIT denies the allegations in Paragraph 165 in all other respects.

166.     In considering the wealth and donation history of certain students and their families, moreover, such Defendants implicitly consider less privileged applicants' lack thereof. Because of the limited number of spots available in any given class, the advantage given to one group entails a disadvantage imposed on the other. Privileging the wealthy and disadvantaging the financially needy are inextricably linked; they are two sides of the same coin.

**ANSWER:**  MIT denies the allegations in Paragraph 166 as they relate to MIT. MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 166 as they relate to any other Defendant and on that basis denies those allegations. MIT denies the allegations in Paragraph 166 in all other respects.

167.     In addition, such Defendants are committed to maintaining admissions as a zero-sum game, by limiting growth in the number of undergraduate seats to maximize perceptions of exclusivity and prestige. Defendants' presidents and senior admissions and development officers know that the other Defendants routinely favor children from wealthy families and thereby fail to admit all students without regard to their financial circumstances or that of their families.

**ANSWER:** MIT denies the allegations in Paragraph 167 as they relate to MIT. MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 167 as they relate to any other Defendant and on that basis denies those allegations. MIT denies the allegations in Paragraph 167 in all other respects.

168.    Darrell M. West, a professor at Brown from 2000-2008, has stated: "When I taught at Brown, I periodically was asked to meet with children of the rich and famous who were seeking admission to the university. I did so and wrote letters to the admissions office giving my impressions of the applicant. The university claims there was no pressure to admit well-connected individuals, but it was clear to me Brown thrived on its reputation as a 'hot Ivy' that had lots of prominent students there. It admitted many well-deserving and talented students, but many on the faculty recognized the university's interest in having children of prominent individuals on campus because it generated publicity for Brown and sometimes paid off down the road in financial contributions to the university. Looking back on these experiences, I can see that wealthy students had admissions advantages over the average applicant because the latter were not getting one-on-one meetings with faculty members or special consideration by the admissions office."[61]

**ANSWER:** MIT admits the existence of a website that currently contains the quoted language in Paragraph 168, to which website MIT refers the Court for a complete and accurate statement of its contents. MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 168 and on that basis denies those allegations in all other respects.

169.    A former Dean of Admissions at Dartmouth, Maria Laskaris, said in 2019: "The ultra-rich have an additional advantage in their ability to donate large sums of money to universities, which can boost their kids' chances of acceptance." According to Laskaris, admissions officers are "made aware of" this factor because "colleges are always in fundraising mode."[62] At Dartmouth, development officers meet with admissions staff to review a list created by the development office. Each year, up to 50 applicants may be considered through this special process, most of whom are admitted, accounting for 4-5% of Dartmouth's student body.[63]

---

[61] Scott Jaschik, *Advantages for Legacies and Wealthy at Brown*, INSIDER HIGHER ED (Mar. 25, 2019), https://www.insidehighered.com/admissions/article/2019/03/25/brown-faces-questions-about-benefits-it-has-provided-legacy-applicants.

[62] Jill Tucker, *In the College Admissions Game, Even the Legal Kind, Money Has Always Mattered*, SAN FRANCISCO CHRON. (Mar. 12, 2019), https://www.sfchronicle.com/bayarea/article/In-the-college-admissions-game-even-the-legal-13683518.php.

[63] Joseph Asch, *Donor Admissions: How It Works Now*, DARTBLOG (Sept. 29, 2014), http://www.dartblog.com/data/2014/09/011686.php.

**ANSWER:** MIT lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 169 and on that basis denies those allegations.

170.    An email exchange exposed by the Sony hack in 2014 illustrates Dartmouth's efforts to evaluate and court wealthy potential donors.[64] Michael Lynton, CEO of Sony Pictures Entertainment, intended to visit Dartmouth with his daughter, a prospective student. Michael Lynton is not an alumnus of Dartmouth, and public records have not shown that Lynton had previously donated to Dartmouth. On the eve of his visit, Lynton received a solicitous email from Jeff Sassorossi, a 1975 Dartmouth graduate and then Dartmouth's "Director, Special Projects & Reporting." Sassorossi explained that his role at Dartmouth was "to serve as the liaison between the Advancement (Alumni Relations and Development) and Admissions. As such, I work with families as they go through the admissions process at Dartmouth." Sassorossi offered Lynton and his daughter a personal tour of the campus. Sassorossi's email also indicated that Lynton was being recruited to Dartmouth by Leon Black, a billionaire private equity investor, major Dartmouth benefactor, and former trustee.[65]

**ANSWER:** MIT admits the existence of websites that currently contain language substantially

similar to the quoted language in Paragraph 170, to which websites MIT refers the Court for a

complete and accurate statement of their contents. MIT lacks knowledge or information sufficient

to form a belief as to the truth of the allegations in Paragraph 170 and on that basis denies those

allegations in all other respects.

171.    Despite these entreaties, Lynton's daughter enrolled at Brown, which got the $1 million donation from Lynton instead of Dartmouth.[66] The opinion editor for the *Brown Daily Herald* described Lynton's gift to Brown as "a $1 million check to Brown with more strings attached than the Los Angeles Philharmonic. Anyone with a pulse can trace the probable outcome of this 'philanthropy'—a prospective student connected to Lynton gets accepted to Brown!"[67]

---

[64] *See* Joseph Asch, *VIP Donor Preferences Cont'd*, DARTBLOG (Feb. 4, 2016), http://www.dartblog.com/data/2016/02/012467.php; Email from Jeff T. Sassorossi to Michael Lynton, Re: Dartmouth College Visit (Mar. 28. 2014), https://wikileaks.org/sony/emails/emailid/132718.
[65] *See* Peter Lattman, *Apollo's Leon Black Donates $48 Million to Dartmouth*, N.Y. TIMES DEALBOOK (Mar. 29, 2012), https://dealbook.nytimes.com/2012/03/29/apollos-leon-black-donates-48-million-to-dartmouth; Office of Communications, Dartmouth University, *Dartmouth Board Elects Three New Charter Trustees*, DARTMOUTH NEWS (June 13, 2011) (announcing Black was stepping down after two terms as trustee), https://news.dartmouth.edu/news/2011/06/dartmouth-board-elects-three-new-charter-trustees.
[66] Chad Simon, *Simon '16: Pimp My University*, BROWN DAILY HERALD (Oct. 21, 2015), https://www.browndailyherald.com/2015/10/21/simon-16-pimp-my-university/.
[67] *Id.*

**ANSWER:** MIT admits the existence of a website that currently contains the quoted language in Paragraph 171, to which website MIT refers the Court for a complete and accurate statement of its contents. MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 171 and on that basis denies those allegations in all other respects.

172. According to journalist Daniel Golden's book The Price of Admission, Defendant Duke "enrolled thousands of privileged but underqualified applicants with no prior ties to the university in the expectation of parental payback."[68] According to Golden, Duke "accepted at least one hundred nonalumni children each year due to family wealth."[69] In some years, between 3-5% of Duke's student body consists of students "who would have been turned away without pressure from the development office."[70]

**ANSWER:** MIT admits the existence of a document that currently contains the quoted language in Paragraph 172, to which document MIT refers the Court for a complete and accurate statement of its contents. MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 172 and on that basis denies those allegations in all other respects.

173. While serving as president of Duke, Richard Brodhead admitted that "it would be naïve to say that any university should pay no attention to a family's ability to help the university," explaining that a family's ability to donate to Duke was a "plus factor" in admissions."[71] A former Director of Undergraduate Admissions at Duke, Jean Scott, estimated that "a couple of hundred" applicants a year received special attention as children of prospective donors. Scott admitted that there "were certainly students who got in because they were a high priority" for fundraising. Scott also said that there "was more of this [fundraising-related] input at Duke than at any other institution I ever worked for."[72]

**ANSWER:** MIT admits the existence of websites that currently contain the quoted language in the first and fourth sentences of Paragraph 173, to which websites MIT refers the Court for a complete and accurate statement of their contents. MIT lacks knowledge or information sufficient

---

[68] Daniel Golden, THE PRICE OF ADMISSION 54 (2006).

[69] *Id.*

[70] *Id.* at 57.

[71] Geoffrey Mock, *Brodhead Discusses Early Admissions, Developmental Admits*, DUKE TODAY (Sept. 22, 2006), https://today.duke.edu/2006/09/admit.html.

[72] Daniel Golden, *How Lowering the Bar Helps Colleges Prosper*, WALL ST. J. (Sept. 9, 2006), https://www.wsj.com/articles/SB115774251817757837.

to form a belief as to the truth of the allegations in Paragraph 173 and on that basis denies those

allegations in all other respects.

174.    The longstanding Dean of Admissions for Georgetown, Charles Deacon, was asked by a reporter: "What about children of alumni and *potential* donors?" (Emphasis added.) In response, Dean Deacon candidly admitted: "On the fundraising side, we also have a small number of 'development *potential*' candidates. If Bill Gates wants his kid to come to Georgetown, we'd be more than happy to have him come and talk to us." (Emphasis added.) Dean Deacon continued to point out that "not all those special cases end up being people who give a lot of money. We have children of Supreme Court justices, senators, and so on apply. We may give extra consideration to them because of the opportunities that may bring."[73]

**ANSWER:**  MIT admits the existence of a website that currently contains the quoted language in

Paragraph 174, to which website MIT refers the Court for a complete and accurate statement of its

contents. MIT lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 174 and on that basis denies those allegations in all other respects.

175.    In short, Georgetown admits a range of students based on their families' wealth, prestige, and influence. Some of these students are given "extra consideration" based on their parents' influence or political power, without any expectation of a financial contribution. On the other hand, some are given "extra consideration" on the basis of their "development potential"— namely, the ability of the family to make a financial contribution to the institution, and the likelihood that it will do so.

**ANSWER:**  MIT lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 175 and on that basis denies those allegations.

176.    Indeed, Dean Deacon has also candidly admitted that Georgetown favors past donors, as well as potential donors, and has even admitted that Georgetown calibrates the extent of the admissions advantage to the size of the donation: "If you were very close to the edge and the family's given to the annual fund every year or something, that might be enough of a tip to get you in. If you're a little farther from the edge, but the family has built Regents Hall, that might tip a little farther."[74]

---

[73] Alvin P. Sanoff, *Getting in to Top Schools*, WASHINGTONIAN (Oct. 1, 2007), https://www.washingtonian.com/2007/10/01/getting-in-to-top-schools/.

[74] Suzanne Monyak, *Legacy Status Tips Admission*, THE HOYA (Mar. 20, 2015), https://thehoya.com/legacy-status-tips-admission-scales/.

**ANSWER:** MIT admits the existence of a website that currently contains the quoted language in Paragraph 176, to which website MIT refers the Court for a complete and accurate statement of its contents. MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 176 and on that basis denies those allegations in all other respects.

177.    A former Director of Selection at MIT, McGreggor Crowley, admitted in March 2019: "In truth, for every office of admissions there is a development office that builds a university's endowment through donations from alumni and wealthy individuals. And every year, regardless of what a college or university says publicly, a number of children of wealthy donors and alumni get a nod in their direction while other applicants are rejected."[75] In an interview with NBC News, Crowley admitted that "as for the children of prominent campus donors, . . . a college's development office might reach out to the dean of admissions to say, 'Hey, just so you know, Lisa's dad has been very generous to us in the past, or something.'" NBC News reported that according to Crowley: "Usually, that kind of information [about a family's financial contribution] is relayed to the most senior officials in an admissions office."[76]

**ANSWER:** MIT admits that McGreggor Crowley was MIT's Associate Director of Admissions, Director of Selection, from 2008 to 2012. MIT admits the existence of news articles currently containing portions of the quoted language attributed to McGreggor Crowley that were purportedly made after he left MIT, to which articles MIT refers the Court for a complete and accurate statement of their contents. MIT denies the allegations in Paragraph 177 in all other respects.

178.    At Northwestern, a separate admissions process exists for the wealthy and well connected. On April 24, 2019, *The Daily Northwestern* published an article with the headline: "Northwestern President Schapiro Says He Reads Applications of Some Legacy, Donor Students." As revealed in the article, in the 2018-19 admissions cycle, Schapiro personally reviewed the applications of about 550 students, including applications associated with wealthy donors. A Northwestern spokeswoman has further admitted that President Schapiro was "frequently involved in dealing with principal donors to the University."[77]

---

[75] McGreggor Crowley, *Confessions of a Former MIT Admissions Director*, BOSTON GLOBE (Mar. 13, 2019), https://www.bostonglobe.com/opinion/editorials/2019/03/13/confessions-former-admissions-director/qPQppf0AhpJIbIJ8mZ6q9L/story.html.

[76] Daniel Arkin, *The College Admissions Scandal is Just the Extreme Version of a System that Already Favors the Wealthy*, NBC, https://www.nbcnews.com/news/us-news/college-cheating-scandal-two-ex-admissions-officers-explain-behind-scenes-n983796.

[77] Alan Perez and Gabby Birenbaum, *Northwestern President Schapiro Says He Reads Applications of*

**ANSWER:** MIT admits the existence of a website that currently contains the quoted language in Paragraph 178, to which website MIT refers the Court for a complete and accurate statement of its contents. MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 178 and on that basis denies those allegations in all other respects.

179. One of the student reporters who broke the story about Northwestern's two-track admissions system later stated in a podcast interview: "[President Schapiro] also told us that he tries to work with the Dean of Admissions Christopher Watson, as much as he can. He brought up an example that if they both disagreed on an applicant that they try to work it out."[78] President Schapiro is the boss at Northwestern, and the Dean of Admissions reports to him. The head of the university is using his discretion to make or influence numerous admissions decisions. Schapiro's involvement in admissions decisions for applicants associated with wealthy donors was not public until revealed by reporting in 2019.

**ANSWER:** MIT admits the existence of a website that currently contains the quoted language in Paragraph 179, to which website MIT refers the Court for a complete and accurate statement of its contents. MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 179 and on that basis denies those allegations in all other respects.

180. The Director of Admissions at Notre Dame for thirty-six years until his retirement in July 2019, Bob Mundy, made appearances at alumni gatherings during his tenure in office. Mundy's biography at these appearances stated: "In his current position as Director of Admissions Operations, he oversees the 35 members of staff, and recruitment efforts that have included as many as 40,000 annual inquiries and a record-setting 16,500 applications for the 2011 class. Ultimately, the office is responsible for 'delivering' a freshmen class of approximately 2,000 students, while also satisfying the needs of various constituencies: i.e. alumni, athletics, *the Development Office*, etc." (Emphasis added.)

**ANSWER:** MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 180 and on that basis denies those allegations.

---

*Some Legacy, Donor Students*, THE DAILY NORTHWESTERN (Apr. 24, 2019), https://dailynorthwestern.com/2019/04/24/campus/northwestern-president-schapiro-says-he-reads-applications-of-some-legacy-donor-students/?print=true.
[78] Cassidy Jackson and Heena Srivastava, *The Weekly: University President Morton Schapiro Reveals Role in Admissions Process*, THE DAILY NORTHWESTERN (May 3, 2019), https://dailynorthwestern.com/2019/05/03/multimedia/audio/the-weekly-university-president-morton-schapiro-reveals-role-in-admissions-process/.

181.     The current Associate Vice Provost for Undergraduate Enrollment at Notre Dame, Don Bishop, acknowledged the significant influence that donations play in the Notre Dame admissions process. Indeed, he admitted that if someone gave $15 million, then their children would be given "some special interest" during the Notre Dame admissions process.[79]

**ANSWER:**  MIT lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 181 and on that basis denies those allegations.

182.     Penn also tracks past and potential donors, rewarding past donors and enticing potential donors by admitting their children. A former Associate Dean of Admissions, Sara Harberson, has described the university's use of "tags" to track applicants that are "a high priority for the institution." Penn tags the applications of "children of donors or potential donors," among others, giving those applicants "the proverbial golden ticket."[80] The university has "spots reserved" for these "development cases," whose "parents have already given significant money to the institution, or plan to."[81]

**ANSWER:**  MIT admits the existence of websites that currently contain the quoted language in

Paragraph 182, to which websites MIT refers the Court for a complete and accurate statement of

their contents. MIT lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 182 and on that basis denies those allegations in all other respects.

183.     A past President of Vanderbilt, E. Gordon Gee, stated in 2019 that any president under "truth serum" would concede that donor connections make a difference in admissions.[82]

**ANSWER:**  MIT admits the existence of a website that currently contains the quoted language in

Paragraph 183, to which website MIT refers the Court for a complete and accurate statement of its

---

[79] Daniel Golden, *How Wealthy Families Manipulate Admissions at Elite Universities*, TOWN & COUNTRY (Nov. 21, 2016), https://www.townandcountrymag.com/society/money-and-power/news/a8718/daniel-golden-college-admission/.
[80] Sarah Harberson, *The Truth about 'Holistic" College Admissions*, LOS ANGELES TIMES (June 9, 2015), https://www.latimes.com/opinion/op-ed/la-oe-harberson-asian-american-admission-rates-20150609-story.html.
[81] Vice News, *How Broken the College Admissions Process Is*, YOUTUBE (Mar. 13, 2019) (Harberson quoted at 5:20), https://www.youtube.com/watch?v=0v5yHnWCiLE&feature=emb_logo.
[82] Jack Stripling, *It's an Aristocracy: What the Admissions-Bribery Scandal Has Exposed About Class on Campus*, THE CHRONICLE OF HIGHER EDUCATION (Apr. 17, 2019), https://www.chronicle.com /article/its-an-aristocracy-what-the-admissions-bribery-scandal-has-exposed-about-class-on-campus/?cid2=gen_login_refresh&cid=gen_sign_in.

contents. MIT lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 183 and on that basis denies those allegations in all other respects.

184. Defendants may independently choose to favor the children of the wealthy if they like, thereby disfavoring every other applicant. But if they make that choice, they cannot lawfully conspire on financial-aid policies. The law does not allow them to do both. Defendants must choose between continuing their wealth favoritism and need-aware admissions practices, on the one hand, and participation in the lucrative 568 Cartel, on the other.

**ANSWER:** The allegations in Paragraph 184 are legal conclusions to which no response is

required. To the extent a response is required, MIT denies the allegations in Paragraph 184.

> E. **The Section 568 Exemption Applies Only to a Group of Schools That All Employ "Need-Blind" Admissions Policies Within the Term's Statutory Meaning**

185. The 568 Exemption, as noted, precludes any school invoking it from taking account of "the financial circumstances" of a student or their family in making admissions decisions. Under the well-established rules of statutory construction, any contrary interpretation of the text of the 568 Exemption would be impermissible speculation as to Congress's intent—in particular, where any antitrust exemption is construed narrowly (with what courts have described as "beady eyes and green eyeshades"). Just as fundamental, the evidence of the purpose and overarching goal of the 568 Exemption, as reflected in its legislative history, compels this interpretation of the plain meaning of "need-blind" as defined in the statute.

**ANSWER:** The allegations in Paragraph 185 are legal conclusions to which no response is

required. To the extent a response is required, MIT denies the allegations in Paragraph 185.

186. The 568 Exemption replaced what had been a general temporary antitrust exemption. The 1994 legislative history of the enactment of Section 568 explains in relevant part: "This provision extends for an additional three years the temporary antitrust exemption for certain collegiate financial aid award analysis, which was originally enacted with the Higher Education Amendments of 1992 as a two-year exemption." H.R. Conf. Rep. 103-761, 911-12, 1994 U.S.C.C.A.N. 2901, 3242-43. This report explained that, as noted above, Section 568 is modeled on the MIT-DOJ settlement: "The temporary exemption has also been revised in light of the 'standards of conduct' adopted as part of the settlement of the antitrust action between the Department of Justice and Massachusetts Institute of Technology in the case of *United States v. Brown University, et al.*, Civ. Action No. 91-3274 (E.D. Pa.), on December 22, 1993." *Id.*

**ANSWER:** MIT admits that the 568 Exemption replaced a temporary antitrust exemption and

that the quoted language appears in the legislative history of the enactment of the 568 Exemption,

to which MIT refers the Court for a complete and accurate statement of its contents. MIT admits

that Section 568 is modeled on the settlement reached between MIT and the Department of Justice

but denies the allegations in the last sentence of Paragraph 186 in all other respects. The remaining

allegations in Paragraph 186 are legal conclusions to which no response is required. To the extent

a response is required, MIT denies the allegations in Paragraph 186 in all other respects.

187.     The referenced "standards of conduct" provided in relevant part: "Non-profit institutions
of higher education may participate in the cooperative financial aid arrangements set forth below
('Participating Schools'), provided that they practice need-blind admissions; that is, admit all
United States citizens to its undergraduate programs without regard to family financial
circumstances, other than admitted from a wait list." This legislative history thus makes clear
that Section 568's language tracks the language in the "standards of conduct" precluding
admissions with regard to "family financial circumstances."

**ANSWER:**  MIT admits that the MIT Standards of Conduct contains the quoted language, to

which MIT refers the Court for a complete and accurate statement of its contents. The allegations

in Paragraph 187 are legal conclusions to which no response is required. To the extent a response

is required, MIT denies the allegations in Paragraph 187.

188.     This legislative history further states that the 568 Exemption "applies only to institutions
of higher education that admit students on a need-blind basis. The definition of 'on a need-blind
basis' in subsection (c)(6) is based on language in the 'standards of conduct' adopted in the MIT
settlement. However, there is one conspicuous difference between the statutory language and the
MIT standards of conduct: the statute deletes the phrase 'other than admitted from a wait list.'
*See also United States v. Brown University*, 5 F.3d 658 (1993)." H.R. Conf. Rep. 103-761, 911-
12, 1994 U.S.C.C.A.N. 2901, 3242-43. This conference report further states:

> The managers have decided against elaborating on the need-blind
> admissions standard in the statutory text. As should be obvious,
> however, evidence of a practice among admissions personnel at an
> institution of higher education of examining, discussing, or
> otherwise considering information relating to a student's financial
> circumstances that is derived from such student's financial aid
> application form, *or from any other document or record obtained*
> *for the purpose of ascertaining such financial circumstances*,
> before the decision is made regarding the student's admission will
> substantially increase the institution's burden of demonstrating that
> the school's admissions policy is truly need-blind.

*Id.* (emphasis added). The report then specifies: "Prudence would counsel that schools wishing to make use of this provision *insulate their admissions, process and admissions personnel as completely as possible from such student financial aid information, until after the admissions process is complete." Id.* (emphasis added). Consistent with the statute, no exception is made for applicants on the institution's waitlists.

**ANSWER:** MIT admits that the quoted language appears in the legislative history of the enactment of the 568 Exemption, to which MIT refers the Court for a complete and accurate statement of its contents. The allegations in Paragraph 188 are legal conclusions to which no response is required. To the extent a response is required, MIT denies the allegations in Paragraph 188.

189.    This aspect of the legislative history thus reflects Congress's intent that a "truly need-blind" admissions policy would not permit a school invoking the 568 Exemption to use the information that the 568 Cartel has used and continues to use to consider the financial circumstances of an applicant's family for admissions purposes—including (i) the common application (which asks questions about the parents' occupation for the purpose, at least in part, of ascertaining the financial circumstances of the applicant and their family); (ii) emails between development and admissions, as well as any "tags" that admissions uses to flag development prospects, obtained for the purpose of ascertaining the financial circumstances of the applicant and their family; (iii) any documents that admissions receives identifying one or both parents as donors, or regarding donation history, or identifying one or both parents as alumni; and (iv) the information integral to enrollment management.

**ANSWER:** The allegations in Paragraph 189 are legal conclusions to which no response is required. To the extent a response is required, MIT denies the allegations in Paragraph 189.

190.    The 2001 legislative history to the renewal of the 568 Exemption further confirms the following congressional goal and purpose: "No student who is otherwise qualified ought to be denied the opportunity to go to one of the nation's most prestigious schools because of the financial situation of his or her family." Report to Accompany H.R. 768, House of the Judiciary, *Need-Based Educational Aid Act of 2001* (Apr. 3, 2001). An admissions policy that admits certain students based on their wealth, in a zero-sum admissions arrangement, necessarily denies admission to at least some students "because of the financial situation of his or her family."

**ANSWER:** MIT admits that the quoted language appears in the legislative history of the renewal of the 568 Exemption, to which MIT refers the Court for a complete and accurate statement of its

contents. The allegations in Paragraph 190 are legal conclusions to which no response is required.

To the extent a response is required, MIT denies the allegations in Paragraph 190.

191.     In a separate part of the 2001 legislative history, Senator Barney Frank, one of the sponsors of the legislation, referenced that it arose out of litigation regarding the Overlap Group (discussed above), and a practice in which "these schools strive to achieve what they call a needs-based admission policy," and "what it meant was that they strove to admit young men and women *based on their ability to do the work of that school*." Statement of Barnie Frank, Need-Based Educational Aid Act of 2001, 147 Cong. Rec. H1360-02, 2001 WL 321629 (Apr. 3, 2001) (emphasis added). An admissions policy that admits certain students based on their wealth as a relevant factor does not admit those students "based on their ability to do the work of that school."

**ANSWER:**  MIT admits that the quoted language appears in the legislative history of the renewal

of the 568 Exemption, to which MIT refers the Court for a complete and accurate statement of its

contents. The allegations in Paragraph 191 are legal conclusions to which no response is required.

To the extent a response is required, MIT denies the allegations in Paragraph 191.

192.     In sum, the scope of the 568 Exemption is rooted in the plain language of the statutory text, and in the statute's legislative history, which shows that the statute's plain text furthers the statute's purposes.

**ANSWER:**  The allegations in Paragraph 192 are legal conclusions that do not require a response.

To the extent a response is required, MIT denies the allegations in Paragraph 192.

## VIII.   DEFENDANTS' CONTINUING VIOLATIONS OF THE ANTITRUST LAWS, AND THE ACCRUAL OF PLAINTIFFS' CLAIMS THEREUNDER

### A.     Defendants' Continuing Violations of the Antitrust Laws

193.     Defendants' violations of the Sherman Act occurred each time any Defendant engaged in conduct in furtherance of the 568 Cartel that harmed Plaintiffs and other Class Members. In the context of Defendants' price-fixing conspiracy, such conduct and violations occurred each time Defendants have exchanged private or confidential information about admissions and/or financial aid, or met to fine-tune their Cartel agreement, and upon each transaction with any Class Member at an artificially inflated net price of attendance.

**ANSWER:**  MIT denies the allegations in Paragraph 193.

194.     Defendants have engaged in continuing violations of the Sherman Act. The 568 Cartel has met at least annually since 2003 to discuss and fine-tune their Cartel agreement, and Class

Members have paid artificially high net prices to attend Defendants' schools since that time and continuing through the present as a result of the conduct alleged herein.[83]

**ANSWER:**  MIT denies the allegations in Paragraph 194.

### B.    The Accrual of Plaintiffs' Claims Under the Discovery Rule

195.    Until the last two years, Plaintiffs in fact did not know (a) the extent to which Defendants had failed to admit all successful applicants without regard to the financial circumstances of the student or the student's family, in violation of the 568 Exemption, or (b) that Defendants' use of the Consensus Methodology has disadvantaged and in fact caused financial injury to the Class Members.

**ANSWER:**  MIT lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 195 regarding Plaintiffs' knowledge and on that basis denies those

allegations. MIT denies the remaining allegations in Paragraph 195.

196.    Until the last two years, moreover, a person exercising reasonable diligence could not have discovered (a) the extent to which Defendants had failed to admit all successful applicants without regard to the financial circumstances of the student or the student's family, in violation of the 568 Exemption, or (b) that Defendants' use of the Consensus Methodology has disadvantaged and in fact caused financial injury to the Class Members.

**ANSWER:**  MIT denies the allegations in Paragraph 196.

197.    In commenting on the larger implications of Plaintiffs' claims, for example, the editorial board of Emory's student newspaper candidly observed: "Financial aid is confusing enough without elite universities colluding to shirk students out of necessary assistance."[84]

**ANSWER:**  MIT admits the existence of a website that currently contains the quoted language in

Paragraph 197, to which website MIT refers the Court for a complete and accurate statement of its

---

[83] In terms of formal membership, as noted above, Brown and Emory claim to have stopped active participation in the 568 Cartel in 2012; Chicago claims to have stopped active participation in 2014; and Penn and Vanderbilt claimed to have stopped active participation it in 2020. Some institutions have attended meetings of the 568 Cartel and exchanged information with the Cartel without being formal members, including certain institutions that never formally joined. (Plaintiffs reserve the right to name such institutions as defendants based on discovery in this case.)

[84] The Editorial Board, "Students demand compensation and transparency in wake of universities' alleged price-fixing," THE EMORY WHEEL (Jan. 19, 2022), https://emorywheel.com/students-demand-compensation-and-transparency-in-wake-of-universities-alleged-price-fixing/.

contents. MIT lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 197 and on that basis denies those allegations in all other respects.

198.     In addition, a person exercising reasonable diligence could not have discovered the
violations of the 568 Exemption and the concomitant antitrust injury at issue, in part because
Defendants have made numerous incomplete and misleading statements that prevented a
reasonable person from discovering those violations and the resulting injury.

**ANSWER:**  MIT denies the allegations in Paragraph 198.

199.     Defendants have publicly stated and advertised, incompletely and misleadingly, that they
admit students on a need-blind basis; indeed, Defendants have continually claimed to be need-
blind in thousands of internet, marketing, and admissions materials and brochures.

**ANSWER:**  MIT admits that it has publicly stated that it admits students on a need-blind basis.

MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations as

they apply to other Defendants in Paragraph 199 and on that basis denies those allegations. MIT

denies the allegations in Paragraph 199 in all other respects.

200.     Defendants and the other members of the 568 Cartel have maintained a website for the
Cartel. The first words printed on the homepage of this website have been: "What is the 568
Presidents Group? 568 Presidents Group is an affiliation of colleges and universities, all of
which must admit students on a need-blind basis." Under an FAQ on the same website, the 568
Cartel has made the following misleading claim: "It is referred to as a 'Presidents' group because
it was formed by a group of 28 college and university presidents from need-blind schools in
1998."

**ANSWER:**  MIT admits that the 568 Presidents Group has a website and admits the existence of

a website currently containing the quoted language, to which website MIT refers the Court for a

complete and accurate statement of its contents. MIT denies the allegations in Paragraph 200 in all

other respects.

201.     Defendants have also individually made similarly misleading statements, including on
websites, during the period of the conspiracy alleged herein. Such Defendants have further
misrepresented, as shown below, that they are "need-blind," within the meaning of that term
under the law, when they are not "need-blind" within the meaning of that term under the law.

**ANSWER:** MIT admits that it has publicly stated that it admits students on a need-blind basis. MIT denies the allegations in Paragraph 201 as they relate to MIT. MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations as it applies to other Defendants in Paragraph 201 and on that basis denies those allegations. MIT denies the allegations in Paragraph 201 in all other respects.

202.     The website for Columbia has stated and continues to state: "Admission to Columbia is need-blind for US Citizens and Eligible Noncitizens, meaning the Office of Undergraduate Admissions considers your application without regard to your financial need." Whether or not Columbia considers each application without regard to the student's financial need, this notion of need-blindness is not consistent with the statutory definition that prohibits Columbia (so long as it participates in the 568 Cartel) from considering either financial need or financial wealth. Columbia's redefinition of "need-blind" is not consistent with the statute. A university's promise to disregard financial need is meaningless if the institution privileges wealth.

**ANSWER:** MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations of the first three sentences in Paragraph 202 and on that basis denies those allegations. MIT denies the allegations in Paragraph 202 in all other respects.

203.     Other Defendants that have not followed a need-blind admissions policy have also engaged in definitional contortions. Dartmouth's website, for example, has contained and continues to contain a glossary of admissions-related terms. As redefined by Dartmouth, an admissions decision is "need-blind" so long as it is not made with "knowledge of an applicant's financial need." If Dartmouth does make admissions decisions without knowledge of an applicant's financial need, this is nevertheless insufficient for compliance with Section 568, which requires that all students be admitted without regard to the financial circumstances of the students or their families. Under Section 568, Dartmouth is not allowed to make admissions decisions with knowledge and on the basis that, an applicant has financial need, or does not have financial need, or is rich, or any other financial circumstance.

**ANSWER:** MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 203 and on that basis denies those allegations.

204.     Duke's website has also employed and continues to employ its own definitions, claiming that its "admissions policy is 'need-blind,' which means that applicants are accepted based on their merit, regardless of their ability to pay for college." Duke's redefinition does not mention whether *all* students "are accepted based on their merit, regardless of" their ability to donate money to Duke. In reality, not all students are admitted to Duke based on merit.

**ANSWER:** MIT lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 204 and on that basis denies those allegations.

205.    MIT's website also has provided and continues to provide a glossary of admissions-related terms. As redefined by MIT, "need-blind" means that "[p]rospective students are not disadvantaged in the undergraduate admissions process because of their financial need." MIT's redefinition is contrary to the statutory meaning of "need-blind basis" and constitutes an admission that MIT considers the financial circumstances of certain applicants.

**ANSWER:** MIT admits that its website provides a glossary of student financial services-related

terms. MIT admits the existence of a website currently containing the quoted language, to which

website MIT refers the Court for a complete and accurate statement of its contents. MIT denies

the allegations in Paragraph 205 in all other respects.

206.    Northwestern's website has claimed and continues to claim that it "has a need-blind admissions policy for U.S. citizens and permanent residents; this means that financial aid is not a factor in determining admission. Applicants are encouraged to apply for financial aid." Northwestern's redefinition of "need-blind basis" is also contrary to the statutory definition and constitutes a further admission that Northwestern fails to conduct admissions without regard to the financial circumstances of all applicants and their families.

**ANSWER:** MIT lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 206 and on that basis denies those allegations.

207.    Penn's website has claimed and continues to claim another misleading definition of "need-blind": "Our need-blind policy means that your ability to pay is not considered in your admission decision." This is misleading because under Section 568, exempt institutions are prohibited from considering the financial circumstances of any applicant or any applicant's family, not just an applicant's "ability to pay."

**ANSWER:** MIT lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 207 and on that basis denies those allegations.

208.    The foregoing redefinitions of "need-blind" for purposes of Section 568 obfuscate that Defendants fail to follow need-blind admissions policies and have made admissions decisions with regard to the financial circumstances of all applicants and their families.

**ANSWER:** MIT denies the allegations in Paragraph 208.

209.    The website for the 568 Cartel has contained and continues to contain the form of a certificate of compliance whereby a member of the Cartel can certify that "its admission and financial aid practices currently comply with the rules of Section 568 regarding 'need-blind admission practices.'" Publicly posting this form of certification misleads any reasonably diligent person who inquires into whether members of the 568 Cartel are need-blind.

**ANSWER:** MIT admits the existence of a 568 Presidents Group website that currently contains a certificate of compliance with the quoted language, to which website MIT refers the Court for a complete and accurate statement of its contents. MIT denies the allegations in Paragraph 209 in all other respects.

210.    The website for the 568 Cartel has stated and continues to state: "This site serves as a resource both for the 568 Presidents Group member institutions wanting to keep up to date on the Group's activities, *as well as for visitors seeking to learn more about the Group*." (Emphasis added.) The 568 Cartel thus continues inaccurately to advertise on its website that all Cartel members are "need-blind" within the meaning of Section 568.

**ANSWER:** MIT admits the existence of a 568 Presidents Group website that currently contains a certificate of compliance with the quoted language, to which website MIT refers the Court for a complete and accurate statement of its contents. MIT denies the allegations in Paragraph 210 in all other respects.

211.    The 568 Cartel has publicly asserted that its activities were carried out for altruistic purposes. The website for the 568 Cartel, for example, has stated and continues to state that the purpose of the conspiracy is to agree on a financial-aid system that is "fair" and that the Consensus Methodology was adopted after consideration of ways to "improve the financial aid system so as to better serve the needs of families in their efforts to pay for college."

**ANSWER:** MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 211 and on that basis denies those allegations. MIT admits the existence of a 568 Presidents Group website that currently contains the quoted language, to which website MIT refers the Court for a complete and accurate statement of its contents. MIT denies the allegations in Paragraph 211 in all other respects.

212. Such assertions are false but would be viewed as credible by a reasonably diligent person investigating the 568 Cartel's conduct. Actors sympathetic to the 568 Cartel have likewise published statements and conclusions that would have persuaded a reasonably diligent person investigating the Cartel's conduct that they had not suffered financial harm.

**ANSWER:** MIT denies the allegations in Paragraph 212.

213. Defendants further engaged in conduct that hindered a reasonably diligent person's ability to discover the violations and injury at issue by consistently omitting, in public statements purporting to describe the reasons for net tuition price increases, any reference to price fixing or the use of the Consensus Methodology as bearing on increased net prices of attendance. Whether or not such statements have accurately described some of the reasons for net tuition price increases, these statements have not acknowledged the effects of the use of the Consensus Methodology.

**ANSWER:** The allegations of Paragraph 213 are legal conclusions to which no response is required. To the extent a response is required, MIT denies the allegations in Paragraph 213 as they relate to MIT. MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 213 as they relate to any other Defendant and on that basis denies those allegations. MIT denies the allegations in Paragraph 213 in all other respects.

214. In targeting Class Members through the institution's alumni magazine, for example, Dartmouth claimed in 2015 that rising tuition prices could be explained because "[j]ust as lattes cost more these days, so do markers and whiteboards and keeping the lights on. Healthcare costs and salaries are rising too—and hiring at the College has shot up more than enrollment."[85] The feature article also listed "[l]ess sizeable but still significant drivers of cost including compliance with a range of government regulations imposed to address issues such as crime, gender equity and accessibility, which have totaled millions of dollars." The article quoted Dartmouth's current President, Phil Hanlon, as saying that these factors, although supposedly "not as much as financial aid" have "'been a driver for the last eight to 10 years.'"[86]

**ANSWER:** MIT admits the existence of an article that currently contains the quoted language in Paragraph 214, to which article MIT refers the Court for a complete and accurate statement of its

---

[85] C.J. Hughes, *Why is Dartmouth So Expensive*, DARTMOUTH ALUMNI MAGAZINE, May-June 2015, https://dartmouthalumnimagazine.com/articles/why-dartmouth-so-expensive.
[86] *Id.*

contents. MIT lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 214 and on that basis denies those allegations in all other respects.

215.    A Georgetown spokesperson explained away the institution's substantial tuition increases by suggesting that "the growing cost 'reflects the reality that many of our operating expenses continue to increase at rates higher than inflation.'"[87]

**ANSWER:** MIT admits the existence of a website that currently contains the quoted language in

Paragraph 215, to which website MIT refers the Court for a complete and accurate statement of its

contents. MIT lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 215 and on that basis denies those allegations in all other respects.

216.    In 2008, an MIT news release incorrectly claimed: "During the past decade, the net tuition for undergraduates—what students and families pay after financial aid—has, on average, dropped by more than 15 percent when adjusted for inflation."[88] Such statements suggest to a reasonable person that MIT had lowered net prices of attendance over time. If MIT's statement were true, moreover, the net price of attendance would have "dropped" even more if MIT had not participated in the 568 Cartel.

**ANSWER:** MIT admits the existence of a website that currently contains the quoted language, to

which website MIT refers the Court for a complete and accurate statement of its contents. MIT

denies the allegations in Paragraph 216 in all other respects.

217.    In 2009, John Affleck-Graves, then an Executive Vice President at Notre Dame, identified only food costs when asked to explain the institution's 4.4 percent increase in tuition: "We are aware of the pressure families are under, and we wanted to be as conservative as we could be, . . . the difficultly for us this year is that we have seen an increase in a lot of our costs, like food . . . . And then we are faced with a difficult choice because we don't want to decrease the opportunities we provide for the students, like study abroad and research opportunities."[89]

---

[87] Connie Parham, *GU Hikes Undergraduate Tuition 5.5 Percent*, THE HOYA (Feb. 22, 2008), https://thehoya.com/gu-hikes-undergraduate-tuition-5-5-percent/.
[88] *MIT to be Tuition-Free for Families Earning less than $75,000 a Year*, MIT NEWS (Mar. 7, 2008), https://news.mit.edu/2008/tuition-0307.
[89] Madeline Buckley, *University Increases Tuition for 2009*, THE OBSERVER (Mar. 4, 2009), https://ndsmcobserver.com/2009/03/university-increases-tuition-for-2009/.

**ANSWER:** MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 217 and on that basis denies those allegations.

218.     In 2017, Amy Gutmann, President of Penn, told *The Daily Pennsylvanian* that "as tuition goes up financial aid goes up even more."[90] If this statement is true, it is also true that but for Penn's participation in the 568 Cartel, financial aid would have gone up even more—and that President Gutmann did not speak to that fact.

**ANSWER:** MIT admits the existence of a website that currently contains the quoted language in Paragraph 218, to which website MIT refers the Court for a complete and accurate statement of its contents. MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 218 and on that basis denies those allegations in all other respects.

219.     In reality, the 568 Cartel was not, and has never been, composed of "need-blind schools" as that term is defined by the statute. The 568 Cartel members made innumerable inaccurate public claims that had the effect of misleading a reasonably diligent person investigating whether the Cartel's conduct gave rise to a cause of action.

**ANSWER:** MIT denies the allegations in Paragraph 219.

## IX.     CLASS ACTION ALLEGATIONS

220.     The proposed Class, under Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), comprises all U.S. citizens or permanent residents, and purchasers of tuition, room, or board on their behalf, who have (a) enrolled in one or more of Defendants' full-time undergraduate programs, (b) received need-based financial aid from one or more Defendants, (c) paid to one or more Defendants tuition, room, or board not fully covered by such financial aid, and (d) first enrolled in one of Defendants' full-time undergraduate programs as follows:
- Chicago, Columbia, Cornell, Duke, Georgetown, MIT, Northwestern, Notre Dame, Penn, Rice, Vanderbilt, Yale—from 2003 through the present.
- Brown, Dartmouth, Emory—from 2004 through the present.
- CalTech—from 2019 through the present.
- Johns Hopkins—from 2022 to the present.

**ANSWER:** The allegations in Paragraph 220 are legal conclusions to which no response is required. To the extent a response is required, MIT admits that Plaintiffs seek to bring this action

---

[90] *Amy Gutmann's Interview with The Daily Pennsylvanian*, THE DAILY PENNSYLVANIAN (Mar. 2, 2017), https://www.thedp.com/article/2017/03/amy-gutmann-penn-transcript-interview.

as a class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of the class set

forth in Paragraph 220 but denies that Plaintiffs have established or can establish the prerequisites

to certification and/or maintenance of the alleged "Class" pursuant to Rule 23 of the Federal Rules

of Civil Procedure, and therefore denies the allegations in Paragraph 220.

221.    The Class excludes purchasers of tuition, room, and board the full cost of which was
covered with institutional aid provided by such Defendant(s). Class Members also exclude
Defendants and their officers, directors, management, employees, subsidiaries, or affiliates; and
the Judge presiding over this action, his or her law clerks, spouse, and any person within the third
degree of relationship living in the Judge's household and the spouse of such a person.

**ANSWER:**    The allegations in Paragraph 221 are legal conclusions to which no response is

required. To the extent a response is required, MIT denies that Plaintiffs have established or can

establish the prerequisites to certification and/or maintenance of the alleged "Class" pursuant to

Rule 23 of the Federal Rules of Civil Procedure, and therefore denies the allegations in Paragraph

221.

222.    Plaintiffs reserve the right to amend the Class definition, including with respect to the
relevant time periods of membership in the 568 Cartel, based on discovery in this action.

**ANSWER:**    The allegations in Paragraph 222 are legal conclusions to which no response is

required. To the extent a response is required, MIT denies that Plaintiffs have established or can

establish the prerequisites to certification and/or maintenance of the alleged "Class" pursuant to

Rule 23 of the Federal Rules of Civil Procedure, and therefore denies the allegations in Paragraph

222.

223.    The Class Members are readily ascertainable and identifiable because records of the
relevant transactions should exist, because the Class Members' identities are known to
Defendants, and because the members may be notified of the pendency of this action by forms of
notice customarily used in class actions.

**ANSWER:**    The allegations in Paragraph 223 are legal conclusions to which no response is

required. To the extent a response is required, MIT denies that Plaintiffs have established or can

establish the prerequisites to certification and/or maintenance of the alleged "Class" pursuant to Rule 23 of the Federal Rules of Civil Procedure, and therefore denies the allegations in Paragraph 223.

224.    The Class Members are so numerous that joinder of all of them is impracticable; the number is unknown to Plaintiffs but, on information and belief, is over 200,000.

**ANSWER:**  The allegations in Paragraph 224 are legal conclusions to which no response is required. To the extent a response is required, MIT denies that Plaintiffs have established or can establish the prerequisites to certification and/or maintenance of the alleged "Class" pursuant to Rule 23 of the Federal Rules of Civil Procedure, and therefore denies the allegations in Paragraph 224.

225.    There are questions of law and fact common to the Class Members, including, but not limited to, the following:
    a.    The scope and operation of the 568 Exemption;
    b.    Whether Defendants' admissions practices fall under the 568 Exemption;
    c.    Whether Defendants conspired as alleged herein;
    d.    Whether the conspiracy harmed competition as alleged herein;
    e.    Whether the conspiracy caused antitrust injury as alleged herein;
    f.    The appropriate Class-wide measure of damages; and
    g.    The common method for determining the damages of Class Members.

**ANSWER:**  The allegations in Paragraph 225 are legal conclusions to which no response is required. To the extent a response is required, MIT denies that Plaintiffs have established or can establish the prerequisites to certification and/or maintenance of the alleged "Class" pursuant to Rule 23 of the Federal Rules of Civil Procedure, and therefore denies the allegations in Paragraph 225.

226.    All or substantially all Class Members were injured by Defendants' unlawful conduct. A common formula exists that allows for determination of damages of individual Class Members and for excluding from recovery any individuals who may not have been damaged.

**ANSWER:** The allegations in Paragraph 226 are legal conclusions to which no response is required. To the extent a response is required, MIT denies that Plaintiffs have established or can establish the prerequisites to certification and/or maintenance of the alleged "Class" pursuant to Rule 23 of the Federal Rules of Civil Procedure, and therefore denies the allegations in Paragraph 226.

227.    Plaintiffs' claims are typical of the claims of the Class Members. Plaintiffs and the other Class Members were damaged by the same common course of conduct by Defendants.

**ANSWER:** The allegations in Paragraph 227 are legal conclusions to which no response is required. To the extent a response is required, MIT denies that Plaintiffs have established or can establish the prerequisites to certification and/or maintenance of the alleged "Class" pursuant to Rule 23 of the Federal Rules of Civil Procedure, and therefore denies the allegations in Paragraph 227.

228.    Plaintiffs will fairly and adequately protect the interests of the Class Members. Plaintiffs' interests are aligned with, and not adverse to, those of the other Class Members.

**ANSWER:** The allegations in Paragraph 228 are legal conclusions to which no response is required. To the extent a response is required, MIT denies that Plaintiffs have established or can establish the prerequisites to certification and/or maintenance of the alleged "Class" pursuant to Rule 23 of the Federal Rules of Civil Procedure, and therefore denies the allegations in Paragraph 228.

229.    Plaintiffs will continue to fully and adequately protect the interests of the Class Members. Plaintiffs have retained counsel competent and experienced in the prosecution of antitrust class action litigation, and with the necessary financial resources, to represent themselves and the other Class Members.

**ANSWER:** The allegations in Paragraph 229 are legal conclusions to which no response is required. To the extent a response is required, MIT denies that Plaintiffs have established or can

establish the prerequisites to certification and/or maintenance of the alleged "Class" pursuant to

Rule 23 of the Federal Rules of Civil Procedure, and therefore denies the allegations in Paragraph

229.

230.    Questions of law or fact that are common to the Class Members predominate over any questions affecting only individual Class Members.

**ANSWER:**    The allegations in Paragraph 230 are legal conclusions to which no response is

required. To the extent a response is required, MIT denies that Plaintiffs have established or can

establish the prerequisites to certification and/or maintenance of the alleged "Class" pursuant to

Rule 23 of the Federal Rules of Civil Procedure, and therefore denies the allegations in Paragraph

230.

231.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The prosecution of separate actions by individual Class Members would impose heavy burdens on the Court and Defendants and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. In contrast, a class action would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results. Absent a class action, it would not be feasible for the vast majority of the Class Members to seek redress for the violations of law alleged herein.

**ANSWER:**    The allegations in Paragraph 231 are legal conclusions to which no response is

required. To the extent a response is required, MIT denies that Plaintiffs have established or can

establish the prerequisites to certification and/or maintenance of the alleged "Class" pursuant to

Rule 23 of the Federal Rules of Civil Procedure, and therefore denies the allegations in Paragraph

231.

232.    Defendants have acted on grounds that apply generally to the Class, so that, in addition to damages, final injunctive relief is appropriate respecting the Class as a whole. Such relief is appropriate with respect to Defendants who are former members of the 568 Cartel in that, as Rice's and Yale's participation in the Cartel illustrates, a Defendant that has left the Cartel may choose to reenter it.

**ANSWER:** The allegations in Paragraph 232 are legal conclusions to which no response is required. To the extent a response is required, MIT denies that Plaintiffs have established or can establish the prerequisites to certification and/or maintenance of the alleged "Class" pursuant to Rule 23 of the Federal Rules of Civil Procedure, and therefore denies the allegations in Paragraph 232.

## X.    ANTITRUST INJURY AND ANTICOMPETITIVE EFFECTS

233.    Plaintiffs and the other Class Members have suffered antitrust injury due to Defendants' illegal conduct. They have suffered injury of the type that the antitrust laws were intended to prevent and that flows from that which makes Defendants' acts unlawful.

**ANSWER:** MIT denies the allegations in Paragraph 233.

234.    Defendants have conspired to reduce or eliminate price competition among the 568 Cartel members on provision of financial-aid packages to Class Members, thereby depriving Plaintiffs and the other Class Members of a competitive marketplace.

**ANSWER:** MIT denies the allegations in Paragraph 234.

235.    As a result of Defendants' conspiracy to share information and fix prices, Plaintiffs and the other Class Members were injured in the form of receiving artificially suppressed financial aid and paying artificially inflated net prices of attendance.

**ANSWER:** MIT denies the allegations in Paragraph 235.

236.    Plaintiffs and the other Class Members are naturally motivated to enforce the antitrust laws because they paid artificially inflated prices. There are no other persons who were more directly injured from, or more motivated to seek redress for, Defendants' misconduct than Plaintiffs and the other Class Members.

**ANSWER:** MIT denies the allegations in Paragraph 236.

237.    Absent Defendants' conspiracy, Defendants would have competed more aggressively to attract Plaintiffs and the other Class Members to their undergraduate programs, by offering all Class Members more generous financial aid and charging lower net prices of attendance than under Defendants' conspiracy.

**ANSWER:** MIT denies the allegations in Paragraph 237.

238.    If Defendants had competed, or competed more aggressively, with respect to financial aid, Plaintiffs and all of the other Class Members would have received more money in financial

aid and paid lower net prices of attendance, as opposed to the artificially inflated net prices that Plaintiffs and the other Class Members paid due to Defendants' conspiracy. Defendants' conspiracy also had the effect of imposing a greater debt burden on students and their families.

**ANSWER:** MIT denies the allegations in Paragraph 238.

239.　　Defendants' conspiracy is an illegal horizontal agreement to fix prices and to share confidential data, methods, and information related to admissions, financial aid, and methods of determining financial aid. Defendants' alleged misconduct directly and proximately caused antitrust injury to Plaintiffs and the other Class Members, who received less money in financial aid, and paid higher net prices of attendance, than they would have if Defendants had competed, or competed more aggressively, rather than conspired to fix prices.

**ANSWER:** MIT denies the allegations in Paragraph 239.

## XI.　　THE RELEVANT MARKET

240.　　Defendants' conduct is *per se* anticompetitive, obviating any market definition, including based on the direct evidence of anticompetitive effects. Defendants' conduct is also, and in the alternative, illegal under the rule of reason and "quick look" modes of analyses.

**ANSWER:**　The allegations in Paragraph 240 are legal conclusions to which no response is required. To the extent a response is required, MIT denies the allegations in Paragraph 240.

241.　　Plaintiffs thus further allege a relevant market, for undergraduate education at private national universities with an average ranking of 25 or higher in the *U.S. News & World Report* rankings from 2003 through 2021 (the most recent year in which Class Members applied to any of Defendants). This is the Market for Elite, Private Universities.

**ANSWER:**　The allegations in Paragraph 241 are legal conclusions to which no response is required. To the extent a response is required, MIT denies the allegations in Paragraph 241.

242.　　This market does not include liberal arts colleges, which offer distinct products and are generally more like each other than elite, private universities. Reflecting industry recognition of these discrete classifications, both *U.S. News & World Report* and the *Carnegie Classifications* classify national universities and liberal arts colleges separately, given that liberal arts colleges are generally regarded as having different characteristics and services, including a smaller student body, smaller and less competitive athletic programs, fewer graduate programs, and less emphasis on research. In contrast, private, national universities tout themselves as offering such distinct services that the liberal arts colleges do not.

**ANSWER:**　The allegations in Paragraph 242 are legal conclusions to which no response is required. To the extent an answer is required, MIT denies the allegations in Paragraph 242.

243.    The Market for Elite, Private Universities has a rational relation to the interchangeability of use or cross-elasticity of demand with respect to the universities in the market. That is, within this market, sufficient cross-elasticity of demand exists such that a sufficient number of admitted students to two or more of these universities would respond to a small but significant increase in the net price by one university in the market by choosing to attend a lower-priced university in the same market that would make the price increase unremunerative.

**ANSWER:**  MIT denies the allegations in Paragraph 243.

244.    The Market for Elite, Private Universities also has a rational relation to the cross-elasticity of demand with respect to elite, private liberal arts colleges and public universities. That is, the cross-elasticity between elite, private universities and elite liberal arts colleges and public universities in the United States is low, such that a hypothetical monopolist in the Market for Elite, Private Universities could impose a small but significant non-transitory increase in price ("SSNIP") without losing so many students to elite liberal arts colleges or public universities as to render the SSNIP unremunerative.

**ANSWER:**  MIT denies the allegations in Paragraph 244.

245.    Admission to elite, private liberal arts colleges is generally less selective than admission to elite, private, national universities. According to *U.S. News & World Report*, the average admission rate of the top 10 national universities is approximately 7%, whereas the average admission rate of the top 10 liberal arts colleges is approximately 14%.

**ANSWER:**  MIT admits that the allegations of the second sentence in Paragraph 245 purport to describe information from the *U.S. News & World Report* rankings. MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 245 and on that basis denies those allegations in all other respects.

246.    A further factor differentiating private universities and liberal arts colleges is the yield rate—that is, the rate at which admissions offers are accepted. Among the private universities ranked in the top 25 by *U.S. News & World Report*, there is a strong correlation between the institution's rank and yield rate. Among the liberal arts colleges, this correlation is much weaker (if it exists at all). The yield rate of both Harvard and Stanford, for example, is usually greater than 80%, whereas the yield rate for the most highly rated private liberal arts colleges— Williams, Amherst, and Swarthmore—is usually approximately 40%.

**ANSWER:**  MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 246 and on that basis denies those allegations.

247.    The Market for Elite, Private Universities does not include public universities. A handful of public universities have national rankings and selectivity comparable to that of the elite,

private universities. Competition between public universities and elite, private institutions, however, is limited in the national market for students seeking financial aid, including the Class Members. The University of California-Los Angeles ("UCLA") and the University of California-Berkeley ("UC Berkeley"), for example, do not provide need-based financial assistance to out-of-state applicants. The University of Michigan-Ann Arbor ("Michigan") has an official policy of prioritizing financial aid for residents. The University of Virginia ("UVA") is required by law to matriculate at least two-thirds of its undergraduate student body from its pool of in-state applicants. Public, national universities generally charge a high average net price to out-of-state students to cross-subsidize in-state students, a pricing policy that is driven by laws and political pressure that private institutions do not face.

**ANSWER:**  The first sentence of Paragraph 247 contains legal conclusions to which no response is required. To the extent a response is required, MIT denies the allegations in the first sentence of Paragraph 247. MIT admits that some public universities have rankings and selectivity comparable to that of some private universities but denies the allegations of the second sentence in Paragraph 247 in all other respects. MIT denies the allegations in the third sentence of Paragraph 247. MIT lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 247 and on that basis denies those allegations.

248.    Defendants themselves have long acknowledged the important distinctions between private and public universities, and that the elite, private universities compete within a distinct market. In its 2001 University Plan, for example, Duke stated:

> Private research universities occupy a special place in the diverse world of American higher education because of their distinctive missions, organization, governance, and funding. They are deliberately intermediate in scope and scale between the small private colleges and the large public universities. As a group, they attract a disproportionate number of the best faculty, are highly selective in their admissions policies, create a residential educational experience that promotes interaction with the faculty and student learning outside the classroom, and provide much of the nation's leadership in research and scholarship. They are resource-intensive places, typically combining large endowments, strong philanthropic support, and external research funding with high tuition. These resources are powerfully additive in supporting the teaching and research missions of these institutions and their commitment to national and international leadership.

> In our consideration of the broader context in which Duke functions, it is important to discuss the dynamics of our market within American higher education. The leading private research universities have much in common, offering similar degree programs and pursing similar lines of research, yet the rivalry among them is often intense. Each institution is pursuing excellence and the public recognition that comes with it—on its own terms, seeking to create the deepest, richest, and most diverse environment possible for teaching, learning, and research and for the preparation of new leaders for our society. The leading universities compete with each other for the human and financial capital they need to excel in their broadly overlapping missions.[91]

**ANSWER:** MIT admits the existence of a website that currently contains the quoted language in Paragraph 248, to which website MIT refers the Court for a complete and accurate statement of its contents. MIT denies the allegations in the first sentence of Paragraph 248. MIT lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 248 and on that basis denies those allegations in all other respects.

249.    Indeed, public universities and private universities make pricing decisions based on very different factors, with public institutions being subject to political pressures, state laws, and dependence on expropriations from state treasuries. Compared to elite, private universities, public universities such as UCLA, UC Berkeley, UVA, and Michigan have different pricing models and largely compete for different students.

**ANSWER:** MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 249 and on that basis denies those allegations.

250.    The schools in the Market for Elite, Private Universities compete with each other and have done so since 2003. Defendants are tightly packed in their average *U.S. News & World Report* rankings over the last 19 years (3.1, 5.1, 5.9, 6.4, 7.3, 8.0, 8.0, 10.7, 11.5, 12.5, 14.8, 14.8, 16.7, 16.7, 18.1, 19.7, and 22.3).

**ANSWER:** MIT denies the existence of any purported "Market for Elite, Private Universities." MIT admits that the allegations of the second sentence in Paragraph 250 purport to describe

---

[91] *Building on Excellence*, THE UNIVERSITY PLAN: DUKE UNIVERSITY (Feb. 23, 2001), https://dukespace.lib.duke.edu/dspace/bitstream/handle/10161/65/UA2006_0037%20Strategic%20Plan.pdf?sequence=1&isAllowed=y.

information from the *U.S. News & World Report* rankings. MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 250 and on that basis denies those allegations. MIT denies the allegations of Paragraph 250 in all other respects.

251.    Defendants themselves have acknowledged that they compete within the Market for Elite, Private Universities. Morton Schapiro, the President of Northwestern, a trained economist, and a spokesperson for the 568 Cartel since at least 2001, acknowledged this market when he stated in 2018—carefully distinguishing between universities and colleges—that "continuous efforts," including a push for more federal funding, "can accelerate improvement" and "allow NU to remain competitive against top COFHE universities." COFHE stands for the Consortium on Financing Higher Education, a trade and lobbying group that describes itself as a "voluntary, institutionally-supported organization of thirty-five highly selective, private liberal arts colleges and universities."[92] Accordingly, by President Schapiro's own admission, Northwestern views itself as competing with the universities in that group, which is 90% identical with the market as Plaintiffs define it. (The COFHE universities consist of the U.S. News top 25, minus Carnegie Mellon, plus the University of Rochester.)

**ANSWER:**  MIT admits the existence of websites that currently contain the quoted language in Paragraph 251, to which websites MIT refers the Court for a complete and accurate statement of their contents. MIT lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 251 and on that basis denies those allegations in all other respects.

252.    Defendants have considerable market power, which they have exercised to increase the net price of attendance and to injure Plaintiffs and the other Class Members through the conduct alleged herein. Since 2003, Defendants have controlled between 61% and 78% of the number of undergraduate slots in the Market for Elite, Private Universities. Within the following relevant time periods, as set forth above, the percentage of undergraduate slots that the participants in the conspiracy have controlled within this market are approximately as follows:
- As of 2003: 61%
- As of 2004: 73%
- As of 2019: 73%
- As of 2022: 78%

**ANSWER:**  MIT denies the allegations in Paragraph 252.

---

[92] Adrian Wan, *Schapiro, Administrators Talk Research Efforts, Campus Inclusion at 'Conversations with the President'*, THE DAILY NORTHWESTERN (Apr. 12, 2018), https://dailynorthwestern.com/2018/04/12/campus/214612/.

253.    Competition in the Market for Elite, Private Universities is constrained by extremely strong brand preferences among consumers and high barriers to entry. Competition is further constrained by the fact that such institutions limit the supply of available seats, which has the effect of generating scarcity and enhancing their prestige. Competition in the Market for Elite, Private Universities is further constrained by the fact that applicants cannot readily substitute one institution for another because an applicant's choice is limited to those universities to which he or she is admitted in a highly selective process.

**ANSWER:**  MIT denies the allegations in Paragraph 253.

254.    The 568 Cartel does not have any pro-competitive impacts. Accordingly, if the rule of reason were to apply, it is not necessary for Plaintiffs to demonstrate reasonable and less restrictive alternatives are available. Unlike the Overlap Group, the 568 Cartel does not agree to allocate aid solely based on demonstrated financial need. Indeed, unlike the Overlap Group, several members of the 568 Cartel offer athletic scholarships and compete to have nationally ranked athletic teams every year.

**ANSWER:**  The allegations in the first two sentences of Paragraph 254 are legal conclusions to which no response is required. To the extent a response is required, MIT denies the allegations in the first two sentences of Paragraph 254. MIT denies that it offers athletic scholarships. MIT lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 254 and on that basis denies those allegations. MIT denies the allegations in Paragraph 254 in all other respects.

255.    Defendants have substantial endowments and the proven capacity to earn rates of return on them that well exceed the minimum 5% distribution requirement of the tax laws. *See* Appendix A. Defendants thus have ample resources to meet the financial needs of their students without reducing their endowments (if that were even imperative) and without colluding on a formula that results in artificially reduced financial aid and that would in fact provide substantially more financial aid, and result in lower net prices of attendance, than through the 568 Cartel.

**ANSWER:**  MIT admits that it has an endowment. MIT denies the remaining allegations in Paragraph 255 as they relate to MIT. As to the allegations in Paragraph 255 that relate to the other Defendants, MIT lacks knowledge or information sufficient to form a belief as to the truth of those

allegations and on that basis denies the allegations. MIT denies the allegations in Paragraph 255 in all other respects.

256.    In addition, since the time of the Overlap Group, important facts relevant to application of any modes of legal analysis that may apply have changed in critical ways. As to the schools for which such information is publicly available, the growth of Defendants' endowments has exceeded the growth of their annual operating expenses. From 1994 to 2021, for instance, Dartmouth's endowment increased by approximately 879%, whereas its annual operating expenses increased by approximately 184%. *See* Appendix A. This is a ratio of approximately 4.8 to 1. The ratios are approximately 8.1 to 1 at Georgetown; 1.9 to 1 at Penn; 1.7 to 1 at Rice; and 3.1 to 1 at Yale. *See id.*

**ANSWER:**  MIT admits that it has an endowment. MIT further admits that the allegations in Paragraph 256 and in Appendix A purport to describe information from MIT's consolidated financial statements. MIT denies any allegations in this Paragraph and Appendix A that are inconsistent with MIT's consolidated financial statements. MIT denies the remaining allegations in Paragraph 256 as they relate to MIT. As to the allegations in Paragraph 256 that relate to the other Defendants, MIT lacks knowledge or information sufficient to form a belief as to the truth of those allegations in Paragraph 256 and on that basis denies those allegations. MIT denies the allegations in Paragraph 256 in all other respects.

257.    These facts underscore that Defendants' endowments have been and continue to be an increasingly ample financial resource for the schools to use to meet the financial needs of their students. These facts also illustrate that, regardless of their status as not-for-profit institutions, Defendants have generated or have the ability to generate revenue that well exceeds expenses on an annual basis, and thus would have been financially able to devote more resources for financial aid if that had competed rather than colluded on their financial aid formulae.

**ANSWER:**  MIT denies the allegations in Paragraph 257 as they relate to MIT. As to the allegations in Paragraph 257 that relate to the other Defendants, MIT lacks knowledge or information sufficient to form a belief as to the truth of those allegations and on that basis denies those allegations. MIT denies the allegations in Paragraph 257 in all other respects.

258.     In addition, a reasonable and less restrictive alternative is for each member of the 568 Cartel to implement a fair financial-aid formula unilaterally, as other elite, private universities have done, without entering into a conspiracy that overcharges students. In addition, no pro-competitive impact that Defendants may proffer justifies the significant overcharge caused by the conspiracy. If even relevant to any analysis under the rule of reason, moreover, there is no legitimate or significant procompetitive justification in Defendants' non-compliance with the 568 Exemption or in combining such non-compliance with the collective application of the Consensus Methodology, and other acts in furtherance of the conspiracy as alleged herein, to artificially reduce financial aid.

**ANSWER:**  MIT denies the allegations in Paragraph 258.

259.     Colluding, agreeing on, and collectively imposing a common aid methodology as part of the 568 Cartel are not reasonably necessary to achieve the objective of awarding financial aid to admitted students. Nor is the sharing of confidential admission and financial-aid data and information, particularly as to the methodologies for awarding financial aid, reasonably necessary for the individual schools to achieve the objective of awarding financial aid to admitted students. Instead, there are substantially less restrictive alternatives for helping to fund need-based financial aid for admitted students—including, as noted, using a portion of the annual investment gains on Defendants' endowments.

**ANSWER:**  MIT denies the allegations in Paragraph 259.

260.     In short, Defendants' illegal conduct has significantly injured more than 200,000 Class Members by artificially reducing the financial aid they were offered and received.

**ANSWER:**  MIT denies the allegations in Paragraph 260.

## XII.     CLAIM FOR RELIEF

### FIRST CAUSE OF ACTION
### Sherman Act Section 1

261.     Plaintiffs incorporate the preceding paragraphs.

**ANSWER:**  MIT restates its response to every allegation set forth above.

262.     At a time currently unknown to Plaintiffs, but at least as early as 2003, and continuing through the present, Defendants entered into a continuing agreement, understanding, and conspiracy in restraint of trade artificially to fix, raise, and stabilize and reduce the amount of financial aid paid to Class Members, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**ANSWER:**  MIT denies the allegations in Paragraph 262.

263.    In formulating and carrying out their conspiracy, Defendants did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others: Using an agreed upon formula or method for fixing, lowering, and stabilizing the amount of financial aid they offered and fixing, increasing, and stabilizing the net price of attendance; and sharing confidential, private data and information related to admissions and financial aid, including the methodologies to be used in awarding financial aid.

**ANSWER:**  MIT denies the allegations in Paragraph 263.

264.    The 568 Cartel has monitored and enforced its conspiracy in several ways, according to the Cartel's website, including (but not limited to) such steps as (a) requiring each participation institution to submit a "Certificate of Compliance," (b) requiring university professionals at each institution to receive "training . . . in the application of the Methodology," (c) imposing a "common calendar for the collection of data from families," (d) agreeing to share information and analyses relating to financial aid and formulae for provision of financial aid, and (e) conducting an annual or biannual meeting every year since at least 2007.

**ANSWER:**  MIT denies the allegations in Paragraph 264.

265.    This conspiracy has had the following effects, among others: The net price of attendance has been fixed, increased, maintained, and stabilized at artificially high, non-competitive levels for all Class Members.

**ANSWER:**  MIT denies the allegations in Paragraph 265.

266.    Plaintiffs and the other Class Members have been injured and will continue to be injured in their businesses and property by paying more for attendance at Defendants than they would have paid and will pay but for the combination and conspiracy.

**ANSWER:**  MIT denies the allegations in Paragraph 266.

267.    Defendants are not entitled to the affirmative defense that they are exempt from the antitrust laws, because they do not satisfy the requirement that all students are admitted on a need-blind basis, for the reasons set forth above.

**ANSWER:**  MIT denies the allegations in Paragraph 267.

268.    Defendants' conspiracy is a per se violation of the Sherman Act; or, in the alternative, is a violation of the Sherman Act under the Rule of Reason or "quick look" analysis.

**ANSWER:**  MIT denies the allegations in Paragraph 268.

269.    Defendants' conduct has directly and proximately caused antitrust injury to Plaintiffs and the other Class Members. The artificially inflated net price of attendance that Plaintiffs and the

82

other Class Members have paid to Defendants flows directly from Defendants' price fixing and is the type of damage that the antitrust laws were designed to prevent.

**ANSWER:** MIT denies the allegations in Paragraph 269.

270.     Plaintiffs and the other Class Members are entitled to treble damages and an injunction against Defendants, preventing and restraining the violations alleged herein.

**ANSWER:** MIT denies the allegations in Paragraph 270.

### XIII.   REQUESTED RELIEF AND DEMAND FOR JURY TRIAL

**ANSWER:** MIT denies that Plaintiffs are entitled to a judgment or any other relief requested in

their Requested Relief or Demand for Jury Trial.

### AFFIRMATIVE DEFENSES

Without assuming any burden that it would not otherwise bear, MIT asserts the

following affirmative defenses to the Amended Complaint. Further, MIT reserves all affirmative

defenses under Federal Rule of Civil Procedure 8(c), at law or in equity, that may now exist or in

the future be available based on discovery and further factual investigation in this case.

### FIRST AFFIRMATIVE DEFENSE

### 568 Exemption

MIT's alleged conduct is exempt from the antitrust laws. *See* 15 U.S.C. § 1 note;

Pub. L. No. 103-382, title V, § 568, 108 Stat. 3518, 4060 (1994). The Section 568 exemption

provides that "[i]t shall not be unlawful under the antitrust laws for 2 or more institutions of

higher education at which all students admitted are admitted on a need-blind basis, to agree or

attempt to agree … to use common principles of analysis for determining the need of such

students for financial aid if the agreement to use such principles does not restrict financial aid

officers at such institutions in their exercising independent professional judgment with respect to

individual applicants for such financial aid." *Id.*; *see id.* (defining "student" as limited to U.S.

83

nationals and certain aliens admitted for permanent residence). MIT's participation in the 568 Presidents Group falls within the Section 568 exemption.

The 568 Presidents Group is and has been composed of institutions of higher education. As explained in the Group's memorandum of understanding, the Group discusses and may agree upon voluntary and common principles of analysis for determining the financial need of undergraduate financial aid applicants for aid funded by each institution. The Group neither restricts financial aid personnel at participating member institutions from exercising independent professional judgment with respect to individual applicants for financial aid nor agrees upon the amount or terms of any prospective financial aid award to a specific individual.

While MIT has been a member of the Group—*i.e.,* from 1998 to present day— MIT has admitted all students on a need-blind basis. When MIT joined the Group, it certified that its admission and financial aid practices complied with the rules of Section 568 regarding need-blind admission practices, and while MIT has been in the Group, it has admitted all students without regard to such students' ability to pay tuition. On information and belief, while MIT has been a member of the Group, all other members of the Group likewise certified compliance with Section 568's need-blind requirement, and during that period, MIT had no knowledge that any other member made an admissions decision for any student with regard to such student's ability to pay tuition.

## SECOND AFFIRMATIVE DEFENSE

### Procompetitive Benefits

Any alleged anticompetitive effects of the alleged agreement are outweighed by the significant procompetitive benefits of the 568 Presidents Group's collaboration. Jointly establishing recommended best practices for measuring need improves the accuracy of

84

determinations of students' ability to pay and promotes a more efficient allocation of aid—thereby decreasing the price paid by some students and increasing the quality of financial aid awards. Such collaboration also broadens the pool of applicants who can afford to attend higher education and improves the socioeconomic diversity of the class of admitted students—thereby increasing consumer access and choice as well as the quality of education and educational experience provided. The U.S. Government Accountability Office has found that the Consensus Methodology did not cause a net increase in the amount students were expected to pay and resulted in higher amounts of need-based aid awarded to some categories of students.

## THIRD AFFIRMATIVE DEFENSE

### Statute of Limitations

The claims of all Plaintiffs are barred by the applicable four-year statute of limitations. *See* 15 U.S.C. § 15b. Plaintiffs' claims arise out of the alleged creation and implementation in 2003 of a "consensus methodology" for determining students' ability to pay for college. Am. Compl. ¶ 5.

Moreover, Plaintiffs filed their original complaint alleging that Defendants violated Section 1 of the Sherman Act on January 9, 2022. Seven Plaintiffs—Frank Carbone, Andrew Corzo, Sia Henry, Michael Maerlender, Brandon Piyevsky, Kara Saffrin, and Tatiana Weaver —matriculated more than four years before Plaintiffs filed their original complaint. Plaintiffs allege they were injured by "receiving artificially suppressed aid and paying artificially inflated net prices of attendance." Am. Comp. ¶ 235. Carbone's daughter, Corzo, Henry, Maerlender, Piyevsky, Saffrin, and Weaver each matriculated before January 9, 2018, and thus incurred the alleged injuries from their initial financial aid awards outside the limitations period. Subsequent financial aid awards for matriculated students were not subject to any agreement

among Defendants, and any alleged effect on such awards from the initial awards was a foreseeable future harm at the time of the initial awards. Indeed, Weaver, Henry, and Piyevsky alleged they graduated before January 9, 2018, and thus could not have incurred any injuries within the limitations period. Likewise, as Carbone's daughter, Corzo, and Saffrin alleged they graduated in Spring 2018, they received their final financial aid awards before January 9, 2018, and thus could not have incurred any injuries within the limitations period.

Each of the Plaintiffs either discovered or should have discovered with reasonable diligence their alleged injuries before January 9, 2018. The publicly available information that Plaintiffs cite in the Amended Complaint to support their alleged injuries was readily accessible before January 9, 2018.

## FOURTH AFFIRMATIVE DEFENSE

### Laches

Setting aside that none of the Plaintiffs faces a sufficient threat of future injury to support equitable relief, their request for such relief is barred by laches. As set forth in the Third Affirmative Defense and incorporated by reference here, Plaintiffs either discovered or should have discovered with reasonable diligence their alleged past and future injuries long before January 9, 2018. And their failure to sue until January 9, 2022, has prejudiced Defendants, because the passage of time without notice of Plaintiffs' suit—at least four years for all Plaintiffs, and more than a decade for certain Plaintiffs—has harmed Defendants' ability to obtain and maintain relevant evidence and otherwise prepare their defense.

## FIFTH AFFIRMATIVE DEFENSE

### Failure to Mitigate Damages

Setting aside that Plaintiffs lack antitrust injury and standing, their claim for damages is barred, on information and belief, because of, and to the extent of, their failure to mitigate damages. For example, each Plaintiff, through the exercise of reasonable diligence, could have attended one or more schools that were not members of the 568 Presidents Group but were otherwise reasonably comparable to the Defendant school that the Plaintiff chose to attend. Among others, private schools in *U.S. News & World Reports'* top 25 schools ranking are (as Plaintiffs themselves allege) reasonable substitutes for Defendants, and multiple schools on those lists were not Group members during some or all of the times that Plaintiffs were applying for admission. If Plaintiffs had attended such schools, they might not have incurred any alleged price increase caused by the challenged conduct at the Defendant schools they chose to attend, while still receiving a reasonably comparable education. In addition, Plaintiffs may not have exhausted all available sources of grants or other tuition relief that could have offset any alleged price increase. Defendants plead this defense on information and belief because Plaintiffs' failure to mitigate damages concerns matters peculiarly within the knowledge of Plaintiffs or other non-Defendants, such as the aid awarded by any non-Group-member schools Plaintiffs reasonably could have attended.

\* \* \* \* \* \*

MIT reserves the right to supplement its Answer and Affirmative Defenses with other defenses that become available or apparent in the course of investigation, preparation, and/or discovery, and to amend its Answer accordingly.

Dated: September 9, 2022

Respectfully submitted,

/s/ *Eric Mahr*
Eric Mahr
Jan Rybnicek
Daphne Lin
FRESHFIELDS BRUCKHAUS
DERINGER US LLP
700 13th Street, NW
10th Floor
Washington, DC 20005
Tel: 202-777-4500
eric.mahr@freshfields.com
jan.rybnicek@freshfields.com
daphne.lin@freshfields.com

Rami Fakhouri
Jennifer L. Greenblatt
GOLDMAN ISMAIL TOMASELLI
BRENNAN & BAUM LLP
200 South Wacker Drive
22nd Floor
Chicago, IL 60606
Tel: 312-681-6000
rfakhouri@goldmanismail.com
jgreenblatt@goldmanismail.com

*Counsel for Massachusetts Institute of
Technology*

## CERTIFICATE OF SERVICE

I hereby certify that on September 9, 2022, a true and correct copy of this document

was served via email on the following counsel of record for Plaintiffs.

Edward Normand
Eric Rosen
Peter Bach-y-Rita
ROCHE FREEDMAN LLP
99 Park Avenue, Suite 1910
New York, NY 10016
Tel: 646-350-0527
tnormand@rochefreedman.com
erosen@rochefreedman.com
pbachyrita@rochefreedman.com

Robert D. Gilbert
Elpidio Villarreal
GILBERT LITIGATORS & COUNSELORS, PC
11 Broadway, Suite 615
New York, NY 10004
Tel: 646-448-5269
rgilbert@gilbertlitigators.com
pdvillarreal@gilbertlitigators.com

Eric L. Cramer
Caitlin Coslett
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: 215-875-3000
ecramer@bm.net
ccoslett@bm.net

Robert E. Litan
Daniel J. Walker
BERGER MONTAGUE PC
2001 Pennsylvania Avenue, NW, Suite 300
Washington, DC 20006
Tel: 202-559-9745
rlitan@bm.net
dwalker@bm.net

Elizabeth A. Fegan

FEGAN SCOTT LLC
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Tel: 312-741-1019
beth@feganscott.com

Brooke Achua
FEGAN SCOTT LLC
140 Broadway, 46th Floor
New York, NY 10005
Tel: 646-502-7910
brooke@feganscott.com

*/s/ Eric Mahr*