## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| FRANK CARBONE, *et al.*, individually and on behalf of all others similarly situated,<br><br>     Plaintiffs,<br><br>     v.<br><br>BROWN UNIVERSITY, *et al.*,<br><br>     Defendants. | Case No.: 22-cv-00125<br><br>Hon. Matthew F. Kennelly |

## JOINT STATUS REPORT

The Parties submit this Joint Status Report pursuant to the Case Management Order, Dkt. No. 195, requiring the Parties to "Set[] Forth Any Areas of Dispute Regarding Custodians, Noncustodial Document Sources, and Search Methodologies" by December 2, 2022.

**I.** **The Parties' Respective Positions on Disputes Regarding Custodians, Non-Custodial Sources, and Search Methodologies**

 **A.** **Plaintiffs' Position**

Plaintiffs have completed six (6) meet-and-confer sessions with all Defendants, and at least one meet-and-confer session individually with each of the Defendants.[1] Unfortunately, we must identify to the Court three areas of dispute with respect to Custodians and Non-Custodial Sources that are global and ripe for presentation to and rulings from the Court.

---

[1] For ease of reference, Plaintiffs refer to these as Global and Individual meet-and-confers, respectively.

1.  **Presidents' and Development Offices Are Custodians**

Sixteen (16) Defendants have taken the uniform position that the Development Office (at certain universities, referred to as the Advancement Office or Alumni Engagement office) is not an appropriate custodian of documents.[2]  Twelve (12) Defendants have taken the position that the President's Office (at certain universities, referred to as the Chancellor) is not an appropriate custodian of documents.[3] At the 6th Global meet-and-confer on November 30, Defendants declined to change their position.

Plaintiffs submit that these positions are unreasonable, inconsistent with the Court's rulings and guidance, and fundamentally interfere with Plaintiffs' right to discover evidence to prove their claims. The sequence of events is illuminating. First, the Plaintiffs went to Individual meet-and-confers with individual Defendants (starting on November 10), several of whom used identical arguments to refuse to identify a custodian in the Development or President's Office, and then said that the Plaintiffs needed to seek recourse at the Global meet-and-confers, and this pattern continued for a couple of weeks. At the subsequent Global meet-and-confer on November 28, to which the Plaintiffs had been referred, all Defendants took the position that Plaintiffs' only recourse was to go back to all seventeen universities separately in at least seventeen more Individual meet-and-confers to determine whether any one of them will agree to provide even a single custodian from one of those offices.[4] From the perspective of the Plaintiffs,

---

[2] As of December 1, Johns Hopkins has identified a custodian from its Development Office.

[3] The five Defendants that have identified or agreed to identify in the future a custodian from their President's Office are Dartmouth, Duke, Georgetown, Johns Hopkins, and Northwestern. Plaintiffs and Caltech are negotiating the need for a custodian from the President's Office.

[4] In a December 1 Individual meet-and-confer, Johns Hopkins identified custodians from its President's and Development offices, leaving sixteen more Individual meet-and-confers.

this is a classic case of being given the run-around. Accordingly, Plaintiffs now seek their recourse from the Court.

This is, after all, the 568 *Presidents* Group. Two Defendant universities joined the 568 Presidents Group in the last three years. It stands to reason that the Presidents of those universities must have substantial communications with their board of trustees, with other officers at the university, and with the 568 Presidents Group itself concerning the reasons why they joined the group after declining to join for approximately two decades, their goals in joining, and the pluses and minuses of a decision to join. With respect to all the other fifteen Defendant universities, it is important to know each President's involvement at or near the time of the formation and operation of the 568 Group, the creation of the Consensus Methodology, and all other operations of this conspiracy. And the Court has recognized the relevance and importance of donation records to Plaintiffs' case:

> **So the whole case -- maybe not the whole case, but a significant part of the case is exactly this, the contention that admissions are tied to donations, or at least that's a significant part of the case.** And so . . . the kind of thing I just said is not going to happen, that basically says the plaintiffs can't get that, therefore, the case is over, then **we have to come up with a way of doing that**[, to allow for discovery] which would allow somebody to say, okay, **this is a donation record that relates to this student over here and so we can determine whether that had any effect on whether that person got admitted or not**.

Oct. 26, 2022 Hr'g Tr. 36:24-37:14 (emphasis added).

In great detail, Plaintiffs explained in writing to all Defendants on November 23:

> The essential function of a Development Office is to solicit, communicate about and keep documents concerning the very donations that Judge Kennelly addressed. For Defendants to say they will not identify and produce custodial sources of documents from the Development Office is plainly inconsistent with the Court's guidance. Similarly, Defendants have taken at least a majority position with respect to the President's Office that it is not an appropriate custodial source for donations. This position

3

disregards, for example, paragraph 183 in the Amended Complaint which states: "A past President of Vanderbilt, E. Gordon Gee, stated in 2019 that any president under 'truth serum' would concede that donor connections make a difference in admissions." These Defendants' positions also ignore the many instances in the public record in which Defendant presidents have in effect gushed about their fundraising success with large donations. Defendants' rationale for these positions, as we understand it, is that the relevance of any such documents is nonexistent until it affects an Admissions decision, and thus must necessarily be contained within the productions of the existing pool of Admissions custodians and noncustodial sources identified by each Defendant.

Plaintiffs have repeatedly explained in numerous meet-and-confers with individual Defendants, and in a general meet-and-confer with all Defendants, that Defendants' rationale has no merit. It is also a barrier to the very discovery that Judge Kennelly has made clear is relevant and should be produced. Plaintiffs have repeatedly provided multiple examples of highly relevant documents in the Development Office and the President's Office that would not be available from Admissions, including the following:

1. Defendants' position assumes the existence of some written evidence, such as an email from the Development office to the director of Admissions saying that "Applicant X's uncle just donated $500k, so please admit X." These may exist, and Plaintiffs would naturally want to see them, but this assumption ignores every scenario in which Development had an oral communication with Admissions, and the real proof is in the documented communications between the Development Office and the Donor or between the Development Office and the President's Office.

2. A written communication between the President's Office or Development Office and Admissions could be as simple as, "Please admit X." In such a situation, there would very likely be preceding communications within and from those two offices (to each other and/or the Donor), and received by those offices that would not be communicated to Admissions. Plaintiffs see these communications as the potential smoking guns; a one-sentence email to Admissions is not a substitute. The communications from, to and among the Donor and the Development/President's office before anything is communicated to Admissions are far more informational, probative and relevant than, "Please admit X."

3. Internal deliberations in the President's Office or Development Office in which a donation was deemed

4

insufficiently large to merit intervention with Admissions, or multiple donations were deemed insufficiently large to warrant such intervention, and thus by definition no record would exist with Admissions, but the determinations of insufficiency would be additional "smoking guns" to support Plaintiffs case.

4. Internal score cards, not shared with Admissions, that note how many candidates the Development Office recommended to the Admissions office in an admissions cycle or other period of time, and how many were admitted.

(Nov. 23 email from Robert Gilbert to Defendants entitled "The President's Office and Development Office Are Custodians of Documents").

Contrary to the Court's rulings and guidance, to summarize, sixteen (16) Defendants refuse to identify any custodians or non-custodial sources in their Development Office; and twelve (12) Defendants have refused or not agreed to identify any custodians or non-custodial sources in their President's Office. Plaintiffs submit that Defendants' positions have no merit beyond creating a barrier to Plaintiffs' ability to establish a link between donations and admissions. For these reasons, Plaintiffs respectfully request the Court to order Defendants to identify custodians and non-custodial sources of documents in their President's and Development Offices.

## 2. Relevant Time Period For Identifying Custodians and Non-Custodial Document Sources

The second area of dispute concerns the relevant time period for discovery, which of course bears directly on the appropriate custodians of documents and noncustodial sources. The 568 Exemption was enacted in 1994. The 568 Cartel was created in 1998. The Consensus Methodology was implemented beginning in 2003. Plaintiffs' RFPs originally generally requested relevant documents and data beginning January 1, 1994. However, Plaintiffs made numerous subsequent modifications and narrowing pursuant to Defendants' requests as explained below (the "Relevant Period"), which comprises the range of documents and data relevant to Plaintiffs' claims.

The Court has already rejected all the theories Defendants advanced on their Motion to Dismiss Plaintiffs' Amended Complaint based on the statute of limitations. As Plaintiffs explained to Defendants:

> In denying Defendants' various motions to dismiss, including with respect to statute of limitations, the Court has neither imposed nor even suggested any limitation on the proposed Class Period or the proposed period for the production of relevant documents.

(Nov. 21, 2022 email from Robert Gilbert to Defendants entitled "Judge Kennelly's Rejection of Every Statute of Limitations Argument at the Motion to Dismiss").

Until November 30, most Defendants had been taking the position for weeks that they would not produce any documents created before 2016. For structured data, Plaintiffs need discovery prior to 2003 to permit an econometric analysis of both the before and after period of the implementation of the Consensus Methodology. In a November 21 email to Defendants, Plaintiffs offered a compromise date of 1998 as to structured data. *Id.* Plaintiffs understand Defendants to have agreed to this 1998 compromise date on the Parties' November 30 Global meet-and-confer call.

As to non-structured data, Plaintiffs proposed a substantially narrower date range for a number of RFPs in their November 21 email, attaching a list of RFPs with proposed date ranges that extend from 2003 to as recently as just one year, 2022. *Id.* Yesterday, December 1, Defendants accepted those proposed compromises.[5]

At our most recent Global meet-and-confer, on November 30, Defendants finally agreed to identify custodians and search for documents going back further than a blanket cutoff date in

---

[5] In the Parties' Global meet-and-confer on November 16, Defendants asked Plaintiffs to review and propose a list of RFPs for which a date range later than 1994 would be acceptable, and Plaintiffs asked Defendants to do the same. Plaintiffs provided their list of proposed RFPs and narrowed date ranges on November 21. Plaintiffs still await any proposal from Defendants.

2016, provided that each of the Defendants reserve the right to independently argue burden and proportionality as to every request for production. Although this will require Individual meet-and-confers with each of seventeen (17) Defendants, Plaintiffs have an open mind as to proceeding in this manner and hopefully seeing it is being conducted in good faith.

What is not acceptable, however, is that Defendants drew "a line in the sand" (Defendants' choice of words in the November 30 Global meet-and-confer) in refusing to identify custodians and documents before 2003. There are several facts leading up to the formation of the 568 Cartel in 1998, which are central to the Amended Complaint, and leading up to the implementation of the Consensus Methodology in 2003, which are also central to the Amended Complaint. Accordingly, it is important for Defendants to seek to identify custodians for certain issues prior to 2003 rather than draw a "line in the sand."

Plaintiffs have repeatedly explained to Defendants the relevance and importance of certain historical data and documents orally at the Global meet-and-confer sessions and at the Individual sessions, and in writing. For example:

> We have also explained why non-structured data during the period 1994-2003 is highly relevant. For example, for what purposes was the 568 Presidents Group formed in 1998? What communications led up to its formation? Were concerns expressed about the purposes and collusion? Similarly, for what purposes did the 568 Presidents Group create the Consensus Methodology (CM)? What concerns (if any) were communicated about the CM and the additional collusion? What alternatives were considered to the CM? How were components of the CM agreed upon? All of these issues would arise before 1998 or 2003, respectively.
>
> The Court's denial of Defendants' various arguments regarding the statute of limitations was clear, such that it appears Defendants either want to ignore those rulings or to cause the parties to reargue them.

(Nov. 21, 2022 email from Robert Gilbert to Defendants entitled "Judge Kennelly's Rejection of Every Statute of Limitations Argument at the Motion to Dismiss").

In sum, any blanket 2003 cut-off is completely inconsistent with the Court's rulings on the motions to dismiss and fundamentally interferes with Plaintiffs' right to uncover evidence to prove their claims. Plaintiffs therefore respectfully request the Court rule that Defendants may not impose any blanket 2003 cut-off date before which they will not identify custodians or non-custodial sources, or search for documents.

### 3. Custodians At Four Universities After Alleged "Withdrawals" From The Cartel

The third area of dispute arises from four Defendant universities that allege having "withdrawn" from the 568 Cartel at various times throughout the existence of the conspiracy: Brown, Chicago, Emory, and Penn. These universities argue that their purported withdrawal bears on the time period over which they should produce discovery. These arguments fail, including because each university has failed to produce any evidence of disavowing or repudiating the conspiracy—much less the evidence that would be required at this stage of the proceedings—that establishes *as a matter of law* that there has been any such "withdrawal" from the conspiracy. And the Defendants, of course, have the burden to prove that they withdrew from the conspiracy. Stated another way, Defendants' position serves to preclude Plaintiffs from taking discovery on Defendants' own affirmative defense (withdrawal).

As this Court has made clear, and Plaintiffs have reminded Defendants, withdrawal from a conspiracy requires both that a conspirator to both communicate its withdrawal to the group **and** repudiate or disavow the criminal goals or objectives of the conspiracy. *See, e.g.*, *United States v. Nagelvoort*, 856 F.3d 1117, 1128–29 (7th Cir. 2017) (noting that a withdrawal defense requires the conspirator to both inform co-conspirators of his withdrawal and disavow the criminal objectives of the conspiracy).

### a) *The Admissions of Chicago and Penn*

To date, Chicago and Penn have each produced a letter purporting to evidence their respective "withdrawals" from the 568 Cartel. Rather than proof of "withdrawal," each of these letters has provided dispositive proof that Chicago and Emory remain in the conspiracy, given their plain failure to disavow or repudiate the illegal aims of the conspiracy.

Plaintiffs wrote to Chicago (with copies to all counsel) concerning Chicago's alleged 2014 "withdrawal" letter, which praised the conspiracy and wished it "all the best going forward":

> Against this backdrop of both well-established law and unequivocal judicial rulings, the 2014 letter concludes as follows: "We have truly appreciated the collegiality of The 568 group and wish you and our colleagues in the group all the best going forward." Frankly, with the reference to the conspiracy as "the collegiality of the 568 group", and the further reference to co-conspirators as "our colleagues in the group", and the finishing touch to expressly wish the conspiracy "all the best going forward", it is difficult to imagine stronger proof that, as a matter of law, Chicago never disavowed nor repudiated the Cartel. If Chicago had wanted to disavow or repudiate the conspiracy and its unlawful objectives in 2014, that letter would have concluded along the following lines: "We urge you to disband this Cartel, terminate its unlawful activities, and cease the pursuit of its unlawful objectives—immediately." *United States v. Vallone*, 698 F.3d 416, 494 (7th Cir. 2012) (finding that the letter did not effectuate withdrawal because it did not "disavow[] the conspiracy and its criminal elements" and "voiced no disapproval" of the conspiracy).

(Nov. 25 email from Robert Gilbert to Defendants entitled "Chicago's Claim That it 'Withdrew' from the Cartel in 2014, and Chicago's Other Rationales for Refusing to Identify Custodians and/or Produce Documents").

Penn's alleged "withdrawal" letter is equally dispositive proof that Penn neither repudiated nor disavowed the conspiracy. As Plaintiffs detailed to Penn (with copies to all counsel), the purported withdrawal letter

> confirms what we suspected, what we argued on the Motion to Dismiss, and the standard the Court made clear both on the record

9

and in its decision when it rejected every argument Defendants asserted: the letter does not in any way come close to doing what is needed to withdraw from a conspiracy, which is publicly to repudiate the conspiracy and its goals. We did not on our meet-and-confer call, and will not here, repeat the law on withdrawal from the 568 Cartel's price-fixing conspiracy, particularly because the Court was so clear on this point, but Penn's January 24, 2020 letter proves Penn continues to be a member of the conspiracy to this day, and is jointly and severally liable for all damages the conspiracy visited on financial aid applicants and awardees from its beginning to the present. And, interestingly, the January 24, 2020 cover transmission email you provided refers to the 568 Presidential *Agreement* (emphasis added). Rather than repudiate anything, the January 24 letter states that Penn "is proud to have been a member of the 568 President's Group…and to have collaborated with other 568 members…." It confirms that Penn and the 568 President's Group had a "shared vision and strategic directions." Penn expressed "deep respect and gratitude" for the 568 President's Group, then expresses its "admiration for the important work that has been accomplished by the 568 President's Group", and wishes it "every continued success." Plaintiffs could not have asked for better proof from Penn of the allegations in the Amended Complaint, including of Penn's continued liability for the effects of the 568 President's Group's price-fixing in violation of the Sherman Act. More to your Second point, that letter reaffirms plaintiffs' right to have Penn search and produce relevant documents covering the entire period of time set forth in Plaintiffs' RFPs, and to have custodians produce documents after Penn's supposed "withdrawal," or "exit," as you prefer to term the "withdrawal".

(Nov. 29, 2022 email from Robert Raymar to Defendants entitled "Fwd: FW: Penn's Claim That it 'Withdrew' from the Cartel in 2020, and Penn's Other Rationales for Refusing to Identify Custodians and/or Produce Documents"). To date, neither Emory nor Brown has provided any evidence of having repudiated or disavowed the conspiracy—let alone as a matter of law. Interestingly, Emory admits in writing that it was need-aware after 2012.[6] *See, e.g.*, Emory Press Release entitled "Commitment to excellence guides financial aid" (Jan. 17, 2013).

---

[6] Brown and Emory have stated that neither will produce its alleged withdrawal letter until December 16.

These four Defendants have taken the position that *they will not* identify certain donor-related custodians or non-custodial sources, including in the Presidents' and Development Offices, beyond some point following their alleged "withdrawals." Penn will not identify custodians or non-custodial sources, nor will they search for or produce donor-related admissions records, beyond January 21, 2021. Chicago appears to have taken the position that it will not identify any custodians or non-custodial sources, or to search for and produce documents, after 2014—even today, except for those related to the 568 Group. Further, they have consistently taken the position that they will not identify any custodians or non-custodial sources, or to search for documents after the date the Complaint was filed. Brown refuses to identify any donor-related custodians or non-custodial sources after 2012 its alleged "withdrawal" in 2012, or to search for and produce documents relating to whether Brown was "need-blind" under the 568 exemption after 2012. Emory refuses to identify custodians or non-custodial sources, or to produce documents responsive to Plaintiffs' "RFPs that relate to Emory's admissions and/or donor activities" after Emory's purported "withdrawal" in 2012.

The letters produced by Penn and Chicago fail to justify any limitation on the discovery that Plaintiffs are entitled to in this case. The same is true for Brown and Emory, who have not produced any evidence that they have repudiated or disavowed the conspiracy. Moreover, Plaintiffs are justifiably more than dubious that any of the universities could prove, now, as a matter of law, that they meet the requisite, summary judgment-level standard for proving "withdrawal," which they would need to do in order to shut off discovery. *See, e.g.*, (Nov. 30, 2022 email from Robert Gilbert to Defendants entitled "Chicago's Claim That it 'Withdrew' from the Cartel in 2014, and Chicago's Other Rationales for Refusing to Identify Custodians and/or Produce Documents").

11

Penn has taken an even more far-reaching position. They have stated, "[a]nd in general, we fail to see the relevance of these donor communications of the kind you are seeking anyway." (Nov. 30, 2022 email from David Gringer to Plaintiffs entitled "RE: FW: Penn's Claim That it 'Withdrew' from the Cartel in 2020, and Penn's Other Rationales for Refusing to Identify Custodians and/or Produce Documents"). In response to Penn's general relevance objection to producing donation records, Plaintiffs were forced to remind counsel for Penn that the Court has expressly denominated these issues as, not just relevant, but "a significant part of the case." (Dec. 1, 2022 email from Robert Gilbert to David Gringer and all Defendants entitled "RE: Penn's Claim That it 'Withdrew' from the Cartel in 2020, and Penn's Other Rationales for Refusing to Identify Custodians and/or Produce Documents") (quoting Oct. 26, 2022 Hr'g Tr. 36:24-37:2).

### b) The Ostensible Need for Defendants to Understand Why Discovery Is Necessary

The Defendants argue below:

> Among the issues the Non-Member Schools have sought to clarify is whether and why Plaintiffs believe discovery is needed about whether the admissions practices of Non-Member Schools were "need blind" for purposes of the 568 Exemption during periods after they ended their membership in the 568 Group (*i.e.*, for periods the Non-Member Schools do not assert the 568 Exemption as a defense). Plaintiffs initially asserted that the Non-Member Schools' admissions and donations records remain relevant to determining whether the Non-Member Schools adequately "disavowed" or "repudiated" the purported conspiracy for the purposes of their separate withdrawal defense. This assertion misses the mark entirely.

> The *only* issues **[emphasis in original]** relevant to the Non-Member Schools post-membership are: (a) did they continue to participate in the alleged agreement to use the Consensus Methodology; and (b) if so, did that agreement have any impact on their financial aid awards? Each of the Non-Member Schools have agreed to produce proportional discovery into their financial need calculation methodologies and how aid is met (loans, grants, etc.) post-membership. But discovery about whether the Non-Member Schools were or were not need-blind in their admissions practices

12

> during that post-membership period is wholly immaterial to resolving questions concerning "disavowal" or "repudiation" for their withdrawal defenses.

The Defendants' position speaks for itself as to the extremely narrow scope as to any discovery that they are prepared to provide. The members of a conspiracy do not get to pronounce the *only* issues that are relevant. Clearly as to pricing, financial aid, and damages, discovery into these "withdrawn" Defendants is relevant, because the other members of the conspiracy continue to be jointly and severally liable for the damages of every member of the conspiracy.

Contrary to Defendants' premise, for the period after a given Defendant purports to have "withdrawn" from the conspiracy, Plaintiffs are not entitled merely to evidence of whether the Defendant continued to use the Common Methodology as such. Instead, consistent with the proof relevant with respect to any price-fixing conspiracy, Plaintiffs are also entitled to discovery of such matters as to whether and to what extent (a) the Defendant continued to use the information shared among the conspirators to make its pricing decisions, (b) the Defendant continued to share pricing-related information with the co-conspirators, (c) the Defendant continued to use a pricing model, strategy, or formula that was based on or derived from the Common Methodology, and (d) the Defendant's pricing otherwise continued to reflect the influence of the co-conspirators' application of the Common Methodology, both before and after the Defendant's purported "withdrawal." Moreover, it is not uncommon for individuals and entities to receive informative communications from groups that they believe they have left, and/or to receive overtures or invitations to re-join, with the reasons to do so.

Chicago has advanced an argument that since they no longer rely on the antitrust exemption as a defense, they are somehow entitled to preferential treatment in discovery. As Plaintiffs explained to Chicago and all Defendants in writing:

13

> Chicago understandably concluded that it would not rely on the 568 exemption as a defense when it realized that it was a terrible defense, because both Chicago and other members of the conspiracy had systemically violated the need-blind predicate to the defense. The fact that Chicago came to conclude that the 568 Exemption was a terrible defense does not change the fact that Chicago remained a member of the conspiracy after its 2014 letter; its subsequent non-need blind admissions practices continued to compound its own liability and also compound the liability of its co-conspirators. Accordingly, we are entitled to the same discovery and identification of custodians after 2014 as before 2014.

Plaintiffs provided a very similar explanation to Emory and all Defendants:

> As articulated by Judge Kennelly in denying Defendants' motion to dismiss and specifically with regard to Emory, prior to an award of summary judgment being granted in Emory's favor, Emory has simply invoked a withdrawal defense and it remains Emory's burden to prove an effective withdrawal from the conspiracy. Therefore, as part of an ongoing conspiracy where no withdrawal or repudiation has been proven by any Defendant, Emory's need-awareness post-2012 impacts not only Emory's liability but the liability of every other member of the conspiracy. Therefore, Plaintiffs reiterate their request that Emory produce all responsive documents, regardless of whatever Emory may have meant by "such documents", created after April 12, 2012.

Furthermore, Plaintiffs are not simply required to rely on certain Defendants' claim that they have somehow repudiated a conspiracy. Plaintiffs are entitled to take discovery on the extent to which that assertion is or is not true.

Plaintiffs therefore ask the Court to confirm that Defendants are required to identify custodians and non-custodial sources and produce discovery as requested by Plaintiffs beyond the date of each Defendant's alleged withdrawal and until the present.

### 4. <u>Search Methodologies</u>

The Plaintiffs' position is that the Parties have exchanged search terms, about which they are meeting and conferring. There are no issues ripe for the Court.

14

5. **Response to Defendants' Insert**

Case Management Order No. 1 directed the Parties to "Set[] Forth Any Areas of Dispute Regarding Custodians, Noncustodial Document Sources, and Search Methodologies" in the December 2 Joint Status Report. Contrary to the Court's direction, much of Defendants' insert is directed to other topics (notwithstanding Plaintiffs having at least twice reminded the Defendants that the Court has specified three topics for this Joint Status Report, which do not include interrogatories). Plaintiffs will address the only two issues in Defendants' insert that are appropriate for this Joint Status Report.

First, as to Plaintiffs' custodians, Defendants insist nonstudent parents and family members are appropriate custodians. As Plaintiffs explained, Plaintiffs will move to amend their Complaint by the end of next week, *i.e.*, December 9, after which the sole parent Plaintiff, Frank Carbone, will be removed, along with reference to "those who pay or commit to pay on behalf of students" in what is currently Paragraph 12 in the Amended Complaint. Plaintiffs have also explained in writing to Defendants why discovery beyond the direct purchaser, in this case the students, is inappropriate in an antitrust inquiry. With no parent as part of the class, and all reference to "those who pay or commit to pay on behalf of students" removed from the Amended Complaint, Plaintiffs submit that Defendants' "dispute" over custodians is moot.

Second, as to search terms, Defendants are making mountains out of a very small mole hill. Plaintiffs have been manually searching their files with the assistance of counsel, and most have identified 25 pages' worth (or fewer) of responsive documents. Plaintiffs have also proposed terms to search their records. Plaintiffs are, after all, individual students and young professionals. They are not multibillion-dollar entities like Defendant universities that both generate and receive *actual* mountains of potentially relevant and responsive data and documents each year, and who retain entire staffs devoted to their data processing, management, organization, and retention.

15

Notwithstanding the small volume of responsive documents that exist, Plaintiffs have proposed search terms for their own records, and are fully amenable to virtually any additional search terms Defendants would like to propose, because there is so very little to search. Indeed, Plaintiffs are happy to meet and confer with Defendants on Tuesday, December 6 to learn Defendants' suggestions, to which Plaintiffs are highly receptive. Plaintiffs submit that there is not any genuine dispute here.

The rest of the Defendants' position is devoted to gloomy predictions about hypothetical disputes that might be ripe sometime in the future. Disregarding the Court's specific instruction that the Parties bring up issues that are ripe on three topics at this time, Defendants have spent some length of their portion of this submission to describe to the Court that it "*appears* the Defendants will *ultimately* have to request" certain relief, which by their own acknowledgement is not a ripe dispute. Defendants then go on to say: "Defendants *expect* the parties will *soon* have a number of disputes that will require Court resolution." Defendants then go on to make this same point a third time, saying that "*if* the parties cannot resolve this and other disputes soon, … Defendants will have no choice but to seek relief from the Court." Plaintiffs respectfully request those sections of the Joint Status Report are mere conjecture. Meanwhile, Plaintiffs are meeting regularly in both Global and Individual meet-and-confers with Defendants, with multiple meet-and-confers that occurred last week, and multiple meet-and-confers that are scheduled for the coming week on other discovery issues.

### B. Defendants' Position

Defendants do not believe there are any disputes ripe for the Court relating to Defendants' identification of custodians, non-custodial sources or search methodologies. Defendants have been working cooperatively with Plaintiffs to meet and confer on these issues

and the parties continue to exchange information (and compromises) in an effort to resolve disputes. However, in anticipation of this submission, Plaintiffs have prematurely halted the meet and confer process so that they could present three "disputes" to the Court and request intervention, even while Defendants are working diligently to follow up on Plaintiffs' requests for more information on these issues. Therefore, Defendants respectfully request that Plaintiffs be required to complete their meet and confer obligations on these issues or that the parties be given an opportunity to brief their respective positions.

### i. Negotiations as to Defendants' Custodians Are Ongoing

Defendants disagree with Plaintiffs that there are disputes regarding custodians that are ripe for the Court's resolution. Plaintiffs have, over the past ten days, expressed their preference for "global" level discussions of the purported need for document custodians from each school's Development Office and President's Office. The parties have held two global meet and confer calls to discuss this issue, and have not been able to reach an agreement or compromise at the global level. That, however, is a product of school-specific variation. Each school operates somewhat differently, and the identification of document custodians (or repositories) is necessarily a function of those specifics.

Each Defendant has provided Plaintiffs with a list of custodians that includes personnel from its Admissions Office (among other offices or departments) and custodial sources such as files maintained and databases used by that office. Defendants believe that these custodians and repositories are the most appropriate starting point for discovery into the discrete issue of whether the Section 568 Exemption is applicable to each school, which turns on whether each was need-blind in its admissions process during its membership in the 568 Group. In light of this Court's decision on the motion to dismiss, the question of need-blindness does not require

17

inquiry into each individual application and admission decision—it is a question of the general policy and approach to admissions at each school, and an understanding of the factors that were or were not considered in making admissions decisions.

Nevertheless, Plaintiffs have forthrightly acknowledged that their Requests for Production were designed to elicit cumulative categories of evidence regarding need-blind admissions, including student-specific application or admissions files, policy and procedure documents, data reflecting the credentials of aggregate groups of applicants, and communications about individual actual or potential applicants and individual actual or potential donors. Plaintiffs' approach greatly increases the burden and expense of discovery in this case, and drastically expands the complexity and length of future dispositive motions or trial, given the tens (or hundreds) of thousands of students who applied to each school over the past two decades. Defendants have explained their view that the parties can and should discuss potential ways to streamline discovery, given the nature of the single question to which this discovery relates. At a minimum, Defendants' proposal of focusing initial discovery efforts on each school's admissions policies, data, and custodians is a logical, reasonable, and most importantly, proportional way to approach the admissions issue, which is wholly distinct from the financial aid methodology on which Plaintiffs' antitrust claims are based.

Against this backdrop, Defendants note that the vast majority of schools have had one individualized meet and confer call with counsel for Plaintiffs. Many Defendants have not yet had the opportunity to have a second (much less a third) conversation with Plaintiffs on these issues. All of these initial meet-and-confer calls resulted in various questions that defense counsel have been investigating and attempting to answer, and in each case, Defendants understood that there would be further conversations to discuss the results of those investigations

and to continue working toward resolution. Defendants disagree with Plaintiffs' assertion that certain (unidentified) Defendants directed Plaintiffs to "seek recourse at the Global meet-and-confers," as none of the Defendants deferred their custodian negotiations to the broader global discussions.[7] Regardless, Plaintiffs now have made clear that they find the individualized meet-and-confer process to be too burdensome, given the number of Defendants. Defendants have done their best to utilize the "global" meet-and-confer process to the greatest extent possible, and to make those discussions as productive as they could be. However, any burden imposed on Plaintiffs in having to address the custodian issue with each school separately—in a context where all parties agree that further individualized discussions are necessary—is simply the reality of a case with this many named Defendants. Adding the topic of custodians to the agendas of those ongoing conversations is not the impediment to progress that Plaintiffs seek to portray. Further, Plaintiffs' own position statement, above, makes clear that the structures and practices at each school already have resulted in different positions being taken by different schools, and Defendants expect that such variations may continue as the conversations continue.

Defendants propose that the Court give the parties a few more weeks to allow this process to play out in good faith, so that discussions about custodians can be more fully developed—in parallel with the ongoing discussions about Defendants' relevance and proportionality objections regarding requests relating to donors and development efforts—before any custodian disputes are prematurely litigated. At a minimum, Defendants respectfully suggest that any motion to compel on the issue of custodians should be University-specific, rather than

---

[7] As was explained on the most recent global conversation, there may have been some misunderstanding on Plaintiffs' part, arising from the fact that the related issue of Defendants' relevance and proportionality objections to certain of Plaintiffs' Requests for Production has indeed been the subject of negotiation at the global level. Some Defendants indicated that they wanted to see how those discussions played out before finalizing their proposed custodian lists. There was no "run-around."

global, and that an opportunity for briefing should be permitted, to allow each school to explain the reasoning behind its proffered list of custodians.

**ii.     Relevant Time Period for Defendants' Data and Document Productions**

Defendants disagree that there is a dispute ripe for resolution related to the Relevant Time Period. As an initial matter, this Court's case management order requires identification of any disputes relating to custodians, document sources, and search methodologies by this date, and Defendants note that the date range within which data and documents are to be collected and produced falls outside that list of issues. More importantly, however, the parties have had productive discussions about the date range for Plaintiffs' First Set of Requests for Production and those discussions are ongoing.

Defendants have described to Plaintiffs their concerns with the 28-year time period for which Plaintiffs originally sought data and documents responsive to their 173 separate requests for production. Those concerns have two dimensions: (1) considerations of both relevance and proportionality throughout, but particularly relevance for the pre-2003 timeframe (before the Consensus Methodology was formulated or implemented) and proportionality for the post-2003 timeframe, and (2) the distinction between structured data (which is extracted from databases and produced as a single file or in a few discrete files) and unstructured data (which includes emails, network or shared drive files, and other forms of electronically stored information), and the existence, accessibility, relevance and burdens of those two categories of information.

At this point in the meet and confer process, Plaintiffs have agreed to narrow their requested date range by four years (to 1998) for most of their structured data requests and most Defendants have agreed to produce data within Plaintiffs' revised requested date range insofar as it exists and is reasonably accessible in their current Admissions and Financial Aid databases,

subject to the parties reaching agreement on the scope of the data to be provided, each school's written responses and objections, and ongoing conferences with Plaintiffs about the availability and burden of such productions. (Defendants University of Pennsylvania, Emory, University of Chicago, Yale, Caltech, Vanderbilt and Johns Hopkins University have unique date-range concerns, primarily relating to the dates of their membership in the 568 Group, which those individual Defendants are separately discussing with Plaintiffs.) Defendants therefore believe there are no disputes as to the date range for structured data productions.

As for Plaintiffs' more than 150 separate requests for unstructured data and documents, the parties also have made meaningful progress through their discussions. Defendants have described their objections, on both relevance and proportionality grounds, to many of the specific requests and to certain general categories of requests. Plaintiffs have responded, in some instances narrowing their requests and in others explaining their rationale. As to the relevant time period, Plaintiffs have agreed to narrow their date range for five of the unstructured data requests but have maintained their position that 28 years of discovery is warranted for the remainder.

Defendants have offered a significant compromise from their initial proposal to produce documents going back to 2016 (four years, based on the statute of limitations, plus an additional two years). Namely, Defendants (except those with unique date range concerns, as mentioned above) have offered for the January 1, 2003 to January 9, 2022 period, to meet and confer individually to discuss what documents or sources of documents exist and are reasonably accessible for the identified custodians and repositories, taking into account each school's particular concerns about burden and proportionality, as well as any specific objections to particular requests. Put differently, these Defendants are willing to work cooperatively with

Plaintiffs to produce unstructured data going back as far as 2003, insofar as such documents still exist in electronic form and can reasonably be accessed from the files of the identified custodians (or non-custodial repositories). Insofar as Plaintiffs continue to seek unstructured data or documents for the period 1994 to 2003, Defendants have confirmed to Plaintiffs that they are open to further meet and confer conversations about specific requests or categories of documents, in light of their relevance and proportionality objections.

Contrary to Plaintiffs' description above, Defendants did not take the position that the "line in the sand" of 2003 represents a blanket "cut off" date beyond which they are refusing to conduct any search for or production of responsive documents. Certainly the parties have not reached an impasse on that issue. Rather, Defendants told Plaintiffs that 2003 represents a significant dividing line for their relevance objection, as documents before that date cannot relate to the Consensus Methodology that is at the core of this case. For that reason, Defendants have not agreed to run broad searches for any and all of Plaintiffs' wide-ranging RFPs in the pre-2003 period. Nevertheless, Defendants explained that they remain open to considering specific categories or types of documents for which an earlier date would be appropriate. Plaintiffs responded (on the November 30th meet and confer call) with their view that (at least) documents relating to the formation and purposes of the 568 Group would be categories they think should be produced for the pre-2003 period, and Defendants said that each school is open to talking further about that proposal.

Defendants respectfully suggest that there are no date range disputes warranting the Court's intervention at this time, and look forward to continued discussions with Plaintiffs about the availability of the documents and data Plaintiffs seek and the burdens associated with producing that information. Insofar as the Court has any concerns about the status of the parties'

22

date range negotiations, Defendants request that an opportunity for briefing be provided, so that they may better understand what precisely is in dispute.

iii. **Post-Membership Discovery Related to "Need-Blind" Admissions, Including Donor Information**

Plaintiffs' request in this Status Report for an order requiring four defendant institutions—Brown, Chicago, Emory, and Penn ("Non-Member Schools")—to identify additional custodians is premature and any motions practice with respect to any such request should occur only if it proves necessary after the parties have completed their ongoing meet and confer efforts. Plaintiffs assert that the Non-Member Schools, each of which previously stopped participating in the 568 Group (some for more than a decade), have refused to provide discovery following their departure from the 568 Group. This is not correct. Rather, all of them have explained to Plaintiffs' counsel in individual meet-and-confers the reasons for their objections to particular categories of discovery, asked for feedback as to those objections, offered to discuss further with Plaintiffs the parties' respective positions, and expressed their willingness to limit their objections and assess what is reasonable and proportional to the needs of the case. Accordingly, Plaintiffs' request in this Status Report for a Court order imposing burdensome and disproportional discovery obligations with respect to discovery the parties are continuing to discuss and trying to resolve is procedurally improper and premature.

For example, contrary to Plaintiffs' assertions, Chicago has explained to Plaintiffs that its custodians and non-custodial sources would be the same regardless of time period and has proposed to search those sources for responsive documents after Chicago was no longer a member of the 568 Group related to (1) the 568 Group, (2) structured financial aid data through 2022, and (3) annual financial aid policies for how need is calculated and how need is to be met. Chicago has also invited Plaintiffs to identify additional proportional searches. Chicago's

proposed end date of the filing of the complaint also is consistent with the position of the other Defendants. Chicago also has advised Plaintiffs that it would meet and confer concerning other topics to understand Plaintiffs' reasons for believing them relevant after Chicago was no longer a member of the 568 Group and discuss proportional searches if appropriate. Those discussions remain ongoing and will continue next week.

Penn has explained that it objects to some requests for the period of time when it was no longer a member of the 568 Group because, for example, the requests seeking documents relating to the 568 Group will not be found in Penn's files. Contrary to Plaintiffs' assertion, Penn has not refused to provide all such discovery and has expressed its interest in further discussing such issues to gain a better understanding of what specific information created after Penn's exit from the Group Plaintiffs seek. Plaintiffs also misstate that Penn has taken the position that documents regarding actual influence of donors on the admission process are categorically irrelevant (though Penn has explained to Plaintiffs that it likely does not have such documents). Instead, Penn has explained it does not see what communications between donors and development, which presumably happen all of the time given the nature of development, have to do with this case, unless they bear on admissions decisions.

Similarly, Emory has asked Plaintiffs to explain why certain requests are relevant in the time period after it stopped participating in the 568 Group and confirmed that it would consider whether to withdraw or limit its objections. Brown likewise reiterated its commitment to further discuss with Plaintiffs whether to expand the discovery it has agreed to provide after it left the

568 Group in 2012. In fact, both Emory and Brown received earlier today some correspondence from the Plaintiffs to further engage on such issues.[8]

Among the issues the Non-Member Schools have sought to clarify is whether and why Plaintiffs believe discovery is needed about whether the admissions practices of Non-Member Schools were "need blind" for purposes of the 568 Exemption during periods after they ended their membership in the 568 Group (*i.e.*, for periods the Non-Member Schools do not assert the 568 Exemption as a defense). Plaintiffs initially asserted that the Non-Member Schools' admissions and donations records remain relevant to determining whether the Non-Member Schools adequately "disavowed" or "repudiated" the purported conspiracy for the purposes of their separate withdrawal defense.[9] This assertion misses the mark entirely.

The *only* issues relevant to the Non-Member Schools post-membership are: (a) did they continue to participate in the alleged agreement to use the Consensus Methodology; and (b) if so, did that agreement have any impact on their financial aid awards? Plaintiffs now, in this Status Report, respond to this observation by stating:

> Plaintiffs are also entitled to discovery of such matters as to whether and to what extent (a) the Defendant continued to use the information shared among the conspirators to make its pricing decisions, (b) the Defendant continued to share pricing-related information with the co-conspirators, (c) the Defendant continued to use a pricing model, strategy, or formula that was based on or derived from the Common Methodology, and (d) the Defendant's pricing otherwise continued to

[8] Notably, Plaintiffs have not raised any concerns regarding Vanderbilt's approach to discovery for the period following its withdrawal from the 568 Group (including in the one-on-one conference between Plaintiffs and Vanderbilt). Similarly, Plaintiffs have not yet responded to Yale's proposed approach regarding the time period that it was not a member of the 568 Group. To the extent Plaintiffs have objections to Vanderbilt's or Yale's approach to such discovery and have not conferred about those objections, they plainly are not ripe for resolution (in addition to the reasons that apply to all Non-Member Schools).

[9] To be clear, none of the Non-Member Schools participated in an unlawful agreement to use the Consensus Methodology in determining need, even during the time they were members of the 568 Group, so there was nothing for them to "repudiate" or "disavow" when they left the Group. But, in any event, none of the unbounded post-membership discovery concerning donors and admissions (to which the Non-Member Schools have objected) has anything to do with whether they participated in any such allegedly illegal agreement.

reflect the influence of the co-conspirators' application of the Common Methodology, both before and after the Defendant's purported "withdrawal."

But each of the Non-Member Schools have agreed to provide much, if not all, of such discovery and have made it clear they are amenable to further discussions to address reasonably tailored requests. Specifically, each Non-Member School has agreed to produce proportional discovery into their financial need calculation methodologies and how aid is met (loans, grants, etc.) post-membership. But discovery about whether the Non-Member Schools were or were not need-blind in their admissions practices during that post-membership period is wholly immaterial to resolving questions concerning "disavowal" or "repudiation" for their withdrawal defenses.

Plaintiffs also now assert in this Status Report that discovery from the Non-Member Schools after they left the 568 Group is relevant "because the other members of the conspiracy continue to be jointly and severally liable for the damages of every member of the conspiracy." But, as noted above, none of the Non-Member Schools have declined to provide proportional discovery of their aid awards after they left the 568 Group. And Plaintiffs have not identified any other discovery they need from the Non-Member Schools in order to calculate any damages that they contend are subject to joint and several liability.

Finally, Plaintiffs have asserted that they seek discovery of donor records and admissions practices solely to establish whether the 568 "need-blind" exemption from antitrust liability applies. But none of the Non-Member Schools rely on that exemption post-membership and, therefore, there is no basis upon which to impose the costs and burdens of providing irrelevant discovery into such issues post-membership.

Given Plaintiffs' failure to meaningfully meet and confer on this point, their request in a status report for an order requiring the Non-Member Schools to identify additional custodians for

the period after they stopped participating in the 568 Group is procedurally improper and should be rejected. Defendants respectfully request that Plaintiffs be required to complete their meet-and-confer obligations with the Non-Member Schools or that the parties be given the opportunity to brief this issue before imposing on those schools the disproportional and unwarranted burdens and expense of providing discovery not relevant to any claim or defense in this action.

### iv. <u>Status of Negotiations on Plaintiffs' Custodians and Search Methodology</u>

Defendants have diligently sought to secure Plaintiffs' commitment to provide fundamentally important and reasonable discovery, and Plaintiffs have responded with delay and refusals to meet their discovery obligations. Despite several efforts to meet and confer, Plaintiffs to date have refused to produce documents from the files of essential custodians and have proposed unreasonably narrow search terms for searching the files of the custodians to which they have agreed (only the named Plaintiffs themselves). Intertwined with these issues, even for their proposed custodians Plaintiffs have agreed to produce materials in response to only one of Defendants' documents requests, have refused to provide materials in response to numerous narrowly tailored requests, and have qualified their commitment to produce in response to the remaining requests. Plaintiffs likewise have failed to provide complete answers to Defendants' interrogatories, and they have refused to supplement those responses with information in their possession or the possession of their family members (a fact Plaintiffs do not deny). Defendants are continuing their efforts to secure appropriate discovery, but it appears that Defendants will ultimately have to request that the Court resolve several important discovery disputes. Defendants summarize below the status of their efforts to date.

Defendants timely served Plaintiffs with document requests and interrogatories on September 19, 2022, and Plaintiffs responded and objected to both on October 19, 2022. Three

27

business days after receiving Plaintiffs' responses, Defendants contacted Plaintiffs to confer about those responses and related discovery matters, including custodians. The parties then met twice.

During the most recent meeting, on November 8, 2022, Plaintiffs declined to say whether they would produce the vast majority of discovery that Defendants have requested. Instead, Plaintiffs stated that they would revert to Defendants with their positions by early the week of November 14, 2022. Plaintiffs did not do so. Receiving nothing, Defendants followed up on November 21, 2022, asking Plaintiffs to provide their positions as soon as possible. That inquiry was met with silence, and Defendants emailed again on November 28, 2022.[10] ***Two weeks after the date they promised***, Plaintiffs finally provided some of the updates (largely refusing to provide any discovery) on the evening of Tuesday, November 29, 2022, and they provided additional updates the next day (two days before the deadline for filing this report).

Defendants have requested another meet-and-confer to discuss some of Plaintiffs' recently received positions, including:

- **Custodians**. Plaintiffs refuse to produce the custodial files of their family members even though the finances of those family members figure materially into the financial aid decisions that form the basis of Plaintiffs' antitrust claims. Indeed, it is very likely that family members possess documents that are essential to understanding a Plaintiff's financial aid award, documents that the Plaintiffs themselves may not have. In addition, Plaintiffs' proposed class includes the same family members that Plaintiffs are refusing to make custodians.[11] Plaintiffs' Amended Complaint states, "Parents, legal guardians, and other family members commonly pay or help to pay the cost of a student's tuition, room, and board. The

---

[10] Plaintiffs' unresponsiveness is particularly indefensible because, as they tout above, they have been "meeting regularly in both Global and Individual meet-and-confers with Defendants." In other words, at the same time they were ignoring Defendants' queries about what Plaintiffs will produce, Defendants were meeting with them dozens of times to discuss discovery from Defendants.

[11] After Defendants argued that parents and legal guardians should be document custodians, Plaintiffs stated that they intend to seek leave to amend their complaint to revise the definition of their proposed class. They also stated they intend to drop the lead plaintiff in the case, Frank Carbone, who is the parent of a student. Defendants' position on custodians, however, does not depend on Plaintiffs' proposed class definition, and Plaintiffs have not yet filed such a motion in any event. Defendants reserve all rights with respect to any proposed amended complaint, including the right to amend their answers.

proposed Class therefore includes both students *and those who pay or commit to pay on behalf of students*." Am. Compl. ¶ 12 (emphasis added). Defendants have thus proposed that the document custodians for each named Plaintiff include (1) for students, the parents and legal guardians and any other relatives who paid tuition, room, or board on the Plaintiff's behalf, and (2) for non-students (*e.g.*, Frank Carbone, the student on whose behalf the non-student paid for tuition, room, or board. Plaintiffs, however, insist that "the students are the sole custodians."

- **Search Terms**. On November 2, 2022, Defendants sent Plaintiffs a comprehensive list of search terms – 128 in total – that Defendants had created for identifying potentially responsive documents in Defendants' files. Plaintiffs did not prepare a similar list for searching their own records until November 28, 2022 (again, right before this report was due), and they did so only in response to Defendants' multiple inquiries. Even then, Plaintiffs proposed just eight search terms *for all of Defendants' document requests*:

  568

  fin* aid

  antitrust

  "price fixing"

  Consensus meth*

  CM

  "class action"

  Sherman Act

  Plaintiffs' proposal is facially inadequate for identifying responsive materials. For example, Plaintiffs agreed to produce materials concerning scholarship applications, yet they did not even propose a search term that mentions "scholarship." The terms plaintiffs did provide are not serious attempts to identify responsive materials as it is unlikely that these individuals were discussing the consensus methodology by name or the Sherman Act.

While the parties will continue to confer in an effort to reach compromise on the above topics, based on the discussions to date, Defendants expect the parties will soon have a number of disputes that will require the Court's resolution. Other likely disputes that bear on the adequacy of Plaintiffs' custodians and search terms include:

- **Rule 34 Requests**. Of the 29 document requests that Defendants served on Plaintiffs, Plaintiffs have refused to produce documents in response to 11, and they have restricted what they are willing to produce in response to another 17. In other words, Plaintiffs have only agreed to produce all of the requested documents in

response to **one request**.  One theme in Plaintiffs' objections is that they refuse to produce discovery concerning third-party funding that they received to pay tuition and other expenses.

- **Interrogatories**.  Defendants served Plaintiffs with four interrogatories.  The first asks for fundamental and easily accessible information such as (1) the undergraduate institutions to which each Plaintiff applied, (2) whether the Plaintiff was admitted, rejected, etc., and (3) financial aid received.  Over two months after they were served with the interrogatories, several Plaintiffs have yet to provide the most basic information about their university applications, such as whether they applied early decision or regular decision.[12]  In many cases, Plaintiffs have refused to provide information about their applications to Defendant institutions on the ground that Defendants have the information in their own records.  That is not a legitimate basis for refusing to answer an interrogatory, especially given that the burden on individual Plaintiffs to provide such information should be minimal, not least because Plaintiffs could be expected to have collected such information as part of a reasonable investigation before filing their complaint.

If the parties cannot resolve these and other disputes soon, or if Plaintiffs continue to delay Defendants' efforts to advance discussion on these topics, Defendants will have no choice but to seek relief from the Court.[13]

Dated:  December 2, 2022                     Respectfully submitted,


By: */s/ Edward J. Normand*                  By: */s/ Kenneth Kliebard*
Devin "Vel" Freedman                         Kenneth Kliebard
Edward J. Normand                            MORGAN, LEWIS & BOCKIUS LLP
Peter Bach-y-Rita                            110 North Wacker Drive
FREEDMAN NORMAND                             Suite 2800
    FRIEDLAND LLP                            Chicago, IL 60606-1511
99 Park Avenue                               Tel: 312-324-1000
Suite 1910                                   kenneth.kliebard@morganlewis.com
New York, NY 10016
Tel: 646-970-7513                            Jon R. Roellke
vel@fnf.law                                  MORGAN, LEWIS & BOCKIUS LLP
tnormand@fnf.law                             1111 Pennsylvania Avenue, NW
pbachyrita@fnf.law                           Washington, DC 20004-2541

---

[12] Plaintiffs have said they will update the responses of at least one Plaintiff in the coming weeks.

[13] Plaintiffs argue that Defendants' submission includes topics beyond the scope of this Joint Status Report. Defendants disagree.  As described herein, each of the topics is relevant to Plaintiffs' "custodians, not-custodial sources and search methodologies."

By: */s/ Robert D. Gilbert*
Robert D. Gilbert
Elpidio Villarreal
Robert S. Raymar*
Alexis Marquez
Steven Magnusson
**GILBERT LITIGATORS &
COUNSELORS, P.C.**
11 Broadway, Suite 615
New York, NY 10004
Tel: (646) 448-5269
rgilbert@gilbertlitigators.com
pdvillarreal@gilbertlitigators.com
rraymar@gilbertlitigators.com
amarquez@gilbertlitigators.com
smagnusson@gilbertlitigators.com

* *Pro hac vice*

Eric L. Cramer
Caitlin G. Coslett
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: 215-875-3000
ecramer@bm.net
ccoslett@bm.net

Daniel J. Walker
Robert E. Litan
Hope Brinn
BERGER MONTAGUE PC
2001 Pennsylvania Avenue, NW
Suite 300
Washington, DC 20006
Tel: 202-559-9745
rlitan@bm.net
dwalker@bm.net
hbrinn@bm.net

*Counsel for Plaintiffs*

Tel: 202-739-5754
jon.roellke@morganlewis.com

Sujal Shah
MORGAN, LEWIS & BOCKIUS LLP
One Market, Spear Street Tower, 28th Floor
San Francisco, CA 94105-1596
Tel: 415-442-1386
sujal.shah@morganlewis.com

*Counsel for Defendant Brown University*

By: */s/ Deepti Bansal*
Deepti Bansal
Alexander J. Kasner
COOLEY LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004-2400
Tel: 202-728-7027
dbansal@cooley.com
akasner@colley.com

Matthew Kutcher
COOLEY LLP
110 N. Wacker Drive
Chicago, IL 60606
Tel: 312-881-6500
mkutcher@cooley.com

*Counsel for Defendant California Institute of
Technology*

By: */s/ James L.Cooper*
James L. Cooper
Michael Rubin
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave, NW
Washington, DC 20001-3743
Tel: 202-942-5014
james.cooper@arnoldporter.com
michael.rubin@arnoldporter.com

Leah Harrell
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street

31

New York, NY 10019-9710
Tel.: 212-836-7767
Leah.Harrell@arnoldporter.com

Valarie Hays
ARNOLD & PORTER KAYE SCHOLER LLP
70 W Madison Street
Suite 4200
Chicago, IL 60602
Tel.: 312-583-2440
valarie.hays@arnoldporter.com

*Counsel for Defendant University of Chicago*

By: */s/ Patrick Fitzgerald*
Patrick Fitzgerald
Amy Van Gelder
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
155 N. Wacker Drive
Chicago, IL 60606-1720
Tel: 312-407-0508
patrick.fitzgerald@skadden.com
amy.vangelder@skadden.com

Karen Hoffman Lent
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
One Manhattan West
Room 40-216
New York, NY 10001-8602
Tel: 212-735-3276
karen.lent@skadden.com

*Counsel for Defendant The Trustees of
Columbia University in the City of New York*

By: */s/ Norm Armstrong*
Norm Armstrong
Christopher Yook
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Suite 200
Washington, D.C.  20006
Tel.: 202-626-8979
narmstrong@kslaw.com

cyook@kslaw.com

Emily Chen
KING & SPALDING LLP
1185 Avenue of the Americas
34th Floor
New York, NY 10036
Tel: 212-556-2224
echen@kslaw.com

Zachary T. Fardon
KING & SPALDING LLP
110 N Wacker Drive
Suite 3800
Chicago, IL 60606
312 764 6960
zfardon@kslaw.com

*Counsel for Defendant Cornell University*

By: */s/ Terri L. Mascherin*
Terri L. Mascherin
Reid J. Schar
JENNER & BLOCK LLP
353 N. Clark Street,
Chicago, IL 60654-3456
Tel: 312-222-9350
tmascherin@jenner.com
rschar@jenner.com

Ishan K. Bhabha
Douglas E. Litvack
Lauren J. Hartz
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001-4412
Tel: 202-637-6327
ibhabha@jenner.com
dlitvack@jenner.com
lhartz@jenner.com

*Counsel for Defendant Trustees of Dartmouth College*

/s/ James A. Morsch

James A. Morsch
Jim.morsch@saul.com
SAUL EWING ARNSTEIN & LEHR
161 North Clark, Suite 4200
Chicago, IL 60601
Telephone: (312) 876-7100
Facsimile: (312) 876-0288
IL Attorney ID #6209558

Christopher D. Dusseault (pro hac vice)
cdusseault@gibsondunn.com
Jacqueline L. Sesia
jsesia@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7000

*Counsel for Defendant Duke University*

By: */s/ Tina M. Tabacchi*
Tina M. Tabacchi
JONES DAY
77 West Wacker Drive
Suite 3500
Chicago, IL 60601-1692
Tel.: 312-782-3939
tmtabacchi@jonesday.com

Craig A. Waldman
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001-2113
Tel.: 202-879-3877
cwaldman@jonesday.com

*Counsel for Defendant Emory University*

By: */s/ Britt M. Miller*
Britt M. Miller
Daniel T. Fenske
Jed W. Glickstein
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Tel: 312-783-0600

bmiller@mayerbrown.com
dfenske@mayerbrown.com
jglickstein@mayerbrown.com

*Counsel for Defendant Georgetown University*

By: */s/ Jeffrey J. Bushofsky*

Jeffrey J. Bushofsky
ROPES & GRAY LLP
191 North Wacker Drive 32nd Floor
Chicago, IL 60606-4302
Tel: 312-845-1200
jeffrey.bushofsky@ropesgray.com

Chong S. Park
Samer M. Musallam
ROPES & GRAY LLP
2099 Pennsylvania Avenue, NW
Washington, DC 20006-6807
Tel: 202-508-4600
chong.park@ropesgray.com
samer.musallam@ropesgray.com

*Counsel for Defendant Johns Hopkins University*

By: */s/ Eric Mahr*
Eric Mahr
Jan Rybnicek
Daphne Lin
FRESHFIELDS BRUCKHAUS DERINGER
700 13th Street, NW
Washington, DC 20005
Tel: 202-777-4500
eric.mahr@freshfields.com
jan.rybnicek@freshfields.com
daphne.lin@freshfields.com

*Counsel for Defendant Massachusetts Institute of Technology*

By: */s/ Scott D. Stein*
Scott D. Stein
Benjamin R. Brunner
Kelsey Annu-Essuman

SIDLEY AUSTIN LLP
1 South Dearborn Street
Chicago, IL 60603
Tel.: 414-559-2434
sstein@sidley.com
bbrunner@sidley.com
kannuessuman@sidley.com

*Counsel for Defendant Northwestern University*

By: */s/ Robert A. Van Kirk*
Robert A. Van Kirk
Jonathan Pitt
Sarah F. Kirkpatrick
Matthew D. Heins
Cole T. Wintheiser
WILLIAMS & CONNOLLY LLP
680 Maine Avenue S.W.
Washington, D.C. 20024
Tel: 202-434-5163
rvankirk@wc.com
cwintheiser@wc.com
jpitt@wc.com
mheins@wc.com
skirkpatrick@wc.com

James Peter Fieweger
MICHAEL BEST & FRIEDRICH LLP
444 West Lake Street
Suite 3200
Chicago, IL 60606
Tel.: 312-222-0800
jpfieweger@michaelbest.com

*Counsel for Defendant University of Notre Dame du Lac*

By: */s/ Seth Waxman*
Seth Waxman
WILMER CUTLER PICKERING HALE
AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
Tel: 202-663-6800
seth.waxman@wilmerhale.com

David Gringer
Alan Schoenfeld
WILMER CUTLER PICKERING HALE
AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel: 212-937-7294
david.gringer@wilmerhale.com
alan.schoenfeld@wilmerhale.com

Daniel Martin Feeney
Edward W. Feldman
MILLER SHAKMAN LEVINE & FELDMAN
LLP
180 North LaSalle Street
Suite 3600
Chicago, IL 60601
Tel.: 312-263-3700
dfeeney@millershakman.com
efeldman@millershakman.com

*Counsel for Defendant The Trustees of the
University of Pennsylvania*

By: */s/ Norm Armstrong*
Norm Armstrong
Christopher Yook
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Suite 200
Washington, D.C. 20006
Tel.: 202-626-8979
narmstrong@kslaw.com
cyook@kslaw.com

Emily Chen
KING & SPALDING LLP
1185 Avenue of the Americas
34th Floor
New York, NY 10036
Tel: 212-556-2224
echen@kslaw.com

Zachary T. Fardon

37

KING & SPALDING LLP
110 N Wacker Drive
Suite 3800
Chicago, IL 60606
312 764 6960
zfardon@kslaw.com

*Counsel for Defendant William Marsh Rice
University*

By: */s/ J. Mark Gidley*
J. Mark Gidley
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005-3807
Tel: 202-626-3600
mgidley@whitecase.com

Robert A. Milne
David H. Suggs
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020-1095
Tel: 212-819-8200
rmilne@whitecase.com
dsuggs@whitecase.com

*Counsel for Defendant Vanderbilt University*

By: */s/ Charles A. Loughlin*
Charles A. Loughlin
Benjamin F. Holt
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004-1109
Tel: 202-637-5600
chuck.loughlin@hoganlovells.com
benjamin.holt@hoganlovells.com

Stephen Novack
Stephen J. Siegel
Serena G. Rabie
NOVACK AND MACEY LLP
100 North Riverside Plaza, 15th Floor
Chicago, IL 60606-1501
Tel.: 312-419-6900

snovack@novackmacey.com
ssiegel@novackmacey.com
srabie@novackmacey.com

*Counsel for Defendant Yale University*