# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

FRANK CARBONE, *et al.*, individually and on behalf of all others similarly situated,

    Plaintiffs,

        v.

BROWN UNIVERSITY, *et al.*,

    Defendants.

Case No.: 22-cv-00125

Hon. Matthew F. Kennelly

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR PROTECTIVE ORDER TO PROHIBIT DEFENDANTS FROM SERVING SUBPOENAS ON PLAINTIFFS' FAMILIES

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................... ii

BACKGROUND .........................................................................................................................1

LEGAL STANDARDS ................................................................................................................4

ARGUMENT ..............................................................................................................................6

I.     DEFENDANTS ARE NOT ENTITLED TO USE THE SUBPOENAS TO OBTAIN
DOCUMENTS THAT DEFENDANTS THEMSELVES POSSESS .................................6

II.    ANY THIRD-PARTY FUNDING OF PLAINTIFFS' EDUCATION IS
IRRELEVANT UNDER THE ANTITRUST LAWS ..........................................................7

III.   DEFENDANTS' BASELESS SPECULATION ABOUT PLAINTIFFS'
FINANCIAL-AID APPLICATIONS IS NO BASIS FOR DISCOVERY ......................11

IV.   INFORMATION RELATED TO ANY "MITIGATION" DEFENSE IS
IRRELEVANT IN PRICE-FIXING ANTITRUST CASES ............................................13

V.    DISCOVERY ON WHETHER AND TO WHAT EXTENT PARENTS
COMPARED PROSPECTIVE SCHOOLS IS IRRELEVANT ......................................13

CONCLUSION ........................................................................................................................15

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Am. Soc'y of Media Photographers v. Google, Inc.*,
  2013 WL 1883204 (N.D. Ill. May 6, 2013) ................................................................6

*Apple Inc. v. Pepper*,
  139 S. Ct. 1514 (2019) ...........................................................................................7

*Bankdirect Capital Finance, LLC v. Cap. Premium Fin., Inc.*,
  2018 WL 946396 (N.D. Ill. Feb. 20, 2018) .............................................................6

*Brenneman v. Knight*,
  297 F. App'x 534 (7th Cir. 2008) ...........................................................................11

*Carbone v. Brown Univ.*,
  2022 WL 3357249 (N.D. Ill. Aug. 15, 2022) ........................................................3, 8

*City of Rockford v. Mallincrodt ARD, Inc.*,
  2020 WL 11191830 (N.D. Ill. May 27, 2020) ..........................................................6

*Craigville Tel. Co. v. T-Mobile USA, Inc.*,
  2022 WL 17740419 (N.D. Ill. Dec. 16, 2022) ..........................................................6

*DeLeon-Reyes v. Guevara*,
  2020 WL 3050230 (N.D. Ill. June 8, 2020) ..............................................................5

*E.E.O.C. v. Harvey L. Walner & Associates*,
  91 F.3d 963 (7th Cir.1996) ....................................................................................11

*FTC v. Advocate Health Network*,
  841 F. 3d 460 (7th Cir. 2016) ................................................................................14

*Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*,
  744 F.2d 588 (7th Cir. 1984) .................................................................................12

*Go-Tane Serv. Stations, Inc. v. Ashland Oil, Inc.*,
  508 F. Supp. 200 (N.D. Ill. 1981) ...................................................................3, 8, 10

*Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*,
  998 F.2d 391 (7th Cir. 1993) .................................................................................12

*Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*,
  995 F.2d 425 (3d Cir. 1993) ....................................................................................9

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.*,
  392 U.S. 481 (1968) ............................................................................................7, 8

*Hartford Acc. & Indem. Co. v. Zhen Feng Lin*,
   2020 WL 3892984 (N.D. Ill. July 10, 2020)...................................5

*Ill. Brick Co. v. Illinois*,
   431 U.S. 720 (1977)..................................................................7, 8

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
   2010 WL 4916723 (E.D.N.Y. Nov. 24, 2010)...........................9

*In re Air Cargo*,
   2010 WL 4916723 (E.D.N.Y. Nov. 24, 2010)...........................9

*In re Airline Ticket Comm'n Antitrust Litig.*,
   918 F. Supp. 283 (D. Minn. 1996).............................................13

*In re Aspartame Antitrust Litig.*,
   2008 WL 2275528 (E.D. Pa. Apr. 8, 2008)..............................15

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
   581 F. Supp. 1029 (N.D. Ill. 2022).............................................12

*In re Epipen Marketing, Sales & Antitrust Litig.*,
   2022 WL 226130 (D. Kan. Jan. 26, 2022)................................11

*In re Hypodermic Prod. Direct Purchaser Antitrust Litig.*,
   2006 WL 6907107 (D.N.J. Sept. 7, 2006)..................................9

*In re K-Dur Antitrust Litig.*,
   2007 WL 5302308 (D.N.J. Jan. 2, 2017)................................9, 10

*In re K-Dur Antitrust Litig.*,
   2008 WL 2660776 (D.N.J., Feb. 21, 2008)...............................11

*In re Lidoderm Antitrust Litig.*,
   2018 WL 7814761 (N.D. Cal. Feb. 7, 2018)..............................9

*In re Namenda Antitrust Litig.*,
   2017 WL 2693713 (S.D.N.Y June 21, 2017).............................5

*In re Nexium (Esomeprazole) Antitrust Litig.*,
   296 F.R.D. 47 (D. Mass. 2013)..............................................8, 14

*In re Photochromic Lens Antitrust Litig.*,
   279 F.R.D. 620 (M.D. Fla. 2012)................................................9

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*,
   2012 WL 1533221 (N.D. Ill. Apr. 27, 2012)..............................9

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  292 F. Supp. 3d 14 (D.D.C. 2017) *aff'd* 934 F.3d 619 (D.C. Cir. 2019).................................12

*In re Relafen Antitrust Litig.*,
  346 F. Supp. 2d 349 (D. Mass. 2004) ........................................................................8

*In re Skelaxin (Metaxalone) Antitrust Litig.*,
  2014 WL 2002887 (E.D. Tenn. May 15, 2014)..........................................................9

*In re Skelaxin (Metaxalone) Antitrust Litig.*,
  292 F.R.D. 544 (E.D. Tenn. 2013) ...........................................................................8

*In re TFTCD (Flat Panel) Antitrust Litig.*,
  2012 WL 6000154 (N.D. Cal. 2012) ........................................................................13

*In re Turkey Antitrust Litig.*,
  2021 WL 6428398 (N.D. Ill. Dec. 16, 2021)..............................................................9

*In re Vitamins Antitrust Litig.*,
  198 F.R.D. 296 (D.D.C. 2000)................................................................................15

*J.B.D.L. Corp. v. Wyeth-Ayerst Labs Inc.*,
  225 F.R.D. 208 (S.D. Ohio 2003) ............................................................................9

*Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007).............................................................................................13

*Lindner v. Occidental Coll.*,
  2020 WL 7350212 (C.D. Ca. Dec. 11, 2020) ...........................................................10

*Little v. JB Pritzker for Governor*,
  2020 WL 1939358 (N.D. Ill. April 22, 2020)..............................................................6

*Ohio v. Am. Express Co.*,
  138 S. Ct. 2274 (2018).........................................................................................14

*Paper Sys. Inc. v. Nippon Paper Indus. Co.*,
  281 F.3d 629 (7th Cir. 2002) ...................................................................................8

*President of the U.S., et al. v. Nebraska, et al.*,
  22-506 BIDEN (22A444), December 1, 2022 ...........................................................12

*PrimeSource Bldg. Prods., Inc. v. Felten*,
  2018 WL 10425599 (N.D. Ill. Apr. 27, 2018)..............................................................6

*Republic Tobacco v. N. Atl. Trading*,
  381 F.3d 717 (7th Cir. 2004) .................................................................................14

*Salerno v. Fla. S. Coll.*,
    488 F. Supp. 3d 1211 (M.D. Fla. 2020) ................................................................10

*Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*,
    131 F.3d 874 (10th Cir. 1997) ......................................................................7, 8, 9

*Todd by Todd v. Merrell Dow Pharms., Inc.*,
    942 F.2d 1173 (7th Cir. 1991) ..............................................................................11

## Other Authorities

Fed. R. Civ. P. 26(b) ......................................................................................................5

Fed. R. Civ. P. 26(c) ......................................................................................................4

Fed. R. Civ. P. 45(a)(4) ................................................................................................5

Fed. R. Civ. P. 6(b)(2)(C) .............................................................................................5

Plaintiffs respectfully submit this Memorandum of Law pursuant to this Court's Order dated December 31, 2022 (ECF No. 265), granting Plaintiffs leave to file the underlying Motion for Protective Order. Plaintiffs ask the Court to prohibit Defendants from serving subpoenas on Plaintiffs' parents. Defendants seek through these subpoenas documents (a) that are legally irrelevant under well-established law; (b) largely already in Defendants' own possession, and/or (c) in categories that Plaintiffs could attempt to obtain from their parents for production to Defendants if the Court deems them relevant and discoverable.

## BACKGROUND

On January 3, 2023, as Plaintiffs had informed Defendants on December 9, 2022, that Plaintiffs would do, Plaintiffs filed their Second Amended and Supplemental Complaint ("SAC"). The SAC, based on counsel's further analysis of the relevant law, redefines the proposed Class to remove parents. Accordingly, as the case stands, parents are not plaintiffs or absent class members.

Defendants nonetheless recently advised that they intend to serve subpoenas on Plaintiffs' parents.[1] Plaintiffs have not seen these proposed subpoenas or a list of topics, but from discussions and emails with defense counsel, including an email from David Suggs dated November 21, 2022 (Ex. 1), it appears that Defendants will seek information relating to third-party funding of the university education of the Plaintiffs, including any parental or student loans, third-party scholarships, "loan forgiveness" payments granted to Plaintiffs, and potentially any other money received by Plaintiffs' families for purposes of paying for Plaintiffs' education. Defendants have also indicated in at least one meet-and-confer that they intend to seek parents' emails regarding any comparisons

---

[1] Defendants provided this notice merely hours after the Court's status conference of December 21, 2022, in which the Court directed discovery issues to be covered in the next status report (due January 13, 2023) and asked about "anything else anybody wants to bring up" on "the defense side," to which Defense counsel said "nothing." Hearing Tr. at 27:21-23 (Feb. 22, 2022).

of colleges or universities Plaintiffs considered attending.

The main bases for Plaintiffs' motion are that: (1) any such documents, as explained below, are irrelevant as a matter of law; and (2) contrary to Defendants' claims that service of the subpoenas is not meant to harass or intimidate Plaintiffs, that will undoubtedly be the natural effect. In cases alleging illegal cartels under the Sherman Act, where the plaintiffs are direct purchasers seeking recovery of overcharges, courts routinely bar this type of discovery as legally irrelevant and for important public policy reasons. In addition, as documents concerning student loans and the financial aid that Plaintiffs received from the Defendants, either Defendants possess these documents or else—if the Court determines such information to be relevant and its production proportionate—Plaintiffs could produce these materials themselves.[2] Indeed, Plaintiffs' counsel have offered to seek from the parents any documents this Court deems relevant and whose production the Court deems proportionate.[3]

Defendants have asserted three main arguments to try to justify the service of these prospective subpoenas. Each argument is without merit.

*First*, Defendants argue that the amount of outside funding Plaintiffs received for attending Defendants' institutions is relevant to determining whether Plaintiffs suffered antitrust injury. Defendants are wrong. The information Defendants seek is irrelevant as a matter of well-settled law. Plaintiffs are direct purchasers of Defendants' services. They claim that they, and the proposed Class they seek to represent, suffered antitrust injury because Defendants' cartel caused them to

---

[2] Letter of Plaintiffs' Counsel to the Court, December 30, 2022, ECF No. 264.

[3] Seeking to avoid motion practice, and without conceding relevance, Plaintiffs previously proposed that they would ask their parents if they possessed certain categories of the documents (in particular, the contents of financial aid applications and communications with financial aid offices), but Defendants declined the proposal. Accordingly, Plaintiffs now ask the Court to address what documents are relevant and whether it would be proportional for Plaintiffs to ask their parents to produce them.

pay artificially inflated net prices of tuition. The Court recognized this theory of recovery in deny-ing Defendants' motions to dismiss. *Carbone v. Brown Univ.*, 2022 WL 3357249, at \*8 (N.D. Ill. Aug. 15, 2022); *see also* Amended Complaint ("AC"), ECF No. 106, ¶ 234 (alleging injury in the form of paying overcharges directly to Defendants). Decades of case law, from the Supreme Court to district courts across the country, establish that direct purchasers in an antitrust case (like Plain-tiffs here) are injured the moment they pay an overcharge; and they are entitled to the full amount of the overcharge paid, irrespective of what other financial benefits or offsets Plaintiffs might have received "downstream" of the alleged overcharge. Accordingly, whether Plaintiffs or their parents received some outside funds to reduce the financial burden of attending Defendants' institutions is legally irrelevant to proof of injury or damages.

The Supreme Court has held that injury (and damages) to direct purchasers in antitrust cases are measured by the full extent of the overcharge for important *policy reasons* regarding efficient and effective enforcement of the antitrust laws. Courts have repeatedly barred discovery of what happens to a direct purchaser "downstream" of the overcharge—*i.e.*, whether or not the overcharge was passed on to, or otherwise experienced by, a third party—because such "down-stream" discovery would waste resources and otherwise discourage robust antitrust enforcement. Under that longstanding law, in this case, investigation into how the cost of tuition was passed on is a "speculative exercise [that] would involve massive discovery, one of the pitfalls which the Court sought to avoid in *Hanover Shoe* and *Illinois Brick*." *Go-Tane Serv. Stations, Inc. v. Ashland Oil, Inc.*, 508 F. Supp. 200, 205 (N.D. Ill. 1981).

*Second*, Defendants assert that the proposed discovery is necessary to determine whether Plaintiffs lied on their financial aid applications. The law does not permit any such open inquiry, or fishing expedition, into a party's credibility. There is no reason to believe, and *no* evidence, that

any Plaintiff lied in seeking financial aid. Just as fundamental, whether Plaintiffs failed to disclose some source of funding is irrelevant on the merits. The measure of injury here is the overcharge, computed by comparing the current overcharge to a world that is *exactly the same,* except for the cartel's misconduct. Any supposedly undisclosed information would be irrelevant, because that lack of disclosure would have been the same even without the cartel behavior.

*Third*, Defendants argue that Plaintiffs' parents' emails comparing the schools (if any such emails exist) would be relevant to assessing the scope of the relevant antitrust market for this case. This is wrong as well. As an initial matter, Plaintiffs allege a *per se* illegal price-fixing conspiracy, which obviates any carefully refined market definition. In addition, defining the rough contours of a market would involve a determination whether the universities are *economic* substitutes. This inquiry is for economic experts who analyze market-wide evidence and undertake econometric analyses of available data relating to the effects of changes in price on overall substitutability. Anecdotes from individual parents reflecting their subjective views about the relative merits of various universities would therefore be irrelevant—or else of insufficient probative value to justify Defendants' plainly intrusive fishing expedition. Moreover, if such information were deemed at all relevant or sufficiently probative, it is likely that the Plaintiffs themselves would have such information, and thus there is no need for the sought non-party subpoenas.

## LEGAL STANDARDS

The relevant law both affords this Court the authority to grant the protective order that Plaintiffs seek and sets out the relevant standards for making that determination.

*First*, as the Court indicated in its Order dated December 31, 2022 (ECF No. 265), the Court "may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c). This Court has granted protective orders under Rule 26(c)(1) in other instances covering discovery aimed at non-parties.

4

*See, e.g.*, *Hartford Acc. & Indem. Co. v. Zhen Feng Lin*, 2020 WL 3892984, at *3 (N.D. Ill. July 10, 2020). Indeed, a court "must limit the frequency or extent of discovery otherwise allowed" if "(i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1)." Fed. R. Civ. P. 6(b)(2)(C).

*Second*, the federal rules allow discovery only "regarding any nonprivileged matter that is *relevant* to any party's claim or defense and proportional to the needs of the case," Fed. R. Civ. P. 26(b) (emphasis added), and considering, among other things, "the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.*[4]

*Third*, the Court should set the proper discovery boundaries now: waiting until the subpoenas are served to address relevancy and proportionality arguments would result in judicial inefficiency. The "very reason Rule 45(a)(4) requires notice to the opposing party before serving the subpoena is to ensure that issues important to the discovery process can be addressed prior to the service. Fed. R. Civ. P. 45(a)(4). And Rule 45(d)(1) requires the Court to enforce the issuing party's duty to take "reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." *DeLeon-Reyes v. Guevara*, 2020 WL 3050230, at *3 (N.D. Ill. June 8, 2020). Whether reviewing a motion challenging the subpoena under Rule 45 or Rule 26, "the initial

---

[4] "This recently-amended rule is intended to 'encourage judges to be more aggressive in identifying and discouraging discovery overuse' by emphasizing the need to analyze proportionality before ordering production of relevant information." *In re Namenda Antitrust Litig.*, 2017 WL 2693713, at *3 (S.D.N.Y June 21, 2017) (denying motion to compel production of plaintiffs' financial information (quoting Rule 26(b)(1) advisory committee's note to 2015 amendment)).

inquiry in enforcement of any discovery request is one of relevance." *City of Rockford v. Mallincrodt ARD, Inc.*, 2020 WL 11191830, at *3 (N.D. Ill. May 27, 2020) (quotations omitted).

*Fourth*, as to non-party discovery, mere relevance is not enough. *Am. Soc'y of Media Photographers v. Google, Inc.*, 2013 WL 1883204, at *2-4 (N.D. Ill. May 6, 2013). A court will also inquire if the documents subject to the subpoena can be obtained from a more convenient or less burdensome source and whether the requesting party had the opportunity to obtain the information through the normal discovery process. *Little v. JB Pritzker for Governor*, 2020 WL 1939358, at *2-4 (N.D. Ill. April 22, 2020). In addition, as to both parties and non-parties, courts "are unanimous in prohibiting discovery from being used as a fishing expedition" and "[u]nless the requestor can demonstrate that the materials sought are relevant, judges should not hesitate to exercise appropriate control over the discovery process." *Bankdirect Capital Finance, LLC v. Cap. Premium Fin., Inc.,* 2018 WL 946396 (N.D. Ill. Feb. 20, 2018).

## **ARGUMENT**

## I.    **DEFENDANTS ARE NOT ENTITLED TO USE THE SUBPOENAS TO OBTAIN DOCUMENTS THAT DEFENDANTS THEMSELVES POSSESS**

Under Rule 26(b), the Court is to consider "the parties' relative access to relevant information" in assessing the propriety of discovery requests. "A party's ability to obtain documents from a source with which it is litigating is a good reason to forbid it from burdening a non-party with production of those same documents." *PrimeSource Bldg. Prods., Inc. v. Felten*, 2018 WL 10425599, at *3 (N.D. Ill. Apr. 27, 2018) (granting protective order to prevent unnecessary burden to the subpoenaed third-parties in producing documents that the party can acquire directly from PrimeSource); *see also Craigville Tel. Co. v. T-Mobile USA, Inc.*, 2022 WL 17740419, at *4 (N.D. Ill. Dec. 16, 2022). In this case, the documents showing the financial aid that Plaintiffs sought from Defendants is in Defendants' own possession, and Plaintiffs have explained that they will ask their

parents for any relevant information that may not be in Defendants' possession—meaning that Defendants can obtain such documents from the Plaintiffs. In addition, if this Court determines that anything else that Defendants seek via subpoenas of Plaintiffs' parents is relevant, Plaintiffs have repeatedly offered to have Plaintiffs request their parents to provide information the Court deems relevant in order to avoid disputes like this one that burdens the Court. If any parents are unwilling to provide the documents, it may then be appropriate to consider limited subpoenas *but only if and after the Court rules that the documents sought by the subpoenas are relevant*. Defendants' arguments about using the subpoenas now to account for the prospect of any non-production is thus premature.

## II. ANY THIRD-PARTY FUNDING OF PLAINTIFFS' EDUCATION IS IRRELEVANT UNDER THE ANTITRUST LAWS

Plaintiffs are direct purchasers from Defendants. They suffered injury in the form of overcharges when they paid to Defendants higher net prices for attendance at Defendants' institutions than Plaintiffs would have paid absent the alleged illegal cartel conspiring to suppress financial aid awards. Overcharges are quintessential antitrust injury, *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 490-91 (1968), and "when a buyer shows that the price paid by him . . . is illegally high and also shows the amount of the overcharge, he has made out a prima facie case of injury and damage." *Id*. at 489-90, 494.

It follows that "the injury occurs and is complete when the defendant sells at the illegally high price." *Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 883 (10th Cir. 1997). Direct purchasers are "injured to the full extent of the overcharge paid by them." *Ill. Brick Co. v. Illinois*, 431 U.S. 720, 746 (1977); *see also Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1521 (2019) ("If the [plaintiffs] prevail, they will be entitled to the *full amount* of the unlawful

overcharge that they paid to [the defendant].").[5] Contrary to the premise of Defendants' November 21 email that third-party funding is relevant to antitrust injury, even where a direct purchaser might have *benefitted* from the anticompetitive conduct, the purchaser nevertheless suffers antitrust injury and can collect the *full amount of the overcharge* without regard to any offsetting benefits. *See, e.g.*, *Sports Racing*, 131 F.3d at 884-85.[6]

The Supreme Court long ago held that "the legislative purpose in creating a group of 'private attorneys general' to enforce the antitrust laws . . . is better served by holding direct purchasers to be injured to the full extent of the overcharge paid by them." *Ill. Brick*, 431 U.S. at 746. The Seventh Circuit has explained one key reason courts have drawn this bright-line rule: "*Illinois Brick* and *Hanover Shoe* together . . . improve deterrence," in part because they allow direct purchasers "to collect the full overcharge, trebled." *Paper Sys. Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 632-33 (7th Cir. 2002); *Go-Tane*, 508 F. Supp. at 205 (same). In addition, allowing only direct purchasers to recover reflects "an unwillingness to complicate treble-damages actions" with complex analyses of whether and to what extent a direct purchaser plaintiff paying an overcharge might ultimately have financially fared absent the anticompetitive conduct. *Ill. Brick*, 431 U.S. at 725 (citing *Hanover Shoe*, 392 U.S. at 492-93). As one court held, "*Hanover Shoe* and *Illinois*

---

[5] This Court has held that paying higher prices due to cartel behavior constitutes antitrust injury. *See Carbone*, 2022 WL 3357249, at *8 ("Without the conspiracy, the plaintiffs allege, the defendants would have competed for students by providing more competitive aid packages. For these reasons, the Court overrules the defendants' arguments concerning antitrust injury and antitrust standing.") (citation omitted).

[6] *See also In re Relafen Antitrust Litig.*, 346 F. Supp. 2d 349 (D. Mass. 2004) ("*Hanover Shoe* precludes not only the 'passing on' defense," but also "permits a direct purchaser to recover the full amount of the overcharge, even if he is otherwise benefited") (cleaned up)); *In re Nexium (Esomeprazole) Antitrust Litig.*, 296 F.R.D. 47, 56 (D. Mass. 2013) ("[A]s *Illinois Brick* makes clear, *Hanover Shoe* permits a direct purchaser to recover the full amount of the overcharge, even if he is otherwise benefited." (cleaned up)); *In re Skelaxin (Metaxalone) Antitrust Litig.*, 292 F.R.D. 544, 553 (E.D. Tenn. 2013) ("Damages . . . are measured purely by overcharges.").

*Brick* make clear that courts and juries will not be forced down the rabbit hole of hypothetical issues antitrust violators may raise to minimize their liability." *In re Skelaxin (Metaxalone) Antitrust Litig.*, 2014 WL 2002887, at *5 (E.D. Tenn. May 15, 2014); *see also, e.g.*, *Sports Racing*, 131 F.3d at 883-84; *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2010 WL 4916723, at *2 (E.D.N.Y. Nov. 24, 2010).

Defendants have sought to defend the prospective subpoenas as going to whether Plaintiffs suffered injury, but Defendants are ultimately seeking discovery of whether Plaintiffs effectively "passed on" any overcharges. Whether Plaintiffs received help from others to pay university expenses, as shown above, is irrelevant. As such, the subpoenas would effectively violate "the long-held precedent of proscribing downstream discovery in antitrust litigation." *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 2012 WL 1533221, at *3 (N.D. Ill. Apr. 27, 2012); *In re Turkey Antitrust Litig.*, 2021 WL 6428398, at *2 (N.D. Ill. Dec. 16, 2021) ("[W]hen only direct purchasers bring suit, defendants are barred from arguing as a defense that the allegedly overcharged amounts were 'passed on' by the direct purchasers to indirect purchasers downstream.").[7]In line with this precedent, in order to promote vigorous enforcement of the antitrust

---

[7] *See also Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 432 (3d Cir. 1993) (affirming exclusion of downstream evidence because it is "irrelevant and inadmissible for the purpose of showing that plaintiff did not suffer the full amount of the alleged overcharge"); *In re Lidoderm Antitrust Litig.*, 2018 WL 7814761, at *3 (N.D. Cal. Feb. 7, 2018) ("Defendants may not solicit or introduce evidence solely for the purpose of showing that [direct purchaser plaintiffs] pass-on damages or that [direct purchaser plaintiff] damages should be reduced."); *In re Air Cargo*, 2010 WL 4916723, at *2 (E.D.N.Y. Nov. 24, 2010) (collecting cases); *In re K-Dur Antitrust Litig.*, 2007 WL 5302308, at *12-13 (D.N.J. Jan. 2, 2017) (holding that "downstream discovery is irrelevant as a matter of law" in a direct purchaser antitrust class action and affirming the magistrate judge's denial of defendants' request for such discovery); *In re Photochromic Lens Antitrust Litig.*, 279 F.R.D. 620, 623 (M.D. Fla. 2012); *In re Hypodermic Prod. Direct Purchaser Antitrust Litig.*, 2006 WL 6907107, at *6 (D.N.J. Sept. 7, 2006) (denying downstream discovery); *J.B.D.L. Corp. v. Wyeth-Ayerst Labs Inc.*, 225 F.R.D. 208, 216 (S.D. Ohio 2003) (ability to pass on overcharge is "irrelevant to the inquiry" about injury or damages in a direct purchaser action).

laws, courts have routinely blocked discovery of the precise type Defendants seek here as being a "speculative exercise [that] would involve massive discovery, one of the pitfalls which the Court sought to avoid in *Hanover Shoe* and *Illinois Brick*." *Go-Tane*, 508 F. Supp. at 205.[8]

If Defendants mean to argue that the Plaintiffs are not the real parties in interest, Defendants would be wrong both as a matter of antitrust law, as set forth above, and as a matter of common law principles applicable to university educations. As a matter of a distinct antitrust standing doctrine, it is the students—not third-party contributors—who are injured. In multiple suits filed by students seeking refunds from colleges or universities that used remote learning during the pandemic, courts have repeatedly found that it is the student, and not the parent, who has standing.[9] It bears emphasis, moreover, that third-party funding sources (credit cards, bank loans, mortgage lines of credit, friends) are used to purchase virtually *every consumer product*. There are no cases permitting discovery into the consumer's choice of financing or whether he/she paid the overcharge with borrowed or gifted money. Whether and to what extent students borrowed or received a third-party scholarship, likewise, are legally irrelevant.

In short, as the direct purchasers of their education, Plaintiffs have been injured to the full extent of Defendants' overcharge—the net price paid less the but for net price. Any amounts they have received from any third parties are *irrelevan*t, either for purposes of establishing antitrust injury or for calculating damages; and there is a *strong public policy against such discovery* as

---

[8] *See also In re K-Dur Antitrust Litig.*, 2007 WL 53022308, *12 ("As the Supreme Court made clear in *Illinois Brick*, the first reason that the so-called 'pass-on' defense was barred in *Hanover Shoe* was because attempts to trace the downstream effects of overcharges would have unduly complicated already complex antitrust litigation[.]").

[9] *See, e.g.*, *Lindner v. Occidental Coll.*, 2020 WL 7350212, at *5 (C.D. Ca. Dec. 11, 2020); *Salerno v. Fla. S. Coll.*, 488 F. Supp. 3d 1211, 1215-17 (M.D. Fla. 2020).

harming the effective enforcement of the antitrust laws. Accordingly, discovery of *any* third-party

funding sources sought by the prospective subpoenas is irrelevant and should be barred.[10]

### III. DEFENDANTS' BASELESS SPECULATION ABOUT PLAINTIFFS' FINANCIAL-AID APPLICATIONS IS NO BASIS FOR DISCOVERY

Defendants speculate that Plaintiffs *could have* misrepresented facts in seeking financial

aid.[11] This argument is no support for the prospective subpoenas.

*First*, there is no evidence or reason to believe that any named Plaintiff lied about any

information provided in his or her financial application.[12] Defendants' speculation amounts to the

kind of fishing expedition that this Circuit has routinely blocked.[13]

*Second*, whether a student (or parent) misstated information in a financial aid application

(whether intentionally or not), *is not relevant to injury or damages*. This is because there is no

reason to believe that the parent would have filled out the application differently in the absence of

the alleged cartel behavior. The amount of an overcharge is measured by taking the amount that a

---

[10] In Defendants' November 21 email, they cited two district court decisions: *In re Epipen Marketing, Sales & Antitrust Litig.,* 2022 WL 226130 (D. Kan. Jan. 26, 2022); *In re K-Dur Antitrust Litig.*, 2008 WL 2660776 (D.N.J., Feb. 21, 2008). Both are inapposite because both relate to indirect purchaser claims under state law. In *K-Dur,* moreover, the central issue was whether a consumer with a flat copay—*i.e.*, a person who did not pay higher prices as a result of the challenged conduct—was injured by delayed entry of a generic drug, which is clearly "no" under both federal and state law. Accordingly, in *K-Dur*, and unlike here, there was no overcharge at all.

[11] *See* Defendants' November 21 email (Ex. 1).

[12] Defendants' tactics would be tantamount to Plaintiffs citing their belief that Defendants have been untruthful about soliciting donations in exchange for admissions, particularly in light of Vanderbilt Chancellor Gee's statement that any university president under "truth serum" would admit that such conduct occurs, to try to justify the issuance of subpoenas *to the families* of Defendant presidents seeking information about those presidents' interactions with major donors.

[13] *See E.E.O.C. v. Harvey L. Walner & Associates,* 91 F.3d 963, 971-72 (7th Cir.1996); *accord Brenneman v. Knight,* 297 F. App'x 534, 538 (7th Cir. 2008) ("But requiring the staff to conduct a fishing expedition, particularly of the magnitude Brenneman requested, would have imposed too great a burden."); *Todd by Todd v. Merrell Dow Pharms., Inc.,* 942 F.2d 1173, 1178 (7th Cir. 1991) ("Todd's speculation that Merrell Dow must possess unspecified additional information is not sufficient grounds to embark upon a virtually boundless fishing expedition.").

purchaser actually paid and subtracting from that the amount that the purchaser would have paid absent the illegal conduct, and *holding all else constant*.[14] If the students' (or parents') conduct would have been the same without the cartel, then whether the student or parent misstated anything on the aid application is not considered when assessing injury, rendering Defendants' prospective subpoenas an unwarranted foray into irrelevancies.[15]

*Third*, to the extent the prospective subpoenas seek information about *loans* that students (or parents) may have taken out, that information also is irrelevant to students' injuries. Plaintiffs are injured because, they allege, the cartel caused the net price they paid to a Defendant to be higher than it would have been absent the cartel. The loans students take out do not reduce the net price they pay (that is, the cost of attendance minus any grants) or the Expected Family Contribution. In short, student or parent loans sought from the Plaintiffs' parents are not relevant to any claim or defense in this matter.[16]

---

[14] *In re Dealer Mgmt. Sys. Antitrust Litig.,* 581 F. Supp. 1029, 1049 (N.D. Ill. 2022) ("'Damages calculations in antitrust cases seek to compare plaintiffs' actual experience in the real world with what the plaintiffs' experience would have been, 'but for' the antitrust violation.'"); *accord In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 56 (D.D.C. 2017) *aff'd* 934 F.3d 619 (D.C. Cir. 2019); *see also Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 395 (7th Cir. 1993).

[15] There is no "unclean hands" defense to antitrust claims. *See, e.g.*, *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n,* 744 F.2d 588, 597 (7th Cir. 1984).

[16] Defendants' November 21 email implies their subpoenas also will seek information about any loan forgiveness afforded to any named plaintiff. Any such request is premature because the lawfulness of the Department of Education's loan forgiveness policy announced on August 24, 2022, is on appeal at the Supreme Court. *President of the U.S., et al. v. Nebraska, et al.,* 22-506 BIDEN (22A444), December 1, 2022. In addition, also as a matter of settled antitrust law, any forgiven amounts of the loans taken out by any of the named Plaintiffs have no legal bearing on the amount Defendants overcharged them.

## IV.  INFORMATION RELATED TO ANY "MITIGATION" DEFENSE IS IRRELE-VANT IN PRICE-FIXING ANTITRUST CASES

Defendants' November 21 email suggests that discovery of Plaintiffs' parents is relevant to Defendants' "failure to mitigate" defense. This is no proper basis for the prospective subpoenas, because under well-settled law, there is no duty to mitigate for victims of horizontal price-fixing like plaintiffs and class members here.[17] This conclusion follows logically from *Hanover Shoe* and *Illinois Brick*: the overcharge is complete the moment a direct purchaser pays it.

## V.  DISCOVERY ON WHETHER AND TO WHAT EXTENT PARENTS COMPARED PROSPECTIVE SCHOOLS IS IRRELEVANT

Defendants indicated during at least one December 2022 meet-and-confer, and implicitly in an email dated December 26, 2022 (Ex. 2), that they should be entitled to seek emails from parents of Plaintiffs that might compare schools because such emails would bear on market defi-nition. This, too, is wrong as a matter of law, and any marginal relevance of any such emails is far outweighed by the burden of having to search through hundreds of thousands of personal emails. Courts routinely bar Defendants from circumventing the bar on downstream discovery by concoct-ing other reasons for the information.

*First*, Defendants' relevant market arguments are misplaced because Plaintiffs allege a *per se* illegal price-fixing conspiracy, where proof of a precise market is not necessary. *See Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007); *see also Republic Tobacco*

---

[17] *See, e.g.*, *In re TFTCD (Flat Panel) Antitrust Litig.*, 2012 WL 6000154, at *3 (N.D. Cal. 2012) ("While an antitrust plaintiff alleging a refusal to deal or vertical price-fixing could reasonably be expected to mitigate damages by finding another supplier, a victim of horizontal price-fixing does not have this option."); *In re Airline Ticket Comm'n Antitrust Litig.*, 918 F. Supp. 283, 286 (D. Minn. 1996) ("In a horizontal price-fixing case, however, mitigation and offset generally do not affect the ultimate measure of damages."); *see generally* ABA Section of Antitrust Law, *Jury Instructions* (2022) (any obligation to mitigate damages "is not applicable in horizontal price-fixing cases because victims of horizontal price fixing are not required to mitigate damages").

*v. N. Atl. Trading*, 381 F.3d 717, 737 (7th Cir. 2004) (in a horizontal price-fixing case, the plaintiff need allege only "the rough contours of a relevant market," not "a precisely defined relevant market"). In addition, Plaintiffs have alleged direct evidence of market power in the form of artificially inflated prices, which also obviates any precise market definition. *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283-85 (2018) ("Direct evidence of anticompetitive effects is proof of reduced output, increased prices, or decreased quality in the relevant market.") (cleaned up).

*Second*, as to any prospective evidence of the "rough contours" of a market, *Republic Tobacco*, 381 F.3d at 737, that exercise will rely on economic analysis of broad swaths of data, not a handful of emails or anecdotes from Plaintiffs' parents (or the Plaintiffs). Market definition is an economic question, turning not on whether certain universities are mere *functional* substitutes, but rather on whether the universities are *economic* substitutes. This economic substitution, also called "cross-elasticity of demand," asks whether enough prospective students would switch universities in the face of small changes in price to make those price changes unwise or unprofitable. *See, e.g.*, *In re Nexium*, 968 F. Supp. 2d at 387-88.

Economists assessing relevant markets apply what the federal antitrust agencies call the "SSNIP" test, which seeks to determine whether a "small but significant [usually five percent] and non-transitory increase in price" would induce customers of a hypothetical monopolist to buy another product or from another location. *FTC v. Advocate Health Network,* 841 F. 3d 460, 465 (7th Cir. 2016). Whether any of the Plaintiffs' parents debated the relative merits of various universities in emails is simply not relevant, and the burden of searching through likely thousands of personal emails outweighs any marginal relevance. Unlike the Defendant universities, which likely carry out sophisticated market analyses of their markets and peer group institutions, based on the decisions of tens if not hundreds of thousands of students over many years, Defendants here seek a

tiny amount of anecdotal views of non-parties of marginal relevance at best, and certainly dispro-

portionate to the burden of having them conduct an intrusive documentary search.

*Third*, courts have rejected similar arguments seeking what amounts to downstream dis-

covery in the guise of seeking information relevant to market definition.[18] Inquiry into what indi-

vidual parents of the student Plaintiffs thought at the time is introducing the very complications

that the decades of case law growing out of *Hanover Shoe* and *Illinois Brick* has sought to prevent.

Finally, to the extent such anecdotes are deemed relevant, they would likely be found in Plaintiffs'

own emails or records, obviating any such need to search non-parties' files.

## CONCLUSION

Plaintiffs respectfully submit, for the foregoing reasons, that the Court should grant Plain-

tiffs' Motion for Protective Order.


Dated: January 4, 2023

|

/s/ Robert D. Gilbert | /s/ Edward Normand
Robert D. Gilbert | Devin (Velvel) Freedman
Elpidio Villarreal | Edward Normand
Robert S. Raymar | Peter Bach-y-Rita
Sarah Schuster | Richard Cipolla
Alexis Marquez | **FREEDMAN NORMAND**
Steven Magnusson | **FRIEDLAND LLP**
**GILBERT LITIGATORS & COUNSE-** | 99 Park Avenue, 19th Floor
**LORS, P.C.** | New York, NY 10016
11 Broadway, Suite 615 | Phone: (646) 350-0527
New York, NY 10004 | vel@fnf.law
Phone: (646) 448-5269 | tnormand@fnf.law
rgilbert@gilbertlitigators.com | pbachyrita@fnf.law

---

[18] *See, e.g., In re Aspartame Antitrust Litig.*, 2008 WL 2275528, at *4-5 (E.D. Pa. Apr. 8, 2008) (rejecting attempt to circumvent downstream discovery bar based on claims of relevance for "(a) the market for aspartame, (b) the fungibility and substitutability of sweeteners; and (c) Plaintiffs' buying power, market position and demand elasticity"); *see also In re Vitamins Antitrust Litig.*, 198 F.R.D. 296, 299 (D.D.C. 2000) (rejecting defendants' attempt to circumvent downstream bar based on contention "that this information is relevant to the determination of consumer demand which, according to [defendants], is a relevant factor in the calculation of 'but for' prices that will be determinative of plaintiffs' damages").

15

pdvillarreal@gilbertlitigators.com
rraymar@gilbertlitigators.com
sschuster@gilbertlitigators.com
amarquez@gilbertlitigators.com
smagnusson@gilbertlitigators.com

rcipolla@fnf.law


/s/ Eric L. Cramer
Eric L. Cramer
Caitlin Coslett
Hope Brinn
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Phone: (215) 875-3000
ecramer@bm.net
ccoslett@bm.net
hbrinn@bm.net


Robert E. Litan
Daniel J. Walker
**BERGER MONTAGUE PC**
2001 Pennsylvania Avenue, NW
Suite 300
Washington, DC 20006
Phone: (202) 559-9745
rlitan@bm.net
dwalker@bm.net

/s/ Richard D. Schwartz
Richard D. Schwartz (ARDC# 6323474)
**BERGER MONTAGUE PC**
1720 W Division Chicago IL 60622
(773) 257-0255
rschwartz@bm.net