### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| SIA HENRY, *et al.*, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BROWN UNIVERSITY, *et al.*,<br><br>Defendants. | Case No.: 22-cv-00125<br><br>Hon. Matthew F. Kennelly |

### JOINT STATUS REPORT

The Parties submit this Joint Status Report pursuant to the Case Management Order, Dkt. No. 260, requiring the Parties "to file a joint status report by 1/13/2023."

### I.      UPDATES TO THE COURT ON RECENT DEVELOPMENTS

Defendants notified Plaintiffs on January 3, 2023, that "[t]he 568 Presidents Group (and all of its Committees) has been formally dissolved, effective November 4, 2022."

### II.      THE PARTIES' RESPECTIVE POSITIONS ON DISCOVERY ISSUES

**Plaintiffs' Position**

Three issues are ripe for the Court's decision:

> 1) Defendants Should Designate Appropriate Custodians From the President's Office and the Development Office;
>
> 2) Custodians At Five Universities Should Provide Discovery After Alleged "Withdrawals" From The Cartel; and
>
> 3) Admissions Scoring Data and its Importance to Plaintiffs' Ability to Prove Our Case.

1

There are two other issues (Discovery of Post-January 9, 2022, Communications and TAR and Search Terms) that are not yet fully ripe, but on which the Parties need the Court's guidance to ensure any disputes will be either resolved or ripe for decision by January 27, 2023.

### A. Procedural Context

This Court made clear on October 26, 2022, that donation records were a significant part of Plaintiffs' case, and that Plaintiffs must be afforded discovery sufficient to establish a link, if any, between donations and admissions decisions. Indeed, the Court even emphasized the importance of this specific discovery, and its expectation that Defendants must make such evidence available to Plaintiffs:

> So first of all--and I don't think this is the case, but I just want to have it out there just so I've said it and I'll be done with it--I mean, this is not going to be a situation where the case comes to a halt and gets adjudicated because the discovery can't get produced. So I just want to make that clear.
> …
> **So the whole case--maybe not the whole case, but a significant part of the case is exactly this, the contention that admissions are tied to donations, or at least that's a significant part of the case.** And so unless there's going to be an opinion that basically says, well, **the kind of thing I just said is not going to happen,** that basically says the plaintiffs can't get that, therefore, the case is over, then **we have to come up with a way of doing that.**

Oct. 26, 2022 Tr. 23:12-17; 36:23-37:6 (emphasis added). And when the Court speaks, its words are rulings. *Id.* 34:16-17 ("**That's the judge talking. Those are called rulings.**") (emphasis added). As best Plaintiffs have been able to determine, *Defendants have produced exactly zero donation records in this case to date.*

In the December 21, 2022 conference, the Court emphasized the importance for the parties to proceed diligently in their discovery work, and that the meet-and-confers cannot continue interminably:

> **What that means is I'm putting a deadline on you. … We've got to get done with all of this stuff.** Here's why it's in your interest to do that. I set the discovery schedule, and I'm pretty sure I told you at the time that's the discovery schedule. **And if it takes you, you know, 24 months to get—you know, to negotiate over the shape of the table and that leaves you a month and a half to do, you know, 250 depositions, then you're going to have a real busy month and a half**, just to put it in stark terms.
>
> …
>
> And don't just give me some kind of, you know, generic wave of the hand saying discovery is ongoing or document production is ongoing. **I need more detail than that so I can be satisfied that people are actually—have their noses to the grindstone and are getting the work done.**

Dec. 21, 2022 Tr. 12:13-13:24 (emphasis added).

## B. Issues From The December 2, 2022 Joint Status Report That Are Ripe For Resolution

In the December 2, 2022 Joint Status Report ("JSR"), Plaintiffs submitted that there were three issues ripe for the Court's intervention. Defendants represented at the December 21, 2022 hearing that none of these issues were ripe. Plaintiffs have taken issue with Defendants' representation to the Court that these three issues were not ripe for resolution at that time. ***See*** **Ex. A.**[1] These issues were ripe on December 2, they were ripe on December 21, and they are ripe now.

### 1. *Defendants Should Designate Appropriate Custodians From the President's Office and the Development Office*

As of the December 2 JSR, sixteen out of seventeen Defendants had refused to designate a custodian in its Development Office, and twelve of seventeen Defendants had refused to designate

---

[1] Exhibit A is an email chain beginning December 23, 2022, Robert D. Gilbert email to Britt Miller and copied to all Defendants entitled "The Defendants' Representation to the Court on December 21 that Three Issues are Not Ripe for Decision by the Court.") Defendants responded to Plaintiffs' email on January 3, offering one justification to support their position that the issues were not ripe. *Id.* On January 9, Plaintiffs explained the lack of merit of that one justification. *Id.*

a custodian in its President's Office.[2] Since then, the only change is that Cornell has added the President's Office as a custodian for certain narrow topics, so there are now eleven out of seventeen Defendants who refuse to designate a custodian at all in its Presidents' office, but of the six Defendants now willing to designate a custodian of documents in the President's Office, at least two of those six refuse to designate a custodian in the President's Office for *donor-related applicant records*.

As Plaintiffs stated in the December 2 joint status report: "The sequence of events is illuminating. First, Plaintiffs went to Individual meet-and-confers with individual Defendants (starting on November 10), several of whom used identical arguments to refuse to designate a custodian in the Development or President's Office, and then said that the Plaintiffs needed to seek recourse at the global meet-and-confers, and this pattern continued for a couple of weeks. At the subsequent global meet-and-confer on November 28, to which the Plaintiffs had been referred, all Defendants took the position that Plaintiffs' only recourse was to go back to all seventeen universities separately in at least seventeen more Individual meet-and-confers to determine whether any one of them will agree to provide even a single custodian from one of those offices. (In a December 1 Individual meet-and-confer, Johns Hopkins identified custodians from its President's and Development offices, leaving sixteen more Individual meet-and-confers.) From the perspective of the Plaintiffs, this is a classic case of being given the run-around." December 2 Joint Status Report, Dkt. No. 255, at 2.

Plaintiffs notified all Defendants *at least 12 times in writing* between November 23 and December 21, 2022, that their positions that they will not designate a custodian from President's

---

[2] Given in part their unique status from joining the Cartel recently, Plaintiffs are still in negotiation with Caltech regarding more limited discovery from these offices and possible alternative discovery to get the necessary materials short of designating individuals from those offices as custodians.

Office (12 Defendants) or the Development Office (16 Defendants) were inconsistent with the Court's October 26 rulings and guidance. In each of these writings, Plaintiffs referred Defendants to Plaintiffs' Four Illustrative Scenarios, each demonstrating how extremely relevant documents would likely be located *only* in the President's Office or Development Office. *See, e.g.*, Ex. B (November 23, 2022 email from Robert D. Gilbert to all Defense counsel). (A shorthand way of referring to these Four Illustrative Scenarios would be to denominate them as the: 1) "The Oral Communication"; 2) "The Terse Instruction Without Context"; 3) "Internal Discussions of Donation Amounts Insufficient to Warrant Instructions to Admissions"; and 4) "Internal Scorecards.")

Northwestern has offered a written response to try to address Plaintiffs' Illustrative Four Scenarios, which is especially instructive. One of the scenarios adduced by the Plaintiffs is where the Presidents' or Development Office has lengthy email and written communications with prospective donors, and then shoots terse or unrevealing emails to (or even merely has an oral conversation with) the admissions department with instructions. In this scenario, limiting custodians to the admissions office would prevent plaintiffs from discovering the smoking gun. In response, Northwestern argues that this and the other scenarios described by the plaintiff are merely "hypothetical" and go "well beyond what is alleged in the complaint." This is ironic because (as was alleged in the original Complaint, the Amended Complaint, and now in the Second Amended Complaint) Northwestern was the subject of an expose by its own student newspaper entitled *"Northwestern President Schapiro Says He Reads Applications of Some Legacy, Donor Students,"* which revealed that President Schapiro personally handled 550 VIP applicants in one year. SAC ¶ 181. As further alleged in the Complaint, "[o]ne of the student reporters who broke the story about Northwestern's two-track admissions system later stated in a podcast interview:

"[President Schapiro] also told us that he tries to work with the Dean of Admissions Christopher Watson, as much as he can. He brought up an example that if they both disagreed on an applicant that they try to work it out." SAC ¶ 182.

President Schapiro and Northwestern are a perfect example of why Plaintiffs need emails from President and Development Office custodians. Given that President Schapiro handled 550 VIP applications in a single year, it is almost guaranteed that there are thousands of discoverable communications between his office and those VIP applicants. On the other hand, Plaintiffs have no idea whether there are also emails from President Schapiro to Dean of Admissions Christopher Watson. President Schapiro told the student reporters that "he tries to work with the Dean of Admissions Christopher Watson"—but does he do that orally? Does he send him short emails without any reason or context, directing him to admit a certain person? We don't know.[3]

Sixteen out of seventeen Defendants still refuse to designate a custodian in their Development Office, and eleven out of seventeen Defendants still refuse to designate a custodian in their President's Office, thwarting the Court's crystal-clear guidance on October 26. Despite Defendants' protestations to the contrary, this issue was also ripe on December 2, was ripe on December 21, and is ripe now. Plaintiffs therefore respectfully ask the Court to order that by January 20, 2023, each Defendant shall each designate a custodian of documents from its

---

[3] The December 23 email to all Defendants not only made all these points about President Schapiro, but also pointed out the following: And in at least six emails copied to all Defendants between December 14 and December 16, Plaintiffs repeated the Four Illustrative Scenarios and referred Defendants to Paragraph 177 of the Amended Complaint [which contains an admission by a former head of selection at MIT that **every** university makes favorable admissions decisions for the children of donors]. This makes clear that the communications between the President's or Development offices are often not in writing; therefore the communications between the Development Office and the Donor, the President's Office and the Donor, and between the two offices, are essential—if the Defendants intend to comply with the direction from the Court on October 26. These are not merely hypothetical or speculative scenarios, as is even further demonstrated by [Vanderbilt] Chancellor Gee's colorful admission about '*truth serum*' in Paragraph 183 of the Amended Complaint." Ex. A (emphasis added).

President's Office and Development Office, to allow Plaintiffs to take discovery central to their theory of liability.

### 2.  *Custodians At Five Universities Refuse Discovery After Alleged "Withdrawals"*

Five Defendant universities (Brown, Chicago, Emory, Penn, and Vanderbilt) allege having "withdrawn" from the 568 Cartel at various times and, for that reason, refuse to search for or produce documents beyond the date of their alleged withdrawal.[4]

Plaintiffs have informed all Defendants of Plaintiffs' position in writing at least six times between November 23, 2022, and December 21, 2022: Brown, Chicago, Emory, and Penn have provided Plaintiffs with "dispositive proof" in writing that they *remained* members of the conspiracy, because their so-called letters of "withdrawal" praised the conspiracy and wished it continued success in the future, the precise opposite of what would be required to withdraw as a matter of law, *i.e.*, in the words of this Court, to disavow or repudiate the conspiracy and its goals.[5] Vanderbilt has produced no evidence to support its alleged withdrawal.

Plaintiffs have further explained to Defendants in writing and in the December 2 JSR that, absent conclusive proof of withdrawal and disavowal or repudiation of the conspiracy and the goals the conspiracy, these Defendants remained a part of the conspiracy, and thus remained

---

[4] To be precise, Penn and Vanderbilt refuse to produce discovery more than one year past the date of their alleged "withdrawal." Penn alleges that it withdrew from the 568 Group in January 2020, and will not produce documents or data beyond January 1, 2021. Vanderbilt alleges that it withdrew from the 568 Group in April 2020, and will not produce documents or data beyond April 8, 2021.

[5] As stated by the Court in denying Defendants' motion to dismiss in its entirety "a withdrawal defense requires the conspirator to both inform co-conspirators of his withdrawal and *disavow* the criminal objectives of the conspiracy." *Carbone v. Brown Univ.*, Case No. 22 C 125, 2022 WL 3357249, at *11 (N.D. Ill. Aug. 15, 2022) (emphasis added); *see also United States v. Nagelvoort*, 856 F.3d 1117, 1128–29 (7th Cir. 2017) (noting that a withdrawal defense requires the conspirator to both inform co-conspirators of his withdrawal and disavow the criminal objectives of the conspiracy). At an August 2, 2022 hearing, this Court used the word "*repudiate*" when referring to the requirements for withdrawal from a conspiracy. Aug. 2, 2022 Tr. 24:11-14.

liable for the acts and omissions of each other member of the conspiracy—and vice versa. There can be no silo of immunity from liability when one is in a conspiracy.

In Defendants' insert, Emory admits in writing that, "after Emory left the 568 Group, it publicly announced that one of its campuses would be need-aware going forward." Given that a) Emory's "withdrawal" letter is dispositive proof that it remained in the conspiracy, and b) Emory made non-need-blind admissions decisions since 2012, thus all seventeen Defendants are liable, then c) Plaintiffs are entitled to discovery from Emory to prove that liability.

Despite four of these Defendants having produced dispositive proof that they remained in the conspiracy, and Vanderbilt having produced no evidence whatsoever that it ever disavowed or repudiated the conspiracy, these Defendants continue to flout the Court's guidance concerning discovery into which Plaintiffs are entitled, in particular with regard to donation records. This issue was also ripe on December 2, was ripe on December 21, and is ripe now.

Remarkably, notwithstanding the statements from the Bench on August 2, 2022, and the Court's rulings on August 15, 2022, these Defendants persist in asserting that their "withdrawal" renders them immune from certain production after the date of their alleged "withdrawals." Indeed, these Defendants have offered to produce discovery concerning whether their withdrawals were "legally adequate." These five Defendants are literally proposing that the Parties must now relitigate what the Court has *already decided five months ago*: that Plaintiffs' allegations are plausible, Defendants have not withdrawn from the conspiracy, and Plaintiffs are entitled to test their allegations through discovery.

Plaintiffs respectfully ask the Court to order that Defendants that allege they withdrew from the alleged conspiracy shall produce the discovery requested for time periods after the alleged withdrawals, to the same end-date ordered for the other Defendants.

### 3. *Admissions Scoring Data and its Importance to Plaintiffs' Ability to Prove Our Case*

A further issue has become ripe since the time of the December 2 JSR. In their Second Set of Requests for Production, Request No. 3, Plaintiffs seek "[f]or all Admitted Applicants, Documents reflecting for each Academic Year the scores assigned to each factor disclosed in response to Request No. 2[6] and the weight, if any, applied to that factor."

As of the end of December 2022, thirteen out of seventeen Defendants refused to produce admissions scoring data in response to this Request. Plaintiffs have explained the relevance and importance of this data in writing in at least seven emails that were copied to all Defendants:

> Plaintiffs seek this information to prove their allegation that donations influenced admissions decisions. *This is an important way to prove that, but for the donation, the applicant would not have been admitted to the university.* Absent this data, Plaintiffs' plausible claims are far more difficult to prove (to say the least), as you must surely know, and Plaintiffs would be precluded from testing Defendants' protestations of compliance with the requirements of the Section 568 exemption.

Ex. C (December 30, 2022 Robert D. Gilbert email to Georgetown and copied to all Defendants) (emphasis added). Plaintiffs were informed on January 11, 2023, that seven more Defendants had agreed to provide structured admissions scoring data. Columbia has represented that it does not "score" applicants in any quantitative manner. The remaining dispute is with five defendants— Brown, Dartmouth, Northwestern, Notre Dame, and Yale. These Defendants have refused to produce their admissions scoring data.

On January 13, 2023 these Defendants (and Columbia) first stated their intention to file a motion for a protective order based upon their representation on January 4, 2023 that they will

---

[6] Request No. 2 from Plaintiffs' Second Set of RFPs seeks "All Documents Concerning any scoring methodologies You have used in considering whether to admit Applicants, including but not limited to the principal factors that You have considered in Admissions; any numerical ranking or scoring system(s) used in connection with those factor(s); and any weight applied to any particular ranking or scoring of the Applicants or any particular factor."

abandon the 568 Exemption as a defense in this litigation. *See infra* part B.4. The Court made clear in its August 15 Decision denying Defendants' Motion to Dismiss, and on the October 26, 2022 record, that Plaintiffs are entitled to discovery that will allow them to tie donations to admissions decisions. Absent a filed stipulation dropping the 568 Exemption defense, absent entry of a protective order, and without having an opportunity to read Defendants' "contemporaneous" motion for a protective order, Plaintiffs view Defendants' refusal as a delaying tactic. The Court should order that these Defendants produce their admissions scoring data.

Defendants' refusal to furnish this discovery severely hampers Plaintiffs' ability to rebut a Defendant's argument that a particular applicant would have been admitted in the absence of the $50,000 donation made by the applicant's parents. In addition, discovery of admissions scoring data will permit Plaintiffs to show that admitted applicants whose parents donated $50,000 or more scored an average of X on factors other than a donation, while applicants unrelated to donors scored X + Y on such factors, substantiating an inference that the university's admission process placed a "thumb on the scale" for donor applicants. Scoring data may very well show a column or "score" that explicitly considers donations in reaching admissions decisions.

This issue is now ripe. In December 30, 2022, and December 31, 2022 emails to the Defendants who have refused to produce admissions scoring data, Plaintiffs explained the importance of this discovery, and requested a response by January 4 clarifying whether Defendants would modify their position; *otherwise Plaintiffs would understand the issue to be ripe for the Court's consideration*. Plaintiffs respectfully ask the Court to order that Defendants shall produce the Admissions Scoring data responsive to Request Nos. 2 and 3 in Plaintiffs' Second Set of Requests for Production.

**4.** ***Defendants' Discovery Positions are Contrary to the Court's Guidance and Incompatible with Defendants' Other Positions***

As we first explained in the December 2 JSR, Plaintiffs submit that Defendants have repeatedly taken positions that were and continue to be "unreasonable, inconsistent with the Court's rulings and guidance, and fundamentally interfere with Plaintiffs' right to discover evidence to prove their claims." Doc. No. 255 at 2.

This Court has been crystal-clear: Plaintiffs are entitled to discovery of donation records and other evidence that would tie donations to admissions decisions, and this meet-and-confer process cannot be drawn out interminably. *See supra* Part II.A. Rather than heed the Court's rulings and guidance, Defendants have in effect converted the Court's guidance as to discovery that should be provided into a roadmap to systematically prevent that very discovery. Individually, Defendants' positions cripple Plaintiffs' ability to establish certain elements of their allegations. By thwarting Plaintiffs' attempts to obtain discovery of donation records from the President's and Development offices, and several also thwarting Plaintiffs' attempts to obtain discovery of admissions scoring data, Defendants' positions amount to an integrated, multi-prong strategy to shield from discovery the exact evidence that is highly important to Plaintiffs to make their case. Or, put in other words, Defendants are doing *precisely* what the Court expressly proscribed.

As part of this pattern of attempts to shield donation records from production, six Defendants (Brown, Columbia, Dartmouth, Northwestern, Notre Dame, and Yale) are so determined to try to prevent discovery of donation records that on January 4, 2023, they stated to Plaintiffs their intention to abandon the 568 Exemption as a defense in this litigation, and advance the argument that, therefore, they need not produce any discovery concerning the relationship of donations to admissions. One day after that January 4 call, those six Defendants provided to Plaintiffs "a list of RFPs and proposed search terms that we identified as relating, in whole or in

part, to the 568 Exemption, and therefore would object to as irrelevant and disproportionate." Unsurprisingly, this list is pervaded by requests that would tie admissions to donations.

This prospective abandonment by six Defendants of the Exemption defense is immaterial to Plaintiffs' entitlement to important discovery from each Defendant concerning its need-awareness or need-blindness in its admissions practices for at least three reasons.

First, as long as at least one Defendant continues to claim the Exemption as a defense, Plaintiffs remain entitled to discovery concerning donor-related applicants at *all* Defendant universities for the duration of the conspiracy. As Plaintiffs have repeatedly explained, and as the Court made clear in denying defendants' Motion to Dismiss, Memorandum Decision and Order, Dkt. No. 185, at 12-13 (Aug 15, 2022), if one Defendant violated the need-blind requirement in its admissions practices, then the Exemption no longer applies to the conduct of *any* of the group members. "The plaintiffs are not required to cite evidence specific to each defendant in their complaint....[T]he fact that at least one member of the conspiracy is plausibly alleged not to be, or not to have been, need-blind means that plaintiffs have plausibly alleged that none of the schools are protected under the 568 Exemption....The defendants' arguments to the contrary are unavailing." *Id.* As stated above in connection with the Defendants who allege to have "withdrawn," there is no silo of immunity from liability for members of a conspiracy. To paraphrase John Donne, "No [conspirator] is an island, entire of itself; every [conspirator] is a piece of the continent, a part of the main."

Second, even if all seventeen Defendants withdrew their Exemption defenses, Plaintiffs would still be required to prove non-need-blind admissions practices to defeat Defendants' Statute of Limitation-based defenses. Defendants wish to simultaneously assert that Plaintiffs must have been aware of Defendants' non-need-blind practices—and thus aware of their antitrust injury for

statute of limitations purposes—while also shielding that very discovery from Plaintiffs. Defendants cannot have it both ways.

Third, Plaintiffs would still be entitled to discovery into Defendants' admissions practices because such information directly bears on Defendants' arguments under the Rule of Reason. The Court has not yet ruled whether it will apply a *per se* standard or the rule of reason. If the Court entertains purported pro-competitive justifications, Defendants are likely to argue (as they did in the 1991 Overlap case) that the conspiracy enabled them to reduce aid to affluent students so that they could redistribute more aid to needy ones and. If any such benefits are argued to have resulted, then Plaintiffs are entitled to show that there were less restrictive alternatives for Defendants to achieve those ends. Plaintiffs must be allowed to take discovery into Defendants' wealth favoritism, to rebut Defendants' contention and to establish that Defendants' need aware admissions practices were geared at constraining student body diversity in favor of revenue.

In sum, unless *each and every Defendant* concedes (i) having practiced non-need-blind admissions *and* concedes (ii) Plaintiffs' inability to have discovered their injury for the purposes of Defendants' Statute of Limitations defenses, *and* concedes (iii) that they did not use the conspiracy to create a more diverse student body, Plaintiffs remain entitled to discovery concerning the non- need-blind admissions practices of each and every Defendant. Defendants have refused to make these concessions. For these and other reasons, the Parties failed to reach an understanding at a meet-and-confer on January 11.

On January 12, Plaintiffs proposed the following compromise that would limit the discovery Plaintiffs can take concerning Defendants' non-need-blind admissions practices in light of the six Defendants' decision to abandon their Exemption defense: Each Defendant would be required to designate as a custodian and produce for deposition one individual named by Plaintiffs,

as well as produce documents pursuant to certain of Plaintiffs' RFPs concerning donor-related applicant records and RFPs specific to each Defendant. *See* Ex. D (Jan. 12, 2023 Edward Normand email to all Defendants). The six Defendants refused to accept the compromise. The Court should order the relief Plaintiffs seek.

### C. Issues That Are Not Yet Ripe But Would Benefit From The Court's Guidance

Mindful of the magnitude of discovery still remaining and the finite window in which to conduct it, there are two additional issues that, while not yet ripe for the Court's decision, Plaintiffs request that the Court facilitate the diligent resolution of these issues.

#### 1. *Discovery of Post-January 9, 2022 Communications*

At least fifteen of the seventeen Defendants have taken the position that they will not produce documents created after January 9, 2022, at the latest (and five Defendants are asserting that they will assert an even earlier end date because they claim to have "withdrawn" from the conspiracy at some point.). Plaintiffs are entitled to *all* discovery *at least* through November 4, 2022, when the 568 Group was dissolved. We explained this in a January 6, 2023 email to Britt Miller and copied to all Defendants. This January 6 email to Defendants remains the best summary of our position, and reflective of the extent to which we have already communicated our views to Plaintiffs, and thus we quote it below:

> First, Plaintiffs are entitled to Defendants' non-privileged communications (internally and with third parties, such as lobbyists) in the period leading up to the expiration of the Exemption on September 30, 2022, and the dissolution of the 568 Presidents Group on November 4, 2022. We are entitled to know, for example, if Defendants acknowledged among themselves or to a third party that they would face liability for wrongdoing in the absence of the Exemption, or if Defendants communicated a need to disband the 568 Group if the Congress declined to re-authorize the Exemption.

> Second, Plaintiffs are entitled to donor-related applicant information and admissions-related practices in the RFPs through November 4, 2022, because such information is integral to assessing the

supposedly need-blind admissions practices while the Cartel was in existence.

Third, even after November 4, 2022, damages have continued to accrue, *e.g.*, for those students whose aid packages had initially been determined while the Cartel existed. We are entitled to discovery through at least December 31, 2023 (*i.e.*, 75 days before the initial expert reports are currently due), with respect to all requests for production relating to damages.

Fourth, we are entitled to communications and financial aid structured data through December 31, 2023, to determine whether (and to what extent, and how) Defendants' financial aid awards changed, after (a) the Complaint was filed and (b) the 568 Group disbanded on November 4, 2022. If Defendants' financial aid awards have increased after (a) or (b), this will constitute further proof that the Consensus Methodology was anticompetitive. If there is no or little change in how Defendants award aid, and the Defendants' net price remains substantially above a control group as it has been for years, this would undercut the Defendants' contention that the group truly or fully disbanded or at least tend to prove that the 17 universities continue to be influenced by common understandings among the Cartel.

Accordingly, expert work will require discovery of financial aid structured data and other documents both leading up to the dissolution date (January 9, 2022-November 4, 2022) and for a period of time after November 4, 2022. We therefore propose an end date for all structured data of December 31, 2023, which captures two years of data following the filing of the Complaint, while still providing a reasonable end date prior to expert discovery deadlines (which is set to close on September 24, 2024).

Fifth, a related basis for post-filing data production in a case like this is to determine an "after" period for the damages model. Sometimes the complaint is filed around the time the conduct has come to an end (*e.g.*, a governmental investigation or guilty plea or the like). Plaintiffs then need post-conduct data for a clean, or at least partially clean, period with which to compare the conduct period. Given the end of the 568 Cartel, this is a basis for supplemental data productions. The effects of the conduct could be continuing even after the disbanding of 568, but it will undoubtedly be important to get data reflecting 2023 financial aid awards and tuition.

It bears emphasis that paragraph 12 of the Second Amended Complaint (like the Amended Complaint) states that the Class

includes students who "first enrolled in one of Defendants' full-time undergraduate programs during the relevant times (defined below) from January 1, 2003, *until the effects of Defendants' continuing conduct ceases."* Experts might differ about when effect of the Defendants conduct ceases, but it is not January 9, 2022. Paragraph 223 of the SAC, in defining the Class, states "through the present." It is common that when Plaintiffs define a class "until the present," the end point of the class period is the date that the plaintiffs file for class certification. *Rodriguez v. It's Just Lunch Int'l*, 2018 WL 3733944, at *7 (S.D.N.Y. Aug. 6, 2018) (modifying an open-ended Class Period to end on the class certification date); *see also Lawrence v. NYC Med. Prac., P.C.*, 2021 WL 2026229, at *12 (S.D.N.Y. May 20, 2021) (interpreting the endpoint of the Class Period ("through the present") as the date plaintiffs filed their motion for class certification). In this case, according to the Case Management Order, that date would be October 18, 2024.

Sixth, we are entitled to know whether and to what extent Defendants have changed their admissions practices since the Complaint was filed. This evidence is relevant whether it shows that a given Defendant has continued the same practices and policies in admissions (which under the controlling law is a further and continuing basis for the liability of *all* members of the 568 Group), or whether it shows that a given Defendant has changed its practices and policies (which we would cite as evidence of culpability and/or as a basis for prospective impeachment).

Ex. E (January 6, 2023 Robert D. Gilbert email to Britt Miller and copied to all Defendants).

Plaintiffs have proposed a global meet-and-confer to discuss these six points with all Defendants on January 17. Plaintiffs believe that a single global meet-and-confer should address the above six issues, which are quite straightforward. Defendants have agreed.

To facilitate timely resolution, Plaintiffs respectfully request this Court to order that by January 20, 2023, the Parties shall complete a global meet-and-confer concerning the scope of post-January 9, 2022, discovery, including all six categories proposed by Plaintiffs; and by the close of January 27, 2023, file a Joint Status Report either informing the Court of the resolution of that issue or setting forth the Parties' positions on that issue, which will then be ripe for the Court's resolution.

## 2. *TAR and Search Terms*

Plaintiffs are concerned Defendants will be unable to meet the March 3 deadline for substantial completion if the parties have not agreed on TAR procedures or search terms by the end of January. If the Parties have not reached agreement on all material issues on potential search methodologies by January 27, any unresolved issues will then be ripe for the Court.

*TAR*

On December 1, 2022, Northwestern served a TAR disclosure letter on Plaintiffs. On December 8, Northwestern and Plaintiffs met and conferred. Plaintiffs wrote to all Defendants the same day to address what Plaintiffs expected to be common issues among Defendants proposing to employ TAR methods, and requesting a global meet and confer for the following Wednesday, December 14. The Parties have agreed to meet and confer globally to discuss common concerns on January 20, 2023. In the meantime, Plaintiffs have received TAR disclosure letters from Georgetown (12/29/2022), Dartmouth (1/7/2023), Brown (1/9/2023), Duke (1/9/2023), Yale (1/11/2023), and JHU.

*Search Terms*

The Parties have met and conferred, exchanged two rounds of proposed search terms and feedback, and Plaintiffs have requested to meet and confer again by January 18 to address any outstanding issues.

In light of the upcoming March 3 deadline for substantial production, Plaintiffs respectfully request the Court to order that by the close of business on January 23, 2023, the Parties shall complete global meet-and-confers on Search Terms.

Plaintiffs also respectfully request the Court to order that by the close of January 27, 2023, the Parties shall file a Joint Status Report with the Court, either informing the Court of the

resolution of those issues, or setting forth the Parties' positions on each issue, which will then be ripe for the Court's resolution.

### D. Fallacies That Pervade Defendants' Positions

There are at least five consistent fallacies that permeate Defendants entire insert: 1) Defendants do not have any serious regard for the upcoming March 3 discovery deadline; 2) Defendants do not acknowledge that on August 15, 2022, the Court ruled Plaintiffs' allegations plausible, and Plaintiffs are entitled to discovery concerning those allegations; 3) Defendants have not taken to heart the Court's October 26 rulings about the importance of Plaintiffs' ability to tie donation records to admissions decisions; 4) Defendants are operating in a world where the admissions office is the final "decisionmaker," rather than the President of the university; and 5) Defendants assert that Plaintiffs are looking for a "needle in a haystack." Plaintiffs are looking for the "needles" in the President's office and Development office, and trying to trace them into the admissions office before they are buried in a haystack of applicants and admittees.

Plaintiffs have already laid out their positions at length above on Fallacies 1-3. With regard to Fallacy 4 concerning the "decisionmakers," Defendants assume an independent admissions office, that they characterize as the "decisionmaker," outside of the chain of command, and beholden to none. When Northwestern President Morton Schapiro personally reviews 550 applications and meets with the Dean of Admissions on an admission decision, the command influence is obvious.

As for Fallacy 5, or the "Haystack Fallacy," Defendants are turning reality on its head by suggesting it is efficient or reasonable to "start with admissions" (the "haystack"). Assuming 4,000 applicants are admitted to a university, each admissions cycle from a pool of 20,000 total applicants, the far more efficient method of identifying the "needles" is to target the donation

records *only* for cumulative gifts of $50,000 or greater as set forth in Plaintiffs' RFPs (which are a small fraction of the applicant pool and admittee pool). Searching the admissions haystack first is not a good way to identify the $50,000+ needles that will stick out in the President's Office or Development Office, which are devoted to tracking these donors and managing the University's relationship with them. Sixteen out of seventeen Defendants refuse to designate custodians in their Development Office, and thirteen out of seventeen Defendants refuse to designate custodians in their President's Office for the purpose of donor-related applicant record discovery.

### E. Conclusion

A proposed form of order is attached as Exhibit F. In light of Defendants' positions that flout this Court's rulings and guidance, and this Court's recognition of the importance of and need for discovery sufficient to prove their allegations. Plaintiffs respectfully request that the Court an order as follows:

1.  By January 20, 2023, each Defendant (with the exception of Caltech) shall each designate appropriate custodians of documents from its President's Office and Development Office, to allow Plaintiffs to take discovery central to their theory of liability;

2.  Defendants that allege they withdrew from the alleged conspiracy shall produce the discovery requested for time periods after the alleged withdrawals, to the same end-date ordered for the other Defendants;

3.  Five Defendants (Brown, Dartmouth, Northwestern, Notre Dame, and Yale) shall produce the admissions scoring data responsive to Request Nos. 2 and 3 in Plaintiffs' Second Set of Requests for Production;

4. By January 20, 2023, the Parties shall complete global meet-and-confers concerning the scope of discovery of post-January 9, 2022 communications; and by January 27, 2023, file a Joint Status Report either informing the Court of the resolution of that issue or setting forth the Parties' positions on that issue, which will then be ripe for the Court's resolution;

5. By January 20, 2023, the Parties shall complete global meet-and-confers on any disputes about TAR; by January 23, 2023, the Parties shall complete global meet-and-confers on any disputes concerning Search Terms; and by the close of January 27, 2023, the Parties shall file a Joint Status Report either informing the Court of the resolution of those issues, or setting forth the parties' positions on those issues, which will then be ripe for the Court's resolution.

**Defendants' Position**

Defendants' statements at the December 21, 2022 status conference that the three issues identified by Plaintiffs in the December 2 JSR—President's and Development Office custodians, relevant time period, and discovery from certain non-participating defendants—were not ripe for decision at that time were accurate. *Accord* ECF No. 255 at 16-27 (explaining why the issues were not ripe for decision). It is true that, as of December 2, Defendants had not surrendered to Plaintiffs' demands on those three issues and thus had not agreed to the sweeping and burdensome discovery such surrender would entail. It is also true that, as of December 21, the parties had not resolved those issues through the meet-and-confer process. But those discussions were still on-going, and the Plaintiffs' counsel who were engaging in the discussions with the individual defendants had not indicated that the discussions had reached an impasse or that Plaintiffs would accept nothing short of everything that they were asking for. It cannot be the case that an issue is "ripe" for decision by the Court in any instance where every responding party has not capitulated

to the propounding party's demands, without further discussion or negotiation and regardless of relevance, proportionality, or other legitimate discovery concerns. Indeed, in the course of the parties' meet-and-confers, both in the weeks between the December 2 JSR and the December 21 hearing, and in the weeks following the December 21 hearing, Defendants offered a number of less burdensome alternatives to the broad discovery Plaintiffs were (and are) insisting upon and were able to narrow or eliminate certain disputes.[7] In any event, although all of the Defendants have not completed the meet-and-confer process, Defendants agree that given Plaintiffs' unwillingness to meet Defendants even part of the way, the issues now are sufficiently mature for the Court to address them.

## A. Development Office and President's Office Custodians[8]

Plaintiffs have expressed in meet and confers that their interest in adding custodians from schools' President and Development Offices relates solely to the Section 568 Exemption. But those custodians' documents are far too attenuated from actual admissions decisions to have any relevance to the 568 Exemption. In addition, their documents are cumulative or even duplicative of information in documents that Defendants have already agreed to produce and thus disproportionate to the needs of this case.

---

[7] Those resolutions, which vary by Defendant, are described more fully below.

[8] Six Defendants (Brown, Columbia, Dartmouth, Northwestern, Notre Dame, and Yale) have decided to withdraw the 568 Exemption defense and therefore believe that discovery related to admissions and development practices is no longer relevant or proportional as to them for that reason. They are addressing that position separately. *See* Section E *infra*.

Five Defendants (Brown, Chicago, Emory, Penn, and Vanderbilt) are not asserting the 568 Exemption as a defense after they stopped being members of the 568 Group at various times over the past decade. They are also addressing admission practice discovery after they were no longer members of the group separately. *See* Section C *infra*. The present section of the JSR sets forth the position of the Defendants asserting the 568 Exemption defense for some or all of the time period as to why the addition of Development and President's Office custodians should not be added at this juncture.

Those Defendants who are asserting the 568 Exemption as a defense do not dispute Plaintiffs' entitlement to certain discovery as to the impact, if any, of financial support to a school on admissions decisions when a school was a member of the 568 Group. The only dispute is how to accomplish that consistent with Rule 26's relevance and proportionality principles. Defendants respectfully submit that adding custodians from the Development Office or the President's Office at this stage of the case is inappropriate in that it would lead to the search for, and production of, documents that are irrelevant or cumulative and is disproportional to the needs of the case given the custodians those Defendants are already agreeing to search. Instead of requiring discovery that is disproportionate to the needs of the case at this early stage, Defendants propose to conduct targeted searches for Development and President's Office custodians' documents for information that is not captured in the schools' other productions if facts arise that provide a reasonable basis to believe that responsive, non-cumulative documents from the Development and President's Office custodians might exist and should be collected.

While Federal Rule of Civil Procedure Rule 26(b)(1) allows discovery of information relevant to a party's claims or defenses, the relevance of the discovery requests must be proportional to the needs of the case. Fed. R. Civ. P. 26(b)(1); *see Motorola Sols., Inc. v. Hytera Commc'ns Corp.*, 365 F. Supp. 3d 916, 924-25 (N.D. Ill. 2019) ("The discovery rules are not a ticket to an unlimited, never-ending exploration of every conceivable matter that captures an attorney's interest."). Furthermore, "the responding party is entitled to select the custodians most likely to possess responsive information . . . unless the choice is manifestly unreasonable or the requesting party demonstrates that the resulting production is deficient." *See Mortg. ADR Servicing, LLC v. JPMorgan Chase Bank, N.A.*, 15CIV0293LTSJCF, 2017 WL 2305398, at *2 (S.D.N.Y. May 18, 2017).

22

For the reasons explained fully herein, Plaintiffs have not demonstrated that any Defendant should be required to add more custodians beyond those that they have already proposed. Moreover, Plaintiffs urge the Court to adopt a "one-size-fits-all" approach where all Defendants are required to add custodians regardless of the documents captured by their agreed-upon searches and regardless of their own unique circumstances. As Defendants have explained in their individual meet-and-confer sessions with Plaintiffs, Defendants are not all similarly situated when it comes to many of the key issues in this case, including how their Admissions, President's, and Development Offices and departments interact with each other. If the circumstances of any particular Defendant suggest that relevant, non-cumulative information may exist beyond what was captured in the search of admissions custodians, the parties could then meet-and-confer about how best to capture that information. Defendants respectfully submit that there are targeted, reasonable school-specific alternatives to accommodate Plaintiffs' discovery requests without running afoul of Rule 26's relevance and proportionality principles, and that account for each school's unique circumstances.

### 1. Plaintiffs' Approach Seeks Disproportionate Discovery.

Under Plaintiffs' interpretation, Defendants' Section 568 Exemption defenses depend on whether *any* Defendants' admissions decision as to *any* applicant while the Defendant was a member of the 568 Group was influenced by an applicant's financial circumstances. Implicit in this statement is that there would have to be admissions decisionmakers who were influenced by their knowledge of an applicant's financial circumstance. In an attempt to establish that Defendants cannot use the 568 Exemption as a defense, Plaintiffs' Second Amended Complaint is replete with allegations that schools' *admissions decisions* were influenced by the consideration of financial circumstances. *See, e.g.,* ECF 266-1 ¶¶ 3, 4, 8, 135, 139, 144, 145, 166, 168, 170, 171-79, 183, 185, 186, 188, 192. These allegations discuss letters to admissions offices, other offices reaching

out to admissions offices, admissions officers attending alumni events, admissions readers tagging applicants for special consideration based on their relationship with a donor, and admissions "plus factors." Nowhere do Plaintiffs allege that admissions decisions were ever made without consulting the admissions office.

As such—and after extensive investigation about the circumstances at *their schools*—Defendants provided Plaintiffs with custodian lists that include personnel from the schools' Admissions Offices (among other offices or departments) and non-custodial sources such as files maintained and databases used by those offices. The custodians and repositories already disclosed include emails and documents between the admissions decisionmakers and are therefore the most appropriate starting point for discovery into the narrow and discrete, threshold issue of whether, under Plaintiffs' interpretation, any school considered any applicant's financial circumstances in making a single admission decision during its membership in the 568 Group. Certainly, that is where proportional discovery should start. Plaintiffs' kitchen-sink approach cannot be justified by the needs of this litigation for which this discovery is sought.[9]

In any event, given the differences among Defendants with respect to their operations, their membership in the 568 Group, and the posture of this case, this Court should not support Plaintiffs' proposed one-size-fits-all approach to discovery. For example, the fact that six Defendants (Georgetown, Northwestern, Dartmouth, John Hopkins, Duke, and Cornell) have agreed to provide

---

[9] Northwestern is an unusual choice for Plaintiffs to focus on in their discussion of purported improper refusals to designate custodians pertaining to admissions. Northwestern did include its former President, as well as other custodial and non-custodial sources relating to the Office of the President, in its disclosures. And the assertion that Plaintiffs have no idea what kinds of responsive documents exist relating to the former President's review of applications is untrue, as it ignores the fact that Northwestern's counsel explained during multiple meet and confers *precisely* what documents existed reflecting those communications, which were included among Northwestern's custodial and non-custodial disclosures. Since that time, Northwestern has elected to withdraw the 568 exemption affirmative defense, meaning that these materials are no longer relevant for the reasons explained below.

an individual in the President's Office as a custodian for 568 Group discovery—based on their investigation as to whether their President substantively engaged with the activities of the 568 Group (*e.g.*, activities beyond being the signatory on a document)—does not mean that discovery of the President's Office is warranted for the Defendants whose Presidents did not engage in the same way. The scope of discovery on Plaintiffs' wide-ranging topics should be reflective of each Defendant's specific circumstances. MIT, for example, has long had a clearly stated public policy of not giving admissions preference to donors, legacy applicants, or athletes, and any suggestion by the Plaintiffs to the contrary is entirely hypothetical and speculative at this stage, before they have even reviewed the extensive documents that will be made available from the Admissions Office.[10] Plaintiffs haven't met their burden of justifying why discovery into these custodians is appropriate for *each* defendant.

Notwithstanding their admitted sole focus on admissions-related information, Plaintiffs argue that they are entitled to information about donors from each and every school that likely never even reached an admissions decisionmaker or even the schools' admissions office. But that information has no bearing on the admissions decisions that were actually made unless it was considered by the admissions decisionmakers themselves. *See Breuder v. Bd. of Trustees of Community College Dist. No. 502, DuPage County, Illinois*, 15 CV 9323, 2019 WL 3386966, at *7 (N.D. Ill. July 26, 2019) (finding that the proposed new custodians are unlikely to produce a significant number of relevant and unique documents when they were not the decisionmakers with respect to the decisions that impacted the plaintiff). And if the information *was* considered by the

---

[10] *See, e.g.*, MIT Admissions, *About MIT Admissions*, available at https://mitadmissions.org/about/about-mit-admissions.

admissions decisionmakers, it will be captured in the documents that Defendants have agreed to produce from their structured and unstructured admissions-related sources.

In response, Plaintiffs have invented a number of hypothetical examples of the types of documents they speculate might exist in other offices that would be incremental to what they will get from admissions offices with which to test the 568 Exemption, such as oral communications between the Development Office and Admissions about specific applicants, or communications between a President's Office and the Development Office about whether a specific donation was sufficiently large to warrant involvement with the admissions process. Plaintiffs' hypotheticals are mere speculation and further demonstrate that the documents they seek are either unrelated to a school's admissions decision or more easily and readily obtainable through an admissions office custodian. *Garcia v. Tyson Foods, Inc.*, No. 06–2198, 2010 WL 5392660, at *14 (D. Kan. Dec. 21, 2010) (Waxse, M.J.) ("Plaintiffs present no evidence that a search of email repositories of the 11 employees at issue is likely to reveal any additional responsive emails . . . Plaintiffs must present something more than mere speculation that responsive emails might exist in order for this Court to compel the searches and productions requested."). Of course, to the extent oral communications occurred, those communications would not be reflected in written documents at all, and document discovery is not the proper vehicle. And if a Development Office communicated with a President's Office about donors, internal deliberations, score cards, or any other analysis as to whether an applicant's financial circumstances warrant preferential treatment, those communications are irrelevant unless and until they reach the admissions personnel who review applications and/or make final admissions decisions—communications that will be captured among the documents that Defendants have agreed to produce from their admissions sources. *See, e.g.*, *Jones v. Nat'l Council of Young Men's Christian Ass'ns of the United States*, No. 09 C 6437, 2011 WL 7568591,

at *2 (N.D. Ill. Oct. 21, 2011) ("The Court finds that Plaintiffs' untargeted, all-encompassing request fails to focus on key individuals and the likelihood of receiving relevant information.").

Defendants can also think of no reason why discussions related to whether a donor has sufficient wealth to warrant preferential treatment *that never reach the admissions department* serve any purpose other than to harass and embarrass the individuals involved. It defies reasoning that an applicant can receive preferential treatment when the only individuals capable of providing preferential treatment—admissions office personnel—are left in the dark.

### 2. *Adding Custodians from the Development and President's Offices Would Impose a Substantial Burden on Defendants.*

Plaintiffs' insistence that all Defendants add Development and President's Office custodians also would impose a significant and unnecessary burden on Defendants. Defendants should not be required to search twenty-plus years of emails and electronic documents for no other purpose than to unearth some imagined "needle in the haystack"[11] that, if it exists at all, will almost certainly be found in materials that Defendants have already agreed to produce.

Defendants have already collected tens of millions of documents from their existing custodians, including custodians from their Admissions Offices. Likewise, Defendants will produce structured admissions data.[12] It would be more efficient for Plaintiffs to review the

---

[11] Plaintiffs' so-called Fallacy 5 ignores that it is Defendants who, in the first instance, bear the burden of looking for any "needle in a haystack," a burden that is by definition disproportional to the legitimate needs of litigation. Given the undisputed fact that Plaintiffs' claims turn on an alleged *connection* between donations and admissions, it makes sense to first look for information from the custodians who actually work in the admissions department. Defendants have all agreed to undertake the substantial burden of searching the files of the relevant admissions custodians. What Plaintiffs are asking Defendants to do is look for documents in additional departments based on nothing but their own speculation that they might find documents that not only relate to donors, but that somehow influenced admissions decisions without also being reflected in the admissions files. The line Defendants seek to draw is the appropriate one based on considerations of relevance and proportionality.

[12] The six Defendants (Brown, Columbia, Dartmouth, Northwestern, Notre Dame, and Yale) that are no longer asserting the Section 568 Exemption defense contend that production of all admissions data is disproportionate as to those Defendants. *See* Section E *infra.*

27

documents and data from those sources before Defendants spend additional time and resources sifting through voluminous information that likely has no bearing on this case. Indeed, adding just one custodian from either office would require that Defendants review hundreds of thousands of documents that have minimal to no connection to the schools' admissions practices.[13] After all, Defendants' planned productions, using search terms already negotiated by the parties, are designed to pick up communications between either a President's Office or Development Office and persons in Admissions asking that an applicant be given favorable treatment by Admissions or other evidence that an admissions office for at least one Defendant considered an applicant's financial circumstances while a member of the 568 Group.

Plaintiffs also have less burdensome avenues of discovery available to determine whether an applicant's financial circumstances influenced the decision of an admissions officer. For example, some Defendants have proposed that, before adding these custodians, Plaintiffs propound interrogatories related to Defendants' admissions policies or conduct a 30(b)(6) deposition of an individual in the admissions office to determine if donations are considered as part of admissions decisions. *See BankDirect Capital Fin., LLC v. Capital Premium Financing, Inc.*, 15 C 10340, 2018 WL 946396, at *6 (N.D. Ill. Feb. 20, 2018) (emphasizing that Rule 26(b)(1)'s proportionality requirement weighs against discovery that could result in a massive quantity of information is unnecessary when the information sought is easily and readily obtained through depositions and interrogatories). To date, Plaintiffs have refused to engage on these proposals or have not responded to them at all.[14]

---

[13] Plaintiffs have not disclosed how many custodians they seek to add from the Development and President's Offices.

[14] Caltech and Plaintiffs are currently engaging in productive conversations as to potential alternative proposals in lieu of custodians from the President's Office and Development Office, respectively. Caltech

In sum, the "need" in this litigation for this type of discovery is not for every document about every applicant whose financial circumstances may have been considered as part of the admissions process. Rather, Plaintiffs argue that the 568 Exemption is unavailable if financial circumstances of *any* applicant was considered by *any* of the 17 schools when that school was a member of the 568 Group. If Plaintiffs' theories are right about the role of financial circumstances in admissions offices' decisions, it is inconceivable that sufficient evidence to test the 568 Exemption will not be reflected in the files of the admissions offices. At a minimum, that is where discovery should start. Once Plaintiffs see that discovery over the next few months, they certainly can come back and say they do not have proportional discovery to test the 568 Exemption. Plaintiffs' requests for all Defendants, no matter their individual circumstances or offers of compromise, to add upfront custodians from the Development and President's Offices are therefore disproportionate, and even unnecessary, to their claim that certain Defendants' admissions decisions were influenced by financial circumstances.

### 3. *Defendants' Proposed Compromise.*

While Defendants do not believe that Development and President's Office custodians are relevant or proportional, they have offered a less burdensome approach for producing relevant documents beyond the admissions office where, based on Defendants' reasonable, good-faith, school-specific investigations, there is reason to believe, beyond sheer speculation, that the documents actually exist. Defendants' initial discovery efforts will focus on each school's admissions policies, data, and custodians. If, after Defendants' production of admission-related documents and data, Plaintiffs can point to follow-up discovery they need to show that an

---

and Plaintiffs are therefore not at an impasse on these issues (and, indeed, any order requiring such custodians would be premature for Caltech).

admissions decision was influenced by the President's or Development Office, Defendants will confer with Plaintiffs in good faith to create targeted searches for documents from those offices that Plaintiffs believe are relevant to a donation allegedly affecting an admissions decision (as Defendants have repeatedly emphasized).[15]

Alternatively, Defendants are also willing to respond to targeted interrogatories or Rule 30(b)(6) deposition notices on the topic of the impact of donations on admissions. If, after those interrogatories or deposition notices, Plaintiffs believe additional targeted discovery is necessary, Defendants are willing to meet and confer about additional discovery. For now, however, Plaintiffs have failed to articulate why Defendants' proposed custodians are manifestly unreasonable and have not yet reviewed Defendants' productions so they cannot claim that they will be deficient.

Defendants' targeted approaches, unlike Plaintiffs' sweeping demand, would be proportional to the needs of the case and would capture such relevant evidence, if it in fact exists.

### 4. *Johns Hopkins' Position.*

Johns Hopkins has offered custodians from its Admissions Office, Financial Aid Office, Development Office, and President's Office. And as specifically requested by Plaintiffs, Johns Hopkins also provided detailed organizational charts for various offices, as well as several other categories of documents, in its initial production on December 16, 2022. Johns Hopkins and Plaintiffs have engaged in productive meet-and-confer sessions. Recognizing that, in contrast to the other Defendants, Johns Hopkins became a member of the 568 Group only very recently in December 2021—just weeks before the filing of the Complaint—Plaintiffs have agreed, in the

---

[15] The six Defendants (Brown, Columbia, Dartmouth, Northwestern, Notre Dame, and Yale) that are no longer asserting the Section 568 Exemption defense have not made this proposal, but have expressed a willingness to consider more targeted discovery. *See* Section E *infra*.

interests of proportionality, that Johns Hopkins will produce documents from January 1, 2019 for

the three Johns Hopkins custodians. Johns Hopkins has agreed with Plaintiffs, in principle, to go

further back than January 1, 2019 for certain topics that the parties are discussing.

## B.  End Date for Defendants' Data and Document Productions

Consistent with ordinary practice in complex litigation, Defendants that remained in the

568 Group proposed the date on which Plaintiffs filed their Complaint as a reasonable cut-off date

for discovery (*i.e.*, January 9, 2022). While acknowledging the issue is not yet ripe for the Court,

Plaintiffs now assert that Defendants are unreasonable for proposing this end date and seek the

Court's "guidance" on this issue. No such guidance is needed. Defendants agree with Plaintiffs

that the issue is not ripe, particularly given that Plaintiffs only emailed Defendants about this issue

a week ago on January 6, 2023. Defendants are amenable to meeting and conferring on this issue

to avoid burdening the Court with yet another dispute.

Indeed, if Plaintiffs had engaged rather than rushing to the Court, Plaintiffs would have

learned that while Defendants have proportionality and relevance concerns about some of

Plaintiffs' positions, particularly in light of the large volume of data and documents Defendants

already have agreed to produce, Defendants are willing to discuss providing significant post-

January 9, 2022 discovery, including: (1) documents relating to the expiration of the 568

exemption and the dissolution of the 568 group (which Plaintiffs spend the bulk of their section

discussing), and (2) structured financial aid data from after January 9, 2022.[16] What Defendants

are not willing to do, at least not without a discussion with the Plaintiffs, is to agree to provide

---

[16] Even Defendants who have exited the 568 group before its dissolution are willing to discuss providing
structured financial aid data from after January 9, 2022. These Defendants will not, however, have
documents relating to the expiration of the 568 exemption and dissolution of the group, as they exited well
before these events took place.

Defendants with post-January 9, 2022 discovery for each and every one of Plaintiffs' massive discovery requests.[17]

In light of this issue only having been raised last week and the fact that many of the documents Plaintiffs seek could not yet have even been created, Defendants respectfully request that the parties be allowed to follow the standard meet and confer process to discuss in good faith the issues the Plaintiffs have raised and any concerns Defendants may have, and to work to reach a resolution.

## C. Post-Membership Admissions-Related Discovery of Non-Member Schools

With respect to discovery from five defendant institutions that stopped participating in the 568 Group years before this suit was filed—Brown, Chicago, Emory, Penn, and Vanderbilt ("Non-Member Schools")—Plaintiffs' position rests on two fundamental flaws.

First, Plaintiffs assert that the Non-Member Schools "refuse to search for or produce documents beyond the date of their alleged withdrawal." *See supra* at § II(B)(3) (emphasis added). That is unequivocally false. Each of the Non-Members has agreed to provide post-membership discovery on myriad relevant topics, including their lack of participation in the 568 Group post-membership and their financial-aid practices post-membership. They simply oppose sweeping discovery into their post-membership admissions practices, for the straightforward reason that admissions evidence is relevant only to the 568 Exemption's applicability and they do not invoke the 568 Exemption as a defense for any post-membership liability they may have.

Second, Plaintiffs contend that by not asserting the Exemption defense for the periods after they left the 568 Group, the Non-Member Schools are seeking to "relitigate" the legal standard for

---

[17] Plaintiffs' January 6, 2023 email to Defendants did not point to specific discovery requests for which they require the post-January 9, 2022 discovery. Thus, Defendants are left without a full understanding of Plaintiffs' request. Defendants ask that Plaintiffs identify specific RFPs during a meet and confer.

withdrawal and use that to "render[] them[selves] immune" from discovery into their post-membership admissions practices. *Id*. That, too, is wrong. As noted, the Non-Member Schools have agreed to provide discovery relevant to whether they adequately withdrew from the alleged conspiracy and remain liable post-membership. But, even if, post-membership, the Non-Member Schools did not adequately "withdraw" from the alleged conspiracy and remain liable for any unlawful acts of the remaining members of the 568 Group (and vice versa), that still does not make discovery into the Non-Member Schools' post-membership admissions practices relevant, because those admissions practices are relevant only to the applicability of the 568 Exemption—which, to repeat, the Non-Member Schools do not invoke as a defense for any post-membership liability. Indeed, Plaintiffs affirmatively assert that one or more of the Non-Member Schools have *already produced evidence* showing that they were not fully need-blind post-membership. And Plaintiffs fail to explain, much less meet their burden to establish, why the expansive post-membership admissions discovery they seek is necessary at all, let alone proportional, to establish what they claim is an *admitted and undisputed* fact.

Plaintiffs persistently ignore these two basic points because they have no answer. As further elaborated below, the challenged discovery should be denied.[18]

---

[18] Non-Member Brown, which left the 568 Group more than a decade ago, is among the six schools that have advised the Plaintiffs that they do not intend to assert the Exemption defense for any period relevant to this case when they answer the Plaintiffs' Second Amended Complaint. Those six schools (Brown, Columbia, Dartmouth, Notre Dame, Northwestern, and Yale) are all separately moving for a protective order barring certain discovery into their admissions and development offices that Plaintiffs claim is relevant only to whether the 568 Exemption applies. The specific post-membership discovery to which the Non-Member Schools object is set forth in that protective order motion, and Plaintiffs' request in this JSR for an order compelling such discovery from the Non-Member Schools for post-membership periods (during which the Non-Member Schools do not assert the defense) should be denied for all the reasons set forth in that motion, including the supporting declaration submitted on behalf of Brown, which details the inordinate and unwarranted burden associated with this unnecessary discovery. *See* Decl. of Jon R. Roellke in Supp. of Mot. For Protective Order. Plaintiffs' request for such discovery from the Non-Member Schools should also be denied for the separate and independent reasons set forth herein.

Each Non-Member School has agreed to provide substantial discovery into the post-membership issues that Plaintiffs have properly identified as relevant to the withdrawal defenses and multiple other topics.[19] Most critically, the Non-Member Schools have agreed to provide post-membership discovery relevant to whether their withdrawal defenses are legally adequate and, if not, to whether any conduct after they terminated membership in the 568 Group is a basis for liability on the merits. For example, each of the Non-Member Schools have agreed to provide proportional discovery into their post-membership financial need calculation methodologies, materials from their financial aid offices as to any alleged continued participation in the 568 Group, and materials concerning how they each met the financial need of admitted students (*e.g.*, loans, grants, etc.). This is the very same post-membership discovery that Plaintiffs have identified as relevant to the Non-Member School withdrawal defenses, and it is the only post-membership discovery they need *even if* the withdrawal defenses are, as Plaintiffs contend, legally inadequate.[20]

---

[19] In the December 2, 2022 JSR (ECF No. 255), Plaintiffs stated they needed post-membership discovery into "whether and to what extent (a) the Defendant continued to use the information shared among the conspirators to make its pricing decisions, (b) the Defendant continued to share pricing-related information with the co-conspirators, (c) the Defendant continued to use a pricing model, strategy, or formula that was based on or derived from the Common Methodology, and (d) the Defendant's pricing otherwise continued to reflect the influence of the co-conspirators' application of the Common Methodology, both before and after the Defendant's purported 'withdrawal.'" *See* Dec. 2, 2022 Joint Status Report at 13. In this current JSR, Plaintiffs ignore entirely that the Non-Member Schools have agreed to provide that discovery.

[20] Plaintiffs' suggestion that the Non-Member Schools have not identified "custodians" after they were no longer members of the 568 Group is misleading, especially as to Chicago, Brown, and Emory. A different temporal scope will not change these Defendants' custodians or non-custodial sources, as these schools have each explained to Plaintiffs. Chicago's custodians from Financial Aid and Admissions—which Plaintiffs have not challenged—started at Chicago as early as July 2009 and have remained through present. There are no successors to be added. Likewise, for Brown, its identified custodians in Financial Aid have been at the University continuously since 2006, and its identified custodians in Admissions cover the period of 2005 to present. Similarly, Emory's custodians with responsive financial aid- and admissions-related documents started as early as 2007, and the custodians still serve in their respective positions (or their successors were included on Emory's custodian list). In sum, for Chicago, Brown, and Emory, there are no additional Financial Aid or Admissions custodians Plaintiffs want added regardless of temporal scope.

Notwithstanding the Non-Member Schools' agreement to provide the discovery described above, Plaintiffs insist that the Non-Member Schools collect, redact for FERPA compliance, and produce from their respective admissions, development, and other offices vast amounts of post-membership documents and student-specific data concerning their admissions practices. Specifically, Plaintiffs have demanded post-membership discovery responsive to more than 70 separate document requests that pertain solely to whether the Non-Member Schools were "need-blind" for purposes of testing the applicability of the 568 Exemption. Plaintiffs fail to meet their burden of establishing that such post-membership discovery into admissions practices is relevant and proportional with respect to the Non-Member Schools, *none of which assert the Exemption defense during the time period they were no longer members of the 568 Group*.[21]

Notably, this extensive post-membership discovery into admissions practices is entirely separate from, and wholly immaterial to, Plaintiffs' assertion that the Non-Member Schools did not adequately "disavow" or "repudiate" the goals of the alleged unlawful agreement for purposes of avoiding continued joint and several liability. *See* 2d Am. Compl. ¶¶ 27, 107.[22] Rather, discovery into admissions practices (and supposedly related donor practices) are relevant only to testing whether a Defendant is immune from antitrust scrutiny for engaging in certain activities authorized by Section 568 (*e.g.*, collaborating with other schools on best practices for evaluating

---

[21] For three of the Non-Member Schools (Brown, Chicago, and Emory), Plaintiffs seek this vast post-membership discovery for every year for almost a decade during which those schools do not assert the 568 Exemption defense, despite Plaintiffs' failure to substantiate that any such extensive discovery is relevant, necessary, or proportional.

[22] To be clear, none of the Non-Member Schools participated in an unlawful agreement to use the Consensus Methodology in determining need (so there was nothing for them to "repudiate" or "disavow" when they left the Group). And Plaintiffs are also wrong about what is required to effectively withdraw from any unlawful agreement. But for present purposes, that is all beside the point. Even assuming that the Non-Member Schools failed to adequately withdraw from the alleged conspiracy, that does not somehow make post-membership admissions information relevant when the Non-Member Schools *are not claiming the Exemption* for that period regardless.

financial need). If, as here, a school leaves the 568 Group, and thus no longer invokes the 568 Exemption to immunize its post-membership conduct, no discovery is needed to determine whether that school meets the Exemption's requirements. Plaintiffs fail to demonstrate otherwise.

Plaintiffs' assertion that post-membership discovery of admissions and admissions-related donor practices remains relevant to whether *other* schools can invoke the exemption is misplaced. The 568 Exemption permits schools to engage in certain collaborative activities related to financial aid without antitrust scrutiny—here, membership in the 568 Group. Once a Non-Member School stopped participating in the 568 Group,[23] its post-membership admissions practices cannot impact the availability of the 568 Exemption to schools that remained in the 568 Group. Stated differently, the 568 Exemption cannot be defeated by the alleged fact that a school that was no longer a member of the 568 Group began post-membership to engage in non-need-blind admissions practices, regardless of whether its withdrawal was legally ineffective to defeat any claim of unlawful financial-aid conduct after the school ceased its membership in the 568 Group. Otherwise, any single school could unilaterally terminate the work of the entire 568 Group, and thereby effectively undermine Congressional intent, by ending its membership in the Group and, thereafter, adopting admission practices that would not qualify for the Exemption.

For example, after Emory left the 568 Group, it publicly announced that one of its campuses would be need-aware going forward. That post-membership change by Emory cannot negate the 568 Exemption defense for schools that remained in the 568 Group, none of which is alleged to have collaborated with Emory on its post-membership financial aid practices. And, even if Emory's post-membership change to its admissions practices did impact the availability of the

---

[23] Lest there be any doubt, these schools will provide reasonable post-membership discovery to allow Plaintiffs to test if they in fact stopped participating in the 568 Group.

defense for other schools, that post-membership change is, and has been, publicly known and thus discovery into it adds nothing but unnecessary burden.[24]

In addition, Plaintiffs will have proportional discovery into 568 Group communications, as well as the admissions practices of any Defendant school for time periods during which any school asserts the 568 Exemption defense. This includes discovery of the Non-Member Schools for the period during which they participated in the 568 Group and are asserting the 568 Exemption defense. Plaintiffs have made no showing that such extensive discovery will in any way be insufficient to establish the extent to which any 568 Group members qualified for the 568 Exemption.

In all events, to the extent Plaintiffs need limited discovery of post-membership admissions practices for the limited purpose of establishing whether other schools may properly assert the 568 Exemption, there are numerous other less burdensome and more proportional means by which to obtain such discovery. Plaintiffs could, for example, propound interrogatories, seek deposition testimony, or serve requests for admissions, all of which would serve to provide meaningful discovery of post-membership admission practices and policies without imposing the inordinate burden and expense of the vast document and data collection and FERPA redactions their post-membership document requests would impose on the Non-Member Schools. Plaintiffs, however, have steadfastly refused to even consider, much less propound, any such less burdensome and

---

[24] Moreover, under Plaintiffs' interpretation of the 568 Exemption, as long as an admission decision was not need-blind for *any* student at *any* of the 17 schools while it was a member of the 568 Group, then the 568 Exemption cannot apply to *any* Defendant. But under Plaintiffs' legal interpretation of the 568 Exemption, which they contend that this Court has accepted in ruling on Defendants' Motions to Dismiss, scorched-Earth discovery into the admissions practices related to *all* applicants at *all* schools for *all* years is not necessary. Under Plaintiffs' statutory interpretation, they do not need *all* discovery as to *every* student from *every* school in *every* year. And they certainly do not need admissions and donor discovery from schools during years that they were not members of the 568 Group.

more proportional means of discovery. Nor does their request for relief in this JSR address any such alternative means.

Given Plaintiffs' failure to even consider any alternative and less burdensome means of discovery into the narrow issues they have speculated could be potentially relevant, and their refusal to budge from their blanket demand that each Non-Member School provide *all* of that requested discovery *without any limitation* that accounts for the fact that those schools are not asserting the 568 Exemption after they stopped participating in the Group, their requested relief should be denied. As this Court has noted, parties that seek "the sun, the moon, and the stars" should recognize that they may wind up with none of the discovery they seek. The Non-Member Schools respectfully submit that Plaintiffs have failed to heed that guidance during the past several months of meet and confers to find an approach to discovery into admissions practices and allegedly related donor records including from these Non-Member Schools after they ended their memberships in the 568 Group. And nothing in this JSR meets the Plaintiffs' burden to establish why any such post-membership discovery is proportional as to the Non-Member Schools. Plaintiffs' request for an order compelling the Non-Member Schools to provide *all* requested discovery into admissions and donor practices—which request is itself premised on incorrect assertions about the vast post-membership discovery that the Non-Member Schools have already agreed to produce—should be denied.

## D. Admissions Scoring Data

Plaintiffs are incorrect that there is a ripe issue with respect to admissions scoring data. As explained in Section E below, six Defendants—Brown, Columbia, Dartmouth, Northwestern, Notre Dame, and Yale—are dropping the defense based upon Section 568 of the Sherman Act, which makes Plaintiffs requests for admissions scoring data no longer relevant and disproportionate as to these Defendants. The remaining Defendants have agreed to produce

admissions scoring data to the extent it appears in structured data or other responsive documents. Plaintiffs' attempt to manufacture a discovery dispute on this issue before even learning of Defendants' position on this structured data is improper and a waste of this Court's time.

## E. Schools Withdrawing the Exemption Defense

Six of the Defendants—Brown, Columbia, Dartmouth, Northwestern, Notre Dame, and Yale—informed Plaintiffs on January 3, 2023, that, when they answer Plaintiffs' Second Amended Complaint, they will no longer assert a defense based upon Section 568 of the Sherman Act ("the Exemption"). These Defendants will instead focus on the numerous other deficiencies in Plaintiffs' case, including with regard to liability, injury, damages, and class certification. These Defendants explained to Plaintiffs that, in light of their decisions not to rely upon the Exemption, much of the discovery that Plaintiffs are currently seeking against all Defendants is no longer relevant and is disproportionate as to these Defendants, because it is aimed only at establishing that these Defendants do not meet the statutory requirements to claim the Exemption. Since that initial discussion, these Defendants have met and conferred with Plaintiffs twice. These Defendants have identified the specific RFPs and Search Terms that are no longer relevant nor proportionate to them.[25] Plaintiffs have expressed the view that the question of whether each of these Defendants met the statutory requirements for the Exemption is still relevant to other issues that remain in the case. The parties have discussed various approaches to allow Plaintiffs more limited discovery to investigate that question, while reducing the burden and expense of discovery to these Defendants, including limited deposition testimony or written discovery. But Plaintiffs have insisted that these Defendants produce documents and data responsive to more than half of the RFPs that relate to

---

[25] As noted in various sections above, these RFPs implicate the issues discussed in sections B1, 4 and 5 of Plaintiffs' section of this Joint Status Report.

the Exemption defense, including production of decades of data from their Development and Admissions databases. That proposed "compromise" did nothing to address the inordinate and disproportionate burden their requests would impose. Indeed, making this unwieldy litigation more manageable by focusing discovery and ultimate adjudication on the issues core to Plaintiffs' claims is precisely the reason these Defendants have decided to withdraw their Exemption defense.

Because the parties are at impasse regarding how discovery should be limited with respect to these six Defendants, they are contemporaneously filing a Motion for Protective Order addressing their concerns.

**F. TAR and Search Terms**

By Plaintiffs' own admission, neither TAR nor search terms is ripe for the Court's consideration. Plaintiffs provided Defendants with a search term proposal just prior to the filing of this JSR (January 13); until Defendants have had a meaningful opportunity to consider that proposal, setting an arbitrary deadline for the finalization of meet-and-confers on the topic is premature.

**G. Discovery from Plaintiffs**

A dispute also exists with respect to discovery sought by Defendants from Plaintiffs. These issues are ripe for decision, and Defendants will file a separate motion to compel this discovery.

**<u>Conclusion</u>**

While Defendants do not believe that Plaintiffs' hyperbole (the "fallacies" narrative) warrants a point-by-point refutation (although Defendants are prepared to provide one if the Court would like), they believe that it is worth stating that they strongly disagree with each and every one of Plaintiffs' allegations in this regard. Defendants have acted in good faith throughout the discovery process. They have been met with considerable delay on the part of Plaintiffs in responding to discovery proposals, inconsistent positions from different Plaintiffs' counsel as to

possible resolutions of various discovery issues, and repeated attempts by Plaintiffs to mischaracterize and misstate Defendants' positions. All of the Defendants are committed to the schedule the Court has set and are doing their very best to achieve those deadlines. But those efforts are being substantially frustrated by Plaintiffs' intractable discovery posture. We believe that the compromises Defendants have offered are appropriate and reasonable and welcome any questions the Court may have as it considers these issues.

Dated: January 13, 2023

Respectfully submitted,

By:/s/ Edward J. Normand
Devin "Vel" Freedman
Edward J. Normand
Peter Bach-y-Rita
FREEDMAN NORMAND
FRIEDLAND LLP
99 Park Avenue
Suite 1910
New York, NY 10016
Tel: 646-970-7513
vel@fnf.law
tnormand@fnf.law
pbachyrita@fnf.law

/s/ Robert D. Gilbert
Robert D. Gilbert
Elpidio Villarreal
Robert S. Raymar*
Sarah Schuster
Alexis Marquez
Steven Magnusson
GILBERT LITIGATORS & COUNSELORS, P.C.
11 Broadway, Suite 615
New York, NY 10004
Phone: (646) 448-5269
rgilbert@gilbertlitigators.com
pdvillarreal@gilbertlitigators.com
rraymar@gilbertlitigators.com
sschuster@gilbertlitigators.com
amarquez@gilbertlitigators.com

By:/s/ Kenneth Kliebard
Kenneth Kliebard
MORGAN, LEWIS & BOCKIUS LLP
110 North Wacker Drive
Suite 2800
Chicago, IL 60606-1511
Tel: 312-324-1000
kenneth.kliebard@morganlewis.com

Jon R. Roellke
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004-2541
Tel: 202-739-5754
jon.roellke@morganlewis.com

Sujal Shah
MORGAN, LEWIS & BOCKIUS LLP
One Market, Spear Street Tower, 28th Flc
San Francisco, CA 94105-1596
Tel: 415-442-1386
sujal.shah@morganlewis.com

*Counsel for Defendant Brown University*

By:/s/ Deepti Bansal
Deepti Bansal
Alexander J. Kasner
COOLEY LLP
1299 Pennsylvania Avenue, NW
Suite 700

smagnusson@gilbertlitigators.com

* *Pro hac vice*

Eric L. Cramer
Caitlin G. Coslett
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: 215-875-3000
ecramer@bm.net
ccoslett@bm.net

Daniel J. Walker
Robert E. Litan
Hope Brinn
BERGER MONTAGUE PC
2001 Pennsylvania Avenue, NW
Suite 300
Washington, DC 20006
Tel: 202-559-9745
rlitan@bm.net
dwalker@bm.net
hbrinn@bm.net

*Counsel for Plaintiffs*

Washington, DC 20004-2400
Tel: 202-728-7027
dbansal@cooley.com
akasner@cooley.com

Matthew Kutcher
COOLEY LLP
110 N. Wacker Drive
Chicago, IL 60606
Tel: 312-881-6500
mkutcher@cooley.com

*Counsel for Defendant California Institute of Technology*

By:*/s/ James L. Cooper*
James L. Cooper
Michael Rubin
Tommy La Voy
ARNOLD & PORTER KAYE
SCHOLER LLP
601 Massachusetts Ave, NW
Washington, DC 20001-3743
Tel: 202-942-5014
james.cooper@arnoldporter.com
michael.rubin@arnoldporter.com
tommy.lavoy@arnoldporter.com

Leah Harrell
ARNOLD & PORTER KAYE
SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
Tel.: 212-836-7767
Leah.Harrell@arnoldporter.com

Valarie Hays
ARNOLD & PORTER KAYE
SCHOLER LLP
70 W Madison Street
Suite 4200
Chicago, IL 60602
Tel.: 312-583-2440
valarie.hays@arnoldporter.com

*Counsel for Defendant University of*

*Chicago*

By:*/s/ Patrick Fitzgerald*
Patrick Fitzgerald
Amy Van Gelder
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
155 N. Wacker Drive
Chicago, IL 60606-1720
Tel: 312-407-0508
patrick.fitzgerald@skadden.com
amy.vangelder@skadden.com

Karen Hoffman Lent
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
One Manhattan West
Room 40-216
New York, NY 10001-8602
Tel: 212-735-3276
karen.lent@skadden.com

*Counsel for Defendant The Trustees
of Columbia University in the
City of New York*

By:*/s/ Norm Armstrong*
Norm Armstrong
Christopher Yook
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Suite 200
Washington, D.C. 20006
Tel.: 202-626-8979
narmstrong@kslaw.com
cyook@kslaw.com

Emily Chen
KING & SPALDING LLP
1185 Avenue of the Americas
34th Floor
New York, NY 10036
Tel: 212-556-2224
echen@kslaw.com

43

Zachary T. Fardon
KING & SPALDING LLP
110 N Wacker Drive
Suite 3800
Chicago, IL 60606
312 764 6960
zfardon@kslaw.com

*Counsel for Defendant Cornell University*

By:*/s/ Terri L. Mascherin*
Terri L. Mascherin
Reid J. Schar
JENNER & BLOCK LLP
353 N. Clark Street,
Chicago, IL 60654-3456
Tel: 312-222-9350
tmascherin@jenner.com
rschar@jenner.com

Ishan K. Bhabha
Douglas E. Litvack
Lauren J. Hartz
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001-4412
Tel: 202-637-6327
ibhabha@jenner.com
dlitvack@jenner.com
lhartz@jenner.com

*Counsel for Defendant Trustees of Dartmouth College*

By:/s/ James A. Morsch
James A. Morsch
Jim.morsch@saul.com
SAUL EWING ARNSTEIN & LEHR
161 North Clark, Suite 4200
Chicago, IL 60601
Telephone: (312) 876-7100
Facsimile: (312) 876-0288
IL Attorney ID #6209558

Christopher D. Dusseault (pro hac vice)
cdusseault@gibsondunn.com
Jacqueline L. Sesia
jsesia@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7000

*Counsel for Defendant Duke University*

By:*/s/ Tina M. Tabacchi*
Tina M. Tabacchi
JONES DAY
77 West Wacker Drive
Suite 3500
Chicago, IL 60601-1692
Tel.: 312-782-3939
tmtabacchi@jonesday.com

Craig A. Waldman
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001-2113
Tel.: 202-879-3877
cwaldman@jonesday.com

*Counsel for Defendant Emory University*

By:*/s/ Britt M. Miller*
Britt M. Miller
Daniel T. Fenske
Jed W. Glickstein
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Tel: 312-783-0600
bmiller@mayerbrown.com
dfenske@mayerbrown.com
jglickstein@mayerbrown.com

*Counsel for Defendant Georgetown University*

By:/s/ Jeffrey J. Bushofsky
Jeffrey J. Bushofsky
ROPES & GRAY LLP
191 North Wacker Drive 32nd Floor
Chicago, IL 60606-4302
Tel: 312-845-1200
jeffrey.bushofsky@ropesgray.com

Chong S. Park
Samer M. Musallam
ROPES & GRAY LLP
2099 Pennsylvania Avenue, NW
Washington, DC 20006-6807
Tel: 202-508-4600
chong.park@ropesgray.com
samer.musallam@ropesgray.com

*Counsel for Defendant Johns Hopkins
University*

By:/s/ Eric Mahr
Eric Mahr
Jan Rybnicek
Daphne Lin
FRESHFIELDS BRUCKHAUS
DERINGER
700 13th Street, NW
Washington, DC 20005
Tel: 202-777-4500
eric.mahr@freshfields.com
jan.rybnicek@freshfields.com
daphne.lin@freshfields.com

*Counsel for Defendant Massachusetts
Institute of Technology*

By:/s/ Scott D. Stein
Scott D. Stein
Kathleen L. Carlson
Benjamin R. Brunner
Kelsey Annu-Essuman
SIDLEY AUSTIN LLP
1 South Dearborn Street
Chicago, IL 60603
Tel.: 3412-853-7000
sstein@sidley.com

kcarlson@sidley.com
bbrunner@sidley.com
kannuessuman@sidley.com

*Counsel for Defendant Northwestern University*

By:/s/ *Robert A. Van Kirk*
Robert A. Van Kirk
Cole T. Wintheiser
Jonathan Pitt
Matthew D. Heins
Sarah F. Kirkpatrick
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Tel: 202-434-5163
rvankirk@wc.com
cwintheiser@wc.com
jpitt@wc.com
mheins@wc.com
skirkpatrick@wc.com

James Peter Fieweger
MICHAEL BEST & FRIEDRICH LLP
444 West Lake Street
Suite 3200
Chicago, IL 60606
Tel.: 312-222-0800
jpfieweger@michaelbest.com

*Counsel for Defendant University of Notre Dame du Lac*

By:/s/ *Seth Waxman*
Seth Waxman
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
Tel: 202-663-6800
seth.waxman@wilmerhale.com

David Gringer
Alan Schoenfeld

WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel: 212-937-7294
david.gringer@wilmerhale.com
alan.schoenfeld@wilmerhale.com

Daniel Martin Feeney
Edward W. Feldman
MILLER SHAKMAN LEVINE
& FELDMAN LLP
180 North LaSalle Street
Suite 3600
Chicago, IL 60601
Tel.: 312-263-3700
dfeeney@millershakman.com
efeldman@millershakman.com

*Counsel for Defendant The Trustees
of the University of Pennsylvania*

By:*/s/ Norm Armstrong*
Norm Armstrong
Christopher Yook
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Suite 200
Washington, D.C. 20006
Tel.: 202-626-8979
narmstrong@kslaw.com
cyook@kslaw.com

Emily Chen
KING & SPALDING LLP
1185 Avenue of the Americas
34th Floor
New York, NY 10036
Tel: 212-556-2224
echen@kslaw.com

Zachary T. Fardon
KING & SPALDING LLP

110 N Wacker Drive
Suite 3800
Chicago, IL 60606
312 764 6960
zfardon@kslaw.com

*Counsel for Defendant William Marsh
Rice University*

By:*/s/ J. Mark Gidley*
J. Mark Gidley
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005-3807
Tel: 202-626-3600
mgidley@whitecase.com

Robert A. Milne
David H. Suggs
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020-1095
Tel: 212-819-8200
rmilne@whitecase.com
dsuggs@whitecase.com

*Counsel for Defendant Vanderbilt
University*

By:*/s/ Charles A. Loughlin*
Charles A. Loughlin
Benjamin F. Holt
Jamie Lee
Molly Pallman
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004-1109
Tel: 202-637-5600
chuck.loughlin@hoganlovells.com
benjamin.holt@hoganlovells.com
jamie.lee@hoganlovells.com
molly.pallman@hoganlovells.com

Stephen Novack
Stephen J. Siegel
Serena G. Rabie

49

NOVACK AND MACEY LLP
100 North Riverside Plaza, 15th Floor
Chicago, IL 60606-1501
Tel.: 312-419-6900
snovack@novackmacey.com
ssiegel@novackmacey.com
srabie@novackmacey.com

*Counsel for Defendant Yale University*