# EXHIBIT 6

Declaration of Sarah Kirkpatrick

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ANDREW CORZO, et al., individually and on behalf of all others similarly situated,<br><br>         Plaintiffs,<br><br>     v.<br><br>BROWN UNIVERSITY, et al.,<br><br>         Defendants. | **Case No. 1:22-cv-00125**<br><br>**Honorable Matthew F. Kennelly**<br><br>**Magistrate Gabriel A. Fuentes** |

**DECLARATION OF SARAH KIRKPATRICK IN SUPPORT OF MOTION FOR PROTECTIVE ORDER BY DEFENDANTS BROWN UNIVERSITY, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, TRUSTEES OF DARTMOUTH COLLEGE, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, AND YALE UNIVERSITY**

I, Sarah F. Kirkpatrick, pursuant to 28 U.S.C. § 1746, declare as follows:

1.  I am a member of the bar of this Court and admitted to practice in this jurisdiction. I am a partner of Williams & Connolly LLP and counsel for Defendant the University of Notre Dame du Lac ("Notre Dame"). I make this Declaration in Support of Motion for Protective Order by Defendants Brown University, The Trustees of Columbia University in the City of New York, Trustees of Dartmouth College, Northwestern University, University of Notre Dame Du Lac, and Yale University (the "Motion for Protective Order"). This declaration is based on my personal knowledge and information provided to me by Notre Dame.

2.  In Exhibit C to Declaration of Amy Van Gelder in Support of the Motion for Protective Order, Defendants Brown, Columbia, Dartmouth, Northwestern, Notre Dame, and Yale (the "Moving Defendants") identified 73 requests for production (the "Disputed Requests") and numerous associated search terms (the "Disputed Search Terms") aimed, in whole or in part, at the Section 568 statutory exemption to the Sherman Act (the "Exemption"), which are irrelevant and disproportionate in light of the Moving Defendants' decision that they will withdraw the Exemption defense in their forthcoming Amended Answers.

3.  For Notre Dame, the burden and expense of responding to the Disputed Requests are significant, both in absolute terms and relative to the overall burdens anticipated for discovery in this litigation. The Disputed Requests implicate structured admissions data, structured data from the Development Office, and custodial and noncustodial documents from various Notre Dame departments (most notably, the Admissions and Development Offices). Notre Dame's response to the Disputed Requests, including collecting data and documents, deidentifying data, and reviewing and redacting documents, would require the expenditure of

2

several hundred, if not thousands of, hours of attorney, client, and/or vendor time. Our best available estimates of the costs associated with this work are described below.

4. ***Structured Admissions Data.*** The Disputed Requests call for the production of structured admissions data for the years 1998–2022. Notre Dame maintains admissions data in electronic format for the time period of 2005–2022. This data is housed in three separate databases: "Banner," "OnBase," and "Slate." Banner contains certain applicant data for all applicants from 2005 through 2022. From approximately 2005 to 2009, Notre Dame's admissions process (i.e., review and evaluation of applications) was conducted on paper, although a database record was created for each individual applicant. From approximately 2010 through 2015, Notre Dame conducted its admissions process electronically, through OnBase. From approximately 2016 through 2017, Notre Dame used OnBase for electronic application review, and began integrating Slate into its process by capturing documents and application data and building email campaigns and applicant portals. In approximately 2018, Notre Dame transitioned away from OnBase to conduct its admissions process electronically through Slate. Collection and production of structured data related to admissions would require work in all of these databases.

5. Within the relevant time period for this litigation, Notre Dame's data includes more than 300,000 individual applicant records, each of which is associated with at least hundreds and sometimes thousands of data fields. The fields that are populated for each individual applicant vary, so identification and extraction of the desired data fields across all available student data would require extensive manual work. Notre Dame's technology department estimates that more than 100 man-hours would be required to query and extract the requested portions of this data. In addition, prior to production, Notre Dame would also have to

assess all of the admissions data fields to ensure the proper deidentification of this data to comply with FERPA, as required by the Confidentiality Order. *See* Dkt. No. 254 ¶ 8(d). This process would require a contractor to expend significant time and resources to match Notre Dame's admissions data against other Defendants' admissions data and generate a unique Identification Code for each applicant, including for the thousands of applicants that did not receive financial aid. *See id.* Then, to prepare the deidentified data for production, a second contractor would substitute the Identification Codes for personally identifiable information in the complete data set. Notre Dame would also bear additional costs related to its own work collecting and extracting the data and attorney time supervising and assisting with this collection and production process, as well as the costs associated with an e-discovery vendor preparing the data for production to Plaintiffs. Reliably estimating the costs associated with the deidentification code generation, application of those codes to the data set, and attorney time for supervision and preparation of the production is not practical at this stage, given the uncertainties relating to the size and content of the data.

6. ***Development Data Analysis.*** The Disputed Requests also call for Notre Dame to analyze and draw conclusions regarding Development Office data for at least the years 1998–2022. In particular, several of the Disputed Requests would require Notre Dame to identify family members of applicants who have donated, or who are capable of donating, $50,000 or more cumulatively, on a one-time or annual basis, and then produce documents or communications related to those donors and/or their family members. *See* Van Gelder Decl., Ex. A, Request Nos. 20, 128, 129; Van Gelder Decl., Ex. B, Request No. 4. Notre Dame's Development Office maintains structured data for the requested time period, but Notre Dame's Admissions and Development databases are separate and do not communicate with one another.

Thus, there is not a reliable, automated way to discern whether family members of donors were applicants for admission.

7. Notre Dame's Development database contains more than 935,000 records. Based on a preliminary investigation, over the time period at issue, there are thousands of unique, individual donors who donated $50,000 or more on an annual or one-time basis. While some Development records may include annotations or information regarding the identity of family members of donors, including whether a family member matriculated at Notre Dame, such data is not reliably tracked for all entries or for all years. Similarly, the Notre Dame Development Office's structured data does not contain any systematic or readily searchable data reflecting family members (or friends) of donors who applied to Notre Dame. In addition, Notre Dame does not track donors who are merely "capable" of donating at certain levels, but who have not done so. Accordingly, production of the requested donation records would require extensive manual review and analysis to identify responsive data and then detailed redaction work, including insertion of Identification Codes (which is necessary for these documents to be matched to the deidentified admissions records). Notre Dame is unable to reliably estimate the costs associated with the collection, review, deidentification and production of this data, but believes it likely would be many tens of thousands of dollars.

8. ***Custodial and Non-Custodial Documents.*** Notre Dame and Plaintiffs have continued to negotiate custodians, non-custodial data sources, and search terms over the past several months, with their most recent communications relating to custodians occurring via email on December 28, 2022 (and Notre Dame has received no response from Plaintiffs to that most recent communication). Although the parties have not yet reached agreement on these discovery parameters, it is already clear that including admissions documents in the collection, search, and

review process would profoundly increase the discovery costs and burdens facing Notre Dame. Prior to the January 4, 2023 meet-and-confer with Plaintiffs, at which the parties first discussed Notre Dame's intention to withdraw its assertion of the Section 568 statutory exemption defense, Notre Dame had proposed seven custodians and four departmental shared drives (one in Enrollment, one in Admissions, and two in Financial Aid) as sources of potentially responsive information. Applying the most recent round of proposed search terms to those sources, including the Disputed Search Terms, yields 152,817 de-duplicated documents, including families, that must be reviewed for responsiveness, privilege, and confidentiality.[1] By contrast, a search that excludes the two Admissions Office custodians and does not apply the Disputed Search Terms yields 75,948 de-duplicated documents, including families, reducing the number of documents that must be reviewed by roughly 50%. Accordingly, including the two Admissions Office document custodians and applying the Disputed Search Terms would increase Notre Dame's document review population by more than 76,000 documents, and the costs associated with the processing, review, and production of those additional documents is estimated to be in excess of $400,000. This estimate includes first- and second-level review for responsiveness, privilege, and confidentiality; standard quality control review; supervision of the document review by Notre Dame's outside counsel at Williams & Connolly LLP; and the costs of hosting, processing, and preparing the documents for production. These cost estimates do not include the unknown costs associated with anticipated, complex redaction work (including, potentially, inserting Identification Codes into documents that mention personal identifying

---

[1] This hit count is not fully complete, as Notre Dame has had technical difficulties with its collection of documents for one Financial Aid Office custodian, and that custodian's documents are therefore not included in the estimates and calculations provided here.

information relating to applicants for admission), or the costs associated with logging privileged documents.

9. Plaintiffs have also demanded that Notre Dame add its President and a Development Office custodian to its sources of information. Each of these individuals has hundreds of thousands of emails in their custodial files. Even if the number of responsive documents in these custodial files is minimal (as Notre Dame expects would be the case), the sheer size of the custodial files means adding them to the overall search population would dramatically increase the size of the review set, as well as the costs associated with reviewing it. Notre Dame has not collected documents from its President or from a Development Office custodian, and so does not have a precise count of the number of documents from these custodians that would hit on the current proposed search terms. However, Notre Dame has determined that the President and a representative member of the Development Office have more than 876,000 emails in their custodial files (combined). Assuming a hit rate of even just 5%, adding these custodians would increase the document review set by approximately 43,500 documents. Using the same assumptions on which the cost estimate for the addition of Admissions custodians and Disputed Search Terms, the incremental cost of review of these additional documents would be approximately $200,000.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 13th day of January 2023, at Washington, D.C.

By: /s/ Sarah F. Kirkpatrick
Sarah F. Kirkpatrick

7