# EXHIBIT 7

Declaration of Benjamin F. Holt

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ANDREW CORZO, *et al.*, individually and on behalf of all others similarly situated,<br><br>　　　　　　　　　　　　　Plaintiffs,<br><br>　　　　　　v.<br><br>BROWN UNIVERSITY, et al.,<br><br>　　　　　　　　　　　　　Defendants. | **Case No. 1:22-cv-00125**<br><br>**Honorable Matthew F. Kennelly**<br><br>**Magistrate Gabriel A. Fuentes** |

**DECLARATION OF BENJAMIN F. HOLT IN SUPPORT OF MOTION FOR PROTECTIVE ORDER BY DEFENDANTS BROWN UNIVERSITY, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, TRUSTEES OF DARTMOUTH COLLEGE, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, AND YALE UNIVERSITY**

I, Benjamin F. Holt, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I have been admitted *pro hac vice* before this Court. I am a partner of Hogan Lovells US LLP and counsel for Defendant Yale University ("Yale"). I make this Declaration in Support of Motion for Protective Order by Defendants Brown University, The Trustees of Columbia University in the City of New York, Trustees of Dartmouth College, Northwestern University, University of Notre Dame Du Lac, and Yale University (the "Motion for Protective Order"). This declaration is based on my personal knowledge and information provided to me by Yale.

2. In Exhibit C to Declaration of Amy Van Gelder in Support of the Motion for Protective Order, Defendants Brown, Columbia, Dartmouth, Northwestern, Notre Dame, and Yale (the "Moving Defendants") identified 73 requests for production (the "Disputed Requests") and numerous associated search terms (the "Disputed Search Terms") aimed, in whole or in part, at discovery of documents and data relevant to the Section 568 statutory exemption to the Sherman Act (the "Exemption"). Such discovery is irrelevant and disproportionate now that the Moving Defendants have withdrawn the Exemption defense.

3. The burden and expense of responding to the Disputed Requests are significant. The Disputed Requests implicate both structured admissions data, as well as custodial and noncustodial documents from various Yale departments. For Yale, responding to the Disputed Requests, including collecting data and documents, deidentifying data, and reviewing and redacting documents, would require the expenditure of hundreds of hours of attorney, client, and/or vendor time.

4. ***Structured Admissions Data.*** The Disputed Requests call for the production of structured admissions data for the years 1998–2022. Yale maintains admissions data for this time

2

period in two separate databases—Banner and Slate. Yale's Admissions Office used Banner until approximately 2015, before it switched to Slate in 2016.

5. Between 1998 and 2022, public data shows that more than 650,000 individuals applied for admission to Yale. This figure is roughly 30 times the number of publicly-reported financial aid applicants within that same time period.

6. Based on a preliminary investigation by Yale, each admissions applicant in Slate is associated with approximately 100 data fields. The admissions data in Banner is significantly more cumbersome, with over 600 separate data fields, containing over 10 million rows of applicant information; and further investigation is likely to reveal a far greater number of rows of data.

7. Yale has estimated that the process of querying and extracting all of this admissions data from the two separate databases by its data analysts would take approximately 90 hours, assuming no unforeseen technical challenges arise. Prior to production, Yale also would have to deidentify this data, as required by the Confidentiality Order in this matter. *See* Dkt. No. 254 ¶ 8(d). This process would require a data analyst to match Yale's admissions data against other defendants' admissions data and generate a unique Identification Code for each applicant. *See id.* Then, to prepare the deidentified data for production, the data analyst would substitute the Identification Codes for personally identifiable information in the complete data set. This work is estimated to cost Yale at least $24,000, which does not include the costs associated with collecting and producing the de-identified admissions structured data.

8. ***Development Data Analysis.*** The Disputed Requests also call for Yale to analyze and draw conclusions regarding development data for at least the years 1998–2022. In particular, several of the Disputed Requests call for Yale to first identify family members of applicants who have donated, or who are capable of donating, $50,000 on a one-time basis or whose donations

3

over time totaled $50,000 or more, and then produce documents or communications related to those donors and/or their family members. *See* Amy Van Gelder Decl., Ex. A, Request Nos. 20, 128, 129, Ex. B., Request No. 4. Yale's admissions and development databases are separate, and there is not a reliable, automated way to discern whether family members of donors were applicants for admission.

9. Based on a preliminary investigation, there are hundreds of thousands of donors over the time period at issue. While some development records denote the family members of donors, including whether a family member *matriculated* at Yale, the structured data generally do not specify whether that donor has a family member who *is applying* to Yale. Responding to the Disputed Requests would therefore almost certainly require a manual process of attempting to match development and admissions records, which—given the volume of admissions and development data—could require hundreds of hours of attorney and/or data analyst time, all at considerable expense. Moreover, production of the related records, if any, would require detailed redaction work, including insertion of Identification Codes (otherwise, documents could not be matched to deidentified admissions records).

10. ***Custodial and Non-Custodial Documents.*** The parties are continuing to negotiate and have not yet finalized custodians, non-custodial data sources, and search terms. To date, Yale has proposed five custodians and three departmental shared drives (Admissions, Financial Aid, and Office of Institutional Research) as sources of information. Although Yale has not yet completed processing data for these custodians and shared drives, applying the most recent round of proposed search terms, including the Disputed Search Terms, to Yale's current collection of

4

documents results in a review population of nearly 430,000 de-duplicated documents, including "family" documents.[1]

11. By contrast, based on Yale's initial analysis, elimination of the Disputed Search Terms and a proposed Admissions custodian only relevant to the Disputed Requests could reduce the total number of documents by more than 100,000.[2]

12. Review of Yale's current review population of documents (which is not yet complete) is estimated to cost approximately $450,000. These costs do not include the unknown costs associated with the additional data that needs to be processed, searched, and reviewed, along with the anticipated, complex redaction work, including potentially inserting Identification Codes into documents mentioning applicants for admission, which will undoubtedly be significant. Adding multiple custodians from the President's Office and Development Office, as Plaintiffs request, will just further exacerbate the disproportionate discovery burden upon Yale.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 13th day of January 2023, at Washington, D.C.

By: */s/ Benjamin F. Holt*
Benjamin F. Holt

---

[1] Among other things, the current collection does not yet include Yale's Admissions Office shared drive, which Yale estimates may contain multiple terabytes of data.

[2] This figure is expected to increase significantly because the current collection does not include all of the Admissions custodian's data.