**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| ANDREW CORZO, SIA HENRY, ALEXANDER LEO-GUERRA, MICHAEL MAERLENDER, BRANDON PIYEVSKY, BENJAMIN SHUMATE, BRITTANY TATIANA WEAVER, and CAMERON WILLIAMS, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, THE JOHNS HOPKINS UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY,<br><br>Defendants. | Case No. 1:22-cv-00125<br><br>Hon. Matthew F. Kennelly<br><br>**JURY TRIAL DEMANDED** |

**DEFENDANT UNIVERSITY OF NOTRE DAME du LAC'S
<u>ANSWER TO SECOND AMENDED AND SUPPLEMENTAL CLASS ACTION
COMPLAINT AND DEFENSES</u>**

Defendant University of Notre Dame du Lac ("Notre Dame"), states the following as its Answer and Defenses to Plaintiffs' Second Amended Class Action Complaint ("Complaint"). Any allegation in the Complaint not explicitly responded to in this Answer, including any allegations made in the Complaint's headings or sub-headings, is hereby denied. These responses pertain only to Notre Dame, and Notre Dame disclaims any knowledge pertaining to any of the allegations regarding any other Defendants named in the Complaint. Notre Dame responds to the allegations in the numbered paragraphs as follows:

## I.

## INTRODUCTION

1.     Defendants are private, national universities that have long been in the top 25 of the *U.S. News & World Report* rankings for such schools. These elite institutions occupy a place of privilege and importance in American society. And yet these same Defendants, by their own admission, have participated and are participating in a price-fixing cartel that is designed to reduce or eliminate financial aid as a locus of competition, and that in fact has artificially inflated the net price of attendance for students receiving financial aid.

**Answer to Paragraph 1:**  Notre Dame admits that it is a private university that has received a top-25 ranking in the *U.S. News & World Report* rankings for such schools.  Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in the second sentence of Paragraph 1 and, on that basis, denies them.  The allegations of Paragraph 1 are otherwise denied, except as to the legal conclusions stated therein, to which no response is required.

2.     Defendants have participated in this cartel while claiming the protection of Section 568 of the Improving America's Schools Act of 1994 (the "568 Exemption"). This exemption from the antitrust laws, laws which otherwise prohibit conspiracies among competitors relating to price, offered antitrust immunity only to two or more institutions of higher education at which "*all* students admitted are admitted on a need-blind basis." (Emphasis added.) Section 568 defines "on a need-blind basis" to mean "without regard to the financial circumstances of the student involved or the student's family." 15 U.S.C. § 1 note.  The 568 Exemption expired at midnight on September 30, 2022.

**Answer to Paragraph 2:**  Notre Dame admits that Section 568 was a statutory exemption from the antitrust laws and that Section 568 expired on September 30, 2022.  To the extent

Paragraph 2 purports to quote the text of Section 568, the statute speaks for itself and no response is required. Notre Dame is not asserting the 568 Exemption as a defense in this litigation. Notre Dame denies the remaining allegations in Paragraph 2.

3. Defendants were not entitled to the 568 Exemption. Under a legally compliant need- blind admissions system, all students must be admitted without regard to their or their families' financial circumstances. Far from adhering to this statutory requirement when the 568 Exemption existed, all Defendants have considered the financial circumstances of students or their families in deciding whether to admit students.

**Answer to Paragraph 3:** Notre Dame is not asserting the 568 Exemption as a defense in this litigation. The allegations of Paragraph 3 are denied, except as to the legal conclusions stated therein, to which no response is required.

4. Defendants have thus made admissions decisions *with regard to* the financial circumstances of students and their families, thereby disfavoring students who need financial aid. All Defendants, in turn, have conspired to reduce the amount of financial aid they provide to admitted students. This conspiracy, which has existed (with only slightly varying membership) for many years, thus falls outside any potentially applicable antitrust exemption.

**Answer to Paragraph 4:** The allegations of Paragraph 4 are denied, except as to the legal conclusions stated therein, to which no response is required.

5. Defendants are and have been members of the so-called "568 Presidents Group," in which the members have agreed on "a set of common standards for determining the family's ability to pay for college," which the members describe as the "Consensus Approach." Based on the Consensus Approach, in approximately 2003, the 568 Presidents Group (the "568 Cartel") devised the Consensus Methodology, which is a common formula for determining an applicant's ability to pay. Under the Consensus Methodology, an applicant's ability to pay is a substantial determinant of the net price, which is the institution's gross tuition plus fees for room and board, less institutional grant aid, charged to the applicant for attendance.

**Answer to Paragraph 5:** Notre Dame admits that it was a member of the "568 Presidents Group" and that this group devised the Consensus Methodology. Notre Dame denies that the 568 Presidents Group was a "cartel." The allegations of Paragraph 5 are otherwise denied, except as to the legal conclusions stated therein, to which no response is required.

6. Since its inception, the goal of the 568 Cartel has been, in the words of the Cartel members, to determine "whether it is possible to reach agreement on common standards for determining financial need at the institutional level." Defendants in fact so determined and so agreed.

3

Defendants have met—and may continue to meet—to devise, agree upon, and collectively implement common principles and a uniform method for analyzing, offering, and providing financial aid to admitted students.

**Answer to Paragraph 6:** Notre Dame denies that the 568 Presidents Group was a "cartel." Notre Dame admits that the 568 Presidents Group website stated that the 568 Presidents Group aimed to develop common standards for determining financial need at the institutional level. Notre Dame further admits that the 568 Presidents Group had meetings. The allegations of Paragraph 6 are otherwise denied, except as to the legal conclusions stated therein, to which no response is required.

7.　　In collectively sharing confidential data and information about admissions and financial aid, adopting this methodology, and regularly meeting to implement this methodology jointly, the 568 Cartel has intended to reduce or eliminate, and in fact succeeded in reducing or eliminating, price competition among its members. As a result, the net price of attendance for financial-aid recipients at Defendants' schools—included among the members of the proposed Class here—has been artificially inflated. In short, due to the conduct challenged herein, over almost two decades, Defendants have overcharged over 200,000 financial-aid recipients by billions of dollars collectively, in violation of Section 1 of the Sherman Act.

**Answer to Paragraph 7:** Notre Dame denies that this action meets the prerequisites for a class action under Federal Rule of Civil Procedure 23. The allegations of Paragraph 7 are denied, except as to the legal conclusions stated therein, to which no response is required.

8.　　This longstanding conspiracy would have been immune from the antitrust laws when the 568 Exemption existed only if all the conspirators had been complying with the Exemption. In fact, all Defendants have been members of the 568 Cartel, and thus conspirators, and none qualified for the 568 Exemption. Instead, all Defendants have considered the financial circumstances of students and their families in deciding whether to admit waitlisted and transfer students; Defendants have maintained admissions systems that favor the children of wealthy past or potential future donors; at least several Defendants have given preference to wealthy applicants through the largely secretive process known as "enrollment management"; and Columbia has considered the financial circumstances of students and families in making admission decisions for its School of General Studies.

**Answer to Paragraph 8:** Notre Dame is not asserting the 568 Exemption as a defense in this litigation. The allegations of Paragraph 8 are denied, except as to the legal conclusions stated therein, to which no response is required.

9.　　In critical respects, elite, private universities like Defendants are gatekeepers to the

American Dream. Defendants' misconduct is particularly egregious because it has narrowed a critical pathway to upward mobility that admission to their institutions represents. The burden of the 568 Cartel's overcharges falls especially on low- and middle-income families struggling to afford the cost of a university education and to achieve success for their children. In addition, unlike prior admissions scandals, such as Varsity Blues,[1] the 568 Cartel's systematic suppression of financial aid, resulting in the artificial inflation of the net price of attendance, has been the official policy of its participants. As Defendants have succinctly admitted, the purpose of their Cartel has been—in these specific terms—to "discuss *and agree upon* common principles of analysis for determining the financial need of undergraduate financial aid applicants."

> **Answer to Paragraph 9:** The allegations of Paragraph 9 are denied, except as to the legal conclusions stated therein, to which no response is required.

10. The 568 Cartel has thus caused substantial injury to Plaintiffs and the other members of the proposed Class (defined below). Plaintiffs bring this lawsuit to prevent Defendants' conspiratorial conduct and to prevent future students from suffering the injury the ongoing conspiracy has inflicted. Plaintiffs do so without having known until recently that they had been injured in violation of the 568 Exemption, and under circumstances in which a reasonable person would have been unaware of the harm resulting from Defendants' use of the Consensus Methodology in violation of the 568 Exemption.

> **Answer to Paragraph 10:** Notre Dame denies that this action meets the prerequisites for a class action under Federal Rule of Civil Procedure 23. The allegations of Paragraph 10 are denied, except as to the legal conclusions stated therein, to which no response is required.

11. Plaintiffs also seek compensation for themselves and a proposed Class of all U.S. citizens or permanent residents, who have
(a) enrolled in one or more of Defendants' full-time undergraduate programs, (b) received need-based financial aid from one or more Defendants, (c) directly purchased from one of more Defendants education, room, or board not fully covered by such financial aid, and (d) first enrolled in one of Defendants' full- time undergraduate programs during the relevant times (defined below) from January 1, 2003 until the effects of Defendants' continuing conduct ceases. Members of this "Class" shall be called "Class Members."

> **Answer to Paragraph 11:** Notre Dame lacks knowledge or information sufficient to

---

[1] "Varsity Blues" is law enforcement's code name for the investigation and prosecution of the college admissions bribery scandal, which involved allegations that certain universities gave admissions preference to the children of wealthy parents in exchange for bribes.

**Answer to Footnote 1:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Footnote 1 and, on that basis, denies them.

form a belief about the truth of the allegations in Paragraph 11 concerning what Plaintiffs seek and on whose behalf Plaintiffs seek it, and, on that basis, denies them. Notre Dame denies that Plaintiffs are entitled to any compensation. Notre Dame denies that this action meets the prerequisites for a class action under Federal Rule of Civil Procedure 23. The remaining allegations of Paragraph 11 are denied.

## II.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. §§ 1331, 1332(d)(2), and 1337.

**Answer to Paragraph 12:** The allegations of Paragraph 12 are denied, except as to the legal conclusions stated therein, to which no response is required.

13. This Court has personal jurisdiction over each Defendant on multiple bases, including that each Defendant has: (1) transacted business in the United States and in this District, including by recruiting, and advertising for, students residing in this District; (2) transacted business with Class Members throughout the United States, including those residing in this District; and (3) committed substantial acts in furtherance of an unlawful scheme in the United States, including in this District. Each Defendant has recruited, accepted, enrolled, and charged artificially high net prices of attendance to, and thus injured, individuals residing within this District. In addition, Defendants have held at least one meeting of the 568 Cartel in Rosemont, Illinois, which is within this District.

**Answer to Paragraph 13:** Notre Dame denies that the 568 Presidents Group was a "cartel." Notre Dame admits that at least one meeting of the 568 Presidents Group was held in Rosemont, Illinois. Notre Dame admits that it has accepted and enrolled individuals from this District. The remaining allegations of Paragraph 13 are denied, except as to the legal conclusions stated therein, to which no response is required.

14. Venue is proper in this District under 15 U.S.C. §§ 15, 22 and 26, and 28 U.S.C. § 1391(b), (c), and (d), because each Defendant transacted business, was found, had agents, and/or resided in this District; a substantial part of the events giving rise to Plaintiffs' claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

**Answer to Paragraph 14:** The allegations of Paragraph 14 are denied, except as to the legal conclusions stated therein, to which no response is required.

15. Defendants' conduct has had a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States and in this District. Defendants' conduct affects admitted students around the country, including through transactions with parties residing in different states. Defendants do business across state lines.

**Answer to Paragraph 15:** The allegations of Paragraph 15 are denied, except as to the legal conclusions stated therein, to which no response is required.

### III.

### THE PARTIES

**A. Plaintiffs**

16. Plaintiff Andrew Corzo attended the University of Chicago as a full-time undergraduate student from the fall of 2014 until he graduated in the spring of 2018. For each of these four years, he received need-based financial aid from Chicago, but also paid to Chicago some costs of tuition, room (in his first year), and board, taking out substantial loans in the process. He resides in Chicago, Illinois.

**Answer to Paragraph 16:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 16 and, on that basis, denies them.

17. Plaintiff Sia Henry attended Duke as a full-time undergraduate student from the fall of 2007 until she graduated in the spring of 2011. For each of these four years, she paid to Duke some of the costs of tuition, room, and board. She received need-based financial aid from Duke in at least two of her four years of attendance. Since graduating from Duke, and subsequently from Harvard Law School, Ms. Henry has dedicated her career to advocacy on behalf of prisoners, most recently as a Senior Program Specialist at Impact Justice. She resides in Atlanta, Georgia.

**Answer to Paragraph 17:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 17 and, on that basis, denies them.

18. Plaintiff Alexander Leo-Guerra is attending Duke as a full-time undergraduate student. He enrolled in August 2019 and expects to graduate in the spring of 2023. For each of the first two years he has attended, he received some need-based financial aid from Duke, but also paid to Duke some of the costs of tuition, room, and board, taking out loans in the process. He resides in Draper, Utah.

**Answer to Paragraph 18:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 18 and, on that basis, denies them.

19. Plaintiff Michael Maerlender attended Vanderbilt as a full-time undergraduate student from the fall of 2015 until he graduated in the spring of 2019. For each of these four years, he received need-based financial aid from Vanderbilt and paid for some of the costs of tuition, room, and board. He resides in New York, New York.

**Answer to Paragraph 19:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 19 and, on that basis, denies them.

20. Plaintiff Brandon Piyevsky attended Northwestern as a full-time undergraduate student from the fall of 2013 until he graduated in the spring of 2017. For each of these four years, he received need-based financial aid from Northwestern and paid for some of the costs of tuition, room, and board, taking out loans in the process. He resides in Toledo, Ohio.

**Answer to Paragraph 20:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 20 and, on that basis, denies them.

21. Plaintiff Benjamin Shumate attended Brown University as a full-time undergraduate student from the fall of 2015 until he graduated in the spring of 2019. For each of these four years, he received need-based financial aid from Brown and paid for some of the costs of tuition, room, and board. He resides in Providence, Rhode Island.

**Answer to Paragraph 21:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegation sin Paragraph 21 and, on that basis, denies them.

22. Plaintiff Brittany Tatiana Weaver attended Vanderbilt as a full-time undergraduate student from 2003 until she graduated in 2007. For each of these four years, she received need-based financial aid from Vanderbilt and paid for some of the costs of tuition, room, and board, taking out substantial loans in the process. She resides in Farmington Hills, Michigan.

**Answer to Paragraph 22:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 22 and, on that basis, denies them.

23. Plaintiff Cameron Williams attended Vanderbilt as a full-time undergraduate student from 2014 until he graduated in 2018. For each of these four years, he received need-based financial aid from Vanderbilt and paid for some of the costs of tuition, room, and board, taking out substantial loans in the process. He resides in New York, New York.

**Answer to Paragraph 23:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 23 and, on that basis, denies them.

24.     Plaintiffs thus were and are direct purchasers from Defendants of education, room, and board, and recipients of need-based financial aid from Defendants.

**Answer to Paragraph 24:**  The allegations in Paragraph 24 that "Plaintiffs thus were and are direct purchasers" are legal conclusions not subject to admission or denial.  To the extent an answer is required, Notre Dame denies the allegations.  Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of Paragraph 24 and, on that basis, denies them.

**B.     Defendants**

25.     Defendants are private, national universities that have been members of the 568 Cartel (most since 2003, and some not continuously) and have been continuously ranked in the top 25 of the *U.S. News & World Report* rankings for national universities since 2003.

**Answer to Paragraph 25:**  Notre Dame admits that it is a private university that has been in the top 25 of the *U.S. News & World Report* since 2003.  Notre Dame admits that it was a member of the 568 Presidents Group, but denies that the 568 Presidents Group was a "cartel."  Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 25 and, on that basis, denies them.

26.     Each Defendant acted as the agent of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein. All Defendants are jointly and severally liable for the acts of all members of the 568 Cartel.

**Answer to Paragraph 26:**  The allegations of Paragraph 26 are denied, except as to the legal conclusions stated therein, to which no response is required.

27.     Under the rule of joint and several liability, each Defendant is liable for all acts undertaken and all damages caused in furtherance of the conspiracy alleged herein, even those committed before the Defendant joined the 568 Cartel.  No Defendant that claims to have "left" the Cartel, but later "rejoined" it, took steps to disavow and repudiate the conspiracy or its goals at any time.  Accordingly, any such Defendant is jointly and severally liable for the conspirators' conduct throughout the course of the conspiracy.  Any Defendant that did not disavow and repudiate the conspiracy and its goals never withdrew from the Cartel and remains jointly and severally liable for all of the conspirators' continuing conduct.

**Answer to Paragraph 27:** The allegations of Paragraph 27 are denied, except as to the legal conclusions stated therein, to which no response is required.

28. Any Defendant that claims to have left the Cartel but later rejoined it, assuming that any such Defendant actually took sufficient steps to fully and formally withdraw, remains jointly and severally liable for all of the conspirators' conduct; and any Defendant that did not fully and formally withdraw from the Cartel remains jointly and several liable for all of the conspirators' continuing conduct as alleged herein.

**Answer to Paragraph 28:** The allegations of Paragraph 28 are denied, except as to the legal conclusions stated therein, to which no response is required.

29. Since the enactment of Section 568, in 1994, Defendants' endowments have all increased enormously, and with respect to those Defendants for which the information is publicly available, the growth of their endowments have substantially outpaced the growth in their annual operating expenses. *See* Appendix A.[2]

**Answer to Paragraph 29:** Notre Dame admits that its endowment has increased since 1994. Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 29 concerning schools other than Notre Dame and, on that basis, denies them. The allegations in Paragraph 29 are otherwise denied.

## Brown

30. Brown University is a private, non-profit institution with its principal place of business in Providence, Rhode Island.

**Answer to Paragraph 30:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 30 and, on that basis, denies them.

31. Brown was established by a charter, approved by the Rhode Island legislature, as "College of Rhode Island" in 1764. The school was the third college in New England and seventh in America. The school's name was changed to Brown in 1804. Brown is a member of the Ivy League, a consortium of eight elite universities.

---

[2] Appendix A compares, for those Defendants for which such information is publicly available, the growth of the Defendant's annual operating expenses versus the growth of the Defendant's endowment from 1994 to 2021. Appendix A also identifies the rate of growth of every Defendant's endowment from 1994 to 2021.

**Answer to Footnote 2:** Footnote 2 and Appendix A purport to characterize the content of public websites, the content of which speaks for itself and to which no response is required.

**Answer to Paragraph 31:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 31 and, on that basis, denies them.

32. Brown's undergraduate student body is generally wealthy and privileged. The median family income of undergraduates is $204,200; 19% of undergraduates come from the top 1% of the country's income distribution, and 70% come from the top 20%; and only 4.1% come from the bottom 20% of the income distribution.[3]

**Answer to Paragraph 32:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 32 and, on that basis, denies them.

33. Brown had an endowment of approximately $608 million in 1994, which has grown to approximately $6.9 billion in 2021. *See* Appendix A.[4]

**Answer to Paragraph 33:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 33 and, on that basis, denies them.

### Caltech

34. The California Institute of Technology is a private, non-profit institution with its principal place of business in Pasadena, California.

**Answer to Paragraph 34:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 34 and, on that basis, denies them.

35. CalTech is one of the nation's leading research universities.

**Answer to Paragraph 35:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 35 and, on that basis, denies them.

36. CalTech's undergraduate student body is generally wealthy and privileged. The median family income of undergraduates is $146,300; 3% of undergraduates come from the top 1% of the country's income distribution, and 69% come from the top 20%; and only 2.9% come from the bottom 20% of the income distribution.[5]

**Answer to Paragraph 36:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 36 and, on that basis, denies them.

37.     CalTech had an endowment of approximately $592 million in 1994, which has grown to approximately $3.8 billion in 2021. *See* Appendix A.

**Answer to Paragraph 37:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 37 and, on that basis, denies them.

## Chicago

38.     The University of Chicago is a private, non-profit institution with its principal place of business in Chicago, Illinois.

**Answer to Paragraph 38:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 38 and, on that basis, denies them.

39.     Chicago was founded in 1890 by the American Baptist Education Society and oil magnate John D. Rockefeller, who later described the school as "the best investment I ever made."

**Answer to Paragraph 39:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 39 and, on that basis, denies them.

40.     Chicago's undergraduate study body is generally wealthy and privileged. The median family income of undergraduates is $134,500; 10% of undergraduates come from the top 1% of the country's income distribution, and 58% come from the top 20%; and only 5.5% come from the bottom 20% of the income distribution.[6]

**Answer to Paragraph 40:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 40 and, on that basis, denies them.

41.     Chicago had an endowment of approximately $1.2 billion in 1994, which has grown to approximately $11 billion in 2021. *See* Appendix A.

**Answer to Paragraph 41:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 41 and, on that basis, denies them.

## Columbia

42.     Trustees of Columbia University in the City of New York is a private, non-profit

institution with its principal place of business in New York, New York.

**Answer to Paragraph 42:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 42 and, on that basis, denies them.

43. Columbia was established as King's College by royal charter of King George II of Great Britain in 1754. It was renamed Columbia College in 1784. In 1896, the campus was moved to its current location in Morningside Heights and renamed Columbia University. According to its website, "Columbia University is one of the world's most important centers of research." Columbia is a member of the Ivy League.

**Answer to Paragraph 43:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 43 and, on that basis, denies them.

44. Columbia's undergraduate student body, with the exception of its School of General Studies, discussed below, is generally wealthy and privileged. The median family income of undergraduates is $150,900; 13% of undergraduates come from the top 1% of the country's income distribution, and 62% come from the top 20%; and only 5.1% come from the bottom 20% of the income distribution.[7]

**Answer to Paragraph 44:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 44 and, on that basis, denies them.

45. Columbia had an endowment of approximately $2 billion in 1994, which has grown to approximately $14.4 billion in 2021. *See* Appendix A.

**Answer to Paragraph 45:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 45 and, on that basis, denies them.

## Cornell

46. Cornell is a private, non-profit institution with its principal place of business in Ithaca, New York.

**Answer to Paragraph 46:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 46 and, on that basis, denies them.

47. Cornell was founded in 1865, as a private, land-grant institution of New York State. According to its website, Cornell has been described as "the first *truly* American university because of its founders' revolutionary egalitarian and practical vision of higher education." (Emphasis in original.) Cornell is a member of the Ivy League.

**Answer to Paragraph 47:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 47 and, on that basis, denies them.

48.     Cornell's undergraduate student body is generally wealthy and privileged. The median family income of undergraduates is $151,600; 10% of undergraduates come from the top 1% of the country's income distribution, and 64% come from the top 20%; and only 3.8% come from the bottom 20% of the income distribution.[8]

**Answer to Paragraph 48:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 48 and, on that basis, denies them.

49.     Cornell had an endowment of approximately $898 million in 1994, which has grown to approximately $10 billion in 2021. *See* Appendix A.

**Answer to Paragraph 49:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 49 and, on that basis, denies them.

### **Dartmouth**

50.     Trustees of Dartmouth College is a private, non-profit institution with its principal place of business in Hanover, New Hampshire.

**Answer to Paragraph 50:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 50 and, on that basis, denies them.

51.     According to Dartmouth's website: "Founded in 1769, Dartmouth is a member of the Ivy League and consistently ranks among the world's greatest academic institutions." Dartmouth's website also claims that "Dartmouth College educates the most promising students."

**Answer to Paragraph 51:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 51 and, on that basis, denies them.

52.     Dartmouth's undergraduate student body is generally wealthy and privileged. The median family income of undergraduates is $200,400; 21% of undergraduates come from the top 1% of the country's income distribution, and 69% come from the top 20%; and only 2.6% come from the bottom 20% of the income distribution.[9]

**Answer to Paragraph 52:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 52 and, on that basis, denies them.

53. Dartmouth had an endowment of approximately $870 million in 1994, which has grown to approximately $8.5 billion in 2021. *See* Appendix A.

**Answer to Paragraph 53:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 53 and, on that basis, denies them.

## Duke

54. Duke University is a private, non-profit institution with its principal place of business in Durham, North Carolina.

**Answer to Paragraph 54:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 54 and, on that basis, denies them.

55. Duke's undergraduate student body is generally wealthy and privileged. The median family income of undergraduates is $186,700; 19% of undergraduates come from the top 1% of the country's income distribution, and 69% come from the top 20%; and only 3.9% come from the bottom 20% of the income distribution.[10]

**Answer to Paragraph 55:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 55 and, on that basis, denies them.

56. Duke had an endowment of approximately $699 million in 1994, which has grown to approximately $12.7 billion in 2021. *See* Appendix A.

**Answer to Paragraph 56:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 56 and, on that basis, denies them.

## Emory

57. Emory University is a private, non-profit institution with its principal place of business in Atlanta, Georgia.

**Answer to Paragraph 57:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 57 and, on that basis, denies them.

58. Emory was established by charter of the Georgia legislature in 1836.

**Answer to Paragraph 58:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 58 and, on that basis, denies them.

59.     Emory's undergraduate student body is generally wealthy and privileged. The median family income of undergraduates is $139,800; 15% of undergraduates come from the top 1% of the country's income distribution, and 58% come from the top 20%; and only 6% come from the bottom 20% of the income distribution.[11]

**Answer to Paragraph 59:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 59 and, on that basis, denies them.

60.     Emory had an endowment of approximately $1.6 billion in 1994, which has grown to approximately $8 billion in 2021. *See* Appendix A.

**Answer to Paragraph 60:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 60 and, on that basis, denies them.

### Georgetown

61.     Georgetown University is a private, non-profit institution with its principal place of business in Washington, District of Columbia.

**Answer to Paragraph 61:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 61 and, on that basis, denies them.

62.     According to its website: "Georgetown University is the oldest Catholic and Jesuit institution of higher learning in the United States."

**Answer to Paragraph 62:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 62 and, on that basis, denies them.

63.     Georgetown's undergraduate student body is generally wealthy and privileged. The median family income of undergraduate students is $229,100; 21% of undergraduates come from the top 1% of the country's income distribution, and 74% come from the top 20%; and only 3.1% come from the bottom 20% of the income distribution.[12]

**Answer to Paragraph 63:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 63 and, on that basis, denies them.

64.      Georgetown had an endowment of approximately $343 million in 1994, which has grown to approximately $2.6 billion in 2021. *See* Appendix A.

**Answer to Paragraph 64:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 64 and, on that basis, denies them.

### Johns Hopkins

65.      The Johns Hopkins University is a private, non-profit institution with its principal place of business in Baltimore, Maryland.

**Answer to Paragraph 65:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 65 and, on that basis, denies them.

66.      Johns Hopkins, the oldest research university in the United States, was founded in 1876 and named after the American philanthropist and entrepreneur Johns Hopkins.

**Answer to Paragraph 66:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 66 and, on that basis, denies them.

67.      Johns Hopkins' undergraduate student body is generally wealthy and privileged. The median family income of undergraduate students is $177,300; 11% of the undergraduates come from the top 1% of the country's income distribution, and 72% come from the top 20%; and only 2.9% come from the bottom 20% of the income distribution.[13]

**Answer to Paragraph 67:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 67 and, on that basis, denies them.

68.      Johns Hopkins had an endowment of approximately $747 million in 1994, which has grown to approximately $9.3 billion in 2021. *See* Appendix A.

**Answer to Paragraph 68:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 68 and, on that basis, denies them.

### MIT

69.      The Massachusetts Institute of Technology is a private, non-profit institution with

its principal place of business in Cambridge, Massachusetts.

**Answer to Paragraph 69:**  Notre Dame lacks knowledge or information sufficient

to form a belief about the truth of the allegations in Paragraph 69 and, on that basis, denies them.

70.     MIT is regularly ranked in the top five in international rankings of the world's best research universities.

**Answer to Paragraph 70:**  Notre Dame lacks knowledge or information sufficient

to form a belief about the truth of the allegations in Paragraph 70 and, on that basis, denies them.

71.     MIT's undergraduate student body is generally wealthy and privileged. The median family income of undergraduates is $137,400; 5.7% of undergraduates come from the top 1% of the income distribution, and 61% come from the top 20%; and only 6.2% come from the bottom 20% of the income distribution.[14]

**Answer to Paragraph 71:**  Notre Dame lacks knowledge or information sufficient

to form a belief about the truth of the allegations in Paragraph 71 and, on that basis, denies them.

72.     MIT had an endowment of approximately $1.8 billion in 1994, which has grown to approximately $27.4 billion in 2021. *See* Appendix A.

**Answer to Paragraph 72:**  Notre Dame lacks knowledge or information sufficient

to form a belief about the truth of the allegations in Paragraph 72 and, on that basis, denies them.

### Northwestern

73.     Northwestern University is a private, non-profit institution with its principal place of business in Evanston, Illinois. Northwestern was founded in 1853.

**Answer to Paragraph 73:**  Notre Dame lacks knowledge or information sufficient to form a

belief about the truth of the allegations in Paragraph 73 and, on that basis, denies them.

74.     Northwestern's undergraduate student body is generally wealthy and privileged. The median family income of Northwestern's undergraduates is $171,200; 14% of undergraduates come from the top 1% of the income distribution, and 66% come from the top 20%; and only 3.7%come from the bottom 20% of the income distribution.[15]

**Answer to Paragraph 74:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 74 and, on that basis, denies them.

75.     Northwestern had an endowment of approximately $1.3 billion in 1994, which has grown to approximately $14.9 billion in 2021. *See* Appendix A.

**Answer to Paragraph 75:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 75 and, on that basis, denies them.

## Notre Dame

76.     The University of Notre Dame du Lac is a private, non-profit institution with its principal place of business in South Bend, Indiana.

**Answer to Paragraph 76:** Admitted.

77.     Notre Dame was founded in 1842. According to its website, Notre Dame is "[o]ne of America's leading undergraduate teaching institutions."

**Answer to Paragraph 77:** Notre Dame admits that it was founded in 1842. The remainder of Paragraph 77 purports to quote the Notre Dame website, which speaks for itself and to which no response is required.

78.     Notre Dame's undergraduate student body is generally wealthy and privileged. The median family income of undergraduates is $191,400; 15% of undergraduates come from the top 1% of the income distribution, and 75% come from the top 20%; and only 1.6% come from the bottom 20% of the income distribution.[16]

**Answer to Paragraph 78:** The footnote to Paragraph 78 (n.16) cites to a website, which speaks for itself and to which no response is required. The allegations of Paragraph 78 are otherwise denied.

79.     Notre Dame had an endowment of approximately $879 million in 1994, which has grown to approximately $22.5 billion in 2021. *See* Appendix A.

**Answer to Paragraph 79:** Appendix A purports to characterize the content of Notre Dame's 2021 Annual Report, which speaks for itself and to which no response is required. The allegations of Paragraph 79 are otherwise denied.

## Penn

80. The Trustees of the University of Pennsylvania is a private, non-profit institution with its principal place of business in Philadelphia, Pennsylvania.

**Answer to Paragraph 80:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 80 and, on that basis, denies them.

81. Penn was founded in 1740 by Benjamin Franklin. As of 2014, Penn had 25 undergraduate alumni that were billionaires, more than any other university in the world.[17] Penn is a member of the Ivy League.

**Answer to Paragraph 81:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 81 and, on that basis, denies them.

82. Penn's undergraduate student body is generally wealthy and privileged. The median family income of undergraduates is $195,500; 19% of undergraduates come from the top 1% of the income distribution, and 71% come from the top 20%; and only 3.3% come from the bottom 20% of the income distribution.[18]

**Answer to Paragraph 82:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 82 and, on that basis, denies them.

83. Penn had an endowment of approximately $1.5 billion in 1994, which has grown to approximately $20.5 billion in 2021. *See* Appendix A.

**Answer to Paragraph 83:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 83 and, on that basis, denies them.

## Rice

84. The William Marsh Rice University is a private, non-profit institution with its principal place of business in Houston, Texas.

**Answer to Paragraph 84:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 84 and, on that basis, denies them.

85. Rice was founded in 1891 by Houston businessman William Marsh Rice.

**Answer to Paragraph 85:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 85 and, on that basis, denies them.

86. Rice's undergraduate student body is generally wealthy and privileged. The median family income of undergraduates is $160,800; 9.8% of undergraduates come from the top 1% of the income distribution, and 64% come from the top 20%; and only 4.9% come from the bottom 20% of the income distribution.[19]

**Answer to Paragraph 86:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 86 and, on that basis, denies them.

87. Rice had an endowment of approximately $1.3 billion in 1994, which has grown to approximately $8.1 billion in 2021. *See* Appendix A.

**Answer to Paragraph 87:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 87 and, on that basis, denies them.

### **Vanderbilt**

88. Vanderbilt University is a private, non-profit institution with its principal place of business in Nashville, Tennessee.

**Answer to Paragraph 88:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 88 and, on that basis, denies them.

89. Vanderbilt was founded in 1873 and named in honor of Cornelius Vanderbilt, who donated a founding gift. According to Vanderbilt's website, "the university's prominent alumni base includes Nobel Prize winners, members of Congress, governors, ambassadors, judges, admirals, CEOs, university presidents, physicians and attorneys, as well as professional sports figures playing in the NFL, NBA, Major League Baseball, the PGA and LPGA."

**Answer to Paragraph 89:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 89 and, on that basis, denies them.

90. Vanderbilt's undergraduate student body is generally wealthy and privileged. The

median family income of undergraduates is $204,500; 23% of undergraduates come from the top 1% of the income distribution, and 70% come from the top 20%; and only 1.9% come from the bottom 20% of the income distribution.[20]

**Answer to Paragraph 90:** Notre Dame lacks knowledge or information sufficient

to form a belief about the truth of the allegations in Paragraph 90 and, on that basis, denies them.

91.     Vanderbilt had an endowment of approximately $860 million in 1994, which has grown to approximately $10.9 billion in 2021. *See* Appendix A.

**Answer to Paragraph 91:** Notre Dame lacks knowledge or information sufficient

to form a belief about the truth of the allegations in Paragraph 91 and, on that basis, denies them.

## Yale

92.     Yale University is a private, non-profit institution with its principal place of business in New Haven, Connecticut.

**Answer to Paragraph 92:** Notre Dame lacks knowledge or information sufficient

to form a belief about the truth of the allegations in Paragraph 92 and, on that basis, denies them.

93.     Originally chartered by the legislature of Connecticut as the Collegiate School in 1701 in multiple locations, the school was moved to New Haven in 1716 and renamed Yale in 1718, after a wealthy British merchant and philanthropist, Elihu Yale. It is the third-oldest university in the United States. Yale is a member of the Ivy League.

**Answer to Paragraph 93:** Notre Dame lacks knowledge or information sufficient

to form a belief about the truth of the allegations in Paragraph 93 and, on that basis, denies them.

94.     Yale's undergraduate study body is generally wealthy and privileged. The median family income of undergraduates is $192,600; 19% of undergraduates come from the top 1% of the income distribution, and 69% come from the top 20%; and only 2.1% come from the bottom 20% of the income distribution.[21]

**Answer to Paragraph 94:** Notre Dame lacks knowledge or information sufficient

to form a belief about the truth of the allegations in Paragraph 94 and, on that basis, denies them.

95.     Yale had an endowment of approximately $3.5 billion in 1994, which has grown to approximately $42.3 billion in 2021. *See* Appendix A. This is the second-highest endowment of any university in the United States.

**Answer to Paragraph 95:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 95 and, on that basis, denies them.

## IV.

## DEFENDANTS' MEMBERSHIP IN THE 568 CARTEL

96.     The 568 Cartel was formed in 1998. Columbia, Cornell, Duke, Georgetown, MIT, Northwestern, and Notre Dame have been members of the 568 Cartel since 1998 and first implemented the Consensus Methodology in 2003.

**Answer to Paragraph 96:** Notre Dame denies that the 568 Presidents Group was a "cartel." Notre Dame admits that the 568 Presidents Group was formed in 1998 and that Notre Dame became a member of this group in 1998. Notre Dame admits that the Consensus Methodology was first developed in 2003. Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 96 concerning other universities and, on that basis, denies them. The allegations of Paragraph 96 are otherwise denied, except as to the legal conclusions stated therein, to which no response is required.

97.     Brown joined the 568 Cartel in 1998 and first implemented the Consensus Methodology in 2004.

**Answer to Paragraph 97:** Notre Dame denies that the 568 Presidents Group was a "cartel." Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 97 and, on that basis, denies them.

98.     CalTech joined the 568 Cartel in 2019 and first implemented the Consensus Methodology the same year.

**Answer to Paragraph 98:** Notre Dame denies that the 568 Presidents Group was a "cartel." Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 98 and, on that basis, denies them.

99.     Chicago joined the 568 Cartel in 1998 and first implemented the Consensus Methodology in 2003.

**Answer to Paragraph 99:**  Notre Dame denies that the 568 Presidents Group was a "cartel."  Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 99 and, on that basis, denies them.

100.    Dartmouth joined the 568 Cartel in 1998 and first implemented the Consensus Methodology in 2004.

**Answer to Paragraph 100:**  Notre Dame denies that the 568 Presidents Group was a "cartel."  Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 100 and, on that basis, denies them.

101.    Emory joined the 568 Cartel in 1998 and first implemented the Consensus Methodology in 2003.

**Answer to Paragraph 101:**  Notre Dame denies that the 568 Presidents Group was a "cartel."  Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 101 and, on that basis, denies them.

102.    Johns Hopkins joined the 568 Cartel in 2021, has taken overt steps in furtherance of the conspiracy alleged herein (including meeting with Defendants and discussing the Consensus Methodology with them), and first implemented the Consensus Methodology with respect to Early Decision applicants in or around November 2021.

**Answer to Paragraph 102:**  Notre Dame denies that the 568 Presidents Group was a "cartel."  Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 102 and, on that basis, denies them.

103.    Rice joined the 568 Cartel in 1998 and first implemented the Consensus Methodology in 2003.

**Answer to Paragraph 103:**  Notre Dame denies that the 568 Presidents Group was a "cartel."  Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 103 and, on that basis, denies them.

104.    Penn joined the 568 Cartel in 1998 and first implemented the Consensus Methodology in 2003.

**Answer to Paragraph 104:** Notre Dame denies that the 568 Presidents Group was a "cartel." Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 104 and, on that basis, denies them.

105. Vanderbilt joined the 568 Cartel in 1998 and first implemented the Consensus Methodology in 2003.

**Answer to Paragraph 105:** Notre Dame denies that the 568 Presidents Group was a "cartel." Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 105 and, on that basis, denies them.

106. Yale joined the 568 Cartel in 1998 and first implemented the Consensus Methodology in 2003.

**Answer to Paragraph 106:** Notre Dame denies that the 568 Presidents Group was a "cartel." Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 106 and, on that basis, denies them.

107. Certain Defendants claim to have stopped participating in the 568 Cartel at various points in time since 2003, but Plaintiffs are unaware of any evidence that any Defendant disavowed and repudiated the conspiracy and its goals. Accordingly, no Defendant withdrew from the conspiracy. Accordingly, since 2003 and through the present, the determinants of the net price of attending Defendants' schools have been established through the conspiracy.

**Answer to Paragraph 107:** Notre Dame denies that the 568 Presidents Group was a "cartel" or that members of the 568 Presidents Group are or have ever been part of a "conspiracy." Notre Dame lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 107 concerning what Plaintiffs are aware or unaware of, and deny them on that basis. Notre Dame lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 107 concerning other members of the 568 Presidents Group and, on that basis, denies them. Notre Dame otherwise denies the allegations of Paragraph 107.

**V.**

**DEFENDANTS' VIOLATION OF THE FEDERAL ANTITRUST LAWS**

## A.    Defendants Have Colluded on Their Financial-Aid Practices

108.    Defendants are purported competitors in enrolling highly selective undergraduate student bodies and providing an undergraduate education. People throughout the United States apply for admission to Defendants' undergraduate programs.

**Answer to Paragraph 108:**  Notre Dame admits that it provides undergraduate education and that people in the United States apply for admission to Notre Dame's undergraduate programs.  Notre Dame denies that it is a "purported competitor in enrolling highly selective undergraduate student bodies and providing an undergraduate education."  Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 108 and, on that basis, denies them.

109.    Each Defendant annually sends out thousands of solicitations and mailings and receives thousands of admission applications that cross state lines, including thousands of applications from Class Members. Out-of-state students, including thousands of Class Members, make up a substantial percentage of each Defendant's undergraduate population.

**Answer to Paragraph 109:**  Notre Dame denies that this action meets the prerequisites for a class action under Federal Rule of Civil Procedure 23.  Notre Dame admits that it sends out mailings and receives admission applications from students who do not live in Indiana, and that it enrolls undergraduate students from states other than Indiana.  Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 109 to the extent they concern other universities and, on that basis, denies them.  The allegations of Paragraph 109 are otherwise denied.

110.    Each Defendant annually receives millions of dollars that flow across state lines in tuition payments, grants, donations, and athletic ticket sales and sponsorships. Each Defendant markets its undergraduate programs and tickets for athletic events to the public across state lines.

**Answer to Paragraph 110:**  Notre Dame admits that it receives tuition payments, grants, donations, and money from athletic ticket sales and sponsorships.  Notre Dame further admits that it markets its undergraduate programs and tickets for athletic events.  Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph

110 to the extent they concern other universities and, on that basis, denies them. The allegations of Paragraph 110 are otherwise denied.

111. Defendants have engaged in a continuing conspiracy in unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act. This violation is likely to continue unless the relief sought herein is granted.

**Answer to Paragraph 111:** The allegations of Paragraph 111 are denied.

112. This conspiracy consists of an agreement, understanding, and concert of action among Defendants, and each of them, the substantial terms of which are to restrain price competition relating to their provision of financial aid for students, and thereby to increase the net price of attending these institutions ("the net price of attendance").

**Answer to Paragraph 112:** The allegations of Paragraph 112 are denied.

113. The 568 Cartel generally meets in person as a group at least twice each year. In October 2017, for example, the 568 Cartel held one of its official biannual meetings at the Hilton Rosemont, in Rosemont, Illinois, near O'Hare International Airport. On information and belief, 568 Cartel members communicate with each other about matters related to the conspiracy through other means as well, such as telephone calls, video calls, emails, and messaging.

**Answer to Paragraph 113:** Notre Dame denies that the 568 Presidents Group was a "cartel." Notre Dame admits that members of the 568 Presidents Group have met in person, including at a meeting at the Hilton Rosemont in Rosemont, Illinois, in October 2017. The remaining allegations of Paragraph 113 are denied.

114. Until recently, Defendants maintained a public-facing website for purpose of representing the 568 Cartel and its purposes to the public. The website stated: "This site serves as a resource . . . for visitors seeking to learn more about the Group."[22] The website explained that the "568 Presidents Group is an affiliation of colleges and universities, all of which must admit students on a need-blind basis." An FAQ section on the website added: "It is referred to as a 'Presidents' group because it was formed by a group of 28 college and university presidents from need-blind schools in 1998." The website also contains the form of a certificate of compliance whereby a member of the group can certify that "its admission and financial aid practices currently comply with the rules of Section 568 regarding 'need-blind admission practices.'" These statements on the website mislead the public by representing that the 568 Cartel members' practices were compliant with Section 568. The truth, as alleged further below, is the opposite.

**Answer to Paragraph 114:** Paragraph 114 and its footnote purport to quote from a website, the content of which speaks for itself and to which no response is required. Notre Dame denies that the 568 Presidents Group was a "cartel." Notre Dame admits that members of the 568 Presidents Group certified that their admission and financial aid practices complied with the rules of Section 568 regarding need-blind admission practices, and that in reliance on the certifications of other 568 Presidents Group members, Notre Dame at all times reasonably believed that the admission practices of all participating members of the 568 Presidents Group were compliant with the rules of Section 568 regarding need-blind admissions. The allegations of Paragraph 114 are otherwise denied.

115. The 568 Cartel has fixed prices through a formula that is based on a "set of common standards for determining the family's ability to pay for college." The 568 Cartel calls this formula the "Consensus Methodology." Defendants admitted on their own website that the "purposes" of the 568 Cartel include, collectively, to "Discuss and agree upon common principles of analysis for determining the financial need of undergraduate financial aid applicants"; to "Build, maintain, and revise, as appropriate, a Consensus Approach need analysis methodology that is consistent with these principles"; and to "Explore ways of developing a data exchange program."

**Answer to Paragraph 115:** To the extent Paragraph 115 purports to quote from a website, the website speaks for itself and requires no response. The allegations of Paragraph 115 are otherwise denied.

116. Defendants further conceded that the "Consensus Methodology" would, in their own words, contain "certain key components, including: 1) common elements of need analysis . . .; 2) a common calendar for the collection of data from families; 3) a means of training aid professionals in the application of the Methodology; and 4) an oversight 568 Group to review and modify the methodology as needed over time."

**Answer to Paragraph 116:** Paragraph 116 purports to quote from a website, the content of which speaks for itself and to which no response is required. The allegations of Paragraph 116 are otherwise denied.

117. Critical components of the 568 Cartel have therefore been the development of a "data exchange program" and the agreement to share information about admissions and financial-aid methodology, and then to meet regularly to discuss this data and information, to enable the Cartel Members to agree to use a common methodology for determining financial-aid awards for the purposes of coordinating financial-aid awards among Cartel members. The common methodology assesses the income and assets of given financial-aid applicants and their families to determine the

applicants' ability to pay and thus the financial contribution that the applicant is expected to make.

**Answer to Paragraph 117:** The allegations of Paragraph 117 are denied.

118. The applicants' assessed ability to pay therefore is a key determinant in the net price of attendance. The 568 Cartel has used the shared, competitively sensitive information about enrollment, costs, and other data relating to Defendants' available resources for financial aid to arrive at a common and agreed formula for setting ability to pay, which results in artificially inflated net prices of attendance.

**Answer to Paragraph 118:** The allegations of Paragraph 118 are denied.

119. Members of the 568 Cartel began meeting sometime after the enactment of Section 568 in 1994. The 568 Cartel was officially formed in 1998.

**Answer to Paragraph 119:** Notre Dame denies that the 568 Presidents Group was a "cartel." Notre Dame admits that the 568 Presidents Group began meeting sometime after the enactment of Section 568 in 1994, and that the 568 Presidents Group was formed in 1998. The allegations of Paragraph 119 are otherwise denied.

120. As of July 2001, Dartmouth had not joined the 568 Cartel. According to Dartmouth's then-Dean of Admissions and Financial Aid, Karl Furstenberg, as of 2001 Dartmouth had a "need analysis methodology that [was] perhaps more enlightened, more generous and more flexible than" that of the 568 Cartel, and Dartmouth was "actually doing more than this new methodology would allow."[23] Not long after Mr. Furstenberg made these statements, however, Dartmouth decided to join the 568 Cartel, implemented the Consensus Methodology, and took other steps in furtherance of the conspiracy as alleged herein.

**Answer to Paragraph 120:** Paragraph 120 and its footnote purport to quote from a website, the content of which speaks for itself and to which no response is required. Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 120 and, on that basis, denies them.

121. The 568 Cartel has monitored and enforced its combination and conspiracy in several ways, according to the Cartel's website, including (but not limited to) such steps as (a) requiring each participating institution to submit a "Certificate of Compliance," (b) requiring university professionals at each institution to receive "training . . . in the application of the Methodology,"(c) imposing a "common calendar for the collection of data from families," and (d) conducting an annual or biannual meeting every year since 2007.

**Answer to Paragraph 121:** Notre Dame denies that the 568 Presidents Group was a "cartel." Notre Dame admits that each member of the 568 Presidents Group annually submitted a "Certificate of Compliance" confirming that the member employed a need-blind admissions policy, and that in reliance on the certifications of other 568 Presidents Group members, Notre Dame at all times reasonably believed that the admission practices of all participating members of the 568 Presidents Group were compliant with the rules of Section 568 regarding need-blind admissions. To the extent Paragraph 121 purports to quote from a website, the website speaks for itself and no response is required. The allegations of Paragraph 121 are otherwise denied.

122. At midnight on September 30, 2022, the 568 Exemption expired. The 568 Cartel website is now blank except for the following message: "The 568 Presidents Group (and all of its Committees) have been formally dissolved, effective November 4, 2022. Thank you."

**Answer to Paragraph 122:** Notre Dame admits that the 568 Exemption expired on September 30, 2022. Notre Dame further admits that the quoted language in Paragraph 122 now appears where the 568 Presidents Group website once existed.

## VI.

## DEFENDANTS' ANTICOMPETITIVE CONDUCT HAS RAISED NET PRICES

123. As higher-education insiders—including employees and officers of the institutions in the 568 Cartel—have acknowledged, the Cartel limits competition in financial-aid offers from supposedly competing schools, driving down aid packages and thereby driving up the net price of attendance for aid-eligible students.

**Answer to Paragraph 123:** The allegations of Paragraph 123 are denied.

124. Yale claims not to have participated in the 568 Cartel from 2008 until 2018. Yale claims it left the Cartel because it determined that membership in the Cartel had restricted the amount of financial aid that Yale could provide to students. That is, Yale's decision to increase financial-aid awards to eligible students prompted it to want to no longer participate. In so doing, referring to a new policy to be implemented in early 2009, Yale stated that its "new, more generous aid policy in January means the University can no longer follow the consensus methodology."[24]

**Answer to Paragraph 124:** Paragraph 124 and its footnote purport to quote from a website, which speaks for itself and to which no response is required. Notre Dame otherwise lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 124 and, on that basis, denies them.

125. Yale's then-Director of Student Financial Services, Caesar Storlazzi, concluded: "By leaving the 568 Group, Yale is now free to give families more aid than they would have gotten under the consensus methodology."[25] Storlazzi stated that what is "not good" about the Cartel's approach is that it has "one needs-analysis formula that everyone has to sign on to."[26] The connection between Yale's withdrawal and the effect on net prices was explicit: "In other words, the percentage of a family's income and assets that Yale takes as a parental contribution is now lower than the percentage taken by 568 schools."[27] (Yale evidently rejoined the Cartel in 2018, without fanfare.) In other words, Yale understood that active members of the 568 Cartel were required to agree to and impose the Consensus Methodology, which had the effect of suppressing the amount of financial aid it could offer to all its students systematically. Only by attempting to pull out of the Cartel could Yale or any Cartel member be free to offer competitively better financial-aid offers, and charge lower net prices for attendance, to all Class Members.

**Answer to Paragraph 125:** Paragraph 125 and its footnotes purport to quote from a website, which speaks for itself and to which no response is required. Notre Dame otherwise lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 125 and, on that basis, denies them.

126. Other universities have similarly declined to participate in the 568 Cartel because it would limit the financial aid they could provide. Harvard's then-Director of Financial Aid, Sally Donahue, said in 2008 that Harvard never joined the 568 Cartel because its financial-aid formula would have yielded financial-aid packages that were smaller than what Harvard wanted to award.[28] In 2015, one anonymous university president who refused to participate in the 568 Cartel described it as "an insider's game" that belonged to a "bygone era." Observing that some schools had left the 568 Cartel to offer more financial aid, this anonymous president opined that "the notion of a collective that would constrain money is counter to public policy."[29]

**Answer to Paragraph 126:** Paragraph 126 and its footnotes purport to quote from websites, the contents of which speak for themselves and to which no response is required. Notre

Dame otherwise lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 126 and, on that basis, denies them.

127.    Indeed, the website of the 568 Presidents Group stated in relevant part: "The Consensus Approach . . . seeks to reduce much of the variance in need analysis results that has been experienced in recent years." The website went on to state that the "participating institutions believe that the Consensus Approach, when applied in a consistent manner, serves to diminish or eliminate . . . divergent results."

**Answer to Paragraph 127:**  Paragraph 127 purports to quote a website, which speaks for itself and to which no response is required.  The allegations in Paragraph 127 are otherwise denied.

128.    The phrases "reduce much of the variance," "consistent manner," and "diminish or eliminate divergent results," in the opaque world of higher-education pricing, are code words meaning that the purpose of the 568 Cartel has been to reduce or eliminate competition between Cartel members over offers of financial aid to prospective students. And elimination of competition over financial-aid offers is simply a means of coalescing around a uniform *and lower* level of aid to all prospective students. The result of the 568 Cartel has thus been not only to reduce the amount of total aid offered by each school, but also to reduce the total amount of aid offered to each prospective student at each Defendant school.

**Answer to Paragraph 128:**  The allegations of Paragraph 128 are denied.

129.    In addition, to diminish variance in prices, according to the 568 Cartel's own website, the members "discuss and *agree*" on how to determine financial need. Under antitrust principles, the fact that members of the 568 Cartel agree to share confidential and competitively sensitive information and data on admissions and their respective applicants, and then further agree to impose a common methodology for determining financial-aid awards, are themselves evidence that the Cartel reduced such aid. If Defendants were truly competing, they would not engage in such behavior and reach such agreements because they would be incentivized to increase aid and reduce net prices of attendance to compete for students. In the absence of the anticompetitive conduct challenged herein, that would mean the awarding of more financial aid and reduction of net prices of attendance for all students in the proposed Class.

**Answer to Paragraph 129:**  Notre Dame denies that this action meets the prerequisites for a class action under Federal Rule of Civil Procedure 23.  The remaining allegations of Paragraph 129 are denied.

130.    Indeed, in a March 2014 interview with *The Georgetown Voice*, John DeGioia, who has been both the President of Georgetown and the President of the 568 Cartel for several years, was clear about the purpose of the Cartel: "I actually chair that group, called the 568 group. The 568 refers to a passage in Higher Reauthorization Bill about a decade ago *What it enables us to do is*

*develop a common formula* by which we would access the need of the student. *We ask the family to contribute the maximum that they are capable of, according to that formula."*[30] The 568 Cartel— whose member schools have enormous endowments, which have been growing substantially for decades—thus develops a "common formula" to extract from working- and middle-class families "the maximum that they are capable of" paying.

**Answer to Paragraph 130:** Paragraph 130 and its footnote purport to quote a website, which speaks for itself and to which no response is required. The remaining allegations of Paragraph 130 are denied.

131. The 568 Exemption allowed the 568 Cartel members not to compete in certain ways only if all the members admitted all students on a need-blind basis. Plaintiffs show herein, however, that by their own actions, Defendants did not satisfy this provision and thus none was entitled to the Exemption. Accordingly, Defendants are all liable for the reduced aid and artificially high net prices of attendance for Class Members that resulted from their agreement and related conspiratorial misconduct.

**Answer to Paragraph 131:** Notre Dame is not asserting the 568 Exemption as a defense in this litigation. The allegations of Paragraph 131 are denied.

132. Absent the alleged collusion, Defendants would compete, or compete more aggressively, on price for the students they have decided to admit because these are the students the admissions department has decided would satisfy the goals of the admissions process—among other things, to generate a diverse student body of high academic performers and student-athletes. Defendants view enrolling such students as critical to maintaining their prestige and influence and continuing to attract donations.

**Answer to Paragraph 132:** The allegations of Paragraph 132 are denied.

133. Given that a large percentage of families cannot afford an elite university education for their children without financial assistance, the 568 Cartel has enabled Defendants to maintain artificially inflated net prices of attendance, through artificially reduced financial aid, without losing admitted students to competitor schools.

**Answer to Paragraph 133:** The allegations of Paragraph 133 are denied.

134. In short, Defendants' anticompetitive conduct has produced overcharges in the net prices of attendance for all Class Members.

**Answer to Paragraph 134:** The allegations of Paragraph 134 are denied.

**VII.**

## ALLEGATIONS RELATED TO DEFENDANTS' ANTICIPATED DEFENSES

135.    While participating in the conspiracy alleged herein, Defendants have failed to conduct their admissions practices on a need-blind basis because all of them made admissions decisions taking into account the financial circumstances of applicants and their families, through policies and practices that favored the wealthy and disfavored those needing aid, including but not limited to those described below.

**Answer to Paragraph 135:**  To the extent they concern Notre Dame, the allegations in Paragraph 135 are denied.  To the extent they concern other universities, Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 135 and, on that basis, denies them.  The allegations in Paragraph 135 are otherwise denied.

136.    Section 568 defines "on a need-blind basis" to mean "without regard to the financial circumstances of the student involved or the student's family."

**Answer to Paragraph 136:**  Paragraph 136 purports to quote a statute and/or state a legal conclusion.  The statute speaks for itself and no response is required.

137.    An admissions practice can be described as "need-aware," as some admissions offices have used the phrase, if the institution considers an applicant's inability or ability to afford the full price of tuition, room, and board as a factor weighing against acceptance in at least some admissions decisions.

**Answer to Paragraph 137:**  Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 137 concerning how "some admissions offices have used the phrase" "'need-aware'" and denies them on that basis.  To the extent Paragraph 137 states a legal conclusion, no response is required.

## A.    Defendants Do Not Employ "Need-Blind" Admissions Policies in Deciding Whether to Admit Waitlisted and Transfer Applicants

138.    The language of Section 568, as well as its legislative history, makes clear that to qualify for the 568 Exemption, a school must follow need-blind admissions with respect to all applicants, including those on the waitlist. Section 568 was modeled on the settlement reached between MIT and the Department of Justice in a case against the predecessor to the 568 Cartel, which operated for decades until the early 1990s. It was known as the Overlap Group. The MIT settlement defined "need-blind admissions" to mean "admit[ting] all United States citizens to its undergraduate programs without regard to family financial circumstances, *other than admitted from a wait list.*" (Emphasis added.) In enacting Section 568, Congress generally followed the terms

of MIT's settlement, but it *omitted* the exception for waitlisted students.

**Answer to Paragraph 138:** The allegations of Paragraph 138 state legal conclusions or purport to quote documents that speak for themselves, and thus no response is required. To the extent a response is required, Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 138 and denies them on that basis.

139. All Defendants, on information and belief, have considered the financial need of waitlisted applicants—both in deciding whether to put them on the waitlist and deciding whether to admit them—despite Section 568's requirement that "all students admitted" be admitted on a need-blind basis. The precise number of affected students varies from Defendant to Defendant, but all schools place a substantial number of its students on their respective waitlists each year, and most Defendants place over 1,000 students on their respective waitlists each year, admitting from as few as only several students to as many as several hundred.

**Answer to Paragraph 139:** Notre Dame admits that it places some students on a waitlist and that the number of students admitted from the waitlist varies each year. Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 139 concerning universities other than Notre Dame, and denies them on that basis. The remaining allegations of Paragraph 139 are denied.

140. With respect to Penn, for example, a former Penn admissions officer, Karen Crowley, conceded in 2009 that although it is "not an official practice," admissions officers give preference to "full-paying student[s]" on the waitlist over those who need financial aid, especially when "endowments are down and cost-cutting is essential." "If a full-paying student says he'll definitely come, letting him in can be a relief."[31] On information and belief, Crowley's concession was reflective of Penn's own admissions practices.

**Answer to Paragraph 140:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 140 and, on that basis, denies them.

141. In May 2021, a college admissions consultant and former Associate Dean of Admissions at Penn until June 2008, Sara Harberson, acknowledged: "When I worked as the associate dean of admissions at the University of Pennsylvania, a need-blind institution, the office was not forthright about the fact that needing financial aid kept a student from being considered or admitted from the waitlist. Many need-blind universities are not open about their policies when it comes to whom they admit off the waitlist."[32]

**Answer to Paragraph 141:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 141 and, on that basis, denies them.

142.    Vanderbilt, as a further example, has indicated being need-aware with respect to waitlisted applicants through statements by its admissions officers. Vanderbilt has stated on its website, for example, that it "reserve[s] the right to be need aware when admitting waitlisted students."[33] This concession was posted on April 13, 2018, by Kim Struglinski, who joined the Vanderbilt office of undergraduate admissions in 2015 and thus was a Vanderbilt employee at the time of the statement.

**Answer to Paragraph 142:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 142 and, on that basis, denies them.

143.    Vanderbilt has indicated it is need-aware for waitlisted applicants on other occasions. In 2013, a Vanderbilt employee named Carolyn Pippen stated that "we do reserve the right to be need-aware when admitting waitlisted students."[34] And in 2014, a Vanderbilt employee named Jay Watson addressed whether Vanderbilt would be need-aware for waitlisted students that year: "We do reserve the right to be need aware when admitting students from the wait list."[35] Vanderbilt has never publicly stated, however, if in fact it has made need-aware decisions in admitting students from the waitlist.

**Answer to Paragraph 143:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 143 and, on that basis, denies them.

144.    Penn's and Vanderbilt's practices are representative of all the other Defendants' practices with respect to the consideration of waitlisted applicants. On this basis alone, at each Defendant school, each year, each Defendant has considered the financial circumstances of many hundreds of students in deciding whether to put them on the waitlist and in deciding whether to admit them from the waitlist. In failing to conduct need-blind admissions as to waitlisted applicants, all Defendants fail to satisfy the requirements of the 568 Exemption, and thus are subject to liability under the antitrust laws.

**Answer to Paragraph 144:** Notre Dame denies that any other university's practices are "representative" of its own. Notre Dame denies that it has considered students' financial circumstances in deciding whether to put them on the waitlist or in deciding whether to admit them from the waitlist. That aside, Notre Dame is not asserting the 568 Exemption as a defense in this

litigation. Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 144 concerning the practices of any university other than Notre Dame and, on that basis, denies them. To the extent legal conclusions are stated in Paragraph 144, no response is required. The remaining allegations of Paragraph 144 are denied.

145. All Defendants, on information and belief, have also considered the financial need of transfer applicants in deciding whether to admit them, despite Section 568's requirement that "all students admitted" be admitted on a need-blind basis. Each Defendant receives at least hundreds (and sometimes over a thousand) transfer applications each year, admitting from as few as only several students to as many as several hundred.

**Answer to Paragraph 145:** Notre Dame admits that it receives transfer applications each year and that the number of applicants admitted varies. Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 145 concerning the practices of any university other than Notre Dame and, on that basis, denies them. The allegations of Paragraph 145 are otherwise denied.

146. On this basis, at each school, each year, each Defendant has considered the financial circumstances of many hundreds of students seeking to transfer to the school in deciding whether to admit them. In failing to conduct need-blind admissions as to transfer applicants, no Defendant qualifies for the 568 Exemption.

**Answer to Paragraph 146:** Notre Dame denies that it has considered the financial circumstances of students seeking to transfer to Notre Dame in deciding whether to admit them. Notre Dame denies that it has failed to conduct need-blind admissions as to transfer applicants. In any event, Notre Dame is not asserting the 568 Exemption as a defense in this litigation. Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 146 concerning universities other than Notre Dame and, on that basis, denies them. The allegations of Paragraph 146 are otherwise denied, except as to the legal conclusions stated therein, to which no response is required.

**B.      Columbia Does Not Employ "Need-Blind" Admissions Policies in Deciding Whether to Admit Applicants to Its School of General Studies**

147.     Columbia further engages in need-aware admissions practices that relate to applicants to its School of General Studies, which is an undergraduate program of Columbia. The School of General Studies is under the governance of Columbia's President, Provost, Trustees, and Faculty of Arts and Sciences, just like Columbia College and equivalent to the School of Engineering and Applied Science.[36] This governance structure contrasts with Barnard College, which is independent of, but affiliated with, Columbia.[37]

**Answer to Paragraph 147:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 147 and, on that basis, denies them.

148.     Columbia's School of General Studies offers an undergraduate degree program for "nontraditional students" who have had a break of a year or more in their studies and for dual-or joint-degree students, who split their time as students between Columbia and other institutions, such as Sciences Po in Paris and Trinity College Dublin.[38] Students in the School of General Studies take the same courses with the same faculty and undertake the same majors as other undergraduates at Columbia. They receive a diploma from Columbia like other undergraduates.

**Answer to Paragraph 148:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 148 and, on that basis, denies them.

149.     According to Columbia's website, the School of General Studies comprises more than 2,500 undergraduate students, which is approximately 30% of Columbia's undergraduate student population.[39] In addition, 68% of undergraduates enrolled in the School of General Studies take classes on a full-time basis.[40]

**Answer to Paragraph 149:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 149 and, on that basis, denies them

150.     Columbia conceded that "General Studies admissions are not need-blind."[41] In fact, Columbia has used General Studies to generate revenue that supports other university initiatives, like campus expansions and new scientific research centers. Columbia's Faculty of Arts & Sciences pays a nine-figure "common-cost tax" to the university.[42] But General Studies recruits and enrolls a less wealthy, more socioeconomically diverse student body than Columbia's other undergraduate programs.[43] The burden of supporting Columbia's preservation of prestige and financial accumulation therefore falls on those who can least afford it.

**Answer to Paragraph 150:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 150 and, on that basis, denies them.

151.     Accordingly, in failing to conduct need-blind admissions as to applicants for the School of General Studies, Columbia does not qualify for the 568 Exemption.

**Answer to Paragraph 151:** To the extent these allegations state a legal conclusion, no response is required. Notre Dame otherwise lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 151 and, on that basis, denies them.

152.     In sum, during the period of the conspiracy alleged herein, all Defendants have considered the financial need of waitlisted and transfer applicants, and Columbia has considered the financial need of students applying to the School of General Studies, in deciding whether to admit such students to attend their undergraduate programs on a full-time basis. This conduct extinguishes the 568 Exemption for all members of the 568 Cartel.

**Answer to Paragraph 152:** Notre Dame denies that there was any "conspiracy." Notre Dame denies that it has considered the financial need of waitlisted and transfer applicants in deciding whether to admit such students to attend its undergraduate programs on a full-time basis. Notre Dame denies that its conduct "extinguishes" any applicable right, privilege, immunity, or exemption, including the 568 Exemption. Nevertheless, Notre Dame is not asserting the 568 Exemption as a defense in this litigation. Notre Dame denies that the 568 Presidents Group was a "cartel." Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 152 concerning universities other than Notre Dame and, on that basis, denies them. To the extent this Paragraph states a legal conclusion, no response is required. The allegations of Paragraph 152 are otherwise denied.

153.     In addition, if any Defendant has not considered the financial circumstances of applicants or their families in making admissions decisions, the fact that other Defendants have done so—and thus that the Cartel includes non-exempt schools with whom otherwise hypothetically compliant schools collude—extinguishes the 568 Exemption for all members of the 568 Cartel. Quite simply, no school was entitled to protection under the Exemption if it colluded with any non-need-blind schools.

**Answer to Paragraph 153:** The allegations of Paragraph 153 are denied, except as to the legal conclusions stated therein, to which no response is required.

**C.    Emory Does Not Employ "Need-Blind" Admissions Policies in Deciding Whether to Admit Applicants to Oxford College**

154.    Oxford College is an undergraduate division of Emory University, exclusively for first- and second-year students.

**Answer to Paragraph 154:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 154 and, on that basis, denies them.

155.    Oxford College is openly need aware.  The Emory University News Center stated in 2013:  "[D]ue to the combination of internal and external financial pressures, Oxford College implemented a need-sensitive framework in admitting and shaping part of its freshman class.[44]

**Answer to Paragraph 155:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 155 and, on that basis, denies them.

**D.    Certain Defendants' Enrollment Management Practices Are Not "Need-Blind"**

156.    Among Defendants, at least Dartmouth, Columbia, Northwestern, Notre Dame, and Penn engage in need-aware admissions through "enrollment management."

**Answer to Paragraph 156:** Notre Dame denies the allegations in Paragraph 156 as they pertain to Notre Dame.  Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 156 concerning universities other than Notre Dame and, on that basis, denies them.

157.    "Enrollment management is "the systematic integration of the functions of admissions, the relationship b etween tuition and fees (pricing) and financial aid, and student retention, along with the use of research to inform institutional policies and practices."[45] It is a "managerial paradigm" that brings together admissions and other institutional functions "into a comprehensive institutional approach designed to enable college and university administrators to exert greater influence over the factors that shape their enrollments."[46]

**Answer to Paragraph 157:** The allegations of Paragraph 157 are denied.

158.    One of the key purposes of enrollment management is to limit the number of

financial-aid-eligible applicants who are admitted to the institution to achieve financial and budgetary objectives. The effect of these practices is to disadvantage applicants based on their need for institutional financial aid.

**Answer to Paragraph 158:** The allegations of Paragraph 158 are denied.

159.    Econometric modeling is central to enrollment management. As explained by Stephen Brooks, a higher-education consultant whose client list includes Columbia and Penn,[47] models draw on standard elements of college applications—academic ability, geography, demographics, interests, whether the student has requested aid, and more—to assess an applicant's likelihood of enrolling if offered admission.[48] These yield models, in turn, permit schools to forecast the revenue and cost implications of their admissions and financial-aid decisions.[49]

**Answer to Paragraph 159:** The allegations of Paragraph 159 are denied.

160.    One anonymous enrollment manager has said: "Good luck getting any institution to tell you exactly how they handle ability to pay as a driver in their admit decision. . . . What they will say is 'We're need blind.' That's bullshit. They would never tell you exactly how they do it, but they do it all the time."[50]

**Answer to Paragraph 160:** Notre Dame lacks knowledge or information sufficient

to form a belief about the truth of the allegations in Paragraph 160 and, on that basis denies them.

161.    Indeed, these institutions know their practices are legally problematic, and thus they maintain a shroud of secrecy over them. For instance, author Jeff Selingo asked two dozen colleges or universities for access to their admissions practices. Nearly all refused, some because they were "worried about exposing how they shaped their class based on the financial need of applicants."[51] Selingo also wrote: "Even at need-blind schools, admission eventually can come down to money. Those colleges control how much they spend on financial aid by recruiting heavily in rich high schools and admitting in early decision a significant proportion of students who tend to be wealthier. And even when schools are need-blind, admissions officers still see the zip codes and the occupations of parents when reviewing applications."[52]

**Answer to Paragraph 161:** The allegations of Paragraph 161 are denied.

162.    In 2015, Dartmouth created the position of Vice Provost for Enrollment Management, announcing that it would permit the university "to use a wealth of newly available data to identify and recruit prospective students."[53] In 2016, Dartmouth announced its hiring of Lee

Coffin from Tufts University, a need-aware school.[54] At Tufts, Coffin operated under strict budgetary limits.[55] He shaped the cohort of admitted students to bring revenues and costs in line. His admissions office sent tentative acceptances to the financial-aid office, which modeled the revenue and cost implications so that the admissions office would meet the university's budgetary goals. As Coffin has acknowledged, "Shifting things at the end . . . happens every year."[56]

**Answer to Paragraph 162:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 162 and, on that basis, denies them.

163. The President of Northwestern since 2009, Morton Schapiro, has been described as "a dean of 'enrollment management,' the art of shaping an incoming class through recruitment, aid, early admission, waiting lists and other variables."[57] During President Schapiro's tenure, at least, Northwestern has employed enrollment management.

**Answer to Paragraph 163:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 163 and, on that basis, denies them.

164. Notre Dame also employs an "enrollment management model."[58] Announcing in 2010 the hire of its associate vice-president for undergraduate enrollment, Don Bishop, Notre Dame praised his "innovative marketing and financial aid strategies" in prior enrollment- management jobs.[59] Announcing a new Dean of Admissions in 2019, Notre Dame touted her status as "a featured presenter at national enrollment management conferences and events."[60] In addition, Notre Dame has a partnership with a software company that develops data-visualization tools, touting "improved scenario analyses on all data associated with an applicant or prospective enrollee."[61] Notre Dame is thus using data analysis to shape need-aware admissions decisions.

**Answer to Paragraph 164:** Notre Dame admits that it publicly stated that its former Associate Vice-President for Undergraduate Enrollment, Don Bishop, had previously deployed "innovative marketing and financial aid strategies." Notre Dame admits that in 2019, Notre Dame stated that its new Dean of Admissions, Christy Pratt, had been "a featured presenter at national enrollment management conferences and events." Notre Dame admits that a January 2016 article on campustechnology.com reported that Notre Dame had "partnered with SynGlyphX, a provider of

interactive data visualization and discovery technology, to develop an interactive data visualization software tool designed for enrollment management and admissions offices," and that the campustechnology.com article described SynGlyphX's product as providing "improved scenario analyses on all data associated with an applicant or prospective enrollee." Notre Dame admits that its Enrollment Division is responsible for "enrollment management," but denies that this term means what is alleged in this or any other Paragraph. Notre Dame denies the remaining allegations in Paragraph 164.

165. Columbia's, Dartmouth's, Northwestern's, Notre Dame's, and Penn's use of enrollment management thus involves the resolution of admissions decisions *with* regard to the financial circumstances of the applicant or their family, in that such management (i) identifies relatively wealthy students, for the benefits (direct and indirect) that the school expects from their admission, and (ii) identifies relatively less wealthy students in order to limit the total amount of financial aid—and then acts upon that information to meet budgetary goals.

**Answer to Paragraph 165:** Notre Dame admits that its Enrollment Division is responsible for "enrollment management," but denies that this term means what is alleged in this or any Paragraph. Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 165 concerning universities other than Notre Dame and, on that basis, denies them. The allegations of Paragraph 165 are otherwise denied.

### E. Defendants Consider Family Financial Circumstances in Giving Preference to the Children of Wealthy Past or Potential Donors, and Thus Do Not Adhere to a Need-Blind Admissions Policy

166. Defendants consider applicants' "financial circumstances" through admissions preferences given to the children of wealthy past or potential donors, such that their chances of admission increase significantly. Such Defendants understand that these applicants— commonly known as "development cases" or "development admits"—have no need for financial aid and that their admission could generate a substantial financial return for the university.

**Answer to Paragraph 166:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 166 concerning universities other than Notre Dame and, on that basis, denies them. The allegations in Paragraph 166 are otherwise denied.

167. Consequently, the development offices of such Defendants analyze and monitor these applicants and coordinate with the university presidents or admissions offices during the

43

admissions cycle. In short, awarding special treatment to the children of wealthy prior and potential donors necessarily means some less privileged applicants are not admitted on account of their financial circumstance to make room for the wealthy.

**Answer to Paragraph 167:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 167 as to universities other than Notre Dame and, on that basis, denies them. The allegations in Paragraph 167 are otherwise denied.

168. Defendants also consider large donations, and even financial capacity in the absence of any donation history, as plus factors for admission. Assessing potential donations of an applicant's family necessarily involves considering the income, assets, and other financial circumstances of that family. Similarly, considering a family's past donations, pursuant to the agreement of the 568 Cartel, constitutes the consideration of family financial circumstances.

**Answer to Paragraph 168:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 168 as to universities other than Notre Dame and, on that basis, denies them. The allegations in Paragraph 168 are otherwise denied.

169. In considering the wealth and donation history of certain students and their families, moreover, such Defendants implicitly consider less privileged applicants' lack thereof. Because of the limited number of spots available in any given class, the advantage given to one group entails a disadvantage imposed on the other. Privileging the wealthy and disadvantaging the financially needy are inextricably linked; they are two sides of the same coin.

**Answer to Paragraph 169:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 169 as to universities other than Notre Dame and, on that basis, denies them. The allegations in Paragraph 169 are otherwise denied.

170. In addition, such Defendants are committed to maintaining admissions as a zero-sum game, by limiting growth in the number of undergraduate seats to maximize perceptions of exclusivity and prestige. Defendants' presidents and senior admissions and development officers know that the other Defendants routinely favor children from wealthy families and thereby fail to admit all students without regard to their financial circumstances or that of their families.

**Answer to Paragraph 170:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 170 as to universities other than Notre Dame and, on that basis, denies them. The allegations in Paragraph 170 are otherwise denied.

171. Darrell M. West, a professor at Brown from 2000-2008, has stated: "When I taught at Brown, I periodically was asked to meet with children of the rich and famous who were seeking

admission to the university. I did so and wrote letters to the admissions office giving my impressions of the applicant. The university claims there was no pressure to admit well-connected individuals, but it was clear to me Brown thrived on its reputation as a 'hot Ivy' that had lots of prominent students there. It admitted many well-deserving and talented students, but many on the faculty recognized the university's interest in having children of prominent individuals on campus because it generated publicity for Brown and sometimes paid off down the road in financial contributions to the university. Looking back on these experiences, I can see that wealthy students had admissions advantages over the average applicant because the latter were not getting one-on- one meetings with faculty members or special consideration by the admissions office."[62]

**Answer to Paragraph 171:** Notre Dame admits that the source cited contains the language quoted. Notre Dame otherwise lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 171 and, on that basis, denies them.

172.    A former Dean of Admissions at Dartmouth, Maria Laskaris, said in 2019: "The ultra-rich have an additional advantage in their ability to donate large sums of money to universities, which can boost their kids' chances of acceptance." According to Laskaris, admissions officers are "made aware of" this factor because "colleges are always in fundraising mode."[63] At Dartmouth, development officers meet with admissions staff to review a list created by the development office. Each year, up to 50 applicants may be considered through this special process, most of whom are admitted, accounting for 4-5% of Dartmouth's student body.[64]

**Answer to Paragraph 172:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 172 and, on that basis, denies them.

173.    An email exchange exposed by the Sony hack in 2014 illustrates Dartmouth's efforts to evaluate and court wealthy potential donors.[65] Michael Lynton, CEO of Sony Pictures Entertainment, intended to visit Dartmouth with his daughter, a prospective student. Michael Lynton is not an alumnus of Dartmouth, and public records have not shown that Lynton had previously donated to Dartmouth. On the eve of his visit, Lynton received a solicitous email from Jeff Sassorossi, a 1975 Dartmouth graduate and then Dartmouth's "Director, Special Projects & Reporting." Sassorossi explained that his role at Dartmouth was "to serve as the liaison between the Advancement (Alumni Relations and Development) and Admissions. As such, I work with families as they go through the admissions process at Dartmouth." Sassorossi offered Lynton and his daughter a personal tour of the campus. Sassorossi's email also indicated that Lynton was being recruited to Dartmouth by Leon Black, a billionaire private equity investor, major Dartmouth benefactor, and former trustee.[66]

**Answer to Paragraph 173:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 173 and, on that basis, denies them.

174. Despite these entreaties, Lynton's daughter enrolled at Brown, which got the $1 million donation from Lynton instead of Dartmouth.[67] The opinion editor for the *Brown Daily Herald* described Lynton's gift to Brown as "a $1 million check to Brown with more strings attached than the Los Angeles Philharmonic. Anyone with a pulse can trace the probable outcome of this 'philanthropy'—a prospective student connected to Lynton gets accepted to Brown!"[68]

**Answer to Paragraph 174:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 174 and, on that basis, denies them.

175. According to journalist Daniel Golden's book *The Price of Admission*, Defendant Duke "enrolled thousands of privileged but underqualified applicants with no prior ties to the university in the expectation of parental payback."[69] According to Golden, Duke "accepted at least one hundred nonalumni children each year due to family wealth."[70] In some years, between 3-5% of Duke's student body consists of students "who would have been turned away without pressure from the development office."[71]

**Answer to Paragraph 175:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 175 and, on that basis, denies them.

176. While serving as president of Duke, Richard Brodhead admitted that "it would be naïve to say that any university should pay no attention to a family's ability to help the university," explaining that a family's ability to donate to Duke was a "plus factor" in admissions."[72] A former Director of Undergraduate Admissions at Duke, Jean Scott, estimated that "a couple of hundred" applicants a year received special attention as children of prospective donors. Scott admitted that there "were certainly students who got in because they were a high priority" for fundraising. Scott also said that there "was more of this [fundraising-related] input at Duke than at any other institution I ever worked for."[73]

**Answer to Paragraph 176:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 176 and, on that basis, denies them.

177. The longstanding Dean of Admissions for Georgetown, Charles Deacon, was asked by a reporter: "What about children of alumni and *potential* donors?" (Emphasis added.) In response,

Dean Deacon candidly admitted: "On the fundraising side, we also have a small number of 'development *potential'* candidates. If Bill Gates wants his kid to come to Georgetown, we'd be more than happy to have him come and talk to us." (Emphasis added.) Dean Deacon continued to point out that "not all those special cases end up being people who give a lot of money. We have children of Supreme Court justices, senators, and so on apply. We may give extra consideration to them because of the opportunities that may bring."[74]

**Answer to Paragraph 177:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 177 and, on that basis, denies them.

178.    In short, Georgetown admits a range of students based on their families' wealth, prestige, and influence. Some of these students are given "extra consideration" based on their parents' influence or political power, without any expectation of a financial contribution. On the other hand, some *are* given "extra consideration" on the basis of their "development potential"— namely, the ability of the family to make a financial contribution to the institution, and the likelihood that it will do so.

**Answer to Paragraph 178:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 178 and, on that basis, denies them.

179.    Indeed, Dean Deacon has also candidly admitted that Georgetown favors past donors, as well as potential donors, and has even admitted that Georgetown calibrates the extent of the admissions advantage to the size of the donation: "If you were very close to the edge and the family's given to the annual fund every year or something, that might be enough of a tip to get you in. If you're a little farther from the edge, but the family has built Regents Hall, that might tip a little farther."[75]

**Answer to Paragraph 179:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 179 and, on that basis, denies them.

180.    A former Director of Selection at MIT, McGreggor Crowley, admitted in March 2019: "In truth, for every office of admissions there is a development office that builds a university's endowment through donations from alumni and wealthy individuals. And every year, regardless of what a college or university says publicly, a number of children of wealthy donors and alumni get a nod in their direction while other applicants are rejected."[76] In an interview with NBC News, Crowley admitted that "as for the children of prominent campus donors, . . . a college's development office might reach out to the dean of admissions to say, 'Hey, just so you know, Lisa's dad has been very generous to us in the past, or something.'" NBC News reported that according to Crowley: "Usually, that kind of information [about a family's financial contribution] is relayed to the most senior officials in an admissions office."[77]

**Answer to Paragraph 180:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 180 and, on that basis, denies them.

181. At Northwestern, a separate admissions process exists for the wealthy and well connected. On April 24, 2019, *The Daily Northwestern* published an article with the headline: "Northwestern President Schapiro Says He Reads Applications of Some Legacy, Donor Students." As revealed in the article, in the 2018-19 admissions cycle, Schapiro personally reviewed the applications of about 550 students, including applications associated with wealthy donors. A Northwestern spokeswoman has further admitted that President Schapiro was "frequently involved in dealing with principal donors to the University."[78]

**Answer to Paragraph 181:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 181 and, on that basis, denies them.

182. One of the student reporters who broke the story about Northwestern's two-track admissions system later stated in a podcast interview: "[President Schapiro] also told us that he tries to work with the Dean of Admissions Christopher Watson, as much as he can. He brought up an example that if they both disagreed on an applicant that they try to work it out."[79] President Schapiro is the boss at Northwestern, and the Dean of Admissions reports to him. The head of the university is using his discretion to make or influence numerous admissions decisions. Schapiro's involvement in admissions decisions for applicants associated with wealthy donors was not public until revealed by reporting in 2019.

**Answer to Paragraph 182:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 182 and, on that basis, denies them.

183. The Director of Admissions at Notre Dame for thirty-six years until his retirement in July 2019, Bob Mundy, made appearances at alumni gatherings during his tenure in office. Mundy's biography at these appearances stated: "In his current position as Director of Admissions Operations, he oversees the 35 members of staff, and recruitment efforts that have included as many as 40,000 annual inquiries and a record-setting 16,500 applications for the 2011 class. Ultimately, the office is responsible for 'delivering' a freshmen class of approximately 2,000 students, while also satisfying the needs of various constituencies: i.e. alumni, athletics, *the Development Office*, etc." (Emphasis added.)

**Answer to Paragraph 183:** Notre Dame admits that Bob Mundy served as the Director of Admissions for more than thirty years and retired in July 2019. Notre Dame admits that Mundy appeared at alumni gatherings while serving in this role. To the extent Paragraph 183 purports

to quote from a written document, the document speaks for itself; Notre Dame denies that there is any inference to be drawn from language emphasized by Plaintiffs in this Paragraph, and denies that any emphasis is appropriate.  The allegations of Paragraph 183 are otherwise denied.

184.    The current Associate Vice Provost for Undergraduate Enrollment at Notre Dame, Don Bishop, acknowledged the significant influence that donations play in the Notre Dame admissions process. Indeed, he admitted that if someone gave $15 million, then their children would be given "some special interest" during the Notre Dame admissions process.[80]

**Answer to Paragraph 184:**  Notre Dame admits that an article published in Town & Country purported to quote Associate Vice President for Undergraduate Enrollment Don Bishop as stating that if someone were to give $15 million to a university, "which could fund 10 to 15 scholarship kids in perpetuity, do you let their children have some special interest?  Yes.  But they still have to be quite good."  The allegations in Paragraph 184 are otherwise denied.

185.    Penn also tracks past and potential donors, rewarding past donors and enticing potential donors by admitting their children. A former Associate Dean of Admissions, Sara Harberson, has described the university's use of "tags" to track applicants that are "a high priority for the institution." Penn tags the applications of "children of donors or potential donors," among others, giving those applicants "the proverbial golden ticket."[81]  The university has "spots reserved" for these "development cases," whose "parents have already given significant money to the institution, or plan to.[82]

**Answer to Paragraph 185:**  Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 185 and, on that basis, denies them.

186.    A past Chancellor of Vanderbilt, E. Gordon Gee, stated in 2019 that any president under "truth serum" would concede that donor connections make a difference in admissions.[83]

**Answer to Paragraph 186:**  Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 186 and, on that basis, denies them.

187.    Certain universities may independently choose to favor the children of the wealthy if they like, thereby disfavoring every other applicant. But if they make that choice, they cannot lawfully conspire on financial-aid policies. The law does not allow them to do both. Defendants must choose between continuing their wealth favoritism and need-aware admissions practices, on

the one hand, and participation in the lucrative 568 Cartel, on the other.

**Answer to Paragraph 187:** The allegations of Paragraph 187 are denied, except as to the legal conclusions stated therein, to which no response is required.

F.     **The Section 568 Exemption Applies Only to a Group of Schools That All Employ "Need-Blind" Admissions Policies Within the Term's Statutory Meaning**

188.     The 568 Exemption, as noted, precludes any school invoking it from taking account of "the financial circumstances" of a student or their family in making admissions decisions. Under the well-established rules of statutory construction, any contrary interpretation of the text of the 568 Exemption would be impermissible speculation as to Congress's intent—in particular, where any antitrust exemption is construed narrowly (with what courts have described as "beady eyes and green eyeshades"). Just as fundamental, the evidence of the purpose and overarching goal of the 568 Exemption, as reflected in its legislative history, compels this interpretation of the plain meaning of "need-blind" as defined in the statute.

**Answer to Paragraph 188:** Notre Dame is not asserting the 568 Exemption as a defense in this litigation. The allegations of Paragraph 188 are denied, except as to the legal conclusions stated therein, to which no response is required.

189.     The 568 Exemption replaced what had been a general temporary antitrust exemption. The 1994 legislative history of the enactment of Section 568 explains in relevant part: "This provision extends for an additional three years the temporary antitrust exemption for certain collegiate financial aid award analysis, which was originally enacted with the Higher Education Amendments of 1992 as a two-year exemption." H.R. Conf. Rep. 103-761, 911-12, 1994 U.S.C.C.A.N. 2901, 3242-43. This report explained that, as noted above, Section 568 is modeled on the MIT-DOJ settlement: "The temporary exemption has also been revised in light of the 'standards of conduct' adopted as part of the settlement of the antitrust action between the Department of Justice and Massachusetts Institute of Technology in the case of *United States v. Brown University, et al.*, Civ. Action No. 91-3274 (E.D. Pa.), on December 22, 1993." *Id.*

**Answer to Paragraph 189:** The allegations of Paragraph 189 state legal conclusions or purport to quote documents that speak for themselves, and thus no response is required. To the extent a response is required, Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 189 and denies them on that basis.

190.     The referenced "standards of conduct" provided in relevant part: "Non-profit institutions of higher education may participate in the cooperative financial aid arrangements set forth below ('Participating Schools'), provided that they practice need-blind admissions; that is, admit all United States citizens to its undergraduate programs without regard to family financial circumstances, other than admitted from a wait list." This legislative history thus makes clear that

Section 568's language tracks the language in the "standards of conduct" precluding admissions *with* regard to "family financial circumstances."

**Answer to Paragraph 190:** The allegations of Paragraph 190 state legal conclusions or purport to quote documents that speak for themselves, and thus no response is required. To the extent a response is required, Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 190 and denies them on that basis.

191. This legislative history further states that the 568 Exemption "applies only to institutions of higher education that admit students on a need-blind basis. The definition of 'on a need-blind basis' in subsection (c)(6) is based on language in the 'standards of conduct' adopted in the MIT settlement. However, there is one conspicuous difference between the statutory language and the MIT standards of conduct is that the statute deletes the phrase 'other than admitted from a wait list.' *See also United States v. Brown University*, 5 F.3d 658 (1993)." H.R. Conf. Rep. 103-761, 911-12, 1994 U.S.C.C.A.N. 2901, 3242-43. This conference report further states:

> The managers have decided against elaborating on the need-blind admissions standard in the statutory text. As should be obvious, however, evidence of a practice among admissions personnel at an institution of higher education of examining, discussing, or otherwise considering information relating to a student's financial circumstances that is derived from such student's financial aid application form, *or from any other document or record obtained for the purpose of ascertaining such financial circumstances*, before the decision is made regarding the student's admission will substantially increase the institution's burden of demonstrating that the school's admissions policy is truly need-blind.

*Id*. (emphasis added). The report then specifies: "Prudence would counsel that schools wishing to make use of this provision *insulate their admissions, process and admissions personnel as completely as possible from such student financial aid information, until after the admissions process is complete*." *Id*. (emphasis added). Consistent with the statute, no exception is made for applicants on the institution's waitlists.

**Answer to Paragraph 191:** Notre Dame is not asserting the 568 Exemption as a defense in this litigation. The allegations of Paragraph 191 state legal conclusions or purport to quote documents that speak for themselves, and thus no response is required. To the extent a response is required, Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 191 and denies them on that basis.

192. This aspect of the legislative history thus reflects Congress's intent that a "truly

need-blind" admissions policy would not permit a school invoking the 568 Exemption to use the information that the 568 Cartel has used and continues to use to consider the financial circumstances of an applicant's family for admissions purposes—including (i) the common application (which asks questions about the parents' occupation for the purpose, at least in part, of ascertaining the financial circumstances of the applicant and their family); (ii) emails between development and admissions, as well as any "tags" that admissions uses to flag development prospects, obtained for the purpose of ascertaining the financial circumstances of the applicant and their family; (iii) any documents that admissions receives identifying one or both parents as donors, or regarding donation history, or identifying one or both parents as alumni; and (iv) the information integral to enrollment management.

**Answer to Paragraph 192:** Notre Dame is not asserting the 568 Exemption as a defense in this litigation. The allegations of Paragraph 192 state legal conclusions and thus no response is required. To the extent a response is required, Notre Dame denies the allegations of Paragraph 192.

193. The 2001 legislative history to the renewal of the 568 Exemption further confirms the following congressional goal and purpose: "No student who is otherwise qualified ought to be denied the opportunity to go to one of the nation's most prestigious schools because of the financial situation of his or her family." Report to Accompany H.R. 768, House of the Judiciary, *Need-Based Educational Aid Act of 2001* (Apr. 3, 2001). An admissions policy that admits certain students based on their wealth, in a zero-sum admissions arrangement, necessarily denies admission to at least some students "because of the financial situation of his or her family."

**Answer to Paragraph 193:** Notre Dame is not asserting the 568 Exemption as a defense in this litigation. The allegations of Paragraph 193 state legal conclusions or purport to quote documents that speak for themselves, and thus no response is required. To the extent a response is required, Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 193 and denies them on that basis.

194. In a separate part of the 2001 legislative history, Representative Barney Frank, one of the sponsors of the legislation, referenced that it arose out of litigation regarding the Overlap Group (discussed above), and a practice in which "these schools strive to achieve what they call a needs-based admission policy," and "what it meant was that they strove to admit young men and women *based on their ability to do the work of that school*." Statement of Barnie Frank, Need-Based Educational Aid Act of 2001, 147 Cong. Rec. H1360-02, 2001 WL 321629 (Apr. 3, 2001) (emphasis added). An admissions policy that admits certain students based on their wealth as a relevant factor does not admit those students "based on their ability to do the work of that school."

**Answer to Paragraph 194:** Notre Dame is not asserting the 568 Exemption as a defense in this litigation. The allegations of Paragraph 194 state legal conclusions or purport to quote documents that speak for themselves, and thus no response is required. To the extent a response is required, Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 194 and denies them on that basis.

195.     In sum, the scope of the 568 Exemption was rooted in the plain language of the statutory text, and in the statute's legislative history, which shows that the statute's plain text furthers the statute's purposes.

**Answer to Paragraph 195:** The allegations of Paragraph 195 are denied, except as to the legal conclusions stated therein, to which no response is required.

# VIII.

## DEFENDANTS' CONTINUING VIOLATIONS OF THE ANTITRUST LAWS, AND THE ACCRUAL OF PLAINTIFFS' CLAIMS THEREUNDER

### A.     Defendants' Continuing Violations of the Antitrust Laws

196.     Defendants' violations of the Sherman Act occurred each time any Defendant engaged in conduct in furtherance of the 568 Cartel that harmed Plaintiffs and other Class Members. In the context of Defendants' price-fixing conspiracy, such conduct and violations occurred each time Defendants have exchanged private or confidential information about admissions and/or financial aid, or met to fine-tune their Cartel agreement, and upon each transaction with any Class Member at an artificially inflated net price of attendance.

**Answer to Paragraph 196:** The allegations of Paragraph 196 are denied, except as to the legal conclusions stated therein, to which no response is required.

197.     Defendants have engaged in continuing violations of the Sherman Act. The 568 Cartel has met at least annually since 2003 to discuss and fine-tune their Cartel agreement, and Class Members have paid artificially high net prices to attend Defendants' schools since that time and continuing through the present as a result of the conduct alleged herein.[84]

---

[84] In terms of formal membership, as noted above, Brown and Emory claim to have stopped active participation in the 568 Cartel in 2012; Chicago claims to have stopped active participation in 2014; and Penn and Vanderbilt claimed to have stopped active participation it in 2020. Some institutions have attended meetings of the 568 Cartel and exchanged information with the Cartel without being formal members, including certain institutions that never formally joined. (Plaintiffs reserve the right to name such institutions as defendants based on discovery in this case.)

**Answer to Paragraph 197:** Notre Dame denies that the 568 Presidents Group was a "cartel." Notre Dame admits that the 568 Presidents Group met annually. Notre Dame denies that this action meets the prerequisites for a class action under Federal Rule of Civil Procedure 23. The allegations of Paragraph 197 are otherwise denied, except as to the legal conclusions stated therein, to which no response is required.

**B.    The Accrual of Plaintiffs' Claims Under the Discovery Rule**

198.    Until the last two years, Plaintiffs in fact did not know (a) the extent to which Defendants had failed to admit all successful applicants without regard to the financial circumstances of the student or the student's family, in violation of the 568 Exemption, or (b) that Defendants' use of the Consensus Methodology has disadvantaged and in fact caused financial injury to the Class Members.

**Answer to Paragraph 198:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 198 concerning what Plaintiffs "in fact did not know." The allegations of Paragraph 198 are otherwise denied, except as to the legal conclusions stated therein, to which no response is required.

199.    Until the last two years, moreover, a person exercising reasonable diligence could not have discovered (a) the extent to which Defendants had failed to admit all successful applicants without regard to the financial circumstances of the student or the student's family, in violation of the 568 Exemption, or (b) that Defendants' use of the Consensus Methodology has disadvantaged and in fact caused financial injury to the Class Members.

**Answer to Paragraph 199:** The allegations of Paragraph 199 are denied, except as to the legal conclusions stated therein, to which no response is required.

200.    In commenting on the larger implications of Plaintiffs' claims, for example, the editorial board of Emory's student newspaper candidly observed: "Financial aid is confusing enough without elite universities colluding to shirk students out of necessary assistance."[85]

**Answer to Footnote 84:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Footnote 84 and, on that basis, denies them, except as to the legal conclusions stated therein, to which no response is required.

**Answer to Paragraph 200:** Notre Dame admits that the article referenced contains the sentence quoted. The allegations of Paragraph 200 are otherwise denied.

201. In addition, a person exercising reasonable diligence could not have discovered the violations of the 568 Exemption and the concomitant antitrust injury at issue, in part because Defendants have made numerous incomplete and misleading statements that prevented a reasonable person from discovering those violations and the resulting injury.

**Answer to Paragraph 201:** The allegations of Paragraph 201 are denied, except as to the legal conclusions stated therein, to which no response is required.

202. Defendants have publicly stated and advertised, incompletely and misleadingly, that they admit students on a need-blind basis; indeed, Defendants have continually claimed to be need-blind in thousands of internet, marketing, and admissions materials and brochures.

**Answer to Paragraph 202:** Notre Dame admits that it has publicly stated that it admits students on a need-blind basis. Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 202 as to universities other than Notre Dame and, on that basis, denies them. The allegations of Paragraph 202 are otherwise denied, except as to the legal conclusions stated therein, to which no response is required.

203. Defendants and the other members of the 568 Cartel maintained a website for the Cartel. The first words printed on the homepage of this website were: "What is the 568 Presidents Group? 568 Presidents Group is an affiliation of colleges and universities, all of which must admit students on a need-blind basis." Under an FAQ on the same website, the 568 Cartel has made the following misleading claim: "It is referred to as a 'Presidents' group because it was formed by a group of 28 college and university presidents from need-blind schools in 1998."

**Answer to Paragraph 203:** Notre Dame denies that the 568 Presidents Group was a "cartel." Notre Dame admits that there was a website for the 568 Presidents Group. Notre Dame admits that the website for the 568 Presidents Group contained the language quoted in Paragraph 203. Notre Dame denies that any "claim" on the website was "misleading." The allegations of Paragraph 203 are otherwise denied, except as to the legal conclusions stated therein, to which no response is required.

204. Defendants have also individually made similarly misleading statements, including on websites, during the period of the conspiracy alleged herein. Such Defendants have further

misrepresented, as shown below, that they are "need-blind," within the meaning of that term under the law, when they are not "need-blind" within the meaning of that term under the law.

**Answer to Paragraph 204:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 204 as to universities other than Notre Dame and, on that basis, denies them. The allegations of Paragraph 204 are otherwise denied, except as to the legal conclusions stated therein, to which no response is required.

205. The website for Columbia has stated and continues to state: "Admission to Columbia is need-blind for US Citizens and Eligible Noncitizens, meaning the Office of Undergraduate Admissions considers your application without regard to your financial need." Whether or not Columbia considers each application without regard to the student's financial need, this notion of need-blindness is not consistent with the statutory definition that prohibits Columbia (so long as it participates in the 568 Cartel) from considering either financial need or financial wealth. Columbia's redefinition of "need-blind" is not consistent with the statute. A university's promise to disregard financial need is meaningless if the institution privileges wealth.

**Answer to Paragraph 205:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 205 concerning universities other than Notre Dame and, on that basis, denies them. The allegations of Paragraph 205 are otherwise denied, except as to the legal conclusions stated therein, to which no response is required.

206. Other Defendants that have not followed a need-blind admissions policy have also engaged in definitional contortions. Dartmouth's website, for example, has contained and continues to contain a glossary of admissions-related terms. As redefined by Dartmouth, an admissions decision is "need-blind" so long as it is not made with "knowledge of an applicant's financial need." If Dartmouth does make admissions decisions without knowledge of an applicant's financial need, this is nevertheless insufficient for compliance with Section 568, which requires that *all* students be admitted without regard to the financial circumstances of the students or their families. Under Section 568, Dartmouth is not allowed to make admissions decisions with knowledge and on the basis that, an applicant has financial need, or does not have financial need, or is rich, or any other financial circumstance.

**Answer to Paragraph 206:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 206 concerning universities other than Notre Dame and, on that basis, denies them. The allegations of Paragraph 206 are otherwise denied, except as to the legal conclusions stated therein, to which no response is required.

207. Duke's website has also employed and continues to employ its own definitions,

claiming that its "admissions policy is 'need-blind,' which means that applicants are accepted based on their merit, regardless of their ability to pay for college." Duke's redefinition does not mention whether *all* students "are accepted based on their merit, regardless of" their ability to donate money to Duke. In reality, not all students are admitted to Duke based on merit.

**Answer to Paragraph 207:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 207 concerning universities other than Notre Dame and, on that basis, denies them. The allegations of Paragraph 207 are otherwise denied, except as to the legal conclusions stated therein, to which no response is required.

208. MIT's website also has provided and continues to provide a glossary of admissions-related terms. As redefined by MIT, "need-blind" means that "[p]rospective students are not disadvantaged in the undergraduate admissions process because of their financial need." MIT's redefinition is contrary to the statutory meaning of "need-blind basis" and constitutes an admission that MIT considers the financial circumstances of certain applicants.

**Answer to Paragraph 208:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 208 concerning universities other than Notre Dame and, on that basis, denies them. The allegations of Paragraph 208 are otherwise denied, except as to the legal conclusions stated therein, to which no response is required.

209. Northwestern's website has claimed and continues to claim that it "has a need-blind admissions policy for U.S. citizens and permanent residents; this means that financial aid is not a factor in determining admission. Applicants are encouraged to apply for financial aid." Northwestern's redefinition of "need-blind basis" is also contrary to the statutory definition and constitutes a further admission that Northwestern fails to conduct admissions without regard to the financial circumstances of all applicants and their families.

**Answer to Paragraph 209:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 209 concerning universities other than Notre Dame and, on that basis, denies them. The allegations of Paragraph 209 are otherwise denied, except as to the legal conclusions stated therein, to which no response is required.

210. Penn's website has claimed and continues to claim another misleading definition of "need-blind": "Our need-blind policy means that your ability to pay is not considered in your admission decision." This is misleading because under Section 568, exempt institutions are prohibited from considering the financial circumstances of any applicant or any applicant's family, not just an applicant's "ability to pay."

**Answer to Paragraph 210:**  Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 210 concerning universities other than Notre Dame and, on that basis, denies them.  The allegations of Paragraph 210 are otherwise denied, except as to the legal conclusions stated therein, to which no response is required.

211.    The foregoing redefinitions of "need-blind" for purposes of Section 568 obfuscate that Defendants fail to follow need-blind admissions policies and have made admissions decisions with regard to the financial circumstances of all applicants and their families.

**Answer to Paragraph 211:**  The allegations of Paragraph 211 are denied.

212.    The website for the 568 Cartel contained the form of a certificate of compliance whereby a member of the Cartel can certify that "its admission and financial aid practices currently comply with the rules of Section 568 regarding 'need-blind admission practices.'" Publicly posting this form of certification misleads any reasonably diligent person who inquires into whether members of the 568 Cartel are need-blind.

**Answer to Paragraph 212:**  Notre Dame denies that the 568 Presidents Group was a "cartel."  Notre Dame admits that the website for the 568 Presidents Group included the form of the certificate of compliance, through which a member of the 568 Presidents Group certified that "its admission and financial aid practices currently comply with the rules of Section 568 regarding 'need-blind admission practices,'" and that in reliance on the certifications of other 568 Presidents Group members, Notre Dame at all times reasonably believed that the admission practices of all participating members of the 568 Presidents Group were compliant with the rules of Section 568 regarding need-blind admissions.  The allegations of Paragraph 212 are otherwise denied.

213.    The website for the 568 Cartel stated: "This site serves as a resource both for the 568 Presidents Group member institutions wanting to keep up to date on the Group's activities, *as well as for visitors seeking to learn more about the Group*." (Emphasis added.) The 568 Cartel thus continues inaccurately to advertise on its website that all Cartel members are "need-blind" within the meaning of Section 568.

**Answer to Paragraph 213:**  Notre Dame denies that the 568 Presidents Group was a "cartel."  Notre Dame admits that the website for the 568 Presidents Group contained the language quoted, but denies any implication suggested by the emphasis added by Plaintiffs.  Notre Dame is not

asserting the 568 Exemption as a defense in this litigation. The allegations of Paragraph 213 are otherwise denied.

214. The 568 Cartel has publicly asserted that its activities were carried out for altruistic purposes. The website for the 568 Cartel, for example, has stated and continues to state that the purpose of the conspiracy is to agree on a financial-aid system that is "fair" and that the Consensus Methodology was adopted after consideration of ways to "improve the financial aid system so as to better serve the needs of families in their efforts to pay for college."

**Answer to Paragraph 214:** Notre Dame denies that the 568 Presidents Group was a "cartel." Notre Dame admits that the 568 Presidents Group website stated that the Consensus Methodology is intended to "improve the financial aid system so as to better serve the needs of families in their efforts to pay for college." The allegations of Paragraph 214 are otherwise denied.

215. Such assertions are false but would be viewed as credible by a reasonably diligent person investigating the 568 Cartel's conduct. Actors sympathetic to the 568 Cartel have likewise published statements and conclusions that would have persuaded a reasonably diligent person investigating the Cartel's conduct that they had not suffered financial harm.

**Answer to Paragraph 215:** The allegations of Paragraph 215 are denied.

216. Defendants further engaged in conduct that hindered a reasonably diligent person's ability to discover the violations and injury at issue by consistently omitting, in public statements purporting to describe the reasons for net tuition price increases, any reference to price fixing or the use of the Consensus Methodology as bearing on increased net prices of attendance. Whether or not such statements have accurately described *some* of the reasons for net tuition price increases, these statements have not acknowledged the effects of the use of the Consensus Methodology.

**Answer to Paragraph 216:** The allegations of Paragraph 216 are denied.

217. In targeting Class Members through the institution's alumni magazine, for example, Dartmouth claimed in 2015 that rising tuition prices could be explained because "[j]ust as lattes cost more these days, so do markers and whiteboards and keeping the lights on. Healthcare costs and salaries are rising too—and hiring at the College has shot up more than enrollment."[86] The feature article also listed "[l]ess sizeable but still significant drivers of cost including compliance with a range of government regulations imposed to address issues such as crime, gender equity and accessibility, which have totaled millions of dollars." The article quoted Dartmouth's current President, Phil Hanlon, as saying that these factors, although supposedly "not as much as financial aid" have "'been a driver for the last eight to 10 years.'"[87]

**Answer to Paragraph 217:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 217 and, on that basis, denies them.

218.　　A Georgetown spokesperson explained away the institution's substantial tuition increases by suggesting that "the growing cost 'reflects the reality that many of our operating expenses continue to increase at rates higher than inflation.'"[88]

**Answer to Paragraph 218:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 218 and, on that basis, denies them.

219.　　In 2008, an MIT news release incorrectly claimed: "During the past decade, the net tuition for undergraduates—what students and families pay after financial aid—has, on average, dropped by more than 15 percent when adjusted for inflation."[89] Such statements suggest to a reasonable person that MIT had lowered net prices of attendance over time. If MIT's statement were true, moreover, the net price of attendance would have "dropped" even more if MIT had not participated in the 568 Cartel.

**Answer to Paragraph 219:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 219 and, on that basis, denies them.

220.　　In 2009, John Affleck-Graves, then an Executive Vice President at Notre Dame, identified only food costs when asked to explain the institution's 4.4 percent increase in tuition: "We are aware of the pressure families are under, and we wanted to be as conservative as we could be, . . . the difficultly for us this year is that we have seen an increase in a lot of our costs, like food. . . . And then we are faced with a difficult choice because we don't want to decrease the opportunities we provide for the students, like study abroad and research opportunities."[90]

**Answer to Paragraph 220:** Notre Dame admits that John Affleck-Graves was an Executive Vice President at Notre Dame. The remainder of Paragraph 220 and its footnote purport to quote from an article, the content of which speaks for itself. The allegations of Paragraph 220 are otherwise denied.

221.　　In 2017, Amy Gutmann, President of Penn, told *The Daily Pennsylvanian* that "as tuition goes up financial aid goes up even more."[91] If this statement is true, it is also true that but for Penn's participation in the 568 Cartel, financial aid would have gone up even more—and that President Gutmann did not speak to that fact.

**Answer to Paragraph 221:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 221 and, on that basis, denies them.

222. In reality, the 568 Cartel was never composed solely of "need-blind schools" as that term is defined by the statute. The 568 Cartel members made innumerable inaccurate public claims that had the effect of misleading a reasonably diligent person investigating whether the Cartel's conduct gave rise to a cause of action.

**Answer to Paragraph 222:** The allegations of Paragraph 222 are denied.

## IX.

## CLASS ACTION ALLEGATIONS

223. The proposed Class, under Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), comprises all U.S. citizens or permanent residents who have (a) enrolled in one or more of Defendants' full-time undergraduate programs, (b) received need-based financial aid from one or more Defendants, (c) directly purchased from one or more Defendants education, room, or board not fully covered by such financial aid, and (d) first enrolled in one of Defendants' full-time undergraduate programs as follows:
- Chicago, Columbia, Cornell, Duke, Georgetown, MIT, Northwestern, Notre Dame, Penn, Rice, Vanderbilt, Yale—from 2003 through the present.
- Brown, Dartmouth, Emory—from 2004 through the present.
- CalTech—from 2019 through the present.
- Johns Hopkins—from 2021 to the present.

**Answer to Paragraph 223:** Notre Dame denies that this action meets the prerequisites for a class action under Federal Rule of Civil Procedure 23. The allegations of Paragraph 223 are denied, except as to the legal conclusions stated therein, to which no response is required.

224. The Class excludes purchasers of education, room, and board the full cost of which was covered with institutional aid provided by such Defendant(s). Class Members also exclude Defendants and their officers, directors, management, employees, subsidiaries, or affiliates; and the Judge presiding over this action, his or her law clerks, spouse, and any person within the third degree of relationship living in the Judge's household and the spouse of such a person.

**Answer to Paragraph 224:** Notre Dame denies that this action meets the prerequisites for a class action under Federal Rule of Civil Procedure 23. The allegations of Paragraph 224 are denied, except as to the legal conclusions stated therein, to which no response is required.

225. Plaintiffs reserve the right to amend the Class definition, including with respect to the relevant time periods of membership in the 568 Cartel, based on discovery in this action.

**Answer to Paragraph 225:** Notre Dame denies that this action meets the prerequisites for a class action under Federal Rule of Civil Procedure 23. The allegations of Paragraph 225 are denied, except as to the legal conclusions stated therein, to which no response is required.

226. The Class Members are readily ascertainable and identifiable because records of the relevant transactions should exist, because the Class Members' identities are known to defendants, and because the members may be notified of the pendency of this action by forms of notice customarily used in class actions.

**Answer to Paragraph 226:** Notre Dame denies that this action meets the prerequisites for a class action under Federal Rule of Civil Procedure 23. The allegations of Paragraph 226 are denied, except as to the legal conclusions stated therein, to which no response is required.

227. The Class Members are so numerous that joinder of all of them is impracticable; the number is unknown to Plaintiffs but, on information and belief, is over 200,000.

**Answer to Paragraph 227:** Notre Dame denies that this action meets the prerequisites for a class action under Federal Rule of Civil Procedure 23. The allegations of Paragraph 227 are denied, except as to the legal conclusions stated therein, to which no response is required.

228. There are questions of law and fact common to the Class Members, including, but not limited to, the following:
   a. The scope and operation of the 568 Exemption;

    b.      Whether Defendants' admissions practices fall under the 568 Exemption;
    c.      Whether Defendants conspired as alleged herein;
    d.      Whether the conspiracy harmed competition as alleged herein;
    e.      Whether the conspiracy caused antitrust injury as alleged herein;
    f.      The appropriate Class-wide measure of damages; and
    g.      The common method for determining the damages of Class Members.

**Answer to Paragraph 228:** Notre Dame denies that this action meets the prerequisites for a class action under Federal Rule of Civil Procedure 23. The allegations of Paragraph 228 are denied, except as to the legal conclusions stated therein, to which no response is required.

229. All or substantially all Class Members were injured by Defendants' unlawful conduct. A common formula exists that allows for determination of damages of individual Class Members and for excluding from recovery any individuals who may not have been damaged.

**Answer to Paragraph 229:** Notre Dame denies that this action meets the prerequisites for a class action under Federal Rule of Civil Procedure 23. The allegations of Paragraph 229 are denied, except as to the legal conclusions stated therein, to which no response is required.

230. Plaintiffs' claims are typical of the claims of the Class Members. Plaintiffs and the other Class Members were damaged by the same common course of conduct by Defendants.

**Answer to Paragraph 230:** Notre Dame denies that this action meets the prerequisites for a class action under Federal Rule of Civil Procedure 23. The allegations of Paragraph 230 are denied, except as to the legal conclusions stated therein, to which no response is required.

231. Plaintiffs will fairly and adequately protect the interests of the Class Members. Plaintiffs' interests are aligned with, and not adverse to, those of the other Class Members.

**Answer to Paragraph 231:** Notre Dame denies that this action meets the prerequisites for a class action under Federal Rule of Civil Procedure 23. The allegations of

Paragraph 231 are denied, except as to the legal conclusions stated therein, to which no response is required.

232.    Plaintiffs will continue to fully and adequately protect the interests of the Class Members. Plaintiffs have retained counsel competent and experienced in the prosecution of antitrust class action litigation, and with the necessary financial resources, to represent themselves and the other Class Members.

**Answer to Paragraph 232:**  Notre Dame denies that this action meets the prerequisites for a class action under Federal Rule of Civil Procedure 23.  The allegations of Paragraph 232 are denied, except as to the legal conclusions stated therein, to which no response is required.

233.    Questions of law or fact that are common to the Class Members predominate over any questions affecting only individual Class Members.

**Answer to Paragraph 233:**  Notre Dame denies that this action meets the prerequisites for a class action under Federal Rule of Civil Procedure 23.  The allegations of Paragraph 233 are denied, except as to the legal conclusions stated therein, to which no response is required.

234.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The prosecution of separate actions by individual Class Members would impose heavy burdens on the Court and Defendants and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. In contrast, a class action would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results. Absent a class action, it would not be feasible for the vast majority of the Class Members to seek redress for the violations of law alleged herein.

**Answer to Paragraph 234:**  Notre Dame denies that this action meets the prerequisites for a class action under Federal Rule of Civil Procedure 23.  The allegations of Paragraph 234 are denied, except as to the legal conclusions stated therein, to which no response is required.

235.    Defendants have acted on grounds that apply generally to the Class, so that, in

addition to damages, including to the extent their conspiracy continues, final injunctive relief is appropriate respecting the Class as a whole. Indeed, such injunctive relief is appropriate with respect to Defendants who claim to be former members of the 568 Cartel in that no Defendant has disavowed and repudiated the conspiracy.

**Answer to Paragraph 235:** Notre Dame denies that this action meets the prerequisites for a class action under Federal Rule of Civil Procedure 23. The allegations of Paragraph 235 are denied, except as to the legal conclusions stated therein, to which no response is required.

# X.

## ANTITRUST INJURY AND ANTICOMPETITIVE EFFECTS

236. Plaintiffs and the other Class Members have suffered antitrust injury due to Defendants' illegal conduct. They have suffered injury of the type that the antitrust laws were intended to prevent and that flows from that which makes Defendants' acts unlawful.

**Answer to Paragraph 236:** The allegations of Paragraph 236 are denied, except as to the legal conclusions stated therein, to which no response is required.

237. Defendants have conspired to reduce or eliminate price competition among the 568 Cartel members on provision of financial-aid packages to Class Members, thereby depriving Plaintiffs and the other Class Members of a competitive marketplace.

**Answer to Paragraph 237:** The allegations of Paragraph 237 are denied, except as to the legal conclusions stated therein, to which no response is required.

238. As a result of Defendants' conspiracy to share information and fix prices, Plaintiffs and the other Class Members were injured in the form of receiving artificially suppressed financial aid and paying artificially inflated net prices of attendance.

**Answer to Paragraph 238:** The allegations of Paragraph 238 are denied, except as to the legal conclusions stated therein, to which no response is required.

239. Plaintiffs and the other Class Members are naturally motivated to enforce the antitrust laws because they paid artificially inflated prices. There are no other persons who were more directly injured from, or more motivated to seek redress for, Defendants' misconduct than Plaintiffs and the other Class Members.

**Answer to Paragraph 239:** The allegations of Paragraph 239 are denied, except as to the legal conclusions stated therein, to which no response is required.

240. Absent Defendants' conspiracy, Defendants would have competed more aggressively to attract Plaintiffs and the other Class Members to their undergraduate programs, by offering all Class Members more generous financial aid and charging lower net prices of attendance than under Defendants' conspiracy.

**Answer to Paragraph 240:** The allegations of Paragraph 240 are denied, except as to the legal conclusions stated therein, to which no response is required.

241. If Defendants had competed, or competed more aggressively, with respect to financial aid, Plaintiffs and all of the other Class Members would have received more money in financial aid and paid lower net prices of attendance, as opposed to the artificially inflated net prices that Plaintiffs and the other Class Members paid due to Defendants' conspiracy. Defendants' conspiracy also had the effect of imposing a greater debt burden on students and their families.

**Answer to Paragraph 241:** The allegations of Paragraph 241 are denied, except as to the legal conclusions stated therein, to which no response is required.

242. Defendants' conspiracy is an illegal horizontal agreement to fix prices and to share confidential data, methods, and information related to admissions, financial aid, and methods of determining financial aid. Defendants' alleged misconduct directly and proximately caused antitrust injury to Plaintiffs and the other Class Members, who received less money in financial aid, and paid higher net prices of attendance, than they would have if Defendants had competed, or competed more aggressively, rather than conspired to fix prices.

**Answer to Paragraph 242:** The allegations of Paragraph 242 are denied, except as to the legal conclusions stated therein, to which no response is required.

# XI.

## THE RELEVANT MARKET

243. Defendants' conduct is *per se* anticompetitive, obviating any market definition, including based on the direct evidence of anticompetitive effects. Defendants' conduct is also, and in the alternative, illegal under the rule of reason and "quick look" modes of analyses.

**Answer to Paragraph 243:** The allegations of Paragraph 243 are denied, except as to the legal conclusions stated therein, to which no response is required.

244.     Plaintiffs thus further allege a relevant market, for undergraduate education at private national universities with an average ranking of 25 or higher in the *U.S. News & World Report* rankings from 2003 through 2021 (the most recent year in which Class Members applied to any of Defendants). This is the Market for Elite, Private Universities.

**Answer to Paragraph 244:** The allegations of Paragraph 244 are denied, except as to the legal conclusions stated therein, to which no response is required.

245.     This market does not include liberal arts colleges, which offer distinct products and are generally more like each other than elite, private universities. Reflecting industry recognition of these discrete classifications, both *U.S. News & World Report* and the *Carnegie Classifications* classify national universities and liberal arts colleges separately, given that liberal arts colleges are generally regarded as having different characteristics and services, including a smaller student body, smaller and less competitive athletic programs, fewer graduate programs, and less emphasis on research. In contrast, private, national universities tout themselves as offering such distinct services that the liberal arts colleges do not.

**Answer to Paragraph 245:** Notre Dame denies that it is proper to exclude liberal arts colleges from the relevant market. The allegations of Paragraph 245 are otherwise denied, except as to the legal conclusions stated therein, to which no response is required.

246.     The Market for Elite, Private Universities has a rational relation to the interchangeability of use or cross-elasticity of demand with respect to the universities in the market. That is, within this market, sufficient cross-elasticity of demand exists such that a sufficient number of admitted students to two or more of these universities would respond to a small but significant increase in the net price by one university in the market by choosing to attend a lower-priced university in the same market that would make the price increase unremunerative.

**Answer to Paragraph 246:** The allegations of Paragraph 246 are denied, except as to the legal conclusions stated therein, to which no response is required.

247.     The Market for Elite, Private Universities also has a rational relation to the cross-elasticity of demand with respect to elite, private liberal arts colleges and public universities. That is, the cross-elasticity between elite, private universities and elite liberal arts colleges and public universities in the United States is low, such that a hypothetical monopolist in the Market for Elite, Private Universities could impose a small but significant non-transitory increase in price ("SSNIP") without losing so many students to elite liberal arts colleges or public universities as to render the SSNIP unremunerative.

**Answer to Paragraph 247:** The allegations of Paragraph 247 are denied, except as to the legal conclusions stated therein, to which no response is required.

248. Admission to elite, private liberal arts colleges is generally less selective than admission to elite, private, national universities. According to *U.S. News & World Report*, the average admission rate of the top 10 national universities is approximately 7%, whereas the average admission rate of the top 10 liberal arts colleges is approximately 14%.

**Answer to Paragraph 248:** Paragraph 248 cites to *U.S. News & World Report*, the content of which speaks for itself and to which no response is required. The allegations of Paragraph 248 are otherwise denied, except as to the legal conclusions stated therein, to which no response is required.

249. A further factor differentiating private universities and liberal arts colleges is the yield rate—that is, the rate at which admissions offers are accepted. Among the private universities ranked in the top 25 by *U.S. News & World Report*, there is a strong correlation between the institution's rank and yield rate. Among the liberal arts colleges, this correlation is much weaker (if it exists at all). The yield rate of both Harvard and Stanford, for example, is usually greater than 80%, whereas the yield rate for the most highly rated private liberal arts colleges—Williams, Amherst, and Swarthmore—is usually approximately 40%.

**Answer to Paragraph 249:** Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 249 and, on that basis, denies them, except as to the legal conclusions stated therein, to which no response is required.

250. The Market for Elite, Private Universities does not include public universities. A handful of public universities have national rankings and selectivity comparable to that of the elite, private universities. Competition between public universities and elite, private institutions, however, is limited in the national market for students seeking financial aid, including the Class Members. The University of California-Los Angeles ("UCLA") and the University of California-Berkeley ("UC Berkeley"), for example, do not provide need-based financial assistance to out-of-state applicants. The University of Michigan-Ann Arbor ("Michigan") has an official policy of prioritizing financial aid for residents. The University of Virginia ("UVA") is required by law to matriculate at least two-thirds of its undergraduate student body from its pool of in-state applicants. Public, national universities generally charge a high average net price to out-of-state students to cross-subsidize in-state students, a pricing policy that is driven by laws and political pressure that private institutions do not face.

**Answer to Paragraph 250:** Notre Dame denies that it is proper to exclude public universities from the relevant market. Notre Dame otherwise lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 250 and, on that basis, denies them, except as to the legal conclusions stated therein, to which no response is required.

251. Defendants themselves have long acknowledged the important distinctions between private and public universities, and that the elite, private universities compete within a distinct market. In its 2001 University Plan, for example, Duke stated:

> Private research universities occupy a special place in the diverse world of American higher education because of their distinctive missions, organization, governance, and funding. They are deliberately intermediate in scope and scale between the small private colleges and the large public universities. As a group, they attract a disproportionate number of the best faculty, are highly selective in their admissions policies, create a residential educational experience that promotes interaction with the faculty and student learning outside the classroom, and provide much of the nation's leadership in research and scholarship. They are resource- intensive places, typically combining large endowments, strong philanthropic support, and external research funding with high tuition. These resources are powerfully additive in supporting the teaching and research missions of these institutions and their commitment to national and international leadership.

> In our consideration of the broader context in which Duke functions, it is important to discuss the dynamics of our market within American higher education. The leading private research universities have much in common, offering similar degree programs and pursing similar lines of research, yet the rivalry among them is often intense. Each institution is pursuing excellence and the public recognition that comes with it—on its own terms, seeking to create the deepest, richest, and most diverse environment possible for teaching, learning, and research and for the preparation of new leaders for our society. The leading universities compete with each other for the human and financial capital they need to excel in their broadly overlapping missions.[92]

**Answer to Paragraph 251:**  Paragraph 251 cites to Duke's University Plan, which speaks for itself.  The allegations of Paragraph 251 are otherwise denied, except as to the legal conclusions stated therein, to which no response is required.

252.     Indeed, public universities and private universities make pricing decisions based on very different factors, with public institutions being subject to political pressures, state laws, and dependence on expropriations from state treasuries. Compared to elite, private universities, public universities such as UCLA, UC Berkeley, UVA, and Michigan have different pricing models and largely compete for different students.

**Answer to Paragraph 252:**  Notre Dame lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 252 concerning the policies and practices of universities other than Notre Dame and, on that basis, denies them.  The allegations of Paragraph 252 are otherwise denied, except as to the legal conclusions stated therein, to which no response is required.

253.     The schools in the Market for Elite, Private Universities compete with each other and have done so since 2003. Defendants are tightly packed in their average *U.S. News & World Report* rankings over the last 19 years (3.1, 5.1, 5.9, 6.4, 7.3, 8.0, 8.0, 10.7, 11.5, 12.5, 14.8, 14.8, 16.7, 16.7, 18.1, 19.7, and 22.3).

**Answer to Paragraph 253:**  The allegations of Paragraph 253 are denied, except as to the legal conclusions stated therein, to which no response is required.

254.     Defendants themselves have acknowledged that they compete within the Market for Elite, Private Universities. Morton Schapiro, the President of Northwestern, a trained economist, and a spokesperson for the 568 Cartel since at least 2001, acknowledged this market when he stated in 2018—carefully distinguishing between universities and colleges—that "continuous efforts," including a push for more federal funding, "can accelerate improvement" and "allow NU to remain competitive against top COFHE universities." COFHE stands for the Consortium on Financing Higher Education, a trade and lobbying group that describes itself as a "voluntary, institutionally-supported organization of thirty-five highly selective, private liberal arts colleges and universities."[93] Accordingly, by President Schapiro's own admission, Northwestern views itself as competing with the universities in that group, which is 90% identical with the market as Plaintiffs define it. (The COFHE universities consist of the U.S. News top 25, minus Carnegie Mellon, plus the University of Rochester.)

**Answer to Paragraph 254:** Notre Dame denies that COFHE's membership is as described in Paragraph 254. Notre Dame is not a member of COFHE and therefore lacks knowledge or information sufficient to form a belief about the truth of allegations concerning it. Notre Dame lacks knowledge or information sufficient to form a belief about the truth of allegations concerning what Morton Shapiro has or has not stated, or about the views of universities other than Notre Dame, and denies them on that basis. Notre Dame denies that it has acknowledged that it competes within the market Plaintiffs describe. The allegations of Paragraph 254 are otherwise denied, except as to the legal conclusions stated therein, to which no response is required.

255. Defendants have considerable market power, which they have exercised to increase the net price of attendance and to injure Plaintiffs and the other Class Members through the conduct alleged herein. Since 2003, Defendants have controlled between 61% and 78% of the number of undergraduate slots in the Market for Elite, Private Universities. Within the following relevant time periods, as set forth above, the percentage of undergraduate slots that the participants in the conspiracy have controlled within this market are approximately as follows:

- As of 2003: 61%
- As of 2004: 73%
- As of 2019: 73%
- As of 2022: 78%

**Answer to Paragraph 255:** The allegations of Paragraph 255 are denied, except as to the legal conclusions stated therein, to which no response is required.

256. Competition in the Market for Elite, Private Universities is constrained by extremely strong brand preferences among consumers and high barriers to entry. Competition is further constrained by the fact that such institutions limit the supply of available seats, which has the effect of generating scarcity and enhancing their prestige. Competition in the Market for Elite, Private Universities is further constrained by the fact that applicants cannot readily substitute one institution for another because an applicant's choice is limited to those universities to which he or she is admitted in a highly selective process.

**Answer to Paragraph 256:** The allegations of Paragraph 256 are denied, except as to the legal conclusions stated therein, to which no response is required.

257.     The 568 Cartel does not have any pro-competitive impacts. Accordingly, if the rule of reason were to apply, it is not necessary for Plaintiffs to demonstrate reasonable and less restrictive alternatives are available. Unlike the Overlap Group, the 568 Cartel does not agree to allocate aid solely based on demonstrated financial need. Indeed, unlike the Overlap Group, several members of the 568 Cartel offer athletic scholarships and compete to have nationally ranked athletic teams every year.

**Answer to Paragraph 257:** The allegations of Paragraph 257 are denied, except as to the legal conclusions stated therein, to which no response is required.

258.     Defendants have substantial endowments and the proven capacity to earn rates of return on them that well exceed the minimum 5% distribution requirement of the tax laws. *See* Appendix A. Defendants thus have ample resources to meet the financial needs of their students without reducing their endowments (if that were even imperative) and without colluding on a formula that results in artificially reduced financial aid and that would in fact provide substantially more financial aid, and result in lower net prices of attendance, than through the 568 Cartel.

**Answer to Paragraph 258:** The allegations of Paragraph 258 are denied, except as to the legal conclusions stated therein, to which no response is required.

259.     In addition, since the time of the Overlap Group, important facts relevant to application of any modes of legal analysis that may apply have changed in critical ways. As to the schools for which such information is publicly available, the growth of Defendants' endowments has exceeded the growth of their annual operating expenses. From 1994 to 2021, for instance, Dartmouth's endowment increased by approximately 879%, whereas its annual operating expenses increased by approximately 184%. *See* Appendix A. This is a ratio of approximately 4.8 to 1. The ratios are approximately 8.1 to 1 at Georgetown; 1.9 to 1 at Penn; 1.7 to 1 at Rice; and 3.1 to 1 at Yale. *See id*.

**Answer to Paragraph 259:** The allegations of Paragraph 259 are denied, except as to the legal conclusions stated therein, to which no response is required.

260.     These facts underscore that Defendants' endowments have been and continue to be an increasingly ample financial resource for the schools to use to meet the financial needs of their students. These facts also illustrate that, regardless of their status as not-for-profit institutions, Defendants have generated or have the ability to generate revenue that well exceeds expenses on an annual basis, and thus would have been financially able to devote more resources for financial aid if that had competed rather than colluded on their financial aid formulae.

**Answer to Paragraph 260:** The allegations of Paragraph 260 are denied, except as to the legal conclusions stated therein, to which no response is required.

261. In addition, a reasonable and less restrictive alternative is for each member of the 568 Cartel to implement a fair financial-aid formula unilaterally, as other elite, private universities have done, without entering into a conspiracy that overcharges students. In addition, no pro- competitive impact that Defendants may proffer justifies the significant overcharge caused by the conspiracy. If even relevant to any analysis under the rule of reason, moreover, there is no legitimate or significant procompetitive justification in Defendants' non-compliance with the 568 Exemption or in combining such non-compliance with the collective application of the Consensus Methodology, and other acts in furtherance of the conspiracy as alleged herein, to artificially reduce financial aid.

**Answer to Paragraph 261:** The allegations of Paragraph 261 are denied, except as to the legal conclusions stated therein, to which no response is required.

262. Colluding, agreeing on, and collectively imposing a common aid methodology as part of the 568 Cartel are not reasonably necessary to achieve the objective of awarding financial aid to admitted students. Nor is the sharing of confidential admission and financial-aid data and information, particularly as to the methodologies for awarding financial aid, reasonably necessary for the individual schools to achieve the objective of awarding financial aid to admitted students. Instead, there are substantially less restrictive alternatives for helping to fund need-based financial aid for admitted students—including, as noted, using a portion of the annual investment gains on Defendants' endowments.

**Answer to Paragraph 262:** The allegations of Paragraph 262 are denied, except as to the legal conclusions stated therein, to which no response is required.

263. In short, Defendants' illegal conduct has significantly injured more than 200,000 Class Members by artificially reducing the financial aid they were offered and received.

**Answer to Paragraph 263:** The allegations of Paragraph 263 are denied, except as to the legal conclusions stated therein, to which no response is required.

## XII.

## CLAIM FOR RELIEF

## FIRST CAUSE OF ACTION
### Sherman Act Section 1

264. Plaintiffs incorporate the preceding paragraphs.

**Answer to Paragraph 264:** Notre Dame incorporates its answers to the foregoing paragraphs as if fully set forth herein.

265.     At a time currently unknown to Plaintiffs, but at least as early as 2003, and continuing through the present to an extent to be determined in discovery, Defendants entered into a continuing agreement, understanding, and conspiracy in restraint of trade artificially to fix, raise, and stabilize and reduce the amount of financial aid paid to Class Members, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**Answer to Paragraph 265:**  The allegations of Paragraph 265 are legal conclusions not subject to admission or denial.  To the extent an answer is required, Notre Dame denies the allegations in Paragraph 265.

266.     In formulating and carrying out their conspiracy, Defendants have done those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others: Using an agreed upon formula or method for fixing, lowering, and stabilizing the amount of financial aid they offered and fixing, increasing, and stabilizing the net price of attendance; and sharing confidential, private data and information related to admissions and financial aid, including the methodologies to be used in awarding financial aid.

**Answer to Paragraph 266:**  The allegations of Paragraph 266 are legal conclusions not subject to admission or denial.  To the extent an answer is required, Notre Dame denies the allegations in Paragraph 266.

267.     The 568 Cartel has monitored and enforced its conspiracy in several ways, according to the Cartel's website, including (but not limited to) such steps as (a) requiring each participation institution to submit a "Certificate of Compliance," (b) requiring university professionals at each institution to receive "training . . . in the application of the Methodology," (c) imposing a "common calendar for the collection of data from families," (d) agreeing to share information and analyses relating to financial aid and formulae for provision of financial aid, and (e) conducting an annual or biannual meeting every year since at least 2007.

**Answer to Paragraph 267:**  Notre Dame denies that the 568 Presidents Group was a "cartel."  Notre Dame admits that members of the 568 Presidents Group certified that their admission and financial aid practices complied with the rules of Section 568 regarding need-blind admission practices, and that in reliance on the certifications of other 568 Presidents Group members, Notre Dame at all times reasonably believed that the admission practices of all participating members of the 568 Presidents Group were compliant with the rules of Section 568

regarding need-blind admissions. The remaining allegations of Paragraph 267 are legal conclusions not subject to admission or denial. To the extent an answer is required, Notre Dame denies the allegations in Paragraph 267.

268. This conspiracy has had the following effects, among others: The net price of attendance has been fixed, increased, maintained, and stabilized at artificially high, non-competitive levels for all Class Members.

**Answer to Paragraph 268:** The allegations of Paragraph 268 are legal conclusions not subject to admission or denial. To the extent an answer is required, Notre Dame denies the allegations in Paragraph 268.

269. Plaintiffs and the other Class Members have been injured and will continue to be injured in their businesses and property by paying more for attendance at Defendants than they would have paid and will pay but for the combination and conspiracy.

**Answer to Paragraph 269:** The allegations of Paragraph 269 are denied.

270. Defendants are not entitled to the affirmative defense that they are exempt from the antitrust laws, because they did not satisfy the requirement that all students are admitted on a need-blind basis, for the reasons set forth above and because, to the extent the conspiracy continues, the 568 Exemption no longer exists.

**Answer to Paragraph 270:** The allegations of Paragraph 270 are legal conclusions not subject to admission or denial. To the extent an answer is required, Notre Dame denies the allegations in Paragraph 270.

271. Defendants' conspiracy is a *per se* violation of the Sherman Act; or, in the alternative, is a violation of the Sherman Act under the Rule of Reason or "quick look" analysis.

**Answer to Paragraph 271:** The allegations of Paragraph 271 are legal conclusions not subject to admission or denial. To the extent an answer is required, Notre Dame denies the allegations in Paragraph 271.

272. Defendants' conduct has directly and proximately caused antitrust injury to Plaintiffs and the other Class Members. The artificially inflated net price of attendance that Plaintiffs and the other Class Members have paid to Defendants flows directly from Defendants' price fixing and is the type of damage that the antitrust laws were designed to prevent.

**Answer to Paragraph 272:** The allegations of Paragraph 272 are legal conclusions not subject to admission or denial. To the extent an answer is required, Notre Dame denies the allegations in Paragraph 272.

273. Plaintiffs and the other Class Members are entitled to treble damages and an injunction against Defendants, preventing and restraining the violations alleged herein.

**Answer to Paragraph 273:** The allegations of Paragraph 273 are legal conclusions not subject to admission or denial. To the extent an answer is required, Notre Dame denies the allegations in Paragraph 273.

## REQUESTED RELIEF

**ANSWER:** Notre Dame admits that Plaintiffs seek certain relief, but denies that Plaintiffs are entitled to judgment or to any other relief.

## AFFIRMATIVE DEFENSES

Notre Dame affirmatively states that Plaintiffs are not entitled to the relief sought in the Amended Complaint. Notre Dame further asserts the following affirmative defenses, without conceding that it bears the burden of production or persuasion as to any of them.

## FIRST AFFIRMATIVE DEFENSE
### Procompetitive Benefits

Any alleged anticompetitive effects of the alleged agreement are outweighed by the significant procompetitive benefits of the 568 Presidents Group's collaboration. Jointly establishing recommended best practices for measuring need improves the accuracy of determinations of students' ability to pay and promotes a more efficient allocation of aid—thereby decreasing the price paid by some students and increasing the quality of financial aid awards. Such collaboration also broadens the pool of applicants who can afford to attend institutions of higher

education and improves the socioeconomic diversity of the class of admitted students, thereby increasing consumer access and choice as well as the quality of education and educational experience provided. The U.S. Government Accountability Office has found that the Consensus Methodology did not cause a net increase in the amount students were expected to pay and resulted in higher amounts of need-based aid awarded to some categories of students.

**SECOND AFFIRMATIVE DEFENSE**
**Statute of Limitations**

The claims of at least seven of the Plaintiffs—Andrew Corzo, Sia Henry, Michael Maerlender, Brandon Piyevsky, Benjamin Shumate, Brittany Tatiana Weaver, and Cameron Williams—are barred by the applicable four-year statute of limitations. *See* 15 U.S.C. § 15b. Plaintiffs filed their original complaint alleging that Defendants violated Section 1 of the Sherman Act on January 9, 2022. The claims of Corzo, Henry, Maerlender, Piyevsky, Shumate, Weaver, and Williams accrued, if at all, before January 9, 2018.

Plaintiffs allege they were injured by "receiving artificially suppressed financial aid and paying artificially inflated net prices of attendance." 2d Am. Compl. ¶ 238. Corzo, Henry, Maerlender, Piyevsky, Shumate, Weaver, and Williams each allegedly matriculated before January 9, 2018, and thus incurred the alleged injuries from their initial financial aid awards outside the limitations period. Subsequent financial aid awards for matriculated students were not subject to any agreement among Defendants, and any alleged effect on such awards from the initial awards was a foreseeable future harm at the time of the initial awards. Indeed, Weaver, Henry, and Piyevsky allegedly graduated before January 9, 2018, and thus could not have incurred any injuries within the limitations period. Likewise, as Corzo and Williams allegedly graduated in Spring 2018, they received their final financial aid awards before January 9, 2018 and thus could

77

not have incurred any injuries within the limitations period.

Each of these seven Plaintiffs either discovered or should have discovered with reasonable diligence their alleged injuries before January 9, 2018. The publicly available information that Plaintiffs cite in the Second Amended Complaint to support their alleged injuries was readily accessible before January 9, 2018—indeed, at least by several years and sometimes by more than a decade.

### THIRD AFFIRMATIVE DEFENSE
**Laches**

Setting aside that none of the Plaintiffs faces a sufficient threat of future injury to support equitable relief, their request for such relief is barred by laches. As set forth in the Third Affirmative Defense and incorporated by reference here, Plaintiffs either discovered or should have discovered with reasonable diligence their alleged past and future injuries long before January 9, 2018. Plaintiffs' failure to sue until January 9, 2022, has prejudiced Notre Dame because the passage of time without notice of Plaintiffs' suit—at least four years for all Plaintiffs, and more than a decade for certain Plaintiffs—has harmed Notre Dame's ability to obtain and maintain relevant evidence and otherwise prepare its defense.

### FOURTH AFFIRMATIVE DEFENSE
**Failure to Mitigate Damages**

Setting aside that Plaintiffs lack antitrust injury and standing, their claim for damages is barred, on information and belief, because of, and to the extent of, their failure to mitigate damages. For example, each Plaintiff, through the exercise of reasonable diligence, could have attended one or more schools that were not members of the 568 Presidents Group but were otherwise reasonably comparable to the Defendant school that the Plaintiff chose to attend. If Plaintiffs had attended

such schools, they might not have incurred any alleged price increase caused by the challenged conduct at the Defendant schools they chose to attend, while still receiving a reasonably comparable education.  In addition, Plaintiffs may have failed to mitigate damages by failing to exhaust all available sources of grants or other tuition relief that could have offset any alleged price increase.  Notre Dame pleads this defense on information and belief because Plaintiffs' failure to mitigate damages concerns matters peculiarly within Plaintiffs' knowledge, such as the non-Group-member schools they reasonably could have attended.

*   *   *

WHEREFORE, Notre Dame hereby requests that Plaintiffs' Second Amended Complaint be dismissed in its entirety, with prejudice; that any and all of Plaintiffs' claims for damages or other relief of any sort or nature be denied; that Notre Dame be awarded costs, disbursements, and reasonable attorney's fees to the extent allowable by law; and that Notre Dame be awarded such other and further relief as this Court may deem just and proper.

DATED:  January 25, 2023

/s/*Robert A. Van Kirk*
Robert A. Van Kirk
Jonathan Pitt
Sarah F. Kirkpatrick
Matthew D. Heins
Cole T. Wintheiser
William J. Donnelly
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, D.C. 20024
Tel: 202-434-5000
rvankirk@wc.com
jpitt@wc.com
skirkpatrick@wc.com
mheins@wc.com
cwintheiser@wc.com
wdonnelly@wc.com

James Peter Fieweger
MICHAEL BEST & FRIEDRICH LLP
444 West Lake Street
Suite 3200
Chicago, IL 60606
Tel.: 312-222-0800
jpfieweger@michaelbest.com

*Counsel for University of Notre Dame du Lac*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on January 25, 2023, I caused a true and correct copy of the foregoing Answer of Defendant University of Notre Dame du lac to be served via electronic mail upon all counsel of record in this action.

Dated:  January 25, 2023

*/s/Matthew D. Heins*
Matthew D. Heins (No. 6320767)
*Counsel for Defendant University of Notre Dame du Lac*