**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ANDREW CORZO, SIA HENRY, ALEXANDER LEO-GUERRA, MICHAEL MAERLENDER, BRANDON PIYEVSKY, BENJAMIN SHUMATE, BRITTANY TATIANA WEAVER, and CAMERON WILLIAMS, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>  v.<br><br>BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, THE JOHNS HOPKINS UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY,<br><br>    Defendants. | Case No.  1:22-cv-00125<br><br><br>Judge Matthew F. Kennelly<br><br>Magistrate Gabriel A. Fuentes<br><br>Jury Trial Demanded |

**DEFENDANT THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFFS' SECOND AMENDED AND SUPPLEMENTAL CLASS ACTION COMPLAINT**

Defendant The Trustees of the University of Pennsylvania ("Penn") answers Plaintiffs'

Second Amended and Supplemental Class Action Complaint ("Second Amended Complaint").

Unless expressly stated otherwise, Penn denies each and every allegation in the Second

Amended Complaint, including any allegations in the preamble, unnumbered and numbered

paragraphs, titles, headings, subheadings, footnotes, appendices, and characterization of

documents, and specifically denies any liability to Plaintiffs. To the extent not expressly denied, all allegations for which Penn denies possessing knowledge or information sufficient to form a belief are denied. Penn lacks knowledge or information sufficient to form a belief as to the truth of the allegations with respect to any other defendant and denies allegations as to other defendants on that basis. Penn also rejects all references in the Second Amended Complaint to the 568 Presidents Group as the "568 Cartel" and denies any suggestion or implication that the 568 Presidents Group was or is an illegal "Cartel," as described in the Second Amended Complaint.

## I.

## INTRODUCTION

1.    Defendants are private, national universities that have long been in the top 25 of the *U.S. News & World Report* rankings for such schools. These elite institutions occupy a place of privilege and importance in American society. And yet these same Defendants, by their own admission, have participated and are participating in a price-fixing cartel that is designed to reduce or eliminate financial aid as a locus of competition, and that in fact has artificially inflated the net price of attendance for students receiving financial aid.

**<u>ANSWER:</u>** Penn admits that it is a private, national university that has been ranked in the top 25 of the *U.S. News & World Report* rankings for such schools during certain years. The allegation that Penn is an "elite institution" that "occup[ies] a place of privilege and importance in American society" is an opinion not subject to admission or denial. To the extent a response is required, Penn denies that allegation. Penn also denies the remaining allegations in Paragraph 1. As to the allegations in Paragraph 1 that relate to the other Defendants, Penn lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, on that basis, denies the allegations.

2.    Defendants have participated in this cartel while claiming the protection of Section 568 of the Improving America's Schools Act of 1994 (the "568 Exemption"). This exemption from the antitrust laws, laws which otherwise prohibit conspiracies among competitors relating to price, offered antitrust immunity only to two or more institutions of higher education at which

"*all* students admitted are admitted on a need-blind basis." (Emphasis added.) Section 568 defines "on a need-blind basis" to mean "without regard to the financial circumstances of the student involved or the student's family." 15 U.S.C. § 1 note. The 568 Exemption expired at midnight on September 30, 2022.

**ANSWER:** Penn admits that Section 568 of the Improving America's Schools Act of 1994 was

a statutory exemption from the antitrust laws. Penn admits that Section 568 expired on

September 30, 2022. To the extent the allegations in Paragraph 2 are meant to draw legal

conclusions regarding how Section 568 is to be interpreted or applied, Penn denies the

allegations. Penn also denies the remaining allegations in Paragraph 2. As to the allegations in

Paragraph 2 that relate to the other Defendants, Penn lacks knowledge or information sufficient

to form a belief as to the truth of those allegations and, on that basis, denies the allegations.

3. Defendants were not entitled to the 568 Exemption. Under a legally compliant need-blind admissions system, all students must be admitted without regard to their or their families' financial circumstances. Far from adhering to this statutory requirement when the 568 Exemption existed, all Defendants have considered the financial circumstances of students or their families in deciding whether to admit students.

**ANSWER:** Penn denies the allegations in Paragraph 3.

4. Defendants have thus made admissions decisions *with regard to* the financial circumstances of students and their families, thereby disfavoring students who need financial aid. All Defendants, in turn, have conspired to reduce the amount of financial aid they provide to admitted students. This conspiracy, which has existed (with only slightly varying membership) for many years, thus falls outside any potentially applicable antitrust exemption.

**ANSWER:** Penn denies the allegations in Paragraph 4.

5. Defendants are and have been members of the so-called "568 Presidents Group," in which the members have agreed on "a set of common standards for determining the family's ability to pay for college," which the members describe as the "Consensus Approach." Based on the Consensus Approach, in approximately 2003, the 568 Presidents Group (the "568 Cartel") devised the Consensus Methodology, which is a common formula for determining an applicant's ability to pay. Under the Consensus Methodology, an applicant's ability to pay is a substantial determinant of the net price, which is the institution's gross tuition plus fees for room and board, less institutional grant aid, charged to the applicant for attendance.

**ANSWER:**  Penn admits that it was a member of the 568 Presidents Group and exited from the

Group before the expiration of Section 568.  Penn further admits that the Group developed a

Consensus Methodology.  Penn denies the remaining allegations in Paragraph 5.  As to the

allegations in Paragraph 5 that relate to the other Defendants, Penn lacks knowledge or

information sufficient to form a belief as to the truth of those allegations and, on that basis,

denies the allegations.

6.      Since its inception, the goal of the 568 Cartel has been, in the words of the Cartel members, to determine "whether it is possible to reach agreement on common standards for determining financial need at the institutional level." Defendants in fact so determined and so agreed.  Defendants have met—and may continue to meet—to devise, agree upon, and collectively implement common principles and a uniform method for analyzing, offering, and providing financial aid to admitted students.

**ANSWER:**  Penn admits that it attended meetings of the 568 Presidents Group during the time

that it was a member of the Group.  Penn denies the remaining allegations in Paragraph 6 as they

relate to Penn.  As to the allegations in Paragraph 6 that relate to the other Defendants, Penn

lacks knowledge or information sufficient to form a belief as to the truth of those allegations and,

on that basis, denies those allegations.

7.      In collectively sharing confidential data and information about admissions and financial aid, adopting this methodology, and regularly meeting to implement this methodology jointly, the 568 Cartel has intended to reduce or eliminate, and in fact succeeded in reducing or eliminating, price competition among its members.  As a result, the net price of attendance for financial-aid recipients at Defendants' schools—included among the members of the proposed Class here—has been artificially inflated.  In short, due to the conduct challenged herein, over almost two decades, Defendants have overcharged over 200,000 financial-aid recipients by billions of dollars collectively, in violation of Section 1 of the Sherman Act.

**ANSWER:**  Penn denies the allegations in Paragraph 7.

8.      This longstanding conspiracy would have been immune from the antitrust laws when the 568 Exemption existed only if all the conspirators had been complying with the Exemption.  In fact, all Defendants have been members of the 568 Cartel, and thus conspirators, and none qualified for the 568 Exemption.  Instead, all Defendants have considered the financial circumstances of students and their families in deciding whether to admit waitlisted and transfer

students; Defendants have maintained admissions systems that favor the children of wealthy past or potential future donors; at least several Defendants have given preference to wealthy applicants through the largely secretive process known as "enrollment management"; and Columbia has considered the financial circumstances of students and families in making admission decisions for its School of General Studies.

**ANSWER:**  Penn denies the allegations in Paragraph 8.

9.      In critical respects, elite, private universities like Defendants are gatekeepers to the American Dream.  Defendants' misconduct is particularly egregious because it has narrowed a critical pathway to upward mobility that admission to their institutions represents.  The burden of the 568 Cartel's overcharges falls especially on low-and middle-income families struggling to afford the cost of a university education and to achieve success for their children.  In addition, unlike prior admissions scandals, such as Varsity Blues,[1] the 568 Cartel's systematic suppression of financial aid, resulting in the artificial inflation of the net price of attendance, has been the official policy of its participants.  As Defendants have succinctly admitted, the purpose of their Cartel has been—in these specific terms—to "discuss *and agree upon* common principles of analysis for determining the financial need of undergraduate financial aid applicants."

**ANSWER:**  Penn denies the allegations in Paragraph 9.

10.     The 568 Cartel has thus caused substantial injury to Plaintiffs and the other members of the proposed Class (defined below).  Plaintiffs bring this lawsuit to prevent Defendants' conspiratorial conduct and to prevent future students from suffering the injury the ongoing conspiracy has inflicted.  Plaintiffs do so without having known until recently that they had been injured in violation of the 568 Exemption, and under circumstances in which a reasonable person would have been unaware of the harm resulting from Defendants' use of the Consensus Methodology in violation of the 568 Exemption.

**ANSWER:**     Penn denies the allegations in Paragraph 10.

11.     Plaintiffs also seek compensation for themselves and a proposed Class of all U.S. citizens or permanent residents, who have (a) enrolled in one or more of Defendants' full-time undergraduate programs, (b) received need-based financial aid from one or more Defendants, (c) directly purchased from one or more Defendants education, room, or board not fully covered by such financial aid, and (d) first enrolled in one of Defendants' full-time undergraduate programs during the relevant times (defined below) from January 1, 2003 until the effects of Defendants' continuing conduct ceases.  Members of this "Class" shall be called "Class Members."

**ANSWER:**  Penn admits that Plaintiffs purport to seek compensation for themselves and for the

alleged "Class Members."  Penn denies that Plaintiffs have established or can establish an

---

[1] "Varsity Blues" is law enforcement's code name for the investigation and prosecution of the college admissions bribery scandal, which involved allegations that certain universities gave admissions preference to the children of wealthy parents in exchange for bribes.

entitlement to any damages or the prerequisites to certification and/or maintenance of the alleged "Class" pursuant to Rule 23 of the Federal Rules of Civil Procedure, and therefore denies the allegations in Paragraph 11.

## II.

### JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. §§ 1331, 1332(d)(2), and 1337.

**ANSWER:**  The allegation in Paragraph 12 is a legal conclusion not subject to admission or denial.  To the extent an answer is required, Penn does not contest that this Court has subject matter jurisdiction over Plaintiffs' claims.

13.     This Court has personal jurisdiction over each Defendant on multiple bases, including that each Defendant has (1) transacted business in the United States and in this District, including by recruiting, and advertising for, students residing in this District; (2) transacted business with Class Members throughout the United States, including those residing in this District; and (3) committed substantial acts in furtherance of an unlawful scheme in the United States, including in this District.  Each Defendant has recruited, accepted, enrolled, and charged artificially high net prices of attendance to, and thus injured, individuals residing within this District.  In addition, Defendants have held at least one meeting of the 568 Cartel in Rosemont, Illinois, which is within this District.

**ANSWER:**  Penn admits that it has recruited, accepted, and enrolled individuals residing in this District.  Penn denies the remaining allegations in Paragraph 13 that relate to Penn.  As to the allegations that relate to the other Defendants, Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 13, and, on that basis, denies those allegations.

14.     Venue is proper in this District under 15 U.S.C. §§ 15, 22 and 26, and 28 U.S.C. § 1391(b), (c), and (d), because each Defendant transacted business, was found, had agents, and/or resided in this District; a substantial part of the events giving rise to Plaintiffs' claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

**ANSWER:**  The allegations in Paragraph 14 are legal conclusions not subject to admission or denial, are not susceptible to being answered because of their ambiguity or vagueness, and Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegations.  To the extent an answer is required, Penn does not contest that venue is proper in this District.

15.     Defendants' conduct has had a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States and in this District.  Defendants' conduct affects admitted students around the country, including through transactions with parties residing in different states.  Defendants do business across state lines.

**ANSWER:**  The allegations in Paragraph 15 are legal conclusions not subject to admission or denial, are not susceptible to being answered because of their ambiguity or vagueness, and Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegations.  On those bases, and to the extent an answer is required, Penn denies the allegations in Paragraph 15.

### III.

### THE PARTIES

**A.     Plaintiffs**

16.     Plaintiff Andrew Corzo attended the University of Chicago as a full-time undergraduate student from the fall of 2014 until he graduated in the spring of 2018.  For each of these four years, he received need-based financial aid from Chicago, but also paid to Chicago some costs of tuition, room (in his first year), and board, taking out substantial loans in the process.  He resides in Chicago, Illinois.

**ANSWER:**  Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 16 and, on that basis, denies the allegations.

17.     Plaintiff Sia Henry attended Duke as a full-time undergraduate student from the fall of 2007 until she graduated in the spring of 2011.  For each of these four years, she paid to Duke some of the costs of tuition, room, and board.  She received need-based financial aid from Duke in at least two of her four years of attendance.  Since graduating from Duke, and subsequently from Harvard Law School, Ms. Henry has dedicated her career to advocacy on behalf of

prisoners, most recently as a Senior Program Specialist at Impact Justice. She resides in Atlanta, Georgia.

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 17 and, on that basis, denies the allegations.

18.     Plaintiff Alexander Leo-Guerra is attending Duke as a full-time undergraduate student. He enrolled in August 2019 and expects to graduate in the spring of 2023. For each of the first two years he has attended, he received some need-based financial aid from Duke, but also paid to Duke some of the costs of tuition, room, and board, taking out loans in the process. He resides in Draper, Utah.

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 18 and, on that basis, denies the allegations.

19.     Plaintiff Michael Maerlender attended Vanderbilt as a full-time undergraduate student from the fall of 2015 until he graduated in the spring of 2019. For each of these four years, he received need-based financial aid from Vanderbilt and paid for some of the costs of tuition, room, and board. He resides in New York, New York.

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 19 and, on that basis, denies the allegations.

20.     Plaintiff Brandon Piyevsky attended Northwestern as a full-time undergraduate student from the fall of 2013 until he graduated in the spring of 2017. For each of these four years, he received need-based financial aid from Northwestern and paid for some of the costs of tuition, room, and board, taking out loans in the process. He resides in Toledo, Ohio.

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 20 and, on that basis, denies the allegations.

21.     Plaintiff Benjamin Shumate attended Brown University as a full-time undergraduate student from the fall of 2015 until he graduated in the spring of 2019. For each of these four years, he received need-based financial aid from Brown and paid for some of the costs of tuition, room and board. He resides in Providence, Rhode Island.

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 21 and, on that basis, denies the allegations.

22.     Plaintiff Brittany Tatiana Weaver attended Vanderbilt as a full-time undergraduate student from 2003 until she graduated in 2007.  For each of these four years, she received need-based financial aid from Vanderbilt and paid for some of the costs of tuition, room, and board, taking out substantial loans in the process.  She resides in Farmington Hills, Michigan.

**ANSWER:**  Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 22 and, on that basis, denies the allegations.

23.     Plaintiff Cameron Williams attended Vanderbilt as a full-time undergraduate student from 2014 until he graduated in 2018.  For each of these four years, he received need-based financial aid from Vanderbilt and paid for some of the costs of tuition, room, and board, taking out substantial loans in the process.  He resides in New York, New York.

**ANSWER:**  Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 23 and, on that basis, denies the allegations.

24.     Plaintiffs thus were and are direct purchasers from Defendants of education, room, and board, and recipients of need-based financial aid from Defendants.

**ANSWER:**  The allegation in Paragraph 24 that "Plaintiffs thus were and are direct purchasers"

is a legal conclusion not subject to admission or denial.  To the extent an answer is required to this

allegation, Penn denies the allegation.  Penn does not have knowledge or information sufficient to

form a belief as to the truth of the remaining allegations in Paragraph 24 and, on that basis, denies

the allegations.

**B.     Defendants**

25.     Defendants are private, national universities that have been members of the 568 Cartel (most since 2003, and some not continuously) and have been continuously ranked in the top 25 of the *U.S. News & World Report* rankings for national universities since 2003.

**ANSWER:**  Penn admits that it is a private, national university that has been ranked in the top

25 of the *U.S. News & World Report* rankings for national universities since 2003.  Penn further

admits that it was a member of the 568 Presidents Group and has since withdrawn from the

Group.  Penn otherwise denies the remaining allegations in Paragraph 25 that relate to Penn.  As

to the allegations in Paragraph 25 that relate to the other Defendants, Penn lacks knowledge or

information sufficient to form a belief as to the truth of those allegations and, on that basis,

denies the allegations.

26.     Each Defendant acted as the agent of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.  All Defendants are jointly and severally liable for the acts of all members of the 568 Cartel.

**ANSWER:**  The allegations in Paragraph 26 are legal conclusions not subject to admission or

denial.  To the extent an answer is required, Penn denies the allegations in Paragraph 26.

27.     Under the rule of joint and several liability, each Defendant is liable for all acts undertaken and all damages caused in furtherance of the conspiracy alleged herein, even those committed before the Defendant joined the 568 Cartel.  No Defendant that claims to have "left" the Cartel, but later "rejoined" it, took steps to disavow and repudiate the conspiracy or its goals at any time.  Accordingly, any such Defendant is jointly and severally liable for the conspirators' conduct throughout the course of the conspiracy.  Any Defendant that did not disavow and repudiate the conspiracy and its goals never withdrew from the Cartel and remains jointly and severally liable for all of the conspirators' continuing conduct.

**ANSWER:**  The allegations in the first, third, and fourth sentences of Paragraph 27 are legal

conclusions not subject to admission or denial.  To the extent an answer is required, Penn denies

the allegations in the first, third, and fourth sentences of Paragraph 27.  Penn does not have

knowledge or information sufficient to form a belief as to the truth of the allegations in the

second sentence of Paragraph 27, and, on that basis, denies those allegations.  Penn denies the

remaining allegations in Paragraph 27.

28.     any Defendant that claims to have left the Cartel but later rejoined it, assuming that any such Defendant actually took sufficient steps to fully and formally withdraw, remains jointly and severally liable for all of the conspirators' conduct; and any Defendant that did not fully and formally withdraw from the Cartel remains jointly and several liable for all of the conspirators' continuing conduct as alleged herein.

**ANSWER:**  The allegations in Paragraph 28 are legal conclusions not subject to admission or

denial.  To the extent an answer is required, Penn denies the allegations in Paragraph 28.

29.     Since the enactment of Section 568, in 1994, Defendants' endowments have all increased enormously, and with respect to those Defendants for which the information is publicly

available, the growth of their endowments have substantially outpaced the growth in their annual operating expenses.  *See* Appendix A.[2]

**ANSWER:**  Penn admits that it has an endowment.  Penn further admits that the allegations in

Paragraph 29 and in Appendix A purport to describe information from Penn's consolidated

financial statements.  Penn denies any allegations in Paragraph 29 (including Footnote 2) and

Appendix A that are inconsistent with Penn's consolidated financial statements.  Penn denies the

remaining allegations in Paragraph 29 that relate to Penn.  As to the allegations in Paragraph 29

that relate to the other Defendants, Penn lacks knowledge or information sufficient to form a

belief as to the truth of those allegations and, on that basis, denies the allegations.

### Brown

30.     Brown University is a private, non-profit institution with its principal place of business in Providence, Rhode Island.

**ANSWER:**  Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 30 and, on that basis, denies the allegations.

31.     Brown was established by a charter, approved by the Rhode Island legislature, as "College of Rhode Island" in 1764.  The school was the third college in New England and seventh in America.  The school's name was changed to Brown in 1804.  Brown is a member of the Ivy League, a consortium of eight elite universities.

**ANSWER:**  Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 31 and, on that basis, denies the allegations.

32.     Brown's undergraduate student body is generally wealthy and privileged.  The median family income of undergraduates is $204,200; 19% of undergraduates come from the top 1% of the country's income distribution, and 70% come from the top 20%; and only 4.1% come from the bottom 20% of the income distribution.[3]

---

[2] Appendix A compares, for those Defendants for which such information is publicly available, the growth of the Defendant's annual operating expenses versus the growth of the Defendant's endowment from 1994 to 2021. Appendix A also identifies the rate of growth of every Defendant's endowment from 1994 to 2021.
[3] *Economic Diversity and Student Outcomes at Brown University*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/brown-university.

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 32 and, on that basis, denies the allegations.

33.     Brown had an endowment of approximately $608 million in 1994, which has grown to approximately $6.9 billion in 2021.  *See* Appendix A.[4]

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 33 and, on that basis, denies the allegations.

### Caltech

34.     The California Institute of Technology is a private, non-profit institution with its principal place of business in Pasadena, California.

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 34 and, on that basis, denies the allegations.

35.     CalTech is one of the nation's leading research universities.

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 35 and, on that basis, denies the allegations.

36.     CalTech's undergraduate student body is generally wealthy and privileged.  The median family income of undergraduates is $146,300; 3% of undergraduates come from the top 1% of the country's income distribution, and 69% come from the top 20%; and only 2.9% come from the bottom 20% of the income distribution.[5]

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 36 and, on that basis, denies the allegations.

37.     CalTech had an endowment of approximately $592 million in 1994, which has grown to approximately $3.8 billion in 2021.  *See* Appendix A.

---

[4] *See also* Michael Nitezel, *Elite University Endowments Soar as Higher Ed Divide Grows*, FORBES (Oct. 15, 2021), https://www.forbes.com/sites/michaeltnietzel/2021/10/15/elite-university-endowments-soar-to-record-highs/?sh=724aa8932d5f.
[5] *Economic Diversity and Student Outcomes at the University of California Institute of Technology*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/california-institute-of-technology.

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 37 and, on that basis, denies the allegations.

## Chicago

38.　　The University of Chicago is a private, non-profit institution with its principal place of business in Chicago, Illinois.

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 38 and, on that basis, denies the allegations.

39.　　Chicago was founded in 1890 by the American Baptist Education Society and oil magnate John D. Rockefeller, who later described the school as "the best investment I ever made."

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 39 and, on that basis, denies the allegations.

40.　　Chicago's undergraduate study body is generally wealthy and privileged. The median family income of undergraduates is $134,500; 10% of undergraduates come from the top 1% of the country's income distribution, and 58% come from the top 20%; and only 5.5% come from the bottom 20% of the income distribution.[6]

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 40 and, on that basis, denies the allegations.

41.　　Chicago had an endowment of approximately $1.2 billion in 1994, which has grown to approximately $11 billion in 2021. *See* Appendix A.

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 41 and, on that basis, denies the allegations.

## Columbia

42.　　Trustees of Columbia University in the City of New York is a private, non-profit institution with its principal place of business in New York, New York.

---

[6] *Economic Diversity and Student Outcomes at the University of Chicago*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/university-of-chicago.

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 42 and, on that basis, denies the allegations.


43.     Columbia was established as King's College by royal charter of King George II of Great Britain in 1754.  It was renamed Columbia College in 1784.  In 1896, the campus was moved to its current location in Morningside Heights and renamed Columbia University.  According to its website, "Columbia University is one of the world's most important centers of research." Columbia is a member of the Ivy League.

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 43 and, on that basis, denies the allegations.


44.     Columbia's undergraduate student body, with the exception of its School of General Studies, discussed below, is generally wealthy and privileged.  The median family income of undergraduates is $150,900; 13% of undergraduates come from the top 1% of the country's income distribution, and 62% come from the top 20%; and only 5.1% come from the bottom 20% of the income distribution.[7]

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 44 and, on that basis, denies the allegations.


45.     Columbia had an endowment of approximately $2 billion in 1994, which has grown to approximately $14.4 billion in 2021.  *See* Appendix A.

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 45 and, on that basis, denies the allegations.

### Cornell

46.     Cornell is a private, non-profit institution with its principal place of business in Ithaca, New York.

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 46 and, on that basis, denies the allegations.


47.     Cornell was founded in 1865, as a private, land-grant institution of New York State. According to its website, Cornell has been described as "the first *truly* American university

---

[7] *Economic Diversity and Student Outcomes at Columbia University*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/columbia-university.

because of its founders' revolutionary egalitarian and practical vision of higher education."
(Emphasis in original.) Cornell is a member of the Ivy League.

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 47 and, on that basis, denies the allegations.


48.     Cornell's undergraduate student body is generally wealthy and privileged. The median
family income of undergraduates is $151,600; 10% of undergraduates come from the top 1% of
the country's income distribution, and 64% come from the top 20%; and only 3.8% come from
the bottom 20% of the income distribution.[8]

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 48 and, on that basis, denies the allegations.


49.     Cornell had an endowment of approximately $898 million in 1994, which has grown to
approximately $10 billion in 2021. *See* Appendix A.

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 49 and, on that basis, denies the allegations.

### Dartmouth

50.     Trustees of Dartmouth College is a private, non-profit institution with its principal place
of business in Hanover, New Hampshire.

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 50 and, on that basis, denies the allegations.


51.     According to Dartmouth's website: "Founded in 1769, Dartmouth is a member of the Ivy
League and consistently ranks among the world's greatest academic institutions." Dartmouth's
website also claims that "Dartmouth College educates the most promising students."

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 51 and, on that basis, denies the allegations.


52.     Dartmouth's undergraduate student body is generally wealthy and privileged. The
median family income of undergraduates is $200,400; 21% of undergraduates come from the top

---

[8] *Economic Diversity and Student Outcomes at Cornell University*, N.Y. TIMES,
https://www.nytimes.com/interactive/projects/college-mobility/cornell-university.

1% of the country's income distribution, and 69% come from the top 20%; and only 2.6% come from the bottom 20% of the income distribution.[9]

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 52 and, on that basis, denies the allegations.

53.     Dartmouth had an endowment of approximately $870 million in 1994, which has grown to approximately $8.5 billion in 2021.  *See* Appendix A.

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 53 and, on that basis, denies the allegations.

### Duke

54.     Duke University is a private, non-profit institution with its principal place of business in Durham, North Carolina.

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 54 and, on that basis, denies the allegations.

55.     Duke's undergraduate student body is generally wealthy and privileged.  The median family income of undergraduates is $186,700; 19% of undergraduates come from the top 1% of the country's income distribution, and 69% come from the top 20%; and only 3.9% come from the bottom 20% of the income distribution.[10]

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 55 and, on that basis, denies the allegations.

56.     Duke had an endowment of approximately $699 million in 1994, which has grown to approximately $12.7 billion in 2021.  *See* Appendix A.

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 56 and, on that basis, denies the allegations.

---

[9] *Economic Diversity and Student Outcomes at Dartmouth College*, N.Y. TIMES
https://www.nytimes.com/interactive/projects/college-mobility/dartmouth-college.
[10] *Economic Diversity and Student Outcomes at Duke University* N.Y. TIMES
https://www.nytimes.com/interactive/projects/college-mobility/duke-university.

**Emory**

57.     Emory University is a private, non-profit institution with its principal place of business in Atlanta, Georgia.

**ANSWER:**  Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 57 and, on that basis, denies the allegations.

58.     Emory was established by charter of the Georgia legislature in 1836.

**ANSWER:**  Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 58 and, on that basis, denies the allegations.

59.     Emory's undergraduate student body is generally wealthy and privileged.  The median family income of undergraduates is $139,800; 15% of undergraduates come from the top 1% of the country's income distribution, and 58% come from the top 20%; and only 6% come from the bottom 20% of the income distribution.[11]

**ANSWER:**  Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 59 and, on that basis, denies the allegations.

60.     Emory had an endowment of approximately $1.6 billion in 1994, which has grown to approximately $8 billion in 2021.  *See* Appendix A.

**ANSWER:**  Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 60 and, on that basis, denies the allegations.

**Georgetown**

61.     Georgetown University is a private, non-profit institution with its principal place of business in Washington, District of Columbia.

**ANSWER:**  Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 61 and, on that basis, denies the allegations.

62.     According to its website:  "Georgetown University is the oldest Catholic and Jesuit institution of higher learning in the United States."

---

[11] *Economic Diversity and Student Outcomes at Emory University* N.Y. TIMES https://www.nytimes.com/interactive/projects/college-mobility/emory-university.

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 62 and, on that basis, denies the allegations.

63.     Georgetown's undergraduate student body is generally wealthy and privileged.  The median family income of undergraduate students is $229,100; 21% of undergraduates come from the top 1% of the country's income distribution, and 74% come from the top 20%; and only 3.1% come from the bottom 20% of the income distribution.[12]

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 63 and, on that basis, denies the allegations.

64.     Georgetown had an endowment of approximately $343 million in 1994, which has grown to approximately $2.6 billion in 2021.  *See* Appendix A.

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 64 and, on that basis, denies the allegations.

### Johns Hopkins

65.     The Johns Hopkins University is a private, non-profit institution with its principal place of business in Baltimore, Maryland.

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 65 and, on that basis, denies the allegations.

66.     Johns Hopkins, the oldest research university in the United States, was founded in 1876 and named after the American philanthropist and entrepreneur Johns Hopkins.

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 66 and, on that basis, denies the allegations.

67.     Johns Hopkins' undergraduate student body is generally wealthy and privileged.  The median family income of undergraduate students is $177,300; 11% of the undergraduates come from the top 1% of the country's income distribution, and 72% come from the top 20%; and only 2.9% come from the bottom 20% of the income distribution.[13]

---

[12] *Economic Diversity and Students Outcomes at Georgetown University*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/georgetown-university.
[13] *Economic Diversity and Students Outcomes at Johns Hopkins University*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/georgetown-university.

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 67 and, on that basis, denies the allegations.

68. Johns Hopkins had an endowment of approximately $747 million in 1994, which has grown to approximately $9.3 billion in 2021. *See* Appendix A.

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 68 and, on that basis, denies the allegations.

### MIT

69. The Massachusetts Institute of Technology is a private, non-profit institution with its principal place of business in Cambridge, Massachusetts.

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 69 and, on that basis, denies the allegations.

70. MIT is regularly ranked in the top five in international rankings of the world's best research universities.

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 70 and, on that basis, denies the allegations.

71. MIT's undergraduate student body is generally wealthy and privileged. The median family income of undergraduates is $137,400; 5.7% of undergraduates come from the top 1% of the income distribution, and 61% come from the top 20%; and only 6.2% come from the bottom 20% of the income distribution.[14]

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 71 and, on that basis, denies the allegations.

72. MIT had an endowment of approximately $1.8 billion in 1994, which has grown to approximately $27.4 billion in 2021. *See* Appendix A.

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 72 and, on that basis, denies the allegations.

---

[14] *Economic Diversity and Student Outcomes at Massachusetts Institute of Technology*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/massachusetts-institute-of-technology.

### Northwestern

73.     Northwestern University is a private, non-profit institution with its principal place of business in Evanston, Illinois.  Northwestern was founded in 1853.

**ANSWER:**  Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 73 and, on that basis, denies the allegations.

74.     Northwestern's undergraduate student body is generally wealthy and privileged.  The median family income of Northwestern's undergraduates is $171,200; 14% of undergraduates come from the top 1% of the income distribution, and 66% come from the top 20%; and only 3.7% come from the bottom 20% of the income distribution.[15]

**ANSWER:**  Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 74 and, on that basis, denies the allegations.

75.     Northwestern had an endowment of approximately $1.3 billion in 1994, which has grown to approximately $14.9 billion in 2021.  *See* Appendix A.

**ANSWER:**  Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 75 and, on that basis, denies the allegations.

### Notre Dame

76.     The University of Notre Dame du Lac is a private, non-profit institution with its principal place of business in South Bend, Indiana.

**ANSWER:**  Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 76 and, on that basis, denies the allegations.

77.     Notre Dame was founded in 1842.  According to its website, Notre Dame is "[o]ne of America's leading undergraduate teaching institutions."

**ANSWER:**  Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 77 and, on that basis, denies the allegations.

78.     Notre Dame's undergraduate student body is generally wealthy and privileged.  The median family income of undergraduates is $191,400; 15% of undergraduates come from the top

---

[15] *Economic Diversity and Student Outcomes at Northwestern University*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/northwestern-university.

1% of the income distribution, and 75% come from the top 20%; and only 1.6% come from the bottom 20% of the income distribution.[16]

**ANSWER:**  Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 78 and, on that basis, denies the allegations.

79.     Notre Dame had an endowment of approximately $879 million in 1994, which has grown to approximately $22.5 billion in 2021.  *See* Appendix A.

**ANSWER:**  Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 79 and, on that basis, denies the allegations.

### Penn

80.     The Trustees of the University of Pennsylvania is a private, non-profit institution with its principal place of business in Philadelphia, Pennsylvania.

**ANSWER:**  Penn admits that it is a private, non-profit institution with its principal place of business in Philadelphia, Pennsylvania.

81.     Penn was founded in 1740 by Benjamin Franklin.  As of 2014, Penn had 25 undergraduate alumni that were billionaires, more than any other university in the world.[17] Penn is a member of the Ivy League.

**ANSWER:**  Penn admits that it was founded in 1740 by Benjamin Franklin and that it is one of eight private universities known as the Ivy League.  Penn admits that the allegations in Paragraph 81 purport to summarize the article referenced in Footnote 17, and Penn lacks knowledge or information sufficient to form a belief as to the truth of the statements set forth therein.

82.     Penn's undergraduate student body is generally wealthy and privileged.  The median family income of undergraduates is $195,500; 19% of undergraduates come from the top 1% of the income distribution, and 71% come from the top 20%; and only 3.3% come from the bottom 20% of the income distribution.[18]

---

[16] *Economic Diversity and Student Outcomes at Notre Dame*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/notre-dame.
[17] Emily Jane Fox, *Top 20 Colleges with Most Billionaire Alumni*, CNN (Sept. 17, 2014), https://money.cnn.com/2014/09/16/luxury/top-colleges-with-billionaire-undergraduates/.
[18] *Economic Diversity and Student Outcomes at the University of Pennsylvania*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/university-of-pennsylvania.

**ANSWER:**  The allegation that Penn's "undergraduate student body is generally wealthy and privileged" is an opinion not subject to admission or denial.  To the extent a response is required, Penn denies that allegation.  Penn admits that the allegations in Paragraph 82 purport to summarize the article referenced in Footnote 18.  Penn lacks knowledge or information sufficient to form a belief as to the truth of the statements set forth therein.

83.     Penn had an endowment of approximately $1.5 billion in 1994, which has grown to approximately $20.5 billion in 2021.  *See* Appendix A.

**ANSWER:**  Penn admits that the allegations in Paragraph 83 and in Appendix A purport to describe information from Penn's consolidated financial statements.  Penn denies any allegations in Paragraph 83 and Appendix A that are inconsistent with Penn's consolidated financial statements.

## **Rice**

84.     The William Marsh Rice University is a private, non-profit institution with its principal place of business in Houston, Texas.

**ANSWER:**  Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 84 and, on that basis, denies the allegations.

85.     Rice was founded in 1891 by Houston businessman William Marsh Rice.

**ANSWER:**  Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 85 and, on that basis, denies the allegations.

86.     Rice's undergraduate student body is generally wealthy and privileged.  The median family income of undergraduates is $160,800; 9.8% of undergraduates come from the top 1% of the income distribution, and 64% come from the top 20%; and only 4.9% come from the bottom 20% of the income distribution.[19]

---

[19] *Economic Diversity and Student Outcomes at Rice University*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/rice-university.

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 86 and, on that basis, denies the allegations.

87.     Rice had an endowment of approximately $1.3 billion in 1994, which has grown to approximately $8.1 billion in 2021. *See* Appendix A.

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 87 and, on that basis, denies the allegations.

### Vanderbilt

88.     Vanderbilt University is a private, non-profit institution with its principal place of business in Nashville, Tennessee.

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 88 and, on that basis, denies the allegations.

89.     Vanderbilt was founded in 1873 and named in honor of Cornelius Vanderbilt, who donated a founding gift. According to Vanderbilt's website, "the university's prominent alumni base includes Nobel Prize winners, members of Congress, governors, ambassadors, judges, admirals, CEOs, university presidents, physicians and attorneys, as well as professional sports figures playing in the NFL, NBA, Major League Baseball, the PGA and LPGA."

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 89 and, on that basis, denies the allegations.

90.     Vanderbilt's undergraduate student body is generally wealthy and privileged. The median family income of undergraduates is $204,500; 23% of undergraduates come from the top 1% of the income distribution, and 70% come from the top 20%; and only 1.9% come from the bottom 20% of the income distribution.[20]

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 90 and, on that basis, denies the allegations.

91.     Vanderbilt had an endowment of approximately $860 million in 1994, which has grown to approximately $10.9 billion in 2021. *See* Appendix A.

---

[20] *Economic Diversity and Student Outcomes at Vanderbilt University*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/vanderbilt-university.

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 91 and, on that basis, denies the allegations.

### Yale

92. Yale University is a private, non-profit institution with its principal place of business in New Haven, Connecticut.

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 92 and, on that basis, denies the allegations.

93. Originally chartered by the legislature of Connecticut as the Collegiate School in 1701 in multiple locations, the school was moved to New Haven in 1716 and renamed Yale in 1718, after a wealthy British merchant and philanthropist, Elihu Yale. It is the third-oldest university in the United States. Yale is a member of the Ivy League.

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 93 and, on that basis, denies the allegations.

94. Yale's undergraduate study body is generally wealthy and privileged. The median family income of undergraduates is $192,600; 19% of undergraduates come from the top 1% of the income distribution, and 69% come from the top 20%; and only 2.1% come from the bottom 20% of the income distribution.[21]

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 94 and, on that basis, denies the allegations.

95. Yale had an endowment of approximately $3.5 billion in 1994, which has grown to approximately $42.3 billion in 2021. *See* Appendix A. This is the second-highest endowment of any university in the United States.

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 95 and, on that basis, denies the allegations.

---

[21] *Economic Diversity and Student Outcomes at Yale University*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/yale-university.

# IV.

## DEFENDANTS' MEMBERSHIP IN THE 568 CARTEL

96.     The 568 Cartel was formed in 1998.  Columbia, Cornell, Duke, Georgetown, MIT, Northwestern, and Notre Dame have been members of the 568 Cartel since 1998 and first implemented the Consensus Methodology in 2003.

**ANSWER:**  Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 96, and, on that basis, denies the allegations.

97.     Brown joined the 568 Cartel in 1998 and first implemented the Consensus Methodology in 2004.

**ANSWER:**  Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 97 and, on that basis, denies the allegations.

98.     CalTech joined the 568 Cartel in 2019 and first implemented the Consensus Methodology the same year.

**ANSWER:**  Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 98 and, on that basis, denies the allegations.

99.     Chicago joined the 568 Cartel in 1998 and first implemented the Consensus Methodology in 2003.

**ANSWER:**  Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 99 and, on that basis, denies the allegations.

100.     Dartmouth joined the 568 Cartel in 1998 and first implemented the Consensus Methodology in 2004.

**ANSWER:**  Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 100 and, on that basis, denies the allegations.

101.     Emory joined the 568 Cartel in 1998 and first implemented the Consensus Methodology in 2003.

**ANSWER:**  Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 101 and, on that basis, denies the allegations.

102.    Johns Hopkins joined the 568 Cartel in 2021, has taken overt steps in furtherance of the conspiracy alleged herein (including meeting with Defendants and discussing the Consensus Methodology with them), and first implemented the Consensus Methodology with respect to Early Decision applicants in 2021.

**ANSWER:**  Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 102 and, on that basis, denies the allegations.

103.    Rice joined the 568 Cartel in 1998 and first implemented the Consensus Methodology in 2003.

**ANSWER:**  Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 103 and, on that basis, denies the allegations.

104.    Penn joined the 568 Cartel in 1998 and first implemented the Consensus Methodology in 2003.

**ANSWER:**  Penn denies the allegations in Paragraph 104.

105.    Vanderbilt joined the 568 Cartel in 1998 and first implemented the Consensus Methodology in 2003.

**ANSWER:**  Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 105 and, on that basis, denies the allegations.

106.    Yale joined the 568 Cartel in 1998 and first implemented the Consensus Methodology in 2003.

**ANSWER:**  Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 106 and, on that basis, denies the allegations.

107.    Certain Defendants claim to have stopped participating in the 568 Cartel at various points in time since 2003, but Plaintiffs are unaware of any evidence that any Defendant disavowed and repudiated the conspiracy and its goals.  Accordingly, no Defendant withdrew from the conspiracy.  Accordingly, since 2003, and through the present, the determinants of the net price of attending Defendants' schools have been established through the conspiracy.

**ANSWER:**  Penn admits that it is not a member of the 568 Presidents Group.  As to the

allegations in Paragraph 107 that relate to Defendants, or to Plaintiffs' awareness or lack thereof

of evidence, Penn lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, on that basis, denies the allegations. Penn denies the remaining allegations in Paragraph 107.

**V.**

**DEFENDANTS' VIOLATION OF THE FEDERAL ANTITRUST LAWS**

**A.      Defendants Have Colluded on Their Financial-Aid Practices**

108.      Defendants are purported competitors in enrolling highly selective undergraduate student bodies and providing an undergraduate education. People throughout the United States apply for admission to Defendants' undergraduate programs.

**ANSWER:** Penn admits that, upon information and belief, there are people who apply for admission to Penn who may also apply for admission to the other Defendant schools in any given year. Penn further admits that people in various parts of the United States apply for admission to Penn's undergraduate programs. Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 108 regarding the other Defendants' admissions practices and, on that basis, denies those allegations.

109.      Each Defendant annually sends out thousands of solicitations and mailings and receives thousands of admission applications that cross state lines, including thousands of applications from Class Members. Out-of-state students, including thousands of Class Members, make up a substantial percentage of each Defendant's undergraduate population.

**ANSWER:** Penn admits that it communicates with applicants throughout the United States and receives applications from prospective students throughout the United States. Penn denies that Plaintiffs have established or can establish the prerequisites to certification and/or maintenance of the alleged "Class" pursuant to Rule 23 of the Federal Rules of Civil Procedure, and therefore denies that any of the Defendants receive applications from Class Members. Penn denies the remaining allegations in Paragraph 109 that relate to Penn. As to the allegations in Paragraph 109 that relate to the other Defendants, Penn does not have knowledge or information sufficient to form a belief as to the truth of those allegations and, on that basis, denies the allegations.

110.    Each Defendant annually receives millions of dollars that flow across state lines in tuition payments, grants, donations, and athletic ticket sales and sponsorships.  Each Defendant markets its undergraduate programs and tickets for athletic events to the public across state lines.

**ANSWER:**  Penn admits that it receives tuition payments and donations.  The remaining

allegations in Paragraph 110 are not susceptible to being answered because of their ambiguity or

vagueness.  To the extent an answer is required, Penn denies the allegations in Paragraph 110

that relate to Penn.  As to the allegations in Paragraph 110 that relate to the other Defendants,

Penn does not have knowledge or information sufficient to form a belief as to the truth of those

allegations and, on that basis, denies those allegations.

111.    Defendants have engaged in a continuing conspiracy in unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act.  This conspiracy, to the extent it continues, is likely to continue unless the relief sought herein is granted.

**ANSWER:**  Penn denies the allegations in Paragraph 111.

112.    This conspiracy has consisted of an agreement, understanding, and concert of action among Defendants, and each of them, the substantial terms of which are to restrain price competition relating to their provision of financial aid for students, and thereby to increase the net price of attending these institutions ("the net price of attendance").

**ANSWER:**  Penn denies the allegations in Paragraph 112.

113.    The 568 Cartel generally meets in person as a group at least twice each year.  In October 2017, for example, the 568 Cartel held one of its official biannual meetings at the Hilton Rosemont, in Rosemont, Illinois, near O'Hare International Airport.  On information and belief, 568 Cartel members communicate with each other about matters related to the conspiracy through other means as well, such as telephone calls, video calls, emails, and messaging.

**ANSWER:**  Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations concerning how the 568 Presidents Group currently operates and, on that

basis, denies the allegations in Paragraph 113.  Penn denies the remaining allegations in

Paragraph 113.

114.    Until recently, Defendants maintained a public-facing website for purpose of representing the 568 Cartel and its purposes to the public.  The website stated: "This site serves as a resource

. . . for visitors seeking to learn more about the Group."[22] The website explained that the "568 Presidents Group is an affiliation of colleges and universities, all of which must admit students on a need-blind basis." An FAQ section on the website added: "It is referred to as a 'Presidents' group because it was formed by a group of 28 college and university presidents from need-blind schools in 1998." The website also contained the form of a certificate of compliance whereby a member of the group could certify that "its admission and financial aid practices currently comply with the rules of Section 568 regarding 'need-blind admission practices.'" These statements on the website misled the public by representing that the 568 Cartel members' practices were compliant with Section 568. The truth, as alleged further below, is the opposite.

**ANSWER:** Penn admits that the 568 Presidents Group had a website and that the allegations in Paragraph 114 purport to quote language from that website. Penn specifically denies any allegations in Paragraph 114 that are inconsistent with the language that previously appeared on the 568 Presidents Group website. Penn denies the remaining allegations in Paragraph 114 that relate to Penn.

115.    The 568 Cartel has fixed prices through a formula that is based on a "set of common standards for determining the family's ability to pay for college." The 568 Cartel calls this formula the "Consensus Methodology." Defendants admitted on their own website that the "purposes" of the 568 Cartel include, collectively, to "Discuss and agree upon common principles of analysis for determining the financial need of undergraduate financial aid applicants"; to "Build, maintain, and revise, as appropriate, a Consensus Approach need analysis methodology that is consistent with these principles"; and to "Explore ways of developing a data exchange program."

**ANSWER:** Penn denies that the 568 Presidents Group fixed prices and denies that the "Consensus Methodology" is a formula through which prices were fixed. Penn admits that the 568 Presidents Group had a website and that the allegations in Paragraph 115 purport to quote language from that website. Penn specifically denies any allegations in Paragraph 115 that are inconsistent with the language that previously appeared on the 568 Presidents Group website. Penn denies the remaining allegations in Paragraph 115.

116.    Defendants further conceded that the "Consensus Methodology" would, in their own words, contain "certain key components, including:  1) common elements of need analysis . . .; 2) a common calendar for the collection of data from families; 3) a means of training aid

---

[22] 568 PRESIDENTS GROUP, http://www.568group.org/home/.

professionals in the application of the Methodology; and 4) an oversight 568 Group to review and modify the methodology as needed over time."

**ANSWER:** Penn admits that the 568 Presidents Group had a website and that the allegations in Paragraph 116 purport to quote language from that website. Penn specifically denies any allegations in Paragraph 116 that are inconsistent with the language that previously appeared on the 568 Presidents Group website. Penn denies the remaining allegations in Paragraph 116.

117. Critical components of the 568 Cartel have therefore been the development of a "data exchange program" and the agreement to share information about admissions and financial-aid methodology, and then to meet regularly to discuss this data and information, to enable the Cartel members to agree to use a common methodology for determining financial-aid awards for the purposes of coordinating financial-aid awards among Cartel members. The common methodology assesses the income and assets of given financial-aid applicants to determine the applicants' ability to pay and thus the financial contribution that the applicant and their family is expected to make.

**ANSWER:** Penn admits that the 568 Presidents Group periodically met to discuss the Group's activities. Penn denies the remaining allegations in Paragraph 117.

118. The applicants' assessed ability to pay therefore is a key determinant in the net price of attendance. The 568 Cartel has used the shared, competitively sensitive information about enrollment, costs, and other data relating to Defendants' available resources for financial aid to arrive at a common and agreed formula for setting ability to pay, which results in artificially inflated net prices of attendance.

**ANSWER:** Penn denies the allegations in Paragraph 118.

119. Members of the 568 Cartel began meeting sometime after the enactment of Section 568 in 1994. The 568 Cartel was officially formed in 1998.

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 119, and, on that basis, denies the allegations.

120. As of July 2001, Dartmouth had not joined the 568 Cartel. According to Dartmouth's then-Dean of Admissions and Financial Aid, Karl Furstenberg, as of 2001 Dartmouth had a "need analysis methodology that [was] perhaps more enlightened, more generous and more flexible than" that of the 568 Cartel, and Dartmouth was "actually doing more than this new

methodology would allow."[23] Not long after Mr. Furstenberg made these statements, however, Dartmouth decided to join the 568 Cartel, implemented the Consensus Methodology, and took other steps in furtherance of the conspiracy as alleged herein.

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 120 and, on that basis, denies the allegations.

121.    The 568 Cartel has monitored and enforced its combination and conspiracy in several ways, according to the Cartel's website, including (but not limited to) such steps as (a) requiring each participating institution to submit a "Certificate of Compliance," (b) requiring university professionals at each institution to receive "training . . . in the application of the Methodology," (c) imposing a "common calendar for the collection of data from families," and (d) conducting an annual or biannual meeting every year since 2007.

**ANSWER:** Penn admits that the 568 Presidents Group had a website and that the allegations in Paragraph 121 purport to quote language from that website. Penn specifically denies any allegations in Paragraph 121 that are inconsistent with the language that previously appeared on the 568 Presidents Group website. Penn denies the remaining allegations in Paragraph 121.

122.    At midnight on September 30, 2022, the 568 Exemption expired. The 568 Cartel website is now blank except for the following message: "The 568 Presidents Group (and all of its Committees) has been formally dissolved, effective November 4, 2022. Thank you."

**ANSWER:** Penn admits that the 568 Exemption expired on September 30, 2022. Penn further admits that the 568 Presidents Group had a website, and that the allegations in Paragraph 122 purport to quote language from that website. Penn specifically denies any allegations in Paragraph 122 that are inconsistent with the language that previously appeared on the 568 Presidents Group website.

## VI.

## DEFENDANTS' ANTICOMPETITIVE CONDUCT HAS RAISED NET PRICES

123.    As higher-education insiders—including employees and officers of the institutions in the 568 Cartel—have acknowledged, the Cartel has limited competition in financial-aid offers from

---

[23] Shevani Jaisingh, *28 Colleges Alter Financial Aid Packages*, THE DARTMOUTH (July 17, 2001), https://www.thedartmouth.com/article/2001/07/28-colleges-alter-fin-aid-packages.

supposedly competing schools, driving down aid packages and thereby driving up the net price of attendance for aid-eligible students.

**ANSWER:**  Penn denies the allegations in Paragraph 123.

124.    Yale claims not to have participated in the 568 Cartel from 2008 until 2018.  Yale claims it left the Cartel because it determined that membership in the Cartel had restricted the amount of financial aid that Yale could provide to students.  That is, Yale's decision to increase financial-aid awards to eligible students prompted it to want to no longer participate.  In so doing, referring to a new policy to be implemented in early 2009, Yale stated that its "new, more generous aid policy in January means the University can no longer follow the consensus methodology."[24]

**ANSWER:**  Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 124 and, on that basis, denies the allegations.

125.    Yale's then-Director of Student Financial Services, Caesar Storlazzi, concluded:  "By leaving the 568 Group, Yale is now free to give families more aid than they would have gotten under the consensus methodology."[25] Storlazzi stated that what is "not good" about the Cartel's approach is that it has "one needs-analysis formula that everyone has to sign on to."[26]  The connection between Yale's withdrawal and the effect on net prices was explicit:  "In other words, the percentage of a family's income and assets that Yale takes as a parental contribution is now lower than the percentage taken by 568 schools."[27] (Yale evidently rejoined the Cartel in 2018, without fanfare.) In other words, Yale understood that active members of the 568 Cartel were required to agree to and impose the Consensus Methodology, which had the effect of suppressing the amount of financial aid it could offer to all its students systematically.  Only by attempting to pull out of the Cartel could Yale or any Cartel member be free to offer competitively better financial-aid offers, and charge lower net prices for attendance, to all Class Members.

**ANSWER:**  Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 125 and, on that basis, denies the allegations.

126.    Other universities have similarly declined to participate in the 568 Cartel because it would limit the financial aid they could provide.  Harvard's then-Director of Financial Aid, Sally Donahue, said in 2008 that Harvard never joined the 568 Cartel because its financial-aid formula would have yielded financial-aid packages that were smaller than what Harvard wanted to award.[28] In 2015, one anonymous university president who refused to participate in the 568 Cartel described it as "an insider's game" that belonged to a "bygone era." Observing that some

---

[24] Caitlin Roman, *University Leaves Financial Aid Group*, YALE DAILY NEWS (Sept. 26, 2008), https://yaledailynews.com/blog/2008/09/26/university-leaves-financial-aid-group/.
[25] *Id*.
[26] *Id*.
[27] *Id.*
[28] *Id.*

schools had left the 568 Cartel to offer more financial aid, this anonymous president opined that "the notion of a collective that would constrain money is counter to public policy."[29]

**ANSWER:**  Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 126 and, on that basis, denies the allegations.

127.    Indeed, the website of the 568 Presidents Group stated in relevant part:  "The Consensus Approach . . . seeks to reduce much of the variance in need analysis results that has been experienced in recent years."  The website went on to state that the "participating institutions believe that the Consensus Approach, when applied in a consistent manner, serves to diminish or eliminate . . . divergent results."

**ANSWER:**  Penn admits that the 568 Presidents Group had a website and that the allegations in

Paragraph 127 purport to quote language from that website.  Penn specifically denies any

allegations in Paragraph 127 that are inconsistent with the language that previously appeared on

the 568 Presidents Group website.  Penn denies the remaining allegations in Paragraph 127.

128.    The phrases "reduce much of the variance," "consistent manner," and "diminish or eliminate divergent results," in the opaque world of higher-education pricing, are code words meaning that the purpose of the 568 Cartel has been to reduce or eliminate competition between Cartel members over offers of financial aid to prospective students.  And elimination of competition over financial-aid offers is simply a means of coalescing around a uniform *and lower* level of aid to all prospective students.  The result of the 568 Cartel has thus been not only to reduce the amount of total aid offered by each school, but also to reduce the total amount of aid offered to each prospective student at each Defendant school.

**ANSWER:**  Penn denies the allegations in Paragraph 128.

129.    In addition, to diminish variance in prices, according to the 568 Cartel's own website, the members "discuss and *agree*" on how to determine financial need.  Under antitrust principles, the fact that members of the 568 Cartel agree to share confidential and competitively sensitive information and data on admissions and their respective applicants, and then further agree to impose a common methodology for determining financial-aid awards, are themselves evidence that the Cartel reduced such aid.  If Defendants were truly competing, they would not engage in such behavior and reach such agreements because they would be incentivized to increase aid and reduce net prices of attendance to compete for students.  In the absence of the anticompetitive conduct challenged herein, that would mean the awarding of more financial aid and reduction of net prices of attendance for all students in the proposed Class.

---

[29] The Education Conservancy, *Financial Aid: Examining the Thinking Behind the Policy* (June 2015), https://www.educationconservancy.org/PresidentialThinking.pdf.

**ANSWER:** Penn admits that the 568 Presidents Group had a website and that the allegations in

Paragraph 129 purport to quote language from that website. Penn specifically denies any

allegations in Paragraph 129 that are inconsistent with the language that previously appeared on

the 568 Presidents Group website. Penn denies the remaining allegations in Paragraph 129.

130. Indeed, in a March 2014 interview with *The Georgetown Voice*, John DeGioia, who has been both the President of Georgetown and the President of the 568 Cartel for several years, was clear about the purpose of the Cartel: "I actually chair that group, called the 568 group. The 568 refers to a passage in Higher Reauthorization Bill about a decade ago. . . . *What it enables us to do is develop a common formula* by which we would access the need of the student. *We ask the family to contribute the maximum that they are capable of, according to that formula.*"[30] The 568 Cartel—whose member schools have enormous endowments, which have been growing substantially for decades—thus develops a "common formula" to extract from working-and middle-class families "the maximum that they are capable of" paying.

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 130 and, on that basis, denies the allegations.

131. The 568 Exemption allowed the 568 Cartel members not to compete in certain ways only if all the members admitted all students on a need-blind basis. Plaintiffs show herein, however, that by their own actions, Defendants did not satisfy this provision and thus none was entitled to the Exemption. Accordingly, Defendants are all liable for the reduced aid and artificially high net prices of attendance for Class Members that resulted from their agreement and related conspiratorial misconduct.

**ANSWER:** Penn denies the allegations in Paragraph 131.

132. Absent the alleged collusion, Defendants would compete, or compete more aggressively, on price for the students they have decided to admit because these are the students the admissions department has decided would satisfy the goals of the admissions process—among other things, to generate a diverse student body of high academic performers and student-athletes. Defendants view enrolling such students as critical to maintaining their prestige and influence and continuing to attract donations.

**ANSWER:** Penn denies the allegations in Paragraph 132.

133. Given that a large percentage of families cannot afford an elite university education for their children without financial assistance, the 568 Cartel has enabled Defendants to maintain

---

[30] Connor Jones, *On the Record with President DeGioia*, THE GEORGETOWN VOICE (Mar. 6, 2014) (emphasis added), https://georgetownvoice.com/2014/03/06/record-president-degioia/.

artificially inflated net prices of attendance, through artificially reduced financial aid, without losing admitted students to competitor schools.

**ANSWER:** Penn denies the allegations in Paragraph 133.

134.    In short, Defendants' anticompetitive conduct has produced overcharges in the net prices of attendance for all Class Members.

**ANSWER:** Penn denies the allegations in Paragraph 134.

## VII.

## ALLEGATIONS RELATED TO DEFENDANTS' ANTICIPATED DEFENSES

135.    While participating in the conspiracy alleged herein, Defendants have failed to conduct their admissions practices on a need-blind basis because all of them made admissions decisions taking into account the financial circumstances of applicants and their families, through policies and practices that favored the wealthy and disfavored those needing aid, including but not limited to those described below.

**ANSWER:** Penn denies the allegations in Paragraph 135.

136.    Section 568 defines "on a need-blind basis" to mean "without regard to the financial circumstances of the student involved or the student's family."

**ANSWER:** Penn admits that Paragraph 136 purports to summarize Section 568.  To the extent

the allegations in Paragraph 136 are meant to draw conclusions regarding how Section 568 is to

be interpreted or applied, Penn denies the allegations.

137.    An admissions practice can be described as "need-aware," as some admissions offices have used the phrase, if the institution considers an applicant's inability or ability to afford the full price of tuition, room, and board as a factor weighing against acceptance in at least some admissions decisions.

**ANSWER:** The allegations in Paragraph 137 are legal conclusions not subject to admission or

denial, and are not susceptible to being answered because of their ambiguity or vagueness.  To

the extent an answer is required, Penn denies the allegations in Paragraph 137.

**A.**    **Defendants Do Not Employ "Need-Blind" Admissions Policies in Deciding Whether to Admit Waitlisted and Transfer Applicants**

138.    The language of Section 568, as well as its legislative history, makes clear that to qualify for the 568 Exemption, a school must follow need-blind admissions with respect to all

applicants, including those on the waitlist. Section 568 was modeled on the settlement reached between MIT and the Department of Justice in a case against the predecessor to the 568 Cartel, which operated for decades until the early 1990s. It was known as the Overlap Group. The MIT settlement defined "need-blind admissions" to mean "admit[ting] all United States citizens to its undergraduate programs without regard to family financial circumstances, *other than admitted from a wait list.*" (Emphasis added.) In enacting Section 568, Congress generally followed the terms of MIT's settlement, but it *omitted* the exception for waitlisted students.

**ANSWER:** Penn admits that Section 568 is a statutory exemption from the antitrust laws. Penn further admits that the allegations in Paragraph 138 purports to summarize Section 568 and its legislative history. To the extent the allegations in Paragraph 138 are meant to draw legal conclusions regarding how Section 568 is to be interpreted or applied, Penn denies the allegations.

139.    All Defendants, on information and belief, have considered the financial need of waitlisted applicants—both in deciding whether to put them on the waitlist and deciding whether to admit them—despite Section 568's requirement that "all students admitted" be admitted on a need-blind basis. The precise number of affected students varies from Defendant to Defendant, but all schools place a substantial number of its students on their respective waitlists each year, and most Defendants place over 1,000 students on their respective waitlists each year, admitting from as few as only several students to as many as several hundred.

**ANSWER:** Penn denies the allegations in Paragraph 139.

140.    With respect to Penn, for example, a former Penn admissions officer, Karen Crowley, conceded in 2009 that although it is "not an official practice," admissions officers give preference to "full-paying student[s]" on the waitlist over those who need financial aid, especially when "endowments are down and cost-cutting is essential." "If a full-paying student says he'll definitely come, letting him in can be a relief."[31]  On information and belief, Crowley's concession was reflective of Penn's own admissions practices.

**ANSWER:** Penn admits that the quoted language in Paragraph 140 appears in the article referenced in Footnote 31, but denies the Second Amended Complaint's mischaracterization of those statements as attributed to Penn. Penn denies that the purported quotations accurately reflect Penn's actions, views, or understanding. Penn lacks sufficient knowledge or information

---

[31] Kathleen Kingsbury, *Dirty Secrets of College Waitlists*, THE DAILY BEAST (Mar. 30, 2009, updated July 14, 2017), https://www.thedailybeast.com/dirty-secrets-of-college-waitlists.

to admit or deny whether any statements attributed to Ms. Crowley accurately reflect her

statements to the author of the article or the context for any such statements.  Penn denies the

remaining allegations in Paragraph 140.

141.    In May 2021, a college admissions consultant and former Associate Dean of Admissions
at Penn until June 2008, Sara Harberson, acknowledged:  "When I worked as the associate dean
of admissions at the University of Pennsylvania, a need-blind institution, the office was not
forthright about the fact that needing financial aid kept a student from being considered or
admitted from the waitlist.  Many need-blind universities are not open about their policies when
it comes to whom they admit off the waitlist."[32]

**ANSWER:**  Penn admits that the quoted language in Paragraph 141 appears in the article

referenced in Footnote 32, but denies the Second Amended Complaint's mischaracterization of

those statements as attributed to Penn.  Penn denies that the purported quotations accurately

reflect Penn's actions, views, or understanding.  Penn denies the remaining allegations in

Paragraph 141.

142.    Vanderbilt, as a further example, has indicated being need-aware with respect to
waitlisted applicants through statements by its admissions officers.  Vanderbilt has stated on its
website, for example, that it "reserve[s] the right to be need aware when admitting waitlisted
students."[33]  This concession was posted on April 13, 2018, by Kim Struglinski, who joined the
Vanderbilt office of undergraduate admissions in 2015 and thus was a Vanderbilt employee at
the time of the statement.

**ANSWER:**  Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 142 and, on that basis, denies the allegations.

143.    Vanderbilt has indicated it is need-aware for waitlisted applicants on other occasions.  In
2013, a Vanderbilt employee named Carolyn Pippen stated that "we do reserve the right to be
need-aware when admitting waitlisted students."[34]  And in 2014, a Vanderbilt employee named
Jay Watson addressed whether Vanderbilt would be need-aware for waitlisted students that year:

---

[32] Sara Harberson, *How Colleges Play the Waitlist Game*, COURIER TIMES (May 17, 2021),
https://www.buckscountycouriertimes.com/story/opinion/2021/05/17/op-ed-how-colleges-play-waitlist-game-
students-detriment/5071470001/.
[33] Kim Struglinski, *Waitlist FAQ 2018*, VANDERBILT UNIVERSITY UNDERGRADUATE ADMISSIONS (Apr.
13, 2018), https://admissions.vanderbilt.edu/vandybloggers/2018/04/waitlist-faqs-2018/.
[34] Carolyn Pippen, *I'm On the Wait List – Now What*, VANDERBILT UNIVERSITY UNDERGRADUATE
ADMISSIONS (Apr. 12, 2013), https://admissions.vanderbilt.edu/vandybloggers/2013/04/im-on-the-wait-list-now-
what-2/.

"We do reserve the right to be need aware when admitting students from the wait list."[35] Vanderbilt has never publicly stated, however, if in fact it has made need-aware decisions in admitting students from the waitlist.

**ANSWER:**  Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 143 and, on that basis, denies the allegations.

144.    Penn's and Vanderbilt's practices are representative of all the other Defendants' practices with respect to the consideration of waitlisted applicants.  On this basis alone, at each Defendant school, each year, each Defendant has considered the financial circumstances of many hundreds of students in deciding whether to put them on the waitlist and in deciding whether to admit them from the waitlist.  In failing to conduct need-blind admissions as to waitlisted applicants, all Defendants fail to satisfy the requirements of the 568 Exemption, and thus are subject to liability under the antitrust laws.

**ANSWER:**  Penn denies the allegations in Paragraph 144.

145.    All Defendants, on information and belief, have also considered the financial need of transfer applicants in deciding whether to admit them, despite Section 568's requirement that "all students admitted" be admitted on a need-blind basis.  Each Defendant receives at least hundreds (and sometimes over a thousand) transfer applications each year, admitting from as few as only several students to as many as several hundred.

**ANSWER:**  Penn denies the allegations in Paragraph 145.

146.    On this basis, at each school, each year, each Defendant has considered the financial circumstances of many hundreds of students seeking to transfer to the school in deciding whether to admit them.  In failing to conduct need-blind admissions as to transfer applicants, no Defendant qualifies for the 568 Exemption.

**ANSWER:**  Penn denies the allegations in Paragraph 146.

**B.     Columbia Does Not Employ "Need-Blind" Admissions Policies in Deciding Whether to Admit Applicants to Its School of General Studies**

147.    Columbia further engages in need-aware admissions practices that relate to applicants to its School of General Studies, which is an undergraduate program of Columbia.  The School of General Studies is under the governance of Columbia's President, Provost, Trustees, and Faculty of Arts and Sciences, just like Columbia College and equivalent to the School of Engineering

---

[35] Jay Watson, *Vanderbilt Admissions AMA*, VANDERBILT UNIVERSITY UNDERGRADUATE ADMISSIONS (Mar. 31, 2014), https://admissions.vanderbilt.edu/vandybloggers/2014/03/vanderbilt-admissions-ama/.

and Applied Science.[36]  This governance structure contrasts with Barnard College, which is independent of, but affiliated with, Columbia.[37]

**ANSWER:**  Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 147 and, on that basis, denies the allegations.

148.    Columbia's School of General Studies offers an undergraduate degree program for "nontraditional students" who have had a break of a year or more in their studies and for dual-or joint-degree students, who split their time as students between Columbia and other institutions, such as Sciences Po in Paris and Trinity College Dublin.[38]  Students in the School of General Studies take the same courses with the same faculty and undertake the same majors as other undergraduates at Columbia.  They receive a diploma from Columbia like other undergraduates.

**ANSWER:**  Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 148 and, on that basis, denies the allegations.

149.    According to Columbia's website, the School of General Studies comprises more than 2,500 undergraduate students, which is approximately 30% of Columbia's undergraduate student population.[39]  In addition, 68% of undergraduates enrolled in the School of General Studies take classes on a full-time basis.[40]

**ANSWER:**  Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 149 and, on that basis, denies the allegations.

150.    Columbia conceded that "General Studies admissions are not need-blind."[41]  In fact, Columbia has used General Studies to generate revenue that supports other university initiatives, like campus expansions and new scientific research centers.  Columbia's Faculty of Arts & Sciences pays a nine-figure "common-cost tax" to the university.[42]  But General Studies recruits and enrolls a less wealthy, more socioeconomically diverse student body than Columbia's other

---

[36] *Compare* COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CHARTERS AND STATUTES (2017), art. XXII (Faculty of General Studies), *with* art. XI (Columbia College), art. XIV (Faculty of Engineering and Applied Science).
[37] *See id.*, art. XXIII.
[38] Columbia School of General Studies, *Dual and Joint Degree Programs*, https://gs.columbia.edu/ content/dual-and-joint-degree-programs.
[39] Columbia University, *Fall Headcount Enrollment by School*, 2010-2019 (Jan. 13, 2020), https://opir.columbia.edu/sites/default/files/content/Statistical%20Abstract/opir_enrollment_history.pdf.
[40] Columbia School of General Studies, *Statistics and Facts*, https://gs.columbia.edu/content/ statistics-and-facts.
[41] Eli Lee, *Public Health Professor Lisa Rosen-Metsch Appointed Dean of General Studies*, COLUMBIA SPECTATOR (Nov. 14, 2017), https://www.columbiaspectator.com/news/2017/11/14/public-health-professor-lisa-rosen-metsch-appointed-dean-of-general-studies/.
[42] Michael Ouimette, *Unfunded Mandate: Columbia College, Arts and Sciences, and the Bollinger Era*, COLUMBIA SPECTATOR (May 5, 2016), https://www.columbiaspectator.com/lead/2016/05/05/ unfunded-mandate-columbia-college-arts-and-sciences-and-bollinger-era/.

undergraduate programs.[43]  The burden of supporting Columbia's preservation of prestige and financial accumulation therefore falls on those who can least afford it.

**ANSWER:**  Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 150 and, on that basis, denies the allegations.

151.    Accordingly, in failing to conduct need-blind admissions as to applicants for the School of General Studies, Columbia does not qualify for the 568 Exemption.

**ANSWER:**  Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 151 and, on that basis, denies the allegations.

152.    In sum, during the period of the conspiracy alleged herein, all Defendants have considered the financial need of waitlisted and transfer applicants, and Columbia has considered the financial need of students applying to the School of General Studies, in deciding whether to admit such students to attend their undergraduate programs on a full-time basis.  This conduct extinguishes the 568 Exemption for all members of the 568 Cartel.

**ANSWER:**  Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 152 regarding Columbia University's School of General Studies and, on that basis, denies the allegations.  Penn denies the remaining allegations in Paragraph 152.

153.    In addition, if any Defendant has not considered the financial circumstances of applicants or their families in making admissions decisions, the fact that other Defendants have done so— and thus that the Cartel includes non-exempt schools with whom otherwise hypothetically compliant schools collude—extinguishes the 568 Exemption for all members of the 568 Cartel. Quite simply, no school was entitled to protection under the Exemption if it colluded with any non-need-blind schools.

**ANSWER:**  The allegations in Paragraph 153 are legal conclusions not subject to admission or denial.  To the extent an answer is required, Penn denies the allegations in Paragraph 153.

---

[43] Jessica Spitz, *At a crossroads; The future of GS*, COLUMBIA SPECTATOR (Apr. 20, 2017), https://www.columbiaspectator.com/news/2017/04/20/at-a-crossroads-the-future-of-gs/ ("[T]he population skews older and many are juggling jobs, raising families, and often do not have parents to rely on for tuition money.").

**C.    Emory Does Not Employ "Need-Blind" Admissions Policies in Deciding Whether to Admit Applicants to Oxford College**

154.    Oxford College is an undergraduate division of Emory University, exclusively for first- and second-year students.

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 154 and, on that basis, denies the allegations.

155.    Oxford College is openly need aware.  The Emory University News Center stated in 2013: "[D]ue to the combination of internal and external financial pressures.  Oxford College implemented a need-sensitive framework in admitting and shaping part of its freshman class."[44]

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 155 and, on that basis, denies the allegations.

**D.    Certain Defendants' Enrollment Management Practices Are Not "Need-Blind"**

156.    Among Defendants, at least Dartmouth, Columbia, Northwestern, Notre Dame, and Penn engage in need-aware admissions through "enrollment management."

**ANSWER:** The allegation in Paragraph 156 regarding "enrollment management" is not susceptible to being answered because of its ambiguity or vagueness.  To the extent an answer is required, Penn denies the allegation.  As to the allegations in Paragraph 156 that relate to Dartmouth, Columbia, and Notre Dame, Penn does not have knowledge or information sufficient to form a belief as to the truth of those allegations and, on that basis, denies the allegations.

157.    Enrollment management is "the systematic integration of the functions of admissions, the relationship between tuition and fees (pricing) and financial aid, and student retention, along with the use of research to inform institutional policies and practices."[45]  It is a "managerial paradigm" that brings together admissions and other institutional functions "into a comprehensive institutional approach designed to enable college and university administrators to exert greater influence over the factors that shape their enrollments."[46]

---

[44] Beverly Clark, Commitment to Excellence Guides Financial Aid, EMORY NEWS CENTER (Jan. 17, 2013), https://news.emory.edu/stories/2013/01/er_financial_aid/campus.html.
[45] Don Hossler, *Origins of Strategic Enrollment Management*, in HANDBOOK OF STRATEGIC ENROLLMENT MANAGEMENT 5 (Don Hossler and Bob Bontrager, eds., 2014).
[46] *Id*. at 4, 7-8.

**ANSWER:** Penn admits that the allegations in Paragraph 157 purport to describe information from a book cited in Footnotes 45 and 46. Penn does not have knowledge or information sufficient to form a belief as to the truth of the information and, on that basis, denies the allegations in Paragraph 157 that are related to the information or purport to rely on the information for support.

158. One of the key purposes of enrollment management is to limit the number of financial-aid-eligible applicants who are admitted to the institution to achieve financial and budgetary objectives. The effect of these practices is to disadvantage applicants based on their need for institutional financial aid.

**ANSWER:** The allegations in Paragraph 158 regarding "enrollment management" are not susceptible to being answered because of their ambiguity or vagueness. To the extent an answer is required, Penn denies the allegations. Penn denies the remaining allegations in Paragraph 158.

159. Econometric modeling is central to enrollment management. As explained by Stephen Brooks, a higher-education consultant whose client list includes Columbia and Penn,[47] models draw on standard elements of college applications—academic ability, geography, demographics, interests, whether the student has requested aid, and more—to assess an applicant's likelihood of enrolling if offered admission.[48] These yield models, in turn, permit schools to forecast the revenue and cost implications of their admissions and financial-aid decisions.[49]

**ANSWER:** Penn admits that the allegations in Paragraph 159 purport to describe information from several publications. Penn does not have knowledge or information sufficient to form a belief as to the truth of the information and, on that basis, denies the allegations in Paragraph 159 that are related to the information or purport to rely on the information for support.

160. One anonymous enrollment manager has said: "Good luck getting any institution to tell you exactly how they handle ability to pay as a driver in their admit decision. . . . What they will

---

[47] *Our Clients*, SHBrooks, https://www.shbrooks.com/clients.
[48] Stephen H. Brooks, *Using Campus-Based Financial Aid Strategically*, in HANDBOOK OF STRATEGIC ENROLLMENT MANAGEMENT 223-26 (Don Hossler and Bob Bontrager, eds., 2014); Stephen H. Brooks, *Econometric Modeling of Enrollment Behavior*, 26 J. Student Fin. Aid 7, 9-10 (1996).
[49] Brooks, *Using Campus-Based Financial Aid Strategically*, at 226; Brooks, *Econometric Modeling of Enrollment Behavior*, at 16-17.

say is 'We're need blind.' That's bullshit. They would never tell you exactly how they do it, but they do it all the time."[50]

**ANSWER:** Penn admits that the allegations in Paragraph 160 purport to describe statements made by an "anonymous enrollment manager." Penn lacks knowledge or information sufficient to form a belief as to the truth of the statements set forth therein, and, on that basis, denies the remaining allegations in Paragraph 160.

161.     Indeed, these institutions know their practices are legally problematic, and thus they maintain a shroud of secrecy over them. For instance, author Jeff Selingo asked two dozen colleges or universities for access to their admissions practices. Nearly all refused, some because they were "worried about exposing how they shaped their class based on the financial need of applicants."[51] Selingo also wrote: "Even at need-blind schools, admission eventually can come down to money. Those colleges control how much they spend on financial aid by recruiting heavily in rich high schools and admitting in early decision a significant proportion of students who tend to be wealthier. And even when schools are need-blind, admissions officers still see the zip codes and the occupations of parents when reviewing applications."[52]

**ANSWER:** Penn denies that *its* practices are "legally problematic" and denies that it maintains a "shroud of secrecy" over those practices. Penn does not have knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 161 and, on that basis, denies the allegations.

162.     In 2015, Dartmouth created the position of Vice Provost for Enrollment Management, announcing that it would permit the university "to use a wealth of newly available data to identify and recruit prospective students."[53] In 2016, Dartmouth announced its hiring of Lee Coffin from Tufts University, a need-aware school.[54] At Tufts, Coffin operated under strict budgetary limits.[55] He shaped the cohort of admitted students to bring revenues and costs in line. His admissions office sent tentative acceptances to the financial-aid office, which modeled the revenue and cost implications so that the admissions office would meet the university's

---

[50] Matthew Quirk, *The Best Class Money Can Buy*, THE ATLANTIC (Nov. 2005) https://www.theatlantic.com/magazine/archive/2005/11/the-best-class-money-can-buy/304307/.
[51] Jeffrey Selingo, WHO GETS IN AND WHY: A YEAR INSIDE COLLEGE ADMISSIONS 13 (2020).
[52] *Id*. at 212.
[53] Dartmouth University, Office of Communication, *Search Has Begun for Undergraduate Admissions Leader* (Oct. 29, 2015), https://news.dartmouth.edu/news/2015/10/search-has-begun-undergraduate-admissions-leader.
[54] Bill Platt, *Lee Coffin to Lead Enrollment, Admissions, and Financial Aid*, DARTMOUTH NEWS (Feb. 4, 2016), https://news.dartmouth.edu/news/2016/02/lee-coffin-lead-enrollment-admissions-and-financial-aid.
[55] Carly Olson, *Crunching the Numbers*, TUFTS OBSERVER (Apr. 25, 2016), https://tuftsobserver.org /crunching-the-numbers/ ("My responsibility as Dean is that I can't spend more dollars than Tufts has. They give me a checkbook every year and they say spend all of it, but don't spend more than that."); *see also id.* ("This year, Coffin said admissions had $19.7 million and 1,325 spots to consider when making their decisions.").

budgetary goals.  As Coffin has acknowledged, "Shifting things at the end . . . happens every year."[56]

**ANSWER:**  Penn admits that the allegations in Paragraph 162 describe statements attributed to a

press release and news articles.  Penn does not have knowledge or information sufficient to form

a belief as to the truth of the statements and, on that basis, denies the allegations in Paragraph

162 that are related to the statements or purport to rely on the statements for support.

163.    The President of Northwestern since 2009, Morton Schapiro, has been described as "a dean of 'enrollment management,' the art of shaping an incoming class through recruitment, aid, early admission, waiting lists and other variables."[57]  During President Schapiro's tenure, at least, Northwestern has employed enrollment management.

**ANSWER:**  Penn admits that the allegations in Paragraph 163 describe statements attributed to

an article published by The Washington Post.  Penn does not have knowledge or information

sufficient to form a belief as to the truth of the statements and, on that basis, denies the

allegations in Paragraph 163 that are related to the statements or purport to rely on the statements

for support.  Further, Penn does not have knowledge or information sufficient to form a belief as

to the truth of the allegation that Northwestern University employs enrollment management and,

on that basis, denies the allegation.

164.    Notre Dame also employs an "enrollment management model."[58]  Announcing in 2010 the hire of its associate vice-president for undergraduate enrollment, Don Bishop, Notre Dame praised his "innovative marketing and financial aid strategies" in prior enrollment-management jobs.[59]  Announcing a new Dean of Admissions in 2019, Notre Dame touted her status as "a featured presenter at national enrollment management conferences and events."[60]  In addition, Notre Dame has a partnership with a software company that develops data-visualization tools,

---

[56] *Id*.

[57] Daniel de Vise, *Northwestern now a first choice to many, its president says*, THE WASHINGTON POST (Apr. 14, 2011), https://www.washingtonpost.com/blogs/college-inc/post/schapiro-northwestern-now-a-first-choice-to-many/2011/04/13/AFSXTacD_blog.html.

[58] Jordan Cockrum and Natalie Weber, *Notre Dame, SMC communities evaluate opportunities, efforts for low socioeconomic students*, THE OBSERVER (Apr. 30, 2018), https://ndsmcobserver.com /2018/04/efforts-low-socioeconomic-students/.

[59] Dennis Brown, *Notre Dame alumnus Bishop appointed associate VP for undergraduate enrollment*, NOTRE DAME NEWS (Sept. 15, 2010), https://news.nd.edu/news/notre-dame-alumnus-bishop-appointed-associate-vp-for-undergraduate-enrollment/.

[60] Joyce Lance, *Christy Pratt appointed director of admissions*, NOTRE DAME NEWS (July 1, 2019), https://news.nd.edu/news/christy-pratt-appointed-director-of-admissions/.

touting "improved scenario analyses on all data associated with an applicant or prospective enrollee."[61]  Notre Dame is thus using data analysis to shape need-aware admissions decisions.

**ANSWER:**  Penn admits that the allegations in Paragraph 164 describe statements attributed to press releases and a news article.  Penn does not have knowledge or information sufficient to form a belief as to the truth of the statements and, on that basis, denies the allegations in Paragraph 164 that are related to the statements or purport to rely on the statements for support. Further, Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegation that the University of Notre Dame employs "enrollment management" and, on that basis, denies the allegation.

165.    Columbia's, Dartmouth's, Northwestern's, Notre Dame's, and Penn's use of enrollment management thus involves the resolution of admissions decisions *with* regard to the financial circumstances of the applicant or their family, in that such management (i) identifies relatively wealthy students, for the benefits (direct and indirect) that the school expects from their admission, and (ii) identifies relatively less wealthy students in order to limit the total amount of financial aid—and then acts upon that information to meet budgetary goals.

**ANSWER:**  The allegations in Paragraph 165 regarding "enrollment management" are not susceptible to being answered because of their ambiguity or vagueness.  To the extent an answer is required, Penn denies the allegations.  Further, Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 165 regarding Columbia's, Dartmouth's, Northwestern's, or Notre Dame's use of "enrollment management" and, on that basis, denies the allegations.

**E.      Defendants Consider Family Financial Circumstances in Giving Preference to the Children of Wealthy Past or Potential Donors, and Thus Do Not Adhere to a Need-Blind Admissions Policy**

166.    Defendants consider applicants' "financial circumstances" through admissions preferences given to the children of wealthy past or potential donors, such that their chances of admission increase significantly.  Such Defendants understand that these applicants—commonly

---

[61] Leila Meyer, *U Notre Dame, SynGlyphX Partner on Enrollment Data Visualization Tool*, CAMPUS TECH. (Jan. 13, 2016), https://campustechnology.com/articles/2016/01/13/u-notre-dame-synglyphx-partner-on-enrollment-data-visualization-tool.aspx?admgarea=news.

known as "development cases" or "development admits"—have no need for financial aid and that their admission could generate a substantial financial return for the university.

**ANSWER:** Penn denies the allegations in Paragraph 166 that relate to Penn. As to the

allegations in Paragraph 166 that relate to the other Defendants, Penn does not have knowledge

or information sufficient to form a belief as to the truth of those allegations and, on that basis,

denies the allegations.

167.    Consequently, the development offices of such Defendants analyze and monitor these applicants and coordinate with the university presidents or admissions offices during the admissions cycle. In short, awarding special treatment to the children of wealthy prior and potential donors necessarily means some less privileged applicants are not admitted on account of their financial circumstances to make room for the wealthy.

**ANSWER:** Penn denies the allegations in Paragraph 167 that relate to Penn. As to the

allegations in Paragraph 167 that relate to the other Defendants, Penn does not have knowledge

or information sufficient to form a belief as to the truth of those allegations and, on that basis,

denies the allegations.

168.    Defendants also consider large donations, and even financial capacity in the absence of any donation history, as plus factors for admission. Assessing potential donations of an applicant's family necessarily involves considering the income, assets, and other financial circumstances of that family. Similarly, considering a family's past donations, pursuant to the agreement of the 568 Cartel, constitutes the consideration of family financial circumstances.

**ANSWER:** Penn denies the allegations in Paragraph 168 that relate to Penn. As to the

allegations in Paragraph 168 that relate to the other Defendants, Penn does not have knowledge

or information sufficient to form a belief as to the truth of those allegations and, on that basis,

denies the allegations.

169.    In considering the wealth and donation history of certain students and their families, moreover, such Defendants implicitly consider less privileged applicants' lack thereof. Because of the limited number of spots available in any given class, the advantage given to one group entails a disadvantage imposed on the other. Privileging the wealthy and disadvantaging the financially needy are inextricably linked; they are two sides of the same coin.

**ANSWER:** Penn denies the allegations in Paragraph 169 that relate to Penn. As to the allegations in Paragraph 169 that relate to the other Defendants, Penn does not have knowledge or information sufficient to form a belief as to the truth of those allegations and, on that basis, denies the allegations.

170. In addition, such Defendants are committed to maintaining admissions as a zero-sum game, by limiting growth in the number of undergraduate seats to maximize perceptions of exclusivity and prestige. Defendants' presidents and senior admissions and development officers know that the other Defendants routinely favor children from wealthy families and thereby fail to admit all students without regard to their financial circumstances or that of their families.

**ANSWER:** Penn denies the allegations in Paragraph 170 that relate to Penn. As to the allegations in Paragraph 170 that relate to the other Defendants, Penn does not have knowledge or information sufficient to form a belief as to the truth of those allegations and, on that basis, denies the allegations.

171. Darrell M. West, a professor at Brown from 2000-2008, has stated: "When I taught at Brown, I periodically was asked to meet with children of the rich and famous who were seeking admission to the university. I did so and wrote letters to the admissions office giving my impressions of the applicant. The university claims there was no pressure to admit well-connected individuals, but it was clear to me Brown thrived on its reputation as a 'hot Ivy' that had lots of prominent students there. It admitted many well-deserving and talented students, but many on the faculty recognized the university's interest in having children of prominent individuals on campus because it generated publicity for Brown and sometimes paid off down the road in financial contributions to the university. Looking back on these experiences, I can see that wealthy students had admissions advantages over the average applicant because the latter were not getting one-on-one meetings with faculty members or special consideration by the admissions office."[62]

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 171 and, on that basis, denies the allegations.

172. A former Dean of Admissions at Dartmouth, Maria Laskaris, said in 2019: "The ultra-rich have an additional advantage in their ability to donate large sums of money to universities, which can boost their kids' chances of acceptance." According to Laskaris, admissions officers

---

[62] Scott Jaschik, *Advantages for Legacies and Wealthy at Brown*, INSIDER HIGHER ED (Mar. 25, 2019), https://www.insidehighered.com/admissions/article/2019/03/25/brown-faces-questions-about-benefits-it-has-provided-legacy-applicants.

are "made aware of" this factor because "colleges are always in fundraising mode."[63]  At Dartmouth, development officers meet with admissions staff to review a list created by the development office.  Each year, up to 50 applicants may be considered through this special process, most of whom are admitted, accounting for 4-5% of Dartmouth's student body.[64]

**ANSWER:**  Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 172 and, on that basis, denies the allegations.

173.    An email exchange exposed by the Sony hack in 2014 illustrates Dartmouth's efforts to evaluate and court wealthy potential donors.[65]  Michael Lynton, CEO of Sony Pictures Entertainment, intended to visit Dartmouth with his daughter, a prospective student.  Michael Lynton is not an alumnus of Dartmouth, and public records have not shown that Lynton had previously donated to Dartmouth.  On the eve of his visit, Lynton received a solicitous email from Jeff Sassorossi, a 1975 Dartmouth graduate and then Dartmouth's "Director, Special Projects & Reporting."  Sassorossi explained that his role at Dartmouth was "to serve as the liaison between the Advancement (Alumni Relations and Development) and Admissions.  As such, I work with families as they go through the admissions process at Dartmouth."  Sassorossi offered Lynton and his daughter a personal tour of the campus.  Sassorossi's email also indicated that Lynton was being recruited to Dartmouth by Leon Black, a billionaire private equity investor, major Dartmouth benefactor, and former trustee.[66]

**ANSWER:**  Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 173 and, on that basis, denies the allegations.

174.    Despite these entreaties, Lynton's daughter enrolled at Brown, which got the $1 million donation from Lynton instead of Dartmouth.[67]  The opinion editor for the *Brown Daily Herald* described Lynton's gift to Brown as "a $1 million check to Brown with more strings attached than the Los Angeles Philharmonic.  Anyone with a pulse can trace the probable outcome of this 'philanthropy'—a prospective student connected to Lynton gets accepted to Brown!"[68]

---

[63] Jill Tucker, *In the College Admissions Game, Even the Legal Kind, Money Has Always Mattered*, SAN FRANCISCO CHRON. (Mar. 12, 2019), https://www.sfchronicle.com/bayarea/article/In-the-college-admissions-game-even-the-legal-13683518.php.
[64] Joseph Asch, *Donor Admissions: How It Works Now*, DARTBLOG (Sept. 29, 2014), http://www.dartblog.com/data/2014/09/011686.php.
[65] *See* Joseph Asch, *VIP Donor Preferences Cont'd*, DARTBLOG (Feb. 4, 2016), http://www.dartblog.com/data/2016/02/012467.php; Email from Jeff T. Sassorossi to Michael Lynton, Re: Dartmouth College Visit (Mar. 28. 2014), https://wikileaks.org/sony/emails/emailid/132718.
[66] *See* Peter Lattman, *Apollo's Leon Black Donates $48 Million to Dartmouth*, N.Y. TIMES DEALBOOK (Mar. 29, 2012), https://dealbook.nytimes.com/2012/03/29/apollos-leon-black-donates-48-million-to-dartmouth; Office of Communications, Dartmouth University, *Dartmouth Board Elects Three New Charter Trustees*, DARTMOUTH NEWS (June 13, 2011) (announcing Black was stepping down after two terms as trustee), https://news.dartmouth.edu/news/2011/06/dartmouth-board-elects-three-new-charter-trustees.
[67] Chad Simon, *Simon '16: Pimp My University*, BROWN DAILY HERALD (Oct. 21, 2015), https://www.browndailyherald.com/2015/10/21/simon-16-pimp-my-university/.
[68] *Id.*

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 174 and, on that basis, denies the allegations.

175.    According to journalist Daniel Golden's book *The Price of Admission*, Defendant Duke "enrolled thousands of privileged but underqualified applicants with no prior ties to the university in the expectation of parental payback."[69] According to Golden, Duke "accepted at least one hundred nonalumni children each year due to family wealth."[70] In some years, between 3-5% of Duke's student body consists of students "who would have been turned away without pressure from the development office."[71]

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 175 and, on that basis, denies the allegations.

176.    While serving as president of Duke, Richard Brodhead admitted that "it would be naïve to say that any university should pay no attention to a family's ability to help the university," explaining that a family's ability to donate to Duke was a "plus factor" in admissions."[72] A former Director of Undergraduate Admissions at Duke, Jean Scott, estimated that "a couple of hundred" applicants a year received special attention as children of prospective donors. Scott admitted that there "were certainly students who got in because they were a high priority" for fundraising. Scott also said that there "was more of this [fundraising-related] input at Duke than at any other institution I ever worked for."[73]

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 176 and, on that basis, denies the allegations.

177.    The longstanding Dean of Admissions for Georgetown, Charles Deacon, was asked by a reporter: "What about children of alumni and *potential* donors?" (Emphasis added.) In response, Dean Deacon candidly admitted: "On the fundraising side, we also have a small number of 'development *potential*' candidates. If Bill Gates wants his kid to come to Georgetown, we'd be more than happy to have him come and talk to us." (Emphasis added.) Dean Deacon continued to point out that "not all those special cases end up being people who give a lot of money. We have children of Supreme Court justices, senators, and so on apply. We may give extra consideration to them because of the opportunities that may bring."[74]

---

[69] Daniel Golden, THE PRICE OF ADMISSION 54 (2006).
[70] *Id.*
[71] *Id.* at 57.
[72] Geoffrey Mock, *Brodhead Discusses Early Admissions, Developmental Admits*, DUKE TODAY (Sept. 22, 2006), https://today.duke.edu/2006/09/admit.html.
[73] Daniel Golden, *How Lowering the Bar Helps Colleges Prosper*, WALL ST. J. (Sept. 9, 2006), https://www.wsj.com/articles/SB115774251817757837.
[74] Alvin P. Sanoff, *Getting in to Top Schools*, WASHINGTONIAN (Oct. 1, 2007), https://www.washingtonian.com/2007/10/01/getting-in-to-top-schools/.

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 177 and, on that basis, denies the allegations.

178.     In short, Georgetown admits a range of students based on their families' wealth, prestige, and influence.  Some of these students are given "extra consideration" based on their parents' influence or political power, without any expectation of a financial contribution.  On the other hand, some *are* given "extra consideration" on the basis of their "development potential"—namely, the ability of the family to make a financial contribution to the institution, and the likelihood that it will do so.

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 178 and, on that basis, denies the allegations.

179.     Indeed, Dean Deacon has also candidly admitted that Georgetown favors past donors, as well as potential donors, and has even admitted that Georgetown calibrates the extent of the admissions advantage to the size of the donation:  "If you were very close to the edge and the family's given to the annual fund every year or something, that might be enough of a tip to get you in.  If you're a little farther from the edge, but the family has built Regents Hall, that might tip a little farther."[75]

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 179 and, on that basis, denies the allegations.

180.     A former Director of Selection at MIT, McGreggor Crowley, admitted in March 2019: "In truth, for every office of admissions there is a development office that builds a university's endowment through donations from alumni and wealthy individuals.  And every year, regardless of what a college or university says publicly, a number of children of wealthy donors and alumni get a nod in their direction while other applicants are rejected."[76]  In an interview with NBC News, Crowley admitted that "as for the children of prominent campus donors, . . . a college's development office might reach out to the dean of admissions to say, 'Hey, just so you know, Lisa's dad has been very generous to us in the past, or something.'" NBC News reported that according to Crowley:  "Usually, that kind of information [about a family's financial contribution] is relayed to the most senior officials in an admissions office."[77]

---

[75] Suzanne Monyak, *Legacy Status Tips Admission*, THE HOYA (Mar. 20, 2015), https://thehoya.com/legacy-status-tips-admission-scales/.
[76] McGreggor Crowley, *Confessions of a Former MIT Admissions Director*, BOSTON GLOBE (Mar. 13, 2019), https://www.bostonglobe.com/opinion/editorials/2019/03/13/confessions-former-admissions-director/qPQppf0AhpJIbIJ8mZ6q9L/story.html.
[77] Daniel Arkin, *The College Admissions Scandal is Just the Extreme Version of a System that Already Favors the Wealthy*, NBC, https://www.nbcnews.com/news/us-news/college-cheating-scandal-two-ex-admissions-officers-explain-behind-scenes-n983796.

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 180 and, on that basis, denies the allegations.

181. At Northwestern, a separate admissions process exists for the wealthy and well connected. On April 24, 2019, *The Daily Northwestern* published an article with the headline: "Northwestern President Schapiro Says He Reads Applications of Some Legacy, Donor Students." As revealed in the article, in the 2018-19 admissions cycle, Schapiro personally reviewed the applications of about 550 students, including applications associated with wealthy donors. A Northwestern spokeswoman has further admitted that President Schapiro was "frequently involved in dealing with principal donors to the University."[78]

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 181 and, on that basis, denies the allegations.

182. One of the student reporters who broke the story about Northwestern's two-track admissions system later stated in a podcast interview: "[President Schapiro] also told us that he tries to work with the Dean of Admissions Christopher Watson, as much as he can. He brought up an example that if they both disagreed on an applicant that they try to work it out."[79] President Schapiro is the boss at Northwestern, and the Dean of Admissions reports to him. The head of the university is using his discretion to make or influence numerous admissions decisions. Schapiro's involvement in admissions decisions for applicants associated with wealthy donors was not public until revealed by reporting in 2019.

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 182 and, on that basis, denies the allegations.

183. The Director of Admissions at Notre Dame for thirty-six years until his retirement in July 2019, Bob Mundy, made appearances at alumni gatherings during his tenure in office. Mundy's biography at these appearances stated: "In his current position as Director of Admissions Operations, he oversees the 35 members of staff, and recruitment efforts that have included as many as 40,000 annual inquiries and a record-setting 16,500 applications for the 2011 class. Ultimately, the office is responsible for 'delivering' a freshmen class of approximately 2,000 students, while also satisfying the needs of various constituencies: i.e. alumni, athletics, *the Development Office*, etc." (Emphasis added.)

---

[78] Alan Perez and Gabby Birenbaum, *Northwestern President Schapiro Says He Reads Applications of Some Legacy, Donor Students*, THE DAILY NORTHWESTERN (Apr. 24, 2019), https://dailynorthwestern.com/2019/04/24/campus/northwestern-president-schapiro-says-he-reads-applications-of-some-legacy-donor-students/?print=true.

[79] Cassidy Jackson and Heena Srivastava, *The Weekly: University President Morton Schapiro Reveals Role in Admissions Process*, THE DAILY NORTHWESTERN (May 3, 2019), https://dailynorthwestern.com/2019/05/03/multimedia/audio/the-weekly-university-president-morton-schapiro-reveals-role-in-admissions-process/.

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 183 and, on that basis, denies the allegations.

184.    The current Associate Vice Provost for Undergraduate Enrollment at Notre Dame, Don Bishop, acknowledged the significant influence that donations play in the Notre Dame admissions process.  Indeed, he admitted that if someone gave $15 million, then their children would be given "some special interest" during the Notre Dame admissions process.[80]

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 184 and, on that basis, denies the allegations.

185.    Penn also tracks past and potential donors, rewarding past donors and enticing potential donors by admitting their children.  A former Associate Dean of Admissions, Sara Harberson, has described the university's use of "tags" to track applicants that are "a high priority for the institution." Penn tags the applications of "children of donors or potential donors," among others, giving those applicants "the proverbial golden ticket."[81] The university has "spots reserved" for these "development cases," whose "parents have already given significant money to the institution, or plan to."[82]

**ANSWER:** Penn admits that the quoted language in Paragraph 185 appears in the article referenced in Footnote 81 and the video referenced in Footnote 82, but denies the Second Amended Complaint's mischaracterization of those statements as attributed to Penn.  Penn denies that the purported quotations accurately reflect Penn's actions, views, or understanding. Penn denies the remaining allegations in Paragraph 185.

186.    A past Chancellor of Vanderbilt, E. Gordon Gee, stated in 2019 that any president under "truth serum" would concede that donor connections make a difference in admissions.[83]

---

[80] Daniel Golden, *How Wealthy Families Manipulate Admissions at Elite Universities*, TOWN & COUNTRY (Nov. 21, 2016), https://www.townandcountrymag.com/society/money-and-power/news/ a8718/daniel-golden-college-admission/.
[81] Sarah Harberson, *The Truth about 'Holistic" College Admissions*, LOS ANGELES TIMES (June 9, 2015), https://www.latimes.com/opinion/op-ed/la-oe-harberson-asian-american-admission-rates-20150609-story.html.
[82] Vice News, *How Broken the College Admissions Process Is*, YOUTUBE (Mar. 13, 2019) (Harberson quoted at 5:20), https://www.youtube.com/watch?v=0v5yHnWCiLE&feature=emb_logo.
[83] Jack Stripling, *It's an Aristocracy: What the Admissions-Bribery Scandal Has Exposed About Class on Campus*, THE CHRONICLE OF HIGHER EDUCATION (Apr. 17, 2019), https://www.chronicle.com /article/its-an-aristocracy-what-the-admissions-bribery-scandal-has-exposed-about-class-on-campus/?cid2=gen_login_refresh&cid=gen_sign_in.

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 186 and, on that basis, denies the allegations.

187.     Certain universities may independently choose to favor the children of the wealthy if they like, thereby disfavoring every other applicant.  But if they make that choice, they cannot lawfully conspire on financial-aid policies.  The law does not allow them to do both.  Defendants must choose between continuing their wealth favoritism and need-aware admissions practices, on the one hand, and participation in the lucrative 568 Cartel, on the other.

**ANSWER:** The allegations in Paragraph 187 are legal conclusions not subject to admission or

denial.  To the extent an answer is required, Penn denies the allegations in Paragraph 187.

### F.     The Section 568 Exemption Applies Only to a Group of Schools That All Employ "Need-Blind" Admissions Policies Within the Term's Statutory Meaning

188.     The 568 Exemption, as noted, precludes any school invoking it from taking account of "the financial circumstances" of a student or their family in making admissions decisions.  Under the well-established rules of statutory construction, any contrary interpretation of the text of the 568 Exemption would be impermissible speculation as to Congress's intent—in particular, where any antitrust exemption is construed narrowly (with what courts have described as "beady eyes and green eyeshades").  Just as fundamental, the evidence of the purpose and overarching goal of the 568 Exemption, as reflected in its legislative history, compels this interpretation of the plain meaning of "need-blind" as defined in the statute.

**ANSWER:** The allegations in Paragraph 188 are legal conclusions not subject to admission or

denial.  To the extent an answer is required, Penn denies the allegations in Paragraph 188.

189.     The 568 Exemption replaced what had been a general temporary antitrust exemption.  The 1994 legislative history of the enactment of Section 568 explains in relevant part:  "This provision extends for an additional three years the temporary antitrust exemption for certain collegiate financial aid award analysis, which was originally enacted with the Higher Education Amendments of 1992 as a two-year exemption."  H.R. Conf. Rep. 103-761, 911-12, 1994 U.S.C.C.A.N. 2901, 3242-43.  This report explained that, as noted above, Section 568 is modeled on the MIT-DOJ settlement:  "The temporary exemption has also been revised in light of the 'standards of conduct' adopted as part of the settlement of the antitrust action between the Department of Justice and Massachusetts Institute of Technology in the case of *United States v. Brown University, et al*., Civ. Action No. 91-3274 (E.D. Pa.), on December 22, 1993."  *Id.*

**ANSWER:** Penn admits that Paragraph 189 purports to summarize Section 568 and its

legislative history.  To the extent the allegations in Paragraph 189 are meant to draw legal

conclusions regarding how Section 568 is to be interpreted or applied, Penn denies the

allegations.

190.    The referenced "standards of conduct" provided in relevant part:  "Non-profit institutions of higher education may participate in the cooperative financial aid arrangements set forth below ('Participating Schools'), provided that they practice need-blind admissions; that is, admit all United States citizens to its undergraduate programs without regard to family financial circumstances, other than admitted from a wait list." This legislative history thus makes clear that Section 568's language tracks the language in the "standards of conduct" precluding admissions *with* regard to "family financial circumstances."

**ANSWER:**  Penn admits that Paragraph 190 purports to summarize Section 568 and its

legislative history.  To the extent the allegations in Paragraph 190 are meant to draw legal

conclusions regarding how Section 568 is to be interpreted or applied, Penn denies the

allegations.  Penn denies the remaining allegations in Paragraph 190.

191.    This legislative history further states that the 568 Exemption "applies only to institutions of higher education that admit students on a need-blind basis.  The definition of 'on a need-blind basis' in subsection (c)(6) is based on language in the 'standards of conduct' adopted in the MIT settlement.  However, a conspicuous difference between the statutory language and the MIT standards of conduct is that the statute deletes the phrase 'other than admitted from a wait list.' *See also United States v. Brown University*, 5 F.3d 658 (1993)." H.R. Conf. Rep. 103-761, 911-12, 1994 U.S.C.C.A.N. 2901, 3242-43.  This conference report further states:

> The managers have decided against elaborating on the need-blind admissions standard in the statutory text.  As should be obvious, however, evidence of a practice among admissions personnel at an institution of higher education of examining, discussing, or otherwise considering information relating to a student's financial circumstances that is derived from such student's financial aid application form, *or from any other document or record obtained for the purpose of ascertaining such financial circumstances*, before the decision is made regarding the student's admission will substantially increase the institution's burden of demonstrating that the school's admissions policy is truly need-blind.
> Id. (emphasis added).  The report then specifies:  "Prudence would counsel that schools wishing to make use of this provision insulate their admissions, process and admissions personnel as completely as possible from such student financial aid information, until after the admissions process is complete."  Id. (emphasis added).
> Consistent with the statute, no exception is made for applicants on the institution's waitlists.

**ANSWER:** Penn admits that Paragraph 191 purports to summarize Section 568 and its legislative history. To the extent the allegations in Paragraph 191 are meant to draw legal conclusions regarding how Section 568 is to be interpreted or applied, Penn denies the allegations. Penn denies the remaining allegations in Paragraph 191.

192.     This aspect of the legislative history thus reflects Congress's intent that a "truly need-blind" admissions policy would not permit a school invoking the 568 Exemption to use the information that the 568 Cartel has used and continues to use to consider the financial circumstances of an applicant's family for admissions purposes—including (i) the common application (which asks questions about the parents' occupation for the purpose, at least in part, of ascertaining the financial circumstances of the applicant and their family); (ii) emails between development and admissions, as well as any "tags" that admissions uses to flag development prospects, obtained for the purpose of ascertaining the financial circumstances of the applicant and their family; (iii) any documents that admissions receives identifying one or both parents as donors, or regarding donation history, or identifying one or both parents as alumni; and (iv) the information integral to enrollment management.

**ANSWER:** The allegations in Paragraph 192 are legal conclusions not subject to admission or denial. To the extent an answer is required, Penn denies the allegations in Paragraph 192.

193.     The 2001 legislative history to the renewal of the 568 Exemption further confirms the following congressional goal and purpose: "No student who is otherwise qualified ought to be denied the opportunity to go to one of the nation's most prestigious schools because of the financial situation of his or her family." Report to Accompany H.R. 768, House of the Judiciary, *Need-Based Educational Aid Act of 2001* (Apr. 3, 2001). An admissions policy that admits certain students based on their wealth, in a zero-sum admissions arrangement, necessarily denies admission to at least some students "because of the financial situation of his or her family."

**ANSWER:** Penn admits that Paragraph 193 purports to summarize Section 568 and its legislative history. To the extent the allegations in Paragraph 193 are meant to draw legal conclusions regarding how Section 568 is to be interpreted or applied, Penn denies the allegations. The remaining allegations in Paragraph 193 are legal conclusions not subject to admission or denial. To the extent an answer is required, Penn denies the allegations in Paragraph 193.

194. In a separate part of the 2001 legislative history, Representative Barney Frank, one of the sponsors of the legislation, referenced that it arose out of litigation regarding the Overlap Group (discussed above), and a practice in which "these schools strive to achieve what they call a needs-based admission policy," and "what it meant was that they strove to admit young men and women *based on their ability to do the work of that school*." Statement of Barney Frank, Need-Based Educational Aid Act of 2001, 147 Cong. Rec. H1360-02, 2001 WL 321629 (Apr. 3, 2001) (emphasis added). An admissions policy that admits certain students based on their wealth as a relevant factor does not admit those students "based on their ability to do the work of that school."

**ANSWER:** Penn admits that Paragraph 194 purports to summarize Section 568 and its

legislative history. To the extent the allegations in Paragraph 194 are meant to draw legal

conclusions regarding how Section 568 is to be interpreted or applied, Penn denies the

allegations. Penn denies the remaining allegations in Paragraph 194.

195. In sum, the scope of the 568 Exemption was rooted in the plain language of the statutory text, and in the statute's legislative history, which shows that the statute's plain text furthers the statute's purposes.

**ANSWER:** The allegations in Paragraph 195 are legal conclusions not subject to admission or

denial. To the extent an answer is required, Penn denies the allegations in Paragraph 195.

## VIII.

## DEFENDANTS' CONTINUING VIOLATIONS OF THE ANTITRUST LAWS, AND THE ACCRUAL OF PLAINTIFFS' CLAIMS THEREUNDER
### A. Defendants' Continuing Violations of the Antitrust Laws

196. Defendants' violations of the Sherman Act occurred each time any Defendant engaged in conduct in furtherance of the 568 Cartel that harmed Plaintiffs and other Class Members. In the context of Defendants' price-fixing conspiracy, such conduct and violations occurred each time Defendants have exchanged private or confidential information about admissions and/or financial aid, or met to fine-tune their Cartel agreement, and upon each transaction with any Class Member at an artificially inflated net price of attendance.

**ANSWER:** The allegations in Paragraph 196 are legal conclusions not subject to admission or

denial. To the extent an answer is required, Penn denies the allegations in Paragraph 196.

197. Defendants have engaged in continuing violations of the Sherman Act. The 568 Cartel has met at least annually since 2003 to discuss and fine-tune their Cartel agreement, and Class

Members have paid artificially high net prices to attend Defendants' schools since that time and continuing through the present as a result of the conduct alleged herein.[84]

**ANSWER:** Penn denies the allegations in Paragraph 197.

**B.    The Accrual of Plaintiffs' Claims Under the Discovery Rule**

198.    Until the last two years, Plaintiffs in fact did not know (a) the extent to which Defendants had failed to admit all successful applicants without regard to the financial circumstances of the student or the student's family, in violation of the 568 Exemption, or (b) that Defendants' use of the Consensus Methodology has disadvantaged and in fact caused financial injury to the Class Members.

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 198 regarding Plaintiffs' knowledge and therefore denies

those allegations.  Penn denies the remaining allegations in Paragraph 198.

199.    Until the last two years, moreover, a person exercising reasonable diligence could not have discovered (a) the extent to which Defendants had failed to admit all successful applicants without regard to the financial circumstances of the student or the student's family, in violation of the 568 Exemption, or (b) that Defendants' use of the Consensus Methodology has disadvantaged and in fact caused financial injury to the Class Members.

**ANSWER:** Penn denies the allegations in Paragraph 199.

200.    In commenting on the larger implications of Plaintiffs' claims, for example, the editorial board of Emory's student newspaper candidly observed:  "Financial aid is confusing enough without elite universities colluding to shirk students out of necessary assistance."[85]

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 200 and, on that basis, denies the allegations.

201.    In addition, a person exercising reasonable diligence could not have discovered the violations of the 568 Exemption and the concomitant antitrust injury at issue, in part because Defendants have made numerous incomplete and misleading statements that prevented a reasonable person from discovering those violations and the resulting injury.

---

[84] In terms of formal membership, as noted above, Brown and Emory claim to have stopped active participation in the 568 Cartel in 2012; Chicago claims to have stopped active participation in 2014; and Penn and Vanderbilt claimed to have stopped active participation it in 2020. Some institutions have attended meetings of the 568 Cartel and exchanged information with the Cartel without being formal members, including certain institutions that never formally joined. (Plaintiffs reserve the right to name such institutions as defendants based on discovery in this case.)
[85] The Editorial Board, "Students demand compensation and transparency in wake of universities' alleged price-fixing," THE EMORY WHEEL (Jan. 19, 2022), https://emorywheel.com/students-demand-compensation-and-transparency-in-wake-of-universities-alleged-price-fixing/.

**ANSWER:** Penn denies the allegations in Paragraph 201.

202.    Defendants have publicly stated and advertised, incompletely and misleadingly, that they admit students on a need-blind basis; indeed, Defendants have continually claimed to be need-blind in thousands of internet, marketing, and admissions materials and brochures.

**ANSWER:** Penn admits that it has publicly stated that it admits domestic and certain other students on a need-blind basis.  Penn denies the remaining allegations in Paragraph 202 that relate to Penn.  As to the allegations in Paragraph 202 that relate to the other Defendants, Penn does not have knowledge or information sufficient to form a belief as to the truth of those allegations and, on that basis, denies the allegations.

203.    Defendants and the other members of the 568 Cartel maintained a website for the Cartel. The first words printed on the homepage of this website were:  "What is the 568 Presidents Group? 568 Presidents Group is an affiliation of colleges and universities, all of which must admit students on a need-blind basis." Under an FAQ on the same website, the 568 Cartel has made the following misleading claim:  "It is referred to as a 'Presidents' group because it was formed by a group of 28 college and university presidents from need-blind schools in 1998."

**ANSWER:** Penn admits that the 568 Presidents Group had a website and that the allegations in Paragraph 203 purport to quote language from that website.  Penn specifically denies any allegations in Paragraph 203 that are inconsistent with the language that previously appeared on the 568 Presidents Group website.  Penn denies the remaining allegations in Paragraph 203 that relate to Penn.

204.    Defendants have also individually made similarly misleading statements, including on websites, during the period of the conspiracy alleged herein.  Such Defendants have further misrepresented, as shown below, that they are "need-blind," within the meaning of that term under the law, when they are not "need-blind" within the meaning of that term under the law.

**ANSWER:**    Penn admits that it has publicly stated that it admits domestic and certain other students on a need-blind basis.  Penn denies the remaining allegations in Paragraph 204 that relate to Penn.  As to the allegations in Paragraph 204 that relate to the other Defendants, Penn

does not have knowledge or information sufficient to form a belief as to the truth of those

allegations and, on that basis, denies the allegations.

205.    The website for Columbia has stated and continues to state:  "Admission to Columbia is
need-blind for US Citizens and Eligible Noncitizens, meaning the Office of Undergraduate
Admissions considers your application without regard to your financial need." Whether or not
Columbia considers each application without regard to the student's financial need, this notion of
need-blindness is not consistent with the statutory definition that prohibits Columbia (so long as
it participates in the 568 Cartel) from considering either financial need or financial wealth.
Columbia's redefinition of "need-blind" is not consistent with the statute.  A university's
promise to disregard financial need is meaningless if the institution privileges wealth.

**ANSWER:**    Penn admits that the allegations in Paragraph 205 purport to describe information

from Columbia University's website.  Penn does not have knowledge or information sufficient to

form a belief as to the basis for or the accuracy of the information from the website and, on that

basis, denies the allegations.  Penn denies the remaining allegations in Paragraph 205.

206.    Other Defendants that have not followed a need-blind admissions policy have also
engaged in definitional contortions.  Dartmouth's website, for example, has contained and
continues to contain a glossary of admissions-related terms.  As redefined by Dartmouth, an
admissions decision is "need-blind" so long as it is not made with "knowledge of an applicant's
financial need." If Dartmouth does make admissions decisions without knowledge of an
applicant's financial need, this is nevertheless insufficient for compliance with Section 568,
which requires that *all* students be admitted without regard to the financial circumstances of the
students or their families.  Under Section 568, Dartmouth is not allowed to make admissions
decisions with knowledge and on the basis that, an applicant has financial need, or does not have
financial need, or is rich, or any other financial circumstance.

**ANSWER:**  Penn admits that the allegations in Paragraph 206 purport to describe information

from Dartmouth's website.  Penn does not have knowledge or information sufficient to form a

belief as to the basis for or the accuracy of the information from the website and, on that basis,

denies the allegations.  Penn denies the remaining allegations in Paragraph 206.

207.    Duke's website has also employed and continues to employ its own definitions, claiming
that its "admissions policy is 'need-blind,' which means that applicants are accepted based on
their merit, regardless of their ability to pay for college." Duke's redefinition does not mention
whether *all* students "are accepted based on their merit, regardless of" their ability to donate
money to Duke.  In reality, not all students are admitted to Duke based on merit.

**ANSWER:** Penn admits that the allegations in Paragraph 207 purport to describe information from Duke's website. Penn does not have knowledge or information sufficient to form a belief as to the basis for or the accuracy of the information from the website and, on that basis, denies the allegations. Penn denies the remaining allegations in Paragraph 207.

208. MIT's website also has provided and continues to provide a glossary of admissions-related terms. As redefined by MIT, "need-blind" means that "[p]rospective students are not disadvantaged in the undergraduate admissions process because of their financial need." MIT's redefinition is contrary to the statutory meaning of "need-blind basis" and constitutes an admission that MIT considers the financial circumstances of certain applicants.

**ANSWER:** Penn admits that the allegations in Paragraph 208 purport to describe information from MIT's website. Penn does not have knowledge or information sufficient to form a belief as to the basis for or the accuracy of the information from the website and, on that basis, denies the allegations. Penn denies the remaining allegations in Paragraph 208.

209. Northwestern's website has claimed and continues to claim that it "has a need-blind admissions policy for U.S. citizens and permanent residents; this means that financial aid is not a factor in determining admission. Applicants are encouraged to apply for financial aid." Northwestern's redefinition of "need-blind basis" is also contrary to the statutory definition and constitutes a further admission that Northwestern fails to conduct admissions without regard to the financial circumstances of all applicants and their families.

**ANSWER:** Penn admits that the allegations in Paragraph 209 purport to describe information from Northwestern's website. Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 209 and, on that basis, denies the allegations.

210. Penn's website has claimed and continues to claim another misleading definition of "need-blind": "Our need-blind policy means that your ability to pay is not considered in your admission decision." This is misleading because under Section 568, exempt institutions are prohibited from considering the financial circumstances of any applicant or any applicant's family, not just an applicant's "ability to pay."

**ANSWER:** Penn admits that the allegations in Paragraph 210 purport to describe information from Penn's website. To the extent the allegations in Paragraph 210 are meant to draw legal

conclusions regarding how Section 568 is to be interpreted or applied, Penn denies the

allegations. Penn denies the remaining allegations in Paragraph 210.

211. The foregoing redefinitions of "need-blind" for purposes of Section 568 obfuscate that Defendants fail to follow need-blind admissions policies and have made admissions decisions with regard to the financial circumstances of all applicants and their families.

**ANSWER:** Penn denies the allegations in Paragraph 211.

212. The website for the 568 Cartel contained the form of a certificate of compliance whereby a member of the Cartel can certify that "its admission and financial aid practices currently comply with the rules of Section 568 regarding 'need-blind admission practices.'" Publicly posting this form of certification misleads any reasonably diligent person who inquires into whether members of the 568 Cartel are need-blind.

**ANSWER:** Penn admits that the allegations in Paragraph 212 purport to describe information

from the 568 President Group's website. Penn specifically denies any allegations in Paragraph

212 that are inconsistent with the 568 Presidents Group website. Penn denies the remaining

allegations in Paragraph 212.

213. The website for the 568 Cartel stated: "This site serves as a resource both for the 568 Presidents Group member institutions wanting to keep up to date on the Group's activities, *as well as for visitors seeking to learn more about the Group*." (Emphasis added.) The 568 Cartel thus continues inaccurately to advertise on its website that all Cartel members are "need-blind" within the meaning of Section 568.

**ANSWER:** Penn admits that the allegations in Paragraph 213 purport to describe information

from the 568 President Group's website. Penn specifically denies any allegations in Paragraph

213 that are inconsistent with the 568 Presidents Group website. Penn denies the remaining

allegations in Paragraph 213.

214. The 568 Cartel has publicly asserted that its activities were carried out for altruistic purposes. The website for the 568 Cartel, for example, has stated and continues to state that the purpose of the conspiracy is to agree on a financial-aid system that is "fair" and that the Consensus Methodology was adopted after consideration of ways to "improve the financial aid system so as to better serve the needs of families in their efforts to pay for college."

**ANSWER:**  Penn admits that the allegations in Paragraph 214 purport to describe information from the 568 President Group's website.  Penn specifically denies any allegations in Paragraph 214 that are inconsistent with the 568 Presidents Group website.  Penn denies the remaining allegations in Paragraph 214.

215.    Such assertions are false but would be viewed as credible by a reasonably diligent person investigating the 568 Cartel's conduct.  Actors sympathetic to the 568 Cartel have likewise published statements and conclusions that would have persuaded a reasonably diligent person investigating the Cartel's conduct that they had not suffered financial harm.

**ANSWER:**  Penn denies the allegations in Paragraph 215.

216.    Defendants further engaged in conduct that hindered a reasonably diligent person's ability to discover the violations and injury at issue by consistently omitting, in public statements purporting to describe the reasons for net tuition price increases, any reference to price fixing or the use of the Consensus Methodology as bearing on increased net prices of attendance. Whether or not such statements have accurately described *some* of the reasons for net tuition price increases, these statements have not acknowledged the effects of the use of the Consensus Methodology.

**ANSWER:**  Penn admits that its public statements describing the reasons for net tuition price increases did not refer to price fixing or use of the Consensus Methodology.  Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 216 regarding the other Defendants' public statements and therefore denies those allegations.  Penn denies the remaining allegations in Paragraph 216.

217.    In targeting Class Members through the institution's alumni magazine, for example, Dartmouth claimed in 2015 that rising tuition prices could be explained because "[j]ust as lattes cost more these days, so do markers and whiteboards and keeping the lights on.  Healthcare costs and salaries are rising too—and hiring at the College has shot up more than enrollment."[86] The feature article also listed "[l]ess sizeable but still significant drivers of cost including compliance with a range of government regulations imposed to address issues such as crime, gender equity and accessibility, which have totaled millions of dollars." The article quoted Dartmouth's current

---

[86] C.J. Hughes, *Why is Dartmouth So Expensive*, DARTMOUTH ALUMNI MAGAZINE, May-June 2015, https://dartmouthalumnimagazine.com/articles/why-dartmouth-so-expensive.

President, Phil Hanlon, as saying that these factors, although supposedly "not as much as financial aid" have "'been a driver for the last eight to 10 years.'"[87]

**ANSWER:**  Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 217 and, on that basis, denies the allegations.

218.    A Georgetown spokesperson explained away the institution's substantial tuition increases by suggesting that "the growing cost 'reflects the reality that many of our operating expenses continue to increase at rates higher than inflation.'"[88]

**ANSWER:**  Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 218 and, on that basis, denies the allegations.

219.    In 2008, an MIT news release incorrectly claimed:  "During the past decade, the net tuition for undergraduates—what students and families pay after financial aid—has, on average, dropped by more than 15 percent when adjusted for inflation."[89] Such statements suggest to a reasonable person that MIT had lowered net prices of attendance over time.  If MIT's statement were true, moreover, the net price of attendance would have "dropped" even more if MIT had not participated in the 568 Cartel.

**ANSWER:**  Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 219 and, on that basis, denies the allegations.

220.    In 2009, John Affleck-Graves, then an Executive Vice President at Notre Dame, identified only food costs when asked to explain the institution's 4.4 percent increase in tuition: "We are aware of the pressure families are under, and we wanted to be as conservative as we could be, . . . the difficultly for us this year is that we have seen an increase in a lot of our costs, like food. . . . And then we are faced with a difficult choice because we don't want to decrease the opportunities we provide for the students, like study abroad and research opportunities."[90]

**ANSWER:**  Penn does not have knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 220 and, on that basis, denies the allegations.

---

[87] *Id.*
[88] Connie Parham, *GU Hikes Undergraduate Tuition 5.5 Percent*, THE HOYA (Feb. 22, 2008), https://thehoya.com/gu-hikes-undergraduate-tuition-5-5-percent/.
[89] *MIT to be Tuition-Free for Families Earning less than $75,000 a Year*, MIT NEWS (Mar. 7, 2008), https://news.mit.edu/2008/tuition-0307.
[90] Madeline Buckley, *University Increases Tuition for 2009*, THE OBSERVER (Mar. 4, 2009), https://ndsmcobserver.com/2009/03/university-increases-tuition-for-2009/.

221.    In 2017, Amy Gutmann, President of Penn, told *The Daily Pennsylvanian* that "as tuition goes up financial aid goes up even more."[91] If this statement is true, it is also true that but for Penn's participation in the 568 Cartel, financial aid would have gone up even more—and that President Gutmann did not speak to that fact.

**ANSWER:**  Penn admits that the allegations in Paragraph 221 purport to quote the article in

Footnote 91.  Penn specifically denies the implication Plaintiffs draw from the quoted statement,

namely that "but for Penn's participation in the 568 Cartel, financial aid would have gone up

even more."  Penn denies the remaining allegations in Paragraph 221.

222.    In reality, the 568 Cartel was never, composed solely of "need-blind schools" as that term is defined by the statute.  The 568 Cartel members made innumerable inaccurate public claims that had the effect of misleading a reasonably diligent person investigating whether the Cartel's conduct gave rise to a cause of action.

**ANSWER:**  Penn denies the allegations in Paragraph 222.

## IX.

## CLASS ACTION ALLEGATIONS

223.    The proposed Class, under Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), comprises all U.S. citizens or permanent residents, who have (a) enrolled in one or more of Defendants' full-time undergraduate programs, (b) received need-based financial aid from one or more Defendants, (c) directly purchased from one or more Defendants education, room, or board not fully covered by such financial aid, and (d) first enrolled in one of Defendants' full-time undergraduate programs as follows:

- Chicago, Columbia, Cornell, Duke, Georgetown, MIT, Northwestern, Notre Dame, Penn, Rice, Vanderbilt, Yale—from 2003 through the present.
- Brown, Dartmouth, Penn—from 2004 through the present.
- CalTech—from 2019 through the present.
- Johns Hopkins—from 2021 to the present.

**ANSWER:**  The allegations in Paragraph 223 are legal conclusions not subject to admission or

denial.  To the extent an answer is required, Penn denies that Plaintiffs have established or can

establish the prerequisites to certification and/or maintenance of the alleged "Class" pursuant to

---

[91] *Amy Gutmann's Interview with The Daily Pennsylvanian*, THE DAILY PENNSYLVANIAN (Mar. 2, 2017), https://www.thedp.com/article/2017/03/amy-gutmann-penn-transcript-interview.

Rule 23 of the Federal Rules of Civil Procedure, and therefore denies the allegations in

Paragraph 223.

224.    The Class excludes purchasers of education, room, and board the full cost of which was covered with institutional aid provided by such Defendant(s).  Class Members also exclude Defendants and their officers, directors, management, employees, subsidiaries, or affiliates; and the Judge presiding over this action, his or her law clerks, spouse, and any person within the third degree of relationship living in the Judge's household and the spouse of such a person.

**ANSWER:**  The allegations in Paragraph 224 are legal conclusions not subject to admission or

denial.  To the extent an answer is required, Penn denies that Plaintiffs have established or can

establish the prerequisites to certification and/or maintenance of the alleged "Class" pursuant to

Rule 23 of the Federal Rules of Civil Procedure, and therefore denies the allegations in

Paragraph 224.

225.    Plaintiffs reserve the right to amend the Class definition, including with respect to the relevant time periods of membership in the 568 Cartel, based on discovery in this action.

**ANSWER:**  The allegations in Paragraph 225 are legal conclusions not subject to admission or

denial.  To the extent an answer is required, Penn denies that Plaintiffs have established or can

establish the prerequisites to certification and/or maintenance of the alleged "Class" pursuant to

Rule 23 of the Federal Rules of Civil Procedure, and therefore denies the allegations in

Paragraph 225.

226.    The Class Members are readily ascertainable and identifiable because records of the relevant transactions should exist, because the Class Members' identities are known to Defendants, and because the members may be notified of the pendency of this action by forms of notice customarily used in class actions.

**ANSWER:**  The allegations in Paragraph 226 are legal conclusions not subject to admission or

denial.  To the extent an answer is required, Penn denies that Plaintiffs have established or can

establish the prerequisites to certification and/or maintenance of the alleged "Class" pursuant to

Rule 23 of the Federal Rules of Civil Procedure, and therefore denies the allegations in

Paragraph 226.

227.    The Class Members are so numerous that joinder of all of them is impracticable; the number is unknown to Plaintiffs but, on information and belief, is over 200,000.

**ANSWER:**  The allegations in Paragraph 227 are legal conclusions not subject to admission or

denial.  To the extent an answer is required, Penn denies that Plaintiffs have established or can

establish the prerequisites to certification and/or maintenance of the alleged "Class" pursuant to

Rule 23 of the Federal Rules of Civil Procedure, and therefore denies the allegations in

Paragraph 227.

228.    There are questions of law and fact common to the Class Members, including, but not limited to, the following:

    a.    The scope and operation of the 568 Exemption;
    b.    Whether Defendants' admissions practices fall under the 568 Exemption;
    c.    Whether Defendants conspired as alleged herein;
    d.    Whether the conspiracy harmed competition as alleged herein;
    e.    Whether the conspiracy caused antitrust injury as alleged herein;
    f.    The appropriate Class-wide measure of damages; and
    g.    The common method for determining the damages of Class Members.

**ANSWER:**  The allegations in Paragraph 228 are legal conclusions not subject to admission or

denial.  To the extent an answer is required, Penn denies that Plaintiffs have established or can

establish the prerequisites to certification and/or maintenance of the alleged "Class" pursuant to

Rule 23 of the Federal Rules of Civil Procedure, and therefore denies the allegations in

Paragraph 228.

229.    All or substantially all Class Members were injured by Defendants' unlawful conduct.  A common formula exists that allows for determination of damages of individual Class Members and for excluding from recovery any individuals who may not have been damaged.

**ANSWER:**  The allegations in Paragraph 229 are legal conclusions not subject to admission or

denial.  To the extent an answer is required, Penn denies that Plaintiffs have established or can

establish the prerequisites to certification and/or maintenance of the alleged "Class" pursuant to Rule 23 of the Federal Rules of Civil Procedure, and therefore denies the allegations in Paragraph 229.

230.     Plaintiffs' claims are typical of the claims of the Class Members.  Plaintiffs and the other Class Members were damaged by the same common course of conduct by Defendants.

**ANSWER:**  The allegations in Paragraph 230 are legal conclusions not subject to admission or denial.  To the extent an answer is required, Penn denies that Plaintiffs have established or can establish the prerequisites to certification and/or maintenance of the alleged "Class" pursuant to Rule 23 of the Federal Rules of Civil Procedure, and therefore denies the allegations in Paragraph 230.

231.     Plaintiffs will fairly and adequately protect the interests of the Class Members.  Plaintiffs' interests are aligned with, and not adverse to, those of the other Class Members.

**ANSWER:**  The allegations in Paragraph 231 are legal conclusions not subject to admission or denial.  To the extent an answer is required, Penn denies that Plaintiffs have established or can establish the prerequisites to certification and/or maintenance of the alleged "Class" pursuant to Rule 23 of the Federal Rules of Civil Procedure, and therefore denies the allegations in Paragraph 231.

232.     Plaintiffs will continue to fully and adequately protect the interests of the Class Members. Plaintiffs have retained counsel competent and experienced in the prosecution of antitrust class action litigation, and with the necessary financial resources, to represent themselves and the other Class Members.

**ANSWER:**  The allegations in Paragraph 232 are legal conclusions not subject to admission or denial.  To the extent an answer is required, Penn denies that Plaintiffs have established or can establish the prerequisites to certification and/or maintenance of the alleged "Class" pursuant to Rule 23 of the Federal Rules of Civil Procedure, and therefore denies the allegations in Paragraph 232.

233.    Questions of law or fact that are common to the Class Members predominate over any questions affecting only individual Class Members.

**ANSWER:**  The allegations in Paragraph 233 are legal conclusions not subject to admission or denial.  To the extent an answer is required, Penn denies that Plaintiffs have established or can establish the prerequisites to certification and/or maintenance of the alleged "Class" pursuant to Rule 23 of the Federal Rules of Civil Procedure, and therefore denies the allegations in Paragraph 233.

234.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The prosecution of separate actions by individual Class Members would impose heavy burdens on the Court and Defendants and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  In contrast, a class action would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.  Absent a class action, it would not be feasible for the vast majority of the Class Members to seek redress for the violations of law alleged herein.

**ANSWER:**  The allegations in Paragraph 234 are legal conclusions not subject to admission or denial.  To the extent an answer is required, Penn denies that Plaintiffs have established or can establish the prerequisites to certification and/or maintenance of the alleged "Class" pursuant to Rule 23 of the Federal Rules of Civil Procedure, and therefore denies the allegations in Paragraph 234.

235.    Defendants have acted on grounds that apply generally to the Class, so that, in addition to damages, including to the extent their conspiracy continues, final injunctive relief is appropriate respecting the Class as a whole.  Indeed, such injunctive relief is appropriate with respect to Defendants who claim to be former members of the 568 Cartel in that no Defendant has disavowed and repudiated the conspiracy.

**ANSWER:**  The allegations in Paragraph 235 are legal conclusions not subject to admission or denial.  To the extent an answer is required, Penn denies that Plaintiffs have established or can establish the prerequisites to certification and/or maintenance of the alleged "Class" pursuant to Rule 23 of the Federal Rules of Civil Procedure or the prerequisites for obtaining injunctive

relief, and therefore denies the allegations in Paragraph 235.  Penn denies the remaining

allegations in Paragraph 235.

## X.

### ANTITRUST INJURY AND ANTICOMPETITIVE EFFECTS

236.    Plaintiffs and the other Class Members have suffered antitrust injury due to Defendants'
illegal conduct.  They have suffered injury of the type that the antitrust laws were intended to
prevent and that flows from that which makes Defendants' acts unlawful.

**ANSWER:**  The allegations in Paragraph 236 are legal conclusions not subject to admission or

denial.  To the extent an answer is required, Penn denies the allegations in Paragraph 236.

237.    Defendants have conspired to reduce or eliminate price competition among the 568 Cartel
members on provision of financial-aid packages to Class Members, thereby depriving Plaintiffs
and the other Class Members of a competitive marketplace.

**ANSWER:**  The allegations in Paragraph 237 are legal conclusions not subject to admission or

denial.  To the extent an answer is required, Penn denies the allegations in Paragraph 237.

238.    As a result of Defendants' conspiracy to share information and fix prices, Plaintiffs and
the other Class Members were injured in the form of receiving artificially suppressed financial
aid and paying artificially inflated net prices of attendance.

**ANSWER:**  Penn denies the allegations in Paragraph 238.

239.    Plaintiffs and the other Class Members are naturally motivated to enforce the antitrust
laws because they paid artificially inflated prices.  There are no other persons who were more
directly injured from, or more motivated to seek redress for, Defendants' misconduct than
Plaintiffs and the other Class Members.

**ANSWER:**  Penn denies the allegations in Paragraph 239.

240.    Absent Defendants' conspiracy, Defendants would have competed more aggressively to
attract Plaintiffs and the other Class Members to their undergraduate programs, by offering all
Class Members more generous financial aid and charging lower net prices of attendance than
under Defendants' conspiracy.

**ANSWER:**  Penn denies the allegations in Paragraph 240.

241.    If Defendants had competed, or competed more aggressively, with respect to financial
aid, Plaintiffs and all of the other Class Members would have received more money in financial

aid and paid lower net prices of attendance, as opposed to the artificially inflated net prices that Plaintiffs and the other Class Members paid due to Defendants' conspiracy. The conspiracy also had the effect of imposing a greater debt burden on students and their families.

**ANSWER:** Penn denies the allegations in Paragraph 241.

242. Defendants' conspiracy is an illegal horizontal agreement to fix prices and to share confidential data, methods, and information related to admissions, financial aid, and methods of determining financial aid. Defendants' alleged misconduct directly and proximately caused antitrust injury to Plaintiffs and the other Class Members, who received less money in financial aid, and paid higher net prices of attendance, than they would have if Defendants had competed, or competed more aggressively, rather than conspired to fix prices.

**ANSWER:** The allegations in Paragraph 242 are legal conclusions not subject to admission or

denial. To the extent an answer is required, Penn denies the allegations in Paragraph 242.

## XI.

## THE RELEVANT MARKET

243. Defendants' conduct is *per se* anticompetitive, obviating any market definition, including based on the direct evidence of anticompetitive effects. Defendants' conduct is also, and in the alternative, illegal under the rule of reason and "quick look" modes of analyses.

**ANSWER:** The allegations in Paragraph 243 are legal conclusions not subject to admission or

denial. To the extent an answer is required, Penn denies the allegations in Paragraph 243.

244. Plaintiffs thus further allege a relevant market, for undergraduate education at private national universities with an average ranking of 25 or higher in the *U.S. News & World Report* rankings from 2003 through 2021 (the most recent year in which Class Members applied to any of Defendants). This is the Market for Elite, Private Universities.

**ANSWER:** The allegations in Paragraph 244 are legal conclusions not subject to admission or

denial. To the extent an answer is required, Penn denies the allegations in Paragraph 244.

245. This market does not include liberal arts colleges, which offer distinct products and are generally more like each other than elite, private universities. Reflecting industry recognition of these discrete classifications, both *U.S. News & World Report* and the *Carnegie Classifications* classify national universities and liberal arts colleges separately, given that liberal arts colleges are generally regarded as having different characteristics and services, including a smaller student body, smaller and less competitive athletic programs, fewer graduate programs, and less emphasis on research. In contrast, private, national universities tout themselves as offering such distinct services that the liberal arts colleges do not.

**ANSWER:** The allegations in Paragraph 245 are legal conclusions not subject to admission or denial. To the extent an answer is required, Penn denies the allegations in Paragraph 245.

246. The Market for Elite, Private Universities has a rational relation to the interchangeability of use or cross-elasticity of demand with respect to the universities in the market. That is, within this market, sufficient cross-elasticity of demand exists such that a sufficient number of admitted students to two or more of these universities would respond to a small but significant increase in the net price by one university in the market by choosing to attend a lower-priced university in the same market that would make the price increase unremunerative.

**ANSWER:** The allegations in Paragraph 246 are legal conclusions not subject to admission or denial. To the extent an answer is required, Penn denies the allegations in Paragraph 246.

247. The Market for Elite, Private Universities also has a rational relation to the cross-elasticity of demand with respect to elite, private liberal arts colleges and public universities. That is, the cross-elasticity between elite, private universities and elite liberal arts colleges and public universities in the United States is low, such that a hypothetical monopolist in the Market for Elite, Private Universities could impose a small but significant non-transitory increase in price ("SSNIP") without losing so many students to elite liberal arts colleges or public universities as to render the SSNIP unremunerative.

**ANSWER:** The allegations in Paragraph 247 are legal conclusions not subject to admission or denial. To the extent an answer is required, Penn denies the allegations in Paragraph 247.

248. Admission to elite, private liberal arts colleges is generally less selective than admission to elite, private, national universities. According to *U.S. News & World Report*, the average admission rate of the top 10 national universities is approximately 7%, whereas the average admission rate of the top 10 liberal arts colleges is approximately 14%.

**ANSWER:** Penn admits that the allegations in Paragraph 248 purport to describe information from the *U.S. News & World Report*. Penn does not have knowledge or information sufficient to form a belief as to the truth of that information and, on that basis, denies the allegations in Paragraph 248 that are related to the information or purport to rely on the information for support. Penn denies the remaining allegations in Paragraph 248.

249. A further factor differentiating private universities and liberal arts colleges is the yield rate—that is, the rate at which admissions offers are accepted. Among the private universities ranked in the top 25 by *U.S. News & World Report*, there is a strong correlation between the

institution's rank and yield rate. Among the liberal arts colleges, this correlation is much weaker (if it exists at all). The yield rate of both Harvard and Stanford, for example, is usually greater than 80%, whereas the yield rate for the most highly rated private liberal arts colleges—Williams, Amherst, and Swarthmore—is usually approximately 40%.

**ANSWER:** Penn admits that the allegations in Paragraph 249 purport to describe information

from the U.S. News & World Report. Penn does not have knowledge or information sufficient

to form a belief as to the truth of that information and, on that basis, denies the allegations in

Paragraph 249 that are related to the information or purport to rely on the information for

support. Penn denies the remaining allegations in Paragraph 249.

250. The Market for Elite, Private Universities does not include public universities. A handful of public universities have national rankings and selectivity comparable to that of the elite, private universities. Competition between public universities and elite, private institutions, however, is limited in the national market for students seeking financial aid, including the Class Members. The University of California-Los Angeles ("UCLA") and the University of California-Berkeley ("UC Berkeley"), for example, do not provide need-based financial assistance to out-of-state applicants. The University of Michigan-Ann Arbor ("Michigan") has an official policy of prioritizing financial aid for residents. The University of Virginia ("UVA") is required by law to matriculate at least two-thirds of its undergraduate student body from its pool of in-state applicants. Public, national universities generally charge a high average net price to out-of-state students to cross-subsidize in-state students, a pricing policy that is driven by laws and political pressure that private institutions do not face.

**ANSWER:** Penn is without knowledge or information sufficient to form a belief as to the truth

of the specific allegations in Paragraph 250 regarding UCLA, UC Berkeley, Michigan, UVA,

and the average prices charged by public, national universities and, on that basis, denies the

allegations. Penn denies the remaining allegations in Paragraph 250.

251. Defendants themselves have long acknowledged the important distinctions between private and public universities, and that the elite, private universities compete within a distinct market. In its 2001 University Plan, for example, Duke stated:

> Private research universities occupy a special place in the diverse
> world of American higher education because of their distinctive
> missions, organization, governance, and funding. They are
> deliberately intermediate in scope and scale between the small
> private colleges and the large public universities. As a group, they
> attract a disproportionate number of the best faculty, are highly

selective in their admissions policies, create a residential educational experience that promotes interaction with the faculty and student learning outside the classroom, and provide much of the nation's leadership in research and scholarship. They are resource-intensive places, typically combining large endowments, strong philanthropic support, and external research funding with high tuition. These resources are powerfully additive in supporting the teaching and research missions of these institutions and their commitment to national and international leadership.

In our consideration of the broader context in which Duke functions, it is important to discuss the dynamics of our market within American higher education. The leading private research universities have much in common, offering similar degree programs and pursing similar lines of research, yet the rivalry among them is often intense. Each institution is pursuing excellence and the public recognition that comes with it—on its own terms, seeking to create the deepest, richest, and most diverse environment possible for teaching, learning, and research and for the preparation of new leaders for our society. The leading universities compete with each other for the human and financial capital they need to excel in their broadly overlapping missions.[92]

**ANSWER:** Penn does not have knowledge or information sufficient to form a belief as to the truth of the statements attributed to The University Plan: Duke University, and, on that basis, denies the allegations in Paragraph 251 that are related to the statements or purport to rely on the statements for support. Penn denies the remaining allegations in Paragraph 251.

252. Indeed, public universities and private universities make pricing decisions based on very different factors, with public institutions being subject to political pressures, state laws, and dependence on expropriations from state treasuries. Compared to elite, private universities, public universities such as UCLA, UC Berkeley, UVA, and Michigan have different pricing models and largely compete for different students.

**ANSWER:** Penn is without knowledge or information sufficient to form a belief as to the truth of the specific allegations in Paragraph 252 regarding UCLA, UC Berkeley, UVA, and Michigan

---

[92] *Building on Excellence*, THE UNIVERSITY PLAN: DUKE UNIVERSITY (Feb. 23, 2001), https://dukespace.lib.duke.edu/dspace/bitstream/handle/10161/65/UA2006_0037%20Strategic%20Plan.pdf?sequence=1&isAllowed=y.

and, on that basis, denies those allegations. Penn denies the remaining allegations in Paragraph

252.

253.    The schools in the Market for Elite, Private Universities compete with each other and
have done so since 2003. Defendants are tightly packed in their average *U.S. News & World
Report* rankings over the last 19 years (3.1, 5.1, 5.9, 6.4, 7.3, 8.0, 8.0, 10.7, 11.5, 12.5, 14.8, 14.8,
16.7, 16.7, 18.1, 19.7, and 22.3).

**ANSWER:** Penn admits that the allegations in Paragraph 253 purport to describe information

from the *U.S. News & World Report* rankings. Penn denies that there is a Market for Elite,

Private Universities and thus denies that it competes with any school in that specific Market.

Penn does not have knowledge or information sufficient to form a belief as to the truth of the

other information alleged and, on that basis, denies the allegations in Paragraph 253 that are

related to the information or purport to rely on the information for support. Penn denies the

remaining allegations in Paragraph 253.

254.    Defendants themselves have acknowledged that they compete within the Market for Elite,
Private Universities. Morton Schapiro, the President of Northwestern, a trained economist, and a
spokesperson for the 568 Cartel since at least 2001, acknowledged this market when he stated in
2018—carefully distinguishing between universities and colleges—that "continuous efforts,"
including a push for more federal funding, "can accelerate improvement" and "allow NU to
remain competitive against top COFHE universities." COFHE stands for the Consortium on
Financing Higher Education, a trade and lobbying group that describes itself as a "voluntary,
institutionally-supported organization of thirty-five highly selective, private liberal arts colleges
and universities."[93]  Accordingly, by President Schapiro's own admission, Northwestern views
itself as competing with the universities in that group, which is 90% identical with the market as
Plaintiffs define it. (The COFHE universities consist of the U.S. News top 25, minus Carnegie
Mellon, plus the University of Rochester.)

**ANSWER:** Penn admits that the allegations in Paragraph 254 describe statements attributed to

Morton Schapiro. Penn does not have knowledge or information sufficient to form a belief as to

the truth of the statements and, on that basis, denies the allegations in Paragraph 254 that are

---

[93] Adrian Wan, *Schapiro, Administrators Talk Research Efforts, Campus Inclusion at 'Conversations with the
President'*, THE DAILY NORTHWESTERN (Apr. 12, 2018), https://dailynorthwestern.com/2018/04/12/
campus/214612/.

related to the statements or purport to rely on the statements for support. Penn denies the

remaining allegations in Paragraph 254.

255.    Defendants have considerable market power, which they have exercised to increase the
net price of attendance and to injure Plaintiffs and the other Class Members through the conduct
alleged herein. Since 2003, Defendants have controlled between 61% and 78% of the number of
undergraduate slots in the Market for Elite, Private Universities. Within the following relevant
time periods, as set forth above, the percentage of undergraduate slots that the participants in the
conspiracy have controlled within this market are approximately as follows:

- As of 2003:  61%
- As of 2004:  73%
- As of 2019:  73%
- As of 2022:  78%

**ANSWER:**  Penn denies the allegations in Paragraph 255.

256.    Competition in the Market for Elite, Private Universities is constrained by extremely
strong brand preferences among consumers and high barriers to entry. Competition is further
constrained by the fact that such institutions limit the supply of available seats, which has the
effect of generating scarcity and enhancing their prestige. Competition in the Market for Elite,
Private Universities is further constrained by the fact that applicants cannot readily substitute one
institution for another because an applicant's choice is limited to those universities to which he
or she is admitted in a highly selective process.

**ANSWER:**  Penn denies the allegations in Paragraph 256.

257.    The 568 Cartel does not have any pro-competitive impacts. Accordingly, if the rule of
reason were to apply, it is not necessary for Plaintiffs to demonstrate reasonable and less
restrictive alternatives are available. Unlike the Overlap Group, the 568 Cartel does not agree to
allocate aid solely based on demonstrated financial need. Indeed, unlike the Overlap Group,
several members of the 568 Cartel offer athletic scholarships and compete to have nationally
ranked athletic teams every year.

**ANSWER:**  Penn admits that it did not agree with any other school to allocate aid solely based

on demonstrated financial need. The allegations that the 568 Presidents Group "does not have

any pro-competitive impacts" and "it is not necessary for Plaintiffs to demonstrate reasonable

and less restrictive alternatives are available" are legal conclusions not subject to admission or

denial. To the extent an answer is required, Penn denies these allegations. Penn does not have

knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 257 and, on that basis, denies those allegations.

258.     Defendants have substantial endowments and the proven capacity to earn rates of return on them that well exceed the minimum 5% distribution requirement of the tax laws.  *See* Appendix A.  Defendants thus have ample resources to meet the financial needs of their students without reducing their endowments (if that were even imperative) and without colluding on a formula that results in artificially reduced financial aid and that would in fact provide substantially more financial aid, and result in lower net prices of attendance, than through the 568 Cartel.

**ANSWER:**  Penn admits that it has an endowment.  Penn denies the remaining allegations in

Paragraph 258 that relate to Penn.  As to the allegations in Paragraph 258 that relate to the other

Defendants, Penn does not have knowledge or information sufficient to form a belief as to the

truth of those allegations and, on that basis, denies the allegations.

259.     In addition, since the time of the Overlap Group, important facts relevant to application of any modes of legal analysis that may apply have changed in critical ways.  As to the schools for which such information is publicly available, the growth of Defendants' endowments has exceeded the growth of their annual operating expenses.  From 1994 to 2021, for instance, Dartmouth's endowment increased by approximately 879%, whereas its annual operating expenses increased by approximately 184%.  *See* Appendix A.  This is a ratio of approximately 4.8 to 1.  The ratios are approximately 8.1 to 1 at Georgetown; 1.9 to 1 at Penn; 1.7 to 1 at Rice; and 3.1 to 1 at Yale.  *See id.*

**ANSWER:**  Penn admits that it has an endowment.  Penn further admits that the allegations in

Paragraph 259 and in Appendix A purport to describe information from Penn's consolidated

financial statements.  Penn denies any allegations in Paragraph 259 and Appendix A that are

inconsistent with Penn's consolidated financial statements.  Penn denies the remaining

allegations in Paragraph 259 that relate to Penn.  As to the allegations in Paragraph 259 that

relate to the other Defendants, Penn does not have knowledge or information sufficient to form a

belief as to the truth of the allegations in Paragraph 259 and, on that basis, denies those

allegations.

260.    These facts underscore that Defendants' endowments have been and continue to be an increasingly ample financial resource for the schools to use to meet the financial needs of their students.  These facts also illustrate that, regardless of their status as not-for-profit institutions, Defendants have generated or have the ability to generate revenue that well exceeds expenses on an annual basis, and thus would have been financially able to devote more resources for financial aid if that had competed rather than colluded on their financial aid formulae.

**ANSWER:**  Penn denies the allegations in Paragraph 260 that relate to Penn.  As to the

allegations in Paragraph 260 that relate to the other Defendants, Penn does not have knowledge

or information sufficient to form a belief as to the truth of those allegations and, on that basis,

denies the allegations.

261.    In addition, a reasonable and less restrictive alternative is for each member of the 568 Cartel to implement a fair financial-aid formula unilaterally, as other elite, private universities have done, without entering into a conspiracy that overcharges students.  In addition, no pro-competitive impact that Defendants may proffer justifies the significant overcharge caused by the conspiracy.  If even relevant to any analysis under the rule of reason, moreover, there is no legitimate or significant procompetitive justification in Defendants' non-compliance with the 568 Exemption or in combining such non-compliance with the collective application of the Consensus Methodology, and other acts in furtherance of the conspiracy as alleged herein, to artificially reduce financial aid.

**ANSWER:**  The allegations in Paragraph 261 are legal conclusions not subject to admission or

denial.  To the extent an answer is required, Penn denies the allegations in Paragraph 261.

262.    Colluding, agreeing on, and collectively imposing a common aid methodology as part of the 568 Cartel are not reasonably necessary to achieve the objective of awarding financial aid to admitted students.  Nor is the sharing of confidential admission and financial-aid data and information, particularly as to the methodologies for awarding financial aid, reasonably necessary for the individual schools to achieve the objective of awarding financial aid to admitted students.  Instead, there are substantially less restrictive alternatives for helping to fund need-based financial aid for admitted students—including, as noted, using a portion of the annual investment gains on Defendants' endowments.

**ANSWER:**  The allegations in Paragraph 262 are legal conclusions not subject to admission or

denial.  To the extent an answer is required, Penn denies the allegations in Paragraph 262.

263.    In short, Defendants' illegal conduct has significantly injured more than 200,000 Class Members by artificially reducing the financial aid they were offered and received.

**ANSWER:**  Penn denies the allegations in Paragraph 263.

## XII.

## CLAIM FOR RELIEF

## **FIRST CAUSE OF ACTION**

Sherman Act Section 1

264.    Plaintiffs incorporate the preceding paragraphs.

**ANSWER:**  Penn restates and incorporates here its responses to Paragraphs 1 through 263.


265.    At a time currently unknown to Plaintiffs, but at least as early as 2003, and continuing through the present to an extent to be determined in discovery, Defendants entered into a continuing agreement, understanding, and conspiracy in restraint of trade artificially to fix, raise, and stabilize and reduce the amount of financial aid paid to Class Members, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**ANSWER:**  The allegations in Paragraph 265 are legal conclusions not subject to admission or

denial.  To the extent an answer is required, Penn denies the allegations in Paragraph 265.


266.    In formulating and carrying out their conspiracy, Defendants have done those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others:  Using an agreed upon formula or method for fixing, lowering, and stabilizing the amount of financial aid they offered and fixing, increasing, and stabilizing the net price of attendance; and sharing confidential, private data and information related to admissions and financial aid, including the methodologies to be used in awarding financial aid.

**ANSWER:**  The allegations in Paragraph 266 are legal conclusions not subject to admission or

denial.  To the extent an answer is required, Penn denies the allegations in Paragraph 266.


267.    The 568 Cartel has monitored and enforced its conspiracy in several ways, according to the Cartel's website, including (but not limited to) such steps as (a) requiring each participation institution to submit a "Certificate of Compliance," (b) requiring university professionals at each institution to receive "training . . . in the application of the Methodology," (c) imposing a "common calendar for the collection of data from families," (d) agreeing to share information and analyses relating to financial aid and formulae for provision of financial aid, and (e) conducting an annual or biannual meeting every year since at least 2007.

**ANSWER:**  The allegations in Paragraph 267 are legal conclusions not subject to admission or

denial.  To the extent an answer is required, Penn denies the allegations in Paragraph 267.

268.    This conspiracy has had the following effects, among others:  The net price of attendance has been fixed, increased, maintained, and stabilized at artificially high, non-competitive levels for all Class Members.

**ANSWER:**  The allegations in Paragraph 268 are legal conclusions not subject to admission or

denial.  To the extent an answer is required, Penn denies the allegations in Paragraph 268.

269.    Plaintiffs and the other Class Members have been injured and will continue to be injured in their businesses and property by paying more for attendance at Defendants than they would have paid and will pay but for the combination and conspiracy.

**ANSWER:**  The allegations in Paragraph 269 are legal conclusions not subject to admission or

denial.  To the extent an answer is required, Penn denies the allegations in Paragraph 269.

270.    Defendants are not entitled to the affirmative defense that they are exempt from the antitrust laws, because they did not satisfy the requirement that all students are admitted on a need-blind basis, for the reasons set forth above and because, to the extent the conspiracy continues, the 568 Exemption no longer exists.

**ANSWER:**  The allegations in Paragraph 270 are legal conclusions not subject to admission or

denial.  To the extent an answer is required, Penn denies the allegations in Paragraph 270.

271.    Defendants' conspiracy is a *per se* violation of the Sherman Act; or, in the alternative, is a violation of the Sherman Act under the Rule of Reason or "quick look" analysis.

**ANSWER:**  The allegations in Paragraph 271 are legal conclusions not subject to admission or

denial.  To the extent an answer is required, Penn denies the allegations in Paragraph 271.

272.    Defendants' conduct has directly and proximately caused antitrust injury to Plaintiffs and the other Class Members.  The artificially inflated net price of attendance that Plaintiffs and the other Class Members have paid to Defendants flows directly from Defendants' price fixing and is the type of damage that the antitrust laws were designed to prevent.

**ANSWER:**  The allegations in Paragraph 272 are legal conclusions not subject to admission or

denial.  To the extent an answer is required, Penn denies the allegations in Paragraph 272.

273.    Plaintiffs and the other Class Members are entitled to treble damages and an injunction against Defendants, preventing and restraining the violations alleged herein.

**ANSWER:**  The allegations in Paragraph 273 are legal conclusions not subject to admission or denial.  To the extent an answer is required, Penn denies the allegations in Paragraph 273.

### REQUESTED RELIEF AND DEMAND FOR JURY TRIAL

**ANSWER:**  Penn admits that Plaintiffs seek certain relief, but Penn denies that Plaintiffs are entitled to a judgment or any other relief requested in their Prayer for Relief or Jury Demand.

### AFFIRMATIVE DEFENSES

Penn affirmatively states that Plaintiffs are not entitled to any relief on their Second Amended Complaint (because, among other things, Penn did not enter into a conspiracy to unreasonably restrain trade or commerce and Plaintiffs lack antitrust injury and standing).  Penn further asserts the following affirmative defenses, without conceding that it bears the burden of production or persuasion as to any of them.

### FIRST AFFIRMATIVE DEFENSE

### 568 Exemption

Penn states that its alleged conduct was exempt from the antitrust laws pursuant to Section 568.  *See* 15 U.S.C. § 1 note; Pub. L. No. 103-382, title V, § 568, 108 Stat. 3518, 4060 (1994).  The Section 568 exemption provided that "[i]t shall not be unlawful under the antitrust laws for 2 or more institutions of higher education at which all students admitted are admitted on a need-blind basis, to agree or attempt to agree … to use common principles of analysis for determining the need of such students for financial aid if the agreement to use such principles does not restrict financial aid officers at such institutions in their exercising independent professional judgment with respect to individual applicants for such financial aid."  *Id.*; *see id.* (defining "student" as limited to U.S. nationals and certain aliens admitted for permanent

residence). Penn's participation in the 568 Presidents Group fell within the Section 568 exemption.

The 568 Presidents Group was composed of institutions of higher education. As explained in the Group's memorandum of understanding, the Group discussed and may have agreed upon common principles of analysis for determining the financial need of undergraduate financial aid applicants for aid funded by each institution. The Group neither restricted financial aid personnel at participating member institutions from exercising independent professional judgment with respect to individual applicants for financial aid nor agreed upon the amount or terms of any prospective financial aid award to a specific individual.

During the period that Penn was a member of the Group, Penn admitted all students (as defined under Section 568) on a need-blind basis. When Penn joined the Group, it certified that its admission and financial aid practices complied with the rules of Section 568 regarding need-blind admission practices, and while Penn was in the Group, it admitted all students without regard to such students' ability to pay tuition.

On information and belief, while Penn was in the Group, all other members likewise certified compliance with Section 568's need-blind requirement, and during that period, at a minimum, Penn had no knowledge that any other member made an admissions decision for any student with regard to such student's ability to pay tuition.

### SECOND AFFIRMATIVE DEFENSE

#### Procompetitive Benefits

Any alleged anticompetitive effects of the alleged agreement are outweighed by the significant procompetitive benefits of the 568 Presidents Group's collaboration. Jointly establishing recommended best practices for measuring need improves the accuracy of

determinations of students' ability to pay and promotes a more efficient allocation of aid—thereby decreasing the price paid by some students and increasing the quality of financial aid awards. Such collaboration also broadens the pool of applicants who can afford to attend higher education and improves the socioeconomic diversity of the class of admitted students—thereby increasing consumer access and choice as well as the quality of education and educational experience provided. The U.S. Government Accountability Office has found that the Consensus Methodology did not cause a net increase in the amount students were expected to pay and resulted in higher amounts of need-based aid awarded to some categories of students.

### THIRD AFFIRMATIVE DEFENSE

### Statute of Limitations

The claims of seven Plaintiffs—Andrew Corzo, Sia Henry, Michael Maerlender, Brandon Piyevsky, Benjamin Shumate, Brittany Tatiana Weaver, and Cameron Williams—are barred by the applicable four-year statute of limitations. *See* 15 U.S.C. § 15b. Plaintiffs filed their original complaint alleging that Defendants violated Section 1 of the Sherman Act on January 9, 2022. The claims of Corzo, Henry, Maerlender, Piyevsky, Shumate, Weaver, and Williams accrued, if at all, before January 9, 2018.

Plaintiffs allege they were injured by "receiving artificially suppressed aid and paying artificially inflated net prices of attendance." Second Am. Comp. ¶ 238. Corzo, Henry, Maerlender, Piyevsky, Shumate, Weaver, and Williams each matriculated before January 9, 2018, and thus incurred the alleged injuries from their initial financial aid awards outside the limitations period. Subsequent financial aid awards for matriculated students were not subject to any agreement among Defendants, and any alleged effect on such awards from the initial awards was a foreseeable future harm at the time of the initial awards. Indeed, Weaver, Henry, and

Piyevsky graduated before January 9, 2018, and thus could not have incurred any injuries within the limitations period.  Likewise, as Corzo, and Williams graduated in Spring 2018, they received their final financial aid awards before January 9, 2018 and thus could not have incurred any injuries within the limitations period.

Each of these seven Plaintiffs either discovered or should have discovered with reasonable diligence their alleged injuries before January 9, 2018.  The publicly available information that Plaintiffs cite in the Second Amended Complaint to support their alleged injuries was readily accessible before January 9, 2018—indeed, at least by several years and sometimes by more than a decade.

## FOURTH AFFIRMATIVE DEFENSE

### Doctrine of Laches

Setting aside that none of the Plaintiffs faces a sufficient threat of future injury to support equitable relief, their request for such relief is barred by laches.  As set forth in the Third Affirmative Defense and incorporated by reference here, Plaintiffs either discovered or should have discovered with reasonable diligence their alleged past and future injuries long before January 9, 2018 and/or waited an unreasonable amount of time to bring their claim after discovering their injuries.  And Plaintiffs' failure to sue until January 9, 2022 has prejudiced Defendants, because the passage of time without notice of Plaintiffs' suit—more than a decade for certain Plaintiffs—has harmed Defendants' ability to obtain and maintain relevant evidence and otherwise prepare their defense.

## FIFTH AFFIRMATIVE DEFENSE

### Withdrawal

Penn has withdrawn from the 568 Presidents Group completely, which defeats liability for all actions of the Group after the date of withdrawal. Since the date of its withdrawal, Penn has not participated in the Group. To the contrary, it has determined a student's need for financial aid on a unilateral basis, (as it had previously). In both word and deed, therefore, Penn has disavowed the goal of the Group for the Group's members to jointly discuss and agree upon common principles of analysis for determining the financial need of undergraduate financial aid applicants.

## SIXTH AFFIRMATIVE DEFENSE

### Failure to Mitigate Damages

Setting aside that Plaintiffs lack antitrust injury and standing, their claim for damages is barred, on information and belief, because of, and to the extent of, their failure to mitigate damages. Each Plaintiff, through the exercise of reasonable diligence, could have attended one or more schools that were not members of the 568 Presidents Group but were otherwise reasonably comparable to the Defendant school that the Plaintiff chose to attend. For example, private universities in *U.S. News and World Report*'s top 25 universities ranking are (as Plaintiffs themselves allege) reasonable substitutes for Defendants, and multiple schools on those lists were not Group members during some or all of the times that Plaintiffs were applying for admission. If Plaintiffs had attended such schools, they would not have incurred any alleged price increase caused by the challenged conduct at the Defendant schools they chose to attend, while still receiving a reasonably comparable education. Defendants plead this defense on information and belief because Plaintiffs' failure to mitigate damages concerns matters

peculiarly within Plaintiffs' knowledge, such as the non-Group-member schools they reasonably could have attended.

## SEVENTH AFFIRMATIVE DEFENSE

### Estoppel

On information and belief, Plaintiffs' claim for damages is barred because of, and to the extent of, estoppel. The circumstances surrounding Plaintiffs' applications for and receipt of financial aid might estop them from seeking damages for any alleged injuries caused by the conduct they challenge. Penn pleads this defense on information and belief because estoppel concerns matters peculiarly within the knowledge of Plaintiffs or other non-Defendants.

Dated: January 25, 2023

Respectfully submitted,


By: /s David Gringer
_____
David Gringer
Alan Schoenfeld
WILMER CUTLER PICKERING HALE AND
    DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel: 212-230-8800
david.gringer@wilmerhale.com
alan.schoenfeld@wilmerhale.com

Seth Waxman
WILMER CUTLER PICKERING HALE AND
    DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
Tel: 202-663-6800
seth.waxman@wilmerhale.com

Edward W. Feldman
Daniel Martin Feeney
MILLER SHAKMAN LEVINE & FELD-MAN
LLP
180 North LaSalle Street
Suite 3600
Chicago, IL 60601
Tel.: 312-263-3700
dfeeney@millershakman.com
efeldman@millershakman.com

*Counsel for The Trustees of the University of
Pennsylvania*