# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| ANDREW CORZO, SIA HENRY, ALEXANDER LEO-GUERRA, MICHAEL MAERLENDER, BRANDON PIYEVSKY, BRANDON SHUMATE, BRITTANY TATIANA WEAVER, and CAMERON WILLIAMS, individually and on behalf of all others similarly situated, | **Case No. 1:22-cv-00125** |
| *Plaintiffs*, | |
| v. | **Hon. Matthew F. Kennelly** |
| BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, JOHNS HOPKINS UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY, | **JURY TRIAL DEMANDED** |
| *Defendants*. | |

**DEFENDANT THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFFS' <u>SECOND AMENDED AND SUPPLEMENTAL CLASS ACTION COMPLAINT</u>**

Defendant The Trustees of Columbia University in the City of New York ("Columbia"), by and through its undersigned counsel, hereby answer plaintiffs' Second Amended and Supplemental Class Action Complaint (the "Second Amended Complaint") upon knowledge as to itself and its own acts and otherwise on information and belief.

## PRELIMINARY STATEMENT

The following matters are incorporated by reference into Columbia's responses to each paragraph of the Second Amended Complaint:

A.      Footnotes to this answer are reproduced as they appear in the Second Amended Complaint. Headings, sub-headings, appendices, and footnotes in the Second Amended Complaint do not constitute well-pleaded allegations of fact and therefore require no response. To the extent a response is required, Columbia denies the allegations in headings, sub-headings, appendices, and footnotes in the Second Amended Complaint.

B.      Except to the extent expressly admitted herein, Columbia denies each and every allegation of the Second Amended Complaint, and expressly denies any liability to plaintiffs. All allegations for which Columbia lacks knowledge or information sufficient to form a belief as to their truth are denied on that basis.

C.      The Requested Relief and Demand for Jury Trial in the Second Amended Complaint do not contain allegations of fact and are therefore omitted from this Answer.

D.      Columbia denies all allegations to the extent they incorporate the term "568 Cartel" and specifically denies any suggestion or implication that the 568 Presidents Group was an illegal "Cartel."

E.      The Second Amended Complaint contains purported excerpts from, and references to, a number of third-party publications, which have often been modified and taken

1

out of context. Columbia respectfully refers the Court to the respective publications for their complete and accurate contents. Columbia does not admit that the third-party publications are accurate, relevant, or admissible in this action, and Columbia reserves all objections regarding admissibility.

F. Columbia reserves the right to amend or supplement this Answer.

## RESPONSE TO SPECIFIC ALLEGATIONS

Plaintiffs, Andrew Corzo, Sia Henry, Alexander Leo-Guerra, Michael Maerlender, Brandon Piyevsky, Benjamin Shumate, Brittany Tatiana Weaver, and Cameron Williams, individually and on behalf of all others similarly situated, bring this class action under Section 1 of the Sherman Act against Brown University ("Brown"), California Institute of Technology ("CalTech"), University of Chicago ("Chicago"), The Trustees of Columbia University in the City of New York ("Columbia"), Cornell University ("Cornell"), Trustees of Dartmouth College ("Dartmouth"), Duke University ("Duke"), Emory University ("Emory"), Johns Hopkins University ("Johns Hopkins"), Georgetown University ("Georgetown"), Massachusetts Institute of Technology ("MIT"), Northwestern University ("Northwestern"), University of Notre Dame du Lac ("Notre Dame"), The Trustees of the University of Pennsylvania ("Penn"), William Marsh Rice University ("Rice"), Vanderbilt University ("Vanderbilt"), and Yale University ("Yale") (collectively, "Defendants").

**Answer:** Columbia admits that plaintiffs purport to bring this action under Section 1 of the Sherman Act on behalf of the persons identified.

## I. INTRODUCTION

1. Defendants are private, national universities that have long been in the top 25 of the *U.S. News & World Report* rankings for such schools. These elite institutions occupy a place of privilege and importance in American society. And yet these same Defendants, by their own admission, have participated and are participating in a price-fixing cartel that is designed to reduce or eliminate financial aid as a locus of competition, and that in fact has artificially inflated the net price of attendance for students receiving financial aid.

**Answer to Paragraph 1:** Columbia admits that it is a private university that has been ranked in the top 25 colleges and universities in *U.S. News & World Report*. Columbia further admits, on information and belief, that other defendants also have been ranked in the top 25 colleges and universities in *U.S. News & World Report* in certain years. Columbia denies the

remaining allegations contained in paragraph 1 of the Second Amended Complaint.

2. Defendants have participated in this cartel while claiming the protection of Section 568 of the Improving America's Schools Act of 1994 (the "568 Exemption"). This exemption from the antitrust laws, laws which otherwise prohibit conspiracies among competitors relating to price, offered antitrust immunity only to two or more institutions of higher education at which "*all* students admitted are admitted on a need-blind basis." (Emphasis added.) Section 568 defines "on a need-blind basis" to mean "without regard to the financial circumstances of the student involved or the student's family." 15 U.S.C. § 1 note. The 568 Exemption expired at midnight on September 30, 2022.

**Answer to Paragraph 2:** Columbia denies the allegations contained in paragraph 2 of

the Second Amended Complaint, except admits that plaintiffs purport to quote from Section 568

of the Improving America's Schools Act of 1994. Columbia refers to that statute for the

complete and accurate content thereof. Columbia further admits that the 568 Exemption expired

on September 30, 2022.

3. Defendants were not entitled to the 568 Exemption. Under a legally compliant need-blind admissions system, all students must be admitted without regard to their or their families' financial circumstances. Far from adhering to this statutory requirement when the 568 Exemption existed, all Defendants have considered the financial circumstances of students or their families in deciding whether to admit students.

**Answer to Paragraph 3:** Columbia denies the allegations contained in paragraph 3 of

the Second Amended Complaint. Columbia states, however, that it is not relying on the 568

Exemption as a defense in this action.

4. Defendants have thus made admissions decisions *with regard to* the financial circumstances of students and their families, thereby disfavoring students who need financial aid. All Defendants, in turn, have conspired to reduce the amount of financial aid they provide to admitted students. This conspiracy, which has existed (with only slightly varying membership) for many years, thus falls outside any potentially applicable antitrust exemption.

**Answer to Paragraph 4:** Columbia denies the allegations contained in paragraph 4 of

the Second Amended Complaint, except lacks knowledge or information sufficient to form a

belief as to the truth of the allegations contained in the first sentence of paragraph 4 as they relate

3

to other defendants' admissions decisions and so denies them on that basis.

5.     Defendants are and have been members of the so-called "568 Presidents Group," in which the members have agreed on "a set of common standards for determining the family's ability to pay for college," which the members describe as the "Consensus Approach." Based on the Consensus Approach, in approximately 2003, the 568 Presidents Group (the "568 Cartel") devised the Consensus Methodology, which is a common formula for determining an applicant's ability to pay. Under the Consensus Methodology, an applicant's ability to pay is a substantial determinant of the net price, which is the institution's gross tuition plus fees for room and board, less institutional grant aid, charged to the applicant for attendance.

**Answer to Paragraph 5:**  Columbia denies the allegations contained in paragraph 5 of the Second Amended Complaint to the extent that they incorporate the term "568 Cartel." Columbia admits that it has been a member of the 568 Presidents Group and, on information and belief, that other defendants have been members of the 568 Presidents Group at certain times. Columbia further admits that the 568 Presidents Group developed a Consensus Methodology of voluntary general recommendations for assessing student need. Columbia denies the remaining allegations contained in paragraph 5 of the Second Amended Complaint.

6.     Since its inception, the goal of the 568 Cartel has been, in the words of the Cartel members, to determine "whether it is possible to reach agreement on common standards for determining financial need at the institutional level." Defendants in fact so determined and so agreed. Defendants have met—and may continue to meet—to devise, agree upon, and collectively implement common principles and a uniform method for analyzing, offering, and providing financial aid to admitted students.

**Answer to Paragraph 6:**  Columbia denies the allegations contained in paragraph 6 of the Second Amended Complaint to the extent that they incorporate the term "568 Cartel." Columbia admits that it attended meetings of the 568 Presidents Group. Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegation regarding whether other defendants attended meetings of the 568 Presidents Group and so denies that allegation on that basis. Columbia denies the remaining allegations contained in paragraph 6 of the Second Amended Complaint.

7. In collectively sharing confidential data and information about admissions and financial aid, adopting this methodology, and regularly meeting to implement this methodology jointly, the 568 Cartel has intended to reduce or eliminate, and in fact succeeded in reducing or eliminating, price competition among its members. As a result, the net price of attendance for financial-aid recipients at Defendants' schools—included among the members of the proposed Class here—has been artificially inflated. In short, due to the conduct challenged herein, over almost two decades, Defendants have overcharged over 200,000 financial-aid recipients by billions of dollars collectively, in violation of Section 1 of the Sherman Act.

**Answer to Paragraph 7:** Columbia denies the allegations contained in paragraph 7 of the Second Amended Complaint.

8. This longstanding conspiracy would have been immune from the antitrust laws when the 568 Exemption existed only if all the conspirators had been complying with the Exemption. In fact, all Defendants have been members of the 568 Cartel, and thus conspirators, and none qualified for the 568 Exemption. Instead, all Defendants have considered the financial circumstances of students and their families in deciding whether to admit waitlisted and transfer students; Defendants have maintained admissions systems that favor the children of wealthy past or potential future donors; at least several Defendants have given preference to wealthy applicants through the largely secretive process known as "enrollment management"; and Columbia has considered the financial circumstances of students and families in making admission decisions for its School of General Studies.

**Answer to Paragraph 8:** Columbia denies the allegations contained in paragraph 8 of the Second Amended Complaint. Columbia states, however, that it is not relying on the 568 Exemption as a defense in this action.

9. In critical respects, elite, private universities like Defendants are gatekeepers to the American Dream. Defendants' misconduct is particularly egregious because it has narrowed a critical pathway to upward mobility that admission to their institutions represents. The burden of the 568 Cartel's overcharges falls especially on low- and middle-income families struggling to afford the cost of a university education and to achieve success for their children. In addition, unlike prior admissions scandals, such as Varsity Blues,[1] the 568 Cartel's systematic suppression of financial aid, resulting in the artificial inflation of the net price of attendance, has been the official policy of its participants. As Defendants have succinctly admitted, the purpose of their Cartel has been—in these specific terms—to "discuss *and agree upon* common principles of analysis for determining the financial need of undergraduate financial aid applicants."

---

[1] "Varsity Blues" is law enforcement's code name for the investigation and prosecution of the college admissions bribery scandal, which involved allegations that certain universities gave admissions preference to the children of wealthy parents in exchange for bribes.

**Answer to Paragraph 9:** Columbia denies the allegations contained in paragraph 9 of the Second Amended Complaint.

10. The 568 Cartel has thus caused substantial injury to Plaintiffs and the other members of the proposed Class (defined below). Plaintiffs bring this lawsuit to prevent Defendants' conspiratorial conduct and to prevent future students from suffering the injury the ongoing conspiracy has inflicted. Plaintiffs do so without having known until recently that they had been injured in violation of the 568 Exemption, and under circumstances in which a reasonable person would have been unaware of the harm resulting from Defendants' use of the Consensus Methodology in violation of the 568 Exemption.

**Answer to Paragraph 10:** Columbia denies the allegations contained in paragraph 10 of the Second Amended Complaint, except lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 10 as they relate to plaintiffs' knowledge and so denies them on that basis.

11. Plaintiffs also seek compensation for themselves and a proposed Class of all U.S. citizens or permanent residents, who have (a) enrolled in one or more of Defendants' full-time undergraduate programs, (b) received need-based financial aid from one or more Defendants, (c) directly purchased from one of [*sic*] more Defendants education, room, or board not fully covered by such financial aid, and (d) first enrolled in one of Defendants' full-time undergraduate programs during the relevant times (defined below) from January 1, 2003 until the effects of Defendants' continuing conduct ceases. Members of this "Class" shall be called "Class Members."

**Answer to Paragraph 11:** Columbia admits that plaintiffs purport to seek compensation for themselves and the members of the putative class they describe in paragraph 11 of the Second Amended Complaint, but denies that plaintiffs have established or can establish the prerequisites to certification or maintenance of the alleged "Class" pursuant to Rule 23 of the Federal Rules of Civil Procedure.

## II.     JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. §§ 1331, 1332(d)(2), and 1337.

**Answer to Paragraph 12:** Columbia admits the allegations contained in paragraph 12 of

the Second Amended Complaint.


13.     This Court has personal jurisdiction over each Defendant on multiple bases, including that each Defendant has: (1) transacted business in the United States and in this District, including by recruiting, and advertising for, students residing in this District; (2) transacted business with Class Members throughout the United States, including those residing in this District; and (3) committed substantial acts in furtherance of an unlawful scheme in the United States, including in this District.  Each Defendant has recruited, accepted, enrolled, and charged artificially high net prices of attendance to, and thus injured, individuals residing within this District.  In addition, Defendants have held at least one meeting of the 568 Cartel in Rosemont, Illinois, which is within this District.

**Answer to Paragraph 13:** Columbia denies the allegations contained in paragraph 13 of

the Second Amended Complaint to the extent that they incorporate the term "568 Cartel."

Columbia further denies the allegations contained in paragraph 13 of the Second Amended

Complaint as to itself, except admits that it has recruited, accepted and enrolled individuals

residing within this District and that at least one meeting of the 568 Presidents Group was held in

Rosemont, Illinois.  Columbia lacks knowledge or information sufficient to form a belief as to

the truth of the allegations contained in paragraph 13 as they relate to other defendants' alleged

activities within this District and so denies them on that basis.


14.     Venue is proper in this District under 15 U.S.C. §§ 15, 22 and 26, and 28 U.S.C. § 1391(b), (c), and (d), because each Defendant transacted business, was found, had agents, and/or resided in this District; a substantial part of the events giving rise to Plaintiffs' claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

**Answer to Paragraph 14:** Columbia denies the allegations contained in paragraph 14 of

the Second Amended Complaint as to itself, except admits that it has recruited, accepted and

enrolled individuals residing within this District. Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 14 as they relate to other defendants and so denies them on that basis.

15.     Defendants' conduct has had a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States and in this District. Defendants' conduct affects admitted students around the country, including through transactions with parties residing in different states. Defendants do business across state lines.

**Answer to Paragraph 15:** Columbia denies the allegations contained in paragraph 15 of the Second Amended Complaint as to itself, except admits that it has recruited, accepted and enrolled individuals residing outside the state of New York. Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 15 as they relate to other defendants and so denies them on that basis.

## III.     THE PARTIES

### A.     Plaintiffs

16.     Plaintiff Andrew Corzo attended the University of Chicago as a full-time undergraduate student from the fall of 2014 until he graduated in the spring of 2018. For each of these four years, he received need-based financial aid from Chicago, but also paid to Chicago some costs of tuition, room (in his first year), and board, taking out substantial loans in the process. He resides in Chicago, Illinois.

**Answer to Paragraph 16:** Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 16 of the Second Amended Complaint and so denies them on that basis.

17.     Plaintiff Sia Henry attended Duke as a full-time undergraduate student from the fall of 2007 until she graduated in the spring of 2011. For each of these four years, she paid to Duke some of the costs of tuition, room, and board. She received need-based financial aid from

Duke in at least two of her four years of attendance. Since graduating from Duke, and subsequently from Harvard Law School, Ms. Henry has dedicated her career to advocacy on behalf of prisoners, most recently as a Senior Program Specialist at Impact Justice. She resides in Atlanta, Georgia.

**Answer to Paragraph 17:** Columbia lacks knowledge or information sufficient to form

a belief as to the truth of the allegations contained in paragraph 17 of the Second Amended

Complaint and so denies them on that basis.

18. Plaintiff Alexander Leo-Guerra is attending Duke as a full-time undergraduate student. He enrolled in August 2019 and expects to graduate in the spring of 2023. For each of the first two years he has attended, he received some need-based financial aid from Duke, but also paid to Duke some of the costs of tuition, room, and board, taking out loans in the process. He resides in Draper, Utah.

**Answer to Paragraph 18:** Columbia lacks knowledge or information sufficient to form

a belief as to the truth of the allegations contained in paragraph 81 of the Second Amended

Complaint and so denies them on that basis.

19. Plaintiff Michael Maerlender attended Vanderbilt as a full-time undergraduate student from the fall of 2015 until he graduated in the spring of 2019. For each of these four years, he received need-based financial aid from Vanderbilt and paid for some of the costs of tuition, room, and board. He resides in New York, New York.

**Answer to Paragraph 19:** Columbia lacks knowledge or information sufficient to form

a belief as to the truth of the allegations contained in paragraph 19 of the Second Amended

Complaint and so denies them on that basis.

20. Plaintiff Brandon Piyevsky attended Northwestern as a full-time undergraduate student from the fall of 2013 until he graduated in the spring of 2017. For each of these four years, he received need-based financial aid from Northwestern and paid for some of the costs of tuition, room, and board, taking out loans in the process. He resides in Toledo, Ohio.

**Answer to Paragraph 20:** Columbia lacks knowledge or information sufficient to form

a belief as to the truth of the allegations contained in paragraph 20 of the Second Amended

Complaint and so denies them on that basis.

21.     Plaintiff Benjamin Shumate attended Brown University as a full-time undergraduate student from the fall of 2015 until he graduated in the spring of 2019. For each of these four years, he received need-based financial aid from Brown and paid for some of the costs of tuition, room and board. He resides in Providence, Rhode Island.

**Answer to Paragraph 21:** Columbia lacks knowledge or information sufficient to form

a belief as to the truth of the allegations contained in paragraph 21 of the Second Amended

Complaint and so denies them on that basis.

22.     Plaintiff Brittany Tatiana Weaver attended Vanderbilt as a full-time undergraduate student from 2003 until she graduated in 2007. For each of these four years, she received need-based financial aid from Vanderbilt and paid for some of the costs of tuition, room, and board, taking out substantial loans in the process. She resides in Farmington Hills, Michigan.

**Answer to Paragraph 22:** Columbia lacks knowledge or information sufficient to form

a belief as to the truth of the allegations contained in paragraph 22 of the Second Amended

Complaint and so denies them on that basis.

23.     Plaintiff Cameron Williams attended Vanderbilt as a full-time undergraduate student from 2014 until he graduated in 2018. For each of these four years, he received need-based financial aid from Vanderbilt and paid for some of the costs of tuition, room, and board, taking out substantial loans in the process. He resides in New York, New York.

**Answer to Paragraph 23:** Columbia lacks knowledge or information sufficient to form

a belief as to the truth of the allegations contained in paragraph 23 of the Second Amended

Complaint and so denies them on that basis.

24.     Plaintiffs thus were and are direct purchasers from Defendants of education, room, and board, and recipients of need-based financial aid from Defendants.

**Answer to Paragraph 24:** Columbia lacks knowledge or information sufficient to form

a belief as to the truth of the allegations contained in paragraph 24 of the Second Amended

Complaint and so denies them on that basis.

**B.      Defendants**

25.      Defendants are private, national universities that have been members of the 568 Cartel (most since 2003, and some not continuously) and have been continuously ranked in the top 25 of the *U.S. News & World Report* rankings for national universities since 2003.

**Answer to Paragraph 25:**  Columbia denies the allegations contained in paragraph 25 of the Second Amended Complaint to the extent that they incorporate the term "568 Cartel." Columbia admits that it is a private university that has been ranked in the top 25 colleges and universities in *U.S. News & World Report* and that it has been a member of the 568 Presidents Group.  Columbia further admits, on information and belief, that other defendants are universities that have been ranked in the top 25 colleges and universities in *U.S. News & World Report* in certain years and that they have been members of the 568 Presidents Group at certain times, as reflected in membership lists previously posted on the website of the 568 Presidents Group.  Columbia denies the remaining allegations contained in paragraph 25 of the Second Amended Complaint.

26.      Each Defendant acted as the agent of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.  All Defendants are jointly and severally liable for the acts of all members of the 568 Cartel.

**Answer to Paragraph 26:**  The allegations contained in paragraph 26 of the Second Amended Complaint are legal conclusions to which no response is required.  To the extent a response is required, Columbia denies the allegations contained in paragraph 26 of the Second Amended Complaint.

27.      Under the rule of joint and several liability, each Defendant is liable for all acts undertaken and all damages caused in furtherance of the conspiracy alleged herein, even those committed before the Defendant joined the 568 Cartel.  No Defendant that claims to have "left" the Cartel, but later "rejoined" it, took steps to disavow and repudiate the conspiracy or its goals at any time.  Accordingly, any such Defendant is jointly and severally liable for the conspirators' conduct throughout the course of the conspiracy.  Any Defendant that did not disavow and

repudiate the conspiracy and its goals never withdrew from the Cartel and remains jointly and severally liable for all of the conspirators' continuing conduct.

**Answer to Paragraph 27:** The allegations contained in paragraph 27 of the Second Amended Complaint are legal conclusions to which no response is required. To the extent a response is required, Columbia denies the allegations contained in paragraph 27 of the Second Amended Complaint.

28. Any Defendant that claims to have left the Cartel but later rejoined it, assuming that any such Defendant actually took sufficient steps to fully and formally withdraw, remains jointly and severally liable for all of the conspirators' conduct; and any Defendant that did not fully and formally withdraw from the Cartel remains jointly and several liable for all of the conspirators' continuing conduct as alleged herein.

**Answer to Paragraph 28:** The allegations contained in paragraph 28 of the Second Amended Complaint are legal conclusions to which no response is required. To the extent a response is required, Columbia denies the allegations contained in paragraph 28 of the Second Amended Complaint.

29. Since the enactment of Section 568, in 1994, Defendants' endowments have all increased enormously, and with respect to those Defendants for which the information is publicly available, the growth of their endowments have substantially outpaced the growth in their annual operating expenses.[2]

**Answer to Paragraph 29:** Columbia denies the allegations contained in paragraph 29 and Appendix A of the Second Amended Complaint as to itself, except admits that its endowment has grown from approximately $2 billion in 1994 to approximately $14.4 billion in 2021. Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 29 and Appendix A relating to other defendants and so denies

---

[2] Appendix A compares, for those Defendants for which such information is publicly available, the growth of the Defendant's annual operating expenses versus the growth of the Defendant's endowment from 1994 to 2021. Appendix A also identifies the rate of growth of every Defendant's endowment from 1994 to 2021.

them on that basis.

## Brown

30.     Brown University is a private, non-profit institution with its principal place of business in Providence, Rhode Island.

**Answer to Paragraph 30:**  On information and belief, Columbia admits the allegations

contained in paragraph 30 of the Second Amended Complaint.


31.     Brown was established by a charter, approved by the Rhode Island legislature, as "College of Rhode Island" in 1764.  The school was the third college in New England and seventh in America.  The school's name was changed to Brown in 1804.  Brown is a member of the Ivy League, a consortium of eight elite universities.

**Answer to Paragraph 31:**  Columbia lacks knowledge or information sufficient to form

a belief as to the truth of the allegations contained in paragraph 31 of the Second Amended

Complaint and so denies them on that basis, except admits that Brown is a member of the Ivy

League.


32.     Brown's undergraduate student body is generally wealthy and privileged.  The median family income of undergraduates is $204,200; 19% of undergraduates come from the top 1% of the country's income distribution, and 70% come from the top 20%; and only 4.1% come from the bottom 20% of the income distribution.[3]

**Answer to Paragraph 32:**  Columbia lacks knowledge or information sufficient to form

a belief as to the truth of the allegations contained in paragraph 32 of the Second Amended

Complaint and so denies them on that basis.

---

[3]     *Economic Diversity and Student Outcomes at Brown University*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/brown-university.

33.     Brown had an endowment of approximately $608 million in 1994, which has grown to approximately $6.9 billion in 2021.[4]

**Answer to Paragraph 33:** Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 33 of the Second Amended Complaint and so denies them on that basis.

### CalTech

34.     The California Institute of Technology is a private, non-profit institution with its principal place of business in Pasadena, California.

**Answer to Paragraph 34:** On information and belief, Columbia admits the allegations contained in paragraph 34 of the Second Amended Complaint.

35.     CalTech is one of the nation's leading research universities.

**Answer to Paragraph 35:** Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 35 of the Second Amended Complaint and so denies them on that basis.

36.     CalTech's undergraduate student body is generally wealthy and privileged.  The median family income of undergraduates is $146,300; 3% of undergraduates come from the top 1% of the country's income distribution, and 69% come from the top 20%; and only 2.9% come from the bottom 20% of the income distribution.[5]

**Answer to Paragraph 36:** Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 36 of the Second Amended Complaint and so denies them on that basis.

---

[4]     *See also* Michael Nitezel, *Elite University Endowments Soar as Higher Ed Divide Grows*, FORBES (Oct. 15, 2021), https://www.forbes.com/sites/michaeltnietzel/2021/10/15/elite-university-endowments-soar-to-record-highs/?sh=724aa8932d5f.

[5]     *Economic Diversity and Student Outcomes at the University of California Institute of Technology*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/california-institute-of-technology.

37.     CalTech had an endowment of approximately $592 million in 1994, which has grown to approximately $3.8 billion in 2021.

**Answer to Paragraph 37:**  Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 37 of the Second Amended Complaint and so denies them on that basis.

## Chicago

38.     The University of Chicago is a private, non-profit institution with its principal place of business in Chicago, Illinois.

**Answer to Paragraph 38:**  On information and belief, Columbia admits the allegations contained in paragraph 38 of the Second Amended Complaint.

39.     Chicago was founded in 1890 by the American Baptist Education Society and oil magnate John D. Rockefeller, who later described the school as "the best investment I ever made."

**Answer to Paragraph 39:**  Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 39 of the Second Amended Complaint and so denies them on that basis.

40.     Chicago's undergraduate study [*sic*] body is generally wealthy and privileged. The median family income of undergraduates is $134,500; 10% of undergraduates come from the top 1% of the country's income distribution, and 58% come from the top 20%; and only 5.5% come from the bottom 20% of the income distribution.[6]

**Answer to Paragraph 40:**  Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 40 of the Second Amended Complaint and so denies them on that basis.

---

[6]     *Economic Diversity and Student Outcomes at the University of Chicago*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/university-of-chicago.

41.     Chicago had an endowment of approximately $1.2 billion in 1994, which has grown to approximately $11 billion in 2021.

**Answer to Paragraph 41:**  Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 41 of the Second Amended Complaint and so denies them on that basis.

## Columbia

42.     Trustees of Columbia University in the City of New York is a private, non-profit institution with its principal place of business in New York, New York.

**Answer to Paragraph 42:**  Columbia admits the allegations contained in paragraph 42 of the Second Amended Complaint.

43.     Columbia was established as King's College by royal charter of King George II of Great Britain in 1754.  It was renamed Columbia College in 1784.  In 1896, the campus was moved to its current location in Morningside Heights and renamed Columbia University. According to its website, "Columbia University is one of the world's most important centers of research."  Columbia is a member of the Ivy League.

**Answer to Paragraph 43:**  Columbia admits the allegations contained in paragraph 43 of the Second Amended Complaint.

44.     Columbia's undergraduate student body, with the exception of its School of General Studies, discussed below, is generally wealthy and privileged.  The median family income of undergraduates is $150,900; 13% of undergraduates come from the top 1% of the country's income distribution, and 62% come from the top 20%; and only 5.1% come from the bottom 20% of the income distribution.[7]

**Answer to Paragraph 44:**  Columbia admits that the allegations contained in the second sentence of paragraph 44 of the Second Amended Complaint purport to recite certain data from a study summarized by the *New York Times*, but Columbia lacks knowledge or information

---

[7]     *Economic Diversity and Student Outcomes at Columbia University*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/columbia-university.

sufficient to form a belief as to the accuracy of the data and so denies those allegations on that basis. Columbia denies the remaining allegations contained in paragraph 44 of the Second Amended Complaint.

45.     Columbia had an endowment of approximately $2 billion in 1994, which has grown to approximately $14.4 billion in 2021.

**Answer to Paragraph 45:** Columbia admits the allegations contained in paragraph 45 of the Second Amended Complaint.

## Cornell

46.     Cornell is a private, non-profit institution with its principal place of business in Ithaca, New York.

**Answer to Paragraph 46:** On information and belief, Columbia admits the allegations contained in paragraph 46 of the Second Amended Complaint.

47.     Cornell was founded in 1865, as a private, land-grant institution of New York State. According to its website, Cornell has been described as "the first *truly* American university because of its founders' revolutionary egalitarian and practical vision of higher education." (Emphasis in original.) Cornell is a member of the Ivy League.

**Answer to Paragraph 47:** Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 47 of the Second Amended Complaint and so denies them on that basis, except admits that Cornell is a member of the Ivy League.

48.     Cornell's undergraduate student body is generally wealthy and privileged. The median family income of undergraduates is $151,600; 10% of undergraduates come from the top 1% of the country's income distribution, and 64% come from the top 20%; and only 3.8% come from the bottom 20% of the income distribution.[8]

---

[8]     *Economic Diversity and Student Outcomes at Cornell University*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/cornell-university.

**Answer to Paragraph 48:** Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 48 of the Second Amended Complaint and so denies them on that basis.

49.     Cornell had an endowment of approximately $898 million in 1994, which has grown to approximately $10 billion in 2021.

**Answer to Paragraph 49:** Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 49 of the Second Amended Complaint and so denies them on that basis.

**Dartmouth**

50.     Trustees of Dartmouth College is a private, non-profit institution with its principal place of business in Hanover, New Hampshire.

**Answer to Paragraph 50:** On information and belief, Columbia admits the allegations contained in paragraph 50 of the Second Amended Complaint.

51.     According to Dartmouth's website: "Founded in 1769, Dartmouth is a member of the Ivy League and consistently ranks among the world's greatest academic institutions." Dartmouth's website also claims that "Dartmouth College educates the most promising students."

**Answer to Paragraph 51:** Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 51 of the Second Amended Complaint and so denies them on that basis, except admits that Dartmouth is a member of the Ivy League.

52.     Dartmouth's undergraduate student body is generally wealthy and privileged. The median family income of undergraduates is $200,400; 21% of undergraduates come from

18

the top 1% of the country's income distribution, and 69% come from the top 20%; and only 2.6% come from the bottom 20% of the income distribution.[9]

**Answer to Paragraph 52:** Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 52 of the Second Amended Complaint and so denies them on that basis.

53. Dartmouth had an endowment of approximately $870 million in 1994, which has grown to approximately $8.5 billion in 2021.

**Answer to Paragraph 53:** Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 53 of the Second Amended Complaint and so denies them on that basis.

## Duke

54. Duke University is a private, non-profit institution with its principal place of business in Durham, North Carolina.

**Answer to Paragraph 54:** On information and belief, Columbia admits the allegations contained in paragraph 54 of the Second Amended Complaint.

55. Duke's undergraduate student body is generally wealthy and privileged. The median family income of undergraduates is $186,700; 19% of undergraduates come from the top 1% of the country's income distribution, and 69% come from the top 20%; and only 3.9% come from the bottom 20% of the income distribution.[10]

**Answer to Paragraph 55:** Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 55 of the Complaint and so denies them on that basis.

---

[9] *Economic Diversity and Student Outcomes at Dartmouth College*, N.Y. TIMES https://www.nytimes.com/interactive/projects/college-mobility/dartmouth-college.

[10] *Economic Diversity and Student Outcomes at Duke University* N.Y. TIMES https://www.nytimes.com/interactive/projects/college-mobility/duke-university.

56.     Duke had an endowment of approximately $699 million in 1994, which has grown to approximately $12.7 billion in 2021.

**Answer to Paragraph 56:**  Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 56 of the Second Amended Complaint and so denies them on that basis.

## Emory

57.     Emory University is a private, non-profit institution with its principal place of business in Atlanta, Georgia.

**Answer to Paragraph 57:**  On information and belief, Columbia admits the allegations contained in paragraph 57 of the Second Amended Complaint.

58.     Emory was established by charter of the Georgia legislature in 1836.

**Answer to Paragraph 58:**  Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 58 of the Second Amended Complaint and so denies them on that basis.

59.     Emory's undergraduate student body is generally wealthy and privileged.  The median family income of undergraduates is $139,800; 15% of undergraduates come from the top 1% of the country's income distribution, and 58% come from the top 20%; and only 6% come from the bottom 20% of the income distribution.[11]

**Answer to Paragraph 59:**  Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 59 of the Second Amended Complaint and so denies them on that basis.

60.     Emory had an endowment of approximately $1.6 billion in 1994, which has grown to approximately $8 billion in 2021.

---

[11]     *Economic Diversity and Student Outcomes at Emory University* N.Y. TIMES
        https://www.nytimes.com/interactive/projects/college-mobility/emory-university.

**Answer to Paragraph 60:** Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 60 of the Second Amended Complaint and so denies them on that basis.

### Georgetown

61.　　Georgetown University is a private, non-profit institution with its principal place of business in Washington, District of Columbia.

**Answer to Paragraph 61:** On information and belief, Columbia admits the allegations contained in paragraph 61 of the Second Amended Complaint.

62.　　According to its website: "Georgetown University is the oldest Catholic and Jesuit institution of higher learning in the United States."

**Answer to Paragraph 62:** Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 62 of the Second Amended Complaint and so denies them on that basis.

63.　　Georgetown's undergraduate student body is generally wealthy and privileged. The median family income of undergraduate students is $229,100; 21% of undergraduates come from the top 1% of the country's income distribution, and 74% come from the top 20%; and only 3.1% come from the bottom 20% of the income distribution.[12]

**Answer to Paragraph 63:** Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 63 of the Second Amended Complaint and so denies them on that basis.

64.　　Georgetown had an endowment of approximately $343 million in 1994, which has grown to approximately $2.6 billion in 2021.

**Answer to Paragraph 64:** Columbia lacks knowledge or information sufficient to form

---

[12]　*Economic Diversity and Students Outcomes at Georgetown University*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/georgetown-university.

a belief as to the truth of the allegations contained in paragraph 64 of the Second Amended

Complaint and so denies them on that basis.

## Johns Hopkins

65.     Johns Hopkins University is a private, non-profit institution with its principal place of business in Baltimore, Maryland.

**Answer to Paragraph 65:**  On information and belief, Columbia admits the allegations

contained in paragraph 65 of the Second Amended Complaint.

66.     Johns Hopkins, the oldest research university in the United States, was founded in 1876 and named after the American philanthropist and entrepreneur Johns Hopkins.

**Answer to Paragraph 66:**  Columbia lacks knowledge or information sufficient to form

a belief as to the truth of the allegations contained in paragraph 66 of the Second Amended

Complaint and so denies them on that basis.

67.     Johns Hopkins' undergraduate student body is generally wealthy and privileged. The median family income of undergraduate students is $177,300; 11% of the undergraduates come from the top 1% of the country's income distribution, and 72% come from the top 20%; and only 2.9% come from the bottom 20% of the income distribution.[13]

**Answer to Paragraph 67:**  Columbia lacks knowledge or information sufficient to form

a belief as to the truth of the allegations contained in paragraph 67 of the Second Amended

Complaint and so denies them on that basis.

68.     Johns Hopkins had an endowment of approximately $747 million in 1994, which has grown to approximately $9.3 billion in 2021.

**Answer to Paragraph 68:**  Columbia lacks knowledge or information sufficient to form

a belief as to the truth of the allegations contained in paragraph 68 of the Second Amended

---

[13]     *Economic Diversity and Students Outcomes at Johns Hopkins University*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/georgetown-university.

Complaint and so denies them on that basis.

## MIT

69.     The Massachusetts Institute of Technology is a private, non-profit institution with its principal place of business in Cambridge, Massachusetts.

**Answer to Paragraph 69:**  On information and belief, Columbia admits the allegations contained in paragraph 69 of the Second Amended Complaint.

70.     MIT is regularly ranked in the top five in international rankings of the world's best research universities.

**Answer to Paragraph 70:**  Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 70 of the Second Amended Complaint and so denies them on that basis.

71.     MIT's undergraduate student body is generally wealthy and privileged.  The median family income of undergraduates is $137,400; 5.7% of undergraduates come from the top 1% of the income distribution, and 61% come from the top 20%; and only 6.2% come from the bottom 20% of the income distribution.[14]

**Answer to Paragraph 71:**  Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 71 of the Second Amended Complaint and so denies them on that basis.

72.     MIT had an endowment of approximately $1.8 billion in 1994, which has grown to approximately $27.4 billion in 2021.

**Answer to Paragraph 72:**  Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 72 of the Second Amended Complaint and so denies them on that basis.

---

[14]  *Economic Diversity and Student Outcomes at Massachusetts Institute of Technology*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/massachusetts-institute-of-technology.

## Northwestern

73.     Northwestern University is a private, non-profit institution with its principal place of business in Evanston, Illinois.  Northwestern was founded in 1853.

**Answer to Paragraph 73:**  On information and belief, Columbia admits the allegations contained in paragraph 73 of the Second Amended Complaint.

74.     Northwestern's undergraduate student body is generally wealthy and privileged. The median family income of Northwestern's undergraduates is $171,200; 14% of undergraduates come from the top 1% of the income distribution, and 66% come from the top 20%; and only 3.7% come from the bottom 20% of the income distribution.[15]

**Answer to Paragraph 74:**  Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 74 of the Second Amended Complaint and so denies them on that basis.

75.     Northwestern had an endowment of approximately $1.3 billion in 1994, which has grown to approximately $14.9 billion in 2021.

**Answer to Paragraph 75:**  Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 75 of the Second Amended Complaint and so denies them on that basis.

## Notre Dame

76.     The University of Notre Dame du Lac is a private, non-profit institution with its principal place of business in South Bend, Indiana.

**Answer to Paragraph 76:**  On information and belief, Columbia admits the allegations contained in paragraph 76 of the Second Amended Complaint.

77.     Notre Dame was founded in 1842.  According to its website, Notre Dame is "[o]ne of America's leading undergraduate teaching institutions."

---

[15]  *Economic Diversity and Student Outcomes at Northwestern University*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/northwestern-university.

**Answer to Paragraph 77:** Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 77 of the Second Amended Complaint and so denies them on that basis.

78. Notre Dame's undergraduate student body is generally wealthy and privileged. The median family income of undergraduates is $191,400; 15% of undergraduates come from the top 1% of the income distribution, and 75% come from the top 20%; and only 1.6% come from the bottom 20% of the income distribution.[16]

**Answer to Paragraph 78:** Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 78 of the Second Amended Complaint and so denies them on that basis.

79. Notre Dame had an endowment of approximately $879 million in 1994, which has grown to approximately $22.5 billion in 2021.

**Answer to Paragraph 79:** Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 79 of the Second Amended Complaint and so denies them on that basis.

### Penn

80. The Trustees of the University of Pennsylvania is a private, non-profit institution with its principal place of business in Philadelphia, Pennsylvania.

**Answer to Paragraph 80:** On information and belief, Columbia admits the allegations contained in paragraph 80 of the Second Amended Complaint.

---

[16] *Economic Diversity and Student Outcomes at Notre Dame*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/notre-dame.

81.     Penn was founded in 1740 by Benjamin Franklin.  As of 2014, Penn had 25 undergraduate alumni that were billionaires, more than any other university in the world.[17]  Penn is a member of the Ivy League.

**Answer to Paragraph 81:**  Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 81 of the Second Amended Complaint and so denies them on that basis, except admits that Penn is a member of the Ivy League.

82.     Penn's undergraduate student body is generally wealthy and privileged.  The median family income of undergraduates is $195,500; 19% of undergraduates come from the top 1% of the income distribution, and 71% come from the top 20%; and only 3.3% come from the bottom 20% of the income distribution.[18]

**Answer to Paragraph 82:**  Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 82 of the Second Amended Complaint and so denies them on that basis.

83.     Penn had an endowment of approximately $1.5 billion in 1994, which has grown to approximately $20.5 billion in 2021.

**Answer to Paragraph 83:**  Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 83 of the Second Amended Complaint and so denies them on that basis.

**<u>Rice</u>**

84.     The William Marsh Rice University is a private, non-profit institution with its principal place of business in Houston, Texas.

**Answer to Paragraph 84:**  On information and belief, Columbia admits the allegations

---

[17]     Emily Jane Fox, *Top 20 Colleges with Most Billionaire Alumni*, CNN (Sept. 17, 2014), https://money.cnn.com/2014/09/16/luxury/top-colleges-with-billionaire-undergraduates/.

[18]     *Economic Diversity and Student Outcomes at the University of Pennsylvania*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/university-of-pennsylvania.

contained in paragraph 84 of the Second Amended Complaint.

85.     Rice was founded in 1891 by Houston businessman William Marsh Rice.

**Answer to Paragraph 85:**  Columbia lacks knowledge or information sufficient to form

a belief as to the truth of the allegations contained in paragraph 85 of the Second Amended

Complaint and so denies them on that basis.

86.     Rice's undergraduate student body is generally wealthy and privileged.  The
median family income of undergraduates is $160,800; 9.8% of undergraduates come from the
top 1% of the income distribution, and 64% come from the top 20%; and only 4.9% come from
the bottom 20% of the income distribution.[19]

**Answer to Paragraph 86:**  Columbia lacks knowledge or information sufficient to form

a belief as to the truth of the allegations contained in paragraph 86 of the Second Amended

Complaint and so denies them on that basis.

87.     Rice had an endowment of approximately $1.3 billion in 1994, which has grown
to approximately $8.1 billion in 2021.

**Answer to Paragraph 87:**  Columbia lacks knowledge or information sufficient to form

a belief as to the truth of the allegations contained in paragraph 87 of the Second Amended

Complaint and so denies them on that basis.

**Vanderbilt**

88.     Vanderbilt University is a private, non-profit institution with its principal place of
business in Nashville, Tennessee.

**Answer to Paragraph 88:**  On information and belief, Columbia admits the allegations

contained in paragraph 88 of the Second Amended Complaint.

---

[19]     *Economic Diversity and Student Outcomes at Rice University*, N.Y. TIMES,
        https://www.nytimes.com/interactive/projects/college-mobility/rice-university.

89. Vanderbilt was founded in 1873 and named in honor of Cornelius Vanderbilt, who donated a founding gift. According to Vanderbilt's website, "the university's prominent alumni base includes Nobel Prize winners, members of Congress, governors, ambassadors, judges, admirals, CEOs, university presidents, physicians and attorneys, as well as professional sports figures playing in the NFL, NBA, Major League Baseball, the PGA and LPGA."

**Answer to Paragraph 89:** Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 89 of the Second Amended Complaint and so denies them on that basis.

90. Vanderbilt's undergraduate student body is generally wealthy and privileged. The median family income of undergraduates is $204,500; 23% of undergraduates come from the top 1% of the income distribution, and 70% come from the top 20%; and only 1.9% come from the bottom 20% of the income distribution.[20]

**Answer to Paragraph 90:** Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 90 of the Second Amended Complaint and so denies them on that basis.

91. Vanderbilt had an endowment of approximately $860 million in 1994, which has grown to approximately $10.9 billion in 2021.

**Answer to Paragraph 91:** Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 91 of the Second Amended Complaint and so denies them on that basis.

## **Yale**

92. Yale University is a private, non-profit institution with its principal place of business in New Haven, Connecticut.

**Answer to Paragraph 92:** On information and belief, Columbia admits the allegations contained in paragraph 92 of the Second Amended Complaint.

---

[20]     *Economic Diversity and Student Outcomes at Vanderbilt University*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/vanderbilt-university.

93.     Originally chartered by the legislature of Connecticut as the Collegiate School in 1701 in multiple locations, the school was moved to New Haven in 1716 and renamed Yale in 1718, after a wealthy British merchant and philanthropist, Elihu Yale.  It is the third-oldest university in the United States.  Yale is a member of the Ivy League.

**Answer to Paragraph 93:**  Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 93 of the Second Amended Complaint and so denies them on that basis, except admits that Yale is a member of the Ivy League.

94.     Yale's undergraduate study body is generally wealthy and privileged.  The median family income of undergraduates is $192,600; 19% of undergraduates come from the top 1% of the income distribution, and 69% come from the top 20%; and only 2.1% come from the bottom 20% of the income distribution.[21]

**Answer to Paragraph 94:**  Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 94 of the Second Amended Complaint and so denies them on that basis.

95.     Yale had an endowment of approximately $3.5 billion in 1994, which has grown to approximately $42.3 billion in 2021.  This is the second-highest endowment of any university in the United States.

**Answer to Paragraph 95:**  Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 95 of the Complaint and so denies them on that basis.

## IV.     DEFENDANTS' MEMBERSHIP IN THE 568 CARTEL

96.     The 568 Cartel was formed in 1998.  Columbia, Cornell, Duke, Georgetown, MIT, Northwestern, and Notre Dame have been members of the 568 Cartel since 1998 and first implemented the Consensus Methodology in 2003.

---

[21]     *Economic Diversity and Student Outcomes at Yale University*, N.Y. TIMES, https://www.nytimes.com/interactive/projects/college-mobility/yale-university.

**Answer to Paragraph 96:**  Columbia denies the allegations contained in paragraph 96 of the Second Amended Complaint to the extent that they incorporate the term "568 Cartel." Columbia admits that the 568 Presidents Group was formed in 1998 and that Columbia has been a member of the 568 Presidents Group since 1998.  Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 96 as they relate to other defendants and so denies them on that basis.  Columbia denies the remaining allegations contained in paragraph 96 of the Second Amended Complaint.

97.     Brown joined the 568 Cartel in 1998 and first implemented the Consensus Methodology in 2004.

**Answer to Paragraph 97:**  Columbia denies the allegations contained in paragraph 97 of the Complaint to the extent that they incorporate the term "568 Cartel."  Columbia further lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 97 as they relate to another defendant and so denies them on that basis.

98.     CalTech joined the 568 Cartel in 2019 and first implemented the Consensus Methodology the same year.

**Answer to Paragraph 98:**  Columbia denies the allegations contained in paragraph 98 of the Second Amended Complaint to the extent that they incorporate the term "568 Cartel." Columbia further lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 98 as they relate to another defendant and so denies them on that basis.

99.     Chicago joined the 568 Cartel in 1998 and first implemented the Consensus Methodology in 2003.

**Answer to Paragraph 99:**  Columbia denies the allegations contained in paragraph 99 of the Second Amended Complaint to the extent that they incorporate the term "568 Cartel."

Columbia further lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 99 as they relate to another defendant and so denies them on that basis.

100.    Dartmouth joined the 568 Cartel in 1998 and first implemented the Consensus Methodology in 2004.

**Answer to Paragraph 100:**  Columbia denies the allegations contained in paragraph 100 of the Second Amended Complaint to the extent that they incorporate the term "568 Cartel." Columbia further lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 100 as they relate to another defendant and so denies them on that basis.

101.    Emory joined the 568 Cartel in 1998 and first implemented the Consensus Methodology in 2003.

**Answer to Paragraph 101:**  Columbia denies the allegations contained in paragraph 101 of the Second Amended Complaint to the extent that they incorporate the term "568 Cartel." Columbia further lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 101 as they relate to another defendant and so denies them on that basis.

102.    Johns Hopkins joined the 568 Cartel in 2021, has taken overt steps in furtherance of the conspiracy alleged herein (including meeting with Defendants and discussing the Consensus Methodology with them), and first implemented the Consensus Methodology with respect to Early Decision applicants in 2021.

**Answer to Paragraph 102:**  Columbia denies the allegations contained in paragraph 102 of the Second Amended Complaint to the extent that they incorporate the term "568 Cartel." Columbia further lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 102 as they relate to another defendant and so denies them on

31

that basis.

103.    Rice joined the 568 Cartel in 1998 and first implemented the Consensus
Methodology in 2003.

**Answer to Paragraph 103:**  Columbia denies the allegations contained in paragraph 103

of the Second Amended Complaint to the extent that they incorporate the term "568 Cartel."

Columbia further lacks knowledge or information sufficient to form a belief as to the truth of the

allegations contained in paragraph 103 as they relate to another defendant and so denies them on

that basis.

104.    Penn joined the 568 Cartel in 1998 and first implemented the Consensus
Methodology in 2003.

**Answer to Paragraph 104:**  Columbia denies the allegations contained in paragraph 104

of the Second Amended Complaint to the extent that they incorporate the term "568 Cartel."

Columbia further lacks knowledge or information sufficient to form a belief as to the truth of the

allegations contained in paragraph 104 as they relate to another defendant and so denies them on

that basis.

105.    Vanderbilt joined the 568 Cartel in 1998 and first implemented the Consensus
Methodology in 2003.

**Answer to Paragraph 105:**  Columbia denies the allegations contained in paragraph 105

of the Second Amended Complaint to the extent that they incorporate the term "568 Cartel."

Columbia further lacks knowledge or information sufficient to form a belief as to the truth of the

allegations contained in paragraph 105 as they relate to another defendant and so denies them on

that basis.

106.    Yale joined the 568 Cartel in 1998 and first implemented the Consensus
Methodology in 2003.

**Answer to Paragraph 106:** Columbia denies the allegations contained in paragraph 106 of the Second Amended Complaint to the extent that they incorporate the term "568 Cartel." Columbia further lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 106 as they relate to another defendant and so denies them on that basis.

107. Certain Defendants claim to have stopped participating in the 568 Cartel at various points in time since 2003, but Plaintiffs are unaware of any evidence that any Defendant disavowed and repudiated the conspiracy and its goals. Accordingly, no Defendant withdrew from the conspiracy. Accordingly, since 2003 and through the present, the determinants of the net price of attending Defendants' schools have been established through the conspiracy.

**Answer to Paragraph 107:** Columbia denies the allegations contained in paragraph 107 of the Second Amended Complaint to the extent that they incorporate the term "568 Cartel." Columbia further denies the allegations contained in paragraph 107, except lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first sentence of paragraph 107 as they relate to plaintiffs or other defendants and so denies them on that basis.

## V. DEFENDANTS' VIOLATION OF THE FEDERAL ANTITRUST LAWS

### A. Defendants Have Colluded on Their Financial-Aid Practices

108. Defendants are purported competitors in enrolling highly selective undergraduate student bodies and providing an undergraduate education. People throughout the United States apply for admission to Defendants' undergraduate programs.

**Answer to Paragraph 108:** Columbia denies the allegations contained in paragraph 108 of the Second Amended Complaint as to itself, except admits that Columbia competes with many other colleges and universities to provide an undergraduate education to a diverse student body and that Columbia receives applications for admission to its undergraduate programs from persons living in states other than New York. Columbia lacks knowledge or information

33

sufficient to form a belief as to the truth of the allegations contained in paragraph 108 as they

relate to other defendants so denies them on that basis.

109.     Each Defendant annually sends out thousands of solicitations and mailings and
receives thousands of admission applications that cross state lines, including thousands of
applications from Class Members.  Out-of-state students, including thousands of Class Members,
make up a substantial percentage of each Defendant's undergraduate population.

**Answer to Paragraph 109:**  Columbia denies the allegations contained in paragraph 109

of the Second Amended Complaint as to itself, except admits that Columbia sends mail to, and

receives admission applications from, persons living in states other than New York and that out-

of-state students are included in its undergraduate student body.  Columbia lacks knowledge or

information sufficient to form a belief as to the truth of the allegations contained in paragraph

109 as they relate to other defendants and so denies them on that basis.

110.     Each Defendant annually receives millions of dollars that flow across state lines
in tuition payments, grants, donations, and athletic ticket sales and sponsorships.  Each
Defendant markets its undergraduate programs and tickets for athletic events to the public across
state lines.

**Answer to Paragraph 110:**  Columbia denies the allegations contained in paragraph 110

of the Second Amended Complaint as to itself, except admits that Columbia receives tuition

payments, grants, donations, and athletic ticket sales and sponsorships from outside the state of

New York, and further admits that Columbia markets its undergraduate programs and athletic

events outside the state of New York.  Columbia lacks knowledge or information sufficient to

form a belief as to the truth of the allegations contained in paragraph 110 as they relate to other

defendants and so denies them on that basis.

111.     Defendants have engaged in a continuing conspiracy in unreasonable restraint of
interstate trade and commerce in violation of Section 1 of the Sherman Act.  This conspiracy, to
the extent it continues, is likely to continue unless the relief sought herein is granted.

**Answer to Paragraph 111:** Columbia denies the allegations contained in paragraph 111 of the Second Amended Complaint.

112. This conspiracy has consisted of an agreement, understanding, and concert of action among Defendants, and each of them, the substantial terms of which are to restrain price competition relating to their provision of financial aid for students, and thereby to increase the net price of attending these institutions ("the net price of attendance").

**Answer to Paragraph 112:** Columbia denies the allegations contained in paragraph 112 of the Second Amended Complaint.

113. The 568 Cartel generally meets in person as a group at least twice each year. In October 2017, for example, the 568 Cartel held one of its official biannual meetings at the Hilton Rosemont, in Rosemont, Illinois, near O'Hare International Airport. On information and belief, 568 Cartel members communicate with each other about matters related to the conspiracy through other means as well, such as telephone calls, video calls, emails, and messaging.

**Answer to Paragraph 113:** Columbia denies the allegations contained in paragraph 113 of the Second Amended Complaint to the extent that they incorporate the term "568 Cartel." Columbia admits that members of the 568 President Group have periodically met in person and sometimes communicated through other means. Columbia further admits that, in October 2017, the 568 Presidents Group held a meeting at the Hilton Rosemont in Rosemont, Illinois. Columbia denies the remaining allegations contained in paragraph 113 of the Second Amended Complaint.

114. Until the fall of 2022, Defendants maintained a public-facing website for purpose of representing the 568 Cartel and its purposes to the public. The website stated: "This site serves as a resource . . . for visitors seeking to learn more about the Group."[22] The website explained that the "568 Presidents Group is an affiliation of colleges and universities, all of which must admit students on a need-blind basis." An FAQ section on the website added: "It is referred to as a 'Presidents' group because it was formed by a group of 28 college and university presidents from need-blind schools in 1998." The website also contained the form of a certificate of compliance whereby a member of the group could certify that "its admission and financial aid practices currently comply with the rules of Section 568 regarding 'need-blind

---

[22]  568 PRESIDENTS GROUP, http://www.568group.org/home/.

admission practices.'" These statements on the website misled the public by representing that the 568 Cartel members' practices were compliant with Section 568. The truth, as alleged further below, is the opposite.

**Answer to Paragraph 114:** Columbia denies the allegations contained in paragraph 114 of the Second Amended Complaint to the extent that they incorporate the term "568 Cartel." Columbia further denies the allegations contained in paragraph 114 of the Complaint, except admits that plaintiffs purport to quote from the website of the 568 Presidents Group. Columbia refers to that website for the complete and accurate content thereof.

115. The 568 Cartel has fixed prices through a formula that is based on a "set of common standards for determining the family's ability to pay for college." The 568 Cartel calls this formula the "Consensus Methodology." Defendants admitted on their own website that the "purposes" of the 568 Cartel include, collectively, to "Discuss and agree upon common principles of analysis for determining the financial need of undergraduate financial aid applicants"; to "Build, maintain, and revise, as appropriate, a Consensus Approach need analysis methodology that is consistent with these principles"; and to "Explore ways of developing a data exchange program."

**Answer to Paragraph 115:** Columbia denies the allegations contained in paragraph 115 of the Second Amended Complaint to the extent that they incorporate the term "568 Cartel." Columbia further denies the allegations contained in paragraph 115 of the Complaint, except admits that plaintiffs purport to quote from the website of the 568 Presidents Group. Columbia refers to that website for the complete and accurate content thereof.

116. Defendants further conceded that the "Consensus Methodology" would, in their own words, contain "certain key components, including: 1) common elements of need analysis . . .; 2) a common calendar for the collection of data from families; 3) a means of training aid professionals in the application of the Methodology; and 4) an oversight 568 Group to review and modify the methodology as needed over time."

**Answer to Paragraph 116:** Columbia denies the allegations contained in paragraph 116 of the Second Amended Complaint, except admits that plaintiffs purport to quote from the website of the 568 Presidents Group. Columbia refers to that website for the complete and

accurate content thereof.

117.    Critical components of the 568 Cartel have therefore been the development of a "data exchange program" and the agreement to share information about admissions and financial-aid methodology, and then to meet regularly to discuss this data and information, to enable the Cartel members to agree to use a common methodology for determining financial-aid awards for the purposes of coordinating financial-aid awards among Cartel members.  The common methodology assesses the income and assets of given financial-aid applicants and their families to determine the applicants' ability to pay and thus the financial contribution that the applicant is expected to make.

**Answer to Paragraph 117:**  Columbia denies the allegations contained in paragraph 117 of the Second Amended Complaint to the extent that they incorporate the term "568 Cartel." Columbia further denies the allegations contained in paragraph 117 of the Complaint, except admits that the 568 Presidents Group developed a Consensus Methodology of voluntary general recommendations for assessing student need, which methodology takes into account the income and assets of financial-aid applicants and their families.

118.    The applicants' assessed ability to pay therefore is a key determinant in the net price of attendance.  The 568 Cartel has used the shared, competitively sensitive information about enrollment, costs, and other data relating to Defendants' available resources for financial aid to arrive at a common and agreed formula for setting ability to pay, which results in artificially inflated net prices of attendance.

**Answer to Paragraph 118:**  Columbia denies the allegations contained in paragraph 118 of the Second Amended Complaint.

119.    Members of the 568 Cartel began meeting sometime after the enactment of Section 568 in 1994.  The 568 Cartel was officially formed in 1998.

**Answer to Paragraph 119:**  Columbia denies the allegations contained in paragraph 119 of the Second Amended Complaint to the extent that they incorporate the term "568 Cartel." Columbia admits that the 568 Presidents Group was formed in 1998 and that members of the 568 Presidents Group began meeting sometime after the statute's enactment.

120.    As of July 2001, Dartmouth had not joined the 568 Cartel.  According to Dartmouth's then-Dean of Admissions and Financial Aid, Karl Furstenberg, as of 2001 Dartmouth had a "need analysis methodology that [was] perhaps more enlightened, more generous and more flexible than" that of the 568 Cartel, and Dartmouth was "actually doing more than this new methodology would allow."[23]  Not long after Mr. Furstenberg made these statements, however, Dartmouth decided to join the 568 Cartel, implemented the Consensus Methodology, and took other steps in furtherance of the conspiracy as alleged herein.

**Answer to Paragraph 120:**  Columbia denies the allegations contained in paragraph 120

of the Second Amended Complaint to the extent that they incorporate the term "568 Cartel."

Columbia further lacks knowledge or information sufficient to form a belief as to the truth of the

allegations contained in paragraph 120 as they relate to another defendant and so denies them on

that basis.


121.    The 568 Cartel has monitored and enforced its combination and conspiracy in several ways, according to the Cartel's website, including (but not limited to) such steps as (a) requiring each participating institution to submit a "Certificate of Compliance," (b) requiring university professionals at each institution to receive "training . . . in the application of the Methodology," (c) imposing a "common calendar for the collection of data from families," and (d) conducting an annual or biannual meeting every year since 2007.

**Answer to Paragraph 121:**  Columbia denies the allegations contained in paragraph 121

of the Second Amended Complaint.


122.    At midnight on September 30, 2022, the 568 Exemption expired.  The 568 Cartel website is now blank except for the following message:  "The Presidents Group (and all of its Committees) have been formally dissolved, effective November 4, 2022.  Thank you."

**Answer to Paragraph 122:**  Columbia denies the allegations contained in paragraph 124

of the Second Amended Complaint to the extent that they incorporate the term "568 Cartel."

Columbia admits that the 568 exemption expired on September 30, 2022, and that the

568group.org website is now blank except for the message that "[t]he Presidents Group (and all

---

[23]    Shevani Jaisingh, *28 Colleges Alter Financial Aid Packages*, THE DARTMOUTH (July 17, 2001), https://www.thedartmouth.com/article/2001/07/28-colleges-alter-fin-aid-packages.

of its Committees) have been formally dissolved, effective November 4, 2022. Thank you."

## VI. DEFENDANTS' ANTICOMPETITIVE CONDUCT HAS RAISED NET PRICES

123. As higher-education insiders—including employees and officers of the institutions in the 568 Cartel—have acknowledged, the Cartel has limited competition in financial-aid offers from supposedly competing schools, driving down aid packages and thereby driving up the net price of attendance for aid-eligible students.

**Answer to Paragraph 123:** Columbia denies the allegations contained in paragraph 123

of the Second Amended Complaint.

124. Yale claims not to have participated in the 568 Cartel from 2008 until 2018. Yale claims it left the Cartel because it determined that membership in the Cartel had restricted the amount of financial aid that Yale could provide to students. That is, Yale's decision to increase financial-aid awards to eligible students prompted it to want to no longer participate. In so doing, referring to a new policy to be implemented in early 2009, Yale stated that its "new, more generous aid policy in January means the University can no longer follow the consensus methodology."[24]

**Answer to Paragraph 124:** Columbia denies the allegations contained in paragraph 124

of the Second Amended Complaint to the extent that they incorporate the term "568 Cartel."

Columbia further lacks knowledge or information sufficient to form a belief as to the truth of the

allegations contained in paragraph 124 as they relate to another defendant and so denies them on

that basis.

125. Yale's then-Director of Student Financial Services, Caesar Storlazzi, concluded: "By leaving the 568 Group, Yale is now free to give families more aid than they would have gotten under the consensus methodology."[25] Storlazzi stated that what is "not good" about the Cartel's approach is that it has "one needs-analysis formula that everyone has to sign on to."[26] The connection between Yale's withdrawal and the effect on net prices was explicit: "In other words, the percentage of a family's income and assets that Yale takes as a parental contribution

---

[24] Caitlin Roman, *University Leaves Financial Aid Group*, YALE DAILY NEWS (Sept. 26, 2008), https://yaledailynews.com/blog/2008/09/26/university-leaves-financial-aid-group/.

[25] *Id.*

[26] *Id.*

is now lower than the percentage taken by 568 schools."[27]  (Yale evidently rejoined the Cartel in 2018, without fanfare.)  In other words, Yale understood that active members of the 568 Cartel were required to agree to and impose the Consensus Methodology, which had the effect of suppressing the amount of financial aid it could offer to all its students systematically.  Only by attempting to pull out of the Cartel could Yale or any Cartel member be free to offer competitively better financial-aid offers, and charge lower net prices for attendance, to all Class Members.

**Answer to Paragraph 125:**  Columbia denies the allegations contained in paragraph 125

of the Second Amended Complaint to the extent that they incorporate the term "568 Cartel."

Columbia lacks knowledge or information sufficient to form a belief as to the truth of the

allegations contained in paragraph 125 as they relate to other defendants and so denies them on

that basis.  Columbia denies the remaining allegations contained in paragraph 125 of the Second

Amended Complaint.

126.    Other universities have similarly declined to participate in the 568 Cartel because it would limit the financial aid they could provide.  Harvard's then-Director of Financial Aid, Sally Donahue, said in 2008 that Harvard never joined the 568 Cartel because its financial-aid formula would have yielded financial-aid packages that were smaller than what Harvard wanted to award.[28]  In 2015, one anonymous university president who refused to participate in the 568 Cartel described it as "an insider's game" that belonged to a "bygone era."  Observing that some schools had left the 568 Cartel to offer more financial aid, this anonymous president opined that "the notion of a collective that would constrain money is counter to public policy."[29]

**Answer to Paragraph 126:**  Columbia denies the allegations contained in paragraph 126

of the Second Amended Complaint to the extent that they incorporate the term "568 Cartel."

Columbia further lacks knowledge or information sufficient to form a belief as to the truth of the

allegations contained in paragraph 126 and so denies them on that basis.

---

[27]    *Id.*

[28]    *Id.*

[29]    The Education Conservancy, *Financial Aid: Examining the Thinking Behind the Policy* (June 2015), https://www.educationconservancy.org/PresidentialThinking.pdf.

127.    Indeed, the website of the 568 Presidents Group stated in relevant part: "The Consensus Approach . . . seeks to reduce much of the variance in need analysis results that has been experienced in recent years." The website went on to state that the "participating institutions believe that the Consensus Approach, when applied in a consistent manner, serves to diminish or eliminate . . . divergent results."

**Answer to Paragraph 127:** Columbia denies the allegations contained in paragraph 127 of the Second Amended Complaint, except admits that plaintiffs purport to quote from the website of the 568 Presidents Group. Columbia refers to that website for the complete and accurate content thereof.

128.    The phrases "reduce much of the variance," "consistent manner," and "diminish or eliminate divergent results," in the opaque world of higher-education pricing, are code words meaning that the purpose of the 568 Cartel has been to reduce or eliminate competition between Cartel members over offers of financial aid to prospective students. And elimination of competition over financial-aid offers is simply a means of coalescing around a uniform *and lower* level of aid to all prospective students. The result of the 568 Cartel has thus been not only to reduce the amount of total aid offered by each school, but also to reduce the total amount of aid offered to each prospective student at each Defendant school.

**Answer to Paragraph 128:** Columbia denies the allegations contained in paragraph 128 of the Second Amended Complaint.

129.    In addition, to diminish variance in prices, according to the 568 Cartel's own website, the members "discuss and *agree*" on how to determine financial need. Under antitrust principles, the fact that members of the 568 Cartel agree to share confidential and competitively sensitive information and data on admissions and their respective applicants, and then further agree to impose a common methodology for determining financial-aid awards, are themselves evidence that the Cartel reduced such aid. If Defendants were truly competing, they would not engage in such behavior and reach such agreements because they would be incentivized to increase aid and reduce net prices of attendance to compete for students. In the absence of the anticompetitive conduct challenged herein, that would mean the awarding of more financial aid and reduction of net prices of attendance for all students in the proposed Class.

**Answer to Paragraph 129:** Columbia denies the allegations contained in paragraph 129 of the Second Amended Complaint.

130.    Indeed, in a March 2014 interview with *The Georgetown Voice*, John DeGioia, who has been both the President of Georgetown and the President of the 568 Cartel for several

41

years, was clear about the purpose of the Cartel: "I actually chair that group, called the 568 group. The 568 refers to a passage in Higher Reauthorization Bill about a decade ago. . . . What it enables us to do is develop a common formula by which we would access the need of the student. We ask the family to contribute the maximum that they are capable of, according to that formula."[30] The 568 Cartel—whose member schools have enormous endowments, which have been growing substantially for decades—thus develops a "common formula" to extract from working- and middle-class families "the maximum that they are capable of" paying.

**Answer to Paragraph 130:** Columbia denies the allegations contained in paragraph 130

of the Second Amended Complaint to the extent that they incorporate the term "568 Cartel."

Columbia lacks knowledge or information sufficient to form a belief as to the truth of the

allegations contained in paragraph 130 as they relate to other defendants and so denies them on

that basis. Columbia denes the remaining allegations contained in paragraph 130 of the Second

Amended Complaint.

131.     The 568 Exemption allowed the 568 Cartel members not to compete in certain ways only if all the members admitted all students on a need-blind basis. Plaintiffs show herein, however, that by their own actions, Defendants did not satisfy this provision and thus none was entitled to the Exemption. Accordingly, Defendants are all liable for the reduced aid and artificially high net prices of attendance for Class Members that resulted from their agreement and related conspiratorial misconduct.

**Answer to Paragraph 131:** Columbia denies the allegations contained in paragraph 131

of the Second Amended Complaint. Columbia states, however, that it is not relying on the 568

Exemption as a defense in this action.

132.     Absent the alleged collusion, Defendants would compete, or compete more aggressively, on price for the students they have decided to admit because these are the students the admissions department has decided would satisfy the goals of the admissions process— among other things, to generate a diverse student body of high academic performers and student-athletes. Defendants view enrolling such students as critical to maintaining their prestige and influence and continuing to attract donations.

**Answer to Paragraph 132:** Columbia denies the allegations contained in paragraph 132

---

[30]    Connor Jones, *On the Record with President DeGioia*, THE GEORGETOWN VOICE (Mar. 6, 2014) (emphasis added), https://georgetownvoice.com/2014/03/06/record-president-degioia/.

of the Second Amended Complaint, except admits that one of the goals of Columbia's

admissions process is to generate a diverse student body of high academic performers. Columbia

lacks knowledge or information sufficient to form a belief as to the truth of the allegations

contained in paragraph 132 as they relate to the goals of the admissions process at other

defendant universities and so denies them on that basis.

133.    Given that a large percentage of families cannot afford an elite university
education for their children without financial assistance, the 568 Cartel has enabled Defendants
to maintain artificially inflated net prices of attendance, through artificially reduced financial aid,
without losing admitted students to competitor schools.

**Answer to Paragraph 133:**  Columbia denies the allegations contained in paragraph 133

of the Second Amended Complaint.

134.    In short, Defendants' anticompetitive conduct has produced overcharges in the net
prices of attendance for all Class Members.

**Answer to Paragraph 134:**  Columbia denies the allegations contained in paragraph 134

of the Second Amended Complaint.

## VII.    ALLEGATIONS RELATED TO DEFENDANTS' ANTICIPATED DEFENSES

135.    While participating in the conspiracy alleged herein, Defendants have failed to
conduct their admissions practices on a need-blind basis because all of them made admissions
decisions taking into account the financial circumstances of applicants and their families,
through policies and practices that favored the wealthy and disfavored those needing aid,
including but not limited to those described below.

**Answer to Paragraph 135:**  Columbia denies the allegations contained in paragraph 135

of the Second Amended Complaint.

136.    Section 568 defines "on a need-blind basis" to mean "without regard to the
financial circumstances of the student involved or the student's family."

**Answer to Paragraph 136:**  Columbia denies the allegations contained in paragraph 136

of the Second Amended Complaint, except admits that plaintiffs purport to quote from Section

568 of the Improving America's Schools Act of 1994. Columbia refers to that statute for the complete and accurate content thereof.

137. An admissions practice can be described as "need-aware," as some admissions offices have used the phrase, if the institution considers an applicant's inability or ability to afford the full price of tuition, room, and board as a factor weighing against acceptance in at least some admissions decisions.

**Answer to Paragraph 137:** Columbia admits that it understands a "need-aware" admissions practice to be one that considers an applicant's inability to afford the full price of tuition, room, and board as a factor weighing against acceptance of the applicant. Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 137 of the Second Amended Complaint as they relate to other defendants' understanding of the term "need-aware" and so denies them on that basis. Columbia denies the remaining allegations contained in paragraph 137 of the Second Amended Complaint.

## A. Defendants Do Not Employ "Need-Blind" Admissions Policies in Deciding Whether to Admit Waitlisted and Transfer Applicants

138. The language of Section 568, as well as its legislative history, makes clear that to qualify for the 568 Exemption, a school must follow need-blind admissions with respect to all applicants, including those on the waitlist. Section 568 was modeled on the settlement reached between MIT and the Department of Justice in a case against the predecessor to the 568 Cartel, which operated for decades until the early 1990s. It was known as the Overlap Group. The MIT settlement defined "need-blind admissions" to mean "admit[ting] all United States citizens to its undergraduate programs without regard to family financial circumstances, *other than admitted from a wait list.*" (Emphasis added.) In enacting Section 568, Congress generally followed the terms of MIT's settlement, but it *omitted* the exception for waitlisted students.

**Answer to Paragraph 138:** Columbia denies the allegations contained in paragraph 138 of the Second Amended Complaint, except admits that Section 568 is modeled on the settlement reached between MIT and the Department of Justice, and further admits that plaintiffs purport to paraphrase from the legislative history of Section 568 and to quote from the MIT settlement. Columbia refers to those documents for the complete and accurate content thereof.

44

139.    All Defendants, on information and belief, have considered the financial need of waitlisted applicants—both in deciding whether to put them on the waitlist and deciding whether to admit them—despite Section 568's requirement that "all students admitted" be admitted on a need-blind basis.  The precise number of affected students varies from Defendant to Defendant, but all schools place a substantial number of its students on their respective waitlists each year, and most Defendants place at least over 1,000 students on their respective waitlists each year, admitting from as few as only several students to as many as several hundred.

**Answer to Paragraph 139:**  Columbia denies the allegations contained in paragraph 139 of the Second Amended Complaint, except admits that, each year, it places undergraduate applicants on its waitlist from which some students may be admitted.  Columbia further lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in the second sentence of paragraph 139 concerning the number of students placed on and admitted from waitlists by other defendants and so denies them on that basis.

140.    With respect to Penn, for example, a former Penn admissions officer, Karen Crowley, conceded in 2009 that although it is "not an official practice," admissions officers give preference to "full-paying student[s]" on the waitlist over those who need financial aid, especially when "endowments are down and cost-cutting is essential."  "If a full-paying student says he'll definitely come, letting him in can be a relief."[31]  On information and belief, Crowley's concession was reflective of Penn's own admissions practices.

**Answer to Paragraph 140:**  Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 140 of the Second Amended Complaint and so denies them on that basis.

141.    In May 2021, a college admissions consultant and former Associate Dean of Admissions at Penn until June 2008, Sara Harberson, acknowledged:  "When I worked as the associate dean of admissions at the University of Pennsylvania, a need-blind institution, the office was not forthright about the fact that needing financial aid kept a student from being

---

[31]    Kathleen Kingsbury, *Dirty Secrets of College Waitlists*, THE DAILY BEAST (Mar. 30, 2009, updated July 14, 2017), https://www.thedailybeast.com/dirty-secrets-of-college-waitlists.

considered or admitted from the waitlist. Many need-blind universities are not open about their policies when it comes to whom they admit off the waitlist."[32]

**Answer to Paragraph 141:** Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 141 of the Second Amended Complaint and so denies them on that basis.

142. Vanderbilt, as a further example, has indicated being need-aware with respect to waitlisted applicants through statements by its admissions officers. Vanderbilt has stated on its website, for example, that it "reserve[s] the right to be need aware when admitting waitlisted students."[33] This concession was posted on April 13, 2018, by Kim Struglinski, who joined the Vanderbilt office of undergraduate admissions in 2015 and thus was a Vanderbilt employee at the time of the statement.

**Answer to Paragraph 142:** Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 142 of the Second Amended Complaint and so denies them on that basis.

143. Vanderbilt has indicated it is need-aware for waitlisted applicants on other occasions. In 2013, a Vanderbilt employee named Carolyn Pippen stated that "we do reserve the right to be need-aware when admitting waitlisted students."[34] And in 2014, a Vanderbilt employee named Jay Watson addressed whether Vanderbilt would be need-aware for waitlisted students that year: "We do reserve the right to be need aware when admitting students from the wait list."[35] Vanderbilt has never publicly stated, however, if in fact it has made need-aware decisions in admitting students from the waitlist.

**Answer to Paragraph 143:** Columbia lacks knowledge or information sufficient to form

---

[32] Sara Harberson, *How Colleges Play the Waitlist Game*, COURIER TIMES (May 17, 2021), https://www.buckscountycouriertimes.com/story/opinion/2021/05/17/op-ed-how-colleges-play-waitlist-game-students-detriment/5071470001/.

[33] Kim Struglinski, *Waitlist FAQ 2018*, VANDERBILT UNIVERSITY UNDERGRADUATE ADMISSIONS (Apr. 13, 2018), https://admissions.vanderbilt.edu/vandybloggers/2018/04/waitlist-faqs-2018/.

[34] Carolyn Pippen, *I'm On the Wait List—Now What*, VANDERBILT UNIVERSITY UNDERGRADUATE ADMISSIONS (Apr. 12, 2013), https://admissions.vanderbilt.edu/vandybloggers/2013/04/im-on-the-wait-list-now-what-2/.

[35] Jay Watson, *Vanderbilt Admissions AMA*, VANDERBILT UNIVERSITY UNDERGRADUATE ADMISSIONS (Mar. 31, 2014), https://admissions.vanderbilt.edu/vandybloggers/2014/03/vanderbilt-admissions-ama/.

a belief as to the truth of the allegations contained in paragraph 143 of the Second Amended

Complaint and so denies them on that basis.

144.    Penn's and Vanderbilt's practices are representative of all the other Defendants'
practices with respect to the consideration of waitlisted applicants.  On this basis alone, at each
Defendant school, each year, each Defendant has considered the financial circumstances of many
hundreds of students in deciding whether to put them on the waitlist and in deciding whether to
admit them from the waitlist.  In failing to conduct need-blind admissions as to waitlisted
applicants, all Defendants fail to satisfy the requirements of the 568 Exemption, and thus are
subject to liability under the antitrust laws.

**Answer to Paragraph 144:**  Columbia denies the allegations contained in paragraph 144

of the Second Amended Complaint.  Columbia states, however, that it is not relying on the 568

Exemption as a defense in this action.

145.    All Defendants, on information and belief, have also considered the financial need
of transfer applicants in deciding whether to admit them, despite Section 568's requirement that
"all students admitted" be admitted on a need-blind basis.  Each Defendant receives at least
hundreds (and sometimes over a thousand) transfer applications each year, admitting from as few
as only several students to as many as several hundred.

**Answer to Paragraph 145:**  Columbia denies the allegations contained in paragraph 145

of the Second Amended Complaint, except admits that, each year, it receives undergraduate

transfer applications from which some students may be admitted.  Columbia lacks knowledge or

information sufficient to form a belief as to the truth of the allegations contained in the second

sentence of paragraph 145 as they relate to other defendants and so denies them on that basis.

146.    On this basis, at each school, each year, each Defendant has considered the
financial circumstances of many hundreds of students seeking to transfer to the school in
deciding whether to admit them.  In failing to conduct need-blind admissions as to transfer
applicants, no Defendant qualifies for the 568 Exemption.

**Answer to Paragraph 146:**  Columbia denies the allegations contained in paragraph 146

of the Second Amended Complaint.  Columbia states, however, that it is not relying on the 568

Exemption as a defense in this action.

### B.    Columbia Does Not Employ "Need-Blind" Admissions Policies in Deciding Whether to Admit Applicants to Its School of General Studies

147.    Columbia further engages in need-aware admissions practices that relate to applicants to its School of General Studies, which is an undergraduate program of Columbia. The School of General Studies is under the governance of Columbia's President, Provost, Trustees, and Faculty of Arts and Sciences, just like Columbia College and equivalent to the School of Engineering and Applied Science.[36]  This governance structure contrasts with Barnard College, which is independent of, but affiliated with, Columbia.[37]

**Answer to Paragraph 147:**  Columbia admits that its School of General Studies includes undergraduate programs.  Columbia further admits that the allegations contained in the second and third sentences of paragraph 147 purport to summarize or characterize Columbia's Charters and Statutes.  Columbia refers to its Charters and Statutes for the complete and accurate content thereof.  Columbia denies the remaining allegations contained in paragraph 147 of the Second Amended Complaint.

148.    Columbia's School of General Studies offers an undergraduate degree program for "nontraditional students" who have had a break of a year or more in their studies and for dual- or joint-degree students, who split their time as students between Columbia and other institutions, such as Sciences Po in Paris and Trinity College Dublin.[38]  Students in the School of General Studies take the same courses with the same faculty and undertake the same majors as other undergraduates at Columbia.  They receive a diploma from Columbia like other undergraduates.

**Answer to Paragraph 148:**  Columbia admits the allegations contained in paragraph 148 of the Second Amended Complaint.

149.    According to Columbia's website, the School of General Studies comprises more than 2,500 undergraduate students, which is approximately 30% of Columbia's undergraduate

---

[36]    *Compare* COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CHARTERS AND STATUTES (2017), art. XXII (Faculty of General Studies), *with* art. XI (Columbia College), art. XIV (Faculty of Engineering and Applied Science).

[37]    *See id.*, art. XXIII.

[38]    Columbia School of General Studies, *Dual and Joint Degree Programs*, https://gs.columbia.edu/ content/dual-and-joint-degree-programs.

student population.[39]  In addition, 68% of undergraduates enrolled in the School of General Studies take classes on a full-time basis.[40]

**Answer to Paragraph 149:**  Columbia admits that the allegations contained in paragraph 149 of the Second Amended Complaint purport to quote from Columbia's website.  Columbia refers to its website for the complete and accurate content thereof.

150.    Columbia conceded that "General Studies admissions are not need-blind."[41]  In fact, Columbia has used General Studies to generate revenue that supports other university initiatives, like campus expansions and new scientific research centers.  Columbia's Faculty of Arts & Sciences pays a nine-figure "common-cost tax" to the university.[42]  But General Studies recruits and enrolls a less wealthy, more socioeconomically diverse student body than Columbia's other undergraduate programs.[43]  The burden of supporting Columbia's preservation of prestige and financial accumulation therefore falls on those who can least afford it.

**Answer to Paragraph 150:**  Columbia denies the allegations contained in paragraph 150 of the Second Amended Complaint, and states that the demographics of its student body are described on its website.

151.    Accordingly, in failing to conduct need-blind admissions as to applicants for the School of General Studies, Columbia does not qualify for the 568 Exemption.

**Answer to Paragraph 151:**  Columbia denies the allegations contained in paragraph 151 of the Second Amended Complaint.  Columbia states, however, that it is not relying on the 568

---

[39]  Columbia University, *Fall Headcount Enrollment by School, 2010-2019* (Jan. 13, 2020), https://opir.columbia.edu/sites/default/files/content/Statistical%20Abstract/opir_enrollment_history.pdf.

[40]  Columbia School of General Studies, *Statistics and Facts*, https://gs.columbia.edu/content/ statistics-and-facts.

[41]  Eli Lee, *Public Health Professor Lisa Rosen-Metsch Appointed Dean of General Studies*, COLUMBIA SPECTATOR (Nov. 14, 2017), https://www.columbiaspectator.com/news/2017/11/14/public-health-professor-lisa-rosen-metsch-appointed-dean-of-general-studies/.

[42]  Michael Ouimette, *Unfunded Mandate: Columbia College, Arts and Sciences, and the Bollinger Era*, COLUMBIA SPECTATOR (May 5, 2016), https://www.columbiaspectator.com/lead/2016/05/05/ unfunded-mandate-columbia-college-arts-and-sciences-and-bollinger-era/.

[43]  Jessica Spitz, *At a crossroads; The future of GS*, COLUMBIA SPECTATOR (Apr. 20, 2017), https://www.columbiaspectator.com/news/2017/04/20/at-a-crossroads-the-future-of-gs/ ("[T]he population skews older and many are juggling jobs, raising families, and often do not have parents to rely on for tuition money.").

Exemption as a defense in this action.

152.     In sum, during the period of the conspiracy alleged herein, all Defendants have considered the financial need of waitlisted and transfer applicants, and Columbia has considered the financial need of students applying to the School of General Studies, in deciding whether to admit such students to attend their undergraduate programs on a full-time basis.  This conduct extinguishes the 568 Exemption for all members of the 568 Cartel.

**Answer to Paragraph 152:**  Columbia denies the allegations contained in paragraph 152 of the Second Amended Complaint.  Columbia states, however, that it is not relying on the 568 Exemption as a defense in this action.

153.     In addition, if any Defendant has not considered the financial circumstances of applicants or their families in making admissions decisions, the fact that other Defendants have done so—and thus that the Cartel includes non-exempt schools with whom otherwise hypothetically compliant schools collude—extinguishes the 568 Exemption for all members of the 568 Cartel.  Quite simply, no school was entitled to protection under the Exemption if it colluded with any non-need-blind schools.

**Answer to Paragraph 153:**  Columbia denies the allegations contained in paragraph 153 of the Second Amended Complaint.  Columbia states, however, that it is not relying on the 568 Exemption as a defense in this action.

### C.     Emory Does Not Employ "Need-Blind" Admissions Policies in Deciding Whether to Admit Applicants to Oxford College

154.     Oxford College is an undergraduate division of Emory University, exclusively for first- and second-year students.

**Answer to Paragraph 154:**  Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 154 of the Second Amended Complaint and so denies them on that basis.

155. Oxford College is openly need aware. The Emory University News Center stated in 2013: "[D]ue to the combination of internal and external financial pressures, Oxford College implemented a need-sensitive framework in admitting and shaping part of its freshman class."[44]

**Answer to Paragraph 155:** Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 155 of the Second Amended Complaint and so denies them on that basis.

### D. Certain Defendants' Enrollment Management Practices Are Not "Need-Blind"

156. Among Defendants, at least Dartmouth, Columbia, Northwestern, Notre Dame, and Penn engage in need-aware admissions through "enrollment management."

**Answer to Paragraph 156:** Columbia denies the allegations contained in paragraph 156 of the Second Amended Complaint.

157. Enrollment management is "the systematic integration of the functions of admissions, the relationship between tuition and fees (pricing) and financial aid, and student retention, along with the use of research to inform institutional policies and practices."[45] It is a "managerial paradigm" that brings together admissions and other institutional functions "into a comprehensive institutional approach designed to enable college and university administrators to exert greater influence over the factors that shape their enrollments."[46]

**Answer to Paragraph 157:** Columbia denies the allegations contained in paragraph 157 of the Second Amended Complaint, except admits that plaintiffs purport to quote a definition of enrollment management. Columbia refers to the source of that definition for the complete and accurate content thereof.

158. One of the key purposes of enrollment management is to limit the number of financial-aid-eligible applicants who are admitted to the institution to achieve financial and

---

[44] Beverly Clark, Commitment to Excellence Guides Financial Aid, EMORY NEWS CENTER (Jan. 17, 2013), https://news.emory.edu/stories/2013/01/er_financial_aid/campus.html.

[45] Don Hossler, *Origins of Strategic Enrollment Management*, in HANDBOOK OF STRATEGIC ENROLLMENT MANAGEMENT 5 (Don Hossler and Bob Bontrager, eds., 2014).

[46] *Id*. at 4, 7-8.

budgetary objectives.  The effect of these practices is to disadvantage applicants based on their need for institutional financial aid.

**Answer to Paragraph 158:**  Columbia denies the allegations contained in paragraph 158 of the Second Amended Complaint.

159.    Econometric modeling is central to enrollment management.  As explained by Stephen Brooks, a higher-education consultant whose client list includes Columbia and Penn,[47] models draw on standard elements of college applications—academic ability, geography, demographics, interests, whether the student has requested aid, and more—to assess an applicant's likelihood of enrolling if offered admission.[48]  These yield models, in turn, permit schools to forecast the revenue and cost implications of their admissions and financial-aid decisions.[49]

**Answer to Paragraph 159:**  Columbia denies the allegations contained in paragraph 159 of the Second Amended Complaint, except admits that plaintiffs purport to summarize or characterize various publications.  Columbia refers to those publications for the complete and accurate content thereof.

160.    One anonymous enrollment manager has said:  "Good luck getting any institution to tell you exactly how they handle ability to pay as a driver in their admit decision. . . .  What they will say is 'We're need blind.'  That's bullshit.  They would never tell you exactly how they do it, but they do it all the time."[50]

**Answer to Paragraph 160:**  Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 160 of the Second Amended Complaint and so denies them on that basis.

---

[47]    *Our Clients*, SHBrooks, https://www.shbrooks.com/clients.

[48]    Stephen H. Brooks, *Using Campus-Based Financial Aid Strategically*, in HANDBOOK OF STRATEGIC ENROLLMENT MANAGEMENT 223-26 (Don Hossler and Bob Bontrager, eds., 2014); Stephen H. Brooks, *Econometric Modeling of Enrollment Behavior*, 26 J. Student Fin. Aid 7, 9-10 (1996).

[49]    Brooks, Using Campus-Based Financial Aid Strategically, at 226; Brooks, Econometric Modeling of Enrollment Behavior, at 16-17.

[50]    Matthew Quirk, *The Best Class Money Can Buy*, THE ATLANTIC (Nov. 2005) https://www.theatlantic.com/magazine/archive/2005/11/the-best-class-money-can-buy/304307/.

161.   Indeed, these institutions know their practices are legally problematic, and thus they maintain a shroud of secrecy over them.  For instance, author Jeff Selingo asked two dozen colleges or universities for access to their admissions practices.  Nearly all refused, some because they were "worried about exposing how they shaped their class based on the financial need of applicants."[51]  Selingo also wrote:  "Even at need-blind schools, admission eventually can come down to money.  Those colleges control how much they spend on financial aid by recruiting heavily in rich high schools and admitting in early decision a significant proportion of students who tend to be wealthier.  And even when schools are need-blind, admissions officers still see the zip codes and the occupations of parents when reviewing applications."[52]

**Answer to Paragraph 161:**  Columbia denies the allegations contained in paragraph 161 of the Second Amended Complaint, except lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 161 as they relate to Mr. Selingo and unidentified "colleges and universities" and so denies them on that basis.

162.   In 2015, Dartmouth created the position of Vice Provost for Enrollment Management, announcing that it would permit the university "to use a wealth of newly available data to identify and recruit prospective students."[53]  In 2016, Dartmouth announced its hiring of Lee Coffin from Tufts University, a need-aware school.[54]  At Tufts, Coffin operated under strict budgetary limits.[55]  He shaped the cohort of admitted students to bring revenues and costs in line. His admissions office sent tentative acceptances to the financial-aid office, which modeled the revenue and cost implications so that the admissions office would meet the university's budgetary goals.  As Coffin has acknowledged, "Shifting things at the end . . . happens every year."[56]

**Answer to Paragraph 162:**  Columbia lacks knowledge or information sufficient to form

---

[51]   Jeffrey Selingo, WHO GETS IN AND WHY: A YEAR INSIDE COLLEGE ADMISSIONS 13 (2020).

[52]   *Id.* at 212.

[53]   Dartmouth University, Office of Communication, *Search Has Begun for Undergraduate Admissions Leader* (Oct. 29, 2015), https://news.dartmouth.edu/news/2015/10/search-has-begun-undergraduate-admissions-leader.

[54]   Bill Platt, *Lee Coffin to Lead Enrollment, Admissions, and Financial Aid*, DARTMOUTH NEWS (Feb. 4, 2016), https://news.dartmouth.edu/news/2016/02/lee-coffin-lead-enrollment-admissions-and-financial-aid.

[55]   Carly Olson, *Crunching the Numbers*, TUFTS OBSERVER (Apr. 25, 2016), https://tuftsobserver.org /crunching-the-numbers/ ("My responsibility as Dean is that I can't spend more dollars than Tufts has. They give me a checkbook every year and they say spend all of it, but don't spend more than that."); *see also id.* ("This year, Coffin said admissions had $19.7 million and 1,325 spots to consider when making their decisions.").

[56]   *Id.*

a belief as to the truth of the allegations contained in paragraph 162 of the Second Amended

Complaint and so denies them on that basis.

163.    The President of Northwestern since 2009, Morton Schapiro, has been described as "a dean of 'enrollment management,' the art of shaping an incoming class through recruitment, aid, early admission, waiting lists and other variables."[57]  During President Schapiro's tenure, at least, Northwestern has employed enrollment management.

**Answer to Paragraph 163:**  Columbia lacks knowledge or information sufficient to form

a belief as to the truth of the allegations contained in paragraph 163 of the Second Amended

Complaint and so denies them on that basis.

164.    Notre Dame also employs an "enrollment management model."[58]  Announcing in 2010 the hire of its associate vice-president for undergraduate enrollment, Don Bishop, Notre Dame praised his "innovative marketing and financial aid strategies" in prior enrollment-management jobs.[59]  Announcing a new Dean of Admissions in 2019, Notre Dame touted her status as "a featured presenter at national enrollment management conferences and events."[60]  In addition, Notre Dame has a partnership with a software company that develops data-visualization tools, touting "improved scenario analyses on all data associated with an applicant or prospective enrollee."[61]  Notre Dame is thus using data analysis to shape need-aware admissions decisions.

**Answer to Paragraph 164:**  Columbia lacks knowledge or information sufficient to form

a belief as to the truth of the allegations contained in paragraph 164 of the Second Amended

---

[57]  Daniel de Vise, *Northwestern now a first choice to many, its president says*, THE WASHINGTON POST (Apr. 14, 2011), https://www.washingtonpost.com/blogs/college-inc/post/schapiro-northwestern-now-a-first-choice-to-many/2011/04/13/AFSXTacD_blog.html.

[58]  Jordan Cockrum and Natalie Weber, *Notre Dame, SMC communities evaluate opportunities, efforts for low socioeconomic students*, THE OBSERVER (Apr. 30, 2018), https://ndsmcobserver.com /2018/04/efforts-low-socioeconomic-students/.

[59]  Dennis Brown, *Notre Dame alumnus Bishop appointed associate VP for undergraduate enrollment*, NOTRE DAME NEWS (Sept. 15, 2010), https://news.nd.edu/news/notre-dame-alumnus-bishop-appointed-associate-vp-for-undergraduate-enrollment/.

[60]  Joyce Lance, *Christy Pratt appointed director of admissions*, NOTRE DAME NEWS (July 1, 2019), https://news.nd.edu/news/christy-pratt-appointed-director-of-admissions/.

[61]  Leila Meyer, *U Notre Dame, SynGlyphX Partner on Enrollment Data Visualization Tool*, CAMPUS TECH. (Jan. 13, 2016), https://campustechnology.com/articles/2016/01/13/u-notre-dame-synglyphx-partner-on-enrollment-data-visualization-tool.aspx?admgarea=news.

Complaint and so denies them on that basis.

165.    Columbia's, Dartmouth's, Northwestern's, Notre Dame's, and Penn's use of enrollment management thus involves the resolution of admissions decisions *with* regard to the financial circumstances of the applicant or their family, in that such management (i) identifies relatively wealthy students, for the benefits (direct and indirect) that the school expects from their admission, and (ii) identifies relatively less wealthy students in order to limit the total amount of financial aid—and then acts upon that information to meet budgetary goals.

**Answer to Paragraph 165:**  Columbia denies the allegations contained in paragraph 165

of the Second Amended Complaint.

### E.    Defendants Consider Family Financial Circumstances in Giving Preference to the Children of Wealthy Past or Potential Donors, and Thus Do Not Adhere to a Need-Blind Admissions Policy

166.    Defendants consider applicants' "financial circumstances" through admissions preferences given to the children of wealthy past or potential donors, such that their chances of admission increase significantly.  Such Defendants understand that these applicants— commonly known as "development cases" or "development admits"—have no need for financial aid and that their admission could generate a substantial financial return for the university.

**Answer to Paragraph 166:**  Columbia denies the allegations contained in paragraph 166

of the Second Amended Complaint as to itself.  Columbia lacks knowledge or information

sufficient to form a belief as to the truth of the allegations contained in paragraph 166 as they

relate to other defendants and so denies them on that basis.

167.    Consequently, the development offices of such Defendants analyze and monitor these applicants and coordinate with the university presidents or admissions offices during the admissions cycle.  In short, awarding special treatment to the children of wealthy prior and potential donors necessarily means some less privileged applicants are not admitted on account of their financial circumstances to make room for the wealthy.

**Answer to Paragraph 167:**  Columbia denies the allegations contained in paragraph 167

of the Second Amended Complaint as to itself.  Columbia lacks knowledge or information

sufficient to form a belief as to the truth of the allegations contained in paragraph 167 as they

relate to other defendants and so denies them on that basis.

168.    Defendants also consider large donations, and even financial capacity in the absence of any donation history, as plus factors for admission.  Assessing potential donations of an applicant's family necessarily involves considering the income, assets, and other financial circumstances of that family.  Similarly, considering a family's past donations, pursuant to the agreement of the 568 Cartel, constitutes the consideration of family financial circumstances.

**Answer to Paragraph 168:**  Columbia denies the allegations contained in paragraph 168 of the Second Amended Complaint to the extent that they incorporate the term "568 Cartel." Columbia further denies the allegations contained in paragraph 168 of the Second Amended Complaint as to itself.  Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 168 as they relate to other defendants and so denies them on that basis.

169.    In considering the wealth and donation history of certain students and their families, moreover, such Defendants implicitly consider less privileged applicants' lack thereof. Because of the limited number of spots available in any given class, the advantage given to one group entails a disadvantage imposed on the other.  Privileging the wealthy and disadvantaging the financially needy are inextricably linked; they are two sides of the same coin.

**Answer to Paragraph 169:**  Columbia denies the allegations contained in paragraph 169 of the Second Amended Complaint as to itself.  Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 169 as they relate to other defendants and so denies them on that basis.

170.    In addition, such Defendants are committed to maintaining admissions as a zero-sum game, by limiting growth in the number of undergraduate seats to maximize perceptions of exclusivity and prestige.  Defendants' presidents and senior admissions and development officers know that the other Defendants routinely favor children from wealthy families and thereby fail to admit all students without regard to their financial circumstances or that of their families.

**Answer to Paragraph 170:**  Columbia denies the allegations contained in paragraph 170 of the Second Amended Complaint as to itself.  Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 170 as they relate to other defendants and so denies them on that basis.

56

171.    Darrell M. West, a professor at Brown from 2000-2008, has stated:  "When I taught at Brown, I periodically was asked to meet with children of the rich and famous who were seeking admission to the university.  I did so and wrote letters to the admissions office giving my impressions of the applicant.  The university claims there was no pressure to admit well-connected individuals, but it was clear to me Brown thrived on its reputation as a 'hot Ivy' that had lots of prominent students there.  It admitted many well-deserving and talented students, but many on the faculty recognized the university's interest in having children of prominent individuals on campus because it generated publicity for Brown and sometimes paid off down the road in financial contributions to the university.  Looking back on these experiences, I can see that wealthy students had admissions advantages over the average applicant because the latter were not getting one-on-one meetings with faculty members or special consideration by the admissions office."[62]

**Answer to Paragraph 171:**  Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 171 of the Second Amended Complaint and so denies them on that basis.


172.    A former Dean of Admissions at Dartmouth, Maria Laskaris, said in 2019:  "The ultra-rich have an additional advantage in their ability to donate large sums of money to universities, which can boost their kids' chances of acceptance."  According to Laskaris, admissions officers are "made aware of" this factor because "colleges are always in fundraising mode."[63]  At Dartmouth, development officers meet with admissions staff to review a list created by the development office.  Each year, up to 50 applicants may be considered through this special process, most of whom are admitted, accounting for 4-5% of Dartmouth's student body.[64]

**Answer to Paragraph 172:**  Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 172 of the Second Amended Complaint and so denies them on that basis.

---

[62]  Scott Jaschik, *Advantages for Legacies and Wealthy at Brown*, INSIDER HIGHER ED (Mar. 25, 2019), https://www.insidehighered.com/admissions/article/2019/03/25/brown-faces-questions-about-benefits-it-has-provided-legacy-applicants.

[63]  Jill Tucker, *In the College Admissions Game, Even the Legal Kind, Money Has Always Mattered*, SAN FRANCISCO CHRON. (Mar. 12, 2019), https://www.sfchronicle.com/bayarea/article/In-the-college-admissions-game-even-the-legal-13683518.php.

[64]  Joseph Asch, *Donor Admissions: How It Works Now*, DARTBLOG (Sept. 29, 2014), http://www.dartblog.com/data/2014/09/011686.php.

173.    An email exchange exposed by the Sony hack in 2014 illustrates Dartmouth's efforts to evaluate and court wealthy potential donors.[65]  Michael Lynton, CEO of Sony Pictures Entertainment, intended to visit Dartmouth with his daughter, a prospective student.  Michael Lynton is not an alumnus of Dartmouth, and public records have not shown that Lynton had previously donated to Dartmouth.  On the eve of his visit, Lynton received a solicitous email from Jeff Sassorossi, a 1975 Dartmouth graduate and then Dartmouth's "Director, Special Projects & Reporting."  Sassorossi explained that his role at Dartmouth was "to serve as the liaison between the Advancement (Alumni Relations and Development) and Admissions.  As such, I work with families as they go through the admissions process at Dartmouth."  Sassorossi offered Lynton and his daughter a personal tour of the campus.  Sassorossi's email also indicated that Lynton was being recruited to Dartmouth by Leon Black, a billionaire private equity investor, major Dartmouth benefactor, and former trustee.[66]

**Answer to Paragraph 173:**  Columbia lacks knowledge or information sufficient to form

a belief as to the truth of the allegations contained in paragraph 173 of the Second Amended

Complaint and so denies them on that basis.


174.    Despite these entreaties, Lynton's daughter enrolled at Brown, which got the $1 million donation from Lynton instead of Dartmouth.[67]  The opinion editor for the *Brown Daily Herald* described Lynton's gift to Brown as "a $1 million check to Brown with more strings attached than the Los Angeles Philharmonic.  Anyone with a pulse can trace the probable outcome of this 'philanthropy'—a prospective student connected to Lynton gets accepted to Brown!"[68]

**Answer to Paragraph 174:**  Columbia lacks knowledge or information sufficient to form

a belief as to the truth of the allegations contained in paragraph 174 of the Second Amended

Complaint and so denies them on that basis.

---

[65]    *See* Joseph Asch, *VIP Donor Preferences Cont'd*, DARTBLOG (Feb. 4, 2016), http://www.dartblog.com/data/2016/02/012467.php; Email from Jeff T. Sassorossi to Michael Lynton, Re: Dartmouth College Visit (Mar. 28. 2014), https://wikileaks.org/sony/emails/emailid/132718.

[66]    *See* Peter Lattman, *Apollo's Leon Black Donates $48 Million to Dartmouth*, N.Y. TIMES DEALBOOK (Mar. 29, 2012), https://dealbook.nytimes.com/2012/03/29/apollos-leon-black-donates-48-million-to-dartmouth; Office of Communications, Dartmouth University, *Dartmouth Board Elects Three New Charter Trustees*, DARTMOUTH NEWS (June 13, 2011) (announcing Black was stepping down after two terms as trustee), https://news.dartmouth.edu/news/2011/06/dartmouth-board-elects-three-new-charter-trustees.

[67]    Chad Simon, *Simon '16: Pimp My University*, BROWN DAILY HERALD (Oct. 21, 2015), https://www.browndailyherald.com/2015/10/21/simon-16-pimp-my-university/.

[68]    *Id.*

175.     According to journalist Daniel Golden's book *The Price of Admission*, Defendant Duke "enrolled thousands of privileged but underqualified applicants with no prior ties to the university in the expectation of parental payback."[69]  According to Golden, Duke "accepted at least one hundred nonalumni children each year due to family wealth."[70]  In some years, between 3-5% of Duke's student body consists of students "who would have been turned away without pressure from the development office."[71]

**Answer to Paragraph 175:**  Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 175 of the Second Amended Complaint and so denies them on that basis.

176.     While serving as president of Duke, Richard Brodhead admitted that "it would be naïve to say that any university should pay no attention to a family's ability to help the university," explaining that a family's ability to donate to Duke was a "plus factor" in admissions.[72]  A former Director of Undergraduate Admissions at Duke, Jean Scott, estimated that "a couple of hundred" applicants a year received special attention as children of prospective donors.  Scott admitted that there "were certainly students who got in because they were a high priority" for fundraising.  Scott also said that there "was more of this [fundraising-related] input at Duke than at any other institution I ever worked for."[73]

**Answer to Paragraph 176:**  Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 176 of the Second Amended Complaint and so denies them on that basis.

177.     The longstanding Dean of Admissions for Georgetown, Charles Deacon, was asked by a reporter:  "What about children of alumni and *potential* donors?"  (Emphasis added.)  In response, Dean Deacon candidly admitted:  "On the fundraising side, we also have a small number of 'development *potential*' candidates.  If Bill Gates wants his kid to come to Georgetown, we'd be more than happy to have him come and talk to us."  (Emphasis added.)  Dean Deacon continued to point out that "not all those special cases end up being people who

---

[69]     Daniel Golden, THE PRICE OF ADMISSION 54 (2006).

[70]     *Id*.

[71]     *Id*. at 57.

[72]     Geoffrey Mock, *Brodhead Discusses Early Admissions, Developmental Admits*, DUKE TODAY (Sept. 22, 2006), https://today.duke.edu/2006/09/admit.html.

[73]     Daniel Golden, *How Lowering the Bar Helps Colleges Prosper*, WALL ST. J. (Sept. 9, 2006), https://www.wsj.com/articles/SB115774251817757837.

give a lot of money.  We have children of Supreme Court justices, senators, and so on apply.  We may give extra consideration to them because of the opportunities that may bring."[74]

**Answer to Paragraph 177:**  Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 177 of the Second Amended Complaint and so denies them on that basis.

178.     In short, Georgetown admits a range of students based on their families' wealth, prestige, and influence.  Some of these students are given "extra consideration" based on their parents' influence or political power, without any expectation of a financial contribution.  On the other hand, some *are* given "extra consideration" on the basis of their "development potential"— namely, the ability of the family to make a financial contribution to the institution, and the likelihood that it will do so.

**Answer to Paragraph 178:**  Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 178 of the Second Amended Complaint and so denies them on that basis.

179.     Indeed, Dean Deacon has also candidly admitted that Georgetown favors past donors, as well as potential donors, and has even admitted that Georgetown calibrates the extent of the admissions advantage to the size of the donation:  "If you were very close to the edge and the family's given to the annual fund every year or something, that might be enough of a tip to get you in.  If you're a little farther from the edge, but the family has built Regents Hall, that might tip a little farther."[75]

**Answer to Paragraph 179:**  Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 179 of the Second Amended Complaint and so denies them on that basis.

180.     A former Director of Selection at MIT, McGreggor Crowley, admitted in March 2019:  "In truth, for every office of admissions there is a development office that builds a university's endowment through donations from alumni and wealthy individuals.  And every

---

[74]    Alvin P. Sanoff, *Getting in to Top Schools*, WASHINGTONIAN (Oct. 1, 2007), https://www.washingtonian.com/2007/10/01/getting-in-to-top-schools/.

[75]    Suzanne Monyak, *Legacy Status Tips Admission*, THE HOYA (Mar. 20, 2015), https://thehoya.com/legacy-status-tips-admission-scales/.

year, regardless of what a college or university says publicly, a number of children of wealthy donors and alumni get a nod in their direction while other applicants are rejected."[76]  In an interview with NBC News, Crowley admitted that "as for the children of prominent campus donors, . . . a college's development office might reach out to the dean of admissions to say, 'Hey, just so you know, Lisa's dad has been very generous to us in the past, or something.'" NBC News reported that according to Crowley:  "Usually, that kind of information [about a family's financial contribution] is relayed to the most senior officials in an admissions office."[77]

**Answer to Paragraph 180:**  Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 180 of the Second Amended Complaint and so denies them on that basis.

181.    At Northwestern, a separate admissions process exists for the wealthy and well connected.  On April 24, 2019, *The Daily Northwestern* published an article with the headline: "Northwestern President Schapiro Says He Reads Applications of Some Legacy, Donor Students."  As revealed in the article, in the 2018-19 admissions cycle, Schapiro personally reviewed the applications of about 550 students, including applications associated with wealthy donors.  A Northwestern spokeswoman has further admitted that President Schapiro was "frequently involved in dealing with principal donors to the University."[78]

**Answer to Paragraph 181:**  Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 181 of the Second Amended Complaint and so denies them on that basis.

182.    One of the student reporters who broke the story about Northwestern's two-track admissions system later stated in a podcast interview:  "[President Schapiro] also told us that he tries to work with the Dean of Admissions Christopher Watson, as much as he can.  He brought

---

[76]  McGreggor Crowley, *Confessions of a Former MIT Admissions Director*, BOSTON GLOBE (Mar. 13, 2019), https://www.bostonglobe.com/opinion/editorials/2019/03/13/confessions-former-admissions-director/qPQppf0AhpJIbIJ8mZ6q9L/story.html.

[77]  Daniel Arkin, *The College Admissions Scandal is Just the Extreme Version of a System that Already Favors the Wealthy*, NBC, https://www.nbcnews.com/news/us-news/college-cheating-scandal-two-ex-admissions-officers-explain-behind-scenes-n983796.

[78]  Alan Perez and Gabby Birenbaum, *Northwestern President Schapiro Says He Reads Applications of Some Legacy, Donor Students*, THE DAILY NORTHWESTERN (Apr. 24, 2019), https://dailynorthwestern.com/2019/04/24/campus/northwestern-president-schapiro-says-he-reads-applications-of-some-legacy-donor-students/?print=true.

up an example that if they both disagreed on an applicant that they try to work it out."[79] President Schapiro is the boss at Northwestern, and the Dean of Admissions reports to him. The head of the university is using his discretion to make or influence numerous admissions decisions. Schapiro's involvement in admissions decisions for applicants associated with wealthy donors was not public until revealed by reporting in 2019.

**Answer to Paragraph 182:** Columbia lacks knowledge or information sufficient to form

a belief as to the truth of the allegations contained in paragraph 182 of the Second Amended

Complaint and so denies them on that basis.

183.     The Director of Admissions at Notre Dame for thirty-six years until his retirement in July 2019, Bob Mundy, made appearances at alumni gatherings during his tenure in office. Mundy's biography at these appearances stated:  "In his current position as Director of Admissions Operations, he oversees the 35 members of staff, and recruitment efforts that have included as many as 40,000 annual inquiries and a record-setting 16,500 applications for the 2011 class.  Ultimately, the office is responsible for 'delivering' a freshmen class of approximately 2,000 students, while also satisfying the needs of various constituencies: i.e. alumni, athletics, *the Development Office*, etc."  (Emphasis added.)

**Answer to Paragraph 183:** Columbia lacks knowledge or information sufficient to form

a belief as to the truth of the allegations contained in paragraph 183 of the Second Amended

Complaint and so denies them on that basis.

184.     The current Associate Vice Provost for Undergraduate Enrollment at Notre Dame, Don Bishop, acknowledged the significant influence that donations play in the Notre Dame admissions process.  Indeed, he admitted that if someone gave $15 million, then their children would be given "some special interest" during the Notre Dame admissions process.[80]

**Answer to Paragraph 184:** Columbia lacks knowledge or information sufficient to form

a belief as to the truth of the allegations contained in paragraph 184 of the Second Amended

[79]   Cassidy Jackson and Heena Srivastava, *The Weekly: University President Morton Schapiro Reveals Role in Admissions Process*, THE DAILY NORTHWESTERN (May 3, 2019), https://dailynorthwestern.com/2019/05/03/multimedia/audio/the-weekly-university-president-morton-schapiro-reveals-role-in-admissions-process/.

[80]   Daniel Golden, *How Wealthy Families Manipulate Admissions at Elite Universities*, TOWN & COUNTRY (Nov. 21, 2016), https://www.townandcountrymag.com/society/money-and-power/news/ a8718/daniel-golden-college-admission/.

Complaint and so denies them on that basis.

185.    Penn also tracks past and potential donors, rewarding past donors and enticing potential donors by admitting their children.  A former Associate Dean of Admissions, Sara Harberson, has described the university's use of "tags" to track applicants that are "a high priority for the institution."  Penn tags the applications of "children of donors or potential donors," among others, giving those applicants "the proverbial golden ticket."[81]  The university has "spots reserved" for these "development cases," whose "parents have already given significant money to the institution, or plan to."[82]

**Answer to Paragraph 185:**  Columbia lacks knowledge or information sufficient to form

a belief as to the truth of the allegations contained in paragraph 185 of the Second Amended

Complaint and so denies them on that basis.

186.    A past Chancellor of Vanderbilt, E. Gordon Gee, stated in 2019 that any president under "truth serum" would concede that donor connections make a difference in admissions.[83]

**Answer to Paragraph 186:**  Columbia lacks knowledge or information sufficient to form

a belief as to the truth of the allegations contained in paragraph 186 of the Second Amended

Complaint and so denies them on that basis.

187.    Certain universities may independently choose to favor the children of the wealthy if they like, thereby disfavoring every other applicant.  But if they make that choice, they cannot lawfully conspire on financial-aid policies.  The law does not allow them to do both. Defendants must choose between continuing their wealth favoritism and need-aware admissions practices, on the one hand, and participation in the lucrative 568 Cartel, on the other.

**Answer to Paragraph 187:**  Columbia denies the allegations contained in paragraph 187

---

[81]   Sarah Harberson, *The Truth about "Holistic" College Admissions*, LOS ANGELES TIMES (June 9, 2015), https://www.latimes.com/opinion/op-ed/la-oe-harberson-asian-american-admission-rates-20150609-story.html.

[82]   Vice News, *How Broken the College Admissions Process Is*, YOUTUBE (Mar. 13, 2019) (Harberson quoted at 5:20), https://www.youtube.com/watch?v=0v5yHnWCiLE&feature=emb_logo.

[83]   Jack Stripling, *It's an Aristocracy: What the Admissions-Bribery Scandal Has Exposed About Class on Campus*, THE CHRONICLE OF HIGHER EDUCATION (Apr. 17, 2019), https://www.chronicle.com /article/its-an-aristocracy-what-the-admissions-bribery-scandal-has-exposed-about-class-on-campus/?cid2=gen_login_refresh&cid=gen_sign_in.

of the Second Amended Complaint.

### F. The Section 568 Exemption Applies Only to a Group of Schools That All Employ "Need-Blind" Admissions Policies Within the Term's Statutory Meaning

188.    The 568 Exemption, as noted, precludes any school invoking it from taking account of "the financial circumstances" of a student or their family in making admissions decisions.  Under the well-established rules of statutory construction, any contrary interpretation of the text of the 568 Exemption would be impermissible speculation as to Congress's intent—in particular, where any antitrust exemption is construed narrowly (with what courts have described as "beady eyes and green eyeshades").  Just as fundamental, the evidence of the purpose and overarching goal of the 568 Exemption, as reflected in its legislative history, compels this interpretation of the plain meaning of "need-blind" as defined in the statute.

**Answer to Paragraph 188:**  The allegations contained in paragraph 188 of the Second

Amended Complaint are legal conclusions to which no response is required.  To the extent a

response is required, Columbia denies the allegations contained in paragraph 188 of the Second

Amended Complaint.  Columbia states, however, that it is not relying on the 568 Exemption as a

defense in this action.

1896.   The 568 Exemption replaced what had been a general temporary antitrust exemption.  The 1994 legislative history of the enactment of Section 568 explains in relevant part:  "This provision extends for an additional three years the temporary antitrust exemption for certain collegiate financial aid award analysis, which was originally enacted with the Higher Education Amendments of 1992 as a two-year exemption."  H.R. Conf. Rep. 103-761, 911-12, 1994 U.S.C.C.A.N. 2901, 3242-43.  This report explained that, as noted above, Section 568 is modeled on the MIT-DOJ settlement:  "The temporary exemption has also been revised in light of the 'standards of conduct' adopted as part of the settlement of the antitrust action between the Department of Justice and Massachusetts Institute of Technology in the case of *United States v. Brown University, et al.*, Civ. Action No. 91-3274 (E.D. Pa.), on December 22, 1993."  *Id.*

**Answer to Paragraph 189:**  Columbia admits that the allegations contained in paragraph

189 of the Second Amended Complaint purport to summarize Section 568 and quote from the

House Conference Report on what became Section 568 of the Improving America's Schools Act

of 1994.  Columbia refers to that report for the complete and accurate content thereof.

190.    The referenced "standards of conduct" provided in relevant part:  "Non-profit institutions of higher education may participate in the cooperative financial aid arrangements set forth below ('Participating Schools'), provided that they practice need-blind admissions; that is, admit all United States citizens to its undergraduate programs without regard to family financial circumstances, other than admitted from a wait list."  This legislative history thus makes clear that Section 568's language tracks the language in the "standards of conduct" precluding admissions *with* regard to "family financial circumstances."

**Answer to Paragraph 190:**  Columbia admits that the allegations contained in the first sentence of paragraph 190 of the Second Amended Complaint purport to quote from the standards of conduct set forth in the MIT-DOJ settlement.  Columbia refers to those standards of conduct for the complete and accurate content thereof.  The allegations contained in the second sentence of paragraph 190 of the Second Amended Complaint are legal conclusions to which no response is required.  To the extent a response is required, Columbia denies those allegations.

191.    This legislative history further states that the 568 Exemption "applies only to institutions of higher education that admit students on a need-blind basis.  The definition of 'on a need-blind basis' in subsection (c)(6) is based on language in the 'standards of conduct' adopted in the MIT settlement.  However, a conspicuous difference between the statutory language and the MIT standards of conduct is that the statute deletes the phrase 'other than admitted from a wait list.'  *See also United States v. Brown University*, 5 F.3d 658 (1993)."  H.R. Conf. Rep. 103-761, 911-12, 1994 U.S.C.C.A.N. 2901, 3242-43.  This conference report further states.

> The managers have decided against elaborating on the need-blind admissions standard in the statutory text.  As should be obvious, however, evidence of a practice among admissions personnel at an institution of higher education of examining, discussing, or otherwise considering information relating to a student's financial circumstances that is derived from such student's financial aid application form, *or from any other document or record obtained for the purpose of ascertaining such financial circumstances*, before the decision is made regarding the student's admission will substantially increase the institution's burden of demonstrating that the school's admissions policy is truly need-blind.

*Id*. (emphasis added).  The report then specifies:  "Prudence would counsel that schools wishing to make use of this provision *insulate their admissions, process and admissions personnel as completely as possible from such student financial aid information, until after the admissions process is complete.*"  *Id.*  (emphasis added).  Consistent with the statute, no exception is made for applicants on the institution's waitlists.

**Answer to Paragraph 191:**  Columbia admits that plaintiffs purport to quote from the

House Conference Report on what became Section 568 of the Improving America's Schools Act

of 1994. Columbia refers to that report for the complete and accurate content thereof. Columbia

denies the remaining allegations contained in paragraph 191 of the Second Amended Complaint.

Columbia states, however, that it is not relying on the 568 Exemption as a defense in this action.

192.    This aspect of the legislative history thus reflects Congress's intent that a "truly need-blind" admissions policy would not permit a school invoking the 568 Exemption to use the information that the 568 Cartel has used and continues to use to consider the financial circumstances of an applicant's family for admissions purposes—including (i) the common application (which asks questions about the parents' occupation for the purpose, at least in part, of ascertaining the financial circumstances of the applicant and their family); (ii) emails between development and admissions, as well as any "tags" that admissions uses to flag development prospects, obtained for the purpose of ascertaining the financial circumstances of the applicant and their family; (iii) any documents that admissions receives identifying one or both parents as donors, or regarding donation history, or identifying one or both parents as alumni; and (iv) the information integral to enrollment management.

**Answer to Paragraph 192:** Columbia denies the allegations contained in paragraph 192

of the Second Amended Complaint. Columbia states, however, that it is not relying on the 568

Exemption as a defense in this action.

193.    The 2001 legislative history to the renewal of the 568 Exemption further confirms the following congressional goal and purpose: "No student who is otherwise qualified ought to be denied the opportunity to go to one of the nation's most prestigious schools because of the financial situation of his or her family." Report to Accompany H.R. 768, House of the Judiciary, *Need-Based Educational Aid Act of 2001* (Apr. 3, 2001). An admissions policy that admits certain students based on their wealth, in a zero-sum admissions arrangement, necessarily denies admission to at least some students "because of the financial situation of his or her family."

**Answer to Paragraph 193:** Columbia denies the allegations contained in paragraph 193

of the Second Amended Complaint, except admits that plaintiffs purport to quote from the

Report to Accompany H.R. 768, House of the Judiciary, *Need-Based Educational Aid Act of*

*2001* (Apr. 3, 2001). Columbia refers to that report for the complete and accurate content

thereof.

194. In a separate part of the 2001 legislative history, Representative Barney Frank, one of the sponsors of the legislation, referenced that it arose out of litigation regarding the Overlap Group (discussed above), and a practice in which "these schools strive to achieve what they call a needs-based admission policy," and "what it meant was that they strove to admit young men and women *based on their ability to do the work of that school*." Statement of Barnie Frank, Need-Based Educational Aid Act of 2001, 147 Cong. Rec. H1360-02, 2001 WL 321629 (Apr. 3, 2001) (emphasis added). An admissions policy that admits certain students based on their wealth as a relevant factor does not admit those students "based on their ability to do the work of that school."

**Answer to Paragraph 194:** Columbia denies the allegations contained in paragraph 194 of the Second Amended Complaint, except admits that plaintiffs purport to quote from the statement of Representative Barney Frank in connection with the Need-Based Educational Aid Act of 2001, 147 Cong. Rec. H1360-02, 2001 WL 321629 (Apr. 3, 2001). Columbia refers to Representative Frank's statement for the complete and accurate content thereof.

195. In sum, the scope of the 568 Exemption was rooted in the plain language of the statutory text, and in the statute's legislative history, which shows that the statute's plain text furthers the statute's purposes.

**Answer to Paragraph 195:** The allegations contained in paragraph 195 of the Second Amended Complaint are legal conclusions to which no response is required. To the extent a response is required, Columbia denies those allegations.

## VIII. DEFENDANTS' CONTINUING VIOLATIONS OF THE ANTITRUST LAWS, AND THE ACCRUAL OF PLAINTIFFS' CLAIMS THEREUNDER

### A. Defendants' Continuing Violations of the Antitrust Laws

196. Defendants' violations of the Sherman Act occurred each time any Defendant engaged in conduct in furtherance of the 568 Cartel that harmed Plaintiffs and other Class Members. In the context of Defendants' price-fixing conspiracy, such conduct and violations occurred each time Defendants have exchanged private or confidential information about admissions and/or financial aid, or met to fine-tune their Cartel agreement, and upon each transaction with any Class Member at an artificially inflated net price of attendance.

**Answer to Paragraph 196:** Columbia denies the allegations contained in paragraph 196 of the Second Amended Complaint.

197.    Defendants have engaged in continuing violations of the Sherman Act.  The 568 Cartel has met at least annually since 2003 to discuss and fine-tune their Cartel agreement, and Class Members have paid artificially high net prices to attend Defendants' schools since that time and continuing through the present as a result of the conduct alleged herein.[84]

**Answer to Paragraph 197:**  Columbia denies the allegations contained in paragraph 197 of the Second Amended Complaint to the extent that they incorporate the term "568 Cartel." Columbia further denies the allegations contained in paragraph 197 of the Second Amended Complaint, except Columbia admits on information and belief that, at times, non-member institutions have attended meetings of the 568 Presidents Group.  Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the footnote and so denies them on that basis.

### B.    The Accrual of Plaintiffs' Claims Under the Discovery Rule

198.    Until the last two years, Plaintiffs in fact did not know (a) the extent to which Defendants had failed to admit all successful applicants without regard to the financial circumstances of the student or the student's family, in violation of the 568 Exemption, or (b) that Defendants' use of the Consensus Methodology has disadvantaged and in fact caused financial injury to the Class Members.

**Answer to Paragraph 198:**  Columbia denies the allegations contained in paragraph 198 of the Second Amended Complaint, except lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 198 as they relate to plaintiffs' knowledge and so denies them on that basis.

199.    Until the last two years, moreover, a person exercising reasonable diligence could not have discovered (a) the extent to which Defendants had failed to admit all successful applicants without regard to the financial circumstances of the student or the student's family, in

---

[84]    In terms of formal membership, as noted above, Brown and Emory claim to have stopped active participation in the 568 Cartel in 2012; Chicago claims to have stopped active participation in 2014; and Penn and Vanderbilt claimed to have stopped active participation it in 2020.  Some institutions have attended meetings of the 568 Cartel and exchanged information with the Cartel without being formal members, including certain institutions that never formally joined.  (Plaintiffs reserve the right to name such institutions as defendants based on discovery in this case.)

violation of the 568 Exemption, or (b) that Defendants' use of the Consensus Methodology has disadvantaged and in fact caused financial injury to the Class Members.

**Answer to Paragraph 199:**  Columbia denies the allegations contained in paragraph 199 of the Second Amended Complaint.

200.    In commenting on the larger implications of Plaintiffs' claims, for example, the editorial board of Emory's student newspaper candidly observed:  "Financial aid is confusing enough without elite universities colluding to shirk students out of necessary assistance."[85]

**Answer to Paragraph 200:**  Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 200 of the Second Amended Complaint and so denies them on that basis.

201.    In addition, a person exercising reasonable diligence could not have discovered the violations of the 568 Exemption and the concomitant antitrust injury at issue, in part because Defendants have made numerous incomplete and misleading statements that prevented a reasonable person from discovering those violations and the resulting injury.

**Answer to Paragraph 201:**  Columbia denies the allegations contained in paragraph 201 of the Second Amended Complaint.

202.    Defendants have publicly stated and advertised, incompletely and misleadingly, that they admit students on a need-blind basis; indeed, Defendants have continually claimed to be need-blind in thousands of internet, marketing, and admissions materials and brochures.

**Answer to Paragraph 202:**  Columbia denies the allegations contained in paragraph 202 of the Second Amended Complaint as to itself, except admits that Columbia has publicly stated that it admits students on a need-blind basis.  Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 202 as they relate to the public statements of any other defendants and so denies them on that basis.

---

[85]    The Editorial Board, "Students demand compensation and transparency in wake of universities' alleged price-fixing," THE EMORY WHEEL (Jan. 19, 2022), https://emorywheel.com/students-demand-compensation-and-transparency-in-wake-of-universities-alleged-price-fixing/.

203.     Defendants and the other members of the 568 Cartel maintained a website for the Cartel.  The first words printed on the homepage of this website were:  "What is the 568 Presidents Group? 568 Presidents Group is an affiliation of colleges and universities, all of which must admit students on a need-blind basis."  Under an FAQ on the same website, the 568 Cartel has made the following misleading claim:  "It is referred to as a 'Presidents' group because it was formed by a group of 28 college and university presidents from need-blind schools in 1998."

**Answer to Paragraph 203:**  Columbia denies the allegations contained in paragraph 203

of the Second Amended Complaint to the extent that they incorporate the term "568 Cartel."

Columbia further denies the allegations contained in paragraph 203 of the Second Amended

Complaint, except admits that the 568 President Group formerly maintained a website and that

plaintiffs purport to quote from that website.  Columbia refers to the website for the complete

and accurate content thereof.

204.     Defendants have also individually made similarly misleading statements, including on websites, during the period of the conspiracy alleged herein.  Such Defendants have further misrepresented, as shown below, that they are "need-blind," within the meaning of that term under the law, when they are not "need-blind" within the meaning of that term under the law.

**Answer to Paragraph 204:**  Columbia denies the allegations contained in paragraph 204

of the Second Amended Complaint.

205.     The website for Columbia has stated and continues to state:  "Admission to Columbia is need-blind for US Citizens and Eligible Noncitizens, meaning the Office of Undergraduate Admissions considers your application without regard to your financial need." Whether or not Columbia considers each application without regard to the student's financial need, this notion of need-blindness is not consistent with the statutory definition that prohibits Columbia (so long as it participates in the 568 Cartel) from considering either financial need or financial wealth.  Columbia's redefinition of "need-blind" is not consistent with the statute.  A university's promise to disregard financial need is meaningless if the institution privileges wealth.

**Answer to Paragraph 205:**  Columbia denies the allegations contained in paragraph 205

of the Second Amended Complaint to the extent that they incorporate the term "568 Cartel."

Columbia further denies the allegations contained in paragraph 205 of the Second Amended

Complaint, except admits the allegations contained in the first sentence of paragraph 205.

Columbia states, however, that it is not relying on the 568 Exemption as a defense in this action.

206.     Other Defendants that have not followed a need-blind admissions policy have also engaged in definitional contortions.  Dartmouth's website, for example, has contained and continues to contain a glossary of admissions-related terms.  As redefined by Dartmouth, an admissions decision is "need-blind" so long as it is not made with "knowledge of an applicant's financial need."  If Dartmouth does make admissions decisions without knowledge of an applicant's financial need, this is nevertheless insufficient for compliance with Section 568, which requires that *all* students be admitted without regard to the financial circumstances of the students or their families.  Under Section 568, Dartmouth is not allowed to make admissions decisions with knowledge and on the basis that, an applicant has financial need, or does not have financial need, or is rich, or any other financial circumstance.

**Answer to Paragraph 206:**  Columbia lacks knowledge of information sufficient to form a belief as to the truth of the allegations contained in paragraph 206 of the Second Amended Complaint as they relate to other defendants and so denies them on that basis.  Columbia denies the remaining allegations contained in paragraph 206.

207.     Duke's website has also employed and continues to employ its own definitions, claiming that its "admissions policy is 'need-blind,' which means that applicants are accepted based on their merit, regardless of their ability to pay for college."  Duke's redefinition does not mention whether *all* students "are accepted based on their merit, regardless of" their ability to donate money to Duke.  In reality, not all students are admitted to Duke based on merit.

**Answer to Paragraph 207:**  Columbia lacks knowledge of information sufficient to form a belief as to the truth of the allegations contained in paragraph 207 of the Second Amended Complaint and so denies them on that basis.

208.     MIT's website also has provided and continues to provide a glossary of admissions-related terms.  As redefined by MIT, "need-blind" means that "[p]rospective students are not disadvantaged in the undergraduate admissions process because of their financial need."  MIT's redefinition is contrary to the statutory meaning of "need-blind basis" and constitutes an admission that MIT considers the financial circumstances of certain applicants.

**Answer to Paragraph 208:**  Columbia lacks knowledge of information sufficient to form a belief as to the truth of the allegations contained in paragraph 208 of the Second Amended

Complaint as they relate to another defendant and so denies them on that basis. Columbia denies the remaining allegations contained in paragraph 208.

209.    Northwestern's website has claimed and continues to claim that it "has a need-blind admissions policy for U.S. citizens and permanent residents; this means that financial aid is not a factor in determining admission. Applicants are encouraged to apply for financial aid." Northwestern's redefinition of "need-blind basis" is also contrary to the statutory definition and constitutes a further admission that Northwestern fails to conduct admissions without regard to the financial circumstances of all applicants and their families.

**Answer to Paragraph 209:** Columbia lacks knowledge of information sufficient to form a belief as to the truth of the allegations contained in paragraph 209 of the Second Amended Complaint as they relate to another defendant and so denies them on that basis. Columbia denies the remaining allegations contained in paragraph 209.

210.    Penn's website has claimed and continues to claim another misleading definition of "need-blind": "Our need-blind policy means that your ability to pay is not considered in your admission decision." This is misleading because under Section 568, exempt institutions are prohibited from considering the financial circumstances of any applicant or any applicant's family, not just an applicant's "ability to pay."

**Answer to Paragraph 210:** Columbia lacks knowledge of information sufficient to form a belief as to the truth of the allegations contained in paragraph 210 of the Second Amended Complaint as they relate to another defendant and so denies them on that basis. Columbia denies the remaining allegations contained in paragraph 210.

211.    The foregoing redefinitions of "need-blind" for purposes of Section 568 obfuscate that Defendants fail to follow need-blind admissions policies and have made admissions decisions with regard to the financial circumstances of all applicants and their families.

**Answer to Paragraph 211:** Columbia denies the allegations contained in paragraph 211 of the Second Amended Complaint.

212.    The website for the 568 Cartel contained the form of a certificate of compliance whereby a member of the Cartel can certify that "its admission and financial aid practices

currently comply with the rules of Section 568 regarding 'need-blind admission practices.'" Publicly posting this form of certification misleads any reasonably diligent person who inquires into whether members of the 568 Cartel are need-blind.

**Answer to Paragraph 212:** Columbia denies the allegations contained in paragraph 212 of the Second Amended Complaint to the extent that they incorporate the term "568 Cartel." Columbia further denies the allegations contained in paragraph 212 of the Second Amended Complaint, except admits that plaintiffs purport to quote from the website of the 568 Presidents Group. Columbia refers to that website for the complete and accurate content thereof.

213. The website for the 568 Cartel stated: "This site serves as a resource both for the 568 Presidents Group member institutions wanting to keep up to date on the Group's activities, *as well as for visitors seeking to learn more about the Group*." (Emphasis added.) The 568 Cartel thus continues inaccurately to advertise on its website that all Cartel members are "need-blind" within the meaning of Section 568.

**Answer to Paragraph 213:** Columbia denies the allegations contained in paragraph 213 of the Second Amended Complaint to the extent that they incorporate the term "568 Cartel." Columbia further denies the allegations contained in paragraph 213 of the Second Amended Complaint, except admits that plaintiffs purport to quote from the website of the 568 Presidents Group. Columbia refers to that website for the complete and accurate content thereof.

214. The 568 Cartel has publicly asserted that its activities were carried out for altruistic purposes. The website for the 568 Cartel, for example, has stated and continues to state that the purpose of the conspiracy is to agree on a financial-aid system that is "fair" and that the Consensus Methodology was adopted after consideration of ways to "improve the financial aid system so as to better serve the needs of families in their efforts to pay for college."

**Answer to Paragraph 214:** Columbia denies the allegations contained in paragraph 214 of the Second Amended Complaint to the extent that they incorporate the term "568 Cartel." Columbia further denies the allegations contained in paragraph 214 of the Complaint, except admits that plaintiffs purport to quote from the website of the 568 Presidents Group. Columbia refers to that website for the complete and accurate content thereof.

215.    Such assertions are false but would be viewed as credible by a reasonably diligent person investigating the 568 Cartel's conduct.  Actors sympathetic to the 568 Cartel have likewise published statements and conclusions that would have persuaded a reasonably diligent person investigating the Cartel's conduct that they had not suffered financial harm.

**Answer to Paragraph 215:**  Columbia denies the allegations contained in paragraph 215

of the Second Amended Complaint to the extent that they incorporate the term "568 Cartel."

Columbia further denies the allegations contained in paragraph 215 of the Second Amended

Complaint, except lacks knowledge or information sufficient to form a belief as to the truth of

the allegations contained in paragraph 215 as they relate to the statements and conclusions of

"[a]ctors sympathetic to" the 568 Presidents Group and so denies them on that basis.


216.    Defendants further engaged in conduct that hindered a reasonably diligent person's ability to discover the violations and injury at issue by consistently omitting, in public statements purporting to describe the reasons for net tuition price increases, any reference to price fixing or the use of the Consensus Methodology as bearing on increased net prices of attendance.  Whether or not such statements have accurately described *some* of the reasons for net tuition price increases, these statements have not acknowledged the effects of the use of the Consensus Methodology.

**Answer to Paragraph 216:**  Columbia denies the allegations contained in paragraph 216

of the Second Amended Complaint.


217.    In targeting Class Members through the institution's alumni magazine, for example, Dartmouth claimed in 2015 that rising tuition prices could be explained because "[j]ust as lattes cost more these days, so do markers and whiteboards and keeping the lights on. Healthcare costs and salaries are rising too—and hiring at the College has shot up more than enrollment."[86]  The feature article also listed "[l]ess sizeable but still significant drivers of cost including compliance with a range of government regulations imposed to address issues such as crime, gender equity and accessibility, which have totaled millions of dollars."  The article quoted Dartmouth's current President, Phil Hanlon, as saying that these factors, although supposedly "not as much as financial aid" have "'been a driver for the last eight to 10 years.'"[87]

---

[86]    C.J. Hughes, *Why is Dartmouth So Expensive*, DARTMOUTH ALUMNI MAGAZINE, May-June 2015, https://dartmouthalumnimagazine.com/articles/why-dartmouth-so-expensive.

[87]    *Id.*

**Answer to Paragraph 217:** Columbia lacks knowledge of information sufficient to form a belief as to the truth of the allegations contained in paragraph 217 of the Complaint and so denies them on that basis.

218. A Georgetown spokesperson explained away the institution's substantial tuition increases by suggesting that "the growing cost 'reflects the reality that many of our operating expenses continue to increase at rates higher than inflation.'"[88]

**Answer to Paragraph 218:** Columbia lacks knowledge of information sufficient to form a belief as to the truth of the allegations contained in paragraph 218 of the Second Amended Complaint and so denies them on that basis.

219. In 2008, an MIT news release incorrectly claimed: "During the past decade, the net tuition for undergraduates—what students and families pay after financial aid—has, on average, dropped by more than 15 percent when adjusted for inflation."[89] Such statements suggest to a reasonable person that MIT had lowered net prices of attendance over time. If MIT's statement were true, moreover, the net price of attendance would have "dropped" even more if MIT had not participated in the 568 Cartel.

**Answer to Paragraph 216:** Columbia lacks knowledge of information sufficient to form a belief as to the truth of the allegations contained in paragraph 219 of the Second Amended Complaint and so denies them on that basis.

220. In 2009, John Affleck-Graves, then an Executive Vice President at Notre Dame, identified only food costs when asked to explain the institution's 4.4 percent increase in tuition: "We are aware of the pressure families are under, and we wanted to be as conservative as we could be, . . . the difficultly for us this year is that we have seen an increase in a lot of our costs, like food . . . . And then we are faced with a difficult choice because we don't want to decrease the opportunities we provide for the students, like study abroad and research opportunities."[90]

---

[88] Connie Parham, *GU Hikes Undergraduate Tuition 5.5 Percent*, THE HOYA (Feb. 22, 2008), https://thehoya.com/gu-hikes-undergraduate-tuition-5-5-percent/.

[89] MIT to be Tuition-Free for Families Earning less than $75,000 a Year, MIT NEWS (Mar. 7, 2008), https://news.mit.edu/2008/tuition-0307.

[90] Madeline Buckley, *University Increases Tuition for 2009*, THE OBSERVER (Mar. 4, 2009), https://ndsmcobserver.com/2009/03/university-increases-tuition-for-2009/.

**Answer to Paragraph 220:**  Columbia lacks knowledge of information sufficient to form a belief as to the truth of the allegations contained in paragraph 220 of the Second Amended Complaint and so denies them on that basis.

221.    In 2017, Amy Gutmann, President of Penn, told *The Daily Pennsylvanian* that "as tuition goes up financial aid goes up even more."[91]  If this statement is true, it is also true that but for Penn's participation in the 568 Cartel, financial aid would have gone up even more—and that President Gutmann did not speak to that fact.

**Answer to Paragraph 221:**  Columbia lacks knowledge of information sufficient to form a belief as to the truth of the allegations contained in paragraph 221 of the Second Amended Complaint and so denies them on that basis.

222.    In reality, the 568 Cartel was never composed solely of "need-blind schools" as that term is defined by the statute.  The 568 Cartel members made innumerable inaccurate public claims that had the effect of misleading a reasonably diligent person investigating whether the Cartel's conduct gave rise to a cause of action.

**Answer to Paragraph 222:**  Columbia denies the allegations contained in paragraph 222 of the Second Amended Complaint.

## IX.    CLASS ACTION ALLEGATIONS

223.    The proposed Class, under Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), comprises all U.S. citizens or permanent residents who have (a) enrolled in one or more of Defendants' full-time undergraduate programs, (b) received need-based financial aid from one or more Defendants, (c) directly purchased from one or more Defendants education, room, or board not fully covered by such financial aid, and (d) first enrolled in one of Defendants' full-time undergraduate programs as follows:

- Chicago, Columbia, Cornell, Duke, Georgetown, MIT, Northwestern, Notre Dame, Penn, Rice, Vanderbilt, Yale—from 2003 through the present.
- Brown, Dartmouth, Emory—from 2004 through the present.
- CalTech—from 2019 through the present.
- Johns Hopkins—from 2021 to the present.

---

[91]    *Amy Gutmann's Interview with The Daily Pennsylvanian*, THE DAILY PENNSYLVANIAN (Mar. 2, 2017), https://www.thedp.com/article/2017/03/amy-gutmann-penn-transcript-interview.

**Answer to Paragraph 223:**  The allegations contained in paragraph 223 of the Second Amended Complaint are legal conclusions to which no response is required.  To the extent a response is required, Columbia admits that plaintiffs purport to define the class described in paragraph 223, but denies that plaintiffs have established or can establish the prerequisites to certification and/or maintenance of the alleged "Class" pursuant to Rule 23 of the Federal Rules of Civil Procedure, and therefore denies the allegations in Paragraph 223.

224.    The Class excludes purchasers of education, room, and board the full cost of which was covered with institutional aid provided by such Defendant(s).  Class Members also exclude Defendants and their officers, directors, management, employees, subsidiaries, or affiliates; and the Judge presiding over this action, his or her law clerks, spouse, and any person within the third degree of relationship living in the Judge's household and the spouse of such a person.

**Answer to Paragraph 224:**  The allegations contained in paragraph 224 of the Second Amended Complaint are legal conclusions to which no response is required.  To the extent a response is required, Columbia admits that plaintiffs purport to exclude certain categories of persons in paragraph 224 from the class that plaintiffs purported to define in paragraph 223, but denies that plaintiffs have established or can establish the prerequisites to certification and/or maintenance of the alleged "Class" pursuant to Rule 23 of the Federal Rules of Civil Procedure, and therefore denies the allegations in Paragraph 224.

225.    Plaintiffs reserve the right to amend the Class definition, including with respect to the relevant time periods of membership in the 568 Cartel, based on discovery in this action.

**Answer to Paragraph 225:**  The allegations contained in paragraph 225 of the Second Amended Complaint are legal conclusions to which no response is required.  To the extent a response is required, Columbia admits that plaintiffs purport to reserve the right to amend their putative class definition in paragraph 225, but denies that plaintiffs have established or can establish the prerequisites to certification and/or maintenance of the alleged "Class" pursuant to

77

Rule 23 of the Federal Rules of Civil Procedure, and therefore denies the allegations in

Paragraph 225.

226.    The Class Members are readily ascertainable and identifiable because records of the relevant transactions should exist, because the Class Members' identities are known to Defendants, and because the members may be notified of the pendency of this action by forms of notice customarily used in class actions.

**Answer to Paragraph 226:**  The allegations contained in paragraph 226 of the Second

Amended Complaint are legal conclusions to which no response is required.  To the extent a

response is required, Columbia lacks knowledge or information sufficient to form a belief as to

the truth of the allegations contained in paragraph 226 of the Second Amended Complaint and so

denies them on that basis.  Columbia further denies that plaintiffs have established or can

establish the prerequisites to certification and/or maintenance of the alleged "Class" pursuant to

Rule 23 of the Federal Rules of Civil Procedure, and therefore denies the allegations in

Paragraph 226 on that basis.

227.    The Class Members are so numerous that joinder of all of them is impracticable; the number is unknown to Plaintiffs but, on information and belief, is over 200,000.

**Answer to Paragraph 227:**  The allegations contained in paragraph 227 of the Second

Amended Complaint are legal conclusions to which no response is required.  To the extent a

response is required, Columbia lacks knowledge or information sufficient to form a belief as to

the truth of the allegations contained in paragraph 227 of the Second Amended Complaint and so

denies them on that basis.  Columbia further denies that plaintiffs have established or can

establish the prerequisites to certification and/or maintenance of the alleged "Class" pursuant to

Rule 23 of the Federal Rules of Civil Procedure, and therefore denies the allegations in

Paragraph 227 on that basis.

228.    There are questions of law and fact common to the Class Members, including, but not limited to, the following:

a.    The scope and operation of the 568 Exemption;

b.    Whether Defendants' admissions practices fall under the 568 Exemption;

c.    Whether Defendants conspired as alleged herein;

d.    Whether the conspiracy harmed competition as alleged herein;

e.    Whether the conspiracy caused antitrust injury as alleged herein;

f.    The appropriate Class-wide measure of damages; and

g.    The common method for determining the damages of Class Members.

**Answer to Paragraph 228:**  The allegations contained in paragraph 228 of the Second Amended Complaint are legal conclusions to which no response is required.  To the extent a response is required, Columbia denies the allegations contained in paragraph 228 of the Second Amended Complaint.  Columbia further denies that plaintiffs have established or can establish the prerequisites to certification and/or maintenance of the alleged "Class" pursuant to Rule 23 of the Federal Rules of Civil Procedure, and therefore denies the allegations in Paragraph 228 on that basis.

229.    All or substantially all Class Members were injured by Defendants' unlawful conduct.  A common formula exists that allows for determination of damages of individual Class Members and for excluding from recovery any individuals who may not have been damaged.

**Answer to Paragraph 229:**  The allegations contained in paragraph 229 of the Second Amended Complaint are legal conclusions to which no response is required.  To the extent a response is required, Columbia denies the allegations contained in paragraph 229 of the Second Amended Complaint.  Columbia further denies that plaintiffs have established or can establish the prerequisites to certification and/or maintenance of the alleged "Class" pursuant to Rule 23 of the Federal Rules of Civil Procedure, and therefore denies the allegations in Paragraph 229 on

that basis.

230.    Plaintiffs' claims are typical of the claims of the Class Members.  Plaintiffs and the other Class Members were damaged by the same common course of conduct by Defendants.

**Answer to Paragraph 227:**  The allegations contained in paragraph 230 of the Second

Amended Complaint are legal conclusions to which no response is required.  To the extent a

response is required, Columbia denies the allegations contained in paragraph 230 of the Second

Amended Complaint.  Columbia further denies that plaintiffs have established or can establish

the prerequisites to certification and/or maintenance of the alleged "Class" pursuant to Rule 23 of

the Federal Rules of Civil Procedure, and therefore denies the allegations in Paragraph 230 on

that basis.

231.    Plaintiffs will fairly and adequately protect the interests of the Class Members. Plaintiffs' interests are aligned with, and not adverse to, those of the other Class Members.

**Answer to Paragraph 231:**  The allegations contained in paragraph 231 of the Second

Amended Complaint are legal conclusions to which no response is required.  To the extent a

response is required, Columbia denies the allegations contained in paragraph 231 of the Second

Amended Complaint.

232.    Plaintiffs will continue to fully and adequately protect the interests of the Class Members.  Plaintiffs have retained counsel competent and experienced in the prosecution of antitrust class action litigation, and with the necessary financial resources, to represent themselves and the other Class Members.

**Answer to Paragraph 232:**  The allegations contained in paragraph 232 of the Second

Amended Complaint are legal conclusions to which no response is required.  To the extent a

response is required, Columbia denies the allegations contained in paragraph 232 of the Second

Amended Complaint, except lacks knowledge or information sufficient to form a belief as to the

truth of the allegations contained in paragraph 232 as they relate to the competence, experience,

and financial resources of plaintiffs and their counsel and so denies them on that basis.

Columbia further denies that plaintiffs have established or can establish the prerequisites to

certification and/or maintenance of the alleged "Class" pursuant to Rule 23 of the Federal Rules

of Civil Procedure, and therefore denies the allegations in Paragraph 232 on that basis.

233.    Questions of law or fact that are common to the Class Members predominate over
any questions affecting only individual Class Members.

**Answer to Paragraph 233:**  The allegations contained in paragraph 233 of the Second

Amended Complaint are legal conclusions to which no response is required.  To the extent a

response is required, Columbia denies the allegations contained in paragraph 233 of the Second

Amended Complaint.  Columbia further denies that plaintiffs have established or can establish

the prerequisites to certification and/or maintenance of the alleged "Class" pursuant to Rule 23 of

the Federal Rules of Civil Procedure, and therefore denies the allegations in Paragraph 233 on

that basis.

234.    A class action is superior to other available methods for the fair and efficient
adjudication of this controversy.  The prosecution of separate actions by individual Class
Members would impose heavy burdens on the Court and Defendants and would create a risk of
inconsistent or varying adjudications of the questions of law and fact common to the Class.  In
contrast, a class action would achieve substantial economies of time, effort, and expense, and
would assure uniformity of decision as to persons similarly situated without sacrificing
procedural fairness or bringing about other undesirable results.  Absent a class action, it would
not be feasible for the vast majority of the Class Members to seek redress for the violations of
law alleged herein.

**Answer to Paragraph 234:**  The allegations contained in paragraph 234 of the Second

Amended Complaint are legal conclusions to which no response is required.  To the extent a

response is required, Columbia denies the allegations contained in paragraph 234 of the Second

Amended Complaint.  Columbia further denies that plaintiffs have established or can establish

the prerequisites to certification and/or maintenance of the alleged "Class" pursuant to Rule 23 of

the Federal Rules of Civil Procedure, and therefore denies the allegations in Paragraph 234 on

that basis.

235.     Defendants have acted on grounds that apply generally to the Class, so that, in addition to damages, including to the extent the conspiracy continues, final injunctive relief is appropriate respecting the Class as a whole.  Indeed, such injunctive relief is appropriate with respect to Defendants who claim to be former members of the 568 Cartel in that no Defendant has disavowed and repudiated the conspiracy.

**Answer to Paragraph 235:**  The allegations contained in paragraph 235 of the Second

Amended Complaint are legal conclusions to which no response is required.  To the extent a

response is required, Columbia denies the allegations contained in paragraph 235 of the Second

Amended Complaint.  Columbia further denies that plaintiffs have established or can establish

the prerequisites to certification and/or maintenance of the alleged "Class" pursuant to Rule 23 of

the Federal Rules of Civil Procedure, and therefore denies the allegations in Paragraph 235 on

that basis.

## X.     ANTITRUST INJURY AND ANTICOMPETITIVE EFFECTS

236.     Plaintiffs and the other Class Members have suffered antitrust injury due to Defendants' illegal conduct.  They have suffered injury of the type that the antitrust laws were intended to prevent and that flows from that which makes Defendants' acts unlawful.

**Answer to Paragraph 236:**  Columbia denies the allegations contained in paragraph 236

of the Second Amended Complaint.

237.     Defendants have conspired to reduce or eliminate price competition among the 568 Cartel members on provision of financial-aid packages to Class Members, thereby depriving Plaintiffs and the other Class Members of a competitive marketplace.

**Answer to Paragraph 237:**  Columbia denies the allegations contained in paragraph 237

of the Second Amended Complaint.

238.    As a result of Defendants' conspiracy to share information and fix prices, Plaintiffs and the other Class Members were injured in the form of receiving artificially suppressed financial aid and paying artificially inflated net prices of attendance.

**Answer to Paragraph 238:** Columbia denies the allegations contained in paragraph 238 of the Second Amended Complaint.

239.    Plaintiffs and the other Class Members are naturally motivated to enforce the antitrust laws because they paid artificially inflated prices.  There are no other persons who were more directly injured from, or more motivated to seek redress for, Defendants' misconduct than Plaintiffs and the other Class Members.

**Answer to Paragraph 239:** Columbia denies the allegations contained in paragraph 239 of the Second Amended Complaint.

240.    Absent Defendants' conspiracy, Defendants would have competed more aggressively to attract Plaintiffs and the other Class Members to their undergraduate programs, by offering all Class Members more generous financial aid and charging lower net prices of attendance than under Defendants' conspiracy.

**Answer to Paragraph 240:** Columbia denies the allegations contained in paragraph 240 of the Second Amended Complaint.

241.    If Defendants had competed, or competed more aggressively, with respect to financial aid, Plaintiffs and all of the other Class Members would have received more money in financial aid and paid lower net prices of attendance, as opposed to the artificially inflated net prices that Plaintiffs and the other Class Members paid due to Defendants' conspiracy.  The conspiracy also had the effect of imposing a greater debt burden on students and their families.

**Answer to Paragraph 241:** Columbia denies the allegations contained in paragraph 241 of the Second Amended Complaint.

242.    Defendants' conspiracy is an illegal horizontal agreement to fix prices and to share confidential data, methods, and information related to admissions, financial aid, and methods of determining financial aid.  Defendants' alleged misconduct directly and proximately caused antitrust injury to Plaintiffs and the other Class Members, who received less money in financial aid, and paid higher net prices of attendance, than they would have if Defendants had competed, or competed more aggressively, rather than conspired to fix prices.

**Answer to Paragraph 242:** Columbia denies the allegations contained in paragraph 242

of the Second Amended Complaint.

## XI.    THE RELEVANT MARKET

243.    Defendants' conduct is *per se* anticompetitive, obviating any market definition, including based on the direct evidence of anticompetitive effects.  Defendants' conduct is also, and in the alternative, illegal under the rule of reason and "quick look" modes of analyses.

**Answer to Paragraph 243:**  Columbia denies the allegations contained in paragraph 243

of the Second Amended Complaint.


244.    Plaintiffs thus further allege a relevant market, for undergraduate education at private national universities with an average ranking of 25 or higher in the *U.S. News & World Report* rankings from 2003 through 2021 (the most recent year in which Class Members applied to any of Defendants).  This is the Market for Elite, Private Universities.

**Answer to Paragraph 244:**  Columbia denies the allegations contained in paragraph 244

of the Second Amended Complaint, except admits that plaintiffs purport to allege a market for

elite private universities.


245.    This market does not include liberal arts colleges, which offer distinct products and are generally more like each other than elite, private universities.  Reflecting industry recognition of these discrete classifications, both *U.S. News & World Report* and the *Carnegie Classifications* classify national universities and liberal arts colleges separately, given that liberal arts colleges are generally regarded as having different characteristics and services, including a smaller student body, smaller and less competitive athletic programs, fewer graduate programs, and less emphasis on research.  In contrast, private, national universities tout themselves as offering such distinct services that the liberal arts colleges do not.

**Answer to Paragraph 245:**  Columbia denies the allegations contained in paragraph 245

of the Second Amended Complaint.


246.    The Market for Elite, Private Universities has a rational relation to the interchangeability of use or cross-elasticity of demand with respect to the universities in the market.  That is, within this market, sufficient cross-elasticity of demand exists such that a sufficient number of admitted students to two or more of these universities would respond to a small but significant increase in the net price by one university in the market by choosing to attend a lower-priced university in the same market that would make the price increase unremunerative.

**Answer to Paragraph 246:**  Columbia denies the allegations contained in paragraph 246 of the Second Amended Complaint.

247.    The Market for Elite, Private Universities also has a rational relation to the cross-elasticity of demand with respect to elite, private liberal arts colleges and public universities. That is, the cross-elasticity between elite, private universities and elite liberal arts colleges and public universities in the United States is low, such that a hypothetical monopolist in the Market for Elite, Private Universities could impose a small but significant non-transitory increase in price ("SSNIP") without losing so many students to elite liberal arts colleges or public universities as to render the SSNIP unremunerative.

**Answer to Paragraph 247:**  Columbia denies the allegations contained in paragraph 247 of the Second Amended Complaint.

248.    Admission to elite, private liberal arts colleges is generally less selective than admission to elite, private, national universities.  According to *U.S. News & World Report*, the average admission rate of the top 10 national universities is approximately 7%, whereas the average admission rate of the top 10 liberal arts colleges is approximately 14%.

**Answer to Paragraph 248:**  Columbia denies the allegations contained in paragraph 248 of the Second Amended Complaint, except admits that plaintiffs purport to cite *U.S. News & World Report*.  Columbia refers to that publication for the complete and accurate content thereof.

249.    A further factor differentiating private universities and liberal arts colleges is the yield rate—that is, the rate at which admissions offers are accepted.  Among the private universities ranked in the top 25 by *U.S. News & World Report*, there is a strong correlation between the institution's rank and yield rate.  Among the liberal arts colleges, this correlation is much weaker (if it exists at all).  The yield rate of both Harvard and Stanford, for example, is usually greater than 80%, whereas the yield rate for the most highly rated private liberal arts colleges—Williams, Amherst, and Swarthmore—is usually approximately 40%.

**Answer to Paragraph 249:**  Columbia denies the allegations contained in paragraph 249 of the Second Amended Complaint, except admits that plaintiffs purport to cite *U.S. News & World Report*.  Columbia refers to that publication for the complete and accurate content thereof.

250.    The Market for Elite, Private Universities does not include public universities.  A handful of public universities have national rankings and selectivity comparable to that of the

elite, private universities. Competition between public universities and elite, private institutions, however, is limited in the national market for students seeking financial aid, including the Class Members. The University of California-Los Angeles ("UCLA") and the University of California-Berkeley ("UC Berkeley"), for example, do not provide need-based financial assistance to out-of-state applicants. The University of Michigan-Ann Arbor ("Michigan") has an official policy of prioritizing financial aid for residents. The University of Virginia ("UVA") is required by law to matriculate at least two-thirds of its undergraduate student body from its pool of in-state applicants. Public, national universities generally charge a high average net price to out-of-state students to cross-subsidize in-state students, a pricing policy that is driven by laws and political pressure that private institutions do not face.

**Answer to Paragraph 250:** Columbia denies the allegations contained in paragraph 250 of the Second Amended Complaint, except admits that public universities have national rankings and selectivity comparable to that of elite private universities. Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 250 as they relate to other universities' financial aid, admissions, and pricing practices and so denies them on that basis.

251. Defendants themselves have long acknowledged the important distinctions between private and public universities, and that the elite, private universities compete within a distinct market. In its 2001 University Plan, for example, Duke stated:

> Private research universities occupy a special place in the diverse world of American higher education because of their distinctive missions, organization, governance, and funding. They are deliberately intermediate in scope and scale between the small private colleges and the large public universities. As a group, they attract a disproportionate number of the best faculty, are highly selective in their admissions policies, create a residential educational experience that promotes interaction with the faculty and student learning outside the classroom, and provide much of the nation's leadership in research and scholarship. They are resource-intensive places, typically combining large endowments, strong philanthropic support, and external research funding with high tuition. These resources are powerfully additive in supporting the teaching and research missions of these institutions and their commitment to national and international leadership.

> In our consideration of the broader context in which Duke functions, it is important to discuss the dynamics of our market within American higher education. The leading private research universities have much in common, offering similar degree programs and pursing similar lines of research, yet the rivalry among them is often intense. Each institution is pursuing excellence and the public recognition that comes with it—on its own terms, seeking to create the deepest, richest, and most

diverse environment possible for teaching, learning, and research and for the preparation of new leaders for our society. The leading universities compete with each other for the human and financial capital they need to excel in their broadly overlapping missions.[92]

**Answer to Paragraph 251:** Columbia denies the allegations contained in paragraph 251 of the Second Amended Complaint, except admits that plaintiffs purport to quote from a Duke 2001 University Plan. Columbia refers to that document for the complete and accurate content thereof.

252. Indeed, public universities and private universities make pricing decisions based on very different factors, with public institutions being subject to political pressures, state laws, and dependence on expropriations from state treasuries. Compared to elite, private universities, public universities such as UCLA, UC Berkeley, UVA, and Michigan have different pricing models and largely compete for different students.

**Answer to Paragraph 252:** Columbia denies the allegations contained in paragraph 252 of the Second Amended Complaint, except lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 252 as they relate to other universities' pricing decisions and models and so denies them on that basis.

253. The schools in the Market for Elite, Private Universities compete with each other and have done so since 2003. Defendants are tightly packed in their average *U.S. News & World Report* rankings over the last 19 years (3.1, 5.1, 5.9, 6.4, 7.3, 8.0, 8.0, 10.7, 11.5, 12.5, 14.8, 14.8, 16.7, 16.7, 18.1, 19.7, and 22.3).

**Answer to Paragraph 253:** Columbia denies the allegations contained in paragraph 253 of the Second Amended Complaint, except admits that defendants have competed with each other and with numerous other colleges and universities since before 2003, and further admits that plaintiffs purport to cite *U.S. News & World Report*. Columbia refers to that publication for

---

[92] *Building on Excellence*, THE UNIVERSITY PLAN: DUKE UNIVERSITY (Feb. 23, 2001), https://dukespace.lib.duke.edu/dspace/bitstream/handle/10161/65/UA2006_0037%20Strategic%20Plan.pdf?sequence=1&isAllowed=y.

the complete and accurate content thereof.

254.    Defendants themselves have acknowledged that they compete within the Market for Elite, Private Universities.  Morton Schapiro, the President of Northwestern, a trained economist, and a spokesperson for the 568 Cartel since at least 2001, acknowledged this market when he stated in 2018—carefully distinguishing between universities and colleges—that "continuous efforts," including a push for more federal funding, "can accelerate improvement" and "allow NU to remain competitive against top COFHE universities." COFHE stands for the Consortium on Financing Higher Education, a trade and lobbying group that describes itself as a "voluntary, institutionally-supported organization of thirty-five highly selective, private liberal arts colleges and universities."[93]  Accordingly, by President Schapiro's own admission, Northwestern views itself as competing with the universities in that group, which is 90% identical with the market as Plaintiffs define it.  (The COFHE universities consist of the U.S. News top 25, minus Carnegie Mellon, plus the University of Rochester.)

**Answer to Paragraph 254:**  Columbia denies the allegations contained in paragraph 254 of the Second Amended Complaint to the extent that they incorporate the term "568 Cartel." Columbia further denies the allegations contained in paragraph 254 of the Second Amended Complaint, except admits that COFHE stands for Consortium on Financing Higher Education, a voluntary organization of colleges and universities.  Columbia lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 254 as they relate to other defendants and so denies them on that basis.

255.    Defendants have considerable market power, which they have exercised to increase the net price of attendance and to injure Plaintiffs and the other Class Members through the conduct alleged herein.  Since 2003, Defendants have controlled between 61% and 78% of the number of undergraduate slots in the Market for Elite, Private Universities.  Within the following relevant time periods, as set forth above, the percentage of undergraduate slots that the participants in the conspiracy have controlled within this market are approximately as follows:

- As of 2003: 61%
- As of 2004: 73%
- As of 2019: 73%
- As of 2022: 78%

---

[93]    Adrian Wan, *Schapiro, Administrators Talk Research Efforts, Campus Inclusion at 'Conversations with the President'*, THE DAILY NORTHWESTERN (Apr. 12, 2018), https://dailynorthwestern.com/2018/04/12/campus/214612/.

**Answer to Paragraph 255:** Columbia denies the allegations contained in paragraph 255 of the Second Amended Complaint.

256.     Competition in the Market for Elite, Private Universities is constrained by extremely strong brand preferences among consumers and high barriers to entry.  Competition is further constrained by the fact that such institutions limit the supply of available seats, which has the effect of generating scarcity and enhancing their prestige.  Competition in the Market for Elite, Private Universities is further constrained by the fact that applicants cannot readily substitute one institution for another because an applicant's choice is limited to those universities to which he or she is admitted in a highly selective process.

**Answer to Paragraph 256:** Columbia denies the allegations contained in paragraph 256 of the Second Amended Complaint.

257.     The 568 Cartel does not have any pro-competitive impacts.  Accordingly, if the rule of reason were to apply, it is not necessary for Plaintiffs to demonstrate reasonable and less restrictive alternatives are available.  Unlike the Overlap Group, the 568 Cartel does not agree to allocate aid solely based on demonstrated financial need.  Indeed, unlike the Overlap Group, several members of the 568 Cartel offer athletic scholarships and compete to have nationally ranked athletic teams every year.

**Answer to Paragraph 257:** Columbia denies the allegations contained in paragraph 257 of the Second Amended Complaint to the extent that they incorporate the term "568 Cartel." Columbia further denies the allegations contained in paragraph 257 of the Second Amended Complaint, except admits that Columbia does not agree with any other college or university to allocate the financial aid it offers to applicants on any particular basis, and further admits that certain members of the 568 Presidents Group compete to offer athletic scholarships and to have nationally ranked athletic teams every year.

258.     Defendants have substantial endowments and the proven capacity to earn rates of return on them that well exceed the minimum 5% distribution requirement of the tax laws. Defendants thus have ample resources to meet the financial needs of their students without reducing their endowments (if that were even imperative) and without colluding on a formula that results in artificially reduced financial aid and that would in fact provide substantially more financial aid, and result in lower net prices of attendance, than through the 568 Cartel.

**Answer to Paragraph 258:**  Columbia denies the allegations contained in paragraph 258 of the Second Amended Complaint to the extent that they incorporate the term "568 Cartel." Columbia further denies the allegations contained in paragraph 258 of the Second Amended Complaint, except lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 258 as they relate to the financial condition of any other defendant and so denies them on that basis.

259.    In addition, since the time of the Overlap Group, important facts relevant to application of any modes of legal analysis that may apply have changed in critical ways.  As to the schools for which such information is publicly available, the growth of Defendants' endowments has exceeded the growth of their annual operating expenses.  From 1994 to 2021, for instance, Dartmouth's endowment increased by approximately 879%, whereas its annual operating expenses increased by approximately 184%.  This is a ratio of approximately 4.8 to 1.  The ratios are approximately 8.1 to 1 at Georgetown; 1.9 to 1 at Penn; 1.7 to 1 at Rice; and 3.1 to 1 at Yale.  *See id.*

**Answer to Paragraph 259:**  Columbia denies the allegations contained in paragraph 259 of the Second Amended Complaint, except lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 259 as they relate to the financial condition of any other defendant and so denies them on that basis.

260.    These facts underscore that Defendants' endowments have been and continue to be an increasingly ample financial resource for the schools to use to meet the financial needs of their students.  These facts also illustrate that, regardless of their status as not-for-profit institutions, Defendants have generated or have the ability to generate revenue that well exceeds expenses on an annual basis, and thus would have been financially able to devote more resources for financial aid if that had competed rather than colluded on their financial aid formulae.

**Answer to Paragraph 260:**  Columbia denies the allegations contained in paragraph 260 of the Second Amended Complaint, except lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 260 as they relate to the financial condition of any other defendant and so denies them on that basis.

261. In addition, a reasonable and less restrictive alternative is for each member of the 568 Cartel to implement a fair financial-aid formula unilaterally, as other elite, private universities have done, without entering into a conspiracy that overcharges students. In addition, no pro-competitive impact that Defendants may proffer justifies the significant overcharge caused by the conspiracy. If even relevant to any analysis under the rule of reason, moreover, there is no legitimate or significant procompetitive justification in Defendants' non-compliance with the 568 Exemption or in combining such non-compliance with the collective application of the Consensus Methodology, and other acts in furtherance of the conspiracy as alleged herein, to artificially reduce financial aid.

**Answer to Paragraph 261:** Columbia denies the allegations contained in paragraph 261

of the Second Amended Complaint.

262. Colluding, agreeing on, and collectively imposing a common aid methodology as part of the 568 Cartel are not reasonably necessary to achieve the objective of awarding financial aid to admitted students. Nor is the sharing of confidential admission and financial-aid data and information, particularly as to the methodologies for awarding financial aid, reasonably necessary for the individual schools to achieve the objective of awarding financial aid to admitted students. Instead, there are substantially less restrictive alternatives for helping to fund need-based financial aid for admitted students—including, as noted, using a portion of the annual investment gains on Defendants' endowments.

**Answer to Paragraph 262:** Columbia denies the allegations contained in paragraph 262

of the Second Amended Complaint.

263. In short, Defendants' illegal conduct has significantly injured more than 200,000 Class Members by artificially reducing the financial aid they were offered and received.

**Answer to Paragraph 263:** Columbia denies the allegations contained in paragraph 263

of the Second Amended Complaint.

## XII.   CLAIM FOR RELIEF

### FIRST CAUSE OF ACTION
### Sherman Act Section 1

264. Plaintiffs incorporate the preceding paragraphs.

**Answer to Paragraph 264:** Columbia incorporates its answers to the preceding

paragraphs.

265.     At a time currently unknown to Plaintiffs, but at least as early as 2003, and continuing through the present to an extent to be determined in discovery, Defendants entered into a continuing agreement, understanding, and conspiracy in restraint of trade artificially to fix, raise, and stabilize and reduce the amount of financial aid paid to Class Members, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**Answer to Paragraph 265:**  Columbia denies the allegations contained in paragraph 265 of the Second Amended Complaint.

266.     In formulating and carrying out their conspiracy, Defendants have done those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others: Using an agreed upon formula or method for fixing, lowering, and stabilizing the amount of financial aid they offered and fixing, increasing, and stabilizing the net price of attendance; and sharing confidential, private data and information related to admissions and financial aid, including the methodologies to be used in awarding financial aid.

**Answer to Paragraph 266:**  Columbia denies the allegations contained in paragraph 266 of the Second Amended Complaint.

267.     The 568 Cartel has monitored and enforced its conspiracy in several ways, according to the Cartel's website, including (but not limited to) such steps as (a) requiring each participation [*sic*] institution to submit a "Certificate of Compliance," (b) requiring university professionals at each institution to receive "training . . . in the application of the Methodology," (c) imposing a "common calendar for the collection of data from families," (d) agreeing to share information and analyses relating to financial aid and formulae for provision of financial aid, and (e) conducting an annual or biannual meeting every year since at least 2007.

**Answer to Paragraph 267:**  Columbia denies the allegations contained in paragraph 267 of the Second Amended Complaint.

268.     This conspiracy has had the following effects, among others:  The net price of attendance has been fixed, increased, maintained, and stabilized at artificially high, non-competitive levels for all Class Members.

**Answer to Paragraph 268:**  Columbia denies the allegations contained in paragraph 268 of the Second Amended Complaint.

269.    Plaintiffs and the other Class Members have been injured and will continue to be injured in their businesses and property by paying more for attendance at Defendants than they would have paid and will pay but for the combination and conspiracy.

**Answer to Paragraph 269:**  Columbia denies the allegations contained in paragraph 269 of the Second Amended Complaint.

270.    Defendants are not entitled to the affirmative defense that they are exempt from the antitrust laws, because they did not satisfy the requirement that all students are admitted on a need-blind basis, for the reasons set forth above; and because, to the extent the conspiracy continues, the 568 Exemption no longer exists.

**Answer to Paragraph 270:**  Columbia denies the allegations contained in paragraph 270 of the Second Amended Complaint.  Columbia states, however, that it is not relying on the 568 Exemption as a defense in this action.

271.    Defendants' conspiracy is a *per se* violation of the Sherman Act; or, in the alternative, is a violation of the Sherman Act under the Rule of Reason or "quick look" analysis.

**Answer to Paragraph 271:**  Columbia denies the allegations contained in paragraph 271 of the Second Amended Complaint.

272.    Defendants' conduct has directly and proximately caused antitrust injury to Plaintiffs and the other Class Members. The artificially inflated net price of attendance that Plaintiffs and the other Class Members have paid to Defendants flows directly from Defendants' price fixing and is the type of damage that the antitrust laws were designed to prevent.

**Answer to Paragraph 272:**  Columbia denies the allegations contained in paragraph 272 of the Second Amended Complaint.

273.    Plaintiffs and the other Class Members are entitled to treble damages and an injunction against Defendants, preventing and restraining the violations alleged herein.

**Answer to Paragraph 273:**  Columbia denies the allegations contained in paragraph 273 of the Second Amended Complaint.

## **AFFIRMATIVE DEFENSES**

274.     Columbia affirmatively states that plaintiffs are not entitled to any relief on their

Second Amended Complaint (because, among other things, Columbia did not enter into a

conspiracy to unreasonably restrain trade or commerce and plaintiffs lack antitrust injury and

standing).  Without relieving plaintiffs of their burden of proof or assuming any burden that the

law would not otherwise impose, Columbia asserts the following affirmative defenses to the

Second Amended Complaint.

### **FIRST AFFIRMATIVE DEFENSE**

275.     Any alleged anticompetitive effects of the alleged agreement are outweighed by

the significant procompetitive benefits of the 568 Presidents Group's collaboration.  Jointly

establishing recommended best practices for measuring need improves the accuracy of

determinations of students' ability to pay and promotes a more efficient allocation of aid—

thereby decreasing the price paid by some students and increasing the quality of financial aid

awards.  Such collaboration also broadens the pool of applicants who can afford to attend

institutions of higher education and improves the socioeconomic diversity of the class of

admitted students—thereby increasing consumer access and choice as well as the quality of the

education and educational experience provided.  The U.S. Government Accountability Office has

found that the Consensus Methodology did not cause a net increase in the amount that students

were expected to pay and resulted in higher amounts of need-based aid awarded to some

categories of students.

### **SECOND AFFIRMATIVE DEFENSE**

276.     Plaintiffs' claims are barred, in whole or in part, by the applicable four-year

antitrust statute of limitations.  The claims of five plaintiffs—Andrew Corzo, Sia Henry, Michael

Maerlender, Brandon Piyevsky, and Tatiana Weaver—are barred by the applicable four-year

statute of limitations.  *See* 15 U.S.C. § 15b.  Plaintiffs filed their original complaint alleging that

defendants violated Section 1 of the Sherman Act on January 9, 2022.  The claims of Corzo,

Henry, Maerlender, Piyevsky, and Weaver accrued, if at all, before January 9, 2018.

277.    Plaintiffs allege they were injured by "receiving artificially suppressed aid and

paying artificially inflated net prices of attendance."  (Comp. ¶ 235.)  Corzo, Henry, Maerlender,

Piyevsky, and Weaver each matriculated before January 9, 2018, and thus incurred the alleged

injuries from their initial financial aid awards outside the limitations period.  Subsequent

financial aid awards for matriculated students were not subject to any agreement among

defendants, and any alleged effect on such awards from the initial awards was a foreseeable

future harm at the time of the initial awards.  Indeed, Weaver, Henry, and Piyevsky allege that

they graduated before January 9, 2018, and thus could not have incurred any injuries within the

limitations period.  Likewise, because Corzo allegedly graduated in Spring 2018, he received his

final financial aid award before January 9, 2018, and thus could not have incurred any injuries

within the limitations period.  Otherwise stated, no act in furtherance of any alleged unlawful

agreement caused him injury during the limitations period.

278.    Each of these five plaintiffs either discovered or should have discovered with

reasonable diligence their alleged injuries before January 9, 2018.  The publicly available

information that plaintiffs cite in the Second Amended Complaint to support their alleged

injuries was readily accessible before January 9, 2018, by at least several years and, in some

cases, by more than a decade.

## THIRD AFFIRMATIVE DEFENSE

279.    Plaintiffs' claims are barred, in whole or in part, by the doctrines of waiver and laches.  As set forth in the Second Affirmative Defense and incorporated by reference here, plaintiffs either discovered or should have discovered with reasonable diligence their alleged past and future injuries long before January 9, 2018.  And their failure to sue until January 9, 2022, has prejudiced Columbia, because the passage of time without notice of plaintiffs' suit—at least four years for all plaintiffs, and more than a decade for certain plaintiffs—has adversely affected Columbia's ability to obtain and maintain relevant evidence and otherwise prepare its defense.

## FOURTH AFFIRMATIVE DEFENSE

280.    Plaintiffs' claim is barred, whole or in part, from recovery of any damages to the extent of their failure to mitigate damages.  For example, based on information and belief, each plaintiff, through the exercise of reasonable diligence, could have attended one or more schools that were not members of the 568 Presidents Group but were otherwise reasonably comparable to the defendant university that plaintiff chose to attend.  If plaintiffs had attended such schools, they may not have incurred any alleged injury caused by the challenged conduct at the defendant university they chose to attend, while still receiving a reasonably comparable education.

## DEFENSES RESERVED

281.    Columbia hereby reserves the right to rely upon any other defenses asserted by other defendants or that may become apparent during fact or expert discovery in this matter, and reserves its right to amend its answer and to assert any such defenses.  Columbia states, however, that it has not reserved its right to rely on—and is not relying on—the 568 Exemption as a defense in this action.

Dated:  January 25, 2023                    Respectfully submitted,


                                            By:  */s/ Amy L. Van Gelder*
                                            Patrick Fitzgerald
                                            Amy L. Van Gelder
                                            Laura Bernescu
                                            SKADDEN, ARPS, SLATE, MEAGHER &
                                            FLOM LLP
                                            155 N. Wacker Drive
                                            Chicago, IL 60606-1720
                                            Tel: 312-407-0508
                                            patrick.fitzgerald@skadden.com
                                            amy.vangelder@skadden.com
                                            laura.bernescu@skadden.com

                                            Karen Hoffman Lent
                                            SKADDEN, ARPS, SLATE, MEAGHER &
                                            FLOM LLP
                                            One Manhattan West
                                            Room 40-216
                                            New York, NY 10001-8602
                                            Tel: 212-735-3276
                                            karen.lent@skadden.com

                                            *Counsel for Defendant The Trustees of
                                            Columbia University in the City of New York*

## **CERTIFICATE OF SERVICE**

I certify that I caused the foregoing to be electronically filed on the docket for the above-captioned matter using the CM/ECF system, which will send notifications to all counsel of record.

Dated: January 25, 2023                              */s/ Amy L. Van Gelder*