**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| SIA HENRY, *et al.*, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | |
| v. | Case No.: 22-cv-00125 |
| BROWN UNIVERSITY, *et al.*, | Hon. Matthew F. Kennelly |
| Defendants. | |

**DECLARATION OF ROBERT D. GILBERT IN OPPOSITION TO**
**MOTION FOR A PROTECTIVE ORDER BY DEFENDANTS**
**BROWN, COLUMBIA, DARTMOUTH, NORTHWESTERN,**
**NOTRE DAME, AND YALE**

I, Robert D. Gilbert, declare as follows:

1.      I am the Managing Partner of Gilbert Litigators & Counselors, PC and one of the lead counsel representing Plaintiffs in the above-captioned action. I make this declaration in opposition to the Motion for Protective Order submitted by Defendants Brown University ("Brown"), The Trustees of Columbia University in the City of New York ("Columbia"), Trustees of Dartmouth College ("Dartmouth"), Northwestern University, University of Notre Dame Du Lac ("Notre Dame"), and Yale University (together, the "Moving Defendants").

2.      Plaintiffs have substantial bases to believe that the Moving Defendants are among the six most culpable Defendants. For example:

a.  Brown

In Brown's alleged "withdrawal" letter from the 568 Cartel, Jim Tilton (Director of Financial Aid) acknowledged that Brown had engaged in need-aware practices for transfer students, and referenced the 568 Group's policy of permitting need-aware admission practices for waitlist students. Furthermore, CEO of Sony Pictures Michael Lynton was courted aggressively as a potential donor by Dartmouth when his daughter was applying to universities. Plaintiffs' Second Amended Complaint ("SAC") (Dkt. 266-1 ¶ 173). Shortly after Lynton's daughter decided to attend Brown, Lynton, according to the Brown Daily Herald, generously cut "a $1 million check to Brown with more strings attached than the Los Angeles Philharmonic." *Id.* ¶ 174.

b.  Columbia

The Columbia Spectator reported on November 14, 2017, about a new head of the School of General Studies at Columbia ("Gen"). In that article the Columbia Spectator specifically stated, "Unlike Columbia College, Gen admissions are *not need-blind*." Gen

enrolls 2,500 undergraduate students, comprising approximately 30% of Columbia's

undergraduate student population. *Id.* ¶¶ 149-50.

The Columbia Spectator's reporting remained unchanged for more than 4 years.

Approximately one month after Plaintiffs filed their complaint on January 9, 2022,

however, someone at the Spectator *other than the author* (who had since graduated)

edited the story to remove assertion that Gen's admissions were not need-blind:

> Editor's Note (Wednesday, Feb. 16, 2022): An earlier version of
> this article stated that General Studies admissions are not need-
> blind. General Studies admissions are need-blind, but General
> Studies does not offer full-need financial aid. Spectator regrets this
> error.

Eli Lee, *Public Health professor Lisa Rosen-Metsch appointed dean of General Studies*,

COLUMBIA SPECTATOR (Nov. 14, 2017),

https://www.columbiaspectator.com/news/2017/11/14/public-health-professor-lisa-rosen-

metsch-appointed-dean-of-general-studies/ (last updated Feb. 16, 2022).

   c.   Dartmouth

As Dartmouth's Director of Special Projects & Reporting (2010-2020), Jeff

Sassorossi's role was "to serve as the liaison between the Advancement (Alumni

Relations and Development) and Admissions." SAC ¶ 173. This role certainly suggests a

pervasive use of wealth favoritism by Dartmouth. Moreover, an email from Mr.

Sassorossi to Sony CEO Michael Lynton was leaked following the 2014 Sony hack,

which illustrated Dartmouth's efforts to assess and court wealthy potential donors whose

children were applicants. *Id.* Mr. Lynton's daughter and his subsequent donation

ultimately went to Brown instead. *Id.* ¶ 174.

   d.   Northwestern

Northwestern President Morton Schapiro has been described as "a dean of 'enrollment management,' the art of shaping an incoming class through recruitment, aid, early admission, waiting lists and other variables." *Id.* ¶ 163. According to The Daily Northwestern, "*in the 2018-19 admissions cycle, Schapiro personally reviewed the applications of about 550 students, including applications associated with wealthy donors,*" and was "*frequently involved in dealing with principal donors to the University.*" *Id*. ¶ 181 (emphasis added). Schapiro says he "*tries to work with the Dean of Admissions Christopher Watson, as much as he can*." *Id*. ¶ 182 (emphasis added).

e. Notre Dame

Notre Dame's Vice Provost for Undergraduate Enrollment, Don Bishop, has publicly spoken regarding the significant influence donations exert in Notre Dame's admissions process; he admitted that if someone gave $15 million, then their children would be given "some special interest." *Id.* ¶ 184. Notre Dame admissions is tasked with "delivering" a freshman class that will satisfy, among others, the Development Office. *Id.* ¶ 183.

f. Yale

Numerous Russian oligarchs have donated large sums of money to Yale. A lengthy and detailed exposé very strongly suggests these donations have given the oligarchs' children a special advantage in the Yale admissions process. As reported in Air Mail:

> Yale seems to have more than its share of students and alumni who are the children of oligarchs. There's Irina Vekselberg (School of Management class of 2005) and her younger brother, Aleksander Vekselberg (Yale class of 2011), the children of sanctioned aluminum czar Viktor Vekselberg. There's Laura Fridman (class of 2015) and Katia Fridman (class of 2018), daughters of

4

> sanctioned multi-conglomerate kingpin Mikhail Fridman. There's
> Denis and Daria Aven. There's Alexander Abramov Jr. (class of
> 2014), son of steel czar Alexander Abramov. And there's Laila
> Blavatnik (class of 2024), daughter of billionaire investor Len
> Blavatnik.

Clara Molot, *Yale for Sale? From Russia With Money. Hungry for money, Yale University took millions from Russian kleptocrats, and its management school cut deals with a shady, Kremlin-tied institute*, AIR MAIL (Mar. 26, 2022), https://airmail.news/issues/2022-3-26/yale-for-sale.

Indeed, Viktor Vekselberg's daughter Irina explained: "We worked a lot with the development office because we wanted to build a relationship. … We went to prominent people. [The development office] had their own list." *Id.* Plaintiffs specifically requested documents from Yale concerning foreign national applicants who are permanent residents, including those mentioned in this article, in their First Set of Requests for Production, No. 117.

3. In support of their Motion for Protective Order, the Moving Defendants submitted a declaration by counsel for Columbia Amy L. Van Gelder (the "Van Gelder Declaration"), which makes representations about meet-and-confer efforts between the parties in this action. (Dkt. 276-1). The Van Gelder Declaration references a November 4, 2022 global meet-and-confer, during which Van Gelder asserts Plaintiffs "agreed the relevance of such requests was based solely on the applicability of the statutory 568 Exemption." (Dkt. 276-1 ¶ 7). As support for this statement, Van Gelder attaches a December 1, 2022 email letter from Sarah Kirkpatrick, counsel for Notre Dame, to Co-Lead Plaintiff's Counsel Ted Normand and myself, which purports to memorialize the substance of six separate global meet-and-confer calls that took place during the prior four weeks, the earliest of which occurred nearly a month before this letter

Case: 1:22-cv-00125 Document #: 297-2 Filed: 01/25/23 Page 6 of 11 PageID #:5005

was sent to Plaintiffs. Ms. Kirkpatrick's December 1, 2022 letter is attached to the Van Gelder

Declaration as Exhibit D. (Dkt. 276-5).

4.      Immediately upon receipt, Plaintiffs found Ms. Kirkpatrick's letter was rife with

inaccuracies and mischaracterizations. Indeed, one day after receiving Kirkpatrick's December 1,

2022 letter, Mr. Normand sent an email replying to Ms. Kirkpatrick, copying all counsel of

record for Defendants, stating that "the letter is not an accurate accounting of the meet-and-

confers at issue. It contains misstatements and mischaracterizations, and it overlooks important

shades of meaning in our positions." Attached as Exhibit A is a true and correct copy of the

December 2, 2022 email from Ted Normand to all counsel of record for Defendants.

5.      The Van Gelder Declaration does not make any mention of Mr. Normand's

December 2, 2022 email, nor make any mention of the fact that Plaintiffs *immediately* disputed

the accuracy of this letter, in multiple respects, in writing.

6.      In addition, the Van Gelder Declaration broadly states that "[d]uring numerous

conferences and correspondence in November and December 2022, counsel for Plaintiffs

consistently acknowledged that discovery regarding admissions and development data,

documents, and communications is relevant only to their arguments in opposition to Defendants'

asserted affirmative defense based on the Exemption." (Dkt. 276-1 ¶ 6). This assertion is

inaccurate, and there are no exhibits or additional facts contained in the Van Gelder Declaration

to support the assertion.

7.      Defendants' use of the words "solely" and "only" fly in the face of the Amended

Complaint, and this Court's several rulings. Plaintiffs have brought a case based on a conspiracy

to violate the antitrust laws. We have argued all along that the acts of any conspirator are binding

and inculpatory on every other member of the conspiracy. The Court agreed with Plaintiffs in

denying Defendants' multi-pronged motions to dismiss. For Defendants to assert that in meet-and-confers, Plaintiffs' counsel unilaterally abandoned the materiality of discovery from one Defendant against the other Defendants is absurd. It did not happen.

8.      All counsel of record have been aware of Plaintiffs' position regarding Plaintiffs' entitlement to admissions- and development-related discovery, regardless of whether a particular Defendant asserts the 568 Exemption, *since at least December 2, 2022*. That is, after a meet-and-confer call with counsel for Defendant University of Chicago ("Chicago") on December 1, 2022, Michael Rubin sent an email to me, copying all counsel of record, purporting to memorialize the substance of that call, as well as make representations about the content of prior calls. Attached as Exhibit B is a true and correct copy of the December 1, 2022 email from Michael Rubin to myself, copying all counsel of record.

9.      Mr. Rubin's email inaccurately stated that Chicago "confirmed that Plaintiffs' only claim of relevance to Chicago's admissions and donations practices was the applicability of the 568 Exemption." *See* Exhibit B. Indeed, in the same paragraph, Mr. Rubin acknowledged that Chicago asked whether "there was any basis, other than applicability of the 568 Exemption, for discovery into Chicago's admissions and donations practices after Chicago was no longer a member of the 568 Group. Plaintiffs' counsel responded: "I think I have stated it" and offered no further explanation of the basis for Plaintiffs' request." *See id.*

10.     The basis for this inaccuracy is a sentence taken completely out of context from the original conversation. That email from Chicago's counsel suffered from material omissions.

11.     Very early in the morning on December 2, 2022, in a written response to Mr. Rubin's December 1, 2022 email, I made plain that I had responded several times on this point, *copying all counsel of record*. My December 2, 2022 email also demonstrated, with

contemporaneous exhibits, certain other inaccuracies in Mr. Rubin's December 1, 2022 email. Attached as Exhibit C is a true and correct copy of the December 2, 2022 email from myself to Mr. Rubin, copying all counsel of record.

12. As reflected in Exhibit C, I had repeatedly explained that the basis for discovery was the liability of co-conspirators, *not* just the liability of Chicago. Each time Mr. Rubin asked the same question, I attempted to rephrase slightly to remedy any comprehension gaps. After four or five iterations, I saw this was futile, and in an effort to move on I replied "I think I have stated it."

13. My December 2, 2022 email, on which all defense counsel were copied, also states, in relevant part:

> Chicago understandably concluded that it would not rely on the 568 exemption as a defense when it realized that it was a terrible defense, because both Chicago and other members of the conspiracy had systemically violated the need-blind predicate to the defense. The fact that Chicago came to conclude that the 568 Exemption was a terrible defense does not change the fact that Chicago remained a member of the conspiracy after its 2014 letter; its subsequent non-need blind admissions practices continued to compound its own liability and also *compound the liability of its co-conspirators*.

Exhibit C (emphasis added).

14. My December 2, 2022 email also informed all counsel of record for Defendants of Plaintiffs' position that we are entitled to "the same discovery and identification of custodians" regardless of whether a particular Defendant is claiming the 568 Exemption as an affirmative defense. *See* Exhibit C.

15. In short, on December 2, Mr. Normand was fending off multiple inaccuracies in Ms. Kirkpatrick's December 1 email (which purported to summarize the six extensive meetings

that had occurred over a period of four weeks), while I was virtually simultaneously engaged in fending off the inaccuracies in Mr. Rubin's email. In light of the controversies surrounding the numerous inaccuracies in these two emails, the Defendants decided not to include them as exhibits in the Joint Status Report that was filed on the evening of December 2. Nonetheless, six weeks after these December 1 – 2 imbroglios, Defendants have decided to rely on the December 1 Kirkpatrick email.

16.     Furthermore, on January 10, 2023, in accordance with an agreement between the parties, Plaintiffs sent a draft insert to the Joint Status Report ("Plaintiffs' Draft Insert"), which was due to the Court on January 13, 2023, to all counsel of record. Attached as <u>Exhibit D</u> is a true and correct copy of the January 10, 2023 email, along with an excerpt of the relevant portion of the draft Joint Status Report attached thereto.

17.     Plaintiffs' Draft Insert stated at some length three reasons why Plaintiffs remain entitled to discovery on admissions and development practices from all Defendants. *See* Exhibit D.

18.     Therefore, all counsel of record received notice of Plaintiffs' position four days before this motion was filed, just as they had all received it 43 days before this motion was filed, on December 2, 2022. *See id*.

19.     Counsel for each of the Moving Defendants also submitted a declaration in support of the Motion for Protective Order. (Dkt. 276-10 through 276-15). Each of these declarations claims that adding disputed custodians and search terms would substantially increase that Defendant's burden. (*See id.*). The Van Gelder Declaration, which is representative of other declarations on this point, states that, during a January 4, 2023 meet-and-confer call between Plaintiffs and the Moving Defendants, "Plaintiffs' counsel (Mr. Normand) stated that he

understood the Moving Defendants' position on burden and proportionality and suggested that it may be possible to gather the evidence Plaintiffs desire regarding other Defendants' entitlement to the Exemption through more limited discovery." (Dkt. 276-1 ¶ 11).

20.     The Van Gelder Declaration also asserts that, in Plaintiffs' Draft Joint Status Report Insert, "Plaintiffs argued that broad discovery into the Moving Defendants' admissions and development practices remains necessary and *declined to curtail their requests in any respect*." (Dkt. 276-1 ¶ 13) (emphasis added). Once again, this description is demonstrably inaccurate according to the contemporaneous exchange of emails. A separate meet-and-confer call took place the next day, on January 11, 2023, addressing, among other things, Plaintiffs' willingness to limit discovery for the Moving Defendants. During that call, the Movants refused to stipulate that they had not been need blind. Following that call on January 12, 2023, Mr. Normand proposed by email a discovery compromise that each of the Moving Defendants produce *only one specific* witness for testimony on this issue, despite the Court's ruling that Plaintiffs are entitled to take up to 10 fact depositions from each Defendant. Attached as Exhibit E is a true and correct copy of a January 12, 2023 email from Ted Normand to Terri Mascherin, counsel for Dartmouth, copying all counsel for Moving Defendants.

21.     Notwithstanding the fact that Plaintiffs' January 12, 2023 compromise proposal could have reduced the number of depositions in this case very substantially, the Van Gelder Declaration stated that the compromise proposal "did not adequately address the Moving Defendants' proportionality concerns." (Dkt. 276-1 ¶¶ 15-16). Mr. Normand's January 12, 2023 email specifically proposed that, in the first instance, the Moving Defendants produce documents responsive to a limited number of Plaintiffs' document requests, at least one of which points

10

Defendants to individual names to search for before reviewing the entire custodial file. *See* Exhibit E.

    22. On at least three separate occasions -- November 23, 2022, December 23, 2022, and December 30, 2022 -- Plaintiffs reminded Defendants **in bold** that this Court had ruled that "a significant part of the case is exactly this, the contention that admissions are tied to donations." Oct. 26, 2022 Tr. 36:24-37:1. In addition, the December 30 email also highlighted in bold the following statement from the October 26 transcript: **"So that's a ruling. That's the judge talking. Those are called rulings."** *Id.* 34:16-17 (emphasis added). Notwithstanding having been reminded of this Court's rulings on three separate occasions, Defendants continue to flout those rulings. Attached hereto as <u>Exhibit F</u> are true and correct copies of email chains containing these emails I sent to all Defendants on November 23, December 23, and December 30, 2022, which were previously filed as exhibits to the January 13, 2023 Joint Status Report. (*See* Dkt. 274-1 at 7; Dkt. 274-2 at 2; Dkt. 274-3 at 5).

I declare under penalty of perjury that the foregoing is true and correct. Executed this 25th day of January 2023.

_____
Robert D. Gilbert

11