# Exhibit B



Sarah Schuster <sschuster@gilbertlitigators.com>

## Chicago's Claim That it "Withdrew" from the Cartel in 2014, and Chicago's Other Rationales for Refusing to Identify Custodians and/or Produce Documents

**Rubin, Michael A.** <Michael.Rubin@arnoldporter.com>  Thu, Dec 1, 2022 at 4:39 PM
To: Robert Gilbert <rgilbert@gilbertlitigators.com>
Cc: "Carbone_Defs_Service@listserv.whitecase.com" <Carbone_Defs_Service@listserv.whitecase.com>, 568 Litigation <568_Litigation@fnf.law>

**[EXTERNAL SENDER]**

Bob

We write to memorialize the parties' meet and confer today (December 1, 2022) regarding Chicago's responses to Plaintiffs' first set of document requests.

1. **Relevant Time Period—Beginning Date**

**Custodial and Non-Custodial Documents**. The parties discussed the relevant time period as it relates to the beginning date of Chicago's search of its proposed custodians' files and non-custodial sources that we have identified. Chicago again confirmed that its custodians and non-custodial sources would be the same regardless if the start date for the production was before January 1, 2010, because, based on our investigation to date, there are no other predecessor custodians or sources that continue to be employed by Chicago or whose documents still exist in the school's systems to search. That is, any predecessor custodians' files, if still available, would only be accessible if they were combined with the files of our proposed custodians or retained as part of the proposed non-custodial sources (i.e., team shares). That said, Chicago offered to search for documents among the proposed custodians' files and on the non-custodial sources that date back to Jan. 1, 2000. We explained that this date is based on our investigation to date in which we have determined that Chicago joined the 568 Group at some point between 2001 and 2003. Plaintiffs accurately paraphrased that explanation as Chicago not being there at the founding of the 568 Group. This search would include documents that predate Chicago joining the Group. We also stated that if, in the course of our investigation, Chicago learns that its membership predates this time period, the parties can discuss whether a further search is relevant and proportional. We also noted that this proposal is based on its current proposed custodians and non-custodial sources and that if we identify other sources that present different proportionality considerations, we preserve our proportionality objections. Plaintiffs did not express any concerns about this proposal. We understand that Plaintiffs are considering it.

**Structured Data.** Chicago agreed to the same scope of structured data production discussed globally by the Joint Defense Group and Plaintiffs, which is that Chicago would provide its structured data that is available and accessible in its currently operative financial aid and admissions databases as far back as those databases go, subject to the parties other discussions concerning structured data. As we have previously explained in writing and to ensure no confusion, Chicago explained again that its current admissions databases includes at least certain data that goes back to 2010 enrollees (i.e., students who enrolled in fall 2010, data for whom were created during the 2009-2010 admissions cycle). For financial aid, Chicago's current database goes back to 2016, with limited data reflecting financial aid outputs for enrolled students available from between 2010-2016. These limitations are based on Chicago's investigation to date, which indicates that both the financial aid and admissions databases were upgraded and transferred in 2016, with varying amounts of legacy data dating back to 2010 enrollees maintained. Should any further structured data be discovered, Chicago will make Plaintiffs aware and will discuss proportionality and burden as appropriate. Chicago also explained that certain of its financial aid data are maintained on an older system whose accessibility may be more challenging. We stated that we believe we will be able to overcome hurdles in downloading agreed-upon fields, but reserved the right to raise any accessibility issues that may develop. Chicago's offer was made with the same caveats as that of the global JDG discussion—i.e., that the parties agree on the data fields required and barring no significant, technical issues with burden in accessing the data. Plaintiffs asked that Chicago search for and produce contemporaneous emails from 2015-2016 that corroborate the information about the change

in databases and Chicago not retaining data from before the 2009-2010 cycle. Chicago took that request under advisement.

Plaintiffs otherwise acknowledged Chicago's proposal and asked for it in writing.

2. **Relevant Time Period—Ending Date**

**Post-2014 Searches**. Chicago reiterated that it is not asserting a 568 Exemption defense after it was no longer a member of the 568 Group and confirmed that Plaintiffs' only claim of relevance to Chicago's admissions and donations practices was the applicability of the 568 Exemption. Chicago then asked if there was any basis, other than applicability of the 568 Exemption, for discovery into Chicago's admissions and donations practices after Chicago was no longer a member of the 568 Group. Plaintiffs' counsel responded: "I think I have stated it" and offered no further explanation of the basis for Plaintiffs' request.

Chicago asked how its proposal to produce financial aid structured data (subject to the same caveats as noted above), combined with documents reflecting annual financial aid formulae and policies regarding expected family contribution and how financial aid is packaged even after the time it left the 568 Group and is not asserting the 568 Exemption, is not relevant and proportional discovery as to Chicago's financial aid after it left the 568 Group. Plaintiffs responded by disagreeing with the premise that Chicago was no longer a member of the 568 Group, and stating that they have a right to test issues through discovery, including whether Chicago continued to interact with the other sixteen Defendants regarding admissions and donations. We explained that because Plaintiffs do not allege a conspiracy as to admissions practices or donation practices, general discovery into admissions and donations are not relevant absent an assertion of the 568 Exemption. Plaintiffs acknowledged Chicago's proposal as to financial aid discovery post-membership, asked for it to be made in writing, and stated that Plaintiffs would consider it and whether Plaintiffs would nonetheless seek additional financial aid-related discovery.

**Joint Status Report**. Plaintiffs agreed to clarify in their portion of the joint status report that Chicago (consistent with the positions of other Defendants) has always proposed that the filing of the complaint is the relevant end date for discovery, which Plaintiffs' draft suggested was a position Chicago took for the first time this week. We also stated that ending discovery with the filing of the complaint is typical practice and asked Plaintiffs to articulate why for Chicago any discovery beyond that time period was relevant and proportional given that Chicago was not a member of the 568 Group after September 2014. Plaintiffs did not provide a reason.

3. **Other Custodians**

**President's Office.** In response to a point made previously by Plaintiffs, that the name of the 568 Presidents Group implies the relevance of documents from Chicago's President's office, Chicago re-confirmed that its investigation had found that the sole Chicago employee who had been involved in the 568 Group was a former director of financial aid and not employees in the President's Office. Plaintiffs stated that their point was merely a "rhetorical point," not a substantive basis for discovery. Plaintiffs further stated that they had a right to test Chicago's contention as "their allegations are plausible," and have a right to ask the President of Chicago about his involvement in the 568 Group in a deposition. After the call, we confirmed that Plaintiffs' Amended Complaint does not allege that Chicago's President participated in the 568 Group. In any event, we believe that Plaintiffs can test Chicago's contention in numerous ways beyond adding additional custodians from the President's Office. For example, Plaintiffs' will receive extensive discovery about 568 Group meetings from other Defendants and from its third-party subpoenas, including to the 568 Group itself. That is a far more proportional means of testing Chicago's representations.

4. **Other Issues**

**Shared Email Account.** Plaintiffs had previously asked whether Chicago's Alumni Relations and Development Office shares any email accounts with its Admissions office. Chicago noted that the employee to ask has been out of the country and Chicago will ask the employee about shared email accounts when they return next week.

If you believe we have not accurately reflected the substance of our discussions or that we have omitted something material, please let us know as soon as possible.

Best regards,

[Quoted text hidden]

---

[Quoted text hidden]