# Exhibit F

 Gmail

Sarah Schuster <sschuster@gilbertlitigators.com>

---

## The Defendants' Representation to the Court on December 21 that Three Issues are Not Ripe for Decision by the Court

---

**Robert Gilbert** <rgilbert@gilbertlitigators.com>  Mon, Jan 9, 2023 at 7:50 AM
To: "Miller, Britt M." <BMiller@mayerbrown.com>, "Carbone_Defs_Service@listserv.whitecase.com" <Carbone_Defs_Service@listserv.whitecase.com>
Cc: 568 Litigation <568_Litigation@fnf.law>

**[EXTERNAL SENDER]**

Britt,

This responds to your email of January 3.

My December 23 letter gave you the benefit of the doubt. I gave you the opportunity to explain any basis for your representation to the Court on December 21, on behalf of all defense counsel, that there were no ripe discovery issues for the Court at that time. In your January 3 email, the only basis you could identify for that representation was this: "Indeed, beginning shortly after the submission of the December 2 Status report and continuing up to right before the December 21 hearing, Plaintiffs sent emails to Defendants outlining Plaintiffs' positions on each of the three issues in question (where relevant to the individual Defendant) and asking to schedule further individual meet/confers to discuss those issues (and others). Many of those requested additional meet-and-confers had not taken place as of the December 21 hearing, and as such we are puzzled by your position that the issues were ripe."

This purported "basis" for your representation to the Court is misleading. As we stated in the December 2 joint status report: "The sequence of events is illuminating. First, Plaintiffs went to Individual meet-and-confers with individual Defendants (starting on November 10), several of whom used identical arguments to refuse to identify a custodian in the Development or President's Office, and then said that the Plaintiffs needed to seek recourse at the global meet-and-confers, and this pattern continued for a couple of weeks. At the subsequent global meet-and-confer on November 28, to which the Plaintiffs had been referred, all Defendants took the position that Plaintiffs' only recourse was to go back to all seventeen universities separately in at least seventeen more Individual meet-and-confers to determine whether any one of them will agree to provide even a single custodian from one of those offices. (In a December 1 Individual meet-and-confer, Johns Hopkins identified custodians from its President's and Development offices, leaving sixteen more Individual meet-and-confers.) From the perspective of the Plaintiffs, this is a classic case of being given the run-around."

The reason we were "asking to schedule further individual meet/confers to discuss those issues," as you know, is that in a global meet-and-confer on November 28, on behalf of *all* defense counsel, Sarah Kirkpatrick demanded that we do so (after refusing to resolve these issues on a global basis). That is, she demanded that Plaintiffs request additional individual meet-and-confers with every Defendant on these issues, even though 17 of 17 (non-structured data before 2003), 16 of 17 (the Development Office), 12 of 17 (the President's Office) , and 5 of 5 (the Defendants who claim to have withdrawn) were taking identical or virtually identical positions, and were doing so for identical or virtually identical reasons. We could not have made it clearer at the time that we viewed this demand as unreasonable, particularly because we had been previously told (over the prior 18 days) at individual meet-and-confers to raise the issue at the global level. Yet we went the extra mile to accede to this demand so that Defendants could not later claim that we had not done what you had demanded.

Defendants now turn these facts on their head and claim that Plaintiffs were "asking to discuss those issues (and *others*)" (emphasis added). The meet-and-confers between December 2 and December 21, as you know, were largely focused on *other* issues. To the extent they addressed the three issues that had been ripe since on or before December 2, Plaintiffs could not have been clearer that our positions were so firmly based on that facts and the controlling law that they absolutely would not change:

1. You and all the defense counsel have been informed at least six times in writing between November 23 and December 21, 2022, of the Plaintiffs' global position: Brown, Chicago, Emory and Penn (BCEP) have provided Plaintiffs with "dispositive proof" in writing that they remained members of the conspiracy, because their so-called letters of withdrawal praised the conspiracy and wished it continued success in the future, the precise opposite of what would be required to withdraw as a matter of law—namely, to disavow or repudiate the conspiracy and its goals. Accordingly, you and all defense counsel knew that their refusal to provide discovery after a so-called "withdrawal" was ripe for judicial resolution because, from the Plaintiffs' repeatedly stated perspective, it was meritless. (The same applies to Vanderbilt, which has provided no proof that it disavowed or repudiated the conspiracy and its goals.)
2. Between November 23 and December 21, 2022, all Defendants had been informed at least 12 times in writing that the position that the President's office was not a custodian of documents (12 Defendants) and the position that the Development office was not a custodian of documents (16 Defendants) were inconsistent with the Court's rulings and guidance on October 26. Accordingly, you and all defense counsel knew, at the time of your representation to the Court on December 21, that issue was also ripe for decision, notwithstanding your representation to the Court to the contrary.
3. On behalf of *all* Defendants, Sarah Kirkpatrick represented at a November 30 global meet-and-confer that the Defendants had drawn a "line in the sand" (her words, not ours) concerning the issue of non-structured data prior to 2003. You and all defense counsel knew, as of December 21, that issue was ripe for resolution by the Court. (It is important to distinguish between the Defendants' "line in the sand" as a matter of principle, regardless of whether documents exist, and meet=-and-confers to learn whether documents do in fact exist.)

Your complaint about a "flurry of emails" is inexplicable. It ignores that it was the Defendants who demanded on November 28 in a global meet-and-confer that, even on issues on which all or virtually all Defendants take identical positions, Plaintiffs should send an email to every Defendant.

Finally, your assertion that the "12/30 and 12/31 emails" were "exactly" about the three ripe issues as of December 2 and 21 is plainly wrong. Those emails, as both their subject lines and their content show, focused on two additional ways in which Defendants are flouting what the Court instructed on October 26, not on the three ripe issues that had already been identified in the December 2 joint status report: Defendants' refusal to provide admissions scoring data; and Defendants' unilateral revision of several definitions in the RFPs that Plaintiffs had served on Defendants.

In short, we reiterate our point that, on December 21, defense counsel was not candid with the Court. Going forward, it would be helpful if Defendants were more accurate in such representations. We will address all of this briefly in the joint status report due to be filed on January 13, 2023.

Very truly yours,

Bob

Robert D. Gilbert
Managing Partner

Gilbert Litigators & Counselors
11 Broadway, Suite 615
New York, NY 10004
rgilbert@gilbertlitigators.com
646-448-5269 work
203-645-0055 cell
www.gilbertlitigators.com

---

**From:** Miller, Britt M.
**Sent:** Tuesday, January 3, 2023 3:01 PM
**To:** Robert Gilbert; Carbone_Defs_Service@listserv.whitecase.com
**Cc:** 568 Litigation
**Subject:** RE: The Defendants' Representation to the Court on December 21 that Three Issues are Not Ripe for Decision by the Court

Bob,

We were surprised and disappointed to receive your December 23 email, in which you imply that Defendants affirmatively misrepresented to the Court that certain issues Plaintiffs raised in the December 2 Status report were not ripe for decision and state your intention to advise the Court of those alleged misrepresentations unless Defendants essentially "prove you wrong" by January 4. This theme is reiterated in the flurry of emails Plaintiffs sent at the end of the day this past Friday and over the weekend. We believe that such charged discourse is affirmatively counterproductive (and in this instance, inaccurate) and hope that we can constructively move forward on these and other issues. In the event Plaintiffs persist with their narrative, however, we will continue to accurately represent the record to the Court.

As to the substance of your email and as you are aware, Defendants told Plaintiffs before the filing of the December 2 Status report (and reported to the Court in the report itself) that they did not believe that the three issues you identified—President/Development office custodians, the relevant time period, and non-member-defendant discovery—should be included in the report because the parties had not completed their negotiations of those issues and continued to work to eliminate, or at least narrow, any disputes. Those discussions have been occurring on a defendant-by-defendant basis and thus, even to the extent that those issues may have been ripe as to some defendants (Defendants do not believe that to be the case), they certainly were not ripe as to all defendants such that the Court could have undertaken to rule on the issues. The events since December 2 have only confirmed the accuracy of Defendants' position. Indeed, beginning shortly after the submission of the December 2 Status report and continuing up to right before the December 21 hearing, Plaintiffs sent emails to Defendants outlining Plaintiffs' positions on each of the three issues in question (where relevant to the individual defendant) and asking to schedule further individual meet/confers to discuss those issues (and others). Many of those requested additional meet-and-confers had not taken place as of the December 21 hearing, and as such we are puzzled by your position that the issues were ripe. We assume that in requesting and scheduling those meet/confers, Plaintiffs were acting in a good faith effort to try to narrow the parties' differences, just as Defendants have acted in good faith in conducting or scheduling meet/confers with Plaintiffs and, in many instances, responding to Plaintiffs in writing. Indeed, the parties' correspondence since December 21 has continued address these issues.

As you know (and as we informed the Court), additional meet/confers are scheduled with various Defendants this week and next to discuss exactly the issues you raise in your email. Plaintiffs' 12/30 and 12/31 emails confirm this fact. We cannot speak for all Defendants on the progress the parties have made (as they vary by Defendant) and will not attempt to address the factual assertions made in your email regarding each Defendants' discovery position (again, leaving those to the individual meet/confers), but if the parties are not able to narrow or eliminate their

differences through those discussions, Defendants will be prepared to individually address the areas of impasse in the January 13 status report.


Regards – Britt

_____

**Britt M. Miller**
*Co-Lead Global Antitrust Practice*
Mayer Brown LLP
71 South Wacker Drive
Chicago, IL  60606
T +1 312 701 8663

LinkedIn | Twitter

mayerbrown.com

---

**From:** Robert Gilbert <rgilbert@gilbertlitigators.com>
**Sent:** Friday, December 23, 2022 4:40 PM
**To:** Miller, Britt M. <BMiller@mayerbrown.com>; Carbone_Defs_Service@listserv.whitecase.com
**Cc:** 568 Litigation <568_Litigation@fnf.law>
**Subject:** The Defendants' Representation to the Court on December 21 that Three Issues are Not Ripe for Decision by the Court

> **CAUTION: External Email -** Only click on contents you know are safe.

Counsel,

We write with respect to your representation to Judge Kennelly on December 21, 2022, that the three issues Plaintiffs outlined in the Joint Status Report (Doc. 255) ("JSR") filed on December 2, 2022 are not ripe for the Court's resolution, but instead are subject to meet-and-confer sessions. We are disappointed and surprised by that representation, because it is obviously inconsistent with the facts. In order to go the extra mile, we seek now to clarify whether there is anything remaining to discuss as to each of the three issues.

**President's and Development Office Custodians**

The first issue that is ripe for decision is the identification of custodians in the President's Office and in the Development Office. As far as we are informed, only 5 Defendants (Dartmouth, Duke, Georgetown, Johns Hopkins, and Northwestern) have agreed to identify the President's Office as a custodian, and only 1 Defendant (Johns Hopkins) has agreed to identify the Development Office as a custodian. (Although Northwestern has disclosed a custodian from its President's Office, it appears they plan to search for and produce documents relating only to matters *unrelated* to Donation records. This position lacks merit in light of Paragraphs 177 and 183 of the Amended Complaint, as explained below, and especially Paragraphs 178-79 of the Amended Complaint, which quote

Northwestern's President Morton Schapiro discussing his influence over admissions decisions on behalf of donors.) **If any other university has agreed to identify a custodian in either office, please identify that university in response to this email not later than January 4.**

As to the identification of such custodians, we have patiently played the game of see-saw Defendants forced upon us: first several individual meet-and-confers starting on November 10 with Defendants stating that these were global issues in the all-Defendants meet and confers; and then the all-Defendants meet-and-confer on November 28 taking the position that these issues were for individual meet-and-confers—all while almost every Defendant has made an almost identical and meritless argument for at least six weeks that all or nearly all the relevant Donation Records would be in the Admissions office. The bottom line from all of these meet-and-confers is that to date, 12 Defendants have refused to identify a custodian in the President's Office, and that 16 Defendants universities have refused to identify a custodian in the Development Office.

In our portion of the December 2 JSR, we explained in detail why both offices are essential custodians, and why the Admissions Office is not a substitute. In addition to their individual meet-and-confers and correspondence with individual Defendants, Plaintiffs explained their justification in Global meet-and-confers with all Defendants on November 11, 16, 18, and 28. Further, I expressly outlined four specific scenarios in my November 23 email to all Defendants that was later quoted at length in the December 2 JSR (the "Illustrative Four Scenarios"). Plaintiffs then reiterated the Illustrative Four Scenarios in 10 additional emails copied to all Defendants between December 13 and December 20.

Northwestern has offered a written response to try to address Plaintiffs' Illustrative Four Scenarios. Northwestern did so on November 28, with the claim that the scenarios were merely "hypothetical" and "well beyond what is alleged in the complaint," and concluding with the oft-repeated theory that any relevant communications would certainly be contained within the productions from the admissions office. In Northwestern's case, in particular, it is a near certainty that there were oral communications between the President's office and Admissions Office about donations and applications, which is underscored by specific allegations about President Schapiro in the Amended Complaint (Paras. 178-89) engaging in exactly those types of oral communications to Admissions. And in at least six emails copied to all Defendants between December 14 and December 16, Plaintiffs repeated the Four Illustrative Scenarios and referred Defendants to Paragraph 177 of the Amended Complaint, which makes clear that the communications between the President's or Development offices are often not in writing, and therefore the communications between the Development Office and the Donor, the President's Office and the Donor, and between the two offices, are essential— if the Defendants intend to comply with the direction from the Court on October 26. These are not merely hypothetical or speculative scenarios, as is even further demonstrated by Chancellor Gee's colorful admission about "truth serum" in Paragraph 183 of the Amended Complaint.

With regard to the two Defendants who claim that their President's or Development offices (or both) have *never* influenced admissions decisions (*i.e.*, Caltech and MIT)—notwithstanding paragraphs 177 and 183 of the Amended Complaint – Plaintiffs have not received an affidavit from either university to that effect. Even if we had such an affidavit, Plaintiffs would have the right to take discovery to test the veracity of these claims. If either university is correct that one or both offices never engaged in recommendations to the Admissions office on behalf of donors, then the discovery Plaintiffs seek would not be burdensome; it would turn up no documents. However, each university made decisions to join the 568 President's Group—and Caltech did so as recently as 2019—so it is highly likely that substantial documentation concerning the reasons for joining, the goals of joining, the terms of joining, communications to trustees or other university officials about joining, etc., would be in the President's office. (In this regard, Caltech and MIT are the only Defendants that have a colorable claim that a meet-and-confer is needed, because the custodian issue in the Development Office is in some respect not entirely ripe. We would be happy to address those two universities' issues in meet and confers at a mutually convenient time before January 4.)

Plaintiffs have repeatedly explained how Defendants' position violates Judge Kennelly's clear instructions at the October 26, 2022, hearing:

**So the whole case -- maybe not the whole case, but a significant part of the case is exactly this, the contention that admissions are tied to donations, or at least that's a significant part of the case.** And so . . .**the kind of thing I just said is not going to happen**, that basically says the plaintiffs can't get that, therefore, the case is over, then **we have to come up with a way of doing that**.

Oct. 26, 2022 Hr'g Tr. 36:24-37:6 (emphasis added). Judge Kennelly also made it clear that Plaintiffs are entitled to discovery "which would allow somebody to say, okay, **this is a donation record that relates to this student over here and so we can determine whether that had any effect on whether that person got admitted or not**." *Id*. 36:7-14 (emphasis added).

**Since you represented to the Court that this first issue is not ripe for decision, kindly explain in a written response to this email by January 4 why you think it is not.**

### Relevant Period

The second issue that is ripe for decision is the relevant time period for identifying custodians and non-custodial document sources. With respect to structured data, we understand there is no pending issue: we reached agreement on a 1998 start date, as represented on p. 6 of the December 2 JSR. As to non-structured data, Defendants "drew a line in the sand" at our November 30 meet-and-confer, and refuse to identify custodians or documents before 2003. **If any university has agreed to identify custodians or documents before 2003 with respect to non-structured data, kindly identify that university in a written response to this email by January 4.** Again, we have explained our position at pp. 7-8 of the December 2 JSR and elsewhere, so we will not repeat ourselves here. **Since you represented to the Court that this second issue is not ripe for decision, kindly explain in a written response to this email by January 4 why you think it is not.**

### Alleged Withdrawals

The third issue that is ripe for decision is the identification of custodians at the 5 universities (Brown, Chicago, Emory, Penn and Vanderbilt) who allege withdrawal from the 568 Cartel. All of them refuse to identify custodians or to produce documents for periods after their so-called withdrawal. **If any of these 5 Defendants has agreed to identify custodians or to produce documents for later periods, kindly identify that university in response to this email by January 4.**

We have explained at pp. 9-14 of the JSR and elsewhere why the so-called withdrawals were ineffective as a matter of law to constitute withdrawal from the price-fixing conspiracy. The December 2 JSR analyzes Chicago's and Penn's so-called withdrawal letters. Because they fail to disavow or repudiate the conspiracy and the aims of the conspiracy, and indeed overtly praise its objectives and wish it success in the future each of those letters provided dispositive proof that Chicago and Penn remain in the conspiracy. As for Brown and Emory, the alleged "withdrawal" letters each produced on December 16 echo the same glowing support as Chicago and Penn for the conspiracy and its goals, while failing to repudiate or disavow the Cartel and its goals in any way, and constitute the same dispositive proof. Similarly, Vanderbilt has not brought any facts to our attention to show that Vanderbilt disavowed or repudiated the conspiracy and its goals.

**Since you represented to the Court that this third issue is not ripe for decision, kindly explain in a written response to this email by January 4 why you think it is not.**

Unless Defendants modify their positions on all three of these three critical issues, or provide compelling explanations

that have not been provided for now more than a month, we intend to alert the Court in our January 13, 2023 submission that they remain ripe for decision (as we advised the Court in the December 2 JSR), and that Defendants' representation to the contrary on December 21 was unfounded. In view of the Court's statement about the discovery schedule, we believe Defendants are attempting to thwart and prejudice Plaintiffs' ability and right to prove our case in just the manner the Court understood and stated on the October 26 record.

Thank you.

Very truly yours,

Robert D. Gilbert
Managing Partner
Gilbert Litigators & Counselors
11 Broadway, Suite 615
New York, NY 10004
rgilbert@gilbertlitigators.com
646-448-5269 work
203-645-0055 cell
www.gilbertlitigators.com

_____

This email and any files transmitted with it are intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. If you are not the named addressee you should not disseminate, distribute or copy this e-mail.

Mayer Brown is a global services provider comprising an association of legal practices that are separate entities, including Mayer Brown LLP (Illinois, USA), Mayer Brown International LLP (England), Mayer Brown (a Hong Kong partnership) and Tauil & Chequer Advogados (a Brazilian partnership).

Information about how we handle personal information and our use of relationship insight tools in conjunction with email is available in our Privacy Notice.

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you

have received this communication in error, please notify us immediately by e-mail, and delete the original message.



Sarah Schuster <sschuster@gilbertlitigators.com>

## The President's Office and Development Office Are Custodians of Documents

**Robert Gilbert** <rgilbert@gilbertlitigators.com>　　　　　　　　　　　Wed, Nov 23, 2022 at 5:34 PM
To: "Kirkpatrick, Sarah" <SKirkpatrick@wc.com>, "Carbone_Defs_Service@listserv.whitecase.com" <Carbone_Defs_Service@listserv.whitecase.com>
Cc: 568 Litigation <568_Litigation@rochefreedman.com>

**[EXTERNAL SENDER]**

Dear Sarah et al.,

　　We write to address an issue that has arisen across at least most Defendants regarding custodian and non-custodial source disclosures. Plaintiffs have repeatedly requested that Defendants include their President's Office and Development Office (at certain universities, referred to as the Advancement Office) as sources for custodians of documents, and multiple Defendants have declined to do so. Several individual Defendants have suggested that this issue should be resolved at the general meet and confers concerning discovery, at which you have taken the lead for the Defendants.

　　Judge Kennelly has already recognized the vital importance of donation records to Plaintiffs' case:

> **So the whole case -- maybe not the whole case, but a significant part of the case is exactly this, the contention that admissions are tied to donations, or at least that's a significant part of the case.** And so . . . the kind of thing I just said is not going to happen, that basically says the plaintiffs can't get that, therefore, the case is over, then **we have to come up with a way of doing that**.

Oct. 26, 2022 Hr'g Tr. 36:24-37:6 (emphasis added). Judge Kennelly also made it clear that Plaintiffs are entitled to discovery "which would allow somebody to say, okay, **this is a donation record that relates to this student over here and so we can determine whether that had any effect on whether that person got admitted or not**." *Id*. 36:7-14 (emphasis added).

The essential function of a Development Office is to solicit, communicate about and keep documents concerning the very donations that Judge Kennelly addressed. For Defendants to say they will not identify and produce custodial sources of documents from the Development Office is plainly inconsistent with the Court's guidance. Similarly, Defendants have taken at least a majority position with respect to the President's Office that it is not an appropriate custodial source for donations. This position disregards, for example, paragraph 183 in the Amended Complaint which states: "A past President of Vanderbilt, E. Gordon Gee, stated in 2019 that any president under 'truth serum' would concede that donor connections make a difference in admissions." These Defendants' position also ignores the many instances in the public record in which Defendant presidents have in effect gushed about their fundraising success with large donations. Defendants' rationale for these positions, as we understand it, is that the relevance of any such documents is nonexistent until it affects an Admissions decision, and thus must

necessarily be contained within the productions of the existing pool of Admissions custodians and noncustodial sources identified by each Defendant.

Plaintiffs have repeatedly explained in numerous meet-and-confers with individual Defendants, and in a general meet-and-confer with all Defendants, that Defendants' rationale has no merit. It is also a barrier to the very discovery that Judge Kennelly has made clear is relevant and should be produced. Plaintiffs have repeatedly provided multiple examples of highly relevant documents in the Development Office and the President's Office that would not be available from Admissions, including the following:

> 1. Defendants' position assumes the existence of some written evidence, such as an email from the Development office to the director of Admissions saying that "Applicant X's uncle just donated $500k, so please admit X." These may exist, and Plaintiffs would naturally want to see them, but this assumption ignores every scenario in which Development had an oral communication with Admissions, and the real proof is in the documented communications between the Development Office and the Donor or between the Development Office and the President's Office.
>
> 2. A written communication between the President's Office or Development Office and Admissions could be as simple as, "Please admit X." In such a situation, there would very likely be preceding communications within and from those two offices (to each other and/or the Donor), and received by those offices that would not be communicated to Admissions. Plaintiffs see these communications as the potential smoking guns; a one-sentence email to Admissions is not a substitute. The communications from, to and among the Donor and the Development/President's office before anything is communicated to Admissions are far more informational, probative and relevant than, "Please admit X."
>
> 3. Internal deliberations in the President's Office or Development Office in which a donation was deemed insufficiently large to merit intervention with Admissions, or multiple donations were deemed insufficiently large to warrant such intervention, and thus by definition no record would exist with Admissions, but the determinations of insufficiency would be additional "smoking guns" to support Plaintiffs case.
>
> 4. Internal score cards, not shared with Admissions, that note how many candidates the Development Office recommended to the Admissions office in an admissions cycle or other period of time, and how many were admitted.

Contrary to Judge Kennelly's instructions, the attempts by at least a majority of Defendants to exclude these offices as custodial and non-custodial sources of documents deprive Plaintiffs of an opportunity to establish a link between donations and admissions, and thereby make our case. In addition, as referenced above, multiple Defendants have stated in individual meet-and-confers that these two issues must be resolved by Plaintiffs with the entire group of Defendants. In light of the December 2 deadline for the Parties to inform the Court of any issues with the Parties' custodial and non-custodial source disclosures, kindly advise us in the general meet-and-confer on November 28 whether all Defendants will produce both custodians and non-custodial sources of documents from the President's Office and Development Office at every Defendant university, or whether this issue is ripe for intervention by the Court. Thank you.

Best,

Bob

Robert D. Gilbert
Managing Partner
Gilbert Litigators & Counselors
11 Broadway, Suite 615
New York, NY 10004
rgilbert@gilbertlitigators.com

646-448-5269 work
203-645-0055 cell
www.gilbertlitigators.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.



Sarah Schuster <sschuster@gilbertlitigators.com>

## Georgetown: Admissions Scoring and Changes to Definitions

**Robert Gilbert** <rgilbert@gilbertlitigators.com>  Fri, Dec 30, 2022 at 5:15 PM
To: "Fenske, Daniel T." <DFenske@mayerbrown.com>, "Miller, Britt M." <BMiller@mayerbrown.com>, "Stride, Megan E." <MStride@mayerbrown.com>
Cc: "Carbone_Defs_Service@listserv.whitecase.com" <Carbone_Defs_Service@listserv.whitecase.com>, 568 Litigation <568_Litigation@fnf.law>

**[EXTERNAL SENDER]**

Dear Daniel, Britt, and Megan,

Thank you for your December 29 letter outlining issues you wish to discuss on our scheduled January 3 meet-and-confer. We write to address several issues Plaintiffs would like to discuss as well.

In addition to your continued refusal to identify custodians in Georgetown's Development Office, which is a topic already presented to the Court in the December 2, 2022 Joint Status Report (Doc. 255), Georgetown has further refused to provide the Admissions scoring data sought by Plaintiffs, and has taken other steps designed to shield proper and complete discovery by unilaterally redefining terms that Plaintiffs explicitly defined in their Second Set of Requests for Production. These positions are prejudicial to Plaintiffs' ability to prove their case, and directly at odds with Judge Kennelly's clear rulings in rejecting Defendants' Motions to Dismiss and on October 26, 2022.

**Admissions Scoring**

Based on your responses and objections, it is Plaintiffs' understanding that you (and twelve additional Defendants) have not agreed to provide the complete admissions scoring data Plaintiffs seek in Plaintiffs' Second Set of Requests for Production, Request No. 3, which clearly states:

> Request for Production No. 3: For all Admitted Applicants, Documents reflecting for each Academic Year the scores assigned to each factor disclosed in response to Request No. 2 and the weight, if any, applied to that factor.

Plaintiffs seek this information to prove their allegation that donations influenced admissions decisions. This is an important way to prove that, but for the donation, the applicant would not have been admitted to the university. Absent this data, Plaintiffs' plausible claims are far more difficult to prove (to say the least), as you must surely know, and Plaintiffs would be precluded from testing Defendants' protestations of compliance with the requirements of the Section 568 exemption.

**Definitions**

We also note that Georgetown and 15 other Defendants have changed the definitions of "Donor-related Admitted Applicant" and "Legacy Admission" contained in Plaintiffs' second set of Requests for Production, and did so without prior discussion with Plaintiffs that you intended to do so. Plaintiffs' original definitions read clearly and concisely as follows:

> *1. "Donor-related Admitted Applicant" is an Admitted Applicant whose family, or someone known to the Admissions Office as a friend of the Admitted Applicant, made Donation(s) to You cumulatively valued at $50,000 or more during the five year period prior to the admission of the Admitted Applicant.*
>
> *2. "Legacy Admission" means a policy or practice, whether formal or informal, in which You grant preferences to relatives or relations of alumni or undergraduate or graduate programs.*

*"Donor-related Admitted Applicant"*

In response to Plaintiffs' definition of "Donor-related Admitted Applicant," you promulgated a new definition with new and different qualifications:

> In responding to the Requests, Georgetown will construe "Donor-related Admitted Applicant" to mean an applicant who has been admitted to Georgetown's undergraduate program who Georgetown's Office of Undergraduate Admissions has *actual knowledge* is someone whose *immediate family* has made donations to Georgetown cumulatively valued at $50,000 or more during the five-year period immediately preceding the applicant's admission.

(emphasis added). Georgetown is attempting to rewrite Plaintiffs' requests by inserting an *actual knowledge requirement for the Admissions Office*, and an additional burden of proof on the Plaintiffs concerning the scienter of a particular office at Georgetown, apparently in reliance on your meritless contention that all relevant donor-related communications would be found in the Admissions documents. Georgetown's insertion of a knowledge requirement here is prejudicial to plaintiffs. If there were a $50,000+ contribution in aggregate, then the University surely already has actual knowledge about it, and proving additional actual knowledge by a particular office should not be imposed.

Indeed, Defendants are seeking to impose a scienter requirement with multiple components: the Admissions office must know that 1) the fact that Georgetown received a donation; 2) the identity of the donor; 3) the relationship between the donor and an applicant; 4) the amount of the donation exceeds $50,000; and 5) the donation or donations were received during the 5-year period previously preceding the admission. Under such stringent requirements, if the President of the University had engaged in negotiations for months to bring in a multimillion-dollar donation in exchange for an applicant's admission, but sent only a short note to Admissions saying "please admit X," Admissions could simply deny knowledge, as none of these 5 data points Defendants attempt to require were ever communicated from the President.

Further, as Plaintiffs have patiently explained time and again to *all* Defendants (*see*, *e.g.*, December 2, 2022 Joint Status Report (Doc. No. 255); Robert Gilbert November 23 email to all defendants with Four Illustrative Scenarios; and in each of 10 emails from Plaintiffs' counsel copied to all Defendants between December 13 and December 20, 2022), there are many scenarios in which Admissions would likely have been told by the President's or Development office to please admit X applicant because their family has been a donor to the university, or Admissions simply received a message from those offices directing the admission of a list of applicants including applicant X. In this scenario, Georgetown's multi-pronged actual knowledge requirement for the Admissions office would permit Georgetown to conceal documents related to any Donor-related Admitted Applicants if the exact amount, timing, and sources of all donations were not clearly communicated to Admissions along with the request or directive to admit the applicant.

Georgetown also attempts to disregard Plaintiffs' intentionally inclusive language describing an applicant's "*family, or someone known to the Admissions Office as a friend of the Admitted Applicant.*" Instead, Georgetown appears simply to ignore the possibility of donations *from anyone other than immediate family members of admitted applicants* (*i.e.*, exclude grandchildren, nieces, nephews, proteges, etc.).

### "Legacy Admission"

Similarly, despite Plaintiffs' clear intent to include both formal *and* informal policies or practices with regard to Legacy Admissions, Georgetown (and 15 other Defendants) unilaterally rewrote this definition as well to omit any reference to informal policies or practices:

> In responding to the requests, Georgetown will construe "Legacy Admission" to mean a *formal* policy or practice by which Georgetown grants preferences in the undergraduate admissions process to the *children* of Georgetown alumni *who have made donations to Georgetown*.

(emphasis added). The exclusion of informal policies or procedures in this definition is plainly prejudicial to Plaintiffs' ability to make their case. As one example of an informal policy that has a devastating admissions impact in violation of the requirements of Section 568, it may well be that in the case of ties among admissions decision-makers, the Legacy of a donor with a solid history of giving even less than $50,000 in the previous five years wins via an informal tie-breaker. To be clear: regardless whether written or unwritten, public or internal, formal or informal, any preferential treatment afforded to relatives or relations of Alumni in any form, even used as an informal tiebreaker, is intentionally encompassed in Plaintiffs' Definition of "Legacy Admission." Without waiting to hear how Defendants propose to circumscribe what qualifies as a "formal" policy or procedure and thus further limit the information and documents available to Plaintiffs, Plaintiffs deem Georgetown's pointed omission of informal policies or procedures flatly unacceptable.

Georgetown has also rewritten this definition to limit "Legacy Admissions" to only the *children* of Georgetown alumni. To say that a grandchild or other relative of an alumnus could not possibly qualify as a "Legacy Admission" strikes us as, quite simply, absurd. This targeted and unilateral limitation of Plaintiffs' definition is, again, flatly unacceptable.

Moreover, Georgetown has gone so far in rewriting Plaintiffs' definition as to add a new requirement that the applicant be a child of alumni *who have donated to the university*. This interpretation misses the point of the RFP relevant to this definition, which seeks documents and information "Concerning Your study, analysis, or discussion regarding any relationship between Your admission of Legacy Admissions and Your receipt of current or future Donations." Whether the alumnus to whom a Legacy Admission is related has donated in the past has no bearing on this inquiry, and instead operates only to exclude potentially relevant and discoverable information.

**Georgetown's Positions are Incompatible with the Court's Rulings and Guidance**

As you know, the Court made quite clear on October 26, 2022 that it would protect Plaintiffs' right to prove that donations by wealthy families influenced admissions decisions, in violation of Section 568's requirement that *all* applicants be admitted "without regard to the financial circumstances of the student involved or the student's family." Indeed, the Court even emphasized the importance of this specific discovery, and its expectation that Defendants make such evidence available to Plaintiffs:

> So first of all -- and I don't think this is the case, but I just want to have it out there just so I've said it and I'll be done with it -- I mean, this is not going to be a situation where the case comes to a halt and gets adjudicated because the discovery can't get produced. So I just want to make that clear.
>
> …
>
> **So the whole case -- maybe not the whole case, but a significant part of the case is exactly this, the contention that admissions are tied to donations, or at least that's a significant part of the case.** And so unless there's going to be an opinion that basically says, well, **the kind of thing I just said is not going to happen**, that basically says the plaintiffs can't get that, therefore, the case is over, then **we have to come up with a way of doing that.**

Oct. 26, 2022 Tr. 23:12-17; 36:23-37:6 (emphasis added). And when the Court spoke, it emphasized that its words are its rulings. *Id.* 34:16-17 ("**So that's a ruling. That's the judge talking. Those are called rulings.**") (emphasis added).

The Joint Status Report filed on December 2, 2022 (Doc. 255) has already brought to the Court's attention Georgetown's refusal to identify custodians in its Development Office, and the prejudicial impact of that refusal on Plaintiffs' ability to prove their case.[1]

Plaintiffs now further object to Georgetown's refusal to provide admissions scoring data, and its attempts to change the definitions in Plaintiffs' discovery requests. Individually, these positions cripple Plaintiffs' ability to establish certain elements of their allegations. Together, and especially in conjunction with Georgetown's refusal to identify custodians in its Development Office, Georgetown's positions amount to a deliberate attempt to shield from discovery the exact evidence Plaintiffs need to make their case. Or, put in other words, Georgetown is doing *precisely* what the Court expressly proscribed.

Rather than heed the Court's clear rulings and guidance, Georgetown has instead converted the Court's guidance into a roadmap to systematically prevent the very discovery Plaintiffs need most. Unless your client reverses its position on these critical issues, we will be forced to bring to the Court's attention these new efforts flout the Court's rulings and prejudice Plaintiffs in the Joint Status Report due January 13, 2023.

We will expect a response from you to this letter by the close of business on January 4, 2023, so that Plaintiffs and Defendants have sufficient time to outline their respective positions in the January 13 Joint Status Report. In the

meantime, we look forward to discussing these matters on our call next Tuesday, January 3.

------------

[1] To the extent any Defendant or Georgetown has proposed to produce only a list of donor-related applicants to the exclusion of all other communications with or regarding donors, Plaintiffs have already addressed the insufficiency of this proposal. Such underlying communications are relevant and important to Defendants' motives and practices, and may also lead to the discovery of additional admissible evidence. A list of donor-related applicants is necessary and must be produced in any case, but is plainly insufficient because a mere list is opaque as to the motivations and factual context underlying the list.

Best,

Bob

Robert D. Gilbert
Managing Partner
Gilbert Litigators & Counselors
11 Broadway, Suite 615
New York, NY 10004
rgilbert@gilbertlitigators.com
646-448-5269 work

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.