# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| ANDREW CORZO, SIA HENRY, ALEXANDER LEO-GUERRA, MICHAEL MAERLENDER, BRANDON PIYEVSKY, BENJAMIN SHUMATE, BRITTANY TATIANA WEAVER, and CAMERON WILLIAMS, individually and on behalf of all others similarly situated, | **Case No. 1:22-cv-00125** |
| Plaintiffs, | |
| v. | **Hon. Matthew F. Kennelly** |
| BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, THE JOHNS HOPKINS UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY, | |
| Defendants. | |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO COMPEL DISCOVERY

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION ....................................................................................................... 1

ARGUMENT ............................................................................................................. 2

I.    THE INTERROGATORIES AT ISSUE SEEK IRRELEVANT AND
DISPROPORTIONATE DISCOVERY ............................................................. 2

    A.    Interrogatory No. 1 (Applications for Admission and Financial Aid) .................. 2

    B.    Interrogatory No. 2 (Sources of Financial Aid) ..................................... 3

    C.    Interrogatory No. 3 (Relevant Market) ................................................. 7

II.    THE REQUESTS FOR PRODUCTION AT ISSUE SEEK IRRELEVANT AND
DISPROPORTIONATE DISCOVERY ............................................................. 8

    A.    Request No. 1 (Reasons Plaintiff Applied to an Institution); Request No. 7
(College Comparisons and Rankings); and Request No. 23
(Market Definition) ............................................................................ 8

    B.    Request No. 2 (Applications for Admission to Defendant Universities) .............. 10

    C.    Request No. 3 (Applications for Financial Aid and Supporting Documents) ...... 10

    D.    Request No. 5 (Third-Party Scholarships and Financial Aid) ........................... 11

    E.    Request No. 6 (Financial Aid Declined) ................................................. 11

    F.    Request No. 11 (Plaintiffs' Involvement in Litigation) ................................. 12

    G.    Request No. 12 (Engagement Letters, Fee Arrangements) .............................. 12

    H.    Request No. 18 (Loan Modification); Request No. 26 (Loan Payment History) . 13

    I.    Request No. 19 (Satisfaction with Institution and Value of Education) .............. 13

    J.    Request No. 20 (Social Media Usernames) ............................................. 14

    K.    Request No. 24 (Tuition and Other Payments) ......................................... 15

    L.    Request No. 25 (Loan Agreements) ...................................................... 15

CONCLUSION ......................................................................................................... 16

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Apple Inc. v. Pepper,*
   139 S. Ct. 1514 (2019) .......................................................................... 5

*Apple iPod iTunes Antitrust Litig.,*
   2014 WL 4899288 (N.D. Cal. Sept. 26, 2014) ......................................... 9

*BASF Catalysts LLC v. Aristo, Inc.,*
   2009 WL 187808 (N.D. Ind. Jan. 23, 2009) ............................................. 7

*Bonkuri v. Grand Caribbean Cruises, Inc.,*
   2021 WL 7082829 (S.D. Fla. Feb. 12, 2021) ......................................... 12

*Brenneman v. Knight,*
   297 F. App'x 534 (7th Cir. 2008) ........................................................... 4

*California v. Sutter Health Sys.,*
   84 F. Supp. 2d 1057 (N.D. Cal.) ........................................................... 13

*Depuy Inc. v. Zimmer Holdings, Inc.,*
   343 F. Supp. 2d 575 (N.D. Ill. 2004) ...................................................... 9

*E.E.O.C. v. Harvey L. Walner & Assocs.,*
   91 F.3d 963 (7th Cir.1996) ..................................................................... 4

*Eberly v. Harnack,*
   2022 WL 1773771 (N.D. Ill. June 1, 2022) ............................................. 2

*ED&F Cap. Mkts. Ltd. v. JVMC Holdings Corp.,*
   2020 WL 3469128 (N.D. Ill. June 25, 2020) ........................................... 3

*Fiore v. Univ. of Tampa,*
   568 F. Supp. 3d 350 (S.D.N.Y. 2021) ..................................................... 4

*Gerlinger v. Amazon.com Inc., Borders Grp., Inc.,*
   526 F.3d 1253 (9th Cir. 2008) ................................................................ 5

*Go-Tane Serv. Stations, Inc. v. Ashland Oil, Inc.,*
   508 F. Supp. 200, 205 (N.D. Ill. 1981) ................................................... 6

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.,*
   392 U.S. 481 (1968) ............................................................................... 5

*Hansen v. Alamo Mobile X-Ray & EKG Servs., Inc.,*
   2015 WL 12866215 (W.D. Tex. Oct. 7, 2015) ........................................ 4

*In re Airline Ticket Comm'n Antitrust Litig.*,
918 F. Supp. 283 (D. Minn. 1996) ........................................................ 6

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
581 F. Supp. 1029 (N.D. Ill. 2022) ........................................................ 4

*In re Hypodermic Prod. Direct Purchaser Antitrust Litig.*,
2006 WL 6907107 (D.N.J. Sept. 7, 2006) ............................................ 5

*In re Neurontin Antitrust Litig.*,
2013 WL 4042460 (D.N.J. Aug. 8, 2013) .............................................. 9

*In re Skelaxin (Metaxalone) Antitrust Litig.*,
292 F.R.D. 544 (E.D. Tenn. 2013) ........................................................ 6

*In re TFTCD (Flat Panel) Antitrust Litig.*,
2012 WL 6000154 (N.D. Cal. 2012) ...................................................... 6

*J.B.D.L. Corp. v. Wyeth-Ayerst Lab'ys Inc.*,
225 F.R.D. 208 (S.D. Ohio 2003) .......................................................... 5

*Med. Assur. Co. v. Weinberger*,
2011 WL 2471898 (N.D. Ind. June 20, 2011) ....................................... 7

*Minter v. Wells Fargo Bank, N.A.*,
2010 WL 11549367 (D. Md. Aug. 13, 2010) ........................................ 12

*Ohio v. Am. Express Co.*,
136 S. Ct. 2274 (2018) ........................................................................... 8

*Optronic Tech., Inc. v. Ningbo Sunny Elec. Co.*,
20 F.4th 466 (9th Cir. 2021) .................................................................. 9

*Perez v. Lebron*,
2021 WL 3471170 (E.D. Pa. Aug. 6, 2021) ......................................... 14

*Phipps v. Wal-Mart Stores Inc.*,
2018 WL 11415280 (M.D. Tenn. Mar. 9, 2018) .................................... 7

*Prolow v. Aetna Life Ins. Co.*,
2022 WL 4080743 (S.D. Fla. Sept. 6, 2022) ....................................... 12

*Reifert v. S. Cent. Wis. MLS Corp.*,
450 F. 3d. 312 (7th Cir. 2006) ............................................................... 9

*Republic Tobacco Co. v. N. Atl. Trad. Co.*,
381 F.3d 717 (7th Cir. 2004) ................................................................. 9

*Sadowski v. Med1online, LLC*,
2008 WL 11343444 (N.D. Ill. Oct. 7, 2008) .......................................... 3

*Shields v. Federation Internationale de Natation*,
  2023 WL 121985 (N.D. Cal. Jan. 6, 2023) ............................................................. 9

*State of California v. Sutter Health*,
  217 F.3d 846 (9th Cir. 2000) ................................................................................ 14

*Todd by Todd v. Merrell Dow Pharms., Inc.*,
  942 F.2d 1173 (7th Cir. 1991) ............................................................................... 4

*United States ex rel. Lusby v. Rolls-Royce Corp.*,
  2011 WL 4387293 (S.D. Ind. Sept. 20, 2011) ......................................................... 7

*United States v. Teva Pharms. USA, Inc.*,
  2022 WL 7578988 (E.D. Pa. Oct. 13, 2022) ............................................................ 9

*Viamedia, Inc. v. Comcast Corp.*,
  335 F. Supp. 3d 1036 (N.D. Ill. 2018) ................................................................... 4

*Watkins v. Hireright, Inc.*,
  2014 WL 11191092 (S.D. Cal. Feb. 21, 2014) ........................................................ 3

*Wofford v. Celani*,
  2012 WL 2847549 (N.D. Ill. July 11, 2012) ........................................................... 2

**Other Authorities**

34 C.F.R. § 673.5(a)-(c) ............................................................................................ 6

Fed. R. Civ. P. 26(b)(2)(C) ....................................................................................... 2

ABA Section of Antitrust Law, *Jury Instructions* (2022) ......................................... 6

Josh Moody, *How To Identify Safety Schools in College Admissions*, U.S. News & World
  Report, Dec. 23, 2020 https://www.usnews.com/education/best-colleges/articles/how-to-
  identify-safety-schools-in-college-admissions ...................................................... 10

W. Rubinstein *et al.*, 3 *Newberg on Class Actions* § 7:8 (4th ed. 2010) ..................... 12

Plaintiffs respectfully submit this Memorandum of Law in Opposition to Defendants' Motion to Compel Discovery.

## **INTRODUCTION**

In antitrust cases like this one, the federal courts routinely and correctly preclude the type of discovery that Defendants primarily seek through their motion—namely, discovery into how consumers paid for the product whose prices the defendants artificially inflated through their misconduct. With no serious defense to liability in this case, Defendants seek to burden Plaintiffs with discovery that ostensibly concerns damages. It does not.

Plaintiffs allege that Defendants have conspired to fix prices for nearly two decades, which misconduct has artificially inflated the net price of tuition at these institutions. The potentially applicable antitrust exemption (the "568 Exemption") does not protect Defendants—not only because six Defendants have announced they are *dropping* the defense, but also because Defendants have failed to engage in "need-blind" admissions practices. Given these facts, and such evidence as various Defendants' public admissions that they engage in need-aware admissions and that the 568 Cartel's goal was to "reduce variance" in pricing and to charge the "maximum" amount that families can afford to pay—which is classically illegal conduct under the antitrust laws—this case is largely about damages. This is the backdrop for Defendants' efforts to burden Plaintiffs through the proposed discovery of irrelevant matters.

On the issue of who helped Plaintiffs pay for college, for example, Defendants argue that whether a student suffered injury depends on whether anyone helped her pay tuition. This is plainly wrong. In a horizontal price-fixing case, it is irrelevant whether the purchasers paid using their own money, borrowed money, or gifted money. This is because as a direct purchaser, the consumer suffers harm at the moment of purchase. This is why, to take comparably complex price-fixing cases, it was irrelevant whether purchasers of cathode ray tubes, tuna fish, or broiler chickens had

somehow financed their purchases. Indeed, under the standard that Defendants propose, the calculation of damages in *any* antitrust class action would be hopelessly complex, and given the supposedly individualized issues of financing and harm—which is the spectre that Defendants seek to raise here—class certification would *never* be possible. Defendants are wrong: they are not in any different a position than the defendants in other classic price-fixing cases.

## ARGUMENT

Discovery must be both relevant and proportionate. Fed. R. Civ. P. 26(b)(2)(C). "As the 2015 amendments to Rule 26 emphasize, the parties and the court have a collective responsibility to consider the proportionality of all discovery and consider it in resolving discovery disputes." *Eberly v. Harnack*, 2022 WL 1773771, at *1 (N.D. Ill. June 1, 2022) (cleaned up). It is the movant's burden to establish "with specificity, that the requested documents are relevant." *Id*. at *2. "Information sought is irrelevant under Rule 26(b)(1) [if] it could not lead to admissible evidence under Rule 401." *Wofford v. Celani*, 2012 WL 2847549, at *4 (N.D. Ill. July 11, 2012).

### I. THE INTERROGATORIES AT ISSUE SEEK IRRELEVANT AND DISPROPORTIONATE DISCOVERY

#### A. Interrogatory No. 1 (Applications for Admission and Financial Aid)

Defendants seek information about Plaintiffs' applications for admissions and financial aid from both Defendants and third-party schools. Defendants did not articulate before their motion how this information is relevant—or that they did not have the applications submitted to them—and they struggle to do so now. They argue (at 3-4) they want to compare the financial-aid packages that different schools offered, but this ignores that the comparison of Defendants' prices with other schools will depend on aggregate data and econometric analysis, and that individual instances of some variance in financial-aid packages even among Defendants is not evidence that they failed in their goal to *reduce* variance. Defendants also claim this information is relevant to whether Plaintiffs have "adequately alleged" a relevant market, but the adequacy of Plaintiffs'

allegations is no longer at issue, and isolated application data from a few individuals is not relevant to the kind of sophisticated market analyses that antitrust cases demand.

Defendants are sophisticated organizations that employ record-keeping departments with access to the information sought. Indeed, to try fully to comply with Defendants' requested discovery, Plaintiffs *would contact the Defendants' own financial aid offices* or request online access to defunct student accounts on Defendants' *own* servers. *See, e.g.*, *Sadowski v. Med1online, LLC*, 2008 WL 11343444, at *2 (N.D. Ill. Oct. 7, 2008) (denying motion to compel where "information is available through an alternative, less burdensome source—[movant's] own records").[1] In addition, Plaintiffs have *already agreed* to provide the requested information they have for third-party institutions and, to the extent Plaintiffs do not have such information, *have already agreed to ask* such other institutions to provide it. Plaintiffs have thus taken on more than a proportionate burden for this category of information.

### B.     Interrogatory No. 2 (Sources of Financial Aid)

Defendants seek information about any sources that helped to fund Plaintiff's undergraduate education. This information is irrelevant, and discovery about it is disproportionate.

*First*, to the extent that Defendants seek this information in the hopes of showing that a Plaintiff misstated or omitted relevant information in seeking financial aid, they lack the requisite "concrete basis" for asserting that any Plaintiff engaged in any such conduct. *Watkins v. Hireright, Inc.*, 2014 WL 11191092, at *5 (S.D. Cal. Feb. 21, 2014). There is no reason to believe, and no evidence, that any Plaintiff lied in seeking financial aid. Defendants' mere "hope of impeaching

---

[1] Defendants cannot deny that they have access to this information, which leads them to claim under the precedent that their possession of the information is immaterial. *See ED&F Cap. Mkts. Ltd. v. JVMC Holdings Corp.*, 2020 WL 3469128 (N.D. Ill. June 25, 2020). In that case, the court required a responding party to answer interrogatories rather than simply point to the 31,000 pages in the record. *See id.* at *6 ("The burden for identifying the parts of that [31,000-page document] production that contain responsive information falls on plaintiffs as the answering party"). This is far different from pointing Defendants to their *own* databases that Plaintiffs would have to query anyway to obtain the information.

the plaintiff's credibility" is insufficient. *Hansen v. Alamo Mobile X-Ray & EKG Servs., Inc.*, 2015 WL 12866215, at *3 (W.D. Tex. Oct. 7, 2015). In short, Defendants' speculation amounts to the kind of fishing expedition that this Circuit has routinely blocked.[2]

*Second*, as to the speculation that anyone misstated or omitted information in a financial aid application, such facts would be irrelevant to injury or damages. The illegal overcharge, under the antitrust laws, is the amount the purchaser paid minus what she would have paid absent the illegal conduct, holding all else constant. *See, e.g.*, *In re Dealer Mgmt. Sys. Antitrust Litig.*, 581 F. Supp. 1029, 1049 (N.D. Ill. 2022) ("'Damages calculations in antitrust cases seek to compare plaintiffs' actual experience in the real world with what the plaintiffs' experience would have been, 'but for' the antitrust violation.'"); *see also Viamedia, Inc. v. Comcast Corp.,* 335 F. Supp. 3d 1036, 1040 (N.D. Ill. 2018) (antitrust plaintiff must establish that the injuries would not have oc-curred "*but for*" the antitrust violation and were "caused by the *unlawful* acts of the defendant"). There is no reason to believe that, absent the 568 Cartel, anyone would have filled out any appli-cation any differently. Where such conduct would have been the same absent the 568 Cartel, then whether the student or parent misstated anything on the aid application is irrelevant to injury.

*Third*, the requested discovery does not bear on whether Plaintiffs are the direct purchasers at issue. They are. Parents and other funding sources do not have Article III standing to assert claims for the overpayments of tuition. *See, e.g.*, *Fiore v. Univ. of Tampa*, 568 F. Supp. 3d 350, 367 (S.D.N.Y. 2021) (explaining that, in Covid-19 tuition cases, whether or not parents are in-volved in the "payment of tuition," where they have "no direct contractual relationship" with the

---

[2] *See E.E.O.C. v. Harvey L. Walner & Assocs.*, 91 F.3d 963, 971-72 (7th Cir.1996); *accord Brenneman v. Knight*, 297 F. App'x 534, 538 (7th Cir. 2008) ("But requiring the staff to conduct a fishing expedition, particularly of the magnitude Brenneman requested, would have imposed too great a burden."); *Todd by Todd v. Merrell Dow Pharms., Inc.*, 942 F.2d 1173, 1178 (7th Cir. 1991) ("Todd's speculation that Merrell Dow must possess unspecified additional information is not sufficient grounds to embark upon a virtually boundless fishing expedition.").

schools, they lack standing). Only the student occupies the position of direct purchaser. *Gerlinger v. Amazon.com Inc., Borders Grp., Inc.*, 526 F.3d 1253, 1256 (9th Cir. 2008) (holding that because party "failed to establish Article III standing, it is neither necessary nor appropriate for us to reach any questions of antitrust standing").

It follows that discovery into collateral sources of funding and financial support is improper. Direct purchasers are entitled to the full amount of the overcharge as damages, regardless of net effect, pass on, or subsequent reimbursement. *In re Hypodermic Prod. Direct Purchaser Antitrust Litig.*, 2006 WL 6907107, at *6 (D.N.J. Sept. 7, 2006) ("For purposes of class certification, direct purchasers that have suffered overcharges have an antitrust injury and would be entitled to recover the full amount of the overcharge they paid; it is irrelevant if they may have also benefitted from the higher prices because their profits were a percentage of their acquisition costs."). Third-party sources of funding are not entitled to anything. *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1521 (2019) ("The bright-line rule of *Illinois Brick*, as articulated in that case and as we reiterated in *UtiliCorp*, means that indirect purchasers who are two or more steps removed from the antitrust violator in a distribution chain may not sue. By contrast, direct purchasers—that is, those who are the immediate buyers from the alleged antitrust violators—may sue.") (cleaned up).

In this case, the student, as direct purchaser, is injured by the full extent of the overcharge regardless of the net effect of the overcharge on the student or whether the student subsequently "passes on" or is otherwise reimbursed in a separate transaction. *See Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 494 (1968) (plaintiff "proved injury and the amount of its damages for the purposes of its treble-damage suit when it proved that [defendant] had overcharged it during the damage period and showed the amount of the overcharge"); *see, e.g., J.B.D.L. Corp. v. Wyeth-Ayerst Lab'ys Inc.*, 225 F.R.D. 208, 216 (S.D. Ohio 2003) (irrelevant whether the plaintiff "passes on" any overcharge); *In re Skelaxin (Metaxalone) Antitrust Litig.*, 292 F.R.D. 544, 553

(E.D. Tenn. 2013) ("Damages in this type of anti-trust litigation are not measured by lost profits; they are measured purely by overcharges"). Investigation into how the cost of tuition was passed on is a "speculative exercise [that] would involve massive discovery, one of the pitfalls which the Court sought to avoid in *Hanover Shoe* and *Illinois Brick*." *Go-Tane Serv. Stations, Inc. v. Ashland Oil, Inc.*, 508 F. Supp. 200, 205 (N.D. Ill. 1981).[3]

*Fourth*, whether parents or third parties made any payments is irrelevant to any mitigation defense, because there is no duty to mitigate for victims of horizontal price-fixing like Plaintiffs and class members here.[4] This conclusion follows logically from *Hanover Shoe* and *Illinois Brick*: the overcharge is complete the moment a direct purchaser pays it.

*Fifth*, Defendants do not need information about individual Plaintiffs' funding sources to assess Plaintiffs' forthcoming statistical analyses about students' overpayments. Defendants cite 34 C.F.R. § 673.5(a)-(c), which relates to the calculation of Federal Perkins Loans and the Federal Supplemental Educational Opportunity Grant ("FSEOG") program. Defendants argue that loans are relevant to their assessment of what Plaintiffs would have received in a "but for" world, because that law requires universities to consider such sources in determining how much financial aid to award. This argument ignores the precepts, shown above, that the measurement of an overcharge under the antitrust laws is the amount the purchaser paid minus what he would have paid

---

[3] In addition, Defendants have records about what checks, credit card payments and transfers they received. Defendants can thus determine the identity of parents and family members that released payment covering the student's account. Accordingly, in addition to the irrelevance of the information requested, Plaintiffs should not be burdened with producing information that Defendants already have.

[4] *See, e.g., In re TFTCD (Flat Panel) Antitrust Litig.*, 2012 WL 6000154, at *3 (N.D. Cal. 2012) ("While an antitrust plaintiff alleging a refusal to deal or vertical price-fixing could reasonably be expected to mitigate damages by finding another supplier, a victim of horizontal price-fixing does not have this option."); *In re Airline Ticket Comm'n Antitrust Litig.*, 918 F. Supp. 283, 286 (D. Minn. 1996) ("In a horizontal price-fixing case, however, mitigation and offset generally do not affect the ultimate measure of damages."); *see generally* ABA Section of Antitrust Law, *Jury Instructions* (2022) (any obligation to mitigate damages "is not applicable in horizontal price fixing cases because victims of horizontal price fixing are not required to mitigate damages").

absent the illegal conduct, *holding all else constant*. If any Plaintiff or class member qualified for Perkins Loans or FSEOG grants, but for some reasons received more federal support than they were entitled to receive, that does *not* affect the level of damages in this case. In other words, for Defendants to be correct, their damages experts would have to take the position that they *cannot determine* if there has been Class-wide injury until they establish the third-party funding that each of the approximately 200,000 students in the proposed Class in fact received. There is no precedent to support this position.

### C. Interrogatory No. 3 (Relevant Market)

Defendants seek information about Plaintiffs' analysis of the relevant market. These requests are premature, and Plaintiffs' analysis is undiscoverable attorney work product.

*First*, as to prematurity, "judicial economy and fairness dictates that parties should not be compelled to prematurely take a position, which would force an artificial narrowing of the issues, instead of an informed paring down." *United States ex rel. Lusby v. Rolls-Royce Corp.*, 2011 WL 4387293, at *2 (S.D. Ind. Sept. 20, 2011) (citation omitted). Accordingly, "the answers to contention interrogatories often are delayed until the end of discovery." *BASF Catalysts LLC v. Aristo, Inc.*, 2009 WL 187808, at *2 (N.D. Ind. Jan. 23, 2009) (citation omitted); *accord Med. Assur. Co. v. Weinberger*, 2011 WL 2471898, at *5 (N.D. Ind. June 20, 2011).

*Second*, as to work product, Plaintiffs' allegations of the relevant market will find support with a rigorous, expert-based market analysis before trial, not from testimony or documents from the Plaintiffs. The allegations are no waiver of work-product protection. *See, e.g.*, *Phipps v. Wal-Mart Stores Inc.*, 2018 WL 11415280, at *3 (M.D. Tenn. Mar. 9, 2018) (the "refined statistical analysis alluded to in the complaint and response to the Motion to Dismiss is protected work product" and that "referencing the analysis in this context does not constitute waiver."). As to Defendants' argument (at 7) that "the requested discovery would help Defendants target additional

discovery and also tailor their own expert work," the same argument could be made regarding almost any protected work product. In addition, Plaintiffs have alleged in detail a market and the facts supporting it—including numerous Defendant admissions, facts arising from the relevance of the *U.S. News & World Report* rankings, and Defendants' participation in the Consortium on Financing Higher Education. *See* Second Amended and Supplemental Complaint ¶¶ 243-56. Defendants know these areas and are well positioned to determine what discovery to seek and what facts their expert should analyze. In sum, it is not credible that Defendants need more information to begin expert work or understand the rough contours of the relevant market. Defendants' only motivation is to prematurely pigeonhole Plaintiffs, which is not a proper purpose.

## II.  THE REQUESTS FOR PRODUCTION AT ISSUE SEEK IRRELEVANT AND DISPROPORTIONATE DISCOVERY

With respect to their Requests for Productions, Defendants now make a host of arguments that either they have never made in any meet-and-confer or they failed to raise with Plaintiffs for months before their motion to compel. Plaintiffs respond below to all of Defendants' arguments, which if raised earlier might have narrowed the parties' disputes.

### A.  Request No. 1 (Reasons Plaintiff Applied to an Institution); Request No. 7 (College Comparisons and Rankings); and Request No. 23 (Market)

Defendants' requests are overbroad and irrelevant to issues in the case. Defendants seek information from these requests about, they say (at 8), "how consumers view different schools and whether the schools are reasonably interchangeable." They contend (also at 8) that this information bears on the relevant market and Defendants are "entitled" to understand the difference between Plaintiffs' alleged market and own application decision.

The requested documents are irrelevant. Plaintiffs allege a *per se* illegal horizontal price-fixing conspiracy, which obviates any carefully refined market definition. *See Ohio v. Am. Express Co.*, 136 S. Ct. 2274, 2285 n.7 (2018); *Republic Tobacco Co. v. N. Atl. Trad. Co.*, 381 F.3d 717,

737 (7th Cir. 2004); *United States v. Teva Pharms. USA, Inc.*, 2022 WL 7578988, at *3 (E.D. Pa. Oct. 13, 2022). In addition, defining the rough contours of a market would involve a determination whether the universities are reasonable economic substitutes for each other. This inquiry is for economic experts who analyze market-wide evidence and undertake econometric analyses of available data relating to the effects of changes in price on overall substitutability. A teenager's subjective views about the relative merits of various universities, which ones are "reaches" and which ones are "safeties," is tertiary at best, compared to Defendants' sophisticated market analyses as horizontal competitors and the work of economists. This is expert work. *See, e.g., Reifert v. S. Cent. Wis. MLS Corp.*, 450 F. 3d. 312 (7th Cir. 2006) ("To demonstrate competition in an antitrust case, the plaintiff must provide an economic analysis of the relevant market."); *see also Optronic Tech., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 482-83 (9th Cir. 2021); *Shields v. Federation Internationale de Natation*, 2023 WL 121985, at *10-11 (N.D. Cal. Jan. 6, 2023); *In re Neurontin Antitrust Litig.*, 2013 WL 4042460, at *5-6 (D.N.J. Aug. 8, 2013); *see also Depuy Inc. v. Zimmer Holdings, Inc.*, 343 F. Supp. 2d 575, 686 (N.D. Ill. 2004).

Plaintiffs offered to produce any responsive documents they authored, considering its arguable but marginal relevance, but withdrew the offer when they saw how burdensome Defendants sought to make the requests. In particular, Plaintiffs sensibly drew the line at producing documents that third parties had authored (such as Barron's College Guide), because Defendants can ask Plaintiffs about such documents at deposition and can access such documents themselves.

In sum, whether and the extent to which any of the Plaintiffs debated the relative merits of various universities in emails is of minimal probative value, if any, and the burden of searching through thousands of personal emails outweighs any marginal relevance. Unlike the Defendant universities, which likely carry out sophisticated, expert market analyses of their markets and peer-group institutions, based on the decisions of tens if not hundreds of thousands of students over

many years, Defendants here seek a tiny amount of anecdotal lay opinion of marginal relevance at best, and certainly disproportionate to the burden of having Plaintiffs conduct an intrusive search.

## B.    Request No. 2 (Applications for Admission to Defendant Universities)

Defendants argue (at 10) that whether Plaintiff applied to multiple schools "is evidence that they are substitutes for one another." This argument is patently unreasonable. It is common that college applicants typically apply to a wide variety of schools, including "safety schools" and "reaches," on the premise that they are *not* equivalent, but rather reflect the student's relative chances of admission.[5] Defendants' argument is equivalent to insisting that when people apply for multiple jobs at once, all of those jobs must be reasonable substitutes for one another—which ignores the typical scenario that the applicant has sensibly concluded that some of the potential jobs are better than others, and that some potential employers may regard the same applicant differently. Defendants further make the new argument (at 1) that these applications are relevant to the statute of limitations because they bear on "what a Plaintiff knew about Defendants' alleged conduct and when she knew it." Plaintiffs do not see how Request No. 2 gets at that question, but do not object to searching for and producing emails related to whether they knew about the activity of the 568 Cartel or Defendants' failure to conduct need-blind admissions.

## C.    Request No. 3 (Applications for Financial Aid and Supporting Documents)

Defendants argue (at 10-11) that the information in any responsive documents "is essential for testing any 'but-for' alternative methodology that Plaintiffs contend Defendants should have used to calculate financial aid awards, as well as the resulting amounts. The documents also could reveal that a Plaintiff was not entitled to financial aid at all – and thus was not injured." These arguments fail for the reasons Plaintiffs set out with respect to Interrogatory No. 2. *See* Part I.B,

---

[5] *See, e.g.*, Josh Moody, *How To Identify Safety Schools in College Admissions*, U.S. NEWS & WORLD REPORT, Dec. 23, 2020 https://www.usnews.com/education/best-colleges/articles/how-to-identify-safety-schools-in-college-admissions ("[A]pplicants should make a list of reach, target and safety schools.").

above. The measurement of an overcharge under the antitrust laws is the amount the purchaser paid minus what he would have paid absent the illegal conduct, *holding all else constant*. In other words, for Defendants to be correct, their damages experts would have to take the position that they *cannot determine* if there has been an overcharge until they know whether and the extent to which each of the approximately 200,000 students in the proposed Class may have misstated information in their applications for financial aid. To state the proposition is to show its absurdity.

### D.    Request No. 5 (Third-Party Scholarships and Financial Aid)

These documents are irrelevant for the reasons Plaintiffs set out with respect to Interrogatory No. 3. *See* Part I.C, above. Consumers commonly fund their purchases of goods and services with third-party funding or financing. College students are no different. There is no suggestion in any precedent that the pervasive use of credit-card debt makes credit statements and account balances fair game for discovery in consumer antitrust cases. Nor is it relevant whether Plaintiffs or class members might have defaulted on or restructured their credit-card debt. Defendants' status as providers of education services does not entitle them to any different treatment. The students, as direct purchasers, are damaged to the full extent of the overcharge, regardless of net effect or pass-on or subsequent reimbursement. *Hypodermic,* 2006 WL 6907107, at *6 ("For purposes of class certification, direct purchasers that have suffered overcharges have an antitrust injury and would be entitled to recover the full amount of the overcharge they paid; it is irrelevant if they may have also benefitted from the higher prices because their profits were a percentage of their acquisition costs."). In addition, as shown, Plaintiffs had no duty to mitigate. *See* note 4, above.

### E.    Request No. 6 (Financial Aid Declined)

The amount and terms of aid that Plaintiffs received and turned down is irrelevant because there is no mitigation defense in horizontal price-fixing cases. *See* note 4, above. Defendants suggest (at 11) that this information also goes to "the competitiveness of the financial aid packages

that Defendants offered." It is unclear what this means. Select information about individual offers from competitor institutions is *not* relevant to the size of the 568 Cartel's net-price overcharge, which is the proper subject of expert market-wide analysis. As to Defendants' allusion (at 11) to "Plaintiffs' reasons for choosing a particular university," Plaintiffs explain above how and why this discovery is marginally relevant, at best, and plainly disproportionate. *See* Part II.A, above.

### F. Request No. 11 (Plaintiffs' Involvement in Litigation)

This request seeks "[a]ll Documents Concerning the circumstances under which You became involved in the Litigation." Objections on grounds of relevance, burden, ambiguity, and attorney-client privilege and work product all apply here. The general rule is that "[u]nless a defendant has information that, if true, would seriously undermine the standing of the plaintiff to bring the action, or otherwise would create a conflict of interest, the defendant ordinarily should not be permitted to engage in a broad fishing expedition, in pretrial discovery, to seek to turn up such facts." *Minter v. Wells Fargo Bank, N.A.*, 2010 WL 11549367, at *4 (D. Md. Aug. 13, 2010) (*citing* W. Rubinstein *et al.*, 3 *Newberg on Class Actions* § 7:8 (4th ed. 2010)). Defendants have failed to propound any such reasons. In addition, there is no pending motion to appoint Plaintiffs' counsel as class counsel or to certify a class. The discovery sought is thus also premature. *Prolow v. Aetna Life Ins. Co*., 2022 WL 4080743, at *5 (S.D. Fla. Sept. 6, 2022).

### G. Request No. 12 (Engagement Letters, Fee Arrangements)

The precedent Defendants cite now indicates that they seek engagement letters to assess Plaintiffs' adequacy as class representatives—to determine if Plaintiffs have a conflict with or are not committed to litigating for the benefit of the proposed Class. The engagement letters say no such thing, and it is common for courts to conclude that engagement letters are not discoverable absent specific reason to believe that the terms give rise to a conflict of interest. *See, e.g.*, *Bonkuri v. Grand Caribbean Cruises, Inc.*, 2021 WL 7082829, at *3 (S.D. Fla. Feb. 12, 2021) (holding

that, in "the class representative context," the "engagement agreement is not relevant absent an indication that there is a conflict of interest between the class representative and class counsel"). Defendants assert no such conflict, either potential or actual, but in the interests of putting the issue to bed, Plaintiffs will produce their engagement letters by January 31, 2023.

### H.    Request No. 18 (Loan Modification); Request No. 26 (Loan Payment History)

These documents are irrelevant for the reasons Plaintiffs set out with respect to Interrogatory No. 2, *see* Part I.B, above, and Request No. 5, *see* Part II.D, above. The students, as direct purchasers, suffered harm when they made overpayments. It is not relevant how those payments were financed, such as through third-party debt. Nor does it matter if financing college tuition is common, because credit-card debt is similarly common for consumer purchases. If this conspiracy involved an agreement to inflate the price of tuna fish, for example, the Court would not allow Defendants to discover whether the Plaintiff had purchased tuna fish using credit-card debt—nor would the Court allow discovery into whether the credit card-debt had been repaid, modified, or even forgiven. Defendants are not special just because they sell educational services.

### I.    Request No. 19 (Satisfaction with Institution and Value of Education)

Defendants argue (at 14) that "[h]ow Plaintiffs view their undergraduate experience and the value of their education bear on whether one university is a substitute for another." This argument fails. *See* Part II.A, above. It is also a non sequitur: a student's attendance and matriculation at one school does not equip her to speculate on whether she would have been more, less, or equally satisfied with schools to which she applied but decided *not* to attend. Any relevance to such documents is miniscule in comparison to the sophisticated expert analysis that this case will produce: "Informal, off-the-cuff remarks and anecdotal evidence concerning the marketplace are no substitute for solid economic evidence." *California v. Sutter Health Sys*., 84 F. Supp. 2d 1057, 1080 (N.D. Cal.), *aff'd*, 217 F.3d 846 (9th Cir. 2000), *and amended*, 130 F. Supp. 2d 1109 (N.D. Cal.

2001). In addition, this request captures sentiments on numerous irrelevant topics, such as the satisfaction of a school's sports team. If Defendants had followed up since November 29, 2022, Plaintiffs would have explained they would consider a narrower version of this Request addressing identifiable procompetitive justifications that Defendants believe the 568 Group enabled. As written, however, the request imposes an unnecessary and disproportionate burden.

### J.    Request No. 20 (Social Media Usernames)

Defendants here bear the initial burden of making a "particularized showing" of the relevance of the requested discovery. *Perez v. Lebron*, 2021 WL 3471170, at *2 (E.D. Pa. Aug. 6, 2021) ("Defendants have not explained why disclosure of Plaintiff's social media usernames pertains to Plaintiff's allegations or any potential defense."). Ignoring Plaintiffs' prior citation to this law, Defendants still have not offered any ground for relevance. Indeed, Defendants' motion resorts to the merely tautological contention: "Defendants can use [the information] to investigate whether Plaintiffs have made any relevant social media statement." That is, Defendants' argument is that social media usernames are relevant because it might lead to information that . . . is relevant. Rule 26 demands more. It appears that the request for social media usernames is merely a tactic to threaten Plaintiffs with intrusive and annoying discovery into their personal lives.

### A.  Request No. 21 (Social Media Posts About a Plaintiff's Institution)

Defendants here seek all "social media network posts or other communications to or from You Concerning Your undergraduate Institution." This request is patently overbroad, burdensome, and harassing. All of Plaintiffs' college-era communications and social media posts could arguably "concern" the institution they attended in some way, whether they are talking about social or academic life. Just as fundamental, any social media expression of complete satisfaction or dissatisfaction with their institution is irrelevant to whether they were overcharged by virtue of the institution's price-fixing. Plaintiffs have never objected to producing any social media posts that

Plaintiffs might have written about the 568 conspiracy or whether the Defendants conducted need-blind admissions. That topic did not come up in meet-and-confers.

### K.      Request No. 24 (Tuition and Other Payments)

Defendants never followed up with Plaintiffs on this issue and thus it is unclear what Defendants are seeking here. Plaintiffs have agreed to produce documents in their "possession, custody or control that are sufficient to identify the payments of tuition and fees, room, board, and books and supplies in connection with Plaintiff's undergraduate education." This covers Defendants' requests, except to the extent Defendants seek records in Plaintiffs' parents' possession, which the parties address in a separate motion. Defendants' records are a better and more centralized repository for payment information. In addition, Defendants have not explained what kinds of documents would efficiently identify such payments other than the student account statements that Defendants themselves have generated. Plaintiffs nevertheless have agreed to search their records and produce those statements *back* to Defendants. Plaintiffs have not agreed to produce credit-card statements, which would be unnecessary, disproportionate, and unduly intrusive.

### L.      Request No. 25 (Loan Agreements)

Plaintiffs already agreed to produce those documents in their "possession, custody or control, if any, that embody a student loan agreement, or modifications thereto, relating to Plaintiff's undergraduate education." In addition, Plaintiffs have repeatedly shown that in a horizontal price-fixing case, it does not matter how the plaintiffs and class members financed their purchase. *See* Parts I.B, II.C, II.D., & II.H, above. If such information were relevant, then antitrust litigation would be practically impossible to conduct. Discovery would become bogged down in endless inquiries tracking down the plaintiffs' credit-card statements, home-equity lines of credit, and third-party loans. There is no suggestion in any precedent that Defendants have cited or that Plaintiffs have found to suggest any such standard for determining damages.

## CONCLUSION

Plaintiffs respectfully request, for the foregoing reasons, that the Court deny Defendants' Motion to Compel Discovery.

Dated: January 25, 2023

/s/ Robert D. Gilbert
Robert D. Gilbert
Elpidio Villarreal
Robert S. Raymar
Sarah Schuster
Alexis Marquez
Steven Magnusson
**GILBERT LITIGATORS & COUNSE-
LORS, P.C.**
11 Broadway, Suite 615
New York, NY 10004
Telephone: 646-448-5269
rgilbert@gilbertlitigators.com
pdvillarreal@gilbertlitigators.com
rraymar@gilbertlitigators.com
sschuster@gilbertlitigators.com
amarquez@gilbertlitigators.com
smagnusson@gilbertlitigators.com

/s/ Edward Normand
Devin (Velvel) Freedman
Edward J. Normand
Peter Bach-y-Rita
Richard Cipolla
**FREEDMAN NORMAND
FRIEDLAND LLP**
99 Park Avenue, 19th Floor
New York, NY 10016
Tel: (646) 350-0527
vel@fnf.law
tnormand@fnf.law
pbachyrita@fnf.law
rcipolla@fnf.law

/s/ Eric L. Cramer
Eric L. Cramer
Caitlin Coslett
Hope Brinn
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Phone: (215) 875-3000
ecramer@bm.net
ccoslett@bm.net
hbrinn@bm.net

/s/ Richard D. Schwartz
Richard D. Schwartz (ARDC# 6323474)
**BERGER MONTAGUE PC**
1720 W Division
Chicago, IL 60622
Phone: (773) 257-0255
rschwartz@bm.net

Robert E. Litan
Daniel J. Walker
**BERGER MONTAGUE PC**
2001 Pennsylvania Avenue, NW
Suite 300
Washington, DC 20006
Phone: (202) 559-9745

rlitan@bm.net
dwalker@bm.net