**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ANDREW CORZO, *et al.*, individually and on behalf of all others similarly situated,<br><br>　　Plaintiffs,<br><br>　　　　　　v.<br><br><br>BROWN UNIVERSITY, *et al.*,<br><br>　　Defendants. | Case No.: 22-cv-00125<br><br><br><br><br>Hon. Matthew F. Kennelly |

**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION FOR PROTECTIVE ORDER TO PROHIBIT DEFENDANTS
<u>FROM SERVING SUBPOENAS ON PLAINTIFFS' FAMILIES</u>**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................................ii

INTRODUCTION .............................................................................................................................. 1

ARGUMENT ...................................................................................................................................... 2

I.      DEFENDANTS ALREADY HAVE PLAINTIFFS' FINANCIAL AID APPLICATIONS AND FINANCIAL AID DATA, AND ANY SUPPORTING DOCUMENTATION FROM PARENTS IS NOT RELEVANT ................................................................................................ 2

II.     DEFENDANTS ALREADY HAVE PLAINTIFFS' FINANCIAL AID AWARDS FROM OTHER UNIVERSITIES, INCLUDING OTHER DEFENDANTS ............................................. 5

III.    DOCUMENTS WITHIN THE PARENTS' POSSESSION REGARDING PLAINTIFFS' COMPARISONS TO OTHER SCHOOLS ARE IRRELEVANT, BUT PLAINTIFFS NONETHELESS COMMIT TO ASKING THEIR PARENTS FOR SUCH INFORMATION .. 10

IV.    DEFENDANTS' REQUEST FOR "MATTERS ALLEGED IN PLAINTIFFS' COMPLAINT" IS HOPELESSLY VAGUE OR UNDULY OVERBROAD ............................... 12

V.     PARENTS ARE NOT THE BEST SOURCE OF RELEVANT INFORMATION ...................... 12

VI.    DEFENDANTS' DRAFT REQUESTS ARE NOT PROPORTIONAL ....................................... 13

VII.   THERE IS NO NEED FOR DEFENDANTS TO NEGOTIATE DIRECTLY WITH PARENTS ABOUT THEIR REQUESTS ...................................................................................... 13

CONCLUSION ................................................................................................................................ 14

# TABLE OF AUTHORITIES

**Cases**

*Allen v. Dairy Mktg. Servs., LLC*,
 2013 WL 6909953 (D. Vt. Dec. 31, 2013) .................................................................................. 3

*Apple iPod iTunes Antitrust Litig.*,
 2014 WL 4809288 (N.D. Cal. Sept. 26, 2014) .......................................................................... 11

*Comcast Corp. v. Behrend*,
 569 U.S. 27 (2013) ...................................................................................................................... 6

*Depuy Inc. v. Zimmer Holdings, Inc.*,
 343 F. Supp. 2d 675 (N.D. Ill. 2004) ........................................................................................ 11

*Dial Corp. v. News Corp.*,
 314 F.R.D. 108 (S.D.N.Y. 2015) ................................................................................................ 3

*Doe v. Emory Univ.*,
 2021 WL 358391 (N.D. Ga. Jan. 22, 2021) ................................................................................ 9

*Espejo v. Cornell Univ.*,
 523 F. Supp. 3d 228 (N.D.N.Y. 2021) ........................................................................................ 9

*Fiore v. Univ. of Tampa*,
 568 F. Supp. 3d 350 (S.D.N.Y. 2021) ......................................................................................... 9

*Gociman v. Loyola Univ. of Chicago*,
 515 F. Supp. 3d 861 (N.D. Ill. 2021) .......................................................................................... 9

*Go-Tane Serv. Stations, Inc. v. Ashland Oil, Inc.*,
 508 F. Supp. 200 (N.D. Ill. 1981) ............................................................................................... 8

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
 392 U.S. 481 (1968) ............................................................................................................. 7, 10

*In re Caustic Soda Antitrust Litig.*,
 2021 WL 9817565 (W.D.N.Y. Dec. 8, 2021) ............................................................................. 9

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
 581 F. Supp. 3d 1029 (N.D. Ill. 2022) ........................................................................................ 7

*In re Elec. Books Antitrust Litig.*,
 2014 WL 1282293 (S.D.N.Y. Mar. 28, 2014) ............................................................................ 3

*In re Fresh & Process Potatoes Antitrust Litig.*,
 2014 U.S. Dist. LEXIS 195443, 2014 WL 1216658 (D. Idaho June 24, 2014) ....................... 10

*In re NASDAQ Market-Makers Antitrust Litig.*,
 169 F.R.D. 493 (S.D.N.Y. 1996) ................................................................................................ 3

*In re Neurontin Antitrust Litig.*,
 2013 WL 4042460 (D.N.J. Aug. 8, 2013) ............................................................................. 11

*In re Nexium (Esomeprazole) Antitrust Litig.*,
 296 F.R.D. 47 (D. Mass. 2013) ............................................................................................. 8

*In re Skelaxin (Metaxalone) Antitrust Litig.*,
 292 F.R.D. 544 (E.D. Tenn. 2013) ........................................................................................ 8

*In re Univ. of Miami COVID-19 Tuition & Fee Refund Litig.*,
 524 F. Supp. 3d 1346 (S.D. Fla. 2021) .................................................................................. 9

*Meissner v. Syracuse Univ.*,
 2021 WL 1536676 (N.D.N.Y. Apr. 13, 2021) ....................................................................... 9

*Menasha Corp. v. News Am. Mktg. In-Store, Inc.*,
 354 F. 2d 661 (7th Cir. 2004) .............................................................................................. 10

*Metzner v. Quinnipiac Univ.*,
 528 F. Supp. 3d 15 (D. Conn. 2021) ..................................................................................... 9

*Optronic Tech., Inc. v. Ningbo Sunny Elec. Co.*,
 20 F.4th 466 (9th Cir. 2021) ................................................................................................ 11

*Paper Sys. Inc. v. Nippon Paper Indus. Co.*,
 281 F.3d 629 (7th Cir. 2002) ................................................................................................ 8

*Reifert v. South Cent. Wis. MLS Corp.*,
 450 F. 3d. 312 (7th Cir. 2006) ............................................................................................. 10

*Romankow v. New York Univ.*,
 2021 WL 1565616 (S.D.N.Y. Apr. 21, 2021) ....................................................................... 9

*Rynasko v. New York Univ.*,
 2021 WL 1565614 (S.D.N.Y. Apr. 21, 2021) ....................................................................... 9

*Shields v. Federation Internationale de Natation*, ---
 F. Supp. 3d ---, 2023 WL 121985 (N.D. Cal. Jan. 6, 2023) ............................................... 11

*Simon & Simon, PC, et al. v. Align Tech., Inc.*,
 No. 20-cv-03754 (N.D. Cal. Jan. 17, 2023) ........................................................................ 11

*Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*,
 131 F.3d 874 (10th Cir. 1997) .............................................................................................. 7

*Tawfilis v. Allergan, Inc.*,
 2017 WL 3084275 (C.D. Cal. June 26, 2017) ...................................................................... 3

*Viamedia, Inc. v. Comcast Corp.*,
 335 F. Supp. 3d 1036 (N.D. Ill. 2018) .................................................................................. 7

**Other Authorities**

Fed. R. Civ. P. 26(b)(1) .................................................................................................................. 1

2020-2021 Sample Student Aid Report, https://fsapartners.ed.gov/sites/default/files/attachments/2019-10/2021SARMockupEnglish_1.pdf (Oct. 3, 2019) ................................................................................ 2

Justin McCrary & Daniel Rubinfeld, *Measuring Benchmark Damages in Antitrust Litigation*, 3 J. ECONOMETRIC METHODS, 63 (2014) ........................................................................................ 3

Plaintiffs respectfully submit this Reply Memorandum of Law in response to Defendants' Memorandum of Law (Dkt. 279) in Opposition ("Br.") to Plaintiffs' Memorandum to Law (Dkt. 271) in Support of Their Motion for Protective Order ("Motion").

## **INTRODUCTION**

Defendants spell out in their brief, for the first time with details, the documents they seek from Plaintiffs' parents. Those documents concern (1) Plaintiffs' applications for financial aid and the materials underlying those applications; (2) financial aid offers from colleges or universities other than the ones they attended; (3) Plaintiffs' payment of tuition and other costs; (4) Plaintiffs' applications for university admission and their reasons for applying to or attending a particular university; and (5) this litigation.

Defendants are entitled in discovery only to information that is relevant. *See* Fed. R. Civ. P. 26(b)(1). None of the documents sought by Defendants meets this standard. As to (1), Defendants already have Plaintiffs' financial aid applications, and the requested data underlying these applications are not relevant to proof of injury or damages, leaving no basis to seek that information from Plaintiffs' parents. As to (2) and (3), Defendants are not entitled to Plaintiffs' funding sources because of the well-established case law holding that direct purchasers are the only parties with standing to pursue the overcharges they allegedly paid, deeming the source of the funds the direct purchaser used (whether from loans, gifts, or credit cards) irrelevant to proof of injury or standing. As to (4), anecdotal information from a small number of Plaintiffs about why they chose to apply to or attend certain universities and not others is not relevant to the data-intensive and expert-driven exercise of defining a relevant market, but Plaintiffs nevertheless commit to seeking this information from their parents and providing it to Defendants, to the extent it is available. As to (5), the request is excessively vague and overbroad. Four Plaintiffs who cannot recall financial

aid awards from other educational institutions also commit to seeking this information from their parents to the extent it is available and not otherwise already in Defendants' possession.

At bottom, as Defendants now make clear, they are asking the Court to allow them to probe intrusively into the financial circumstances of non-parties and to obtain third-party funding information, all of which are irrelevant to proving the Plaintiffs' alleged injuries or the quantification of their damages. The law does not allow for such intrusive, irrelevant inquiries of third parties.

## ARGUMENT

### I. DEFENDANTS ALREADY HAVE PLAINTIFFS' FINANCIAL AID APPLICATIONS AND FINANCIAL AID DATA, AND ANY SUPPORTING DOCUMENTATION FROM PARENTS IS NOT RELEVANT

As to Draft Request No. 1, Defendants already have the information concerning Plaintiffs' applications for financial aid, including the income and assets of students and their parents, as reported on the Student Aid Reports ("SARs") drawn from each Plaintiff's Free Application for Federal Student Aid ("FAFSA") form.[1] Defendants nonetheless seek the documentation underlying these applications, "including but not limited to tax returns; W-2s, 1099s, K-1s, and other tax forms; records of untaxed income; and records of assets." Draft Request No. 1, Ex. 1 to Defendants' Br. (ECF No. 279-1, at 2). Defendants argue that this intrusive request from non-parties is warranted because Plaintiffs supposedly must "identify an alternative EFC methodology and show that it would have resulted in Plaintiffs receiving higher aid." Br. at 4. This pretext, and the others that Defendants had asserted, do not justify the Defendants' expansive request, for multiple reasons.

---

[1] This includes information called for in various numbered parts of the SAR: No. 36 (student adjusted gross income); No. 40 (student cash savings); No. 41 (student net worth); No. 58 (parent's marital status); No. 84 (parent's adjusted gross income); No. 86 (father's earned income); No. 87 (mother's earned income); No. 88 (parents' cash savings); and 89 (parents' net worth of investments). *See* 2020-2021 Sample Student Aid Report, https://fsapartners.ed.gov/sites/default/files/attachments/2019-10/2021SARMockupEnglish_1.pdf (Oct. 3, 2019).

2

*First*, the Defendants have no right to ask for information from the parents (or the Plaintiffs directly) because they believe it is necessary for *Plaintiffs* to make their case. As discussed below, Plaintiffs do not intend to prove their injury or damages in the manner Defendants suggest, nor do Plaintiffs need to do so under governing law. In any event, if Defendants are right that Plaintiffs have chosen an incorrect method of proving their injuries or damages, then presumably Defendants can simply point to the purported absence of required proof—no information from parents or anyone else is necessary for *that*.

*Second*, Defendants are wrong that Plaintiffs must "identify an alternative EFC methodology and show that it would have resulted in Plaintiffs receiving higher aid." *Id.* Plaintiffs appropriately intend to use a standard statistical method to prove impact and damages by comparing net prices charged by Defendants to competitive benchmarks. Applied to this case, the competitive benchmarks either will be (a) a "yardstick" consisting of net prices at comparable schools that were not part of the alleged conspiracy and/or (b) net prices during a period when the conspiracy was not operative.[2] In either or both comparisons, the statistical method will control for other

---

[2] Comparing the "prices paid by the plaintiff with the corresponding data for a firm or in a [comparable] market unaffected by the violation"—known as a "yardstick" or "benchmark" analysis—is "widely accepted" both to prove that impact and damages can be established on a classwide basis, as required under Rule 23(b)(3), and to prove impact and calculate damages at trial. *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 521 (S.D.N.Y. 1996); *see also Tawfilis v. Allergan, Inc.*, 2017 WL 3084275, at *6 (C.D. Cal. June 26, 2017) (yardstick approach "'is especially useful in cases where the pre-conspiracy prices are unreliable predictors of future prices—that is, in cases where the before-and-after approach is unavailing'" (quoting IIA Phillip E. Areeda *et al.*, *Antitrust Law* ¶ 395(b)(3) (3d ed. 2007))); *Dial Corp. v. News Corp.*, 314 F.R.D. 108, 118 (S.D.N.Y. 2015) ("The 'yardstick' method for calculating damages is an accepted means of measuring damages in an antitrust action."); *In re Elec. Books Antitrust Litig.*, 2014 WL 1282293, at *25 (S.D.N.Y. Mar. 28, 2014) ("[T]he two most common methods of quantifying antitrust damages are the 'before and after' and yardstick' measures." (quoting *Eleven Line, Inc. v. N. Tex. State Soccer Ass'n*, 213 F.3d 198, 207 (5th Cir. 2000))); *Allen v. Dairy Mktg. Servs., LLC*, 2013 WL 6909953, at *16 (D. Vt. Dec. 31, 2013) (holding that the plaintiff's expert "properly use[d] a yardstick approach when he compare[d] the prices in the proposed geographic market . . . to the prices in a market that is alleged to be unaffected by the antitrust violations"); Justin McCrary & Daniel Rubinfeld, *Measuring Benchmark Damages in Antitrust Litigation*, 3 J. ECONOMETRIC METHODS, 63 (2014) ("[T]he benchmark approach evaluates prices only in the market at issue, comparing prices in the impact period to available prices before

factors affecting net prices as between the actual world and the proposed benchmarks. Defendants will have an ample opportunity to contest any statistical analyses, along with the data used in such analyses, that Plaintiffs' experts will proffer. There is no requirement in law or economics to posit a series of counterfactual financial aid models, collect data that might have been used in those models, and compute the outputs.

*Third*, even if Defendants were right that the appropriate way to evaluate impact and damages would be to posit but-for financial aid methods, Defendants' argument that they need the sought information to able to compute the amount of financial aid Plaintiffs would have received absent the challenged conduct is also without merit. Defendants' lawyers speculate (without any expert or other factual support) that they would need additional data under hypothetical, alternative, non-collusive, financial aid methodologies that would have existed absent the challenged conduct. But Defendants have not shown they would need data beyond the student and parental income and assets reported on the FAFSAs and SARs for each student, *which Defendants already have.* In any event, if Defendants plan to use or refer to any alternative EFC methodologies, no additional data, from parents or students, would be needed to make such an argument (although for the foregoing reason, specification of alternative methodologies is not necessary for Plaintiffs to prove injury and damages).

---

and/or after the alleged period of impact . . . . We have found the benchmark approach to be the most commonly used damages methodology."); ABA Section of Antitrust Law, *Proving Antitrust Damages* 180 (3d ed. 2017) ("The dummy variable model uses data from both the alleged conspiracy period and the non-conspiracy period to estimate the relationship between price, economic factors, and a dummy variable for the alleged conspiracy period, with the dummy variable measuring how much higher prices were in the alleged conspiracy period relative to the non-conspiracy period, after controlling for the other economic factors."); ABA Proof of Conspiracy at 39 ("One way to estimate such a model would be to use the price of the product in question as the dependent variable, while using measurements of relevant demand and supply factors as explanatory variables, including a dummy variable that takes a value of one during the class period and zero otherwise. This dummy variable would capture the price inflation if any, during the class period after controlling for the effect of all the other demand and supply factors.").

## II. DEFENDANTS ALREADY HAVE PLAINTIFFS' FINANCIAL AID AWARDS FROM OTHER UNIVERSITIES, INCLUDING OTHER DEFENDANTS

Defendants seek documents concerning financial awards provided to Plaintiffs by any educational institutions, including any other Defendants. Plaintiffs have already provided this information that is in their possession as part of Plaintiffs' responses to Defendants' Interrogatories, while Defendants themselves have information about financial awards they would have extended to any Plaintiffs.

In any event, information about aid awards Plaintiffs may have received from educational institutions other than those they attended is not relevant to whether the Defendants, through their information sharing and alleged agreement to use the Consensus Methodology, conspired to fix or stabilize the floor price they charged. Plaintiffs do not allege that all Defendants always offered the same financial aid award to every student, nor do their allegations require such an extreme position. Instead, Plaintiffs allege that the challenged conduct, involving collusion on a financial aid methodology and sharing competitively sensitive information, caused all conspiring schools to offer less aid and charge higher net tuition prices than they otherwise would have. Differences in aid awards provided by Defendants to Plaintiffs in the actual world—with the alleged misconduct in place—would not be relevant to showing what awards the Plaintiffs actually would have received *absent the alleged collusion*.

Because aid awards from other schools are not relevant to showing how Plaintiffs were harmed by the collusion, information about those awards has no relevance to Defendants' statute of limitations defense, which rests on Plaintiffs having been able to discover how they were injured or damaged from Defendants' collusion, let alone account for other factors that could give rise to a difference in awards. Further, any differences in loan repayment terms in aid packages offered by multiple schools to Plaintiffs, which Defendants also seek from parents, are irrelevant to proof

5

of impact or quantification of damages because loans do not reduce the net prices paid by Plaintiffs (which are the sticker prices for tuition, room, and board minus any institutional aid). And information about whether students declined an award is irrelevant because, as Plaintiffs showed earlier, plaintiffs in horizontal price-fixing cases have no duty to mitigate. Mot. at 13.

## I. THIRD-PARTY FUNDING SOURCES ARE IRRELEVANT

Plaintiffs showed in their Motion, as they did in the parties' meet-and-confers, that third-party funding sources are irrelevant to proof of injury or damages. Mot. at 7-11. Nonetheless, Defendants seek documents relating to other forms of aid, such as third-party merit aid, and documents relating to how Plaintiffs paid for their educations, including payments by others on their behalf. These documents are irrelevant as a matter of well-settled law.

*First*, Plaintiffs have already provided information about any third-party merit aid awards they did or did not receive to Defendants. To the extent Defendants want access to the parents to effectively "audit" the information about such aid that Plaintiffs have already produced, any such audit would be irrelevant to assessing impact or computing damages. Plaintiffs allegedly paid overcharges due to the challenged conduct. As Plaintiffs pointed out earlier, overcharges are computed by taking the net price Plaintiffs actually paid and subtracting the price they would have paid absent the anticompetitive conduct. Mot. at 7-11. The Supreme Court has held that estimates of impact and damages must isolate the effects of the anticompetitive conduct from other possible causes of damage (or benefit). *Comcast Corp. v. Behrend*, 569 U.S. 27, 38 (2013) ("The first step in a damages study is the translation of the *legal theory of the harmful event* into an analysis of the economic impact *of that event*." (quoting Federal Judicial Center, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 432 (3d ed. 2011) (emphasis added))). Accordingly, the overcharge computation must hold constant all factors other than the alleged unlawful agreement. *See, e.g.*, *In re Dealer*

6

*Mgmt. Sys. Antitrust Litig.*, 581 F. Supp. 3d 1029, 1049 (N.D. Ill. 2022) ("'Damages calculations in antitrust cases seek to compare plaintiffs' actual experience in the real world with what the plaintiffs' experience would have been, 'but for' the antitrust violation.'" (quoting *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 56 (D.D.C. 2017)).[3] If any Plaintiff or class member received more or less federal support because he or she failed to disclose amounts of third-party merit aid or mistakenly disclosed too much aid, under the law, that would have *no effect* on whether that class member was injured by the challenged conduct or by how much.

*Second*, Defendants' arguments that information from parents about how Plaintiffs paid for educations is relevant to injury, the adequacy of Plaintiffs as class representatives, and the calculations of their EFCs all fail. Br. at 5. Plaintiffs showed in their opening brief that all these grounds amount to asking, in effect, whether and the degree to which Plaintiffs "passed-on" the overcharges they paid due to Defendants' alleged collusive conduct. Mot. at 7-10. The case law is clear, however, that the injury and damage inquiries end once overcharges are proved. Full stop. *See Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 490-91 (1968); *see also id*. at 489-90, 494 (explaining that "when a buyer shows that the price paid by him . . . is illegally high and also shows the amount of the overcharge, he has made out a prima facie case of injury and damage"); *Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 883 (10th Cir. 1997) ("[A]ny passing on of overcharges to the downstream buyers is ignored.").

Defendants attempt to circumvent *Hanover Shoe* and its progeny by asserting that these cases apply only to situations in which plaintiffs "resell" the goods at issue. Br. at 8. That is wrong.

---

[3] *See also Viamedia, Inc. v. Comcast Corp.,* 335 F. Supp. 3d 1036, 1040 (N.D. Ill. 2018) ("'[T]o prevail on an antitrust claim, a plaintiff must establish that the injuries alleged would not haves occurred *but for* [the defendant's] antitrust violation. . . . A plaintiff, thus, must be able to distinguish between financial loss from the *lawful* activities of a competitor from loss caused by the *unlawful* acts of the defendant." (internal quotations and citations omitted)).

7

This argument ignores the cases cited in Plaintiffs' Motion, holding that the point of the direct purchaser rule is to ensure that the direct purchasers recover the *full extent of the overcharge*, regardless of whether they may have been otherwise affected or benefited in some other way as part of the transaction at issue. Mot. at 8-9.[4]

Plaintiffs here are the direct purchasers, and thus the only persons with standing to pursue an overcharge damage claim under federal antitrust law. *See* Memorandum and Order Denying Defendants' Motions to Dismiss, ECF No. 185 at 1014-15. As such, it is well settled that their injuries are measured by the full extent of the overcharge they paid even if someone else compensated the students for the amounts they paid. The implication of Defendants' argument is that some or all of the injury allegedly caused by the challenged conduct may have been sustained by the entity supplying the funds to the student (be it a bank, a credit card, or family members). Reduced to its essence, this argument implies that the harm has effectively been "passed on" to (or suffered by) an entity other than the direct purchaser. That argument is foreclosed by well settled law.

More fundamentally, Defendants' argument ignores the clear *policy* behind the rule that injury is measured only by the overcharge—it would waste resources, discourage robust antitrust enforcement, and complicate treble-damages actions. *Paper Sys. Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 632-33 (7th Cir. 2002); *Go-Tane Serv. Stations, Inc. v. Ashland Oil, Inc.*, 508 F. Supp. 200, 205 (N.D. Ill. 1981). This policy applies to third-party funding of Plaintiffs' purchases of educational services from Defendants.

---

[4] *In re Relafen Antitrust Litig.*, 346 F. Supp. 2d 349 (D. Mass. 2004) (plaintiffs' recovery not to be reduced by benefits to direct purchaser as part of the transaction upon which the overcharge was based); *In re Nexium (Esomeprazole) Antitrust Litig.*, 296 F.R.D. 47, 56 (D. Mass. 2013) (adhering to the ruling in *In re Relafen* that direct purchaser is injured by the full extent of the overcharge regardless of other effects on the direct purchaser); *In re Skelaxin (Metaxalone) Litig.*, 292 F.R.D. 544, 554 (E.D. Tenn. 2013) (explaining that "[d]amages . . . are measured purely by overcharges" even where defendants claim that some plaintiffs benefited from the challenged conduct).

Defendants further argue that "Plaintiffs ignore the economic reality of the typical college arrangement, when parents pay all or some college costs directly to the university," implying that parents are the direct purchasers. Br. at 7-8. This assertion is contradicted by overwhelming case law holding that that once students reach majority, only they have privity of contract with their universities, and thus parents lack standing to sue, even if they directly made payments to universities on their children's behalf.[5] Parents are thus not the direct purchasers as a matter of law.[6]

Defendants' citations do not hold otherwise. Br. at 8. In *In re Caustic Soda Antitrust Litigation.*, 2021 WL 9817565, at *2 (W.D.N.Y. Dec. 8, 2021),[7] the defendants sought communications between direct purchasers and downstream distributors, where the distributors were sophisticated businesses, many had retained counsel and had already produced responsive documents, and the defendants were already engaged in the meet and confer process with the distributors. None of those unique factors applies to Defendants' requests relating to *third-party funding*, of individuals (not sophisticated business) who have not retained counsel, have not produced any documents, and where no meet and confer process exists.

---

[5] *Gociman v. Loyola Univ. of Chicago*, 515 F. Supp. 3d 861 (N.D. Ill. 2021), *aff'd in relevant part*, *vacated in part and remanded*, 41 F.4th 873 (7th Cir. 2022); *see also, e.g.*, *Espejo v. Cornell Univ.*, 523 F. Supp. 3d 228 (N.D.N.Y. 2021); *Fiore v. Univ. of Tampa*, 568 F. Supp. 3d 350 (S.D.N.Y. 2021); *In re Univ. of Miami COVID-19 Tuition & Fee Refund Litig.*, 524 F. Supp. 3d 1346 (S.D. Fla. 2021); *Metzner v. Quinnipiac Univ.*, 528 F. Supp. 3d 15 (D. Conn. 2021); *Doe v. Emory Univ.*, 2021 WL 358391 (N.D. Ga. Jan. 22, 2021); *Romankow v. New York Univ.*, 2021 WL 1565616 (S.D.N.Y. Apr. 21, 2021); *Rynasko v. New York Univ.*, 2021 WL 1565614 (S.D.N.Y. Apr. 21, 2021); *Meissner v. Syracuse Univ.*, 2021 WL 1536676 (N.D.N.Y. Apr. 13, 2021).

[6] Defendants argue that the pandemic-era cases are irrelevant because they concern remote learning which "affects the student, not the parent." Br. at 8, n.7. The holding of each pandemic-era case, consistent with the precedent in note 5, *supra*, is that *even though the parents paid the universities*, they had no standing to sue. By the same logic, parents who fund students' payments to universities cannot be direct purchasers in an antitrust case if they have no standing.

[7] Defendants cites the Lexis version of this decision, but mistakenly identified the Northern District of Illinois as having issued it.

The decision in *In re Fresh & Process Potatoes Antitrust Litig.*, 2014 U.S. Dist. LEXIS 195443, at *13-14, 2014 WL 1216658, at *1-*2 (D. Idaho June 24, 2014), is also inapposite. *See* Br. at 8. In that case, the discovery was limited to differences in customer preferences among downstream parties that the court indicated might render named plaintiffs to be inadequate class representatives. *Potatoes*, 2014 WL 1216658, at *1-*2. The court carefully distinguished this limited discovery situation from the discovery of data relating to sales to downstream purchasers that are covered by the direct purchaser rule of *Hanover Shoe* and *Illinois Brick. Id.*

In short, the case law makes clear that where direct purchasers seek to recover overcharges flowing from alleged anticompetitive conduct, the injury and damages inquiries end the moment the alleged overcharge is paid. Accordingly, the sources of the funding a direct purchaser used to pay the defendant are irrelevant to questions relating to impact or damages in this case.

### III. DOCUMENTS WITHIN THE PARENTS' POSSESSION REGARDING PLAINTIFFS' COMPARISONS TO OTHER SCHOOLS ARE IRRELEVANT, BUT PLAINTIFFS NONETHELESS COMMIT TO ASKING THEIR PARENTS FOR SUCH INFORMATION

Defendants seek all documents relating to a "Plaintiff's consideration of, evaluation of, or decision to attend or not attend, the full-time undergraduate program of any Institution." Ex. 1 to Br., Request No. 4. Plaintiffs showed in their Motion that any anecdotal emails or other documents comparing Defendant universities to other universities are irrelevant (or of marginal relevance) because relevant markets are traditionally defined through an exercise that is data-intensive and expert driven and does not depend on the kind of limited anecdotal evidence Defendants seek. Mot. at 13-15; *see, e.g., Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d. 312, 320 (7th Cir. 2006) ("This Court has emphasized the use of economic analysis in the law. To demonstrate competition in an antitrust case, the plaintiff must provide an economic analysis of the relevant market." (citing *Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 354 F.2d 661 (7th Cir. 2004) (requiring

economic evidence to prove the existence of a distinct market))); *see also Optronic Tech., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 482-83 (9th Cir. 2021); *Shields v. Federation Internationale de Natation*, --- F. Supp. 3d ---, 2023 WL 121985, at *10-11 (N.D. Cal. Jan. 6, 2023); *Apple iPod iTunes Antitrust Litig.*, 2014 WL 4809288, at *7 (N.D. Cal. Sept. 26, 2014); *In re Neurontin Antitrust Litig.*, 2013 WL 4042460, at *5-6 (D.N.J. Aug. 8, 2013); *Depuy Inc. v. Zimmer Holdings, Inc.*, 343 F. Supp. 2d 675, 686 (N.D. Ill. 2004) (collecting precedent).[8]

Defendants point out that certain named Plaintiffs *applied* to universities outside the Plaintiffs' market definition. Br. at 6. This is irrelevant. Unlike purchasers of other goods and services that have no qualification test for purchasers (other than if they can afford the item or service), college students must be accepted before they purchase educational services. Accordingly, the relevant market here can only include the universities that students, *once accepted,* consider to be close economic substitutes.[9]

---

[8] Defendants cite one magistrate opinion, *Simon & Simon, PC, et al. v. Align Tech., Inc.*, No. 20-cv-03754 (N.D. Cal. Jan. 17, 2023), ECF No. 255, in which the court considered both expert testimony and the named plaintiffs' views concerning the relevant market. This case is easily distinguishable because the defendants in *Align* sought information from *employees* of the plaintiff, who the court held were Plaintiff's "managing agents." Further, these individuals were already agreed-to document custodians on the case. By contrast, the parents are not employees or "managing agents" of their adult children, and Plaintiffs have not agreed that parents are document custodians. And, most critically, the dentists from whom the court compelled discovery were already represented by Plaintiffs' counsel. These factors are not present here. In addition, in *Align*, in contrast to this one, the named plaintiffs were trained professionals considering the substitutability of products important in their field. In this case, parents of students are not professionals, and buying an input for their business, but instead lay persons relying on a combination of limited personal experience and ratings by such organizations as *U.S. News*. There is little or nothing parents can add to the ratings themselves, nor are they the ones attending school. Defendants have ample opportunity to inquire among named plaintiffs themselves about *their* views relating to the substitutability of schools that accepted them.

[9] The fact that some named Plaintiffs or proposed class members may have *applied* to public universities and other less elite private institutions does not mean that those institutions are potentially in the same market as elite national private universities. Any students or parents who have gone through the college admissions process know that many students who apply to one or more of the elite private universities also apply to one or more "safety" schools in case they are not accepted at their first or second choices.

Notwithstanding all of the foregoing, Plaintiffs commit to providing to Defendants by February 20 such information in possession of their parents, if available, and attesting that to the Plaintiffs' knowledge, the information provided is responsive to Defendants' Request.

## IV. DEFENDANTS' REQUEST FOR "MATTERS ALLEGED IN PLAINTIFFS' COMPLAINT" IS HOPELESSLY VAGUE OR UNDULY OVERBROAD

Defendants' request for documents held by parents that relate to "matters alleged in Plaintiffs' complaint," Br. at 7, is hopelessly vague or, read literally, unduly overbroad — requiring the parents to produce any and all documents that have anything to do with Plaintiffs' college educations.[10] The burden of responding to the request is plainly disproportionate.

## V. PARENTS ARE NOT THE BEST SOURCE OF RELEVANT INFORMATION

Plaintiffs have supplied to Defendants the financial aid information about their financial aid awards from the Defendant universities they have attended. Plaintiffs acknowledge that this is relevant, but Defendants are not entitled to seek any of it from parents.[11]

In contending otherwise, Defendants cite the financial aid awards Plaintiffs may have received from other universities that four Plaintiffs did not attend and cannot recall. Br. at 9. This information is irrelevant for reasons stated above in Part II. Defendants nonetheless assert that parents "are better record keepers than their teenaged children, especially about financial details relevant to awarding need-based financial aid." *Id.* Defendants have not made clear what documents they seek to which this statement refers. If they mean that "financial details relevant to awarding need-based financial aid" mean the data underlying student and parent income and assets

---

[10] Plaintiffs served a similar request on Defendants. The sensible course appears for both sides to withdraw their parallel requests, which Plaintiffs agree to do.

[11] Nonetheless, as indicated above, Plaintiffs have committed to providing documents within their parents' possession that relate to "the Plaintiff's consideration of, evaluation of, or decision to attend or not attend, the full-time undergraduate program of any Institution." Parents Subpoena to Parent – Draft Requests for Production, Exhibit 1 to Defendants' Br., Draft Request No. 4.

12

reported on each student's FAFSA, then that information is irrelevant for reasons set forth in Part I above. In any event, such underlying data has nothing to do with information *about Plaintiffs' awards from other universities that they did not attend* and so does not establish that parents are the best source of it. And to the extent the four Plaintiffs received aid awards from other Defendant universities, Defendants would have the financial awards themselves, along with access to all financial information Plaintiffs provided in their FAFSA applications, which is made available to all Defendants through SARs.

Notwithstanding these points, the four named Plaintiffs who do not recall their financial aid awards from educational institutions commit to providing to Defendants by February 20 such information relating to financial awards from non-Defendant institutions that may be in possession of their parents, and attesting that to the Plaintiffs' knowledge, the information provided is responsive to Defendants' request.

### VI. DEFENDANTS' DRAFT REQUESTS ARE NOT PROPORTIONAL

Given the foregoing, on the basis that just four Plaintiffs cannot recall the financial aid awards from educational institutions they did not attend, Defendants seek all of the irrelevant information called for in their proposed subpoenas from *all* parents of *all* Plaintiffs. On its face, such a broad request is not proportional and excessively burdensome.

### VII. THERE IS NO NEED FOR DEFENDANTS TO NEGOTIATE DIRECTLY WITH PARENTS ABOUT THEIR REQUESTS

Defendants ask the Court to "issue and permit Defendants to negotiate directly with Plaintiffs' parents pursuant to the standard Rule 45 process for non-party discovery." Br. at 10. As shown above, however, (1) Plaintiffs have already provided information about their financial aid awards and financial data relevant to their application for need-based awards, (2) four named Plaintiffs have committed to provide information that is in their parents' possession, to the extent it is

available, about these Plaintiffs' financial aid awards from other universities that Defendants do not already have, (3) Plaintiffs have committed to provide any documents in their parents' possession, to the extent it is available, concerning the comparison of schools, even though this information, too, is irrelevant; (4) all other documents Defendants seek are irrelevant. Accordingly, there is no need for Defendants to "negotiate" with parents about anything. Defendants' proposed subpoenas would seek information that they already have, is irrelevant, or is of marginal relevance. Defendants have not and cannot satisfy their burden on this motion, especially in light of the potential intimidation factor involved in compelling Plaintiffs' parents to participate in this case.

## CONCLUSION

Plaintiffs respectfully submit, for the foregoing reasons, that the Court should grant Plaintiffs' Motion for Protective Order.

Dated: January 26, 2023

| | |
|---|---|
| /s/ Robert D. Gilbert | /s/ Edward Normand |
| Robert D. Gilbert | Devin (Velvel) Freedman |
| Elpidio Villarreal | Edward Normand |
| Robert S. Raymar | Peter Bach-y-Rita |
| Sarah Schuster | Richard Cipolla |
| Alexis Marquez | **FREEDMAN NORMAND** |
| Steven Magnusson | **FRIEDLAND LLP** |
| **GILBERT LITIGATORS & COUNSELORS, P.C.** | 99 Park Avenue, 19th Floor |
| | New York, NY 10016 |
| 11 Broadway, Suite 615 | Phone: (646) 350-0527 |
| New York, NY 10004 | vel@fnf.law |
| Phone: (646) 448-5269 | tnormand@fnf.law |
| rgilbert@gilbertlitigators.com | pbachyrita@fnf.law |
| pdvillarreal@gilbertlitigators.com | rcipolla@fnf.law |
| rraymar@gilbertlitigators.com | |
| sschuster@gilbertlitigators.com | |
| amarquez@gilbertlitigators.com | |
| smagnusson@gilbertlitigators.com | |
| | |
| /s/ Eric L. Cramer | /s/ Richard D. Schwartz |
| Eric L. Cramer | Richard D. Schwartz (ARDC# 6323474) |
| Caitlin Coslett | **BERGER MONTAGUE PC** |

14

**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Phone: (215) 875-3000
ecramer@bm.net
ccoslett@bm.net

Robert E. Litan
Daniel J. Walker
Hope Brinn
**BERGER MONTAGUE PC**
2001 Pennsylvania Avenue, NW
Suite 300
Washington, DC 20006
Phone: (202) 559-9745
rlitan@bm.net
dwalker@bm.net
hbrinn@bm.net

1720 W Division Chicago IL 60622
(773) 257-0255
rschwartz@bm.net