1            IN THE UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION

3   SIA HENRY, et al.,                    )
                                          )
4                      Plaintiffs,        )
                                          )
5              vs.                        )   No. 22 CV 00125
                                          )
6   BROWN UNIVERSITY, et al.,             )
                                          )   July 24, 2023
7                      Defendants.        )   9:48 a.m.

8          TRANSCRIPT OF VIDEOCONFERENCE PROCEEDINGS

9          BEFORE THE HONORABLE MATTHEW F. KENNELLY

10  APPEARANCES VIA VIDEOCONFERENCE:

11  For the Plaintiffs:    ROCHE FREEDMAN, LLP
                           BY:  MR. EDWARD J. NORMAND
12                         99 Park Avenue, Suite 1910
                           New York, New York 10016
13                         (646) 970-7513

14                         GILBERT LITIGATORS & COUNSELORS
                           BY:  MR. ROBERT D. GILBERT
15                              MR. ROBERT RAYMAR
                           11 Broadway, Suite 615
16                         New York, New York 10004
                           (646) 448-5269

17

18

19  Court Reporter:        JUDITH A. WALSH, CSR, RDR, F/CRR
                           Official Court Reporter
20                         219 South Dearborn Street, Suite 2342
                           Chicago, Illinois 60604
21                         (312) 702-8865
                           judith_walsh@ilnd.uscourts.gov
22

23

24

25

```
 1    APPEARANCES VIA VIDEOCONFERENCE (CONTINUED):

 2    For Defendants:

 3    Brown University:        MORGAN LEWIS & BOCKIUS, LLP
                               BY:  MR. JON R. ROELLKE
 4                             1111 Pennsylvania Avenue, NW
                               Washington, DC 20004
 5                             (202) 739-5754

 6    Columbia University:     SKADDEN ARPS SLATE MEAGHER & FLOM, LLP
                               BY:  MS. AMY L. VAN GELDER
 7                             155 North Wacker Drive, Suite 2700
                               Chicago, Illinois 60606
 8                             (312) 407-0903

 9    Dartmouth College:       JENNER & BLOCK, LLP
                               BY:  MS. TERRI L. MASCHERIN
10                             353 North Clark Street
                               Chicago, Illinois 60654
11                             (312) 222-9350

12    Georgetown University:  MAYER BROWN, LLP
                               BY:  MS. BRITT M. MILLER
13                              71 South Wacker Drive
                               Chicago, Illinois 60606
14                              (312) 782-0600

15    Northwestern
      University:              SIDLEY AUSTIN LLP
16                             BY:  MR. SCOTT D. STEIN
                               One South Dearborn Street
17                             Chicago, Illinois 60603
                               (312) 853-7000
18

19    Yale University:         HOGAN LOVELLS US, LLP
                               BY:  MR. CHARLES A. LOUGHLIN
20                             555 Thirteenth Street, NW
                               Washington, DC 20004
21                             (202) 637-5661

22

23

24

25
```

1            (Proceedings heard via videoconference:)

2                THE CLERK:  Case 22 C 125, Henry versus Brown

3    University.

4                THE COURT:  Can I get a thumbs-up if people can hear

5    me?

6                Okay.  Good.  Melissa, I think we're good to go here,

7    but I'm not hearing you.

8                THE CLERK:  Judge, I called the case already.

9            (Pause.)

10                THE COURT:  Melissa, I'm not hearing you.  And

11   everybody seems to be hearing me, but I'm not hearing you.

12   Let me just do an adjustment here.

13                All right.  Melissa, can you say something so I can

14   figure out if I can hear you now?

15                THE CLERK:  Can you hear me now, Judge?

16                THE COURT:  I can hear you now.  Okay.  All right.

17   Good morning.  Sorry for that glitch on my part.

18                This is Judge Kennelly.  I'm going to ask anybody

19   who's not talking to mute yourself.  This is particularly the

20   case for people who are on the phone.  And I am looking at the

21   list right now, and there are at least two people on the phone

22   who have not muted themselves -- actually, three.

23                So I am going to wait a couple seconds for you to do

24   that until I see the little mute sign show up so we don't have

25   any problems like we've had in the past.  And then what's

1    going to happen is if those people haven't muted themselves,

2    I'm simply going to kick them out.

3          Down to one.  Okay.  Everybody's muted themselves.

4          I assume that counsel have given a list to my

5    courtroom deputy clerk.

6          Can plaintiffs' counsel please give your names for

7    the record if you're planning to speak.

8          MR. NORMAND:  Your Honor, it's Ted Normand for the

9    plaintiffs.  My colleagues Robert Raymar and Robert Gilbert

10   might also speak depending on what issues arise.

11         THE COURT:  Okay.  Defense counsel?

12         MS. MILLER:  Your Honor, Britt Miller on behalf of

13   Georgetown University.  We submitted a full list to your court

14   reporter and to your courtroom deputy.

15         THE COURT:  Okay.  I see one other person with a

16   video on.  It's a young lady with a black jacket.

17         MS. VAN GELDER:  Yes.  Good morning, your Honor.

18   It's Amy Van Gelder.  I'm for Columbia.  I can turn my video

19   off.

20         THE COURT:  Okay.  So preface-wise, going forward,

21   I'm going to change some procedures here.  This is going to be

22   the last one we do by video or phone.  Everything else, we're

23   going to do in person.  And I'm going to treat this like it

24   was an MDL because it's roughly the same size or scope of an

25   antitrust MDL.

1        We're going to have a -- we're going to have an

2    in-person status hearing every six weeks.  I'm going to set a

3    deadline.  Anything that anybody -- I'm going to require

4    status reports before that, but any motion that anybody wants

5    to have heard is going to be due ten days before the status

6    hearing, and the response will be due three days before the

7    status hearing.  And if that schedule isn't met for a motion,

8    you'll wait until the next one to get it done unless there's a

9    true emergency which has a very narrow and limited definition.

10        We'll do it like I do in most MDLs.  We'll have a

11    call-in number so people can listen, but that will be listen-

12    only.  If you want to talk, you're going to have to be in the

13    room.  And I know there's a lot of lawyers in the case, but

14    that's the way we're going to do it going forward.

15        So it looks like aside from a few odds and ends in

16    the status report, most of which aren't really matters of

17    controversy, there's really two things before me today, and

18    that's the motion that's entitled "Motion for reconsideration"

19    that was filed by the plaintiffs.  That's docket No. 387.

20        And then the other one is the motion that's entitled

21    "Motion to compel and for sanctions against Georgetown."

22    That's docket No. 402.  There's been a response to the latter

23    motion.  There's been a response and a reply on the first one,

24    so I want to start on the first one.

25        And a lot of the ink has been spilled by both sides

6

1    on the, quote, unquote, motion to reconsider about whether

2    reconsideration -- about the procedures and the rules around

3    motions to reconsider.  So I just want to start off by saying,

4    I'm not going to deal with any of that stuff.

5           So first of all, everything that we're talking about

6    here in terms of the prior orders that I've made, the prior

7    rulings that I've made, they're all interlocutory.  None of

8    them have the equivalent of, are the equivalent of some sort

9    of holy writ.  That's going to -- that applies to both sides

10   in this case.

11          If there's been -- you know, it's perfectly okay, I

12   don't want people to be doing this willy-nilly, and I

13   certainly wouldn't change a ruling willy-nilly but if I -- if

14   I did something that's wrong or I did something that later

15   developments have shown is wrong or should be modified, then

16   it's perfectly appropriate.  So I'm just going to completely

17   bypass, and I don't want to spend a nanosecond of time today

18   other than what I've already spent on the issues about

19   procedural appropriateness or not.

20          So let me just make a couple comments.  Here's what I

21   thought as it relates to what I'll just call redaction of

22   names.  And I'm using the word "names" to include both student

23   names and donor names.  I thought we had developed this

24   mechanism relating to the FERPA issue -- which for the benefit

25   of the court reporter, that's F-E-R-P-A, all capitals -- that

1     would allow at least for now bypassing the potential need to

2     notify persons named in educational records of their impending

3     production.

4             And my recollection and understanding was that there

5     had been a mechanism developed whereby the name of the student

6     or applicant would be replaced by what was referred to as a

7     unique identifier, in other words, something specific to that

8     person, and that would -- and that that particular student or

9     applicant would be identified by the exact same identifier in

10    every time they get -- their name gets redacted so that they

11    could be compared across different documents; and, and if

12    there was a donor, a parent, or some other person related to

13    the student who appeared in a record in a way that if you

14    named the other person but not the student, it would allow

15    identification of the student -- you would be able to figure

16    out who it was, in other words -- that that person, the donor,

17    parent, or other person or whoever they are would also be

18    given a unique identifier that would allow that person to be

19    matched not just with themselves across records but with the

20    particular student to which they relate.

21            So that's what I thought we had.  Am I right about

22    that?  I'm going to ask the plaintiff first and then defendant

23    second.  And what I want is, to start off with, that's a yes

24    or no question.  I want a one-word answer:  Am I right or am I

25    not right?

1        MR. RAYMAR:  No, you're not right --

2        THE COURT:  That was Mr. Raymar.

3        MR. RAYMAR:  -- in that sense --

4        THE COURT:  That was Mr. Raymar.

5        MR. RAYMAR:  No.

6        THE COURT:  You said no.

7        What do the defendants think?

8        MR. LOUGHLIN:  Your Honor, this is Charles Loughlin

9   on behalf of Yale.  I believe you're correct.  That is what

10  the UIDs do.

11       THE COURT:  Okay.  So let me go back to Mr. Raymar

12  and tell me why you think my rendition is wrong.

13       MR. RAYMAR:  There was a procedure to establish UIDs

14  for students and applicants.  There was no procedure to

15  establish UIDs for donors or parents because in the

16  confidentiality order, we worked off the October 26th rulings

17  that essentially said donor names are not education records.

18  So --

19       THE COURT:  Pause for a second.  Pause for a second.

20       Okay.  So your belief was that donors weren't going

21  to get -- donors or parents or whoever they are, their names

22  weren't going to get redacted, period, full stop, right?  That

23  was your understanding?

24       MR. RAYMAR:  Full stop, yes, correct.

25       THE COURT:  Okay.  But then it sounds like -- and we

1    can argue about whether your understanding is right or not.

2    Defendants think it's not, but that's your understanding or

3    that's what you say your understanding was.

4          If I am understanding the current state of affairs

5    correctly, what you're telling me is that that hasn't happened

6    as it relates to donors, slash, parents.  In other words,

7    they've just been blacked out, and there's no way that you can

8    compare them to -- or that you can match them up with a

9    particular student.

10         Am I understanding you right?

11         MR. RAYMAR:  Yes.

12         THE COURT:  Okay.  So one -- okay.  So let me -- who

13   was that talking?  That was Mr. Loughlin talking before.  It

14   doesn't have to be Mr. Loughlin that deals with this point.

15   It can be anybody, obviously.

16         But I guess from just kind of a common sense

17   standpoint if you define the universe of common sense to

18   include knowledge of this case, it would be a pretty odd

19   situation in which there wouldn't be a way to match a donor, a

20   parent, or somebody else who is referred to in a record that's

21   subject to production with the particular student or applicant

22   to whom they are related, and I don't mean "relation" to mean

23   just blood relations.  Right?

24         MR. LOUGHLIN:  You're correct, your Honor.  The UID

25   for a given student and that student's parents, for example,

1    are the same UID so that --

2              THE COURT:  In other words, if I -- let's say my kid

3    applies to a school, and they're given UID 1234.  And then I'm

4    a donor, and I'm referred to in a record, I'm identified as

5    1234 as well?

6              MR. LOUGHLIN:  Correct.

7              THE COURT:  Okay.

8              MR. STEIN:  Your Honor, this is Scott Stein from

9    Northwestern.  May I clarify?

10              THE COURT:  Okay.

11              MR. STEIN:  With respect, I actually believe what

12    your Honor described is correct.  We did not apply --

13              THE COURT:  Which thing that I described?

14              MR. STEIN:  The -- well, sorry.  Let me clarify.  I

15    agree with Mr. Raymar.  In other words, I think what you

16    described is correct.  We did not apply UIDs to donor names.

17              However, all the records I'm aware of that we've

18    produced where donor names are redacted, it's in conjunction

19    with a particular student.  In other words, we didn't produce

20    standalone donor records.  So for Northwestern, attached to

21    the motion were examples of these tracking lists --

22              THE COURT:  Right.

23              MR. STEIN:  -- which show particular applicants.

24              So where we had a UID for the student -- again, those

25    were generated from structured admissions and financial aid

1   data -- we applied the UID.  If the name of the potential

2   donor was related to the student, we redacted that.  Now,

3   there would not be a separate UID applied there, but it's

4   apparent from the document, you know, it's a line talking

5   about this applicant, this UID, and we redacted the parent's

6   name.  So it's not some freestanding name of the donor.

7           Likewise, there is --

8           THE COURT:  In the stuff that's filed, is there a

9   particular exhibit you can point me to so I can just kind

10  of -- I've read all this stuff, obviously.  This is just so I

11  can kind of eyeball it as you're talking about it.

12          MR. STEIN:  Yes.  If you...

13          THE COURT:  I'll give you a second.  That's fine.

14          MR. STEIN:  It will just take me a second.

15      (Pause.)

16          MR. STEIN:  I'm looking at, it's docket 355.  I just

17  have to find --

18          THE COURT:  Oh, this isn't part of the current

19  briefing then?  This is earlier stuff?

20          MR. STEIN:  Right.  I believe the exhibits to the --

21  the exhibits to the motion for reconsideration are focused on

22  other defendants.

23          THE COURT:  Okay.  Hang on a second.  I'm just, let

24  me -- I'm just pulling up the docket here so I can go find

25  355.

1          All right.  I'm at 355.  Which exhibit should I be

2    looking at?

3          MR. STEIN:  3.

4          THE COURT:  Well, they're A, B, C, so that means,

5    that means C or does that mean D?  Is it tab 3, I guess is

6    what I'm asking.

7          MR. STEIN:  It's tab B.

8          THE COURT:  Tab B.  Okay.  All right.  So this is

9    docket number -- just so everybody knows what I'm looking at,

10   I'm looking at docket No. 355-3.  And give me just a second

11   here.

12         Okay.  So I'm looking at -- okay.  So it's a

13   spreadsheet, basically.

14         MR. STEIN:  It's a spreadsheet.  And --

15         THE COURT:  So column one which is blacked out would

16   have, it says last name, first name.  That presumably is the

17   name of the student.

18         MR. STEIN:  Correct.

19         THE COURT:  And then the second --

20         MR. STEIN:  There are not UIDs for this particular

21   student because we don't have structured admissions data going

22   back beyond 2007-2008.

23         THE COURT:  This is pre 2' -- oh, this is 2005.

24         MR. STEIN:  Right.  But we produced versions of

25   these, you know, that do have UIDs.

1          THE COURT:  So let me just, just so that the record

2     is clear, so the first column says last name, first name.

3     That's blocked out.  The second column says "interested

4     party."  That's not blocked out for some of them and it is for

5     others.  Then it says, then there's a, something that

6     characterizes their degree of interest.

7          Then there's something that characterizes their

8     affiliation, and that might be their title.  It might be

9     donor.  It might be trustee.  It might be whatever.  There's

10    another column about application type, and there's a column of

11    comments which has some stuff blocked out.

12         So if I wanted to, on the first column of that, on

13    the first line, if I wanted to know what student that relates

14    to, you're saying that this was produced in conjunction with

15    other documents that it would make that clear.  Is that

16    what -- did I get that right?

17         MR. STEIN:  No.  No, you would not be able to tell

18    who the student is, but the purpose of having a -- without

19    unredacting it, that would -- that presents a FERPA issue.

20    For older documents where there's not structured data because

21    the UID -- let me back up for a second.

22         Recall that the goal of the UID process was to come

23    up with a common identifier that could be used to identify the

24    same student across the records of all the institutions.  The

25    only way to do that is through structured data, right, so it

1    could be done by computer.

2              THE COURT:  Okay.

3              MR. STEIN:  So the ability to have a UID necessarily

4    depends on how far back your structured data goes.  And most

5    schools don't maintain admissions data, you know, forever.  So

6    this document is not representative of, you know, let's say,

7    the last 15 years, but where we could identify a student from

8    the admissions data, we would have applied and did for other

9    documents apply a UID.

10              Now, for the first line, you can see that the name of

11   the individual, it says "son of blank," right.  So blank is

12   redacted because necessarily if you can tell who they're the

13   son of --

14              THE COURT:  Yeah, right.

15              MR. STEIN:  So we wouldn't have applied a separate

16   UID to that "son of blank," but you can tell from the

17   document, you know, it's referring to that student on that

18   line.

19              THE COURT:  But you don't know who the student is

20   because it's been blacked out.

21              MR. STEIN:  Correct.

22              THE COURT:  Okay.  So if I'm a lawyer in the case on

23   the plaintiffs' side and I want to try to figure out -- and

24   the first line is probably not the best one because it doesn't

25   seem like there's a financial thing.  There's one further down

1   the page.  Let's say the initials of the interested party are

2   JR.  That's a donor.

3          Okay.  If you want to figure out the extent to which

4   financial considerations played an impact in the admission of

5   the particular student, how would you do that because you

6   don't know who the student is.

7          MR. STEIN:  Correct, but as your Honor explained, you

8   know, when we litigated this previously, plaintiffs have the

9   ability to ask questions about how was this type of

10  information used, was it considered as part of the admissions

11  process to try to get at some of the policies and practices.

12         Somebody sitting there is not going to be able to

13  necessarily address a particular issue but again, given the

14  limited nature of the inquiry here which is, did we

15  consider -- did the defendants consider the financial

16  circumstances of the student or the student's family, and that

17  being a binary inquiry, you know, that applies to all schools,

18  your Honor recommended --

19         THE COURT:  Does everybody on the defense side agree

20  that's a binary inquiry?  There's no gradations, it's yes/no?

21  Yes, you lose; no, you win?

22         I've got like 20 defendants, right.  Do I ask for a

23  show of hands at this point?

24         Anyway, continue with your point.

25         MR. STEIN:  Yeah, and to be fair, your Honor, that's

1    our understanding of your order in the motion to dismiss which
2    means --

3              THE COURT:  Yeah.  Okay.  Fine.  Go ahead.

4              MR. STEIN:  And that that would be -- and then if the
5    plaintiffs can establish that that's not sufficient, they
6    would be able to get more.  Now, we think -- we don't believe
7    that when the time comes for plaintiffs to make that showing
8    at least as to Northwestern they will be able to do that.

9              I would also note one other point, your Honor, which
10   is if you recall, there are a number of different vectors for
11   unique blindness.  There's transfers, wait lists.  This issue
12   isn't some sense of sideshow because there has been testimony
13   elicited clearly on the record from a number of schools that
14   were not -- that said they were made aware of wait lists or
15   transfers or the like.

16             So we are in some sense beating a dead horse here but
17   as -- you know, that is a separate --

18             THE COURT:  I haven't seen any offers of judgment
19   getting filed yet, though.

20             MR. STEIN:  Well, yeah, it's not a judgment but it
21   does, we think, frankly, go to the whole proportionality
22   question here.

23             THE COURT:  Okay.  Okay.  All right.

24             So let me go back to Mr. Raymar then.  Why don't you
25   tell me what's wrong with what I'm hearing here from the

1   defense.

2           MR. RAYMAR:  There's a lot wrong.  First of all, in

3   Section 8 of the confidentiality order, there's a requirement

4   of UIDs for all student names who are redacted.  There's no --

5           THE COURT:  It was a little glitched.  Can you repeat

6   that sentence?  There was a requirement in Section 8 --

7           MR. RAYMAR:  There is a requirement of UIDs for all

8   students and applicants and not simply those who end up in the

9   structured data.  So it's perfectly possible for Northwestern

10  and Yale against whom we originally brought the motion to

11  insert UIDs for students who do not appear in structured data.

12          Secondly, Mr. Stein repeated the --

13          THE COURT:  Can you pause right there for a second?

14  Remember your other points but pause right there.

15          And, therefore, what?  What's bad about that?  In

16  other words, the fact that there -- the UIDs apply to anybody

17  whether they're in the structured data or not, what difference

18  does that make?  What difference does that make to me?

19          MR. RAYMAR:  Without a UID or a name, we can't ask

20  anyone, was this person admitted because the statute requires

21  not (inaudible) -- typically consideration but impact on

22  admission.  And we can't ask any questions of, what were the

23  circumstances regarding the donor?  What did the donor ask

24  for?  What did the donor pledge?  What was asked of the donor?

25  Did the donor increase a donation by virtue of a conversation

1  with whomever put the student on this list or in what other

2  defendants have produced which is a presidents list?

3          It's now proposed that we're going to get a

4  presidents list, there may be 100 or 200 students, to the

5  admissions office, "Please admit these kids."  And we won't

6  know who the kids are, and we won't know who the donors are.

7          And we've already had four depositions, two from

8  Dartmouth, one from Northwestern, one from Georgetown where

9  your Honor's hypothetical "how the heck am I supposed to

10 answer this question" manifested itself.

11         We need the circumstances of the donation.  We can't

12 try this case on assumptions.  Mr. Stein for the first time

13 now says at least in Northwestern's case, we should assume

14 that the name of the donor was related to a family member in

15 the applicant.

16         Your Honor would laugh us out of court if we tried to

17 prove the case based on assumption.  Not only has there been

18 no offer of judgment, there's been no offer of stipulations.

19         THE COURT:  Okay.  So just picking up on that point,

20 one of the things that was said a moment ago -- and it's not

21 the first time it's been said.  I think I've heard this in

22 prior conferences that, I don't know if it's all, but a bunch

23 of the schools have essentially conceded that they are not

24 financial circumstances blind as it relates to transfer

25 students, and there was one other category.

1          Let's just take that as a given.  Let's just say

2    that's true for at least one college.  If it were true for a

3    particular college, would you need more as to that college

4    and, if so, why?  In other words, the college -- the college

5    concedes, "We consider financial circumstances when it relates

6    to transfer students."

7          MR. RAYMAR:  I'll answer your Honor's question

8    first --

9          THE COURT:  Go ahead.

10          MR. RAYMAR:  -- and hope to make a second point.

11          We would still need the data because this is a

12   conspiracy case in which if one university blows the exemption

13   standard under the statute, it's blown for all the

14   co-conspirators.  And so we need more than a de minimus of

15   proof that they considered the financial circumstances of

16   applicants they admitted, not simply considered financial

17   circumstances, but the kid was admitted.

18          THE COURT:  So what you're telling me here is or at

19   least part of what you're telling me here is that given what

20   you've gotten in redactions and even taking into account the

21   unique identifiers, you're not always able to tell whether the

22   particular student was actually admitted that's referenced in

23   some other documents?

24          MR. RAYMAR:  That's correct.  That's correct.  And

25   without unique identifiers, we can't go to the structured data

1    to find either the qualifications of the student -- because we

2    want to be able to prove that this student was less qualified

3    and got admitted by virtue of the donation -- or that the

4    student was admitted.

5            THE COURT:  Okay.

6            MR. STEIN:  Your Honor, may I respond to that point

7    briefly?

8            THE COURT:  Give me just a second because I want to

9    finish, process.

10           Yes, go ahead.

11           MR. STEIN:  So a couple of things.  First of all, the

12   confidentiality order expressly applies -- provides that UIDs

13   will be generated from structured data.  There's no other way

14   to do it.  You'd otherwise have to have a team of people

15   sitting down --

16           THE COURT:  Coming up with numbers.

17           MR. STEIN:  -- right, and then matching them to other

18   schools.  It's impossible to do it otherwise.

19           And the plaintiffs here are focusing on the exception

20   rather than the rule, right.  There's a reason they attach

21   documents from 2005 and 2004.  Those are old.  We produced 15

22   years of things that are replete with UIDs, and you can take

23   those UIDs -- if there's a UID, there is structured data.

24           They can take our documents, everyone with a UID, go

25   to the structured data, see exactly what happened with that

1  student, see the academic information they requested from that

2  student, see the financial aid for that student.  They can do

3  that with every single one of those, and there's not been any

4  argument to the contrary.

5         And, you know, again, I'm not sure I understand the

6  point about the response to the question about transfers.

7  Again, if Northwestern says we would need an order for

8  transfers, I'm hard pressed as to how that means they need

9  even more data about donors for Northwestern let alone for any

10 other school.  And, you know, if they want to propose some

11 stipulation, we could certainly consider that, but this "boil

12 the ocean" approach with donor information --

13        THE COURT:  So you're the person who came up with the

14 "boil the ocean" metaphor?

15        MR. STEIN:  Yes.

16        THE COURT:  I just wondered who it was.

17        MR. STEIN:  I couldn't use the sun, the moon, and the

18 stars.  I had to find a different element, but yes.  You know,

19 we --

20        THE COURT:  That's kind of the opposite of the

21 metaphor "draining Lake Michigan with a spoon"?

22        MR. STEIN:  Right.  But, you know --

23        THE COURT:  I've heard that one before too.

24        MR. STEIN:  These tracking lists, again,

25 Northwestern, for example, you can see information in there.

1    And this was elicited at Mr. -- at former President Strotz's

2    deposition.  You can see information in there about giving

3    levels, about potential donor capacity.  It's all -- you know,

4    it's all in these documents.

5            Now, again, they have not put that in the motion

6    before you, and that's why we're loath to have this decided in

7    this context because your Honor had set forth a process where

8    if they could come forward and show, you know, based on

9    documents and deposition testimony that they need more, they

10   would get it, but I don't think they can.

11           And I'm concerned about this being decided on this,

12   you know, potentially incomplete record.  Plaintiffs have done

13   what you suggested they do, which was take the deposition of

14   Northwestern of its former president.  And we believe if your

15   Honor -- we don't believe they can make that showing.

16           THE COURT:  You were about to say if I were to read

17   the deposition.

18           MR. STEIN:  We are welcome --

19           THE COURT:  Yeah, I -- how many pages is it?  450?  I

20   don't think so.

21           MR. STEIN:  It's 200.

22           MR. GILBERT:  I'll interject because I actually took

23   the deposition.

24           THE COURT:  I can't hear you.  I mean, I can hear

25   that there's somebody talking, but I can't hear what you're

1    saying.

2          Now you're muted.

3          You're muted, Mr. Gilbert.

4          MR. GILBERT:  I'll try again.  This is Robert

5    Gilbert.

6          THE COURT:  Yeah, but your mike is turned on, like,

7    mouse level, and I mean a physical mouse, not a computer

8    mouse.  So either crank it up or yell or get closer to it.

9          MR. GILBERT:  Sorry, your Honor.  I'm trying my best

10   here.

11         Is that better?

12         THE COURT:  Slightly.

13         MR. GILBERT:  Is that better?

14         THE COURT:  That's better.

15         MR. GILBERT:  Okay.  Sorry.  All right.  I'm sorry.

16   This is Robert Gilbert, if I may interject just briefly.

17         I was the person who took the deposition of the

18   president of Northwestern, and many times or at least several

19   times he said pretty much what your Honor anticipated:  "How

20   the heck should I know?  I don't know who this person is."  So

21   that's what we encountered when we took the deposition of

22   Morton Schapiro.

23         THE COURT:  I think, though, what I think I'm hearing

24   at least in part from the defendants is that what's the --

25   there's no significant gain to having that issue hashed out on

1    a granular level.  In other words, and you're looking at that

2    undue burden and proportionality or whatever, you know.

3    Fighting that out on a -- or figuring that out on an

4    individual-by-individual basis may have some benefit to it

5    from the plaintiffs, but at least in the context we're talking

6    about now, what I'm hearing from the defendants is it imposes

7    a very significant burden in terms of this whole redaction

8    process or unredaction process.

9         And the benefit on the other side is not significant

10   in comparison with the other data that you already have which

11   is this structured data that at least if it's -- you know, I'm

12   going to -- I'm going to single somebody out here.

13   Mr. Raymar, would you stop freaking shaking your head when

14   other people are talking?  It is really distracting.  It's

15   really distracting when you're in a courtroom, and it's even

16   more distracting when you're on a video, so cut it out.

17        And now I have lost my train of thought.  Just answer

18   right where I said, Mr. Gilbert, or whoever.

19        MR. RAYMAR:  May I address that, your Honor?

20        THE COURT:  This is one of the reasons why we're not

21   doing any more videos or phone calls because when I have

22   somebody in the courtroom and they start doing crap like that,

23   I can just put them in the penalty box and tell them they

24   don't get to talk anymore, and that's exactly what's going to

25   happen.

1          MR. RAYMAR:  Might I address that, your Honor?

2          THE COURT:  I don't know.  See if you can.

3          MR. RAYMAR:  The statute requires the order to break

4    through the 568 exemption that we showed at a university or

5    the conspiracy with regard to the financial terms of

6    (inaudible) -- different universities including Northwestern

7    have waived the 568 defense, but they have not stipulated that

8    the -- they or their colleague universities were admitting

9    students without -- with regard to financial circumstances.

10         Yes, there are some individual questions on which

11   they said on the wait list or transfer, "we were made aware."

12   There are some examples in the exhibits.

13         Mr. Stein called to your attention where it could be

14   inferred that a donation had something to do with the

15   admission of a related family member, but we can't try the

16   case on assumptions and inferences.  That's why without

17   stipulations, we still have a case to prove.

18         Yes, we have months left to prove it, but as we take

19   all these depositions and we get the answers your Honor

20   anticipated that, "I can't tell.  I can't answer the question.

21   I don't know who the heck the person was.  I can't tell you

22   that this student would not have been admitted without the

23   donation."  We need to prove that absent stipulations.

24         And although Mr. Stein correctly says there are

25   inferences here, there's circumstantial evidence there, there

1   perhaps was need awareness on wait list at some schools, there

2   perhaps was need awareness on transfers at some schools, we

3   don't have stipulations.  We still have to try to prove our

4   case.

5          And when you look through each of the entries even on

6   the two Northwestern exhibits in our original motion, we can't

7   not only ask the witness, the admissions director or the

8   president, was this person admitted on account of a donation.

9   We can't get into the circumstances.  We can't even ask

10  Mr. Schapiro, "Well, what were the discussions that led to

11  putting this person on your presidents list" because he

12  doesn't know who the person is.

13         So he can't tell us the circumstances.  And without

14  telling us the circumstances, he can't tell us that it was a

15  donation that breaches the 568 exemption in this case for

16  Northwestern.

17         THE COURT:  Okay.  So the specific remedy, specific

18  remedy that you are asking me for on this particular motion is

19  what exactly?

20         MR. RAYMAR:  We asked for the names of the donors.

21         THE COURT:  Which donors?  Every donor?  Donors that

22  are named on the -- that's what "specifically" means.  Just

23  donors that are named on these presidents lists?  What?

24         MR. RAYMAR:  With regard to that student

25  (inaudible) --

1      THE COURT:  You want me to -- you want me to enter an

2  order, right?  You want me to enter an order?

3      MR. RAYMAR:  Yes.

4      THE COURT:  And the order is supposed to say what on

5  this?  I mean, I can't enter an order saying, okay, disclose

6  it with this -- on this particular student.  That's a

7  meaningless order.

8      So what's the relief?  What's the order supposed to

9  say that you want me to make?

10      MR. RAYMAR:  Donor names are not to be redacted,

11  number one.  Number --

12      THE COURT:  Okay.  So pause -- okay.  That's number

13  one, donor names are not to be redacted.  What's number two?

14      MR. RAYMAR:  Number two, for students who don't have

15  UIDs, create UIDs.

16      THE COURT:  Okay.  Is there a number three, or is

17  that it?

18      MR. RAYMAR:  There is number three.  I have to look

19  it up, your Honor.

20      I'll stick with that.

21      THE COURT:  Okay.  So on the second part of that,

22  students without UIDs, is that -- is that just -- is that --

23  as a category of people, does that just tend to be the older

24  records before all of this stuff was computerized, or is it

25  more than that?

1            MR. RAYMAR:  I can't honestly answer that question.

2    I don't know.  I know that a lot of the documents we were

3    given had no UIDs including the Northwestern documents.  They

4    say it's because they're the older documents.  I don't doubt

5    Mr. Stein, but I don't know.

6            THE COURT:  All right.  So let me ask you then on

7    number one, don't redact donor names.  Let me ask this very

8    specific question.  So it's a hypothetical.  So let's say

9    you've got an email, an email from, you know, the president of

10   University X to the admissions director saying, "I received a

11   call from donor Matthew Kennelly who gives a million dollars a

12   year, and he asked that we admit his grandson to our

13   university.  Please do this."

14           Okay.  Now, if you don't redact my name from that

15   record, you know who the student is.  So that's -- you're in

16   effect identifying the student when you identify me.  This

17   would be true for many, perhaps most, maybe not all, records

18   like that.  Identifying the donor is going to identify the

19   student, and they're likely going to be identified in the same

20   record.

21           So it would seem to me that that, before that

22   happens, there would have to be under FERPA notice given to

23   the student saying, "We're about to disclose your records."

24           Mr. Raymar's picture just disappeared.

25           Okay.  It came back.

1       All right.  So what about that?  So what about that?

2       MR. RAYMAR:  Right.  The (inaudible) -- the type of

3   records that Mr. Stein referred to and that we have been

4   referring to is, in fact, an education record.

5       There's a distinction between the donation record and

6   an education record in the confidentiality order.  And under

7   both the regulations and the guidance from the Department of

8   Education, these are not education records.  If they're not

9   education records, you don't have to worry about identifying

10  the student.

11      If the CFR wanted to say, if the Department wanted to

12  say that every time a student's name is identified, that's an

13  education record that has to be redacted or notice given, they

14  could have said that.  It did not say that.

15      THE COURT:  So stop.  I am looking at, I forget which

16  title, 34 CFR 99.3.  That's the definition section.

17  "Education records, (a):  The term means those records that

18  are:  (1) directly related to a student; and (2) maintained by

19  an educational agency or institution or by a party acting for

20  the agency or institution."

21      So right there, the thing that I just described

22  qualifies because it's a record, it's directly related to the

23  student, and it's maintained by the university.

24      MR. RAYMAR:  May I respectfully disagree because the

25  donor --

1          THE COURT:  Okay.  Is there a word that's missing

2     from the regulation?

3          MR. RAYMAR:  Yes.  It's about the donor, the donor's

4     history of donation, his ties to Northwestern, the amount of

5     his --

6          THE COURT:  Stop.  So don't change my hypothetical.

7     My hypothetical says it's an email from the president to the

8     director of admissions saying, "I got -- I was contacted by

9     Matthew Kennelly who gives a million dollars a year, and he

10    wants us to admit his grandson X who's an applicant."

11         And let's say the admissions director then checks off

12    the file and that person, and the grandson gets admitted, so

13    now the grandson is a student.  How is this not a record

14    that's directly related to a student?  That's the --

15         MR. RAYMAR:  Not --

16         THE COURT:  Those are the words in the regulation:

17    "This term means those records that are directly related to a

18    student."

19         MR. RAYMAR:  We disagree with that, your Honor.

20         THE COURT:  Well, how can you?  I mean, it's the

21    English language, for God's sake.

22         MR. RAYMAR:  Because we quoted the guidance in the

23    reply memorandum about what is an education record, and it

24    talks about student academic performance, about disciplinary

25    proceedings, about his curriculum, about the papers he wrote.

1    It's not that the grandfather wants to make a million dollar

2    donation so that his daughter can be admitted.  The focus

3    there is not on the student.  The focus is on the donor.

4          And what we see in these donation records again and

5    again is these 16 remaining universities building

6    relationships with donors, building their endowments, seeing

7    how much they could get -- I read you the numbers as to Yale

8    on May 31st -- in order to get a preferential treatment of the

9    student.  The focus is on the donor, not on the academic

10    credentials or the disciplinary record or the record at a

11    university or high school of the student.

12          THE COURT:  I have to tell you, I don't understand

13    how you, or if it's the agency, how the agency is getting from

14    the regulation that is published in the CFR to what you just

15    said.  The term "record" is defined in the same regulation.

16    It means any information recorded in any way, dot, dot, dot.

17    Education record means a record, so in other words, any

18    information recorded in any way that directly relates to a

19    student.

20          MR. RAYMAR:  I'm looking for the guidance.

21          THE COURT:  Guidance -- I mean, I don't want to say

22    this.  Guidance, schmidance.  It's a regulation, for God's

23    sake.

24          MR. RAYMAR:  Your Honor, it's not a regulation.  It

25    says every name of the student makes it an education record.

1    That's why in the confidentiality order there was a

2    distinction drawn between education records and donation

3    records.

4         THE COURT:  That's -- but, see, this is why I gave

5    you the hypothetical that I did because I wanted to have it

6    deal with something like what we're talking about here.

7         I completely agree that you -- if you've got a list

8    of the donors of the university, those aren't education

9    records.  They're not.  They're not education records, no way.

10   The hypothetical that I gave you -- I mean, it wasn't just

11   pulled out of the air, for God's sake.  I made it up for a

12   reason.  It's a record that includes the name of a donor and

13   relates it to a particular student so that if you disclose the

14   name of the donor and black out the name of the student, you

15   know who the student is.

16        MR. RAYMAR:  I hear you.  I found the reference I was

17   looking for, and that is, includes -- an education record,

18   quote, includes student-related data such as grades,

19   transcripts, class lists, student course schedules, health

20   records, student financial information, student disciplinary

21   files.  That's on Page 6 of our brief.

22        It's not my grandfather --

23        THE COURT:  Keep going.  Did you read me the whole

24   thing, the "such as"?  Are applications included in there?

25        MR. RAYMAR:  I don't know.  I --

1      THE COURT:  You have it in front of you.  You're

2   reading from it.

3      MR. RAYMAR:  No, I'm reading from my brief.  I can't

4   get on two sites at the same time.  I don't think so, and I

5   don't -- can't answer your question more than that.

6      There's a second point, your Honor.  We're not

7   boiling an ocean anymore.  We've -- we've distilled this to

8   the applicants whose family member made a substantial

9   contribution with the understanding or the anticipation that

10  it would impact the admission of the student.  That is a

11  limited set of student names.

12     If they need to give FERPA notice, that's not

13  burdensome.  The notice requirements are not burdensome.  It's

14  the last known email address.  And there's even the notice

15  that has to be given attached to the FERPA order your Honor

16  entered.  It's not burdensome.

17     If they have to give notice, your Honor disagrees

18  with me, fine, or the university disagrees, that's fine, let

19  them give the notice to that limited set of students.  But

20  without it, we can't prove -- they're going to come up and

21  say --

22     THE COURT:  I get -- I get -- I completely understand

23  the evidentiary proof issue.  I completely understand the

24  proof issue.  You don't have to keep repeating that part of

25  it.  I completely understand the proof issue.

1          What I'm trying to get a handle on --

2          MR. RAYMAR:  May I --

3          THE COURT:  No, you may not.  You've said pretty much

4     everything.  You've talked more than me during this hearing,

5     so you're going to be done after I finish saying what I'm

6     saying.

7          And you interrupted me again, and I lost my train of

8     thought, so now I've got to look at the transcript to try to

9     figure it out.  Sorry.

10          I completely understand the proof issue.  What I'm

11     trying to get a handle on is the following, that the

12     defendants are saying that in terms of trying to decide burden

13     and proportionality, they're saying that this is a relatively

14     minor point that would impose a significant burden, okay, and

15     that I ought to rule their way on the proportionality or undue

16     burden issues which is two sides of the same coin.  That's

17     what I'm trying to get a handle on.

18          So I want to have somebody on the defense side who is

19     willing to be the spokesman for everybody, spokesperson for

20     everybody, give me the counterpoint to what Mr. Raymar has

21     been saying.

22          MS. MASCHERIN:  Your Honor, this is Terri Mascherin

23     on behalf of Dartmouth.  I'm happy to speak to this since

24     Dartmouth's name was mentioned a little bit ago.

25          It is a significant burden, your Honor, and the

1  burden does -- it is disproportionate.  Just by way of

2  example, we put forth a witness last week who gave testimony

3  to the effect that each year in certain admissions decisions,

4  candidates who were on the fence, if you will, would be

5  admitted because of the interest of the alumni affairs and

6  development office.

7       We have also, we -- unlike Northwestern, we have

8  structured data that goes back two decades.  We've produced

9  student admissions, structured data going back to the early

10  2000s.  We've generated UIDs for all those students.

11       The UIDs have been inserted into all of the priority

12  lists that we've produced which are ample in number and,

13  therefore, the combination of deposition testimony that is

14  being elicited and plaintiffs' ability to match the UIDs from

15  those priority lists to the admissions records do allow

16  plaintiff to discern evidence to show that information that

17  was contained on those lists was, in fact, taken into

18  consideration in the admissions decision.  And they can see

19  from their admissions structured data what those decisions

20  were.

21       And, in fact, in the first deposition of a Dartmouth

22  employee that was taken in this case, the questioning lawyer,

23  in fact, commented that his associate had run the UIDs against

24  the structured data and that -- I believe the number was 14 of

25  the however many were on that list had, in fact, been

1    admitted.  So the -- in comparison, your Honor, from my client

2    we're talking about records going back a couple of decades and

3    a substantially large number of notice, notices that would

4    have to be given out.

5         So this is not a "one size fits all," but I

6    wholeheartedly agree with Mr. Stein's articulation earlier

7    that plaintiffs have, through the wide range of discovery

8    available to them, the ability to flip the switch with respect

9    to whether the exemption does or does not apply to the group.

10        And to be clear, Dartmouth is one of the schools that

11   is not asserting the exemption and that this burden would be

12   disproportionate.

13        THE COURT:  You responded -- this is a distillation

14   of some of the points that Mr. Raymar raised and Mr. Gilbert

15   were making.

16        We get that there's at least some indication out

17   there that at least some of the universities considered

18   financial circumstances in at least some situations.  A,

19   nobody has stipulated to that yet and, B, we don't want to

20   prove our case by 50.1 percent to 49.9 percent.  Nobody does.

21   We want to prove our case way more than that.

22        And so it's not enough to have these, you know, many

23   not even admissions here in the next place, we want to be able

24   to put the whole package together.  And in doing that, the

25   fact that we, you know, can pull a bit or piece from here or

1    there really doesn't do the -- do it for us.

2         We need to be able to ask actual witnesses actual

3    questions about actual information that's been produced to us,

4    and we're being hamstrung in doing that because of all of the

5    blackouts that are happening pursuant to, I guess, the

6    protective order because when we stick the thing in front of

7    the witness, the witness says, "I have no idea what this is

8    about, so I can't really comment on it."

9         What about that, all of that?

10        MS. MASCHERIN:  Your Honor, in the deposition, when

11   the UIDs are present in the document, the plaintiffs can tell

12   who on the list was admitted and who was not admitted.  The

13   plaintiffs can also tell from many of these documents produced

14   by many of the defendants what the specific information was

15   that was given.  As Mr. Stein noted, what's the parent's

16   giving history?  What's the assessed giving potential of this

17   particular interested donor, etcetera?

18        And so there is ample evidence, your Honor, from

19   which the plaintiffs can make their case.  They don't need --

20   I submit they don't need to know who a particular parent or

21   grandparent is who was mentioned in the record whose name is

22   redacted under FERPA to know that this student was -- for

23   example, was admitted; that this student had certain academic

24   credentials; where that puts the student in the spectrum of

25   the students who applied in that cycle; and the fact that the

1  dean of admissions was provided with information about either

2  the giving potential of the family or the family's

3  longstanding legacy relationship or contributions to the

4  alumni body, any of those things.  And that, your Honor--

5         THE COURT:  Yeah, but what if the dean of admissions

6  then testifies in their deposition when asked, "Well, did you

7  take any of that into account" says, "I don't know because I

8  don't know who you're talking about here."

9         You can't tell me that's not going to happen or that

10 it hasn't happened.  It has.

11        MS. MASCHERIN:  I -- I don't deny that that --

12        THE COURT:  I mean, in other words, A gives B all of

13 this, you know, financial -- financial need-related

14 information or financial, whatever we're calling it, financial

15 circumstances-related information.  A gives it to B, but the

16 question is whether it got considered or not.

17        I get stuff all the time that I don't consider.

18 Okay.  It's given to me, but I don't consider it because it's

19 not relevant.  It doesn't make a difference.  It's a tiny

20 factor in the overall scheme of things or whatever.

21        And it's not enough, it would seem to me, for the

22 plaintiffs to be able to show all this information was

23 provided, it was put out there that this person had this very

24 wealthy -- this very wealthy parent who we might be able to

25 set up as a donor or this person has a wealthy grandparent who

1    already is a donor or whatever.

2          That's all well and good, but if they can't -- at

3    least on some of it, if they can't make the match on whether

4    that got taken into account which likely involves asking some

5    person a question that the person can answer, then what good

6    is it?

7          MS. MASCHERIN:  Your Honor, speaking just for the

8    records that I am most familiar with in this case, typically

9    the records have -- the records include an initial decision by

10   the admissions department, information provided from alumni

11   affairs and development with respect to a limited number of

12   applicants, and then a final admissions decision.

13         In fact, for many years, there are reports that show

14   initial decision, final decision.  So it's quite evident how

15   the decisions changed as a result of the meeting and --

16         MR. STEIN:  Your Honor --

17         MS. MASCHERIN:  -- they don't need to know the

18   individual identities of the students and their parents to see

19   that it happened.  And once there is that evidence then we get

20   to, you now, emptying Lake Michigan or boiling the ocean or

21   whatever metaphor you would like to apply.

22         MR. STEIN:  And, your Honor, all of those questions

23   you described are all great questions that I was shocked were

24   not asked at Morty Schapiro's deposition.  I don't know why

25   they didn't.  They didn't.  That's one of the reasons -- I

1    would be happy to have you review that deposition as part of

2    the analysis about whether more is needed here.

3         You know, plaintiffs come in with this table pounding

4    about selling admissions.  It's ridiculous.  But then they

5    have the person that they've made the poster child for this,

6    Northwestern in the deposition.  They don't ask him those

7    questions.  They don't ask him.  How was this information

8    considered?  They said what does this column mean, what does

9    that column mean.  They didn't ask him.

10        So then to come in and say, turn out their pockets

11   and say, "Oh, we need more," they didn't even do the very

12   basic kinds of things that your Honor suggested.

13        And, sure, he can't tell who the name is behind a

14   particular line, but why is that necessary?  You can easily

15   ask, how was this information considered?  Did you consider

16   it?

17        THE COURT:  Okay.  I have to bring this to a close

18   here.  So here's where I think we are.  So a couple of things.

19   So number one, I'm not backtracking on what I said before in

20   the prior hearings about a donor record is not an education

21   record, but I want to be clear on what I meant by that.

22        What I didn't mean by that, that's the best way to

23   define it for this purpose, is when a record -- Mr. Raymar

24   just went the other way.  I want to make sure he's listening.

25        MR. RAYMAR:  I can walk and talk.

1          THE COURT:   What I didn't mean by that is that when a

2     record discloses something about a donor and also discloses a

3     relationship between that donor and somebody who has ended up

4     as a student, whether they were an applicant at the time or a

5     student at the time or whatever, I didn't mean that that's not

6     an education record.

7          As far as your reading of the regulation, the

8     regulation is -- seems to me to be pretty clear on its face.

9     And I will just comment on this guidance.  And if you had been

10    able to pull it up for me or show it to me, I could have

11    commented on it further.

12         You know, the laundry list of items in there was

13    "such as."  That's by definition nonexclusive.  Okay.  And so

14    I -- it just seems to me that a record that says, "Donor X

15    called about -- contacted us about their child, applicant Y"

16    and applicant Y ends up being a student that under the plain

17    language of the definition in the -- in Section 99.3 of Title

18    34 of the Code of Federal Regulations, that qualifies as an

19    education record, and the name constitutes personally

20    identifiable information, whatever the lingo is.

21         So that's kind of my thinking about all of that.

22    Now, is that -- is that a holy writ either?  Of course, it's

23    not a holy writ.  I haven't had the -- to the extent I had to

24    deal with it in a 12(b)(6) motion which, by the way, I point

25    out, that's not the final judgment in the case either, but

1   whatever.  You know, it's not a holy writ.  It's subject to

2   modification if I get a brief later on that convinces me

3   otherwise, but that's kind of where I sit right now.

4          And so I'm not prepared at this point to start

5   telling people to -- we're chucking the redaction scheme out

6   the window and do the two things that Mr. Raymar said is,

7   don't redact donor names and for students without UIDs, create

8   UIDs.

9          On the latter point, it just seems to me that that

10  would involve a significant burden.  I'm not at the moment

11  persuaded that it's proportional.  And on the donor names

12  thing if, in the types of records I'm talking about, it seems

13  to me that it's appropriate to redact them unless -- and

14  here's where we're going to get to the rest of it, unless

15  there's going to be a FERPA disclosure made.  Okay.  But I'm

16  not prepared to do that in gross either.

17         And one of the things I think I have to be cognizant

18  of is that this motion relates to two schools, but I've got

19  however many, 15 or however many I've got here.  And anything

20  I say is going to probably end up applying to everybody.  And

21  so I'm not prepared to do it in gross because I don't know how

22  much notification -- you know, how many instances of

23  notification would be required if I were to make -- if I were

24  to say, okay, it's time to do that.

25         And the reason I don't know that is that nobody's

1    told me.  In the first instance, it's the plaintiffs' -- it's

2    on the plaintiffs to tell me, I think, "Okay, Judge, we don't

3    necessarily agree with your ruling about what the regulation

4    means, but taking that as a given, we want you to give -- we

5    want you to require the universities to disclose these records

6    which is going to mean requiring giving notice to

7    approximately X number of people."

8            I don't know what that X is, and I think the

9    plaintiffs need to tell me what that is, and I think the

10   defendants need to tell me what that is.

11           So what I'm going to say at the moment is that the

12   motion to reconsider is -- in terms of the relief that's being

13   requested is denied without prejudice.  And the "without

14   prejudice" means to, some motion that after, you know,

15   appropriate consultation and whatever, basically tells me

16   what -- what the numbers are that I'm dealing with here

17   because I think it's reasonable to expect that, you know, if

18   it's 100 people, it's going to be one thing.  If it's 10,000

19   people, it's going to be another thing.

20           And one of the things that I have to take into

21   account is, you know, I have to think down the road on what

22   the ultimate burden is going to be later and how many of those

23   people are going to object and how are we going to deal with

24   all of that.  So that's the ruling on that.

25           I don't have time to -- at this point I don't have

1    time to talk about the other motion that's on the table right

2    now which is the motion to compel and for sanctions as it

3    relates to Georgetown, but I do want to make a couple of

4    comments about it, and I have a couple of questions.  And I

5    don't want to hear argument.  I just want answers to my

6    questions, and then I'll make a couple of comments.

7           So hang on one second.  Let me just get to my notes

8    here.  Pardon me.

9           So I entered this order back in March that imposed

10   limits on post -- on discovery of matters that occurred after

11   the complaint was filed in this case.  And the complaint was

12   filed in this case in January of 2022, and the order was

13   entered in March of 2023.

14          Did the defendants know at that point that there was

15   this investigation going on by the Department of Justice and

16   the New York Attorney General?  Yes or no?  March of 2023, did

17   you know that?

18          MS. MILLER:  Yes.

19          THE COURT:  Did anybody tell me that?  In conjunction

20   with that ruling that I made, did anybody tell me that?

21          MS. MILLER:  Not that I'm aware of, your Honor.

22          THE COURT:  And that was Ms. Miller that was talking

23   just then?

24          MS. MILLER:  Yes, sir.  Apologies.

25          THE COURT:  Okay.  Did the plaintiffs know that

1 that -- as of March of 2023, March 8th when I entered the

2 order, did the plaintiffs know that investigation was going

3 on?

4    MR. GILBERT:  Your Honor, no.  This is Robert

5 Gilbert.

6    THE COURT:  Okay.  So let me just make a couple of --

7 and actually, I think I might have one more question.  Give me

8 a second.

9    All right.  I want to ask one other question, and

10 it's about a statement that's made in summary in an earlier

11 part of the response brief that's more detail on Page 6:

12    "Notwithstanding that Georgetown and a number of

13 other defendants determined that the DOJ transcript was not

14 responsive to the March 8th order, in the lead-up both to

15 certain deadlines, Georgetown again considered the Deacon

16 transcript" -- D-e-a-c-o-n transcript -- "and elected to

17 produce it so that plaintiffs had an opportunity to question

18 appropriate witnesses about the substance of the testimony and

19 to avoid later discovery disputes about whether the transcript

20 should have been produced."

21    So I want to just kind of drill down a little bit on

22 the last part of that, "to avoid later discovery disputes

23 about whether the transcript should have been produced."

24    What the heck does that mean after you spend most of

25 your brief telling me that it didn't have to be produced?

1          MS. MILLER:  Your Honor, we didn't want to be --

2    inevitably in a deposition the plaintiffs will ask, "Have you

3    ever been deposed before?"  At some point inevitably

4    Mr. Deacon will be deposed.  We expect that he would have

5    said, "Yes, I have been deposed."  The fact of the deposition

6    would have come out.

7          We wanted to avoid potential motion practice, the

8    very motion practice we find ourselves in right now as to

9    whether or not it should have been produced.  We had hoped to

10   avoid that dis --

11         THE COURT:  Even -- but that's why I focused on the

12   language that you used, "to avoid later discovery disputes

13   about whether the transcripts should have been produced."

14         I mean, you take this very strident position in your

15   response here that the transcript wasn't required to be

16   produced because I entered an order that specifically covered

17   post-complaint discovery.

18         So why would there have been a dispute about it if

19   you hadn't produced it?

20         MS. MILLER:  If we hadn't produced it and plaintiffs

21   had find out about it at one of the depositions, I have no

22   doubt that plaintiffs would have filed a motion seeking its

23   production and we would have had the very dispute that we are

24   having right now and now --

25         THE COURT:  Okay.  Now I've got another question.

1    And I'll take an answer on this from any defense counsel who

2    wants to answer, but whoever goes first is the first -- is the

3    person who is going to do it.

4         Why didn't anybody tell me when you asked me for this

5    sort of limiting post-complaint discovery that there was an

6    investigation going on that already had at that point involved

7    depositions being taken of people on the very same issues

8    involved in this case?

9         Why did nobody think, "Gee, maybe the judge should

10   know about this when he's being asked to make a ruling about

11   post-complaint discovery"?  Why didn't anybody do that?  I'll

12   take a volunteer.

13        MR. ROELLKE:  Your Honor, John Roellke for Brown

14   University.  I'll just say for Brown, we weren't involved in

15   the investigation, so that's the reason we didn't do it.

16        THE COURT:  Well, then you're not a good person to

17   answer this question, okay, so don't waste my time.

18        Okay.  The record will reflect a really long silence.

19        This is a no-brainer, folks on the defense side.

20   This is a no-brainer, no-brainer.  I should have been told

21   about that.  I should have been told that there was a parallel

22   investigation involving -- involving depositions being -- were

23   already ongoing when I was being asked to limit post-complaint

24   discovery.

25        And I will tell you that it's not -- it should not be

1    surprising to you that when I read all of this stuff, I

2    figured, yeah, there's a pretty good chance that I wasn't told

3    that on purpose because if I had been told that, you wouldn't

4    have gotten an order that said anything like the one that you

5    said -- that you got here.  Of course, those depositions would

6    have been produced.  Of course, they would have.  Of course,

7    they would have.

8          So you can stand on the language of an order that I

9    entered in an information vacuum that was created by the

10   defendants.  There's lots of words for that.  We could call it

11   concealment.  We could call it a bunch of other things, but

12   that's -- that's dirty pool as far as I am concerned.  It is

13   dirty pool.

14         Now, does that mean I should be putting people in --

15   you know, imposing sanctions and stuff like that?  I'm not

16   really persuaded of that either at this point, but you have

17   not put yourselves in a good position, the folks who were

18   involved in that investigation that knew about it and didn't

19   think to breathe a word of me or thought not to breathe a word

20   of me which is what I suspect actually happened.

21         You did not put yourselves in a good position.  And,

22   you know, how that colors later rulings, I guess we can all

23   argue about that five years from now, but it's not a good

24   thing.

25         What I want you to do on that is I want you to

1    take -- on that motion is to take the -- take the proposal

2    that Georgetown made that's listed in bullet -- it's

3    described, it's summarized at the bottom of Page 3 and the top

4    of Page 4 on some bullet points.  Take the issue of sanctions

5    off the table.

6            Maybe there's somebody -- I'm not averse to making

7    somebody come back and testify more.  That part of it, I'm

8    okay with.  We're not going to be talking about money, you

9    know, censuring or reprimanding or anything like that beyond

10   what I have already done because I think I just kind of did

11   the reprimand thing.  And try to come up with an agreement on

12   what's going to happen in terms of additional production.

13           I think on the defense side, you have to assume that

14   your person who already got deposed is going to have to sit

15   some more.  So that motion is taken under advisement.  You're

16   to talk about it more.  I want a status report by a week from

17   now that --

18           MR. GILBERT:  Your Honor, this is Robert Gilbert for

19   the plaintiffs.

20           THE COURT:  Hold on.  No, you may not.  You just

21   interrupted me, so you just lost your right to talk for the

22   rest of the hearing.

23           I want that report by the 31st of July.

24           And this is why we're not doing any more phone or

25   video hearings because when a person interrupts me in the

1    courtroom, that's going to be the last time they talk there

2    too.

3          So here is the deal from now on.  The first of the

4    in-person hearings that I referenced is going to be on the

5    24th of -- it's going to be on -- hang on a second.  I want to

6    make sure I don't blow the date here.  It's going to be on the

7    25th of August -- excuse me.  It's going to be on the 24th of

8    August at 1:00 o'clock in the afternoon in person in the

9    courtroom.

10         Any motions that anybody wants -- there's a status

11   report that's due a week before that which is the 17th of

12   August.  This one is only four weeks out.  Going forward it

13   will be six weeks, but I have to do it then for a couple of

14   reasons relating to schedule.

15         Any motions that relate, that anybody wants me to

16   decide are going to need to be filed by 10 days before that,

17   which is the 14th of August which is a Monday, and the

18   responses to any such motions are due on the 21st.  There

19   won't be any replies.  And if I need to hear argument, I'll

20   hear it at the hearing.

21         The deal is going to be you have to be there in

22   person to talk.  We'll provide a call-in number for people to

23   call in and listen, but it's listen only.

24         That concludes our hearing today.  I've given you an

25   hour and 15 minutes or an hour and 10 minutes, and that's all

51

1    I got to give you because I've got people sitting in my
2    courtroom waiting for me.
3            Take care.  Thanks.
4        (Proceedings adjourned at 10:57 a.m.)
5                    * * * * * * *
6                C E R T I F I C A T E
7        I, Judith A. Walsh, do hereby certify that the
8    foregoing is a complete, true, and accurate transcript of the
9    proceedings had in the above-entitled case before the
10   Honorable MATTHEW F. KENNELLY, one of the judges of said
11   court, at Chicago, Illinois, on July 24, 2023.
12
13   /s/ Judith A. Walsh, CSR, RDR, F/CRR_____     July 26, 2023
14   Official Court Reporter
15   United States District Court
16   Northern District of Illinois
17   Eastern Division
18
19
20
21
22
23
24
25