## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ANDREW CORZO, SIA HENRY, ALEXANDER LEOGUERRA, MICHAEL MAERLENDER, BRANDON PIYEVSKY, BENJAMIN SHUMATE, BRITTANY TATIANA WEAVER, and CAMERON WILLIAMS, individually and on behalf of all others similarly situated, | Case No. 1:22-cv-00125-MFK |
| *Plaintiffs*, | Judge Matthew F. Kennelly |
| v. | |
| BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, THE JOHNS HOPKINS UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY, | |
| *Defendants*. | |

## DECLARATION OF STEVEN WEISBROT, ESQ. OF ANGEION GROUP LLC
## RE: THE PROPOSED NOTICE PLAN

I, Steven Weisbrot, Esq., declare under penalty of perjury as follows:

1.      I am the President and Chief Executive Officer at the class action notice and claims administration firm Angeion Group, LLC ("Angeion"). Angeion specializes in designing, developing, analyzing, and implementing large-scale legal notification plans.

2.      I have personal knowledge of the matters stated herein. In forming my opinions regarding notice in this action, I have communicated with class counsel and reviewed relevant pleadings and

other documents relating to the case, in addition to drawing from my extensive class action notice experience, as described below.

3.      I have been responsible in whole or in part for the design and implementation of hundreds of court-approved notice and administration programs, including some of the largest and most complex notice plans in recent history. I have taught numerous accredited Continuing Legal Education courses on the Ethics of Legal Notification in Class Action Settlements, using Digital Media in Due Process Notice Programs, as well as Claims Administration, generally. I am the author of multiple articles on Class Action Notice, Claims Administration, and Notice Design in publications such as Bloomberg, BNA Class Action Litigation Report, Law360, the ABA Class Action and Derivative Section Newsletter, and I am a frequent speaker on notice issues at conferences throughout the United States and internationally.

4.      I was certified as a professional in digital media sales by the Interactive Advertising Bureau ("IAB") and I am co-author of the Digital Media section of Duke Law's *Guidelines and Best Practices—Implementing 2018 Amendments to Rule 23* and the soon to be published George Washington Law School Best Practices Guide to Class Action Litigation.

5.      I have given public comment and written guidance to the Judicial Conference Committee on Rules of Practice and Procedure on the role of direct mail, email, broadcast media, digital media, and print publication, in effecting Due Process notice, and I have met with representatives of the Federal Judicial Center to discuss the 2018 amendments to Rule 23 and offered an educational curriculum for the judiciary concerning notice procedures.

6.      Prior to joining Angeion's executive team, I was employed as Director of Class Action Services at Kurtzman Carson Consultants, an experienced notice and settlement administrator. Prior to my notice and claims administration experience, I was employed in private law practice.

7.      My notice work comprises a wide range of class actions that include antitrust, data breach, mass disasters, product defect, false advertising, employment discrimination, tobacco, banking, firearm, insurance, and bankruptcy cases.

8.  I have been at the forefront of infusing digital media, as well as big data and advanced targeting, into class action notice programs. Courts have repeatedly recognized my work in the design of class action notice programs. A comprehensive summary of judicial recognition Angeion has received is attached hereto as **Exhibit A**.

9.  By way of background, Angeion is an experienced class action notice and claims administration company formed by a team of executives that have had extensive tenures at five other nationally recognized claims administration companies. Collectively, the management team at Angeion has overseen more than 2,000 class action settlements and distributed over $15 billion to Settlement Class Members. The executive profiles as well as the company overview are available at https://www.angeiongroup.com/our_team.php.

10.  As a class action administrator, Angeion has regularly been approved by both federal and state courts throughout the United States and abroad to provide notice of class actions and claims processing services.

11.  This declaration will describe the Notice Plan that, if approved by the Court, Angeion will implement in this matter, including the considerations that informed the development of the plan and why it will provide due process to the Settlement Class in an effective and efficient manner.

## SUMMARY OF THE NOTICE PLAN

12.  Based on the Settlement Agreement, the Settlement Class is defined as follows: All U.S. citizens or permanent residents who have during the Class Period (a) enrolled in one or more of Defendants' full-time undergraduate programs, and (b) received at least some need-based financial aid from one or more Defendants, and (c) directly purchased from one or more Defendants tuition, fees, room, or board that was not fully covered by the combination of any types of financial aid or merit aid (not including loans) from one or more Defendants in any undergraduate year. The Class Period is defined as follows:

- For Chicago, Columbia, Cornell, Duke, Georgetown, MIT, Northwestern, Notre Dame, Penn, Rice, Vanderbilt, Yale—from 2003 through the date the Court enters an order preliminarily approving the Settlement.

3

- For Brown, Dartmouth, Emory—from 2004 through the date the Court enters an order preliminarily approving the Settlement.

- For Caltech—from 2019 through the date the Court enters an order preliminarily approving the Settlement.

- For Johns Hopkins—from 2021 through the date the Court enters an order preliminarily approving the settlement.

- Excluded from the Class are:

  i. Any Officers and/or Trustees of Defendants, or any current or former employees holding any of the following positions: Assistant or Associate Vice Presidents or Vice Provosts, Executive Directors, or Directors of Defendants' Financial Aid and Admissions offices, or any Deans or Vice Deans, or any employees in Defendants' in-house legal offices; and

  ii. The Judge presiding over this action, his or her law clerks, spouse, and any person within the third-degree of relationship living in the Judge's household and the spouse of such a person.

It is my understanding that this group includes students and former students at the seventeen elite university defendants in this case from 2003 through the date the Court enters an order preliminarily approving the Settlement. Based on my research, I am aware that this case has received substantial media coverage and is being followed by reporters from multiple national publications including the *New York Times*[1] and the *Wall Street Journal*.[2] I expect that the filing of this Settlement will be covered extensively in the press. The proposed Notice Plan intends to capitalize on this free public exposure of the case and the Settlement by implementing a comprehensive media campaign, as described below.

---

[1] Stephanie Saul and Anemona Hartocolis, *Lawsuit Says 16 Elite Colleges Are Part of Price-Fixing Cartel,* https://www.nytimes.com/2022/01/10/us/financial-aid-lawsuit-colleges.html (last visited July 10, 2023).

[2] Melissa Korn, *Yale, Georgetown, Other Top Schools Illegally Collude to Limit Student Financial Aid, Lawsuit Alleges*, https://www.wsj.com/articles/yale-georgetown-other-top-schools-illegally-collude-to-limit-student-financial-aid-lawsuit-alleges-11641829659 (last visited July 10, 2023).

I do understand that Plaintiffs' Counsel has collected the names and addresses of multiple members of the Settlement Class who have asked for information about the case, and that some or all of the Defendants will provide Settlement Class Member email addresses, and possibly postal address information from their alumni databases during the relevant periods. Thus, it appears that Angeion will have available a relatively comprehensive set of email addresses for a large share of the members of the Settlement Class. For that large share of Settlement Class members for whom email address information is available, notice will be sent via email. The email will contain a "summary notice" in the form attached hereto as **Exhibit B**. To the extent that Angeion received "bounce backs" from email addresses, and postal addresses are available from those persons, Angeion will send the Long Form notice via first class mail to those persons. The Long Form Notice is attached hereto as **Exhibit C**. Settlement Class Members will also be able to download a copy of the notice from the Settlement Website, or by requesting it via email, mail, or the toll-free hotline.

13.     The proposed Notice Plan provides for a relatively comprehensive direct email notice process, coupled with a  robust multi-tiered media campaign strategically designed to provide notice to Settlement Class Members via a variety of additional methods, including state-of-the-art targeted internet notice, social media notice, a paid search campaign, and two press releases. The Notice Plan also provides for the implementation of a dedicated Settlement Website and a toll-free telephone line where Settlement Class Members can learn more about their rights and options pursuant to the terms of the Settlement.

14.     As discussed in greater detail below, separate and apart from the direct email or mailed notice procedure, the media campaign alone is designed to deliver an approximate 75.31% reach with an average frequency of 3.22 times to an audience that we have modelled to include the vast majority of members of the Settlement Class (the "Target Audience"). What this means in practice is that 75.31% of our Target Audience (defined more specifically in paragraph 18 below) will see a digital advertisement concerning the lawsuit an average of 3.22 times each. This number is calculated using objective syndicated advertising data relied upon by most advertising agencies and brand advertisers. It is further verified by sophisticated media software and calculation engines that cross reference

which media is being purchased with the media habits of our specific Target Audience. It is important to note that the Target Audience is distinct from the class definition, and is used as a proxy audience, as is commonplace in class action notice plans.

15.     The Federal Judicial Center states that a publication notice plan that reaches 70% of class members is one that reaches a "high percentage" and is within the "norm." Barbara J. Rothstein & Thomas E. Willging, Federal Judicial Center, "Managing Class Action Litigation: A Pocket Guide or Judges," at 27 (3d Ed. 2010).

## MEDIA CAMPAIGN

16.     Angeion's comprehensive media campaign will utilize a carefully tailored mix of programmatic display advertising, social media notice, search engine marketing and two press releases to effectively and efficiently diffuse notice of the Settlement through a variety of mediums. Angeion will be sure to build upon the free media attention to the case and the significant amount of anticipated national publicity that will accompany the filing of the settlement papers.

### Programmatic Display Advertising

17.     Angeion will also utilize a form of internet advertising known as Programmatic Display Advertising, which is the leading method of buying digital advertisements in the United States,[3] to provide notice of the Settlement to Settlement Class Members. The media notice outlined below is strategically designed to provide notice by driving Settlement Class Members to the dedicated Settlement Website, where they can learn more about the Settlement, including their rights and options.

18.     To develop the media notice campaign and to verify its effectiveness, our media team analyzed

---

[3] Programmatic Display Advertising is a trusted method specifically utilized to reach defined target audiences. It has been reported that U.S. advertisers spent nearly $105.99 billion on programmatic display advertising in 2021, and it is estimated that approximately $123.22 billion will be spent on programmatic display advertising in 2022. *See* https://www.emarketer.com/content/us-programmatic-digital-display-ad-spending-2022. In laypeople's terms, programmatic display advertising is a method of advertising where an algorithm identifies and examines demographic profiles and uses advanced technology to place advertisements on the websites where members of the audience are most likely to visit (these websites are accessible on computers, mobile phones and tablets).

data from 2022 comScore Multi-Platform/MRI Simmons USA Fusion[4] to profile the Settlement Class and arrive at an appropriate target group ("Target Audience") based on criteria pertinent to this Settlement. Specifically, the following syndicated research definition was used to profile potential Settlement Class Members:

- Respondent: Attended College: YES
- Loans and Mortgages: Personal Loan for Education (Student Loan) Have Personally or Jointly Utilized
- Ages 18-44

19.     The Target Audience was identified and selected based on the composition of the Settlement Class based on the Settlement Class definition and Settlement Class Period(s). For example, the age group qualifier (ages 18-44) includes potential Settlement Class Members from the earliest year amongst the Settlement Class Periods (2003), while still capturing those included at the end of the Class Period (*i.e.*, close to the present). Likewise, the Target Audience specifically consists of those individuals who attended college. Here, the Settlement Class includes those who enrolled in one or more of the seventeen University Defendants full-time undergraduate programs over many years. The objective syndicated data does not allow us to measure against specific universities' student or alumni thereof; however, multiple targeting layers utilizing the Target Audience's online interests and behaviors will be used to further refine the delivery of media advertisements to those most likely to be Settlement Class Members (e.g., being a member of an alumni group of one of the seventeen Defendants on social media). Lastly, inclusion in the Settlement Class requires that the Settlement Class Members have received at least some need-based financial aid from one or more Defendants.

20.     Based on the Target Audience definition used, the size of the Target Audience is approximately 12,061,000 individuals in the United States. Utilizing an overinclusive proxy audience maximizes the

---

[4] GfK MediaMark Research and Intelligence LLC ("GfK MRI") provides demographic, brand preference and media-use habits, and captures in-depth information on consumer media choices, attitudes, and consumption of products and services in nearly 600 categories. comSCORE, Inc. ("comSCORE") is a leading cross-platform measurement and analytics company that precisely measures audiences, brands, and consumer behavior, capturing 1.9 trillion global interactions monthly. comSCORE's proprietary digital audience measurement methodology allows marketers to calculate audience reach in a manner not affected by variables such as cookie deletion and cookie blocking/rejection, allowing these audiences to be reach more effectively. comSCORE operates in more than 75 countries, including the United States, serving over 3,200 clients worldwide.

efficacy of the Notice Plan and is considered a best practice among media planners and class action notice experts alike. Using proxy audiences is also commonplace in both class action litigation and advertising generally.[5]

21.     Additionally, the Target Audience is based on objective syndicated data, which is routinely used by advertising agencies and experts to understand the demographics, shopping habits and attitudes of the consumers that they are seeking to reach.[6] Using this form of objective data will allow the Parties to report the reach and frequency to the Court with confidence that the reach percentage and the number of exposure opportunities comply with due process and exceed the Federal Judicial Center's threshold as to reasonableness in notification programs. Virtually all professional advertising agencies and commercial media departments use objective syndicated data tools, like the ones described above, to quantify net reach. Sources like these guarantee that advertising placements can be measured against an objective basis and confirm that the reporting statistics are not overstated. Objective syndicated data tools are ubiquitous tools in a media planner's arsenal and are regularly accepted by courts in evaluating the efficacy of a media plan or its component parts. Understanding the socioeconomic characteristics, interests and practices of a target group aids in the proper selection of media to reach that target. Here, the objective syndicated data from 2022 comScore Multi-Platform/MRI Simmons USA Fusion reports that the Target Audience has the following characteristics:

- 100% are ages 18-44, with a median age of 32.4 years old;
- 61.11% are female;

---

[5] If the total population base (or number of class members) is unknown, it is accepted advertising and communication practice to use a proxy-media definition, which is based on accepted media research tools and methods that will allow the notice expert to establish that number. The percentage of the population reached by supporting media can then be established. *See* Duke Law School, GUIDELINES AND BEST PRACTICES IMPLEMENTING 2018 AMENDMENTS TO RULE 23 CLASS ACTION SETTLEMENT PROVISIONS, at 56.

[6] The notice plan will include an analysis of the makeup of the Settlement Class. The target audience should be defined and quantified. This can be established through using a known group of persons, or it can be based on a proxy-media definition. Both methods have been accepted by the courts and, more generally, by the advertising industry, to determine a population base. *See* Duke Law School, GUIDELINES AND BEST PRACTICES IMPLEMENTING 2018 AMENDMENTS TO RULE 23 CLASS ACTION SETTLEMENT PROVISIONS, at 56.

- 48.67 % are married;

- 46.20% have children;

- 61.33% have received a bachelor's or post-graduate degree;

- 69.54% are currently employed full time;

- The average household income is $109,820; and

- 94.79% have used social media in the last 30 days.

22.     To identify the best vehicles to deliver messaging to the Target Audience, the media quintiles, which measure the degree to which an audience uses media relative to the general population, were reviewed. Here, the objective syndicated data shows that members of the Target Audience are heavy internet users, spending an average of approximately 34.9 hours per week on the internet.

23.     Given the strength of digital advertising, as well as our Target Audience's consistent internet use, we recommend utilizing a robust internet advertising campaign to reach Settlement Class Members. This media schedule will allow us to deliver an effective reach level and frequency, which will provide due and proper notice to the Settlement Class.

24.     Multiple targeting layers will be implemented into the programmatic campaign to help ensure delivery to the most appropriate users, inclusive of the following tactics:

- <u>Look-a-like Modeling</u>: This technique utilizes data methods to build a look-a-like audience against known Settlement Class Members.

- <u>Predictive Targeting</u>: This technique allows technology to "predict" which users will be served by the advertisements about the Settlement.

- <u>Audience Targeting</u>: This technique utilizes technology and data to serve the impressions to the intended audience based on demographics, purchase behaviors and interests.

- <u>Site Retargeting</u>: This technique is a targeting method used to reach potential Settlement Class Members who have already visited the dedicated website while they browsed other pages. This allows Angeion to provide a potential Settlement Class Member sufficient exposure to an advertisement about the Settlement.

- <u>Geotargeting</u>: The campaign will run nationally.

25.     To combat the possibility of non-human viewership of digital advertisements and to verify effective unique placements, Angeion employs Oracle's BlueKai, Adobe's Audience Manger and/or Lotame, which are demand management platforms ("DMP"). DMPs allow Angeion to learn more about the online audiences that are being reached. Further, online ad verification and security providers such as Comscore Content Activation, DoubleVerify, Grapeshot, Peer39 and Moat will be deployed to provide a higher quality of service to ad performance.

**Social Media**

26.     The Notice Plan also includes a social media campaign utilizing Facebook and Instagram, two of the leading social media platforms[7] in the United States. The social media campaign uses an interest-based approach which focuses on the interests that users exhibit while on these social media platforms.

27.     The social media campaign will engage with the Target Audience desktop sites, mobile sites, and mobile apps. Additionally, specific tactics will be implemented to further qualify and deliver impressions to the Target Audience. *Look-a-like modeling* allows the use of consumer characteristics to serve ads. Based on these characteristics, we can build different consumer profile segments to ensure the Notice Plan messaging is delivered to the proper audience. *Conquesting* allows ads to be served in relevant placements to further alert potential Settlement Class Members of the Settlement. The social media ads will run nationally.

28.     The social media campaign will coincide with the programmatic display advertising portion of the Notice Plan. Combined, these media notice efforts are designed to deliver approximately twenty-nine million impressions. To track campaign success, we will implement conversion pixels throughout the dedicated website to understand audience behavior better and identify those most likely to convert. The programmatic algorithm will change based on success and failure to generate conversions throughout the process to provide the most effective messaging.

---

[7] In 2023, Facebook has a reported 243.58 million users, and Instagram has a reported 150.99 million users. *See* https://www.statista.com/statistics/408971/number-of-us-facebook-users/ and https://www.statista.com/statistics/293771/number-of-us-instagram-users.

**Paid Search Campaign**

29.     The Notice Plan also includes a paid search campaign on Google to help drive Settlement Class Members who are actively searching for information about the litigation to the dedicated website. Paid search ads will complement the programmatic and social media campaigns, as search engines are frequently used to locate a specific website, rather than a person typing in the URL. Search terms would relate to not only the Settlement itself but also the subject matter of the lawsuit. In other words, the paid search ads are driven by the individual user's search activity, such that if that individual searches for (or has recently searched for) the Settlement, or other terms related to the litigation, that individual could be served with an advertisement directing them to the dedicated website.

**Press Release**

30.     Angeion will also cause two press releases to be distributed over PR Newswire (or a similar press release distribution service) to further diffuse news of the Settlement. The press releases will help garner "earned media" (*i.e.*, other media outlets and/or publications will report the story) to supplement the comprehensive notice efforts outlined herein, which will lead to increased awareness and participation amongst members of the Settlement Class.

## DIRECT NOTICE

31.     Angeion is informed that all seventeen Defendants are likely to provide Angeion with email address and potentially postal address information for a large share of the members of the Settlement Class. As such, the Notice Plan provides for sending email notice containing the text from the proposed Summary Notice (**Exhibit B**) formatted into the body of the email. The Notice Plan further provides for sending the Long Form Notice (**Exhibit C**) via first class U.S. mail, postage pre-paid to potential Settlement Class Members and those Settlement Class Members who ask Angeion or Class Counsel for a mailed Long Form Notice The forms of notice will also both be available on the Settlement Website.

32.     Angeion designs the email notice to avoid many common "red flags" that might otherwise cause a Settlement Class Member's spam filter to block or identify the email notice as spam. For

example, Angeion does not include attachments like the Long Form Notice to the email notice, because attachments are often interpreted by various Internet Service Providers (ISP") as spam.

Angeion also accounts for the real-world reality that some emails will inevitably fail to be delivered during the initial delivery attempt. Therefore, after the initial noticing campaign is complete, Angeion, after an approximate 24- to 72-hour rest period (which allows any temporary block at the ISP level to expire) causes a second round of email noticing to continue to any email addresses that were previously identified as soft bounces and not delivered. In our experience this minimizes emails that may have erroneously failed to deliver due to sensitive servers and optimizes delivery.

33.    Angeion will employ best practices to increase the deliverability rate of the mailed Notices. Angeion will cause the mailing address information for members of the Settlement Class to be updated utilizing the United States Postal Service's ("USPS") National Change of Address database, which provides updated address information for individuals or entities who have moved during the previous four years and filed a change of address with the USPS.

34.    Notices returned to Angeion by the USPS with a forwarding address will be re-mailed to the new address provided by the USPS and the Settlement Class Member records will be updated accordingly with the new address information.

35.    Notices returned to Angeion by the USPS without forwarding addresses will be subjected to an address verification search (commonly referred to as "skip tracing") utilizing a wide variety of data sources, including public records, real estate records, electronic directory assistance listings, etc., to locate updated addresses.

36.    Notices will be re-mailed to Settlement Class Members for whom updated addresses were obtained via the skip tracing process.

37.    In addition, the Long Form Notice will be emailed to anyone who requests one via the toll-free number or by email or mail. The Long Form Notice will also be available for downloading or printing at the Case Website.

## **SETTLEMENT WEBSITE & TOLL-FREE TELEPHONE SUPPORT**

38.    The Notice Plan will also implement the creation of a case-specific Settlement Website where

Settlement Class Members can easily view general information about this Settlement, review relevant Court documents, and view important dates and deadlines pertinent to the Settlement. The Settlement Website will be designed to be user-friendly and make it easy for Settlement Class Members to find information about this Settlement. The Settlement Website will also have a "Contact Us" page whereby Settlement Class Members can send an email with any additional questions to a dedicated email address. Likewise, Settlement Class Members will also be able to submit a claim form online via the Settlement Website and securely upload documentation at the appropriate time in the process after final approval. Angeion understands that Class Counsel intend to submit a detailed proposed procedure for the Allocation Plan, including proposed Claim Forms and a schedule for the Claims Process, in their brief in support of final approval.

39.     A toll-free hotline devoted to this case will be implemented to further apprise Settlement Class Members of their rights and options pursuant to the terms of the Settlement. The toll-free hotline will utilize an interactive voice response ("IVR") system to provide Settlement Class Members with responses to frequently asked questions and provide essential information regarding the Settlement. This hotline will be accessible 24 hours a day, 7 days a week. Additionally, Settlement Class Members will be able to leave a request to have the Notice and/or Claim Form mailed to them at the appropriate time in the process after final approval.

## DATA SECURITY & INSURANCE

40.     Angeion recognizes the critical need to secure our physical and network environments and protect data in our custody. It is our commitment to these matters that has made us the go-to administrator for many of the most prominent data security matters of this decade. We are constantly improving upon our robust policies, procedures, and infrastructure by periodically updating data security policies as well as our approach to managing data security in response to changes to physical environment, new threats and risks, business circumstances, legal and policy implications, and evolving technical environments.

41.     Angeion's privacy practices are compliant with the California Consumer Privacy Act, as currently drafted. Consumer data obtained for the delivery of each project is used only for the purposes

intended and agreed in advance by all contracted parties, including compliance with orders issued by State or Federal courts as appropriate. Angeion Group imposes additional data security measures for the protection of Personally Identifiable Information (PII) and Personal Health Information (PHI), including redaction, restricted network and physical access on a need-to-know basis, and network access tracking. Angeion requires background checks of all employees, requires background checks and ongoing compliance audits of its contractors, and enforces standard protocols for the rapid removal of physical and network access in the event of an employee or contractor termination.

42.     Data is transmitted using Transport Layer Security (TLS) 1.3 protocols. Network data is encrypted at rest with the government and financial institution standard of AES 256-bit encryption. We maintain an offline, air-gapped backup copy of all data, ensuring that projects can be administered without interruption.

43.     Further, our team stays on top of latest compliance requirements, such as GDPR, HIPAA, PCI DSS, and others, to ensure that our organization is meeting all necessary regulatory obligations as well as aligning to industry best practices and standards set forth by frameworks like CIS and NIST. Angeion is cognizant of the ever-evolving digital landscape and continually improves its security infrastructure and processes, including partnering with best-in-class security service providers. Angeion's robust policies and processes cover all aspects of information security to form part of an industry leading security and compliance program, which is regularly assessed by independent third parties. Angeion is also committed to a culture of security mindfulness. All employees routinely undergo cybersecurity training to ensure that safeguarding information and cybersecurity vigilance is a core practice in all aspects of the work our teams complete.

44.     Angeion currently maintains a comprehensive insurance program, including sufficient Errors & Omissions coverage.

## **REACH AND FREQUENCY**

45.     This declaration describes the reach and frequency evidence which courts systemically rely upon in reviewing class action publication notice programs for adequacy. The reach percentage exceeds the guidelines as set forth in the Federal Judicial Center's Judges' Class Action Notice and

Claims Process Checklist and Plain Language Guide to effectuate a notice program which reaches a high degree of the members of the Settlement Class.

46.     Specifically, the comprehensive media campaign is designed to deliver an approximate 75.31% reach with an average frequency of 3.22 times each. It should be noted that the 75.31% reach approximation is separate and apart from the direct notice efforts, Settlement Website, and toll-free telephone support.

## CONCLUSION

47.     The Notice Plan outlined herein provides for direct notice via mail to all reasonably identifiable Settlement Class Members, combined with a robust, multi-faceted media campaign. The Notice Plan also includes the implementation of a dedicated Settlement Website and toll-free hotline to further inform Settlement Class Members of their rights and options in the Settlement.

48.     In my professional opinion, the Notice Plan described herein will provide full and proper notice to Settlement Class Members before the claims, opt-out, and objection deadlines. Moreover, it is my opinion that the Notice Plan is the best notice that is practicable under the circumstances and fully comports with due process, and Fed. R. Civ. P. 23. After the Notice Plan has been executed, Angeion will provide a final report verifying its effective implementation to this Court.

I hereby declare under penalty of perjury that the foregoing is true and correct.


Dated:  August 11, 2023

STEVEN WEISBROT