# Exhibit A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ANDREW CORZO, SIA HENRY, ALEXANDER
LEO-GUERRA, MICHAEL MAERLENDER,
BRANDON PIYEVSKY, BENJAMIN SHUMATE,
BRITTANY TATIANA WEAVER, and
CAMERON WILLIAMS, individually and on
behalf of all others similarly situated,

Plaintiffs,

v.

BROWN UNIVERSITY, CALIFORNIA
INSTITUTE OF TECHNOLOGY, UNIVERSITY
OF CHICAGO, THE TRUSTEES OF COLUMBIA
UNIVERSITY IN THE CITY OF NEW YORK,
CORNELL UNIVERSITY, TRUSTEES OF
DARTMOUTH COLLEGE, DUKE UNIVERSITY,
EMORY UNIVERSITY, GEORGETOWN
UNIVERSITY, THE JOHNS HOPKINS
UNIVERSITY, MASSACHUSETTS INSTITUTE
OF TECHNOLOGY, NORTHWESTERN
UNIVERSITY, UNIVERSITY OF NOTRE DAME
DU LAC, THE TRUSTEES OF THE
UNIVERSITY OF PENNSYLVANIA, WILLIAM
MARSH RICE UNIVERSITY, VANDERBILT
UNIVERSITY, and YALE UNIVERSITY,

Defendants.

Case No.: 1:22-cv-00125

**Hon. Matthew F. Kennelly**

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
THEIR MOTION TO COMPEL PRODUCTION OF CERTAIN DONOR REPORTS
AND TO COMPEL NORTHWESTERN TO PRODUCE PRESIDENT MORTON
SCHAPIRO FOR TWO ADDITIONAL HOURS OF DEPOSITION**

Plaintiffs respectfully submit this Memorandum of Law in Support of their Motion to Compel Production of Certain Donor Reports and to Compel Northwestern to Produce President Morton Schapiro for Two Additional Hours of Deposition Testimony, along with Plaintiffs' Local Rule 37.2 Statement ("LR 37.2 St.") and Proposed Order.

## INTRODUCTION

Northwestern has produced its President's Lists—comprising applicants of "special interest to Northwestern," often because of their families' past or potential future donations—but has *not* produced highly relevant documents related to the creation and use of the President's Lists. Former President Morton Schapiro and Robert McQuinn, the Vice President of Alumni Relations and Development, frequently met with prospective donors, including family members of potential applicants, some of whom presumably ended up on the President's List. After these meetings, Mr. McQuinn would write up "development reports" concerning these prospective donors.

Yet Northwestern has not produced any of these development reports. Just as fundamental an obstacle is that Northwestern has produced the President's Lists in heavily redacted format, making it difficult to interpret the entries. Indeed, *President* Schapiro himself was unable to testify with any specificity about the entries on the *President's* List due to the excessive redactions. President Schapiro repeatedly testified that he could not determine who the list was referring to and thus could not answer any specific questions about the individuals identified on the list.

Given these circumstances, and the Parties' inability to resolve the dispute through discussion, Plaintiffs ask the Court compel Northwestern to produce the development reports created and maintained for the first 100 donor-related applicants on each President's List during the class period. Plaintiffs make this request for three main reasons: (1) these development reports are directly relevant to the litigation, in particular whether and to what extent Northwestern

practiced need-blind admission; (2) Assistant Vice President for Student Outreach and Dean of Undergraduate Enrollment Christopher Watson gave demonstrably inaccurate testimony to the U.S. Department of Justice regarding the contents of the President's Lists, and the unexplained disappearance of Mr. Watson's electronic notes on the President's Lists make the requested documents more important for establishing the fact and extent of wealth favoritism in Northwestern's admissions process; and (3) the burden on Northwestern is minimal, particularly in light of Plaintiffs' offer to meet and confer to reach a compromise if more than three development reports exist for any designated applicant.

Plaintiffs also ask the Court to compel Northwestern to produce President Schapiro for an additional two hours of deposition testimony in order to give him a chance to address the President's Lists with specificity. In this additional questioning, President Schapiro would have access to a glossary that would allow him to know who the President's List entries were referring to without revealing any purportedly confidential or protected information to Plaintiffs, therefore allowing Plaintiffs meaningful discovery.

## FACTUAL BACKGROUND

I.    **The Existence of Development Reports Associated with Applicants on the President's List That Northwestern Has Not Produced.**

Morton Schapiro was the President of Northwestern University from 2009 to 2022. Ex. 1, Schapiro Tr. Excerpts, at 14:19-15:8. In his deposition, President Schapiro offered testimony about the development of Northwestern "President's List," also known as the "Admissions Interest List." *Id.* at 39:12-40:8. President Schapiro testified that the President's List consists of a list of applicants in whom Northwestern had special interest and was compiled by him; Judith Remington, his Chief of Staff; Marilyn McCoy, Secretary to the Board and Vice President for Planning; and Robert McQuinn, Vice President of Alumni Relations and Development. *Id.*

President Schapiro testified that he personally ranked applicants on the List according to "level of interest," which meant the level of "institutional importance" placed on the success of their applications. *Id.* at 41:7-42:6. The List also included the "major gift capacity" of the applicant—that is, a dollar value of the potential donation that might be realized from the applicant's family or recommender after their admission—along with the applicant's family members' donation history. *Id.* at 45:3-46:3; 47:9-48:20; 61:18-25.

President Schapiro's testimony revealed the existence of documents, related to the development of the President's Lists, that Northwestern has not produced and that could even more directly establish that previous or prospective donations by the applicants' family were considered in Northwestern's decision to admit specific applicants. In particular, President Schapiro testified that he had numerous private meetings a year with donors, including parents. *Id.* at 50:15-21, 111:7-17. Mr. McQuinn would also attend these meetings. *Id.* at 52:6-23, 111:7-17. Prior to these meetings, the Development Office would provide President Schapiro with briefings concerning the prospective donor. *Id.* at 57:23-58:12. Following these meetings, Mr. McQuinn would create "development reports." *Id.* at 103:25-104:8. Mr. McQuinn also provided President Schapiro with "little write-ups" to refresh his memory of donors he had met previously prior to subsequent meetings. *Id.* at 110:13-113:6. When asked whether the President's Office retained copies of these development reports, President Schapiro testified that "[s]ome things I think were thrown out" when he transitioned from President to faculty member in September 2022—nine months after this litigation was filed—but that some of the discarded documents "might be there somewhere" in electronic form. *Id.* at 112:21-113:6.[1] Northwestern has refused to produce these development reports, citing burden.

---

[1] Although he knew that "some things . . . were thrown out," President Schapiro was also unable to state whether relevant documents had been thrown out. When Plaintiffs asked whether donor records, admissions

II.    **President Schapiro's Inability to Answer Many Questions About Donors and Donor-Linked Applicants.**

President Schapiro testified about general admissions practices at Northwestern but was unable to answer most questions about specific entries on the President's Lists, specific applicants, or specific donors due to the extensive redactions by Northwestern, who cited FERPA. The following deposition excerpts are included below as examples of President Schapiro's inability to answer many questions about donors and donor-linked applicants:

> Q. And [the President's List] goes on to say, "It is noted that [blacked out] is a generous man that has donated to Princeton." Do you see that?
>
> A. Yes, I do.
>
> Q. Do you know if this applicant's family ever donated to Northwestern?
>
> A. I have no idea who this person is. I don't know whether the person applied. I don't know whether the person was admitted. I don't know if the person's family, in those two cases, ever gave money.

Ex. 1, Schapiro Tr. 97:17-98:4 (objection omitted).

---

records, or financial aid records had been thrown out, President Schapiro stated for each that he had no idea. Ex. 1, Schapiro Tr. 137:17-138:8. Following President Schapiro's deposition, Plaintiffs requested that counsel for Northwestern "describe what steps were taken to make sure that any documents 'thrown out' were not in any way related to issues in the litigation." Ex. 1 to L.R. 37.2 St. at July 25, 2023 Email from R. Gilbert. In response, on August 8, 2023, counsel for Northwestern stated that "Northwestern has taken reasonable steps to preserve documents throughout this litigation. Both President Schapiro and his chief of staff received multiple litigation hold notices and associated instructions and reminders." *Id.* at Aug. 8, 2023 Email from S. Stein. Plaintiffs requested "an affidavit from the chief of staff detailing the implementation of the document preservation procedures" taken at the time of President Schapiro's transition to faculty. *Id.* at Aug. 9, 2023 Email from R. Gilbert. In a meet and confer on August 10, 2023, Northwestern refused to provide any such affidavit, instead asserting only, without evidence or any particulars, that an unidentified person conducted some unspecified diligence. On September 15, 2023, Plaintiffs again Northwestern requested that Northwestern produce the affidavit by September 20, 2023. Ex. 2 to L.R. 37.2 St. at Sept. 15, 2023 Email from R. Litan. In response, Northwestern for the first time asserted that the only "hard copy documents . . . disposed of were mere duplicates of attachments to emails (which have been separately preserved)." *Id.* at Sept. 21, 2023 Email from S. Stein. In its email, Northwestern stated that it would not produce an affidavit from the President's Chief of Staff unless Plaintiffs brought a spoliation motion and threatened to seek sanctions if Plaintiffs did so. *Id.* Plaintiffs reserve the right to bring a future spoliation motion concerning the destruction of these physical documents.

Q. And in the comments column [of the President's List], it says, "President Schapiro met with [blacked out] and his father and [blacked out] in July 2013. [Blacked out] is professor of economics at [blacked out]." Do you know whether this person was admitted to Northwestern?

A. I don't.

Q: Line 20 on the same page, there is no UID; correct?

A. Correct.

Q. And in the comments, it says, "[Blank]" – or not blank – crossed out – "[Blacked out] sat in on a class of President Schapiro's February 2018. See email communication. [Blacked out] is the son of [blacked out], CEO of [blacked out]." Do you know if this person was admitted?

A. I have no idea who this person is.

*Id.* 99:19-100:13.

Q. "[Blacked out] is of interest to [blacked out]. He is the son of [blacked out] senior partners at [blacked out] in New York." . . .

Q. Do you know if that person was admitted?

A. Nope.

Q. Do you know if that person's family made a donation to the university?

A. No idea.

*Id.* 101:7-19.

After this deposition, Plaintiffs negotiated a global agreement with Defendants to create glossaries of 150 UIDs chosen by Plaintiffs so that witnesses could reference the glossaries and determine to whom the redacted documents were referring. This agreement applies only to depositions that had not occurred when the agreement was reached. As a result, Plaintiffs requested via email on September 15 that Northwestern "permit further deposition of President Schapiro for a period of two hours for discussion of donors and donor-linked applicants with a glossary as a reference." Ex. 2 to L.R. 37.2 St. at Sept. 15, 2023 Email from R. Litan. Northwestern has ignored the request.

III.   **Chris Watson's Demonstrably Inaccurate Testimony to the U.S. Department of Justice Regarding the Contents of the President's Lists and the Disappearance of His Notes on the President's Lists.**

In his deposition, President Schapiro testified that he received copies of the applications of all approximately 500 applicants on the President's List, so he could discuss them with Chris Watson. Ex. 1, Schapiro Tr. at 42:19-43:12. President Schapiro described that he "would walk over to Chris [Watson]'s office, and we'd spend a couple hours going through the [President's] list." *Id.* at 53:2-5. During these meeting, Mr. Watson "was always on the keyboard on the computer." *Id.* at 53:8-9. Following President Schapiro's deposition, Plaintiffs emailed Northwestern's counsel, stating that this testimony indicates that Mr. Watson likely took extensive notes during his meetings with Dr. Schapiro but that no such notes had been produced. Ex. 1 to L.R. 37.2 St. at July 25, 2023 Email from R. Gilbert. Plaintiffs requested that Northwestern confirm it had searched for and produced all such notes or that any such notes that had not been produced would be produced by August 2, 2023. *Id.* On August 8, 2023, counsel for Northwestern responded that Northwestern has made a reasonable inquiry to determine whether electronic notes of such meetings exist, and that it was not aware of any such electronic documents. *Id.* at Aug. 8, 2023 Email from S. Stein. This is very puzzling, to say the least, as there were annual meetings of "a couple hours each."

On August 9, 2023, Plaintiffs asked to meet and confer with counsel to discuss, *inter alia*, the absence of these notes in Northwestern's productions to Plaintiffs. *Id.* at Aug. 9 Email from R. Gilbert. In this meet and confer and in a subsequent email to counsel on August 12, 2023, Plaintiffs raised the implausibility that no such notes exist, particularly in light of the fact Mr. Watson gave false testimony to the U.S. Department of Justice as a Rule 30(b)(6) witness regarding the contents of the annual President's Lists. *See id.* at Aug. 12, 2023 Email from R. Gilbert. In that prior

deposition, Mr. Watson falsely claimed that the President's Lists contained only the names of

donors and no other information such as past giving or gift capacity.

> Q. So just to clarify, the list that the president sends to you is a list
> of the applicant's names and noting else; is that correct?
>
> A. Right.

Ex. 2, Watson Dep't of Justice Dep. Tr. at 49:13-17.

> Q. Do you ever discuss with President Schapiro whether an
> applicant has donated to Northwestern?
>
> A. No, I'm not given – well, I'm not given information on anyone's
> donation history of potential donation. History of donation may
> come up, but I'm not ever given an amount. Again, there's kind of
> a firewall between – there is a firewall between admissions and the
> office of alumni relations and development in that way.

*Id.* 122:15-22.

Contrary to Mr. Watson's sworn testimony, the President's Lists that President Schapiro

authenticated in fact include entire columns discussing each applicant's donation history and

giving capacity. For instance, in the image below—a President's List that was an exhibit in

President Schapiro's deposition—virtually every entry discusses the applicant's family's major

giving capacity and/or lifetime giving:



*See* Ex. 3, Schapiro Dep. Ex. 6, NULIT-0000169374, at -386.

Defendants responded to Plaintiffs' concerns regarding Mr. Watson's demonstrably inaccurate testimony by calling them "spurious," but offered no further response on the testimony nor the implausible prospect that no notes from Mr. Watson's annual meetings with President Schapiro exist. *See* Ex. 1 to L.R. 37.2 St. at Aug. 15, 2023 Email from S. Stein. Plaintiffs subsequently requested via email sent on September 15, 2023, that by September 20, Defendants detail all steps taken to search for Mr. Watson's notes and to search any backup tapes or files that may have been deleted. Ex. 2 to L.R. 37.2 St. at Sept. 15, 2023 Email from R. Litan. Defendants have not complied with this request.

## **ARGUMENT**

**I.    The Court Should Compel Northwestern to Produce Development Reports for the First 100 Donor-Related Applicants on Each President's List During the Class Period.**

Plaintiffs seek the development reports that President Schapiro referenced in his deposition. Plaintiffs submit that the Court should grant this motion because (1) the reports are directly relevant to the litigation; (2) Chris Watson's false testimony and inexplicably disappearing notes make documentary evidence more important to determine Northwestern's admissions practices; and (3) Northwestern's burden is minimal.

Plaintiffs seek the development reports that correspond to applicants on Northwestern's annual President's List. Plaintiffs reasonably expect these reports to reveal the extent of a donor-linked applicant's familial contributions to Northwestern; the topics of any conversations Northwestern leadership had with donors (including the applications and admissions of their children or grandchildren); and the timing of any donations and pledges around their children or grandchildren's applications to Northwestern. All such content makes it likely that Northwestern favored applicants related to wealthy donors and that for certain donors, donations were a *quid pro*

*quo* for a child or grandchild's admission to the University. [2] *See Seong v. Joong-Any Daily News, Inc.*, 2018 WL 11473494, at \*4 (N.D. Ill. July 27, 2018) (determining that production of additional documents sought would not be unreasonably cumulative, because, while other discovery already produced tended to support the same inference plaintiff thought the additional documents would support, those additional documents would further corroborate plaintiff's claim). This evidence is central to the legality of the 568 Group and any potential procompetitive justifications Defendants might offer, such as the purported absence of revenue-maximizing purposes. In short, these donor reports are directly relevant to Plaintiffs' claims and defenses, and Northwestern does not dispute that it possesses and can produce the reports.

While Plaintiffs maintain that production of these development reports is appropriate regardless of the circumstances, Mr. Watson's false testimony to the Department of Justice and the disappearance of the extensive notes Mr. Watson took on the President's List make production of these reports even more important. Mr. Watson's testimony will be an important source of evidence on Northwestern's admissions practices with respect to wealth favoritism. Mr. Watson's inaccurate testimony and the inexplicable disappearance of the notes on the same subject of that testimony underscores that Plaintiffs cannot rely on Mr. Watson's testimony without independent, documentary corroboration. The development reports Plaintiffs seek will assist in either confirming or denying the veracity of Mr. Watson's future testimony on donor-linked admissions

---

[2] Section 568 of the Improving America's Schools Act of 1994 creates an antitrust exemption covering agreements to use common principles of analysis for determining financial need only where all participating colleges or universities admit students on a need-blind basis. *See* 15 U.S.C. § 1 note. Under the statute, "on a need-blind basis means without regard to the financial circumstances of the student involved or the student's family." *Id.* (internal quotation marks omitted). By considering the donation history or giving capacity of an applicant's family, as the Court acknowledged in denying Defendants' motions to dismiss, Northwestern was considering the financial circumstances of the student applicant or those of their family. The issue of Northwestern's wealth-favoritism in its admissions process goes to the heart of whether the 568 Group and its members are entitled to antitrust immunity.

practices, wealth favoritism, and his knowledge of a candidate's family's donation history and giving capacity when making admissions decisions.

Finally, it bears emphasis that Plaintiffs have asked Northwestern to produce a narrow universe of documents from the Development Office: certain of the "development reports" Mr. McQuinn drafted following meetings between Dr. Schapiro and prospective donors. Plaintiffs are *not* seeking the production of all such development reports relating to all applicants and their families on the Presidents' Lists over the relevant period, to which Plaintiffs believe they are entitled given their relevance the apparent spoliation of documents outlined here. Plaintiffs' request is much more limited and less burdensome: the development reports associated with the family members and/or recommenders of the first 100 donor-related applicants listed on each year's President's List during the relevant period. In addition, Plaintiffs told Northwestern that should any individual in the first 100 donor-related applicants of a President's List contain more than three development reports, Plaintiffs are willing to work out a compromise with Northwestern to reduce the number of productions. The narrow universe of documents requested should reduce any purported burden on Northwestern.

## II.     The Court Should Require Northwestern to Produce President Schapiro for an Additional Two Hours of Deposition.

During the hearing on May 31, 2023, the Court contemplated reopening depositions where a witness is unable to answer questions due to excessive redactions by Defendants:

> Okay. So, look, we can predict what's going to happen here. Somebody's going to get in a deposition – I'm still looking at Exhibit B, I guess, which is, you know, we're going to ask about the first entry here, you're going to say, what happened with that person? And the deponent is going to say, how the heck am I supposed to know? I can't even tell who it was. And then we're going to be right back where we are now with a plaintiff not being able to get – plaintiffs not being able to get information that basically I more or less already concluded that they need.

10

May 31, 2023 Hearing Tr. 16:17-24.

President Schapiro's responses were precisely of the type the Court anticipated. President Schapiro's inability to answer questions about the President's List entries and specific donors has prejudiced Plaintiffs. Reopening the deposition to allow Plaintiffs to ask President Schapiro questions about donors and donor-linked applicants while he has access to a glossary will help ameliorate this prejudice.

## CONCLUSION

Plaintiffs respectfully request, for the foregoing reasons, that the Court issue an order compelling Northwestern to produce development reports associated with the families or recommenders of the first one hundred applicants on each year's President's List. Plaintiffs also request that Northwestern make President Schapiro available for an additional two hours of deposition time.

Dated: September 25, 2023

By:/s/Robert D. Gilbert
Robert D. Gilbert
Elpidio Villarreal
Robert S. Raymar
David Copeland
Steven Magnusson
Natasha Zaslove
**GILBERT LITIGATORS &**
  **COUNSELORS, P.C.**
11 Broadway, Suite 615
New York, NY 10004
Phone: (646) 448-5269
rgilbert@gilbertlitigators.com
pdvillarreal@gilbertlitigators.com
rraymar@gilbertlitigators.com
dcopeland@gilbertlitigators.com
smagnusson@gilbertlitigators.com
nzaslove@gilbertlitigators.com

Respectfully Submitted,

/s/ Edward J. Normand
Devin "Vel" Freedman
Edward J. Normand
Peter Bach-y-Rita
Richard Cipolla
**FREEDMAN NORMAND**
  **FRIEDLAND LLP**
99 Park Avenue
Suite 1910
New York, NY 10016
Tel: 646-970-7513
vel@fnf.law
tnormand@fnf.law
pbachyrita@fnf.law
rcipolla@fnf.law

11

Eric L. Cramer
Caitlin G. Coslett
Ellen Noteware
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: 215-875-3000
ecramer@bm.net
ccoslett@bm.net
enoteware@bm.net

Richard Schwartz
**BERGER MONTAGUE PC**
1720 W Division
Chicago, IL 60622
Tel: 773-257-0255
rschwartz@bm.net

Daniel J. Walker
Robert E. Litan
Hope Brinn
**BERGER MONTAGUE PC**
2001 Pennsylvania Avenue, NW
Suite 300
Washington, DC 20006
Tel: 202-559-9745
rlitan@bm.net
dwalker@bm.net
hbrinn@bm.net

*Counsel for Plaintiffs*