# EXHIBIT I

**In the Matter Of:**

*Henry vs*

*Brown University*

---

*JOHN MCLAUGHLIN*

*July 12, 2023*

---



Henry vs
Brown University
Case: 1:22-cv-00125 Document #: 461-10 Filed: 10/12/23 Page 3 of 8 PageID #:8657
Attorneys Eyes Only
John McLaughlin
July 12, 2023

## Page 1

```
 1      IN THE UNITED STATES DISTRICT COURT
 2         NORTHERN DISTRICT OF ILLINOIS
 3                EASTERN DIVISION
 4                     - - -
 5   HENRY, et al,              :
                                :
 6        Plaintiffs,            : CASE NO.
                                : 1:22-CV-00125
 7        v.                    :
                                :
 8   BROWN UNIVERSITY, et       :
     al,                        :
 9                              :
          Defendants.           :
10
                  - CONFIDENTIAL -
11               ATTORNEYS' EYES ONLY
12                     - - -
13                  July 12, 2023
14                     - - -
     Final transcript without Confidentiality Designations
15
16          Videotaped deposition of
     JOHN McLAUGHLIN, Ed.D., taken pursuant to
17   notice, was held at the Doubletree Hilton
     Utica, 102 Lafayette Street, Utica, New
18   York, beginning at 9:03 a.m., on the
     above date, before Michelle L. Gray, a
19   Registered Professional Reporter,
     Certified Court Reporter, Certified
20   Realtime Reporter, and Notary Public.
21                     - - -
22
23
24
```

## Page 2

```
 1   APPEARANCES:
 2
         GILBERT LITIGATORS
 3       & COUNSELORS, P.C.
         BY:  ROBERT S. RAYMAR, ESQ.
 4       BY:  SARAH SCHUSTER, ESQ.
         (In person)
 5       DAVID COPELAND, ESQ.
         (Zoom)
 6       11 Broadway, Suite 615
         New York, New York 10004
 7       646.448.5269
         Rraymar@gilbertlitigators.com
 8       Sschuster@gilbertlitigators.com
         Representing the Plaintiffs
 9
10       WILMER HALE, LLP
         BY:  DAVID GRINGER, ESQ.
11       (In person)
         7 World Trade Center
12       250 Greenwich Street
         New York, New York 10007
13       212.230.8800
         David.gringer@wilmerhale.com
14
            - and -
15
         WILMER HALE, LLP
16       BY:  ARIELLE K. HERZBERG, ESQ.
         (In person)
17       1225 Seventeenth St.
         Suite 2600
18       Denver, Colorado 80202 USA
         720.274.3158
19       Arielle.herzberg@wilmerhale.com
         Representing the Defendant, The
20       Trustees of the University of
         Pennsylvania, University of
21       Pennsylvania
22
23
24
```

## Page 3

```
 1   APPEARANCES:  (Cont'd.)
 2
     WILLIAMS & CONNOLLY LLP
 3   BY:  WILLIAM DONNELLY, ESQ. (Zoom)
     680 Maine Avenue SW
 4   Washington, D.C. 20024
     202.434.5000
 5   wdonnelly@wc.com
     Representing the Defendant,
 6   University of Notre Dame Du Lac
 7
     SIDLEY AUSTIN LLP
 8   BY:  JANE E. FISHER, ESQ.
     (Zoom)
 9   One South Dearborn
     Chicago, Illinois 60603
10   312.853.7000
     Jane.fisher@sidley.com
11   Representing the Defendant,
     Northwestern University
12
13   HOGAN LOVELLS US LLP
     BY:  JAMIE LEE, ESQ.  (Zoom)
14   Columbia Square
     555 Thirteenth Street, NW
15   Washington, D.C. 20004
     202.637.5600
16   jamie.lee@hoganlovells.com
     Representing the Defendant, Yale
17   University
18
     JONES DAY
19   BY:  CHRISTOPHER N. THATCH, ESQ.
     (Zoom)
20   110 North Wacker Drive, Suite 4800
     Chicago, Illinois 60606
21   312.782.3939
     cthatch@jonesday.com
22   Representing the Defendant, Emory
     University
23
24
```

## Page 4

```
 1   ZOOM APPEARANCES:  (Cont'd.)
 2
     ROPES & GRAY LLP
 3   BY:  TYLER PALADINO, ESQ. (Zoom)
     ELIZABETH MCINERNEY (TOLON), ESQ.
 4   (Zoom)
     191 North Wacker Drive, 32nd Floor
 5   Chicago, Illinois 60606
     312.845.1200
 6   tyler.paladino@ropesgray.com
     Elizabeth.mcinerney@ropesgray.com
 7   Representing the Defendant, The
     Johns Hopkins University
 8
 9   WHITE & CASE, LLP
     BY:  LAUREN GORAB, ESQ.
10   (Zoom)
     1221 Avenue of the Americas
11   New York, New York 10020
     212.819.8200
12   Lauren.gorab@whitecase.com
     Representing the Defendant,
13   Vanderbilt University
14
     MORGAN, LEWIS & BOCKIUS LLP
15   BY:  BY:  NOAH J. KAUFMAN, ESQ.
     (Zoom)
16   One Federal Street
     Boston, Massachusetts 02110
17   617.341.7700
     noah.kaufman@morganlewis.com
18   Representing the Defendant, Brown
     University
19
20   COOLEY, LLP
     BY:  ANGELA JACOB, ESQ. (Zoom)
21   55 Hudson Yards
     New York, New York 10001
22   212.479.6000
     ajacob@cooley.com
23   Representing the Defendant,
     California Institute of Technology
24   (Caltech)
```

Page 153

1      (Whereupon, a discussion was
2      held off the record.)
3  BY MR. RAYMAR:
4      Q.  To your knowledge, during
5  your tenure at Penn, did anyone at Penn
6  evaluate a potential applicant, or
7  applicant's family's financial
8  circumstances for potential donations?
9      A.  No.  No.  We -- in interest
10 in trying to bring in students from lower
11 income backgrounds, we would be attentive
12 to things that we might see in the
13 application like they are a
14 First-Generation student.  The parents
15 didn't go to college.  Or that they
16 applied using a fee waiver, because they
17 are on public housing or public
18 assistance.
19      And in our interest to try
20 and bring in more students from lower
21 income backgrounds, that contextual
22 information is helpful to us.
23      But for those students and
24 for all students, we didn't have any

Page 154

1  specific information about financial
2  circumstances.  The financial aid
3  application and everything that's
4  associated with that was completely
5  separate from what we would see in the
6  admission application.
7      Q.  All right.  Let me go back
8  and ask the same question in a slightly
9  different way.
10      At Penn, during your tenure,
11 did -- to your knowledge, did anyone
12 evaluate applicants, or potential
13 applicants, for the purpose of
14 determining whether the applicant's
15 family was a good candidate for making
16 donations to Penn --
17      MR. GRINGER:  Object to
18      form.
19 BY MR. RAYMAR:
20      Q.  -- quite aside from paying
21 for the cost of their child or grandchild
22 attending Penn?
23      MR. GRINGER:  Object to
24      form.  Compound.

Page 155

1      THE WITNESS:  I don't know.
2  BY MR. RAYMAR:
3      Q.  Are you familiar with the
4  term "need-blind" from your tenure at
5  Penn?
6      A.  Can you tell me in what --
7  what definition are you using for the
8  term?
9      Q.  Well, I was going to ask you
10 what definition Penn was using for the
11 term.
12      So let's start off with, at
13 Penn, did you hear the term "need-blind"?
14      A.  We did.  And the way we
15 would interpret it, the way I would
16 interpret it, is that a student's
17 financial circumstances would not be -- a
18 student's financial circumstances would
19 not be -- have an adverse impact on their
20 application.
21      So a student with
22 significant financial need, a low income
23 student, a First-Generation student, that
24 this is not something that we would --

Page 156

1  that would negatively impact their
2  application review.
3      Q.  And using that definition of
4  need-blind, during your tenure was Penn
5  need-blind with respect to applications
6  to the four schools you listed?
7      MR. GRINGER:  Object to
8      form.
9      THE WITNESS:  Yes.  We were
10     need-blind for U.S. citizen and
11     permanent residents, Canadian
12     citizen and permanent residents,
13     Mexican citizen and permanent
14     residents.
15     We were need-aware for those
16     four schools for international
17     citizens of other nations.
18     So for students from -- that
19     fall into that category, going
20     back to the earlier definition of
21     foreign financial aid, those
22     students would be considered under
23     a need-aware framework, which
24     means that it was -- it was more

Page 161

1  Q.  I'm sorry, did I cut you
2  off?
3  A.  No.
4  MR. GRINGER:  Go ahead.
5  BY MR. RAYMAR:
6  Q.  Every year your target was
7  to have 2400 undergraduate admits, right?
8  A.  In recent years, yes.  Our
9  goal was to have 2400 -- not admits,
10 2400 enrolled students.
11 Q.  I'm sorry, you're right.  I
12 stand corrected.  Sorry.
13     So about how many students
14 would be put on the waitlist each year?
15 MR. GRINGER:  Objection.
16 Asked and answered.
17 **THE WITNESS:  It varies from**
18 **year to year.  And I can't**
19 **remember a specific year or a**
20 **specific number.**
21 **In recent years, we might**
22 **put somewhere between 2 and 3,000**
23 **people on the waitlist.**
24 BY MR. RAYMAR:

Page 162

1  Q.  And about how many transfer
2  students did Penn take every year?
3  MR. GRINGER:  Objection.
4  Overbroad.
5  **THE WITNESS:  Again, it**
6  **would vary for the same -- for the**
7  **same reasons.**
8  **Every year is different.**
9  **Application pool is different.**
10 **The number of students we admit.**
11 **Yield is different.**
12 **Most years we might admit**
13 **somewhere between 150 and**
14 **200 transfer students.**
15 BY MR. RAYMAR:
16 Q.  Do you know the name Sara
17 Harberson?
18 **A.  I do know that name.  I do.**
19 Q.  And who do you know that
20 person to be?
21 MR. GRINGER:  Objection.
22 Vague.
23 **THE WITNESS:  She -- I have**
24 **a couple of relationships with**

Page 163

1  her.  She was my admission officer
2  at Penn.
3  BY MR. RAYMAR:
4  Q.  When you got admitted to
5  Penn?
6  A.  Yes.  She reviewed my
7  application.  And she was one of my first
8  supervisors when I was starting at Penn
9  and Penn admissions.  She subsequently
10 left and went to, I think, Franklin &
11 Marshall College, and more recently has
12 been operating as a college consultant,
13 you know, has a consulting business.
14 Q.  So I'm going to read you a
15 quotation from her and ask your reaction
16 to it.
17     "When I worked as the
18 associate dean of admissions at the
19 University of Pennsylvania, a need-blind
20 institution, the office was not
21 forthright about the fact that needing
22 financial aid kept a student from being
23 considered or admitted from the
24 waitlist."

Page 164

1     Is that accurate to your
2  knowledge?
3  A.  No.  It doesn't reflect my
4  experience in working at Penn and seeing
5  how we work through the waitlist.
6     You know, Sara, in her -- in
7  her present role, she makes money by
8  sensationalizing admissions, and, you
9  know, I don't think that's a fair
10 representation of the work that I've done
11 during my time at Penn.
12 Q.  In your time at Penn, has
13 the president's office, to your
14 knowledge, ever asked the admissions
15 office to move a waitlisted applicant to
16 admit?
17 A.  Never.  I've never heard or
18 seen that.
19 Q.  And to your knowledge,
20 during your tenure at Penn, has the
21 development office ever asked that an
22 applicant be moved from the waitlist to
23 admit status?
24 A.  I've never heard or seen

Page 165

1 that.
2   MR. RAYMAR: Give me Tab 52.
3   (Document marked for
4   identification as McLaughlin
5   Exhibit 23.)
6 BY MR. RAYMAR:
7   Q. It may make sense to take a
8 look at this from the bottom to the top.
9 But you're entitled to look at it in
10 whatever order you'd like to.
11   And my question is going to
12 be, do you know anything about this set
13 of e-mails?
14   A. No. It's not familiar to
15 me.
16   Q. And were the circumstances,
17 or the incident, or the vignette, or the
18 anecdote, or whatever you want to call
19 it, familiar to you from hearing about it
20 in the admissions office at Penn?
21   MR. GRINGER: Objection.
22   Too many objections to list to
23   that one.
24   THE WITNESS: I've never

Page 166

1 seen this before.
2 BY MR. RAYMAR:
3   Q. Or heard of an exchange that
4 bears some resemblance to this?
5   MR. GRINGER: Object to
6   form.
7   THE WITNESS: No.
8   MR. RAYMAR: Do we have a
9 copy of this? Tab 68.
10   162147. Sheet 1.
11   (Document marked for
12   identification as McLaughlin
13   Exhibit 24.)
14   MR. RAYMAR: Do we have to
15 wait for something mechanically to
16 happen now?
17   Why don't we go off the
18 record for five minutes.
19   THE VIDEOGRAPHER: The time
20 is now 2:12. We're going off the
21 record.
22   (Short break.)
23   THE VIDEOGRAPHER: The time
24 is now 2:28 p.m. We're now back

Page 167

1 on the record.
2 BY MR. RAYMAR:
3   Q. And I show the witness
4 McLaughlin 24, and ask if you recognize
5 this document, which is Sheet 1 of a
6 multi-sheet document.
7   MR. GRINGER: You know, I'm
8   just going to object for the
9   record. This -- since it seems to
10   start at Column S, that there's a
11   lot of this document cut off. I'm
12   not even talking about there's
13   lots of rows cut off. There
14   appears to be lots of columns cut
15   off.
16   MR. RAYMAR: That appears to
17   be correct. Because it was too
18   wide to do anything with. But the
19   record reflects it.
20   MR. GRINGER: Yep. Exactly.
21   THE WITNESS: I don't
22   recognize this document.
23 BY MR. RAYMAR:
24   Q. And when you click, I

Page 168

1 believe it's on the letters, at the top
2 of the columns --
3   MS. SCHUSTER: In between
4   the two columns, if you
5   double-click.
6 BY MR. RAYMAR:
7   Q. I'll represent to you that
8 it expands, and the yellow boxes either
9 appear or don't appear --
10   MR. GRINGER: This is a
11   black and white copy.
12   How can you tell it's
13   yellow?
14   THE WITNESS: Oh.
15   MR. RAYMAR: Do you have --
16   do you have it expanded or not?
17   MR. GRINGER: I just have
18   what you gave me.
19   MR. RAYMAR: Yes. These
20   expand.
21   MR. GRINGER: Okay.
22   THE WITNESS: Okay.
23   MR. RAYMAR: On my copy,
24   they are yellow. I don't know how

Page 229

1 last entry of FERPA/PII REDACTION on
2 Page 66, you don't recognize any of the
3 names?
4  A. I don't recognize any of
5 these names.
6   MR. RAYMAR: I may not have
7  anything else. I ask -- I'm going
8  to go off the record with Sara
9  just to double-check.
10   THE VIDEOGRAPHER: The time
11  is now 4:39 p.m. We're now going
12  off the record.
13   (Short break.)
14   THE VIDEOGRAPHER: The time
15  is 4:54 p.m. We're on the record.
16   MR. RAYMAR: Let the record
17  reflect that plaintiffs have no
18  further questions at this time.
19   I think we have an hour and
20  20 minutes left.
21   MR. GRINGER: I don't think
22  you have that much time.
23   How much time does he have?
24   MR. RAYMAR: He said 5:40.

Page 230

1   MR. GRINGER: At the last
2  break it was 5:30.
3   MR. RAYMAR: Yeah, because
4  he said he --
5   THE VIDEOGRAPHER: I had
6  estimated.
7   MR. GRINGER: All right.
8  Well, whatever.
9   MR. RAYMAR: And so I
10  reserve the hour and 20 minutes in
11  case Mr. Gringer causes me to ask
12  some follow-up cross.
13   MR. GRINGER: All right.
14  The witness is mine.
15    - - -
16    EXAMINATION
17    - - -
18 BY MR. GRINGER:
19  Q. Good afternoon,
20 Mr. McLaughlin, my name is David Gringer
21 I'm a lawyer for the University of
22 Pennsylvania in this case.
23   And thank you for your time
24 today for those who aren't with us and

Page 231

1 maybe watching in the future in the
2 courtroom, it's been quite warm in here
3 today. So I appreciate your patience.
4 And I won't ask you any architectural
5 design questions, so you have that
6 commitment from me over the next few
7 minutes.
8   So, just so we can remind
9 the court and the jury, where do you work
10 today?
11  A. I currently work at Hamilton
12 College.
13  Q. Where -- where is Hamilton
14 College?
15  A. Hamilton College is located
16 in Clinton, New York.
17  Q. And do you live near
18 Hamilton College now?
19  A. Yes. I currently rent an
20 apartment in Clinton.
21  Q. And to your knowledge, is
22 Clinton, New York, more than 100 miles
23 from the city of Chicago, Illinois?
24  A. Yes.

Page 232

1  Q. All right. And before you
2 worked at Hamilton College, you worked
3 at -- for my client, at the University of
4 Pennsylvania; is that right?
5  A. That's correct.
6  Q. And you also attended the
7 University of Pennsylvania, correct?
8  A. I did.
9  Q. About how many years, in
10 total, did you work for the University of
11 Pennsylvania?
12  A. Over ten years.
13  Q. And during that ten-year
14 period, your positions were all in
15 admissions; is that right?
16  A. That's correct.
17  Q. And at Hamilton, what is
18 your role?
19  A. I am the associate vice
20 president for enrollment management and
21 the dean of admission.
22  Q. And during the time that you
23 worked at the University of Pennsylvania,
24 about how many applications for

Page 233

1  undergraduate admission did you review?
2  **A.  Thousands.**
3  Q.  More than 2,000?
4  **A.  More than 10,000.**
5  Q.  More than 10,000.
6  Of the more than 10,000
7  applications you reviewed during your
8  time at the University of Pennsylvania in
9  the admissions office for more than ten
10 years, how many otherwise unqualified
11 applicants were admitted because of an
12 actual or potential donation from one of
13 their family members?
14 **A.  Zero.**
15 Q.  Stepping back for a minute,
16 Mr. Raymar asked you a lot of questions
17 without, I think, sort of getting some
18 basic facts in the record.  And I want to
19 just take a few minutes to do that now so
20 the jury and the court can understand.
21 This is a case proceeding in
22 Chicago, so there may be people not as
23 familiar with the university and with
24 sort of its dynamic.

Page 234

1  So, first, what is the
2  University of Pennsylvania?
3  **A.  The University of**
4  **Pennsylvania is a private research**
5  **university located in Philadelphia.**
6  **10,000 undergraduate students, about**
7  **10,000 graduate students.**
8  Q.  And Pennsylvania, University
9  of Pennsylvania, Pennsylvania is a state,
10 right?
11 **A.  Pennsylvania is a state.**
12 **The University of Pennsylvania is not a**
13 **public institution.  Sometimes there's**
14 **confusion between Pennsylvania State**
15 **University, Penn State, and the**
16 **University of Pennsylvania.**
17 Q.  And so for folks who know
18 Chicago, you are familiar with the state
19 school in Illinois, right, its name?
20 **A.  The University of Illinois?**
21 Q.  Right.  And so unlike the
22 University of Illinois, Penn is not a
23 state school?
24 **A.  That's correct.**

Page 235

1  Q.  And so when we talk about
2  admissions generally, what does that
3  mean?
4  **A.  Admission is the process of**
5  **recruiting, selecting, yielding the**
6  **incoming class for a university.**
7  Q.  And for those who don't
8  know, about how many applicants in a
9  typical year would Penn receive to its
10 undergraduate schools in total?
11 **A.  It varies from year to year.**
12 **In my experience between -- around --**
13 **between 50 and 60,000.**
14 Q.  And does Penn admit everyone
15 who applies?
16 **A.  No.**
17 Q.  About how many students are
18 admitted to Penn for undergraduate
19 education each year?
20 **A.  In the last year that I was**
21 **there, it was around 6 percent.**
22 Q.  So that's about, if I'm
23 doing my math right, a little more than
24 2400?

Page 236

1  **A.  It's more than 2400.**
2  Q.  Oh right.
3  **A.  2400 is where we want to --**
4  **that's the number we want to enroll.  We**
5  **need to admit more than 2400, because we**
6  **know not everyone is going to choose**
7  **Penn.  So we admit, probably closer to**
8  **34, 35, in order to end up with 2400.**
9  Q.  And why -- why do you have
10 to admit more -- well, let me ask you
11 this.
12 If you don't get into Penn,
13 does that mean you're not qualified to
14 attend Penn?
15 **A.  No.**
16 Q.  Why not?
17 **A.  60,000 applications.**
18 **There's many qualified applicants that we**
19 **can only accommodate 2400 people on**
20 **campus.  We have to make tough choices.**
21 Q.  Is there just, you know, and
22 for those who may not be familiar with
23 these applications and applying to
24 universities, is there a certain test