**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ANDREW CORZO, SIA HENRY, ALEXANDER LEO-GUERRA, MICHAEL MAERLENDER, BRANDON PIYEVSKY, BENJAMIN SHUMATE, BRITTANY TATIANA WEAVER, and CAMERON WILLIAMS, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, THE JOHNS HOPKINS UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY, <br><br> Defendants. | Case No.: 1:22-cv-00125 <br> **Hon. Matthew F. Kennelly** |

**NORTHWESTERN UNIVERSITY'S OPPOSITION
TO PLAINTIFFS' MOTION TO COMPEL**

Plaintiffs' Motion (Dkt. 441, the "Motion") to compel Defendant Northwestern University ("Northwestern") to produce notes of meetings between President Emeritus Morton Schapiro and any of hundreds or thousands of donors through "the class period," and to produce him again for two more hours of deposition testimony, should be denied. The information requested would be entirely irrelevant, unduly burdensome to produce, and not remotely proportional to the needs of the case. And the fact that Plaintiffs rely primarily on fabricated claims of "spoliation" to support their motion highlights how indefensible the requested discovery is on its own merits.

Plaintiffs again trot out the argument that their latest request is needed to show that Northwestern was not "need blind," as necessary to qualify for the Section 568 exemption, because it considered the donor potential of certain applicants for admission. Northwestern, however, is not one of the defendants asserting the Section 568 exemption as a defense in this litigation. And in any event, Northwestern has already produced hundreds of versions of its so-called "President's Lists" for the entirety of the class period, as well as emails related to such President's Lists—documents that, unlike the documents that are the subject of this Motion, are directly related to admissions. Plaintiffs' only explanation for seeking *additional* donor-related discovery is the unsubstantiated and illogical assertion that records of meetings that President Schapiro had with donors "*could* even more directly establish that previous or prospective donations by the applicants' family were considered in Northwestern's decision to admit specific applicants." Mot. at 3 (emphasis added). This is pure speculation. Plaintiffs' Motion does not include *any* explanation as to why the significant discovery on this exact issue that Northwestern has already produced is insufficient or why the next appropriate step is to require Northwestern to review records of *every meeting* with 100 donors a year for every year of the class period on the off chance that there *might* be some record that "could" "more directly establish" that information about

1

donations was considered—beyond the information that is reflected in the President's Lists themselves. *See id*.

Plaintiffs' request for additional deposition time with President Emeritus Schapiro should be denied for the same reasons. As set forth below, during the full-day deposition they already took, Plaintiffs either deliberately or negligently made no effort to get answers to the questions the Court advised them to seek answers to before seeking additional relief. Moreover, Plaintiffs are scheduled to take the deposition of Northwestern's former Dean of Undergraduate Enrollment, Chris Watson, on October 10, and will have ample opportunity to ask him about his meetings with President Schapiro concerning applicants on the President's Lists.

## RELEVANT BACKGROUND

As this Court has recognized, "this isn't a lawsuit about wealth favoritism. It's a lawsuit about colluding on financial aid essentially." *See* Ex. 1, Aug. 24, 2023 Hr'g Tr. at 22:8-11. But Plaintiffs' Motion is directed at seeking documents exclusively related to "wealth favoritism" to demonstrate that Northwestern "considered" information pertaining to past donations or donor potential in considering the applications of some applicants. Mot. at 2-4. Although this issue is entirely peripheral to the merits of Plaintiffs' antitrust claim (particularly as to Northwestern, which is not asserting the 568 exemption as a defense), Northwestern has already produced voluminous documentation relating to Plaintiffs' "wealth favoritism" theory, including:

- All documents pertaining to President's Lists from Northwestern's Admissions office, including 272 versions of such lists dating back twenty years (both in electronic and hard copy form). As Plaintiffs themselves state in their Motion, these lists "included the 'major gift capacity' of the applicant—that is, a dollar value of the potential donation that might be realized from the applicant's family or recommender after their admission—along with the applicant's family members' donation history." Mot. at 3, internal citations omitted.

- Emails pertaining to President's Lists in which students on such lists were recommended for admission.

- Unique numerical identifiers (UIDs) for applicants whose names were redacted pursuant to FERPA, allowing Plaintiffs to cross-reference the voluminous structured admissions and financial aid data produced by Northwestern, which would show, among other things, whether students who appeared on the President's Lists were admitted and their application ranking scores by Northwestern admissions personnel.

Plaintiffs also deposed President Emeritus Morton Schapiro for a full day on July 17, during which Plaintiffs had ample opportunity to question him about their "wealth favoritism" theory. Mysteriously, Plaintiffs failed to ask him any questions about what role things like major gift capacity or donation history played in admissions decisions. In addition, Plaintiffs will be deposing Northwestern's former Dean of Undergraduate Enrollment, Chris Watson, next Tuesday, October 10. Mr. Watson met with President Schapiro to discuss applicants on the President's Lists, so Plaintiffs will have yet another opportunity to obtain further evidence on this subject.

As reflected by the fact that this is now at least the fourth such motion Plaintiffs have filed involving Northwestern, Plaintiffs have continuously sought more and more donor-related discovery aimed at their arguments regarding "wealth favoritism." *See* Dkt. 297 (Pl.s' Mem. in Opp'n to Mot. for a Protective Order); Dkt. 379 (Pl.s' Mem. in Supp. of their Mot. to Limit Redactions); Dkt. 385 (Pl.s' Mem. in Supp. of their Mot. for Recons. of the Court's May 31, 2023 Ruling on Pl.s' Mot. to Limit Redactions); Dkt. 433 (Aug. 17, 2023 Joint Status Report) at 2-3; Ex. 2, Feb. 8, 2023 Hr'g Tr.; Ex. 3, May 31, 2023 Hr'g Tr.; Ex. 1, Aug. 24, 2023 Hr'g Tr. In response to such requests, this Court has repeatedly indicated that additional donor discovery is not necessary without additional justification. For example, at a hearing in May 2023—just before President Emeritus Schapiro was deposed—the Court stated the following to Plaintiffs' counsel:

> You've got what you've got. Yeah, there's some redacted information [in the President's Lists]. You've got what you've got. You're going to do the depositions. And if you're not able to get, you know, answers to questions that allow you to understand the records that you've gotten in some reasonable way

3

> during the deposition, then I'll have to revisit it. . . . *Why can't you ask about them . . . in terms of policies, practices and so on? In other words, somebody who has—who has a relative or a good buddy or whatever that gives a donation of X amount, what's done with—how does that fit into the whole scoring system and how does that affect . . . the likelihood of admission of the student that's involved?*

Ex. 3, May 31, 2023 Hr'g Tr. at 12:2-7, 14:11-18, emphasis added. Despite subsequently spending an entire day deposing President Schapiro, Plaintiffs chose not to heed the Court's direction. Plaintiffs used exactly two Presidents' Lists as exhibits at President Schapiro's deposition, but the only questions they asked him about these lists fell into two categories: (1) asking him to explain the meaning of various abbreviations or shorthand appearing on the lists; and (2) questions designed to demonstrate the completely unsurprising fact that President Schapiro did not know the names of individuals whose names were redacted on the exhibits. *See* Ex. 4, Schapiro Dep. Tr. at 40:19-46:22, 92:7-103:21, 106:15-108:22. Plaintiffs' counsel, for reasons never explained, did not ask the follow-up questions the Court suggested.

**ARGUMENT**

I. **Plaintiffs' Motion Seeks Cumulative Discovery of Marginal Relevance that is Disproportionate to the Needs of the Case.**

Plaintiffs' Motion fails to include any explanation beyond pure speculation as to how the so-called "development reports"—reports of meetings between President Emeritus Schapiro and donors—will provide them any incremental information to make arguments regarding "wealth favoritism" in light of the voluminous information Northwestern has already produced. In Plaintiffs' Motion to Compel Defendants to Provide FERPA Notices (the "FERPA Motion"), Plaintiffs argue that:

> a key part of Plaintiffs' proof that Defendants' admissions policies were never need-blind under the statute . . . is proving *that a given Defendant . . . admit[ted] students while considering their families' large donations and/or ability to make*

4

> *large donations, reflecting their "financial circumstances," rather than solely on their academic qualifications.*

FERPA Mot., Dkt. 443-1 at 3-4, emphasis added.[1] But as set forth above, Northwestern has produced hundreds of President's Lists and documents relating to such lists which, as Plaintiffs concede (Mot. at 3) and the example that Plaintiffs attached as Exhibit 3 to their motion reflect, include information about gift capacity and donation history—*i.e.* information about "large donations and/or ability to make large donations." These lists are also populated with UIDs that can be matched to the structured admissions and financial aid data Northwestern produced so that Plaintiffs can themselves determine which applicants from these lists were admitted to Northwestern and what application ranking they were given by Northwestern admissions personnel.

Significantly, Plaintiffs had all of this information in hand when then took the deposition of President Schapiro in July, but *chose not to ask President Schapiro any questions about how and whether he considered donation history or gift capacity when discussing admissions decisions with Chris Watson*. Instead, Plaintiffs limited their questioning about the President's Lists to technical questions about the meaning of certain terms on the list and the identification of individuals whose names were redacted. Ex. 4, Schapiro Dep. Tr. at 40:19-46:22, 92:7-103:21, 106:15-108:22. It was as if the questioning was designed deliberately *not* to try to get answers to the questions the Court previously directed Plaintiffs' counsel to explore with the discovery already provided (Ex. 3, May 31, 2023 Hr'g Tr. at 14:11-18), and instead to set up this Motion.

---

[1] Plaintiffs also do not explain how this Motion interacts with the contemporaneously-filed FERPA Motion. Plaintiffs state in the FERPA Motion that they need unredacted information for a handful of donors because they cannot make effective use of redacted information. FERPA Mot. at 5-6. Yet in *this* Motion, they are seeking *redacted* information about 2000 applicants related to donors, which they want Northwestern to produce *in addition* to de-identified information about applicants related to *certain* identified donors.

5

Thus, Plaintiffs' request for additional time to depose President Schapiro is equally as unjustified as their request for "development reports." This is particularly true given that Plaintiffs are also scheduled to depose Chris Watson next Tuesday, October 10, during which time they will have an additional opportunity to obtain testimony on these issues from Northwestern's former Dean of Undergraduate Enrollment.

Plaintiffs argue that the additional production of development reports "could even more directly establish that previous or prospective donations by the applicants' family were considered in Northwestern's decision to admit specific applicants." Mot. at 3. Not only is such a statement speculative, it does nothing to account for proportionality or burden. Indeed, the burden in producing what Plaintiffs seek—information on over 1,000 donors going back decades, would be massive.

To the extent Plaintiffs are seeking records summarizing visits that President Schapiro had with donors, such records are stored in a database maintained by Northwestern's Alumni Relations and Development Office (ARD), but there is no way to readily identify whether such meetings occurred (or whether notes of such meetings exist) without someone manually querying the database for each donor. Put aside for the moment that it is not even clear which are the specific thousand(s) of donor names at issue.[2] A Northwestern employee would have to individually identify each "donor-related applicant" for each year, match each UID to a student name, and cross

---

[2] There were many copies and different iterations of the "President's List" each year, thus resulting in the production of 272 lists for a 20-year period. Which version do Plaintiffs seek information from? Moreover, as President Schapiro testified, applicants were placed on the President's List for all sorts of reasons, not simply because a donor recommended them, and thus not every applicant has a donor associated with them. Ex. 4, Schapiro Dep. Tr. at 109:17-110:6. In addition, in many instances, the person recommending the applicant listed on the President's List is not actually related to the applicant. Are Plaintiffs seeking information on the applicant's family or the unrelated donor? And what qualifies someone as a donor? In the development column of the lists, some of the entries state that families have never given any money to Northwestern in the past, while others list de minimis amounts—do those persons qualify as donors? *See* Mot., Ex. 3.

6

reference that student name with a donor relative. Then, a Northwestern employee would need to look up the Northwestern alumni ID for each relative in Northwestern's system, since that ID is how records are maintained. That employee would then have to query the system—for each such donor—to identify any documented visits or meetings for each such donor, which would then need to be exported to a spreadsheet and reviewed. Based on a review of a handful of examples, it appears that many notes of meetings are too voluminous to fit in a single Excel box. Thus, the document reviewers would need to keep track of any entries that are "cut off" and ask Northwestern personnel to individually access the meeting notes for each such entry on an entry-by-entry basis from yet another system.[3] Moreover, each of the entries would need to be reviewed for FERPA redactions and redacted as appropriate. Northwestern estimates that this would take hundreds of hours of work—work that is clearly disproportionate to the needs of the case in light of (a) the voluminous information that is already in Plaintiffs' possession through Northwestern's production of its President's Lists and related documents and (b) the fact that Northwestern is not asserting the 568 exemption defense.

## II. Plaintiffs' Allegations of Spoliation and False Testimony Are Both Meritless and Irrelevant to Their Motion.

Unable to justify their requests on the merits, Plaintiffs lob in allegations of "spoliation" and "false testimony" that are both meritless and irrelevant to their request for additional donor-related discovery. With respect to Northwestern's former Dean of Undergraduate Enrollment, Chris Watson, Plaintiffs claim that (a) some set of electronic notes exist pertaining to his meetings with President Schapiro exist apart from documents Northwestern has already produced, and (b) because this imagined set of documents was not produced, they must have been spoliated. This

---

[3] For all of these reasons, Plaintiffs' "offer" to "work out a compromise with Northwestern" if any individual has more than three associated "development reports" (Mot. at 10) does little to reduce the burden associated with this exercise.

whole argument is a fabrication by Plaintiffs' counsel—something that was explicitly explained to them before they repeated these false claims in their motion. Dkt. 441-5, Ex. 1 at 7-10, 12-13; Dkt. 441-6, Ex. 2.

There is no such set of notes apart from the documents already produced. Plaintiffs' false assertions to the contrary appears to be based solely on President Schapiro's testimony that, during meetings about certain applicants on the "President's List," Mr. Watson was "always on the computer." When he was asked about any notes from the meetings with President Schapiro during his prior deposition taken by the Department of Justice, Mr. Watson explained that "there might be some notes" *on* his copies of the President's Lists—documents that Northwestern has already produced. Ex. 5, Watson Dep. Tr. at 53:12-16.

In addition, the notion that Mr. Watson gave false testimony in his prior deposition is yet another fiction invented by Plaintiffs' counsel. Plaintiffs' counsel gives a misleading impression of the nature of the questions at Mr. Watson's prior deposition—the testimony cited by Plaintiffs (Mot. at 7) related to something other than the initial list of candidates provided by the Office of the President to the Admissions Office. And Mr. Watson did not testify that he never saw documents containing donation information. Dkt. 441-2, Ex. 2 at 49:13-17, 122:12-22. Indeed, Mr. Watson *acknowledged* during his prior deposition that he occasionally did have donor-related information about the applicants that he and President Schapiro discussed. Ex. 4, Schapiro Dep. Tr. at 122:24-123:13 (testifying that President Schapiro would sometimes tell him "whether an applicant or their family has made any donation," including "probably" in some cases "the amount of a donation.").[4]

---

[4] In footnote 1 Plaintiffs also raise a threatened spoliation claim with respect to certain hard copy documents of President Schapiro. Just as with the claims with respect to Mr. Watson, Plaintiffs' allegations in this regard are utterly meritless, which counsel for Northwestern has communicated to Plaintiffs' counsel on numerous occasions. Dkt. 441-5, Ex. 1 at 5, 11-13; Dkt. 441-6, Ex. 2.

## CONCLUSION

For the reasons set forth above, Northwestern respectfully requests that the Court deny Plaintiffs' Motion.

Dated: October 4, 2023

Respectfully submitted,

By: */s/ Scott D. Stein*

Scott D. Stein
Kathleen L. Carlson
Benjamin K. Brunner
SIDLEY AUSTIN LLP
One South Dearborn St.
Chicago, IL 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
sstein@sidley.com
kathleen.carlson@sidley.com
bbrunner@sidley.com

*Counsel for Defendant Northwestern University*

9

## CERTIFICATE OF SERVICE

I hereby certify that on October 4, 2023, the foregoing document was served on all counsel of record by email or using the CM/ECF system, which will send notice of this filing to all parties, as set forth below:

Robert D. Gilbert
Elpidio Villarreal
Robert S. Raymar
Steven Magnusson
**GILBERT LITIGATORS & COUNSELORS, P.C.**
11 Broadway, Suite 615
New York, NY 10004
Phone: (646) 448-5269
rgilbert@gilbertlitigators.com
pdvillarreal@gilbertlitigators.com
rraymar@gilbertlitigators.com
sschuster@gilbertlitigators.com
amarquez@gilbertlitigators.com
smagnusson@gilbertlitigators.com

Devin "Vel" Freedman
Edward J. Normand
Peter Bach-y-Rita
**FREEDMAN NORMAND FRIEDLAND LLP**
99 Park Avenue
Suite 1910
New York, NY 10016
Tel: 646-970-7513
vel@fnf.law
tnormand@fnf.law
pbachyrita@fnf.law

Eric L. Cramer
Caitlin G. Coslett
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: 215-875-3000
ecramer@bm.net
ccoslett@bm.net

Richard Schwartz
**BERGER MONTAGUE PC**
1720 W Division

Chicago, IL 60622
Tel: 773-257-0255
rschwartz@bm.net

Daniel J. Walker
Robert E. Litan
Hope Brinn
**BERGER MONTAGUE PC**
2001 Pennsylvania Avenue, NW
Suite 300
Washington, DC 20006
Tel: 202-559-9745
rlitan@bm.net
dwalker@bm.net
hbrinn@bm.net

*/s/ Scott D. Stein*
**SIDLEY AUSTIN LLP**
One South Dearborn Street
Chicago, IL 60603