# Exhibit 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3

 4    SIA HENRY, et al.,                )  Docket No. 22 C 125
                                        )
 5                       Plaintiffs,    )
                                        )
 6              vs.                     )
                                        )
 7    BROWN UNIVERSITY, et al.,         )  Chicago, Illinois
                                        )  August 24, 2023
 8                       Defendants.    )  1:00 o'clock p.m.

 9
                      TRANSCRIPT OF PROCEEDINGS
10        BEFORE THE HONORABLE MATTHEW F. KENNELLY

11
      APPEARANCES:
12

13    For the Plaintiffs:   GILBERT LITIGATORS & COUNSELORS
                             BY:  MR. ROBERT DEWITT GILBERT
14                                MR. ERIC CRAMER
                             11 Broadway, Suite 615
15                           New York, NY  10004
                             (646) 448-5269
16

17                           BERGER MONTAGUE PC
                             BY:  MR. ERIC L. CRAMER
18                           1818 Market Street, Suite 3600
                             Philadelphia, PA  19103
19                           (215) 875-3009

20

21    Court Reporter:       MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
                             Official Court Reporter
22                           219 S. Dearborn Street, Suite 2102
                             Chicago, IL  60604
23                           (312) 435-5639

24

25
```

2

1    APPEARANCES CONTINUED:

2                                    ROCHE FREEDMAN LLP
                                     BY:  MR. EDWARD NORMAND
3                                    99 Park Avenue, Suite 1910
                                     New York, NY  10016
4                                    (646) 970-7513

5
     For the Defendants:
6
     University of
7    Chicago:                        ARNOLD & PORTER
                                     BY:  MR. JAMES L. COOPER
8                                    555 Twelfth Street, N.W.
                                     Washington, DC  20004-1202
9                                    (202) 942-5000

10

11   Northwestern
     University:                     GASS TUREK
12                                   BY:  MR. SCOTT DAVID STEIN
                                     241 N. Broadway, Ste 300
13                                   Milwaukee, WI 53202
                                     (312) 853-7000

14

15

16   Georgetown
     University:                     MAYER BROWN LLP
17                                   BY:  MS. BRITT MARIE MILLER
                                          MR. DANIEL FENSKE
18                                   71 South Wacker Drive
                                     Chicago, IL  60606
19                                   (312) 782-0600

20

21

22

23

24

25

1    (The following proceedings were had in open court:)

2          THE CLERK:  Case 22 C 125, Henry v. Brown University.

3          THE COURT:  Okay.  So we're here in person.  So do

4    people want to do your names or not do your names or how do

5    you want to do it?  Do you just want to give your name if and

6    when you're talking?  I don't really care.  Everybody is

7    nodding with the last suggestion.  We'll go with that one.

8          So here's what's on my agenda I think more or less in

9    this order.

10          One would be the motion for preliminary approval of

11    the settlement with the University of Chicago.  And then the

12    other -- well, there's the lingering issues in the motion to

13    compel relating to Georgetown, and then there's a couple of

14    issues in the status report that was filed on the 17th.  There

15    was at least one general thing that I want to bring up and

16    then anything else anybody wants to talk about.

17          So why don't we talk about things in that order.  So

18    whoever is going to talk about the proposed settlement for the

19    University of Chicago, it's probably better for you to be

20    standing up here.  I have some questions that I want to ask.

21          MR. CRAMER:  Good afternoon, your Honor.  Eric Cramer

22    for the plaintiffs.

23          THE COURT:  Okay.  So the 200,000 number, that's

24    everybody, all schools, right?  It's not just University of

25    Chicago?  They couldn't possibly have had that many.

4

1          MR. CRAMER:  That's correct, your Honor.  It's the
2    entire class from all 17 schools.
3          THE COURT:  And it actually took me more than a
4    minute to kind of actually even figure this out, but it's not
5    just the settlement for people who were accepted at the
6    University of Chicago.  It's class wide?
7          MR. CRAMER:  Correct.
8          THE COURT:  Right, okay.  Has anybody done any kind
9    of thinking or is there any kind of data out there in a case
10   like this about what percentage of people are likely to put in
11   claim forms, or are they going to have to?
12         MR. CRAMER:  When we do present the process, we
13   intend to try to make it very simple.  So preprinted forms --
14         THE COURT:  Right.
15         MR. CRAMER:  -- with information to the class members
16   to make it very simple for them to submit.  They will sign
17   something with a preprinted form and turn it back.
18         We have hired a claims administration firm that is
19   skilled in this area, and we are going to work hard to make
20   sure that as many class members as possible --
21         THE COURT:  Yeah, so back to my question, though.  Is
22   there any kind of life experience, data, or anything like that
23   out there?  Is it 5 percent?  Is it 10 percent?  Is it 50
24   percent?  Is it 1 percent?
25         MR. CRAMER:  In my experience, it varies.  In classes

5

1    with businesses who are getting significant settlements --

2            THE COURT:  It's going to be higher.

3            MR. CRAMER:  -- it's going to be higher.  In classes

4    like this where they're a disbursed group of individuals, it

5    could be lower.  I would say somewhere between 40 or 50

6    percent might put in claims on the high end, but it's hard to

7    say.

8            THE COURT:  Okay.  And I was kind of digging through

9    all of the stuff yesterday.  Let me just see if I can pull a

10   particular thing up here.  Remind me which exhibit to which

11   filing is the proposed notice?

12           MR. CRAMER:  The proposed notice is Exhibit -- well,

13   it's exhibit, the long form notice is Exhibit C to the

14   Weiss-brought declaration which itself is Exhibit E to the

15   joint declaration.

16           THE COURT:  It's the joint declaration and it's

17   Exhibit E to that and it's Exhibit C to that.

18           MR. CRAMER:  Let me get my book so I have it in front

19   of me, if you don't mind.

20           THE COURT:  Sure.

21           This is usually the point in time when my laptop

22   decides it's not going to cooperate with me, which is exactly

23   what it's doing.  There we go.

24           It's the Weiss-brought declaration.

25           MR. CRAMER:  Correct.

1    THE COURT:  And it's Exhibit C to that.

2    MR. CRAMER:  Correct.  That's the long form, and then

3    the short form publication would be Exhibit B to the

4    Weiss-brought declaration.

5    THE COURT:  I'm going to look at Exhibit B first

6    actually.

7    Okay.  So here's my question.  Here's -- is there

8    anything in there that says of the 13,500,000, we're going to

9    ask for -- I guess a third of that would be 4 and a half

10   million which would leave 9 million for the class.  Is there

11   anything that talks about fees and whatnot in any kind of

12   specific terms?

13   MR. CRAMER:  It does.  On page 16, there is a

14   question number 19.

15   THE COURT:  It's not in the short form?

16   MR. CRAMER:  That's right.  I'm sorry.  It's in the

17   long form.  The short form, the idea is give basic

18   information, send people to the website where all of the

19   information will be.

20   THE COURT:  So it's page 16 of the long form.

21   MR. CRAMER:  Correct.  Question 19:  How would the

22   lawyers for the plaintiffs and the settlement class be paid.

23   THE COURT:  Okay.  I'm seeing that here.  Is there

24   anything in either the long or short form that tells class

25   members how many class members there are estimated to be?  Let

1   me tell you why I'm asking these questions.  It's probably

2   obvious at this point.  I guess my question -- my bottom-line

3   question is is there going to be something that's going to

4   give anybody who looks at this a sense without doing a huge

5   amount of work about what's my end of this likely to end up

6   being?  That's going to be likely the only thing anybody cares

7   about, if they actually look at it.

8           MR. CRAMER:  Right.  So the allocation plan, which is

9   part of the record and will be posted to the settlement

10  website, the preliminary approval brief, and other papers do

11  identify.

12          THE COURT:  In other words, you got to read a whole

13  bunch of stuff.  You're going to have to find a better way of

14  doing that.

15          MR. CRAMER:  Your Honor, we can put the

16  200,000-person number in the notice itself.

17          THE COURT:  Yeah, so I think it needs to be

18  relatively easy for somebody to look at this and say, okay,

19  there's this much money, it's actually going to net out to

20  this because the lawyers are going to take some of it, and

21  there's this many people, here's what the math is.

22          MR. CRAMER:  Okay.

23          THE COURT:  I don't want them to have to look and

24  flip back and forth to a bunch of different pages in a bunch

25  of different documents to have do that.

1    MR. CRAMER:  We can do that, your Honor.

2    THE COURT:  It would be helpful if there's something

3    about that in the short form.  Now, who knows.  I guess the

4    downside to that potentially is it might -- if all 200,000

5    people ask for it, it ends up being a relatively modest amount

6    of money.  Let's just put it that way.

7    MR. CRAMER:  It's 40 to $50 on average.

8    THE COURT:  I had about 45 bucks.  I mean, maybe

9    there's a way of saying there that the amount of money you

10   will get will depend on how many people put in claims.  Now,

11   that's true and it's obvious.  You know, I don't know what

12   people would think about that.  Anyway, that was one set of

13   questions.

14   MR. CRAMER:  Your Honor, if I may, there is a

15   discussion of the allocation plan that I think gets at the

16   last concept that you made.

17   THE COURT:  Which document?

18   MR. CRAMER:  It's in the long form notice.

19   THE COURT:  Yeah, so here's the problem with the long

20   form notice.  Not that this is a problem with the notice

21   itself; all that stuff needs to be in there.  The problem is

22   that it's 19 pages.

23   MR. CRAMER:  Right.

24   THE COURT:  And we could take an over/under on what

25   percentage of the people who actually open the envelope are

1   actually going to read that -- are actually going to go to
2   where they have to go to read it.
3            MR. CRAMER:  Okay.
4            THE COURT:  I'll take the under.  Whatever your
5   numbers are, I'll take the under.
6            MR. CRAMER:  I agree with you, your Honor.  I think
7   we can propose some language, work it out with the University
8   of Chicago counsel to put in --
9            THE COURT:  Who is University of Chicago's counsel?
10  Hi.
11           MR. CRAMER:  -- to put in both the short form and the
12  long form that gives a sense as to the scale of recovery for
13  each class member and how it depends on the number of claims
14  that are made.
15           THE COURT:  Let me just cross out things on my notes
16  here.
17           Why U.S. citizens and permanent residents only?  I'm
18  assuming there are students who are neither of the above;
19  otherwise, you wouldn't have had that limitation in there.
20           MR. CRAMER:  Yes.  That has to do in part with U.S.
21  antitrust law and whether non-U.S. citizens or residents have
22  a claim.
23           THE COURT:  That's about extraterritoriality
24  basically?
25           MR. CRAMER:  Right.

1    THE COURT:  I mean, I just -- we're making some
2  assumptions here.  I'm making an assumption because you guys
3  know the law and I don't, to be blunt.  I guess I would
4  just -- I just want to make sure we're not doing that wrong.
5    MR. CRAMER:  Well, your Honor --
6    THE COURT:  That's the settlement.  I get that that's
7  the settlement, but part of what I have to decide is -- I
8  mean, if the actual class of people who could be certified
9  actually includes other people who you're not including in the
10  settlement, that would seem to me to be something that I at
11  least have to think about.
12    MR. CRAMER:  Right.  We could brief that, your Honor,
13  but under -- there's a Supreme Court opinion called Empagran,
14  and under that opinion, it's my understanding that if you are
15  not a U.S. citizen or resident, there is a complicated test
16  about whether you can recover.
17    THE COURT:  So even if the conduct is entirely in the
18  United States, if you're not in the United States or
19  non-citizen, non-resident, you can't automatically recover
20  from an antitrust violation.
21    MR. CRAMER:  Also, the case relates to --
22    THE COURT:  The University of Chicago person needs to
23  be up here too.  Sorry.
24    MR. CRAMER:  The case relates to financial aid policy
25  in the United States, and I think that there were some parts

1    of the underlying claim --

2            THE COURT:  Can you say anything about this?  I know

3    I'm putting you on the spot, this question about why are

4    non-citizens, non-permanent residents not part of this.

5            MR. COOPER:  I'm James Cooper, your Honor, on behalf

6    of the University of Chicago.  I agree with what Mr. Cramer

7    said about the law.  With respect to the mechanics of the

8    settlement, the scope of the class or settlement is the same

9    as the scope of the release we're getting.  So if for some

10   reason --

11           THE COURT:  Fair enough.

12           MR. COOPER:  -- those people had a claim --

13           THE COURT:  Their claims aren't released.

14           MR. COOPER:  Correct.  Correct.

15           MR. CRAMER:  And the scope of the class is consistent

16   with the class as pled in the complaint.

17           THE COURT:  So that's the way you pled it too.  I

18   didn't look back and compare.  Okay.

19           MR. CRAMER:  Correct.

20           THE COURT:  Okay.  Given the amounts of money that

21   people are -- this next issue is not likely to be a massive

22   issue, but it was a matter of curiosity for me.  For any given

23   student who pays tuition and fees and whatever, the student

24   may be paying it or the student may be indirectly paying it by

25   taking out a loan that they have to pay back or somebody else

1    might be paying it; for example, a parent.  Who gets the
2    money?

3            MR. CRAMER:  In our view, the student is the person
4    who gets the money.

5            THE COURT:  If the parent wants to say, Hey, I want
6    my $45 back, then that's what they can do.

7            MR. CRAMER:  That's a question between the student
8    and the parent.

9            THE COURT:  I'm assuming this is something you
10    thought about when you were doing this?

11            MR. CRAMER:  Yes, we did.

12            THE COURT:  All right.  Just a flag on the service
13    award issue.  It's not an issue for this one, but I can
14    imagine because it's the same plaintiffs, you know, the same
15    eight or however many plaintiffs there are, if there are other
16    settlements, at some point that number might -- the overall
17    number might end up getting too big.  You're smiling, so I'm
18    assuming you've thought about that too.

19            MR. CRAMER:  Yes, we agree with you your Honor.

20            THE COURT:  I just wanted to put the issue out there.
21    It's not really an issue for this one.

22            MR. CRAMER:  Understood.

23            THE COURT:  This is kind of the biggest one.  What is
24    this going to require then of the non-settling plaintiffs?
25    Because you got to send notice to people, right?

13

1        MR. CRAMER:  The non-settling plaintiffs?

2        THE COURT:  The non-settling defendants, sorry.  I

3 wrote a delta down there and I read it as a pi.  Sorry about

4 that.

5        MR. CRAMER:  Your Honor, happily we've worked out an

6 arrangement with all of the defendants, including the

7 non-settling defendants.  They have agreed to provide email

8 addresses of all class members that they have in their systems

9 of both alumni and current students, and those will be

10 provided within 45 days.

11        THE COURT:  And I saw something like that in there,

12 and I guess what I assumed -- and I'm just going to say

13 this -- I assumed that if that was wrong or anybody had a

14 problem with that, I would have gotten that as an objection of

15 some sort.  I guess I'm saying this to the crowd.  Nobody's

16 considering those email addresses to be FERPA records, I

17 guess, right?

18        MR. CRAMER:  Your Honor, we have a provision in the

19 preliminary approval order that accounts for that.

20        THE COURT:  What's it say?

21        MR. CRAMER:  If your Honor would turn to the

22 preliminary approval order --

23        THE COURT:  Which is?

24        MR. CRAMER:  It's Exhibit C to the joint declaration.

25        THE COURT:  To the point declaration?

1       MR. CRAMER:  Yes, so 428-5.

2       THE COURT:  Dash 5, okay.

3       MR. CRAMER:  And it's on page 7, paragraphs 17 and

4    18.

5       THE COURT:  You said where, page 7?

6       MR. CRAMER:  Page 7 and 8, paragraphs 17 and 18 under

7    the heading Email and Mailing Addresses.

8       THE COURT:  Okay.  So there's something in the reg

9    about, quote/unquote, directory information.

10      MR. CRAMER:  Right.  The defendants have all agreed

11   to provide information unless there's a FERPA block that a

12   student or alumni have provided to the school.

13      THE COURT:  That's something -- that's like opting

14   out of robocalls or something like that, you can check off a

15   box?  Everybody's nodding.

16      MR. CRAMER:  That's my understanding.

17      THE COURT:  Okay.  All right.

18      Okay, then.  One second.

19      Have you sent me a draft order on this thing yet?

20      MR. CRAMER:  I have.

21      THE COURT:  No.  I mean, separately, a Word version

22   that I can sign?  You're going to need to do that.

23      MR. CRAMER:  We will do that.

24      THE COURT:  Just to kind of cover the bases here.

25   First of all, I think there's a sufficient basis shown for

1    class certification.  There's a settlement class for the

2    reasons that are cited in there.  I think all of the Rule

3    23(a) criteria and 23(b) criteria are met.  And then as far as

4    the proposed settlement is concerned, pursuant to -- well, the

5    preliminary approval part of the order, I think it's been

6    shown on a preliminary basis that there's been adequate

7    representation to the class; the proposal was definitely

8    negotiated at arm's length; the relief is adequate taking into

9    account the factors in the rule -- I say this preliminarily,

10   of course -- Rule 23(e)(2)(C); and it treats class members

11   equitably relative to each other.  I get there might be an

12   issue on -- they talk about what's equitable, but I think it's

13   a reasonable way of doing that.  So I think the settlement is

14   within the range of reasonableness and the other criteria are

15   met, so the motion to approve it is granted.  Get me a Word

16   version of that order to my proposed order email address, and

17   I'll get it signed.

18        MR. CRAMER:  Thank you, your Honor.  There's one

19   amendment to the proposed order we submitted and we'd like to

20   include.  It has to do with the dates.  In the proposed order

21   we submitted that your Honor already has, we asked to start

22   the notice program within 30 days.  We're going to ask to push

23   all of those dates back 60 days.

24        THE COURT:  That's fine.  Thanks.

25        MR. COOPER:  Thank you, your Honor.

1    MR. CRAMER:   Thank you, your Honor.

2    THE COURT:   Next.   Let's talk about the status report

3    next.   So the status report I will just tell you tends to

4    follow the pattern of status reports in this case.   And here's

5    what I mean by that.   The plaintiffs say, Well, there's this

6    issue, this issue, and this issue and I get to the defendants'

7    section and they say, None of those are real issues, they're

8    premature, but here's what we have to say about them.   So the

9    thing follows that pattern.

10   I guess I'm looking for something and I was looking

11   for something that says, okay, Judge, in the plaintiffs'

12   section, here's the things we want you to do, bullet point

13   one, two, three, and four.   So I didn't see it.   So give me

14   the verbal bullet point.   And I mean bullet points.   This is

15   the elevator pitch, not the brief.

16   MR. GILBERT:   This is Robert Gilbert, partner of

17   Gilbert Litigators and counsel to the plaintiffs.   The

18   elevator pitch, your Honor, is we want the donor reports from

19   Northwestern.

20   THE COURT:   Okay.   Donor reports from Northwestern.

21   MR. GILBERT:   We want -- Georgetown is a separate

22   issue.

23   THE COURT:   That's a separate issue.   Keep that

24   separate.

25   MR. GILBERT:   From Vanderbilt, we want them to do a

1    FERPA notice for ten people.  It might be as many as 50, but

2    we agreed so they couldn't have an argument about burden that

3    we'd limit it at 50 people.

4            THE COURT:  Okay.

5            MR. GILBERT:  And that's really what we're seeking.

6            THE COURT:  Okay.  If there was a list at the end

7    saying, this is what we want you to do now, it would be those

8    two things as it relates to the stuff in this report, not the

9    Georgetown thing.

10           MR. GILBERT:  That's correct, your Honor.

11           THE COURT:  All right.  So we're going to talk about

12   that.

13           Who is the Northwestern person?  Come on up.

14           My takeaway from the defense section in the status

15   report as it relates to Northwestern is, this is going to be

16   an enormous amount of work and it's not worth it.  Flesh that

17   out for me a little bit.  If I got it wrong, tell me where I

18   got it wrong.

19           MR. STEIN:  No, I think that's certainly true.  Your

20   Honor will recall we had extensive briefing --

21           THE COURT:  Don't assume I recall anything.

22           MR. STEIN:  Fair enough.

23           THE COURT:  I mean, I probably do, but just don't

24   assume it.

25           MR. STEIN:  I'll give you our perspective.  Earlier

1   this year, there was briefing on whether the defendants, all

2   of us, would have to produce materials relating to so-called

3   donor related admissions from our president's office and our

4   development offices.  Your Honor denied that request and said

5   the defendants would be produced -- the defendants did produce

6   things from their admissions offices and said to the

7   plaintiffs that if they could come back afterward and make a

8   showing that that was insufficient to address the narrow

9   question that this is relevant to, which, of course, is not

10  the core of the claims but this need blind-issue --

11              THE COURT:  It's the exemption issue.

12              MR. STEIN:  Correct.  Correct.

13              -- (continuing) they could do that.

14              MS. REPORTER:  Could you state your name, please.

15              MR. STEIN:  I'm sorry.  Scott Stein.

16              THE COURT:  I should have told you to do that.

17              MR. STEIN:  And I was telling everyone at the table

18  before the hearing to do that.  Mea culpa.

19              Plaintiffs then filed another motion which your Honor

20  dealt with at the last status hearing to unredact donor names

21  from Yale and Northwestern.

22              THE COURT:  I basically said we're not there yet.

23              MR. STEIN:  Correct.  And you said to the plaintiffs,

24  if you want them to do that, you need to come back to me and

25  tell me what the burden of that is going to be and I'll hear

1    from Northwestern.  Plaintiffs chose not to do that.  Now
2    they've come -- the other thing that your Honor said at that
3    hearing or at the subsequent hearing is, we're going to do
4    things cleanly.  Somebody wants to file a motion, file the
5    motion, the other side will get to respond, and I'll deal with
6    this which we thought, frankly, was going to end these kind of
7    lobbying in of issues in these disguised motions in the
8    context of a status report.
9            Be that as it may, plaintiffs have now come back with
10   this request for donor documents.  Again, the same kind of
11   documents your Honor already ruled we didn't have to produce,
12   and they haven't made a showing that this is remotely
13   necessary.  Let me give you a couple of reasons why.
14           First of all, President Schapiro testified at his
15   deposition that Northwestern was need aware for transfer
16   students.  Under your Honor's interpretation of the exemption,
17   that is a trigger that eliminates the exemption for
18   Northwestern.  It doesn't matter whether we were not
19   need-blind under the interpretation of your Honor's ruling for
20   six other reasons.  It doesn't matter.  Right?  So put that to
21   the side.
22           On the donor issue, plaintiffs have not made any
23   showing that they need this.  Mr. Gilbert says "donor
24   records."  It doesn't really explain exactly what that is and
25   it's not really clear what that is.  But as best that we can

1    tell, what he's asking for is for 1300 people who are donors
2    to the university who are on these lists.  He wants all
3    records of any communications between the president and those
4    individuals dating back to 2005.  To what end?  The president
5    of the university meets with donors all the time.  He meets
6    with them at football games, he meets with them at alumni
7    events, he meets with them at board meetings where many of
8    them are trustees.  What possible purpose could there be to go
9    collect every record of a communication, a memo of a meeting
10   with a donor, even if that donor -- many donors are parents --
11   even if that donor later had a student who applied?

12          So I will pause there.  I'll cede before your Honor
13   and Mr. Gilbert.  We could have briefed this if it had been
14   raised in the context we thought it should have been.

15          THE COURT:  Remind me.  Is it Dr. Schapiro or is it
16   Mr. Schapiro?

17          MR. STEIN:  It's Dr. Schapiro.

18          THE COURT:  I would assume.  Has he been deposed yet?

19          MR. STEIN:  Yes.

20          THE COURT:  He was deposed.  And I think part of what
21   I read -- and I don't remember if it's in this stuff or if
22   it's in the stuff that was before the prior status hearing or
23   maybe it was discussed during the status hearing -- was he
24   asked during his deposition, okay, did you ever -- questions
25   along the lines of:  Okay, you've got this donor here.  Did

1    you ever tell admissions, hey, let this guy's kid in?

2         MR. STEIN:  No.  I'm surprised he wasn't asked that

3    question.

4         THE COURT:  That's what I thought I was told in an

5    earlier submission.  Maybe not on this one.

6         MR. STEIN:  He wasn't.  That's one reason, your

7    Honor, why it's somewhat frustrating for us.  If the

8    plaintiffs want to file a motion, make a record and we can

9    respond.  We'll deal with it.  But, you know, in the context

10   of lobbying this in with the status hearing about allegations

11   or characterizations of his testimony we think that are

12   inaccurate --

13        THE COURT:  Mr. Gilbert, go ahead.

14        MR. GILBERT:  Let me respond to two things, your

15   Honor.

16        THE COURT:  We'll talk about the whole should it be

17   in a status report or should it be in a motion thing in a

18   second.  Just talk about the merits of the issue.

19        MR. GILBERT:  The merits.  On the point that

20   Northwestern's already acknowledged that they were need aware

21   as to transfer students, as your Honor has previously said,

22   it's not a requirement on the plaintiffs that they prove their

23   case 50.1 percent to 49.9 percent.

24        THE COURT:  Well, actually, it is a requirement, but

25   no rational plaintiff would want to do it that way.

1          MR. GILBERT:  Thank you, your Honor.  Well said.  A

2     jury could very much see that as a technical argument.  It

3     could be seen as subject to jury nullification.  So we're

4     interested and we believe your Honor's repeatedly ruled that

5     we're entitled to have an opportunity to prove our case that

6     there was wealth favoritism.  Now, there's some very unusual

7     circumstances at Northwestern.

8          THE COURT:  Pause there for a second.  So the wealth

9     favoritism issue, so this isn't a lawsuit about wealth

10    favoritism.  It's a lawsuit about colluding on financial aid

11    essentially.

12         MR. GILBERT:  Right.

13         THE COURT:  The wealth favoritism issue relates to

14    the -- I don't remember if it's the 368 or the 568, whatever

15    the defense is, right?

16         MR. GILBERT:  Correct, your Honor.

17         THE COURT:  Does it relate to anything else other

18    than that?

19         MR. GILBERT:  It does a second thing.  It relates to

20    whether this is a per se case or whether it's a rule of

21    reasoning case.

22         THE COURT:  How does it relate to that?

23         MR. GILBERT:  Because the Third Circuit in Brown said

24    that the reason that they were sending the case back was that

25    MIT -- they wanted more fact discovery on MIT's claim they had

1  a pure altruistic motive without any revenue maximizing

2  purpose.  Those were the words.  If if there is a revenue

3  maximizing purpose in what they're doing, this is a per se

4  case.

5        THE COURT:  I get it.  Go back to your point then.

6        MR. GILBERT:  We go back to the three-ring circus, if

7  you will, that's going on at Northwestern.  Dr. Schapiro

8  testified that when he transferred from being president of the

9  university --

10        THE COURT:  I know.  Maybe some records got lost.

11  Let's just talk about the merits at this point.

12        MR. GILBERT:  Then the second person -- it goes to

13  the reason of why we need the donor reports from one person.

14  It's from Mr. McQuinn.

15        THE COURT:  Who is Mr. McQuinn?

16        MR. GILBERT:  Mr. McQuinn is head of development and

17  went to each of the meetings with Dr. Schapiro when

18  Dr. Schapiro met with a donor and he wrote a report about it.

19  So Dr. Schapiro says, well, I have no idea whether these were

20  thrown out, whether the donor reports were thrown out, whether

21  admissions reports were thrown out, whether financial aid was

22  thrown out.

23        And the other person who is material is Mr. Watson,

24  the head of admissions.  Mr. Watson, we have been told, says

25  he has no electronic notes of his meetings with Dr. Schapiro.

1    Now, Dr. Schapiro, on the other hand -- and this is in both
2    the sealed and the public version of the JSR -- he contradicts
3    that.  Dr. Schapiro says, well, I met every year with
4    Mr. Watson going over the president's lists.  Virtually every
5    entry, by the way, on the president's list has a donation
6    amount and a major gift capacity.  When I went over those
7    every year, he was always on the keyboard on his computer.  So
8    there's the president at these meetings saying, he's always on
9    the keyboard on his computer, and the fellow says, I have no
10   electronic notes.  By the way, in the sealed version of the
11   JSR, there's another false statement made.
12            THE COURT:  Yeah.
13            MR. GILBERT:  Now --
14            THE COURT:  I'm trying to diagram the sentences and
15   we're kind of over here at this point.  Let's get back here.
16            MR. GILBERT:  Fair enough.  That brings us to the key
17   person, McQuinn.  McQuinn actually has donor reports.  He has
18   the documents.
19            THE COURT:  How does this relate to the issue in the
20   case?  That's my question.  It really kind of goes back to --
21   I don't know if you took the deposition or who it was.  Why
22   didn't somebody ask Dr. Schapiro in his deposition:  Okay.
23   You got all of those reports.  You knew who the donors were.
24   Did you ever tell the admissions people, Let this kid in?
25            MR. GILBERT:  We absolutely did that.  We certainly

1    did that in the deposition, and he said he met with them

2    annually and he went over the list annually and that the list

3    had on it, the donation amounts, and he did that every year.

4           THE COURT:  What did he say was done with that?  I

5    mean, wouldn't that be the real question?  I mean, everything

6    else is preliminary.  What's done with it?

7           MR. GILBERT:  I believe that the purpose of it was to

8    -- and I think it was made clear in the deposition -- was to

9    influence the admission of the students who are on the

10   president's list.

11          THE COURT:  Okay.  So the specific documents that

12   you're asking for now, I mean, I know from looking at prior

13   transcripts that I've used this whole sun and moon and stars

14   thing once too many probably in this case, but let's say

15   you're not getting everything you asked for.  What are the

16   specific things you're looking for at this point as it relates

17   to Northwestern?

18          MR. GILBERT:  There's been a lot of metaphors in this

19   case.

20          THE COURT:  And I used most of them.  So that's on

21   me.

22          MR. GILBERT:  I would say it's a small hand document

23   to soak up a small puddle.  It's one person's documents.  It's

24   Mr. McQuinn's documents.

25          THE COURT:  You're calling them the donor's list?

1        MR. GILBERT:  Donor reports.

2        THE COURT:  Donor reports.

3        MR. GILBERT:  Donor reports.  And we've limited it to

4    a hundred a year.  That's it.

5        THE COURT:  It's a hundred what a year?  You're

6    saying this isn't all one document.  It's a hundred

7    separate --

8        MR. GILBERT:  It's a series of reports; that's been

9    the testimony.

10       THE COURT:  Okay.  Let's say you get that.  I get

11   what it is.  Let's say you get that.  What are you going to do

12   with it?  What are you going to be able to do it with?

13       MR. GILBERT:  What we're going to do with it is then

14   be able to tie the donor reports to the actual submissions.

15       THE COURT:  How so?  You don't have the names of the

16   kids.

17       MR. GILBERT:  Well, we do have the UIDs, and what

18   we'll be able to do is, for example, if someone had for the

19   sake -- if you had had 1100 --

20       THE COURT:  Let me cut to the chase here.  Isn't part

21   of what you're asking for is that you want them to either

22   identify everything or you want them to create UIDs, or

23   whatever the acronym is, for the donor reports that correspond

24   to the UIDs on the other things that you've got?

25       MR. GILBERT:  That's fine.

1        THE COURT:  Isn't that what you're asking for?

2        MR. GILBERT:  That's exactly right.

3        THE COURT:  You need to do one of the two; otherwise,

4    it's just a bunch of names that don't really tie to anything.

5        MR. GILBERT:  That is exactly right, your Honor, and

6    they only have to do it for the first hundred names on each

7    list and one person has the report.

8        THE COURT:  How many years of these lists are there?

9        MR. GILBERT:  Well, Dr. Schapiro was the president of

10   the university from 2010 to 2022, so 13 years.

11       THE COURT:  13, okay.

12       So back to Mr. Stein for a second.  When you're

13   talking about burden here, what I've just been talking about

14   with him, is that the burden issue, or is it something beyond

15   that?

16       MR. STEIN:  I have to say somewhat sarcastically,

17   it's interesting to hear Mr. Gilbert describe records that I

18   have no idea where he's getting this from.  He seems to be

19   leaving the impression that there's some single report for

20   each of these hundred people of a meeting.  And I think the

21   impression -- I want to make clear that we dispel this -- is

22   any suggestion that there was -- that these are reports of

23   meetings with donors about admissions, right?

24       THE COURT:  I wasn't getting that.

25       MR. STEIN:  Right.

1      THE COURT:  Hang on one second.

2      Sorry.  Go ahead.

3      MR. STEIN:  So when the president would meet with

4  donors, with the head of the development office, the head of

5  the development office would prepare a report, right, and

6  that's a report that's necessarily prepared after a particular

7  meeting.

8      THE COURT:  Right.

9      MR. STEIN:  So if there's 30 meetings over the last

10  13 years for that one donor, we're talking about 30 for that

11  one person that would have to go be located.  Again, when

12  Mr. Gilbert says, these are the records of one person, the one

13  person who is the head of the development office.  Again, if

14  he's suggesting that these are sitting in a file somewhere, I

15  don't know where he's getting that from.  There's no testimony

16  to that effect.

17      But then I heard, We would have to get those.  As

18  your Honor noted by definition, these would be reports of

19  people who were the parents of students applying for

20  admission.  So now we have a FERPA issue.

21      THE COURT:  Some of them would be; some of them

22  wouldn't.

23      MR. STEIN:  Well, by definition, if they're on these

24  lists, essentially.

25      THE COURT:  Okay.  Fair enough.

1        MR. STEIN:  So now we have to, what, redact what all
2  personally identifying information in these documents and then
3  go through and apply, you know, a uniform identifier to them?
4  Again, for what?
5        The other thing Dr. Schapiro testified to is there
6  were no discussions with donors about admissions either at the
7  time or for a year after.
8        THE COURT:  You don't know whether there was a
9  discussion with the donor about the admission.  I mean, this
10 is Chicago.  Wink, wink, nod, nod works.  So you wouldn't have
11 to have a discussion with a donor about an admission.  The
12 question is whether there's a discussion with the admission's
13 office about the admission of the donor  --
14       MR. STEIN:  That's exactly -- that's my point.  We
15 have produced the stuff that's the nucleus:  those documents,
16 the communications, those lists.  Again, I will stop after
17 this, but we're sitting here -- Mr. Gilbert is asserting
18 things about what Dr. Schapiro said that I disagree with.  But
19 I don't understand why we don't just -- if this had been
20 raised in the way we thought it should, we could put the
21 testimony in front of you.
22       THE COURT:  Actually, I think that is a good point.
23 You're going to need to file a motion on this.  I will say I
24 think Mr. Stein is right about this.  When I said the thing
25 about, you know, we're going to have regular hearings in

1    person, there's going to be a deadline for filing the motions,
2    it's going to be X days before, there's going to be deadline
3    for filing a response, it's Y days after the motion's filed,
4    part -- not the only reason -- but part of the reason why I
5    did that is that I don't think I'm getting enough information
6    from the status reports.  That's not a criticism of the status
7    reports.  I don't think I'm getting enough information from
8    the status reports to decide something that really ought to be
9    a motion to compel.  So that's what you're going to have to
10   do.  You're going to have to file a motion.
11           We're going to move on to the next thing.  My guess
12   is we're going to end up in the same place.
13           That's Vanderbilt.  Who is Vanderbilt?  Come on up
14   here.
15           So the thing on Vanderbilt is -- okay.  So this is
16   pages 7 and 8 of the plaintiffs' part of the status report
17   where they're asking to -- I guess some number of -- I'm
18   sorry.  That's the defendants' part.  7 and 8 is the
19   defendants' part of the status report.
20           The plaintiffs are asking for some number, page 4, of
21   FERPA notices to go out to people.  My question on that is --
22   and I just want to make sure that this isn't, whether it's
23   intentional or not, kind of the stalking horse or whatever.
24   Is this for some reason a Vanderbilt-unique issue?
25           MR. GILBERT:  It's ripe with Vanderbilt.

1    THE COURT:  Am I going to have the same issue with
2  everybody?
3    MR. GILBERT:  Well, the principle with Vanderbilt, if
4  it's vindicated, would have applicability to other defendants.
5    THE COURT:  Fine.  Then you're going to brief that
6  too.  I don't want to decide something based on three pages in
7  a status report if it's going to end up affecting other folks.
8  That's the deal.  I'll set the next date and then all the
9  other deadlines will kick in.  That's what we're going to do.
10    Now we're going to talk about Georgetown.  Okay.  So
11  the main -- I don't think we need to rehash everything that
12  was discussed at the last date, but I guess I'm having -- I'm
13  having a hard time getting my arms around exactly where things
14  stand right now as it relates to, you know, what's going to
15  happen in terms of identifying people in these president's
16  lists.  So what I really need is I need this crystallized in a
17  nice, neat little nutshell by each side as to how you see what
18  exactly the issue is.  I was -- honestly, I was having to read
19  too much.  I had -- everything referred back to something
20  else.  So I was having to go back to the transcript and go
21  back to the motions, and at some point in there, I said I'm
22  not doing this anymore, so go ahead.
23    MS. MILLER:  Your Honor, Britt Miller on behalf of
24  Georgetown.  At the last hearing, your Honor directed us to
25  meet and confer with the plaintiffs.  Starting with the

1 | proposal that Georgetown had made on page 4 of its response
2 | and to the motion for sanctions, we had that meet and confer.
3 | Plaintiffs chose not to engage on the bullet points that we
4 | offered and asked for, we believe, more than we had proposed.

5 | THE COURT: What do you exactly understand the
6 | plaintiffs to be asking for right now as it relates to this?

7 | MS. MILLER: We understand they are continuing to ask
8 | for the entire president's office to be designated for as a
9 | custodian, a single custodian, and all of the members of the
10 | president's office be collected, processed, and searched for
11 | documents. They are also --

12 | THE COURT: What would that exactly mean in terms of
13 | numbers of people and burden and whatnot? What would it mean?

14 | MS. MILLER: I don't have an exact number of the
15 | number of people, but I believe it's well over ten people that
16 | would have to have their documents collected.

17 | THE COURT: Aside from that, how many custodians are
18 | designated from Georgetown as of right now that you had to do
19 | the searches on?

20 | MS. MILLER: I'd have to ask my colleague for the
21 | exact number.

22 | THE COURT: Is your colleague here?

23 | MR. FENSKE: It's 10 or 11, your Honor.

24 | THE COURT: It's 10 or 11. So it's basically
25 | doubling the number of custodians.

1    MS. MILLER:  Just as to the president's list.  As to
2    the advancement office, they've asked for the head of the
3    advancement office to be designated on behalf of all of the
4    members of the advancement office and search for documents
5    responsive.  I started out with all RFPs and then narrowed it
6    down to I believe 10 RFPs, but, again, all of those people --
7    and I can get you a number if you need to know a number -- but
8    I would imagine it's well over ten people in the advancement
9    office and all of their emails.
10          THE COURT:  So a bunch more custodians.  What else do
11   you understand them to be asking for?  Or is that basically
12   it?
13          MS. MILLER:  Certainly.  They're asking for what
14   we've already done.  We have gone forward with the information
15   and the bullet points that we committed to producing in the
16   motion for sanctions and are almost complete with that
17   production, but they've also asked for non -- for all of the
18   -- all of the lists to be unredacted, so no FERPA redactions
19   whatsoever on any of the lists.  And they've asked --
20          THE COURT:  The lists meaning the president's list?
21          MS. MILLER:  Yes.  And any related information
22   related to those lists to be unredacted and there should be no
23   redactions whatsoever.
24          THE COURT:  So the big problem from your perspective
25   with the first part of it, the custodian thing, is burden.

1     MS. MILLER:  Yes.

2     THE COURT:  And then the problem with the second part

3  of it, the FERPA thing is, also burden but a different kind of

4  burden, or something else other than that?

5     MS. MILLER:  It's primarily a FERPA.  The redaction

6  issue is primarily a FERPA, and we've already done a number of

7  redactions.

8     THE COURT:  The unredacted and you'd have to notify

9  potentially all those people?

10     MS. MILLER:  Correct.

11     THE COURT:  Which is how many people are we talking

12  about?  Do you have any kind of a feel for it?

13     MS. MILLER:  Tens of thousands of students I would

14  imagine over the course of the entire period.

15     THE COURT:  Thanks.

16     Mr. Gilbert.

17     MR. GILBERT:  Your Honor, that is not accurate as to

18  what the relief we're seeking.  We actually submitted proposed

19  forms of order.  But the priority of what we're seeking is --

20  and Georgetown, of course, is in a league of its own in having

21  had two forms of misconduct, discovery misconduct --

22     THE COURT:  So remember what my question was.  Look,

23  when I said what I said before about diagramming sentences, I

24  actually meant it.  You started a sentence, you ended up in

25  another concept, and now you're off to the third one.  You got

1    to stay on number one.  I asked one question.  What are you

2    asking for?

3           I don't need -- I don't need -- I don't need the

4    manager calling the bullpen, the guy walking in from the

5    bullpen warming up, winding up, and then doing the pitch.  I

6    just want the pitch.  That's all I want.

7           MR. GILBERT:  Georgetown shall produce all

8    president's lists and documents concerning those lists no

9    later than August 15th.  That was the first thing in the

10   order.

11          THE COURT:  What about this thing that Ms. Miller

12   said about custodians?

13          MR. GILBERT:  Well, that's a different -- our

14   priority -- I think we should be able to speak to what our

15   priority is.

16          THE COURT:  The priority is the list?

17          MR. GILBERT:  No, it's the documents concerning the

18   list.

19          THE COURT:  What does that mean?  What does

20   "documents concerning the list" mean?

21          MR. GILBERT:  The list as they've known for months.

22   Again, the deadline for production --

23          THE COURT:  What does "documents concerning the list"

24   mean?

25          MR. GILBERT:  How or why someone was on the list and

1   the communications from the president to his immediate staff
2   about the reason people are on the list.

3          THE COURT:  I'm just going to throw something out
4   here.  And I know you guys don't want to do your 30(b)(6)s
5   yet.  I know that.  I read all that stuff.

6          Why wouldn't the more efficient way to do that be
7   just say, here's the 30(b)(6) notice.  We want somebody to
8   come in and explain all of the stuff that you're just talking
9   about now about these president's lists.  We want somebody to
10  explain how do you get on the list, what does it mean to be on
11  the list, what happens with the list, how does this translate
12  into admissions, whatever the other topics are.  Why don't you
13  do that?

14         MR. GILBERT:  Because that with all due respect, your
15  Honor, is not what we're focused on.  What we're focused in
16  each case -- what they should do, frankly, is by a week from
17  tomorrow pull the files of -- that have on each of these
18  people who was on the president's list that spells out why
19  they're on the list or how they got on the list, those
20  documents.  That's what "concerning" means, and we've made it
21  clear to them for months, and they've known that.  And these
22  should have been done by May 15th.  They should just pull
23  those files, produce them by a week from tomorrow.

24         THE COURT:  Okay.  So wait a second.  Okay.  Thank
25  you.

1          Now please answer my question.  And I know what
2 you're going to tell me.  You're going to say, Can you repeat
3 the question, and I'm going to say, No, because you should
4 have listened to it and answered it the first time.
5          MR. GILBERT:  The question, as I understood it --
6          THE COURT:  Why don't you do a 30(b)(6)?  Why isn't
7 that a more efficient way of finding out what these
8 president's lists mean and how they're used?
9          MR. GILBERT:  Because it isn't a question of what the
10 lists mean.  It's the content of what is said about --
11          THE COURT:  That what I mean by mean.  What's the
12 import of these president's lists and how do they get used?
13 That's what you're trying to find out, right?
14          MR. GILBERT:  I guess I'm not communicating that
15 clearly.  That's not what we're trying to do, your Honor.
16 What we're trying to do is:  Why was this person on the list?
17 That is, his dad gave $5 million or his mother gave a quarter
18 million dollars.
19          THE COURT:  Okay.
20          MR. GILBERT:  We need to know --
21          THE COURT:  And then what?  Let's say you find that
22 out, that this person A is on the list because their mom gave
23 a million bucks.  Then what?  Then what?
24          MR. GILBERT:  Then we compare it to the evaluation
25 ratings of the person and we have an opportunity to prove our

1 | case.

2 | THE COURT: Compare it with the evaluation ratings --

3 | MR. GILBERT: Of each of these people who was on the

4 | list --

5 | THE COURT: -- to figure out what? I know the answer

6 | to this question. I just want you to say it. To figure out

7 | what?

8 | MR. GILBERT: That the donation was a significant

9 | factor.

10 | THE COURT: How the list got used. It's five words.

11 | Just say it. Why don't you just do a 30(b)(6) to ask somebody

12 | how do these lists get used?

13 | MR. GILBERT: Because that level of generality, your

14 | Honor, is not what we're seeking. What we're seeking is --

15 | THE COURT: You got to start somewhere, though,

16 | right?

17 | MR. GILBERT: Well, there was a court-ordered

18 | deadline of May 15th was that flouted, your Honor. We have

19 | depositions in September. And it isn't some general question

20 | of how are the lists used. We know that in general they were

21 | used to influence admissions. How is this person -- what was

22 | the deal? Was it $5 million? Was it a million dollars?

23 | THE COURT: You need to be specific.

24 | MR. GILBERT: That's why we need --

25 | THE COURT: It's not enough to know it in

1  generalities.  You need to know specifically how this affected

2  specific things?

3          MR. GILBERT:  Correct, your Honor.

4          THE COURT:  That's what you're telling me.  See, you

5  actually could have said that ten minutes ago, and then we all

6  would have had that ten minutes of our life back.

7          MR. GILBERT:  Well, there you go.

8          MS. MILLER:  Your Honor, if you'd like, I can speak

9  to what we have produced, if that would be helpful.

10          THE COURT:  This is what I want you to deal with.

11  Here's what I want you to deal with.  These president's lists

12  have some level of significance.  We can argue about how much

13  significance, how little significance; they have some level of

14  significance.  So what Mr. Gilbert says the plaintiffs want to

15  be able to do is they want to be able to figure out how being

16  on that list translates into effect on the admissions process,

17  how being on a list that you're a donor, your family is a

18  donor, relative is a donor, whatever, translates into the

19  admissions process.

20          Okay.  That's relevant, right?

21          MS. MILLER:  In theory, your Honor, yes.

22          THE COURT:  What's the theory?

23          MS. MILLER:  We can have a debate as to how relevant

24  it is.

25          THE COURT:  You read the difference between Rule 402

1    and Rule 403 and materiality.  It's relevant.  It's something
2    that makes a fact more likely than not.  It's relevant, right?
3            MS. MILLER:  Yes, your Honor.
4            THE COURT:  Okay.  So what -- does he already have
5    that?
6            MS. MILLER:  Yes.
7            THE COURT:  How does he have it?
8            MS. MILLER:  He has the lists in question.  They were
9    produced in the motion for sanctions.  In response, we said we
10   would conduct a supplemental search for the lists from both
11   the president's office and from the admissions office.  Those
12   were produced on July 31st, August 2nd, 7th, and August 21st.
13   That has been completed.
14           THE COURT:  Okay.  Does he have documentation -- when
15   I say he, I mean the plaintiffs -- do they have documentation
16   that would allow them to translate that president's list,
17   which has some names on it or whatever, and connect it with
18   admissions?
19           MS. MILLER:  We have inserted UIDs.
20           THE COURT:  You inserted UIDs that correspond?  In
21   other words, if it was Jane Kennelly that was the student and
22   it was Matthew Kennelly who was the donor, they've got an ID
23   that makes it clear that they're related to each other?
24           MS. MILLER:  They will have a UID for the student if
25   they appear on the list, and then to the extent we have a UID

1  in our data that identifies that student, they would be able

2  to match that person up.  We are also producing --

3  THE COURT:  You got to stop doing that.  I told you

4  this on the TV the last time.  Okay?  All of the body language

5  that's going on off camera.  It's a little less distracting

6  here than it is on the video because I can look away from you,

7  and on the video, you're staring me in the face, but you got

8  to cut it out.  It's really aggravating, and I say this on

9  behalf of every judge in the world.  Just wait.

10  Go ahead, Ms. Miller.

11  MS. MILLER:  As part of the meet and confer,

12  plaintiff asked for certain documents from the advancement

13  office stating the reasons why a given student was on the

14  list.  We have done a search for those, a go-get search and we

15  are in the process of going through the FERPA redaction and

16  the UID process.  We think we have about 500 of those

17  documents.

18  THE COURT:  Thanks.  Stop.

19  Now, here's what I want you to do.  And I know you're

20  getting angry.  You just got to get past it.  Okay?  Here's

21  what I want you to do.  I want you to respond to what she just

22  said, and I want you to tell me why it's not sufficient, what

23  she just said is being produced, why it's not sufficient to

24  get what you're looking for.

25  MR. GILBERT:  We already know how the lists -- the

1    impact on admissions.  We know that.  The defendant Georgetown
2    has redacted it from the sealed -- from the public version of
3    the JASR -- a public version of the motion practice.  They've
4    been very heavily redacted in what is available to the public.
5            THE COURT:  Okay.
6            MR. GILBERT:  But we know how it's used, and I'll
7    speak obliquely.
8            THE COURT:  Okay.
9            MR. GILBERT:  If you're on that list, it's a done
10   deal.  There's an extremely high percentage to say the least
11   that you're in.  It's a done deal.  Virtually done deal.
12           THE COURT:  Pause there for a second.  Just pause
13   there for a second.  Why isn't that good enough?  For what
14   you're -- why isn't that good enough for what you're trying to
15   prove?
16           MR. GILBERT:  Because again, your Honor, we don't
17   know why the person was on the list.  It could be because it's
18   a faculty child, it could be an administrator's child.
19           THE COURT:  Ah.
20           MR. GILBERT:  Or it could be that they gave 5
21   million.
22           THE COURT:  A disadvantaged person or something?
23           MR. GILBERT:  Or whatever reason they were put on the
24   list, it's virtually a done deal.
25           THE COURT:  So pause.  I want to make sure I'm

1    extracting the right information from what you told me.  What

2    you told me is that we know the list has an impact on

3    admissions.  What we don't know is why the people are on the

4    list.

5              MR. GILBERT:  Specific individuals are on the list,

6    correct.

7              THE COURT:  Why this person is on the list.  We don't

8    specifically know why this specific person was on the list.

9    We may know that being on the list got him or her in, but we

10   don't know why they're on the list in the first place, and you

11   need to know that -- and now I'm extrapolating here -- you

12   need to know that because that has a bearing on whether

13   financial considerations were taken into account.

14             MR. GILBERT:  And how big the financial

15   consideration.

16             THE COURT:  How much, yeah.

17             MR. GILBERT:  Exactly.

18             THE COURT:  Like a threshold or something like that.

19             MR. GILBERT:  Exactly.

20             THE COURT:  Pause.

21             What's wrong with what he just said?

22             MS. MILLER:  Those are the documents I just

23   referenced, your Honor.  On a go-get basis, we have gone to

24   the advancement office and we have collected approximately 500

25   documents that will provide information as to why different

1    inquiries were made as to people that were potentially being

2    considered for admissions.  We're in the process of going

3    through the UID FERPA redaction process.  So that takes a

4    while given how much information and personally identifiable

5    information are in these documents, but that is a process that

6    is underway.

7              THE COURT:  Okay.  So I'm just going to ask you a

8    question.  You see me paging through stuff up here.  What you

9    just now said, where do I find that in the supplement?  You

10   both know the answer to this question.

11             MS. MILLER:  If you give me a moment, your Honor.

12             THE COURT:  The supplement being docket number 423.

13   I'm talking about the supplement.

14             MS. MILLER:  I believe it's in the main status report

15   where we said that we were -- as part of the meet and confer,

16   we agreed to do a supplemental go-get for the advancement

17   office for those documents that would be -- indicate why a

18   particular person was being inquired about and that we would

19   go get those.

20             THE COURT:  Just tell me where.  I'm just asking.

21             MS. MILLER:  It's on page 6, your Honor.

22             THE COURT:  Of what document?

23             MS. MILLER:  Of the July --

24             THE COURT:  You're talking about something that was

25   filed before the last hearing, right?

1          MR. FENSKE:  No, your Honor, July 31st.

2          THE COURT:  Oh, the July 31st one.  That's the one I

3    didn't physically print out.

4          Mr. Gilbert, you know what she's referring to, right?

5          MR. GILBERT:  I'm looking at, your Honor, page 6.

6          THE COURT:  Georgetown's position on the unresolved

7    issues.

8          MS. MILLER:  It's the second paragraph down.

9          THE COURT:  "Georgetown agreed to go beyond its

10   original proposal and search the centralized files" -- I'm

11   just going to say this, folks.  I don't care if it's sealed or

12   not.  I'm saying it. -- "centralized files of its advancement

13   office on a go-get basis for any documentation describing the

14   reasons that the advancement office suggested particular

15   candidates under that policy, i.e., this would not be a

16   custodial search.  Georgetown's counsel explained that such

17   discovery may be sufficient for plaintiffs to evaluate whether

18   an actual potential donation influenced a candidate's

19   admission."  And it goes on from there a couple more

20   sentences.

21         Have you guys looked at that stuff and you've

22   determined it's insufficient or you just haven't gotten yet?

23         MR. GILBERT:  Absolutely.

24         THE COURT:  Haven't gotten it yet.

25         MR. GILBERT:  Yeah.  It first talks about -- number

1  one talks about lists.  Number two talks about similar lists.
2  They basically -- and then three, meet and confer.  So having
3  flouted --
4          THE COURT:  Okay.  We're going to stop right here.  I
5  got to take this verdict.  Please, when we come back, I know
6  the flouting thing.  You don't have to keep saying it.  Just
7  I'm begging you, don't keep saying it.  I want to deal with
8  the issues that I actually have to decide right now, and I
9  don't have to decide that one right now.
10         I need people to clear out from these two tables just
11 for a little bit because I need the lawyers from the case on
12 trial to be able to sit there.  Apologies.
13   (Brief pause.)
14         THE COURT:  It's 22 C 125.  Here's where we were.
15         MS. MILLER:  Your Honor, if I may briefly respond to
16 a statement that Mr. Gilbert made right before we broke.
17         THE COURT:  No, because he's talking right now.
18 Write it down, make a note, and you'll tell me in a second.
19         MS. MILLER:  Sure.
20         THE COURT:  So basically my question was -- the
21 question on the table is -- I quoted from it -- was page 6 of
22 the status report of July the 31st I think it was, and I said,
23 Have you folks looked at that stuff and have you determined
24 that it's insufficient or have you just not gotten to it yet?
25 So that's my question.  So we're back there.  Go ahead,

1    Mr. Gilbert.

2            MR. GILBERT:  It's insufficient because it is a

3    prescription to slow walk the process that's already way

4    overdue.  That is, they're creating a two-step process.

5    First, get the lists that should have been produced long ago,

6    and then after the lists, have a meet and confer about what

7    more is needed, okay, and then have another period of time to

8    go beyond that.  And we've said, you know what we need as to

9    why these people were on the list; that is, the documents that

10   we've been discussing about a moment ago about was it a

11   donation or was it a faculty child or that type of thing and

12   then how much was the donation, what were the communications

13   with the donor and the immediate staff?  And they said 21 days

14   and then 28 days.

15           THE COURT:  At this point, at this point as of right

16   now today at this moment, do you have the list?

17           MR. GILBERT:  We have the list.

18           THE COURT:  Okay.  Pause.  I want to ask another

19   question.

20           So consistent with the way things have been done on a

21   number of the other, you know, discovery issues that have

22   largely been worked out by the parties, would there be a

23   problem with saying, okay, you need more information but you

24   don't need it for each and every one of the people on each and

25   every one of the lists?  I mean, I don't know how many people

1    we're talking about, so let's come up with a subset or let's

2    come up with some form of sampling or you pick 50 names or you

3    pick two names from this year and three names from that year,

4    something like that.  Is there some reason why you can't do

5    something like that?

6           If I can ask -- I thought the people on the phone

7    were supposed to be muted.  Anybody who is on the phone, if

8    you don't mute your phone, then you're ruining it for

9    everybody because we're going to cut off the entire phone call

10   because I'm hearing somebody click clacking on a typewriter

11   and it's distracting.  You're hearing it, right?  It's not me.

12           MR. GILBERT:  We're hearing it.

13           THE COURT:  Okay.  The phone is getting turned off.

14   Disconnect.  Done.

15           Go ahead.

16           MR. GILBERT:  The issue, your Honor, is we don't know

17   how to make, considering your point, a selection process that

18   would not be in effect a cherry-picking of the most favorable

19   things by --

20           THE COURT:  Why can't you select them?  You can

21   select them.  It would be you doing the cherry-picking.  I

22   mean, you've got the lists, right?  Why don't we just say --

23   why don't you just say, okay, I want the first five people on

24   the list or numbers 1, 6, 11, 16, and 21 or whatever.

25           MR. GILBERT:  Again, I have to speak obliquely.  We

1    know the number of names on the list.  We could pick out a

2    segment of that list.  I think that if we picked out a segment

3    of, say, 30 on that list each year, we could probably

4    accomplish what your Honor is --

5              THE COURT:  How many years total are we talking

6    about?

7              MS. MILLER:  We have data for the UID process back to

8    2017.

9              MR. FENSKE:  For the admissions office in 2009 for

10   anyone who is in our financial aid database, which is a

11   subset.

12             THE COURT:  You guys just said two different things.

13   You said 2017.  You said 2009.

14             MS. MILLER:  There's two different databases in

15   question, your Honor.  Our admissions database goes back to --

16             THE COURT:  I'm talking about what we're talking

17   about.  I'm not talking about what we're not talking about.

18   Let's talk about what we're talking about.  That's going to

19   look great on the transcript, but you know what I mean.

20             MR. FENSKE:  Yes, your Honor.  We produced the

21   original lists.

22             THE COURT:  How many years of lists do we have?

23             MR. FENSKE:  2012 to the present.  There may be a few

24   before that time.

25             THE COURT:  All right.  So we can negotiate about the

1    number.  If I were to tell you -- if we're going to take a

2    subset, X number per year you're allowed to do this go-get

3    thing, what is it you want?  And if you tell me, I want

4    everything that relates to, you're going to lose, so don't say

5    that.  This is great.  I'm telling you in advance what the

6    losing argument is.  You don't usually get that from a judge.

7    I'm telling you what the losing argument is, so don't make

8    that argument.  What would you need as it relates to that

9    subset of people?

10         MR. GILBERT:  For that subset of people, we would

11   need the documents that show why the person is on the list,

12   whether it was related to a financial donation, and the amount

13   of the donation and who the donation amounts were communicated

14   with and who recommended the person to be on the list.

15         THE COURT:  Okay.  So let's say this.  All right.

16   I'm just going to pull a number out of the air.  Let's say

17   it's seven people per year that I let them pick for all the

18   years we're talking about and it's what he just said is what

19   you'd have to get.  Talk to me about what that would entail on

20   your part.

21         MS. MILLER:  Okay.  In the first instance, we

22   already --

23         THE COURT:  If you want to now correct that thing you

24   wanted to correct, go ahead and do that.

25         MS. MILLER:  I'm not sure how he can say he's

1  evaluated that list and found them insufficient, because
2  although we've produced the president's list, we have not yet
3  produced the documents that we said we were going to produce
4  that have reasons for why various people were on the list.
5  Those are the documents we are in the process of redacting.
6  So he doesn't --
7       THE COURT:  Pause.  Pause.  What's your time frame
8  for being done with the redacting?
9       MS. MILLER:  We estimate based on the number of FERPA
10 redactions that need to be made, we need another three weeks
11 to get that done.
12      MR. FENSKE:  Your Honor --
13      THE COURT:  What if I tell you you got ten days?
14      MR. FENSKE:  I do not --
15      MS. MILLER:  I don't think we'd make it.
16      MR. FENSKE:  We have 195 of them that are being
17 processed for production.
18      THE COURT:  What's "them"?
19      MR. FENSKE:  Of approximately 500 documents that
20 we've collected for these purposes, and we have 195 of them
21 that are being processed for production right now, and the
22 remainder are in the redaction process.
23      THE COURT:  Okay.  Are so let me just talk here for a
24 second.  I don't need to repeat what I said at the last
25 hearing about the source of this problem, but I'll say this

1    one thing.  The source of the problem is that something was

2    not disclosed to me that ought to have been disclosed to me

3    when I entered the order that I did.  That's a shorthand for

4    what I said before.

5            And so for that reason, what we're trying to do is

6    now clean up the aftermath of that problem.  It is not

7    pleasant to hear that cleaning up the aftermath, which has

8    already now taken four to six weeks, is going to take an

9    enormous amount more time because we would not have this

10   problem if I had been told what I ought to have been told way,

11   way back when I entered that order.  So I'm not terribly

12   sympathetic -- strike out the "terribly" -- I'm not the least

13   bit sympathetic that this is going to take a long time.

14   People should have thought about that when they withheld --

15   it's like talking to a criminal defendant.  Well, you should

16   have thought about that before you committed the crime.

17           All right.  So here's what needs to happen.  The

18   plaintiff needs -- the plaintiffs need to be able to know --

19   and I'm not talking about in two months or a month and a half

20   or whatever.  They need to be able to know with regard to some

21   significant number of people on these lists, whatever you're

22   calling them, the president's lists, why they're on the list

23   and who the list got communicated to and the documentation, if

24   there is any, that would show what impact it had on the

25   admission process.  If you want to talk about that as being a

1   penalty for what happened before, then that's fine with me.

2   That's what needs to happen.  I don't care how it happens.  I

3   don't care what the order says.  That's what needs to happen.

4   That's the end game.

5           Now you guys need to figure out how to get there.

6   Today is Thursday.  You need to figure it out by next Tuesday

7   morning.  That's how long you got to figure it out.  And when

8   I say "figure it out," I will not accept, will not accept one

9   of these status reports where everybody says to the other side

10  in my presence, go jump in the lake, strong letter to follow.

11  I won't accept it.  I want an agreed -- I don't care how long

12  it takes, and it involves compromise to get there.  I told you

13  what the end game is.  Now you need to tell me by Tuesday how

14  you're going to get there.  And there's going to be an order

15  that I'm going to sign that's going to be enforceable by

16  however court orders get enforced.

17          So does everybody understand that?

18          MS. MILLER:  Yes, your Honor.

19          MR. GILBERT:  I actually don't.

20          THE COURT:  I didn't think you would.

21          MR. GILBERT:  We know the impact.  The question --

22          THE COURT:  You know what I just did?  It's called a

23  ruling.

24          MR. GILBERT:  Fine, your Honor.

25          THE COURT:  So you're going to take it.  If you need

1   to know what it says, that's why God created court reporters

2   and transcripts.  So you'll order it.  She'll be happy to

3   provide you one.  It's not exactly what you're asking for.

4   It's what you're getting.  I'm not saying it's what you're

5   getting forever.  Okay?  I'm saying that's what you're getting

6   now.  That's the ruling.

7            Now, on the rest of this, what I want in the status

8   reports from now on is two things.  I want, here's where we

9   are in discovery.  Like we've taken this many depositions,

10  we've got these depositions scheduled.  I want to know that

11  stuff.  And if there's any discussions going on about

12  settlement, I want to know that.  I don't want disputes about

13  stuff.  Those all have to go in motions.  Those all have to go

14  in motions.  I set the schedule for the filing of those and

15  the responses to them at the previous date.  And that's going

16  to be the way we're going to do it.  I'm absolutely going to

17  read everything you've given me just like I have so far, but

18  I'm not going to deal with discovery disputes or other

19  disputes that aren't in the form of a motion.  And I get that

20  that makes for more work for everybody.  Hey, it's a big case.

21  You can handle it.

22           So here's the one other thing that I wanted to talk

23  about.  So this case -- it's a large case because of the --

24  I'm told there's 200,000 people potentially in the class, and

25  there's however many defendants, somewhere between 15 and 20.

1   So it's a big case.  It's like an MDL.  It's like an MDL

2   except it's not an MDL.  What I would normally be doing in an

3   MDL at this point is I would be considering the appointment of

4   a settlement master, not to coerce anybody to settle, but just

5   to start talking to people.  I don't know whether you need

6   that in this case or not.

7          A settlement has been negotiated.  If I had to bet, I

8   bet there's discussions going on with other people, but I need

9   you to think about whether you have a position on whether I

10  ought to do that or not because that's what I would normally

11  do at this stage of an MDL.  You know, we're past the motion

12  to dismiss stage and you're into the discovery stage enough at

13  least to have some sense of what's going on.  I would normally

14  do that.  We can talk about who at some other point, but I

15  need you to think about that, and your positions on that need

16  to go in the next status report.  And if you want to propose a

17  selection process, that's fine too.

18         So the next -- unfortunately, I start on Tuesday a

19  trial in a 13-year-old criminal case that I inherited from a

20  colleague who left the court in which the defendant, God bless

21  him, is pro se.  That criminal case, which involves a single

22  defendant, has as of right now 1,199 docket entries.  The

23  average number of docket entries -- the criminal lawyers will

24  know this -- for a single-defendant criminal case is maybe 30;

25  40 if there's a lot of stuff filed.  I'm going to be on trial

1   for three weeks and probably close to the whole month of

2   September and I have to get that case done.  I'm not going to

3   be able to do one in September, so I'm going to set it for the

4   first week of August -- October rather, so I'm just telling

5   you why.

6           Okay.  So the next one of these is going to be on

7   Thursday, the 5th of October, at 1:00.  So the deadlines --

8   the status report is due a week before that which means the

9   28th of September, and the deadlines that I told you about

10  before for motions and responses kick in.  It's X days before

11  and Y days before.

12          All right.  Is there anything anybody needs to take

13  up before you leave the room?

14          MS. MILLER:  1:00 o'clock?  I just didn't hear you.

15          THE COURT:  1:00 o'clock.  It will be in an order

16  too.

17          Okay.  Thanks.  Bye.

18    (Which were all the proceedings had in the above-entitled

19  cause on the day and date aforesaid.)

20    I certify that the foregoing is a correct transcript from
    the record of proceedings in the above-entitled matter.

21

22  Carolyn R. Cox                          Date
    Official Court Reporter

23  Northern District of Illinois
    /s/Carolyn R. Cox, CSR, RPR, CRR, FCRR

24

25