# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SIA HENRY, et al., | ) | Docket No. 22 C 125 |
| Plaintiffs, | ) | |
| vs. | ) | |
| BROWN UNIVERSITY, et al., | ) | Chicago, Illinois |
| | ) | August 24, 2023 |
| Defendants. | ) | 1:00 o'clock p.m. |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE MATTHEW F. KENNELLY

APPEARANCES:

For the Plaintiffs:

GILBERT LITIGATORS & COUNSELORS
BY: MR. ROBERT DEWITT GILBERT
MR. ERIC CRAMER
11 Broadway, Suite 615
New York, NY 10004
(646) 448-5269

BERGER MONTAGUE PC
BY: MR. ERIC L. CRAMER
1818 Market Street, Suite 3600
Philadelphia, PA 19103
(215) 875-3009

Court Reporter:

MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
Official Court Reporter
219 S. Dearborn Street, Suite 2102
Chicago, IL 60604
(312) 435-5639

THE COURT: Am I going to have the same issue with everybody?

MR. GILBERT: Well, the principle with Vanderbilt, if it's vindicated, would have applicability to other defendants.

THE COURT: Fine. Then you're going to brief that too. I don't want to decide something based on three pages in a status report if it's going to end up affecting other folks. That's the deal. I'll set the next date and then all the other deadlines will kick in. That's what we're going to do.

Now we're going to talk about Georgetown. Okay. So the main -- I don't think we need to rehash everything that was discussed at the last date, but I guess I'm having -- I'm having a hard time getting my arms around exactly where things stand right now as it relates to, you know, what's going to happen in terms of identifying people in these president's lists. So what I really need is I need this crystallized in a nice, neat little nutshell by each side as to how you see what exactly the issue is. I was -- honestly, I was having to read too much. I had -- everything referred back to something else. So I was having to go back to the transcript and go back to the motions, and at some point in there, I said I'm not doing this anymore, so go ahead.

MS. MILLER: Your Honor, Britt Miller on behalf of Georgetown. At the last hearing, your Honor directed us to meet and confer with the plaintiffs. Starting with the

proposal that Georgetown had made on page 4 of its response and to the motion for sanctions, we had that meet and confer. Plaintiffs chose not to engage on the bullet points that we offered and asked for, we believe, more than we had proposed.

THE COURT: What do you exactly understand the plaintiffs to be asking for right now as it relates to this?

MS. MILLER: We understand they are continuing to ask for the entire president's office to be designated for as a custodian, a single custodian, and all of the members of the president's office be collected, processed, and searched for documents. They are also --

THE COURT: What would that exactly mean in terms of numbers of people and burden and whatnot? What would it mean?

MS. MILLER: I don't have an exact number of the number of people, but I believe it's well over ten people that would have to have their documents collected.

THE COURT: Aside from that, how many custodians are designated from Georgetown as of right now that you had to do the searches on?

MS. MILLER: I'd have to ask my colleague for the exact number.

THE COURT: Is your colleague here?

MR. FENSKE: It's 10 or 11, your Honor.

THE COURT: It's 10 or 11. So it's basically doubling the number of custodians.

MS. MILLER: Just as to the president's list. As to the advancement office, they've asked for the head of the advancement office to be designated on behalf of all of the members of the advancement office and search for documents responsive. I started out with all RFPs and then narrowed it down to I believe 10 RFPs, but, again, all of those people -- and I can get you a number if you need to know a number -- but I would imagine it's well over ten people in the advancement office and all of their emails.

THE COURT: So a bunch more custodians. What else do you understand them to be asking for? Or is that basically it?

MS. MILLER: Certainly. They're asking for what we've already done. We have gone forward with the information and the bullet points that we committed to producing in the motion for sanctions and are almost complete with that production, but they've also asked for non -- for all of the -- all of the lists to be unredacted, so no FERPA redactions whatsoever on any of the lists. And they've asked --

THE COURT: The lists meaning the president's list?

MS. MILLER: Yes. And any related information related to those lists to be unredacted and there should be no redactions whatsoever.

THE COURT: So the big problem from your perspective with the first part of it, the custodian thing, is burden.

MS. MILLER: Yes.

THE COURT: And then the problem with the second part of it, the FERPA thing is, also burden but a different kind of burden, or something else other than that?

MS. MILLER: It's primarily a FERPA. The redaction issue is primarily a FERPA, and we've already done a number of redactions.

THE COURT: The unredacted and you'd have to notify potentially all those people?

MS. MILLER: Correct.

THE COURT: Which is how many people are we talking about? Do you have any kind of a feel for it?

MS. MILLER: Tens of thousands of students I would imagine over the course of the entire period.

THE COURT: Thanks.

Mr. Gilbert.

MR. GILBERT: Your Honor, that is not accurate as to what the relief we're seeking. We actually submitted proposed forms of order. But the priority of what we're seeking is -- and Georgetown, of course, is in a league of its own in having had two forms of misconduct, discovery misconduct --

THE COURT: So remember what my question was. Look, when I said what I said before about diagramming sentences, I actually meant it. You started a sentence, you ended up in another concept, and now you're off to the third one. You got

to stay on number one. I asked one question. What are you asking for?

I don't need -- I don't need -- I don't need the manager calling the bullpen, the guy walking in from the bullpen warming up, winding up, and then doing the pitch. I just want the pitch. That's all I want.

MR. GILBERT: Georgetown shall produce all president's lists and documents concerning those lists no later than August 15th. That was the first thing in the order.

THE COURT: What about this thing that Ms. Miller said about custodians?

MR. GILBERT: Well, that's a different -- our priority -- I think we should be able to speak to what our priority is.

THE COURT: The priority is the list?

MR. GILBERT: No, it's the documents concerning the list.

THE COURT: What does that mean? What does "documents concerning the list" mean?

MR. GILBERT: The list as they've known for months. Again, the deadline for production --

THE COURT: What does "documents concerning the list" mean?

MR. GILBERT: How or why someone was on the list and

the communications from the president to his immediate staff about the reason people are on the list.

THE COURT: I'm just going to throw something out here. And I know you guys don't want to do your 30(b)(6)s yet. I know that. I read all that stuff.

Why wouldn't the more efficient way to do that be just say, here's the 30(b)(6) notice. We want somebody to come in and explain all of the stuff that you're just talking about now about these president's lists. We want somebody to explain how do you get on the list, what does it mean to be on the list, what happens with the list, how does this translate into admissions, whatever the other topics are. Why don't you do that?

MR. GILBERT: Because that with all due respect, your Honor, is not what we're focused on. What we're focused in each case -- what they should do, frankly, is by a week from tomorrow pull the files of -- that have on each of these people who was on the president's list that spells out why they're on the list or how they got on the list, those documents. That's what "concerning" means, and we've made it clear to them for months, and they've known that. And these should have been done by May 15th. They should just pull those files, produce them by a week from tomorrow.

THE COURT: Okay. So wait a second. Okay. Thank you.

Now please answer my question. And I know what you're going to tell me. You're going to say, Can you repeat the question, and I'm going to say, No, because you should have listened to it and answered it the first time.

MR. GILBERT: The question, as I understood it --

THE COURT: Why don't you do a 30(b)(6)? Why isn't that a more efficient way of finding out what these president's lists mean and how they're used?

MR. GILBERT: Because it isn't a question of what the lists mean. It's the content of what is said about --

THE COURT: That what I mean by mean. What's the import of these president's lists and how do they get used? That's what you're trying to find out, right?

MR. GILBERT: I guess I'm not communicating that clearly. That's not what we're trying to do, your Honor. What we're trying to do is: Why was this person on the list? That is, his dad gave $5 million or his mother gave a quarter million dollars.

THE COURT: Okay.

MR. GILBERT: We need to know --

THE COURT: And then what? Let's say you find that out, that this person A is on the list because their mom gave a million bucks. Then what? Then what?

MR. GILBERT: Then we compare it to the evaluation ratings of the person and we have an opportunity to prove our

case.

THE COURT: Compare it with the evaluation ratings --

MR. GILBERT: Of each of these people who was on the list --

THE COURT: -- to figure out what? I know the answer to this question. I just want you to say it. To figure out what?

MR. GILBERT: That the donation was a significant factor.

THE COURT: How the list got used. It's five words. Just say it. Why don't you just do a 30(b)(6) to ask somebody how do these lists get used?

MR. GILBERT: Because that level of generality, your Honor, is not what we're seeking. What we're seeking is --

THE COURT: You got to start somewhere, though, right?

MR. GILBERT: Well, there was a court-ordered deadline of May 15th was that flouted, your Honor. We have depositions in September. And it isn't some general question of how are the lists used. We know that in general they were used to influence admissions. How is this person -- what was the deal? Was it $5 million? Was it a million dollars?

THE COURT: You need to be specific.

MR. GILBERT: That's why we need --

THE COURT: It's not enough to know it in

generalities. You need to know specifically how this affected specific things?

MR. GILBERT: Correct, your Honor.

THE COURT: That's what you're telling me. See, you actually could have said that ten minutes ago, and then we all would have had that ten minutes of our life back.

MR. GILBERT: Well, there you go.

MS. MILLER: Your Honor, if you'd like, I can speak to what we have produced, if that would be helpful.

THE COURT: This is what I want you to deal with. Here's what I want you to deal with. These president's lists have some level of significance. We can argue about how much significance, how little significance; they have some level of significance. So what Mr. Gilbert says the plaintiffs want to be able to do is they want to be able to figure out how being on that list translates into effect on the admissions process, how being on a list that you're a donor, your family is a donor, relative is a donor, whatever, translates into the admissions process.

Okay. That's relevant, right?

MS. MILLER: In theory, your Honor, yes.

THE COURT: What's the theory?

MS. MILLER: We can have a debate as to how relevant it is.

THE COURT: You read the difference between Rule 402

and Rule 403 and materiality. It's relevant. It's something that makes a fact more likely than not. It's relevant, right?

MS. MILLER: Yes, your Honor.

THE COURT: Okay. So what -- does he already have that?

MS. MILLER: Yes.

THE COURT: How does he have it?

MS. MILLER: He has the lists in question. They were produced in the motion for sanctions. In response, we said we would conduct a supplemental search for the lists from both the president's office and from the admissions office. Those were produced on July 31st, August 2nd, 7th, and August 21st. That has been completed.

THE COURT: Okay. Does he have documentation -- when I say he, I mean the plaintiffs -- do they have documentation that would allow them to translate that president's list, which has some names on it or whatever, and connect it with admissions?

MS. MILLER: We have inserted UIDs.

THE COURT: You inserted UIDs that correspond? In other words, if it was Jane Kennelly that was the student and it was Matthew Kennelly who was the donor, they've got an ID that makes it clear that they're related to each other?

MS. MILLER: They will have a UID for the student if they appear on the list, and then to the extent we have a UID

in our data that identifies that student, they would be able to match that person up. We are also producing --

THE COURT: You got to stop doing that. I told you this on the TV the last time. Okay? All of the body language that's going on off camera. It's a little less distracting here than it is on the video because I can look away from you, and on the video, you're staring me in the face, but you got to cut it out. It's really aggravating, and I say this on behalf of every judge in the world. Just wait.

Go ahead, Ms. Miller.

MS. MILLER: As part of the meet and confer, plaintiff asked for certain documents from the advancement office stating the reasons why a given student was on the list. We have done a search for those, a go-get search and we are in the process of going through the FERPA redaction and the UID process. We think we have about 500 of those documents.

THE COURT: Thanks. Stop.

Now, here's what I want you to do. And I know you're getting angry. You just got to get past it. Okay? Here's what I want you to do. I want you to respond to what she just said, and I want you to tell me why it's not sufficient, what she just said is being produced, why it's not sufficient to get what you're looking for.

MR. GILBERT: We already know how the lists -- the

impact on admissions. We know that. The defendant Georgetown has redacted it from the sealed -- from the public version of the JASR -- a public version of the motion practice. They've been very heavily redacted in what is available to the public.

THE COURT: Okay.

MR. GILBERT: But we know how it's used, and I'll speak obliquely.

THE COURT: Okay.

MR. GILBERT: If you're on that list, it's a done deal. There's an extremely high percentage to say the least that you're in. It's a done deal. Virtually done deal.

THE COURT: Pause there for a second. Just pause there for a second. Why isn't that good enough? For what you're -- why isn't that good enough for what you're trying to prove?

MR. GILBERT: Because again, your Honor, we don't know why the person was on the list. It could be because it's a faculty child, it could be an administrator's child.

THE COURT: Ah.

MR. GILBERT: Or it could be that they gave 5 million.

THE COURT: A disadvantaged person or something?

MR. GILBERT: Or whatever reason they were put on the list, it's virtually a done deal.

THE COURT: So pause. I want to make sure I'm

extracting the right information from what you told me. What you told me is that we know the list has an impact on admissions. What we don't know is why the people are on the list.

MR. GILBERT: Specific individuals are on the list, correct.

THE COURT: Why this person is on the list. We don't specifically know why this specific person was on the list. We may know that being on the list got him or her in, but we don't know why they're on the list in the first place, and you need to know that -- and now I'm extrapolating here -- you need to know that because that has a bearing on whether financial considerations were taken into account.

MR. GILBERT: And how big the financial consideration.

THE COURT: How much, yeah.

MR. GILBERT: Exactly.

THE COURT: Like a threshold or something like that.

MR. GILBERT: Exactly.

THE COURT: Pause.

What's wrong with what he just said?

MS. MILLER: Those are the documents I just referenced, your Honor. On a go-get basis, we have gone to the advancement office and we have collected approximately 500 documents that will provide information as to why different

inquiries were made as to people that were potentially being considered for admissions. We're in the process of going through the UID FERPA redaction process. So that takes a while given how much information and personally identifiable information are in these documents, but that is a process that is underway.

THE COURT: Okay. So I'm just going to ask you a question. You see me paging through stuff up here. What you just now said, where do I find that in the supplement? You both know the answer to this question.

MS. MILLER: If you give me a moment, your Honor.

THE COURT: The supplement being docket number 423. I'm talking about the supplement.

MS. MILLER: I believe it's in the main status report where we said that we were -- as part of the meet and confer, we agreed to do a supplemental go-get for the advancement office for those documents that would be -- indicate why a particular person was being inquired about and that we would go get those.

THE COURT: Just tell me where. I'm just asking.

MS. MILLER: It's on page 6, your Honor.

THE COURT: Of what document?

MS. MILLER: Of the July --

THE COURT: You're talking about something that was filed before the last hearing, right?

MR. FENSKE: No, your Honor, July 31st.

THE COURT: Oh, the July 31st one. That's the one I didn't physically print out.

Mr. Gilbert, you know what she's referring to, right?

MR. GILBERT: I'm looking at, your Honor, page 6.

THE COURT: Georgetown's position on the unresolved issues.

MS. MILLER: It's the second paragraph down.

THE COURT: "Georgetown agreed to go beyond its original proposal and search the centralized files" -- I'm just going to say this, folks. I don't care if it's sealed or not. I'm saying it. -- "centralized files of its advancement office on a go-get basis for any documentation describing the reasons that the advancement office suggested particular candidates under that policy, i.e., this would not be a custodial search. Georgetown's counsel explained that such discovery may be sufficient for plaintiffs to evaluate whether an actual potential donation influenced a candidate's admission." And it goes on from there a couple more sentences.

Have you guys looked at that stuff and you've determined it's insufficient or you just haven't gotten yet?

MR. GILBERT: Absolutely.

THE COURT: Haven't gotten it yet.

MR. GILBERT: Yeah. It first talks about -- number

one talks about lists. Number two talks about similar lists. They basically -- and then three, meet and confer. So having flouted --

THE COURT: Okay. We're going to stop right here. I got to take this verdict. Please, when we come back, I know the flouting thing. You don't have to keep saying it. Just I'm begging you, don't keep saying it. I want to deal with the issues that I actually have to decide right now, and I don't have to decide that one right now.

I need people to clear out from these two tables just for a little bit because I need the lawyers from the case on trial to be able to sit there. Apologies.

(Brief pause.)

THE COURT: It's 22 C 125. Here's where we were.

MS. MILLER: Your Honor, if I may briefly respond to a statement that Mr. Gilbert made right before we broke.

THE COURT: No, because he's talking right now. Write it down, make a note, and you'll tell me in a second.

MS. MILLER: Sure.

THE COURT: So basically my question was -- the question on the table is -- I quoted from it -- was page 6 of the status report of July the 31st I think it was, and I said, Have you folks looked at that stuff and have you determined that it's insufficient or have you just not gotten to it yet? So that's my question. So we're back there. Go ahead,

Mr. Gilbert.

MR. GILBERT: It's insufficient because it is a prescription to slow walk the process that's already way overdue. That is, they're creating a two-step process. First, get the lists that should have been produced long ago, and then after the lists, have a meet and confer about what more is needed, okay, and then have another period of time to go beyond that. And we've said, you know what we need as to why these people were on the list; that is, the documents that we've been discussing about a moment ago about was it a donation or was it a faculty child or that type of thing and then how much was the donation, what were the communications with the donor and the immediate staff? And they said 21 days and then 28 days.

THE COURT: At this point, at this point as of right now today at this moment, do you have the list?

MR. GILBERT: We have the list.

THE COURT: Okay. Pause. I want to ask another question.

So consistent with the way things have been done on a number of the other, you know, discovery issues that have largely been worked out by the parties, would there be a problem with saying, okay, you need more information but you don't need it for each and every one of the people on each and every one of the lists? I mean, I don't know how many people

we're talking about, so let's come up with a subset or let's come up with some form of sampling or you pick 50 names or you pick two names from this year and three names from that year, something like that. Is there some reason why you can't do something like that?

If I can ask -- I thought the people on the phone were supposed to be muted. Anybody who is on the phone, if you don't mute your phone, then you're ruining it for everybody because we're going to cut off the entire phone call because I'm hearing somebody click clacking on a typewriter and it's distracting. You're hearing it, right? It's not me.

MR. GILBERT: We're hearing it.

THE COURT: Okay. The phone is getting turned off. Disconnect. Done.

Go ahead.

MR. GILBERT: The issue, your Honor, is we don't know how to make, considering your point, a selection process that would not be in effect a cherry-picking of the most favorable things by --

THE COURT: Why can't you select them? You can select them. It would be you doing the cherry-picking. I mean, you've got the lists, right? Why don't we just say -- why don't you just say, okay, I want the first five people on the list or numbers 1, 6, 11, 16, and 21 or whatever.

MR. GILBERT: Again, I have to speak obliquely. We

know the number of names on the list. We could pick out a segment of that list. I think that if we picked out a segment of, say, 30 on that list each year, we could probably accomplish what your Honor is --

THE COURT: How many years total are we talking about?

MS. MILLER: We have data for the UID process back to 2017.

MR. FENSKE: For the admissions office in 2009 for anyone who is in our financial aid database, which is a subset.

THE COURT: You guys just said two different things. You said 2017. You said 2009.

MS. MILLER: There's two different databases in question, your Honor. Our admissions database goes back to --

THE COURT: I'm talking about what we're talking about. I'm not talking about what we're not talking about. Let's talk about what we're talking about. That's going to look great on the transcript, but you know what I mean.

MR. FENSKE: Yes, your Honor. We produced the original lists.

THE COURT: How many years of lists do we have?

MR. FENSKE: 2012 to the present. There may be a few before that time.

THE COURT: All right. So we can negotiate about the

number. If I were to tell you -- if we're going to take a subset, X number per year you're allowed to do this go-get thing, what is it you want? And if you tell me, I want everything that relates to, you're going to lose, so don't say that. This is great. I'm telling you in advance what the losing argument is. You don't usually get that from a judge. I'm telling you what the losing argument is, so don't make that argument. What would you need as it relates to that subset of people?

MR. GILBERT: For that subset of people, we would need the documents that show why the person is on the list, whether it was related to a financial donation, and the amount of the donation and who the donation amounts were communicated with and who recommended the person to be on the list.

THE COURT: Okay. So let's say this. All right. I'm just going to pull a number out of the air. Let's say it's seven people per year that I let them pick for all the years we're talking about and it's what he just said is what you'd have to get. Talk to me about what that would entail on your part.

MS. MILLER: Okay. In the first instance, we already --

THE COURT: If you want to now correct that thing you wanted to correct, go ahead and do that.

MS. MILLER: I'm not sure how he can say he's

evaluated that list and found them insufficient, because although we've produced the president's list, we have not yet produced the documents that we said we were going to produce that have reasons for why various people were on the list. Those are the documents we are in the process of redacting. So he doesn't --

THE COURT: Pause. Pause. What's your time frame for being done with the redacting?

MS. MILLER: We estimate based on the number of FERPA redactions that need to be made, we need another three weeks to get that done.

MR. FENSKE: Your Honor --

THE COURT: What if I tell you you got ten days?

MR. FENSKE: I do not --

MS. MILLER: I don't think we'd make it.

MR. FENSKE: We have 195 of them that are being processed for production.

THE COURT: What's "them"?

MR. FENSKE: Of approximately 500 documents that we've collected for these purposes, and we have 195 of them that are being processed for production right now, and the remainder are in the redaction process.

THE COURT: Okay. Are so let me just talk here for a second. I don't need to repeat what I said at the last hearing about the source of this problem, but I'll say this

one thing. The source of the problem is that something was not disclosed to me that ought to have been disclosed to me when I entered the order that I did. That's a shorthand for what I said before.

And so for that reason, what we're trying to do is now clean up the aftermath of that problem. It is not pleasant to hear that cleaning up the aftermath, which has already now taken four to six weeks, is going to take an enormous amount more time because we would not have this problem if I had been told what I ought to have been told way, way back when I entered that order. So I'm not terribly sympathetic -- strike out the "terribly" -- I'm not the least bit sympathetic that this is going to take a long time. People should have thought about that when they withheld -- it's like talking to a criminal defendant. Well, you should have thought about that before you committed the crime.

All right. So here's what needs to happen. The plaintiff needs -- the plaintiffs need to be able to know -- and I'm not talking about in two months or a month and a half or whatever. They need to be able to know with regard to some significant number of people on these lists, whatever you're calling them, the president's lists, why they're on the list and who the list got communicated to and the documentation, if there is any, that would show what impact it had on the admission process. If you want to talk about that as being a

penalty for what happened before, then that's fine with me. That's what needs to happen. I don't care how it happens. I don't care what the order says. That's what needs to happen. That's the end game.

Now you guys need to figure out how to get there. Today is Thursday. You need to figure it out by next Tuesday morning. That's how long you got to figure it out. And when I say "figure it out," I will not accept, will not accept one of these status reports where everybody says to the other side in my presence, go jump in the lake, strong letter to follow. I won't accept it. I want an agreed -- I don't care how long it takes, and it involves compromise to get there. I told you what the end game is. Now you need to tell me by Tuesday how you're going to get there. And there's going to be an order that I'm going to sign that's going to be enforceable by however court orders get enforced.

So does everybody understand that?

MS. MILLER: Yes, your Honor.

MR. GILBERT: I actually don't.

THE COURT: I didn't think you would.

MR. GILBERT: We know the impact. The question --

THE COURT: You know what I just did? It's called a ruling.

MR. GILBERT: Fine, your Honor.

THE COURT: So you're going to take it. If you need

to know what it says, that's why God created court reporters and transcripts. So you'll order it. She'll be happy to provide you one. It's not exactly what you're asking for. It's what you're getting. I'm not saying it's what you're getting forever. Okay? I'm saying that's what you're getting now. That's the ruling.

Now, on the rest of this, what I want in the status reports from now on is two things. I want, here's where we are in discovery. Like we've taken this many depositions, we've got these depositions scheduled. I want to know that stuff. And if there's any discussions going on about settlement, I want to know that. I don't want disputes about stuff. Those all have to go in motions. Those all have to go in motions. I set the schedule for the filing of those and the responses to them at the previous date. And that's going to be the way we're going to do it. I'm absolutely going to read everything you've given me just like I have so far, but I'm not going to deal with discovery disputes or other disputes that aren't in the form of a motion. And I get that that makes for more work for everybody. Hey, it's a big case. You can handle it.

So here's the one other thing that I wanted to talk about. So this case -- it's a large case because of the -- I'm told there's 200,000 people potentially in the class, and there's however many defendants, somewhere between 15 and 20.

So it's a big case. It's like an MDL. It's like an MDL except it's not an MDL. What I would normally be doing in an MDL at this point is I would be considering the appointment of a settlement master, not to coerce anybody to settle, but just to start talking to people. I don't know whether you need that in this case or not.

A settlement has been negotiated. If I had to bet, I bet there's discussions going on with other people, but I need you to think about whether you have a position on whether I ought to do that or not because that's what I would normally do at this stage of an MDL. You know, we're past the motion to dismiss stage and you're into the discovery stage enough at least to have some sense of what's going on. I would normally do that. We can talk about who at some other point, but I need you to think about that, and your positions on that need to go in the next status report. And if you want to propose a selection process, that's fine too.

So the next -- unfortunately, I start on Tuesday a trial in a 13-year-old criminal case that I inherited from a colleague who left the court in which the defendant, God bless him, is pro se. That criminal case, which involves a single defendant, has as of right now 1,199 docket entries. The average number of docket entries -- the criminal lawyers will know this -- for a single-defendant criminal case is maybe 30; 40 if there's a lot of stuff filed. I'm going to be on trial

for three weeks and probably close to the whole month of September and I have to get that case done. I'm not going to be able to do one in September, so I'm going to set it for the first week of August -- October rather, so I'm just telling you why.

Okay. So the next one of these is going to be on Thursday, the 5th of October, at 1:00. So the deadlines -- the status report is due a week before that which means the 28th of September, and the deadlines that I told you about before for motions and responses kick in. It's X days before and Y days before.

All right. Is there anything anybody needs to take up before you leave the room?

MS. MILLER: 1:00 o'clock? I just didn't hear you.

THE COURT: 1:00 o'clock. It will be in an order too.

Okay. Thanks. Bye.

(Which were all the proceedings had in the above-entitled cause on the day and date aforesaid.)

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Carolyn R. Cox
Official Court Reporter
Northern District of Illinois
/s/Carolyn R. Cox, CSR, RPR, CRR, FCRR

Date