# EXHIBIT 2

```
 1                 IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3

 4    SIA HENRY, et al.,                )  Docket No. 22 C 125
                                        )
 5                        Plaintiffs,   )
                                        )
 6               vs.                    )
                                        )
 7    BROWN UNIVERSITY, et al.,         )  Chicago, Illinois
                                        )  August 24, 2023
 8                        Defendants.   )  1:00 o'clock p.m.

 9
                          TRANSCRIPT OF PROCEEDINGS
10            BEFORE THE HONORABLE MATTHEW F. KENNELLY

11
      APPEARANCES:
12

13    For the Plaintiffs:   GILBERT LITIGATORS & COUNSELORS
                            BY:  MR. ROBERT DEWITT GILBERT
14                               MR. ERIC CRAMER
                            11 Broadway, Suite 615
15                          New York, NY  10004
                            (646) 448-5269
16

17                          BERGER MONTAGUE PC
                            BY:  MR. ERIC L. CRAMER
18                          1818 Market Street, Suite 3600
                            Philadelphia, PA  19103
19                          (215) 875-3009

20

21    Court Reporter:       MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
                            Official Court Reporter
22                          219 S. Dearborn Street, Suite 2102
                            Chicago, IL  60604
23                          (312) 435-5639

24

25
```

1    THE COURT:  Am I going to have the same issue with
2    everybody?
3    MR. GILBERT:  Well, the principle with Vanderbilt, if
4    it's vindicated, would have applicability to other defendants.
5    THE COURT:  Fine.  Then you're going to brief that
6    too.  I don't want to decide something based on three pages in
7    a status report if it's going to end up affecting other folks.
8    That's the deal.  I'll set the next date and then all the
9    other deadlines will kick in.  That's what we're going to do.
10    Now we're going to talk about Georgetown.  Okay.  So
11    the main -- I don't think we need to rehash everything that
12    was discussed at the last date, but I guess I'm having -- I'm
13    having a hard time getting my arms around exactly where things
14    stand right now as it relates to, you know, what's going to
15    happen in terms of identifying people in these president's
16    lists.  So what I really need is I need this crystallized in a
17    nice, neat little nutshell by each side as to how you see what
18    exactly the issue is.  I was -- honestly, I was having to read
19    too much.  I had -- everything referred back to something
20    else.  So I was having to go back to the transcript and go
21    back to the motions, and at some point in there, I said I'm
22    not doing this anymore, so go ahead.
23    MS. MILLER:  Your Honor, Britt Miller on behalf of
24    Georgetown.  At the last hearing, your Honor directed us to
25    meet and confer with the plaintiffs.  Starting with the

1   proposal that Georgetown had made on page 4 of its response

2   and to the motion for sanctions, we had that meet and confer.

3   Plaintiffs chose not to engage on the bullet points that we

4   offered and asked for, we believe, more than we had proposed.

5          THE COURT:  What do you exactly understand the

6   plaintiffs to be asking for right now as it relates to this?

7          MS. MILLER:  We understand they are continuing to ask

8   for the entire president's office to be designated for as a

9   custodian, a single custodian, and all of the members of the

10  president's office be collected, processed, and searched for

11  documents.  They are also --

12         THE COURT:  What would that exactly mean in terms of

13  numbers of people and burden and whatnot?  What would it mean?

14         MS. MILLER:  I don't have an exact number of the

15  number of people, but I believe it's well over ten people that

16  would have to have their documents collected.

17         THE COURT:  Aside from that, how many custodians are

18  designated from Georgetown as of right now that you had to do

19  the searches on?

20         MS. MILLER:  I'd have to ask my colleague for the

21  exact number.

22         THE COURT:  Is your colleague here?

23         MR. FENSKE:  It's 10 or 11, your Honor.

24         THE COURT:  It's 10 or 11.  So it's basically

25  doubling the number of custodians.

1      MS. MILLER:  Just as to the president's list.  As to

2  the advancement office, they've asked for the head of the

3  advancement office to be designated on behalf of all of the

4  members of the advancement office and search for documents

5  responsive.  I started out with all RFPs and then narrowed it

6  down to I believe 10 RFPs, but, again, all of those people --

7  and I can get you a number if you need to know a number -- but

8  I would imagine it's well over ten people in the advancement

9  office and all of their emails.

10      THE COURT:  So a bunch more custodians.  What else do

11  you understand them to be asking for?  Or is that basically

12  it?

13      MS. MILLER:  Certainly.  They're asking for what

14  we've already done.  We have gone forward with the information

15  and the bullet points that we committed to producing in the

16  motion for sanctions and are almost complete with that

17  production, but they've also asked for non -- for all of the

18  -- all of the lists to be unredacted, so no FERPA redactions

19  whatsoever on any of the lists.  And they've asked --

20      THE COURT:  The lists meaning the president's list?

21      MS. MILLER:  Yes.  And any related information

22  related to those lists to be unredacted and there should be no

23  redactions whatsoever.

24      THE COURT:  So the big problem from your perspective

25  with the first part of it, the custodian thing, is burden.

1         MS. MILLER: Yes.

2         THE COURT: And then the problem with the second part

3 of it, the FERPA thing is, also burden but a different kind of

4 burden, or something else other than that?

5         MS. MILLER: It's primarily a FERPA. The redaction

6 issue is primarily a FERPA, and we've already done a number of

7 redactions.

8         THE COURT: The unredacted and you'd have to notify

9 potentially all those people?

10         MS. MILLER: Correct.

11         THE COURT: Which is how many people are we talking

12 about? Do you have any kind of a feel for it?

13         MS. MILLER: Tens of thousands of students I would

14 imagine over the course of the entire period.

15         THE COURT: Thanks.

16         Mr. Gilbert.

17         MR. GILBERT: Your Honor, that is not accurate as to

18 what the relief we're seeking. We actually submitted proposed

19 forms of order. But the priority of what we're seeking is --

20 and Georgetown, of course, is in a league of its own in having

21 had two forms of misconduct, discovery misconduct --

22         THE COURT: So remember what my question was. Look,

23 when I said what I said before about diagramming sentences, I

24 actually meant it. You started a sentence, you ended up in

25 another concept, and now you're off to the third one. You got

1   to stay on number one.  I asked one question.  What are you
2   asking for?
3           I don't need -- I don't need -- I don't need the
4   manager calling the bullpen, the guy walking in from the
5   bullpen warming up, winding up, and then doing the pitch.  I
6   just want the pitch.  That's all I want.
7           MR. GILBERT:  Georgetown shall produce all
8   president's lists and documents concerning those lists no
9   later than August 15th.  That was the first thing in the
10  order.
11          THE COURT:  What about this thing that Ms. Miller
12  said about custodians?
13          MR. GILBERT:  Well, that's a different -- our
14  priority -- I think we should be able to speak to what our
15  priority is.
16          THE COURT:  The priority is the list?
17          MR. GILBERT:  No, it's the documents concerning the
18  list.
19          THE COURT:  What does that mean?  What does
20  "documents concerning the list" mean?
21          MR. GILBERT:  The list as they've known for months.
22  Again, the deadline for production --
23          THE COURT:  What does "documents concerning the list"
24  mean?
25          MR. GILBERT:  How or why someone was on the list and

1   the communications from the president to his immediate staff

2   about the reason people are on the list.

3           THE COURT:  I'm just going to throw something out

4   here.  And I know you guys don't want to do your 30(b)(6)s

5   yet.  I know that.  I read all that stuff.

6           Why wouldn't the more efficient way to do that be

7   just say, here's the 30(b)(6) notice.  We want somebody to

8   come in and explain all of the stuff that you're just talking

9   about now about these president's lists.  We want somebody to

10  explain how do you get on the list, what does it mean to be on

11  the list, what happens with the list, how does this translate

12  into admissions, whatever the other topics are.  Why don't you

13  do that?

14          MR. GILBERT:  Because that with all due respect, your

15  Honor, is not what we're focused on.  What we're focused in

16  each case -- what they should do, frankly, is by a week from

17  tomorrow pull the files of -- that have on each of these

18  people who was on the president's list that spells out why

19  they're on the list or how they got on the list, those

20  documents.  That's what "concerning" means, and we've made it

21  clear to them for months, and they've known that.  And these

22  should have been done by May 15th.  They should just pull

23  those files, produce them by a week from tomorrow.

24          THE COURT:  Okay.  So wait a second.  Okay.  Thank

25  you.

1          Now please answer my question.  And I know what

2     you're going to tell me.  You're going to say, Can you repeat

3     the question, and I'm going to say, No, because you should

4     have listened to it and answered it the first time.

5          MR. GILBERT:  The question, as I understood it --

6          THE COURT:  Why don't you do a 30(b)(6)?  Why isn't

7     that a more efficient way of finding out what these

8     president's lists mean and how they're used?

9          MR. GILBERT:  Because it isn't a question of what the

10    lists mean.  It's the content of what is said about --

11         THE COURT:  That what I mean by mean.  What's the

12    import of these president's lists and how do they get used?

13    That's what you're trying to find out, right?

14         MR. GILBERT:  I guess I'm not communicating that

15    clearly.  That's not what we're trying to do, your Honor.

16    What we're trying to do is:  Why was this person on the list?

17    That is, his dad gave $5 million or his mother gave a quarter

18    million dollars.

19         THE COURT:  Okay.

20         MR. GILBERT:  We need to know --

21         THE COURT:  And then what?  Let's say you find that

22    out, that this person A is on the list because their mom gave

23    a million bucks.  Then what?  Then what?

24         MR. GILBERT:  Then we compare it to the evaluation

25    ratings of the person and we have an opportunity to prove our

**FILED PUBLICLY**

38

 1 | case.

 2 | THE COURT: Compare it with the evaluation ratings --

 3 | MR. GILBERT: Of each of these people who was on the

 4 | list --

 5 | THE COURT: -- to figure out what? I know the answer

 6 | to this question. I just want you to say it. To figure out

 7 | what?

 8 | MR. GILBERT: That the donation was a significant

 9 | factor.

10 | THE COURT: How the list got used. It's five words.

11 | Just say it. Why don't you just do a 30(b)(6) to ask somebody

12 | how do these lists get used?

13 | MR. GILBERT: Because that level of generality, your

14 | Honor, is not what we're seeking. What we're seeking is --

15 | THE COURT: You got to start somewhere, though,

16 | right?

17 | MR. GILBERT: Well, there was a court-ordered

18 | deadline of May 15th was that flouted, your Honor. We have

19 | depositions in September. And it isn't some general question

20 | of how are the lists used. We know that in general they were

21 | used to influence admissions. How is this person -- what was

22 | the deal? Was it $5 million? Was it a million dollars?

23 | THE COURT: You need to be specific.

24 | MR. GILBERT: That's why we need --

25 | THE COURT: It's not enough to know it in

1  generalities.  You need to know specifically how this affected

2  specific things?

3          MR. GILBERT:  Correct, your Honor.

4          THE COURT:  That's what you're telling me.  See, you

5  actually could have said that ten minutes ago, and then we all

6  would have had that ten minutes of our life back.

7          MR. GILBERT:  Well, there you go.

8          MS. MILLER:  Your Honor, if you'd like, I can speak

9  to what we have produced, if that would be helpful.

10          THE COURT:  This is what I want you to deal with.

11  Here's what I want you to deal with.  These president's lists

12  have some level of significance.  We can argue about how much

13  significance, how little significance; they have some level of

14  significance.  So what Mr. Gilbert says the plaintiffs want to

15  be able to do is they want to be able to figure out how being

16  on that list translates into effect on the admissions process,

17  how being on a list that you're a donor, your family is a

18  donor, relative is a donor, whatever, translates into the

19  admissions process.

20          Okay.  That's relevant, right?

21          MS. MILLER:  In theory, your Honor, yes.

22          THE COURT:  What's the theory?

23          MS. MILLER:  We can have a debate as to how relevant

24  it is.

25          THE COURT:  You read the difference between Rule 402

1   and Rule 403 and materiality.  It's relevant.  It's something

2   that makes a fact more likely than not.  It's relevant, right?

3          MS. MILLER:  Yes, your Honor.

4          THE COURT:  Okay.  So what -- does he already have

5   that?

6          MS. MILLER:  Yes.

7          THE COURT:  How does he have it?

8          MS. MILLER:  He has the lists in question.  They were

9   produced in the motion for sanctions.  In response, we said we

10  would conduct a supplemental search for the lists from both

11  the president's office and from the admissions office.  Those

12  were produced on July 31st, August 2nd, 7th, and August 21st.

13  That has been completed.

14         THE COURT:  Okay.  Does he have documentation -- when

15  I say he, I mean the plaintiffs -- do they have documentation

16  that would allow them to translate that president's list,

17  which has some names on it or whatever, and connect it with

18  admissions?

19         MS. MILLER:  We have inserted UIDs.

20         THE COURT:  You inserted UIDs that correspond?  In

21  other words, if it was Jane Kennelly that was the student and

22  it was Matthew Kennelly who was the donor, they've got an ID

23  that makes it clear that they're related to each other?

24         MS. MILLER:  They will have a UID for the student if

25  they appear on the list, and then to the extent we have a UID

1   in our data that identifies that student, they would be able

2   to match that person up.  We are also producing --

3         THE COURT:  You got to stop doing that.  I told you

4   this on the TV the last time.  Okay?  All of the body language

5   that's going on off camera.  It's a little less distracting

6   here than it is on the video because I can look away from you,

7   and on the video, you're staring me in the face, but you got

8   to cut it out.  It's really aggravating, and I say this on

9   behalf of every judge in the world.  Just wait.

10        Go ahead, Ms. Miller.

11        MS. MILLER:  As part of the meet and confer,

12   plaintiff asked for certain documents from the advancement

13   office stating the reasons why a given student was on the

14   list.  We have done a search for those, a go-get search and we

15   are in the process of going through the FERPA redaction and

16   the UID process.  We think we have about 500 of those

17   documents.

18        THE COURT:  Thanks.  Stop.

19        Now, here's what I want you to do.  And I know you're

20   getting angry.  You just got to get past it.  Okay?  Here's

21   what I want you to do.  I want you to respond to what she just

22   said, and I want you to tell me why it's not sufficient, what

23   she just said is being produced, why it's not sufficient to

24   get what you're looking for.

25        MR. GILBERT:  We already know how the lists -- the

1    impact on admissions.  We know that.  The defendant Georgetown

2    has redacted it from the sealed -- from the public version of

3    the JASR -- a public version of the motion practice.  They've

4    been very heavily redacted in what is available to the public.

5           THE COURT:  Okay.

6           MR. GILBERT:  But we know how it's used, and I'll

7    speak obliquely.

8           THE COURT:  Okay.

9           MR. GILBERT:  If you're on that list, it's a done

10   deal.  There's an extremely high percentage to say the least

11   that you're in.  It's a done deal.  Virtually done deal.

12          THE COURT:  Pause there for a second.  Just pause

13   there for a second.  Why isn't that good enough?  For what

14   you're -- why isn't that good enough for what you're trying to

15   prove?

16          MR. GILBERT:  Because again, your Honor, we don't

17   know why the person was on the list.  It could be because it's

18   a faculty child, it could be an administrator's child.

19          THE COURT:  Ah.

20          MR. GILBERT:  Or it could be that they gave 5

21   million.

22          THE COURT:  A disadvantaged person or something?

23          MR. GILBERT:  Or whatever reason they were put on the

24   list, it's virtually a done deal.

25          THE COURT:  So pause.  I want to make sure I'm

1   extracting the right information from what you told me.  What
2   you told me is that we know the list has an impact on
3   admissions.  What we don't know is why the people are on the
4   list.
5           MR. GILBERT:  Specific individuals are on the list,
6   correct.
7           THE COURT:  Why this person is on the list.  We don't
8   specifically know why this specific person was on the list.
9   We may know that being on the list got him or her in, but we
10  don't know why they're on the list in the first place, and you
11  need to know that -- and now I'm extrapolating here -- you
12  need to know that because that has a bearing on whether
13  financial considerations were taken into account.
14          MR. GILBERT:  And how big the financial
15  consideration.
16          THE COURT:  How much, yeah.
17          MR. GILBERT:  Exactly.
18          THE COURT:  Like a threshold or something like that.
19          MR. GILBERT:  Exactly.
20          THE COURT:  Pause.
21          What's wrong with what he just said?
22          MS. MILLER:  Those are the documents I just
23  referenced, your Honor.  On a go-get basis, we have gone to
24  the advancement office and we have collected approximately 500
25  documents that will provide information as to why different

1  inquiries were made as to people that were potentially being

2  considered for admissions.  We're in the process of going

3  through the UID FERPA redaction process.  So that takes a

4  while given how much information and personally identifiable

5  information are in these documents, but that is a process that

6  is underway.

7           THE COURT:  Okay.  So I'm just going to ask you a

8  question.  You see me paging through stuff up here.  What you

9  just now said, where do I find that in the supplement?  You

10  both know the answer to this question.

11           MS. MILLER:  If you give me a moment, your Honor.

12           THE COURT:  The supplement being docket number 423.

13  I'm talking about the supplement.

14           MS. MILLER:  I believe it's in the main status report

15  where we said that we were -- as part of the meet and confer,

16  we agreed to do a supplemental go-get for the advancement

17  office for those documents that would be -- indicate why a

18  particular person was being inquired about and that we would

19  go get those.

20           THE COURT:  Just tell me where.  I'm just asking.

21           MS. MILLER:  It's on page 6, your Honor.

22           THE COURT:  Of what document?

23           MS. MILLER:  Of the July --

24           THE COURT:  You're talking about something that was

25  filed before the last hearing, right?

1        MR. FENSKE:  No, your Honor, July 31st.

2        THE COURT:  Oh, the July 31st one.  That's the one I

3   didn't physically print out.

4        Mr. Gilbert, you know what she's referring to, right?

5        MR. GILBERT:  I'm looking at, your Honor, page 6.

6        THE COURT:  Georgetown's position on the unresolved

7   issues.

8        MS. MILLER:  It's the second paragraph down.

9        THE COURT:  "Georgetown agreed to go beyond its

10  original proposal and search the centralized files" -- I'm

11  just going to say this, folks.  I don't care if it's sealed or

12  not.  I'm saying it. -- "centralized files of its advancement

13  office on a go-get basis for any documentation describing the

14  reasons that the advancement office suggested particular

15  candidates under that policy, i.e., this would not be a

16  custodial search.  Georgetown's counsel explained that such

17  discovery may be sufficient for plaintiffs to evaluate whether

18  an actual potential donation influenced a candidate's

19  admission."  And it goes on from there a couple more

20  sentences.

21        Have you guys looked at that stuff and you've

22  determined it's insufficient or you just haven't gotten yet?

23        MR. GILBERT:  Absolutely.

24        THE COURT:  Haven't gotten it yet.

25        MR. GILBERT:  Yeah.  It first talks about -- number

1  one talks about lists. Number two talks about similar lists.

2  They basically -- and then three, meet and confer. So having

3  flouted --

4  THE COURT: Okay. We're going to stop right here. I

5  got to take this verdict. Please, when we come back, I know

6  the flouting thing. You don't have to keep saying it. Just

7  I'm begging you, don't keep saying it. I want to deal with

8  the issues that I actually have to decide right now, and I

9  don't have to decide that one right now.

10  I need people to clear out from these two tables just

11  for a little bit because I need the lawyers from the case on

12  trial to be able to sit there. Apologies.

13  (Brief pause.)

14  THE COURT: It's 22 C 125. Here's where we were.

15  MS. MILLER: Your Honor, if I may briefly respond to

16  a statement that Mr. Gilbert made right before we broke.

17  THE COURT: No, because he's talking right now.

18  Write it down, make a note, and you'll tell me in a second.

19  MS. MILLER: Sure.

20  THE COURT: So basically my question was -- the

21  question on the table is -- I quoted from it -- was page 6 of

22  the status report of July the 31st I think it was, and I said,

23  Have you folks looked at that stuff and have you determined

24  that it's insufficient or have you just not gotten to it yet?

25  So that's my question. So we're back there. Go ahead,

1    Mr. Gilbert.

2            MR. GILBERT:  It's insufficient because it is a

3    prescription to slow walk the process that's already way

4    overdue.  That is, they're creating a two-step process.

5    First, get the lists that should have been produced long ago,

6    and then after the lists, have a meet and confer about what

7    more is needed, okay, and then have another period of time to

8    go beyond that.  And we've said, you know what we need as to

9    why these people were on the list; that is, the documents that

10   we've been discussing about a moment ago about was it a

11   donation or was it a faculty child or that type of thing and

12   then how much was the donation, what were the communications

13   with the donor and the immediate staff?  And they said 21 days

14   and then 28 days.

15           THE COURT:  At this point, at this point as of right

16   now today at this moment, do you have the list?

17           MR. GILBERT:  We have the list.

18           THE COURT:  Okay.  Pause.  I want to ask another

19   question.

20           So consistent with the way things have been done on a

21   number of the other, you know, discovery issues that have

22   largely been worked out by the parties, would there be a

23   problem with saying, okay, you need more information but you

24   don't need it for each and every one of the people on each and

25   every one of the lists?  I mean, I don't know how many people

1    we're talking about, so let's come up with a subset or let's

2    come up with some form of sampling or you pick 50 names or you

3    pick two names from this year and three names from that year,

4    something like that.  Is there some reason why you can't do

5    something like that?

6          If I can ask -- I thought the people on the phone

7    were supposed to be muted.  Anybody who is on the phone, if

8    you don't mute your phone, then you're ruining it for

9    everybody because we're going to cut off the entire phone call

10   because I'm hearing somebody click clacking on a typewriter

11   and it's distracting.  You're hearing it, right?  It's not me.

12         MR. GILBERT:  We're hearing it.

13         THE COURT:  Okay.  The phone is getting turned off.

14   Disconnect.  Done.

15         Go ahead.

16         MR. GILBERT:  The issue, your Honor, is we don't know

17   how to make, considering your point, a selection process that

18   would not be in effect a cherry-picking of the most favorable

19   things by --

20         THE COURT:  Why can't you select them?  You can

21   select them.  It would be you doing the cherry-picking.  I

22   mean, you've got the lists, right?  Why don't we just say --

23   why don't you just say, okay, I want the first five people on

24   the list or numbers 1, 6, 11, 16, and 21 or whatever.

25         MR. GILBERT:  Again, I have to speak obliquely.  We

1  know the number of names on the list.  We could pick out a

2  segment of that list.  I think that if we picked out a segment

3  of, say, 30 on that list each year, we could probably

4  accomplish what your Honor is --

5          THE COURT:  How many years total are we talking

6  about?

7          MS. MILLER:  We have data for the UID process back to

8  2017.

9          MR. FENSKE:  For the admissions office in 2009 for

10  anyone who is in our financial aid database, which is a

11  subset.

12          THE COURT:  You guys just said two different things.

13  You said 2017.  You said 2009.

14          MS. MILLER:  There's two different databases in

15  question, your Honor.  Our admissions database goes back to --

16          THE COURT:  I'm talking about what we're talking

17  about.  I'm not talking about what we're not talking about.

18  Let's talk about what we're talking about.  That's going to

19  look great on the transcript, but you know what I mean.

20          MR. FENSKE:  Yes, your Honor.  We produced the

21  original lists.

22          THE COURT:  How many years of lists do we have?

23          MR. FENSKE:  2012 to the present.  There may be a few

24  before that time.

25          THE COURT:  All right.  So we can negotiate about the

1    number.  If I were to tell you -- if we're going to take a

2    subset, X number per year you're allowed to do this go-get

3    thing, what is it you want?  And if you tell me, I want

4    everything that relates to, you're going to lose, so don't say

5    that.  This is great.  I'm telling you in advance what the

6    losing argument is.  You don't usually get that from a judge.

7    I'm telling you what the losing argument is, so don't make

8    that argument.  What would you need as it relates to that

9    subset of people?

10         MR. GILBERT:  For that subset of people, we would

11   need the documents that show why the person is on the list,

12   whether it was related to a financial donation, and the amount

13   of the donation and who the donation amounts were communicated

14   with and who recommended the person to be on the list.

15         THE COURT:  Okay.  So let's say this.  All right.

16   I'm just going to pull a number out of the air.  Let's say

17   it's seven people per year that I let them pick for all the

18   years we're talking about and it's what he just said is what

19   you'd have to get.  Talk to me about what that would entail on

20   your part.

21         MS. MILLER:  Okay.  In the first instance, we

22   already --

23         THE COURT:  If you want to now correct that thing you

24   wanted to correct, go ahead and do that.

25         MS. MILLER:  I'm not sure how he can say he's

1  evaluated that list and found them insufficient, because

2  although we've produced the president's list, we have not yet

3  produced the documents that we said we were going to produce

4  that have reasons for why various people were on the list.

5  Those are the documents we are in the process of redacting.

6  So he doesn't --

7          THE COURT:  Pause.  Pause.  What's your time frame

8  for being done with the redacting?

9          MS. MILLER:  We estimate based on the number of FERPA

10  redactions that need to be made, we need another three weeks

11  to get that done.

12          MR. FENSKE:  Your Honor --

13          THE COURT:  What if I tell you you got ten days?

14          MR. FENSKE:  I do not --

15          MS. MILLER:  I don't think we'd make it.

16          MR. FENSKE:  We have 195 of them that are being

17  processed for production.

18          THE COURT:  What's "them"?

19          MR. FENSKE:  Of approximately 500 documents that

20  we've collected for these purposes, and we have 195 of them

21  that are being processed for production right now, and the

22  remainder are in the redaction process.

23          THE COURT:  Okay.  Are so let me just talk here for a

24  second.  I don't need to repeat what I said at the last

25  hearing about the source of this problem, but I'll say this

1    one thing.  The source of the problem is that something was

2    not disclosed to me that ought to have been disclosed to me

3    when I entered the order that I did.  That's a shorthand for

4    what I said before.

5             And so for that reason, what we're trying to do is

6    now clean up the aftermath of that problem.  It is not

7    pleasant to hear that cleaning up the aftermath, which has

8    already now taken four to six weeks, is going to take an

9    enormous amount more time because we would not have this

10   problem if I had been told what I ought to have been told way,

11   way back when I entered that order.  So I'm not terribly

12   sympathetic -- strike out the "terribly" -- I'm not the least

13   bit sympathetic that this is going to take a long time.

14   People should have thought about that when they withheld --

15   it's like talking to a criminal defendant.  Well, you should

16   have thought about that before you committed the crime.

17            All right.  So here's what needs to happen.  The

18   plaintiff needs -- the plaintiffs need to be able to know --

19   and I'm not talking about in two months or a month and a half

20   or whatever.  They need to be able to know with regard to some

21   significant number of people on these lists, whatever you're

22   calling them, the president's lists, why they're on the list

23   and who the list got communicated to and the documentation, if

24   there is any, that would show what impact it had on the

25   admission process.  If you want to talk about that as being a

FILED PUBLICLY

1 penalty for what happened before, then that's fine with me.

2 That's what needs to happen. I don't care how it happens. I

3 don't care what the order says. That's what needs to happen.

4 That's the end game.

5 Now you guys need to figure out how to get there.

6 Today is Thursday. You need to figure it out by next Tuesday

7 morning. That's how long you got to figure it out. And when

8 I say "figure it out," I will not accept, will not accept one

9 of these status reports where everybody says to the other side

10 in my presence, go jump in the lake, strong letter to follow.

11 I won't accept it. I want an agreed -- I don't care how long

12 it takes, and it involves compromise to get there. I told you

13 what the end game is. Now you need to tell me by Tuesday how

14 you're going to get there. And there's going to be an order

15 that I'm going to sign that's going to be enforceable by

16 however court orders get enforced.

17 So does everybody understand that?

18 MS. MILLER: Yes, your Honor.

19 MR. GILBERT: I actually don't.

20 THE COURT: I didn't think you would.

21 MR. GILBERT: We know the impact. The question --

22 THE COURT: You know what I just did? It's called a

23 ruling.

24 MR. GILBERT: Fine, your Honor.

25 THE COURT: So you're going to take it. If you need

1  to know what it says, that's why God created court reporters

2  and transcripts.  So you'll order it.  She'll be happy to

3  provide you one.  It's not exactly what you're asking for.

4  It's what you're getting.  I'm not saying it's what you're

5  getting forever.  Okay?  I'm saying that's what you're getting

6  now.  That's the ruling.

7          Now, on the rest of this, what I want in the status

8  reports from now on is two things.  I want, here's where we

9  are in discovery.  Like we've taken this many depositions,

10  we've got these depositions scheduled.  I want to know that

11  stuff.  And if there's any discussions going on about

12  settlement, I want to know that.  I don't want disputes about

13  stuff.  Those all have to go in motions.  Those all have to go

14  in motions.  I set the schedule for the filing of those and

15  the responses to them at the previous date.  And that's going

16  to be the way we're going to do it.  I'm absolutely going to

17  read everything you've given me just like I have so far, but

18  I'm not going to deal with discovery disputes or other

19  disputes that aren't in the form of a motion.  And I get that

20  that makes for more work for everybody.  Hey, it's a big case.

21  You can handle it.

22          So here's the one other thing that I wanted to talk

23  about.  So this case -- it's a large case because of the --

24  I'm told there's 200,000 people potentially in the class, and

25  there's however many defendants, somewhere between 15 and 20.

1  So it's a big case.  It's like an MDL.  It's like an MDL

2  except it's not an MDL.  What I would normally be doing in an

3  MDL at this point is I would be considering the appointment of

4  a settlement master, not to coerce anybody to settle, but just

5  to start talking to people.  I don't know whether you need

6  that in this case or not.

7          A settlement has been negotiated.  If I had to bet, I

8  bet there's discussions going on with other people, but I need

9  you to think about whether you have a position on whether I

10  ought to do that or not because that's what I would normally

11  do at this stage of an MDL.  You know, we're past the motion

12  to dismiss stage and you're into the discovery stage enough at

13  least to have some sense of what's going on.  I would normally

14  do that.  We can talk about who at some other point, but I

15  need you to think about that, and your positions on that need

16  to go in the next status report.  And if you want to propose a

17  selection process, that's fine too.

18          So the next -- unfortunately, I start on Tuesday a

19  trial in a 13-year-old criminal case that I inherited from a

20  colleague who left the court in which the defendant, God bless

21  him, is pro se.  That criminal case, which involves a single

22  defendant, has as of right now 1,199 docket entries.  The

23  average number of docket entries -- the criminal lawyers will

24  know this -- for a single-defendant criminal case is maybe 30;

25  40 if there's a lot of stuff filed.  I'm going to be on trial

1    for three weeks and probably close to the whole month of

2    September and I have to get that case done.  I'm not going to

3    be able to do one in September, so I'm going to set it for the

4    first week of August -- October rather, so I'm just telling

5    you why.

6            Okay.  So the next one of these is going to be on

7    Thursday, the 5th of October, at 1:00.  So the deadlines --

8    the status report is due a week before that which means the

9    28th of September, and the deadlines that I told you about

10   before for motions and responses kick in.  It's X days before

11   and Y days before.

12           All right.  Is there anything anybody needs to take

13   up before you leave the room?

14           MS. MILLER:  1:00 o'clock?  I just didn't hear you.

15           THE COURT:  1:00 o'clock.  It will be in an order

16   too.

17           Okay.  Thanks.  Bye.

18     (Which were all the proceedings had in the above-entitled

19   cause on the day and date aforesaid.)

20     I certify that the foregoing is a correct transcript from
       the record of proceedings in the above-entitled matter.

21

22   _____                    Date _____
     Carolyn R. Cox
     Official Court Reporter

23   Northern District of Illinois
     /s/Carolyn R. Cox, CSR, RPR, CRR, FCRR

24

25