# EXHIBIT 6

```
 1                IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3

 4   SIA HENRY, et al.,                )   Docket No. 22 C 125
                                       )
 5                      Plaintiffs,    )
                                       )
 6             vs.                     )
                                       )
 7   BROWN UNIVERSITY, et al.,         )   Chicago, Illinois
                                       )   February 23, 2023
 8                      Defendants.    )   9:30 o'clock a.m.

 9
                     TRANSCRIPT OF PROCEEDINGS
10        BEFORE THE HONORABLE MATTHEW F. KENNELLY

11
     APPEARANCES:
12

13   For the Plaintiffs:   GILBERT LITIGATORS & COUNSELORS
                            BY:  MR. ROBERT DEWITT GILBERT
14                          11 Broadway, Suite 615
                            New York, NY  10004
15                          (646) 448-5269

16

17

18

19

20

21

22
     Court Reporter:       MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
23                         Official Court Reporter
                           219 S. Dearborn Street, Suite 2102
24                         Chicago, IL  60604
                           (312) 435-5639
25
```

1  APPEARANCES CONTINUED:

2
   For the Defendants:
3
   Brown University:        MORGAN, LEWIS & BOCKIUS LLP
4                           BY:  MR. JON R. ROELLKE
                            1111 Pennsylvania Avenue, NW
5                           Washington, DC  20004
                            (202) 739-5754
6

7
   University of
8  Chicago:                 ARNOLD & PORTER
                            BY:  MR. JAMES L. COOPER
9                               MR. MICHAEL RUBIN
                            555 Twelfth Street, N.W.
10                          Washington, DC  20004-1202
                            (202) 942-5000
11

12
   Columbia University:     SKADDEN ARPS SLATE MEAGHER & FLOM, LLP CH
13                          BY:  MS. AMY VAN GELDER
                            155 North Wacker Drive, Suite 2700
14                          Chicago, IL  60606-1720
                            (312) 407-0903
15

16
   Cornell University:      KING & SPALDING
17                          BY:  MR. ZACHARY THOMAS FARDON
                            110 North Wacker Drive, Suite 3800
18                          Chicago, IL  60606
                            (312) 995-6333
19

20
   Dartmouth College:       JENNER & BLOCK LLP
21                          BY:  MR. DOUGLAS LITVACK
                            353 N. Clark Street
22                          Chicago, IL  60654
                            (312) 222-9350
23

24

25

```
 1   APPEARANCES CONTINUED:

 2
     Duke University:        GIBSON, DUNN & CRUTCHER LLP
 3                           BY:  MR. CHRISTOPHER DEAN DUSSEAULT
                             333 South Grand Avenue
 4                           Los Angeles, CA  90071
                             (213) 229-7855
 5

 6
                             SAUL EWING ARNSTEIN & LEHR LLP
 7                           BY:  MR. JAMES A. MORSCH
                             161 North Clark Street, Suite 4200
 8                           Chicago, IL  60601
                             (312) 876-7100
 9

10
     Georgetown
11   University:             MAYER BROWN LLP
                             BY:  MS. BRITT MARIE MILLER
12                                MS. JESSICA MAURER
                             71 South Wacker Drive
13                           Chicago, IL  60606
                             (312) 782-0600
14

15
     MIT:                    FRESHFIELDS
16                           BY:  MR. JAN RYBNICEK
                             700 13th Street, NW
17                           10th Floor
                             Washington, DC  20005-3960
18                           (202) 777-4500

19

20   Northwestern
     University:             GASS TUREK
21                           BY:  MR. SCOTT DAVID STEIN
                             241 N. Broadway, Ste 300
22                           Milwaukee, WI  53202
                             (312) 853-7000
23

24

25
```

1   APPEARANCES CONTINUED:

2

3   Vanderbilt
    University:                WHITE & CASE LLP
4                              BY:  MR. DAVID H. SUGGS
                               1221 Avenue of the Americas
                               New York, NY  10020
5                              (212) 819-8200

6

7   Yale University:           HOGAN LOVELLS US LLP
                               BY:  MR. CHARLES A. LOUGHLIN
8                                   MR. BENJAMIN F. HOLT
                               555 Thirteenth Street, NW
9                              Washington, DC  20004
                               (202) 637-5661

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (The following proceedings were had by video:)

2         THE COURT:  This is Judge Kennelly.  It's a video

3    hearing.

4         I think defense counsel sent a list of appearances to

5    my courtroom deputy clerk, so we don't need to go through

6    that.

7         I don't know if the same was done on the plaintiffs'

8    side or not, but do plaintiffs' counsel -- does anybody want

9    to put your names on the record at this point?

10         You're muted.

11         MR. GILBERT:  Robert D. Gilbert.

12         THE COURT:  You're not muted, but you got to crank

13    your volume up.  I'm barely hearing you.

14         MR. GILBERT:  This is Robert D. Gilbert.

15         Is that better, your Honor?

16         THE COURT:  That's way better.  Thanks.

17         MR. GILBERT:  Okay.  Gilbert Litigators & Counselors

18    on behalf of the plaintiffs.

19         THE COURT:  All right.  So I set this because of the

20    motion that I got from the plaintiffs asking for a hearing on

21    what were represented to be three issues.  The three issues

22    are the issue about custodians and the president's office and

23    development office; the second was -- has to do with TAR,

24    which is -- for the benefit of the court reporter, is T-A-R,

25    all capitals; and the third has to do with production dates.

 1          So the first of those, I think I can take care of

 2   pretty quickly.

 3          I'm not sure who that was.  But if you're not

 4   talking, please mute yourself.  Thanks.

 5          The first of those, I can take care of pretty

 6   quickly.  I dealt with it in our hearing on February the 8th.

 7   I don't know that anybody's ordered the transcript yet, but

 8   I'm looking at the rough transcript.  And the rough

 9   transcript, it's at page 61.  I don't know if that will

10   translate into the same page as when you get to the official

11   version or not, but here's what it says.  This was after a

12   discussion about depositions of certain presidents or former

13   presidents who had allegedly made public comments.

14          Here's what I said:

15          As far as adding the development and president's

16   office as custodians, I'm putting the pause on that for now.

17   We're going to readdress that in a couple of months, once

18   stuff is actually getting produced.  I have to get this thing

19   off the dime, so we're going to put the pause on having

20   custodians from the development and president's office right

21   now.

22          Here's what that means for the defendants.  So I want

23   to make real clear what that means for the defendants.  What

24   it means is that if I later determine there is a basis to

25   include those for some or all of the defendants, you're not

1    going to get a whole lot of time to produce the stuff, and
2    you're not going to get to do it at anybody's leisure; it's
3    going to be my definition of when you get it done.

4            So as far as I'm concerned, that issue's off the
5    table.  For now, we're presumably going to revisit it at some
6    point in time, but I don't really see a basis for -- at this
7    point, for further discussion about that, so what I intend to
8    do is move on to the other two.

9            And the defendants are telling me they're not ripe.
10   And I get what you're saying, that you're still talking about
11   this, but I need to say this:

12           We've got to -- there's a deadline that's in place;
13   it's less than two weeks from now.  In fact, it's only barely
14   more than a week from now regarding substantial completion of
15   production, and to some extent, we're still talking about the
16   shape of the table here, and that's not a good thing, and so
17   we are going to talk about these things today.  And if that
18   means that -- you know, that you're not going to have, you
19   know, three more four-hour meet and confers with the other
20   side, then, okay, we're just putting the fast-forward button
21   on.

22           So let's talk, first, about the TAR issue.  Who wants
23   to talk -- I've got the plaintiffs' position and the thing
24   that was filed on the -- back on -- well, I guess, the more
25   recent thing that was filed just the other day.

1          So can the defendants kind of talk to me about that,

2    whoever is going to deal with it?

3          MS. MAURER:  Yes, your Honor, this is Jessica Maurer,

4    on behalf of Georgetown, for the defendants.

5          Our position is that the appropriate standard to

6    apply in assessing the defendants' TAR process is reasonable

7    and proportional.  The weight of the authority, both case law

8    and Sedona Principle 6, supports our position that search

9    terms are an appropriate tool to use to pre-cull the document

10   population before implementing a TAR workflow.  I'm happy to

11   provide you with some case citations, if that would be

12   helpful.

13         Plaintiffs' approach would significantly increase the

14   burden on TAR defendants by requiring us to add potentially

15   millions of documents into our review queue that are likely

16   not relevant because they're not hitting on an extensive list

17   of search terms that the parties have negotiated specifically

18   to identify responsive documents.

19         THE COURT:  Can you just -- I get that that's -- can

20   you explain to me how you get there?  So why is it that the

21   plaintiffs' approach is going to -- would end up adding all of

22   these extra documents?

23         MS. MAURER:  Yes, your Honor.  So it's impossible to

24   tell you exactly how many documents we're going to have to

25   review, but our e-discovery experts suggest that it's

1  reasonable to expect to review about 75 percent of the

2  document population in a TAR review.  So if we have 4 million

3  documents, 75 percent of that is a lot higher than if we're

4  talking about 750,000 documents.

5          THE COURT:  Okay.  I guess my question was why is --

6  and maybe this is just a fairly overt display of my ignorance

7  here, but why is it that the plaintiffs' approach is going to

8  make you look at more things?

9          MS. MAURER:  It's simply the number of documents that

10  you're adding into the review queue on the whole, on the

11  total.  So our approach would be to, first, cull our

12  collection using search terms that the parties have agreed

13  upon.  And speaking for Georgetown, that population would be

14  about 640,000 documents.  From there, we would implement our

15  TAR workflow, and our e-discovery vendors would expect that we

16  would look at about 75 percent of those documents.

17          Using the plaintiffs' approach --

18          THE COURT:  What you're talking about right -- what

19  you're talking about right now seems to me to -- and I'm -- I

20  know -- of all of the people on this call, I know the least

21  about this, okay?

22          So what you're talking about right now seems to me to

23  be what Mr. Gilbert's part of the status report filed on

24  February 10th calls the second area.  The second area concerns

25  the use of applying search terms before applying TAR methods.

1    The parties disagree over whether it's appropriate to use

2    search terms, dot, dot, dot, to pre-cull defendants' documents

3    prior to applying TAR methods.  That's what I think you were

4    just talking about; is that right?

5              MS. MAURER:  Yes, your Honor.

6              THE COURT:  The other issue -- I think I get your

7    position on that.

8              The other issue, what he calls the first area, is

9    what's called the target recall rate.

10             MS. MAURER:  Yes, your Honor.

11             THE COURT:  And so it's a question of setting a

12   percentage, I guess.

13             MS. MAURER:  So the recall rate is essentially the

14   number of responsive documents from your entire population

15   that you have actually identified.  So defendants suggest that

16   a target recovery of about 70 percent is a reasonable and

17   proportionate rate.  This is just a target, right?  So the

18   defendants may actually exceed 70 percent recall.  In some

19   interim testing that some defendants have done suggest that

20   they will exceed 70 percent by a significant margin.

21             So we're talking right now about a target.

22   70 percent -- it's our position that 70 percent recall has

23   been recognized in prior cases as reasonable.  So, for

24   instance, in *Broiler Chicken*, the special master said that 70

25   to 80 percent range was reasonable and noted that a higher or

1  even lower percentage could be reasonable depending on the

2  types of documents that you're finding during your testing at

3  the end.

4        So, you know, it's our position that a target of

5  70 percent is reasonable.

6        THE COURT:  And so what we're talking about here when

7  we're talking about the percentage, this is the -- this is

8  when you're basically training the system; is that right?

9        MS. MAURER:  This is actually at the end of the

10  reviews.

11        THE COURT:  The end of the reviews.  Okay.

12        MS. MAURER:  Yeah.  This is actually at the end of

13  the reviews.  So it's a -- how many responsive documents out

14  of the total population of responsive documents did you find,

15  so our position is that 70 out of 100 is reasonable.

16        THE COURT:  Okay.  I get you.  If I can translate

17  that into 1980s terms, if you don't mind.

18        So what that means is that -- is that if there were

19  100 responsive documents out there, 70 percent means the

20  search method is going to get 70 of them.

21        MS. MAURER:  Correct, your Honor.

22        THE COURT:  And the plaintiffs are going to get 85.

23        MS. MAURER:  Well, that's the target.

24        And I would like to add that if we're comparing this

25  to a linear review -- so a review where you're looking at

1 every single document, studies have suggested that, you know,

2 an average recall for that type of review is about 60 percent.

3 And there's no reason to hold TAR to a higher standard than a

4 linear review, where you're looking at every single document.

5       THE COURT: So can I just ask, to make sure I'm

6 translating what you just said right, when you say --

7       MS. MAURER: I apologize.

8       THE COURT: -- when you say "linear review," does

9 that mean somebody paging through a paper file?

10       MS. MAURER: That means somebody looking -- so

11 technology-assisted review essentially allows you to stop

12 looking at documents before you --

13       THE COURT: No, I get what TAR is; I want to know

14 what you mean by linear.

15       MS. MAURER: Okay. A linear review means you're not

16 using TAR; you're looking at every single document. So if we

17 have a million documents, it means you're looking at a million

18 documents.

19       THE COURT: But you're saying that there are studies

20 that say when a person is actually looking at everything,

21 they're catching less than the TAR does?

22       MS. MAURER: Correct, your Honor.

23       THE COURT: Yikes. That's why I --

24       MR. GILBERT: Your Honor, can I speak to that?

25       THE COURT: Sure. Go ahead.

1    MR. GILBERT:  We find it ironic that institutions of

2    higher education find 70 percent a success rate because every

3    student who got 70 percent would be a horrible student or

4    would be failing.

5    THE COURT:  Well, it depends on what kind of curve

6    they grade on.  I don't know.

7    MR. GILBERT:  There you go.  There you go.  This is a

8    pretty steep curve in their favor, okay, 30 percent false

9    negatives.  But in addition to that, they want to compound the

10   false negatives in the search terms.  So now, there's like a

11   double whammy on the plaintiffs of false negatives.

12   We don't think that's appropriate, your Honor, and

13   it's not necessary.  And by the way, we find it really

14   difficult to listen all the time to how many millions of

15   documents they have to look at because that -- we gave them

16   623 names more than five months ago on donation records.

17   Here's the name of the donor, we believe there's a substantial

18   basis they gave more than $50,000, and that we gave the name

19   of the donor and the name of the student admitted.  Okay?

20   They've all, except Cal Tech, refused to look at 623

21   documents, yet they scream "Millions of documents" if they

22   have to try to get it right in looking for documents in this

23   case.  We don't think that's an appropriate line of argument,

24   and we think 85 percent is -- having 15 percent false

25   negatives is a sufficient number of false negatives, and we

1    certainly don't think that we should compound the false
2    negatives by adding search terms on top of TAR.  It should be
3    85 percent TAR, or it should be the search terms, but not both
4    making each worse than the other.
5              THE COURT:  So if you -- I have a question about the
6    first part, but I'm going to do that second.
7              When you say the search terms on top of TAR, what
8    you're basically telling me I think, and I just want to make
9    sure I'm understanding it right, is that 70 percent ends up
10   actually being less than 70 percent because of -- you're
11   basically compounding things that are going to have false
12   negatives.
13             MR. GILBERT:  That's exactly right.  There's one set
14   of false negatives, and then there's a second level of false
15   negatives, okay?  And so one makes the other worse than the
16   one before.
17             THE COURT:  Can I go back to the other thing you
18   mentioned, the thing about the 60 -- however many it was -- or
19   600 names or whatever it was?
20             MR. GILBERT:  Yes.
21             THE COURT:  And, again, I apologize for asking
22   questions that make it appear that I do not understand what
23   you're talking about because I understand, I think, about
24   70 percent or maybe it's 85 percent.
25             MR. GILBERT:  I think I'd assume more than

1   85 percent, your Honor.

2           THE COURT:  By the way, that's a TAR joke.

3           MR. GILBERT:  Okay.  I get it.  I get it.

4           THE COURT:  It's Volume 1 of 1 of all TAR jokes.

5           MR. GILBERT:  Okay.  Got it.

6           THE COURT:  So is that a -- looking at the 620 names,

7   or whatever it was, is that a separate issue from the TAR or

8   is that part of the TAR stuff?

9           MR. GILBERT:  I think it's part of the way they're

10  being serious about searching or not searching.  I mean --

11          THE COURT:  So let me tell you where I'm going with

12  this because, I mean, I get what you're saying when you say,

13  "Okay.  We asked University A to look at -- to look up records

14  regarding 50 people, and we shouldn't" -- and if the records

15  relating to those 50 people is part of the whole ESI and TAR

16  review, then I guess I might say, "Well, why do we have to

17  apply the same TAR percentages to everything?"  But if that's

18  a separate thing, then that's a -- my point is kind of

19  worthless.

20          MR. GILBERT:  Well, I think it's -- they're certainly

21  related points, okay?  I mean, they're not going to look at --

22  I think it goes to the pattern of trying to obfuscate with

23  claims that there's going to be millions of documents

24  involved, okay, and that they should be allowed to make

25  30 percent mistakes that are compounded by other mistakes.

1    They have something that's been sitting in front of them for
2    five months, and they've failed to look at it, except for Cal
3    Tech.
4               MS. MAURER:  Your Honor, may I respond to that?
5               So a couple points:
6               First of all, there are separate categories of
7    documents that, speaking for Georgetown, we have agreed to go
8    get, meaning they're separate from our TAR review.  We're
9    targeting, you know, targeted searches of documents that
10   plaintiffs have requested that are not part of our TAR review.
11   I cannot respond directly to the 635 documents.  I'm not
12   entirely sure what that relates to, but there are separate
13   categories of documents that are separate from our TAR review.
14              Second of all, when we're talking about the numbers
15   of documents, these are -- you know, these are in response to
16   the hundred RFPs that plaintiffs have propounded, and these
17   are actual numbers based on the collections that we've done to
18   date.  So for Georgetown, it's 4.7 million documents that
19   would go --
20              THE COURT:  Honestly, I wasn't doubting you on that.
21              MS. MAURER:  Okay.
22              THE COURT:  I mean, I know it's a big case.  I know
23   there's a lot of records.  So, I mean, whether it's a million
24   two versus a million three, okay, but I wasn't doubting you on
25   that, so you don't need to worry about that.

1        Okay.  So let me just kind of for -- play out the
2   string here a little bit.  So let's say that today I give you
3   a -- I answer both of these questions, so I give you the
4   percentage on the target recall rate, and I say yes or no
5   whether the search terms are applied before you do the TAR.
6        And I know you can only speak for yourself, but
7   that's a reasonably random sample, I guess.  So how soon is
8   stuff going to start actually getting produced?  And I
9   recognize that you then -- that somebody's going to have to
10  review stuff, but can you kind of give me the time frame?
11       MS. MAURER:  So for Georgetown, we've already started
12  rolling productions.  We've made three rolling productions to
13  date.  We have another production of about 14,000 documents
14  planned for tomorrow.  We have another production obviously
15  planned for March 3rd.
16       THE COURT:  That can't be the stuff that we're
17  talking about now as it relates to TAR, right?
18       MS. MAURER:  No, that's the stuff that's already in
19  our review.
20       THE COURT:  I'm talking about the stuff that we're
21  dealing with in this target recall rate-type thing.
22       MS. MAURER:  So in terms of --
23       THE COURT:  If I decide both of those issues today
24  and you're good to go, how long is it going to take to get
25  that stuff produced?

1    MS. MAURER:  It's going to add a significant amount
2  of time to our review, to be quite frank.  We have to add
3  3 million documents into our review.

4    THE COURT:  Does that mean a week?  a month?  a year?
5    MS. MAURER:  For Georgetown, I would expect in order
6  to finish the first-level review if we need to add multiple
7  millions of documents it would take us approximately three
8  months.  Now we could make rolling productions, your Honor --
9    THE COURT:  Yeah, of course.

10    MS. MAURER:  -- but I think it would take months.

11    THE COURT:  Okay.  Anything else anybody wants to say
12  about this that you haven't already said?

13    Okay.  I'll take that as a no.  I'm going to pause
14  that for a second, and we're going to talk about the other
15  thing.

16    The other thing has to do with -- I'm looking at
17  February 10th, Joint Status Report, page 3, Item Number 2 at
18  the top of page 3, whether defendants should produce
19  structured data concerning defendants' admission decisions
20  through the end of this calendar year; in other words, through
21  the end of 2023.  Plaintiffs have asked defendants to do so.

22    So I gather that the defendants haven't agreed to
23  that or at least all the defendants haven't agreed to that.

24    So who's going to talk about that?

25    Somebody else just appeared.  You're muted.

1         MR. RYBNICEK:  Good morning, your Honor.  Jan

2   Rybnicek, counsel for MIT, speaking on behalf of defendants.

3         THE COURT:  Okay.

4         MR. RYBNICEK:  This issue relates to discovery of

5   materials created after January 9th, 2022, the filing of the

6   complaint.  We have -- defendants have agreed to produce

7   several types of materials created during that time.  One

8   issue that remains in dispute is the production of financial

9   aid data.  We are proposing to provide updated financial aid

10   data in October 2023 that will give completed financial aid

11   data through the most recent calendar year or the most recent

12   school year.

13         Plaintiffs are asking for us to produce data and

14   collect data in December, at the end of December 2023, which

15   is in the middle of the admissions cycle.  It would be

16   incomplete, subject to change, and it would obviously create a

17   significant burden on the --

18         THE COURT:  Pause for a second.

19         So the dispute, it sounds like, has to do with

20   whether -- putting aside this collection date thing, whether

21   the data concerns -- goes up through the 2022/2023 school year

22   or whether it effectively goes into the following school year.

23         Am I getting you right?

24         MR. RYBNICEK:  That's correct, your Honor.

25         THE COURT:  Okay.  All right.  So finish your point.

1   I cut you off in the middle.  I just wanted to make sure I was

2   getting it.

3           MR. RYBNICEK:  The only thing I was going to add was

4   that this obviously creates a burden because the staff that

5   would be required to pull that data would be in the middle of

6   the busiest time of the year, making the financial aid

7   determinations for the next admissions cycle.

8           THE COURT:  Okay.  Mr. Gilbert, go ahead on that one.

9           MR. GILBERT:  Your Honor, this is a very narrow

10  issue.  We have -- our experts have advised us that it's

11  important to have at least two sets of data following the

12  ostensible dissolution of the conspiracy on November 4th --

13          THE COURT:  So they need the after to compare it to

14  the before.

15          MR. GILBERT:  Exactly.  And so in order to --

16          THE COURT:  They're telling you they don't want just

17  one year; they want two years.

18          MR. GILBERT:  They don't want just one cycle; they

19  want at least the beginning of the next cycle as to what

20  happened, right, because it would go to a lot of proofs if

21  they -- and we haven't requested that the data be produced to

22  us by December 31st; we requested that it be by February 15th

23  of 2024.

24          The burden is really on our experts who then have to

25  produce their final expert report by March 15th, within one

1  month, so the burden is on them.  It's not on the people who
2  get two months to provide the data.
3        And the argument -- the only argument that we've
4  heard is that, "Well, they're busy."  Well, we've given them
5  until February 15th.  Our experts are busy too.
6        THE COURT:  Can I ask a question in terms of the data
7  because your status report refers to this as structured data?
8  What exactly does that mean?
9        MR. GILBERT:  Structured data and I'm not a stat
10 person myself --
11        THE COURT:  Is it --
12        MR. GILBERT:  -- but it's quantitative data, okay?
13 And it goes to both the admissions and to the financial aid,
14 okay?  It's the quantitative data.  What was the size of the
15 awards?  How many awards were given?  How many students were
16 admitted from a social-economic group?  That kind of data,
17 that's the structured data.
18        THE COURT:  Okay.  If I can ask Mr. -- I'm going to
19 botch your name -- Rybnicek --
20        MR. RYBNICEK:  Perfect.
21        THE COURT:  Okay.
22        -- this question:  So when somebody is pulling this
23 structured data, I assume that what has to happen, and
24 probably you've done this for past years already, is that
25 somebody has to create some sort of a -- it's not a computer

1   program, that's the wrong word, they're going to have to

2   create some sort of a script, in other words, to extract the

3   relevant data from all of the stuff that you've got and spit

4   it out in the form that's being asked for.  Is that pretty

5   much right?

6           MR. RYBNICEK:  That's pretty much right, and there

7   are multiple tables that need to be collected, and then they

8   need to be anonymized to abide by --

9           THE COURT:  Oh, of course.  Right, right.

10          So one of the things that Mr. Gilbert said is they

11  aren't actually asking for this in December; they're asking

12  for it in February of next year.

13          MR. RYBNICEK:  I understood that they are asking for

14  us to pull it no earlier than December 31st and produce it

15  within 45 days.

16          THE COURT:  Okay.  What's the date -- what's the date

17  for the plaintiffs' expert disclosures?

18          MR. GILBERT:  March 15th is when the experts have to

19  release their report.

20          THE COURT:  Of 2024?

21          MR. GILBERT:  Of 2024.

22          THE COURT:  Yeah.  Okay.

23          MR. RYBNICEK:  Your Honor, our argument is not just

24  about burden.  It's also about the data will be incomplete and

25  tentative at best.  Many schools will not have made a

1   significant portion of their financial aid determinations by

2   the end of December; for example, MIT doesn't make its

3   determinations until mid-January.  So there are only so many

4   determinations that are made in December, and many of those

5   are subject to appeal and revision.

6           THE COURT:  So let me go back to Mr. Gilbert on that.

7   And what you say makes sense to me just based on my own

8   increasingly old anecdotal experience from when I had to deal

9   with this stuff on my kids.  You know, some people get their

10  packages put together fairly early in the process, some come

11  later on, and not everybody has everything put together by the

12  end of December.

13          So, Mr. Gilbert, what that means, and I guess it's

14  kind of inherent in the enterprise, if you will, given the due

15  date for the experts' reports, that you're likely to face a

16  situation where you're not going to have full data for that

17  particular school year when you get that production in January

18  or February of 2024.

19          MR. GILBERT:  Well, going back to your Honor's point

20  about negotiating about the shape of the table.  Weeks ago, we

21  asked to substantiate that point and give us just a one-page

22  chart which universities of the 17 cannot -- do not make those

23  determinations until January, okay?  We expressly asked for

24  that in a meet and confer.  We were expressly told, "We'll

25  take it under advisement."  We pretty much responded, "You

1　have to be kidding."  I mean, this is a one-page chart that an

2　associate or a paralegal could put together in half a day at

3　most.  And they've still refused to produce that to

4　substantiate this point.  So if they refuse to substantiate

5　this point --

6　　　　　　　THE COURT:  Okay.

7　　　　　　　MR. GILBERT:  -- that's exactly the argument.

8　　　　　　　THE COURT:  Let's just kind of war game this out

9　here.  Let's say I tell them to give you that chart by like

10　next Tuesday, and it substantiates at least for some

11　significant number of schools the point that they are making

12　now?  So now we're back to my question.  You're going to be

13　getting -- what would you do at that point, then, now that you

14　know that you're going to be getting at least for some schools

15　not fully 100 percent complete data for that particular school

16　year?

17　　　　　　　MR. GILBERT:  I know that the experts' general

18　response is more data is better than less data.

19　　　　　　　THE COURT:  More data --

20　　　　　　　MR. GILBERT:  And we have to see exactly what this

21　chart shows, and we've been asking for it for weeks.

22　　　　　　　THE COURT:  Okay.  All right.  Okay.  So here's what

23　we're going to do on that.  I'm going to put short time frames

24　on this.  And I know that we're talking about a decision

25　that -- we're talking about production that isn't going to be

1   made for months.  I'm hoping to kind of put issues to bed

2   here.  This one we're not going to fully put in bed; we're

3   kind of starting to tuck it in, if you will.

4           So by next Tuesday, just to pull a date out of the

5   air, that's the -- what is that, the 28th? -- the 28th of

6   February, the defendants are to produce to Mr. Gilbert the

7   chart that he's talking about regarding the timing of

8   financial aid decisions for the -- not for the current school

9   year, but for what's anticipated for the 2023/24 admissions

10  cycle.  And I'm probably using the wrong lingo, but you know

11  what I mean, okay?

12          My inclination is to require the defendants to

13  produce that data as long as the deadline isn't, you know, in

14  January, and as long as the deadline is in February, it needs

15  to be enough before the plaintiffs' expert disclosure date to

16  give them sufficient time to assess it, but I think you can

17  take the comments that I'm making and kind of where I'm

18  leading it and work something out, so that's what I'm going to

19  ask you to do.

20          I'm going to ask you to file a status report on that

21  then by the 6th of March, which is the following Monday, just

22  addressing this one issue which I'm calling the 2023/24

23  admission data issue, okay?

24          On the --

25          MR. RYBNICEK:  A point of clarification, your Honor,

1    it's financial aid data.

2              THE COURT:  That's what I meant.

3              MR. GILBERT:  I'm sorry, your Honor --

4              THE COURT:  It's both, right?  It's both.  It's both,

5    yeah, because financial aid kind of travels as a team with

6    admissions except for some people.  Anyway, so that's that

7    one.

8              Going back to the TAR issue, you know, as you were

9    talking, I, quite honestly, contemplated for a couple of

10   nanoseconds saying "Let me see these cases that you're talking

11   about which talk about, you know, what's the right

12   percentage."  I've been at this long enough to know that

13   there's a decent amount of pulling things out of the air

14   that's happening, and those things are likely to be, so I

15   don't think that's a -- that's kind of a waste of time.

16             So understanding that there are no perfect solutions

17   to problems, I'm going to go with the defendants' position on

18   the question of -- I want to make sure that I state the

19   question correctly -- on whether -- pardon me -- on the issue

20   of applying search terms before applying the TAR methods.

21             And on the other issue which is the target recall

22   rate, I'm going to make it 75 percent which is a little higher

23   than what the plaintiffs asked for and somewhat lower than

24   what the defendants asked for.  I'm sorry.  I got that

25   backwards.  Somewhat lower than what the plaintiffs asked for

1   and a little bit higher than what the defendants asked for.

2           So there you go.

3           MR. RYBNICEK:  Your Honor, there are two other

4   issues.  And apologies if this wasn't clear.  There are two

5   other issues related to post-complaint discovery, if I could

6   just quickly address those?

7           THE COURT:  Okay.  I don't know.  Can you just

8   quickly address them?

9           MR. RYBNICEK:  I will try to as quickly as possible.

10  The first we have already dealt with is financial aid, the

11  other two are related to financial aid documents, and the

12  third is related to admissions documents.

13          So plaintiffs have said that they want to see our

14  practices after our financial -- our financial aid practices

15  after the expiration of Section 568 and the dissolution of the

16  568 Group.  Defendants have said that they're willing to

17  produce financial aid documents.

18          What we're proposing is providing updated versions of

19  our financial aid handbooks, guidelines, training materials

20  that show how we determine financial aid awards after the

21  expiration of the 568 Group that we can --

22          THE COURT:  As opposed to what?

23          MR. RYBNICEK:  As opposed to doing a broad collection

24  and search of all documents.

25          THE COURT:  So is that the first issue, or is that

1  both of the issues?

2       MR. RYBNICEK:  That is the first issue, your Honor.

3       THE COURT:  Tell me what the second issue is.

4       MR. RYBNICEK:  The second issue is that plaintiffs

5  have asked for admissions documents for the post-complaint

6  period.  And the defendants that are asserting the 568

7  exemption are already producing, as you know, many years of

8  admissions documents, and those are the appropriate and

9  logical place for plaintiffs to start.  And for similar

10  reasons as your earlier ruling, your Honor, we don't think

11  that post-complaint admissions documents are relevant or

12  necessary to produce here.

13       THE COURT:  So I'm going to anticipate Mr. Gilbert's

14  argument or at least part of it and ask you to respond to it.

15  So my expectation is that Mr. Gilbert is going to say:

16       How can you -- how can we see what the effect of the

17  alleged conspiracy was or the 568 exemption unless we see how

18  and to what extent things changed after either people withdrew

19  from the group or the exemption expired?

20       And if you don't provide the data, and not just the

21  manuals, but the data for that after period, that then the

22  experts, and ultimately me or the jury, doesn't have anything

23  relevant to compare it to.

24       So how would you respond to that?

25       MR. RYBNICEK:  We don't disagree with that, your

1   Honor.  That is why we have offered to provide handbooks

2   related to the financial aid determinations.  Remember, this

3   is an alleged financial aid conspiracy, and admissions

4   materials are only relevant because of the 568 exemption, and

5   we have -- and there's no other relevance to those materials.

6                MR. GILBERT:  Your Honor, may I address that?

7                THE COURT:  Hang on a second.  Let me just -- I just

8   want to push back a little bit.

9                And, again, maybe I'm anticipating something

10  Mr. Gilbert would be saying, but, I mean, I guess as a -- you

11  know, as a professional skeptic, what I would probably say on

12  that is "It's all well and good what's in the manuals, but we

13  want to actually see how it actually works in the field."

14               So what about that?

15               I mean, I don't know how this stuff works in

16  practice, but, you know, if what you're telling me is that the

17  folks in the admissions office and the financial aid office

18  are a bunch of automatons that basically just apply the manual

19  and it gets spit out, then, okay, that's what you're telling

20  me, but I'm guessing that you wouldn't tell me that.

21               MR. RYBNICEK:  No, your Honor, but we think that the

22  manuals and handbooks and trading guides by which they make

23  these determinations are the most relevant piece of evidence

24  or at least the evidence or materials that are most responsive

25  to the request here.

1          THE COURT:  Okay.  Mr. Gilbert?

2          MR. GILBERT:  First let me clarify a couple of things

3     about the issues on the table and then address these -- the

4     documents that we're talking about in terms of admissions and

5     financial aid policies.

6          What both parties or all parties have been using --

7     we're using the phrase "structured data" -- it's quantitative

8     things about admissions and financial aid.  And we understand

9     your Honor just ruled on what has to happen about that, about

10    a chart on next Tuesday, et cetera.

11         THE COURT:  Yeah.

12         MR. GILBERT:  Okay.  The other thing is documents,

13    not data.  Documents go to financial aid policies and

14    admissions policies.  We have -- and practices, how they've

15    changed their practices or didn't change their practices.  We

16    have given the defendants multiple times at least six reasons

17    why this is relevant, and we've cited cases.  They have not

18    rebutted any of those cases.

19         THE COURT:  Right.

20         MR. GILBERT:  None.  The reasons include, first,

21    causation which your Honor was getting at; in other words, if

22    they changed the policies and the price went down after they

23    dissolved the conspiracy, that would strongly be evidence of

24    the cartel was raising the price.

25         Another is whether these are revenue-maximizing

1 entities which would trigger the per se rule rather than the
2 rule of reason.
3      Another reason is it can be used to rebut
4 justifications that, "Well, it was never feasible due to
5 something other than have a cartel."
6      Another reason was admission, rather, impeachment.
7      Another is internal admissions that -- what they had
8 been doing in the past; an email that says, "Henceforth, we
9 will no longer be made aware as to transfer students" -- says
10 what they were doing as to transfer students when the cartel
11 existed.
12      And it could be used as evidence against other
13 defendants who did not change their policies after the
14 dissolution of the cartel.
15      So for all those reasons, we've identified case law.
16 They haven't rebutted a single one.  It's obviously relevant
17 evidence, your Honor, in multiple ways, and it should be
18 produced as to the policies and practices of financial aid and
19 admissions.
20      THE COURT:  Okay.  Mr. Rybnicek?
21      MR. RYBNICEK:  Your Honor, we don't dispute that
22 there are -- we understand why the plaintiffs want financial
23 aid material, data and documents for the pre- and post-568
24 period:  Obviously, to compare what had happened before and
25 after.  And that is why we have readily offered to produce the

1   data and as well as the policies and practices.

2          The admissions materials is only relevant for the 568

3   exemption, and that is a binary --

4          THE COURT:  See, that's the part I'm not getting.

5   I'm not understanding why that's the case.  I mean, I -- and

6   maybe I'm just naive, but it just seems to me that the two, I

7   think I said before, travel as a team.  Maybe that's a bit of

8   an overstatement, but there's linkage between the two as it

9   relates to the claims that are made in this case.

10         MR. GILBERT:  Your Honor, if I may --

11         THE COURT:  No, I'm with Mr. Rybnicek right now.

12         That's what I'm not understanding in your response.

13  I don't understand how you can de-link them.

14         MR. RYBNICEK:  Well, the financial -- again, the

15  plaintiffs are alleging a financial aid conspiracy and whether

16  or not an alleged collusion changed the amount of financial

17  aid that is provided to students.  Admissions materials -- and

18  in particular what they're seeking is materials that suggest

19  that the defendants are not need-blind so that they cannot

20  assert a 568 exemption.  Admissions materials --

21         THE COURT:  And so what you're telling me -- what

22  you're telling me is that once the exemption has expired or

23  it's no longer being asserted, the question of whether

24  admissions are need-blind doesn't matter anymore.  That's what

25  I just got from what you said.

1          Did I get it right?

2          MR. RYBNICEK:  Yes.  Yes, your Honor.  As well as

3    there are already many, many years of admissions documents

4    that we are producing during the period we're asserting the

5    exemption, the defendants that are asserting the exemption,

6    and adding additional documents.

7          THE COURT:  Mr. Gilbert?

8          MR. GILBERT:  Your Honor, may I respond?

9          THE COURT:  It's got to be short, but, yes, go ahead.

10         MR. GILBERT:  We believe your Honor has ruled on this

11   multiple times, okay, that the admissions goes to issues

12   beyond just the exemption, okay?  We've talked about that the

13   last time your Honor ruled on it, okay, and you ruled on it

14   last August 15th; that is, it goes to statute of limitations

15   issues, okay, whether or not they were -- what they were doing

16   they were concealing, okay?  We have to have -- be able to get

17   an opportunity to take discovery on that.  It goes, as I

18   said --

19         THE COURT:  Stop.  All right.  I've made up my mind

20   on this.

21         I think the plaintiffs have the better of this

22   argument.  I think the admissions data is relevant, and I

23   don't think it's disproportionate, and I think that the --

24   just producing the manuals, as was suggested, isn't --

25   doesn't -- it falls short of providing relevant and reasonably

1   proportional materials.  So that's the ruling on that.

2          So here's what I need you to do.  The thing I talked

3   about as the first issue, the reason we were even talking

4   about it is I basically botched the language in the order when

5   I said that the custodial documents from the president and

6   development office is that the objecting defendants don't have

7   to apply, and I meant everybody, so I botched it.  So I'm not

8   going to do that again.

9          Here's what I need you to do.  I need a draft order

10  from you all by Monday which embodies the rulings that I made

11  here today.  Don't try to change anything.  I don't have to

12  have a whole bunch of findings in there.  It's just the bottom

13  lines:  This is what happens, this is when it happens, this is

14  who does it, this is how much you got to do.  Get me that.

15  Hopefully, you'll be able to agree on the language.  Send a

16  Word version to my proposed order email address.

17         MR. GILBERT:  Thank you, your Honor.

18         THE COURT:  Okay.  All right.  I'm going to gird my

19  loins before I ask this next question:  Is there anything

20  anybody else wants to talk about?

21         MR. GILBERT:  We want to talk about when we're

22  finally going to get a donation record.  We haven't received

23  one yet.

24         THE COURT:  I had to ask the question.  I had to ask

25  the question.  You know, the *New York Times* says that if you

1   ask a question in a video or a phone meeting and nobody

2   answers for 7 seconds, that means nobody's going to. You got

3   in at 6.8.

4          MR. GILBERT: All right.

5          THE COURT: All right. That's an issue for another

6   -- for the next time.

7          So, look, again, folks, I mean, I don't expect that

8   you're going to be able to, you know, look at the rulings that

9   I've made on these discovery issues and come up with a

10  pattern. And I acknowledge that this is a big and complicated

11  case, and there's a lot of parties on both sides, and there's

12  going to be problems. And I completely get that you've --

13  there's all of this stuff that you've worked out that's

14  completely under the -- you know, off of my radar screen, but

15  I hope -- the goal is as we go on, the number of -- the curve

16  on the issues that I have to decide is going south rather than

17  north, so just do your best to work out what else you've got.

18         I think we've got another status hearing down the

19  road, so I'm just going to table everything else until then

20  unless there's something that comes up that I have to decide

21  before then.

22         Everybody, take care. Thanks.

23         MR. GILBERT: Thank you, your Honor.

24         MR. RYBNICEK: Thank you, your Honor.

25    (Which were all the proceedings had in the above-entitled
      cause on the day and date aforesaid.)

1    I certify that the foregoing is a correct transcript from
2  the record of proceedings in the above-entitled matter.

3  Carolyn R. Cox                          Date
   Official Court Reporter
4  Northern District of Illinois
   /s/Carolyn R. Cox, CSR, RPR, CRR, FCRR
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25