# EXHIBIT 7

1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SIA HENRY, et al.,                           )   Docket No. 22 C 125
                                             )
                          Plaintiffs,        )
                                             )
              vs.                            )
                                             )
BROWN UNIVERSITY, et al.,                    )   Chicago, Illinois
                                             )   October 5, 2023
                          Defendants.        )   1:00 o'clock p.m.


                    TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE MATTHEW F. KENNELLY


APPEARANCES:


For the Plaintiffs:     GILBERT LITIGATORS & COUNSELORS
                        BY:  MR. ROBERT DEWITT GILBERT
                             MR. ROBERT SOL RAYMAR
                        11 Broadway, Suite 615
                        New York, NY  10004
                        (646) 448-5269



                        FREEDMAN NORMAND FRIEDLAND LLP
                        BY:  MR. EDWARD J. NORMAND
                        99 Park Avenue, Suite 1910
                        New York, NY  10016
                        (646) 970-7513




Court Reporter:         MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
                        Official Court Reporter
                        219 S. Dearborn Street, Suite 2102
                        Chicago, IL  60604
                        (312) 435-5639

1  | APPEARANCES CONTINUED:

2  |
   | For the Defendants:
3  |

4  | Northwestern
   | University:              SIDLEY AUSTIN
5  |                          BY:  MR. SCOTT DAVID STEIN
   |                          One South Dearborn
6  |                          Chicago, Illinois 60603
   |                          (312) 853-7000
7  |

8  |
   | Georgetown
9  | University:              MAYER BROWN LLP
   |                          BY:  MS. BRITT MARIE MILLER
10 |                          71 South Wacker Drive
   |                          Chicago, IL  60606
11 |                          (312) 782-0600

12 |
   | Trustees of the
13 | University of
   | Pennsylvania:            WILMER CUTLER PICKERING HALE AND DORR LLP
14 |                          BY:  MR. SETH P. WAXMAN
   |                          2100 Pennsylvania Avenue, N.W.
15 |                          Washington, DC 20037
   |                          (202) 663-6800
16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

1    (The following proceedings were had in open court:)

2            THE CLERK:  Case 22 C 125, Henry v. Brown.

3            THE COURT:  Good afternoon.  I'm assuming that the

4    protocol we're going to use is everybody's given their names

5    to the court reporter, and if you speak, then you should say

6    who you are.  So that's what we'll do.

7            If you're on the phone, just make sure you're muted.

8    If you're not, you're going to ruin it for everybody because

9    I'm going to cut the whole thing off.  So just mute your phone

10   if you're on the phone.

11           So I want to talk first about the motions to compel,

12   and I think the one relating to FERPA notices first and the

13   one relating to Northwestern second.

14           So whoever is going to talk about the first one, you

15   can come on up to the podium.  I've got some questions, and

16   then I'll -- who's going to talk about it on the other side?

17           Yeah, that'd be you.

18           MR. WAXMAN:  I'm sorry.  Do you --

19           THE COURT:  Whoever's going to talk about it, I want

20   them to come up to the podium.  So if you're going to talk

21   about it, come up to the podium.  I'm going to have questions,

22   and I want to have somebody that's by a microphone.  Okay.

23           So give me a second here just to get it in the right

24   spot.  Okay.

25           A couple of just sort of nuts-and-boltsy-type

1  questions first.

2        So on the plaintiffs' request, your request is for a

3  hundred donor-related applicants -- or a hundred names per

4  year, basically.  Did I get that pretty much right?

5        No, it's 20 per year.

6        MR. RAYMAR:  No, it's 180 in total against seven

7  defendants.

8        THE COURT:  So that's 180 times 7, or it's 180

9  divided by 7?

10        MR. RAYMAR:  Some are only in the single digits.

11  It's -- I'm Robert Raymar, by the way.

12        THE COURT:  Sorry.

13        MR. RAYMAR:  And it's -- it's 180 total for the

14  defendants.

15        THE COURT:  Okay.

16        MR. RAYMAR:  There's only seven left.

17        THE COURT:  There's only seven that haven't -- that

18  haven't agreed to something yet, basically.

19        MR. RAYMAR:  Or were not, for some other reason,

20  moving.  We filed something for Notre Dame this morning.

21        THE COURT:  Got it.

22        Who are the seven?

23        MR. RAYMAR:  The seven are Cornell, Dartmouth,

24  Georgetown, Northwestern, Penn, Rice, Vanderbilt.

25        THE COURT:  And on Northwestern, does this overlap at

1     all with the other motion?

2               MR. RAYMAR:  Only in the sense that we're --

3               THE COURT:  They both sort of generally involve the

4     same topic.  I get that.

5               MR. RAYMAR:  Correct.

6               THE COURT:  But in terms of what you're asking for,

7     it doesn't really.

8               MR. RAYMAR:  No.

9               THE COURT:  Okay.  So I don't think I really need to

10    get into this, but I'm going to ask anyway.

11              There's an argument made somewhere in here that this

12    information is relevant not just to the 568 argument but also

13    to the application of the per se rule versus the rule of

14    reason.

15              Can you just flesh that out for me a little bit?

16              MR. RAYMAR:  Yes, part of what Brown considered in

17    reversing the -- a trial that found MIT liable was that the

18    district court should have considered, for example, whether a

19    school is revenue maximizing.  To the extent here that any of

20    these universities --

21              THE COURT:  The idea being that if they were, that

22    would be a reason to consider applying a per se rule?

23              MR. RAYMAR:  Yes.

24              THE COURT:  Okay.  Go ahead.

25              MR. RAYMAR:  And to the extent any of these

1　universities were setting criteria to receive an A or a 1 or a

2　high score from development and alumni relations or from a

3　president's list, that is part of revenue maximization as well

4　as donor influence on the admissions process.

5　　　　THE COURT: Okay. I don't think I really have to get

6　into that now, but the other -- because the other argument --

7　so, Mr. Waxman, do you want to say anything about that?

8　　　　MR. WAXMAN: Yes.

9　　　　THE COURT: What do you --

10　　　　MR. WAXMAN: Yes, thank you. Seth Waxman for the

11　defendants. I also think you don't need to get into this at

12　this point, but the notion that the discovery that they're

13　seeking somehow bears upon per se treatment of the alleged

14　price fixing violation that they're alleging in this case, I'm

15　having a hard time following it.

16　　　　The point in Brown, Brown was a case in which the

17　schools were, in fact, agreeing on how much scholarship aid to

18　award each student, and the argument was that's a -- that's

19　per se price fixing under the antitrust laws.

20　　　　The district court and the Court of Appeals -- the

21　Court of Appeals said, we're not going to apply per se

22　treatment because MIT in that case is alleging that it had an

23　altruistic reason for joining the overlap group, and so we're

24　going to let this go forward on a rule of reason case.

25　　　　The analogous inquiry here would be was their theory

1    of wealth favoritism for some students the motive -- that is,
2    did we -- did it -- is it relevant -- the motive of these
3    schools for joining the 568 Group, it's hard to see how it is.
4    I mean, they can make an argument that -- if they have any
5    evidence that our motive for joining this group was to
6    maximize revenue, but it's impossible to see how the evidence
7    relating to a particular student's name as opposed to the
8    student's UID could possibly bear on that.
9         THE COURT:  Okay.  Yeah.  And I actually don't think
10   I need to get into it now, I mean, because the 568 argument is
11   enough to get the plaintiffs over whatever relevance hurdle
12   they have to get over.
13        So here's my main question, and I'm looking at page 2
14   of the response.  I'm going to read a sentence, kind of a long
15   sentence, in the middle of the page.  It says, "In any event,
16   plaintiffs already have ample means available through
17   discovery to pursue either theory, including admissions data
18   with unique identifiers assigned to each student, documents
19   from admission departments responsive to search terms,
20   including many of the very donor names the plaintiffs used to
21   support their motion, and records of any development-related
22   communications with university admission officers about
23   individual applicants into which defendants have also inserted
24   available unique identifiers from any students."
25        So what I -- what I get out of that, I guess, is that

1   you've got -- since there's these unique identifiers that are

2   supposed to kind of match up across different documents -- in

3   other words, student X is always going to be number 123

4   irrespective of what document they're referred to in -- that

5   ought to be enough by itself that you don't really need the

6   name.

7           So what's wrong with that?

8           MR. RAYMAR:  First of all, as to these 180, we do not

9   have any identifiers.  That's the point of the motion.  For

10  the --

11          THE COURT:  You don't even have the -- what you're

12  referring to in here as the UIDs.

13          MR. RAYMAR:  That's correct.  That's what defendants

14  are resisting on the grounds that if they give us the UID, we

15  can match up the name with the data they may have given us

16  either on spreadsheets or in structured data production.

17          THE COURT:  Okay.

18          MR. RAYMAR:  And they're -- although on the next

19  page, they say that, at the bottom:  "For almost all

20  defendants or a substantial majority, the names are on the

21  lists that plaintiffs now include in the motion."

22          We don't know that.  We've got millions and millions

23  of lines of data.  We don't know where these names are.  We

24  don't even know that we may -- in our work product chanced in

25  identifying 150 UIDs to create a global glossary, we may

1    have -- by happenstance and coincidence, have hit upon one of
2    the 180 names from which we have public records and
3    disclosures by the families of their privilege and their
4    wealth favoritism.
5          Obviously, we didn't put on our list of names
6    bragging about 1600 on the college boards or making all state
7    on the Lacrosse team.  We're trying to prove -- we may not
8    have to prove it, but we don't have a crystal ball -- that
9    these students would not have been admitted except for the
10   finger put on the scale which the defendants allowed to be put
11   on the scale in order to maximize their revenue and their
12   endowments.  The defendants did not have to do that.
13         And so we are not limited by Rule 26 or by any of the
14   cases or by the FERPA statute or the FERPA regulations to
15   proving our case based solely on documents that defendants
16   give us.  We're entitled to go to other sources, which we have
17   done, in order when we question the witness to confront the
18   witness with, well, she said her major extracurricular
19   activity was sleeping, or, he said his parents got him a tutor
20   and he hated the tutor.
21         How is this person's criteria, which were not 1600
22   for Northwestern or wherever, but 1200, how does a person with
23   a 1200 get in when your average for the year is 1400?
24         THE COURT:  The major point, though, for purposes of
25   the question I asked is that on the specific things you're

1   talking about, you're not really able to do the matching up

2   that they're -- that they're saying is doable.

3           MR. RAYMAR:  True.

4           THE COURT:  Okay.  Stop right there.

5           Answer that.

6           MR. WAXMAN:  So I think -- I think I'll answer it

7   this way.  In terms of the sentence that you read, I think

8   it's important for your Honor to understand what has

9   produced -- been produced in response to the -- it's either 99

10  or 100 RFPs that we have received.

11          At their request, we have produced hundreds of

12  structured data that includes hundreds of thousands -- all of

13  the students who were admitted to all of these schools during

14  the relevant -- during what they claimed is the relevant

15  period, along with any tags in those application files that

16  would indicate special interest, donor parent, et cetera, et

17  cetera.  They have all that identified by agreement by UID

18  number.

19          They have requested, in repeated RFPs, which we have

20  completely complied with, any documents in the admissions

21  office, emails, letters, notes of conversations, that include

22  lists of hundreds and hundreds and hundreds of names that

23  they've provided us and searched for 47 different search terms

24  that they imposed on us supposedly connoting with wealth or

25  donor status or something like that.  All of that has been

1    produced, and anything that was a donor record has the UID

2    identified with it.  And the ones that don't qualify as donor

3    records under your Honor's order, which adopted their

4    definition of donor records, the names are blacked out, but we

5    have already agreed with them that upon request, if there's a

6    particular document they want to use or ask somebody, we will

7    substitute for that blacked-out name the UID number.

8            We have also provided to them any number of lists

9    maintained by admissions offices of special interest

10   applicants.  You only have to look at the exhibit that the

11   plaintiffs themselves have attached to the Northwestern --

12   their Northwestern motion to compel to see how that actually

13   works.  There's a student UID number such-and-so, and under

14   this column, it says, you know, the parents are potential

15   givers of a million dollars.  They can take that UID and match

16   it up against the application -- all of the data in the

17   application file for that student and make their case.  They

18   have not identified a single instance of that.

19           Now, as to these -- what is it now, 180 names?

20           THE COURT:  180.

21           MR. RAYMAR:  Yes.

22           MR. WAXMAN:  There is a discovery process.  These are

23   names that either they've already given us and we've already

24   produced or that they never asked for.  They could have

25   used --

1      THE COURT:  So stop right there.  You're saying that
2  the plaintiffs have never said, hey, tell us who these 180
3  names are?
4      MR. WAXMAN:  Right.
5      THE COURT:  So I think we may be ships passing in the
6  night here.
7      Let me ask this.  I have a question for plaintiffs'
8  counsel.  And I want to put aside for the moment this argument
9  that wealth favoritism, whatever you want to call it, impacts
10  whether it's per se or rule of reason.  Put that aside.  I'm
11  just talking about the rest of the case.
12      Okay.  So if every defendant stipulated, yeah, you
13  got us, we consider financial need in determining admissions,
14  and we did during the relevant time period, we wouldn't need
15  to be doing this stuff, right?
16      MR. RAYMAR:  That's correct.  That's why we withdrew
17  Notre Dame, who stipulated just that this morning.
18      THE COURT:  Yeah.  Okay.  And, basically, what you're
19  talking about here is that -- and I know -- I've seen
20  references to this, I don't think it's in your side's papers
21  but in the other side's papers, that -- on this proposition
22  that you mentioned a minute ago, which is, we might have to
23  prove or we might -- at least we have to be prepared to prove
24  that student A who had wealth as a consideration wouldn't have
25  gotten in but for wealth as a consideration.

1        That -- am I getting that right?  That argument has

2    been advanced at some level?

3        MR. RAYMAR:  With a nuance.

4        THE COURT:  Yeah.

5        MR. RAYMAR:  Most applicants, and the presidents of

6    the universities usually say this after the year is done, fit

7    within a range that they're not geniuses who are automatically

8    admitted, and they're not people who are automatically

9    rejected.  They're people in the middle for whom a thumb on

10   the scale, whether it's a letter from the Lacrosse coach --

11        THE COURT:  Yeah, can make a difference.  Right.

12        MR. RAYMAR:  -- can make a difference, and where a --

13   a -- if it's a legacy, a long period of donations, a

14   significant donation, makes the difference.  It breaks the tie

15   and allows the president to put this person on an admit list

16   or it allows the development office to do the same.  And in

17   the admissions decisionmaking process, it is a factor that has

18   weight.  Does it have to be dispositive weight?  No.  Nor do

19   we have to prove that but for the donation, the applicant

20   would've been rejected.  We're not saying that.

21        We're saying that in each of these cases, we want to

22   show that the donation impacted the admissions process.

23        THE COURT:  Okay.  So I'm just going to ask this

24   because -- is it the position -- I'm asking this to the

25   defendants.  I got like 50 people in the room here.  Okay?

1     MR. WAXMAN:  But I'm the only one at the microphone.

2          THE COURT:  Yeah, but the rest of them are here, and

3     they all gave their names to the court reporter, and I've got

4     them in my claws until they walk out the door.

5          Is it the position of any defendant -- and I think

6     I've seen this argument in papers here -- is it the position

7     of any defendant that as to student A, there's going to be an

8     argument that, nah, we really didn't consider wealth in that

9     because that person would have gotten in anyway even if they

10    didn't have somebody who was making -- who was giving a lot of

11    money?

12         MR. WAXMAN:  Well, I -- I will defer to my colleagues

13    with respect to their respective class.

14         THE COURT:  It's a yes, right?  Somebody's arguing

15    that right now, right?

16         MR. WAXMAN:  Well, of course.  Just speaking for

17    Penn --

18         THE COURT:  Okay.  Fine.  The motion to compel is

19    granted.  It's that simple.

20         The motion to compel is granted.

21         MR. RAYMAR:  Thank you.

22         THE COURT:  Now we're going to move on to the other

23    thing.

24         You know, the whole thing about, you know, trotting

25    people in public is a non-starter here because there's a

1   protective order.  You can make these things attorneys' eyes

2   only.  You can make them confidential.  Admissibility at trial

3   is a whole different story.

4           The motion is granted.

5           Now we're going to talk about the other one, which is

6   the Northwestern motion.

7           Okay.  So here's my question for the plaintiff, and

8   this is based on what's said in the response.  I gather that

9   this fellow Watson, his deposition is scheduled for next week

10  or something like that.

11          So one of the -- one of the big points that the

12  defendants make in response -- or that Northwestern makes in

13  the response here is that -- hang on a second.  I just want to

14  find it because it's better for me to more or less quote it.

15  Hang on.

16          So they refer back to something that I said at a

17  prior hearing of some sort, and they say, well, you know,

18  the -- and I said, in substance, why can't you just ask these

19  people, the officers or officials, that you're -- that you

20  have up there for a deposition, why can't you just ask them

21  what's the practice about how this gets considered, whether

22  somebody's given a donation or is likely to give a donation or

23  is capable of giving a donation or has promised to give a

24  donation or whatever.

25          And they kind of make a big point out of saying, you

1   had former president Schapiro up there for however many hours,

2   six or seven hours, that question never got asked.

3          So how come?

4          MR. GILBERT:  Well, your Honor, whenever I hear that

5   from the defense counsel, I'm kind of reminded what Ronald

6   Regan said:  There he goes again.  That is simply untrue.

7          Page --

8          THE COURT:  So you got the deposition -- okay.  Show

9   me.

10         MR. GILBERT:  Page 39 of 53 of the deposition --

11         THE COURT:  So here's the problem.  It's going to

12  take me a second to pull it up.  This is going to --

13         MR. GILBERT:  Well, I can certainly summarize, but if

14  you'd like to, that's great too.

15         THE COURT:  Can you put it on the ELMO, or is that

16  considered super double secret -- I have to clear the room and

17  make everybody put their hands over their eyes type of stuff,

18  or --

19         MR. GILBERT:  Your Honor, let me see if I can get a

20  copy --

21         THE COURT:  Great.  Thanks.

22         I may beat you to the punch, but I'm not sure.

23         UNIDENTIFIED SPEAKER:  May I approach, your Honor?

24         THE COURT:  Yeah, please.

25         Okay.  You got it there.  I'll just look at it.

1    Thanks.  Much appreciated.

2            Okay.  You said page 39, Mr. Gilbert?

3            MR. GILBERT:  39 to 53, your Honor.

4            THE COURT:  All right.  Just give me a second.

5            I just looked at page 39, and I'm not seeing what I'm

6    talking about here.

7            I'm seeing a lot of questions about, what do you do

8    for people who have a major gift capacity?  Do you call

9    them -- do you call them after the kid gets in, do you call

10   them before the kid gets in, what's this form mean, and I'm

11   not seeing the question I'm talking -- if I was taking this

12   guy's deposition, I probably would've said, what's your name,

13   next question, do you guys consider a person's wealth or

14   financial aid -- or financial donation capacity in making

15   admissions, yes or no?

16           MR. GILBERT:  It's clearly yes.

17           THE COURT:  If he said yes --

18           MR. GILBERT:  It's clearly yes.

19           THE COURT:  -- I'd say, thank you very much.  Have a

20   nice day.  Go home.

21           MR. GILBERT:  It's -- it's clearly yes.

22           THE COURT:  Okay.  But because you asked that --

23           MR. GILBERT:  All --

24           THE COURT:  Look, did you ask that question or

25   something like that?

1       MR. GILBERT:  I did not ask that literal question --
2       THE COURT:  Why not?
3       MR. GILBERT:  Because there are documents that after
4  they create the president's list and then the president
5  himself rates the list, A, B-1, B-2, B-3, to C, after he's
6  done that, they then transmit the list or emails shows the
7  list gets transmitted to the admissions director.  And then
8  there's testimony from Dr. Schapiro he met with the admissions
9  director every year for a couple hours to discuss his ratings
10  that he put on the list.
11      THE COURT:  The admissions director, that's not this
12  guy Watson.
13      MR. GILBERT:  It is Watson.
14      THE COURT:  It is Watson.  Okay.
15      Okay.  And?  What's next?
16      MR. GILBERT:  Well --
17      THE COURT:  Next is the question:  When you talked to
18  Watson, did you say to him, hey, this person is -- you know,
19  their parent is a billionaire and they're going to give us a
20  lot of money, you know, put a red flag on his file.
21      MR. GILBERT:  Every -- he did that.  Every entry on
22  the list, almost every entry on the list, contains the
23  donation amount historically and the major gift capacity and
24  he's rated for Watson --
25      THE COURT:  Right.  I get that, and that's what all

1    of these questions from 39 to 53 are about.  It's what does
2    the form mean and how does the form get put together.

3           But the question for purposes of the 568 exemption as
4    you guys have pitched it to me from pretty much day one is
5    that if you consider financial -- if you consider financial
6    need or the absence of financial need, then you're not
7    entitled to the exemption, and by the way, if you're a part of
8    this group and somebody else in the group does that, you're
9    not entitled to the exemption even if you don't consider it.

10          So that makes the question, you got all this info
11   about donation capacity, gift capacity, whatnot, you've tagged
12   all these things, then what happens to it as it relates to
13   admissions?  That's the thing that I'm not understanding when
14   you're asking me to bring this guy back for two more hours and
15   you're asking to, you know, cough up all this information.
16   Why didn't you just ask that question?  I have no clue what
17   the answer would have been.  I can guess, but --

18          MR. GILBERT:  Well -- I'm sorry, your Honor.

19          THE COURT:  Yeah.

20          MR. GILBERT:  When I asked a series of questions as
21   in our motion papers, he gave answers, I don't know, I don't
22   know who this person is.

23          THE COURT:  That was -- those were different
24   questions.

25          Okay.  So here's what we're going to do on this one.

1   You guys are going to take Watson's deposition next week, and
2   I'm going to hold this, and you're going to file a joint
3   status report after it's done, and we're going to find out if
4   you got the information.
5           But here's the deal, if you don't ask it, you lose.
6   You're going to have to ask those questions.
7           Pretend it's a trial, because it kind of is, right?
8   Because any witness could potentially not be available for
9   trial and the deposition could be it.  Pretend it's a trial.
10  Just stick the question in his ear and see what comes out.
11          MR. GILBERT:  I will make it one of the first
12  questions, your Honor.
13          THE COURT:  Well, it doesn't have to be the first
14  question.  I don't really care about that.  I'm going to table
15  this one.
16          Okay.  So we need to -- we need to talk about
17  something having to do with filing, okay?  And I'm looking at
18  you because you're the Northwestern person, right?
19          MR. GILBERT:  Yes.
20          THE COURT:  Okay.  So file the motion -- file the
21  response by October 4th does not mean file a motion for leave
22  to file it under seal by October 4th.
23          Let me tell you what I do with this stuff, because
24  when you guys file these things, there's all sorts of exhibits
25  attached to them, understandably.  They're big filings.  We

1    don't -- we abrogated the rule that requires courtesy copies
2    which we had for like 5,000 years, and we abrogated it six
3    months ago.  I don't ask for them anyway because it's easier
4    for me to just download the stuff.
5          Now, when I download the stuff, I don't want to
6    download the stuff that has blacked-out stuff in it.  I want
7    to download the real stuff.
8          And so what I'm looking for, and what I was doing
9    yesterday at about 4:30 p.m. sitting back at my desk back
10   there, is I was downloading all this stuff so I could take it
11   home and read it.  And what was there was the motion on the
12   FERPA notices, the response on the FERPA notices, the under
13   seal -- the unredacted versions of both, the motion on
14   Northwestern, and a motion for leave to file under seal with
15   nothing else.
16         It has been the practice in this court, in the
17   clerk's office, since we've had CM/ECF, that when you file a
18   motion for leave to file under seal, you can provisionally
19   file the sealed thing under seal.  You guys didn't do that
20   until 7:49 p.m.  You know how I know that?  There's a little
21   dot over there that you can click and it says when it's filed.
22         By 7:49, I was done reading all this stuff.
23         Now, I read it this morning.  It's no harm, no foul.
24   But in the future, when you file something under seal, a
25   motion for leave to file under seal, just file the thing too

1 provisionally under seal.

2      That's the first thing.

3      The second thing -- this is a really tiny point --
4 don't file notices of motion.  We abrogated that rule three
5 months ago -- it was published six months ago; we abrogated it
6 three months ago -- and it just cutters up the docket at this
7 point.  The judges can do it individually, but I don't, so --
8 because I look at this stuff kind of every morning.

9      It's not a huge deal on this one, but there's going
10 to be things where it might be, so that's kind of not just a
11 message to you, it's a message to everybody.

12      MR. STEIN:  May I ask one question?  Would your Honor
13 prefer going forward if we -- because I think many filings in
14 this case are going to be under seal, you know, and like you,
15 we're only looking at the -- on -- you know, at the -- do you
16 have an email -- you know, we could maybe email you --

17      THE COURT:  No, I don't want to do that, because then
18 people are going to get -- then people are going to get used
19 to doing that, and somebody will forget to file something on
20 the docket.  So that's not a good idea.

21      MR. STEIN:  Okay.

22      THE COURT:  I don't want to set up a situation where
23 that's going to happen.

24      The other thing, though, and I -- the one thing I --
25 because I ended up printing out a hard copy of your thing this

1    morning.  I got to tell you, I'm having a hard time

2    understanding why the stuff that you've blacked out is

3    legitimately under seal, which is why I have not ruled on that

4    motion yet.  And we're going to need to go through that.

5         So there's -- in the blacked-out version, there's --

6    I know we're talking about really tiny stuff here, but there's

7    four passages that are blacked out.  They are on pages 2, 6 in

8    a footnote, and 8, there's two of them.  Actually -- yeah, two

9    of them.

10        I looked at the blacked-out version, and I looked at

11   the non-blacked-out version, and I am scratching my head in

12   trying to figure out what -- why what's blacked out is

13   legitimately filed under seal.

14        So -- and it's not a justification -- it's not an

15   appropriate justification under the way the Seventh Circuit

16   looks at these things and under the way I look at these things

17   to say, well, it was designated as confidential by somebody.

18   That's -- I mean, back to the old days when people had the

19   confidential stamp, when you can designate stuff as

20   confidential, people tend to over designate.  It's a different

21   question from whether something's appropriately filed under

22   seal in a case that's supposed to be litigated in public.  And

23   I'm at a loss to figure out a legitimate basis for keeping

24   under seal the four passages that you're talking about here.

25        So I'm going to -- I am not going to grant the motion

1    to file under seal yet.  You're going to have to file

2    something that says why each one of those things should be

3    filed under seal.

4         And so here's the deal.  And this is -- the reason

5    that I looked at that one and didn't do the side-by-side

6    comparison on the other one is because it was only four

7    passages in that one.  There's bigger stuff on the other ones,

8    and this is a bigger issue in this case.  That practice change

9    is starting right now.

10        I'm not going to take -- anytime somebody files a

11   motion to file under seal that says, I need to file this under

12   seal because somebody designated it as confidential or super

13   confidential or whatever, the motion is going to be denied.

14        You're going to have to explain why the passages that

15   you're cutting out are appropriately cut out of the public

16   record.  And that hasn't been done.  I've let people get lax

17   on it.  That ends right now.  Okay?

18        So that's the practice going forward.

19        So those are the two motions -- or I guess the three

20   if you count the motion to file under seal.  There's a bunch

21   of stuff in the status report where -- I mean, and I said I'm

22   not going to deal with arguments in status reports that aren't

23   filed as motions.  I thought I was going to get shorter status

24   reports.  I guess that didn't work.

25        But as far as the -- you know, the upcoming

1    deadlines, which I gather that there is some concern about

2    ability to meet them, but nobody's actually filed a motion

3    yet, you're going to need to file a motion.

4            And I kind of have a sense of what the arguments are

5    going to be:  The plaintiffs are going to say, you know, we've

6    had to claw and scrape to get everything; the defendants are

7    going to say they wasted their time.  You know, I'm going to

8    have to decide all that.  But just don't wait until the last

9    minute to get that teed up if that's going to happen.

10           So I've covered everything that I wanted to talk

11   about today, so is there stuff that you guys want to talk

12   about, starting with the plaintiffs?

13           MR. WAXMAN:  Could I just ask a point of

14   clarification --

15           THE COURT:  Of something I said?  Yeah, sure, for

16   sure.

17           You mean the thing where I said granted?

18           MR. WAXMAN:  I'm sorry?

19           THE COURT:  You mean the thing where I said granted?

20   You want to know what that means?

21           MR. WAXMAN:  Yeah.  Yes, I do.

22           THE COURT:  It means granted.

23           MR. WAXMAN:  I want to know the scope of what's been

24   granted --

25           THE COURT:  Well, okay --

1    MR. WAXMAN:  -- so let me just pose the question for
2    clarification.
3         The list of 180 names includes many, many names that
4    were previously provided us in Appendix A for their first
5    request for production.
6         We have searched all of our records, and we have
7    produced all responsive documents with UIDs so that if there
8    is correspondence or there's a list of special people along
9    with the structured data, they already have it.
10        Do we now have to provide FERPA notices with respect
11   to the people that we've already searched for telling them
12   that we're going to unmask their identities, or is it just the
13   new people on this list that weren't previously the subject of
14   documents discovery under an RFP?
15        THE COURT:  Okay.  So I'm going to say this as nicely
16   as I can and with respect.
17        I granted the motion.  That means the way you know
18   what was granted is you look at the prayer for relief in the
19   motion and I granted that.
20        Now, these arguments about how we already did this
21   and we already did that and we already did this and we already
22   did that, that might have been an argument that somebody could
23   have made in saying, well, you should only grant this in part.
24   That wasn't the argument.
25        The argument was, they don't need this stuff, they

1    wasted their time, et cetera, et cetera.

2            I ruled against you.  The motion is granted.

3            If you confer afterwards and you point out to the

4    plaintiffs, hey, you don't really need this, here's why, and

5    the plaintiffs agree to it, that's fine, but I have granted

6    the motion --

7            MR. WAXMAN:  Okay.

8            THE COURT:  -- and the prayer for relief defines the

9    scope of what I have granted.  I cannot be any clearer than

10   that.

11           MR. WAXMAN:  Okay.  I --

12           THE COURT:  Do you want to keep going?

13           MR. WAXMAN:  I have another question for

14   clarification.

15           THE COURT:  Okay.

16           MR. WAXMAN:  There is another part of their motion

17   which we have opposed which doesn't deal with FERPA or UIDs.

18           They have asked for discovery from the president's

19   office -- from the president's offices and development's

20   offices of all documents, whether it relates to an applicant

21   or not, between those offices and donors.

22           This Court has previously said that there will need

23   to be a special showing of particularized need in order to get

24   discovery from president's offices and development offices.

25           THE COURT:  That's not part of this motion, I don't

1    think.

2             MR. WAXMAN:  It is.

3             THE COURT:  Okay.  So I'm going to read to you the

4    last -- the -- I'm going to you what the motion says.  It's

5    basically two sentences, all right?

6             No, it's one sentence.

7             "On the grounds set forth in the supporting

8    memorandum submitted on this date, plaintiffs respectfully

9    move the Court to enter an order as follows, colon:  Each

10   defendant, with the exceptions of MIT, Cal Tech, Chicago, and

11   Yale, maybe another one or two, is ordered to send FERPA

12   notices pursuant to this Court's prior order regarding FERPA

13   in the same form as Exhibit A to that order to each of the

14   students admitted to that university and identified by

15   plaintiffs as an intended recipient of such FERPA notice."

16   Full stop.

17            That's it.  That's what I granted.

18            The thing you're talking about now about president's

19   offices, I'm not seeing that there.  And just to be clear, I

20   looked at the last paragraph of the memorandum in support to,

21   and that's docket number 443-1, it says exactly the same thing

22   as what I just read.  I mean, there's a word or two different,

23   but it says the same thing.

24            MR. WAXMAN:  If that's what your Honor is ordering --

25            THE COURT:  That's what I ordered.

1    MR. WAXMAN:  -- that's what we'll do.

2    THE COURT:  That is what I ordered.

3    MR. WAXMAN:  Thank you.

4    THE COURT:  Okay.

5    All right.  Anything else on the plaintiffs' side

6  that you need to bring up today?

7    MR. NORMAND:  No.

8    THE COURT:  No?

9    Anything else on the defense side?

10    Okay.  So, you know, just to make sure that I touch

11  bases on stuff here, it sounds like you have -- to the extent

12  that you might need a mediator, there's somebody that's

13  already been used, and it's -- I think it's -- if I'm

14  recalling correctly -- is it a judge from some -- from a

15  district court -- retired judge from somewhere in the Tenth

16  Circuit or something like that?

17    MR. NORMAND:  Layn Phillips.

18    THE COURT:  Oklahoma, maybe?

19    MR. NORMAND:  That's right.

20    THE COURT:  Yeah.  Okay.  That's fine.  I don't need

21  to worry about that anymore.

22    And I think there was one other thing, but it's going

23  to take me a second to just -- I walked out here without my

24  hard copy of the status report, so it's going to take me a

25  second to pull it up.  So bear with me.  Unless somebody has a

1   hard copy available that I can borrow for a second, in which

2   case it won't take quite as long.

3         To sign into a computer these days, I need three

4   devices.

5         MS. MILLER:  Would you like one, your Honor?

6         THE COURT:  Yeah, I'll take it.  Thanks.  I'll give

7   it back to you.

8         I thought there was one other thing.

9         Okay.  This was the one other thing.

10        I think that the two motions that I have dealt with

11   today, not counting the motion to file under seal, were the

12   only pending and unresolved motions.

13        Are there any others?

14        MR. NORMAND:  Not that we're --

15        THE COURT:  Everybody is shaking their head back and

16   forth.  Okay.  So then I think that's it.

17        You know, as far as everything else, I know there's a

18   lot of discussion back and forth -- you can take this back --

19   in the status report about, you know, issues with discovery.

20   Like I say, there needs to be a motion.

21        The one tweak I need to make to that, to the last --

22   what I said the last time about anything has to be a motion,

23   is I want to have it next time so that I'm not getting the

24   response the day before.  It worked out okay, but I'd rather

25   do that a little bit differently.

1          So let's talk first about what the next date is going
2     to be.  So give me just a second to do that.

3          So what I'm going to set it for for the next date,
4     and these are all going to be in person, I'm going to make it
5     the 28th of November.

6          Before you panic, that's not the day before or the
7     Monday after Thanksgiving.  It's the Tuesday.  And I'm going
8     to make it in the afternoon.  And so you ought to be able to
9     come in in the morning unless you're coming from a really,
10    really long way away.

11         The 28th of November at, let's just say, 1:00
12    o'clock.

13         So any motions that anybody wants to, you know, that
14    are -- that anybody wants to file are going to need to be
15    filed by -- I'm going to make this a little earlier than you'd
16    probably like it to be because of the Thanksgiving holiday.
17    They're going to be due on the 15th of November, which is a
18    Wednesday, and any responses are going to be on the 22nd of
19    November, which is the day before Thanksgiving so I don't have
20    to worry about people needing to work over the Thanksgiving
21    weekend and so I have everything in hand.

22         If the motion is agreed upon, then it can -- well --
23    yeah.  If it's agreed upon and there's not going to be a
24    response to it, then you can hold off until the 22nd to file
25    it.  And we'll set up the call-in thing like we did today.

1   Okay?

2           Thank you.

3           MR. NORMAND:  Your Honor --

4           THE COURT:  Now there's something.

5           MR. NORMAND:  -- this is Ted Normand.  Did you want

6   us to put in a JSR on a particular date?

7           THE COURT:  Oh, yeah.  Thanks.  Yeah.  Let's say by

8   the 22nd of November on that too, status report.

9           Okay.  Thanks a lot, everybody.  Take care.

10    (Which were all the proceedings had in the above-entitled

11  cause on the day and date aforesaid.)

12    I certify that the foregoing is a correct transcript from
    the record of proceedings in the above-entitled matter.
13

14  Carolyn R. Cox                          Date
    Official Court Reporter
15  Northern District of Illinois
    /s/Carolyn R. Cox, CSR, RPR, CRR, FCRR
16

17

18

19

20

21

22

23

24

25