# Exhibit 4

```
 1                IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3

 4   SIA HENRY, et al.,                )   Docket No. 22 C 125
                                       )
 5                      Plaintiffs,    )
                                       )
 6             vs.                     )
                                       )
 7   BROWN UNIVERSITY, et al.,         )   Chicago, Illinois
                                       )   February 8, 2023
 8                      Defendants.    )   9:15 o'clock a.m.

 9
                       TRANSCRIPT OF PROCEEDINGS
10          BEFORE THE HONORABLE MATTHEW F. KENNELLY

11
     APPEARANCES:
12

13   For the Plaintiffs:    ROCHE FREEDMAN LLP
                            BY:  MR. EDWARD J. NORMAND
14                          99 Park Avenue, Suite 1910
                            New York, NY 10016
15                          (646) 970-7513

16

17                          GILBERT LITIGATORS & COUNSELORS
                            BY:  MR. ROBERT DEWITT GILBERT
18                          11 Broadway, Suite 615
                            New York, NY 10004
19                          (646) 448-5269

20

21

22
     Court Reporter:        MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
23                          Official Court Reporter
                            219 S. Dearborn Street, Suite 2102
24                          Chicago, Illinois  60604
                            (312) 435-5639
25
```

```
1   APPEARANCES CONTINUED:

2

3   For the Defendants:
    Brown University:       MORGAN, LEWIS & BOCKIUS LLP
4                           BY:  MR. JON R. ROELLKE
                            1111 Pennsylvania Avenue, NW
5                           Washington, DC 20004
                            (202) 739-5754
6

7   University of
    Chicago:                ARNOLD & PORTER
8                           BY:  MR. JAMES L. COOPER
                                 MR. MICHAEL RUBIN
9                           555 Twelfth Street, N.W.
                            Washington, DC 20004-1202
10                          (202) 942-5000

11

12  Columbia University:    SKADDEN ARPS SLATE MEAGHER & FLOM, LLP CH
                            BY:  MS. AMY VAN GELDER
13                          155 North Wacker Drive, Suite 2700
                            Chicago, IL 60606-1720
14                          (312) 407-0903

15

16  Cornell University:     KING & SPALDING
                            BY:  MR. ZACHARY THOMAS FARDON
17                          110 North Wacker Drive, Suite 3800
                            Chicago, IL 60606
18                          (312) 995-6333

19

20
    Dartmouth College:      JENNER & BLOCK LLP
21                          BY:  MR. DOUGLAS LITVACK
                            353 N. Clark Street
22                          Chicago, IL 60654
                            (312) 222-9350
23

24

25
```

```
APPEARANCES CONTINUED:

Duke University:        GIBSON, DUNN & CRUTCHER LLP
                        BY:  MR. CHRISTOPHER DEAN DUSSEAULT
                        333 South Grand Avenue
                        Los Angeles, CA  90071
                        (213) 229-7855


                        SAUL EWING ARNSTEIN & LEHR LLP
                        BY:  MR. JAMES A. MORSCH
                        161 North Clark Street, Suite 4200
                        Chicago, IL  60601
                        (312) 876-7100


Georgetown University:  MAYER BROWN LLP
                        BY:  MS. BRITT MARIE MILLER
                        71 South Wacker Drive
                        Chicago, IL 60606
                        (312) 782-0600


Northwestern
University:             GASS TUREK
                        BY:  MR. SCOTT DAVID STEIN
                        241 N. Broadway, Ste 300
                        Milwaukee, WI 53202
                        (312) 853-7000



Vanderbilt University:      WHITE & CASE LLP
                            BY:  MR. DAVID H. SUGGS
                            1221 Avenue of the Americas
                            New York, NY  10020
                            (212) 819-8200


Yale University:        HOGAN LOVELLS US LLP
                        BY:  MR. CHARLES A. LOUGHLIN
                             MR. BENJAMIN F. HOLT
                        555 Thirteenth Street, NW
                        Washington, DC 20004
                        (202) 637-5661
```

1    (The following proceedings were had by video:)

2    THE CLERK:  Case 22 C 125, Henry v. Brown University.

3    THE COURT:  So I know we got, you know, a lot of

4 people on, most by phone.  I'm going to suggest we do this the

5 way we've done all of them, which is that anybody who wants to

6 give your name for the record, please do so.  But anybody

7 who's on by phone only, you need to mute your phone right now.

8 If I have to mute you more than once, I'm going to cut you

9 off.

10    Okay.  So go ahead in terms of people who are on

11 video that want to give your names.

12    MR. GILBERT:  This is Robert D. Gilbert from Gilbert

13 Litigators and counselors on behalf of the plaintiffs.

14    MR. NORMAND:  It's Ted Normand from Freeland Norman

15 Freeland for the plaintiffs as well, your Honor.

16    MS. MILLER:  Your Honor, this is Britt Miller from

17 Mayer Brown on behalf of Georgetown.  We previously sent to

18 your clerk and to the court reporter a list of all of the

19 defense counsel who would be appearing on the record today so

20 we didn't have to do this.  If your Honor would like us to

21 formally appear, we can, but we sent that list.

22    THE COURT:  That's great.  That covers it.  I

23 appreciate you doing that.

24    Okay.  So I'm going to dispense with asking anybody

25 else for your names at this point.  But all I'll ask is that

1  when you talk, just say who you are so the court reporter can

2  get it down.

3       We have an awful lot to cover and not an eternity to

4  cover it.

5       So I'll tell you where I actually want to start is

6  with I think the last set of things that were filed, and that

7  is the motion by some defendants for entry of an order

8  regarding the HEA statute and production of certain FAFSA

9  information.  So for the benefit of the court reporter, FAFSA

10  is F-A-F-S-A, all capitals.

11       I got something on Monday from Cornell, and I'm

12  hoping the lawyer from Cornell is on here because I don't

13  understand what you're asking me to do or telling me to do.

14  You kind of state a position here, but you don't really tell

15  me what you think I should do.  So tell me.

16       MR. FARDON:  Your Honor, good morning.  Zach Fardon

17  for Cornell.  Your Honor, the reason we filed the position

18  paper is we do differ from the other defendants only in this

19  narrow regard.  They're asking the Court to enter a finding

20  that collection of production and use of FAFSA data in this

21  litigation is part of administration of -- as that term is

22  used in the HEA.  And Cornell's concern is there's no case law

23  that says that.

24       And unlike the other universities, Cornell does not

25  believe that such a permissive interpretation of the HEA is

1  necessarily consistent with the limited existing education

2  department guidance on the issue or the -- yes, sir.

3      THE COURT:  So you're just repeating what I already

4  read.  Did you remember my question, Mr. Fardon?  So let's

5  answer that in the next words that come out of your mouth.

6      MR. FARDON:  Your Honor, we had submitted an inquiry

7  to the education department where custodians of that data --

8      THE COURT:  Stop.  What are you asking me to do?  I

9  mean, you came out and stated your position.  I get that.  I

10  understand your position.  What are you asking me to do?  Are

11  you asking me to enter -- to not enter an order, to enter some

12  order different from one that's provided or what?

13      MR. FARDON:  Your Honor, we would like either

14  guidance from the education department or suggest the Court

15  seek guidance from the education department as to what their

16  position is.

17      THE COURT:  So I'm supposed to ask the education

18  department what I should do?  That's your position?  That's

19  what you just said.

20      MR. FARDON:  Your Honor, we have submitted an

21  inquiry, and we wanted the comfort of knowing what the

22  education department's position is on this.

23      THE COURT:  So your position right now is that it's

24  not covered, right, that you can't turn this stuff over?

25  That's got to be your position, otherwise, you wouldn't be

 1   asking for guidance.

 2          MR. FARDON:  That's right, your Honor.

 3          THE COURT:  Okay.  So stop.  This case was filed in,

 4   when, January a year ago, so it's about 13 months old.  And I

 5   went through all of these motions to dismiss.  You know,

 6   extensive briefing was filed, and the -- you know, because

 7   it's absolutely 100 percent without question crystal clear

 8   that in order to litigate the case, disclosure of this

 9   information is needed because it goes to the core of what's

10   alleged.

11          That if your position was what you just said it is, I

12   should have gotten a motion to dismiss like eight months ago

13   saying, you got to dismiss the case, Judge, because the

14   plaintiffs aren't going to be able to get the information

15   because it's illegal.  I never got that motion.  So why

16   shouldn't I just consider you to have forfeited your position?

17          MR. FARDON:  Judge, we're only talking about FAFSA

18   information here, this limited set of data.  We're not

19   objecting to production of relevant financial --

20          THE COURT:  So you guys have asked for FAFSA

21   information from the plaintiffs, haven't you?

22          MR. FARDON:  I'm not aware, your Honor.  Perhaps

23   someone else --

24          THE COURT:  That's half of the briefing on the stuff

25   I got to deal with today is you wanting the plaintiffs to

1    provide the FAFSA forms and all the information that underlies
2    them that they submitted during whatever years in question.
3    Am I wrong about that?

4         MR. FARDON:  I do not believe you're wrong, your
5    Honor.

6         THE COURT:  Okay.  So what is -- the prohibition
7    doesn't apply when it's going the other way?

8         MR. FARDON:  It's not that, your Honor.  It's that we
9    can find no precedent, and we are contractual in private -- to
10   oversee obligations as custodians of this data to the
11   education department, and we just wanted to raise this
12   position with the Court.

13        THE COURT:  Thanks.

14        Is there anybody on the defense side that agrees with
15   Cornell's position on this?  If so, you need to tell me right
16   now, whether you're on video or not.

17        MR. RUBIN:  Your Honor, this is Michael Rubin from
18   Arnold Porter for University of Chicago, and I am here to
19   speak on behalf of the other defendants.  And all the other
20   defendants joined in the motion to have the FAFSA order
21   entered.  That's an answer to your question.

22        THE COURT:  Actually, it's not even close to an
23   answer to my question.  My question was real simple.  Does
24   anybody agree with Cornell's position that this material can't
25   be turned over?  So that's a question that can be answered yes

1    or no and so --

2              MR. RUBIN:  No, your Honor.

3              THE COURT:  Okay.  So no other defendant agrees with

4    that.

5              All right.  So, basically, Cornell's position is that

6    I should just put the brakes on the litigation and just sit

7    back and wait for a federal bureaucracy to respond to an

8    inquiry that's been made.

9              When did you make the inquiry?

10             MR. FARDON:  January 17th, your Honor.

11             THE COURT:  Why did you wait so gosh darn long?

12             MR. FARDON:  Your Honor, once we identified this

13   specific concern and couldn't find any precedent for the

14   concern, we submitted the inquiry.

15             THE COURT:  When did you get the request that this --

16   that would have called for this information?  When was that

17   served?

18             MR. FARDON:  I don't have that date handy, your

19   Honor.  I apologize.

20             THE COURT:  Somebody?  Ballpark.

21             MR. GILBERT:  September 19th, your Honor.  This is

22   Robert Gilbert speaking.  September 19th, your Honor.

23             THE COURT:  That would be four months before,

24   Mr. Fardon, you guys made the request to the education

25   department.  I mean, seriously, with a straight face, you are

1   telling me that I should wait on this.  Well, my view is the

2   position has been forfeited twice.  It's been forfeited once

3   because the upshot of this position is that the litigation

4   can't proceed because it's been clear from day one that this

5   type of information is needed in order to pursue the

6   litigation.  So it should have been raised as part of a motion

7   to dismiss.

8         Secondly, you forfeited it by waiting four months

9   after you got the request to even ask the education

10  department, not even ask me.  You waited three more weeks to

11  do that.

12        So the only other question I have about this one then

13  is that in the last document that I got, which was from the

14  plaintiffs, there was a proposed tweak, I guess is what I

15  would call it, of the draft order.  And I have the -- I don't

16  want to share it because that's just going to be too

17  cumbersome.  I've got the plaintiffs' proposed version of this

18  up on my screen now.

19        And so my question on the -- to whoever is the

20  spokesperson for the defense, which seems like it's Mr. Rubin

21  on this, at least, is do you have any problem with the

22  proposed tweaks by the plaintiff?  And, if so, tell me what I

23  should untweak and where because I didn't get a redlined

24  version of it.

25        MR. RUBIN:  Yes, we do have a problem, your Honor.

1  We submitted this order for the narrow purpose of getting this

2  data to the plaintiffs and getting it produced.  The

3  plaintiffs want to address before they've ever seen the data

4  and ask the Court to hold before ever seeing the data whether

5  the file that we produce the data in to be produced as

6  confidential versus highly confidential -- outside eyes only,

7  attorneys' eyes only.

8          THE COURT:  Stop right there.  Stop right there.  I

9  don't need to decide that right now.  So if that's what the

10  plaintiff is asking me to do, I don't need to do that.  So do

11  I have a draft order somewhere from the defendants on this?

12  If you can just tell me when it got sent, because, honestly,

13  my proposed order in-box is kind of full of orders for this

14  case.

15          MR. RUBIN:  Yes, it was sent at, I believe it was, on

16  Friday, this past Friday, the 3rd.

17          THE COURT:  February 3rd.  Okay.  All right.

18          MR. RUBIN:  Actually, it was technically the 4th,

19  around 2:00 a.m.

20          THE COURT:  Okay.  That will be easy to find.  All

21  right.  Thanks.  All right.  That's done on that.

22          Okay.  What I want to do next -- I guess I'm going to

23  kind of try to go back and go through this more or less

24  sequentially.  On most of these -- on some of these, I don't

25  even have any questions.  I'm just going to tell you what the

1    rulings are.  That's going to be the case on the one where

2    there's a whole laundry list of stuff.  On some of them, I

3    have a question or two.  And on maybe one or two, I'm going to

4    need to hear a little bit more argument.

5            So the first one I've got is the dispute about

6    numbers of depositions and lengths.  And so what this boils

7    down to, as I understand it, is a dispute over whether the

8    plaintiff gets to do only one or more than one 30(b)(6)

9    deposition of each defendant.

10           So to me, the way I read the defendant's position, it

11   kind of seems to assume that there is some sort of a rule or

12   precedent or whatever that a party only gets one 30(b)(6)

13   deposition of the other side.  It all has to be done at once.

14   I'll just tell you that that's completely inconsistent with my

15   experience in complex litigation.  But if there's something

16   that says that somewhere, I'd appreciate somebody on the

17   defense side telling me what it is.

18           MS. MILLER:  Your Honor, Britt Miller for Georgetown.

19   I think the defendants' position was simply that in order to

20   be able to meaningfully schedule these, including the

21   possibility of individual 30(b)(1)s being overlapped with

22   30(b)(6)s, that the identification of the 30(b)(6) topics are

23   told to us up front so that we can appropriately prepare a

24   witness or witnesses and ensure that our witnesses are not

25   taken in duplicative order; i.e., a 30(b)(6) follows six

1  months after we've done most of the depositions or vice versa
2  is an interest of efficiencies and to ensure that our clients
3  are not unduly burdened.

4  THE COURT:  Okay.  I mean, kind of imbedded within
5  your answer is it was probably an unintentional concession
6  that 30(b)(6)s aren't limited to one because you said witness
7  or witnesses.  That's the norm, actually, in complex
8  litigation is it takes more than one witness.  And so by
9  definition it's not one deposition.

10  So here's the deal.  I'm going to limit it to -- I'm
11  going to limit it to two per defendant.  And I'm just going to
12  say that's a number I am pulling out of the air.  Okay?  So if
13  somebody wants to call that arbitrary, you're right.  It is.
14  So that's the adjudication of that dispute.

15  The next one I want to talk about is the subpoenas to
16  the parents.  A couple of questions.

17  So let me just say by way of preface, it seems to me
18  the question is whether there's anything that's relevant and
19  not disproportionate.  And if that's -- if the answer to those
20  questions is yes, I'm really not inclined to require the
21  defendants to go through the plaintiffs' lawyers on this.

22  So the categories are -- there's five of them, as I
23  understand it.  Number one would be financial aid applications
24  and underlying materials.

25  Number two would be records regarding other forms

1  of -- other forms of financial aid.

2          Three would be documents regarding the payment of

3  tuition and expenses.

4          Four would be college applications and communications

5  about them.

6          And five would be documents regarding, quote/unquote,

7  this litigation.

8          So I will tell you there's a lot of ink spilled I

9  think in both sides' submission over this whole question about

10  who's a direct purchaser and what's downstream and all that.

11  I am -- that strikes me as an issue that's going to have to be

12  decided on the merits.  I am strongly, strongly disinclined to

13  do that now in the context of deciding a discovery motion.  So

14  I'm inclined to bypass it.

15          So I'm going to start with request No. 5 because

16  that's an easy one.  That's the one about documents regarding

17  the litigation.  And that's a paraphrase, but I see that in

18  the defendants' submission, which kind of gives the

19  categories.

20          It's too vague and overbroad.  I'm not allowing that

21  one.

22          Now we're going back to number one, financial aid

23  applications to the defendant universities.  Are we talking

24  about the FAFSA form?  Is that what we're talking about?  I

25  mean, it's been a while since I was in the business of helping

1   kids apply to universities, but, I mean, in the old days, at
2   least, you submitted a FAFSA form.  And some schools had an
3   additional form that they needed you to submit.  So when
4   you're asking about financial aid applications, can you just
5   tell me, on the defense side, physically what it is you're
6   talking about.

7          MR. SUGGS:  Your Honor, this is David Suggs for
8   Vanderbilt.  We're talking about whatever form the plaintiff
9   submitted, as you said.  There may be --

10         THE COURT:  That's not what I'm asking you.  Okay.
11  So you speak for Vanderbilt.  What is it at Vanderbilt?  What
12  do they -- what do people submit?

13         MR. SUGGS:  Nowadays, your Honor, it comes through
14  the college board, and there's a form.  So it's filtered
15  through the third party, and Vanderbilt just kind of gets the
16  data, not the form directly.

17         THE COURT:  And at the time of the lawsuit, which
18  probably isn't right now, but let's say five years ago or
19  whatever, was that the case or was it done differently at that
20  point?

21         MR. SUGGS:  I don't know when that became the case.
22  The plaintiffs are asking for data going back to the '90s.  So
23  there have been changes, but I don't know exactly when the
24  changes occurred.  And we're also asking for other information
25  including the underlying --

1    THE COURT:  Look, look, look.  I got an hour and 15
2  minutes to give you guys, 15 minutes which we've already used.
3  And we've got about 20 minutes to cover, so I'm really just
4  going to ask that people just answer the questions I'm asking.
5  You're now going beyond the question I'm asking.

6    So the short answer is you don't know.  My question
7  is -- can somebody else answer this question?  What is it
8  we're talking about when you're asking for financial aid
9  applications?

10    MR. RUBIN:  Your Honor, this is Michael Rubin for
11  University of Chicago.  When the parents submit the FAFSA,
12  they get a return copy of it.  So that's one form of it.  Then
13  there's the application to the college board called the CSS
14  Profile.  That's another piece of it.

15    THE COURT:  Got it.

16    MR. RUBIN:  And then some schools have their own
17  individual one.  Chicago has their own private shorter one.

18    THE COURT:  That's helpful.

19    Here's my question.  Do the schools, the defendants
20  in this case, in other words, don't you already have this from
21  these applicants?  Whatever they sent in, don't you already
22  have it?

23    MR. SUGGS:  Your Honor, we have it for the
24  defendants, but we don't have it for other schools to which
25  the plaintiffs applied.  And if any of those schools used

1    customized forms, then we wouldn't have those, even if we have

2    the FAFSA or CSS Profile.  And, again, we don't have the

3    underlying documents.

4           THE COURT:  I thought that this request was for

5    financial aid applications to the defendant universities.

6    Does it go -- did I misread it?  Does it go beyond that?

7           MR. SUGGS:  Your Honor, it does go beyond.  It asks

8    for all documents about the plaintiffs' applications for

9    financial aid, any decision concerning the application,

10   documents used in connection with the application.

11          THE COURT:  Okay.  I'm just trying to get a handle on

12   it.

13          Okay.  So here's the ruling.  Okay?  I am not, repeat

14   not, allowing subpoenas for the -- what you refer to as the

15   underlying materials; in other words, I gather the materials

16   that would -- that were used to prepare the forms.  I think

17   that is largely, if not entirely, a fishing expedition

18   regarding whether financial aid applications were truthful or

19   not.  There's no showing that that's likely to be a relevant

20   issue in this case.

21          Even if so, even if it were, it's extremely

22   tangential and it's not fair, reasonable, or proportionate for

23   a non-party to a lawsuit.  So you can subpoena the parents for

24   the materials that were actually submitted to universities,

25   but that's it.  That's request one.

1    Request two, this is the one for other forms of
2    financial aid.  Give me one second here.  I just got to
3    decipher my notes.  So on some of these, as I said, I'm just
4    going to rule.

5    The defendants argue that this is important in order
6    to compare financial aid offers and that it might show the
7    non-existence of collusion or the absence of impact of
8    collusion.  I think that has some potential relevance.  I
9    think the same thing about records regarding financial aid
10   offers from other sources.  I'm not buying into the no injury
11   argument that the defendants make.  It's really super thin on
12   authority.  But, nevertheless, I think this information could
13   have some relevance, so that one is okay.

14   Category No. 3 concerns documents regarding tuition
15   and other payments.  I'm really not understanding the
16   relevance of this, and the defendants really don't make much
17   of an effort in this submission to explain it, so that one is
18   a no.

19   And then the last one is communications regarding
20   attending -- reasons for attending a particular school or
21   discussing the pros and cons or the merits -- relative merits
22   of schools.

23   So the only thing that comes close to hitting the
24   relevance mark on this -- and by close, I don't mean close --
25   is that this has a bearing on the relevant market.  I just

1   have to say I think the opinions of parents and the students
2   are unlikely to even be relevant on that.  Or if they're
3   relevant, the probative value of it is quite minimal.  You can
4   certainly ask people what schools they applied to and why, how
5   they compared them.  But basically what you're asking for is
6   for people to go back in all likelihood into their emails,
7   going back eight or ten years in some cases, maybe even more.
8   And I just think it's beyond disproportionate.
9          So the bottom line is the defendants can subpoena the
10  plaintiffs' parents for their applications -- their -- excuse
11  me -- the financial aid applications to other schools -- I do
12  think it's more likely that a parent would have kept that than
13  a kid -- their financial aid offers from other schools or from
14  third parties, and that's basically it.
15         Okay.  That's the ruling on that one.
16         MR. NORMAND:  Your Honor, Ted Normand for the
17  plaintiffs.  I apologize if I missed this.  You made an
18  opening reference to the extent which defendants would be
19  interacting with the parents.
20         THE COURT:  They can subpoena them.  They don't have
21  to go through you.
22         MR. NORMAND:  For purposes of the subpoena,
23  understood, your Honor.
24         THE COURT:  Well, I mean, that's all I'm being asked
25  to decide.

1          Okay.  Next item.  Okay.  So I'm actually going to

2     skip ahead just in sequence.  This is the defendants' motion

3     to compel.  This is the one that basically has the list of

4     various interrogatories and requests for production.

5          There may be one or two I have questions on, but I

6     don't think so.  So I'm just going to go through.  I'm just

7     going to tell you, it is not likely that I am going to go back

8     and issue a written ruling on all of this stuff.  It's just

9     going to say granted in part, denied in part, as stated on the

10    record.  So just either take really great notes or order the

11    transcript.

12          Excuse me one second.

13          Okay.  Starting with interrogatories 1 and 2, that's

14    parallel with something I just talked about.  That has to do

15    with applications for admission and financial aid in documents

16    regarding other sources of financial aid that was actually

17    received.  Those are enforced for the reasons that I just

18    discussed on the parents' subpoena.

19          Interrogatory number 3 asks for analysis of the

20    relevant market.  I think that's premature at this point.

21    It's a contention interrogatory.  And contention

22    interrogatories don't always have to wait until closer to the

23    end of discovery, but I think that's appropriate here because

24    everybody who is on this call understands that this is almost

25    entirely going to come from experts.  And it's way too early

1    to make people take a position on that, so I'm not enforcing

2    interrogatory 3.

3           The rest are requests for production, I'm basically

4    organizing this.  It's not exactly in sequence, but it's in

5    the sequence they're discussed I think.

6           So the first one is request for production of 1 and

7    7, documents regarding the reasons the plaintiff applied and

8    comparing schools.  That one -- I think that's relevant, and

9    so I'm enforcing that one.

10          Documents regarding the relevant market, that's not.

11   I'm not enforcing that for the reasons I just discussed.  I

12   think one of those is 117.  I forget which is which.

13          Request for production 2, applications for admission

14   to the defendant universities.  Okay.  This one is actually

15   just asking for applications for admission to the defendant

16   universities.  I'm trying to figure out why you need to have

17   the plaintiffs produce that.  Don't you already have them?

18          MR. SUGGS:  Your Honor, in some cases, as we're

19   learning in responding to plaintiffs' discovery request, we do

20   not always have the documents.

21          THE COURT:  Really?  They don't keep them?

22          MR. SUGGS:  Sometimes -- sometimes due to standard

23   document retention policies, the materials are not retained.

24          THE COURT:  Okay.  Fine.  You told me what I need to

25   know.  That one is enforced.  I think it's relevant.

1          Request for production 3, applications for financial

2   aid, that's essentially parallel to the thing I dealt with on

3   the parents' subpoena.  That's enforced, but just the

4   applications, not the underlying or supporting documents.

5          Request for production No. 5, this has to do with

6   third-party scholarships and financial aid from third parties.

7   Again, I'm not taking a position on this direct purchaser or

8   downstream issue that's addressed in the briefs.  I'm

9   enforcing this one because I think it could lead to relevant

10   evidence.  I'm not positive of that, but close enough.

11          Request for production 6, this has to be -- this has

12   to do with documents regarding getting turned down for

13   financial aid -- no, excuse me -- documents regarding turning

14   down financial aid offers.  That's the way I read it.  I'm not

15   enforcing that one.  It's not relevant as it's described.

16   Anything relevant is otherwise requested and is going to be

17   produced, as I understand it, namely, financial aid offers

18   from other institutions.  So to the extent that that's within

19   the scope of 6, that's enforced.  Otherwise, it isn't.

20          Request 11 is the next one.  My shorthand is

21   documents regarding the circumstances under which the

22   plaintiffs got involved in litigation.  I think this is

23   overwhelmingly likely to involve work product or attorney

24   client privilege.  It's pretty tangential at best to any

25   relevant issue.  It's certainly okay to ask about this at

1  depositions, but I'm not going to at this point require

2  production of documents.  You can come back to me on that if

3  something pops out during a deposition that you think you need

4  to see.

5  MR. SUGGS:  Your Honor, if I could just -- if I may

6  ask a question?

7  THE COURT:  No, you can ask when I'm done.

8  Request for production 12, this is documents

9  regarding fee arrangements and engagement letters.  My

10  understanding is that plaintiffs undertook to produce

11  engagement letters.  Did that get done?  It was supposed to

12  happen I think on January the 30th.  Did that get done?

13  MR. SUGGS:  No, your Honor, we have not received

14  anything from plaintiffs.

15  THE COURT:  You have to produce the engagement

16  letters.  But otherwise -- but that's it on that one.

17  Request 18 and 26 are discussed together.  These are

18  records regarding loans and modifications and payment

19  histories.  I'm not seeing the relevance of that.  So

20  basically for the reasons that are discussed in the

21  plaintiffs' memorandum, so I'm not enforcing that one.

22  Request 19, documents regarding satisfaction with the

23  institution and the value of the education, it's just the way

24  it's written, it's overly broad and unduly burdensome given

25  the breadth of it, so I'm not enforcing that one.

1           19 and 21, these are social media user names and

2    documents regarding social media.  That's a hard no.  It's a

3    fishing expedition, and it's inappropriately intrusive, in my

4    opinion.

5           Request for production 24, documents -- oh, I'm

6    sorry.  The documents that the plaintiffs say they've agreed

7    to produce on that, this is page 15 of their response, seems

8    sufficient to me on that one, so I'm not enforcing it beyond

9    that.

10          The last one is loan agreements, and for the reason I

11   said on request 18 and 26, I don't think that's relevant.  I'm

12   not enforcing that.  So I'm done with this motion.

13          What was your question?

14          MR. SUGGS:  Your Honor, with respect to request 11 --

15          THE COURT:  As I said at the beginning, every time

16   you talk, say your name so the court reporter doesn't have to

17   go running her cursor across the screen while she's trying to

18   type.

19          MR. SUGGS:  I apologize, your Honor.  David Suggs for

20   Vanderbilt University.

21          This was the request for documents about how the

22   plaintiffs became involved in the litigation.  You stated that

23   you think --

24          THE COURT:  Number 11?

25          MR. SUGGS:  Yes, sir.  You stated that you think the

1    documents are privileged.  All we ask is that --

2         THE COURT:  That's not what I said.  That is actually

3    not what I said.  I said -- I'll quote you what I said.  Give

4    me a second.

5         What I said was, I think it's overwhelmingly likely

6    to involve work product or attorney-client privilege, and it's

7    pretty tangential at best to any relevant issue.

8         That is what I said.

9         MR. SUGGS:  Okay, your Honor.  Well, our position is

10   that when they became involved in the litigation --

11        THE COURT:  Fine.  Look, you filed two briefs on

12   this.  I considered your position.  I considered your

13   position.  I'm not holding oral argument on this.  You filed

14   two briefs.  That was one more than the plaintiffs filed.  I

15   ruled on it.

16        All right.  So we're going to go on to the next

17   thing.  That is -- hang on a second.  Pardon me.  The next one

18   is the motion by Brown, Columbia, Dartmouth, Northwestern,

19   Notre Dame, and Yale for a protective order.

20        So now we're getting into kind of more heavy

21   questions I think here.

22        So I want to start off asking the plaintiff a couple

23   of things here, plaintiffs, a couple of things here.  So can

24   you give me -- and it's been done in other places, and maybe

25   to some extent in briefing on this.  But can you give me kind

1   of a nutshell explanation for how the contention that

2   admissions, at least some admissions, are tied to donations

3   bears on your antitrust claim.

4         MR. GILBERT:  This is Robert Gilbert, your Honor.

5   That's a fairly broad question, as I understand it.

6         THE COURT:  Basically what I'm asking you to do is

7   explain the relevance of the information about donations and

8   trying to link that to admissions.

9         MR. GILBERT:  The culpability of -- as your Honor has

10  ruled on August 15th, the culpability --

11        THE COURT:  Stop.  Stop.  I know what I ruled.  I'm

12  just -- I have a reason for doing this, so let's just answer

13  my question without giving me the entire history of time.

14        MR. GILBERT:  Okay.  It's relevant because the

15  admissions that were wrongdoing at Dartmouth, for example, are

16  evidence of the liability of Georgetown and every other

17  defendant.

18        THE COURT:  You're missing my question.  Let's say --

19  I'm just talking about on an individual basis.  Let's just

20  stick with Dartmouth.  Okay?  So how does -- let's say just

21  hypothetically that Dartmouth had a practice of giving

22  enhanced consideration or automatic admission to high-level

23  donor's kids.  Okay?  How would that bear on your proof of

24  Dartmouth's liability for the antitrust conspiracy?  Put all

25  the 568 issues to the side for now.

1          MR. GILBERT:  Okay.  It would show that as to just

2     Dartmouth that Dartmouth was not entitled to an exemption and

3     that it's a pure price fixing collusion case.  But it would

4     also show that every other defendant is liable on the same

5     basis.

6          THE COURT:  I get the every other thing.  You don't

7     need to keep going into it.  So the reason it would show that

8     that particular school was not entitled to an exemption is

9     what exactly?  I'm not arguing with you.  I'm just asking you

10    to explain it.

11         MR. GILBERT:  If I understood your question, your

12    Honor, the question is -- I'm sorry.  I'm going to have to ask

13    you to repeat it.

14         THE COURT:  What does it show?  In other words, if a

15    school is tying some admissions to high-level donations, why

16    does that help show that that school is not entitled to a 568

17    exemption?  Because --

18         MR. GILBERT:  Okay.  Now I understand the question.

19    I think I understand the question better, your Honor.  I

20    apologize.

21         THE COURT:  I just answered it.  It was my answer,

22    right, because they're not need-blind, right?

23         MR. GILBERT:  They're not need-blind.  And

24    "need-blind" means all applicants are admitted, all admittees

25    are admitted without regard to the financial circumstances of

1    the student or the student's family.  That's for the whole
2    conspiracy.
3           THE COURT:  Pause.  I got my answer.  I pretty much
4    had to give it myself, but that's okay.
5           Now I'm going to go onto my next hypothetical
6    question.  Let's say that every defendant in the case dropped
7    the 568 defense, every defendant drops the 568 defense.  Would
8    the donations tied to admissions, quote/unquote, evidence
9    still be relevant, and, if so, why?
10          MR. GILBERT:  This is an interesting hypothetical,
11   your Honor.  If every defendant dropped it and they admitted
12   that they had violated the exemption --
13          THE COURT:  I'm a law professor.  Okay?  Let's just
14   pretend.  You don't get to change the law professor's
15   hypothetical.
16          MR. GILBERT:  If they dropped it, then we'd have --
17   every single one dropped it, we'd have a pure price fixing
18   standard collusion case in which they've already admitted they
19   have a formula.
20          THE COURT:  You probably wouldn't need it in that
21   situation, right?  "It" being the donations tied to
22   information, tied to admission.
23          MR. GILBERT:  My initial response to that
24   hypothetical is we would not need it if every single defendant
25   dropped the defense and then this was a pure price fixing

1　formula case.

2　　　　　THE COURT:  They haven't.  They haven't dropped the

3　defense.  It's just these six.  And how many defendants total

4　do you have in the case?

5　　　　　MR. GILBERT:  17.

6　　　　　THE COURT:  There's another 11 or so that haven't

7　dropped it yet.

8　　　　　Okay.  Thanks.

9　　　　　So my next question is, and this is a more

10　particularized question, as it does relate to the motion.

11　It's not a hypothetical.  So part of the thrust of this motion

12　is that, hey, wait a second, we -- we dropped the defense.  We

13　don't agree with the argument that if one did it, everybody

14　gets hooked in, but put that to the side.  You got 11 other

15　schools you can get this stuff from.  You don't really need to

16　get it from us too, and we ought to get something out of

17　having dropping this defense.  It's kind of like a

18　proportionality argument.

19　　　　　And that's probably putting it more directly than

20　it's put in the motion, but I guess I'd like to get the

21　plaintiffs' take on that.  Basically, it's an argument by

22　these six schools, hey, we did something here.  We dropped the

23　defense.  We should give some credit for that.  You can get

24　this information from other schools.  You don't really need it

25　from us too because --

1           MR. GILBERT:  Your Honor, let me respond in three

2    levels.  The first is to slightly amend what I said before.

3    They're still asserting a statute of limitations defense.

4    Okay?  If the 17 are still asserting a statute of limitations

5    defense, that means there was -- they say we should have known

6    to file a complaint earlier, which means we should have known

7    that there was wrongdoing that they were concealing.  So we're

8    still entitled to find out what they were doing and how they

9    were hiding it.  So even if they -- all 17 dropped the --

10           THE COURT:  Okay.

11           MR. GILBERT:  That's the first point.

12           The second point is, as to the other schools, we have

13    substantial basis to believe that these six schools are the

14    most culpable.  I'll just give you three examples, your Honor.

15    And it would be the most efficient to just establish this,

16    that the conspiracy was not need-blind.

17           The first is that Brown has sent a letter that was

18    produced on -- let's see -- I guess it was December 16th.  And

19    the letter admits that they were need aware as to transfer

20    students and admits that the other conspirators, all of them,

21    were need aware as to wait list students.  So getting -- Brown

22    is the best place to go.  Okay?  And they're one of the people

23    that filed the motion.

24           The second example, Yale, months after the filing of

25    the complaint, was the subject of an exposé in which Russian

1    oligarch billionaires were making substantial donations to
2    Yale in exchange for their kids getting admitted to Yale.
3    Okay?  That's another reason why it would be very efficient to
4    go to these rather than see what we could find at the other
5    11.
6         A third example would be Northwestern.  Actually, I
7    want to do four, if you don't mind.  Northwestern, there was a
8    student newspaper article that the president had reviewed and
9    spoken to the admissions office about 550 applications in one
10   year, most of which related to donors.  Okay?  It would be
11   much more efficient to just have discovery about that than to
12   chase around 11 other defendants.
13        The final example I say is Dartmouth.  Dartmouth had
14   a senior official whose last name was Sassorossi, whose job
15   for years was to coordinate fundraising and admissions.  So
16   the most efficient way for us to establish the liability of
17   the conspiracy and the violation that we have a strong statute
18   of limitations argument, because they were hiding what they
19   were doing, okay, is to go to these defendants, your Honor.
20        THE COURT:  Let me push back in this way.  First with
21   a question.  Understood on these six defendants.  Are you
22   asking from the six the same information or what?
23        MR. GILBERT:  We're asking for the information about
24   their violation of need-blind.
25        THE COURT:  Okay.  I'm being very specific in what

1    I'm asking -- let me be very clear on what I'm asking.  When I

2    say "this information," what I mean is information that would

3    assist you in determining whether admissions were tied to

4    donations.  Are you asking for that from the other 11?

5          MR. GILBERT:  Yes.  And as to your question about

6    getting something -- I want to do it in response to your

7    question about getting something.

8          THE COURT:  No, no, no.  Hang on.  What you told me a

9    second ago was that it's most efficient to go to these six.  I

10   get that.  They're the major malefactors of what you're

11   contending, in other words, but you're also going to the other

12   11.  So it's kind of hard to swallow it's the most efficient

13   argument if you're doing it from everybody.

14         MR. GILBERT:  Well, your Honor, we had actually

15   addressed what you said as sort of a proportionality.  We had

16   made a compromise offer that we want to take the depositions

17   of six specific people.  We're authorized to take ten

18   depositions at every defendant.  Okay?  And we said, no, we

19   just want six specific individuals for depositions on this

20   issue.

21         THE COURT:  You're deciding them by title or by

22   function, I'm assuming?

23         MR. GILBERT:  Mr. Sassorossi, his job was to --

24         THE COURT:  You don't need to give me the details.

25         MR. GILBERT:  But you understand the point, I'm sure,

1    your Honor.

2          THE COURT:  Okay.  Who is going to address this on

3    the defense side?

4          MR. LITVACK:  Your Honor, Doug Litvack for Dartmouth.

5          THE COURT:  You're just going to need to keep your

6    voice up because since you're so far away from the mic, it

7    sounds like you're talking from the bottom of a barrel.

8          MR. LITVACK:  Sure.  I'll keep my voice up.  I

9    apologize for that.

10          THE COURT:  By the way, that is great art in the

11    background.  You win the background contest for today.

12          MR. LITVACK:  I'll be sure to let the firm know that,

13    your Honor.

14          Your Honor, to Mr. Gilbert's point, I just want to

15    address a few things that Mr. Gilbert said.  First,

16    Mr. Gilbert is conflating the exemption with liability.  Those

17    are two distinct issues in this case.  There's antitrust

18    liability, which he conceded has nothing to do with admission

19    practices.  And then there's the narrow question of the

20    exemption.

21          And, your Honor, you spent a good amount of time in

22    the motion to dismiss order interpreting the exemption and

23    giving us guidance on what the exemption means.  And it's a

24    binary question.  It's a very simple binary question of

25    whether schools' need admissions process consider an

1    applicant's financial circumstances in making an admissions

2    decision.

3            And the scope of discovery the plaintiff seeks is

4    completely, grossly disproportionate to the needs of the case.

5    They're seeking here, your Honor, 73 RFPs, and we put in our

6    declarations what that would entail in terms of work.  Those

7    documents seek 25 years of information, hundreds of thousands

8    of documents --

9            THE COURT:  Time -- time out.  Time out.

10           MR. LITVACK:  -- that's millions of dollars of

11   additional expense --

12           THE COURT:  This motion doesn't talk about all 73.

13   So let's just talk about what this motion talks about.

14           MR. LITVACK:  Your Honor, respectfully, it does talk

15   about all 73.  Yes.

16           THE COURT:  All 73, every one of the 73 is covered by

17   this motion?

18           MR. LITVACK:  Correct, your Honor.  Let me just

19   explain what we're asking for here.  Your Honor, we're asking

20   for here a protective order from the discovery -- the grossly

21   disproportionate discovery the plaintiff seeks.  We're not

22   saying that no discovery from us on these issues is

23   appropriate.  However, the discovery that the plaintiffs are

24   currently seeking is completely disproportionate, and

25   Mr. Gilbert's compromise that he discussed, he didn't tell --

1   he failed to tell that they're seeking production of 37 of the

2   73 RFPs, doesn't meaningfully reduce the burden.  We didn't

3   have any issue with the depositions.  We had an issue with

4   spending millions of dollars and significant time and effort

5   for a defense that we're not asserting.  And, frankly, there's

6   easier, more targeted ways to get the information that the

7   plaintiffs need for this narrow question.

8           THE COURT:  Okay.  So time out here.  I'm just

9   looking at the request for production.  So I understood this

10   motion as basically saying, don't make us, the six movants,

11   produce information about donations to the school and linkage

12   of that with admissions.  Did I misread the motion?

13           MR. LITVACK:  You did, your Honor.

14           THE COURT:  Okay.  It wouldn't be the first time I've

15   done that.

16           MR. LITVACK:  It's also about admissions practices as

17   well, your Honor.  Admission practices are equally as relevant

18   to plaintiffs' antitrust claim, as Mr. Gilbert explained.

19           THE COURT:  Okay.  Give me just a second here.  I

20   just want to pull up something.

21           Bear with me.

22           So I guess maybe my problem is that nothing in your

23   memorandum tells me what the limitations are that you're

24   looking at.  And the bulk of the discussion is under -- what I

25   see as the discussion is under heading II, Roman numeral II,

1     which says:  "Discovery into admissions and development

2     activities of the moving defendants is not relevant to the

3     merits of the plaintiffs' claim or the statute of limitations

4     defense."

5             And so I guess I read that, you know -- you will

6     excuse me if I read it kind of consistently with the title,

7     Admissions and Development Activities, as this motion was more

8     or less targeted into the linkage between those two things.

9     And there's really nothing in the memorandum, which I'll just

10    point out is 15 pages that says, here's specifically what you

11    want me to do.

12            So just from kind of a consumer standpoint, me being

13    the consumer, that's a little problematic.  So can you tell me

14    in a nutshell what you want me to do?

15            MR. LITVACK:  Yes, your Honor.  We want you to issue

16    a protective order that prohibits plaintiffs from enforcing

17    compliance of the 73 RFPs that were attached to our motion as

18    Exhibit C and -- so we're willing to entertain more targeted,

19    lesser forms of discovery --

20            THE COURT:  So your proposal is strike everything,

21    and we start over.  And we'll talk to you.  That's what I got

22    from what you just said.  Did I get it right?

23            MR. LITVACK:  No, no, no, your Honor.  No, your

24    Honor.

25            THE COURT:  Okay.  I don't want to paraphrase.  Let

1   me read back to you what you said to me.

2           We want you to issue a protective order that

3   prohibits plaintiffs from enforcing compliance of the 73 RFPs

4   that were attached to our motion, and we're willing to

5   entertain more targeted, lesser forms of discovery.

6           So what -- how would a person in my shoes understand

7   that other than what I just said?  Strike everything and start

8   over, and we'll talk to you.  That's what you told me.

9           MR. LITVACK:  Sorry, your Honor.  Sorry, I didn't

10  mean to speak over you.

11          I didn't finish the part of what we're asking for

12  was --

13          THE COURT:  I didn't interrupt you.  I didn't

14  interrupt you.

15          MR. LITVACK:  We're willing to submit, as our motion

16  suggested, written interrogatories as well as produce

17  documents sufficient to show whether our clients' admissions

18  departments did or did not consider an applicant's financial

19  circumstances in any way in making admissions decisions.  We

20  think those two things will give the plaintiffs the discovery

21  they want related to the exemption and will be

22  proportionate --

23          THE COURT:  Stop.  Stop.  What you just said, what

24  you said, where do I find that in the memorandum in support of

25  the motion?  I guess it's just -- it's a motion.  It's kind of

1    a speaking motion.  Just point to me where I find that in the

2    motion because I guess I must have missed it.  So tell me

3    where it is.  I've got it pulled up in front of me.

4          MR. LITVACK:  Your Honor, you didn't miss it in the

5    motion.

6          THE COURT:  Because it's not in there.  Because it's

7    not in there.  I mean, seriously, folks.  You guys gave me

8    like, you know, the book that I put together of all of this

9    stuff, I'm just going to tell you how many pages it's got in

10   it.  645 pages of all the stuff -- 645.  That doesn't count

11   the 40-page status report from back in January.  I mean,

12   what's the planet on which you don't put in your motion --

13   your 15-page motion for protective order exactly what you're

14   asking me to do?  It's not this one.  It's not the planet

15   Earth.  Okay?

16          So basically when I asked you, point blank, tell me

17   what you want me to do, you said, don't make us respond to the

18   73 RFPs.  And we're willing to entertain more targeted, lesser

19   forms of discovery.  Translation, that's the only reasonable

20   translation of what you told me is strike the 73 RFPs.  And if

21   you want to serve something else, we'll think about it.  We're

22   willing to entertain it.  That's just not a viable

23   alternative.  And it's not in your motion.  It's not in your

24   motion.

25          Here's the deal.  I'm about ten seconds here from

1   just striking the motion because it doesn't describe the

2   relief you're asking for.  So you get one more chance to tell

3   me why I shouldn't do that.

4           MR. LITVACK:  Your Honor, in the motion, we do

5   request a protective order from all 73 RFPs.  That's the

6   relief that we're seeking, your Honor.

7           THE COURT:  Again, I'm going to ask you where in the

8   motion does it say that?

9           MS. VAN GELDER:  Your Honor, this is Amy Van Gelder.

10          THE COURT:  No, no.  I am talking to a particular

11  person here.  I am sorry.  I'm going to deal with the person

12  who is talking to me here, who has taken up the last

13  12 minutes of my life that I'm never going to get back.  Okay?

14  So tell me where in the motion I find it.  I'm not saying it's

15  not in there.  I just want you to tell me where I can find it

16  so I can look at it in black and white.

17          MR. LITVACK:  Your Honor, it's -- first of all, it's

18  in the conclusion on page 15.  And then we reference in the

19  introduction of the motion.

20          THE COURT:  The conclusion on 15 says:  "For the

21  foregoing reasons, the Court should grant this motion and

22  enter the proposed protective order as to the moving

23  defendant."

24          So it basically refers me to something else.  That's

25  not containing it within the confines of the motion.  Where is

1  it in the motion?

2      MR. LITVACK:  Your Honor, it's on page 3 on the

3  last -- I'll just read it out loud, your Honor.

4      "Accordingly, the moving defendants seek a protective

5  order precluding discovery from the moving defendants with

6  respect to admissions and development activities including

7  through requests for production and search terms identified in

8  Exhibit C to Exhibit 1 of the motion."

9      It's in --

10      THE COURT:  Time out.  Again, when you file stuff

11  with a judge, okay, and you guys -- I mean, it's kind of a

12  foregone conclusion in any litigation that the judge is the

13  person who knows the least about it.  The parties know about

14  it.  The lawyers for the parties know about it.  I know what

15  you told me.  Okay?  So here's what you told me in the thing

16  that you just read, which is the last sentence of the full

17  paragraph on page 3:

18      A protective order precluding discovery from the

19  moving defendants "with respect to their admissions and

20  development activities," including through the requests for

21  production and search terms identified in Exhibit C to

22  Exhibit 1.

23      So, again, the last part of that refers me to

24  something else, and when I read this about admissions and

25  development activities, since the thrust of most of the actual

1   discussion had to do with contributions to the university, I
2   read the "and" as meaning and, linkage, in other words.  You
3   didn't explain otherwise.

4           So now I'm actually going to go look at -- if I can
5   find it -- Exhibit C to Exhibit 1.  Exhibit C to Exhibit 1.

6           So Exhibit C to Exhibit 1 is a spreadsheet -- it's a
7   19-page spreadsheet.  It gives a bunch of search terms in it.
8   Honestly, again, that doesn't tell me -- okay.  This has kind
9   of been a waste of 20 -- we're now up to about 20 minutes.
10  It's kind of been a waste of 20 minutes.

11          So, look, I'm not going to make the plaintiffs go
12  back over from scratch.  I'm just not.  That's number one.

13          Number two, part of the reason why I'm not going to
14  make the plaintiffs go back to scratch is that unless
15  everybody withdraws the defense, which they have not, it's
16  seven out of -- or 6 out of 17, which is something like 33
17  percent or something like that, maybe 35 percent.  It's
18  hornbook law of conspiracy, or at least the way this
19  conspiracy is defined and the way the exemption works is that
20  if other defendants -- and I already ruled on this in the
21  motion to dismiss.  To the extent that what I'm about to say
22  varies from the motion to dismiss, I'm not intending that.
23  Basically says that everybody within the alleged group has to
24  have been complying with 568 in order for anybody to take
25  advantage of it.

1        Okay.  Now, you might openly convince me that that's
2    not right.  But as of right now, that's the operative
3    complaint and what it says and at least part of the basis on
4    which I sustained it.  So the proposition that by some but not
5    all defendants withdrawing the defense, you've essentially
6    removed yourselves from the need to provide discovery on these
7    points really is not accurate.  It's not right.  It's
8    incorrect.  And I'm not even thinking about the statute of
9    limitations issue.

10        If I had gotten a more targeted motion here -- which
11    I kind of thought I had, but I guess I didn't -- that says,
12    you know, limit it in various ways, I would have considered
13    it, but you haven't done that.  And I don't think you've made
14    the case on disproportionality.  The information is relevant.
15    The motion is denied.

16        Next.

17        MR. GILBERT:  Your Honor, may I address one more
18    issue regarding if the 17 withdrew the defense?

19        THE COURT:  So wait a second.  I just ruled in your
20    favor on the motion.

21        MR. GILBERT:  Right, right.

22        THE COURT:  Are you going to try to talk me out of
23    it?

24        MR. GILBERT:  We're delighted by that, your Honor.
25    But I would like --

 1          THE COURT:  What do I need to hear about it then?

 2          MR. GILBERT:  That's fine, your Honor.

 3          THE COURT:  No, I don't need to hear more about it.

 4          So I think now we're over to the stuff in the status

 5    report.  And let me check my time here.  So we're down to

 6    basically about our last 10 or 12 minutes that I've got for

 7    this.

 8          Okay.  I'm looking at the January 13th status report.

 9    Bear with me.  I'm pulling it up.

10          A question for the plaintiffs:  On page 28 of the

11    status report -- and it would be helpful if you could look at

12    that -- there's a paragraph that says:  "Plaintiffs also have

13    less burdensome avenues of discovery available to determine

14    whether an applicant's financial circumstances influenced the

15    decision of an admissions officer.  For example, some

16    defendants have proposed that before adding these custodians,

17    plaintiffs propound interrogatories relating to defendants'

18    admissions policies or conduct a 30(b)(6) deposition of an

19    individual in the admissions office to determine if donations

20    are considered as part of admissions decisions."

21          So that kind of sounds like a good idea to me.

22    What's wrong with it?

23          MR. GILBERT:  Two things, your Honor.  I might be

24    mistaken, but I believe there's only a very small minority

25    that have actually proposed that.  But more fundamentally, the

1   records of interest are not in the admissions office.  The

2   records that show the tying of the donation and the admissions

3   is where the deal was made, and the deal was made between the

4   development office and the donor or by the president of the

5   university and the donor.  That's why Morton Schapiro of

6   Northwestern looked at 550 applications and spoke to the

7   admissions office about it.  He could tell them orally, which

8   is certainly strongly implied by the article of the

9   Northwestern student newspaper that that's what he did.  He

10  told the admissions office orally what to do.

11         So the real records tying the donation to the deal

12  are not in the admissions office.

13         THE COURT:  Why wouldn't there be in that situation?

14  I mean, wouldn't there be like a notation in the file or

15  something like that, that the president of the university

16  said, admit this person?

17         MR. GILBERT:  There may be -- you're absolutely

18  right, your Honor.  There may very well be, "Schapiro said

19  admit."  Okay?  We then miss all the why he said admit.  Okay?

20  What was the basis?  How much money donated?  And what was the

21  negotiation of the donation?

22         THE COURT:  Again, the proposal isn't that instead of

23  adding these custodians.  The proposal, as I read it, is

24  before adding these custodians, "the custodians" being the

25  ones in the development and the president's office.

1     MR. GILBERT:  All right.  Well --

2     THE COURT:  I mean, in other words, let's say

3  university X, somebody, you know, that qualifies as a 30(b)(6)

4  deponent or, you know, by their title or by, you know, being

5  educated about it or whatever comes in and says, it's never --

6  I guess -- apparently, if I'm reading this stuff right, MIT is

7  going to say this.  It's never happened in recorded history

8  that we've been told by the development office or the

9  president's office to give more weight to this person or admit

10  this person or look at their application again or anything

11  like that.

12     So, I mean, I -- that's the way I'm reading this is

13  that before you tell them, okay, go look in the admission --

14  go look in the development and the president's office, let's

15  at least find out if there's some basis to believe that those

16  kind of communications coming from one of those two places or

17  both of them are happening.

18     MR. GILBERT:  As long as we're not excluding these

19  custodians, I think that's going to, your Honor, very much

20  extend the life of the discovery because we think we know

21  exactly where to go.  As we said, we think we have six names

22  where we think we could prove this, take six depositions, and

23  be done with it.  To go through the admissions office --

24     THE COURT:  You better watch out how many times you

25  say that.

1         MR. GILBERT:  Okay.  In terms of efficiency, we think

2  that's the most efficient way to go, rather than go to people

3  who, at most, may have received a note --

4         THE COURT:  What if I were to say, fine, rather

5  than -- at least initially, rather than sending, you know,

6  putting the development and the president's office and all 17

7  schools on the custodian list, if you've got these six people

8  that you want to depose, you know, ask for their records.

9         MR. GILBERT:  I believe we've asked for that, your

10  Honor.

11         THE COURT:  I understand.  But, I mean, in other

12  words, let's pause the rest of it.

13         MR. GILBERT:  That would be -- that would be

14  acceptable to us, your Honor, that if we had those six --

15         THE COURT:  So thanks.  You said "acceptable."  I'll

16  take a yes.

17         So let me turn over to the defense side here.  So the

18  proposal on the table is pause generally the inclusion of the

19  president and development office among the custodians with the

20  exemption of these six -- I forget which ones they are -- the

21  six institutions that plaintiffs' counsel is talking about,

22  Mr. Gilbert.  So somebody from the six that wants to answer

23  that.

24         MR. DUSSEAULT:  Your Honor, do you want to hear from

25  someone from the six?  This is Chris Dusseault.  I'm the one

1    addressing the issue more generally of the compromised
2    proposal.

3            THE COURT:  It probably makes sense for somebody from
4    one of the six to answer that, I think, given what the
5    suggestion is that I put on the table.

6            MR. ROELLKE:  Your Honor, it's Jon Roellke for Brown
7    University.  I think that proposal kind of stands us on its
8    head and that --

9            THE COURT:  That's what I thought you were going to
10   say is that should be -- since we withdrew a defense, we
11   should have less stuff, not more, and now we're getting more.

12           MR. ROELLKE:  Yeah, precisely, your Honor.  And I
13   think the proposition that the plaintiffs assert that they
14   already have dispositive evidence that those six or the folks
15   that they want to depose engaged in not need-blind practices
16   proves too much.  If they already have the evidence, I don't
17   know why they need more.  And certainly with respect --

18           THE COURT:  Have you ever heard of testimony?  I
19   mean, as opposed to an article in a student newspaper?  You
20   get that, right?  What you just said proves too much.

21           MR. ROELLKE:  Your Honor, my point being that to --
22   and we aren't asking the plaintiffs to start from scratch on
23   this.  This relates solely to the issue of whether or not
24   they're entitled to discovery of need-blind practices for
25   purposes of the exemption.  There's 140 document requests, 73

1   of which relate solely to the application of the exemption.

2   And those are the requests that we are seeking to foreclose

3   the plaintiffs --

4        THE COURT:  I've ruled on that motion.  We're talking

5   about something else now.  Seriously.

6        MR. ROELLKE:  Well, it relates to the question of

7   whether or not discovery of entity of schools that do not rely

8   on the exemption is appropriate.  And if what the proposal on

9   the table is that discovery of the schools that have moved for

10  a protective order should in the first instance be limited to

11  a deposition and not preceded by the 73 different document

12  requests that relate to the application --

13       THE COURT:  Okay.  So let me just give you a

14  hypothetical which probably isn't all that hypothetical.

15  Let's say we did that.  And so Mr. Gilbert lays a subpoena on

16  the president of Northwestern.  I don't know if he's still a

17  president or not.  Let's just assume he is.  Lays a subpoena

18  on the president of Northwestern.  Says, okay, what about it,

19  Mr. So-and-So, or Dr. So-and-so?  Did you say this?  I don't

20  remember.

21       What about -- did you ever, you know, put in a call

22  or send any kind of communication to the admission office

23  about, you know, an applicant whose family had given a lot of

24  money?  Well, I don't remember.

25       Did you do it with regard to -- and then he quotes

1    something from out of the student newspaper?  I don't recall
2    one way or another.
3         We all know stuff like that is going to happen.  It
4    might not be a hundred percent across the board.  We're
5    talking about -- just by definition, we're talking about stuff
6    that happened 8, 10, 12, maybe more years ago.  People aren't
7    going to remember.  You're talking about busy people who've
8    got -- it's kind of like a judge or a lawyer.  They've got 57
9    things they're doing.  This is one of them.  They're not going
10   to remember details of that.
11        So, I mean, unless you were willing to say, okay, so
12   if -- I tell Gilbert, okay, Gilbert, you got to go take these
13   six depositions, just do it with what you've got right now.
14   Unless you're willing to say, on the defense side, if we get
15   any "I don't knows" out of those depositions, then I'm going
16   to let them go back and get the documents and then make the
17   person appear again to answer the questions they didn't
18   remember the first time.  Unless you're willing to say that,
19   in other words, agree that the person could sit for a second
20   deposition if they don't recall something significant, which
21   I'm betting you won't do, that's my bet, then what are we
22   talking about?  Would you do that?  Would you agree to that?
23        MR. ROELLKE:  Your Honor, I understood the proposal
24   to be that in order to --
25        THE COURT:  No, no, no, don't respond to somebody

1    else's question.  Respond to mine.  Seriously.  It's not one
2    of those Sunday morning talk shows where, you know, George
3    Stephanopoulos asks a question and then whoever is answering
4    it just gives their talking points.  That's not the way it
5    works.  It's a real question and answer.  You have to actually
6    answer the question.  So it's my question.  Just answer it.

7                MR. ROELLKE:  And I don't understand how that would
8    solve the proportionality problem that we're trying to
9    address.

10               THE COURT:  Here's how it would solve it, because you
11   just said that, hey, if he's got these six smoking guns here,
12   just take those depositions and be done with it.  And don't
13   make us cough up the documents.  So my comeback was what
14   happens if one of those people doesn't remember something
15   that's significant?  Would you be willing to make him sit for
16   a second time and get the documents in between?  That's the
17   question I asked you, and you basically answered me with a
18   non-answer twice.  Let's try for three.

19               MR. ROELLKE:  I just speak for Brown University, your
20   Honor.  To the extent that the plaintiffs want to take a
21   deposition of Brown University --

22               THE COURT:  We have somebody who is signed in from
23   two devices in the same room.  That's why we're getting the
24   echo.  So if you did that, please turn off the second device.
25               Thanks.  Go ahead.

1          MR. ROELLKE:  For Brown University, if the plaintiffs
2     forego what we believe to be oppressive and burdensome
3     document discovery in exchange for a deposition to address the
4     issues that we think are disproportionate, we would -- and
5     that witness did not provide sufficient facts to satisfy the
6     plaintiffs as to particular questions, we would then be
7     prepared to pursue the document discovery that, again -- if it
8     was proportional -- and permit that witness to be deposed
9     again as to those documents.
10          THE COURT:  I think I counted five hedges in there.
11     Who represents Northwestern?
12          Mr. Stein.  Okay.  Since the hypothetical concerned
13     the president of Northwestern, what's your view about this?
14     You're muted right now.  I can't hear you.  You're muted.
15          MR. STEIN:  I'm sorry, your Honor.  Can you hear me?
16          THE COURT:  There you go.  Yes.
17          MR. STEIN:  Scott Stein.  The lead for Northwestern.
18          Just to answer one question you articulated,
19     Mr. Schapiro is now the former president of Northwestern.
20          THE COURT:  I kind of thought that, yeah.  Okay.
21     Right.
22          MR. STEIN:  But if I understand -- if I'm
23     understanding correctly what your Honor is proposing -- we
24     heard you on the protective order motion.  Our concern, if
25     there's going to be discovery on these issues, is to make it

1    proportional, right?  And to the point that this is really a
2    binary issue and the issue that the plaintiffs are focused on
3    is, is there evidence that schools, Northwestern and other
4    schools, considered the financial circumstances of certain
5    students or families, then what your Honor is proposing seems
6    a reasonable way to get at that.

7          In other words -- and Mr. Schapiro, by the way,
8    President Schapiro, Former President Schapiro, was also the
9    vice chair of the 568 group.  He's going to be deposed.
10   There's no question he's going to be deposed.  And I have
11   little doubt that in a deposition, the plaintiffs would be
12   able to get the evidence that they'll argue is sufficient for
13   them to make the arguments they want to make on the
14   applicability of the 568 exemption.  I hear you.  If there's a
15   lot of "I don't knows," of course, I can't say they have to be
16   bound in advance.

17         But I think we would be able to make a strong showing
18   after such a deposition that they have what they need, as
19   they've articulated today.  And we don't need to produce
20   20 years of donor records and admissions data.  Let's do this
21   quickly, efficiently.  And I think that will be -- frankly, I
22   think that will satisfy both sides' concerns.

23         MR. GILBERT:  Your Honor, may I address that, please?
24   This is Robert Gilbert.

25         THE COURT:  Sure.  Go ahead.

1          MR. GILBERT:  The other point that has not been
2     raised is the admissions decisions and whether it was wealth
3     favoritism applies to whether the per se rule or the rule of
4     reason or Brown doctrine applies.  In the Brown case about the
5     overlap group, the key issue was were the universities
6     altruistic or were they revenue maximizing.  If they engage in
7     wealth favoritism, that would be another indication that they
8     were not purely altruistic, which was the standard in the
9     Brown case, but instead revenue maximizing.  So that's another
10     area of why this is important even if 17 conceded that the --
11     on the -- the exemption does not apply.
12          THE COURT:  Okay.  Folks, you've kind of reached the
13     end of my available time for this.  So I'm going to -- I guess
14     what I'm going to do is kind of apply a hopefully somewhat
15     sharpened meat ax approach.  That would be m-e-a-t, a-x,
16     approach.  And I know that this isn't directly teed up with
17     what we're talking about.
18          So right now, if I'm counting right, between the
19     first and second document requests that the plaintiffs served,
20     there's 179 requests for production, 173 plus 6.  Is there a
21     third or fourth, or is that the universe right now?  Just yes
22     or no?  Somebody say yes or no on the plaintiffs' side or on
23     the defense side.
24          MR. GILBERT:  There is a third.
25          THE COURT:  How many are in the third?  Just ballpark

1    it.  10, 20, 30, 40, 150?

2         MR. STEIN:  I think it's much closer to 20.

3         MR. GILBERT:  13.

4         THE COURT:  Okay.  So that takes us up to 192.

5         So here's what I'm doing.  Did I put -- was there any

6    kind of -- in the earlier orders, did I say you get this many

7    interrogatories and this many RFPs?

8         MR. STEIN:  Yes.

9         THE COURT:  What was the number?

10        MR. STEIN:  45 interrogatories.  I don't believe

11   there was a limit on number of RFPs.

12        THE COURT:  There is now.  So you get to pick your

13   best 100.  You get to pick your best 100.

14        And as far as adding the development and president's

15   office as custodians, I'm putting the pause on that for now.

16   For now.  We're going to readdress that in a couple of months

17   once stuff is actually getting produced.  I have to get this

18   thing off the dime.  So we're going to put the pause on having

19   custodians from the development and the president's office

20   right now.

21        Here's what that means for the defendants.  I want to

22   make it real clear what that means for the defendants.  Okay?

23   What that means is if I later determine that there's a basis

24   to include those for some or all of the defendants, you're not

25   going to get a whole lot of time to produce the stuff, and

1   you're not going to get to do it at anybody's leisure.  It's

2   going to be my definition of how quick you get it done.  So

3   that's the condition.

4           I don't have any more time to give you folks today.

5   I got to start in three minutes an argument about patents and

6   computer processors, which is going to make this look like a

7   discussion of an action movie by comparison.

8           MR. MORSCH:  Your Honor, James Morsch, on behalf of

9   Duke.  I just want to give your Honor advance notice of

10  something that wasn't on the agenda today.  The defendants

11  filed an extension -- for an extension of the structured data

12  deadline that was filed as item 313.

13          THE COURT:  That got filed yesterday.  That just got

14  filed yesterday.  I saw something got filed.

15          MR. MORSCH:  Yes, that's a little bit time sensitive.

16          THE COURT:  Hang on.  Stop, stop, stop, stop, stop,

17  stop, stop.  I'm just pulling it up.  It will just take a

18  second for it to come up here.

19          Here it is.  You're asking to extend the structured

20  data deadline to March the 13th.

21          MR. MORSCH:  That's right.

22          THE COURT:  Do the plaintiffs have a problem with it?

23          MR. GILBERT:  Yes, your Honor.  We're going to file a

24  brief --

25          THE COURT:  No, you're not.  No, no, no.

1    MR. GILBERT:  We'll file an opposition in two days.

2    THE COURT:  No.  You're going to tell me right now

3  what the problem with it is.

4    MR. GILBERT:  The problem is, number one, it's not

5  accurate.  It misrepresents what was represented to the

6  defendants.

7    Second is its meritless; that is, the anonymization

8  could have started on November 22nd.  The first we even heard

9  there was a problem was on February 3rd.  The first time it

10  was explained was two days ago.  Our experts have said this

11  can be done much faster.  Essentially, they've presented a

12  fait accompli to the Court, basically telling the Court, this

13  is the way it's going to be.  They're violating two deadlines,

14  not one.  It requires them to violate also the deadline on

15  March 3rd, which is court ordered.  Okay?  Which they don't

16  mention --

17    THE COURT:  What's that deadline?  What's on March

18  3rd?

19    MR. GILBERT:  That is for the substantial response to

20  all RFPs, many of which are structured data.  So now there's

21  two deadlines they're blowing.

22    And we're prejudiced.  In order to get the number of

23  depositions done in this case, we had indeed -- indeed hired

24  additional people -- to start the depositions in mid April so

25  we could get done by the beginning of next year, which is,

1   again, the court deadline.  And our ability to start the

2   depositions in mid April has been prejudiced.

3          So for all of those reasons, we oppose the motion.

4   And they have not even said there's going to be a rolling

5   production is another thing.  We were told there would be a

6   rolling motion.  All they said is in the motion was there was

7   going to be data in a month.

8          THE COURT:  Stop on that.  Stop on that.

9          And, Mr. Morsch, you brought this up, so I'm hereby

10  appointing you the spokesperson.  So if I give you an

11  extension, is it going to be -- pardon me one second here --

12  is it going to be a dump on that date, or is it going to be

13  rolling production between now and then?

14         MR. MORSCH:  It's going to be a rolling production,

15  as we stated in the motion itself.

16         THE COURT:  You get three weeks, not four.  It's

17  extended to the 6th of March.

18         MR. MORSCH:  Thank you, your Honor.

19         One other thing.  Item 2, which you talked about, the

20  depositions, there was a little bit of a stun silence you may

21  have seen when you raised that issue.  You issued an order on

22  February 12th.

23         THE COURT:  Okay.  Good, then.  Never mind.

24         MR. MORSCH:  Did you mean to revisit that order?

25         THE COURT:  I didn't.

1          MR. MORSCH:  Okay.  Thank you, your Honor.

2          THE COURT:  If I already ruled on it -- hey, I got a

3     lot of stunned silences during this thing, so I can't really

4     read much into it, other than the sound doesn't work that

5     well.  So it's not my intention to revisit the order.  I just

6     thought that was still on the table.

7          I got to end this, folks, because, as you can see,

8     I'm having a hard time even talking.

9          MR. GILBERT:  Your Honor, I apologize.  But there's

10    two reasons I need to address from the hearing commission.

11         THE COURT:  I got to this end this now.  I got to

12    this end this now.  The hearing is concluded.  File something

13    else.  I don't want to have to go through the 469 pages again

14    or whatever it was.  The hearing is concluded.

15         Thanks.  Bye.

16      (Which were all the proceedings had in the above-entitled

17    cause on the day and date aforesaid.)

18      I certify that the foregoing is a correct transcript from
      the record of proceedings in the above-entitled matter.
19
      /s/ *Carolyn R. Cox, CSR, RPR, F/CRR*_____    February 9, 2023
20    Official Court Reporter
      United States District Court
21    Northern District of Illinois
      Eastern Division
22

23

24

25