## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| ANDREW CORZO, SIA HENRY, ALEXANDER LEO-GUERRA, MICHAEL MAERLENDER, BRANDON PIYEVSKY, BENJAMIN SHUMATE, BRITTANY TATIANA WEAVER, and CAMERON WILLIAMS, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | |
| v. | Case No.: 1:22-cv-00125 |
| BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, THE JOHNS HOPKINS UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY, | **Hon. Matthew F. Kennelly** |
| Defendants. | |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO EXCLUDE THE TESTIMONY OF DEFENDANTS' EXPERT DR. LONG

## TABLE OF CONTENTS

TABLE OF AUTHORITIES................................................................................................ ii

GLOSSARY OF ABBREVIATION ................................................................................... v

INTRODUCTION ............................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................ 2

LEGAL STANDARD ....................................................................................................... 5

ARGUMENT .................................................................................................................... 5

I.      DR. LONG'S TESTIMONY REGARDING PURPORTED BENEFITS OF THE
        CHALLENGED RESTRAINTS ON TRADE WILL NOT ASSIST THE JURY ............. 5

        A.      Purported Benefits That Do Not Promote Competition Are Irrelevant ................. 5

        B.      The Purported Benefits Identified by Dr. Long Do Not Promote Competition ...... 9

                1.   The Purported Benefits Are Impermissible Social Welfare Justifications ...... 10

                2.   The Purported Benefits Are Impermissibly Based on the Premise That
                     Horizontal Price-Fixing Is Better Than Market Competition ........................ 13

        C.      The Purported Benefits Identified by Dr. Long Could Be Achieved Without
                Horizontal Price-Fixing ............................................................................... 14

        D.      Dr. Long's Testimony Regarding Purported Access and Socioeconomic Diversity
                Benefits Is Too Equivocal and Speculative to Help the Trier of Fact .......................... 15

# TABLE OF AUTHORITIES

**Cases**

*Andersen v. City of Chicago,*
    454 F. Supp. 3d 740 (N.D. Ill. 2020) ........................................................................ 5

*Apotex, Inc. v. Cephalon, Inc.,*
    2017 WL 10963610 (E.D. Pa. May 24, 2017) ........................................................... 6

*Catalano, Inc. v. Target Sales, Inc.,*
    446 U.S. 643 (1980) ................................................................................................... 13

*Clarett v. Nat'l Football League,*
    306 F. Supp. 2d 379 (S.D.N.Y. 2004) ................................................................... 9, 15

*Clarett v. Nat'l Football League,*
    369 F.3d 124 (2d Cir. 2004) ....................................................................................... 9

*Daubert v. Merrell Dow Pharm., Inc.,*
    509 U.S. 579 (1993) ............................................................................................... 5, 18

*Durkin v. Equifax Check Servs., Inc.,*
    406 F.3d 410 (7th Cir. 2005) ...................................................................................... 5

*Entrata, Inc. v. Yardi Sys., Inc.,*
    2019 WL 13076536 (D. Utah Aug. 23, 2019) ........................................................... 6

*Epic Games, Inc. v. Apple, Inc.,*
    67 F.4th 946 (9th Cir. 2023) ......................................................................... 7, 12, 18

*Freeman v. San Diego Ass'n of Realtors,*
    322 F.3d 1133 (9th Cir. 2003) ............................................................................... 9, 14

*FTC v. Indiana Fed'n of Dentists,*
    476 U.S. 447 (1986) ............................................................................................... 8, 12

*FTC v. Superior Court Trial Lawyers Ass'n,*
    493 U.S. 411 (1990) ........................................................................................... 8, 9, 12

*Gen. Elec. Co. v. Joiner,*
    522 U.S. 136 (1997) ................................................................................................... 16

*George v. Kraft Foods Global, Inc.,*
    641 F.3d 786 (7th Cir. 2011) ...................................................................................... 5

*Giant Eagle, Inc. v. E. Mushroom. Mktg. Coop.,*
    2020 WL 1903640 (E.D. Pa. Feb. 14, 2020) ............................................................. 6

*Goswami v. DePaul Univ.*,
 8 F. Supp. 3d 1019 (N.D. Ill. 2014) ......................................................... 5

*Henderson v. Wilkie*,
 966 F.3d 530 (7th Cir. 2020) .................................................................. 18

*In re Cardizem CD Antitrust Litig.*,
 332 F.3d 896 (6th Cir. 2003) ................................................................... 6

*In re Loestrin 24 Fe Antitrust Litig.*,
 433 F. Supp. 3d 274 (D.R.I. 2019) ........................................................... 5

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*,
 37 F. Supp. 3d 1126 (N.D. Cal. 2014) ...................................................... 8

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*,
 2024 WL 1142860 (E.D.N.Y. Mar. 15, 2024) ......................................... 10

*Kleen Prods. LLC v. Int'l Paper*,
 2017 WL 2362567 (N.D. Ill. May 31, 2017) ........................................... 18

*Kraft Foods Global, Inc. v. United Egg Producers, Inc.*,
 2023 WL 6049912 (N.D. Ill. Sept. 15, 2023) ...................................... 8, 10

*Law v. Nat'l Collegiate Athletic Ass'n*,
 134 F.3d 1010 (10th Cir. 1998) ..........................................................8, 11

*Minasian v. Standard Chartered Bank, PLC*,
 109 F.3d 1212 (7th Cir. 1997) ............................................................... 16

*Muniz v. Rexnord Corp.*,
 2006 WL 5153078 (N.D. Ill. Nov. 2, 2006) ............................................ 16

*Nat'l Collegiate Athletic Ass'n v. Alston*,
 594 U.S. 69 (2021) .................................................................................. 8

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*,
 468 U.S. 85 (1984) ...................................................................... 6, 10, 14

*Nat'l Soc'y of Prof'l Eng'rs v. United States*,
 435 U.S. 679 (1978) ........................................................................ passim

*O.M. by and through Moultrie v. Nat'l Women's Soccer League, LLC*,
 544 F. Supp. 3d 1063 (D. Or. 2021) ....................................................... 11

*Obrycka v. City of Chicago*,
 792 F. Supp. 2d 1013 (N.D. Ill. 2011) ..................................................... 5

*Ohio v. Am. Express Co.*,
585 U.S. 529 (2018)..................................................................................7, 11, 15

*PLS.com, LLC v. Nat'l Ass'n of Realtors*,
32 F.4th 824 (9th Cir. 2022).......................................................................11, 14

*Sandifer v. Hoyt Archery Inc.*,
907 F.3d 802 (5th Cir. 2018) ........................................................................... 16

*Tennessee v. Nat'l Collegiate Athletic Ass'n*,
718 F. Supp. 3d 756 (E.D. Tenn. 2024)..............................................................9, 15

*United States v. Addyston Pipe & Steel Co.*,
85 F. 271 (6th Cir. 1898), *aff'd*, 175 U.S. 211 (1899) ......................................... 7

*United States v. Am. Airlines Grp. Inc.*,
121 F.4th 209, 2024 WL 4716418 (1st Cir. Nov. 8, 2024)........................................ 7, 9

*United States v. Brown Univ.*,
5 F.3d 658 (3d Cir. 1993) .......................................................................... 12, 14

*United States v. Gallardo*,
497 F.3d 727 (7th Cir. 2007) ............................................................................ 5

*United States v. Topco Assocs., Inc.*,
405 U.S. 596 (1972) ....................................................................................... 6

*Ventriloscope v. MT Tool & Mfg.*,
2019 WL 12528939 (N.D. Ill. Feb. 22, 2019) .................................................... 17

*Viamedia, Inc. v. Comcast Corp.*,
951 F.3d 429 (7th Cir. 2020) .....................................................................9, 10, 11

*Weir v. Crown Equip. Corp.*,
217 F.3d 453 (7th Cir. 2000) ............................................................................ 5

**Other Authorities**

Cameron D. Ginder, *NCAA & the Rule of Reason: Analyzing Improved Education Quality as a Procompetitive Justification*, 57 Wm. & Mary L. Rev. 675 (2015).......................................... 14

H.R. Rep. 105-44 (1997)................................................................................... 13

Herbert Hovenkamp, *The Rule of Reason*, 70 Fla. L. Rev. 81, 133 (2018) ................................. 12

John M. Newman, *Procompetitive Justifications in Antitrust Law*, 94 Ind. L.J. 501 (2019) ....... 13

Julie L. Seitz, *Consideration of Noneconomic Procompetitive Justifications in the MIT Antitrust Case*, 44 Emory L.J. 395, 426 (1995) .................................................... 6

## <u>GLOSSARY OF ABBREVIATIONS</u>

**Ex.__:**                Exhibit to the Declaration of Edward Normand dated December 16, 2024

**Long Rpt.:**         Expert Report of Bridget Terry Long, Ph.D., dated August 7, 2024

**568 Exemption:**   Section 568 of the Improving America's Institutions Act of 1994, 15 U.S.C. § 1 note

## INTRODUCTION

Plaintiffs are former undergraduate students who received institutional, need-based financial aid from Defendants, a group of seventeen elite private universities. Plaintiffs allege that Defendants, in violation of Section 1 of the Sherman Act, engaged in a long-running, overarching conspiracy on the principles and methods of calculating financial aid and for sharing critical pricing-related information. Plaintiffs further allege that, as a result of that conspiracy, they paid inflated net prices at Defendants' universities.

Defendants have proffered Dr. Bridget Terry Long, an education professor and economist, to opine on a wide range of topics. Plaintiffs here seek only to preclude Dr. Long from testifying about three purported benefits of the 568 Group: increased "access" to higher education for low-income students, increased "equity" in financial aid, and increased socioeconomic diversity at Defendants' universities. Dr. Long's testimony regarding these purported benefits would not assist the jury and is therefore inadmissible under Rules 702, 402, and 403. This is so for four primary reasons.

*First*, under federal antitrust law, even if the Rule of Reason applies, Defendants may only justify their horizontal agreement restraining price competition by demonstrating that the restraints furthered some end that enhanced competition. Dr. Long does not claim, and cannot reasonably claim, that the purported benefits from the restraints that she identifies—increased access, equity, and socioeconomic diversity—enhanced competition between or among Defendants in any way. Indeed, the purported benefits that she identifies are precisely the kind of "social objectives beyond enhancing competition" that the Supreme Court has "regularly" characterized as irrelevant to antitrust analysis.

*Second*, these "social objectives" that Dr. Long addresses are also irrelevant here because she concedes that Defendants could have achieved those objectives without entering into a

horizontal agreement restraining competition on financial aid. That is, she admits that Defendants' horizontal agreement is unnecessary to achieve increased access, equity, and socioeconomic diversity. Accordingly, those benefits cannot serve to justify the challenged conduct.

*Third*, exclusion of Dr. Long's testimony regarding purported access and socioeconomic diversity benefits is particularly warranted because that testimony is not only unsupported, but is also ambiguous and equivocal to such a degree that it is unclear whether she even believes that the restraints imposed as part of the 568 Group, as opposed to something else, produced those purported benefits. As a result, her testimony on those points will not help the jury determine anything, let alone a material issue.

## FACTUAL BACKGROUND

Defendants' proposed expert Dr. Bridget Terry Long is an education professor whose "research has focused on policies and programs that aim to increase higher educational access, affordability, and completion." Long Rpt. ¶ 1 (Ex. 115). In her 383-page report, she addresses, among many other issues, the impact and purported benefits of the 568 Group. *See* B. Long 14:18-22 (Ex. 116) ("I did very much focus on the question, if the goal is to increase access and equity for low-income students, did the 568 Group benefit students and families in the system overall. So that was really the focus of my report.").[1]

Specifically, Dr. Long argues (with varying degrees of certainty) that the 568 Group improved both "access" to higher education and "equity" in financial aid.[2] She also suggests (with

---

[1] Additionally, Dr. Nicholas Hill, another of Defendants' experts, references without any further detail or elaboration of her conclusions or procompetitive justifications that "I therefore conclude that there are no anticompetitive effects that would outweigh any procompetitive benefits of the 568 Group, as identified by Dr. Long in her report." Hill Rpt. ¶ 14.

[2] *See* Long Rpt. ¶ 143 ("These discussions benefited students in multiple ways and enhanced equity in [the] need analysis process."); Long Dep. at 27:1-7 (arguing that Defendants were "improving equity and fairness in how we try to measure a family's ability to pay"), 103:18-21 ("I do see examples where the defendants were doing things to better meet the needs of low-income students."), 105:6-10 ("Without the 568 Group,

even less conviction) that the 568 Group *might* have contributed to increased socioeconomic diversity at Defendants' universities. *See* B. Long 38:18-42:9 (emphasizing that her focus was not on whether the 568 Group increased socioeconomic diversity at Defendants' universities).

Dr. Long does not, however, quantify any of these purported benefits. For example, she defines "access" as "the ability of students to be able to afford" an institution, B. Long 102:7-12, but she does not opine that the 568 Group resulted in lower average expected family contributions ("EFCs") for students, *id.* 71:11-22. Similarly, although she defines equity as incorporating two concepts—"vertical equity, which is to treat families in different financial circumstances differently, and horizontal equity, which is to treat families in similar financial circumstances similarly," Long Rpt. ¶ 23—her report is silent on how much equity increased on either of these dimensions, B. Long 112:24-113:8, let alone the extent to which those increases produced positive or negative economic impacts in the relevant market. And as to socioeconomic diversity, she is unable to say whether the 568 Group had any impact at all, economic or otherwise. B. Long 38:18-42:9.

Consistent with these gaps, Dr. Long was not asked to assess "procompetitive benefits;" instead, she was asked to "evaluate what the 568 Group was, what it did, and to outline the impact of the group." B. Long 13:15-21. And she does not regard increased "access" or increased "equity" as procompetitive, as evidenced by her testimony that "competition" for students "really sits with

---

it's unclear whether or not there would have been improvement to the same degree on elements of how we understand the needs of low-income students."), 111:23-112:4 ("It is my opinion that the 568 Group did advance horizontal equity among the defendants but also their peer institutions and many other institutions that they shared the lessons that they learned and the recommendations that they made with the broader industry."), 112:19-23 ("It is my opinion that the goal of the 568 Group was to improve vertical equity. And by doing careful analysis and discussion of how to treat different elements, that it likely also increased vertical equity."), 119:20-120:1 ("It is my opinion that the 568 Group had the goal of increasing fairness and equity and took steps through their discussions and research to put forth a series of recommendations that in fact did a better job at trying to account for a family's ability to pay.").

things like merit-based aid," which "was separate from the focus of the 568 Group." *Id.* at 15:4-18. She similarly emphasizes that Defendants' conduct is, in her view, not motivated by profit or increasing endowments, but is instead motivated by Defendants' "public service" missions. Long Rpt. ¶¶ 22, 30, 61. It bears emphasizing that, notwithstanding her suggestion that the 568 Group produced social benefits, Dr. Long also asserts that Defendants' "public service missions" would cause them to adopt policies that are effectively the same as those that are incorporated into the horizontal agreement challenged here, regardless of whether they ever joined the 568 Group.[3]

---

[3] *See id.* ¶¶ 22 ("[I]t is flawed to think that absent the Challenged Conduct, Defendants would have adopted financial aid philosophies, principles, or policies that were inconsistent with their broader missions . . . . These investments show that Defendants are dedicated to their missions and undermine the plausibility of any notion that Defendants would have approached these policies and practices differently absent their participating in the 568 Group."), 29 ("Dr. Singer has not demonstrated that Defendants would have approached these fundamental policies and practices differently absent their participating in the 568 Group in light of their long-standing missions . . . ."), 99 ("It thus would not be logical to think that absent the Challenged Conduct, Defendants would have adopted financial aid philosophies, principles, or policies that were inconsistent with these broader and long-standing missions shared by Defendants and their peers."), 214 ("That is, regardless of their participation in the 568 Group, I have seen no indication that Defendants would have acted any differently than other schools focused on increasing access, both in the 568 Group and out . . . .").

## **LEGAL STANDARD**

Federal Rule of Evidence 702, which governs expert testimony, "requires that the evidence or testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993) (quoting former Fed. R. Evid. 702(a)). "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.'" *Id.* (quoting 3 Weinstein & Berger ¶ 702[02], at 702-18). Such evidence is inadmissible and thus routinely excluded. *See George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 791-92 (7th Cir. 2011); *United States v. Gallardo*, 497 F.3d 727, 733 (7th Cir. 2007); *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 420-21 (7th Cir. 2005); *Weir v. Crown Equip. Corp.*, 217 F.3d 453, 459-60 (7th Cir. 2000); *Andersen v. City of Chicago*, 454 F. Supp. 3d 740, 745-46 (N.D. Ill. 2020); *Goswami v. DePaul Univ.*, 8 F. Supp. 3d 1019, 1029-31 (N.D. Ill. 2014); *Obrycka v. City of Chicago*, 792 F. Supp. 2d 1013, 1023 n.5 (N.D. Ill. 2011).

## **ARGUMENT**

## I. DR. LONG'S TESTIMONY REGARDING PURPORTED BENEFITS OF THE CHALLENGED RESTRAINTS ON TRADE WILL NOT ASSIST THE JURY

### A. Purported Benefits That Do Not Promote Competition Are Irrelevant

Under federal antitrust law, restraints on trade are either *per se* illegal or are examined under the rule of reason. The parties dispute which standard applies in this case: Plaintiffs argue that Defendants' conduct is *per se* illegal, while Defendants argue that their conduct is subject to the rule of reason. The Court need not resolve that dispute now. As explained below, even if the rule of reason applies, testimony that a restraint on trade produces benefits other than those that promote competition, is irrelevant and therefore inadmissible. *See In re Loestrin 24 Fe Antitrust Litig.*, 433 F. Supp. 3d 274, 317 (D.R.I. 2019) (excluding expert testimony on non-cognizable benefit); *accord Giant Eagle, Inc. v. E. Mushroom. Mktg. Coop.*, 2020 WL 1903640, at *1 n.1

(E.D. Pa. Feb. 14, 2020); *Entrata, Inc. v. Yardi Sys., Inc.*, 2019 WL 13076536, at *6 (D. Utah Aug. 23, 2019); *Apotex, Inc. v. Cephalon, Inc.*, 2017 WL 10963610, at *1-2 (E.D. Pa. May 24, 2017).[4]

Indeed, the Sherman Act is "the Magna Carta of free enterprise," *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972), and "reflects a legislative judgment that ultimately competition will produce not only lower prices, but also better goods and services," *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 695 (1978). Consistent with that judgment, "the inquiry" under Section 1 "is confined to a consideration of impact on competitive conditions." *Id.* at 690; *see also Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 104 (1984) ("Under the Sherman Act *the criterion* to be used in judging the validity of a restraint on trade is its impact on competition." (emphasis added)). Accordingly, "the purpose of the analysis is to form a judgment about the competitive significance of the restraint; it is not to decide whether a policy favoring competition is in the public interest, or in the interest of the members of an industry." *Prof'l Eng'rs*, 435 U.S. at 692.

This approach—limiting the inquiry to competitive impacts—is not only mandated by precedent, but is also grounded in common sense. The Supreme Court has long professed an "inability to weigh, in any meaningful sense, destruction of competition in one sector of the economy against promotion of competition in another sector." *Topco*, 405 U.S. at 609-10. It is presumably even more difficult, if not outright impossible, to weigh the destruction of competition in one sector of the economy against the promotion of wholly noneconomic values in society more generally. *See* Julie L. Seitz, *Consideration of Noneconomic Procompetitive Justifications in the MIT Antitrust Case*, 44 Emory L.J. 395, 426 (1995) ("The inclusion of social benefit arguments

---

[4] If the *per se* rule applies, evidence regarding any purported benefits (procompetitive or otherwise) is "irrelevant." *In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 909 (6th Cir. 2003).

will force courts to make value judgments regarding which social benefits are goals worthy of pursuing and force judges to assign relative weights to competing social benefit arguments—an approach the Supreme Court has clearly stated belongs to Congress."). To attempt to do so, as Justice Taft memorably put it, would be to impermissibly "set sail on a sea of doubt." *United States v. Addyston Pipe & Steel Co.*, 85 F. 271, 283-84 (6th Cir. 1898), *aff'd*, 175 U.S. 211 (1899).

The foregoing principles are reflected in the rule of reason, "a three-step burden-shifting framework." *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018). "Under this framework, the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Id.* "If the plaintiff carries its burden, then the burden shifts to the defendant to show a *procompetitive* rationale for the restraint." *Id.* (emphasis added). "If the defendant makes this showing, then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id.* at 542.[5]

Under this analysis, "[c]ontrary to its name," the rule of reason "does not open the field of antitrust inquiry to any argument in favor of a challenged restraint that may fall within the realm of reason." *Prof'l Eng'rs*, 435 U.S. at 688. "Instead, it focuses directly on the challenged restraint's impact on competitive conditions." *Id.* To that end, for purposes of justifying anticompetitive conduct, "[o]nly *procompetitive* benefits count, meaning the type of benefits that would promote competition itself and help consumers," such as "higher output" and "lower costs" to consumers.

---

[5] Circuit courts have also identified a "fourth step," which involves weighing the restraint's procompetitive and anticompetitive effects. *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 994 (9th Cir. 2023) ("[W]here a plaintiff's case comes up short at step three, the district court must proceed to step four and balance the restriction's anticompetitive harms against its procompetitive benefits."); *United States v. Am. Airlines Grp. Inc.*, 121 F.4th 209, 2024 WL 4716418, at *5 (1st Cir. Nov. 8, 2024) (instead of demonstrating that "the procompetitive efficiencies could be achieved through less anticompetitive means," plaintiff may show that "on balance, the restraint's harms outweigh its benefits").

*Kraft Foods Global, Inc. v. United Egg Producers, Inc.*, 2023 WL 6049912, at \*8 (N.D. Ill. Sept. 15, 2023) (emphasis in original). Other justifications—*i.e.*, those that do not enhance competition—are outside the scope of federal antitrust law. *See Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1010, 1021 (10th Cir. 1998) ("Justifications offered under the rule of reason may be considered *only* to the extent that they tend to show that, on balance, 'the challenged restraint enhances competition.'" (quoting *Bd. of Regents*, 468 U.S. at 104) (emphasis added)).

The Supreme Court therefore has "regularly refused" requests "from litigants seeking special dispensation from the Sherman Act on the ground that their restraints of trade serve uniquely important social objectives beyond enhancing competition." *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 94-95 (2021); *see also Kraft*, 2023 WL 6049912, at \*8 ("A restraint on competition cannot be justified solely on the basis of social welfare concerns." (quoting *United States v. Brown Univ.*, 5 F.3d 658, 669 (3d Cir. 1993))); *FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 424 (1990) ("The social justifications proffered for respondents' restraint of trade thus do not make it any less unlawful."). The Court has found, for example, that horizontal agreements restraining trade cannot be justified on the grounds that they are necessary to ensure that engineering work does not pose risks to "public safety," *Prof'l Eng'rs*, 435 U.S. at 692-96; to ensure that dental patients receive sufficient "quality of care," *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 462-63 (1986); or to ensure that indigent clients receive higher "quality of representation," *Trial Lawyers*, 493 U.S. at 423-24.[6] Those kinds of arguments are "properly

---

[6] Other examples of non-cognizable justifications for horizontal restraints on trade include promoting "animal welfare" and "the happiness of chickens," *Kraft Foods*, 2023 WL 6049912, at \*10; promoting "the integration of education and athletics," *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 37 F. Supp. 3d 1126, 1149-50 (N.D. Cal. 2014); "opening up [NCAA] coaching positions for younger people," *Law*, 134 F.3d at 1021-22; protecting "younger athletes from injury or over-training," *Clarett v. Nat'l Football League*, 306 F. Supp. 2d 379, 408-09 (S.D.N.Y. 2004), *rev'd on other grounds*, 369 F.3d 124 (2d Cir. 2004); and "protecting student-athletes from exploitation," *Tennessee v. Nat'l Collegiate Athletic Ass'n*, 718 F. Supp. 3d 756, 763 (E.D. Tenn. 2024).

addressed to Congress and may justify an exemption from the statute for specific industries," but they are "not permitted by the Rule of Reason." *Prof'l Eng'rs*, 435 U.S. at 689-90.

Underscoring that only competition-related benefits are relevant, the Seventh Circuit recently reaffirmed that any purported procompetitive justification "premised upon the proposition that competition itself is insufficient, unreasonable, or confusing is not cognizable." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 479 (7th Cir. 2020); *accord Am. Airlines Grp.*, 2024 WL 4716418, at *9. Indeed, federal antitrust law is based on "[t]he assumption that competition is the best method of allocating resources in a free market" and "will produce not only lower prices, but also better goods and services." *Prof'l Eng'rs*, 435 U.S. at 695. Accordingly, the notion that competitors could do better than the market by, for example, agreeing on how much to charge or on which goods to produce, "is nothing less than a frontal assault on the basic policy of the Sherman Act." *Id.* Any argument that defendants have fixed a more "reasonable" price, *Trial Lawyers*, 493 U.S. at 424 (quoting *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647 (1980)), or fixed prices "as a mere quid pro quo for providing consumers with better products," *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1152 (9th Cir. 2003), necessarily fails.

### B.  The Purported Benefits Identified by Dr. Long Do Not Promote Competition

Dr. Long alludes to three potential benefits of the horizontal restraints agreed to as part of the 568 Group: increased "access" to higher education, increased "equity" in financial aid, and increased socioeconomic diversity at Defendants' universities. It bears emphasizing that the 568 Group could not produce these benefits unless Defendants in fact agreed on a methodology for calculating financial aid and used that agreed-upon methodology to make financial aid offers. Setting that aside, none of these purported benefits is cognizable under federal antitrust law. *See In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 2024 WL 1142860, at *4 (E.D.N.Y. Mar. 15, 2024) (observing that "[c]ourts routinely assess whether proffered

procompetitive justifications are cognizable as a matter of law"). As a result, Dr. Long's testimony regarding these purported benefits will not assist the jury and should be excluded.

### 1. The Purported Benefits Are Impermissible Social Welfare Justifications

The purported benefits identified by Dr. Long are classic social welfare justifications that do not "count" under the Sherman Act. *Kraft*, 2023 WL 6049912, at *8.

*First*, although Dr. Long suggests at times that the 568 Group achieved (or might have achieved) improvement with respect to access, equity, and socioeconomic diversity, she does not argue that those improvements promoted competition or otherwise produced procompetitive effects, like "higher output" or "lower costs" in aggregate for students. *Id.*; *see Viamedia*, 951 F.3d at 478 (similar); *Bd. of Regents*, 468 U.S. at 114 ("If the NCAA's television plan produced procompetitive efficiencies, the plan would increase output and reduce the price of televised games."). Indeed, she did not discuss output at all in her report and professed ignorance on whether the 568 Group had any aggregate impact on average EFCs. *See* B. Long 71:18-22 (testifying that her "focus was on responding to claims by the plaintiffs' expert that the changes in guidelines only went in one direction to the disadvantage of students").

Dr. Long mentions a theoretical link between one purported benefit—socioeconomic diversity—and education quality, *see* Long Rpt. ¶¶ 56-57, but she does not claim that the 568 Group improved the quality of education at any Defendant's university, let alone in a way that promoted competition between Defendants and other market participants, *see O.M. by and through Moultrie v. Nat'l Women's Soccer League, LLC*, 544 F. Supp. 3d 1063, 1074 (D. Or. 2021) (rejecting proposed procompetitive justification as "speculative").[7] Instead, she suggests the

---

[7] It is, for example, altogether unclear whether demand for an education at Defendants' universities is a function of the socioeconomic diversity of those universities.

opposite when she claims that Defendants' efforts to increase socioeconomic diversity "do not maximize revenue for Defendants and their peers, and instead support their core missions." Long Rpt. ¶ 69. There is, accordingly, no basis to conclude that the purported benefits identified by Dr. Long are cognizable under federal antitrust law. *See Am. Express*, 585 U.S. at 541 (burden is on defendant to come forward with procompetitive justification); *PLS.com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 836 (9th Cir. 2022) ("This is not a procompetitive justification because it does not explain how the Clear Cooperation Policy enhances *competition*." (emphasis in original)).

*Second*, Dr. Long's failure to tout the procompetitive virtues of increased access and equity is particularly unsurprising given that neither purported benefit could plausibly be associated with enhanced competition. As to access, assuming that Defendants somehow could not spend more than they already did on financial aid, any benefits would necessarily stem from Defendants "wasting" less money on scholarships (*i.e.*, charging *higher prices*) for students who could afford to attend, B. Long 125:2-6—an anticompetitive, not procompetitive, result, *see Viamedia*, 951 F.3d at 479 ("[I]f Comcast has reduced advertising, promotions, or other incentives that it previously offered to customers or local retailers when competing with *Viamedia*, those savings would represent harm to competition."); *Law*, 134 F.3d at 1022-23 (rejecting argument that "cost-cutting" is a "valid procompetitive justification").

As to equity, the concept is so amorphous and "subjective," B. Long 143:23-144:2, that it is difficult to see how any increase might be detected, let alone measured and weighed as part of "step four" of the rule of reason. *Epic Games*, 67 F.4th at 994; *see also* Herbert Hovenkamp, *The Rule of Reason*, 70 Fla. L. Rev. 81, 133 (2018) (observing that "[b]alancing is not even conceptually possible without a unit of measurement"). In addition, Defendants' agreement on the "most equitable" approach to financial aid cannot conceivably result in more, as opposed to less,

competition between Defendants: the agreement reduces price competition by design (or else it has no impact on equity). *See Brown Univ.*, 5 F.3d at 675 (rejecting argument that eliminating price competition promoted competition on other dimensions).

*Third*, consistent with the notion that the purported equity, access, and socioeconomic diversity benefits are impermissible social welfare justifications, Dr. Long emphasizes that Defendants' financial aid policies are motivated by their "public service missions," which include "advanc[ing] equitable access to education." Long Rpt. ¶ 22; *see also id.* ¶ 31 ("At the core of each Defendant's mission is an acknowledgement of their role in the betterment of society . . . ."). The Supreme Court has repeatedly rejected similar public-minded justifications. *See Prof'l Eng'rs*, 435 U.S. at 692-96 (public safety); *Indiana Fed'n of Dentists*, 476 U.S. at 462-63 (quality of dental care); *Trial Lawyers*, 493 U.S. at 423-24 (quality of legal representation for indigent clients). If agreements among competitors to restrain trade cannot be justified on the grounds that they are necessary to protect the public from the dangers of substandard engineering, ensure that indigent clients receive adequate legal services, or ensure that dentists provide adequate care to patients, then Defendants surely cannot justify their horizontal agreement on the grounds that it promotes access to education, equity in financial aid, and socioeconomic diversity.

Instead, as with these other goals, the purported benefits identified by Dr. Long are "properly addressed by Congress." *Prof'l Eng'rs*, 435 U.S. at 689-90. That is, the "social goals" relating to "[t]he need-based financial aid system" fall outside the scope of the "antitrust laws." H.R. Rep. 105-44, at 3 (1997). This is why the 568 Exemption is not wholly redundant: it concerns issues that federal antitrust law does not address. *See* John M. Newman, *Procompetitive Justifications in Antitrust Law*, 94 Ind. L.J. 501, 530 (2019) (describing exemption). Dr. Long's testimony concerning those issues in an antitrust case is thus irrelevant.

2.    <u>**The Purported Benefits Are Impermissibly Based on the Premise That Horizontal Price-Fixing Is Better Than Market Competition**</u>

Improved access, equity, or socioeconomic diversity are not cognizable procompetitive benefits here for the further reason that Dr. Long's opinion is necessarily premised on the notion that Defendants, through the 568 Group, have fixed a better and more reasonable price than the market, and created a better product than what the market would produce—both nonstarters under federal antitrust law.

*First*, with respect to "equity," which Dr. Long equates with "fairness," B. Long 119:2-6, Dr. Long's view is plainly that Defendants have fixed a better price than the market. For Dr. Long, "equity" means that students with "fewer resources" receive "more financial aid" (and thus pay lower prices), students with more resources receive less financial aid (and thus pay higher prices), and students with similar resources receive similar amounts of financial aid (and thus pay similar prices). *Id.* 119:2-16. As a result, when Dr. Long says that equity improved, she means that prices became more correlated with students' resources and thus became "fairer." Black-letter law precludes that kind of justification to horizontal price fixing. *See Catalano*, 446 U.S. at 647 ("It is no excuse that the prices fixed are themselves reasonable.").

*Second*, Dr. Long's "access" justification suffers from the same problem. For the 568 Group to improve "access" to Defendants' universities, it must result in more students receiving financial aid offers sufficient to enable them to attend those universities. Accepting Dr. Long's premise that Defendants for some reason cannot reasonably spend more than they are already spending on financial aid, Long Rpt. ¶ 22, improved "access" means that students are generally not being charged less than their ability to pay. Accordingly, as in *Prof'l Eng'rs*, "[t]he logic of [Dr. Long's] argument rests on the assumption that the agreement will tend to maintain the price level; if it had no such effect, it would not serve its intended purpose." 435 U.S. at 693; *see also Freeman*, 322

F.3d at 1152 (rejecting proposed justification, where defendants "fixed prices precisely in order to keep them above competitive levels").

*Third*, Dr. Long's socioeconomic diversity justification fails for a similar reason. The only plausible mechanism through which socioeconomic diversity could bear on competition is by improving the quality of the education offered by Defendants. Long Rpt. ¶¶ 56-57. But, as explained, "justifying a restraint on competition based on an assumption it will improve a product's quality 'is nothing more than a frontal assault on the basic policy of the Sherman Act.'" *PLS.com*, 32 F.4th at 836 (quoting *Prof'l Eng'r*, 435 U.S. at 695); *see also* Cameron D. Ginder, *NCAA & the Rule of Reason: Analyzing Improved Education Quality as a Procompetitive Justification*, 57 Wm. & Mary L. Rev. 675, 705 (2015) ("If better bridges, better health care, or better legal services for the indigent do not justify a restraint, it seems a stretch to say the Court would hold otherwise for education quality."). That is especially so where, as here, there is no evidence that more students wanted that product than the one that Defendants would have produced in the but-for world. *See Brown Univ.*, 5 F.3d at 674 ("The Supreme Court has recognized improvement in the quality of a product or service that *enhances the public's desire for that product or service* as one possible procompetitive virtue." (citing *Bd. of Regents*, 468 U.S. at 114-15) (emphasis added)).

## C. The Purported Benefits Identified by Dr. Long Could Be Achieved Without Horizontal Price-Fixing

Access, equity, and socioeconomic diversity benefits are irrelevant for the further reason that Dr. Long concedes that they could have and would have been achieved without the horizontal price restraints inherent in the 568 Group. As a result, Dr. Long's testimony regarding these benefits should be excluded.

Under the rule of reason, as noted, the plaintiff will prevail if he or she demonstrates that any valid "procompetitive efficiencies could be reasonably achieved through less anticompetitive

means." *Am. Express*, 585 U.S. at 542. As a result, the purported benefits identified by Dr. Long are of no consequence if they could be achieved without Defendants' horizontal agreement. *See Clarett*, 306 F. Supp. 2d at 410 ("[E]ven if a procompetitive justification for the Rule existed, summary judgment for Clarett would be appropriate because an alternative to the Rule existed that is less prejudicial to competition."); *Tennessee*, 718 F. Supp. 3d at 763 ("Even if the Court were to accept that the foregoing procompetitive benefits flow from the challenged NIL rules, these benefits can be accomplished through less restrictive rules already in place within the NCAA Bylaws."). Accepting Dr. Long's testimony as true, they could.

Indeed, she claims that "regardless of their participation in the 568 Group," she has "seen no indication that Defendants would have acted any differently than other schools focused on increasing access, both in the 568 Group and out, in that they would have approached their financial aid policies with goals of equity, efficiency, and transparency, offered substantial need-based aid, used the IM as the starting point for their need analysis, used professional judgment in exceptional circumstances, and participated in information sharing through industry groups like COFHE." Long Rpt. ¶ 214. Put differently, Defendants "would have adopted" the same "financial aid philosophies, principles, [and] policies" in the but-for world. *Id.* ¶ 22. It thus follows that the purported benefits identified by Dr. Long could be achieved without the 568 Group's horizontal agreement, an inference that is strengthened by Dr. Long's opinion that schools that are not members of the 568 Group achieved the same access-, equity-, and diversity-related benefits. *See* B. Long 23:12-24:18, 26:8-27:12, 39:10-16, 109:8-110:21.

### D. Dr. Long's Testimony Regarding Purported Access and Socioeconomic Diversity Benefits Is Too Equivocal and Speculative to Help the Trier of Fact

Dr. Long's testimony regarding two purported benefits of the 568 Group—increased access and socioeconomic diversity—is also too equivocal, ambiguous, and speculative to be admissible.

15

"An expert opinion must 'help the trier of fact to understand the evidence or to determine a fact in issue.'" *Sandifer v. Hoyt Archery Inc.*, 907 F.3d 802, 809 (5th Cir. 2018) (quoting Fed. R. Evid. 702). "A perfectly equivocal opinion does not make any fact more or less probable" and is therefore unhelpful. *Id.* (quoting *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 245 (5th Cir. 2002)). In addition, "an expert's report that does nothing to substantiate" the expert's "opinion is worthless, and therefore inadmissible." *Minasian v. Standard Chartered Bank, PLC*, 109 F.3d 1212, 1216 (7th Cir. 1997); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

Dr. Long's opinions regarding purported access and socioeconomic diversity benefits fail on these grounds. As to access, Dr. Long was asked "whether the 568 Group improved access to education at the 568 schools," and whether "the 568 schools would have better improved access to education if they had not created the 568 group." B. Long 103:13-105:10. She did not say "yes" or "no" to those questions; instead, she conceded that it was "unclear whether or not there would have been improvement to the same degree" absent the 568 Group. *Id.* To the extent that her opinion is that access improved, she has failed to clearly say so, let alone adequately substantiate that opinion. *See Muniz v. Rexnord Corp.*, 2006 WL 5153078, at *2 (N.D. Ill. Nov. 2, 2006) (excluding expert opinion, where exert report drew "equivocal conclusions"); *Ventriloscope v. MT Tool & Mfg.*, 2019 WL 12528939, at *6 (N.D. Ill. Feb. 22, 2019) (excluding expert opinion, where expert failed to adequately explain opinions).

Dr. Long's testimony regarding socioeconomic diversity was similarly vague. She was asked if she analyzed "whether the overarching agreement among the defendants increased socioeconomic diversity at the defendants' schools," "whether the 568 schools would have

16

increased their socioeconomic diversity even if there had not been the 568 group," "whether four-year colleges that were not in the 568 Group have increased their socioeconomic diversity to a greater extent than the schools in the 568 Group," and whether she tried "to quantify" the "extent to which the 568 Group itself has helped to increase socioeconomic diversity at those schools." B. Long 38:18-39:9, 39:17-42:9. She did not say "yes" to any of these questions. Instead, she emphasized that her report focused on other issues, *see id.* at 38:22-39:4, 42:7-9, that "things far beyond the work of the 568 Group" contributed to increased socioeconomic diversity at Defendants' universities, *id.* at 39:6-9, and that it's "unclear" whether the same benefits "would have been brought to bear" without the 568 Group, *id.* at 40:5-10. As with her opinions regarding access, she again has not only failed to clearly state whether her opinion is in fact that socioeconomic diversity improved, but has also failed to adequately substantiate such an opinion.

These ambiguous and unsupported opinions will not help the trier of fact determine whether the 568 Group improved access or socioeconomic diversity. Nor will they otherwise assist the jury in the rule of reason inquiry. Indeed, even if purported access and socioeconomic improvements were cognizable procompetitive justifications that could not be achieved without a horizontal agreement, Dr. Long's testimony does not provide the jury with sufficient information to attribute any weight to the purported access and socioeconomic improvements at "step four" of the rule of reason. *Epic Games*, 67 F.4th at 993-94. As a result, those purported benefits are weightless, cannot justify Defendants' horizontal agreement, and are irrelevant.[8]

---

[8] Finally, if it had any probative value (which it does not), Dr. Long's testimony fails Rule 403 because it would necessitate time-consuming, complex, and confusing mini-trials on issues that are collateral to, and would distract from, the merits, such as trials on whether the restraints agreed to by the 568 Group in fact caused those purported benefits. Testimony that satisfies Federal Rule of Evidence 702 "may be excluded under other rules of evidence, most notably Rule 403's weighing of the probative value of the evidence against the danger of the expert misleading or confusing the jury." *Kleen Prods. LLC v. Int'l Paper*, 2017 WL 2362567, at *2 (N.D. Ill. May 31, 2017) (citing *Daubert*, 509 U.S. at 595. Indeed, the Seventh Circuit frequently affirms the exclusion of evidence on this basis. *See, e.g.*, *Henderson v. Wilkie*, 966 F.3d 530, 538-

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' motion should be granted, and Dr. Long should be precluded from testifying about purported access, equity, and socioeconomic diversity benefits.

---

39 (7th Cir. 2020). As this infirmity does not implicate *Daubert*, Plaintiffs will oppose or move to exclude the testimony on this basis at the appropriate time, in part depending how and when Defendants offer the testimony.

Dated: December 16, 2024

Respectfully Submitted,

/s/ Robert D. Gilbert
Robert D. Gilbert
Elpidio Villarreal
Robert S. Raymar
David S. Copeland
Natasha Zaslove
**GILBERT LITIGATORS &**
  **COUNSELORS, PC**
11 Broadway, Suite 615
New York, NY 10004
Tel: (646) 448-5269
rgilbert@gilbertlitigators.com
pdvillarreal@gilbertlitigators.com
rraymar@gilbertlitigators.com
dcopeland@gilbertlitigators.com
nzaslove@gilberlitigators.com

/s/ Eric L. Cramer
Eric L. Cramer
Ellen T. Noteware
David Langer
Jeremy Gradwohl
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
ecramer@bm.net
enoteware@bm.net
dlanger@bm.net
jgradwohl@bm.net

Richard Schwartz
**BERGER MONTAGUE PC**
1720 W Division
Chicago, IL 60622
Tel: (773) 257-0255
rschwartz@bm.net

/s/ Edward J. Normand
Devin "Vel" Freedman
Edward J. Normand
Richard Cipolla
Joseph Delich
Peter Bach-y-Rita
**FREEDMAN NORMAND**
  **FRIEDLAND LLP**
155 E. 44th Street, Suite 915
New York, NY 10017
Tel: (646) 350-0527
vel@fnf.law
tnormand@fnf.law
rcipolla@fnf.law
jdelich@fnf.law
pbachyrita@fnf.law

Ivy Ngo
**FREEDMAN NORMAND**
  **FRIEDLAND LLP**
1 SE 3d Avenue, Suite 1240
Miami, FL 33131
Tel: (786) 924-2900
ingo@fnf.law

Daniel J. Walker
Robert E. Litan
Hope Brinn
**BERGER MONTAGUE PC**
1001 G Street, NW, Suite 400 East
Washington, DC 20001
Tel: (202) 559-9745
rlitan@bm.net
dwalker@bm.net
hbrinn@bm.net

*Counsel for Plaintiffs*