**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ANDREW CORZO, SIA HENRY, ALEXANDER LEO-GUERRA, MICHAEL MAERLENDER, BRANDON PIYEVSKY, BENJAMIN SHUMATE, BRITTANY TATIANA WEAVER, and CAMERON WILLIAMS, individually and on behalf of all others similarly situated, | Case No.: 1:22-cv-00125 **Hon. Matthew F. Kennelly** |
| Plaintiffs, | |
| v. | |
| BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, THE JOHNS HOPKINS UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY, | |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF**
**THEIR MOTION FOR CLASS CERTIFICATION**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 5

I.      The Background, Formation, and Goals of the 568 Group ................................. 5

II.     The Commercial Nature of Defendants' Operations ........................................... 8

III.    Defendants' Alleged Adherence to the Overarching Agreement ...................... 12

        A.      Common Qualitative Evidence Consistent With Conspiracy and Inconsistent
                with Unfettered Competition ................................................................. 12

        B.      Common Quantitative Evidence of Conspiracy ..................................... 16

        C.      The Dissolution of the 568 Group ......................................................... 16

IV.     Classwide Evidence of Defendants' Collective Market Power ......................... 17

V.      Classwide Evidence of Common Impact: The Overarching Agreement Artificially
        Inflated Net Prices for Virtually All Class Members ......................................... 19

        A.      Step 1: Classwide Evidence of Generalized Impact on Net Prices ........ 19

                1.      Exemplary Classwide Qualitative Evidence of Impact ............... 19

                2.      Exemplary Classwide Quantitative Evidence of Impact ........... 22

        B.      Step 2: Classwide  Evidence That Nearly All Class Members Paid Artificially
                Inflated Net Prices ............................................................................... 25

                1.      Exemplary Classwide Qualitative Evidence of Widespread Impact ........ 25

                2.      Exemplary Classwide Quantitative Evidence of Widespread Impact ....... 26

VI.     Standard Classwide Proof of Aggregate Class Damages .................................. 29

VII.    Classwide Evidence of Defendants' Failure to Satisfy the 568 Exemption .................... 29

ARGUMENT ................................................................................................................. 35

I.      Plaintiffs Satisfy the Four Prerequisites of Rule 23(a) .................................... 36

        A.      The Class Is Numerous ......................................................................... 36

    B.     Questions of Law and Fact Are Common to the Class ......................................... 36

    C.     The Proposed Class Representatives Are Typical ................................................. 37

    D.     Plaintiffs and Their Counsel Will Adequately Represent the Class ..................... 38

II.     Plaintiffs Satisfy the Requirements of Rule 23(b)(3) .......................................................... 39

    A.     Common Issues of Law and Fact Predominate Over Individual Issues .............. 39

          1.     The Existence and Scope of the Alleged Conspiracy Has Been and Will Continue to Be the Focus of This Litigation. .................................... 39

          2.     The Alleged Inapplicability of the 568 Exemption Is a Common Question. ....................................................................................................... 40

          3.     The Appropriate Mode of Analysis Is a Common Question. ..................... 41

          4.     Defendants' Alleged Collective Market Power Is a Common Question. ....................................................................................................... 41

          5.     Whether the Overarching Conspiracy Caused Widespread Impact Across the Class Is a Common Question. .................................................... 42

               i.     Step 1: Classwide Evidence of General Impact on Net Prices ........... 43

               ii.    Step 2: Classwide Evidence That the Overarching Agreement Artificially Inflated Prices to All or Nearly All Class Members ......... 45

          6.     Plaintiffs' Classwide Analysis of Aggregate Class Damages. .................. 48

          7.     The Application of the Discovery Rule Is a Classwide Issue. .................. 49

    B.     The Class Action Mechanism Is Superior ............................................................ 50

CONCLUSION .................................................................................................................... 51

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Aftermarket Auto. Lighting Prods. Antitrust Litig.*,
   276 F.R.D. 364 (C.D. Cal. 2011) ........................................................ 48

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997) .................................................................... 1, 39

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013) .................................................................. passim

*ATA Airlines, Inc. v. Fed. Express Corp.*,
   665 F.3d 882 (7th Cir. 2011) ............................................................ 44

*Behar v. Northrop Grumman Corp.*,
   2024 WL 4004052 (C.D. Cal. July 1, 2024) .............................................. 49

*Bell v. PNC Bank, Nat'l Ass'n*,
   800 F.3d 360 (7th Cir. 2015) ............................................................ 36

*Butler v. Sears, Roebuck & Co.*,
   727 F.3d 796 (7th Cir. 2013) ........................................................ 39, 50

*Carbone v. Brown Univ.*,
   621 F. Supp. 3d 878 (N.D. Ill. 2022) ................................................ passim

*Castro v. Sanofi Pasteur Inc.*,
   134 F. Supp. 3d 820 (D.N.J. 2015) ................................................... 42, 48

*Chicago Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chicago*,
   797 F.3d 426 (7th Cir. 2015) ............................................................ 35

*City of Philadelphia v. Bank of Am. Corp.*,
   2023 WL 6160534 (S.D.N.Y. Sept. 21, 2023) ............................................. 49

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) ...................................................................... 48

*Cosby v. KPMG, LLP*,
   2021 WL 1828114 (E.D. Tenn. May 7, 2021) .............................................. 49

*Fine v. Kansas City Life Ins. Co.*,
   2023 WL 7393027 (C.D. Cal. Nov. 6, 2023) .............................................. 38

*Fond du Lac Bumper Exch., Inc. v. Jui Li Enter., Co.*,
   2016 WL 3579953 (E.D. Wis. June 24, 2016) ............................................. 43

*Gomez v. St. Vincent Health, Inc.*,
  649 F.3d 583(7th Cir. 2011), *as modified* (Sept. 22, 2011) ...................................... 38

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014) .................................................................................... 39

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
  2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014) ........................................................ 47

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
  2015 WL 5093503 (E.D.N.Y. July 10, 2015) ........................................................ 47

*In re Allstate Corp. Sec. Litig.*,
  966 F.3d 595 (7th Cir. 2020) ......................................................................... 39

*In re Blood Reagents Antitrust Litig.*,
  2015 WL 6123211 (E.D. Pa. Oct. 19, 2015) ......................................................... 44

*In re Broiler Chicken Antitrust Litig.*,
  2022 WL 1720468 (N.D. Ill. May 27, 2022) ................................................... passim

*In re Broiler Chicken Antitrust Litig.*,
  2023 WL 6977387 (N.D. Ill. Oct. 23, 2023) ......................................................... 42

*In re Broiler Chicken Grower Antitrust Litig.*,
  2024 WL 2117359 (E.D. Okla. May 8, 2024) ................................................. passim

*In re Capacitors Antitrust Litig. (No. III)*,
  2018 WL 5980139 (ND. Cal. Nov. 145, 2018) ...................................................... 47

*In re Cardizem CD Antitrust Litig.*,
  200 F.R.D. 297 (E.D. Mich. 2001) ................................................................... 46

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
  308 F.R.D. 606 (N.D. Cal. 2015) ..................................................................... 44

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
  581 F. Supp. 3d 1029 (N.D. Ill. 2022) .......................................................... 12, 40

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
  2024 WL 3509668 (N.D. Ill. July 22, 2024) ................................................... passim

*In re Disposable Contact Lens Antitrust Litig.*,
  329 F.R.D. 336 (M.D. Fla. 2018) ..................................................................... 46

*In re Domestic Drywall Antitrust Litig.*,
  322 F.R.D. 188 (E.D. Pa. 2017) ...................................................................... 47

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*,
    256 F.R.D. 82 (D. Conn. 2009) ............................................................... 46

*In re High Fructose Corn Syrup Antitrust Litig.*,
    295 F.3d 651 (7th Cir. 2002) ........................................................... 43, 48

*In re High-Tech Emp. Antitrust Litig.*,
    985 F. Supp. 2d 1167 (N.D. Cal. 2013) ...................................... 39, 43, 46

*In re Korean Ramen Antitrust Litig.*,
    2017 WL 235052 (N.D. Cal. Jan. 19, 2017) .......................................... 47

*In re Opana ER Antitrust Litig.*,
    2021 WL 3627733(N.D. Ill. June 4, 2021) ........................................... 35

*In re Packaged Seafood Prods. Antitrust Litig.*,
    2019 WL 3429174 (S.D. Cal. July 30, 2019) ......................................... 44

*In re Packaged Seafood Prods. Antitrust Litig.*,
    332 F.R.D. 308 (S.D. Cal. 2019) ........................................................... 47

*In re Processed Egg Prods. Antitrust Litig.*,
    312 F.R.D. 171 (E.D. Pa. 2015) ............................................................ 48

*In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*,
    335 F.R.D. 1 (E.D.N.Y. 2020) .............................................................. 42

*In re Scrap Metal Antitrust Litig.*,
    2004 WL 7340436 (N.D. Ohio Mar. 31, 2004) .................................... 49

*In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*,
    325 F.R.D. 136 (D.S.C. 2018) .............................................................. 49

*In re Text Messaging Antitrust Litig.*,
    630 F.3d 622 (7th Cir. 2010) ................................................................ 40

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    267 F.R.D. 291 (N.D. Cal. 2010) .......................................................... 44

*In re Urethane*,
    768 F.3d 1245 (10th Cir. 2014) ............................................................ 45

*In re Wheat Rail Freight Rate Antitrust Litig.*,
    579 F. Supp. 517 (N.D. Ill. 1984), *aff'd*, 759 F.2d 1305 (7th Cir. 1985).................................. 6

*Kleen Prods. LLC v. Int'l Paper*,
    306 F.R.D. 585 (N.D. Ill. 2015) ................................................... 40, 44, 45

*Kleen Prods. LLC v. Int'l Paper*,
   831 F.3d 919 (7th Cir. 2016) .................................................................... passim

*Kohen v. Pac. Inv. Mgmt. Co.*,
   571 F.3d 672 (7th Cir. 2009) .................................................................... 44, 46

*Le v. Zuffa, LLC*,
   2023 WL 5085064 (D. Nev. Aug. 9, 2023) ................................................ 43, 47

*Loeb Indus., Inc. v. Sumitomo Corp.*,
   306 F.3d 469 (7th Cir. 2002) .................................................................... 49

*Manpower, Inc. v. Ins. Co. of Pa.*,
   732 F.3d 796 (7th Cir. 2011) .................................................................... 44

*Meek v. Kansas City Life Ins. Co.*,
   2022 WL 499049 (W.D. Mo. Feb. 7, 2022) ............................................... 49

*Messner v. Northshore Univ. HealthSystem*,
   669 F.3d 802 (7th Cir. 2012) .................................................................... passim

*Moehrl v. Nat'l Ass'n of Realtors*,
   2023 WL 2683199 (N.D. Ill. Mar. 29, 2023) ............................... 36, 37, 40, 43

*Mullins v. Direct Digital, LLC*,
   795 F.3d 654 (7th Cir. 2015) .................................................................... 50

*NCAA v. Bd. of Regents*,
   468 U.S. 85 (1984) ................................................................................... 41

*Nitsch v. Dreamworks Animation SKG Inc.*,
   315 F.R.D. 270 (N.D. Cal. 2016) ............................................................. 43

*Olean Wholesale Grocery Corp., Inc. v. Bumble Bee Foods LLC*,
   31 F.4th 651 (9th Cir. 2022) ............................................................. 44, 46, 47

*Pella Corp. v. Saltzman*,
   606 F.3d 391 (7th Cir. 2010) .................................................................... 46

*Saltzman v. Pella Corp.*,
   257 F.R.D. 471 (N.D. Ill 2009) ................................................................ 37

*Schofield v. Delta Air Lines, Inc.*,
   2019 WL 955288 (N.D. Cal. Feb. 27, 2019) ............................................. 38

*Suchanek v. Sturm Foods, Inc.*,
   764 F.3d 750 (7th Cir. 2014) .................................................................... 45

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016) ................................................................ 4, 36, 39

*United States v. McKesson*,
    351 U.S. 305 (1956) ....................................................................... 6

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) .................................................................. 36, 37


**Other Authorities**

15 U.S.C. § 1 note ............................................................................ 5

Fed. R. Civ. P. 23(b)(3) ................................................................... 50

7 C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure* § 1781 (3d ed. 2020).......... 39

B.T. Long, *How Do Financial Aid Policies Affect Colleges? The Institutional Impact of the Georgia HOPE Scholarship*, JOURNAL OF HUMAN RESOURCES, Vol. 39, No. 4 (Autumn 2004).............................................................................. 9

Daniel L. Rubinfeld, *Reference Guide on Multiple Regression,* in Reference Manual on Statistical Evidence (3d ed. 2011)................................................. 44

Scott J. Thomas, *Do Not-for-Profit Firms Behave Differently*, in ECONOMICS OF ANTITRUST: COMPLEX ISSUES IN A DYNAMIC ECONOMY 193 (2007)............................................. 8

## GLOSSARY OF CERTAIN ABBREVIATIONS

**Bulman Rpt.:**    Expert Report of George Bulman, Ph.D., dated May 14, 2024

**Bulman Rbtl.:**    Rebuttal Expert Report of George Bulman, Ph.D., dated October 7, 2024

**Ex. __:**    Exhibit to the Declaration of Edward Normand, dated December 16, 2024

**Long Rpt.:**    Expert Report of Bridget Terry Long, Ph.D., dated August 7, 2024

**Mora Rpt.:**    Expert Report of Elizabeth Mora, dated May 14, 2024

**Mora Rbtl.:**    Rebuttal Expert Report of Elizabeth Mora, dated October 7, 2024

**SR1:**    Expert Report of Hal J. Singer, Ph.D., dated June 10, 2024

**SR2:**    Rebuttal Expert Report of Hal J. Singer, Ph.D., dated October 7, 2024

**SR3:**    Supplemental Rebuttal Expert Report of Hal J. Singer, Ph.D., dated November 8, 2024

**568 Exemption:**    Section 568 of the Improving America's Institutions Act of 1994, 15 U.S.C. § 1 note.

## INTRODUCTION

This is an action under Section 1 of the Sherman Act involving the typical elements of a horizontal price-fixing case, which the federal courts recognize as particularly appropriate for class treatment. *See*, *e.g.*, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) (the test for class certification is "readily met in certain cases alleging . . . violations of the antitrust laws"). In particular, Plaintiffs satisfy Federal Rules of Civil Procedure 23(a) and 23(b)(3).[1] The proposed Class Representatives are former undergraduate students who received institutional, need-based financial aid. They allege that, through the "568 Presidents Group" (the "568 Group"), the Defendants, a group of seventeen elite private universities, engaged in a long-running, overarching conspiracy on the principles and methods for calculating institutional financial aid and for sharing critical pricing-related information—rather than aggressively competing to attract students.[2]

Plaintiffs seek certification of a proposed Class defined as follows: "All persons who have during the Class Period (a) enrolled in one or more of Defendants' full-time undergraduate programs, (b) received at least some need-based financial aid from one or more Defendants, and (c) whose tuition, fees, room, or board to attend one or more of Defendants' full-time undergraduate programs was not fully covered by the combination of any types of grant or merit aid in any undergraduate year."[3] Plaintiffs seek appointment of Andrew Corzo, Sia Henry,

---

[1] Plaintiffs initially sought class certification under Rule 23(b)(2) as well, but the alleged conspiracy disbanded in the fall of 2022, mooting the need for injunctive relief. *See* Background, *infra*, § III.C.

[2] In July 2024, the Court gave final approval to the settlements that Plaintiffs had reached with ten of the seventeen Defendants for a combined total of $284 million. ECF No. 726.

[3] In addition to the typical exclusions concerning the Judge and Court personnel, the Class excludes "Any Officers and/or Trustees of Defendants, or any current or former employees holding any of the following positions: Assistant or Associate Vice Presidents or Vice Provosts, Executive Directors, or Directors of Defendants' Financial Aid and Admission offices, or any Deans or Vice Deans, or any employees in Defendants' in-house legal offices"; and "Any person who was not a U.S. citizen or permanent resident at the time such person attended a full-time undergraduate program and received at least some need-based financial aid from one or more Defendants." SR1 ¶ 10. The "Class Period" is defined by reference to when

Alexander Leo-Guerra, Michael Maerlander, Brandon Piyevsky, Brittany Tatiana Weaver, and Cameron Williams as Class Representatives under Rule 23(a)(4). Plaintiffs seek appointment of the following law firms as Co-Lead Class Counsel under Rules 23(a)(4) and 23(g): Freedman Normand Friedland LLP, Gilbert Litigators & Counselors, PC, and Berger Montague PC.[4]

Plaintiffs present a wealth of classwide evidence, both qualitative and quantitative, demonstrating that common issues predominate as to this case as a whole (and as to each element). *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 469 (2013) (Rule 23(b)(3) "does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof." (cleaned up)). There is abundant evidence that the alleged conspiracy took place; that each Defendant participated; that the alleged conspiracy was *per se* illegal, and if not, that Defendants had the market power to cause anticompetitive effects under the Rule of Reason; and that "antitrust impact is capable of proof at trial through evidence that is common to the class rather than individual to its members." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 818 (7th Cir. 2012); *accord In re Broiler Chicken Antitrust Litig.*, 2022 WL 1720468, at *7 (N.D. Ill. May 27, 2022).

As to antitrust impact, Plaintiffs and their experts have employed the "broadly accepted two-step method" to show that element of the claim—first, Class members paid artificially inflated net prices, and second, nearly all Class members suffered this artificial price inflation. *In re Broiler Chicken Grower Antitrust Litig.*, 2024 WL 2117359, at *29 (E.D. Okla. May 8, 2024) (collecting

---

the Defendants identified as members of the 568 Group. *See* SR1 ¶ 9; SR2 ¶ 255. This differs from the definition in the settlements to date, ECF No. 726 ¶ 5, because Plaintiffs' economic experts have credited Defendants' claimed departure dates from the Group. This is one of many respects, as discussed below, in which those analyses conservatively estimate the effect of the challenged conduct.

[4] In giving final approval to the ten earlier settlements in the case, the Court found that these Plaintiffs and these counsel met the relevant standards. ECF 726. Given the Class Period and his dates of attendance at Brown, counsel do not propose plaintiff Benjamin Shumate to be a Class Representative.

precedent). Plaintiffs have common evidence capable of demonstrating both steps of this analysis. At root, the parties' dispute over common impact is fundamentally classwide in nature: The jury finds either that Plaintiffs have demonstrated classwide impact or that they have not. Plaintiffs also have qualitative and quantitative evidence, primarily through their main economic expert, Dr. Hal Singer,[5] that the Class suffered aggregate damages of approximately $685 million (before trebling) during the Class Period due to the challenged conduct—which Defendants undertook while their collective endowments skyrocketed by approximately $165 billion.

In fact, classwide evidence, including incriminating contemporaneous documents from Defendants' own files, makes clear that the 568 Group was founded and maintained to *prevent* "bidding wars" over aid for admitted students—a natural aspect of unfettered competition. In leaving the Group in 2008, for example, Yale said it was now "free to give families more aid than they would have gotten." Ex. 84. The University of Chicago recognized in 2013 that the "568 Group – it is hampering our ability to compete." Ex. 79. Harvard, Princeton, and Stanford declined to join the Group because each concluded it would "have to reduce" its financial aid, Ex. 75; it wanted to be more "generous" with its financial aid, Ex. 83; and it wanted such offers to be under its own "control," Ex. 80. MIT recognized in 2014 that a 568 Group school can "be more stringent in how it defines financial need, but not more generous." Ex. 18. Plaintiffs' expert analyses are capable of proving that virtually all Class members paid these artificially inflated net prices.

---

[5] Dr. Singer is the Managing Director at EconOne Research and a Career-Line Professor at the University of Utah College of Social and Behavioral Science, where he teaches Antitrust Economics to graduate economics students and Economics and the Law to undergraduate economics students. SR1 ¶ 19. He is also the director of an inter-disciplinary institute at the University of Utah, named the Utah Project, that "straddles the law school and the economics department and is dedicated to the study of antitrust and consumer protection law and policy." *Id.* Ten federal courts have certified classes in antitrust cases on the strength of Dr. Singer's analyses, and five in consumer protection matters. *Id.* ¶ 21.

Whether the conspiracy took place, which schools were involved in it, and its impact are all common questions with classwide answers. *Broiler Chicken*, 2022 WL 1720468, at *7. Such allegations present the "prototypical" example of a case in which common issues predominate. *Id*. In addition, Rule 23(b)(3) requires only common questions that predominate, "not that those questions will be answered, on the merits, in favor of the class." *Amgen*, 568 U.S. at 459. In this respect, Plaintiffs must only present evidence that is "reliable in proving or disproving the elements of the relevant causes of action." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 455 (2016). Plaintiffs' evidence, described in detail below, meets this standard.

The common evidence also reflects that Defendants were relying on a statutory *exemption* from price-fixing liability, the 568 Exemption. Yet the classwide evidence shows that the 568 Exemption did not apply—because, contrary to its terms, Defendants *did* consider the "financial circumstances" of applicants and their families in admissions. There were always Defendants, for example, that favored children and grandchildren of wealthy donors in admissions. This means that no Defendant can claim the 568 Exemption. *See Carbone v. Brown Univ.*, 621 F. Supp. 3d 878, 884-89 (N.D. Ill. 2022). Indeed, as to Cornell, Georgetown, MIT, Penn, and Notre Dame, any applicant placed on a priority or special-interest list, including applicants who were on the list because of substantial donations to the school from family members, were admitted at a *much* higher rate than regular applicants. As Notre Dame administrator Don Bishop observed as to dozens of "very low ranked admits," "we allowed their high gifting or potential gifting to influence our choices more this year than last year—because they simply were higher ranked and larger donors." Ex. 24. He lamented: "Sure hope the wealthy next year raise a few more smart kids!" *Id*. The Court need not resolve now, of course, whether the 568 Exemption applies and, if so, its scope.

What matters at this stage is that, like the other main issues in this case, this question is capable of being resolved for all members of the Class in one fell swoop.

Accordingly, for the reasons summarized above and addressed in detail below, Plaintiffs respectfully request that the Court certify the proposed Class and appoint the proposed Class Representatives and Class Counsel under Rules 23(a), 23(b)(3), and 23(g).

## BACKGROUND

I.      **The Background, Formation, and Goals of the 568 Group**

Defendants are elite, private universities that were each members of the "568 Presidents Group" at some point between January 1, 1998, and November 4, 2022. The Group was named after Section 568 of the Improving America's Institutions Act of 1994, which allowed colleges and universities to agree to award financial aid solely on the basis of "financial need" and to agree to formulate and apply common principles in analyzing and defining such need. 15 U.S.C. § 1 note. These schools could thus agree to limit competition but only on the condition that each of them admitted "all" of its students who were U.S. citizens and permanent residents "on a need-blind basis." *Id*. The statute defined "need-blind" to mean "without regard to the financial circumstances of the student involved or the student's family." *Id*.

The precursor to the 568 Group was the so-called "Overlap Group," in which the eight Ivy League schools and MIT agreed in the 1980s on a method for calculating aid awards. SR1 ¶¶ 46-48. The Department of Justice prosecuted the Overlap Group under the antitrust laws, settled, and entered into a consent decree imposing conditions and limitations on the extent to which these schools collude on financial aid. *Id*. ¶¶ 47-48. Congress enacted the 568 Exemption shortly thereafter, in part modeled on the consent decree. *Id*. ¶ 49. The 568 Exemption thus presupposed that in agreeing on particular principles and a methodology for calculating financial aid, Group

member schools *would* be conspiring in violation of the antitrust laws—but under the legislatively specified conditions, they could be exempt.[6]

Shortly after its enactment, most of the Defendants began to address and discuss how to take advantage of the 568 Exemption. SR1 ¶¶ 138-39. A central issue was whether Defendants would charge different "effective net prices"— the cost of attendance ("COA") minus institutional financial aid—based on the student's "ability to pay." Under this approach, the school calculates what the student and family can supposedly afford to pay (the "expected family contribution," or "EFC") and subtracts the EFC from the list price to determine the student's "need"; the school then builds a "package" of financial aid to meet the need. *Id.* ¶ 28. The package comprises grants, loans, and work-study payments. *Id*. Only grant aid, which need not be repaid or earned through work, reduces net price. *Id*. ¶ 29. In short, in "awarding" financial aid, the school is simply offering a discount off the list price. *Id.* ¶¶ 25-30, 45 n.42; Mora Rpt. ¶ 70.[7]

The 568 Group's goal for giving out primarily need-based aid, and for calculating "ability to pay," was to achieve "agreement" and "consensus." *See, e.g.*, SR1 ¶¶ 50-58 & App'x 7 (collecting evidence as to each Defendant). The founding member schools had concluded that the pre-existing "Federal Methodology" (or "FM"), used to calculate awards of federal financial aid, did not adequately assess student and family "ability to pay." SR1 ¶¶ 31-45. The schools concluded that the College Board's "Institutional Methodology" (or "IM") was a more accurate tool. *Id*. ¶ 39.

---

[6] *See United States v. McKesson*, 351 U.S. 305, 310-11 (1956) ("no basis for supposing" any change in the applicable antitrust law if the exemption at issue did *not* apply); *accord In re Wheat Rail Freight Rate Antitrust Litig.*, 579 F. Supp. 517, 539-40 (N.D. Ill. 1984), *aff'd*, 759 F.2d 1305 (7th Cir. 1985).

[7] Ms. Mora held multiple leadership positions at Harvard University from 1997 to 2008, including Director of Cost Accounting, Director of Sponsored Research, and Chief Financial Officer, where she was the University's liaison to and sat on the board of directors of the Harvard Management Company. Mora Rpt. ¶¶ 9-12. From 2008 to 2020, she was the CFO and Chief Administrative Officer at the Charles Stark Draper Laboratory, an independent, not-for-profit research and development corporation that spun out from MIT in the 1970s. *Id*. ¶ 13. She has served on several public company boards. *Id*. ¶ 14.

The schools thus thought that the IM better addressed "vertical equity," which refers to the principle that families with greater "ability to pay" should pay higher prices, *id*. ¶¶ 43, 150, 254, by calculating EFCs through its range of "assessment rates" (in the form of a fraction) multiplied by the "available income and assets" of the family, *id*. ¶ 42.

At the same time, as the College Board's longtime economist Dr. Sandy Baum has acknowledged, there are no "particular economic precepts" underlying vertical equity, *id*. ¶¶ 41 (quoting S. Baum 106:9-15 (Ex. 78)), and there is "clearly no right answer to it," *id*. ¶ 42 (quoting S. Baum 172:3-13 (Ex. 78)). The founding schools had recognized in the late 1990s that Princeton had eliminated loans for families below $40,000 in income and had eliminated the consideration of family home equity in assessing "ability to pay" if a family's income fell below $90,000. *Id*. ¶ 50. In 2001, Princeton eliminated loans for all its students receiving institutional aid. *Id.* ¶ 52. The founding schools did not want to try to match such policies. *Id*. ¶¶ 50-54. As to the desire to avoid "bidding wars," which in other contexts is just called "competition," Yale President Richard Levin said at the time: "If we tried to match we'd be collecting zero tuition." Ex. 57 at 2.

The main public announcement of the 568 Group came in 2001, SR1 ¶¶ 54-55, 140, emphasizing the schools' commitment "to provide financial aid based on financial need," *id*. ¶ 140. The 568 Group formed an Overarching Agreement—including (a) to apply several core principles in awarding aid, which included the agreement to make need-based aid the primary form of financial aid and to base it on student and family "ability to pay," (b) to use the College Board's standard IM (or "Base IM") as the foundation for developing a "Consensus Methodology," (c) to use agreed-upon guidelines for applying "professional judgment" in modifying the EFCs that the Consensus Methodology generated, and (d) to share information with each other regarding their annual calculations of financial aid. *Id*. ¶¶ 57, 125-27, 142-75; SR2 ¶¶ 33-56.

The 568 Group created and maintained lengthy, detailed "manuals" and "guidelines" reflecting the Group's agreement and consensus. SR1 ¶¶ 126-91. A "Technical Committee" carefully and regularly updated these documents. *See, e.g.*, *id*. ¶¶ 136, 147, 156, 176-77, 181-85, 208-09, 211-14, 224. The Overarching Agreement included some principles and methodological components that were not unique to the 568 Group members, but other schools had not *agreed* with each other to apply such elements, and they were not all competing in the same market. *See, e.g.*, *id*. ¶¶ 37-45; *see also* SR2 ¶¶ 47-56.

## II.     The Commercial Nature of Defendants' Operations

The fact that Defendants are non-profits does not mean that they are oblivious to revenues or endowment growth. Mora Rpt. ¶¶ 20-66; Mora Rbtl. ¶¶ 4-26. Far from it. With multiple departments and schools, wide and scattered property holdings (including commercial real estate), diversified income streams (including multi-billion dollar hospital systems), intellectual-property rights, complex endowment management, lucrative cash investments, distinct forms of annual fundraising, large executive and administrative staff, and a variety of relevant stakeholders, Mora Rpt. ¶¶ 32-57, an elite private university in many respects must operate like a public company or sophisticated corporate conglomerate, *id*. ¶¶ 20-66; Mora Rbtl. ¶¶ 4-26.

As the United States explained in its Statement of Interest in this case: "Whether an entity is a 'nonprofit' or a 'university,' it can still be organized to maximize the revenue it collects from consumers or other trading partners." ECF 167-1 at 16. In fact, "differences between for-profit and not-for-profit firms vanish in competitive markets."[8] An elite private university may not be seeking

---

[8] Scott J. Thomas, *Do Not-for-Profit Firms Behave Differently*, in ECONOMICS OF ANTITRUST: COMPLEX ISSUES IN A DYNAMIC ECONOMY 193, 196 (2007) (surveying literature); *see also id*. at 195-96 ("If the firms sell goods or services in competitive markets, then all firms may be forced to charge the profit-maximizing price (the competitive price) to remain in business, even if they have an objective other than to maximize profits. . . . Hence, economic theory predicts that if not-for-profit firms are going to deviate from profit maximization, they are going to do so mainly in those situations where they have market power.").

to generate "profit" as such, but it is always mindful of keeping revenues in line with—and, ideally, in excess of—costs. Mora Rpt. ¶¶ 56-57. As Defendants' expert Dr. Bridget Terry Long stated in an article published as the 568 Group began, "colleges seek to maximize revenues including net student fees."[9] And, of course, these universities have a continuing goal of maximizing endowment growth, Mora Rpt. ¶¶ 42-46, 67-68, as Defendants have done with remarkable success throughout the Class Period, Bulman Rpt. ¶¶ 9, 24-31; Bulman Rbtl. ¶¶ 8-23, 31-46, 55-69.[10]

This commercial quality of elite, private universities is reflected in Defendants' longstanding practices of giving admissions preferences to children and grandchildren of wealthy donors. SR2 ¶ 251 & App'x 4; *see also* Background, *infra*, § VII.A. The quantitative evidence as to Cornell, Georgetown, MIT, Penn, and Notre Dame, for example, shows that applicants placed on a priority or special-interest list, including applicants on the list as a result of substantial donations to the school from family members, were admitted at a *much* higher rate than regular applications, as quantified below, and at all of these schools the priority-designated students on average had lower (or similar) standardized-test scores than non-priority applicants:

> *Cornell*. Across all years with available data, Cornell Watchlist (81% admitted on average) as well as Cornell Connection priority-designated applicants (65% admitted on average) were admitted at an average rate at least 50 percentage points higher than non-priority applicants (15% on average).

> *Georgetown*. Admissions rates of applicants on the President's List ranged from 83% to 100%. In contrast, non-priority-designated admissions rates ranged from 9% to 13%.

---

[9] B.T. Long, *How Do Financial Aid Policies Affect Colleges? The Institutional Impact of the Georgia HOPE Scholarship*, JOURNAL OF HUMAN RESOURCES, Vol. 39, No. 4, 1048 (Autumn 2004).

[10] Dr. Bulman is an Associate Professor of Economics at the University of California, Santa Cruz, where he teaches econometrics to undergraduate and masters students, and applied microeconomics at the Ph.D. level. Bulman Rpt. ¶ 13. He is also a Research Associate with the National Bureau of Economic Research. *Id*. He received his Ph.D. in Economics from Stanford University. *Id*. He is an applied microeconomist with research in, among other fields, the economics of education. *Id*. ¶ 14. He has been frequently published in leading general interest and field journals in economics and on higher-education topics. *Id*. ¶ 15.

*MIT*. Across the years with available data (2011 through 2023), the average difference in admission rates between priority-designated applicants (29.9%) and other applicants (6.5%) was 23.4 percentage points.

*Notre Dame*. Priority-designated applicants had significantly higher admission rates than other applicants; for example, the 2017 admission rate of "University Relations" applicants was 64%, "President" was 42%, and "University Interest" was 38%, while the admission rate for non-priority applicants was only 18%.

*Penn*. For 2003-09, the admission rates of students with a special interest tag was 66% versus 18% for non-tagged; for 2010-2015, the admissions rate was 87% of "Bona Fide Special Interest A" ("BSI-A") tagged versus 11% without any designations; and for 2019, the admission rate was 73% for BSI-A tagged versus 7% without any designations.

SR2 App'x 4. The classwide qualitative evidence, including Defendants' internal analyses, confirm the obvious: admitting children of wealthy donors, a form of fundraising, is a way to generate substantial revenues, increase the size of endowments, and maintain the prestige necessary to continue to generate such revenues. *See, e.g.*, Mora Rpt. ¶¶ 53, 71-75.

The formation of the 568 Group, and the Overarching Agreement, further reflect the commercial quality of the founding members. *See, e.g.*, SR1 ¶¶ 45, 56-57, 126, 130, 150, 221, 298, 362. Defendants worked from the false premise that each school had a fixed (or very limited) pot of money for financial aid. *Id*. ¶ 45. For one thing, if full competition required increased aid, then the competing schools would make any necessary trade-offs. In addition, the evidence is that the schools in fact possessed the resources to avoid such trade-offs. *See, e.g.*, Bulman Rpt. ¶¶ 62-69; Bulman Rbtl. ¶¶ 17-30, 47-53. The formation of the 568 Group was thus consistent with cost control and endowment maximization. SR1 ¶¶ 56-57. Absent the restrictions on price competition that underpinned the 568 Group, Defendants expressed concern that they would otherwise have to engage in "bidding wars" over aid awards and net prices, *see, e.g.*, Ex. 38 at 1, that were not merely based on student and family "ability to pay." SR1 ¶¶ 126, 130, 221, 298, 362.

Defendants thus agreed to make awards based on "ability to pay" the primary way they would award their institutional aid—and proceeded to increase their endowments enormously. *See, e.g.*, Bulman Rpt. ¶¶ 9, 24-31; Bulman Rbtl. ¶¶ 8-23, 31-46, 55-69. This was consistent with their general goals of limiting their use of endowment funds more than necessary to maintain the endowment's purchasing power, as Defendants were competing over key prestige metrics such as endowment dollar per student and total endowment. Mora Rpt. ¶¶ 42-46, 67-68. Without aggressively competing for students through net prices based on what *Defendants* could afford to offer, during the Class Period, Defendants increased their endowments in inflation-adjusted dollars between 46% and 281%, with an average of *144%*. Bulman Rpt. ¶¶ 24-31.

The notion of financial constraints preventing larger price discounts was illusory: From 2003 to 2023, Defendants collectively grew their endowments by approximately *$165 billion*. Bulman Rbtl. Table 3. Virtually every Defendant from 2003 to 2022 could have awarded 10-20% more institutional financial aid each year while still increasing the purchasing power of its endowment at virtually the same rate as it did (and the exception, Georgetown, could have spent 10% more and still enjoyed approximately 90% of the same endowment growth). Bulman Rpt. ¶¶ 62-69; Bulman Rbtl. ¶¶ 6, 17-30. Defendants had the flexibility to make such increased awards through, for example, their unrestricted endowment funds. Bulman Rpt. ¶¶ 46-50; Bulman Rbtl. ¶¶ 47-53, 70-80; *see also, e.g.*, Mora Rpt. ¶¶ 27-28, 48-50; Mora Rbtl. ¶¶ 32-29.[11] As of 2017, for example, Penn had approximately $5.9 billion in unrestricted endowment funds, Ex. 36 at 2, with

---

[11] The availability of "unrestricted funds" is also beside the point, because money is fungible, such that various revenue sources can support aid. *See* Bulman Rpt. ¶ 49; Bulman Rbtl. ¶¶ 28, 83; *see, e.g.*, Ex. 27 at 6-7 (Notre Dame telling Congress in 2016, with respect to "tuition, unrestricted contributions, and other unrestricted revenues," that "[t]hese revenues are essentially fungible"); Ex. 6 at 1 (██████████ ████████████████████████████████████████████████████ ").

no legal restriction on its ability to use them to award aid, Ex. 103.[12]

## III. Defendants' Alleged Adherence to the Overarching Agreement

Plaintiffs have a wealth of classwide evidence that the Defendants adhered to the Overarching Agreement. *See, e.g.*, SR1 ¶¶ 126-91 & App'x 7; SR2 ¶¶ 37-70 & App'x 2 & 3.

### A. Common Qualitative Evidence Consistent with Conspiracy and Inconsistent with Unfettered Competition

Dr. Singer uses an economic lens to evaluate both quantitative and qualitative evidence to determine whether the record evidence is consistent with the alleged conspiracy and inconsistent with unfettered competition. As a threshold matter, as to whether Defendants would compete with each other over price for students in the but-for world—they would. ███████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████ " L. Stiroh 176:15-23 (Ex. 69). ████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████ ." *Id*. 149:17-24.

The qualitative evidence, "when viewed through the criteria economists use to assess cartels, is consistent with Plaintiffs' allegation that Defendants engaged in the alleged conspiracy to suppress the institutional grant aid and to artificially inflate Effective Institutional Prices, and inconsistent with unfettered competition and unilateral conduct." SR1 ¶¶ 123-24; *see also* SR2 ¶¶ 37-56 & App'x 2 & 3.[13] Vanderbilt, for example, reasoned that if all of the members charged

---

[12] As perspective on Penn's discretionary, competitive spending, according to the university's tax filings, in addition to her over $2.5 million salary, Penn paid its outgoing President, Amy Gutmann, over $20 million in deferred compensation and investment gains in 2021. Ex. 104.

[13] It is well established that "economic experts may testify as to whether certain conduct is indicative of collusion or consistent with a conspiracy." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 581 F. Supp. 3d 1029, 1052 (N.D. Ill. 2022) (cleaned up) (allowing expert opinion on conduct consistent with collusion and rejecting defense arguments that such opinions did not involve "genuine economic[s]").

students in similar financial situations similar amounts due to their agreement not to compete on price, families would not be "focusing on the lowest net price." Ex. 38. Similarly, a member of the Technical Committee described the 568 Group "approach" as "try[ing] to come up with . . . that right Net Price." Ex. 16 at 2. And Defendants' focus on "net price" also explains why they monitored peers' net prices through each school's "net price calculator."[14]

Abundant classwide internal documents reflect Defendants' agreement to apply the Consensus Methodology. SR1 ¶¶ 53-58, 125-75; SR2 ¶¶ 37-70. As to Penn, for example, in 2018, Deloitte & Touche compiled an over 100-page "Policy Procedure Manual" stating the following: "Penn uses a variation of the College Board's Institutional Methodology (IM) to award institutional grant funds. Penn further adheres to the Consensus Methodology, a set of guidelines based on IM issued by the 568 President's Group of need-blind schools." Ex. 34 at 39. This dovetails with a 2017 document, titled "Summary of changes to Needs Analysis," in which Penn states: "Decisions were made to keep Penn aligned with the 568 Presidents Group Consensus Methodology." Ex. 33. In 2020, Penn's Director of Financial Aid Elaine Vara acknowledged "the restrictions of the needs analysis consensus document, which requires us to apply certain needs analysis assessment constantly amongst all of our schools." Ex. 35 at 4.

Similarly, documents common to the Class as a whole reflect Defendants' agreement, as part of the alleged cartel beginning in 2003, to pricing principles, including that they would award financial aid based on a common understanding of "ability to pay" and that each would apply the same basic formula for calculating "ability to pay." *See, e.g.*, SR2 ¶¶ 39-41, 47-56 & App'x 2. James Belvin, the founding Chair of the 568 Technical Group, explained: "Implementation of the

---

[14] *See, e.g.*, Ex. 2 (comparing Cornell's net prices to those of peer schools and the net price calculator that they use); Ex. 85 (████████████████████████████████████); J. Tilton 191:6-17 (Ex. 68) (Brown compared the results from its net price calculator with the results from other schools' net price calculators).

Consensus Approach begins with the cohort of students applying to enter college in the fall of 2003." Ex. 102. He called out "the responsibility of each financial aid officer to implement the Consensus Approach (CA) methodology on his or her campus." *Id*. The classwide evidence also indicates that Defendants would, for example, monitor output and prices, created organizations to effectuate cartel prices, and developed inducements to support collusion. SR1 ¶¶ 200-16. The following evidence—that each Class member would introduce as part of its case if brought individually—is representative of the classwide proof of the alleged agreement and each Defendant's participation in it. *See id*. ¶¶ 126-91 & App'x 7; SR2 ¶¶ 37-70 & App'x 2 & 3.

- Each Defendant participated in the regular in-person, multi-day conferences that the 568 Group held and organized for its members every year regarding policies, practices, principles, and methodologies concerning financial aid.

- Defendants participated in the 568 Group's regular maintenance, updating, and distribution of the detailed understandings, policy manuals, and guidelines that summarized the up-to-date Consensus Methodology and principles.

- Defendants participated in the 568 Group's "Common Standards Subcommittee" and "Technical Committee," and the Group's overlapping membership with the leadership of the College Board, to work with the College Board to modify the Base IM.

- Defendants each applied essentially all or nearly all of the core pricing principles of the Overarching Agreement as members of the 568 Group.

- Defendants, while identifying as members of the 568 Group, each applied essentially the same basic formula for calculating a student's available income and assets.

- Defendants regularly acknowledged that they had both adopted and applied the Consensus Methodology as part of the 568 Group in awarding financial aid.

*See, e.g.*, Ex. 105 (a copy of the 568 Group's Consensus Methodology Guidelines Manual); Ex. 106 (a copy of the 568 Group's Memorandum of Understanding); Ex. 107 (a copy of the 568 Group's Professional Judgement Guidelines Manual).

The classwide evidence consistent with conspiracy and inconsistent with competition further includes Defendants' own contemporaneous recognition that, absent the exemption, the

568 Group constituted a conspiracy in violation of the antitrust laws. That is, Defendants saw it as important to meet the 568 Exemption and saw legal risk in their failure to do so. *See, e.g.*, SR1 ¶¶ 133-34. █████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████ Ex. 12 at 1, and "[i]f Oxford moves to need-aware admission . . . this would clearly be a violation of Section 568's antitrust exemption," Ex. 11 at 2; *see also* Background, *infra*, § III.C (the Group promptly disbanded when the 568 Exemption expired).

The classwide evidence consistent with conspiracy and inconsistent with unfettered competition further includes the documents and testimony revealing the Group members' extensive exchange of sensitive and contemporaneous pricing data. SR1 ¶ 163; SR2 ¶¶ 48-49, 53-54. The Group's "Need Analysis Council" frequently asked member schools to answer detailed survey questions regarding policies and practices which "allowed the 568 schools to understand that they were applying almost all of the Core Principles and most of the components of the CM." SR1 ¶¶ 164, 181. Defendants also shared competitively sensitive information through their overlapping membership in, most prominently, the Consortium of Financing Higher Education ("COFHE"). *Id*. ¶ 165. The COFHE "colorbooks," containing data that in material part was not publicly available, would include details about Defendants' calculation of "Parent Contribution" and "Net Price" broken down by groupings of family income; the school's most recent calculations of EFC; and other "compiled and analyzed data to help the Defendants understand where they stood relative to their peer schools and to adjust their policies and practices accordingly." *Id*. ¶¶ 165-75. This data "deviates from the general benchmarking data used by other universities" and was "not widely available." SR2 ¶ 543.

### B.    Common Quantitative Evidence of Conspiracy

Drs. Singer and Bulman each provided detailed econometric analyses of Defendants' financial aid and pricing practices. The results were both consistent with the existence of the Overarching Agreement and inconsistent with unfettered competition. Dr. Singer, for instance, used a robust regression model comparing Defendants' aid and pricing during the years each Defendant identified as a Group member to years when it did not. Such membership was associated in a statistically significant way with artificially inflated Effective Institutional Prices of approximately $1,202 per student per year. SR2 ¶¶ 72, 150, 256 & Table 7; *see also* Background, *infra*, § V.A.2 (discussing Dr. Singer's analysis in more detail). Dr. Singer further found that, due to the alleged Overarching Agreement, each Defendant artificially inflated its Effective Institutional Prices ranging from 1% artificial price inflation (CalTech) to 9.8% artificial price inflation (MIT). SR1 ¶ 261 & Table 13.

Dr. Bulman compared Defendants spending on institutional aid out of their "excess" endowment returns—those that exceed the target spending rate from the endowment plus inflation—before and after their participation in the alleged Overarching Conspiracy. Bulman Rpt. ¶¶ II.b, 32-35. The analysis showed that, before the alleged conspiracy, higher endowment returns resulted in greater financial aid and reduced net prices, whereas during the alleged conspiracy, higher endowment returns were not allocated to increasing aid or reducing net prices. *Id.* ¶ 32. The results were "highly statistically significant," and the before-after differences are "consistent with Defendants' participating in the Challenged Conduct." *Id.*

### C.    The Dissolution of the 568 Group

In August 2022, the Court denied Defendants' motions to dismiss. *See Carbone*, 621 F. Supp. 3d at 884-89. Congress thereafter chose not to renew the 568 Exemption, leaving it to expire

on October 1, 2022. The 568 Group, as its former members explained, disbanded shortly thereafter. *See, e.g.*, M. Hall 55:15-22 (Ex. 70); P. McWade 106:10-14 (Ex. 73).

## IV. Classwide Evidence of Defendants' Collective Market Power

Whether the Court applies the *per se* rule (as Plaintiffs urge) or the Rule of Reason (as Defendants argue), the question and its answer are common to the Class as a whole. Analysis under the Rule of Reason would simply add additional classwide questions, including whether Defendants collectively had market power—the ability to inflate price above competitive levels. *See, e.g.*, SR1 ¶¶ 59-122; SR2 ¶¶ 6-32. Plaintiffs have (1) direct proof and (2) indirect proof of market power. The direct proof includes the evidence that Defendants did inflate prices above competitive levels, as shown through Dr. Singer's regression analyses. SR1 ¶¶ 62-63.

As to indirect proof, Dr. Singer defines a relevant market of the 22 elite, private universities whose average rankings in the *U.S. News & World Report* put them in the top-25 for universities during the Class Period. *Id*. ¶ 65. The classwide evidence confirms the relevance of the *U.S. News* rankings. *Id*. ¶¶ 72-78, 82-85. Defendants' own documents show they give these rankings weight. *See, e.g.*, SR2 ¶¶ 6-32. When undertaking to identify their principal competitors, Defendants consistently identify the vast majority of the 22 universities in the relevant market, often with 90% overlap with the market as Dr. Singer defines it. SR1 ¶¶ 74-78, 82-85. ███████████

████████████████████████████████

███████████████████████ *See* Ex. 37 at 4.

Dr. Singer used a "peer analysis," using extensive industry data, to quantify the extent to which Defendants perceive their undergraduate services as a separate market. SR1 ¶¶ 85-93. This data reinforces the qualitative evidence that the elite, private universities that comprise the relevant market view each other as peers to a much greater extent than they view other schools as peers— and vice versa. *Id*. The quantitative data further show that, as a telling metric, students are willing

to travel much further to attend an elite, private university than to attend other schools. *Id.* ¶¶ 94-100; *see also* SR2 ¶¶ 6-32 (refuting Defendants' experts' criticisms of relevant market analysis).

Dr. Singer also measured the revealed preferences of students who compare schools at which they are admitted, in a "pairwise" comparison. SR1 ¶¶ 101-07. The results are that (a) the correlation between the *U.S. News* rankings and these revealed preferences are high, and (b) adding 10 additional highly ranked universities does not create any substantial impact on the rankings of schools in the relevant market, and adding in the top 10 liberal arts schools does not change the highest 18 ranked schools in the relevant market. *Id.* Defendants' unweighted collective market share was 77.3%. *Id.* ¶¶ 73, 101-08 & App'x 6. With each university weighted according to its undergraduate population, Defendants' average collective market share during the Class Period was 77.2% to 78.6%. *Id.* ¶ 110. With each university weighted according to the list prices for undergraduate tuition—which accounts for pricing differences across the schools—Defendants' average collective market share during the Class Period was 76.9% and 78%. *Id.* ¶ 111.

In addition, classwide evidence shows that high barriers to entry protect Defendants' longstanding, collective market shares. *Id.* ¶¶ 114-22. Over the Class Period, *none* of the 221 schools with the Carnegie Classification of "Baccalaureate Colleges—Liberal Arts" switched its classification to "university." *Id.* ¶ 114. Elite, private universities also tend to have much higher endowments, and much higher ratios of endowment per student, than other schools. *Id.* ¶¶ 115-16. And elite, private universities have admission rates and admissions yield rates, and faculty quality and faculty compensation, that other schools do not and cannot easily match. *Id.* ¶¶ 117-18; *see also* SR2 ¶¶ 27-32 (refuting arguments that public universities belong in the relevant market).

## V. Classwide Evidence of Common Impact: The Overarching Agreement Artificially Inflated Net Prices for Virtually All Class Members

Plaintiffs have amassed classwide qualitative and quantitative evidence that the Overarching Agreement had a common impact on the Class members. *See* SR1 ¶¶ 217-69; SR2 ¶¶ 57-210; SR3 ¶ 2. This evidence, summarized here and addressed below, is set forth in two steps. Step 1 is the general evidence, common to the Class, showing that the challenged conduct artificially inflated net prices as a general matter. Step 2 is the specific evidence, common to the Class, showing that the artificial price inflation was experienced broadly across the Class.

### A. Step 1: Classwide Evidence of Generalized Impact on Net Prices

#### 1. Exemplary Classwide Qualitative Evidence of Generalized Impact

Plaintiffs have abundant classwide evidence that the 568 Group consistently intended not merely to narrow variance on financial aid awards, but to do so in the direction of *less* aid—by setting a price floor through formulaic means. And as the United States observed in its Statement of Interest in this case, an agreement on the methodology for calculating need-based aid "eliminates an important dimension of price competition—whether the offers are identical or the differences simply narrowed." ECF 167-1 at 13. No less an authority than John DeGioia, the longtime President of Georgetown, Chair of the 568 Group for fifteen years, admitted in 2014 that the 568 Exemption "enables" the Group "to develop a *common formula* by which we would assess the need of the student. We ask the family to contribute *the maximum that they* are *capable, according to the formula*." Ex. 40 at 2 (emphasis added); *see also* J. DeGioia 95:6-96:9 (Ex. 86) (admitting the statement). This "maximum" contribution served as the agreed-upon price floor.

Dartmouth's Director of Financial Aid stated in 2004 that in the 568 Group, "the institution must . . . commit to using the results of the CA as the *lowest* contribution that would be expected for a family," such that "institutions are permitted to *raise* the EFC." Ex. 7 at 9. Alluding to parental

contributions (or "PCs"), James Belvin, the founding Chair of the 568 Technical Group, said the 568 Group had a "policy of making across-the-board revisions only if PCs are *increased*." Ex. 10 at 1. Patricia McWade, the former Chair of the Group's Technical Committee and Dean of Student Financial Services at Georgetown, stated in 2014: "I think it was made clear to those wanting to participate in 568 that they could NOT use an EFC that was lower than what was calculated using the CA." Ex. 17. Elizabeth ("Betsy") Hicks, MIT's Executive Director of Student Financial Services, admitted in 2014 that a 568 Group school can "be more stringent in how it defines financial need, but not more generous." Ex. 18 at 8.

Plaintiffs have further evidence, common to the Class, that the 568 Group restrained competition and raised prices. In numerous contemporaneous internal documents, Defendants described why they left the 568 Group (without formally withdrawing), and other elite private universities explained their decisions not to join. For example, after Yale announced its departure in 2008, it explained that it was now "free to give families more aid than they would have gotten under" the Consensus Methodology because the 568 Group imposed "one needs-analysis formula that everyone has to sign on to." Ex. 84. Emory concluded in 2011 that it "must drop our membership in the 568 group as it does not allow us to be as flexible as we should be with families." Ex. 81 at 8. Chicago recognized in 2013 that the "568 Group – it is hampering our ability to compete," and the school was able to "dramatically improv[e its] financial aid program and increase[e] outreach to low-income students" after leaving the Group. Ex. 79 at 2; Ex. 82 at 2. Penn explained in January 2020 that it was resigning from the 568 Group because "we will need increased flexibility in our needs analysis." Ex. 123.

Harvard, Princeton, and Stanford each declined to join the 568 Group because, respectively, if the school joined it would "have to reduce" its aid, S. Donahue 56:4-15 (Ex. 75);

it wanted to be more "generous" with its aid, Ex. 83 at 2, and it wanted aid offers to be under its own "control," D. Betterton 17:20-18:11 (Ex. 80). Sarah Donahue, former Director of Financial Aid at Harvard, testified that Harvard declined to join because it "would not be able to award the financial aid we had awarded to families—we'd have to reduce it. And that was counter to our goals of keeping Harvard affordable." S. Donahue 56:4-15 (Ex. 75). Alluding to Harvard, Yale, and Princeton as "HYP," Georgetown recognized in 2014 that the price floor "was why HYP felt the need to leave the group; they wanted to offer more 'need-based' scholarship aid." Ex. 17. MIT recognized in 2014 that Harvard, Princeton, Stanford, and Yale—which had left the Group—had decided "to be more generous." Ex. 21 at 4.

Brent Tener, Director of Financial Aid at Vanderbilt, explained that the benefit of the 568 Group (and 568 Exemption) was "to avoid bidding wars between schools." Ex. 38 at 1; *see also* Ex. 7 at -527 (November 2000 memorandum from Dartmouth's then-Director of Financial Aid, Virginia Hazen, stating that one "[p]urpose of the Consensus Methodology" was to "[a]void bidding wars" over admitted students). If the exemption were to expire, then Vanderbilt "could be forced into a bidding war for students, using need-based financial aid as a major tool. This could cause an increase in need-based aid expenditures." Ex. 38 at 1. When Congress renewed the 568 Exemption in 2015, Notre Dame's Director of Financial Aid, who was on the 568 Group's Technical Committee, celebrated this "great news for Notre Dame and how we compete and try to 'level' the playing field at least in the calculation of need." Ex. 118 at 1; M. Nucciarone 30(b)(6) (Ex. 119) 39:24-40, 230:10-22. Patricia McWade of Georgetown similarly testified that the exemption expiring meant that "we're going back to the old Wild Wild West . . . where schools would do, you know, what they wanted." P. McWade 190:18-191:4 (Ex. 73). This is an apt description of the but-for world of unfettered competition.

And that is not merely a prediction. Defendants have substantially improved aid for students after leaving the 568 Group or after the Group disbanded. After exiting, Vanderbilt announced that it was dropping consideration of the family's home equity in assessing "ability to pay." D. Christiansen 61:16-63:3 (Ex. 63). In November 2024, Penn announced that it was expanding "financial aid for middle income families," would "exclude home equity" in calculating EFCs, and would "raise the income threshold for families eligible to receive full tuition scholarships from $140,000 to $200,000." Ex. 88. The next day, MIT followed suit, announcing it too would offer free tuition to families with incomes below $200,000. Ex. 89. Dartmouth, Notre Dame, Vanderbilt, and Yale have announced similar financial aid enhancements. Exs. 90-93; *see also* D. Christiansen 62:16-63:3 (Ex. 63) (alluding to Vanderbilt's decision to eliminate home equity in needs analysis); Ex. 94 at 8 (████████████████████████████████████ ████████████████████████████).

## 2. Exemplary Classwide Quantitative Evidence of Generalized Impact

Dr. Singer used a standard multiple-regression analysis comparing net prices during periods when Defendants identified as part of the 568 Group with periods when Defendants claimed to have left the Group. Controlling for all factors other than Group membership that might cause changes in Defendants' net prices, Dr. Singer was able to isolate the effect of the Group on net prices to a statistically significant degree. SR1 ¶¶ 218-51; SR2 ¶¶ 57-210; SR3 ¶¶ 5, 20-26. In his primary model, Dr. Singer used as the dependent variable the Effective Institutional Price for a student at an institution in an academic year. He then identified explanatory variables for movements in Effective Institutional Prices, including both control variables and the key variable of interest—membership in the Group. To run the analyses, Dr. Singer used a substantial amount of data reflecting, among other things, pricing for each Defendant to each student. He combined financial aid structured data that Defendants produced in this case with data from the Integrated

Postsecondary Educational Data System (IPEDS) and used data from the Delta Cost Project, which the DOE makes available online, from the period 1987-2015. SR1 ¶¶ 229-37.

Dr. Singer chose multiple student-level and institutional-level control variables relying on both economic theory and the relevant industry literature. *Id*. ¶¶ 244-45. He included both institution and student fixed effects, to control for institution and student characteristics that do not vary over time, such as socioeconomic and demographic factors. He used the model to analyze the impact of the challenged conduct on each Class Member, in each academic year in the Class Period, at each Defendant. Dr. Singer contrasted the prices that Class members paid during the Class Period against a benchmark that involved pricing during periods where Defendants did not identify as part of the 568 Group, controlling for all other factors affecting price. *Id*. ¶¶ 238-45.

Dr. Singer reported his results under several specifications, to show that the dependent variable was not highly sensitive to any one specification. *Id*. ¶¶ 246-51. Dr. Singer concluded, after accounting for the "myriad adjustments" that Defendants' expert Dr. Hill proffered, that a Defendant's participation in the challenged conduct resulted in a $1,202 average, per-student, per-year artificial increase to their Effective Institutional Prices during the Class Period. SR2 ¶¶ 150, 256 & Table 6. The conduct coefficient is highly statistically significant, with a less than 1% probability that the challenged conduct had no such effect on net price. SR1 ¶ 249; SR2 ¶ 150 & Table 6. "These results are consistent with the Challenged Conduct having artificially inflated Class Members' Effective Institutional Prices relative to a but-for world absent the Challenged Conduct." SR2 ¶ 150.

In numerous respects, moreover, Dr. Singer's regression analysis is *conservative*: (1) while the but-for world is one in which the Overarching Agreement never occurred, the benchmark he uses necessarily includes periods in which the 568 Group still existed (but some schools claimed

to have departed), which means that the non-participating Defendants' prices in his "clean" benchmark would still be artificially due under the "umbrella effect," SR1 ¶ 228; SR2 ¶ 73; SR3 ¶ 34; (2) his methodology credits Defendants' claim that they withdrew from the 568 Group, which means that if the Defendants did not immediately alter their pricing after withdrawal (given that the Group still existed), then the prices that the regression treats as "clean" were in fact contaminated, SR1 ¶¶ 228, 238, 248; SR2 ¶ 73 n.253; SR3 ¶ 35; (3) the professional literature indicates that there is usually a lag between when a cartel ends and when market prices return to competitive levels, and this lag is greater the longer the cartel was in place, which means that for the many Defendants for which only a post-conduct benchmark was available, these "lingering effects" likely still affected their pricing, SR2 ¶¶ 73, 186; (4) to the extent that elements of the challenged conduct were present during benchmark periods, as Defendants' experts Drs. Stiroh and Nicholas Hill suggest, then they would have diluted the effect of the conduct on prices, SR2 ¶ 210; and (5) to the extent that a Defendant's prior membership in the 568 Group had the lingering effect of reducing the school's financial aid awards after its departure from the Group, then treating that Defendant's post-Group pricing as "clean" underestimates the effect of the challenged conduct, SR2 § III.A.2h.[15]

Dr. Singer's analyses also showed that the Overarching Conspiracy artificially inflated EFCs. Dr. Singer used his primary regression model to test whether EFCs were affected by Defendants' participation in the 568 Group. SR2 ¶ 44 & Table 1. The resulting conduct coefficient of 515 implies that the "the Challenged Conduct resulted in an artificial overcharge to EFCs of

---

[15] ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████ H. Singer 50:3-51:4 (Ex. 64).

roughly $515 per student and academic year." *Id.* ¶ 44. This conduct coefficient is also highly statistically significant, with a less than 1% probability that the challenged conduct had no such effect. *Id.* Dr. Singer also assessed how the challenged conduct impacts the difference in the EFCs offered to cross-admitted students. Using the same controls as in his main regression (minus any controls that did not inform the range in EFCs), he showed that "the absolute differences between the EFCs is lower when both Defendants for the cross-admitted student are in the 568 Group than when one or both Defendants are not." SR2 ¶46. His analyses are classwide evidence that "the EFC and the resulting Effective Institutional Price are closer together when the Challenged Conduct is in effect than when the Challenged Conduct is not." *Id.* ¶ 46.

**B.  Step 2: Classwide Evidence That Nearly All Class Members Paid Artificially Inflated Net Prices**

**1.  Exemplary Classwide Qualitative Evidence of Widespread Impact**

The first form of classwide evidence of classwide impact is qualitative and includes economic and other evidence that Defendants treated similar students similarly in net pricing. Dr. Singer's analysis shows, for example, that the schools adhered to two economic principles in pricing that would tend to show that any generalized inflation of prices (from Step 1) would be broadly felt across the Class: horizontal and vertical equity. Horizontal equity is the principle that students and families with similar financial circumstances pay similar net prices. SR1 ¶ 150. A "school can achieve horizontal equity based on ability to pay only if it is primarily awarding institutional grant aid based on need." *Id.* ¶ 152. Vertical equity, as noted, is the principle that families with greater "ability to pay" should pay higher prices. *Id.* ¶ 254. Georgetown President John DeGioia alluded to both types of "equity" when he said that the 568 Exemption "enables" the Group "to develop a *common formula* by which we would assess the need of the student. We ask the family to contribute *the maximum that they* are *capable, according to the formula*." Ex. 40

(emphasis added); *see also* J. DeGioia 95:6-96:9 (Ex. 86) (admitting the statement). Dr. Singer identified classwide evidence that Defendants pursued both vertical equity and horizontal equity, which is "consistent with an Effective Institutional Price Structure," SR1 ¶ 269, through which these prices were related to each other, and thus the impact of the Overarching Agreement would be transmitted across virtually all aid recipients. *Id*. ¶ 254; SR2 ¶¶ 213, 219, 239-40; SR3 ¶ 53, 75.

### 2. Exemplary Classwide Quantitative Evidence of Widespread Impact

Dr. Singer used two primary classwide quantitative methods of demonstrating harm to all or nearly all Class members. First, he used the commonly cited and accepted in-sample prediction methodology. This method "uses the standard definition of harm as the difference between the actual and counterfactual ('but-for') conditions." SR1 ¶ 255. Dr. Singer used the output of his primary regression model, which showed impact at Step 1, to compare the actual Effective Institutional Price that each student paid to what the model shows each would have paid in the but-for world. The model incorporates dozens of variables individual to each student, including fixed effects for each student, in order to refine its "prediction" of the but-for price to each Class member. Under this approach, a Class member is deemed to suffer antitrust injury whenever the Effective Institutional Price that she paid for at least one academic year during the Class Period is greater than what she would have paid in the but-for world absent the Overarching Agreement. *Id*. Dr. Singer goes on to "count the number of Class Members impacted and divide this by the total count of Class Members in the sample during the Class Period." *Id*. ¶ 258. Dr. Singer concluded that but for the challenged conduct, 97% of Class members would have paid lower Effective Institutional Prices for at least one (if not more) years. *Id*. ¶ 259; SR2 ¶¶ 224, 231 n.394.

In addition, considering Yale's stated intent to be more generous after leaving the 568 Group in 2008, Dr. Singer applied his in-sample prediction to the Class members who attended Yale during the period just before and after it left the Group in 2008, and thus who show up in

Yale's data during those periods. SR3 ¶¶ 69-73. He then compared the actual Effective Institutional Prices paid by each of those Class members with the prices the model predicts they would have paid absent the alleged cartel. He then counts how many transactions show a price greater than the but-for price and computes the share of Class members with an impacted transaction in this subset. *Id*. ¶ 72. ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████, *id*.; H. Singer 47:13-48:10 (Ex. 64), resulting in 93% of these Class members injured. Dr. Singer found that this result shows a widespread effect far greater than random chance. SR3 ¶ 72.

Dr. Singer's in-sample results are all the more remarkable given how difficult it is for this analysis to pick up any effect due to its inherent conservatism. For instance, (1) inherent in the in-sample approach, if a Class member received a discount in the actual world for idiosyncratic reasons not picked up by the model, the in-sample approach might identify that transaction as "unimpacted" even though whatever factor caused the price discount in the actual world would have caused an equivalent change in the but-for world, SR2 ¶¶ 232-33; SR3 ¶¶ 61-62; and (2) the Yale model is even more conservative than the main prediction model, because (a) these students are those less likely to show as impacted because they all paid Yale fewer than four years while Yale was in the Group (and thus all had fewer opportunities to suffer injury than the typical Class member), SR3 ¶ 67, and (b) this analysis assumes that the full effect of having been in the Group for many years would disappear immediately after leaving the 568 Group, whereas those effects would likely ramp up over time, *id*. ¶¶ 70, 73.[16]

Dr. Singer also demonstrates a price structure, implying classwide effects, using two

---

[16] ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ █████████████████████████████████████ H. Singer 192:9-193:5 (Ex. 64).

separate quantitative methods. The existence of a price structure implies that prices are set in relation to each other so that if the price to one class member changes, the price to other class members change as well. SR1 ¶¶ 263, 266. First, Dr. Singer uses standard correlation analyses to show that the artificially inflated Effective Institutional Prices charged by each Defendant, as shown in Step 1, were broadly distributed across the Class. He conducts a common "shock" test (here, a hypothetical 5% reduction in the Effective Institutional Price charged by a given Defendant) and finds that an average price reduction of 5% would have reduced the price paid by Class members at each income decile at that Defendant, SR1 ¶¶ 262-65. Next, he specifies price-structure regressions that analyze how changes in average Effective Institutional Prices paid by other Class members correlate with the price paid by each Class member. *Id.* ¶¶ 266-68. These analyses, respectively, produce correlation coefficients of 0.90 (meaning that a one-dollar increase in the average Effective Institutional Price charged to other Class members at the same Defendant is associated with a $0.90 increase in the price charged to an individual Class member attending the same school) and 0.67 (meaning that a one-dollar increase in the average Effective Institutional Price charged to Class members at other Defendants is associated with a $0.67 increase in the price charged to an individual Class member). *Id.* ¶ 267.

The overcharge comprises (a) an artificial overcharge in EFCs, and (b) adverse effects on packaging (via a shift from institutional grant aid to loan), artificial inflation of list prices, or both. SR3 ¶¶ 56-57. As Dr. Singer explains, where Plaintiffs allege that the Overarching Conspiracy's goals were to reduce competition on aid to reduce endowment spending and aid variability: "If increasing EFCs were the only mechanisms to accomplish this goal, members could simply circumvent the cartel by altering another pricing element." *Id.* ¶ 31. ██████████████

█████████████████████████████████████████████████████████████



L. Stiroh 185:19-25, 190:25-191:9 (Ex. 69). This classwide evidence is further proof that all or nearly all Class members paid higher prices due to the challenged conduct because there are various components of pricing through which the challenged conduct expressed itself.

## VI. Standard Classwide Proof of Aggregate Class Damages

Dr. Singer used his primary regression model—which established that the challenged conduct artificially inflated Effective Institutional Prices and quantified that effect—to compute aggregate damages to the Class. To do that, he multiplies the number of Class member-years by the overcharge per Class member-year (from his model). Under this analysis, where Defendants' Effective Institutional Prices were artificially inflated during the Class Period by approximately $1,202 per student per year, the total aggregate damages to the Class amount to $685.3 million (before trebling). SR2 ¶ 256 & Table 7; *see also* SR1 ¶¶ 276-81.[17]

## VII. Classwide Evidence of Defendants' Failure to Satisfy the 568 Exemption

The 568 Exemption would apply only if all Defendants admitted all of their undergraduates in satisfaction of the Exemption. *Carbone*, 621 F. Supp. 3d at 884-89. Plaintiffs' classwide

---

[17] This calculation is also *conservative* for the reasons discussed above as related to Dr. Singer's model. In addition, Dr. Singer's exclusion of foreign students from the Class, based on their share of all students from IPEDSs data, likely understates aggregate damages. On average, foreign undergraduates receive less need-based aid than non-foreign undergraduates. Excluding foreign students on a per capita basis, which Dr. Singer does because of limitations in Defendants' data, thus has the effect of subtracting more need-based aid from the total pool on which aggregate damages are calculated than would be the case if the exclusion were based on the portion of overall need-based aid that foreign students receive. SR1 n.370.

evidence is capable of demonstrating that, for example, Defendants engaged in wealth favoritism and thus did not comply with the Exemption. *Id*. at 886-87. Northwestern and Notre Dame each stipulated that for each year from 2003 through 2022, the school "in some instances admitted students based on factors which included the applicant's family's donation history and/or capacity for future donations," Exs. 95, 96; Vanderbilt stipulated that for each of those years, in some instances it admitted students based on the "financial circumstances" of the student or the student's family as the Court has interpreted that term, Ex. 97. At Cornell, Georgetown, MIT, Penn, and Notre Dame, in addition to the very high rates of admission for applicants from families with a history or prospect of high donations, SR2 App'x 4, there is further classwide qualitative evidence that these institutions put their proverbial thumbs on the scale for the rich and well-connected.

*Cornell*. Admissions used "Connection Reviews" for applicants that Development was tracking as connected to large donors, and Development's "VIP watch lists" tracked candidates backed by substantial institutional donors.[18] Cornell had sought to make a change around 2020 to limit the influence of outside recommenders on the admissions process, but the university "remain[ed] well-prepared to consider . . . the involvement of highly motivated and consequential donors specifically, as part of our admission reviews." *Id*.[19]

---

[18] *See, e.g.*, Ex. 5 at 1 (referring to the use of a "'Cornell Connection Review' form which lets anyone who reviews the folder know that she was a 'tracked VIP' for the university"); Ex. 4 at 1 (Admissions created multiple "Watch Lists" for "select legacy, VIP and F/S [faculty/staff]"); J. Locke 178:11-180:10, 203:9-204:17 (Ex. 66) (the applicant's file "could say that a family was generous to the university"). Until 2019, Admissions used "giving code[s]" that reflected "different levels of prospective giving" that "trigger[ed]" additional support from Development. Ex. 3. ██████████████████████████████████████████ ██████████ Ex. 87 at 1. ████ *Id*. In sum, as Cornell itself recognized, "admissions readers were in effect deputized in the fund-raising process." Ex. 1 at 1.

[19] *Dartmouth*. The Advancement Office created an annual "priority list" of applicants whose families had a record of giving or potential future giving. J. Sassorossi 45:5-16, 51:2-24, 52:6-53:13, 233:16-234:5 (Ex. 67). Admissions was given the list, with briefing packages containing "donor profiles" showing their total giving and estimated giving capacity. *Id*. 55:3-56:13, 58:15-20, 130:8-131:2, 217:13-24, 220:3-21.

*Georgetown.* President John DeGioia told an elite audience at the Economic Club of Washington in September 2015 that the university had "never met a marginal child of a big donor." Ex. 98. This cynical (albeit realistic) perspective was codified by the "Special Interest Policy" summary that Dean of Admissions Charles Deacon wrote for his staff, that the school re-published every year with virtually no change, and that stated in relevant part:

> The special interest admissions policy allows the university to consider special circumstances in the admission of some qualified candidates who might not be admitted competitively. *These special circumstances normally are related to the potential the university will find by developing an association with the family or its sponsor or by continuing a long term association with the family or sponsor not covered by the legacy policy. Special interest admission is an important avenue for development opportunities.* Given the very large and strong applicant pool this allows certain well qualified candidates to be provided *favored treatment in admission* in exchange for the opportunity the university will have to develop a better association with this family or sponsor. . . .

Exs. 40-46 (emphasis added). Georgetown adhered to this policy by (a) creating, through President DeGioia, a "President's List" of approximately 80 applicants per year, J. DeGioia 50:15-23 (Ex. 86); A. Koenig 26:19-27:11, 33:5-36:16, 208:6-209:5 (Ex. 58), using a "Tracking List" of over 200 names that typically included the parents' donation history and capacity, Ex. 49; (b) often adding the words "Please Admit" at the top of the President's List, Exs. 47, 48, 59; and (c) admitting almost every applicant on the President's List, J. DeGioia 50:15-51:18 (Ex. 86); A. Koenig 25:13-27:11 (Ex. 58). The data President DeGioia reviewed included the financial circumstances—namely, wealth—of the applicant's family, J. DeGioia 65:11-66:24 (Ex. 86), but

---

███████████████████████████████████████████████. *Id.* 163:7-8, 165:20-167:16, 169:8-170:2, 171:18-172:25, 175:16-178:12, 182:21-183:6, 198:15-20.█████████████████████████████ ████████████████████████. *Id.* 179:18-180:5; 181:8-182:3.█████████████████████████████ ██████████████████ *Id.* 250:25-251:13.██████████████████████████. 297:11-298:19. Yet Plaintiffs could not precisely quantify the impact of the priority lists because, tellingly, Mr. Sassorossi would store them only on his laptop, rather than on any school database, and he destroyed the lists. *Id.* 242:5-243:12, 290:7-292:16, 295:20-297:10.

his review did not even include the applicant's transcript, or teacher recommendations, or personal essays. *See* A. Koenig 27:12-28:23 (Ex. 58); C. Deacon (DOJ) 91:12-23 (Ex. 56).

An egregious example of Georgetown's wealth favoritism was President DeGioia's annual attendance at the Allen & Co. annual conference in Sun Valley, Idaho, which *Forbes* dubbed "the annual summer camp for billionaires." Ex. 39; *see also* J. DeGioia 67:2-6 (Ex. 86) (has attended since 2012). President DeGioia mingled and met personally with wealthy individuals and their children. *See* J. DeGioia 255:23-256:14 (Ex. 86). In one instance, he met an applicant at Sun Valley who later thanked him in writing for the meeting. Ex. 50. Georgetown deferred the applicant's Early Action application, but after four months of communications between President DeGioia and the father, the applicant was placed on the President's List and then admitted, in April 2019. *See* Exs. 51-54. ███████████████████████████████████

███████████████████████████████████████████████. *See* Ex. 55 at 26; Ex. 56 at 14. Asked why he put this applicant on the President's List, President DeGioia implausibly claimed he did so because the student had "overcome . . . obstacles"—namely, that the parents had been divorced. J. DeGioia 254:23-256:10 (Ex. 86).

*MIT*. In March 2019, former MIT Admissions Director McGreggor Crowley wrote an article for the *Boston Globe* acknowledging that "every year, regardless of what a college or university says publicly, a number of children of wealthy donors and alumni get a nod in their direction while other applicants are rejected." Ex. 99 at 2-3. In discussing internally its response to Crowley's column, Vice Chancellor Ian Waitz stated that "[t]he challenge with donors is that what was done in the past (even the very recent past) is not reflective of what we are doing now" and asked whether it would have made more sense "to acknowledge what we did in the past . . . but say it is no longer the practice?" Ex. 20 at 1. As to prior practice, in 2016 Chancellor of

Academic Advancement Eric Grimson explained to Director of Admissions Stuart Schmill that Mr. Grimson had "put together a list of applicants (both early and regular) to admissions this year, for whom there is a development link (parents are either already significant donors or are in the pipeline)." Ex. 19 at 2. Mr. Schmill explained in response that "when I talk about our need-blind approach and legacy-free policy, I always say I don't receive any lists. Perhaps a better way to do this would be for us to meet and talk and not exchange the list?" *Id*. In fact Robert Millard, Chairman of the MIT Corporation, had successfully pressured MIT's Dean of Admissions to admit two applicants who were the children of the Chairman's wealthy former colleague at Lehman Brothers. *See* I. Waitz 110:17-21, 113:16-23 (Ex. 65); R. Millard 57:13-58:11 (Ex. 74). According to Mr. Schmill, these were students "that we would really not have otherwise admitted." Ex. 22; *see also* S. Schmill 233:10-234:3, 239:12-15 (Ex. 77).

*Notre Dame*. The pipeline of major donors and the admission of their children grew so overwhelming the university's Institutional Risk and Compliance Committee identified it as a "top four risk" to the institution. Ex. 23 at 6. High-priority donor applicants received the rating "University Relations Discuss" (or "URD"), referring to the Alumni Association and the Department of Development, meaning that admissions would discuss and negotiate that candidate's admission with University Relations. Ex. 26 at 1; D. Bishop 302:21-303:1 (Ex. 62).[20]

A 2020 report authored by Donald Bishop, Associate Vice President for Undergraduate Enrollment, stated as to donor-influenced candidates: "From the table on page 4, you can see the extent of how many benefit from this added consideration." Ex. 25 at 1. The referenced table shows

---

[20] *Yale*. Yale also compiled lists of donor-linked applicants and assigned them "grades" or "ratings" according to the amounts of their family members' donations to Yale. *See* J. O'Neill 52:2-24 (Ex. 120); Ex. 21. The admissions office then received these graded lists for purposes of evaluating applicants for admission. *See* J. O'Neill 53:9-24 (Ex. 120).

that 86 donor-influenced applicants were enrolled in 2020, 4% of the incoming class; and 76%

percent (65/86) of those donor admits "needed special" consideration to be admitted. Mr. Bishop

observed in 2012 that Notre Dame that year had admitted 163 applicants off the University

Relations List, including 38 applicants with academic ratings in the range of 13-18, far below the

typical ratings of 1-6. Ex. 24 at 1. He noted that "the gain of 18 very low ranked admits (13-18

academic ratings) means we allowed their high gifting or potential gifting to influence our choices

more this year than last year—because they simply were higher ranked and larger donors." *Id*. Mr.

Bishop lamented: "Sure hope the wealthy next year raise a few more smart kids!" *Id*.[21]

*Penn*. Penn extensively used "BSI" (or "bona fide special interest") tags. *See* Singer Rbtl,

App'x 4.E. The quantitative evidence, as shown above, is that tagged students had starkly higher

rates of admission. In addition, Sara Harberson, the Associate Dean of Admissions from 1999-

2008, testified: "To get a BSI tag, you were untouchable. You would have gotten in almost 100

percent of the time. A BSI would have been a student whose family were big donors or someone

on the board was advocating for that student." S. Harberson 223:2-9 (Ex. 76). If a student was

"untagged" and the class was overenrolled, "we were told that . . . each admissions officer has to

remove 50 admitted students from the class and take them to Lee [Stetson, then Dean of

Admissions] to move to a waitlist. But you were not allowed to touch any student who had a tag.

---

[21] *Northwestern*. President Morton Schapiro, working closely with senior personnel, created and maintained detailed "president's lists," which typically included an applicant's name, their connection to a donor, historical giving by family members, future giving capacity, ███████████████████████. M. Schapiro 39:12-40:8, 45:3-46:3, 47:9-48:20, 61:18-25 (Ex. 71); *see also, e.g.*, Exs. 28-32 (examples of such president's lists). President Schapiro admitted that he discussed for "a couple hours" the President's List (with its donation history and potential donation information) in face-to-face meetings every year with Dean of Undergraduate Enrollment Chris Watson, while Mr. Watson took notes on his computer. M. Schapiro 42:19-43:12, 53:2-5, 53:8-9 (Ex. 71). Mr. Watson testified that whether an applicant was on the President's List was a factor in admissions for some students each year. C. Watson 40:3-8 (Ex. 61). In addition, applicants with higher development "grades" were admitted at higher rates than other applicants, and applicants with an "A" grade were rarely denied admission. *See, e.g.*, *id*. 60:7-9, 62:9-15, 68:21-25.

Because once they were admitted -- and if they were tagged, they were usually admitted by Lee . . . even if the student was incredibly weak, even if the student had a major issue in the application. You had absolutely no power as an admissions officer." *Id.* 224:17-225:12.[22]

## ARGUMENT

A main "purpose of class action litigation" is "to facilitate prosecution of claims that any one indvidiual might not otherwise bring on her own." *Chicago Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chicago*, 797 F.3d 426, 433 (7th Cir. 2015). Cases alleging antitrust conspiracies are "particularly well suited" for class treatment. *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012). "Indeed, defendants seeking to defeat class certification in a case alleging a horizontal price-fixing conspiracy face an uphill battle." *In re Broiler Chicken Grower Antitrust Litig. (No. 11)*, 2024 WL 2117359, at *11 (E.D. Okla. May 8, 2024) (quotations omitted). Plaintiffs must show, by a preponderance of the evidence, that they satisfy Rule 23(a). *Messner*, 669 F.3d at 811. In addition, under Rule 23(b)(3) Plaintiffs must show that (1) questions of law or fact common to class members predominate over individualized issues; and (2) a class action is the superior method for adjudicating the case. *Id.*

The Court's assessment of the requirements for class certification may overlap with the merits of the case, *Amgen*, 568 U.S. at 466, but class certification does not involve any *determination* on the merits. *Messner*, 669 F.3d at 824 (collecting cases); *accord In re Opana ER Antitrust Litig.*, 2021 WL 3627733, at *3 (N.D. Ill. June 4, 2021). In this respect, Plaintiffs need

---

[22] Defendants also failed to adhere to "need-blind" admissions in that, among other evidence, Defendants such as ▬▬▬▬ and Vanderbilt admitted waitlist applicants with regard to whether those applicants had applied for financial aid. Exs. 100, 101. ▬▬▬▬ waitlisted applicants with special-interest tags, like its other applicants with such tags, were admitted at a much higher rate than waitlisted applicants without such tags. *See* H. Singer 404:24-414:7 (Ex. 64) (describing the analysis). The 568 Exemption does not make any exception, or impose any cross-school "knowledge" requirement, as to waitlisted applicants. *See Carbone*, 621 F. Supp. 3d at 886-88.

do no more here than to present evidence that is "reliable in proving or disproving the elements of the relevant causes of action." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 455 (2016). As to the alleged conspiracy, for example, whether the "evidence is sufficient to survive summary judgment or to demonstrate liability at trial is not at issue in this motion." *In re Broiler Chicken Antitrust Litig.*, 2022 WL 1720468, at *7 (N.D. Ill. May 27, 2022). On each element, whether Plaintiffs "will ultimately prevail on the merits" is for another day. *Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 360, 377 (7th Cir. 2015); *see also Amgen*, 568 U.S. at 466.

I.      **Plaintiffs Satisfy the Four Prerequisites of Rule 23(a)**

    A.      **The Class Is Numerous**

    Under Rule 23(a)(1), there is no "magic number," but a forty–member class is often regarded as sufficient to meet the numerosity requirement. *Broiler Chicken*, 2022 WL 1720468, at *3. Plaintiffs easily satisfy numerosity here. Dr. Singer calculates from the Defendants' own data that the proposed Class includes 224,840 current and former students. *See* SR1 ¶ 259.

    B.      **Questions of Law and Fact Are Common to the Class**

    Rule 23(a)(2) requires only "the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "Even a single question will do." *Id.* at 359. Commonality is "readily met" in antitrust cases. *Chicken Grower*, 2024 WL 2117359, at *7 (cleaned up). This is "because proof of the alleged conspiracy focuses on the defendants' standardized conduct." *Moehrl v. Nat'l Ass'n of Realtors*, 2023 WL 2683199, at *11 (N.D. Ill. Mar. 29, 2023). In particular, common questions include "whether Defendants illegally conspired to restrict supply and increase the price" and "the nature of the conspiracy, whether the conspiracy caused the price increase, and what is the appropriate measure of damages." *Broiler Chicken*, 2022 WL 1720468, at *5. In antitrust class actions, expert testimony typically explains the "'common, class-wide economic methods to

36

evaluate' market definition, market power, liability, and antitrust injury." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 2024 WL 3509668, at *4 (N.D. Ill. July 22, 2024); *accord Moehrl*, 2023 WL 2683199, at *5. Plaintiffs here rely on common evidence to prove market power (if the Court deems the Rule of Reason applicable). *See* Background, *supra*, § IV.

A further common question is whether the 568 Exemption applies, which implicates, for example, Defendants' wealth favoritism. *See Carbone*, 621 F. Supp. 3d at 887-88. The evidence here includes Defendants' various lists that reflected prior and prospective family donations and that the admissions offices considered in deciding whom to admit, and the expert analyses showing that such applicants were admitted at a *much* higher rate than regular applicants, controlling for grades and standardized-test scores. *See* Background, *supra*, § VII. Where any school's wealth favoritism precludes the application of the 568 Exemption for all Defendants, *see Carbone*, 621 F. Supp. 3d at 887-88, this case has the "capacity" to generate a "common *answer*" on whether the 568 Exemption applies. *Wal-Mart*, 564 U.S. at 350.

### C.    The Proposed Class Representatives Are Typical

Under Rule 23(a)(3), typicality "is closely related to commonality and should be liberally construed." *Saltzman v. Pella Corp.*, 257 F.R.D. 471, 479 (N.D. Ill. 2009). "In the antitrust context, typicality 'will be established by plaintiffs and all class members alleging the same antitrust violation by the defendants.'" *Moehrl*, 2023 WL 2683199, at *12; *accord Broiler Chicken*, 2022 WL 1720468, at *5. The six proposed Class Representatives received need-based financial aid from one or more Defendants, and they allege they paid artificially inflated net prices as a result of the alleged conspiracy. *See* Background, *supra*, §§ I, V-VI. In addition, Plaintiffs invoke the "discovery rule," which poses the question of whether "a reasonably diligent person would not have been able to discover the injury until a date within the limitations period." *Carbone*, 621 F. Supp. 3d at 892. As to the proposed Class Representatives, typical of those Class members who

attended college in whole or in part before 2017, Plaintiffs' argument under the discovery rule "applies to both the named representative *and* the putative class members." *Fine v. Kansas City Life Ins. Co.*, 2023 WL 7393027, at *4 (C.D. Cal. Nov. 6, 2023). That is, whether the discovery rule is satisfied will "turn on common evidence or patterns of evidence." *Schofield v. Delta Air Lines, Inc.*, 2019 WL 955288, at *4 (N.D. Cal. Feb. 27, 2019). Dr. Singer's analysis of the complexities regarding this inquiry, for example, is such evidence. *See* Argument, *infra*, § II.A.7.

### D. The Proposed Class Representatives and Their Counsel Will Adequately Represent the Class

The inquiry under Rule 23(a)(4) "consists of two parts: (1) the adequacy of the named plaintiffs as representatives of the proposed class's myriad members, with their differing and separate interests, and (2) the adequacy of the proposed class counsel." *Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 592 (7th Cir. 2011), *as modified* (Sept. 22, 2011). The interests of Plaintiffs and the absent Class members are aligned, as shown by "Plaintiffs' prosecution of the case to this point," *Chicken Grower*, 2024 WL 2117359, at *10, which has resulted in $284 million in settlements. *See* ECF No. 276; *cf. Chicken Grower*, 2024 WL 2117359, at *10 (successful settlements to date make arguments against adequacy "particularly unpersuasive").

In addition, Plaintiffs have reviewed and responded to written discovery; prepared for and had their depositions taken; and searched for, collected, preserved, and produced documents. *See* ECF No. 726 ¶ 31 (approving service awards). Plaintiffs have also retained skilled counsel with experience prosecuting antitrust and class action litigation. *See id*. ¶¶ 24-29 (approving counsel's request for fees); *Broiler Chicken*, 2022 WL 1720468, at *3 (citing finding of adequacy in approving the "several class settlements" in the case to date). Class Counsel have vigorously prosecuted Plaintiffs' claims in their role as Interim Class Counsel throughout this litigation, and they have substantial knowledge of and experience with the applicable law.

## II.     Plaintiffs Satisfy the Requirements of Rule 23(b)(3)

### A.     Common Issues of Law and Fact Predominate Over Individual Issues

Common issues are abundant in this matter and predominate over any possible issues unique to individual Class members. Under Rule 23(b)(3), the question is whether common issues predominate as to the case as a whole, not as to individual elements. *See Amgen*, 568 U.S. at 469 (Rule 23(b)(3) "does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof") (cleaned up); *accord Tyson Foods*, 577 U.S. at 453; *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013). Any individualized issues will not defeat predominance under Rule 23(b)(3) so long as they do not "overwhelm common ones." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014); *see also Tyson Foods*, 577 U.S. at 453 (when common issues predominate, certification is warranted "even though other important matters will have to be tried separately"). In antitrust cases, as illustrated below, predominance is "readily met." *Amchem*, 521 U.S. at 625; *accord In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 603 (7th Cir. 2020); *Messner*, 669 F.3d at 815.

### 1.     The Existence and Scope of the Alleged Conspiracy Has Been and Will Continue to Be the Focus of This Litigation.

The primary reason that predominance is "readily met" in a case like this one, *Amchem*, 521 U.S. at 625, is that "whether a conspiracy exists is a common question that is thought to predominate over the other issues in the case." 7 C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure* § 1781 (3d ed. 2020) (collecting cases). In fact, "this type of alleged conspiracy is the prototypical example of an issue where common questions predominate." *Broiler Chicken*, 2022 WL 1720468, at *7. At the risk of stating the obvious, the more Defendants contend that there was no conspiracy or that its scope was narrow, the more the issue is framed as "central to this litigation." *In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1206 (N.D. Cal. 2013).

The evidence of Defendants' anticompetitive conduct is common to all Class members. *See* Background, *supra*, § III. In that regard, "all class members would be relying on the same evidence." *Kleen Prods. LLC v. Int'l Paper*, 306 F.R.D. 585, 594 (N.D. Ill. 2015), *aff'd*, 831 F.3d 919 (7th Cir. 2016). "If the evidence does not establish the existence of the alleged nationwide conspiracy for the duration of the class period, Plaintiffs fail to establish an element of their claim and they simply lose their case." *Id.*; *accord Moehrl*, 2023 WL 2683199, at *14. In addition, "[d]irect evidence of conspiracy is not a sine qua non" in a price-fixing case, as "[c]ircumstantial evidence can establish an antitrust conspiracy." *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628-29 (7th Cir. 2010); *accord Chicken Grower*, 2024 WL 2117359, at *15 (collecting authority).

This case centrally concerns whether, as Plaintiffs have propounded abundant classwide evidence to prove, Defendants agreed and adhered to the Overarching Conspiracy. *See* Background, *supra*, § III. Dr. Singer appropriately analyzed the qualitative evidence on these issues as consistent with collusion and inconsistent with unfettered competition. *See id.*; *see, e.g.*, *Dealer Mgmt.*, 581 F. Supp. 3d at 1052 (allowing expert opinion on conduct consistent with collusion). In addition, Dr. Singer set forth quantitative analyses that the presence of the challenged conduct led to artificially inflated net prices and artificially reduced institutional aid for those institutions that identified as Group members, controlling for all other factors affecting price. *See* Background, *supra*, §§ III & V.B. As further evidence consistent with conspiracy, Dr. Bulman set forth quantitative analysis that, in contrast to prior years, during the conspiracy Defendants did not allocate their unusually higher endowment returns to increasing aid or reducing net prices. *See id.* § V.B. In short, whether the conspiracy happened "can be resolved for all members of a class in a single adjudication." *Kleen Prods. LLC v. Int'l Paper Co.*, 831 F.3d 919, 925 (7th Cir. 2016).

### 2. The Alleged Inapplicability of the 568 Exemption Is a Common Question.

If the 568 Exemption applies throughout the Class Period, then all Plaintiffs "simply lose

their case." *Chicken Grower*, 2024 WL 2117359, at *15 (collecting authority). Unless all of the Defendants have satisfied the Exemption—which applies to "all" students who were U.S. citizens and permanent residents —no single Defendant can successfully invoke it. *Carbone*, 621 F. Supp. 3d at 887-88. This makes the issue a central one. The analysis will include the classwide evidence of Defendants' longstanding practices of favoritism in admissions for children and grandchildren of wealthy prior and prospective donors. *See* Background, *supra*, § VII.

### 3. The Appropriate Mode of Analysis Is a Common Question.

The parties dispute whether the "*per se*" rule of "Rule of Reason" applies, *see Carbone*, 621 F. Supp. 2d at 889, for which there is a common answer for the class as a whole. *See, e.g.*, *Chicken Grower*, 2024 WL 2117359, at *26. The issue need not be decided now. In fact the resolution of the issue "may require considerable inquiry into market conditions before the evidence justifies a presumption of anticompetitive conduct," *NCAA v. Bd. of Regents*, 468 U.S. 85, 104 n.26 (1984), and as discussed just below, Plaintiffs' classwide evidence concerning Defendants' ability to artificially inflate their prices through collusion will bear directly upon this central common issue. Should the Court ultimately decide after "considerable inquiry" that the Rule of Reason applies, that would magnify the number of common issues to decide—as it would increase the focus upon such classwide issues as market power, relevant market, and alleged pro-competitive justifications. *See* Background, *supra*, § IV.

### 4. Defendants' Alleged Collective Market Power Is a Common Question.

Plaintiffs present common evidence of Defendants' collective market power using direct and indirect proof. The artificial inflation in Defendants' net prices is the direct evidence of their market power. *See* Background, *supra*, § IV; *see, e.g.*, *Dealer Mgmt.*, 2024 WL 3509668, at *5. (Whether Plaintiffs must define a market at all, or with this level of specificity need not be resolved now.) The indirect evidence includes proof that Defendants collectively account for a sizable share

of the market for Elite Private University services in the United States; and high barriers to entry protect Defendants' shares. *See* Background, *supra*, § IV. The parties' dispute over the proper scope of the market similarly "presents a question of fact that will be proven or disproven through evidence common to the class." *Chicken Grower*, 2024 WL 2117359, at *21.

### 5.  Whether the Overarching Conspiracy Caused Widespread Impact Across the Class Is a Common Question.

Another "primary common question" is whether the "conspiracy caused Plaintiffs to suffer injury." *Broiler Chicken*, 2022 WL 1720468, *6. That is, a further reason predominance is "readily met" in antitrust cases, *Amchem*, 521 U.S. at 625, is the alleged conspiracy's "effect on prices." *Kleen*, 831 F.3d at 926. In this regard, a plaintiff suffers antitrust injury from even a single overcharge, which gives rise to liability. *See, e.g.*, *In re Broiler Chicken Antitrust Litig.*, 2023 WL 6977387, at *6 (N.D. Ill. Oct. 23, 2023). Plaintiffs need only "demonstrate that the element of antitrust impact is capable of proof at trial through evidence that is common to the class rather than individual to its members." *Messner*, 669 F.3d at 826.[23] "At this stage, the court need not determine whether Plaintiffs' theory will ultimately prevail." *Chicken Grower*, 2024 WL 2117359, at *17.

Plaintiffs show that antitrust impact is capable of proof at trial through the "broadly accepted two-step method that antitrust impact presents issues susceptible to common proof." *Chicken Grower*, 2024 WL 2117359, at *29; *accord In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 335 F.R.D. 1, 15 (E.D.N.Y. 2020); *Castro v. Sanofi Pasteur Inc.*, 134 F. Supp. 3d 820, 847-48 (D.N.J. 2015). Plaintiffs will show with common evidence "first, that class members paid artificially inflated prices and, second, that 'this price inflation occurred to substantially all class members.'" *Restasis*, 335 F.R.D. at 15 (quoting *Castro*, 134 F. Supp. 3d at

---

[23] *Accord Dealer Mgmt.*, 2024 WL 3509668, at *12 (collecting precedent); *see, e.g.*, *Chicken Grower*, 2024 WL 2117359, at *30; *Broiler Chicken*, 2022 WL 1720468, at *7-20.

847); *accord Chicken Grower*, 2024 WL 2117359, at *29.[24] The parties' dispute here is thus fundamentally classwide in nature: The jury either finds common impact or not.[25]

### i. Step 1: Classwide Evidence of General Impact on Net Prices

Plaintiffs have abundant classwide evidence that the Overarching Conspiracy caused a general artificial inflation in net prices to members of the Class. *See* Background, *supra*, § V.A.

**Qualitative Evidence**. Contemporaneous documents show that elite private universities had concluded that participating in the 568 Group limited price competition and reduced aid generosity. *See id.*, §§ V.A.1. As such evidence repeatedly confirms, for example, (a) the 568 Group was founded and maintained to *prevent* "bidding wars"—that is, to impede price competition; and (b) schools recognized that the Group was limiting competition and restricting aid. *See id*. Dr. Singer evaluated this and other qualitative evidence as inconsistent with competition and facilitating cartelization. *See id.* §§ III, IV.A; *see, e.g.*, *Kleen*, 831 F.3d at 927 (the structure of the market making it susceptible to cartelization is a predominant issue). Courts routinely accept expert opinion concerning the structural characteristics of a market in support of common impact and class certification in antitrust conspiracy cases.[26]

---

[24] *See also Le v. Zuffa, LLC*, 2023 WL 5085064, at *25 (D. Nev. Aug. 9, 2023) ("[T]he Court engages with record evidence [of impact] in two distinct inquiries."); *Nitsch v. Dreamworks Animation SKG Inc.*, 315 F.R.D. 270, 297-98 (N.D. Cal. 2016) (plaintiffs' expert analyses first showed that "classwide evidence was capable of showing that the alleged conspiracy [affected] class members generally," and then that "economic studies and theory, documentary evidence, and statistical analyses were capable of showing that this [impact] had widespread effects"); *High-Tech*, 985 F. Supp. 2d at 1206 (explaining common-impact analysis proceeds in the "two steps" of general and classwide impact).

[25] *See, e.g.*, *Chicken Growers*, 2024 WL 2117359, at *23 (a jury finding in defendant's favor on common impact "would be class-wide evidence that Plaintiffs have failed to prove an element of their claim"); *see also Dealer Mgmt.*, 2024 WL 3509668, at *14 (finding predominance based on "the relatively narrow inquiry" of "is it possible for the Vendors to prove injury with evidence that is common to the class?"); *Moehrl*, 2023 WL 2683199, at *19 ("Plaintiffs have shown the existence of common questions concerning antitrust impact that can be answered with common evidence such as . . . expert opinions.").

[26] *See, e.g.*, *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 656 (7th Cir. 2002) (crediting expert opinion that market structure was conducive to cartelization and common impact); *Fond du Lac Bumper Exch., Inc. v. Jui Li Enter., Co.*, 2016 WL 3579953, at *7, *10 (E.D. Wis. June 24, 2016) (finding

---

**Quantitative Evidence**. Plaintiffs will introduce at trial multiple economic and statistical analyses capable of showing that the Overarching Agreement caused a general increase in net prices to the Class and an artificial reduction of institutional aid. Dr. Singer used regression modelling to reach these conclusions. *See* Background, *supra*, § V.A.2. "Regression analysis is a statistical method by which data is organized as dependent and independent variables—e.g., price changes over time—and is boiled down to a straight line such that predictions can be made about scenarios outside that data—e.g., what prices will be in the future." *Broiler Chicken*, 2022 WL 1720468, at *10. Such analysis "is common in antitrust cases, where the plaintiffs use it to show that an alleged 'conspiracy' has a statistically significant impact on the dependent variable— usually price." *Kleen I*, 306 F.R.D. at 602 (citing *Reference Guide on Multiple Regression,* in REFERENCE MANUAL ON STATISTICAL EVIDENCE 305-07 (3d ed. 2011)[27]). This approach is well- established "even when the market involves diversity in products, marketing, and prices." *Broiler Chicken*, 2022 WL 1720468, at *12 (quotations omitted).[28]

Dr. Singer specified his primary regression model determining the Effective Institutional

---

market-structure analysis as supportive of class certification); *In re Blood Reagents Antitrust Litig.*, 2015 WL 6123211, at *31 (E.D. Pa. Oct. 19, 2015) ("Many courts have accepted market-structure analyses in finding predominance with respect to antitrust impact."); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 308 F.R.D. 606, 627 (N.D. Cal. 2015) (market-structure analysis supportive of class certification).

[27] *See, e.g.*, *ATA Airlines, Inc. v. Fed. Express Corp.*, 665 F.3d 882, 889-90 (7th Cir. 2011) (finding the REFERENCE MANUAL reliable for understanding technical evidence).

[28] *See, e.g*., *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 808 (7th Cir. 2011) (describing regression as "a proven statistical methodology"); *Broiler Chicken*, 2022 WL 1720468, at *10 ("Regression analysis is a widely accepted method . . . and is commonly used in price-fixing cases."); *accord Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 676 (7th Cir. 2009); *In re Packaged Seafood Prods. Antitrust Litig*., 2019 WL 3429174, at *9 (S.D. Cal. July 30, 2019); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 291, 313 (N.D. Cal. 2010); *see also Olean Wholesale Grocery Coop. v. Bumble Bee Foods LLC*, 31 F.4th 651, 681-83 (9th Cir. 2022) (en banc) (upholding class certification where there was a "rational basis" for use of pooled regression model (one that combined the data of multiple defendants into a single model) capable of showing generalized injury to the Class); *accord Dealer Mgmt.*, 2024 WL 3509668, at *6. Defendants' expert Dr. Hill agrees that a regression is appropriate here to determine whether the challenged conduct had an effect on prices. N. Hill 92:23-93:6 (Ex. 72). Dr. Hill admitted that antitrust agencies like the Department of Justice and the Federal Trade Commission regularly use regression analyses to determine the economic impact of alleged price-fixing conspiracies. *Id.* 92:23-93:6.

Price as a function of the alleged anticompetitive conduct and appropriate "control variables." Background, *supra*, § V.A.2. In constructing his model, Dr. Singer "went to great lengths to include in his independent variables all sorts of factors that might otherwise explain the price increases during the class period," and his model is "firmly rooted in sound economic and econometric principles." *Kleen I*, 306 F.R.D. at 605. "To the extent that Defendants challenge the specific factors included and excluded from his model, those arguments go to the weight and probative value of his testimony, not to the underlying methodology." *Id*.

Dr. Singer concluded, with a high degree of statistical significance, that a Defendant's participation in the challenged conduct resulted in an average, per-student, per-year $1,202 artificial increase to their Effective Institutional Prices. Background, *supra*, §§ III.B, V.A.2. This analysis is *conservative*, including because his benchmark necessarily includes periods in which the 568 Group still existed (but some schools claimed to have departed), when non-participating Defendants' prices would still be artificially inflated under the "umbrella effect." In addition, there were likely "lingering effects" that affected the pricing of the Defendants who left the 568 Group, such that the prices that the regression treats as "clean" were in fact contaminated. These factors limited the regression's ability to find an effect and reduced the size of the effect it found. *See id*.

### ii. Step 2: Classwide Evidence That the Overarching Agreement Artificially Inflated Prices to All or Nearly All Class Members

Plaintiffs' classwide evidence here is consistent with the "prevailing view" that horizontal conspiracies to fix prices "affect[] all market participants, creating an inference of class-wide impact even when prices are individually negotiated." *In re Urethane*, 768 F.3d 1245, 1254 (10th Cir. 2014) (collecting cases); *accord Chicken Grower*, 2024 WL 2117359, at *8. Plaintiffs need not show that "each and every class member" has been injured. *Kleen*, 831 F.3d at 927; *accord Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 757 (7th Cir. 2014). Instead, "a class will often

include persons who have not been injured by the defendant's conduct." *Kohen*, 571 F.3d at 677.[29]

**Qualitative Evidence**. Defendants pursued their goals of increasing and preserving both "horizontal equity" and "vertical equity" in awarding aid. Background, *supra*, § V.B.2. Horizontal equity exists when students and families with similar financial resources pay similar net prices. Vertical equity exists when students and families pay what they can afford to pay—in the case of the Overarching Conspiracy, the "maximum" they can afford to pay. Defendants' own expert Dr. Long has opined that the 568 Group members sought to increase "horizontal equity" for their schools. *See, e.g.*, Long Rpt. ¶¶ 23, 145. Defendants' efforts to maintain such equity thus created price structures through which their net prices were related and the impact of the Overarching Agreement was transmitted across virtually all recipients of institutional financial aid. Background, *supra*, § V.B.2. Such efforts to "maintain internal equity" in defendants' pricing practices are thus evidence of classwide impact. *High-Tech*, 985 F. Supp. 2d at 1197.[30]

**Quantitative Evidence**. Dr. Singer concluded that but for the challenged conduct, 97% of Class members would have paid lower Effective Institutional Prices for at least one (if not more) years. Background, *supra*, § V.B.2. In addition, Dr. Singer applied his standard in-sample prediction model to the Class members who attended Yale during the period just before and after it left the Group in 2008. He compared the actual Effective Institutional Prices paid by each of

---

[29] *See also, e.g.*, *Pella Corp. v. Saltzman*, 606 F.3d 391, 2394 (7th Cir. 2010) (affirming class certification in a consumer fraud case despite the possibility that the class could include people whom defendant's conduct did not injure); *Olean*, 31 F.4th at 668-69 (holding that the court need not decide on class certification whether the class includes only a *de minimis* number of uninjured class members).

[30] *See also, e.g.*, *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 89 (D. Conn. 2009) ("[E]vidence of a standardized pricing structure, which . . . presumably establishes an artificially inflated baseline from which any individualized negotiations would proceed, provides generalized proof of class-wide impact." (quotations omitted)); *In re Disposable Contact Lens Antitrust Litig.*, 329 F.R.D. 336, 420 (M.D. Fla. 2018) (same); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 318 (E.D. Mich. 2001) (finding classwide impact where plaintiffs provided evidence of a "common, standardized structure for . . . prices charged to direct purchasers").

those Class members with the prices the model predicts they would have paid absent the alleged cartel. He then counts how many transactions show a price greater than the but-for price and computes the share of Class members with an impacted transaction in this subset. He found that 80% of those transactions were impacted—meaning that 80% of this subset of transactions before Yale left the Group show higher prices than the predicted, but-for prices—resulting in 93% of these Class members injured. Dr. Singer found that this result shows a widespread effect far greater than random chance and implies nearly all Class members were injured. *Id*. Such in-sample methodology is widely accepted by econometrists to determine and measure the effects of anticompetitive conduct on market prices, and the federal courts routinely accept it.[31]

Dr. Singer's analysis, moreover, is inherently conservative. For one thing, inherent in the in-sample approach is that if a Class member received a discount in the actual world for idiosyncratic reasons not picked up by the model, the in-sample approach might identify that transaction as "unimpacted" even though whatever factor caused the price discount in the actual world would have caused an equivalent change in the but-for world; and in the Yale model, these students are those less likely to show as impacted because they had fewer opportunities to suffer injury than the typical Class member), and the analysis assumes that the full effect of having been in the Group for many years would disappear immediately after leaving the 568 Group, whereas those effects would likely ramp up over time. *See* Background, *supra*, § V.B.2.

Dr. Singer shows further, through "correlation analysis," *Chicken Grower*, 2024 WL

---

[31] *See, e.g.*, *Olean*, 31 F.4th at 676-82; *Chicken Grower*, 2024 WL 2117359, at *30; *Simon and Simon, PC v. Align Tech., Inc.*, No. 20-cv-03754-VC (N.D. Cal. Nov. 29, 2023); *Le v. Zuffa, LLC*, 2023 WL 5085064 (D. Nev. Aug. 9, 2023); *Broiler Chicken*, 2022 WL 1720468, at *10, *13; *In re Packaged Seafood Prods. Antitrust Litig.*, 332 F.R.D. 308 (S.D. Cal. 2019); *In re Capacitors Antitrust Litig. (No. III)*, 2018 WL 5980139, at *7-9 (N.D. Cal. Nov. 14, 2018); *In re Domestic Drywall Antitrust Litig.*, 322 F.R.D. 188, 217 (E.D. Pa. 2017); *In re Korean Ramen Antitrust Litig.*, 2017 WL 235052, at *6 (N.D. Cal. Jan. 19, 2017); *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014), *report and recommendations adopted*, 2015 WL 5093503, at *1 (E.D.N.Y. July 10, 2015)).

2117359, at *19, that the artificially inflated Effective Institutional Prices were broadly distributed across the Class—first, by determining that a common "shock" (here, a 5% reduction in the Effective Institutional Price charged by a given Defendant) would have reduced the average price paid by Class members at each income decile at that Defendant; and second, by running price-structure regressions analyzing how changes in average Effective Institutional Prices paid by other Class members highly correlate with the price paid by each Class member. Background, *supra*, § V.B.2. These analyses are also "a standard methodology regularly used in antitrust litigation for demonstrating impact with class-wide evidence." *Id*.[32]

Dr. Singer thereby employed, through his in-sample and price-structure analyses, "two econometric techniques commonly used for demonstrating the broad impact of an alleged antitrust conspiracy." *Id*. Plaintiffs' model is reliable and "consistent with its liability case." *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013); *see, e.g.*, *High Fructose*, 295 F.3d at 660-61 (expert's statistical analysis held admissible to establish classwide impact at trial).

### 6. Plaintiffs' Classwide Analysis of Aggregate Class Damages.

Given the predominance of common issues shown above, the Court "could conclude Plaintiffs have satisfied their burden under Rule 23(b)(3) and end the analysis there." *Chicken Grower*, 2024 WL 2117359, at *28. In the "interest of completeness," however, Plaintiffs also show that "damages present a common issue capable of class-wide proof." *Id*. In antitrust cases, damages calculations "need not be exact." *Comcast*, 569 U.S. at 35. "[P]laintiffs are permitted to use estimates and analysis to calculate a reasonable approximation of their damages." *Kleen*

---

[32] *See, e.g.*, *In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 171, 184-200 (E.D. Pa. 2015) (statistical analysis showing co-movement of prices and price structure in the egg industry was evidence of common impact of alleged agreement to reduce the supply of eggs); *Castro*, 134 F. Supp. 3d at 847-48 (certifying class and accepting expert analysis of price structure as evidence of common impact across the class); *Aftermarket Auto. Lighting Prods. Antitrust Litig.*, 276 F.R.D. 364, 369-74 (C.D. Cal. 2011) (crediting economic modeling and price-structure analysis in certifying class).

*Prods.*, 831 F.3d at 929.[33] In another *conservative* analysis, Dr. Singer calculated $685.3 million in aggregate damages. *See* Background, *supra*, § VI. Dr. Singer's standard damages model is inherently common to the Class as a whole.

### 7. The Application of the Discovery Rule Is a Classwide Issue.

Defendants have asserted that Plaintiffs' claims are untimely. While Defendants are wrong on the merits, the Court may not decide that issue now. The analysis includes, in addition to equitable tolling doctrines, whether "a reasonably diligent person would not have been able to discovery the injury until a date within the limitations period." *Carbone*, 621 F. Supp. 3d at 892. The application of this objective "discovery rule," and the related issue of equitable tolling, pose a common question and is no barrier to class certification.[34]

Plaintiffs' classwide evidence on the question includes Dr. Singer's analysis. SR1 ¶¶ 270-75. Any "statistically significant analysis of the impact of the Overarching Agreement" would have required all of the industry-specific facts and financial aid practices, not to mention the relevant variables, structured data, and regression-based analyses at issue here. *Id.* ¶ 271. In short, "even if an intrepid person had tried to determine if the Overarching Agreement was having a negative economic impact on Financial Aid Students, he or she would not have been able to determine the answer." *Id.* ¶ 272. This analysis dovetails with Defendants' recognition that the 568 Group was "████████████████████," Ex. 9, and that "████████████████████████████████

---

[33] *Accord Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 493 (7th Cir. 2002); *see, e.g.*, *Chicken Grower*, 2024 WL 2117359, at *28 (aggregate damages are "widely endorsed by courts" and sufficient to meet the "'low burden' the Supreme Court requires for damages calculations in antitrust cases") (citations omitted).

[34] *See, e.g.*, *Behar v. Northrop Grumman Corp.*, 2024 WL 4004052, at *17-18 (C.D. Cal. July 1, 2024); *City of Philadelphia v. Bank of Am. Corp.*, 2023 WL 6160534, at *13 (S.D.N.Y. Sept. 21, 2023); *Meek v. Kansas City Life Ins. Co.*, 2022 WL 499049, at *13 (W.D. Mo. Feb. 7, 2022); *Cosby v. KPMG, LLP*, 2021 WL 1828114, at *8-9 (E.D. Tenn. May 7, 2021); *In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*, 325 F.R.D. 136, 172 (D.S.C. 2018); *In re Scrap Metal Antitrust Litig.*, 2004 WL 7340436, at *12 & n.10 (N.D. Ohio Mar. 31, 2004).

██████████████████████," Ex. 13. Defendants even now designate as "Confidential" all manner of 568 Group documents describing its goals, methodologies, and even meeting agendas. *See, e.g.*, Exs. 8, 14, 15. Similarly, someone reviewing the 2006 report of the Government Accounting Office would have likely concluded—albeit incorrectly—that the 568 Group had not had any statistically significant impact. SR1 ¶ 273.

### B.      The Class Action Mechanism Is Superior

Rule 23(b)(3)'s superiority requirement "is comparative: the court must assess efficiency with an eye toward 'other available methods.'" *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 664 (7th Cir. 2015). A "non-exhaustive" list of factors guides the inquiry: "(A) the class members' interest in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3).

These factors all weigh heavily in favor of a finding of superiority here. The class action method has already promoted efficiency and economy, as "the litigation has been ongoing in this centralized forum" for years and "class settlements have already been reached." *Chicken Grower*, 2024 WL 2117359, at *31. With respect to the settlements to date, few Class members have opted out. *See* ECF No. 726 ¶ 9; *cf. Chicken Grower*, 2024 WL 2117359; *see, e.g.*, *Messner*, 669 F.3d at 815 n.5 (given numerous common issues, "the superiority requirement likely poses no serious obstacle to class certification here"). With thousands of Class members across the country, each with materially identical claims, the most feasible and efficient way for them to pursue their claims is by way of a class action. *See Butler*, 727 F.3d at 801 ("[T]he more claimants there are, the more likely a class action is to yield substantial economies in litigation." (quotations omitted)).

## CONCLUSION

Plaintiffs respectfully request, for the reasons set forth above, that the Court certify the proposed Class and appoint the proposed Class Representatives and Class Counsel.

Dated: December 16, 2024      Respectfully Submitted,

/s/ Robert D. Gilbert
Robert D. Gilbert
Elpidio Villarreal
Robert S. Raymar
David S. Copeland
Natasha Zaslove
**GILBERT LITIGATORS &**
  **COUNSELORS, PC**
11 Broadway, Suite 615
New York, NY 10004
Tel: (646) 448-5269
rgilbert@gilbertlitigators.com
pdvillarreal@gilbertlitigators.com
rraymar@gilbertlitigators.com
dcopeland@gilbertlitigators.com
nzaslove@gilberlitigators.com


/s/ Eric L. Cramer
Eric L. Cramer
Ellen T. Noteware
David Langer
Jeremy Gradwohl
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
ecramer@bm.net
enoteware@bm.net
dlanger@bm.net
jgradwohl@bm.net

Richard Schwartz
**BERGER MONTAGUE PC**
1720 W Division
Chicago, IL 60622
Tel: (773) 257-0255
rschwartz@bm.net

/s/ Edward J. Normand
Devin "Vel" Freedman
Edward J. Normand
Richard Cipolla
Joseph Delich
Peter Bach-y-Rita
**FREEDMAN NORMAND**
  **FRIEDLAND LLP**
155 E. 44th Street, Suite 915
New York, NY 10017
Tel: (646) 350-0527
vel@fnf.law
tnormand@fnf.law
rcipolla@fnf.law
jdelich@fnf.law
pbachyrita@fnf.law

Ivy Ngo
**FREEDMAN NORMAND**
  **FRIEDLAND LLP**
1 SE 3d Avenue, Suite 1240
Miami, FL 33131
Tel: (786) 924-2900
ingo@fnf.law

Daniel J. Walker
Robert E. Litan
Hope Brinn
**BERGER MONTAGUE PC**
1001 G Street, NW, Suite 400 East
Washington, DC 20001
Tel: (202) 559-9745
rlitan@bm.net
dwalker@bm.net
hbrinn@bm.net

*Counsel for Plaintiffs*