PUBLIC VERSION

**In the Matter Of:**

CORTZO V. BROWN UNIVERSITY

1:22-cv-00125

---

**HAL J. SINGER, PH.D.**

*November 27, 2024*

---

*Confidential*



800.211.DEPO (3376)
EsquireSolutions.com

1  controlling for all other factors affected

2  the EFC or affected ultimately the price that

3  the students paid.

4        Q.      Since you didn't reverse

5  engineer the formula, you don't know whether

6  the formulas across the defendants were the

7  same; correct?

8                MR. CRAMER:  Objection to form.

9                THE WITNESS:  Sitting here, I

10  can't tell you that they were identically the

11  same, however, I can tell you that my

12  understanding of the documents was that the

13  objective of the -- of the 568 Group was to

14  steer participants to a common formula and

15  most importantly, to come to an agreement on

16  a floor, that is, it was fine to deviate

17  upwards.  You could ask more of the family.

18  But you couldn't go below the floor.

19  BY MR. GRINGER:

20        Q.     Okay.  I'm going to -- I

21  appreciate that extra context, but I'd ask

22  you to just answer my question.  I'll move to

23  strike everything after the word same in that

24  answer.

25                MR. CRAMER:  And we will oppose



1  that motion.  It was responsive to your broad

2  question.

3            MR. GRINGER:  It was very

4  specific, that question.

5  BY MR. GRINGER:

6       Q.    So, just to be clear,

7  Dr. Singer, you did not determine the

8  supposed formula that any defendant used to

9  calculate EFCs; correct?

10            MR. CRAMER:  Asked and answered.

11            THE WITNESS:  I feel -- I don't

12  think I can do better than the last answer.

13  It's -- we didn't reverse engineer the

14  formula.

15            My assignment was something

16  different, which is to assess whether the

17  conduct caused the EFCs to be higher.

18  BY MR. GRINGER:

19       Q.    That was -- that's your

20  assignment was to determine whether the

21  conduct caused EFCs to be higher?

22            MR. CRAMER:  Objection to form.

23  Asked and answered.

24            THE WITNESS:  My

25  internalization -- the assignment is much



1   broader than that, which was to assess other

2   things, impact, and whether can be shown with

3   common proof and common evidence.

4              But central to the alleged

5   cartel or agreement here, is the notion that

6   the schools got together and came up with

7   common formula with an eye towards dampening

8   competition for this one dimension, among

9   others, but principally the dimension of the

10  EFC and namely to set a floor on the EFC.

11             I internalized that to be to go

12  out and design a model to assess whether the

13  conduct was associated, in fact, caused the

14  EFC to move in a direction that would be

15  consistent with the anticompetitive theory in

16  the case.

17  BY MR. GRINGER:

18       Q.     In your first report that you

19  submitted, you didn't make any calculations

20  with regard to EFC at all; correct?

21             MR. CRAMER:  Form.

22             THE WITNESS:  In the first

23  report, I did not offer my EFC regressions,

24  that is correct.  I did not offer those until

25  the second report.



1   BY MR. GRINGER:

2       Q.    Why didn't you offer your EFC

3   regression until your second report?

4       A.    Right.  That's a good question.

5           I think that the -- as I said in

6   my report, what the families ultimately care

7   about from a -- and what economists

8   ultimately care about from a consumer welfare

9   perspective would be what the family ended up

10  paying on that.

11          So, my focus on the first

12  report, as you know, was on the effective

13  institutional price.  I'm going to avoid ever

14  saying that verbal thing again by just using

15  the acronym EIP.  If you bear with me, I'll

16  try not to have a complete acronym soup

17  today.  EFC and IEP are going to come up a

18  few times.

19      Q.    Is it your understanding that by

20  applying the consensus methodology, a school

21  can directly calculate an EFC?

22      A.    My understanding is that

23  applying the consensus methodology would not

24  give you a crisp formula to use.  Instead, it

25  was a set of principals that would guide how



1    EFC would be calculated in broad strokes.

2         Q.      What do you mean by crisp

3    formula?

4         A.      I don't think that the 568 Group

5    ever presented an Excel spread sheet and said

6    here's the formula that you should use.  I

7    don't think it was that concrete.  And I do

8    acknowledge that there was scope for

9    amendments.  We know about the exceptions

10   under the professional guidance principal.

11             So, I think that, you know, what

12   I've said, they've agreed to broad

13   principals.  And that's what the consensus

14   methodology was aimed at.

15             And, you know, we can tick

16   through the various principals, but, you

17   know, they were able to meet in person and

18   confer, but the major theme that I take away

19   from all the citations, all the depositions,

20   that it appears as if they were trying to

21   establish a floor.  They wanted to dampen

22   competition in the sense that, you know, I

23   think Vanderbilt, one Vanderbilt document

24   talked about, you know, competition breaking

25   loose or Georgetown document talked about



1   moving to the wild, wild west what would

2   happen if we didn't establish the floor and

3   people could just do whatever they wanted to.

4              So, there was a floor and based

5   on certain principals and you could, of

6   course, go over the floor and you wouldn't be

7   in violation of the agreement.  But you

8   couldn't go under the floor.

9        Q.    So, what was the floor?

10       A.    The floor, it's hard for me to

11  define it in real-time here.

12             But I think that we have

13  documents that discuss the floor.

14       Q.    Uh-huh.

15       A.    Right.  And so I think that

16  there was a -- the group got together.  They

17  began with the IM, made certain modifications

18  and, you know, they could arrive at what

19  they -- what they thought the group should be

20  paying -- should be asking of the family and

21  nothing less.

22       Q.    I understand these people are

23  not in the potential class, but you're aware

24  that at every defendant school there were

25  students who did not have to pay anything



1   allegedly run afoul of the criteria for

2   getting the exemption.

3               Under which they would come up

4   with common formula, a common set of

5   principals for arriving at student aid

6   packages.

7        Q.     Do you know if there were

8   members of the 568 Group who are not

9   defendants in this case?

10       A.     I can't think of any members.  I

11  mean it's possible, but I can't think of

12  members sitting here that aren't also

13  defendants.

14       Q.     You ran regression models in

15  this case?

16       A.     Yes.

17       Q.     None of your regression models

18  analyzed data from any school that was a

19  member of the 568 Group that is not a

20  defendant in this case; correct?

21              MR. CRAMER:  Objection to form.

22              THE WITNESS:  I think that's

23  correct.  The only way that I could get data

24  is if granular student level data, was if the

25  school was a defendant in this case.



1  there's data out there for someone who never

2  belonged, then they would always be coded a

3  zero, in which case it would be hard, at

4  least for the technique that I applied to

5  assess the impact of the cartel.

6       Q.    Well, I think I was asking you

7  something slightly different than you

8  answered, but maybe not.

9            But I'll just -- I want to be

10  clear.  If you wanted to assess whether the

11  challenged conduct had an impact on EIPs or

12  EFCs, do you think it's important to analyze

13  the data for all the members of the alleged

14  cartel?

15            MR. CRAMER:  Objection to form.

16  Asked and answered.  Incomplete hypothetical.

17            THE WITNESS:  I believe that I

18  have assessed all the members in the sense

19  those who are actively participating during

20  the scope of this class period.  I don't

21  think that we've omitted anyone.

22            If you're asking me to assume

23  that there's a hypothetical member out there

24  who's data I didn't get, I'm just not aware

25  that there was a member who's data I didn't



1  get.

2  BY MR. GRINGER:

3      Q.    I'm asking you for then to just

4  assume that there are members of the 568

5  Group whose data is not included in your

6  regression.

7              Given that, so assume there is

8  that data out there, in assessing whether the

9  challenged conduct had an impact on EIPs

10  and/or EFCs, isn't it important to consider

11  the data from all the group members, not just

12  a subset?

13            MR. CRAMER:  Incomplete

14  hypothetical.  Objection to form.  Asked and

15  answered.

16            THE WITNESS:  I don't think that

17  it's critical.  If you're asking me as an

18  economist, would I like to see more data, I

19  think economists are never going to turn down

20  that invitation.  But I don't think it's

21  critical.

22            If I thought I was missing some

23  important component of the activity of the

24  members of the cartel here, but I don't think

25  I am.  I think I've seen all the important



 1   members.

 2   BY MR. GRINGER:

 3        Q.    So, you analyzed that data from

 4   Swarthmore College in your regressions?

 5        A.    No.

 6        Q.    Do you know Swarthmore College

 7   was a member of the 568 Group?

 8        A.    Sitting here, I can't tell you

 9   if they were, but I don't think that they

10   would have, you know, made certain criteria

11   that plaintiffs have required to be a

12   defendant in the case.

13        Q.    Do you know if Wesleyan was a

14   member of the 568 Group?

15        A.    They may have attended a

16   meeting, but I don't know if they were a

17   member.

18        Q.    Do you know if Pomona College

19   was a member of the 568 Group?

20        A.    I haven't seen any documents or

21   evidence on Pomona College.

22              Pomona did you say?

23        Q.    Yeah, Pomona.

24        A.    Yeah.

25        Q.    You don't know one way or the



1    other if they were a member?

2         A.    If I don't get to see their

3    documents or data, it's hard for me to say.

4              If the plaintiffs haven't named

5    them as a defendant, my strong surmise is

6    there's something different about Pomona.

7         Q.    Is it your strong surmise that

8    maybe it would be inconvenient for the

9    proposed market definition to look at Pomona

10   College?

11             MR. CRAMER:  Objection to form.

12             THE WITNESS:  Would it -- I mean

13   are you asking me is that the reason why be

14   they didn't name Pomona as a defendant?

15   BY MR. GRINGER:

16        Q.    You said you surmised asking.

17   Is that the reason?

18             MR. CRAMER:  Objection form.

19   Asked and answered.

20             THE WITNESS:  I don't have an

21   opinion on that.

22   BY MR. GRINGER:

23        Q.    You don't know whether Pomona

24   college was a member of the 568 Group;

25   correct?



1  you, Dr. Singer, does a school have to

2  actually do something different?

3          MR. CRAMER:  Objection to form.

4  Asked and answered.

5          THE WITNESS:  They don't have

6  to.  Now it turns out that a lot of people

7  did change their behavior towards students

8  upon leaving.  I just went through the list

9  of people who adopted the no-loan policy for

10  the first time, those who threw out home

11  equity from the equation.  I think Penn,

12  after the organization disbanded, you know,

13  raised the income threshold from 140 to

14  200,000, according to November Bloomberg

15  article and MIT shortly copied thereafter.

16          So, we do see a lot of -- a lot

17  of revisions to the approach upon leaving,

18  which creates the strong impression to an

19  economist at least that they felt that they

20  were constrained by the strictures of the 568

21  Group.

22          Q.    What were the strictures of the

23  568 Group that were constraining the leavers?

24          A.    Well, let's talk about the --

25  the no-loan policy, right?



1        Now, when Yale -- when Yale left

2    in 2008 and announced that it was going no

3    loan, Penn copied Yale from within the cartel

4    and Dartmouth considered this to be

5    blasphemy.  Dartmouth thought they were

6    cheating on the cartel; right?

7        And so my reading of the record

8    evidence there would suggest that the members

9    of the cartel felt constrained in moving to a

10   no-loan policy.

11       And we also talked about all the

12   leavers who immediately went to, you know,

13   removed home equity.  That again tends to

14   suggest that home equity was -- was something

15   that the group agreed to should be included

16   in the formula; right?

17       So, if you wanted to remove home

18   equity from consideration, it was difficult

19   to do that from within the strictures of the

20   cartel.

21       Q.    Uh-huh.  So you acknowledge that

22   Penn went to no loans while it was a member

23   of the 568 Group; correct?

24       A.    Yes.  And I have a section in my

25   report talks about that was largely in



1    response to what Yale did, but I've also

2    cited multiple other schools that went to no

3    loan upon leaving.

4              We just went through Yale,

5    Emory, Chicago, Brown, there's a lot of

6    schools that went to no loan upon leaving.

7    That suggests to me that while you could do

8    it, it was difficult; right?  And Dartmouth

9    would consider you to be bending the rules.

10        Q.    Uh-huh.

11        A.    Right.

12        Q.    What made it difficult for Penn

13   to go to no loan while it was a member of the

14   568 Group?

15        A.    I think that my reading of the

16   record suggests that the movement to no loan

17   was not considered appropriate under 568 and

18   that Penn felt compelled to do so in order to

19   stay competitive with Yale who had just

20   broken out and went to no loan and Dartmouth

21   reacted by suggesting that what Penn had done

22   was not in compliance.

23        Q.    You're offering an opinion about

24   what Penn thought?

25              MR. CRAMER:  Objection to form.



1  fact, that if we got to, you know, 81 percent

2  of those transactions, you know, suffered

3  impact and of course it's even higher when

4  you consider at least once it would go into

5  the 90s if you considered, you know, the

6  students at Yale who lived through that

7  experience would have suffered impact, I

8  think it's 93 percent.

9           So, that was the regression

10 analysis that I had in mind.

11      Q.    Is it your understanding that

12 Penn was the only school to adopt a no-loan

13 policy while it was a member of the 568

14 Group?

15      A.    No.  There was one other --

16 there was one other one, at least one other

17 one who did it concurrent with Penn.  And I

18 think both of those were done in reaction to

19 Yale.

20           It starts with a C and I think

21 it may have been Cornell.

22      Q.    Columbia?

23      A.    Oh, you know, you try -- there's

24 so many facts here and I just -- I'm trying

25 to remember.  For some reason my brain is



HAL J. SINGER, PH.D.  Confidential                    November 27, 2024
CORTZO V. BROWN UNIVERSITY                                          49

1    telling me it was Penn plus someone who

2    started with a C.  It could be Columbia, yes.

3         Q.    And just tell me the schools you

4    believe adopted a no-loan policy after

5    leaving the 568 Group?

6              MR. CRAMER:  Asked and answered.

7              THE WITNESS:  Okay.  Yeah, let's

8    see how good my memory is compared to seven

9    minutes ago.

10             I think I answered Yale, Emory,

11   Chicago, Rice, Brown went to no loan.  Those

12   are the ones that I'm just doing by memory.

13   But I would -- I would probably rather go

14   with what I put in my reports than memory,

15   but that's the best my memory can do.

16   BY MR. GRINGER:

17        Q.    When Yale rejoined the 568

18   Group, it continued to have a no-loan policy;

19   correct?

20        A.    I don't have that concrete.  I

21   think that's consistent with my

22   understanding, but I don't have the histories

23   of each school completely memorized.

24        Q.    In your view, is leaving the 568

25   Group the same thing as no longer engaging in



1  would tend to cause my regression to

2  understate the effect of the conduct.

3  BY MR. GRINGER:

4       Q.    Is that something you've looked

5  at, whether there are changes in the results

6  between the benchmark period and the class

7  period at the school level?

8            MR. CRAMER:  Objection to form.

9            THE WITNESS:  I don't run models

10 of course for individual schools.  But I

11 am -- when I code a school as being zero in a

12 given year, I'm assuming, I'm telling the

13 computer to assume that the conduct is off;

14 right?

15           That they are now setting prices

16 no longer pursuant to the strictures of the

17 568.  And so to the extent that they don't

18 immediately change, now I'm repeating myself,

19 that would tend to bias these coefficients

20 towards zero.

21           That would cause my methodology

22 to understate the effect of the conduct.

23 BY MR. GRINGER:

24       Q.    So, I take it your understanding

25 is that one of the strictures of 568 was that



HAL J. SINGER, PH.D.  Confidential                    November 27, 2024
CORTZO V. BROWN UNIVERSITY                                          60

1   you can't have a no-loan policy.  Is that

2   correct?

3        A.     Well, we've been through this

4   before; right?

5              So, Penn obviously did while it

6   was in 568, so, we -- as an economist, I

7   can't infer from that that there's a hard

8   rule that says don't.  We know the

9   affordability principle applied to packaging.

10  We see a whole bunch of schools adopting no

11  loans upon leaving.  We have record evidence

12  that tells us why Penn and I think you said

13  Columbia did it in response to Yale and

14  Dartmouth thought that they were cheating on

15  the agreement.  So, there's a lot there.

16             But I feel like we've been

17  through here before.  I fully admit that you

18  could go no loan while inside a 568.  Penn

19  did so.  I mean no reasonable person could

20  say otherwise.

21       Q.    If there was a conspiracy among

22  some, but not all defendants, are your

23  regression models capable of capturing that?

24             MR. CRAMER:  Objection to form.

25  Incomplete hypothetical.



HAL J. SINGER, PH.D.  Confidential                    November 27, 2024
CORTZO V. BROWN UNIVERSITY                                          61

```
 1                THE WITNESS:  So I think I got
 2     the drift.  I just want to drill down.  You
 3     want me to assume there's a different
 4     conspiracy than the one that's been alleged
 5     here.  Because the one that's been alleged
 6     here, the one I've been asked to assess is a
 7     single overarching conspiracy that touches
 8     all defendants.  You're asking me to assume
 9     that instead there was a mini conspiracy that
10     only touched a subset; right?
11     BY MR. GRINGER:
12         Q.      Right.  Right.  Same terms,
13     whatever they may be.  I'm still, you know,
14     trying to sort through that with you.
15                But same terms but just certain
16     defendants did not participate, is your
17     regression capable of capturing that?
18                MR. CRAMER:  Objection to form.
19                THE WITNESS:  I mean the
20     hypothesis that I'm testing is whether
21     there's a single overarching conspiracy.
22                So of course as I've implemented
23     it, it couldn't get at these alternative
24     hypotheses.
25                But if you wanted to pause it,
```



1    an alternative conspiracy say a mini

2    conspiracy that affected four schools, one

3    could go do that with the caveat that I would

4    like there to be substantial record evidence

5    in support of that.  Number one, there should

6    be like an a priori reason for doing that

7    test and number two, it's really, it's -- I

8    don't get to pick the theory of harm; right?

9    And you don't get to pick it either.  These

10   guys do.  They get to write, it's their

11   theory of harm.  They've got a theory and I'm

12   testing that theory.  I didn't test other

13   theories.

14        Q.    So, if, in fact, let's just say

15   12 of the 17 defendants were in a conspiracy

16   but five were not, you're regression model is

17   still capable of returning a positive conduct

18   coefficient; correct?

19             MR. CRAMER:  Objection to form.

20             THE WITNESS:  It's capable, but

21   under that fact pattern, if you want me to

22   accept this hypothesis as being true that

23   there were five who I've coded incorrectly as

24   ones, but they should have been zeros, that

25   means that I would have watered down the



```
 1                    (Whereupon, there was a recess.)
 2                         -   -   -
 3                    THE VIDEOGRAPHER:  Back on the
 4      record.  10:55.
 5      BY MR. GRINGER:
 6          Q.      Welcome back, Dr. Singer.
 7          A.      Thank you.
 8          Q.      Am I correct that you use what
 9      economists call a before and after approach
10      in your regression models?
11          A.      I think that's pretty close.
12      You could before, during, after, but it's --
13      it's -- I think it fairly falls within that
14      family, yes.
15          Q.      Are there other methods besides
16      the before, during and after that economists
17      can use to estimate an overcharge?
18          A.      Sure.
19          Q.      Let's mark as Singer Exhibit 2
20      your second report in this case, which I'll
21      probably call the Singer rebuttal report for
22      lack of a better way.  Maybe I'll just refer
23      to it as Exhibit 2.
24                         -   -   -
25                    (Whereupon, Deposition Exhibit
```



1   $10,000 jump in the EIPs in the first year

2   and that's a bigger jump than we had ever

3   seen leading up to that.  And then we see

4   another jump that I think is on the order of

5   $20,000.

6           And so, we are very skeptical

7   about what's going on with the post 2016

8   data.

9           I have all other sorts of

10  thoughts on it, too, but I don't want to keep

11  talking.  You go ahead.

12          Q.    I appreciate that.  Thank you.

13          You're making the assumption

14  that the data until 2016 when the database

15  changed is accurate; correct?

16          A.    I am making an assumption that

17  it is accurate and I am -- but most

18  importantly, and I think this is I'm going to

19  tee up this dispute, we have variation in the

20  conduct, in the pre '16 period; right?

21          So, whatever infirmities that

22  pre '16 data might have, what's nice is that

23  we can -- we can see how it changes with

24  respect to a change in the conduct.

25          The problem, you know, Dr. Hill



1  proposed during his deposition, that we

2  should instead only include 2016 post 2016.

3           And the problem with that, I

4  don't know if he's aware or not, but it's

5  just a run of zeros.  There's no variation in

6  the conduct during that period.

7           So, if you limit the data that

8  way, you're, by design or by accident,

9  depriving the model of being able to

10  ascertain any effect of the challenged

11  conduct.

12           And if that one was done in

13  isolation, I would say okay, maybe it was an

14  oversight.

15           But there's a theme that emerges

16  in Dr. Hill's criticisms, in that they are

17  almost all appear to be motivated as a way to

18  deprive the regression of the data that it

19  would need to find an effect.

20           We can go through the Chicago

21  example where he chooses post 2016, the

22  killing 2023, which is one of the only years

23  that we have for many of these schools that

24  they weren't in the conduct.  He wants it

25  gone from the regression.  You know, the



1    staggered DID deprives it of the Yale

2    experience after they leave.  The cluster

3    standard errors we talked about, depriving

4    the classification of errors.  Putting in the

5    COVID period through 2024, which of course

6    coincides with the very few clean period

7    observations we have as away to conflate the

8    model and to inject confusion as to what is

9    causing it, between COVID and the conduct.

10                   Finally the year fixed effects

11   as opposed to my time is another way to

12   inject collinearity with the conduct and

13   therefore make it harder for the regression

14   to find an effect.

15                   I feel like the theme that's

16   emerging from Dr. Hill is that not how to

17   design the best model, but how can I derive

18   the model?  How can I, Dr. Hill, deprive the

19   model by making these choices to ever find an

20   effect.

21                   I realize it's very convenient

22   for the defendants to not find an effect, but

23   that can't be the load star.  The load star

24   can't be let me suggest changes that deprive

25   the model.  We have to give the model the



1   data.  We have to give it a chance to find

2   these effects.

3        Q.    I appreciate all that context.

4   My question was really just are you making

5   the assumption that the data until 2016 when

6   the database changed is accurate?  You

7   answered that and then went on, I think, you

8   know, and I don't want to fight with you too

9   hard on this.  You're an expert.  I

10  understand this.  But am going to move to

11  strike everything after the word accurate in

12  this answer.

13            MR. CRAMER:  We'll oppose that

14  motion.

15            MR. GRINGER:  It was a little

16  lengthy, I think all things considered.

17  BY MR. GRINGER:

18       Q.    You don't actually know which

19  data set with regard to Chicago is the

20  accurate data set; correct?

21            MR. CRAMER:  Objection to form.

22            THE WITNESS:  I know that the

23  two can't be put side by side; right?

24            What I -- and also, when you say

25  accurate, we don't want to hold up the data.



1   There's no such thing as a pristine database.

2   Every database is going to have a certain

3   amount of infirmities.

4              What I think is more attractive

5   about the pre 2016 is that you at least have

6   variation in the conduct. You at least have

7   the opportunity to see, do prices change when

8   the conduct goes in and out; right?

9              So, if we're forced to chose

10  between pre 2016 and post 2016, to me it's a

11  very easy choice. One gives the model an

12  opportunity to find an effect. It doesn't

13  guarantee an effect but it gives the model an

14  opportunity to find one, if one exists.

15             Dr. Hill's choice precludes the

16  model from finding an effect.

17             If you just have a run of zeros,

18  we can't find an effect. You've basically

19  eliminated Chicago's contribution, right, to

20  informing the conduct variable.

21      Q.     How is that any less outcome

22  determinative than what you just criticized

23  Dr. Hill for doing?

24      A.     Because there's no guarantee of

25  an outcome. There's no guarantee of an



1    outcome just because you have zeros and ones.

2                    We could run the regression and

3    find that there was no effect; right?

4                    But at least you have some

5    period of zeros and some period of ones to

6    test.  You have data that you're feeding the

7    model; right?

8                    If we take Dr. Hill's approach,

9    which is throw out 2023, you know, just look

10   at Chicago post 2016; right?  We're taking

11   away some of the very small sources of

12   variation in the database where you have

13   clean periods, right, or where you have a

14   change in the conduct.

15                   If my methodology is let's

16   exploit the changes, and his fixes are just

17   remove the possibility of studying changes,

18   right, then the likelihood of finding an

19   effect is going to vanish.

20       Q.    You're the one who removed the

21   2016 to 2022 Chicago data; correct?

22       A.    I removed the 2016 because it

23   can't be compared.  When you see the $10,000

24   jump when they change databases and then you

25   see another jump of $20,000, something is



1  | two percent a year, one to two percent a

2  | year, right?

3  |              So, the 16 does stand out.

4  |              The other thing that I'm

5  | concerned about is you don't have the $20,000

6  | increase that I understand to have happened

7  | in Chicago and during a break I can -- I'm

8  | happy to get you where that happened as well.

9  | BY MR. GRINGER:

10 |      Q.    Well, look.  You would agree

11 | with me, 37 percent is a greater change than

12 | 16 percent in EIP; correct?

13 |              MR. CRAMER:  You're asking if 37

14 | is more than 16?

15 |              MR. GRINGER:  That's what I'm

16 | asking there.

17 |              THE WITNESS:  You got me there.

18 | BY MR. GRINGER:

19 |      Q.    Did you look to see, before you

20 | concluded that a 16 percent jump in EIP in a

21 | particular year was an unreasonably large

22 | jump, did you look in the data to see if

23 | there were other similarly sized jumps for

24 | other defendants?

25 |      A.    I can't recall if I looked at



1   the other jumps, but again, I didn't make the

2   decision on Chicago based on the jump alone.

3              I did look at what happened to

4   Chicago previously and had I seen a bunch of

5   15s, are you with me, had I seen a bunch of

6   15s in prior years or 16, sorry, I probably

7   would have been more accommodating to the 16.

8              The last thing is I notice that

9   you don't show Chicago for '23.  I don't

10  think you've suppressed the $20,000 jump

11  there; right?

12       Q.    Not to my knowledge.  I

13  wasn't -- certainly wasn't trying to.

14       A.    Okay.

15       Q.    I think it just has to do with

16  when you throw the data out for?

17       A.    Hill wants to throw out 2013 --

18  2023, but yet you have Emory here in 2023.

19       Q.    Just to -- I also want to now

20  talk about Penn.

21              If you go from, which is on Page

22  2 of Exhibit 3.

23       A.    Okay.

24       Q.    Is there any scenario in which a

25  jump of 83 percent year over year in the EIP



```
 1          Q.     So, you don't use this data in
 2    your analysis?
 3          A.     I think I do.  I do.  I thought
 4    I heard you say '25.
 5          Q.     Well, it's the '24/'25 academic
 6    year.
 7          A.     Oh, okay.  Sorry.  Sorry.
 8          Q.     So you use data for '23 and '24.
 9                 You use the '24, data even
10    though it was only for early decision
11    applicants; correct?
12          A.     You're talking about for Duke
13    right now or --
14          Q.     No.  For the '24 data you have.
15          A.     I know it's a subset, but it was
16    everything the defendants gave me.  You know,
17    we asked to produce all data.  And this is
18    what they gave us.
19                 I don't know if I was cognizant
20    sitting here, if it's early decision only.  I
21    don't know if I had heard that before.  And
22    that doesn't change my opinion as to whether
23    or not we should make use of it.
24          Q.     Why doesn't it change your
25    opinion?
```



1        A.      Well, because we are trying to

2   figure out in one of these previous few clean

3   periods, if Duke is or not just Duke, the

4   defendants generally, are altering their

5   behavior with respect to financial aid.

6               So, to just, to throw out one of

7   these precious few clean periods is doing a

8   lot of harm in the sense that it's depriving

9   the model of having any chance of finding an

10  effect.

11       Q.      Why do you think that's a good

12  reason to consider the data in '24?

13       A.      I think I just told you.  That

14  we have, for nine of the 17 defendants, we

15  have no pre conduct data; right?

16              And so that forces us to exploit

17  the remaining variation, which often only

18  occurs in the post period; right?

19              So, I'm telling you these years,

20  '23 and '24, right, turn out to be precious

21  that we don't have any other source of

22  variation in the conduct to assess.  Right?

23              So, I'm extremely loathe to get

24  rid of the few sources of data that would

25  allow us to estimate the effect.



1  not to adopt a policy like a higher minimum

2  wage policy in which each state is making

3  independent decisions.

4            This is whether or not to be a

5  member of a cartel and the cartel formed in

6  2002 and it ran to 2023.

7            So the exposure to the

8  treatment, exposure to the cartel, the cartel

9  was a constant.  It didn't vary across

10  schools and didn't vary across years.

11      Q.      Did the consensus methodology

12  vary across years?

13      A.      I think that there were

14  refinements to the CM over time.

15            But that doesn't change how I

16  would design the zero one decision to just

17  one conspiracy.  There's not a series of

18  independent serially stacked up conspiracies

19  here.

20      Q.      Okay.  And if we go to your

21  rebuttal report, Singer-2 at Footnote 218,

22  really starting at 216 through 218 which is

23  on Page 62.

24            And you also quote in the text.

25      A.      Yes.  I'm here.



1          The treatment is the exposure to

2    the conduct, which is a 20-year long price

3    fixing conspiracy; right?

4          And within a year, within a

5    given year, again, these firms aren't making,

6    you know, decisions about whether or not the

7    conduct -- the cartel exists.  The cartel

8    exists regardless of whether or not one

9    person defects in a given year.  The cartel

10   is the cartel.

11      Q.      How does your model adjust for

12   staggered entry and exit into the 568 Group?

13      A.      My model, so, I don't do a

14   staggered diff and diff or DID the way that

15   Dr. Hill does.

16          So my model treats you as a one

17   or a zero, depending on whether or not you

18   were alleged to have participated in the

19   cartel in that year; right?

20          In contrast, for the staggered

21   different difference, as Dr. Hill

22   acknowledges in his report, if you have

23   someone like Yale, who starts off say outside

24   of the conduct, comes in and then leaves,

25   right, he has to eliminate Yale's post 2008



1   experience from his model, right.  Under

2   staggered treatment you use the post 2008

3   Yale experience, which I got to tell you is

4   probably one of the most important

5   experiences we can investigate in the

6   entirety of the data set.

7            Dr. Hill's technique eviscerates

8   it.  It eliminates Yale post 2008.

9            So, if I -- if you understand

10  kind of the hand that you're dealt, where you

11  can find variation in the data and you

12  recognize the downside of the staggered DID,

13  you would hopefully quickly come to the

14  conclusion that this is too important.  This

15  data that he's eliminating from the

16  regression is just too important to get rid

17  of.

18            And yet he does.  So for me, I,

19  you know, we considered it and we decided to

20  treat, you know, in and out of the conduct as

21  one in zero regardless of whether or not you

22  had been there.  If you were there and you

23  left, you know, you get -- you continue to

24  stay in the database and you continue to

25  inform the conduct coefficient.



```
 1    financial aid.  We didn't want to include
 2    those who had free rides.
 3            Q.     Because those are not in the
 4    class?
 5            A.     Correct.
 6            Q.     Weren't students who received a
 7    full ride subject to the same challenged
 8    conduct as the potential class members?
 9            A.     Sure.
10            Q.     So, why should the definition of
11    the class determine whether or not -- let me
12    ask you this:  You would agree with me that
13    the people, the students who got 95 percent
14    or more of the cost of attendance are the
15    individuals for whom defendants were most
16    generous towards with their financial aid;
17    correct?
18            A.     Sure.
19            Q.     So, in your regression models,
20    you exclude observations from the very
21    individuals from whom defendants were most
22    generous to; correct?
23            A.     Yes.  Because they are not
24    members of the class.
25                   So, what we want to do is build
```



```
 1              That's what this exclusion is
 2    doing in this footnote.  We're not treating
 3    Yale any differently.  If a student got a
 4    full ride at Yale, he or she would be out of
 5    the database.
 6         Q.    But your regression does include
 7    nonclass members at Yale, many nonclass
 8    members; correct?
 9         A.    I don't know if it's many.
10         Q.    Well, it's like eight years'
11    worth of students, at least two full
12    graduating classes; correct?
13         A.    When you say eight years, you're
14    talking about the run from 2008 to 2016?
15         Q.    Right.  If you were in the -- if
16    you were started at Yale between 2009 and
17    2012, you're not a class member?
18         A.    Correct.
19         Q.    Okay.  So, that's a lot of years
20    in which you are considering Yale students in
21    your regression models who are not class
22    members; correct?
23         A.    That is correct, but that's not
24    the criteria for getting in.  The criteria
25    for getting into the sample was whether
```



1  you're a full ride tuition -- full ride

2  tuition or not.  If you were full ride, you

3  were taken out by that exclusion there.  It

4  wasn't whether or not you were subjected

5  conduct.

6          It was just if you were a full

7  ride.  That's all this threshold is doing.

8      Q.    Okay.  Can you think of -- so,

9  and the only reason you excluded the full

10  ride people is because they are not in the

11  plaintiff's proposed class?

12      A.    Correct.

13      Q.    And as a matter of economics,

14  you don't believe it useful to assess the

15  impact of the challenged conduct on those

16  students for whom the defendants were most

17  generous?

18          MR. CRAMER:  Objection to form.

19          THE WITNESS:  I don't think it's

20  useful.  I didn't do, neither did Dr. Hill,

21  which is interesting, nor did Dr. Stiroh.  I

22  think if someone was interested in exploring

23  whether nonclass members were injured or

24  benefited from the conduct, that would be

25  interesting as an academic inquiry.  I don't



1   free ride as a sophomore, but had paid

2   something as a freshman, there would be a

3   decrease in effective institutional price for

4   that student.  Is that right?

5          A.     If you included them in the

6   database in that second year, yes.  And you

7   only computed EIP for that student, you'd see

8   a decrease, a decrease in EIP, yes.

9          Q.     And so if a student received

10  paid in year one and received a free ride in

11  year two, you would include the year one

12  observation but exclude the year two

13  observation; correct?

14         A.     I think through this exclusion,

15  I think I'd want to go back and check, but

16  through this exclusion, I think that we're

17  taking out any one in any year who got the

18  full ride tuition.

19         Q.     How does that choice not bias

20  your results because you're excluding someone

21  who in a particular year he got a free ride?

22               MR. CRAMER:  Objection to form.

23               THE WITNESS:  This may never

24  happen, right, in the database.

25               But because my understanding is



1    that the schools tend to be most generous in

2    the first year and then their generosity

3    declines over time.  But you're asking me,

4    hypothetically, could it happen?  I don't

5    know if it's ever happened.

6    BY MR. GRINGER:

7         Q.     Okay.  But just -- I understand

8    you may not know whether or not it happened.

9    That wasn't my question.  I take it your

10   testimony is you don't actually know whether

11   or not that has occurred?

12             MR. CRAMER:  Objection.  Form.

13   Asked and answered.

14             THE WITNESS:  From my

15   understanding, it would tend not to occur.

16   They go in the opposite direction.  They get

17   less generous over time.

18   BY MR. GRINGER:

19        Q.     What's your basis for saying

20   that the schools get less generous over time?

21        A.     I think I have a cite.

22        Q.     I think I saw you say that.  I

23   didn't see any cite.

24             Sitting here today, can you tell

25   me the basis for your statement that the



1              THE WITNESS:  I wouldn't put it

2     that way.  It's not requiring it.  Because it

3     could find no effect.

4              The way that you put the

5     question, it almost sounds as if there has to

6     be an effect.

7     BY MR. GRINGER:

8          Q.     No.

9          A.     It's just testing for a single

10    uniform effect.

11         Q.     So, just so -- because I'm

12    screwing up.

13              Your EIP regression model is

14    testing for a single uniform effect.  Is that

15    correct?

16         A.     It's testing for a single

17    uniform effect because one of the nature of

18    the challenged conduct which you and I don't

19    get to write, but two, we don't have an a

20    priori basis in the record for why the effect

21    would vary from one year to the next.

22              The mere fact that one of 17

23    schools peeled out, you know, in the middle

24    of a period would not materially alter the

25    efficacy of the alleged cartel.  I mean



1    either the cartel is inflating prices or it's

2    not.  And when one of 17 goes out or two of

3    17 goes out in a given year, that doesn't

4    give you an a priori reason in economics to

5    believe that the cartel would all of a sudden

6    unravel and the effects would go to zero.

7    Right?

8                    You would need substantial

9    defection in order to achieve an unraveling

10   of the cartel.  We never get anywhere close

11   to that.

12                   That's the quibble that I'm

13   having with Dr. Stiroh.  You need an a priori

14   reason to test for break.  If you don't have

15   an a priori reason, you have one conduct

16   coefficient.  It's just that simple.

17        Q.      And in your EIP regression model

18   tests for the alleged impact of the

19   challenged conduct to be constant across the

20   individual schools; right?

21                   MR. CRAMER:  Objection.  Form.

22                   THE WITNESS:  Well, it's

23   estimating the effect of one uniform

24   coefficient across all schools across all

25   time periods.



1        Again, I said that when we go

2  and use our in-sample prediction techniques,

3  we generate differential effects, right, by

4  defendant in that table.  We get differential

5  effects.

6      Q.    What are institution fixed

7  effects?

8      A.    An institution fixed effect is a

9  dummy variable that will control for the

10  identity of the institution when making the

11  prediction of what the EIP or the EFC was in

12  any given year.

13      Q.    Do you use institution fixed

14  effects in your regression models?

15      A.    I think that we have some

16  combination of institution student fixed

17  effects.  We can go back and look in the

18  summary tables where we show the regression

19  coefficients.  We define how we've

20  constructed the student fixed effects.

21      Q.    I will concede you do that.

22      A.    Okay.

23      Q.    My question was just a

24  stand-alone institution fixed effect.

25      A.    I think that if you added those



```
 1              MR. GRINGER:  Would now be a

 2   good time for a break?

 3              THE WITNESS:  Sure.

 4              THE VIDEOGRAPHER:  The time is

 5   3:15.  Now going off the record.

 6                   -  -  -

 7              (Whereupon, there was a recess.)

 8                   -  -  -

 9              THE VIDEOGRAPHER:  We are back

10   on the record.  3:39.

11   BY MR. GRINGER:

12       Q.    Dr. Singer, you also alluded to

13   a couple of times today what you call a harm

14   done by net analysis.

15       A.    Harmed on net.

16       Q.    Harmed on net.  I'm sorry.  I

17   have it both ways in my outline here.  Harmed

18   on net.

19              What is the purpose of your

20   harmed on net analysis?

21       A.    Right.  So, I offered initially

22   in my Singer-1, I offered a harmed at least

23   once standard, and Dr. Stiroh's critique was

24   that even under the hypothesis of no effect,

25   you would get to a high harmed on net with
```



1    four shots at the apple, four bites at the

2    apple.

3              MR. CRAMER:  Harmed at least

4    once, I think you meant to say.

5              THE WITNESS:  Sorry.  Harmed at

6    least once.  Yes.

7              I said well, that's not a good

8    critique because if we had gotten no effect,

9    we would have stopped at stage one.  Even

10   ignoring that, let's consider an alternative

11   metric or measure of injury, which is harmed

12   on net across all of your observations in the

13   data.

14             That's where the harmed on net

15   came from.

16             It was a -- it was offered as a

17   rejoinder to Dr. Stiroh's critique if aimed

18   at my harmed at least once standard.

19   BY MR. GRINGER:

20        Q.    Do your harmed on net and harmed

21   at least once analyses give the same results

22   for singletons?

23        A.    Yes.  So, under the student

24   fixed effect variety, for singletons, yes,

25   the singletons are going to be suffered



1  can be vastly different, in fact, it could

2  even be zero in a given year.

3            The prediction for a given year

4  is not constrained in any way.

5       Q.     Not only that, the prediction

6  can be and often is negative; correct?

7       A.     You could have -- you could have

8  a, when you say negative, I want to make sure

9  that the predicted price comes in above the

10  actual price.  That could happen; right?

11            Even with, we should give a name

12  for these people, the never -- we should come

13  up with a name, this is different than the

14  singletons.  These are people who only

15  purchase while their school is a member of

16  the cartel.  The -- I don't know what you

17  want to call it.

18       Q.     If you think of something, get

19  back to us.

20            So, would it be and what we

21  just -- that average effect across the number

22  of years is true regardless of the individual

23  characteristics of the student; correct?

24       A.     The average across the four

25  years will be the same, right.



1         And so, you know, you know my

2  response to this.  I think I these -- these

3  class members, the ones that are unfortunate

4  enough to have actually matriculated four

5  years under the cartel, that is, their school

6  was a member of the cartel, each of the four

7  years I think these are the most vulnerable

8  students, the most likely to be injured given

9  the generalized effect that we already know.

10        So, we're faced with this issue

11 of should we remove them from the test, which

12 Dr. Stiroh never does, but that's her

13 implication, but I strongly would reject

14 taking them out because my inclination is to

15 give the fact finder my best estimate of the

16 share of the class members who are injured

17 under a given standard.

18        But having said that, we said

19 fine, if you want to do a test purely on

20 students who don't fall under the singleton

21 category or about the only cartel, we'll come

22 up with a name for them, they are only

23 purchasing while they are sellers in the

24 cartel.  I've got another test, that's the

25 Yale test and that's in Singer-3.



HAL J. SINGER, PH.D.  Confidential                    November 27, 2024
CORTZO V. BROWN UNIVERSITY                                           266

```
 1        Q.     I'm sorry.
 2        A.     Do you mind reading it back?
 3  There were a lot of nuances there.
 4        Q.     Without agreeing with that, my
 5  question is:  Is there any way in which your
 6  harmed-on-net analysis could identify an
 7  individual class member who was not impacted
 8  by the challenged conduct if that class
 9  member attended a defendant school and during
10  the period they attended, their school was a
11  member of the 568 Group each year they
12  attended?
13              MR. CRAMER:  Asked and answered.
14              THE WITNESS:  Yeah.  So, it's
15  the -- just to be careful, it's the --
16  there's nothing wrong on the harmed-on-net
17  standard.  The difficulty here is that we
18  have class members who purchased only in the
19  years in which a defendant was a member of
20  the alleged cartel; right?  That's the
21  challenge.
22              And the third interactions with
23  student fixed effect.
24              So, it's -- it's not the
25  harmed-on-net standard, the way that you put
```



 1    the question is wouldn't your harmed-on-net

 2    always do this?  There's nothing wrong with

 3    harmed-on-net.  That's a metric of injury;

 4    right?

 5                    The challenge that we have here

 6    is the use of student fixed effects combined

 7    with class members who matriculated only

 8    while their defendant was a member of the

 9    cartel.

10                    And so long as we use the

11    student fixed effect and I will grant you

12    that those students will be shown to be

13    harmed on average, I also insist that if you

14    ask me to give the best prediction of what

15    that student would have paid in a but-for

16    world, I would do the precise -- I would do

17    the precise thing that I did, which is I'd

18    take the best model that I had, which is

19    specification six, and I would project what

20    that student would have paid in a but-for

21    world and I would compare it to what he paid

22    in the actual world.

23                    That is the best that

24    econometrics can do for that.

25                    The final thing is that if



1   you -- if you're not satisfied with that

2   answer, I offer the Yale test in Singer-3,

3   which removes all students who matriculated

4   only during years, right, it gets around this

5   problem that Dr. Stiroh has identified,

6   matriculated during years, the only people on

7   the Yale experiment is people who

8   matriculated some in the clean, some in the

9   dirty and some in the clean.

10          Q.      Dr. Singer, this is an important

11  case to my clients and the clients who are

12  continuing to litigate.  I'd ask you not to

13  waste our time with these nonresponsive

14  answers.  I didn't ask you to defend what we

15  did.  I asked you to answer my question.

16              I think the answer was yes, but

17  in fact --

18          A.      That wasn't my answer.  You

19  heard my answer.  I gave you a full, detailed

20  answer.  I'm not going to give it to you

21  again.  Move on.  Let's move on to the next

22  question.

23          Q.      I asked the question --

24          A.      And I also, what is this I'm

25  not -- we're not serious?  Was I joking in



```
 1            (Whereupon, Deposition Exhibit

 2    Singer-9, Surrebuttal Expert Report of Lauren

 3    J. Stiroh, Ph.D., was marked for

 4    identification.)

 5                   -  -  -

 6    BY MR. GRINGER:

 7         Q.    If you could turn to Page 14,

 8    Singer-9, 3.86.

 9                 This is an actual Cornell

10    student in your data, Dr. Singer.

11                 And this student ostensively is

12    overcharged by $1,282 in year one, $4,030 in

13    year two, undercharged by $9,487 in year

14    three and was harmed by $8,983 in year four.

15                 What could explain the switch

16    from a $4,030 overcharge in year two to a

17    $9,487 undercharge in year three?

18         A.    Yeah.  It's easy.  He got --

19    this student, I don't know if it's a man or a

20    woman, but if you look at the actual EIP in

21    Column D, they got a remarkably low EIP.  And

22    it's so low that I priced the regression.

23    The regression can't explain why it was so

24    low.

25                 So, when I go to predict what
```



1    this person would have paid, my prediction is

2    above the actual EIP in that third year.  My

3    prediction, the best prediction I can make,

4    given all the characteristics of that

5    student, is that that student's EIP in year

6    three would have been 17,226.

7                    But in fact, they got this

8    remarkably low EIP of 7,739.

9                    So, I cannot show injury under

10   this method in year three.

11       Q.     What could explain the switch

12   from the $4,030 overcharge in year two to the

13   $9,487 undercharge in year three?

14                  MR. CRAMER:  Asked and answered.

15   He just answered that question.

16                  THE WITNESS:  I mean I can do it

17   again.

18                  I think maybe you're asking now

19   why didn't that happen in the previous year?

20                  MR. GRINGER:  Okay.

21                  THE WITNESS:  I can answer it --

22   let me just say it.  It's okay.

23                  Look at the price in the

24   previous year.  I mean you're going to see a

25   pattern.



1      Here the price shot up from

2   their initial EIP, their initial EIP was

3   14,000.  Do you see that?

4      It goes up to 19,000 in year

5   two.  And the regression predicts, the

6   prediction model, right, my best-fitting

7   model, model six, right, is that this student

8   would have paid in year two an EIP of 15,501;

9   right?

10      And, therefore, they suffered an

11   overcharge of $4,000; right?

12      But I don't want you to look at

13   the 4,000 and the minus 9,000 and think

14   there's some infirmity with the prediction.

15      The model just could not have

16   predicted that this student would have gone

17   from 14 to 19 to 7,000 in an EIP.

18      These are the examples I'm

19   talking about before where these very large

20   discounts manifest.  The model could not have

21   predicted them and the model will consider

22   the student to be uninjured in those years.

23      Despite the fact that whatever

24   shock gave that low price, likely that same

25   shock would have occurred in the but-for



HAL J. SINGER, PH.D. Confidential
CORTZO V. BROWN UNIVERSITY

November 27, 2024
273

1   world, but we're not crediting the student

2   for that.  We're just going to assume that

3   that shock was associated entirely with the

4   conduct; right?

5               We're going to take that out and

6   the model, the model can't predict it; right?

7   BY MR. GRINGER:

8       Q.    Do you have any idea what

9   Cornell did in year three for this student

10  that was better for the student?

11      A.    We'd have to go into the

12  individual database to look to see what

13  happened.

14              But I have to accept that those

15  are the actual EIPs according to the data.

16      Q.    Even with these data swings from

17  14 to 19 to 7 to 25, this student's total

18  overcharge just happened to equal exactly

19  $4,808.  That doesn't strike you as a

20  coincidence?

21      A.    It is not a coincidence.  It is

22  happening because of the student fixed

23  effects that we're using.  This would not

24  happen had we not used student fixed effects.

25              This is a -- this is an artifact



1    of two things, I'm telling you.  The use of

2    the student fixed effects, which I think is

3    the best model that we can use.

4              When you look at the R squared,

5    among other factors, but if you look at the R

6    squares as we move across the bottom of the

7    row, we get much, much better predictive

8    power with the student fixed effects than we

9    do without, right.

10             I want to come up with the best

11   prediction model possible.

12             This is entirely an artifact of

13   the use of fixed effects, student fixed

14   effects combined with students who were

15   unfortunate to have just matriculated while

16   their school was part of the cartel.

17        Q.    Do you dispute that 26 percent

18   of proposed class members were, according to

19   your methodology, overcharged by more than

20   $5,000 in at least one year and undercharged

21   by more than $5,000 in at least one other

22   year?

23             MR. CRAMER:  Objection to form.

24             THE WITNESS:  I've never seen or

25   heard that stat before.  You're asking me to



1  them opportunities to be injured, you know,

2  in the years where they were in the conduct,

3  when Yale was in the conduct.

4          If you start with 81 on a per

5  transaction basis, you're going to get up

6  into the high 90s for all students in the

7  class who got four year opportunities; on the

8  harmed at least once standard.

9      Q.    Did you perform your in-sample

10  prediction method using the results of your

11  alternative overcharge model specification

12  that does not use student fixed effects?

13      A.    I did not -- well, it may have

14  been performed.  I don't know if it was

15  performed, but I certainly didn't offer it up

16  as a measure of impact.

17      Q.    Why not?

18      A.    I think I told you that when

19  I -- when -- we could go to the results or I

20  could just tell you that we get drastically

21  better results in terms of goodness of fit of

22  the model as we move rightward across the

23  specifications.

24          So, I wanted to offer up the

25  in-sample metric based on what I thought was



1   the best model.

2                   And method, you know,

3   specification six is my preferred model.

4                   I continue to use student fixed

5   effects even when I do the Yale regression.

6   I continue to do student fixed effects.  But

7   just for those students who experience the

8   switch by Yale in the 2008 period.

9        Q.    Okay.  Do you still have

10  Singer-9 in front of you?

11       A.    Yes.

12       Q.    Page earlier, footnote 53.  Do

13  you dispute Dr. Stiroh's finding that when

14  you apply your harmed-on-net analysis to your

15  EIP specification, that uses only school

16  fixed effects rather than school and student

17  fixed effects that only half of proposed

18  class members are flagged as harmed?

19       A.    Do I dispute it?  I don't know

20  what the answer is.  I can't dispute it.

21       Q.    Is the only difference between

22  model three and model six in your EIP

23  regression analysis the inclusion of student

24  fixed effects?

25       A.    I believe so.



HAL J. SINGER, PH.D.  Confidential                    November 27, 2024
CORTZO V. BROWN UNIVERSITY                                        282

```
 1          Q.      Okay.
 2          A.      And I could -- I just happen to
 3    have the page here.
 4          Q.      Please.
 5          A.      Let me just confirm.
 6          Q.      Please confirm.
 7          A.      Yes.  That's the only
 8    difference.
 9          Q.      Now we've been talking all about
10    EIPs.  And you've built a regression model to
11    analyze the challenged conducts impact on
12    EIPs; correct?
13          A.      Correct.
14          Q.      And you define EIP as the cost
15    of attendance minus institutional grant aid;
16    correct?
17          A.      Correct.
18          Q.      EIP is a measure you came up
19    with; correct?
20          A.      It is a measure I came up with,
21    but it's based off of a much more commonly
22    known net price measure.
23                  The reason, as I explained in my
24    report, I didn't want to use net price is
25    that net price subtracts out aid from other
```



 1   sources.

 2             And I felt like including that

 3   into the dependent variable would create a

 4   source of confusion and would confound what

 5   we're looking for.

 6             And I'm fairly confident that

 7   Dr. Hill uses the same measure of pricing

 8   that I do as well.

 9        Q.    Your EIP metric does not include

10   work study awards; correct?

11        A.    I don't think the base version

12   of my EIP model uses work study.  It's

13   subtracting out institutional grant aid.

14        Q.    Why does your definition of EIP

15   not include work study awards?

16        A.    Because the theory of harm here

17   is that the defendants coordinated in their

18   decisions of how much to offer in terms of

19   grant aid.

20             So, if we included other

21   measures of aid that were outside of what I

22   think the scope of the challenged conduct is,

23   I don't think there's a theory of harm that

24   says that this inflated work study or

25   deflated work study.  Now they may have gone



1              MR. CRAMER:  There are a lot of
2    class members in here.
3              MR. GRINGER:  Could you stop it?
4              MR. CRAMER:  It was a joke.
5              MR. GRINGER:  First of all, i
6    did receive financial aid from Penn which is
7    more than certain people and their children
8    can say.  Okay?
9    BY MR. GRINGER:
10        Q.    So, you don't know, and we can
11    come back to that, Dr. Singer.
12              But just so the record is clear,
13    if a student received $50,000 in grant aid
14    and the $2,000 work study award and the cost
15    of attendance was $80,000, the student would
16    pay to the school $28,000; correct?
17              MR. CRAMER:  Asked and answered.
18              THE WITNESS:  That sounds right.
19    BY MR. GRINGER:
20        Q.    But you would treat the EIP as
21    $30,000; correct?
22        A.    Correct.
23        Q.    So you're personally inflating
24    your measure of the EIP inflates what every
25    single potential class member actually paid



 1  to their institution; correct?

 2              MR. CRAMER:  Objection to form.

 3              THE WITNESS:  No.  That's way

 4  too much of a stretch.  Did you mean to say

 5  every single?  Maybe -- I think maybe what

 6  you meant to say was for those who got work

 7  study assistance.

 8  BY MR. GRINGER:

 9      Q.    That's fair.  Your measure of

10  EIP inflates for every student who received

11  work study assistance what they actually paid

12  to a defendant?

13      A.    It -- I'm going to push back

14  gently on that it inflates.

15              I'm trying to capture out of

16  pocket no strings attached.  I think that

17  I've come up with the best measure of that.

18              You know, I note that none of

19  your experts have said that Dr. Singer should

20  include work study as -- in his EIP.  This is

21  the first time I'm hearing this critique.

22  But having heard it now for the first time, I

23  think that my measure is still superior.  I

24  like mine better.

25      Q.    EIP also does not include



1    subsidized loans; correct?

2         A.      It does not include subsidized

3    loans.

4         Q.      You don't think the opportunity

5    to obtain a subsidized loan is a benefit

6    offered to students?

7         A.      Oh, no, not if it's coming in

8    lieu of an unconditional grant.  You'd always

9    prefer a grant over a loan.  My goodness.

10   These students, I know you think they should

11   be thankful, but they don't like coming out

12   of college in debt up to their eyeballs.

13        Q.      Let me ask you:  You're assuming

14   that the choice is between a subsidized loan

15   and more grant money.  If the choice is

16   between a subsidized loan and nothing, a

17   student prefers a subsidized loan; correct?

18        A.      If that's the choice, I don't

19   think that that -- I don't think that that is

20   the outcome, though, in the but-for world.  I

21   think that what's happening is that the

22   defendants were able to drive a harder

23   bargain and push more loans than they

24   otherwise would have been able to.

25        Q.      Okay.  And what percentage of



```
1    aid -- you've reviewed many documents in this

2    case or at least many documents are cited in

3    your reports; correct?

4         A.      Correct.

5         Q.      How many of those documents

6    referenced your concept of EIP?

7         A.      Well, I don't know if there is

8    a -- if there's a document that defines EIP

9    as I've defined it.

10               I've cited published, you know,

11   economics studies and other statutory

12   language over a net price.  And mine is a

13   derivative of a net price and I've now told

14   you that I don't want to include scholarships

15   and funding from other sources in my price

16   measure because that would conflate and

17   confound the effect of the alleged

18   conspiracy.

19        Q.    You didn't -- are there any

20   benefits to a family who receives a

21   subsidized loan as part of their financial

22   aid package?

23               MR. CRAMER:  Objection to form.

24               THE WITNESS:  I would say it

25   depends on relative to what?  If it was -- if
```



1   it came about because of a conspiracy to

2   suppress grant aid, then they would be

3   unequivocally worse off.

4   BY MR. GRINGER:

5       Q.    What if it -- just putting aside

6   no -- I'm not looking compared to what.  Is

7   there any benefit to a family if being able

8   to obtain a subsidized loan as part of their

9   financial aid package?

10          MR. CRAMER:  Asked and answered.

11          THE WITNESS:  You could

12  construct a fact pattern under which a

13  subsidized loan is better than having to

14  borrow at prevailing commercial rates.

15  BY MR. GRINGER:

16      Q.    Many student loans are forgiven.

17  Are you aware of that?

18      A.    I understand it can happen, yes.

19      Q.    Did you go back and recalculate

20  EIP for potential class members though had

21  their student loan forgiven?

22      A.    No.

23      Q.    You don't consider a Pell grant

24  and other federal grants in your EIP

25  calculation; correct?



1          A.      Correct.

2          Q.      Why not?

3          A.      For the reason I told you.  If

4    it's coming from third parties, then it's

5    going to conflate the measure of our

6    dependent variable in particular, it's going

7    to inject components that are not under the

8    control of the defendant institutions.

9          Q.      But nonetheless, any outside

10   scholarship or Pell grant a student might

11   receive, might have lowered the net price

12   that they paid to attend a defendant

13   institution; correct?

14         A.      It may have lowered it relative

15   to the actual world but relative to the

16   but-for world.  It can't compensate for the

17   injury that the class members suffered as a

18   result of this cartel.

19         Q.      Why not?

20         A.      Oh, because that's easy.

21   Because they would have continued to get,

22   presumably they would have gotten the same

23   funding from third parties in the but-for

24   world.

25              The only thing that would change



1  into consideration when they are making their

2  grant aid decisions.

3       Q.     But do you have an actual

4  understanding of what happens?

5       A.     I don't think I have a good

6  enough understanding to explain it to you

7  right now.

8            I would submit that at least in

9  our student fixed effect models, if those

10 Pell grants are constant over time, they

11 would be controlled for with the student

12 fixed effects.

13      Q.     Do you know if Pell grants are

14 constant over time?

15      A.     I don't know that if every case

16 they are constant.

17      Q.     Do you know if in any case they

18 are constant?

19      A.     No, but I think a reasonable

20 surmise is that if you got a grant such as a

21 Pell grant, that the amount would be the same

22 in every year that you're in the database.

23      Q.     Do you know of any higher

24 education institution that uses EIP?

25      A.     Well, they are all using it



1   implicitly, right, because they are all

2   trying to figure out how to bridge the gap

3   between the list price and the various

4   payers.  I didn't say that well.  But they

5   are trying to figure out how the various

6   payers can get up to the list price and one

7   component would be the EFC.  Another

8   component would be the loans.  The third

9   component would be the grant aid.

10                  And so, you know, that formula

11  incorporates and embeds what I've defined as

12  the EIP.

13                  So they are all implicitly using

14  it.

15       Q.      What about explicitly?  Do you

16  know of any school that explicitly uses the

17  EIP?

18       A.      I don't know if they write out

19  EIP as a separate formula and model it the

20  way that I have.

21       Q.      We talked earlier today about

22  the principle of horizontal equity.

23       A.      Uh-huh.

24       Q.      One possibility is that schools

25  that adhere to that principle make more



1    answer.  We can go through all of these.  I

2    don't think that sitting here certainly I

3    can't give you a specific change to the

4    formula that CalTech or any defendant made

5    upon joining.  I get to see the offers of

6    EFC.  I don't get go see the actual formula

7    itself.

8         Q.    Your -- we were talking a moment

9    ago about your common shock analysis.

10              By itself, that's not enough to

11   show common impact; correct?

12              MR. CRAMER:  Objection to form.

13              THE WITNESS:  I think that

14   whether it's in sample -- remember, there's

15   two parts of the proof.  Okay?

16              You have to first show a

17   generalized effect and in my case I'm doing

18   it with my regression model.

19              And then at part two, you can go

20   in different directions.  You could go the

21   price structure direction, you can go in

22   sample prediction and you can go horizontal

23   and vertical equity.

24              The common shock was meant to

25   corroborate the price structure path.  I'm



1  going to agree, it was a great question --
2  she should write more of them -- that by
3  itself, that would not constitute a proof of
4  common impact.  Just like in sample by
5  itself.
6            These are all, it's a two-step
7  process.  You have to pair part two, whether
8  it's the pricing structure, in sample
9  prediction or horizontal vertical equity you
10 have to pair that with a finding of the
11 generalized effect.  If you don't have a
12 generalized effect, you don't get -- you
13 don't get passing.  You're over.  That's the
14 first box.  Only if you get to the second.
15 The question kind of presumes that some of
16 these ancillary or second stage techniques
17 could by themselves count as a sufficient
18 proof of common impact.  I just want to make
19 sure we're all on the same page.  None of
20 them by themselves can do it.
21            They have to be married up with
22 the first stage regression.
23 BY MR. GRINGER:
24     Q.    Are you aware that many
25 potential class members received financial



1    summaries on what's in the yellow book by

2    staff.  I turn it into prose for the

3    declaration.  I speak with my staff about

4    their understanding of what they saw in the

5    yellow books.

6         Q.      Did you review any of the

7    documents in this case?

8         A.      Yes.

9         Q.      How many?

10        A.      I don't have a count for you,

11   but there are documents.

12        Q.      How did you choose which

13   documents to review personally?

14        A.      I think that the way that the

15   documents come about, I mean first of all we

16   have access, of course, to everything that

17   gets produced and we had it broken down by

18   defendant.

19             But we're not just going into

20   the documents and just reading.  We're

21   looking for particular things.  If we're

22   defining markets, I'm looking at peers.  I'm

23   looking for key word search for the word

24   peers to find markets.

25             So, we come up with an outline.



1   I come up with an outline with my team as to

2   what the report is going to cover.  And then

3   the team goes looking for data and documents

4   that would inform the various inquiries that

5   we're trying to make.

6          Q.    Do you go look for documents

7   that are -- that contradict your opinions?

8          A.    We don't go look for them, but

9   sometimes we find them.

10         Q.    Your assessment of the

11  qualitative evidence in this case is

12  important to your opinions; correct?

13         A.    It is important.  It's a one --

14  it's one prong.  It's one pillar that one

15  needs to look at when forming hypotheses and

16  rendering opinions.

17              I think that doctor, at least

18  Dr. Hill agrees with me on this regard.  I

19  got the sense that Dr. Stiroh doesn't think

20  qualitative evidence is informative.

21              But Dr. Hill I think would agree

22  with me that you want to look at both the

23  record evidence and the data.

24         Q.    What did you do make sure you

25  were getting a complete picture of the



1   Group specific surveys there were?

2                   MR. CRAMER:  Objection to form.

3                   THE WITNESS:  No, I don't.

4   BY MR. GRINGER:

5           Q.      What is your understanding of

6   the requirements to be a member of the 568

7   Group?

8           A.      Well, I think at a very large

9   level, to be a member in good standing you

10  would abide by the various consensus

11  methodologies.  I think that when we see

12  people leaving who don't want to abide by it

13  any longer tells me that these two aren't

14  compatible.  You either have to abide by the

15  common methodology or you can't be a member.

16          Q.      Did you review the testimony

17  from numerous individuals in this case that

18  said the only requirement to be a member of

19  the 568 Group was to be need blind?

20                  MR. CRAMER:  Objection to form.

21                  THE WITNESS:  I don't recall

22  that specific testimony, but it seems

23  inconsistent with why would Yale have to

24  leave the group?

25  BY MR. GRINGER:



1    Q.    And Michigan is higher than

2  Vanderbilt; correct?

3    A.    Correct.

4    Q.    And Virginia is higher than

5  Vanderbilt; correct?

6    A.    Correct.

7    Q.    And UCLA, UC Berkeley and

8  Michigan are higher than ivy league school

9  Dartmouth; correct?

10    A.    Slow down.  Give me -- give it

11  to me again.

12    Q.    UCLA, UC Berkeley and Michigan

13  are all higher than ivy league school

14  Dartmouth; correct?

15    A.    Yes.

16    Q.    Your own revealed preference

17  rankings actually strongly support including

18  flagship public universities in your relevant

19  market; correct?

20        MR. CRAMER:  Objection to form.

21        THE WITNESS:  No.

22  BY MR. GRINGER:

23    Q.    Why not?

24    A.    You're confusing the purpose of

25  the test.  What we want to see is when we



1    start with a set of -- we start with the

2    defendants and we start layering on

3    additional schools.  The test is to see

4    whether the preference rankings of the

5    defendants move down materially and they

6    don't; right?

7                  And we confirm that when we do

8    it, when we add the ten highly ranked -- ten

9    more highly ranked university, when we add

10   the ten liberal arts schools or we add both.

11   That was the purpose of the test.

12        Q.    You pointed to the test in

13   response to my question about close

14   competitors.  Maybe you didn't do an analysis

15   of how close the competitors are?

16                  MR. CRAMER:  Objection to form.

17                  THE WITNESS:  I did do an

18   analysis of how close the competitors are.

19   It shows that when you begin with the

20   defendant's ranking and you add in these

21   candidates, you don't reduce the revealed

22   preference of the defendants.  And that tells

23   me that you've -- this is consistent with the

24   defendants constituting their own relevant

25   market.



1        Q.     I count documents from Duke as

2    one, CalTech as two, Columbia as three,

3    Cornell as four, Dartmouth as five, Emory as

4    six, Georgetown is seven and Johns Hopkins is

5    eight; correct?

6                 MR. CRAMER:  What's the

7    question?

8                 MR. GRINGER:  Do you agree --

9    correct?

10                MR. CRAMER:  What's correct?

11   What's the question?

12                MR. GRINGER:  What I just

13   counted.

14                THE WITNESS:  His counting was

15   correct.

16                MR. GRINGER:  Thank you.

17                MR. CRAMER:  I'm not sure what

18   the question was.

19                THE WITNESS:  I think he wanted

20   to know the unique number of documents or

21   schools that I -- for which I could find --

22                MR. CRAMER:  In this section.

23                THE WITNESS:  Yes.  It's eight.

24   BY MR. GRINGER:

25        Q.     So that means for half of the



1    schools in the 568 Group you did not cite a

2    single document in this section; correct?

3         A.    Oh, in this section I grant you,

4    but I cite documents elsewhere.

5         Q.    Can I have Tab 84, please, which

6    we'll mark as 17.

7                    -  -  -

8              (Whereupon, Deposition Exhibit

9    Singer-17, Email Chain, was marked for

10   identification.)

11                   -  -  -

12   BY MR. GRINGER:

13        Q.    Singer-17 is a multi-page

14   document with a Bates number beginning with

15   ND_0158341.

16             Dr. Singer, if you could take a

17   look at the email from Paul Mueller to Thomas

18   Bear and Robert Mundy.

19        A.    Should I read from the bottom

20   up?  Does it go in the reverse order?

21        Q.    I'm asking you about

22   Mr. Mueller's email right now.  I'm just

23   asking you about the top email.  The others

24   are different subjects.

25        A.    Let me read the top one.  I've



HAL J. SINGER, PH.D.  Confidential      November 27, 2024
CORTZO V. BROWN UNIVERSITY      371

```
 1  read the October 3rd email from Paul Mueller.
 2  Did you want me to read anything else?
 3       Q.    No.  Have you seen this email
 4  before?
 5       A.    I don't recall seeing it.
 6       Q.    Could I have Tab 85 which we'll
 7  mark as Singer-18.
 8            Dr. Singer, Singer-18 is a
 9  multi-page document with a Bates number
10  beginning with Emory_568 lit_0058886.
11                  -  -  -
12            (Whereupon, Deposition Exhibit
13  Singer-18, Notes of questions from President
14  Wagner regarding financial aid and
15  undergraduate admissions competitiveness
16  dated September 7th, 2014, was marked for
17  identification.)
18                  -  -  -
19  BY MR. GRINGER:
20       Q.    Dr. Singer, do you see there are
21  a series of questions, question two is what
22  are the top three to six schools to whom we
23  most frequently lose admitted students?
24       A.    Yes.
25       Q.    Do you see listed are eight
```



1 schools?

2    A.  Yes.

3    Q.  This is talking about Emory.

4     Of those eight schools, five of

5 them are outside of your proposed relevant

6 market; correct?

7    A.  Correct.

8    Q.  It says note the significant

9 presence of public universities here;

10 correct?

11    A.  Yes.

12    Q.  Did you consider this document

13 in forming your opinions on the relevant

14 market in this case?

15    A.  I did not consider it.  And

16 having seen it, it wouldn't change my

17 opinion.

18    Q.  Can I have Tab 216, please.

19 This will be Singer-19.  Singer-19 is a

20 multi-page document with a Bates number

21 beginning with Penn 568-lit-00089925.

22      -  -  -

23    (Whereupon, Deposition Exhibit

24 Singer-19, Penn All Staff Retreat dated May

25 28, 2013, was marked for identification.)



1    below do you want me to go?  Down there.  I'm

2    sorry.  I thought we were still in the

3    figure.

4              Top competitors.

5        Q.    Yeah.  On average, they win

6    students from Penn 95 percent of the time.

7              Do you see that?

8        A.    Yes.

9        Q.    So, is it your interpretation

10   from this document is that those schools are

11   Penn's closest competitors even though they

12   win students from Penn 95 percent of the

13   time?

14       A.    I think Penn by using the word

15   top competitors I think is a fair inference

16   that they consider those to be competitors.

17       Q.    Aren't those inferences for the

18   fact finder, not for you?

19       A.    I --

20       Q.    I'm sorry.  You make a lot of

21   inferences about what documents mean; don't

22   you?  You got into trouble with that before?

23             MR. CRAMER:  Objection to form.

24   Would you like him to answer the first

25   question you asked or the second?  Are you



HAL J. SINGER, PH.D.  Confidential
CORTZO V. BROWN UNIVERSITY

November 27, 2024
384

1    the schools included in the relevant market

2    which I think is $980,000 per student.

3         Q.      Do you have any reason to doubt

4    that the endowment for student at Amherst is

5    $1.4 million per student?

6         A.      That would seem high relative to

7    what I know, but I'd have to look at it.  It

8    doesn't seem correct.

9              What's the source of the data?

10   Is this another one of your 83 percent price

11   increase things?  I don't know where that's

12   coming from.

13        Q.     What is it that you know that

14   suggests that number is high?

15        A.     Just look at schools like

16   Chicago, you know, Brown, Columbia, 630,000.

17   You're asking me to believe that Amherst is

18   double what these Ivy League schools are?  It

19   just seems very implausible.

20        Q.     Do you know what Williams

21   College endowment per student is?

22        A.     No.

23        Q.     Do you know what Bowdoin

24   College's endowment per student is?

25        A.     No.



1    Q.    Uh-huh.

2    A.    I don't know if I can be

3  surprised anymore.

4    Q.    And I take it you never compared

5  the expected cost of attendance at the

6  University of Michigan for out-of-state

7  students to say an unaided students who

8  attends Rice University; correct?

9    A.    Correct.

10   Q.    How distinct do prices have to

11 be before they meet your definition of

12 distinct prices?

13   A.    Well, if I were to put an

14 economic lens on I would say the difference

15 should be economically significant.  It

16 should be a material difference; as they are

17 in the Duke UNC example.

18   Q.    Did you do a systematic analysis

19 of the differences, if any, in price between

20 what you call the private university and

21 public universities?

22   A.    Not in that paragraph, I grant

23 you that.

24   Q.    Did you do an analysis of the

25 material differences, if any, in price

