**PUBLIC VERSION**

# EXHIBIT 11

**In the Matter Of:**

CORZO V. BROWN UNIVERSITY

1:22-cv-00125

---

**ELIZABETH MORA**

*October 29, 2024*

---



800.211.DEPO (3376)
EsquireSolutions.com

1    A.  Yes.

2    Q.  Paragraph 2 lists a number of topics that

3  you were asked to address.  Is that a complete and

4  exhaustive list of the topics that plaintiffs'

5  counsel asked you to consider?

6    A.  Yes.

7    Q.  Okay.  Were you asked at any point to

8  offer your views or provide any analysis regarding

9  whether defendants have as a purpose or a primary

10  purpose to maximize revenues?

11    A.  I was.

12    Q.  Okay.  Where does that fall in this list

13  of topics that you were asked to address?

14    A.  It's not on here because I did not agree

15  with the idea that maximizing revenue was a goal.

16    Q.  Okay.  What do you understand maximizing

17  revenue to mean in the context of the university?

18    A.  So, to me, maximizing revenue, I think of

19  more broadly as maximizing endowment growth,

20  because the endowment is the fuel for everything,

21  and if one has a large endowment with hefty

22  returns, that's the engine for everything else.  So

23  it's not revenue, it's capital for investment into

24  many other things -- many things.



1    or after 2008; is that correct?

2         A.   That's correct.

3         Q.   So you've never worked in any other

4    institution of higher education other than Harvard?

5         A.   In my consulting practice, I was on

6    several engagements at higher education

7    institutions, sometimes for more than a year, but I

8    was not employed by them as an employee.

9         Q.   And when you refer to your consulting

10   practice, you mean your time working as an

11   accountant or auditor?

12        A.   No.   This was after that.

13             If we go to Appendix B on page 38, this

14   was a representation of my client list in the

15   regulatory consulting practice.

16        Q.   Okay.   And in what years did you have that

17   regulatory consulting practice?

18        A.   '91 to '97.

19        Q.   Okay.   What were the sorts of things that

20   you were consulting on in that six year period?

21        A.   So training of faculty around research

22   practices.   We were -- I was the arbitrator between

23   the government and the university on issues of

24   indirect cost reimbursement, compliance, a term



1   something that the NIH and federal grants require

2   called effort reporting, which people didn't

3   understand.

4          It was during this period of years

5   President Clinton doubled the NIH budget, so many

6   of these schools on this list went from very little

7   to quite a bit of research dollars and did not have

8   the infrastructure to support the compliance

9   required.

10          So we were hired by boards of trustees,

11   regents, presidents, provosts to come in and do

12   full scale setup of animal facilities, human

13   subject committees, training manuals, teaching

14   faculty, really anything having to do with research

15   administration, but also budgeting, as research was

16   becoming a larger part of the budget, not only in

17   the form of direct costs but in an indirect cost

18   perspective.

19      Q.  So the consulting work that you did

20   between 1991 and 1997 did not have any relationship

21   to or involvement with undergraduate financial aid;

22   is that accurate?

23      A.  It's accurate in that the consulting work

24   was not specific to financial aid, but in the



ELIZABETH MORA
CORZO V. BROWN UNIVERSITY

October 29, 2024
41

1    course of looking at budgets and expenditures for
2    many of these universities, financial aid was a
3    component, as was endowment income.
4        Q.  What do you mean by financial aid was a
5    component of your consulting work?
6        A.  Component of the budget, of the
7    university's budget writ large, so it was a line
8    item that was discussed and --
9        Q.  So you saw -- sorry.
10       A.  -- analyzed in the context of other
11   expenditures.
12       Q.  Okay.  So you would see financial aid as a
13   budget line item, but you were not, in substance,
14   consulting or advising on anything about financial
15   aid; is that fair?
16           MR. CIPOLLA:  I can't hear you, Sarah,
17   although you're coming in clearly and I see the
18   transcript moving.
19           MS. KIRKPATRICK:  Let's go off the record.
20           THE WITNESS:  We were not able to hear
21   your question.
22           THE VIDEOGRAPHER:  You want to go off the
23   record?
24           MS. KIRKPATRICK:  Just for a moment, yeah.



```
 1          THE VIDEOGRAPHER:  Going off video record
 2    at 10:27 a.m. Eastern time.
 3          (Proceedings interrupted at 10:27 a.m. and
 4       reconvened at 10:30 a.m.)
 5          THE VIDEOGRAPHER:  We are back on video
 6    record at 10:30 a.m. Eastern time.
 7    BY MS. KIRKPATRICK:
 8       Q.  All right.  Ms. Mora, I was asking you
 9    before the brief break whether it's fair to say
10    that in the course of your accounting and
11    consulting role, you saw financial aid as a line
12    item included in various university budgets, but
13    you had no responsibility for financial aid
14    administration, policy, procedure or the like.
15       A.  That is correct.
16       Q.  Okay.  And your consulting work, while you
17    worked at an accounting firm, was not -- you were
18    never employed at any actual university other than
19    Harvard; is that correct?
20       A.  Correct.
21       Q.  Your time at Harvard started with five
22    years in research administration, correct?
23       A.  Yes.
24       Q.  And the research administration role
```



1   sounds like it flowed directly from your accounting

2   and consulting practice in terms of grants and

3   contracts for research and the administration

4   compliance accounting for those; is that a fair

5   description?

6       A.  Yes.

7       Q.  None of your work in research

8   administration at Harvard involved direct

9   involvement with undergraduate student financial

10  aid, correct?

11      A.  Correct.

12      Q.  Did you have any involvement with

13  management of Harvard's endowment during your time

14  in the research administration role?

15          MR. CIPOLLA:  Objection, form.

16      A.  So I got to know the endowment CEO, as I

17  was part of the chief financial officer's

18  roundtable, and he would come and make

19  presentations about the endowment performance and

20  the investment strategy to her staff and the

21  financial deans of the schools from time to time.

22      Q.  When did you become a part of the chief

23  financial officer's roundtable?

24      A.  From the day I started.



1  chief financial officer and then chief financial

2  officer between 2006 and 2008; is that correct?

3      A.  Yes.

4      Q.  What was the nature or extent of your

5  involvement with undergraduate financial aid during

6  that two year period when you were CFO?

7      A.  Did you say -- I'm sorry -- other graduate

8  financial aid?

9      Q.  Undergraduate.

10      A.  Oh, undergraduate.

11          There was no involvement with

12  undergraduate financial aid.

13      Q.  So you were not involved in any

14  formulation of needs analysis methodologies; is

15  that correct?

16      A.  Correct.

17      Q.  You were not involved in packaging

18  financial aid awards?

19      A.  No.

20      Q.  You were not --

21      A.  That all happened at Harvard College.

22      Q.  So you had no role in undergraduate

23  financial aid at any point during your tenure at

24  Harvard?



1      A.  I did not have any role in undergraduate
2   financial aid.
3      Q.  And fair to say, I assume then, that you
4   have had no role in undergraduate financial aid at
5   any other university since you have not worked at
6   any other university other than Harvard?
7      A.  That's correct.
8      Q.  You've never been involved in developing
9   or implementing need analysis methodologies for any
10  university, correct?
11     A.  No, I have not.
12     Q.  You've not been involved in determining
13  what should comprise a financial aid package for
14  any undergraduate students of any university?
15     A.  No, I have not.
16     Q.  You've never participated in forums or
17  industry groups focused on financial aid policy or
18  procedure?
19     A.  No, I have not.
20     Q.  Your report, your opening report at
21  paragraph 16, which appears on page 8, under the
22  heading Higher Education Industry Experience --
23     A.  Yes.
24     Q.  -- refers to the familiarity -- to you



1        So people who were working on index cards

2    could not support a 33-digit chart of account

3    enterprise reporting system.  So there was a lot of

4    turnover, and there was an effort to recruit people

5    from outside the university.  And as part of my

6    recruitment and others recruitment, it was

7    considered good practice to share what we were

8    doing with others.

9        Q.  You say in paragraph 16 that you gained

10   knowledge about other universities' operations

11   through your participation in various forums.  Did

12   you also learn about other university operations

13   through the four or five professional -- the

14   national professional organizations that you've

15   referred to?

16       A.  Yes.

17       Q.  Okay.  And did you also have conversations

18   with peers or counterparts from other universities

19   outside the context of those two groups of sort of

20   formal industry gatherings, or were your

21   conversations in the context of those different

22   groups and forums?

23       A.  I'm not sure I understand the question.

24       Q.  So you described meetings and seminars of



1  the four or five national professional

2  organizations on the one hand that you do not list

3  here and then the three narrower forums that you do

4  list in paragraph 17.

5      A.  Yes.

6      Q.  And I'm trying to understand whether the

7  conversations you had with your counterparts from

8  other universities were confined to the formal

9  activities of those two sets of groups or whether

10  you also had ad hoc separate conversations that

11  form part of the knowledge and familiarity that

12  you're describing in paragraph 16?

13      A.  Oh, there were many ad hoc conversations.

14  I would pick up the phone, someone would pick up

15  the phone, I would go to San Francisco for personal

16  reasons and spend an afternoon at Stanford with my

17  counterparts there as one example.

18         I became friendly with the people at

19  CalTech, hence the consulting arrangement.  So when

20  I would go to LA for other reasons, I would, you

21  know, have dinner with my counterpart at CalTech.

22      Q.  Okay.  Are there other schools that you

23  had conversations with your counterparts or peers

24  other than Stanford and CalTech that formed part of



1    this familiarity and knowledge that you're

2    describing in paragraph 16?

3        A.  Yes.

4        Q.  Can you identify the other schools that

5    you spoke with?

6        A.  Yes.  My boss at Harvard had left Harvard

7    and went to Brown as executive vice president, and

8    I would be in frequent communication with her.  The

9    woman who was the executive dean for administration

10   at Harvard Medical School went to Yale, and I

11   frequently spoke to her.  I had an employee who --

12   another employee who went to Johns Hopkins, and I

13   would speak to him frequently.

14          I mentioned CalTech.  So I had a lot of

15   interaction with MIT around the formation of the

16   Broad Institute, so I was with those folks several

17   times a week for a period of two years.  So yes,

18   so, you know, frequent conversations, Brown, Yale,

19   Hopkins, CalTech, MIT, Stanford.

20       Q.  And that list of schools, there are -- it

21   appears that there are at least a number of the

22   defendant schools in this litigation that you have

23   not identified.

24          Are there schools in this litigation with



1    whom you did not have personal relationships or

2    regularly engage in conversations about how they

3    operated?

4            MR. CIPOLLA:  Object to form.

5        A.  So let me look at the list again.

6            As I said, I interviewed the fellow who

7    ran the endowment at Notre Dame.  I did a project

8    at Northwestern.  I didn't know anybody at

9    Georgetown.  My people who went to Johns Hopkins

10   then went to Duke, and they're at Duke now.  I met,

11   through the woman at Brown who was my former boss,

12   the fellow who became the president of the

13   University of Chicago, he was a provost at Brown,

14   and I had dinner with her and him a couple of

15   times.

16           I don't think there was any interaction

17   with anybody at Penn, and there was not interaction

18   with anybody at Rice or Vanderbilt.

19       Q.  You've mentioned twice that you

20   interviewed a man who ran the endowment at Notre

21   Dame.  Did you have any other source of contact in

22   terms of understanding Notre Dame's university

23   operations more generally or is that limited to

24   interviewing the head of the endowment?



ELIZABETH MORA                                    October 29, 2024
CORZO V. BROWN UNIVERSITY                                      57

```
 1        A.  It was --
 2             MR. CIPOLLA:  Object to form.
 3        A.   It was limited to him, because they
 4   didn't -- they weren't in these other groups.  They
 5   may have been at some of these other meetings that
 6   I just mentioned, NCUBO, but, you know, they were
 7   not -- I don't know why, but they were not -- they
 8   were sort of on the margin, if you will.  They
 9   didn't send representatives to the leaders in some
10   of the organizations that I mentioned during the
11   time that I was at Harvard.
12        Q.  Were the schools with whom you did have
13   some connections or personal relationships that you
14   used to gain familiarity with how other
15   universities operated, are you relying for your
16   opinions in this case on any specific conversations
17   that you had in the course of your time at Harvard?
18        A.   No, not specific conversations, but rather
19   the accumulation of many conversations, workshops,
20   symposium, presentations, discussions.  As you --
21        Q.  Did you --
22        A.  Sorry.
23        Q.  Go ahead.
24        A.   The woman who was my close colleague in
```



ELIZABETH MORA                                    October 29, 2024
CORZO V. BROWN UNIVERSITY                                       58

1   the faculty of arts and sciences at Harvard went to

2   become CFO of Dartmouth, and I'm friendly with her

3   today.  She's left, but she was there for a number

4   of years.

5        Q.  Okay.

6            MR. CIPOLLA:  Are we reaching a natural

7   stopping point?  It's been almost --

8            MS. KIRKPATRICK:  I was just going to say,

9   I think this is a good point to take a break, so

10  let's go off the record.

11           THE VIDEOGRAPHER:  Okay.  We're going off

12  video record at 10:58 a.m. Eastern time.

13           (Proceedings interrupted at 10:58 a.m. and

14      reconvened at 11:11 a.m.)

15           THE VIDEOGRAPHER:  We are back on video

16  record at 11:11 a.m. Eastern time.

17  BY MS. KIRKPATRICK:

18       Q.  All right.  Ms. Mora, at paragraph 18 of

19  your opening report, you refer in the first

20  sentence to efforts that you made to understand the

21  various secondary source rankings of educational

22  institutions to compare where we stood in those

23  rankings compared to other universities.

24           Do you see that?



1      A.  No.

2      Q.  Have you performed any research on the

3  economics of higher education?

4      A.  No.

5      Q.  Do you have any academic degrees or study

6  or educational credentials regarding financial aid,

7  undergraduate financial aid?

8      A.  No.

9      Q.  Any publications, scholarly literature,

10  other research that you've conducted on

11  undergraduate financial aid?

12      A.  No.

13      Q.  Any professional experience that you have

14  working with or in the field of undergraduate

15  financial aid?

16          MR. CIPOLLA:  Objection, form.

17      A.  No.

18      Q.  Do you have any academic degrees, study,

19  or other educational credentials regarding the

20  characteristics of non-profit organizations?

21      A.  I have taken a course in non-profit

22  accounting, but that's not a degree.

23      Q.  Okay.  When was that course?

24      A.  Late '80s.



1    Q.   Is that the extent of your academic study

2    regarding the characteristics of non-profit

3    organizations?

4    A.   So I just -- I want to make sure I

5    understand the question.  So these professional

6    organizations that I'm describing, that I described

7    to you before we broke, there were many seminars

8    offered on the characteristics of colleges versus

9    universities, decentralized institutions,

10   centralized institutions, state universities,

11   community college.  So there were a cadre of

12   courses that I would -- seminars that I would

13   attend, but without a degree.  So I immersed myself

14   in the teaching and knowledge gathering around

15   higher education writ large, but without a degree

16   program per se.

17   Q.   Okay.  Is it fair to say that you've not

18   undertaken any academic study and you don't have

19   any educational credentials regarding non-profit

20   organizations more broadly, so not focused here on

21   higher education, but non-profits as a broader

22   category of organization?

23   A.   That's fair to say.

24   Q.   Okay.  And what you described as your



1   governance course and one of the topics addressed

2   by that course was the difference between

3   non-profits and for-profits?

4       A.  Yes.

5       Q.  Have you yourself conducted any academic

6   study or analysis regarding the differences between

7   for-profits and non-profit organizations?

8       A.  No.

9       Q.  Have you authored any publications or

10  scholarly literature about the differences between

11  for-profit and non-profit organizations?

12      A.  I've given talks about the difference, but

13  I haven't written a publication.

14      Q.  To whom have you given talks about that?

15      A.  There's an organization called The Boston

16  Club and it's a professional women's organization

17  in Boston, and they put on workshops throughout the

18  year.  And there's a subgroup within that

19  organization on governance, and I have been

20  asked -- I was asked, let's see, before the

21  pandemic, 2017, something like that, to give a talk

22  on having worked in not-for-profit and having

23  served on a number of corporate boards, if I could

24  talk about the differences in governance aspects



1  opinion that although they are non-profits, legally

2  and, I don't know, functionally, you observe

3  certain operational similarities between Harvard

4  and the defendants on the one hand and some

5  category of for profit companies that you describe

6  as diversified conglomerate businesses; is that

7  correct?

8       A.  That's correct.

9            MR. CIPOLLA:  Objection, form.

10      Q.  Okay.  Is it fair to say that you also

11  observe, although you don't discuss it in your

12  opening report, certain operational differences

13  between Harvard and the defendants on the one hand

14  and at least some diversified conglomerate

15  for-profit businesses on the other hand?

16           MR. CIPOLLA:  Objection, form.

17      A.  Operational differences, yes.

18      Q.  So there are some operational similarities

19  and some operational differences?

20      A.  Yes.

21      Q.  And you have in your opening report

22  focused on seven what you observe to be operational

23  similarities between universities and diversified

24  conglomerate businesses, right?



1        A.   What page are you on?

2        Q.   Still on paragraph 20.  We haven't made

3   very much progress yet.

4        A.   When you say seven --

5        Q.   Well, proceed from paragraphs 21 through

6   31, seven features.

7        A.   Oh, I see.  Yes.  Yes.

8        Q.   How did you select the seven features that

9   you chose to talk about in section V of your

10  report?

11       A.   They seem to me to be the most obvious,

12  those that really -- when I put some thought into

13  the way the university ran and my knowledge of how

14  the group under discussion here runs, these were

15  prominent examples of ways that the institutions

16  mirrored public company operations and governance.

17       Q.   Would you agree that each of these seven

18  features are sort of a spectrum on which any one

19  entity sort of could be more or less like any other

20  entity but not -- not sort of objective yes/no

21  features?

22       MR. CIPOLLA:  Objection, form.

23       A.   Are each of these seven -- I want to make

24  sure I understand your question.  Are each of these



 1   seven examples scalable in terms of varying in

 2   degree?  Yes.

 3       Q.  And therefore would you agree that each of

 4   the individual 17 defendants might be more or

 5   less -- might have these features in greater or

 6   lesser degrees?

 7       A.  Yes.  They're different, but they are --

 8   while they may not have exactly these seven, they

 9   may have others that are not shown here.

10       Q.  So they may have other similarities in

11   terms of operations that you've not discussed.

12       A.  Yes.

13       Q.  Correct?  Yes?

14       A.  Yes.

15       Q.  And they also have certain operational

16   differences that you have also not discussed,

17   correct?

18       A.  Yes.

19       Q.  Okay.  Is it fair to say that the opinion

20   you've offered here about certain similarities,

21   certain operational similarities between defendants

22   and what you describe as diversified conglomerate

23   businesses, that observation of similarities would

24   also apply to at least some other universities



ELIZABETH MORA
CORZO V. BROWN UNIVERSITY

October 29, 2024
93

1   beyond the 17 defendants?

2       A.  Yes.

3       Q.  Can you think of any universities outside

4   of the 17 defendants who would similarly share some

5   of these operational similarities?

6       A.  Yes.  The University of California system,

7   for example.

8       Q.  The UC system?

9       A.  Yeah.

10      Q.  Okay.  Any others?

11      A.  University of Michigan, University of

12  North Carolina, the New York state university

13  system, UMass system.

14          Let me look at my list of my clients.

15  Georgia Tech, Northeastern has become a huge

16  business, UAB, University of Alabama, Minnesota is

17  huge and complicated.  Those are examples.

18      Q.  Okay.  I take it from your answer that

19  you're not offering an opinion that there's

20  anything about the membership in the 568 group per

21  se that corresponds to this observation you've made

22  about certain operational similarities between

23  universities and for-profit businesses; is that

24  right?



1  with complex business operations as those that are

2  akin to for-profit businesses in some respects.

3      Q.  And you also view, sounds like, a large

4  number of public universities as having complex

5  business operations that are akin to for-profit

6  businesses in certain respects as well.

7      A.  In certain respects, yes.

8      Q.  And I take it in addition, you are not

9  suggesting -- or tell me if I'm wrong about this --

10  I believe you're not suggesting that there's some

11  dividing line at the U.S. News & World Report top

12  25 such that the 26th ranked school does not have

13  operational similarities to for-profit businesses,

14  where the 25th ranked school does have those

15  similarities, correct?

16      A.  Correct.  I'm not saying that.

17      Q.  Okay.  So there are other private

18  universities that are not necessarily in the top 25

19  of the U.S. News & World Report rankings about whom

20  these operations of operational similarities would

21  also apply, correct?

22      A.  Correct.

23          MR. CIPOLLA:  We've been going for more

24  than an hour and it's getting close to lunch.  I



1  for-profit public companies other than the seven

2  that you discuss in your opening report?

3     A.  Let's see.  I'm sure I could think of

4  others.  These are those that really popped out to

5  me as exemplary of ways that Harvard and the other

6  defendants have elements that reminded me very much

7  of the way that corporations operate.  I'm sure I

8  could think of others if I had to.

9         MS. KIRKPATRICK:  Okay.  Let's take a

10  break there and go off the record.

11         THE VIDEOGRAPHER:  Okay.  Going off video

12  record at 12:28 p.m. Eastern time.

13         (Proceedings interrupted at 12:28 p.m. and

14    reconvened at 1:21 p.m.)

15         THE VIDEOGRAPHER:  We are back on video

16  record at 1:21 p.m. Eastern time.

17  BY MS. KIRKPATRICK:

18     Q.  All right.  Good afternoon, Ms. Mora.

19         I asked you before lunch about the seven

20  features that we're going to talk about now that

21  you go through in section V of your report, and I

22  asked you how you selected those seven features.

23  And I believe that you said that those were the

24  ones that struck you as the most obvious.



1        Can you point me to any published

2   literature or research or study or analysis that

3   you reviewed for purposes of forming your opinions

4   in this case that relies on these same seven

5   features or characteristics in order to describe or

6   indicate that a given company is a for-profit

7   public company?

8        A.  No.

9        Q.  Any literature or study or analysis that

10   you can point to that suggests that these

11   particular seven features are indicative of

12   operations similar to a for-profit public company?

13        A.  If we were to look at the annual report of

14   a public company or the proxy statement, there are

15   elements of these characteristics that would be

16   featured in the report and to the proxy statement,

17   such as number of employees, business unit

18   diversification, description of how the business

19   operated, those entities within the business that

20   were most profitable and those that were not, or

21   that were least profitable, governance structure.

22        Q.  Okay.  So if I'm understanding you

23   correctly, you're saying these seven features would

24   be to some degree described or reported on in a



1    one or more defendants should have allocated more

2    of the five revenue sources that you just

3    identified to undergraduate financial aid?

4        A.  I'm not offering that opinion.

5        Q.  So you are observing that there are six

6    sources of revenue, of which five entail

7    flexibility that includes the ability to allocate

8    to financial aid, correct?

9        A.  Right.

10       Q.  Okay.  And you go through in this section

11   of your report and talk about each of these six

12   sources of revenue based on your experience at

13   Harvard.  For purposes of this report, did you

14   undertake any systematic analysis, research, where

15   you have data to assess the six forms of revenue

16   and their availability to the 17 defendants?

17       A.  I did not undertake an analysis for the 17

18   defendants, no.  But I did read, for example, as

19   one example, about the University of Pennsylvania

20   earning close to $1 billion in royalties from the

21   development of the RNA vaccine, technology that

22   Moderna and Pfizer used to create the COVID-19

23   vaccine.  And Northwestern had a similar

24   blockbuster in the Lyrica drug.



1          So I did not undertake a systematic

2    analysis, but I saw data points, if you will,

3    within categories of revenue that, coupled with my

4    knowledge of the defendants, in particular Brown,

5    CalTech, Cornell, Dartmouth, MIT, and Penn and

6    Yale, that led me to believe that each of those

7    also have flexibility with -- each of those has

8    these six sources, five of which have inherent

9    flexibility to increase a contribution to financial

10   aid.

11        Q.   Okay.   Would you agree that the relative

12   size of these six different revenue sources varies

13   from school to school?

14        A.   Yes.

15        Q.   So some of the defendant schools may earn

16   sizable revenues from its, for example,

17   intellectual property royalties, where other

18   schools in this group may not earn very much from

19   that category?

20        A.   I agree with that.

21        Q.   The same would be true, for example, of

22   athletic revenues, correct?

23        A.   I agree with that.

24        Q.   One might not expect to see substantial



ELIZABETH MORA                                     October 29, 2024
CORZO V. BROWN UNIVERSITY                                       163

1    financial flexibility flowing from athletic

2    revenues at CalTech or MIT?

3         A.  I knew you were going to say that.  Yes.

4              (Simultaneous speaking.)

5              MS. KIRKPATRICK:  Okay.  Some of these

6    schools are not exactly in our athletic league.

7         Q.  Okay.  You did not undertake, I gather,

8    any overall or systematic quantification of the six

9    different categories of revenue of the 17 different

10   defendants, correct?

11        A.  I did not.

12        Q.  Putting aside the grants and contracts

13   category, which you've already agreed does not

14   entail the same degree of flexibility, is it your

15   view that other five categories are all equally

16   flexible in terms of discretionary spending or are

17   there differences between the flexibility that

18   flows from the other five categories of revenue?

19        A.  So let's go one by one.  Tuition is

20   unrestricted, it can be used to subsidize financial

21   aid.  Distributions from the endowment, to me, is

22   the most powerful engine of all the revenue

23   categories.

24              When I say grant and contract revenue,



1   what I mean is direct costs of grant and contract

2   revenue.  The indirect cost rate applied to grants

3   and contracts comes back to the university as

4   unrestricted, so it could be used.  And the

5   indirect cost is a percentage of their direct cost.

6   When I was there, it was 68 percent.

7          To the extent that annual donations are

8   directed toward financial aid or unrestricted, yes,

9   they can be used, athletic revenue could be used,

10  and IP could be used after the investigator --

11  usually there's a formula, the investigator gets a

12  percentage, the school gets a percentage, the dean

13  gets a percentage, and the legal fees are paid, and

14  then the rest is unrestricted.

15      Q.  Okay.  It sounds to me like the answer to

16  my question is the different categories of revenue

17  identified here have different degrees of

18  flexibility or restriction.

19      A.  Yes.

20      Q.  And given that you have not undertaken any

21  quantification or analysis of the six categories of

22  revenue and the 17 defendants, I take it that you

23  also have not undertaken to quantify the exact

24  amounts of revenue and the percentages of those



1   revenues that may be flexible or inflexible,

2   restricted or unrestricted on the 17 defendants,

3   correct?

4      A.   Correct.

5      Q.   During your couple of years as the CFO at

6   Harvard, was one of your goals to achieve a

7   balanced budget for the university?

8      A.   Goal, yes.

9      Q.   Okay. And what did you -- how would you

10   define a balanced budget in that context?

11      A.   Having a -- I would define a balanced

12   budget as having a slightly positive net asset

13   surplus.

14      Q.   When you say "slightly positive," what do

15   you mean by that?

16      A.   More than zero.

17      Q.   So you were looking to have at least one

18   more dollar in revenues coming in than the range of

19   costs and obligations and expenditures you had

20   going out?

21      A.   Correct.

22      Q.   You described that goal at paragraph 57 of

23   your report where you say, "At Harvard, we made it

24   one of our goals to be able to report on our public



1    funds can only be spent in support of fund's

2    designated purpose."

3        A.  Yes.  I see that.

4        Q.  So your recollection is inconsistent with

5    this, in that your recollection is that half of the

6    restricted endowment funds did not have

7    restrictions on the payout or the income?

8            MR. CIPOLLA:  Objection, form.

9        A.  Yes.  My recollection is that while I was

10   there, half of the restricted funds did not have

11   stipulations with respect to restricting the income

12   from the endowment.

13       Q.  Did you review any information or

14   materials about the 17 defendant universities in

15   terms of the percentage of their restricted

16   endowment that was associated with unrestricted

17   income?

18       A.  No.

19       Q.  So I take it that you are not offering any

20   opinion that the percentage that you recall from

21   your time at Harvard accurately corresponds to any

22   other defendant universities' endowment flexibility

23   in terms of income coming from restricted endowment

24   funds?



1    corresponded to its restricted endowment or that it

2    had flexibility as to some portion of its

3    restricted endowment principal and income?

4         MR. CIPOLLA:  Objection, form.

5       A.  As I said in my report, some of the

6    restricted endowment income was unrestricted.

7       Q.  And during your tenure at Harvard, the

8    proportion of endowment principal that was

9    restricted was what?

10      A.  85 percent.

11      Q.  85 percent.

12         And you have not evaluated how that

13   85 percent corresponds or doesn't correspond to the

14   percentage of restrictions applicable to any of the

15   defendants' endowments, correct?

16      A.  I have not.

17      Q.  So some of them may have a higher

18   percentage of restricted funds, some them may have

19   a lower percentage of restricted funds?

20      A.  Yes.

21      Q.  Have you looked at any individual

22   endowment funds or restrictions at any of the other

23   -- any of the defendant schools in order to

24   evaluate the terms or look at how they're



ELIZABETH MORA                                    October 29, 2024
CORZO V. BROWN UNIVERSITY                                     195

1    structured or anything along those lines?

2         A.  I have not.

3         Q.  And you're not offering any opinion on the

4    degree of flexibility that any of the 17 defendants

5    had for any particular proportion of their

6    endowment principal or endowment income, correct?

7         A.  No, I'm not offering any opinion on that.

8         Q.  In paragraph 50 you refer to the

9    unrestricted endowment funds, and you say that at

10   Harvard you regarded unrestricted endowment funds

11   as a source of working capital for the university

12   as a whole and for special projects.  And then you

13   go on to say that it's your understanding that that

14   was also true of the defendants.

15        Is that understanding based on anything

16   other than the general conversations you have

17   described with representatives of some subset of

18   the defendants?

19        A.  It is not based on anything other than

20   those conversations.

21        Q.  And, again, those were conversations that

22   took place during your tenure at Harvard.  You're

23   not relying on conversations postdating 2008,

24   right?



ELIZABETH MORA                                October 29, 2024
CORZO V. BROWN UNIVERSITY                               222

1          So I'm back in your report in paragraph

2    5.D.  Are you offering an opinion that schools,

3    Harvard and other schools, offer institutional

4    financial aid solely for the purpose of maintaining

5    excellence and prestige, or are you offering the

6    opinion that providing institutional financial aid

7    has the consequence of maintaining excellence and

8    prestige?

9          A.  The latter.

10          MR. CIPOLLA:  Objection, form.

11          A.  Financial aid was given to diversify the

12   student body, which served to create excellence and

13   prestige.

14          Q.  Going back to section VII of your report.

15   After the discussion of prestige, you have a

16   section beginning at paragraph 67 on endowments.

17          Do you see that?

18          A.  Yes, I do.

19          Q.  And you describe defendants and their

20   peers as competing with one another over endowment

21   size and endowment growth.

22          A.  Yes.

23          Q.  What do you mean when you say that

24   "defendants compete with each other over endowment



1    A.  Yes.

2    Q.  And the question there is the reason

3  institutional grants for institutional financial

4  aid are provided to students.  Is that one of the

5  questions that you were asked when you undertook

6  this engagement?

7    A.  Yes.

8    Q.  Which portion or portions of your opening

9  report addresses that question?

10    A.  I believe section VIII, paragraph 69.

11    Q.  Okay.  And does the remainder of section

12  VIII, carrying on through paragraph 75, also have

13  some bearing, or is it your view that paragraph 69

14  is the full response to that question?

15    A.  No.  It's paragraph 69, paragraph 70 and

16  paragraph 71, paragraph 72.

17    Q.  Okay.  So one of the purposes then of

18  institutional financial aid is, as you say in

19  paragraph 69, to enroll the most talented students;

20  is that right?

21    A.  Yes.

22    Q.  And that corresponds to providing the best

23  possible education because of the peer effect and

24  other dynamics that we've talked about; is that



ELIZABETH MORA
CORZO V. BROWN UNIVERSITY

October 29, 2024
235

1    right?

2        A.   Yes.

3        Q.   And what you described earlier as the role

4    of financial aid and diversifying the student body;

5    is that right?

6        A.   Yes.

7        Q.   Is the discussion that appears from

8    paragraph 69 to say 74, a sort of fulsome and

9    complete listing of all the reasons that the

10   university might provide institutional financial

11   aid?

12       A.   I don't -- I don't imagine it's fulsome

13   and complete.  I think these are rather the

14   highlights of why the university should provide

15   institutional financial aid.

16            Something that we have not talked about is

17   investing in the class so that the graduates look

18   favorably upon the institution as they enter their

19   lives and begin to find success.  So they remember

20   as alumni, the investment made in them and can

21   further the investment in -- by way of gifts so

22   that, again, the endowment continues into

23   perpetuity.

24       Q.   Yeah.  And we'll turn to that investment



1   rationale in just a moment.

2          But in terms of the sort of

3   diversification, quality of education, educational

4   mission component of institutional financial aid,

5   the opinions that you're offering here are based on

6   your experience and your personal observations of

7   Harvard; is that right?

8       A.  Yes.

9       Q.  Are you basing these opinions on any other

10  research analysis, et cetera?

11      A.  No.

12      Q.  But you did observe during your time at

13  Harvard, participate in conversations that the

14  diversification, the enrollment of talented

15  students and the pursuit of educational mission

16  were at least contributing reasons for Harvard's

17  administration of institutional financial aid?

18      A.  Yes, that's right.

19      Q.  So I want to turn now to paragraph 74 and

20  the point that you just made about institutional

21  financial aid as a form of business strategy for

22  seeking future donations to the university.

23          What's the basis for that rationale for

24  financial aid?



ELIZABETH MORA                                October 29, 2024
CORZO V. BROWN UNIVERSITY                                  237

1        A.   The basis is if someone feels that they

2   have been invested in, they're more likely to give

3   back to that investment.  It's a concept of, you

4   know, gratitude and loyalty.

5        Q.   Have you undertaken any analysis or

6   research into the sort of cost benefit of investing

7   into student's educational experience and how that

8   corresponds to returns in the form of later

9   donations or investments by those alumni back into

10  the university?

11       A.   I have not.  I just have anecdotal

12  information.

13       Q.   So that is an impression that you have

14  from your time at Harvard; is that fair?

15       A.   That's fair.

16       Q.   But you are not purporting to offer an

17  opinion that there is some economic analysis or

18  rationale underlying that?

19       A.   No.

20       Q.   And I take it you've not conducted any

21  analysis or study or research as to any of the

22  other schools, the 17 defendants, to assess whether

23  that rationale applies or is borne out economically

24  at those schools?



1    A.  I have not.

2    Q.  Okay.  Are you offering the opinion that

3    Harvard University as an institution used this

4    business strategy or investment return rationale as

5    the primary rationale for institutional financial

6    aid?

7    A.  No.  I'm not offering that opinion that

8    it's the primary.  It's one of many factors.

9    Q.  Okay.  So this is a rationale that you

10   observed or you believe you observed at Harvard,

11   but not the motivating rationale, in your view?

12   A.  Correct.  The motivating rationale was to

13   secure a diverse student body.

14   Q.  Okay.  I want to go back to something we

15   talked about right before we took the lunch break.

16   We were discussing section V of your report, and if

17   it helps to have it in front of you, that is the

18   section that begins at paragraph 20 on page 10.

19        And we were talking about your opinion,

20   which you clarified in your rebuttal report, is an

21   opinion that the defendants have certain

22   operational similarities to for-profit public

23   companies.

24        Do you recall that --



```
 1   of your departure?

 2        A.  Yes.

 3        Q.  Fair to say that your departure was

 4   unplanned and unexpected?

 5             MR. CIPOLLA:  Objection, form.

 6        A.  No.  It was -- that would not be fair to

 7   say.

 8        Q.  Okay.  Can you describe the reason for

 9   your departure in spring of 2008?

10        A.  I was recruited to Draper.  I had an issue

11   with my background check that needed my full

12   attention to resolve.

13        Q.  So you departed Harvard to go to Draper

14   because you preferred to work at Draper rather than

15   to remain the CFO of Harvard?

16        A.  Yes.  I was a little tired of the musical

17   chairs of presidents, and I felt Draper was more

18   stable and could afford me responsibility and

19   authority.

20        Q.  So your departure had nothing to do with

21   the substantial cash losses that Harvard suffered

22   in 2008?

23        A.  I left long before that.

24        Q.  Did the investment strategy in which
```



ELIZABETH MORA                                          October 29, 2024
CORZO V. BROWN UNIVERSITY                                            244

 1   Harvard's, or some significant portion of Harvard's

 2   cash reserves were invested alongside its

 3   endowment, was that a strategy implemented under

 4   your supervision?

 5        A.  That was a strategy that President Larry

 6   Summers insisted upon.

 7        Q.  Okay.  And it continued while you were

 8   CFO, correct?

 9        A.  Yes.

10        Q.  And then at some point in 2008, that

11   resulted in what was properly described as

12   catastrophic loss for Harvard?

13        A.  Yes.  I wasn't there, but yes.

14        Q.  When did you decide to pursue the Draper

15   Laboratories position as opposed to the Harvard CFO

16   position?

17        A.  I got a call in the early spring of 2008,

18   and I had several evening meetings over there.  But

19   a condition of my employment involved getting a

20   certain type of clearance, which I thought would be

21   fairly easy, but ended up not being as easy, and it

22   required my full time attention.  So I had kept

23   them hanging while this was going on and I just

24   needed to resolve it.

