PUBLIC VERSION

# EXHIBIT 24

# REPORT OF THE COMMON STANDARDS SUBCOMMITTEE TO THE 568 PRESIDENTS' WORKING GROUP

# June 2001

## CONTENTS

Executive Summary

Background

Introduction --- Creating a Consensus Approach to Need Analysis

Part I --- Need Analysis and Professional Judgment Issues

A. Divorced and Separated Families
B. Assessment of Business and Real Estate
C. Cost of Living Variances
D. Family and Student Assets
E. Home Equity
F. Retirement Allowance
G. Institutional Methodology Taxation Bands
H. Number of Siblings in College
I. Elementary and Secondary School Tuition Expenses
J. Extrapolating Assets
K. Day Trader Stock Issues
L. Medical Expenses
M. One-Time Income Adjustments
N. Special Expense Adjustments
O. Family Loan Debt

Part II --- Management and Process Issues

A. Tax Form Collection
B. Professional Judgment Guidelines Manual

CONFIDENTIAL
COFHE-02-00002603

## C. Limited Data Exchange

## Part III --- Recommendations for Future Work

## Appendices

> **Appendix A---Divorced/Separated/Single Parent Guidelines**
> **Appendix B---Treatment of Self-Employment/Rental Property**
> **Appendix C---Cost-of-Living Adjustment**
> **Appendix D---Treatment of Assets Held in the Student's Name**
> **Appendix E---Previous Educational Debt**
> **Appendix F---Limited Data Exchange**

---

## Executive Summary

The Subcommittee on Common Standards unanimously recommends that the 568 Presidents' Working Group adopt a new Consensus Approach to Need Analysis as outlined in the following Report.

In coming to this recommendation, the Subcommittee began with the assumption that the College Board's 1999 revision of the Institutional Methodology (IM) should serve as the starting point for our work.

The Subcommittee has reached broad consensus and makes specific recommendations in three areas:

- need analysis and professional judgment;
- management and process issues; and
- recommendations for future work and maintenance of the Consensus Approach.

### Recommendations

> **Need Analysis and Professional Judgment Recommendations —** Specific recommendations have been made in each of the following areas of need analysis:

A. Divorced and Separated Families
B. Assessment of Business and Real Estate
C. Cost of Living Variances
D. Family and Student Assets
E. Home Equity
F. Retirement Allowance
G. Institutional Methodology Taxation Bands

CONFIDENTIAL
COFHE-02-00002604

   H. **Number of Siblings in College**
   I. **Elementary and Secondary School Tuition Expenses**
   J. **Extrapolating Assets**
   K. **Day Trader Stock Issues**
   L. **Medical Expenses**
   M. **One-Time Income Adjustments**
   N. **Special Expense Adjustments**
   O. **Family Loan Debt**

**Management and Process Recommendations**

- **Tax Form Collection:** Before award preparation, collect all of the most recent tax and W-2 forms from all applicants.
- **Professional Judgment Guidelines Manual:** Develop a Professional Judgment Guidelines Manual that borrows heavily from the current CSS manual with modifications as appropriate.
- **Limited Data Exchange:** Move forward with a data exchange test using three small colleges with a large common applicant database

**Recommendations for Future Work Long-Term Maintenance of the Consensus Approach**

- **Maintaining a Consensus Approach:** Appoint a Need Analysis Committee to review and revise this methodology as appropriate. Our Subcommittee would be pleased to serve as the first such Committee.

- **Federal Methodology Concerns:** Support changes in federal law which currently disadvantage some students by excluding them from federal aid programs when a lower institutional parental contribution results in a reduction in federal eligibility.



We believe that this Consensus Approach to Need Analysis, if properly implemented and maintained, will eliminate much of the variance in need analysis that has been experienced in recent years. We do not view the Consensus Approach as a panacea, however. Need analysis procedures have traditionally depended on "professional judgment" applied locally. Although the Consensus Approach would standardize many policies now subject to professional judgment, it is important to recognize that no system will completely eliminate disparate results or the effects of individual institutional "packaging" decisions.

In developing its recommendations, the Subcommittee has focused on arriving at the "right" approach to determining parental ability to pay, without regard to potential cost implications. We expect that the adoption of our recommendations could significantly affect parent contributions in the aggregate and, in many cases, expected family contributions will be reduced. The impact of the recommendations is likely to vary from institution to institution depending on the school's applicant profile and the extent to

CONFIDENTIAL
COFHE-02-00002605

which similar adjustments are already included in their need analysis procedures.

Although the Subcommittee fully supports the Consensus Approach outlined in this paper, it is important to note that our recommendations can be expected initially to heighten the difficulties associated with the new IM and certain institutional changes that have been announced in the last few years. Specifically, both the new IM and certain need analysis modifications adopted unilaterally by individual schools have led to cases in which the institution's family contribution is less than the one derived from Federal Methodology, resulting in an over-award which limits or eliminates eligibility for federal funding. In an effort to deal with this problem the Professional Judgment Guidelines Manual will include a section on the various methods schools may wish to adopt to reconcile differences in results between institutional and federal need analysis.

The Subcommittee believes strongly that matters of professional judgment should be independent of the qualifications or desirability of a particular applicant to an institution. That is, rules should not be interpreted more leniently because an applicant will bring strong academic or athletic ability or other desirable qualities to the campus.

The Subcommittee is also concerned about restrictions that federal regulations place on the expenditure of need-based institutional aid funds. We believe that the Consensus Approach will produce fair parent contribution levels and that participating institutions should not be forced to disadvantage students by reducing the amount of institutional aid they may receive or excluding them from subsidized federal loans or work-study. We recommend, therefore, that the 568 Presidents' Working Group, singularly or in concert with other groups, petition Congress for relief in this critical area of institutional prerogative.

Finally, it is important to note that the Subcommittee views its efforts as the beginning of a long-term process. Some of the issues identified in our paper require further exploration and analysis. Moreover, implementation of the Consensus Approach will present, over time, new and unexpected issues and concerns. Likewise, technological advances will provide opportunities for improving and updating the recommendations outlined in the attached paper. Responding to these concerns will require the regular attention of an experienced standing Consensus Approach Need Analysis Committee and a continuing training effort for participants.

## Background

On April 18, 2000, the 568 Presidents' Working Group met and appointed a group of eight senior financial aid professionals to serve on a Common Standards Subcommittee and to report back to them concerning:

CONFIDENTIAL
COFHE-02-00002606

Case: 1:22-cv-00125 Document #: 755-26 Filed: 12/16/24 Page 6 of 29 PageID #:19587

*whether it is possible to reach agreement on common standards for determining financial need at the institutional level consistent with the Statement of Principles for need-based financial aid and as permitted by Section 568.*

The charge to the Subcommittee further requested that, in the pursuit of these goals, the panel:

- *address the principal issues that give rise to divergent need calculations;*
- *arrive at reasonable compromises in the areas where the principles may conflict;*
- *strive for recommendations supportive of a system that many schools could adopt while still being able to manage their individual aid resources;*
- *seek solutions that aspire to simplicity and consistency, that discourage manipulation of the system, and are realistic regarding the capacity of families to contribute to educational expenses;*
- *explore avenues to maintain a system supportive of a Consensus Approach to Need Analysis, if one is adopted.*

The work of the Subcommittee was in turn guided by a statement of Need Analysis Principles adopted by the 568 Presidents at that meeting. These Principles are as follows:

## FINANCIAL AID PRINCIPLES

1. To the extent they are able, parents and students have the primary responsibility to contribute to educational expenses before an institution awards financial aid.
2. Families should contribute to educational expenses according to their ability. Those with similar financial profiles should contribute similar amounts.
3. Institutions should evaluate both income and assets as part of the assessment of the parents' and applicants' ability to pay.
4. Each institution should inform applicants about the policies and practices it applies when measuring a family's ability to pay, carry out its policies consistently throughout a student's eligibility, and support the awarding of need-based aid.
5. An institution that allocates any financial assistance that is not based exclusively on need should inform all prospective applicants of the standards it applies in allocating that aid.
6. The exercise of "professional judgment" by financial aid officers in assessing a family's ability to pay should recognize unique or extenuating financial circumstances in individual cases; such professional judgment is not the proper mechanism for systematically

CONFIDENTIAL
COFHE-02-00002607

treating groups of students differently in order to advance institutional objectives.

The Common Standards Subcommittee held two face-to-face meetings as well as conducted numerous conference call meetings and regular exchanges of various draft documents via e-mail. The recommendations that appear below represent the best efforts of the Subcommittee to develop a Consensus Approach that is both consistent with the Need Analysis Principles adopted by the 568 Presidents and is compatible with the financial aid policies of institutions committed to the values that underlie the 568 Presidents' Statement of Principles.

The Subcommittee recommends that the 568 Presidents agree to adopt and implement a Consensus Approach for determining the financial need of applicants. This Consensus Approach would have certain key components, including: 1) common elements of need analysis as described below; 2) a common calendar for the collection of data from families; 3) a means of training aid professionals in the application of the Methodology; 4) an oversight group to review and modify the methodology as needed over time; and 5) to the extent allowed by law, a data sharing capability among eligible institutions in order to evaluate institutional consistency in the application of the Methodology.

It is the Subcommittee's strong recommendation that, where possible, the professional expertise and program services of the College Scholarship Service (CSS) of the College Board be used as resources to advance the implementation of a Consensus Approach. In addition to their long-standing role as the primary data collection agency, CSS services can also assist with the modeling of various recommendations in order to assess their impact on both families and institutions.

Finally, because need analysis is a complex and detailed process requiring the examination of many dozens of elements to measure a family's ability to pay, several recommendations of the Subcommittee are inconclusive and will require additional discussion and research. In this sense this report to the Presidents should be viewed as an "organic" document. While containing a number of quite specific recommendations for the implementation of a Consensus Approach, it is only the first step in an ongoing process to develop a need analysis system that seeks to assure fair and equitable access to educational opportunity.

## Introduction -- Creating a Consensus Approach

## to Need Analysis

CONFIDENTIAL
COFHE-02-00002608

In response to the charge of the 568 Presidents' Working Group, the Common Standards Subcommittee has reached agreement on a series of common need analysis standards designed to be included in a Consensus Approach to Need Analysis. We believe that this Consensus Approach, if applied in a consistent manner, would go a long way toward eliminating the divergent results that now threaten the long-standing tradition of awarding aid on the basis of need. It is important to note that our efforts have been restricted to policies affecting first-year awards only. The issue of school-to-school inconsistency applies primarily to first-year students and we believe that it is necessary for financial aid officers to retain as much flexibility as possible in dealing with their already-enrolled students. Moreover, any budgetary issues associated with these recommendations will be moderated by implementing a phase-in one class at a time.

Our Subcommittee began its work with the understanding that the College Board's Institutional Methodology (IM), as revised in 1999, would serve as our starting point. Consequently, we have focused on those aspects of the current IM that are most often subject to local interpretation or professional judgment. We have attempted to approach our work with an eye toward serving the "greater good" rather than our individual institutions' needs and capabilities. This required compromise in some cases, but we believe that we have remained true to both the institutional and professional principles that undergird our efforts.

At the Subcommittee's first meeting, we reviewed our charge and began the difficult task of reviewing a need analysis methodology that, with revisions, has been in place nationally for more than forty-five years. We discussed the new IM at some length and agreed that the revisions included in this Consensus Approach have been helpful in removing some of the problems inherent in the previous methodology.

Building on the items included in our initial charge, we developed a list of those issues that required further review. A number of less complex issues were resolved at our first meeting. Several more complicated issues required the appointment of small working groups. Issues addressed by the working groups included: 1) the creation of a regional cost-of-living adjustment; 2) the treatment of small business issues (and real estate ventures); 3) the treatment of divorced and separated parents; 4) the development and testing of a post-award data sharing project; and 5) the creation of a Professional Judgment Guidelines Manual to be made available to all institutions making use of the Consensus Approach.

In developing its recommendations, the Subcommittee has focused on arriving at the "right" policy without regard to the potential cost implications. We would expect that adoption of these common sense recommendations could serve to reduce expected parent contributions in the aggregate. As noted in earlier 568 Group discussions, schools will be free to deal with institutional resource issues through their packaging policies.

CONFIDENTIAL
COFHE-02-00002609

We have attempted, as charged, to err on the side of simplicity. Some of the issues, however, do not lend themselves to a simplified process. Matters relating to divorced and separated parents and the analysis of small business enterprises are two such examples. We believe, however, that our collective interest in achieving a fair and equitable result justifies the added complexity associated with our recommendations in these two areas. Additionally, we believe that the new IM, as amended by our recommendations, will encourage savings for college and recognizes that a family's ability to pay is largely a function of a) its financial strength and b) the number of children they will have been required to educate. In the area of discouraging asset manipulation, our recommendations begin the process of addressing this problem, but more work needs to be done in this difficult area.

Our recommendations and this paper are divided into three sections: Part I --- Need Analysis and Professional Judgment Issues; Part II --- Management and Process Issues; and Part III --- Recommendations for Future Work.

## Part I --- Need Analysis and Professional Judgment Issues

At the core of the need analysis system is the accepted methodology for treating each element that goes into determining a family's ability to pay. We have examined fifteen specific and important areas and we recommend a common standard to deal with each.

### A. Divorced and Separated Families

**Recommendation:** Both natural parents are expected to cooperate and provide financial information and, if one or both of the custodial parents has remarried, both natural parents and the stepparent(s) are expected to cooperate. Exactly how the information is used in measuring the student's need would be based upon other considerations and additional guidelines to be provided.

**Discussion:** Of the many challenges facing the financial aid office, treatment of the divorced and separated family is clearly one of the most vexing. As a result, locally applied professional judgment varies from campus to campus, substantially contributing to inconsistency in parent contributions. We anticipate that the use of the Professional Judgment Guidelines Manual by participating institutions will lead to reasonably consistent parent contributions. Our Subcommittee's recommendations in this critical area are outlined in Appendix A.

CONFIDENTIAL
COFHE-02-00002610

## B. Assessment of Business and Real Estate

**Recommendation: Continue to exclude business and rental losses from the calculation of income in central processing; add back rental depreciation; impute rental property value; redesign Business/Farm Supplement Form to improve quality of data; seek expert advice on various adjustments; and ask CSS to keep us informed of and involved in their work in this area.**

**Discussion: An increasing number of our applicant families present complex business and real estate profiles for our review and this complexity makes central processing of this information impossible. Consequently, financial aid professionals have attempted to make sense of this information with varying levels of experience, expertise, and applicant-provided information. More experienced aid officers have learned to apply a "sixth sense" to these cases, while those with little experience and limited staff resources are often forced to deal with these applicants as if they were salaried employees rather than as self-employed business persons or entrepreneurs. Understandably, the self-employed family's calculated ability to pay often varies significantly from campus to campus. Because business and real estate issues may not always lend themselves to central processing, we propose to standardize local treatment of these matters. The details of our recommendations can be found in Appendix B.**

## C. Cost of Living Variances

**Recommendation: Monitor new developments and refine procedures on this issue over time.**

**Discussion: It is widely understood that cost of living in Manhattan, Kansas, is substantially different than it is in Manhattan, New York. Although the current Institutional Methodology offers a local option that provides cost-of-living adjustments in a few metropolitan areas, the central calculation does not. This failure reduces the "face validity" of current parent contributions and must be corrected. Although we considered a series of options ranging from zip code to regional adjustments, we have determined that the expanded metropolitan cost-of-living structure previewed in Appendix C and provided to users electronically. As new technologies and pricing models are developed we would expect to refine our approach further.**

## D. Family and Student Assets

**Recommendation: In general, student assets and assets held in college savings programs and pre-payment tuition plans are to be treated as family assets.**

**Discussion: Traditional need analysis procedures have examined parent and student assets individually, assessing separate contributions from the**

CONFIDENTIAL
COFHE-02-00002611

Case: 1:22-cv-00125 Document #: 755-26 Filed: 12/16/24 Page 11 of 29 PageID #:19592

resources of each. Assets held by the parent are assessed at a marginal taxation rate of 5%, while student assets are taxed at 25% (35% in the old methodology and FM). This separate treatment of assets has been deemed appropriate in the past because a student should participate fully in the financing of his or her education. Parents, on the other hand, must pay for their children's educational expenses, support their families, and prepare for retirement, all from the same resources. When families take advantage of the lower tax rates by saving for college in their children's names, they must often make significantly higher contributions towards college expenses because of the higher rate of student asset assessment. We believe that this result is inappropriate and that parents who attempt to prepare for college expenses in this way are being unfairly penalized. Moreover, the harsh treatment of assets held in the student's name encourages families to spend or transfer those resources in an effort to circumvent the financial aid system.

Our Subcommittee recommends that all assets be viewed as family assets and be assessed at the lower parental rate. As a result of recent IM revisions, sibling assets are already viewed as family assets. Treating student assets as family assets will insure consistency in the treatment of all family-owned assets. While we recognize that student trust funds and particularly large student asset accumulations will and should be the subject of professional judgment, as a general principle, all family assets should be treated as parent assets. This policy will encourage further saving for college. (See Appendix D.)

## E. Home Equity

Recommendation: Count home equity capped at 2.4 times income minus mortgage debt with professional judgement adjustments in individual cases.

Discussion: Congress's decision to remove home equity from the federal formula has been a major factor in the confusion now surrounding need-based aid awards nationally and particularly at institutions like ours. The absence of home equity in the federal formula has meant that for many families contributions based on the Federal Methodology have often been considerably lower than those calculated via IM. For reasons relating to both fairness and competition, institutions have begun to vary the manner in which home equity is considered. At some institutions, these policy changes have been applied across the board. At others the treatment of home equity has been applied selectively based on the applicant's circumstances or the institutional admissions rating.

Our subcommittee believes that home equity can be an important indicator of a family's financial strength and that it should be considered in need analysis. We believe that most of our 568 Group colleagues, as well as a significant number at other institutions, agree with this proposition; however, we feel that the current practice of capping home equity at 3 times

CONFIDENTIAL
COFHE-02-00002612

income ignores the fact that home equity is an asset that is less liquid than other forms of assets and less readily available for financing education expenses. We also feel that it is important to realize that one's home is both an investment good and a consumption good. While other assets are held strictly for the appreciation in wealth that they may bring (an investment good), one's home is also a good from which housing services are currently provided and non-pecuniary factors are important (a consumption good). The current methodology ignores the consumption value of the home and treats it strictly as an investment good like any other asset. For these reasons, and to narrow the divide between the treatment of home equity in the FM and the Consensus Approach we recommend capping the value of the home at 2.4 times income. Because many 568 institutions already adjust home equity in some fashion, we feel that this recommendation will encourage consistency in the treatment of this important asset.

### F. Retirement Allowance

**Recommendation: Create a retirement allowance for families not now covered by a formal retirement plan.**

Discussion: Until its recent revision the standard IM treatment of assets included a retirement allowance provision for all families. This provision was created at a time when most families expected that Social Security would serve as their principle source of retirement income. The IM retirement allowance was designed to supplement the family's Social Security income during retirement. Because most families are now covered by formal, privately owned retirement plans not considered in need analysis, CSS determined that the IM retirement allowance was no longer necessary. It was eliminated and formal educational savings and family emergency savings allowances were added.

Our Subcommittee believes that it is appropriate to provide retirement protection for those families not covered by a formal retirement plan. We recommend that such an allowance be created in consultation with CSS and other experts in the field of retirement planning. Our Subcommittee recognizes that this will require CSS to add one, possibly two questions on the PROFILE form. In the short term, we recommend that the current Federal Methodology (FM) asset protection (retirement allowance) tables be used, if necessary.

We understand that CSS plans a long-term project in which they will review retirement assets currently held by applicant families. Although our Subcommittee does not necessarily agree with the inclusion of such assets in the need analysis formula, we are interested in supporting and participating in this project.

CONFIDENTIAL
COFHE-02-00002613

Case: 1:22-cv-00125 Document #: 755-26 Filed: 12/16/24 Page 13 of 29 PageID #:19594

## G. Institutional Methodology Taxation Bands

**Recommendation: No change until further study assesses their impact**

**Discussion:** Institutional Methodology is a highly progressive formula designed to determine the family's ability to pay through a careful review of their overall financial circumstances. An Income Protection Allowance (IPA) does not define the amount of money required by most families to cover their living expenses–in fact it is much lower than that. Instead, it represents the income level below which a family has no discretion about how its income is spent. Parents with incomes at or below the IPA are not asked to make contributions at all to their children's educational costs. Those with higher incomes have more choices about how they spend their income and are expected to use some fraction of their income to pay for their children's education. Because of concerns about the progressivity of the IPA, the new IM has recalibrated the lower-income taxation bands and reduces the highest band by one percent.

After a great deal of consideration, we have concluded that a better understanding of the impact these changes have on the new IM is needed. Given this uncertainty and the additional methodological changes recommended elsewhere in this paper, we believe that it is important to understand the impact of the revised tables as part of developing a Consensus Approach. Consequently, we recommend that no additional adjustments be made at this time. We propose, instead, to study this critical aspect of the new IM over the next three years, making any appropriate changes at that time.

## H. Number of Siblings in College

**Recommendation: Adopt the revised Institutional Methodology formula for multiple siblings in college.**

**Discussion:** In recent years the need analysis formula divided the total parent contribution by the number of siblings enrolled in college to derive an expected parent contribution for each sibling. This approach meant that families with children spaced closely together were advantaged when applying for financial aid while families with children born farther apart were penalized. Concerns about the inequity resulted in a restoration of the original rationale in IM that considers the number of children enrolled simultaneously, but instead of dividing by the number in college it reduces the calculated Parent Contribution by 40% for two in college and by 55% if three are enrolled.

CONFIDENTIAL
COFHE-02-00002614

A number of institutions ignored this change because they were concerned about the impact that reduced aid eligibility might have on enrollment. After a great deal of consideration, our Subcommittee recommends that the current IM treatment of the number of siblings in college be included in the Consensus Approach.

Additionally, we recommend that the Consensus Approach include the following policy clarifications:

    A. Siblings enrolled in graduate or professional school will not be counted as in college (but will be included in household size) unless the family can document that the institution has determined that the student is dependent for aid purposes and that the parents are paying the assigned parent contribution.

    B. Parents will not be counted as family members in college. If, however, the parent's current job requires course work or they need to be retrained after losing a job, the institution may include as a consideration the amount of such unreimbursed tuition.

A related issue is the consideration of previous educational debt the parents may have accumulated when educating other children. This issue is addressed in Section O below.

## I. Elementary and Secondary School Tuition Expenses

Recommendation: Employ the Institutional Methodology optional treatment of such expenses.

Discussion: Unlike the Federal Methodology (FM), both the old and new IM formulas offered the option of counting elementary and secondary school expenses. In each case the tuition allowance cap for each sibling is based on a national average of the annual cost of elementary/secondary school tuition. We recommend that this IM formula option be made a standard part of the Consensus Approach. Tuition expenses in excess of the cap would generally not be considered.

Although the Federal Methodology ignores elementary and secondary school expenses, most 568-type schools already use the IM formula.

## J. Extrapolating Assets

Recommendation: Employ the Institutional Methodology treatment of extrapolating assets.

Discussion: Cash and investment assets reported by both parents and students often fail to correlate with interest and dividend income as reported

CONFIDENTIAL
COFHE-02-00002615

on federal tax forms. Institutions use a variety of formulas to extrapolate the asset holdings implied by the reported income. We recommend that the Consensus Approach incorporate the annually updated IM option for extrapolating assets where the result exceeds reported assets. If available information does not allow CSS to make this adjustment centrally, local adjustments will utilize the annual CSS multiplier.

## K. Day Trader Stock Issues

**Recommendation: Professional Judgment Guidelines Manual Issue.**

**Discussion:** An increasing number of financial aid applications show income earned from "day trading" in stocks. The large volume of stock trades reported on tax forms often makes it very difficult to verify family holdings. Given the complexity of this issue we recommend that a consultant be retained to develop language to be included in the Professional Judgment Guidelines Manual.

## L. Medical Expenses

**Recommendation: Employ the Institutional Methodology treatment of such expenses.**

**Discussion:** Families whose unreimbursed medical expenses exceed 7.5% of income may deduct these expenses when completing their federal tax forms. Unlike the Federal Methodology, which ignores these costs, current IM considers unreimbursed medical expenses that exceed 4%. We recommend that the current IM treatment of medical expenses be included in the Consensus Approach. In cases of extreme medical expenses, professional judgment guidelines should be applied locally.

## M. One-time Income Adjustments

**Recommendation: Exclude certain non-recurring income.**

**Discussion:** Families often request that the income used for need analysis be reduced to reflect non-recurring income. Such income might include certain capital gains, withdrawals from pension plans, IRA rollovers, or unemployment income. We suspect that most 568-type schools already reduce need analysis income by documenting one-time-only income and we recommend that this practice be incorporated into the Consensus Approach. Specifically not included would be over-time and bonus income unless the parent's employer can document a related change in company policy.

CONFIDENTIAL
COFHE-02-00002616

### N. Special Expense Adjustments

**Recommendation: Consider the impact of certain non-reoccurring, non-discretionary expenses.**

**Discussion: Families often incur one-time only, non-reoccurring expenses that can significantly affect their ability to support educational costs. These expenses can include costs associated with parental care, funeral expenses, uninsured natural disasters, and extraordinary home repair costs. Treatment of such costs varies from campus to campus and contributes to the variability in need analysis results. The Professional Judgment Guidelines Manual will include specific recommendations on how institutions can respond to these expenses.**

### O. Family Loan Debt

**Recommendation: Recognize educational debt under certain circumstances.**

**Discussion: Many parents support their children's costs of education by borrowing through formal programs such as PLUS as well as informal programs including home equity and pension fund loans. Repayment of these funds exacerbates the difficulty associated with supporting future educational expenses. As outlined in Appendix E, we recommend that the Consensus Approach include consideration of these expenses.**

## Part II --- Management and Process Issues

**Our Subcommittee also discussed what steps might need to be taken to assist with the maintenance and management of a new common standard of need analysis if it were to be adopted by a significant number of institutions.**

### A. Tax Form Collection

**Recommendation: Collect all of the most recent tax and W-2 forms from all applicants.**

**Discussion: While most 568-type institutions require families to submit their most recent tax forms (all pages and all schedules) before releasing financial**

CONFIDENTIAL
COFHE-02-00002617

aid resources for account payments, application requirements for first-year students vary considerably from institution to institution. Some institutions will not prepare first-year awards until the family submits either their most recent or prior year tax forms. Others use tax forms if they are available, verifying awards after the fact when tax documents are received. Some institutions require W-2 forms and others do not. We believe that this lack of uniformity in tax form usage could be a source of the variance in measuring the family's ability to pay.

As a general policy, we recommend, therefore, that institutions subscribing to the Consensus Approach require that families be asked to submit their most recent tax forms (personal and, where appropriate, corporate) and all W-2 forms before first-year aid awards are prepared. If families have not completed their most recent year tax forms when applications are due, these forms should be submitted no later than May 1 of the application year. While we expect that this policy may require a calendar change at some institutions, it should not increase the workload significantly at most schools. But it will insure that participating institutions subscribe to recognized and formal verification procedures prior to providing a final financial aid notification.

While we believe that the timely receipt of tax forms will result in more consistent aid awards, we recognize the importance of being able to complete first-year aid offers expeditiously. We further understand that there will be families with uncomplicated financial circumstances where a delay in award preparation would disadvantage both the family and the institution. Consequently, the Professional Judgment Guidelines Manual will outline those circumstances where it will be appropriate to prepare the aid award before tax forms are received.


B. Professional Judgment Guidelines Manual

Recommendation: Create a Professional Judgment Guidelines Manual that borrows heavily from the current CSS manual with modifications as appropriate

Discussion: As mentioned several times in this paper, we propose that institutions participating in the Consensus Approach be provided with a Professional Judgment Guidelines Manual. We recognize that locally applied professional judgment is a critical component of need analysis and it is not our intention to eliminate or restrict this practice. Instead, this manual will be designed to standardize both those issues that should be treated locally and, to the extent possible, the manner in which such issues are handled.

Rather than reinvent the proverbial wheel, we have collected the tried-and-true professional judgment advisories prepared by the CSS and others. We expect to modify these where appropriate and add others as needed. Those advisories will be collected and developed by our

CONFIDENTIAL
COFHE-02-00002618

Case: 1:22-cv-00125 Document #: 755-26 Filed: 12/16/24 Page 18 of 29 PageID #:19599

Subcommittee for dissemination at a later date.

Finally, the issue of training is critical to the success of the Consensus Approach. Staff members, especially new hires, must be trained in the Methodology. Time and resources should be devoted to both in-house and group activities.

## C. Limited Data Exchange

Recommendation: Move forward with a data exchange test using three small colleges with a large common applicant database

Discussion: In addition to seeking agreement on the Consensus Approach, we have explored ways of developing a data exchange program as permitted by the MIT Settlement Standards of Conduct. Amherst, Wesleyan, and Williams have agreed to participate in this project. (See Appendix F.)

---

# Part III --- Recommendations for Future Work

Maintaining a Consensus Approach to Need Analysis: It is important to note that the creation of a Consensus Approach should be viewed as an on-going process. Should our recommendations result in the development and implementation of a Consensus Approach we recommend that a Need Analysis Committee be appointed to review and revise this methodology as appropriate. Our Subcommittee would be pleased to serve as the first such Committee.

Federal Methodology Concerns: Current regulations specify that an award containing federal Title IV funds (Federal Work-Study, Perkins, SEOG, and subsidized Stafford loans), must not exceed the eligibility established through Federal Methodology (FM). Due to the standard Institutional Methodology, we already have a number of cases in which the institutional contribution is lower than the federal. The Consensus Approach is likely to increase the number of such cases.

Current approaches to the problem vary. Some schools default to the higher federal contribution while others use the lower institutional contribution and package institutional grant and unsubsidized federal loan. Still others use the lower institutional level and package institutional grant, subsidized institutional loan, and institutional work.

CONFIDENTIAL
COFHE-02-00002619

We recommend that the 568 Presidents' Working Group support efforts for legislative relief in this critical area. If the Consensus Approach produces fair contribution levels, we should not be in a position of disadvantaging students either in the amount of aid that they receive or by excluding their eligibility for subsidized federal loans or Work-Study.

# APPENDICES

**Appendix A---Divorced/Separated/Single Parent Guidelines**

**Appendix B---Treatment of Self-Employment/Rental Property**

**Appendix C---Cost-of-Living Adjustment**

**Appendix D---Treatment of Assets Held in the Student's Name**

**Appendix E---Previous Educational Debt**

**Appendix F---Limited Data Exchange**

CONFIDENTIAL
COFHE-02-00002620

# APPENDIX A

## Divorced/Separated/Single Parent Guidelines

**Current Treatment:** There is no consistent way of evaluating the financial need of students whose natural parents are not married to each other. While some institutions attempt to secure data from both parents in order to determine what is a reasonable contribution from each, the effort is not always successful. The process is often made more complex because of the re-marriage of one or both natural parents. In addition, Federal Methodology (FM) completely excludes non-custodial data.

**Proposal:** We propose to begin with the custodial family unit and then seek additional information concerning the non-custodial family unit. In the case of re-marriage of either or both natural parents, the standard approach would be to request the cooperation of and information from all parents and spouses. Generally, a contribution from the income and assets of no more than two parents will be expected. Institutions could exercise judgment to use information from more than two parents. Guidelines would be published for applicants in difficult circumstances who fall outside of the standard procedures.

**Rationale:**

- Having a consensus on policy and procedure for calculating parental support will reduce significant variances in measuring need among institutions.
- As with students whose parents are married to one another, ability to pay, not willingness, should be used to determine the expected parent contribution.
- Parents divorce one another, not the child.

**Issues:**

- Determining when to waive the requirement of information/cooperation from the non-custodial parent
- Different treatment by FM leading to expectations that non-custodial information will not be sought or used to derive a higher parental contribution level.
- Inconsistencies in the treatment of stepparent information when either or both natural parents have remarried.
- Difficulty in maintaining policies due to the influence of competitive enrollment marketing pressures.

**Implementation/Resolution of Issues:** Guidelines will be included in the Professional Judgment Manual.

CONFIDENTIAL
COFHE-02-00002621

# APPENDIX B

## Treatment of Self-Employment/Rental Property

**Current Treatment:** Federal Methodology (FM) has no special provisions for self-employment or rental income. Standard Institutional Methodology (IM) eliminates business losses. Many institutions make professional judgment changes, e.g., adding back business and/or rental depreciation and/or a percentage of business expenses, or falling back on a bottom-line adjustment to the parent contribution (PC) to better reflect what they think the family can afford.

**Proposal:**

- **Continue to exclude business losses from income.**
- **Create an aid officer's guide to need analysis for self-employed families that would include procedures for identifying when families have business income, documentation requirements, and methodologies for translating reported net business income into a figure that more accurately reflects their true financial strength. (We expect to work closely with the CSS, which has already engaged a third party to do this project.)**
- **Add back rental depreciation to income.**
- **Add back any remaining rental loss to income.**
- **Impute rental property value from rental income and/or purchase price and year of purchase.**

**Rationale:** The experience of most financial aid administrators is that self-employed families are usually financially stronger than wage-earning families with similar adjusted gross incomes. Rental property depreciation, while allowable for income tax purposes, is a paper loss and distorts families' real incomes. To the extent other components of the methodology (e.g., a cap on home value) are linked to income, the methodology should use as realistic an income as possible. There should be objective measures to assess rental property value, just as there are with home value, rather than relying merely on family-reported data.

**Issues:** There may be increased document/data collection required, although many schools collect much of it already. Adjustments to self-employment income, while they probably yield a more reasonable and equitable result, may present a challenge with regard to face validity of the rationale. (For this reason, we believe much of this issue has to be addressed through guidelines and professional judgment, rather than in a standard calculation.)

**Implementation/Resolution of Issues:** Work closely with CSS and their contractors in the development of a self-employed guidelines handbook. Identify data capture requirements to support recommended changes to the standard methodology.

CONFIDENTIAL
COFHE-02-00002622

# APPENDIX C

## Cost-of-Living Adjustment

**Current Treatment: The current Institutional Methodology uses a uniform, basic living expense allowance. Although it is generally recognized that living expenses vary significantly in different geographic areas, the standard calculation does not consider these variations. The current methodology includes an option that allows institutions to adjust the living allowance for applicants from a small number of metropolitan areas. Unfortunately, the optional cost-of-living adjustment now available does not offer the breadth or accuracy required to properly consider cost-of-living variances.**

**Proposal: We believe that the number of locales needs to be expanded and that research is needed to develop a reliable cost-of-living adjustment methodology. Given the difficulty (and often the inappropriateness) of developing a cost-of-living table that works at the micro-geographic level, we have determined that a table describes differences in cost-of-living at the metropolitan level is most desirable.**

**Rationale: We all recognize that living in Manhattan, Kansas, requires less non-discretionary income than living in Manhattan, New York. However it is very difficult to draw exact lines for the purpose of defining cost-of-living areas. Where does the high cost of living in NYC stop? Which suburbs are included? While there would be a desire to develop a table that defined cost-of-living areas at the micro level, we realize that, even within a zip code, housing values can differ significantly. Gathering detailed information to define a micro-level table would be extremely difficult and would have questionable long-term reliability.**

**In addition to the concerns about differences in cost-of-living within metropolitan areas, we are concerned about another issue. We find it difficult to deal with the variety of choices that families make. One family might choose to live in an upscale suburb while another family with the same income might choose a lower-cost area. Giving one family a higher allowance to account for their decision to enjoy a higher standard of living would be unfair and inappropriate. It is also virtually impossible to distinguish between true cost-of-living issues and standard-of-living differences within metropolitan areas. Again, the metropolitan area table would resolve this problem.**

**Issues**

- **Identification of the boundaries of major metropolitan areas within which there is a reasonably uniform cost of living.**

- **Identification of the appropriate market basket of goods and services to be used to define cost-of-living indices. In particular, we need to**

CONFIDENTIAL
COFHE-02-00002623

exclude state and local taxes, which are allowed separately in both IM and FM.

**Resolution of Issues:** The question of how to adjust the need analysis formula to account for geographical differences in the cost-of-living is complex and the solutions are likely to change over time. Consequently, our Subcommittee believes that it will be necessary to establish procedures by which cost-of-living standards can be reviewed and updated annually. In the short term we recommend that the attached cost-of-living tables be used in the Consensus Approach. These tables are based on the Bureau of Labor Statistics Consumer Expenditure Survey (CES), a data source that is used throughout the current IM formula. The tables include 28 metropolitan areas from a wide range of geographic areas. They also do not include the impact of local and state taxes, thereby, avoiding an issue that taints other cost-of-living studies. It is recommended that the table be used only to increase IPAs, not decrease them. Using the table to decrease IPAs would be unfair to students from cities with lower housing costs because we would not be lowering IPAs for students from rural areas or cities not covered by the table.

We believe that this issue requires collaboration with CSS's Financial Aid Standards and Services Advisory Committee. That group has begun work on the cost-of-living issue and we look forward to lending out support to their on-going efforts in this regard. Given the complexity of the issue and the amount of time that it will take to come to resolution, it is appropriate to expand the number working on the problem.

CONFIDENTIAL
COFHE-02-00002624

# SAMPLE COST OF LIVING INDEX TABLE

| CITY | ST | COLA |
|------|-----|------|
| Washington | DC | 1.15 |
| New York | NY | 1.13 |
| San Francisco | CA | 1.11 |
| Boston | MA | 1.10 |
| Atlanta | GA | 1.09 |
| Anchorage | AK | 1.08 |
| Los Angeles | CA | 1.08 |
| Chicago | IL | 1.08 |
| San Diego | CA | 1.07 |
| Philadelphia | PA | 1.07 |
| Honolulu | HI | 1.07 |
| Minneapolis | MN | 1.06 |
| Dallas | TX | 1.06 |
| Baltimore | MD | 1.06 |
| Seattle | WA | 1.05 |
| Houston | TX | 1.05 |
| Miami | FL | 1.05 |
| Portland | OR | 1.04 |
| Milwaukee | WI | 1.04 |
| Pittsburgh | PA | 1.03 |
| Cincinnati | OH | 1.02 |
| Cleveland | OH | 1.02 |
| Denver | CO | 1.00 |
| Phoenix | AZ | 1.00 |

**Return to the report**

CONFIDENTIAL
COFHE-02-00002625

Case: 1:22-cv-00125 Document #: 755-26 Filed: 12/16/24 Page 25 of 29 PageID #:19606

## APPENDIX D

### Treatment of Assets Held in the Student's Name

**Current Treatment:** Student assets are treated separately from parental assets in the current institutional and federal analyses. They are assessed at 25% in Institutional Methodology (IM) and 35% in Federal Methodology (FM). In IM, sibling assets are added to parental assets; the assessment rate is approximately 5% on these joint family assets. Assets in pre-paid tuition and savings plans are treated in Federal Methodology as a direct resource that reduces financial need dollar for dollar.

**Proposal:** We propose to include student assets and assets held in pre-paid tuition and savings plans in the analysis of family assets.

**Rationale:** This treatment has several advantages over the current system:

It is consistent with the treatment of sibling assets since they are already added to parental assets in IM. Since it minimizes the assessment rate of student assets, it reduces the incentive to manipulate assets by spending or transferring student assets prior to applying for aid. It is also consistent with new public policy initiatives that encourage families to participate in plans offering pre-paid tuition and/or savings plans.

**Issues:** There are several issues that need to be resolved:

- **The cost of treating student assets at a lower rate of assessment (5% versus 25%) will be significant for many institutions.**
- **Professional judgment will need to be exercised in cases where this treatment might not be appropriate. An example is the case in which large assets are given to the student by third parties, such as grandparents.**
- **Since the federal system still assesses student assets at 35% and treats pre-paid plans as direct resources, our recommendation may result in federal overawards.**

**Implementation/Resolution of Issues:** We recommend a phase-in of the new treatment of student assets, beginning with the first year class. It would minimize the budgetary impact and the number of cases in which the family contribution falls below the federal level. In addition, a broad examination of family assets might result in somewhat higher assessment rates on parental assets. Our Subcommittee or a future working group will need to formulate standards of professional judgment covering those cases in which assets held in the student's name are to be treated as student resources. Due to the federal issues involved, we recommend placing the proposal on future legislative agendas.

CONFIDENTIAL
COFHE-02-00002626

**Return to the report**

CONFIDENTIAL
COFHE-02-00002627

# APPENDIX E

## Previous Educational Debt

**Current Treatment: Previous educational debt of parents and students is ignored in both Institutional Methodology (IM) and Federal Methodology (FM). The CSS Profile collects some data for information purposes only. Professional judgment may be exercised in addressing certain situations where such debt affects the ability to contribute, but the treatment is inconsistent across institutions.**

**Proposal: We propose that the Consensus Approach include allowances for documented debt incurred for the higher education of the applicant, the applicant's siblings, and the applicant's parents. Allowances for such debt would be made against parental assets and/or income:**

1. **The outstanding principal balance of any such loans would be allowed against parental assets.**
2. **Annual payments on such loans would be allowed against income only in those cases where, if the education were not concurrent with the applicant's, an allowance would be made for the current educational expense:**

    a. **Loans incurred for a sibling's undergraduate schooling**
    b. **Loans incurred for a parent's higher education if required for the parent's employment or was for job retraining.**

1. **Annual payments would not be allowed for loans incurred for the applicant, or for the sibling in a program in which he or she is currently enrolled (and whose expenses are therefore considered in the adjustment for multiple siblings in college).**

**Rationale: Educational debt affects current financial strength. Recognizing prior debt further addresses any previous and legitimate commitments to education by broadening the perspective from a "snap shot" view to a wider one that includes consideration of certain financing expenses incurred by the family. Finally, the financial aid system has become sensitive to the concerns of families with younger children to educate. It seems fair to give consideration to families who have educated older children and are still in debt as a result.**

**Issue: To what extent can an allowance be incorporated into central processing vs. local professional judgment guidelines?**

**Implementation/Resolution of Issues: Identify what data would be required in**

CONFIDENTIAL
COFHE-02-00002628

http://www.mvp.coned.edu/releases/July01/appE.htm

order to incorporate this recommendation into central processing, and whether such central data collection is feasible.

### Return to the report

7/31/01 4:08 PM

CONFIDENTIAL
COFHE-02-00002629

# APPENDIX F

## Limited Data Exchange

While not a part of the original charge from the 568 Presidents, we have encouraged a group of eligible schools to participate in a limited exchange of admitted student financial aid data under the terms of the MIT Settlement Standards of Conduct.

The MIT Standards allow institutions that are both need blind in admissions and meet the demonstrated need of all admitted applicants to participate in a limited data exchange. (Due to the terms of the Ivy Consent Decree, and until the Decree expires, no Ivy institution can participate in such an exchange without Court approval.)

The data that can be shared is limited to each aid applicant's parent/family contribution, his or her cost of attendance, and total aid awarded for all admitted students. The data must be analyzed by an independent third party. The reports can only show summary information for cumulative overlaps — there can be no sharing of information on individual students.

We have identified a third party to collect the data and do the analysis. Amherst, Wesleyan, and Williams have agreed to submit their data as a test group and we expect the process will be completed by early fall.

While this exchange will provide the institutions with very limited information, we believe that it is important to go forward with a process that will test the feasibility of conducting a larger data sharing effort in the future. After the exchange takes place, participating schools will review the process and recommend ways in which it might be expanded and improved. The process is also likely to provide us with recommendations to be addressed during any possible efforts to seek an extension and expansion of Section 568 when the statute expires on September 30, 2001.

**Return to the report**

CONFIDENTIAL
COFHE-02-00002630