# EXHIBIT 40

## In the Matter Of:

*HENRY v*

*BROWN UNIVERSITY*

*PETER AMMON*

*October 25, 2024*



1   donor-restricted, that doesn't mean 88 percent of
2   Penn's value, endowment value was donor-restricted;
3   correct?
4        A.   Correct.
5        Q.   So as of June 30th, 2023, do you know
6   approximately how much of the value of Penn's
7   endowment was donor-restricted?
8        A.   I believe that approximately half of
9   the endowment by value was restricted by donor or
10  legal considerations.  The other half, which would
11  be legally, technically classified as unrestricted,
12  was dedicated to specific uses and purposes across
13  the University.
14       Q.   So in terms of considering how much of
15  the endowment is available for financial aid, and
16  in rebutting Dr. Bulman's report for this
17  paragraph, what's the import of the 88 percent
18  statistic?
19            MR. GRINGER:  Object to form.
20            THE WITNESS:  The 88 percent statistic
21       reflects the percentage of endowment units
22       that are restricted.
23  BY MR. CIPOLLA:
24       Q.   Now, out of the roughly 7700 funds that
25  are donor-restricted, do you know how many are

1  school, but it was unrestricted, but intended to be
2  used by the law school, that the donor wanted it to
3  be used by the law school, and the law school -- or
4  the med school turned around and took that money,
5  which it couldn't actually do, but it's for the
6  sake of hypothetical, that would be incredibly
7  damaging to the -- Penn's relationship with that
8  donor who gave it to the law school.
9  So there are both very practical, from
10 the standpoint of how the University is operated
11 and run, and also very practical considerations,
12 limitations from how University engages with, for
13 example, donors.
14         MR. CIPOLLA:  So we've been going for
15     about an hour, a little bit more.  I think
16     now is a good time for a break.
17         MR. GRINGER:  Sure.
18         THE VIDEOGRAPHER:  The time is
19     10:40 a.m.  Off the record.
20         (A recess is held from 10:40 a.m. to
21     10:57 a.m.)
22         THE VIDEOGRAPHER:  Okay.  The time is
23     10:57 a.m.  Back on the record.
24 BY MR. CIPOLLA:
25     Q.  All right.  Welcome back, Mr. Ammon.

48

1        So before the break, do you recall
2   saying that Dr. Bulman seems to think the endowment
3   is a big pool of money that can be spent
4   willy-nilly on anything at any point in time?
5        A.   Yes, something to that effect.
6        Q.   Okay.  He didn't use the words
7   "willy-nilly" in any of his reports; correct?
8        A.   Not that I saw, correct.
9        Q.   All right.  So what do you understand
10  him to be -- like, why do you think the implication
11  of his report is that money could be spent
12  willy-nilly on anything at any point at any time?
13       A.   Throughout his report and his rebuttal,
14  Dr. Bulman keeps coming back to this idea that
15  there are all these funds -- or his idea that there
16  are all these funds within the endowment that could
17  be spent, in his word, or should have been spent on
18  financial aid that are, in -- that in his telling
19  of the story are essentially unrelated, not
20  designated for financial aid, were designated for
21  other things, but he seems to think that those
22  funds could have been spent on financial aid.
23            It's simply not how the endowment
24  actually works.  The endowment has restricted
25  funds, which are legal restricted, and unrestricted

1    funds.  And those unrestricted funds at Penn have
2    designated purposes for which they best be spent.
3            And doing what Dr. Bulman suggests is
4    both impractical and disruptive -- or would be both
5    impractical and disruptive.  And, in fact, Penn's
6    history of spending from the endowment on financial
7    aid is such that we spend from financial aid units
8    to support financial aid.  And when Penn grew its
9    financial aid program, Penn has gone out to
10   actually create more endowment financial aid units
11   to support that program.
12               MR. GRINGER:  Sorry, just -- Mr. -- so,
13         Peter, and for the court reporter, I think
14         there may have been a transcription error,
15         but I'm not positive 'cause the word kind of
16         got a little blurred.
17               The court reporter has you saying,
18         "Unrestricted funds at Penn have
19         designated purpose for -- purposes for which
20         they best be spent."
21               I thought I heard you say, "must be
22         spent."
23               THE WITNESS:  Correct.  I didn't --
24         yes, "must," not "best."  I'm sorry.
25   BY MR. CIPOLLA:

1    Q.  So you say it would be impractic --
2  impractical and disruptive to spend from even parts
3  of the unrestricted endowment fund that were --
4  because they are designated for other uses?
5    A.  So all of Penn's unrestricted endowment
6  funds are designated for particular uses.  Penn --
7  when Penn spends -- when Penn increased its
8  endowment support for financial aid during the
9  period in question, Penn actually first temporarily
10  increased the target spending rate, and then went
11  out and created fundraise to create additional
12  financial aid units to support that growth in
13  financial aid.
14        This is consistent with how Penn and
15  the -- and the endowment work, that there are units
16  that support -- as I discussed earlier, there
17  are finan -- there are endowment units that are
18  unrestricted, but designated to support specific
19  parts of the University.  For example, the health
20  system where much of the endowment is unrestricted,
21  but designated for the health system.
22        Similarly, there are undesignated --
23  or, sorry, unrestricted units across other parts of
24  the University that are designated for specific
25  purposes, and the spending is designated for those

1   specific purposes.  Penn has obligations,
2   commitments, budgets that need to be met with --
3   planned for.  And it would be, as I -- as you
4   noted, as I said, impractical, disruptive to -- and
5   not consistent with how Penn has spent for
6   financial aid historically.
7        Q.   Does the disruption turn on part how
8   much money would have been needed to support more
9   financial aid under Dr. Bulman's analysis?
10            MR. GRINGER:  Object to form.
11            THE WITNESS:  So Dr. Bulman's
12       analysis -- Dr. Bulman does some analysis
13       that says the defendants could have spent
14       10 percent more on financial aid.  This is
15       flawed in multiple dimensions.
16            First of all, as discussed in the
17       disclosure report, Penn's financial aid units
18       actually just maintain purchasing power
19       through the period in question.  Meaning that
20       spending was as high as possible and still
21       barely maintained our goal of maintaining
22       purchasing power on those units.
23            Had we, as Dr. Bulman suggests we
24       should have, increased the entire financial
25       aid budget by 10 percent and spent that out