# EXHIBIT 86

50

JOHN J. DeGIOIA, Ph.D. | 02.16.24

1

2     but I will bring a great deal of knowledge and

3     history.  I may have had conversations with

4     people who are on the tracking list, may have

5     had conversations with recommenders on the

6     tracking list.  So I bring a great deal of

7     information to my review of the tracking list.

8         Q.    Once you send the list of names to

9     the admissions office, that is, the

10    President's list, does the admissions office

11    push back on any of those names?

12        A.    I would learn from my conversations

13    with Mr. Koenig that admissions might have

14    some concerns about potential candidates.

15        Q.    And approximately how many of those

16    candidates generate concerns from the

17    admissions office each year?

18        ATTORNEY MILLER:  Objection.  Form.

19        A.    I couldn't say.

20        Q.    Does approximately five a year

21    sound right?

22        A.    It's not a great number.  So five

23    could be -- could be a reasonable estimate.

24        Q.    When Mr. Koenig points out that

25    five or so names have generated a reaction

51

```
1              JOHN J. DeGIOIA, Ph.D. | 02.16.24

2    from the admissions office, what do you do?

3         A.    I look over the cases in question

4    and I would make one of two judgments.  One is

5    to accept that, that the admissions office has

6    reasons to be concerned, and then if I think

7    it's very important to the institution, I

8    would ask if there would be an alternative way

9    for the person to be considered for admission,

10   and that would include one of two different

11   options.

12              One would be coming for summer

13   school and performing well in summer school.

14   The other could be what we refer to as kind of

15   a preferential transfer.  They could go to

16   another school, perform at an appropriate

17   level, and if they perform at that appropriate

18   level, they could be admitted as transfers.

19        Q.    And the process that we've been

20   describing has applied to the regular decision

21   process, is that correct, in terms of the

22   cycle of the university?

23        A.    Yes.

24        Q.    Is there a similar process of names

25   that you send to the admissions office in
```

65

1           JOHN J. DeGIOIA, Ph.D. | 02.16.24
2           ATTORNEY GILBERT:   FERPA is a word in
3    this case, all caps F-E-R-P-A.
4    BY ATTORNEY GILBERT:
5        Q.     Did you consider the fact of the
6    applicant's father being the CEO of a company,
7    the ████████ affiliate of another company, in
8    deciding the priority to put this person on
9    the President's list?
10       A.     No.
11       Q.     Going to page eight, the first one
12   there, the notes are:  Applicant is the
13   granddaughter of, FERPA redaction, co-founder
14   of ████████
15              Do you see that?
16       A.     Yes, I do.
17       Q.     And there is a UID number of 9949
18   and that person is on the President's list;
19   correct?
20           ATTORNEY MAGNUSSON:   That will be on
21   the second page, Bates number ending 051,
22   approximately halfway down, ending in 949.
23           THE WITNESS:   Sure.
24       Q.     And in the notes, there is no
25   reference to the qualifications of the

66

1      JOHN J. DeGIOIA, Ph.D. | 02.16.24

2  applicant herself; is there?

3      A.    No.

4      Q.    When you placed this applicant on

5  the President's list, did you consider the

6  fact that she is the granddaughter of a

7  co-founder of ████████

8      A.    Yes.

9      Q.    In plain English, would you

10  consider a person's being the granddaughter of

11  the co-founder of ██████ as a financial

12  circumstance?

13      ATTORNEY MILLER:  Objection.  Form.

14      A.    Could you define "financial

15  circumstance"?

16      Q.    Just using the phrase "financial

17  circumstance" the way you understand that

18  phrase, would you consider being the

19  granddaughter of the co-founder of ██████ as a

20  financial circumstance of that applicant?

21      A.    No.

22      Q.    Would you consider it as a

23  financial circumstance of her family?

24      A.    Yes.

25      Q.    Do you go to a conference in

67

```
 1              JOHN J. DeGIOIA, Ph.D. | 02.16.24
 2    Sun Valley with some regularity?
 3         A.    Yes.
 4         Q.    And do you go to that conference
 5    almost every year?
 6         A.    Almost every year since 2012.
 7         Q.    And have you ever heard of that
 8    conference being referred to as summer camp
 9    for billionaires?
10         A.    No, but I understand why you might
11    ask me that question.
12              ATTORNEY GILBERT:  Could we use the
13    Forbes Magazine?
14              ATTORNEY MAGNUSSON:  This will be tab
15    54.
16                   (Whereupon, article entitled Inside
17    The Annual Summer Camp for Billionaires in Sun
18    Valley, Idaho, is received and marked as
19    Exhibit 8 for Identification.)
20              CERTIFIED STENOGRAPHER:  Number eight.
21    BY ATTORNEY GILBERT:
22         Q.    That's the conference we're
23    referring to?
24         A.    Yes, it is.
25         Q.    Okay.  And it's run by
```

95

1    JOHN J. DeGIOIA, Ph.D. | 02.16.24

2    ██████████████████████████████████████

█████████████████████████████████████████████

████████████████████

████████████████████████████████████████

6        ATTORNEY GILBERT:  The next document

7    we're going to have marked is currently tab

8    50.

9            (Whereupon, Georgetown Voice

10   article entitled On the Record with President

11   DeGioia , is received and marked as Exhibit 13

12   for Identification.)

13       CERTIFIED STENOGRAPHER:  Number 13.

14       THE WITNESS:  Thank you.

15   BY ATTORNEY GILBERT:

16       A.    Okay.

17       Q.    This is an article that appeared in

18   the Georgetown Voice on March 6, 2014, and my

19   questions are going to center around about the

20   sixth and seventh paragraph.

21       A.    Sure.

22       Q.    And you say:  I actually chair that

23   group called the 568 Group.

24       A.    Yes.

25       Q.    The 568 refers to a passage in

96

1          JOHN J. DeGIOIA, Ph.D. | 02.16.24

2    higher reauthorization bill about a decade

3    ago.  What it enables us to do is develop a

4    common formula by which we would assess the

5    need of the student.

6          A.    Yes.

7          Q.    We ask the family to contribute the

8    maximum that they are capable of according to

9    that formula.

10               Do you know of any other business

11   or economic activity in the U.S. economy that

12   tries to determine the maximum amount that

13   people are capable of paying and then ask them

14   to pay that?

15         ATTORNEY MILLER:  Objection.  Form.

16         A.    I wouldn't know.

17         Q.    This -- when you state we ask the

18   family to contribute the maximum they are

19   capable of according to that formula, that

20   allows Georgetown to maximize its revenue;

21   correct?

22         ATTORNEY MILLER:  Objection.  Form.

23   Foundation.

24   ████████████████████████████████████

████████████████████████████████████████

254

JOHN J. DeGIOIA, Ph.D. | 02.16.24

1   
2   list and the student is admitted and within a

3   year you have them at the president's move-in

4   reception with a capacity rating of $20

5   million, isn't this all just a wink and a nod

6   that wealthy people who can attend the

7   Sun Valley conference get a benefit in the

8   admissions process?

9        ATTORNEY MILLER:  Objection.  Form.

10   Foundation.

11       A.    I can -- now that I know what the

12   case is, I can provide a bit more background.

13       Q.    Sure.

14       A.    I had not met this individual, the

15   father, prior to the conference in -- I think

16   it would be ▉, I think it would have been

17   the ▉conference if I'm following the track

18   here.  I think that's right.  I met him for

19   the first time at that conference.  He asked

20   me if I was the president of Georgetown and I

21   indicated I was.  He said he had -- his

22   daughter was here as one of the attendees.

23           There are a couple of hundred

24   children who attend the conference.  He said

25   his daughter was one of those children.  She

255

```
1              JOHN J. DeGIOIA, Ph.D. | 02.16.24
2    was very interested in Georgetown and would I
3    be willing to spend time with her.  I said,
4    Yes, I'd be happy to interview her.  Spend
5    time with her.  Discuss Georgetown with her.
6    He shared with me some difficult challenges
7    that he and his wife had essentially created
8    during her adolescence.  They were divorced
9    and -- I believe they were divorced and it was
10   quite difficult for -- on her during that
11   period.
12              I spent some time with her one on
13   one.  I know there is a reference to Ted
14   Leonsis.  Ted would not have participated in a
15   conversation with me with the young woman.
16              I had that conversation and that
17   led me to put her on the tracking list, and
18   then when I was assessing the tracking list
19   later in March, made a determination to put
20   her on the President's list.
21              I take a number of things into
22   consideration.
23        Q.    What --
24        A.    There are --
25        Q.    -- percentage of applicants to
```

256

```
 1              JOHN J. DeGIOIA, Ph.D. | 02.16.24

 2    Georgetown have the opportunity to speak to

 3    the president of Georgetown and have the dad

 4    speak to the president of Georgetown at the

 5    Sun Valley conference to tell their story of

 6    what they say their challenges were?

 7         A.    Obstacles overcome.

 8         Q.    What percentage?

 9         A.    It's a small number.  A small

10    number.

11         Q.    Some small fraction of 1 percent?

12         A.    I couldn't do the math in my head,

13    but we have 24,000, 25,000 candidates for

14    admission.

15         Q.    And of these 24, 25,000, this one

16    who had a capacity rating of $20 million had

17    his daughter admitted and was at the move-in

18    reception by August of the following year;

19    right?

20         ATTORNEY MILLER:  Objection.  Form.

21         A.    My judgment in reviewing the

22    tracking document, which ultimately produced

23    the President's list, was not informed by this

24    capacity rating.

25         Q.    But it was informed by -- I'm
```

257

```
 1              JOHN J. DeGIOIA, Ph.D. | 02.16.24
 2   sorry, I didn't mean to cut you off?
 3        A.    And at no time did I ever have a
 4   discussion with the father about any potential
 5   philanthropy.
 6        Q.    But the point is you don't need to
 7   have a discussion; right?  You're at the
 8   Sun Valley conference.  You don't need
 9   somebody to run analytics or metrics on the
10   person.  You know what you're dealing with,
11   and if the kid is some small fraction of 1
12   percent of your potential applicants because
13   she's at that Sun Valley conference and she
14   can have a conference with you about what she
15   and her dad think are her obstacles?
16        A.    Yes, she can.
17        Q.    All right.
18           ATTORNEY GILBERT:  The next document --
19   yeah.
20           ATTORNEY MAGNUSSON:  This will be tab
21   69.
22           ATTORNEY GILBERT:  I'm going to take a
23   very short break.
24           How are we doing on time?
25           THE VIDEOGRAPHER:  We're at 6:21.
```