# EXHIBIT 105

# THE 568 PRESIDENTS' GROUP
## CONSENSUS METHODOLOGY
## POLICY GUIDELINES MANUAL
## 2004-05

## (Members Only Version)

CONFIDENTIAL

NULIT-0000161662

## Contents

Background     2

Policy Guidelines for the Maintenance of the
Consensus Approach Methodology     3

Introduction - The Consensus Approach to Need Analysis     5

Part I --- Need Analysis and Professional Judgment Issues     6

      A. Divorced and Separated Families
      B. Assessment of Business and Real Estate
      C. Cost of Living Variances
      D. Family and Student Assets
      E. Home Equity
      F. Retirement Allowance
      G. Institutional Methodology Taxation Bands
      H. Number of Siblings in College
      I. Elementary and Secondary School Tuition Expenses
      J. Extrapolating Assets
      K. Day Trader Stock Issues
      L. Medical Expenses
      M. One-time Income Adjustments
      N. Special Expense Adjustments
      O. Family Loan Debt

Part II --- Management and Process Issues     13

      A. Tax Form Collection
      B. Professional Judgment Guidelines Manual

Part III --- Organization and Participation     14

Appendices

    Appendix A -- Divorced/Separated/Single Parent Guidelines
    Appendix B -- Treatment of Self-Employment/Rental Property
    Appendix C -- Cost-of-Living Adjustment
    Appendix D -- Treatment of Assets Held in the Student's Name
    Appendix E -- Previous Educational Debt

CONFIDENTIAL     NULIT-0000161663

## Background

On April 18, 2000, the 568 Presidents' 568 Group met and appointed eight senior financial aid professionals from participating 568 institutions to serve on a Common Standards Subcommittee and to report back to them concerning:

> *whether it is possible to reach agreement on common standards for determining financial need at the institutional level consistent with the Statement of Principles for need-based financial aid and as permitted by Section 568.*

The charge to the Subcommittee further requested that, in the pursuit of these goals, the panel:

- *address the principal issues that give rise to divergent need calculations;*
- *arrive at reasonable compromises in the areas where the principles may conflict;*
- *strive for recommendations supportive of a system that many schools could adopt while still being able to manage their individual aid resources;*
- *seek solutions that aspire to simplicity and consistency, that discourage manipulation of the system, and are realistic regarding the capacity of families to contribute to educational expenses;*
- *explore avenues to maintain a system supportive of a Consensus Approach to Need Analysis, if one is adopted.*

The work of the Subcommittee was in turn guided by a statement of Need Analysis Principles adopted by the 568 Presidents at that meeting. These Principles are as follows:

### *FINANCIAL AID PRINCIPLES*

1. *To the extent they are able, parents and students have the primary responsibility to contribute to educational expenses before an institution awards financial aid.*

2. *Families should contribute to educational expenses according to their ability. Those with similar financial profiles should contribute similar amounts.*

3. *Institutions should evaluate both income and assets as part of the assessment of the parents' and applicants' ability to pay.*

4. *Each institution should inform applicants about the policies and practices it applies when measuring a family's ability to pay, carry out its policies consistently throughout a student's eligibility, and support the awarding of need-based aid.*

2

CONFIDENTIAL

NULIT-0000161664

5. *An institution that allocates any financial assistance that is not based exclusively on need should inform all prospective applicants of the standards it applies in allocating that aid.*

6. *The exercise of "professional judgment" by financial aid officers in assessing a family's ability to pay should recognize unique or extenuating financial circumstances in individual cases; such professional judgment is not the proper mechanism for systematically treating groups of students differently in order to advance institutional objectives.*

The policy guidelines contained in this Manual represent the best efforts of the 568 Presidents' Group to develop a Consensus Approach that is both consistent with the Need Analysis Principles adopted by the Presidents of the participating institutions and is compatible with the values that underlie the 568 Presidents' Statement of Principles.

The Consensus Approach contains certain key components, including: 1) common elements of need analysis as described below; 2) a common calendar for the collection of data from families; 3) a means of training aid professionals in the application of the Methodology; and 4) an oversight group to review and modify the methodology as needed over time.

Where possible, the professional expertise and program services of the College Scholarship Service (CSS) of the College Board shall be used as resources to advance the implementation of this Consensus Approach. In addition to their long-standing role as the primary data collection agency, CSS can also assist with the modeling of various recommendations in order to assess their impact on both families and institutions.

Finally, because need analysis is a complex and detailed process requiring the examination of many dozens of elements to measure a family's ability to pay, a number of policy guidelines require additional background and research over time. In this sense this Manual should be viewed as an "organic" document. While containing a number of quite specific guidelines for the implementation of the Consensus Approach, it should be viewed as the basis of an ongoing process to construct a need analysis system that will assure fair and equitable access to educational opportunity.

## Policy Guidelines for the Maintenance
## of the Consensus Approach Methodology

The 568 Group believes that the Consensus Approach to Need Analysis, when properly implemented and maintained, eliminates much of the variance in the need analysis results that has been experienced in recent years. The 568 Group does not view the Consensus Approach as a panacea, however. Need analysis procedures have traditionally depended on "professional judgment" applied locally. Although the Consensus Approach would standardize many policies now

3

CONFIDENTIAL

NULIT-0000161665

subject to professional judgment, it is important to recognize that no system will completely eliminate disparate results or the effects of individual institutional "packaging" decisions.

In developing its policy guidelines, the 568 Group has focused on arriving at the "right" approach to determining parental ability to pay, without regard to potential cost implications. It can be expected that the adoption of these guidelines could significantly affect parent contributions in the aggregate and, in many cases, expected family contributions will be reduced. The impact of these policy guidelines is likely to vary from institution to institution depending on the school's applicant profile and the extent to which similar adjustments are already included in their need analysis procedures.

Although the 568 Group fully supports the Consensus Approach outlined in this Manual, it is important to note that these guidelines can be expected initially to heighten the difficulties associated with the FM, the new IM, and certain institutional changes that have been announced in recent years. Specifically, both the new IM and certain need analysis modifications adopted unilaterally by individual schools have led to cases in which the institution's family contribution is less than the one derived from Federal Methodology, resulting in an over-award which limits or eliminates eligibility for federal funding. In an effort to deal with this problem, the Professional Judgment Guidelines Manual includes a section on the various methods schools may wish to adopt to reconcile differences in results between institutional and federal need analysis.

The 568 Group believes strongly that matters of need analysis, including professional judgment, should be independent of the qualifications or desirability of a particular applicant for an institution. That is, rules should not be interpreted more leniently because an applicant will bring strong academic or athletic ability or other desirable qualities to the campus.

The 568 Group is also concerned about restrictions that federal regulations place on the expenditure of need-based institutional aid funds. The 568 Group believes that the Consensus Approach results in fair parent contribution levels and that participating institutions should not be forced to disadvantage students by reducing the amount of institutional aid they may receive or excluding them from subsidized federal loans or work-study. The 568 Presidents' 568 Group, singularly or in concert with other groups, will support petitions to Congress for relief in this critical area of institutional prerogative.

Finally, it is important to note that the 568 Group views its efforts as the beginning of a long-term process. Some of the policy issues identified in this Manual will require further exploration and analysis. Moreover, the use of the Consensus Approach will present, over time, new and unexpected issues and concerns. Likewise, technological advances will provide opportunities for improving and updating the policy guidelines outlined in this Manual. Responding to these concerns will require the regular attention of an experienced

CONFIDENTIAL

NULIT-0000161666

standing Consensus Approach Need Analysis Council and a continuing training effort for participants.

## Introduction – The Consensus Approach to Need Analysis

The 568 Presidents' Group institutions have agreed on a series of common standards designed to be included in a Consensus Approach to Need Analysis. The participating institutions believe that this Consensus Approach, when applied in a consistent manner, serves to diminish or eliminate the divergent results that now threaten the long-standing tradition of awarding aid on the basis of need. It is important to note that the efforts of the 568 Group are restricted to policies that affect first-year awards only. The issue of school-to-school inconsistency applies primarily to first-year students and the 568 Group believes that it is necessary for financial aid officers to retain as much flexibility as possible in dealing with their already-enrolled students. Although, these guidelines apply primarily to first year students, it is understood that most institutions, will, for purposes of consistency, apply this approach to both first year and upper-class students. Budgetary issues associated with these policy guidelines may be moderated by a phase-in of one class at a time.

The Consensus Methodology begins with the understanding that the College Board's Institutional Methodology (IM), as revised in 1999, is an appropriate base for institutional need analysis and provides an appropriate platform for further work. Consequently, the 568 Group has focused on those aspects of the current IM that are most often subject to local interpretation or professional judgment. The desire to serve the "greater good" rather than individual institutional needs and capabilities has required compromise in some areas, but the 568 Group believes that the resulting methodology remains true to both the institutional and professional principles that under gird its cooperative efforts. By developing policy guidelines that attempt to set the "right" policy without regard to the potential cost implications, the 568 Group's guidelines should serve to reduce expected parent contributions in the aggregate.

Although the 568 Group has sought, where possible, to err on the side of simplicity, many need analysis issues do not lend themselves to a simplified process. Matters relating to divorced and separated parents and the analysis of small business enterprises are two such examples. The 568 Group believes, however, that its collective interest in achieving a fair and equitable result requires the added complexity associated with the policy guidelines in these and other particularly complicated areas. Additionally, the 568 Group believes that the new IM, as amended by the Consensus Approach, will encourage savings for college and recognizes that the parents' ability to pay is largely a function of: a) its financial strength; and b) the number of children they hope to educate. In the area of discouraging asset manipulation, the policy guidelines begin the process of addressing this problem, but, as noted earlier, our work is incremental in nature and more work must be done in this difficult area.

CONFIDENTIAL

NULIT-0000161667

The Policy Guidelines and this Manual are divided into three sections: Part I --- Need Analysis and Professional Judgment Issues; Part II --- Management and Process Issues; and Part III --- Recommendations for Future Work.

## Part I --- Need Analysis and Professional Judgment Issues

At the core of the need analysis system is an accepted methodology for treating each element that goes into determining a family's ability to pay. The 568 Group has examined fifteen specific and important areas and recommended a common standard to deal with each.

### A. Divorced and Separated Families

**Consensus Agreement**: Both natural parents are expected to cooperate and provide financial information and, if one or both of the custodial parents has remarried, both natural parents and the stepparent(s) are expected to cooperate. Exactly how the information is used in measuring the student's need would be based upon other considerations and additional guidelines included in the Professional Judgment Manual.

**Background**: Of the many challenges facing the financial aid office, treatment of the divorced and separated family is clearly one of the most vexing. As a result, locally applied professional judgment will vary from campus to campus, substantially contributing to inconsistency in parent contributions. The use of the Professional Judgment Guidelines Manual by participating institutions will result in reasonably consistent parent contributions. Further policy guidelines in this critical area are outlined in Appendix A.

### B. Assessment of Business and Real Estate

**Consensus Agreement**: Continue to exclude business and rental losses, (including those expenses associated with operating a business in the home) from the calculation of income in central processing; add back rental depreciation and loans to stockholders; impute rental property value; redesign or supplement the Business/Farm Supplement Form to improve quality of data; seek expert advice on various adjustments; and ask CSS to keep us informed of and involved in their work in this area.

**Background**: An increasing number of applicant families present complex business and real estate profiles for review, making central processing of this information impossible. Consequently, financial aid professionals have attempted to make sense of this information with varying levels of experience, expertise, and applicant-provided information. More experienced aid officers have learned to apply a "sixth sense" to these cases, while those with little experience and limited staff resources are often forced to deal with these applicants as if they were salaried

CONFIDENTIAL

NULIT-0000161668

employees rather than as self-employed business persons or entrepreneurs. Understandably, the self-employed family's calculated ability to pay often varies significantly from campus to campus. Because business and real estate issues may not always lend themselves to central processing, the Consensus Methodology calls for standardized local treatment of these matters. The details of these policy guidelines can be found in Appendix B.

## C. Cost of Living Variances

**Consensus Agreement**: Monitor new developments and refine procedures on this issue over time.

**Background**: It is widely understood that cost of living in Manhattan, Kansas, is substantially different than it is in Manhattan, New York. Although the current CSS Institutional Methodology offers a local option that provides cost-of-living adjustments in a few metropolitan areas, the central calculation does not. This failure reduces the "face validity"[1] of current parent contributions and requires correction. Consequently, an expanded metropolitan cost-of-living structure has been developed working with CSS. This expanded Cost-of-Living table is provided in Appendix C. At the request of the 568 Group, this expanded Cost-of-Living table is available to all institutions as a PROFILE local option. As new technologies and pricing models are developed, this approach will be refined further.

## D. Family and Student Assets

**Consensus Agreement**: In general, student assets and assets held in college savings programs and pre-payment tuition plans are to be treated as family assets.

**Background**: Traditional need analysis procedures have examined parent and student assets individually, assessing separate contributions from the resources of each. Assets held by the parent are assessed at a marginal taxation rate of 5%, while student assets are taxed at 25% in the New IM (35% in the old Institutional Methodology and FM). This separate treatment of assets has been deemed appropriate in the past because obtaining an education is the most important issue facing a student and he or she should participate fully in the financing of his or her education. Parents, on the other hand, must pay for their children's educational expenses, support their families, and prepare for retirement, all from the same resources. When families take advantage of lower tax rates by saving for college in their children's names, they must often make significantly higher contributions towards college expenses because of the

---

[1] A formula is said to have face validity if the average person believes that the formula's results are fair---that the results are, on their face, valid.

CONFIDENTIAL

NULIT-0000161669

higher rate of student asset assessment. The 568 Group believes that this result is inappropriate and that parents who attempt to prepare for college expenses in this way are being unfairly penalized. Moreover, the harsh treatment of assets held in the student's name encourages families to spend or transfer those resources in an effort to circumvent the financial aid system. Treating student-held assets as parental assets will work to encourage further saving for college.

In addition, as a result of recent standard IM revisions, sibling assets are already viewed as family assets and assessed at the parental rate. Treating student assets as parental assets will insure consistency in the treatment of all family-owned assets.

Student trust funds and other particularly large student asset accumulations will and should be the subject of professional judgment. In addition, schools may decide under professional judgment to treat assets from third parties (non-parents) as student assets. (See Appendix D for further discussion.) Nevertheless, the position that all student assets should be treated as parental assets provides the baseline for the Common Approach treatment of assets held in the student's name.

## E. Home Equity

**Consensus Agreement**: Count home <u>value</u> capped at 2.4 times income minus mortgage debt with professional judgment adjustments in individual cases.

**Background**: The Congressional decision to remove home equity from the federal formula has been a major factor in the confusion now surrounding need-based aid awards nationally and particularly at the 568 Group institutions. The absence of home equity in the federal formula has meant that for many families contributions based on the Federal Methodology have often been considerably lower than those calculated via IM. For reasons relating to both fairness and competition, institutions have begun to vary the manner in which home equity is considered. At some institutions, these policy changes have been applied across the board. At others the treatment of home equity has been applied selectively based on the applicant's circumstances or the institutional admissions rating.

The 568 Group believes that home equity can be an important indicator of a family's financial strength and that it should be considered in need analysis. The current IM practice of capping home equity at 3 times income does not sufficiently recognize the fact that home equity is an asset that is less liquid than other forms of assets and less readily available for financing education expenses. The 568 Group is aware that the family home is both an investment good and a consumption good.

CONFIDENTIAL

NULIT-0000161670

While other assets are held strictly for the appreciation of wealth (an investment good), one's home is also a good from which housing services and other non-pecuniary factors are important considerations (a consumption good). The current methodology ignores the consumption value of the home and treats it strictly as an investment good like any other asset. For these reasons, and to narrow the divide between the treatment of home equity in the FM and the Consensus Approach the value of the home shall be capped at 2.4 times income. Because many 568 institutions already adjust home equity in some fashion, this policy will encourage greater consistency in the treatment of this important asset.

## F. Retirement Allowance

**Consensus Agreement**: Create a retirement allowance for families not now covered by a formal retirement plan.

**Background**: Until its recent revision, the standard IM treatment of assets included a retirement allowance provision for all families. This provision was created at a time when most families expected that Social Security would serve as the principle source of retirement income. The IM retirement allowance was designed to supplement the family's Social Security income during retirement. Because most families are now covered by formal, privately owned retirement plans not considered in need analysis, CSS determined that the IM retirement allowance was no longer necessary. It was eliminated and formal educational savings and family emergency savings allowances were added.

The 568 Group recognizes that many families are not covered by formal retirement programs and believes that it is appropriate to provide retirement protection for those without such support. Such an allowance should be created in consultation with CSS and other experts in the field of retirement planning. Recognizing that this will involve research and ultimately require CSS to add one, or possibly two, questions to the PROFILE form, in the interim the current Federal Methodology (FM) asset protection (retirement allowance) tables shall be used.

CSS plans a long-term project in which they will review retirement assets currently held by applicant families. Although the 568 Group does not necessarily agree with the inclusion of such assets in the need analysis formula, members of the 568 Group are interested in supporting and participating in this project.

## G. Institutional Methodology Taxation Bands

**Consensus Agreement**: No change until further study assesses their impact

9

NULIT-0000161671

**Background**: Institutional Methodology is a highly progressive formula designed to determine the parents' ability to pay through a careful review of their overall financial circumstances. An Income Protection Allowance (IPA) does not, as is commonly understood, define the amount of money required by individual families to cover their living expenses. Instead, it represents the income level below which a family has no discretion about how its income is spent. Parents with incomes at or below the IPA are not asked to make contributions from income to their children's educational costs. Those with higher incomes have more choices about how they spend their income and are expected to use some fraction of their income to pay for their children's education. Because of concerns about the progressivity of the IPA, the new IM has recalibrated the lower-income taxation bands and reduces the highest band by one percent.

After a great deal of consideration, the 568 Group concludes that a better understanding of the impact these changes have on the new IM is needed. Given this uncertainty and the additional methodological changes described elsewhere in this Manual, it is important to review over time the impact of the revised tables as part of the process of improving the Consensus Approach. Consequently, no additional adjustments are recommended at this time, subject to further study over the next several years.

The Technical Committee requests that users of the Consensus Approach provide feedback on the impact of the current taxation bands on need analysis. The Committee will collect such data over time as part of its examination of the current approach.

## H. Number of Siblings in College

**Consensus Agreement**: Adopt the revised Institutional Methodology formula for multiple siblings in college.

**Background**: In recent years the need analysis formula divided the total parent contribution by the number of siblings enrolled in college to derive an expected parent contribution for each sibling. This approach meant that families with children spaced closely together were advantaged when applying for financial aid while families with children born farther apart were penalized. Concerns about the inequity resulted in a restoration of the original rationale in IM that considers the number of children enrolled simultaneously, but instead of dividing by the number in college it reduces the calculated Parent Contribution by 40% for two in college and by 55% if three are enrolled.

A number of institutions ignored this change because they were concerned about the impact that reduced aid eligibility might have on enrollment. After a great deal of consideration, the 568 Group agrees that

10

NULIT-0000161672

the current IM treatment of the number of siblings in college shall be included in the Consensus Approach.

Additionally, the Consensus Approach shall include the following policy clarifications:

A) Siblings enrolled in graduate or professional school shall not be counted as in college (but will be included in household size) unless the family can document that the enrolling institution has determined that the student is dependent for aid purposes and that the parents are paying the assigned parent contribution.

B) Parents shall not be counted as family members in college. If, however, the parent's current job requires course work or they need to be retrained after losing a job, the institution may include as a consideration the amount of such unreimbursed tuition.

C) [Place holder for possible recommendations on counting siblings who receive merit or athletic support while enrolled.]

A related issue is the consideration of previous educational debt the parents may have accumulated when educating other children. This issue is addressed in Paragraph O below.

## I. Elementary and Secondary School Tuition Expenses

**Consensus Agreement**: Employ the Institutional Methodology optional treatment of such expenses.

**Background**: Unlike the Federal Methodology (FM), both the old and new IM formulas offer the option of counting elementary and secondary school expenses. In each case the tuition allowance cap for each sibling is based on a national average of the annual cost of elementary/secondary school tuition. This IM formula option has been made a standard part of the Consensus Approach. Tuition expenses in excess of the cap would generally not be considered.

Although the Federal Methodology ignores elementary and secondary school expenses, most 568 Group-like schools already use the IM formula.

## J. Extrapolating Assets

**Consensus Agreement**: Use reported interest and dividend income to extrapolate the principle values that generated this income.

**Background**: Cash and investment assets reported by both parents and students often fail to correlate with interest and dividend income as reported on federal tax forms. Historically, institutions have used a variety of formulas to extrapolate the asset holdings implied by the reported income. The Consensus Approach will use reported interest and dividend

11

NULIT-0000161673

income to extrapolate the principle values generated this income. Each year, the 568 Technical Committee will establish a multiplier, based on market results, to be used for this purpose. .

### K. Day Trader Stock Issues

**Consensus Agreement**: Professional Judgment Guidelines Manual Issue.

**Background**: A number of financial aid applications show income earned from "day trading" in stocks. The large volume of stock trades reported on tax forms often makes it very difficult to verify family holdings. Given the complexity of this issue the 568 Group recommends that a consultant be retained to develop language to be included in the Professional Judgment Guidelines Manual. Such recommendations are currently being developed.

### L. Medical Expenses

**Consensus Agreement**: Employ the Institutional Methodology treatment of such expenses.

**Background**: Families whose unreimbursed medical expenses exceed 7.5% of AGI may deduct these expenses when completing their federal tax forms. Unlike the Federal Methodology, which ignores these costs, current IM considers unreimbursed medical expenses that, for 2004-2005, exceed 3.4% (This allowance is set annually based on a three-year moving average. It will 3.5% for 2005-2006). The current IM treatment of medical expenses shall be included in the Consensus Approach. In cases of extreme medical expenses, professional judgment guidelines should be applied locally.

### M. One-time Income Adjustments

**Consensus Agreement**: Exclude certain non-recurring income.

**Background**: Families often request that the income used for need analysis be reduced to eliminate non-recurring income. Such income might include certain capital gains, withdrawals from pension plans, IRA rollovers, or unemployment income. Most 568-type schools already reduce need analysis income by documenting one-time-only income and this practice shall be incorporated into the Consensus Approach. Income specifically not excluded would be overtime and bonus income unless the employer can document a related change in company policy.

12

NULIT-0000161674

### N. Special Expense Adjustments

**Consensus Agreement**: Consider the impact of certain non-reoccurring, non-discretionary expenses

**Background**: Families often incur one-time only, non-reoccurring expenses that can significantly affect their ability to support educational costs. These expenses can include costs associated with parental care, funeral expenses, uninsured natural disasters, and extraordinary home repair costs. Treatment of such costs varies from campus to campus and contributes to the variability in need analysis results. The Professional Judgment Guidelines Manual includes specific guidelines on how institutions can respond to these expenses.

### O. Family Loan Debt

**Consensus Agreement**: Recognize educational debt under certain circumstances.

**Background**: Many parents support their children's costs of education by borrowing through formal programs such as PLUS as well as informal programs, including home equity and pension fund loans. Repayment of these funds exacerbates the difficulty associated with supporting future educational expenses. As outlined in Appendix E, the Consensus Approach shall include consideration of these expenses.

## Part II --- Management and Process Issues

The maintenance and management of a new common standard of need analysis requires a number of specific agreements related to processing.

### A. Tax Form Collection

**Consensus Agreement**: Collect all of the most recent tax and W-2 forms from all applicants.

**Background**: Application requirements for first-year students can vary considerably from institution to institution. Most 568 Group institutions require families to submit their most recent tax forms (all pages and all schedules) before releasing financial aid resources for account payments. As a general policy, the 568 Group calls for participating institutions to require families to submit their most recent tax forms (personal and, where appropriate, corporate) and all W-2 forms before first-year aid awards are prepared. If families have not completed their most recent year tax forms when applications are due, these forms should be submitted no later than May 1 of the application year.

CONFIDENTIAL

NULIT-0000161675

Where a delay in the award preparation for families with uncomplicated financial circumstances would disadvantage both the family and the institution, exceptions can be made consistent with circumstances outlined in the Professional Judgment Guidelines Manual.

## B. Professional Judgment Guidelines Manual

**Consensus Agreement**: Maintain a Professional Judgment Guidelines Manual that borrows heavily from the current CSS Manual with modifications as appropriate

**Background**: the 568 Group recognizes that locally applied professional judgment is a critical component of need analysis. The PJ Manual standardizes both those issues that should be treated locally and, to the extent possible, the manner in which such issues are handled.

Rather than reinvent the proverbial wheel, the tried-and-true professional judgment advisories prepared by CSS and others are used where appropriate. These will be modified where appropriate and others will be added as needed.

## C. Training For Participating Staff Members

**Consensus Agreement**: Develop a regime that can be used to support the regular training of participating Consensus Approach institutions.

**Background**: The issue of training is critical to the success of the Consensus Approach. Staff members, especially new hires, must be trained in the use of this new approach to determining family ability to pay. Time and resources should be devoted to both in-house and 568 Group activities. A training regime is being developed for implementation in the spring of 2004-2005.

## Part III --- Organization and Participation

**Maintaining a Consensus Approach to Need Analysis:** The implementation and maintenance of the Consensus Approach is an on-going process that requires regular input from participating institutions. Accordingly, the 568 Presidents' 568 Group is organized under a Memorandum of Understanding (See Appendix I) which calls for the presidential appointment of institutional representatives to a Need Analysis Council of financial aid experts. In support of this effort, the Need Analysis Council appoints a Technical Committee from within its members to be responsible for managing and, where appropriate, updating the Consensus Approach.

14

**Federal Methodology Concerns:** Current regulations specify that an award containing federal Title IV funds (Federal Work-Study, Perkins, SEOG, and subsidized Stafford loans), must not exceed the eligibility established through Federal Methodology (FM) and use of the Consensus Approach is likely to increase the number of such cases. Current approaches to the problem vary. Some schools default to the higher federal contribution while others use the lower institutional contribution and package institutional grant and unsubsidized federal loan. Still others use the lower institutional level and package institutional grant, subsidized institutional loan, and institutional work.

The 568 Group supports efforts for legislative relief in this critical area. Given that the Consensus Approach produces fair contribution levels, students should not be disadvantaged, either in the amount of aid that they receive, or by excluding their eligibility for subsidized federal loans or Work-Study.

CONFIDENTIAL

NULIT-0000161677

# APPENDICES

CONFIDENTIAL

NULIT-0000161678

# APPENDIX A

## Divorced/Separated/Single Parent Guidelines

**Prior Treatment**: There has been no consistent way of evaluating the financial need of students whose natural parents are not married to each other. While some institutions attempt to secure data from both parents in order to determine what a reasonable contribution from each is, the effort is not always successful. The process is often made more complex because of the re-marriage of one or both natural parents. In addition, Federal Methodology (FM) completely excludes non-custodial data.

**Consensus Agreement**: 568 Group guidelines begin with the custodial family unit and then seek additional information concerning the non-custodial family unit. In the case of re-marriage of either or both natural parents, the standard approach would be to request the cooperation of and information from all parents and spouses. Generally, a contribution from the income and assets of no more than two parents will be expected. Institutions may, however, exercise professional judgment to use information from more than two parents. Such guidelines have been published and are available in the 568 Professional Judgment Manual.

**Rationale**:

- Having a consensus on policy and procedure for calculating parental support will reduce significant variances in measuring need among institutions.
- As with students whose parents are married to one another, ability to pay, not willingness, should be used to determine the expected parent contribution.
- Parents divorce one another, not the child.

**Issues:**

- Determining when to waive the requirement of information/cooperation from the non-custodial parent
- Different treatment by FM leading to expectations that non-custodial information will not be sought or used to derive a higher parental contribution level.
- Inconsistencies in the treatment of stepparent information when either or both natural parents have remarried.
- Difficulty in maintaining policies due to the influence of competitive enrollment marketing pressures.

**Implementation/Resolution of Issues**: Guidelines are included in the Professional Judgment Manual.

CONFIDENTIAL

NULIT-0000161679

# APPENDIX B

## Treatment of Self-Employment/Rental Property

**Prior Treatment:** Federal Methodology (FM) has no special provisions for self-employment or rental income. Standard Institutional Methodology (IM) eliminates business losses. Many institutions make professional judgment changes, e.g., adding back business and/or rental depreciation and/or a percentage of business expenses, or falling back on a bottom-line adjustment to the parent contribution (PC) to better reflect what they think the family can afford.

**Consensus Agreement:**

- Continue to exclude business losses from income.
- Create an aid officer's guide to need analysis for self-employed families that includes procedures for: identifying when families have business income, documenting requirements, and creating methodologies for translating reported net business income into a figure that more accurately reflects the family's true financial strength. (The 568 Group will work closely with CSS, which has engaged a third party to do this project.)
- Add back rental depreciation to income.
- Add back any remaining rental loss to income.
- Impute rental property value from rental income and/or purchase price and year of purchase.
- Add back deducted expenses related to maintaining a business in the home.

**Rationale:** The experience of most financial aid administrators is that self-employed families are usually financially stronger than wage-earning families with similar adjusted gross incomes. Rental property depreciation, while allowable for income tax purposes, is a paper loss that distorts a family's real income. To the extent that other components of the methodology (e.g., a cap on home value) are linked to income, the methodology should use as realistic an income as possible. There should be objective measures to assess rental property value, just as there are with home value, rather than relying solely on family-reported data.

**Issues:** There may be increased document/data collection required, although many schools collect much of it already. Adjustments to self-employment income, while they probably yield more reasonable and equitable results, may present a challenge with regard to face validity of the rationale. (For this reason, much of this issue will be addressed through professional judgment guidelines, rather than in a standard calculation.)

**Implementation/Resolution of Issues:** The 568 Group will work closely with CSS and their contractors in the development of a self-employed guidelines

CONFIDENTIAL

NULIT-0000161680

handbook.  This includes identifying data capture requirements to support changes to the standard methodology.

CONFIDENTIAL

NULIT-0000161681

# APPENDIX C

## Cost-of-Living Adjustment

**Prior Treatment**: Institutional Methodology has traditionally used a uniform, basic living expense allowance. Although it is generally recognized that living expenses vary significantly in different geographic areas, the standard calculation does not consider these variations. The current methodology now includes an option developed initially by the 568 Group that allows institutions to adjust the living allowance for applicants from virtually all metropolitan areas.

**Consensus Agreement**: The 568 Group believed that the number of locales needed to be expanded and appreciates CSS's cooperation in developing a new expanded Cost of Living Table that incorporates all major metropolitan areas. The 568 Group recognizes that the complexity of gauging the ever changing costs of living in the various metropolitan areas will require an on going research effort. The 568 Group looks forward to further cooperation with CSS in that regard.

**Rationale**: While everyone recognizes that living in Manhattan, Kansas, requires less non-discretionary income than living in Manhattan, New York, it is very difficult to draw exact lines for the purpose of defining cost-of-living areas. Where does the high cost of living in NYC stop? Which suburbs are included? While there would be a desire to develop a table that defined cost-of-living areas at the micro level, the 568 Group is aware that, even within a zip code, housing values can differ significantly. Gathering detailed information to define a micro-level table would be extremely difficult and would have questionable long-term reliability.

It is also difficult to deal with the variety of choices that families make. One family might choose to live in an upscale suburb while another family with the same income might choose a lower-cost area. Giving one family a higher allowance to account for their decision to enjoy a higher standard of living would be unfair and inappropriate. It is also virtually impossible to distinguish between true cost-of-living issues and standard-of-living differences within metropolitan areas. Again, the common metropolitan area Cost-of-Living Table developed with CSS resolves this problem.

**Issues:**

- Identification of the boundaries of major metropolitan areas within which there is a reasonably uniform cost of living.
- Identification of the appropriate market basket of goods and services to be used to define cost-of-living indices. In particular, state and local taxes, which are allowed separately in both IM and FM, should be excluded in the market basket approach.

20

CONFIDENTIAL

NULIT-0000161682

**Resolution of Issues**: The question of how to adjust the need analysis formula to account for geographical differences in the cost-of-living allowance is complex and the solutions are likely to change over time. Consequently, the 568 Group believes that cost-of-living standards should be reviewed and updated annually. In the short term, the cost-of-living tables now offered by CSS as a PROFILE option shall be used in the Consensus Approach. These tables are based on the Bureau of Labor Statistics Consumer Expenditure Survey (CES), a data source that is used throughout the current IM formula. The tables include metropolitan areas from throughout the country, but do not include the impact of local and state taxes, thereby avoiding an issue that taints other cost-of-living studies.[2] The table shall be used only to increase IPAs, not decrease them. Using the table to decrease IPAs would be unfair to students from cities with lower housing costs because the methodology does not lower IPAs for students from rural areas or cities not covered by the table.

The 568 Group agrees that this issue requires ongoing collaboration with CSS's Financial Aid Standards and Services Advisory Committee. That 568 Group is at work on the cost-of-living issue and the 568 Group looks forward to lending its support to their on-going efforts in this regard. Given the complexity of the issue and the amount of time that it will take to come to resolution, it is appropriate to expand the number working on the problem.

---

[2] The 568 Group's initial concern with the CES data was based on the fact that it gives information on expenditures and not the cost of a fixed market basket of goods. Therefore, the CES data presents information on standards of living rather than cost of living. A subsequent review of the CES data focused on the component that describes the cost of housing. This was done because it is clear that housing costs represent the most significant driving force in differential costs of living and because it eliminates the effect of discretionary choices that families make in the purchase of discretionary items such as entertainment, dining out, etc. In addition to developing a cost of living table based on differential housing costs, the 568 Group examined its impact when applied against the entire Income Protection Allowance (IPA) and against only the housing component of the IPA. As one would expect, the differences are quite significant.

CONFIDENTIAL

NULIT-0000161683

# APPENDIX D

## Treatment of Assets Held in the Student's Name

**Prior Treatment**: Student assets are treated separately from parental assets in the current institutional and federal analyses. They are assessed at 25% in Institutional Methodology (IM) and 35% in Federal Methodology (FM). In IM, sibling assets are added to parental assets; the assessment rate is approximately 5% on these joint family assets. Assets in pre-paid tuition and savings plans are treated in Federal Methodology as a direct resource that reduces financial need dollar for dollar.

**Consensus Agreement**: The 568 Group agrees to include student assets and assets held in pre-paid tuition and savings plans in the analysis of parental assets.

**Rationale**: This treatment has several advantages over both the standard IM and FM methodologies. It is consistent with the IM treatment of sibling assets since they are already added to parental assets in IM. Since it minimizes the assessment rate of student assets, it reduces the incentive to manipulate assets by spending or transferring student assets prior to applying for aid. It is also consistent with new public policy initiatives that encourage families to participate in plans offering pre-paid tuition and/or savings plans.

**Issues**: The Technical Committee has considered a number of issues, in particular, cost, type of asset, source of asset, and federal overaward:

- The cost of treating student assets at a lower rate of assessment (approximately 5% versus 25%) will be significant for many institutions. Allowances against parental assets may, in fact, produce a situation in which there is no contribution from parental assets even with a sizeable student asset added to them.
- Professional judgment should be exercised when the student asset is from a trust fund.
- Professional judgment may also be exercised in cases in which the student asset is from third parties, such as grandparents, as opposed to parents, particularly when the accumulation is a large one.
- Since the federal system still assesses student assets at 35% and treats pre-paid plans as direct resources, the 568 Group's agreement may result in federal overawards.

**Implementation/Resolution of Issues**: The 568 Group agrees that the new treatment of student assets should be phased in order to minimize immediate costs. Phase-in would begin with the first year class. This approach minimizes the budgetary impact and the number of cases in which the family contribution falls below the federal level. Trust funds and assets, especially large assets,

22

NULIT-0000161684

from third parties may, at the discretion of the school, be exempt from the CA treatment of student assets.

The CA EFC will frequently be smaller than the Federal EFC, resulting in a federal overaward if federal funds are packaged.  The CA treatment of student assets is a major contributor to the IM/FM conundrum.  Some financial aid offices will increase the CA EFC to match the federal in at least some of their cases in which the benefits of a subsidized federal loan are compelling.

Due to federal overaward issues, 568 Technical Committee agrees that the logic of our approach in general, including our approach to student assets, should be placed on future legislative agendas.  It seems counterintuitive for federal policy to encourage the "rearrangement" of student assets and discourage parents from saving in a college account in the student's name.

23

CONFIDENTIAL

NULIT-0000161685

## APPENDIX E

### Previous Educational Debt

**Prior Treatment**: Previous educational debt of parents and students is ignored in both Institutional Methodology (IM) and Federal Methodology (FM). The CSS Profile collects some data for information purposes only. Professional judgment may be exercised in addressing certain situations where such debt affects the ability to contribute, but the treatment is inconsistent across institutions.

**Consensus Agreement**: The 568 Group agrees that the Consensus Approach shall include allowances for documented debt incurred for the higher education expenses of an applicant's siblings and his or her parents. Allowances for such debt would be made against parental assets and/or income:

1) The outstanding principal balance of any such loans would be allowed against parental assets.
2) Annual payments on such loans would be allowed against income only in those cases where, if the education were not concurrent with the applicant's, an allowance would be made for the current educational expense:

   a) Loans incurred for a sibling's undergraduate schooling
   b) Loans incurred for a parent's higher education if required for the parent's employment or was for job retraining.

3) Annual payments would not be allowed for loans incurred for the applicant, or for the sibling in a program in which he or she is currently enrolled (and whose expenses are therefore considered in the adjustment for multiple siblings in college).

**Rationale**: Educational debt affects current financial strength. Recognizing prior debt further addresses any previous and legitimate commitments to education by broadening the perspective from a "snap shot" view to a wider one that includes consideration of certain financing expenses incurred by the family. Finally, the financial aid system has become sensitive to the concerns of families with younger children to educate. In fairness, consideration should be given to families who have supported the education of older children and are still in debt as a result.

**Issue**: To what extent can an allowance be incorporated into central processing vs. local professional judgment guidelines?

**Implementation/Resolution of Issues**: Work with CSS to identify what data would be required in order to incorporate this policy guideline into central processing, and whether such central data collection is feasible.

24

NULIT-0000161686

PJ Manual, Edition 2005.1

# 568 PRESIDENTS' GROUP

# PROFESSIONAL JUDGMENT
# GUIDELINES MANUAL
# 2004-05

CONFIDENTIAL

NULIT-0000161687

# *CONTENTS*

| | | Page |
|---|---|---|
| 1. | Divorced/Separated/Single Parent | 2 |
| 2. | Divorced/Separated/Single Parents Guidelines | 5 |
| 3. | The CA/FM Conundrum | 7 |
| 4. | Imputing the Value of Liquid Assets | 8 |
| 5. | Retirement Allowance | 9 |
| 6. | Treatment of Assets Held in the Student's Name | 10 |
| 7. | Income Losses from Business | 13 |
| 8. | Income and Assets Not Proportional (Low Income/High Assets) | 14 |
| 9. | Medical / Dental Expenses | 16 |
| 10. | One-Time Taxable Income | 18 |
| 11. | Prior Parental Educational Debt | 20 |
| 12. | Parents' Estimated Year Income | 22 |
| 13. | Number in College/Parents' College Costs | 24 |
| 14. | Rental Income and Losses | 26 |
| 15. | Distribution of Retirement Funds (Rollovers) | 28 |
| 16. | Sabbatical Leaves | 29 |
| 17. | Number in College/Children's College Costs | 30 |

CONFIDENTIAL

NULIT-0000161688

**Topic: Divorced/Separated/Single Parent**

**Current IM Treatment:** There is no consistent way of evaluating the financial need of students whose natural parents are not married to each other. While some institutions attempt to secure data from both parents in order to determine what is a reasonable contribution from each, the effort is not always successful. The process is often made more complex because of the re-marriage of one or both natural parents. In addition, Federal Methodology (FM) completely excludes non-custodial data.

**568 Technical Committee Guidelines:** Analysis begins with the custodial family unit and then additional information is sought concerning the non-custodial family unit. In the case of re-marriage of either or both natural parents, the standard approach would be to request the cooperation of and information from all parents and spouses. Generally, a contribution from the income and assets of no more than two parents will be expected. Institutions could exercise judgment to use information from more than two parents.

**Rationale:**

- Having a consensus on policy and procedure for calculating parental support will reduce significant variances in measuring need among institutions.

- As with students whose parents are married to one another, **ability** to pay, not **willingness**, should be used to determine the expected parent contribution.

- Parents divorce one another, not the child.

**A. Data Collection:**

Collect information for both the custodial and non-custodial parent household. This information should include documents such as the CSS PROFILE/Institutional Aid Form, the Non/Custodial Parent Statement, and the most recent tax year 1040 and W-2 forms for **both** custodial and non-custodial parents.

**B. Determining Which Parent(s) to Be Used in Analysis**

Use both biological parents whenever possible as the basis of the need analysis unless:

a. The resulting parent contribution (from the biological/adoptive) is lower than the federal parent contribution derived using FM. If the FM parent contribution is higher than the CA parent contribution, the

CONFIDENTIAL

NULIT-0000161689

FM result should be used. Exceptions should be based on extenuating circumstances and must be carefully documented.
b. Information from the non-custodial parent is waived via the Non-custodial Parent Waiver process

C. The Non-custodial Parent Waiver Process

Information may be waived using the Consensus Approach **Non-custodial Parent Waiver Petition** or other appropriate documentation from the non-custodial parent in any of the following circumstances:

- When there is documentation of physical abuse. Acceptable documentation could include a police report, restraining order, or supervised visitation in the divorce decree.

- When there is documentation that the non-custodial parent is disabled and receiving benefits.

- When the non-custodial parent is receiving public assistance.

- When the non-custodial parent is incarcerated.

- When the stepparent has legally adopted the student.

- When the divorce is over 10 years old and there is evidence of no-contact/no child support/parent is uninvolved. In most cases, a 3rd party confirmation letter should be required.

- When the divorce is less than 10 years old and the student provides additional information to support a claim of "abandonment" by the non-custodial parent.

NOTE: The Technical committee recommends that the **Non-custodial Parent Waiver Petition** be made available only if requested and not offered as a part of the initial aid application, or as a readily available WEB form.

**Professional Judgment Circumstances:**

The Technical Committee understands that there may be problems trying to apply the above **general procedures** to each individual family's situation. The Technical Committee, therefore, recommends that the following Professional Judgment Circumstances recommendations, be used, when appropriate, to supplement those detailed in Section B of Data Collection as detailed above

After collecting a **Non-custodial Parent Waiver Petition,** information may be waived in the following circumstances:

- 3 -

CONFIDENTIAL

NULIT-0000161690

When the non-custodial parent is unemployed; in this case only a one-year waiver should be granted.

When the custodial parent is remarried for at least 5 years and there is information provided by the family to support the fact that the stepparent has acted as the "real" parent of record.

## B. Assessing Parent Contributions/Treatment

1. Neither parent is remarried

The custodial parent household size includes all household members; the non-custodial household includes only the parent and the student.

If there are siblings living with the non-custodial parent, they should be included in that household and not in the custodial household. The student is the only one "counted twice". Other siblings in college may be included in both households if they attend schools that expect a contribution from both parents.

2. One or both parent(s) is remarried.

The stepparents are taken out of the household(s) along with any of the stepparent's children.

- change the household size
- change the marital status to single
- take out the employment allowance if the spouse also works
- cut in half all assets and non-wage income (not attributable to either parent)
- prorate the taxes based on the parent's income as a percentage of total income.
- prorate IPA as above (consideration of stepparent income contribution)
- calculate as above.

3. Professional Judgment Situations/Suggestions

- When 9 months of child support paid for the student is more than the calculated non-custodial PC, use that amount as an "offer" (and take it out of custodial income).
- Use the non-custodial parent offer (if greater than the calculated contribution and reasonable)
- If child support is going to end, remove it as income from the custodial parent and as an offset in the non-custodial calculation in order to maintain consistency in future years

- 4 -

NULIT-0000161691

- Allow the student/custodial parent to take on the obligation of N/C parent through additional self-help or outside scholarships
- If the divorce is more than 10 years old and the non-custodial parent has been remarried for a while, the parent contribution could be reduced or eliminated
- When there is a second family, the step or half-siblings could be allowed in the parents' household.
- In a remarriage with very young new children, a non-working spouse could be added as a dependent.
- Untaxed income may be added to a household where the stepparent supplies the bulk of the financial support (i.e., prorate IPA)

*    *    *    *    *

## Divorced/Separated/Single Parents Guidelines

In rendering a proper decision regarding expected parental contribution, the following considerations might sometimes prove helpful:

1. The aid administrator should always be sensitive to the principle that it is the parent's ability to pay rather than their willingness to pay, that is the defining issue in need analysis. That said. Professional judgment might be exercised when the non-custodial parent (NCP) is clearly acting in a hostile manner or there is clear evidence of serious problems, e.g., drug addiction, chronic unemployment, full disability, or the parent is on public assistance. In such cases the aid director might:

   a. proceed with a full review and render an FM decision for non institutional funds only; or
   b. proceed to request the NCP information/cooperation directly from the NCP rather than through the applicant; or
   c. render a decision that meets the applicant's need but with differential packaging (higher work and/or loan awards).

2. Length of time since natural parents were together: if period of separation exceeds ten years, then pursuing the NCP could be waived unless the NCP:

   a. has provided regular child support and/or is in regular communication with the applicant;
   b. has claimed the applicant for tax purposes in the last three years;
   c. lives in same general vicinity;
   d. has provided other means of significant support to the applicant, e.g., car insurance, tuition for high school for applicant or siblings, vacation visits;
   e. has obviously been involved in supporting applicant after initial waiver to pursue NCP was determined, e.g., applicant declines all self help yet bills were paid in full.

- 5 -

CONFIDENTIAL

NULIT-0000161692

Other reasons for being more deliberate in reviewing the role for the NCP:

    a. separation is not a "legal" one recognized by court;
    b. NCP clearly has resources to contribute;
    c. lifestyle of custodial parent who is not remarried would suggest there
       might be other resources available.

3. Abandonment: There is clear evidence that the NCP has been completely out of the picture because of:

    a. incarceration;
    b. being out the country permanently and has not provided support;
    c. receipt of AFDC by the custodial parent;
    d. other extreme circumstances, e.g., recent total bankruptcy.

4. Abuse: If there is clear and documented evidence of child abuse by the NCP:

    a. be cautious of simply accepting statement from school counselor, e.g., "Father's whereabouts unknown;"
    b. a written confirmation from one or more objective third party person might be appropriate in some cases.

## Other Observations

1. These guidelines are always subject to the aid administrator's professional judgment and would serve as a basic standard for all 568 schools. Individual institutions could employ additional expectations either on an individual basis or as policies to be applied to all such cases.
2. The exact calculation of any additional resources from more than the applicants' current parent(s) is an important standard and will be determined separately at a later time.
3. The aid administrator will always have the discretion as to how or whether to use the NCP information in the need analysis and/or packaging process.
4. Rulings by a court, while part of the big picture, do not necessarily direct institutional aid policies. If one is a parent, his/her responsibility to the child does not end with separation/divorce.
5. Differences between FM and IM will always present a challenge.

CONFIDENTIAL

NULIT-0000161693

**Topic: The CA/FM Conundrum**

**Current IM and FM Treatment:** Recent changes in the Institutional Methodology (IM) have increased the number of cases in which the IM Family Contribution is lower than the federal EFC, creating potential federal "overaward" situations. In some cases, application of the Consensus Approach (CA) to need analysis may increase the incidence of this problem. The 568 Group seeks to create, to the extent practicable, reasonably consistent family contributions. Application of the Consensus approach throughout our Group, local professional judgment considered, will help to ensure this result.

**568 Technical Committee Guidelines:**

1. Where appropriate, professional judgment should be used to modify the FM result. This could, of course, be done only when carefully documented circumstances justify this option.

2. There will be cases where lowering the federal EFC via PJ is deemed to be inconsistent with regulations, but where the aid officer believes that the Consensus Approach EFC more fairly responds to the family's financial circumstance. Should this occur, the award could be based on CA results only if need based federal funds are removed from the aid award and replaced with institutional or private funds. These cases should be carefully documented.

3. If the local aid officer believes that options 1 and 2 are inappropriate or inconsistent with institutional resources, the following should be considered. If the difference between CA and FM is less than the amount of packaged Stafford, the CA result should be used and the award should be packaged with unsubsidized Stafford loan funds.

4. As a final option, the local aid officer can accept the federal EFC and set the CA Family Contribution at the federal level. This option may be appropriate when the difference between CA and FM is small and the aid officer determines that the terms of the subsidized federal loan outweigh an institutional or federal unsubsidized loan.

CONFIDENTIAL

NULIT-0000161694

**TOPIC: Imputing the Value of Liquid Assets**

**Current IM and FM: Treatment: FAFSA** (FM) collects all asset data, except for the home, with one question. The PROFILE (IM) uses questions that delineate assets into cash and bank accounts, and investments, real estates, etc.

An examination of tax return data including interest and dividend income may suggest assets that do not appear on the CSS Profile. Prior to the establishment of CA, Institutions made various assumptions concerning the value of those assets depending on the assumed rate of return they choose to use. Additional differences in treatment occurred when aid officers use different multipliers for interest and dividend income. Interest income can, in fact, indicate a simple bank account or an investment (e.g., CD). A system that imputes bank accounts from interest paid can give the wrong result if the family has entered the corpus as an investment.

**Technical Committee Guidelines**: The Consensus Methodology calls for assets to be imputed at 4% for the current year as an attempt to use a rate that is reasonable based on the various investment vehicles that exist. It is suggested that one rate be used for all bank accounts and investments, interest and dividends, to eliminate the possibility of double counting an interest-bearing asset as described above. This multiplier is set annually based on market conditions.

The system should use the greater of the stated assets or the imputed amount. Assets can easily be greater than the multiplier would assume. Many checking accounts do not generate interest income. Stocks will often not pay dividends or pay very little. It is therefore important to use either the imputed value of the investment or the value that the family has entered if it is higher.

This treatment applies to parents' assets and to those of the student when they are either added back to parents' assets or left as a student asset.

CONFIDENTIAL

NULIT-0000161695

**TOPIC: Retirement Allowance**

**Current IM Treatment:** In its recent revision of the standard IM treatment of assets, CSS eliminated any allowance against assets for retirement and added educational savings and family emergency savings allowances.

The 568 Group believes that it is appropriate to provide, as a professional judgment option, retirement protection to those for whom social security is the only significant source of retirement income.

**Consensus Methodology:** To determine if a family has retirement resources other than social security, the institution should refer to the following:

- Section N, items 71f and 72f of the CSS PROFILE Form
- Information about tax deferred contributions on the W-2 form (box 12 coded D, E, F, G, H, or S).
- Box 13 of the W-2 form which indicates that there is an employer sponsored plan.
- Tax forms to determine if IRA, KEOGH or SEP-IRA contributions were made.

In addition, institutions may choose to collect information about retirement plans, including the current value of the plan as a CSS Profile Q question, on an institutional application, or on a case-by-case basis.

Once it has been established that the family does not have retirement resources other than social security, the appropriate value from the FM Asset Protection Allowance table may be used as an offset against assets.

**Other Professional Judgment Issues:** "Retirement resources" are defined broadly as any retirement asset other than social security, including IRA accounts. Institutions may use professional judgment in identifying cases where these non-social security assets are insufficient to support the parent's reasonable retirement needs. In those cases, the institution may consider factors such as parent age, occupation, and family size in determining if it is appropriate to allow all or part of the FM asset protection allowance against assets.

CONFIDENTIAL

NULIT-0000161696

**Topic: Treatment of Assets Held in the Student's Name**

**Current Treatment in IM and FM**: Student assets are treated separately from parental assets in the current institutional and federal analyses. They are assessed at 25% in IM and 35% in FM. In IM, sibling assets are added to parental assets; the assessment rate is approximately 5% on these joint family assets.

Assets in pre-paid tuition plans are treated in Federal Methodology as a direct resource that reduces financial need dollar for dollar. In IM, pre-paid plans, student and sibling, are considered as a parental asset if the parent set them up. Information is, therefore, included in the basic Profile information. If other relatives, such as grandparents, or other third parties, such as godparents, are sources, a Section Q question (522) can be used to get the information

The new 529 plans are part of parental assets in both IM and FM if the parent set them up. If other relatives, such as grandparents, or other third parents, such as godparents, are sources, another Section Q question (521) can be used to get the information.

**Consensus Methodology**: Most student assets should be considered parental assets in assessing the EFC. This includes assets given to students by parents for their future college expenses and assets that the student has saved from his/her employment. [in a particular year?]

Adding student assets to parental assets has significant advantages:

- It is consistent with the treatment of sibling assets since they are already added to parental assets in IM.
- Parents who have saved in the student's name have done so in order to use the money to make their future parental contribution; using this asset as an addition to their contribution is unfair.
- Student assets that derive from the student's employment may be double-counted in the sense that a separate student income contribution is expected. For continuing students, the situation can be further complicated by the fact that their assets reflect term-time Work-study amounts.
- Considering most student assets as parent assets reduces the incentive to manipulate assets by spending or transferring student assets prior to applying for aid because it eliminates a basic perceived inequity in the financial aid system.
- This approach is consistent with new public policy initiatives that encourage parents to participate in plans offering pre-paid tuition and/or savings.

**When Student Asset Contributions are Appropriate**: Assets given to students by third parties (grandparents, godparents, or other relatives) should be

- 10 -

CONFIDENTIAL

NULIT-0000161697

considered as a student asset and assessed at 25% in CA. Those assets can be apportioned over the four-year enrollment period. They include new forms of assets, such as the popular 529 plans, marketed to grandparents as part of their estate planning. In these cases, assets in sibling's names should be removed from parent assets on the assumption that third parties have also contributed to sibling assets.

Reasons for this approach include:

- A basic principle of financial aid is that parents contribute according to their ability to pay. Their ability to pay reflects their resources. Money saved in the student's name can be considered their asset since they are the source. Third party resources are different.
- Assessing these assets at 5% rather than 25% would give families with extended third party resources a significant advantage over those that do not.
- The Student Asset provision in CA is one of the most generous parts of the methodology—and rightly so.. Assets from third parties can be treated as student assets without disrupting the overall generous approach of CM.

**Implementation**: Most schools will want to set the present option in INAS or their financial aid operating system to add student assets to parental assets. Student assets from parents and from after-school/vacation earnings will be the most common sources of student assets.

Assets from third parties would be treated as exceptions. Profile, Section Q, or questions on the institutional application (if required) can be used to gather information.

- The CSS Profile now asks for the source of trust funds (Section D, question 23c).

- The Profile includes pre-paid plans and 529 plans in parental assets both for the student and siblings if they are from the parent. It does not collect information for either pre-paid plans or 529 plans when those plans are from third parties. The Student Asset section does not include them either. Section Q can be used—this time, to gather information on assets in these plans from third parties. Existing questions include:

**Q 521** - Collects total value of assets held in state-sponsored [or private] college savings plans that were established for the student by someone other than the student's parent(s).

**Q 522** – Collects the total value of assets held in state-sponsored [or private] prepaid tuition plans that were established for the student by someone other than the student's parent(s).

A new Section Q question can ask students to delineate the source of student assets in questions 26, 27, 28 in Section C—Student's Assets:
**QXXX** Refer to questions 26, 27, 28 on the Profile and indicate the amount from

- 11 -

NULIT-0000161698

Student's Parents _____
Others                    _____
Student Earnings  _____

Institutions with institutional aid applications can include questions that get at his information if they do not want to use Section Q.

**IM Vs. FM -** In many cases, treating student assets as parental assets will result in IM EFCs that are lower than federal EFCs. Delineating student assets by source and having the signed Profile and/or the institutional application may serve as documentation for moving the assets to parents in FM when the parents are the source. This will be an individual decision that each campus must make for itself.

- 12 -

CONFIDENTIAL

NULIT-0000161699

**TOPIC: Income Losses from Business**

**IM Standard Treatment:** The IM standard treatment is to disallow such losses.

**Why Professional Judgment Might Be Appropriate:** Tax laws allow business losses reported on IRS Form 1040 Schedule C to be reported as income losses on page one of the 1040, reducing adjusted gross income and lowering calculated parent contributions. Reported losses are often not the result of a "real" income reduction to the family. For example, depreciation of business assets and property do not affect the family income. As a result, the standard IM does not allow such losses to offset other forms of income. However, there may be situations where losses are real and should be allowed to reduce family income in CA. For example, a review of a Schedule C with a high "cost of goods sold" figure might suggest to an aid administrator that a reported business loss would be a legitimate offset to income.

A review of Schedule C may also provide details on the type of business and allow the aid administrator to determine if the business value and debt reported in the asset section appears to be reasonable. For example, significant depreciation and/or interest expenses may suggest the existence of equipment, machinery, real estate, or inventories.

**How CA Could Be Adjusted:** The aid administrator may wish to allow certain business losses on a case-by-case basis. Allowable losses would not be added back to adjusted gross income.

**FM Standard Treatment:** Adjusted gross income is used in the FM computation. Therefore, any Schedule C business losses are allowed to offset income.

**How FM Could Be Adjusted:** Since the FM uses AGI as its measure of taxable income, an adjustment to zero out losses should probably not be made when determining eligibility for federal aid.

**Documentation:** An IRS form 1040 with Schedule C should be collected. A CSS Business/Farm Supplement may be useful. If allowable business losses reduce adjusted gross income to a level where meeting basic family financial needs seems difficult, reviewing a monthly income and expense balance sheet from the family might be necessary. See CA common form XX.

- 13 -

CONFIDENTIAL

NULIT-0000161700

**Topic: Income and Assets Not Proportional (Low Income/High Assets)**

**IM Standard Treatment:** IM standard treatment uses reported base year income and current asset data.

**Why Professional Judgment Might Be Appropriate:** In many self-employment situations, a family's financial strength can be greater than indicated by Adjusted Gross Income (AGI). Examples of such professions are restaurant or store owners, taxi drivers, and property managers. For these families, total income may not be accurately reported (income from tips, etc.), or the business may support otherwise major expenses such as housing. It may be appropriate to expect a higher parent contribution than is calculated by the need analysis methodology.

In identifying these cases, the following indicators may suggest that income is higher than reported:

- Mortgage or rent payment may absorb a disproportionately high percentage of reported income;
- Total reported income may be too low to reasonably support the household size;
- Interest and dividend income may be high in relation to AGI and/or reported cash and investments;
- The family may be paying private school tuition in an amount that would be difficult to manage on reported income;
- Parental offer may be higher than income would seem to support.

Conversely, some families are "house-poor." In other words, their income is insufficient to purchase their own house in today's housing market. This situation is not uncommon in certain areas of the country, where home values have skyrocketed (e.g., San Francisco, Boston, New York, northern Virginia). In such cases the calculated contribution may indicate greater financial strength than is actually the case and downward adjustments may be warranted.

**How IM Could Be Adjusted:** The institution could ask the family to complete a worksheet that is designed to give a more complete understanding of total family income and expenses. (If, in response, the family reports untaxed income that was previously unreported, this income needs to be factored into both FM and IM calculations.) The family offer for these cases should be considered carefully, particularly if PROFILE information indicates that the family is paying tuition at a private school or another college or university. In some instances the aid administrator may use professional judgment to decide on a PC that is unrelated to the computed result, using that number as a basis for entering into discussion with the family.

In cases where the home equity is much higher than the family income would indicate, a downward adjustment to the home equity may be warranted. For

- 14 -

CONFIDENTIAL

NULIT-0000161701

example, the aid administrator could cap the home value at three times the family income and recompute home equity. (Three times income is reasonable, since it indicates the maximum home value that a family could afford to purchase today.)

**FM Standard Treatment:** AGI is the basis of the FM calculation. If verification reveals errors (particularly in omitted untaxed income), corrections are required to the relevant data elements.

**How FM Could Be Adjusted:** Since the FM uses AGI as its measure of taxable income, an adjustment to increase taxable income should probably not be made when determining eligibility for federal aid. However, if omitted income sources are identified during follow up, corrections to the FM data elements are required.

**Documentation:** A worksheet such as the attached could be sent to the family to clarify their income and assets.

CONFIDENTIAL

NULIT-0000161702

**Topic: Medical / Dental Expenses**

**IM Standard Treatment:** Expenses in excess of four percent of total income are included as an allowance against income. The basic coverage for medical premiums and routine expenses are included in the Income Protection Allowance. Based on current Consumer Expenditure Survey data, median expenses represent approximately 4 percent of total family income.

**Why Professional Judgment Might Be Appropriate:** In some cases where medical expenses related to complicated surgery or prolonged rehabilitation are extremely high, families may carry forward the expense for more than one year or liquidate assets to pay medical or dental bills. In these cases, the aid administrator may make additional adjustments to allow the family time to recoup their financial strength.

**How IM Could Be Adjusted:** If the family arranged a payment plan, the annual payments should be used as an allowance against income. This will require follow up in subsequent years for similar adjustments.

**FM Standard Treatment:** No medical/dental allowance is provided in the standard FM. The Department of Education has advised colleges that the basic medical and dental expenses included in the federal IPA represent 11 percent of family income. As a result, exceptional expenses would be defined as any expenses in excess of 11 percent of total income.

**How FM Could Be Adjusted:** An FM adjustment could be made by calculating exceptional expenses as defined above and adding these expenses to U.S. taxes paid to reduce the family's available income.

**Documentation:**

The following types of documentation may be helpful:

- Statement from family about circumstances
- Copy of payment plans or agreements
- Copies of charges and insurance coverage statements
- IRS Schedule A

**CSS/Financial Aid PROFILE:**

- The parents' medical and dental expenses for the base year and the projected year are collected in PROFILE question 35. The independent student's expenses are collected in question 25.

- 16 -

CONFIDENTIAL

NULIT-0000161703

- INAS and PowerFAIDS support, on an individual student basis, adjustments to the FM to account for exceptional medical and dental expenses. The actual value of the allowance should be entered in the ISIR Extension record.
- INAS permits institutions to redefine "exceptional" medical/dental expenses by entering a percent other than 4 percent. If a different percent is provided as a global parameter, the IM calculation will adjust the medical/dental allowance to consider expenses above the percent of income established by the institution.

CONFIDENTIAL

NULIT-0000161704

**Topic: One-Time Taxable Income**

**IM Standard Treatment:** One-time taxable income is included in Adjusted Gross Income (AGI). The standard IM considers all base year income, including one-time taxable income, in computing the contribution.

**Why Professional Judgment Might Be Appropriate:** There are times when a portion of the family's income is one-time income, and is therefore, not representative of the family's annual recurring income. Examples of one-time income include:

- Capital gains
- Bonus income
- Gambling or prize earnings
- Early distribution of IRA or retirement plan income
- Conversion of traditional IRA to Roth IRA
- Employer reimbursement for moving expenses
- Insurance settlements

**How IM Could Be Adjusted:** The aid administrator may decide either to disregard the one-time income or to zero out the income and consider it as an asset instead.

- If the AGI is reduced by the amount of one time income, the aid administrator should recompute the taxes paid based on the lower AGI.
- If the aid administrator decides to treat the one-time income as an asset, consideration should be given to any significant expenses incurred related to the one-time income. For example, if the one-time income is the result of a life insurance settlement, it may be necessary to take into account funeral expenses incurred by the family.

**FM Standard Treatment:** The standard FM treatment is the same as standard IM.

**How FM Could Be Adjusted:** FM could be adjusted in the same way as IM.

Documentation:

- Request further explanation of the income in question
- Documentation from the source that this is really one-time income (e.g., moving expense reimbursement from the employer)
- Documentation of expenses related to the acquisition or use of the one-time income (medical expenses related to insurance reimbursement)

**CSS/Financial Aid PROFILE:**

- The PROFILE Application collects three years of parent income—the base year used in the analysis, the prior tax year, and the projected

- 18 -

NULIT-0000161705

year. Families are instructed to explain differences in income from one year to the next on page 4 under special circumstances.

- FNAR messages 58-61 identify cases where the difference in total income from one year to the next is significant. The aid administrator may want to give careful review to cases when one or more of these messages are triggered.

- 19 -

CONFIDENTIAL

NULIT-0000161706

**Topic: Prior Parental Educational Debt**

**IM Standard Treatment:** The standard IM ignores the annual cost of repaying educational debt in calculating parents' available income and discretionary net worth.

**Why Professional Judgment Might Be Appropriate:** For many families, the ability to pay current college costs is diminished by the family's prior educational debt. This could be debt accumulated as a result of either the parents' or the student's siblings' educational costs. Professional judgment is probably not appropriate if the parents have opted to repay the student's educational loans.

**How CA Could Be Adjusted:** The "allowances against income" in the IM are defined as non-discretionary expenses—expenses that don't reflect lifestyle choices. Incurring educational debt and meeting the subsequent repayment obligation can be justified as "non-discretionary" expenses. The aid administrator may wish to consider either of the following adjustments:

➢ The family's annual educational loan payments could be subtracted from "available income," to reflect the non-discretionary expenses.
➢ The family's total educational debt could reduce the net worth.

**FM Standard Treatment:** The annual cost of repaying educational debt is ignored in the treatment of income and assets in the FM.

**How Fm Could Be Adjusted:** An FM adjustment could be made in the same way as IM. However, an adjustment must be made to a data element.

**Documentation:**

The following types of documentation may be helpful:

▪ Copies of promissory notes
▪ Documentation of payments and outstanding balances

**CSS/Financial Aid PROFILE:**

- The PROFILE Application collects information about parents' annual educational loan repayments in question 34. This information is requested for the base year and the next year.

- Institutions may select Q question 214, which asks if the parents are paying off educational loans, and if so, to specify the type of loan, the current amount owed, the expected year payments, and for whom the payments are made.

- Institutions that use INAS or PowerFAIDS may move the information collected on the PROFILE about educational loan repayments into

- 20 -

CONFIDENTIAL

NULIT-0000161707

Other Income Allowances, thereby reducing the parents' available income in the IM.

CONFIDENTIAL

NULIT-0000161708

**Topic: Parents' Estimated Year Income**

**IM Standard Treatment:** The standard IM uses the parents' base year income—the taxable and nontaxable income received during the tax year prior to the beginning of the academic year for which the student is applying for aid. Base year income is generally considered to be a valid predictor of annual income for most families, and has the benefit of being verifiable.

**Why Professional Judgment Might Be Appropriate:** Parental income is the most important factor in determining the family's ability to pay. There are situations where the base year income is not indicative of the parents' continuing ability to pay because of a confirmed significant drop in income in the next tax year. Reasons for decreases in parent income include:

- Death of a parent
- Parent's temporary or permanent disability
- Parent's retirement
- Loss of parent's employment and/or benefits

**How IM Could Be Adjusted:** There are at least two approaches the aid administrator may wish to consider in cases where the base year income does not reflect ability to pay.

- Reduce the base year income based on documentation of the income or benefit loss. Calculate a new AGI and total income. Federal taxes may need to be recalculated.

- Use expected year taxable and untaxed income from the PROFILE or collect more detailed information using the 568 Projected Income Form worksheet. If there is taxable income, federal taxes will need to be calculated.

**FM Standard Treatment:** The FM standard treatment is the same as IM.

**How Fm Could Be Adjusted:** The FM could be adjusted in the same manner as IM. Revised AGI and/or untaxed income figures, along with appropriate changes to "federal taxes paid," can result in a more equitable federal eligibility figure in cases where income is projected to drop sharply in the next tax year.

**Documentation:** A Parent's Estimated Year Income Statement and documentation of the termination of income, if appropriate, could be collected.

CONFIDENTIAL

NULIT-0000161709

RE: Student's Name
S.S.#: 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
DATE: 01/01/05

## PARENTS' ESTIMATED YEAR INCOME STATEMENT

You have indicated a decrease in parent(s) income in 2001. Please provide the following information:

1) Date parent's employment ceased (if applicable) _____

2) Income earned by mother from January 1, 2004 to December 31, 2004 $_____

3) Income earned by father from January 1, 2004 to December 31, 2004 $_____

4) Mother's taxable income (other than earned wages) expected from 01/01/04 to 12/31/04 (unemployment compensation, interest income, severance compensation, etc.) $_____

5) Father's taxable income (other than earned wages) expected from 01/01/04 to 12/31/04 (unemployment compensation, interest income, severance compensation, etc.) $_____

6) Parents' nontaxable income from 01/01/04 to 12/31/04 from the following sources:

A) Deductible IRA and/or Keogh payments $_____

B) Payments to tax-deferred pension and savings plans (paid directly or withheld from earnings). Include untaxed portions of 401(K) and 403(B) plans. $_____

C) Social Security Benefits $_____

D) Child Support $_____

E) TANF/Welfare Benefits $_____

F) Untaxed portions of pensions (excluding "rollovers") $_____

G) Any other untaxed income and benefits (please explain and provide expected amount(s), such as: worker's compensation, foreign income exclusion etc..):

_____

**Please provide copies of written documentation that support the information that you have provided.**
I/We certify the information listed above is a complete and accurate breakdown of all expected income, taxed and untaxed, for the calendar year 2004. *I further certify that if any of the above information changes, I will immediately notify the Financial Aid Office in writing of the changes.*

Student's Signature _____ Date _____
Mother's Signature _____ Date _____
Father's Signature _____ Date _____

- 23 -

CONFIDENTIAL                                    NULIT-0000161710

**Topic: Number in College/Parents' College Costs**

**IM Standard Treatment:** The parent is not included in the number in college in the standard IM treatment. The reason is that in many cases, the parent attends a low-cost local institution on less than a full-time basis, and may not be enrolled in a degree program. Even if enrolled in a degree program, the costs incurred by the parent are usually fairly low. In addition, if the parent is pursuing a degree or certificate for professional advancement reasons, the costs are often paid by the parent's employer.

**Why Professional Judgment Might Be Appropriate:** Although the parent is not included in the number in college adjustment in the standard IM, there may be instances when the financial aid administrator might want to account for the costs the parent incurs. In deciding whether to recognize these costs, the aid administrator may want to determine whether the parent's enrollment is discretionary, or whether the parent's educational goal is related to retraining or professional advancement.

**How IM Could Be Adjusted:** Parents' direct educational expenses (out of pocket expenses for tuition, fees, books and supplies) can be recognized in one of four ways. However, before deciding whether to make an adjustment, the aid administrator may want to consider whether the parent has other resources such as employer-reimbursed tuition benefits, or whether the parent is receiving financial aid.

- Make a direct allowance against income based on the actual direct educational expenses of the parent. In this case, the number in college would not be adjusted.
- Make a direct allowance against the parent contribution based on the out-of-pocket expenses incurred by the parents. This would only be appropriate if the out-of-pocket expenses were less than half of the contribution for the student.
- Allow a standard amount to be deducted from the parent contribution based on the average cost at the type of institution the parent is attending (i.e., community college, four-year private institution, etc.)
- In unusual cases, increase the number in college to include the parent. In choosing this option, the aid administrator should keep in mind that the IPA will be reduced, and may only be appropriate when the parent's educational expenses are equal to at least half of the parent contribution for the student based on one-in-college

**FM Standard Treatment:** Beginning in the 2000-2001 academic year, parents will be excluded from the FM number in college adjustment.

**How FM Could Be Adjusted:** The parent could be added to the FM number in college. Alternatively, the amount of the parent's direct education expenses could be added to U.S. taxes paid, resulting in a reduction in the parent's available income.

- 24 -

**Documentation:** The aid administrator may wish to ask the parent for documentation of enrollment from the college or university, as well as verification of the portion of costs incurred by the parent.

CONFIDENTIAL

NULIT-0000161712

**Topic: Rental Income and Losses**

**IM Standard Treatment:** The IM standard treatment is to disallow income losses reported on the PROFILE Application. Since categories of income and losses are grouped together, it is not possible to separate rental losses from other income and losses.

**Why Professional Judgment Might Be Appropriate:** Tax law allows losses reported on IRS Form 1040 Schedule E to reduce other family income. Many times the loss from rental property is only a "paper" loss, since owners of rental property are permitted to depreciate their property, reducing their rental income. As a result, the standard IM does not allow such losses. However, there may be unusual cases where properties remain vacant for a period of time and the owner incurs real expenses—mortgage, utilities, property taxes, etc. In such cases, the aid administrator may wish to allow the family's losses related to rental property.

**How IM Could Be Adjusted:** The aid administrator may elect to allow such losses on a case-by-case basis. By reviewing Schedule E, the aid administrator can determine which expenses relate to real costs born by the family and which do not. For example, depreciation should be disallowed, since this represents a tax benefit for the family investment without a corresponding cash expense. Schedule E may also help the aid administrator determine if the other real estate value and debt reported in the asset section appears reasonable.

**FM Standard Treatment:** Adjusted gross income from a federal tax return is used in the income computation. Therefore, any Schedule E rental losses are reflected in the AGI and allowed to offset other income.

**How Fm Could Be Adjusted:** Since the FM uses AGI as its measure of taxable income, an adjustment to zero out losses should probably not be made.

**Documentation:** The complete federal tax return for the base year, including all Schedules E, should be collected. If corresponding asset values appear inconsistent, a detailed description of the family's real estate holdings may be necessary, collecting such information as date of purchase, price of purchase, current market value, and explanation of all debts, and monthly mortgage principal and interest payments. If the rental losses reduce AGI to a level where meeting basic family financial needs seems difficult, reviewing a monthly income and expense balance sheet from the family might be necessary.

**CSS/Financial Aid PROFILE:**

- The PROFILE Application captures income and losses from business, farm, rents, royalties, partnerships, estates, trusts, etc. in question 50d. Information about the value and debts associated with parents' other real estate, including rental property, as well as the year the property was purchased and the purchase price are collected in Section I.

- 26 -

NULIT-0000161713

- Institutions may select Q question 111, which asks parents to write the number of properties, other than their home, that they own, and to provide details about the value, amount owed, purchase year, and purchase price for each.

- The PROFILE Service Options Form provides institutions with an option to allow parents' losses in the IM.

- 27 -

CONFIDENTIAL

NULIT-0000161714

**Topic: Distribution of Retirement Funds (Rollovers)**

**IM Standard Treatment:** The retirement distribution is reported on the PROFILE and on the IRS Form 1040 as income, either taxed or untaxed. If reinvested in anything other than an eligible retirement plan, it is also reported as an asset. If "rolled over" to another eligible retirement plan in the same tax year, the distribution is excluded from income.

**Why Professional Judgment Might Be Appropriate:** Families often explain that income in a particular calendar year is unusually high, due to the distribution of retirement funds. In attempting to assess the family's financial strength, it is important to determine the nature of the distribution. A distribution might represent:

- an annual income stream
- a one-time transfer of funds
- a resource used to make consumer purchases, pay college costs, or pay off consumer debt

Additionally, it is important to determine whether the IM is counting the distribution as both income and assets in the same year.

**How IM Could Be Adjusted:** The aid administrator must determine what the family did with the distribution. The current disposition of the funds should determine whether it should be counted as income, asset, both (split between income and assets), or not counted at all. Options might include:

- counting as income an annual pension pay out
- counting as assets the transfer of funds to savings
- counting only a portion as income when used to pay college tuition and consumer debt
- ignoring the income when used to pay off outstanding medical bills

If a tax liability occurred and the decision is made to reduce or eliminate the family's income based on the distribution, the federal tax paid may also need to be adjusted.

**FM Standard Treatment:** FM treats retirement distributions in the same manner as IM.

**How FM Could Be Adjusted:** FM could be adjusted in the same way as IM.

- 28 -

CONFIDENTIAL

NULIT-0000161715

**Topic: Sabbatical Leaves**

**IM Standard Treatment:** The standard IM uses base (prior) year income. Sabbatical leave reduces income during the year in which student is in school.

**Why Professional Judgment Might Be Appropriate:** Employees of educational institutions are sometimes allowed to take sabbatical leaves for further education or research. Leaves may vary in length, but are usually for one or two semesters. Salary usually continues to be received, but often at a reduced rate. Benefits are almost always continued. Because salary may be reduced, and additional expenses may be incurred, resources to pay for college are reduced.

**How IM Could Be Adjusted:** IM can be adjusted by using estimated year income from the PROFILE Application, or information from an Estimated Year Income Worksheet. Some relevant questions unique to the sabbatical leaves might be added, however, such as:

- What is the exact period of the sabbatical (it may be over an academic year, and therefore span two calendar years)?
- What is the exact reduction in pay (the educational institution may have a written policy that could serve as documentation)?
- Is some type of research grant being received?
- Are there additional expenses during the sabbatical for travel, temporary learning expenses, equipment, etc.?

Educators are usually eligible for sabbaticals on some regular cycle, such as every five, seven or ten years. The sabbatical can usually be delayed, though, without losing the benefit. The financial aid administrator may choose not to make an allowance for reduced income or higher expenses because taking a sabbatical may be discretionary or may be able to be delayed until the student has graduated.

**FM Standard Treatment:** The standard FM uses base (prior) year income, as does the IM.

**How Fm Could Be Adjusted:** The FM could be adjusted in the same way as the IM.

**Documentation:** The aid administrator may require documentation from the parent's college or university, verifying the length and terms of the sabbatical.

- ..

CONFIDENTIAL

NULIT-0000161716

**Topic: Number in College/Children's College Costs**

**IM Standard Treatment:** When more than one child is enrolled at least half-time at a postsecondary institution, the parent contribution is discounted for each child. If two are enrolled, the parent is expected to contribute 60 percent of the calculated contribution to each child; if three are enrolled, 45 percent; if four or more are enrolled, 35 percent. A parent attending a postsecondary institution is not counted in the total family members in college.

Attached for your consideration is a form that can be used to collect sibling enrollment information.

- 30 -

CONFIDENTIAL

NULIT-0000161717

*Your College*
Financial Aid Office
Anywhere, US 00000

CERTIFICATE
OF
SIBLING ENROLLMENT

---

**A. *YOUR COLLEGE* STUDENT INFORMATION**

Name_____          S.S.
#_____
My sibling,_____ will (   ) will not (   ) be attending a post-secondary
institution during the 2000-2001 academic year.
Continue to Section B if sibling <u>will</u> be attending a post-secondary institution; return form to the above
address if sibling <u>will not</u> be attending a post-secondary institution.

---

**B. TO BE COMPLETED BY SIBLING OF YOUR COLLEGE STUDENT**

In order to verify information on my sibling's financial aid application, I authorize the institution at which I
am enrolled to release the information requested to *Your College*.

Name of Institution _____

_____/_____          _____     _____
Sibling's Name              Signature                          S.S. #                Date

---

**C. TO BE COMPLETED BY INSTITUTION REFERENCED IN SECTION B**

The *Your College* student referenced in Section A has indicated on her/his financial aid application that
s/he has a sibling, referenced in Section B, who will be attending your institution during the 2000-2001
academic year. Please complete the following information regarding the student enrolled at your
institution to assist us in our certification.

EXPECTED DATE OF GRADUATION
1.   _____/_____
     (Month/ Year)

2000-2001 ENROLLMENT STATUS
2. (   )  Undergraduate (   ) Graduate
3. (   )  Full-time (   ) Less than 1/2 (   ) Half-time (   ) Not enrolled
4. (   )  Degree (   ) Certificate (   ) Non-degree

DEPENDENCY STATUS
5. (   )  Dependent (   )  Independent

RESIDENCY STATUS
6. (   )  Resident (   )  Commuter (   )  Off-Campus

COSTS FOR THE ACADEMIC YEAR
7.   _____ Tuition & Fees _____ Rm & Bd_____ Total Cost of Attendance

FINANCIAL AID INFORMATION
8.   Is the student a financial aid applicant? (   ) Yes    (   ) No
9.   PC for 2000-01: FM _____ IM _____
10. Is the student receiving non-need based aid? (   )  Yes        (   ) No
11. If yes, please indicate sources and amounts:

---

I CERTIFY THAT THE ABOVE INFORMATION IS ACCURATE TO THE BEST OF MY KNOWLEDGE.

_____          _____
Name/Signature of College Official                        Date

- 31 -