# EXHIBIT 111

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ANDREW CORZO, SIA HENRY, MICHAEL MAERLANDER, ALEXANDER LEO-GUERRA, BRANDON PIYEVSKY, BENJAMIN SHUMATE, BRITTANY TATIANA WEAVER, and CAMERON WILLIAMS, individually and on behalf of all others similarly situated, | Case No. 1:22-cv-00125 *Class Action* **EXPERT REBUTTAL REPORT OF ELIZABETH MORA** October 3, 2024 |
| *Plaintiffs*, | |
| v. | |
| BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY, | |
| *Defendants*. | |

This report contains material designated by Defendants as Confidential or AEO under the Second Amended Confidentiality Order (ECF No. 608)

**TABLE OF CONTENTS**

I.      Introduction and Assignment ................................................................................. 1

II.     Characteristics of a For-Profit Conglomerate ...................................................... 3

III.    Revenue Diversification.......................................................................................... 6

IV.    Governance Structures .......................................................................................... 8

V.     Employment and Administrative Structures ...................................................... 12

VI.    Compensation of University Administrators ...................................................... 13

VII.   Flexibility of Endowment Spending .................................................................. 15

i

## I.      Introduction and Assignment

1.      Class Counsel have asked me to respond to the expert reports of Dr. David L. Yermack (the "Yermack Rpt.") and Dr. Bridget Terry Long (the "Long Rpt.") dated August 7, 2024, which address part of my report dated May 14, 2024 (the "Mora Rpt.").

2.      In my Report, I offered the following principal opinions:

A.   Defendants are complex organizations that, in many material respects, operate like for-profit businesses using sophisticated investment strategies;

B.   Defendants have substantial flexibility in managing and spending their annual revenues and endowment earnings on operations and programs, including institutional financial aid;

C.   Defendants compete with each other for personnel, prestige, and endowment growth and size;

D.   Institutional financial aid (defined below) is important for maintaining excellence and prestige, and is generally accounted for as a discount off tuition, not an expense of the institution;

E.   Rather than serve an altruistic purpose, institutional financial aid is critical to secure acceptance from the most gifted students to thereby maximize endowment growth over time; and

F.   The evidence and analyses I rely on in this report are common to the proposed Class as a whole.

3.      I have reviewed the Yermack and Long Reports, and they do not change any of my opinions. Neither Dr. Yermack nor Dr. Long contests the opinions summarized in subparagraphs C, D, E, and F, above. As to subparagraphs A and B, neither Dr. Yermack nor Dr. Long criticizes my factual descriptions of university operations. Their criticisms instead address the business-world analogies that I present and conclusions that I draw from my descriptions based on my years of operational experience in both academia and for-profit institutions. These criticisms are flawed, primarily because they rely on addressing arguments that I have not made.

4. Dr. Long, for example, alludes to "Ms. Mora's attempt to *equate* non-profit universities to for-profit entities is absurd." Long Rpt. ¶ 102 (emphasis added). This use of the word "equate" incorrectly suggests that my opinion was that non-profit universities are the equivalent of for-profit entities. I did not offer that opinion. Instead, I opined that Defendants *operate like* for-profit businesses *in many material respects*, which means that there are differences between Defendants and for-profit businesses. *See, e.g.*, Mora Rpt. ¶ 33 ("Because elite universities' educational services are always in such high demand, their revenues are less cyclical than those of much of the business sector."). I also explained that Defendants seek to maximize prestige, *e.g.*, *id.* ¶¶ 64-66, which is not one of the ways they operate like large businesses.

5. Similarly, Dr. Yermack and Dr. Long compare Defendants and their constituent operations to various exceptional entities such as (1) General Electric, one of the largest conglomerates in history, (2) the most profitable hedge fund managers in the country, and (3) the for-profit, largely online University of Phoenix. The logical flaw here is that Defendants need not parrot all of the behaviors of such entities to exhibit qualities that make their operations akin to those of for-profit diversified conglomerates in critical respects. Defendants are structured as non-profit entities with educational and societal "missions," Long Rpt. ¶ 101, and they are also highly complex organizations with multiple revenue streams, sophisticated governance, and operational divisions that behave like business units within a conglomerate. A school's mission or tax-code status is not an operational mechanism that describes how it functions day-to-day but rather a set of overriding guidelines often set by the founder(s) under which the entity sits, that is separate and distinct from how it operates. Further, having a "mission" does not preclude having sophisticated operations similar to a for-profit entity—any more than a for-profit entity's revenue-maximization goals foreclose philanthropy or a mission-driven ethos.

2

6.     Dr. Yermack's and Dr. Long's focus on Defendants' nonprofit status and charitable missions obscures the ways in which universities manage their resources and operations in ways that align with the behavior of for-profit conglomerates. Defendants need not be as large and varied as General Electric or as profitable as the most successful hedge funds to exhibit qualities similar to them. Defendants operate more like General Electric than like volunteer-driven nonprofits such as the YMCA, Habitat for Humanity or World Wildlife Fund. Those nonprofits, which have brand recognition and sizable funds, do not have significant campuses, run hospitals and printing presses, delve into the discovery and development of new drugs, build robots, or engage in a fraction of the other types of revenue-generation operations serving a range of customers that Defendants do.

7.     Class Counsel have also asked me to review the Rule 26(a)(2)(C) disclosure dated August 7, 2024, regarding the anticipated testimony of Peter Ammon, the Chief Investment Officer at the University of Pennsylvania ("Ammon Rpt."). I understand from this document that Mr. Ammon intends to testify that contractual obligations, and the nature of certain funds' ownership at different schools and units across Penn, restrict the use of Penn's endowment. Dr. Yermack similarly opines that endowments are not "fungible" and that restricted endowment gifts do not "free up" institutional resources for financial aid spending. Yermack Rpt. ¶ 119. I disagree. Such restrictions do not displace universities' practical flexibility in how they raise, manage, and deploy endowment and operating funds for multiple purposes, including financial aid (discount off list price) through a variety of financial mechanisms and revenue sources.

## II.     Characteristics of a For-Profit Conglomerate

8.     Dr. Long criticizes my selection of the specific "critical ways" I opined that Defendants operated like for-profit conglomerates. Long Rpt. ¶ 109. Dr. Long opines that the relevant characteristics and operations I evaluated are "applicable to any complex organization." *Id.* ¶ 102. Dr. Long cites examples such as the U.S. Department of Education, the Smithsonian

3

Institution, the Bill & Melinda Gates Foundation, the Mayo Clinic, and the American National Red Cross as other entities that, in her opinion, share some characteristics of for-profit conglomerates but are not-for-profit. *Id.* ¶¶ 110-13.

9.     Dr. Long's critique in these regards amount to a strawman. The U.S. Department of Education is a large and complex organization, and it likely has certain operations and practices that are similar to large for-profit companies. My opinions, however, go far beyond the mere size and structure of the Defendants' organizations and operations. In addition, given the publicly available information, there are critical differences between the Department of Education and large for-profit companies. A core example is that the Department of Education engages in almost no revenue-generating activities, receiving most of its budget solely through government appropriations. It also has no pharmaceutical patents, athletic teams, hospitals, printing presses, or real estate holdings generating income. I am not aware of any endowment that it manages or research laboratories it staffs. Its head, the Secretary of Education, has a salary capped at less than $250,000 and is not subject to oversight from anything analogous to shareholders or board members. In short, apart from its size, the Department of Education has little in common with Defendants and for-profit companies.

10.     The Smithsonian Institute may be a more apt comparison, as it may operate similarly to a for-profit conglomerate, but it is again a strawman for Dr. Long to argue that these facts do not mean "it is a profit-seeking organization, rather than a mission-driven non-profit." Long Rpt. ¶ 112. Dr. Long is excluding the middle. Formalistic line-drawing about whether an entity "is" or "is not" profit-seeking is not informative to determine whether and in what ways it operates more or less like a profit-seeking company. The Mayo Clinic also appears to be a non-profit entity that operates in a fashion similar to a for-profit conglomerate. The cited materials

4

indicate it has significant operations, with tens of thousands of employees, varied revenue streams (such as medical services, licensing intellectual property, research and grants, medical school tuition), different department, and a board of trustees that oversees its management.

11.     Dr. Long also cites the Bill & Melinda Gates Foundation and the American National Red Cross, but she describes no details about their operations, and I am not sufficiently familiar with their operations to opine on whether they are more similar or more different than Defendants or large for-profit companies. Given the cited annual report, for example, the American Red Cross seems to engage in revenue-generating activities, but few and far-between and without much diversification. Similarly, while the American Red Cross operates at some scale, it is unclear how many employees (versus volunteers) it has, and in any event, it does not offer multiple services to different categories of customers (students, patients, book authors, and others) in the ways that Defendants do.

12.     Dr. Long also offers the example of the University of Phoenix, with a vastly different operation than Defendants, as what "profit-motivated higher education institution looks like." Long Rpt. ¶ 108. I agree that the University of Phoenix operates very differently than Defendants and other large, diversified companies, but not solely because it is a for-profit entity. That is, there are non-profit schools of higher education which are also largely online, have aggressive online marketing, and provide vastly different educational outcomes than the prestige-maximizing Defendants. Southern New Hampshire University and the formerly for-profit Grand Canyon University are two examples. The reality is that few institutes of higher education, profit or non-profit, can take on the "wide-ranging activities that Defendants do," Long Rpt. ¶ 108, because they simply do not have the resources for it—just as most companies do not operate like large, diversified conglomerates.

### III.    Revenue Diversification

13.    In my opening report, I opined that one respect in which Defendants operate like diversified conglomerates is that they have varied sources of revenue that are reliable due to the high demand of their services. *See, e.g.*, Mora Rpt. ¶ 33. Dr. Yermack argues that universities cannot be considered diversified because their activities (such as schools, hospitals, and athletics) are all tied to common educational missions, such that Defendants are not diversified in the way that conglomerate General Electric is. Yermack Rpt. ¶ 140.

14.    These and similar criticisms are not aimed at my factual description of the different departments and sources of revenue at the Defendants, such as grants, intellectual property revenue, profitable executive degree programs, and hospital systems. Mora Rpt. ¶ 139. That is, Dr. Yermack's argument rests on an overly narrow definition of diversification. Defendants are not diversified like General Electric, for example, because the "business performances of the university . . . [t]ends to be highly correlated." Yermack Rpt. ¶ 140. This uncited proposition posits a false equivalency. I never stated or implied that Defendants are the equivalent of General Electric, which at one point during the Class Period was a top-ten company on the Fortune 500 and one of the largest conglomerates in the world.[1] A business, or non-profit operating in many ways like a business, obviously need not be as diversified as General Electric to be "diversified."

15.    Instead, an entity is diversified when, for example, it manages multiple revenue streams and operational units that may respond differently to market forces. In this regard, Dr. Yermack does not dispute elite universities generate income from a variety of sources: tuition, research grants, endowments, intellectual property licensing, healthcare services, athletics, and

---

[1] *Fortune 500*, CNN MONEY (2006),
https://money.cnn.com/magazines/fortune/fortune500/2006/full_list/.

donations among others. These revenue streams are often managed independently at the unit level and are also subject to distinct external forces. The financial success of a university's teaching hospital, for example, is influenced by healthcare markets, intellectual property revenue by research success, tuition revenue by student enrollment trends, and athletics revenue by on-the-field performance. These revenue streams are not necessarily "highly correlated," as Dr. Yermack presumes, and if they were, they would still represent diversified operations. If connected to education, the financial structures and performance of these revenue streams can still differ significantly, just as the financial structures and performance of a conglomerate's business units may differ. That is, the magnitudes of each of these revenue sources can and do fluctuate independently of general university performance or economic downturns. These differences help universities spread financial risk and mitigate volatility, much as a conglomerate business balances revenues across diverse lines of business.

16.     The prospect that hypothetical shocks of the sort that Dr. Yermack identifies (such as "general economic conditions," "national tax policy," or "public health emergencies") *might* impact Defendants' various activities does not change their diverse character. Yermack Rpt. ¶ 140.[2]

---

[2] Dr. Yermack provides no factual support to argue that these hypothetical shocks do or would meaningfully impact universities across business units. And for at least some of the proposed shocks, there are reasons to believe these diversified universities would be impacted differently from large conglomerates. For instance, Defendant universities did not shut down during the COVID-19 "public health emergency" and generally saw historic *increases* in applications. *Admission Offered to First Members of the Class of 2026*, DARTMOUTH.EDU. (DEC. 13, 2021), https://home.dartmouth.edu/news/2021/12/admission-offered-first-members-class-2026; *837 Admitted to Class of 2025 from record-high early action option*, YALE NEWS (Dec. 16, 2020), https://news.yale.edu/2020/12/16/837-admitted-class-2025-record-high-early-action-pool. Dr. Yermack cites no data, and I am not aware of any, that changes in immigration policy have impacted the international student make-up at Defendants. And many Defendants have campuses abroad to make up for any limitations that immigration policies place on "tuition-paying foreign students."

In addition, no amount of diversification insulates even a conglomerate like General Electric from "general economic conditions" or "national tax policy" changes.[3] In this respect, universities are no different from General Electric, which was and is precisely one of my points.

17.     The financial independence of various university units, and the diversity of their income streams, mirrors the operational strategy of a conglomerate. Universities manage risk and sustain financial stability through the same principles that guide diversified corporations.

## IV.     Governance Structures

18.     In my opening report, I explained that even without shareholders, Defendants have governance structures with various boards and multiple stakeholders that are similar to public companies with shareholders. Mora Rpt. ¶ 29. Dr. Yermack contends that because universities lack shareholders to monitor managers and have "self-perpetuating boards," their governance structures are fundamentally different from those of for-profit corporations. Yermack Rpt. ¶¶ 122, 125 129. Dr. Yermack does not offer any further opinions on how such differences manifest into any differences in the day-to-day operations of Defendants compared to large companies.

19.     Dr. Yermack's critique raises few practical differences between the differing governance structures and acknowledges almost none of the operational similarity between the groups. Dr. Yermack posits, for instance, that without a residual claimant, there is no "natural group with incentives" to monitor the behavior of university managers. *Id*. ¶ 125. On the contrary, it is my experience in academia that unlike a disgruntled shareholder who can always sell their stake and move on, donors and alumni can be deeply invested stakeholders in a university brand. At a minimum, someone who donated the "Smith Building for Life Sciences" will likely have strong

---

[3] General Electric's stock price and financial performance famously crashed during the "general economic conditions" of the 2008 financial crisis. Stephen Manning, *GE cuts quarterly dividend to 10 cents a share*, NBC NEWS (Feb. 27, 2009), https://www.nbcnews.com/id/wbna29431869.

feelings on a university's life sciences activities. And one needs to look no further than to recent high-profile resignations among presidents of Defendants to see that stakeholders such as donors and alumni closely monitor behavior.[4] The same is true of the formal mechanisms Defendant universities implement to ensure students and/or alumni have a voice and monitoring capacity.[5]

20.     Dr. Yermack's differences also downplay the fiduciary role of a university board of trustees that mirrors the oversight and strategic direction provided by corporate boards. While each company is different, in my experience, corporate boards, which are the bodies analogous to university boards of trustees, can be more important for directly monitoring managers than ephemeral shareholders. Corporate boards represent the shareholders. University boards represent the alumni and other stakeholders. Trustees at Defendant universities provide that kind of direct oversight. University trustees are responsible for ensuring that the institution's financial operations are sustainable, that long-term investments are sound, and that the university's leadership is effectively managing resources. This oversight function is analogous to the responsibilities of a corporate board, which ensures that management is held accountable for performance. Universities have audit-risk committees, budget and finance committees, capital construction committees, among others. For instance, at Harvard University, the Corporation decides on the President's annual salary increase, just as the compensation committee on a corporate board determines the top executive's compensation.

---

[4] Stephanie Saul, Alan Blinder, Anemona Hartocollis and Maureen Farrell, *Penn's Leadership Resigns Amid Controversies Over Antisemitism*, N.Y. TIMES (Dec. 9, 2023), https://www.nytimes.com/2023/12/09/us/university-of-pennsylvania-president-resigns.html.

[5] *Alumni-Elected Trustees*, COLUMBIA.EDU, https://alumni.cornell.edu/volunteer/leadership/trustees/; *Alumni Council*, DARTMOUTH.EDU, https://alumni.dartmouth.edu/alumni-council; *By-Laws*, JHU.EDU, https://trustees.jhu.edu/by-laws/ (describing the election of "Alumni Trustees"); *Young Trustee*, DUKE.EDU, https://trustees.duke.edu/young-trustee/ (describing the role of "Young Trustees" that are current undergraduate or graduate students).

21.     Dr. Yermack does not dispute that a board of trustees plays this oversight function; he just belittles Defendants' boards as being too large and filled with "prominent alumni" rather than "investors or business executives with expertise" in the relevant industry of "higher education." Yermack Rpt. ¶ 129. These statements are unsupported, and Dr. Yermack offers no facts or measurement for concluding that Defendants' boards have more or less industry experience than comparable companies. Public companies often have board members with experience and expertise outside the narrow "industry" in which the company operates. The Chairman of the Board at the Walt Disney Company, for example, is a lifetime Nike, Inc. employee and executive. William Clay Ford Jr., a longtime chair of his family's namesake Ford Motor Company, sat on the board of directors for eBay Inc. for a decade. Arriana Huffington of the Huffington Post was a board member at Uber. It is no surprise that the boards of prestigious universities are also composed of individuals with similarly varied expertise. "Higher education" is not the only relevant industry experience when running a complicated entity such as a university with the different operations I have described. In addition Defendants' boards of trustees often do have members with higher-education experience.[6]

---

[6] *See, e.g.*, *Catharine Bond Hill Trustee Profile*, YALE.EDU, https://www.yale.edu/board-trustees/current-trustees/catharine-bond-hill (former president at Vassar); James Dean, *Kraig Kayser elected Board of Trustees chair*, CORNELL CHRONICLE (Jan. 11, 2022), https://news.cornell.edu/stories/2022/01/kraig-kayser-elected-board-trustees-chair (former trustee at Rochester Institute of Technology); Dennis Brown, *Notre Dame elects four new Trustees*, NOTRE DAME NEWS (Jun. 28, 2021), https://news.nd.edu/news/notre-dame-elects-four-new-trustees/ (former president at Wake Forest University); Board of Directors, GEORGETOWN.EDU, https://governance.georgetown.edu/board-of-directors/ (former president of Xavier University of Louisiana); *Dedric A. Carter Member Profile*, MIT.EDU, https://corporation.mit.edu/all-members/dedric-carter (chief innovation officer at UNC Chapel Hill); *David A. Thomas Trustee Profile*, YALE.EDU, https://www.yale.edu/board-trustees/current-trustees/david-thomas (president of Morehouse College).

22.     The size of Defendants' Board of Trustees is also no barrier to their oversight function. This is partly because universities have adopted governance practices from the corporate world such as creating specialized procedures and sub-committees, including those for cybersecurity, auditing, fund-raising and long term strategic planning, among others. For instance, the University of Pennsylvania has a smaller Executive Committee that can act on behalf of the full board between meetings, as well as other committees such as Budget & Finance.[7] University presidents and administrators are also subject to review by these boards, much like corporate CEOs, reinforcing the governance parallels.

23.     With respect to Dr. Yermack's argument that Defendants' board of trustees are self-perpetuating because boards choose their own successors, this paints with a broad brush. There are famous examples of dual-class share companies or founder-led companies where individuals like Mark Zuckerberg can control who is on the board. And on the other hand, at least some Defendants have mechanisms for a regular rotation of outsiders to be a part of the board.[8] If Defendants do tend to have more self-perpetuating boards than other large companies, moreover, Dr. Yermack does not describe any impact that dynamic would have on the board's oversight function. In my opinion, it would not have any significant impact.

---

[7] https://secretary.upenn.edu/trustees-governance

[8] Jin Kwon, *Inside Penn's highest governing body: The Board of trustees, by the numbers*, THE DP (May 11, 2023), https://www.thedp.com/article/2024/03/penn-board-of-trustees-attendance (certain trustees are elected by alumni or appointed by the Pennsylvania General Assembly); Joe Wilensky, *Board of Trustees 101*, CORNELL.EDU, https://alumni.cornell.edu/cornellians/trustees-101/ (New York Governor appoints three Cornell trustees); *Alumni Council*, DARTMOUTH.EDU, https://alumni.dartmouth.edu/alumni-council (describing alumni-elected trustees); *New Alumni Trustee Elections*, BROWN.EDU, https://corporation.brown.edu/about/new-alumni-trustee-elections (describing new alumni trustees).

## V.     Employment and Administrative Structures

24.     In my opening report, I opined that the significant number of personnel Defendants employ makes their operations similar to large public companies. Mora Rpt. ¶ 21. Dr. Yermack criticizes the comparison between university employment structures and those of for-profit businesses, arguing that universities do not face the same pressures to reduce costs and optimize workforce efficiency. Yermack Rpt. ¶¶ 142-43. This criticism misses the mark in two ways.

25.     First, it downplays the ways that employing a large number of people makes Defendants operationally similar to large public companies. The operational complexity associated with employing a large number of employees comes from the structures and processes created to manage the day-to-day administration of those employees. Not from occasional layoffs and downsizing which are not daily or regular features at large companies.

26.     Second, it is inaccurate to say universities face completely different pressures on headcounts than large companies. On the one hand, because of the high demand for Defendants' services and diversified revenue streams like conglomerates, Defendants can weather economic storms without large layoffs. But downsizing still happens at universities. Defendants have had layoffs, "early retirement" programs, or shifted resources and headcount to certain more popular degree programs over others over time.[9] And during the COVID-19 pandemic, many universities

---

[9] *See e.g.*, Max Schindler, *Cornell Cuts More Than 700 Support Staff Positions in Two Years*, THE CORNELL DAILY SUN (Feb. 13, 2011), https://cornellsun.com/2011/02/13/cornell-cuts-more-than-700-support-staff-positions-in-two-years/; *Duke University to lay off 75 employees due to COVID-19* disruptions, ABC NEWS, (Oct. 11, 2020), https://abc11.com/duke-university-layoffs-tip-college-covid/6874746/; *Brown University will lay off 60 staffers*, TIMES ARGUS (Oct. 18, 2018), https://www.timesargus.com/news/brown-university-will-lay-off-60-staffers/article_e4ee60bd-0bbe-502c-8396-e771a4fbbf96.html; Vivian Yee, *250 staff laid off since May*, YALE DAILY NEWS (July 9, 2010), https://yaledailynews.com/blog/2010/07/09/250-staff-laid-off-since-may/; Associated Press, *Vanderbilt chancellor received nearly $3 million bonus amid layoffs*, WMOT NEWS (May 30, 2018), https://www.wmot.org/from-wmot-news/2018-05-30/vanderbilt-chancellor-received-nearly-3-million-bonus-amid-layoffs.

implemented hiring freezes, furloughed staff, stopped or reduced contributions to 403b accounts, shifted more health care costs to employees and sought to streamline administrative functions to maintain financial stability.[10] These actions are directly comparable to the cost-cutting measures taken by businesses during times of economic stress. Furthermore, universities must balance competitive pressures—attracting top faculty, ensuring student services, and maintaining operational efficiency—in ways that mirror for-profit companies competing for talent and resources. Finally, contrary to Dr. Yermack's characterization (Yermack Rpt. ¶ 142), large successful public companies have over-employed personnel in a way inconsistent with "intense pressure from shareholders" to "maximize profits."[11]

## VI. Compensation of University Administrators

27. Dr. Yermack disputes my comparison of university administrators' compensation to that of Fortune 500 corporate executives, arguing that university presidents earn less than corporate CEOS. Yermack Rpt. ¶ 153.

28. The tables of salaries show that there remains a pay gap between the compensation of the top executives of the most industrious Fortune 500 companies and those of Defendants, but that Defendants' top officials are in the "same range" of executives at other large public

---

[10] *See e.g.*, *John Hopkins University Moving Forward with Union Layoffs During Pandemic*, LIUNA! (Feb. 9, 2021), https://www.liunamidatlantic.org/news/story/johns-hopkins-university-moving-forward-with-union-layoffs-during-pandemic; Jaisal Noor, *US University Leading COVID Response Leaves Black Workers Behind*, TRUTHOUT (May 16, 2020), https://truthout.org/articles/us-university-leading-covid-response-leaves-black-workers-behind/; James Pollard, *NU announces 87 staff layoffs, lowered F.Y. 2021 budget in financial update*, THE DAILY NORTHWESTERN(Aug. 5, 2020), https://dailynorthwestern.com/2020/08/05/campus/nu-announces-87-staff-layoffs-lowered-f-y-2021-budget-in-financial-update/; *FAQ archive: Financial implications*, JHU.EDU, https://covidinfo.jhu.edu/faq/faq-archive-financial-implications/.

[11] Irina Ivanova, *Meta is laying people off for the first time in its history*, CBS NEWS (Sept. 30, 2022), https://www.cbsnews.com/news/meta-is-cutting-staff-for-the-first-time-in-its-history/ (Meta/Facebook conducted layoffs in 2022 for the first time in company's 18-year history)

companies.[12] The study Dr. Yermack cites provides helpful context for what "same range" means. Dr. Yermack cites one study as part of the "abundant economic research" showing that "non-profit managers are paid significantly less." Yermack Rpt. ¶ 157 (citing Haddock 2002 at 404). But that study found that top officers of charities, not universities, averaged $160,000 in compensation.[13] But Dr. Yermack concedes that the median compensation of University Presidents is at about $2.2 million. That is much closer to a CEO salary than a typical nonprofit head.

29.    Dr. Yermack also criticizes my inclusions of investment managers in my comparison of compensation at Defendants' universities with those at public companies, arguing the more "relevant benchmark . . . would be Wall Street hedge fund managers" and that the "top 25 hedge fund managers earned $21.5 billion in 2022." Yermack Rpt. ¶ 158.

30.    The fact that Dr. Yermack believes that the appropriate comparisons of Defendants' Chief Investment Officers are for those at the top-25 earning hedge funds on Wall Street is a telling reflection of the playing field he equates with Defendants' investment operations. On the other end of the spectrum, I could equally cite to the fact that New York City's Chief Investment Officer, who oversees the city's $274 billion in pension assets, currently earns $350,000 a year, far below the salary of the university CIO's I cited in my opening report.[14]

---

[12] Dr. Yermack also states that executives "all owned considerable amounts of stock in their companies and had the opportunity to profit from its appreciation." Yermack Rpt. ¶ 155. Putting aside any legal or practical hurdles in leveraging that profit, to be clear the CEO compensation figures reported in Table 2 of my Report included stock awards and option awards, not just salary and bonuses.

[13] Kevin F. Hallock, *Managerial Pay and Governance in American Nonprofits*, CORNELL.EDU, https://ecommons.cornell.edu/server/api/core/bitstreams/55b4a775-b199-4984-8caf-451a59bd7e3a/content

[14] Matthew Sedacca, *NYC Comptroller Brad Lander looking to sink millions in taxpayer money to boost salaries and size of his staff*, NY POST (Aug. 3, 2024), https://nypost.com/2024/08/03/us-news/brad-lander-to-boost-pension-staff-size-pay-despite-middling-results/

31. Finally, though I previously focused on the salaries of university presidents and chief investment officers for simplicity, the Defendants employ several others well-compensated upper management and vice-presidents. To take just some examples, according to its 2022 Form 990, Georgetown's Executive Vice President and Provost since 2012 had a salary of nearly $800,000. Notre Dame's Vice President and General Counsel also had a salary over $780,000 according to its 2022 Form 990. Penn's Senior Executive Vice Present earned over $3 million according to its 2022 Form 990.

## VII.    Flexibility of Endowment Spending

32. In my report, I explained how Defendants' varied sources of revenue give them flexibility on how much to spend on specific line items. *See, e.g.*, Mora Rpt. ¶ 32. Dr. Yermack disputes my characterization of universities' financial flexibility, arguing that their endowment-smoothing practices are designed for stability rather than flexibility. Yermack Rpt. ¶ 146. Mr. Ammon may also testify, based on financial reports, that the use of Penn's endowment is restricted based on contractual obligations and University divisions. Ammon Rpt. ¶¶ 7(a), 7(b).

33. In my experience, as I have explained, the size and scope of Defendants provide a meaningful financial flexibility and monetary fungibility during the budgeting process. This is true even when considering the endowment "limitations" Dr. Yermack and Mr. Ammon reference. Indeed, "[b]ecause very few activities at universities are fully funded by endowment gifts, even restricted endowments are more 'fungible' than they look." Sandy Baum & Michael McPherson, Campus Economics: How Economic Thinking Can Help Improve College and University Decisions 126 (Princeton Univ. Press 2023). Dr. Yermack's and Mr. Ammon's emphasis on the supposed limitation of endowment funds overlooks the practical mechanisms through which universities achieve budgetary flexibility. And when considering their criticisms and the practical

flexibility universities have, it is important to distinguish between *ex ante* and *ex post* strategies that universities employ to maximize flexibility and ensure they can meet financial needs across their broad operations.

34.     *Ex ante*, universities actively shape their fundraising campaigns to encourage donations that align with institutional needs. Put simply, if university development personnel present to large potential donors the need for increasing aid for financial aid, above other priorities, they will often find receptive audiences for their requests. In other words, university development personnel can help shape the amounts of so-called "restricted" funding even before it is provided. As a result, restricted endowment funds often serve an important purpose the university would have to find other funding sources but for the restricted endowment funds.

35.     Moreover, in seeking even restricted funds, development officers can help ensure that even donors of restricted funds enable the university to maintain Donation agreements to set up specific endowed funds that can be drafted at a high level of generality to maximize university flexibility or contain escape clauses that permit universities to reallocate funds over time if needs change. *See, e.g.*, Ex. 1, GTWNU_0000327877 (donor agreement explaining that if the fulfillment becomes "impracticable, inappropriate, or impossible as recommended by the Provost" and the Board of Directors, Georgetown can use the donation for "such purposes most in keeping with the purpose described above"). In my experience, even though schools had "restricted endowments," it was well known that there were degrees of restrictions that allowed greater or lesser freedom to deploy funds, which universities can and would track. *E.g.*, Ex. 2, DARTMOUTH_0000025962 (classifying degrees of fungibility for different endowed funds).

36.     *Ex post*, after funds are endowed or in the university system, there is still flexibility. For instance, I agree with Dr. Yermack and Mr. Ammon's observation that school departments

16

often operate on their own with their own endowments and revenues. But as previously described, Mora Rpt. ¶¶ 23-24, a university's central administration can and does make up shortfalls for less well-resourced departments because of the financial flexibility. *See* Ex. 3, Emory_568Lit_0052955 (describing the use of tens of millions of "unassigned income" and "central strategic funds" that the provost controls); GTWNU_0000071333 (Penn administrator explaining that "unrestricted revenue," including royalties, indirect cost revenue and other income streams, is subject to a "tug of war between aid and other institutional needs" decided by the institution which has central control); Grady Dep. Tr. at 57:11-58:20 (describing a university-wide "scrape" or assessment ██████ ████████████████████).

37.     Indeed, consistent with my experience, it has been reported that at a 2008 public roundtable event Northwestern hosted to discuss the book "Mission and Money: Understanding the University," Northwestern University's former president shared the sentiment that the school would not even need an accountant to rearrange figures to satisfy a 5% spending rule, if one were mandated.[15] It is a fact of life at universities that restricted funds help free up operating funds to be used for other purposes. *See* Ex. 4, Emory_568Lit_0039665 (stating that gifts and support for financial aid doesn't actually "help students pay for college" but "takes the pressure off the budget" because dollars are "fungible").

38.     Beyond flexibility in the general budget, there are at least two other formal mechanisms schools can use to increase financial flexibility. First, universities can change the spending rate in a given year to provide more income in a given year. Typically, the school's target spending rate is artificially constrained to maximize the principal. But universities have flexibility to change their spending rate as necessary. Shor Dep. Tr. at 52:21-53:1, 89:1-89:25. Thus, the

---

[15] GTWNU_0000067165.

operating margin reflects choices about endowment preservation, rather than an absolute limit on available financial resources. As a result, assessing financial flexibility requires looking beyond "profit margins," Yermack Rpt. ¶ 149, to the broader context of endowment management and spending policies.

39.     Second, universities have mechanisms to revise the stated goals or restrictions of a restricted fund. Most simply, universities can go back to the donor or estate and ask to change the restrictions. *E.g.*, Ex. 5, Vanderbilt-00325752 (revising a previous donor agreement to broaden the uses of the endowed funds from "seniors at Peabody College of high academic standing who demonstrated outstanding leadership" to "financial support on need and merit for professional students at Peabody College" with a "preference" for certain types of students). Alternatively, universities can follow a cy-près process and ask the Government for authority to modify the terms of an endowment.

40.     In conclusion, I have reviewed the Yermack and Long Reports, and they do not change any of my opinions contained in my initial report.

Elizabeth Mora:

Executed on October 3, 2024

18

## MATERIALS RELIED UPON

**Bates Documents**

DARTMOUTH_0000025962

Emory_568Lit_0039665

GTWNU_0000067165

GTWNU_0000071333

GTWNU_0000327877

Vanderbilt-00325752

**Deposition Transcripts**

Helen Grady Deposition Transcript, dated February 21, 2024

Glen Shor Deposition Transcript, dated December 21, 2023

**Other Materials**

*837 Admitted to Class of 2025 from record-high early action option*, YALE NEWS (Dec. 16, 2020), https://news.yale.edu/2020/12/16/837-admitted-class-2025-record-high-early-action-pool.

*Admission Offered to First Members of the Class of 2026*, DARTMOUTH.EDU. (DEC. 13, 2021), https://home.dartmouth.edu/news/2021/12/admission-offered-first-members-class-2026.

*Alumni Council*, DARTMOUTH.EDU, https://alumni.dartmouth.edu/alumni-council.

*Alumni-Elected Trustees*, COLUMBIA.EDU, https://alumni.cornell.edu/volunteer/leadership/trustees/.

Associated Press, *Vanderbilt chancellor received nearly $3 million bonus amid layoffs*, WMOT NEWS (May 30, 2018), https://www.wmot.org/from-wmot-news/2018-05-30/vanderbilt-chancellor-received-nearly-3-million-bonus-amid-layoffs.

*Board of Directors*, GEORGETOWN.EDU, https://governance.georgetown.edu/board-of-directors/.

*Brown University will lay off 60 staffers*, TIMES ARGUS (Oct. 18, 2018), https://www.timesargus.com/news/brown-university-will-lay-off-60-staffers/article_e4ee60bd-0bbe-502c-8396-e771a4fbbf96.html.

*By-Laws*, JHU.EDU, https://trustees.jhu.edu/by-laws/.

*Catharine Bond Hill Trustee Profile*, YALE.EDU, https://www.yale.edu/board-trustees/current-trustees/catharine-bond-hill.

*David A. Thomas Trustee Profile*, YALE.EDU, https://www.yale.edu/board-trustees/current-trustees/david-thomas.

*Dedric A. Carter Member Profile*, MIT.EDU, https://corporation.mit.edu/all-members/dedric-carter.

Dennis Brown, *Notre Dame elects four new Trustees*, NOTRE DAME NEWS (Jun. 28, 2021), https://news.nd.edu/news/notre-dame-elects-four-new-trustees/.

*Duke University to lay off 75 employees due to COVID-19* disruptions, ABC NEWS, (Oct. 11, 2020), https://abc11.com/duke-university-layoffs-tip-college-covid/6874746/.

*FAQ archive: Financial implications*, JHU.EDU, https://covidinfo.jhu.edu/faq/faq-archive-financial-implications/.

*Fortune 500*, CNN MONEY (2006), https://money.cnn.com/magazines/fortune/fortune500/2006/full_list/.

Irina Ivanova, *Meta is laying people off for the first time in its history*, CBS NEWS (Sept. 30, 2022), https://www.cbsnews.com/news/meta-is-cutting-staff-for-the-first-time-in-its-history/.

Jaisal Noor, *US University Leading COVID Response Leaves Black Workers Behind*, TRUTHOUT (May 16, 2020), https://truthout.org/articles/us-university-leading-covid-response-leaves-black-workers-behind/.

James Dean, *Kraig Kayser elected Board of Trustees chair*, CORNELL CHRONICLE (Jan. 11, 2022), https://news.cornell.edu/stories/2022/01/kraig-kayser-elected-board-trustees-chair.

James Pollard, *NU announces 87 staff layoffs, lowered F.Y. 2021 budget in financial update*, THE DAILY NORTHWESTERN(Aug. 5, 2020), https://dailynorthwestern.com/2020/08/05/campus/nu-announces-87-staff-layoffs-lowered-f-y-2021-budget-in-financial-update/.

Jin Kwon, *Inside Penn's highest governing body: The Board of trustees, by the numbers*, THE DP (May 11, 2023), https://www.thedp.com/article/2024/03/penn-board-of-trustees-attendance.

Joe Wilensky, *Board of Trustees 101*, CORNELL.EDU, https://alumni.cornell.edu/cornellians/trustees-101/.

*John Hopkins University Moving Forward with Union Layoffs During Pandemic*, LIUNA! (Feb. 9, 2021), https://www.liunamidatlantic.org/news/story/johns-hopkins-university-moving-forward-with-union-layoffs-during-pandemic.

Kevin F. Hallock, *Managerial Pay and Governance in American Nonprofits*, CORNELL.EDU, https://ecommons.cornell.edu/server/api/core/bitstreams/55b4a775-b199-4984-8caf-451a59bd7e3a/content.

Matthew Sedacca, *NYC Comptroller Brad Lander looking to sink millions in taxpayer money to boost salaries and size of his staff*, NY POST (Aug. 3, 2024), https://nypost.com/2024/08/03/us-news/brad-lander-to-boost-pension-staff-size-pay-despite-middling-results/.

Max Schindler, *Cornell Cuts More Than 700 Support Staff Positions in Two Years*, THE CORNELL DAILY SUN (Feb. 13, 2011), https://cornellsun.com/2011/02/13/cornell-cuts-more-than-700-support-staff-positions-in-two-years/.

*New Alumni Trustee Elections*, BROWN.EDU, https://corporation.brown.edu/about/new-alumni-trustee-elections.

Stephanie Saul, Alan Blinder, Anemona Hartocollis and Maureen Farrell, *Penn's Leadership Resigns Amid Controversies Over Antisemitism*, N.Y. TIMES (Dec. 9, 2023), https://www.nytimes.com/2023/12/09/us/university-of-pennsylvania-president-resigns.html.

Stephen Manning, *GE cuts quarterly dividend to 10 cents a share*, NBC NEWS (Feb. 27, 2009), https://www.nbcnews.com/id/wbna29431869.

*Trustees &Governance*, UPENN.EDU, https://secretary.upenn.edu/trustees-governance.

Vivian Yee, *250 staff laid off since May*, YALE DAILY NEWS (July 9, 2010), https://yaledailynews.com/blog/2010/07/09/250-staff-laid-off-since-may/.

*Young Trustee*, DUKE.EDU, https://trustees.duke.edu/young-trustee/.