# EXHIBIT 122

CONFIDENTIAL

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ANDREW CORZO, SIA HENRY, ALEXANDER LEO-GUERRA, MICHAEL MAERLENDER, BRANDON PIYEVSKY, BENJAMIN SHUMATE, BRITTANY TATIANA WEAVER, and CAMERON WILLIAMS, individually and on behalf of all others similarly situated, <br><br> *Plaintiffs*, <br><br> v. <br><br> BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, THE JOHNS HOPKINS UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY, | Case No. 1:22-cv-00125 <br><br> Hon. Matthew F. Kennelly |

## PENN'S RULE 26(a)(2)(C) DISCLOSURE OF PETER AMMON'S TESTIMONY

Penn hereby discloses that it may present at trial testimony from Peter Ammon that is covered by Fed. R. Civ. P. 26(a)(2)(C):

1. Mr. Ammon is currently Chief Investment Officer at the University of

Pennsylvania. He has served in this role since 2013. Before joining Penn, Mr. Ammon worked

at the Yale University Investments Office.

1

**CONFIDENTIAL**

2.      Mr. Ammon holds an AB in Politics from Princeton University, an MA in International Relations from Yale University, and an MBA from Yale University.

3.      Mr. Ammon has extensive experience managing the investment of Penn's endowment funds and personal knowledge of Penn's endowment investment returns.  For over 10 years, Mr. Ammon has led Penn's Office of Investments, overseeing the team of 25 investment professionals.  The Office of Investments, under Mr. Ammon's leadership, has been delegated authority to recommend investment strategy (including strategic asset allocation), select and appoint investment managers, directly manage assets, and take any other actions necessary to carry out those responsibilities.

4.       Penn's investment goal is to generate total returns high enough both to (i) support significant current spending from endowment units and (ii) maintain those units' purchasing power into perpetuity, such that the real value of annual spending distributions can be permanently sustained.

5.      Mr. Ammon has reviewed the Expert Report of Dr. George Bulman ("Bulman Report")—which contains analysis of and opinions regarding Penn's historical endowment growth—and he will offer testimony rebutting aspects of the report that he believes to be inaccurate or misleading.  In accordance with Federal Rule of Evidence 702, Mr. Ammon has specialized technical knowledge of the composition and performance of Penn's endowment investment portfolio; the strategic considerations, institutional priorities, and financial factors that guide and constrain Penn's investment decisions; and the market conditions in which Penn operates.  This specific knowledge will help the trier of fact understand the sources and scope of Penn's endowment growth and Penn's reasons for deciding to allocate its endowment investments in the manner that it does.

**CONFIDENTIAL**

6.     Mr. Ammon has not been retained or specially employed to provide expert testimony in this case, nor do his duties as a Penn employee regularly involve providing expert testimony.  Because aspects of Mr. Ammon's testimony may involve opinions about Penn's endowment and Dr. Bulman's reports as they relate to Penn, Penn below provides a summary of the facts and opinions to which Mr. Ammon is expected to testify.  Penn reserves the right for Mr. Ammon to provide testimony regarding other facts or opinions as needed to address new information received in discovery or opinions advanced by Plaintiffs' experts, including in any reply reports.

7.     Mr. Ammon is expected to testify—based on his personal knowledge and management of Penn's endowment investment strategy—regarding inaccurate and misleading statements in the Bulman Report.  Below are summaries of the facts and opinions to which Mr. Ammon is expected to testify:

  a. Mr. Ammon will testify that Dr. Bulman inaccurately analyzes the availability of endowment funds for use for financial aid.  The University of Pennsylvania's endowment is not a single pool of capital to be spent on whatever the Trustees or administration wish.  Rather, the endowment is a collection of roughly 8,700 individual endowment funds (also called endowment "units").  As of June 30, 2023, 7,695 of those funds—roughly 88%—were "donor-restricted,"[1] meaning use of the investment returns from those funds is governed by restrictions set forth in the gift agreement at the time the funds were donated to the University.  Mr. Ammon's understanding is that Penn has a legal duty to manage each donor-

---

[1] *See Annual Financial Report (2022-2023)*, University of Pennsylvania, 43, https://www.finance.upenn.edu/wp-content/uploads/Penn-Division-of-Finance-FY23-Annual-Report.pdf ("Penn 2023 Annual Report").

**CONFIDENTIAL**

restricted fund in accordance with the donor's instructions, and to use those funds to support the specific programs, departments, or initiatives designated by the donor. Categories of donor-restricted funds include not only those devoted to undergraduate financial aid, but also endowed professorships, graduate financial aid, and capital improvements, to name only a few.

b. Mr. Ammon will also testify that the use of Penn's endowment is further restricted by nature of those funds' ownership across the University. At Penn, the vast majority of endowment units are owned by one of Penn's twelve schools (the majority of which do not have undergraduate students), by the University's Health System,[2] or by University centers such as the Library. These endowments are dedicated for use by those owners to fund their planned operational expenses. Separately, there are endowment units dedicated to support undergraduate financial aid, regardless of which school an undergraduate is enrolled in. The Bulman Report does not adequately account for these distinctions.

c. Mr. Ammon will also testify that, contrary to the implication in Dr. Bulman's report, Penn dramatically increased endowment spending in support of undergraduate financial aid from 2003 to 2019. In 2009, Penn launched its undergraduate "no-loan" grant-based financial aid program, reflecting the vision of then-President Amy Gutmann's Penn Compact, which emphasized inclusion as one of its key tenets. The program, which meets 100% of demonstrated financial need with grants and work-study funds, makes Penn the largest university in the

---

[2] As of June 30, 2023, $4.5 billion of Penn's endowment assets—roughly 21% of the total endowment value—were restricted for use by the University of Pennsylvania Health System. *See* Penn 2023 Annual Report at 27.

**CONFIDENTIAL**

United States with a program that enables eligible undergraduates to receive grant-based financial aid packages for eight semesters.[3]  In order to fund its growing financial aid program over the period, Penn made fundraising for new aid endowments a priority.  The University also used operating funds to increase financial aid endowments over the period.  Through these methods, Penn created hundreds of millions of dollars in new endowment units dedicated to undergraduate financial aid during the period in question.

d.   Mr. Ammon will further testify that Penn's commitment to growing endowment support for undergraduate financial aid is reflected in its spending history.  From 2003 through 2019, Penn's academic budget grew 95%.  Over that same period, the undergraduate financial aid budget grew by 227%, dramatically outpacing the growth rate in the overall budget.  Much of this growth was supported by endowment spending for financial aid.  In 2003, the endowment funded 13.8% of the undergraduate financial aid budget.  By 2019, the endowment supported 22.5% of the now much larger aid budget.  In aggregate, annual spending from the endowment in support of undergraduate financial aid more than quintupled over the period in question.

e.   Relatedly, Mr. Ammon will testify that Dr. Bulman's regression analysis of Defendants' "excess" investment returns is undermined by Penn's demonstrated commitment to supporting financial aid even during periods of weak endowment returns.  Dr. Bulman's regression is supposedly designed to test the hypothesis

---

[3] *See Undergraduate Aid Program*, University of Pennsylvania, https://srfs.upenn.edu/financial-aid/undergraduate-aid-program.

**CONFIDENTIAL**

that "the higher the investment returns on the endowment, the more an institution devotes to institutional aid."[4] He concludes that during the Challenged Conduct period, there was actually an inverse relationship—that higher excess returns reduced institutional grant aid—and argues this is consistent with schools "not competing in an unfettered way."[5] However, Dr. Bulman fails to consider that universities might have purposefully increased their financial aid spending in the wake of the global financial crisis, a behavior pattern that would show an inverse relationship between trailing returns and spending. Indeed, this is exactly what Penn did. With student aid needs rising as unemployment spiked, Penn implemented a bold new financial aid policy and took the proactive measure of increasing aid spending from its endowment in order to continue to fulfill student needs.[6] As shown in the chart below, this increase in spending happened despite the endowment's trailing three-year "excess" returns being sharply negative. What Dr. Bulman views as evidence of collusion is actually Penn demonstrating its strong commitment to financial aid despite incredible financial market headwinds.

---

[4] *See* Bulman Report at 18.
[5] *Id.* at 22-24.
[6] *See infra* ¶ 7(f) (discussing Penn's increased spend rate for financial aid endowment units).

**CONFIDENTIAL**



f. Mr. Ammon will also testify that Dr. Bulman's calculation of Defendants'
"excess investment returns" relies on an average endowment spend rate that is not
reflective of Penn's actual spending rate from financial aid endowment units. Dr.
Bulman says he calculates the excess returns that Defendants generated between
2003 and 2022 using a spend rate of 4.7%.[7] In fact, as shown in the following
graph, for much of the Challenged Conduct period, Penn's effective spending rate
for financial aid endowment units was significantly higher than 4.7%, and
significantly higher than Penn's effective spending rate for non-financial aid
units.

---

[7] *See* Bulman Report at 19.

**CONFIDENTIAL**



This was a result of Penn temporarily increasing its target spend rate for undergraduate financial aid endowment funds from 4.7% to 6.5%. The purpose of this temporary increase was to help fund Penn's new "no-loan" financial aid policy, discussed above, which eliminated loans from undergraduate financial aid packages and significantly increased the amount of institutional grant aid given to undergraduate financial aid recipients.[8] The higher target spending rate, which if left in place perpetually would very likely erode endowment purchasing power over the long-term, was designed to provide bridge funding for the University's new no-loan financial aid initiative while additional gifts were being raised. The target spend rate for financial aid funds remained at 6.5% until fiscal year 2016, when it was lowered to 5.9%. In 2017, it was lowered again to 5.3%. In 2018, the spend rate for financial aid funds was reduced to 5.0% to match the spend rate for

---

[8] Exhibit A, Spending Rule Overview – April 2023, PENN568-LIT-00180108.

**CONFIDENTIAL**

all other endowments, where it remained until fiscal year 2021, when the spend rate for all endowments was temporarily increased to 7.0% to provide additional resources for responding to the COVID-19 pandemic.  In fiscal year 2022, the overall spend rate was reduced to 6.0%, and then it was returned to 5.0% in fiscal year 2023, where it remains today.  Mr. Ammon will testify that if Dr. Bulman had used Penn's actual, historical spend rates in his analysis—and only considered returns on financial aid endowments or unrestricted endowment funds that could have legally been used for financial aid—his estimation of Penn's "excess endowment returns" would have been significantly lower than the inflation-adjusted $4.5 billion figure he includes in his report.[9]

g.  Mr. Ammon will also testify that Dr. Bulman's analysis of Defendants' "excess" endowment returns—and his suggestion that more of those returns could have been devoted to financial aid—implicitly assumes that endowment investment managers have perfect foresight regarding market trends.  In fact, investment managers operate against a backdrop of uncertainty and market volatility.  In any given year, Penn's endowment investments may perform better or worse than expected, resulting in a temporary "excess" or shortfall, relative to target returns.  Indeed, like most universities, Penn uses a spending rule to smooth the impact of this return volatility on the University's budget.  As Penn's Chief Investment Officer, Mr. Ammon is responsible for maintaining the purchasing power of each of Penn's 8,700 individual endowment funds in perpetuity.  When Penn's endowment funds generate excess returns in a given year, Penn must steward

---

[9] *See* Bulman Report at 29.

**CONFIDENTIAL**

those returns responsibly, understanding that market conditions will likely change in the future. By looking retroactively at Penn's endowment gains since 2003, Dr. Bulman imagines a counterfactual world in which Penn could have made investment and spending decisions without considering the risks and uncertainty that Penn's investment and spending strategy is designed to mitigate. Relatedly, Dr. Bulman's projections regarding the future of Penn's endowment growth under different financial aid spending scenarios is highly speculative.[10] The future of Penn's endowment growth will depend on the success of capital campaigns, market conditions, Penn's investment strategy, and a variety of other factors that are not currently foreseeable. Dr. Bulman cannot realistically project the size of Penn's endowment in 2032, as he purports to do.

h.  Mr. Ammon will also testify that Dr. Bulman's discussion of Penn's endowment growth from 2003 to 2022 is misleading in several respects. Although, according to Dr. Bulman's figures, Penn's endowment grew 483% between 2003 and 2022,[11] this growth was not linear. First, a significant portion of that growth occurred in a single year—2021 (after Penn had left the 568 Group)—when Penn's endowment investments returned 41.1%, increasing the value of the endowment by $5.6 billion.[12] Put differently, nearly a third of Penn's total endowment growth from 2003 to 2022 occurred in 2021. To the extent Dr. Bulman's analyses rely on Penn's endowment growth through 2022, they are skewed by significant "endpoint sensitivity." Dr. Bulman's analyses in Tables 2,

---

[10] *See* Bulman Report at 44, Table B5.
[11] *See* Bulman Report at 16, Table 5.
[12] *See Annual Financial Report (2020-2021)*, University of Pennsylvania, 14, https://www.finance.upenn.edu/wp-content/uploads/Penn-Division-of-Finance-FY21-Annual-Report.pdf.

**CONFIDENTIAL**

3, 4, 5, 9, and 10 would show materially different numbers if he used the period from 2003 through 2019 when Penn was a member of the 568 Group, rather than extending his analysis beyond that period. Second, the value of Penn's endowment decreased during several years in the relevant period—between 2007 and 2009, the fair value of Penn's endowment dropped from $6,444,861,000 to $5,170,539,000.[13] Dr. Bulman's reliance on averages and aggregate growth figures fails to consider how this downturn might affect endowment spending.

i. Additionally, Mr. Ammon will testify that Dr. Bulman's analysis does not adequately account for the fact that Penn's endowment growth between 2003 and 2022 resulted from factors other than investment returns, including new gifts in support of Penn's capital campaigns and Penn's acquisition of healthcare facilities and their endowments. As noted above, gifts and new endowments are managed in perpetuity to support their designated purposes, and Penn may not elect to use endowment principal or repurpose non-aid endowments (e.g., health system endowment funds) to pay for financial aid or other operational expenses, except to the extent permitted under donor restrictions. For example, the section of Dr. Bulman's report entitled, "Defendants Had Ample Endowment Resources to Have Spent More on Institutional Aid and Thus to Have Reduced Effective Institutional Prices,"[14] does not distinguish between Penn's endowment growth from investments and growth from gifts or other sources, creating the false impression that Penn had access to greater financial resources than it did. Growth and

---

[13] *Financial Report (2009-2010)*, University of Pennsylvania, 20, https://www.finance.upenn.edu/wp-content/uploads/Annual-Financial-Report-10.pdf.
[14] *See* Bulman Report at 30-34.

**CONFIDENTIAL**

spending should be examined at the level of an endowment unit, which is unaffected by new gifts (changing only with spending and investment returns).

j.   Mr. Ammon will also testify that Dr. Bulman is incorrect to suggest that Penn could have increased spending from endowment units dedicated to financial aid without eroding long-term purchasing power.  The following chart shows the real (inflation adjusted) value of a financial aid endowment unit from 1996 through 2019.  The unit is indexed to have a value of 100 in 2003.  The unit's real value is affected by investment returns, inflation, and spending distributions.



Representative AIF Financial Aid Unit
Inflation-adjusted FYE Market Value (2003 = 100)

k.   As the chart shows, the real value of an endowment financial aid unit was flat in real terms, after spending, from 2003 to 2019.  Despite that period being one of strong investment returns, Penn's spending was such that it barely managed to maintain purchasing power—contrary to Dr. Bulman's assertions of substantial "excess returns."  Moreover, had Penn increased spending from all financial aid units to fund a 10% increase to the overall undergraduate financial aid budget for

**CONFIDENTIAL**

years from 2003 to 2019—as Dr. Bulman suggests it could have[15]—Penn's

financial aid units would have ended the period at only 60% of their beginning

real value. Dr. Bulman's policy would have eroded long-term purchasing power

and dramatically favored students of that generation over future Penn students.

l. Mr. Ammon will also testify that Dr. Bulman is incorrect in his assertion that "in

a competitive environment, institutions with high investment returns could use

their enhanced wealth to reduce their list price or offer more generous aid to

attract students."[16] This oversimplifies the competitive dynamics of higher

education—students are drawn to schools for reasons other than price, and under

any circumstances schools have institutional incentives to spend investment

returns on facilities, professors, academic and non-academic programming, and

other amenities that are equally (or more in some cases) important for attracting

students.

m. Mr. Ammon will finally testify that Dr. Bulman's discussion of Defendants'

average revenue per undergraduate student is inaccurate as applied to Penn. Dr.

Bulman asserts that, on average, Defendants' revenue per undergraduate student

was $31,150 in Higher Education Price Index inflation-adjusted dollars in 2003,

and $32,475 in 2022.[17] These averages are not applicable to Penn. In fact, the

amount paid by students receiving need-based financial aid at Penn—i.e., the "net

cost"—decreased significantly in inflation-adjusted dollars during the same

period. The average net cost for a Penn freshman receiving aid in the fall of 2003

---

[15] *See* Bulman Report at 31.

[16] Bulman Report at 17.

[17] *See* Bulman Report at 17, Table 6.

**CONFIDENTIAL**

was $18,837 (in 2005 dollars); the average net cost for a Penn freshman receiving financial aid in the fall of 2019 was $14,649 (in 2005 dollars)—a roughly 22% decrease.[18] By the fall of 2022, the net cost was $12,857 (in 2005 dollars), representing a roughly 32% decrease from fall 2003.[19] That corresponds to a 22% decrease in Penn's inflation-adjusted net revenue from undergraduate students receiving financial aid between 2003 and 2019, and a 32% decrease between 2003 and 2022. Additionally, even for undergraduate students who do not receive financial aid at Penn, the revenue generated from tuition and fees does not cover the full cost of educating that student.

Dated: August 7, 2024

By: */s/ David Gringer*
David Gringer
Alan Schoenfeld
**WILMER CUTLER PICKERING HALE AND DORR LLP**
7 World Trade Center
New York, NY 10007
Tel.: 212-230-8800
david.gringer@wilmerhale.com
alan.schoenfeld@wilmerhale.com

Seth Waxman
**WILMER CUTLER PICKERING HALE AND DORR LLP**
2100 Pennsylvania Avenue NW
Washington, DC 20037
Tel.: 202-663-6800
seth.waxman@wilmerhale.com

Daniel Martin Feeney
Edward W. Feldman
**MILLER SHAKMAN LEVINE**

---

[18] Exhibit B, Net Cost in 2005 Dollars, PENN568-LIT-00168914
[19] *Id.*

**CONFIDENTIAL**

**& FELDMAN LLP**
30 West Munroe Street
Chicago, IL 60601
Tel.: 312-263-3700
dfeeney@millershakman.com
efeldman@millershakman.com

*Counsel for Defendant*
*The Trustees of the University of*
*Pennsylvania*

**CONFIDENTIAL**

<u>**CERTIFICATE OF SERVICE**</u>

I, Shelby Martin, an attorney, hereby certify that on August 7, 2024, I caused a true and correct copy of **Penn's Rule 26(A)(2)(C) Disclosure of Peter Ammon's Testimony** to be served electronically on all counsel of record via email.

By: <u>/s/ *Shelby L. Martin*</u>
Shelby L. Martin

# Exhibit A

**University of Pennsylvania**

**Spending Rule Policy Overview**

The University's endowment spending policy balances the objectives of maximizing budgetary support to endowed programs and maintaining purchasing power of the endowment into perpetuity. The actual payout in any given year is determined by a formula designed to smooth the impact of short-term changes in the endowment's value on spending distributions. The spending rule payout for fiscal 2023 is based on the sum of: (i) 70% of the fiscal 2022 distribution adjusted by an inflation factor; and (ii) 30% of the June 30, 2021 fair value of the AIF, multiplied by a 5.0% target spending rate. Spending rule calculations apply distribution factors to unitized market values. This ensures that the income available for spending is adjusted proportionately for new gifts to the endowment.

**Historical Context**

- Income distribution from the University's endowment is governed by a spending policy which is designed to smooth the impact of short-term market moves that may affect the endowment's market value. The policy aims to make endowment distributions more predictable for purposes of managing the University's operating budget while protecting the real value of the endowment over time (i.e., providing intergenerational equity). The spending policy supports Penn's total return investment approach, taking into account both current yield and appreciation.

- The University Trustees first adopted a spending rule in FY1980 for implementation in FY1981. From FY1981 through FY2006, Penn's spending rule formula used a three-year moving average of market value, lagged one year, times a target spending rate, which was 4.7% for many years.

- In FY2006, the Trustees adopted a new spending rule for implementation in FY2007, with the primary goal of reducing income volatility while producing relatively more spendable income over time. This spending rule uses a hybrid formula, whereby current year income is the sum of 1) prior year income adjusted by an inflation factor (70% weighting), and 2) prior ending market value, lagged one year, multiplied by a target spending rate (30% weighting). The target spending rate under the new spending rule was initially set at 4.7%, unchanged from the prior spending rule. It has since changed as follows:

  - Effective FY2009, the Trustees approved a temporary increase in the target spending rate to 6.5% for financial aid endowment funds, while maintaining the 4.7% rate on non-aid endowment. Incremental income on undergraduate financial aid endowments was designed to provide bridge funding for the University's no-loan financial aid initiative while additional gifts were being raised. Additional graduate and professional aid endowment income supported increased PhD stipends and professional aid.

  - In FY2010, the University capped the payout on non-aid endowment at the FY2009 level and limited the growth in the payout on aid endowment to 8.2%, in response to the Great Recession. Absent this action, spendable income would have grown by 3.9% on aid endowment and 11.0% on non-aid endowment.

  - In FY2016, the University began a three-year phase out of the higher target spending rate on aid endowment, reducing it to 5.9% in FY2016, 5.3% in FY2017, and 5.0% in FY2018.

**CONFIDENTIAL**

- o In FY2017, the University increased the target spending rate on non-aid endowment to 5.0%, so that the target spending rates on aid and non-aid endowment would align at 5.0% in FY2018, when the temporary increase in the aid target spending rate was phased-out.

- o In FY2021, the Trustees approved a temporary increase in the target spending rate to 7.0% to provide schools and centers with additional resources for strategic investments while managing through the pandemic. The target spending rate was reduced 6.0% for FY2022 and returned to 5.0% in FY2023.

**Definitions**

- Spending rule:  Formula that determines the amount that is distributed for spending during a given fiscal year.

- Total return:  Measure of investment performance that includes both income (current yield) and market value (appreciation) components.

- Investment administration charge:  Funds internal University expenses associated with the management of Penn's endowment, including cost of the Office of Investments and a portion of costs of other central University offices involved in investment accounting and administration. This charge is about 0.14% of a fund's market value.

- Endowment assessment:  Used to help cover Development's costs related to the stewardship of Penn's endowment.  This assessment is about 0.05% of a fund's market value.

- Income available for spending:  Spending rule-based amount posted to and spendable by a school/responsibility center.

- Indirect cost allocation:  This allocation, typically representing 20% of the income available for spending, is transferred from the responsibility center's endowment fund to its general purpose fund to cover the indirect expenses of endowed activities.  These include the costs of keeping buildings heated, lighted and maintained and other support services provided by the University as well as school or resource center specific expenses.

- Net distribution:  Amount of income available for spending posted to and spendable by school/responsibility center's endowment funds.  For funds that are exempt from the indirect cost allocation, this is the same as the income available for spending.

- Effective payout rate:  The amount of income available for spending for a given year as a percentage of that year's beginning market value, before considering new gifts to the endowment.  The effective payout rate may be higher or lower than the target spending rate and provides a basis for comparison across peers, regardless of spending rule formulas and stated spending rates.

**Impact of New Gifts**

How do new gifts impact the amount of income that is distributed?

A fund that has no new gifts or withdrawals during the fiscal year will receive the same amount of income distribution each month of that year, as determined by the spending rule.

A fund that has new gifts during the year will receive additional income during the months following the investment of that gift in the endowment.  The additional income will be proportionate to the market value that the new investment represents relative to the market value of that fund prior to the new

**CONFIDENTIAL**                                                    **PENN568-LIT-00180109**

investment. Given that the income to be distributed for a given month is based on market value factors, the spending rule calculation applies to gifts to new funds as well.

*Example 1*

A fund with a market value of $1,000,000 at the end of FY2020 received $56,995 in annual income during FY2022 ($38,995 from the income-based component and $18,000 from the market value-based component), or $4,750 per month, before new gifts. Assume that the fund had received a $250,000 gift payment in December 2021 that was invested at the end of the month and that the fund had a market value of $1,010,000 prior to that receipt. The $250,000 receipt represents 24.75% of the $1,010,000 market value. Therefore, the monthly income distribution for January through June would be $5,926, or 24.75% more than December's income distribution. Total income for FY2022 would therefore have been $64,056 (i.e., $4,750 x 6 + $5,926 x 6) rather than $56,995 (i.e., $4,750 x 12). The increase in income attributable to the new gift would be $7,061 (i.e., $64,056 - $56,995).

If the $250,000 gift were for a new fund, that fund would have received $1,176 monthly for January through June, or $7,061 for the year, the same incremental income that a gift of the same amount invested in the same month to an existing fund would generate.

*Example 2*

Fund A was established many years ago with a gift of $250,000 and had a market value of $1,000,000 at the end of end of FY2020. Fund B was created at the end of FY2020, with a new $1,000,000 gift. Given that both funds had the same market value at the end of FY2020, each would have received $56,995 in income during FY2022.

**Endowment Spending Rule Model**

The attachment shows actual and projected results for a non-aid endowment that had a $1,000,000 market value at the end of FY2000. Note that the model excludes the impact of new gift receipts. As illustrated above, the income on such gifts is proportionate to income on existing endowment. For budget planning purposes, investment income projections for FY2023 and beyond assume a 7.5% annual total return.

**Endowment Income Projections in the Budget Planning Application**

After the end of each fiscal year, Penn's Office of Budget Planning & Analysis prepopulates investment income lines in the University's budget application for the current year forecast and preliminary budgets for the next five years based on final year-end endowment market values using payout factors derived from the spending rule. The application uses those same factors for calculating the income on projected gift receipts for the current and next five years. For that purpose, it assumes that all endowment gifts payments are received mid-year (i.e., in December), and therefore receive six months of income in the fiscal year of receipt. The following year's projected income on those gift receipts is calculated by doubling the income in the year of receipt and then applying an annual growth rate as determined by the spending rule.

Using the mid-year convention for gift receipts simplifies data entry and provides a reasonable approximation of investment income on those receipts. As a matter of policy, gift receipts are invested at the beginning of the month following receipt and receive income from that point forward.

# Exhibit B



### Net Cost in 2005 Dollars
#### 1st Time, 1st Year Traditional Undergraduate Cohort Receiving Need-based Grant Aid
#### Entering Fall 2003 - 2022 (FY/AY 2004-2023)

Attorney's Eyes Only