PUBLIC VERSION

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ANDREW CORZO, SIA HENRY, ALEXANDER LEO-GUERRA, MICHAEL MAERLENDER, BRANDON PIYEVSKY, BENJAMIN SHUMATE, BRITTANY TATIANA WEAVER, and CAMERON WILLIAMS, individually and on behalf of all others similarly situated, | |
| *Plaintiffs*, | |
| v. | Case No. 1:22-cv-00125 |
| BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, THE JOHNS HOPKINS UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY, | Hon. Matthew F. Kennelly |
| *Defendants*. | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF**
**THEIR MOTION FOR SUMMARY JUDGMENT**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................. iv

INTRODUCTION ................................................................................................ 1

BACKGROUND .................................................................................................. 5

    I.      Need-Based Financial Aid ............................................................... 5

    II.     The Financial Aid Process ............................................................... 6

    III.    The 568 Exemption and the 568 Group ........................................ 8

    IV.    This Lawsuit...................................................................................... 11

ARGUMENT ....................................................................................................... 13

    I.      No Reasonable Jury Could Conclude That Defendants Agreed To Engage In "A Single Alleged Price-Fixing Conspiracy To Raise The Floor On EIPs." ................................................................. 13

          A.    There Is No Evidence Of An "Overarching" Agreement To Raise "EIPs." ........................................................... 14

          B.    The Individual "Components" Of The Challenged Conduct Refute Any Inference Of Plaintiffs' Alleged Conspiracy. ................................... 16

          C.    The Benefits Of The Challenged Conduct To Students Undercut Any Inference Of Plaintiffs' Conspiracy. ................................... 25

    II.     The Rule Of Reason Applies As A Matter of Law. ....................... 26

          A.    This Is Not A "Typical" Price Fixing Case. ..................... 27

          B.    Judicial Experience Shows That The Rule of Reason Applies ................ 27

    III.    Plaintiffs Cannot Meet Their Burden To Show That Much Of The Challenged Conduct Has Substantial Anticompetitive Effects. .......................... 31

    IV.    Plaintiffs Fail To Establish A Relevant Product Market As A Matter Of Law. .................................................................... 34

          A.    Plaintiffs Fail To Support Their Proposed Product Market. ..................... 35

          B.    The Facts Refute Plaintiffs' Self-Serving Market Definition. ................. 38

V.    Cornell, Georgetown, MIT, and Penn Are Entitled To Summary Judgment
      Under The 568 Exemption........................................................................................ 40

      A.    Schools Are "Need-Blind" If They Do Not Consider An Applicant's
            Decision To Seek Financial Aid In Making Admissions Decisions......... 41

      B.    The Exemption Applies As Long As Two Or More Schools Are
            Need-Blind................................................................................................ 44

      C.    Cornell, Georgetown, MIT, and Penn Are Need-Blind Under This
            Interpretation of the Statute. ................................................................... 46

VI.   Members Of The Putative Class Who Did Not Pay Their Own Tuition
      Suffered No Antitrust Injury As A Matter Of Law................................................ 47

VII.  Even Assuming The Existence Of Some Kind Of "Conspiracy," Penn
      Affirmatively Withdrew In January 2020............................................................. 49

CONCLUSION............................................................................................................................ 50

CERTIFICATE OF SERVICE ...................................................................................................... 53

PUBLIC VERSION

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*ABS Glob., Inc. v. Inguran, LLC*,
   2016 WL 3963246 (W.D. Wis. July 21, 2016) ........................................................ 35

*Agnew v. NCAA*,
   683 F.3d 328 (7th Cir. 2012) ................................................................................... 34

*Air Wis. Corp. v. Hoeper*,
   571 U.S. 237 (2014) ................................................................................................. 42

*Am. Needle, Inc. v. New Orleans La. Saints*,
   2014 WL 1364022 (N.D. Ill. Apr. 7, 2014) ............................................................. 30

*Anderson News, L.L.C. v. Am. Media, Inc.*,
   899 F.3d 87 (2d Cir. 2018) ................................................................................ 24, 26

*Atl. Richfield Co. v. USA Petroleum Co.*,
   495 U.S. 328 (1990) ................................................................................................. 26

*In re Baby Food Antitrust Litig.*,
   166 F.3d 112 (3d Cir. 1999) ..................................................................................... 22

*Blades v. Monsanto Co.*,
   400 F.3d 562 (8th Cir. 2005) ................................................................................... 47

*Bond v. United States*,
   572 U.S. 844 (2014) ................................................................................................. 44

*In re Brand Name Prescription Drugs Antitrust Litig.*,
   123 F.3d 599 (7th Cir. 1997), *abrogated on other grounds by Rivet v. Regions
   Bank of La.*, 522 U.S. 470 (1998) ..................................................................... 49, 50

*In re Brand Name Prescription Drugs Antitrust Litig.*,
   288 F.3d 1028 (7th Cir. 2002) ................................................................................. 17

*Broad. Music, Inc. v. CBS, Inc.*,
   441 U.S. 1 (1979) ............................................................................... 27, 28, 29, 30

*In re Broiler Chicken Antitrust Litig.*,
   702 F. Supp. 3d 635 (N.D. Ill. 2023) ..................................................... 31, 32, 33, 34

*Brown Shoe Co. v. United States*,
   370 U.S. 294 (1962) ........................................................................................... 35, 36

*Brunson Commc'ns, Inc. v. Arbitron, Inc.*,
239 F. Supp. 2d 550 (E.D. Pa. 2002) ....................................................26

*Car Carriers, Inc. v. Ford Motor Co.*,
745 F.2d 1101 (7th Cir. 1984) ............................................................26

*Carbone v. Brown Univ.*,
621 F. Supp. 3d 878 (N.D. Ill. 2022) ............................................41, 44

*ChampionsWorld, LLC v. U.S. Soccer Fed'n, Inc.*,
890 F. Supp. 2d 912 (N.D. Ill. 2012) .............................................13, 36

*Chi. Studio Rental, Inc. v. Ill. Dep't of Com.*,
940 F.3d 971 (7th Cir. 2019) ..............................................................47

*In re Chocolate Confectionary Antitrust Litig.*,
801 F.3d 383 (3d Cir. 2015).........................................................17, 18

*Choh v. Brown Univ.*,
2024 WL 4465476 (D. Conn. Oct. 10, 2024) .......................................31

*Concord Assocs., L.P. v. Ent. Props. Tr.*,
817 F.3d 46 (2d Cir. 2016)..................................................................31

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
801 F.3d 758 (7th Cir. 2015) ..........................................................2, 14

*Dvorak v. St. Clair Cnty.*,
2018 WL 514326 (S.D. Ill. Jan. 23, 2018)...........................................47

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992)............................................................................39

*ECOS Elecs. Corp. v. Underwriters Lab'ys*,
743 F.2d 498 (7th Cir. 1984) ..............................................................32

*Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*,
478 F. Supp. 243 (E.D. Pa. 1979), *aff'd*, 637 F.2d 105 (3d Cir. 1980)................................25

*Exhaust Unlimited, Inc. v. Cintas Corp.*,
223 F.R.D. 506 (S.D. Ill. 2004) ..........................................................47

*In re Flat Glass Antitrust Litig.*,
385 F.3d 350 (3d Cir. 2004)................................................................32

*Gociman v. Loyola Univ. of Chi.*,
515 F. Supp. 3d 861 (N.D. Ill. 2021) ..................................................49

*Herrera v. Target Corp.*,
2009 WL 3188054 (N.D. Ill. Sept. 30, 2009) ........................................................23

*Honeywell Int'l Inc. v. Ecoer, Inc.*,
2024 WL 3521591 (S.D.N.Y. July 23, 2024) ........................................................25

*Ill. Brick Co. v. Illinois*,
431 U.S. 720 (1977) ..............................................................................................49

*Int'l Healthcare Mgmt. v. Haw. Coal. for Health*,
332 F.3d 600 (9th Cir. 2003) ................................................................................30

*Kleen Prods. LLC v. Georgia-Pacific LLC*,
910 F.3d 927 (7th Cir. 2018) ..........................................................18, 20, 24, 26

*Kraft Foods Glob., Inc. v. United Egg Producers, Inc.*,
2024 WL 4346418 (N.D. Ill. Sept. 30, 2024) ......................................................28

*Ky. Speedway, LLC v. NASCAR, Inc.*,
588 F.3d 908 (6th Cir. 2009) ................................................................................35

*In re Late Fee & Over-Limit Fee Litig.*,
528 F. Supp. 2d 958 (N.D. Cal. 2007) ................................................................24

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
551 U.S. 877 (2007) ..............................................................................................26

*Marion HealthCare, LLC v. S. Ill. Hosp. Servs.*,
41 F.4th 787 (7th Cir. 2022) ................................................................................13

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ........................................................................................*passim*

*McLaughlin Equip. Co. Inc. v. Servaas*,
2004 WL 1629603 (S.D. Ind. Feb. 18, 2004) ......................................................36

*Mellouli v. Lynch*,
575 U.S. 798 (2015) ..........................................................................................42, 44

*Menasha Corp. v. News Am. Mktg. In-Store, Inc.*,
238 F. Supp. 2d 1024 (N.D. Ill. 2003) ............................................................34, 35

*In re Mercedes-Benz Anti-Trust Litigation*,
157 F. Supp. 2d 355 (D.N.J. 2001) ......................................................................48

*In re Musical Instruments & Equip. Antitrust Litig.*,
798 F.3d 1186 (9th Cir. 2015) ..............................................................................23

**PUBLIC VERSION**

*Nat'l Broiler Mktg. Ass'n v. United States*,
    436 U.S. 816 (1978)................................................................................46

*NCAA v. Alston*,
    594 U.S. 69 (2021)................................................................................31

*NCAA v. Bd. of Regents of Univ. of Okla.*,
    468 U.S. 85 (1984)................................................................................29

*Nucap Indus., Inc. v. Robert Bosch LLC*,
    273 F. Supp. 3d 986 (N.D. Ill. 2017) ....................................................38

*Ohio v. Am. Express Co.*,
    585 U.S. 529 (2018)................................................................................31

*Omnicare, Inc. v. UnitedHealth Grp., Inc.*,
    629 F.3d 697 (7th Cir. 2011) ...................................................... *passim*

*Patel v. Univ. of Vt.*,
    2021 WL 4523683 (D. Vt. Oct. 1, 2021) ................................................47

*Powerex Corp. v. Reliant Energy Servs., Inc.*,
    551 U.S. 224 (2007)................................................................................42

*Procaps S.A. v. Patheon Inc.*,
    141 F. Supp. 3d 1246 (S.D. Fla. 2015), *aff'd*, 845 F.3d 1072 (11th Cir. 2016).......................31

*Reifert v. S. Cent. Wis. MLS Corp.*,
    450 F.3d 312 (7th Cir. 2006) ..........................................................35, 36

*Republic Tobacco v. N. Atl. Trading Co.*,
    381 F.3d 717 (7th Cir. 2004) .................................................................38

*Rynasko v. NYU*,
    63 F.4th 186 (2d Cir. 2023) ...................................................................49

*Sackett v. EPA*,
    598 U.S. 651 (2023)................................................................................43

*Schachar v. Am. Acad. of Ophthalmology, Inc.*,
    870 F.2d 397 (7th Cir. 1989) .................................................................21

*Sci. Prods. Co. v. Chevron Chem. Co.*,
    384 F. Supp. 793 (N.D. Ill. 1974) .........................................................40

*Shah v. VHS San Antonio Partners, L.L.C.*,
    985 F.3d 450 (5th Cir. 2021) .................................................................35

**PUBLIC VERSION**

*Sharif Pharm., Inc. v. Prime Therapeutics, LLC*,
 950 F.3d 911 (7th Cir. 2020) ..................................................35

*In re Sulfuric Acid Antitrust Litig.*,
 703 F.3d 1004 (7th Cir. 2012) ...........................................26, 28

*Texaco Inc. v. Dagher*,
 547 U.S. 1 (2006)..................................................................26

*In re Text Messaging Antitrust Litigation*,
 46 F. Supp. 3d 788 (N.D. Ill. 2014), *aff'd*, 782 F.3d 867 (7th Cir. 2015) ..................... *passim*

*Theme Promotions, Inc. v. News Am. Mktg. FSI*,
 546 F.3d 991 (9th Cir. 2008) ..................................................36

*Tri-Gen Inc. v. Int'l Union of Operating Eng'rs, Loc. 150*,
 433 F.3d 1024 (7th Cir. 2006) .................................................27

*In re Turkey Antitrust Litig.*,
 2025 WL 264021 (N.D. Ill. Jan. 22, 2025) .................................48

*U.S. Bd. of Oral Implantology v. Am. Bd. of Dental Specialties*,
 390 F. Supp. 3d 892 (N.D. Ill. 2019) ........................................35

*United States v. Brown University*,
 5 F.3d 658 (3d Cir. 1993)................................................ *passim*

*United States v. Cont'l Can Co.*,
 378 U.S. 441 (1964)..............................................................37

*United States v. U.S. Gypsum Co.*,
 438 U.S. 422 (1978)..........................................................32, 50

*Zbaraz v. Madigan*,
 572 F.3d 370 (7th Cir. 2009) ..................................................45

**Statutes**

7 U.S.C. § 291.......................................................................46

15 U.S.C. § 1..........................................................................8

**Other Authorities**

34 C.F.R. § 673.5.....................................................................7

147 Cong. Rec. H7730-32 (2001)..............................................43

Fed. R. Civ. P. 56(a) ..............................................................13

H.R. Rep. No. 103-761 (1994) ................................................................................41, 43

H.R. Rep. No. 105-144 (1997) .....................................................................................45

H.R. Rep. No. 110-577 (2008) .....................................................................................43

Improving America's Schools Act of 1994, Pub. L. No. 103-382, § 568(a), 108
    Stat. 3518, 4060 (1994) ................................................................................ *passim*

U.S. Gov't Accountability Off., GAO-06-963, Higher Education: Schools' Use of
    the Antitrust Exemption Has Not Significantly Affected College Affordability
    or Likelihood of Student Enrollment to Date (Sept. 2006) .....................................10

PUBLIC VERSION

## INTRODUCTION

Despite years of sprawling discovery, plaintiffs cannot identify sufficient evidence to support their theory that defendants, by participating in the 568 Group or otherwise, agreed to inflate the price students paid to attend college. Rather, the undisputed evidence shows defendants competed vigorously for students, expanded their financial-aid programs, and reduced net cost. On these facts, no reasonable jury could find for plaintiffs.

Defendants are preeminent private universities committed to making their academic opportunities affordable for qualified students from all walks of life. Rather than enroll only students who can afford full tuition, defendants have each chosen to admit students regardless of their ability to pay and to fully fund their demonstrated need, ensuring that financial circumstances do not preclude enrollment. Since the beginning of plaintiffs' proposed class period in 2003, defendants more than *doubled* institutional grant aid (even after adjusting for inflation) and *reduced* the average net price aid recipients pay. SOF 55.[1]

Fairly and equitably distributing aid to those who need it most is no simple matter. No two financial aid applications are the same, and defendants face myriad recurring questions such as how to measure ability to pay when the value of a family's home far exceeds their income; when one or more of the student's siblings attends college at the same time; or when the student comes from a region with a high cost of living. The answers can differ from defendant to defendant based on each defendant's applicant pool, financial resources, academic programs, and experiences. There is nothing surprising, however, about the idea that defendants, through the 568 Group,

---

[1] "SOF" refers to Defendants' Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment, filed concurrently. "Ex. __" refers to the exhibits to the Declaration of Daniel T. Fenske, also filed concurrently.

wanted to exchange ideas about how best to evaluate financial need, and antitrust law encourages such pro-competitive collaboration. Defendants are entitled to summary judgment for five reasons.

*First*, plaintiffs cannot prove the "agreement" element of their § 1 claim. Where, as here, there is no direct evidence of the conspiracy plaintiffs allege, plaintiffs must show "that the inference of conspiracy is reasonable in light of the competing inferences of independent action," and must put forth evidence "that tends to exclude the possibility" of independent action. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). Merely pointing to evidence *consistent with* conspiracy is not enough. *See In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 801 F.3d 758, 763 (7th Cir. 2015). Where the evidence is consistent with lawful independent behavior, even a "richly detailed" § 1 claim cannot proceed to trial. *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 720 (7th Cir. 2011).

Plaintiffs cannot meet their burden. They imagine a sprawling, decades-long conspiracy to set a floor on the "Effective Institutional Price" ("EIP")—a metric plaintiffs' expert made up for litigation and which often does not reflect the price students paid to attend college. But there is no evidence of an agreement to set a floor for "EIP." And the conspiracy is refuted by the evidence showing defendants varied widely in how they determined student need and the net prices they charged, all while reducing net prices on average for aid recipients.

Analyzing the various components of the so-called "overarching agreement" to inflate "EIPs" similarly refutes plaintiffs' case. That defendants might have independently adopted certain "principles" of financial aid is not evidence of agreement, as schools in and out of the purported conspiracy have endorsed these same principles for decades. Nor did defendants agree to use the Consensus Methodology ("CM") Guidelines to calculate need. To the contrary: they openly deviated from the CM Guidelines, employing different caps on home equity, differing sibling

discounts, and varied cost-of-living adjustments, among other differences, often to students' benefit. And regardless, the CM Guidelines cannot lead to an inference of a conspiracy to *increase prices* given that most of the CM Guidelines served to *reduce* a family's expected contribution in comparison to alternative methods. Further, defendants frequently exercised professional judgment and granted financial-aid appeals—affecting upwards of 20 percent of awards in some cases—to further reduce prices students paid. The data bear this out. It is undisputed that defendants calculated widely varying Expected Family Contributions ("EFCs") and net prices for the very same students—a result that would make no sense under the theory of conspiracy plaintiffs are pursuing.

Other aspects of the alleged conspiracy are similarly baseless. The data sharing that 568 Group members openly participated in (along with non-members) does not come close to showing an agreement on "EIP." The undisputed facts show the 568 Group did not collaborate on the "packaging" of financial aid or tuition levels. And, through the alleged conspiracy, defendants increased overall aid and reduced the net price of attendance for students requiring aid. Accordingly, no "inference of conspiracy is reasonable in light of the competing inferences of independent action." *Matsushita*, 475 U.S. at 588. The evidence shows robust competition.

*Second,* even if plaintiffs had adduced enough evidence to suggest some form of agreement, the default rule of reason standard—not the *per se* rule—governs. *Per se* treatment is the exception, not the rule. It is limited to restraints that, through substantial judicial experience, courts can be confident nearly always are anticompetitive. Here, there is no evidence of naked price fixing or anything comparable, and as noted, the conduct coincided with *falling* net prices for aid recipients across defendants. Further, the challenged conduct has pro-competitive virtues (*e.g.*, enhanced consumer choice, product quality, and efficiency) and occurred in a setting (higher

PUBLIC VERSION

education) fundamentally ill-suited to *per se* analysis. The rule of reason applies in these kinds of cases, as recognized in *United States v. Brown University*, 5 F.3d 658 (3d Cir. 1993).

*Third*, under the rule of reason, plaintiffs must prove substantial, market-wide anticompetitive effects, but they cannot do so for much of the challenged conduct—which includes being transparent with applicants as to their financial aid policies, sharing stale and non-sensitive information, prioritizing need-based aid, and developing the CM Guidelines. These practices benefitted students by enabling informed decision-making, expanding access for needy students, and increasing the size of financial aid packages. At minimum, summary judgment is warranted on these elements of the alleged conspiracy.

*Fourth*, the undisputed facts refute plaintiffs' proposed market, an essential element of their rule of reason claim. Plaintiffs advance a gerrymandered market of 22 private universities from the *U.S. News & World Report* (USNWR) Top 25, which excludes public flagships (*e.g.*, University of Michigan, UC Berkeley, UCLA, UVA), other highly ranked private universities (*e.g.*, NYU, USC), and top liberal arts colleges (*e.g.*, Pomona, Swarthmore, Williams). The evidence—and common sense—shows defendants compete vigorously against these excluded schools. What is more, plaintiffs' expert, Hal Singer, did not conduct the most basic quantitative analysis—the hypothetical monopolist test—necessary to define an antitrust market. Nor did he apply any other comparable, accepted economic tool. Plaintiffs' proposed market fails, which is fatal to their claim.

*Fifth*, defendants are entitled to summary judgment due to their immunity under § 568. Congress immunized "need-blind" institutions from antitrust liability for collaborating on common principles of need-based financial aid. Every remaining defendant asserting this defense qualifies as "need-blind" because none made admissions decisions based on an applicant's desire or need

for financial aid. Plaintiffs' insistence to the contrary relies on reading "need-blind" to prohibit consideration of any fact that suggests the financial circumstances of applicants or their families, which would include (among other things) a personal statement about an applicant's impoverished childhood. It is doubtful that a single school has ever been or could ever be "need-blind" under plaintiffs' reading of § 568, confirming the implausibility of their position.

*Finally*, the Court should enter judgment against all plaintiffs who did not personally pay tuition, and against plaintiffs who attended Penn after 2020, when the undisputed facts show Penn withdrew from the 568 Group.

The Court should grant defendants summary judgment.

## BACKGROUND

### I.     Need-Based Financial Aid

The cost of attending college is high, and the cost to provide an excellent college education is even higher. SOF 4, 34. At each defendant school, the average cost of educating undergraduate students over the last 20 years has far exceeded tuition and fees. SOF 4.

Although defendants could fill their classes entirely with qualified full-pay students, defendants believe an outstanding education should not be a privilege reserved to the wealthy. SOF 5, 7. Defendants are thus among the few schools that admit students without regard to whether they can afford the full cost of tuition (*i.e.*, through "need-blind" admissions policies), and meet 100% of demonstrated need through financial aid (*i.e.*, through "full need" financial aid policies), ensuring that any qualified student who applies can earn admission and can afford to enroll, regardless of their financial circumstances. SOF 6. Fairly allocating resources to students who need them advances equity in and access to higher education and improves socioeconomic diversity on campus, which in turn improves the educational experience. SOF 8, 15. That is why prioritizing financial need, striving for equity, and accounting for unique circumstances through the exercise

of professional judgment are bedrock principles of financial aid—and have been for decades. SOF 7, 15, 100.

The foundational principles of financial aid in higher education were first developed in the 1950s. SOF 21. Need-based aid is premised on the idea that while students and their families have primary responsibility for paying for college, aid should be provided to those who need it and should be fairly allocated based on a family's true financial strength. SOF 16, 21. Even schools that offer non-need based "merit" aid commonly prioritize need-based aid. SOF 19.

## II. The Financial Aid Process

A student seeking need-based aid must submit financial aid application materials, providing the school with information about the financial circumstances of the student and their family. SOF 22. Financial aid officers then apply school-specific methodologies and policies, while exercising professional judgment case by case, to determine the student's EFC, *i.e.*, what the student is expected to contribute towards the cost of education. SOF 23, 27, 100. Determining an EFC "is an art and a science" that requires financial aid officers to "look[] at the story of a family" and "connect[] dots" on "a family's capacity to pay." SOF 23. Every school chooses its own approach to analyzing a student's need. SOF 27. Many use or adapt established methodologies like the federal government's Federal Methodology ("FM") or the College Board's Institutional Methodology ("IM"), while others develop in-house, school-specific methodologies. *Id.*

The IM relies on information submitted in the College Scholarship Service Profile ("CSS Profile"), including detailed information about the income, assets, and financial circumstances of a student and their family. SOF 22, 25. A school collecting CSS Profile information may choose to use all the information in exactly the way the College Board recommends (the "Base IM") or may customize the IM, choosing what information to use and which College Board

PUBLIC VERSION

recommendations to adopt, adjust, or ignore. SOF 26, 28. Because it is detailed and readily customizable, the Base IM has served as the starting point for developing need analysis methodologies for hundreds of schools throughout the country—defendants and countless others—for decades. SOF 28.

Schools using the IM typically collect and consider information about a family's income and assets. SOF 31. They may consider multiple income streams and decide whether to treat them similarly or differently: they may consider taxable income and untaxable income similarly or differently; they may treat student income the same as parent income, or differently; and they may apply allowances against income for things like retirement savings (or lack thereof) or special circumstances. *Id.* Schools' need analysis methodologies may also treat different classes of assets differently; may treat student assets and parent assets the same, or differently; and may ignore certain assets because of a view that those assets should not be considered an available resource to finance a student's education. *See* SOF 32. Importantly, the federal government also provides financial assistance, which schools consider in setting their own aid awards, as federal regulations require. *See* SOF 35 (citing 34 C.F.R. § 673.5).

In addition to the formulaic need-analysis methodology each school develops and applies, financial aid officers apply professional judgment in evaluating applicants' financial circumstances on a case-by-case basis. SOF 100. "Professional judgment" refers to a holistic evaluation of an application and might result in an institution independently adjusting certain inputs to a given student's EFC calculation, or considering special circumstances, like parental job loss, to manually adjust its award to that student. *Id.* Using professional judgment to evaluate case-specific special circumstances is common throughout higher education because it improves fairness and equity. *Id.*

PUBLIC VERSION

Determining EFC is not the end of the process. A student's EFC is subtracted from the school's "cost of attendance" to determine the amount the student "needs." SOF 33. Even if two schools calculate the same EFC for a student, the prices quoted to the student and their family often still differ because schools "package" aid differently through school- and student-specific combinations of institutional or non-institutional (*e.g.*, federal, state, or third-party) grants, loans (at some schools), and work-study. SOF 35-36, 39. Some schools do not package aid with any loans; others "preferentially package" loans (meaning they offer fewer loans to certain students). SOF 38-39. Some defendant schools also offer students "merit" aid, *i.e.*, aid that is not based on financial need. SOF 18. Merit aid may replace some or all of a student's need-based aid, or may be provided in addition to some or all of a student's need-based aid. SOF 37. Students can "appeal" their financial aid award from a given school. SOF 41-42. Appeals are frequently made and granted. *Id.*

## III.    The 568 Exemption and the 568 Group

No school's financial aid office alone has the economic expertise to develop its own comprehensive approach to assess student need. SOF 28 (quoting Penn's University Director of Student Financial Aid stating that "it would be impossible" for a school to develop a comprehensive to assessing student need). Thus, Congress encouraged collaboration with the Improving America's Schools Act of 1994. Section 568 of that law provided an antitrust exemption for need-blind institutions to, among other things, discuss common principles of need analysis.[2] In 1998, several colleges and universities began to do that. SOF 63. Ultimately, the 568 Group endorsed—but did not require—six long-held "Need Analysis Principles": (1) "parents and students have the primary responsibility" to pay for school; (2) families "should contribute …

---

[2] *See* 15 U.S.C. § 1 note. The exemption was renewed in 1997, 2001, 2008, and 2015, before it expired in 2022. *See* Dkt. 308, Second Am. and Suppl. Class Action Compl. ("SAC") ¶2.

according to their ability," and similarly situated families "should contribute similar amounts"; (3) ability to pay should be evaluated based on "both income and assets"; (4) institutions should be transparent about their approach to "measuring a family's ability to pay"; (5) applicants should be informed about any non-need based aid; and (6) "professional judgment" should be exercised to "recognize unique or extenuating financial circumstances in individual cases." SOF 93-95, 98-99. The Group also discussed and developed a set of periodically updated best practices published in what was known as the CM Guidelines. SOF 69, 76-77.

The CM Guidelines did not reflect any school's full methodology for calculating EFCs. Nor could they, as they addressed only 17 elements of the many discrete components typically found in need analysis, leaving countless others unaddressed. SOF 69, 74. Even among the 17 elements the Guidelines addressed, several were generalized and did not provide actionable recommendations. SOF 74. The handful that did typically corrected for financial burdens not adequately accounted for by the Base IM. *See* SOF 69. For example, although the Base IM treated cost of living as the same for everyone, the 568 Group developed new recommendations that accounted for significant regional differences, benefitting students from high-cost urban areas like Chicago. SOF 75-76. The 568 Group also developed tools to account for retirement savings beyond the Base IM's formula, benefitting families without retirement accounts. SOF 75, 78. All else equal, use of the CM Guidelines would reduce EFCs and increase aid awards for most students. SOF 75.

Where the CM Guidelines spoke to specific issues, defendants implemented them differently, if at all. SOF 81, 83. Each school in the Group "was free to … do whatever they deemed appropriate," and rigid adherence to the Guidelines was neither required nor expected. SOF 82.

**PUBLIC VERSION**

The GAO verified this fact in 2006.[3] As noted, many CM Guidelines were deliberately framed at a high level of generality, and even specific recommendations were not consistently adopted. For example, only four defendants (Columbia, Duke, Georgetown, and Johns Hopkins) applied the CM Guidelines' recommended home equity cap throughout the class period. SOF 85. The remaining 13 defendants took different approaches, including removing home equity from the analysis altogether (MIT and Caltech), or using a different—and in some cases more favorable—approach (Penn, ▮▮▮▮▮▮, Rice, Brown, Emory). SOF 86-87. Similarly, only nine members adopted the retirement allowance tools the 568 Group developed in 2019. SOF 88. No defendant adopted the CM Guidelines in their entirety while a member of the 568 Group. SOF 83. Members of the 568 Group knew other members routinely adopted policies that diverged from the CM Guidelines' recommendations in various ways. SOF 82, 84. The 568 Group included no enforcement mechanism, and the Group never disciplined a member school for diverging from the CM Guidelines. SOF 80.

      The 568 Group also published a Professional Judgment Guidelines Manual ("PJ Guidelines"). SOF 101. Those guidelines did not prescribe how professional judgment would be exercised as a general matter or in specific cases. Rather, the Group's PJ Guidelines encouraged schools to comport with the generally accepted foundational principle that professional judgment should be exercised case by case to account for the unique financial circumstances of each student and family. SOF 100-101. The 568 Group did not dictate how any member school would exercise professional judgment. SOF 101.

---

[3] U.S. Gov't Accountability Off., GAO-06-963, Higher Education: Schools' Use of the Antitrust Exemption Has Not Significantly Affected College Affordability or Likelihood of Student Enrollment to Date 9 (Sept. 2006), *available at* https://www.gao.gov/assets/gao-06-963.pdf.

Unsurprisingly, then, EFCs varied widely across schools. Indeed, students "cross-admitted" by multiple defendants had an average EFC spread of at least $15,399. Ex. 1.1, Hill Reb. ¶102. For 56% of cross-admits, EFCs varied by 20% or more between defendants. *Id.* fig. 14; *see also id.* fig. 13 (noting student whose EFC varied from $43,177 to $69,156). EFCs for over 70% of students admitted to more than one defendant school differed by more than 10%. *Id.* fig. 14. Almost every purported class member admitted by more than one defendant was asked to make *different* contributions. *Id.* ¶101. To give just one example, Dartmouth expected one cross-admitted student to contribute north of *$25,000* more than Penn expected. *Id.* ¶99 & fig. 13. Virtually no cross-admitted students received identical net prices from any two defendants, and net prices for more than two-thirds differed by 15%. *Id.* ¶120 & fig. 20; *see also* Ex. 3.1, Stiroh Reb. ¶142 & fig. 5.6 (net prices for students with EFCs near the median of $18,690 ranged from $5,330 to $61,462).

Net prices at defendant schools also varied widely. That is unsurprising, as the Group did not work on or agree to tuition levels, SOF 111, or how members should package financial aid, SOF 104. To the contrary, the CM Guidelines expressly specified that they were not directed to the "packaging decisions" of individual institutions. *Id.* Defendants joined and left the 568 Group at various times throughout the relevant period. SOF 66. Yet the data reflect that students' average EFCs were similar before and after defendants joined the 568 Group. SOF 61. The data also reflect that grant aid increased at defendant schools while they were members of the 568 Group, and it increased at about the same rate as grant aid increased at non-member schools plaintiffs have identified as defendants' peers. SOF 54.

## IV. This Lawsuit

Named plaintiffs are former students of several defendant schools who claim that defendants allegedly depressed their financial aid awards. Like many college students, almost none

of the named plaintiffs paid for their own education. SOF 43. Nevertheless, the named plaintiffs allege that defendants—17 of the nearly 30 schools that at one time or another were members of the 568 Group—conspired to charge higher prices in violation of the Sherman Act. *See generally* SAC.

According to the operative complaint, defendants "fixed prices" by using the CM Guidelines, which plaintiffs described as "a common formula for determining an applicant's ability to pay." SAC ¶¶5, 115. But years of discovery, including more than 100 depositions and millions of pages of documents, refuted this accusation. Their lead expert admitted he "d[id]n't think there was an explicit agreement on prices." Ex. 191, Singer Tr. 22:13-14. Quite the opposite: he recognized that "the consensus methodology would not give you a crisp formula to use." *Id.* 19:22-24. And to the extent each defendant created its own formula to calculate EFCs, he "can't tell you that they were identically the same." *Id.* 16:9-11. In short, the "common formula" alleged in plaintiffs' complaint never existed.

Plaintiffs now claim that defendants formed a so-called "Overarching Agreement" to "raise the floor on EIPs," Dkt. 807, Pls.' Class Cert. Reply 16, by agreeing to "apply several core principles in awarding aid," to develop the "Consensus Methodology," to apply agreed-upon guidelines as to "professional judgment," and to "share information." Dkt. 757, Pls.' Class Cert. Mot. 7. None of those components suggest the conspiracy plaintiffs allege, and the supposed "core principles" contradict the kind of "formula" alleged in the complaint. Indeed, "core principles" about the "primacy of need-based aid," SOF 93-94, undercut the complaint's assertion that defendants did "not agree to allocate aid solely based on demonstrated financial need," SAC ¶257. Other "core principles" reflect generic statements about financial aid that plaintiffs admit "were not unique to the 568 Group members." Dkt. 757, Pls.' Class Cert. Mot. 8.

Regardless of what form the alleged conspiracy took, plaintiffs believe that it affected competition in what they referred to as "the Market for Elite, Private Universities," defined as "undergraduate education at private national universities with an average ranking of 25 or higher in the *U.S. News & World Report* rankings from 2003 through 2021." SAC ¶244; *see also* Ex. 4, Singer Am. Rep. ¶72. Plaintiffs contend that the relevant market does not include liberal arts colleges and public flagship schools in the USNWR Top 25, nor does it include private research universities whose average position in the USNWR rankings over this particular 18-year span was slightly below 25—meaning that, according to plaintiffs, Notre Dame competes with Caltech but not the University of Michigan or USC, and Dartmouth and Brown compete with Emory but not Amherst.

## ARGUMENT

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and [defendants are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Here, the undisputed facts belie plaintiffs' proposed "overarching agreement" to increase "EIPs" and otherwise defeat their claims in whole or in part for multiple additional reasons.[4]

## I.    No Reasonable Jury Could Conclude That Defendants Agreed To Engage In "A Single Alleged Price-Fixing Conspiracy To Raise The Floor On EIPs."

The undisputed evidence fails to show defendants conspired to manipulate the "Effective Institutional Price."[5] It instead shows they pursued their independent interests in making financial

---

[4] Plaintiffs' only injury, damages, and market-definition evidence comes from their expert, Dr. Singer. If the Court grants defendants' motion to exclude Dr. Singer's opinions, plaintiffs will be left "without any means to show market power, antitrust injury (or any injury)"—an independent basis for summary judgment. *Marion HealthCare, LLC v. S. Ill. Hosp. Servs.*, 41 F.4th 787, 792 (7th Cir. 2022); *see also ChampionsWorld, LLC v. U.S. Soccer Fed'n, Inc.*, 890 F. Supp. 2d 912, 951 (N.D. Ill. 2012) ("The Court having rejected [plaintiff's expert's] opinion as inadequate, Plaintiff cannot carry its burden on the threshold requirement of demonstrating a cognizable market and concomitant market power in the Defendants.").

[5] Plaintiffs do not allege—because they cannot—that the price students actually paid was inflated.

aid decisions. In evaluating whether plaintiffs have put forth sufficient evidence of their alleged conspiracy to survive summary judgment, a two-step framework applies. First, the court "asses[es] whether [plaintiff's] evidence of agreement is ambiguous—that is, whether it is equally consistent with the Defendants' permissible independent interests as it is with improper activity." *Omnicare*, 629 F.3d at 707. If the evidence is ambiguous, the court "look[s] for any evidence that tends to exclude the possibility that Defendants were pursuing independent interests." *Id*. Absent such evidence, summary judgment is required. *Id.*; *see also Matsushita*, 475 U.S. at 587-88 (emphasizing need for evidence "to exclude the possibility" of independent action).

According to plaintiffs, defendants engaged in a "price-fixing conspiracy to raise the floor on EIPs." Dkt. 807, Pls.' Class Cert. Reply 16. The evidence is inconsistent with any such agreement. And plaintiffs' case does not improve when looking at the individual components of the supposed "Overarching Agreement," which plaintiffs have described inconsistently in their expert's reports and briefing. None of the "components" plaintiffs have varyingly identified comes close to supporting a conspiracy to raise "EIPs," either on their own or when viewed as a whole.

## A. There Is No Evidence Of An "Overarching" Agreement To Raise "EIPs."

Plaintiffs cannot identify any evidence of the alleged agreement to fix "EIPs" or set an "EIP floor." There is no evidence of any "admission by the defendants that they agreed to fix their [EIPs]." *Omnicare*, 629 F.3d at 706. Nor can plaintiffs "point[] to a single communication" or any other evidence "that suggests a meeting of the minds to fix" an "EIP" floor. *Dairy Farmers*, 801 F.3d at 763. That makes sense: "EIP" is a measure plaintiffs invented for this litigation, and it rarely reflects the price anyone actually paid, Dkt. 754, Defs.' *Daubert* Mot. 5-6. Even plaintiffs' expert "do[es]n't think there was an explicit agreement on prices." Ex. 191, Singer Tr. 22:13-14.

Plaintiffs can only muster a handful of emails from the early years of the group in which some representatives of certain defendant schools mentioned the idea of setting a "floor" for EFCs—*not* "EIPs" or other pricing metrics—and a Yale official's public statement in 2008 that the school was leaving the 568 Group to award more aid. *See, e.g.*, Dkt. 785, Pls.' *Daubert* Opp. 2-3. But a few off-hand remarks and a single piece of self-serving publicity cannot overcome the mountain of undisputed evidence disproving plaintiffs' conspiracy. It is undisputed, for example, that thousands of aid recipients who were subject to the challenged conduct received full rides, so the "floor" for the supposedly "fixed" "EIPs" would have had to be zero. Likewise undisputed is the fact that average net prices (that is, the cost-of-attendance less grant aid) consistently declined for financial aid recipients during the class period. SOF 111. Defendants' financial aid expenditures exploded, with both the inflation-adjusted total amount of aid defendants provided and the average aid per first-year, full-time, undergraduate student *doubling* (or more) since 2003, the start of the supposed conspiracy. SOF 55. The proportion of students receiving aid also increased. SOF 53. There are, moreover, no systematic differences between members and non-members of the 568 Group in the timing or pace of these increases in aid. SOF 54. And at Yale—plaintiffs' exemplar of the purported agreement's effects—the school opted to adopt less student-friendly policies, like a higher home equity cap and reduced retirement allowances, following the school's departure from the Group. SOF 86. Finally, each defendant developed their own internal needs-analysis methodologies that differed both from each other and from the CM Guidelines. *See infra* §I.B.2; SOF 81, 83-84. All of this is inconsistent with the alleged conspiracy.[6]

---

[6] Singer's regressions are not evidence of the alleged conspiracy either, *contra* Dkt. 757, Pls.' Class Cert. Mot. 16, because he *assumed* that the conspiracy existed in constructing his models, Ex. 191, Singer Tr. 94:18-95:17, 117:8-18.

This Court's decision in *In re Text Messaging Antitrust Litigation*, 46 F. Supp. 3d 788 (N.D. Ill. 2014), *aff'd*, 782 F.3d 867 (7th Cir. 2015), is instructive. The plaintiffs in that case, like those here, lacked direct evidence of the claimed agreement. *Id.* at 804. They instead proffered supposedly "lockstep" price increases that could not "be explained by unilateral profit-maximizing decisions," and emphasized a series of "meetings" through an industry organization as the "conduit[]" for the alleged conspiracy. *Id.* at 804-05. But "in the face of evidence that each [defendant] performed some financial analysis, and experienced some internal debate, before carrying out each of the [alleged] pricing increases," the existence of a forum for agreement and contemporaneous price increases was insufficient. *Id.* at 805. Here too, no reasonable jury could infer that defendants formed an "overarching agreement" to raise "EIPs."

### B. The Individual "Components" Of The Challenged Conduct Refute Any Inference Of Plaintiffs' Alleged Conspiracy.

According to plaintiffs, defendants conspired to raise "EIPs" through a variety of means, including by agreeing "(a) to apply several core principles in awarding aid," "(b) to use the College Board's standard IM (or 'Base IM') as the foundation for developing a 'Consensus Methodology,' (c) to use agreed-upon guidelines for applying 'professional judgment' in modifying the EFCs that the Consensus Methodology generated, and (d) to share information with each other regarding their annual calculations of financial aid," Dkt. 757, Pls.' Class Cert. Mot. 7. At times, plaintiffs have also claimed that the alleged conspiracy led to "adverse effects on packaging (via a shift from institutional grant aid to loan), artificial inflation of list prices [tuition], or both." *Id.* at 28. The evidence tells a markedly different story, foreclosing any inference of an "overarching" agreement to raise "EIPs" from these supposed components of the conspiracy.

16

### 1.    The "Core Principles" Do Not Tend To Exclude Independent Action.

Plaintiffs claim that each defendant having "applied essentially all or nearly all of the core pricing principles" is evidence of an agreement. Dkt. 757, Pls.' Class Cert. Mot. 14. That is wrong. Plaintiffs have identified no evidence that defendants agreed with one another to apply the "core principles." To the contrary, the undisputed evidence shows defendants and countless other schools were guided by those principles simply because they are the bedrock of need-based aid across higher education, and have been since long before the 568 Group existed. There is no basis to "infer a conspiracy" to increase "EIPs" "from behavior that is in fact consistent with how this industry has historically operated." *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 410 (3d Cir. 2015); *cf. In re Brand Name Prescription Drugs Antitrust Litig.*, 288 F.3d 1028, 1034 (7th Cir. 2002) (inference of knowledge would be "shaky" where the alleged conspiratorial system predated the alleged collusion).

Consider first the principles relating to students' and families' primary responsibility to pay for school (principle one), according to their ability to pay (principle two), based on an evaluation of their income and assets (principle three). All three appeared in the College Board's 1970 College Scholarship Service Assembly proclamation that:

> Parents are expected to contribute according to their means, taking into account their income [and] assets …. Students themselves are expected to contribute from their own assets and earnings …. The amount of aid offered should not exceed the amount needed to meet the difference between the student's total educational expenses and the family's resources.

Ex. 126, Meade (College Board 30(b)(6)) Dep. Ex. 34 at 22; *see also* SOF 16, 21, 95. The remaining three principles have also been standard practice among financial aid professionals for many years and were ratified in similar form by the College Board's 4,200-school membership. SOF 95. Unsurprisingly, many defendants followed these principles—as did non-568 member schools like Harvard and Stanford—long before the Group was formed. SOF 98.

This kind of "continuation of a historic pattern … does not plausibly allow one to infer the existence of a cartel." *Kleen Prods. LLC v. Georgia-Pacific LLC*, 910 F.3d 927, 937 (7th Cir. 2018); *see also Chocolate*, 801 F.3d at 410 ("For a change in conduct to create an inference of a conspiracy, the shift in behavior must be a 'radical' or 'abrupt' change from the industry's business practices."). Espousing the "core principles" was therefore "just as consistent with independent action as with collusion." *Kleen Prods.*, 910 F.3d at 937; Dkt. 788, Defs.' Class Cert. Opp. 11-16 (collecting evidence).

### 2. The Consensus Methodology Does Not Tend To Exclude Independent Action.

Plaintiffs contend that defendants "each applied essentially the same basic formula for calculating" EFCs, and that this formula is "evidence … of the alleged agreement." Dkt. 757, Pls.' Class Cert. Mot. 14. But plaintiffs' own expert admits he never saw a common EFC formula (Ex. 191, Singer Tr. 12:5-16), was never "provided a formula" (*id.* 15:7-15), could not write any formula down (*id.* 26:19-27:15), and did not derive it (*id.* 17:6-17). What plaintiffs once described as a "crisp formula" was instead, at best, a "set of broad principals [*sic*]," *id.* 19:19-20:14, from which schools could—and did—deviate, *id.* 248:17-249:1.

Even so, plaintiffs maintain that defendants "adopted and applied the Consensus Methodology" as part of an overarching conspiracy. Dkt. 757, Pls.' Class Cert. Mot. 14. The undisputed facts refute that theory. The CM Guidelines were "recommendations" that explicitly provided for schools to independently decide which parts, if any, to use. SOF 68, 81. Indeed, 568 Group members accepted deviation from the CM Guidelines—often to be more generous—as normal and appropriate. SOF 82, 84-90. Indeed, no defendant adopted the CM Guidelines in their entirety while a member of the 568 Group. *Id.*

**PUBLIC VERSION**

Consider that starting in 2005, the CM Guidelines recommended capping consideration of home equity in need analysis at 1.2 times parental income minus mortgage debt. SOF 79. Yet some defendants did not consider home equity at all, some counted the full value of a family's home, and others capped consideration above or below the CM Guidelines recommendation. SOF 85-86. MIT is a case in point: the school removed home equity from its need analysis for families earning less than $100,000, raised this threshold to $150,000 in 2014, and stopped considering home equity altogether in 2016. SOF 87. Similarly, Caltech stopped considering home equity in 2019, and Penn capped its consideration of home equity at a lower level than the CM Guidelines recommended in 2005. SOF 86. Similar variation occurred as schools implemented CM Guidelines regarding parent and student assets, cost-of-living adjustments, and the reduction of parent contributions for siblings in college. SOF 89-91. For example, Emory, MIT, and Penn at times lowered the parental contribution for each sibling in college more than the CM Guidelines recommended. SOF 91.

The data, too, reveal continued and significant variations in EFCs of students admitted to more than one member school. *See Text Messaging*, 782 F.3d at 877 (citing "price differences" "for months on end" as a "weakness" in plaintiffs' presentation of evidence on collusion). 74% of these cross-admitted students received EFCs differing by more than 10%. SOF 57. Almost none received the same EFCs from defendant schools. *Id.* Students admitted to two or more defendants received EFCs with an average spread of more than $15,000 and a net price spread of more than $19,000. SOF 58, 60. For those cross-admitted to four defendant schools, average EFC and net price spreads jumped to $26,566 and $36,538, respectively. SOF 58, 60. Average differences in EFCs, moreover, did not change materially after schools joined the 568 Group. SOF 61. If anything, EFC variation for cross-admitted students *increased* after the CM Guidelines were

introduced. *Id.* These differences show defendants never agreed to implement "essentially the same" formula to calculate EFCs, whether through the CM Guidelines or otherwise.

That the record is bereft of evidence that defendants did anything to enforce their purported "cartel"—despite what would have been rampant "cheat[ing]" by Group members—undermines any inference of a conspiracy. *See Kleen Prods.*, 910 F.3d at 937 (lack of enforcement efforts even though "nearly half the price hikes failed" shows the evidence was consistent with independent conduct). A "cartel" typically "impose[s] disciplinary measures on the 'cheaters' who did not go along." *Id.* But "that type of evidence is conspicuously absent" here. *Id.* There was "no disciplinary mechanism" for schools who did not follow the CM or any portion of it. SOF 80. Nor did "penalties, consequences, or the like" result "if any school failed to follow" the Guidelines. SOF *Id.* Indeed, no school was ever sanctioned despite widespread noncompliance with the CM Guidelines. *Id.*

### 3. Professional Judgment Does Not Tend To Exclude Independent Action.

Plaintiffs argue that defendants "used agreed-upon guidelines for applying" professional judgment and that in turn those guidelines restrained the use of professional judgment. Dkt. 757, Pls.' Class Cert. Mot. 7. Although the 568 Group developed the PJ Guidelines, *see* SOF 101, they are hardly a constraint on the exercise of professional judgment and, even if they were, many defendants *did not use it*. *Id.* And the PJ Guidelines mean even less when one recognizes that by its very nature, professional judgment *cannot* be standardized because it is based on the unique circumstances of individual aid applications. SOF 98-99.

There is simply nothing in the record from which a jury could reasonably infer that defendants agreed to use the 568 Group's PJ Guidelines, much less in a way that would inflate "EIPs." Instead, the undisputed record shows that aid counselors referenced individualized, internal guidelines developed by their institution or the federal government as a starting point for

need analysis and then used their professional judgment to make bespoke aid determinations on a student-by-student basis, yielding individualized adjustments to EFCs. SOF 23-28, 69, 101. Some adjustments came from manually modifying certain financial inputs to a given student's EFC calculation to compensate for individual circumstances. SOF 100-101. Others resulted from financial aid appeals submitted to a given institution. SOF 103. At Georgetown, for example, an average of 356 students—over 20% of its typical class size—successfully appealed their aid awards each year between 2004 and 2022. *Id.* Other defendants granted similarly large percentages of appeals. SOF 42.[7]

      The extensive and undisputed use of student-specific professional judgment modifications and appeals in the financial aid process belies plaintiffs' assertion that defendants agreed to depress aid and increase "EIPs." No evidence supports a reasonable inference that defendants agreed to use guidelines the 568 Group developed, or that using professional judgment generally or the Guidelines specifically would tend to raise "EIPs"—especially given the undisputed evidence that defendants' independent exercise of professional judgment routinely led to *increased* aid.

      **4.**    **Information Exchange Does Not Tend To Exclude Independent Action.**

      Plaintiffs allege that defendants agreed to share "competitively sensitive" information through the Consortium of Financing Higher Education ("COFHE"). Dkt. 757, Pls.' Class Cert. Mot. 15. COFHE is an entity separate from the 568 Group that dates back to the 1970s. SOF 112. Fewer than half of COFHE's members are defendants, and not all defendants were members of COFHE. SOF 113. Accordingly, COFHE's activities cannot support an inference that defendants conspired to do anything, much less to increase "EIPs." *See Schachar v. Am. Acad. of*

---

[7] Indeed, several of the ████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████

PUBLIC VERSION

*Ophthalmology, Inc.*, 870 F.2d 397, 399 (7th Cir. 1989) (provision of information "does not violate the antitrust laws" absent agreement to act on it). And, in any event, the information shared through COFHE was stale, aggregated, and generally publicly available, *see infra* 32-33, and thus not "demonstrative of anticompetitive behavior." *Omnicare*, 629 F.3d at 709; *see also In re Baby Food Antitrust Litig.*, 166 F.3d 112, 124-26 (3d Cir. 1999) (applying *Matsushita* and holding that purported exchange of price information did "not permit an inference of an agreement to fix prices," as it "can be consistent with independent competitor behavior").

### 5.  There Is No Evidence Of Any Agreement On Packaging.

Plaintiffs also assert that the alleged conspiracy caused "adverse effects on packaging (via a shift from institutional grant aid to loan)." Dkt. 757, Pls.' Class Cert. Mot. 28. That is false and unsupported in the record. The CM Guidelines explicitly stated "[a]ll 568 Group schools are free to deal with institutional resource issues through their packaging policies." SOF 104. Other evidence confirms that there was no agreement on packaging. *See, e.g., id.* (testimony from former 568 Group leader not affiliated with any defendant that "568 schools could package their financial aid in any way they saw fit," and there was no "restraint on packaging as a result of being a 568 member"). To the contrary, defendants competed vigorously on packaging: Columbia eliminated loans for families earning less than $50,000 per year in 2006, Penn did the same for families earning less than $60,000 in 2007, and MIT began offering free tuition to families with incomes under $75,000 in 2008. SOF 105-106. Other members, such as Georgetown, competed by implementing additional programs to replace loans with grants for low-income students. SOF 109.

Against that evidence, plaintiffs invoke an unremarkable statement from a 1996 book: that it "is quite reasonable for parents and students to borrow to pay for college." Ex. 5, Singer Reb. ¶69 & n.182 (quoting Sandy Baum, *A Primer on Economics for Financial Aid Professionals, College Board & the National Association of Student Financial Administrators* 4 (1996) at 54).

No reasonable jury could infer a conspiracy by 568 Group members as to packaging from an opinion offered in a book published before the formation of, and unrelated to, the 568 Group. The same is true for an Emory faculty committee's recommendation that the school withdraw from the 568 Group to give itself "greater flexibility in the packaging of financial aid." Ex. 247, Emory_568Lit_0006213. There is no evidence this committee's members understood the 568 Group and its requirements, as would be necessary for this document to be admissible, let alone probative. *See Herrera v. Target Corp.*, 2009 WL 3188054, at *2 (N.D. Ill. Sept. 30, 2009). Nor does the document explain how the 568 Group reduced Emory's flexibility in packaging, or whether "packaging" was used in the technical sense. And the record shows Emory left the 568 Group for a different reason: to become need aware. SOF 65. A single cryptic remark from a faculty committee at one school can no more create a genuine dispute of material fact than the single email at a single defendant found insufficient in *Text Messaging*, 46 F. Supp. 3d at 804.

Finally, plaintiffs believe that there is circumstantial evidence of a packaging agreement because several schools adopted no-loan policies after leaving the 568 Group. *See* Ex. 5, Singer Reb. ¶¶64-65. But Emory adopted the policy a full decade after it exited the Group. SOF 107. Brown adopted the policy five years after exiting the Group. *Id.* And as discussed, many schools adopted such policies, or other policies to reduce loans for some or all students, while still members of the Group. SOF 105. On those facts, even plaintiffs' expert admitted that "no reasonable person could say" that the 568 Group prohibited adopting such policies. SOF 104 (quoting admission from plaintiffs' expert). Rather, the adoption of no-loan policies at different times by schools both within and outside the 568 Group is consistent with independent decision-making on how to offer the most competitive packages of aid subject to each school's budgetary and other constraints. *See, e.g.*, *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1196 (9th Cir. 2015)

(where plaintiff alleged that defendants "adopted the policies over a period of several years," such "slow adoption of similar policies does not raise the specter of collusion"); *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 958, 962 (N.D. Cal. 2007) (observing "that time lags of three to six months between pricing moves 'refute rather than support' allegations of conspiracy").

### 6.    There Is No Evidence Of Any Agreement On List Prices.

Likewise absent is evidence that defendants agreed to fix their list prices (*i.e.*, tuition levels). Dkt. 757, Pls.' Class Cert. Mot. 28. At least 20 witnesses testified that no such agreement existed; none testified otherwise. *See* SOF 111. And net price for aid recipients *decreased* during the conduct period, which is inconsistent with an agreement to inflate list prices. *Id.*[8]

This is devastating to plaintiffs' case. Plaintiffs' expert has *conceded* that a conspiracy only on need analysis but not on packaging or tuition levels would make no economic sense, because without agreement on those issues "members could simply circumvent the cartel" by adjusting packaging or tuition policies to reduce prices regardless of their EFC calculations. Ex. 299, Singer Supp. Reb. ¶ 31; Ex. 191, Singer Tr. 92:19-24, 93:4-12. A higher EFC floor, for example, could be offset by lower tuition or a shift from loans to grants. The lack of evidence of any agreement on packaging or tuition, therefore, disproves the existence of plaintiffs' alleged conspiracy. *See Anderson News, L.L.C. v. Am. Media, Inc.*, 899 F.3d 87, 101, 112 (2d Cir. 2018) (affirming grant of summary judgment where alleged conspiracy was "economically implausible").

### 7.    The 568 Group Does Not Tend To Exclude Independent Action.

Finally, the 568 Group's existence, meetings, and guidelines are not evidence of plaintiffs' conspiracy. *Contra* Dkt. 757, Pls.' Class Cert. Mot. 3, 8, 14. Because "having the opportunity to conspire does not necessarily imply that wrongdoing occurred," *Kleen Prods.*, 910 F.3d at 938,

---

[8] It is unclear whether plaintiffs still believe defendants agreed on tuition levels, as they seemingly abandoned the issue in their class certification reply. *See* Dkt. 807, Pls.' Class Cert. Reply 14 & n.31.

the 568 Group's existence and operations are at most "ambiguous" evidence "as consistent with permissible competition as with illegal conspiracy," *Omnicare*, 629 F.3d at 707.[9] 568 Group members undisputedly continued to independently determine and implement their own financial aid policies throughout the Group's existence. SOF 83-84, 92, 101, 105. Indeed, plaintiffs have identified *nothing* with respect to defendants' financial aid practices that changed for the worse when the schools joined the 568 Group, Ex. 191, Singer Tr. 313:25-315:7 (explaining that he cannot identify changes upon joining), which undermines any inference of the broader agreement, *supra* 15. And the "decision by a group of industry players to have a meeting … does not constitute a conspiracy," absent evidence "that defendants' communications involved collusion regarding prices." *Text Messaging*, 46 F. Supp. 3d at 806.

### C. The Benefits Of The Challenged Conduct To Students Undercut Any Inference Of Plaintiffs' Conspiracy.

The undisputed evidence that aspects of the challenged conduct could only *benefit* students, not harm them, further refutes plaintiffs' conspiracy. *Matsushita*, 475 U.S. at 587. For example, it is undisputed that certain CM Guideline recommendations would produce a lower EFC for a student, all else equal, than would be calculated at a school using the industry-standard Base IM. SOF 75. A student whose home equity exceeded family income by more than 1.2 times would be treated more favorably under the CM Guidelines than under the Base IM and a student from a high cost-of-living region would be too. *See* SOF 76, 79. In other words, much of the challenged conduct took defendants' money to discount the costs students paid. It is "inherently implausible" that each defendant joined a conspiracy intended to *reduce* aid to students while also agreeing with

---

[9] Members of the 568 Group did agree to admit students on a need-blind basis, but plaintiffs do not challenge that agreement. Plaintiffs cannot "establish the existence of the [alleged] combination or conspiracy by merely establishing the existence of an otherwise lawful agreement." *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 478 F. Supp. 243, 265 (E.D. Pa. 1979), *aff'd*, 637 F.2d 105 (3d Cir. 1980); *see also Honeywell Int'l Inc. v. Ecoer, Inc.*, 2024 WL 3521591, at *7 (S.D.N.Y. July 23, 2024) (similar).

each other to adopt many specific practices that *increased* it. *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1109 (7th Cir. 1984); *see also, e.g.*, *Brunson Commc'ns, Inc. v. Arbitron, Inc.*, 239 F. Supp. 2d 550, 564 (E.D. Pa. 2002); *Anderson News*, 899 F.3d at 102.

*    *    *

In short, the alleged "Overarching Agreement" to raise "EIPs" makes no sense. "EIP" was made up for this lawsuit, so defendants would never have thought to fix it. And even if they could have, no reasonable jury could find on this record that defendants entered into the purported conspiracy. Each defendant mixed and matched which parts (if any) of the CM Guidelines to adopt based on its individual circumstances, competed to offer competitive aid packages, and cut prices. Plaintiffs' equivocal, ambiguous evidence does not remotely "exclude the possibility of independent action." *Kleen Prods*., 910 F.3d at 935.

## II.    The Rule Of Reason Applies As A Matter of Law.

Even if there were sufficient evidence of an agreement, the challenged conduct should be evaluated under the rule of reason. This is a legal question appropriate for resolution at summary judgment. *See In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1008 (7th Cir. 2012).

The rule of reason, under which plaintiffs must show that a restraint's "anticompetitive effects outweigh its procompetitive effects," is the default framework courts use to evaluate § 1 claims. *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 342 (1990); *see also Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006). By contrast, the *per se* rule applies only in rare cases when judicial experience allows courts to predict that the challenged conduct has "manifestly anticompetitive effects" and lacks "any redeeming virtue," as in cases of express horizontal price fixing. *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) (cleaned up). Absent that level of judicial experience, the rule of reason governs. *See Sulfuric Acid*, 703 F.3d at 1011

(explaining that it "is a bad idea to subject a novel way of doing business (or an old way in a new and previously unexamined context …) to per se treatment").

### A. This Is Not A "Typical" Price Fixing Case.

This case is not about conduct that "considerable experience" shows to be nearly always anticompetitive. Plaintiffs have repeatedly accused defendants of "price fixing" subject to *per se* treatment, but unsupported labels are not enough. *See Broad. Music, Inc. v. CBS, Inc.*, 441 U.S. 1, 8-9 (1979) ("*BMI*"). Instead, plaintiffs must, at minimum, offer *evidence* of an agreement to fix prices to bypass the rule of reason. *See Tri-Gen Inc. v. Int'l Union of Operating Eng'rs, Loc. 150*, 433 F.3d 1024, 1030, 1032-34 (7th Cir. 2006). There is none.

Defendants did not fix tuition prices or use a common formula for financial aid, *see* SOF 69 (plaintiffs' expert acknowledging as much), and Plaintiffs challenge much more than that anyway, *see supra* 16-24. For instance, plaintiffs challenge open-ended principles and guidelines that schools applied differently to arrive at different financial aid awards. *See supra* 16-21; SOF 57-61, 81, 96, 101. None of that is "price fixing." Instead, plaintiffs' novel claims attack conduct with plausible pro-competitive virtues, requiring full rule of reason treatment.

### B. Judicial Experience Shows That The Rule of Reason Applies

What little judicial experience exists supports applying the rule of reason. Take, for example, *United States v. Brown University*. *See* 5 F.3d at 658. That case dealt with the "Overlap Agreement" among MIT and eight Ivy League schools "to jointly determine the amount of the family contribution for each commonly admitted student" and to award aid based only on "demonstrated need." *Id.* at 662-63. All four judges in that case agreed that the *per se* rule was inapplicable, *id.* at 664, 670-72; *id.* at 684-85 (Weis, J., dissenting), even though the Overlap Agreement went even further than the alleged agreement here and required schools to align their aid awards for individual students, *see infra* 30.

27

As the Third Circuit explained, universities are not ordinary businesses: they "have greater incentives to pursue ethical, charitable, or other non-economic objectives that conflict with the goal of pure profit maximization," including to further "the undisputed public interest in equality of educational access and opportunity." *Brown Univ.*, 5 F.3d at 671-72; *see also* SOF 8, 15. Universities "could fill [their] class[es] with students able to pay the full tuition"—and thus make the most money possible—but choose instead to "attract a greater portion of the 'cream of the crop.'" *Id.* at 666-67. Because of those factors, financial aid in higher education is "*sui generis*" and thus should not be subject to *per se* treatment. *BMI*, 441 U.S. at 10; *Sulfuric Acid*, 703 F.3d at 1011.

Further, as *Brown* recognized, collaboration as to financial aid practices has plausible pro-competitive virtues. *See* 5 F.3d at 678 ("The nature of higher education, and the asserted procompetitive and pro-consumer features of the Overlap, convince us that a full rule of reason analysis is in order here."); *see also Sulfuric Acid*, 703 F.3d at 1011; *Kraft Foods Glob., Inc. v. United Egg Producers, Inc.*, 2024 WL 4346418, at *11-12 (N.D. Ill. Sept. 30, 2024) (rule of reason applies if there is at least "some evidence" of pro-competitiveness). *Brown* noted that increasing financial aid for needy students widens "consumer choice," a "procompetitive benefit." 5 F.3d at 674-75, 678. It also recognized that practices facilitating "equality of educational access and opportunity" could "enhanc[e] the quality of our educational system" (another "procompetitive virtue") by allowing "better communication" among students with diverse "socio-economic backgrounds." *Id.* at 672, 674, 678. Congress, too, recognized that the challenged conduct can benefit competition. That § 568 authorized cooperation in crafting financial-aid methodologies "reflect[s] an opinion" that the challenged conduct is "economically beneficial in at least some

circumstances," regardless of whether the 568 exemption is "directly controlling." *BMI*, 441 U.S. at 15-16. Here, the challenged conduct furthers at least three pro-competitive virtues.

### 1. The Challenged Conduct Widens Consumer Choice.

The challenged conduct widened "consumer choice" by making schools more affordable for many students. *Brown Univ.*, 5 F.3d at 675; *see also NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 102 (1984) (rules that "widen consumer choice … can be viewed as procompetitive"). As discussed, the CM Guidelines recommended adjustments to address financial burdens inadequately considered by the Base IM. SOF 69. Those recommendations—including caps on consideration of home equity and cost-of-living adjustments—reduced families' expected contributions. *See supra* 25-26. Lower expected contributions meant more students could afford to attend a defendant school, thus "widening consumer choice." *Brown Univ.*, 5 F.3d at 675.

### 2. The Challenged Conduct Enhances Quality Of Education.

The undisputed record reflects that prioritizing need-based aid—a component of the "core principles" plaintiffs claim defendants agreed to, *see supra* 16—benefits low-income students more than the alternative, *i.e.*, prioritizing merit-based aid. Agreeing on a philosophy aimed at increasing access for low income students would have helped defendants attract students from all walks of life, "improv[ing] … the quality of education and enhanc[ing] the vitality of student life." *Brown Univ.*, 5 F.3d at 674.

Socioeconomic diversity "is an important part of producing educational quality." Ex. 167, Long Tr. 64:21-23; *see Brown Univ.*, 5 F.3d at 674 (same). Student bodies "made up of a wide range of backgrounds and experiences can have a positive effect on students' learning outcomes." Ex. 2.1, Long Reb. ¶¶56-57; *see also* SOF 8. After all, students "play an important role in the production of education as both inputs and outputs to the process." Ex. 2.1, Long Reb. ¶56. For example, a college student with a roommate or classmate with a different upbringing than them is

likely to be a better critical thinker and be well-prepared to engage with diverse perspectives. *Id.* ¶¶57, 61. This is not theoretical: socioeconomic diversity—and the benefits it creates—is valued by students applying to college, Ex. 167, Long Tr. 50:9-18, as plaintiffs themselves acknowledge, *see, e.g.*, SOF 44. Because the challenged conduct facilitates the consumer-friendly goal of boosting socioeconomic diversity on campus, it is procompetitive—or at least plausibly so. *See Am. Needle, Inc. v. New Orleans La. Saints*, 2014 WL 1364022, at *1 (N.D. Ill. Apr. 7, 2014) (applying rule of reason where challenged conduct improved product quality).

### 3. The Challenged Conduct Creates Efficiencies In Financial Aid.

Finally, even if defendants had agreed with each other to apply the CM Guidelines and the "core principles" (they did not, *see supra* 16-21), those practices create "efficiencies" and rendered the market "more, rather than less, competitive." *BMI*, 441 U.S. at 20-21. Take the core principle that an institution should "inform applicants about the policies and practices it applies" and "carry out its policies consistently." SOF 93. This principle ensures families can evaluate which schools provide the best value, helping them make better-informed decisions, which fosters competition. *See Int'l Healthcare Mgmt. v. Haw. Coal. for Health*, 332 F.3d 600, 608 (9th Cir. 2003) ("Disseminating information that fosters rational … decisions is pro-competitive.").

\*     \*     \*

These plausible procompetitive benefits require application of the rule of reason. *See Brown Univ.*, 5 F.3d at 678. Indeed, the challenged conduct offers these benefits without presenting the same risk to competition as the Overlap Agreement, which required schools to "agree" on "family contribution figures for each commonly admitted student" when estimates varied by $500 or more and ensured compliance through "retaliatory sanctions" for deviating. *Id.* at 663. If the Overlap Agreement qualified for the rule of reason, then the far-less-restrictive conduct alleged here must too.

Plaintiffs argue this case should be treated differently because defendants are engaged in "revenue maximizing." *See, e.g.*, Dkt. 785, Pls.' *Daubert* Opp. 34. But that is wrong as a matter of fact and law. For one thing, the record is undisputed that the average cost of educating students is more than full-pay students pay in tuition, and defendants gave billions of dollars in discounts and free rides to financial aid recipients during the conduct period—all activities antithetical to "revenue maximizing." Plaintiffs' own expert, Elizabeth Mora, agrees. SOF 2. And in any event, neither *Brown* nor other decisions suggest that *per se* analysis applies whenever a defendant seeks to maximize revenue. *See Choh v. Brown Univ.*, 2024 WL 4465476, at *7 (D. Conn. Oct. 10, 2024); *NCAA v. Alston*, 594 U.S. 69, 94 (2021).

## III. Plaintiffs Cannot Meet Their Burden To Show That Much Of The Challenged Conduct Has Substantial Anticompetitive Effects.

Under the rule of reason, plaintiffs bear the burden to show that the challenged conduct "has a substantial anticompetitive effect that harms consumers in the relevant market." *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018). The effect must be "market-wide," *Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 53 n.5 (2d Cir. 2016), as "*de minimis*" effects on "a small subset of customers" do not give rise to a § 1 violation, *Procaps S.A. v. Patheon Inc.*, 141 F. Supp. 3d 1246, 1281 (S.D. Fla. 2015), *aff'd*, 845 F.3d 1072 (11th Cir. 2016).

Plaintiffs cannot show that much of the challenged conduct—the alleged agreements to be transparent with financial aid applicants, Ex. 4, Singer Am. Rep. ¶149; to share information, *id.* ¶¶163-175; to prioritize need-based aid, *id.* ¶152; and to "develop" the CM Guidelines, *id.* ¶¶156-159—harmed competition. Summary judgment on these elements of the alleged conspiracy is therefore warranted. *See In re Broiler Chicken Antitrust Litig.*, 702 F. Supp. 3d 635, 689-90 (N.D. Ill. 2023) ("*Broilers*") (granting summary judgment on plaintiffs' "claims about 2015-16 breeder hen slaughters and the Georgia Dock," and their "overarching conspiracy" theory, despite evidence

of "2008-09 and 2011-12 supply reductions"); *see also In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 378 (3d Cir. 2004) (affirming grant of summary judgment on conspiracy "to fix the prices of automotive replacement glass" despite evidence of conspiracy "to fix the prices of flat glass").

*First*, the alleged agreement to be transparent with applicants "about the policies and practices … applie[d] when measuring a family's ability to pay" and the standards governing "financial assistance that is not based exclusively on need," Ex. 4, Singer Am. Rep. ¶149, had no anticompetitive effect. Quite the opposite: if anything, applicants *benefitted* from additional financial aid information, which helped them obtain the best aid packages possible and created incentives for schools to match their competitors' financial aid offerings. *See* SOF 97. "Providing consumers with information" accordingly "is not an illegal restraint of competition." *ECOS Elecs. Corp. v. Underwriters Lab'ys*, 743 F.2d 498, 503 (7th Cir. 1984).

*Second*, there is no evidence that any agreement to share information through COFHE or otherwise harmed competition. Dkt. 757, Pls.' Class Cert. Mot. 15. Information exchanges are not, "on [their] own[,] demonstrative of anticompetitive behavior, even when pricing data is what is exchanged." *Omnicare*, 629 F.3d at 709. Rather, they can "increase economic efficiency and render markets more, rather than less, competitive." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 443 n.16 (1978). To determine whether the exchange of information poses competitive risks, the Court considers: "(1) whether the information is current or past; (2) whether it identifies particular parties, transaction[s], and prices; and (3) whether the data is publicly available." *Broilers*, 702 F. Supp. 3d at 678. All three factors weigh against plaintiffs.

To begin with, the data defendants allegedly shared through COFHE—financial aid and admissions statistics contained in the annually published "Colorbooks," Dkt. 757, Pls.' Class Cert. Mot. 15—was stale by the time defendants received it. SOF 115. Plaintiffs cannot show that

32

sharing year-old data was anticompetitive. *See Broilers*, 702 F. Supp. 3d at 678 ("Plaintiffs have cited no authority that exchange of 45 day old information can constitute anticompetitive conduct.").

Next, COFHE's Colorbooks consisted of charts and tables showing "aggregate level" trends and analysis; "there was no sharing of ... granular data with the schools." SOF 112, 115. Indeed, the COFHE Colorbooks only allowed defendants to get a "high-level picture of how their prices compare to competitors' prices" and did not include information about defendants' "specific transactions." *Broilers*, 702 F. Supp. 3d at 679.

Finally, the information contained in the Colorbooks was generally publicly available. SOF 115. For example, the Colorbooks described defendants' endowment spending on financial aid; the amount of self-help in defendants' financial aid packages; and the amount of institutional grant aid that each defendant awarded. *Id.* Similar information appeared in defendants' annual reports and in publications of other institutions like the College Board and the National Association of College and University Business Officers. *Id.* In short, there is no reason to think that any exchange of information posed risks to competition.

*Third*, plaintiffs cannot show that an agreement to prioritize need-based aid harmed them. If such an agreement had resulted in a shift to need-based aid, the most plausible inference would be that plaintiffs—who qualified for and received need-based aid—were the agreement's *beneficiaries*. *See* SOF 20. Besides, the evidence offers no basis for thinking defendants prioritized need-based aid because of an agreement to do so. In fact, schools prioritized need-based aid decades before the 568 Group formed. In 1970, the College Board declared that "[t]he primary purpose of a collegiate financial aid program should be to provide financial assistance to accepted students who, without such aid, would be unable to attend that college." SOF 16. What is more,

33

several defendants offered solely need-based aid *before* they were members of the 568 Group. SOF 17. No evidence supports plaintiffs' assertion that defendants would have abandoned their pre-568 Group and decades-long commitment to need based aid in the absence of the 568 Group. Without it, plaintiffs cannot show this alleged agreement had any anticompetitive effect. Ex. 3.1, Stiroh Reb. ¶94.

*Fourth*, an agreement to "develop" the CM Guidelines from the industry-standard "Base IM," Dkt. 757, Pls.' Class Cert. Mot. 7, could not have harmed competition either. Because the CM Guidelines were more student-friendly—that is, yielded smaller EFCs—than the Base IM in most cases, shifting to the CM Guidelines would have *reduced* most EFCs, *increasing* the size of financial aid packages. *See supra* 9. Therefore, this agreement could only benefit many if not most class members, and could not produce market-wide anticompetitive effects.

In sum, many elements of the challenged conduct—transparency, information sharing, need-based aid, and the CM Guidelines—had no plausible market-wide anticompetitive effects, but benefitted many if not most students. Summary judgment on these aspects of the alleged conspiracy is therefore warranted under the rule of reason. *See Broilers*, 702 F. Supp. 3d at 678.[10]

## IV.     **Plaintiffs Fail To Establish A Relevant Product Market As A Matter Of Law.**

The rule of reason also requires plaintiffs to supply "a precise market definition in order to demonstrate that a defendant wields market power." *Agnew v. NCAA*, 683 F.3d 328, 337 (7th Cir. 2012). So, at summary judgment, plaintiffs "must offer admissible evidence that is sufficient for a jury to find that the proposed relevant market[] [is] accurate." *Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 238 F. Supp. 2d 1024, 1033 (N.D. Ill. 2003). Plaintiffs assert there is a market for

---

[10] Singer's analysis cannot save these components; he was "instructed to assume that this is one overarching conspiracy," and did not analyze the effect of any individual element of the challenged conduct. Ex. 191, Singer Tr. 94:18-95:17.

"Elite Private Universities whose undergraduate programs consistently ranked in the USNWR Top 25 during the Class Period" comprising defendants, Carnegie Mellon, Harvard, Princeton, Stanford, and WashU. Ex. 4, Singer Am. Rep. ¶72. But plaintiffs lack quantitative or qualitative evidence that this market exists. *See Menasha Corp.*, 238 F. Supp. 2d at 1034.

### A.   Plaintiffs Fail To Support Their Proposed Product Market.

A market comprises "the commodities reasonably interchangeable by consumers for the same purposes." *Sharif Pharm., Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 916-17 (7th Cir. 2020). A proposed market that "does not encompass all interchangeable substitute products" is thus "legally insufficient." *U.S. Bd. of Oral Implantology v. Am. Bd. of Dental Specialties*, 390 F. Supp. 3d 892, 907-08 (N.D. Ill. 2019); *see also Shah v. VHS San Antonio Partners, L.L.C.*, 985 F.3d 450, 454 (5th Cir. 2021) (similar). Establishing the outer bounds of a proposed market is no small feat: while plaintiffs may use the "practical indicia" of market definition explained in *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962), they still "must provide an *economic* analysis of the relevant market" using "[a]ctual data." *Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 320 (7th Cir. 2006) (emphasis added). *Brown Shoe*'s "practical indicia" are relevant only after the "outer boundaries of a product market are determined" by evaluating "the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.'" *Ky. Speedway, LLC v. NASCAR, Inc.*, 588 F.3d 908, 918 (6th Cir. 2009); *see also ABS Glob., Inc. v. Inguran, LLC*, 2016 WL 3963246, at *14 (W.D. Wis. July 21, 2016) ("[A] definition of a relevant market centered solely on the *Brown Shoe* factors is insufficient as a matter of law in this circuit." (citing *Reifert*, 450 F.3d at 320)).

Plaintiffs fail to provide sufficient quantitative evidence to support their proposed market definition. Experts often perform a hypothetical monopolist test ("HMT") to identify the relevant market by analyzing consumer reactions to a "small but significant and non-transitory increase in

price ('SSNIP') on the product. DOJ & FTC, *Horizontal Merger Guidelines* § 4.3.A (2023). If "a significant number of customers would respond to a SSNIP by purchasing substitute products" outside the proposed market, then the proposed market is too narrow. *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1002 (9th Cir. 2008). Plaintiffs claim their expert "perform[ed] an HMT," Ex. 4, Singer Am. Rep. ¶79, but that is false. Singer admits he did not run a "standard hypothetical monopolist test," *contra* Dkt. 785, Pls.' *Daubert* Opp. 23, because of what he calls the "idiosyncratic characteristics of higher education," Ex. 4, Singer Am. Rep. ¶79. And the section of his report that he (mis)labels as a "Hypothetical Monopolist Test (SSNIP Test)" contains no quantitative analysis whatsoever. *See id.* ¶¶79-81. Rather, Singer presents his "impact regressions" as a substitute for an ordinary HMT because, in his view, those regressions show defendants could charge supracompetitive prices. *Id.* ¶80; Ex. 5, Singer Reb. ¶6.

Singer's regression analysis is not an HMT. It does not analyze how students would react if so-called "Elite Private Universities" raised prices, so it provides no quantitative answer to whether competition from other schools constrains the prices of those in the alleged market. Singer performed no statistical test of cross-elasticity of demand, or any other quantitative analysis of market definition. *See* Ex. 4, Singer Am. Rep. ¶¶79-81. Rather, his purported proof of his "Elite Private Universities" market derives from his qualitative analysis of various *Brown Shoe* factors. *Id.* ¶64. That is not enough. *See Reifert*, 450 F.3d at 320; *see also ChampionsWorld*, 890 F. Supp. 2d at 945-46 (dismissing antitrust claim where expert did not perform a SSNIP or HMT analysis or evaluate substitute goods or interchangeability); *McLaughlin Equip. Co. Inc. v. Servaas*, 2004 WL 1629603, at *6-7 (S.D. Ind. Feb. 18, 2004) (similar).

Even aside from the lack of quantitative evidence, Singer's qualitative *Brown Shoe* analysis contradicts his proposed market. Singer claims defendants "charge significantly higher prices for

their product relative to all public universities and to many other private universities." Ex. 4, Singer Am. Rep. ¶83; Ex. 191, Singer Tr. 75:17-76:6. But public and liberal arts colleges have similar costs of attendance to defendants. For example, in academic year 2023-2024, the cost of attendance was $83,271 at Notre Dame, $83,622 at Emory, $78,278 at Rice, $75,626 at the University of Michigan (out-of-state), $85,300 at Pomona, $84,103 at Swarthmore, and $84,860 at Williams. SOF 34.

In addition, Singer's own "revealed preferences" analysis conflicts with his proposed market definition because it shows that cross-admitted students preferred many schools outside his proposed product market. Dkt. 754, Defs.' *Daubert* Mot. 27-28; Dkt. 806, Defs.' *Daubert* Reply at 14. This analysis, which examines "students who compare one school at which they are admitted to another such school, in a 'pairwise' fashion," Ex. 4, Singer Am. Rep. ¶101 & tbl. 7, shows that students preferred three public universities (UCLA, UC Berkeley, and University of Michigan) over 13 schools in Singer's proposed market. SOF 46. It also demonstrates that students preferred five liberal arts colleges (Pomona, Williams, Swarthmore, Bowdoin, and Amherst) over two schools in Singer's proposed market. *Id.* This evidence of "effective competition" "necessarily implie[s]" a market "embracing" the top public, private, and liberal arts schools. *United States v. Cont'l Can Co.*, 378 U.S. 441, 456-57 (1964); *see also* SOF 45.

Singer claims that the 22 schools in his proposed market have "a substantial resource advantage in terms of endowments." Ex. 4, Singer Am. Rep. ¶115. But his analysis shows that "highly ranked" public universities like the University of Michigan and the University of Virginia have greater endowments—both in absolute terms and on a per-student basis—than schools in Singer's market like Georgetown and Carnegie Mellon. SOF 3. Singer also neglected to consider

liberal arts colleges for this analysis, nine of which have higher endowments per student than six schools in Singer's market. *Id.*

Finally, Singer cites a handful of documents pertaining to eight schools to try to show that defendants perceived themselves as constituting a distinct market. *See* Ex. 4, Singer Am. Rep. ¶¶74-78. One of them treats COFHE schools as comparable—most of which are *not* in the proposed market—and thus sheds no light on plaintiffs' so-called "Elite Private Universities" market. *Id.* ¶74 (admitting that "not all COFHE members are part of the relevant market"). Others include public universities or private institutions outside the proposed market. *Id.* ¶¶76-77 & nn.89, 93, 96, 97. None establishes that institutions of higher education perceive Singer's so-called market as distinct.

### B. The Facts Refute Plaintiffs' Self-Serving Market Definition.

Plaintiffs' failure to substantiate their proposed market is unsurprising, as the undisputed evidence refutes it. Schools within the proposed market compete with schools outside of it, including public universities, liberal arts colleges, and other private universities.

*First*, the USNWR "Top 25" school rankings from 2003 to 2022 that plaintiffs use to define their proposed market includes public schools that plaintiffs omitted, such as UC Berkeley (20.95), UCLA (23.5), and UVA (24.25). SOF 52. That USNWR ranks private and public universities together further undercuts plaintiffs' baseless attempt to exclude public institutions. Plaintiffs also exclude USC, which ranked in the Top 25 eleven times during the Class Period, with an average USNWR rank of 25.4, *id.*, because it has "a lower average ranking" than the schools in the proposed relevant market. Ex. 4, Singer Am. Rep. ¶72. But Plaintiffs fail to show why "an average ranking across the Class Period of at least 25[th] place," *id.*, as opposed to 27th or 30th, is a valid delineation of "the rough contours of a relevant market." *Republic Tobacco v. N. Atl. Trading Co.*, 381 F.3d 717, 737 (7th Cir. 2004); *see also Nucap Indus., Inc. v. Robert Bosch LLC*, 273 F. Supp.

3d 986, 1012 (N.D. Ill. 2017) (with no "plausible reason to limit the definition of the markets of relevant consumers … [a] court cannot meaningfully analyze" antitrust claims). Plaintiffs' choice of the top "25" is wholly arbitrary.

*Second*, the required "factual inquiry into the commercial realities" faced by each student involves their academic and extracurricular interests, geographic preferences, and other individualized factors that need not align to the USNWR rankings. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482 (1992); *see also* Dkt. 788, Defs.' Class Cert. Opp. 56-58. For example, students interested in performing arts might consider schools like Yale, Juilliard, NYU, and UCLA, while those interested in engineering or other STEM fields might focus on Caltech, MIT, UC Berkeley, Stanford, and Princeton. SOF 47. Geography matters too. A plurality of Caltech's applicants come from California. SOF 49. Likewise, Emory's applicants often consider other Georgia schools, while Rice's applicants often consider other Texas schools. *Id.* ███

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

*Third*, defendant schools often had lower win rates (a measure of how often cross-admitted students decided to enroll) against schools outside the proposed market than they did against other in-market schools. *See, e.g.*, SOF 50 ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

The same is true for gross numbers: for some defendants, more cross-admitted students chose to attend public schools than other "Elite Private Universities." For example, ███████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████ SOF 51.

*Fourth*, defendants viewed schools outside the so-called "Elite Private Universities" market as competitors. Flagship public universities qualified. SOF 51 ██████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████ So did top liberal arts colleges. *Id.* ████████████

████████████████████████████████████████████████████████████████████

██████████████████████████ All of this is also common sense that anyone would acknowledge—unless they were trying to gerrymander an antitrust market.

There is no genuine dispute of fact that the schools in the proposed "Elite Private Universities" market are reasonably interchangeable with certain schools outside of it. Plaintiffs' proposed market thus fails as a matter of law. *See Sci. Prods. Co. v. Chevron Chem. Co.*, 384 F. Supp. 793, 795 (N.D. Ill. 1974) ("If competition cuts across product or industry lines, the product market must be drawn broadly to include competition as it exists.").

## V. Cornell, Georgetown, MIT, and Penn Are Entitled To Summary Judgment Under The 568 Exemption.

Plaintiffs' claims also fail because the challenged conduct is immune from antitrust scrutiny under § 568 of the Improving America's Schools Act of 1994. Section 568 permitted "2 or more" need-blind schools to, among other things, agree "to use common principles of analysis for determining the need of … students for financial aid if the agreement to use such principles does

not restrict financial aid officers at such institutions in their exercising independent professional judgment with respect to individual applicants for such financial aid." § 568(a)(2).

At the motion-to-dismiss stage, the Court found plaintiffs had adequately alleged that defendants were not "need-blind" in admissions, but it left open whether the exemption applied. *Carbone v. Brown Univ.*, 621 F. Supp. 3d 878, 884-87 (N.D. Ill. 2022). Since then, discovery has revealed that the remaining defendants asserting the § 568 defense—Cornell, Georgetown, MIT, and Penn—in fact did practice "need-blind" admissions within the meaning of § 568.[11] Because those defendants comprise "2 or more" need-blind schools, their conduct would be exempt under § 568 even if they had agreed on common principles for determining need-based aid.

### A. Schools Are "Need-Blind" If They Do Not Consider An Applicant's Decision To Seek Financial Aid In Making Admissions Decisions.

Section 568 permitted schools that admitted undergraduates "on a need-blind basis" to agree on "common principles of analysis for determining … need." Improving America's Schools Act of 1994, Pub. L. No. 103-382, § 568(a), 108 Stat. 3518, 4060 (1994). Under § 568, a school is "need-blind" if it admits all students "without regard to the financial circumstances of the student involved or the student's family." § 568(c)(6). The text, history, and purpose of § 568 show that "financial circumstances" refer to whether a student has applied for financial aid and the contents of that application—that is, information "derived from [the applicant's] financial aid application form." H.R. Rep. No. 103-761, at 912 (1994) (Conf. Rep.). Thus, a school is "need-blind" if it does not use an applicant's decision to seek financial aid—*i.e.*, the fact that an applicant has financial need—as a factor in determining whether to admit the applicant. Being "need-blind" does not, as plaintiffs suggest, prohibit consideration of anything that might suggest other "financial circumstances" of an applicant.

---

[11] Notre Dame is no longer asserting § 568 as a defense.

This interpretation of the § 568 exemption flows from the statutory text. Section 568 refers to "need" in two contexts: "need-based" financial aid, § 568(a)(3), and "need-blind" admissions, § 568(a), (c)(6). The meaning of "*need*-based" financial aid informs the understanding of "*need*-blind" admissions because a term is presumed to bear the same meaning throughout a statute. *See Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007) ("[I]dentical words and phrases within the same statute should normally be given the same meaning."). Financial aid is "need-based" if it is awarded because of a "demonstrated financial need for such aid." § 568(a)(1). Whether an applicant needs financial aid is "demonstrated" by the information in an applicant's financial aid application form. Because aid awards based on the financial circumstances disclosed in an applicant's financial aid application are "need-based," it follows that admissions made without regard to those same financial circumstances—the applicant's eligibility for financial aid—are "need-blind." *See Mellouli v. Lynch*, 575 U.S. 798, 809 (2015) ("Statutes should be interpreted 'as a symmetrical and coherent regulatory scheme.'").

This interpretation matches how institutions of higher education understand the term "need-blind." Throughout higher education, "need-blind" is generally understood to mean that an applicant will not be disadvantaged in the admissions process due to their potential need for financial aid. SOF 11. As Harvard's website explains to prospective applicants, "[n]eed-blind admissions" means that "[y]our financial need and your aid application will never affect your chance of being admitted to Harvard." *Id.* Other schools have said the same. SOF 10-11. "Congress presumably kn[ew] and adopt[ed]" this meaning in choosing to "employ[] a term of art" like need-blind, *Air Wis. Corp. v. Hoeper*, 571 U.S. 237, 248 (2014), which is yet another reason why "financial circumstances" should be read to mean information derived from an applicant's financial-aid application. And if any ambiguity remains, the legislative history dispels it: to qualify

for the exemption, Congress explained, admissions personnel should avoid "considering information relating to a student's financial circumstances *that is derived from such student's financial aid application form*." H.R. Rep. No. 103-761, at 912 (emphasis added).

This interpretation also aligns with the purpose of the 568 exemption: increasing educational access for low-income college applicants by allowing schools to collaboratively develop strategies for directing aid to those who need it. When Congress reauthorized § 568 in 2001, the bill's sponsor emphasized that universities should use scholarship funds to "enable[] poor or moderate-income young people to attend," and that the "sole purpose" of § 568 was to "extend the reach of scholarship aid based on need." 147 Cong. Rec. H7730-32 (2001) (statement of Rep. Barney Frank). Similarly, in 2008, Congress recognized that schools using the exemption were "endeavoring to ensure that no student who is otherwise qualified is denied the opportunity to go to one of the Nation's most prestigious schools because of the financial situation of his or her family." H.R. Rep. No. 110-577, at 2 (2008). In short, Congress passed § 568 to foster increased enrollment of low-income students at top universities by encouraging schools to develop strategies for identifying students in need, so long as those students would not be disadvantaged in admissions based on information from their financial aid applications.

Plaintiffs resist this well-supported definition of "need-blind." They have suggested that consideration of *any* fact suggesting the "financial circumstances" of an applicant in the admissions process is enough to disqualify a school from invoking the exemption. *See* Dkt. 164, Pls.' Mot. Dismiss Opp. 15-16. For example, they insist that schools that consider an applicant's family's capacity to donate to the institution—information that is *not* about a student's need—are not need-blind. *See, e.g.*, SAC ¶166. But that approach wrongly reads the word "need" out of the statute. *See Sackett v. EPA*, 598 U.S. 651, 672 (2023) ("refus[ing] to read 'navigable' out of the

statute" when interpreting the defined term "navigable waters"). Section 568 did not say that schools must be blind to *all* aspects of a student's background even if suggestive of the applicant's financial means—just to the fact the applicant might *need* financial aid. Plaintiffs' interpretation also runs headlong into the rule of construction that "the ordinary meaning of a defined term" matters, "particularly when there is dissonance between that ordinary meaning and the reach of the definition." *Bond v. United States*, 572 U.S. 844, 861 (2014).

Indeed, plaintiffs' boundless interpretation "leads to consequences Congress could not have intended." *Mellouli*, 575 U.S. at 809. For instance, their reading would imply that admissions policies aimed at increasing enrollment of less privileged students—the *very people Congress sought to help* by enacting § 568—violate the statute's "need-blind" requirement as well, because they, too, take into account students' "financial circumstances." Congress could not have meant to exclude schools from § 568 for pursuing the exact purpose of § 568.[12]

### B. The Exemption Applies As Long As Two Or More Schools Are Need-Blind.

The 568 exemption applies to "2 or more institutions of higher education at which all students admitted are admitted on a need-blind basis." § 568(a). The use of the phrase "2 or more" means that the exemption applies as long as two schools at which all students are admitted on a need-blind basis agree to use common principles to determine financial aid. This is true even if other schools who claim to be part of that agreement are not need-blind.[13] In other words, § 568(a) does not say that "all institutions" participating in an agreement must be "need-blind" for any of

---

[12] Defendants do not rely on the absurdity doctrine, which this Court addressed in its motion to dismiss opinion. *See Carbone*, 621 F. Supp. 3d at 884-85. Rather, defendants contend that the settled meaning of "need-blind" informs the best reading of "financial circumstances." That a broader reading would produce results Congress could not have intended only reinforces that point.

[13] While the Court's opinion on defendants' motion to dismiss rejected an "actual knowledge" requirement under the statute, the Court was not presented with—and did not address—the meaning of the statute's "2 or more" language. *See Carbone*, 621 F. Supp. 3d at 887-88. Defendants maintain that actual knowledge is required and preserve their right to present that argument in future proceedings, including on appeal.

those institutions to benefit from the exemption's protection. If that were the intended effect, Congress could have drafted language that unambiguously would have such import.

Section 568's history and purpose confirm this interpretation. The § 568 exemption arose from litigation between MIT and the Department of Justice concerning the "Overlap Group," an earlier and different arrangement among certain colleges and universities. *See generally Brown Univ.*, 5 F.3d 658; *see supra* 27-28 (discussing *Brown*). Congress modeled § 568 on MIT's 1993 settlement of that case with the DOJ. *See* H.R. Rep. No. 105-144 (1997). That settlement provided that a school could participate in certain "cooperative financial aid agreements" if admission decisions for "*its* undergraduate programs" were made "without regard to family financial circumstances." Ex. 122, COFHE-02-00003005 at -033. The settlement provided that need-blind status would be evaluated on a school-by-school basis. Section 568 takes the same approach.

Plaintiffs argue that if even *one* member of the 568 Group admitted a single student on a non-need-blind basis, all members lose the exemption's protection. *See* Dkt. 164, Pls.' Mot. Dismiss Opp. 18-19, 20. That interpretation cannot possibly be correct. Operating under the exemption would require a rigorous monitoring scheme among participating schools and would necessitate sharing highly confidential, applicant-level admissions data—something Congress sharply restricted. *See* § 568(a)(4) (delineating limited categories of applicant data that could be exchanged). Congress did not intend to create such an onerous compliance regime that would raise its own antitrust issues, and it should not be read into the statute when there is a much simpler reading. *See Zbaraz v. Madigan*, 572 F.3d 370, 387 (7th Cir. 2009) ("It is an elementary rule of construction that 'the act cannot be held to destroy itself.'").

Equally misguided is plaintiffs' analogy of § 568 to the Capper-Volstead Act. *See* Dkt. 164, Pls.' Mot. Dismiss Opp. 18-19, 20. Because Capper-Volstead immunizes "associations" of certain

agricultural producers, 7 U.S.C. § 291, its exemption is triggered only if "*all* its members [are] qualified to act collectively," *Nat'l Broiler Mktg. Ass'n v. United States*, 436 U.S. 816, 822 (1978). But § 568 does not refer to a collective set of parties as an "association." Instead, it mentions only conduct taken by two or more schools that "agree or attempt to agree" about certain issues. § 568(a). Congress could have written § 568 to replicate the strict standard under the Capper-Volstead Act, but it chose to take a different approach.

### C. Cornell, Georgetown, MIT, and Penn Are Need-Blind Under This Interpretation of the Statute.

Under the proper interpretation of § 568, Cornell, Georgetown, MIT, and Penn are entitled to summary judgment. There is no genuine dispute of material fact that these defendants did not disadvantage applicants in the admissions process because they applied for need-based financial aid. To the contrary:

- **Cornell**'s former associate provost for admissions and enrollment testified that "when we're reviewing a student's application, the person reading the application has absolutely no idea if the student is applying for financial aid." SOF 9.

- **Georgetown**'s senior associate director of admissions testified that we "do not have access to financial aid information prior to somebody being admitted." SOF 9 (policy of admissions "without regard to [applicants'] ability to pay (known as 'need-blind' admissions)").

- **MIT**'s dean of admissions testified that the school is "need-blind for admissions of all undergraduates," and internal documents repeatedly make clear that MIT's need-blind admissions policy means that "[s]tudents are not at a disadvantage because of their financial need in the admissions process." SOF 6, 11.

- **Penn**'s former interim dean of admissions testified that "a student's inability to pay the full cost is not something that's going to be held against them in our application process … [and] lower income people are not at a disadvantage in our admissions process." SOF 9.

Thus, Cornell, Georgetown, MIT, and Penn comprise "2 or more institutions of higher education at which all students admitted are admitted on a need-blind basis." These defendants are

therefore entitled to § 568's antitrust exemption, regardless of the practices of other 568 Group members.

## VI.   Members Of The Putative Class Who Did Not Pay Their Own Tuition Suffered No Antitrust Injury As A Matter Of Law.

Even if § 1 somehow applied to defendants' conduct, numerous plaintiffs lack a right to sue because others paid for their college educations. An antitrust plaintiff must suffer "an anticompetitive injury that flows from defendant's actions." *Chi. Studio Rental, Inc. v. Ill. Dep't of Com.*, 940 F.3d 971, 978 (7th Cir. 2019). In a price-fixing case, that means showing *the plaintiff* "had to pay supracompetitive prices" as the result of a conspiracy. *Blades v. Monsanto Co.*, 400 F.3d 562, 569 (8th Cir. 2005). Students who did not personally pay for their undergraduate education (*e.g.*, if parents, third parties, or other relatives paid for them) could not themselves have been injured by the alleged conspiracy because they paid no supracompetitive prices. *See Dvorak v. St. Clair Cnty.*, 2018 WL 514326, at *3 (S.D. Ill. Jan. 23, 2018); *see also Exhaust Unlimited, Inc. v. Cintas Corp.*, 223 F.R.D. 506, 513 (S.D. Ill. 2004) ("A class member could not have actually been injured unless the alleged conspiracy inflated its net payments … above the competitive (or 'but-for') price."); *Patel v. Univ. of Vt.*, 2021 WL 4523683, at *4 (D. Vt. Oct. 1, 2021) (a "student seeking the return of tuition which he or she has not paid … has suffered no injury"). Plaintiffs admit as much in excluding from their proposed Class students who paid nothing for their educations because they received financial aid awards equal to or greater than their cost of attendance. Dkt. 757, Pls.' Class Cert. Mot. 1; *see* Dkt. 785-2, Singer Decl. ¶1 (similar).

Lack of injury is widespread. For example, others paid the bills for almost all the named plaintiffs. SOF 43. They, like all other students who did not pay for their education themselves, suffered no antitrust injury.

Whether these students *could* have paid in some alternative universe is beside the point.

*Contra* Dkt. 807, Pls.' Class Cert. Reply 34-35. And although plaintiffs analogize students to direct purchasers who qualify as injured even if they pass on the alleged overcharge to indirect purchasers down a chain of distribution, *id.* at 35, their own cases make clear that "antitrust injury is considered complete when the direct purchaser *pays an illegal overcharge*." *In re Turkey Antitrust Litig.*, 2025 WL 264021, at *4 (N.D. Ill. Jan. 22, 2025). That is not true here: these students *never* paid in the first place, so rules relating to *later* offsets have no bearing on today's case.

*In re Mercedes-Benz Anti-Trust Litigation*, 157 F. Supp. 2d 355 (D.N.J. 2001), is not to the contrary. There, the court held that a car lessee who finances their purchase is not rendered an indirect purchaser because they obtained financing. *See id.* at 365-66. Plaintiffs argue this means that a third party paying on the buyer's behalf does not render the buyer an "indirect purchaser." Dkt. 807, Pls.' Class Cert. Reply 35. But the *Mercedes-Benz* consumer still paid the purported overcharge to the Mercedes-Benz Credit Corporation, either as "financier" of the transaction, or as "agent of the defendant dealers." *In re Mercedes-Benz*, 157 F. Supp. 2d at 365-66. Students whose parents or relatives paid for their education did not pay either a third-party financier or an agent of the school and had no legal obligation to pay the third party. These students are not "purchasers," they are *gift* recipients. SOF 43 (citing interrogatory response stating: ██████

████████████████████████████████████████████████████████████

██████. Absent actual payments on their part (whether to a school or third party), they do not suffer injury just because they might have been legally responsible for a balance they never actually paid.

Plaintiffs' theory of antitrust injury would also permit double recovery in contravention of the principles underlying the antitrust injury doctrine. If the challenged conduct inflated prices, those who paid—students' parents, relatives, and other third parties—suffered antitrust injury and could potentially recover. On plaintiffs' theory, however, the students can *also* recover. That may

require defendants to pay twice for one inflated price. That is not the law. Nor could it be, as it would imply that anyone obligated to pay a supracompetitive price (guarantors, insurers, and so on) could recover alongside the party that actually paid. *See Ill. Brick Co. v. Illinois*, 431 U.S. 720, 731 (1977) (refusing to "open the door to duplicative recoveries" in antitrust suits).

Finally, cases finding that parents who paid their children's tuition lack standing to sue colleges and universities on their children's behalf are inapposite. *See* Dkt. 807, Pls.' Class Cert. Reply 35. In those cases, the parents' standing turned on the existence of a contractual relationship between them and the college or university. *See Rynasko v. NYU*, 63 F.4th 186, 193 (2d Cir. 2023) ("Because [Emily's parent] is neither a party to the contract between Emily and NYU, nor an intended third-party beneficiary of that agreement, nor an assignee of Emily's claims … she lacks standing to sue for breach of contract"); *see also Gociman v. Loyola Univ. of Chi.*, 515 F. Supp. 3d 861, 866 (N.D. Ill. 2021). The cases say nothing about who—the student or the parent—suffers the antitrust injury resulting from an alleged overcharge.

## VII. Even Assuming The Existence Of Some Kind Of "Conspiracy," Penn Affirmatively Withdrew In January 2020.

Plaintiffs allege the putative class includes students who attended Penn "from 2003 through the present," SAC ¶223, but Penn withdrew from any alleged agreement by January 2020. "To terminate one's liability for the continuing illegal acts of a conspiracy that one had joined, a withdrawing member must either report the conspiracy to the authorities or announce his withdrawal to his coconspirators." *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 616 (7th Cir. 1997), *abrogated on other grounds by Rivet v. Regions Bank of La.*, 522 U.S. 470 (1998). Here, Penn withdrew from any "conspiracy" related to the 568 Group in January 2020 by resignation letter to the Group's chairman. SOF 67. Penn officials then stopped attending 568 Group meetings and declined to participate in its initiatives. *Id.* Penn thus unequivocally

"announce[d its] withdrawal" to the remaining 568 Group members. *Brand Name*, 123 F.3d at 616.

Plaintiffs' arguments confirm Penn's withdrawal. Plaintiffs claim that Penn left to "increase flexibility" in its need analysis, and it expressly communicated that goal to the remaining Group members. Dkt. 757, Pls.' Class Cert. Mot. 20 (quoting Ex. 81, PENN568-LIT-00000002). If plaintiffs are right that the 568 Group's purpose was to "reduce competition on aid to reduce endowment spending and aid variability," Dkt. 757, Pls.' Class Cert. Mot. 28, then publicly rejecting the Group's methods in favor of an alternative approach amounted to an "[a]ffirmative act[] inconsistent with the object of the conspiracy" sufficient to establish withdrawal. *U.S. Gypsum Co.*, 438 U.S. at 464-65. So too does Penn's ostensible public deviation from the CM Guidelines after leaving. Dkt. 757, Pls.' Class Cert. Mot. 22. Even plaintiffs' damages model "credits" Penn's withdrawal from the alleged conspiracy, on which the model's results depend. *See* Ex. 4, Singer Am. Rep. ¶228. Thus, whatever the Court concludes regarding the alleged conspiracy, Penn withdrew in January 2020.

## CONCLUSION

For the foregoing reasons, defendants respectfully request that this Court grant their motion for summary judgment and enter judgment in favor of defendants.

50

Dated: May 7, 2025

By: _/s/ David Gringer_
David Gringer
Alan Schoenfeld
WILMER CUTLER PICKERING HALE
    AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel: 212-937-7294
david.gringer@wilmerhale.com
alan.schoenfeld@wilmerhale.com

Seth Waxman
WILMER CUTLER PICKERING HALE
    AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Tel: 202-663-6800
seth.waxman@wilmerhale.com

Edward W. Feldman
Daniel Martin Feeney
MILLER SHAKMAN LEVINE &
    FELDMAN LLP
30 W. Monroe St.
Suite 1900
Chicago, IL 60603
Tel.: 312-263-3700
dfeeney@millershakman.com
efeldman@millershakman.com

_Counsel for The Trustees of the University
of Pennsylvania_

Respectfully submitted,

By: _/s/ Norman Armstrong_
Norman Armstrong
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, D.C. 20004
Tel.: 202-389-5000
norman.armstrong@kirkland.com

Emily T. Chen
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Tel.: 212-446-4800
emily.chen@kirkland.com

Daniel E. Laytin
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Tel.: 312-862-2000
daniel.laytin@kirkland.com

_Counsel for Defendant Cornell University_

By: _/s/ Britt M. Miller_
Britt M. Miller
Daniel T. Fenske
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Tel: 312-782-0600
bmiller@mayerbrown.com
dfenske@mayerbrown.com

_Counsel for Defendant Georgetown University_

**PUBLIC VERSION**

By: _/s/ Eric Mahr_
Eric Mahr
Jan Rybnicek
Daphne Lin
FRESHFIELDS US LLP
700 13th Street, NW
Washington, DC 20005
Tel: 202-777-4500
eric.mahr@freshfields.com
jan.rybnicek@freshfields.com
daphne.lin@freshfields.com

Rami Fakhouri
Jennifer L. Greenblatt
GOLDMAN ISMAIL TOMASELLI BRENNAN &
BAUM LLP
200 South Wacker Drive, Floor 22
Chicago, IL 60604
Tel: (312) 681-6000
rfakhouri@goldmanismail.com
jgreenblatt@goldmanismail.com

_Counsel for Massachusetts Institute of
Technology_

By: _/s/ Robert A. Van Kirk_
Robert A. Van Kirk
Jonathan Pitt
Sarah F. Kirkpatrick
Matthew D. Heins
Feyilana Lawoyin
Cole T. Wintheiser
William J. Donnelly
WILLIAMS & CONNOLLY LLP
680 Maine Ave. SW
Washington, D.C. 20024
Tel: 202-434-5000
rvankirk@wc.com
jpitt@wc.com
skirkpatrick@wc.com
mheins@wc.com
flawoyin@wc.com
cwintheiser@wc.com
wdonnelly@wc.com

James Peter Fieweger
MICHAEL BEST & FRIEDRICH LLP
444 West Lake Street
Suite 3200
Chicago, IL 60606
Tel.: 312-222-0800
jpfieweger@michaelbest.com

_Counsel for University of Notre Dame_

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 7, 2025, I caused a true and correct copy of the foregoing document to be filed and served electronically via the court's CM/ECF system. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

*/s/ Britt M. Miller*
Britt M. Miller

*Counsel for Georgetown University*