PUBLIC VERSION

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| ANDREW CORZO, SIA HENRY, ALEXANDER LEO-GUERRA, MICHAEL MAERLENDER, BRANDON PIYEVSKY, BENJAMIN SHUMATE, BRITTANY TATIANA WEAVER, and CAMERON WILLIAMS, individually and on behalf of all others similarly situated, | **Case No. 1:22-cv-00125** |
| Plaintiffs, | |
| v. | **Hon. Matthew F. Kennelly** |
| BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, THE JOHNS HOPKINS UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY, | |
| Defendants. | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON THE <u>STATUTE OF LIMITATIONS</u>

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ....................................................................................................1

BACKGROUND ...................................................................................................3

    I.     Plaintiffs Applied For And Received Financial Aid................................3

    II.    Defendants Participated In The 568 Group ..........................................4

    III.   Plaintiffs Waited To Sue Until January 2022 .......................................5

LEGAL STANDARD...........................................................................................6

ARGUMENT ........................................................................................................6

    I.     The Vast Majority Of Plaintiffs' Claims Are Time-Barred....................6

    II.    The Discovery Rule Does Not Save Plaintiffs' Untimely Claims...........7

           A.    The Facts Underlying Plaintiffs' Alleged Pre-2018 Injuries Were Known Or Knowable More Than Four Years Before Plaintiffs Sued................................................................................................8

           B.    Allegedly Complex Facts Do Not Delay Accrual....................12

           C.    It Is Irrelevant Whether The Facts Pertaining To Defendants' Affirmative Defense Were Knowable—But They Were Widely Known....................................................................................14

           D.    Reading A Discovery Rule In To The Clayton Act Is Contrary to Supreme Court Precedent .......................................................18

    III.   There Is No Basis To Toll The Statute Of Limitations..........................19

           A.    There Was No Fraudulent Concealment...................................19

           B.    Plaintiffs' Claims Are Not Equitably Tolled ...........................20

CONCLUSION....................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ..................................................................................................... 19

*Bethesda Lutheran Homes & Services, Inc. v. Born*,
   238 F.3d 853 (7th Cir. 2001) ...................................................................................... 15

*Burd v. New Jersey Telephone Co.*,
   386 A.2d 1310 (N.J. 1978) .......................................................................................... 14

*Cada v. Baxter Healthcare Corp.*,
   920 F.2d 446 (7th Cir. 1990) ...................................................................................... 20

*Cancer Foundation, Inc. v. Cerberus Capital Management, LP*,
   559 F.3d 671 (7th Cir. 2009) .................................................................. 7, 13, 14, 15

*Carbone v. Brown University*,
   621 F. Supp. 3d 878 (N.D. Ill. 2022) ................................................................. 18, 19

*Clark v. City of Braidwood*,
   318 F.3d 764 (7th Cir. 2003) ...................................................................................... 15

*Cunningham v. Cornell University*,
   No. 23-1007, 604 U.S. - -, slip op. (2025) ................................................................ 15

*Delgado v. Liberty Mutual Fire Insurance Co.*,
   2016 WL 7448312 (D.N.M. Sept. 15, 2016) ............................................................ 13

*Fidelity National Title Insurance Co. of New York v. Howard Savings Bank*,
   436 F.3d 836 (7th Cir. 2006) ...................................................................................... 14

*Fish v. GreatBanc Trust Co.*,
   749 F.3d 671 (7th Cir. 2014) ...................................................................................... 15

*Glen Flora Dental Center, Ltd. v. First Eagle Bank*,
   2024 WL 621601 (N.D. Ill. Feb. 14, 2024) ............................................... 7, 13, 14

*Green v. United States*,
   765 F.2d 105 (7th Cir. 1985) ........................................................................................ 6

*Hexcel Corp. v. Ineos Polymers, Inc.*,
   681 F.3d 1055 (9th Cir. 2012) .................................................................................... 18

*In re Animation Workers Antitrust Litigation*,
   87 F. Supp. 3d 1195 (N.D. Cal. 2015) ..................................................................... 18

*In re Copper Antitrust Litigation*,
    436 F.3d 782 (7th Cir. 2006) ........................................................................ 19

*In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Products Liability Litigation*,
    352 F. Supp. 2d 533 (E.D. Pa. 2004) ........................................................... 11

*In re Sulfuric Acid Antitrust Litigation*,
    703 F.3d 1004 (7th Cir. 2012) .................................................................... 18

*In re Sulfuric Acid Antitrust Litigation*,
    743 F. Supp. 2d 827 (N.D. Ill. 2010) ........................................................... 20

*Johnson v. Railway Express Agency, Inc.*,
    421 U.S. 454 (1975) .................................................................................... 18

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997) .................................................................................... 19

*Massey v. United States*,
    312 F.3d 272 (7th Cir. 2002) ......................................................................... 6

*Mathews v. Kidder, Peabody & Co.*,
    260 F.3d 239 (3d Cir. 2001) ........................................................................ 18

*Matter of Excello Press, Inc.*,
    967 F.2d 1109 (7th Cir. 1992) ..................................................................... 15

*Matter of Leeds Building Products Inc.*,
    181 B.R. 1006 (Bankr. N.D. Ga. 1995) ........................................................ 15

*McIntyre v. United States*,
    367 F.3d 38 (1st Cir. 2004) ......................................................................... 11

*Obiefuna v. Hypotec, Inc.*,
    451 F. Supp. 3d 928 (S.D. Ind. 2020) ............................................................ 8

*Patel v. American Dental Association*,
    2024 WL 5279870 (C.D. Cal. Dec. 16, 2024) .............................................. 13

*Regents of the University of California v. Bakke*,
    438 U.S. 265 (1978) .................................................................................... 17

*Rotella v. Wood*,
    528 U.S. 549 (2000) ............................................................... 7, 13, 14, 18

*Rotkiske v. Klemm*,
    589 U.S. 8 (2019) ................................................................................. 18, 19

*Stephan v. Goldinger*,
  325 F.3d 874 (7th Cir. 2003) ........................................................................... 19

*Travis v. Knappenberger*,
  204 F.R.D. 652 (D. Or. 2001) .......................................................................... 14

*United States v. Kubrick*,
  444 U.S. 111 (1979)........................................................................................... 13

*Vasquez v. Indiana University Health, Inc.*,
  40 F.4th 582 (7th Cir. 2022) ............................................................................ 18

*White v. Gen. Motors Corp.*,
  908 F.2d 675 (10th Cir. 1990) ......................................................................... 15

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
  401 U.S. 321 (1971)............................................................................................ 7

**Statutes**

15 U.S.C. § 1 ........................................................................................................ 4

15 U.S.C. § 15b ............................................................................................ 7, 19

**Other Authorities**

A. Scalia & B. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 94 (2012) ......... 18

H.R. Conf. Rep. No. 103-761 (1994).............................................................. 4

House Rpt. 107-32 (Apr. 3, 2001) ................................................................. 9

Improving America's Schools Act, Pub. L. No. 103-382, 108 Stat. 3518 (1994)........................ 4

Pub. L. No. 105-43, 111 Stat. 1140 (1997)................................................... 4

Pub. L. No. 107-72, 115 Stat. 648 (2001)..................................................... 4

Pub. L. No. 110-327, 122 Stat. 3566 (2008).................................................. 4

Pub. L. No. 114-44, 129 Stat. 472 (2015)...................................................... 4

## <u>INTRODUCTION</u>

Everything plaintiffs needed to know to commence this suit has been available to them for decades, and discovery revealed nothing "new" that came to light within the limitations period to alert them to their claims. To the contrary, when a group of higher education administrators, including representatives of many of the defendants, gathered in 1998 to begin the process of forming the "568 Group"—named after a law, passed in 1994, through which Congress declared that schools should work together to develop common principles for assessing a student's ability to pay for college—they announced their efforts and aims publicly. By the early 2000s, the 568 Group was working to address certain discrete recurring topics associated with need-based aid, again sharing its activities publicly. In fact, it maintained a public website that reported its membership, its activities, and many of its recommendations. If the 568 Group's activities somehow depressed aid awards and inflated prices under any particular student's circumstances, there is no reason any financial aid recipient who experienced that harm could not have sued when it happened: any reasonably diligent aid recipient would have known they attended a 568 Group school, that the 568 Group existed to develop approaches to need analysis, that the 568 Group school they attended used a need-analysis methodology to calculate and offer their financial aid award, and that the price they ultimately paid was the product of that need-analysis methodology.

Only a small fraction of the proposed class has timely claims. Despite the widespread public availability of all relevant facts since the early 2000s, plaintiffs waited until January 9, 2022 to sue. There is no reason to excuse the overwhelming majority of plaintiffs whose claims are stale under the Clayton Act's four-year time bar. If any of the students who received tens or hundreds of thousands of dollars in gift aid from defendants feel they were deprived of something more, their failure to timely sue bars their claims. The Court should grant summary judgment on these time-barred claims for the following reasons:

1

**PUBLIC VERSION**

*First*, the claims of all plaintiffs who were allegedly "overcharged" before January 9, 2018 (*i.e.*, four years before plaintiffs sued) are barred by the Clayton Act's statute of limitations. Under the discovery rule, an action accrues when the necessary facts underlying an alleged injury are knowable to a reasonably diligent plaintiff. Plaintiffs have previously argued that they could not have pieced together the "jigsaw puzzle" of this case until at least 2020. But the evidence conclusively demonstrates otherwise. The facts underlying plaintiffs' claims were easily discoverable in numerous public sources describing the 568 Group and its activities dating back to at least the early 2000s.

*Second*, plaintiffs have previously argued that they had no way of knowing the facts that purportedly showed defendants were ineligible for the 568 exemption—namely, that their admissions policies allegedly did not meet the statutory definition of "need-blind." But such facts are irrelevant because a plaintiff need not anticipate and overcome affirmative defenses to sue. And even if that were not the case, plaintiffs' pre-2018 claims still would have accrued before the limitations period, because the facts plaintiffs (wrongly) contend disqualify defendants for the 568 exemption were ubiquitous throughout the 2000s and 2010s. Reporting in best-selling books, in articles in prominent newspapers, on television, and in various 568 Group members' media publications discussed the so-called "wealth favoritism" that plaintiffs (wrongly) contend stripped defendants of eligibility for the protections of Section 568. Plaintiffs cannot credibly claim ignorance of these myriad publicly available materials.

*Third*, recent Supreme Court precedent—and the decisions of each other circuit to have considered the question—shows the Seventh Circuit's practice of reading a "discovery rule" into the antitrust laws is an exercise of judicial overreach that ignores the important role of Congress in balancing the competing interests captured by limitations periods.

*Finally*, plaintiffs are not entitled to "tolling" of the limitations period based on fraudulent concealment or equitable tolling. Fraudulent concealment requires plaintiffs to show that, due to defendants' affirmative acts, they could not have reasonably known or discovered the harm they suffered. But the relevant facts were widely available, and neither defendants' denials of liability nor statements of their honestly held belief that they practiced need-blind admissions constitute "fraud" or "concealment." Plaintiffs fail to identify any newly discovered facts that triggered their untimely filing, so equitable tolling is also unavailable.

Plaintiffs had all they needed to bring their claims on time. Most did not do so. Summary judgment should be granted on all claims that accrued before the 4-year limitations period.

## BACKGROUND

### I. Plaintiffs Applied For And Received Financial Aid

Named plaintiffs represent a putative class of current and former students who applied for and received need-based financial aid that, while it may have covered some or all of their tuition, did not cover their full cost of attendance at defendant schools. SAC ¶223; Dkt. 757, Pls.' Class Cert. Mot. 1. To receive need-based financial aid, every putative plaintiff filled out financial aid applications and submitted them to the schools to which they were admitted. SOF 22.[1] Each school then analyzed each student's need by applying a need analysis methodology, exercising "professional judgment," and calculating the student's Expected Family Contribution ("EFC"). SOF 23, 27, 100. Each school then told the student the outcome of the analysis: how much their family would be expected to pay towards the student's education (i.e., their EFC), how much would be covered by institutional or non-institutional grant aid, and how much, if any, would be

---

[1] "SOF" refers to Defendants' Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment, filed concurrently. "Ex. __" refers to the exhibits to the Declaration of Daniel T. Fenske, also filed concurrently.

covered by "self-help" such as loans or work-study. SOF 35-40. First-year students typically received notice of their aid awards contemporaneously with, or shortly after, gaining admission to a school; continuing students typically received notice of their aid awards for the following year in late spring or summer. SOF 40.

## II.    Defendants Participated In The 568 Group

Section 568 of the Improving America's Schools Act of 1994, Pub. L. No. 103-382, 108 Stat. 3518 (1994), allowed need-blind schools to work together "to agree or attempt to agree … to use common principles of analysis for determining the need" of students. 15 U.S.C. § 1 Note. This antitrust exemption was originally set to expire in 1997. But Congress, recognizing the societal benefits the exemption promoted—including "enhancing access by needy students to higher education," H.R. Conf. Rep. No. 103-761, at 912 (1994)—extended it four times.[2]

In the late 1990s, a group of colleges and universities—including (but not limited to) some defendants—formed the 568 Presidents' Group ("568 Group"). SOF 63. In 2001, a subcommittee of the Group published a "Report of the Common Standards Subcommittee to the 568 Presidents' Working Group." SOF 68. That report identified six preexisting "financial aid principles" that "guided" the Group: (1) "parents and students have the primary responsibility" to pay for school; (2) families "should contribute … according to their ability," and similarly situated families "should contribute similar amounts"; (3) ability to pay should be evaluated based on "both income and assets"; (4) institutions should be transparent about the "policies and practices [they] appl[y] when measuring a family's ability to pay"; (5) prospective applicants should be informed of the basis for the allocation of any non-need based aid; and (6) "professional judgment"—

---

[2] *See* Pub. L. No. 105-43, 111 Stat. 1140 (1997); Pub. L. No. 107-72, 115 Stat. 648 (2001); Pub. L. No. 110-327, 122 Stat. 3566 (2008); Pub. L. No. 114-44, 129 Stat. 472 (2015).

individualized assessments of what is fair and reasonable for a given family—should be exercised to "recognize unique or extenuating financial circumstances in individual cases." SOF 93.

The Report, which was adapted in 2003 into a set of "Consensus Methodology Policy Guidelines" ("CM Guidelines"), also listed recommended best practices for addressing certain challenging issues that commonly arose when calculating EFC but that were not adequately addressed by the College Board's "Institutional Methodology" (the industry standard need analysis framework). SOF 69. In line with Congress's legislative purpose in enacting Section 568, these guidelines addressed things like how to fairly treat two students with similar income and assets but different costs of living due to their geographic location; how to measure financial strength when a family's home equity dramatically exceeded their income; or how best to assist families that appeared to have substantial income but were underprepared for retirement. SOF 75-79.

### III.     Plaintiffs Waited To Sue Until January 2022

On January 9, 2022, plaintiffs filed this lawsuit alleging that through their participation in the 568 Group, defendants conspired to raise prices by adopting a rigid and mandatory methodology for deciding a student's EFC. *See* Dkt. 1, Compl. According to the latest iteration of plaintiffs' theory, defendants were part of an "overarching agreement" to raise what plaintiffs call "Effective Institutional Price" ("EIP") by developing the CM Guidelines, adhering to what plaintiffs call the "Core Principles" (the need analysis principles set forth in the Subcommittee Report and CM Guidelines), agreeing that professional judgment should be exercised on a case-by-case basis, dedicating themselves to the "primacy" of need-based aid over merit-based aid, and sharing information another trade organization created and distributed. *See, e.g.*, Ex. 4, Singer Am. Rep. ¶¶149-191; Dkt. 757, Pls.' Class Cert. Mot. 12-15.

The named plaintiffs purport to represent a class including all financial aid recipients whose grant-based aid did not cover their full cost of attendance at a defendant school during its

membership in the 568 Group in any academic year between 2003-2004 and 2022-2023. SAC ¶223; Dkt. 757, Pls.' Class Cert. Mot. 1. Of the eight named plaintiffs, seven received their first aid award before January 2018; five received none after that date. SAC ¶¶16-23. Nearly 80% of the "overcharges" plaintiffs' lead expert claims to have identified in the data allegedly were incurred before January 9, 2018.

## LEGAL STANDARD

"Summary judgment is properly granted on the basis of a statute of limitations defense if '(1) the statute of limitations has run, thereby barring the plaintiff's claim as a matter of law, and (2) there exist no genuine issues of material fact regarding the time at which plaintiff's claim has accrued and the application of the statute to plaintiff's claim which may be resolved in plaintiff's favor.'" *Massey v. United States*, 312 F.3d 272, 276 (7th Cir. 2002) (quoting *Green v. United States*, 765 F.2d 105, 107 (7th Cir. 1985)).

## ARGUMENT

Every claim that accrued before January 9, 2018, is barred under the applicable antitrust statute of limitations. Neither the discovery rule nor any tolling doctrine can save plaintiffs' pre-2018 claims from plaintiffs' tardiness. Widely available materials make clear that all relevant facts underlying plaintiffs' alleged injuries were known or knowable for many years before plaintiffs sued, and extensive discovery has failed to unearth a shred of evidence that defendants engaged in any fraudulent acts to conceal their allegedly harmful behavior—virtually all of which defendants themselves publicly disclosed. To allow these untimely claims to proceed would contravene the important principles of repose and certainty underlying the Clayton Act's limitations period, and allow plaintiffs and their lawyers to profit from their delay.

## I. The Vast Majority Of Plaintiffs' Claims Are Time-Barred

The Clayton Act's statute of limitations is four years and runs from the date of accrual of

a claim. 15 U.S.C. § 15b. An antitrust action accrues for purposes of the statute of limitations when "a defendant commits an act that injures" the plaintiff. *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971). Here, plaintiffs' alleged injury is the receipt of artificially deflated financial aid awards stemming from the defendants' alleged conspiracy. *See* SAC ¶238. That means each individual plaintiff's claim accrued upon receipt of their initial financial aid award, and that claim expired four years later. *See Zenith*, 401 U.S. at 338-39.

## II. The Discovery Rule Does Not Save Plaintiffs' Untimely Claims

Recognizing the devastating effect of the four-year statute of limitations on their proposed class, plaintiffs have previously claimed that the accrual date should be delayed until such time as the facts underlying their purported injuries were knowable. At the motion to dismiss stage, plaintiffs claimed they were unable to discover the necessary facts until "January 2020"—two years before they filed their complaint, and within the 4-year limitations period. *See* SAC ¶¶198-199; Dkt. 164, Pls.' Mot. Dismiss Opp. 46-50. But at summary judgment, plaintiffs cannot simply count on their allegations being "taken as true," Dkt. 164, Pls.' Mot. Dismiss Opp. 47—the evidence must back them up. The evidence here does not.

Plaintiffs' pre-2018 claims are untimely. The discovery rule delays accrual only until such time as the facts underlying an injury would be knowable to a reasonably diligent person. It does not delay accrual for the discovery of legal theories or the elements of a claim. *See Cancer Found., Inc. v. Cerberus Cap. Mgmt., LP*, 559 F.3d 671, 674 (7th Cir. 2009) ("A plaintiff does not need to know that his injury is actionable to trigger the statute of limitations—the focus is on the discovery of the harm itself, not the discovery of the elements that make up a claim."); *Glen Flora Dental Ctr., Ltd. v. First Eagle Bank*, 2024 WL 621601, at *19 (N.D. Ill. Feb. 14, 2024) ("[D]iscovery of the injury, not discovery of the other elements of a claim, is what starts the clock." (quoting *Rotella v. Wood*, 528 U.S. 549, 555 (2000))). Discovery has made clear that every fact pertaining to

plaintiffs' alleged injuries was known or knowable for years before they filed suit. So too was every fact pertaining to plaintiffs' theory that defendants were ineligible for the 568 exemption (though that does not matter). And in any event, recent Supreme Court precedent dictates that the discovery rule does not apply to antitrust claims at all.

Had they engaged in reasonable due diligence—as is required, *see Obiefuna v. Hypotec, Inc.*, 451 F. Supp. 3d 928, 940 n.2 (S.D. Ind. 2020)—plaintiffs would have learned all relevant facts long before 2020. Discovery rule or no, plaintiffs' pre-2018 claims are time-barred.

A. **The Facts Underlying Plaintiffs' Alleged Pre-2018 Injuries Were Known Or Knowable More Than Four Years Before Plaintiffs Sued**

*First*, any reasonably diligent plaintiff would have known long before 2018 that they attended a school that was a member of the 568 Group. From its official launch in 2001, the 568 Group announced its membership and activities publicly through press releases and other means. SOF 72. Beginning no later than 2005, the 568 Group maintained a public-facing website that, among other things, listed its member institutions—including all fifteen defendants that were members at the time. SOF 72. Plaintiffs were perfectly capable of accessing this website, as evidenced by their repeated citations to it across their complaint. *See* SAC ¶¶114-115, 121, 127, 129, 203, 212-214, 267. Print media, too, featured articles published in a variety of outlets (including student newspapers) in the 2000s and 2010s that discussed the 568 Group and its members, frequently noting that schools in the Group had joined together "to develop a standard set of guidelines," Ex. 249. SOF 71. And defendants did not hide their membership in the Group. Schools mentioned their membership on their financial aid websites, and financial aid officers routinely acknowledged their school's membership and how it might or might not impact aid awards. SOF 72. More than a decade ago, all a putative class member would have needed to do was "a bit of reading" to learn that their school was a "member [of] the 568 Group" and to know

8

that this would impact the need analysis methodology it used, including as to things like their family's home equity—and their school would be happy to confirm as much, Ex. 78 (2013 email from aid recipient to Northwestern financial aid office expressing disappointment with aid award, observing that they thought Northwestern would "cap[] the home value" at "1.2x AGI" as a 568 Group member). SOF 72.

*Second*, well before 2018, any reasonably diligent plaintiff would have known that defendants endorsed common principles of awarding need-based financial aid, and that they developed the CM Guidelines as one tool a school could use when determining what financial aid applicants could afford to contribute to their education. The Subcommittee Report detailing the principles and methodology the Group espoused was available to the public as early as at least August 2001. SOF 68, 71. Schools disclosed and print media publicly reported the 568 Group's endorsement of its "comprehensive set of principles," Ex. 218, for determining a student's financial aid award that same year. SOF 71. The specifics of the 568 Group's Consensus Methodology were discussed openly in the press, with college newspapers reporting that member schools were developing a "common methodology" that would, among other things, impact the way schools evaluated "home equity" and "the payment role of non-custodial parents," Ex. 275, Ex. 229. SOF 71. Congressional materials published in 2001, when the House of Representatives publicly debated whether to extend the 568 exemption, likewise featured discussion of what the 568 Group's member schools were doing:

> The presidents of the universities have tentatively agreed to a common set of principles affirming the primacy of need-based aid. In addition, they are discussing and testing guidelines based on the 1997 proposals of the financial aid officers. The presidents expect to announce agreement on the principles and guidelines in the next several months.

House Rpt. 107-32 (Apr. 3, 2001), at 3. And in 2006, the Government Accountability Office

published a detailed report on the 568 Group's activities, including its membership, that included a side-by-side comparison of how each of several specific components of the CM Guidelines compared to the College Board's Institutional Methodology, Ex. 408. SOF 73. Any student, therefore, could assess how their aid might be affected by the Group's activities.

None of this took intrepid reporting or rigorous investigation to uncover, because the 568 Group was happy to tell the public what it was doing. Representatives of member schools were quoted in the press describing their membership in the 568 Group. SOF 72. Schools provided information to the GAO for its report. SOF 73. And the 568 Group posted to its website as early as May 2005 a "statement of Need Analysis Principles … adopted by the 568 Presidents." SOF 94. That statement, and the explanation of how the CM Guidelines "represent[ed] the best efforts of the Presidents' Group to develop a Consensus Approach" that was "compatible with the values that underlie" those principles, appeared there until at least April 2016. *Id.*; Ex. 225; Ex. 228.

*Third*, plaintiffs had all the information they needed to connect the dots between the allegedly inflated prices they paid and defendants' purported activities. It should go without saying that every plaintiff knew they received need-based aid from the schools they attended and knew grants covered less than their full cost of attendance. They also knew or should have known that their aid could potentially have been higher; indeed, several of the named plaintiffs testified that they felt their aid awards were too low and that they submitted appeals to their respective schools upon receiving those awards to ask that they be increased (many years before filing suit). SOF 41. Any reasonably diligent plaintiff would also have known then, just as easily as they claim to know now, that their aid awards might be impacted by their school's membership in the 568 Group. After all, the Group's website at least since 2005 informed anyone who cared to look that the Group's need-analysis approaches were directed to all first-year aid applicants at member schools,

PUBLIC VERSION

as well as continuing students at "most institutions," Ex. 220. SOF 72. And any reasonably diligent plaintiff could have learned, long before 2018, of the public statements plaintiffs have cited to support their (incorrect) contention that the 568 Group's activities depressed aid. Plaintiffs' January 2022 complaint cited newspaper articles from 2001 and 2008 in which representatives of Yale and Dartmouth made self-serving comments about doing "more" than the 568 Group's recommended approach would "allow," *see* Compl. ¶107, ¶110-111, Ex. 409, Ex. 41; these articles were as available before 2018 as after. SOF 71.

*Fourth*, and most importantly, people publicly raised concerns over whether the 568 Group's activities were anticompetitive *decades ago*. Stories began appearing in *the early 2000s*— almost as soon as the 568 Group came into existence—questioning whether the 568 Group negatively impacted competition. An article published in 2001 titled, "*Colleges and Student Aid: Collusion or Competition*," for example, asked whether the Group "invite[d] high-price, brand-name private institutions to eliminate price competition by private, collective action," thereby "operating much like a cartel," Ex. 259; *see* Ex. 50. SOF 71. U.S. News & World Report—which plaintiffs cite as an authoritative publication for purposes of defining the relevant market— published stories in 2002 querying whether the 568 Group's "new approach will reduce competition," Ex. 425, and whether it might "dampen … bidding for top students," Ex. 245. SOF 71. *See McIntyre v. United States*, 367 F.3d 38, 60 (1st Cir. 2004) (in the face of "widespread publicity" of events, plaintiffs "may be charged with knowledge of their occurrence"); *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Products Liability Litig.*, 352 F. Supp. 2d 533, 541 (E.D. Pa. 2004) (claims barred due to "widespread publicity" of alleged injurious acts).

These are the same allegations it took plaintiffs twenty more years to finally assert. There is no excuse for their delay. All the information plaintiffs needed was freely available to any

reasonably diligent person who looked for it. Notably, since at least 2005, the 568 Group's website on its "Consensus Approach Methodology" was replete with language describing its members' commitment to the "financial aid principles" plaintiffs challenge, Ex. 233. SOF 94. It said that the Consensus Methodology "seeks to eliminate much of the variance in need analysis results that has been experienced in recent years," and that by applying it "in a consistent manner," schools could "diminish or eliminate the divergent results that threaten the long-standing tradition of awarding aid on the basis of need," Ex. 233—all of which plaintiffs, in their complaint and in subsequent expert reports and motion practice, have pointed to as the key, damning evidence that the 568 Group's activities were unlawful, *see* SAC ¶¶127, 129; Singer Rep. ¶¶149-191; MCC at 12-15.

## B.    Allegedly Complex Facts Do Not Delay Accrual

Despite this veritable mountain of publicly available information, plaintiffs claimed in their complaint that they could not have discovered they had a cognizable claim before 2020. SAC ¶¶198-199. According to plaintiffs, it would have required "fit[ting] together multiple pieces of information like a jigsaw puzzle" for plaintiffs to discover their injuries before 2020, so accrual did not occur until then. Dkt. 164, Pls.' Mot. Dismiss Opp. 48. But the record lacks anything that would explain what plaintiffs purportedly "discovered" in 2020 that suddenly made it apparent that all the obvious facts at plaintiffs' fingertips for years were in fact the basis for a claim. For the at least 10% of the proposed class whose claims accrued in 2016 or 2017, it appears the explanation for their untimeliness is that their lawyers delayed filing from 2020 to 2022 while squabbling over who would get financial credit for the case, *see* Ex. 303 (Compl., *Gilbert v. Bach-y-Rita*, No. CGC-21-589875 (Cal. Sup. Ct. Feb. 22, 2021) (claiming plaintiffs' counsel drafted complaint in 2020)). And it is no answer to say, as plaintiffs have, that the facts were simply too "complex[]" to have been discoverable at an earlier date. Dkt. 164, Pls.' Mot. Dismiss Opp. 47. That is not how the discovery rule works.

12

What is relevant for purposes of accrual is the discoverability of the facts underlying an injury—regardless of their complexity—not the piecing together of a potential legal theory. *See, e.g.*, *Cancer Found.*, 559 F.3d at 674; *Glen Flora*, 2024 WL 621601, at *19. This is true even when it may require "considerable enquiry" on the part of a plaintiff to determine whether a particular set of facts constitutes a legal harm. *Rotella*, 528 U.S. at 556. In *Rotella*, the Supreme Court rejected the contention that factual complexity warranted special treatment under the discovery rule. Once a plaintiff is "in possession of the critical facts" underlying his injury, the Court reasoned, accrual is complete. *Id.* (quoting *United States v. Kubrick*, 444 U.S. 111, 122 (1979)). Although a plaintiff, especially in complex cases, may not know himself whether he has suffered a legal harm, "[t]here are others who can tell him if he has been wronged, and he need only ask." *Id.* "[C]onsiderable enquiry and investigation" may be required before a plaintiff "can make a responsible judgment about the actionability" of the purported harm. *Id.* But such a rule is necessary to prevent elongated limitations periods that effectively "bar repose, prove a godsend to stale claims, and doom any hope of certainty in identifying potential liability." *Id.* at 559.

Numerous other federal and state courts, analyzing various states' discovery rules, have arrived at the same conclusion: complexity, and the potential need to consult a lawyer to piece together a claim, are *not* sufficient reasons to delay accrual under the discovery rule. *See, e.g.*, *Patel v. Am. Dental Ass'n*, 2024 WL 5279870, at *7 (C.D. Cal. Dec. 16, 2024) (rejecting plaintiff's argument that "his claims should be tolled until after he completed his studies in law," because "[i]f that was the standard, statute of limitations would only apply to those who had legal training"); *Delgado v. Liberty Mut. Fire Ins. Co.*, 2016 WL 7448312, at *8 (D.N.M. Sept. 15, 2016) ("The key consideration under the discovery rule is the factual, not the legal, basis for a cause of action. The action accrues when the plaintiff knows or should know the relevant facts,

13

whether or not the plaintiff also knows that these facts are enough to establish a legal cause of action." (cleaned up)); *Travis v. Knappenberger*, 204 F.R.D. 652, 656 (D. Or. 2001) ("The running of the statute of limitations is delayed by the discovery rule while the *facts* of the wrong remain unknowable, but the statute of limitations is not tolled if only the legal theory is unknown."); *Burd v. N.J. Tel. Co.*, 386 A.2d 1310, 1314 (N.J. 1978) (same).

This case is not so complex. But even if it were, it would not matter: the vast record in this case lacks even a scintilla of evidence supporting the claim that plaintiffs could not have known of their pre-2018 claims until "January 2020," and the law does not permit the answer to be an invented "complexity" exception to the statute of limitations. To hold otherwise would "thwart[] the basic objective of repose underlying the very notion of a limitations period," *Rotella*, 528 U.S. at 554, not just here but in any case involving complex statutes or legal theories.

## C. It Is Irrelevant Whether The Facts Pertaining To Defendants' Affirmative Defense Were Knowable—But They Were Widely Known

Nor can plaintiffs invoke the discovery rule by claiming they did not know, and could not have known, the extent to which various defendants were allegedly not "need-blind" under the 568 exemption and therefore unable to win dismissal on this affirmative defense. For one thing, whether a defendant can or cannot prevail on an affirmative defense is irrelevant. The discovery rule delays accrual of a claim when the facts underlying the injury are unknowable. *See, e.g.*, *Cancer Found.*, 559 F.3d at 674; *Fid. Nat'l Title Ins. Co. of N.Y. v. Howard Sav. Bank*, 436 F.3d 836, 839 (7th Cir. 2006) ("[W]hen a statute of limitations does not begin to run until 'discovery,' the discovery referred to is merely discovery that the plaintiff has been wrongfully injured."); *Glen Flora*, 2024 WL 621601, at *19. But no court has ever held that even where the facts underlying the plaintiff's injury are known or knowable, a claim nevertheless does not accrue until the plaintiff is sure they can defeat the defendant's affirmative defenses. That is no surprise. A plaintiff "need

not anticipate and overcome affirmative defenses" to bring cognizable claims. *Cunningham v. Cornell Univ.*, No. 23-1007, 604 U.S. --, slip op. at 18 (2025) ("Plaintiffs are not required to plead and prove that the [relevant affirmative defenses] pose no barrier to ultimate relief."); *id.* at 19 (Alito, J., concurring) ("[I]t would make no sense to require a complaint to anticipate and attempt to refute all the affirmative defenses that a defendant might raise."); *Cancer Found.*, 559 F.3d at 674; *see also Clark v. City of Braidwood*, 318 F.3d 764, 767 (7th Cir. 2003) ("[A] plaintiff is not required to negate an affirmative defense in his complaint."). Logically, then, knowledge that an affirmative defense can be overcome is not a prerequisite to a claim accruing. The discovery rule exists to protect reasonably diligent plaintiffs who cannot discern their injury—not to preserve claims until whenever plaintiffs feel confident they will prevail if they sue.[3]

But even if the knowability of facts pertaining to an affirmative defense were relevant, it would not matter: the facts plaintiffs cite for the wrongheaded notion that defendants were not "need-blind" were widely known for years before the limitations period. If there were any doubt about that, one would need look no further than plaintiffs' own complaint, which is replete with citations to Daniel Golden's 2006 book "THE PRICE OF ADMISSION," Ex. 372, a detailed

---

[3] Plaintiffs previously noted that an attorney filing a complaint "may have a responsibility to examine whether any obvious affirmative defenses bar the case" or face potential Rule 11 sanctions, *Fish v. GreatBanc Tr. Co.*, 749 F.3d 671, 587 (7th Cir. 2014). Hr'g on MTD (Aug. 2, 2022) Tr. 42:20-23. But *Fish* and the cases it cites do not help plaintiffs. The obligation to examine whether an "obvious" affirmative defense "bar[s] the case" arises where "all of the information necessary *to conclusively establish* that defense was *in [plaintiff's] control*," *Matter of Excello Press, Inc.*, 967 F.2d 1109, 1113 (7th Cir. 1992) (emphases added), such as where an issue or claim is precluded because the plaintiff already litigated it and lost, *see, e.g.*, *Bethesda Lutheran Homes & Servs., Inc. v. Born*, 238 F.3d 853, 858 (7th Cir. 2001), or where the plaintiff signed a release of claims, *see, e.g.*, *White v. Gen. Motors Corp.*, 908 F.2d 675, 682 (10th Cir. 1990). No authority supports the idea that a defense that would require "discovery to establish" can be so "obvious" that a plaintiff must know they will overcome it before they can sue, *Matter of Leeds Bldg. Prods. Inc.*, 181 B.R. 1006, 1010 (Bankr. N.D. Ga. 1995), and construing *Fish* or the cases it cites as holding otherwise would override established precedent holding that a plaintiff and their counsel need not anticipate affirmative defenses to state a claim. *Cf. Excello Press*, 967 F.2d at 1113 ("Ordinarily, it will be reasonable for a plaintiff's counsel not to make a pre-filing investigation regarding affirmative defenses.").

examination of the policies and practices of defendants and others to engage in the admissions practices that plaintiffs claim constitute "wealth favoritism" that disqualified defendants for the 568 exemption. SOF 13. Golden devoted an entire chapter to describing Duke's admissions practices relating to donors, revealing among other things that the school's president identified for admission "the children of corporate titans expected, in the event of a favorable decision, to contribute to the university endowment," Ex. 372 at 51. In Golden's chapter on Notre Dame, he described how an admissions official candidly acknowledged that "wealthy families with a record of substantial gifts to the university are given a particularly large edge." *Id.* at 132. Discussing Brown, Golden wrote that the school had a "liaison to the rich and famous whose children were seeking admission." *Id.* at 104. Golden's book included detailed accounts of similar practices at Yale, Emory, NYU, Harvard, and Princeton, among others. The book was a follow-up to a series of Wall Street Journal articles that earned Golden a Pulitzer Prize in 2004, and all this reporting was widely available—it "stirred attention, controversy, and outrage," Ex. 325, and was a reference point for more reporting in 2006, 2016, and 2019. SOF 13. Golden even testified in the Senate and made "appearances on Ivy League campuses and on television shows from *The Colbert Report* to *Nightline*," Ex. 325. SOF 13.

Golden and others could report this information in part because defendants themselves openly shared it. SOF 13. Duke's university-run news website reported in 2006 that the school's president had recently defended "the practice of admitting students of wealthy families who could potentially donate money," noting "[a] family's ability to donate to Duke is a 'plus factor' used in admissions" and saying, "It would be naïve to say that any university should pay no attention to a family's ability to help the university …. The question is how much, what is the weight we will give this." Ex. 250. Notre Dame's magazine in 2014 quoted the university's Vice-President of

Enrollment saying that the children of "benefactors" "enjoy[ed] added consideration" in admissions. Ex. 311. Golden even included an Acknowledgment in his book thanking Notre Dame's Assistant Provost for Enrollment for his openness. Ex. 372 at 361. Other years-old examples of these kinds of reports abound. SOF 13. Indeed, the facts surrounding what plaintiffs refer to as "wealth favoritism" in admissions have been so widely known, and for so long, that Justice Blackmun commented on their ubiquity in a concurring opinion of the Supreme Court written *more than forty years ago*:

> It is somewhat ironic to have us so deeply disturbed over a program where race is an element of consciousness, and yet to be aware of the fact, as we are, that institutions of higher learning … have given conceded preferences … to the children of alumni, to the affluent who may bestow their largess on the institutions, and to those having connections with celebrities, the famous, and the powerful.

*Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 404 (1978) (Blackmun, J., concurring).

These materials are just the tip of the iceberg that is the publicly available record concerning the admissions practices plaintiffs contend render defendants ineligible for the 568 exemption. It is no wonder, then, that named plaintiffs themselves admitted in their depositions that they "believed that wealthy families had some preference" in admissions at defendant schools, and that this was a broad "perception in the student body" at defendant schools, years before the limitations period, Ex. 165; Ex. 190. SOF 14. One named plaintiff went further, testifying that he "*always* thought that wealthier families could donate money to universities to sway admissions offices," Ex. 183. SOF 14. Even if the discovery rule meant plaintiffs' injuries did not accrue until facts were known or knowable revealing defendants might arguably not be exempt under Section 568, there is no reasonable basis from which a jury could conclude that those facts were unknowable before January 2018. The pertinent facts were available to plaintiffs for years—decades, even—before the limitations period. To allow plaintiffs' claims to proceed anyway would

be an affront to the values of finality and certainty underpinning limitation periods. *See Rotella*, 528 U.S. at 554.

### D. Reading A Discovery Rule In To The Clayton Act Is Contrary to Supreme Court Precedent

Finally, and to preserve this issue for any future appeal: defendants acknowledge that the Court has found it is bound by Seventh Circuit law applying the discovery rule to antitrust actions, *see Carbone v. Brown Univ.*, 621 F. Supp. 3d 878, 892 (N.D. Ill. 2022) (citing *Vasquez v. Ind. Univ. Health, Inc.*, 40 F.4th 582, 588 (7th Cir. 2022)); *see also In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1014 (7th Cir. 2012). But recent Supreme Court decisions contradict the Seventh Circuit's approach, *see Rotkiske v. Klemm*, 589 U.S. 8, 14 (2019), and other courts to consider the issue have rejected the discovery rule in the antitrust context, *see, e.g.*, *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1060 (9th Cir. 2012); *In re Animation Workers Antitrust Litig.*, 87 F. Supp. 3d 1195, 1209 (N.D. Cal. 2015); *Mathews v. Kidder, Peabody & Co.*, 260 F.3d 239, 246 n.8 (3d Cir. 2001). That is because where Congress has made a "value judgment concerning the point at which the interest in favor of protecting valid claims are outweighed by the interest in prohibiting the prosecution of stale ones," *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 463-64 (1975), it is the court's role to "simply enforce" such periods, not to second-guess them, *Rotkiske*, 589 U.S. at 15. That is what should happen here.

The Supreme Court has made clear that discovery rules should not be "read in" to federal statutes where Congress has elected not to include them. *See id.* at 14 (rejecting argument that the discovery rule should be "read in" to the Fair Debt Collection Practices Act's limitations period). Doing so violates the "fundamental principle of statutory interpretation that 'absent provision[s] cannot be supplied by the courts.'" *Id.* (quoting A. Scalia & B. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 94 (2012)). This very reasoning explains why the Seventh

Circuit's "[a]textual judicial supplementation" of the Clayton Act is wrong. *Id.* The law's text is simple: claims are "forever barred unless commenced within four years after the cause of action accrued." 15 U.S.C. § 15b. Congress knows how to write a discovery rule. It chose not to do so. Its choice should be honored.

## III. There Is No Basis To Toll The Statute Of Limitations

Plaintiffs are also not entitled to tolling of the limitations period. In ruling on plaintiffs' tolling arguments at the motion to dismiss stage, the Court noted it was required to take plaintiffs' allegations as true. *Carbone*, 621 F. Supp. 3d at 891. But now the standard is not so generous. Plaintiffs have failed to produce a shred of evidence suggesting tolling—under either the doctrine of fraudulent concealment or equitable tolling—is warranted. And the record in fact reveals the opposite. Therefore, the Court should grant summary judgment on plaintiffs' untimely claims. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

### A. There Was No Fraudulent Concealment

There is no evidence in the record that defendants fraudulently concealed any facts about plaintiffs' claims. Fraudulent concealment "presupposes that the plaintiff has discovered, or … should have discovered, that the defendant injured him, and denotes efforts by the defendant— above and beyond the wrongdoing upon which the plaintiff's claim is founded—to prevent the plaintiff from suing in time." *In re Copper Antitrust Litig.*, 436 F.3d 782, 791 (7th Cir. 2006). Plaintiffs bear the burden of showing "that [they] neither knew, nor in the exercise of due diligence, could reasonably have known of the offense" due to affirmative actions by defendants to conceal the harm. *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 194-95 (1997). They cannot show that here.

Mere denials of liability are not enough to toll the statute of limitations. *See Stephan v. Goldinger*, 325 F.3d 874, 877 (7th Cir. 2003) (this is the rule because "otherwise a statute of limitations would never run unless the potential defendant confessed error before he was sued!").

Nor are defendants' public statements that they are and were "need-blind." Those statements were not "fraudulent." A mountain of undisputed evidence shows defendants believed they are and were "need-blind." SOF 12. The record contains no evidence that any defendant's statements that it was "need-blind" were knowingly false or made with the intent of preventing plaintiffs from timely filing. *See In re Sulfuric Acid Antitrust Litig.*, 743 F. Supp. 2d 827, 854 (N.D. Ill. 2010). Nor were such statements "concealing." For one thing, the point of defendants communicating that they were "need-blind" was to encourage low-income students to apply and enroll, and not to worry that they would be disfavored because they lacked resources—it had nothing to do with the 568 exemption, or with so-called "wealth favoritism." There is not a shred of evidence that any representative of any school ever denied claims of "wealth favoritism" by claiming to be "need-blind"—the two concepts had nothing to do with each other. And defendants' public statements that they were "need-blind" did not stop dozens of authors and reporters from publishing news stories, magazine articles, and books proclaiming that certain defendants and their peers engaged in "wealth favoritism" in admissions; to the extent plaintiffs contend such practices are inconsistent with being need-blind, the idea that such statements "concealed" their claims is fanciful.

## B. Plaintiffs' Claims Are Not Equitably Tolled

Equitable tolling "permits a plaintiff to avoid the bar of the statute of limitations if despite all due diligence he is unable to obtain vital information bearing on the existence of his claim." *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 451 (7th Cir. 1990). For the reasons discussed, plaintiffs exercising diligence would have known all of the facts necessary to determine that they could bring a claim, years or even decades before they did. Equitable tolling cannot apply.

## <u>CONCLUSION</u>

Summary judgment should be granted to defendants on plaintiffs' time-barred claims.

Dated: May 7, 2025

Respectfully submitted,

By: */s/ David Gringer*
David Gringer
Alan Schoenfeld
WILMER CUTLER PICKERING HALE
    AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel: 212-937-7294
david.gringer@wilmerhale.com
alan.schoenfeld@wilmerhale.com

Seth Waxman
WILMER CUTLER PICKERING HALE
    AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Tel: 202-663-6800
seth.waxman@wilmerhale.com

Edward W. Feldman
Daniel Martin Feeney
MILLER SHAKMAN LEVINE &
  FELDMAN LLP
30 W. Monroe Street
Suite 1900
Chicago, IL 60603
Tel.: 312-263-3700
dfeeney@millershakman.com
efeldman@millershakman.com

*Counsel for The Trustees of the University*
*of Pennsylvania*

By: */s/ Norman Armstrong*
Norman Armstrong
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, D.C. 20004
Tel.: 202-389-5000
norman.armstrong@kirkland.com

Emily T. Chen
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Tel.: 212-446-4800
emily.chen@kirkland.com

Daniel E. Laytin
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Tel.: 312-862-2000
daniel.laytin@kirkland.com

*Counsel for Defendant Cornell University*

By: */s/ Britt M. Miller*
Britt M. Miller
Daniel T. Fenske
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Tel: 312-782-0600
bmiller@mayerbrown.com
dfenske@mayerbrown.com

*Counsel for Defendant Georgetown University*

**PUBLIC VERSION**

By: */s/ Eric Mahr*
Eric Mahr
Jan Rybnicek
Daphne Lin
FRESHFIELDS US LLP
700 13th Street, NW
Washington, DC 20005
Tel: 202-777-4500
eric.mahr@freshfields.com
jan.rybnicek@freshfields.com
daphne.lin@freshfields.com

Rami Fakhouri
Jennifer L. Greenblatt
GOLDMAN ISMAIL TOMASELLI BRENNAN &
BAUM LLP
200 South Wacker Drive, Floor 22
Chicago, IL 60604
Tel: (312) 681-6000
rfakhouri@goldmanismail.com
jgreenblatt@goldmanismail.com

*Counsel for Massachusetts Institute of Technology*

By: */s/ Robert A. Van Kirk*
Robert A. Van Kirk
Jonathan Pitt
Sarah F. Kirkpatrick
Matthew D. Heins
Feyilana Lawoyin
Cole T. Wintheiser
William J. Donnelly
WILLIAMS & CONNOLLY LLP
680 Maine Ave. SW
Washington, D.C. 20024
Tel: 202-434-5000
rvankirk@wc.com
jpitt@wc.com
skirkpatrick@wc.com
mheins@wc.com
flawoyin@wc.com
cwintheiser@wc.com
wdonnelly@wc.com

James Peter Fieweger
MICHAEL BEST & FRIEDRICH LLP
444 West Lake Street
Suite 3200
Chicago, IL 60606
Tel.: 312-222-0800
jpfieweger@michaelbest.com

*Counsel for University of Notre Dame*

PUBLIC VERSION

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 7, 2025, I caused a true and correct copy of the foregoing document to be filed and served electronically via the court's CM/ECF system. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

*/s/ Britt M. Miller*
Britt M. Miller
*Counsel for Georgetown University*
