**PUBLIC VERSION**

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ANDREW CORZO, SIA HENRY, ALEXANDER LEO-GUERRA, MICHAEL MAERLENDER, BRANDON PIYEVSKY, BENJAMIN SHUMATE, BRITTANY TATIANA WEAVER, and CAMERON WILLIAMS, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, THE JOHNS HOPKINS UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY,<br><br>*Defendants*. | Case No. 1:22-cv-00125<br><br>Hon. Matthew F. Kennelly |

**DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

**PUBLIC VERSION**

**TABLE OF CONTENTS**

I.    UNDERGRADUATE HIGHER EDUCATION.................................................1

    A.    School Missions ...........................................................................1

    B.    Need-Based Financial Aid...........................................................5

    C.    Financial Aid Process.................................................................23

    D.    Application and Admissions Process ..........................................39

II.    EFC CALCULATIONS AND NET PRICES........................................45

III.    568 GROUP ............................................................................................47

    A.    Consensus Methodology Policy Guidelines.................................50

    B.    "Need Analysis Principles"........................................................62

    C.    Professional Judgment ...............................................................68

    D.    Packaging ..................................................................................71

    E.    Tuition .......................................................................................76

    F.    Information Sharing....................................................................76

**PUBLIC VERSION**

Pursuant to Local Rule 56.1(a)(3), Defendants Cornell University ("Cornell"), Georgetown University ("Georgetown"), Massachusetts Institute of Technology ("MIT"), the University of Notre Dame ("Notre Dame"), and the Trustees of the University of Pennsylvania ("Penn") (collectively, "Litigating Defendants") hereby submit this statement of undisputed material facts in support of their motions for summary judgment.

Litigating Defendants submit this statement only for the purpose of establishing facts as to which there is no genuine issue, warranting judgment for Litigating Defendants as a matter of law, and make no admissions for any other purpose. *See, e.g.*, *Brown v. Navarro*, 2012 WL 3987427, at *3 (N.D. Ill. Sept. 11, 2012) (citing multiple cases for the principle that facts deemed undisputed in a Local Rule 56.1 statement are not established for trial).

## I. UNDERGRADUATE HIGHER EDUCATION

### A. School Missions

1. Defendants[1] are nonprofit institutions of higher education whose missions are to provide a world-class education to students from various walks of life, and to serve society more broadly through education, research, and public service. Ex. 2.1, Long Reb. ¶¶11, 22, 29; Ex. 411, *University Mission*, CORNELL UNIV., https://www.cornell.edu/about/mission.cfm (last visited May 4, 2025) ("Cornell's mission is to discover, preserve and disseminate knowledge, to educate the next generation of global citizens, and to promote a culture of broad inquiry throughout and beyond the Cornell community. Cornell also aims, through public service, to enhance the lives and livelihoods of students, the people of New York and others around the world."); Ex. 410, *University Mission Statement*, GEORGETOWN UNIV., https://governance.georgetown.edu/mission-

---

[1] "Defendants" refers to the Litigating Defendants, plus Brown, Caltech, the University of Chicago, Columbia, Dartmouth, Duke, Emory, Johns Hopkins, Northwestern, Rice, Vanderbilt, and Yale.

statement (last visited May 4, 2025) ("Georgetown educates women and men to be reflective lifelong learners, to be responsible and active participants in civic life and to live generously in service to others."); Ex. 350, *Mission Statement*, MIT, https://www.mit.edu/about/mission-statement (last visited May 4, 2025) ("The mission of MIT is to advance knowledge and educate students in science, technology, and other areas of scholarship that will best serve the nation and the world in the 21st century."); Ex. 351, *Mission*, Univ. of Notre Dame, https://www.nd.edu/about/mission (last visited May 4, 2025) ("The University is dedicated to the pursuit and sharing of truth for its own sake" and "to create a sense of human solidarity and concern for the common good that will bear fruit as learning becomes service to justice"); Ex. 258, *College Mission*, Univ. of Pa., https://www.college.upenn.edu/college-mission (last visited May 4, 2025) ("The College's goal is to help students to become knowledgeable about the world and the complexities of today's society, aware of moral, ethical and social issues, prepared to exercise intellectual leadership, and enlivened by the use of their minds.").

2.     Defendants and similar schools engage in many activities that do not "maximize revenues," such as offering a range of academic programs, funding faculty and faculty research (even for obscure areas of study), residential facilities and related programming, and facilities like libraries, museums, rare book collections, archives, and science laboratories. *See* Ex. 178, Mora Tr. 22:7-15, 24:16-18, 173:9-22, 209:12-18; Ex. 2.1, Long Reb. ¶¶34, 36; Ex. 341, *Majors*, Univ. of Pa., https://catalog.upenn.edu/undergraduate/arts-sciences/majors (last visited May 4, 2025); Ex. 286, *Search Classes 2024*, Univ. of Pa., https://courses.upenn.edu (last visited May 4, 2025); Ex. 415, *University of Pennsylvania Programs/Majors*, Nat'l Center for Educ. Stats., https://nces.ed.gov/collegenavigator/?id=215062#programs (last visited May 4, 2025); Ex. 260, *Colleges, Schools, and Academic Areas of Interest*, Cornell Univ.,

https://admissions.cornell.edu/academics/colleges-schools-and-academic-areas-interest#:~:text=From%20Africana%20studies%20to%20environmental,and%20more%20than%20120%20minors (last visited May 4, 2025); Ex. 334, *Leading the Way in Artificial Intelligence Research*, CORNELL UNIV., https://ai.cornell.edu (last visited May 4, 2025); Ex. 340, *Majors, Minors, and Certificates*, GEORGETOWN UNIV., https://college.georgetown.edu/academics/majors-minors-and-certificates (last visited May 4, 2025); Ex. 401, *Undergraduate Program*, GEORGETOWN UNIV. DEP'T OF THEOLOGY & RELIGIOUS STUDIES, https://theology.georgetown.edu/undergraduate (last visited May 4, 2025); Ex. 339, *Majors & Minors*, MIT, https://mitadmissions.org/discover/the-mit-education/majors-minors (last visited May 4, 2025); Ex. 402, *Undergraduate Programs*, UNIV. OF NOTRE DAME, https://www.nd.edu/academics/undergraduate-programs (last visited May 4, 2025); Ex. 354, *MIT Reshapes Itself to Shape the Future*, MIT NEWS (Oct. 15, 2018), https://news.mit.edu/2018/mit-reshapes-itself-stephen-schwarzman-college-of-computing-1015; Ex. 276, *Department of Theology - Major*, UNIV. OF NOTRE DAME, https://theology.nd.edu/major-minors (last visited May 4, 2025); Ex. 333, *KROC Institute for International Peace Studies*, UNIV. OF NOTRE DAME, https://kroc.nd.edu/undergraduate (last visited May 4, 2025); Ex. 412, *University of Notre Dame Programs/Majors*, NAT'L CENTER FOR EDUC. STATS., https://nces.ed.gov/collegenavigator/?id=152080#programs (last visited May 4, 2025); Ex. 352, MIT FACTS 2021 4, 14-15, MIT, https://facts.mit.edu/wp-content/uploads/2022/03/MIT-Facts-2021-Accessible-with-Cover.pdf (last visited May 4, 2025); Ex. 358, *MIT Welcomes Nine MLK Visiting Professors and Scholars for 2023*, MIT NEWS (Sept. 27, 2023), https://news.mit.edu/2023/mit-welcomes-mlk-visiting-professors-scholars-0927; Ex. 357, *MIT Undergraduate Research Opportunities Program*, MIT, https://urop.mit.edu (last visited May 4, 2025); Ex. 98, UNIV. OF NOTRE DAME, 2023 ANNUAL REPORT 12 (2023), *available at*

https://finance.nd.edu/assets/553662/university_annual_report_2023_web.pdf;        Ex. 378,

*Residence Halls*, CORNELL UNIV., https://scl.cornell.edu/residential-life/housing/campus-housing/first-year-undergraduates/residence-halls (last visited May 4, 2025); Ex. 336, *Living Learning Communities*, GEORGETOWN UNIV., https://residentialliving.georgetown.edu/leadership/llc (last visited May 4, 2025); Ex. 234, *About the College House System at Penn*, UNIV. OF PA., https://www.collegehouses.upenn.edu/about (last visited May 4, 2025); Ex. 337, *Living Options*, UNIV. OF PA., https://residential-services.business-services.upenn.edu/living-options (last visited May 4, 2025); Ex. 379, *Residence Halls*, UNIV. OF NOTRE DAME, https://residentiallife.nd.edu/undergraduate/residence-halls (last visited May 4, 2025); Ex. 257, *Collections*, CORNELL UNIV., https://www.library.cornell.edu/collections (last visited Apr. 10, 2025) (Cornell's library system contains more than eight million volumes, including a Rare and Manuscript collection with an additional 500,000 printed volumes and 80 million manuscripts); Ex. 376, *Rare and Manuscript Collections*, CORNELL UNIV., https://rare.library.cornell.edu (last visited May 4, 2025); Ex. 256, *Collection Development*, CORNELL UNIV., https://www.library.cornell.edu/collections/collection-development (last visited May 4, 2025); Ex. 248, *Basilica of the Sacred Heart*, UNIV. OF NOTRE DAME, https://basilica.nd.edu/about (last visited May 4, 2025) (Notre Dame's Basilica of the Sacred Heart, which was added to the National Register of Historic Places in 1978, is home to both the world's largest collection of 19th century French stained glass and the oldest carillon in North America).

3.      Defendants and many other schools have endowments.  Endowments vary across schools, with certain liberal arts colleges—including Amherst, Pomona, Williams, Swarthmore, Bowdoin, Wellesley, Middlebury, Carleton College, and Claremont McKenna—having higher endowments per student than Brown, Columbia, Cornell, Johns Hopkins, Carnegie Mellon, and

Georgetown.  *See* Ex. 329, *Integrated Postsecondary Education Data System*, NAT'L CENTER FOR EDUC. STATS., https://nces.ed.gov/ipeds/datacenter (last visited Apr. 29, 2025).  The same is true for public schools, with flagship universities like the University Michigan and the University of Virginia having greater endowments—both in absolute terms and on a per-student basis—than private schools like Georgetown and Carnegie Mellon.  *See* Ex. 4, Singer Am. Rep. tbl. 8.

### B.    Need-Based Financial Aid

4.    During the relevant time period, the average cost of educating an undergraduate student at Defendant schools was more than the average price a student paid to attend, even if that student was not receiving financial aid of any kind.  Ex. 2.1, Long Reb. ¶¶43, fig. 1.

5.    A far greater number of qualified and capable students apply for admission to Defendants and their peers than are admitted each year, meaning Defendants and their peers could enroll classes comprising only "full-pay" students, *i.e.*, those who do not need financial assistance to attend.  Ex. 2.1, Long Reb. ¶¶52-55.

6.    Defendants make admissions decisions for domestic undergraduate students without regard for whether those students can afford to pay the cost of attendance (known in the higher education industry as having a "need-blind" admissions policy) and commit to meeting 100% of every domestic financial aid applicant's demonstrated financial need (known as having a "full-need" financial aid policy).  *See* Ex. 388, *Tuition and Aid*, BROWN UNIV., https://admission.brown.edu/tuition-aid#:~:text=We%20actively%20seek%20students%20from, percent%20of%20demonstrated%20financial%20need (last visited May 4, 2025); Ex. 238, *Afford*, CALTECH, https://www.admissions.caltech.edu/afford (last visited May 4, 2025); Ex. 397, *Undergraduate Financial Aid Basics*, UNIV. OF CHICAGO, https://financialaid.uchicago.edu/undergraduate/how-aid-works/undergraduate-financial-aid-basics (last visited May 4, 2025); Ex. 239, *Affordability & Aid*, COLUMBIA UNIV.,

https://undergrad.admissions.columbia.edu/affordability (last visited May 4, 2025); Ex. 391, *Types of Aid*, CORNELL UNIV., https://finaid.cornell.edu/types-of-aid (last visited May 4, 2025); Ex. 331, *Introduction to Financial Aid*, DARTMOUTH COLL., https://financialaid.dartmouth.edu/how-aid-works/introduction-financial-aid (last visited May 4, 2025); Ex. 313, *How Aid is Calculated*, DUKE UNIV., https://financialaid.duke.edu/how-aid-calculated (last visited May 4, 2025); Ex. 399, *Undergraduate Financial Aid*, EMORY UNIV., https://www.emory.edu/home/admission/financial-aid.html (last visited May 4, 2025); Ex. 296, *Financial Aid*, GEORGETOWN UNIV., https://uadmissions.georgetown.edu/financial-aid (last visited May 4, 2025); Ex. 297, *Financial Aid*, JOHNS HOPKINS UNIV., https://www.jhu.edu/admissions/financial-aid (last visited May 4, 2025); Ex. 342, *Making MIT Affordable*, MIT, https://sfs.mit.edu/undergraduate-students/the-cost-of-attendance/making-mit-affordable (last visited May 4, 2025); Ex. 264, *Cost and Aid*, NORTHWESTERN UNIV., https://admissions.northwestern.edu/tuition-aid (last visited May 4, 2025); Ex. 241, *Aid and Affordability*, UNIV. OF NOTRE DAME, https://admissions.nd.edu/aid-affordability (last visited May 4, 2025); Ex. 406, *Eligibility and Demonstrated Need*, RICE UNIV., https://financialaid.rice.edu/forms-resources/eligibility-and-demonstrated-need#:~:text=Families%20who%20apply%20for%20financial,aid%2C%20work%20study%20and%20loans (last visited May 4, 2025); Ex. 322, *How it Works*, UNIV. OF PA., https://admissions.upenn.edu/affording-penn/how-it-works (last visited May 4, 2025); Ex. 368, *Opportunity Vanderbilt Makes it Happen*, VANDERBILT UNIV., https://www.vanderbilt.edu/financialaid/#:~:text=Vanderbilt%20will%20meet%20100%25%20of,Vanderbilt%20offers%20additional%20grant%20assistance (last visited May 4, 2025); Ex. 240, *Affordability*, YALE UNIV., https://finaid.yale.edu/costs-affordability/affordability (last visited

May 4, 2025); *see also* Ex. 34, CORNELL_LIT0000245115 at -117 ("The Cornell University Board of Trustees adopted the following statement of principles in March 1998: Cornell University makes admissions decisions without regard to the ability of students or parents to pay educational costs. Students who are U.S. citizens or permanent residents and who demonstrate financial need will be assisted in meeting that need …."); Ex. 44, DUKE568_0033960 at -018 ("Duke is one of the few institutions nationally committed to need-blind admissions and meeting full demonstrated need …."); Ex. 140, Chang (Caltech) Tr. 94:9-14 (describing Caltech's full-need policy); Ex. 180, Nucciarone (Notre Dame) Tr. 96:3-5; Ex. 188, Schmill (MIT) Tr. 151:19-21 (testifying that MIT is "need-blind for admissions of all undergraduates"); Ex. 150, DeGioia (Georgetown) Tr. 33:18-20 ("[W]e are committed to a need-blind, full-need financial aid policy for our undergraduates.").

7.     Defendants provide need-based financial aid to domestic undergraduate students because Defendants believe that an education at their institutions should be available to qualified students, irrespective of their ability to afford the cost of attendance.  *See* Ex. 2.1, Long Reb. ¶79 ("Each Defendant prioritizes need-based financial aid, as do other members of the 568 Group and their peer schools, and this choice reflects each of these schools' missions of increasing access for admitted students, especially low- and middle income students, through the use of institutional resources."); Ex. 294, *Financial Aid*, CORNELL UNIV., https://finaid.cornell.edu (last visited May 6, 2025) ("Ezra Cornell's founding vision—a university where 'any person can find instruction in any study'—holds true today."); Ex. 391, *Types of Aid*, CORNELL UNIV., https://finaid.cornell.edu/types-of-aid (last visited May 4, 2025) ("Annual aid offers are tailored to each student's unique financial circumstances and are designed to ensure Cornell is accessible to all, at an affordable cost."); Ex. 366, *Office of Student Financial Aid*, GEORGETOWN UNIV., https://finaid.georgetown.edu (last visited May 6, 2025) ("Our mission is to make it financially

possible for every admitted applicant to attend Georgetown University, ensuring that we recruit, retain, and graduate a talented and diverse learning community."); Ex. 403, *Undergraduate Students*, MIT, https://sfs.mit.edu/undergraduate-students (last visited May 6, 2025) ("At MIT, we are committed to helping our students pay for their education. The price of an MIT education varies for each student depending on how much they can afford, but our commitment to affordability remains a constant."); Ex. 371, *Pathways to Notre Dame*, UNIV. OF NOTRE DAME, https://financialaid.nd.edu/costs-and-affordability (last visited May 6, 2025) ("Notre Dame is committed to providing an exceptional education regardless of a family's financial circumstances. We offer financial aid that meets 100% of every student's demonstrated financial need regardless of background, socioeconomic status, or the ability to pay for college."); Ex. 71, ND_0181690 (UNIV. OF NOTRE DAME, 2022 ANNUAL REPORT) at -693 (explaining that it did "even more this year to ensure that a Notre Dame education is affordable and accessible to all students, with $183 million in undergraduate need-based financial aid awarded"); Ex. 180, Nucciarone (Notre Dame) Tr. 91:1-14 ("[Y]ou will read about [John Monro's] philosophy as education is a public good, not a private good. It shouldn't be restricted only to the wealthy. So that's the philosophical basis at which he created the first methodology and on which need analysis was built, including what eventually became federal methodology …."); Ex. 83, PENN568-LIT-00024436 at -436 ("Making a Penn education available to the best and brightest students regardless of their financial means is a top institutional priority. In fulfillment of this goal, Penn continues to guarantee that undergraduates who matriculate with demonstrated financial need will receive all-grant aid packages that meet the full extent of their need for all four years …."); *see also* Ex. 13, CBD000001 (CSS/FINANCIAL AID PROFILE USER'S GUIDE, COLLEGE BOARD, 2003-2004) at -022 ("Since the founding of postsecondary educational institutions in this country, there has existed a

tradition that scholarships and other forms of financial support should be provided for students who are 'in need.'").

8.      Defendants and their peers also award need-based financial aid because they recognize the educational benefits that come from students learning alongside peers of different backgrounds and walks of life than their own (also known as "peer effects").  Ex. 2.1, Long Reb. ¶56; Ex. 167, Long Tr. 64:21-23; Ex. 136, Bishop (Notre Dame) Tr. 179:5-182:12 ("So we want to make sure that Notre Dame has a distribution.  Also, the faculty would argue from the learning standpoint in the classroom, all points of view, and do people from lower income have a different point of view? … So we're trying to build this diverse group of students because we think it will be more attractive.  But we also think it will be a better learning environment and make our graduates more effective in being leaders in a broader society that we believe and hope America is going to embrace."); Ex. 134, Bear (Notre Dame) Tr. 51:13-54:2 ("We want students who come from different economic backgrounds, again to think about what the learning experience that students need to have should be in a manner that one student can learn from another who does not look or come with the same experiences as that individual has."); Ex. 154, Furda (Penn) Tr. 312:10-313:5 (Penn did not seek to fill its class with only students who did not need financial aid because "the whole mission of higher education is to learn from your peers … [and] learn from differences of backgrounds and opinions"); Ex. 56, GTWNU_0000270820 at -928 (noting that Georgetown's commitment to meeting demonstrated financial aid is "about all of us being educated" by "scholars coming from diverse, underrepresented backgrounds," as "[w]e learn not just from disciplinary knowledge," but "[w]e learn from community"); Ex. 383, *Scholarships Help Build an Exceptional Student Body*, MIT NEWS (Dec. 25, 2019), https://news.mit.edu/2019/scholarships-help-build-exceptional-student-body-1226 ("Scholarships

... help create 'a robustly talented and diverse class in order to enhance the living and learning environment, and therefore the educational outcomes, for all our students. Every scholarship introduces a new mind into the MIT community, and simultaneously enriches the life of the recipient and the campus.'"); Ex. 142, Christiansen (Vanderbilt) Tr. 142:5-18 ███████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████); Ex. 175, McGann (Amherst 30(b)(6))

Tr. 20:1-14 ("We believe that our education is best when students can learn across difference, including socioeconomic difference .... Having a need-blind admission process better allows us to enroll, among other things, a socioeconomically diverse student body that makes for what we believe is an ideal educational setting.").

9.    Consistent with their need-blind policies, Defendants make admissions decisions without considering whether a student has applied for financial aid. *See* Ex. 154, Furda (Penn) Tr. 25:18-26:8 (Columbia's former director of admissions recalling that, because of the school's need-blind admissions policy, "[w]e did not get information from the financial aid office while we were admitting the class to Columbia College and the School of Engineering and Applied Science"); Ex. 149, Davis (Cornell) Tr. 19:6-12 (testifying that when Cornell is "reviewing a student's application, the person reading the application has absolutely no idea if the student is applying for financial aid"); Ex. 148, Costanzi (Georgetown) Tr. 201:4-7 (testifying that Georgetown's admissions officers "do not have access to financial aid information prior to somebody being admitted"); Ex. 58, GTWNU_0000353731 at -741 ("Students are admitted to" Georgetown "without regard to their ability to pay (known as 'need-blind' admissions) ...."); *see also* Ex. 200,

Wallace-Juedes (Yale) Tr. 162:5-9 (explaining that he "would generally understand 'need-blind manner' to be that admission decisions are made absent information—financial information that's submitted to the financial aid office about a family's ability to contribute"); Ex. 154, Furda (Penn) Tr. 126:4-9 (testifying that need-blind means "not taking into consideration a family's ability to pay to inform the admission decision"); Ex. 188, Schmill (MIT) Tr. 29:13-16 (testifying that need-blind means "an applicant's ability to pay tuition is not a factor in the admission review"); Ex. 137, Bridson (MIT) Tr. 20:15-21:1 (need-blind "means that someone's financial status won't impact them in the admissions process"); Ex. 176, McLaughlin (Penn) Tr. 239:16-240:3 ("[A] student's inability to pay the full cost is not something that's going to be held against them in our application process … [and] lower income people are not at a disadvantage in our admissions process."); Ex. 179, Mundy (Notre Dame) Tr. 66:25-67:25 (Notre Dame is need-blind because it "wanted to make sure that a family's financial circumstances did not disadvantage them"); Ex. 180, Nucciarone (Notre Dame) Tr. 51:21-22 (explaining that "admissions doesn't have financial information"); Ex. 186, Sassorossi (Dartmouth) Tr. 84:14-85:6; Ex. 155, *Need Blind*, DARTMOUTH UNIV., https://admissions.dartmouth.edu/glossary-term/need-blind-0 (last visited May 5, 2025); Ex. 195, Tuman (Columbia) Tr. 56:23-58:10; Ex. 140, Chang (Caltech) Tr. 308:19-309:9; Ex. 238, *Afford*, CALTECH, https://www.admissions.caltech.edu/afford (last visited May 5, 2025) ("Caltech Admissions is need-blind for domestic students (including undocumented and DACA students who graduate from a U.S. high school).").

10.     Many non-Defendant schools have adopted policies to make admissions decisions without considering whether a student has applied for financial aid, which those non-Defendant schools also refer to as "need-blind" policies. *See*, *e.g.*, Ex. 169, Maloney (Wisconsin 30(b)(6)) Tr. 119:3-13 (University of Wisconsin's corporate representative noting that, under the school's

need-blind admissions policy, it reaches "admission decisions without any sort of information from the financial aid office"); Ex. 175, McGann (Amherst 30(b)(6)) Tr. 18:9-19:10 ("In the context of [Amherst's] admission process, 'need-blind' means that an applicant's financial need will not be held against them in the admission process."); Ex. 287, *Financial Aid - Frequently Asked Questions*, AMHERST COLL., https://www.amherst.edu/offices/financialaid/frequently-asked-questions#:~:text=What%20does%20it%20mean%20that,your%20achievements%2C%20talents%20and%20promise (last visited May 6, 2025) (explaining that Amherst's admission policy "is need-blind for all applicants," which means that the applicant and their "family's financial situation is not considered"); Ex. 291, *Financial Aid at USC*, UNIV. OF S. CAL., https://financialaid.usc.edu/undergraduate-financial-aid/prospective-students/financial-aid-at-usc (last visited May 6, 2025) ("Our admission process is need-blind. Ability to pay, or interest in financial aid, does not affect admission decisions."); Ex. 360, *Need to Know Financial Aid*, CARNEGIE MELLON UNIV., https://www.cmu.edu/enrollment/admission/process/financial_aid.html (last visited May 6, 2025) (explaining that Carnegie Mellon is "aid-blind," and that "[a]pplying for financial aid will have no affect [*sic*] on your chances for admission"); Ex. 321, *How Financial Aid Works*, PRINCETON UNIV., https://admission.princeton.edu/cost-aid/how-financial-aid-works (last visited May 6, 2025) ("Need-blind admission means that applying for aid is not in any way a disadvantage in the admission process, ensuring equality of opportunity for low- and middle-income students.").

11.     Many in the higher education industry consider "need-blind" to mean that "it is not a disadvantage to apply for financial aid." Ex. 184, Rapelye (COFHE) Tr. 72:22-73:3; *see also* Ex. 84, PENN568-LIT-00036489 at -491 ("Need-blind: Your ability to pay is *not* factored into the admissions process; applying for financial aid does not hurt your chances of admission."); Ex. 164,

Knuth (Cornell) Tr. 57:18-58:1 (need-blind means making admissions decisions "without considering the family's or the student's ability to pay to attend"); Ex. 176, McLaughlin (Penn) Tr. 239:16-240:3 ("[A] student's inability to pay the full cost is not something that's going to be held against them in our application process … [and] lower income people are not at a disadvantage in our admissions process."); Ex. 179, Mundy (Notre Dame) Tr. 66:25-67:25 (Notre Dame is need-blind because it "wanted to make sure that a family's financial circumstances did not disadvantage them"); Ex. 137, Bridson (MIT) Tr. 20:15-21:1 (need-blind "means that someone's financial status won't impact them in the admissions process"); Ex. 140, Chang (Caltech) Tr. 80:6-10 (as a result of the school's need-blind policy, Caltech "do[es] not disadvantage students that cannot pay"); Ex. 188, Schmill (MIT) Tr. 29:13-16 (testifying that need-blind means "an applicant's ability to pay is not a factor in the admission review"); Ex. 65, MITLIT-000157100 at -101 ("Students are not at a disadvantage because of their financial need in the admissions process."); Ex. 154, Furda (Penn) Tr. 126:4-9 (testifying that need-blind means "not taking into consideration a family's ability to pay to inform the admission decision"); Ex. 353, *MIT Need-Based Aid Dates Back to 1867*, MIT NEWS (May 6, 1992), https://news.mit.edu/1992/aid-0506; Ex. 327, *Images in Flux: The 20th Century Development of the Undergraduate Experience at Penn*, UNIV. OF PA. (Sept. 1999), https://archives.upenn.edu/exhibits/penn-history/images-in-flux/part-8; Ex. 57, GTWNU_0000327371 at -392; Ex. 315, *How Aid Works*, HARVARD COLL., https://college.harvard.edu/financial-aid/how-aid-works (last visited May 6, 2025) (explaining that "[n]eed-blind admissions" mean that "[y]our financial need and your aid application will never affect your chance of being admitted to Harvard"); Ex. 2.1, Long Reb. ¶77.

12.    Defendants who held themselves out to be need-blind believed themselves to be need-blind.  Ex. 194, Tilton (Brown) Tr. 198:11-18 ("[A]gain, we're need-blind."); Ex. 140,

Chang (Caltech) Tr. 308:19-24 ("Caltech is need-blind in admissions."); Ex. 95, UCHICAGO_0000004730 at -731 ("The University of Chicago is need-blind and meets the full demonstrated need of citizens and permanent residents of the United States."); Ex. 195, Tuman (Columbia) Tr. 217:13-17 ("[W]e are need-blind for domestic students."); Ex. 146, Corbett (Cornell) Tr. 30:10-31:20 ("Cornell University not only was need-blind, but offered full financial need."); Ex. 156, Furstenberg (Dartmouth) Tr. 83:16-84:3 ("The financial aid program at Dartmouth is need-based, need-blind."); Ex. 144, Coleman (Duke) Tr. 63:25-64:3 ("I do know that we are need-blind."); Ex. 150, DeGioia (Georgetown) Tr. 33:18-19 ("[W]e are committed to a need-blind, full-need financial aid policy for our undergraduates."); Ex. 174, McDermott (Johns Hopkins) Tr. 75:3-19 ("[M]y recollection is that we had been operating need-blind for several years."); Ex. 137, Bridson (MIT) Tr. 158:2-3 ("We're a need-blind school."); Ex. 187, Schapiro (Northwestern) Tr. 73:8-22 ("[W]e are need-blind."); Ex. 134, Bear (Notre Dame) Tr. 99:11-100:4 ("At Notre Dame, we were need-blind."); Ex. 176, McLaughlin (Penn) Tr. 240:18-20 (Q. "So with regard to domestic students, is Penn need-blind?"  A. "Yes."); Ex. 199, Walker (Rice) Tr. 19:6-23 ("We're need-blind and cover 100 percent of unmet need."); Ex. 157, Gaines (Vanderbilt) Tr. 53:1-54:5 ("We were need-blind for admission for all first-year, U.S. citizen applicants and eligible permanent residents and for transfer students."); Ex. 121, YALE_LIT_0000005734 at -734.

13. It was widely reported throughout the 2000s and 2010s that some Defendants and many of their peers granted additional admissions consideration to students whose families were actual or prospective donors to the institution, Ex. 372, DANIEL GOLDEN, THE PRICE OF ADMISSION 1-20, 49-144, 369-371 (2006); Ex. 236, Daniel Golden, *Admissions Preferences Given to Alumni Children Draws Fire*, WALL ST. J. (Jan. 15, 2003), https://www.wsj.com/

public/resources/documents/golden3.htm; Ex. 343, Daniel Golden, *Many Colleges Bend Rules To Admit Rich Applicants*, Wall St. J. (Feb. 20, 2003), https://www.wsj.com/public/resources/documents/Polk_Rich_Applicants.htm; Ex. 306, Daniel Golden, *For Groton Grads, Academics Aren't Only Keys to Ivy Schools*, Wall St. J. (Apr. 25, 2003), https://www.wsj.com/articles/SB105122532572026400; Ex. 305, Daniel Golden, *For Five Supreme Court Justices, Affirmative Action Isn't Academic*, Wall St. J. (May 14, 2003), https://www.wsj.com/public/resources/documents/golden4.htm; Ex. 323, Daniel Golden, *How Lowering the Bar Helps Colleges Prosper*, Wall St. J. (Sept. 9, 2006), https://www.wsj.com/articles/SB115774251817757837; Ex. 325, Daniel Golden, *How Wealthy Families Manipulate Admissions at Elite Universities*, Town & Country Mag. (Nov. 21, 2016) https://www.townandcountrymag.com/society/money-and-power/news/a8718/daniel-golden-college-admission ("*The Price of Admission* stirred attention, controversy, and outrage. I decried what I called the 'preferences of privilege' in appearances on Ivy League campuses and on television shows from *The Colbert Report* to *Nightline*. I even testified before a Senate committee."); Ex. 312, Ava Kofman & Daniel Golden, *The Hedge Fund Billionaire's Guide to Buying Your Kids a Better Shot at Not Just One Elite College, but Lots of Them*, ProPublica (Sept. 28, 2019), https://www.propublica.org/article/hedge-fund-billionaires-donations-college-admissions-elite-universities, and representatives of some Defendants themselves long publicly acknowledged their institutions' use of these practices, Ex. 250, Geoffrey Mock, *Brodhead Discusses Early Admissions, Developmental Admits*, Duke Today (Sept. 22, 2006), https://today.duke.edu/2006/09/admit.html; Ex. 311, Kerry Temple, *Having Lunch with … Don Bishop*, Notre Dame Mag. (Fall 2014), https://magazine.nd.edu/stories/having-coffee-with-don-bishop ("There also are 'different cohorts who enjoy added consideration'—the sons and daughters

Case: 1:22-cv-00125 Document #: 862 Filed: 05/07/25 Page 18 of 84 PageID #:34052

**PUBLIC VERSION**

of faculty, staff, and benefactors ….”); Ex. 279, Joseph Asch, *Donor Admissions: How It Works Now*, DARTBLOG (Sept. 29, 2014), https://web.archive.org/web/20190316233913/ http://www.dartblog.com:80/data/2014/09/011686.php; Ex. 237, RICHARD D. KAHLENBERG, *Introduction*, *in* AFFIRMATIVE ACTION FOR THE RICH: LEGACY PREFERENCES IN COLLEGE ADMISSIONS 1-18 (2010); Ex. 335, Richard D. Kahlenberg, *The Legacy Racket: The Problem with College Admission Preferences for Children of Alumni*, THE CENTURY FOUND., at 4 (Sept. 22, 2010), *available at* https://production-tcf.imgix.net/app/uploads/2010/09/17185402/tcf-Legacy_brief-2.pdf.

14. ████████████ have believed for years before January 2018 that Defendants engaged in these admission practices. *See* Ex. 165, ████████████████████ Tr. 129:12-132:4 (“Q. So you have a view that at the Defendant schools you just believe that the students of wealthy families have some preferential treatment? A. I believe, and I have many – I know of many other people who believe the same thing …. Q. Can you remember, like where would you put the earliest age for you that you had a view that the Defendant schools that we’re talking about here in this case gave preferences based on wealth? A. Likely around ninth or tenth grade. I had some elementary understanding that that was the case …. Q. ████ somewhere around there? A. Somewhere around there.”); Ex. 190, ████████████ Tr. 246:14-247:22, 248:8-249:24 (“Q. So you were aware in approximately ██████ that at least some students believed that there was a correlation between █████████████████████████████, is that correct? A. I was aware that that was a perception in the student body, yes.”); Ex. 183, ████████████████ Tr. 139:12-140:18 (“I had always thought that wealthier families could donate money to universities to sway admissions offices.”).

15.     To increase access, enhance socioeconomic diversity, and advance equity and fairness, Defendants focus their financial aid funds on students who most need them. *See* Ex. 388, *Tuition and Aid*, BROWN UNIV., https://admission.brown.edu/tuition-aid#:~:text=We%20 actively%20seek%20students%20from,percent%20of%20demonstrated%20financial%20need (last visited May 6, 2025); Ex. 238, *Afford*, CALTECH, https://www.admissions.caltech.edu/afford (last visited May 6, 2025); Ex. 397, *Undergraduate Financial Aid Basics*, UNIV. OF CHI., https://financialaid.uchicago.edu/undergraduate/how-aid-works/undergraduate-financial-aid-basics (last visited May 6, 2025); Ex. 239, *Affordability & Aid*, COLUMBIA UNIV., https://undergrad.admissions.columbia.edu/affordability (last visited May 4, 2025); Ex. 391, *Types of Aid*, CORNELL UNIV., https://finaid.cornell.edu/types-of-aid (last visited May 4, 2025); Ex. 331, *Introduction to Financial Aid*, DARTMOUTH COLL., https://financialaid.dartmouth.edu/ how-aid-works/introduction-financial-aid (last visited May 6, 2025); Ex. 313, *How Aid is Calculated*, DUKE UNIV., https://financialaid.duke.edu/how-aid-calculated (last visited May 6, 2025); Ex. 399, *Undergraduate Financial Aid*, EMORY UNIV., https://www.emory.edu/home/admission/financial-aid.html (last visited May 6, 2025); Ex. 296, *Financial Aid*, GEORGETOWN UNIV., https://uadmissions.georgetown.edu/financial-aid (last visited May 6, 2025); Ex. 297, *Financial Aid*, JOHNS HOPKINS UNIV., https://www.jhu.edu/admissions/financial-aid (last visited May 6, 2025); Ex. 342, *Making MIT Affordable*, MIT, https://sfs.mit.edu/undergraduate-students/the-cost-of-attendance/making-mit-affordable (last visited May 6, 2025); Ex. 264, *Cost and Aid*, NORTHWESTERN UNIV., https://admissions.northwestern.edu/tuition-aid (last visited May 6, 2025); Ex. 241, *Aid & Affordability*, UNIV. OF NOTRE DAME, https://admissions.nd.edu/aid-affordability (last visited May 6, 2025); Ex. 406, *Eligibility and Demonstrated Need*, RICE UNIV.,

https://financialaid.rice.edu/forms-resources/eligibility-and-demonstrated-need#:~:text=Families%20who%20apply%20for%20financial,aid%2C%20work%20study%20and%20loans (last visited May 4, 2025); Ex. 322, *How it Works*, UNIV. OF PA., https://admissions.upenn.edu/affording-penn/how-it-works; Ex. 368, *Opportunity - Vanderbilt Makes it Happen*, VANDERBILT UNIV., https://www.vanderbilt.edu/financialaid/#:~:text=Vanderbilt%20will%20meet%20100%25%20of,Vanderbilt%20offers%20additional%20grant%20assistance (last visited May 6, 2025); Ex. 240, *Affordability*, YALE UNIV., https://finaid.yale.edu/costs-affordability/affordability (last visited May 6, 2025); *see also* Ex. 44, DUKE568_0033960 at -018 (providing information on Duke's full-need policy); Ex. 140, Chang (Caltech) Tr. 94:9-94:14 (describing Caltech's full-need policy); Ex. 131, Affleck-Graves (Notre Dame) Tr. 220:20-221:18 (describing Notre Dame's full-need policy); Ex. 188, Schmill (MIT) Tr. 151:19-21 (testifying that MIT is "need-blind for admissions of all undergraduates"); Ex. 180, Nucciarone (Notre Dame) Tr. 149:5-19 (importance of "need-based aid providing access to students" and "need-based aid as the door that opens access to higher education").

16.    Other schools like Carnegie Mellon, Amherst, Stanford, Harvard, Princeton, and the University of Wisconsin, as well as many others of the College Board's member schools, also work to focus their financial aid funds on students who need them, *see, e.g.*, Ex. 162, Hill (Carnegie Mellon 30(b)(6)) Tr. 55:16-56:4; Ex. 175, McGann (Amherst 30(b)(6)) Tr. 16:10-17:8; Ex. 145, Cooper (Stanford 30(b)(6)) Tr. 106:20-107:8; Ex. 152, Donahue (Harvard) at 74:18-20; Ex. 135, Betterton (Princeton) Tr. 62:6-16; Ex. 169, Maloney (Wisconsin 30(b)(6)) Tr. 37:9-24; Ex. 177, Meade (College Board 30(b)(6)) Tr. 274:16-23, 277:4-8; Ex. 13, CBD000001 (CSS/FINANCIAL AID PROFILE USER'S GUIDE, COLLEGE BOARD, 2003-2004) at -010, and the College Board has identified prioritizing need-based aid as a key principle of financial aid for decades, Ex. 177,

Meade (College Board 30(b)(6)) Tr. 273:17-24, 274:16-23; Ex. 126, Meade (College Board 30(b)(6)) Dep. Ex. 34 at 21-22 (College Board adopted "Principles of Student Financial Aid Administration," the first of which stated, "[t]he primary purpose of a collegiate financial aid program should be to provide financial assistance to accepted students who, without such aid, would be unable to attend that college.").

17. Some Defendant schools, as well as other schools like Harvard and Stanford, award only need-based aid, and did so well before the 568 Group was formed. *See, e.g.*, Ex. 414, 21 U. PA. ALMANAC 33 at 10 (May 13, 1975), *available at* https://almanac.upenn.edu/archive/v21pdf/n33/051375.pdf (last visited May 6, 2025) (stating in 1975, "Penn has a policy of giving financial aid to undergraduates exclusively on the basis of need"); Ex. 369, *Other Grants and Scholarships*, BROWN UNIV., https://finaid.brown.edu/aid-types/grants-scholarships (last visited May 6, 2025); Ex. 278, *Does Columbia Offer Merit Scholarships?*, COLUMBIA UNIV. – COLUMBIA COLL. & COLUMBIA ENG'G, https://www.cc-seas.columbia.edu/content/does-columbia-offer-merit-scholarships (last visited May 4, 2025); Ex. 309, *Grants and Scholarships*, CORNELL UNIV., https://finaid.cornell.edu/types-of-aid/grants-and-scholarships (last visited May 4, 2025); Ex. 392, *Types of Financial Aid*, DARTMOUTH COLL., https://admissions.dartmouth.edu/afford/types-financial-aid (last visited May 4, 2025); Ex. 355, *MIT Scholarships*, MIT, https://sfs.mit.edu/undergraduate-students/types-of-aid/mit-scholarship (last visited May 4, 2025); Ex. 382, *Scholarships and Grants*, YALE UNIV., https://finaid.yale.edu/costs-affordability/types-aid/scholarships-and-grants (last visited May 4, 2025); *How Aid Works*, HARVARD COLL. GRIFFIN FIN. AID OFF., https://college.harvard.edu/financial-aid/how-aid-works (last visited May 4, 2025); *How Financial Aid Works*, PRINCETON UNIV., https://admission.princeton.edu/cost-aid/how-financial-aid-works

(last visited May 4, 2025); Ex. 316, *How Aid Works*, STANFORD UNIV., https://financialaid.stanford.edu/undergrad/how/index.html (last visited May 4, 2025); Ex. 3.1, Stiroh Reb. ¶92, Ex. 3.

18. Some Defendant schools, like Chicago, Duke, Emory, Johns Hopkins, Notre Dame, Rice, and Vanderbilt, as well as many other schools like WashU, USC, and the University of Michigan, provide financial aid that is not entirely based on financial need—what is known in higher education as "merit" or "merit-based" aid. Ex. 348, *Merit Scholarships*, UNIV. OF CHI., https://collegeadmissions.uchicago.edu/financial-support/scholarships/merit-scholarships (last visited May 6, 2025); Ex. 345, *Merit Scholarships*, DUKE UNIV., https://ousf.duke.edu/merit-scholarships (last visited May 6, 2025); Ex. 310, *Grants and Scholarships*, EMORY UNIV., https://studentaid.emory.edu/undergraduate/types/grants-scholarships/index.html (last visited May 6, 2025); Ex. 346, *Merit Scholarships*, JOHNS HOPKINS UNIV., https://apply.jhu.edu/tuition-aid/types-of-financial-aid/merit-scholarships (last visited May 6, 2025); Ex. 349, *Merit-Based Scholarships*, UNIV. OF NOTRE DAME, https://financialaid.nd.edu/aid-types/merit-based-scholarships (last visited May 6, 2025); Ex. 347, *Merit Scholarships*, RICE UNIV., https://financialaid.rice.edu/types-aid/merit-scholarships (last visited May 6, 2025); Ex. 344, *Merit Scholarship Opportunities*, VANDERBILT UNIV., https://www.vanderbilt.edu/scholarships/faq.php (last visited May 6, 2025); Ex. 381, *Scholarships*, WASHU FIN. AID, https://financialaid.washu.edu/how-aid-works/types-of-aid/scholarships (last visited May 4, 2025); Ex. 380, *Scholarships*, USC UNDERGRADUATE ADMISSION, https://admission.usc.edu/cost-and-financial-aid/scholarships (last visited May 4, 2025); Ex. 395, *Undergraduate*, UNIV. OF MICHIGAN FIN. AID, https://finaid.umich.edu/types-aid/scholarships/undergraduate (last visited

May 4, 2025). Georgetown provides merit-based aid only for student-athletes. Ex. 307, GTWNU_0000223576 (GEORGETOWN COMMON DATA SET 2021-2022) at -601.

19.     Defendants, as well as many other schools including Stanford, Harvard, the University of Wisconsin, Amherst, Carnegie Mellon, and innumerable College Board member schools, prioritize need-based financial aid over merit-based aid, and provide significantly more need-based aid than merit-based aid. Ex. 13, CBD000001 (CSS/FINANCIAL AID PROFILE USER'S GUIDE, COLLEGE BOARD, 2003-2004) at -002, -010 (the College Board, an organization comprising 4,200 schools, endorsed the principle that schools should "commit[] to the primacy of need based aid in the institution's student aid portfolio" to "support access for students who couldn't otherwise attend the institution"); Ex. 145, Cooper (Stanford 30(b)(6)) Tr. 106:20-107:8 (noting that Stanford does not offer merit-based aid because all "students who get admitted" are "merit worthy," and Stanford thus "prefer[s] to put [its] resources toward need-based aid"); Ex. 152, Donahue (Harvard) Tr. 74:18-20; Ex. 135, Betterton (Princeton) Tr. 62:6-16; Ex. 169, Maloney (Wisconsin 30(b)(6)) Tr. 36:9-21, 37:18-38:9; Ex. 175, McGann (Amherst 30(b)(6)) Tr. 16:10-17:8; Ex. 162, Hill (Carnegie Mellon 30(b)(6)) Tr. 55:16-56:4; Ex. 349, *Merit-Based Scholarships*, UNIV. OF NOTRE DAME, https://financialaid.nd.edu/aid-types/merit-based-scholarships (last visited May 6, 2025) ("Around three percent of admitted students receive merit aid, while need-based financial aid is a possibility for many more students."); Ex. 181, Nucciarone (Notre Dame 30(b)(6)) Tr. 71:20-72:11 ("Notre Dame has consistently remained committed, from our board of trustees' statements down, to need-based aid. We are not critical of schools who choose to focus their aid programs on merit aid. That is not the direction the university has ever taken."); Ex. 180, Nucciarone (Notre Dame) Tr. 292:24-293:16 ("[M]erit aid has not been really a

significant part of the fabric of Notre Dame aid programs …. We are going to continue to focus on need-based financial aid.").

20.     Merit aid disproportionately benefits more affluent students.  *See* Ex. 2.1, Long Reb. ¶88, nn.176-178; Ex. 180, Nucciarone (Notre Dame) Tr. 300:7-301:2 ("Merit aid is not inherently bad. Merit aid, however, if it's based on academic merit, one would – and it was based on test scores, we can draw some conclusions on who got merit aid."); Ex. 181, Nucciarone (Notre Dame 30(b)(6)) Tr. 72:12-73:9 ("Yes, [awarding need-based aid would be likely to better ensure access for students than awarding merit aid], I believe that's, again, the university commitment, is to need-based aid. … I believe there is research out there … that suggests that merit aid often goes to wealthier students ….").

21.     The principle that a family should be asked to contribute to a student's education in accordance with their ability to pay has been a foundational tenet of financial aid policy throughout the higher education industry since at least the 1950s.  Ex. 177, Meade (College Board 30(b)(6)) Tr. 266:3-267:11, 268:19-270:6 (explaining that awarding aid based on need and assuming that families bear primary responsibility for paying for college have been College Scholarship Service ("CSS") principles since 1954); Ex. 126, Meade (College Board 30(b)(6)) Dep. Ex. 34 at 20-23; Ex. 413, 12 U. PA. ALMANAC 4 (Jan. 1966) at 5, *available at* https://almanac.upenn.edu/archive/v12pdf/n04/011666.pdf (at Penn, "scholarships, loans, and job opportunities are made available to the student … in proportion to their ability to pay"); Ex. 146, Corbett (Cornell) Tr. 116:23-117:22 (noting that "generally in financial aid, we do espouse the theory that the responsibility for financing the college education lies with the parent or student if they have the ability to pay"); Ex. 13, CBD000001(CSS/FINANCIAL AID PROFILE USER'S GUIDE, COLLEGE BOARD, 2003-2004) at -009-013; *see also* Ex. 145, Cooper (Stanford 30(b)(6)) Tr. 205:2-

206:3 (viewing the Need Analysis Principles, including the idea that families should contribute according to their ability, as "foundational to the concept of need-based financial aid").

### C. Financial Aid Process

22.     To obtain need-based financial aid, students must submit financial aid applications that provide information about their family's financial circumstances (income, assets, etc.), Ex. 1.1, Hill Reb. ¶¶56-57, such as the Free Application for Federal Student Aid ("FAFSA") Form, which is used to determine eligibility for federal financial aid, Ex. 420, *What Is the FAFSA?*, COLLEGE BOARD, https://blog.collegeboard.org/what-is-the-fafsa (last visited May 6, 2025); Ex. 424, *When Is FAFSA Due? Important Deadlines for 2024 and Beyond*, COURSERA, https://www.coursera.org/articles/when-is-fafsa-due (last visited May 6, 2025).  Many schools also require students to fill out and submit the College Scholarship Service ("CSS") Profile, an application developed by the College Scholarship Service (a division of the College Board) to collect more detailed information about a family's financial circumstances.  Ex. 232, *About CSS Profile*, COLLEGE BOARD, https://cssprofile.collegeboard.org/about (last visited Apr. 30, 2025); Ex. 417, *What Are the Different Types of Financial Aid?*, BIGFUTURE, https://bigfuture.collegeboard.org/pay-for-college/get-help-paying-for-college/different-types-financial-aid (last visited May 1, 2025).  Some schools also require financial aid applicants to submit school-specific supplemental forms.  *See, e.g.*, Ex. 242, *Applying as an Incoming Domestic Student: Regular Decision*, CALTECH, https://www.finaid.caltech.edu/applying/how/newdomesticreg (last visited May 1, 2025) (Caltech requiring students to submit the Caltech Supplemental Aid Application in addition to the FAFSA and CSS Profile); Ex. 230, *2024–2025 Financial Aid Application Checklist*, UNIV. OF PA., https://srfs.upenn.edu/financial-aid/apply/prospective-UG-checklists/US (last visited Apr. 30, 2025) (Penn requiring applicants to submit the Penn Outside Resource Form); Ex. 177, Meade (College Board 30(b)(6)) Tr. 12:12-16; *see also*

23

Ex. 243, *Applying for Financial Aid*, UNIV. OF S. CAL. https://financialaid.usc.edu/graduate-professional-financial-aid/applying-for-financial-aid (last visited May 7, 2025).

23.     Financial aid officers use this financial information to assess each student's "Expected Family Contribution," or "EFC," which is how much the student and their family are expected to contribute towards the cost of the student's education for a given award year.  Ex. 1.1, Hill Reb. ¶¶46-47; Ex. 180, Nucciarone (Notre Dame) Tr. 57:8-59:5 (determining a family's EFC "is an art and a science" that requires "looking at the story of a family" and "putting pieces of a family's story together and connecting dots" as financial aid officers "think about a family's capacity to pay"); Ex. 252, *Chapter 3: Expected Family Contribution (EFC)*, FED. STUDENT AID, https://fsapartners.ed.gov/knowledge-center/fsa-handbook/2023-2024/application-and-verification-guide/ch3-expected-family-contribution-efc (last visited Apr. 30, 2025).

24.     The Institutional Methodology ("IM") was created by the College Board, a nonprofit membership organization, and its origins trace back to the 1950s.  Ex. 13, CBD000001 (CSS/FINANCIAL AID PROFILE USER'S GUIDE, COLLEGE BOARD, 2003-2004) at -022-031; Ex. 235, *About Us*, COLLEGE BOARD, https://about.collegeboard.org (last visited Apr. 10, 2025); Ex. 177, Meade (College Board 30(b)(6)) Tr. 21:12-18.  Hundreds of schools have used the IM since the 1990s.  *See* Ex. 133, Baum Tr. 53:14-54:11 ("Q.  Did you have an understanding during the 1990s as to how prevalent the use of the IM was among colleges? …. A.  There was a certain number of colleges that used it.  I was never totally on top of what that number was.  It was a couple hundred.  Q.  Do you have any sense of, during your time of your work in the 1990s, as to how many schools used FM as opposed to the IM.  A.  All schools have to use the FM for federal aid.  Most schools use only the FM, and a few hundred schools use the IM in addition."); Ex. 177, Meade (College Board 30(b)(6)) Tr. 171:16-173:11 ("Q.  About how many colleges and

universities use the CSS Profile today? A. We say 300 colleges and scholarship organizations …. Q. About how many colleges and universities use some version of the institutional methodology today, to your knowledge? A. It would be -- it would be very close to the same number. You can't use IM without accepting the Profile. Q. Are there schools that you are aware of that use the Profile but do not use any form of the institutional methodology? A. No.").

25.     Relative to the Federal Methodology ("FM") used to determine eligibility for federal aid, the IM offers a more comprehensive and holistic assessment of a family's financial position—whereas the FM relies on information from the FAFSA, the IM relies on information from the CSS Profile, meaning it accounts for many more aspects of a family's financial condition and circumstances. Ex. 330, INSTITUTIONAL METHODOLOGY, COLLEGE BOARD, *available at* https://secure-media.collegeboard.org/digitalServices/pdf/professionals/institutional-methodology.pdf; Ex. 13, CBD000001 (CSS/FINANCIAL AID PROFILE USER'S GUIDE, COLLEGE BOARD, 2003-2004) at -029-031; Ex. 139, Chan (USC 30(b)(6)) Tr. 65:4-11.

26.     Because the IM is customizable, a school collecting CSS Profile information may choose to use or not use information, or may process or evaluate information consistently with or differently from the way the College Board recommends. Ex. 13, CBD000001 (CSS/FINANCIAL AID PROFILE USER'S GUIDE, COLLEGE BOARD, 2003-2004) at -050-051; Ex. 14, CBD000546 (CSS/FINANCIAL AID PROFILE USER'S GUIDE, COLLEGE BOARD, 2005-2006) at -591-592; Ex. 15, CBD001802 (CSS/FINANCIAL AID PROFILE USERS' GUIDE, COLLEGE BOARD, 2012-2013) at -806-807; Ex. 273, *CSS Profile*, COLLEGE BOARD, https://highered.collegeboard.org/financial-aid/management/css-profile (last visited Apr. 28, 2025); Ex. 330, INSTITUTIONAL METHODOLOGY, COLLEGE BOARD, *available at* https://secure-media.collegeboard.org/digitalServices/pdf/

professionals/institutional-methodology.pdf. An uncustomized IM—*i.e.*, used exactly as provided by the College Board—is referred to as the "Base IM." *See* Ex. 177, Meade (College Board 30(b)(6)) Tr. 34:22-35:2 ("Q. Have you heard the phrase 'base IM'? A. Yes. Q. What do you understand base IM to be? A. Base IM is – essentially started the default settings for the components of IM."); Ex. 175, McGann (Amherst 30(b)(6)) Tr. 52:16-53:9 ("Q. Okay. Are you familiar with the term "base IM"? A. Yes. Q. Okay. And what do you understand 'base IM' to refer to? A. There -- as kind of a baseline to using Institutional Methodology, a methodology used by many, many institutions of higher education. There are some -- for each kind of identified option within IM, there's kind of a default condition, but institutions are able to make changes as they see best. Q. Okay. So just so we're on the same page going forward, if I use the phrase 'base IM,' will you understand it to mean the IM as produced by the College Board, with no changes made by Amherst or otherwise? A. Yes.").

27.      Every Defendant school chose its own approach to analyzing a student's need. At some schools, financial aid officers applied variations of other, existing methodologies (like the FM or IM), while at other schools, financial aid officers used in-house, school-specific approaches. Ex. 2.1, Long Reb. ¶¶163-202; Ex. 195, Tuman (Columbia) Tr. 218:3-219:13; Ex. 180, Nucciarone (Notre Dame) Tr. 57:8-24.

28.      The Base IM has been the starting point for hundreds of schools' need-analysis methodologies—including Defendants and countless others—since the 1990s. *See, e.g.*, Ex. 80, NULIT-0000181680 (INSTITUTIONAL METHODOLOGY USER GUIDE, COLLEGE BOARD, July 15, 2022) at -685; Ex. 119, VANDERBILT-00272944 (PROFILE USERS GUIDE, COLLEGE BOARD, Oct. 2013) at -970-971; Ex. 177, Meade (College Board 30(b)(6)) Tr. 171:16-172:6, 173:2-19; Ex. 152, Donahue (Harvard) Tr. 165:5-166:5, 184:23-185:24; Ex. 161, Higinbotham (NYU 30(b)(6)) Tr.

**PUBLIC VERSION**

74:6-75:12; Ex. 139, Chan (USC 30(b)(6)) Tr. 65:2-20; 112:17-20, 65:2-20; Ex. 162, Hill (Carnegie Mellon 30(b)(6)) Tr. 59:24-61:4; Ex. 180, Nucciarone (Notre Dame) Tr. 78:21-79:3 (Notre Dame uses the "institutional methodology with professional judgment approaches applied"); *see also* Ex. 231, *2024-25 Participating Institutions and Programs*, COLLEGE BOARD (archived June 1, 2024), https://web.archive.org/web/20240601205323/https://profile. collegeboard.org/profile/ppi/participatingInstitutions.aspx (last visited May 7, 2025); Ex. 198, Varas (Penn 30(b)(6)) Tr. 217:2-218:13 (explaining that schools refer to the Base IM because "it would be impossible" for a school to develop a similarly comprehensive approach to assess student need). Schools may simply use the Base IM with its "Global Settings" set as provided by College Board, or may adjust the Global Settings as they see fit, adapting the IM to form their own school-specific version of the methodology. Ex. 14, CBD000546 (CSS/FINANCIAL AID PROFILE USER'S GUIDE, COLLEGE BOARD, 2005-2006) at -591-592; Ex. 15, CBD001802 (CSS/FINANCIAL AID PROFILE USERS' GUIDE, COLLEGE BOARD, 2012-2013) at -806-807; Ex. 273, *CSS Profile*, https://highered.collegeboard.org/financial-aid/management/css-profile (last visited Apr. 28, 2025); Ex. 330, INSTITUTIONAL METHODOLOGY, COLLEGE BOARD, *available at* https://secure-media.collegeboard.org/digitalServices/pdf/professionals/institutional-methodology.pdf.

29.     By April 2008, some schools—including Defendants Yale, Penn, Columbia, Chicago, Cornell, Duke, Northwestern, Brown, and MIT—adopted "income threshold" policies, whereby families with ordinary assets and annual incomes below a certain threshold are automatically assigned an EFC of $0 or are not offered loans. Ex. 24, Columbia_00015333; Ex. 261, *Cornell Drops Need-Based Loans for Students From Families Earning Under $75,000*, CORNELL UNIV. (Jan. 31, 2008), https://news.cornell.edu/stories/2008/01/cornell-announces-sweeping-new-financial-aid-program (last visited May 6, 2025); Ex. 124, Kotlikoff (Cornell

30(b)(6)) Dep. Ex. 2 at 2; Ex. 196, Varas (Penn) Aug. 2, 2023 Tr. 219:13-221:24; Ex. 198, Varas (Penn 30(b)(6)) Tr. 98:14-101:7; Ex. 8, BROWN_0000050379 at -379; Ex. 152, Donahue (Harvard) Tr. 27:17-29:6, 33:2-16.

30. Defendants routinely publish information about their financial aid requirements, policies, and approaches on the "financial aid" pages of their websites. Ex. 398, *Undergraduate Financial Aid*, BROWN UNIV., https://finaid.brown.edu (last visited May 7, 2025); Ex. 416, *Welcome to the Office of Financial Aid*, CALTECH, https://www.finaid.caltech.edu (last visited May 7, 2025); Ex. 396, *Undergraduate Aid*, UNIV. OF CHI., https://financialaid.uchicago.edu/undergraduate (last visited May 7, 2025); Ex. 288, F*inancial Aid & Educational Financing*, COLUMBIA UNIV., https://cc-seas.financialaid.columbia.edu (last visited May 7, 2025); Ex. 294, *Financial Aid*, CORNELL UNIV., https://finaid.cornell.edu (May 6, 2025); Ex. 295, *Financial Aid*, DARTMOUTH COLL., https://financialaid.dartmouth.edu (last visited May 7, 2025); Ex. 332, *Karsh Office of Undergraduate Financial Support*, DUKE UNIV., https://financialaid.duke.edu (last visited May 7, 2025); Ex. 399, *Undergraduate Financial Aid*, EMORY UNIV., https://studentaid.emory.edu/undergraduate/index.html (last visited May 7, 2025); Ex. 296, *Financial Aid*, GEORGETOWN UNIV., https://uadmissions.georgetown.edu/financial-aid (last visited May 7, 2025); Ex. 297, *Financial Aid*, JOHNS HOPKINS UNIV., https://www.jhu.edu/admissions/financial-aid (last visited May 7, 2025); Ex. 342, *Making MIT Affordable*, MIT, https://sfs.mit.edu/undergraduate-students/the-cost-of-attendance/making-mit-affordable (last visited Apr. 30, 2025); Ex. 400, *Undergraduate Financial Aid*, NORTHWESTERN UNIV., https://undergradaid.northwestern.edu (last visited May 7, 2025); Ex. 364, *Office of Financial Aid*, UNIV. OF NOTRE DAME, https://financialaid.nd.edu (last visited May 7, 2025); Ex. 363, *Office of Financial Aid*, RICE UNIV., https://financialaid.rice.edu (last visited May 7,

2025); *Financial Aid*, UNIV. OF PA., https://srfs.upenn.edu/financial-aid (last visited May 7, 2025); Ex. 365, *Office of Student Financial Aid and Scholarships*, VANDERBILT UNIV., https://www.vanderbilt.edu/financialaid/#:~:text=Vanderbilt%20will%20meet%20100%25%20o f,that%20impact%20or%20limit%20eligibility (last visited Apr. 30, 2025); Ex. 301, *Financial Aid*, YALE UNIV., https://finaid.yale.edu (last visited May 7, 2025).

31.     Schools that use the IM, like Defendants, typically collect and consider information about a family's income and assets to determine EFCs.  Ex. 285, *Factors Considered in Brown's Need Analysis Formula*, BROWN UNIV., https://finaid.brown.edu/basics/financial-need-eligibility/factors-considered-browns-needs-analysis-formula (last visited May 6, 2025); Ex. 318, *How Caltech Calculates Your Family Contribution*, CALTECH, https://www.finaid.caltech.edu/ howitworks/familycontribution (last visited May 6, 2025); Ex. 394, UCHICAGO COLLEGE AID HANDBOOK FOR STUDENTS AND FAMILIES, ACADEMIC YEAR 2024-25, UNIV. OF CHI., *available at* https://financialaid.uchicago.edu/uchicago-college-aid-handbook-2024-2025.pdf;      Ex. 277, *Determining Eligibility*, COLUMBIA UNIV., https://cc-seas.financialaid.columbia.edu/how/ determine-eligibility (last visited May 6, 2025); Ex. 292, *Financial Aid Eligibility*, CORNELL UNIV., https://finaid.cornell.edu/cost-to-attend/financial-aid-eligibility (last visited May 6, 2025); Ex. 324, *How Much Help Will I Get?*, DARTMOUTH COLL., https://financialaid.dartmouth.edu/ how-aid-works/how-much-help-will-i-get (last visited May 6, 2025); Ex. 246, *Awarding & Policy*, DUKE UNIV., https://financialaid.duke.edu/forms-resources/awarding-policy (last visited May 6, 2025);   Ex. 314, *How Aid Works for Undergraduates*, GEORGETOWN UNIV., https://finaid.georgetown.edu/undergrad/aid-for-undergrads (last visited May 6, 2025); Ex. 423, *What We Consider*, MIT, https://sfs.mit.edu/undergraduate-students/our-approach-to-aid/what-we-consider (last visited May 6, 2025); Ex. 302, *Financial Need*, NORTHWESTERN UNIV.,

https://undergradaid.northwestern.edu/aid-basics-eligibility/financial-need.html (last visited May 6, 2025); Ex. 406, *Eligibility and Demonstrated Need*, RICE UNIV., https://financialaid.rice.edu/forms-resources/eligibility-and-demonstrated-need#:~:text=Families%20who%20apply%20for%20financial,aid%2C%20work%20study%20and%20loans (last visited May 4, 2025); Ex. 284, *Expected Family Contribution*, YALE UNIV., https://finaid.yale.edu/award-letter/financial-aid-terminology/expected-family-contribution (last visited May 6, 2025); Ex. 326, *How We Determine Need*, UNIV. OF PA., https://srfs.upenn.edu/financial-aid/undergraduate-aid-program/how-we-determine-need (last visited May 6, 2025). They may consider multiple streams of income and may decide to treat different streams similarly to or differently from one another; they may consider taxable income and untaxable income similarly or differently; they may treat student income the same as parent income, or differently; and they may apply allowances against income for things like retirement savings (or lack thereof) or special circumstances, among other things. Ex. 13, CBD000001 (CSS/FINANCIAL AID PROFILE USER'S GUIDE, COLLEGE BOARD, 2003-2004) at -138-165; Ex. 14, CBD000546 (CSS/FINANCIAL AID PROFILE USER'S GUIDE, COLLEGE BOARD, 2005-2006) at -655-705; Ex. 15, CBD001802 (CSS/FINANCIAL AID PROFILE USERS' GUIDE, COLLEGE BOARD, 2012-2013) at -830-850; Ex. 181, Nucciarone (Notre Dame 30(b)(6)) Tr. 194:9-195:15 (describing retirement allowances).

32.     A school's need analysis methodology may also treat different classes of assets differently from one another, or not; may treat student assets and parent assets the same, or differently; and may ignore certain kinds of assets if the school does not believe that ownership of a certain type of asset should be considered a resource that may be tapped to finance a student's education. Ex. 13, CBD000001 (CSS/FINANCIAL AID PROFILE USER'S GUIDE, COLLEGE BOARD, 2003-2004) at -034-035, -050-051, -117; Ex. 14, CBD000546 (CSS/FINANCIAL AID PROFILE

USER'S GUIDE, COLLEGE BOARD, 2005-2006) at -591-592; Ex. 15, CBD001802 (CSS/FINANCIAL AID PROFILE USERS' GUIDE, COLLEGE BOARD, 2012-2013), at -822, -835-836; Ex. 18, COFHE-02-00009011 at -012 (describing Princeton's exclusion of home equity under certain circumstances); Ex. 180, Nucciarone (Notre Dame) Tr. 238:9-239:6 (applying higher levels of protection to parent assets).

33.    Defendants assess a student's financial need by subtracting their EFC from the school's Cost of Attendance ("COA"), which includes tuition, room, board, books, fees, and other expenses.  *See* Ex. 289, *Financial Aid 101*, UNIV. OF PA., https://srfs.upenn.edu/financial-aid/undergraduate-aid-program/financial-aid-101 (last visited May 6, 2025); Ex. 320, *How Financial Aid Works at Caltech*, CALTECH, https://www.finaid.caltech.edu/howitworks (last visited May 6, 2025); Ex. 292, *Financial Aid Eligibility*, CORNELL UNIV., https://finaid.cornell.edu/cost-to-attend/financial-aid-eligibility (last visited May 6, 2025); Ex. 1.1, Hill Reb. ¶48; Ex. 2.1, Long Reb. ¶46; Ex. 4, Singer Am. Rep. ¶28 ("There are two components of a higher-education institution's computation of institutional aid, or the discount off the list price. First, institutions calculate what they believe families can pay, or the 'expected family contribution' ('EFC'). Second, from the list price, institutions subtract the EFC to determine a student's 'need' and then determine how to 'meet' that need, through a 'package' of institutional aid."); *see also* Ex. 191, Singer Tr. 82:3-9 (describing "cost of attendance" as the "list price").

34.    Public and other private universities have similar COAs, and Defendants' COAs are similar to the COAs at leading private liberal arts colleges or for out-of-state students attending flagship public universities.  For example, in academic year 2023-2024, the cost of attendance was $83,271 at Notre Dame, $83,622 at Emory, $78,278 at Rice, $75,626 at the University of Michigan (for out-of-state students), $85,300 at Pomona College, $84,103 at Swarthmore College, and

$84,860 at Williams College.  *See* Ex. 255, *College Navigator*, U.S. DEP'T OF EDUC. - NAT'L CTR. FOR EDUC. STATS., https://nces.ed.gov/collegenavigator (last visited Apr. 18, 2025).

35.     Once a student's need is decided, Defendants put together individualized financial aid packages aimed at meeting that need.  Because Defendants all meet full-need, *see supra* SOF 6, the financial aid package each student receives covers the difference between the student's EFC calculated by the school and that school's COA.  Ex. 2.1, Long Reb. ¶46; *see also* Ex. 44, DUKE568_0033960 (█████████ ████████████ ████ ████ ██ ████████ ████████████████████ ) at -018 (showing that Duke meets full demonstrated need); Ex. 43, DUKE568_0004165 (██████████████████████ ) at -194 (█████ ████████████████████████████████████████████████████████ ██████████████████████████████████████ ); Ex. 140, Chang (Caltech) Tr. 94:9-94:14 (describing Caltech's full-need policy); Ex. 131, Affleck-Graves (Notre Dame)  Tr.  220:20-221:18  (describing  Notre  Dame's  full-need  policy);  Ex. 59, GTWNU_0000390613 (POLICIES AND PROCEDURES MANUAL 2023-2024, GEORGETOWN UNIVERSITY, 2023-2024) at -624; Ex. 34, CORNELL_LIT0000245115 (UNDERGRADUATE FINANCIAL AID TASK FORCE - FINAL REPORT, CORNELL UNIVERSITY, Apr. 27, 2012) at -117. Defendants also take into account the financial assistance offered by the federal government when setting their own financial aid awards, because Department of Education regulations require schools to adjust financial aid awards to avoid "overawards" of aid, whereby a student's financial aid "exceed[s] the student's financial need."  34 C.F.R. § 673.5 *see, e.g.*, Ex. 180, Nucciarone (Notre Dame) Tr. 43:5-44:3 (describing how Notre Dame takes into account federal grants and loans in adjusting financial aid packages to avoid federal overawards).

36.     A student's financial aid package may comprise institutional grants, government grants (such as from the federal government or a state or local government), third-party grants (like from an alumni group, community organization, or scholarship program), loans (subsidized or unsubsidized, from the institution or from another source such as a governmental entity or a community organization or bank), work-study, or a combination of any of these types of aid. Ex. 144, Coleman (Duke) Tr. 66:2-12; *see also* Ex. 393, *Types of Financial Aid: Grants, Work-Study*, *and Loans*, FED. STUDENT AID, https://studentaid.gov/understand-aid/types (last visited Apr. 28, 2025); Ex. 359, NATIONAL STUDENT AID PROFILE: OVERVIEW OF 2022 FEDERAL PROGRAMS, NAT'L ASS'N OF STUDENT FIN. AID ADM'RS (NASFAA) (updated Oct. 2022) at 4, 6, 8, and 13, *available at* https://www.nasfaa.org/uploads/documents/2022_National_Profile.pdf; Ex. 319, *How Financial Aid Is Calculated*, FED. STUDENT AID, https://studentaid.gov/complete-aid-process/how-calculated (last visited Apr. 28, 2025); Ex. 386, *State Aid*, FED. STUDENT AID, https://studentaid.gov/help-center/answers/article/state-aid (last visited Apr. 28, 2025). Defendants' packaging policies vary. *See infra* SOF 105-110.

37.     If a student receives merit-based aid from a school that offers merit aid, that aid may, depending on the school's individual policies, replace some or all of the student's need-based aid, or it may be provided in addition to some or all of the student's need-based aid. Ex. 72, ND_0210163 at -164; Ex. 73, ND_0253013; Ex. 74, ND_0254694; Ex. 97, UCHICAGO_0000254603. For example, Notre Dame had a policy of only meeting demonstrated financial need, reducing the amount of Federal Perkins Loans, federal work-study, federal subsidized Stafford loans, and University scholarships, in that order, if a student received additional outside aid after an initial aid package was offered. Ex. 72, ND_0210163. The University of Chicago's policy depended on whether the student was a University Scholar Award

33

recipient or not—for such scholars, if they received merit-aid that exceeded the self-help (e.g., summer earnings and work-study) portion of their financial aid package, the school reduced their "parental contribution dollar-for-dollar" by that amount.  Ex. 97, UCHICAGO_0000254603.

38.     Schools' packaging policies vary.   Some Defendants have used "preferential packaging" to strike a different balance between grant aid and self-help (*i.e.*, loans and work-study) for different individual or groups of students in order to achieve institutional goals or incentivize certain students to matriculate.  For example, Columbia reported that, for academic year 2019-2020, self-help was waived for most students in their first or second year in the Scholars Program, which provided enhanced academic and cultural opportunities to participants.    Ex. 27, Columbia_00277674 (COFHE YELLOWBOOK FOR 2019-2020 QUESTIONNAIRE, CONSORTIUM ON FINANCING HIGHER EDUCATION, 2019-2020).  Similarly, Georgetown reported, for academic year 2016-2017, removing loans for students in their Georgetown Scholars Program ("GSP") and John Carroll   program.    Ex. 53,   GTWNU_0000195239   (COFHE   YELLOWBOOK   FOR   2016-2017, CONSORTIUM ON FINANCING HIGHER EDUCATION, 2016-2017).  Other schools did the same.  *See* Ex. 26, Columbia_00258862 at -884 (15 institutions self-reported using more generous packaging policies for low-income students in the COFHE "TUITION, STUDENT BUDGETS, AND SELF-HELP AT THE CONSORTIUM INSTITUTIONS FOR ACADEMIC YEAR 2013-2014" report); Ex. 124, Kotlikoff (Cornell 30(b)(6) Dep. Ex. 2 at 3 (explaining various criteria for students to receive "reduced loans (by replacing with grants)"); Ex. 7, BROWN_0000003161 at -191 (Brown's Sydney Frank Scholars receive packages with no loans); Ex. 180, Nucciarone (Notre Dame) Tr. 47:7-50:20 (explaining that Notre Dame used preferential packaging certain students, including for low-income and first generation students).

39. Defendants' school-specific packaging approaches mean that even if two schools were to calculate the same EFC for a particular student, the composition of that student's financial aid package may nevertheless be meaningfully different at each school. Ex. 1.1, Hill Reb. ¶¶122-124, fig. 22; *id.* ¶¶131-132; Ex. 3.1, Stiroh Reb. ¶¶142-143, fig. 5.6; Ex. 191, Singer Tr. 92:19-24 ("I'm also in agreement … with Dr. Stiroh here that if you're going to go through the hassle of conspiring over the EFC, it could be defeated if you didn't also control the participants' behavior with respect to loans."). For example, at Duke, ███████████████████████ ████████████████████████████████ Ex. 172, McCall (Duke) Tr. 23:19-21, but any such student receiving financial aid from Penn would not receive loans in their aid package, regardless of their EFC, Ex. 298, *Financial Aid*, UNIV. OF PA., https://srfs.upenn.edu/financial-aid (last visited May 6, 2025) (Penn meets "100% of demonstrated financial need with grants and work-study funding").

40. Upon determining a student's aid award, a Defendant school notifies the student of the results in an award letter that states (1) the COA for the year (which is also typically posted on the school's website; (2) the EFC that the school has determined for the student; and (3) the amount and types of financial aid that they are being offered for that academic year. Ex. 407, *Understanding Your Financial Aid Award Offers*, BIGFUTURE, https://bigfuture.collegeboard.org/pay-for-college/financial-aid-awards/understanding-your-financial-aid-award-offers (last visited Apr. 28, 2025); Ex. 265, *Cost of Attendance*, BROWN UNIV., https://finaid.brown.edu/estimate-cost-aid/cost (last visited Apr. 29, 2025); Ex. 266, *Cost of Attendance*, CALTECH, https://www.finaid.caltech.edu/costs (last visited Apr. 29, 2025); Ex. 271, *Cost of Attendance*, UNIV. OF CHI., https://financialaid.uchicago.edu/undergraduate/how-aid-works/undergraduate-costs (last visited May 6, 2025); Ex. 262, *Cost & Aid*, COLUMBIA UNIV.,

https://undergrad.admissions.columbia.edu/affordability/cost (last visited Apr. 29, 2025); Ex. 272, *Cost to Attend*, CORNELL UNIV., https://finaid.cornell.edu/cost-to-attend (last visited Apr. 29, 2025); Ex. 267, *Cost of Attendance*, DARTMOUTH COLL., https://admissions.dartmouth.edu/afford/cost-attendance (last visited Apr. 29, 2025); Ex. 268, *Cost of Attendance*, DUKE UNIV., https://financialaid.duke.edu/how-aid-calculated/cost-attendance (last visited Apr. 29, 2025); Ex. 280, EMORY UNIVERSITY COST OF ATTENDANCE WORKSHEET, EMORY UNIV., *available at* https://studentaid.emory.edu/_includes/documents/sections/undergraduate/apply/cost-of-attendance-worksheet.pdf; Ex. 389, *Tuition and Other Expenses*, GEORGETOWN UNIV., https://bulletin.georgetown.edu/expenses-and-financialassistances/basicgeneralexpenses (last visited Apr. 29, 2025); Ex. 263, *Cost & Tuition*, JOHNS HOPKINS UNIV., https://sfs.jhu.edu/cost-tuition (last visited Apr. 29, 2025); Ex. 269, *Cost of Attendance*, MIT, https://sfs.mit.edu/undergraduate-students/the-cost-of-attendance/annual-student-budget (last visited Apr. 29, 2025); Ex. 270, *Cost of Attendance*, NORTHWESTERN UNIV., https://undergradaid.northwestern.edu/aid-basics-eligibility/cost-of-attendance.html (last visited Apr. 29, 2025); Ex. 371, *Pathways to Notre Dame*, UNIV. OF NOTRE DAME, https://financialaid.nd.edu/costs-and-affordability (last visited Apr. 29, 2025); Ex. 390, *Tuition, Fees, & Expenses*, RICE UNIV., https://bursar.rice.edu/tuition_fee_rates/undergraduate-programs (last visited Apr. 29, 2025); Ex. 404, *Undergraduate Tuition and Fees*, UNIV. OF PA., https://srfs.upenn.edu/costs-budgeting/undergraduate-tuition-and-fees (last visited Apr. 29, 2025); Ex. 405, *Undergraduate Tuition and Fees*, VANDERBILT UNIV., https://www.vanderbilt.edu/stuaccts/fees/tuition_fees_2023-24_ugrd.php (last visited Apr. 29, 2025); Ex. 281, *Estimated Cost of Attendance*, YALE UNIV., https://finaid.yale.edu/award-letter/financial-aid-terminology/estimated-cost-attendance (last visited Apr. 29, 2025). First-year

students who receive need-based financial aid offers typically receive them close-in-time to being granted admission to a school, while continuing students typically receive their financial aid offers in late spring or summer. Ex. 407, *Understanding Your Financial Aid Award Offers*, BigFuture, https://bigfuture.collegeboard.org/pay-for-college/financial-aid-awards/understanding-your-financial-aid-award-offers (last visited Apr. 28, 2025).

41.     Students have the opportunity to appeal to the financial aid office if they feel as though the amount or composition of the financial aid award they have been offered is incorrect, unfair, or otherwise unacceptable. Ex. 140, Chang (Caltech) Tr. 70:18-71:15; Ex. 137, Bridson (MIT) Tr. 165:13-21, 168:13-18; Ex. 181, Nucciarone (Notre Dame 30(b)(6)) Tr. 330:12-333:12. Many students, including ███████████████████████████████████████, appeal their initial awards. Ex. 3.1, Stiroh Reb. ¶146 (Penn received 12,690 appeals between 2003 to 2019); Ex. 209, Georgetown Am. Rog Resps. at 33-34 (Georgetown received 8,156 appeals between 2004 to 2023); Ex. 192, Storlazzi (Yale) Tr. 38:1-7 (10% of financial aid awards were appealed, close to 90% of appeals resulted in some change); Ex. 187, Schapiro (Northwestern) Tr. 123:9-17; Ex. 204, ████████████████ Tr. 237:19-240:5 (████ gave additional aid after ██████ appealed in both █████████); Ex. 183, ███████████████████ Tr. 82:13-85:12 (successfully appealed his initial aid award); Ex. 165, ███████████████████ Tr. 195:13-21 (disagreed with █████ aid award calculations); *id.* 194:11-195:2 (successfully appealed every aid award he received); Ex. 190, ████████████ ██████ Tr. 36:7-13 (appealed his aid award because he believed it was inadequate).



42.     Schools evaluate appeals pursuant to their own school-specific processes and criteria, and appeals are often granted. Ex. 422, *What to Do When Your Financial Aid Award Isn't Enough*, BigFuture, https://bigfuture.collegeboard.org/pay-for-college/financial-aid-awards/

what-to-do-when-your-financial-aid-award-isnt-enough (last visited Apr. 28, 2025); Ex. 290, *Financial Aid Appeals*, CORNELL UNIV., https://finaid.cornell.edu/special-circumstances/financial-aid-appeals (last visited Apr. 28, 2025); Ex. 385, *Special and Unusual Circumstances*, UNIV. OF NOTRE DAME, https://financialaid.nd.edu/apply-or-renew/special-circumstance (last visited Apr. 29, 2025); Ex. 3.1, Stiroh Reb. ¶146 (Penn granted 75% of appeals from 2003 to 2019); Ex. 209, Georgetown Am. Rog Resps. at 33-34 (Georgetown approved 82% of appeals from 2004 to 2023); Ex. 192, Storlazzi (Yale) Tr. 38:1-7 (10% of financial aid awards were appealed, close to 90% resulted in some change).

43.     Because parents, other family members, or third parties sometimes pay for the cost of a student's education, *see* Ex. 317, SALLIE MAE, HOW AMERICA PAYS FOR COLLEGE, 24, 26, 35, 51 (2024), *available at* https://www.salliemae.com/content/dam/slm/writtencontent/Research/HAP_2024.pdf, including by making tuition payments directly to the school, those students—such as Named Plaintiffs ███████████████████████████████████ ████████████████████████████████████—do not contribute to paying the net price, Ex. 147, ████ Tr. 158:22-24 ██████████████ parents "pa[id] the school directly"); Ex. 190, ██████ Tr. 268:13-20 ██████████ "didn't personally pay any of the costs of tuition, room and board" because ████████████████████████████████████ Ex. 207, ████████████████████ Dep. Ex. 5 ██████ Suppl. Resps. & Objs. to Defs.' 1st Rogs) at 7; Ex. 210, ████████████████ Dep. Ex. 15 (██████ Suppl. Resps. & Objs. to Defs.' 1st Rogs) at 6; Ex. 206, ██████████████████████ Dep. Ex. 7 (████████ 2d Suppl. Resps. & Objs. to Defs.' 1st Rogs) at 6; Ex. 211, ████████████████████ Dep. Ex. 7 (██████████ Suppl. Resps. & Objs. to Defs.' 1st Rogs) at 7; Ex. 212, ██████████████████ Dep. Ex. 1 (██████ Suppl.

Resps. & Objs. to Defs.' 1st Rogs) at 6; Ex. 213, ██████████████ Dep. Ex. 7 (██████

Suppl. Resps. & Objs. to Defs.' 1st Rogs) at 7.

### D.   Application and Admissions Process

44.    In deciding where to apply (and potentially matriculate), students consider various factors that are highly dependent on their personal preferences, interests, needs, and skills, and different students prioritize different schools because they assign different weight to different factors.  Ex. 2.1, Long Reb. ¶¶248-251, 255-281; Ex. 254, COLLEGE BOARD, ASQ PLUS™ USER GUIDE 2013-2015 40 (2013), *available at* https://secure-media.collegeboard.org/digitalServices/pdf/professionals/admitted-student-questionnaire-plus-user-guide.pdf; Ex. 204, ██████████ ████ Tr. 95:15-96:7 ██████████████████████████████████ Ex. 202, ██████████████ Nov. 14, 2023 Tr. 39:4-13, 46:4-11 ██████████████████████████████████); Ex. 165, ██████████████ Tr. 300:13-301:16 (deciding not to apply to a school because ██████████████████████████); Ex. 167, Long Tr. 50:9-18 (noting that there are "a host of factors that students consider in choosing a college," including "the composition of the student body" and "socioeconomic diversity"); Ex. 160, ████ ██████████ Tr. 105:11-106:4 ("reasons" for applying ██████████████████ ██████████████████████).

45.    Many students who apply to Defendants also apply to and consider attending flagship public universities and top liberal arts colleges.  Ex. 2.1, Long Reb. ¶¶252-254, fig. 11. Indeed, six of the eight Named Plaintiffs applied to both private and public schools: ██████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

46. Students expressed preferences for certain public universities and liberal arts colleges over "elite" private universities, including Defendants. *See* Ex. 4, Singer Am. Rep. tbl. 7 (Singer's "revealed preference" analysis showing that students preferred three public universities—UCLA, UC Berkeley, and University of Michigan—over 13 schools in Plaintiffs' proposed market, and preferred five liberal arts colleges—Pomona, Williams, Swarthmore, Bowdoin, and Amherst—over two schools in Plaintiffs' proposed market); Ex. 191, Singer Tr. 363:11-366:15.

47.     Different students may view different schools as competitors based on their unique preferences and attributes, including academic focus.  For example, students interested in the performing arts might apply to Yale, Juilliard, NYU, and/or UC San Diego; religiously-minded Catholic students may apply to Notre Dame, Georgetown, Boston College, Marquette University, and/or DePaul University; aspiring social workers may consider WashU, Columbia, Ohio State, and/or UC Berkeley; and students focused on engineering or other STEM fields might choose between Caltech, MIT, UC Berkeley, Stanford, Harvard, and/or Princeton.  *See* Ex. 2.1, Long Reb. ¶260; *see also id.*¶¶261-273; Ex. 387, *Top 10 College Theater Programs To Know In 2024*, LINKEDIN (Nov. 22, 2024), https://www.linkedin.com/pulse/top-10-college-theater-programs-know-in2024-ken-davenport-s12re Ex. 251, *Catholic Colleges and Universities in the United States*, U.S. CONFERENCE OF CATHOLIC BISHOPS, https://www.usccb.org/committees/catholic-education/catholic-colleges-and-universities-united-states (last visited May 4, 2025); Ex. 375, *Ranking of U.S. Social Work/Welfare Programs*, SOCIAL PSYCH. NETWORK, https://www.socialpsychology.org/gsocwork.htm (last visited Apr. 28, 2025); Ex. 11,

██████████████████████████████████████████████████████

████████████████████████████; Ex. 244, Christopher N. Avery et al., *A Revealed Preference Ranking of U.S. Colleges and Universities*, 128 Q. J. ECON. 425, 449 (2013); Ex. 51,

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████

48.     Given the multitude of offerings at modern universities, different programs or departments at a given school may have different competitors.  For example, ████████████████

41

PUBLIC VERSION

49.     Competition also varies based on where an applicant resides. ███████

50.     ████████████████████████████████████████████

51.     Each school views a different set of other schools as its strongest competition.

52.     Three public universities consistently ranked among the "Top 25" schools in the USNWR rankings from 2003 to 2022.  Ex. 4, Singer Am. Rep. ¶73.  On average, during the class period, UC Berkeley was ranked 20.95, UCLA was ranked 23.5, and UVA was ranked 24.25.  *See* Ex. 99, USNWR0000000102 at -102-113 (2003 rankings); Ex. 100, USNWR0000000134 at -134-145 (2004 rankings); Ex. 101, USNWR0000000166 at -166-177 (2005 rankings); Ex. 102, USNWR0000000198 at -198-209 (2006 rankings); Ex. 103, USNWR0000000230 at -230-241 (2007 USNWR rankings); Ex. 104, USNWR0000000262 at -262-274 (2008 rankings); Ex. 105, USNWR0000000295 at -295-307 (2009 rankings); Ex. 106, USNWR0000000328 at -328-340 (2010 rankings); Ex. 107, USNWR0000000361 at -361-373 (2011 rankings); Ex. 108, USNWR0000000394 at -394-405 (2012 rankings); Ex. 109, USNWR0000000426 at -426-438 (2013 USNWR rankings); Ex. 110, USNWR0000000460 at -460-472 (2014 USNWR rankings); Ex. 111, USNWR0000000492 at -492-505 (2015 rankings); Ex. 112, USNWR0000000525 at -525-538 (2016 rankings); Ex. 113, USNWR0000000558 at -558-570 (2017 rankings); Ex. 114, USNWR0000000589 at -589-602 (2018 rankings); Ex. 115, USNWR0000000621 at -621-635 (2019 rankings); Ex. 116, USNWR0000000654 at -654-669 (2020 rankings); Ex. 117, USNWR0000000687 at -687-701 (2021 rankings); Ex. 118, USNWR0000000720 at -720-734 (2022 rankings).  USC, a private university, ranked in the "Top 25" eleven times and was, on average, ranked 25.4.  *See* sources cited *supra* SOF 52.

## II.     EFC CALCULATIONS AND NET PRICES

53.     Since 2003, the proportion of students receiving financial aid at Defendant schools increased.  Ex. 1.1, Hill Reb. ¶83, fig. 9.

54.     Grant aid increased at Defendant schools while they were members of the 568 Group, and it increased at approximately the same rate as grant aid increased at non-member

schools Plaintiffs have identified as market participants or peer schools of Defendants. Ex. 1.1, Hill Reb. ¶¶87-92, figs. 7-8, 11-12.

55.     The total amount of aid Defendants provided to undergraduate students at least quadrupled since 2003, and in inflation-adjusted terms, the average aid per student approximately doubled. Ex. 1.1, Hill Reb. ¶¶80-81, figs. 7-8. The average price paid by aid recipients correspondingly dropped in inflation-adjusted terms. Ex. 2.1, Long Reb. figs. 4-5; Ex. 85, PENN568-LIT-00060839 at -848, -854.

56.     Tens of thousands of financial aid recipients who were subject to the challenged conduct—*i.e.*, whose financial need was determined by Defendant schools using need-analysis methodologies while those schools were members of the 568 Group—received full rides, meaning the full cost of their attendance was covered by financial aid. Ex. 191, Singer Tr. 21:22-23:12; *see also* Ex. 428, Transcript of Proceedings at 97:25-98:22, *Henry et. al. v. Brown*, (N.D. Ill. Apr. 14, 2025) (No. 1:22-cv-00125).

57.     Almost all purported class members who were admitted by more than one Defendant ("cross admits") received different EFCs from the Defendants who admitted them. Ex. 1.1, Hill Reb. ¶101, fig. 14. EFCs for 74% of cross-admits differed by more than 10%, Ex. 1.1, Hill Reb. fig. 14., and the EFCs for 56% of the cross-admits varied by more than 20% between different Defendants, Ex. 1.1, Hill Reb. fig. 14; *see also* Ex. 1.1, *id.* ¶¶99, fig. 13 (noting student whose EFCs calculated by four Defendant schools to which they were admitted varied from $43,177 to $69,156. For example, Dartmouth expected one cross-admit to contribute more than $25,000 more than Penn expected. Ex. 1.1, *id.* ¶99, fig. 13.

58.     Cross-admits to two Defendants had an average spread in their EFCs of $15,399, and this spread increased to $21,773 for cross-admits to three Defendants, $26,566 for cross-

admits to four Defendants, and $24,466 for cross-admits to five or more Defendants.  Ex. 1.1, Hill Reb. ¶102, fig. 15.

59.     Only a fraction of a percent of cross-admits received identical net prices from any two Defendants, and net prices for more than two-thirds of cross-admits differed by more than 15%.  Ex. 1.1, Hill Reb. ¶120, fig. 20; *see also* Ex. 3.1, Stiroh Reb. ¶142, fig. 5.6 (net prices for class members with EFCs near the median of $18,690 for academic year 2018-2019 ranged from $5,330 to $61,462).

60.     Cross-admits to two Defendants had an average spread in net prices of more than $19,000, and this spread increases to $29,606 for cross-admits to three Defendants, $36,538 for cross-admits to four Defendants, and more than $45,000 for cross-admits to five or more Defendants.  Ex. 1.1, Hill Reb. ¶121, fig. 21.

61.     Average differences in school-specific EFCs were similar before and after Defendants joined the 568 Group.  Ex. 1.1, Hill Reb. ¶105, fig. 16.  If anything, average variation in school-specific EFCs did not decrease after the CM Guidelines were introduced.  Ex. 1.1, Hill Reb. ¶¶106-107, fig. 17.

62.     There were no changes to the financial aid process that adversely affected putative class members at any of the Defendant schools upon joining the 568 Group.  Ex. 191, Singer Tr. 313:25-315:7.

## III.   568 GROUP

63.     In 1998 a group of colleges and universities formed the 568 Presidents Group (the "568 Group"), named after Section 568 of the Improving America's Schools Act of 1994, Pub. L. 103-382, § 568(a), 108 Stat. 3518, 4060 (1994), *see* Ex. 429; *see also* Ex. 419, *What is the 568 Presidents Group?*, 568 Presidents Group (archived Jan. 25, 2022), https://web.archive.org/web/20220125094142/http://www.568group.org/home (last visited May

6, 2025); Ex. 181, Nucciarone (Notre Dame 30(b)(6)) Tr. 18:5-19:9.  The 568 Group disbanded in November 2022.  Ex. 219, *568 Group*, https://www.568group.org ("The 568 Presidents Group (and all of its Committees) has been formally dissolved, effective November 4, 2022."); Ex. 25, Need-Based Educational Act of 2015, Pub. L. 114–44, § 2, 129 Stat. 472 (Aug. 6, 2015).

      64.     In addition to Defendants, the 568 Group's membership at various times included other need-blind private national universities and liberal arts colleges, including Amherst College, Boston College, Claremont McKenna College, College of the Holy Cross, Davidson College, Grinnell College, Haverford College, Wake Forest University, Wellesley College, Wesleyan University, and Williams College.  Ex. 220, *568 Presidents' Group Member Institutions*, 568 PRESIDENTS GROUP (archived Feb. 23, 2005), https://web.archive.org/web/20050223041238/http://www.568group.org:80/membership/members.html (last visited May 7, 2025); Ex. 221, *568 Presidents' Group Member Institutions*, 568 PRESIDENTS GROUP (archived June 26, 2008), https://web.archive.org/web/20080626203756/http://568group.org/membership/members.html (last visited May 6, 2025); Ex. 223, *568 Presidents' Group Member Institutions*, 568 PRESIDENTS GROUP (archived July 24, 2011), https://web.archive.org/web/20110724210442/http://568group.org/membership/index.html (last visited May 6, 2025); Ex. 224, *568 Presidents Group Member Institutions*, 568 PRESIDENTS GROUP (archived Jan. 24, 2022), https://web.archive.org/web/20220124014615/http:/www.568group.org/home/?q=node/24 (last visited May 6, 2025).  In all, at least 28 Defendant and non-Defendant schools at one time or another were members of the 568 Group.  Ex. 222, *568 Presidents Group Member Institutions*, 568 PRESIDENTS GROUP (last archived May 28, 2009), https://web.archive.org/web/20090528212801/http://www.568group.org/membership/members.html (last visited May 6, 2025).

65. The only requirement for membership in the 568 Group was to practice need-blind admissions. *See* Ex. 9, BROWN_0000078665; Ex. 31, CORNELL_LIT0000108811; Ex. 68, ND_0011629 *see also* Ex. 132, Arleth (COFHE) Tr. 40:14-16; 192:19-193:6; 201:7-17; Ex. 197, Varas (Penn) Mar. 18, 2024 Tr. 319:1-23. The Group monitored compliance with this requirement by requiring schools to "recertify their compliance with Section 568 annually." Ex. 9, BROWN_0000078665. When schools could not certify compliance, they left the Group. ███

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████

66. The 568 Group has included dozens of different schools, and the exact composition of its membership has changed over time, with Defendants entering and exiting at different times. *See* Ex. 1.1, Hill Reb. ¶¶71-76, figs. 3-5.

| Defendant | Membership in 568 Group |
|---|---|
| Brown | 2004 – May 2012 |
| Caltech | 2019 – 2022 |
| Columbia | 1998 – 2022 |
| Cornell | 1998 – 2022 |
| Dartmouth | 2004 – 2022 |
| Duke | 1998 – May 2021 |
| Emory | December 2003 – April 2012 |
| Georgetown | 1998 – 2022 |
| Johns Hopkins | December 2021 – 2022 |
| MIT | 1998 – 2022 |
| Northwestern | 1998 – 2022 |
| Notre Dame | 1998 – 2022 |
| Penn | 1998 – January 2020 |
| Rice | 1998 – 2011; 2014 – November 2021 |
| UChicago | 1998 – September 2014 |
| Vanderbilt | 1998 – April 2020 |
| Yale | 1998 – 2008; 2018 – 2022 |

67. Penn left the 568 Group by January 2020. Ex. 81, PENN568-LIT-00000002 (Jan. 24, 2020 letter from Matt Sessa to Jack DeGioia). Penn officials stopped attending 568 Group

meetings and declined to participate in 568 Group initiatives. *See* Ex. 87, PENN568-LIT-00136163 (2021 email declining an invitation to participate in 568 Group meetings and stating that Penn "is not planning to return to 568").

### A.     Consensus Methodology Policy Guidelines

68.     In 2001 the 568 Group's Common Standards Subcommittee to the 568 Presidents' Working Group published a Report (the "Subcommittee Report") that built on the College Board's "Base IM" and provided recommendations on certain discrete components of need analysis not fully addressed by the IM. *See, e.g.*, Ex. 377, *Report of the Common Standards Subcommittee to the 568 Presidents' Working Group* (archived Aug. 18, 2001), https://web.archive.org/web/20010818090442/http:/www.news.cornell.edu/releases/July01/568.presidents.report.html (last visited May 6, 2025).

69.     The recommendations in the Subcommittee Report were eventually adapted by the 568 Group to create the Consensus Methodology Policy Guidelines ("CM Guidelines"), which addressed 17 of the many discrete components that comprise Defendants' need-analysis methodology, Ex. 2.1, Long Reb. ¶¶145, 166; Ex. 75, NULIT-0000000348 (Dec. 2016 CM Guidelines) at -349, -352; Ex. 79, NULIT-0000161662 (2004-05 CM Guidelines) at -664; Ex. 39, DARTMOUTH_0000152041 (Nov. 2015 CM Guidelines) at -042, and recommended adjustments to account for financial burdens that had previously been unaccounted for by the Base IM, Ex. 2.1, Long Reb. ¶146. The CM Guidelines did not provide any "formula" for calculating EFCs. *See* Ex. 191, Singer Tr. 12:5-16, 15:7-15, 17:6-17, 19:19-20:14, 26:19-27:15.

70.     The CM Guidelines emphasized the importance of making need analysis equitable and transparent, and stated that following them would "reduce expected parent contributions in the aggregate." Ex. 75, NULIT-0000000348 (CM Guidelines, Dec. 2016) at -351-352.

71.     The 568 Group's membership, the need analysis "principles" in the Subcommittee Report, the CM Guidelines and components thereof, and various activities of the 568 Group were publicly reported in the media in the 2000s and 2010s (before 2018), including in stories asking, "Collusion or Competition?" and "A Truce In The Scholarship Bidding Wars?," as well as stories discussing the 568 Group's work to develop a "common methodology."  *See, e.g.*, Ex. 259, Peter Cartensen, *Colleges and Student Aid: Collusion or Competition?*, CHRON. OF HIGHER EDUC. (Aug. 10, 2001), https://www.chronicle.com/article/colleges-and-student-aid-collusion-or-competition ("The presidents of 28 private colleges recently endorsed a set of common standards for measuring a family's ability to pay for college – such as how to calculate the value of home equity or the financial need of a student with divorced parents."); Ex. 50, GTWNU_0000009876 (*Colleges Aim to Simplify Student Financial Aid Process Colleges Aim to Simplify Student Financial Aid Process*, BOSTON GLOBE (Mar. 20, 2005)); Ex. 218, Henrik N. Dullea, *28 University Presidents Affirm Commitment to Financial Aid*, CORNELL CHRON. (July 6, 2001), https://news.cornell.edu/stories/2001/07/28-university-presidents-affirms-commitment-financial-aid; Ex. 41, DARTMOUTH_0000359371 at -467 (Shevani Jaisingh, *28 Colleges Alter Fin. Aid Packages*, THE DARTMOUTH (July 17, 2001)); Ex. 55, GTWNU_0000257603 (Kim & Athavaley, *Colleges Seek to Address Affordability*, WALL ST. J. (May 3, 2007)); Ex. 409, *University Leaves Financial Aid Group*, YALE DAILY NEWS (Sept. 26, 2008), https://yaledailynews.com/blog/2008/09/26/university-leaves-financial-aid-group; Ex. 367, *On the Record with President DeGioia*, THE GEORGETOWN VOICE (Mar. 6, 2014), https://georgetownvoice.com/2014/03/06/record-president-degioia; Ex. 275, Louise Story, *Deadlines Looming in Aid Law*, YALE DAILY NEWS (Apr. 2, 2001), https://yaledailynews.com/blog/2001/04/02/deadlines-looming-in-aid-law ("The group continues to work on a common methodology that may remove

home equity from the aid formula and may change the payment role of non-custodial parents."); Ex. 249, Andrew Williamson, *Beginning of the End for 568 Group Oligopoly*, YALE DAILY NEWS (Jan. 16, 2008), https://yaledailynews.com/blog/2008/01/16/beginning-of-the-end-for-568-group-oligopoly; Ex. 229, Troy Onink, *2017 Guide to College Financial Aid, the FAFSA and CSS Profile*, FORBES (Jan. 8, 2017), https://www.forbes.com/sites/troyonink/2017/01/08/2017-guide-to-college-financial-aid-the-fafsa-and-css-profile/#621b2ff64cd4 (reporting that "under the CM home equity is capped at 1.2 times the parent's adjusted gross income"); Ex. 425, Kim Clark, *Who Truly Needs Financial Aid?*, U.S. NEWS & WORLD REP., Sept. 13, 2002; Ex. 245, Kim Clark, *A Truce In The Scholarship Bidding Wars?*, U.S. NEWS & WORLD REP., Sept. 30, 2002; Ex. 90, H.R. REP. NO. 107-32, at 3 (Apr. 3, 2001) ("In addition, they are discussing and testing guidelines based on the 1997 proposals of the financial aid officers. The presidents expect to announce agreement on the principles and guidelines in the next several months.").

72. The 568 Group and members of the 568 Group publicly disclosed the Group's membership, the "principles" in the Subcommittee Report, the CM Guidelines and components thereof, who the Group's need analysis approaches were directed to (first year aid applicants, and continuing students at most institutions), and various activities of the 568 Group, including on the 568 Group's website and on various member schools' websites, as well as in response to inquiries from families and the news media, in the 2000s and 2010s (before 2018). *See, e.g.*, Ex. 377, *Report of the Common Standards Subcommittee to the 568 Presidents' Working Group* (archived Aug. 18, 2001), https://web.archive.org/web/20010818090442/http://www.news.cornell.edu/releases/July01/568.presidents.report.html (last visited May 6, 2025) (archived Cornell news release webpage from Aug. 18, 2001 posting CM Guidelines); Ex. 29, CORNELL_LIT0000002461 (July 6, 2001 press release about the 568 Group) at -464; Ex. 6, AMHE-00000092 (2001 Press Release);

Ex. 220, *568 Presidents' Group Member Institutions*, 568 PRESIDENTS GROUP (archived Feb. 23, 2005), https://web.archive.org/web/20050223041238/http://www.568group.org:80/membership/members.html (last visited May 7, 2025); Ex. 78, NULIT-0000056485 ███████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████████ Ex. 41, DARTMOUTH_0000359371 at -467 (*28 Colleges Alter Fin. Aid Packages*, THE DARTMOUTH (July 17, 2001)); Ex. 55, GTWNU_0000257603 (Kim & Athavaley, *Colleges Seek to Address Affordability*, WALL ST. J. (May 3, 2007)); Ex. 409, *University Leaves Financial Aid Group*, YALE DAILY NEWS (Sept. 26, 2008), https://yaledailynews.com/blog/2008/09/26/university-leaves-financial-aid-group; Ex. 367, *On the Record with President DeGioia*, THE GEORGETOWN VOICE (Mar. 6, 2014), https://georgetownvoice.com/2014/03/06/record-president-degioia (President DeGioia confirming Georgetown's membership in 568 Group, noting that he is the "chair" of the Group); Ex. 275, Louise Story, *Deadlines Looming in Aid Law*, YALE DAILY NEWS (Apr. 2, 2001), https://yaledailynews.com/blog/2001/04/02/deadlines-looming-in-aid-law (describing statements from Cornell President Hunter Rawlings—"Rawlings said he expects the group will release the exact methodology this spring.").

73.     The 568 Group and its members provided information about the recommendations in the CM Guidelines to the U.S. Government Accountability Office ("GAO"), which led to the GAO publishing a report in 2006 in which it concluded that the 568 Group's activities had "not significantly affected college affordability" and disclosed the Group's membership, various activities of the Group, and details about the CM Guidelines, including with this chart that compared the IM to the CM Guidelines:

Table 3: Comparison of Consensus Approach Developed by Schools Using the Antitrust Exemption Compared to the College Board's Institutional Methodology

| | Institutional methodology | Consensus approach |
|---|---|---|
| Home equity | Included. No limit on amount considered asset available to pay for college. | Included. Home value is capped at 2.4 times income minus mortgage debt. |
| Family farm equity | Included. | Included. |
| Student and family assets | Included, but assets counted separately. 25 percent of student's net worth expected to be used for college costs. 5 percent of parent's assets expected to be used for college costs. | Included. In general student assets—such as prepaid and college savings plans are combined with family assets. 5 percent of family assets expected to be used for college. Trust funds will be considered on a case by case basis. |
| Divorced and separated families (Noncustodial parent) | Included. Expects noncustodial parent to contribute towards college costs. | Same as IM. |
| Total income/adjusted gross income | Included in total income any untaxed income and any paper depreciation and business, rental, or capital losses which artificially reduced adjusted gross income. | Excluded business and rental losses from calculation of income. |
| Medical/elementary and secondary school expenses | Included.[a] | Included. |
| Cost of living variance | Excluded.[b] | Adjusted living expenses based on geographic location. Takes into consideration that it is more costly to live in some areas of the country. |
| Number of siblings in college | Included—considers number of children enrolled in college, but instead of dividing by the number in college, it reduced the parental contribution for each student by 40 percent if 2 in college and by 55 percent if 3. | Same as IM. |
| One-time income adjustment | Not included.[c] | Excluded income that was not received on an annual basis, such as unemployment income or capital gains. |
| Family debt | Not included. | Made allowance for debt payments on loans incurred by parents for student's education. |

Source: GAO analysis.

Note: The consensus approach is being compared to the base institutional methodology. Schools may choose to implement other options available under the institutional methodology when assessing a student's financial need.

[a]Private elementary and secondary school tuition allowed at the option of the institution.

[b]As an option schools can adjust living expenses based on geographic locations.

[c]This is not in the base IM; however, a financial aid officer can adjust for this on a case-by-case basis, consistent with professional judgment.

Page 13                                              GAO-06-963 Higher Education

Ex. 408, U.S. Gov't Accountability Off., Schools' Use of the Antitrust Exemption Has Not Significantly Affected College Affordability or Likelihood of Student Enrollment to Date (Sept. 2006) at 13, *available at* https://www.gao.gov/assets/gao-06-963.pdf.

74.     The CM Guidelines did not address every element of a comprehensive need-analysis methodology, and for at least eight of the 17 discrete elements that they addressed, the

recommendations were vague, incomplete, or open to interpretation and dictated no particular result. Ex. 2.1, Long Reb. ¶176 & n.357; *see also* Ex. 180, Nucciarone (Notre Dame) Tr. 78:21-79:20 ("Consensus Methodology I believe to be a misnomer" as "[t]he methodology is institutional methodology with professional judgment approaches applied to institutional methodology").

75.     The CM Guidelines provided certain adjustments to the Base IM that served to reduce EFCs in comparison to the Base IM.  *See* Ex. 2.1, Long Reb. ¶146; Ex. 75, NULIT-0000000348 (CM Guidelines, Dec. 2016) at -351-352; *see also id.* at -357-358 (providing for a treatment of retirement allowances more generous to students than the Base IM); *id.* at -356-357 (CM Guidelines suggesting that pre-paid tuition and savings plans for students be treated as parent assets, and thus assessed a lower rate than they would be under the Base IM); *id.* at -354-356 (CM Guidelines suggest adjusting certain cost of living allowances using CSS Profile's Cost of Living Adjustment tables, as opposed to the Base IM's traditional use of a "uniform, basic living expense allowance"); *id.* at -357 (CM Guidelines capping home equity at 1.2 times family income, as opposed to the "prior IM option of capping home equity at 3 times income").

76.     Starting in 2001, for example, the 568 Group's Standards Subcommittee suggested adjusting certain allowances using the CSS Profile's Cost of Living Adjustment ("COLA") tables, which resulted in more generous financial aid offers for families in higher cost zip codes.  Ex. 96, UCHICAGO_0000183661 at -682-684; *see also* Ex. 75, NULIT-0000000348 (CM Guidelines, Dec. 2016) at -354-356 (CM Guidelines suggest adjusting certain cost of living allowances using CSS Profile's Cost of Living Adjustment tables, as opposed to the Base IM's traditional use of a "uniform, basic living expense allowance"); Ex. 2.1, Long Reb. ¶¶147-149.

77.     Starting in 2015, the CM Guidelines suggested that "[m]ost student assets should be considered parental assets in assessing the EFC," which, for students with many assets or large

amounts of pre-paid tuition, would lower EFC calculations as compared to the Base IM's approach. Ex. 17, COFHE-02-00007049 (Professional Judgment Guidelines Manual, Dec. 2016) at -057-059; Ex. 39, DARTMOUTH_0000152041 (CM Guidelines, Nov. 2015) at -049-050; *see* Ex. 2.1, Long Reb. ¶¶194-196.

78.     Unlike the Base IM, the CM Guidelines also provided for the use of retirement allowances for families that did not have formal retirement plans or assets, which allowed those families to protect more of their assets from being counted in financial aid calculations. Ex. 2.1, Long Reb. ¶¶157-161; Ex. 75, NULIT-0000000348 (CM Guidelines, Dec. 2016) at -357-358 (noting that while the IM retirement allowance was "eliminated," the "568 Group recognizes that many families are not covered by formal retirement programs and that it may be appropriate to provide retirement protection for those without such support").

79.     Starting in 2005, the CM Guidelines limited the consideration of home equity to "1.2 times total income," which would "limit the amount of equity to be assessed" as compared to the Base IM's approach. Ex. 75, NULIT-0000000348 (CM Guidelines, Dec. 2016) at -357; Ex. 41, DARTMOUTH_0000359371 at -375 (providing that the CM's home equity cap is modified from 2.4 times family income to 1.2 times family income); Ex. 36, CORNELL_LIT0000335803 ("Need Analysis Compare – Institutional Methodology"), at -804 (Base IM calculation does not cap home equity, and 2022 IM provides "recommended" cap of "2 times the [parents'] total income").

80.     There were no "penalties, consequences, or the like if any school failed to follow" the Guidelines. Ex. 142, Christiansen (Vanderbilt) Tr. 177:13-23; *see also* Ex. 137, Bridson (MIT) Tr. 208:19-209:2 (same); Ex. 143, Coffin (Dartmouth) Tr. 272:7-13 (same); Ex. 187, Schapiro (Northwestern) Tr. 196:22-197:2 (same); Ex. 200, Wallace-Juedes (Yale) Tr. 258:8-18 (same);

Ex. 159, Hall (Columbia) Tr. 278:12-18 (same); Ex. 170, Marinaccio (Columbia) Tr. 415:24-416:7 (same); Ex. 144, Coleman (Duke) Tr. 111:8-13 (same); Ex. 172, McCall (Duke) Tr. 315:10-15 (same); Ex. 185, Russo (Notre Dame) Tr. 282:15-21 (same); Ex. 174, McDermott (JHU) Tr. 411:19-23 (same); Ex. 176, McLaughlin (Penn) Tr. 252:2-9 (same); Ex. 196, Varas (Penn) Aug. 2, 2023 Tr. 291:19-292:2 (same); Ex. 148, Costanzi (Georgetown) (June 29, 2023) Tr. 326:8-16 (same); Ex. 153, Downs-Burns (Middlebury) Tr. 226:19-25 (former chair of the 568 Group's "Technical Committee" confirming that there was "no disciplinary mechanism" for schools who did not follow the CM or any portion of it).

81. Each Defendant independently determined whether and how to implement the discrete components of need analysis with actionable recommendations in the CM Guidelines. Ex. 2.1, Long Reb. ¶176, App'x D; Ex. 191, Singer Tr. 19:19-21:8; Ex. 75, NULIT-0000000348 (CM Guidelines, Dec. 2016) at -349 (Guidelines' purpose was to serve as "recommendations" with a framework "that many schools could adopt while still being able to manage their individual resources"); Ex. 171, Maxson (Cornell) Tr. 155:20-22; Ex. 199, Walker (Rice) Tr. 66:1-9 (explaining the 568 Group allowed Rice to "glean what best practices are being done out in the field and whether those do or not apply to Rice in how we do things"); Ex. 181, Nucciarone (Notre Dame 30(b)(6)) Tr. 20:15-21:5; 328:12-329:8 (568 Group developed "best practices" that precipitated "institutional discussion" about what "fits with our university"); Ex. 193, Tener (Vanderbilt) Tr. 76:16-23 (stating that the 568 Group put together "best practices" but that Vanderbilt "would develop [its] own procedures that [Vanderbilt] ultimately followed"); *see also infra* SOF 84-91.

82. Defendants accepted and acknowledged deviation from the CM Guidelines as normal and compatible with 568 Group membership. *See* Ex. 61, MITLIT-000004381 (Scott

**PUBLIC VERSION**

Wallace-Juedes (Yale) noting to Penn that "you don't have to follow CM 100%" to be in the 568 Group); Ex. 141, Chang (Caltech 30(b)(6)) Tr. 81:16-82:1 (noting that the 568 Group did not require adoption of the CM Guidelines); Ex. 140, Chang (Caltech) Tr. 304:11-305:12 ("Caltech never used the Consensus Methodology"); Ex. 137, Bridson (MIT) Tr. 49:9-15 (568 members "could use what we wanted and not use what we did not want to use" of the CM); Ex. 150, DeGioia (Georgetown) Tr. 181:10-182:11 (noting that "each school was free to go back to their place and do whatever they deemed appropriate"); Ex. 146, Corbett (Cornell) Tr. 48:24-49:6 ("Cornell looked at all of the options independently to decide on the methodology that [it] would employ."); *id.* 110:16-111:3 ("[T]here were best practices that we at Cornell could choose to adopt or not as we developed our own methodology."); Ex. 166, Locke (Cornell) Tr. 73:3-11 (the 568 Group "developed" the CM which "an individual institution could ultimately decide to utilize parts of," but "it was really centered around kind of best practices"); Ex. 138, Bridson (MIT 30(b)(6)) Tr. 127:4-16 (declining to dispute the accuracy of the statement that "MIT's variation of IM incorporates some, but not all, of the aspects of what is known as the Consensus Approach to Need Analysis" when asked); Ex. 181, Nucciarone (Notre Dame 30(b)(6)) Tr. 93:22-94:19 (Notre Dame understood it did not need to "use all of th[e] principles" of the CM Guidelines nor use the CM principles "exactly the way they were written"); Ex. 180, Nucciarone (Notre Dame) Tr. 325:17-326:14 (Notre Dame "did not interpret anything about th[e] 568 guidelines as mandatory"); Ex. 64, MITLIT-000072948 at -950 (MIT "incorporates some, but not all, of the aspects of" the CM); Ex. 62, MITLIT-000008772 (MIT uses the CM "as a guideline" but "[i]n several instances" is "more generous"); Ex. 194, Tilton (Brown) Tr. 59:13-19 ("We did not use the consensus methodology when calculating Brown['s] institutional methodology."); *id.* 45:18-46:14 (Brown "agreed to the principles related to the needs analysis" but did not adopt the CM in full); Ex. 198,

Varas (Penn 30(b)(6)) Tr. 218:20-219:10 (Penn did not follow the CM); Ex. 159, Hall (Columbia) Tr. 54:12-24 (noting that the CM Guidelines were about "best practices," and that "even at Columbia, we weren't always following what the consensus methodology said to the letter, anyway"); *id.* 73:14-75:18 (same); Ex. 174, McDermott (Johns Hopkins) Tr. 410:19-411:23 (Johns Hopkins did not follow the CM); Ex. 199, Walker (Rice) Tr. 35:15-36:10; 40:25-41:13; 221:15-25 (Rice did not follow all aspects of the CM, nor did it understand other schools to follow all aspects); Ex. 193, Tener (Vanderbilt) Tr. 206:13-24 (Vanderbilt "deviated" from portions of the CM).

83.     No Defendant adopted the CM Guidelines in their entirety while a member of the 568 Group, and no single component of the CM Guidelines was applied by every Defendant every year of their membership. Ex. 2.1, Long Reb. ¶¶174-198, fig. 8; Ex. 35, CORNELL_LIT0000252669 ("Results of Consensus Methodology Questionnaire," Jan. 2015), at -679, -681-683, -685, -687 (out of 19 schools that completed 568 Group survey, three schools reported deviating from the recommended treatment of divorced, separated, and single parents, three schools reported deviating from the recommended treatment of cost-of-living variances, six schools reported deviating from the recommended treatment of family and student assets, two schools reported deviating from the recommended treatment of retirement allowances, two schools reported deviating from the recommended treatment of the number of siblings in college, and one school reported deviating from the recommended imputation of the value of liquid assets); *see also* Ex. 132, Arleth (COFHE) Tr. 191:7-192:6; Ex. 174, McDermott (Johns Hopkins) Tr. 410:19-411:23; Ex. 38, DARTMOUTH_0000082031 at -033 (Dartmouth telling the GAO that it "has not implemented the Consensus Approach," despite being a member of the 568 Group); Ex. 142, Christiansen (Vanderbilt) Tr. 71:20-72:2 (Vice Provost and Dean of Admissions and Financial Aid

at Vanderbilt explaining that Vanderbilt "did not follow [the consensus] methodology 100 percent entirely, and we deviated, and we did what we need to do best for us and our students"); Ex. 63, MITLIT-000026032 (Director of Student Financial Services at MIT explaining that "[w]hile 568 schools use the Consensus Approach, there can be variances within that approach"); Ex. 61, MITLIT-000004381 (Scott Wallace-Juedes (Yale) noting to Penn that "you don't have to follow CM 100%" to be in the 568 Group); Ex. 191, Singer Tr. 248:17-249:7 (recognizing Defendants made "deviations" from the CM).

84. Defendants frequently diverged from the CM Guidelines, including in ways that benefitted students. *See* Ex. 2.1, Long Reb. ¶¶145, 174-198, App'x D (discussing Defendants' deviations from the CM Guidelines; how they implemented the CM Guidelines differently, if at all; and how Defendants' deviations resulted in *lower* EFCs); Ex. 62, MITLIT-000008772 (Bridson of MIT noting that "[i]n several instances, [MIT] is more generous than CM, but we do use it as a guideline").

85. For example, only four Defendants—Columbia, Duke, Georgetown, and Johns Hopkins—adopted and consistently applied the CM Guidelines' recommended cap on how much home equity to consider in evaluating a student's EFC. Ex. 2.1, Long Reb. ¶178, fig. 8.

86. Some Defendants counted the full value of a family's home, some instituted caps above or below the CM Guidelines, and some did not consider home equity at all. *See*, *e.g.*, Ex. 2.1, *id.* App'x D, tbls. D.1, D.8, D.11, D.12. For example, Caltech stopped considering home equity in 2020, Ex. 2.1, *id.* tbls. D.2, while Penn instituted a lower cap on home equity than the CM Guidelines recommended in 2005, Ex. 2.1, *id.* D.14, and Brown, Emory, and ███████ instituted a home equity cap above the CM Guidelines in certain years, Ex. 2.1, *id.* tbls. D.1, D.8, D.15, ███ Similarly, after it exited the 568 Group for the first time, Yale became less generous

than the CM Guidelines by increasing its home equity cap and reducing retirement asset allowances. Ex. 120, YALE_LIT_0000005427; *see also* Ex. 2.1, Long Reb. App'x D, tbl. D.17.

87.     Other approaches to home equity varied. For example, MIT removed home equity from its analysis for families that earned less than $100,000 in yearly income in 2008, raised that threshold to $150,000 in 2014, and stopped considering home equity altogether in 2016. Ex. 2.1, Long Reb. App'x D, tbl. D.11; Ex. 328, *Increase of 10.4 Percent in Financial Aid Will Benefit a Wide Range of MIT Families*, MIT NEWS (Mar. 4, 2016), https://news.mit.edu/2016/increase-financial-aid-benefit-students-families-0304. Similarly, Rice capped home equity at 1.2 times income in 2007, raised the cap to 2 times income in 2012, and lowered the cap to 0.1 times income in 2020. *See* Ex. 2.1, Long Reb. App'x D, tbl. D.15.

88.     Similarly, only nine of the 20 then-members of the 568 Group adopted the retirement allowance tools that the 568 Group developed for the 2019-2020 award cycle. Ex. 2.1, Long Reb. ¶160; Ex. 67, ND_0000624 at -625.

89.     Only two Defendants, Columbia and Dartmouth, adopted the December 2016 CM Guidelines' recommendations regarding adjusting parental contributions for students with siblings in college through the end of the class period. Ex. 2.1, Long Reb. ¶189, fig. 8.

90.     Other deviations by Defendants included variations in how schools implemented the CM Guidelines' recommendations on the treatment of parent and student assets, Ex. 2.1, Long Reb. ¶196, App'x D, tbls. D.3, D.4, D.5, D.6, D.11, D.13, and the treatment of and the reduction of parent contributions to account for other siblings in college, *id.* ¶¶190-192, fig. 8, and cost-of-living adjustments, *id.* ¶183 n.371.

91.     Emory, MIT, and Penn lowered the parental contribution for each sibling in college more than the CM Guidelines recommended. Ex. 2.1, Long Reb. App'x D, tbls. D.8, D.11, D.14.

92.     While members of the 568 Group, certain Defendants utilized "income threshold" policies, pursuant to which families below certain income thresholds would not be expected to take out any loans to pay for college. *See, e.g.*, Ex. 8, BROWN_0000050379 ("Financial Aid Office: Undergraduate Overview," 2014) at -379; Ex. 196, Varas (Penn) Aug. 2, 2023 Tr. 219:13-221:24; Ex. 198, Varas (Penn 30(b)(6)) Tr. 98:14-101:7; Ex. 261, *Cornell Drops Need-Based Loans for Students From Families Earning Under $75,000*, CORNELL CHRON. (Jan. 31, 2008), https://news.cornell.edu/stories/2008/01/cornell-announces-sweeping-new-financial-aid-program; Ex. 124, Kotlikoff (Cornell 30(b)(6)) Dep. Ex. 2 at 2.

## B.     "Need Analysis Principles"

93.     The 2001 Subcommittee Report stated that the "work of the Subcommittee was … guided by a statement of Need Analysis Principles adopted by the 568 Presidents [at a meeting in April 2000]."  The Subcommittee Report disclosed that those principles are:

- "1. To the extent they are able, parents and students have the primary responsibility to contribute to educational expenses before an institution awards financial aid."

- "2. Families should contribute to educational expenses according to their ability. Those with similar financial profiles should contribute similar amounts."

- "3. Institutions should evaluate both income and assets as part of the assessment of the parents' and applicants' ability to pay."

- "4. Each institution should inform applicants about the policies and practices it applies when measuring a family's ability to pay, carry out its policies consistently throughout a student's eligibility, and support the awarding of need-based aid."

- "5. An institution that allocates any financial assistance that is not based exclusively on need should inform all prospective applicants of the standards it applies in allocating that aid."

- "6. The exercise of 'professional judgment' by financial aid officers in assessing a family's ability to pay should recognize unique or extenuating financial circumstances in individual cases; such professional judgment is not the proper mechanism for systematically treating groups of students differently in order to advance institutional objectives."

The same six principles were reproduced and included in every subsequent version of the CM Guidelines Policy Manual. *See, e.g.*, Ex. 75, NULIT-0000000348 (CM Guidelines, Dec. 2016) at -349.

94. The 568 Group publicly endorsed these "Need Analysis Principles" starting in the early 2000s. Ex. 6, AMHE-00000092 (2001 Press Release). They were disclosed on the 568 Group's website throughout the 2000s and 2010s, *see* Ex. 225, *568 Presidents' Group Document Center* (archived Feb. 5, 2005), https://web.archive.org/web/20050205194043/http://568group.org/docs/index.html (archive of 568 Group website's "Document Center" from Feb. 5, 2005) (last visited May 6, 2025); Ex. 233, *About the 568 Presidents' Group* (archived Apr. 6, 2005), https://web.archive.org/web/20050406033309/http://www.568group.org/about/chairman.html (last visited May 6, 2025) (archive of "About the 568 President's Group" page of the website from Apr. 6, 2005); Ex. 226, *The 568 Presidents' Group Consensus Methodology Policy Guidelines* (archived May 20, 2005), https://web.archive.org/web/20050520200523/http://www.568group.org/docs/cmmanual-non.pdf (archived copy of publicly available CM Guidelines from May 20, 2005) (last visited May 6, 2025); Ex. 228, *568 Presidents' Group Document Center* (archived Apr. 22, 2016), https://web.archive.org/web/20160422211732/http://568group.org/docs/index.html (archive of 568 Group website's "Document Center" from Apr. 22, 2016) (last visited May 6, 2025); Ex. 227, *The 568 Presidents' Group Consensus Methodology Policy Guidelines* (archived Apr. 22, 2016), https://web.archive.org/web/20160422163238/http://568group.org/docs/cmmanual-non.pdf (archived copy of publicly available CM Guidelines from Apr. 22, 2016) (last visited May 6, 2025); and were described in the Congressional record and in print media, *see* Ex. 90, H.R. REP. NO. 107-32, at 3 (Apr. 3, 2001) ("The presidents of the universities have tentatively agreed to a common set of principles affirming the primacy of need-based aid.");

Ex. 218, Henrik N. Dullea, *28 University Presidents Affirms Commitment to Financial Aid*, CORNELL CHRON. (July 6, 2001), https://news.cornell.edu/stories/2001/07/28-university-presidents-affirms-commitment-financial-aid ("28 leading colleges and universities today … endorsed a comprehensive set of principles for the fair determination of a family's contribution to the cost of securing an undergraduate education.").

95.     The principles the 568 Group endorsed publicly in the Subcommittee Report in 2001 and in every subsequent version of the CM Guidelines Manual have guided other schools and organizations for decades, long before the formation of the 568 Group.  For example, the College Board publishes a set of principles for need analysis and the administration of student financial aid in its annual IM User Guides, and a subset of those principles mirror the principles the 568 Group said guided its thinking.  *See* Ex. 2.1, Long Reb. ¶¶217-219, fig. 10:

**Figure 10**
**The 568 Group's and College Board's Principles of Need Analysis and Administration of Student Financial Aid**[435]

| | **568 Group Principles** | **College Board Principles Ratified by Member Institutions** |
|---|---|---|
| 1. | To the extent they are able, parents and students have the primary responsibility to contribute to educational expenses before an institution awards financial aid. | Because postsecondary education is a valuable personal investment, the student and the family have the primary responsibility for paying for educational costs to the extent they are able. |
| 2. | Families should contribute to educational expenses according to their ability. Those with similar financial profiles should contribute similar amounts. | An equitable need analysis system expects families in similar circumstances to make similar contributions. An equitable need analysis system expects families with different circumstances to contribute appropriately different amounts. |
| 3. | Institutions should evaluate both income and assets as part of the assessment of parents' and applicants' ability to pay. | A need analysis system should provide a comprehensive measurement of family financial strength. Both income and assets contribute to the family's financial strength and both should be considered when measuring any family's ability to pay. A family's ability to pay, not willingness to pay, is measured by the need analysis system. |
| 4. | Each institution should inform applicants about the policies and practices it applies when measuring a family's ability to pay, carry out its policies consistently throughout a student's eligibility, and support the awarding of need-based aid. | Each institution has a responsibility to disclose information about the policies and practices it applies in measuring family ability to pay. |
| 5. | An institution that allocates any financial assistance that is not based exclusively on need should inform all prospective applicants of the standards it applies in allocating that aid. | Each institution has the responsibility to make clear to students and their families whether offered funds are awarded based on financial need or other grounds. |
| 6. | The exercise of "professional judgment" by financial aid officers in assessing a family's ability to pay should recognize unique or extenuating financial circumstances in individual cases; such professional judgment is not the proper mechanism for systematically treating groups of students differently in order to advance institutional objectives. | The financial aid administrator must always make the final assessment of family ability to pay, guided by these principles and considering the particular circumstances of the individual student and family. |

*See also* Ex. 13, CBD000001 (CSS/Financial Aid Profile User's Guide, College Board, 2003-2004) at -010 ("A strong commitment to need-based aid has been embedded in the College Board's statements of principles and practices since establishing the College Scholarship Service (CSS) in 1954."); Ex. 152, Donahue (Harvard) Tr. 235:11-239:5 (testifying that "Harvard's financial aid practices" were "consistent with these six principles" and that the principles are "widely adopted by financial aid professionals"); Ex. 145, Cooper (Stanford 30(b)(6)) Tr. 201:1-

65

206:5 (testifying the principles were not "unique to the 568 Group" and "widely endorsed" by institutions "awarding need-based aid;" and that Stanford agreed with "these general principles" and "Stanford's financial aid practices [were] broadly consistent with those principles"); Ex. 135, Betterton (Princeton) Tr. 168:13-170:8 (testifying the "principles were agreed to by a much larger group" than the 568 Group). The fourth, fifth, and sixth principles listed in the Subcommittee Report, in the CM Guidelines Manuals, and on the 568 Group's website were long ago endorsed by the College Board's more than 4,200 member colleges and universities. *See* Ex. 2.1, Long Reb. ¶¶217-219, fig. 10; Ex. 13, CBD000001 (CSS/FINANCIAL AID PROFILE USER'S GUIDE, COLLEGE BOARD, 2003-2004) at -010-012.

96.     These Need Analysis Principles represented a commitment to achieving equity, efficiency, and transparency in financial aid, and they were considered "general principle[s] of need-based aid" or "best practice[s]" in the field. Ex. 140, Chang (Caltech) Tr. 227:6-234:11; Ex. 153, Downs-Burns (Middlebury) Tr. 232:19-234:16; Ex. 180, Nucciarone (Notre Dame) Tr. 304:15-306:18; Ex. 214, Notre Dame's Resps. & Objs. to Plaintiffs' Second Set of Rogs at 23 (noting that, with regard to these principles, Notre Dame's philosophy of financial aid was consistent with that "espoused by the College Board and thought leaders in the industry throughout the late 20th century").

97.     Transparency in financial aid provides families with accessible information, which allows them to more effectively evaluate which school provides the best value. *See, e.g.*, Ex. 151, Donaghey (Middlebury/Dartmouth) Tr. 16:10-14.

98.     Many schools—including Defendants, non-Defendants who were members of the 568 Group, and non-Defendants who were never members of the 568 Group—have endorsed these foundational principles since they were developed in the 1950s. *See, e.g.*, Ex. 175, McGann

(Amherst 30(b)(6)) Tr. 47:10-51:22 (agreeing that the Need Analysis Principles were "principle[s] of Amherst financial aid philosophy prior to joining the 568 Group"); Ex. 140, Chang (Caltech) Tr. 227:6-234:11; Ex. 153, Downs-Burns (Middlebury) Tr. 232:19-234:16; Ex. 180, Nucciarone (Notre Dame) Tr. 306:6-12 ("Those principles existed before 568."); Ex. 152, Donahue (Harvard) Tr. 235:4-239:5 (testifying that the principles were "widely adopted by financial aid professions" and that Harvard agreed with these principles in 2000); Ex. 135, Betterton (Princeton) Tr. 168:13-170:8 (testifying the "principles were agreed to by a much larger group" than the 568 Group); Ex. 145, Cooper (Stanford 30(b)(6)) Tr. 201:1-206:5 (testifying the principles were not "unique to the 568 Group" and "widely endorsed" by institutions "awarding need-based aid;" and that Stanford agreed with "these general principles" and "Stanford's financial aid practices [were] broadly consistent with those principles"); Ex. 161, Higinbotham (NYU 30(b)(6)) Tr. 144:15-148:18; Ex. 177, Meade (College Board 30(b)(6)) Tr. 266:3-270:6 (explaining that awarding aid based on need and assuming that families bear primary responsibility for paying for college have been CSS principles since 1954); Ex. 142, Christiansen (Vanderbilt) Tr. 162:8-162:25; Ex. 413, 12 U. PA. ALMANAC 4 (Jan. 1966) at 5, *available at* https://almanac.upenn.edu/archive/v12pdf/n04/011666.pdf (Penn President Gaylord Harnwell stating that "scholarships, loans, and job opportunities are made available to the student … as in the instance of the graduated income tax … in proportion to their ability to pay"); Ex. 214, Notre Dame's Resps. & Objs. to Plaintiffs' Second Set of Rogs at 23 (noting that, with regard to these principles, Notre Dame's philosophy of financial aid was consistent with that "espoused by the College Board and thought leaders in the industry throughout the late 20th century").

99.     The Need Analysis Principles endorsed by the 568 Group were subject to different interpretations and methods of implementation, *see, e.g.*, Ex. 173, McCourt (Penn) Tr. 253:18-

254:10 (describing the Need Analysis Principles as "very vague" and "pretty basic"), so schools that have endorsed them, like Defendants, viewed them as values with which to align their financial aid practices, and not as firm rules that must be applied, *see, e.g.*, Ex. 142, Christiansen (Vanderbilt) Tr. 162:16-25 (describing the principles as "common sense" and "positive things about our profession and how we think about" financial aid).

### C.    Professional Judgment

100.    In addition to the need-analysis methodology that each school develops and applies in its financial aid process, financial aid officers apply professional judgment in their review to evaluate applicants' financial circumstances on a case-by-case basis.  "Professional judgment" refers to a holistic evaluation of an applicant's application and might adjust certain inputs to a given student's EFC calculation, or consider special circumstances, like job loss, to manually adjust an award.    Ex. 418, *What is Professional Judgment?*, FED. STUDENT AID, https://studentaid.gov/help-center/answers/article/what-is-professional-judgment (last visited May 4, 2025) ("When there are unusual situations or circumstances that impact your federal student aid eligibility, federal regulations give a financial aid administrator discretion or professional judgment on a case-by-case basis and with adequate documentation to make adjustments to the data elements … that impact your Expected Family Contribution (EFC) to gain a more accurate assessment of your family's ability to contribute to your cost of education."); Ex. 163, Keane (Cornell) Tr. 182:20-184:1; Ex. 180, Nucciarone (Notre Dame) Tr. 56:23-60:20; Ex. 139, Chan (USC 30(b)(6)) Tr. 19:21-20:3; Ex. 159, Hall (Columbia) Tr. 196:14-21 (explaining that professional judgments are "unique" and are "particular to each situation and different to each situation"); Ex. 195, Tuman (Columbia) Tr. 218:3-219:13; *see also* Ex. 3.1, Stiroh Reb. ¶147. Using professional judgment to evaluate case-specific special circumstances is common throughout higher education because it improves fairness and equity.  *See, e.g.*, Ex. 126, Meade

**PUBLIC VERSION**

(College Board 30(b)(6)) Dep. Ex. 34 (Allan M. Cartter, "New Approaches to Student Financial Aid: Report of the Panel on Student Financial Need Analysis," College Entrance Examination Board (1971)) at 20-21 ("From the beginning it was a fundamental precept that the computation procedures were designed as an aid to, not as a substitute for, the aid officer's considered judgment."); Ex. 13, CBD000001 (CSS/FINANCIAL AID PROFILE USER'S GUIDE, COLLEGE BOARD, 2003-2004) at -012 ("The financial aid administrator must always make the final assessment of family ability to pay, guided by these principles and considering the particular circumstances of the individual student and family."); Ex. 139, Chan (USC 30(b)(6)) 63:16-25; Ex. 169, Maloney (Wisconsin 30(b)(6)) Tr. 46:17-48:916.

101.    The 568 Group developed a set of Professional Judgment Guidelines, *see* Ex. 17, COFHE-02-00007049 (Professional Judgment Guidelines Manual, Dec. 2016), which many Defendants did not use, *see, e.g.*, Ex. 196, Varas (Penn) Aug. 2, 2023 Tr. 210:3-211:22 (Penn did not use the 568 Group's professional judgment "guidelines"); Ex. 142, Christiansen (Vanderbilt) Tr. 80:21-81:19 (the 568 Group's professional judgment guidelines were "not something that we would go through and say, Yes, yes, yes, yes"); Ex. 159, Hall (Columbia) Tr. 95:7-96:8 (Columbia "internally [had its] own professional judgments beyond what's in the 568 professional judgment guide"); Ex. 181, Nucciarone (Notre Dame 30(b)(6)) Tr. 116:21-117:11 ("We had our own policies and procedures.").    These Professional Judgment Guidelines did not dictate what specifically a financial aid officer should do in a particular context to exercise professional judgment but instead encouraged schools to comport with the generally accepted foundational principle of financial aid that professional judgment should be exercised on a case-by-case basis to account for the unique financial circumstances of each student and their families.  *See* Ex. 200, Wallace-Juedes (Yale) Tr. 147:18-148:6 ("[P]rofessional judgment by definition … has to be on a

case by case [basis] … [a]nd you can't have a standard approach to that."); Ex. 17, COFHE-02-00007049 (Professional Judgment Guidelines Manual, Dec. 2016) at -055 ("These guidelines are always subject to the aid administrator's professional judgment and would serve as a basic standard for all 568 schools. Individual institutions could employ additional expectations either on an individual basis or as policies to be applied to all such cases."); Ex. 159, Hall (Columbia) Tr. 195:19-196:21; Ex. 185, Russo (Notre Dame) Tr. 201:1-202:13; Ex. 374, PROFESSIONAL JUDGMENT, NAT'L ASS'N OF STUDENT FIN. AID ADM'RS (NASFAA) (Apr. 2021) at 3, *available at* https://www.nasfaa.org/uploads/documents/NASFAA_AE_2021-22_PJ_SSG_192CD.pdf.

102.    Many financial aid recipients, including at Defendant schools, received individualized adjustments to their EFCs.  *See* Ex. 180, Nucciarone (Notre Dame) Tr. 60:7-20 (modifications made in "80, 90 percent" of cases); Ex. 159, Hall (Columbia) Tr. 195:2-24-196:21; Ex. 123, Chang (Caltech) Dep. Ex. 14 (CALTECH000007635 at -635); Ex. 3.1, Stiroh Reb. ¶147; Ex. 373, *Professional Judgment*, FINAID, https://finaid.org/educators/pj (last visited May 5, 2025); Ex. 421, *What Is the Foundation for Your Financial Aid Appeal?*, COLL. SELECTION STRATEGY, https://collegeselectionstrategy.com/financial-aid-appeal-professional-judgment (last visited May 5, 2025); Ex. 283, *The Expected Family Contribution (EFC): FAQ*, COLL. BD. (Oct. 30, 2023) https://web.archive.org/web/20231030104944/https://bigfuture.collegeboard.org/pay-for-college/calculate-your-cost/expected-family-contribution/faqs.

103.    Defendants, like other schools, exercise additional discretion through the appeals process, with many students—including five of the eight Named Plaintiffs—receiving increases to their aid package through the appeals process. *See* █████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

 Tr. 218:23-219:3, 231:19-233:25, 245:7-246:21, 248:9-249:12, 257:11-258:1 (describing additional aid awarded following financial aid appeals); Ex. 206, ████████████████ 2d Suppl. Resps. & Objs. to Defs.' 1st Rogs) at 3-4; ████ ████████████████ Tr. 79:3-7, 84:10-16, 86:6-10 1 (describing additional aid awarded following financial aid appeal); ████████████ ████ ████ ██ ████

223:6-13, 226:15-21, 227:24-228:15, 229:19-230:2, 231:6-15 (describing additional aid awarded following financial aid appeal); ████████████

████████████████ Tr. 237:19-238:10, 239:17-240:5 (describing additional aid awarded following financial aid appeals); ████████████ ████ Supp. Resps. & Objs. To Defs.' 1st Rogs) at 4-5 (████████

████████████ ; Ex. 3.1, Stiroh Reb. ¶146; Ex. 209, Georgetown Am. Rog Resps. at 33-34 (noting that an average of 356 students successfully appealed their aid award each year between 2004 and 2022); Ex. 158, Gall (Georgetown) Tr. 226:20-227:9; Ex. 192, Storlazzi (Yale) Tr. 38:1-7.

**D.    Packaging**

104.    The 568 Group did not address schools' packaging policies.  *See* Ex. 75, NULIT-0000000348 (CM Guidelines, Dec. 2016) at -352 ("All 568 Group schools are free to deal with institutional resource issues through their packaging policies."); Ex. 181, Nucciarone (Notre Dame

30(b)(6)) Tr. 134:13-23 ("So 568 had nothing to do with influencing that or any of our other ways we packaged"); Ex. 153, Downs-Burns (Middlebury) Tr. 228:17-229:3 (agreeing "568 schools could package their financial aid in any way they saw fit while they were members of the 568 Group" and there was no "restraint on packaging as a result of being a 568 member" because the 568 Group "did not discuss packaging"); Ex. 191, Singer Tr. 59:24-60:20 (admitting that "no reasonable person could say" that the 568 Group prohibited adopting a no-loan policy).

105.     Multiple Defendant schools adopted or maintained no-loan or low-loan policies while members of the 568 Group.  *See* Ex. 24, Columbia_00015333 (Peer School Financial Aid: Initiatives) at -335; *id.* at -336 (MIT eliminated loans for students with family incomes less than $75,000); Ex. 194, Tilton (Brown) Tr. 120:21-122:10; Ex. 205, Brown Resps. & Objs. to Pls.' 1st Rogs at 27-28; Ex. 189, Sessa (Penn) Tr. 223:23-224:22; Ex. 370, Julie McWilliams, *Penn Expands Financial Aid Program to Eliminate Loans: Fact Sheet*, PENN TODAY (Dec. 17, 2007), https://penntoday.upenn.edu/news/penn-expands-financial-aid-program-eliminate-loans-fact-sheet; Ex. 33, CORNELL_LIT0000213959 ("COFHE Yellowbook for 2019-2020 Questionnaire," Consortium on Financing Higher Education, 2019-2020) (starting in academic year 2018-2019, Cornell removed loan requirements for students with family incomes less than or equal to $60,000); Ex. 40, c( ("COFHE Yellowbook for 2019-2020," Consortium on Financing Higher Education, 2019-2020) (noting that, as of academic year 2018-2019, Dartmouth had removed loan requirements for students with family incomes less than $100,000); Ex. 300, *Financial Aid*, VANDERBILT UNIV., https://www.vanderbilt.edu/financialaid (last visited May 4, 2025); Ex. 193, Tener (Vanderbilt) Tr. 146:2-146:6; Ex. 240, *Affordability*, YALE UNIV., https://finaid.yale.edu/costs-affordability/affordability (last visited May 4, 2025); Ex. 200, Wallace-Juedes (Yale) Tr. 183:17-184:19; Ex. 362, Christine Farolan, "*Northwestern Eliminates*

*Loans as Part of Financial Aid Packages*, THE DAILY NORTHWESTERN (Mar. 4, 2016), https://dailynorthwestern.com/2016/03/03/campus/northwestern-eliminates-loans-as-part-of-financial-aid-packages; Ex. 361, Josiah Bonifant & Allie Goulding, *No-Loan Policy to Be Fully Implemented in 2019–2020, But Students Still Grapple with Financial Aid Options*, THE DAILY NORTHWESTERN (Feb. 5, 2019), https://dailynorthwestern.com/2019/02/05/lateststories/no-loan-policy-to-be-fully-implemented-in-2019-2020-but-students-still-grapple-with-financial-aid-options; Ex. 264, *Cost and Aid*, NORTHWESTERN UNIV., https://admissions.northwestern.edu/tuition-aid (last visited May 4, 2025); Ex. 342, *Making MIT Affordable*, MIT STUDENT FIN. SERVS., https://sfs.mit.edu/undergraduate-students/the-cost-of-attendance/making-mit-affordable (last visited May 4, 2025); Ex. 138, Bridson (MIT 30(b)(6)) Tr. 49:13-18; Ex. 174, McDermott (Johns Hopkins) Tr. 124:15-125:5; Ex. 293, *Financial Aid Glossary: No Loan*, JOHNS HOPKINS UNIV., https://apply.jhu.edu/tuition-aid/financial-aid-glossary (last visited May 4, 2025); Ex. 217, Scott Jaschik, *$1.8 Billion to Make Johns Hopkins Need-Blind*, INSIDE HIGHER ED, Nov. 18, 2018, https://www.insidehighered.com/admissions/article/2018/11/19/largest-gift-ever-higher-education-will-make-johns-hopkins-need-blind (last visited May 4, 2025); Ex. 239, *Affordability & Aid*, COLUMBIA UNIV., https://undergrad.admissions.columbia.edu/affordability (last visited May 4, 2025); Ex. 331, *Introduction to Financial Aid*, DARTMOUTH COLL., https://financialaid.dartmouth.edu/how-aid-works/introduction-financial-aid (last visited May 4, 2025); Ex. 124, Kotlikoff (Cornell 30(b)(6)) Dep. Ex. 2 at 3-4; Ex. 246, *Awarding & Policy*, DUKE UNIV., https://financialaid.duke.edu/forms-resources/awarding-policy (last visited May 4, 2025); Ex. 172, McCall (Duke) Tr. 25:8-26:1; Ex. 42, DUKE568_0000428 at -429; Ex. 140, Chang (Caltech) Tr. 127:20-128:11, 130:23-133:1, 134:5-15; Ex. 238, *Afford*, CALTECH,

https://www.admissions.caltech.edu/afford (last visited May 4, 2025); *see also* Ex. 2.1, Long Reb. figs. 6, 9.

106.    Among schools that adopted no-loan policies while members of the 568 Group, different schools adopted different approaches to no-loan policies, and at different times during their membership.  For example, Columbia eliminated loans for families earning less than $50,000 per year in September 2006, Ex. 24, Columbia_00015333 at -334, and in 2008, while MIT eliminated loans for families with less than $75,000 in income, Ex. 356, *MIT to Be Tuition-Free for Families Earning Less Than $75,000 a Year*, MIT NEWS (Mar. 7, 2008), https://news.mit.edu/2008/tuition-0307, Cornell eliminated loans for families with an annual income of less than $60,000, Ex. 124, Kotlikoff (Cornell 30(b)(6)) Dep. Ex. 2 at 4; Ex. 274, *CU Recommits to Need-Based Financial Aid for Undergrads*, CORNELL CHRON. (Nov. 13, 2008), https://news.cornell.edu/stories/2008/11/cornell-enhances-financial-aid-undergraduates.

107.    Emory and Brown adopted no-loan policies in 2022 and 2017, which was 10 years and 5 years, respectively, after they left the 568 Group in 2012, *see* Ex. 194, Tilton (Brown) Tr. 120:21-122:10; Ex. 205, Brown Resps. & Objs. to Pls.' 1st Rogs at 28; Ex. 398, *Undergraduate Financial Aid*, BROWN UNIV., https://finaid.brown.edu (last visited May 4, 2025); Ex. 282, Laura Diamond, *Emory Expands Financial Aid to Allow More Students to Graduate Debt-Free*, EMORY NEWS CENTER (Jan. 31, 2022), https://news.emory.edu/stories/2022/01/upress_emory_advantage_expansion_31-01-2022/story.html; Ex. 338, *Loans*, EMORY UNIV., https://studentaid.emory.edu/undergraduate/types/loans.html (last visited May 4, 2025).

108.    Columbia, Dartmouth, MIT, Northwestern, Penn, and ███████ eliminated loans entirely from all undergraduate student financial aid packages while members of the Group.  *See* Ex. 2.1, Long Reb. Fig. 6; Ex. 24, Columbia_00015333 (Peer School Financial Aid: Initiatives) at

-335; *see also* Ex. 239, *Affordability & Aid*, COLUMBIA UNIV., https://undergrad.admissions.columbia.edu/affordability (last visited May 4, 2025); Ex. 331, *Introduction to Financial Aid*, DARTMOUTH COLL., https://financialaid.dartmouth.edu/how-aid-works/introduction-financial-aid (last visited May 5, 2025); Ex. 342, *Making MIT Affordable*, MIT STUDENT FIN. SERVS., https://sfs.mit.edu/undergraduate-students/the-cost-of-attendance/making-mit-affordable (last visited May 5, 2025); Ex. 138, Bridson (MIT 30(b)(6)) Tr. 49:13-18; Ex. 362, Christine Farolan, *Northwestern Eliminates Loans as Part of Financial Aid Packages*, THE DAILY NORTHWESTERN, (Mar. 4, 2016), https://dailynorthwestern.com/2016/03/03/campus/northwestern-eliminates-loans-as-part-of-financial-aid-packages; Ex. 189, Sessa (Penn) Tr. 223:23-224:22; Ex. 370, Julie McWilliams, *Penn Expands Financial Aid Program to Eliminate Loans: Fact Sheet*, PENN TODAY (Dec. 17, 2007), https://penntoday.upenn.edu/news/penn-expands-financial-aid-program-eliminate-loans-fact-sheet; Ex. 300, *Financial Aid*, VANDERBILT UNIV., https://www.vanderbilt.edu/financialaid (last visited May 5, 2025); Ex. 193, Tener (Vanderbilt) Tr. 146:2-146:6.

109.    In 2004, Georgetown introduced a program that replaced most loans with scholarships for many low-income students.  Ex. 56, GTWNU_0000270820 at -931.

110.    Some schools provide work-study—"a need-based, 'self-help' financial aid program that enables eligible students to work part-time to meet a portion of their educational costs," Ex. 426, *Work-Study*, CORNELL UNIV., https://finaid.cornell.edu/types-of-aid/work-study (last visited May 5, 2025)—as part of their financial aid packages, *see, e.g.*, Ex. 32, CORNELL_LIT0000213572 at -578-579 (Cornell's "2022-2023 Undergraduate Need Analysis and Packaging Policies"); Ex. 140, Chang (Caltech) Tr. 127:13-134:15 (noting that Caltech's incoming students receive up to $1,350 of work study, while returning students receive $2,500);

Ex. 66, MITLIT-000659580 (Timeline of Select MIT Financial Aid Policy Changes describing changes in MIT's self-help component); Ex. 52, GTWNU_0000186083 (GEORGETOWN OFFICE OF FINANCIAL SERVICES POLICIES AND PROCEDURES MANUAL, 2013-2014) at -157-158; Ex. 8, BROWN_0000050379 (FINANCIAL AID OFFICE: UNDERGRADUATE OVERVIEW, BROWN UNIVERSITY, 2014) at -381, -383.

### E. Tuition

111.    Members of the 568 Group did not enter any agreements on the amount of tuition to charge.  *See*, *e.g.*, Ex. 148, Costanzi (Georgetown) Tr. 325:20-326:1 (testifying she was not "aware of" "any agreement with any other school regarding tuition levels"); Ex. 143, Coffin (Dartmouth) Tr. 271:14-17; Ex. 137, Bridson (MIT) Tr. 208:6-12; Ex. 142, Christiansen (Vanderbilt) Tr. 176:23-177:4; Ex. 200, Wallace-Juedes (Yale) Tr. 257:22-258:3; Ex. 159, Hall (Columbia) Tr. 278:2-6; Ex. 170, Marinaccio (Columbia) Tr. 415:2-7; Ex. 144, Coleman (Duke) Tr. 110:25-111:3; Ex. 172, McCall (Duke) Tr. 314:25-315:4; Ex. 185, Russo (Notre Dame) Tr. 282:5-9; Ex. 174, McDermott (JHU) Tr. 411:24-412:5; Ex. 176, McLaughlin (Penn) Tr. 251:15-20; Ex. 184, Rapelye (COFHE 30(b)(6)) Tr. 273:5-12; Ex. 156, Furstenberg (Dartmouth) Tr. 302:3-7; Ex. 187, Schapiro (Northwestern) Tr. 196:12-16; Ex. 136, Bishop (Notre Dame) Tr. 412:25-413:4; Ex. 180, Nucciarone (Notre Dame) Tr. 328:9-13; Ex. 196, Varas (Penn) Aug. 2, 2023 Tr. 291:8-12; Ex. 192, Storlazzi (Yale) Tr. 198:8-12; Ex. 140, Chang (Caltech) Tr. 306:22-307:1.  Instead, during the conduct period, tuition levels varied between schools and net price decreased.  Ex. 2.1, Long Reb. figs. 4 & 5.

### F. Information Sharing

112.    Since the 1970s, some Defendants and various non-Defendant schools that meet full demonstrated financial need of applicants, including private liberal arts colleges like Amherst College and non-Defendant private universities like the University of Rochester, shared

76

aggregated historical financial aid and admissions data through "Colorbooks" that were published on an annual basis by the Consortium of Financing Higher Education ("COFHE"), which is a separate entity from the 568 Group.  Ex. 2.1, Long Reb. ¶242; Ex. 3.1, Stiroh Reb. ¶¶48 n.152, 99-100; Ex. 253, *Consortium on Financing Higher Education*, COFHE, https://web.mit.edu/cofhe (last visited May 4, 2025); Ex. 19, COFHE-02-00018026 (Presidents Book, Nov. 2022); Ex. 20, COFHE-02-00022277 (COFHE Admissions Statistics, Class Entering 2021 (Redbook XLVI), June 2022) at -285; Ex. 22, COFHE-02-00022429 (Sources of Undergraduate Grant Aid at the COFHE Institutions, 2020-2021 Academic Year (Brownbook), Jan. 2023) at -437; Ex. 21, COFHE-02-00022378 (First-Year Financial Aid/Admissions Survey, Class of 2025 – Entering Fall 2021 (Bluebook XXXVII), Oct. 2022) at -386 (containing analysis of trends "for the cohort entering in fall 2021"); Ex. 23, COFHE-02-00022468 (Tuition, Student Budgets, and Self-Help at the Consortium Institutions for Academic Year 2022-23 (Yellowbook), Mar. 2023) at -473 (analyzing trends in tuition, student budgets, and self-help expectation, which were "set the previous year").

113.    Of the thirty-nine schools that were members of COFHE for at least some period of time, many never joined the 568 Group, including Amherst College, Mount Holyoke College, the University of Rochester, and Wesleyan.  Ex. 16, CFHE-00000014 at -018; Ex. 253, *Consortium on Financing Higher Education*, COFHE, https://web.mit.edu/cofhe (last visited May 4, 2025).

114.    All Defendants other than Notre Dame have been members of COFHE, and many were members long before the 568 Group was formed, but Defendants comprise less than half of total COFHE's membership.  *See* Ex. 16, CFHE-00000014 at -018-019; Ex. 253, *Consortium on Financing Higher Education*, COFHE, https://web.mit.edu/cofhe (last visited May 4, 2025); *see*

*also* Ex. 184, Rapelye (COFHE) Tr. 99:16-20 ("Notre Dame has never been a member of COFHE.").

115. The information in the COFHE Colorbooks, which was shared with both Defendant and non-Defendant schools, consisted of historical admissions and financial aid data, Ex. 21, COFHE-02-00022378 (First-Year Financial Aid/Admissions Survey, Class of 2025 – Entering Fall 2021 (Bluebook XXXVII), Oct. 2022) at -382; Ex. 20, COFHE-02-00022277 (COFHE Admissions Statistics, Class Entering 2021 (Redbook XLVI), June 2022) at -281; Ex. 154, Furda (Penn) Tr. 80:2-14 (noting that information in COFHE Colorbooks was released "after the fact" and contained information that was widely available "in a press release already"), charts and tables at the "aggregate level," Ex. 176, McLaughlin (Penn) Tr. 25:22-26:7 (noting that "there was no sharing of … granular data with the schools"), and descriptions of Defendants' endowment spending on financial aid, the amount of self-help in Defendants' financial aid packages, and the amount of institutional grant aid awarded by each Defendant, Ex. 2.1, Long Reb. ¶244; Ex. 22, COFHE-02-00022429 (Sources of Undergraduate Grant Aid at the COFHE Institutions, 2020-2021 Academic Year (Brownbook), Jan. 2023) at -433; Ex. 23, COFHE-02-00022468 (Tuition, Student Budgets, and Self-Help at the Consortium Institutions for Academic Year 2022-23 (Yellowbook), Mar. 2023) at -470, -473; Ex. 21, COFHE-02-00022378 (First-Year Financial Aid/Admissions Survey, Class of 2025 – Entering Fall 2021 (Bluebook XXXVII), Oct. 2022) at -382, -386, much of which data was generally publicly available in Defendants' annual financial reports and in publications from other industry groups, like College Board and the National Association of College University Business Officers, Ex. 2.1, Long Reb. ¶244; *see, e.g.*, Ex. 28, CORNELL_LIT0000002053 (2021-2022 CORNELL UNIVERSITY OPERATING & CAPITAL BUDGET PLAN) at -057-058, -074-077; Ex. 82, PENN568-LIT-00007087 at -092, -097-099 (University of

Pennsylvania 2021-2022 Annual Financial Report); Ex. 308, *Georgetown University Tuition and Costs*, BigFuture, https://bigfuture.collegeboard.org/colleges/georgetown-university/tuition-and-costs (last visited May 6, 2025); Ex. 304, U.S. and Canadian Institutions Listed by Fiscal Year (FY) 2021 Endowment Market Value and Change* in Endowment Market Value from FY20 to FY21, The Nat'l Ass'n of Coll. & Univ. Bus. Offs., *available at* https://edge.sitecorecloud.io/nacubo1-nacubo-prd-dc8b/media/Nacubo/Documents/research/2021-NTSE-Public-Tables--Endowment-Market-Values--FNIAL-REVISED-February-18-2022.pdf.

Dated: May 7, 2025

By: */s/ David Gringer*
David Gringer
Alan Schoenfeld
WILMER CUTLER PICKERING HALE
    AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel: 212-937-7294
david.gringer@wilmerhale.com
alan.schoenfeld@wilmerhale.com

Seth Waxman
WILMER CUTLER PICKERING HALE
    AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Tel: 202-663-6800
seth.waxman@wilmerhale.com

Edward W. Feldman
Daniel Martin Feeney
MILLER SHAKMAN LEVINE &
    FELDMAN LLP
30 W. Monroe St.
Suite 1900
Chicago, IL 60603
Tel.: 312-263-3700
dfeeney@millershakman.com
efeldman@millershakman.com

*Counsel for The Trustees of the University
of Pennsylvania*

Respectfully submitted,

By: */s/ Norman Armstrong*
Norman Armstrong
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, D.C. 20004
Tel.: 202-389-5000
norman.armstrong@kirkland.com

Emily T. Chen
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Tel.: 212-446-4800
emily.chen@kirkland.com

Daniel E. Laytin
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Tel.: 312-862-2000
daniel.laytin@kirkland.com

*Counsel for Defendant Cornell University*

By: */s/ Britt M. Miller*
Britt M. Miller
Daniel T. Fenske
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Tel: 312-782-0600
bmiller@mayerbrown.com
dfenske@mayerbrown.com

*Counsel for Defendant Georgetown University*

By: */s/ Eric Mahr*
Eric Mahr
Jan Rybnicek
Daphne Lin
FRESHFIELDS US LLP
700 13th Street, NW
Washington, DC 20005
Tel: 202-777-4500
eric.mahr@freshfields.com
jan.rybnicek@freshfields.com
daphne.lin@freshfields.com

Rami Fakhouri
Jennifer L. Greenblatt
GOLDMAN ISMAIL TOMASELLI BRENNAN & BAUM LLP
200 South Wacker Drive, Floor 22
Chicago, IL 60604
Tel: (312) 681-6000
rfakhouri@goldmanismail.com
jgreenblatt@goldmanismail.com

*Counsel for Massachusetts Institute of Technology*

By: */s/ Robert A. Van Kirk*
Robert A. Van Kirk
Jonathan Pitt
Sarah F. Kirkpatrick
Matthew D. Heins
Feyilana Lawoyin
Cole T. Wintheiser
William J. Donnelly
WILLIAMS & CONNOLLY LLP
680 Maine Ave. SW
Washington, D.C. 20024
Tel: 202-434-5000
rvankirk@wc.com
jpitt@wc.com
skirkpatrick@wc.com
mheins@wc.com
flawoyin@wc.com
cwintheiser@wc.com
wdonnelly@wc.com

James Peter Fieweger
MICHAEL BEST & FRIEDRICH LLP
444 West Lake Street
Suite 3200
Chicago, IL 60606
Tel.: 312-222-0800
jpfieweger@michaelbest.com

*Counsel for University of Notre Dame*

**PUBLIC VERSION**

## CERTIFICATE OF SERVICE

I hereby certify that on May 7, 2025, I caused a true and correct copy of the foregoing document to be filed and served electronically via the court's CM/ECF system. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

*/s/ Britt M. Miller*
Britt M. Miller

*Counsel for Georgetown University*