# EXHIBIT 41

file - 568 group

568 PRESIDENTS' GROUP

November 28, 2005

INVOICE

**To: Dartmouth College**

| | |
|---|---|
| Membership dues in support of<br>The 568 Presidents' Group for FY 2006 and 2007 | $1,000.00 |

Please make check payable to the 568 Presidents' Group and mail to:

568 Presidents' Group
238 Main Street
Suite 402-COFHE
Cambridge, MA 02142

PRESIDENT MORTON O. SCHAPIRO, WILLIAMS COLLEGE, CHAIRMAN
P.O. BOX 687, WILLIAMSTOWN, MA 01267 * 413-597-4233 (FAX -4015)

# A Report on the Activities of the 568 Group Technical Committee and Need Analysis Council

The year 2004-2005 has been a productive and successful one for both the 568 Technical Committee and the 568 Need Analysis Council. Two national meetings were held, one in February and the second in June. The first was a two-day training session held in Hartford, Connecticut. This was the second in a series of training sessions designed to fulfill the Technical Committee's commitment to provide continuing education opportunities to financial aid officers at participating institutions. In June, the Need Analysis Council of 568 financial aid officers held its annual meeting at the University of Pennsylvania. As will be detailed later in this report, the annual meeting provided our membership with the opportunity to discuss the Congressionally mandated Government Accountability Office (GAO) study now underway. Each of these events was well received and served to underscore the continuing value of membership in the 568 Group and the opportunities it provides for collegial discussion of need-analysis and other issues affecting the financial aid community.

**The GAO and 568**

The Technical Committee has worked carefully with the Government Accountability Office (GAO) to refine and focus the survey instrument recently distributed to 568 institutions and a select group of similar, but non-participating, institutions. During our initial contacts with the GAO, we sought counsel from our attorney, Thane Scott, and a small group of federal relations experts from our campuses. After several conference calls, the GAO provided our Committee with a proposed survey instrument. The proposed document revealed a not unexpected lack of knowledge about need-analysis in general, the 568 Consensus Approach (CA), and the manner in which our institutions collect and use data. Our Committee prepared a detailed response, which was reviewed by our federal relations subcommittee and Thane Scott, and returned it to the GAO. Over the next several months, a series of conference calls and an additional advisory provided by the Committee were used to further refine the GAO document. In the late spring of 2005, a Technical Committee working group traveled to Washington, D.C., to meet face-to-face with the GAO staff responsible for this study. During this meeting we invited the GAO to present at the annual 568 Need Analysis Council meeting then scheduled for mid-June.

After two additional iterations, the GAO provided the Committee with a copy of the proposed survey to be distributed to the 568 financial aid community for its review prior to their presentation at our Council meeting. Led by its then manager, Tom Weko, the entire GAO 568 study staff participated in a helpful two-hour discussion with the 568 financial aid community. Although some in the aid community continued to have doubts about the scope of the study and their institution's ability to provide helpful data in a timely, cost-efficient manner, I think it is fair to say that many concerns were assuaged and ultimately the survey instrument was improved significantly.

As you know, the final survey, which consists of three separate modules, was distributed in July. The final module was to be completed and returned to the GAO by October 15.

At this point, we have no firm information on the number or identity of the non-568 schools that were asked to participate in this study. Moreover, we have no information on the GAO's projected project completion date. The Technical Committee has asked for the courtesy of an advance copy of the study results so that we can bring clarity to any issues of concern prior to the document being forwarded to the Senate. At this point, the GAO has made no commitments regarding our receipt of an advance copy of their results.

In June, Tom Weko contacted the Committee to announce his departure from the GAO and the 568 study. He has been replaced by Andrea Sykes. We do not expect this change in leadership will affect the nature or result of the study.

**Technical Committee Assignments 2004-2005**

Although the GAO study has been the focus of much of our activity this year, we continued to work on the various Consensus Approach-related assignments given to the Committee at the 2004 Annual Meeting. These assignments, the Committee's recommendations, and the Council's methodological recommendations to the 568 Presidents are detailed below.

**Home Equity** – When first implemented, the Consensus Approach included an innovative approach to the inclusion of home value in need analysis. In an effort to soften the impact of home ownership in need analysis, home value was capped at 2.4 times the family's income. While this new approach improved need-analysis results in the aggregate, an unanticipated outcome allowed some families to eliminate home value from the need-analysis equation by simply refinancing their homes.

After a great deal of research and consideration, the Committee recommended that the Consensus Approach treatment of home value be modified to use home equity rather than home value. To maintain consistency over time we have established a home equity cap of 1.2 times family income. Here is how it will work: the amount of home equity used in need analysis will be capped at 1.2 times family income. Home equity in excess of the capped amount will be categorized as inflationary value not supportable by family income. It will not be used when determining a student's parent contribution.

The College Board's Institutional Methodology recently modified its treatment of the home so as to consider home equity rather than value. As a result, its overall approach is now similar to the Consensus Approach. Substituting home equity for value in the Consensus Approach, albeit it with a different income cap, will further reduce confusion within the need-analysis community.

**Parents' Partners** – Traditionally, the College Board's PROFILE form has collected information from an applicant's biological parents, regardless of martial status. Where a natural parent has remarried, the step parent is also asked to provide information. The current edition of the Consensus Approach, like the Federal Methodology, is silent with respect to parents who have made informal living

arrangements. The biological parent is not currently asked to provide financial information about the individual sharing their household responsibilities.

We believe that parents, regardless of marital or legal status or legal obligations, have the primary responsibility for paying for their children's education. This basic principle guides treatment of non-custodial parents and should be similarly applied to all forms of domestic partnerships where there are two individuals supporting the household. This would apply to same and opposite sex partnerships where only one partner has legal parent status and/or biological parents who were never married.

We have asked the College Board to develop PROFILE questions that will collect this information. Further, recommendations for managing this issue will be included within the 568 Group's Professional Judgment Manual.

**Divorced and Separated Parents** – The College Board has recently adopted a new formula for dealing with Divorced and Separated parents. Although this new approach was similar to the approach included in the Consensus Approach, the 568 Need Analysis Council was uncomfortable with several elements of the new approach and asked the Technical Committee to consider what, if any, modifications might make the new formula fit within the Consensus Approach. As a result, the Technical Committee has recommended, and the Council has approved, three modifications that we have asked CSS to include within its methodology. These include:

- Child support and alimony included in the custodial parent (CP) household income should be subtracted as an allowance from the non-custodial parent (NCP) household income, in order to avoid double counting.
- If the NCP has remarried, alimony and child support paid and allowed should be subtracted from NCP household income in allocating the NCP household parental contribution between the NCP and his or her current spouse.
- If the child support for the applicant ends when the applicant graduates from high school, it should not be included in the CP household income nor allowed against the NCP household income.

**Committee Assignments for 2005-2006**

In addition to the need analysis changes requested of CSS, the Need Analysis Council assigned the Technical Committee three additional tasks for the 2005-2006 academic year.

- Include in the 568 Professional Judgment manual advice for reading and using W-2 forms.
- Continue to development of the Professional Judgment need-analysis methodology for international students.
- Further develop the Technical Committee recommendation for handling the relatives of students who are living abroad.

Finally, because the 2005 training session was so successful, the Need Analysis Council has asked the Technical Committee to sponsor a third session in 2005-2006.

**Managing the Need Analysis Council and the Technical Committee**

Some three years ago, participating 568 Group members were asked to contribute $1,000 toward the support the on-going expenses of the Need Analysis Council and the Technical Committee, including a reimbursement for significant legal bills that accumulated during the formative days of the 568 Group. We are now out of money and the Council has recommended that our members contribute a second $1,000 to be used to support our modest operating expenses into the future. Attached for your review is an accounting of the uses to which the initial $1,000 contribution was put.

*James Belvin, Duke University*
*Technical Committee Chairman*
*November 2005*

Staff Columnist Matt Soriano '03 discusses the limits of equality


# The Dartmouth

Hanover, N.H.
www.thedartmouth.com

*America's Oldest College Newspaper. Founded 1799.*

Weather Today: *Rain, 70s*
Tonight: *Rain possible, 50s*

Vol. CLVIII No. 105 — Tuesday, July 17, 2001 — 35 Cents


## 28 colleges alter fin. aid packages

**By Shevani Jaisingh**
*The Dartmouth Senior Staff*

The presidents of 28 top colleges and universities, including four of the eight Ivies, have endorsed a set of guiding principles for the fair determination of financial aid eligibility focusing on financial need rather than merit.

Notably missing from this group are Dartmouth, Harvard and Princeton. Financial aid directors at Dartmouth and Harvard said they feared committing to the principles could actually lead to reductions in their financial aid offerings.

Schools that signed the principles said they did so in order to make the cost of higher education more feasible for all students, not just those an institution is recruiting. The principles came out of the work of an ad hoc assembly called the 568 Presidents' Working Group.

While these recommendations are not binding contracts but rather guidelines developed as a "consensus approach to need analysis," according to working group's report they are meant to bring clarity, simplicity and fairness to the assessment of financial aid.

Decisions against signing on to the principles at Dartmouth, Princeton and Harvard were made in the context of recent independent initiatives meant to strengthen financial aid offerings at the three schools.

"We have a need analysis methodology that is perhaps more enlightened, more generous and more flexible than I think this group is working on," said Dean of Admissions and Financial Aid Karl Furstenberg. Both Dartmouth and Harvard have been involved in the discussions all along, however.

"We are actually doing more than this new methodology would allow.... I think Harvard and Princeton are in the same position," Furstenberg said.

Furstenberg also noted that the new principles are still in the process of being formed. "There's still a lot of work to be done," he said.

Sally Donahue, Director of Financial Aid at Harvard College, had similar sentiments. "We are very supportive of the general principles," she said. "The reason we didn't actually sign the agreement was that it would have required us to ask families to contribute a bit more to the educa-

See **FINANCIAL**, page 3

## WCI calls for diversity

**By Ithan Peltan**
*The Dartmouth Staff*

Revisions to Dartmouth's mission statement and the establishment of a "Council on Diversity" are among recommendations made in the final report of the Committee on Institutional Diversity and Equity that College President James Wright accepted for immediate implementation.

The most recent step in the implementation of the Student Life Initiative, the Committee's report calls for expanding the current institutional focus on diversity from attracting diverse faculty, students and staff to Dartmouth to include making the actual campus experience more pluralistic.

"For too long we've focused on ways of recruiting minority students, faculty and staff, Wright said. "I think that even more critical is the sort of community that people find when they come here."

The Committee — initially known as the World Cultures Initiative Committee — has been discussing diversity issues and gathering input since November.

"A serious and continuing gap exists between the College's stated commitment to diversity and the practical steps that have thus far been taken to achieve it," the group's report states. "We therefore believe that the onus is

See **WCI**, page 5


The Dartmouth
**College President James Wright**

## *Summer brings job openings*

**By Devin Foxall**

A growing number of job opportunities during the summer at Dartmouth has allowed students to be more selective, but has also made it harder for some employers to find enough help.

"We have an ever expanding job base. There's unprecedented opportunity for students," Donna Desjardins, the director of the Student Employment Office, said.

At the same time, the increasing variety of job options has put more pressure on the larger College employers — specifically the Library System and Dining Services — to quickly find enough student employees.

"The difficulty has really been experienced in Dartmouth Dining Services," Desjardins said.

Kelly Mousley, the personnel administrator for DDS, said that while there remain openings at the various dining facilities, there are currently no serious shortages. "We explained. "In the summer we have so much difficulty finding as many students as we'd like that we hire high school students and people from outside the College."

The library has not always had to look beyond the student population to find employees, he said.

"At one point, I had so many students interested in working in the library that we actually hired a student to hire students. We had students lined up six-deep in my office, and out the door, and around the bend waiting to see me ...