# EXHIBIT 75

# THE 568 PRESIDENTS' GROUP
# CONSENSUS METHODOLOGY
# POLICY GUIDELINES

**December 2016**

## Background

On April 18, 2000, the 568 Presidents Group met and appointed eight senior financial aid professionals from participating 568 institutions to serve on a Common Standards Subcommittee and to report back to them concerning:

> *whether it is possible to reach agreement on common standards for determining financial need at the institutional level consistent with the Statement of Principles for need based financial aid and as permitted by Section 568.*

The charge to the Subcommittee further requested that, in the pursuit of these goals, the panel:

- *address the principal issues that give rise to divergent need calculations;*
- *arrive at reasonable compromises in the areas where the principles may conflict;*
- *strive for recommendations supportive of a system that many schools could adopt while still being able to manage their individual aid resources;*
- *seek solutions that aspire to simplicity and consistency, that discourage manipulation of the system, and are realistic regarding the capacity of families to contribute to educational expenses;*
- *explore avenues to maintain a system supportive of a Consensus Approach to Need Analysis, if one is adopted.*

The work of the Subcommittee was in turn guided by a statement of Need Analysis Principles adopted by the 568 Presidents at that meeting. These Principles are as follows:

### Financial Aid Principles

1. To the extent they are able, parents and students have the primary responsibility to contribute to educational expenses before an institution awards financial aid.
2. Families should contribute to educational expenses according to their ability. Those with similar financial profiles should contribute similar amounts.
3. Institutions should evaluate both income and assets as part of the assessment of the parents' and applicants' ability to pay.
4. Each institution should inform applicants about the policies and practices it applies when measuring a family's ability to pay, carry out its policies consistently throughout a student's eligibility, and support the awarding of need-based aid.
5. An institution that allocates any financial assistance that is not based exclusively on need should inform all prospective applicants of the standards it applies in allocating that aid.
6. The exercise of "professional judgment" by financial aid officers in assessing a family's ability to pay should recognize unique or extenuating financial circumstances in individual cases; such professional judgment is not the proper mechanism for systematically treating 568 Groups of students differently in order to advance institutional objectives.

The revised policy guidelines contained in this Manual represent the best efforts of the 568 Presidents' Group to develop and maintain a Consensus Methodology that is both consistent with the Need Analysis Principles adopted by the Presidents of the participating institutions and compatible with the values that underlie the 568 Presidents' Statement of Principles.

The Consensus Methodology contains certain key components, including: 1) common elements of need analysis as described below; 2) a common calendar for the collection of data from families; 3) a means of training aid professionals in the application of the Methodology; and 4) an oversight 568 Group to review and modify the methodology as needed over time.

Where possible, the professional expertise and program services of the College Scholarship Service (CSS) of the College Board shall be used as resources to advance the implementation of this Consensus Methodology. In addition to their long-standing role as the primary data collection agency, the College Board is invited, when appropriate, to assist with the modeling of various recommendations in order to assess their impact on both families and institutions.

Finally, because need analysis is a complex and detailed process requiring the examination of many dozens of elements to measure a family's ability to pay, many policy guidelines require regular exploration and analysis. In this sense this Manual continues to be an "organic" document. While containing a number of quite specific guidelines for the implementation of the Consensus Methodology, the Manual should be viewed as the basis of an ongoing process to construct a need analysis system that will continue to assure fair and equitable access to educational opportunity.

## Policy Guidelines for the Maintenance of the Consensus Approach Methodology

The 568 Group believes that the Consensus Approach to Need Analysis, referred to as the Consensus Methodology, when properly implemented and maintained, eliminates much of the variance in the need analysis results that was experienced in the past. The 568 Group does not view the Consensus Methodology as a panacea, however. Need analysis procedures have traditionally depended on professional judgment applied locally. Although the Consensus Methodology would standardize many policies now subject to professional judgment, it is important to recognize that no system will completely eliminate disparate results or the effects of individual institutional packaging decisions, in which the institution determines the mix of grant, loan, and work components in students' awards.

In developing its policy guidelines, the 568 Group has focused on arriving at the “right” approach to determining parental ability to pay without regard to potential cost implications. For many families, especially middle-income families, the methodology has the effect of reducing the expected family contribution. The impact of these policy guidelines is likely to vary from institution to institution depending on the school’s applicant profile and the extent to which similar adjustments are already included in its need analysis procedures.

Although the 568 Group fully supports the Consensus Methodology outlined in this manual, it is important to note that these guidelines can be expected to heighten the differences associated with the Federal Methodology (FM), and the College Board’s Institutional Methodology (IM), as well as certain institutional changes that have been implemented in recent years. Specifically, both the IM and certain need analysis modifications adopted unilaterally by individual schools have led to cases in which the institution’s family contribution is less than that derived from Federal Methodology, resulting in an over-award which limits or eliminates eligibility for federal funding. In an effort to deal with this problem, the 568 Group’s Professional Judgment Guidelines Manual includes a section on the various methods that schools may wish to adopt in order to reconcile differences in results between institutional and federal need analysis.

The 568 Group is concerned about restrictions that federal regulations place on the expenditure of need-based institutional aid funds. The 568 Group believes that the Consensus Methodology results in fair parent contribution levels and that participating institutions should not be forced to disadvantage students by reducing the amount of institutional aid they may receive or excluding them from subsidized federal loans or work-study. The 568 Presidents Group, singularly or in concert with other groups, will support petitions to Congress for relief in this critical area of institutional prerogative.

The 568 Group believes strongly that matters of need analysis, including professional judgment, should be independent of the qualifications or desirability of a particular applicant for an institution. That is, rules should not be interpreted more leniently because an applicant will bring strong academic or athletic ability or other desirable qualities to the campus.

Finally, it is important to note that the 568 Group views its ongoing efforts as a long-term process. Many of the policy issues identified in this manual will continue to require further exploration and analysis. Moreover, we have found that the use of the Consensus Methodology continues to present new and unexpected issues and concerns over time. Likewise, technological advances may also provide opportunities for improving and updating the policy guidelines outlined in this manual. Responding to these concerns will require the regular attention of the Group's Need Analysis Council and ongoing training efforts for participants.

## Introduction - The Consensus Approach to Need Analysis

The 568 Presidents Group institutions have agreed on a series of common need analysis standards designed to be included in a Consensus Methodology. The participating institutions believe that this approach, when applied in a consistent manner, serves to diminish or eliminate the divergent results that continue to threaten the long-standing tradition of awarding aid on the basis of need. It is important to note that the efforts of the 568 Group are restricted to policies that affect first-year awards only. The issue of school-to-school inconsistencies applies primarily to first-year students and the 568 Group believes that it is necessary for financial aid officers to retain as much flexibility as possible in dealing with their already-enrolled students.

The Consensus Methodology begins with the understanding that the College Board's Institutional Methodology (IM) is an appropriate base for institutional need analysis and provides an appropriate platform for further work. Consequently, the 568 Group has focused on those aspects of the existing IM that are most often subject to local interpretation or professional judgment. The desire to serve the "greater good" rather than individual institutional needs and capabilities requires compromise in some areas, but the 568 Group believes that the resulting methodology remains true to both the institutional and professional principles that undergird its cooperative efforts. By developing policy guidelines that attempt to set the "right" policy without regard to the cost implications, the 568 Group's guidelines serve to reduce expected parent contributions in the aggregate. All 568 Group schools are free to deal with institutional resource issues through their packaging policies.

Although the 568 Group has sought, where possible, to err on the side of simplicity, many need analysis issues do not lend themselves to a simplified process. Matters relating to divorced and separated parents and the analysis of small business enterprises are two such examples. The 568 Group believes, however, that its collective interest in achieving a fair and equitable result requires the added complexity associated with the policy guidelines in these and other particularly complicated areas. Additionally, the 568 Group believes that IM, as amended by the Consensus Methodology, encourages savings for college and recognizes that a family's ability to pay is largely a function of: a) its financial strength and b) the number of children to be educated. In the area of discouraging asset manipulation, our policy guidelines seek to address this problem, but more work must be done in this difficult area.

## Part I – Need Analysis and Professional Judgment Issues

## A. Divorced/Separated/Single Parent

**Consensus Agreement:** Analysis begins with the custodial family unit. In most cases, additional information is sought concerning the non-custodial family unit. In the case of re-marriage of either or both natural Parents, the standard approach would be to request the cooperation of and information from all parents and spouses. Generally, a contribution from the income and assets of no more than two parents will be expected. Institutions may exercise professional judgment to use information from more than two parents.

**The Non-Custodial Waiver Process**—Information may be waived using the Consensus Approach **Non-custodial Waiver Petition** or other appropriate documentation from the non-custodial parent in any of the following circumstances:

- physical or emotional abuse documented by, for example, a police report, restraining order, or supervised visitation in the divorce decree;
- receiving public assistance or is disabled and receiving benefits;
- incarceration;
- step-parent has legally adopted the student;
- when the divorce occurred over ten years ago and there is no contact, no child support, or parent involvement. In most cases, a third party confirmation letter is advised;
- when the divorce is more recent and the student provides adequate information to support a claim of "abandonment;" (excluding financial or emotional) or
- no known second parent.

NOTE: How and when the non-custodial parent is given information about accessing the **Non-Custodial Waiver Petition** is an institutional decision.

**Background:** Until the development of the 568 Group approach to the analysis of Divorced/Separated parents, there was no consistent way of evaluating the financial need of students whose parents are not married to each other but who remain the primary source of the student's financial, physical, and emotional support. In response to the process introduced by the 568 Group, the College Board developed an online Non-Custodial Profile form and a corresponding non-custodial parent need analysis. The process presumes that institutions will attempt to secure data from both natural parents (Parent A, the custodial parent; and Parent B the non-custodial parent) in order to determine what is a reasonable contribution from each; recognizing, of course, that this effort may not always be successful. The process is often made more complex because of the re-marriage of one or both parents. In addition, Federal Methodology (FM) completely excludes all non-custodial data.

**Rationale:**

- A consensus approach on policy and procedure for calculating parental support will reduce significant variances in measuring need among institutions.
- As with students whose parents are married to one another, **ability** to pay, not **willingness** should be used to determine the expected parent contribution.

• Parents' divorce one another, not their child.

***[NOTE: See Appendix for supplemental language that will be included in the Professional Judgment Manual]***

## B. Assessment of Rental Property/Other Real Estate

**Prior Treatment**: Federal Methodology (FM) has no special provisions for rental income. Base Institutional Methodology (IM) eliminates Schedule E losses. Many institutions make professional judgment changes, e.g., adding back rental/real estate depreciation, or falling back on a bottom-line adjustment to the parent contribution (PC) to better reflect what they think the family can afford.

**Consensus Agreement**:

- Add back any rental loss to income.
- Add back rental/real estate depreciation (net of loss) to income and include any positive income to overall family income.
- Use Housing multiplier to determine rental property value from purchase price and year of purchase.
- Treat purely rental/real estate businesses as real estate assets unless it is the primary source of income for the family, especially in cases where the business is as a developer.
- Multi-family real estate – Determine the percentage of the family's residence and include appropriate value/debt under the home. The remaining value/debt will be included under other real estate.

**Rationale**: Rental property depreciation, while allowable for income tax purposes, is a paper loss that distorts a family's real income. To the extent that other components of the methodology (e.g., a cap on home equity) are linked to income, the methodology should use as realistic an income as possible. There should be objective measures to assess rental property value, just as there are with home value, rather than relying solely on family-reported data.

**Issues**: Increased document/data collection may be required, although many schools collect much of it already.

**Implementation/Resolution of Issues:** Schedule E combines rental/real estate and other business income. Each business and real estate loss should be zeroed out separately and losses should not be combined with income from other businesses and rental properties.

## C. Cost of Living Variances

**Prior Treatment**: Institutional Methodology has traditionally used a uniform, basic living expense allowance. Although it is generally recognized that living expenses vary significantly in different geographic areas, the standard calculation does not consider these variations. The current methodology now includes an option developed initially by the 568 Group that allows institutions to adjust the living allowance for applicants from virtually all metropolitan areas.

**Consensus Agreement**: The 568 Group believes that the number of locales needs to be expanded and appreciates College Board's cooperation in developing a new and expanded Cost of Living Table that incorporates all major metropolitan areas. The 568 Group recognizes that the complexity of gauging the ever-changing costs of living in the various metropolitan areas will require an ongoing research effort. The 568 Group looks forward to further collaboration with CSS to finesse the current tables.

**Rationale**: While everyone recognizes that living in Manhattan, Kansas requires less non-discretionary income than living in Manhattan, New York, it is very difficult to draw exact lines for the purpose of defining cost-of-living areas. Where does consideration of the high cost of living in NYC end? Which suburbs should be included? While there would be a desire to develop a table that defined cost-of-living areas at the micro level, the 568 Group is aware that, even within a zip code, housing values can differ significantly. Gathering detailed information to define a micro-level table would be extremely difficult and would have questionable long-term reliability.

It is also difficult to deal with the variety of choices that families make. One family might choose to live in an upscale suburb while another family with the same income might choose a lower-cost area. Giving one family a higher allowance to account for their decision to enjoy a higher standard of living would be unfair and inappropriate. It is also virtually impossible to distinguish between true cost-of-living issues and standard-of-living differences within metropolitan areas. Again, the common metropolitan area Cost-of-Living Table developed with CSS resolves this problem.

**Issues:**

- Identification of the boundaries of major metropolitan areas within which there is a reasonably uniform cost of living.
- Identification of the appropriate market basket of goods and services to be used to define cost-of-living indices. In particular, state and local taxes, which are allowed separately in both IM and FM, should be excluded.

**Resolution of Issues**: The question of how to adjust the need analysis formula to account for geographical differences in the cost of living is complex and the solutions are likely to change over time. Consequently, the 568 Group believes that cost-of-living standards should be reviewed and updated annually. The cost-of-living tables offered by CSS as a PROFILE option shall be used in the Consensus Approach. These tables are based on the Bureau of Labor Statistics Consumer Expenditure Survey (CES), a data source that is used throughout the current IM formula. The tables include metropolitan areas from throughout the country, but do not include the impact of local and state taxes, thereby avoiding an issue that taints other cost-of-

living studies.[1] The table shall be used only to increase IPA, not decrease it. Using the table to decrease the IPA and ERA would be unfair to students from cities with lower housing costs because the methodology does not lower the IPA or ERA for students from rural areas or cities not covered by the table.

The 568 Group agrees that this issue requires ongoing collaboration with CSS's Financial Aid Standards and Services Advisory Committee. The 568 Group is continuing its work on the cost-of-living issue and the 568 Group looks forward to lending its support to FASSAC on-going efforts in this regard. Given the complexity of the issue and the amount of time that it will take to come to resolution, it is appropriate to expand the number working on the problem.

**Consensus Agreement**: Adjust the IPA and ERA allowances, using CSS tables. Continue to consider whether there is a better approach to the COLA tables.

### D. Family and Student Assets

**Prior Treatment**: Student assets are treated separately from parental assets in the current institutional and federal analyses. They are assessed at 25% in Institutional Methodology (IM) and 20% in Federal Methodology (FM). In IM, sibling assets are added to parental assets; the assessment rates range from 3% to 5% of family assets. Assets in pre-paid tuition and savings plans are treated in Federal Methodology as untaxed income.

**Consensus Agreement**: If the student is the source of the asset, then the consensus agreement is to treat them as student assets. Assets in pre-paid tuition and savings plans are to be treated as parent assets. Assets from grandparents (and other outside benefactors) and Trusts are generally to be treated as student assets.

**Rationale**: This treatment of assets has several advantages over both the IM and FM methodologies. It is consistent with the treatment of sibling assets since they are already added to parental assets in IM. It is also consistent with public policy initiatives that encourage families to participate in plans offering pre-paid tuition and/or savings plans.

**Issues**: Several issues need to be resolved:

- The cost of treating student assets at a lower rate of assessment (3 to 5% versus 25%) will be significant for many institutions.

---

[1] The 568 Group's initial concern with the CES data was based on the fact that it gives information on expenditures and not the cost of a fixed market basket of goods. Therefore, the CES data presents information on standards of living rather than cost of living. A subsequent review of the CES data focused on the component that describes the cost of housing. This was done because it is clear that housing costs represent the most significant driving force in differential costs of living and because it eliminates the effect of discretionary choices that families make in the purchase of discretionary items such as entertainment, dining out, etc. In addition to developing a cost of living table based on differential housing costs, the 568 Group examined its impact when applied against the entire Income Protection Allowance (IPA) and against only the housing component of the IPA. As one would expect, the differences are quite significant

- Professional judgment will need to be exercised in cases where this treatment might not be appropriate. An example is the case in which large assets are given to the student by third parties, such as grandparents.
- Since the federal system still assesses student assets at 20%, the 568 Group's agreement may result in federal overawards.

**Implementation/Resolution of Issues**: A broad examination of family assets might result in somewhat higher assessment rates on parental assets. The 568 membership institutions will need to formulate standards of professional judgment to cover those cases in which assets held in the student's name are to be treated as student resources. Due to the federal issues involved, the 568 Group agrees that the proposal should be placed on future legislative agendas.

### E. Home Equity

**Consensus Agreement**: Home equity can be an important indicator of a family's financial strength and it should be given consideration in need analysis. In many cases a cap based on a family's income should be used to limit the amount of equity to be assessed. The consensus view is that the standard cap should be 1.2 times total income (as defined by CM), with professional judgment adjustments in individual cases, including where it may be necessary to impute a value other than what is reported.

**Background**: The Congressional decision to remove home equity from the federal formula has been a major factor in the confusion now surrounding need-based aid awards nationally and particularly at the 568 Group institutions. The absence of home equity in the federal formula has meant that for many families contributions based on the Federal Methodology have often been considerably lower than those calculated via IM. For reasons relating to both fairness and competition, institutions have begun to vary the manner in which home equity is considered. At some institutions, these policy changes have been applied across the board. At others the treatment of home equity has been applied selectively based on the applicant's circumstances or the institutional admissions rating.

The prior IM option of capping home equity at 3 times income does not sufficiently recognize the fact that home equity is an asset that is less liquid than other forms of assets and is therefore less readily available for financing education expenses. The 568 Group is aware that the family home is both an investment good and consumption good. While other assets are held strictly for the appreciation of wealth (an investment good), one's home is also a good from which housing services and other non-pecuniary factors are important considerations (a consumption good). The IM methodology ignores the consumption value of the home and treats it strictly as an investment good like any other asset. Furthermore, housing values have appreciated over time at very different rates in different parts of the country. In these and other cases, the use of the full reported home value may result in an expected PC significantly out of line with the family's income. For these reasons, and to narrow the divide between the treatment of home equity in the FM and the Consensus Approach the equity of the home should be capped at 1.2 times income as defined in CM. Because many 568 institutions already adjust home equity in some fashion, this policy encourages greater consistency in the treatment of this significant asset.

### F. Retirement Allowance

**Consensus Agreement**: Because the world of retirement planning continues to change, an allowance for retirement needs to be viewed from a broader perspective than in the past, incorporating an overview of family assets that may exist outside of traditional IRAs, Keoghs, defined-benefit, and defined-contribution plans. Need Analysis must recognize that part of a family's financial planning necessarily must include saving for retirement. The 568 Group agrees to create a Task Force on Retirement, and perhaps collaborating with CSS, to bring about a comprehensive review of the treatment of assets in Need Analysis as they relate to retirement planning.

**Background**: Until its recent revision, the Base IM treatment of assets included a retirement allowance provision for all families. This provision was created at a time when most families expected that Social Security would serve as the principal source of retirement income. The IM retirement allowance was designed to supplement the family's Social Security income during retirement. Because most families are now covered by formal, privately owned retirement plans not considered in need analysis, CSS determined that the IM retirement allowance was no longer necessary. It was eliminated and formal educational savings and family emergency savings allowances were added.

The 568 Group recognizes that many families are not covered by formal retirement programs and that it may be appropriate to provide retirement protection for those without such support. Such an allowance should be created in consultation with CSS and other experts in the field of retirement planning. Recognizing that this will involve research and would ultimately require CSS to add questions to PROFILE, in the interim the current Federal Methodology (FM) asset protection (retirement allowance) tables should be used on a case-by-case basis.

CSS plans a long-term project in which they will review retirement assets currently held by applicant families. The planning for this project was delayed given a negative response from the IM User group to some preliminary data, the Reimagined PROFILE and Prior PriorYear projects. Although the 568 Group does not necessarily agree with the inclusion of such assets in the need analysis formula, members of the 568 Group are interested in supporting and participating in this project. (Fall of 2016) A subcommittee of 568 is currently in conversation with CSS regarding how retirement asset information is currently being asked for on the PROFILE and how we (568) might be able to use collected information to test models for an income or asset protection allowance for retirement.

## G. Institutional Methodology Taxation Bands

**Consensus Agreement**: No change until further study assesses their impact.

**Background**: Institutional Methodology is a highly progressive formula designed to determine the family's ability to pay through a careful review of its overall financial circumstances. An Income Protection Allowance (IPA) does not, as is commonly understood, define the amount of money required by individual families to cover their living expenses. Instead, it represents the income level below which a family has no discretion about how its income is spent. Parents with

incomes at or below the IPA are not asked to make contributions from income to their children's educational costs. Those with higher incomes have more choices about how they spend their income and are expected to use some fraction of their income to pay for their children's education. Because of concerns about the progressivity of the IPA, the new IM recalibrated the lower-income taxation bands and reduced the highest band by one percent. In addition, CSS published new, more liberal, optional assessment rate tables in 2009. The 568 Group endorses the use of these new tables.

After a great deal of consideration, the 568 Group concludes that a better understanding of the impact these changes have on the new IM is needed. Given this uncertainty and the additional methodological changes described elsewhere in this Manual, it is important to review over time the impact of the revised tables as part of the process of improving the Consensus Approach. Consequently, no additional adjustments are recommended at this time, subject to further study over the next several years.

### H. Number of Siblings in College

**Consensus Agreement:** Continue the Institutional Methodology formula for multiple siblings in college.

**Background**: Federal Methodology divides the total parent contribution by the number of siblings enrolled in college to derive an expected parent contribution for each sibling.

The 568 Group agrees that the current IM treatment of the number of siblings in college shall be included in the Consensus Approach. Additionally, the Consensus Approach shall include the following policy clarifications:

1. Siblings enrolled in graduate or professional school shall not be counted as in college (but will be included in household size) unless the family can document that the enrolling institution has determined that the student is dependent for aid purposes and that the parents are paying the assigned parent contribution.
2. The allowance for siblings enrolled at community colleges and other similar low-cost schools should be capped at the amount of their tuition and mandatory fees. (Schools may also want to cap the allowance for siblings at four-year public colleges at their tuition, mandatory fees, room, and board, but there is not consensus on this issue.)
3. If the sibling is receiving a non-need-based scholarship, the allowance should be capped at tuition, fees, room and board, net of the scholarship.
4. Parents shall not be counted as family members in college. If, however, the parent's current job requires course work or they need to be retrained after losing a job, the institution may include as an allowance against income the amount of such unreimbursed tuition.

A related issue is the consideration of previous educational debt the parents may have accumulated when educating other children. This issue is addressed in Paragraph N below.

## I. Elementary and Secondary School Tuition Expenses

**Consensus Agreement**: Employ the Institutional Methodology optional treatment of such expenses.

**Background**: Unlike the Federal Methodology (FM), the IM formula offers the option of counting elementary and secondary school expenses. In each case the tuition allowance cap for each sibling is based on a national average of the annual cost of elementary/secondary school tuition. This IM formula option has been made a standard part of the Consensus Approach. Tuition expenses in excess of the cap would generally not be considered, unless perhaps through professional judgement.

Although the Federal Methodology ignores elementary and secondary school expenses, most 568 Group-like schools already use the IM formula.

## J. Imputing Assets

**Consensus Agreement:** Use reported interest and dividend income to extrapolate the value of the principal that generates this income.

**Background**: Cash and investment assets reported by both parents and students often fail to correlate with interest and dividend income as reported on federal tax forms. Historically, institutions have used a variety of formulas to impute the asset holdings implied by the reported income. The Consensus Approach will use reported interest and dividend income to impute the principal value that would be expected to generate this income. Each year, the 568 Technical Committee will establish a multiplier, based on market results, to be used for this purpose. The multiplier has been 25, based on an assumed 4% return. The 568 Group has discussed that, in the current interest rate climate, this may be overly generous, but no decision has been made to modify it. Also, the Group has discussed the possible use of different multipliers for interest and dividends, but, again, no specific agreement has been made.

## K. Medical Expenses

**Consensus Agreement**: Employ the Institutional Methodology treatment of such expenses.

**Background**: Unlike the Federal Methodology, which ignores medical expenses, current IM allows unreimbursed medical expenses that exceed 4.6% of IM income. The current IM treatment of medical expenses shall be included in the Consensus Approach. In cases of extreme medical expenses, professional judgment guidelines should be applied locally. If reported medical expenses are higher in 2016 than 2015 (itemized on Schedule A), a special adjustment can be made to include 2016.

## L. One-time Income Adjustments

**Consensus Agreement**: Exclude certain non-recurring income. Treatment of non-recurring income is to be handled on a case-by-case basis.

**Background**: Because the Consensus Approach uses base year income to estimate a parent's ongoing income, it may be appropriate to exclude certain non-recurring income, such as capital gains (and losses), early withdrawals from pension plans and IRA's, and. rollovers. Most 568-type schools already reduce need analysis income by documenting one-time-only income and this practice shall be incorporated into the Consensus Approach, with appropriate adjustments to tax allowances. Specifically not included would be overtime and bonus income unless the parent's employer can document a related change in company policy. You may wish to perform a mid-year review with documentation in such instances.

**M. Special Expense Adjustments**

**Consensus Agreement**: Consider the impact of certain non-reoccurring, non-discretionary expenses

**Background**: Families often incur one-time-only, non-reoccurring expenses that can significantly affect their ability to support educational costs. These expenses can include costs associated with parental care, funeral expenses, uninsured natural disasters, and extraordinary home repair costs. As a general rule, for an allowance to be made for an expense, the expense must be both extraordinary (i.e. an expense that most families don't incur) and non-discretionary. In the case of one-time expenses such as weddings and funerals, schools may want to spread the allowance over the student's remaining years, to smooth the impact on PC and to recognize that families often spread these expenses by borrowing. Treatment of such costs varies from campus to campus and contributes to the variability in need analysis results. The Professional Judgment Guidelines Manual includes specific guidelines on how institutions can respond to these expenses. If reported elder care expenses are higher in 2016 than 2015, a special adjustment can be made to include 2016.

**N. Family Loan Debt**

**Consensus Agreement**: The Consensus Approach recognizes that it is reasonable to make an allowance for parents' personal education debt within the methodology. Allowances for such debt would be made against parental income and/or assets but is left to the discretion of individual schools and is addressed in the Professional Judgment Handbook. It is agreed that an educational debt allowance would not include debt incurred for the higher education expenses of an applicant's sibling(s). In addition, no allowance would be made for debt incurred for the applicant, or for the sibling in a program in which he or she is currently enrolled (and whose expenses are therefore considered in the adjustment for multiple siblings in college).

**Rationale**: A parent's personal educational debt affects current financial strength. Recognizing a parent's educational debt further addresses previous and legitimate commitments to education by broadening the perspective from a "snap shot" view to a wider one that includes consideration of certain financing expenses incurred by the parent(s). In fairness, consideration should be given

to parents who have incurred their own personal educational debt which they are required to repay while supporting the educational costs of the applicant.

**Implementation/Resolution of Issues**:
Skip logic will be included in the Re-Imagine PROFILE that distinguishes debt for parent, currently enrolled sibling and not currently enrolled sibling. The 568 Group will continue to work with CSS to craft language and assist in articulating what information and data would be most useful to implement this policy guideline into central processing.

### O. Definition of Income

**Consensus Agreement**: Zero out all losses (Schedule C, Schedule E, Capital and other losses) to income. If Schedule C, E or F income represents multiple entities, one or more of which has a positive income and one or more of which has a loss, add back the individual losses to income.

### P. Parent Businesses

**Background**: It is the sense of most financial aid professionals that self-employed families generally have greater financial strength than wage-earning families with the same AGI, and that adding back Schedule C, E and F losses is not generally sufficient to achieve horizontal equity among these families. While no consensus approach has been attempted to address this concern, the PJ Manual provides extensive suggestions for reviewing tax returns for Corporations/Partnerships and Schedule C, E and F enterprises.

### Q. Parental Unemployment

**Consensus Agreement**: – In cases where it is appropriate to use anticipated year income, it is agreed that there should be a mid-year review follow-up process. Anticipated year income can be used when there has been an interruption or change in employment that has caused a significant reduction in household income. For the parent who is unemployed or where there is a significant reduction to income, it should be assumed that the parent will be reemployed at a reduced rate from his or her previous salary. (Of course the parents' anticipated earnings could be used, if higher than the base or recent year earnings.) Appropriate unemployment benefits should be built in for the assumed period of unemployment. Other income elements (e.g. the other parent's wages) should be built in at the base year level unless the parents' projection indicates a significant (and explained) change. Appropriate adjustments should be made to tax allowances (US, state/local, FICA).

**Background**: The standard IM and CM is to use base year data in constructing the parental contribution. This raises the issue of how to construct income and otherwise deal with cases where a parent has become unemployed, or otherwise projects a significant decline in income from the base year level, since base-year income is not a reflection of the parents' ability to contribute in these cases. Most schools follow up for additional information, including the parents' projection of income for the following year. However, it was apparent to the 568 Group

that there was inconsistency in how income was constructed once the additional information was received. In order to attempt to bring about greater consistency among the 568 schools in these cases, the Technical Committee developed a prototype Appeal/Projected Year Income follow-up document, and recommended a standard approach (included in the appendix). We recognize that parents who are unemployed are likely to present the worst-case scenario when projecting income, and feel that a floor is needed to recognize this fact.

**R. International Students-**

**Background**: While most of the 568 schools used the College Board's Certification of Finances to collect information about the financial circumstances of international aid applicants, there was very little rationale or consistency in how family contributions were determined. It was clear that simply plugging the data for these students into the standard IM/CA calculation was inappropriate, since infrastructural allowances and tables did not reflect the very different levels of income required for maintenance in the various foreign countries, and therefore did not accurately reflect how much of the family income and assets could be reasonably considered discretionary and available toward educational expenses. Some schools attempted to determine a PC by subtracting reported expenses from reported income. Parent offers were frequently used. A Global Spreadsheet was developed using CIA data for individual countries' GNPs to serve as a reasonable basis for adjusting IM tables. The 568 Group adopted the Global Spreadsheet, and the College Board thereafter incorporated it into their processing. A CSS group is expected to be reviewing this in the near future.

## Part II – Management and Process Issues

The maintenance and management of a new common standard of need analysis requires a number of specific agreements related to processing.

### A. Tax Form Collection

**Consensus Agreement**: Collect all of the base tax and W-2 forms from all applicants.

**Background**: Application requirements for first-year students can vary considerably from institution to institution. Most 568 Group institutions require families to submit their base tax forms (all pages and all schedules) before releasing financial aid resources for account payments. As a general policy, the 568 Group calls for participating institutions to require families to submit their base tax forms (personal and, where appropriate, corporate and partnership) and all W-2 forms before first-year aid awards are prepared.

### B. Professional Judgment Guidelines Manual

**Consensus Agreement**: Maintain a Professional Judgment Guidelines Manual that borrows heavily from the current CSS manual with modifications as appropriate.

**Background**: the 568 Group recognizes that locally applied professional judgment is a critical component of need analysis. The PJ Manual standardizes both those issues that should be treated locally and, to the extent possible, the manner in which such issues are handled.

Rather than reinvent the proverbial wheel, the tried-and-true professional judgment advisories prepared by the CSS and others should be used where appropriate. These are subject to modification where appropriate and others will be added as needed.

Finally, the issue of training is critical to the success of the Consensus Approach. Staff members, especially new hires, must be trained in the use of the Consensus Approach to determining the family's ability to pay. Time and resources should be devoted to both in-house and 568 Group activities.

**CERTIFICATE**
**OF**
**SIBLING ENROLLMENT**

**A. *YOUR COLLEGE* STUDENT INFORMATION**

Name_____________________________________ ID#_________________________

My sibling,________________________________ will ( ) will not ( ) be attending a post-secondary institution during the 2000-2001 academic year.

Continue to Section B if sibling will be attending a post-secondary institution; return form to the above address if sibling will not be attending a post-secondary institution.

**B. TO BE COMPLETED BY SIBLING OF YOUR COLLEGE STUDENT**

In order to verify information on my sibling's financial aid application, I authorize the institution at which I am enrolled to release the information requested to *Your College*.

______________________________________________

Name of Institution

______________________/_____________________ ____________________ __________

Sibling's Name Signature S.S. # Date

**C. TO BE COMPLETED BY INSTITUTION REFERENCED IN SECTION B**

The *Your College* student referenced in Section A has indicated on her/his financial aid application that s/he has a sibling, referenced in Section B, who will be attending your institution during the 2000-2001 academic year. Please complete the following information regarding the student enrolled at your institution to assist us in our certification.

EXPECTED DATE OF GRADUATION

1. __________/________
(Month/ Year)

2000-2001 ENROLLMENT STATUS

2. ( ) Undergraduate ( ) Graduate
3. ( ) Full-time ( ) Less than 1/2 ( ) Half-time ( ) Not enrolled
4. ( ) Degree ( ) Certificate ( ) Non-degree

DEPENDENCY STATUS

5. ( ) Dependent ( ) Independent

RESIDENCY STATUS

6. ( ) Resident ( ) Commuter ( ) Off-Campus

COSTS FOR THE ACADEMIC YEAR

7. ________ Tuition & Fees ________ Rm & Bd___________ Total Cost of Attendance

FINANCIAL AID INFORMATION

8. Is the student a financial aid applicant? ( ) Yes ( ) No
9. PC for 2000-01: FM ________ IM ________
10. Is the student receiving non-need based aid? ( ) Yes ( ) No
11. If yes, please indicate sources and amounts:

I CERTIFY THAT THE ABOVE INFORMATION IS ACCURATE TO THE BEST OF MY KNOWLEDGE.

______________________________________________________________

Name/Signature of College Official Date