# EXHIBIT 126

Exhibit
34
Witness: David Meade
5/2/2024
Michelle Keegan, RMR, CRR, CSR

DOCUMENT RESUME

ED 052 708 HE 002 336

TITLE New Approaches to Student Financial Aid; Report of the Panel on Student Financial Need Analysis.
INSTITUTION College Entrance Examination Board, New York, N.Y.
PUB DATE 71
NOTE 142p.
AVAILABLE FROM Publications Order Office, College Entrance Examination Board, Box 592, Princeton, New Jersey 08540 ($3.00)

EDRS PRICE EDRS Price MF-$0.65 HC Not Available from EDRS.
DESCRIPTORS *College Students, Disadvantaged Youth, Educational Finance, Family Income, *Financial Needs, *Financial Services, *Financial Support, *Higher Education, Minority Groups
IDENTIFIERS *College Scholarship Service

ABSTRACT

The College Scholarship Service (CSS) was established to develop a standardized need analysis system and collateral services that had to provide: (1) a standard form for the collection of data pertaining to family income, assests and other family circumstances that might affect parental ability to pay for higher education; (2) a rationale for analysis of the data; (3) centralized processing and distribution of the information; and (4) agreement among users of the CSS services to policies for the distribution of funds to students on the basis of actual need rather than competitive bidding. A panel was established in 1968 to review the CSS system within the current frame of parental responsibility, and this report presents the panel's evaluations and recommendations for change. It deals with the following topics: (1) college admissions and financial aid policies as revealed by institutional practices; (2) financial aid attitudes and concerns of users and problems of special student populations; (3) adequacy of CSS need analysis system for low income and minority students; (4) technical changes to improve equity in determination of parental contributions; and (5) the packaging of financial aid. A report on student attitudes toward student aid and the questionnaire are appended. (AF)

ERIC Full Text Provided by ERIC

# New Approaches to Student Financial Aid

U.S. DEPARTMENT OF HEALTH, EDUCATION & WELFARE
OFFICE OF EDUCATION
THIS DOCUMENT HAS BEEN REPRODUCED EXACTLY AS RECEIVED FROM THE PERSON OR ORGANIZATION ORIGINATING IT. POINTS OF VIEW OR OPINIONS STATED DO NOT NECESSARILY REPRESENT OFFICIAL OFFICE OF EDUCATION POSITION OR POLICY.

"PERMISSION TO REPRODUCE THIS COPYRIGHTED MATERIAL BY MICROFICHE ONLY HAS BEEN GRANTED BY

CEEB

TO ERIC AND ORGANIZATIONS OPERATING UNDER AGREEMENTS WITH THE U.S. OFFICE OF EDUCATION. FURTHER REPRODUCTION OUTSIDE THE ERIC SYSTEM REQUIRES PERMISSION OF THE COPYRIGHT OWNER."

ERIC
Full Text Provided by ERIC

ED052708

# New Approaches to Student Financial Aid

Report of the Panel on Student Financial Need Analysis

Allan M. Cartter, *Chairman*

College Entrance Examination Board, New York
1971

ERIC
Full Text Provided by ERIC

Copies of this book may be ordered from Publications Order Office, College Entrance Examination Board, Box 592, Princeton, New Jersey 08540. The price is $3.

Editorial inquiries concerning this book should be directed to Editorial Office, College Entrance Examination Board, 888 Seventh Avenue, New York, New York 10019.

Copyright © 1971 by the College Entrance Examination Board. All rights reserved.

Library of Congress Catalog Card Number: 70-169265

Printed in the United States of America

ERIC Full Text Provided by ERIC

# Contents


Panel on Student Financial Need Analysis (Members and Consultants) . . vi

Special Committees . . . . . . . . . . viii

Introduction . . . . . . . . . . 1

An Overview of Higher Education and Financial Aid Problems, 1955 to 1985 . . . . . . . . . . 4

Objectives and Principles . . . . . . . . . . 11

College Admissions and Financial Aid Policies as Revealed by Institutional Practices . . . . . . . . . . 15

- Collection of the Data . . . . . . . . . . 15
- The Institutional Data . . . . . . . . . . 18
  - Tabulation of the Results . . . . . . . . . . 18
  - Prediction Equations: Some Linear Relationships within the Institutional Data . . . . . . . . . . 20
- The Individual Data . . . . . . . . . . 21
  - The Admission Decision . . . . . . . . . . 27
  - Proportion of College-Defined Need Met . . . . . . . . . . 29
  - Packaging . . . . . . . . . . 29
  - Institutional Changes in CSS Need Computation . . . . . . . . . . 31
- Conclusions and Recommendations . . . . . . . . . . 32

Financial Aid Attitudes and Concerns of Users and Problems of Special Student Populations . . . . . . . . . . 36

- Survey of Attitudes of Financial Aid Officers . . . . . . . . . . 36
- Survey of Student Opinion . . . . . . . . . . 37
- Self-Supporting Students . . . . . . . . . . 40
- Graduate and Professional Students . . . . . . . . . . 42
- Recommendations . . . . . . . . . . 45

Adequacy of the CSS Need Analysis System for Low-Income and Minority Students . . . . . . . . . . 47

- Adequacy for Low-Income Families . . . . . . . . . . 47
- Adequacy for Minority Families . . . . . . . . . . 49

Technical Changes to Improve Equity in Determination of Parental Contributions . . . . . . . . . . 53

- Past, Present, and Future . . . . . . . . . . 53

The Present-Value-Total-Resources (PVTR) Approach to Measuring Parental Ability-to-Pay . . . . . . . . . . . . . . . . . 56
Outline of Steps . . . . . . . . . . . . . . . . . . . . . . . . 56
Lifetime to Current Earnings Ratios . . . . . . . . . . . . . . . . 57
Discretionary Resources . . . . . . . . . . . . . . . . . . . . 60
The Contribution Rate Schedule. . . . . . . . . . . . . . . . . . . . 62
A Trial Run: Cases Illustrating How the PVTR Approach with the Suggested Rate Schedule Compares with Present CSS Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
A Liquidity Index . . . . . . . . . . . . . . . . . . . . . . . . 70
The Measurement of Net Worth and Current Earnings. . . . . . . . . 72
Treatment of Multiple Offspring. . . . . . . . . . . . . . . . . . . 74
Place-to-Place Differentials in Living Costs . . . . . . . . . . . . . 75
The Packaging of Financial Aid . . . . . . . . . . . . . . . . . . . 77
Varieties of Financial Aid . . . . . . . . . . . . . . . . . . . . 77
Financial Aid Objectives . . . . . . . . . . . . . . . . . . . . . 78
Objectives and Packaging . . . . . . . . . . . . . . . . . . . . 79
The Universal GI Bill . . . . . . . . . . . . . . . . . . . . . . 79
First-Come First-Served . . . . . . . . . . . . . . . . . . . . 80
The Scholarship-Prize. . . . . . . . . . . . . . . . . . . . . . 80
Need-Related Aid . . . . . . . . . . . . . . . . . . . . . . . . 81
Need-Related Aid with Academic Preference . . . . . . . . . . . 81
Need-Related Aid with Need Preference. . . . . . . . . . . . . . 82
Need-Related Aid with Threshold Preference . . . . . . . . . . . 82
Constraints and Uncertainties . . . . . . . . . . . . . . . . . . . 84
Recommendations . . . . . . . . . . . . . . . . . . . . . . . . 85
Summary and Recommendations . . . . . . . . . . . . . . . . . . . . 87
Appendix. How Students See It: Report of the Committee on Student Attitudes and Concerns toward Student Aid . . . . . . . . . 106
Survey Questionnaire . . . . . . . . . . . . . . . . . . . . . . . 127

ERIC Full Text Provided by ERIC

## Tables

1. Summary of Responses to Institutional Questionnaire . . . . . . . . . 16
2. Unused Student Capacity (1969-70) . . . . . . . . . . . . . . . . . . . . 19
3. Institutional Decision Making on Financial Aid Policy and Individual Applications for Aid (1969-70) . . . . . . . . . . . . . 20
4. Individual Student Analysis Summary . . . . . . . . . . . . . . . . . 22
5. Institutions Surveyed, by Region and Type . . . . . . . . . . . . . 36
6. 1959 Ratios of Present Value of Expected Lifetime Earnings to Current Earnings . . . . . . . . . 58
7. 1968 and 1959 Ratios of Present Value of Lifetime Earnings to Current Earnings . . . . . . . . . . . . . . . . . . . . . . . . . . 60
8. Effect of Increasing the Discount Rate on White-Nonwhite Differentials in Ratios of the Present Value of Expected Lifetime Earnings to Current Earnings . . . . . . . . . . 61
9. Suggested Contribution Rate Schedule . . . . . . . . . . . . . . . . 64
10. Calculation of Parental Contribution for Fleming Case: Comparing Present CSS Computations with Those for the PVTR Approach . . . . . . . . . . . . . . . . . . . . . . . . . 65
11. CSS Parental Contribution and Contribution under PVTR Approach for Illustrative Variations in Earnings and Resources . . . . . . . . . 66
12. Progressivity of the Contribution Rate and Response to General Inflation . . . . . . . . . . . . . . . . . . . . . . . . . 68
13. Influence of Education and Color on Parental Contribution under PVTR . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

ERIC Full Text Provided by ERIC

## Panel on Student Financial Need Analysis (Members and Consultants)

### Members

Allan M. Cartter, Chancellor, New York University (Chairman)
Mary Jean Bowman, Professor of Economics and Education, University of Chicago
Ronald M. Brown, Director of Financial Aid, University of Michigan
*Jack B. Critchfield, President, Rollins College
Douglas R. Dickson, Director of Student Planning and Information, University of Pennsylvania
Eunice L. Edwards, Director of Financial Aid, Fisk University
Carl A. Fields, Assistant Dean of the College, Princeton University
W. Lee Hansen, Professor of Economics, University of Wisconsin
Watts Hill Jr., Member, North Carolina Board of Higher Education
Robert P. Huff, Director of Financial Aid, Stanford University
Hugh W. Lane, President, National Scholarship Service and Fund for Negro Students
Robert F. Lanzilotti, Dean, Graduate School of Business Administration, University of Florida
Arthur S. Marmaduke, Executive Director, California State Scholarship and Loan Commission
S. V. Martorana, Vice Chancellor of Two-Year Colleges, State University of New York
Roy Radner, Professor of Economics and Statistics, University of California, Berkeley
†Arthur M. Ross, Vice President for State Relations and Planning, University of Michigan
Melvin I. White, Professor of Economics, Brooklyn College of the City University of New York
Walter W. Wilcox, Senior Specialist in Agriculture, Legislative Reference Service, Library of Congress

### Consultants

Morris J. Blachman, Student, New York University
Howard R. Boozer, Director, Educational Development Administration, RCA Corporation
Gerard Brannon, Associate Director, Office of Tax Analysis, U.S. Department of the Treasury
Martin David, Professor of Economics, University of Wisconsin

---

* Resigned July 15, 1970
† Died June 5, 1970

Thomas Juster, Vice President for Research, National Bureau of Economic Research
Leonard Miller, Assistant Professor of Economics, State University of New York at Stony Brook
Dorothy Projector, Director, Division of Economics and Long Range Studies, Office of Research and Statistics, U.S. Social Security Administration
Thomas Ribich, Associate Professor of Economics, University of North Carolina, Chapel Hill
Gertrude Weiss, Consulting Economist, Washington, D.C.

**Staff Associate to the Panel**

John Bishop, Lecturer in Economics, New York University

### Special Committees

A number of committees assisted the Panel in developing materials related to objectives and principles, special student populations, packaging guidelines, student opinion, research on institutional practices, and needed technical changes. The three committees on research, student opinion, and technical changes made special surveys or studies. The members of those committees are listed below:

*Research Committee:*
Allan M. Cartter (Chairman), Robert P. Huff (Director of the Research Study and the Survey of Attitudes of Financial Aid Officers), John Bishop, Ronald M. Brown, W. Lee Hansen, and Roy Radner. The committee was assisted by Leonard Miller (consultant) and by Dale Borglum, David Harvey, and James Ware (graduate students at Stanford University).

*Technical Task Force:*
Melvin I. White (Chairman), James L. Bowman (CSS Program Director, Educational Testing Service), Douglas R. Dickson, and Walter W. Wilcox.

*Committee on Student Attitudes and Concerns Toward Student Aid:*
Morris J. Blachman (Chairman), Ronald Hellman, James Holzhauer, and Jane Klare, Students at New York University; Steve London, Rutgers University; Sharon Pero, University of Wisconsin; and Roosevelt Randolph, University of North Carolina.

ERIC Full Text Provided by ERIC

## Introduction

The College Scholarship Service (CSS) was established by the College Entrance Examination Board in 1954 and was the Board's first venture into an area not associated with testing activities. The CSS came into being principally as the result of requests from a number of member colleges of the Board for a standardized method of determining parental financial contributions toward the costs of attending college. Competitive bidding for students with exceptional intellectual promise, or other desirable talents such as outstanding athletic ability, had reached proportions that were of widespread concern. In the view of many people, funds in limited supply were being expended unwisely in the competition to induce exceptional students to enroll at particular colleges. The charge to the CSS was to develop a standard need analysis system and collateral services that would provide the following. (1) A standard form for the collection of data pertaining to family income, assets, and other family circumstances that might affect parental ability to contribute to the costs of educating their offspring. (2) A rationale for analysis of the data. (3) Centralized processing and distribution of this information to the institutions designated by students to receive it. (4) Agreement among users of the CSS services to policies for the distribution of funds to students on the basis of actual need rather than competitive bidding.

In 1966 the CSS acquired its own membership organization, the College Scholarship Service Assembly (CSSA). Articles of Association were approved by the Assembly and by the trustees of the College Entrance Examination Board. The CSS Assembly functions as an advisory body to the CSS Council, which reports to the Board of Trustees of the College Board through the Board's president.

Through the years CSS processes have been refined and computerized. These processes are used to determine the amount a family is expected to contribute from income and assets, added to the student's summer earnings and other contributions. These are then compared with individual institutional budgets, and the student's financial aid requirements at a particular college are reported to the student aid officer at that college. The undergirding economic rationale for this analysis has also been modified from time to time. In 1970, approximately 900,000 families completed the CSS financial aid form, the Parents' Confidential Statement (PCS), and submitted it to the CSS for processing and distribution.

While from hindsight and today's perspective it may be said that





ERIC

Case: 1:22-cv-00125 Document #: 864-45 Filed: 05/07/25 Page 13 of 144 PageID #:34899



the College Scholarship Service initially served primarily institutional purposes, it is also clear that it helped stop many unreasonable and illogical practices among colleges, increased higher educational opportunities and access to higher education for many students, made possible more efficient and economical use of limited student aid funds, and influenced the thinking of the educational community and the public in the area of student financial assistance. The CSS provided a rationale for action, a system, and leadership.

The users of the College Scholarship Service have grown from a few prestigious, largely private colleges to over 4,000 institutions that include a broad cross section of colleges and universities (public and private), community colleges, other postsecondary schools, and state and other scholarship sponsors. The CSS need analysis system is now the principal instrument used in allocating to students millions of dollars of federal, state, college, and private aid funds. It has moved from a device to select the ablest of a needy group for a small group of colleges, to a means of selecting needy students at varying ability levels and the very neediest of students from disadvantaged families.

The College Scholarship Service is still growing, and its years of greatest service and responsibility may lie ahead. Because of the importance of the CSS need analysis system as an allocation device and its increasing impact on all of higher education, it was recognized in 1968 that a critical review of the economic assumptions, the logic, and elements of the system was required.

In May 1968 the CSS Committee (now renamed the CSS Council) formally recommended "That the Standing Committee on the College Scholarship Service establish a Panel on Financial Need Analysis which will review, within the current frame of reference of parental responsibility, the present CSS system and submit to the Standing Committee both evaluations of the present system and recommendations for changes which might make the system more definitive and comprehensive. The members of the Panel shall be appointed by the Chairman of the Standing Committee and shall include representatives of the financial aid community, economists, and such others who can contribute to the work of the Panel. . . ."

The College Scholarship Service Assembly and the College Entrance Examination Board concurred in this recommendation, and the CSS Panel on Student Financial Need Analysis, with Allan M. Cartter, chancellor of New York University, as chairman, was later appointed. The Panel met formally on five occasions (April 18-19, June 25-26, and September 12-13, 1969; September 1-2, 1970; and February



ERIC Full Text Provided by ERIC

11-12, 1971). Numerous meetings of subcommittees were also held over a number of months.

The Panel in its studies and deliberations operated on the basic assumptions that the primary responsibility for meeting college costs rests with the family, and that the role of the college or agency in student financial aid is to supplement parental and student contributions. It also recognized that the College Scholarship Service serves many types and kinds of students and institutions in all sections of the country; that the CSS need analysis system is used generally to allocate both public and private funds; and that it serves both public and institutional purposes.

It would have been an impossibility to achieve absolute unanimity on every point of view and recommendation in this report from a panel whose membership includes as many thoughtful individuals from such varied backgrounds and affiliations. The Panel has achieved substantial consensus on all major aspects of this report, however, and is pleased to present it in this light.

The Panel is particularly indebted to John I. Kirkpatrick (vice president, College Board), Edward Sanders (vice president, College Board), Alexander G. Sidar Jr. (executive director, CSS), Alan S. Mishne (associate director, CSS), and James L. Bowman (CSS program director, Educational Testing Service), for their untiring efforts to expedite the work of the Panel; and to Howard R. Boozer (director, Educational Development Administration, RCA Corporation), who edited the Panel's report.

ERIC Full Text Provided by ERIC

Case: 1:22-cv-00125 Document #: 864-45 Filed: 05/07/25 Page 15 of 144 PageID #:34901

## An Overview of Higher Education and Financial Aid Problems, 1955 to 1985

The College Scholarship Service was founded in the mid-1950s in an educational age not greatly different from that experienced by the grandparents of today's students. In 1955 the size of the college-age group in the United States was no larger than it had been in 1925; the country had lived in a relatively stable educational world through a generation that was highly unstable economically. The past 15 years, however, have exactly reversed this state of affairs. Although there has been relatively consistent prosperity, social and political stability are increasingly challenged, and the college-age cohort has increased nearly 70 percent in that period. In addition to the growth of the college-age group, the percentage of that cohort enrolled in college is now half again as large as it was in 1955.

But just as the nation has become accustomed to rapid rates of growth and a long period of educational prosperity, a dramatic change in the world of higher education is about to take place. One important cause of the new stresses that higher education will face is the projected slowdown in the expansion of college enrollments. The change in the growth rate of the 18-21 age group is evidenced by the following percentage increases in five-year periods:

| *Five-year period* | *Percentage increase* |
|---|---|
| 1955 to 1960 | 12.2 |
| 1960 to 1965 | 28.7 |
| 1965 to 1970 | 18.3 |
| 1970 to 1975 | 12.8 |
| 1975 to 1980 | 5.1 |
| 1980 to 1985 | −9.3 |
| 1985 to 1990 | −6.2 |

Not only will the population reservoir from which students are drawn experience a rapidly declining growth rate, but there will be an absolute shrinkage in the 1980s nearly as rapid as the expansion now going on. In the late 1980s the college-age population will be smaller by several hundred thousand than it is today.[1] For the nation as a whole, the

1. See Bureau of Census, Current Population Reports, Series P-25, No. 448, August 1970, *Population Estimates and Projections.* Nearly one-third of undergraduate enrollments consist of persons outside the 18-21 age group, and this fraction may be larger in the future. However, over the last decade it has remained reasonably stable.

percentage of the age group entering college has now risen above 50 (approximately 60 percent including formal nondegree postsecondary education); as the percentage gets closer to 100, the population will also be shrinking so that growth from higher participation rates will add progressively smaller increments to total enrollment.

Quite apart from the restiveness of students and younger faculty, the 1975-90 period is likely to be one of difficult adjustment, particularly since the customary lag in the capacity of the educational system to handle those aspiring to higher education will soon disappear. Excess demand (a shortage of places) has come to be expected as a permanent characteristic of higher education; within the decade of the 1970s, however, there is likely to be excess capacity instead in many regions and in many categories of education. Such an abrupt reversal of fortunes is already evident in graduate work in the arts and sciences. Present state plans for expanding systems of collegiate education suggest that overexpansion is also quite possible at the undergraduate level within a few short years.

A marked slowing down in the growth rate of the total higher educational system will place great strains on the existing dual structure of the system. A number of weaker independent colleges and universities are likely to disappear or become wards of the state.[2] Those that continue are likely to be bolstered by public funds, both state and federal. State assistance to independent colleges and universities, long a tradition in Pennsylvania, has recently been introduced in New York State and is under serious consideration in Illinois, California, Texas, and several other states. Over the next 15 years it seems likely that the distinction between public and private institutions will become increasingly blurred. At the federal level no distinction has been made in the past (other than for sectarian programs in church-related institutions, under the terms of the First Amendment). Broad institutional aid, and aid to students from both federal and state sources, are likely to become regular forms of public support before the end of this decade.

At the same time that government support of independent institu-

---

2. The recent Carnegie Commission and American Association of Colleges studies have illustrated the dramatically increasing deficit position of a large number of private colleges and universities. See Earl Cheit, *The New Depression in Higher Education*, New York: McGraw-Hill, 1971; and William W. Jellema, *"The Red and the Black," Special Preliminary Report on the Financial Status, Present and Projected, of Private Institutions of Higher Learning*. Washington, D.C.: Association of American Colleges, 1970, 23 pp.



ERIC Full Text Provided by ERIC

tions is likely to expand in recognition of their contribution to public objectives, the growing cost of higher education will create increasing pressures for larger tuition charges in public institutions to cover a major share of the direct costs of education. Low-tuition systems of higher education were more easily supported from state and municipal tax funds when only 10 to 20 percent of the age group attended college than today when the percentage has risen above 50 percent and is moving toward 75 percent. The burden on public revenues is made heavier at the present time by the fact that in the 1960-75 period the college-age group will have expanded more rapidly than the total labor force. Thus the tax base will not have kept pace with the educational demands placed upon it, in part because state and local tax structures are less progressive than the federal system. This combination of forces is driving many state systems to raise tuition charges more rapidly than in the past.

Another key pressure on tuition in public institutions is the need to find additional sources to fund expanded access to college for students from low-income families, through enlarged government-supported student aid programs. Tuition increases can be used to release appropriations for such state aid programs by effectively increasing charges to financially able students and reducing net costs to needy students. A more precise guess about future pricing policy in public higher education systems would predict a continuation of comparatively low tuition in community colleges, tuition approaching direct instructional costs in senior institutions, and charges for out-of-state residents becoming comparable to private-college tuition levels over the next 15 years.

These changes, which are already beginning to become evident in many parts of the country, represent much more than just marginal shifts in an evolutionary system of higher education. They begin to challenge the traditional assumptions about who should pay for higher education, and how. They also challenge the means by which access to higher education has been determined in the past. On the one hand, it seems likely that public systems in the future will be forced to place much greater emphasis on parental responsibility for bearing the costs of higher education whenever such parental resources are available. It also seems evident, on the other hand, that vastly expanded state and federal programs will tend to relieve more low-income parental groups from *all* responsibility through a benefit arrangement that has little similarity to old-style scholarships based on high academic achievement. Further complicating the scene, some

ERIC Full Text Provided by ERIC

institutions will experiment soon with contingent loan programs that essentially shift part of the burden of educational costs to the user in later life. Some states may experiment with voucher systems for both lower and higher education in this decade, and the number of states that fund and administer aid programs available to students at both public and private institutions will increase.

An irony of the present structure of higher education in the United States is that approximately 55 percent of the direct costs of education is covered by subsidies from either public or private philanthropic sources, and another 10 to 15 percent is met by various forms of student financial aid. It seems clear that if it were possible to reconstitute the entire system of higher education, it could be done in such a way that all financial need of qualified students could be met today with existing resources. Within the framework of the present dual system, however, there seems little likelihood that such a goal could be accomplished within a reasonably short time without seriously crippling private or public institutions. The alternative that is often recommended by the academic communities, that society devote a large share of public resources to supporting college students and institutions, may be highly desirable but seems unlikely within the immediate future in view of other pressing claims of social merit. The outlook for the next one or two decades poses a seeming paradox. The current trend is placing even greater emphasis on parental responsibility. The Panel believes this to be a transitional shift, however, that will give way within the next 15 years or so to a relative decline in emphasis on parental responsibility as the proportion of students from low-income families increases, and a parallel increase in the responsibility to be shared by society and by the student through self-help (loans and work).

In this world of flux, the College Scholarship Service itself may prove to be a transitional institution. Over the near future the Panel sees increased emphasis on financial need analysis, but a relative shift of responsibility from service essentially to institutions to service to public agencies. Institutional needs and objectives will continue to be important for some time, but serving societal objectives as determined by governmental bodies will increasingly play a dominant role. The Panel sees such changes in the financing of higher education as generally desirable, recognizing that some costs and sacrifices are entailed in any course of development that markedly widens the range of educational opportunities.

The Panel's perception of the changing directions in higher educa-

Case: 1:22-cv-00125 Document #: 864-45 Filed: 05/07/25 Page 19 of 144 PageID #:34905



tion left it with a sense of uneasiness when it first considered its charge to "review, *within the current frame of parental responsibility*, the present CSS system" (emphasis added). At the completion of the Panel's work that uneasiness remains. Much of the effort of this study —as illustrated in the body of this report—has been devoted to refining a system of student aid within that traditional framework, although this framework may become only one of a number of approaches required in the next 15 years.

This is not to say that financial need analysis *per se* may become obsolete, but rather that the current reliance on parental responsibility appears most likely to be insufficient if it continues to be the sole framework of need analysis.

In the Panel's view, as acceptance grows of the responsibility of government to provide access to educational opportunity for its citizens commensurate with their ability, motivation, and the needs of society, so will acceptance grow of changes required to make the discharge of that responsibility a reality. These changes are most likely to include a shift to greater governmental and student financing of educational opportunity, a relative decrease in parental responsibility for the increased number of students from low-income families, and increased student or parental contribution expectations where there is capacity to pay higher charges.

The requirement that need analysis reflect this changing framework, in the Panel's opinion, will continue to increase in the next 15 years. Low-income students may require less complex systems of need analysis, but larger numbers of students now expected to be self-supporting will require aid. Additional frameworks for need analysis that reflect these emerging constituencies and demands must be developed.

The CSS has greatly influenced changes in student aid in the past. With the assistance of the financial aid community and others it can, indeed must, continue to do so in the future. The Panel's deliberations over nearly two years have convinced it that the financial aid community, with little fanfare, has moved the system significantly in the right direction, but much remains to be done.

The nation has yet to make equality of educational opportunity a reality. The vast resources committed to the support of higher education fail by a substantial margin to be adequate. Research for this study (summarized later in this report in the section beginning on page 15) makes abundantly clear that need, as a primary determinant of student aid, is still only a hoped-for goal.

A cherished myth of educators and the general public is that student financial aid today is primarily based on relative need. However, when the source and application of all aid funds (including the G.I. Bill, Social Security, athletic grants, and scholarships from restricted funds) are considered, the greater amount of student aid appears to be beyond institutional control and is commonly awarded on the basis of criteria other than need. In the case of one major university reviewed by the Panel, only 20 percent of total student aid funds, and less than one-third of the grant funds received by students, came from sources under the control of the institution. Another 25 percent of all forms of aid was administered by the institution under guidelines established by external agencies. Thus, while the Panel is moderately critical of institutional practices as revealed in its study of a number of colleges and universities, it also recognizes that financial aid officers have the impossible task of attempting to complement, or compensate, for all the irregular (and sometimes inequitable) patterns built into the system of financing higher education.

If, indeed, the next 10 to 15 years will see many heretofore private colleges and universities gradually becoming public, a general pricing revolution in the state senior colleges and universities, a dramatic increase of public funds going to students from low- and middle-income groups, and the development of new lifetime devices of self-help, critical questions will be raised about the role that the CSS can and should play in the future. The Panel sees this as the single most important issue that the CSS will face in this decade. The significance of what the Panel hopes is a careful and thoughtful report, attempting to improve the existing need analysis system, may be of secondary importance to the larger issue.

In the Panel's view the CSS must consciously decide whether it will play out its future primarily as a constituency organization attempting continually to improve a service that may eventually wane in national importance, or whether it will attempt to play a major leadership role in the formulation of public policy on a much broader scale. The key decisions that will significantly influence the shape of the educational system in the years ahead will not wait for the slow deliberations of academic councils. The social and political climate in the 1970s is likely to demand a speedier resolution of current inequities, and to place a premium on the search for broadly inclusive programs that will implement society's educational objectives. The Panel hopes that the CSS will not be bound by its continuing service routines, its institutional focus, and the increasing professionalization of financial



ERIC

Case: 1:22-cv-00125 Document #: 864-45 Filed: 05/07/25 Page 21 of 144 PageID #:34907



aid, and fail to serve adequately as a major forum for innovation and for devising public strategies.

These questions are raised here at the outset because the Panel believes that the body of this report needs a broader perspective than the more restricted charge to which the larger share of the study has been devoted. No specific proposals for altering the structure of the CSS are made here, for that is obviously beyond the task and competence of the Panel. It seems imperative, however, that the fastest growing constituency of the CSS—federal and, most particularly, state governments—be encouraged to play a larger role within the policy councils. Failure to achieve this end may, by default, leave public policy determination in the hands of legislatures and agency staffs who are less sensitive to the interdependent needs of students and their colleges.

The greatest contribution that the CSS can make in the next 15 years is to speed the time when equality of access to educational opportunity becomes a reality. As a public service organization the CSS has an obligation to act boldly. The Panel believes that it has both the will and the capacity to do so.

## Objectives and Principles

One of the major reasons for the establishment of the College Scholarship Service in 1954 was to bring order out of a chaotic situation at a time when colleges were experiencing excess capacity and the competition for students was intense. Colleges were often using limited aid funds competitively to secure for institutional purposes the most capable students in a market of scarcity.

The CSS developed objectives and procedures of financial aid administration that permitted colleges to allocate their student aid funds more rationally, to increase opportunity, and to serve students more effectively. The procedures were designed so that ambitious and talented students could obtain a college education without regard to family financial circumstances, and to end the practice of awarding scholarships as prizes.

When the CSS began operating, there was no formal statement of principles nor general consensus on ethical procedures in the administration of financial aid. Nevertheless, some acceptance of common assumptions developed quickly. For example, it was understood that institutions participating in the system proposed to base the amount of financial aid on the gap between a family's ability to pay and the total expense to the student of attending college. Award winners were to be chosen solely for academic achievement or promise, although it was assumed that colleges would define these terms in varying ways and that different kinds of talent might be sought. Talented students without demonstrated financial need were not to receive substantial financial stipends.

Families were expected to be the first source of support for their children in college, and the intent of the CSS procedures was to insure uniformity of sacrifice on the part of families without encroaching severely on their standards of living. Family assets and income, as well as any unusual problems, were taken into account. Students were expected to contribute from earnings and personal assets, though not generally, at that time, by incurring indebtedness. The amount of the family contribution was expected to be the same regardless of the cost of attending a particular college. It was assumed that aided students would not be required to live in penury, but that they would be permitted to live at the standard of living of the majority of students.

From the beginning it was a fundamental precept that the computation procedures were designed as an aid to, not as a substitute for,

ERIC Full Text Provided by ERIC

the aid officer's considered judgment. Consultation among institutional aid officers soon developed as a means of understanding and reconciling differences, though each institution remained free to reach its own conclusions and make its own offer.

By 1964 most of these understandings were formalized in a statement of principles that was adopted by the members and widely disseminated. As the membership of the CSS increased, new participants were asked to endorse the formal statement.

In the ensuing years since 1964, changes have occurred in the broad social aspirations and hopes for higher education. Initially, the intent was to lower or remove financial barriers facing ambitious and talented students who wanted to enter college. Increasingly it has become general public policy to assure the maximum opportunity for enrollment in postsecondary educational institutions. It has also become apparent that to achieve this goal requires special attention to identifying, encouraging, and financing students from disadvantaged backgrounds.

During the two years the Panel on Student Financial Need Analysis deliberated, it became evident to many that the 1964 statement had become inadequate because of widespread changes on the national and educational scenes. Both within the Panel and in meetings of CSS members and committees, considerable thought and discussion were given to a revised statement more pertinent to the seventies. As a result of lengthy consultation and study, to which this Panel contributed extensively, the members of the College Scholarship Service Assembly adopted on October 26, 1970, and the Board of Trustees of the College Entrance Examination Board approved on December 10, 1970, the following revised statement of "Principles of Student Financial Aid Administration."

"In recognition of the fact that equality of educational opportunity can be realized only with fully funded and properly administered need-based programs of student financial assistance, the member institutions of the Assembly affirm their intent to make the goals set down in the statement of financial aid Principles become realities.

"*Financial Aid* as used in these Principles consists of scholarships or grant assistance and self-help (loans and employment) which may be offered singly or in various combinations to students who demonstrate need:

"1. The purpose of any financial aid program—institutional, governmental or private—should be to provide monetary assistance to students who can benefit from further education but who cannot do

ERIC Full Text Provided by ERIC

so without such assistance. The primary purpose of a collegiate financial aid program should be to provide financial assistance to accepted students who, without such aid, would be unable to attend that college.

"2. Each college has an obligation to assist in realizing the national goal of equality of educational opportunity. The college, therefore, should work with schools, community groups, and other educational institutions in support of this goal.

"3. The college should publish budgets that state total student expenses realistically including, where applicable, maintenance at home, commuting expenses, personal expenses and necessary travel.

"4. Parents are expected to contribute according to their means, taking into account their income, assets, number of dependents and other relevant information. Students themselves are expected to contribute from their own assets and earnings, including appropriate borrowing against future earnings.

"5. Financial aid should be offered only after determination that the resources of the family are insufficient to meet the student's educational expenses. The amount of aid offered should not exceed the amount needed to meet the difference between the student's total educational expenses and the family's resources.

"6. The amount and type of self-help expected from students should be related to the circumstances of the individual. In the assignment of funds to those students designated to receive financial aid, the largest amounts of total grant assistance should go to students with the least ability to pay.

"7. The college should review its financial assistance awards annually and adjust them, if necessary, to reflect changes in the financial needs of students and the expenses of attending the institution. The college has an obligation to inform students and parents of the financial aid renewal policies for enrolled students at the time of the initial offer of financial assistance.

"8. Because the amount of financial assistance awarded reflects the economic circumstances of the student and his family, the college should refrain from any public announcement of the amount of aid offered, and encourage the student, his secondary school, and others to respect the confidentiality of this information.

"9. All documents, correspondence and conversations between and among the aid applicant, his family, and financial aid officers are confidential and entitled to the protection ordinarily arising from a counseling relationship.





ERIC Full Text Provided by ERIC

e: 1:22-cv-00125 Document #: 864-45 Filed: 05/07/25 Page 25 of 144 PageID #:3



"10. Concern for the student should be paramount. Financial aid should be administered in such a manner that other interests, important though they may be, are subordinate to the needs of students."

The CSS Assembly and the College Board urge all individuals, institutions, and organizations interested in student financial assistance to join in accepting these principles as important goals that can and will help define the evolving role of higher education in America.

This Panel heartily endorses these principles and commends them to all institutions and agencies responsible for administering financial aid. The recommendations presented in this report have been developed in the spirit of these principles, and the Panel believes that if they are adopted they will assist both in increasing the effectiveness of the financial aid process and in extending equality of educational opportunity.

## College Admissions and Financial Aid Policies as Revealed by Institutional Practices

Early in its deliberations, the Panel requested its research committee to undertake a study of the relationships between student attributes and financial aid practices. This study was made for the purpose of ascertaining institutional goals, and admissions and financial aid policies, as revealed by actions rather than simply by statements of policy.

All students can be described in terms of certain characteristics such as academic achievement, test results, grades, and financial resources, to identify a few of the more obvious, and these attributes apply generally to all students who seek admission to a college, with or without financial assistance. Because limited physical and financial resources and academic standards usually place restraints on enrollment, colleges and universities rank their applicants according to explicit or implicit objectives and establish their admissions and financial aid policies accordingly.

It was felt that this study should provide not only significant information about current financial aid practices, but that it should also allow the development of statistical models that could be used to predict what might happen to admissions and financial aid decisions as the sources of aid or other conditions change. Such analyses would permit, for example, forecasting the consequences of different federal student aid programs on the size and composition of college and university student bodies.

### Collection of the Data

The presidents of 130 colleges and universities were informed in November 1969 of the purpose of the study and were requested to provide certain data. Enclosed with the letter was a questionnaire that sought information on the number of applications for admission and financial aid, enrollment, capacity factors, tuition revenue, aid resources, and unmet financial aid needs. Also enclosed was a questionnaire on individual freshman applicants, which solicited information on such characteristics as scores on the College Board's Scholastic Aptitude Test, secondary school grade-point average, religion, race, nonacademic characteristics, admissions decision, enrollment status, and financial aid data. Each institution was requested to complete this form on the basis of a stratified random sample of its applicants for freshman admission in the fall of 1969.

ERIC Full Text Provided by ERIC

Case: 1:22-cv-00125 Document #: 864-45 Filed: 05/07/25 Page 27 of 144 PageID #:34913



**Table 1. Summary of Responses to Institutional Questionnaire**

| *Colleges and universities* | *% freshman applicants seeking aid* | *% transfer applicants seeking aid* | *% male applicants seeking aid* | *% female applicants seeking aid* | *% freshmen students receiving aid* | *% transfer students receiving aid* | *% other undergraduates receiving aid* | *% total gift aid is of total aid* | *% total gift aid is of tuition income* | *% institutional aid is of total aid* | *% institutional aid is of tuition income* | *% guaranteed loan aid is of total aid* | *% loan aid is of total aid* | *% job aid is of total aid* | *% federal aid is of total aid* | *% state aid is of total aid* |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total population | 32 | 17 | 31 | 27 | 39 | 23 | 38 | 34 | 21 | 44 | 27 | 21 | 37 | 28 | 27 | 6 |
| Public | 26 | 14 | 24 | 23 | 36 | 22 | 34 | 22 | 16 | 39 | 28 | 25 | 42 | 35 | 30 | 5 |
| Private | 44 | 25 | 45 | 38 | 46 | 25 | 46 | 63 | 27 | 56 | 26 | 10 | 25 | 10 | 21 | 10 |
| Small | 25 | 10 | 26 | 19 | 33 | 23 | 37 | 33 | 30 | 35 | 22 | 13 | 41 | 24 | 45 | 5 |
| Medium | 31 | 14 | 27 | 31 | 37 | 15 | 47 | 47 | 20 | 42 | 27 | 18 | 33 | 18 | 32 | 7 |
| Large | 35 | 19 | 35 | 28 | 41 | 25 | 34 | 30 | 20 | 40 | 27 | 23 | 37 | 31 | 23 | 6 |
| Eastern | 35 | 18 | 38 | 27 | 38 | 17 | 35 | 53 | 22 | 47 | 22 | 20 | 34 | 11 | 20 | 10 |
| Southern | 27 | 15 | 20 | 33 | 40 | 20 | 47 | 40 | 32 | 35 | 29 | 17 | 33 | 26 | 45 | 1 |
| Midwestern | 24 | 11 | 22 | 22 | 42 | 39 | 34 | 20 | 14 | 48 | 33 | 23 | 37 | 41 | 22 | 5 |
| Western | 38 | 21 | 34 | 30 | 37 | 27 | 28 | 35 | 27 | 35 | 20 | 20 | 40 | 24 | 36 | 7 |
| Southwestern | 28 | 13 | 24 | 29 | 29 | 9 | 59 | 59 | 23 | 72 | 61 | 14 | 31 | 8 | 13 | 0 |
| Small public | 18 | 7 | 15 | 16 | 28 | 21 | 32 | 11 | 18 | 32 | 18 | 13 | 51 | 36 | 51 | 2 |
| Medium public | 28 | 15 | 25 | 27 | 33 | 12 | 47 | 26 | 14 | 28 | 26 | 28 | 44 | 29 | 42 | 0 |
| Large public | 28 | 16 | 26 | 23 | 39 | 26 | 30 | 22 | 17 | 41 | 28 | 26 | 40 | 36 | 26 | 6 |
| Small private | 46 | 35 | 59 | 31 | 48 | 31 | 54 | 55 | 38 | 38 | 24 | 14 | 32 | 11 | 39 | 7 |
| Medium private | 38 | 14 | 32 | 39 | 45 | 25 | 47 | 66 | 24 | 54 | 27 | 9 | 24 | 9 | 23 | 12 |
| Large private | 46 | 30 | 50 | 39 | 47 | 24 | 44 | 65 | 27 | 66 | 26 | 10 | 24 | 10 | 12 | 10 |
| Public Eastern | 27 | 11 | 27 | 21 | 31 | 10 | 24 | 36 | 18 | 15 | 11 | 37 | 50 | 12 | 31 | 15 |
| Public Southern | 27 | 12 | 18 | 34 | 45 | 21 | 47 | 36 | 25 | 42 | 29 | 19 | 31 | 31 | 35 | 2 |
| Public Midwestern | 21 | 11 | 20 | 19 | 41 | 41 | 33 | 19 | 12 | 49 | 33 | 24 | 37 | 42 | 20 | 5 |
| Public Western | 32 | 21 | 27 | 27 | 33 | 25 | 20 | 19 | 27 | 28 | 21 | 24 | 48 | 32 | 45 | 0 |
| Public Southwestern | 29 | 13 | 25 | 29 | 26 | 9 | 59 | — | 15 | — | — | — | — | — | — | — |
| Private Eastern | 44 | 31 | 50 | 36 | 46 | 23 | 44 | 67 | 24 | 73 | 27 | 7 | 21 | 10 | 11 | 7 |
| Private Southern | 27 | 23 | 25 | 30 | 34 | [illegible] | 48 | 46 | 62 | 25 | 29 | 16 | 34 | 19 | 58 | 0 |
| Private Midwestern | 40 | 13 | 28 | 62 | 50 | [illegible] | 48 | 44 | 22 | 6 | — | 13 | 37 | 17 | 76 | 3 |
| Private Western | 48 | 18 | 48 | 38 | 48 | 36 | 45 | 69 | 27 | 49 | 19 | 10 | 23 | 7 | 16 | 22 |
| Private Southwestern | 21 | 14 | 20 | 22 | 61 | 57 | 57 | 59 | 63 | 72 | 61 | 14 | 31 | 8 | 13 | 0 |

| *Institutional aid per student receiving aid* | *Institutional aid per student* | *Federal aid per student receiving aid* | *State aid per student receiving aid* | *Guaranteed loan aid per student receiving aid* | *Total gift aid per student receiving aid* | *Total gift aid per student* | *Total aid per student receiving aid* | *Total aid per student* | *% total aid is of tuition income* | *% freshmen and transfer aid applicants awarded aid* | *Colleges and universities* |
|---|---|---|---|---|---|---|---|---|---|---|---|
| $ 545 | $183 | $318 | $78 | $220 | $ 432 | $143 | $1,198 | $ 414 | 62 | 43 | Total population |
| 431 | 136 | 287 | 55 | 244 | 234 | 79 | 1,068 | 350 | 78 | 58 | Public |
| 927 | 423 | 386 | 151 | 157 | 1,031 | 460 | 1,633 | 746 | 41 | 26 | Private |
| 524 | 184 | 475 | 158 | 302 | 541 | 171 | 1,433 | 516 | 82 | 49 | Small |
| 490 | 176 | 308 | 66 | 170 | 467 | 168 | 1,041 | 413 | 58 | 44 | Medium |
| 568 | 185 | 295 | 72 | 227 | 388 | 122 | 1,218 | 402 | 61 | 42 | Large |
| 685 | 211 | 359 | 130 | 253 | 710 | 181 | 1,431 | 441 | 47 | 22 | Eastern |
| 333 | 151 | 440 | 17 | 169 | 383 | 174 | 949 | 432 | 80 | 47 | Southern |
| 462 | 179 | 249 | 57 | 214 | 257 | 96 | 921 | 373 | 65 | 106 | Midwestern |
| 628 | 154 | 481 | 135 | 299 | 638 | 163 | 1,654 | 436 | 70 | 43 | Western |
| 1,211 | 431 | 107 | 15 | 90 | 370 | 211 | 1,404 | 597 | 71 | 57 | Southwestern |
| 437 | 122 | 458 | 92 | 346 | 205 | 52 | 1,276 | 378 | 144 | 67 | Small public |
| 247 | 78 | 281 | 32 | 171 | 188 | 80 | 708 | 274 | 91 | 42 | Medium public |
| 471 | 151 | 262 | 59 | 254 | 260 | 83 | 1,126 | 364 | 72 | 64 | Large public |
| 629 | 316 | 514 | 231 | 226 | 988 | 515 | 1,623 | 816 | 61 | 34 | Small private |
| 773 | 390 | 337 | 115 | 169 | 893 | 431 | 1,429 | 722 | 39 | 47 | Medium private |
| 1,337 | 496 | 387 | 160 | 133 | 1,400 | 481 | 1,938 | 740 | 38 | 18 | Large private |
| 170 | 42 | 329 | 173 | 461 | 377 | 96 | 1,130 | 280 | 74 | 25 | Public Eastern |
| 372 | 155 | 352 | 23 | 169 | 320 | 133 | 882 | 368 | 69 | 43 | Public Southern |
| 472 | 180 | 196 | 60 | 212 | 176 | 68 | 897 | 361 | 65 | 119 | Public Midwestern |
| 503 | 104 | 551 | 29 | 339 | 299 | 69 | 1,599 | 362 | 150 | 58 | Public Western |
| – | – | 95 | 16 | 94 | 176 | 115 | – | – | – | 53 | Public Southwestern |
| 1,334 | 594 | 377 | 88 | 133 | 1,213 | 539 | 1,808 | 806 | 36 | 19 | Private Eastern |
| 266 | 143 | 618 | 8 | 170 | 490 | 264 | 1,064 | 573 | 125 | 53 | Private Southern |
| 106 | 92 | 593 | 34 | 232 | 771 | 383 | 1,710 | 1,485 | – | 62 | Private Midwestern |
| 877 | 381 | 276 | 398 | 191 | 1,249 | 560 | 1,764 | 766 | 38 | 25 | Private Western |
| 1,211 | 431 | 134 | 0 | 43 | 1,244 | 358 | 1,404 | 597 | 71 | 94 | Private Southwestern |





ERIC Full Text Provided by ERIC

Case: 1:22-cv-00125 Document #: 864-45 Filed: 05/07/25 Page 29 of 144 PageID #:349



Extensive effort was devoted to selecting the institutions asked to participate, to assure a representative sample. Taken into consideration were such factors as size, control, geographic location, academic selectivity, and institutional resources. Particular effort was made to include in the sample colleges and universities with special characteristics, such as those (1) enrolling a high proportion of minority students, (2) drawing their enrollment from predominantly urban areas, (3) limiting their student bodies to one sex, (4) offering principally engineering and scientific curriculums, (5) with two-year programs, and (6) with only liberal arts programs.

Eighty-six of the 130 institutions approached agreed to furnish as much as possible of the requested institutional data. Thirty-five colleges and universities furnished data on individual students; they returned 16,850 questionnaires with at least part of the requested information supplied.

**The Institutional Data**

The 86 colleges and universities providing institutional data enrolled just over one-half million undergraduates in the 1969-70 academic year, which approximated 10 percent of the undergraduate enrollment in the United States.[1] The total financial aid used by the undergraduate students at these 86 institutions was in excess of $193 million. This total amounts to about 10 percent of the aggregate student aid resources estimated as available for undergraduate students during that academic year.[2]

*Tabulation of the results.* The answers to 27 questions pertaining to the percentage of applicants seeking aid, the percentage of students receiving aid, the relative composition of aid programs, and the sources of aid were tabulated (Table 1). As Table 1 shows, cooperating institutions were stratified by type so that their responses could be examined by size, region, and type of control.

The Panel hoped that the institutional questionnaires would yield some meaningful information in two areas of specific concern: unused student capacity of the institutions surveyed, particularly as this was related to insufficient financial aid resources; and the source of student aid decisions at the institutions.

---

1. Edward Sanders and James Nelson, "Financing of Undergraduates, 1969-1970." *Financial Aid News*, July 1970.

2. *Ibid.*

Although unused capacity (vacant student spaces) could not be measured quantitatively from the responses, analysis of indications of unused capacity and the reasons provided by the institutions

**Table 2. Unused Student Capacity (1969-70)**

| *Reasons for unused student capacity* | *Type of institution* | | |
|---|---|---|---|
| | *Public* | *Private* | *Total* |
| Financial aid shortage | 9 | 6 | 15 |
| Insufficient applicants | 7 | 10 | 17 |
| Both | 8 | 7 | 15 |
| Total | 24 | 23 | 47 |

yielded the information given in Table 2. Of the 86 institutions responding, 47 indicated they had unused student capacity. Insufficient financial aid resources and insufficient applicants, both singly and together, were the important reasons for this underenrollment. The public and private institutions had the same problems, but the lack of financial aid seemed more restraining to public colleges, and insufficient applicants was more of a problem to the private institutions.

With reference to institutional decision-making processes, the Panel sought to distinguish between decisions on individual aid applicants and decisions affecting policy. Table 3 indicates how these decisions are made at the 84 institutions that responded. The most significant finding was that the financial aid officer is predominantly responsible for making decisions on individual student applications. He had this function, which in earlier times was usually handled by a committee,[3] in more than 75 percent of the responding institutions. Table 3 also indicates the composition of the committees that make in-

3. George Nash found in 1968, in a study of 849 financial aid directors, that in 76 percent of the institutions the financial aid committee made some of the individual decisions. He suggested that the role of the committee in individual decision making was directly proportionate to the size of the aid office's clerical staff. In 24 percent of the institutions whose aid programs were examined by this study, the aid officers were also making the policy decisions. See George Nash and Paul F. Lazarsfeld, *New Administrator on Campus: A Study of the Director of Student Financial Aid.* New York: College Entrance Examination Board and Bureau of Applied Social Research, Columbia University, 1968, pp. 7-17. Unpublished report.

Case: 1:22-cv-00125 Document #: 864-45 Filed: 05/07/25 Page 31 of 144 PageID #:34917



dividual and policy decisions on the 84 campuses. At 30 percent of the institutions, the policy-making bodies contained student representation.

**Table 3. Institutional Decision Making on Financial Aid Policy and Individual Applications for Aid (1969-70)**

| | *Individual decisions* | | | *Policy decisions* | | |
|---|---|---|---|---|---|---|
| *Decision maker* | *Public* | *Private* | *Total* | *Public* | *Private* | *Total* |
| Aid officer | 32 | 34 | 66 | 11 | 9 | 20 |
| Admissions officer | | 3 | 3 | | 2 | 2 |
| Faculty committee | | 1 | 1 | 1 | 3 | 4 |
| Faculty-administrative committee | 6 | 4 | 10 | 10 | 19 | 29 |
| Faculty-administrative-student committee | 3 | 1 | 4 | 17 | 8 | 25 |
| Other officer | | | | 2 | 2 | 4 |
| Total | 41 | 43 | 84 | 41 | 43 | 84 |

Note: The specific decisions concerning who received aid, the amount of aid, and the form in which it was made available, are combined under "individual decision" because all three of these decisions were consistently found to be made by the same person or committee.

*Prediction equations: some linear relationships within the institutional data.* Colleges and universities should find it useful to relate variables such as the percentage of applicants seeking aid and sources of student aid to other characteristics of the institution in such a manner that predictions can be made about future values of these variables. To that end, multiple linear regression was applied to the institutional data in an attempt to construct prediction equations for 22 of the institutional variables listed in Table 1. Ten variables describing various other characteristics of the institution, such as tuition, average student ability, and revenue per student were used as the independent or predictor variables in establishing these relationships. For the variable gift aid as a percentage of tuition income, for example, average parental assets of students filing a Parents' Confidential Statement and revenue per student were identified as the significant independent variables. Gift aid as a percentage of tuition in-

ERIC Full Text Provided by ERIC

come was negatively related to the former and positively related to the latter. The percentage of students seeking and receiving aid was significantly related only to the percentage of black students enrolled, this being a positive relationship.

The types of aid at institutions were influenced by a number of factors. Among them were an increase in the importance of gift aid at institutions with higher average student ability, a decline in the importance of gift aid as average parental assets increased, and a substitution of job aid for gift aid at private institutions. After controlling for revenue per student and average parental assets, there was evidence of regional variations in aid packaging. Those institutions in the sample from the South, Southwest, and West had larger gift aid programs, those in the Midwest larger job programs, and those in the East larger loan programs.

Finally, it was found that average total aid per enrolled student was greater by $320 at private institutions, increased $78 for every 100-point increase in average Scholastic Aptitude Test (SAT) scores, and increased $7 for every percent increase in the black students enrolled. Not surprisingly, many of the variables describing institutional characteristics were highly colinear, and an exact measure of the various effects will require further analysis.

These results were generally consistent with the analysis of individual questionnaires: that high-ability students and high tuition costs were associated with increased availability of aid funds, and that the average financial aid received did not correlate negatively with parental assets. That is, consistent with the earlier finding of George Schlekat, students from more prosperous families attended higher-cost institutions, and as a consequence received as much aid as their less well-to-do counterparts attending low-cost institutions.[4] Using in the analysis a control for financial need, it was evident that high-ability students tended to receive a greater proportion of their aid packages in the form of grant aid.

### The Individual Data

The purpose of the analysis of individual student data was to identify institutional admissions and financial aid policies as revealed by the decisions actually made in admitting and awarding financial aid to

4. George Schlekat, *Financial Aid Awards to High School Seniors in Northeastern States as a Function of Socioeconomic Class*. New York: College Entrance Examination Board, Research and Development Report No. 4, March 1968.

**Table 4. Individual Student Analysis Summary**

| Colleges | *Percentages of need met* — *Effect of need on probability of admission (00's)* | *Mean need × effect of need* | SAT *Coefficient* | SAT *Value of F††* | GPA *Coefficient* | GPA *Value of F††* | *Financial need* *Coefficient* | *Financial need* *Value of F††* | *Change in aid per $100 increase in need* |
|---|---|---|---|---|---|---|---|---|---|
| *Private:* | | | | | | | | | |
| 1(R) . . | −.005** | −10% | – | – | .14857 | 1.25 | −.03393 | 110 | $43 |
| 2 . . . | −.007** | −16 | – | – | – | – | −.01588 | 25 | 54 |
| 3 . . . | −.002 | − 4 | −.09176 | 20 | .28814 | 6.2 | −.02821 | 234 | 43 |
| 4 . . . | −.002 | − 4 | – | – | – | – | −.02883 | 102 | 45 |
| 5 . . . | −.006** | − 4 | – | – | .06911 | 3.0 | −.04087 | 212 | 20 |
| 6 . . . | −.004† | − 7 | −.07 | 15 | – | – | −.01391 | 26 | 83 |
| 7 . . . | −.03** | −41 | – | – | .13681 | 5.2 | −.05446 | 33 | 15 |
| 8 . . . | −.001 | − 2 | −.06 | 4.5 | – | – | −.04712 | 97 | 15 |
| 9 . . . | −.01** | −14 | – | – | – | – | −.02220 | 38 | 72 |
| 10 . . . | NA | – | – | – | – | – | −.03332 | 42 | 71 |
| 11 . . . | −.004† | − 7 | – | – | – | – | −.03639 | 79 | 26 |
| 12(R) . | −.02** | −34 | .06 | 4.5 | – | – | −.01404 | 29 | 83 |
| 13(R) . | −.004** | − 8 | −.07 | 4.1 | – | – | −.04117 | 63 | 16 |
| 14(R) . | −.002 | − 3 | .08 | 19 | – | – | −.01544 | 16 | 68 |
| 15 . . . | −.007* | −11 | – | – | – | – | −.04256 | 12 | 36 |
| 16(R) . | −.007** | −12 | – | – | – | – | −.01639 | 17 | 67 |
| 17(R) . | −.007** | −15 | – | – | – | – | −.02876 | 59 | 37 |
| 18(R) . | −.004** | − 6 | – | – | – | – | −.02514 | 170 | 58 |
| 19 . . . | −.001 | − 2 | – | – | – | – | −.03738 | 19 | 12 |
| Average | −.007 | −11% | | | | | | | $45 |

(R) Race controlled

NA Information not available

– Insignificant result

* Result significant at .10 level

† Result significant at .05 level

** Result significant at .01 level

†† The F statistic allows a test of the hypothesis that when the other variables in the regression are held constant the particular student characteristic in question has *no* independent effect on the college's decision. If that F is above 3.89 that hypothesis may be rejected at the 5 percent confidence level. If the F is above 2.73, rejecting the hypothesis of no independent effect will be wrong less than 10 percent of the time. If the F is above 1.3, it will be wrong less than 25 percent of the time.

ERIC Full Text Provided by ERIC

| *Percentage of grant aid* | | | | | | |
|---|---|---|---|---|---|---|
| SAT | | GPA | | *Financial need* | | |
| *Coefficient* | *Value of F††* | *Coefficient* | *Value of F††* | *Coefficient* | *Value of F††* | *Change in grant aid per $100 increase in need* |
| – | – | – | – | .00182 | 1.2 | $36 |
| – | – | – | – | – | – | 40 |
| – | – | – | – | .01231 | 96 | 48 |
| .02001 | 3.1 | – | – | – | – | 36 |
| – | – | .19107 | 5.7 | – | – | 12 |
| – | – | – | – | – | – | 66 |
| – | – | – | – | .03204 | 52 | 55 |
| .09089 | 25 | – | – | – | – | 14 |
| .06090 | 8.0 | – | – | – | – | 32 |
| .05061 | 8.8 | .23541 | 9.2 | – | – | 29 |
| – | – | – | – | –.00921 | 48 | 6 |
| .12212 | 12 | – | – | .02213 | 20 | 76 |
| .05945 | 11 | – | – | .00863 | 7.6 | 29 |
| – | – | – | – | –.01185 | 14 | 38 |
| .11624 | 20 | .14510 | 5.4 | – | – | 32 |
| – | – | – | – | – | – | 55 |
| – | – | – | – | – | – | 27 |
| – | – | – | – | .01147 | 9.1 | 59 |
| – | – | – | – | .01137 | 17 | 28 |
| | | | | | | $37 |

ERIC Full Text Provided by ERIC

**Table 4. Individual Student Analysis Summary (Continued)**

| | *Percentages of need met* | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | *Effect of need on probability of admission (00's)* | *Mean need × effect of need* | SAT | | GPA | | *Financial need* | | *Change in aid per $100 increase in need* |
| *Colleges* | | | *Coefficient* | *Value of F††* | *Coefficient* | *Value of F††* | *Coefficient* | *Value of F††* | |
| *Public:* | | | | | | | | | |
| 20 . . . | –.02** | –11% | NA | – | .15932 | 2.2 | –.11150 | 133 | $38 |
| 21 . . . | –.004** | –2.5 | – | – | – | – | –.09646 | 16 | 36 |
| 22 . . . | –.01** | – 7 | NA | – | – | – | –.10664 | 19 | 26 |
| 23 . . . | .002 | 1 | –.04777 | 8.2 | – | – | –.02871 | 47 | 81 |
| 24 . . . | –.008* | – 4 | NA | – | – | – | –.08046 | 52 | 60 |
| 25(R) . | –.002 | – 1 | NA | – | – | – | –.09614 | 31 | 43 |
| 26 . . . | 0 | 0 | NA | – | – | – | –.05755 | 22 | 57 |
| 27 . . . | –.01** | – 7 | NA | – | .14596 | 3.3 | –.09031 | 96 | 27 |
| 28 . . . | –.03** | –24 | NA | – | – | – | –.16841 | 31 | 0 |
| 29 . . . | –.006 | – 6 | NA | – | – | – | –.03022 | 24 | 70 |
| 30 . . . | –.001 | – 1 | NA | – | – | – | – | – | 116 |
| 31 . . . | –.007* | – 7 | NA | – | .37942 | 9.2 | –.05437 | 17 | 53 |
| 32 . . . | –.02** | –16 | NA | – | – | – | – | – | – |
| 33 . . . | –.03** | – | – | – | – | – | –.13549 | 26 | – |
| 34(R) . | –.002 | – 2 | – | – | – | – | –.39965 | 31 | 0 |
| 35 . . . | –.02 | –15 | .11450 | 9.7 | – | – | –.11939 | 41 | 0 |
| Average | –.011 | – 7% | | | | | | | $43 |

(R) Race controlled

NA Information not available

– Insignificant result

* Result significant at .10 level

† Result significant at .05 level

** Result significant at .01 level

†† The F statistic allows a test of the hypothesis that when the other variables in the regression are held constant the particular student characteristic in question has *no* independent effect on the college's decision. If that F is above 3.89 that hypothesis may be rejected at the 5 percent confidence level. If the F is above 2.73, rejecting the hypothesis of no independent effect will be wrong less than 10 percent of the time. If the F is above 1.3, it will be wrong less than 25 percent of the time.

| *Percentage of grant aid* | | | | | | |
|---|---|---|---|---|---|---|
| SAT | | GPA | | *Financial need* | | *Change in grant aid per $100 increase in need* |
| *Coeffi-cient* | *Value of F††* | *Coeffi-cient* | *Value of F††* | *Coeffi-cient* | *Value of F††* | |
| NA | – | – | – | .01736 | 13 | $20 |
| – | – | .11013 | 4.3 | – | – | 24 |
| NA | – | + | 13 | – | – | 11 |
| – | – | – | – | – | – | 24 |
| NA | – | + | 65 | .01611 | 5.9 | 41 |
| NA | – | + | 173 | – | – | 21 |
| NA | – | .31075 | 27 | – | – | 32 |
| NA | – | .21556 | 23 | .01125 | 6.7 | 13 |
| NA | – | – | – | .02694 | 6.4 | – |
| NA | – | + | 146 | – | – | 28 |
| NA | – | – | – | – | – | – |
| NA | – | .14919 | 6.1 | –.02183 | 15 | 19 |
| NA | – | – | – | – | – | – |
| .08843 | 4.9 | – | – | – | – | – |
| .07501 | 7.8 | .21077 | 9.4 | – | – | – |
| – | – | + | 12 | – | – | – |
| | | | | | | $17 |



ERIC Full Text Provided by ERIC

students in the 1969 freshman class. Of special interest to the Panel was a determination of the deviation of actual practices from CSS recommended practices, and investigation of the causes of such deviation. In areas where CSS has not established standards, institutional practices were compared with the Panel's recommendations concerning packaging.

The admission-aid process was considered in three categories: admission, determination of the amount of aid awarded students who received aid, and determination of the grant component of the package. The behavior of each college was characterized by estimating separate multiple linear regressions to predict each stage of each college's admission-aid process. Multiple linear regressions provide a measure of both the *size* and statistical significance of the *independent* effect of each student characteristic on the decision of the college. The coefficients reported in Table 4 measure the partial effect on the college's decision of a change in that student characteristic while the other characteristics of the student are held constant.

Because the purpose was to predict institutional decisions, the variables used to describe the student were those available to the college. The quantifiable indicators of ability used by the colleges in the sample were high school grade-point average or rank in class and SAT scores.[5] Because it is not of interest at this time which of these indicators affects the decision more, a summary term "ability" or "measured ability" will be used to refer to the combined impact of any combination of the three variables. However, these terms are not intended to imply that any or all of the three variables are necessarily true measures of ability.

In Table 4 "financial need" is the institution's own calculation of need, not the CSS central computation of need. It reflects all the adjustments made by that college's financial aid officer in expected summer earnings, parental contribution, and expectation from student assets; 44 percent of the Parents' Confidential Statements handled by the institutions responding were so adjusted. Analysis of the reasons given for adjustment is presented separately beginning on page 31, under "Institutional changes in CSS need computation." No attempt was made, however, to determine if the adjustments made were correlated with ability measures or with the amount of CSS-computed

5. The SAT variable used in the regressions is the sum of the mathematical and verbal scores.

need. The "aid" referred to in the column headed "Change in aid per $100 increase in need" is the sum of all grants, loans, and jobs whether provided by the college, by an outside agency, or obtained by the student on his own initiative and known to the college. The "Percentage of need met," then, is aid offered, divided by institutionally calculated need. "Grant aid" referred to in the far-right column includes scholarships and grants offered by both the institution and outside agencies.

It was found that in about half the institutions large financial need significantly reduced the probability of acceptance, even when quantifiable indicators of ability were used as controls. It was also found that the higher the financial need calculated by each institution, the smaller the proportion of it that was met by the total package of institutional and outside aid. It was further discovered that although packaging practices varied considerably, high ability was often associated with a higher grant component. High financial need was only weakly associated with an increase in the grant share of the package and was sometimes negatively associated with the grant share.[6]

*The admissions decision.* The dominant factor in the admissions decision was, as expected, the measured ability of students, especially in those institutions which had heterogeneous applicant pools.[7] A major finding, however, was the consistently negative relationship between institutionally computed financial need and the probability of being offered admission, as indicated by a 0-1 variable. Thirty-two of 35 colleges had negative coefficients on the financial need variable.[8] In the

---

6. It should be noted that the analysis of the data for public institutions did not control for out-of-state residency. This might partly explain the findings that students with large financial need were less likely to be admitted, had less of their need met, and received a smaller percentage of their support in gift aid. It would not be the sole cause of the effect, however, for the colleges with a statistically significant negative effect of need on probability of admission averaged fewer out-of-state applicants than those with insignificant negative effects.

7. Better understanding of the admissions policies of many colleges resulted from use of the Automatic Interaction Detector program, which divided the population into subgroups, based on ability, in such a way as to form groups whose members fared similarly in the admissions competition. The success of this procedure supported the view that, in many cases, admission is determined by a ranking process with a cutoff point determined by the number of spaces available.

8. In 18 of those institutions, the coefficient was significant at the 5 percent level on a two-sided T test. In four it was significant at the 5 percent level on a one-sided T test. This result is especially interesting considering that the statistical and sampling biases should work primarily to produce the opposite effect. If errors were made in the sam-

Case: 1:22-cv-00125 Document #: 864-45 Filed: 05/07/25 Page 39 of 144 PageID #:3492



private institutions, the average effect of applying for aid and having need of $1,000 was to reduce the probability of admission by 7 percent. In the public institutions, the average effect of applying for aid and having need of $1,000 was to reduce probability of admission by 11 percent. Because the typical amount of need in private colleges is larger, the impact of this effect is greater in those institutions. The reduced probability of admission for the typical aid applicant is specified, for each college providing data, in Table 4, "Effect of need on probability of admission."

In six of the seven private colleges that provided racial identification of applicants, being black improved the probability of being admitted. If SAT, high school GPA, and financial need are held constant, a minority applicant's probability of being admitted in those six colleges was higher by 15 to 50 percentage points. Introducing race as a control variable increases the probability of identifying a significant negative effect of financial need on the probability of admission. In each of the six colleges where being black improved the probability of admission, the negative effect of extra financial need was strong and significant. Because black applicants who are given preference in admission typically have greater financial need, excluding race in the multiple regression partially masks the strong tendency within each racial group for financial need to reduce the probability of admission. The fact that the negative effect of financial need on admission appears as well in colleges where no control for race was available attests to the importance of the effect.

For three selective private colleges regressions were run in a manner that made it possible to determine whether black students with high need were more likely to be admitted or receive full funding than blacks with low need. The evidence indicated that the effect among blacks alone of greater financial need on probability of admission was significantly negative in every case, and only 1 percentage point per $1,000 smaller than for whites.

The consistent result that greater financial need is associated with

---

pling of aid applicants, one would expect that the error would be in the direction of missing applicants who were not admitted. Further, since there is a widespread impression among students that aid is primarily a reward for exceptional records, those applicants with positive characteristics, such as musical, sports, or leadership ability, not controlled for in the relationship being measured, should be more likely to apply for aid. Since these exceptional students have high probabilities of admission to begin with, the result overshadows any negative effect attributable to financial need.

ERIC Full Text Provided by ERIC

lowered probability of admission has two interpretations: (1) that colleges are limiting the demand on their meager financial aid resources by not admitting some needy students who otherwise would be admissible; or (2) that financial need is a proxy for other characteristics—such as a parent not being an alumnus or being a public school graduate or (at public colleges) being an out-of-state resident—that may be the real cause of the reduced probability of admission. In either case, the effect is to make it more difficult for low-income students to be admitted.

*Proportion of college-defined need met.* For students who received some aid, an analysis was conducted of the degree to which the institutionally calculated need was met. It was found that the greater a student's need, the smaller the proportion of it was met by college or outside sources. In every college in the sample, the hypothesis that as need increased the aid offer also increased at least proportionately was rejected at the .001 level. In the private colleges the proportion of financial need met fell by 3 percent for every $100 of increased need. In the public colleges, the proportion of need met fell by 11 percent for every $100 of additional need. Evaluated at the mean financial need, aid increased $50 on the average for every $100 increase in college-defined need.[9] The marginal rise in aid per $100 increase in need (evaluated at the college's mean need) is presented in Table 4, "Change in aid per $100 increase in need."

*Packaging.* The packaging decision was investigated to determine how the ratio of grant aid to total aid varied with financial need, abil-

---

9. The partial of aid with respect to need can be derived from the regression equation as follows:

$$\frac{\text{Aid}}{\text{Need}} = \frac{A}{N} = a + b_1N + b_2(\text{ability})$$

$$A = aN + b_1N^2 + b_2N(\text{ability})$$

$$\frac{\delta A}{\delta N} = a + 2b_1N + b_2(\text{ability})$$

Since

$$\overline{\left(\frac{A}{N}\right)} = a + b_1\overline{N} + b_2\overline{(\text{ability})}$$

$$\frac{\delta A}{\delta N} = \overline{\frac{A}{N}} + b_1\overline{N} \text{ evaluated at the mean } (\overline{N}).$$

It was evaluated on the assumption that the mean ratio of Aid to Need is 1.

ity, and race. There are real constraints on the absolute amount of self-help (borrowing and working) students may be able to assume. Students with great financial need often come from cultures where borrowing is associated with exploitive merchants, so that loans may often be unacceptable to them.

The CSS principles suggest that as need goes up, the grant proportion should rise substantially. In 10 of 35 colleges, there was a statistically significant tendency for the grant proportion to rise as need increased. In 4 colleges statistically significant tendencies in the opposite direction were observed. Though positive relationships of grant proportion to need predominated, the hypothesis of proportionality could not be rejected in any of the 21 remaining colleges. By combining the change in grant proportion with the relationship between total aid and institutionally calculated need, an estimate was calculated of the marginal tendency for grant aid to rise as need increases.[10] This figure was below the marginal increase rate for all aid in most cases, but not by much in at least half of the private colleges. This reflects both the heavy use of grant aid in these private colleges and adherence to the CSS approach to packaging suggested in the CSS principles. The public colleges averaged a marginal rate of increase about half that for all aid as a whole. The estimate for each college is presented in the far right column of Table 4.

Ability was generally found to be the most important predictor of the grant component of the aid package. In 18 of the colleges, greater measured ability was significantly associated with grants being a higher fraction of the total package. This indicates a common practice

---

10. The ch .nge in grant per $100 change in need is calculated in the following way:

$$G = \frac{G}{A} \cdot A$$

$$\frac{\delta G}{\delta N} = \frac{\delta\left(\frac{G}{A}\right)}{\delta N} \cdot A + \frac{\delta A}{\delta N} \cdot \frac{G}{A}$$

$\frac{G}{A}$ is the Grant/(total aid) proportion.

$\frac{\delta A}{\delta N}$ is the marginal effect of need on aid evaluated at the mean.

$\frac{\delta\left(\frac{G}{A}\right)}{\delta N}$ is the coefficient on need in the equation predicting grant proportion.

of using aid in the form of a grant as a reward for a student's past achievement.[11]

*Institutional changes in* CSS *need computation.* Another question motivating the collection of data on individual students concerned institutional practice in regard to the use of CSS need analysis. Specifically, to what extent and in what manner were institutions modifying CSS central computation? The data on individual students submitted by 35 institutions made possible some definitive answers to these questions.

Consideration was restricted to individuals who were accepted for admission and who filed a Parents' Confidential Statement (PCS). In this category, 4,572 observations were obtained, for an average of 130 for each of the 35 institutions submitting individual data. In only two cases was the number of relevant questionnaires smaller than 50, and neither of these institutions reported modifications.

Institutions were asked to report the CSS computation of the parents' contribution, applicants' summer earnings, and applicants' assets whenever the individual student being observed was accepted and had filed a PCS. They were also requested to indicate any modification of the CSS need analysis made by the institutions.

Overall it was found that institutions had modified the CSS need analysis in 44 percent of the cases. This figure is the average of the percentage of modifications reported by the 35 institutions and does not give weight to larger institutions or colleges that returned more questionnaires. CSS computation of total family contribution was adjusted upward in 37 percent of all cases for an average of $202 and downward in 7 percent of all cases for an average of $255. This means that in more than 1 out of 3 cases, institutions asked for a family contribution larger than the CSS computation and that this increase averaged $202; and that in 1 case out of 14 the institution sought a smaller family contribution in the average amount of $255.

With the exception of small public colleges that were underrepresented, this result was not restricted to one type of institution. Medium-sized public colleges reported the smallest number of modifi-

11. The possibilities for analysis of these valuable data are by no means exhausted, and investigation is continuing. In particular, since the admissions measure is a binomial variable, there is a possibility for a second regression stage, using the correction for nonhomogeneity of variance, which will increase the descriptive power of the analysis. Also, the A.I.D. grouping program will be used much more extensively to identify boundary points in admissions and aid policies. Some stochastic equations have been proposed that are likely to have even higher descriptive power.

cations, and large public colleges made the greatest percentage of adjustments.

One factor can be immediately isolated as contributing to this high percentage of adjustments. Twelve institutions, a third of the respondents, reported that as a matter of course they increased the CSS computation of applicants' summer earnings. Specific instances of such a general modification in the CSS formula accounted for two-thirds of the reported upward adjustments in total family contribution. The number of downward adjustments reported for applicants' summer earnings was inconsequential.

The other principal area in which institutions modified CSS need analysis was that of parents' contribution. In 12 percent of all cases, parents' contribution was adjusted upward by an average of $240; and in 8 percent of all cases, it was adjusted downward by an average of $324. Thirteen institutions adjusted parents' contribution upward more than 10 percent of the time, and 10 of these were private colleges. There was no apparent pattern in the average dollar amount of adjustments. Of the 13 institutions modifying the CSS calculation of parents' contribution by more than 15 percent, 6 were among the 12 that also consistently adjusted applicants' summer earnings.

In the category of applicants' assets, only two colleges reported a frequent change in the CSS computation; and on the average, institutions reported modifications of the CSS figures in only 6 percent of all cases.

It is clear that the reported changes in the CSS estimate of total contribution have two principal sources: the 12 institutions at which the CSS estimate of summer earnings was considered too small, and the 13 institutions that made a practice of modifying the CSS computation of parents' contribution. It appears that most of the responding financial aid officers did not accept the CSS analysis of parents' contribution. Most reviewed the CSS computation of parents' contribution and arrived at a value different from the CSS value in 1 out of 5 cases.

**Conclusions and Recommendations**

The major purpose of the CSS need analysis system is to recommend an amount of aid commensurate with a student's financial need. Knowledge of the extent to which actual awards made by the colleges vary from CSS norms, as this investigation attempted on a limited basis to gain, is vital to an evaluation of the success of the CSS in helping to assure that financial aid is put to the most productive service of students, institutions, and society.

ERIC Full Text Provided by ERIC

*In view of the evidence that colleges frequently deviate from* CSS *principles, the Panel recommends most emphatically that:*

*An institution's aid resources be utilized to the maximum benefit by limiting aid to the amount of need; and by allocating funds, particularly grants, to assure equal access to educational opportunity to students with the greatest financial need.*

Prompting this recommendation are the study's findings that reveal that the students most likely to be excluded from higher education by insufficient financial aid are those with the highest need. Students from low-income families are also the students who without question seem to fare the worst through the system currently operating.

At each step of the admission-aid process, the high-need student does not receive aid up to the need level established by CSS norms. This is perhaps understandable since the financial aid resources of colleges and universities are limited, and several low-need students can be aided (and most likely persuaded to attend) for the cost of fully assisting one high-need student. The increasing difficulty that many private colleges are having recruiting enough students who are able to pay higher tuition, as indicated by the institutional data, suggests that pressure from within the college to use student aid as a recruitment device is not likely to end. That which may be defensible from the point of view of one college, however, is counter-productive when it becomes standard practice in all colleges. Given the counter pressures, CSS success in leading colleges toward aid policies that reflect student and national priorities is both necessary and commendable.

Further improvement seems indicated, however, by the distance yet to go. There are some possible interim approaches that could improve the effective utilization of currently available financial aid resources. One would be the calculation by the CSS of a suggested grant award amount as well as the computation of overall financial need. This in substance is suggested later in this report, in the section titled "The Packaging of Financial Aid." It might involve a determination by the CSS, through its policy-determining structure, of the extent to which students should be expected to accept self-help, particularly substantial long-term educational loans.

Another approach might be to provide parents a copy of a modified version of the Financial Need Analysis Report (FNAR). This was suggested by students in the study of student opinion (see pages 36-46 and Appendix). It would have to be explained to aid applicants and their parents on a modified FNAR that institutional financial aid

Case: 1:22-cv-00125 Document #: 864-45 Filed: 05/07/25 Page 45 of 144 PageID #:3493



budgets are often inadequate and that therefore actual grants are likely to be below the recommended amounts. A major effect of this would be to create pressure for the expansion of federal and state student aid programs. A second effect would be to encourage financial aid officers to adjust grants to favor the most needy students. For example, when grant aid budgets are insufficient to finance all needy applicants at preferred levels, reducing everyone's grant aid proportionately, or not making any aid offers to some, concentrates the burden of adjustment on those least able to secure the extra resources. Rather, if the proper adjustment is made, all self-help or family expectation amounts would be revised upward by the same amount, or proportionate to the contribution expected from the parents.

Such an approach would make it difficult for institutions to sustain the observed practice of providing disproportionate aid packages and larger grants to students of higher measured ability. It would also be more difficult for aid officers to sustain the current practice of meeting a smaller proportion of calculated need when the need is larger, and it would tend to reduce the use of financial aid in competing for the limited supply of very able students.

*Recognizing that the* CSS *has no sanctions with which to police adherence to its stated principles, the Panel recommends that:*

*Member institutions utilize more extensively such procedures as the exchange of information on aid tenders through the use of overlap lists and meetings.*

The results of this study of institutional practices point to the need for continuing investigation of financial aid packaging and compliance with CSS principles. If studies such as this were to be conducted regularly, institutions would be encouraged to maintain their records so that the kinds of data required would be more readily available. Record-keeping in admissions and financial aid is clearly not highly developed in most institutions at this time.

Related to the need for continuing studies of financial aid practices and procedures is the desirability for the systematic collection, by the CSS, of research studies, reports, articles, and the like which deal with financial aid matters. These materials should be maintained in such a way as to be readily available to CSSA member institutions in their efforts to solve their problems, possibly by having them available in duplicated form in College Board regional offices as well as at CSS headquarters in New York.

ERIC Full Text Provided by ERIC

A good part of CSS research in the past appears to have been related to rather specific problems. This approach does not serve to push forward the body of knowledge about student financial aid continuously and systematically.

*The Panel therefore recommends that:*

*The* CSS *establish a standing committee on research, which would meet regularly and encourage, by means of grants or other funding arrangements, scholarly investigation of the major areas of concern.*

The Panel was greatly impressed during this study by the way in which so many financial aid officers and admissions directors are struggling against discouraging odds to carry out their responsibilities. Most were found to have insufficient staffs, little access to automated information systems, and a volume of aid applications that far outnumbered available resources. It is hoped that the information reported in this chapter will be of use to them, and more important, will encourage similar studies on a regular basis by the CSS and other concerned agencies.

ERIC Full Text Provided by ERIC

## Financial Aid Attitudes and Concerns of Users and Problems of Special Student Populations

Surveys were made of the attitudes toward financial assistance on the part of representative financial aid officers over the country, and of students at four major universities in the East, Midwest, and South. This section deals with the results of these surveys, and with special problems of meeting the financial aid needs of self-supporting students and of graduate and professional students.

### Survey of Attitudes of Financial Aid Officers

The Panel surveyed the reactions of a number of financial aid officers to the CSS need analysis system. Questionnaires were mailed to the financial aid officers at 54 representative institutions of higher education as well as to 6 officials responsible for federal and state aid programs, 1 talent search director, and 1 high school guidance officer. Including 34 institutions and 7 others who responded, there was a 76 percent return. Table 5 gives the distribution of the 34 institutions by region and type.

**Table 5. Institutions Surveyed, by Region and Type***

| | *East* | *South* | *Mid-west* | *South-west* | *West* | *Total* |
|---|---|---|---|---|---|---|
| Public | 1 | 3 | 2 | 3 | 7 | 16 |
| Private | 8 | 3 | 1 | 2 | 4 | 18 |
| Total | 9 | 6 | 3 | 5 | 11 | 34 |

* Included among the 34 responding institutions were 9 liberal arts colleges. 5 colleges predominantly enrolling black students, 5 men's colleges, and 1 women's college.

Seven questions were used to ascertain the respondents' views concerning the CSS need analysis system and its specific procedures:

1. Is the basic rationale of the CSS need assessment system appropriate?
2. If not, how do you feel its philosophy should be changed?
3. Are the specific procedures of need assessment appropriate?
4. If not, enumerate any that give you particular difficulty. If possible, rank the areas by degree of difficulty.
5. What modification would you care to see made in the techniques that are now used?

6. What are your views on the effectiveness of CSS services?

7. What specific recommendations would you make for their improvement?

The most significant finding was that a substantial majority of the financial aid officers in the survey endorsed the rationale of the CSS need analysis system as still very appropriate. Even those who suggested alternatives to the system did not advocate its immediate abandonment, but rather a gradual move away from viewing parents as the primary source for the payment of college expenses. While it was quite clear that these users accept the rationale, the survey identified certain troublesome areas. Forty-one percent of the respondents believed that low-income and minority families were not being served properly by the system. Almost as many reported dissatisfaction with the way in which assets were treated, although there was no consensus on how the present procedures might be improved.

While there clearly are problem areas that require attention, many of the respondents believed that the system is a viable one and could be modified, where needed, through their efforts. A number of areas of concern were already scheduled to be altered in the Parents' Confidential Statement in the next processing year.

**Survey of Student Opinion**

The Panel was interested in including the perceptions and ideas of students in carrying out its charge to evaluate the present CSS need analysis system and recommend improvements in that system. Accordingly, a Committee on Student Attitudes and Concerns toward Financial Aid was appointed, with the request that it study representative student opinion and report its findings to the Panel.

The study, made in the summer of 1970, was based on two sources of information: (1) a questionnaire survey of approximately 125 students at each of four universities (University of North Carolina, New York University, Rutgers University, and the University of Wisconsin); and (2) 55 interviews with students on the same four campuses.

It was recognized by the student committee that its survey was limited by the pressure of time, that the sample was relatively small, and that it was administered in the summer when there was less opportunity to secure a wider range of sample opinions. Despite these limitations, however, the Panel concurs with the committee that the insights and possibilities suggested by the data warrants serious consideration.

Students surveyed were dissatisfied with the present administra-

ERIC Full Text Provided by ERIC

tion of financial aid and believed it could and must be significantly improved. The committee's efforts were exploratory in nature, and its findings are meant only to suggest areas in which students have manifested serious doubts about the continued viability of the system. Students interviewed wanted better dissemination of information, a reorientation in the criteria used for granting and packaging aid, and the creation of mechanisms by which students can actively participate in making the decisions that affect their lives.

Because the survey was designed and administered by students (not members of the Panel), the report of the survey is not included in the body of the Panel report but is attached, in the Appendix.

It was clear that few of the students queried had more than a "vague idea" of the purposes or functions of the College Scholarship Service. As would be expected, many more of those who had applied for aid were familiar with the CSS and the administration of aid than were those who had not applied. They also reflected a general lack of information about student financial aid. Students who do not know what possibilities exist, and therefore need the help of competent counselors, often do not get the guidance they need simply because they do not know where to go or what they need to know.

Few students were aware that the role of the CSS in the aid system is limited to computing the potential contribution of the applicant's family, and that the final decisions are made by the institutions regarding whom to aid, how much, and with what kind of financial aid package. Here again, they reflected an information void about how decisions are made. Most believed that some of the confusion and mystery concerning the administration of aid and the role of the CSS would be eliminated if they and their parents were provided copies of the Financial Need Analysis Report (FNAR) or were advised of the amount of the recommended parental contribution.

One out of every 6 to 7 students reported his contacts with high school counselors or college aid officers as "unpleasant." Almost all indicated that admission to college should be made without regard to financial need. They saw both need and academic ability as the twin pillars of the process of selecting students to receive aid; but it was clear that they believed need should receive top priority in the allocation of the various types of aid—grant, loan, work-study. They were generally negative in their views of how aid was packaged, believing that those with the least need tended to receive the grants and scholarships, and those with greatest need were aided through loans and work-study.

They objected to the work-study program as it actually exists and is conducted, although they supported the concept of the program as outlined in the CSS *Manual for Financial Aid Officers* that "jobs must be related to the educational objective of the student." They thought that all too often the jobs were dull, tedious, and at best only tenuously related to the student's educational objective.

The students believed that financial support can be an important vehicle for helping a student develop independence. The majority agreed with the position of the CSS that "parents have an obligation to pay for the education of their children to the extent they are able to do so," but one-third disagreed with the statement. Fifty-seven percent of the students in the survey would give the government the responsibility for contributing at least 40 percent of the needed aid.

These findings, combined with the interviews and responses regarding aid for self-supporting students, revealed a complex set of attitudes held by students concerning independence (financial and otherwise) and the sources that should be responsible for providing aid to students. Students believed it important to be independent and believed that sufficient financial aid would help them to be so. They were sensitive to the dilemma they faced between on the one hand wanting to encourage independence, and on the other wanting to provide the limited funding available to the most needy—thereby fostering further dependence of students in middle- and upper-income families on their parents.

Central to the notion that independence and growth are critical aspects of the university experience was a concern of students for their role in setting the policies that shape the conditions of their life. Respondents were asked to indicate the degree to which they felt students should participate in several different decisions relevant to financial aid. In each case the largest single grouping indicated that there should be "organized student representation on the decision-making body."

The general orientation of the students toward financial aid seemed to stem from broader concerns for social justice. A heightened social consciousness was exhibited by the high percentages of students who consistently took positions aimed at providing a college education to the broadest possible segments of the society.

When asked to consider aid for part-time students, nearly half favored only small amounts of aid, and about the same number favored treating the part-time student in the same manner as the full-time student. A large majority (84 percent) endorsed the idea of assisting

Case: 1:22-cv-00125 Document #: 864-45 Filed: 05/07/25 Page 51 of 144 PageID #:3493



more students, "providing them with less than the full amount they need," rather than aiding fewer students, "providing them with the full amount they need."

The problems and concerns raised by the students in this study were, for the most part, not new, but the fact that they have been raised before in no way reduces their importance. Aside from a few areas, primarily the issues of parental responsibility and student participation, most of the issues raised by the students are discussed, in terms they would probably endorse, in the CSS *Manual for Financial Aid Officers*. Students believed that if the constituent members of the CSSA were to adhere to the financial aid policy positions outlined in the *Manual*, many of their concerns would be alleviated. They also believed that the relationship between CSS policy statements and college practices is one that demands serious attention.

This exploratory study, in the view of the student committee, was not the appropriate mechanism for probing problem areas in the depth and breadth they warrant; the committee believed that separate studies should be commissioned for those purposes. Consequently, specific solutions were not recommended. However, a number of general recommendations growing out of the survey are included in the committee's report (see Appendix).

**Self-Supporting Students**

Self-supporting students pose special problems with reference to financial aid, such as the definition of types (minors, married students, and those 21 or more years of age), proof of self-support, and the ability and willingness of parents to contribute to their support. What should be the responsibility of institutions to assist such students whose parents cannot contribute to their educational costs, or to assist those whose parents can contribute?

The survey of student opinion reported in the Appendix, revealed complex attitudes concerning independence and the sources that should be responsible for providing aid to students. Forced reliance on their parents, they felt, leads to an undesirable dependency relationship, destructive of their own growth and development as well as their relationship with their families.

Students in the survey were asked to set the standard for choosing between two financially independent students in a situation of limited aid funds. One of the hypothetical students was financially independent because his parents were unable to contribute to his support; the other was independent because he chose to be so even though his

ERIC Full Text Provided by ERIC

parents could afford to contribute. Fifty-eight percent of the students favored giving priority to the student who had to be self-supporting because his parents could not contribute, and only two percent would give priority to the student who chose to be independent. A third category exists, of course: the student whose parents would be able to contribute but who, for whatever reasons, refuse to do so.

There is justification in aiding self-supporting students who demonstrate need in their own right as independent persons. It would appear to be more equitable, however, to limit grant aid to those who are involuntarily independent because their parents cannot contribute; and to aid voluntarily independent students, or students whose parents would be able to contribute but refuse to do so, through loans and work-study.

It is particularly difficult to ascertain the facts and the bona fide need of students who are voluntarily self-supporting but whose parents could assist if they would. The Panel urges extreme caution in recognizing minors as self-supporting, where parents could contribute. Funds inequitably so distributed to so-called "self-supporting" students would reduce the aid available to students with real need.

The determination of the residency status—in-state or out-of-state—of self-supporting students for tuition purposes in public colleges can have the effect of providing or preventing financial assistance (tuition subsidy) because of lower charges to residents of a state and higher charges to nonresidents. Only about half the states have rules concerning the classification of self-supporting minors for tuition purposes in public colleges; those that do generally require proof of self-support. In New Mexico, "mere absence from the parental domicile is not proof of its complete abandonment." Proof of self-support in two states (Ohio and Massachusetts) "consists of evidence that the parents do not contribute to the student's support or claim him as an income tax deduction." In those two states and in California, South Carolina, South Dakota, and Texas, a "qualifying period of one year while not enrolled as a student" is required to establish proof of self-support. Other states require the purchase of land, longer qualifying periods as a resident while not enrolled as a student, or specify other requirements.[1] There are also similarly wide variations among the states in their rules concerning proof of self-support for married students and those age 21 and over.

---

1. Robert F. Carbone, *Resident or Nonresident*. Denver, Colo.: Education Commission of the States, 1970, pp. 21-22.

ERIC Full Text Provided by ERIC

Case: 1:22-cv-00125 Document #: 864-45 Filed: 05/07/25 Page 53 of 144 PageID #:34939



The Panel is aware that the CSS introduced a supplementary aid application form for married students in 1965 and introduced a Students' Confidential Statement in 1968 for use by institutions with self-supporting students was also introduced. Further, within the 1970-71 academic year a special form for graduate and professional students, many of whom are self-supporting, has been put into use in certain professional areas.

The Panel also understands that the CSS is currently giving attention to combining these forms into a single form and is also making a special study of the information on self-supporting students (their budgets, needs, and resources) that it has been gathering for several years. The Panel hopes this study will clarify the ambiguities related to financial aid for part-time, married, graduate and professional, minor, and undergraduate self-supporting students. This is an important area that deserves continuing attention.

**Graduate and Professional Students**

At the outset of the Panel's work in 1969 only limited information was available on the distribution of institutional aid to graduate students. Graduate and professional schools have generally followed a policy of awarding all grant aid strictly on the basis of applicants' ability. Nationally, financial aid for graduate and advanced professional students has been viewed as a form of institutional and social investment in a small but highly talented segment of the population, necessary to the continuing intellectual and scientific renewal of the society.

Several factors have reinforced this pattern of support. For one, the major externally funded fellowships, such as Woodrow Wilson and the National Science Foundation, have been based on national or regional competitions, and the guidelines for federally funded but institutionally awarded fellowships and traineeships, under the National Defense Education Act and the National Endowment for the Humanities, have stressed scholarly merit. For another, the bulk of support for graduate students, particularly in the scientific fields, has traditionally been in the form of teaching or research assistantships, where expected performance has been a major element in selection. Also, because of the extremely high cost to institutions of graduate training, limited institutional funds, ordinarily allocated by graduate faculty committees, have followed this pattern of selective talent-based awards.

When members of the Panel first met with representatives of the

various graduate and professional school associations in 1969, deans in several professional areas showed some interest in exploring need analysis for allocating aid, but arts and sciences deans showed little inclination to explore this possibility. Over the intervening two years, however, there has been a considerable shift in sentiment, and need is becoming a more important variable in determining the amount and form of support in several fields.

For the past year the Association of American Medical Colleges and the American Association of Dental Schools have been working with the CSS, and these organizations now have a specially designed need analysis system available for the use of member schools. The American Association of Law Schools is experimenting with use of the undergraduate Financial Need Analysis Report through Educational Testing Service. Three major graduate schools of arts and sciences (Princeton, Yale, and Columbia) have developed a need analysis system of their own and have partially implemented it for awards made in the 1970-71 academic year. Growing interest on the part of other graduate schools within the Council of Graduate Schools is now apparent. It also seems likely that some federal programs may begin to take need into account in the determination of stipends in the future. Federal fellowship programs have long included stipend supplements for dependents.

It seems evident to the Panel that the shift away from merit-based to need-based student aid that has occurred in under-graduate education since the 1950s will have a marked impact on the graduate and professional schools in the 1970s. Historic patterns and different assumptions of parental responsibility, however, are likely to produce a somewhat different development than has occurred at the undergraduate level.

Until the past few years there has been a dearth of student aid funds in such professional fields as medicine, dentistry, and law. Parental responsibility was implicitly assumed, unmet needs being filled primarily by forms of self-help. In the medical and dental fields academic schedules are so demanding that loans, for all practical purposes, are the only available means of self-help. Over the last decade, however, the salaries of interns and residents have improved significantly, thus reducing the number of years for which financial aid is necessary, and state and federal aid funds have also increased markedly. In fields such as law, business, engineering, journalism, and public administration greater opportunities have traditionally existed for concurrent employment and study. In fields such as social work,

ERIC Full Text Provided by ERIC

Case: 1:22-cv-00125 Document #: 864-45 Filed: 05/07/25 Page 55 of 144 PageID #:349



and to a lesser extent business and engineering, employer assistance has aided students in financing advanced degree work.

At the opposite extreme from the health fields, for doctoral education in the arts and sciences little or no parental responsibility has generally been assumed, primary reliance being placed on grant aid and academic employment through teaching or research assistantships. Over half of the nation's full-time graduate students (a larger number in science fields) have been fully supported by fellowships and assistantships during the past decade.

At the undergraduate level there is common acceptance of the responsibility of parents for the education of their offspring, insofar as they have the ability to contribute. At postbaccalaureate levels there is no such common assumption. Students are beyond the age of legal dependence, most are determined to be self-sufficient, and a majority are married and have assumed family responsibilities. Need analysis, therefore, must obviously focus more on the income and assets of the individual student or student family, and parental contribution must be viewed as a supplementary, rather than a primary, source of support. Given the limited grant funds available in graduate and professional education, however, accentuated by the sharp reduction in federally funded fellowship programs since 1968, parental contribution at this level should be strongly encouraged where there is adequate family ability to share the burden.

The Panel believes there will be a significant increase in weight given to need factors in the allocation and packaging of student aid at the graduate and professional level over the coming decade. Because the situation is even more complex at the graduate than at the undergraduate level, it is even more important that an agency such as the CSS, with its experience and sophistication, play a leadership role. It is less important at the graduate level that all professional fields adopt a standardized policy and procedure, given the varying needs, traditions, and availability of different forms of support and self-help among these fields. It seems quite evident that the federal role, despite present cuts in fellowship programs, will increase over time, necessitating a close link between the various graduate and professional councils and public agencies in Washington.

Reviewing the emerging needs, the Panel urges that the CSS offer its services as an experienced consultant, aiding in the development of an adequate system (or systems), even if it ultimately is not the agency that collects and processes the FNARs. In the Panel's view of the broad leadership responsibility of CSS and the College Board, it is

more important that they act as a wise catalyst than seek to be the operational instrument.

It also seems clear that the concept of long-term loans with repayment contingent on lifetime earnings is more applicable to specialized graduate training than it is to broad undergraduate education. Both high institutional costs and high income expectations of individuals pursuing advanced degrees make contingent loans a more attractive device, with great possibility of success, at the graduate and advanced professional level.

**Recommendations**

The following recommendations of the Panel relate to the preceding summary reports of the attitudes and concerns of users of financial aid (institutional aid officers and students); and to the special aid problems posed by self-supporting students and by graduate and professional students.

*The Panel recommends that:*

*The* CSS *regularly conduct formal surveys, on a sample or regional basis, of the opinions of financial aid officers toward the need analysis system and the other services performed by the* CSS. *The information and views gathered in this way would be most useful to* CSS *staff and committees in their continued effort to improve the system.*

*The* CSS *sponsor studies, national in scope, of the attitudes and concerns of students and parents as they relate to student financial assistance.*

*The* CSS, *in cooperation with its constituent members, put materials that explain the financial aid system into the hands of school and college counselors; and urge constituent members to plan programs to inform students and parents at the local community level as well as to develop more extensive training programs for aid counselors. The purpose of these steps would be to insure that counselors are well informed regarding the financial aid system and the availability of aid, and to reinforce the importance of interpersonal contacts with those who seek their help.*

*The* CSS *urge its members to make their financial aid procedures more flexible, with the aim of encouraging students to avail themselves of the services, not just allowing them to do so.*

*The* CSS, *in cooperation with its members and students, develop mechanisms that would allow and encourage student participation in the financial aid process at both the* CSS *and institutional levels.*

Case: 1:22-cv-00125 Document #: 864-45 Filed: 05/07/25 Page 57 of 144 PageID #:349



*The* CSS *give further and continuing attention to the special problems related to financial aid for self-supporting students, and develop appropriate policies and procedures for the guidance of aid officers in the member institutions.*

*The* CSS *increase its efforts to help guide the development of need analysis procedures at the graduate and professional level. The Panel urges that the* CSS *appoint to its staff one or more highly competent and well-known persons (perhaps selected from among retiring deans or university presidents) to direct this effort over the next several years.*

*The* CSS, *through the efforts previously proposed, supplemented by adequate research and planning, seek to remain in the forefront in the current debate over contingent loan plans.*

*Grant and loan aid to graduate and professional students be based primarily on need and secondarily on scholarly or professional potential.*

## Adequacy of the CSS Need Analysis System for Low-Income and Minority Students

Students from low-income and minority families pose unique problems with reference to their need and eligibility for financial aid at most institutions. The adequacy of the CSS system for these student populations is discussed in this section.

A Panel committee has concentrated on the question of whether or not the CSS system, designed originally at a time when the primary beneficiaries were lower-middle-class white youth, is adequate in coping (1) with the rising numbers of students from low-income families, and (2) with the rising proportion of students from ethnic minorities. The full Panel has also devoted many hours of illuminating discussion to this critically important topic.

Some members of the Panel believe that mere tinkering with CSS practices is inadequate, and that only massive infusions of public funds can solve problems of open access to higher education and of adequate financial aid to these populations. The Panel would not aid the CSS in identifying its role in today's world, however, if it failed to go beyond the financial problems and attempt to improve the philosophy governing the existing system.

In addressing these basic questions the Panel has attempted to separate the adequacy of the financial need analysis instrument (the Parents' Confidential Statement) from the manner in which it is applied in practice by institutions. The Panel believes, however, that the CSS and the institutions must accept responsibility for the manner in which financial need is calculated, and the ways in which financial aid decisions are made.

### Adequacy for Low-Income Families

In a world where there were no differences except for family-income variations, the broad outlines of the present system, in the Panel's judgment, would be adequate. One could debate the appropriate income level of 100 percent need, and the progressivity of the curves relating adjusted effective income and expected parental contribution, but the basic financial need analysis system itself would appear to be adequate.

The Panel recognizes, as already documented in this report, that actual practice frequently varies from stated principles and institutional objectives. This is seen here as a "performance gap" to which continuing attention must be given by institutional representatives

ERIC Full Text Provided by ERIC

: 1:22-cv-00125 Document #: 864-45 Filed: 05/07/25 Page 59 of 144 PageID #:3



who influence local aid decisions, rather than as a failure of the financial need analysis system itself.

Youth from low-income families, however, do have special problems. Low-income-group students are most commonly from families where foregone income would be severely missed; where community environment is less conducive to college attendance; and where unanticipated expenses such as legal aid, illness or death, evictions, and credit foreclosures can have a devastating effect on the student who shares in family responsibility. All such conditions are effective restraints to college attendance. In addition, many hidden costs for the student, if he is to be able to afford even a reasonably minimal life style within his peer group, are commonly excluded from the student costs budgeted by the college. At the margin, financial aid decisions have a greater impact on initiation and continuation of college work by young people from low-income families than for the more affluent.

Several recommendations in the section of this report beginning on page 53 for greater progressivity in the CSS need analysis system would aid low-income youth. The budget problems of low-income students can be accommodated within the existing CSS system, given sympathetic financial aid officers and appropriate income-need curves or special institutional modification to meet special circumstances. The Panel particularly urges that in periodic revisions of the curves attention be given to providing increased aid for low-income students.

Many students experience only the impersonal side of large and overburdened financial aid offices, however, and because of unintended oversight, administrative rigidities, or the students' own pride or timidity, they often are not equitably handled even when the will to do so exists. The Panel urges that financial aid decisions be made, where any option exists, on the side of generosity to compensate to some extent for the implicit handicaps of being economically poor.

The Panel gave considerable thought to the possibility of carrying need analysis below the point of zero parental contribution, and possibly recommending modest "negative contributions" from low-income parents (that is, the institution compensating the low-income family for lost contributions to family support from the student). The idea has much merit, the Panel believes, and public programs should consider contributions to low-income families as well as to students.

The college or university, as much as it may wish to contribute to the elimination of barriers to college attendance, cannot alone shoulder the broad social responsibility this would entail. The Panel does believe, on the other hand, that a partial movement in this direction

ERIC Full Text Provided by ERIC

can and should be made with respect to a student's summer earnings.

*The Panel therefore recommends that:*

*The standard expectation of contribution to college costs from summer earnings be sharply reduced for students from low-income families; and that individual institutions treat sympathetically the situation in which a student from a low-income family cannot find summer employment, and seek alternate aid resources.*

The Panel does not wish to recommend that potential summer earnings be ignored for all students, for many middle-income students who could have found positions will then choose not to do so, and the Panel believes that such a choice should not reduce the expected parental or self-help contributions.

**Adequacy for Minority Families**

As much as one might wish to assume that the particular problems of minority-group students and families are essentially economic—that is, that the problem is simply that a much higher proportion of black, Puerto Rican, Indian, and Mexican American students happens to fall in low-income categories—and can therefore be resolved by antipoverty measures, the Panel strongly disavows this conclusion. To be poor is not an insuperable obstacle; to be both poor and to perceive oneself already to a degree separate from the majority can be a heavy burden, particularly when one is passing through the most impressionable years of life. This may be particularly, although not exclusively, true of minority-group students attending a predominantly white college or university.

There is now a heretofore unequaled opportunity to erase or significantly reduce the unjustified differences in opportunity open to young persons of different ethnic backgrounds. Perhaps the greatest asset of the present generation of college students is its genuine social egalitarianism. One of the greatest hopes for overcoming racial prejudice and discrimination lies in the success of colleges and universities in unifying their own society. The greatest reponsibility for creating the climate in which such progress can be made rests with the nation's educational leadership.

On several counts the Panel believes that the present CSS system fails to compensate adequately for subtle but important inequities. In two categories of hidden costs the Panel has concluded that the CSS as an organization cannot supply the appropriate correctives, but it urges individual institutions to consider them seriously and initiate

ERIC Full Text Provided by ERIC

research to determine the magnitude of the problems. In the predominantly white college or university located in a white neighborhood where the racial mix is at variance with the student enrollment mix, many common services may be more expensive for the minority students than for a typical white student. Food, clothing, beauty salon or barber, housing, and other items may be more costly to the minority-group student who does not wish to cut himself off from his community, or who does not feel fully welcome in the immediate locale. Depending on the circumstances of the individual college and its clientele, the Panel believes that financial aid officers should take these factors into account in estimating appropriate student budgets. Not only is it true in many such situations that "the poor pay more," but the poor from a racial minority often pay significantly more or go without items that would be considered standard in the budgets of white students.

Similarly, the minority family is frequently constrained to live in a racially segregated neighborhood. Near the poverty line this may mean that families pay disproportionately more for food, housing, and various services. Household budgets in urban ghetto neighborhoods are frequently significantly higher than in upper- and middle-income neighborhoods, reflecting real differences in prices of identical goods and services. The upper- or middle-income family from an ethnic minority frequently finds that its costs too are higher than they might be for a comparably white family. That these conditions exist is not disputed; how significant these differences are in limiting the ability of parents to contribute to educational expenses is an open question. Because such economic penalties vary according to locality, the Panel urges that individual institutions attempt to take them into account rather than attempt to adjust overall CSS curves. The Panel also urges that the CSS make available to institutions the results of significant surveys of typical household costs and use its influence to encourage appropriate federal agencies, such as the Bureau of Labor Statistics and the Department of Health, Education, and Welfare, to collect and disseminate such information.

A third area in which there is a possible discriminatory burden lies in the expectation that a student's summer earnings will be applied toward the following year's college cost. Department of Labor publications document well the differential unemployment rate of 18-21-year-olds by color. Although it is less well documented, the Panel believes that the problem is probably even more severe for temporary summer positions. Many low-income students have difficulty even

supporting themselves during the summer, much less accumulating savings.

A fourth area in which discrimination in society frequently places a heavy burden on the ethnic minority family, and a factor the Panel believes the CSS should take into account in determining need, is the lifetime income expectations of minority families. Present CSS procedures consider current income and discretionary assets – that is, they consider the present income situation as a reflection of past earnings. Later in this report the Panel strongly recommends that family ability to pay be based on discretionary assets and *expected future earnings* as reflected by current (in this case, three-year-average) earnings (see page 55). Such a policy, which the Panel recommends for equity reasons, would also permit adjustments for broad occupational, color, and sex differences by use of federal income data published by the Bureau of the Census. The Panel also recommends that the CSS take positive steps to secure legal permission to obtain and use information concerning the racial identification of applicants (see page 59).

To illustrate the effect of these recommendations, take the case of three families with identical income and age of parents, where the wage earner is, respectively, a white "blue collar" worker, a nonwhite "blue collar" worker, and a white "white collar" worker. The white collar worker, by his occupational designation, will typically have a lifetime income pattern that rises more steeply with age than will his blue collar counterparts. Thus, over the remaining period of his working life he can be expected to have considerably larger disposable income. (See the Panel's recommendation on page 55 for appropriate discounting of future income in estimating ability to pay.)

Between the two blue collar workers there is also a significant difference in income expectation because of frequent racial barriers to advancement. The expected differences in lifetime earnings by color for each occupational classification have been determined by the Bureau of the Census. Thus, as is approximately the case, the nonwhite "blue collar" parent will typically earn about 11 percent less during his remaining working years than his white counterpart, and the Panel believes strongly that his contribution to his children's college costs should be correspondingly less. The Panel's recommendation on page 55 stresses equal treatment for equal income *expectations*. The Panel in no way seeks to give favorable treatment to the minority group parent to compensate him for being black, Puerto Rican, Indian, or Mexican American; on the contrary, it recognizes that social

se: 1:22-cv-00125 Document #: 864-45 Filed: 05/07/25 Page 63 of 144 PageID #:349



barriers at present restrict his earning capacity, and it would be an inequity to treat him as though he had the *same* capacity to contribute, on the basis of expected future income.

The present CSS system recognizes current differences in income, but it fails to take into account that current inequities are compounded over a lifetime. Once one accepts the philosophy that parental contributions to college costs should be seen as the disposition of a segment of one's lifetime earnings, and should reflect not only past savings but also potential future earnings, the adjustment for occupation, color, or sex of the head of the family follows quite naturally. To ignore these well-recognized and unfortunately long-lasting differences would be like saying that a 38-year-old plumber and a 38-year-old second-year medical resident, both of whom might be earning $12,000 in a particular year in question, have the same expectations for the future. If the combination of governmental and social action is successful over the next few years in erasing differences in income expectations by color for all occupations, then the adjustment that will emerge from the Panel's recommendation will substantially fall to zero. By including such a color factor in the calculations, however, the CSS and its member institutions are better able to take cognizance of the real world in computing financial need.

The two adjustments recommended in the next section and further advocated here, plus additional institutional attention to expenditure differentials, will in the Panel's opinion go a long way toward making more equitable the allocation of existing financial aid, even though it will take a marked increase in total aid resources to really eliminate financial barriers to going to college.

The problem of restricted access to higher education on the part of ethnic minority youth is obviously much greater than the CSS can hope to resolve. As the major vehicle by which most financial aid is allocated, however, the CSS is in an important position to influence both governmental and institutional policy. The Panel applauds its efforts in the past and urges even more vigorous action in the future.

*The Panel therefore recommends that:*

*The* CSS *appoint a permanent high-level commission to review annual progress in the nation's colleges toward accomplishing the goal of equality of access to higher education, and to make proposals to federal, state, and private agencies for expanding educational opportunities.*

## Technical Changes to Improve Equity in Determination of Parental Contributions

This section includes recommendations for improving the procedures used by the College Scholarship Service in measuring parental resources and determining the rate of parental contribution. The Panel's concern has been with improving the fairness of the present CSS system by achieving greater equity in the required contribution from families who have equal resources, and with providing a better basis for applying the widely accepted principle of ability-to-pay in determining the relative contribution expected from families of unequal resources.

In dealing with such questions as what to include in income or in net worth, what to allow as deductions, and most important, what role future prospects with regard to earnings and living costs should play, the Panel was continually aware of informational and administrative limitations. An effort has been made to keep recommendations within the realm of the feasible. In short, the objective might be stated as the maximization of equity, subject to some practical constraints.

### Past, Present, and Future

An essential feature of the family contribution to college costs is that it is usually made within a relatively short time segment out of the family's economic life. To what extent and how should the determination of the parental contribution take account of the family's past economic experience, and its future prospects?

The assets that a family possesses in the year in which it first applies for aid reflect its past earnings experience, its past costs of maintenance, and, of particular concern from an equity viewpoint, its past willingness to forgo consumption and save. Of two families with otherwise similar economic histories, the one that has saved more will have accumulated larger assets although it has really not had a better economic experience. If these assets are taken as evidence of ability to contribute to college costs, then the family that saves more will be penalized for its thrift. This point becomes even more troubling if the motive for the thriftier family was exactly to make provision for college costs. It may well be, however, that for most families at low-income levels, low rates of past saving really do imply special hardship, so that no general inequity would arise from granting relatively more aid to low savers. In any case the Panel found no feasible method for properly taking such past circumstances into account and decided to

ERIC Full Text Provided by ERIC

Case: 1:22-cv-00125 Document #: 864-45 Filed: 05/07/25 Page 65 of 144 PageID #:34951



accept the principle (also implied in the present CSS system) of letting bygones be bygones. Thus it was concluded that the appraisal of the family's ability to contribute to college costs should be based on its economic situation at the time of the initial application for aid and on its future economic prospects.

With regard to the future, the Panel believes the present CSS procedure can be further improved. At present, the family's future prospects and living requirements are taken into account primarily in the calculation of the annual income supplement from discretionary net worth. In the first place, for the calculation of net worth itself, the cost of an annuity sufficient to assure the parents an income equal to the cost of the moderate standard of living after retirement is subtracted. Second, it is recognized that a younger parent has more earnings years ahead of him in which to save, and hence a higher percentage of his discretionary net worth is considered available as an income supplement. For example, the income supplement from $10,000 of discretionary net worth is $1,200 if possessed by a 40-year-old parent, and $700 if possessed by a 60-year-old parent. (If discretionary net worth is itself small, the age differential in parental contribution becomes insignificant.)

In the Panel's judgment, it is desirable and now feasible to integrate current income, current assets, and estimates of future income and family living costs into a consistently defined measure of family resources. Tables are now available from the Bureau of the Census providing estimates of the present value of expected future lifetime earnings for age groups from 18 to 64. Separate tables show the influence on current and expected earnings of educational level, occupation, and color. Other tables permit the estimation of the present value of future living costs at any specified level. The data available now are based on the 1960 census and interim samples; the 1970 census will provide more comprehensive, reliable, and up-to-date figures.

Allowing for future earnings not only provides a more accurate assessment of the economic status of younger parents relative to older ones, but also recognizes differences in economic position that are due to differences in the expected patterns of future earnings. A 40-year-old man with a college education has greater earnings expectations relative to his current earnings level than does a 40-year-old man with only a high school education; even if both have the same current earnings, the present value of the expected future earnings of the college-educated man is larger because the patterns of lifetime earnings in occupations open to the college-educated tend to show a sharper

trend upward and to provide more continuous employment. As an example, the expectations of an established plumber may be compared to those of a beginning doctor. Similarly, and because of lower life expectancy, nonwhites have lower expected future earnings than do whites of the same age, education, and current income.

The Panel has explored in some depth the potentialities of using these expected lifetime earnings estimates in measuring family financial strength, always keeping in mind the numerous technical problems of method and data, and of course the inevitable uncertainty and error in any evaluation of the future. The ultimate error to be minimized, however, is not the error of forecasting as such but rather the error of being unfair – of attributing too much or too little ability to provide for college costs to some families relative to others in similar circumstances. Assuming no disagreement about the relevance and importance of future earnings in appraising financial ability, the "equity error" cannot be avoided by ignoring future prospects and depending exclusively on the more certain data on current income and assets. It is the Panel's opinion that making use of estimates of expected lifetime earnings will, on the average, result in more accurate assessments of relative financial capability and hence substantially greater equity.

*The Panel therefore recommends that:*

CSS *procedures for determining parental ability to contribute to educational costs of offspring be modified to incorporate estimates of the future earnings and living costs of the family. The present method of treating assets should also be modified accordingly.*

The Panel is not prepared to recommend a detailed procedure as necessarily the best way to implement this recommendation. Before such a specific judgment is made, alternative techniques and sources of data ought to be investigated and tested in depth, a task that would best be undertaken by those who will have the continuing responsibility for carrying out the procedures. The Panel's investigations suggest, however, that what might be termed a Present-Value-Total-Resources (PVTR) approach is most promising.

*The Panel therefore recommends that:*

*The* CSS *give careful consideration to, and thoroughly explore, a Present-Value-Total-Resources approach to determining parental ability to contribute to college costs for offspring.*

The major steps required by this approach are outlined below, and

ERIC Full Text Provided by ERIC

Case: 1:22-cv-00125 Document #: 864-45 Filed: 05/07/25 Page 67 of 144 PageID #:34953



subsequently examples are developed to show how it would compare with the present CSS system in its treatment of specific family situations. This is done here not only because the PVTR approach appears promising, but because developing these examples seems the most helpful way to chart the course for any serious attempt to integrate future prospects into current measures of ability-to-pay.

**The Present-Value-Total-Resources (PVTR) Approach to Measuring Parental Ability-to-Pay**

*Outline of steps.* The objective of the PVTR approach, to repeat, is to integrate current and estimated future earnings, current and estimated future living costs, and net current assets into one overall and consistent measure of family discretionary resources. The computation requires deriving the present value of the family's estimated earnings through age 64, including the current year, which is then added to the family's net worth. From this must be subtracted the present value of an allowance for personal maintenance at a moderate standard of living through age 64, and the cost of an annuity sufficient to assure a moderate living standard in retirement years. (This latter subtraction would be made, as in the present CSS system, only where necessary to supplement Social Security benefits and any other retirement benefits provided by employers.) The net figure, discretionary resources, is the basis of parental ability to contribute to college costs. The estimation of future earnings and living costs is examined first below.

It is not feasible, of course, to tailor-make estimates of future earnings on an individual basis for every family. It is feasible, however, to take an actuarial approach and place the earning parent in a group whose relevant characteristics he shares. It can then be assumed that the lifetime pattern of earnings of this group will apply to him also.

The estimates of the present value of lifetime earnings prepared by the Bureau of the Census (referred to above) are given in the Bureau's *Technical Paper No. 16*, based on 1959 economic data from the 1960 Census and published in 1967. Alternative estimates are presented that allow for alternative assumptions about annual increases in productivity (0, 2, 3, and 4 percent) and for use of alternative discount rates up to 5 percent. The estimates for a male of a specified age, color, educational level, and occupation are based on what is called a cross-sectional analysis. For this computation, the actual average of current-year earnings in 1959 for each subgroup, for each age level, is tabulated. It is then assumed that as an individual's

working life progresses, his earnings will follow, through time, the pattern that is shown by the earnings average for successive age groups in the single year 1959. Further, since not all individuals survive to 65, the average earnings at each age level are reduced by the appropriate mortality rates (the Bureau uses 1964 rates for all white and nonwhite males). The present value of the resulting earnings series is obtained by discounting it using the alternative rates indicated. Any desired assumption about changes over the future in prices or productivity can be built in by adjusting the average annual earnings data appropriately.

*Lifetime to current earnings ratios.* For each subgroup, the ratios of present value of lifetime earnings to current-year earnings can be computed. Differences among the subgroup ratios reflect differences in patterns of lifetime earnings, differences in the incidence of unemployment, and differences between whites and nonwhites in mortality rates. Such ratios can be applied to the current earnings of any specific individual who is identified as a member of a particular subgroup in order to estimate the present value of his lifetime earnings. The assumption here is that, while his current earnings level may differ from that of his group average, the pattern of earnings and the incidence of unemployment over the remainder of his working life will approximate the group average. This appears to be a reasonable assumption for the age and career stage of parents of students applying for aid.[1]

The importance of taking future earnings into account in measuring present ability-to-pay is indicated by the differences among the ratios presented in Table 6. These are ratios of the present value of expected lifetime earnings to current earnings for males classified by age, educational level, and color, using a 5 percent discount rate and assuming zero productivity increase.[2]

---

1. It may be that a given family's deviation from the average of current earnings for its subgroup reflects random rather than stable factors (a bonus, moonlighting, and so forth). This could be adjusted for by including only a portion, say one-half, of the deviation of any particular family from the subgroup average. Also the recommendation below, that three years' income be examined, would make it possible to eliminate components of earnings that seem unlikely to be maintained.

2. The present values of expected lifetime earnings are also available by 10 occupational cross classifications and given in Bureau of the Census *Technical Paper No. 16*. However, the Panel has reservations about their usefulness, on the ground that the groupings are likely to be quite heterogeneous and that an individual's membership in a subgroup may not be stable over his working life. Educational level will be more stable and reflect the more significant differentials.

**Table 6. 1959 Ratios of Present Value of Expected Lifetime Earnings to Current Earnings**

(For males, by age, educational level, and color. Assuming zero productivity increase and 5% discount rate)

| | *Elementary school – eight years* | | *High school – four years* | | *College – four years or more* | |
|---|---|---|---|---|---|---|
| *Age* | *White* | *Nonwhite* | *White* | *Nonwhite* | *White* | *Nonwhite* |
| 40 | 13.13 | 12.06 | 13.46 | 11.70 | 14.93 | 12.16 |
| 45 | 11.36 | 10.58 | 11.54 | 10.24 | 11.98 | 10.31 |
| 50 | 9.40 | 8.69 | 9.55 | 8.69 | 9.35 | 8.53 |
| 55 | 6.93 | 6.63 | 7.04 | 6.47 | 6.81 | 6.42 |
| 60 | 4.08 | 3.92 | 4.03 | 3.87 | 3.93 | 3.76 |

Source: U.S. Bureau of the Census, *Technical Paper No. 16* (1967). Odd years by interpolation.

No attempt is made here to project the earnings of female members of the household. Working women have a future earnings prospect that bears a different relation to current earnings than that of men; further, housewives not now in the labor force may enter it later. Such projections will have more uncertainty than those for males, but the PVTR approach requires that they also be used.

The most important factor producing differentials in these ratios for males, not surprisingly, is age. Comparing ages 55 and 45 – the range that includes the bulk of parents of college aid applicants – the ratios for the older group are half to two-thirds those for the younger one.

Education for whites at the younger ages has a consistently positive effect on the ratios. For 50 and above, however, the ratios for college-educated whites are below those that apply to whites with less education; this does not mean that the total earnings are less, but only that the earnings of the college-educated fall relatively more rapidly as retirement approaches. For nonwhites, the ratios of expected lifetime to current earnings are slightly higher for those with only an elementary education than for the more educated, with the exception of college-educated 40-year-olds.

A very significant differential is the consistently lower ratio for nonwhites at all age and educational levels. For a 45-year-old, the white-nonwhite gap amounts to 7 percent for the elementary school graduates and rises to 11 percent for high school graduates and 14

percent for college graduates.[3] Were no adjustment made for these differentials, white and nonwhite parents of equal current income would be considered of equal financial ability whereas actually the nonwhite parent has significantly lower expected future earnings.

*In view of the apparent importance of these white-nonwhite differentials, the Panel recommends that:*

*The* CSS *take the necessary steps to obtain and use information concerning the racial identification of applicants for student aid.*

These ratios have been prepared from estimates based on data from the 1960 Census. The question naturally arises of whether the ratios and the differentials among them would be significantly different if they were based on later data. The results of the 1970 Census are not yet available, but the Bureau's *Current Population Report* Series P-60, No. 74, gives 1968 estimates of the present value of expected lifetime earnings for employed males in 1968, based on a sample survey. While these figures are not exactly comparable since the 1959 data were for all males in the experienced labor force, and no white-nonwhite breakdown was given, there are estimates for each age group and for a detailed educational breakdown. Ratios of the present value of expected lifetime earnings to current earnings are shown in Table 7 for approximately comparable groups of males for the two years 1959 and 1968.

The ratios are generally of the same order of magnitude, and the differentials due to age and education are similar. For elementary and high school graduates, the 1968 ratios are somewhat lower than the 1959 ones; for the college-educated 45 and over, the 1968 ratios are somewhat higher.

A factor of considerable importance in the computation of the ratios is the rate of discount used to obtain the present value of expected lifetime earnings. A 5 percent rate is used for the figures in Tables 6 and 7; this is the highest rate for which the Bureau of the Census has computed the present values. The view has been expressed that a much higher discount rate should be used. The purpose

3. About one-half of the white-nonwhite differentials in the ratios arises from the lower life expectancy of nonwhites; the other half represents differences in the patterns of earnings and in the incidence of unemployment. It may in general be noted that, in making these computations, no distinction in survival rates by educational level was employed. If this distinction had been made, the apparent higher future earnings relative to current earnings of the nonwhite less well-educated might well have disappeared.

Case: 1:22-cv-00125 Document #: 864-45 Filed: 05/07/25 Page 71 of 144 PageID #:34957



**Table 7. 1968 and 1959 Ratios of Present Value of Lifetime Earnings to Current Earnings**

(For males, by age and educational level but not color. Assuming zero productivity increase and 5% discount rate)

| | *Elementary school — eight years* | | *High school — four years* | | *College — four years or more* | |
|---|---|---|---|---|---|---|
| *Age* | *1959* | *1968* | *1959* | *1968* | *1959* | *1968* |
| 40 | 13.27 | 12.84 | 13.38 | 12.95 | 14.88 | 14.53 |
| 45 | 11.32 | 10.72 | 11.50 | 10.84 | 11.88 | 11.99 |
| 50 | 9.38 | 8.63 | 9.55 | 8.74 | 9.28 | 9.53 |
| 55 | 6.94 | 6.47 | 7.08 | 6.47 | 6.81 | 7.01 |
| 60 | 3.93 | 3.91 | 4.10 | 3.81 | 3.92 | 4.02 |

Sources: 1959: See Table 6: figures given here are for whites and nonwhites combined. 1968: U.S. Bureau of the Census, *Current Population Reports*, Series P-60, No. 74. Ratios for 1959 are for all males; those for 1968 are for males with income in 1968 and hence do not reflect all the differential unemployment rates among age groups.

of a higher discount rate would be to diminish further the importance of estimates of earnings for the remote future as compared to those for the near-term. It would, of course, also reduce differentials among the subgroups.

The implications of using a high discount rate, specifically 15 percent, for one important set of differentials in the ratios (namely, the white-nonwhite differentials) are illustrated in Table 8, using 1959 data. The differences between the white and nonwhite ratios are significantly reduced by using the higher discount rate, but they are by no means eliminated. The reduction is more significant for high school and college graduates than for the group with only an elementary education.

*Discretionary resources.* Once the ratios of present value of expected lifetime earnings to current earnings have been established for each subgroup, the next step is to apply the appropriate ratio to the actual current earnings of the applicant's family. This provides an estimate of the present value of the family's expected lifetime earnings. To this must be added the family's Net Worth to obtain Total Resources.

The present value of expected future living costs necessary for the maintenance of the moderate standard of living must then be estimated and subtracted. The annual amount to allow up to age 65 will depend on the present age of the parents, their survival probabilities

**Table 8. Effect of Increasing the Discount Rate on White-Nonwhite Differentials in Ratios of the Present Value of Expected Lifetime Earnings to Current Earnings**

| | (1) Ratios at age 45 | (2) | |
|---|---|---|---|
| | *Whites* | *Nonwhites* | *(2) as % of (1)* |
| Elementary school | | | |
| Discount rate of 5% | 11.36 | 10.58 | 93% |
| Discount rate of 15% | 5.91 | 5.58 | 94% |
| High school | | | |
| Discount rate of 5% | 11.54 | 10.24 | 89% |
| Discount rate of 15% | 5.98 | 5.49 | 92% |
| College | | | |
| Discount rate of 5% | 11.98 | 10.31 | 86% |
| Discount rate of 15% | 6.19 | 5.53 | 89% |

Sources: 5% figures from Table 6. 15% figures computed by discounting the annual earnings data given in Bureau of the Census *Technical Paper No. 16* and adjusting for survival rates for 1967 as computed from mortality rates for 1967 given in the *Statistical Abstract* for 1969, page 54.

and the precise ages of their children. These annual amounts of projected living costs must then be discounted by the same rate used in the estimation of the present value of lifetime earnings. The result is the present value of the expected cost of living.

For the postretirement years, the consistent procedure would be to subtract here an allowance that would provide for any supplement to Social Security benefits necessary to maintain the moderate standard of living. The present CSS procedure described above is followed here instead, however; this subtracts the retirement allowance from net worth to obtain discretionary net worth. (The result of adding only discretionary net worth to the present value of lifetime earnings is a slightly lower figure for total resources, a similarly lower figure for the cost of living, and the same figure for discretionary resources as would be obtained were the retirement allowance subtracted in its proper place along with the cost of living.[4])

4. This lowering of the total resources figure slightly affects the relationship between the parental contribution and the rate structure suggested below, because the rates are made a function of the ratio of Total Resources to the present value of the cost of living.

e: 1:22-cv-00125 Document #: 864-45 Filed: 05/07/25 Page 73 of 144 PageID #:34



The magnitude of discretionary resources for a family will be many times larger than the CSS adjusted effective income, but this does not imply that the expected contribution from any given family is to be anything like proportionately enlarged. The expected contribution for many families would in fact be reduced under the rate schedule suggested below, for the size of the contribution depends on the level of the contribution rate schedule. Under the PVTR approach, these rates will be a fraction of those implied by the present CSS parental contribution tables. It should be kept in mind that the main purpose of deriving discretionary resources is not to influence in any substantial way the aggregate amount of financial aid to, or the aggregate contribution expected from, the population of families as a whole. Rather, its significance is in providing an improved measure of *relative* parental ability-to-pay, resulting in a more equitable *distribution* among families of the financial aid available.

A comparison of the PVTR approach with the present CSS system in specific terms for a prototype family is presented beginning on page 64. Since the comparison includes the expected parental contribution under the PVTR approach based on a suggested contribution schedule, the formulation of such a schedule follows here.

### The Contribution Rate Schedule

A general sense of justice can be readily invoked to support the conclusion that families with equal ability should contribute equal amounts to the payment of college costs.[5] There is also consensus that families of greater ability should contribute at a higher percentage rate than families of lesser ability. In addition, the rate structure ought, as a practical matter, to be graduated smoothly and should not result at any point in an excessively high rate on increments in earnings. Subject to these constraints, the particular degree of progression to be built into the rate structure is a matter of judgment.

The Panel is convinced that the rate structure should be so formulated that it is effective in real terms, necessitating no adjustment when inflationary changes in income and prices occur. That is, a family whose earnings rise by 10 percent when prices also rise by 10 percent should automatically be expected to contribute the same percentage of its discretionary resources as it would have in the absence

5. Leaving aside for the moment the question of how the parental contribution should be related to the number of children going to college, which is discussed in "Treatment of Multiple Offspring" below.

ERIC Full Text Provided by ERIC

of the general increase in prices and earnings; and, the contribution rates should automatically decline for a family whose income does not keep pace with a general inflation.

The present CSS system obviously cannot accomplish this. Specific amounts of contribution are attached to specific monetary amounts of adjusted effective income; a higher nominal income inevitably leads to a higher contribution, and an unchanged nominal income results in an unchanged contribution, irrespective of what happens to prices.[6] Therefore as inflation has progressed in recent years, it has been necessary to introduce changes in the contribution tables.

A contribution rate schedule can be formulated rather simply that will function properly during inflation. Essentially, for the PVTR approach, it requires that the level of the contribution rate be made a function of the ratio of total resources to the present value of the cost of maintaining a moderate standard of living. Since the cost of living rises with inflation, the nominal rates to which a family is subjected will remain constant if, and only if, family resources expand proportionately.

*With reference to the contribution rate schedule, the Panel therefore recommends that:*

*The rate schedule be made a function of the ratio of resources to cost of living to avoid adjustment in response to changes in the price level. The schedule should be changed only as a deliberate policy to alter the real progressivity of the system. Automatic adjustments of the cost of living should, of course, be made whenever new data are made available by the Bureau of Labor Statistics. The equity principle underlying this formulation of the rate structure is that all families of equal potential standard of living should contribute an equal percentage of their resources to the payment of college costs.*

*The contribution rate schedule be made more progressive than the rates implied by the present CSS contribution tables, although the degree of progressivity of the system is a matter of judgment rather than of technical improvement.*

A suggested structure that conforms to these recommendations is presented in Table 9. As shown in the next section, it results in requir-

6. An adjustment of the subtraction from net worth for the cost of the retirement annuity when the price level rises is perhaps implied by the CSS procedures and has been made for the illustrative calculations given below; however it has only a minor effect on the parental contribution.

ERIC Full Text Provided by ERIC

ing a higher contribution than does the present CSS system from families at the upper end of the range of applicants, a lower contribution at the lower end, and a similar contribution from a family near the middle of the range.

**Table 9. Suggested Contribution Rate Schedule**

(For Total Resources computed from 15% discount rates)

4% of the amount by which total resources exceeds the present value of the cost of maintaining the moderate living standard, *plus*
1% of any excess of total resources over one and one-half times the present value of the cost of maintaining the moderate living standard, *plus*
1% of any excess of total resources over twice the present value of the cost of maintaining the moderate living standard

Under this rate schedule, the maximum effective marginal rate on increments of earnings is something less than 50 percent.[7]

### A Trial Run: Cases Illustrating How the PVTR Approach with the Suggested Rate Schedule Compares with Present CSS Procedures

The prototype on which the illustrations here are constructed is the family of Margaret Fleming (fictitious name), whose Parents' Confidential Statement and Financial Need Analysis Report are presented in the CSS *Manual for Financial Aid Officers*, 1969 Revision, pages A-7 to A-10. There are three children in the family, the aid applicant being the oldest. The father's education and color are not reported, and it is assumed initially that he is white and is a high school graduate. The CSS calculations of effective income and net worth are used as recorded.

Table 10 shows the parental contribution for Fleming as it is now computed under the present CSS system and as it would be computed under the PVTR approach, using the suggested rate structure of Table 9. The difference between column (1) and column (2) is that, for the latter, Fleming is assumed to be 10 years older than the 45 years of age given in the *Manual*; but he has the same current earnings, prop-

7. Under the PVTR approach, an increment in current earnings implies a multiple increase in the estimate of the present value of lifetime earnings. With the 15 percent discount rate, the maximum ratio of the present value of lifetime to current earnings is about 7; since the highest marginal contribution rate is 6 percent, the maximum effective marginal rate on earnings is about 42 percent.

erty income, and net worth (although not, of course, the same present value of lifetime earnings or of living costs). A comparison of columns (1) and (2) thus brings out the greater sensitivity to age of the PVTR approach than of the present CSS system.

**Table 10. Calculation of Parental Contribution for Fleming Case: Comparing Present CSS Computations with Those for the PVTR Approach**

(Assuming a 15% discount rate, no productivity increases; that Fleming is white, is a high school graduate, and has three children, as given in the *Manual*; using the illustrative rate schedule of Table 9.)
All figures in dollars except as indicated.

| | (1) Age 45 | (2) Age 55 |
|---|---|---|
| *Characteristics from Manual:* | | |
| (1) Effective income after tax | 10,890 | 10,890 |
| (2) Property income after tax – est. | 340 | 340 |
| (3) Earned income after tax (1) – (2) | 10,550 | 10,550 |
| (4) Net worth | 19,800 | 19,800 |
| CSS *computations:* | | |
| (5) Retirement allowance (*Manual* Table 4) | 7,800 | 10,800 |
| (6) Discretionary net worth (4) – (5) | 12,000 | 9,000 |
| (7) Income supplement (*Manual* Table 5) | 1,320 | 810 |
| (8) Adjusted effective income (1) + (7) | 12,210 | 11,700 |
| (9) Parental contribution (*Manual* Table E) | 1,510 | 1,390 |
| % Change from column (1) | | –9% |
| PVTR *computations:* | | |
| (10) Lifetime to current earnings ratio | 5.983 | 4.648 |
| (11) PV of earned income (10) × (3) | 63,121 | 49,036 |
| (12) Total resources (11) + (6) | 75,121 | 58,036 |
| (13) PV of cost of moderate living standard* | 38,617 | 32,217 |
| (14) Discretionary resources (12) – (13) | 36,504 | 25,819 |
| (15) 4% of (12) – (13) | 1,460 | 1,032 |
| (16) 1% of (12) – 1½ (13) | 172 | 97 |
| (17) 1% of (12) – 2 (13) | 0 | 0 |
| (18) Parental contribution (15) + (16) + (17) | 1,632 | 1,129 |
| % Change from column (1) | | –31% |

* Allowing $5,000 per year for Fleming and his wife up to age 64, discounted at 15% and adjusted for mortality rates; $500 a year for the four college years for each child; and $1,500 a year for the precollege years for each child; again discounted by 15% but assuming zero mortality rates for the children.

Under the CSS system, Fleming at age 45 would be expected to contribute $1,510 (row 9); under the PVTR approach the contribution would be $1,632 (row 18). If he were 55 years old, his expected contribution under the CSS system would be reduced by about one-tenth; under the PVTR approach it would be reduced by three-tenths.

Tables 11 and 12 are concerned with showing the comparative progressivity and the comparative responsiveness to inflation of the two systems. Four different levels of current income and consistent amounts of net worth are assumed for the Fleming prototype family; all other characteristics are assumed to be as given in Table 10, column (1). As indicated by the headings and the footnotes, the income levels illustrated are intended to represent the low-income level, the moderate-income level, Fleming's actual income level, and a higher level of income toward the top of the range of parents applying for aid. The difference between column (1) and column (2) in both tables shows the results of a general 10 percent inflation, affecting the cost of living (including the cost of family maintenance at the low-income level and at the moderate level), all incomes, and all assets.

**Table 11. CSS Parental Contribution and Contribution under PVTR Approach for Illustrative Variations in Earnings and Resources**

(For prototype family with Fleming family's personal characteristics; all figures in dollars)

| | *(1) Prevailing prices 1968* | *(2) After 10% general inflation* |
|---|---|---|
| *A. Low level of current income:* | | |
| (1) Effective income | $ 6,550 | $ 7,205 |
| (2) Net worth | 7,300 | 8,030 |
| (3) CSS parental contribution | 200 | 350 |
| (4) Total resources | 38,689 | 42,558 |
| (5) PV cost of living | 38,617 | 42,479 |
| (6) Discretionary resources (4) – (5) | 72 | 79 |
| (7) PVTR parental contribution | – | – |
| *B. Moderate level of current income:* | | |
| (1) Effective income | 9,700 | 10,670 |
| (2) Net worth | 16,360 | 17,996 |
| (3) CSS parental contribution | 1,125 | 1,390 |
| (4) Total resources | 66,595 | 73,255 |
| (5) PV cost of living | 38,617 | 42,479 |

| | (1) Prevailing prices 1968 | (2) After 10% general inflation |
|---|---|---|
| (6) Discretionary resources (4) – (5) | 27,978 | 30,776 |
| (7) PVTR parental contribution | 1,206 | 1,326 |
| *C. Original Fleming data:* | | |
| (1) Effective income | 10,890 | 11,979 |
| (2) Net worth | 19,800 | 21,780 |
| (3) CSS parental contribution | 1,510 | 1,810 |
| (4) Total resources | 75,121 | 82,633 |
| (5) PV cost of living | 38,617 | 42,479 |
| (6) Discretionary resources (4) – (5) | 36,504 | 40,154 |
| (7) PVTR parental contribution | 1,632 | 1,795 |
| *D. High level of current income:* | | |
| (1) Effective income | 15,250 | 16,775 |
| (2) Net worth | 31,700 | 34,870 |
| (3) CSS parental contribution | 3,300 | 3,900 |
| (4) Total resources | 112,149 | 123,364 |
| (5) PV cost of living | 38,617 | 42,479 |
| (6) Discretionary resources (4) – (5) | 73,532 | 80,885 |
| (7) PVTR parental contribution | 3,832 | 4,215 |

---

A: This case is designed to illustrate not only the low level of current income but also an approximately zero level of discretionary resources. The low level of effective income is that given in the CSS *Manual*, 1969 Revision, Table 2, p. 5-5 and refers to 1968 prices for column (1).

B: The moderate-income level for column (1) is taken from Table 1 of the *Manual*, p. 5-4. The accompanying net worth figure is obtained by interpolating between the low-income level assumption of net worth and the Fleming case figure in C, in accordance with the change in income.

C: The original Fleming data as given in the *Manual*.

D: An arbitrarily selected income level 40% above Fleming's, intended to be toward the top of the income range of aid applicants. Net worth is assumed to be 60% above Fleming's, which is consistent with the relationship between income and assets for Fleming's age group, as given by D. S. Projector and G. S. Weiss in *Survey of Financial Characteristics of Consumers*. Washington, D. C.: Board of Governors of Federal Reserve System, August 1966, p. 111.

All figures are computed as illustrated in Table 10. The second column shows the effect of allowing for a general inflation of 10% affecting all incomes and assets as well as the cost of maintaining the various levels of real income. At all income levels it is assumed that the applicant's employer makes no provision for retirement, other than Social Security benefits, and hence an annuity cost has been subtracted from net worth.

ERIC Full Text Provided by ERIC

**Table 12. Progressivity of the Contribution Rate and Response to General Inflation**

| | (1) *Prevailing prices 1968* | (2) *After 10% general inflation* |
|---|---|---|
| I. *Contribution as percentage of effective income* | | |
| CSS *parental contribution rates:* | | |
| A. Low level of current income | 3.1% | 4.8% |
| B. Moderate level of current income | 11.6 | 13.0 |
| C. Original Fleming level of current income | 13.9 | 15.1 |
| D. High level of current income | 21.6 | 23.2 |
| PVTR *contribution rates:* | | |
| A. Low level of current income | – | – |
| B. Moderate level of current income | 12.4 | 12.4 |
| C. Original Fleming level of current income | 15.0 | 15.0 |
| D. High level of current income | 25.1 | 25.1 |
| II. *Contribution as percentage of discretionary resources* | | |
| CSS *parental contribution rates:* | | |
| A. Low level of current income | – | – |
| B. Moderate level of current income | 4.0 | 4.5 |
| C. Original Fleming level of current income | 4.1 | 4.5 |
| D. High level of current income | 4.5 | 4.8 |
| PVTR *contribution rates:* | | |
| A. Low level of current income | – | – |
| B. Moderate level of current income | 4.3 | 4.3 |
| C. Original Fleming level of current income | 4.5 | 4.5 |
| D. High level of current income | 5.2 | 5.2 |

Source: Computed from figures in Table 11.

The parental contribution at 1968 prices for the low level of income under the present CSS system is $200; it would be negligible under the PVTR approach. At the moderate-income level, the PVTR figure is close to that for the present CSS system. At the level of the original Fleming family and at that of the high-income example, however, the contribution under the PVTR approach becomes higher than under the CSS system. Thus the PVTR rates of Table 9 provide about the same parental contribution at the moderate-income level and a significantly steeper progression both upward and downward.

The contribution figures in column (2) are, of course, higher than in

column (1), but it is the changed relationship among them that is significant. This aspect is better discussed in terms of the percentage rates of contribution that are presented in Table 12.

Section I of Table 12 shows contribution rates expressed as percentages of the CSS concept of effective income; Section II shows them as percentages of the PVTR concept of discretionary resources. The level of the percentages is much higher in Section I than in Section II, since effective income is a much smaller figure than the total of discretionary resources. On either computation, the greater progressivity of the PVTR approach is clear. As a percent of effective income, the PVTR contribution rate rises with income from 0 to 25.1 percent, whereas the CSS system's rate rises from 3.1 percent to 21.6 percent. The patterns are similar when the rates are expressed as percentages of discretionary resources. (The rate here is actually undefined for the low level of income, since discretionary resources are zero.)

Greater progressivity could readily be built into the PVTR approach by adjustment of the rate structure. The rates given in Table 9 are intended to be illustrative. There is nothing to prevent the rates from going negative at levels below the point of zero discretionary resources, which would imply a contribution from the college to the student, to recognize the higher budget needs and limited summer savings of students from impoverished families.

*The Panel therefore recommends that:*

*The rate schedule be extended downward to provide for a negative expectation from families with incomes falling below the Bureau of Labor Statistics low budget standard.*[8]

The contrast in response to inflation between the CSS rate structure and the rates proposed in Table 9 is brought out sharply by comparing the two columns of percentages in Table 12. The CSS percentages are all increased by inflation; families at every income level are called upon to contribute a higher *percentage* of their income or resources,

8. This would recognize not only the explicit costs of college attendance, but also the implicit costs to these families. When a college cannot financially recognize the increased budget costs, because of lack of funds or institutional policy, the negative expectation can serve as a ranking device for setting priorities on existing funds. In such cases, students from low-income families would have a greater indicated need for financial assistance, and would receive priority in the allocation of institutional and public funds. (See James L. Bowman, *Some Thoughts and Reflections Regarding Parental Ability to Pay for Higher Education*. Princeton, New Jersey: Educational Testing Service, December 1970, page 22.)



ERIC Full Text Provided by ERIC

even though the increases in the dollar value of income and resources have been no more than the increase in prices. The percentage contribution rates under the PVTR approach, however, whether figured on Effective Income or on Discretionary Resources, are exactly the same as before inflation—which is as it should be since no change has taken place in real income or real resources.[9]

Figures are presented in Table 13 to show the differential effect of color and education on the expected parental contribution under the PVTR approach. (There is no such differential under the present CSS system.) For this purpose, the income and family composition of the Fleming family as given in Table 10, column (1) are assumed, but education and color are varied. The parental contributions are computed as illustrated in Table 10. For white parents, the contribution, as would be expected, increases with education (the *current* level of income is given), reflecting the better future prospects of the better educated relative to current earnings. This is not the case for nonwhites. For nonwhites, with given current earnings, the differential in contribution for different educational levels is small, and it is actually the person with only an elementary education who is required to make a slightly larger contribution than those who have a better education.[10]

The contribution expected of nonwhites would be consistently lower than for whites, at the same level of current income. The differential widens as the educational level increases—from a 7 percent difference at the elementary school level to a 16 percent difference for the college graduate.

## A Liquidity Index

Discretionary resources indicate ability to contribute, but not necessarily the ready ability to make cash payments at a particular time. This depends on the liquidity of the resources. Assets that are complementary with earning activity such as farm and business assets

9. If income and resources have not kept pace with general price inflation, the PVTR contribution rates would decline. For example, if the original Fleming income and resources remained unchanged in spite of the general inflation, the contribution rate as a percentage of effective income would be reduced from the 15 percent given in Table 12 to 12.7 percent; as a percentage of Discretionary Resources, the rate would be reduced from the 4.5 percent of Table 12 to 3.8 percent. The contribution rates under present CSS procedures would be reduced only very slightly.

10. See footnote 3, page 59.

ERIC Full Text Provided by ERIC

**Table 13. Influence of Education and Color on Parental Contribution under PVTR**

| | (1) White | (2) Nonwhite | (2) as % of (1) |
|---|---|---|---|
| A. Contribution based on original Fleming data if only elementary school is assumed . . . | $1,596 | $1,486 | 93% |
| B. Contribution if four years of high school is assumed . . . . . . . . . . . . . | $1,632 | $1,437 | 88% |
| Percentage of A. . . . . . . . . . . . . . . . . . | 102% | 97% | |
| C. Contribution if college degree is assumed . . . . . . . . . . . . . . . . . . . | $1,742 | $1,461 | 84% |
| Percentage of A. . . . . . . . . . . . . . . . . . | 109% | 98% | |

have a particularly low liquidity; and of course the present value of future earnings is not as liquid as current income, or investments such as stocks and bonds.

The expected contribution computed on the basis of a proper measure of resources may therefore exceed a family's available liquid assets. Such a situation ought not to be used, however, as a justification for scaling down the expected contribution. Rather it should be seen for what it is—a timing problem. It justifies the provision of a loan to cover the excess of the parental contribution over the family's liquid resources. The loan repayment might even be made contingent on the forecast earnings actually materializing in the next few years. (Thus the handling of the liquidity problem would become a device for hedging against errors in forecasting earnings.)

A satisfactory index of liquidity is needed to determine the eligibility for loans. A straightforward one would be: cash and possibly near-cash assets plus the excess of current cash flow (including current year earnings, dividends, interest and capital gains) over the current cost of the moderate living standard. (For Fleming, liquid assets would consist of $1,190—$10,890 minus $9,700—of excess current income, $1,800 in a bank account, and possibly some portion of the $10,000 in securities held for retirement. With a parental contribution of $1,632 the parent would clearly not be entitled to a liquidity loan for this year.)

*The Panel therefore recommends that:*

*A liquidity index be developed and incorporated into the* CSS *evaluation of family resources. Inadequate liquidity should be the basis for a*

Case: 1:22-cv-00125 Document #: 864-45 Filed: 05/07/25 Page 83 of 144 PageID #:34969



*loan to parents to cover part of the expected contribution, but not a basis for scaling down the contribution.*[11]

The components of property income (other than any imputation for home equity) would be needed in order to compute this liquidity index. It should be pointed out, however, that the PVTR approach does not require a property income calculation; the CSS system includes both property income and a supplementary flow from net worth in effective income.

**The Measurement of Net Worth and Current Earnings**

The Panel has given attention to the problem of properly measuring net worth at the time of application and the problem of defining current earnings and recommends to the CSS several specific revisions.

The present CSS system does not include all farm and business assets in Net Worth. The Panel views this omission of an important component of assets as essentially a liquidity adjustment, which should be handled as discussed above.

*The Panel therefore recommends that:*

*The full value of all farm and business assets be included in the measure of net worth.*

The Panel has given special attention to the treatment of life insurance in the measurement of Net Worth. It is difficult as a practical matter to obtain accurate information on the cash value of life insurance.

*As a possible alternative approach, the Panel recommends that:*

*Consideration be given to the integrating of life insurance into total resources by including in the expected future earnings estimates amounts obtained by multiplying the death benefits of the insurance by the probability of dying in each successive year, with an appropriate allowance for premium payments.*

Two important issues arise in the computation of current earnings: the treatment of entrepreneurial earnings, and the treatment of the current earnings of the wife.[12] When the household head is engaged in

11. We recognize that to implement this recommendation a source of loans available to parents, which does not now exist, should be developed.

12. As to the question of the expected lifetime earnings of females, see page 58.

ERIC Full Text Provided by ERIC

an unincorporated business or owns a farm, the accounting net profit must be allocated between earnings of labor and the return on invested capital. The present value of expected lifetime earnings must be estimated from current earnings alone, not from investment income.

*The Panel therefore recommends that:*

*Profit from unincorporated enterprise (business or farm), in excess of the amount required to provide a return on invested capital equal to the rate on high-grade corporate bonds be identified as earnings. If this amount is not at least equal to the wage of an unskilled worker, then such a wage should be used as a basis for estimating the present value of expected lifetime earnings.*

The problem of a wife's earnings takes two interrelated forms: imputation of earnings to a wife not in the labor force, and a deduction for expenses of a wife who is employed. If there were a direct measure of the value of housewife services, this would be a basis for imputing earnings to a wife not in the labor force. In view of the practical difficulties of innovating in this area, however, and the questionable significance of doing so, such imputation is not recommended.

A housekeeping deduction *is* in order for the working wife. We believe, however, that the present CSS deduction should be modified.

*The Panel therefore recommends that:*

*The working wife deduction be based on some standard rate reflecting the average family costs attributable to earning this outside income (for example, household help, commuting costs, and so forth).*

The Panel has several recommendations concerning the mechanics of obtaining information from the family on current income. The current earnings figure should be as representative as possible of the situation of the family relative to other applicants for aid.

*Therefore, the Panel recommends that:*

*The current earnings figure in general be an average of three years (the previous and current years, and an estimate of the forthcoming one) unless there is evidence that the average itself includes unusual or nonrecurring earnings experience.*

*The Panel also recommends that:*

*In deriving the current earnings figure, the* CSS *impute an income from owner-occupied housing.*

ase: 1:22-cv-00125 Document #: 864-45 Filed: 05/07/25 Page 85 of 144 PageID #:349



The federal income tax should be directly exploited in eliciting current income information in the interest both of simplification of the task of supplying the information and of improving its accuracy.

*Hence the Panel recommends that:*

*For each of the two years to be reported, the family be requested to supply adjusted gross income, separated into wage income (earnings) and property income. To adjusted gross income should be added missing income items such as excluded capital gains, and all state and local bond interest.*

**Treatment of Multiple Offspring**

When parents have the financial responsibility for the college education of more than one child, the question arises of whether (and how) the parental contribution should vary with the numbers and ages of offspring. An extremely pure ability-to-pay view would call for parental contribution to be independent of the number of children going to college and be determined only by the measure of parental resources. Such a pure approach is probably difficult to specify and to implement and is not necessarily the most desirable. The concept of equity can accommodate a benefit element: families whose members absorb more of the output of higher education may, with fairness, be expected to contribute more out of a given level of resources. The aggregate expected contribution over time would, therefore, depend on the number of college years to be covered.

A hardship may be considered to arise when parents have more than one child in college simultaneously. (It has been suggested that this is a piece of hard luck, analogous with other aspects of poverty, and deserving of special treatment.) This is actually an aspect of the liquidity problem. Some adjustment is in order, but present CSS treatment amounts to substantial favoritism to parents with more than one child in college. Under the present system, the annual parental contribution based on Discretionary Income is the same regardless of the number of children simultaneously in college; it is simply divided between or among them. For a family with twins, the total cost to the parents (ignoring interest) of providing college education for both can be substantially less than the cost to a family with two children spaced four years apart.

A reasonable reduction in this favoritism can be achieved. A standardized spacing of multiple children can be established as a benchmark. The contribution of parents with children spaced otherwise can

be adjusted to correspond to the contribution made by parents of children spaced according to the benchmark. For example, suppose that the benchmark established for two children is that the second one enters college after the first one graduates, so that the parental contribution is made in eight successive years. Parents of twins could be given an interest-free loan to cover the expected contribution for the second child during the four years both are in college, to be paid back in four consecutive years after the twins graduate. The payment schedule over eight years then would approximate that of parents in similar circumstances but whose children were spaced four years apart. (Alternatively, the contribution for the second child could be reduced by an amount that would cover the interest on such a loan provided commercially.)

*The Panel therefore recommends that:*

*An appropriate technique be devised to provide for some reduction in the contribution when a second or third child is simultaneously in college, without producing the excessive favoritism now shown to parents of children whose college years overlap.*

**Place-to-Place Differentials in Living Costs**

The earlier discussion of real as contrasted to nominal resources was occasioned by the problem of inflation. A similar problem arises as a result of place-to-place (rather than time-to-time) differentials in the cost of living. The same nominal resources should be interpreted to represent more real resources in places where the cost of living is lower than in places where it is higher. If the rate structure for the parental contribution were strictly proportional, place-to-place differentials in living costs would not be a matter of concern. A proportional structure requires that the contribution constitute the same percentage of resources, regardless of their level. However, when the rate structure is progressive, then a family with given nominal resources but living in a high-cost area should contribute a *lower* percentage of resources than a family with the same nominal resources but living in a low-cost area. Unless a proper deflation procedure is followed, this will not be the case.

The Panel has examined the possibility of incorporating a place-to-place cost-of-living adjustment into the determination of the parental contribution. It is not sanguine about the use of existing indices nor about the development of alternatives—particularly to deal with the important types of differences in living costs that exist between city

ERIC Full Text Provided by ERIC

e: 1:22-cv-00125 Document #: 864-45 Filed: 05/07/25 Page 87 of 144 PageID #:34



and small communities within given areas. Finally, it is not clear how place-to-place differentials ought to influence estimates of the future cost of the moderate living standard.

*In view of these considerations, the Panel recommends that:*

*No attempt be made at the present time to incorporate place-to-place differentials in the cost of living into the determination of the parental contribution.*

## The Packaging of Financial Aid

How can best use be made of an institution's financial aid resources? Three aspects of this question are discussed here. The first concerns the definition of financial aid and the fact that there are three different types of aid: grants, loans, and work. The second concerns the objectives that institutions are attempting to achieve with the financial aid available to them and some ways in which the packaging of financial aid may be used to implement those objectives. The third deals with some of the constraints and uncertainties under which educational institutions must operate.

### Varieties of Financial Aid

Student financial aid consists of one or the other or some combination of outright grants, work opportunities, and loans. Grants or scholarships represent a simple transfer of resources to students and involve no repayment; they have often been given largely as a reward for academic achievement or potential, rather than as an offset to limited family income. Work opportunities enable students to help support themselves through part-time employment at the college or in the community. Loans represent a simple borrowing of funds, to be repaid later out of the expected income of students. Since most loan funds are supported by either state or federal agencies, the student gains from interest subsidization.

The frequent lumping together of grants, work-study, and loans into "financial aid" is misleading because these forms of aid are not perfect or even good substitutes for each other. Indeed, students are not indifferent about the "mix" of financial aid. They prefer outright grants to either loans or employment, since no obligation is incurred as the result of a grant. In general, they prefer loans over employment, although low-income students frequently express the opposite preference. Loans may be easier to obtain through the college than through banks, but desirable jobs can often be obtained without the help of the financial aid office.

Student financial aid is arbitrarily defined as aid given out through educational institutions. But money is money, from whatever source it is obtained, and it all helps to finance college-going. Loans that can be obtained through the college or from banks have the same effect in facilitating college attendance. Similarly, the student who is given the job of chauffeuring the college president will perform essentially the same tasks and earn about the same amount of money as the

ERIC Full Text Provided by ERIC

equally needy student who, on his own initiative, finds a job driving a taxi.

Just as there are student preferences for different types of aid the impact of the mix of aid on scholastic performance is of importance. For two equally needy students the awarding of a grant to one and a job to another may give rise to differential scholastic achievement or to different choices of college. The impact of loans on student achievement is comparable to that of grants—neither loans nor grants deter students from pursuing their studies.

What this suggests is that the packaging of financial aid can have significant effects on the academic progress of students. The traditional policy of giving more in the way of grants to the more able students may have an adverse effect on student achievement. Given the fact that two students are equally qualified one might argue for giving larger grants to the less able but qualified student rather than to the more able student.

Because student preferences for different types of aid exist, because the mix of aid produces different effects, and because financial aid funds fall short of measured financial need, institutions have moved to the strategy of "packaging" financial aid. By such packaging, limited resources can be utilized more effectively.

## Financial Aid Objectives

The administration of financial aid must somehow be linked to some set of formal or informal, stated or unstated, objectives. In the United States, society has as one of its objectives the education of the maximum number of its citizens to the maximum extent possible for each. It must move toward this goal, however, in a context of distinctly limited resources; there are claims on those resources for welfare, national defense, transportation, communication, and a host of other pressing needs. Although those engaged in higher education might argue with great cogency that they can show society a way out of many of its present dilemmas by increasing funds for education, there are others who can argue with equal cogency that they have claims that are as great or greater. Thus society has allocated resources to higher education that are insufficient for the task, and it is the job of all those in colleges and universities in general, and in financial aid administration in particular, to distribute those resources in such a way as to maximize movement toward the goal of open access to education by all who can benefit.

Students also have objectives related to higher education. They

may see higher education as a means of self-fulfillment, but on a more practical level they and their parents see it as a means of achieving social mobility and status in the society. They frequently also see themselves as being prevented from fulfilling either of these objectives because of insufficient funds.

Institutions of higher learning also have their own objectives. Great universities with a reputation for high levels of intellectual attainment need to assure a continuing supply of able students as much as they need to attract the finest faculties in order to maintain their status. Other universities and colleges also aspire to eminence and want to "upgrade" their student bodies. Many colleges and universities, particularly in the past decade, have recognized that their students are not representative of the larger society, and so they have as an objective a broader mix of racial groups or economically disadvantaged students.

If money were plentiful, societal, individual, and institutional objectives could be easily reconciled. Unfortunately, however, resources allocated for higher education are scarce. There are times when institutional interest in having a high percentage of high school valedictorians in the freshman class (and the willingness to waive tuition for all such students regardless of financial need) will conflict with the interests of a society that wants maximum educational opportunity for students of all levels of academic attainment, many of whom need substantially more than tuition waivers to assure access to higher education.

Those responsible for administering student financial aid must weigh all objectives and consider precisely what they are trying to do with the funds entrusted to their care. From those objectives will flow the techniques of administering and packaging the various kinds of financial aid available.

### Objectives and Packaging

A variety of approaches to financial aid packaging and the relationship of each to various objectives are described below.

*The universal* GI *Bill.* For sheer simplicity and direct relationship between a set of objectives and a technique of reaching those objectives, no method of financial aid distribution has improved upon the GI Bill and similar programs such as Social Security educational benefits, the GI Orphans Bill, and Vocational Rehabilitation. Under these programs, members of a defined group have been made eligible for funds to enable them to attend college, a reasonable subsidy for such



ERIC Full Text Provided by ERIC

se: 1:22-cv-00125 Document #: 864-45 Filed: 05/07/25 Page 91 of 144 PageID #:349



attendance has been determined, and all those eligible are provided with the agreed-upon amounts of funds. They receive such funds regardless of financial need, date of application, or academic achievement (except, of course, that they must be academically able to remain as students in their chosen college or university). The simplicity comes from the fact that funding is open-ended—the allocation is made in the original definition of eligibility and the taxing power of the Federal Government assures that all eligible will receive aid. Furthermore, there is no need to package various financial aid elements, since all the aid is in the desirable form of direct grants.

From the standpoint of society, individual students, and educational institutions, there is little doubt, given sufficient resources, that a steady broadening of the GI Bill concept to include more groups would be a desirable goal. The reality of the demands upon public and private funds for the foreseeable future, however, makes movement toward this goal doubtful; it is for this reason that additional allocational devices are necessary.

*First-come first-served.* One method of distributing financial aid would be to follow the GI Bill concept of a standard amount for each applicant, but with the understanding that this procedure would be followed only until funds were exhausted. If such a system were adopted it would immediately produce protests that funds would be going to the early birds and that more deserving students—however one might define deserving—might apply after the cutoff. The fact remains that many colleges and universities do have specific financial aid application deadlines and that they are unable to assist those who apply after the deadline, however valid the reason for their tardiness. Moreover, many public colleges and universities admit qualified students until all spaces are filled; since there is a substantial public subsidy expended for each enrolled student, it may well be argued that admission and the accompanying subsidy are allocated on a first-come first-served basis.

*The scholarship-prize.* In the early 1950s, most grant assistance was awarded directly in relation to academic achievement, just as many graduate fellowships are awarded today. Under such a system, an A student might be offered a $1,000 scholarship, a B+ student might receive $500, and a C+ student might be left to fend for himself, regardless of his need. With the increased numbers of students in the late 1950s it was seen that this method of allocation was distributing aid to those who already had sufficient funds, and so the concept of relating assistance to financial need was introduced.

*Need-related aid.* The origins and practice of need analysis are described elsewhere in this report. It need only be noted here that such analysis generally consists of three basic elements: the construction of a reasonable budget the applicant will require to meet his college-going costs; an estimate of parental ability to contribute from income and assets; and a projected amount the applicant should provide from summer earnings, savings, and other resources available to him. If the budget is greater than the student will have available from his parents and other sources, he is said to have financial need; if these resources are equal to or greater than the budget, he is said not to have financial need.

The increasing scarcity of resources in relation to needs, coupled with pressures from the various federal student aid programs, have led to almost universal use of some kind of need analysis system in distributing undergraduate student financial aid in the United States. But several questions still must be answered: How is the applicant's need to be met—by grant, loan, or employment? Who gets priority on grants, the most desirable form of aid—those with high academic rank, those who apply first, those with the greatest need, or some other group? Given a number of students each with the same amount of financial need, with what combination of grant-loan-job should the need of each be met?

*Need-related aid with academic preference.* Although there has been general acceptance in the past decade of relating the amount of financial aid to the applicant's need, there is no national consensus on the *kind* of aid that should be used to meet a given amount of need. As documented earlier in this report, preference for gift aid is most frequently given to high academic achievers. Assuming three students, each with $1,000 in financial need, the valedictorian might receive his full $1,000 in the form of a grant or receive priority for the maximum individual grant available, the B+ student might receive a small grant with the majority of his aid in the form of loan or job, while the C+ student might still be left to his own devices or be saddled entirely with loan or job to meet his educational costs. There is little doubt that such an approach to awarding financial aid serves institutional objectives in that it attracts able students to a given institution, still within the context of financial need. If, however, one of the original purposes of using need criteria in the distribution of financial assistance was to cut down competitive bidding for attractive students and to permit students to make free choices on academic considerations alone, then it would appear that the prevalent approach to packaging aid tends to

Case: 1:22-cv-00125 Document #: 864-45 Filed: 05/07/25 Page 93 of 144 PageID #:349



defeat that purpose. There is also a question of whether such an approach serves societal and individual interests, since it makes higher education attractive to those who have already demonstrated that they are motivated and are capable of achieving academic distinction. Conceivably the A student is better able to bear the burden of a term-time job than the student who was marginally admissible to the institution, and it is even possible that he is better able to take the gamble of a loan. This does not imply that high achievers should be by-passed in giving aid, but it does question the preference usually given them in distributing scholarships.

*Need-related aid with need preference.* In 1965 federal Educational Opportunity Grants provided that preference on grant funds should go to the neediest, regardless of their academic achievement. The premise was that students with lesser amounts of need already had a substantial subsidy by virtue of the relative wealth of their parents, while students from disadvantaged families found themselves earning their own way even in high school. Such students are frequently not from culturally enriched homes and thus face additional obstacles in realizing whatever their true academic potentials might be. This, of course, flew directly in the face of traditional academic criteria for grants, and it was difficult for financial aid officers to change their long-held traditions. Nevertheless, under this program, large numbers of students have been given the opportunity to move toward their educational goals with a minimum of loan and job burdens. At the same time, societal and institutional goals of extending educational opportunities to racially and economically disadvantaged students have been furthered.

*Need-related aid with threshold preference.* One additional allocational device has been used in the packaging of aid: the idea that there should be a difference between freshmen and upperclassmen in the amount to be earned or borrowed. It has been traditional since the early days of need-related financial aid to have different summer earnings expectations at each of the four undergraduate years and for men and women, recognizing that a male entering his senior year is likely to be able to earn substantially more than an entering freshman female. Some institutions have extended the concept further and have concentrated grants in the lower years, moving to a larger mix of self-help as students progress through their undergraduate years. Examples of such a plan appear on page 83. Such a plan concentrates grant aid among two groups: the neediest and the freshmen and sophomores. It does not ignore the high achievers—it puts students from





ERIC Full Text Provided by ERIC




**Example 1. Assuming $3,000 student budget, $1,500 parental contribution.**




**Example 2. Assuming $3,000 student budget, $1,000 parental contribution.**




**Example 3. Assuming $3,000 student budget, no parental contribution.**



Case: 1:22-cv-00125 Document #: 864-45 Filed: 05/07/25 Page 95 of 144 PageID #:34981



all academic levels on the same footing. It increases the total amount of self-help, both earnings and loans, over the four-year period and avoids giving grants to students with relatively small need. Ideally, it would also give the student free choice between loans and job in meeting the self-help expectation. In Examples 1-3, the amounts of expected earnings and loans are constant for all students in all classes except the senior class (unless, of course, there are individual reasons why the student cannot earn or borrow). A student with no parental contribution, for example, would receive a grant of $2,500 his first year instead of the $1,500 given the student with $1,000 in parental contribution.

Many institutions would claim that they have insufficient grant funds to provide the dollar amounts shown in the illustration. This is undoubtedly true in many cases, but the principle could be maintained simply by adjusting the amounts of earnings and loans expected before eligibility for a grant is reached. Moreover, many institutions are now spending large sums of money for scholarships to students with relatively small financial need, funds that could be used to aid the neediest and youngest students if the institution chose.

### Constraints and Uncertainties

Given agreement on the objectives of financial aid, there are still constraints under which institutions must operate. One involves the amount and mix of available financial aid, and another involves uncertainties about both financial need and financial aid resources.

The amount of financial aid available varies greatly from one institution to another. In general, public institutions have fewer funds and generally have a smaller proportion in the form of grants, though all students receive a public subsidy. Hence, their strategy must be quite different from that of private institutions where available aid funds, and student costs, are generally much greater.

The uncertainties in financial aid funding are also great. First, it is difficult to estimate the amount of student financial need. Summer earnings that count as part of the student-family contribution may not materialize because of a depressed labor market, as was true in 1970. Thus, the amount of financial aid needed may be quite different in September than it was thought to be in the spring when many financial aid allocations are made. There is additional uncertainty about parental incomes and the amount parents should be expected to contribute. While the Parents' Confidential Statement provides an indication of recent income flows, subsequent layoffs and other unfore-

ERIC Full Text Provided by ERIC

seen events may drastically change a family's economic position. This, too, makes the estimation of financial need difficult and requires planning to assure that reserves are available.

The amount of financial aid funds available for distribution to students is also uncertain. Earnings from endowments vary from year to year and are especially sensitive to stock-market fluctuations. State appropriations for financial aid frequently are not made until late in the year, thereby making difficult the allocation of sufficient funds. Federal monies, likewise, have often been appropriated very late in the year thus preventing their wisest allocation. Finally, frequently ill-timed increases in tuition rates coming late in the year have also required drastic readjustments in financial aid allocations.

Yet another constraint concerns the amount of self-help that is reasonable and desirable. While a certain minimum of loan or employment will serve to stretch gift aid and may foster a student's sense of investment in himself, too much work may interfere with his academic progress and too much borrowing may prove to be an even more intolerable burden at a later time.

In conclusion, there are numerous constraints and uncertainties that must be recognized and allowed for in designing any packaging proposal that will be consistent with an institution's financial aid objectives. These conditions, however, must not prevent institutions from using creativity and ingenuity in packaging financial aid in a manner that will implement societal, individual, and institutional objectives.

**Recommendations**

*With reference to the packaging of student financial aid, the Panel recommends that:*

*Institutions and agencies administering financial aid define and make known their student aid objectives and establish guidelines before developing patterns of packaging financial aid resources.*

*Institutions and agencies administering financial aid be strongly encouraged to combine the various available resources—including parental contribution, student summer and term-time earnings, student assets, long-term loans, scholarships, and grants—in such a manner as to direct available scholarships and grants to those students with the greatest financial need and those at the earlier stages of their undergraduate experience.*

*Financial aid for students whose aid is not now based on financial need (such as athletes, band members, and other service awardees) be*

e: 1:22-cv-00125 Document #: 864-45 Filed: 05/07/25 Page 97 of 144 PageID #:34



*guided by the need principles applicable to other students. The Panel recognizes that such activities effectively limit the portion of the financial aid package that may be met through employment, and that a larger-than-average proportion of such aid may consist of grant funds.*

*Students be given free choice, wherever possible, between long-term loans and jobs in meeting the self-help component of their financial aid package.*

*The* CSS *consider incorporating a recommended financial aid package in the Financial Need Analysis Report.*

*Aid-granting institutions and agencies share information with families and students regarding the expected amount of family contribution.*

## Summary and Recommendations

The Panel on Student Financial Need Analysis was appointed by the College Scholarship Service to "review, within the current frame of reference of parental responsibility, the present CSS system and submit . . . both evaluations of the present system and recommendations for changes which might make the system more definitive and comprehensive." It met five times between April 1969 and February 1971 and was assisted by several subcommittees on topics of particular concern. It was also assisted by a number of special consultants and by staff members of the College Scholarship Service and the College Entrance Examination Board.

One of the major reasons for the establishment of the College Scholarship Service in 1954 was to bring order out of a chaotic and confused situation. Colleges were often using limited aid funds indiscriminately to secure for institutional purposes the most capable students in a market of scarcity.

The CSS developed objectives and procedures of financial aid administration that permitted colleges to allocate their student aid funds more economically, to increase opportunity, and to serve students more effectively. The procedures were designed so that ambitious and talented students could obtain a college education without regard to family financial circumstances, and to end the practice of awarding scholarships as prizes.

In the ensuing years, changes have occurred in the broad social aspirations and hopes for higher education. Initially, the intent was to lower or remove financial barriers facing ambitious and talented students who wanted to enter college. It is general public policy now to assure the maximum opportunity for enrollment in postsecondary educational institutions. It has become increasingly apparent that to achieve the goal of expanding access to higher education requires special attention to identifying, encouraging, and financing students from disadvantaged backgrounds. It is also apparent that most student aid funds now come from public rather than private sources.

The member institutions of the CSS Assembly, and the College Board, in recognition of the problems facing higher education in the seventies, adopted in 1970 the revised statement of "Principles of Student Financial Aid Administration" (see pages 12-14). All individuals, institutions, and organizations interested in student financial assistance are urged to join in accepting these principles as important goals and in helping in their implementation.



ERIC Full Text Provided by ERIC

### College Admissions and Financial Aid Policies as Revealed by Institutional Practices

In the special study of "College Admissions and Financial Aid Policies as Revealed by Institutional Practices" (see pages 15-35) it was found that types of aid at institutions were influenced by a number of factors. Among them were an increase in the importance of gift aid at institutions with higher average student ability, a decline in the importance of gift aid as average parental assets increased, and a substitution of job aid for gift aid at private institutions. Regional variations in aid packaging were also in evidence. Those institutions in the sample from the South, Southwest, and West had larger gift aid programs, those in the Midwest larger job programs, and those in the East larger loan programs.

The admission-aid process was considered in three categories: admission, determination of the amount of aid awarded students who received aid, and determination of the grant component of the package. It was found that in about half the institutions, large financial need significantly reduced the probability of acceptance of nonminority students, even when quantifiable indicators of ability were used as controls. It was also found that the higher the financial need calculated by each institution, the smaller the proportion that was met by the total package of institutional and outside aid. It was further discovered that, while packaging practices varied considerably, high ability was often associated with a higher grant component.

From the consistent result that greater financial need is associated with lowered probability of admission, it is clear that (1) colleges are limiting the demand on their meager financial aid resources by not admitting some needy students who otherwise would be admissible, or that (2) financial need is a proxy for other characteristics such as a parent not being an alumnus, or being a public school graduate, or (at public colleges) being an out-of-state resident. In either case, the effect is to make it more difficult for low-income students to be admitted to college.

The colleges and universities were also requested to report the CSS computation of need, and the extent to which they modified the need analysis in practice. Overall it was found that the institutions had modified the CSS need analysis in 44 percent of the cases. With the exception of the small colleges, which were under-represented, this result was not restricted to one type of institution. Medium-sized colleges reported the smallest number of modifications, and large public institutions made the greatest percentage of adjustments.

The major purpose of the CSS need analysis system is to recommend an amount of aid commensurate with a student's financial need.

*In view of the evidence that colleges frequently deviate from CSS principles, the Panel recommends most emphatically that:*

*1. An institution's aid resources be utilized to the maximum benefit by limiting aid to the amount of need; and by allocating funds, particularly grants, to assure equal access to educational opportunity to students with the greatest financial need.*

Prompting this recommendation are the study's findings revealing that the students most likely to be excluded from higher education by insufficient financial aid are those with the highest need. Students from low-income families are also the students who without question seem to fare the worst through the system currently operating. At each step of the admission-aid process, the high-need student does not receive aid up to the need level established by College Scholarship Service norms.

The CSS has had commendable success in leading colleges toward aid policies that reflect student and national priorities. Further improvement seems indicated, however, by the distance yet to go. There are some possible interim approaches that could improve the effective utilization of currently available financial aid resources. One would be the calculation by the CSS of a suggested grant award amount as well as the computation of overall financial need. This in substance is suggested in "The Packaging of Financial Aid," pages 77-86.[1]

Another approach might be to provide parents a copy of a modified version of the Financial Need Analysis Report. This was suggested by students in the study of student opinion, reported in "Financial Aid Attitudes and Concerns of Users" (pages 37-40) and the Appendix. It would have to be explained to aid applicants and their parents on a modified FNAR that institutional financial aid budgets are often inadequate and therefore actual grants are likely to be below the recommended amounts.

Such an approach would make it difficult for institutions to sustain the observed practice of providing disproportionate aid packages and larger grants to students of higher measured ability. It would also be more difficult for aid officers to sustain the current practice of meeting a smaller proportion of calculated need when the need is larger,

1. Economists and some other members of the Panel urged a related reexamination of tuition policies and their implications with respect to aid resources and need criteria.

ERIC Full Text Provided by ERIC

e: 1:22-cv-00125 Document #: 864-45 Filed: 05/07/25 Page 101 of 144 PageID #:34



and it would tend to reduce the use of financial aid in competing for the limited supply of very able students.

*Recognizing that the CSS has no sanctions with which to police adherence to its stated principles, the Panel recommends that:*

*2. Member institutions utilize more extensively such procedures as the exchange of information on aid tenders through the use of overlap lists and meetings.*

The results of this study of institutional practices point to the need for continuing investigation of financial aid packaging and improvement in CSS procedures in computing the financial need of students; in addition, it would be desirable for the CSS systematically to collect research studies, reports, articles, and the like which deal with financial aid matters, for use by CSS member institutions in their efforts to solve their problems.

A good part of CSS research in the past appears to have been related to specific problem situations. This approach does not serve continuously and systematically to push forward the body of knowledge about student financial aid.

*The Panel therefore recommends that:*

*3. The CSS establish a standing committee on research, which would meet regularly and encourage, by means of grants or other funding arrangements, scholarly investigation of the major areas of concern.*

**Financial Aid Attitudes and Concerns of Users and Problems of Special Student Populations**

Surveys were made on the attitudes toward financial assistance on the part of representative financial aid officers over the country, and of students at four major universities in the East, Midwest, and South. This section of the report deals with the results of these surveys, and with special problems that are found in meeting the financial aid needs of self-supporting students and of graduate and professional students.

*Attitudes of financial aid officers.* The Panel surveyed the reactions of 34 representative financial aid officers to the CSS need analysis system. Included also were five officials responsible for federal and state aid programs, one talent search director, and one high school guidance officer.

The most significant finding was that a substantial majority of the financial aid officers in the survey endorsed the rationale of the CSS

ERIC Full Text Provided by ERIC

need analysis system as still very appropriate. Even those who suggested alternatives to the system did not advocate its immediate abandonment, but rather a gradual move away from viewing parents as the primary source for the payment of college expenses. While it was quite clear that these users accept the rationale, 41 percent of the respondents believed that low-income and minority families were not being served properly by the system. Almost as many reported dissatisfaction with the way in which assets were treated, although there was no consensus on how the present procedures might be improved. Many of the respondents believed that the system is a viable one and could be modified, where needed, through their efforts.

*Financial aid attitudes and concerns of students.* The Panel appointed a Committee on Student Attitudes and Concerns toward Financial Aid, with the request that it study representative student opinion on financial aid and report its findings to the Panel. The full report of that study is included in the Appendix.

The study was based on a questionnaire survey and depth interviews on four university campuses. Students surveyed were dissatisfied with the present administration of financial aid, and they believed it can and must be significantly improved. Their views ranged from a call for better dissemination of information, to a reorientation in the criteria used for granting and packaging aid, to the creation of mechanisms by which students can actively participate in making those decisions which affect their lives.

Few students were aware that the role of the CSS in the aid system is limited to computing the potential contribution of the applicant's family, and that the final aid decisions are made by the institutions. Most believed that some of the confusion and mystery concerning the administration of aid and the role of the CSS would be eliminated if they and their parents were provided copies of the Financial Need Analysis Report (FNAR), or were advised of the amount of the recommended parental contribution.

The students saw both need and academic ability as the twin pillars of the process of selecting students to receive aid; but it was clear that in their view need should receive top priority in the allocation of the various types of aid. They were generally negative with respect to how aid was packaged, believing that those with the least need tended to receive grants and scholarships, and that those with greatest need were aided through loans and work-study. They also objected to the work-study program as it actually exists and is conducted, although they supported the concept of the program as outlined in the CSS *Man-*

ERIC Full Text Provided by ERIC

se: 1:22-cv-00125 Document #: 864-45 Filed: 05/07/25 Page 103 of 144 PageID #:349



*ual for Financial Aid Officers*, that "jobs must be related to the educational objective of the student."

The majority agreed with the position of the CSS that "parents have an obligation to pay for the education of their children to the extent they are able to do so," but one-third disagreed. These findings, combined with the interviews and responses regarding aid for self-supporting students, revealed a complex set of attitudes held by students concerning independence (financial and otherwise).

Central to independence and growth as critical aspects of the university experience was a concern of students for their role in setting the policies that shape the conditions of their lives. Respondents were asked to indicate the degree to which they felt students should participate in several different decisions relevant to financial aid. It was the usual view that there should be "organized student representation" in the decision-making process.

This exploratory study, in the view of the student committee, was not the appropriate mechanism for probing problem areas in the depth and breadth they warrant. The committee believed that separate studies should be commissioned for those purposes, and consequently, specific solutions were not recommended. However, a number of general recommendations growing out of the survey are included in the committee's report (see Appendix).

*Self-supporting students*. The survey of student opinion, reported in "Financial Aid Attitudes and Concerns of Users" and in the Appendix, revealed a wide range of opinion concerning independence and the sources that should be responsible for providing aid to students. Forced reliance upon their parents, students felt, leads to an undesirable dependency relationship, destructive of their own growth and development as well as their relationship with their families.

Self-supporting students pose special problems with reference to financial aid, such as the definition of types (minors, married students, and those 21 or more years of age) who should and should not receive assistance, and proof of financial independence.[2] What should be the

2. The determination of in-state or out-of-state residency status of self-supporting students for tuition purposes in public colleges can have the effect of providing or withholding financial assistance (tuition subsidy), through the lower charges to residents of a state and higher charges to nonresidents. Only about half the states have rules concerning the classification of self-supporting minors for tuition purposes in public colleges; those that do generally require proof of financial independence. Robert F. Carbone, *Resident or Nonresident*. Denver, Colo.: Education Commission of the States, 1970, pages 21-22.

ERIC Full Text Provided by ERIC

responsibility of institutions to assist such students whose parents cannot contribute to their educational costs, or to assist those with parents who can contribute?

There is justification in aiding self-supporting students who demonstrate need in their own right as independent persons. It would appear to be more equitable, however, to limit grant aid to those who are involuntarily independent because their parents cannot contribute; and to aid voluntarily independent students, or students whose parents would be able to contribute but refuse to do so, through loans and work-study.

It is particularly difficult to ascertain the facts and the bona fide need of students who are voluntarily self-supporting but whose parents could assist if they would. The Panel urges extreme caution in recognizing minors as self-supporting, where parents could contribute. Funds inequitably so distributed to so-called "self-supporting" students would reduce the aid available to students with real need.

*Graduate and professional students.* Graduate and professional schools have generally followed a policy of awarding all grant aid strictly on the basis of ability criteria. In the past two years there has been a considerable shift in sentiment, and need is becoming a more important variable in determining the amount and form of support, especially in several professional fields.

The shift away from merit-based to need-based student aid that has occurred in undergraduate education since the 1950s will have a marked impact on the graduate and professional schools in the 1970s. Historic patterns and different assumptions of parental responsibility, however, are likely to produce a somewhat different development than has occurred at the undergraduate level.

The Panel believes there will be a significant increase in weight given to need factors in the allocation and packaging of student aid at the graduate and professional level over the coming decade. Because the situation is even more complex at the graduate than at the undergraduate level, it is even more important that an agency such as the CSS, with its experience and sophistication, play a leadership role.

Reviewing the emerging needs, the Panel urges that the CSS offer its services as an experienced consultant, aiding in the development of an adequate system (or systems), even if it ultimately is not the agency that collects and processes the FNARs. In the Panel's view of the broad leadership responsibility of the CSS and the College Board, it is even more important to act as a wise catalyst than to seek to be the operational instrument.

Case: 1:22-cv-00125 Document #: 864-45 Filed: 05/07/25 Page 105 of 144 PageID #:34991



*Recommendations.* The following recommendations of the Panel relate to the preceding summary reports of the attitudes and concerns of users of financial aid (institutional aid officers and students); and to the special aid problems posed by self-supporting students and by graduate professional students.

*The Panel recommends that:*

*4. The* CSS *regularly conduct formal surveys, on a sample or regional basis, of the opinions of financial aid officers toward the need analysis system and the other services performed by the* CSS. *The information and views gathered in this way would be most useful to* CSS *staff and committees in their continued effort to improve the system.*

*5. The* CSS *sponsor studies, national in scope, of the attitudes and concerns of students and parents as they relate to student financial assistance.*

*6. The* CSS, *in cooperation with its constituent members, put materials that explain the financial aid system into the hands of school and college counselors; and urge constituent members to plan programs to inform students and parents at the local community level as well as to develop more extensive training programs for aid counselors. The purpose of these steps would be to insure that counselors are well informed regarding the financial aid system and the availability of aid, and to reinforce the importance of interpersonal contacts with those who seek their help.*

*7. The* CSS *urge its members to make their financial aid procedures more flexible with the aim of encouraging students to avail themselves of the services, not just allowing them to do so.*

*8. The* CSS, *in cooperation with its members and students, develop mechanisms that would allow and encourage student participation in the financial aid process at both the* CSS *and institutional levels.*

*9. The* CSS *give further and continuing attention to the special problems related to financial aid for self-supporting students, and develop appropriate policies and procedures for the guidance of aid officers in the member instituutions.*

*10. The* CSS *increase its efforts to help guide the development of need analysis procedures at the graduate and professional level. The Panel urges that the* CSS *appoint to its staff one or more highly competent and well-known persons (perhaps selected from among retiring deans or university presidents) to direct this effort over the next several years.*

*11. The* CSS, *through the efforts previously proposed, supplemented by adequate research and planning, seek to remain in the forefront in the*



ERIC

*current debate over contingent loan plans.*

*12. Grant and loan aid to graduate and professional students be based primarily on need and secondarily on scholarly or professional potential.*

**Adequacy of the CSS Need Analysis System for Low-Income and Minority Students**

Students from low-income and minority families pose unique problems with reference to their need and eligibility for financial aid at most institutions. The adequacy of the CSS system for these student populations is discussed in this section of the report. The Panel concentrated on the question of whether or not the CSS system, designed originally at a time when the primary beneficiaries were lower-middle-class white youth, is adequate in coping (1) with the rising numbers of students from low-income families, and (2) with the rising proportion of students from ethnic minorities.

The broad outlines of the present CSS need analysis system, in the Panel's judgment, are adequate for dealing with low-income students. Youth from poverty families, however, do have special problems; financial aid decisions have a greater impact on initiation and continuation of college work by young people from these families than for the more affluent. The budget problems of low-income students can be accommodated within the existing CSS system given sympathetic financial aid officers, and appropriate income-need curves or special institutional modifications to meet special circumstances.

The Panel gave considerable thought to the possibility of carrying need analysis below the point of zero parental contribution, and possibly recommending modest "negative contributions" from low-income parents. The Panel believes that the idea has much merit, and that public programs should consider contributions to the low-income family as well as to the student. The college or university, however, cannot alone shoulder the broad social responsibility this would entail. The Panel does believe, on the other hand, that a partial movement in this direction can and should be made with regard to summer earnings.

*The Panel therefore recommends that:*

*13. The standard expectation of contribution to college costs from summer earnings be sharply reduced for students from low-income families; and that individual institutions treat sympathetically the situation in which a student from a low-income family cannot find sum-*

Case: 1:22-cv-00125 Document #: 864-45 Filed: 05/07/25 Page 107 of 144 PageID #:349



*mer employment, and seek alternate aid resources.*

The Panel does not wish to recommend that potential summer earnings be ignored for all students, for many middle-income students who could have found positions will choose not to do so, and the Panel believes that such a choice should not reduce the expected parental or self-help contributions.

The present CSS system fails to compensate adequately for subtle but important inequities to minority families in several ways, among them being lifetime income expectations. The adjustments recommended in the section of the report beginning on page 53 and further advocated here, plus additional institutional attention to expenditure differentials, will in the Panel's opinion go a long way toward making more equitable the allocation of existing financial aid.

The problem of restricted access to higher education on the part of ethnic minority youth is obviously much greater than the CSS can hope to resolve. The CSS is in an important position, however, to influence both governmental and institutional policy. The Panel applauds its efforts in the past and urges even more vigorous action in the future.

*The Panel therefore recommends that:*

*14. The* CSS *appoint a permanent high-level commission to review annual progress in the nation's colleges toward accomplishing the goal of equality of access to higher education, and to make proposals to federal, state, and private agencies for expanding educational opportunities.*

### Technical Changes to Improve Equity in Determination of Parental Contributions

This section includes recommendations for improving the procedures used by the CSS in measuring parental resources and determining the rate of parental contribution. The Panel's concern has been with improving the fairness of the present CSS system by achieving greater equity in the required contribution from families with equal resources, and with providing a better basis for applying the widely accepted principle of ability-to-pay in determining the relative contribution expected from families of unequal resources. The objective was perceived as the maximization of equity, subject to some practical constraints.

The Panel explored in depth the use of lifetime earnings estimates in measuring family financial strength and was aware of the inevitable errors that result in predicting the future. The ultimate error to

be minimized, however, is not the error of forecasting as such, but that of being unfair. The "equity error" cannot be avoided by ignoring future prospects and depending exclusively on the more certain data on current income and assets. Use of estimates of expected lifetime earnings will, on the average, result in more accurate assessments of relative financial capability and hence substantially greater equity.

*The Panel therefore recommends that:*

*15.* CSS *procedures for determining parental ability to contribute to educational costs of offspring be modified to incorporate estimates of the future earnings and living costs of the family. The present method of treating assets should also be modified accordingly.*

Before detailed procedures to implement this recommendation are developed, alternative techniques and sources of data ought to be studied in depth. The Panel's investigations suggest, however, that a Present-Value-Total-Resources (PVTR) approach is most promising.

*The Panel therefore further recommends that:*

*16. The* CSS *give careful consideration to, and thoroughly explore, a Present-Value-Total-Resources approach to determining parental ability to contribute to college costs for offspring.*

The major steps required by this approach are outlined in this section, and examples are given to show how it would compare with the present CSS system in its treatment of specific family situations. The Panel believes that the PVTR approach is the most helpful way to proceed in integrating future prospects into current measures of ability-to-pay.

A significant differential in the ratios of present value of expected lifetime earnings to current earnings is the consistently lower ratio for nonwhites at all age and educational levels. Were no adjustment made for these differentials, white and nonwhite parents of equal current income would be considered of equal financial ability, whereas actually the nonwhite parent has significantly lower expected future earnings.

*In view of the apparent importance of these white-nonwhite differentials, the Panel recommends that:*

*17. The* CSS *take the necessary steps to obtain and use information concerning the racial identification of applicants for student aid.*

It is generally agreed that families with equal ability should con-

tribute equal amounts to the payment of college costs. There is also consensus that families of greater ability should contribute at a higher percentage rate than families of lesser ability. The Panel believes that the rate structure should be so formulated that it is effective in real terms, necessitating no adjustment when inflationary changes in income and prices occur. The present CSS system cannot accomplish this; as inflation has progressed in recent years, it has been necessary to introduce changes in the contribution tables.

A contribution rate schedule can be formulated simply that will function properly during inflation. Since the cost of living rises with inflation, the nominal rates to which a family is subjected will remain constant if, and only if, family resources expand proportionately.

*Therefore, the Panel recommends that:*

*18. The rate schedule be made a function of the ratio of resources to cost of living to avoid adjustment in response to changes in the price level. The schedule should be changed only as a deliberate policy to alter the real progressivity of the system. Automatic adjustments of the cost of living should, of course, be made whenever new data are made available by the Bureau of Labor Statistics. The equity principle underlying this formulation of the rate structure is that all families of equal potential standard of living should contribute an equal percentage of their resources to the payment of college costs.*

*19. The contribution rate schedule be made more progressive than the rates implied by the present CSS contribution tables, although the degree of progressivity of the system is a matter of judgment rather than of technical improvement.*

A suggested structure that conforms to these recommendations, presented in this section, results in requiring a higher contribution than does the present CSS system from families at the upper end of the range of applicants, a lower contribution at the lower end, and a similar contribution from a family near the middle of the range. Greater progressivity could readily be built into the PVTR approach by adjustment of the rate structure. There is nothing to prevent the rates from going negative at levels below the point of zero discretionary resources.

*The Panel therefore recommends that:*

*20. The rate schedule be extended downward to provide for a negative expectation from families with incomes falling below the Bureau of Labor Statistics low budget standard.*

ERIC Full Text Provided by ERIC

Discretionary resources indicate ability to contribute, but not necessarily the ready ability to make cash payments at a particular time. This depends on the liquidity of resources. The expected contribution computed on the basis of a proper measure of resources may therefore exceed a family's available liquid assets. Such a situation ought not to be used, however, as a justification for scaling down the expected contribution. Rather it should be seen as a timing problem, justifying the provision of a loan to cover the excess of the parental contribution over the family's liquid resources.

*Because a satisfactory index of liquidity is needed to determine the eligibility for loans, the Panel recommends that:*

*21. A liquidity index be developed and incorporated into the* CSS *evaluation of family resources. Inadequate liquidity should be the basis for a loan to parents to cover part of the expected contribution, but not a basis for scaling down the contribution.*

The Panel recognizes that to implement this recommendation, a source of loans available to parents, which does not now exist, would have to be developed.

The present CSS system does not include all farm and business assets in net worth. The Panel views this omission of an important component of assets as essentially a liquidity adjustment, which should be handled as discussed above.

*The Panel therefore recommends that:*

*22. The full value of all farm and business assets be included in the measure of net worth.*

The Panel has given special attention to the treatment of life insurance in the measurement of net worth. It is difficult as a practical matter to obtain accurate information on the cash value of life insurance.

*As a possible alternative approach, the Panel recommends that:*

*23. Consideration be given to the integrating of life insurance into total resources by including in the expected future earnings estimates amounts obtained by multiplying the death benefits of the insurance by the probability of dying in each successive year, with an appropriate allowance for premium payments.*

Two important issues arise in the computation of current earnings: the treatment of entrepreneurial earnings, and the treatment of current earnings of the wife. The present value of expected lifetime earn-



ERIC Full Text Provided by ERIC

ings must be estimated from current earnings alone, not from investment income.

*The Panel therefore recommends that:*

*24. Profit from unincorporated enterprise (business or farm), in excess of the amount required to provide a return on invested capital equal to the rate on high-grade corporate bonds, be identified as earnings. If this amount is not at least equal to the wage of an unskilled worker, then such a wage should be used as a basis for estimating the present value of expected lifetime earnings.*

The problem of a wife's earnings takes two interrelated forms: imputation of earnings to a wife not in the labor force, and a deduction for expenses of a wife who is employed. If there were a direct measure of the value of housewife services, this would be a basis for imputing earnings to a wife not in the labor force. Such imputation, however, is not recommended.

A housekeeping deduction *is* in order for the working wife. The Panel believes, however, that the present CSS deduction should be modified.

*The Panel therefore recommends that:*

*25. The working wife deduction be based on some standard rate reflecting the average family costs attributable to earning this outside income (for example, household help, commuting costs, and so forth).*

The current earnings figure should be as representative as possible of the situation of the family relative to other applicants for aid.

*Therefore, the Panel recommends that:*

*26. The current earnings figure in general be an average of three years (the previous and current years, and an estimate of the forthcoming one) unless there is evidence that the average itself includes unusual or nonrecurring earnings experience.*

*The Panel also recommends that:*

*27. In deriving the current earnings figure, the* CSS *impute an income from owner-occupied housing.*

The federal income tax should be directly exploited in eliciting current income information in the interest both of simplification of the task of supplying the information and of improving its accuracy.

*Hence the Panel recommends that:*

*28. For each of the two years to be reported, the family be requested to*

*supply adjusted gross income, separated into wage income (earnings) and property income. To adjusted gross income should be added missing income items such as excluded capital gains and all state and local bond interest.*

A hardship may be considered to arise when parents have more than one child in college simultaneously. This is actually an aspect of the liquidity problem. Present CSS treatment amounts to substantial favoritism to parents with children in college simultaneously; the annual parental contribution based on discretionary income is now the same regardless of the number of children in college at the same time —it is simply divided between or among them. A reasonable reduction in this favoritism can be achieved. A standardized spacing of multiple children can be established as a benchmark.

*The Panel therefore recommends that:*

*29. An appropriate technique be devised to provide for some reduction in the contribution when a second or third child is simultaneously in college, without producing the excessive favoritism now shown to parents of children whose college years overlap.*

The Panel has examined the possibility of incorporating a place-to-place cost-of-living adjustment into the determination of the parental contribution. It is not clear how such differentials ought to influence estimates of the future cost of the moderate living standard.

*In view of this, the Panel recommends that:*

*30. No attempt be made at the present time to incorporate place-to-place differentials in the cost of living into the determination of the parental contribution.*

**The Packaging of Financial Aid**

How can best use be made of an institution's financial aid resources? Three aspects of this question are discussed in this section of the report: the definition of financial aid and the three types of aid—grants, loans, and work; the objectives that institutions are attempting to achieve with financial aid available; and some of the constraints and uncertainties under which educational institutions must operate.

Society has as one of its objectives, in the United States, the education of the maximum number of its citizens to the maximum extent possible for each. It must move toward this goal, however, in a context of distinctly limited resources because of competing demands and other high priorities.

ERIC Full Text Provided by ERIC

Individual students also have objectives related to higher education. They may see higher education as a means of self-fulfillment, but on a more practical level they and their parents see it as a means of achieving social mobility and status in society. They frequently also see themselves as being prevented from fulfilling either objective because of insufficient funds.

Institutions of higher learning also have their own objectives. Great universities need to assure a continuing supply of able students as much as they need to attract the finest faculties to maintain their stature; other universities and colleges also aspire to eminence; and many have as an objective a broader mix of racial groups or economically disadvantaged students.

If resources of money, faculties, and students were plentiful, these several objectives could be easily reconciled. The increasing scarcity of resources in relation to needs, however, coupled with pressures from the various federal student aid programs, have led to near-universal use of some kind of need analysis system in distributing undergraduate student financial aid in the United States. This still leaves several questions unanswered: How is the applicant's need to be met —by grant, loan, or employment? Who gets priority on grants, the most desirable form of aid—those with high academic rank, those who apply first, those with the greatest need, or some other group? Given a number of students each with the same amount of financial need, with what combination of grant-loan-job should the need of each be met?

Answers to some of these questions are suggested in this section, where various approaches to financial aid packaging and their relationships are discussed: the universal GI Bill; first-come first-served; the scholarship-prize; and need-related aid with academic preference, need preference, and threshold preference. These approaches serve societal, individual, and institutional objectives in varying degrees.

Given agreement on the objectives of financial aid, there are still constraints under which institutions must operate. One involves the amount and mix of available financial aid, and another involves uncertainties about both financial need and financial aid resources. The amount of financial aid available varies greatly from one institution to another; it is difficult to estimate the amount of student financial need; and there is additional uncertainty about parental incomes and the amount parents should be expected to contribute. The amount of financial aid funds available for distribution to students is also uncertain. Yet another constraint concerns the amount of self-help that is





ERIC Full Text Provided by ERIC

reasonable and desirable. These constraints and uncertainties, however, must not prevent institutions from using creativity and ingenuity in packaging financial aid in a manner that will implement societal, individual, and institutional objectives.

*With reference to the packaging of student financial aid, the Panel recommends that:*

*31. Institutions and agencies administering financial aid define and make known their student aid objectives and establish guidelines before developing patterns of packaging financial aid resources.*

*32. Institutions and agencies administering financial aid be strongly encouraged to combine the various available resources—including parental contribution, student summer and term-time earnings, student assets, long-term loans, scholarships, and grants—in such a manner as to direct available scholarships and grants to those students with the greatest financial need and those at the earlier stages of their undergraduate experience.*

*33. Financial aid for students whose aid is not now based on financial need (such as athletes, band members, and other service awardees) be guided by the need principles applicable to other students. The Panel recognizes that such activities effectively limit the portion of the financial aid package that may be met through employment, and that a larger-than-average proportion of such aid may consist of grant funds.*

*34. Students be given free choice, wherever possible, between long-term loans and jobs in meeting the self-help component of their financial aid package.*

*35. The CSS consider incorporating a recommended financial aid package in the Financial Need Analysis Report.*

*36. Aid-granting institutions and agencies share information with families and students regarding the expected amount of family contribution.*

**Future Prospects**

When the College Scholarship Service was initiated in 1954 most financial aid funds were to be found in the private colleges and universities, and the picture was dominated by the several-score best-endowed institutions. While institutional policies and procedures will remain important in the future as means of accomplishing local ends, the focuses of national student aid policy will likely shift to public institutions and agencies. This raises major questions for the CSS concerning its future role.

Case: 1:22-cv-00125 Document #: 864-45 Filed: 05/07/25 Page 115 of 144 PageID #:350



As federal and state programs become more significant, should the CSS view its position primarily as serving the needs of individual institutions in a manner that complements basic state and national programs? If this question is answered affirmatively, should the CSS think of independent institutions as its primary constituency, recognizing that various state systems may be under local pressures to use other means of determining aid eligibility? This would be an important and responsible role for the CSS to play, but one of declining relative importance over the coming 15 years.

Alternatively the CSS might more actively seek to have a major leadership role on the national scene, adapting its policies and procedures to fit the changing federal and state presence. In this posture it probably would have to give federal and state agencies an official voice in the determination of policy, and it would perforce become less of a constituency organization.

In recent years the CSS has straddled this course, shifting modestly (and informally) toward the latter position. The Panel sees this as the single most important policy issue the CSS will face over the coming decade, and one whose consideration could too easily be postponed until the options are foreclosed. The CSS has traditionally been a service organization for its members, working to create an environment of equitable competition based on common standards while institutions pursued their self-determined educational objectives. The Panel believes that increasingly the CSS, if it is to be a leadership organization, will have to cast itself in the role of a major shaper of national objectives and attempt to influence institutional behavior in the pursuit of those objectives. The Panel urges that the issues be clearly faced in the next year or two before the initiative is lost to some other organization, public or private, that may not be as sensitive to institutional concerns.

One consequence of the dramatic change in the past 15 years in the social climate in which higher education exists has been the quiet revolution that has made financial need, rather than academic merit, almost the sole determinant of undergraduate financial aid. The Panel believes that the same changes will take place at the graduate and advanced professional levels in the next few years. Another consequence is the participatory role of students in the governance of colleges and universities. In few institutions have students yet played much of a role, however, in the determination of financial aid policy. This will change in the near future.

The CSS has greatly influenced changes in student aid in the past.



ERIC
Full Text Provided by ERIC

With the assistance of the financial aid community and others it can, indeed must, continue to do so in the future. As a nation we have yet to make equality of educational opportunity a reality. Despite the vast resources committed to the support of higher education, we fail by a substantial margin. As this report makes abundantly clear, need as a primary determinant of student aid is still a distant goal.

The greatest contribution that the CSS can make in the next 15 years is to speed the time when equality of access to educational opportunity becomes a reality. The Panel hopes that this report, and the 36 recommendations set forth in it, will be of direct assistance in achieving this important goal. As a public service organization the CSS has an obligation to act boldly. The Panel believes that it has both the will and the capacity to do so.

ERIC Full Text Provided by ERIC

# Appendix. How Students See It

*Report of the Committee on*
*Student Attitudes and Concerns toward Student Aid*

*September 9, 1970*

*Submitted to the*
*Panel on Student Financial Need Analysis*
*of the College Scholarship Service*

## Preface

This study grew out of the desire of the members of the Panel on Student Financial Need Analysis to include in their deliberations the perceptions and ideas of students. In the short space of three months, this committee, relying upon the sincerity and intellectual quality of the students' responses, has attempted to provide the Panel with student perspectives on aspects of the financial aid system.

Because the time was limited and the possible areas for exploration were numerous, the committee has purposely emphasized in this report some of the more serious concerns exhibited by the students who participated in the study. Many aspects of the system have been excluded, not because the committee deemed them unimportant, but because the number of areas that could be covered was necessarily limited.

This study concerned student perceptions only, and therefore this report does not purport to present a balanced account of the financial aid system. While one might disagree about the validity of some or all of these perceptions, it must be recognized that valid or not, this is the base from which many students operate. As Robert M. McIver, the renowned sociologist, has pointed out, perceptions can be very real in their social consequences.

Final responsibility for this report lies primarily with Morris J. Blachman, Chairman of the Committee (New York University) and secondarily with Steven London (Rutgers University). Jane Klare (New York University) and Ronald Hellman (New York University) both provided ideas and some of the written materials upon which the report is based. Roosevelt Randolph (University of North Carolina) and Sharon Pero (University of Wisconsin) were most helpful in all stages of the project and particularly in administering the survey and the interview. Finally, James Holzhauer (New York University) pro-

vided that most critical element, the computer printout of the survey data.

Special thanks go also to the Center for International Studies of New York University for allowing the committee to make use of their facilities, and to the staff at the Center and the staff in the Chancellor's Office at New York University for their kind help at critical periods during the project.

## Introduction

Alexander Heard, chancellor of Vanderbilt University and special adviser to President Nixon on student unrest, recently characterized student feelings as follows: "The student revolt may seem baffling and chaotic to outsiders but underneath it is a *deep moral commitment*, a *seriousness of purpose*, to eliminate what the students *genuinely* believe to be the weaknesses of American society. . . ." (*New York Times*, July 4, 1970. Emphasis added)

According to a recent poll of 7,300 students on nearly 200 different campuses, conducted by a national magazine:

". . . today's college student emerges as a concerned, reasonable and angry citizen. . . . He refuses to believe that he is politically ineffectual or that the only way to restructure the system is to tear it down . . . he is ideologically opposed to violence – whether it takes the form of an Asian war, a campus demonstration or authoritarian repression. But he is dangerously frustrated. . . .

"The overwhelming majority of students (82 percent) believe there are serious deficiencies in the education system that urgently require reform . . . it is almost incredible that their [the students'] sense of isolation and frustration has not led to more extensive violence and bloodshed than it has." (*Playboy*, September 1970)

Such is the variety of discontents against which any serious consideration of student views and concerns today must be weighed. As a general rule, students are dissatisfied with the present financial aid system; they believe it can and must be significantly improved. Whatever efforts are made to reform or reconstruct the system must take into account the perceptions and experiences of the students themselves. Students must be among the architects and builders of the plans and programs for the future.

In the summer of 1970, the Committee on Student Attitudes and Concerns toward Student Aid attempted to elicit some notion of the concerns and attitudes of students toward the workings and problems of the financial aid system. The committee's efforts were exploratory

Case: 1:22-cv-00125 Document #: 864-45 Filed: 05/07/25 Page 119 of 144 PageID #:35005



in nature, and this report is meant only to suggest areas in which students have manifested serious doubts about the continued viability of the system. These views range from a call for the better dissemination of information, to a reorientation in the criteria used for granting and packaging awards, to the creation of mechanisms by which students can actively participate in making those decisions which affect their lives.

The committee relied on two major sources for its information: a survey (the questionnaire used is reproduced on pages 127-133) of approximately 125 students in each of four universities—University of North Carolina, New York University, Rutgers University, and University of Wisconsin; and 55 depth interviews with students, also conducted on the same four campuses. The interviews were designed to illuminate more fully some of the subjects covered by the questionnaire.

**The Information Void**

In response to the question, "How well do you know the purpose of the College Scholarship Service and the process by which it determines financial need?" 31 percent of the students said they had "no real idea" and another 29 percent said they had only a "vague idea." Knowledge of the CSS and of the workings of the financial aid system seems to be lacking not only among students but among counselors of students as well, particularly at the high school level.

Some of the students' personal comments were illuminating:

"My high school did very little in aiding me to find out about financial aid. Perhaps they could have given us some brochures on types of scholarships and financial aid available."

"They didn't tell me anything. They were very uninformed. The university did even less."

"[The counselors were] very nice, but [there was a] tremendous lack of knowledge on their part."

"My guidance counselor didn't ever explain anything to me about financial need. I don't know if it was apathy . . . or what."

"The information thing is always fouled up. People are never explicit and things are never explained by anyone. In high school the whole process of getting financial aid is very mysterious."

When asked to evaluate the help they received in high school, 32 percent of those responding reported that the information and materials were "not very helpful," another 45 percent said they were "all right," while only 24 percent thought the materials were "helpful."

ERIC Full Text Provided by ERIC

Responses concerning the university level were only slightly more encouraging: 37 percent felt that the materials were "helpful," while 48 percent indicated they were "all right" and 15 percent checked "not very helpful."

The implications of this lack of information are obvious. Students who do not know what possibilities exist and therefore need the help of competent counselors often cannot go elsewhere for help simply because they do not know where to go or what they need to know. The result may be that the student either doesn't go to any college, or applies only to colleges within his financial range:

"A lot of people are afraid to apply to a school out of their parents' financial means, when they could go to that school if they knew how to get money."

Or in some cases, the student may be advised not to apply to certain schools, perhaps, because the counselor is unaware of the possibilities for funding:

"In the end [my high school adviser] advised me not to go to school partially because of my family's low income and my not-better-than-average high school grades. However, I attended school anyway . . . with the help of a loan."

An even more serious problem, however, is the degree to which low-income families may be indirectly affected by the information barrier. During the interviews, some pointed out that students from low-income families need to know early in their high school years that there is a possibility they might be able to go to college. ("Kids who are going to vocational school because they don't have funds to go to college might reconsider.") If they don't realize that the opportunity exists, they may orient their studies away from college preparatory subjects. The effect might be to deny them entrance to college even though money might be available, because they would be unprepared intellectually.

Among the suggestions made to improve this state of affairs were the following:

CSS and financial aid office personnel should visit high schools, speak in assembly programs, offer special information sessions at night to members of the community, and make materials available for distribution in the school and in the community.

The CSS should make extensive use of the media to point out to the public the kinds of financial aid that exist and the means by which one can apply for them.

The CSS, in cooperation with universities, should employ students

Case: 1:22-cv-00125 Document #: 864-45 Filed: 05/07/25 Page 121 of 144 PageID #:35



on work-study programs to visit high schools and other gathering places of students. It would be their responsibility to talk with students (or potential students) about the possibilities of financial assistance, the processes by which funds are allocated, and the procedures to follow in applying for admission to college and for financial aid.

The problem of an information void also applies to the process by which institutions determine need and allocate funds. One student stated that she could not possibly begin to comment on ways for improving the system because she did not know "what went on behind the closed doors":

"Let us kids know what's going on. Nobody knows who gives aid or where it comes from. A group of men in mysterious places hand out the aid now. This image has to be changed."

This lack of information may also be contributing to a trust gap. Only 22 percent of the students believed other students' financial need had been fairly determined, 27 percent took a noncommittal position, and 40 percent indicated that they thought it was unfair.

Few students seem to know that the role of the CSS in the aid system is limited to computing the potential contribution of the applicant's family, and that the institutions make all the final decisions regarding whom to aid, how much, and with what kind of financial aid package.

One way to eliminate some of the confusion and mystery concerning the role of the CSS would be to follow the recommendation of the students, 84 percent of whom believed that they should receive a copy of the Financial Need Analysis Report (FNAR); 77 percent felt that a copy should also be sent to their parents.

In addition to the actual information made available to students and society at large, the quality of personal contacts between the counselor or the financial aid officer and the person seeking aid may have a significant impact on the student's future. Of the respondents, 14 percent claimed that their personal contacts with high school counselors were "unpleasant" and 17 percent said the same for their university experience. When 1 out of every 6 or 7 students feels that his contacts with financial aid personnel are "unpleasant," the situation requires serious attention no matter who is at fault. It is these "bad" experiences that help create and perpetuate the myths and realities of the "cold, arrogant, pompous, insensitive, and sadistic financial aid officers." The combination of myth and experience may lead to an attitude on the part of students and aid officers that severely hinders, if

not precludes, a helpful relationship. As one student said: "I see the financial aid officer as the enemy. He has the money and I have to get it from him. I am defensive before the interview. The interview turns out to be an interrogation for the student. I imagine him as an ogre and I'm always afraid of him."

A more typical experience was expressed by a student who is a junior: "My high school counselor . . . didn't even want me to attend this school. I wrote to this [school myself] for information concerning financial aid."

Of those who have applied for aid, 30 percent believed that parents tend to underestimate their income and assets on the Parents' Confidential Statement ("Figures on the PCS are often fudged—people try to outthink the CSS"), 28 percent thought they were accurate, and only 6 percent said they thought they overestimated. Fifty-six percent felt that their parents were "concerned about the effect of their responses on the amount of aid awarded."

While 36 percent believed their parents felt that the PCS was a "reasonable form to complete," 29 percent were "suspicious as to how the information might be used" and 21 percent felt the form was an affront to their pride.

**Who Gets What—How and Why?**

One of the thorniest problems of the financial aid process is the setting of criteria for awarding funds. The basic stance of the CSS is that the determination of awards should be based on financial need—defined as student's cost minus the ability of the family to pay. This stance is not binding on constituent member institutions. In fact, the CSS goes to great pains in its *Manual for Financial Aid Officers* to point out that "*a system of need analysis must always be a guide for judgment, not a substitute.*" Sometimes the criteria are established by the source of the funds as, for example, in the National Defense Student Loan Program, where "priority . . . is given to the 'superior student.'" Need and merit have for some time been the dual mainstays as criteria for making awards.

Students were sharply divided in selecting between need and merit in their responses on the questionnaire. They were asked to indicate in rank order which criteria should be used for making awards. In the first of two situations where need and merit were both possible choices, 50 percent ranked merit as first priority, while 44 percent ranked need first; 25 percent ranked merit second and need was ranked second by 25 percent. In the second situation, 49 percent

ERIC Full Text Provided by ERIC

Case: 1:22-cv-00125 Document #: 864-45 Filed: 05/07/25 Page 123 of 144 PageID #:35009



ranked merit first and 42 percent ranked need first, while merit was ranked second by 20.5 percent and need was ranked second by 28 percent.

Other criteria that students indicated should be considered were social priorities (for example, members of underprivileged groups or special skill groups), alternatives (for example, knowledge that the student has been accepted and offered aid at another school), motivation, educational goals, and emotional stability. Of these only social priorities with a high of 16 percent and alternatives with a high of 19 percent received more than 1.2 percent first-rank votes in any of the four situations set forth in the questionnaire. What is most interesting, however, is the difference in rankings when the question shifted to the criteria for packaging of awards: 55 percent ranked need first, compared to 38 percent who gave merit the top spot.

The students surveyed see need and merit as the twin pillars of the process of selecting students to receive aid. But once that decision has been made, it is to need that most turn as the basis for allocating the various types of funds—grant, loan, work-study. At least part of the explanation for the tension between need and merit and for the endorsement of need in packaging can be found in the interviews.

In reading through the interviews, one is struck by the almost casual manner with which virtually every student interviewed said that need should receive top priority. At first this would seem to be in conflict with the divided responses on the questionnaire. Why should need be most important? The answer according to one respondent is quite simple: "If you don't have money, then you can't go to school."

A more detailed explanation was elicited from two students:

"There is no need for merit to be considered. If a student has been admitted to a college he should be able to realize his complete potential as a student. Detracting from the needy because someone wants to reward another person is silly. If we had bundles of money, it might be nice to reward students [for merit]. But to do that while detracting from basic need is illogical. It is an unwise policy. It is hypocritical and cruel to deprive one of a better environment to reward another for doing better work."

"It is better to elevate someone whose parents are poor and have never gone to college, than to give someone aid who has come from a middle-class background and college-educated parents, simply because the poor person has limited means of support. Middle-class persons invariably can find means of support outside of the university and do not require scholarships; loans should be given to them."

Why did merit come off so poorly? In large measure this was due to the attitude students exhibited toward the more common indicators of merit such as grade-point average and scores on standardized tests. Some said that using merit as the major criterion was unfair because "merit is the result of students being exposed to a good environment. It's like punishing the underprivileged twice."

Relying on merit as determined by the more standard indicators also might, as one student put it, eliminate "late bloomers, just as I was. If it had not been for the G.I. Bill, I wouldn't have been able to attend school." In addition, people who are particularly well qualified in some areas but not strong overall (more common among less-privileged groups) are likely to be eliminated from the list for awards or placed on the bottom end of it.

Students think more emphasis should be placed on encouraging an overall educational experience that must be evaluated in subtle and complex ways, not by "artificial" standards. Academic gamesmanship can lead to a high grade-point average without commensurate substantive knowledge:

"Grade point is confederate money. . . . There shouldn't be scholarship funds based on grade point. . . . Sure it benefits some people—those who are willing to put up with what is handed out in classes. . . . College, the way it is set up, is a game. You have to be a con artist, a good talker. . . . Rewards for merit are absurd. A man does not merit money for good grades."

Some see the use of merit as actively encouraging students to work for grades rather than knowledge, placing a premium on competition, "gut" courses, and "psyching out" the professor on tests, rather than encouraging personal growth and development. ("All too often, money is used as an incentive to push for higher grades. This should not be the case.")

Despite the overwhelming endorsement of need and the apparent disregard for merit, a careful reading of the interviews reveals that merit is also important to students. They are not unconcerned with quality education; they are concerned, however, with providing opportunities to all to receive a quality education. They feel that merit—defined as a combination of one's capabilities, motivation, and emotional stability—should be used as a criterion for admission, not for awarding aid: "I am assuming that students who apply for financial aid meet the minimum requirements for admission; therefore, no other criterion [beyond need] should be considered."

Once the decision is made to aid a student, the next step is to deter-

Case: 1:22-cv-00125 Document #: 864-45 Filed: 05/07/25 Page 125 of 144 PageID #:35011



mine the aid package. Student views on packaging tend to parallel those regarding awards in general:

"We have a tendency to give loans to low-income students which hurts them more so after school. . . . Give the bright, high-income students the loans, and the poor, deserving low-income students the scholarships."

"Excuse the expression, but I think packaging is prejudiced as hell. All the kids from the big and best high schools receive the scholarship money and the rest of us underprivileged get a chance to pay for an education the rest of our lives. It's just not fair."

"By packaging awards you punish a child who has achieved less by standards, perhaps because of his social background, by asking him to pay society again when society is the one which really caused his problems in the first place."

"Scholarship is very important for encouraging students to strive for excellence in their academic work. Scholarships, however, have a tendency to fall in the hands of one group, the upper class. The reason that this happens is that upper-class families provide the social background necessary for achievement."

Students generally felt that the purpose of financial aid should be to allow students to participate as much as they might desire in the full panoply of the university experience. A meaningful college education is not viewed as simply a course-work degree; rather, it should be a time when the student develops himself emotionally and experientially as well as intellectually. There is no reason why he should not simultaneously be able to be a participant member of the university community and of society:

"The college experience is incomplete without other activities. I place extracurricular activities very high, second of course to scholastic activities. . . . The university should promote an open-minded life style. The university's purpose is to teach one how to think coherently. A well-rounded university experience is essential to producing creativity."

"Financial aid is critical to school activity patterns as only those with no financial aid problems and good grades have the time to participate on campus. [Financial aid problems and the stress on grades] keeps the average student . . . struggling to stay alive all the time."

"Outside the classroom is very important. The university should encourage a kid to move around and try out new experiences open to him, informally and with freedom."

The effect that different forms of aid (for example, a grant *instead*

ERIC Full Text Provided by ERIC

of a loan) have on a student's life style can be rather drastic:

"Financial aid generally gives the student a feeling that he is wanted . . . it makes you feel that you deserve to go to college, that you belong here. It's given me more free time. If I [had to take a job], I couldn't have devoted time to personal desires. . . . I would have been just hanging in there. . . . Under these conditions, college becomes a grind."

"Since I received the scholarship, I have had time to develop myself in terms of my own personal interests. . . . [Loans] change the way one thinks about his career. Setting career goals may be hindered. . . . The responsibility of paying back the money would be constantly on the student's mind in college. It would have an adverse effect."

In the questionnaire sample, 84.5 percent said that "one of the more important goals of American society should be to insure that every American receives a college education if he or she wants one." Likewise, 91 percent indicated that the decision to accept or reject a student's application to college should be made without regard to his financial status.

These responses like many others in the questionnaire are indicative of a heightened social concern exhibited by students. They feel strongly that members of the society should be given the opportunity to develop themselves with a college education and that those who have been excluded, in whole or in part, from society's rewards should be given the opportunity to partake of the country's abundance. This can be best accomplished, according to the students, by aiding those who are most needy. Interviews where feasible should be used to assess students on an individual basis. Both personal and social circumstances should be taken into account:

"It's a fact that blacks can't get as high paying jobs as whites when they get out of college. So [the black] should get more scholarship aid when he is in school. It will be easier for the white to pay it back."

"Minority-group values and life styles force a different consideration of what can be accomplished on a given income. Thus, what a standard family should be able to do on a given income may not be true for them."

Loans may be a very valuable opportunity for many people: "without a loan there were a lot of problems, but with the loan I could devote more time to being a student." On the other hand, loans also create some hardship.

"Lower-income families may become discouraged when they have to borrow large sums of money for educational purposes."

Case: 1:22-cv-00125 Document #: 864-45 Filed: 05/07/25 Page 127 of 144 PageID #:35013



"Loans take you away [from the university community] just by creating anxiety about the future or career choice."

"It [packaging] is a policy of this nature that forced me out of school after the first year. If I had received some scholarship money my parents wouldn't have worried so much about me borrowing what they considered a large sum of money."

Another aspect of loans mentioned by the students was the enormous range of types of loans available. Loans under the National Defense Student Loan Program are quite generous in interest rates and repayment schedules when compared to many other loan programs, especially in comparison to commercial loans. Loans, however, can be difficult to get, particularly when a student needs a substantial amount of money.

Students felt there should be an intensive effort to assure that sufficient funds are available at reasonable interest rates and with reasonable repayment schedules, to provide all students with the aid they need to attend college and have a full university experience.

The third element of most packaging plans is work-study or some form of job placement:

"Working takes you out of the [university] community; you need to be here."

"Working seriously limits a student both as a worker, because it's only a part-time involvement, and as a student, because it can't be 'full' full-time participation."

The degree to which an individual can cope with both working and attending school varies from person to person. As was suggested earlier, individuals should be screened to determine how well they can handle work.

Students objected rather strenuously to the whole work-study program as it actually exists and is conducted, although they manifested strong support for the concept of the program as outlined in the CSS *Manual for Financial Aid Officers:* "Jobs provided on campus *must* be related *to the educational objective* of the student. . . ." (emphasis added). All too often the jobs are thought to be dull, tedious, and at best only tenuously related to the student's "educational objective."

A work experience related to a student's personal and educational growth and development could be, as the *Manual* suggests, beneficial "both as a part of his maturation process and as a means of exploring various jobs."

Students also were quite concerned about the ways in which financial assistance might have a restraining effect on their university ex-

perience in general, and on their life style in particular:

"Students are afraid to pursue their political beliefs because of the threat of losing their financial support."

". . . it has limited my participation in political issues."

"Since I am on a rehabilitation scholarship, political participation by me has not been limited. However, I have noticed this fear in some of my friends."

"You don't raise hell on scholarship or loan. My financial situation prohibits me from leaning too far to the left. . . . If I get caught in any kind of disturbance in a demonstration there is a chance that I may . . . lose my money."

The policies for granting financial assistance also may affect the course of a student's development as an independently thinking, feeling, and acting person. Among the respondents, 40 percent received at least half of their income in 1969-70 from their parents, nearly four times as many as are supported by any other single source such as grants, loans, work, spouse, or savings. Although it is not true that financial dependence *necessarily* means emotional dependence, it often ends up that way:

"It is very important to feel emotionally independent of your family. The contrast between home and school is large. When I go home, I have to live in a midway state."

"Emotional detachment from one's parents is one function of college. The student learns to be independent on an everyday level."

Contrary to the image of the student as seeking all opportunities to rebel from, and break all ties with his family, the independent students interviewed believed that self-growth could lead to even better relationships with parents:

"I don't want to be cut loose from my family. I [just] like the freedom to do what I want, and I like not asking permission to do it. Going to school should not hurt the closeness of a family."

"I'm [financially] independent of my family in life style and decisions. But I'm emotionally close with them. My corporate self is independent."

Financial support can be an important vehicle for helping a student develop this independence:

"Financial aid was important because it allowed me to live without a loan from my father. It is important to be economically independent from home. Money is one of the main controls that a parent has over his child. Once freed from potential control the . . . contact with my family is pleasant."

**Who Is Responsible for What?**

The students believe that the ideal situation would be support for all students and thus a fostering of growth and independence. But because funds are limited at present, this situation is impossible to attain. There must therefore be some clear delineation of responsibility for supporting students. The position of the CSS is clear: "Parents have an obligation to pay for the education of their children to the extent they are able to do so."

The majority of students surveyed agreed that this responsibility should, in fact, be borne by the parents, but there was a sizable dissenting minority. Fully 33.5 percent, or 1 out of every 3 students, disagreed with the statement. If the parents shouldn't pay, who should? Survey respondents were also asked how, given the present resources of American society, they would apportion the responsibility for aiding students among the following groups: students themselves, parents, government (state and national), independent public agencies, independent private agencies, and others. Government was saddled with the responsibility for contributing at least 40 percent of the support by 57 percent of the students, while only 23 percent thought that parents should contribute that much. Parents shouldn't have to contribute anything at all was the view of 29 percent of the students, while another 29 percent said that the contribution of parents should be 20 percent of the cost or less. Nine percent felt that they should be responsible for 40 percent of the funding, and 39 percent believed that students should not contribute at all.

These findings, combined with the interviews and responses regarding aid for financially independent students, reveal a complex set of attitudes held by students concerning independence (financial and otherwise) and the sources that should be responsible for providing aid to students. Students tend to feel that it is important to be independent and that sufficient financial aid helps them to be so. Forced reliance upon their parents, they feel, leads to an undesirable dependency relationship which is destructive of their own growth and development, as well as of their relationship to their family. This is particularly evident in students from middle-income families, where the parental contribution sometimes causes family hardship but where income is such that the student does not qualify for financial aid: "[This system] keeps you bound emotionally and financially to [your] parents. It squeezes the middle class who really have to struggle to get the contribution together without the family suffering."

Students in the survey were asked to set the standard for choosing between two financially independent students in a situation of limited funds. One of the hypothetical students was financially independent because his parents were unable to contribute to his support; the other was independent because he chose to be so even though his parents could afford to contribute. Giving priority to the student who had to be independent was favored by 58 percent of the sample; only 2 percent wanted to give greater priority to the student who chose to be independent; and just over 38 percent preferred to "treat both equally and not consider the financial capabilities of the students' parents."

The respondents were sensitive to the dilemma they faced between wanting to encourage independence on the one hand, and on the other wanting to provide the limited funding available to the most needy—thereby fostering further dependence of students upon their parents in middle- and upper-income families:

"I would judge the voluntarily emancipated student favorably, but he would be penalizing the other . . . if he received aid. He must be shown, in this instance, that he is hurting others."

"The university is obligated to help a kid who's conscientiously trying to establish independence from his parents. But this takes money away from those most needy. They should be seen as equals since all have the same need, but I feel guilty about being the one to take money away from the very people I know to be conspicuously absent from the student body."

The major problem is one of trying to find sources of aid that would allow all students the opportunity to go to college. If sufficient funding were provided for all, obviously many of the problems in the financial aid process would be eliminated.

Most students placed the primary responsibility for funding squarely in the hands of the government. Others also favored having the government take the responsibility, but they feared the consequences:

"Despite the dangers, state and federal governments have a real obligation to students. It is not a parental function to pay for education, but a societal function."

"If the government paid for the education then the burden would be taken off the family of the student. All citizens would share equally."

"[I] place the responsibility . . . on society. . . . If parents bore the main responsibility then some income groups' children would have a better chance for advancement. This is exactly the kind of financial system that I detest."

e: 1:22-cv-00125 Document #: 864-45 Filed: 05/07/25 Page 131 of 144 PageID #:35



"All education, basically, should be free. But I'm afraid that government will impose its own criteria. If that's the case, then forget it."

Some wanted responsibility left where it is now, with their parents. One student strongly opposed saddling the government with this burden: "Basically, I am a conformist and I don't think that the payment for education should be forced down the throats of the Federal Government. The government is already doing more than its share in education. Why should the government pay for the education of these long-haired radicals who seek to destroy the educational system?"

**Who Rules?**

Central to the notion that independence and growth are critical aspects of the university experience is a concern of students for their role in setting the policies that shape the conditions of their life.

Respondents were asked to indicate the degree to which they felt students should participate in several different decisions relevant to financial aid. In each case the largest single grouping indicated that there should be "organized student representation on the decision-making body." Student participation in the decision "to accept or reject a student's declaration of financial independence from his parents" was important to 38 percent; 54 percent believed students should participate in establishing "the criteria for awarding financial aid" and in the setting of "basic policies for the CSS." Just under 18 percent believed that a student's budget should be decided entirely by students. They clearly feel they should no longer be denied the right to participate actively and constructively in important decisions of this kind:

"Student nonparticipation is ridiculous and a byproduct of the paternalistic attitude of the student aid structure."

"The student is the one really . . . affected by these bodies. Therefore, students should be allowed to vote and express their opinions."

"Students should be on the board so they can provide their experience or young opinions."

"A voice is worthless, there must be active involvement."

"The administration [is] not in touch to know what's going on and what it takes to live here, what the quality of life is like . . . for a student. But students . . . know what's happening."

Several students, however, voiced concern over the meaning of participation:

"I can't be for student participation basically because I don't think that . . . [it] would have any effect. . . . The administration would only

wind up using the students as token puppets to reiterate decisions they had already made. The students don't have any power whatsoever. . . . If I were a free man . . . perhaps I would be for it."

"The students will probably be selected because they agree with the people in power."

**Who Shall Ascend the Mountain?**

The general orientation of the students toward financial aid seems to stem from broader concerns for social justice. There is a heightened consciousness exhibited by the high percentages of students who consistently took positions aimed at providing a college education to the broadest possible segments of American society. One manifestation of this concern has already been mentioned: the overwhelming response of students (84.5 percent) suggesting that every American should be assured a college education. As one student argued, "The education of the masses should be a government project with the people responsible for allowing everyone a chance to go to school, free of financial obligation."

When students were asked to consider aid for part-time students, 47 percent favored giving them "small amounts of aid as a supplement to their other sources of income." Another 46 percent felt that part-time students "should be awarded financial aid based on the same criteria and in regular competition with full-time students." Only 4 percent claimed they "should not be given financial aid unless all eligible full-time students have been assisted." Similarly, 84 percent endorsed the idea of assisting more students, "providing them with less than the full amount they need," rather than aiding fewer students, "providing them with the full amount they need."

**Who Are These People?**

One of the aims of the student study was to see whether some groups of students were more likely to hold a given set of views concerning the financial aid system than other groups Were upperclassmen more likely than underclassmen, for example, to believe that parents should not assume the primary responsibility for financing their children in college? Not only was the above hypothetical relationship found to be false, but there were no significant relationships between a series of 15 different characteristics (such as school year, sex, major, and political identification) and 11 sets of positions regarding the financial aid system (such as setting the criteria for awards and packaging, and setting priorities for funding different categories of inde-

ERIC Full Text Provided by ERIC

pendent students), as shown by answers to the questionnaire.[1]

The most significant set of differences found was between those who had previously applied for financial aid and those who had not. Most of these were differences in their backgrounds. Parents of students who have not applied for aid tend to be better educated and have larger incomes. The students, themselves, have considerably more assets upon which to draw. These two groups did not exhibit significantly different views concerning financial aid. The major difference was their knowledge of the CSS. Whereas 9 percent of the applicants for aid said they were thoroughly familiar with the CSS, and another 43 percent said they had "a general idea" about the CSS, 42.5 percent of the nonapplicants checked "no real idea" and another 36 percent said they had only a "vague idea."

**Conclusion and Recommendations**

It is typical in reports such as this one to conclude by taking one of two positions: sing the song of impending doom, or praise the forward movement of present efforts to correct the ills uncovered. Neither of these views is appropriate here. The problems and concerns raised by the students in this study are, for the most part, not new, but the fact that they have been raised before in no way reduces their importance.

Aside from a few areas, primarily the issues of parental responsibility and student participation, most of the issues raised by the students and reported above have already been discussed, in terms the student would probably endorse, in the CSS *Manual for Financial Aid Officers*. If the constituent members of the CSS were to adhere to the financial aid policy positions outlined in the *Manual*, many of the difficulties and concerns of the students would, no doubt, be alleviated.

A dominant theme throughout the interviews, for example, was a sense of depersonalization that students experience during the entire financial aid process. The *Manual* deals, in part, with this problem: "Ideally a member of the aid staff will interview each aided student at least once a year in order to explain how the size of the award has been determined and to allow the student to clarify his problem."

Another important statement which gets to the heart of this stu-

1. The characteristics tested correspond to items 1, 3, 5, 10–16, 18, and 27 on the questionnaire. In addition, two composite items were used: one related the student's political identification to his perception of most students, and the other related it to his perception of most Americans. The 11 sets of positions regarding the financial aid system correspond to items 23–29 and 31–34 on the questionnaire.

dent concern is found in the *Manual:* "Thus, financial aid functions are not simply fiscal in character. They involve students in deeply personal ways, touching questions of values, reality, and purpose. Such concerns imply that the institution's financial responsibility to the student is also personal."

Students believe that the relationship between CSS policy statements and college practices is one that demands serious attention. Students fear the creation of a national centralized agency that would make decisions on financial aid; they also believe that the university is not the proper location for this kind of activity. Their fear seems to be far less one of centralization per se, and much more an extrapolation of their experiences at the local (that is, college) level to the national level. One of the students made this point quite clear: "I can't conceive of this being national. Students have enough trouble checking things through at their individual universities."

This exploratory study is not the appropriate mechanism for probing these problem areas with the depth and breadth they warrant. Separate studies should be commissioned for those purposes. Consequently, specific solutions are not being recommended here. Some of the problems are far too complex to begin constructing approaches to solutions without a serious examination and consideration of all the factors involved. Neither the students nor anyone else—specialists in these areas perhaps excepted—should be expected to offer meaningful answers when initially confronted with the problems.

The following are a selected listing of recommendations, which are presented in conjunction with the themes developed in the main body of the report.

*1. The CSS in cooperation with its constituent members should develop materials that would explain the financial aid system; more imaginative means for disseminating the materials should be devised. Efforts should be made to put such materials in the hands of all counselors; programs should be planned to inform students and parents at the local community level; and more extensive training programs for aid counselors should be established to insure that counselors are well informed regarding the financial aid system and the availability of aid, and to instill in them the importance of interpersonal contacts with those who seek their help.*

*2. The CSS should encourage its members to rationalize and make more flexible their financial aid procedures to make the process as simple and as comfortable for the applicants as possible. The aim should be*





ERIC Full Text Provided by ERIC

Case: 1:22-cv-00125 Document #: 864-45 Filed: 05/07/25 Page 135 of 144 PageID #:350



*to encourage students to avail themselves of the services, not just allow them to do so. With reference to flexibility, for example, colleges might reconsider the rigidity with which aid application deadlines are observed. Deadlines should be done away with. Students may believe at the beginning of the year that they can support themselves, but later in the year, for some reason, find that they may not be able to do so. Arbitrary deadlines punish such students.*

*3. The* CSS *should develop means of encouraging the reporting of unique circumstances on the* PCS *(for example, whether or not the income reported is the result of one of the parents working at two jobs).*

*4. The* CSS *should encourage the members of the* CSSA *to follow financial aid policy guidelines more closely. With this in mind, the* CSS *should investigate the possibility of reorganizing the* CSSA *in order to seek greater compliance from its members, and assume a more active leadership role in the financial aid field. (For example, the* CSS *might consider developing studies that would examine the major problems of the system with suggested approaches to solutions. It could also assume the role of a national clearinghouse for information concerning financial aid.)*

*5. The* CSS *should commission studies to seek alternative sources of aid for students. In the immediate future, these might look to promote the development of funds for loans and work-study programs. Their general orientation, however, should be to seek ways to provide sufficient financial assistance for all students. Such studies should not only look for additional sources of aid, they should also seriously question the assumption that the primary responsibility for funding rests with the parents.*

*6. The* CSS*, in cooperation with its members and students, should work to develop mechanisms for allowing and encouraging student participation in the financial aid process. The* CSS *should open its meetings and deliberations to students and should encourage* CSSA *members to do so at the institutional level. The* CSS *should consider encouraging student-sponsored and student-run studies on the more troublesome facets of the aid process—including student participation—as a means of generating information, interest, and imaginative participation among students.*

*7. The* CSS *should encourage its members to recognize that many of the problems in the financial aid process transcend the student aid system itself. They involve broader questions concerning the nature and purposes of education. The allocation of student aid funds would differ if it were the belief that students should be able to partake of a full uni-*

ERIC Full Text Provided by ERIC

*versity experience, rather than that it is sufficient for them only to have the opportunity to attend classes. While the committee recognizes that a study would not resolve these differences, it believes that an effort to clarify the thinking behind these conceptions would be beneficial to all.*

This study of student attitudes must be recognized as very limited in scope. Generalizations from the students surveyed to all students are not in order. In the opinion of the Committee on Student Attitudes and Concerns toward Financial Aid, the insights and possibilities suggested by the data, however, warrant serious consideration for effecting change now, and for further study.

**Methodological Note**

This study was undertaken as an exploratory effort to provide the Panel on Student Financial Need Analysis with some data on student attitudes and concerns regarding financial aid. In order to facilitate this task and to provide as much information as possible, the committee decided to pursue a two-pronged approach consisting of a survey of college summer school students and a series of interviews.

The questionnaire was designed at New York University after consultation with members of the committee. The pretest was conducted in late June 1970, and following a few minor revisions, the questionnaire was sent to the field where it was administered by the committee members to students in their own institution. Introductory and advanced classes in the social sciences, humanities, and the natural and biological sciences were sampled at each of the four universities – University of North Carolina, New York University, Rutgers University, and the University of Wisconsin. Students who had never applied for financial aid were included in the sample in order to provide a more detailed picture of student perceptions and to allow comparison with those who did apply. The completed questionnaires were returned to New York University for key punching, processing, and analysis. A total of 517 questionnaires were returned: 124 from North Carolina, 145 from New York University, 128 from Rutgers, and 120 from Wisconsin.

The survey was supplemented with interviews. The purpose of these was to elicit some insight into the kinds of student concerns, the arguments and data they use to express them, and the recommendations they might suggest. The committee members at each of the four universities interviewed students with an interview schedule designed, after consultation with the committee members, at New York

ERIC Full Text Provided by ERIC

Case: 1:22-cv-00125 Document #: 864-45 Filed: 05/07/25 Page 137 of 144 PageID #:35023



University. Interviewers were selected on a voluntary basis.

The committee members attended an interview training session led by Freida Silvert at New York University during a two-day conference on the project in mid-June. During the summer of 1970, a total of 56 interviews were conducted: 20 at North Carolina, 15 at New York University, 11 at Rutgers, and 10 at Wisconsin. The interviewers submitted a full report on each of the interviews conducted.

135

**Survey Questionnaire**

Committee on Student Attitudes and Concerns toward Financial Aid
Panel on Student Financial Need Analysis
of the College Scholarship Service

Dear Fellow Student,

We are conducting an exploratory study of student attitudes and concerns toward financial aid. This questionnaire is part of a larger effort to review the whole process of financial aid as well as the assumptions upon which the process rests. Our study is being sponsored by a review panel of the College Scholarship Service. Despite the importance of College Scholarship Service activities, few students are familiar with either its goals or practices. This organization was established in 1954 "to help colleges, universities, and scholarship-granting agencies determine the amount of financial assistance a student may need to pursue his college education."

Every applicant for financial aid at any of the nearly 900 member institutions of the College Scholarship Service must submit either a Parents' Confidential Statement or a Student's Confidential Statement (for financially independent students) to the College Scholarship Service. These forms are processed and the College Scholarship Service computes the amount of aid required to allow the student to attend the colleges to which he has applied. The actual determination of awards is made by the individual college using the computations and criteria established by the CSS.

We assure you that your responses will be strictly anonymous. Individual identity is, in fact, not ascertainable, since the questionnaires have not been numbered. We are interested only in aggregate findings and under no circumstances will we report responses on an individual basis.

We hope you will find the questions interesting. Please accept our thanks and sincere appreciation for your cooperation.

1. What year of school will you be entering in the Fall?
   ___freshman (1) ___sophomore (2) ___junior (3) ___senior (4) ___graduated (5) ___other (6)
2. Will you be attending school ___full-time (1) ___part-time? (2)
3. What is your major area of study?
   ___social sciences (1) ___humanities (2) ___biological sciences (3) ___natural sciences (4) ___fine arts (5) ___education (6) ___engineering (7) ___undecided (8) ___other (please (9) specify ______________________________)

ERIC Full Text Provided by ERIC

Case: 1:22-cv-00125 Document #: 864-45 Filed: 05/07/25 Page 139 of 144 PageID #:35025



4. What is your age?
___16 or less (1) ___17 or 18 (2) ___19 or 20 (3) ___21 or 22 (4) ___23 or 24 (5) ___25 or more (6)
5. Sex: ___female (1) ___male (2)
6. In the fall, will you be living in:
___university housing (1) ___your home (2) ___your own room or apartment (3)
___other (please specify ______________________________) (4)
7. What is your marital status?
___single (1) ___living together (2) ___married (3) ___separated (4) ___divorced (5) ___widowed (6)
8. What did you do last summer? (Check the one that best depicts your summer.) ___worked (1) ___attended school (2) ___traveled (3) ___studied on my own (4) ___vacation (5) ___other (6)
9. Do you expect to continue in school and graduate? ___yes (1) ___no (2)
If you answered no, is it primarily because of a lack of funds? ___no (1) ___yes (2)
10. In relation to other students in your major area of study, rank yourself. (Entering freshmen, please respond based on your high school class.)
A. In terms of your estimate of your *formal* standing (professors' evaluations, grade-point average).
___top 20% (1) ___2nd 20% (2) ___3rd 20% (3) ___4th 20% (4) ___5th 20% (5)
B. In terms of your *own* evaluation of your abilities.
___top 20% (1) ___2nd 20% (2) ___3rd 20% (3) ___4th 20% (4) ___5th 20% (5)
11. During the past year, to what extent have you worked on departmental or university-wide activities involving curriculum, student decision-making, and similar issues?
___very much (1) ___moderately (2) ___slightly (3) ___not at all (4)
12. During the past year, to what extent have you worked in political activities related to competition for public office? (primary and election campaigns, etc.)
___very much (1) ___moderately (2) ___slightly (3) ___not at all (4)
13. During the past year, to what extent have you worked in political activity *NOT* directly related to competition for public office? (e.g. civil rights, anti-war, etc.)
___very much (1) ___moderately (2) ___slightly (3) ___not at all (4)
14. What was your parents' education level?

| | *Father* | *Mother* |
|---|---|---|
| Higher degree . . . . . . . . . . . . . . . . . . . . . . . | ___ (1) | ___ (1) |
| Bachelor's degree . . . . . . . . . . . . . . . . . . . . | ___ (2) | ___ (2) |
| Some college . . . . . . . . . . . . . . . . . . . . . . . | ___ (3) | ___ (3) |

| | Father | Mother |
|---|---|---|
| High school graduate . . . . . . . . . . . . . . . . . . | ___ (4) | ___ (4) |
| Some high school. . . . . . . . . . . . . . . . . . . . | ___ (5) | ___ (5) |
| 5 to 8 years elementary school . . . . . . . . . . . . . | ___ (6) | ___ (6) |
| 4th grade or less . . . . . . . . . . . . . . . . . . . | ___ (7) | ___ (7) |

15. About what was your parents' average income for the past three years?
___(1) $4,999 or less ___(2) 5,000-7,499 ___(3) 7,500-9,999 ___(4) 10,000-12,499 ___(5) 12,500-14,999 ___(6) 15,000-19,999 ___(7) 20,000 or more

16. Indicate your sources of income for the school year 1969-1970 by listing the approximate percentage derived from each of the following. (If you are an entering freshman, answer by estimating for the co- ʻng school year 1970-1971, and check here ___.) The total should equal 100%.

_____% Scholarship, fellowship, or grant
_____% Loan
_____% Work-study
_____% Parents
_____% Spouse
_____% Outside work
_____% Savings
_____% GI Bill
_____% Other (please specify) __________

17. Approximately what is the value of your own financial assets (include savings, endowments, trust funds, stocks and bonds)?
___(1) $0 ___(2) 1-499 ___(3) 500-999 ___(4) 1,000-1,499 ___(5) 1,500-1,999 ___(6) 2,000 or more

18. Indicate on the following scale how you see your own political position.
*Left* *Right*
___(1) ___(2) ___(3) ___(4) ___(5) ___(6) ___(7)

19. Indicate on the following scale how you see the political position of most students.
*Left* *Right*
___(1) ___(2) ___(3) ___(4) ___(5) ___(6) ___(7)

20. Indicate on the following scale how you see the political position of most Americans.
*Left* *Right*
___(1) ___(2) ___(3) ___(4) ___(5) ___(6) ___(7)

21. How well do you know the purpose of the College Scholarship Service and the process by which it determines financial need?
___(1) thoroughly familiar ___(2) general idea ___(3) vague idea ___(4) no real idea

22. Have you ever requested any information concerning financial aid or the College Scholarship Service from your high school or college?
___(1) no ___(2) yes. If yes, how satisfied were you with the responses?

*High School:*
Information and materials ___helpful (1) ___all right (2) ___not very helpful (3)
Personal treatment ___very nice (1) ___all right (2) ___unpleasant (3)
*College:*
Information and materials ___helpful (1) ___all right (2) ___not very helpful (3)
Personal treatment ___very nice (1) ___all right (2) ___unpleasant (3)

23. Do you think that one of the more important goals of American society should be to insure that every American receives a college education if he or she wants one? ___yes (1) ___no (2)

24. Students who wish to attend college part-time should
   ___(1) not be given any financial aid unless all eligible full-time students have been funded.
   ___(2) be eligible for small amounts of funding as a supplement to their other sources of income.
   ___(3) be awarded financial aid based on the same criteria and in regular competition with full-time students.

25. A student should not be admitted to college unless he has sufficient financial means to attend (i.e. support from parents, school, work, etc.).
   ___strongly agree (1) ___agree (2) ___disagree (3) ___strongly disagree (4)

26. Some students are financially independent of their parents because their parents do not earn enough to support them. Others are financially independent of their parents because they choose to be so. Given the limited funds available for financial aid, should a financial aid officer
   ___(1) give greater priority to those students who are financially independent because their parents are unable (financially) to contribute to their support.
   ___(2) give greater priority to those students who choose to be financially independent even though their parents could contribute to their support.
   ___(3) treat both equally and not consider the financial capabilities of the students' parents.

27. To what degree do you think the determination of other people's financial need has been fair?
   *Very fair* *Very unfair*
   ___(1) ___(2) ___(3) ___(4) ___(5) ___(6) ___(7)

28. In a situation of limited funds, is it better
   ___(1) to fund less people, providing them with the full amount they need so that they can devote full time to their studies and university activities,
   *OR*
   ___(2) to fund more people, providing them with less than the full amount they need (say $300 less) which they will have to acquire somehow on their own.

ERIC Full Text Provided by ERIC

29. "The purpose of a scholarship or grant is to allow the student financial freedom so that he can devote full time to his studies." Which of the following criteria should be used to determine which students receive grants or scholarships rather than loans and/or jobs? Please rank order your responses. Mark the most important criterion with a one (1). If you think that one or more of the items listed should not be considered, please mark it (them) with a zero (0).
___merit ___financial need ___social priorities (e.g. members of underprivileged groups, special skill groups) ___student's alternatives (e.g. knowledge that student has been accepted and offered funding at another school) ___other (please specify ______________________).

30. After the College Scholarship Service computes a student's financial need, the information is sent only to the schools indicated on the Parents' Confidential Statement (or the Student's Confidential Statement for financially independent students). Do you think the College Scholarship Service's determination should also be sent to
the parents . . . . . . . . . . . . . . . . . . . . . . . . ___yes (1) ___no (2)
the student. . . . . . . . . . . . . . . . . . . . . . . . . ___yes (1) ___no (2)
anyone who requests it . . . . . . . . . . . . . . . . . . . ___yes (1) ___no (2)
other (specify ______________) . . . . . . . . . . . . ___yes (1) ___no (2)

31. The central premise upon which the College Scholarship Service's determination of an applicant's need is that the "parents have an obligation to pay for the education of their children to the extent they are able to do so." Do you agree that this responsibility should be borne by the parents?
___strongly agree (1) ___agree (2) ___disagree (3) ___strongly disagree (4)

32. Given the present resources of American society, how do you think the responsibility for funding students *should* be distributed among the following? The total should equal 100%.
_____% student
_____% parents
_____% government (state or local)
_____% government (federal)
_____% independent public agencies (e.g. National Science Foundation)
_____% independent private agencies (e.g. American Council on Education)
_____% other (please specify ______________________)

33. For each of the following four situations, please indicate which criteria you think should be taken into account by financial aid officers in awarding funds. Please rank order your responses. Mark the most important criterion with a one (1). If you think that one or more of the items listed should not be considered, please mark it (them) with a zero (0).

ERIC Full Text Provided by ERIC

A. Two students of equal financial need apply for aid and sufficient funding exists for only one of them.
__merit __social priorities (e.g. members of underprivileged groups, special skill groups) __student's alternatives (e.g. knowledge that student has been accepted and offered funding at another school) __other (please specify ______)

B. Two students of equal merit apply for aid and sufficient funding exists for only one of them.
__financial need __social priorities __student's alternatives __other (please specify ______)

C. Two students from the same social grouping apply for aid and sufficient funding exists for only one of them.
__merit __financial need __student's alternatives __other (please specify ______)

D. Two students, neither of whom have the possibility of attending any other school, apply for aid and sufficient funding exists for only one of them.
__merit __financial need __social priorities __other (please specify ______)

34. How much of a voice do you think students should have in each of the following five areas? Please choose from among the alternatives listed below: 1. Unorganized individual suggestions. 2. Organized student participation. 3. Organized student representation on the decision-making body. 4. Full determination by students. 5. None.

A. __In their college or university as regards establishing the criteria for awarding financial aid.

B. __In their college or university as regards the decision to accept or reject a student's declaration of financial independence from his parents.

C. __In their college or university as regards the packaging of awards (amount to be given in scholarship or grant, loan, and work-study).

D. __In their college or university as regards the determination of what a student's budget should be.

E. __In the College Scholarship Service as regards the setting of basic policies.

35. Did you claim financial independence from your parents last year?
__yes (1) __no (2). If yes, was your claim accepted by the financial aid office of the school you are regularly attending? __yes (1) __no (2).

36. Have you ever applied for financial aid? __yes (1) __no (2).
*Note:* If you answered no, please skip to question 46.

37. To what degree do you think the determination of your financial need has been fair?

*Very fair* *Very unfair*

__ (1) __ (2) __ (3) __ (4) __ (5) __ (6) __ (7)

38. Did your parents submit a Parents' Confidential Statement (PCS) for the College Scholarship Service (CSS) or did you submit a Student's Confidential Statement (SCS) for the CSS?
___PCS ___SCS ___neither one.
(1) (2) (3)

39. Were you eventually funded at
___all schools to which you applied ___some schools ___none.
(1) (2) (3)

40. Were you funded at your first choice? ___yes ___no.
(1) (2)

41. What kind of funding did you receive in your first funded year?
___all scholarship or grant ___scholarship or grant plus loan ___scholarship or grant plus job ___scholarship or grant plus loan and job ___loan ___loan plus job ___job.
(1) (2) (3) (4) (5) (6) (7)

42. Do you think that in filling out the PCS or SCS, most people's statements of their income and assets are
___overestimated ___accurate ___underestimated ___don't know.
(1) (2) (3) (4)

43. Do you think your parents believe that their PCS will be checked against their federal income tax return? (If you are officially a financially independent student, please answer this question (43) and the next one (44) as if it referred to you and not to your parents.) ___yes ___no ___no idea.
(1) (2) (3)

44. Do you think that in filling out the PCS, your parents (check as many as are applicable):
___feel that the form is an affront to their pride.
(1)
___are concerned about the effect of their responses on the amount of aid awarded.
(2)
___don't have sufficient information to answer all the questions.
(3)
___feel that the form is too difficult to understand.
(4)
___are suspicious as to how the information might be used.
(5)
___feel that it is a reasonable form to complete.
(6)

45. Do you think the student should:
___let his parents fill out the Parents' Confidential Statement (PCS). ___play a minor role in helping to fill out the PCS. ___aid in filling out all or most of the PCS. ___fill out the PCS himself.
(1) (2) (3) (4)

46. To which ethnic group in American society do you consider yourself to belong? ________________________________________.

Thank you very much for your cooperation in filling out this questionnaire.