# EXHIBIT 140

**In the Matter Of:**

*HENRY v*

*BROWN UNIVERSITY*

*MALINA CHANG*

*September 13, 2023*

LEXITAS™

and not an ad hoc way, of looking at a family who did not have any retirement, that might have property, for example, and what we might do to try and treat that family in a similar way, where we actually -- in the formula you do not count retirement assets, and maybe counting some of their assets that are normally counted in the formula but maybe sheltering them, to try to treat our families as equitably as possible.

Q. And do you know if Caltech did come to use that tool?

A. We do not use it consistently. But it is available for appeals, for example.

Q. And when you say -- here is another dense question. When you say appeals, what do you mean?

A. So we review -- if a student -- after we give a financial aid offer, if a student has had a change after we've made the offer, they can contact us and ask for another review

because they've had -- they've had changes.

Or if they tell us, for example, with the sheltering of assets, you know, my mother doesn't -- is not working, she doesn't have any retirement, this house is basically her retirement, then we would take another look. And we could possibly use that tool, for example, to have a robust calculation, not some ad hoc sheltering, but something that we could use consistently with all of our families and not one family treat one way and then treat another family a different way.

Q. During your tenure as director, if you know, what -- what percentage of students tend to file appeals?

A. I don't know the percentage, but not very many. It's not overwhelming.

Q. Test your recollection. Is it closer to 10 percent, 20 percent,

understand the certification of compliance to be?

A. That Caltech was need-blind. You had to be need-blind to be part of 568 or even attend 568 meetings.

Q. And what did you understand need-blind to mean?

A. For me, understanding need-blind is that we do not disadvantage students that cannot pay.

Q. And do you recall when you formed that understanding of need-blind?

A. I was basically trained, when I came into the financial aid office, of that Caltech was need-blind, met full need and did not do legacy. That's sort of the high-level training of who we are at Caltech.

Q. And you recall receiving that training at what period of time?

A. When I -- I mean, it was sort of part of coming into the financial aid office and sort of knowing the high-level information about financial

Q. And further in that e-mail, Ms. Downs-Burns says, "Also, while meeting full need with need-based aid is not a requirement of 568 membership, all of our current members do meet full need with need-based aid."

Do you see that language?

A. Yes.

Q. And do you know when Caltech started meeting full need with need-based aid?

A. As far as I know, Caltech has always been need-blind and full need, meeting full need.

Q. To your understanding, when you joined the school, it -- both were its policies at that point?

A. Yes.

Q. And to your understanding, those policies never changed?

A. Yes.

Q. Do you know if there was anyone at Caltech who participated in any lobbying efforts or renewal efforts

form.

THE WITNESS: It depends.

BY MR. NORMAND:

Q. What does it depend on?

A. The levels of first year versus upper class. There's a difference.

Q. And has that been true throughout your tenure, that there'd be a different approach to packaging for first-years as opposed to upperclass?

A. Yes.

Q. And how does the school decide, if you know, from year to year, how it will approach packaging for that given year?

A. It's been pretty consistent during my time in the financial aid office.

Q. When you say it's been pretty consistent, can you tell me, in general, how the school has approached packaging for first-years?

A. So for first-year students,

they've had similar -- for students who receive loans and work-study, it's been a similar level for -- for a long time.

Q. When you say a similar level, can you tell me what you mean.

A. So that they get the same amount of loan. And that has not changed over many years.

Q. And what is the amount of that loan?

A. $4500.

Q. And do you recall when the school first started using that amount for the loan?

A. I don't recall.

Q. Was it, if you recall, before your tenure at the school began?

A. No. It was during my time there.

Q. Do you recall what the loan amount was before $4500?

A. No, I don't.

Q. And would the loan amount used in Caltech's packaging be reflected

in PowerFAIDS software anywhere?
A. Yes.
Q. Is there a particular part of the software that reflects the packaging approach from year to year?
A. Yes.
Q. What part of the software is that?
A. Packaging.
Q. I guess that makes sense.
Apart from the $4500 loan amount, what is the other component or components of packaging that has been, as you say, at a similar level at the school for some time?
A. The work-study.
Q. And what level has the work-study been at?
A. For incoming students, it's $1350.
Q. And do you recall that the $1350 was sent around the same time as the $4500?
A. I think so.

Q. And do you recall what -- again, do you recall what the $1350 was before it was $1350?

A. No, I do not. It's been $1350 for a long time.

Q. And has there been a time when grants have been part of Caltech's packaging?

A. Grants are always a part of Caltech's packaging.

Q. And have the grants been at a similar level over time?

A. The grants are at the level to meet full need.

Q. So what does that mean?

A. So the packaging order is, you package self-help first, and remaining need is packaged with grant aid.

Q. Are you distinguishing in your answer between grants and loans?

A. I don't understand.

Q. I guess what I'm confused about is whether Caltech's packaging

approach has involved grants, loans, and work-study?

A. Packages always involve grants, loans, self-help, and grants, or they could be just grants.

Q. Has Caltech's packaging involved a $4500 loan?

A. Some packages, yes.

Q. Is there any general statement you can make about which packages have loans as opposed to grants?

MR. KUTCHER: Object to form.

BY MR. NORMAND:

Q. If I'm following your testimony, I may not be.

MR. KUTCHER: I don't think that's her testimony.

MR. NORMAND: Yeah, yeah. That's why I figured you were objecting.

BY MR. NORMAND:

Q. So are there times -- when will there be a loan of $4500 that is

part of the Caltech package?
A. What we call a standard package.
Q. What's a standard package?
A. It's a not-low-income package.
Q. Is there a particular income threshold that divides low income from not-low income?
A. Yes.
Q. What is that amount?
A. $90,000 or below.
Q. And do you recall how long that income amount has been the dividing line?
A. I don't recall. It's been a while.
Q. Do you recall if there was an income threshold before the $90,000 was used?
A. Yes.
Q. And what do you recall that amount being?
A. I think it was around

$65,000.
Q. Do you recall the amount before $65,000?
A. It was a no-loan package.
Q. And are these thresholds reflected in the PowerFAIDS software?
A. Yes.
Q. And when -- since the $90,000 threshold was adopted, when the income falls below that threshold, can you tell me how the packaging works?
A. So the student would get work-study and then grant aid.
Q. And in that instance, how does the school determine the amount of the grant?
A. The remaining need.
Q. And when you say remaining need, what do you mean?
A. So if a student had $1350 of work-study, whatever is remaining in their need, the rest will be filled with grant aid.
Q. And for --

A. So if there is zero, then there is zero. Then total cost of attendance will be filled, work-study, and rest with grant aid.

Q. And for those students with income above the $90,000 threshold, how has packaging worked?

A. That would be a standard package with self-help amounts, work-study, and loan.

Q. And can you tell me what the breakdown in the standard package is?

A. So $1350 for work-study, $4500 loan for incoming students. Upperclass, $2500 work-study, $5500 loan.

Q. I take it you've heard of matching?

A. Yes.

Q. What do you understand matching to be?

A. Schools that will match financial aid offers.

Q. And during your tenure at Caltech, has the school engaged in

just didn't remember when.

Q. Do you recall reviewing it in or around August 2021?

A. I don't know when I reviewed it.

Q. If you look at that Bates page 1846?

A. Yes.

Q. There's a sub-header for "Background." And then there's a sub-header that says "Financial Aid Principles"?

A. Yes.

Q. The first principle listed says, "To the extent they are able, parents and students have the primary responsibility to contribute to educational expenses before an institution awards financial aid."

Do you see that language?

A. Yes.

Q. During your tenure at Caltech, did the school apply that principle?

A. That's a principle of financial aid, so, yes.

Q. When you say it's a principle of financial aid, did you develop any understanding, during your tenure at Caltech, as to that -- as to whether this is how all colleges apply financial aid?

A. When we say it's a principle of financial aid, that that means it's a principle in our profession for everybody.

Q. But do you know if all colleges applied financial aid solely on the basis of this principle?

MR. KUTCHER: Object to the form.

Come on, Ted, all colleges?

MR. NORMAND: To be fair, I've heard the witness say that this is a principle of financial aid, and I'm trying to understand the extent to which you concluded, during your tenure, that all

schools applied financial aid in this way.

THE WITNESS: I didn't make any such conclusions. I didn't really think about it. I just hear it, when you come into financial aid and you're trained, there are a certain set of principles that you're trained by.

And my whole career has been in -- financial aid has been at Caltech. These are the principles we applied at Caltech, and that was also my understanding, that these were the principles of financial aid.

BY MR. NORMAND:

Q. And when you give that testimony, are you distinguishing financial aid from merit aid?

A. So, yes. Need -- again, I've only been at Caltech, which is a school that offers need-based, and it's full need. So my entire -- so when

speaking about financial aid, it is need-based financial aid for me. Because that is the sole experience -- the experience that I have is working at Caltech in financial aid, which is we meet full need, and it's all need-based financial aid, yes.

Q. So if I follow this first principle, you understand to be a general principle of need-based aid; is that fair to say?

A. Yes.

Q. Number 2 on this list of financial aid principles states, "Families should contribute to educational experiences according to their ability. Those with similar financial profiles should contribute similar amounts."

Do you see that language?

A. Yes. That is horizontal equity.

Q. And during your tenure at Caltech, has Caltech applied that

principle?

A. Yes. That's also, again, a principle of financial aid we call the Principles of Needs Analysis.

Q. And you regard this second principle here as a general principle of need-based aid; is that fair to say?

A. Yes.

Q. The third principle listed here says, "Institutions should evaluate both income and assets as part of the assessment of the parents' and applicants' ability to pay."

Do you see that language?

A. Yes.

Q. And you can see where I'm going with these.

Did Caltech apply this principle during your tenure?

A. Yes. And that's also a general principle of needs analysis.

Q. The fourth principle listed here says, "Each institution should inform applicants about the policies and

practices it applies when measuring a family's ability to pay, carry out its policies consistently throughout a student's eligibility, and support the awarding of need-based aid."

Do you see that language?

A. Yes.

Q. Did Caltech apply this principle -- has it applied this principle during your tenure?

A. Yes, it did.

Q. And do you understand this fourth principle to be a general principle of need-based aid?

A. I don't know if it's a general principle but certainly a best practice that is recommended for our field.

Q. The fifth principle listed here says, "An institution that allocates any financial assistance that is not based exclusively on need should inform all prospective applicants of the standards it applies in allocating that

aid."

Do you see that language?

A. Yes.

Q. Do you have an understanding of what that means?

A. Well, Caltech does not have aid that is not need-based, so I can't speak to that.

Q. Did you ever, during your tenure at Caltech, undertake to assess whether other schools were following this fifth principle?

A. I did not.

Q. And then the sixth principle starts out by saying, "The exercise of 'professional judgment' by financial aid officers in assessing a family's ability to pay should recognize unique or extenuating financial circumstances in individual cases."

Do you see that language?

A. Yes.

Q. And did Caltech apply this principle during your tenure?

A. Yes, it did. And that's also another tenet of financial aid for federal methodology, institutional methodology, that professional judgment exists in the world of financial aid for all schools.

Q. You understand the first part of the sixth principle to be a general tenet of need-based aid; is that right?

A. Yes.

MR. NORMAND: So I'm in Manhattan. There is a parade going by me. I don't know if you can hear it, but it's entertaining me.

MR. KUTCHER: We do not hear it, but it's good to know.

MR. NORMAND: That's good. Lucky you.

BY MR. NORMAND:

Q. As to this document we've been looking at, Ms. Chang, do you recall if you offered any input to

A. No, I do not.

MR. NORMAND: Okay. I have no further questions at this time.

MR. KUTCHER: Okay. I have just a few questions for Ms. Chang.

\- - -

EXAMINATION

\- - -

BY MR. KUTCHER:

Q. And just some of these, I think, will become obvious, Ms. Chang, after going through that document that you just went through.

But, to your knowledge, was it ever a requirement of being in the 568 Group that Caltech had to adopt the consensus methodology?

A. No.

Q. Did you ever understand that Caltech had to adopt any part of the consensus methodology as a requirement for being a member of the 568 Group?

A. No.

Q. Did Caltech ever agree to use the consensus methodology?
A. No.
Q. Did Caltech, in fact, ever use the consensus methodology?
A. Caltech never used the consensus methodology.
Q. Are you aware of any penalties or consequences for any 568 Group member who did not adopt the consensus methodology?
A. I'm not aware of any, no.
Q. And I take it from that, Caltech did not suffer any penalties or consequences for not using the 568 -- sorry -- for not using consensus methodology?
A. No, it did not.
Q. Are you aware of any penalties or consequences for any 568 Group member who did not adopt any methodology at all for calculating financial aid?
A. I am not aware of any.

Q. Did Caltech ever make any agreement with any other member of the 568 Group regarding what financial aid formula to use?

A. No, it did not.

Q. Did Caltech ever make any agreement with any other school at all regarding what financial aid formula to use?

A. No, it did not.

Q. Did Caltech ever make any agreement with any other member of the 568 Group or any other school regarding how to calculate the estimated family contribution?

A. No, it did not.

Q. Did Caltech ever make any agreement with any member of the 568 Group or any other school regarding how to calculate financial aid packages?

A. No, it did not.

Q. To your knowledge, did Caltech ever make any agreement with any other school regarding tuition levels?

A. No, it did not.
Q. Have you ever discussed any student's financial aid package with any employee from any other school?
A. No, I have not.
Q. During your time at Caltech, to your knowledge, has Caltech made any agreement with any other school with respect to individual aid packages?
A. No, it has not.
Q. During your time at Caltech, did you ever become aware of any penalties or consequences if any university failed to follow any particular methodology with respect to assessing a student's ability to pay for going to Caltech?
A. I am not aware of any, no.
Q. Have you ever discussed with any other school the specific options in the institutional methodology that Caltech has selected for calculating estimated family contributions?
A. No, I have not discussed

those options.
Q. Do you have any knowledge of any circumstance in which Caltech has considered a donation to Caltech as part of its admission decision for any student?
A. I'm not aware of any circumstances, no.
Q. To your knowledge, does Caltech consider donations in admissions?
A. My understanding, Caltech does not consider donations for admissions.
Q. To your knowledge, does Caltech consider legacy status in admissions?
A. No, Caltech does not consider legacy status.
Q. We've gone over this a little bit before, but is Caltech need-blind in its admissions for domestic students?
A. Yes. Caltech is need-blind in admissions.

Q. Is that true for regular admissions?
A. Yes.
Q. Is that true for waitlist students?
A. Yes.
Q. Is that true for transfer students?
A. Yes.
MR. KUTCHER: I have no further questions.
Anyone else on the call has any other questions?
Anyone else on the Zoom?
MR. NORMAND: I have redirect questions.
MR. KUTCHER: Okay.

\- - -

EXAMINATION

\- - -

BY MR. NORMAND:
Q. Ms. Chang, do you have any firsthand knowledge as to whether Caltech considers donations in admissions?

**FOR TRANSCRIPT OF THE**

**DEPOSITION OF MALINA CHANG**

ERRATA SHEET

| Page | Line(s) | | |
|---|---|---|---|
| 73 | 15 | Reason:<br>Change: | Clarification<br>Change “I” to “they” |
| 74 | 20 | Reason:<br>Change: | Clarification<br>Change “if anyone did” to “of anyone that did” |
| 75 | 23 | Reason:<br>Change: | Clarification<br>Change “meeting” to “meaning” |
| 76 | 2 | Reason:<br>Change: | Clarification<br>Change “your” to “What is your understanding of it?” |
| 77 | 9-10 | Reason:<br>Change: | Clarification<br>Change “wanted to make sure we are complying” to “wanted to edit to make sure we’re compliant” |
| 136 | 20-21 | Reason:<br>Change: | Clarification<br>Change “reflected in the form” to “reflecting a form” |
| 238 | 3 | Reason:<br>Change: | Clarification<br>Change “jumble” to “general” |
| 272 | 18 | Reason:<br>Change: | Clarification<br>Change “data” to “table” |
| 159 | 20-21 | Reason:<br>Change: | Correction<br>Change “FAFSA's implication” to “ FAFSA Simplification” |
| 261 | 18 | Reason:<br>Change: | Correction<br>Change “metropolitans' fiscal areas” to “metropolitan statistical areas” |