# EXHIBIT 146

**In the Matter Of:**

*HENRY v*

*BROWN UNIVERSITY*

---

*DIANE CORBETT*

*January 08, 2024*

---

LEXITAS™

D. CORBETT

you, you didn't report to them, but you were meant to collaborate with each other to assist each other in your job duties?

A. Yes. I didn't report to them. They -- the dotted line to me was so that we could have conversations to see if there was a way that we could better support those areas.

Q. Okay. Were there any specific reasons that you left Ohio State and took the job at Cornell?

A. So leaving Ohio State for Cornell -- it's probably twofold. So I have family in New York State, that's where I'm from originally. So there was -- I mean, the idea of moving back to New York State was somewhat appealing, although I was very happy where I was.

But in addition to that, and I think more importantly, I had spent my entire career at need-blind institutions that provided access to students who otherwise might not have been able to attend an institution of higher education.

D. CORBETT

Cornell University took that to another level. Cornell University not only was need-blind, but offered full financial need. So they met full financial need. The large institutions where I worked before, we were able to do that for pockets of the population, but not for the entire population.

As a first generation college student, I can tell you that I know firsthand that there are students who self-select out of the process because they don't think they can afford it.

So this, to me, was an opportunity to work at a level where not only could we -- you know, could we help those students with their educational costs, but at a level where we could make it affordable for them.

Q. Pardon me. My technology here is malfunctioning on me. It's kind of frozen, but I have a backup on my computer.

Okay. So were there students at the previous institutions you worked at

D. CORBETT

Q. Okay.

A. The term agreement, no.

Q. And what did you consider the consensus approach to be?

A. Consensus approach was, again, this various aspects of a need analysis that was designed to provide a fair and equitable approach to need analysis.

Q. So what's the difference between the consensus approach and the consensus methodology?

A. So the methodology -- I guess when I'm hearing you say methodology, I'm thinking more comprehensive. The consensus approach would be the aspects of that methodology. That's how I'm interpreting it, your question.

Q. So the methodology meaning like all of it together, the approach being specific subparts of that umbrella?

A. That's how I'm interpreting your question.

Q. Okay. Thanks.

Did Cornell use the consensus

D. CORBETT

methodology while you were there?

A. Parts of the consensus methodology. But Cornell looked at all of the options independently to decide on the methodology that we would employ.

Q. Do you remember specific areas of the consensus methodology or specific consensus approach or portions of the consensus approach that Cornell rejected?

A. I don't recall. I would -- you know, I had a very competent staff that was very experienced in institutional methodology and consensus methodology. So I deferred to them often because I was working on other priorities.

Q. Do you know whether or not there was ever an analysis performed by Cornell or the 568 Group to determine whether it achieved the goals you had identified before?

A. No, I don't know.

Q. Who benefited from Cornell being in the 568 Group?

MR. ARMSTRONG: Objection.

D. CORBETT

I'm just trying to test where your knowledge base is here, so to do that I'm going to put words in your mouth, which people don't always like, but if I'm wrong you'll correct me and tell me what it is.

So, to your knowledge, 568 didn't focus at all on eliminating divergent results or consistent treatment of families, is that fair?

MR. ARMSTRONG: Objection.

A. So my focus was not 568. So I cannot speak to what 568, what their focus was because that was not part of my focus during my tenure.

Q. Okay. What if we ask it like this: From the interaction you had with 568, do you agree that they work toward consistent treatment of families and the elimination of divergent results?

MR. ARMSTRONG: Objection.

A. I cannot speak to what 568 was working toward. My understanding was there were best practices that we at Cornell could choose to adopt or not as we

D. CORBETT

developed our own methodology for need analysis to meet the needs of our students.

Q. And in your interactions with 568, do you believe the policies they proposed and the discussions that they curated helped eliminate divergent results?

MR. ARMSTRONG: Objection.

A. I was not involved in those discussions and I can't -- I don't have the expertise to comment on that.

Q. Do you have any basis to disagree with the statements in this value of 568 membership?

A. No.

Q. In the final paragraph, the "Outcomes" paragraph, it says: The 568 Group has led to a number of successful outcomes, including the development of a standardized non-custodial parent waiver petition.

Do you see that?

A. Yes.

Q. Do you know what they're talking about there?

D. CORBETT

Principles" and that's where I'm directing your attention to.

A. Okay.

Q. Are you there?

A. Yes.

Q. So that first principle is to the extent -- and just so you know where I'm going, I'm going to ask you whether or not you agree that Cornell adopted these principles for its financial aid principles as well, did it abide by these principles.

So number one --

MR. ARMSTRONG: For clarification, this is a 2015 principles one?

MR. FREEDMAN: This is 2105, yes. I did find one from 2019 but it was only a draft, so I adopted the 2015 one.

MR. ARMSTRONG: Gotcha.

BY MR. FREEDMAN:

Q. Ms. Corbett, number 1: To the extent they are able, parents and students have the primary responsibility to

D. CORBETT

contribute to educational expenses before an institution awards financial aid.

Do you agree that -- well, strike that.

Do you believe Cornell implemented this principle while you were there?

MR. ARMSTRONG: Objection to form.

A. Do I agree -- so generally in financial aid, we do a spousal theory that the responsibility for financing the college education lies with the parent or student if they have the ability to pay. I think that's what that's driving at. That's my interpretation.

Q. And during your tenure at Cornell, they abided by that interpretation, yes?

A. Yes, we looked at a student's financial need.

Q. 2. Families should contribute to educational expenses according to their ability. Those with similar financial

**CONFIDENTIAL**

**ERRATA SHEET FOR**
**THE TRANSCRIPT OF DIANE CORBETT**

Matter: *Henry, et al. v. Brown University, et al.*, 1:22-cv-00125 (N.D. Ill.)

Dep. Date: January 8, 2024

Deponent: Diane Corbett

| Page:Line | Change | Reason for Change |
|---|---|---|
| 12:8 | Insert "FERPA/PII REDACTION" in lieu of "January 15" such that the last line of the response reads: "FERPA/PII REDACTION, 1959." | FERPA/PII |
| 15:2 | "work in a" to "work on a" | Stenographic error |
| 27:19 | "strategy to" to "strategy, to" | Stenographic error |
| 27:21 | "members to" to "members who" | Stenographic error |
| 39:6 | "of," to "of factors," | Clarification |
| 40:14-15 | "John Burdick" to "Jon Burdick" | Stenographic error |
| 44:13 | "under conditions." to "under difficult conditions" | Stenographic error |
| 50:12 | "other forms for" to "other forums for" | Stenographic error |
| 50:15 | "other forms, did" to "other forums, did" | Stenographic error |
| 50:21 | "position," to "positions," | Stenographic error |
| 51:3 | "than by other" to "than at other" | Stenographic error |
| 62:10 | "a pain for" to "a pain point for" | Stenographic error |
| 65:6 | "John Burdick" to "Jon Burdick" | Stenographic error |
| 65:12 | "was Cornell" to "was at Cornell" | Stenographic error |
| 115:23 | "Guideline" to "Guidelines" | Stenographic error |
| 117:12 | "we do a spousal theory that" to "we do espouse the theory that" | Stenographic error |
| 138:11 | "zero expectation" to "zero expected contribution" | Clarification |
| 138:12 | "that were loan" to "that where loan" | Stenographic error |
| 138:14 | "drive, drive" to "drive -- drive" | Stenographic error |
| 138:22-23 | "lower middle" to "lower and middle" | Stenographic error |
| 140:18 | "and institutional federal methodology is using the wording federal" to "and federal methodology is used in awarding federal" | Stenographic error |
| 160:2 | "school funding" to student funding" | Clarification |
| 184:14-16 | "diversity and including them in campuses and" to "diversity on campuses and" | Clarification |
| 185:12 | "Raj Chheda's" to "Raj Chetty's" | Stenographic error |
| 186:11 | "through" to "throughout" | Stenographic error |
| 199:16 | "loan for them." to "loan program." | Stenographic error |
| 203:16 | "I this" to "I" | Stenographic error |

**CONFIDENTIAL**

| Page:Line | Change | Reason for Change |
|---|---|---|
| 206:19 | "controls in, there all" to "controls in there, all" | Stenographic error |
| 207:9 | "John and Sean" to "Jon and Shawn" | Stenographic error |
| 207:23 | "at what I" to "at, what I" | Stenographic error |
| 207:25 | "John and Sean" to "Jon and Shawn" | Stenographic error |
| 208:6 | "or" to "for" | Stenographic error |
| 213:4 | "John and Sean" to "Jon and Shawn" | Stenographic error |
| 213:6 | "John Burdick" to "Jon Burdick" | Stenographic error |
| 213:7 | "Sean Helton" to "Shawn Felton" | Stenographic error |
| 217:17 | "concessions" to "discussions" | Stenographic error |
| 218:21 | "aid was" to "aid, which was" | Clarification |
| 219:14 | "Vice President" to "Vice Provost" | Stenographic error |
| 220:14 | "approve" to "improve" | Stenographic error |
| 220:17 | "alum" to "alumni" | Stenographic error |
| 222:19 | "that, and" to "that. And" | Stenographic error |
| 222:20 | "some type of some expectations release that" to "some type of expectation at least that" | Stenographic error |
| 223:13 | "active -- which" to "active acceptance, which" | Stenographic error |
| 225:11 | "there's not a question" to "there's a question" | Stenographic error |
| 225:15-16 | "It was not as though an institutional budget" to "It was not through an institutional budget" | Stenographic error |
| 240:3 | "it was awarding" to "it was -- awarding" | Clarification |
| 244:11 | "Department of FAFSA" to "Department of Education" | Stenographic error |
| 247:25 | "perhaps people at" to "perhaps at" | Stenographic error |
| 249:22 | "would have been" to "would not have been" | Stenographic error |
| 263:7 | "Roundtable where the" to "roundtable that the" | Stenographic error |
| 267:9 | "don't who" to "don't know who" | Stenographic error |
| 267:16 | "Going to" to "I'm not going to" | Stenographic error |
| 270:4 | "per the" to "part of the" | Stenographic error |
| 273:19 | "Pamela Tand" to "Pamela Tan" | Stenographic error |
| 277:2 | "wording" to "awarding" | Stenographic error |
| 285:6-7 | "drove the policy. It's not as though so much other" to "drove the awarding. It's not as though -- so at other" | Stenographic error |
| 289:22 | "I can see it unless you read it," to "I can see it, haven't read it," | Stenographic error |
| 301:8 | "that," to "that" | Stenographic error |
| 301:19 | "there's a" to "there's no" | Clarification |

DEPOSITION ERRATA SHEET

Case Caption: Henry v. Brown University

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Diane Corbett
_______________________________
DIANE CORBETT

Subscribed and sworn to on the 6th day of February, 2024, before me,

Danielle [signature]
_______________________________

Notary Public, in and for the State of Vermont