**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ANDREW CORZO, SIA HENRY, ALEXANDER LEO-GUERRA, MICHAEL MAERLENDER, BRANDON PIYEVSKY, BENJAMIN SHUMATE, BRITTANY TATIANA WEAVER, and CAMERON WILLIAMS, individually and on behalf of all others similarly situated, <br><br> *Plaintiffs*, <br><br> v. <br><br> BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, THE JOHNS HOPKINS UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY, <br><br> *Defendants*. | Case No. 1:22-cv-00125 <br><br> Hon. Matthew F. Kennelly |

**THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA'S OPPOSITION TO**
<u>**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**</u>

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 3

ARGUMENT ......................................................................................................................... 5

    I.    Penn Withdrew From The Alleged Conspiracy in January 2020. .......................... 5

        *a.*    *Plaintiffs Seek To Impose An Artificially High Bar For Withdrawal From An Antitrust Conspiracy.* .............................................................................. 5

        *b.*    *Penn Withdrew From The Alleged Conspiracy, Even Applying Plaintiffs' Heightened "Repudiate[] or Disavow[]" Requirement.* .......... 10

    II.    Plaintiffs' Motion Confirms The Unreliability Of Their Lead Expert's Report ..................................................................................................................... 12

CONCLUSION .................................................................................................................... 14

# TABLE OF AUTHORITIES

**CASES**               **Page(s)**

*Carbone v. Brown Univ.*,
　621 F. Supp. 3d 878 (N.D. Ill. 2022) .................................................................................8

*In re Brand Name Prescription Drugs Antitrust Litig.*,
　123 F.3d 599 (7th Cir. 1997), *abrogated on other grounds by Rivet v. Regions Bank of La.*, 522 U.S. 470 (1998) ..............................................................2, 5, 7, 9

*In re Cathode Ray Tube*,
　2016 WL 8669891 (N.D. Cal. Aug. 22, 2016). ...............................................................6, 9

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
　2024 WL 3509668 (N.D. Ill. July 22, 2024) .......................................................................6

*United States v. Andreas*,
　1999 WL 515484 (N.D. Ill. July 15, 1999), *aff'd and remanded*, 216 F.3d 645 (7th Cir. 2000) .........................................................................................................6

*United States v. Bullis*,
　77 F.3d 1553 (7th Cir. 1996) ..................................................................................5, 8, 10

*United States v. Didion Milling, Inc.*,
　2023 WL 3372636 (W.D. Wis. May 11, 2023) ...................................................................8

*United States v. Nagelvoort*,
　856 F.3d 1117 (7th Cir. 2017) ..........................................................................................7, 8

*United States v. Sax*,
　39 F.3d 1380 (7th Cir. 1994) ...............................................................................................7

*United States v. Swiss Valley Farms Co.*,
　912 F. Supp. 401 (C.D. Ill. 1995) ........................................................................................6

*United States v. U.S. Gypsum Co.*,
　438 U.S. 422 (1978) ........................................................................................2, 5, 6, 7, 9, 11

*United States v. Vallone*,
　698 F.3d 416 (7th Cir. 2012) ...............................................................................................8

*Virginia v. McKesson Corp.*,
　2013 WL 1287423 (N.D. Cal. Mar. 28, 2013) .....................................................................6

*Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop.*,
　2021 WL409982 (E.D. Pa. Feb. 5, 2021) ...................................................................5, 6, 9

**INTRODUCTION**

There is no genuine dispute that Penn left the 568 Group in January 2020 in both word and deed. In fact, plaintiffs' own expert Hal Singer assumes Penn did so in his regression model, an assumption that more than doubles the purported effect he claims to find from the challenged conduct. Plaintiffs nonetheless demand summary judgment *in their favor* on Penn's supposed non-withdrawal from the Group. While it appears that the real purpose of the brief is to yet again attack Penn and its counsel in a public filing, *see* Mot. 2, n.1, on the merits plaintiffs not only fail to establish their own entitlement to summary judgment, they confirm that it is Penn who is entitled to summary judgment on the question of withdrawal while raising even deeper concerns about the reliability of Singer's analysis. *See* Defs.' Mot. Summ. J. 49-50, Dkt. No. 847.

Plaintiffs' argument first asks the Court to impose an artificially circumscribed and improper requirement for withdrawal from an alleged antitrust conspiracy. Then, to try and show that Penn fails to meet that requirement, plaintiffs misrepresent the facts showing Penn's unequivocal withdrawal from the 568 Group. In doing so, they further contradict Singer, whose analysis is conditioned on Penn withdrawing from the 568 Group in January 2020. Plaintiffs' argument for summary judgment should be rejected and summary judgment on the question of withdrawal should be entered in Penn's favor.[1]

*First*, plaintiffs ignore the rule from Supreme Court and Seventh Circuit antitrust cases on withdrawal and instead impose an inapposite requirement from drug and other criminal conspiracies. The controlling standard for antitrust cases is the following: a defendant may withdraw from a conspiracy by communicating his or her withdrawal to co-conspirators or taking affirmative action inconsistent with the object of the conspiracy communicated in a manner

---

[1] Penn moved for summary judgment on the issue of its withdrawal from the alleged conspiracy in defendants' affirmative summary judgment motion. Defs.' Mot. Summ. J. 49-50, Dkt. No. 847.

-1-

reasonably calculated to reach co-conspirators. *See United States v. U.S. Gypsum Co.*, 438 U.S. 422, 463-464 (1978); *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 616 (7th Cir. 1997), *abrogated on other grounds by Rivet v. Regions Bank of La.*, 522 U.S. 470 (1998). It is undisputed that Penn did exactly that. Plaintiffs instead argue that withdrawal requires a further express "repudiation" of the conspiracy or its goals, a requirement that courts have imposed in criminal drug and fraud conspiracies, but not in antitrust cases, in part because it makes no sense in the antitrust context.

*Second*, the undisputed facts show that Penn did "repudiate[] or disavow[]," Mot. 6, the 568 Group and its alleged goals. It is undisputed that Penn resigned from the Group in January 2020, wrote a letter to the group clearly informing them of Penn's withdrawal, gave reasons for that withdrawal that contradicted the alleged goals of the "conspiracy," and then did not attend 568 Group meetings and publicly pursued policies that plaintiffs claim were at odds with the alleged challenged conduct in this case. This is plainly a legal withdrawal; so much so that plaintiffs repeatedly refer to Penn's January 24, 2020 letter as the "withdrawal letter." *See* Pls.' Statement of Undisputed Material Facts ("Pls.' SOF") ¶¶ 2, 4, 5, 8, 11. If plaintiffs are correct that the goal of the 568 Group was to artificially inflate prices and decrease financial aid through an agreement on a common approach to need analysis and other principles—which, to be clear, is wrong—then Penn's statements and actions constitute a clear disavowal of that goal.

*Finally*, plaintiffs' motion reinforces the unreliability of their lead expert's regression model and damages calculation. Singer's model "credited" each defendant's claims regarding withdrawal from the Group and treated periods after those dates as "clean." Now, plaintiffs argue that Penn and other defendants remained in the conspiracy even after leaving the Group. Singer's model is thus at odds with plaintiffs' argument in their motion and his calculations are inaccurate

if plaintiffs' argument about Penn's withdrawal is correct. Plaintiffs cannot have it both ways—if Penn did not formally withdraw, Singer's model and damages calculation is fundamentally flawed on this ground (as well as the other grounds defendants have exposed in their *Daubert* motion). *See* Defs.' Opp. to Pls.' Mot. Class Cert. 44-49, Dkt. No. 789.

## BACKGROUND

Penn did not use or agree to use the 568 Group's Consensus Methodology, Penn's Statement of Additional Undisputed Material Facts ("SOF") ¶¶ 4-5, and was not required to do so as a condition of Group membership, SOF ¶ 9. Eventually, Penn came to the view that attending the meetings of the Group was not a good use of its time or limited travel budget, SOF ¶ 3, and it left the 568 Group on January 24, 2020. Normand Decl. Ex. 2, Dkt. No. 850-4, PENN568-LIT-00000002. On that day, Matt Sessa, Penn's Executive Director of Student Registration and Financial Services, sent a letter to 568 Group Steering Committee Chair, Jack DeGioia. SOF ¶ 1; Normand Decl. Ex. 2, Dkt. No. 850-4, PENN568-LIT-00000002. In what plaintiffs refer to as the "withdrawal letter," Mr. Sessa wrote:

> Penn's commitment to need-blind admissions and all-grant financial aid is stronger than ever. Over the past 16 years, our financial aid program has expanded as our undergraduate students have become more socioeconomically diverse. Today more than one in seven Penn freshmen are the first generation in their family to attend college (up from one in twenty in 2004) and over a quarter are first generation, low-income or both. We have much more to accomplish. Our ambitious Penn First Plus program now seeks to better support our highly-aided and first-generation students based on demonstrated need. It has become clear that for Penn to continue to pursue greater access and inclusion for our students we will need increased flexibility in our needs analysis. It is therefore with deep respect and gratitude that I write to resign from the 568 President's Group.

Normand Decl. Ex. 2, Dkt. No. 850-4, PENN568-LIT-00000002.

While Mr. Sessa's letter included polite expressions of collegiality toward the Group's members, Mot. 2-3 (quoting Normand Decl. Ex. 2), and was meant to be "diplomatic," SOF ¶ 2, Penn also stated unequivocally that it no longer wished to be a part of the Group and would be

-3-

proceeding independently. Although Penn made the decision to leave the Group because it "no longer found [the Group] useful," SOF ¶ 3, the letter offered a desire for "increased flexibility" as an explanation for its departure. SOF ¶ 1.

After receiving the letter, remaining Group members noted to each other that Penn had "le[ft] the group in order to have more flexibility in the need analysis." SOF ¶ 9. Because the Group did not, in fact, require members to adopt any specific need analysis policies, the remaining members also expressed confusion about "why [Penn] thought that they needed to leave" for this purpose, "given that we have made clear there is a lot of flexibility," *id.*, and they speculated that Penn left because it "d[idn't] want to even appear to be constrained by their membership in 568," SOF ¶ 10. When 568 Group representatives later invited Penn to participate in 568 Group meetings in a limited capacity, Penn declined those invitations and unambiguously responded that "we will not be returning to 568" and that Penn was "not planning to return." SOF ¶¶ 7, 8.

Plaintiffs have affirmatively argued that after leaving the Group, Penn took actions inconsistent with the alleged conspiracy, such as announcing that it would exclude home equity in its need analysis and "raise the income threshold for families eligible to receive full tuition scholarships from $140,000 to $200,000." Pls.' Mot. Class Cert. 22, Dkt. No. 752-1; SOF ¶ 13.[2] Just as it had while a member of the Group, Penn continued to adopt new and increasingly generous financial aid policies after leaving that were inconsistent with the Group's alleged goal of "reduc[ing] competition on aid to reduce endowment spending and aid variability," Pls.' Class Cert. Mot. 28, Dkt. No. 752-1, including increasing Penn's summer funding for middle-income

---

[2] Plaintiffs rely upon this evidence to suggest that Penn was previously constrained by the Group. *See* Pls.' Mot. Class Cert. 22, Dkt. No. 752-1. Penn disputes that it is evidence of anything other than its continued commitment to improving its financial aid, which it also demonstrated while it was a member of the Group. The core of the supposed conspiracy was to award loans, not grants in financial aid packaging; Penn had not awarded loans for eleven years while a member of the Group.

students, SOF ¶ 11; and raising the income threshold for students qualifying for its highly aided program, SOF ¶ 12. Plaintiffs also concede that while a member of the Group, Penn was not part of any unlawful agreement on packaging of financial aid offers, SOF ¶ 6, and thus cannot argue that Penn was required to say or do anything to formally withdraw from that aspect of the alleged conspiracy ostensibly responsible for the majority of supposed overcharge, SOF ¶ 25.

## ARGUMENT

I. **Penn Withdrew From The Alleged Conspiracy in January 2020.**

   a. *Plaintiffs Seek To Impose An Artificially High Bar For Withdrawal From An Antitrust Conspiracy.*

Plaintiffs contend that Penn did not withdraw from the alleged antitrust conspiracy because it did not sufficiently "repudiate[] or disavow[] the 568 [Group's] purposes when it left the 568 Group." Mot. 6. Leaving aside for the moment that Penn did "repudiate[] or disavow[]" the 568 Group through its withdrawal letter and subsequent actions, *see infra* 10-12, plaintiffs are wrong that withdrawal from a purported antitrust conspiracy requires the type of express repudiation they describe.

In antitrust cases, a defendant may withdraw from an antitrust conspiracy in two ways. First, a defendant may withdraw by "announc[ing] his withdrawal to his coconspirators." *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 616 (7th Cir. 1997) (citing *Gypsum*, 438 U.S. at 463–65), *abrogated on other grounds by Rivet v. Regions Bank of La.*, 522 U.S. 470 (1998); *United States v. Bullis*, 77 F.3d 1553, 1562 (7th Cir. 1996) (a defendant may withdraw by "ceas[ing] his activity in the conspiracy and ... communicating his withdrawal in a manner reasonably calculated to inform his coconspirators). For example, in *Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop.*, a defendant was found to have effectively withdrawn from a price-fixing conspiracy among members of a mushroom growers' trade association when the defendant sent

letters notifying the group that it "could 'no longer be bound to the rules and regulations of the cooperative.'" 2021 WL 409982, at *5-6 (E.D. Pa. Feb. 5, 2021). The Court held that the defendant "severed all ties with the conspiracy" and effectively withdrew by "communicat[ing] its resignation to its co-conspirators." *Id.* at *6.

Second, a defendant may withdraw through a range of "[a]ffirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators." *Gypsum*, 438 U.S. at 464; *see also United States v. Andreas*, 1999 WL 515484, at *5 (N.D. Ill. July 15, 1999), *aff'd and remanded*, 216 F.3d 645 (7th Cir. 2000) (participants in an antitrust conspiracy can withdraw by taking "'affirmative acts inconsistent with the object of the conspiracy and communicat[ing those acts] in a manner reasonably calculated to reach co-conspirators'" (quoting *Gypsum*)); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 2024 WL 3509668, at *17 (N.D. Ill. July 22, 2024). Affirmative acts inconsistent with the object of the conspiracy may include "resuming procompetitive behavior" by, for example, making procompetitive changes to a defendant's "pricing scheme." *See United States v. Swiss Valley Farms Co.*, 912 F. Supp. 401, 402 (C.D. Ill. 1995) ("resumption of competitive activity can be used to show an affirmative act by Defendants to withdraw from the charged conspiracy"); *Virginia v. McKesson Corp.*, 2013 WL 1287423, at *3-4 (N.D. Cal. Mar. 28, 2013) (applying the *Gypsum* standard to find that resuming competitive pricing can constitute withdrawal in price-fixing conspiracies). Even indirect evidence of such inconsistent acts can be sufficient to establish withdrawal, as in *In re Cathode Ray Tube (CRT) Antitrust Litig.*, where "extensive press coverage" of a defendant's exit from the cathode ray tube industry sufficed to establish that the defendant withdrew from an antitrust conspiracy in that industry. 2016 WL 8669891, at *13 (N.D. Cal. Aug. 22, 2016).

The Supreme Court has rejected efforts to require a defendant to demonstrate withdrawal from an antitrust conspiracy through "circumscribed and arguably impractical methods." *Gypsum*, 438 U.S. at 464. In *Gypsum*, the Court held that jury instructions requiring a defendant to either notify "each other member" of their resignation or "make disclosures of the illegal scheme to law enforcement" were circumscribed and impractical because they placed "confining blinders ... on the jury's freedom to consider" other relevant evidence. *Id.* at 463-464. Plaintiffs here attempt to require a similarly narrow method of proving withdrawal, appearing to argue that a defendant must *expressly* "repudiate[] or disavow[]" the conspiracy and its purposes. *See* Mot. 6. Although plaintiffs provide scant detail about what type of statements or actions would be sufficient to "repudiate or disavow" a conspiracy in their view—they simply assert that Penn's withdrawal letter was *insufficient* because it contained generic pleasantries and expressions of goodwill, *see* Mot. 7-8—the clear implication is that a defendant must expressly renounce a conspiracy, denounce their alleged co-conspirators, and otherwise take steps beyond "announc[ing their] withdrawal to [their] coconspirators" or taking "[a]ffirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators," which is all that the law requires. *See Gypsum*, 438 U.S. at 464-465; *In re Brand Name Prescription Drugs*, 123 F.3d at 616.

The cases plaintiffs rely on are not antitrust cases and do not purport to overrule the controlling Supreme Court and Seventh Circuit case law on the governing standard for withdrawal from an antitrust conspiracy. Those cases discuss withdrawal in the context of criminal conspiracies to, for example, commit fraud and sell drugs. *See* Mot. 7 nn.2, 4 (citing, e.g., *United States v. Nagelvoort,* 856 F.3d 1117, 1129 (7th Cir. 2017) (criminal conspiracy to violate anti-kickback statute); *United States v. Sax*, 39 F.3d 1380, 1386 (7th Cir. 1994) (criminal conspiracy

to distribute marijuana); *United States v. Vallone*, 698 F.3d 416, 494 (7th Cir. 2012) (criminal conspiracy to commit fraud and tax violations); *United States v. Didion Milling, Inc.*, 2023 WL 3372636, at *7 (W.D. Wis. May 11, 2023) (criminal conspiracies to commit fraud and make false statements)). Although *Nagelvoort* held in a criminal case related to a violation of an antikickback statute that a withdrawing defendant must do more than communicate his withdrawal to coconspirators, that case was not analyzing an alleged antitrust conspiracy.

Moreover, to the extent the Seventh Circuit has required some form of "disavowal" in the antitrust context, it has made clear that "communicating [a defendant's] withdrawal in a manner reasonably calculated to inform his coconspirators" *is* "an affirmative act to ... disavow the conspiracy's purpose." *Bullis*, 77 F.3d at 1562. Plaintiffs do not—and cannot—cite a Supreme Court or Seventh Circuit case applying their heightened repudiation requirement in an antitrust matter.[3] And for good reason: in an antitrust case challenging an unlawful agreement, such a rule would make no sense. This is because in an antitrust case, the challenged agreement *is* the conspiracy. A defendant's clear statement to co-conspirators that it is no longer party to, and plans to act inconsistent with, the agreement is as direct a "disavowal" as could possibly be required to withdraw in such a case. Under the antitrust laws, illegal agreements extend to normal business contracts that happen to have anticompetitive effects. It cannot be the law—and in fact it is not the law—that businesses must expressly repudiate the goals of such arms-length agreements before

---

[3] In considering motions to dismiss in this case, this Court decided not to dismiss claims against Brown, Emory, and Chicago based on their withdrawal, because the Complaint said that these defendants "*claimed to withdraw*," and taking the facts in the light most favorable to the Plaintiff, this Court held that this did not necessarily "amount to a concession that they did, in fact, withdraw." *Carbone v. Brown Univ.*, 621 F. Supp. 3d 878, 893 (N.D. Ill. 2022). The Court cited *Nagelvoort*, 856 F. 3d at1128-29 in discussing that there is Seventh Circuit law on the legal withdrawal for a conspiracy. In citing *Nagelvoort*, the Court did not expressly adopt plaintiffs' withdrawal standard in antitrust cases. Respectfully, to the extent the Court intended to adopt the plaintiffs' proposed standard for withdrawal, it was in error for the reasons discussed herein.

terminating their antitrust liability. This is just the sort of "circumscribed and arguably impractical method[] of demonstrating withdrawal" that the Supreme Court rejected in *Gypsum*. 438 U.S. at 464.

Applying the correct legal standard, Penn "announce[d its] withdrawal" to its alleged "co-conspirators," *In re Brand Name Prescription Drugs*, 123 F.3d 599 at 616, through its withdrawal letter, as plaintiffs concede. SOF ¶ 1; Pls.' SOF ¶ 2. Further, plaintiffs concede that Penn took "[a]ffirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators." *Gypsum*, 438 U.S. at 464. Penn officials stopped attending 568 Group meetings and declined to participate in 568 Group initiatives. SOF ¶¶ 7, 8. Penn also publicly announced new financial aid initiatives that plaintiffs contend were inconsistent with the goals of the conspiracy. SOF ¶¶ 11-13. Just as the defendant in *Winn-Dixie* successfully withdrew from an allegedly conspiring trade association by notifying the group of its resignation and ceasing its adherence to the group's minimum pricing structure, Penn's letter—coupled with its stated intent to pursue "increased flexibility" in its financial aid policies and its pursuit of policies plaintiffs claim are inconsistent with the alleged conspiracy—is more than enough evidence to show that Penn withdrew from the alleged conspiracy in January 2020. *See Winn-Dixie*, 2021 WL 409982, at *5-6. Further, plaintiffs do not allege that Penn took any steps in furtherance of the alleged conspiracy after sending its withdrawal letter in January 2020, as would be required to rebut Penn's substantial evidence of withdrawal. *See In re Cathode Ray Tube*, 2016 WL 8669891, at *13-14 (granting summary judgment when defendants established prima facie case of withdrawal by exiting the conspiring industry and plaintiffs "fail[ed] to provide any evidence that [defendants] continued their involvement" in the conspiracy).

> b. *Penn Withdrew From The Alleged Conspiracy, Even Applying Plaintiffs' Heightened "Repudiate[] or Disavow[]" Requirement.*

Even assuming withdrawal requires a participant in an antitrust conspiracy to "repudiate" or otherwise directly "disavow" the goals of the conspiracy in the manner plaintiffs claim, Mot. 6-8, Penn did that several times over. As noted, "communicating [a defendant's] withdrawal in a manner reasonably calculated to inform his coconspirators" *is* "an affirmative act to ... disavow the conspiracy's purpose." *See Bullis*, 77 F.3d at 1562. Plaintiffs admit that Penn exited the 568 Group through its January 24, 2020 letter to the Chair of the Group's Steering Committee. Pls.' SOF ¶ 2. In that withdrawal letter, Penn told the 568 Group that it intended to pursue "increased flexibility in [its] needs analysis." Pls.' SOF ¶ 5. Pursuing increased flexibility in need analysis is exactly what plaintiffs say defendants were barred from doing while members of the 568 Group. *See* Pls.' Mot. Class Cert. 28, Dkt. No. 752-1 (alleging that defendants conspired to "reduce competition on aid" and "reduce … variability" in expected family contributions and financial aid offers). Notwithstanding the letter's boilerplate expressions of collegiality and goodwill, Pls.' SOF ¶ 6, the upshot was clear: in communicating that Penn was leaving the 568 Group to pursue increased flexibility in its own need analysis policies, it adequately disavowed and renounced any "agreement" the Group is alleged to have had.

The 568 Group's reaction to Penn's withdrawal further underscores that Penn disavowed the Group and its alleged goals. Shortly after Penn sent its withdrawal letter, remaining members of the 568 Group acknowledged that Penn had "le[ft] the group in order to have more flexibility in the need analysis." SOF ¶ 9. They also noted they were "not sure why [Penn] thought that they needed to leave" for this purpose, "given that we have made clear that there is a lot of flexibility," *id.*, and speculated that Penn left because it "d[idn't] want to even appear to be constrained by their membership in 568," SOF ¶ 10. Although these comments demonstrate that the 568 Group did

not, in fact, have an agreement to restrict need analysis, they also show that Penn clearly communicated its repudiation of any purported agreement to the Group. Moreover, as plaintiffs' lead expert assumed in his report, membership in the 568 Group *is* the challenged conduct, at least insofar as plaintiffs purport to measure its effects. SOF ¶ 22. Penn's departure from the 568 Group was thus a clear disavowal of that conduct.

Following its departure, Penn took additional steps confirming its "repudiat[ion] or disavow[al]" of the Group and any purported agreement among its members. Penn officials stopped attending 568 Group meetings and declined to participate in 568 Group initiatives. SOF ¶¶ 7, 8. Penn also publicly announced new policies that increased its financial aid generosity and, according to plaintiffs, deviated from the alleged 568 Group agreement. *See* Pls.' Mot. Class Cert. 22, Dkt. No. 752-1. After leaving the Group, Penn increased its summer funding for middle-income students, SOF ¶ 11, raised the income threshold for students qualifying for its highly aided program, SOF ¶ 12, and announced that it would exclude home equity in its need analysis and "raise the income threshold for families eligible to receive full tuition scholarships from $140,000 to $200,000," SOF ¶ 13. According to plaintiffs' inaccurate conception of the 568 Group's purported goals, these were further "[a]ffirmative acts inconsistent with the object of the [alleged] conspiracy," *Gypsum*, 438 U.S. at 464-465, and they put the 568 Group on notice that Penn had disavowed the Group and its alleged purpose. Thus, not only must plaintiffs' motion for summary judgment be denied, Penn's motion for summary judgment on the issue of withdrawal must be granted. *See* Defs.' Mot. Summ. J. 49-50, Dkt. No. 847.

Plaintiffs' attempt to obfuscate these facts by attacking Penn and its counsel falls flat. Penn has consistently maintained that it withdrew from the purported conspiracy in January 2020. Plaintiffs argue that Penn's response to plaintiffs' Interrogatory No. 25 is "evasive." Mot. 2 & n.1.

It is not.[4] Penn stated that it had "no reason to vow or disavow" the "purposes or Core Principles of the 568 Group" because Penn's position was, and remains, that no conspiracy existed. Penn immediately went on to assert in response to that interrogatory that, even assuming an agreement existed, its actions met "the legal standard for withdrawal" from such an agreement. Pls.' SOF ¶ 4. There is nothing evasive about Penn reiterating that it does not believe any agreement existed before repeating what Penn has said all along: even assuming the existence of a conspiracy, Penn met the legal standard for withdrawal. For example, in Penn's response to plaintiffs' Request for Admission No. 27, Penn denied that it "never publicly disavowed" the 568 Group's purposes and principles. Normand Decl. Ex. 7, refiled publicly as Dkt. No. 874-22, Penn R&Os to Pls.' 1st RFAs, at 22-23 (Nov. 13, 2023). And in its answer to plaintiffs' Second Amended Complaint, Penn stated that it "disavowed the goal of the Group" both "in … word and deed." Dkt. No. 291 at 84; Pls.' SOF ¶ 3. As discussed directly below, it is plaintiffs who have been evasive on this issue, taking whatever position on withdrawal happens to suit them at the particular moment.

## II. Plaintiffs' Motion Confirms The Unreliability Of Their Lead Expert's Report.

Plaintiffs' motion for partial summary judgment directly contradicts core assumptions that their lead putative expert, Hal Singer, made in his regression model and damages calculations. Singer's model purports to measure the effect of the challenged conduct by comparing defendants' Effective Institutional Prices ("EIPs")[5] while they were members of the 568 Group to their "EIPs" during so-called "clean" benchmark periods, when they were not members of the Group. SOF ¶ 21. Singer credited every formal withdrawal from the 568 Group. SOF ¶ 22; *see* Pls.' Mot. Class Cert. 1-2 n.3. That includes crediting Penn's withdrawal from the 568 Group in 2020. SOF ¶ 23.

---

[4] Tellingly, plaintiffs never moved to compel a different response.
[5] EIP is a metric that Singer made up, SOF ¶ 18; Singer Tr. 282:18-283:8, and that is far afield from the price that anyone paid, Daubert Hr'g Tr. 45:6-50:10.

By crediting formal withdrawals, Singer's model and opinions assume that schools who withdrew from the 568 Group exited the conspiracy and ceased the anticompetitive conduct. Pls.' Mot. Class Cert. 24, Dkt. No. 752-1 (noting that Singer treated periods after defendants' claimed withdrawal dates as "clean"); *see also* Defs.' Mot. to Exclude 12, Dkt. No. 754; Defs.' Opp. to Pls.' Mot. Class Cert. 44-49, Dkt. No. 789. Yet plaintiffs now claim that neither Penn nor Brown, Chicago, Emory, or Vanderbilt withdrew from the Group and its alleged conspiracy. *See* Mot. 7-8. That means Singer's regression model—which assumes the opposite—contradicts plaintiffs' theory of liability and is an unreliable measure of the effect (including damages) of the actually *challenged* conduct. *See* Defs.' Opp. to Pls.' Mot. Class Cert. 44-49, Dkt. No. 789. Indeed, modifying the assumptions in Singer's regression to reflect plaintiffs' argument that Penn and others did not, in fact, withdraw from the alleged conspiracy wipes out the effect of the challenged conduct in four of the six specifications of his model, and reduces the overcharge by more than half in the other two. SOF ¶ 24. "Dr. Singer's model only returns a finding of overcharge when assuming the opposite" of plaintiffs' theory of liability: that the challenged conduct ceased when defendant's left the 568 Group. Gringer Decl., Ex. 2.1 (Stiroh Reb. ¶ 193).

In any event, plaintiffs are trying to have their cake and eat it too. They wish to use Singer's model—which shows an effect only by crediting Penn's 2020 withdrawal—to prove the existence of a conspiracy, establish common impact, and calculate damages. Yet their motion argues that Penn's withdrawal from the 568 Group was ineffective and did not terminate Penn's liability for the alleged conspiracy. In view of plaintiffs' motion, Singer's model and opinions thus unreliably measure the effects of the challenged conduct. By treating membership in the 568 Group as a proxy for participating in the challenged conduct and crediting Penn's and others' claims of withdrawal, Singer's model measures the effect of a conspiracy that does not comport with the

theory of liability outlined in plaintiffs' motion. That is not reliable.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Partial Summary Judgment should be denied.

Dated: June 27, 2025

Respectfully submitted,

By: */s/ David Gringer*
David Gringer
Alan Schoenfeld
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel: 212-937-7294
david.gringer@wilmerhale.com
alan.schoenfeld@wilmerhale.com

Seth Waxman
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Ave., NW
Washington, DC 20037
Tel: 202-663-6800
seth.waxman@wilmerhale.com

Edward W. Feldman
Daniel Martin Feeney
MILLER SHAKMAN LEVINE &
   FELDMAN LLP
30 W. Monroe Street, Suite 1900
Chicago, Illinois 60603
Tel.: 312-263-3700
dfeeney@millershakman.com
efeldman@millershakman.com

*Counsel for The Trustees of the University of Pennsylvania*