## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| ANDREW CORZO, SIA HENRY, ALEXANDER LEO-GUERRA, MICHAEL MAERLENDER, BRANDON PIYEVSKY, BENJAMIN SHUMATE, BRITTANY TATIANA WEAVER, and CAMERON WILLIAMS, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, THE JOHNS HOPKINS UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY,<br><br>Defendants. | Case No. 1:22-cv-00125<br><br>Hon. Matthew F. Kennelly |

### PLAINTIFFS' RESPONSES, OBJECTIONS, AND COUNTERSTATEMENTS TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIALS FACTS IN <u>OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, by and through their undersigned counsel, Plaintiffs respectfully submit (1) the following Responses and Objections to Defendants' Statement of Undisputed Materials Facts in Support of their Motion for Summary Judgment ("RSOF")[1] and (2) Plaintiffs' Counterstatement of Undisputed Material Facts in Opposition to

---

[1] To distinguish citations between Defendants' Statement of Undisputed Materials and Plaintiffs' Responses and Objections and to maintain consistency with the acronyms used in Defendants' Statements, citations to Defendants' Statement of Undisputed Materials will remain "SOF," while

Defendants' Summary Judgment Motion ("CSOF"). All capitalized terms otherwise undefined have the meaning ascribed to them in Defendants' Memoranda of Law in Opposition to Defendants' Motions for Summary Judgment. All referenced Plaintiffs' exhibits are attached to the accompanying declaration of Edward Normand.

**RESPONSES AND OBJECTIONS TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIALS FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

**I.      UNDERGRADUATE HIGHER EDUCATION**

    **A.      School Missions**

    1.      **DEFENDANTS' ASSERTION:** Defendants[2] are nonprofit institutions of higher education whose missions are to provide a world-class education to students from various walks of life, and to serve society more broadly through education, research, and public service. Ex. 2.1, Long Reb. ¶¶11, 22, 29; Ex. 411, *University Mission*, CORNELL UNIV., https://www.cornell.edu/about/mission.cfm (last visited May 4, 2025) ("Cornell's mission is to discover, preserve and disseminate knowledge, to educate the next generation of global citizens, and to promote a culture of broad inquiry throughout and beyond the Cornell community. Cornell also aims, through public service, to enhance the lives and livelihoods of students, the people of New York and others around the world."); Ex. 410, *University Mission Statement*, GEORGETOWN UNIV., https://governance.georgetown.edu/mission-statement (last visited May 4, 2025) ("Georgetown educates women and men to be reflective lifelong learners, to be responsible and active participants in civic life and to live generously in service to others."); Ex. 350, *Mission Statement*, MIT, https://www.mit.edu/about/missionstatement (last visited May 4, 2025) ("The mission of MIT is to advance knowledge and educate students in science, technology, and other areas of scholarship that will best serve the nation and the world in the 21st century."); Ex. 351, *Mission*, UNIV. OF NOTRE DAME, https://www.nd.edu/about/mission (last visited May 4, 2025) ("The University is dedicated to the pursuit and sharing of truth for its own sake" and "to create a sense of human solidarity and concern for the common good that will bear fruit as learning becomes service to justice"); Ex. 258, *College Mission*, UNIV. OF PA., https://www.college.upenn.edu/college-mission (last visited May 4, 2025) ("The College's goal is to help students to become knowledgeable about the world and the complexities of today's society, aware of moral, ethical and social issues, prepared to exercise intellectual leadership, and enlivened by the use of their minds.").

    **PLAINTIFFS' RESPONSE: Disputed in part.** Plaintiffs do not dispute that Defendants

---

Plaintiffs will use "RSOF." Similarly, references to "Ex." or "Def. Ex." are to Defendants' exhibits filed in connection with their Motion for Summary Judgment. For clarity, Plaintiffs' Exhibits will be labelled "Pl. Ex."

[2] "Defendants" refers to the Litigating Defendants, plus Brown, Caltech, the University of Chicago, Columbia, Dartmouth, Duke, Emory, Johns Hopkins, Northwestern, Rice, Vanderbilt, and Yale.

are nonprofit institutions that focus, in part, on higher education. Plaintiffs dispute the balance of statement. First, Plaintiffs object to Defendants' citations to unproduced present-day (i.e., post-Class Period) websites as inadmissible. Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record. Second, Defendants do much more than higher education. CSOF ¶ 24 (summarizing Defendants' real estate holdings, hospitals, and other diversified income streams). Third, while Defendants might *have* missions, that is not an "operational mechanism that describes how it functions day-to-day." Pl. Ex. 39, Mora Rbtl. ¶ 5. Fourth, Plaintiffs dispute any implication that Defendants' purported missions are relevant to the anticompetitive conduct at issue or that their admissions practices have furthered those stated goals. For instance, as the United States explained in its Statement of Interest in this case: "Whether an entity is a 'nonprofit' or a 'university,' it can still be organized to maximize the revenue it collects from consumers or other trading partners." ECF No. 167-1 at 16. Nor do these missions preclude Defendants from maximizing prestige. Pl. Ex. 14, Singer Rpt. ("SR1") ¶¶ 56-57; Pl. Ex. 5, Mora Rpt. ¶ 64.

2. **DEFENDANTS' ASSERTION:** Defendants and similar schools engage in many activities that do not "maximize revenues," such as offering a range of academic programs, funding faculty and faculty research (even for obscure areas of study), residential facilities and related programming, and facilities like libraries, museums, rare book collections, archives, and science laboratories. *See* Ex. 178, Mora Tr. 22:7-15, 24:16-18, 173:9-22, 209:12-18; Ex. 2.1, Long Reb. ¶¶34, 36; Ex. 341, *Majors*, UNIV. OF PA., https://catalog.upenn.edu/undergraduate/arts-sciences/majors (last visited May 4, 2025); Ex. 286, *Search Classes 2024*, UNIV. OF PA., https://courses.upenn.edu (last visited May 4, 2025); Ex. 415, *University of Pennsylvania Programs/Majors*, NAT'L CENTER FOR EDUC. STATS., https://nces.ed.gov/collegenavigator/?id=215062#programs (last visited May 4, 2025); Ex. 260, *Colleges, Schools, and Academic Areas of Interest*, CORNELL UNIV., https://admissions.cornell.edu/colleges-schools-and-academic-areas-interest#:~:text=From%20Africana%20studies%20to%20environmental,and%20more%20than%20120%20minors (last visited May 4, 2025); Ex. 334, *Leading the Way in Artificial Intelligence Research*, CORNELL UNIV., https://ai.cornell.edu (last visited May 4, 2025); Ex. 340, *Majors, Minors, and Certificates*, GEORGETOWN UNIV., https://college.georgetown.edu/academics/majors-minors-andcertificates (last visited May 4, 2025); Ex. 401, *Undergraduate Program*, GEORGETOWN UNIV. DEP'T OF THEOLOGY & RELIGIOUS STUDIES, https://theology.georgetown.edu/undergraduate (last visited May 4, 2025); Ex. 339, *Majors & Minors*, MIT, https://mitadmissions.org/discover/themit-education/majors-minors (last visited May 4, 2025); Ex. 402, *Undergraduate Programs*, UNIV. OF NOTRE DAME,

https://www.nd.edu/academics/undergraduate-programs (last visited May 4, 2025); Ex. 354, *MIT Reshapes Itself to Shape the Future*, MIT NEWS (Oct. 15, 2018), https://www.mit.edu/2018/mit-reshapes-itself-stephen-schwarzman-college-of-computing-1015; Ex. 276, *Department of Theology - Major*, UNIV. OF NOTRE DAME, https://theology.nd.edu/majorminors (last visited May 4, 2025); Ex. 333, *KROC Institute for International Peace Studies*, UNIV. OF NOTRE DAME, https://kroc.nd.edu/undergraduate (last visited May 4, 2025); Ex. 412, *University of Notre Dame Programs/Majors*, NAT'L CENTER FOR EDUC. STATS., https://nces.ed.gov/collegenavigator/?id=152080#programs (last visited May 4, 2025); Ex. 352, MIT FACTS 2021 4, 14-15, MIT, https://facts.mit.edu/wp-content/uploads/2022/03/MIT-Facts2021-Accessible-with-Cover.pdf (last visited May 4, 2025); Ex. 358, *MIT Welcomes Nine MLK Visiting Professors and Scholars for 2023*, MIT NEWS (Sept. 27, 2023), https://news.mit.edu/2023/mit-welcomes-mlk-visiting-professors-scholars-0927; Ex. 357, *MIT Undergraduate Research Opportunities Program*, MIT, https://urop.mit.edu (last visited May 4, 2025); Ex. 98, UNIV. OF NOTRE DAME, 2023 ANNUAL REPORT 12 (2023), *available at* https://finance.nd.edu/assets/553662/university_annual_report_2023_web.pdf; Ex. 378, *Residence Halls*, CORNELL UNIV., https://scl.cornell.edu/residential-life/housing/campushousing/first-year-undergraduates/residence-halls (last visited May 4, 2025); Ex. 336, *Living Learning Communities*, GEORGETOWN UNIV., https://residentialliving.georgetown.edu/ leadership/llc (last visited May 4, 2025); Ex. 234, *About the College House System at Penn*, UNIV. OF PA., https://www.collegehouses.upenn.edu/about (last visited May 4, 2025); Ex. 337, *Living Options*, UNIV. OF PA., https://residential-services.business-services.upenn.edu/living-options (last visited May 4, 2025); Ex. 379, *Residence Halls*, UNIV. OF NOTRE DAME, https://residentiallife.nd.edu/undergraduate/residence-halls (last visited May 4, 2025); Ex. 257, *Collections*, CORNELL UNIV., https://www.library.cornell.edu/collections (last visited Apr. 10, 2025) (Cornell's library system contains more than eight million volumes, including a Rare and Manuscript collection with an additional 500,000 printed volumes and 80 million manuscripts); Ex. 376, *Rare and Manuscript Collections*, CORNELL UNIV., https://rare.library.cornell.edu (last visited May 4, 2025); Ex. 256, *Collection Development*, CORNELL UNIV., https://www.library.cornell.edu/collections/collection-development (last visited May 4, 2025); Ex. 248, *Basilica of the Sacred Heart*, UNIV. OF NOTRE DAME, https://basilica.nd.edu/about (last visited May 4, 2025) (Notre Dame's Basilica of the Sacred Heart, which was added to the National Register of Historic Places in 1978, is home to both the world's largest collection of 19th century French stained glass and the oldest carillon in North America).

**PLAINTIFFS' RESPONSE: Disputed.** First, Plaintiffs object to Defendants' citations to unproduced present-day (i.e., post-Class Period) websites as inadmissible. Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record. Second, Plaintiffs object to Defendants' characterization of isolating individual "activities" that do not "maximize revenues." Even for-profit companies also have "revenue generators" and "loss leaders," Mora Rpt. ¶ 24 (e.g., donations to charities, retirement parties, etc.), which makes examining individual activities as "maximizing revenue" artificial especially here, where these

4

activities support Defendants' prestige and endowment maximization goals, which further promotes their brands. Pl. Ex. 5 Mora Rep. ¶ 65; Pl. Ex. 14, SR1 ¶¶ 45, 56. In that context, for instance, Defendants' aid system both increases prestige while functioning ████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

████████████████████████ Pl. Ex. 6, DUKE568_0150792 at –807; *see also* RSOF ¶ 1. Third, particularly because Defendants put "maximize revenue" in quotes, Plaintiffs dispute any implication that Defendants are not motivated by university finances or maximizing revenues. Indeed, on the very next page after the testimony that Defendants cite from Ms. Mora's testimony (which Defendants omitted from Exhibit 178), Ms. Mora explains ██████████████████

████████████████████████ *See* Pl. Ex. 1, Mora Tr. 23:1-9; *see also* Pl. Ex. 5 Mora Rpt. ¶¶ 56-57, 42-46, 67-68; Pl. Ex. 39, Mora Rbtl. ¶¶ 4-26. Similarly, Defendants' expert Dr. Bridget Terry Long, has stated that "colleges seek to maximize revenues including net student fees." Pl. Ex. 2, B.T. Long, *How Do Financial Aid Policies Affect Colleges? The Institutional Impact of the Georgia HOPE Scholarship*, 39 J. OF HUMAN RES. 1048 (2004), at 1057. Defendants have described themselves █████████████████████████████████████████████████. *See, e.g.,* ██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████

3.      **DEFENDANTS' ASSERTION:** Defendants and many other schools have endowments. Endowments vary across schools, with certain liberal arts colleges—including Amherst, Pomona, Williams, Swarthmore, Bowdoin, Wellesley, Middlebury, Carleton College, and Claremont McKenna—having higher endowments per student than Brown, Columbia, Cornell, Johns Hopkins, Carnegie Mellon, and Georgetown. *See* Ex. 329, *Integrated Postsecondary Education Data System*, NAT'L CENTER FOR EDUC. STATS., https://nces.ed.gov/ipeds/datacenter (last visited Apr. 29, 2025). The same is true for public schools, with flagship universities like the University Michigan and the University of Virginia having greater endowments—both in absolute terms and on a per-student basis—than private

schools like Georgetown and Carnegie Mellon. *See* Ex. 4, Singer Am. Rep. tbl. 8.

      **PLAINTIFFS' RESPONSE: Disputed in part.** Plaintiffs admit that Defendants and many other schools have endowments. Plaintiffs admit that certain liberal arts colleges may have, or had at some point, higher endowments per student than some Defendants. But Plaintiffs dispute that the cited evidence supports the contention that "Amherst, Pomona, Williams, Swarthmore, Bowdoin, Wellesley, Middlebury, Carleton College, and Claremont McKenna" have "higher endowments per student than Brown, Columbia, Cornell, Johns Hopkins, Carnegie Mellon, and Georgetown." Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record. Def. Exhibit 329 is just a screenshot of a website that has data one can access, not a link to or description of a specific underlying dataset for a specific period. It does not reflect the endowment per student for any of those schools at any specific period, let alone one relevant to the Class Period. Plaintiffs admit that the University Michigan and the University of Virginia have greater endowments than Georgetown and Carnegie Mellon. Plaintiffs dispute any implication that any other public schools have greater endowments than any other Defendant, as that is not supported by the cited evidence at Def. Exhibit 4. Generally speaking, elite, private universities also tend to have much higher endowments, and much higher ratios of endowment per student, than other schools. Pl. Ex. 14, SR1 ¶¶ 115-16.

### B. Need-Based Financial Aid

      4.   **DEFENDANTS' ASSERTION:** During the relevant time period, the average cost of educating an undergraduate student at Defendant schools was more than the average price a student paid to attend, even if that student was not receiving financial aid of any kind. Ex. 2.1, Long Reb. ¶¶43, fig. 1.

      **PLAINTIFFS' RESPONSE: Disputed.** First, Defendants have not cited evidence showing the average costs "during the relevant time period." Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record. Exhibit 2.1 purports to represent that "Institutional Educational Expenditures Per Student Exceed Maximum Potential

Revenues Per Student, by Defendant in ***2021-2022***." *Id.* (emphasis added). But the "relevant time period" in this case is much greater than just 2021-2022. Second, if this analysis covered the Class Period, it does not properly account for potential revenues per student, as it omits expected donations, which can far exceed financial aid provided. Pl. Ex. 5, Mora Rpt. ¶¶ 35 72. Third, Plaintiffs dispute that "institutional educational expenditures" are equivalent to the true "cost of educating an undergraduate student." Not all of Defendants' expenditures are relevant for "educating an undergraduate student." Nor are all "expenditures" actual costs. For instance, when schools raise tuition, it increases the "cost" of financial aid to the school from an internal accounting standpoint. But this is just an accounting fiction whereby it *appears* that more money is "spent" per student—even though, in reality, more money has come through the door at zero cost. *See, e.g.,* Pl. Ex. 7, ███████████████████ Tr. 51:25-53:2. Fourth, █████████████

██████████████████████████████████████████████████

███████████████████████████████ 50:19-51:4; Pl. Ex. 8, ████

███████████ Tr. 92:16-93:4. Fifth, Plaintiffs dispute that the average cost of educating a student exceeded the tuition being paid by full pay students. For example, ████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████. █████████████

██████████████████████████████████████████████████

███████████. Finally, Plaintiffs dispute that "aid" is provided at all. *See* PSOF ¶ 55.

   5.    **DEFENDANTS' ASSERTION:** A far greater number of qualified and capable students apply for admission to Defendants and their peers than are admitted each year, meaning Defendants and their peers could enroll classes comprising only "full-pay" students, *i.e.*, those who do not need financial assistance to attend. Ex. 2.1, Long Reb. ¶¶52-55.

   **PLAINTIFFS' RESPONSE: Disputed in part.** Plaintiffs admit that a far greater number

of students apply for admission to Defendants' institutions than are admitted each year. But Rule

56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record. Defendants have not cited any evidence supporting what constitutes Defendants' "peers," what proportion are "qualified and capable," or what proportion could be "full-pay." And while Defendants cite application statistics from Dr. Long's Report (*see, e.g.*, Ex. 2.1 ¶ 53), at a minimum, her analysis does not appear to consider overlap in applications or admissions. Accordingly, while it may be true that *one* Defendant could admit a class of "qualified and capable" students who are "full pay," there is certainly no evidence in the record that ***all*** Defendants could do so in any given year. The existence of merit aid further undermines that schools could admit an equally "qualified and capable" class of entirely "full-pay" students. Moreover, admitting solely full-pay students, even if possible, would not be revenue maximizing in the long run. Defendants themselves contend that there is market demand from students to attend socially economically diverse universities. *See* SOF ¶ 44 ████████████████████████████████████ ████████████████████████████████████████ Admitting only "full-pay" students would mean a less diverse student body and lower quality students on average, would jeopardize alumni relations, would sour support from government entities, and would cause a long-term legacy hit. Pl. Ex. 5, Mora Rpt. ¶¶ 65, 69; ████████████████████████████ ████████████████████████████████

6.      **DEFENDANTS' ASSERTION:** Defendants make admissions decisions for domestic undergraduate students without regard for whether those students can afford to pay the cost of attendance (known in the higher education industry as having a "need-blind" admissions policy) and commit to meeting 100% of every domestic financial aid applicant's demonstrated financial need (known as having a "full-need" financial aid policy). *See* Ex. 388, *Tuition and Aid*, BROWN UNIV., https://admission.brown.edu/tuition-aid#:~:text=We%20actively%20seek%20students%20from, percent%20of%20demonstrated%20financial%20need (last visited May 4, 2025); Ex. 238, *Afford*, CALTECH, https://www.admissions.caltech.edu/afford (last visited May 4, 2025); Ex. 397, *Undergraduate Financial Aid Basics*, UNIV. OF CHICAGO, https://financialaid.uchicago.edu/undergraduate/how-aid-works/undergraduate-financial-aidbasics (last visited May 4, 2025); Ex. 239, *Affordability & Aid*, COLUMBIA UNIV., https://undergrad.admissions.columbia.edu/affordability (last visited May 4, 2025); Ex. 391, *Types of Aid*, CORNELL UNIV., https://finaid.cornell.edu/types-of-aid (last visited May 4, 2025); Ex. 331, *Introduction to Financial Aid*, DARTMOUTH COLL.,

https://financialaid.dartmouth.edu/how-aid-works/introduction-financial-aid (last visited May 4, 2025); Ex. 313, *How Aid is Calculated*, DUKE UNIV., https://financialaid.duke.edu/how-aidcalculated (last visited May 4, 2025); Ex. 399, *Undergraduate Financial Aid*, EMORY UNIV., https://www.emory.edu/home/admission/financial-aid.html (last visited May 4, 2025); Ex. 296, *Financial Aid*, GEORGETOWN UNIV., https://uadmissions.georgetown.edu/financial-aid (last visited May 4, 2025); Ex. 297, *Financial Aid*, JOHNS HOPKINS UNIV., https://www.jhu.edu/admissions/financial-aid (last visited May 4, 2025); Ex. 342, *Making MIT Affordable*, MIT, https://sfs.mit.edu/undergraduate-students/the-cost-of-attendance/making-mitaffordable (last visited May 4, 2025); Ex. 264, *Cost and Aid*, NORTHWESTERN UNIV.,BROWN_0000000439 https://admissions.northwestern.edu/tuition-aid (last visited May 4, 2025); Ex. 241, *Aid and Affordability*, UNIV. OF NOTRE DAME, https://admissions.nd.edu/aid-affordability (last visited May 4, 2025); Ex. 406, *Eligibility and Demonstrated Need*, RICE UNIV., https://financialaid.rice.edu/forms-resources/eligibility-and-demonstrated-need#:~:text=Families %20who%20apply%20for%20financial,aid%2C%20work%20study%20and%20loans (last visited May 4, 2025); Ex. 322, *How it Works*, UNIV. OF PA., https://admissions.upenn.edu/affording-penn/how-it-works (last visited May 4, 2025); Ex. 368, *Opportunity Vanderbilt Makes it Happen*, VANDERBILT UNIV., https://www.vanderbilt.edu/financialaid/#:~:text=Vanderbilt%20will%20meet%20100%25%20o f,Vanderbilt%20offers%20additional%20grant%20assistance (last visited May 4, 2025); Ex. 240, *Affordability*, YALE UNIV., https://finaid.yale.edu/costs-affordability/affordability (last visited May 4, 2025); *see also* Ex. 34, CORNELL_LIT0000245115 at -117 ("The Cornell University Board of Trustees adopted the following statement of principles in March 1998: Cornell University makes admissions decisions without regard to the ability of students or parents to pay educational costs. Students who are U.S. citizens or permanent residents and who demonstrate financial need will be assisted in meeting that need …."); Ex. 44, DUKE568_0033960 at -018 ("Duke is one of the few institutions nationally committed to need-blind admissions and meeting full demonstrated need …."); Ex. 140, Chang (Caltech) Tr. 94:9-14 (describing Caltech's full-need policy); Ex. 180, Nucciarone (Notre Dame) Tr. 96:3-5; Ex. 188, Schmill (MIT) Tr. 151:19-21 (testifying that MIT is "need-blind for admissions of all undergraduates"); Ex. 150, DeGioia (Georgetown) Tr. 33:18-20 ("[W]e are committed to a need-blind, full-need financial aid policy for our undergraduates.").

**PLAINTIFFS' RESPONSE: Disputed.** First, Plaintiffs object to Defendants' citations to

unproduced current-day (i.e., post-Class Period) websites as inadmissible. Rule 56(c)(1)(A) and

Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record. Second,

given that the statement is in the present tense, it appears to relate solely to Defendants' current

admission decision-making apparatus, which is not at issue. Third (and construing this statement

to refer to the Class Period and implying all Defendants met this test every year), although

Defendants may have "fully" met the suppressed "demonstrated financial need" they calculated

under the Overarching Conspiracy, Plaintiffs dispute any implication that Defendants *actually*

committed to meeting applicants' full need given this suppression. CSOF ¶ 44. Fourth, Plaintiffs

dispute how Defendants define "need-blind" in the higher education industry. *See* RSOF ¶ 11. Plaintiffs also dispute that Defendants make admissions decisions "without regard for whether those students can afford to pay" for two reasons. One, ███████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████ Finally, Plaintiffs dispute that "aid" is provided at all. *See* PSOF ¶ 55

7.    **DEFENDANTS' ASSERTION:** Defendants provide need-based financial aid to domestic undergraduate students because Defendants believe that an education at their institutions should be available to qualified students, irrespective of their ability to afford the cost of attendance. *See* Ex. 2.1, Long Reb. ¶79 ("Each Defendant prioritizes need-based financial aid, as do other members of the 568 Group and their peer schools, and this choice reflects each of these schools' missions of increasing access for admitted students, especially low- and middle income students, through the use of institutional resources."); Ex. 294, *Financial Aid*, CORNELL UNIV., https://finaid.cornell.edu (last visited May 6, 2025) ("Ezra Cornell's founding vision—a university where 'any person can find instruction in any study'—holds true today."); Ex. 391, *Types of Aid*, CORNELL UNIV., https://finaid.cornell.edu/types-of-aid (last visited May 4, 2025) ("Annual aid offers are tailored to each student's unique financial circumstances and are designed to ensure

Cornell is accessible to all, at an affordable cost."); Ex. 366, *Office of Student Financial Aid*, GEORGETOWN UNIV., https://finaid.georgetown.edu (last visited May 6, 2025) ("Our mission is to make it financially possible for every admitted applicant to attend Georgetown University, ensuring that we recruit, retain, and graduate a talented and diverse learning community."); Ex. 403, *Undergraduate Students*, MIT, https://sfs.mit.edu/undergraduate-students (last visited May 6, 2025) ("At MIT, we are committed to helping our students pay for their education. The price of an MIT education varies for each student depending on how much they can afford, but our commitment to affordability remains a constant."); Ex. 371, *Pathways to Notre Dame*, UNIV. OF NOTRE DAME, https://financialaid.nd.edu/costs-and-affordability (last visited May 6, 2025) ("Notre Dame is committed to providing an exceptional education regardless of a family's financial circumstances. We offer financial aid that meets 100% of every student's demonstrated financial need regardless of background, socioeconomic status, or the ability to pay for college."); Ex. 71, ND_0181690 (UNIV. OF NOTRE DAME, 2022 ANNUAL REPORT) at -693 (explaining that it did "even more this year to ensure that a Notre Dame education is affordable and accessible to all students, with $183 million in undergraduate need-based financial aid awarded"); Ex. 180, Nucciarone (Notre Dame) Tr. 91:1-14 ("[Y]ou will read about [John Monro's] philosophy as education is a public good, not a private good. It shouldn't be restricted only to the wealthy. So that's the philosophical basis at which he created the first methodology and on which need analysis was built, including what eventually became federal methodology …."); Ex. 83, PENN568-LIT-00024436 at -436 ("Making a Penn education available to the best and brightest students regardless of their financial means is a top institutional priority. In fulfillment of this goal, Penn continues to guarantee that undergraduates who matriculate with demonstrated financial need will receive all-grant aid packages that meet the full extent of their need for all four years …."); *see also* Ex. 13, CBD000001 (CSS/FINANCIAL AID PROFILE USER'S GUIDE, COLLEGE BOARD, 2003-2004) at -022 ("Since the founding of postsecondary educational institutions in this country, there has existed a tradition that scholarships and other forms of financial support should be provided for students who are 'in need.'").

**PLAINTIFFS' RESPONSE: Disputed.** Plaintiffs dispute that Defendants provide need-based financial aid to domestic undergraduate students because of a supposed "belief" that "an education at their institutions should be available to qualified students, irrespective of their ability to afford the cost of attendance." First, Defendants engaged in a twenty-year conspiracy to suppress aid to needy students. CSOF ¶¶ 7-12, 19-22. Second, Defendants did not make education available "irrespective of their ability to afford the cost of attendance" ███████████████████ *Id.* ¶¶ 35-36. Third, while it may be true that some decision-makers at some Defendants held that belief, Defendants have not provided evidence of how widespread that belief is or was, nor that their statements in that regard were something other then efforts to enhance their reputations. Indeed, as Defendants themselves contend, there would be market demand from students to attend socially economically diverse universities. *See* SOF ¶ 44 ████████████████

 In addition, universities recognize that aided students may feel indebted to the university and reciprocate with alumni donations in the future. Pl. Ex. 5, Mora Rep. ¶¶ 71-73. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ , ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Pl. Ex. 6, DUKE568_0150792 at -807. In addition, Plaintiffs object to any implied bright-line distinction between need-based and merit aid, as further stated in RSOF ¶ 17. Plaintiffs further object to Defendants' citations to unproduced present-day (i.e., post Class Period) websites as inadmissible. Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record. Finally, Plaintiffs dispute that "aid" is provided at all. *See* PSOF ¶ 55.

8.     **DEFENDANTS' ASSERTION:** Defendants and their peers also award need-based financial aid because they recognize the educational benefits that come from students learning alongside peers of different backgrounds and walks of life than their own (also known as "peer effects"). Ex. 2.1, Long Reb. ¶56; Ex. 167, Long Tr. 64:21-23; Ex. 136, Bishop (Notre Dame) Tr. 179:5-182:12 ("So we want to make sure that Notre Dame has a distribution. Also, the faculty would argue from the learning standpoint in the classroom, all points of view, and do people from lower income have a different point of view? … So we're trying to build this diverse group of students because we think it will be more attractive. But we also think it will be a better learning environment and make our graduates more effective in being leaders in a broader society that we believe and hope America is going to embrace."); Ex. 134, Bear (Notre Dame) Tr. 51:13-54:2 ("We want students who come from different economic backgrounds, again to think about what the learning experience that students need to have should be in a manner that one student can learn from another who does not look or come with the same experiences as that individual has."); Ex. 154, Furda (Penn) Tr. 312:10-313:5 (Penn did not seek to fill its class with only students who did not need financial aid because "the whole mission of higher education is to learn from your peers … [and] learn from differences of backgrounds and opinions"); Ex. 56, GTWNU_0000270820 at -928 (noting that Georgetown's commitment to meeting demonstrated financial aid is "about all of us being educated" by "scholars coming from diverse, underrepresented backgrounds," as "[w]e learn not just from disciplinary knowledge," but "[w]e learn from community"); Ex. 383, *Scholarships Help Build an Exceptional Student Body*, MIT NEWS (Dec. 25, 2019), https://news.mit.edu/2019/scholarships-help-build-exceptional-student-body-1226 ("Scholarships ... help create 'a robustly talented and diverse class in order to enhance the living and learning environment, and therefore the educational outcomes, for all our students. Every scholarship introduces a new mind into the MIT community, and simultaneously enriches the life of the recipient and the campus.'"); Ex. 142, Christiansen (Vanderbilt) Tr. 142:5-18 ▮▮▮▮▮▮▮▮▮▮

Ex. 175, McGann (Amherst 30(b)(6))
Tr. 20:1-14 ("We believe that our education is best when students can learn across difference, including socioeconomic difference .... Having a need-blind admission process better allows us to enroll, among other things, a socioeconomically diverse student body that makes for what we believe is an ideal educational setting.").

**PLAINTIFFS' RESPONSE: Disputed.** Defendants and their peers do not award need-based financial aid solely because of peer effects. *See* RSOF ¶ 8. Moreover, enhancing "peer effects" is itself a means of bolstering a school's reputation and thereby increasing alumni donations and government support. *Id.* ¶ 5. Plaintiffs further object to Defendants' citations to unproduced websites as inadmissible. Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record. Plaintiffs also object to any implied bright-line distinction between need-based and merit aid, as further stated in RSOF ¶ 17. Finally, Plaintiffs dispute that "aid" is provided at all. *See* PSOF ¶ 55.

7. **DEFENDANTS' ASSERTION:** Consistent with their need-blind policies, Defendants make admissions decisions without considering whether a student has applied for financial aid. *See* Ex. 154, Furda (Penn) Tr. 25:18-26:8 (Columbia's former director of admissions recalling that, because of the school's needblind admissions policy, "[w]e did not get information from the financial aid office while we were admitting the class to Columbia College and the School of Engineering and Applied Science"); Ex. 149, Davis (Cornell) Tr. 19:6-12 (testifying that when Cornell is "reviewing a student's application, the person reading the application has absolutely no idea if the student is applying for financial aid"); Ex. 148, Costanzi (Georgetown) Tr. 201:4-7 (testifying that Georgetown's admissions officers "do not have access to financial aid information prior to somebody being admitted"); Ex. 58, GTWNU_0000353731 at -741 ("Students are admitted to" Georgetown "without regard to their ability to pay (known as 'need-blind' admissions) ...."); *see also* Ex. 200, Wallace-Juedes (Yale) Tr. 162:5-9 (explaining that he "would generally understand 'need-blind manner' to be that admission decisions are made absent information— financial information that's submitted to the financial aid office about a family's ability to contribute"); Ex. 154, Furda (Penn) Tr. 126:4-9 (testifying that need-blind means "not taking into consideration a family's ability to pay to inform the admission decision"); Ex. 188, Schmill (MIT) Tr. 29:13-16 (testifying that need blind means "an applicant's ability to pay tuition is not a factor in the admission review"); Ex. 137, Bridson (MIT) Tr. 20:15-21:1 (need-blind "means that someone's financial status won't impact them in the admissions process"); Ex. 176, McLaughlin (Penn) Tr. 239:16-240:3 ("[A] student's inability to pay the full cost is not something that's going to be held against them in our application process … [and] lower income people are not at a disadvantage in our admissions process."); Ex. 179, Mundy (Notre Dame) Tr. 66:25-67:25 (Notre Dame is need-blind because it "wanted to make sure that a family's financial circumstances did not disadvantage them"); Ex. 180, Nucciarone (Notre Dame) Tr. 51:21-22 (explaining that "admissions doesn't have financial information"); Ex. 186, Sassorossi (Dartmouth) Tr. 84:14-85:6; Ex. 155, *Need Blind*, DARTMOUTH UNIV., https://admissions.dartmouth.edu/glossary-

term/need-blind-0 (last visited May 5, 2025); Ex. 195, Tuman (Columbia) Tr. 56:23-58:10; Ex. 140, Chang (Caltech) Tr. 308:19-309:9; Ex. 238, *Afford*, CALTECH, https://www.admissions.caltech.edu/afford (last visited May 5, 2025) ("Caltech Admissions is need-blind for domestic students (including undocumented and DACA students who graduate from a U.S. high school).").

**PLAINTIFFS' RESPONSE: Disputed.** First, Plaintiffs object to Defendants' citations to unproduced current-day (i.e., post-Class Period) websites as inadmissible. Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record. Second, Plaintiffs object to the present-tense formulation of Defendants' current financial aid belief system, which is not at issue nor squarely addressed in discovery. Third, Plaintiffs dispute how Defendants define "need-blind" in the higher education industry. *See* RSOF ¶ 11. ███████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████. ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████ Fourth, Plaintiffs also dispute Defendants' implied definition of "need blind." *See* RSOF ¶ 11.

9. **DEFENDANTS' ASSERTION:** Many non-Defendant schools have adopted policies to make admissions decisions without considering whether a student has applied for financial aid, which those non-Defendant schools also refer to as "need-blind" policies. *See, e.g.,*

Ex. 169, Maloney (Wisconsin 30(b)(6)) Tr. 119:3-13 (University of Wisconsin's corporate representative noting that, under the school's need-blind admissions policy, it reaches "admission decisions without any sort of information from the financial aid office"); Ex. 175, McGann (Amherst 30(b)(6)) Tr. 18:9-19:10 ("In the context of [Amherst's] admission process, 'need-blind' means that an applicant's financial need will not be held against them in the admission process."); Ex. 287, *Financial Aid - Frequently Asked Questions*, AMHERST COLL., https://www.amherst.edu/offices/financialaid/frequently-askedquestions#:~:text=What%20does%20it%20mean%20that,your%20achievements%2C%20talents%20and%20promise (last visited May 6, 2025) (explaining that Amherst's admission policy "is need-blind for all applicants," which means that the applicant and their "family's financial situation is not considered"); Ex. 291, *Financial Aid at USC*, UNIV. OF S. CAL., https://financialaid.usc.edu/undergraduate-financial-aid/prospective-students/financial-aid-at-usc (last visited May 6, 2025) ("Our admission process is need-blind. Ability to pay, or interest in financial aid, does not affect admission decisions."); Ex. 360, *Need to Know Financial Aid*, CARNEGIE MELLON UNIV., https://www.cmu.edu/enrollment/admission/process/financial_aid.html (last visited May 6, 2025) (explaining that Carnegie Mellon is "aid-blind," and that "[a]pplying for financial aid will have no affect [*sic*] on your chances for admission"); Ex. 321, *How Financial Aid Works*, PRINCETON UNIV., https://admission.princeton.edu/cost-aid/howfinancial-aid-works (last visited May 6, 2025) ("Need-blind admission means that applying for aid is not in any way a disadvantage in the admission process, ensuring equality of opportunity for low- and middle-income students.").

**PLAINTIFFS' RESPONSE: Disputed in part.** Plaintiffs do not dispute that many non-

Defendant schools have *announced* policies that reflect that admissions officers are not permitted

to have access to whether an applicant applied for financial aid. Plaintiffs dispute the balance of

the statement. First, object to Defendants' citations to unproduced websites as inadmissible. Rule

56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the

record. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████ Plaintiffs further object that neither party obtained discovery from the admissions offices

of these third parties to determine whether and to what extent they engaged in wealth favoritism.

Third, Plaintiffs dispute Defendants' implied definition of "need blind." *See* RSOF ¶ 11.

10.     **DEFENDANTS' ASSERTION:** Many in the higher education industry consider "need-blind" to mean that "it is not a disadvantage to apply for financial aid." Ex. 184, Rapelye (COFHE) Tr. 72:22-73:3; *see also* Ex. 84, PENN568-LIT-00036489 at -491 ("Need-blind: Your ability to pay is *not* factored into the admissions process; applying for financial aid does not hurt your chances of admission."); Ex. 164, Knuth (Cornell) Tr. 57:18-58:1 (need-blind means making admissions decisions "without considering the family's or the student's ability to pay to attend"); Ex. 176, McLaughlin (Penn) Tr. 239:16-240:3 ("[A] student's inability to pay the full cost is not

something that's going to be held against them in our application process … [and] lower income people are not at a disadvantage in our admissions process."); Ex. 179, Mundy (Notre Dame) Tr. 66:25-67:25 (Notre Dame is needblind because it "wanted to make sure that a family's financial circumstances did not disadvantage them"); Ex. 137, Bridson (MIT) Tr. 20:15-21:1 (need-blind "means that someone's financial status won't impact them in the admissions process"); Ex. 140, Chang (Caltech) Tr. 80:6-10 (as a result of the school's need-blind policy, Caltech "do[es] not disadvantage students that cannot pay"); Ex. 188, Schmill (MIT) Tr. 29:13-16 (testifying that need-blind means "an applicant's ability to pay is not a factor in the admission review"); Ex. 65, MITLIT-000157100 at -101 ("Students are not at a disadvantage because of their financial need in the admissions process."); Ex. 154, Furda (Penn) Tr. 126:4-9 (testifying that need-blind means "not taking into consideration a family's ability to pay to inform the admission decision"); Ex. 353, *MIT Need-Based Aid Dates Back to 1867*, MIT NEWS (May 6, 1992), https://news.mit.edu/1992/aid-0506; Ex. 327, *Images in Flux: The 20th Century Development of the Undergraduate Experience at Penn*, UNIV. OF PA. (Sept. 1999), https://archives.upenn.edu/exhibits/penn-history/images-in-flux/part-8; Ex. 57, GTWNU_0000327371 at -392; Ex. 315, *How Aid Works*, HARVARD COLL., https://college.harvard.edu/financial-aid/how-aid-works (last visited May 6, 2025) (explaining that "[n]eed-blind admissions" mean that "[y]our financial need and your aid application will never affect your chance of being admitted to Harvard"); Ex. 2.1, Long Reb. ¶77.

**PLAINTIFFS' RESPONSE: Disputed**. As set forth below, the definition of "need blind" in this statement was not the uniformly understood definition or even the most commonly understood definition in the "higher education industry." Plaintiffs further dispute any implication that people in the higher education consider "need-blind" to mean that "it is not a disadvantage to apply for financial aid" uniformly or commonly understood that definition to be *exclusive* of considering, for example, an applicant's familial wealth or potential for donations. Defendants' own citations (largely to post-litigation deposition testimony) do not support the narrow definition they seek. For instance, the Penn language from September 1999 tracks the statutory definition of need-blind, which was that need-blind meant "that Penn would accept a candidate by examination of his or her high-school record, resume, and qualifying statistics without regard to the financial situation of the applicant." Def. Ex. 327. The same is true for MIT's 1992 document. *See* Def. Ex. 353 at 2 ("The need-blind policy breathed life into the principle that an MIT education should be accessible to any applicant who meets the rigorous academic standards at MIT, *and that wealthy students should not displace those of equal talent but lesser means*.") (emphasis added). What is more, Defendants cite a 2010 Georgetown document, but omit the quote that "Need blind

admissions ensure that every student is considered for admissions *solely on merit*." (emphasis added). Def. Ex. 57 at -392. Other documents further support that there was a much broader contemporaneous understanding of the definition of "need blind" among higher education professionals. For example, ███████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████ Many witnesses testified similarly. *See, e.g.*, Pl. Ex. 134,

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████ █████████████████████████████████████

████████████████████████████████████████████████████████

████████████████ Former Yale president Kingman Brewster, for example, described Yale's pre-568 Group "need-blind" policy as one in which "the pocketbook was no longer relevant to admission"—"the privileged took pride in the feeling that [they] had made it on the merits rather than on the basis of something ambiguously called 'background.'" GEOFFREY KABASERVICE, THE GUARDIANS: KINGMAN BREWSTER, HIS CIRCLE, AND THE RISE OF THE LIBERAL ESTABLISHMENT 264 (2004). Similarly, in *United States v. Brown University*, the court described MIT's "need-blind admissions system" as one where admissions are "based entirely on merit, without consideration of an applicant's ability to pay tuition," where "financial status is irrelevant." 5 F.3d 658, 661 (3d Cir. 1993). In January 2018, an industry commentator stated: "Elite universities have increasingly adopted need-blind admissions, which is the practice of disregarding economic factors when looking at prospective applicants," thus excluding "giving preference to students with higher family income even if they are less qualified." Collin Hong, *Need-Blind Admissions Advantages Wealthy Applicants*, VANDERBILT POL. REV. (Jan. 1, 2018), https://vanderbiltpoliticalreview.com/6372/campus/need-blind-admissions-advantages-wealthy-

applicants/, at 1. Plaintiffs further object to Defendants' citations to unproduced present-day (i.e.,

post Class Period) websites as inadmissible. Rule 56(c)(1)(A) and Local Rule 56.1(d) require the

fact asserted to be supported by evidence in the record.

11. **DEFENDANTS' ASSERTION:** Defendants who held themselves out to be need-blind believed themselves to be need-blind. Ex. 194, Tilton (Brown) Tr. 198:11-18 ("[A]gain, we're need-blind."); Ex. 140, Chang (Caltech) Tr. 308:19-24 ("Caltech is need-blind in admissions."); Ex. 95, UCHICAGO_0000004730 at -731 ("The University of Chicago is need-blind and meets the full demonstrated need of citizens and permanent residents of the United States."); Ex. 195, Tuman (Columbia) Tr. 217:13-17 ("[W]e are need-blind for domestic students."); Ex. 146, Corbett (Cornell) Tr. 30:10-31:20 ("Cornell University not only was need-blind, but offered full financial need."); Ex. 156, Furstenberg (Dartmouth) Tr. 83:16-84:3 ("The financial aid program at Dartmouth is need-based, need-blind."); Ex. 144, Coleman (Duke) Tr. 63:25-64:3 ("I do know that we are need-blind."); Ex. 150, DeGioia (Georgetown) Tr. 33:18-19 ("[W]e are committed to a need-blind, full-need financial aid policy for our undergraduates."); Ex. 174, McDermott (Johns Hopkins) Tr. 75:3-19 ("[M]y recollection is that we had been operating need-blind for several years."); Ex. 137, Bridson (MIT) Tr. 158:2-3 ("We're a need-blind school."); Ex. 187, Schapiro (Northwestern) Tr. 73:8-22 ("[W]e were need-blind."); Ex. 134, Bear (Notre Dame) Tr. 99:11100:4 ("At Notre Dame, we were need-blind."); Ex. 176, McLaughlin (Penn) Tr. 240:18-20 (Q. "So with regard to domestic students, is Penn need-blind?" A. "Yes."); Ex. 199, Walker (Rice) Tr. 19:6-23 ("We're need-blind and cover 100 percent of unmet need."); Ex. 157, Gaines (Vanderbilt) Tr. 53:1-54:5 ("We were need-blind for admission for all first-year, U.S. citizen applicants and eligible permanent residents and for transfer students."); Ex. 121, YALE_LIT_0000005734 at -734.

**PLAINTIFFS' RESPONSE: Disputed**. First, Defendants' stated "beliefs" contains an

implied and unsupported statement of corporate scienter. Particularly as Plaintiffs do not define

"need blind" in this statement, it is impossible to know what it means or what Defendants say

people understood about what it means. Further, to the extent Defendants claim a historical

institutional belief, they must identify the basis for that belief across all relevant decisionmakers—

not just after-the-fact deposition testimony. This is uniquely a concern with regards to this

statement for two reasons. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████ Defendants have not produced the privileged materials

concerning ██████████ and they cannot selectively disclose favorable testimony after

withholding the documents that would have allowed Plaintiffs to test further ▮▮▮▮▮

▮▮▮▮ *See In re Consol. Litig. Concerning Int'l Harvester's Disposition of Wis. Steel*, 666 F. Supp. 1148, 1153 (N.D. Ill. 1987) ("[A] party should not be allowed to exploit selective disclosure for tactical advantage."). ▮▮▮▮



12. **DEFENDANTS' ASSERTION:** It was widely reported throughout the 2000s and 2010s that some Defendants and many of their peers granted additional admissions consideration to students whose families were actual or prospective donors to the institution, Ex. 372, DANIEL GOLDEN, THE PRICE OF ADMISSION 1-20, 49-144, 369-371 (2006); Ex. 236, Daniel Golden, *Admissions Preferences Given to Alumni Children Draws Fire*, WALL ST. J. (Jan. 15, 2003), https://www.wsj.com/_public/resources/documents/golden3.htm; Ex. 343, Daniel Golden, *Many Colleges Bend Rules To Admit Rich Applicants*, WALL ST. J. (Feb. 20, 2003),https://www.wsj.com/public/resources/documents/Polk_Rich_Applicants.htm; Ex. 306, Daniel Golden, *For Groton Grads, Academics Aren't Only Keys to Ivy Schools*, WALL ST. J. (Apr. 25, 2003), https://www.wsj.com/articles/SB105122532572026400; Ex. 305, Daniel Golden, *For Five Supreme Court Justices, Affirmative Action Isn't Academic*, WALL ST. J. (May 14, 2003), https://www.wsj.com/public/resources/documents/golden4.htm; Ex. 323, Daniel Golden, *How Lowering the Bar Helps Colleges Prosper*, WALL ST. J. (Sept. 9, 2006), https://www.wsj.com/articles/SB115774251817757837; Ex. 325, Daniel Golden, *How Wealthy Families Manipulate Admissions at Elite Universities*, TOWN & COUNTRY MAG. (Nov. 21, 2016) https://www.townandcountrymag.com/society/money-and-power/news/a8718/daniel-goldencollege-admission ("*The Price of Admission* stirred attention, controversy, and outrage. I decried what I called the 'preferences of privilege' in appearances on Ivy League campuses and on television shows from *The Colbert Report* to *Nightline*. I even testified before a Senate committee."); Ex. 312, Ava Kofman & Daniel Golden, *The Hedge Fund Billionaire's Guide to Buying Your Kids a Better Shot at Not Just One Elite College, but Lots of Them*, PROPUBLICA (Sept. 28, 2019), https://www.propublica.org/article/hedge-fund-billionaires-donations-collegeadmissions-elite-universities, and representatives of some Defendants themselves long publicly acknowledged their institutions' use of these practices, Ex. 250, Geoffrey Mock, *Brodhead Discusses Early Admissions, Developmental Admits*, DUKE TODAY (Sept. 22, 2006), https://today.duke.edu/2006/09/admit.html; Ex. 311, Kerry Temple, *Having Lunch with … Don Bishop*, NOTRE DAME MAG. (Fall 2014), https://magazine.nd.edu/stories/having-coffee-with-

donbishop ("There also are 'different cohorts who enjoy added consideration'—the sons and daughters of faculty, staff, and benefactors …."); Ex. 279, Joseph Asch, *Donor Admissions: How It Works Now*, DARTBLOG (Sept. 29, 2014), https://web.archive.org/web/20190316233913/http://www.dartblog.com:80/data/2014/09/011686.php; Ex. 237, RICHARD D. KAHLENBERG, *Introduction*, *in* AFFIRMATIVE ACTION FOR THE RICH: LEGACY PREFERENCES IN COLLEGE ADMISSIONS 1-18 (2010); Ex. 335, Richard D. Kahlenberg, *The Legacy Racket: The Problem with College Admission Preferences for Children of Alumni*, THE CENTURY FOUND., at 4 (Sept. 22, 2010), *available at* https://production tcf.imgix.net/app/uploads/2010/09/17185402/tcfLegacy_brief-2.pdf.

**PLAINTIFFS' RESPONSE: Disputed in part.** Plaintiffs do not dispute these issues were reported in these media outlets to varying degrees of specificity. But since Defendants do not define what "widely reported" means, Plaintiffs dispute that vague and ambiguous term. For instance, the *Wall Street Journal* reports from the early days of the internet were behind "paywalls," as the Wall Street Journal was "paywalled from the very beginning." Shan Wang, *The Wall Street Journal Website — Paywalled from the Very Beginning — Turns 20 Years Old Today*, Nieman Journalism Lab (Apr. 4, 2016), https://www.niemanlab.org/2016/04/the-wall-street-journal-website-paywalled-from-the-very-beginning-turns-20-years-old-today/.

14.     **DEFENDANTS' ASSERTION:** ███████████ have believed for years before January 2018 that Defendants engaged in these admission practices. *See* Ex. 165, ███████████ ██████████ Tr. 129:12-132:4 ("Q. So you have a view that at the Defendant schools you just believe that the students of wealthy families have some preferential treatment? A. I believe, and I have many – I know of many other people who believe the same thing …. Q. Can you remember, like where would you put the earliest age for you that you had a view that the Defendant schools that we're talking about here in this case gave preferences based on wealth? A. Likely around ninth or tenth grade. I had some elementary understanding that that was the case …. ███████████ somewhere around there? A. Somewhere around there."); Ex. 190, ███████████ Tr. 246:14-247:22, 248:8249:24 ("Q. So you were aware in approximately ████████ that at least some students believed that there was a correlation between ███████████ ███████████ is that correct? A. I was aware that that was a perception in the student body, yes."); Ex. 183, ███████████ Tr. 139:12-140:18 ("I had always thought that wealthier families could donate money to universities to sway admissions offices.").

**PLAINTIFFS' RESPONSE: Disputed in part**. Plaintiffs do not dispute that these three witnesses made these statements, but dispute that all ███████████ had the stated "belief" for "years" before "January 2018" or in a context relevant to this case. The testimony of only ████ ███████████ is cited. Even for these ███████████ Defendants paint with too broad a

brush. 

.

15.   **DEFENDANTS' ASSERTION:** To increase access, enhance socioeconomic diversity, and advance equity and fairness, Defendants focus their financial aid funds on students who most need them. *See* Ex. 388, *Tuition and Aid*, BROWN UNIV., https://admission.brown.edu/tuition-aid#:~:text=We%20 actively%20seek%20students%20from,percent%20of%20demonstrated%20financial%20need (last visited May 6, 2025); Ex. 238, *Afford*, CALTECH, https://www.admissions.caltech.edu/afford (last visited May 6, 2025); Ex. 397, *Undergraduate Financial Aid Basics*, UNIV. OF CHI., https://financialaid.uchicago.edu/undergraduate/how-aid-works/undergraduate-financial-aidbasics (last visited May 6, 2025); Ex. 239, *Affordability & Aid*, COLUMBIA UNIV., https://undergrad.admissions.columbia.edu/affordability (last visited May 4, 2025); Ex. 391, *Types of Aid*, CORNELL UNIV., https://finaid.cornell.edu/types-of-aid (last visited May 4, 2025); Ex. 331, *Introduction to Financial Aid*, DARTMOUTH COLL., https://financialaid.dartmouth.edu/how-aid-works/introduction-financial-aid (last visited May 6, 2025); Ex. 313, *How Aid is Calculated*, DUKE UNIV., https://financialaid.duke.edu/how-aid-calculated (last visited May 6, 2025); Ex. 399, *Undergraduate Financial Aid*, EMORY UNIV., https://www.emory.edu/home/admission/financial-aid.html (last visited May 6, 2025); Ex. 296, *Financial Aid*, GEORGETOWN UNIV., https://uadmissions.georgetown.edu/financial-aid (last visited May 6, 2025); Ex. 297, *Financial Aid*, JOHNS HOPKINS UNIV., https://www.jhu.edu/admissions/financial-aid (last visited May 6, 2025); Ex. 342, *Making MIT Affordable*, MIT, https://sfs.mit.edu/undergraduate-students/the-cost-of-attendance/making-mitaffordable (last visited May 6, 2025); Ex. 264, *Cost and Aid*, NORTHWESTERN UNIV., https://admissions.northwestern.edu/tuition-aid (last visited May 6, 2025); Ex. 241, *Aid & Affordability*, UNIV. OF NOTRE DAME, https://admissions.nd.edu/aid-affordability (last visited May 6, 2025); Ex. 406, *Eligibility and Demonstrated Need*, RICE UNIV., https://financialaid.rice.edu/forms-resources/eligibility-and-demonstrated-need#:~:text=Families %20who%20apply%20for%20financial,aid%2C%20work%20study%20and%20loans (last visited May 4, 2025); Ex. 322, *How it Works*, UNIV. OF PA., https://admissions.upenn.edu/affording-penn/how-it-works; Ex. 368, *Opportunity - Vanderbilt Makes it Happen*, VANDERBILT UNIV., https://www.vanderbilt.edu/financialaid/#:~:text=Vanderbilt%20will%20meet%20100%25%20of ,Vanderbilt%20offers%20additional%20grant%20assistance (last visited May 6, 2025); Ex. 240, *Affordability*, YALE UNIV., https://finaid.yale.edu/costs-affordability/affordability (last visited May 6, 2025); *see also* Ex. 44, DUKE568_0033960 at -018 (providing information on

Duke's full-need policy); Ex. 140, Chang (Caltech) Tr. 94:9-94:14 (describing Caltech's full-need policy); Ex. 131, Affleck-Graves (Notre Dame) Tr. 220:20-221:18 (describing Notre Dame's full-need policy); Ex. 188, Schmill (MIT) Tr. 151:19-21 (testifying that MIT is "need-blind for admissions of all undergraduates"); Ex. 180, Nucciarone (Notre Dame) Tr. 149:5-19 (importance of "need-based aid providing access to students" and "need-based aid as the door that opens access to higher education").

      **PLAINTIFFS' RESPONSE: Disputed**. Plaintiffs object to Defendants' citations to unproduced present-day (i.e., post Class Period) websites as inadmissible. Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record. Plaintiffs further dispute that ███████████████████████████████████████████████ ███████████████████████████████████████████████████ ██████████████████████████████████████████ Moreover, Plaintiffs dispute that Defendants' rationales or such policies were not ultimately related to enhancing reputations, increasing alumni donations, and garnering support from governmental entities. PSOF ¶ 5.

      16.    **DEFENDANTS' ASSERTION:** Other schools like Carnegie Mellon, Amherst, Stanford, Harvard, Princeton, and the University of Wisconsin, as well as many others of the College Board's member schools, also work to focus their financial aid funds on students who need them, *see, e.g.*, Ex. 162, Hill (Carnegie Mellon 30(b)(6)) Tr. 55:16-56:4; Ex. 175, McGann (Amherst 30(b)(6)) Tr. 16:10-17:8; Ex. 145, Cooper (Stanford 30(b)(6)) Tr. 106:20-107:8; Ex. 152, Donahue (Harvard) at 74:18-20; Ex. 135, Betterton (Princeton) Tr. 62:6-16; Ex. 169, Maloney (Wisconsin 30(b)(6)) Tr. 37:9-24; Ex. 177, Meade (College Board 30(b)(6)) Tr. 274:16-23, 277:4-8; Ex. 13, CBD000001 (CSS/FINANCIAL AID PROFILE USER'S GUIDE, COLLEGE BOARD, 2003-2004) at -010, and the College Board has identified prioritizing need-based aid as a key principle of financial aid for decades, Ex. 177, Meade (College Board 30(b)(6)) Tr. 273:17-24, 274:16-23; Ex. 126, Meade (College Board 30(b)(6)) Dep. Ex. 34 at 21-22 (College Board adopted "Principles of Student Financial Aid Administration," the first of which stated, "[t]he primary purpose of a collegiate financial aid program should be to provide financial assistance to accepted students who, without such aid, would be unable to attend that college.").

      **PLAINTIFFS' RESPONSE: Disputed.** *See* PSOF ¶ 15.

      17.    **DEFENDANTS' ASSERTION:** Some Defendant schools, as well as other schools like Harvard and Stanford, award only need-based aid, and did so well before the 568 Group was formed. *See, e.g.*, Ex. 414, 21 U. PA. ALMANAC 33 at 10 (May 13, 1975), *available at* https://almanac.upenn.edu/archive/v21pdf/n33/051375.pdf (last visited May 6, 2025) (stating in 1975, "Penn has a policy of giving financial aid to undergraduates exclusively on the basis of need"); Ex. 369, *Other Grants and Scholarships*, BROWN UNIV., https://finaid.brown.edu/aid-types/grants-scholarships (last visited May 6, 2025); Ex. 278, *Does Columbia Offer Merit Scholarships?*, COLUMBIA UNIV. – COLUMBIA COLL. & COLUMBIA ENG'G, https://www.cc-seas.columbia.edu/content/doescolumbia-offer-merit-scholarships (last visited

May 4, 2025); Ex. 309, *Grants and Scholarships*, CORNELL UNIV., https://finaid.cornell.edu/types-of-aid/grants-and-scholarships (last visited May 4, 2025); Ex. 392, *Types of Financial Aid*, DARTMOUTH COLL., https://admissions.dartmouth.edu/afford/types-financial-aid (last visited May 4, 2025); Ex. 355, *MIT Scholarships*, MIT, https://sfs.mit.edu/undergraduate-students/types-of-aid/mit-scholarship (last visited May 4, 2025); Ex. 382, *Scholarships and Grants*, YALE UNIV., https://finaid.yale.edu/costs-affordability/types-aid/scholarships-and-grants (last visited May 4, 2025); *How Aid Works*, HARVARD COLL. GRIFFIN FIN. AID OFF., https://college.harvard.edu/financial-aid/how-aid-works (last visited May 4, 2025); *How Financial Aid Works*, PRINCETON UNIV., https://admission.princeton.edu/cost-aid/how-financial-aid-works (last visited May 4, 2025); Ex. 316, *How Aid Works*, STANFORD UNIV., https://financialaid.stanford.edu/undergrad/how/index.html (last visited May 4, 2025); Ex. 3.1, Stiroh Reb. ¶92, Ex. 3.

**PLAINTIFFS' RESPONSE: Disputed**. Plaintiffs object to any implied bright-line definition of need-based aid, as further stated in RSOF ¶ 17. Plaintiffs do not dispute that some Defendant schools and peers *describe themselves as* awarding only need-based aid. But as longtime College Board economist Dr. Baum has acknowledged, "there is no simple way to draw a distinction between state need-based and non-need-based aid," and that "[t]he ambiguity is even greater for institutional grant aid." Pl. Ex. 140, SANDY BAUM, TRENDS IN STUDENT AID 2005, COLLEGE BOARD at 3 (2005);

Plaintiffs object to Defendants' citations to unproduced present-day (i.e., post Class Period)

23

websites as inadmissible. Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record. Finally, Plaintiffs dispute that "aid" is provided at all. *See* PSOF ¶ 55.

18.    **DEFENDANTS' ASSERTION:** Some Defendant schools, like Chicago, Duke, Emory, Johns Hopkins, Notre Dame, Rice, and Vanderbilt, as well as many other schools like WashU, USC, and the University of Michigan, provide financial aid that is not entirely based on financial need—what is known in higher education as "merit" or "merit-based" aid. Ex. 348, *Merit Scholarships*, UNIV. OF CHI., https://collegeadmissions.uchicago.edu/financial-support/scholarships/merit-scholarships (last visited May 6, 2025); Ex. 345, *Merit Scholarships*, DUKE UNIV., https://ousf.duke.edu/meritscholarships (last visited May 6, 2025); Ex. 310, *Grants and Scholarships*, EMORY UNIV., https://studentaid.emory.edu/undergraduate/types/grants-scholarships/index.html (last visited May 6, 2025); Ex. 346, *Merit Scholarships*, JOHNS HOPKINS UNIV., https://apply.jhu.edu/tuitionaid/types-of-financial-aid/merit-scholarships (last visited May 6, 2025); Ex. 349, *Merit-Based Scholarships*, UNIV. OF NOTRE DAME, https://financialaid.nd.edu/aid-types/merit-basedscholarships (last visited May 6, 2025); Ex. 347, *Merit Scholarships*, RICE UNIV., https://financialaid.rice.edu/types-aid/merit-scholarships (last visited May 6, 2025); Ex. 344, *Merit Scholarship Opportunities*, VANDERBILT UNIV., https://www.vanderbilt.edu/_scholarships/faq.php (last visited May 6, 2025); Ex. 381, *Scholarships*, WASHU FIN. AID, https://financialaid.washu.edu/how-aid-works/types-of-aid/scholarships (last visited May 4, 2025); Ex. 380, *Scholarships*, USC UNDERGRADUATE ADMISSION, https://admission.usc.edu/costand-financial-aid/scholarships (last visited May 4, 2025); Ex. 395, *Undergraduate*, UNIV. OF MICHIGAN FIN. AID, https://finaid.umich.edu/types-aid/scholarships/undergraduate (last visited May 4, 2025). Georgetown provides merit-based aid only for student-athletes. Ex. 307, GTWNU_0000223576 (GEORGETOWN COMMON DATA SET 2021-2022) at -601.

**PLAINTIFFS' RESPONSE:** Subject to the objection to Defendants' claimed distinction drawn between need-based and merit aid stated in RSOF ¶ 17, **undisputed.**



Plaintiffs object to Defendants' citations to unproduced present-day (i.e., post Class Period) websites as inadmissible. Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the

record. Finally, Plaintiffs dispute that "aid" is provided at all. *See* PSOF ¶ 55.

19. **DEFENDANTS' ASSERTION:** Defendants, as well as many other schools including Stanford, Harvard, the University of Wisconsin, Amherst, Carnegie Mellon, and innumerable College Board member schools, prioritize need-based financial aid over merit-based aid, and provide significantly more need-based aid than merit-based aid. Ex. 13, CBD000001 (CSS/FINANCIAL AID PROFILE USER'S GUIDE, COLLEGE BOARD, 2003-2004) at -002, -010 (the College Board, an organization comprising 4,200 schools, endorsed the principle that schools should "commit[] to the primacy of need based aid in the institution's student aid portfolio" to "support access for students who couldn't otherwise attend the institution"); Ex. 145, Cooper (Stanford 30(b)(6)) Tr. 106:20-107:8 (noting that Stanford does not offer merit-based aid because all "students who get admitted" are "merit worthy," and Stanford thus "prefer[s] to put [its] resources toward need-based aid"); Ex. 152, Donahue (Harvard) Tr. 74:18-20; Ex. 135, Betterton (Princeton) Tr. 62:6-16; Ex. 169, Maloney (Wisconsin 30(b)(6)) Tr. 36:9-21, 37:18-38:9; Ex. 175, McGann (Amherst 30(b)(6)) Tr. 16:10-17:8; Ex. 162, Hill (Carnegie Mellon 30(b)(6)) Tr. 55:16-56:4; Ex. 349, *Merit-Based Scholarships*, UNIV. OF NOTRE DAME, https://financialaid.nd.edu/aid-types/merit-basedscholarships (last visited May 6, 2025) ("Around three percent of admitted students receive merit aid, while need-based financial aid is a possibility for many more students."); Ex. 181, Nucciarone (Notre Dame 30(b)(6)) Tr. 71:20-72:11 ("Notre Dame has consistently remained committed, from our board of trustees' statements down, to need-based aid. We are not critical of schools who choose to focus their aid programs on merit aid. That is not the direction the university has ever taken."); Ex. 180, Nucciarone (Notre Dame) Tr. 292:24-293:16 ("[M]erit aid has not been really a significant part of the fabric of Notre Dame aid programs …. We are going to continue to focus on need-based financial aid.").

**PLAINTIFFS' RESPONSE: Disputed in part.** Plaintiffs object to the purported distinction Defendants draw between need-based and merit-based aid as stated in RSOF ¶ 17. Plaintiffs do not dispute that Defendants, as well as many other schools, including Stanford, Harvard, the University of Wisconsin, Amherst, and Carnegie Mellon, prioritize need-based financial aid over merit-based aid and provide significantly more need-based aid than merit-based aid. Plaintiffs dispute that "innumerable College Board member schools prioritize need-based financial aid over merit-based aid." Ex. Def. 13. Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record. While the cited evidence indicates that the "CSS Assembly of the College Board" endorsed the stated principles in Def. Exhibit 13, there is no evidence (such as an annual certification or memorandum of understanding) that any, let alone all, of the 4,200 member schools did individually prioritize need-based financial aid in this way. Finally, Plaintiffs dispute that "aid" is provided at all. *See* PSOF ¶ 55.

20.    **DEFENDANTS' ASSERTION:** Merit aid disproportionately benefits more affluent students. *See* Ex. 2.1, Long Reb. ¶88, nn.176-178; Ex. 180, Nucciarone (Notre Dame) Tr. 300:7-301:2 ("Merit aid is not inherently bad. Merit aid, however, if it's based on academic merit, one would – and it was based on test scores, we can draw some conclusions on who got merit aid."); Ex. 181, Nucciarone (Notre Dame 30(b)(6)) Tr. 72:12-73:9 ("Yes, [awarding need-based aid would be likely to better ensure access for students than awarding merit aid], I believe that's, again, the university commitment, is to need-based aid. … I believe there is research out there … that suggests that merit aid often goes to wealthier students ….").

**PLAINTIFFS' RESPONSE: Disputed**. Plaintiffs object that the term "disproportionately" is vague and ambiguous in this context. Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record. Defendants present no evidence as to what would be the "proportionate" measure for merit aid for "affluent" students. Plaintiffs further object to the bright-line distinction between need-based and merit aid implied. *See* RSOF ¶ 17.

21.    **DEFENDANTS' ASSERTION:** The principle that a family should be asked to contribute to a student's education in accordance with their ability to pay has been a foundational tenet of financial aid policy throughout the higher education industry since at least the 1950s. Ex. 177, Meade (College Board 30(b)(6)) Tr. 266:3-267:11, 268:19-270:6 (explaining that awarding aid based on need and assuming that families bear primary responsibility for paying for college have been College Scholarship Service ("CSS") principles since 1954); Ex. 126, Meade (College Board 30(b)(6)) Dep. Ex. 34 at 20-23; Ex. 413, 12 U. PA. ALMANAC 4 (Jan. 1966) at 5, *available at* https://almanac.upenn.edu/archive/v12pdf/n04/011666.pdf (at Penn, "scholarships, loans, and job opportunities are made available to the student … in proportion to their ability to pay"); Ex. 146, Corbett (Cornell) Tr. 116:23-117:22 (noting that "generally in financial aid, we do espouse the theory that the responsibility for financing the college education lies with the parent or student if they have the ability to pay"); Ex. 13, CBD000001(CSS/FINANCIAL AID PROFILE USER'S GUIDE, COLLEGE BOARD, 2003-2004) at -009-013; *see also* Ex. 145, Cooper (Stanford 30(b)(6)) Tr. 205:2206:3 (viewing the Need Analysis Principles, including the idea that families should contribute according to their ability, as "foundational to the concept of need-based financial aid").

**PLAINTIFFS' RESPONSE: Disputed in part.** Plaintiffs do not dispute that the tenet that a family should contribute according to the ability to pay dates back to the early 1950s, an era when Penn's combined tuition and fees totaled less than $1,000, Pl. Ex. 141, UNIVERSITY OF PENNSYLVANIA, TUITION AND MANDATED FEES, ROOM AND BOARD, AND OTHER EDUCATIONAL COSTS AT PENN (1950-1959), https://archives.upenn.edu/exhibits/penn-history/tuition/tuition-1950-1959/; the average American family made more than 3 times that cost of attendance ($3,300

a year), Pl. Ex. 142, UNITED STATES CENSUS, INCOME OF FAMILIES AND PERSONS IN THE UNITED STATES: 1950 (March 25, 1952), https://www.census.gov/library/publications/1952/demo/p60-009.html, and the University of Pennsylvania Fund was "approximately $5,000,000," *see* Pl. Ex. 15, University of Pennsylvania, Minutes of the Board of Trustees from October 10, 1947 to December 11, 1953 at 254. Plaintiffs also note that at this time, Penn's Minutes of the Board of Trustees stated that "[a]ll the colleges in the Ivy Group adhere to the agreement that financial aid should be given only on the basis of need, and information is exchanged so that the colleges stay in line with one another in the amount of aid that is offered. There seems to be no problem among the Ivies, Pennsylvania included, in adherence to that agreement." Pl. Ex. 16, University of Pennsylvania, Minutes of the Board of Trustees from September 11, 1964 to January 21, 1966 at 171. Plaintiffs dispute any implication that this principle accurately reflects current practices or practices throughout the Class Period, because it simply states that wealthy families should pay more. ██████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ Pl. Ex. 143, DeGioia Dep. Exhibit 13 at 2.

### C. Financial Aid Process

22.     **DEFENDANTS' ASSERTION:** To obtain need-based financial aid, students must submit financial aid applications that provide information about their family's financial circumstances (income, assets, etc.), Ex. 1.1, Hill Reb. ¶¶56-57, such as the Free Application for Federal Student Aid ("FAFSA") Form, which is used to determine eligibility for federal financial aid, Ex. 420, *What Is the FAFSA?*, COLLEGE BOARD, https://blog.collegeboard.org/what-is-the-fafsa (last visited May 6, 2025); Ex. 424, *When Is FAFSA Due? Important Deadlines for 2024 and Beyond*, COURSERA, https://www.coursera.org/articles/when-is-fafsa-due (last visited May 6, 2025). Many schools also require students to fill out and submit the College Scholarship Service ("CSS") Profile, an application developed by the College Scholarship Service (a division of the College Board) to collect more detailed information about a family's financial circumstances. Ex. 232, *About CSS Profile*, COLLEGE BOARD, https://cssprofile.collegeboard.org/about (last visited Apr. 30, 2025); Ex. 417, *What Are the Different Types of Financial Aid?*, BIGFUTURE, https://bigfuture.collegeboard.org/pay-for-college/get-help-paying-for-college/different-typesfinancial-aid (last visited May 1, 2025). Some schools also require financial aid applicants to submit school-specific supplemental forms. *See, e.g.*, Ex. 242, *Applying as an Incoming Domestic Student: Regular Decision*, CALTECH, https://www.finaid.caltech.edu/applying/how/newdomesticreg (last visited May 1, 2025) (Caltech requiring students to submit the Caltech

Supplemental Aid Application in addition to the FAFSA and CSS Profile); Ex. 230, *2024–2025 Financial Aid Application Checklist*, UNIV. OF PA., https://srfs.upenn.edu/financial-aid/apply/prospective-UG-checklists/US (last visited Apr. 30, 2025) (Penn requiring applicants to submit the Penn Outside Resource Form); Ex. 177, Meade (College Board 30(b)(6)) Tr. 12:12-16; *see also* Ex. 243, *Applying for Financial Aid*, UNIV. OF S. CAL. https://financialaid.usc.edu/graduateprofessional-financial-aid/applying-for-financial-aid (last visited May 7, 2025).

        **PLAINTIFFS' RESPONSE: Undisputed.**

       23.    **DEFENDANTS' ASSERTION:** Financial aid officers use this financial information to assess each student's "Expected Family Contribution," or "EFC," which is how much the student and their family are expected to contribute towards the cost of the student's education for a given award year. Ex. 1.1, Hill Reb. ¶¶46-47; Ex. 180, Nucciarone (Notre Dame) Tr. 57:8-59:5 (determining a family's EFC "is an art and a science" that requires "looking at the story of a family" and "putting pieces of a family's story together and connecting dots" as financial aid officers "think about a family's capacity to pay"); Ex. 252, *Chapter 3: Expected Family Contribution (EFC)*, FED. STUDENT AID, https://fsapartners.ed.gov/knowledge-center/fsa-handbook/2023-2024/application-andverification-guide/ch3-expected-family-contribution-efc (last visited Apr. 30, 2025).

        **PLAINTIFFS' RESPONSE: Undisputed.**

       24.    **DEFENDANTS' ASSERTION:** The Institutional Methodology ("IM") was created by the College Board, a nonprofit membership organization, and its origins trace back to the 1950s. Ex. 13, CBD000001 (CSS/FINANCIAL AID PROFILE USER'S GUIDE, COLLEGE BOARD, 2003-2004) at -022-031; Ex. 235, *About Us*, COLLEGE BOARD, https://about.collegeboard.org (last visited Apr. 10, 2025); Ex. 177, Meade (College Board 30(b)(6)) Tr. 21:12-18. Hundreds of schools have used the IM since the 1990s. *See* Ex. 133, Baum Tr. 53:14-54:11 ("Q. Did you have an understanding during the 1990s as to how prevalent the use of the IM was among colleges? …. A. There was a certain number of colleges that used it. I was never totally on top of what that number was. It was a couple hundred. Q. Do you have any sense of, during your time of your work in the 1990s, as to how many schools used FM as opposed to the IM. A. All schools have to use the FM for federal aid. Most schools use only the FM, and a few hundred schools use the IM in addition."); Ex. 177, Meade (College Board 30(b)(6)) Tr. 171:16-173:11 ("Q. About how many colleges and universities use the CSS Profile today? A. We say 300 colleges and scholarship organizations …. Q. About how many colleges and universities use some version of the institutional methodology today, to your knowledge? A. It would be -- it would be very close to the same number. You can't use IM without accepting the Profile. Q. Are there schools that you are aware of that use the Profile but do not use any form of the institutional methodology? A. No.").

        **PLAINTIFFS' RESPONSE: Undisputed.** But, for clarity, the IM was formally created

in 1992. *See* Defendant Exhibit 13 at -022-031.

       25.    **DEFENDANTS' ASSERTION:** Relative to the Federal Methodology ("FM") used to determine eligibility for federal aid, the IM offers a more comprehensive and holistic assessment of a family's financial position—whereas the FM relies on information from the

FAFSA, the IM relies on information from the CSS Profile, meaning it accounts for many more aspects of a family's financial condition and circumstances. Ex. 330, INSTITUTIONAL METHODOLOGY, COLLEGE BOARD, *available at* https://secure-media.collegeboard.org/digitalServices/pdf/professionals/institutionalmethodology.pdf; Ex. 13, CBD000001 (CSS/FINANCIAL AID PROFILE USER'S GUIDE, COLLEGE BOARD, 2003-2004) at -029-031; Ex. 139, Chan (USC 30(b)(6)) Tr. 65:4-11.

      **PLAINTIFFS' RESPONSE: Disputed in part.** It is undisputed that the IM "accounts for many more aspects of a family's financial condition and circumstances." Plaintiffs dispute that this necessarily allows the IM to offer a more "comprehensive and holistic assessment of a family's financial position" and objects to those vague and ambiguous terms. Defendants' qualitative editorializing ignores fundamental differences between the two methodologies, such as that the FM does not measure home equity but the IM does. *See* Ex. 330 at 2. Excluding home equity arguably makes the FM more comprehensive and holistic because it focuses on a family's actual financial capacity—liquid assets and income—rather than illiquid and often inaccessible wealth. Indeed, consistent with that dynamic, certain schools have stopped considering home equity in their calculations altogether. ████████████████████████████████

Plaintiffs further dispute that USC's cited testimony, about its own institutional methodology which only uses "some aspects" of the IM, supports the stated contention.

      26.    **DEFENDANTS' ASSERTION:** Because the IM is customizable, a school collecting CSS Profile information may choose to use or not use information, or may process or evaluate information consistently with or differently from the way the College Board recommends. Ex. 13, CBD000001 (CSS/FINANCIAL AID PROFILE USER'S GUIDE, COLLEGE BOARD, 2003-2004) at -050-051; Ex. 14, CBD000546 (CSS/FINANCIAL AID PROFILE USER'S GUIDE, COLLEGE BOARD, 2005-2006) at -591-592; Ex. 15, CBD001802 (CSS/FINANCIAL AID PROFILE USERS' GUIDE, COLLEGE BOARD, 2012-2013) at -806807; Ex. 273, *CSS Profile*, COLLEGE BOARD, https://highered.collegeboard.org/financialaid/management/css-profile (last visited Apr. 28, 2025); Ex. 330, INSTITUTIONAL METHODOLOGY, COLLEGE BOARD, *available at* https://secure-media.collegeboard.org/digitalServices/pdf/professionals/institutional-methodology.pdf. An uncustomized IM—*i.e.*, used exactly as provided by the College Board—is referred to as the "Base IM." *See* Ex. 177, Meade (College Board 30(b)(6)) Tr. 34:22-35:2 ("Q. Have you heard the phrase 'base IM'? A. Yes. Q. What do you understand base IM to be? A. Base IM is – essentially started the default settings for the components of IM."); Ex. 175, McGann (Amherst 30(b)(6)) Tr. 52:16-53:9 ("Q. Okay. Are you familiar with the term "base IM"? A. Yes. Q. Okay. And what do you understand 'base IM' to refer to? A. There -- as kind of a baseline to using Institutional Methodology, a methodology used by many, many institutions of higher education. There are some -- for each kind of identified option

within IM, there's kind of a default condition, but institutions are able to make changes as they see best. Q. Okay. So just so we're on the same page going forward, if I use the phrase 'base IM,' will you understand it to mean the IM as produced by the College Board, with no changes made by Amherst or otherwise? A. Yes.").

**PLAINTIFFS' RESPONSE: Disputed in part.** Practically, the IM is implemented via certain software. ████████████████████████████████████████████ And within that software, it is difficult to customize at least certain key elements of the IM, such as its assessment rates. *Id.* at 105:13-21. Using the IM also locks schools into at least some version of its assets and income framework, whereas one can imagine—as Defendants have internally— entirely different approaches to financial aid. ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ So, while Plaintiffs do not dispute that as a general matter schools can technically customize *certain* elements of the IM in the limited ways that IM permits, Plaintiffs dispute any characterization that the IM is practically customizable as to all aspects.

27. **DEFENDANTS' ASSERTION:** Every Defendant school chose its own approach to analyzing a student's need. At some schools, financial aid officers applied variations of other, existing methodologies (like the FM or IM), while at other schools, financial aid officers used in-house, school-specific approaches. Ex. 2.1, Long Reb. ¶¶163-202; Ex. 195, Tuman (Columbia) Tr. 218:3-219:13; Ex. 180, Nucciarone (Notre Dame) Tr. 57:8-24.

**PLAINTIFFS' RESPONSE: Disputed in part.** First, at least while they were members of the 568 Group, Defendants agreed to the CM and the Base IM. *See* CSOF ¶¶ 10-11. Plaintiffs further dispute the implication that Defendants' aid awards were in no way influenced by other Elite Private Universities' awards. In fact, ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████ Similarly, Defendants regularly corresponded about

30

specific applicants' aid awards, especially when a Defendant did not understand another school's

EFC calculation. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████

28.     **DEFENDANTS' ASSERTION:** The Base IM has been the starting point for hundreds of schools' need-analysis methodologies—including Defendants and countless others—since the 1990s. *See, e.g.*, Ex. 80, NULIT-0000181680 (INSTITUTIONAL METHODOLOGY USER GUIDE, COLLEGE BOARD, July 15, 2022) at -685; Ex. 119, VANDERBILT-00272944 (PROFILE USERS GUIDE, COLLEGE BOARD, Oct. 2013) at -970-971; Ex. 177, Meade (College Board 30(b)(6)) Tr. 171:16-172:6, 173:2-19; Ex. 152, Donahue (Harvard) Tr. 165:5-166:5, 184:23-185:24; Ex. 161, Higinbotham (NYU 30(b)(6)) Tr. 74:6-75:12; Ex. 139, Chan (USC 30(b)(6)) Tr. 65:2-20; 112:17-20, 65:2-20; Ex. 162, Hill (Carnegie Mellon 30(b)(6)) Tr. 59:24-61:4; Ex. 180, Nucciarone (Notre Dame) Tr. 78:21-79:3 (Notre Dame uses the "institutional methodology with professional judgment approaches applied"); *see also* Ex. 231, *2024-25 Participating Institutions and Programs*, COLLEGE BOARD (archived June 1, 2024), https://web.archive.org/web/20240601205323/https://profile. collegeboard.org/profile/ppi/participatingInstitutions.aspx (last visited May 7, 2025); Ex. 198, Varas (Penn 30(b)(6)) Tr. 217:2-218:13 (explaining that schools refer to the Base IM because "it would be impossible" for a school to develop a similarly comprehensive approach to assess student need). Schools may simply use the Base IM with its "Global Settings" set as provided by College Board, or may adjust the Global Settings as they see fit, adapting the IM to form their own school-specific version of the methodology. Ex. 14, CBD000546 (CSS/FINANCIAL AID PROFILE USER'S GUIDE, COLLEGE BOARD, 2005-2006) at -591-592; Ex. 15, CBD001802 (CSS/FINANCIAL AID PROFILE USERS' GUIDE, COLLEGE BOARD, 2012-2013) at -806-807; Ex. 273, *CSS Profile*, https://highered.collegeboard.org/financial-aid/management/css-profile (last visited Apr. 28, 2025); Ex. 330, INSTITUTIONAL METHODOLOGY, COLLEGE BOARD, *available at* https://securemedia.collegeboard.org/digitalServices/pdf/professionals/institutional-methodology.pdf.

**PLAINTIFFS' RESPONSE: Disputed in part.** Plaintiffs do not dispute that the Base IM

was a component to their needs-analysis methodology. Plaintiffs dispute that the Base IM is the

"starting point for hundreds of schools' needs-analysis methodology." Rule 56(c)(1)(A) and Local

Rule 56.1(d) require the fact asserted to be supported by evidence in the record. The purported

evidence cited in Defendants' Exhibit 231 that Defendants content reflect "participating

institutions" shows universities that use College Board's data collection tool, CSS. But as the

College Board's corporate representative testified.  At a minimum, there is no evidence that all of these hundreds of universities—the majority of which do not purport to be among the few "need blind" and "full need" schools like Defendants do—used the same starting point as Defendants. As of the end of the Class Period, for example, the endowment levels for the approximately 200 colleges and universities that Defendants claim use the Base IM are dramatically less than Defendants' endowments. *See* Pl. Ex. 14, SR1 ¶¶ 115-116.

29.    **DEFENDANTS' ASSERTION:** By April 2008, some schools—including Defendants Yale, Penn, Columbia, Chicago, Cornell, Duke, Northwestern, Brown, and MIT—adopted "income threshold" policies, whereby families with ordinary assets and annual incomes below a certain threshold are automatically assigned an EFC of $0 or are not offered loans. Ex. 24, Columbia_00015333; Ex. 261, *Cornell Drops Need-Based Loans for Students From Families Earning Under $75,000*, CORNELL UNIV. (Jan. 31, 2008), https://news.cornell.edu/stories/2008/01/cornell-announcessweeping-new-financial-aid-program (last visited May 6, 2025); Ex. 124, Kotlikoff (Cornell 30(b)(6)) Dep. Ex. 2 at 2; Ex. 196, Varas (Penn) Aug. 2, 2023 Tr. 219:13-221:24; Ex. 198, Varas (Penn 30(b)(6)) Tr. 98:14-101:7; Ex. 8, BROWN_0000050379 at -379; Ex. 152, Donahue (Harvard) Tr. 27:17-29:6, 33:2-16.

**PLAINTIFFS' RESPONSE: Undisputed.**

30.    **DEFENDANTS' ASSERTION:** Defendants routinely publish information about their financial aid requirements, policies, and approaches on the "financial aid" pages of their websites. Ex. 398, *Undergraduate Financial Aid*, BROWN UNIV., https://finaid.brown.edu (last visited May 7, 2025); Ex. 416, *Welcome to the Office of Financial Aid*, CALTECH, https://www.finaid.caltech.edu (last visited May 7, 2025); Ex. 396, *Undergraduate Aid*, UNIV. OF CHI., https://financialaid.uchicago.edu/undergraduate (last visited May 7, 2025); Ex. 288, F*inancial Aid & Educational Financing*, COLUMBIA UNIV., https://cc-seas.financialaid.columbia.edu (last visited May 7, 2025); Ex. 294, *Financial Aid*, CORNELL UNIV., https://finaid.cornell.edu (May 6, 2025); Ex. 295, *Financial Aid*, DARTMOUTH COLL., https://financialaid.dartmouth.edu (last visited May 7, 2025); Ex. 332, *Karsh Office of Undergraduate Financial Support*, DUKE UNIV., https://financialaid.duke.edu (last visited May 7, 2025); Ex. 399, *Undergraduate Financial Aid*, EMORY UNIV., https://studentaid.emory.edu/undergraduate/index.html (last visited May 7, 2025); Ex. 296, *Financial Aid*, GEORGETOWN UNIV., https://uadmissions.georgetown.edu/financial-aid (last

visited May 7, 2025); Ex. 297, *Financial Aid*, JOHNS HOPKINS UNIV., https://www.jhu.edu/admissions/financial-aid (last visited May 7, 2025); Ex. 342, *Making MIT Affordable*, MIT, https://sfs.mit.edu/undergraduate-students/the-cost-of-attendance/making-mitaffordable (last visited Apr. 30, 2025); Ex. 400, *Undergraduate Financial Aid*, NORTHWESTERN UNIV., https://undergradaid.northwestern.edu (last visited May 7, 2025); Ex. 364, *Office of Financial Aid*, UNIV. OF NOTRE DAME, https://financialaid.nd.edu (last visited May 7, 2025); Ex. 363, *Office of Financial Aid*, RICE UNIV., https://financialaid.rice.edu (last visited May 7, 2025); *Financial Aid*, UNIV. OF PA., https://srfs.upenn.edu/financial-aid (last visited May 7, 2025); Ex. 365, *Office of Student Financial Aid and Scholarships*, VANDERBILT UNIV., https://www.vanderbilt.edu/financialaid/#:~:text=Vanderbilt%20will%20meet%20100%25%20of,that%20impact%20or%20limit%20eligibility (last visited Apr. 30, 2025); Ex. 301, *Financial Aid*, YALE UNIV., https://finaid.yale.edu (last visited May 7, 2025).

**PLAINTIFFS' RESPONSE: Undisputed with clarification.** Plaintiffs do not dispute that these websites—accessed well after the Class Period—contain some "information about [Defendants'] financial aid requirements, policies, and approaches." Plaintiffs do not understand Defendants to be asserting as undisputed fact that, throughout the Class Period, Defendants published complete and exhaustive "information about their financial aid requirements, policies, and approaches," including about the 568 Group. Nor did they. ██████████████ ████████████████████████████████████████████████████████████ Plaintiffs object to Defendants' citations to unproduced present-day (i.e., post Class Period) websites as inadmissible. Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record.

31.    **DEFENDANTS' ASSERTION:** Schools that use the IM, like Defendants, typically collect and consider information about a family's income and assets to determine EFCs. Ex. 285, *Factors Considered in Brown's Need Analysis Formula*, BROWN UNIV., https://finaid.brown.edu/basics/financial-needeligibility/factors-considered-browns-needs-analysis-formula (last visited May 6, 2025); Ex. 318, *How Caltech Calculates Your Family Contribution*, CALTECH, https://www.finaid.caltech.edu/_howitworks/familycontribution (last visited May 6, 2025); Ex. 394, UCHICAGO COLLEGE AID HANDBOOK FOR STUDENTS AND FAMILIES, ACADEMIC YEAR 2024-25, UNIV. OF CHI., *available at* https://financialaid.uchicago.edu/uchicago-college-aid-handbook-2024-2025.pdf; Ex. 277, *Determining Eligibility*, COLUMBIA UNIV., https://cc-seas.financialaid.columbia.edu/how/determine-eligibility (last visited May 6, 2025); Ex. 292, *Financial Aid Eligibility*, CORNELL UNIV., https://finaid.cornell.edu/cost-to-attend/financial-aid-eligibility (last visited May 6, 2025); Ex. 324, *How Much Help Will I Get?*, DARTMOUTH COLL., https://financialaid.dartmouth.edu/how-aid-works/how-much-help-will-i-get (last visited May 6, 2025); Ex. 246, *Awarding & Policy*, DUKE UNIV., https://financialaid.duke.edu/forms-resources/awarding-policy (last visited May 6,

2025); Ex. 314, *How Aid Works for Undergraduates*, GEORGETOWN UNIV., https://finaid.georgetown.edu/undergrad/aid-for-undergrads (last visited May 6, 2025); Ex. 423, *What We Consider*, MIT, https://sfs.mit.edu/undergraduate-students/our-approach-to-aid/whatwe-consider (last visited May 6, 2025); Ex. 302, *Financial Need*, NORTHWESTERN UNIV., https://undergradaid.northwestern.edu/aid-basics-eligibility/financial-need.html (last visited May 6, 2025); Ex. 406, *Eligibility and Demonstrated Need*, RICE UNIV., https://financialaid.rice.edu/ forms-resources/eligibility-and-demonstrated-need#:~:text=Families%20who%20apply%20for%20financial,aid%2C%20work%20study%20a nd%20loans (last visited May 4, 2025); Ex. 284, *Expected Family Contribution*, YALE UNIV., https://finaid.yale.edu/award-letter/financial-aidterminology/expected-family-contribution (last visited May 6, 2025); Ex. 326, *How We Determine Need*, UNIV. OF PA., https://srfs.upenn.edu/financial-aid/undergraduate-aid-program/how-wedetermine-need (last visited May 6, 2025). They may consider multiple streams of income and may decide to treat different streams similarly to or differently from one another; they may consider taxable income and untaxable income similarly or differently; they may treat student income the same as parent income, or differently; and they may apply allowances against income for things like retirement savings (or lack thereof) or special circumstances, among other things. Ex. 13, CBD000001 (CSS/FINANCIAL AID PROFILE USER'S GUIDE, COLLEGE BOARD, 2003-2004) at -138-165; Ex. 14, CBD000546 (CSS/FINANCIAL AID PROFILE USER'S GUIDE, COLLEGE BOARD, 2005-2006) at -655-705; Ex. 15, CBD001802 (CSS/FINANCIAL AID PROFILE USERS' GUIDE, COLLEGE BOARD, 2012-2013) at -830-850; Ex. 181, Nucciarone (Notre Dame 30(b)(6)) Tr. 194:9195:15 (describing retirement allowances).

      **PLAINTIFFS' RESPONSE: Undisputed in part.** Plaintiffs do not dispute that the IM permits one to consider these assets and incomes differently. Plaintiffs dispute that Defendants materially did so while adhering to the CM. *See* CSOF ¶¶ 9-10. Plaintiffs object to Defendants' citations to unproduced present-day (i.e., post Class Period) websites as inadmissible. Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record.

      32.    **DEFENDANTS' ASSERTION:** A school's need analysis methodology may also treat different classes of assets differently from one another, or not; may treat student assets and parent assets the same, or differently; and may ignore certain kinds of assets if the school does not believe that ownership of a certain type of asset should be considered a resource that may be tapped to finance a student's education. Ex. 13, CBD000001 (CSS/FINANCIAL AID PROFILE USER'S GUIDE, COLLEGE BOARD, 2003-2004) at -034-035, -050-051, -117; Ex. 14, CBD000546 (CSS/FINANCIAL AID PROFILE USER'S GUIDE, COLLEGE BOARD, 2005-2006) at -591-592; Ex. 15, CBD001802 (CSS/FINANCIAL AID PROFILE USERS' GUIDE, COLLEGE BOARD, 2012-2013), at -822, -835-836; Ex. 18, COFHE02-00009011 at -012 (describing Princeton's exclusion of home equity under certain circumstances); Ex. 180, Nucciarone (Notre Dame) Tr. 238:9-239:6 (applying higher levels of protection to parent assets).

      **PLAINTIFFS' RESPONSE: Disputed in part.** Plaintiffs do not dispute that a "school's

need analysis methodology may also treat different classes of assets differently from one another, or not; may treat student assets and parent assets the same, or differently; and may ignore certain kinds of assets." Plaintiffs dispute that such different treatment turn on whether a school "believes" an "asset should be considered." For instance, one of the premises of the 568 Group was ██████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████ Further, the facts show that what Defendants "believed" was influenced by, and converged as a result of, membership in the 568 Group. CSOF ¶¶ 9-10.

33.     **DEFENDANTS' ASSERTION:** Defendants assess a student's financial need by subtracting their EFC from the school's Cost of Attendance ("COA"), which includes tuition, room, board, books, fees, and other expenses. *See* Ex. 289, *Financial Aid 101*, UNIV. OF PA., https://srfs.upenn.edu/financialaid/undergraduate-aid-program/financial-aid-101 (last visited May 6, 2025); Ex. 320, *How Financial Aid Works at Caltech*, CALTECH, https://www.finaid.caltech.edu/howitworks (last visited May 6, 2025); Ex. 292, *Financial Aid Eligibility*, CORNELL UNIV., https://finaid.cornell.edu/cost-to-attend/financial-aid-eligibility (last visited May 6, 2025); Ex. 1.1, Hill Reb. ¶48; Ex. 2.1, Long Reb. ¶46; Ex. 4, Singer Am. Rep. ¶28 ("There are two components of a higher-education institution's computation of institutional aid, or the discount off the list price. First, institutions calculate what they believe families can pay, or the 'expected family contribution' ('EFC'). Second, from the list price, institutions subtract the EFC to determine a student's 'need' and then determine how to 'meet' that need, through a 'package' of institutional aid."); *see also* Ex. 191, Singer Tr. 82:3-9 (describing "cost of attendance" as the "list price").

        **PLAINTIFFS' RESPONSE: Undisputed.**

34.     **DEFENDANTS' ASSERTION:** Public and other private universities have similar COAs, and Defendants' COAs are similar to the COAs at leading private liberal arts colleges or for out-of-state students attending flagship public universities. For example, in academic year 2023-2024, the cost of attendance was $83,271 at Notre Dame, $83,622 at Emory, $78,278 at Rice, $75,626 at the University of Michigan (for out-of-state students), $85,300 at Pomona College, $84,103 at Swarthmore College, and $84,860 at Williams College. *See* Ex. 255, *College Navigator*, U.S. DEP'T OF EDUC. - NAT'L CTR. FOR EDUC. STATS., https://nces.ed.gov/collegenavigator (last visited Apr. 18, 2025).

        **PLAINTIFFS' RESPONSE: Disputed in part.** Plaintiffs do not dispute that for these dates outside the Class Period, the cost of attendance for these schools is as stated. Plaintiffs dispute the implication or characterization that it is generally the case that Defendants' cost of attendance is similar to all leading private liberal arts colleges or flagship public universities. *See, e.g.*, Pl. Ex.

14, SR1 ¶ 83. Plaintiffs object to Defendants' citations to unproduced present-day (i.e., post Class Period) websites as inadmissible. Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record.

35.    **DEFENDANTS' ASSERTION:** Once a student's need is decided, Defendants put together individualized financial aid packages aimed at meeting that need. Because Defendants all meet full-need, *see supra* SOF 6, the financial aid package each student receives covers the difference between the student's EFC calculated by the school and that school's COA. Ex. 2.1, Long Reb. ¶46; *see also* Ex. 44, DUKE568_0033960 ██████████████████████ at -018 ████████████████ Ex. 43, DUKE568_0004165 (████████████ at -194 ██████████████ Ex. 140, Chang (Caltech) Tr. 94:9-94:14 (describing Caltech's full-need policy); Ex. 131, Affleck-Graves (Notre Dame)      Tr. 220:20-221:18 (describing Notre Dame's full-need policy); Ex. 59, GTWNU_0000390613 (POLICIES AND PROCEDURES MANUAL 2023-2024, GEORGETOWN UNIVERSITY, 2023-2024) at -624; Ex. 34, CORNELL_LIT0000245115 (UNDERGRADUATE FINANCIAL AID TASK FORCE - FINAL REPORT, CORNELL UNIVERSITY, Apr. 27, 2012) at -117. Defendants also take into account the financial assistance offered by the federal government when setting their own financial aid awards, because Department of Education regulations require schools to adjust financial aid awards to avoid "overawards" of aid, whereby a student's financial aid "exceed[s] the student's financial need." 34 C.F.R. § 673.5 *see, e.g.*, Ex. 180, Nucciarone (Notre Dame) Tr. 43:5-44:3 (describing how Notre Dame takes into account federal grants and loans in adjusting financial aid packages to avoid federal overawards).

**PLAINTIFFS' RESPONSE: Disputed**. Once a student's need is decided, Defendants put together a financial aid package which covers the difference between the student's EFC calculated by the school and that school's COA. "Defendants also take into account the financial assistance offered by the federal government when setting their own financial aid awards," although there are more solutions to the problem than that described in Ms. Nucciarone's testimony. ████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████ Plaintiffs dispute the characterization that awards are "individualized." Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record, and Defendants have failed to provide evidentiary support for this proposition. Rather, (a) packaging was influenced by membership in the 568 Group and thus involved collective decision-making, PSOF ¶ 38, and (b) packaging is

formulaic.  For instance, ███████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████

36.     **DEFENDANTS' ASSERTION:** A student's financial aid package may comprise institutional grants, government grants (such as from the federal government or a state or local government), third-party grants (like from an alumni group, community organization, or scholarship program), loans (subsidized or unsubsidized, from the institution or from another source such as a governmental entity or a community organization or bank), work-study, or a combination of any of these types of aid. Ex. 144, Coleman (Duke) Tr. 66:2-12; *see also* Ex. 393, *Types of Financial Aid: Grants, WorkStudy, and Loans*, FED. STUDENT AID, https://studentaid.gov/understand-aid/types (last visited Apr. 28, 2025); Ex. 359, NATIONAL STUDENT AID PROFILE: OVERVIEW OF 2022 FEDERAL PROGRAMS, NAT'L ASS'N OF STUDENT FIN. AID ADM'RS (NASFAA) (updated Oct. 2022) at 4, 6, 8, and 13, *available at* https://www.nasfaa.org/uploads/documents/2022_National_Profile.pdf; Ex. 319, *How Financial Aid Is Calculated*, FED. STUDENT AID, https://studentaid.gov/completeaid-process/how-calculated (last visited Apr. 28, 2025); Ex. 386, *State Aid*, FED. STUDENT AID, https://studentaid.gov/help-center/answers/article/state-aid (last visited Apr. 28, 2025). Defendants' packaging policies vary. *See infra* SOF 105-110.

**PLAINTIFFS' RESPONSE: Undisputed**, except to the extent Plaintiffs dispute the contentions in the SOF paragraphs 105-110 to support the statement "Defendants' packaging policies vary." Plaintiffs object to Defendants' citations to unproduced present-day (i.e., post Class Period) websites as inadmissible. Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record.

37.     **DEFENDANTS' ASSERTION:** If a student receives merit-based aid from a school that offers merit aid, that aid may, depending on the school's individual policies, replace some or all of the student's need-based aid, or it may be provided in addition to some or all of the student's need-based aid. Ex. 72, ND_0210163 at -164; Ex. 73, ND_0253013; Ex. 74, ND_0254694; Ex. 97, UCHICAGO_0000254603. For example, Notre Dame had a policy of only

meeting demonstrated financial need, reducing the amount of Federal Perkins Loans, federal work-study, federal subsidized Stafford loans, and University scholarships, in that order, if a student received additional outside aid after an initial aid package was offered. Ex. 72, ND_0210163. The University of Chicago's policy depended on whether the student was a University Scholar Award recipient or not—for such scholars, if they received merit-aid that exceeded the self-help (e.g., summer earnings and work-study) portion of their financial aid package, the school reduced their "parental contribution dollar-for-dollar" by that amount. Ex. 97, UCHICAGO_0000254603.

**PLAINTIFFS' RESPONSE: Undisputed**, subject to Plaintiffs' objection to the Defendants' characterization of a bright-line distinction between need-based and merit aid, as stated in RSOF ¶ 17, and that Plaintiffs dispute that "aid" is provided at all. *See* PSOF ¶ 55

38. **DEFENDANTS' ASSERTION:** Schools' packaging policies vary. Some Defendants have used "preferential packaging" to strike a different balance between grant aid and self-help (*i.e.*, loans and work-study) for different individual or groups of students in order to achieve institutional goals or incentivize certain students to matriculate. For example, Columbia reported that, for academic year 2019-2020, self-help was waived for most students in their first or second year in the Scholars Program, which provided enhanced academic and cultural opportunities to participants. Ex. 27, Columbia_00277674 (COFHE YELLOWBOOK FOR 2019-2020 QUESTIONNAIRE, CONSORTIUM ON FINANCING HIGHER EDUCATION, 2019-2020). Similarly, Georgetown reported, for academic year 2016-2017, removing loans for students in their Georgetown Scholars Program ("GSP") and John Carroll program. Ex. 53, GTWNU_0000195239 (COFHE YELLOWBOOK FOR 2016-2017, CONSORTIUM ON FINANCING HIGHER EDUCATION, 2016-2017). Other schools did the same. *See* Ex. 26, Columbia_00258862 at -884 (15 institutions self-reported using more generous packaging policies for low-income students in the COFHE "TUITION, STUDENT BUDGETS, AND SELF-HELP AT THE CONSORTIUM INSTITUTIONS FOR ACADEMIC YEAR 2013-2014" report); Ex. 124, Kotlikoff (Cornell 30(b)(6)) Dep. Ex. 2 at 3 (explaining various criteria for students to receive "reduced loans (by replacing with grants)"); Ex. 7, BROWN_0000003161 at -191 (Brown's Sydney Frank Scholars receive packages with no loans); Ex. 180, Nucciarone (Notre Dame) Tr. 47:7-50:20 (explaining that Notre Dame used preferential packaging certain students, including for low-income and first generation students).

**PLAINTIFFS' RESPONSE: Disputed in part.** Plaintiffs do not dispute that Defendants did not each have identical packaging policies throughout the Class Period, and thus, they "varied." To the extent Defendants are implying they varied *materially,* Plaintiffs dispute that contention. Consistent with the Overarching Conspiracy, the Defendants use███████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████



Indeed, as Defendants' SOF ¶ 38 admits, many institutions reported "using more generous packaging policies for low-income students."

The similarity in packaging policies follows logically as well from the CM's explicit goal of eliminating variance in awards, ostensibly to avoid parent "confusion" when receiving differing awards.

Moreover, the evidence is that the challenged conduct caused packaging to be less generous than it otherwise would have been at all Defendants. CSOF ¶ 17.

39. **DEFENDANTS' ASSERTION:** Defendants' school-specific packaging approaches mean that even if two schools were to calculate the same EFC for a particular student, the composition of that student's financial aid package may nevertheless be meaningfully different at each school. Ex. 1.1, Hill Reb. ¶¶122-124, fig. 22; *id.* ¶¶131-132; Ex. 3.1, Stiroh Reb. ¶¶142-143, fig. 5.6; Ex. 191, Singer Tr. 92:19-24 ("I'm also in agreement … with Dr. Stiroh here that if you're going to go through the hassle of conspiring over the EFC, it could be defeated if you didn't also control the participants' behavior with respect to loans."). For example, at Duke, Ex. 172, McCall (Duke) Tr. 23:19-21, but any such student receiving financial aid from Penn would not receive loans in their aid package, regardless of their EFC, Ex. 298, *Financial Aid*, UNIV. OF PA., https://srfs.upenn.edu/financial-aid (last visited May 6, 2025) (Penn meets "100% of demonstrated financial need with grants and work-study funding").

**PLAINTIFFS' RESPONSE:** Plaintiffs do not dispute that packaging may result in a student's financial aid package having a slightly different composition among Defendants even if the EFC is the same. Plaintiffs do dispute any implication that Defendants' packaging policies or supposed competition in packaging did result in "meaningfully" different net prices, at least to

such an extent that it cures the problems caused by their anti-competitive agreement. *See* RSOF ¶ 38. In particular, packaging policies are not divorced from the need assessment and a "no-loan" school may still have an equivalent net price to a "loan" school. For example, while Penn has claimed to have a buzzy "no loan" packaging policy since 2010, nearly 19% of Penn students still took out institutional loans as recently as 2023. ██████████████████████████

Luis Ferre Sadurni, *"No Loans," but Penn Students Still Graduate with Debt*, THE DAILY PENNSYLVANIAN (Feb. 13, 2016), https://www.thedp.com/article/2016/02/student-debt-national-penn-analysis; ████████████████████████████████████████

████████████████████████████████████████ *see also* Pl. Ex. 149, Marc Novicoff, *Dartmouth Didn't Get Rid of Even Half of Student Loans for Undergraduates*, THE DARTMOUTH (July 22, 2022), https://www.thedartmouth.com/article/2022/07/dartmouth-didnt-get-rid-of-even-half-of-all-student-loans-for-undergraduates (describing a similar problem at Dartmouth). Plaintiffs further object to Defendants' citations to unproduced present-day (i.e., post Class Period) websites as inadmissible. Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record.

40.    **DEFENDANTS' ASSERTION:** Upon determining a student's aid award, a Defendant school notifies the student of the results in an award letter that states (1) the COA for the year (which is also typically posted on the school's website); (2) the EFC that the school has determined for the student; and (3) the amount and types of financial aid that they are being offered for that academic year. Ex. 407, *Understanding Your Financial Aid Award Offers*, BIGFUTURE, https://bigfuture.collegeboard.org/ pay-for-college/financial-aid-awards/understanding-your-financial-aid-award-offers (last visited Apr. 28, 2025); Ex. 265, *Cost of Attendance*, BROWN UNIV., https://finaid.brown.edu/estimatecost-aid/cost (last visited Apr. 29, 2025); Ex. 266, *Cost of Attendance*, CALTECH, https://www.finaid.caltech.edu/costs (last visited Apr. 29, 2025); Ex. 271, *Cost of Attendance*, UNIV. OF CHI., https://financialaid.uchicago.edu/undergraduate/how-aid-works/undergraduate-costs (last visited May 6, 2025); Ex. 262, *Cost & Aid*, COLUMBIA UNIV., https://undergrad.admissions.columbia.edu/affordability/cost (last visited Apr. 29, 2025); Ex. 272, *Cost to Attend*, CORNELL UNIV., https://finaid.cornell.edu/cost-to-attend (last visited Apr. 29, 2025); Ex. 267, *Cost of Attendance*, DARTMOUTH COLL., https://admissions.dartmouth.edu/afford/cost-attendance (last visited Apr. 29, 2025); Ex. 268, *Cost of Attendance*, DUKE UNIV., https://financialaid.duke.edu/how-aid-calculated/cost-attendance (last visited Apr. 29, 2025); Ex. 280, EMORY UNIVERSITY COST OF ATTENDANCE WORKSHEET, EMORY UNIV., *available                                                                                                          at* https://studentaid.emory.edu/_includes/documents/sections/undergraduate/apply/cost-

ofattendance-worksheet.pdf; Ex. 389, *Tuition and Other Expenses*, GEORGETOWN UNIV., https://bulletin.georgetown.edu/expenses-and-financialassistances/basicgeneralexpenses (last visited Apr. 29, 2025); Ex. 263, *Cost & Tuition*, JOHNS HOPKINS UNIV., https://sfs.jhu.edu/cost-tuition (last visited Apr. 29, 2025); Ex. 269, *Cost of Attendance*, MIT, https://sfs.mit.edu/undergraduate-students/the-cost-of-attendance/annual-student-budget (last visited Apr. 29, 2025); Ex. 270, *Cost of Attendance*, NORTHWESTERN UNIV., https://undergradaid.northwestern.edu/aid-basics-eligibility/cost-of-attendance.html (last visited Apr. 29, 2025); Ex. 371, *Pathways to Notre Dame*, UNIV. OF NOTRE DAME, https://financialaid.nd.edu/costs-and-affordability (last visited Apr. 29, 2025); Ex. 390, *Tuition, Fees, & Expenses*, RICE UNIV., https://bursar.rice.edu/tuition_fee_rates/undergraduate-programs (last visited Apr. 29, 2025); Ex. 404, *Undergraduate Tuition and Fees*, UNIV. OF PA., https://srfs.upenn.edu/costs-budgeting/undergraduate-tuition-and-fees (last visited Apr. 29, 2025); Ex. 405, *Undergraduate Tuition and Fees*, VANDERBILT UNIV., https://www.vanderbilt.edu/stuaccts/fees/tuition_fees_2023-24_ugrd.php (last visited Apr. 29, 2025); Ex. 281, *Estimated Cost of Attendance*, YALE UNIV., https://finaid.yale.edu/awardletter/financial-aid-terminology/estimated-cost-attendance (last visited Apr. 29, 2025). First-year students who receive need-based financial aid offers typically receive them close-in-time to being granted admission to a school, while continuing students typically receive their financial aid offers in late spring or summer. Ex. 407, *Understanding Your Financial Aid Award Offers*, BIGFUTURE, https://bigfuture.collegeboard.org/pay-for-college/financial-aid-awards/understanding-yourfinancial-aid-award-offers (last visited Apr. 28, 2025).

**PLAINTIFFS' RESPONSE: Undisputed.** However, Plaintiffs object to Defendants' citations to unproduced present-day (i.e., post Class Period) websites as inadmissible. Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record.

41. **DEFENDANTS' ASSERTION:** Students have the opportunity to appeal to the financial aid office if they feel as though the amount or composition of the financial aid award they have been offered is incorrect, unfair, or otherwise unacceptable. Ex. 140, Chang (Caltech) Tr. 70:18-71:15; Ex. 137, Bridson (MIT) Tr. 165:13-21, 168:13-18; Ex. 181, Nucciarone (Notre Dame 30(b)(6)) Tr. 330:12-333:12. Many students, including ███████████ appeal their initial awards. Ex. 3.1, Stiroh Reb. ¶146 (Penn received 12,690 appeals between 2003 to 2019); Ex. 209, Georgetown Am. Rog Resps. at 33-34 (Georgetown received 8,156 appeals between 2004 to 2023); Ex. 192, Storlazzi (Yale) Tr. 38:1-7(10% of financial aid awards were appealed, close to 90% of appeals resulted in some change); Ex. 187, Schapiro (Northwestern) Tr. 123:9-17; Ex. 204, ██████████ Tr. 237:19240:5 ███ gave additional aid after ███ appealed in both ██ Ex. 183, ████████████ Tr. 82:13-85:12 (successfully appealed his initial aid award); Ex. 165, ████████ Tr. 195:13-21 (disagreed with ███ aid award calculations); *id.* 194:11-195:2 (successfully appealed every aid award he received); Ex. 190, ███████████ Tr. 36:7-13 (appealed his aid award because he believed it was inadequate).

**PLAINTIFFS' RESPONSE: Disputed in part.** Plaintiffs do not dispute that students

have an opportunity to "appeal" financial aid decisions to the financial aid office. Plaintiffs dispute

any implication that the ability to appeal turned solely or largely on if applicants "felt" like an offer

was "incorrect, unfair, or otherwise unacceptable." Indeed, at a minimum, Defendants' documents

reflect ███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████.

     42.    **DEFENDANTS' ASSERTION:** Schools evaluate appeals pursuant to their own school-specific processes and criteria, and appeals are often granted. Ex. 422, *What to Do When Your Financial Aid Award Isn't Enough*, BIGFUTURE, https://bigfuture.collegeboard.org/pay-for-college/financial-aid-awards/ what-to-do-when-your-financial-aid-award-isnt-enough (last visited Apr. 28, 2025); Ex. 290, *Financial Aid Appeals*, CORNELL UNIV., https://finaid.cornell.edu/special-circumstances/financial-aid-appeals (last visited Apr. 28, 2025); Ex. 385, *Special and Unusual Circumstances*, UNIV. OF NOTRE DAME, https://financialaid.nd.edu/apply-or-renew/specialcircumstance (last visited Apr. 29, 2025); Ex. 3.1, Stiroh Reb. ¶146 (Penn granted 75% of appeals from 2003 to 2019); Ex. 209, Georgetown Am. Rog Resps. at 33-34 (Georgetown approved 82% of appeals from 2004 to 2023); Ex. 192, Storlazzi (Yale) Tr. 38:1-7 (10% of financial aid awards were appealed, close to 90% resulted in some change).

     **PLAINTIFFS' RESPONSE: Disputed in part.** First, Plaintiffs object that the publicly

listed websites constitute inadmissible admissible hearsay that, at best, describe *current* practices

and not the Class Period. Second, Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted

to be supported by evidence in the record. Here, there is no admissible or cited evidence pertaining

to the "processes and criteria" Defendants used to evaluate appeals—the citations only go to the

percentage of appeals granted. And there is reason to believe the "process and criteria" in appeals

were not "school-specific processes," because ███████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████ Plaintiffs do not dispute the "grant rate" of the

appeal statistics cited, but note that the cited materials provide no evidence on the magnitude or

materiality of the award.

     43.    **DEFENDANTS' ASSERTION:** Because parents, other family members, or third parties sometimes pay for the cost of a student's education, *see* Ex. 317, SALLIE MAE, HOW

AMERICA PAYS FOR COLLEGE, 24, 26, 35, 51 (2024), *available at* https://www.salliemae.com/content/dam/slm/writtencontent/_Research/HAP_2024.pdf, including by making tuition payments directly to the school, those students—such as Named Plaintiffs ████████████████████████████ do not contribute to paying the net price, Ex. 147, ████████ 158:22-24 ██████ parents "pa[id] the school directly"); Ex. 190, ███████ 268:13-20 ██████ "didn't personally pay any of the costs of tuition, room and board" because ████████████████████████████; Ex. 207, ████████████████ Dep. Ex. 5 ████ Suppl. Resps. & Objs. to Defs.' 1st Rogs) at 7; Ex. 210, ████████ Dep. Ex. 15 ████ Suppl. Resps. & Objs. to Defs.' 1st Rogs) at 6; Ex. 206, ████████) Dep. Ex. 7 ████ 2d Suppl. Resps. & Objs. to Defs.' 1st Rogs) at 6; Ex. 211, ██████ ████████ Ex. 7 (████ Suppl. Resps. & Objs. to Defs.' 1st Rogs) at 7; Ex. 212, ████████████ Dep. Ex. 1 (████ Suppl. Resps. & Objs. to Defs.' 1st Rogs) at 6; Ex. 213, ██████████ Dep. Ex. 7 ████ Suppl. Resps. & Objs. to Defs.' 1st Rogs) at 7.

**PLAINTIFFS' RESPONSE: Disputed.** First, Defendants themselves have stated for years that students are ultimately responsible for "paying" for their education at the Defendant universities regardless of where the money comes from. *See, e.g.*, Brown University, *University Policies,* https://policy.brown.edu/policy/student-account-financial (last visited June 24, 2025) at § 3.2 ("All students must complete a Student Financial Responsibility Agreement (SFRA) on an annual basis, prior to registering for classes. The SFRA is between the student and Brown University and outlines the financial obligations and responsibilities students agree to when enrolling at Brown University."); California Institute of Technology, *Undergraduate Accounts* (October 2020), https://web.archive.org/web/20201031012541/http://bursar.caltech.edu/accounts/ugaccounts, under "Tuition Payment" ("If tuition is being paid by a Third Party agency, an anticipated payment will be applied to the student account to reduce the amount that is owed. If the agency does not remit payment for tuition by the end of the second term, the payment will be reversed from the account and the student will be responsible for the unpaid balance. An unpaid balance will result in a diploma or registration hold."); The University of Chicago Bursar's Office, *Financial Responsibility Agreement*, https://bursar.uchicago.edu/en/policies/financial-responsibility-agreement (last visited June 24, 2025) ("I understand when I enroll at the University of Chicago

or receive any service from the University of Chicago I accept full responsibility to pay all tuition, fees, and other associated costs assessed as a result of my registration and/or receipt of services."); Columbia University, *Student Financial Services: Sponsored Students* (April 2013), https://web.archive.org/web/20130409013738/http://sfs.columbia.edu/sponsored-students ("The student is responsible for reviewing charges billed to the sponsor and payments made by the sponsor and making sure that these fulfill the Third Party Billing Agreement. Students must pay any portion of the bill not covered by the sponsor."); Cornell University, Office of the Bursar, *Bursar and Cornellcard Procedures* (June 2010), https://web.archive.org/web/20100613232722/http://www.dfa.cornell.edu/dfa/cms/treasurer/bursar/studentsparents/bursarbill/upload/BUCCprocedures.pdf ("The student is responsible for fees not covered by the sponsor. If for any reason the sponsor does not pay the student is responsible for full payment of all charges incurred."); Dartmouth College, *Information for Incoming Students*, https://www.dartmouth.edu/finance/tuition/billing_paying_tuition/information_incoming_students.php (last visited June 24, 2025) ("How does my parent/guardian view my bill? If you would like parents, guardians or other individuals to view your account statement or make payments to your account, you must first authorize them."); Duke University, *Making Payments* (March 2011), https://web.archive.org/web/20110304213948/http://finance.duke.edu/bursar/Payments/index.php#third ("It is your responsibility to pay any charges or outstanding amounts not paid by your sponsor. If your sponsor fails to pay the billed amount by the designated due date, you will be responsible for payment."); Emory University, *Third Party Billing* (August 2012), https://web.archive.org/web/20110728035325/http://www.emory.edu/studentfinancials/Services_Third_Party.htm ("Students will be given temporary credit on their account in the amount of the agreement. The student retains the responsibility for on-time payment of their account."); Emory University, *Student Financial Agreement*, https://studentfinancials.emory.edu/policies/sfa.html (last visited June 24, 2025) ("I understand that when I register for any class at Emory University

or receive any service during my tenure as a student in my degree program from Emory University, I accept full responsibility to pay all tuition, fees and other associated costs (less financial aid) assessed as a result of my registration and/or receipt of services. . . . I promise to pay for all assessed tuition, fees and other associated costs by the published or assigned due date."); Georgetown University, *Summer Bills* (October 2007), https://web.archive.org/web/20071019044422/ http://studentaccounts.georgetown.edu/Information/Billing/printbill.html ("It is the student's responsibility to ensure his or her enrollment and registration is correct and that charges for said registration are paid in full by the payment deadline."); Johns Hopkins University, *Third Party Payments*, https://seam.jhu.edu/billing/third-party-payer/ (last visited June 24, 2025) ("Payments not received by Johns Hopkins from the third party payer will become the responsibility of the student."); Massachusetts Institute of Technology, *Tuition and Fees* (October 2015), https://web.archive.org/web/20151019021508/http://catalog.mit.edu/mit/undergraduate-education/costs/#paymentoftuitionotherchargestext ("An individual who registers as a student at MIT agrees to pay all charges on his or her account when due, and acknowledges that the Institute may charge late payment fees, suspend registration, revoke Institute services, and withhold the degree if these charges are not paid."); Northwestern University, *Tuition and Financial Aid*, https://sps.northwestern.edu/part-time-undergraduate/tuition-costs.html (last visited on June 24, 2025) ("Each student is responsible for fulfilling financial obligations to Northwestern University. If a student's account becomes overdue, a late fee must be paid. In addition, students are liable for any costs associated with the college"); Northwestern University, *Third Party Billing*, https://www.northwestern.edu/sfs/payments/methods/third-party-billing.html (last visited June 24, 2025) ("Because you as a student are responsible for your account at all times, you will receive invoices even while a third party is receiving invoices. In the event that the third party fails to pay, responsibility for paying the invoice and any applicable late payment fees reverts to you."); University of Notre Dame, Office of Student Accounts, *Statement FAQs*,

https://studentaccounts.nd.edu/faqs/statement-faqs/#faq_137 (last visited June 24, 2025) ("It is [the student's] responsibility to ensure that all charges billed to your student account are paid by the due date on your billing statement."); University of Pennsylvania, *Billing and Payment* (2016), https://web.archive.org/web/20161202083324/http://www.sfs.upenn.edu/billing/third-party-payment.htm ("Students are responsible for on time payment of any charges not paid for by their sponsor. They will be subject to a late payment penalty of 1.5% per month on any past due balance."); University of Pennsylvania, *Student Financial Responsibility Statement*, https://srfs.upenn.edu/policies-publications/student-financial-responsibility-statement (last visited June 24, 2025) ("By registering for class(es) offered by the University of Pennsylvania, I am agreeing to pay tuition, fees and other charges associated with my enrollment in these classes on or before the scheduled due dates. This constitutes a legal financial obligation."); Rice University, *Student Financial Responsibility Agreement*, https://bursar.rice.edu/student-financial-responsibility-agreement (last visited June 24, 2025) ("I understand that when I register for any class at Rice University, receive any service from Rice University or incur any fines at Rice University, I accept full responsibility to pay all tuition, room and board, fees and other charges incurred by me or assessed as a result of my registration and/or receipt of services or fines."); Vanderbilt University, *Third Party Billing* (2014), https://web.archive.org/web/20141122051822/https://finance.vanderbilt.edu/stuaccts/payments/third-party.php ("You are responsible for the items on the bill that are not covered by your sponsor. . . . If your sponsor fails to pay the agreed amount . . . you will be responsible for payment."); Vanderbilt University, *Student Account and Collection Policy*, https://www.vanderbilt.edu/stuaccts/policies/Policy_Student_Account_and_Collection.pdf (last visited June 24, 2025) ("The student is financially responsible for their student account. It is the responsibility of the student to check for the latest e-bill and ensure that it is paid on or before the due date."); Yale University, *Student Financial Responsibility Agreement*, https://student-accounts.yale.edu/understanding-your-bill/student-financial-responsibility-

agreement (last visited June 24, 2025) ("I understand that when I register for any class at Yale University, I accept full responsibility to pay all tuition, fees and other associated costs assessed as a result of my registration, including charges related to housing, meals, and/or receipt of services. . . . I promise to pay for all assessed tuition, fees and other associated costs by the applicable due date."). Second, Plaintiffs object that Defendants too narrowly construe how a student might "contribute to paying." Even a student who does not pay out of pocket might forego opportunities or extracurriculars that may have been available had there been more grant aid available. Or a student might contribute indirectly to paying. As a concrete example, ██████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████ Even Dr. Long's own analysis on "net price" uses a data field that calculates "net price" "by subtracting the average amount of aid students receive from federal, state, and local government sources, as well as institutional grant and scholarship aid from cost of attendance." Def. Ex. 2.1, Long Reb. fig. 4 at 39. That is, her analysis considers any work study or loans borne by the student as part of the "net price."

### D. Application and Admissions Process

44. **DEFENDANTS' ASSERTION:** In deciding where to apply (and potentially matriculate), students consider various factors that are highly dependent on their personal preferences, interests, needs, and skills, and different students prioritize different schools because they assign different weight to different factors. Ex. 2.1, Long Reb. ¶¶248-251, 255-281; Ex. 254, COLLEGE BOARD, ASQ PLUS™ USER GUIDE 2013-2015 40 (2013), *available at* https://secure-media.collegeboard.org/digitalServices/ pdf/professionals/admitted-student-questionnaire-plus-user-guide.pdf; Ex. 204, ███████████████████ Tr. 95:15-96:7 ██████████████████████████████████████████████████████████████████ ██████ Ex. 202, ██████████████████████ Nov. 14, 2023 Tr. 39:4-13, 46:4-11 ████████████████████████████████; Ex. 165, ███████ Tr. 300:13-301:16 (deciding not to apply to a school because ████████████████████████████████████████ Ex. 167, Long Tr. 50:9-18 (noting that there are "a host of factors that students consider in choosing a college," including "the composition of the student body" and "socioeconomic diversity"); Ex. 160, ███████████████ Tr. 105:11-106:4 ("reasons" for applying ██████████████████████████████████████████ ██████

**PLAINTIFFS' RESPONSE: Disputed in part.** Plaintiffs do not dispute that students

consider various factors when deciding where to apply and matriculate. Plaintiffs do dispute that such factors are "highly dependent on personal preferences," as if preferences are uncorrelated, shaped in a vacuum, and divorced from financial realities. First, Plaintiffs object that the publicly listed websites constitute inadmissible hearsay. Second, Defendants themselves recognize that finances might trump personal preferences. ██████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

Put differently, emphasizing students' "personal preferences" was a design feature of the 568 Group so applicants would focus on and articulate other "personal preferences" beyond finances. ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████ Finally, when evaluating where students apply (and potentially matriculate), rather than using *stated* preferences, it is more appropriate to consider ***revealed*** preferences to determine the factors that matter to students. And here, the "revealed" preferences supports the defined market and import of the U.S. News & World Report Rankings. *See* Pl. Ex. 14, SR1 ¶¶ 101-107.

45. **DEFENDANTS' ASSERTION:** Many students who apply to Defendants also apply to and consider attending flagship public universities and top liberal arts colleges. Ex. 2.1, Long Reb. ¶¶252-254, fig. 11. Indeed, six of the eight Named Plaintiffs applied to both private and public schools: ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████



**PLAINTIFFS' RESPONSE: Disputed in part.** Plaintiffs do not dispute that "[m]any students who apply to Defendants also apply to and consider attending flagship public universities and top liberal arts colleges." It is also undisputed that ██████████████████ ████████████████████  ████████████████████████████ ████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████ ███████████████████████████████ What matters here is where students decide to *enroll* once they know their options. *Id.* Plaintiffs further dispute that Plaintiffs seriously "considered attending" these alternatives. Plaintiffs' actual preference are revealed by where they chose to matriculate. That is similar to the rest of the market: students prefer Defendants' schools more than schools that are lower-ranked by the U.S. News & World Report. *See* Pl. Ex. 14, SR1 ¶¶ 105-07; *see also* Pl. Ex. 32, SR2 ¶¶ 19-23.

46. **DEFENDANTS' ASSERTION:** Students expressed preferences for certain public universities and liberal arts colleges over "elite" private universities, including Defendants. *See* Ex. 4, Singer Am. Rep. tbl. 7 (Singer's "revealed preference" analysis showing that students preferred three public universities—UCLA, UC Berkeley, and University of Michigan—over 13 schools in Plaintiffs' proposed market, and preferred five liberal arts colleges—Pomona, Williams, Swarthmore, Bowdoin, and Amherst—over two schools in Plaintiffs' proposed market); Ex. 191, Singer Tr. 363:11-366:15.

**PLAINTIFFS' RESPONSE: Undisputed with clarification.** Dr. Singer interpreted his "revealed preference analysis" to contextualize the revealed preference analysis beyond the rank order Defendants' describe and stated: ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████

47.     **DEFENDANTS' ASSERTION:** Different students may view different schools as competitors based on their unique preferences and attributes, including academic focus. For example, students interested in the performing arts might apply to Yale, Juilliard, NYU, and/or UC San Diego; religiously-minded Catholic students may apply to Notre Dame, Georgetown, Boston College, Marquette University, and/or DePaul University; aspiring social workers may consider WashU, Columbia, Ohio State, and/or UC Berkeley; and students focused on engineering or other STEM fields might choose between Caltech, MIT, UC Berkeley, Stanford, Harvard, and/or Princeton. *See* Ex. 2.1, Long Reb. ¶260; *see also id.*¶¶261-273; Ex. 387, *Top 10 College Theater Programs To Know In 2024*, LINKEDIN (Nov. 22, 2024), Ex. 251, *Catholic Colleges and Universities in the United States*, U.S. CONFERENCE OF CATHOLIC BISHOPS, https://www.usccb.org/committees/catholic-education/catholic-colleges-and-universities-united-states (last visited May 4, 2025); Ex. 375, *Ranking of U.S. Social Work/Welfare Programs*, SOCIAL PSYCH. NETWORK, https://www.socialpsychology.org/gsocwork.html (last visited Apr. 28, 2025); Ex. 11, ████████████████████████████ ██████ Ex. 244, Christopher N. Avery et al., *A Revealed Preference Ranking of U.S. Colleges and Universities*, 128 Q. J. ECON. 425, 449 (2013); Ex. 51, ██████████████ ████████████████████████████████████████ ████████████████████████████████████████████

**PLAINTIFFS' RESPONSE: Disputed in part.** Plaintiffs do not dispute that *some* "students may view different schools as competitors based on their unique preferences and attributes, including academic focus." Plaintiffs otherwise object that this contention is vague, ambiguous, unquantified, and unsupported. Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record. Defendants' Exhibit 51, however, is an "admitted student questionnaire" that does not support the implied contention about the market. For instance, while 17.4 percent of students listed "Program of Study" as their principal reason for

selecting what school to attend, 23.7% listed "Academic Reputation." Def. Ex. 51 at 2. These metrics, however, are not broken down by which other schools accepted the applicant. Put differently: perhaps an applicant filling out the survey did not select "Academic Reputation" as the "principal reason" because they were only accepted to Georgetown and other Elite Private Universities. Similarly, Dr. Long's analysis on statements such as ██████████████████ ████████████████████████████████████ is (1) erroneously based on *applications* and (2) entirely conjecture. For instance, she does not cite any examples ██████████████████ █████████████████████████████

48.     **DEFENDANTS' ASSERTION:** Given the multitude of offerings at modern universities, different programs or departments at a given school may have different competitors. For example, ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ █████████████████████████████

**PLAINTIFFS' RESPONSE: Disputed in part.** Plaintiffs do not dispute that "different programs or departments at a given school may have different competitors." Plaintiffs dispute that such program-specific competition is relevant to determining the relevant market, which depends on economic analyses aggregating the decisions of students as a whole. ████████████████ ████████████████████████████████████████████████████████████████████ █████████████████████████████████████████

49.     **DEFENDANTS' ASSERTION:** Competition also varies based on where an applicant resides. ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████

**PLAINTIFFS' RESPONSE: Disputed.** Rule 56(c)(1)(A) and Local Rule 56.1(d) require

the fact asserted to be supported by evidence in the record.

50. **DEFENDANTS' ASSERTION:**

**PLAINTIFFS' RESPONSE: Disputed.**

██████████████████████████████████████████████████████████

51. **DEFENDANTS' ASSERTION:** Each school views a different set of other schools as its strongest competition. ████████████████████████████████████████

████████████████████████████████████████████████████████

**PLAINTIFFS' RESPONSE: Disputed in part**. Plaintiffs do not dispute that certain institutions outside of the Elite Private University market may view different sets of other schools as their strongest competitors. Plaintiffs dispute the implication that the Elite Private University market has different competitors, however. ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████ ██████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████ Plaintiffs further object that Rule

56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the

record. Defendants' exhibits largely do not support the stated facts:

- ███████████████████████████████████████████

  ███████████████████████████████████████████

  ███████████████████████████████████████████

  ███████████████████████████████████████████

  ███████████████████████████████████████████

  ███████████████████████████████████████████

  ███████████████████████████████████████████

  ████

- ███████████████████████████████████████████

  ███████████████████████████████████████████

  ███████████████████████████████████████████

  ███████████████████████████████████████████

  ███████████████████████████████████████████

  ███████████████████████████████████████████

  ███████████████████████████████████████████

52. **DEFENDANTS' ASSERTION:** Three public universities consistently ranked among the "Top 25" schools in the USNWR rankings from 2003 to 2022. Ex. 4, Singer Am. Rep. ¶73. On average, during the class period, UC Berkeley was ranked 20.95, UCLA was ranked 23.5, and UVA was ranked 24.25. *See* Ex. 99, USNWR0000000102 at -102-113 (2003 rankings); Ex. 100, USNWR0000000134 at -134145 (2004 rankings); Ex. 101, USNWR0000000166 at -166-177 (2005 rankings); Ex. 102, USNWR0000000198 at -198-209 (2006 rankings); Ex. 103, USNWR0000000230 at -230-241 (2007 USNWR rankings); Ex. 104, USNWR0000000262 at -262-274 (2008 rankings); Ex. 105, USNWR0000000295 at -295-307 (2009 rankings); Ex. 106, USNWR0000000328 at -328-340 (2010 rankings); Ex. 107, USNWR0000000361 at -361-373

(2011 rankings); Ex. 108, USNWR0000000394 at -394-405 (2012 rankings); Ex. 109, USNWR0000000426 at -426-438 (2013 USNWR rankings); Ex. 110, USNWR0000000460 at -460-472 (2014 USNWR rankings); Ex. 111, USNWR0000000492 at -492-505 (2015 rankings); Ex. 112, USNWR0000000525 at 525-538 (2016 rankings); Ex. 113, USNWR0000000558 at -558-570 (2017 rankings); Ex. 114, USNWR0000000589 at -589-602 (2018 rankings); Ex. 115, USNWR0000000621 at -621-635 (2019 rankings); Ex. 116, USNWR0000000654 at -654-669 (2020 rankings); Ex. 117, USNWR0000000687 at -687-701 (2021 rankings); Ex. 118, USNWR0000000720 at -720-734 (2022 rankings). USC, a private university, ranked in the "Top 25" eleven times and was, on average, ranked 25.4. *See* sources cited *supra* SOF 52.

**PLAINTIFFS' RESPONSE: Disputed in part**. Plaintiffs do not dispute that there were a few public universities that consistently ranked within the USNWR's top 25 schools. Plaintiffs further do not dispute that USC ranked in the Top 25 eleven times during the relevant period, although it had an average ranking of 25.4—just outside of the Top 25. ████████████████

████████████████████████████████████████████████████

████████████████████████████

## II.     EFC CALCULATIONS AND NET PRICES

53.     **DEFENDANTS' ASSERTION:** Since 2003, the proportion of students receiving financial aid at Defendant schools increased. Ex. 1.1, Hill Reb. ¶83, fig. 9.

**PLAINTIFFS' RESPONSE: Disputed.** Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record. The only cited reference relates to "full-time, first-time, degree-seeking" students, not all "students." Moreover, the chart also shows that at the beginning of the 2003 academic year, the proportion of the students studied in the chart receiving aid was approximately 50% and in 2022, at the end of the time-period covered by the chart, it was also approximately 50%, and apparently headed downward. Moreover, since 2003, the cost of attendance has also increased in constant dollars. *See* Def. Ex. 2.1 Figure 4 at 39. Finally, Plaintiffs dispute that "aid" is provided at all. *See* PSOF ¶ 55.

54.     **DEFENDANTS' ASSERTION:** Grant aid increased at Defendant schools while they were members of the 568 Group, and it increased at approximately the same rate as grant aid increased at non-member schools Plaintiffs have identified as market participants or peer schools of Defendants. Ex. 1.1, Hill Reb. ¶¶ 87-92, figs. 7-8, 11-12.

**PLAINTIFFS' RESPONSE: Disputed**. As Dr. Singer explains, Defendants' assertion is

based solely on Dr. Hill's analysis, which is "misleading" and relies on a flawed application of a difference-in-difference approach. Pl. Ex. 32, SR2 ¶¶ 286-99. Among other flaws, Dr. Hill's analysis is "fundamentally unreliable because it (1) ignores the granular student-level structured data, (2) excludes years of data from IPEDS, (3) misapplies the literature, and (4) fails to perform the requisite checks to investigate whether his analysis does not violate the basic assumptions of DiD (parallel trends)." *Id.* ¶ 297. Finally, Plaintiffs dispute that "aid" is provided at all. *See* PSOF ¶ 55.

55.     **DEFENDANTS' ASSERTION:** The total amount of aid Defendants provided to undergraduate students at least quadrupled since 2003, and in inflation-adjusted terms, the average aid per student approximately doubled. Ex. 1.1, Hill Reb. ¶¶80-81, figs. 7-8. The average price paid by aid recipients correspondingly dropped in inflation-adjusted terms. Ex. 2.1, Long Reb. figs. 4-5; Ex. 85, PENN568-LIT-00060839 at -848, -854.

**PLAINTIFFS' RESPONSE: Disputed.** First, Plaintiffs dispute that "aid" is provided at all. Aid is not "provided" to students. Financial aid is a discount from the list price. SOF ¶ 33. Second, this statement is incomplete and misleading without additional context. Since 2003, the cost of attendance has ***also*** increased in inflation-adjusted terms. *See* RSOF ¶¶ 39, 53. Plaintiffs further object because whether Defendants have increasingly "provided" greater discounts off rising tuition prices is irrelevant to whether the Challenged Conduct lessened competition and whether Defendants would have been more generous, and charged lower net prices, in a world without the Challenged Conduct.

56.     **DEFENDANTS' ASSERTION:** Tens of thousands of financial aid recipients who were subject to the challenged conduct—*i.e.*, whose financial need was determined by Defendant schools using need-analysis methodologies while those schools were members of the 568 Group— received full rides, meaning the full cost of their attendance was covered by financial aid. Ex. 191, Singer Tr. 21:22-23:12; *see also* Ex. 428, Transcript of Proceedings at 97:25-98:22, *Henry et. al. v. Brown*, (N.D. Ill. Apr. 14, 2025) (No. 1:22-cv-00125).

**PLAINTIFFS' RESPONSE: Disputed.** The term "subject to the challenged conduct" is undefined, vague, and ambiguous. Students who had their full cost of attendance covered by financial aid are not in the Class and so Plaintiffs do not claim that any such students are injured

by, or were the targets of, the Challenged Conduct. Finally, Plaintiffs dispute that "aid" is provided

at all. *See* PSOF ¶ 55.

57.    **DEFENDANTS' ASSERTION:** Almost all purported class members who were
admitted by more than one Defendant ("cross admits") received different EFCs from the
Defendants who admitted them. Ex. 1.1, Hill Reb. ¶101, fig. 14. EFCs for 74% of cross-admits
differed by more than 10%, Ex. 1.1, Hill Reb. fig. 14., and the EFCs for 56% of the cross-admits
varied by more than 20% between different Defendants, Ex. 1.1, Hill Reb. fig. 14; *see also* Ex. 1.1,
*id.* ¶99, fig. 13 (noting student whose EFCs calculated by four Defendant schools to which they
were admitted varied from $43,177 to $69,156). For example, Dartmouth expected one cross-admit
to contribute more than $25,000 more than Penn expected. Ex. 1.1, *id.* ¶99, fig. 13.

**PLAINTIFFS' RESPONSE: Undisputed with clarification**. Plaintiffs do not dispute that

cross-admits had different EFCs at the Defendants who admitted them. But Dr. Singer shows with

regression analysis of cross-admits that even if the EFCs differ, ███████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████    Further, Plaintiffs dispute that variance is relevant,

as Defendants were explicitly permitted to "deviate" toward the price floor. *See* PSOF ¶ 82. There

is abundant evidence that the 568 Group consistently intended not only to narrow the variance of

financial aid awards, but to do so in the direction of less aid—by setting a price floor through

formulaic means. *See* CSOF ¶¶ 4, 9, 18. And as the United States observed in its Statement of

Interest in this case, an agreement on the methodology for calculating need-based aid "eliminates

an important dimension of price competition—whether the offers are identical or the differences

simply narrowed." ECF 167-1 at 13.

58.    **DEFENDANTS' ASSERTION:** Cross-admits to two Defendants had an average
spread in their EFCs of $15,399, and this spread increased to $21,773 for cross-admits to three
Defendants, $26,566 for cross-admits to four Defendants, and $24,466 for cross-admits to five or
more Defendants. Ex. 1.1, Hill Reb. ¶102, fig. 15.

**PLAINTIFFS' RESPONSE: Undisputed with clarification**. Plaintiffs refer to and

incorporate their response to Defendants' SOF ¶ 57. Further, Defendants' presentation of averages

is misleading: ████████████████████████████████████████████████████████

████████████████████████████████████████████████

59.    **DEFENDANTS' ASSERTION:** Only a fraction of a percent of cross-admits received identical net prices from any two Defendants, and net prices for more than two-thirds of cross-admits differed by more than 15%. Ex. 1.1, Hill Reb. ¶120, fig. 20; *see also* Ex. 3.1, Stiroh Reb. ¶142, fig. 5.6 (net prices for class members with EFCs near the median of $18,690 for academic year 2018-2019 ranged from $5,330 to $61,462).

**PLAINTIFFS' RESPONSE: Undisputed with clarification**. Plaintiffs refer to and incorporate their response to Defendants' SOF ¶¶ 57-58. The same criticisms regarding Defendants' analysis of the EFCs of cross-admits applies to their analysis of the net-prices of cross-admits. Pl. Ex. 32, SR2 ¶¶ 306-08. ████████████████████████

████████████████████████████████████████████████

█████████████████████████

60.    **DEFENDANTS' ASSERTION:** Cross-admits to two Defendants had an average spread in net prices of more than $19,000, and this spread increases to $29,606 for cross-admits to three Defendants, $36,538 for cross-admits to four Defendants, and more than $45,000 for cross-admits to five or more Defendants. Ex. 1.1, Hill Reb. ¶121, fig. 21.

**PLAINTIFFS' RESPONSE: Disputed.** Plaintiffs refer to and incorporate their responses to Defendants' SOF ¶¶ 57-59.

61.    **DEFENDANTS' ASSERTION:** Average differences in school-specific EFCs were similar before and after Defendants joined the 568 Group. Ex. 1.1, Hill Reb. ¶105, fig. 16. If anything, average variation in school-specific EFCs did not decrease after the CM Guidelines were introduced. Ex. 1.1, Hill Reb. ¶¶106-107, fig. 17.

**PLAINTIFFS' RESPONSE: Disputed.** Plaintiffs dispute that differences in school-specific EFCs were similar before and after the Defendants joined the 568 Group. Plaintiffs refer to and incorporate their response to Defendants' SOF ¶ 57. Plaintiffs further dispute that EFCs did not decrease after the CM Guidelines were introduced. ████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████ Further, Plaintiffs object that whether EFCs decreased after the CM Guidelines were introduced is immaterial to whether Defendants' conduct lessened competition and whether

Defendants would have been more generous in the world without the Challenged Conduct.

62.     **DEFENDANTS' ASSERTION:** There were no changes to the financial aid process that adversely affected putative class members at any of the Defendant schools upon joining the 568 Group. Ex. 191, Singer Tr. 313:25-315:7.

**PLAINTIFFS' RESPONSE: Disputed**. First, ███████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████ CSOF ¶ 44; *see also* RSOF ¶¶ 57, 61. Further, Rule 56(c)(1)(A) and

Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record. The cited

evidence does not support the statement. ████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████

## III.     568 GROUP

63.     **DEFENDANTS' ASSERTION:** In 1998 a group of colleges and universities formed the 568 Presidents Group (the "568 Group"), named after Section 568 of the Improving America's Schools Act of 1994, Pub. L. 103-382, § 568(a), 108 Stat. 3518, 4060 (1994), *see* Ex. 429; *see also* Ex. 419, *What is the 568 Presidents Group?*, 568 Presidents Group (archived Jan. 25, 2022), https://web.archive.org/web/20220125094142/http://www.568group.org/home (last visited May 6, 2025); Ex. 181, Nucciarone (Notre Dame 30(b)(6)) Tr. 18:5-19:9. The 568 Group disbanded in November 2022. Ex. 219, *568 Group*, https://www.568group.org ("The 568 Presidents Group (and all of its Committees) has been formally dissolved, effective November 4, 2022."); Ex. 25, Need-Based Educational Act of 2015, Pub. L. 114–44, § 2, 129 Stat. 472 (Aug. 6, 2015).

**PLAINTIFFS' RESPONSE: Undisputed with clarification**. In August 2022, the Court

denied Defendants' motions to dismiss. *See Carbon v. Brown Univ.*, 621 F. Supp. 3d 878, 884-89

(N.D. Ill. 2022). Congress thereafter chose not to renew the 568 Exemption, leaving it to expire on

October 1, 2022. The 568 Group, as its former members explained, disbanded shortly thereafter.

████████████████████████████████████████████████████████████████████

██

64.     **DEFENDANTS' ASSERTION:** In addition to Defendants, the 568 Group's membership at various times included other need-blind private national universities and liberal arts colleges, including Amherst College, Boston College, Claremont McKenna College, College of the Holy Cross, Davidson College, Grinnell College, Haverford College, Wake Forest University, Wellesley College, Wesleyan University, and Williams College. Ex. 220, *568 Presidents' Group Member Institutions*, 568 PRESIDENTS GROUP (archived Feb. 23, 2005), https://web.archive.org/web/20050223041238/ http://www.568group.org:80/membership/members.html (last visited May 7, 2025); Ex. 221, *568 Presidents' Group Member Institutions*, 568 PRESIDENTS GROUP (archived June 26, 2008), https://web.archive.org/web/20080626203756/http://568group.org/membership/members.html (last visited May 6, 2025); Ex. 223, *568 Presidents' Group Member Institutions*, 568 PRESIDENTS GROUP (archived July 24, 2011), https://web.archive.org/web/20110724210442/http://568group.org/membership/index.html (last visited May 6, 2025); Ex. 224, *568 Presidents Group Member Institutions*, 568 PRESIDENTS GROUP (archived Jan. 24, 2022), https://web.archive.org/web/20220124014615/http:/www.568group.org/home/?q=node/24 (last visited May 6, 2025). In all, at least 28 Defendant and non-Defendant schools at one time or another were members of the 568 Group. Ex. 222, *568 Presidents Group Member Institutions*, 568 PRESIDENTS GROUP (last archived May 28, 2009), https://web.archive.org/web/20090528212801/http://www.568group.org/membership/members.html (last visited May 6, 2025).

**PLAINTIFFS' RESPONSE: Undisputed**. Plaintiffs, however, object to Defendants' citations to unproduced websites as inadmissible. Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record.

65.     **DEFENDANTS' ASSERTION:** The only requirement for membership in the 568 Group was to practice need-blind admissions. *See* Ex. 9, BROWN_0000078665; Ex. 31, CORNELL_LIT0000108811; Ex. 68, ND_0011629 *see also* Ex. 132, Arleth (COFHE) Tr. 40:14-16; 192:19-193:6; 201:7-17; Ex. 197, Varas (Penn) Mar. 18, 2024 Tr. 319:1-23. The Group monitored compliance with this requirement by requiring schools to "recertify their compliance with Section 568 annually." Ex. 9, BROWN_0000078665. When schools could not certify compliance, they left the Group. ███████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████

**PLAINTIFFS' RESPONSE: Disputed**. While the 568 Group purported that need-blind admissions were required for membership (which would be consistent with the language under Section 568), it was not actually a ████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████ Plaintiffs dispute that there weren't *other* requirements of 568 Group membership. At a minimum, Defendants were also required to sign and execute a memorandum of understanding indicating their explicit "agreement" to a variety of obligations, such as paying member dues, assigning a representative to the "Needs Analysis Council," and "participat[ing] in the collaborative work" of the 568 Group, including its "purpose" of "agreeing" on common principles of need analysis and "maintaining" the Consensus Approach. ████████

██████████████████████ More fundamentally, Defendants routinely expressed an obligation to apply the CM as a condition of membership in the 568 Group. ████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████,

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████ The schools that complained and then left the 568 Group, in particular, compel the inference that they believed their continued membership in the 568 Group was incompatible with changes they wanted to make to their financial aid methodology, which is why they left the 568 Group. ██████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████



These contemporaneous expressions of the obligations to apply the CM follow naturally from Defendants' agreeing to apply the CM and following through on applying with the CM. CSOF ¶¶ 9-10. And are reflected in the fact that (1) statistical analysis reveals an overcharge associated with the Challenged Conduct, *id.* ¶ 44, (2) Defendants became more generous after leaving the 568 Group. CSOF ¶ 17.

66.     **DEFENDANTS' ASSERTION:** The 568 Group has included dozens of different schools, and the exact composition of its membership has changed over time, with Defendants entering and exiting at different times. *See* Ex. 1.1, Hill Reb. ¶¶71-76, figs. 3-5.

| Defendant | Membership in 568 Group |
| --- | --- |
| Brown | 2004 – May 2012 |
| Caltech | 2019 – 2022 |
| Columbia | 1998 – 2022 |
| Cornell | 1998 – 2022 |
| Dartmouth | 2004 – 2022 |
| Duke | 1998 – May 2021 |
| Emory | December 2003 – April 2012 |
| Georgetown | 1998 – 2022 |
| Johns Hopkins | December 2021 – 2022 |

| MIT | 1998 – 2022 |
| Northwestern | 1998 – 2022 |
| Notre Dame | 1998 – 2022 |
| Penn | 1998 – January 2020 |
| Rice | 1998 – 2011; 2014 – November 2021 |
| UChicago | 1998 – September 2014 |
| Vanderbilt | 1998 – April 2020 |
| Yale | 1998 – 2008; 2018 – 2022 |

**PLAINTIFFS' RESPONSE: Undisputed with clarification**. While the 568 Group existed prior to 2003, that was the first year Defendants agreed to implement the CM as part of the Overarching Conspiracy, which Plaintiffs contend is the more relevant measure. *See* Pl. Ex. 14, SR1 App'x 3 (listing Defendants' year of conduct); Pl. Ex. 32 ¶ 255 (describing modifications to SR1 Appendix 3)

67. **DEFENDANTS' ASSERTION:** Penn left the 568 Group by January 2020. Ex. 81, PENN568-LIT-00000002 (Jan. 24, 2020 letter from Matt Sessa to Jack DeGioia). Penn officials stopped attending 568 Group meetings and declined to participate in 568 Group initiatives. *See* Ex. 87, PENN568-LIT00136163 (2021 email declining an invitation to participate in 568 Group meetings and stating that Penn "is not planning to return to 568").

**PLAINTIFFS' RESPONSE: Undisputed with clarification**. As set forth in Plaintiffs' separate briefing (Dkt. No. 850), while Plaintiffs do not dispute Penn officials stopped attending, Plaintiffs contend that does not satisfy the standard for withdrawing from a conspiracy.

A. **Consensus Methodology Policy Guidelines**

68. **DEFENDANTS' ASSERTION:** In 2001 the 568 Group's Common Standards Subcommittee to the 568 Presidents' Working Group published a Report (the "Subcommittee Report") that built on the College Board's "Base IM" and provided recommendations on certain discrete components of need analysis not fully addressed by the IM. *See, e.g.*, Ex. 377, *Report of the Common Standards Subcommittee to the 568 Presidents' Working Group* (archived Aug. 18, 2001), https://web.archive.org/web/20010818090442/http://www.news.cornell.edu/releases/July01/568.presidents.report.html (last visited May 6, 2025).

**PLAINTIFFS' RESPONSE: Disputed in part**. Plaintiffs do not dispute that the Subcommittee Report was published in 2001 or that it provided recommendations. Plaintiffs dispute any implication that it *only* "provided recommendations on certain discrete components of

need analysis not fully addressed by the IM." To be clear, it covered areas not only "addressed by the IM" but also standardized and "focused on those aspects of the current IM that are most often subject to local interpretation or professional judgment." Def. Ex. 377 at 4. And, for instance, it also suggested (1) developing a "professional judgment guidelines manual," (2) appointing a "Need Analysis Committee . . . to review and revise this methodology," and (3) creating a "[l]imited [d]ata [e]xchange," among other substantive and process-oriented recommendations. *Id.* at 8. Plaintiffs further dispute any implication that, because it was "published," that the Subcommittee Report was widely disseminated, available beyond this URL, or known outside of financial aid professional circles. *See* RSOF ¶¶ 71-72. Plaintiffs further object to Defendants' citations to unproduced present-day (*i.e.*, post Class Period) websites as inadmissible. Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record.

69. **DEFENDANTS' ASSERTION:** The recommendations in the Subcommittee Report were eventually adapted by the 568 Group to create the Consensus Methodology Policy Guidelines ("CM Guidelines"), which addressed 17 of the many discrete components that comprise Defendants' need-analysis methodology, Ex. 2.1, Long Reb. ¶¶145, 166; Ex. 75, NULIT-0000000348 (Dec. 2016 CM Guidelines) at -349, -352; Ex. 79, NULIT-0000161662 (2004-05 CM Guidelines) at -664; Ex. 39, DARTMOUTH_0000152041 (Nov. 2015 CM Guidelines) at -042, and recommended adjustments to account for financial burdens that had previously been unaccounted for by the Base IM, Ex. 2.1, Long Reb. ¶146. The CM Guidelines did not provide any "formula" for calculating EFCs. *See* Ex. 191, Singer Tr. 12:5-16, 15:7-15, 17:6-17, 19:19-20:14, 26:19-27:15.

**PLAINTIFFS' RESPONSE: Disputed in part.** Plaintiffs do not dispute that the recommendations in the Subcommittee Report formed the basis for the 568 Group to create the CM and that they cover discrete components. Plaintiffs do dispute that the adjustments solely cover "financial burdens that had previously been unaccounted for" and any implications that those adjustments simply ease burdens. For instance, far from "easing" any burden, the CM dictates that "in most cases, additional information is sought concerning the non-custodial family unit" because "parents' divorce one another, not their child." Def. Ex. 75 at 353-54. Plaintiffs further dispute that

there is no "formula" associated with the CM. ████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████

70.     **DEFENDANTS' ASSERTION:** The CM Guidelines emphasized the importance of making need analysis equitable and transparent, and stated that following them would "reduce expected parent contributions in the aggregate." Ex. 75, NULIT-0000000348 (CM Guidelines, Dec. 2016) at -351-352.

**PLAINTIFFS' RESPONSE: Disputed in part.** Plaintiffs do not dispute that the CM

Guidelines *state* that they purportedly aimed to make need analysis fair and equitable and to

"reduce expected parent contributions in the aggregate." While that was Defendants' misleading

public statement, *see also* PSOF ¶ 71, privately 568 Group members were contemporaneously

worried about ██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████     In fact, there were schools that did

not join the 568 Group or left it because their aid awards would be less generous under the CM

Guidelines. *See* CSOF ¶¶ 16-18. And before leaving the 568 Group in 2020 to be more generous

with their financial aid, *id.*, ████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████ Finally, even if the CM Guidelines resulted in reduced "expected parent contributions" compared to existing policies at the time the statement was written, that is not relevant. What *is* relevant is whether the net price was lower under the CM guidelines than they would have been in a but-for world. CSOF ¶ 44.

71. **DEFENDANTS' ASSERTION:** The 568 Group's membership, the need analysis "principles" in the Subcommittee Report, the CM Guidelines and components thereof, and various activities of the 568 Group were publicly reported in the media in the 2000s and 2010s (before 2018), including in stories asking, "Collusion or Competition?" and "A Truce In The Scholarship Bidding Wars?," as well as stories discussing the 568 Group's work to develop a "common methodology." *See, e.g.*, Ex. 259, Peter Cartensen, *Colleges and Student Aid: Collusion or Competition?*, CHRON. OF HIGHER EDUC. (Aug. 10, 2001), https://www.chronicle.com/article/colleges-and-student-aid-collusion-or-competition ("The presidents of 28 private colleges recently endorsed a set of common standards for measuring a family's ability to pay for college – such as how to calculate the value of home equity or the financial need of a student with divorced parents."); Ex. 50, GTWNU_0000009876 (*Colleges Aim to Simplify Student Financial Aid Process Colleges Aim to Simplify Student Financial Aid Process*, BOSTON GLOBE (Mar. 20, 2005)); Ex. 218, Henrik N. Dullea, *28 University Presidents Affirm Commitment to Financial Aid*, CORNELL CHRON. (July 6, 2001), https://news.cornell.edu/stories/2001/07/28-university-presidents-affirms-commitment-financialaid; Ex. 41, DARTMOUTH_0000359371 at -467 (Shevani Jaisingh, *28 Colleges Alter Fin. Aid Packages*, THE DARTMOUTH (July 17, 2001)); Ex. 55, GTWNU_0000257603 (Kim & Athavaley, *Colleges Seek to Address Affordability*, WALL ST. J. (May 3, 2007)); Ex. 409, *University Leaves Financial Aid Group*, YALE DAILY NEWS (Sept. 26, 2008), https://yaledailynews.com/_blog/2008/09/26/university-leaves-financial-aid-group; Ex. 367, *On the Record with President DeGioia*, THE GEORGETOWN VOICE (Mar. 6, 2014), https://georgetownvoice.com/2014/03/06/record-president-degioia; Ex. 275, Louise Story, *Deadlines Looming in Aid Law*, YALE DAILY NEWS (Apr. 2, 2001), https://yaledailynews.com/blog/2001/04/02/deadlineslooming-in-aid-law ("The group continues to work on a common methodology that may remove home equity from the aid formula and may change the payment role of non-custodial parents."); Ex. 249, Andrew Williamson, *Beginning of the End for 568 Group Oligopoly*, YALE DAILY NEWS (Jan. 16, 2008), https://yaledailynews.com/blog/2008/01/16/beginning-of-the-end-for-568-groupoligopoly; Ex. 229, Troy Onink, *2017 Guide to College Financial Aid, the FAFSA and CSS Profile*, FORBES (Jan. 8, 2017), https://www.forbes.com/sites/troyonink/2017/01/08/2017-guideto-college-financial-aid-the-fafsa-and-css-profile/#621b2ff64cd4 (reporting that "under the CM home equity is capped at 1.2 times the parent's adjusted gross income"); Ex. 425, Kim Clark, *Who Truly Needs Financial Aid?*, U.S. NEWS & WORLD REP., Sept. 13, 2002; Ex. 245, Kim Clark, *A Truce In The Scholarship Bidding Wars?*, U.S. NEWS & WORLD REP., Sept. 30, 2002; Ex. 90, H.R. REP. NO. 107-32, at 3 (Apr. 3, 2001) ("In addition, they are discussing and testing guidelines based on the 1997 proposals of the financial aid officers. The presidents expect to announce agreement on the principles and guidelines in the next several months.").

**PLAINTIFFS' RESPONSE: Disputed in part**. Plaintiffs do not dispute that the 568 Group's membership and the need analysis "principles" in the Subcommittee Report were reported in the media before 2018. Plaintiffs dispute that the "CM Guidelines and components thereof, and various activities of the 568 Group" were publicly reported, especially in any systematic or material way, before 2018. First, over half of the cited exhibits date from 2001 or 2002—that is, they effectively predate the 568 Group's activities because they predate the 2003-2004 academic year when Defendants first implemented the CM. *See* Def. Ex. 408 at 34, 36. ████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████ Third, several of the cited exhibits are not reported "in the media" as much as they are posted on student blogs and university communications, such as the three separate exhibits from the *Yale Daily News* blog and two other exhibits from Cornell and Georgetown. Only the *Chronicle of Higher Education*, the *Boston Globe*, and *Forbes* links reflect "media." As to the *Chronicle of Higher Education* article, it currently requires at least a membership to access and may well have been behind a paywall because there is no publicly archived copy. *See* Pl. Ex. 220, Internet Archive, https://web.archive.org/web/20211015000000*/https://www.chronicle.com/article/colleges-and-student-aid-collusion-or-competition/ (reflecting no publicly archived copy). As to the 2005 *Boston Globe* article, that article parrots the same misconceptions at issue in this very case. It provided a rosy picture of the 568 Group, quoting Defendants as claiming that they're "definitely more generous," have "increased the eligibility of students to receive financial aid" under the CM, and are "transparent" and "upfront about [] the methodology." ████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████ Finally, if anything, the *Forbes* article from 2017 highlights just how little the "components" of the CM were published by the "media": despite being published over 15 years after the first CM Guidelines Policy Manual, the *only* details contained about the CM in the *Forbes* article are that (1) the CM "treats both student and parent assets at 5%"; (2) "[s]mall business assets do not count under the Federal Methodology, but they do under the Institutional and Consensus Methodologies"; and (3) "[l]ikewise, home equity counts under the Institutional Methodology, but only up to 1.2 times the parent's adjusted gross income (AGI) under the" CM. Def. Ex. 229, Troy Onink, *2017 Guide to College Financial Aid, the FAFSA and CSS Profile*, FORBES (Jan. 8, 2017), https://www.forbes.com/sites/troyonink/2017/01/08/2017-guideto-college-financial-aid-the-fafsa-and-css-profile/#621b2ff64cd4 at 5 (reporting that "under the CM home equity is capped at 1.2 times the parent's adjusted gross income"). Plaintiffs further object that the publicity of these documents is not relevant, that they are taken out of context, and are outweighed by Plaintiffs' additional evidence related to Defendants' statute of limitations defense, including evidence related to the discovery rule and to Defendants' fraudulent concealment. Plaintiffs further object to Defendants' citations to unproduced websites as inadmissible. Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record.

72. **DEFENDANTS' ASSERTION:** The 568 Group and members of the 568 Group publicly disclosed the Group's membership, the "principles" in the Subcommittee Report, the CM Guidelines and components thereof, who the Group's need analysis approaches were directed to (first year aid applicants, and continuing students at most institutions), and various activities of the 568 Group, including on the 568 Group's website and on various member schools' websites, as well as in response to inquiries from families and the news media, in the 2000s and 2010s (before 2018). *See, e.g.*, Ex. 377, *Report of the Common Standards Subcommittee to the 568 Presidents' Working Group* (archived Aug. 18, 2001), https://web.archive.org/web/20010818090442/http://www.news.cornell.edu/releases/July01/568.presidents.report.html (last visited May 6, 2025) (archived Cornell news release webpage from Aug. 18, 2001 posting CM Guidelines); Ex. 29, CORNELL_LIT0000002461 (July

6, 2001 press release about the 568 Group) at -464; Ex. 6, AMHE-00000092 (2001 Press Release); Ex. 220, *568 Presidents' Group Member Institutions*, 568 PRESIDENTS GROUP (archived Feb. 23,                                                                                                          2005), https://web.archive.org/web/20050223041238/http://www.568group.org:80/membership/ members.html (last visited May 7, 2025); Ex. 78, NULIT-0000056485 ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ Ex. 41, DARTMOUTH_0000359371 at -467 (*28 Colleges Alter Fin. Aid Packages*, THE DARTMOUTH (July 17, 2001)); Ex. 55, GTWNU_0000257603 (Kim & Athavaley, *Colleges Seek to Address Affordability*, WALL ST. J. (May 3, 2007)); Ex. 409, *University Leaves Financial Aid Group*, YALE DAILY NEWS (Sept. 26, 2008), https://yaledailynews.com/blog/2008/09/26/university-leavesfinancial-aid-group; Ex. 367, *On the Record with President DeGioia*, THE GEORGETOWN VOICE (Mar. 6, 2014), https://georgetownvoice.com/2014/03/06/record-president-degioia (President DeGioia confirming Georgetown's membership in 568 Group, noting that he is the "chair" of the Group); Ex. 275, Louise Story, *Deadlines Looming in Aid Law*, YALE DAILY NEWS (Apr. 2, 2001), https://yaledailynews.com/blog/2001/04/02/deadlines-looming-in-aid-law (describing statements from Cornell President Hunter Rawlings—"Rawlings said he expects the group will release the exact methodology this spring.").

**PLAINTIFFS' RESPONSE: Disputed in part**. It is undisputed that the 568 Group and members of the 568 Group publicly disclosed the Group's membership, the "principles" in the Subcommittee Report, to whom the Group's need analysis approaches were directed to (first year aid applicants, and continuing students at most institutions), and certain activities of the 568 Group—including on the 568 Group's website and on various member schools' websites, as well as in response to inquiries from families and the news media—in the 2000s and 2010s (before 2018). Even these disclosures, however, were paired with repeated assurances that the 568 Group's financial aid system would be "fair." Pl. Ex. 221, 568 PRESIDENTS' GROUP, ABOUT THE 568 PRESIDENT'S                                                                                                GROUP, https://web.archive.org/web/20160320141210/http://568group.org/about/history.html (Group's founding members shared a "common concern about restoring public confidence in a financial aid system that aspires to be both understandable and *fair*.") (emphasis added); Pl. Ex. 222, 568 PRESIDENTS'               GROUP,             STATEMENT        OF        THE             CHAIRMAN, https://web.archive.org/web/20160320141210/http://568group.org/about/chairman.html (the Group's members had a "shared belief in the primacy of a need-based financial aid system that is

both understandable and *fair*") (emphasis added). Plaintiffs dispute that the CM Guidelines and all its components were ever disclosed. The evidence Defendants cite to support that the CM Guidelines were posted is that a Cornell news release webpage posted the 2001 Subcommittee's Report. *See* Def. Ex. 377. While that document is foundational to the CM Guidelines, that document is *not* the CM Guidelines, as it was adapted to create the CM Guidelines. *See* Defendants' SOF ¶ 69 ("The recommendations in the Subcommittee Report were eventually adapted by the 568 Group to create the Consensus Methodology Policy Guidelines."). Plaintiffs also dispute the extent to which even that document was public. Putting aside whether an attachment to a 2001 press release is practically accessible, as illustrated by the fact that Defendants cited the web.archive.org version of the link, it is no longer currently publicly accessible and web.archive.org does not show whether it was publicly accessible at all after 2012. *See* Internet Archive, https://web.archive.org/web/20250000000000*/http://www.news.cornell.edu/releases/ July01/568.presidents.report.html. ███████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████. Finally, Plaintiffs dispute the extent to which "various activities of the 568 Group" were public. ██████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████. If the activities were truly public, Defendants wouldn't note internally to colleagues ██████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████ Plaintiffs further object that the publicity of these documents is not relevant, that they are taken out of context, and are outweighed by

Plaintiffs' additional evidence related to Defendants' statute of limitations defense, including evidence related to the discovery rule and to Defendants' fraudulent concealment. Finally, Plaintiffs object to Defendants' citations to unproduced websites as inadmissible. Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record.

73. **DEFENDANTS' ASSERTION:** The 568 Group and its members provided information about the recommendations in the CM Guidelines to the U.S. Government Accountability Office ("GAO"), which led to the GAO publishing a report in 2006 in which it concluded that the 568 Group's activities had "not significantly affected college affordability" and disclosed the Group's membership, various activities of the Group, and details about the CM Guidelines, including with this chart that compared the IM to the CM Guidelines:

**Table 3: Comparison of Consensus Approach Developed by Schools Using the Antitrust Exemption Compared to the College Board's Institutional Methodology**

| | Institutional methodology | Consensus approach |
|---|---|---|
| Home equity | Included. No limit on amount considered asset available to pay for college. | Included. Home value is capped at 2.4 times income minus mortgage debt. |
| Family farm equity | Included. | Included. |
| Student and family assets | Included, but assets counted separately. 25 percent of student's net worth expected to be used for college costs. 5 percent of parent's assets expected to be used for college costs. | Included. In general student assets—such as prepaid and college savings plans are combined with family assets. 5 percent of family assets expected to be used for college. Trust funds will be considered on a case by case basis. |
| Divorced and separated families (Noncustodial parent) | Included. Expects noncustodial parent to contribute towards college costs. | Same as IM. |
| Total income/adjusted gross income | Included in total income any untaxed income and any paper depreciation and business, rental, or capital losses which artificially reduced adjusted gross income. | Excluded business and rental losses from calculation of income. |
| Medical/elementary and secondary school expenses | Included.[a] | Included. |
| Cost of living variance | Excluded.[b] | Adjusted living expenses based on geographic location. Takes into consideration that it is more costly to live in some areas of the country. |
| Number of siblings in college | Included—considers number of children enrolled in college, but instead of dividing by the number in college, it reduced the parental contribution for each student by 40 percent if 2 in college and by 55 percent if 3. | Same as IM. |
| One-time income adjustment | Not included.[c] | Excluded income that was not received on an annual basis, such as unemployment income or capital gains. |
| Family debt | Not included. | Made allowance for debt payments on loans incurred by parents for student's education. |

Source: GAO analysis.

Note: The consensus approach is being compared to the base institutional methodology. Schools may choose to implement other options available under the institutional methodology when assessing a student's financial need.

[a] Private elementary and secondary school tuition allowed at the option of the institution.

[b] As an option schools can adjust living expenses based on geographic locations.

[c] This is not in the base IM; however, a financial aid officer can adjust for this on a case-by-case basis, consistent with professional judgment.

Page 13                                    GAO-06-963  Higher Education

Ex. 408, U.S. GOV'T ACCOUNTABILITY OFF., SCHOOLS' USE OF THE ANTITRUST EXEMPTION HAS NOT SIGNIFICANTLY AFFECTED COLLEGE AFFORDABILITY OR LIKELIHOOD OF STUDENT ENROLLMENT TO DATE (Sept. 2006) at 13, *available at* https://www.gao.gov/assets/gao-06963.pdf.

**PLAINTIFFS' RESPONSE: Undisputed with clarification**. The GAO Report had only one year of data and thus specifically addressed its limitations. *See* Def. Ex. 408 at 22 ("Our econometric analysis has some limitations that could have affected our findings. For example, we could not include all the schools using the consensus approach in our analysis *because there was no data available for some of them*.") (emphasis added); *see also id.* at 23 (with respect to the GAO Report's purported conclusion regarding the 568 Group's effect on "affordability," the Report stated "the data for our post-consensus approach period was collected in 2003-2004—the first or second year that some schools were using the consensus approach. Because we have data for only one year after implementation, it is possible that some eventual effects of the consensus approach may not be captured. The effects of using the consensus approach could be gradual, rather than immediate, and therefore may not be captured until later years"); ████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████. The GAO Report also contained a 10-page rebuttal from the Chairman of the 568 Group, characterizing the finding as: "There is no evidence that exempting our institutions from antitrust laws has stifled competition or that there has been any collusion aimed at reducing aid expenditures at member institutions"; and further arguing that "[t]he

complete absence of any evidence of individuals being hurt through this limited antitrust exemption, implies strongly that the public interest has been served by the 568 exemption." Def. Ex. 408 at 23, 78-79. Finally, Plaintiffs object that the publicity of these documents is not relevant, that they are taken out of context, and are outweighed by Plaintiffs' additional evidence related to Defendants' statute of limitations defense, including evidence related to the discovery rule and to Defendants' fraudulent concealment.

74. **DEFENDANTS' ASSERTION:** The CM Guidelines did not address every element of a comprehensive need analysis methodology, and for at least eight of the 17 discrete elements that they addressed, the recommendations were vague, incomplete, or open to interpretation and dictated no particular result. Ex. 2.1, Long Reb. ¶ 176 & n.357; *see also* Ex. 180, Nucciarone (Notre Dame) Tr. 78:2179:20 ("Consensus Methodology I believe to be a misnomer" as "[t]he methodology is institutional methodology with professional judgment approaches applied to institutional methodology").

**PLAINTIFFS' RESPONSE: Disputed**. At a minimum, the CM Guidelines implicitly address every element of a comprehensive need analysis methodology, because it begins with the premise of implementing the Base IM, which Defendants implicitly contend *is* a "comprehensive" need analysis methodology. SOF ¶ 28; ███████████████████████████████████ ████████████████████████████████ But more fundamentally, Plaintiffs object to Defendants' use of the vague and ambiguous term "comprehensive" as it implies needs analysis must be "comprehensive" and reflects a contested and misleading characterization of what it means to be "comprehensive." A needs analysis methodology may be functionally "comprehensive" even if it does not resolve every conceivable scenario. ██████████████████████████████

Put differently, that the CM Guidelines—which proscribed fundamental features such as considering a family's assets and income and using standardized tables to assess family contribution—may have left room for interpretation in certain *other* areas does not render the CM non-comprehensive. Plaintiffs further dispute that "eight of the 17 discrete elements that [the CM] addressed" were "vague, incomplete, or open to interpretation and dictated no particular result." Defendants' expert Dr. Long states that the CM Guidelines did not "provide actionable

recommendations" for several items the CM Guidelines address:

- divorced, separated, and single parents;

- Parental unemployment;

- Retirement allowances;

- IM taxation bands;

- Family loan debt;

- One-time income adjustments;

- Special expense adjustments; and

- Parent businesses.

Def. Ex. 2.1, Long Reb. ¶ 176 & n.357. But the CM Guidelines—particularly when paired with the Professional Judgment Manual—provide detailed instructions for several of these categories. Indeed, Defendants had no problem describing themselves and their peers as implementing or following the CM. *See* CSOF ¶ 10. To take just a few examples Dr. Long analyzed:

- **Divorced, separated, and single parents**. The CM Guidelines provide that the "analysis begins with the custodial family unit"; "in most cases, additional information is sought concerning the non-custodial family"; if the parents remarry, the "standard approach" is to request information "from all parents and spouses" and that information from non-custodial parents may be waived by using the "Consensus-Approach non-custodial waiver petition" which provides several examples of when information is not necessary (such as when there is no known second parent, the second parent divorced long ago and has no contact, etc.). Def. Ex. 75 at -353. ████████████████████████████

  ████████████████████████████████████

  ████████████████████████████████████

  ██████████ And the Professional Judgment Manual provides four full pages of further clarification. *See* Def. Ex. 17 at -051, -053 (for instance, dictating the premise that a

university should "use both natural parents whenever possible as the basis of the needs analysis" and even how to account for children, step-children, and half-siblings that live with just one parent).

- **Parental unemployment**. The CM Guidelines recommended that when a parent becomes unemployed, a 568 Group member should use "anticipated year income" with the assumption that the parent will "be reemployed at a reduced rate from his or her previous salary" and pair that with a "mid-year review follow-up process." Def. Ex. 75 at -362. The 568 Group recommendation came specifically because "it was apparent to the 568 Group that there was inconsistency in how income was constructed once the additional information was received" and so the 568 Group "developed a prototype . . . and recommended a standard approach." *Id.* at -362-63.

- **Retirement allowances**. Though the 568 Group agreed to "create a Task Force on Retirement," and further study the issue, in the interim it dictated a particular result for families that were "not covered by formal retirement programs": use the "current Federal Methodology (FM) asset protection (retirement allowance) tables" on a "case-by-case basis." Def. Ex. 75 at -358.

- **IM taxation bands**. As previously addressed, Defendants were not able to customize the Base IM's assessment tables. *See* RSOF ¶ 26. Thus, stating that this is "vague" or "incomplete" is a red herring, as the issue in the CM Guidelines was whether "*additional adjustments*" were necessary. Def. Ex. 75 at -359 (emphasis added). And the CM Guidelines did not recommend any. In fact, the CM Guidelines explained that, among the Base IM's assessment tables, in 2009, the College Board published "new, more liberal, optional assessment rate tables in 2009," which the 568 Group "endorsed." Def. Ex. 75 at -359. And again, financial aid professionals had no problem during depositions understanding and answering whether they followed the CM Guidelines regarding taxation

bands. █████████████████████████████

75.     **DEFENDANTS' ASSERTION:** The CM Guidelines provided certain adjustments to the Base IM that served to reduce EFCs in comparison to the Base IM. *See* Ex. 2.1, Long Reb. ¶ 146; Ex. 75, NULIT0000000348 (CM Guidelines, Dec. 2016) at -351-352; *see also id.* at -357-358 (providing for a treatment of retirement allowances more generous to students than the Base IM); *id.* at -356-357 (CM Guidelines suggesting that pre-paid tuition and savings plans for students be treated as parent assets, and thus assessed at a lower rate than they would be under the Base IM); *id.* at -354-356 (CM Guidelines suggest adjusting certain cost of living allowances using CSS Profile's Cost of Living Adjustment tables, as opposed to the Base IM's traditional use of a "uniform, basic living expense allowance"); *id.* at -357 (CM Guidelines capping home equity at 1.2 times family income, as opposed to the "prior IM option of capping home equity at 3 times income").

**PLAINTIFFS' RESPONSE: Disputed in part.** *First*, Plaintiffs object that it is inconsistent for Defendants to maintain that the elements of retirement allowances, pre-paid tuition and savings plans, and IM taxation bands both (1) differ from the Base IM but (2) are also "vague, incomplete, or open to interpretation." *Compare* SOF ¶ 74 (considering the retirement allowance guidance as one of the unactionable recommendations) *with id.* ¶ 76 (claiming the CM is more generous in these categories). *Second*, Plaintiffs dispute that certain of the CM Guidelines were "adjustments to the Base IM," as some of them, such as the cost-of-living adjustments, became the IM recommendation. *See* Pl. Ex. 14, SR1 ¶ 159; Pl. Ex. 32, SR2 ¶ 62. *Finally*, Plaintiffs object that whether the CM was more generous in certain respects than the Base IM is immaterial to whether Defendants' conduct lessened competition and whether Defendants would have been more generous in a world without the Challenged Conduct.

76.     **DEFENDANTS' ASSERTION:** Starting in 2001, for example, the 568 Group's Standards Subcommittee suggested adjusting certain allowances using the CSS Profile's Cost of Living Adjustment ("COLA") tables, which resulted in more generous financial aid offers for families in higher cost zip codes. Ex. 96, UCHICAGO_0000183661 at -682-684; *see also* Ex. 75, NULIT-0000000348 (CM Guidelines, Dec. 2016) at -354-356 (CM Guidelines suggest adjusting certain cost of living allowances using CSS Profile's Cost of Living Adjustment tables, as opposed to the Base IM's traditional use of a "uniform, basic living expense allowance"); Ex. 2.1, Long Reb. ¶¶ 147-49.

**PLAINTIFFS' RESPONSE: Disputed in part**. *See* RSOF ¶ 75.

77.     **DEFENDANTS' ASSERTION:** Starting in 2015, the CM Guidelines suggested that "[m]ost student assets should be considered parental assets in assessing the EFC," which, for

students with many assets or large amounts of pre-paid tuition, would lower EFC calculations as compared to the Base IM's approach. Ex. 17, COFHE-02-00007049 (Professional Judgment Guidelines Manual, Dec. 2016) at -057-059; Ex. 39, DARTMOUTH_0000152041 (CM Guidelines, Nov. 2015) at -049-050; *see* Ex. 2.1, Long Reb. ¶¶ 194-96.

**PLAINTIFFS' RESPONSE: Disputed**. . As indicated in Professor Baum's *A Primer on Economics for Financial Aid Professionals*, which Dr. Long cites, as far back as 2004 the "Institutional Methodology takes the more rational approach of treating all 529 plans, whether prepaid tuition plans or not, as parental assets in the case of dependent students, assessing them at the same rate as any other parental assets." Pl. Ex. 55, Baum, *supra*, at 82. Thus, students with "large amounts of prepaid tuition" have those assets assessed at the parental asset rate under both the IM and CM. Plaintiffs further dispute that students with "many assets" would have lower assets under the CM because the CM specifically carves out "student trust funds and other particularly large student asset accumulations" from its guidelines. Def. Ex. 75, CM Guidelines at 8.

78. **DEFENDANTS' ASSERTION:** Unlike the Base IM, the CM Guidelines also provided for the use of retirement allowances for families that did not have formal retirement plans or assets, which allowed those families to protect more of their assets from being counted in financial aid calculations. Ex. 2.1, Long Reb. ¶¶157-161; Ex. 75, NULIT-0000000348 (CM Guidelines, Dec. 2016) at -357-358 (noting that while the IM retirement allowance was "eliminated," the "568 Group recognizes that many families are not covered by formal retirement programs and that it may be appropriate to provide retirement protection for those without such support").

**PLAINTIFFS' RESPONSE: Disputed in part**. *First*, it is inconsistent for Defendants to maintain that retirement allowances both (1) differ from the Base IM but (2) are also "vague, incomplete, or open to interpretation." *Compare* SOF ¶ 74 (considering the retirement allowance guidance as one of the unactionable recommendations) *with id.* ¶¶ 78, 83 (purporting to cite a survey gauging compliance with those "unactionable recommendations"). *Second*, Plaintiffs

dispute that the CM retirement "allowed those families to protect more of their assets from being counted in financial aid calculations" compared to the IM. Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record. Defendants' cited material— the CM Guidelines—acknowledges that the Base IM "eliminated" the retirement allowance, but the same sentence goes on to state that "formal educational savings and family emergency savings *were added.*" Def. Ex. 75 at 11 (emphasis added). There is no evidence as to whether "more" assets were counted under the Base IM versus the CM in the likely very few edge cases where this mattered. *Third*, Plaintiffs object that whether the CM was more or less generous than the Base IM is immaterial to whether Defendants' conduct lessened competition and whether Defendants would have been more generous in a world without the Challenged Conduct.

79. **DEFENDANTS' ASSERTION:** Starting in 2005, the CM Guidelines limited the consideration of home equity to "1.2 times total income," which would "limit the amount of equity to be assessed" as compared to the Base IM's approach. Ex. 75, NULIT-0000000348 (CM Guidelines, Dec. 2016) at -357; Ex. 41, DARTMOUTH_0000359371 at -375 (providing that the CM's home equity cap is modified from 2.4 times family income to 1.2 times family income); Ex. 36, CORNELL_LIT0000335803 ("Need Analysis Compare – Institutional Methodology"), at -804 (Base IM calculation does not cap home equity, and 2022 IM provides "recommended" cap of "2 times the [parents'] total income").

**PLAINTIFFS' RESPONSE: Undisputed**. Plaintiffs object that whether the CM was more or less generous than the Base IM is immaterial to whether Defendants' conduct lessened competition and whether Defendants would have been more generous in the world without the Challenged Conduct.

80. **DEFENDANTS' ASSERTION:** There were no "penalties, consequences, or the like if any school failed to follow" the Guidelines. Ex. 142, Christiansen (Vanderbilt) Tr. 177:13-23; *see also* Ex. 137, Bridson (MIT) Tr. 208:19-209:2 (same); Ex. 143, Coffin (Dartmouth) Tr. 272:7-13 (same); Ex. 187, Schapiro (Northwestern) Tr. 196:22-197:2 (same); Ex. 200, Wallace-Juedes (Yale) Tr. 258:8-18 (same); Ex. 159, Hall (Columbia) Tr. 278:12-18 (same); Ex. 170, Marinaccio (Columbia) Tr. 415:24-416:7 (same); Ex. 144, Coleman (Duke) Tr. 111:8-13 (same); Ex. 172, McCall (Duke) Tr. 315:10-15 (same); Ex. 185, Russo (Notre Dame) Tr. 282:15-21 (same); Ex. 174, McDermott (JHU) Tr. 411:19-23 (same); Ex. 176, McLaughlin (Penn) Tr. 252:2-9 (same); Ex. 196, Varas (Penn) (Aug. 2, 2023) Tr. 291:19-292:2 (same); Ex. 148, Costanzi (Georgetown) (June 29, 2023) Tr. 326:8-16 (same); Ex. 153, Downs-Burns (Middlebury) Tr. 226:19-25 (former chair of the 568 Group's "Technical Committee" confirming that there was "no disciplinary mechanism" for schools who did not follow the CM or any portion of it).

**PLAINTIFFS' RESPONSE: Disputed.** First, Defendants acknowledged various requirements to be a member of the 568 Group, including following the CM. *See* PSOF ¶ 65 (addressing the "requirements" to be a member of the 568 Group). Second, various purported eligible schools left or never joined the 568 Group, CSOF ¶¶ 16-18, from which a reasonable person could infer that Defendants (1) viewed membership as incompatible with their more generous financial aid programs or (2) believed they would be "shunned" in some way if they participated while not complying.

81.    **DEFENDANTS' ASSERTION:** Each Defendant independently determined whether and how to implement the discrete components of need analysis with actionable recommendations in the CM Guidelines. Ex. 2.1, Long Reb. ¶176, App'x D; Ex. 191, Singer Tr. 19:19-21:8; Ex. 75, NULIT-0000000348 (CM Guidelines, Dec. 2016) at -349 (Guidelines' purpose was to serve as "recommendations" with a framework "that many schools could adopt while still being able to manage their individual resources"); Ex. 171, Maxson (Cornell) Tr. 155:20-22; Ex. 199, Walker (Rice) Tr. 66:1-9 (explaining the 568 Group allowed Rice to "glean what best practices are being done out in the field and whether those do or not apply to Rice in how we do things"); Ex. 181, Nucciarone (Notre Dame 30(b)(6)) Tr. 20:15-21:5; 328:12-329:8 (568 Group developed "best practices" that precipitated "institutional discussion" about what "fits with our university"); Ex. 193, Tener (Vanderbilt) Tr. 76:16-23 (stating that the 568 Group put together "best practices" but that Vanderbilt "would develop [its] own procedures that [Vanderbilt] ultimately followed"); *see also infra* SOF 84-91.

**PLAINTIFFS' RESPONSE: Disputed**. Defendants agreed to implement the CM, understood themselves and each other to be implementing the CM, monitored each others' compliance with the CM and spending, and understood that they could only deviate from the CM so long as the result was not "more generous." *See* CSOF ¶¶ 7-12, 19-22. The proof of their success in holding each other to the CM is that net price was inflated. *Id.* ¶ 44.

82.    **DEFENDANTS' ASSERTION:** Defendants accepted and acknowledged deviation from the CM Guidelines as normal and compatible with 568 Group membership. *See* Ex. 61, MITLIT-000004381 (Scott Wallace-Juedes (Yale) noting to Penn that "you don't have to follow CM 100%" to be in the 568 Group); Ex. 141, Chang (Caltech 30(b)(6)) Tr. 81:16-82:1 (noting that the 568 Group did not require adoption of the CM Guidelines); Ex. 140, Chang (Caltech) Tr. 304:11-305:12 ("Caltech never used the Consensus Methodology"); Ex. 137, Bridson (MIT) Tr. 49:9-15 (568 members "could use what we wanted and not use what we did not want to use" of the CM); Ex. 150, DeGioia (Georgetown) Tr. 181:10-182:11 (noting that "each school was free to go back to their place and do whatever they deemed appropriate"); Ex. 146, Corbett (Cornell) Tr. 48:24-49:6 ("Cornell looked at all of the options independently to decide on the methodology that

[it] would employ."); *id.* 110:16-111:3 ("[T]here were best practices that we at Cornell could choose to adopt or not as we developed our own methodology."); Ex. 166, Locke (Cornell) Tr. 73:3-11 (the 568 Group "developed" the CM which "an individual institution could ultimately decide to utilize parts of," but "it was really centered around kind of best practices"); Ex. 138, Bridson (MIT 30(b)(6)) Tr. 127:4-16 (declining to dispute the accuracy of the statement that "MIT's variation of IM incorporates some, but not all, of the aspects of what is known as the Consensus Approach to Need Analysis" when asked); Ex. 181, Nucciarone (Notre Dame 30(b)(6)) Tr. 93:22-94:19 (Notre Dame understood it did not need to "use all of th[e] principles" of the CM Guidelines nor use the CM principles "exactly the way they were written"); Ex. 180, Nucciarone (Notre Dame) Tr. 325:17326:14 (Notre Dame "did not interpret anything about th[e] 568 guidelines as mandatory"); Ex. 64, MITLIT-000072948 at -950 (MIT "incorporates some, but not all, of the aspects of" the CM); Ex. 62, MITLIT-000008772 (MIT uses the CM "as a guideline" but "[i]n several instances" is "more generous"); Ex. 194, Tilton (Brown) Tr. 59:13-19 ("We did not use the consensus methodology when calculating Brown['s] institutional methodology."); *id.* 45:18-46:14 (Brown "agreed to the principles related to the needs analysis" but did not adopt the CM in full); Ex. 198, Varas (Penn 30(b)(6)) Tr. 218:20-219:10 (Penn did not follow the CM); Ex. 159, Hall (Columbia) Tr. 54:12-24 (noting that the CM Guidelines were about "best practices," and that "even at Columbia, we weren't always following what the consensus methodology said to the letter, anyway"); *id.* 73:14-75:18 (same); Ex. 174, McDermott (Johns Hopkins) Tr. 410:19-411:23 (Johns Hopkins did not follow the CM); Ex. 199, Walker (Rice) Tr. 35:15-36:10; 40:25-41:13; 221:1525 (Rice did not follow all aspects of the CM, nor did it understand other schools to follow all aspects); Ex. 193, Tener (Vanderbilt) Tr. 206:13-24 (Vanderbilt "deviated" from portions of the CM).

**PLAINTIFFS' RESPONSE: Disputed.** The CM established a price floor for deviations.

Defendants' agreement to apply several core principles in awarding aid (CSOF ¶ 12)—including

the agreement to make need-based aid the primary form of financial aid and to base it on student

and families' maximum "ability to pay"—created a "pricing floor" when combined with their

agreement to apply same approach for calculating that "ability to pay." ██████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████ Thus,

contrary to Defendants' after-the-fact testimony, contemporaneous, non-public documents reflect

that deviations were accepted only insofar as they were ***less*** generous. ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████





83.    **DEFENDANTS' ASSERTION:** No Defendant adopted the CM Guidelines in their entirety while a member of the 568 Group, and no single component of the CM Guidelines was applied by every Defendant every year of their membership. Ex. 2.1, Long Reb. ¶¶174-198, fig. 8; Ex. 35, CORNELL_LIT0000252669 ("Results of Consensus Methodology Questionnaire," Jan. 2015), at -679, -681-683, -685, -687 (out of 19 schools that completed 568 Group survey, three schools reported deviating from the recommended treatment of divorced, separated, and single parents, three schools reported deviating from the recommended treatment of cost-of-living variances, six schools reported deviating from the recommended treatment of family and student assets, two schools reported deviating from the recommended treatment of retirement allowances, two schools reported deviating from the recommended treatment of the number of siblings in college, and one school reported deviating from the recommended imputation of the value of liquid assets); *see also* Ex. 132, Arleth (COFHE) Tr. 191:7-192:6; Ex. 174, McDermott (Johns Hopkins) Tr. 410:19-411:23; Ex. 38, DARTMOUTH_0000082031 at -033 (Dartmouth telling the GAO that it "has not implemented the Consensus Approach," despite being a member of the 568 Group); Ex. 142, Christiansen (Vanderbilt) Tr. 71:20-72:2 (Vice Provost and Dean of Admissions and Financial Aid at Vanderbilt explaining that Vanderbilt "did not follow [the consensus] methodology 100 percent entirely, and we deviated, and we did what we need to do best for us and our students"); Ex. 63, MITLIT-000026032 (Director of Student Financial Services at MIT explaining that "[w]hile 568 schools use the Consensus Approach, there can be variances within that approach"); Ex. 61, MITLIT-000004381 (Scott Wallace-Juedes (Yale) noting to Penn that "you don't have to follow CM 100%" to be in the 568 Group); Ex. 191, Singer Tr. 248:17-249:7 (recognizing Defendants made "deviations" from the CM).

**PLAINTIFFS' RESPONSE: Disputed in part**. It is undisputed that not every Defendant used the literal same formula resulting from the CM every year. But Plaintiffs dispute Defendants' assertion that no single component of the CM Guidelines was applied by every Defendant every year of their membership. For instance, at least one element of the CM that every Defendant implemented was the agreement to use the Base IM, which in turn locked Defendants into one of at most two static and preset asset and income tables, which apply progressively higher assessment rates to higher levels of available income and assets.



Finally, Defendants' EFCs converged closer together while they were members of the 568 Group. CSOF ¶ 48.

84.     **DEFENDANTS' ASSERTION:** Defendants frequently diverged from the CM Guidelines, including in ways that benefitted students. *See* Ex. 2.1, Long Reb. ¶¶145, 174-198, App'x D (discussing Defendants' deviations from the CM Guidelines; how they implemented the CM Guidelines differently, if at all; and how Defendants' deviations resulted in *lower* EFCs); Ex. 62, MITLIT-000008772 (Bridson of MIT noting that "[i]n several instances, [MIT] is more generous than CM, but we do use it as a guideline").

**PLAINTIFFS' RESPONSE: Disputed.** First, to the extent Defendants rely on Dr. Long's analysis on Defendants' adherence to the CM, it is misleading. As Dr. Singer explains, she only considered a Defendant to adhere to a CM Guideline if it followed it *exactly* and in *every* year. Pl. Ex. 14, SR2 ¶ 42. So if there was a year a Defendant deviated by being less generous and complying with the CM price floor mandate—*see* RSOF ¶ 75—Dr. Long classifies it as non-compliance. Pl. Ex. 14, SR2 ¶ 42. Second, Plaintiffs further object that whether a Defendant diverged from the CM Guidelines with regard to a single component is, at a minimum, an incomplete assertion and irrelevant without the context of whether the school was more or less generous on other components. A Defendant that is more generous on one component but less generous on many more may be less generous to students overall. *See also* RSOF ¶ 75.

85.     **DEFENDANTS' ASSERTION:** For example, only four Defendants—Columbia, Duke, Georgetown, and Johns Hopkins—adopted and consistently applied the CM Guidelines' recommended cap on how much home equity to consider in evaluating a student's EFC. Ex. 2.1, Long Reb. ¶178, fig. 8.

**PLAINTIFFS' RESPONSE: Disputed.** First, Dr. Long's analysis is misleading. *See* PSOF ¶ 84. Second, many other Defendants consistently applied the CM Guidelines' home equity cap, ███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████ In addition, at least some of the Defendants that did not consistently apply the CM's home equity cap (or did not comply in certain years) were in fact *less* generous than the CM and therefore their non-compliance was not because they were more giving. ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████

86.  **DEFENDANTS' ASSERTION:** Some Defendants counted the full value of a family's home, some instituted caps above or below the CM Guidelines, and some did not consider home equity at all. *See, e.g.*, Ex. 2.1, *id.* App'x D, tbls. D.1, D.8, D.11, D.12. For example, Caltech stopped considering home equity in 2020, Ex. 2.1, *id.* tbls. D.2, while Penn instituted a lower cap on home equity than the CM Guidelines recommended in 2005, Ex. 2.1, *id.* D.14, and Brown, Emory, and ████████ instituted a home equity cap above the CM Guidelines in certain years, Ex. 2.1, *id.* tbls. D.1, D.8, D.15, ██████ Similarly, after it exited the 568 Group for the first time, Yale became less generous than the CM Guidelines by increasing its home equity cap and reducing retirement asset allowances. Ex. 120, YALE_LIT_0000005427; *see also* Ex. 2.1, Long Reb. App'x D, tbl. D.17.

**PLAINTIFFS' RESPONSE: Disputed in part.** Plaintiffs do not dispute that "[s]ome Defendants counted the full value of a family's home, some instituted caps above or below the CM Guidelines, and some did not consider home equity at all." It is similarly undisputed that "Caltech stopped considering home equity in 2020," that "Penn instituted a lower cap on home equity than the CM Guidelines recommended in 2005," and that Brown, Emory, and Yale instituted a less generous home equity cap than the CM Guidelines in certain years. However, Plaintiffs dispute the

suggestion that perfect compliance with the CM generally, or with the home equity element specifically, was required or expected for every year of the conspiracy, ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████ Regardless, as a 2015 568 Group survey shows, there was broad compliance amongst Defendants for most of the CM elements. ████████████████

████████████████████████████████████████

Concerning home equity specifically, ████████████████████

████████████████████████████████████████

████████████████████████ ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

Plaintiffs also dispute that Yale became less generous than the CM Guidelines after leaving the 568 Group by reducing retirement asset allowances. ████████████████████

████████████████████████████████████████

87. **DEFENDANTS' ASSERTION:** Other approaches to home equity varied. For example, MIT removed home equity from its analysis for families that earned less than $100,000 in yearly income in 2008, raised that threshold to $150,000 in 2014, and stopped considering home equity altogether in 2016. Ex. 2.1, Long Reb. App'x D, tbl. D.11; Ex. 328, *Increase of 10.4 Percent in Financial Aid Will Benefit a Wide Range of MIT Families*, MIT NEWS (Mar. 4, 2016), https://news.mit.edu/2016/increasefinancial-aid-benefit-students-families-0304. Similarly, Rice capped home equity at 1.2 times income in 2007, raised the cap to 2 times income in 2012, and lowered the cap to 0.1 times income in 2020. *See* Ex. 2.1, Long Reb. App'x D, tbl. D.15.

**PLAINTIFFS' RESPONSE: Disputed in part.** Plaintiffs do not dispute that MIT generally stopped considering home equity in its analysis for families earning less than $100,000 in yearly income in 2008, $150,000 in 2014 and for all families in 2016. It is similarly undisputed that "Rice capped home equity at 1.2 times income in 2007 [and] raised the cap to 2 times income in 2012." Plaintiffs dispute, however, that MIT strictly adhered to its home equity income cap policy. *See* Pl. Ex. 77, ███████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████ Plaintiffs also dispute that Rice lowered its home equity cap to 0.1 times income in 2020. ████████████████████████████████

████████████ *See, e.g.*, Pl. Ex. 78, RICE_LIT0000006551 (██████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████

88.    **DEFENDANTS' ASSERTION:** Similarly, only nine of the 20 then-members of the 568 Group adopted the retirement allowance tools that the 568 Group developed for the 2019-2020 award cycle. Ex. 2.1, Long Reb. ¶160; Def. Ex. 67, ND_0000624 at -625.

**PLAINTIFFS' RESPONSE: Undisputed.**

89.    DEFENDANTS' ASSERTION: Only two Defendants, Columbia and Dartmouth, adopted the December 2016 CM Guidelines' recommendations regarding adjusting parental contributions for students with siblings in college through the end of the class period. Ex. 2.1, Long Reb. ¶189, fig. 8.

**PLAINTIFFS' RESPONSE: Disputed.** This element provides an example of both errors in Dr. Long's characterization of Defendants' policies and the unrealistic strictness Dr. Long's analysis which fails to capture the depth of Defendants' agreement. Pl. Ex. 14 ¶ 42. Take Penn for instance. ████████████████████████████████████████████████████████

90.     **DEFENDANTS' ASSERTION:** Other deviations by Defendants included variations in how schools implemented the CM Guidelines' recommendations on the treatment of parent and student assets, Ex. 2.1, Long Reb. ¶196, App'x D, tbls. D.3, D.4, D.5, D.6, D.11, D.13, and the treatment of and the reduction of parent contributions to account for other siblings in college, *id.* ¶¶190-192, fig. 8, and cost-of-living adjustments, *id.* ¶183 n.371.

91.     **PLAINTIFFS' RESPONSE: Disputed.** First, to the extent SOF ¶ 90 also addresses "reduction of parent contribution to account for other siblings in college," Plaintiffs refer to RSOF ¶ 90. Second, Dr. Long's analysis is misleading. *See* PSOF ¶ 84.

92.     **DEFENDANTS' ASSERTION:** Emory, MIT, and Penn lowered the parental contribution for each sibling in college more than the CM Guidelines recommended. Ex. 2.1, Long Reb. App'x D, tbls. D.8, D.11, D.14.

**PLAINTIFFS' RESPONSE: Disputed**. First, the statement is vague and ambiguous as to when and to what extent these Defendants "lowered the parental contribution for each sibling in college." Second, to the extent SOF ¶ 90 also addresses "reduction of parent contribution to account for other siblings in college," Plaintiffs refer to RSOF ¶ 90. Third, this statement stands at odds with Dr. Long's assessment that in 2012, Penn *reduced* the allowance for [1] siblings enrolled at a community college or other low-cost college and for siblings receiving non-need based scholarships. *Id.*

93.     **DEFENDANTS' ASSERTION:** While members of the 568 Group, certain Defendants utilized "income threshold" policies, pursuant to which families below certain income thresholds would not be expected to take out any loans to pay for college. *See, e.g.*, Ex. 8, BROWN_0000050379 ("Financial Aid Office: Undergraduate Overview," 2014) at -379; Ex. 196, Varas (Penn) Aug. 2, 2023 Tr. 219:13221:24; Ex. 198, Varas (Penn 30(b)(6)) Tr. 98:14-101:7; Ex. 261, *Cornell Drops Need-Based Loans for Students From Families Earning Under $75,000*, CORNELL CHRON. (Jan. 31, 2008), https://news.cornell.edu/stories/2008/01/cornell-announces-sweeping-new-financial-aidprogram; Ex. 124, Kotlikoff (Cornell 30(b)(6)) Dep. Ex. 2 at 2.

**PLAINTIFFS' RESPONSE: Disputed in part**. Plaintiffs do not dispute that these income thresholds existed. Plaintiffs dispute the implication, with the context of the preceding paragraphs, that this makes the Defendants that utilized "income thresholds" more generous under the CM or to their peers. ████████████████████████████████████████████████████ ███████████████████████████ *See* Pl. Ex. 104, Nucciarone (Notre Dame 30(b)(6)) Tr. 341:1-20, 349:22-351:12; Pl. Ex. 97, Nucciarone (Notre Dame) Tr. 52:24-54:6; 176:4-13.

## B.     "Need Analysis Principles"

93.     The 2001 Subcommittee Report stated that the "work of the Subcommittee was … guided by a statement of Need Analysis Principles adopted by the 568 Presidents [at a meeting in April 2000]." The Subcommittee Report disclosed that those principles are:

- "1. To the extent they are able, parents and students have the primary responsibility to contribute to educational expenses before an institution awards financial aid."

- "2. Families should contribute to educational expenses according to their ability. Those with similar financial profiles should contribute similar amounts."

- "3. Institutions should evaluate both income and assets as part of the assessment of the parents' and applicants' ability to pay."

- "4. Each institution should inform applicants about the policies and practices it applies when measuring a family's ability to pay, carry out its policies consistently throughout a student's eligibility, and support the awarding of need-based aid."

- "5. An institution that allocates any financial assistance that is not based exclusively on need should inform all prospective applicants of the standards it applies in allocating that aid."

- "6. The exercise of 'professional judgment' by financial aid officers in assessing a family's ability to pay should recognize unique or extenuating financial circumstances in individual cases; such professional judgment is not the proper mechanism for systematically treating groups of students differently in order to advance institutional objectives."

The same six principles were reproduced and included in every subsequent version of the CM Guidelines Policy Manual. *See, e.g.*, Ex. 75, NULIT-0000000348 (CM Guidelines, Dec. 2016) at -349.

**PLAINTIFFS' RESPONSE: Undisputed**.

94.     **DEFENDANTS' ASSERTION:** The 568 Group publicly endorsed these "Need Analysis Principles" starting in the early 2000s. Ex. 6, AMHE-00000092 (2001 Press Release). They were disclosed on the 568 Group's website throughout the 2000s and 2010s, *see* Ex. 225, *568 Presidents' Group Document Center* (archived Feb. 5, 2005), https://web.archive.org/web/20050205194043/http://568group. org/docs/index.html (archive of 568 Group website's "Document Center" from Feb. 5, 2005) (last visited May 6, 2025); Ex. 233, *About the 568 Presidents' Group* (archived Apr. 6, 2005), https://web.archive.org/web/20050406033309/http://www.568group.org/about/chairman.html (last visited May 6, 2025) (archive of "About the 568 President's Group" page of the website from Apr. 6, 2005); Ex. 226, *The 568 Presidents' Group Consensus Methodology Policy Guidelines* (archived May 20, 2005), https://web.archive.org/web/20050520200523/http://www.568group. org/docs/cmmanual-non.pdf (archived copy of publicly available CM Guidelines from May 20, 2005) (last visited May 6, 2025); Ex. 228, *568 Presidents' Group Document Center* (archived Apr. 22, 2016), https://web.archive.org/web/20160422211732/http://568group.org/docs/index.html (archive of 568 Group website's "Document Center" from Apr. 22, 2016) (last visited May 6, 2025); Ex. 227, *The 568 Presidents' Group Consensus Methodology Policy Guidelines* (archived Apr. 22, 2016), https://web.archive.org/web/20160422163238/http://568group.org/docs/cmmanual-non.pdf (archived copy of publicly available CM Guidelines from Apr. 22, 2016) (last visited May 6, 2025); and were described in the Congressional record and in print media, *see* Ex. 90, H.R. REP. NO. 107-32, at 3 (Apr. 3, 2001) ("The presidents of the universities have tentatively agreed to a common set of principles affirming the primacy of need-based aid."); Ex. 218, Henrik N. Dullea, *28 University Presidents Affirms Commitment to Financial Aid*, CORNELL CHRON. (July 6, 2001), https://news.cornell.edu/stories/2001/07/28-universitypresidents-affirms-commitment-financial-aid ("28 leading colleges and universities today … endorsed a comprehensive set of principles for the fair determination of a family's contribution to the cost of securing an undergraduate education.").

**PLAINTIFFS' RESPONSE: Undisputed with clarification**. Specifically, the publicly available documents cited herein entitled "Consensus Methodology Policy Guidelines Manual" are not the "complete" versions of the Guidelines Policy Manual, such as that in Defendant's Exhibit 75, cited in Defendants' SOF ¶ 93.

95.     **DEFENDANTS' ASSERTION:** The principles the 568 Group endorsed publicly in the Subcommittee Report in 2001 and in every subsequent version of the CM Guidelines Manual have guided other schools and organizations for decades, long before the formation of the 568 Group. For example, the College Board publishes a set of principles for need analysis and the administration of student financial aid in its annual IM User Guides, and a subset of those principles mirror the principles the 568 Group said guided its thinking. *See* Ex. 2.1, Long Reb. ¶¶217-219, fig. 10:

**Figure 10**
**The 568 Group's and College Board's Principles of Need Analysis and Administration of Student Financial Aid[435]**

| | 568 Group Principles | College Board Principles Ratified by Member Institutions |
|---|---|---|
| 1. | To the extent they are able, parents and students have the primary responsibility to contribute to educational expenses before an institution awards financial aid. | Because postsecondary education is a valuable personal investment, the student and the family have the primary responsibility for paying for educational costs to the extent they are able. |
| 2. | Families should contribute to educational expenses according to their ability. Those with similar financial profiles should contribute similar amounts. | An equitable need analysis system expects families in similar circumstances to make similar contributions. An equitable need analysis system expects families with different circumstances to contribute appropriately different amounts. |
| 3. | Institutions should evaluate both income and assets as part of the assessment of parents' and applicants' ability to pay. | A need analysis system should provide a comprehensive measurement of family financial strength. Both income and assets contribute to the family's financial strength and both should be considered when measuring any family's ability to pay. A family's ability to pay, not willingness to pay, is measured by the need analysis system. |
| 4. | Each institution should inform applicants about the policies and practices it applies when measuring a family's ability to pay, carry out its policies consistently throughout a student's eligibility, and support the awarding of need-based aid. | Each institution has a responsibility to disclose information about the policies and practices it applies in measuring family ability to pay. |
| 5. | An institution that allocates any financial assistance that is not based exclusively on need should inform all prospective applicants of the standards it applies in allocating that aid. | Each institution has the responsibility to make clear to students and their families whether offered funds are awarded based on financial need or other grounds. |
| 6. | The exercise of "professional judgment" by financial aid officers in assessing a family's ability to pay should recognize unique or extenuating financial circumstances in individual cases; such professional judgment is not the proper mechanism for systematically treating groups of students differently in order to advance institutional objectives. | The financial aid administrator must always make the final assessment of family ability to pay, guided by these principles and considering the particular circumstances of the individual student and family. |

*See also* Ex. 13, CBD000001 (CSS/FINANCIAL AID PROFILE USER'S GUIDE, COLLEGE BOARD, 2003-2004) at -010 ("A strong commitment to need-based aid has been embedded in the College Board's statements of principles and practices since establishing the College Scholarship Service (CSS) in 1954."); Ex. 152, Donahue (Harvard) Tr. 235:11-239:5 (testifying that "Harvard's financial aid practices" were "consistent with these six principles" and that the principles are "widely adopted by financial aid professionals"); Ex. 145, Cooper (Stanford 30(b)(6)) Tr. 201:1206:5 (testifying the principles were not "unique to the 568 Group" and "widely endorsed" by institutions "awarding need-based aid;" and that Stanford agreed with "these general principles" and "Stanford's financial aid practices [were] broadly consistent with those principles"); Ex. 135, Betterton (Princeton) Tr. 168:13-170:8 (testifying the "principles were agreed to by a much larger group" than the 568 Group). The fourth, fifth, and sixth principles listed in the Subcommittee Report, in the CM Guidelines Manuals, and on the 568 Group's website were long ago endorsed by the College Board's more than 4,200 member colleges and universities. *See* Ex. 2.1, Long Reb. ¶¶217-219, fig. 10; Ex. 13, CBD000001 (CSS/FINANCIAL AID PROFILE USER'S GUIDE, COLLEGE BOARD, 2003-2004) at -010-012.

**PLAINTIFFS' RESPONSE: Disputed in part**. Plaintiffs do not dispute that the College Board's stated principles predate and "mirror" the 568 Group's principles. And while Plaintiffs do not dispute that the College Board, as an entity, endorsed the stated principles, Plaintiffs further dispute that the 4,200 members of College Board "endorsed" or "ratified" them individually. Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record. Neither Exhibit 2.1 nor 13 provide support for the contention that individual members ratified these principles, such as through a memorandum of understanding or agreement among university presidents, as occurred in the 568 Group. *C.f.* CSOF ¶¶ 9, 12. Nor did the individual members agree among themselves to apply these principles or compete in the same market.

96. **DEFENDANTS' ASSERTION:** These Need Analysis Principles represented a commitment to achieving equity, efficiency, and transparency in financial aid, and they were considered "general principle[s] of need-based aid" or "best practice[s]" in the field. Ex. 140, Chang (Caltech) Tr. 227:6-234:11; Ex. 153, Downs-Burns (Middlebury) Tr. 232:19-234:16; Ex. 180, Nucciarone (Notre Dame) Tr. 304:15-306:18; Ex. 214, Notre Dame's Resps. & Objs. to Plaintiffs' Second Set of Rogs at 23 (noting that, with regard to these principles, Notre Dame's philosophy of financial aid was consistent with that "espoused by the College Board and thought leaders in the industry throughout the late 20th century").

**PLAINTIFFS' RESPONSE: Disputed in part**. Plaintiffs object on the ground that the statement that "these Need Analysis Principles represented a commitment to achieving equity, efficiency, and transparency in financial aid" is vague and ambiguous. To the extent Defendants are asserting that they believed these principles "achiev[ed] equity, efficiency, and transparency in financial aid," Plaintiffs dispute that the cited evidence supports that. Plaintiffs also dispute that the 568 Group's closed-door meetings and wealth favoritism reflect commitments to achieving "equity, efficiency, and transparency." *See* CSOF ¶¶ 35-36, 54-55. Plaintiffs do not dispute that the Needs Analysis Principles were similar to other general principles of need-based aid, albeit with clarification. *See* RSOF ¶ 21.

97. **DEFENDANTS' ASSERTION:** Transparency in financial aid provides families with accessible information, which allows them to more effectively evaluate which school provides the best value. *See, e.g.*, Ex. 151, Donaghey (Middlebury/Dartmouth) Tr. 16:10-14.

**PLAINTIFFS' RESPONSE: Disputed.** Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record. The cited testimony says nothing about transparency. *See* Def. Ex. 151, Donaghey (Middlebury/Dartmouth) Tr. 16:7-14 █████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████

98.     **DEFENDANTS' ASSERTION:** Many schools—including Defendants, non-Defendants who were members of the 568 Group, and non-Defendants who were never members of the 568 Group—have endorsed these foundational principles since they were developed in the 1950s. *See, e.g.*, Ex. 175, McGann (Amherst 30(b)(6)) Tr. 47:10-51:22 (agreeing that the Need Analysis Principles were "principle[s] of Amherst financial aid philosophy prior to joining the 568 Group"); Ex. 140, Chang (Caltech) Tr. 227:6-234:11; Ex. 153, Downs-Burns (Middlebury) Tr. 232:19-234:16; Ex. 180, Nucciarone (Notre Dame) Tr. 306:6-12 ("Those principles existed before 568."); Ex. 152, Donahue (Harvard) Tr. 235:4-239:5 (testifying that the principles were "widely adopted by financial aid professions" and that Harvard agreed with these principles in 2000); Ex. 135, Betterton (Princeton) Tr. 168:13-170:8 (testifying the "principles were agreed to by a much larger group" than the 568 Group); Ex. 145, Cooper (Stanford (30(b)(6)) Tr. 201:1-206:5 (testifying the principles were not "unique to the 568 Group" and "widely endorsed" by institutions "awarding need-based aid;" and that Stanford agreed with "these general principles" and "Stanford's financial aid practices [were] broadly consistent with those principles"); Ex. 161, Higinbotham (NYU 30(b)(6)) Tr. 144:15148:18; Ex. 177, Meade (College Board 30(b)(6)) Tr. 266:3-270:6 (explaining that awarding aid based on need and assuming that families bear primary responsibility for paying for college have been CSS principles since 1954); Ex. 142, Christiansen (Vanderbilt) Tr. 162:8-162:25; Ex. 413, 12 U. PA. ALMANAC 4 (Jan. 1966) at 5, *available at* https://almanac.upenn.edu/archive/_v12pdf/n04/011666.pdf (Penn President Gaylord Harnwell stating that "scholarships, loans, and job opportunities are made available to the student … as in the instance of the graduated income tax … in proportion to their ability to pay"); Ex. 214, Notre Dame's Resps. & Objs. to Plaintiffs' Second Set of Rogs at 23 (noting that, with regard to these principles, Notre Dame's philosophy of financial aid was consistent with that "espoused by the College Board and thought leaders in the industry throughout the late 20th century").

**PLAINTIFFS' RESPONSE: Undisputed with clarification**. Plaintiffs do not dispute that these witnesses, and other universities outside of the 568 Group "agree" with the principles insofar as they also accept the principles. But Plaintiffs dispute that they did not formally "agree" to follow the principles with Defendants, such as through the memoranda of understanding and the 568 Group Presidents' joint agreement to principles. CSOF ¶¶ 9, 12.

99.     **DEFENDANTS' ASSERTION:** The Need Analysis Principles endorsed by the

568 Group were subject to different interpretations and methods of implementation, *see, e.g.*, Ex. 173, McCourt (Penn) Tr. 253:18254:10 (describing the Need Analysis Principles as "very vague" and "pretty basic"), so schools that have endorsed them, like Defendants, viewed them as values with which to align their financial aid practices, and not as firm rules that must be applied, *see, e.g.*, Ex. 142, Christiansen (Vanderbilt) Tr. 162:16-25 (describing the principles as "common sense" and "positive things about our profession and how we think about" financial aid).

**PLAINTIFFS' RESPONSE: Disputed**. First, Plaintiffs dispute that Defendants "endorsed" the Need Analysis Principles. Defendants did not merely "endorse" the Needs Analysis Principles. They agreed to adhere to them. *See* CSOF ¶ 12. Second, Plaintiffs dispute that the principles were "subject to different interpretations and methods of implementation." The Need Analysis Principles were explicitly interpreted and implemented within the context of applying the Base IM and the CM, as part of the larger Challenged Conduct. ████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████). Plaintiffs do not dispute that the principles reflected in part how the financial aid professions "think about financial aid," with clarification. *See* RSOF ¶ 21.

**C.     Professional Judgment**

100.     **DEFENDANTS' ASSERTION:** In addition to the need-analysis methodology that each school develops and applies in its financial aid process, financial aid officers apply professional judgment in their review to evaluate applicants' financial circumstances on a case-by-case basis. "Professional judgment" refers to a holistic evaluation of an applicant's application and might adjust certain inputs to a given student's EFC calculation, or consider special circumstances, like job loss, to manually adjust an award. Ex. 418, *What is Professional Judgment?*, FED. STUDENT AID, https://studentaid.gov/help-center/answers/article/what-is-professional-judgment (last visited May 4, 2025) ("When there are unusual situations or circumstances that impact your federal student aid eligibility, federal regulations give a financial aid administrator discretion or professional judgment on a case-by-case basis and with adequate documentation to make adjustments to the data elements … that impact your Expected Family Contribution (EFC) to gain a more accurate assessment of your family's ability to contribute to your cost of education."); Ex. 163, Keane (Cornell) Tr. 182:20-184:1; Ex. 180, Nucciarone (Notre Dame) Tr. 56:23-60:20; Ex. 139, Chan (USC 30(b)(6)) Tr. 19:21-20:3; Ex. 159, Hall (Columbia) Tr. 196:14-21 (explaining that professional judgments are "unique" and are "particular to each situation and different to each situation"); Ex. 195, Tuman (Columbia) Tr. 218:3-219:13; *see also* Ex. 3.1, Stiroh Reb. ¶147. Using professional judgment to evaluate case-specific special circumstances is common throughout higher education because it improves fairness and equity. *See, e.g.*, Ex. 126, Meade (College Board 30(b)(6)) Dep. Ex. 34 (Allan M. Cartter, "New Approaches to Student Financial Aid: Report of the Panel on Student Financial Need Analysis," College Entrance Examination

Board (1971)) at 20-21 ("From the beginning it was a fundamental precept that the computation procedures were designed as an aid to, not a substitute for, the aid officer's considered judgment."); Ex. 13, CBD000001 (CSS/FINANCIAL AID PROFILE USER'S GUIDE, COLLEGE BOARD, 2003-2004) at -012 ("The financial aid administrator must always make the final assessment of family ability to pay, guided by these principles and considering the particular circumstances of the individual student and family."); Ex. 139, Chan (USC 30(b)(6)) 63:16-25; Ex. 169, Maloney (Wisconsin 30(b)(6)) Tr. 46:17-48:916.

**PLAINTIFFS' RESPONSE: Disputed in part.** Plaintiffs object to Defendants' vague equivocation of what "case-by-case" or "particular circumstances" means in this context. Plaintiffs do not dispute the formal definition of professional judgment or that professional judgment exists to address "unusual circumstances." But, for instance, applying an institution's stated policy on non-custodial parents or small business income is not a "unique circumstance" but instead becomes a mechanical byproduct of a university policy. The whole point of the CM was to standardize such decisions—including the given example like job loss—and effectively remove them from the ambit of professional judgment. ████████████████████████████████████████ ████████████████████████████████████████ So, while applying stated professional judgement policies may be "common," Plaintiffs dispute that the cited evidence supports Defendants' contention that truly "unique circumstances" were "common." *See also* RSOF ¶ 102.

101. **DEFENDANTS' ASSERTION:** The 568 Group developed a set of Professional Judgment Guidelines, *see* Ex. 17, COFHE-02-00007049 (Professional Judgment Guidelines Manual, Dec. 2016), which many Defendants did not use, *see, e.g.*, Ex. 196, Varas (Penn) Aug. 2, 2023 Tr. 210:3-211:22 (Penn did not use the 568 Group's professional judgment "guidelines"); Ex. 142, Christiansen (Vanderbilt) Tr. 80:21-81:19 (the 568 Group's professional judgment guidelines were "not something that we would go through and say, Yes, yes, yes, yes"); Ex. 159, Hall (Columbia) Tr. 95:7-96:8 (Columbia "internally [had its] own professional judgments beyond what's in the 568 professional judgment guide"); Ex. 181, Nucciarone (Notre Dame 30(b)(6)) Tr. 116:21-117:11 ("We had our own policies and procedures."). These Professional Judgment Guidelines did not dictate what specifically a financial aid officer should do in a particular context to exercise professional judgment but instead encouraged schools to comport with the generally accepted foundational principle of financial aid that professional judgment should be exercised on a case-by-case basis to account for the unique financial circumstances of each student and their families. *See* Ex. 200, Wallace-Juedes (Yale) Tr. 147:18-148:6 ("[P]rofessional judgment by definition … has to be on a case by case [basis] … [a]nd you can't have a standard approach to that."); Ex. 17, COFHE-0200007049 (Professional Judgment Guidelines Manual, Dec. 2016) at -055 ("These guidelines are always subject to the aid administrator's professional judgment and would serve as a basic standard for all 568 schools. Individual institutions could employ additional expectations either on an individual basis or as policies to be applied to all such cases."); Ex. 159,

Hall (Columbia) Tr. 195:19-196:21; Ex. 185, Russo (Notre Dame) Tr. 201:1-202:13; Ex. 374, PROFESSIONAL JUDGMENT, NAT'L ASS'N OF STUDENT FIN. AID ADM'RS (NASFAA) (Apr. 2021) at 3, *available at* https://www.nasfaa.org/uploads/documents/NASFAA_AE_2021-22_PJ_SSG_192CD.pdf.

**PLAINTIFFS' RESPONSE: Disputed**. First, the CM Guidelines themselves were a "set of recommendations for professional judgment." Pl. Ex. 104, Nucciarione (Notre Dame 30(b)(6)) Tr. 61:10-18. The Professional Judgment Manual was effectively incorporated into the CM, Def. Ex. 75 at -363, to which the Defendants explicitly adhere. See CSOF ¶ 10. Plaintiffs also dispute Defendants' post-litigation testimony that they did "did not use" them. ██████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████ And even if universities could still exercise professional judgment as to other unaddressed matters, these professional judgment agreements narrowed Defendants' discretion to depart from agreed pricing principles to ensure that any variations from the CM would not undermine the price floor. *See, e.g.*, Pl. Ex. 14, SR1 ¶¶ 144, 160.

102. **DEFENDANTS' ASSERTION:** Many financial aid recipients, including at Defendant schools, received individualized adjustments to their EFCs. *See* Ex. 180, Nucciarione (Notre Dame) Tr. 60:7-20 (modifications made in "80, 90 percent" of cases); Ex. 159, Hall (Columbia) Tr. 195:2-24-196:21; Ex. 123, Chang (Caltech) Dep. Ex. 14 (CALTECH000007635 at -635); Ex. 3.1, Stiroh Reb. ¶147; Ex. 373, *Professional Judgment*, FINAID, https://finaid.org/educators/pj (last visited May 5, 2025); Ex. 421, *What Is the Foundation for Your Financial Aid Appeal?*, COLL. SELECTION STRATEGY, https://collegeselectionstrategy.com/financial-aid-appeal-professional-judgment (last visited May 5, 2025); Ex. 283, *The Expected Family Contribution (EFC): FAQ*, COLL. BD. (Oct. 30, 2023) https://web.archive.org/web/20231030104944/https://bigfuture.collegeboard.org/pay-for-college/calculate-your-cost/expected-family-contribution/faqs.

**PLAINTIFFS' RESPONSE: Disputed**. Plaintiffs object that "individualized adjustments" is vague and ambiguous. To the extent Defendants contend that a financial aid officer's adjustment to an individual's financial aid offer *pursuant to a standard policy* is an

"individualized adjustment," Plaintiffs would dispute that definition, particularly in light of the cited testimony. Additionally, Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record. In Defendants' Exhibit 180, Nucciarone (Notre Dame) Tr. at 60:11-20, ████████████████████████████████████████████████ ████████████████████████ which is not part of professional judgment. In Defendants' Exhibit 159, the witness does not purport to quantify how often professional judgment is exercised and discusses it in the context of remarking how the process is otherwise automatic. Defendants' Exhibits 3.1 and 123 similarly do not attempt to quantify how frequently professional judgment is exercised. Plaintiffs further object to Defendants' citations to unproduced present-day (*i.e.*, post Class Period) websites as inadmissible. Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record.

103. **DEFENDANTS' ASSERTION:** Defendants, like other schools, exercise additional discretion through the appeals process, with many students—including five of the eight Named Plaintiffs—receiving increases to their aid package through the appeals process. *See* ████████████████████████████████████████████████████████████████████ ████████████████████████████████████ Tr. 218:23-219:3, 231:19-233:25, 245:7-246:21, 248:9-249:12, 257:11-258:1 (describing additional aid awarded following financial aid appeals); Ex. 206, ████████████████████ Dep. Ex. 7 ██████████ 2d Suppl. Resps. & Objs. to Defs.' 1st Rogs) at 3-4; Ex. 183, ████████████████ Tr. 79:3-7, 84:10-16, 86:6-10 1 (describing additional aid awarded following financial aid appeal); ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ (describing additional aid awarded following financial aid appeal); ████████████████████████████████████████████████████████████ Tr. 237:19-238:10, 239:17-240:5 (describing additional aid awarded following financial aid appeals); ████████████████████████████████████████████████████████████ Ex. 3.1, Stiroh Reb. ¶146; Ex. 209, Georgetown Am. Rog Resps. at 33-34 (noting that an average of 356 students successfully appealed their aid award each year between 2004 and 2022); Ex. 158, Gall (Georgetown) Tr. 226:20-227:9; Ex. 192, Storlazzi (Yale) Tr. 38:1-7.

**PLAINTIFFS' RESPONSE: Disputed in part.** Plaintiffs do not dispute that appealing

can and does at times increase aid awards. But appeals often happen in the context of "matching," which is when an applicant brings another school's higher aid offer to the school for consideration. Pl. Ex. 116, ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████ It is no surprise that such a process may result in higher awards at the end of the process. But the appeal process is governed by the same need analysis principle and methodology to which Defendants agreed to. ███████████████ ████████████████████████ And in any event, students would still have appealed awards in a but-for world without the Overarching Conspiracy. *See* Pl. Ex. 335, Singer Tr. 317:9-22.

### D.    Packaging

104.    **DEFENDANTS' ASSERTION:** The 568 Group did not address schools' packaging policies. *See* Ex. 75, NULIT0000000348 (CM Guidelines, Dec. 2016) at -352 ("All 568 Group schools are free to deal with institutional resource issues through their packaging policies."); Ex. 181, Nucciarone (Notre Dame 30(b)(6)) Tr. 134:13-23 ("So 568 had nothing to do with influencing that or any of our other ways we packaged"); Ex. 153, Downs-Burns (Middlebury) Tr. 228:17-229:3 (agreeing "568 schools could package their financial aid in any way they saw fit while they were members of the 568 Group" and there was no "restraint on packaging as a result of being a 568 member" because the 568 Group "did not discuss packaging"); Ex. 191, Singer Tr. 59:24-60:20 (admitting that "no reasonable person could say" that the 568 Group prohibited adopting a no-loan policy). Multiple Defendant schools adopted or maintained no-loan or low-loan policies while members of the 568 Group. *See* Ex. 24, Columbia_00015333 (Peer School Financial Aid: Initiatives) at -335; *id.* at -336 (MIT eliminated loans for students with family incomes less than $75,000); Ex. 194, Tilton (Brown) Tr. 120:21-122:10; Ex. 205, Brown Resps. & Objs. to Pls.' 1st Rogs at 27-28; Ex. 189, Sessa (Penn) Tr. 223:23-224:22; Ex. 370, Julie McWilliams, *Penn Expands Financial Aid Program to Eliminate Loans: Fact Sheet*, PENN TODAY (Dec. 17, 2007), https://penntoday.upenn.edu/news/penn-expands-financial-aid-program-eliminate-loans-factsheet; Ex. 33, CORNELL_LIT0000213959 ("COFHE Yellowbook for 2019-2020 Questionnaire," Consortium on Financing Higher Education, 2019-2020) (starting in academic year 2018-2019, Cornell removed loan requirements for students with family incomes less than or equal to $60,000); Ex. 40, ("COFHE Yellowbook for 2019-2020," Consortium on Financing Higher Education, 2019-2020) (noting that, as of academic year 2018-2019, Dartmouth had removed loan requirements for students with family incomes less than $100,000); Ex. 300, *Financial Aid*, VANDERBILT UNIV., https://www.vanderbilt.edu/financialaid (last visited May 4, 2025); Ex. 193, Tener (Vanderbilt) Tr. 146:2-146:6; Ex. 240, *Affordability*, YALE UNIV., https://finaid.yale.edu/costs-affordability/affordability (last visited May 4, 2025); Ex. 200, Wallace-Juedes (Yale) Tr. 183:17-184:19; Ex. 362, Christine Farolan, "*Northwestern Eliminates Loans as Part of Financial Aid Packages*, THE DAILY NORTHWESTERN (Mar. 4, 2016), https://dailynorthwestern.com/2016/03/03/campus/northwestern-eliminates-loans-as-part-offinancial-aid-packages; Ex. 361, Josiah Bonifant & Allie Goulding, *No-Loan Policy to Be Fully Implemented in 2019–2020, But Students Still Grapple with Financial Aid Options*, THE DAILY NORTHWESTERN (Feb. 5, 2019), https://dailynorthwestern.com/2019/02/05/lateststories/no-

loanpolicy-to-be-fully-implemented-in-2019-2020-but-students-still-grapple-with-financial-aidoptions; Ex. 264, *Cost and Aid*, NORTHWESTERN UNIV., https://admissions.northwestern.edu/ tuition-aid (last visited May 4, 2025); Ex. 342, *Making MIT Affordable*, MIT STUDENT FIN. SERVS., https://sfs.mit.edu/undergraduate-students/the-cost-of-attendance/making-mit-affordable (last visited May 4, 2025); Ex. 138, Bridson (MIT 30(b)(6)) Tr. 49:13-18; Ex. 174, McDermott (Johns Hopkins) Tr. 124:15-125:5; Ex. 293, *Financial Aid Glossary: No Loan*, JOHNS HOPKINS UNIV., https://apply.jhu.edu/tuition-aid/financial-aid-glossary (last visited May 4, 2025); Ex. 217, Scott Jaschik, *$1.8 Billion to Make Johns Hopkins Need-Blind*, INSIDE HIGHER ED, Nov. 18, 2018, https://www.insidehighered.com/admissions/article/2018/11/19/largest-gift-ever-highereducation-will-make-johns-hopkins-need-blind (last visited May 4, 2025); Ex. 239, *Affordability & Aid*, COLUMBIA UNIV., https://undergrad.admissions.columbia.edu/affordability (last visited May 4, 2025); Ex. 331, *Introduction to Financial Aid*, DARTMOUTH COLL., https://financialaid.dartmouth.edu/how-aid-works/introduction-financial-aid (last visited May 4, 2025); Ex. 124, Kotlikoff (Cornell 30(b)(6)) Dep. Ex. 2 at 3-4; Ex. 246, *Awarding & Policy*, DUKE UNIV., https://financialaid.duke.edu/forms-resources/awarding-policy (last visited May 4, 2025); Ex. 172, McCall (Duke) Tr. 25:8-26:1; Ex. 42, DUKE568_0000428 at -429; Ex. 140, Chang (Caltech) Tr. 127:20-128:11, 130:23-133:1, 134:5-15; Ex. 238, *Afford*, CALTECH, https://www.admissions.caltech.edu/afford (last visited May 4, 2025); *see also* Ex. 2.1, Long Reb. figs. 6, 9.

**PLAINTIFFS' RESPONSE: Disputed.** Multiple Defendants adopted or maintained no-loan or low-loan policies while members of the 568 Group. First, Plaintiffs object to Defendants' citations to unproduced past and present-day *(i.e.*, post-Class Period) websites as inadmissible. Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record. Second, Plaintiffs object to the formulation that "*The 568 Group* did not address schools' packaging policies." (emphasis added). The Challenged Conduct included information sharing for a reason. As Defendants' own cites to the COFHE Yellowbook to describe their packaging policies illustrate, Defendants used that information sharing to shape their own packaging policies. ██████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████ (emphasis added); *see also* CSOF ¶ 20. Third, Plaintiffs dispute that the 568 Group did not address packaging. For instance, when announcing no-loan policies at certain income thresholds like those described here, Defendants still subjected such policies to the CM. *See* RSOF ¶ 109. This is because (1) ██████████████████████



, *see* Pl. Ex. 104, Nucciarone (Notre Dame 30(b)(6)) Tr. 350:19-351:12 and Pl. Ex. 97, Nucciarone (Notre Dame) Tr. 52:24-54:16, and (2) Defendants applied the

, *see* RSOF ¶ 38. This consistency follows directly from the "affordability principle" driving need analysis, whereby the Defendants endeavored to charge students what they could afford. Pl. Ex. 14, SR1 ¶ 188; Pl. Ex. 32, SR2 ¶ 60.

And finally, Defendants competed more aggressively on packaging after leaving the 568 Group. *See* CSOF ¶ 17.

106. **DEFENDANTS' ASSERTION:** Among schools that adopted no-loan policies while members of the 568 Group, different schools adopted different approaches to no-loan policies, and at different times during their membership. For example, Columbia eliminated loans for families earning less than $50,000 per year in September 2006, Ex. 24, Columbia_00015333 at -334, and in 2008, while MIT eliminated loans for families with less than $75,000 in income, Ex. 356, *MIT to Be Tuition-Free for Families Earning Less Than $75,000 a Year*, MIT NEWS (Mar. 7, 2008), https://news.mit.edu/2008/tuition-0307, Cornell eliminated loans for families with an annual income of less than $60,000, Ex. 124, Kotlikoff (Cornell 30(b)(6)) Dep. Ex. 2 at 4; Ex. 274, *CU Recommits to Need-Based Financial Aid for Undergrads*, CORNELL CHRON. (Nov. 13, 2008), https://news.cornell.edu/stories/2008/11/cornell-enhances-financial-aid-undergraduates.

**PLAINTIFFS' RESPONSE:** Subject to Plaintiffs' responses and objections to SOF ¶ 105,

**undisputed** that different Defendants adopted different "no-loan" policies at different times.

107. **DEFENDANTS' ASSERTION:** Emory and Brown adopted no-loan policies in 2022 and 2017, which was 10 years and 5 years, respectively, after they left the 568 Group in 2012, *see* Ex. 194, Tilton (Brown) Tr. 120:21-122:10; Ex. 205, Brown Resps. & Objs. to Pls.' 1st Rogs at 28; Ex. 398, *Undergraduate Financial Aid*, BROWN UNIV., https://finaid.brown.edu (last visited May 4, 2025); Ex. 282, Laura Diamond, *Emory Expands Financial Aid to Allow More Students to Graduate Debt-Free*, EMORY NEWS CENTER (Jan. 31, 2022), https://news.emory.edu/stories/2022/01/upress_emory_advantage_expansion_31-01-2022/story.html; Ex. 338, *Loans*, EMORY UNIV., https://studentaid.emory.edu/undergraduate/types/loans.html (last visited May 4, 2025).

**PLAINTIFFS' RESPONSE: Undisputed**.

108. **DEFENDANTS' ASSERTION:** Columbia, Dartmouth, MIT, Northwestern, Penn, and ▮▮▮▮ eliminated loans entirely from all undergraduate student financial aid packages while members of the Group. *See* Ex. 2.1, Long Reb. Fig. 6; Ex. 24, Columbia_00015333 (Peer School Financial Aid: Initiatives) at -335; *see also* Ex. 239, *Affordability & Aid*, COLUMBIA

UNIV., https://undergrad.admissions.columbia.edu/affordability (last visited May 4, 2025); Ex. 331, *Introduction to Financial Aid*, DARTMOUTH COLL., https://financialaid.dartmouth.edu/how-aidworks/introduction-financial-aid (last visited May 5, 2025); Ex. 342, *Making MIT Affordable*, MIT STUDENT FIN. SERVS., https://sfs.mit.edu/undergraduate-students/the-cost-of-attendance/makingmit-affordable (last visited May 5, 2025); Ex. 138, Bridson (MIT 30(b)(6)) Tr. 49:13-18; Ex. 362, Christine Farolan, *Northwestern Eliminates Loans as Part of Financial Aid Packages*, THE DAILY NORTHWESTERN, (Mar. 4, 2016), https://dailynorthwestern.com/2016/03/03/campus/ northwestern-eliminates-loans-as-part-of-financial-aid-packages; Ex. 189, Sessa (Penn) Tr. 223:23-224:22; Ex. 370, Julie McWilliams, *Penn Expands Financial Aid Program to Eliminate Loans: Fact Sheet*, PENN TODAY (Dec. 17, 2007), https://penntoday.upenn.edu/news/pennexpands-financial-aid-program-eliminate-loans-fact-sheet; Ex. 300, *Financial Aid*, VANDERBILT UNIV., https://www.vanderbilt.edu/financialaid (last visited May 5, 2025); Ex. 193, Tener (Vanderbilt) Tr. 146:2-146:6.

**PLAINTIFFS' RESPONSE: Disputed in part**. Plaintiffs do not dispute that "Columbia, Dartmouth, MIT, Northwestern, Penn, ███████ eliminated loans entirely from all undergraduate student financial aid packages while members of the [568] Group." But the undergraduates still, however, took out significant loans and revenue per student still increased—a good example of this is at Penn. *See* RSOF ¶¶ 39, 111.

109.    **DEFENDANTS' ASSERTION:** In 2004, Georgetown introduced a program that replaced most loans with scholarships for many low-income students. Ex. 56, GTWNU_0000270820 at -931.

**PLAINTIFFS' RESPONSE: Disputed in part**. Plaintiffs do not dispute that Georgetown introduced a program that replaced loans with scholarships for many low-income students in 2004. But these kinds of policies were designed explicitly to be in line with the CM. *See* Pl. Ex. 89, GTWNU_0000325757 at -759 ███████████████████████████████████

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████

110.    **DEFENDANTS' ASSERTION:** Some schools provide work-study—"a need-based, 'self-help' financial aid program that enables eligible students to work part-time to meet a

portion of their educational costs," Ex. 426, *Work-Study*, CORNELL UNIV., https://finaid.cornell.edu/types-of-aid/work-study (last visited May 5, 2025)—as part of their financial aid packages, *see, e.g.*, Ex. 32, CORNELL_LIT0000213572 at -578-579 (Cornell's "2022-2023 Undergraduate Need Analysis and Packaging Policies"); Ex. 140, Chang (Caltech) Tr. 127:13-134:15 (noting that Caltech's incoming students receive up to $1,350 of work study, while returning students receive $2,500); Ex. 66, MITLIT-000659580 (Timeline of Select MIT Financial Aid Policy Changes describing changes in MIT's self-help component); Ex. 52, GTWNU_0000186083 (GEORGETOWN OFFICE OF FINANCIAL SERVICES POLICIES AND PROCEDURES MANUAL, 2013-2014) at -157-158; Ex. 8, BROWN_0000050379 (FINANCIAL AID OFFICE: UNDERGRADUATE OVERVIEW, BROWN UNIVERSITY, 2014) at -381, -383.

**PLAINTIFFS' RESPONSE: Undisputed with clarification**. ████████████

████████████████████████████████████████████████████████████

████████████████████████████

### E. Tuition

111. **DEFENDANTS' ASSERTION:** Members of the 568 Group did not enter any agreements on the amount of tuition to charge. *See, e.g.*, Ex. 148, Costanzi (Georgetown) Tr. 325:20-326:1 (testifying she was not "aware of" "any agreement with any other school regarding tuition levels"); Ex. 143, Coffin (Dartmouth) Tr. 271:14-17; Ex. 137, Bridson (MIT) Tr. 208:6-12; Ex. 142, Christiansen (Vanderbilt) Tr. 176:23-177:4; Ex. 200, Wallace-Juedes (Yale) Tr. 257:22-258:3; Ex. 159, Hall (Columbia) Tr. 278:2-6; Ex. 170, Marinaccio (Columbia) Tr. 415:2-7; Ex. 144, Coleman (Duke) Tr. 110:25-111:3; Ex. 172, McCall (Duke) Tr. 314:25-315:4; Ex. 185, Russo (Notre Dame) Tr. 282:5-9; Ex. 174, McDermott (JHU) Tr. 411:24-412:5; Ex. 176, McLaughlin (Penn) Tr. 251:1520; Ex. 184, Rapelye (COFHE 30(b)(6)) Tr. 273:5-12; Ex. 156, Furstenberg (Dartmouth) Tr. 302:3-7; Ex. 187, Schapiro (Northwestern) Tr. 196:12-16; Ex. 136, Bishop (Notre Dame) Tr. 412:25-413:4; Ex. 180, Nucciarone (Notre Dame) Tr. 328:9-13; Ex. 196, Varas (Penn) Aug. 2, 2023 Tr. 291:8-12; Ex. 192, Storlazzi (Yale) Tr. 198:8-12; Ex. 140, Chang (Caltech) Tr. 306:22307:1. Instead, during the conduct period, tuition levels varied between schools and net price decreased. Ex. 2.1, Long Reb. figs. 4 & 5.

**PLAINTIFFS' RESPONSE: Disputed**. First, Dr. Singer's analysis shows that the resulting tuition each Defendant charged was artificially inflated by Group membership, thereby demonstrating that Defendants' entered agreements relating to the prices they charged. CSOF ¶ 44; *see also* Pl. Ex. 335, Singer Tr. 226:12-227:15 (explaining also that the Challenged Conduct may have impacted list prices as well). Second, financial aid is a discount off tuition which enables price discrimination on ability to pay, an especially unusual occurrence in the U.S. economy. Pl. Ex. 14, SR1 ¶¶ 26-27. Plaintiffs contend, and the Challenged Conduct centers around, Defendants'

agreement on the principles, guidelines, and inputs to that financial aid calculation resulting in that discount off tuition. *See, e.g.*, *id.* ¶¶ 125-27. Plaintiffs further dispute that "tuition levels varied between schools," particularly in any material or statistically significant sense. Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record. Nothing in the cited evidence—Long Reb. figs. 4 & 5—purports to analyze tuition levels across school or do any statistical analysis on the variation of the tuition levels across schools. Defendants know how to do this type of statistical analysis, as they purport to in other similar contexts. *See* Defendants' SOF ¶ 54. Plaintiffs further dispute that net price decreased. First, as Dr. Bulman explained, during the period Penn claims its net price decreased, its revenue per student increased due to list price effects. Pl. Ex. 90, Bulman Reb. ¶ 73; *see also* Pl. Ex. 119, PENN568-LIT-00000706 ███████████████████████████████████████████████████

███████████████████████ Plaintiffs further object that even if net price decreased in an absolute sense, that would be immaterial to whether Defendants' conduct lessened competition and whether Defendants would have been more generous in the world without the Challenged Conduct.

## F. Information Sharing

112. **DEFENDANTS' ASSERTION:** Since the 1970s, some Defendants and various non-Defendant schools that meet full demonstrated financial need of applicants, including private liberal arts colleges like Amherst College and non-Defendant private universities like the University of Rochester, shared aggregated historical financial aid and admissions data through "Colorbooks" that were published on an annual basis by the Consortium of Financing Higher Education ("COFHE"), which is a separate entity from the 568 Group. Ex. 2.1, Long Reb. ¶242; Ex. 3.1, Stiroh Reb. ¶¶48 n.152, 99100; Ex. 253, *Consortium on Financing Higher Education*, COFHE, https://web.mit.edu/cofhe (last visited May 4, 2025); Ex. 19, COFHE-02-00018026 (Presidents Book, Nov. 2022); Ex. 20, COFHE-02-00022277 (COFHE Admissions Statistics, Class Entering 2021 (Redbook XLVI), June 2022) at -285; Ex. 22, COFHE-02-00022429 (Sources of Undergraduate Grant Aid at the COFHE Institutions, 2020-2021 Academic Year (Brownbook), Jan. 2023) at -437; Ex. 21, COFHE-02-00022378 (First-Year Financial Aid/Admissions Survey, Class of 2025 – Entering Fall 2021 (Bluebook XXXVII), Oct. 2022) at -386 (containing analysis of trends "for the cohort entering in fall 2021"); Ex. 23, COFHE-02-00022468 (Tuition, Student Budgets, and Self-Help at the Consortium Institutions for Academic Year 2022-23 (Yellowbook), Mar. 2023) at -473 (analyzing trends in tuition, student budgets, and self-help expectation, which were "set the previous year").

**PLAINTIFFS' RESPONSE: Undisputed with clarification**. Plaintiffs do not understand

Defendants to be asserting here that COFHE information sharing was limited strictly to historical financial aid and admissions data through "Colorbooks." To the extent Defendants take such a position, it is disputed. Plaintiffs further refer to RSOF ¶ 115.

113.    Of the thirty-nine schools that were members of COFHE for at least some period of time, many never joined the 568 Group, including Amherst College, Mount Holyoke College, the University of Rochester, and Wesleyan. Ex. 16, CFHE-00000014 at -018; Ex. 253, *Consortium on Financing Higher Education*, COFHE, https://web.mit.edu/cofhe (last visited May 4, 2025).

**PLAINTIFFS' RESPONSE: Undisputed**.

114.    All Defendants other than Notre Dame have been members of COFHE, and many were members long before the 568 Group was formed, but Defendants comprise less than half of total COFHE's membership. *See* Ex. 16, CFHE-00000014 at -018-019; Ex. 253, *Consortium on Financing Higher Education*, COFHE, https://web.mit.edu/cofhe (last visited May 4, 2025); *see also* Ex. 184, Rapelye (COFHE) Tr. 99:16-20 ("Notre Dame has never been a member of COFHE."). Plaintiffs also object to Defendants' citations to unproduced and present-day (i.e., post Class Period) websites as inadmissible. Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record.

**PLAINTIFFS' RESPONSE: Undisputed with clarification**. Plaintiffs do not dispute that 16 of 17 Defendants (except Notre Dame) have been members of COFHE, that many were members long before the 568 Group was formed, and that Defendants comprise less than half of the total COFHE membership. Although Notre Dame was never a member, ████████████
████████████████████████████████████████████████████████████████

115.    **DEFENDANTS' ASSERTION:** The information in the COFHE Colorbooks, which was shared with both Defendant and non-Defendant schools, consisted of historical admissions and financial aid data, Ex. 21, COFHE-02-00022378 (First-Year Financial Aid/Admissions Survey, Class of 2025 – Entering Fall 2021 (Bluebook XXXVII), Oct. 2022) at -382; Ex. 20, COFHE-02-00022277 (COFHE Admissions Statistics, Class Entering 2021 (Redbook XLVI), June 2022) at -281; Ex. 154, Furda (Penn) Tr. 80:2-14 (noting that information in COFHE Colorbooks was released "after the fact" and contained information that was widely available "in a press release already"), charts and tables at the "aggregate level," Ex. 176, McLaughlin (Penn) Tr. 25:22-26:7 (noting that "there was no sharing of … granular data with the schools"), and descriptions of Defendants' endowment spending on financial aid, the amount of self-help in Defendants' financial aid packages, and the amount of institutional grant aid awarded by each Defendant, Ex. 2.1, Long Reb. ¶244; Ex. 22, COFHE-02-00022429 (Sources of Undergraduate Grant Aid at the COFHE Institutions, 2020-2021 Academic Year (Brownbook), Jan. 2023) at -433; Ex. 23, COFHE-02-00022468 (Tuition, Student Budgets, and Self-Help at the Consortium Institutions for Academic Year 2022-23 (Yellowbook), Mar. 2023) at -470, -473; Ex. 21, COFHE-02-00022378 (First-Year Financial Aid/Admissions Survey, Class of 2025 – Entering Fall 2021 (Bluebook XXXVII), Oct. 2022) at 382, -386, much of which data was generally publicly available

in Defendants' annual financial reports and in publications from other industry groups, like College Board and the National Association of College University Business Officers, Ex. 2.1, Long Reb. ¶244; *see, e.g.*, Ex. 28, CORNELL_LIT0000002053 (2021-2022 CORNELL UNIVERSITY OPERATING & CAPITAL BUDGET PLAN) at -057-058, -074-077; Ex. 82, PENN568-LIT-00007087 at -092, -097-099 (University of Pennsylvania 2021-2022 Annual Financial Report); Ex. 308, *Georgetown University Tuition and Costs*, BIGFUTURE, https://bigfuture.collegeboard.org/colleges/georgetown-university/tuitionand-costs (last visited May 6, 2025); Ex. 304, U.S. AND CANADIAN INSTITUTIONS LISTED BY FISCAL YEAR (FY) 2021 ENDOWMENT MARKET VALUE AND CHANGE* IN ENDOWMENT MARKET VALUE FROM FY20 TO FY21, THE NAT'L ASS'N OF COLL. & UNIV. BUS. OFFS., *available at* https://edge.sitecorecloud.io/nacubo1-nacubo-prd-dc8b/media/Nacubo/Documents/research/2021-NTSE-Public-Tables--Endowment-Market-Values--FNIAL-REVISED-February-182022.pdf.

**PLAINTIFFS' RESPONSE: Disputed in part**. Plaintiffs dispute both (1) the narrow description of what COFHE shares; (2) that the data was "generally publicly available"; and (3) that it was always historical. For instance, the Colorbooks contained detailed school-by-school and by-income-level packaging and self-help information. RSOF ¶ 38; *see also* Pl. Ex. 266, VANDERBILT-00021810 at -820-23. This level of detail differs dramatically from the "average-need based scholarship and grant award" information provided by the College Board that Dr. Long appears to say is equivalent in Defendants' cited evidence. Defendants' Ex. 2.1, Long Reb. ¶ 244. Indeed, Dr. Long ignores "the reality of the preferential and coordinated data the Defendants received, which deviates from the general benchmarking data used by other universities," which was "not widely available" publicly. Pl. Ex. 32, SR2 ¶ 54. While Dr. Long claims that NACUBO, like COFHE, also provides information on the extent to which the endowments fund need-based aid, there is a again significant difference in quality. For instance, in contrast to COFHE's efforts to maintain high data quality, CSOF ¶ 21, Defendants' own expert noted several limitations to the quality of the NACUBO data. *See* Pl. Ex. 121, Yermack Tr. 218:12-219:14, 293:1-21. Similarly, while some of the described data may be accessible from public financial reports, not all of it was, as Defendants themselves have lamented when doing competitor analysis on their peers. *See, e.g.*, Pl. Ex. 122, Vanderbilt-00314487 at 491-92 (

████████████████████████████████████████████ It was for reasons like

this that, according to COFHE's own president, the information in the Colorbooks was to be treated

as confidential by the member ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████  ████████████

████████████████████████████████████████████████████████

████████  Pl. Ex. 125, Arleth (COFHE) Tr. 123:6-124:33, 124:24-125:3, 125:16-10. Plaintiffs'

academic expert succinctly summarized that the Bluebook data he analyzed was ████████████████

████████████████████████████████████████████████████████

████████████████████  Plaintiffs also dispute Defendants' narrow focus on the

Colorbooks, as COFHE shared other data—including non-historical data—in other reports and

means. ████████████████████████████████████████████████

████████████████████████████████████████████████████████

*See* Pl. Ex. 123, Rapelye (COFHE 30(b)(6)) Tr. 122:1-123:24; Pl. Ex. 127, GTWNU_0000021131;

*see also* Pl. Ex. 99, DUKE568_0056313. And in terms of other non-Colorbook reports using the

wealth of student-record data, COFHE would also provide bespoke reports and studies, based on

the confidential Colorbook information, for individual Defendants, such ████████████████████

████████████████████████████████████████████  ████████████

████████████████████████████████████████████████████████

██████████████████████

**PLAINTIFFS' COUNTERSTATEMENT OF UNDISPUTED MATERIALS FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

### A. 568 Group Origins

1.      Shortly after the Department of Justice prosecuted and settled via consent decree antitrust claims against the "Overlap Group"—a consortium of Ivy League schools and MIT that had agreed in the 1980s on a method for calculating financial aid—Congress enacted the 568 Exemption, modeling it in part on the resulting 1992 consent decree. *Unites States v. Brown Univ.*, 5 F.2d 658 (3d Cir. 1992); *United States v. Brown Univ.*, No. 91-3274, 1991 WL 536896, at *1 (E.D. Pa. Sept. 20, 1991); Improving America's Schools Act of 1994, Pub. L. 103-382, § 568(a), 108 Stat. 3518, 4060 (1994); 15 U.S.C. § 1, note; Pl. Ex. 14, SR1 ¶¶ 46-49.

2.      Within a few years of its enactment, most of the Defendants began to address and discuss how to take advantage of the 568 Exemption via what would become the "568 Presidents' Working Group." Pl. Ex. 51, COFHE-02-00012226 at -227 ██████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████ Pl. Ex. 200, CORNELL_LIT0000116174 at -175 █████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████ Pl. Ex. 14, SR1 ¶¶ 138-39.

3.      In 1998, Princeton announced new financial aid policies that (1) a family with an income less than $40,000 would not be required to take out a loan and (2) eliminated the consideration of home equity as part of the resources available to pay for a Princeton education if a family's income fell below $90,000. Pl. Ex. 52, Betterton (Princeton) Tr. 22:5-23. And building

on these policies, in 2001, Princeton announced a "no-loan" policy for all applicants, which prompted an immediate response from Harvard. Pl. Ex. 52, Betterton (Princeton) Tr. 45:16-46:13, 55:17-56:6; 109:23-110:14.

4.  One of the main motivations for founding and pursuing the 568 Group was a desire to ███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████ Absent the restrictions on price competition that underpinned the 568 Group, Defendants expressed concern that they would otherwise have to engage in "bidding wars" over aid awards and net prices and have to use "need-based financial aid as a major tool" which would "increase [] need-based aid expenditures," Pl. Ex. 31 at 1, including expenditures that were not merely based on student and family "ability to pay." ████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████

5.     Founding member schools of the 568 Group believed that the "Federal Methodology" (or "FM") did not adequately assess student and family "ability to pay" and the College Board's "Institutional Methodology" (or "IM") was a more accurate tool. *See* Pl. Ex. 55, Sandy Baum, *A Primer on Economics for Financial Aid Professionals*, NAT'L ASS'N OF STUDENT FINANCIAL AID ADMINS (June 1996) (produced at JHULIT_0000026861); Pl. Ex. 114, MITLIT-000078586 at -591 █████████████████████████████████████████████

███████████████████████████████████████████████████████ Pl. Ex. 104, Nucciarone (Notre Dame 30(b)(6)) Tr. 27:14-28:13, 30:5-22; Pl. Ex. 170, BROWN_0000050379 at -384 ████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

6.     The 568 Group's founding member schools believed that, compared to the FM, the IM better addressed both "vertical equity" (which refers to the principle that families with greater "ability to pay" should pay higher prices) and "horizontal equity" (which refers to the principle that similarly situated families should pay similar amounts), which was a priority for them in a needs analysis system. *See, e.g.*, Pl. Ex. 217, X, GTWNU_0000324155 at -155 (Georgetown's dean of student financial aid services wrote in a 2004 memorandum that ████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████ Pl. Ex. 46, McWade (Georgetown) Tr. 116:10-22; Pl. Ex. 104, Nucciarone (Notre Dame 30(b)(6)) Tr. 56:19-57:3 ████████████████████████████████████

██████████████████████████████████ *see also id.* at 19:2-9, 72:7-11 (the "568 focus" was ████████████████████████████████████████████████████████████

████████████████████████ While these helpfully create a "price structure" to effectuate the

conspiracy, *see* Pl. Ex. 14, SR1 ¶¶ 262-68; Pl. Ex. 32, SR2 ¶¶ 239-41, these concepts have no "particular economic precepts" and there is "clearly no right answer to" how to organize financial aid. Pl. Ex. 160, Baum Tr. 106:9-15, 172:3-13.

### B. 568 Group Operations and Agreement

7.     The 568 Group created the CM "manuals" and "guidelines" reflecting the Group's consensus, carefully maintained and updated by a "Technical Committee" which convened several times a year. *See* Pl. Ex. 146, Columbia_00184489 at -510



Pl. Ex. 161, CORNELL_LIT0000273249

; Pl. Ex. 162, Downs-Burns (Middlebury) Tr. 107:21-108:7 (indicating the Technical Committee had between 12-15 calls a year); Pl. Ex. 14, SR1 ¶¶ 126-91. The 568 Group also maintained the Professional Judgment manual. *See, e.g.*, *id.*, SR1 ¶ 162 (citing various versions of the Professional Judgment manual over the years). The Technical Committee, in turn, was composed of employees at the Defendants' institutions. Pl. Ex. 104, Nucciarone (Notre Dame 30(b)(6)) Tr. 227:6-21, 230:5-22; Pl. Ex. 354, VANDERBILT-00000811 at -811

8.     As part of putting on the annual and semi-annual conferences each Defendant attended, the 568 Group provided training and workshops for financial aid officers on these manuals and guidelines. *See, e.g.*, Pl. Ex. 102, BROWN_0000020366 at -371

Pl. Ex. 14, SR1 at App'x 8 (listing 568 Group conferences, denoting ones that were scheduled to coincide

with other financial aid industry groups). The conferences often included programming on needs analysis and were scheduled to coincide with the meetings of other financial aid industry groups in which most 568 Group schools were also participating. *See, e.g.*, Pl. Ex. 43, Columbia_00056392; Pl. Ex. 44, COFHE-02-00012997. A typical example from 2010 shows that the agenda called for four separate sessions over more than four hours on "Need Analysis Topics" addressing projected year income, retirement issues, illiquid assets, sibling and parent educational expenses, and assessment rates, among other topics. *See* Pl. Ex. 163, BROWN_0000016487. This document, and others agendas like it, was marked confidential in discovery and never shared publicly.

9. Defendants agreed to apply the CM, with many documents explicitly referencing the existence of, and adherence to, an "agreement." ████████████████████████████

███████████████████████████████████████ ██████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████ Pl.

Ex. 14, SR1 ¶¶ 135-36 (explaining how the MOU language did not change across versions of the MOU from 2006-2021); ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████



Pl.

Pl. Ex. 56, BROWN_0000017721

Pl. Ex. 14, SR1 ¶¶ 126-91, App'x

7; Pl. Ex. 32,SR2 ¶¶ 51-52, App'x 2.

10.     Not only did each Defendant agree to apply the CM, but Defendants understood themselves and co-Defendants to actually be applying the CM. *See* Pl. Ex. 164, at -012-016 (the founding Chair of the Technical Committee, Mr. Belvin,

Pl. Ex. 165, GTWNU_0000317271 at -271

Pl. Ex. 167, DUKE568_0083862 at -848-865

*see also* Pl. Ex. 14, SR1 ¶¶ 123-24 (Dr. Singer reviewing this and other qualitative evidence and concluding the qualitative evidence "is consistent with Plaintiffs' allegation that Defendants engaged in the alleged conspiracy to suppress the institutional grant aid and to artificially inflate Effective Institutional Prices, and inconsistent with unfettered competition and unilateral conduct"); *id.* ¶¶ 199-216 (describing how the Overarching Agreement activities satisfies criteria such as monitoring output and prices, creating organizations to effectuate cartel prices, and developing) inducements to support collusion); Pl. Ex. 32, SR2 ¶¶ 37-56, App'x 2, App'x 3. This common understanding is reflected in across the Defendants' documents:

- **Brown University.** Pl. Ex. 169, BROWN_0000002706

    ); Pl. Ex. 171, BROWN_0000009178

    Pl. Ex. 173,

- **The University of Chicago.** Pl. Ex. 177, UCHICAGO_0000183885 at -885 ██████████

██████████████████████████████████████████

██████████████████████████████████████████

█████████████████████

- **Columbia University.** Pl. Ex. 82, Columbia_00058566 at -569 ████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████

- **Cornell University**. Pl. Ex. 190, CORNELL_LIT0000101721 at -773 █████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████ Pl. Ex. 191, CORNELL_LIT0000102974 at -3000

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

Pl. Ex. 192, CORNELL_LIT0000100841 at -847 ██████████████████

██████████████████████████████████████████

████████  ██████  ████████  ██████████  ██████████████ Pl. Ex. 49,

CORNELL_LIT0000120783 at -784 (internal 2010 Cornell correspondence explaining that



Pl. Ex. 193, CORNELL_LIT0000230307 at -307 (internal 2010 Cornell correspondence explaining that

Pl. Ex. 194, CORNELL_LIT0000149131 at -132 (internal 2010 Cornell correspondence explaining that among 568 Group

Pl. Ex. 198, CORNELL_LIT0000272526 at -

- **Duke University.** Ex. 201, ND_0006828

(emphasis and ellipsis in original); Pl. Ex. 202, McCall (Duke) Tr. 217:18-245:13 (

Pl. Ex. 203, DUKE568_0081152 at -395 (Duke

Pl. Ex. 203, DUKE568_0081152 at -169

██████████████████████████████████████████████████████ Pl. Ex. 203 at -169.

██████████████████████████████████████████████████████ Pl.

Ex. 203, DUKE568_0081152 at -395 ████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████

- **Emory University.** Pl. Ex. 209, Emory_568Lit_0011424 at -424 ██████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████ Pl. Exs. 210-212 ████████████████

████████████████████████████████ Pl. Ex. 213, Emory_568Lit_0007185

at -186 (██████████████████████████████████████████

- **Georgetown University.** Pl. Ex. 84, Georgetown Resp. to Interrogatory No. 3 (████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████

- **Johns Hopkins University.** Pl. Ex. 154, Wyatt (Johns Hopkins) Tr. 103:3-105:10, 51:18-

52:2, 192:2-14 ███████████████████████████████████████████████

████████████████████████████████████████████ ); Pl. Ex. 67, McDermott (Johns



Hopkins) Tr. 178:3-195:1 ████████████████████████████████████

████████

- **Massachusetts Institute of Technology**. Pl. Ex. 155, MITLIT-000226348 at -356 (████

  ████████████████████████████████████████

  ███████████████████████ Pl. Ex. 156, MITLIT-000171439 at -453 (independent

  consulting report found that MIT uses a █████████████████████████████

  ████████████████████████████████████████

  █████████████ Pl. Ex. 225, MITLIT-000238091 at -091-92 █████████████

  ████████████████████████████████████████

  ████████████████████████████████████████

  ████████████████████████████████████████

  ████████████

- **Northwestern University**. Pl. Ex. 226, NULIT-0000110563 (2003 assessment that "NU

  should continue to follow the consensus methodology in awarding financial aid that this

  group has devised and that NU should continue to be members of it"); Pl. Ex. 227, NULIT-

  0000112607 at -609 (████████████████████████████████████████

  ████████████████████████████████

- **University of Notre Dame**. Pl. Ex. 104, Nucciarone (Notre Dame 30(b)(6)) Tr. 117:13-118,

  304:19-22, 230:15-20, 316:2-4, 364:23-365:11 (Notre Dame's IM was based on the Base

  IM, and it aligned with most components of the CM).

- **University of Pennsylvania**. Pl. Ex. 228, PENN568-LIT-00080968 at -968 (████

  ████████████████████████████████████████

  ████████████████████████████████████████

  █████████████████████████ Pl. Ex. 119, PENN568-LIT-00000706 at -706

  ████████████████████████████████████████



Pl. Ex. 229, PENN568-LIT-00016120

Pl. Ex. 230, PENN568-LIT-00017761 at -799

- **Rice University.** Pl. Ex. 231, Walker (Rice) Tr. 36:25-37:24, 74:18-75:5, 204:7-16

Pl. Ex. 232, RICE_LIT0000002016 at -016 (Rice's Vice President for Finance referring to Rice's "agreement with the 568 Group in using home equity").

- **Vanderbilt University.** Pl. Ex. 233, VANDERBILT-00041936 at -936 (

Pl. Ex. 234, VANDERBILT-00200229

Pl. Ex. 235, VANDERBILT-00204227 at -227

Pl. Ex. 236, VANDERBILT-00163991

- **Yale University.** Pl. Ex. 238, Wallace-Juedes (Yale) Tr. 60:17-61:6 ("

Pl. Ex. 14, SR1 ¶¶ 123-24 (Dr.

Singer reviewing this and other qualitative evidence and concluding the qualitative evidence "is consistent with Plaintiffs' allegation that Defendants engaged in the alleged conspiracy to suppress the institutional grant aid and to artificially inflate Effective Institutional Prices, and inconsistent with unfettered competition and unilateral conduct"); *id.* ¶¶ 199-216 (describing how the Overarching Agreement activities satisfies criteria such as monitoring output and prices, creating organizations to effectuate cartel prices, and developing) inducements to support collusion; *see also* Pl. Ex. 32, SR2 ¶¶ 37-56 & App'x 2 & 3.

11.     In implementing the CM, the Defendants agreed to use the Base IM. *See* Def. Ex. 75 (CM Guidelines state that the CM "begins with the understanding that the College Board's Institutional Methodology (IM) is an appropriate base for institutional needs analysis and provides an appropriate platform for further work); Pl. Ex. 104, Nucciarone (Notre Dame 30(b)(6)) Tr. 61:10-18, 156:18-21, 281:14-18, 300:2-10 (testifying how the CM is built off of the Base IM); Pl. Ex. 355.███████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████ Pl. Ex. 356, DUKE568_0031405 at -414 (██████████████████████████████

██████████████████████████ ███████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████ Pl. Ex. 135, Kotlikoff (Cornell 30(b)(6)) Tr. 31:14-17 (████████████████████████████████████████████████████

████████████████████ Pl. Ex. 204, DUKE568_0019856 at -857 (█████████████

███████████████████████████████████████████████████████████████

██████████████ Pl. Ex. 202, McCall (Duke) Tr. 64:20-23 ████████████████████



*See, e.g.*, Pl. Ex. 104, Nucciarone (Notre Dame 30(b)(6)) Tr. 228:23-229:7; 230:23-233:4; Pl. Ex. 115, PENN568-LIT-00029001 at -001

Pl. Ex. 358, AMHE-00012771 at -783

Pl. Ex. 359, COFHE-02-00011341 at -343

Pl. Ex. 14, SR1 ¶ 159; Pl. Ex. 32, SR2 ¶ 62.

12. Defendants agreed to apply the same several Core Principles when awarding aid, which included the agreement to make need-based aid the primary form of financial aid and to base it on student and family's "ability to pay." SOF ¶ 94 (describing how the 568 Presidents "endorsed" the principles); Pl. Ex. 37, (CalTech 30(b)(6)) Tr. 227:9-234:11, 289:24-300:16

Pl. Ex. 206, DUKE568_0052450 at -453 (Duke employees circulate a 2016 568 Group presentation describing the purposes of the group as being to

Pl. Ex. 202, McCall (Duke) Tr. 205:10-212:10; Pl. Ex. 208, Coleman (Duke) 71:9-74:10; Pl. Ex. 104, Nucciarone (Notre Dame 30(b)(6)) Tr. 71:20-72:19 (



███ Pl. Ex. 231, Walker (Rice) Tr. 173:13-178:8 ███

████████████████████████

███ Pl. Ex. 237, Christiansen (Vanderbilt) Tr. 64:15-65:20, 66:20-69:2 ████████ Pl. Ex. 145, Storlazzi (Yale) Tr. 77:17-80:9 (████████████████████ ███

████████████ Pl. Ex. 17, K. Cooper 37:2-38:2 (emphasis added).██████████████

████████████████████████

13.    The 568 Exemption was renewed four times. Pub. L. No. 105-43, 111 Stat. 1140 (1997); Pub. L. No. 107-72, 115 Stat. 648 (2001); Pub. L. No. 110-327, 122 Stat. 3558 (2008); Pub. L. No. 114-44, 129 Stat. 472 (2015). ██████████████████

████████████████████ *See* Pl. Ex. 239, ND_0001624; Pl. Ex. 240, ND_0004084; Pl. Ex. 241, YALE_LIT_0000122514; Pl. Ex. 242, DUKE568_0047047 at -048. In public remarks accompanying the bill's enactment in 2015, Rep. Goodlatte noted written statements by Defendants Duke and Cornell that the legislation "makes a real difference for our students," and stated: "Additionally, the Government Accountability Office

conducted a study to determine whether the exemption adversely impacted the affordability of college and concluded that it did not." 161 Cong. Rec. H5490, July 27, 2015.

14. Defendants saw renewing the 568 Exemption as existential to the "implementation of the CM." Pl. Ex. 243, DUKE568_0155589 at -613; *see also* Pl. Ex. 244, Columbia_00058983

██████████████████████████████████████████████████████

███████████████████████████████ Pl. Ex. 245, CBD004681 (████████████████

██████████████████████████████████████████████████████

████████████████████████████ Pl. Ex. 246, ND_0065243 (████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████ "); Pl. Ex.

247, ND_0162636 at -637 (Notre Dame explaining internally that: ████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████ (emphasis added)). And

important to prevent bidding wars. Pl. Ex. 31 ████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████

15. Defendants saw it as important to meet the statutory requirements for the 568 Exemption and stated there was legal risk in their failure to do so. *See, e.g.*, Pl. Ex. 14, SR1 ¶¶ 133-

34; Pl. Ex. 248 at 1 ███████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████ Pl.

████████████████████████████████████████████████████████████████████████

██████████████████████████ SOF ¶ 63 (admitting the 568 Group disbanded in 2022—when

the exemption was not renewed).

16.    Defendants who left the 568 Group contemporaneously described their decision in

internal documents as being motivated by a desire to be more generous. █████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████

17.    Schools changed their policies, including via packaging, to be more generous after

they left the 568 Group or after it disbanded. ████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

Christiansen (Vanderbilt) Tr. 61:16-63:3. In November 2024, Penn announced that it was expanding

"financial aid for middle income families," would "exclude home equity" in calculating EFCs, and

would "raise the income threshold for families eligible to receive full tuition scholarships from

$140,000 to $200,000." Pl. Ex. 253 at 1. The next day, MIT followed suit, announcing it too would

offer free tuition to families with incomes below $200,000. Pl. Ex. 254. Dartmouth, Notre Dame,

Vanderbilt, and Yale have announced similar financial aid enhancements. Pl. Exs. 255-258; *see also* Pl. Ex. 237, Christiansen (Vanderbilt) Tr. 62:16-63:3 (discussing Vanderbilt's decision to eliminate home equity in needs analysis); Pl. Ex. 259 at -770 (stating a FY2024 initiative to eliminate home equity from needs analysis at a cost of $3.6 million to Vanderbilt). On June 6, 2025, the *Wall Street Journal* reported that elite universities such as Defendants Chicago, Duke, JHU and Rice (as well as Harvard, Princeton, Stanford, and Yale) had backed a plan "to avoid a huge potential tax hike by pitching an alternative plan to Congress: a pledge to spend more of their own money," in the order of "billions." Pl. Ex. 260, J. Chung & R. Rubin, *Colleges Hope to Stave Off Big Tax Hike by Pledging to Spend More Endowment Cash*, WALL ST. J. (June 6, 2025).

18.     Harvard, Stanford, and Princeton each declined to join the 568 Group because, respectively, if the school joined it would "have to reduce" its aid, Pl. Ex. 26, Donahue (Harvard) Tr. 56:4-15, it wanted to be more "generous" with its aid, Pl. Ex. 17, Cooper (Stanford 30(b)(6)) Tr. 19:24-20:11, and it wanted aid offers to be under its own "control," Pl. Ex. 52, Betterton (Princeton) Tr. 17:20-18:11. Stanford's Associate Dean and Director of Financial Aid specifically explained that Stanford did not join because it was ██████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████ Pl. Ex. 17, Cooper (Stanford 30(b)(6)) Tr. 19:24-20:11). She further explained that Defendants knew this is why these schools did not join the 568 Group. Alluding to ███████████████████████████████████ ████████████████████████████████ ████████████████████████████████████████████████████████████████████████ Pl. Ex. 88, GTWNU_0000193182; *see also* Pl. Ex. 58, PENN568-LIT-00133526 at -529 ██████████ ███████████████████████████████████████████████████████████████. █ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ Pl. Ex.

262, Columbia_00056363 at -364; *see also* Pl. Ex. 26, Donahue (Harvard) Tr. 62:4-24 (██████████)

████████████████████████████████████████████████████████████

████████████████████████████ *see also id.* at 56:11-17 ████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████

## C. Information Sharing

19. Defendants agreed to share competitively sensitive, contemporaneous, non-public information about their adherence to their agreement via 568 Group surveys. Pl. Ex. 14, SR1 ¶¶ 163, 164, 181; Pl. Ex. 32, SR2 ¶¶ 48-49, 53-54. The Group's "Need Analysis Council" frequently asked member schools to answer detailed survey questions regarding policies and practices which allowed the Defendants to understand that they were applying almost all of the Core Principles and most of the components of the CM. ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████. *See generally* Pl. Ex. 91, BROWN_ 0000000308. This document, and others survey results like it, was marked confidential in discovery and never shared publicly. ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████ Pl. Ex. 263, BROWN_0000017726 at -728, -726. In December 2014, the Technical Committee designed a survey reflecting a ████████████████████████████

████████████████████████████████████████████████████████ Pl. Ex. 264, MIDDLEBURY0499.████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████

20.    Defendants also monitored each other's policies through data they shared via COFHE, including its Colorbooks, to compare themselves to one another. *See generally, e.g.*, Pl. Ex. 266, VANDERBILT-00021810 ███████████████████████████████

███████████████████████████████████████████████████████████

█████████ Pl. Ex. 123, Rapelye (COFHE 30(b)(6)) Tr. 49:6-23. In particular, Defendants made adjustments to their policies and practices regarding student self-help based on the Colorbooks; referenced the data for purposes of fundraising efforts; used the data to try to understand how financial aid offers affected the yield on the students in the class; and reviewed the data in making allowances and to compare cost of attendance. *Id.* at 116:8-129:5; Pl. Ex. 267 ███████████████████

█████████████████████████████████████████ Pl. Ex. 361, ND_0168159 at -159

("███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████ Pl. Ex. 14, SR1 ¶¶ 165-75 ████████████████████████████

███████████████████████████████████████████████████████████

█████████████

21.    ████████████████████████████████████████████████████

███████████████████████████████████████████████████ Pl. Ex. 123, Rapelye (COFHE 30(b)(6)) Tr. 52:2-10, 184:19-185:3, 116:8-129:5; Pl. Ex. 267 (COFHE session on Colorbooks); Pl. Ex. 127 (discussing COFHE data).

22.    Defendants also monitored peers' net prices through each school's "net price calculator." Pl. Ex. 268 at -830-839 (████████████████████████████████████

████████████████████████████████ Pl. Ex. 269 at -903-905 (██████████████████████

███████████████████████████████████████████████████████████

████████████████████████ Pl. Ex. 173, Tilton (Brown) Tr. 191:6-17 (Brown compared the results from its net price calculator with the results from other schools' net price calculators).

### D. Defendants' Significant Endowment Growth and Budget Flexibility

23. Defendants seek to grow and increase their revenues and endowment. Pl. Ex. 5, Mora Rep. ¶¶ 22-66; Pl. Ex. 39, Mora Reb. ¶¶ 4-26.

24. Defendants have certain operational features—like multiple departments and schools, wide and scattered property holdings, diversified income streams (including multi-billion dollar hospital systems), intellectual property rights, complex endowment management, lucrative cash investments, distinct forms of annual fundraising, large executive and administrative staff, and a variety of relevant stakeholders—that are similar to a public company or sophisticated corporate conglomerate. Pl. Ex. 5, Mora Rep. ¶¶ 20-66.

25. During the Class Period, Defendants increased their endowments in inflation-adjusted dollars between 46% and 281%, with an average of 144%. Pl. Ex. 270, Bulman Rep. ¶¶ 9, 24-31; Pl. Ex. 90, Bulman Reb. ¶¶ 8-23, 31-46, 55-69. From 2003 to 2023, Defendants collectively grew their endowments by approximately $165 billion. *See id.* at Table 3.

26. Endowment funds generally fall into two types: restricted endowment funds are donor-designated for specific purposes, while unrestricted endowment funds may be used at the institution's discretion. Pl. Ex. 5, Mora Rep. ¶¶ 48-50. ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████. Within the category of restricted endowment funds, there are different levels of restriction depending on the specific language of the donation agreement, Pl. Ex. 273, ███████████████████████████████

████████████████████████████ Pl. Ex. 5, Mora Rep. ¶ 35.

27. Endowment funds are spent via the spending rule set by the Board of Trustees, which is used to determine current year spending from the endowment as a percent of lagged

endowment levels. Pl. Ex. 270, Bulman Rep. ¶ 33; Pl. Ex. 274, Yermack Rep. ¶¶ 26-33; Pl. Ex. 5, Mora Rep. ¶¶ 42, 47. So long as an endowment's investment return exceeded the target spending rate plus inflation, the endowment would grow. Pl. Ex. 270, Bulman Rep. ¶ 33. For example, if institutions target spending at a rate of 4.5% of start-of-year endowment and inflation is 2.5%, then an investment return of 8% would allow an endowment to grow and enable increased spending in future years without impairing the ability of any institution's endowment to maintain its purchasing power. *Id.* The Board of Trustees can increase the spending rule to spend more on financial aid. ███

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████

28.     As they told Congress, █████████████████████████████

████████████████████████████████████████████████

29.    Between 2003 and 2022, Defendants' average spending rule target was generally between 5% to 6%. *See* Pl. Ex. 90, Bulman Reb. at Fig. 1. This was to support a stated goal of

maintaining purchase power. Pl. Ex. 365 at -041 ████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████ Pl. Ex, 367 at YALE_LIT_ 0000158457 ███

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████. But, contrary to the stated goal of "maintaining"

purchasing power, endowment returns vastly outpaced that endowment spending, even when

controlling for inflation and excluding new gifts:



*Id.* at Fig. 3.

30.     Defendants worked from the premise that each school had a fixed and limited pot

of money for financial aid. Pl. Ex. 55, Baum, *supra*, at 1, 2, 5 (describing how, among other things,

the premise of institutional grant aid is that "institutions search for creative ways to make their

limited aid dollars go further"); *see also* Pl. Ex. 162, Downs-Burns (Middlebury) Tr. 315:21-316:7

█████████████████████████████████████████████████████████████

███████████████████████████████████. Defendants publicly promulgated—and continue to maintain—this "limited resources" narrative as well, including and specifically in relation to the 568 Group's activities. *See, e.g.*, Pl. Ex. 221, 568 GROUP WEBSITE, HISTORY OF THE 568 GROUP, https://web.archive.org/web/20160320141210/http://568group.org/about/history.html (the 568 Group's Consensus Methodology was an "approach [that] enabled colleges to spread their limited financial aid dollars among the greatest number of worthy applicants"); Pl. Ex. 274, Yermack Rep. ¶ 46 ("████████████████████████████████████████████ ████████████████████████████████████████████████████████"); Pl. Ex. 280, Ammon (Penn) Tr. 51:1-6 ████████████████████████████████████████████ ████████████████████. Ex. 373, Long Tr. 83:18-84:9 ██████████████████████ █████████████████████████████████████████████

31.     But the premise was false because Defendants had the flexibility to make increased awards while still growing their respective endowments' purchasing power. Virtually every Defendant from 2003 to 2022 could have awarded 10-20% more institutional financial aid each year while still increasing the purchasing power of its endowment at virtually the same rate as it did (and the exception, Georgetown, could have spent 10% more and still enjoyed approximately 90% of the same endowment growth). *See* Pl. Ex. 270, Bulman Rep. ¶¶ 62-69; Pl. Ex. 90, Bulman Reb. ¶¶ 6, 17-30.

32.     Defendants further had the flexibility to make such increased awards because not only did the endowments grow well beyond the spending rate, but all the revenue sources (e.g., restricted endowment funds, unrestricted endowment funds, and tuition) of their budgets were flexible due to the inherent fungibility of money. *See* Pl. Ex. 281, Emory_568Lit_0039665 (████ █████████████████████████████████████████████████████████ ████████████████████████████████ Pl. Ex. 282 at 6-7 (██████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████ Pl. Ex. 283, GTWNU_0000067165

██████████████████████████████████████████████████████

████████████████████████████████████████████); Pl. Ex. 270,

Bulman Rep. ¶¶ 46-50, 70-80; Pl. Ex. 5, Mora Rep. ¶¶ 23-34, 48-50; Pl. Ex. 39, Mora Reb. ¶¶ 32-39.

33.     As further proof that Defendants had and have flexibility, on June 6, 2025, when faced with a proposed 21% annual tax on the wealthiest schools' investment income, a group of universities—including Defendants Johns Hopkins, Duke, Rice and Chicago (as well as Harvard, Princeton, Stanford, and Yale)—announced that they "support a requirement to distribute 5% of their endowment's value annually" and will "commit to spending more in such areas as student financial aid. . . ." Pl. Ex. 260, J. Chung & R. Rubin, *Colleges Hope to Stave Off Big Tax Hike by Pledging to Spend More Endowment Cash*, WALL ST. J. (June 6, 2025), available at www.wsj.com/us-news/education/colleges-hope-to-stave-off-big-tax-hike-by-pledging-to-spend-more-endowment-cash-353606fb.

34.     Defendants' historical narrative about limited financial aid resources was consistent with their general goals of limiting their use of endowment funds more than necessary to maintain the endowment's purchasing power, to compete over key prestige metrics such as endowment dollar per student and total endowment. Pl. Ex. 5, Mora Rep. ¶¶ 42-46, 67-68.

**E.  Defendants' Violation of Need-Blind Requirements**

35.     Statistical evidence shows that Defendants ████████████████████████

██████████████████████████████ *See* Pl. Ex. 32, SR2 ¶ 251, App'x 4. ████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████. Pl. Ex. 32, SR2 at App'x 4.

36.     The qualitative evidence further shows that Defendants gave admissions preferences to children and grandchildren of wealthy or prospective donors.

**Cornell**: █████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

at 2. ████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████. *Id.*

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████

**Dartmouth**: ███████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████



**Georgetown**. ▮

▮, Pl. Ex. 223, DeGioia (Georgetown) Tr. 50:15-23; Pl. Ex. 298, Koenig (Georgetown) Tr. 26:19-27:11, 33:5-36:16, 208:6-209:5; (b) ▮



████████████████████████████████████, *see* Pl. Ex. 299-301; and (c)████████████████████████████████████████████. 50:15-51:18; Pl. Ex. 298, Koenig (Georgetown) Tr. 25:13-27:11. ████████

████████████████████████████████; *see also* Pl. Ex. 223, DeGioia (Georgetown) Tr. 67:2-6 (has attended since 2012). ████████

████████████ Tr. 255:23-256:14. ████████

████. ████████████████ Pl. Ex. 307 at 26; Pl. Ex. 308 at 14. ████

**MIT**. In March 2019, former MIT Admissions Director McGreggor Crowley wrote an article for the *Boston Globe* acknowledging that "every year, regardless of what a college or university says publicly, a number of children of wealthy donors and alumni get a nod in their direction while other applicants are rejected." Pl. Ex. 311 at 2-3. In discussing internally its

response to Crowley's column, ███████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████ Pl. Ex. 312 at 1. As████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████ Pl. Ex. 313 at 2. ██████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████ *Id*. In ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████ *See* Pl. Ex. 134, Waitz (MIT) Tr. 110:17-21, 113:16-23; Pl. Ex. 314, Millard (MIT) Tr. 57:13-58:11. █████████████████████████████████████████████

████████████████████. Ex. 315; *see also* Pl. Ex. 316, Schmill (MIT) Tr. 233:10-234:3, 239:12-15.

**Northwestern**: Northwestern stipulated that for each year from 2003 through 2022, the school "in some instances admitted students based on factors which included the applicant's family's donation history and/or capacity for future donations." Pl. Ex. 317. █████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████. Pl. Ex. 323, Schapiro (Northwestern) Tr. 39:12-40:8, 45:3-46:3, 47:9-48:20, 61:18-25; *see also* Pl. Exs. 318-322 ██████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████

**Notre Dame.** Notre Dame stipulated that for each year from 2003 through 2022, the school "in some instances admitted students based on factors which included the applicant's family's donation history and/or capacity for future donations." Pl. Ex. 325 ¶ 1. █████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████. Pl. Ex. 327 at 1; Pl. Ex. 330, Bishop (Notre Dame) Tr. 302:21-303:1. Furthermore, a 2020 report authored by Donald Bishop, Associate Vice President for Undergraduate Enrollment, stated ████████████████████████████████████████

██████████████████████████████████████." Pl. Ex. 328 at ████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████ Pl. Ex. 329 at 1.████████████████

██████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████

**Penn.** ████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████9

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████ *Id.* at 224:17-225:12. ████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████

**Vanderbilt**: Vanderbilt stipulated that for each of these years, in some instances it admitted students based on the "financial circumstances" of the student or the student's family, as the Court has interpreted that term. Pl. Ex. 332, at 2.

**Yale**. Yale also ████████████████████████████████████

██████████████████████████████████████████████████

O'Neill (Yale) Tr. 52:2-24; *see also* Pl. Ex. 374, Yale_Lit_0000183774 at 775-776 (describing evaluation of the "████████████████████████████████. The ██████████████

██████████████████████████████████████████████████████

████████████████████-24.

37.     Admitting children of wealthy donors is a way to generate substantial revenues, increase the size of endowments, and maintain the prestige necessary to continue to generate such revenues. Pl. Ex. 5, Mora Rep. ¶¶ 53, 71-75; Pl. Ex. 32, SR2 ¶ 251.

**F. Defendants' Competitors**

38.     Dr. Singer's indirect and direct analysis of market power yields a relevant market of elite, private universities defined as the 22 elite, private universities whose average rankings in the *U.S. News & World Report* put them in the top 25 for universities during the Class Period. Pl. Ex. 14, SR1 ¶¶ 62-65; Pl. Ex. 32, SR2 ¶¶ 6-32. Analyzing that market, Dr. Singer found that Defendants' average collective market share, whether weighted or unweighted, was between 76.9% and 78.6% during the Class Period. *Id.* ¶¶ 73, 101-08, 110; *see also id.* at App'x 6. Even if one includes top public universities, "the combined share of the Defendants in that larger market would still be sufficiently large to infer that they possess market power," with such shares "ranging from 51 to 72 percent." Pl. Ex. 14, SR1 ¶ 73, App'x 6; *see also* RSOF ¶ 52.

39.     Elite, private universities have high barriers to entry, as reflected by their admission rates and admissions yield rates, as well as faculty quality and faculty compensation, that other schools do not and cannot easily match. Pl. Ex. 14, SR1 ¶¶ 117-18; *see also* Pl. Ex. 32, SR2 ¶¶ 27-32. Over the Class Period, none of the 221 schools with the Carnegie Classification of "Baccalaureate Colleges—Liberal Arts" switched its classification to "university." Pl. Ex. 14, SR1 ¶ 114.

40.     Defendants considered themselves competitors. Indeed, the evidentiary record supports the proposition that non-market schools did not meaningfully compete with the Elite Private Universities. For instance, ████████████████████████████

████████████████████████████████████████████████████████



Pl. Ex. 4, DUKE568_0018646 at -648. ███████████████████████████ Pl. Ex. 33, CORNELL_LIT0000213582 at -582. ███████████████ Pl. Ex. 34, DARTMOUTH_0000050515, at -517; *see also* Pl. Ex. 36, JHULIT_0000000794 at 801 ██████████████████████████. *See* Pl. Ex. 40, at 4; *see also* Pl. Ex. 266, VANDERBILT-00021810 at -816, 822-23; Pl. Ex. 14, SR1 ¶¶ 74-78, 82-85 ██████████████████████.

41.     Dr. Singer analyzed Defendants' market power several ways, including via the Hypothetical Monopolist test, a peer analysis, and revealed preferences examination, which all supported his conclusions. The results of Dr. Singer's hypothetical monopolist test—which examines whether a hypothetical monopoly provider of services that included only the institutions in the defined relevant market could raise prices profitably over competitive levels—showed that, analyzing their change in net assets, Defendants were able to inflate prices above competitive levels. *See* Pl. Ex. 14, SR1 ¶¶ 64, 79-81; Pl. Ex. 32, SR2 ¶¶ 2, 6-8, 22 n.91, 25, 32, 79 ("A hypothetical monopolist test (HMT), applied here, asks whether a hypothetical monopoly provider of Elite Private University services that included only the institutions in my defined relevant market could raise prices profitably over competitive levels."). This necessarily implies that cross-elasticity is sufficiently low such that the relevant market is no larger than that of the elite, private universities. Pl. Ex. 14, SR1 ¶ 79.

42.     The peer analysis quantifies the extent to which Defendants perceive their undergraduate services as a separate market. Pl. Ex. 14, SR1 ¶¶ 85-93. This data reinforces the qualitative evidence that the schools in the relevant market view each other as peers to a much

greater extent than they view other schools as peers—and vice versa. *Id*. The quantitative data further show that, as a telling metric, students are willing to travel much further to attend an elite, private university than to attend other schools. *Id.* ¶¶ 94-100; *see also* Pl. Ex. 32, SR2 ¶¶ 6-32 (refuting Defendants' experts' criticisms of relevant market analysis). Dr. Singer also measured the revealed preferences of students who compare schools at which they are admitted, in a "pairwise" comparison. Pl. Ex. 14, SR1 ¶¶ 101-07. The results are that (a) the correlation between the *U.S. News* rankings and these revealed preferences is high, and (b) adding 10 additional highly ranked universities does not create any substantial impact on the rankings of schools in the relevant market, and adding in the top 10 liberal arts schools does not change the highest 18 ranked schools in the market. *Id*.

43. Dr. Singer also measured the revealed preferences of students who compare schools at which they are admitted, in a "pairwise" comparison. Pl. Ex. 14, SR1 ¶¶ 101-07. The results are that (a) the correlation between the *U.S. News* rankings and these revealed preferences is high, and (b) adding 10 additional highly ranked universities does not create any substantial impact on the rankings of schools in the relevant market, and adding in the top 10 liberal arts schools does not change the highest 18 ranked schools in the market. *Id*.

## G. Quantitative Impact of the Overarching Conspiracy

44. Plaintiffs retained economic expert Dr. Singer to analyze what Effective Institutional Prices (EIPs)—the cost of attendance remaining after subtracting any institutional grant aid—would have been in the but-for world. *See, e.g.*, Pl. Ex. 14, SR1 ¶¶ 3, 6 17. The EIP reflects the discount off of list tuition price resulting from the institutional aid the school (as opposed to third parties) awarded. *Id.* Dr. Singer's statistically significant analysis, controlling for other factors, found that Defendant's participation in the Challenged Conduct resulted in an average artificial increase of $1,202 per-student, per-year to their EIPs during the Class Period, with such artificial

inflation in each Defendant's EIPs ranging from 1% (CalTech) to 9.8% (MIT). *See* Pl. Ex. 32, SR2 ¶¶ 150, 256, Table 7; Pl. Ex. 14, SR1 ¶¶ 218-261, Table 13; Pl. Ex. 334, SR3 ¶¶ 5, 20-26.

45.     Dr. Singer performed this analysis by comparing the prices that Class members paid during the Class Period against a benchmark that involved pricing during periods in which Defendants did not identify as part of the 568 Group, controlling for all other factors affecting price. Pl. Ex. 14, SR1 ¶¶ 238-45. Dr. Singer's regression analysis is, for many reasons, conservative, given such factors as the "umbrella effect," *see* Pl. Ex. 14, SR1 ¶ 228; Pl. Ex. 32, SR2 ¶ 73; Pl. Ex. 334, SR3 ¶ 34, and his assumption that Defendants would have immediately altered their pricing after resigning from the 568 Group, Pl. Ex. 14, SR1 ¶¶ 228, 238, 248; Pl. Ex. 32, SR2 ¶ 73 n.253; SR3 ¶ 35. In reality, there were likely "lingering effects," Pl. Ex. 32, SR2 ¶¶ 73, 186, such that treating Defendants' post-Group pricing as "clean" underestimates the effect of the challenged conduct, Pl. Ex. 32, SR2 § III.A.2h; Pl. Ex. 335, Singer Tr. 50:3-51:4 ("After you've been with a cartel for ten years, you're going to have learned the technique, you're going to have learned how to keep prices high and so the idea that, you know, that you're going to unlearn that because you're going to come out, is a big ask of the data," and yet "despite all of these limitations, we're still finding economically and statistically significant effects of the cartel.").

46.     Dr. Singer's conclusions still remained after implementing the "myriad adjustments" offered by Defendants' experts regarding the data and analysis. *See* Pl. Ex. 32, SR2 ¶ 45. Based on this regression, there's a less than a 1% probability that the challenged conduct had no such effect on net price. Pl. Ex. 14, SR1 ¶ 249; SR2 ¶ 150, Table 6.

47.     Dr. Singer found Defendants artificially inflated EFCs, too. Pl. Ex. 32, SR2 ¶ 44, Table 1. Specifically, he found the resulting conduct coefficient implies that the "the Challenged Conduct resulted in an artificial overcharge to EFCs of roughly $515 per student and academic year." *Id.* ¶ 44. This conduct coefficient is also highly statistically significant, with a less than 1% probability that the challenged conduct had no such effect. *Id.* Dr. Singer also showed that "the

absolute difference between the EFCs is lower when both Defendants for the cross-admitted student are in the 568 Group than when one or both Defendants are not." *Id.* ¶ 46. His analyses are evidence that "the EFC and the resulting Effective Institutional Price are closer together when the Challenged Conduct is in effect than when the Challenged Conduct is not," *id.* ¶ 46, which is consistent with the presence of an agreement and inconsistent with unfettered competition. *Id.*

48.    Dr. Singer also found that 568 Group membership not only inflated net prices but also brought such prices between schools in the Group closer together. Pl. Ex. 32, SR2 ¶ 304.

49.    Dr. Singer has observed that, as a matter of economics, Defendants had several potential mechanisms with which to compete; therefore, their agreement had to concern packaging as well, because an agreement regarding solely the EFCs would be unstable as "members could simply circumvent the cartel by altering another pricing element." Pl. Ex. 14, SR1 ¶ 31. Defense expert ██████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████ Pl. Ex. 25, Stiroh Tr. 185:19-25, 190:25-191:9.

50.    Plaintiffs also have qualitative evidence of the effect of the challenged conduct on packaging. This evidence includes that (a) the conduct included the common adoption of the "affordability principle"—namely, Defendants' agreement that price should be based on ability to pay (or pay back loans), Pl. Ex. 334, SR3 ¶ 56; Pl. Ex. 14, SR1 ¶¶ 188-91; ████████████████ ███████████████████████████████████████████ Pl. Ex. 334, SR3 ¶ 56; Pl. Ex. 32, SR2 ¶ 40; and (c) several schools adopted no-loan policies, which concern packaging, only after leaving the Group. Pl. Ex. 32, SR2 ¶ 65.

51.    Dr. Singer thus concluded that the "evidence and analyses in my reports have shown that unfettered competition would have prompted the development of a more generous 'alternative' methodology or set of more generous methodologies in the but-for world." Pl. Ex. 14, SR1 ¶ 220.

Examples of potential alternatives would be either a more generous IM or changes to the assets considered, such as not including home equity at all at any aid level. *See* Pl. Ex. 335, Singer Tr. 300:7-15. Another example is that Defendants could have applied lower assessment rates or reduced the base calculation of income and assets. *See id.* at 302:2-20.

52.     These conclusions follow expected economic precepts. Economics teaches us that when competitors regularly meet, share information, and coordinate around formulas relating to price, competition is softened, and prices are inflated. *See, e.g.*, Pl. Ex. 32, SR2 ¶ 58; Pl. Ex. 335, Singer Tr. 98:5-25, 99:13-19 (imperfect coordinating on pricing formula can still restrain competition and impact price).

53.     Dr. Bulman compared Defendants' spending on institutional aid out of their "excess" endowment returns—those that exceed the target spending rate from the endowment plus inflation—before and after their participation in the 568 Group. Pl. Ex. 90, Bulman Rep. ¶¶ 32-35. He obtained "highly statistically significant" results indicating that higher endowment returns had previously resulted in greater financial aid and reduced net prices, but during the challenged conduct higher endowment returns were not allocated to increasing aid or reducing net prices— which is "consistent with Defendants' participating in the Challenged Conduct." *Id.* ¶ 32.

## H. The Complicated and Confidential Nature of Defendants' Activities

54.     Most people, including some of those in higher education, do not understand the details of how financial aid is awarded because of its complexity. *See, e.g.*, Pl. Ex. 104, Nucciarone (Notre Dame 30(b)(6)) Tr. 77:1-78:2, 80:18-81:18 (testimony by Notre Dame's Director of Financial Aid ███████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████████ Pl. Ex. 123, Rapelye (COFHE 30(b)(6)) Tr. 77:9-15 ██████████████████████████████████████████

████████████████ College Board's longtime economist Dr. Baum herself observed that "it is

increasingly evident that the complexities of existing financial aid policies and programs make it difficult for many of those who most need the help to understand and navigate the system." Pl. Ex. 336, Sandy Baum, *Trends in Student Aid 2011*, COLLEGE BOARD (2011) at 7; *see also* Pl. Ex.160, Baum Tr. 130:6-23; Pl. Ex. 14, SR1 ¶¶ 274-75 (describing how Dr. Baum has often spoken to the complexities of the system of awarding financial aid and the resulting inability of average people to understand its operation).

55.    Anyone doing the kind of statistically significant analysis of the economic impact of the Defendants' Overarching Agreement and the 568 Group would have had to understood that complexity, have access to confidential, non-public pricing data available, and been capable of performing complicated analysis; because such data was not available, even an interested party "would not have been able to determine" that Defendants' conduct "was having a negative impact on Financial Aid Students"). Pl. Ex. 14, SR1 ¶¶ 271-72 ("Any statistically significant analysis of the economic impact of the Overarching Agreement, prior to this litigation, would have required someone to understand, at least (a) the nature and scope [of that agreement]; (b) the relationship among Tuition, COA, and Net Price; (c) the main components of the CM and Base IM in comparison to alternative IMs; (d) the distinction between federal financial aid and Institutional Financial Aid; (e) a nuanced understanding of variables among the Defendants affecting the calculation of their average Net Prices; (f) had access to all of the structured data that Defendants have produced in this litigation (under a confidentiality order) so as to be able to conduct a statistical analysis demonstrating that Defendants' participation in the 568 Group had the effect of suppressing their awards of Institutional Financial Aid; and (g) then have conduct[ed] the kind of [] complex, multi-variable, regression-based analysis that I have conducted in my Report.").

56.    This lawsuit was filed on January 9, 2022. ECF No. 1. Named Plaintiffs did not become aware of the possibility of injury until their privileged discussions with counsel leading up to the filing of the complaint or amended complaint. ███████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

57.     The Named Plaintiffs were also generally unaware of the 568 Group, the Consensus

Methodology, or the Federal or Institutional Methodologies at the time they applied for financial

aid and/or prior to this litigation. ██████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████

58.     Prior to this litigation, Defendants made numerous public statements that attributed

rising tuition and net prices to multiple external factors, included but not limited to the rising costs

of faculty salaries and benefits, facility maintenance, student residences, smaller classes,

computers, food, energy, and compliance with governmental regulations. *See e.g.*, Pl. Ex. 342,

Elizabeth Rowe, *Percent Rise in Tuition Approved*, THE HOYA (March 22, 2010),

https://thehoya.com/news/3-percent-tuition-rise-approved/ (discussing "operating costs of

maintaining . . . facilities" at Georgetown); Pl. Ex. 343, Katie Harris, *Tuition*, SCHOLASTIC

(September 23, 2015), https://scholastic.nd.edu/issues/tuition/ (the need "to hire 'great professors'"

and provide "[s]mall classes [and] great residence hall experience(s)" at Notre Dame); Pl. Ex. 344,

*Trustees Approve Tuition and Fees for 2011-12*, CORNELL CHRONICLE (January 30, 2011),

https://news.cornell.edu/stories/2011/01/board-approves-tuition-and-fees-2011-12 ("rising costs

across this [higher education] sector and a reduction in state support for . . . statutory colleges and

programs"); Pl. Ex. 345, *University Increases Tuition for 2009*, THE OBSERVER (March 3, 2009), https://www.ndsmcobserver.com/article/2009/03/university-increases-tuition-for-2009 ("food service and utilities" at Notre Dame); Pl. Ex. 346, *Tuition hike info needs to be public*, THE GEORGETOWN VOICE (March 2, 2006), https://georgetownvoice.com/2006/03/02/tuition-hike-info-needs-to-be-public/ ("energy costs [and] technological costs"); Pl. Ex. 347, *Inflation, staffing pressures expected to drive up college tuition*, THE FEED AT GEORGETOWN UNIVERSITY (February 11, 2022), https://feed.georgetown.edu/access-affordability/inflation-staffing-pressures-expected-to-drive-up-college-tuition/ ("Supply chain issues coupled with rising demand continue to inflate the price of fuel, rent, food, and other essentials . . . [are] affecting a number of sectors, including higher education."); Pl. Ex. 348, C.J. Hughes, *Why Is Dartmouth So Expensive?*, DARTMOUTH ALUMNI MAG. (May – June 2015), https://dartmouthalumnimagazine.com/articles/why-dartmouth-so-expensive (noting that "Dartmouth and other elite schools have become locked in a virtual arms race, going after professors who are experts in their fields, constructing dazzling gyms with cutting-edge fitness equipment and installing the fastest-possible computer connections," and quoting Dartmouth President Phil Hanlon's statement that "a driver [of expenses] for the last 8 to 10 years" included "compliance with a range of government regulations imposed to address issues such as crime, gender equity and accessibility").

59.     The Department of Justice began an investigation into the 568 Group only after the instant lawsuit was filed, which Defendants did not disclose to Plaintiffs or the Court for at least several months. Pl. Ex. 349, July 24, 2024 Hr'g Tr. 47:5-8, 48:12 (statement by Court that Defendants' non-disclosure of "an investigation going on that involved depositions being taken of people on the very same issues involved in this case" was "dirty pool as far as I am concerned").

## I.  Student Responsibilities

60.     Students receive Defendants' tuition bills and are solely responsible for their payment. *See, e.g.*, Pl. Ex. 376, Penn568-LIT-00073116 (Penn's Financial Responsibility Statement

requiring students to agree "to pay tuition, fees and other charges associated with [their] enrollment in these classes. . . . This constitutes a legal financial obligation."); Pl. Ex. 351, GEORGETOWN REVENUE AND RECEIVABLES, POLICIES AND PROCEDURES, https://studentaccounts.georgetown.edu/policies/ (last visited Mar. 5, 2025) ("[T]he student accepts financial responsibility for charges assessed to his or her account."); PSOF ¶ 43. Indeed, as Defendants said themselves, "putative class members paid tuition to get a degree." ECF 788 at 39.

Dated: June 27, 2025

Respectfully Submitted,

/s/ Robert D. Gilbert
Robert D. Gilbert
Elpidio Villarreal
Robert S. Raymar
David S. Copeland
Natasha Zaslove
**GILBERT LITIGATORS &
  COUNSELORS, PC**
11 Broadway, Suite 615
New York, NY 10004
Tel: (646) 448-5269
rgilbert@gilbertlitigators.com
pdvillarreal@gilbertlitigators.com
rraymar@gilbertlitigators.com
dcopeland@gilbertlitigators.com
nzaslove@gilberlitigators.com

/s/ Eric L. Cramer
Eric L. Cramer
David Langer
Jeremy Gradwohl
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
ecramer@bm.net
dlanger@bm.net
jgradwohl@bm.net

Richard Schwartz
**BERGER MONTAGUE PC**
1720 W Division
Chicago, IL 60622
Tel: (773) 257-0255
rschwartz@bm.net

/s/ Edward J. Normand
Devin "Vel" Freedman
Edward J. Normand
Richard Cipolla
Joseph Delich
Peter Bach-y-Rita
**FREEDMAN NORMAND
  FRIEDLAND LLP**
155 E. 44th Street, Suite 915
New York, NY 10017
Tel: (646) 494-2900
vel@fnf.law
tnormand@fnf.law
rcipolla@fnf.law
jdelich@fnf.law
pbachyrita@fnf.law

Ivy Ngo
**FREEDMAN NORMAND
  FRIEDLAND LLP**
1 SE 3d Avenue, Suite 1240
Miami, FL 33131
Tel: (786) 924-2900
ingo@fnf.law

Daniel J. Walker
Robert E. Litan
Hope Brinn
**BERGER MONTAGUE PC**
1001 G Street, NW, Suite 400 East
Washington, DC 20001
Tel: (202) 559-9745
rlitan@bm.net
dwalker@bm.net
hbrinn@bm.net