# EXHIBIT 110

Sydney Earle, 2/21/01 4:37 PM -0500, IMPORTANT!! Hunter Rawlings Memo          1

```
Status: U
Date: Wed, 21 Feb 2001 16:37:15 -0500
From: "Sydney Earle" <searle@mail.jhuwash.jhu.edu>
To: <tgerety@amherst.edu>, <redwards@bowdoin.edu>, <rupp@columbia.edu>,
     <akh2@cornell.edu> {Anna K. Huntzinger}, <james.wright@dartmouth.edu>,
     <nkeohane@duke.edu>, <brodie@gunet.georgetown.edu>,
     <beverly_sullivan@harvard.edu>, <mcpherson@macalester.edu>,
     <mccardel@middlebury.edu>, <cmvest@mit.edu>, <hsbienen@nwu.edu>,
     <rodin@pobox.upenn.edu>, <peters@pomadm.pomona.edu>,
     <hts@princeton.edu>, <mgillis@rice.edu>, <hennessy@stanford.edu>,
     <gordon.gee@vanderbilt.edu>, <DWALSH@WELLESLEY.EDU>,
     <dbennet@wesleyan.edu>, <mschapiro@williams.edu>,
     <richard.levin@yale.edu>
Subject: IMPORTANT!! Hunter Rawlings Memo re: 568
```

To: Presidential Members of the 568 Working Group

At the request of the chairman of the 568 Presidents' Working Group,
President Hunter Rawlings, we are forwarding an important note to you
from him about recent and possible future media coverage of the 568
Group's activities. It is being sent as an Email attachment (Word for
Windows) as it is urgent information.

If you are unable to open and read the attached memo and the text of
the recent article which appeared in the Christian Science Monitor,
please contact the COFHE office in Washington (202/663-5920 or
cofhe@jhu.edu) and we will FAX you a hard copy.

If you do receive a direct call from the media about the 568 Working
Group or see it mentioned in your local media, Hunter will appreciate
knowing about it. Please give him a call directly if you have any
questions about his note or the general progress of the project (his
phone number and Email address can be found at the bottom of the
attached memo).



CSMArticle.doc

pressinquirymemo.doc

CONFIDENTIAL                                              CORNELL_LIT0000411894

## 568 PRESIDENTS' WORKING GROUP

**February 21, 2001**

**To:** 568 Group Presidents

**From:** Hunter R. Rawlings III

**Subject:** Press Inquiries

Princeton's dramatic announcement of its latest enrichment of financial aid support has generated several intensive press inquiries here at Cornell as well as at many of your institutions. Mark Clayton, a reporter for the *Christian Science Monitor*, seems to have probed furthest in this regard. As a result, there has been some indication in the press that a group of presidents has been examining the financial aid issue for some time. I am attaching the text of Mr. Clayton's February 13 article for your information.

While we had hoped to be ready to release our report before any major story, follow-up inquiries from members of the media are now likely. As we had planned, in my role as chairman, I will continue to serve as the key 568 spokesperson, but recognize other members may receive calls. For your consideration, I have sketched below several possible talking points that might be appropriate under the circumstances.

On the research front, we have been making excellent progress. Jim Belvin has shared the methodology with several schools of different size, both to allow them to perform initial test runs that would give them a feel for the potential impact of the proposed methodology on their financial aid programs and also to help us identify any further tweaking of the program that would improve the ability of all the participating institutions to run such a test. The results so far from Haverford, Wellesley, and Duke suggest that we are in a good position to send out the material to everyone, and that will be accomplished in the next few days.

Please let me know if you have any questions.

---

### SAMPLE TALKING POINTS

Q.  Is it true that a coalition of presidents is examining the whole financial aid picture?

A.  Over the past two years a group of college and university presidents of institutions committed to need-blind admissions has been examining the factors that most appropriately ought to be considered in determining a family's contribution to the cost of a student's college attendance. We've made good progress in this regard, but the project is still under way and we are not yet at the point of reaching final conclusions.

Q.  Has this effort been generated by the changes in financial aid policies announced by Princeton and a number of other institutions in recent years?

A.  No. The presidents I have been working with have been sensitive to the changing nature of the American economy, as well as changes in family structures that have a direct impact on the ability of our students and their families to contribute to the cost of their education. That was and remains the driving force behind our efforts. We want to develop institutional student financial aid policies that are fair, up-to-date, and readily understandable, not only for our campus financial aid officers but also for the families of students who are planning their educational future.

---

**HUNTER RAWLINGS III, CORNELL UNIVERSITY, CHAIRMAN**
**300 DAY HALL, ITHACA, NY 14853 * 607.255.5201 (FAX -9924)**

CONFIDENTIAL

Q.    Are the presidents with whom you are working trying to reduce the amount of institutional aid they must award as a result of the competitive pressure generated by decisions such as those at Princeton?

A.    No. That's not the point of this at all. In fact, the net result of what we're doing will probably be that most, if not all, of the participating institutions will have to allocate more institutional financial aid, not less, in the years ahead, thereby reducing parental contributions.

Q.    When will you be making your recommendations?

A.    Thanks to the great efforts of some of the very best financial aid officers in the country, we have been exploring not only a core set of principles for the determination of family contributions, but also a detailed methodology that could be utilized by campus financial aid officers as they render their professional decisions. We're in the final stages of that endeavor, and I hope that we'll be able to report on our progress soon. In any event, the changes that might be proposed would need to be implemented carefully and would likely be phased in over several years.

Q.    Will you be dealing with the question of packaging institutional financial aid awards?

No, that's not a subject under discussion. Nor is the question of non-need-based awards Those are separate questions for individual campus determination.

HUNTER RAWLINGS III, CORNELL UNIVERSITY, CHAIRMAN
300 DAY HALL, ITHACA, NY 14853 ' 607.255.5201 (FAX -9924)

CONFIDENTIAL

From the *Christian Science Monitor*
February 13, 2001

*Quiet Effort to Promote More Need-Based Aid*
By Mark Clayton

In 1994, a settlement on an antitrust lawsuit set down new rules for colleges that were considering financial-aid packages for the same student. The message: schools could share general institutional information regarding aid, but no specific data on an individual. The ruling laid the groundwork for bidding wars that had been prevented by collaboration among members of what was known as the "Overlap Group."

That group is gone now. But a new, similarly secretive gathering of elite college presidents is meeting to discuss financial-aid policy. Called the "568 Group" after the subsection of federal law that permits the general communication, it was formed in 1998 after Princeton moved to give low-income students grants instead of loans, thus sparking further battles for students, individuals close to the group said.

The aim of the group is reportedly to develop a set of general principles that will encourage more needs-based, rather than merit-based, financial aid among institutions.

"This group of presidents got together two years ago," says one source close to the group's members, who requested anonymity. "Their purpose is to get to talk about common principles the idea that financial aid should be needs-based, consistent, and fair. They are concerned that institutions have not been conferring enough, not paying enough attention to the public good.... This is a set of folks who say you should use it in a socially responsible way."

The group is said to have arrived at a set of principles. But Princeton's recent move toward an all-grant system of aid may set off a bidding war among elites that could damage or destroy the nascent principles the group had crafted, some say.

"I know some say we [the 568 group] are trying this, and Princeton is trying to blow us out of the water," says Morton Schapiro, president of Williams College, the only member of the group to admit its existence on the record. "I don't think that's true. But [Princeton's move] certainly isn't helping. It doesn't make it easier to come to some sort of broad agreement in principle."

Don Betterton, director of undergraduate financial aid at Princeton, denied the school's shift from loans to grants was motivated by anything but Princeton's internal needs. "We were aware of what was going on [with the 568 group]," he says. "We don't know whether it advances their purposes or not. On loan elimination, they had said institutions should be free to package aid any way they want. And I don't think we're counter to that. We're aware of what they did, and we had a desire to cooperate. Maybe we got out ahead a bit."

He adds that Princeton is permitted by law to speak with the group, but that he had not attended any group meetings.

"We saw a report they produced," he says. "We took into account where they were going in a general way."

CONFIDENTIAL

CORNELL_LIT0000411897

# FINANCIAL AID BACKGROUNDER

2/20/01

American postsecondary education has long followed a principle that financial support should be provided for students in need. In 1954, a number of colleges and universities came together to improved and centralize the techniques used to determine a family's need financial aid to help in paying for college. This joint undertaking led to a need-based model for awarding financial aid that continues to be the basis for most federal undergraduate aid, and enabled colleges to spread their limited financial aid dollars among the greatest number of worthy applicants. For some five decades, need-based aid has helped to assure the high degree of access to private education enjoyed by low- and middle-income students across the country.

Section 568 of the Improving America's Schools Act (IASA) of 1994 sets forth the conditions under which financial aid officers from different colleges and universities may establish common approaches for awarding non-federal, or institutional, student aid. The provision does not permit discussion or comparison of institutional aid awards for individual students.

In enacting Section 568, Congress recognized that it is in the public interest for colleges and universities need to work together to develop financial aid policies that enhance access to higher education, and it authorized efforts to develop and maintain common principles for how need should be determined. Discussions among institutions concerning institutional aid had been thrown into question by an antitrust action initiated by the Justice Department in 1989. When the case was settled in 1993 the parties agreed on the specific ways in which colleges and universities could work together to maintain their commitment to students and their families and to the financial aid principles that underlie the awarding of institutional aid. Congress enacted Section 568 after the settlement, to set forth in statute the terms under which institutions may cooperate in awarding need-based aid.

Section 568 was included in the IASA to extend and modify a similar provision contained in the Higher Education Amendments of 1992. The antitrust exemption was intended to increase access to higher education by promoting financial aid policies that

CORNELL_LIT0000411898

support the largest possible number of low- and middle-income students and their families.

Section 568 applies only to institutional aid and only to colleges and universities that admit all students on a need-blind basis — that is, without considering the financial circumstances of the student or the student's family. It permits those institutions:

• to agree to award aid only on the basis of demonstrated financial need;

• to use common principles of analysis for determining the need of students for that aid;

• to use a common application form for institutional aid; and

• to exchange certain financial data through an independent third party before the award of institutional aid.

In the late fifties, a number of colleges and universities worked with the College Board to develop a set of general principles and methods to be used in determining a family's eligibility for institutional aid above and beyond any federal aid a student may receive. Referred to as the Institutional Methodology (IM), this formula for determining a family's ability to support the expenses associated with college attendance was updated and re-rationalized in 1998. The principles and methods included within in the newly revised IM address a number of issues not covered in the federal rules for need analysis. Section 568 has allowed financial aid officers to pool their expertise in the study of these complex issues and has resulted in recommendations for a further revision of the methodology used by participating institutions. For example, these recommendations provide guidelines for the expected contribution, if any, from non-custodial parents in the case of divorce or separation; the fair treatment of families without formal retirement savings programs; the recognition of regional cost of living variances; and the recognition of unusually high medical and dental expenses.

Because of these discussions, colleges and universities that are eligible to participate will have at their disposal more sophisticated guidelines that lead to a more accurate and reliable assessment of applicants' and their families' financial circumstances. Financial aid awards will therefore be more equitable, and institutional funds will be awarded in a way that supports the maximum number of students. In addition, financial aid officers will be better informed about the needs analysis methods used by each school and therefore better able to explain differences in aid

CORNELL_LIT0000411899

3

packages to families. These principles and methods will also serve as a model for other schools, including smaller colleges that may not have in-house the expertise required to resolve the questions covered by these needs analysis guidelines.

The issues addressed by financial aid officers are not static, and over time there is a continuing need to refine the guidelines and the application forms as new issues are identified.

In late 1998, an ad hoc group of college and university presidents was formed. These presidents share a belief in the primacy of need-based financial aid and a common concern about steady erosion of public confidence in a financial aid system that aspires to be both understandable and fair. The group, formed initially under the leadership of Cornell University President Hunter Rawlings, who continues as its chair, and then-President Harry Payne of Williams College, limited the purview of its work to strengthening need-based aid programs. Their recommendations were designed to bring greater clarity, simplicity and fairness to the process of assessing each family's ability to pay for college.

In addition, the presidents' group is seeking the permanent renewal of Section 568, which is due to expire on Sept. 30.

With the guidance of legal counsel and working subcommittees composed of presidents and financial aid experts from member institutions, the presidents identified major factors that have contributed to the erosion of public confidence in the current financial aid system. The presidents identified the need to reassert common financial aid principles appropriate to the needs of families today. They also committed to the development of a common methodology based on recommendations already developed for ongoing consideration by participating institutions.

On April 18, 2000, the 568 Presidents' Working Group met and appointed a group of eight campus-based senior financial aid professionals to serve on a Common Standards Subcommittee and to identify ways to improve the financial aid system to serve the needs of families in their efforts to pay for college.

CONFIDENTIAL