# EXHIBIT 146

General Context
Possible Income Adjustment
Possible Asset Adjustment
Possible Business Equity Adjustment

# THE 568 PRESIDENTS' GROUP
# CONSENSUS METHODOLOGY
# POLICY GUIDELINES

# November 2012

1

CONFIDENTIAL

Columbia_00184489

General Context
Possible Income Adjustment
Possible Asset Adjustment
Possible Business Equity Adjustment

## Background

On April 18, 2000, the 568 Presidents' 568 Group met and appointed eight senior financial aid professionals from participating 568 institutions to serve on a Common Standards Subcommittee and to report back to them concerning:

> *whether it is possible to reach agreement on common standards for determining financial need at the institutional level consistent with the Statement of Principles for need-based financial aid and as permitted by Section 568.*

The charge to the Subcommittee further requested that, in the pursuit of these goals, the panel:

- *address the principal issues that give rise to divergent need calculations;*
- *arrive at reasonable compromises in the areas where the principles may conflict;*
- *strive for recommendations supportive of a system that many schools could adopt while still being able to manage their individual aid resources;*
- *seek solutions that aspire to simplicity and consistency, that discourage manipulation of the system, and are realistic regarding the capacity of families to contribute to educational expenses;*
- *explore avenues to maintain a system supportive of a Consensus Approach to Need Analysis, if one is adopted.*

The work of the Subcommittee was in turn guided by a statement of Need Analysis Principles adopted by the 568 Presidents at that meeting. These Principles are as follows:

### *FINANCIAL AID PRINCIPLES*

1. *To the extent they are able, parents and students have the primary responsibility to contribute to educational expenses before an institution awards financial aid.*

2. *Families should contribute to educational expenses according to their ability. Those with similar financial profiles should contribute similar amounts.*

2

Columbia_00184490

General Context
Possible Income Adjustment
Possible Asset Adjustment
Possible Business Equity Adjustment

3. *Institutions should evaluate both income and assets as part of the assessment of the parents' and applicants' ability to pay.*

4. *Each institution should inform applicants about the policies and practices it applies when measuring a family's ability to pay, carry out its policies consistently throughout a student's eligibility, and support the awarding of need-based aid.*

5. *An institution that allocates any financial assistance that is not based exclusively on need should inform all prospective applicants of the standards it applies in allocating that aid.*

6. *The exercise of "professional judgment" by financial aid officers in assessing a family's ability to pay should recognize unique or extenuating financial circumstances in individual cases; such professional judgment is not the proper mechanism for systematically treating 568 Groups of students differently in order to advance institutional objectives.*

The revised policy guidelines contained in this Manual represent the best efforts of the 568 Presidents' Group to develop and maintain a Consensus Approach that is both consistent with the Need Analysis Principles adopted by the Presidents of the participating institutions and compatible with the values that underlie the 568 Presidents' Statement of Principles.

The Consensus Approach contains certain key components, including: 1) common elements of need analysis as described below; 2) a common calendar for the collection of data from families; 3) a means of training aid professionals in the application of the Methodology; and 4) an oversight 568 Group to review and modify the methodology as needed over time.

Where possible, the professional expertise and program services of the College Scholarship Service (CSS) of the College Board shall be used as resources to advance the implementation of this Consensus Approach. In addition to their long-standing role as the primary data collection agency, CSS may be invited to assist with the modeling of various recommendations in order to assess their impact on both families and institutions.

Finally, because need analysis is a complex and detailed process requiring the examination of many dozens of elements to measure a family's ability to pay, many policy guidelines will require additional background and research over time. In this sense this Manual continues to be an "organic" document. While containing a number of quite specific guidelines for the implementation of the Consensus Approach, the Manual should be viewed as the basis of an ongoing process to construct a need analysis system that will continue to assure fair and equitable access to educational opportunity.

3

CONFIDENTIAL

Columbia_00184491

General Context
Possible Income Adjustment
Possible Asset Adjustment
Possible Business Equity Adjustment

## Policy Guidelines for the Maintenance
## of the Consensus Approach Methodology

The 568 Group believes that the Consensus Approach to Need Analysis, when properly implemented and maintained, eliminates much of the variance in the need analysis results that has been experienced in years past. The 568 Group does not view the Consensus Approach as a panacea, however. Need analysis procedures have traditionally depended on "professional judgment" applied locally. Although the Consensus Approach would standardize many policies now subject to professional judgment, it is important to recognize that no system will completely eliminate disparate results or the effects of individual institutional "packaging" decisions.

In developing its policy guidelines, the 568 Group has focused on arriving at the "right" approach to determining parental ability to pay without regard to potential cost implications. It can be expected that the adoption of these guidelines could significantly affect parent contributions in the aggregate and, in many cases, expected family contributions will be reduced. The impact of these policy guidelines is likely to vary from institution to institution depending on the school's applicant profile and the extent to which similar adjustments are already included in its need analysis procedures.

Although the 568 Group fully supports the Consensus Approach outlined in this manual, it is important to note that these guidelines can be expected to heighten the difficulties associated with the Federal Methodology (FM), and the College Board's traditional Institutional Methodology (IM), as well as certain institutional changes that have been implemented in recent years. Specifically, both the new IM and certain need analysis modifications adopted unilaterally by individual schools have led to cases in which the institution's family contribution is less than that derived from Federal Methodology, resulting in an over-award which limits or eliminates eligibility for federal funding. In an effort to deal with this problem, the 568 Group's Professional Judgment Guidelines Manual includes a section on the various methods that schools may wish to adopt in order to reconcile differences in results between institutional and federal need analysis.

The 568 Group believes strongly that matters of need analysis, including professional judgment, should be independent of the qualifications or desirability of a particular applicant for an institution. That is, rules should not be interpreted more leniently because an applicant will bring strong academic or athletic ability or other desirable qualities to the campus.

The 568 Group is also concerned about restrictions that federal regulations place on the expenditure of need-based institutional aid funds. The 568 Group believes that the Consensus Approach results in fair parent contribution levels

4

Columbia_00184492

General Context
Possible Income Adjustment
Possible Asset Adjustment
Possible Business Equity Adjustment

and that participating institutions should not be forced to disadvantage students by reducing the amount of institutional aid they may receive or excluding them from subsidized federal loans or work-study.  The 568 Presidents' Group, singularly or in concert with other groups, will support petitions to Congress for relief in this critical area of institutional prerogative.

Finally, it is important to note that the 568 Group views its ongoing efforts as a long-term process.  Many of the policy issues identified in this manual will continue to require further exploration and analysis.   Moreover, we have found that the use of the Consensus Approach continues to present new and unexpected issues and concerns over time.  Likewise, technological advances may also provide opportunities for improving and updating the policy guidelines outlined in this manual.  Responding to these concerns will require the regular attention of the Group's Need Analysis Council and a ongoing training efforts for participants.

## Introduction - The Consensus Approach to Need Analysis

The 568 Presidents' 568 Group institutions have agreed on a series of common need analysis standards designed to be included in a Consensus Approach Need Analysis Methodology.  The participating institutions believe that this approach, when applied in a consistent manner, serves to diminish or eliminate the divergent results that continue to threaten the long-standing tradition of awarding aid on the basis of need.  It is important to note that the efforts of the 568 Group are restricted to policies that affect first-year awards only.  The issue of school-to-school inconsistencies applies primarily to first-year students and the 568 Group believes that it is necessary for financial aid officers to retain as much flexibility as possible in dealing with their already-enrolled students.  Although, these guidelines apply primarily to first-year students, it is understood that some institutions, will, for purposes of internal consistency, apply this approach to both first- year and upper-class students, while others may phase it in one class at a time.

 The Consensus Methodology begins with the understanding that the College Board's Institutional Methodology (IM) is an appropriate base for institutional need analysis and provides an appropriate platform for further work.  Consequently, the 568 Group has focused on those aspects of the existing IM that are most often subject to local interpretation or professional judgment.  The desire to serve the "greater good" rather than individual institutional needs and capabilities requires compromise in some areas, but the 568 Group believes that the resulting methodology remains true to both the institutional and professional principles that undergird its cooperative efforts. By developing policy guidelines that attempt to set the "right" policy without regard to the cost implications, the

5

Columbia_00184493

General Context
Possible Income Adjustment
Possible Asset Adjustment
Possible Business Equity Adjustment

568 Group's guidelines serve to reduce expected parent contributions in the aggregate. All 568 Group schools are free to deal with institutional resource issues through their packaging policies.

Although the 568 Group has sought, where possible, to err on the side of simplicity, many need analysis issues do not lend themselves to a simplified process. Matters relating to divorced and separated parents and the analysis of small business enterprises are two such examples. The 568 Group believes, however, that its collective interest in achieving a fair and equitable result requires the added complexity associated with the policy guidelines in these and other particularly complicated areas. Additionally, the 568 Group believes that IM, as amended by the Consensus Methodology, encourages savings for college and recognizes that a family's ability to pay is largely a function of: a) its financial strength and b) the number of children to be educated. In the area of discouraging asset manipulation, our policy guidelines seek to address this problem, but more work must be done in this difficult area.

The Policy Guidelines and this Manual are divided into three sections: Part I --- Need Analysis and Professional Judgment Issues; Part II --- Management and Process Issues; and Part III --- Recommendations for Future Work.

## Part I --- Need Analysis and Professional Judgment Issues

At the core of the need analysis system is an accepted methodology for treating each element that goes into determining a family's ability to pay. The 568 Group has examined the following specific and important areas and recommended a common standard to deal with each.

### A. Divorced/Separated/Single Parent

**Current IM Treatment:** Until the development of the 568 Group method for the analysis of Divorced/Separated parents, there was no consistent way of evaluating the financial need of students whose biological parents are not married to each other. In response to the process built by the 568 Group, Subsequent to the 568 Group's first attempt at standardization, the College Board introduced an online Non-Custodial Parent Profile and a corresponding Non-Custodial Parent Need analysis, which, the 568 Group adopted in 2005. The process presumes that institutions attempt to secure data from both parents in order to determine what is a reasonable contribution from each; of course, this effort is not always successful. The process is often made more complex because of the re-marriage of one or both biological parents. In addition, Federal Methodology (FM) completely excludes non-custodial data.

**568 Technical Committee Guidelines:** Analysis begins with the custodial family unit.Additional information is sought concerning the non-custodial family unit. In the

6

Columbia_00184494

General Context
Possible Income Adjustment
Possible Asset Adjustment
Possible Business Equity Adjustment

case of re-marriage of either or both biological parents, the standard approach would be to request the cooperation of and information from all parents and spouses. Generally, a contribution from the income and assets of no more than two parents will be expected. Institutions can exercise judgment to use information from more than two parents.

**Rationale:**

- Having a consensus on policy and procedure for calculating parental support will reduce significant variances in measuring need among institutions.
- As with students whose parents are married to one another, **ability** to pay, not **willingness**, should be used to determine the expected parent contribution.
- Parents divorce one another, not the child.

### A. Data Collection:

Collect information for both the custodial and non-custodial parent household. This information should include documents such as the CSS PROFILE/Institutional Aid Form, the Non-Custodial PROFILE, and the most recent tax year 1040 and W-2 forms for **both** custodial and non-custodial parents.

### B. Determining Which Parent(s) to Be Used in Analysis

Use both biological parents whenever possible as the basis of the need analysis unless:

    a. The institution chooses to use a higher FM contribution from the custodial family rather than using the calculated lower 568 Group contribution from the biological parents. When the resulting parent contribution (from the biological/adoptive parents) is lower than the federal parent contribution derived using FM, the FM result could be used in place of the resultant 568 Group contribution.

    b. Information from the non-custodial parent is waived via the Non-custodial Parent Waiver process (see C, below)

### C. The Non-custodial Parent Waiver Process

Information may be waived using the Consensus Approach ***Non-custodial Parent Waiver Petition*** or other appropriate documentation from the non-custodial parent in any of the following circumstances:

- When there is documentation of physical or emotional abuse. Acceptable documentation could include a police report, restraining order, or supervised visitation in the divorce decree.
- When there is documentation that the non-custodial parent is disabled and receiving benefits.
- When the non-custodial parent is receiving public assistance.
- When the non-custodial parent is incarcerated.
- When the step-parent has legally adopted the student.

7

General Context
Possible Income Adjustment
Possible Asset Adjustment
Possible Business Equity Adjustment

• When the divorce is over 7 years old and there is evidence of no-contact/no child support/parent is uninvolved. In most cases, a 3rd party confirmation letter should be required.
• When the divorce is less than 7 years old and the student provides additional information to support a claim of "abandonment" by the non-custodial parent.
• When there is no known second biological parent.

NOTE: The Technical committee recommends that the **Non-custodial Parent Waiver Petition** be made available only if requested and not offered as a part of the initial aid application, or as a readily available WEB form.

**Professional Judgment Circumstances:**

The Technical Committee understands that there may be problems trying to apply the above **general procedures** to each individual family's situation. The Technical Committee, therefore, recommends that the following Professional Judgment Circumstances recommendations, be used, when appropriate, to supplement those detailed in Section B of Data Collection as detailed above

.

After collecting a ***Non-custodial Parent Waiver Petition,*** information may be waived in the following circumstances:

When the non-custodial parent is unemployed; in this case only a one-year waiver should be granted.

When the custodial parent is remarried for at least 5 years and there is information provided by the family to support the fact that the stepparent has acted as the "real" parent of record.

**D. Assessing Parent Contributions/Treatment**

1. Neither parent is remarried
    The custodial parent household size includes all household members; the non-custodial household includes the parent, the student, and any siblings with the same parents as the student.
    If there are siblings living with the non-custodial parent, they should be included in both households for 568 purposes (but not in the custodial household for FM analysis). Other siblings in college should be included in the number in college in both households if they attend schools that expect a contribution from both parents.
2. One or both parent(s) is remarried.
    A full analysis is completed using the income and assets of both the parent and step-parent in the household. Any children of step-parents or half-siblings are included in the household in which they reside, but not in both the custodial and non-custodial households.

8

Columbia_00184496

General Context
Possible Income Adjustment
Possible Asset Adjustment
Possible Business Equity Adjustment

- Once the analysis is complete, the portion of the income earned by the birth parent is determined. This percentage is applied to the contribution from income to determine the income contribution from the birth parent.
- The contribution from assets is divided in half (between the birth parent and stepparent).
- The resulting modified contributions from income and assets are added together to determine the birth parent's contribution (either custodial or non-custodial)
- The custodial and non-custodial contributions are added together to determine the final PC for the household.

3. Professional Judgment Situations/Suggestions
- When 9 months of child support paid for the student is more than the calculated non-custodial PC, use that amount as an "offer" (and take it out of custodial income).
- Use the non-custodial parent offer (if greater than the calculated contribution and reasonable)
- If child support is going to end, remove it as income from the custodial parent and as an offset in the non-custodial calculation in order to maintain consistency in future years • Allow the student/custodial parent to take on the obligation of N/C parent through additional self-help or outside scholarships
- If the divorce is more than 7 years old and the non-custodial parent has been remarried for at least __-years, the non-custodial parent contribution could be reduced or eliminated

## B. Assessment of Rental Property/Other Real Estate

**Prior Treatment**: Federal Methodology (FM) has no special provisions for rental income. Standard Institutional Methodology (IM) eliminates Schedule E losses. Many institutions make professional judgment changes, e.g., adding back rental/real estate depreciation , or falling back on a bottom-line adjustment to the parent contribution (PC) to better reflect what they think the family can afford.

**Consensus Agreement**:

- Add back any rental loss to income.
- Add back rental/real estate depreciation (net of loss) to income.
- Impute rental property value from rental income and/or purchase price and year of purchase.
- Treat purely rental/real estate businesses as real estate assets unless it is the primary source of income for the family.

9

Columbia_00184497

General Context
Possible Income Adjustment
Possible Asset Adjustment
Possible Business Equity Adjustment

• Multi-family real estate – Determine the percentage of the families' residence and include appropriate value/debt under the home. The remaining value/debt will be included under other real estate.

**Rationale**: Rental property depreciation, while allowable for income tax purposes, is a paper loss that distorts a family's real income. To the extent that other components of the methodology (e.g., a cap on home value) are linked to income, the methodology should use as realistic an income as possible. There should be objective measures to assess rental property value, just as there are with home value, rather than relying solely on family-reported data.
**Issues**: There may be increased document/data collection required, although many schools collect much of it already.
**Implementation/Resolution of Issues:** Schedule E combines rental/real estate and other business income.

### C. Cost of Living Variances

**Prior Treatment**: Institutional Methodology has traditionally used a uniform, basic living expense allowance, with an option to invoke cost-of-living adjustments. Although it is generally recognized that living expenses vary significantly in different geographic areas, the standard calculation does not consider these variations. The current methodology now includes an option developed initially by the 568 Group that allows institutions to adjust the living allowance for applicants from virtually all metropolitan areas.

**Consensus Agreement**: The 568 Group agrees that the cost-of-living adjustment should be a standard element in the Consensus Approach. The 568 Group believesd that the number of locales needed to be expanded and appreciates CSS's cooperation in developing a new expanded Cost of Living Table that incorporates all major metropolitan areas. The 568 Group recognizes that the complexity of gauging the ever changing costs of living in the various metropolitan areas will require an ongoing research effort. The 568 Group looks forward to further cooperation with CSS in that regard.

**Rationale**: While everyone recognizes that living in Manhattan, Kansas, requires less non-discretionary income than living in Manhattan, New York, it is very difficult to draw exact lines for the purpose of defining cost-of-living areas. Where does the high cost of living in NYC stop? Which suburbs are included? While there would be a desire to develop a table that defined cost-of-living areas at the micro level, the 568 Group is aware that, even within a zip code, housing values can differ significantly. Gathering detailed information to define a micro-level table would be extremely difficult and would have questionable long-term reliability.
It is also difficult to deal with the variety of choices that families make. One family might choose to live in an upscale suburb while another family with the

10

Columbia_00184498

General Context
Possible Income Adjustment
Possible Asset Adjustment
Possible Business Equity Adjustment

same income might choose a lower-cost area. Giving one family a higher allowance to account for their decision to enjoy a higher standard of living would be unfair and inappropriate. It is also virtually impossible to distinguish between true cost-of-living issues and standard-of-living differences within metropolitan areas. Again, the common metropolitan area Cost-of-Living Table developed with CSS resolves this problem.

**Issues:**

- Identification of the boundaries of major metropolitan areas within which there is a reasonably uniform cost of living.
- Identification of the appropriate market basket of goods and services to be used to define cost-of-living indices. In particular, state and local taxes, which are allowed separately in both IM and FM, should be excluded.

**Resolution of Issues**: The question of how to adjust the need analysis formula to account for geographical differences in the cost-of-living is complex and the solutions are likely to change over time. Consequently, the 568 Group believes that cost-of-living standards should be reviewed and updated annually. In the short term, the cost-of-living tables now offered by CSS as a PROFILE option shall be used in the Consensus Approach. These tables are based on the Bureau of Labor Statistics Consumer Expenditure Survey (CES), a data source that is used throughout the current IM formula. The tables include metropolitan areas from throughout the country, but do not include the impact of local and state taxes, thereby avoiding an issue that taints other cost-of-living studies.[1] The table shall be used only to increase IPAs, not decrease them. Using the table to decrease IPAs would be unfair to students from cities with lower housing costs because the methodology does not lower IPAs for students from rural areas or cities not covered by the table.

The 568 Group agrees that this issue requires ongoing collaboration with CSS's Financial Aid Standards and Services Advisory Committee. That 568 Group is at work on the cost-of-living issue and the 568 Group looks forward to lending its support to their on-going efforts in this regard. Given the complexity of the issue

---

[1] The 568 Group's initial concern with the CES data was based on the fact that it gives information on expenditures and not the cost of a fixed market basket of goods. Therefore, the CES data presents information on standards of living rather than cost of living. A subsequent review of the CES data focused on the component that describes the cost of housing. This was done because it is clear that housing costs represent the most significant driving force in differential costs of living and because it eliminates the effect of discretionary choices that families make in the purchase of discretionary items such as entertainment, dining out, etc. In addition to developing a cost of living table based on differential housing costs, the 568 Group examined its impact when applied against the entire Income Protection Allowance (IPA) and against only the housing component of the IPA. As one would expect, the differences are quite significant

11

Columbia_00184499

General Context
Possible Income Adjustment
Possible Asset Adjustment
Possible Business Equity Adjustment

and the amount of time that it will take to come to resolution, it is appropriate to expand the number working on the problem.

> **Consensus Agreement**: Adjust the IPA allowance, using CSS tables. Continue to consider whether there is a better approach to the C-O-L yables.

## D. Family and Student Assets

**Prior Treatment**: Student assets are treated separately from parental assets in the current institutional and federal analyses. They are assessed at 20% in both Institutional Methodology (IM) and Federal Methodology (FM). In IM, sibling assets are added to parental assets; the assessment rate is approximately 5% on these joint family assets. Assets in pre-paid tuition and savings plans are treated in Federal Methodology as a direct resource that reduces financial need dollar for dollar.

**Consensus Agreement**: The 568 Group agrees to include student assets and assets held in pre-paid tuition and savings plans in the analysis of family assets.

**Rationale**: This treatment has several advantages over both the IM and FM methodologies. It is consistent with the treatment of sibling assets since they are already added to parental assets in IM. Since it minimizes the assessment rate of student assets, it reduces the incentive to manipulate assets by spending or transferring student assets prior to applying for aid, and avoids penalizing students who have saved substantial amounts from earnings. It is also consistent with new public policy initiatives that encourage families to participate in plans offering pre-paid tuition and/or savings plans.

**Issues**: Several issues need to be resolved:

- The cost of treating student assets at a lower rate of assessment (5% versus 25%) will be significant for many institutions.
- Professional judgment will need to be exercised in cases where this treatment might not be appropriate. An example is the case in which large assets are given to the student by third parties, such as grandparents.
- Since the federal system still assesses student assets at 20%, the 568 Group's agreement may result in federal overawards.

**Implementation/Resolution of Issues**: A broad examination of family assets might result in somewhat higher assessment rates on parental assets. The Need Analysis Council will need to formulate standards of professional judgment to

12

CONFIDENTIAL

Columbia_00184500

General Context
Possible Income Adjustment
Possible Asset Adjustment
Possible Business Equity Adjustment

cover those cases in which assets held in the student's name are to be treated as student resources. Due to the federal issues involved, the 568 Group agrees that the proposal should be placed on future legislative agendas.


### E. Home Equity

**Consensus Agreement**:  Use purchase year and price to impute home equity, subject to a home equity cap equal to 1.2 X total income (as defined by CAM), with professional judgment adjustments in individual cases.

**Background**:  The Congressional decision to remove home equity from the federal formula has been a major factor in the confusion now surrounding need-based aid awards nationally and particularly at the 568 Group institutions.  The absence of home equity in the federal formula has meant that for many families contributions based on the Federal Methodology have often been considerably lower than those calculated via IM.  For reasons relating to both fairness and competition, institutions have begun to vary the manner in which home equity is considered.  At some institutions, these policy changes have been applied across the board.  At others the treatment of home equity has been applied selectively based on the applicant's circumstances or the institutional admissions rating.  (Current IM includes an option to cap home equity at 2 X income.)

The 568 Group believes that home equity can be an important indicator of a family's financial strength and that it should be considered in need analysis.  The current IM option of capping home equity at 3 times income does not sufficiently recognize the fact that home equity is an asset that is less liquid than other forms of assets and less readily available for financing education expenses.  The 568 Group is aware that the family home is both an investment good and a consumption good.  While other assets are held strictly for the appreciation of wealth (an investment good), one's home is also a good from which housing services and other non-pecuniary factors are important considerations (a consumption good). The current methodology ignores the consumption value of the home and treats it strictly as an investment good like any other asset.  Furthermore, housing values have appreciated over time at very different rates in different parts of the country, In these and other cases, the use of the full reported home value may result in an expected PC significantly out of line with the family's income.  For these reasons, and to narrow the divide between the treatment of home equity in the FM and the Consensus Approach the equity of the home shall be capped at 1.2 times income as defined in CAM.  Because many 568 institutions already adjust home

13

Columbia_00184501

General Context
Possible Income Adjustment
Possible Asset Adjustment
Possible Business Equity Adjustment

equity in some fashion, this policy will encourage greater consistency in the treatment of this important asset.

### F. Retirement Allowance

**Consensus Agreement**:  Create a retirement allowance for families not now covered by a formal retirement plan.

**Background**:   Until its recent revision the standard IM treatment of assets included a retirement allowance provision for all families.  This provision was created at a time when most families expected that Social Security would serve as the principal source of retirement income.  The IM retirement allowance was designed to supplement the family's Social Security income during retirement.  Because most families are now covered by formal, privately owned retirement plans not considered in need analysis, CSS determined that the IM retirement allowance was no longer necessary.  It was eliminated and formal educational savings and family emergency savings allowances were added.

The 568 Group recognizes that many families are not covered by formal retirement programs and believes that it is appropriate to provide retirement protection for those without such support.  Such an allowance should be created in consultation with CSS and other experts in the field of retirement planning. Recognizing that this will involve research and would ultimately require CSS to add, questions to the PROFILE, in the interim the current Federal Methodology (FM) asset protection (retirement allowance) tables shall be used on a case-by-case basis..

CSS plans a long-term project in which they will review retirement assets currently held by applicant families.  Although the 568 Group does not necessarily agree with the inclusion of such assets in the need analysis formula, members of the 568 Group are interested in supporting and participating in this project.

### G. Institutional Methodology Taxation Bands

**Consensus Agreement**: No change until further study assesses their impact

**Background**:  Institutional Methodology is a highly progressive formula designed to determine the family's ability to pay through a careful review of their overall financial circumstances.  An Income Protection Allowance (IPA) does not, as is commonly understood, define the amount of money required by individual families to cover their living expenses.  Instead, it

14

CONFIDENTIAL

Columbia_00184502

General Context
Possible Income Adjustment
Possible Asset Adjustment
Possible Business Equity Adjustment

represents the income level below which a family has no discretion about how its income is spent. Parents with incomes at or below the IPA are not asked to make contributions from income to their children's educational costs. Those with higher incomes have more choices about how they spend their income and are expected to use some fraction of their income to pay for their children's education. Because of concerns about the progressivity of the IPA, the new IM recalibrated the lower-income taxation bands and reduces the highest band by one percent. In addition, CSS published new, more liberal, optional assessment rate tables in _____.. The 568 Group endorses use of the new tables.

After a great deal of consideration, the 568 Group concludes that a better understanding of the impact these changes have on the new IM is needed. Given this uncertainty and the additional methodological changes described elsewhere in this manual, it is important to review over time the impact of the revised tables as part of the process of improving the Consensus Approach. Consequently, no additional adjustments are recommended at this time, subject to further study over the next several years.

## H. Number of Siblings in College

**Consensus Agreement:** Adopt the revised Institutional Methodology formula for multiple siblings in college.

**Background**: In recent years the need analysis formula divided the total parent contribution by the number of siblings enrolled in college to derive an expected parent contribution for each sibling. This approach meant that families with children spaced closely together were advantaged when applying for financial aid while families with children born farther apart were penalized. Concerns about the inequity resulted in a restoration of the original rationale in IM that considers the number of children enrolled simultaneously, but instead of dividing by the number in college it reduces the calculated Parent Contribution by 40% for two in college and by 55% if three are enrolled.

A number of institutions ignored this change because they were concerned about the impact that reduced aid eligibility might have on enrollment. After a great deal of consideration, the 568 Group agrees that the current IM treatment of the number of siblings in college shall be included in the Consensus Approach.
Additionally, the Consensus Approach shall include the following policy clarifications:

15

Columbia_00184503

General Context
Possible Income Adjustment
Possible Asset Adjustment
Possible Business Equity Adjustment

A) Siblings enrolled in graduate or professional school shall not be counted as in college (but will be included in household size) unless the family can document that the enrolling institution has determined that the student is dependent for aid purposes and that the parents are paying the assigned parent contribution.

B) The allowance for siblings enrolled at community colleges and other similar low-cost schools should be capped at the amount of their tuition and mandatory fees. (Schools may also want to cap the allowance for siblings at four-year public colleges at their tuition, mandatory fees, room, and board, but there is not consensus on this issue.)

C) If the sibling is receiving a non-need-based scholarship, the allowance should be capped at tuition, fees, room, and board net of the scholarship.

D) Parents shall not be counted as family members in college. If, however, the parent's current job requires course work or they need to be retrained after losing a job, the institution may include as an allowance against income the amount of such unreimbursed tuition.

A related issue is the consideration of previous educational debt the parents may have accumulated when educating other children. This issue is addressed in Paragraph O below.

## I. Elementary and Secondary School Tuition Expenses

**Consensus Agreement**: Employ the Institutional Methodology optional treatment of such expenses.

**Background**: Unlike the Federal Methodology (FM), both the old and new IM formulas offer the option of counting elementary and secondary school expenses. In each case the tuition allowance cap for each sibling is based on a national average of the annual cost of elementary/secondary school tuition. This IM formula option has been made a standard part of the Consensus Approach. Tuition expenses in excess of the cap would generally not be considered.

Although the Federal Methodology ignores elementary and secondary school expenses, most 568 Group-like schools already use the IM formula.

## J. Imputing Assets

**Consensus Agreement:** Use reported interest and dividend income to extrapolate the principal values that generated this income.

16

Columbia_00184504

General Context
Possible Income Adjustment
Possible Asset Adjustment
Possible Business Equity Adjustment

**Background**:  Cash and investment assets reported by both parents and students often fail to correlate with interest and dividend income as reported on federal tax forms.  Historically, institutions have used a variety of formulas to impute the asset holdings implied by the reported income.  The Consensus Approach will use reported interest and dividend income to impute the principal value that would be expected to generate this income. Each year, the 568 Technical Committee will establish a multiplier, based on market results, to be used for this purpose. The multiplier has been 25, based on an assumed 4% return.  The 568 Group has discussed that, in the current interest rate climate, this may be generous, but no decision has been made to modify it.  Also, the Group has discussed the possible use of different multipliers for interest and dividends, but, again, no specific agreement has been made. .(IM includes an option to impute assets.)

## K. Medical Expenses

**Consensus Agreement**: Employ the Institutional Methodology treatment of such expenses.

**Background**.  Unlike the Federal Methodology, which ignores medical expenses , current IM allows unreimbursed medical expenses that exceed 3.5% of IM income.  The current IM treatment of medical expenses shall be included in the Consensus Approach.  In cases of extreme medical expenses, professional judgment guidelines should be applied locally.

## L. One-time Income Adjustments

**Consensus Agreement**:  Exclude certain non-recurring income.

**Background**:  Because the Consensus Approach uses base-year income to estimate a family's ongoing income, it may be appropriate to exclude certain non-recurring income, such as  capital gains (and losses), early withdrawals from pension plans and IRA's, and. rollovers.Most 568-type schools already reduce need analysis income by documenting one-time-only income and  this practice shall be incorporated into the Consensus Approach, with appropriate adjustments to tax allowances.  Specifically not included would be overtime and bonus income unless the parent's employer can document a related change in company policy.

## M. Special Expense Adjustments

**Consensus Agreement**:  Consider the impact of certain non-reoccurring, non-discretionary expenses

17

Columbia_00184505

General Context
Possible Income Adjustment
Possible Asset Adjustment
Possible Business Equity Adjustment

**Background**:  Families often incur one-time only, non-reoccurring expenses that can significantly affect their ability to support educational costs.  These expenses can include costs associated with parental care, funeral expenses, uninsured natural disasters, and extraordinary home repair costs.  As a general rule, for an allowance to be made for an expense , the expense must be both extraordinary (i.e. an expense that most families don't incur) and non-discretionary. In the case of one-time expenses such as weddings and funerals, schools may want to spread the allowance over the student's remaining years, to smooth the impact on PC and to recognize that families often spread these expenses by borrowing. Treatment of such costs varies from campus to campus and contributes to the variability in need analysis results. The Professional Judgment Guidelines Manual includes specific guidelines on how institutions can respond to these expenses.

## N. Family Loan Debt

**Prior Treatment**: Previous educational debt of parents and students is ignored in both Institutional Methodology (IM) and Federal Methodology (FM). The CSS Profile collects some data for information purposes only.  Professional judgment may be exercised in addressing certain situations where such debt affects the ability to contribute, but the treatment is inconsistent across institutions.

**Consensus Agreement**: The 568 Group agrees that the Consensus Approach shall include allowances for documented debt incurred for the higher education expenses of an applicant's siblings and his or her parents.  Allowances for such debt would be made against parental assets and/or income:

1) The outstanding principal balance of any such loans would be allowed against parental assets.
2) Annual payments on such loans would be allowed against income only in those cases where, if the education were not concurrent with the applicant's, an allowance would be made for the current educational expense:

   a) Loans incurred for a sibling's undergraduate schooling
   b) Loans incurred for a parent's higher education if required for the parent's employment or was for job retraining.

3) Annual payments would not be allowed for loans incurred for the applicant, or for the sibling in a program in which he or she is currently enrolled (and whose expenses are therefore considered in the adjustment for multiple siblings in college).

18

Columbia_00184506

General Context
Possible Income Adjustment
Possible Asset Adjustment
Possible Business Equity Adjustment

**Rationale**: Educational debt affects current financial strength. Recognizing prior debt further addresses any previous and legitimate commitments to education by broadening the perspective from a "snap shot" view to a wider one that includes consideration of certain financing expenses incurred by the family. Finally, the financial aid system has become sensitive to the concerns of families with younger children to educate. In fairness, consideration should be given to families who have supported the education of older children and are still in debt as a result.

**Issue**: To what extent can an allowance be incorporated into central processing vs. local professional judgment guidelines?

Implementation/Resolution of Issues: Identify what data would be required in order to incorporate this policy guideline into central processing, and whether such central data collection is feasible.

## P. Definition of Income

Consensus Agreement: Add back all losses (Schedule C, Schedule E, Capital and other losses) to income. If either Schedule C or Schedule E income represents multiple entities, one or more of which has a positive income and one or more of which has a loss, add back the individual losses to income

## Q. Parent Businesses

Background: It is the sense of most financial aid professionals that self-employed families generally have greater financial strength than wage-earning families with the same AGI, and that adding back Schedule C and Schedule E losses is not generally sufficient to achieve horizontal equities among these families. While no consensus has been attempted to address this concern, Appendix A provides extensive suggestions for reviewing tax returns for Schedule C and Schedule E enterprises.

## R. Parental Unemployment

Background: The standard IM and CA approach is to use the most recent completed calendar year (base-year) data in constructing parental This raises .the issue of how to construct income and otherwise deal with cases where a parent has become unemployed, or otherwise projects a significant decline in income from the base year level, since base-year income is not a reflection of the parents' ability to contribute in these cases. Most schools follow up for additional information, including the parents' projection of income for the following year. However, it was apparent to the 568 Group that there was

19

CONFIDENTIAL

Columbia_00184507

General Context
Possible Income Adjustment
Possible Asset Adjustment
Possible Business Equity Adjustment

inconsistency in how income was constructed once the additional information was received.  In order to attempt to bring about greater consistency among the 568 schools in these cases, the Technical Committee developed a prototype Employment Information/Projected Year Income follow-up document, and recommended a standard approach.  We recognize that parents who are unemployed are likely to present the worst-case scenario when projecting income, and feel that a floor is needed to recognize this fact.

Consensus Agreement: For the parent who is unemployed, assume that the period of unemployment will last for four months, and that the parent will be reemployed at 80% of their previous salary.  (Of course, we would always use the parent's projected earnings, if higher than the calculated floor.)  Appropriate unemployment benefits should be built in for the assumed period of unemployment.  Other income elements (e.g. the other parent's wages) should be built in at the base-year level unless the parents' projection indicates a significant (and explained) change.  Appropriate adjustments should be made to tax allowances (US, state/local, FICA).

Note: after the economy went into recession in 2008, it became clear that unemployment was of longer duration than before, and we agreed to change the income floor assumptions to 6 months of unemployment and reemployment at 60% of the previous earnings level.  As the nation slowly emerges from recession, these assumptions will have to be revisited.:

Process: Most schools indicated that they follow up for an income update at the end of the first calendar year in the academic year.  Some schools package a non-disbursable grant for the Spring term, pending review of the income update.  In some cases, schools will not finalize the Spring aid until they receive tax documents for the projected year.  There was no attempt to reach consensus on these processes, since they occur subsequent to the students; matriculation decisions.

## S. International Students

Background: While most of the 568 schools used the College Board's Certification of Finances to collect information about the financial circumstances of international aid applicants, there was very little rationale or consistency in how family contributions were determined.  It was clear that simply plugging the data for these students into the standard IM/CA calculation was inappropriate, since infrastructural allowances and tables did not reflect the very different levels of income required for maintenance in the various foreign countries, and therefore did not accurately reflect how much of the family income and assets could be reasonably considered discretionary and available toward educational expenses.  Some schools attempted to determine a PC by subtracting reported expenses from reported income.  Parent offers were frequently used.

20

Columbia_00184508

General Context
Possible Income Adjustment
Possible Asset Adjustment
Possible Business Equity Adjustment

A Global Spreadsheet was developed by Daniel Barkowitz of MIT, Bob Donaghey of Dartmouth, Kate Gentile of Amherst, and Caesar Storlazzi of Yale, using CIA data on individual countries GNP's to serve as a reasonable basis for adjusting IM tables.

The 568 Group adopted the Global Spreadsheet, and the College Board thereafter incorporated it into their processing.

## Part II --- Management and Process Issues

The maintenance and management of a new common standard of need analysis requires a number of specific agreements related to processing.

### A. Tax Form Collection

**Consensus Agreement**: Collect all of the most recent tax and W-2 forms from all applicants.

**Background**: Application requirements for first-year students can vary considerably from institution to institution. Most 568 Group institutions require families to submit their most recent tax forms (all pages and all schedules) before releasing financial aid resources for account payments. As a general policy, the 568 Group calls for participating institutions to require families to submit their most recent tax forms (personal and, where appropriate, corporate) and all W-2 forms before first-year aid awards are prepared. If families have not completed their most recent year tax forms when applications are due, these forms should be submitted no later than May 1 of the application year. In the interim, the families should submit their tax documents from the prior year.

Where a delay in the award preparation for families with uncomplicated financial circumstances would disadvantage both the family and the institution, exceptions can be made consistent with circumstances outlined in the Professional Judgment Guidelines Manual.

### B. Professional Judgment Guidelines Manual

**Consensus Agreement**: Create a Professional Judgment Guidelines Manual that borrows heavily from the current CSS manual with modifications as appropriate

**Background**: the 568 Group recognizes that locally applied professional judgment is a critical component of need analysis. The PJ Manual will

21

Columbia_00184509

General Context
Possible Income Adjustment
Possible Asset Adjustment
Possible Business Equity Adjustment

standardize both those issues that should be treated locally and, to the extent possible, the manner in which such issues are handled.

Rather than reinvent the proverbial wheel, the tried-and-true professional judgment advisories prepared by the CSS and others are used where appropriate. These will be modified where appropriate and others will be added as needed.

Finally, the issue of training is critical to the success of the Consensus Approach. Staff members, especially new hires, must be trained in the use of this new approach to determining family ability to pay. Time and resources should be devoted to both in-house and 568 Group activities.

## Part III --- Organization and Participation

Maintaining a Consensus Approach to Need Analysis: The implementation and maintenance of the Consensus Approach Methodology is an on-going process that requires regular input from participating institutions. Accordingly, the 568 Presidents' 568 Group is organized under a Memorandum of Understanding (See Appendix I) which calls for the presidential appointment of institutional representatives to a Need Analysis Council of financial aid experts. In support of this effort, the Need Analysis Council shall appoint a Technical Committee responsible for managing and, where appropriate, updating the Consensus Approach.

**Federal Methodology Concerns:** Current regulations specify that an award containing federal Title IV funds (Federal Work-Study, Perkins, SEOG, and subsidized Directloans), must not exceed the eligibility established through Federal Methodology (FM) and use of the Consensus Approach is likely to increase the number of such cases. Current approaches to the problem vary. Some schools default to the higher federal contribution while others use the lower institutional contribution and package institutional grant and unsubsidized federal loan. Still others use the lower institutional level and package institutional grant, subsidized institutional loan, and institutional work.

The 568 Group supports efforts for legislative relief in this critical area. If the Consensus Approach produces fair contribution levels, students should not be disadvantaged, either in the amount of aid that they receive, or by excluding their eligibility for subsidized federal loans or Work-Study.

22

Columbia_00184510

General Context
Possible Income Adjustment
Possible Asset Adjustment
Possible Business Equity Adjustment

# APPENDICES

## APPENDIX A

### SCHEDULE C CHECKLIST

- Top line: Name of proprietor
  - Look at name to determine ownership (mother or father) to ensure that income from work is reported correctly on FAFSA/Profile.

- Line A: Type of Business
  - Look at business type to assist in making decisions about add-backs for certain business expenses. For example, we will make different allowances for cars and truck expenses and depreciation based upon the type of business. See depreciation instructions below for guidance.

- Line E: Business Address
  - Look at this line to determine if same as home address. If yes, check Line 30 and add back as untaxed income for IM. Also check line 20b for a rent deduction and then Form 1040 schedule E to determine if a portion of the home is being rented to the business. How should the value of the business portion of the home be treated?

- Line 1: Gross Receipts
  - Look at scale of business. Is it full-time or part-time? Is it the primary business for individual? Come up with a good description of how to review this. What do we do with small hobby type businesses? If net profit > $0 then add back gross profit from line 5.

- Line 9: Car and Truck Expense
  - Add back 100% as IM untaxed income unless a specialized vehicle is required for business, at which point add back at 25%. Plumbers, Carpenters, Electricians etc. will receive the 25% treatment. Attorneys, accountants, real estate brokers will receive 100% add back treatment.

23

Columbia_00184511

General Context
Possible Income Adjustment
Possible Asset Adjustment
Possible Business Equity Adjustment

- Line 12: Depletion
  - An expense that you are allowed to claim when you are selling an intangible or a natural resource (i.e. patent/copyright, mineral rights, oil well)/ Always add back at 100% as IM untaxed income.

- Line 13: Depreciation
  - An expense for the cost of assets used in a trade or business. Look at page 2 of form 4562 to determine if any depreciation is from a vehicle, at which point use Car & Truck expense logic for add back. Otherwise allow depreciation.

- Line 16 a/b: Interest
  - If blank, assume no business debt. If >0, then impute at 10X for projected business debt. Compare to Profile.

- Line 20a: Rent or Lease (Vehicles, etc)
  - If >0, it will almost always be a vehicle lease - refer to Car & Truck logic for add back. Be aware that this line may contain expenses for equipment leases. Explain at meeting.

- Line 20b: Rent or Lease (Other Business Property)
  - If > 0 check to see if rent is being paid to the family for use of a portion of their personal residence. If yes, add back rent as other untaxed income and disregard any income or loss from related rental activity reported on Schedule E.

- Line 24: Travel, meals, and entertainment
  - Ignore.

- Line 26: Wages: Do we need to review this line?

- Line 27: Other expenses: How should we treat specific other expenses deducted here such as cell phone, ISP, dry-cleaning, car expenses, … Discussion point.

- Line 30: Business use at home
  - Add back at 100%

- A note on Business Value
  - The majority of these businesses are worth almost nothing. The exception might be licensed practitioners such as MDs, Dentists, lawyers, etc who might have practices with customer bases. If you are concerned that the business value has been incorrectly reported you may wish to request a detailed depreciation report to help assess value of business assets.

24

CONFIDENTIAL

Columbia_00184512

General Context
Possible Income Adjustment
Possible Asset Adjustment
Possible Business Equity Adjustment

## SCHEDULE D CHECKLIST

- Line 10: Total long term sales price amounts
  - This amount represents actual cash received by family and should be compared to assets reported on FAFSA/Profile and any major discrepancies should be resolved.

- Short-Term Capital Gains and Losses
  - If there are just a few transactions here treat total sales price in column D of line 3 as potential family asset amount. If there is a lot of activity here request the consolidated brokerage statement(s) and IRS form 1099-B for all accounts as of 12/31 of the prior year. Tie in box 2 of the 1099-B to the total stock proceeds reported in column D of lines 3 and 10 of Schedule D.

25

General Context
Possible Income Adjustment
Possible Asset Adjustment
Possible Business Equity Adjustment

## SCHEDULE E CHECKLIST

PAGE 1
- Line 1: Description of Property
  - This will provide clues to asset value and income potential based on location, and type/size of property.

- Line 3: Rents Received
  - Typically rental income may not tie to value of property.  Discuss with group concept of multiplier.

- Line 6:  Auto and Travel
  - People can visit their rental property twice a year.  Discuss 50% add back if rental property is also vacation property.

- Line 12:  Mortgage interest paid to banks
  - Project other real estate debt using 12X (8%) multiplier and compare to FAFSA/Profile.

- Line 20:  Depreciation
  - Add back 100% but don't double count when there is a rental loss. On appeal consider subtracting principle paid from add back.

PAGE 2
- Line 28, Columns a & b: Name and Type of business
  - If there is an entry on this line we must collect and review the related business tax return, either Partnership or S-Corp, depending on 28b coding.  Request a copy of the complete business return with balance sheet and all K-1s.

- To calculate total income add the following lines:
  Line 30 for partnerships, sub-s corporations and LLC's.
  Line 35 for estates and trusts.
  Line 39 - if a positive number
  Line 40 - if a positive number
Sum of above = total income
If line 41 > $0 add back difference between total income and line 41 as untaxed.  If line 41 <$0 add back total income amount.
- How will we treat individual business entities?  Will we allow losses to offset income?

- Part V: Summary
  - This section is for form 4835 (special farm crop or animal rentals) and for summarizing all activity reported in the previous sections. An entry for form 4835 indicates the presence of farm assets.

26

Columbia_00184514

General Context
Possible Income Adjustment
Possible Asset Adjustment
Possible Business Equity Adjustment

## 1065 & K-1 CHECKLIST

- Review K-1, Part II Line L: Partner's share of profit, loss and capital
  - Use to determine what percentage of each you partner owns. The percentages as of the end of the year will control how much of the various items this partner will report on their return.

- Lines A & B: Principal business activity/product/service
  - Review question A for type of business and B for products and services.

- Line E: Date business started
  - Review to see how long the business has been in operation. Use for potential asset appreciation estimates

- Line F: Total Assets
  - Ignore as it reports assets at original costs and does not take any liabilities into account.

- Line 1a: Gross Receipts
  - Review line 1a for size of business - size may relate to potential value.

- Line 4: Ordinary income (loss) from other partnerships, estates, and trusts
  - If entries here it indicates that this partnership has an interest in another business. Request appropriate K-1's to determine if you need a copy of the related business return.

- Line 5: Net farm profit (loss)
  - If an entry here the partnership is engaged in farming and there may be significant assets present.

- Line 7: Other income
  - If an entry here, then review attached statement to determine type of income. In most cases it will be for interest income earned on savings, CD's, or notes receivable. Tie to corresponding asset on the balance sheet.

- Line 13: Rent
  - If there is an entry here it *typically* indicates that the business rents its office space and does not own a building. If there is no entry here stay alert for land and buildings on the balance sheet.

- Line 15: Interest

27

Columbia_00184515

General Context
Possible Income Adjustment
Possible Asset Adjustment
Possible Business Equity Adjustment

- o If there is a deduction for interest you should expect to see a corresponding debt amount on the balance sheet. If there is no entry here we would expect that there to be no debt on the balance sheet.

- Line 16: Depreciation
  - o Review related form 4562 for types and amounts of depreciation. Add back only vehicle depreciation at the same percentage as family ownership.
  - o If there are questions about the reported value of the assets request a detailed depreciation report from family. This detailed report lists each asset by date, type, description and cost.

- Line 17: Depletion
  - o Add back at same % of ownership.
  - o If there is an entry for depletion the partnership will have some intangible assets. These may be organizational costs - with little or no value or they may be patents, copyrights, oil wells, timber stands, etc that have significant value. The presence of an entry on this line should trigger an interest on your part to determine what is being depleted.

- Line 20: Other deductions - Same discussion about these as for schedule C.

- Review K-1, Part II Line L: Partner's share of profit, loss and capital
  - o Were there any changes from the beginning to end of year? This typically indicates a sale or purchase of a portion of the partnership by this partner. What was the cash effect to the family for this? If they acquired more of the partnership where did the cash come from - if they sold some of their interest where did the cash go?

- Review K-1, Part II Line N: Partner's capital account analysis
  - o Review to determine capital contributed and capital withdrawn during the year. Capital contributed is the second line of this analysis and capital withdrawn is the fourth line. Capital contributed is a use of resources by the family and capital withdrawn is a receipt of cash or property by the family. Line 4 - withdrawals and distributions should agree with what is shown on lines 19A and 19B in Part III of the K-1. How should we handle I

  - o Remember that partners' capital account balances rarely represent the actual fair market value of the partnership. These capital accounts are mathematical calculations designed to track capital contributed, earned and withdrawn by each partner. The partners'

28

Columbia_00184516

General Context
Possible Income Adjustment
Possible Asset Adjustment
Possible Business Equity Adjustment

capital accounts do not rise or fall based on the changes in the fair market value of the partnerships assets.

- Review K-1, Part III, Line 14 - Self-employment earnings (loss)
  - If this is a positive amount it is considered "earned income" for federal methodology. If it is a negative amount it has been used to offset any other positive self-employment earnings but it has not reduced any earned amounts reported on a W-2.

- Schedule L: Balance Sheet
  - Assets, liabilities and partners' capital accounts. The assets - good things - are shown on lines 1 through 13 and totaled on line 14. The liabilities - bad things - are shown on lines 15 through 20 and the partners' capital accounts are shown on line 21 and are then totaled on line 22. Accounting theory requires that the asset number shown on line 14 equal the liabilities and capital number shown on line 22. Hence the term "balance sheet." Note that schedule L actually contains two balance sheets - columns (a) and (b) are as of the first day of the tax year and columns (c) and (d) are as of the last. These dates are typically 1/1/XX and 12/31/XX.
  - The entire balance sheet may be reviewed to assist in determining family cash flow as well as the value of the business. While the balance sheet is helpful it is not intended to provide us with the current market value of the partnerships' assets.

- Schedule L, Lines 3 - 13
  - Use to determine if there are assets recorded on these lines at a figure that does not correspond with their current market value. Remember that assets are recorded on the balance sheet at their original cost - not their current value. Make appropriate adjustments.
  - If there is an entry on both lines 11 (land) and line 9a (buildings …) be alert for the presence of appreciated real estate.
  - Line 9a: Represents the original cost of real and personal property used in the business.
  - Line 10a: Represents the cost of assets we may deplete such as copyrights, timber rights, mineral rights, etc. These may have significant value in excess of what is recorded on the balance sheet.
  - Line 11 may indicate the presence of appreciated land, if it is the only entry.
  - Line 12 is for intangible assets such as organizational costs, refinancing charges, etc. These assets typically have no current market value and should be subtracted from the total asset value.

29

CONFIDENTIAL

Columbia_00184517

General Context
Possible Income Adjustment
Possible Asset Adjustment
Possible Business Equity Adjustment

- Schedule L, Lines 15-20
  - Reports the current value of the liabilities. The sum of these lines should be subtracted from the current market value of the assets to determine the net value. The net value would then be multiplied by the ending ownership percentages of all of the family members as shown on their 1065 K-1 forms Part II question L to arrive at a value for both parent and/or students for FM and IM purposes.

30

Columbia_00184518

General Context
Possible Income Adjustment
Possible Asset Adjustment
Possible Business Equity Adjustment

## 1120S CHECKLIST

- Review the following questions for a basic understanding of the business:
  - Name and address of business
  - Fiscal or calendar year - see entry just above name and address.  If other than calendar year wages paid and compensation of officers may not agree with amounts reported on W-2's.
  - Question D - date incorporated
  - Question G - number of shareholders = # of 1120S K-1's you should have
  - Page 2 Schedule B - Question 2 - What does the business do?
  - Page 2 Schedule B - Question 3 - If answered yes then request related tax return(s)
  - Review page 1 line 1a to determine business gross income

- Line 7: Compensation of officers
  - This is typically compensation for the parents - tie to W-2's on 1040.  See note above for fiscal year companies.

- Line 14: Depreciation - Form 4562
  - There should be assets on the balance sheet.  If vehicle depreciation present then add back amounts for family members per schedule C guidelines.

- Line 19: Other deductions
  - Review for agreed upon expenses and add back for family members per schedule C guidelines.

- Review Schedule L,  Balance sheet, Line 7: Loans to shareholders
  - If there is an entry in columns b or d determine if any is for parents and/or student.  Any amounts on this line allocated to the family represent either a source or use of family resources.  An increase in the loan amount to our family equals a non-taxable receipt of cash.  A decrease indicates a non-deductible use of cash.

- Review Schedule L, Line 10a: Buildings and other depreciable assets
  - Review for magnitude of the original cost (not FMV) of assets being depreciated in the business.

- Review Schedule L, Line 12 - Land
  - If there is an entry here **and** an entry on line 10a then consider that the company owns a land and building.  Determine potential FMV by adding lines 10a and 12 together to get total original cost.  Refer

31

Columbia_00184519

General Context
Possible Income Adjustment
Possible Asset Adjustment
Possible Business Equity Adjustment

back to date incorporated on page 1 question D and multiply total original cost by institutionally computed appreciation factor to obtain potential FMV.

- Review Schedule L, Line 19, Columns b & d: Loans from shareholders
  - If an entry here determine if any is from your family.  If so, an increase in their amount equals a non-taxable receipt of cash by the family and a decrease equals a non-deductible use of family cash. The ending balance for your family in 19d is equal to the asset to be reported on FAFSA and PROFILE.

- Business equity – to calculate business value subtract total liabilities on lines 16 – 21 from the total fair market value of the assets to arrive at net value.  Multiply net value by family ownership % to determine business value for FAFSA and Profile.

**11/28/12**

32

Columbia_00184520