**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ANDREW CORZO, SIA HENRY, ALEXANDER LEO-GUERRA, MICHAEL MAERLANDER, BRANDON PIYEVSKY, BENJAMIN SHUMATE, BRITTANY TATIANA WEAVER, and CAMERON WILLIAMS, individually and on behalf of all others similarly situated,** | ) ) ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **vs.** | ) ) | **Case No. 22 C 125** |
| **BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, THE JOHNS HOPKINS UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY,** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Former undergraduate students have brought this putative class action against various private universities, alleging that they violated section 1 of the Sherman Act, 15 U.S.C. § 1, by conspiring to suppress competition on financial aid. The universities

have moved for summary judgment on the merits and on the statute of limitations.  The students have moved for partial summary judgment on the University of Pennsylvania's (UPenn) withdrawal defense.  For the reasons below, the Court denies both motions.

## Background

This case is the second of its kind.  In 1958, the eight Ivy League schools[1] and the Massachusetts Institute of Technology (MIT) formed the "Ivy Overlap Group." *United States v. Brown Univ.*, 5 F.3d 658, 662 (3d Cir. 1993).  That group agreed not to award merit-based financial aid, instead committing to awarding financial aid solely based on demonstrated financial need.  *Id.*  The Ivy Overlap Group members also agreed to share financial aid information with one another and to jointly develop and apply a common method for assessing expected family contribution (EFC)—the amount a school assumes that a student's family can contribute and a core determinant in calculating financial need.  *Id.*  Lastly, to mitigate discrepancies in financial aid calculation, the Ivy Overlap Group agreed to meet once a year to jointly determine EFCs for commonly admitted students.  *Id.* at 663.

In 1991, the Department of Justice Antitrust Division brought a civil antitrust enforcement action against the Ivy Overlap Group, alleging that the schools' agreement violated section 1 of the Sherman Anti-Trust Act, 15 U.S.C. § 1, by suppressing competition among the schools in the prices offered to students receiving financial aid.  Verified Compl. ¶ 25, *United States v. Brown Univ.*, 805 F. Supp. 288 (E.D. Pa. 1992) (No. 91 C 3274).  That lawsuit ultimately ended in a consent decree that limited

---

[1] The Ivy League comprises the following schools:  Brown University, Columbia University, Cornell University, Dartmouth College, Harvard University, the University of Pennsylvania, Princeton University, and Yale University.

collusion on financial aid.

In 1994, Congress enacted a temporary antitrust exemption—the 568 Exemption—that permitted some agreements regarding financial aid between "2 or more institutions of higher education at which all students admitted are admitted on a need-blind basis."  Improving America's Schools Act of 1994, Pub. L. No. 103-382, § 568(a), 108 Stat. 3518, 4060 (1994).  Specifically, the 568 Exemption permitted agreements:

> (1) to award such students financial aid only on the basis of demonstrated financial need for such aid; (2) to use common principles of analysis for determining the need of such students for financial aid [subject to independent professional judgment]; (3) to use a common aid application form for need-based financial aid . . . ; and (4) to exchange through an independent third party, before awarding need-based financial aid . . . , [information about students' financial need].

*Id.*

In 1998, a group of colleges and universities, including the defendant universities in this case, formed the 568 Presidents Group, named after the 568 Exemption.  This lawsuit centers around that group's activities.

In 2000, the 568 Group created a "Common Standards Subcommittee" to consider "whether it is possible to reach agreement on common standards for determining financial need at the institutional level consistent with the Statement of Principles for need-based financial aid and as permitted by Section 568."  Defs.' Mot. for Summ. J., Ex. 377 (Subcommittee Report) at 5.[2]  The 568 Group specifically asked the Common Standards Subcommittee to "address the principal issues that give rise to

---

[2] Pincites for exhibits are based on ECF pagination.  Pincites for briefs are based on the page numbers in the briefs.

divergent need calculations" and "arrive at reasonable compromises in the areas where

[six agreed-upon financial aid] principles may conflict."  *Id.*  Those agreed-upon

principles, which the Court will refer to as the Core Principles, were:

1. To the extent they are able, parents and students have the primary responsibility to contribute to educational expenses before an institution awards financial aid.
2. Families should contribute to educational expenses according to their ability.  Those with similar financial profiles should contribute similar amounts.
3. Institutions should evaluate both income and assets as part of the assessment of the parents' and applicants' ability to pay.
4. Each institution should inform applicants about the policies and practices it applies when measuring a family's ability to pay, carry out its policies consistently throughout a student's eligibility, and support the awarding of need-based aid.
5. An institution that allocates any financial assistance that is not based exclusively on need should inform all prospective applicants of the standards it applies in allocating that aid.
6. The exercise of "professional judgment" by financial aid officers in assessing a family's ability to pay should recognize unique or extenuating financial circumstances in individual cases; such professional judgment is not the proper mechanism for systematically treating groups of students differently in order to advance institutional objectives.

*Id.*

In 2001, the Common Standards Subcommittee published a report proposing a

"Consensus Approach to Need Analysis" that the subcommittee believed would

"eliminate much of the [recent] variance in need analysis."  *Id.* at 3–4.  According to the

report, the Common Standards Subcommittee took the College Board's Institutional

Methodology (IM) as its "starting point" and "focused on those aspects of the current IM

that are most often subject to local interpretation or professional judgment."  *Id.* at 6.

The result was a set of common standards for "fifteen specific and important areas" in

"determining a family's ability to pay," the Consensus Methodology (CM).  *Id.* at 6–10.

Some recommendations simply adopted the IM.  *See id.* at 9 (recommending that

4

the 568 Group use the IM's treatment for extrapolating assets and accounting for medical expenses). But others provided additional or different guidance. Of those, some recommendations were relatively straightforward. For example, the report recommended that "student assets and assets held in college savings programs and pre-payment tuition plans [should generally] be treated as family assets." *Id.* at 7. Some were virtually formulaic, subject to limited exceptions. *Id.* ("Count home equity capped at 2.4 times income minus mortgage debt with professional judgement [sic] adjustments in individual cases."). Others were open-ended or more complex. *See id.* at 9 ("Consider the impact of certain non-reoccurring, non-discretionary expenses. . . . Recognize educational debt under certain circumstances."); *see also id.* at 6 (providing more complex recommendations regarding divorced families and business and real estate).

The report also proposed future tasks for the 568 Group. One proposal was to appoint a "Need Analysis Committee to review and revise [the CM] as appropriate." *Id.* at 10. Another was to create a "Professional Judgment Guidelines Manual." *Id.* Regarding that suggestion, the report recognized that "locally applied professional judgment is a critical component of need analysis" that the manual should not "eliminate or restrict." *Id.* Instead, the manual would "standardize both those issues that should be treated locally and, to the extent possible, the manner in which such issues are handled." *Id.* Lastly, the report proposed testing a "data exchange program as permitted by the MIT Settlement Standards of Conduct." *Id.*

The 568 Group followed through on many of the report's recommendations. It adopted a revised version of the CM, developed Professional Judgment Guidelines, and

created a "Technical Committee" to review and revise both sets of standards.  Defs.' Resp. to Pls.' Stat. of Facts ¶ 7.[3]  As for information sharing, some 568 Group members— and all but one of the defendant universities—were also members of the Consortium on Financing Higher Education (COFHE), a separate organization that predated the 568 Group and shared admissions and financial aid data from its member schools in the form of "colorbooks."  Pls.' Resp. to Defs.' Stat. of Facts ¶¶ 112–15.

In a letter to financial aid directors, the chairman of the 568 Group Common Standards Subcommittee stated:

> Each of the 568 Group institutions has made a commitment to the [six] financial aid principles adopted by the 568 Presidents' Group . . . and to the implementation of the need analysis policies and procedures first published [in the 2001 report] and revised with your help in the ensuing months.

Pls.' Resp. to Defs.' Mot. for Summ. J., Ex. 117 (Implementation Letter) at 2.  The letter summarized nineteen policies for "determining financial need" that "participating institutions agree[d] to."  *Id.* at 2–3.  The letter also said that the aid directors were "responsible for . . . implementing the currently agreed upon Consensus Approach need analysis methodology," starting with "the cohort of students applying to enter college in the fall of 2003."  *Id.* at 2–3.  It further cautioned that although professional judgment was "a critical element" of the Consensus Approach, "the goal of consistent results requires that variations . . . beyond those detailed in the[] guidelines[] should be the exception[] rather than the rule."  *Id.* at 2.

An attached document clarified that the agreement was "limited to following the formula for parent and student contribution results."  *Id.* at 4.  Financial aid packaging—

---

[3] Unless otherwise specified, citations to the parties' statements of facts refer to those submitted in response to the universities' motion for summary judgment.

the combination of work-study, loan, grants, or other forms of aid a school offers to meet a student's financial need—was "a separate matter altogether." *Id.* The attached document stated that "[t]here [could not] be agreement ahead of time" on how to package financial aid and that financial aid offices could not "consult with other aid offices on individual cases before or after the aid decision is delivered to a student." *Id.*

Meanwhile, Congress tasked the Government Accountability Office (GAO) to determine "whether the [568] Exemption resulted in changes in the amount students and their families would pay for college." Defs.' Mot. for Summ. J., Ex. 408 (2006 GAO Report) at 9. In 2006, GAO published its conclusion: the "schools' use of the consensus approach did not have a significant impact on affordability." *Id.* at 12.

In its report, GAO reviewed the history of the Overlap Group lawsuit, the creation of the 568 Exemption, the formation of the 568 Group, and the group's development of a "common methodology for assessing financial need . . . called the consensus approach." *Id.* at 3. The report also noted that "[b]y the 2004–2005 school year, 25 of 28 schools in the [568] group were using the consensus approach," but it acknowledged that "[s]chools' implementation of the approach varied, . . . with officials from 12 of the 25 schools reporting that they partially implemented it." *Id.*

Nearly ninety pages of the report described the data GAO used, the statistical and econometric methodologies GAO applied, and its results. In those ninety pages, GAO recognized various limitations of its study, including ten pages worth of comments from the 568 Group, which consisted mostly of concerns about methodology and data collection. One noteworthy limitation that GAO acknowledged was that it had "data for only one year after implementation" and that therefore it was "possible that some

eventual effects of the consensus approach may not be captured." *Id.* at 13.

Over the next sixteen years, the 568 Group continued to collaborate on common financial aid principles and practices, with Congress renewing the 568 Exemption several times during that period. The 568 Group's composition changed over the years, with its members—including some of the defendant universities—periodically leaving and joining the group. Pls.' Resp. to Defs.' Stat. of Facts ¶ 66. The 568 Group publicly disclosed its membership, the Core Principles, and at least part of the CM. *See id.* ¶¶ 72, 94. Much of that information was available on the 568 Group's website, where the group asserted that it "work[ed] together in an effort to maintain a need-based financial aid system that is understandable and fair and will bring greater clarity, simplicity, and equity to the process of assessing each family's ability to pay for college." Defs.' Mot. for Summ. J., Ex. 419 at 3.

On January 9, 2022, the students initiated this lawsuit, alleging that the 568 Group violated section 1 of the Sherman Act by engaging in a "price-fixing cartel that is designed to reduce or eliminate financial aid as a locus of competition, and that in fact has artificially inflated the net price of attendance for students receiving financial aid." Compl. ¶¶ 1, 4.

On October 1, 2022, Congress declined to renew the 568 Exemption. Just over a month later, the 568 Group formally dissolved.

## Discussion

Summary judgment is appropriate if there is "no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986) (quoting Fed. R. Civ. P. 56(c)). In other words,

a court may grant summary judgment if a jury could not reasonably find for the nonmovant based on the evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252 (1986).

The party seeking summary judgment bears the initial burden of showing that there is no genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the movant has met this burden, the "party that bears the ultimate burden at trial must show that there is evidence creating a genuine issue of material fact." *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000) (citing *Celotex*, 477 U.S. at 323–25).

## A. Antitrust violation

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1.

Read literally, section 1 "could be understood to [outlaw] every conceivable agreement." *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 189 (2010) (citing *Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 688 (1978)). But that is not what the statute means. *Id.* The Supreme Court has long recognized that "Congress could not have intended a literal interpretation of the word 'every.'" *Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 342–43 (1982) (citing *United States v. Joint Traffic Ass'n*, 171 U.S. 505 (1898)). Instead, for over a century, the Court has understood section 1 to outlaw only those restraints that *unreasonably* restrain trade. *Ohio v. Am. Express Co.*, 585 U.S. 529, 540 (2018); *see Standard Oil Co. of N.J. v. United States*, 221 U.S. 1, 59–60 (1911). A restraint unreasonably restrains trade if it "may suppress or even destroy competition." *Pro. Eng'rs*, 435 U.S. at 691.

Section 4 of the Clayton Act provides a private cause of action to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws."  15 U.S.C. § 15(a).  Thus in a private suit like this one, the plaintiffs "must show more than a conspiracy in violation of the antitrust laws; they must show an injury to them resulting from the illegal conduct."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Putting these principles together, the students must show:  "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade . . . ; and (3) an accompanying injury."  *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012) (quoting *Denny's Marina, Inc. v. Renfro Prods., Inc.*, 8 F.3d 1217, 1220 (7th Cir. 1993)).

### 1. Agreement

"The meaning of the term 'contract, combination . . . or conspiracy' is informed by the basic distinction in the Sherman Act between concerted and independent action . . . ."  *Am. Needle*, 560 U.S. at 190 (cleaned up).  "Section 1 applies only to *concerted action* that restrains trade."  *Id.* (emphasis added).  Put differently, section 1 does not reach unilateral action; it requires an agreement.  *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984).

The universities devote much of their briefing to arguing that the students "cannot prove the 'agreement' element."  Defs.' Mem. in Supp. of Mot. for Summ. J. at 2.  They do not dispute that they were part of the 568 Group and collaborated on common financial aid practices, including the Core Principles, the CM, and the Professional Judgment Guidelines.  They instead contend that the students cannot show the

agreement alleged in the complaint: an overarching conspiracy to artificially inflate the net price of attendance.

The problem with this argument is that it shifts the goalposts away from what the agreement element requires. An agreement that suppresses competition violates section 1, regardless of its form or purpose. *Am. Tobacco Co. v. United States*, 328 U.S. 781, 809 (1946). In other words, section 1 does not require any particular kind of agreement to trigger antitrust scrutiny; it distinguishes only between agreements that harm competition and those that do not. And importantly, the existence of an agreement is "different from and antecedent to the question whether it unreasonably restrains trade." *See Am. Needle*, 560 U.S. at 186; *see also* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1400b (5th ed. 2025) ("In the antitrust universe, the existence of an agreement must always be considered separately from the question of legality."). As a result, the students do not need to prove an overarching price-fixing conspiracy to satisfy the agreement element, they simply need to show that there was an agreement. *Cf. Always Towing & Recovery, Inc. v. City of Milwaukee*, 2 F.4th 695, 704 (7th Cir. 2021) (holding that the existence of a contract established agreement but not a resulting unreasonable restraint of trade).

Of course, there are conceptual boundaries to what constitutes an agreement. But as a leading antitrust treatise observes, section 1 can reach "even a vague understanding between competitors on a common course of action" or "[c]ollective decision making without . . . implementation." Areeda, *supra*, ¶ 1404. And even a mutual understanding to exchange information may constitute a section 1 violation if it has an anticompetitive effect. *See United States v. Container Corp. of Am.*, 393 U.S.

11

333, 335 (1969).

Viewed in that light, a jury reasonably could find that the agreement element is satisfied.  At a minimum, it is undisputed that all the universities were members of the 568 Group and collaborated on devising common financial aid practices, which they all at least partially implemented.  Defs.' Resp. to Pls.' Stat. of Facts ¶ 2; Defs.' Mot. for Summ. J., Ex. 2.1 at Fig. 8.  That alone is enough concerted action to trigger further antitrust scrutiny.

Moreover, there is enough evidence in the record for a jury reasonably to find that the 568 Group agreed on the Consensus Approach to avoid bidding wars and then adhered to it.  The 2001 subcommittee report stated that the Consensus Approach would "eliminate much of the [recent] variance in need analysis."  Subcommittee Report at 3–4.  Similarly, a November 2000 memorandum from Dartmouth's then-Director of Financial Aid said that one purpose of the Consensus Methodology was to "[a]void bidding wars," and it expressed concerns about other competitors not "sign[ing] on." *See* Pls.' Resp. to Defs.' Mot. for Summ. J., Ex. 158 at 3–4.

Those same concerns show up in Vanderbilt's internal communications in 2014 regarding the 568 Exemption.  Vanderbilt's Vice Provost for Enrollment at the time recommended pushing for the 568 Exemption's renewal "to avoid bidding wars between schools" and warned that its expiration "would cause instability in the marketplace" and "could . . . force[] [schools] into a bidding war for students, using need-based aid as a major tool."  *Id.*, Ex. 369 at 4.  The Chancellor agreed.  *Id.* at 3.

The record also contains evidence that the 568 Group members felt obligated to follow the Consensus Approach, at least to some degree.  The letter from the chairman

12

of the 568 Group Common Standards Subcommittee told aid directors that they were responsible for implementing the Consensus Approach.  The 2006 GAO Report shows that the universities followed through on that message, finding that twenty-five of the twenty-eight schools in the group used the Consensus Approach the following year.  GAO Report at 3.

There are also several statements by 568 Group institutions indicating that they believed the Consensus Approach restricted their financial aid analysis and that following the approach was a condition of remaining in the 568 Group.  In 2014, one 568 Group member stated:

> I think it was made clear to those wanting to participate in 568 that they could NOT use an EFC that was lower than what is calculated using the [Consensus Approach], unless they had documented the case using "professional judgment."  That was why HYP felt the need to leave the group; they wanted to offer more "need-based" scholarship aid.  Maybe this is not the document to explain that nuance but it is a reality.

Pls.' Resp. to Defs.' Mot for Summ. J., Ex. 88 at 2.  Similarly, in 2016, MIT's Dean of Admissions wrote, "When Harvard, Princeton, Yale, and Stanford started making their more serious financial aid enhancements, they had to leave the group . . . .  We may or may not be asked to leave if we adopt some similar enhancements."  *Id.*, Ex. 205 at 3; *see also id.*, Ex. 41 at 2 ("I thought at Georgetown we could say such an endowment would allow us to be more generous in our aid calculation (no more 568 Group!) . . . ."); *id.*, Ex. 57 at 7 ("[Penn should] [w]eigh the tradeoffs of 568 Group membership[,] *e.g.*, Harvard, Yale and Princeton are not members and therefore can adopt different methods to calculate parental contribution[.]"); *id.*, Ex. 58 at 5 (noting that "Harvard and Princeton never joined" the 568 Group "because they did not want to limit the usage of their funds").

Some statements further allude to a price floor.  For example, in an email chain from 2002, one 568 Group member asked, "Presumably, as are [sic] using CA as the 'floor' . . . , we are still in compliance with the agreement, at least in theory.  Do I have this right?"  *Id.*, Ex. 60 at 3.  The response confirmed that understanding, stating, "What we are trying to eliminate is the downside adjustments that lead to real confusion."  *Id.* at 2.  Another letter echoed that belief in 2008, asserting that "the core Consensus Approach agreement established a 'floor' approach that could be breeched [sic] only in cases involving locally applied individual case based professional judgment."  *Id.*, Ex. 62 at 2.  The letter also expressed concern that the 568 Group "must have a common methodology that serves as [its] base line" for it to "have meaning and a viable future."  *Id.* at 3.

In sum, a jury reasonably could find that the 568 Group created the Consensus Approach at least in part to avoid bidding wars, that members were expected or required to adhere to the approach, and that they did in fact partially implement it.  This would be sufficient to satisfy the agreement element.

## 2.    Unreasonable restraint of trade

As discussed above, section 1 prohibits an agreement only if it unreasonably restrains trade.  That inquiry "is confined to a consideration of impact on competitive conditions."  *Pro. Eng'rs*, 435 U.S. at 690.  In other words, "[t]he true test of legality is whether the restraint . . . promotes competition or . . . may suppress or even destroy competition."  *Id.* at 691.

### i.    Mode of analysis

The default test for assessing whether an agreement is anticompetitive is the rule

of reason, which entails a "fact-specific assessment of 'market power and market structure . . . to assess the [agreement's] actual effect' on competition." *Am. Express*, 585 U.S. at 541. Under that framework, the plaintiffs bear the initial burden to show that the agreement harms competition in some way. *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 96 (2021). The defendants may respond with countervailing procompetitive justifications for the agreement. *Agnew*, 683 F.3d at 335–36.

But not all agreements call for the same analytical framework. Some agreements are so obviously anticompetitive that a court can condemn them as "unlawful *per se*" without an inquiry into the agreements' actual effect on the market. *Alston*, 594 U.S. at 89. A departure from the rule of reason, however, "must be based upon demonstrable economic effect rather than . . . upon formalistic line drawing." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 887 (2007) (internal quotations omitted). *Per se* treatment is therefore appropriate only when the courts have "amassed 'considerable experience with the type of restraint at issue' and 'can predict with confidence that it would be invalidated in all or almost all instances.'" *Alston*, 594 U.S. at 89.

For other agreements, "an observer with even a rudimentary understanding of economics could conclude that the[y] would have an anticompetitive effect . . . but there are nonetheless reasons to examine potential procompetitive justifications." *Agnew*, 683 F.3d at 336. These agreements should not be condemned *per se* but can be assessed with a "quick look," which typically entails shifting the initial burden to the defendants to rebut the presumption that the agreement is anticompetitive. *Id*. If the defendants meet that burden, a full rule of reason analysis may be necessary. *Id*.

Ultimately, all of these frameworks "are meant to answer the same question": whether the agreement suppresses or promotes competition. *Id.* at 335.

The parties dispute which mode of analysis should apply to this case. The students argue that this case involves a horizontal price-fixing agreement between competitors that justifies *per se* treatment or, at a minimum, shifting the burden to the universities under the "quick look" framework. The universities contend that a full rule of reason analysis is required.

The Court agrees with the universities that the agreement in this case cannot be condemned under the *per se* rule. To the best of the Court's knowledge, this is only the second time that any court has assessed an antitrust challenge to an agreement on college financial aid. And in the only other case to consider a similar agreement, the Third Circuit held that the *per se* rule was inappropriate. *Brown Univ.*, 5 F.3d at 670. It instead applied a "quick look" analysis and, after the defendants offered the same procompetitive justifications as the universities claim here, determined that a full rule of reason inquiry was appropriate. *Id.* at 671–78.

The lack of judicial experience with the higher education market at the very least cautions strongly against *per se* classification, *see Alston*, 594 U.S. at 89, but it might not preclude *per se* condemnation for a naked price-fixing agreement between competitors. *See Maricopa*, 349–51 (rejecting the argument that the *per se* rule is inapplicable to a price-fixing agreement merely because it is claimed to be procompetitive in a new industry). On the other hand, "[n]ot all arrangements among actual or potential competitors that have an impact on price are *per se* violations of the Sherman Act or even unreasonable restraints." *Broad. Music, Inc. v. Columbia Broad.*

*Sys., Inc.*, 441 U.S. 1, 23 (1979). And "even price fixing by agreement between competitors . . . [is] governed by the rule of reason . . . if the challenged practice when adopted could reasonably have been believed to promote 'enterprise and productivity.'" *In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1011 (7th Cir. 2012).

Acknowledging those limits takes this agreement out of the purview of *per se* analysis. The challenged agreement does not fix prices or components of pricing. Nor does it set a pricing formula. The students argue that the agreement ultimately has the effect of fixing a component of pricing, but that is not obvious from the face of the agreement. *See Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 340 n.10 (2d Cir. 2008) (Sotomayor, J., concurring) ("When empirical analysis is required to determine a challenged restraint's net competitive effect, neither a *per se* nor a quick-look approach is appropriate."). To the contrary, three aspects of the agreement caution against condemning it without an investigation into its actual effects.

First, it is not obvious whether or how the agreed-upon principles and practices affected competition. Some aspects of the agreement may have even promoted competition. For example, the 2016 version of the Consensus Approach deviated from the Institutional Methodology—the standard methodology in the industry for assessing financial need—by encouraging cost of living variances. That adds another variable which the 568 Group members could use to compete with one another and which, as a practical reality, likely would not otherwise exist.

Second, a jury reasonably could find that the 568 Group did not agree on other aspects of pricing, such as packaging or list prices, or enforce any other aspects of the agreement. If so, the 568 Group's members could easily circumvent any price-fixing

effects from the challenged agreement. That further undermines the *per se* rule's assumption that the agreement's inherent "anticompetitive potential" means that a full-blown rule of reason analysis will likely be "wholly fruitless." *See Maricopa*, 457 U.S. at 351.

Third, the universities could have adopted the Consensus Approach for purposes other than suppressing competition in the higher-education market. For example, as the Third Circuit recognized in the Overlap Group case, a commitment to need-based aid might enable universities to more evenly allocate financial aid to those students who otherwise would be unable to afford the cost of attendance. The universities also suggest that the 568 Group created efficiencies in financial aid that fostered competition. To be clear, the students have sufficient evidence to support a reasonable inference that the universities adopted the agreement at least in part to suppress competition. *See supra*, Part 1; *cf. Matsushita*, 475 U.S. at 596 (requiring a showing that the inference of an illegal agreement is reasonable in light of competing inferences). But a reasonable inference is not a certainty. To the extent that the agreement may have been motivated by purposes other than fixing prices, that possibility further cautions against reflexively condemning an already ambiguous agreement without analyzing its actual effect on competition. *See Broad. Music*, 441 U.S. at 19 (noting that purpose is relevant for whether to apply *per se* analysis because "it tends to show effect"). *See generally* Areeda, *supra*, ¶ 1506 (cautioning that intent is not a substitute for analyzing effects on competition).

In sum, the agreement in this case is distinguishable from obviously anticompetitive price-fixing arrangements. The agreement here is one on general

standards—short of a formula—that arguably but do not obviously narrow decisionmaking on a single aspect of pricing that can be undone by decisions regarding other aspects of pricing. To the best of the Court's knowledge, no court has applied the *per se* rule to another agreement with a similarly attenuated relationship to price fixing. Mindful of the Supreme Court's repeated warnings that the *per se* rule must be based on real experience with a type of restraint, the Court concludes that the *per se* rule is inappropriate in this case.

With that established, the Court need not resolve whether the students or the universities bear the initial burden of showing how the agreement affects competition and instead goes on to assess the question of anticompetitive effect directly.

### ii. Anticompetitive effect

Discerning how an agreement affects competition is no easy task. Harm to competition usually manifests as a detrimental effect on the market, such as a "reduction of output, . . . increase in price, or deterioration in quality of goods or services." *Brown*, 5 F.3d at 668. But because the market is subject to a plethora of confounding variables, it takes more to infer that those effects are a product of the challenged agreement rather than some other market force. *See id.*; Areeda, *supra*, ¶ 1503a.

As a result, an antitrust plaintiff must show as a threshold matter that the defendants have enough market power to ignore competitive pressures, *e.g.*, by profitably raising prices above the competitive level. *See Agnew*, 683 F.3d at 335; Areeda, *supra*, ¶ 501. That in turn requires a plaintiff to define at least the rough contours of a relevant market—that is, to identify which other products are "reasonably

interchangeable by consumers for the same purposes" and therefore exert meaningful competitive constraints on the defendants. *Sharif Pharm., Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 916 (7th Cir. 2020) (quoting *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956)). A properly defined market identifies which products are similar enough (the product market) and close enough (the geographic market) to compete with one another. *See id.* at 917. If the market is properly defined, then showing that the defendants control a substantial portion of that market supports an inference of market power. *See generally* Areeda, *supra*, ¶ 532.

A plaintiff may meet its burden without evidence of detrimental effects if it can produce strong proof of market power by precisely defining a relevant market and showing that the defendants have a monopoly market share. *See Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 737 (7th Cir. 2004); *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986) (stating that market power is a surrogate for detrimental effects). Put differently, a plaintiff armed with evidence of actual detrimental effects on the market has more leeway in defining the market and showing market power.

To summarize, a plaintiff has two ways to meet its initial burden to show that an agreement harms competition. One is to provide evidence of the rough contours of a relevant market, the defendant's market power, and the detrimental effects of the assertion of that power. The other is to provide a precise market definition and enough market power to presume harm to the market.

In this case, the students choose the first method and rely on their expert, Dr. Singer, to define the relevant market, calculate the defendants' market shares, and

provide evidence of anticompetitive effects.  The universities challenge Singer's findings at each step, arguing that they are unreliable or fail to satisfy the students' burden.  The universities advanced similar arguments in their motion to exclude Singer's testimony as inadmissible under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).  The Court has denied that motion, and much of the reasoning in that opinion applies equally here.

That said, an expert's opinion may be admissible under *Daubert* but still not enough to create a genuine dispute of material fact.  Thus the Court addresses the universities' challenges to Singer's findings to the extent necessary to determine whether the students have met their burden at summary judgment.

The students define the relevant market as twenty-two "elite, private universities whose average rankings in the *U.S. News & World Report* [USNWR] put them in the top 25 for universities during the Class Period."  Pls.' Resp. to Defs.' Mot. for Summ. J. at 29.  The parties seem to agree that the geographic market is nationwide.  They instead dispute whether the relevant market extends beyond the elite, private universities identified by the students to, for example, highly ranked public universities or liberal arts colleges.

To support their market definition, the students rely on two main kinds of evidence.  First, they rely on Singer's regression analyzing the effect of 568 Group membership on the universities' "effective institutional prices" (EIPs), which Singer defines as the "cost of attendance minus institutional need-based grants and scholarships."  Pls.' Resp. to Defs.' Mot. for Summ. J., Ex. 14 (Singer Report) ¶ 7.  That regression model analyzed data from "clean" periods when the universities were not

formally part of the 568 Group and treated them as benchmark prices. Based on those benchmarks, the model predicted what the prevailing prices would have been without the challenged agreement. It then compared that prediction to the actual prices charged while the universities were formally 568 Group members. To isolate the effect of 568 Group membership, the model accounted for confounding variables that might affect price, including expressly accounting for macroeconomic trends; the COVID-19 pandemic; and characteristics of students, universities, and academic years.

After accounting for some adjustments proposed by the universities' rebuttal experts, Singer observed that the universities charged, on average, $1,202 more per student per year when they were members of the 568 Group than they otherwise would have. The students characterize Singer's regression as a modified version of the "Hypothetical Monopolist test" (HMT), which the Seventh Circuit has endorsed as a method to define a relevant geographic market in the healthcare context. The universities argue that Singer's regression is not an adequate substitute for a standard HMT and is "incapable of defining the relevant market." Defs.' Reply in Supp. of Mot. for Summ. J. at 19.

The HMT test asks whether a hypothetical monopolist in a candidate market could maximize its profits by raising prices above competitive levels. *See FTC v. Advoc. Health Care Network*, 841 F.3d 460, 468 (7th Cir. 2016); Areeda, *supra*, ¶ 536. If it could, then the candidate market is a relevant market; the hypothetical monopolist's success implies that there are not enough reasonably interchangeable products outside the market for consumers to switch to. *Advoc. Health Care*, 841 F.3d at 468. "But if customers would defeat the attempted price increase by buying from outside the

[candidate market], it is not a relevant market; the test should be rerun using a larger candidate [market]." *Id.* Though the Seventh Circuit has only expressly endorsed the use of HMTs regarding geographic markets in the healthcare industry, the same concept applies to product markets and other contexts. *See* Areeda, *supra*, ¶ 536.

The universities argue that Singer's regression does not serve the same functions as an HMT because it neither "analyze[s] how students would react if [the universities] raised prices" nor performs any "statistical test of cross-elasticity of demand," *i.e.*, product interchangeability. Defs.' Mem. in Supp. of Mot. for Summ. J. at 36.

For purposes of summary judgment, the Court disagrees. Singer's regression observes that the universities in fact inflated their prices while in the 568 Group over a two-decade period. According to Singer, his regressions show "that a not-so hypothetical collection of universities exercised market power . . . in the form of significant artificial price inflation." Singer Report ¶ 80. The universities do not elaborate on why that interpretation is unreasonable. A jury reasonably could infer from that evidence that the students could not defeat the price increase because products outside the candidate market were not sufficiently interchangeable.

To be sure, there are other possible explanations for the observed price increase that complicate whether it can be used to help define the market. For example, the price increase might have gone unchecked simply because it did not hit the point at which competitive pressures would have kicked in. Or perhaps the price increase was not price maximizing but nonetheless continued because the universities did not realize that it was unprofitable or did not seek to maximize their profits.

23

On the other hand, if one assumes that the universities charged close to the prevailing price when they were not in the 568 Group, then the inflated price during their membership likely was supracompetitive. And if one assumes that the universities aimed to maximize profits and were reasonably competent at doing so, then the fact that they maintained an average overcharge over two decades suggests that the overcharge was in fact price-maximizing.

These assumptions are not inherently unreasonable. In fact, such assumptions are often part of standard HMTs too. Standard HMTs often treat prices predating the challenged conduct as benchmark, prevailing prices. *See* U.S. Dep't of Just. & Fed. Trade Comm'n, Merger Guidelines, 42 (2023), https://www.justice.gov/d9/2023-12/2023%20Merger%20Guidelines.pdf. And in doing so, they assume that the firms in the market are profit maximizing—charging the most profitable prices under the competitive conditions at the time.

Recognizing the risk that a price increase might occur for reasons besides anticompetitive conduct, standard HMTs require that the hypothetical price increase be a "small but significant and nontransitory increase in price" (SSNIP). Areeda, *supra*, ¶ 536; *see Advoc. Health Care*, 841 F.3d at 465. An insignificant or transitory price increase is more likely to reflect a competitive market moving toward equilibrium. Areeda, *supra*, ¶ 537. In contrast, a significant and lasting increase in price is more likely to be truly supracompetitive and indicative of market power. *Id.* In other words, the more significant and lasting the price increase, the more reliably it suggests a relevant market and market power. With this function in mind, significance is a matter of degree. *Id.* A standard HMT typically looks for a 5% increase in total price, but different

market characteristics might justify different significance thresholds.  *Id.*  For example, in an industry with low profit margins, a substantially smaller significance level might be appropriate.  *Id.*

Singer does not say how significant the observed price inflation was in terms of a percentage of total price.  He instead states that the price inflation was "economically and statistically significant, meaning [it was] non-trivial in magnitude and highly unlikely due to random chance."  Singer Report ¶ 286.  He further quantifies the statistical significance, stating that "there is less than a one percent probability that the Challenged Conduct had no effect on Effective Institutional Price given such large conduct coefficients."  *Id.* ¶ 249.  But Singer conspicuously does not do the same with economic significance, despite stating in his rebuttal report that in this case "economic significance is equally if not more important than statistical significance."  Pls.' Resp. to Defs. Mot. for Summ. J., Ex. 32 (Singer Rebuttal), ¶ 88.  *See generally* ABA, Proving Antitrust Damages:  Legal and Economic Issues, § II.6.C.5.c (3rd ed. 2017) ("[H]ypothesis tests . . . represent statistical statements about both the estimated coefficient *and* the precision with which it is estimated, not purely economic statements about the size of the measured effect.").  Singer does, however, note in a later footnote that the average predicted EIP was $39,728.  That means that the observed increase of $1,202 was roughly 3%.

That is lower than the presumptive 5% benchmark, but the universities have not challenged Singer's regression on this basis.  Additionally, three factors suggest that the 3% number understates the proposed market's power.  First, Singer's regression analyzes a smaller market—just the seventeen defendant universities—than the market

25

the students ultimately proposed.  The larger proposed market of twenty-two elite, private universities, if united, likely would be able to impose a larger price increase.

Second, Singer's regression assumes that the universities' prices are not affected by the 568 Group's existence when they are not formal members of the group. In other words, it treats those prices as the prices that would have prevailed if the 568 Group did not exist at all.  But as Singer points out, those prices too might be artificially inflated under the umbrella effect—which observes that a price-fixing cartel's existence can distort the market, causing even non-members to set higher prices than what would have otherwise prevailed—or lingering effects of 568 Group membership on a former member's pricing.

Third, the universities' profit margins are low.  In fact, one of the universities' own experts, Terry Long, finds that each defendant university operates its undergraduate program at a deficit.  That is a double-edged sword.  On the one hand, it might suggest that the universities do not aim to maximize their profits or charge competitive prices, undermining the assumptions necessary to infer the existence of a relevant market from an observed price increase.  On the other hand, if one accepts the premise that the universities are profit maximizing—a reasonable explanation for why they would increase prices—the lower profit margins suggest that even a 3% increase in price can imply the existence of a relevant market.  And because the students have produced evidence suggesting that the universities did compete with one another on price and sought to avoid competition, a jury reasonably could choose the latter inference.

Moreover, the students do not rest their market definition solely on Singer's regression.  They also provide his analysis of the so-called *Brown Shoe* factors—

26

practical indicia that help define the relevant market.  *See Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).  Singer claims that four factors support the students' market definition.

First, Singer points to industry recognition, asserting that USNWR "is considered the premier ranking institution for U.S. schools."  Singer Report ¶ 82.  According to Singer, the fact that the twenty-two elite, private universities have been ranked consistently in the top 25 suggests that they are a separate market, "perceived to be the best route to achieving social status and promoting one's employment prospects."  *Id.* Second, Singer points out that the elite, private universities "charge significantly higher prices for their product relative to all public universities and to many other private universities."  *Id.* ¶ 83.

Third, Singer argues that the elite, private universities recognize one another as their primary competitors.  He supports this claim in part through record evidence.  For example, he cites an internal document from Dartmouth comparing Dartmouth to a list of twenty-seven "peer institutions."  Pls.' Resp. to Defs.' Mot. for Summ. J., Ex. 34 at 2. That document states that the list "is based on the top 20 National Universities in the US News and World Report ranking" and "should be updated based on the most recent top 20 institutions."  *Id.*  The document describes the additional seven institutions as "Comparable Institutions" which "should be reviewed regularly to make sure they are still comparable."  *Id.*  A Vanderbilt internal document similarly compares Vanderbilt's undergraduate tuition to the rest of the "Private USN&WR Top 25."  *Id.*, Ex. 40 at 5.

Singer also performed a peer analysis to show empirically that the elite, private universities consider themselves as a separate market.  He surveyed two sets of data

where 373 universities self-reported whom they considered as peers. Based on that data, he analyzed the universities' peer / reverse-peer ratio—how many peers a university listed as compared to how often that university was listed by another as a peer. Singer asserts that the lower peer / reverse-peer ratio is a proxy for quality, noting that Harvard's ratio was 0.11.

Singer found that the elite, private universities had, on average, a peer / reverse-peer ratio of 0.52. By contrast, the ten highest USNWR-ranked universities outside of the elite, private universities had an average ratio of 0.77, and the top ten liberal arts colleges had an average of 0.62. Adding either other group, or both groups, to the proposed market of elite, private universities, increased the peer / reverse-peer ratio. According to Singer, this "reinforce[s] the conclusion that the different groups of institutions are viewed as belonging to separate markets." Singer Report ¶ 90.

Singer also analyzed a market / non-market odds ratio—how often a group of schools listed one another as peers versus listing out-of-group schools as peers—as a measurement for how "self-contained a market is in terms of peer recognition." *Id.* ¶ 91. Singer found that the elite, private universities had significantly higher odds ratios than a grouping that added the other ten highest ranked universities, the top ten liberal arts colleges, or both.

Fourth, Singer analyzed student preferences with two tests: a comparison of how far each school's student body traveled to attend and a "revealed preferences" test analyzing how students chose between multiple schools they were admitted to. His geographic test calculated how far students traveled on average to attend schools and, to account for the fact that some schools are closer to more densely populated areas,

compared that average to a hypothetical average if the school had a perfectly nationwide reach. A ratio of those averages closer to 1 indicated a nationwide student body, whereas a lower ratio indicated a more regional student body. That test showed that students traveled much farther, on average, for the elite, private universities (actual average distance of 757, ratio of 0.72) than for the other ten highest ranked universities (actual average distance of 352, ratio of 0.30). But the top ten liberal arts colleges (actual average distance of 814, ratio of 0.67) more closely resembled the elite, private universities.

Singer's revealed preferences analysis found that within the group of elite, private universities, a university's win rate roughly correlated with its USNWR average. He also compiled a revealed preferences ranking that added the other ten highest ranked universities, the top ten liberal arts colleges, or both. In general, the elite, private universities had stronger win rates. And proportionally, expanding the market did not significantly change the overall distribution of win rates. For example, the top eighteen schools were still elite, private universities even after adding the top ten liberal arts colleges. According to Singer, his geographic and revealed preferences analyses demonstrate that the elite, private universities have distinct characteristics and customers, two other *Brown Shoe* factors.

The universities raise a host of objections to Singer's *Brown Shoe* analysis, but none are persuasive enough to prevent a jury from reasonably accepting his conclusion. Their arguments fall into three main buckets. First, the universities argue that the cutoff USNWR ranking of top 25, as opposed to some other number, "is wholly arbitrary." Defs.' Mem. in Supp. of Mot. for Summ. J. at 38–39. In the abstract, that might be true

(though unhelpful, since the law requires that *some* line be drawn).  But the whole point of Singer's analysis is to show that the market definition is not arbitrary.  The universities cannot rebut his showing without explaining why his analysis is wrong.

Second, the universities point out that schools compete in multiple dimensions that are not captured by the USNWR or the elite, private university market. For example, students interested in performing arts might prioritize different schools than students interested in engineering.  Or students in California might prioritize different schools than students in Georgia or Texas.  For those students, the area of effective competition is not the elite, private university market but instead the top performing arts or engineering schools, or the top schools in California, Georgia, or Texas.

This argument suggests the existence of smaller markets, but it does not disprove the existence of the elite, private university market as a relevant market.  To show that there is not an elite, private university market, the universities cannot merely point out that individual consumers, or sets of consumers, view their options differently. That is true of most if not all markets.  The antitrust laws, however, are concerned with aggregates.  The universities must therefore show that consumers, as an aggregate population, do not view the elite, private universities as a separate market.

In that light, the students' proposed market is supported by a few intuitive propositions.  The first is that prestige matters.  The most prestigious schools compete primarily against one another, not with less prestigious schools.  Next, liberal arts colleges differ from universities.  Ranking authorities often place them in different categories entirely.  Liberal arts colleges do not have the same focus on research—an important consideration for many students—and often focus relatively narrowly on

liberal arts. Lastly, public universities differ from private universities. Some public universities may be just as prestigious as the elite, private universities, but they compete primarily within a smaller, more regional, market by subsidizing tuition for in-state residents. Additionally, public universities often offer different experiences from private universities, with larger class sizes and less tightly knit alumni networks.

The universities' third set of arguments challenges Singer's interpretations of several of his findings, contending that they in fact contradict his proposed market. For example, they argue that Singer's revealed preferences analysis "shows that cross-admitted students preferred many schools outside his proposed product market." *Id.* at 37. Specifically, the universities point to three public universities—UCLA, UC Berkeley, and University of Michigan—that had a higher win-rate than thirteen elite, private universities, and five liberal arts colleges—Pomona, Williams, Swarthmore, Bowdoin, and Amherst—that had a higher win-rate than two elite, private universities. Similarly, the universities point out that some highly ranked public universities and/or liberal arts colleges had similar costs of attendance and public endowments to the elite, private universities.

To be sure, some of Singer's studies, viewed in isolation, raise some questions about his market definition. For example, Singer's peer analysis assumes that the elite, private universities are a distinct group and that if the market is any bigger, it must encompass all ten of the other highest-ranked universities or all ten of the top liberal arts colleges. But if the data were disaggregated and listed purely in order of the peer / reverse-peer ratio, the result would be a very mixed distribution of elite, private universities and the other schools. UC Berkeley and Amherst, for example, have a ratio

much closer to most of the elite, private universities than Notre Dame does.  Similarly, the revealed preference rankings show that UCLA, UC Berkeley, and the University of Michigan have similar win-rates to a majority of elite, private universities, whereas Emory and Carnegie—considered as part of the market—are relative outliers. Additionally, some metrics show that the elite, private universities are similar to their out-of-market counterparts.  The geographic test shows that liberal arts colleges command a similarly nationwide reach.

Considering all of the metrics together, however, shows that schools that appear to be in the market for one reason may be excluded for another reason.  For example, the geographic test suggests that liberal arts colleges are similar to elite, private universities, but those colleges are almost universally lower by Singer's prestige metrics.  On the flip side, Singer's prestige metrics leave only a few reasonable contenders for schools that should be included in the market.  The ones with the best claims are UCLA, UC Berkeley, the University of Virginia, the University of Michigan, and USC, all of which have some combination of meeting the USNWR top-25 cutoff, strong peer / reverse-peer ratios, and relatively high win-rates.  The geographic test, however, indicates that these schools have less nationwide reach.[4]

As a result, a jury reasonably could conclude that the students' proposed market is off only slightly, if at all.  A jury might reasonably find that a few additional schools

---

[4] That test did not list individual school data, so this difference might merely be an artifact of comparing averages.  But the perceived difference in reach aligns with the fact that public schools, like UCLA, UC Berkeley, UVA, and Michigan, subsidize tuition for in-state students but not for out-of-state students.  Because USC is a private school, its geographic reach is more likely to resemble that of the elite, private universities, but a one-school difference is not material.

belong in the market and/or that a few schools in the market do not belong, but the overall picture would be largely the same. Put differently, the students have sufficiently proven the rough contours of the market. And because the students offer Singer's regression as direct evidence of anticompetitive effects, that is enough.

The rest of the analysis is easier. After defining the relevant market, the students must show that the defendant universities had enough market power to have caused the anticompetitive effects that they proffer. To do so, they rely on Singer's calculation of the universities' market shares—how much of the market the universities controlled.

Singer used three calculations, one where the universities have equal weight, one where each university is weighted by its number of undergraduate students, and one where each university is weighted by its undergraduate tuition. All three showed that the universities controlled roughly 77–79% of the market. For good measure, Singer also recalculated market shares based on a larger market that included the three other universities consistently ranked in the USNWR top 25—UC Berkeley, UCLA, and UVA. Based on that market, Singer calculated the defendant universities' market share to range from 51–72%.

Because market shares are merely a proxy for market power, there is no exact point at which the percentage of the market is enough. *See* Areeda, *supra*, ¶ 532. One complexity is that market shares only convey a sense of market power as the market currently exists. But if the market might easily expand with the entry of new competitors, then market shares might overestimate market power. As the Areeda treatise explains, a defendant with 100% of the market obviously controls output and price in the market entirely. *Id.* But if demand is highly reactive to price changes, or

33

new entry is so easy that even a small increase in price would entice new competitors, then that control does not translate to meaningful market power. *Id.* As a result, the requisite percentage of the market might depend in part on other characteristics of the market.

Singer addresses this point by showing that the elite, private universities are protected from new competition by their well-established research and post-graduate programs, large endowments, and higher quality faculty. Any prospective entrant would have a hard time clearing these barriers to entry. As a result, the market is relatively stable, and market share is a relatively good indication of market power.

The Court concludes that Singer's market share calculations in the 70% range are sufficient to permit a reasonable inference of market power. *See Valley Liquors, Inc. v. Renfield Imps., Ltd.*, 822 F.2d 656, 666 (7th Cir. 1987). Singer's lowest calculation of 51% is likely too low. *See id.* at 667; Areeda, *supra*, ¶ 532c. But given the high barriers to entry, and the fact that the universities do not challenge Singer's market share analysis beyond objecting to the market definition used, the Court does not believe that in this case it is too low as a matter of law.

As the final component of their proof of anticompetitive effects, the students use Singer's regression to show an artificial price increase. The universities raise two sets of responses. The universities first raised several methodological challenges in their *Daubert* motion largely focused on Singer's choice of data, control variables, and standard errors. Considering those criticisms for purposes of summary judgment, the Court concludes that none of them preclude a jury from reasonably finding that Singer's regression means what he says it to mean.

34

The universities also argue that the Court should grant summary judgment on discrete parts of the challenged agreement that they claim could not have possibly harmed competition.  In doing so, they implicitly accept that Singer's regression might reflect competitive harms caused by other aspects of the agreement.  Since the students need not show any particular agreement to prevail, this line of argument is not a basis for summary judgment.  As for the request to grant partial summary judgment on certain aspects of the agreement, the Court declines to do so.  As the students point out, it would not be appropriate to prevent the jury from viewing the alleged conspiracy in its entirety.  *See Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698–99 (1962) ("[T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.").

To summarize, the students have presented evidence supporting the rough contours of a relevant market, high enough market shares to infer market power, and the proposed effects of that market power in the form of an artificial price increase.  That evidence is all consistent with the type of agreement that the students allege.  Despite the universities' challenges, a jury reasonably could find that the challenged agreement harmed competition.

### 3.    Antitrust standing / injury

The doctrine of antitrust standing and the "subsidiary doctrine" of antitrust injury impose additional restrictions on when a private plaintiff can sue for a violation of the antitrust laws.  *See Kochert v. Greater Lafayette Health Servs., Inc.*, 463 F.3d 710, 715 (7th Cir. 2006).  The universities invoke these doctrines by arguing that "[e]ven if [section] 1 somehow applied to defendants' conduct, numerous plaintiffs lack a right to

sue because others paid for their college educations."  Defs.' Mem. in Supp. of Mot. for Summ. J. at 47.  Specifically, the universities contend that the students who had their college expenses paid for by parents or other third parties have not suffered any injury.

The universities frame their arguments primarily in terms of antitrust standing. They do not claim that the students lack Article III standing, which limits the federal courts' jurisdiction to cases involving an injury in fact traceable to the defendant and likely to be redressed by a favorable decision.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).  But because their arguments implicate Article III standing and therefore the Court's jurisdiction, the Court briefly addresses that issue first.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998).

Article III requires that the plaintiff suffered an injury in fact.  *Lujan*, 504 U.S. at 560.  Monetary harm, like paying an artificially inflated tuition cost, readily qualifies.  *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 417 (2021).  But as the universities point out, some students—the plaintiffs in this case—did not pay tuition themselves.  Instead, their tuition costs came out of someone else's pocket, like a parent, as a gift that the students had no obligation to pay back.  In that case, it seems like the parent has suffered an Article III injury but not the student.

That problem is illusory.  When the students in this case were admitted to the defendant universities, they alone incurred the legal obligation to pay tuition.  The parents, in contrast, had no contract or agreement with the universities.  As far as the law is concerned, the parents must have gifted or loaned the money to the students. *See Rynasko v. N.Y. Univ.*, 63 F.4th 186, 195 & n.9 (2d Cir. 2023).  The students then paid their tuition with that money and suffered an injury when they paid too much.

The district court's decision in *In re iPhone Antitrust Litigation*, 4:11-cv-6714-YGR, 2025 WL 3124160 (N.D. Cal. Oct. 27, 2025), which the universities cite as supplemental authority, does not persuade this Court otherwise. The district court there rejected an argument that children who paid for iPhone apps with their parents' money had Article III and antitrust standing because they "directed the payment" by clicking the purchase button. *Id.* at *13. As an initial matter, that decision by another district court outside of this circuit is not binding on this Court. Additionally, courts in more analogous cases have generally held that parents do not have standing to sue colleges and universities merely because they paid tuition on behalf of their children. *See, e.g.*, *Rynasko*, 63 F.4th at 195; *Gociman v. Loyola Univ. of Chi.*, 515 F. Supp. 3d 861, 866 (N.D. Ill. 2021) (citing cases). Though the parents' lack of standing does not necessarily imply that the students have standing, the logic in those cases supports treating this case as analogous to one where the parent gives the money to the student to then pay tuition themselves. *See Rynasko*, 63 F.4th at 195 n.9. In that situation, the student would have standing, and so too here.

With the jurisdictional issue out of the way, the Court turns to the question of antitrust standing. The universities primarily invoke one strand of antitrust standing, the *Illinois Brick* doctrine, "a bright-line rule that authorizes suits by *direct* purchasers but bars suits by *indirect* purchasers." *Apple, Inc. v. Pepper*, 587 U.S. 273, 279 (2019) (citing *Ill. Brick Co. v. Illinois*, 431 U.S. 720, 746 (1977)). According to the universities, students who had their parents pay are not direct purchasers; they are gift recipients. The universities further warn that permitting the students to sue would run the risk of imposing double liability because the people who actually paid the tuition could also

sue.

As with the Article III issue, the Court sees this problem as illusory. The students are the ones paying because they are the only ones with a legal obligation to the universities. The fact that the parents are the effective source of the money does not change that fact. *See In re Payment Card Interchange Fee & Merch. Discount Antitrust Litig.*, 05-MD-1720 (MKB), 2024 WL 1014159, at *12 (E.D.N.Y. Mar. 8, 2024) ("Defendants' 'who pays' rule 'would require [the Court] to rewrite the rationale of *Illinois Brick* and to gut the longstanding bright-line rule.'" (quoting *Apple*, 587 U.S. at 282)). Nor does it matter that the parents mailed cash or provided their card information directly, rather than giving it to the students first. Thus the students have standing to sue the universities, not the parents. Otherwise, antitrust standing would turn on factual differences that have no relation to any legitimate purpose of the doctrine.

The Court therefore concludes that the students have met their burden of proof to establish a prima facie antitrust case.

## B. Affirmative defenses

Having addressed the core arguments on the merits, the Court turns to the parties' disputes regarding the universities' affirmative defenses. The universities first argue that they are immune from antitrust liability under the 568 Exemption. They have also asked the Court to bar all claims based on tuition charges prior to 2018, contending that they fall outside the Sherman Act's four-year statute of limitations. The students have moved for summary judgment on UPenn's defense that it withdrew from the alleged conspiracy in 2020.

The Court denies the universities' motion for summary judgment on the basis of

38

the 568 Exemption.  It also denies the parties' requests for summary judgment on the statute of limitations and withdrawal defenses because genuine disputes of material fact exist regarding both issues.

### 1.  568 exemption

The 568 Exemption provides that "[i]t shall not be unlawful under the antitrust laws for 2 or more institutions of higher education at which all students admitted are admitted on a need-blind basis, to agree or attempt to agree" to four enumerated types of agreements.  Cornell, Georgetown, MIT, and UPenn argue that they are immune from liability by virtue of this exemption.  § 568(a).  Although they acknowledge that other schools involved in the agreement were not need blind, they argue that they were individually need blind and therefore are protected "regardless of the practices of other 568 Group members."  Defs.' Mem. in Supp. of Mot. for Summ. J. at 46–47.

The Court has already rejected this argument in its opinion denying the universities' motion to dismiss.  *Carbone v. Brown Univ.*, 621 F.Supp.3d 878, 887–89 (N.D. Ill. 2022).  Antitrust exemptions are to be strictly construed.  *See Fed. Mar. Comm'n v. Seatrain Lines, Inc.,* 411 U.S. 726, 733 (1973).  By its text, the exemption protects agreements, not individual universities.  And it only protects certain agreements—those between "2 or more institutions of higher education at which all students admitted are admitted on a need-blind basis."  § 568(a).  That requires all of the "2 or more institutions" to admit all students on a need-blind basis.

The universities interpret this language to instead protect an institution that is individually need-blind, regardless of whether other participants in the agreement were also need-blind.  But under that reading, Congress's decision to include the phrase "2 or

more" makes no sense.  If Congress wanted to protect individual need-blind institutions without considering the admissions practices of other participants to the agreement, it could have instead said, "It shall not be unlawful under the antitrust laws for *an institution* at which all students admitted are admitted on a need-blind basis, to agree or attempt to agree . . . ."[5]  That is not what Congress did.

Accordingly, for the 568 Exemption to apply, every institution in the agreement must admit all students on a need-blind basis.  Because it is undisputed that some of the 568 Group members did not do so, none of the universities may benefit from the 568 Exemption's protections in this case.

Even if the universities' interpretation were correct, they still would not be entitled to summary judgment on their exemption defense.  The students have produced sufficient evidence for a jury reasonably to find that each of the universities claiming the exemption favored wealthier applicants and therefore did not admit all students "on a need-blind basis."  The universities resist this conclusion by arguing that a school is still need-blind even if it engages in wealth favoritism.  In their view, "need-blind" merely means that the school does not disadvantage applicants "because of their decision to seek financial aid or information in their financial aid application."  Defs.' Reply in Supp. of Mot. for Summ. J. at 23.

The universities' argument is contrary to the statutory text.  The exemption expressly defines "on a need-blind basis" to mean "without regard to the financial

---

[5] The only other possible reading is that Congress wanted to protect agreements where at least two participants were need-blind institutions, regardless of the other members' admissions practices.  There is no reason to think Congress intended such an arbitrary result.

40

circumstances of the student involved or the student's family." § 568(c)(6). A school that provides preferential treatment to an applicant with a wealthy background is plainly not admitting all students "without regard to the financial circumstances of the student involved or the student's family." *Id.*

The universities try to circumvent the statutory definition by appealing to legislative history and other parts of the statute that use the term "need-based" information, which they argue supports their narrower definition. Even assuming these arguments could overcome the plain text of the exemption, neither is persuasive. The legislative history the universities cite expressly states that it is not "elaborating on the need-blind admissions standard in the statutory text." H.R. Conf. Rep. 103-761 (1994). And though it does suggest that schools should not consider information derived from a financial application form, it does so only as one example of a non-need-blind practice, not as the exhaustive definition that the universities propose. The universities argue that "need-based" uses the term "need" to mean "demonstrated financial need," but the statute never connects those terms. "Need-based" and "demonstrated financial need" instead appear in two separate provisions which list two different types of exempt agreements. *See* § 568(a)(1), (3). There is no basis in the text for stitching those terms together as the universities suggest, let alone using them to rewrite the statutory definition of "need-blind."

In summary, the universities are not entitled to summary judgment based on the 568 Exemption.

## 2. Statute of limitations

The timeliness of antitrust claims is governed by the Clayton Act's limitations

41

provision, which states that "[a]ny action to enforce any [antitrust] cause of action . . . shall be forever barred unless commenced within four years after the cause of action accrued."  15 U.S.C. § 15b; *see Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971).  A cause of action accrues "when the plaintiff has a complete and present cause of action."  *Corner Post, Inc. v. Bd. of Governors of Fed. Res. Sys.*, 603 U.S. 799, 810 (2024) (internal quotations omitted).  In the antitrust context, that is generally when the plaintiff is injured by the defendant's anticompetitive action, *e.g.*, by paying an overcharge.  *See Zenith*, 401 U.S. at 338.

If that were all, then all claims in this case based on tuition payments before January 9, 2018—four years before this suit was filed—would be barred.  But in the Seventh Circuit, the antitrust statute of limitations "is qualified by the discovery rule," a federal common law rule that postpones accrual until the plaintiff discovers or should have discovered the injury and its cause through the exercise of reasonable diligence. *In re Copper Antitrust Litig.*, 436 F.3d 782, 789 (7th Cir. 2006); *see Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir. 1990); *Stoleson v. United States*, 629 F.2d 1265, 1269 (7th Cir. 1980); *see also Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 644 (2010).  In seeking summary judgment, the universities only argue that the students should have discovered their injury and its cause, not that any plaintiff actually did so.

Additionally, tolling doctrines might pause a statute of limitations once it has started to run.  *See Zenith*, 401 U.S. at 338 (acknowledging that the antitrust statute of limitations may be tolled).  Most relevant here, equitable estoppel tolls the statute of limitations "if the defendant takes active steps to prevent the plaintiff from suing in time, as by promising not to plead the statute of limitations."  *Cada*, 920 F.2d at 450–51.

Starting with the discovery rule, the Court first addresses the universities' backup argument that the rule contradicts recent Supreme Court precedent. The universities rely primarily on *Rotkiske v. Klemm*, 589 U.S. 8, 14 (2019), which they cite for the proposition that "discovery rules should not be 'read in' to federal statutes where Congress has elected not to include them." Defs.' Mem. in Supp. of Mot. for Summ. J. on the Statute of Limitations at 18.

That overreads *Rotkiske*, which dealt with a different statute of limitation providing that a cause of action under the Fair Debt Collection Practices Act (FDCPA) "may be brought . . . within one year from the date on which the violation *occurs*." *Rotkiske*, 589 U.S. at 13 (quoting 15 U.S.C. § 1692k(a)). The Court expressly distinguished that language from an accrual-based statute, noting that the FDCPA "unambiguously sets the date of the violation as the event that starts the one-year limitations period." *Id.* The Court held that the discovery rule should not be read into that unambiguous language, but it did not address the separate question of whether the discovery rule applies to an accrual-based statute, like the one in the Clayton Act. *See id.* at 13–15. *Rotkiske* thus did not overrule Seventh Circuit precedent requiring the discovery rule in antitrust cases, like this one.

With that established, the Court turns to the parties' primary dispute over when the students should have discovered their injury. As indicated, the universities do not seriously contend that any students actually knew that they had been injured. Instead, they argue that at the time of overcharge, all of the "necessary facts underlying an alleged injury" were known or knowable to a reasonably diligent plaintiff . Specifically, they point out that information about the 568 Group was available to the public,

including its membership, its agreement on common need-analysis principles, the 2001 subcommittee report, the 2006 GAO report, and even concerns from other observers that the 568 Group might have an anticompetitive effect on financial aid.

The students respond that identifying the injury in this case—paying a higher price than what they would have but for the challenged agreement—requires analyzing a "nuanced, data-intensive, expert-driven, econometric question that arises out of practices that . . . are complicated and opaque to students and families."  Pls.' Resp. to Defs.' Mot. for Summ. J. on the Statute of Limitations at 1.  As for the publicly available information, the students argue that "knowing that Defendants had coordinated on financial aid would not allow a [reasonably diligent plaintiff] to understand that such coordination was working to her *detriment*."  *Id.* at 5.

The universities are not entitled to summary judgment on this defense.  The initial problem is that even a reasonably diligent plaintiff would be unlikely to detect that they had been injured at all.  A student receiving their financial award, even one lower than they had hoped for, has no reason to suspect that their award *should have been* higher.  Most for whom it even registers that the award seems low likely would attribute this to one of the many opaque and nebulous factors that go into financial aid calculation.  The publicly available information might help a student identify the 568 Group as a potential cause, but none of that information helps if a student never suspects injury in the first place.  *Cf. Stark v. Johnson & Johnson*, 10 F.4th 823, 836–37 (7th Cir. 2021) ("[An] unfortunate outcome, by itself, is not sufficient to start the statute of limitations clock. . . . There must be some other circumstances present that would prompt a reasonable person . . . to suspect or investigate a potential wrongful cause.").

44

Importantly, the point is not that it would take a long time to run a complex econometric analysis and confirm an anticompetitive overcharge. As the universities point out, the relevant starting point under the discovery rule is the discovery of injury and its cause, not the piecing together of a legal theory. *See United States v. Kubrick*, 444 U.S. 111, 122 (1979). The point instead is that the fact of injury is hard to detect without complex analysis or, more realistically, knowledge of other circumstances that might heighten a reasonable person's suspicions. That detection problem is precisely why the discovery rule exists. *See Gabelli v. SEC*, 568 U.S. 442, 450–51 (2013) ("The discovery rule exists in part to preserve the claims of victims who do not know they are injured and who reasonably do not inquire as to any injury. . . . Most of us do not live in a state of constant investigation; absent any reason to think we have been injured, we do not typically spend our days looking for evidence that we were [injured].").

The universities emphasize that information about the 568 Group was publicly available for years, but that does not necessarily mean that it all would have been known by a reasonably diligent plaintiff. *See In re Broiler Chicken Antitrust Litig.*, 290 F.Supp.3d 772, 807–08 (N.D. Ill. 2017). Imputing knowledge of publicly available information might generally make sense in considering what a plaintiff should discover in investigating their injury. But imputing knowledge in considering whether a plaintiff would investigate in the first place is entirely different. The Court does not see a basis to impute knowledge of all publicly available information regarding the 568 Group for this purpose. Thus what exactly a reasonable student knew or should have known about the 568 Group involves questions of material fact that, on this record, the Court cannot resolve. *See Massey v. United States*, 312 F.3d 272, 276 (7th Cir. 2002).

45

In any event, much of the publicly available information would dispel, rather than heighten, students' suspicions. All of the 568 Group's public statements, for example, repeated that the Consensus Approach was more generous to students. The 2006 Gao Report found no significant impact on affordability. In contrast, none of the criticisms of the 568 Group indicated that its activities were unlawful. Thus even a plaintiff armed with full knowledge of the publicly available information might still reasonably not realize that their tuition award was lower than it should have been. *See In re Copper*, 436 F.3d at 789–90.

The students' equitable estoppel argument, on the other hand, falls short. As a preliminary matter, both parties frame their arguments in terms of fraudulent concealment. Strictly speaking, fraudulent concealment is a subset of the broader doctrine of equitable estoppel, which does not require fraud or concealment, "only conduct or representations by the defendant that prevent the plaintiff from suing before the statute of limitations has run." *Singletary v. Cont'l Ill. Nat'l Bank & Tr. Co. of Chi.*, 9 F.3d 1236, 1241 (7th Cir. 1993); *see Sebelius v. Auburn Reg'l Med. Center*, 568 U.S. 145, 164 (2013) (Sotomayor, J., concurring) (noting that equitable estoppel and fraudulent concealment are distinct doctrines). Some cases, however, have suggested that the defendant must intend to delay filing or at least should know that their actions are likely to do so. *See, e.g.*, *Hedrich v. Bd. of Regents of Univ. of Wis. Sys.*, 274 F.3d 1174, 1182 (7th Cir. 2001); *Mull v. ARCO Durethene Plastics, Inc.*, 784 F.2d 284, 292 (7th Cir. 1986).

In any event, even the broadest notion of equitable estoppel does not apply to mere denials of liability. *Stephan v. Goldinger*, 325 F.3d 874, 877 (7th Cir. 2003). That

effectively covers all of the statements upon which the students rely. For example, the students contend that the universities made misrepresentations in the 568 Group's letter to the GAO. The alleged misrepresentations, however, were statements that there was no evidence that the 568 Group stifled competition. That is a mere denial of liability. Some statements are harder to characterize as a denial of liability but nonetheless fall within the spirit of the rule. For example, the students point to statements by the universities attributing rising prices to external factors. To the extent that those statements prevented students from suing, they did so by merely denying liability— namely by attributing the injury to some other cause. *Cf. Mitchell v. Donchin*, 286 F.3d 447, 450–51 (7th Cir. 2002) (holding that equitable estoppel did not apply when the defendant represented that the injury was caused by someone else).

Perhaps the statements would justify equitable estoppel if the students could show an intent to mislead them. But the statements they point to are perfectly consistent with good faith representations by the universities. There is no basis in the record, for example, to conclude that the universities intended to mislead anybody through their "misrepresentations" to the GAO that there was no evidence of anticompetitive effects. In context, those statements were plainly made in response to the GAO's own finding that there were, in fact, no observable anticompetitive effects at the time. The universities, like the students, may well have been unaware whether their agreement in fact harmed students.

In sum, the Court overrules the students' equitable estoppel argument but concludes that it is nonetheless inappropriate to bar all pre-2018 claims given the discovery rule.

### 3.     Withdrawal

The last issue is whether UPenn withdrew from the challenged agreement in January 2020, when it stated in a letter to the 568 Group that it was resigning from the group.

The students argue that the letter was insufficient for withdrawal as a matter of law because it did not "repudiate or disavow the Group or its goals."  Pls. Mem. in Supp. of Mot. for Summ. J. at 1.  They point out that the letter contained amicable and even praiseworthy language.  The first paragraph is representative:

> The University of Pennsylvania is proud to have been a member of the 568 President's Group for the past two decades and to have collaborated with other 568 members to increase access to financial aid by bringing "greater clarity, simplicity, and fairness to the process of assessing each family's ability to pay for college."  This essential work has had a transformative impact on students in our participating institutions because of the shared vision and strategic directions pursued by member colleges and universities.

Defs.' Mot. for Summ. J., Ex. 81 (Penn Withdrawal Letter) at 2.

UPenn responds that the students' test is too stringent.  It argues instead that communicating withdrawal is sufficient in antitrust cases.  It also contends that UPenn did repudiate or disavow the 568 Group and its goals by unequivocally resigning, stating its intent to pursue "increased flexibility" in its financial aid policies, and publicly announcing new policies that deviated from the alleged agreement.

The Court begins by reviewing the standard for withdrawal.  The basic standard for withdrawal is the same in criminal and antitrust cases.  *See United States v. U.S. Gypsum Co.*, 438 U.S. 422, 464–65 (1978).  Generally, "[a]ffirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators [are] sufficient to establish withdrawal or abandonment."  *Id.*

48

Implicit in that formulation is the principle that merely ceasing to participate in the conspiracy is not enough. *United States v. Patel*, 879 F.2d 292, 294 (7th Cir. 1989).

That raises the question of what distinguishes communicating withdrawal from definitively ceasing to participate in a conspiracy. As Judge Posner explained, "[t]here are two points, one evidentiary and one substantive." *Id.* The evidentiary point is that the existence of a communication confirms that the defendant's lack of participation is in fact a clean break. *Id.* The substantive point is a proximate-cause-like principle:

> [H]aving set in motion a criminal scheme, a conspirator will not be permitted by the law to limit his responsibility for its consequences by ceasing, however definitively, to participate. Such cessation may or may not be effective withdrawal in a lay sense, but this is one of those places where the law uses a word in a special sense. You do not absolve yourself of guilt of bombing by walking away from the ticking bomb. And similarly the law will not let you wash your hands of a dangerous scheme that you have set in motion and that can continue to operate and cause great harm without your continued participation.

*Id.*

The substantive principle means that to be legally effective, and to "limit a conspirator's liability for losses that his own activity made more probable," the withdrawal must do more than clearly indicate the end of the withdrawer's participation. *United States v. Paladino*, 401 F.3d 471, 479 (7th Cir. 2005). It must, for example, weaken the conspiracy by raising the threat that the withdrawer might go to the authorities. *Id.*

Based on these principles, the Seventh Circuit has held that a conspirator may not effectuate a legally effective withdrawal by merely announcing that it is ceasing to participate. *United States v. Nagelvoort*, 856 F.3d 1117, 1129 (7th Cir. 2017). For communication of withdrawal alone to suffice, it must "disavow the conspiracy and its

49

criminal objectives." *Id.* (quoting *United States v. Vallone*, 698 F.3d 416, 494 (7th Cir. 2012)).

The universities argue that this test—applied thus far only to criminal cases—should not be extended to the antitrust context. They point out that antitrust violations can arise from ordinary and even good-faith business agreements and that requiring hostility would be perverse. If repudiation were required for any form of withdrawal, the Court would agree. But repudiation is necessary only when there is no affirmative act other than the communication of withdrawal itself. *See Vallone*, 698 F.3d at 494. Any other affirmative act that would undermine the conspiracy would satisfy the requirement for withdrawal without express repudiation. *See Paladino*, 401 F.3d at 479. In antitrust cases, the most obvious act is to resume competitive behavior inconsistent with the anticompetitive goals of the conspiracy. *See Gypsum*, 438 U.S. at 465 n.38.

Applying those principles to this case, UPenn's resignation letter alone was not a legally effective withdrawal as a matter of law. As the students point out, the letter is a far cry from repudiation. The part of the letter that creates the most tension with the conspiracy's goals is UPenn's explanation that it felt it needed "increased flexibility in [its] need analysis." Penn Withdrawal Letter at 2. But that is not enough to cut off UPenn's liability, especially because it could continue to reap the benefits of the alleged anticompetitive market conditions it helped to create.

The question then becomes when UPenn took an affirmative act inconsistent with the goals of the conspiracy, for example, by resuming competition. UPenn points out that it announced several discrete changes to its financial aid policies. Most of those happened after dissolution of the 568 Group, but at least one happened before

the 568 Group dissolved.  That change increased the income threshold for students to qualify for Penn's "highly aided" program.  The students also seem to acknowledge that UPenn's need analysis system underwent some other minor changes before the 568 Group dissolved.  *See* Pls.' Resp. to Defs.' Stat. of Facts on the Statute of Limitations, ¶ 7.

Depending on what the contours and purposes of the challenged agreement were, those changes might sufficiently conflict with the agreement to constitute a legally effective withdrawal.  A jury reasonably could find, for example, that UPenn's expansion of its highly aided program was inconsistent with the goals of avoiding bidding wars.  Those questions of fact preclude summary judgment in the students' favor on UPenn's withdrawal defense.  *See United States v. Bafia*, 949 F.2d 1465, 1480 (7th Cir. 1991) (noting that "withdrawal from a conspiracy is a question of fact").

## Conclusion

For the reasons stated above, the Court denies the universities' motion for summary judgment in its entirety [dkt. 848] and the students' motion for partial summary judgment on UPenn's withdrawal defense [dkt. 850].

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  January 12, 2026