**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ANDREW CORZO, SIA HENRY, ALEXANDER LEO-GUERRA, MICHAEL MAERLANDER, BRANDON PIYEVSKY, BENJAMIN SHUMATE, BRITTANY TATIANA WEAVER, and CAMERON WILLIAMS, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No. 22 C 00125 |
| BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, THE JOHNS HOPKINS UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Plaintiffs Andrew Corzo, Sia Henry, Michael Maerlander, Alexander Leo-Guerra,

Brandon Piyevsky, Benjamin Shumate, Brittany Tatiana Weaver, and Cameron Williams

have moved to certify a class of persons similarly situated in their claims against

defendants, a group of private universities.  The defendants include Brown University (Brown), California Institute of Technology (CalTech), University of Chicago (Chicago), the Trustees of Columbia University in the City of New York (Columbia), Cornell University (Cornell), the Trustees of Dartmouth College (Dartmouth), Duke University (Duke), Emory University (Emory), Georgetown University (Georgetown), the Johns Hopkins University (Johns Hopkins), Massachusetts Institute of Technology (MIT), Northwestern University (Northwestern), University of Notre Dame Du Lac (Notre Dame), the Trustees of the University of Pennsylvania (Penn), William Marsh Rice University (Rice), Vanderbilt University (Vanderbilt), and Yale University (Yale).  Plaintiffs allege that defendants participated in a horizontal price-fixing scheme in violation of section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

For the reasons outlined below, the Court finds that plaintiffs have satisfied all of the requirements for class certification, save one:  adequacy of counsel.  The Court defers final ruling on the motion for class certification while affording plaintiffs an opportunity to bring in new, and adequate, proposed lead class counsel.

## Background

The background of this case has been taken from the parties' briefs and the complaint.

### A.    Factual background

According to plaintiffs, defendants—all "elite, private universities"—were each "members of the '568 Presidents Group' at some point between January 1, 1998, and November 4, 2022."  Pls.' Mem. in Supp. of Mot. for Class Certification at 5.  The Group derived its name from Section 568 of the Improving America's Schools Act of 1994,

2

which permitted "institutions of higher education" like defendants "to award [students admitted on a need-blind basis] financial aid only on the basis of demonstrated financial need for such aid" and "to use common principles of analysis for determining the need of such students for financial aid if the agreement to use such principles does not restrict financial aid officers at such institutions in their exercising independent professional judgment with respect to individual applicants for such financial aid."  15 U.S.C. § 1 note.  "[I]nstitutions of higher education" are exempted from antitrust laws under section 568 if "all students admitted are admitted on a need-blind basis."  *Id.* Section 568 defines "on a need-blind basis" as "without regard to the financial circumstances of the student involved or the student's family."  *Id.*  In other words, the Act permits institutions of higher education to use common principles when determining how much financial aid to offer a student—and thus, according to plaintiffs, limit competition among themselves—but avoid a federal antitrust violation so long as the institutions adhere to section 568's requirements.

According to plaintiffs, the 568 Group operated the alleged price-fixing conspiracy by requiring each participant in the Group to adhere to an "Overarching Agreement," which plaintiffs allege included the following:

> (a) to apply several core principles in awarding aid, which included the agreement to make need-based aid the primary form of financial aid and to base it on student and family "ability to pay," (b) to use the College Board's standard IM (or "Base IM") as the foundation for developing a "Consensus Methodology," (c) to use agreed-upon guidelines for applying "professional judgment" in modifying the [Expected Family Contributions] that the Consensus Methodology generated, and (d) to share information with each other regarding their annual calculations of financial aid.

Pls.' Mem. in Supp. of Mot. for Class Certification at 7.  Plaintiffs contend that the defendants, in this way, "engaged in a long-running, overarching conspiracy on

3

the principles and methods for calculating institutional financial aid and for sharing critical pricing-related information—rather than aggressively completing to attract students." *Id*. at 1 (footnote omitted). They further contend that despite defendants' purported reliance on the section 568 exemption, "the classwide evidence shows that the [exemption] did not apply—because, contrary to its terms, Defendants *did* consider the 'financial circumstances' of applicants and their families in admission." *Id.* at 4.

## B. Litigation history

On January 9, 2022, plaintiffs filed suit against the defendants, alleging that each "participated and are participating in a price-fixing cartel that is designed to reduce or eliminate financial aid as a locus of competition, and that in fact has artificially inflated the net price of attendance for students receiving financial aid." Second Am. Compl. ¶ 1. They have sued for actual damages or restitution. *Id.* at 70.

Defendants moved to dismiss the complaint, a motion the Court denied in August 2022. *See Carbone v. Brown Univ.*, 621 F. Supp. 3d 878, 894 (N.D. Ill. 2022). Discovery is now complete, and the Court has denied defendants' motion for summary judgment, as well as a motion for summary judgment by plaintiffs on one of defendants' affirmative defenses. *See Corzo v. Brown Univ.*, No. 22 C 125, 2026 WL 91424 (N.D. Ill. Jan. 12, 2026). The plaintiffs have moved for class certification under Federal Rule of Civil Procedure 23(a) and 23(b)(3).[1]

---

[1] Plaintiffs initially sought class certification under Rule 23(b)(2) as well, but according to their motion for class certification, "the alleged conspiracy disbanded in the fall of 2022, mooting the need for injunctive relief." Pls.' Mem. in Supp. of Mot. for Class Certification at 1 n.1.

**C.      The motion for class certification**

Plaintiffs seek certification of the following proposed Class:

All persons who have during the Class Period (a) enrolled in one or more Defendants' full-time undergraduate programs, (b) received at least some need-based financial aid from one or more Defendants, and (c) whose tuition, fees, room, or board to attend one or more Defendants' full-time undergraduate programs was not fully covered by the combination of any types of grant or merit aid in any undergraduate year.

Pls.' Mem. in Supp. of Mot. for Class Certification at 1. This proposed Class is limited to individuals who "first enrolled in one of Defendants' full-time undergraduate programs" during the time periods outlined below. *See* Second Am. Compl. ¶ 223. The following individuals are excluded from the proposed Class:

Any Officers and/or Trustees of Defendants, or any current or former employees holding any of the following positions: Assistant or Associate Vice Presidents or Vice Provosts, Executive Directors, or Directors of Defendants' Financial Aid and Admission[s] offices, or any Deans or Vice Deans, or any employees in Defendants' in-house legal offices; and [a]ny person who was not a U.S. citizen or permanent resident at the time such person attended a full-time undergraduate program and received at least some need-based financial aid from one or more Defendants.

Pls.' Mem. in Supp. of Mot. for Class Certification at 1 n.3; *see also* Second Am. Compl. ¶ 224. The proposed Class also excludes "the Judge presiding over this action, his or her law clerks, spouse, and any person within the third degree of relationship living in the Judge's household and the spouse of such a person." Second Am. Compl. ¶ 224.

Plaintiffs propose to define the Class period as follows:

(a) For Brown, Dartmouth, and Emory—from fall term 2004 through June 30, 2023. (b) For Chicago—from fall term 2003 through June 30, 2014. (c) For Columbia, Cornell, Duke, Georgetown, MIT, Northwestern, Notre Dame, and Rice—from fall term 2003 through June 30, 2023. (d) For Penn—from fall term 2003 through June 30, 2019. (e) For Vanderbilt— from fall term 2003 through June 30, 2020. (f) For Yale—from fall term 2003 through June 30, 2007, and from fall term 2018 through June 30, 2023. (g) For CalTech—from fall term 2020 through June 30, 2023. (h)

For Johns Hopkins—from fall term 2022 through June 30, 2023. Singer Am. Rep. ¶ 9. This is intended to reflect the specific periods when each defendant is claimed to have been a member of the 568 Group.

Plaintiffs seek the appointment of Andrew Corzo, Sia Henry, Alexander Leo-Guerra, Michael Maerlander, Brandon Piyevsky, Brittany Tatiana Weaver, and Cameron Williams as class representatives under Rule 23(a)(4). Plaintiffs seek the appointment of law firms Freedman Normand Friedland LLP, Gilbert Litigators & Counselors, PC, and Berger Montague PC as co-lead class counsel under Rules 23(a)(4) and 23(g).

## Discussion

Class actions are governed by Rule 23 of the Federal Rules of Civil Procedure. Under Rule 23, a plaintiff must show that the proposed class satisfies all four requirements of Rule 23(a):

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). In addition, plaintiffs must also satisfy the requirements of one of three alternatives under Rule 23(b). Plaintiffs must establish each of Rule 23(a) and Rule 23(b)'s requirements by a preponderance of the evidence. *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012).

A court's assessment of the requirement for class certification under Rule 23 must be "rigorous" and may "entail some overlap with the merits" of plaintiffs' case, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011), but consideration of the merits for class certification purposes must "be limited to those aspects of the merits that affect

6

the decisions essential under Rule 23." *Schleicher v. Wendt*, 618 F.3d 679, 685 (7th Cir. 2010); *see also Messner*, 669 F.3d at 823 (finding that "an argument that some class members' claims will fail on the merits if and when damages are decided" is "a fact generally irrelevant to the district court's decision on class certification"). "Rule 23 allows certification of classes that are fated to lose as well as classes that are sure to win" and therefore "[t]he chance, even the certainty, that a class will lose on the merits does not prevent its certification." *Schleicher*, 618 F.3d at 686–87.

## A.     Rule 23(a)

As outlined earlier, plaintiffs seeking class certification must establish the four requirements of Rule 23(a), commonly referred to as (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy. Plaintiffs bear the burden of showing that each element is met and must establish each requirement by a preponderance of the evidence. *Messner*, 669 F.3d at 811.

Plaintiffs contend that in their brief filed in opposition to the motion for class certification, "[d]efendants do not contest any of the requirements under Rule 23(a)." Pls.' Reply Mem. in Supp. of Mot. for Class Certification at 1. Parsing defendants' opposition brief, it does appear that all of defendants' arguments opposing class certification attack plaintiffs' ability to establish the requirements of Rule 23(b)(3). For example, defendants' brief asserts that "[p]laintiffs cannot establish antitrust impact of this [alleged conspiracy] through common proof and so cannot satisfy Rule 23(b)(3)'s predominance requirement." Defs.' Mem. in Opp. to Pls.' Mot. for Class Certification at 1. Defendants also contend that "the putative class includes too many uninjured members" and therefore "the 'need to identify those *individuals*' would '*predominate* and

7

render an adjudication unmanageable.'" *Id.* at 52 (emphases added) (quoting *In re Asacol Antitrust Litig.*, 907 F.3d 42, 53–54 (1st Cir. 2018)). As yet another example, defendants argue that "*[i]ndividualized* issues separately *predominate* because the class includes students whose parents (or other third parties) paid for their education" which, according to defendants, means that these students "suffered no injury." *Id.* at 53 (emphases added).

Though defendants' challenges implicated whether plaintiffs' claims are sufficiently common for class certification, the specific language defendants used sounds more in Rule 23(b)(3) than Rule 23(a). *See* Fed. R. Civ. P. 23(b)(3) (requiring that "questions of law or fact common to class members *predominate* over any questions affecting only *individual members*") (emphases added). The Court conducted both a visual and an electronic search within defendants' opposition brief for "23(a)" and found no mention of it. *See generally* Defs.' Mem. in Opp. to Pls.' Mot. for Class Certification. The Court finds that defendants have waived any opposition to plaintiffs' contention that they satisfy the requirements of Rule 23(a), except for the adequacy of class counsel, which defendants challenged in later briefing, and which the Court addresses below. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver."); *Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1075 (7th Cir. 2013) ("[Plaintiffs] also failed to respond to the City's arguments against these claims in their reply to the City's motion to dismiss. Because they did not provide the district court with any basis to decide their claims, and did not respond to the City's arguments, these claims are waived."); *see also Williams v. Bd. of Educ. of City of Chi.*, 982 F.3d 495, 507 n.30 (7th Cir. 2020) (finding that a failure

8

to raise an argument in the initial brief results in waiver of that argument).

Despite defendants' waiver , the Court will address in the following sections each element of Rule 23(a) based on the record before it.  The exception is the adequacy of counsel aspect of the Rule 23(a) adequacy analysis.  The Court will hold that to the end of this opinion for reasons that will become apparent.

### 1.      Numerosity

"The key numerosity inquiry under Rule 23(a)(1) is not the number of class members alone but the practicability of joinder." *Anderson v. Weinert Enters., Inc.*, 986 F.3d 773, 777 (7th Cir. 2021).  Accordingly, plaintiffs must show "that it is extremely difficult or inconvenient to join all members of the class" based on "the nature of the action, the size of the individual claims, and the location of the members of the class or the property that is the subject matter of the dispute." *Id.* (quoting 7A C. Wright & A. Miller, *Federal Practice & Procedure* § 1762 (3d ed. 2011)).  Though courts have emphasized that there is no magic number for establishing numerosity, the Seventh Circuit has "recognized that 'a forty-member class is often regarded as sufficient to meet the numerosity requirement.'" *Id.* (quoting *Orr v. Shicker*, 953 F.3d 490, 498 (7th Cir. 2020)); *see also Mulvania v. Sheriff of Rock Island Cnty.*, 850 F.3d 849, 859 (7th Cir. 2017).

Plaintiffs contend that numerosity is easily met here.  According to plaintiffs, their economic expert, Dr. Singer, "calculates from the Defendants' own data that the proposed Class includes 224,840 current and former students" based on his initial expert report dated May 14, 2024.  Pls.' Mem. in Supp. of Mot. for Class Certification at 36; *id.,* Ex. 108 ¶ 259.  This proposed class number appears to have shifted marginally

9

downward based on Dr. Singer's amended expert report, dated May 28, 2024, which indicates that the "Class Members in Sample" total 224,744. Singer Am. Rep. ¶ 259.

One way or another, plaintiffs have put forth sufficient evidence to establish numerosity. A class exceeding 224,000 individual members, scattered throughout the country (and, given the decades-long alleged conspiracy, perhaps around the globe) reflects that joinder would be impractical.

### 2. Commonality

To satisfy the commonality requirement under Rule 23(a)(2), plaintiffs' claims "must 'depend on a common contention' and '[t]hat common contention . . . must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Ross v. Gossett*, 33 F.4th 433, 437 (7th Cir. 2022) (quoting *Wal-Mart*, 564 U.S. at 350). Put differently, "[w]hat matters to class certification . . . is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350 (quoting Richard Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)). For the purposes of Rule 23(a)(2), "even a single common question" will suffice to satisfy this requirement. *Id.* at 359 (cleaned up) (quoting Richard Nagareda, *The Preexistence Principle and the Structure of the Class Action*, 103 Colum. L. Rev. 149, 176 n.110 (2003)).

Plaintiffs contend that "[c]ommonality is 'readily met' in antitrust cases" like this one "because proof of the alleged conspiracy focuses on the defendants' standardized

conduct." Pls.' Mem. in Supp. of Mot. for Class Certification at 36 (first quoting *Chicken Grower*, 2024 WL 2117359, at *7, then quoting *Moehrl v. Nat'l Ass'n of Realtors*, No. 19 C 1610, 2023 WL 2683199, at *11 (N.D. Ill. Mar. 29, 2023)). According to plaintiffs, common questions in this action "include 'whether Defendants illegally conspired to restrict supply and increase the price' and 'the nature of the conspiracy, whether the conspiracy caused the price increase, and what is the appropriate measure of damages.'" *Id.* (quoting *In re Broiler Chicken Antitrust Litig.*, No. 16 C 8637, 2022 WL 1720468, at *5 (N.D. Ill. May 27, 2022) (hereinafter *Broiler Chicken*)). Plaintiffs further contend that another "common question is whether the 568 Exemption applies, which implicates . . . Defendants' wealth favoritism," because "[w]here any school's wealth favoritism precludes the application of the 568 Exemption for all Defendants . . . this case has the 'capacity' to generate a 'common *answer*' on whether the 568 Exemption applies." *Id.* at 37 (quoting *Wal-Mart*, 564 U.S. at 350); *see also Carbone*, 621 F. Supp. 3d at 887–88 ("[T]he fact that at least one member of the conspiracy is plausibly alleged not to be, or not to have been, need-blind means that the plaintiffs have plausibly alleged that none of the schools are protected under the 568 Exemption.").

The Court finds that plaintiffs have met Rule 23(a)(2)'s commonality requirement. As the plaintiffs point out, even a single common question is enough to meet this standard. Here, at a minimum, the common question of whether the defendants engaged in the alleged conspiracy "is capable of classwide resolution," and the "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims." *Wal-Mart*, 564 U.S. at 350. If the defendants did not engage in a conspiracy, then the entirety of plaintiffs' suit will be resolved. Similarly, a showing that

11

none of the defendants ran afoul of the 568 Exemption may resolve this litigation. Accordingly, plaintiffs have met Rule 23(a)(2)'s requirement that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).

### 3. Typicality

Under Rule 23(a)(3), a "plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and [is] based on the same legal theory." *Lacy v. Cook County*, 897 F.3d 847, 866 (7th Cir. 2018) (quoting *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992)). The typicality requirement "is meant to ensure that the named representative's claims have the same essential characteristics as the claims of the class at large." *Id.* (cleaned up) (quoting *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006)). "In the antitrust context, typicality will be established by plaintiffs and all class members alleging the same antitrust violation by the defendants." *Moehrl*, 2023 WL 2683199, at *12 (internal quotation marks and citation omitted).

Plaintiffs contend that the proposed class representatives meet the typicality requirement because the "proposed Class Representatives received need-based financial aid from one or more Defendants, and they allege they paid artificially inflated net prices as a result of the alleged conspiracy." Pls.' Mem. in Supp. of Mot. for Class Certification at 37. And in response to a limitations defense interposed by defendants, plaintiffs also invoke the "'discovery rule,' which poses the question of whether 'a reasonably diligent person would not have been able to discover the injury until a date within the limitations period.'" *Id.* (quoting *Carbone*, 621 F. Supp. 3d at 892). Plaintiffs argue that applicability of the discovery rule encompasses both the named

representatives and the putative class members, and therefore "whether the discovery rule is satisfied will 'turn on common evidence or patterns of evidence.'" *Id.* at 38 (quoting *Schofield v. Delta Air Lines, Inc.*, No. 18-CV-00382-EMC, 2019 WL 955288, at *4 (N.D. Cal. Feb. 27, 2019)).

The Court finds that plaintiffs' proposed class representatives satisfy Rule 23(a)(3)'s typicality requirement. Though the defendants are alleged to have participated in the conspiracy during varying time periods, the challenged conduct underlying the conspiracy is more or less uniform across the various defendants. In other words, the claims of the class representatives turn on evidence that is in common with that of the class as a whole. Further, "all class members, including the named representatives, will likely face the same challenge with respect to the statute of limitations defense." *Schofield*, 2019 WL 955288, at *4. In short, the named class representatives face the same challenges and rely on the same evidence as the putative class members; their claims arise from the same alleged course of conduct and rely on the same legal theory as the claims of the putative class members. The Court therefore finds that the proposed class representatives satisfy Rule 23(a)(3)'s typicality requirement.

### 4. Adequacy

Finally, plaintiffs must meet Rule 23(a)(4)'s adequacy requirements. "Adequacy is a two-part test: (i) the class representatives must not have claims in conflict with other class members, and (ii) the class representatives and proposed class counsel must be able to litigate the case vigorously and competently on behalf of named and absent class members alike." *Broiler Chicken*, 2022 WL 1720468, at *3 (citing *Kohen v.*

13

*Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 679 (7th Cir. 2009)).

Regarding the first part of the adequacy test, plaintiffs contend that the now-$320 million in settlements[2] that have resulted from their prosecution of the case thus far shows that the "interests of Plaintiffs and absent Class members are aligned." Pls.' Mem. in Supp. of Mot. for Class Certification at 38; *cf. Chicken Growers*, 2024 WL 2117359, at *10 (finding that "successfully securing settlements on behalf of the class" makes arguments that class representatives are not adequate representatives of the class as a whole "particularly unpersuasive").

The Court finds that the proposed class representatives do not have any claims in conflict with the absent class members. For starters, defendants do not identify any evidence indicating any conflicts that may undermine adequacy of representation. And nothing else in the history of this litigation would lead one to believe that any such conflict of interest exists. Thus far, the named plaintiffs have diligently litigated this case, resulting in numerous settlements. Plaintiffs have shown that they adequately represent the interests of the absent class members.

The second part of the adequacy test involves the adequacy of class counsel. As indicated earlier, defendants' original class certification response brief did not address this factor. It later became contested, however, after information came to light regarding alleged ethical breaches by the proposed class counsel. This led to several hearings and extensive additional briefing. The Court will hold off on discussion of this point until later in this opinion.

---

[2] The first ten settlements reached as of July 2024, as referenced in the plaintiffs' opening brief, totaled $248 million. The overall total is now higher, approximately $320 million, following approval of two additional settlements in 2025.

In sum, the Court finds that plaintiffs have established the requirements of Rule 23(a), save for adequacy of counsel.  The Court proceeds to consider whether plaintiffs meet the requirements of Rule 23(b)(3).

**C.      Rule 23(b)(3)**

Plaintiffs here seek to certify their proposed class under Rule 23(b)(3), which requires showing (1) "that the questions of law or fact common to class members predominate over any questions affecting only individual members" and (2) "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  "Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class."  *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013).  Rule 23(b)(3) does not "require a plaintiff seeking class certification to prove that each element of [his or her] claim is susceptible to class wide proof."  *Id.* at 469 (cleaned up).  Nor does it require the absence of individual questions.  The plain language of Rule 23(b)(3) clearly contemplates that such individual questions may, and likely will, be present, but the rule permits certification so long as common questions predominate.  *See* Fed. R. Civ. P. 23(b)(3) (requiring that "questions of law or fact common to the class predominate over questions affecting *only individual members*") (emphasis added).  For instance, "it is well established that the presence of individualized questions regarding damages does not prevent certification under Rule 23(b)(3)."  *Messner*, 669 F.3d at 815.

Rule 23(b)(3) contains a non-exhaustive list of factors that courts should consider when determining whether predominance and superiority are met:

15

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in a particular forum; and (D) the likely difficulties in managing a class action.

*Id.*

"Predominance is satisfied when common questions represent a significant aspect of a case and . . . can be resolved for all members of a class in a single adjudication." *Kleen Prods. LLC v. Int'l Paper Co.*, 831 F.3d 919, 925 (7th Cir. 2016). "There is no mathematical or mechanical test for evaluating predominance." *Messner*, 669 F.3d at 814 (citing 7A C. Wright & A. Miller, *Federal Practice & Procedure* § 1778 (3d ed. 2011)). Instead, the inquiry under Rule 23(b)(3) "'trains on the legal or factual questions that qualify each class member's case as a genuine controversy,' with the purpose being to determine whether a proposed class is 'sufficiently cohesive to warrant adjudication by representation.'" *Id.* (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)). Though similar to Rule 23(a)'s commonality and typicality requirements, "the predominance criterion is far more demanding." *Amchem Prods., Inc.*, 521 U.S. at 623–24. Predominance is shown when "common questions represent a significant aspect of a case and can be resolved for all members of a class in a single adjudication." *Messner*, 669 F.3d at 815 (cleaned up). Courts have found that common questions may predominate if "a 'common nucleus of operative facts and issues' underlies the claims brought by the proposed class." *Id.* (quoting *In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 228 (2d Cir. 2006)). If establishing a prima facie showing on a given question requires members of a proposed class to present evidence that varies from member to member, then it is an individual question, but "[i]f the same

evidence will suffice for each member to make a prima facie showing, then it becomes a common question." *Id.* (quoting *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005)).

### 1. Predominance of common questions

Plaintiffs contend that predominance is "readily met" in cases alleging "violations of antitrust law," *Amchem*, 521 U.S. at 625, and they cite seven specific common issues of law and fact that they claim predominate over individual issues. First, plaintiffs argue that "this type of alleged conspiracy is the prototypical example of an issue where common questions predominate," *Broiler Chicken*, 2022 WL 1720468, at *7, because "whether a conspiracy exists is a common question that is thought to predominate over the other issues in the case." 7A C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure* § 1781 (3d ed. 2020) (collecting cases). According to plaintiffs, "the more Defendants contend that there was no conspiracy or that its scope was narrow, the more the issue is framed as 'central to this litigation.'" Pls.' Mem. in Supp. of Mot. for Class Certification at 39 (quoting *In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1206 (N.D. Cal. 2013)).

Second, plaintiffs contend that whether defendants may invoke the 568 Exemption is a common question that is susceptible to classwide proof. If any one defendant fails to satisfy the 568 Exemption, plaintiffs argue, then none of them can. Alternatively, if all defendants satisfy the Exemption, then plaintiffs will ultimately lose, as the alleged conspiracy would not violate antitrust law. Thus answering this common question, plaintiffs say, may resolve the litigation, and as such it represents a significant aspect of the case.

17

Third, plaintiffs argue that whether the "*per se*" rule or the "Rule of Reason" is the proper mode of analysis for the antitrust claim is also a common question. Plaintiffs contend that they rely on classwide evidence to show that defendants' conduct was *per se* anticompetitive, and alternatively if the Rule of Reason applies, it will apply for all defendants. (The Court notes that it has since determined, on summary judgment, that the *per se* rule does not apply. *See Corzo*, 2026 WL 91424, at *19.)

Fourth, plaintiffs purport to rely on common evidence of defendants' collective market power. The plaintiffs' evidence on this point is primarily the testimony of Dr. Singer, who will use common evidence to address whether defendants had the market power to permit them to artificially raise prices.

Fifth, issues of antitrust impact are common questions relying on common evidence for the entire class. As with collective market power, plaintiffs rely on Dr. Singer's regression analysis to show common impact. Though defendants contend that Singer's regression analysis is flawed because it assumes common conduct across defendants, the Court has previously found the proffered testimony admissible. Singer's two-step method showing common impact addresses a central issue in this litigation, and it applies to all defendants and all Class members.

Sixth, plaintiffs contend that damages present a common issue capable of classwide proof. At the class-certification stage, "any model supporting a plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation." *Comcast v. Behrend*, 569 U.S. 27, 35 (2013) (citation and quotation marks omitted). Accordingly, "a model purporting to serve as evidence of damages in [a] class action must measure only those damages

18

attributable to that theory." *Id.* If a model does not attribute damages based on plaintiffs' theory of antitrust conspiracy, then "it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id.* Damages calculations, however, "need not be exact." *Id.* "[P]laintiffs are permitted to use estimates and analysis to calculate a reasonable approximation of their damages." *Kleen Prods. LLC*, 831 F.3d at 929; *see also id.* ("[A]t the class certification stage, plaintiffs are not obliged to drill down and estimate each individual class members' damages."). At this point, a showing that aggregated damages are susceptible to classwide proof is sufficient to satisfy Rule 23(b)(3)'s predominance requirement.

Seventh, and finally, plaintiffs argue that whether or not their claims are time-barred is a common issue. If the claims are untimely, it will resolve the litigation. The evidence and analysis regarding application of the discovery rule and tolling doctrines apply to the class as a whole.

The Court finds that plaintiffs have established that common questions predominate over individual issues of law and fact. Plaintiffs' claims largely depend on Dr. Singer's testimony and other common evidence supporting the claim of a conspiracy, and accordingly the case is likely to rise or fall depending upon the probative weight given to that evidence.

In opposing class certification, defendants assert many issues similar to those they raised in their motion seeking to exclude Dr. Singer. For instance, defendants contend that individualized issues predominate regarding antitrust impact because defendants did not adhere to the same core principles at all times throughout the Class

period.  Further, defendants argue that differences in packaging decisions for financial aid are individualized across defendant-schools, and therefore class members would have been impacted differently.  And defendants repeat their arguments that Singer's regression analysis is flawed and therefore cannot support a finding of common impact. For the reasons discussed in the Court's ruling on defendants' motion to exclude Singer's testimony, these contentions are unavailing.  Dr. Singer's testimony is sufficiently reliable and is admissible, and thus the contention that class certification is unwarranted because his testimony is unreliable does not carry the day.[3]

For these reasons, the Court concludes that common issues predominate over individual issues.

### 2.    Superiority of a class action

A court's assessment of whether a class action is a superior method "is comparative:  the court must assess efficiency with an eye toward 'other available methods.'"  *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 664 (7th Cir. 2015) (quoting Fed. R. Civ. P. 23(b)(3)).  As previously stated, Rule 23(b)(3) includes a non-exhaustive list of factors that courts may consider to determine whether a class action is superior to other available methods.  *See* Fed. R. Civ. P. 23(b)(3).

Plaintiffs contend that these factors all indicate that a class action is the superior

---

[3] In a supplemental brief filed just recently, ostensibly on the adequacy of counsel issue discussed later, defendants contend that class certification should be denied, among other reasons, because in ruling on summary judgment the Court supposedly "held that there was no price-fixing conspiracy."  Dkt. 1239 at 3 (citing Dkt. 1210 at 18-19).  Putting aside the fact that class certification denial is not supposed to be based on claimed lack of merit of the underlying claims, that's a considerable overstatement of the Court's conclusion that the *per se* rule does not apply because the claimed conspiracy did not directly fix prices as such.

20

method of adjudicating their claims, and defendants do not articulate in their response to plaintiffs' class certification motion an argument to the contrary. *See generally* Defs.' Mem. in Opp. to Pls.' Mot. for Class Certification. Considering the factors listed under Rule 23(b)(3), the proposed class includes thousands of members across the country, and all their claims are materially the same. The Court has already successfully managed this case for several years, including through several class settlements with particular defendants. The Court concludes that a class action is superior to other available methods for adjudicating the claims of the members of the class.

The Court therefore finds that plaintiffs have shown, by a preponderance of the evidence, that they satisfy the requirements of Rule 23(b)(3). This leaves only the issue of adequacy of class counsel under Rule 23(a), which the Court addresses in the following section.

## D. Adequacy of class counsel

Defendants challenge the adequacy of proposed class counsel. They contend that counsel have engaged in misconduct that prejudiced the class. The Court first summarizes the pertinent facts and then considers the parties' arguments.

### 1. First round of class settlements

The plaintiffs have achieved class-wide settlements with twelve of the seventeen defendants in this case, who collectively have agreed to pay about $319 million to the class and class counsel. The first round of settlement approvals came in the summer of 2024, pursuant to motions filed by plaintiffs' counsel in April of that year. In that round, the plaintiffs sought approval for settlements with ten defendants totaling $284 million.

In a separately-filed motion and memorandum seeking approval of attorney's

21

fees, plaintiffs' counsel requested fees totaling one-third of the overall settlement amount—a little under $95 million—and expenses of about $3.5 million. The joint memorandum in support of the requested award of fees and costs was signed by the three lead attorneys, Eric Cramer of Berger Montague (Berger), Robert Gilbert of Gilbert Litigators and Counselors (GLC), and Edward Normand of Freedman Normand Friedland (FNF).

As just indicated, counsel sought fees based on a percentage of the settlement amount. Counsel argued—accurately—that the percentage-of-recovery method is, in this district and circuit, the favored method of calculating fees in common-fund cases like this one. Dkt. 679 at 15-16 (citing *Gaskill v. Gordon*, 160 F.3d 361, 362 (7th Cir. 1988), and *In re Dairy Farmers of Am., Inc.*, 80 F. Supp. 3d 838, 844 (N.D. Ill. 2015) (Dow, J.)). Counsels' memorandum discussed at length the Seventh Circuit's decision in *In re Synthroid Marketing Litigation*, 264 F.3d 712, 718 (7th Cir. 2001), in particular the proposition that in common-fund cases, "courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time," adjusting the market rate to account for the risk of nonpayment that a firm agrees to bear, the quality of its performance, the amount of work necessary to resolve the litigation, and the stakes of the case. Dkt. 679 at 16-17 (citing *Synthroid*, 264 F.3d at 718, 721). Counsel also cited numerous cases for the proposition that percentages from 33 to 40 percent represent the norm in similar antitrust class action litigation. *Id.* at 18-19 & nn. 12, 13, 14.

Class counsel argued that a one-third fee "is reasonable considering the risk of nonpayment," the quality of the work done, the amount of work done, and the stakes

22

involved.  *Id.* at 20.  On the first factor, the memorandum referenced "[t]he substantial risk that Settlement Class Counsel assumed in prosecuting this case," and it quoted *Silverman v. Motorola Solutions, Inc.*, 738 F.3d 956, 958 (7th Cir. 2013), for the proposition that "[c]ontingent fees compensate lawyers for the risk of nonpayment.  The greater the risk of walking away empty-handed, the higher the award must be to attract competent and energetic counsel."  Dkt. 679 at 20, 21.  As will be seen, however, one of the three firms did not actually risk "walking away empty handed."  Counsel also discussed the other *Synthroid* factors.  This included, as noted earlier, a statement that the three firms had collectively devoted over 91,313 hours to the case, and a representation they had committed this time as well as significant out of pocket expenses "with no guarantee of recovery."  Dkt. 679 at 22 (footnote omitted).

Counsel also offered a "lodestar" calculation (hours times hourly rate) for purposes of a reasonableness cross-check.  *See, e.g., Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 636 (7th Cir. 2011).  On this point, counsel represented that their firms the total hours of professional time "amount[s] to a collective lodestar of $70,150,911.00 based on historical market rates."  Dkt. 679 at 4.  (The motion defined "historical" rates as the rates as of the time the work was performed, as distinguished from those in effect at the time of the fee petition.  *See id.* at n.4.)  Counsel stated that based on the lodestar cross-check, the requested one-third award "would result in a modest lodestar multiplier of 1.35 . . ., which is well below multipliers awarded in comparable antitrust and other class actions."  *Id.* at 4, 24 (citing cases noting that multipliers between 1 and 4 have been approved, and particular decisions approving multipliers of 2.04 and 1.11).  Counsels' memorandum also emphasized, however,

Seventh Circuit pronouncements that "consideration of a lodestar check is not an issue of required methodology" and that "we have never ordered the district judge to ensure that the lodestar result mimics that of the percentage approach." *Id.* at 23 (footnote omitted) (quoting *Williams*, 658 F.3d at 636, and *Cook v. Niedert*, 142 F.3d 1004, 1013 (7th Cir. 1998)).

Each of the three primary plaintiffs' lawyers submitted a separate affidavit regarding his firm's work, including the time spent, hourly rates for the attorneys involved, and the amount of out-of-pocket expenses. Cramer's affidavit stated that "My firm's work on this case was performed on a wholly contingent basis" and that his firm's total lodestar was about $17 million, representing 22,351 attorney and paralegal hours at hourly rates ranging from $240 (for a legal assistant) to $1,390 (for Cramer in 2024). Dkt. 679-2 ¶ 3 & Ex. A. Gilbert's affidavit stated his firm's "work on this case was performed on a contingent basis," Dkt. 679-3 ¶ 4, and that the firm's lodestar was a little over $31 million, representing 36,232 hours at hourly rates from $240 (for a paralegal) to $1,495 (for Gilbert in 2024). *Id.* ¶ 2 & Ex. A. Normand's affidavit stated that his firm "performed its work in this Action on a contingent basis," Dkt. 679-4 ¶ 6, and that the firm's lodestar was $21 million, representing 32,730 hours at hourly rates from $100 (for investigators) and $345 (for paralegals) to $1,250 (for Normand and Devin Freedman) in 2023-24. *Id.*, Ex. A. The three affiants also represented that their respective firms had expended a little over $856,000 "in unreimbursed costs and expenses" (Cramer), dkt. 679-2 ¶ 4; $1,007,669 "in costs and expenses" (Gilbert), dkt. 679-3 ¶ 4; and a little under $997,000 "in unreimbursed costs and expenses" (Normand), dkt. 679-4 ¶ 7.

The Court approved the class settlements with the ten defendants, including the

24

requested one-third fee award.  *See* Dkt. 726.  In determining whether to approve the fee award, the Court reviewed the representations in the attorneys' affidavits regarding the time spent and the claimed hourly rates.  But that was not the Court's focus:  based on Seventh Circuit caselaw, the Court relied principally on the reasonableness of the percentages sought, and the comparisons to percentages awarded in other similar litigation.  That said, the Court did reference the collective firms' total lodestar as a crosscheck.  But the Court did not delve into the breakdown among the three firms.  In fact, the Court cannot say that it took notice of the differences among the hours claimed by each firm (roughly 36,000 for GLC, 32,000 for FNF, and 22,000 for Berger).  Had the Court noticed this, it would have chalked up the difference to how tasks had been doled out among the three firms.

The order that the Court signed approving the settlements and fee and expense awards had been prepared and submitted by moving counsel, and to the best of the Court's recollection it did not modify the draft.  The order stated in paragraph 27 that "Settlement Class Counsel undertook this case *on a wholly contingent basis* and ran *a substantial risk of no recovery whatsoever*."  Dkt. 726 ¶ 27 (emphasis added).  This was not accurate with respect to GLC, as will be seen.  The order also referenced the "lodestar cross-check" and the 1.35 fees-to-lodestar ratio.  *Id.*

### 2.     The second round of class settlements

The second and, to date, last round of class settlements involved two defendants, Johns Hopkins and Cal Tech.  These settlements totaled $35,250,000, bringing the overall total to $319,250,000.  Plaintiffs' counsel submitted the materials in support of these settlements in April 2025.  The motion and supporting memorandum—

25

signed by all three lead attorneys—represented that counsels' collective lodestar was $95.5 million, which was said to represent 127,557 hours of attorney and other professional time.  Dkt. 830 at 4.  The motion again sought a fee award of one-third of the $35.25 million settlement total, in other words, $11.75 million.  Counsel stated that adding this to the fee amount previously approved, and comparing it with the overall settlement totals, "would result in a modest lodestar multiplier of just over 1.1 or lower" for the entire period of the litigation through the date the new settlements were preliminarily concluded.  *Id*. at 4, 12.

Counsels' motion also stated that class counsel had incurred a total of $2,441,739 in "unreimbursed litigation expenses" through February 2025.  This, as will be seen, was not accurate with respect to expenses incurred by GLC.  Counsels' joint memorandum represented that "Settlement Class Counsel undertook the risks inherent to this complex case on contingency, knowing it could take years to prosecute and millions of dollars and tens of thousands of attorney hours to properly resource—*with no guarantee of any return* for those material investments."  *Id.* at 3 (emphasis added).  Again, the "no guarantee" reference was not accurate with respect to GLC.

In support of the proposed award of fees and expenses, the same three lead attorneys also submitted a joint affidavit, Dkt. 830-1, which incorporated the affidavits submitted in connection with the earlier settlements.  *Id.* ¶ 2.  With respect to GLC, the joint affidavit represented that GLC "has expended a total of $1,044.295 in *unreimbursed* costs and expenses . . . ."  *Id.* ¶ 42 (emphasis added).  This was not accurate.

The three lead plaintiffs' attorneys, Cramer, Gilbert, and Normand, also submitted

separate affidavits supporting the fees and expenses sought for the Johns Hopkins/Cal Tech settlements, as they had with the first round of settlement approvals. Cramer's affidavit stated, as had his earlier affidavit, that "[m]y firm's work on this case was performed on a wholly contingent basis." Dkt. 830-2 ¶ 5. Cramer stated that his firm's total lodestar from inception was a little over $21 million, about $5.6 million of which postdated his April 2024 affidavit. *Id.* As before, the highest hourly rate referenced was $1,390, for Cramer himself. *Id.*, Ex. A. Normand's affidavit stated that "[m]y firm's work on this case was performed on a wholly contingent basis," Dkt. 830-3 ¶ 5; the word "wholly" had not been included in the parallel representation in Normand's April 2024 affidavit. Normand stated that his firm's total lodestar from inception was a little over $35 million, of which a little over $19 million postdated the April 2024 submission. *Id.* The highest hourly rate disclosed was $1,250, for Normand himself. *Id.*, Ex. A. Gilbert's affidavit stated that "[m]y firm's work on this case was performed on a *wholly* contingent basis." Dkt. 830-4 ¶ 5 (emphasis added). The word "wholly" had not been included in Gilbert's April 2024 affidavit, though the Court did not notice this shift at the time. Gilbert represented that his firm's total lodestar was a little over $39 million, of which just under $12 million postdated the April 2024 submission. The highest hourly rate referenced, as before, was $1,495, for both Gilbert and Elpidio Villarreal. *Id.*, Ex. A.

Regarding litigation expenses, Cramer represented that his firm had been reimbursed for a little over $856,000 and had a little under $334,000 in unreimbursed expenses. Dkt. 830-2 ¶ 6. Normand represented that his firm had a little under $674,000 in expense outlays, all unreimbursed. Dkt. 830-3 ¶ 6. Gilbert represented that "[m]y firm has expended a total of $1,044,295.00 in unreimbursed costs and

27

expenses" from inception and stated, "[t]hese costs were incurred on behalf of the Settlement Class by my firm *and have not been reimbursed*." Dkt. 830-4 ¶ 6 (emphasis added). The latter representation was not accurate.

The draft order provided by all three counsel along with the motion for approval of the Johns Hopkins/Cal Tech settlements included a sentence stating: "Settlement Class Counsel undertook this case on a wholly contingent basis and ran a substantial risk of no recovery whatsoever." Dkt. 843-13 ¶ 27. Again, this was not true with respect to GLC, as will be seen.

### 3. Allegations by an FNF associate; the June 23, 2025 hearing

Matters began to go awry for plaintiffs' counsel a little before the scheduled June 20, 2025 final approval hearing for the Johns Hopkins/Cal Tech settlements. On June 19, 2025, the day before the hearing, Peter Bach-y-Rita, an associate with FNF who had appeared in the case, wrote to the Court. Bach-y-Rita claimed that he was "the attorney who conceived, developed, and originated" this case. Dkt. 878 at 1. He wrote to advise the Court of what he contended were "potential violations of the ethical rules (in particular, Rule 1.5(f) of the Illinois Rules of Professional Conduct)." *Id.* He said he had tried without success to resolve his concerns with his colleagues and co-counsel in advance of the hearing. He advised that plaintiffs' counsel had asked him to refrain from raising this issue in connection with the June 20 hearing and had indicated that they would ask the Court to defer a decision on their fee application.

Later the same day, lead class counsel filed a response. The response noted that Bach-y-Rita "is involved in an employment and compensation dispute" with the Freeman firm that was in arbitration after mediation had failed just a few days earlier, on

28

June 16.  Dkt. 879 at 2.  Lead class counsel stated that the claimed ethical issue, as asserted by Bach-y-Rita's lawyer in a communication on June 17, was that "Class Counsel lacked written consent from the eight Named Plaintiffs for the fee division among the three Class Counsel firms litigating this case . . . ."  *Id.*  Lead counsel argued, citing caselaw, that Rule of Professional Conduct 1.5(f) (regarding division of fees among counsel) does not apply in class actions and that in any event, the issue was moot because, after Bach-y-Rita's lawyer raised the issue, class counsel had obtained written consent to their agreement regarding division of fees.  *Id.* at 2-3.  Less than a half hour after the filing of this response, still on June 19, Bach-y-Rita filed a further letter in reply, explaining why he believed that class counsel's solution was inadequate and also contending that (earlier) he had been retaliated against for raising the potential rules violation, by his firm "purporting to cut me out of my agreed-upon share of the attorneys' fees entirely."  Dkt. 880 at 1.

The final approval hearing ended up taking place on June 23 rather than June 20 due to a technical glitch.  *See* Dkt. 881.  At the hearing, the Court had an extended discussion with Bach-y-Rita regarding the inter-firm allocation issue he had raised, including why—as one of the attorneys of record—he had not raised it with the Court at the time of the earlier settlement approvals.  The Court also asked if Bach-y-Rita was objecting to the Cal Tech settlement.[4]  He affirmatively stated, twice, that he was not. June 23, 2025 Tr. at 11, 12.  Nor did any class members or counsel for any of the other parties.

---

[4] Final approval of the Johns Hopkins settlement had to be held over by about a month for unrelated reasons.  *See* Dkt. 882.

29

The Court orally approved the Cal Tech settlement, including the proposed fee award, and later entered a written approval order.  Dkt. 884.  The Court notes that the settlement approval order did not include anything, nor had the Court been asked to include anything, regarding how fees would be split among class counsels' firms.  This was also true of the 2024 settlement approval order; it just awarded an overall percentage fee of one-third.

Still during the June 23 hearing, one of the lead class counsel (Cramer) asked to respond to Bach-y-Rita's contentions.  That prompted a further response by Bach-y-Rita, and some back-and-forth with the Court.  Toward the end of the hearing, Bach-y-Rita advanced a new allegation:  "the root ethical violation here that [RPC] 1.5 was used to cover up was essentially – was a fraud on the Court, was a submission of inflated billing records.  And I have the documentation that establishes that that likely happened." *Id.* at 21.  The Court advised Bach-y-Rita that if he wanted to bring additional matters to the Court's attention, he should make an appropriate filing.  *Id.* at 22-23.

### 4.      The July 11, 2025 hearing and its immediate aftermath

Bach-y-Rita did not make a further filing at that point.  But on July 1, the non-settling defendants filed what they entitled a "motion for *limited discovery* into plaintiffs' counsel's allegations of misconduct and related briefing," Dkt. 908 at 1 (emphasis added), contending this was relevant regarding the already-pending motion for class certification with respect to claims against the non-settling defendants.  The request was not actually all that "limited":  defendants asked to take 5 depositions of plaintiffs' counsel and serve 10 document requests and 5 interrogatories.  In support of the

30

motion, defendants relied on Bach-y-Rita's letter and his contention at the June 23 hearing regarding inflated billing records.

The Court ordered plaintiffs to respond to defendants' motion and held a further hearing on July 11. After hearing argument on that date, the Court addressed whether the requested discovery was warranted. The Court first stated that the alleged division-of-fees-among-counsel issue did not, in its view, impact class certification or the adequacy of counsel, nor would it have any impact on the class. July 11, 2025 Tr. at 16-17, 18.

On the claim of inflated billing records, the Court noted that under Seventh Circuit caselaw, attorney misconduct impacts class certification "only if the misconduct prejudices the class or if it jeopardizes the integrity [of] the judicial process in the sense of jeopardizing the Court's ability to reach a just and proper outcome." *Id.* at 17. The Court briefly reviewed the history of the fee applications in the case, saying that fees had been awarded based on a percentage, not based on time spent. *Id.* at 18. On the lodestar crosscheck point, the Court said the following:

> Yes, there is a [lodestar] cross-check. That's the lingo that's used. That's the last of several factors, probably the least important of [them], and it's not even required by the Seventh Circuit. But . . . [t]here's no question it was offered in this case. . . . I'm just going to tell you I didn't look at a single one of the billing records [sic][5] because that's not what cross-check means. But it was referenced, and there's a reference which I would call pretty close to a passing reference in the . . . two orders of approval . . . which refer to this.
>
> But yes, it was considered. Was it significant? No. Would the settlement have been approved even without the reference to the [lodestar] cross-checks? Yes. And that's true for both of them. But it was submitted.
>
> . . .

---

[5] Actually no "billing records" had been submitted, but only the totals referenced in counsels' submissions.

31

So I think within [ ] legally strict and circumscribed limits, which I'm going to tell you right now, I want to know more information about this. I'm not granting your motion for discovery . . . . There's no reason to do any [of] that. Mr. Bach-y-Rita is one of the approved class counsel in the case. He has a fiduciary duty to the class, and he's under an obligation [of] candor to me. . . . I'm going to direct him in very short order to file . . . a statement of his contentions regarding inflated billing records, overbilling, whatever the lingo is. . . .

And then I'm going to see what that is, and I'm going to figure out whether there's any discovery that out to be . . . allowed once I get that. . . .

*Id.* at 18-20.

The Court's order following the hearing stated, in relevant part, as follows:

Class counsel Peter Bach-y-Rita is directed to file under seal by no later than 12:00 PM Central Time on 7/21/2025 a statement that details his contentions regarding submission of false or inflated billing records to the Court in this case. Mr. Bach-y-Rita may attach (also under seal) supporting documentation but should take care not to include any material on which a claim of attorney-client or work product privilege could be asserted. . . . A further hearing on defendants' motion for discovery is set for 7/28/2025 at 10:00 AM.

Dkt. 912.

Bach-y-Rita filed an affidavit on July 21, 2025. In the affidavit, he stated that in or around October 2023, in anticipation of the first round of settlement approvals, his colleagues at FNF had reviewed the reported hours and lodestar from GLC and "repeatedly expressed their incredulity of [sic] GLC's reported hours, rates, and lodestar, as well as the numerous reasons for their incredulity and their thoughts regarding what actions they may need to take as a result." Dkt. 913 ¶ 7. Bach-y-Rita said that though he "had limited involvement in, and limited visibility into" the discussions that followed this (presumably given his status as an associate), he had "repeatedly raised my concerns regarding the firm's ethical obligations with my FNF colleagues who were more directly involved in such discussions, including Mr. Normand." *Id.* ¶ 9. Bach-y-

Rita said that in response, they had not provided him with "information to allay my concerns" but instead had restricted his work on the case and purported to "cut me out of my agreed-upon share of the fee award." *Id.*

On July 28, 2025, the Court held a video hearing as scheduled but was advised that Bach-y-Rita, via his personal counsel, had declined to participate. The Court continued the matter and entered an order stating, in relevant part, as follows:

> The Court sets the matter--specifically the dispute over discovery arising from Mr. Bach-y-Rita's apparent allegation of a fraud upon the Court--for an in-person hearing on 8/8/2025 at 10:30 AM. Mr. Bach-y-Rita, who is one of the attorneys of record for the plaintiffs and the putative class in this case, is hereby ordered to attend in person. . . . Mr. Bach-y-Rita is to be prepared to testify regarding any contention on his part that false or inflated billing records were submitted to the Court. He is also to bring with him any supporting evidence (as referenced in his sealed submission).

Dkt. 921.

### 5.     The August 8, 2025 hearing

#### a.     Bach-y-Rita's testimony

At the hearing on August 8, Bach-y-Rita provided records, and the Court questioned him under oath. The Court summarizes certain salient points here. When asked if he believed any of the time submitted to the Court under the GLC umbrella was false "either because they put in hours that weren't actually worked or they inflate[d] the hours or there's an inaccurate description of what was done" or on some other basis, Bach-y-Rita initially said, "I believe it to be the case," based on discussions before the time was actually submitted. Aug. 8, 2025 Tr. at 12. When asked why he had not raised this when the submission was made to the Court—a submission on which Bach-y-Rita's name appeared as counsel—he said it was because he was waiting to see how a "reallocation" of fees, suggested as a way to deal with the Gilbert hours, worked out.

*Id.* at 14. "So the decision to reallocate was instead of raising ethical concerns. So what I decided I would do was – because I didn't feel that I knew that there had been ethical violations." *Id.* at 15. When he later saw that the reallocation had not been disclosed to the named plaintiffs, Bach-y-Rita said, he decided to raise the issue. *Id.* (The Court notes that the named plaintiffs later consented to the inter-firm allocation, though it's not likely the law actually required their consent.)

When asked the basis for his belief that GLC's time was inflated, Bach-y-Rita referred to email correspondence among lead counsel, which he produced at the hearing (some of it in redacted form at the insistence of Gilbert, who cited work product issues regarding the redacted material). Specifically, he referred to an October 2023 email from attorney Normand analyzing "reasons why the [Gilbert] [lode]star might be high and the reasons why FNF felt uncomfortable with the [Gilbert] [lode]star." *Id.* at 19. When asked again by the Court to describe directly the basis for his concerns, Bach-y-Rita referenced Normand's assessment regarding too many partner-level hours claimed by GLC; redundancy; and high hourly rates.

### b. The October 2023 emails

The Court next summarizes, briefly, the lengthy emails among lead class counsel in October 2023 that Bach-y-Rita produced at the hearing. The first was an October 3, 2023 email from Normand to Cramer and Velvel Freedman (of FNF), but not to Gilbert, evidently summarizing earlier discussions and containing proposed talking points for a discussion with Gilbert. The main talking point was, "We find the GLC hours billed implausible. It's simply too many hours in too short a time, and the comparison to the FNF hours makes no sense. But that's probably not true. The hours billed are about

34

50% more than FNF, and they include a lot of pre-filing work. The real problem, per below, is the level of senior work and redundancy." Concern was expressed regarding whether the Court would approve GLC's hours or whether submitting those hours as-is would "decrease [the] likelihood of a full contingency recovery for the group"—the primary problems with GLC's time being "Senior people doing junior work. All the time." and "Many senior people apparently doing many of the same things at the same time." Normand suggested several solutions to propose to Gilbert, including, "GLC should agree to take a haircut" on its lodestar submission and various proposals for going forward, involving GLC cutting back on its billing and/or reallocating work away from GLC.

There evidently ensued a discussion among lead class counsel, including Gilbert, which in turn led to a lengthy response email from Gilbert dated October 13, 2023. Gilbert expressed "disappoint[ment]" and responded to the points made by the other attorneys. He defended at length the accuracy and appropriateness of the hours spent by GLC attorneys, attributing it in part to the departure or non-involvement of certain attorneys with FNF (which required GLC to take on a greater share of the work), and he indicated that the proposal to try to equalize billing as between GLC and FNF would lead to inefficiency and redundancy. Gilbert—evidently perceiving this, at least in part, as an issue regarding how fees would be divided—said he would make his own proposal to increase the lodestars of the other firms.

After a further exchange, Normand raised an issue with the claimed hourly rates of some of the attorneys under the GLC umbrella; said the claimed GLC lodestar "will operate to hurt all three firms" because the overall lodestar would be viewed by the

35

Court as unreasonable (and for other reasons); and stated that "FNF and [Berger] will not submit any papers supporting the GLC umbrella lodestar . . ., and may need to express our concerns about it, consistent with our ethical obligations." Normand's email also made reference to assertions by Gilbert—in support of GLC's billings—to "the payments that GLC's funder has made based on the GLC umbrella lodestar to date." Normand further stated that "the fact that you are being paid hourly on this case may help to explain why GLC has billed double the hours of the firms that are not being paid hourly, and which do not have the incentive of doing work that duplicates efforts." Later in the email, Normand stated that he understood that Gilbert was prepared to justify the "disproportionate lodestar to date" but said, "we disagree with that story." Normand's bottom-line proposal was to reallocate work to rebalance the firms' respective lodestars, allocating more work to FNF and BMPC and less to GLC.

Gilbert's response email, dated October 23, 2023, again defended at length the amount of attorney time claimed by GLC. He repeated that attorneys from FNF whose participation in the litigation had been expected had not participated; he stated that the allocation of work among firms had been repeatedly discussed and agreed to; and he pointed out that the relative lodestar proportions had been known to all three firms for over a year, without any criticism or attempt to modify it. He also defended the quality of the work done by GLC and the level of involvement of more senior lawyers. Gilbert also made the case that GLC's lodestar was reasonable, as were the billing rates claimed by the GLC attorneys. In this regard, Gilbert cited his litigation funder's approval of these rates. Gilbert did, however, express willingness to accommodate the other firms' request to undertake a greater proportion of the work going forward.

36

### c. Bach-y-Rita's testimony, continued

The Court now returns to Bach-y-Rita's testimony at the August 8, 2025 hearing. Nearer the end of his testimony, Bach-y-Rita volunteered the following: "Your Honor raised the idea at the previous hearing [sic] of hours that were simply made up. I don't have any reason to think that – or I did not – that's not something that was ever raised in that way. Like, there's the idea that the hours are too much, but made-up hours, there's nothing in here that goes to that." *Id.* at 27. Asked about this again, directly, by the Court later in the hearing, Bach-y-Rita said, "I'd rather think that probably did not happen"—"that" being a reference to time claimed that had not actually been spent. *Id.* at 31.

### d. Arguments at the hearing

After the conclusion of Bach-y-Rita's testimony, defense counsel summarized the testimony as follows: Bach-y-Rita's "allegation of fraud is based on suspicions that the work was intentionally generated to generate a high number that would allow Mr. Gilbert to claim a higher allocation." *Id.* To put it another way, as counsel summarized, "[t]he idea is that they put bodies on this case in order to generate time that would be used in that allocation [among plaintiffs' counsel] so that [GLC] could take a larger percentage." *Id.* at 33. Defense counsel emphasized that the time claimed by GLC had been submitted to the Court, "and the Court did rely on it as a check on the thing," *id.*, "check" being a reference to the lodestar cross-check. Defense counsel repeated the defendants' request for additional discovery.

The tenor of at least part of defense counsel's comments—particularly his comment regarding attorney Gilbert's billings—indicated to the Court that at least some

37

of what had been alleged (regarding excessive hours) had been apparent to defense counsel at an earlier time. The Court asked why defense counsel had not raised this point earlier, for example in connection with the earlier settlement approvals. *Id.* at 41. Defense counsel initially stated, "The fee request for us, for the non-settling defendants, we don't have a dog in that fight." *Id.* at 42. When pressed, in particular regarding the obligation of counsel to disclose their awareness what they were now contending was a fraud on the court, defense counsel essentially said that although the defense understood there would be "a fight [among plaintiffs' counsel] on allocation among themselves," it did not have enough evidence of a fraud on the Court to raise that issue at the time. *Id.* at 43. The Court pushed back to some extent but at this point does not intend to dwell on this issue further, so it will refrain from summarizing that discussion.

In response, plaintiffs' attorney Cramer stated that, after further discussion and exchanges of information that followed the October 2023 correspondence, the other lead plaintiffs' attorneys had become comfortable with the time claimed by the Gilbert firm. Cramer's comments included:

> As to Mr. Gilbert's 3,000 hours, that sounds like a lot of time and it is. That's because that's all Mr. Gilbert did during that time. He had no other cases. And, sadly, he had no other life during that period. I felt for his health during that period he was working so hard. There was some discussion here. Well, we don't have enough information. There's only top line summaries. We need the detail. Well, the top line summaries are all Mr. Bach-y-Rita saw. . . .
>
> . . .
>
> [B]etween October 2023 and April 2024 when the fee petition as submitted, our firms had multiple meetings . . . where we figured out, oh, well, the reason why Gilbert and Mr. Raymar and Mr. Villareal and all the other people associated with Gilbert Litigators were doing X, Y, and Z was because they were working on this. And they were working on that, and they were working on this. . . . [B]ecause we were each involved in our own small corners of the case, large corners of the case, we didn't necessarily know what each other was working on.

38

And so we had – you saw a reaction in October 2023. Oh, that seems high.

But Mr. Bach-y-Rita wasn't privy to what happened after[,] where we worked it out. Where we not just worked out how we're going to allocate fees amongst each other, we worked out and understood why the work was done, why so much work was done, and who did it.

*Id.* at 48-49.

### e.     The Court's ruling on the request for more discovery

On defendants' request for discovery, the Court commented that—with respect to the issue of excessive hours—the requested discovery was unlikely to be productive. The Court stated: "[O]ne small part of my issue with all of the discovery that the defendants had wanted to do on this is . . . you'd just be running around in circles because how are you ever going to prove that somebody didn't actually do the work that they [said they] did?" *Id.* at 52. Ultimately, the Court concluded that "[t]he request for discovery that was made by the defendants goes significantly beyond anything . . . that I might consider reasonable, given the circumstances. So that request is overruled." *Id.* at 62-63.

The Court did, however, direct production to defendants of the emails Bach-y-Rita had produced at the hearing. The Court also gave leave to file supplemental briefs "regarding any impact on the motion for class certification of the evidence adduced at the hearing, the inter-attorney correspondence, and the surrounding issues." Dkt. 944.

### 6.     The September 4, 2025 hearing and the supplemental briefs

Defendants filed a supplemental brief that primarily addressed the issues of overbilling and hourly rates but also identified an issue arising from the references in counsels' emails to GLC's litigation funding arrangement. On this point, defendants referenced plaintiffs' counsels' representation in the earlier fee petitions that "the fee

39

award they sought was fair and reasonable given the extraordinary risk of litigating on a contingency fee." Dkt. 947 at 7 (internal quotation marks omitted). Defendants argued that "for GLC, the representation was false, and FNF and [Berger] knew it . . . [and] signed on anyway." *Id.* On the hourly rate issue, defendants attached material outside the existing record, consisting of fee submissions in other cases in which lower hourly rates were used.

In response, plaintiffs evidently took this as an invitation to further expand the record themselves. Their response attached a series of further affidavits from lead class counsel explaining how the inter-attorney disputes over time, rates, and allocation had been worked out. They also attached an affidavit from a law professor who is a noted expert in class action and complex litigation, providing an opinion that largely focused on these same points.

The Court viewed these submissions, collectively, as expanding the record far beyond what was warranted under the circumstances, and plaintiffs' affidavits in particular (even more particularly the expert's affidavit) as potentially opening the door to full-blown satellite discovery even beyond what defendants previously had requested. By this point, the Court concluded, the record on the hours/hourly rates/allocation issues was sufficiently developed, and additional discovery on those points was unwarranted and disproportionate. The Court therefore struck the parties' supplemental submissions and, ultimately, ordered further oral argument and more focused supplemental briefing. *See* Dkt. 954, 956, 960.

Defendants' arguments at a hearing held on September 4, 2025 mostly addressed the attorney time and hourly rate issues, but they also focused on issues

40

relating to GLC's litigation financing.  Defendants argued that given what had been said about the financing in the October 2023 emails, the representations made to the Court by plaintiffs' counsel to support their fee requests (relating to contingency and risk) were false, a further basis to deny class certification.

In response, plaintiffs' counsel Normand emphasized "the excellence of the results" obtained by class counsel—$320 million in settlements—and noted that "when the defendants oppose the adequacy of class counsel, they are not acting in the best interest of the class" but instead were furthering their own interest in defeating class certification.  Sept. 4, 2025 Tr. at 23-24.  Normand argued that under governing caselaw, "ethical issues of the sort that get raised on class cert are relevant for purposes of adequacy only when they prejudice the class, result in a direct conflict within counsel and the class, [or] jeopardize the Court's ability to reach a just and proper outcome."  *Id.* at 24.  None of the defendants' accusations, Normand contended, rose to that level.  Normand elaborated on this at some length, focusing—as defendants' counsel had—on the time and hourly rate issues.  On the litigation funding issue raised by defendants, Normand stated that on the "issue of whether and to what extent the GLC firm was operating on a contingent basis, which is the expression they used.  They were on a contingent basis.  I mean, Mr. Gilbert can address this now and in a declaration, but this is a common representation when plaintiffs' lawyers have some funding where, as a whole, the funder and the lawyers are taking a risk.  It is contingent.  And that's what happened here."  *Id.* at 30-31.

The Court directed production of the GLC litigation funding agreements for *in camera* inspection and thereafter directed their production to defendants on an

41

attorney's eyes only basis, with one minor redaction. *See* Dkt. 960, 1086. The Court

also ordered further supplemental briefing. *Id.* In their ensuing briefs, defendants

continued to address the attorney time and hourly rate issues. They also placed greater

emphasis on their contentions that plaintiffs' counsel had made misrepresentations

regarding the purportedly contingent nature of Gilbert's fee arrangement. They

contended that counsels' conduct and representations prejudiced the class, showed

counsel were inadequate as class counsel, and should defeat class certification.

Defendants' further submission after production of the GLC litigation funding documents

further emphasized their contentions that counsel had made false statements to the

detriment of the class. *See* Dkt. 1021, 1146.

The post-hearing submissions by plaintiffs' counsel argued that the attorney

billing rates were supported via the record and otherwise and that the time spent was

reasonable and justifiable. *See* Dkt. 1077, 1175. Regarding whether GLC's fee

arrangement was contingent, counsel argued, among other things, that

> Defendant's focus on GLC's "contingency" and "risk" is also meritless.
> GLC incurred extraordinary risk and "with no guarantee of recovery," because
> litigation funding is not a "recovery." Defendants also ignore that a funder is part
> of the firm's undertaking. Defendants' misinterpretation of "contingent" and "risk"
> would require every firm seeking fees from a common fund to detail its funding or
> lending, however general or specific. There is no such rule in this District, and no
> caselaw regarding how such firm economics implicate fee awards. Instead, as
> this Court recognized, "the proposition that a plaintiffs' law firm in this kind of
> case would get litigation funding is old hat," and "fee awards in antitrust cases in
> this circuit are almost always one-third."

*Id.* at 8 (footnotes and record citations omitted). Plaintiffs' counsel further emphasized

these points in their memorandum filed after the production of the GLC agreements.

*See* Dkt. 1175. They also argued that the claim that GLC worked on a "contingent"

basis was accurate because "no client or class member is obligated to pay fees unless

42

there is a recovery," which they said "reflects the conventional usage of 'contingent fees that clients pay lawyers.'"  *Id.* at 1.  Plaintiffs' counsel further argued that even considering GLC's fee arrangement, GLC had "incurred substantial risk," as only a portion of its fees were funded.  *Id.* at 4.

### 7. The litigation funding issue

As indicated earlier, Gilbert produced, initially for *in camera* review and later for defense counsel at the Court's direction, GLC's agreements with litigation funders. The Court will discuss the terms at a high level.[6]  The first agreement, dated in January 2022, provided for payment to GLC of 50 percent of its hourly billings with a payment cap of about $5.9 million, and its litigation expenses.  Later agreements (the first dated October 13, 2023 and the last in January 2025) modified this in stages, ultimately providing for payment to GLC of 40 percent of its hourly billings up to, ultimately, $14 million, and for its litigation expenses.

By the time of the first fee motion in April 2024, GLC's reimbursed fees had surpassed the then-existing cap of $8 million.  Specifically, GLC's claimed lodestar at that point was $31 million, which at 40 percent would have translated to about $12.5 million.

### 8. The March 11, 2026 hearing

The Court held a further hearing on March 11, 2026, largely for the purpose of questioning the three lead plaintiffs' attorneys regarding the references in the earlier filings to the purportedly contingent nature of GLC's work on the case.

---

[6] None of what the Court references here is legitimately kept out of the public record, so the Court will not do so.

43

Cramer and Normand advised that, unlike GLC, their firms did not have funding arrangements under which some part of their fees was funded as the litigation progressed. Mar. 11, 2026 Tr. at 11-12. Both stated that they viewed their fee arrangements as "contingent," by which they meant they would not be paid by anyone unless there was a settlement or judgment (though Normand stated that this "describes what our agreement with our clients was"). *Id.* at 13, 14.

The Court asked Gilbert what he meant by the representation in his April 2024 affidavit that "GLC's work on this case was performed on a contingent basis." *Id.* at 14. Gilbert responded: "That if there would be a recovery that the clients would not have to pay anything, and we would be paid when there's a recovery. The clients would not have to pay anything." *Id.* at 14-15. The Court pointed out that Gilbert's affidavit had said nothing about the clients but rather simply stated that "*work* is being performed on a contingent basis." The Court asked, "Isn't that something that would be reasonably understood by a reader that you weren't getting paid at all unless you prevailed in the case or got a settlement?" *Id.* at 15. Gilbert replied, "it doesn't mean what your Honor said." *Id.* He resisted the Court's suggestion that given GLC's litigation funding deal— under which GLC would get paid up to $14M—it would be more accurate to describe the arrangement as "partly contingent." *Id.* at 16. He stated, "My understanding is that it's accurately – it's a fully contingent basis and also get [sic] litigation finance as reflect[ing] my state of mind, going back to the very outset of the case, in the client retention letter." *Id.* at 18.

The Court pointed out that Gilbert's affidavit didn't say his firm wasn't getting paid by the clients but simply that "GLC's work was performed on a contingent basis," and

44

asked again, "How can you say that your work was performed on a contingent basis when you were getting paid up to $14 million for your work?" Gilbert replied, "We understood that in this district, it's perfectly proper to say that it's a contingent basis and to have funding and that there's never been a case or law that we need to disclose if it's a contingent [sic] that there's funding." *Id.* The Court asked the basis for Gilbert's stated "understanding," and Gilbert said simply, "There's no case or rule or law in this circuit or this district that suggests that in the contingent case someone needs to indicate their finances." *Id.* at 18-19.

The Court next turned to counsels' joint memorandum submitted in connection with the first round of settlement approvals, dkt. 679, and specifically the representation in that memorandum that "[s]ettlement class counsel also filed this case on contingency, knowing it could take years to prosecute the millions of dollars and tens of thousands of attorney hours to properly resource, thus assuming the very risk of nonpayment." Mar. 11, 2026 Tr. at 21. The Court asked Cramer and Normand, "As to Mr. Gilbert, at least, there was not a risk of non-payment was there?" *Id.* at 22. Cramer replied that from what he knows how, Gilbert "was not funded at anything close to a hundred percent of his lodestar. . . . And I think in that sentence, at least what I meant, was non-payment in the case, by the class from the case, not from an outside funder." *Id.* Normand concurred. *Id.* When the Court asked "don't you think that that would communicate to a listener that there was no payment at all forthcoming unless there was a recovery in the case?," Normand said, "that's not what I understood it to mean when I read it." *Id.* at 22. He stated that "in retrospect, it could have" been made clearer. *Id.* at 23.

Court next asked Gilbert about the statement in his March 2025 affidavit that "My

45

firm's work on this case was performed on a *wholly* contingent basis." Dkt. 830-4 (emphasis added). Asked what he meant by "wholly contingent," Gilbert stated: "Well, I signed previous [statements] that said contingent. I said [in this] one that's wholly contingent. I meant exactly what I thought about right from the beginning of the case when I say to the client, the agreement is entered into on a fully contingent basis. I understood that to be what the meaning of contingency was." *Id.* at 24. The Court pointed out, again, that Gilbert's affidavit made no reference to his agreement with the clients but rather said that his firm's "work on the case was performed on a wholly contingent basis, when, in fact, you had gotten paid or were going to get paid $14 million. How is that wholly contingent? It's not wholly contingent, is it?" *Id.* In response, Gilbert referred to the joint enterprise with the litigation funder. The Court noted that Gilbert's filing had said nothing about a litigation funder or his agreement with the clients and asked "Do you not see how [your statement] would communicate to a reader that what was happening was that you weren't getting paid anything unless you made a recovery?" *Id.* at 25. Gilbert said, "I can see now how your Honor would be concerned about that. I can see that now. So I apologize for that." *Id.*

The Court asked lastly about Gilbert's expense reimbursement arrangement with the litigation funder. He stated that the expenses "were being paid as we go on approximately a monthly basis." *Id.* at 27-28. The Court then quoted Gilbert's statement in the same affidavit that "These costs were incurred on behalf of the settlement class by my firm and have not been reimbursed" and asked Gilbert, "Was that true?" Gilbert replied, "Not reimbursed by the client. That's [the] meaning of that." *Id.* at 28. When the Court pointed out that the affidavit included no such qualifier,

46

Gilbert again referenced the "joint enterprise" with the litigation funder: "I had been given an advance, I guess, is one way of looking at it, that, as part of a joint enterprise with the funder, I would have to pay back at a multiple." *Id.* at 28-29. He said, "The reality of our situation, when we owe a substantial debt to a funder, it's hard to think of it as we've been reimbursed by the funder." *Id.* at 29. When the Court suggested that any reasonable reader would understand Gilbert's affidavit statement to convey that "you laid out $1,044,000 and you hadn't gotten a dime of it back," *id.* at 29, Gilbert disagreed, stated that he viewed the statement as candid, and said "I don't think of us as having been paid for that, and I don't see that as a fair, necessarily, with all respect, characterization, your honor." *Id.* at 30.

The Court then heard argument from both sides. In oral comments, Cramer stated, "I . . . regret that some of the language in some of the documents that were filed in support of the fee petition were not as transparent as they could have been" and appeared to acknowledge that the statements, which he claimed were largely borrowed from filings in other cases, "did not account for the funding agreement that Mr. Gilbert had." *Id.* at 33. He stated that 'in hindsight, I would say that we should have been clearer regarding that, and I apologize to the Court for that." *Id.* Normand noted that the Court was "understandably frustrated with the ambiguity of some of the language. I understand that. There's no, from my perspective, intentional wrongdoing. These were negligent mistakes of omission, I think you could say." *Id.* at 34. Both Cramer and Normand emphasized the results obtained by the class thus far and contended that there was no misconduct of the sort "that would call into question the ability to represent the class as loyal to the class." *Id.*; *see also id.* at 33. Gilbert made some separate

47

points regarding hours and hourly rates and said, on the issue at hand, "I apologize to the extent there was some inference, understanding, from words that were used that was not intended, certainly not intended and never understood that there was any requirement in this district to view this as a joint enterprise between the law firm and its sponsors [sic]." *Id.* at 36-37. Defendants' counsel emphasized their arguments that counsel had made knowing misrepresentations that prejudiced the class.

### 9. The motion to amend

Following the March 2026 hearing, plaintiffs filed a motion to amend their motion for class certification. Specifically, plaintiffs stated that they "now seek the appointment of only Freedman Normand Friedland LLP ('FNF') and Berger Montague PC ('BMPC') as Class Counsel for the proposed litigation Class in this case," and not Gilbert Litigators and Counselors. Dkt. 1236 at 2. They argued that this would adequately and appropriately address the concerns noted by the Court at the March 11 hearing. Gilbert filed a supplement to the motion asking to keep GLC on in a supporting role to FNF and BMPC but offering to have GLC "withdraw altogether" "if the Court believes [GLC] cannot adequately represent the interests of the Class under the leadership of BMPC and FNF (without Mr. Gilbert's involvement) . . . ." Dkt. 1237 at 3.

In response, defendants argued that plaintiffs' motion "does not solve their problem. BMPC and FNF made the same misrepresentations as GLC and thus share responsibility for misleading the Court on this and related overbilling issues by GLC, which they did for their own benefit and to the detriment of the proposed class." Dkt. 1239 at 2. Defendants also noted that FNF and Berger might be contractually obligated to share any further fee awards with GLC, which they contended would improperly

permit GLC to profit even if removed from the case.

The Court grants the motion to amend, including the proposal by GLC to withdraw from representation of the class. But for the reasons described below, the Court does not believe that this is sufficient to remedy the problem caused by counsels' inappropriate conduct. Nor, however, does the Court agree with defendants' contention that the Court should simply deny class certification and proceed on an individual basis.

**10.    The Court's assessment of the fee split and excessive hours issues**

The Court ultimately did not order further discovery from the law firms regarding the fee split and excessive hours issues. Thus the record does not include contemporaneous records describing exactly how the dispute was resolved. The other lead plaintiffs' counsel have represented that, following extended discussions, they became comfortable with the amount claimed by GLC and also worked out the division of labor among the three firms going forward.

The Court declined defendants' request for extended discovery largely because it was likely to be a dead end on these points, and on proportionality grounds. It is overwhelmingly unlikely that further discovery ever could have established that an attorney who claimed X hours on a particular date for a particular set of tasks did not actually spend that time. Nor would discovery likely have provided any additional meaningful insight into the issue of inappropriate allocation of work among upper and lower-level attorneys. Among other things, we already know Gilbert's view on this; it is expressed in his October 23, 2023 email. Furthermore, it is already obvious from the face of the attorney's fee motions that GLC's hours and claimed lodestar were significantly higher than those of the other two firms: GLCs lodestar was about fifty

49

percent higher than FNF's and nearly double that of Berger.  And it is also obvious from the face of the papers that the average hourly rate for the GLC work was higher than for the other firms, meaning that more of the time had been claimed by more senior attorneys.[7]

Just as importantly, the Court can confidently say (as it did at the July 11, 2025 hearing) that the claimed overinvolvement of more senior GLC attorneys and the allegedly inflated hourly rates, though material in an objective sense, did not *actually* make a difference in the Court's fee rulings regarding the two groups of settlements. Some simple math illustrates this.  For the first group of 10 settlements, totaling $285 million in payments, plaintiffs' counsel sought a little under $95 million in fees.  They represented that the total lodestar was a little over $70 million, meaning that on the "lodestar crosscheck" the multiplier was a bit over 1.3.  The $70 million was broken down approximately as follows:  $31 million for GLC; $21 million for FNF, and $17 million for Berger Montague.  *Even if (to account for hours and rates) one were to cut the GLC number in half, to $15.5 million, the lodestar crosscheck multiplier still would be under 1.8* (at a total lodestar of $54 million), which is comfortably within the range of typical approvals.  The Court would have approved a one-third fee even if those had been the lodestar numbers.  Again, the Seventh Circuit has made clear that the

---

[7] Regarding the hourly rate issue, there do appear to be disparities between the rates provided for some GLC attorneys for this case and amounts they sought in other litigation.  But it is not apparent that the market hourly rates for the other matters are similar to those for complex antitrust matters like this one.  And the range of rates for the GLC attorneys (from lowest to highest) is roughly the same as the range for Berger and FNF.  On a separate point, the question of whether GLC was an actual preexisting "law firm" or instead served as an umbrella for not-previously-affiliated lawyers—another point identified by defendants—is of little consequence in the Court's view.

standard is the market rate, and the relevant caselaw establishes that the market rate in a common fund case of this type is a percentage, not hours-times-rate.  The discovery sought by defendants would not have altered these facts.[8]

The Court also notes that defendants have not been in anything approaching an information vacuum here.  They were given the detailed correspondence among the plaintiffs' firms from October 2023; Bach-y-Rita testified; and the three lead plaintiffs' counsel were questioned extensively by the Court at the March 2026 hearing.  They have had plenty of information that enabled them to advance their contentions on the adequacy of counsel issue, and what they got was proportional to the issues under consideration.

### k.     The candor issue

The real concern here is not overinvolvement of senior attorneys, inappropriate allocation of work, or even hourly rates.  In the Court's view, the most significant issue—which did not emerge right away—arises from  litigation funding arrangement, in particular the representations to the Court claiming that GLC's work was done on a "contingent" or "wholly contingent" basis and that its expense outlays were "unreimbursed."

Before discussing this issue, the Court wishes to make clear that the problem does not involve the fact that Gilbert had litigation financing or the particular terms of the financing.  The Court has nothing at all against litigation financing.  Just as liability

---

[8] The Court acknowledges that, as defendants contend, there is a logical link between this issue and the hours/hourly rate issue, as both were part of counsels' argument that they should be awarded a one-third fee.  The Court will address this point below.  But this logical link does not make the hours/hourly rate issue independently significant.

51

insurance (in part a form of litigation financing) allows an alleged tortfeasor to present a defense, plaintiff-side litigation financing allows parties with potentially viable legal claims to pursue them where they otherwise could not. There are, to be sure, problems that arise from certain types of funding arrangements, but those problems are not at issue here. There is no question that the plaintiff class in this case has potentially viable claims that the litigation has enabled the class to pursue—achieving nearly $320 million in settlements.[9]

Likewise, the issue here does not involve any view on the Court's part that there was, or should be, an affirmative obligation to disclose GLC"s litigation financing. The current Federal Rules do not require it; nor do this District's local rules; and the undersigned judge has not imposed such a requirement on an individualized basis.

Rather, the issue here involves candor. Plaintiffs' counsel were not required to tell the Court or defendants about GLC's litigation financing. But making untruthful and misleading statements about it is a different matter. And that is what happened here.

The Court starts with Gilbert. He represented, in his April 2024 affidavit, that "GLC's work on this case was performed on a contingent basis." Dkt. 679-3 ¶ 4. That was not accurate. By that time, payment of $8 million for 40 percent of GLC's time was *guaranteed* and likely already had happened. And even though GLC had exceeded that cap by the time of the April 2024 affidavit, that meant only that GLC's work was *partly*

---

[9] The repeated rhetorical flourish by defense counsel that the record shows this is litigation "by lawyers, for lawyers" is unpersuasive. The Court's reaction to the first part of that is, so what: all non-*pro se* lawsuits are "by lawyers." The pejorative connotation of the second part is defeated by the class settlements, which have returned over $220 million *for the class members* exclusive of fees, which by any reasonable measure is a wildly successful outcome.

performed on a contingent basis.  Gilbert's affidavit, however, included no such qualifier; it said the firm's work was performed on a "contingent" basis, period.  Even if this was not completely untrue—in that the work was *partly* performed on a contingent basis—it was at least misleading without a qualifier.

And in any event, in Gilbert's March 2025 affidavit, he effectively doubled down: he represented that "[m]y firm's work on this case was performed on a *wholly* contingent basis."  Dkt. 830-4 ¶ 5 (emphasis added).  It most certainly was not.  By then GLC had been paid $14 million, which it would have to pay back only in the event of a recovery. It is, of course, true that GLC would be paying the funder back from the settlement-related fee and expense award, but Gilbert's sworn representations to the Court expressly concerned *the period when the work "was performed."*  Words matter, and context matters.  The statements by Gilbert would have misled any reasonable reader to believe that, at the time GLC's work was performed, it risked total nonpayment for its work.  The truth is that it didn't.  If the case had been dismissed that day, Gilbert would have walked away with the funder's millions in hand.

And it didn't stop there.  Gilbert represented in his March 2025 affidavit that GLC had over $1 million "in unreimbursed costs and expenses" and repeated that "[t]hese costs . . . *have not been reimbursed*."  *Id.* ¶ 6 (emphasis added).  That was not true:  the litigation funding agreements guaranteed payment of 100 percent of GLC's expenses. GLC almost certainly had already been reimbursed for these outlays by the time Gilbert signed the affidavits.  But even if that had not happened just yet, it would have been quite misleading to call "unreimbursed" expense outlays for which GLC was guaranteed to be repaid.

Up to this point the focus has been on Gilbert. That does not mean that the other attorneys or firms can walk away unscathed. The October 2023 emails reflect that by then, Cramer and Normand were aware of Gilbert's litigation financing arrangement—including the fee payments (in fact, it appears that at the relevant time, they may have believed that GLC was getting 100 percent of its hourly fees paid). Indeed, Cramer and Normand confirmed at the March 2026 hearing that they were aware that Gilbert was receiving payment for his firm's hourly fees. Despite this knowledge, they filed with the Court submissions that included the false statements by Gilbert just discussed, without disavowing them or even calling the Court's attention to the point. And in both the March 2024 and April 2025 submissions, which both Cramer and Normand signed, the attorneys all represented that counsel had worked on the case "with no guarantee of recovery," which they knew was not accurate with regard to GLC. Their joint (with Gilbert) April 2025 affidavit incorporated the earlier submissions, which included Gilbert's statements that his firm's work had been performed on a contingent basis, which was likewise not accurate as stated. And they submitted draft settlement approval orders that called upon the Court to find that counsel "undertook this case on a wholly contingent basis and ran a substantial risk of no recovery whatsoever"—which unquestionably was untrue with respect to GLC—knowing full well that the Court did not know any better.

The Court suspects that if Cramer or Normand had told Gilbert—as they had earlier regarding the hours/rates issue—that they would not be party to a submission that included a statement that GLC's work had been performed on a "contingent" or "wholly contingent" basis—which is what they should have done—the Court would have

54

been told the straight story and would not have been forced onto this extended detour. But none of that happened.

It is worthy of note that Cramer and Normand did not simply choose to remain silent in the face of Gilbert's misstatements; they *affirmatively adopted* them. This is not simply a matter of being less than "fully transparent," as counsel suggested at the March 2026 hearing.

Counsels' primary contention is that what they really meant was that recovery by what they refer to as the GLC/litigation financer joint venture was indeed contingent. But even if that is true in the abstract, it totally ignores what the affidavits and other submissions *actually said*. They made no reference to litigation financing. a joint venture, or anything of the kind. Rather, Gilbert repeatedly said that "*GLC's work on this case* was performed on a contingent basis," or, even worse, "on a wholly contingent basis." GLC did not perform its work on a contingent basis. It had an arrangement on which it was guaranteed up to $14 million for its time and all of its out of pocket expenses, and it didn't have to pay this back to anyone except in the event of a recovery via settlement or judgment. Yes, the litigation funder was 100 percent at risk, but Gilbert's affidavits, and all three counsel's submissions, referred to GLC, not the litigation funder or any sort of a joint venture. Again, words matter, and context matters. What these words communicated in context to any reasonable reader—and certainly to the Court—was that if GLC did not win or get a settlement it was not getting paid, period. That was false.

The next question concerns the significance of the misstatements. There is no doubt that Gilbert made his statements about the "contingent" and "wholly contingent"

nature of GLC's work to persuade the Court that GLC risked, in the words of the April 2024 submission (quoting *Silverman*) "walking away empty handed." That is what any reasonable judicial reader would have understood Gilbert's statements to mean. And that, in turn, is what any reasonable lawyer in the position of Gilbert, Cramer, and Normand would understand. From an objective standpoint, the misstatements were material: they were capable of influencing the intended decisionmaker, namely the Court. The statements that GLC's work was performed on a contingent or wholly contingent basis, and the statement in March 2025 that GLC's expense outlays of over $1 million were unreimbursed—which similarly was false—were made in the context of a discussion of the risk taken on by class counsel. Under governing caselaw, the degree of risk was an important consideration in determining a reasonable fee. All three lead counsel most certainly knew this.

It is a separate question, however, whether these misstatements *actually* influenced the Court. The Court acknowledges that it is assessing this with hindsight. But the Court concludes that counsels' misstatements regarding the purportedly contingent nature of GLC's work and its purportedly unreimbursed expense outlays did not actually impact the award of fees and expenses in connection with the settlements. GLC was not the only firm prosecuting the case. The work of FNF and Berger *was* fully contingent; they have represented that they do not have litigation financing arrangements that compensate them for attorney and other professional time. As for GLC, though it had been paid a very large sum for its time on the case, at the time of the settlements its work was still *partially* contingent: the hourly fee reimbursement was for 40 percent of its lodestar, and it was capped at $14 million. This meant that the

56

overall percentage for which GLC had been paid started to drop once it had put more than $35 million in time into the case. Considered globally, class counsel's fees still were overwhelmingly contingent. In addition, the Court has no basis to believe that awareness of Gilbert's arrangement would have affected the percentage of the award. This is the one place where the fact that Gilbert was in a "joint venture" with the funder *was* relevant: the funder would recover its advances off the top of the fee award to GLC. Thus knowledge that GLC had been paid (as Gilbert put it, advanced) $14 million would not have impacted the Court's decision to award a one-third fee.

The same is true regarding the false representations concerning reimbursement for GLC's expense outlays. There is no scenario where this, by itself or together with the fact that Gilbert's work was not actually performed on a fully contingent basis, would have altered the Court's decision to approve the one-third fee award and the award of expenses proposed by counsel. To put a finer point on it, the fact that Gilbert bore only a limited risk would not have impacted the Court's decision to approve payment in full for class counsel's litigation expenses, or the one-third fee.

This does not mean that counsels' misrepresentations regarding Gilbert's arrangements do not matter. They do. The issue here boils down to candor. Gilbert's affidavits were affirmatively misleading. And at a minimum, the other two lead counsel, Cramer and Normand, helped pull the wool over the Court's eyes. Gilbert made affirmative misstatements; Cramer and Normand could have corrected or tried to correct them but did not. Further, they did not disavow Gilbert's misstatements and, worse, affirmatively adopted them as part of the joint filings. And even though, as the Court has discussed, these representations had no *actual* effect on its decision, Gilbert,

Cramer, and Normand all plainly understood that it *could* affect the fee awards.

That much is clear.  What is less clear is what the Court should do about it.  For defendants, it's simple:  do not certify the class.  But it is not that simple.  For one thing, although the Court has not yet certified a class as to the litigating defendants, it's not as if a class doesn't exist.  One does:  a settlement class has been certified, and over 74,000 class members have submitted claims to the $220 million fund (net of fees) created on their behalf.  In other words, *there is an existing class*, certified for settlement purposes, that effectively mirrors the class that plaintiffs have moved to certify with regard to the claims against the litigating defendants.  This is not the typical situation where, when class certification is considered, the putative class is an anonymous group of arguably uninterested persons who are not actually before the Court.  Rather, the class is already here.  This may not matter in terms of the specific requirements for class certification.  But it does matter from a practical, commonsense standpoint.

The defendants express concern about prejudice to the class as well.  They point out that the false statements about the purportedly contingent nature of GLC's work are linked to the excess-billing issues noted by Bach-y-Rita and the hourly-rate issues involving GLC.  Specifically, defendants argue, this was all part of an effort to get more for counsel at the expense of the class.  The Court cannot disagree with that.  But the solution proposed by defendants gives *them* a windfall and penalizes the alleged victims.  Denial of certification is, of course, the usual result if class counsel are inadequate.  But again, the overwhelming majority of those situations involve still-anonymous groups of people who have not actually chosen to bring claims to court.  That is not the situation here:  over 74,000 class members have actually asserted

58

claims.  Denial of class certification would reward the defendants at the expense of those the defendants contend were harmed by counsels' improper actions.

The Court turns to the law regarding attorney misconduct and Rule 23(a).  The Seventh Circuit has stated that "[w]hen class counsel have demonstrated a lack of integrity, a court can have no confidence that they will act as conscientious fiduciaries of the class."  *Creative Montessori Learning Centers v. Ashford Gear LLC,* 662 F.3d 913, 918 (7th Cir. 2011); *see also, e.g., Eubank v. Pella Corp.*, 753 F.3d 718, 724 (7th Cir. 2014) (quoting *Ashford Gear*).  The Seventh Circuit has explained this concern as follows:

> [U]nethical conduct by class counsel implicates class certification because class counsel serves as a fiduciary for the unnamed plaintiffs.  Class actions present strong incentives for counsel to sell out the class by agreeing with the defendant to recommend that the judge approve a settlement involving a meager recovery for the class but generous compensation for the lawyers.  Thus, when class counsel have demonstrated a lack of integrity through misconduct and unethical action, a court can have no confidence that they will act as conscientious fiduciaries of the class.

*Reliable Money Ord., Inc. v. McKnight Sales Co.*, 704 F.3d 489, 495 (7th Cir. 2013) (cleaned up).

Given this concern, it is *not* the rule that misconduct by class counsel defeats class certification, period.  As the court stated in *Reliable Money Order*,

> Not any ethical breach justifies the grave option of denying class certification.  [M]isconduct that prejudices the class or creates a direct conflict between counsel and the class requires such denial . . . .  [And] even "serious" or "major" ethical violations—not prejudicial to the class—can require denial of class certification.  . . .  That does not mean, however, that an ethical violation always requires denial of certification . . . .  A "slight" or ""harmless" breach of ethics will not impugn the adequacy of class counsel. . . .  This conclusion makes sense: the ABA Model Rules, the Illinois Rules, and the Wisconsin Rules all warn that "the purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons."  Thus, unless the violation prejudices one of the parties or undermines the court's ability to resolve the case justly, state bar

59

authorities—not a court—should enforce the rules and sanction the attorney. *Id.* (citations omitted). The court stated the governing rule as follows: "[U]nethical conduct, not necessarily prejudicial to the class, nevertheless raises a 'serious doubt' about the adequacy of class counsel when the misconduct jeopardizes the court's ability to reach a just and proper outcome in the case." *Id.*

Conflicts between counsel and an actual or putative class are more or less inherent in the relationship. The class—to the extent it is engaged in the matter, which generally is not the case—wants fair compensation for the wrongs it suffered. Counsel have an interest in being paid for their time. Thus, as the Seventh Circuit recognized, counsel have an incentive to sell the class short in return for getting paid.

But nothing about this case leads the Court to believe that counsel have sold the class short thus far in connection with either litigation or settlement. Counsel have ably prosecuted the case to date. The class's claims have survived summary judgment, and the case is set for trial. And counsel have achieved from twelve of the seventeen defendants very large settlements that have gained $220 million in compensation for the class, net of fees.

Going forward, it is unlikely that counsels' lack of candor with the Court would impact their zealous prosecution of the case from a litigation standpoint. And regarding settlement, any opportunities for the class to be sold short from here on in are likely quite limited. The prospect of settlement with the five remaining defendants appears to be remote. Based on discussions the Court has had with the parties, including a settlement conference involving plaintiffs' counsel and the remaining defendants, plaintiffs' counsel have insisted on settlement payments higher than those from the

60

defendants who settled earlier on, and defendants have made it clear that they are unwilling to pay anything close to what earlier settling defendants did. This posture may, of course, change on one side or both. But settlement—and thus the opportunity for an attempted "sellout" by counsel—appears relatively unlikely at this point.

That said, the breach here was a significant one. The ability of a court to trust counsel matters, particularly when counsel represents a class. Here counsel have impaired that trust in a significant way. And there is no way to predict with certainty that this will not matter going forward. If nothing else, there is a risk that current class counsel may pull their punches to avoid a perceived risk of antagonizing the Court.

On the other side of the ledger, however, removal of all the current attorneys poses a very high risk of impairing the prosecution of the case going forward. The current lawyers have spent years preparing and developing the case; they are familiar with its strengths and weaknesses; and they have developed a strategy that has enabled them to achieve significant settlements and ready the case for trial. The putative class risks being seriously harmed if current counsel are removed completely.

Weighing these competing concerns is not easy. Given counsels' candor problem, the Court concludes that there is at least significant doubt that current class counsel, even with GLC out of the mix, are adequate within the meaning of Rule 23(a). But the level of doubt is insufficient to require their removal entirely. Instead the Court concludes that the appropriate measure—both to protect the class and avoid unfairly prejudicing it—is to require bringing in new lead counsel outside the current group. If this is done, and the new counsel is shown to be adequate, then the Court will grant the motion for class certification and appoint the new counsel as the lead, with FNF and

61

Berger as co-counsel.  If new and adequate lead counsel is not brought in, then the balance will tip the other way, and the Court will deny the motion for class certification.

The Court therefore defers entry of a ruling on the motion for class certification. Plaintiffs are given 21 days, to file a submission proposing new lead class counsel.

### Conclusion

In sum, the Court grants plaintiffs' motion to amend their motion for class certification and withdraws from consideration as class counsel the attorneys associated with Gilbert Litigators and Counselors [dkt. 1236, 1237].  The Court enters and continues plaintiffs' motion for class certification [dkt. 757] and gives plaintiffs 21 days, to April 21, 2026, to file a motion proposing new lead class counsel.  The case is set for an in-person status hearing on April 28, 2026 at 9:30 a.m.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  March 31, 2026

62