# EXHIBIT B

# LAWDRAGON

# LEGENDS OF THE LAWDRAGON 500: STEVEN MOLO

By John Ryan , Katrina Dewey  |  January 31, 2022  |  Lawyer Limelights, News & Features



*Photo by Michael Paras.*

Many of the ingredients that go into being a great trial lawyer – tenacity, intelligence, the talent for storytelling, the ability to shift gears in an instant after months of preparation – don't necessarily guarantee success over the long haul in such a competitive profession. For Steven Molo, the traits that have proven just as important to his longevity – his decades of success in public and private practice across every type of complex case imaginable – are gratitude and optimism. These have supported his tireless devotion to his craft in court as well as his stewardship of a litigation boutique forged in the wake of the Great Recession. Firms built on both talent and nimbleness have an edge in times of crisis: Not surprisingly, MoloLamken has thrived in the pandemic, and even a people-person like Molo sees the silver linings of some of the changes brought to the practice of trial law over the past 20 months.

Like many a perennial Lawdragon 500 member, Molo began his career as a prosecutor. He then practiced at Winston & Strawn and Shearman & Sterling before co-founding his own firm in 2009 with renowned appellate litigator Jeffrey Lamken. In the world of litigation boutiques, Molo feels blessed to have had a mentor like Stephen Susman, another Lawdragon Legend who passed away in July 2020 after a biking accident. Their last conversation focused on the wisdom of investing in the next generation of trial lawyers. Molo is confident that group will take the reins of a profession that better reflects the nation's diversity.

**Lawdragon:** What are you working on these days?

**Steven Molo:** It's the usual mix of complex business disputes, white collar criminal matters, and a bit of IP. I'm about to start a jury trial representing a shareholder class in a securities fraud case before Judge Rakoff here in New York. I'm representing the Special Litigation Committee of Twitter's board related to a derivative suit in the Delaware Court of Chancery challenging a transaction the company did with Silver Lake and Elliot Management. Later in the year, I'm trying an accounting malpractice arbitration in Philadelphia and a trade secrets case in California. I was just retained to represent a non-US defendant in a high-profile white collar criminal matter. All interesting work. I'm fortunate.

**LD:** Where does the work come from?

**SM:** All over, really. We get a lot of referrals from other lawyers. We get referrals from current and past clients. People read about our work on the internet and contact us. Large and small firms bring us into matters when they are looking to add additional courtroom firepower, sometimes early and sometimes late in a case. We're proud that more than half our cases involve another firm. We're highly collaborative within the firm and that extends to working with others. Our juniors are taught: do excellent work, don't worry about the credit, be commercial, be user friendly.

**LD:** You mentioned you are about to start a jury trial. You're known as a great cross-examiner. Is there a tip or two you are willing to share to help those trying to develop that skill?

**SM:** Prepare and improvise. I enter every cross-examination having spent hours and hours researching everything inside and outside the record that can be used to elicit testimony that may help my case, undercut my opponent's case, or undermine the witness's credibility. I have both questions and a strategy planned in detail. But a cross-examination is not a performance, it's a dynamic interaction between two people. Whether through fear, inexperience, or incompetence, many lawyers fail to truly listen to the witness's answers and consider them in the context of the rest of the evidence. Sometimes a witness will serve up a nugget. You've got to be prepared to snatch it and run with it despite what's in your notes. Or maybe you have to abandon a line of carefully crafted questions. Extraordinary preparation won't make you a good cross-examiner if you lack situational awareness and the ability to react. Just as bad are lawyers who believe that the key is being quick on your feet and are unwilling to put in the time to prepare.

**LD:** How has the pandemic impacted your firm?

**SM:** We pushed through the initial uncertainty everyone faced, remained busy, and have gotten stronger. We've always staffed matters across all three of our offices. So, the transition to full-time remote work wasn't particularly challenging. But our culture is critical to our success and that's easier to tend to when you see your colleagues in person. We've grown the team with some fantastic people and that caused us to rethink and improve our onboarding and training. We've generally enhanced our internal communication and mentorship as well. As for the practice, we've had fewer trials but lots of appellate and trial court arguments. That said, we have four trials starting in early 2022.

**LD:** How about you personally?

**SM:** I've appreciated the reduced travel. It's made for greater efficiency and less expense. It seems video hearings and depositions are with us to stay. But, there are those times when appearing in person makes a difference. Some studies claim that as much as 85% of communication is non-verbal. Zoom, Teams, and similar platforms don't capture the full extent of non-verbal communication you experience in a courtroom. As an advocate you want to have every tool available. So, I miss the amount of time I spent in courtrooms.

**LD:** You are one of the nation's truly elite litigators, what trends do you see in terms of high-profile litigation and investigations these days?

**SM:** Antitrust is an area of increasing activity as the current administration is stepping up its efforts. We're starting to see disputes relating to SPACs. With high-profile athletes and other celebrities – as opposed to traditional financial players – featured in some of the transactions, you have to think the market is overheated. Crypto is still the wild west without any real regulation and high volatility in valuations. That makes it ripe for lawsuits and investigations. And we believe that while it's a bit slow at the moment, restructuring and insolvency litigation will make a big comeback when the markets turn, as they inevitably do. We've added some talent and enhanced our learning in all of these areas.

**LD:** Where does IP fit, in terms of litigation trends?

**SM:** IP remains hot. We're quite active in patent litigation and don't see it slowing. With technology continuing to advance rapidly and playing so big a part in our lives, the stakes are enormous. We're also seeing an increase in the related area of trade secrets – across an array of industries. We just collected a $31.7 million judgment in a case I tried involving the development of electric power plants. We have another high-profile matter pending that involves the conversion of passenger airplanes to freighters.

**LD:** What about litigation finance – it seems to be an increasing presence in high-profile disputes?

**SM:** The litigation finance industry and our firm have pretty much grown up together. We know essentially all of the key players and have worked with many of them – sometimes helping vet matters, sometimes having them provide capital to a client. At its core, litigation finance is a great thing because it provides access to justice. Clients that might not be able to find a lawyer, or at least a high caliber lawyer, to take a worthy case on a full contingency basis can vindicate their rights. Smart corporations are using it to realize the value of assets without using their own balance sheets. And law firms like ours, that do a fair amount of alternative fee work, can hedge some of their risk. There are some major financial organizations with extremely smart people committed to the space. There are some not-so-smart folks too. Like any relatively new industry you'll see a shakeout. But long term, it's here to stay.

**LD:** It seems that litigation is both local and increasingly global. What has that meant for you and MoloLamken?

**SM:** It may seem unusual for a firm with no overseas offices, but many of our clients are important organizations and individuals based outside the US. We have particularly strong ties to the UK, Japan, Germany, Switzerland, France, and Latin America. And we have clients – including sovereigns – from other parts of the world. Many of them find us through our relationships with excellent lawyers in other countries. Our partners work to develop and maintain those relationships – calling on those lawyers and helping them whenever possible. Despite the recent nationalist rhetoric here and abroad, technology and commercial realities continue to drive law – including disputes and investigations – to become more international. Lawyers doing sophisticated work need to have sensitivity to other cultures. That's part of our firm DNA. And besides, it's fun having friends all over the world.

**LD:** You lost a friend and mentor with the death of Steve Susman. Has that caused you to reflect on the meaning and effect of mentorship?

**SM:** I've said before that I've been extremely fortunate to have had great mentors throughout my career. I met Steve when I was still in big law, but we became much closer once we launched MoloLamken. He was sort of the granddaddy of the litigation boutique world, a great lawyer, and lots of fun. He was incredibly generous with his time and insights and wasn't worried about helping someone who might be a competitor. He believed that sharing made for a richer life. What's the adage, "you can hold more water in an open palm than in a tight fist"?

**LD:** When did you see him last?

**SM:** A few months before his biking accident we had lunch in Aspen, just the two of us. We talked about a lot of things – new types of cases, the need to make time to physically and mentally recharge, how bad the remake of Mary Poppins was. I declined to see it with Steve the night before.

**LD:** Is there anything that sticks out from that conversation?

**SM:** It's interesting given what's going on with associate compensation right now. Both Susman Godfrey and our firm pay associates above the so-called "market rate". He was saying how it was worth it and actually made, rather than cost, the firm money. The compensation attracts and rewards top talent, but the investment only pays off if you also provide associates with the training and opportunities to develop into strong lawyers.

**LD:** How do you train and give opportunities to junior lawyers?

**SM:** All of our associates have clerked for judges so that's an excellent foundation. Within the first six or seven months they get ten days of offsite training through the NITA deposition and trial programs. We look for pro bono opportunities that will not only get them on their feet but also have them in charge of the case. It's almost a rite of passage for associates to argue a 7th Circuit appeal. Most importantly, we give them responsibility on cases. They routinely take and defend fact and expert depositions. If we go to trial, we find a way for them to take a witness or argue motions. We spend a lot of time and money to hire extraordinarily talented people. Why not put that talent to work?

**LD:** How does today's focus on diversity and inclusion play out in an elite firm like MoloLamken?

**SM:** We started the firm, as we say, with "five white guys". We are extremely proud that today more than a third of our lawyers are from backgrounds traditionally underrepresented in the legal profession. And we do not have the large first and second year classes that favorably impact diversity statistics in larger firms. Our senior staff is all women, mostly women of color. We earnestly believe that diversity makes us stronger and demonstrate that belief with our time and money. We're big supporters of the ABA Judicial Internship Opportunity Program, which places law students from underrepresented backgrounds with judges for the summer. We're active sponsors of the Leadership Council on Legal Diversity, a great partnership between law firms and corporations. Several partners and associates have been LCLD fellows. We partner with Genesys Works to employ and mentor high school students from underserved communities. It's very much on our mind. Even though we don't have the resources of a mega-firm, we can do more, and we will.

**LD:** Your firm has grown steadily over 12 years, adding great people and handling important, high-stakes matters. If you had to identify a single factor in that success, what would it be?

**SM:** It's a little hard because a lot of things, including luck, have combined to get us where we are today. We always say it begins and ends with our people. Hard work, talent, following a clear vision all play a role. I guess if you have to single out one factor, I'd say it's our culture. We are passionate about the representation of our clients and practicing with the highest degree of professionalism. We strive to employ the best talent and resources to do that. We recognize people bring different strengths to the firm and we work to develop those not only to benefit our clients but also to benefit our people. We work every day at having a respectful and mutually supportive environment that allows people to reach their potential. We don't always get it right, but we try.

**LD:** Do you see the pandemic having lasting effects on the legal profession?

**SM:** Of course, like the rest of the world lawyers have learned you don't need to get on a plane, or even go to the office, to meet effectively. I doubt we'll ever go back to the traditional five days in the office work week. That's good because it can give people more time and allow firms to access talent in remote places without opening offices. And of course, office space and cost will shrink too. The downside is that the informal mentoring and spontaneous collaboration that occurs from running into someone in the hallway will occur less often. The effect of that can't be underestimated because we essentially train through an apprenticeship process. Firm leaders need to keep that top of mind and account for it, or the profession and those we serve are going to have problems.

**LD:** Have you noticed the pandemic effecting how lawyers conduct themselves?

**SM:** Anyone who tells you this has not been hard is a liar. Even the great corporate transactional firms that have enjoyed a boom have had challenges with the mental strain that the isolation, sickness or fear of getting sick, and almost total dependency on technology have imposed. Life's more complicated. In some ways that's a positive because I think it's really raised awareness of the importance of mental health. What we do is hard. Seeking help has often been seen as a weakness. The pandemic has made many people realize that their mental health and the mental health of those around them has to be a priority. My best friend from law school took his own life so this issue has always been important to me.

**LD:** Are law schools doing a good job preparing students to practice?

**SM:** We don't hire directly from law schools but obviously our associates are the product of what's being taught. The increased practical training through clinical courses is good. However, I think schools would better serve students and the profession by offering and requiring more and shorter courses. For example, you could learn a lot about antitrust or securities regulation in eight weeks rather than sixteen. Law school is the place to get that basic doctrinal training in a variety of subjects. I see a lot of "law and…" courses on transcripts and maybe not enough federal courts.

**LD:** The country is deeply divided between the right and left, with dialogue and actions that are often extreme and disturbing. Where do lawyers fit in this discourse?

**SM:** In a sense, we're paying the price for our extraordinary liberty. The internet, the absence of the Fairness Doctrine, the virtually unlimited money that can back a cause or a candidate, the tougher burdens for public figures in defamation cases. They all contribute to the vitriol. But just because you can say almost anything, loudly, doesn't mean you should. We have an obligation to uphold the rule of law. I tried two redistricting cases, both more than ten years ago, that ultimately determined the control of the state legislature. The parties fought extremely hard, but everyone understood there'd be a winner and a loser and we'd abide by the court's decision. That's not the sentiment we've seen recently. Lawyers need to step up, in a non-partisan way, to both ensure, and then publicly endorse, the integrity of elections. The electoral process and peaceful transition of power are central to our democracy. Officials, with the help of responsible lawyers, have to structure and run elections that cannot be credibly challenged. And lawyers, both through organizations and individually, have to tell the public, friends, and family that things are on the square. Tell them challenging the rule of law is playing with fire, and a misstep can burn down the house. Without the rule of law, we're no better than some petty dictatorship. Every lawyer owes that to our country.

**LD:** Non-lawyer ownership of law firms is trending. The compensation gap between lawyers at the handful of most profitable firms and those at other large firms, not to mention lawyers in smaller cities and in public service, is enormous. Lawyers have been sanctioned for making unsubstantiated allegations to challenge the election. How optimistic are you about the future of the legal profession?

**SM:** I'm extremely optimistic about the legal profession. Law schools continue to attract bright people who want to make a difference in the world. Applications are way up. Lawyers played a central role in founding this country. Every social, political, business, and scientific advancement we've had has been in some way tied to the law. Lawyers and the law influence the arts and religion. Smart, honest, hard-working people want to be part of that. There have always been lawyers who've been paid a lot of money for valuable service to business and those who are compensated much less for equally valuable service in the public interest. And the stakes in law, like the stakes in business, have gone up. That's capitalism. Maybe the non-lawyer ownership of firms is a way to provide basic legal services at a lower cost to people who can't afford an expensive lawyer. The fact that the courts have held lawyers accountable for their conduct in the election cases shows the system works. The law provides for our ordered liberty. Fortunately for all of us, there are still plenty of capable people who recognize that and want a career in its service.