# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


SIA HENRY, et al.,                          )  Case No. 22 C 125
                                            )
                        Plaintiffs,         )
                                            )
            vs.                             )
                                            )
BROWN UNIVERSITY, et al.,                   )  Chicago, Illinois
                                            )  March 11, 2026
                        Defendants.         )  9:00 a.m.


                TRANSCRIPT OF PROCEEDINGS - MOTION
          BEFORE THE HONORABLE MATTHEW F. KENNELLY


APPEARANCES:


For the Plaintiffs:    FREEDMAN NORMAND FRIEDLAND LLP
                       BY:  MR. EDWARD J. NORMAND
                       10 Grand Central
                       155 E. 44th Street, Suite 915
                       New York, New York 10016


                       FREEDMAN NORMAND FRIEDLAND LLP
                       MR. RICHARD CIPOLLA
                       225 Franklin Street, 26th Floor
                       Boston, Massachusetts  09110



Court Reporter:        CAROLYN R. COX, RPR, CRR, FCRR
                       Official Court Reporter
                       219 S. Dearborn Street, Suite 2102
                       Chicago, Illinois  60604
                       (312) 435-5639
                       C.Cox.courtreporter@gmail.com

                       * * * * *
                PROCEEDINGS REPORTED BY STENOTYPE
     TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

APPEARANCES (Cont'd):

                        BERGER MONTAGUE PC
                        BY:  MR. ERIC L. CRAMER
                        1818 Market Street, Suite 3600
                        Philadelphia, Pennsylvania 19103


                        BERGER MONTAGUE PC
                        BY:  MR. ROBERT E. LITAN
                        1001 G Street, NW
                        Suite 400 East
                        Washington, D.C. 20001


                        GILBERT LITIGATORS & COUNSELORS
                        BY:  MR. ROBERT DEWITT GILBERT
                             MR. ROBERT SOL RAYMAR
                             MR. DAVID STUART COPELAND
                        11 Broadway, Suite 615
                        New York, New York 10004


Cornell University:    KIRKLAND & ELLIS LLP
                        BY:  MR. NORMAN ARMSTRONG, JR.
                        1301 Pennsylvania Avenue, NW
                        Washington, DC 20004


                        KIRKLAND & ELLIS LLP
                        BY:  MS. EMILY T. CHEN
                        601 Lexington Avenue
                        New York, New York 10022


Georgetown University: MAYER BROWN LLP
                        BY:  MS. BRITT MARIE MILLER
                             MR. DANIEL FENSKE
                        71 South Wacker Drive
                        Chicago, Illinois 60606

APPEARANCES (Cont'd):

```
Massachusetts Institute
Of Technology:          FRESHFIELDS BRUCKHAUS DERINGER US LLP
                        BY:  MR. JAN RYBNICEK
                        700 13th St NW, 10th Floor
                        Washington, DC 20005


University of
Notre Dame:             WILLIAMS & CONNOLLY LLP
                        BY:  MR. ROBERT ALOIS VAN KIRK
                             MR. MATTHEW HEINS
                        725 Twelfth Street N.W.
                        Washington, DC 20005


University of
Pennsylvania:           WILMER CUTLER PICKERING HALE AND DORR LLP
                        BY:  MR. DAVID GRINGER
                        7 World Trade Center
                        New York, New York 10007
```

(Proceedings heard by videoconference:)

THE CLERK:  Case 22 C 125, Henry v. Brown.

THE COURT:  Okay.  So the way we're going to do this -- this is Judge Kennelly.  This is a video hearing.  I'm going to have -- I'm going to try to do this.  Just the people who are depicted on the screen, the people who are participating by video, just have you identify yourselves, starting with counsel for the plaintiffs and putative class.

MR. GILBERT:  Robert Gilbert, Gilbert Litigators & Counselors, for the plaintiffs.

THE COURT:  Your sound is really bad, Mr. Gilbert.  You need to get closer to the mic.  I heard you, but it's pretty bad.

Mr. Cramer, you're up next.

MR. CRAMER:  Eric Cramer from Berger Montague for the plaintiffs.

THE COURT:  Thanks.

Mr. Normand.

Mr. Normand, if you said anything, I can't hear you.  It must mean you're muted.  I don't know.

Try again.  Try to say something.  I see your lips moving, but I'm not hearing you.  And I didn't mute you, so it's not me.  It's on your end.

So my suggestion would be, sign out and sign back in quickly.

I heard you for a second there.

MR. NORMAND: Does that work?

THE COURT: Yeah. Now it's working. Go ahead and give your name for the record, Mr. Normand.

MR. NORMAND: Ted Normand from Freedman Normand Friedland for the plaintiffs.

THE COURT: Okay. So your sound is worse than Mr. Gilbert's, so you're going to need to get closer to the mic. I mean, I heard it, but not very well.

Anybody else on the plaintiffs' side who is on the video, give your name, please.

MR. LITAN: Robert Litan from Berger Montague for the plaintiffs.

THE COURT: Thanks.

Who else?

MR. CIPOLLA: Richard Cipolla, Freedman Normand Friedland, for the plaintiffs.

THE COURT: All right. Counsel for, let's say, Notre Dame first. And then just go down the list after that.

MR. VAN KIRK: Sure. Bob Van Kirk with Williams & Connolly for Notre Dame.

MR. HEINS: Matthew Heins from Williams & Connolly for Notre Dame.

THE COURT: Mr. Heins, your sound is worse than Mr. Normand's, so you got to get closer to the mic, too. We

can't get much further down the scale than that.  The next person I won't be able to hear.

Okay.  Anybody else for Notre Dame?

Move on to whoever wants to go next.  Penn, let's say.

MR. GRINGER:  Good morning, your Honor.  David Gringer from Wilmer Hale for Penn.

THE COURT:  Anybody else with Mr. Gringer?

Thanks.  MIT.

MR. RYBNICEK:  Good morning.  Jan Rybnicek with Freshfields for MIT.

THE COURT:  Thanks.

Do we have Cornell?

MR. ARMSTRONG:  Yes.  Good morning, your Honor.  Norm Armstrong from Kirkland & Ellis for Cornell University.

THE COURT:  Thanks.

Georgetown, maybe.

MS. MILLER:  Good morning, your Honor.  Britt Miller with Mayer Brown on behalf of Georgetown, and with me is my partner, Dan Fenske.

THE COURT:  All right.  Is there anybody else on the video who has not given your name yet?

MR. GILBERT:  Your Honor, this is Robert Gilbert.  I believe Robert Raymar and David Copeland are on the video but have not given their name.

THE COURT:  I'm asking them.  Not you.

MR. RAYMAR: Robert Raymar is on the video.

THE COURT: So anybody who else -- anybody who's on the video who hasn't given your name, now is the time to do it.

MR. RAYMAR: Robert Raymar.

THE COURT: Mr. Raymar, I'm not seeing you.

MR. COPELAND: David Copeland, also from Gilbert Litigators, also for plaintiffs.

THE COURT: All right. And I just realized that I left one of the things I need back in chambers. So you're going to see this chair being empty for a minute while I go get it. Hang on for one second.

(Pause.)

THE COURT: Okay. So I have questions for -- in alphabetical order, not necessarily in the order I'm going to question them -- Mr. Cramer, Mr. Gilbert, and Mr. Normand. I'm not going to swear anybody in because lawyers have a duty of candor to the Court, and I'm relying on that.

I need to start off -- I think I understand -- give me one second here. I think I understand the arrangements that Mr. Gilbert had with the funders, but I need to ask a couple questions about them.

If I am understanding it correctly, Mr. Gilbert, the first agreement was the one that's referred to as the -- in some of the other documents as the Nivalion agreement, N-I-V-A-L-I-O-N. That's from, I want to say, 2012 or something

like that.  Am I correct about that?

MR. GILBERT:  Yes, your Honor.

THE COURT:  Not 2012, I meant 2022.  2022.

MR. GILBERT:  That's correct.  That was the first funder.  Your Honor may recall, your Honor also entered an order that those agreements would be AEO.

THE COURT:  Yeah, so here's the deal.  I don't care. This is now -- this is now a matter -- this is now a matter that is something I believe that I need to take into account in making a decision on the motion for class certification, and so it's not appropriately left confidential.  I'm not going to ask necessarily real detailed questions about that, but I have a couple that are going to involve terms.

So then the other three agreements were with a different entity or group of entities, and that's referred to as -- I think the first one of those is referred to as TRGP or something like that, right?

MR. GILBERT:  That's correct.

THE COURT:  My first question is, so did the TRGP agreement supplant -- in other words, replace -- the Nivalion agreement or are they add-ons to it?

MR. GILBERT:  They supplanted it.  At that point, the first funder stopped funding, and a new funder stepped in.

THE COURT:  That's what I thought.  I wasn't quite sure.

So the next question I'm going to ask you does involve terms. So if I'm understanding it correctly, there are basically three agreements that I got with what I'll call the replacement funders. One was from October of '23. One's from June of '24. One's from January of '25. The first one -- the first and the second -- well, they all provide that the funder or funders would pay attorneys' fees in accordance with a particular provision, which I think is 5.2.2 of the first agreement, up to a total amount. It was a particular number in the first of those three agreements, the October '23, and then it gets increased in the second one.

And if I'm understanding it correctly -- and this is the term I'm going to ask you -- that number in the second one was $11 million. Is that right?

MR. GILBERT: That's the total of the first and the second together.

THE COURT: Right. Right.

MR. GILBERT: Correct.

THE COURT: It was originally a lower number, and then it got increased.

Okay. And did it ever get increased beyond that, after that?

MR. GILBERT: Yes. Then there was a third agreement.

THE COURT: That's the one I had a harder time understanding. So what's the ultimate number in the third

agreement that it gets increased to?

MR. GILBERT: 14 million.

THE COURT: Okay. And then there was -- there were separate provisions of each of these agreements that provided in substance -- I'm going to paraphrase the one in the first one -- that the funder would pay a hundred percent of the expenses reasonably incurred. And then there was a definition of expenses.

Does that sound right, too?

MR. GILBERT: That sounds right.

THE COURT: Okay. So give me one second. I'm going to need to share my screen on something now. It's just going to take me a minute to do that. Actually, no, I'm going to switch over to Mr. Cramer and to Mr. Normand for a second. And we can just kind of do it in alphabetical order, I guess. First of all, I'm not sure why -- I got to do something to my screen here. Maximize it. There we go.

So my question for Mr. Cramer and Mr. Normand is, it seems to me pretty clear that at some point, it's clear from the emails, you two or your two firms were aware of the Gilbert -- Mr. Gilbert and his entity's funding, that they had funding from an outside source. Is that right?

MR. CRAMER: That's correct, your Honor.

MR. NORMAND: That's correct.

THE COURT: And was that around the time the lawsuit

was filed, before that, after that?  Whereabouts does that knowledge come into your head?

MR. CRAMER:  For me, your Honor -- this is Eric Cramer -- it was around the time the lawsuit was filed.  I believe it is stated in at least one of the retention agreements with the clients that I've seen to give them notice of it, for example.

THE COURT:  Okay.  Mr. Normand, same for you?

MR. NORMAND:  I think it would have been a little later.  I'm not sure our retention agreements had that language.  I think I learned sometime in 2022, but not at the --

THE COURT:  Okay.  Close enough.  That tells me what I need to know.

And I think I have been told on one or more -- at least one prior occasion by Mr. Cramer on behalf of his firm and by Mr. Normand on behalf of his firm that your firms did not have similar arrangements.  And let me just be clear on what I mean by "similar."  By "similar arrangements," I mean an arrangement under which some amount of attorneys' fees would be funded as the litigation was proceeding.  Am I right about that?  You did not have anything like that, Mr. Cramer?

MR. CRAMER:  My firm did not have anything like that, your Honor.  That is correct.

THE COURT:  Same for your firm, Mr. Normand?

MR. NORMAND: Yes, your Honor.

THE COURT: Okay. So I'm going to go back to Mr. Gilbert for a second, and then I'm going to need to share my screen. I'm not as good at that as lawyers do, because I don't have to do it as much. Just give me a second to pull up the document I need, and I'm going to ask a couple questions. So give me a second here.

So I'm going to ask -- these are all about documents that were filed. And, by the way, they're all filed in the -- as best I can tell, they're all filed in the public record. The documents I'm going to ask you about are various documents that were submitted in connection with requests for approval of class action settlements or fees or both. And it's just going to take me a second to get the first one up.

So my first question is for Mr. Cramer. And the document I'm going to show you is 679-2. And as soon as I share my screen, I will do that. You should be seeing 679-2. And I'm going to go down to page 4. So this is -- just pause on the first page of the actual document. This is Mr. Cramer's declaration that was submitted on April 29th of 2014. You can see that from the CM/ECF header. I'm going to go over to page 4, and there's going to be a little highlighted thing on there.

It says: "My firm's work on" -- this is paragraph 3, the third sentence. "My firm's work on this case was performed on a wholly contingent basis."

What did you mean by the word "wholly," W-H-O-L-L-Y?

MR. CRAMER: I meant that my agreement with my clients and with the class was that I would not get paid unless there was a settlement, a judgment, or some kind of payment in the case.

THE COURT: Not get paid by whom?

MR. CRAMER: Well, since I didn't have a funding agreement, what I meant there is there would be no compensation for me or my firm at all.

THE COURT: Wouldn't get paid by anyone, in other words.

MR. CRAMER: Correct.

THE COURT: Okay. Thanks. Now I'm going to share a different document. And this is Mr. Normand's declaration, which is 679-4. You can see the CM/ECF header there. There's the title. I'm going to go to page 10. Sorry for all the scrolling. I'm closing in on it.

Okay. So at paragraphs 6, last sentence says: "FNF" -- which is the abbreviation for the firm -- "performed its work in this action on a contingent basis."

What did you mean by that?

MR. NORMAND: I meant that our agreements with our client was that we wouldn't get paid unless there was a recovery.

THE COURT: All class action is like that, though,

right? You don't ever get paid by the class until there's a recovery. So did you mean you weren't getting paid by the class, or do you mean you weren't getting paid by anybody?

MR. NORMAND: Well, that's reflective of our agreement with our clients. And as with Mr. Cramer, we also were not getting --

THE COURT: That's not what this says. It says, "FNF performed its work in this action on a contingent basis." That seems to me to be geared to communicate to the listener that you're not going to get paid unless you win, full stop. Am I wrong?

MR. NORMAND: That describes what our agreement with our clients was.

THE COURT: Okay. So that would be a yes.

MR. NORMAND: Yes.

THE COURT: Okay. All right. Now I'm going to go to Mr. Gilbert's declaration, which is 679-3, April 29th, 2024. I'm going to go to page 8. There's a highlighted provision on page 8. It'll just take me a second to get there. Sorry for the scrolling.

GLC -- last sentence of paragraph 4: "GLC's work on this case was performed on a contingent basis."

What did you mean by that?

MR. GILBERT: That if there would be a recovery that the clients would not have to pay anything, and we would be

paid when there's a recovery. The clients would not have to pay anything.

THE COURT: It doesn't say anything about the clients there. It says your work on this case was performed on a contingent basis. It doesn't say that vis-à-vis the clients. It doesn't -- it just says work is being performed on a contingent basis. Isn't that something that would be reasonably understood by the reader that you weren't getting paid at all unless you prevailed in the case or got a settlement?

MR. GILBERT: Your Honor, from the very outset of this matter --

THE COURT: Look, I'm going to cut you off because you're about to not answer my question. Pretend you're on cross, because you are. Okay? So let's go with an answer to my question.

MR. GILBERT: No, it doesn't mean what your Honor said. I'm happy to explain.

THE COURT: Okay. So you think that a person would read that and think that it still allows for the possibility that you're getting paid by someone as the case goes on?

MR. GILBERT: We certainly understood that a contingent basis could include funding, which has always been our understanding of the law for the last 30 years --

THE COURT: Wouldn't that mean it was partly

contingent? Because part of your funding wasn't contingent. You had a signed deal with the funders that was going to pay you up to whatever the number was you said, 11 million or 14 million or whatever it was. You had a signed deal with them that was going to pay you irrespective of the outcome of the case. Isn't it more accurate to describe that as a partly contingent arrangement?

MR. GILBERT: No. No, your Honor. If I may --

THE COURT: Okay. So let's say I have a personal injury case. So Kennelly is suing Van Kirk because I slipped and fell on his sidewalk. And my lawyer -- because I have a really good friend who is a billionaire, my lawyer gets paid by the billionaire. But he also has an agreement with me that he'll get paid a third out of the recovery. And the billionaire agreement is in there basically just to make sure the lawyer gets paid his hourly rate one way or another. He's hoping for more because he hopes he's going to recover more than his regular hourly rate.

Can that lawyer accurately describe his -- accurately say that his work on the case was performed on a contingent basis?

MR. GILBERT: If I understood your Honor's hypothetical, the lawyer was getting a hundred percent of its rates. But then --

THE COURT: Right. Right.

MR. GILBERT: I would think that's probably not --

THE COURT: What's the difference?

MR. GILBERT: -- something we would describe as contingent. That's not our situation.

THE COURT: What's the difference?

MR. GILBERT: We told our clients in the retention letter from the beginning, this agreement is entered into on a fully contingent basis. You are not responsible for the payment of any costs --

THE COURT: I'm going to cut you off because what we're talking about here is not what you told your clients. We're talking about what you told me because that's what this is.

MR. GILBERT: Well, it goes to what my understanding was of what was accurate. And the very next sentence --

THE COURT: Okay. My question, though, is, what is the difference between -- my question, which I'm cutting you off because you're being nonresponsive. And if you want to come here tomorrow instead of going to Brazil, just keep being non-responsive. All right?

So what's the --

MR. GILBERT: My --

THE COURT: My question is, what's the difference between your situation that you had and the situation -- the hypothetical that I described on my personal injury suit?

MR. GILBERT: My understanding is that it's accurately -- it's a fully contingent basis and also get litigation finance as reflected my state of mind, going back to the very outset of the case, in the client retention letter.

THE COURT: I'm looking at the words you told me under oath: "GLC's work on this case was performed on a contingent basis." It says, your firm's work was performed on a contingent basis. That's all it says. It doesn't say it was -- we weren't getting paid by our clients. It says your work was performed on a contingent basis. How can you say that your work was performed on a contingent basis when you were getting paid up to $14 million for your work?

MR. GILBERT: We understood that in this district, it's perfectly proper to say that it's a contingent basis and to have funding and that there's never been a case or law that --

THE COURT: Okay.

MR. GILBERT: -- we need to disclose if it's a contingent that there's funding.

THE COURT: Okay. So when you say it's clear -- I think your words were -- I'm just going to look at the transcript to make sure I don't misquote it -- we understood in this district it's perfectly proper to say that it's a contingent basis and to have funding.

So where did you get that understanding about this

district from?

MR. GILBERT: There's no case or rule or law in this circuit or this district that suggests that in the contingent case someone needs to indicate their finances.

THE COURT: In other words, it's not that you had authority supporting this, which is kind of what you just suggested to me; it's that there wasn't any authority going the other way?

MR. GILBERT: I know that there's maybe one district I know of in the United States where it's a contingency case.

THE COURT: No, no, no. You're departing from the question. You quoted to me -- I'm quoting your own words back to you. You said it to me at 9:23 in the morning: We understood that in this district, it's perfectly proper to say that it's a contingent basis and to have funding and that there's never been a case or law that -- and I cut -- we need to disclose it.

Okay? So how did you have that understanding about this district if there wasn't any case law one way or the other?

MR. GILBERT: The fact that there's no requirement speaks for itself. You're not required to disclose how you get your finances.

THE COURT: We're not talking here about some sort of a requirement -- we're not talking here, Mr. Gilbert, with all

due respect, about a requirement of disclosure. We are talking about something you said to me under oath to get me to approve the settlement, which included a fee award. Whether there's a requirement or not is a separate story. We're talking about the words you said to me.

MR. GILBERT: Those words I understand to be accurate as to the meaning of contingency, and it's not diminished by the fact that we have funding. There's an extremely substantial debt that is owed to the funder.

THE COURT: What's that?

MR. GILBERT: A multiple of the amount that's expended.

THE COURT: A multiple of the amount -- I didn't catch the last part of that.

MR. GILBERT: The amount that the funder actually puts into the case.

THE COURT: Right. But that -- that's only payable -- that's only payable out of a recovery, right?

MR. GILBERT: The signed certification was signed --

THE COURT: That's only payable after a recovery, correct?

MR. GILBERT: Correct. And the recovery at the time I signed the salutations.

THE COURT: Right. But if you didn't get a recovery, you didn't owe that debt to the funder. In other words, the

funder was going to be out the money if the case came up as a loser, correct?

MR. GILBERT:  If that were true, yes.  But at the time this was signed, there were recoveries.

THE COURT:  I mean, you're the person -- you're the person that brought up that you had a debt -- Mr. Gilbert, respectfully, you're the person that brought up that you had a debt to the funder.  And, I mean, quite honestly, that's got to have a big asterisk on it, but that's not the question I was asking anyway.  So I'm going to move on to something else now.

So I'm going to go back to -- I'm going to go to a different document.  This is 679.  I got to do some scrolling here.  Pardon me.

So this is 679 without a hyphen.  It's the motion in support of the service awards, fees, et cetera.  This is, again, April '24.  Page 3.  And let me go to the end of it first.  I screwed that up.

Okay.  So this is signed by Mr. Cramer, Mr. Gilbert, and Mr. Normand.  And I'm going to go to page 3.  Just give me a second to get there.  Page 3, I guess first full paragraph, second sentence:  "Settlement class counsel also filed this case on contingency, knowing it could take years to prosecute and millions of dollars and tens of thousands of attorney hours to properly resource -- thus assuming the very real risk of non-payment."

So as to -- this is a question for Mr. Cramer and Mr. Normand. As to Mr. Gilbert, at least, there was not a risk of non-payment, was there? Non-payment.

MR. CRAMER: Your Honor, what I would say is that if there's -- Mr. Gilbert, I think, was not -- I know now was not funded at anything close to a hundred percent of his lodestar, in other words, I think he received under 40 percent of his lodestar. And the total funding for class counsel, if you included all three firms, was less than 18 percent of lodestar. So there was a very real risk of non-payment. And I think in that sentence, at least what I meant, was non-payment by the case, by the class from the case, not from an outside funder.

THE COURT: But don't -- what's your thoughts, Mr. Normand, in addition to whatever Mr. Cramer just said?

MR. NORMAND: My thoughts are parallel with Mr. Cramer's on that one.

THE COURT: Okay. So when you see a sentence that says, settlement class counsel filed the case on contingency, dot, dot, dot, thus assuming the very real risk of non-payment, don't you think that that would communicate to a listener that there was no payment at all forthcoming unless there was a recovery in the case?

MR. CRAMER: I mean -- go ahead, Mr. Normand.

MR. NORMAND: I was going to say that that's not what I understood it to mean when I read it. It's not what I

intended. As we've gone down this path over the last six or eight months, could it have been made clearer? I think in retrospect, it could have.

THE COURT: Mr. Cramer?

MR. CRAMER: Your Honor, I would say the same thing. I've been in many other cases where one of the firms was funded, and we've handled it the same way. But in hindsight, I think what is coming out is that in cases where one or more of the firms are funding -- funded, I think it's -- the best practice would be just to disclose that to the Court. But that had never been my practice. I didn't intend it that way.

THE COURT: Okay.

MR. CRAMER: And I apologize if the Court thinks that we were not fully transparent.

THE COURT: I'm going to skip ahead to a different document. And so this is going to be the motion that was filed in March of '25. I think this is the Cal Tech and, I want to say, Johns Hopkins settlement approval. I'm going to pull up -- I'm back to Mr. Gilbert here -- 830-4. So there's the date, March 25th of '25. There is the CM/ECF header. There's the title, Declaration of Gilbert Litigators & Counselors, et cetera. And now I'm over to page 6. Give me a second to get there.

Paragraph 5, last sentence on page 6: "My firm's work on this case was performed on a wholly" -- W-H-O-L-L-Y --

24

"contingent basis."

So the word "wholly" actually didn't appear in the previous affidavit from April of '24 we looked at. So this is different. So what did you mean by "wholly contingent"?

MR. GILBERT: Well, I signed previous (unintelligible) that said contingent. I said one that's wholly contingent. I meant exactly what I thought about right from the beginning of the case when I say to the client, the agreement is entered into on a fully contingent basis. I understood that to be what the meaning of contingency was.

THE COURT: Right. But this sentence doesn't say the agreement with the client is entered into a wholly contingent basis. That's not what it says. It says your firm's work on the case was performed on a wholly contingent basis, when, in fact, you had gotten paid or were going to get paid $14 million.

How is that wholly contingent? It's not wholly contingent, is it?

MR. GILBERT: I believe it is, your Honor, in that --

THE COURT: Explain it to me because I'm having -- explain it to me because I'm having a --

MR. GILBERT: -- enterprise.

THE COURT: But you didn't tell me about the funder. You didn't tell me about a joint enterprise. You didn't say that the joint enterprise that's financing the litigation is

working on a wholly contingent basis. You said, my firm's work on this case was performed on a wholly contingent basis. That's what you said. That's what you said to me to get me to approve this arrangement or the fee award. It doesn't say --

MR. GILBERT: Your Honor --

THE COURT: It doesn't say the agreement is contingent vis-à-vis the client. It says, my firm's work on this case was performed on a wholly contingent basis.

Do you not see how that would communicate to a listener or to a reader that what was happening was that you weren't getting paid anything unless you made a recovery? Do you see how that could communicate that to a reader of the document?

MR. GILBERT: May I answer, your Honor?

THE COURT: You can answer my question, and then you can explain.

MR. GILBERT: Yes. Okay.

THE COURT: What's the answer to my question?

MR. GILBERT: I can see now how your Honor would be concerned about that. I can see that now. So I apologize for that. But that said --

THE COURT: No, no. Stop. You don't get -- actually, Mr. Gilbert.

MR. GILBERT: -- my understanding that --

THE COURT: Mr. Gilbert --

MR. GILBERT: -- it was relevant to risk having a funding agreement.

THE COURT: Do you know what this means? It means time out, or it means technical foul. In this case, maybe both. Okay?

So that means stop because you answered a question that -- you didn't answer the question I asked. Do you not see how this would communicate to a listener or to a reader that what was happening was that you weren't getting paid anything unless you made a recovery. And what you said is, you can see how I would be concerned about that, but I apologize for it. That's not what -- I didn't ask if you could see how I could be concerned about that.

Do you not see how this would communicate to a listener or a reader that what was happening was that you weren't getting paid anything unless you made a recovery? Do you see that?

MR. GILBERT: I can see that now.

THE COURT: Okay.

MR. GILBERT: Notwithstanding 30 years, there's never been a requirement to do this, that that would be --

THE COURT: Well, time out. I didn't -- time out.

I did not require anybody to disclose litigation funding. By the way, I have no problem with litigation funding. Litigation funding is, by and large, a good thing

because it allows people and claims who can't otherwise -- people who otherwise wouldn't be able to pursue claims and claims that otherwise wouldn't be able to be pursued to be pursued. I get that. Litigation funding is a very old thing. It's not new. It's called liability insurance. It goes back to the 1800s. That's litigation funding, too, and there's nothing wrong with that.

I'm not talking about the proprietary of having litigation funding. I'm not talking about some independent requirement to disclose litigation funding, which I didn't impose, our district doesn't impose. And I know of only one that does. It's Delaware. There may be others.

But what I'm talking about is a statement that's made in a document that's filed with me that nobody had to file that isn't pursuant to any requirements -- these are the words you chose. "My firm's work on this case was performed on a wholly contingent basis."

But you've answered my question now.

So now I want to ask about a different aspect of this. So the costs, the expenses, as you said before and as the agreements say that the funder had agreed to pay a hundred percent of the expenses reasonably incurred.

In what manner were those getting paid? As you go or what?

MR. GILBERT: They were being paid as we go on

approximately a monthly basis.

THE COURT: Now I'm going to look in the same affidavit at page 6. Last two sentences. "My firm has expended a total of $1,044,295 in unreimbursed costs and expenses in connection with the prosecution of the action from inception of the case through and including February 28th, 2025."

Last sentence: "These costs were incurred on behalf of the settlement class by my firm and have not been reimbursed."

Was that true?

MR. GILBERT: Not reimbursed by the client. That's the meaning of that.

THE COURT: That's not what it says. It doesn't say not reimbursed by the client. It says they have not been reimbursed. Was that true? You had been paid back for those costs, right, at that point?

MR. GILBERT: At that point, I owed a multitude of those costs to --

THE COURT: I'm not talking about a multiple of those costs. I'm talking about the $1,044,000 you took, you put in the affidavit that you filed with me. You had been paid for those costs, had you not?

MR. GILBERT: I had been given an advance, I guess, is one way of looking at it, that, as part of a joint enterprise

with the funder, I would have to pay back at a multiple. And at that time, I owed a debt of, I believe, four times that amount.

THE COURT: Okay. But this is not what this says. It says have not been reimbursed. The costs had been reimbursed, hadn't they?

MR. GILBERT: The reality of our situation, when we owe a substantial debt to a funder, it's hard to think of it as we've been reimbursed by the funder.

THE COURT: What do you think any person with a rudimentary understanding of the English language that read this sentence would think? That you already had actually been paid, but you might have to pay it back if you lost or you might owe a multiple? Would they think you laid out $1,044,000 and you hadn't gotten a dime of it back. Isn't the latter what any person with a basic understanding of English would think?

MR. GILBERT: I don't accept that any person would be --

THE COURT: Okay. Let's narrow it down to me, the intended recipient of this thing.

MR. GILBERT: Again, I was not aware -- I don't think anyone was aware that there was, in this district or circuit, something to be said other than this.

THE COURT: You were aware, I assume, of the rule of professional conduct that requires you to -- imposes a duty of

candor when you're dealing with with a Court, are you not? Yes or no. Yes or no, unless you want to be in my courtroom tomorrow answering this question.

MR. GILBERT: Yes. Yes. Yes.

THE COURT: Was this candid?

MR. GILBERT: I believe so, your Honor, yes.

THE COURT: When you told me it had not been reimbursed and, in fact, you had gotten paid for that.

MR. GILBERT: Again, I don't think of us as having been paid for that, and I don't see that as a fair, necessarily, with all respect, characterization, your Honor.

THE COURT: Okay. Thank you.

I'm going to unshare my screen. I have some other similar things, but I think it's largely been covered. Actually, no, there is one other thing. No, never mind. I don't think so.

Oh, right. I'll just point out -- I don't need to ask you about this -- that the draft orders that were given to me by plaintiff's counsel on both of these approval motions had me using the phrase "wholly contingent." Let me just pull -- actually, let me just go ahead and pull one of them up here. I'll just go with the one that I entered in June, July of '24 regarding the -- I think this was the Brown settlement, Brown and a bunch of others. It was about a good dozen. And it's page 12. Page 12. Let me get to page 12. Paragraph 27.

So this is the order that was presented to me by plaintiff's counsel that I signed. "Settlement class counsel undertook this case on a wholly contingent basis," W-H-O-L-L-Y. I'm just pointing that out at this point.

Now I'm going to unshare my screen.

Okay. Motion for class certification is the plaintiffs' motion, so I'm going to give Mr. Van Kirk or whoever wants to make any comments on what has happened today as it relates to the motion for class certification now.

MR. VAN KIRK: Thank you, your Honor. Bob Van Kirk, Williams & Connolly, for Notre Dame and defendants. You basically stole my prepared remarks, which was to go through and identify all of the representations that were made that are contradicted by the finding of funding.

The one point that I think I would add is regarding Mr. Cramer's statement that this was a largely contingent case because of the 40 percent discount that Mr. Gilbert's firm received. The 40 percent discount is the tell on the other misrepresentation, which is that they were using usual and customary rates.

THE COURT: Okay. So let me just short circuit this. What you're going to tell me is that because Mr. Gilbert was getting his $1400 hourly rate concerning that, that's not his real hourly rate, it really wasn't contingent. I get that. You don't have to go -- I'm just trying to focus on what we did

today.

MR. VAN KIRK: So I think it isn't the case that they were out that money. They were not out it at all. They were not at risk at all, even at a 40 percent discount, because that was the real rate that the Hellring firm charged. I think that's the major additional point that we'd make. This is all tied together, all of these issues.

They're not our issues. These are the issues that the plaintiffs themselves raised with each other. They keep saying that this is contrived and dubious of the defendants. We didn't make this up. This is from their own emails at the time. They knew it, and they proceeded anyway. And as you pointed out, they put it in the order for you to sign. And I think that's the only additional point that I'd make, your Honor.

MR. GILBERT: May I respond to the additional point?

THE COURT: Hang on one second. I'm going to give each of the three people on the plaintiffs' side who are speaking today a chance to -- does anybody on the defense side want to say anything beyond what Mr. Van Kirk did?

Everybody is shaking their heads.

Okay. So I'm going to give each of the three people on the plaintiffs' side an opportunity to respond. And we're going to start with Mr. Cramer, then Mr. Normand, then Mr. Gilbert.

Mr. Cramer, what would you like to tell me, if anything, in response to Mr. Van Kirk or whatever has been said today?

MR. CRAMER: What I would say, your Honor, is that I, you know, regret that some of the language in some of the documents that were filed in support of the fee petition were not as transparent as they could have been. Part of what happens is we work from forms and documents -- that's not an excuse; it's just an explanation -- that we use all the time, and they just get transposed to a new case and new facts are added in. And we did not account for the funding agreement that Mr. Gilbert had. And in hindsight, I would say that we should have been clearer regarding that, and I apologize to the Court for that.

I guess the only other thing I would say is that in terms of the motion for class certification, what matters is the interest of the class. I've always had the interest of the class at heart. I think what matters here is that we're acting in support of the class, that the class would benefit from class certification, and the class would benefit from having the class counsel that have brought this case to such success to date continue as class counsel so that we can try the case on behalf of the class.

So thank you, your Honor, for allowing us to respond. Again, I apologize and regret the statements in the briefs that

your Honor identified and in the declarations that your Honor identified. And all I would say is that I have the interest in the class at heart, and that is fundamentally what matters here.

But thank you, your Honor.

THE COURT: All right. Mr. Normand.

MR. NORMAND: Yeah, your Honor. Thank you. Your Honor is understandably frustrated with the ambiguity of some of the language. I understand that. There's no, from my perspective, intentional wrongdoing. These were negligent mistakes of omission, I think you could say. And to the extent that on Rule 23, the Court is entitled to consider asserted wrongdoing by opposing counsel and defendants proposed a motion.

In the cases we've seen, this type of conduct has to rise to the level of egregious that would call into question the ability to represent the class as loyal to the class. None of that is at play here. And I would just end by saying it's not nearly a case of any standard set of defendants having an ax to grind in disputing counsel's adequacy. This was a case where class counsel had already gotten a tremendous result, which is evidence that the class was getting a benefit, maximize their chance of benefiting from class counsel staying on.

So I apologize for the ambiguity in the statements and

to the extent the Court thinks it's been misled, but we didn't intentionally do it. And we remain best able to represent this class going forward.

THE COURT: Thank you.

Mr. Gilbert.

MR. GILBERT: Yes, just to respond to Mr. Van Kirk about --

THE COURT: No. I think what I said is respond to Mr. Van Kirk or any further comments you make on what's happened today.

MR. GILBERT: Thank you. The Ninth Circuit recently held in district court -- said it was abuse of discretion to do exactly what Mr. Van Kirk just proposed.

THE COURT: What's the case?

MR. GILBERT: Case is *L.A. International Corp. v. Prestige.*

THE COURT: Say it again.

MR. GILBERT: The Ninth Circuit.

THE COURT: Just give me the title of the case. I get it's Ninth Circuit.

MR. GILBERT: *L.A. international Corps. v. Prestige.*

THE COURT: What's the cite?

MR. GILBERT: Let's see here.

THE COURT: Anything will do, a Westlaw site.

MR. GILBERT: It's called Prestige Brands. I have

2026 Westlaw 504763.

THE COURT: Okay. Go ahead. Pick it up from there.

MR. GILBERT: The question of what are appropriate rates as set forth in the (unintelligible) affidavit at some length, what is usual and customary for a complex national antitrust case. We're well within that. We've always been well within that.

And beyond that, it's important to bear in mind the qualifications of the people whose rates are being questioned. Raymar is a 1973 graduate of Yale Law School. I'm a 1982 graduate of Yale Law School, former partner at Mayer Brown, by the way. Elpidio Vilarreal is a 1985 Yale Law School graduate, 41 years ago. He, for more than a decade, was the head of litigation at a major pharmaceutical company. David Copeland on our team was a former litigation partner at -- antitrust litigation partner at Arnold & Porter, and (unintelligible), our antitrust expert, is a 1977 graduate of a leading law school, who has been a national -- in national leadership positions in the antitrust section ABA. These are entirely appropriate rates.

And I guess I would only add -- there's a couple things. One is the issue for defendants is not that we are inadequate counsel; it's that we're too adequate for their taste, given the superb work, frankly. That's the issue here, your Honor. And I regret -- I apologize to the extent that

there was some inference, understanding, from words that were used that was not intended, certainly not intended and never understood that there was any requirement in this district to view this as a joint enterprise between the law firm and its sponsors.

THE COURT: All right. So let me just kind of give you a status report from my end. So the motion for class certification has been on my docket for a very long time. It's going to get ruled on before the end of March. It's going to get ruled on before the end of March. Probably not within the next week or ten days because I got a couple of things I got to deal with in the interim. But once we get into something like the 23rd, 24th, in there, the range of when I'm going to issue the ruling is going to be -- is going to be somewhere in that range, 23rd to 24th to the end of the month.

Once the ruling is issued, it's issued. It can't be undone. So if anybody has any idea of -- I'm just going to put this out there. If anybody has any idea about withdrawing the motion for class certification and maybe coming back and asking me later to refile it, you got a window. It's about ten days.

So that's all I got for you today. I know that there's another motion on file. I'm tabling that until I deal with the class cert motion. And the motion for class certification is again taken under advisement. I appreciate everybody calling in today.

MR. CRAMER: Your Honor, can I just ask? You piqued my attention with what you just said, if you don't mind. What exactly did you mean by withdrawing the motion and refiling it, if you could just give us --

THE COURT: I think what I said was withdrawing the motion and asking me to refile it with some sort of -- in some sort of different form or configuration or whatever. I mean, the deadline has run. I mean, I have to be concerned about prejudicing the class, obviously, based on things that counsel are alleged to have done or not done. I mean, for example, in a case in which a judge finds that a class representative is an inappropriate class representative, it's pretty common for the judge to say, okay, you've got 30 days or 60 days or whatever to substitute a new class representative.

But -- so that's kind of the gist of what I was referring to.

MR. CRAMER: Are you suggesting --

THE COURT: I'm not suggesting anything. I'm just telling you what your window is. I'm not suggesting anything. Everybody on the screen here is a smart person and can figure out what the various possibilities are and what the consequences of those possibilities are, each one of them. You can all war game it out. You're smart people.

My suggestion is, you know, I'm going to rule on this motion somewhere in the window from the 23rd or 24th through

the 31st of this month.  And whatever you do or not do, you should just have that in mind.  That's all I'm going to say.

MR. CRAMER:  Thank you, your Honor.

THE COURT:  All right.  Take care.  Thanks.

(Proceedings concluded at 9:52 a.m.)

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter.

/s/ *Carolyn R. Cox*                       March 11, 2026
Carolyn R. Cox, RPR, F/CRR
Official Court Reporter