# EXHIBIT 2

1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


SIA HENRY, et al.,                          )   Case No. 22 C 125
                                            )
                        Plaintiffs,         )
                                            )
             vs.                            )
                                            )
BROWN UNIVERSITY, et al.,                   )   Chicago, Illinois
                                            )   April 24, 2026
                        Defendants.         )   11:00 a.m.


                TRANSCRIPT OF PROCEEDINGS - MOTION
         BEFORE THE HONORABLE MATTHEW F. KENNELLY


APPEARANCES:


For the Plaintiffs:     FREEDMAN NORMAND FRIEDLAND LLP
                        BY:  MR. EDWARD J. NORMAND
                        10 Grand Central
                        155 E. 44th Street, Suite 915
                        New York, New York 10016



                        MOLO LAMKEN LLP
                        BY:  MR. STEVEN F. MOLO
                        430 Park Avenue
                        New York, New York 10022



Court Reporter:         CAROLYN R. COX, RPR, CRR, FCRR
                        Official Court Reporter
                        219 S. Dearborn Street, Suite 2102
                        Chicago, Illinois  60604
                        (312) 435-5639
                        C.Cox.courtreporter@gmail.com

                        * * * * *
             PROCEEDINGS REPORTED BY STENOTYPE
    TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

APPEARANCES (Cont'd):

MOLO LAMKEN LLP
BY:  MR. MATTHEW GOLD
     MS. LAUREN F. DAYTON
300 N. LaSalle Street
Chicago, Illinois 60654

BERGER MONTAGUE PC
BY:  MR. RICHARD D. SCHWARTZ
110 N. Wacker Drive, Suite 2500
Chicago, Illinois 60606

BERGER MONTAGUE PC
BY:  MR. ROBERT E. LITAN
1001 G Street, NW
Suite 400 East
Washington, D.C. 20001

BERGER MONTAGUE PC
BY:  MR. ERIC L. CRAMER
1818 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103

Cornell University:    KIRKLAND & ELLIS LLP
BY:  MR. NORMAN ARMSTRONG, JR.
1301 Pennsylvania Avenue, NW
Washington, DC 20004

Georgetown University: MAYER BROWN LLP
BY:  MS. BRITT MARIE MILLER
71 South Wacker Drive
Chicago, Illinois 60606

Massachusetts Institute
Of Technology:         FRESHFIELDS BRUCKHAUS DERINGER US LLP
BY:  MR. JAN RYBNICEK
700 13th St NW, 10th Floor
Washington, DC 20005

APPEARANCES (Cont'd):


University of
Notre Dame:            WILLIAMS & CONNOLLY LLP
                       BY:  MR. ROBERT ALOIS VAN KIRK
                            MR. MATTHEW HEINS
                       725 Twelfth Street N.W.
                       Washington, DC 20005


University of
Pennsylvania:          WILMER CUTLER PICKERING HALE AND DORR LLP
                       BY:  MR. DAVID GRINGER
                       7 World Trade Center
                       New York, New York 10007

(Proceedings heard in open court:)

THE CLERK:  Case 22 C 125, Henry v. Brown.

THE COURT:  Okay.  So to start off with, we're going to have the people in the courtroom identify themselves.  So start over here.

MS. DAYTON:  Good morning, your Honor.  Lauren Dayton of MoloLamken.

MR. GOLD:  And Matthew Gold from MoloLamken.

MR. SCHWARTZ:  Richard Schwartz from Berger Montague.

MR. LITAN:  Robert Litan from Berger Montague.

MR. NORMAND:  Ted Normand, Friedman Normand and Friedland.

MR. VAN KIRK:  Bob Van Kirk from Williams & Connolly for Notre Dame.

MR. ARMSTRONG:  Norm Armstrong from Kirkland & Ellis on behalf of Cornell University.

MS. MILLER:  Good morning, your Honor.  Britt Miller, Mayer Brown, on behalf of Georgetown.

MR. RYBNICEK:  Good morning, your Honor.  Jan Rybnicek with Freshfields on behalf of MIT.

MR. GRINGER:  Good morning, your Honor.  David Gringer from Wilmer Hale for the University of Pennsylvania.

THE COURT:  Okay.  And I think we have two people on the phone.

So, Mr. Cramer, can you identify yourself for the

record.

MR. CRAMER: Good morning, your Honor. Eric Cramer from Berger Montague.

THE COURT: Thanks.

And, Mr. Molo.

MR. MOLO: Your Honor, good morning. Steven Molo from MoloLamken. Apologies for not being there. I'm in a federal courthouse in Oakland this morning.

THE COURT: Okay. So just so the folks in the courtroom know, the only way the people on the phone will hear you is if you're talking into a microphone. So if you're going to talk, then just come up to the podium and just make sure you're talking into the microphone. They probably didn't hear two-thirds of what was said in terms of identifying names, but that's not all that critical.

So the main topic on my agenda today, and maybe the only topic on my agenda today, is to set a date for the response, what I think is a response to -- well, the defendant to file their position paper on the question of adequacy of counsel. And then a date for the plaintiffs to reply and then probably a telephonic status hearing after that.

So before I do that, are there other things that people want to talk about, starting on the defense side?

MR. VAN KIRK: Bob Van Kirk, your Honor, no.

THE COURT: And on the plaintiffs' side?

MR. NORMAND: Nothing, your Honor.

THE COURT: Everybody is all dressed up and no place to go then. I figured that people were going to want to talk about things, and that's why I set it for in-person. Okay. That was dumb on my part. The airlines will thank me.

MR. NORMAND: To your Honor's --

THE COURT: They needed the help from what we're hearing.

MR. NORMAND: To your Honor's suggestion that we use the microphone, I think counsel didn't know what your Honor might have wanted to hear about the process of selection. But now that we understand that there's going to be further briefing, we can --

THE COURT: If you want to tell me something about the process, that would be something to talk about. But I will just leave that in your hands.

MR. NORMAND: I think we can do it by the briefing, your Honor.

THE COURT: Well, with the briefing you're going to file is going to be the last brief, so maybe you should tell me a little bit about it now.

MR. NORMAND: Well, we interviewed at bottom about 12 firms and spent three weeks pondering the decision, going over various criteria, main criteria being experienced trial counsel, which, obviously, Steven Molo and his colleagues who

are here fit the bill; presence in Chicago, familiarity with the Court. Those were the main criteria. And just track record of success. And based on the interviews, co-counsel's ability to work with them. That's the process at bottom.

THE COURT: Okay. Now does anybody else want to say anything?

All the mics work. You don't have to go to the same one.

MR. VAN KIRK: Bob Van Kirk of Williams & Connolly for Notre Dame.

The only issue that we were going to raise in our papers, but we should probably raise it now, which is the issue of discovery. Typically when you have class counsel selected, there is discovery from class counsel and there's discovery from the class.

THE COURT: Like what?

MR. VAN KIRK: About either the qualifications -- in this case, their relationship with the existing counsel. Also, in two instances --

THE COURT: When you say typically there would be discovery about that, that is actually contrary to my experience.

Do you want to explain?

MR. VAN KIRK: Just in terms of the adequacy of counsel. There usually are the opportunity to take discovery

about the adequacy of the --

THE COURT: Like what? What would the discovery be?

MR. VAN KIRK: In this case, it would probably be about the relationship between --

THE COURT: Are you talking about sending interrogatories to people? You send them a letter saying, give me these documents. You take depositions. What are we talking about?

MR. VAN KIRK: In this case, it would be interrogatories of MoloLamken or through the existing plaintiffs. Also, typically, we did ask in the deposition process of the named plaintiffs, their selection process for counsel, and knowing why they -- or their level of involvement here with the selection process and why they selected or chose the selection of MoloLamken would be something that we would raise and did raise --

THE COURT: You're not going to get that much time to file a response to this. I need you to tell me why it matters what the named plaintiffs did, if anything.

MR. VAN KIRK: The named plaintiffs are supposed to be in charge of the litigation.

THE COURT: Yeah.

MR. VAN KIRK: And they have an obligation, particularly in this case where you have found their designated counsel to be inadequate, to exercise that authority and to be

involved in the process. As it's represented here, our understanding is that the counsel that you found inadequate did the interviews, conducted the analysis.

THE COURT: When you say the counsel that I found inadequate, who are you talking about?

MR. VAN KIRK: I'm talking about Mr. Cramer and Mr. --

THE COURT: Can you point to me in my opinion where I found them inadequate?

MR. VAN KIRK: I don't have it, but --

THE COURT: I can print it out for you, and then you can point me to it. So give me just a second.

MR. VAN KIRK: I do have it, your Honor.

THE COURT: It takes me a second to get the docket up here. It's kind of a long one. Sorry. My computer being a government computer does not work all that well.

Okay. Look at page 61.

MR. VAN KIRK: I'm there, your Honor.

THE COURT: Yeah. So I'm going to quote myself.

"Given counsel's candor problem, the Court concludes that there is at least significant doubt that current class counsel, even with GLC out of the mix, are adequate within the meaning of Rule 23(a). But the level of doubt is insufficient to require their removal entirely."

So you're reading that as a finding that they were inadequate? Because that's actually not what it says.

MR. VAN KIRK: I understand your position.

THE COURT: So are you going to correct yourself now?

MR. VAN KIRK: I think I will correct myself, your Honor.

THE COURT: Is there someplace else in the opinion where I found somebody inadequate?

MR. VAN KIRK: No. I think it's just the finding that they had lacked candor with the Court and that you had --

THE COURT: Lacking candor with the Court, like misquoting an opinion? I'm dead serious here.

MR. VAN KIRK: I understand, your Honor.

THE COURT: The first thing you say when you get up is to basically make something up. Seriously.

MR. VAN KIRK: Your Honor, I think the point that we're making --

THE COURT: Whole cloth.

MR. VAN KIRK: The point that we're making is that these are folks that you found are inadequate -- have made presentations --

THE COURT: What do you want to do? You want to take -- who all do you want to take depositions of? Let's just get it out on the table right now.

MR. VAN KIRK: We would want to retake the depositions of the named plaintiffs.

THE COURT: "Retake" meaning what? You want to ask

them questions about their involvement in the selection of counsel?

MR. VAN KIRK:  Yes.

THE COURT:  Okay.  So that should probably take about 15 minutes.

MR. VAN KIRK:  I don't know that it will take 15 minutes, but it'll be short.

THE COURT:  It'll take about 15 minutes because that's what you're going to get.

Who are the people who are the class representatives at this point?  I'm asking Mr. Normand this question.

MR. NORMAND:  Well, there's six or seven individuals, your Honor.

THE COURT:  Here's the deal.  This is not a negotiation.  Within the next ten days, they're all to be made available for a video deposition not to exceed 15 minutes.  That's it.  That's more than enough.  If it takes you more than seven, then you're doing something wrong.

MR. NORMAND:  What's the subject matter of the deposition?

THE COURT:  Their involvement in the selection of counsel.  In the selection of new counsel, if any.  Okay?  So there's that.

What else?

MR. VAN KIRK:  That was the one issue that we were

going to raise as a procedural matter, but I think it does make more sense to do it now in advance of the filing of those papers.

THE COURT: Because we're not going to do it later. We're going to do it now.

MR. VAN KIRK: I think that that is the...

THE COURT: Everybody's allowed to talk. He's not the spokesperson for everybody, Mr. Gringer. If you want to talk, come up here and talk. Come up here and talk.

MR. VAN KIRK: The other issue, your Honor --

THE COURT: The reason I'm saying that is I'm not going to have somebody say, well, Van Kirk said this, but he wasn't speaking for everybody. So everybody is going to come up and sign on the dotted line here. So if you want to say something, come up and tell me yourself.

MR. GRINGER: Sorry, your Honor. I'm happy to say it. I was trying to be efficient.

But we have concerns. I'm certainly not going to approach it that way. But we have concerns Mr. Posner is not here today, like Mr. Molo and Mr. Cramer. But DC Rule 1.11 says that when a government employee is involved in a matter substantially that they cannot then be involved in the same matter.

Mr. Posner was an employee of the Department of Justice, antitrust division, in the exact window in which the

DOJ was both looking at this conduct and submitted a statement of interest to you. Obviously, we don't know the level of his involvement.

THE COURT: Fair enough. What's the DC rule say again?

MR. GRINGER: 1.11.

THE COURT: What's it say? You can just paraphrase it. I'll take your word for it.

MR. GRINGER: It says if you are involved in a matter --

THE COURT: Yeah.

MR. GRINGER: -- substantially that you can't --

THE COURT: Substantial involvement, it's kind of like the test for conflicts generally.

MR. GRINGER: Right. But you cannot then be involved with -- in this case it would be the same matter -- or a substantially related matter. And, significantly, if a timely screen and notification to both the government and the other parties is not provided, then the entire firm has to be disqualified.

THE COURT: Okay. So when I said is there stuff that you had to bring up today and everybody said no, did it not occur to anybody that these are things that I might want to hear about now?

MR. GRINGER: It certainly occurred to us that you

14

wanted -- we thought --

THE COURT:  I had to drag it out of you?

MR. GRINGER:  You didn't have to drag it out of us, your Honor.  You asked us about the date, and that's why we didn't say a thing.  We didn't have an issue about the date.

THE COURT:  I said -- and I'll quote myself.  I said, is there anything that anybody would like to bring up, and I got nothing but stares.

MR. GRINGER:  Your Honor, we're bringing it up.  You know, that's the best I can do.  We're bringing it up right now.  It was certainly our plan to bring it up.

THE COURT:  So would an affidavit from Mr. Posner regarding his involvement, if any, in the underlying matter, and if he had any, whether he did this whole screening thing.

MR. GRINGER:  We know he did not do the screening thing, so...

THE COURT:  How do you know?

MR. GRINGER:  Because he's in the -- he's supposed to be screened.  He's put forward --

THE COURT:  Oh, I see what you're saying.  Got it.  Got it.  Got it.  Okay.

Would an affiliate from him be sufficient on that?

MR. GRINGER:  You know, I would certainly trust a lawyer's representations.

THE COURT:  Okay.  So we need an affidavit from

Mr. Posner pursuant to DC Rule --

MR. GRINGER: 1.11.

THE COURT: 1.11?

MR. GRINGER: 1.11.

THE COURT: -- 1.11 by -- what's today? Today is Friday. By Wednesday, whatever Wednesday is. I think that's the 29th.

MR. POSNER: That's no problem, Judge.

MR. GRINGER: Right. Then we have a separate issue that Mr. Posner is employed by the University of Chicago, a defendant originally in this case.

THE COURT: Is he a teacher?

MR. GRINGER: He is a teacher.

THE COURT: Okay.

MR. GRINGER: And that could also pose a conflict. I have no idea what confidential information he's received from the University of Chicago. We expect them to be a witness in this case. So, again, you know, that's an issue that I think he should address, whether there's a conflict or not.

THE COURT: Mr. Molo.

MR. MOLO: Judge, this is Steve Molo. Yeah. I can represent that Mr. Posner has not represented the University of Chicago in this matter.

MR. GRINGER: He's an employee.

THE COURT: I think the contention was he was an

employee.  Your issue would be whether he received any -- wether he has any client confidences, basically, relating to this case?

MR. GRINGER:  Correct.

THE COURT:  What would that consist of?  Just what's the --

MR. GRINGER:  He could -- he's an antitrust expert at the university.  They could have consulted with him about this case.

THE COURT:  That would not be as an employee.  That would be as a lawyer.

MR. GRINGER:  Not necessarily, no.

THE COURT:  If you go to a law professor and say, hey, what's your legal opinion about antitrust, that kind of sounds like consultant as a lawyer to me.

MR. GRINGER:  Well, you know -- all right.  Either way, how you look at it, I think it's a concern.  And I think there's a conflict analysis here.  I mean, it's a little unusual to have an employee of a defendant serve as counsel for the plaintiffs.  He's an ongoing employee there.  That's unusual -- in my experience, it's never happened.  I can't find an example -- I can't find an example of it.

THE COURT:  Haven't they been dismissed at this point?

MR. GRINGER:  Say that again?

THE COURT:  Hasn't the university --

MR. GRINGER: They have settled, yes.

THE COURT: But they've been dismissed out of the case. They are not a current defendant.

MR. GRINGER: They are not a current defendant. But certainly the plaintiffs have suggested that the University of Chicago is going to testify and --

THE COURT: Well, they are an alleged co-conspirator.

MR. GRINGER: Alleged co-conspirator?

THE COURT: Kind of like what you'd call in a criminal case at this point an unindicted co-conspirator or something like that.

MR. GRINGER: I mean, yes, I think that's a fair way of looking at it. So I think that's another concern, too, that we intend to raise. In the interest of raising everything, that's a concern.

THE COURT: Good. I'm glad we're having this discussion. Let's get it all out.

What else is there? Because I mean, some of these problems I would prefer to be trying to deal with them now rather than dealing with them four weeks from now and six weeks from now.

MR. GRINGER: And I apologize. I think we just got thrown off momentarily by sort of the issue on the date. I can tell you we spent quite a bit of time preparing for this hearing to raise exactly these issues.

There is a similar issue, I think less acute, with Mr. Gold, who is here, regarding his time at the DOJ.

THE COURT: Is that the guy out there?

MR. GRINGER: Mr. Posner was in the front office position, you know, devoted to labor issues, so it seems logical that he would have had some involvement in this case. I don't know that Mr. Gold had any involvement, but he can tell us himself.

THE COURT: So same affidavit from Mr. Gold.

MR. GRINGER: That would be good.

THE COURT: Same kind of affidavit.

MR. GRINGER: Same kind of --

THE COURT: He didn't teach at U of C.

MR. GRINGER: Not to my knowledge.

THE COURT: It's now called U Chicago, I guess. They don't call it U of C anymore.

MR. GRINGER: You'd have to ask him that, but I'll take your word for that.

Thank you, your Honor.

THE COURT: So in the interest of getting all of the laundry out on the table right now, so in -- I don't recall if it was the last brief because there were so many, but it was one of the briefs. Yeah. I think it was very much toward the end. I'm not going to hit this exactly right. I'm going to do my best to give you my memory of it.

There was an issue raised in one of the defendants' filings about -- I think this was after Mr. Gilbert volunteered in one of the filings to say, I'll step aside, or my law firm will step aside. There was an issue raised in one of the filings, well, wait a second. He's still going to get money. Okay. Is that going to be an issue? And is anybody asking for discovery about that? Like I say, this is what's called me dragging it out of you guys.

MR. VAN KIRK: Yeah. I think we would want to know from them. If we're doing interrogatories, that is one of the issues that we would ask them.

THE COURT: You are doing interrogatories if I say you can do interrogatories because discovery is actually closed.

MR. VAN KIRK: Yeah.

THE COURT: So why does that matter?

MR. VAN KIRK: It matters -- it potentially matters because in terms of the relationship between these folks and what the incentives will be for the new counsel. So if they are dividing the fees in a way that's different from the way we understand them to be dividing it, it could affect their level of rigor in the case. Instead of having -- dividing money three ways, they're dividing it four ways. And so knowing whether or not Mr. Gilbert has any ongoing economic interest in the case in the future resolutions is relevant in that regard.

THE COURT: You said somewhere in there -- and I don't

want to misquote you, but I don't have the realtime up and running, so I'm going to do my best.

MR. VAN KIRK:  It's better that way.

THE COURT:  If it's different from what you understood.  What you understood is what?  It's what was disclosed before about the fee sharing essentially?

MR. VAN KIRK:  Yes.  Yes.

THE COURT:  So basically what you're asking me if that's changed --

MR. VAN KIRK:  Yes.

THE COURT:  -- you want to know how it's changed.

MR. VAN KIRK:  Yes.  And whether Mr. Gilbert, while he has said that he is out of the case, is really out of the case. And whether he's continuing to assert financial interest in --

THE COURT:  How do you define out of the case?

MR. VAN KIRK:  I don't know because I don't know what they're --

THE COURT:  Well, you just used the phrase.  I'm just asking what you meant by the phrase.

MR. VAN KIRK:  By out of the case I would mean he has no further involvement.  What we would like to know is, does he have any further involvement in the prosecution of the case, other than for any named plaintiff that he continues to represent.  And, two, whether he has any ongoing financial interest in whatever might be eventual recoveries in the case.

THE COURT: Okay. So those are two hugely different things, the first of which I have something to do with, because I can basically say you don't have anything to do with it except with regard to the person that you represent. But putting that aside, on the other part of it, that's the part when I saw this in the briefs before. And I didn't address it because I didn't need to at that point, given what the decision was. I wondered why that mattered.

So why would that matter? I'm kind of pushing back on the question. Why does it matter whether the lawyers -- let's just say, for purposes of discussion, that Mr. Gilbert is not going to have any role in the prosecution of the class action. Okay? Let's just say that. But let's say, for purposes of discussion, that he has this agreement that preexisted all of these rulings and whatnot and preexisted the case probably with the other counsel where he gets X percent of whatever is recovered in the case. Okay? And so let's just assume, again, for purposes of discussion, that that's still the case.

Why does that matter?

MR. VAN KIRK: It matters with regard to the rigor that MoloLamken brings to the representation.

THE COURT: I'm perplexed. Why do you say that?

MR. VAN KIRK: It's a different financial arrangement, a different financial incentive. So one of the things that you've discussed and the case law suggests is that this third

recovery is what's necessary -- a third of the recovery is what's necessary to provide adequate incentive for parties to participate. If they have --

THE COURT: Why does that -- I get that.

MR. VAN KIRK: Yeah.

THE COURT: I mean, like, in other words, if Molo was coming in and doing this pro bono, you might say, hey, wait a second. He's going to sell out the class just so he can cut the bleeding, so to speak. So what his financial arrangement is might matter. And I put that to the side for a second. I'm not understanding what Mr. Gilbert's financial arrangement ongoing might matter.

MR. VAN KIRK: I think they're related.

THE COURT: Why?

MR. VAN KIRK: In that if Mr. Gilbert is continuing to assert some dominion over and a right to compensation from future recoveries, that will have an impact on the financial incentives created for MoloLamken because there will less -- be more people trying to divide the same pie.

THE COURT: Yeah. But, I mean -- again -- so let's just put some numbers on this. Let's say -- I don't know if this is what the deal was. Let's say the deal before was a third, a third, a third. So the Gilbert firm, GLC, gets a third. FNF gets a third. And Berger Montague gets a third. Let's assume that stays in effect. And let's say that

everybody's given up a third of their third for MoloLamken. Okay?

So I get why it matters what MoloLamken -- whether they are adequately incentivized to adequately represent the class. I get that. What I don't get is what it matters what Gilbert is getting.

MR. VAN KIRK: Only to the extent that it diminishes what's available for MoloLamken.

THE COURT: But the amount that MoloLamken is getting is whatever it is, whether it's -- somebody else is getting something else or not. I mean, that's -- let's -- let me just put -- try to come up with an example here.

Okay. So let's say you're going to pay me to file a personal injury lawsuit against Home Depot. And, yes, we get those around here. And you agree to pay me a third. You're my client. You just slipped and fell and broke your ankle or something at the Home Depot. You agree to pay me a third. And I'm not asking you about rules of professional conduct disclosure issues at this point. I'm just asking you about incentives. Okay?

And I bring on another lawyer, and I agree to pay that other lawyer half of my third. Okay? And let's say that other lawyer then brings in another lawyer and agrees to pay him half of his half of my third.

Now the proposition that I'm only getting half of a

third you might argue -- if this were a class action, you might say, well, Kennelly's not going to do a good job because he's only getting a sixth. But the fact that there's other people getting -- the question is what I'm getting and whether it's adequate to incentivize me, not what somebody else is getting and whether that affects my incentive. Because it doesn't affect my incentive. My incentive is what it is.

MR. VAN KIRK: Can I use a simpler example?

THE COURT: It probably would be quite easy because mine wasn't good.

MR. VAN KIRK: It's also a class action. Say that there's $10 million in future recoveries that are attorneys' fees. Under the existing arrangement, if it's a third, a third, a third, they each get 3.3 million. If the MoloLamken firm comes in and say they're going to get 10 percent, well, it matters whether or not they're getting 10 percent of -- it matters if --

THE COURT: Yeah, yeah, you almost slipped there. Go ahead and finish it. You almost walked right into it.

MR. VAN KIRK: If they're dividing what's left -- if they're taking 10 percent of the share that Friedman Normand and Berger Montague have, then that would be a smaller share if Gilbert --

THE COURT: Right. I completely agree with you. But the question is what their share is, not what somebody else's

share is.

MR. VAN KIRK: It's their share of what? It's either a share of 33 percent, or it's a share -- or 66 percent, or it's a share of a hundred percent. In other words, if Gilbert is out and they're getting 10 percent of the money given to these two firms, that's a different --

THE COURT: We're talking past each other. I don't think I'm doing a good enough job of making myself understood. Let me just ask the folks at the table here.

Does anybody want to say what the financial arrangement is?

MR. NORMAND: Ted Normand, your Honor.

THE COURT: Mr. Molo wants to talk.

Go ahead and talk, Mr. Molo.

MR. MOLO: All I was going to say is that we are operating on a full contingency basis. And the more money that the class recovers, the more money we get paid. And our intention is to get the largest possible recovery for the class, whether that means going to trial and getting a large verdict or it means the defendants deciding they want to liquidate the risk of that and pay us a great deal of money that would be satisfactory --

THE COURT: So I'm going to try to put myself in Mr. Van Kirk's shoes and ask a question or two that he might have asked if he had just heard this, which he did. Okay.

Full contingent. That means a percentage. A percentage of what? Is it a percentage --

MR. MOLO: It's a percentage --

THE COURT: -- of all recovery? Is it a percentage of the fees that are recovered? What is it a percentage of?

MR. MOLO: It's a percentage of the fees that are recovered.

THE COURT: Okay. So you're working on a contingent -- when I say "fully contingent," there's been a lot of discussion in this case about what that means. In other words, you're not getting your hourly rate paid.

MR. MOLO: No funding.

THE COURT: Okay. You have a percentage -- you have an agreement for a percentage of whatever fees are recovered.

MR. MOLO: Correct.

THE COURT: Mr. Normand, you're standing at the podium. Is that consistent with your understanding?

MR. NORMAND: It is. I can shed a little more light and speak to Mr. Van Kirk's comments. For one, the Court found FNF and Berger adequate without regard to what their financial arrangement was with Mr. Gilbert. So the notion that suddenly that information needs to be disclosed to understand whether our firms have proper incentives is an illogical one.

Your Honor does a lot of MDL work, a lot of class action certification. I'm not aware in those contexts of the

Court insisting that they understand what the fee sharing arrangement is among the proposed counsel or executive teams to understand if each individual firm is sufficiently incentivized.

And, finally, I think I can say without waiver that Mr. Molo's stake and his firm's stake, the percentage that he described, their contingency stake, is carved out from whatever happens with regard to FNF, Berger, and Gilbert.

THE COURT: What does that mean?

MR. NORMAND: It means contrary to the example that you went over with Mr. Van Kirk, those firms are not all cutting their shares to provide some stake for Mr. Molo that could be reduced depending on whether Mr. Gilbert is paid. There's no sliding scale there. If our firms end up in a situation with Mr. Gilbert's firm in which we're talking about who owes what, none of that affects the MoloLamken firm recovery.

THE COURT: Okay. I will tell you -- it would be contrary -- I'm saying this to defense counsel. It would be contrary to my experience -- MDLs are a different story. MDLs are a different story because you sometimes have these things called common benefit arrangements where there's a pooling of money for the lawyers that are going to do the work on behalf of everybody else.

But in class actions, it's contrary to my experience

that a defendant would get discovery of the plaintiffs' fee arrangement or the plaintiffs' attorney's fee arrangement as a part of determination of class certification. And I haven't been doing this forever, but I've been doing it for 27 years. It would be contrary to my experience.

Do you have a different experience, Mr. Van Kirk, or anybody?

MR. VAN KIRK: No, no different experience, to answer your question directly.

I think the point that we want to know is whether Mr. Gilbert has any ongoing financial interest because we do think that is relevant to the adequacy of this group of plaintiffs.

THE COURT: Let's say it's a yes.

MR. VAN KIRK: It sounds like it is.

THE COURT: Yeah. Let's say it's a yes. And, therefore, what? What's the argument?

MR. VAN KIRK: I think it goes to whether or not the existing counsel continue to be adequate because the only way to excise Mr. Gilbert from having ongoing financial interests in the case would be to deny class certification generally and/or to deny the continuing participation of the Friedman Normand and Berger Montague firms. And we think that is the appropriate remedy --

THE COURT: There was a giant leap between your

premise and your conclusion. I need you to explain the leap to me.

MR. VAN KIRK: We think the appropriate remedy for a finding that Mr. Gilbert lacked candor and is not an adequate counsel.

THE COURT: Is -- kick out everybody. I get that. You said that before.

MR. VAN KIRK: That he should have no ongoing financial interests in what happens in the case. And they're saying, we can't tell you that because under our arrangement and because of our continuing participation in the case.

THE COURT: I don't think anybody told me they couldn't tell me that. Let's just try to keep it on the accurate side of the needle.

MR. VAN KIRK: To be clear, they couldn't tell you that he is not going to assert an interest, a future financial interest in the case. I think what I heard Mr. Normand say was that he may well assert a future financial interest in the case, not just about past settlements or recoveries, but any future settlement or recoveries, should there be any.

And we think that's significant. We don't think, giving your findings, that he should have any right to a future recovery. And the way to remedy that and ensure that is to not have a continuing participation.

THE COURT: I'm not understanding why that would have

an impact on -- assuming that he -- let me start the question in a different way.

Assuming that Mr. Gilbert is not class counsel and doesn't have any role in the prosecution of the case, I'm not understanding why the fact that he might gain money from the settlement of the case or the judgment in the case has any bearing on whether the other counsel are adequate. I'm just not understanding it at all.

MR. VAN KIRK: I think your opinion did a very good job of saying this is --

THE COURT: I'm going to have my court reporter print that out. Just the first part of the sentence. Just up to the word "job."

MR. VAN KIRK: Because it is probably the last nice thing we'll say about it for some time.

THE COURT: Yeah. You got it right.

MR. VAN KIRK: You did a good job of pointing out that this is a delicate balance and that you had multiple considerations. And you had to weigh those considerations in terms of deciding how to address what I think was your finding that all of the existing counsel said -- made misleading statements to the Court and lacked candor to the Court. I think that's a fair summary of your opinion. If it's not, you can correct me.

THE COURT: Yeah, I'm not going to -- I'm not going to

try to summarize 64 pages in a sentence and a half.

MR. VAN KIRK: Understood.

But in that situation, we think it's appropriate to factor into the balance what has been the penalty for those counsel for making those statements to the Court.

THE COURT: Nobody's asked me to impose a penalty. I've been asked to certify a class --

MR. VAN KIRK: I understand.

THE COURT: -- or not certify a class, just to be clear about it.

So let me just ask this question of plaintiffs' counsel.

MR. NORMAND: Can I speak briefly to Mr. Van Kirk's comments?

THE COURT: Can you tell me -- I think the yes or no will, I think, probably be an adequate answer. Does Mr. Gilbert -- let's say there's a settlement in the future with some defendant that hasn't settled yet or a judgment. Does Mr. Gilbert, under the existing arrangement, have some entitlement to a percentage of the fees or to some portion of the fees?

MR. NORMAND: I'm going to channel Mr. Gilbert, and I would say Mr. Gilbert may very well argue that.

But there's an easy solution, your Honor. Your Honor has it right. This is about adequacy of counsel. If your

Honor comes to the view and the defendants want to press their view, at such time, if there comes such a time that there's more money to distribute in the form of fees, which Mr. Molo's firm would be seeking, if at that time your Honor wants to say something about whether or not Mr. Gilbert and his firm should be paid for their time, your Honor's free to say that.

It would be, I think, unusual. I guess it wouldn't be unprecedented. I can't say I've never seen it. But that would be the time to address that issue. If for some reason -- and it would be a form of punishment -- the Court wanted to speak to that, it's not relevant to any decision now. It would be relevant down the road to the Court's view of what should happen with these moneys.

THE COURT: I'm going to ask my question in a different way because -- I appreciate the way you responded to the question. The first part of your answer was responsive to the question.

Under the written documentation that's currently in effect, would Mr. Gilbert have some claim of entitlement to some percentage of whatever fees are generated by the remainder of the litigation?

MR. NORMAND: I think it's an issue that we will have to discuss with his firm. There's no clear answer. Mr. Gilbert may think there's a clear answer. Our firm's view is there's not a clear answer.

33

THE COURT: Okay. So I think, honestly, in terms of briefing this, I think you should assume it's a yes, Mr. Van Kirk, and then just brief it accordingly. You'll argue that it's significant, and here's why it's significant. And the plaintiffs will argue it's not significant, and here's why it's not significant.

MR. NORMAND: Your Honor's phrasing was "claim of entitlement." I think Mr. Gilbert's view is he has a claim of entitlement.

THE COURT: Yeah. I worded it the way I did for a reason.

Okay. So now we had this nice long discussion going after nobody wanted to talk about anything. Does anybody want to talk about anything else?

MR. VAN KIRK: Yes. I do. I apologize from the start. I think the way it began, we assumed you were going to ask them to say something and we would respond. I think it just got -- the one issue that I think is still out there is the relationship, so -- between the MoloLamken firm and the Friedman Norman and Berger Montague --

THE COURT: What do you mean by relationship?

MR. VAN KIRK: Their working relationship.

So we talked about interrogatories. One of the things -- the discovery that we would take is what is the relationship between the firms. We know that there are two

34

cases either currently or very recently that they have worked together as co-counsel.  We know they've mentioned, I think, the *Amore* case.

THE COURT:  I saw something in the filing.

MR. VAN KIRK:  In the filing about that.

And then, separately, there is a case in Connecticut. Maybe it's an *Anheuser-Busch* case.  The *Amore* case is with the Berger Montague firm, and the case in Connecticut is with the Friedman Normand firm.

I think one of the interrogatories or discovery we would take would be asking what other cases they have worked together on because I think one of the questions is, when you have made the findings that you have about the proposed class counsel and found that you were not going to certify them as class counsel but needed somebody else, is what is the relationship between them?  And should they be the ones making that determination, or should there be a Court-authorized process for doing so?

So one of the questions --

THE COURT:  What determination?

MR. VAN KIRK:  The determination of who should serve as class counsel.

THE COURT:  I thought that's what I'm supposed to decide.

MR. VAN KIRK:  You are.  But in terms of who's

proposing class counsel. In that instance, we would like to know how many other cases have they worked together. So an interrogatory would be --

THE COURT: Why would that matter?

MR. VAN KIRK: I think, given your findings, we would say that it is not the appropriate procedural step to allow counsel who you have found you could not certify as the class counsel on their own, that it's not the appropriate procedural posture to have them select who their -- who the lead will be.

THE COURT: Do you want -- is Corzo a man or a woman? I'm sorry. I don't remember, the plaintiff Corzo?

UNIDENTIFIED SPEAKER: Male.

THE COURT: Do you want him to go out and go in the Yellow Pages, if those still exist, and try to find a lawyer on his own? I mean, it's borderline ridiculous, Mr. Kirk -- Mr. Van Kirk. Sorry for botching your name.

MR. VAN KIRK: No, I think what happens in some occasions is the Court will ask whether there are applicants -- whether there are people who want to serve in that role, and/or -- one of the things we would ask --

THE COURT: In what context have you seen -- I have seen that in some contexts, but I want to know what contexts you've seen it in. That's the norm in private securities litigation, reform act litigation. Full stop.

What else?

MR. VAN KIRK: In the MDL that I'm currently involved in in the District of Columbia, there was an invitation to the firms that had been participating in the case and otherwise to make nominations to serve as the lead counsel in that case. It's the settlement administrator's case.

THE COURT: What's the nature of the MDL?

MR. VAN KIRK: The nature of the MDL is an antitrust class action.

THE COURT: Different situation. I mean, that's a common -- that's an amalgamation of a bunch of different lawsuits.

MR. VAN KIRK: I understand that you may reject their premise. I think from our standpoint, we would simply ask them to identify the other cases -- I don't think it's burdensome -- to identify the other cases that they have worked together on in some reasonable period of time.

THE COURT: Let's play the hypothetical out. Let's just say it ends up being just these two that you're aware of. Therefore what?

MR. VAN KIRK: Therefore, part of what we were going to say, I think in our preview, is this isn't a procedure. Definitely, you don't typically get a redo on this. No authority has been cited by the Court or the plaintiffs for this process, period, full stop.

Secondly, in terms --

37

THE COURT: Now you're borrowing my lingo.

MR. VAN KIRK: It's good lingo. You know, mimicry is the sincerest form of flattery.

On that issue, secondly, if you were going to have a process by which you were going to select new counsel, having the existing counsel who the Court has found lacked candor in their representation to the Court participate and make that is not appropriate. They're going to pick a friend, and that's not an adequate form of oversight.

THE COURT: Fair enough.

All right. I mean, it seems to me all things you can argue.

Go ahead, Mr. Molo.

MR. MOLO: I was just going to say a couple things.

One, you as the judge presiding over the class action has a fiduciary duty to the class, and it's you that makes the selection. As I understand the law, well-developed law on this, the issue isn't whether somebody is my friend. The issue is whether we are adequate for the position that you are considering us for. And whether or not we'd work with these other firms or not is really irrelevant to that.

THE COURT: So I guess the argument -- and Mr. Van Kirk didn't really put it in these terms. But I guess the argument is, is that if you're friends, that basically you wouldn't actually be the leader, the captain of the ship; you

would roll over for the other people. I'm assuming that's at least part of the point.

MR. MOLO: Okay. So the working relationship that we have with these firms, we are co-counsel with Berger Montague in a veterinarian's case. In Virginia, we were recently appointed by the Court as co-lead counsel. We have never been co-lead counsel. We've never done anything else. We did represent a client that they had in what was called the Rocky Flats litigation, which was a very long environmental tort case years and years ago that Jeff Lamken represented the client, worked with them on appeal. That's probably going back seven or eight years ago. We know the firm. We've talked about things with them. But that's the full extent.

I'm curious about what this *Anheuser-Busch* case is. I don't know what it is. What is this *Anheuser-Busch* case in Connecticut? It's news to me. I wasn't personally involved in it.

THE COURT: I'm the last person who would know that.

MR. MOLO: Maybe they could tell us. They said we were involved -- yeah, what is the *Anheuser-Busch* case?

MR. VAN KIRK: Mr. Van Kirk is looking.

THE COURT: Sit tight for a second.

MR. VAN KIRK: The case that we've identified is *BBSR, LLC v. Anheuser-Busch* in the superior court in Connecticut pending in Hartford.

THE COURT: Okay.

MR. VAN KIRK: We did our best to identify.

THE COURT: Does it sound like -- look like it's a current case? Do you have a case number or anything like that?

MR. VAN KIRK: Case number --

MR. NORMAND: That's an FNF case, your Honor.

MR. VAN KIRK: Yes.

THE COURT: I think that's the point actually.

MR. MOLO: But were we involved?

MR. VAN KIRK: MoloLamken is. No. That's the Friedman case.

MR. NORMAND: I thought Steve was described because you were describing it as a Berger case -- I mean, as a Molo case.

MR. GRINGER: Do you know that you have a case?

MR. NORMAND: That case was closed. I don't think there was any involvement from --

THE COURT: That was a voice from the crowd who could not be heard because he ignored the instruction to speak into a microphone.

MR. NORMAND: I worked on that case, and I can tell your Honor that I did not meet Steve Molo. I didn't meet anyone from MoloLamken on that case. So maybe they did something on the stray.

I can also say it had nothing to do with our decision

in this instance, and I would also say I know Mr. Cramer is out of pocket. I don't believe Mr. Cramer had ever met Mr. Molo before this process started. So this notion of there being some reciprocal friendship which flies in the face of, you know, the really hard-to-get-around notion that anyone is going to prevail over Steve Molo and force him to defer to our view in anything in a case in which he's coming in as lead counsel.

MR. VAN KIRK: This is why you take discovery on these issues.

THE COURT: But you don't get discovery regarding -- you don't get to take discovery of law firms regarding -- it like never happens, Mr. Van Kirk. It just doesn't happen.

MR. VAN KIRK: I'm not sure that that's true. In our experience --

THE COURT: I'm sure that it's true in my experience.

MR. VAN KIRK: Okay. It is a very simple question. You may find it irrelevant. The plaintiffs --

THE COURT: You can argue it. You can argue it. I mean, the thing that I think you're entitled to is the thing -- the two things that I think you're entitled to are the two things that I talked about. That's the short deposition -- reopen depositions of the plaintiffs to ask them about what involvement they had, if any, in the selection of counsel, and the disclosures from the two individuals regarding their involvement or any lack of involvement when they were at DOJ in

whatever the underlying matter was. That's it. Nothing else.

MR. MOLO: And --

THE COURT: You're going to help me out here, Mr. Molo? That's not necessary.

MR. MOLO: I want to say one other thing. Neither of those individuals had done one bit of work or gotten any confidential information in connection with this case up to this point.

THE COURT: They'll submit affidavits.

MR. MOLO: Yes. Yes.

THE COURT: So I think I said the depositions have to happen within the next, what did I say, ten days?

MR. NORMAND: Ten days.

THE COURT: So today is the 24th. That means by May the 4th. So we'll call it the further response by the defendants on the adequacy of counsel issue is due on the 14th of May -- 15th of May. So a week and a half-ish. Final reply by the plaintiffs is due on the 22nd of May.

There's at least some possibility -- I'm not going to say how much. There's at least some possibility I may need to talk to you. In other words, we may need to have argument. So I'm going to set a date for that. And sorry to everybody, but we're going to do it in person. So it's going to be the very end of May. I just need to pull up my calendar for that week. It's probably better to do it this way.

It has to be on the 26th of May because on the 27th, I have to travel for a JPML hearing. So for those of you who are coming out of town, which would be everybody pretty much, is it better to do these things in the morning or is it better to do them in the afternoon?

MR. GRINGER: On that day specifically, I think it would be better for the afternoon.

THE COURT: Because the day before is a holiday?

MR. GRINGER: Yes.

THE COURT: That makes perfect sense.

MR. NORMAND: I'm sorry, your Honor. What day is that?

THE COURT: The day after Memorial Day. I'm going to set it for -- let me just think this through. I'm going to set it for 2:30. Okay. If the thought crosses anybody's mind to ask for an extension, make the thought go away. Because it ain't going to happen.

MR. CRAMER: Your Honor, this is Eric Cramer. I just wanted to ask whether it would be okay to do these depositions by video.

THE COURT: I already said that. That's what I said. That's how they're going to happen is by video.

MR. CRAMER: Thank you.

MR. GRINGER: And, your Honor, I may regret doing this.

THE COURT: Just get closer to the mic so the people on the other end of the phone can hear you.

MR. GRINGER: Given what you said earlier today, your Honor -- it's David Gringer again for Penn -- about making sure you say everything you want said. You know, I don't -- you were just talking about the sort of practicality of law firm discovery and how it's not what's usually done. In Penn's view, this is not regular order.

THE COURT: I get it. Completely get it.

MR. GRINGER: Okay. And so given that, and there were a number of representations made today, including contingency representation, I regret not scrutinizing those at the time they were made and would like the opportunity to scrutinize them this time.

THE COURT: Okay. I'm not sure what that means. I'm not going to preclude you from scrutinizing anything.

MR. GRINGER: I only have discovery on the named plaintiffs.

THE COURT: As the former Mayor Daley would have said, "Go ahead and scrutin away." He actually did say that.

MR. GRINGER: I believe he did. I've read both American Pharoah and --

THE COURT: No, it's the other one. It's Daley the younger.

MR. GRINGER: Oh, the second Daley. Okay. I haven't

44

read anything about him, but I don't dispute that he said that.

From our perspective, we should receive -- from Penn's perspective, a least -- and I'm speaking for Penn here -- we should receive copies of whatever agreements exist. We should be able to investigate Mr. Molo's claim that he's working fully on contingency. We should understand the exact terms of Mr. Gilbert's relationship with FNF.

And, you know, there was not a finding yet that they are adequate, and we should be able to view all of this. We should be able to issue a request for production for those agreements and whatever the normal course practice is in this case. Given the misrepresentations, we should get discovery into that.

THE COURT: Okay. Thanks. I don't think you're entitled to that.

MR. GRINGER: Thank you, your Honor.

THE COURT: Okay. Anybody else have anything you want to say?

MR. NORMAND: There was one last issue, your Honor, in the interest of front ending it. The question of what the named plaintiffs did at the deposition is one thing. The question of their communications with us is something else, typically privileged. I'm just assuming this is going to come up in every one of them.

THE COURT: Okay.

MR. NORMAND: And I don't know if you want to -- your Honor wants to hear that now.

THE COURT: I assume that kind of stuff comes up in class rep depositions all the time when people are asked, as they often are, you know, what did you have to do with the investigation of this case? Not a damn thing. What did you have to do with picking the lawyer? They say what they did or what they didn't do.

MR. NORMAND: I guess I'm just trying to front end what I expect will be an issue both on the days of the deposition and the days following them, which is --

THE COURT: So here you go. Here's the deal. When did I say these have -- the depositions have to happen within the next, what did I say, ten days?

MR. GRINGER: Correct, your Honor.

THE COURT: That's the 4th of May. Unfortunately, there's a good part of that period that I'm going to be away. I'm going to be away from the 29th through the weekend. But I'm around on the 27th and the 28th. And I'm around on the 4th. And I don't have -- well, other than the regular kind of stuff that I have to do, I don't have anything special going on on the 4th. The 27th and 28th are a little busy, but I can make time. My guess is you won't be doing them Monday and Tuesday. My guess is they're all going to get packed into the end of the period. I'm at least available on the 4th if

somebody wants to call me from the deposition.

MR. NORMAND: Okay, your Honor.

THE COURT: Which happens sometimes. There you go.

All right. Thanks for coming in today. Take care.

(Recess at 11:50 a.m., until 11:55 a.m.)

THE COURT: All right. I was asked to come back out. Why?

MR. NORMAND: It's Ted Normand, your Honor. Mr. Gold from the Molo firm would like to relay a conversation -- a brief conversation that he just had with Mr. Gringer which we find problematic and we think the Court may find problematic.

MR. GRINGER: I'm going to apologize. I was angry.

THE COURT: Well, you can do it in a second after he says it.

MR. GOLD: Good morning, Judge. Matt Gold from MoloLamken. I'm not trying to initiate anything. There was an interaction in the hallway. I didn't say anything. I'm happy to answer questions if the Court asks, but I have nothing further to say on the record on the point.

THE COURT: Okay. Again, all dressed up and no place to go. All right.

(Adjourned at 11:56 a.m.)

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter.

/s/ *Carolyn R. Cox*                    Apri 26, 2026
Carolyn R. Cox, RPR, F/CRR
Official Court Reporter