# EXHIBIT 8

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ANDREW CORZO, SIA HENRY,      )
ALEXANDER LEO-GUERRA, MICHAEL  )
MAERLENDER, BRANDON PIYEVSKY,  )
BENJAMIN SHUMATE, BRITTANY     )
TATIANA WEAVER, and CAMERON    )
WILLIAMS, individually and on  )
behalf of all others similarly )
situated,                 )
                          )
            Plaintiffs, )
                          )
v.                        )  Case No. 1:22-cv-00125
                          )
BROWN UNIVERSITY, CALIFORNIA   )
INSTITUTE OF TECHNOLOGY,       )
UNIVERSITY OF CHICAGO, THE     )
TRUSTEES OF COLUMBIA           )
UNIVERSITY IN THE CITY OF NEW  )
YORK, CORNELL UNIVERSITY,      )
TRUSTEES OF DARTMOUTH COLLEGE, )
DUKE UNIVERSITY, EMORY         )
UNIVERSITY, GEORGETOWN         )
UNIVERSITY, THE JOHNS HOPKINS  )
UNIVERSITY, MASSACHUSETTS      )   ** CONFIDENTIAL **
INSTITUTE OF TECHNOLOGY,       )
NORTHWESTERN UNIVERSITY,       )
UNIVERSITY OF NOTRE DAME DU    )
LAC, THE TRUSTEES OF THE       )
UNIVERSITY OF PENNSYLVANIA,    )
WILLIAM MARSH RICE UNIVERSITY, )
VANDERBILT UNIVERSITY, and     )
YALE UNIVERSITY,               )
                          )
            Defendants. )
_____ )

VIDEOCONFERENCE VIDEOTAPED DEPOSITION
OF
MICHAEL MAERLENDER
Thursday, April 30, 2026
(Taken virtually by Defendants)

Reported by:  Christine A. Taylor, RPR
Job No.:  J14744971

REMOTE APPEARANCES:

Representing the Plaintiffs:

   FREEDMAN NORMAND FRIEDLAND LLP
   BY:  RICHARD CIPOLLA, ESQ.
      225 Franklin Street, 26th Floor
      Boston, Massachusetts  02110
      617.374.3700
      rcipolla@fnf.law

Representing the Defendant The Trustees of the University of Pennsylvania:

   WILMER CUTLER PICKERING HALE and DORR LLP
   BY:  DAVID GRINGER, ESQ.
        BECKY MAZ, ESQ. (Washington, DC)
      7 World Trade Center
       250 Greenwich Street
      New York, New York  10007
       212.937.7294
      david.gringer@wilmerhale.com
       becky.maz@wilmerhale.com

Representing the Defendant University of Notre Dame Du Lac:

   WILLIAMS CONNOLLY LLP
   BY:  SARAH KIRKPATRICK, ESQ.
       680 Maine Avenue SW
      Washington, DC  20024
       202.434.5000
      skirkpatrick@wc.com

            (continued)

Representing the Defendant Georgetown University:

   MAYER BROWN LLP
   BY:  KATHERINE F. ARAGON, ESQ.
      1999 K Street, NW
      Washington, DC 20006
      202.263.3000
      karagon@mayerbrown.com


Also Present:

   Juliana Ardila, Videographer

        On April 30, 2026, commencing at 6:03 p.m., the videconference videotaped deposition of MICHAEL MAERLENDER was taken remotely via Zoom pursuant to notice and pursuant to the Federal Rules of Civil Procedure, on behalf of the Defendants.

C O N T E N T S

PAGE

EXAMINATION BY MR. GRINGER                    6

* * *

E X H I B I T S

(No exhibits were identified.)

P R O C E E D I N G S

* * *

THE VIDEOGRAPHER:  Good afternoon. We are now on the record.

The time is now 6:03 p.m. on April 30th, 2026.

This begins the video-recorded deposition of Michael Maerlender, taken in the matter of Andrew Corzo, et al., versus Brown University, et al., filed in the United States District Court for the Northern District of Illinois, Eastern Division.  Case number of which is 1:22-cv-00125.

The videographer today is Juliana Ardila.  The court reporter today is Christine Taylor.  We are both representing Esquire Deposition Solutions.

All counsel will be recorded on the stenographic record.

Will the court reporter please swear in the witness.

* * *

MICHAEL MAERLENDER, having first been duly sworn, was examined

and testified as follows:

* * *

EXAMINATION

BY MR. GRINGER:

Q.  Good afternoon, Mr. Maerlender. Thank you for your time.  My name is David Gringer, I represent the University of Pennsylvania in this case.

We've never met before; is that correct?

A.  That is correct.

Q.  I once asked someone that and they said, "not in this life," which I thought was a funny answer.

So could you tell me, you know, how closely you've been following this case for the last couple of years?

MR. CIPOLLA:  Objection.  Scope.

You may answer.

THE WITNESS:  I've been following the case fairly closely, as a -- as a lead plaintiff in the case.

I've been, you know, kept apprised of motions and movements happening behind the scenes.  Of course, my direct

participation has been limited to only a

couple of instances.  But my counsel keeps

me in the loop.

BY MR. GRINGER:

Q.   And who is your counsel in this case?

A.   Richard Cipolla, FNF, and the other

law firms named.

Q.   And who are those other law firms

named?

A.   I believe the previous one was

Berger.  It's FNF.  And -- oh, I'm blanking on

the last one, but there's a third that is

currently now the co-counsel.

Q.   And is your understanding that -- do

you have an understanding of who the lead counsel

is in the case?

A.   As of this time, I believe there

isn't a co-counsel.  I'd have to check with my

counsel on that because I know, obviously, the

nature of this deposition is about the

rearrangement of that.  So I'm not 100 percent

sure at the moment.

Q.   Have you ever heard of -- well, let

me ask you.

What is your understanding of the

purpose of this deposition?

A.   The purpose of the deposition is to ask me some questions about my understanding of the process by which we are finding a new lead counsel firm.

Q.   What is the process that was used to find a new lead counsel firm?

A.   After it was identified that one was needed by the judge, my counsel spent a lot of time doing rigorous research into the right kind of partner and then relayed their findings to me and the other lead plaintiffs.  And we authorized their decision.

Q.   How do you know that the research your counsel did was rigorous?

MR. CIPOLLA:  I'm going to caution the witness not to reveal the context of privileged conversations, but to answer to the best of his ability otherwise.

THE WITNESS:  Yeah.  I know it was rigorously researched.  It was presented to me in a way that showed thought and care on the part of my counsel.  And the materials and the sort of advice that they provided to me indicated the sort of depth

of research that they had committed.

BY MR. GRINGER:

Q.  And do you know what research they had done?

A.  I don't know the full extent of the research.  But I do know that lots of research was conducted.

Q.  Okay.  And you know that because they told you?

MR. CIPOLLA:  Objection.

THE WITNESS:  Yeah.

BY MR. GRINGER:

Q.  Did you do any research into the law firm they had selected to be the lead counsel in this case?

A.  When I was notified of the name that they were suggesting as their top pick, I did look into them.

Q.  How did you look into them?

A.  I used the Internet.

Q.  And what did you do on the Internet to look into them?

A.  I searched their name on the Internet.

Q.  Using Google?

A.  Yeah.

Q.  And what did you do when Google returned results?

A.  I read the results.

Q.  All of them?

A.  No.

Q.  How many results did you read?

A.  I don't know off the top of my head.

Q.  Was it more than one?

A.  Yes.

Q.  Was it more than two?

A.  Yes.

Q.  More than five?

A.  Yes.

Q.  More than ten?

A.  I can't say positively more than ten.

Q.  So somewhere probably between five and ten?

A.  By my estimate, yeah.

Q.  And this was after you had heard -- and what is the name of the firm that's going to be serving as lead counsel?

A.  The firm, the name is MoloLamken.

Q.  And do you have anything open on your computer right now besides this Zoom?

A.  I don't, no.  This is full screen.

Q.  Is your phone with you?

A.  My phone is on my desk, face down in front of me.

Q.  And do you understand -- do you have any understanding of whether any other firms were considered for the lead counsel role?

MR. CIPOLLA:  Objection.

THE WITNESS:  Only my presumptions.

BY MR. GRINGER:

Q.  Okay.  But you don't know whether any other firms were considered?

A.  I don't.

Q.  Did you -- do you have an understanding of the circumstances by which there was a need to select new lead counsel?

A.  I have a partial awareness of it. I'm sure I don't understand it in its full complexity, but I do know some of the details.

Q.  Why don't you tell us what you do know.

A.  The details as they have been relayed to me by my counsel are that --

MR. CIPOLLA:  Objection.  I'm going to direct the witness not to state what

your counsel told you.

You can speak about your understanding, but don't reveal the contents of communications.

THE WITNESS:  My understanding is that there was an issue raised by the judge with one of our previous co-counsels.  And so in order to certify the class, which is our goal, we needed to find a new lead counsel.

BY MR. GRINGER:

Q.  When you say that is our goal, what did you mean by that?

A.  It's an objective.

Q.  Of whom?

A.  Of -- I mean, me as a lead plaintiff representing the class.

Q.  Why -- why is it your goal to certify a class?

MR. CIPOLLA:  Objection.  Scope.

You may answer.

THE WITNESS:  Well, I believe the class is well defined, and certifying it would mean that we move forward with the justice that we seek to obtain.

BY MR. GRINGER:

Q.  Can't you obtain justice for yourself?

MR. CIPOLLA:  Objection.  Scope.

You may answer.

THE WITNESS:  Can you -- sorry, can you restate the question?  I'm not sure what you mean.

BY MR. GRINGER:

Q.  Well, you said -- isn't it possible for you to seek justice for yourself?

MR. CIPOLLA:  Objection.  Scope.

THE WITNESS:  Yes.

BY MR. GRINGER:

Q.  Are you prepared to proceed with this case even if a class is not certified?

MR. CIPOLLA:  Objection.  Scope.

I'm going to direct the witness not to answer that question.

MR. GRINGER:  On what grounds?

MR. CIPOLLA:  It's outside the scope.

MR. GRINGER:  He brought it up with his answer.

MR. CIPOLLA:  All those questions were outside the scope too.

MICHAEL MAERLENDER  Confidential                                    April 30, 2026
ANDREW CORZO vs BROWN UNIVERSITY                                             14

MR. GRINGER:  Well, you didn't object.

MR. CIPOLLA:  I did object to all of them.

BY MR. GRINGER:

Q.   Anyway, what role did you personally play in choosing a new lead counsel?

A.   My role in choosing a lead counsel was to be directed by my counsel and making the ultimate decision on whether to proceed with them.

Q.   And how did you decide to make the -- the decision to proceed with new lead counsel?

A.   I used the information that I had, the information that was given to me by my counsel and my own research to come to a logical conclusion.

Q.   Did you talk to anyone from MoloLamken before they were chosen to be new lead counsel?

A.   I did not.

Q.   Do you think it's a good idea to hire a lawyer without ever having talked to them first?

MR. CIPOLLA:  Objection.  Scope.

You may answer.

THE WITNESS:  Do I think it's a good idea to hire a lawyer without ever having spoken to them first?

I mean, I guess it depends on sort of, like, the way you want to think about what's a good idea.  I do think in this circumstance it was the correct choice to use the resources and the information I had to make that decision.

BY MR. GRINGER:

Q.  Did you ask to speak to MoloLamken before they were chosen to be lead counsel?

A.  I did not.

Q.  You didn't want to talk -- to the lawyers who would be the ones responsible for bringing justice to the class before they were chosen?

A.  No.

Q.  Did you talk to your other lawyers in this case before you hired them?

A.  I spoke primarily with Richard.

Q.  That's Mr. Cipolla here?

A.  Yes, Mr. Cipolla.

Q.  What did you do to prepare for your

deposition today?

A.  I met with my counsel.

Q.  How many times?

A.  We met one time.

Q.  Okay.  And what -- when did you meet with your counsel to prepare for your deposition?

A.  I met with my counsel yesterday.

Q.  For how long did you meet with your counsel?

A.  Not very long.  I want to say the meeting was about 30 minutes --

Q.  Was anyone --

A.  -- at the most.

Q.  Who was at the meeting besides yourself?

A.  It was myself, Richard Cipolla, Peter Normand, and one of the lawyers from MoloLamken.

Q.  Do you remember the name of the lawyer from MoloLamken?

A.  I want to say his last name was Gold, but I can't be sure on that.

Q.  Matthew Gold?

A.  That could have been it.

Q.  Bald guy?

A.  Yes.

Q.  And nothing wrong with that.  I am too.  But, you know, just making sure we have the right person.

And have you signed an engagement letter with the MoloLamken firm?

A.  I have not.

Q.  Is Mr. Gold your attorney?

MR. CIPOLLA:  Objection.

THE WITNESS:  As far as I --

MR. CIPOLLA:  Objection.  Calls for legal conclusion.

You may answer.

THE WITNESS:  As far as I understand it, he is not directly my lawyer.

BY MR. GRINGER:

Q.  And so what did Mr. Cipolla and Mr. Gold tell you -- and Mr. Normand tell you yesterday in the deposition prep session?

MR. CIPOLLA:  Objection, privileged. I'm going to direct the witness not to answer that question because of privilege.

MR. GRINGER:  Let's go off the record.

THE VIDEOGRAPHER:  The time is 6:15 p.m. and we're going off the record.

(Recess taken from 6:15 p.m. to 6:16 p.m.)

THE VIDEOGRAPHER:  The time is 6:16 p.m. and we're back on the record.

BY MR. GRINGER:

Q.  Mr. Maerlender, are you going to follow Mr. Cipolla's instruction not to answer my question about what he told you in the presence of someone who's not your counsel to prepare you for this deposition?

A.  I am.  Because I agree with the position, as far as I understand his reason for it.

Q.  Okay.  And before yesterday's deposition prep session with Mr. Cipolla and someone who is not your lawyer, had you ever spoken to anyone from MoloLamken before?

A.  I believe I already answered that, but I had not.

Q.  What role is Mr. Lamken going to be playing in this case?

A.  Steven Lamken, the head of MoloLamken, I'm not sure specifically what his individual role is.  I do know that his firm will play a role.

Q.  Okay.  And what about Eric Posner,

what role is he going to play?

A.  I am unfamiliar with the name.

Q.  And when you were told that MoloLamken would be the choice of Mr. Cipolla and his colleagues to be the new lead counsel, were you told who from MoloLamken would be working on the case?

A.  I don't recall specifically if I was when the initial mention of it was brought up.

Q.  And have you since been told who from MoloLamken is going to be working on the case besides Mr. Gold?

A.  I don't know off the top of my head. I could have been told, but it might have been in passing.

Q.  Do you know what role Mr. Molo is going to play in this case relative to Mr. Lamken or otherwise?

MR. CIPOLLA:  Objection, scope.

You may answer.

THE WITNESS:  Again, I -- I don't know specifically.

BY MR. GRINGER:

Q.  Have you ever heard the name Eugene Sokoloff?

MICHAEL MAERLENDER  Confidential                    April 30, 2026
ANDREW CORZO vs BROWN UNIVERSITY                              20

A.   I don't believe so.

Q.   What about Rayiner Hashem, what role does -- is Rayiner Hashem going to be playing in this case?

MR. CIPOLLA:  Objection, scope.

You may answer.

THE WITNESS:  I'm not sure.  I'm unfamiliar with the name.

BY MR. GRINGER:

Q.   Your lawyers told the Court that they interviewed 12 different law firms to serve as lead counsel for the class in this case.

How many of those interviews did you participate in?

A.   I did not participate in any of the interviews.

Q.   What are the names of the firms that were interviewed to serve as lead counsel in this case?

A.   Besides MoloLamken, I can't think of one off the top of my head.

Q.   Do you know for a fact that other firms besides MoloLamken were interviewed?

A.   As far as I trust my counsel, that's what they told me.

Q.  But you don't have any independent proof of that?

A.  I don't have any proof that wouldn't exist elsewhere, no.

Q.  Do you -- they didn't send you any materials from any of the other firms; correct?

A.  I don't recall being sent anything about the other firms.

Q.  Do you have any understanding of how it is Mr. -- the MoloLamken firm will be paid in this case?

A.  How they'll be paid?

MR. CIPOLLA:  Object.  I just want to caution the witness to only answer yes or no if you have an understanding and not to divulge any privileged communication.

MR. GRINGER:  That's an improper instruction.  I asked a yes or no question, so you don't need to tell him to only answer yes or no.

I didn't do that with Penn employees.

You shouldn't do that with your clients.

BY MR. GRINGER:

Q.  Do you have an understanding, Mr. Maerlender, of the financial arrangements for

how MoloLamken is going to get paid?

A.  No.

Q.  Are you aware -- do you have any understanding of why it is -- what you allude to as the issue involving your previous lead counsel, why they can no longer be in the case?

A.  Not well enough to speak to it very articulately.  I know it revolved around funding.  But I can't speak to it further than that.

Q.  What's your opinion of Elon Musk?

MR. CIPOLLA:  Objection.  Scope.

You may answer.

THE WITNESS:  Okay.  My personal opinion you're asking for?

BY MR. GRINGER:

Q.  Uh-huh.  Yeah.

A.  Are we -- are we sure this is within scope?

Q.  Uh-huh.  You can answer.  Just --

A.  Okay.  I -- I don't like him.

Q.  Are you comfortable having the same lawyer as Elon Musk has?

MR. CIPOLLA:  Objection.  Scope.

I'm going to direct the witness not to answer.  And you are well past time.  I

gave you some leeway this time, too, David.  So --

MR. GRINGER:  What's basis for that instruction?

MR. CIPOLLA:  We're past time.

MR. GRINGER:  It's definitely within scope, Mr. Cipolla.  He -- you chose for him a lawyer for someone else he doesn't like.  So I'm allowed to ask him if he knew that.  It's completely within the scope.

MR. CIPOLLA:  You're allowed to ask him --

MR. GRINGER:  It's completely within the scope --

MR. CIPOLLA:  -- what he did --

MR. GRINGER:  It's part of the process.

MR. CIPOLLA:  -- and his opinions on -- his opinion is different than the process itself.  And you're past time anyway.

BY MR. GRINGER:

Q.  Is he -- let me ask it this way.

Are you comfortable with the fact

that your law firm, that the new law firm being proposed, MoloLamken, also represents Elon Musk?

MR. CIPOLLA:  I'm going to continue to direct him not to answer because you were past time when you asked the question.  And it's outside the scope.

BY MR. GRINGER:

Q.  Are you going to follow that instruction?

A.  I am.

Q.  I take it you didn't know that until I just told you; is that correct?

MR. CIPOLLA:  I'm going to direct him not to answer that question because you're out of time.

BY MR. GRINGER:

Q.  Mr. Maerlender, are you going to follow that instruction not to answer my question if you're comfortable with the same law firm as Elon -- representing you as Elon Musk?

MR. CIPOLLA:  This -- this deposition is over.  You don't get to keep asking him questions and then say will he answer that question despite the instruction.

Time is up, David.

BY MR. GRINGER:

Q.   Are you going to answer my question, Mr. Maerlender, or not?

A.   I'm going to continue to follow the advice of my counsel.

MR. GRINGER:  Well, we object to these improper instructions.  Not to -- and that's all I'll say for now.

Thank you for your time, Mr. Maerlender.

THE WITNESS:  Thank you.

THE VIDEOGRAPHER:  Shall I take us off the video record, Counsel?

MR. CIPOLLA:  Yeah.

MR. GRINGER:  I will note we object to Mr. Cipolla's counting of the time, his improper instructions on privilege, on scope, particularly with the regard to the last question which was important, and his speaking objections otherwise.

MR. CIPOLLA:  If it was important, you could have led with it.  The judge said you could have done all of this in 7 or 8 minutes.

MR. GRINGER:  I guess I'm just not --

I did the best I could with the time I had given obstruction from counsel.

Thank you.

MR. CIPOLLA:  Thanks, Michael.

THE WITNESS:  Thank you very much. Have a good day.

THE VIDEOGRAPHER:  Time is 6:23 p.m. and this concludes today's proceeding.

- - -

(Read and sign not reserved.)

- - -

(Deposition concluded at 6:23 p.m.)

- - -

CERTIFICATE OF REPORTER

I, Christine A. Taylor, Certified Court Reporter within and for the State of Georgia, do hereby certify:

That the foregoing deposition was taken before me on the date and at the time and location stated on Page 1 of this transcript; that the deponent was duly sworn to testify to the truth, the whole truth and nothing but the truth; that the testimony of the deponent and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed; that the foregoing deposition as typed is a true, accurate and complete record of the testimony of the deponent and of all objections made at the time of the examination to the best of my ability.

I further certify that I am neither related to nor counsel for any party to the cause pending or interested in the events thereof. Witness my hand, this 30th of April, 2026.

_____

Christine A. Taylor, RPR
Georgia CCR-4736