## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

ANDREW CORZO, SIA HENRY, ALEXANDER LEO-GUERRA, MICHAEL MAERLENDER, BRANDON PIYEVSKY, BENJAMIN SHUMATE, BRITTANY TATIANA WEAVER, and CAMERON WILLIAMS, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, THE JOHNS HOPKINS UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY,

Defendants.

Case No.: 1:22-cv-00125

Hon. Matthew F. Kennelly

**PUBLIC VERSION**

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO CLARIFY

Whether the defendants' Section 568 defense is viable or not, the 568 exemption and evidence that the defendants favored wealthy applicants are central to the plaintiffs' liability case. A separate trial on damages would accomplish nothing. Instead, it would impose enormous costs and risk inconsistent results in violation of the Seventh Amendment. Rule 42(b) permits bifurcation only if "separate trials would avoid prejudice to a party or promote judicial economy." *Houseman v. U.S. Aviation Underwriters*, 171 F.3d 1117, 1121 (7th Cir. 1999). The defendants' proposed bifurcation would do neither. The request to bifurcate should be denied.

**ARGUMENT**

While this Court's rulings on summary judgment mean that the 568 defense is virtually certain to fail at trial, it remains live. But even if the defense were dead—or if all the defendants abandoned it (as Notre Dame has)—the story of Section 568's exemption and evidence of the defendants' wealth favoritism would remain integral to the plaintiffs' case.

## I. The 568 Defense Remains Live—If Only Barely

This Court's summary judgment order read Section 568 to require that *every* party to the 568 Group be need-blind. ECF 1210 at 39. Since it was undisputed that at least some members of the Group were *not* need-blind, the Court denied summary judgment on the 568 defense. *Id.* at 39-41. But it does not follow that the Court *granted* judgment in the plaintiffs' favor.

As the Court observed at the July 23 conference, the plaintiffs never moved for summary judgment on the 568 defense. 7/23/26 Hr'g Tr. 11:19-23. Rule 56(f) requires notice to a party before granting judgment on "grounds not raised by a party." Fed. R. Civ. P. 56(f). The defendants do not contend they were on notice. So, while the Court's conclusions may well support a motion for directed verdict at the close of evidence, they did not resolve the defense. As the defendants' motion effectively concedes, that puts their disqualifying wealth favoritism squarely at issue.[1]

## II. The 568 Exemption Is Relevant for Reasons Independent of the 568 Defense

The result would be the same even if the 568 defense were off the table. The 568 exemption is relevant for a host of reasons.

---

[1] The defendants could abandon or stipulate away their defense, but they cannot unilaterally dictate how the plaintiffs try this case. *Cf. Jimenez v. City of Chicago*, 877 F. Supp. 2d 649, 672 (N.D. Ill. 2012) (Kennelly, J.) (defendants "offer[ed] no authority to support the proposition that a party in a civil case is required to accept a stipulation in lieu of proving a point at trial"), *aff'd*, 732 F.3d 710 (7th Cir. 2013). As explained below, evidence of wealth favoritism will be relevant whatever they decide.

**First,** at the most basic level, the defendants *named* their collusive enterprise "after the 568 Exemption." ECF 1210 at 3. The defendants may wish they had named it something else. But that ship has sailed. Their choice makes an explanation of Section 568 indispensable. It would make no sense to try this case without telling the jury why practically *every* witness and document is talking about "568." As this Court's own discussion of the background to this litigation shows, Section 568 is central to the story of the defendants' conduct. *See* ECF 1210 at 2-8. It explains everything from why the defendants founded the 568 Group to why the group dissolved in 2022.

**Second,** the 568 exemption and its need-blind requirement are baked into the principal evidence that the defendants formed an agreement—the first element of the plaintiffs' claim. *See* ECF 1210 at 12. Every defendant signed a "Memorandum of Understanding" in which they agreed, among other things, that "[p]articipation in the Group is limited by federal law to colleges and universities that practice need-blind admissions" and that "[i]f, at any time, an institution fails to meet the need-blind requirement, its participation shall terminate immediately." ECF 1025-6 (Pl. MSJ Ex. 107) at 1 (Cornell's signed memorandum). "The Group's continuation," the Memorandum stipulated, was "contingent on renewal of Section 568 by Congress." *Id.* at 2. None of that makes sense without an explanation of Section 568 and its need-blind requirement.

**Third,** the 568 exemption is central to rebutting the defendants' statute-of-limitations defense. To prevail on that defense, this Court has held, the defendants must prove that a reasonable plaintiff could have discovered his or her "injury and its cause through the exercise of reasonable diligence." ECF 1210 at 42. That the defendants named their enterprise after a statute that *authorized* at least some agreements on financial aid is one reason why potential plaintiffs would not have suspected that the group's conduct harmed them. *See* ECF 892 at 12-17.

3

### III.    Evidence of Wealth Favoritism Is Also Independently Relevant

Given the significance of the 568 exemption, it would be extraordinarily prejudicial to bar the plaintiffs from introducing evidence that the defendants' conduct was *not*, in fact, shielded by that exemption.  Telling the jury that the defendants named their group after the 568 exemption without *also* telling the jury that the defendants engaged in disqualifying wealth favoritism would be unthinkable.  But evidence of the defendants' wealth favoritism would remain relevant even if the jury never heard about Section 568—both as part of the plaintiffs' affirmative case and as impeachment against defense witnesses.[2]

For example, the defendants have consistently argued that their educational missions and supposed altruism excused their conduct.  They have maintained that they are not "revenue maximizing" and that the "average cost" of educating students is "more than full-pay . . . tuition."  ECF 860 at 31.  If the jury hears that, it must also hear how the defendants prioritized applicants from whom they hoped to get much more than tuition.  The jury should hear that Notre Dame, for example, prioritized applicants whose families "present[ed] potential to be substantial donors of funds."  ECF 898-32 (Pl. MSJ Ex. 328) at 3.  And it should see how Cornell's leadership ███ ███ .  *See, e.g.*, ECF 906-11 (Pl. MSJ Ex. 289) at 1.  The list goes on, but the point is simple. The defendants cannot rely on evidence of their supposed altruism without facing up to evidence they gave special treatment to wealthy applicants they hoped would help grow their endowments.

---

[2] It is not true, as the defendants claim, that this Court "noted" that the plaintiffs wouldn't need evidence of wealth favoritism "if the 568 Exemption were not a live issue."  ECF 1295 at 1.  Nor is it true that the plaintiffs "agreed" to such a limitation.  *Id*. at 7.  The Court asked, as a "hypothetical," whether "donations tied to admissions" would "still be relevant" if every defendant "drop[ped] the 568 defense."  2/8/23 Hr'g Tr. 28:5-9.  The plaintiffs' (former) counsel allowed that, insofar as that made this a per se case, in which the agreement's illegality would be presumed, such evidence might not be needed.  *See id.* at 28:17-18 ("we'd have a pure price fixing standard collusion case").  But counsel made clear that, at a minimum, the evidence would be relevant to rebutting the defendants' statute-of-limitations defense.  *Id.* at 30:4-9.

4

The same is true of the defendants' anticipated efforts to defend their conduct under the rule of reason. The defendants have argued that freezing competition over need-based aid was "pro-competitive" because it was "aimed at increasing access for low income students" and "improving the quality of education." ECF 860 at 29 (internal quotation marks and alterations omitted). If the jury is allowed to hear that kind of argument, it should also be told how the defendants admitted *high*-income students for their "high gifting or potential gifting" despite knowing that they *lowered* the quality of the student body. ECF 760 at 4. It should see how, after an admissions cycle in which "'very low ranked'" applicants were repeatedly admitted for fundraising reasons, one Notre Dame administrator was left "'hop[ing] the wealthy next year raise a few more smart kids!'" *Id.* It should be told that Georgetown's president sent the University's admissions office a list of wealthy applicants marked for admission without even *looking* at those applicants' transcripts, recommendations, or personal essays. *See* ECF 916-17 (Pl. MSJ Ex. 223) at 65:11-66:24 (DeGioia Tr.); ECF 898-10 (Pl. MSJ Ex. 298) at 27:12-28:23 (Koenig Tr.); ECF 898-22 (Pl. MSJ Ex. 310) at 91:12-23 (Deacon Tr.).

Evidence of wealth favoritism is also necessary to rebut testimony that stifling competition somehow improved the quality of the defendants' programs. For example, the defendants proffered an expert—Dr. Long—who opined at length that the defendants' horizontal agreement enhanced "equity." *See* ECF 1160 at 45-47. If that testimony is admitted, then evidence that the defendants maintained lists of applicants whose families made substantial donations—lists from which they admitted students at much higher rates than regular applicants—should be admitted too. The jury should know that MIT, for example, admitted anywhere from ███████ percent of applicants on its list of well-connected students, even as it admitted just ███████ percent of applicants overall. ECF 900-5 (Pl. MSJ Ex. 32) at app. 4, tbl. 7 (Singer Rebuttal Rep.). It should know

that Cornell used ███████████████████████████████████████████████████

██████████████████████████████. ECF 906-9 (Pl. MSJ Ex. 287) at 2. It should hear

that the defendants "compete[d]" to admit "lower considered applicants" based on "potential

wealth" and "potential giving." ECF 898-32 (Pl. MSJ Ex. 328) at 2-4.

Finally, evidence of wealth favoritism is relevant to impeach testimony by the defendants'

fact witnesses who might deny that wealth played a factor in admissions. For example, Eric Furda,

a former Dean of Admissions at the University of Pennsylvania, testified that Penn was "need-

blind" because it did not consider a family's ability to pay when making admissions decisions.

ECF 864-73 (Def. MSJ Ex. 154) at 126:1-24 (Furda Tr.). But a Penn admissions officer testified

that students "whose famil[ies] were big donors" were "tag[ged]" for preferential treatment. ECF

917-8 (Pl. MSJ Ex. 331) at 223:2-9 (Harberson Tr.). A student with such a "tag," she explained,

would "have gotten in almost 100 percent of the time"—"even if the student was incredibly weak,

even if the student had a major issue in the application." *Id.* at 223:2-9, 224:17-225:12. Such

directly contradictory testimony is fair game on cross-examination, whether to attack the witness's

testimony directly or to probe their character for truthfulness.

## IV. Bifurcation Would Be Ineffective, Inefficient, and Potentially Unconstitutional

In this context, the defendants' request for bifurcation makes no sense. The defendants

claim bifurcation is necessary to avoid prejudice. But splitting the trial into separate liability and

damages phases would not address the defendants' concerns. Even if the 568 *defense* were

relegated to the damages phase—an odd place for a liability defense—evidence of the exemption

and wealth favoritism would have to be presented in the liability phase, too.

Not only would bifurcation be pointless, it would be inefficient. The plaintiffs' evidence

of damages and liability overlaps. The overcharge calculated by the plaintiffs' expert, Dr. Singer,

for example, is central *both* to damages *and* to proving the contours of the relevant market (part of

the liability case). *See* ECF 1160 at 12, 31-32. A bifurcated trial would require the parties to present "the same evidence in two separate trials." *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 431 F. Supp. 2d 834, 841 (N.D. Ill. 2006) (denying bifurcation). That "clearly" would "not serve the interest of the Court in economy, the interest of the parties in an expeditious resolution, or the interest of potential witnesses in mitigating their inconvenience." *Real v. Bunn-O-Matic Corp.*, 195 F.R.D. 618, 624 (N.D. Ill. 2000) (same).

Given that overlap in proof, bifurcation would also risk inconsistent findings between phases in violation of the Seventh Amendment's Re-examination Clause. For example, in *Matter of Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293 (7th Cir. 1995), the trial court ordered the question of the defendants' negligence to be tried to a jury on a class-wide basis, leaving damages to be tried individually. *Id.* at 1297. The Seventh Circuit granted a writ of mandamus, rejecting that plan. The elements of negligence and causation "overlap," the court explained. *Id.* at 1303. The jury hearing the first phase of the case might decide that the defendant was negligent. But a jury hearing one of the individual cases might well conclude that the defendants' negligence did not cause the plaintiffs' injuries. "How the resulting inconsistency between juries could be prevented," the court of appeals concluded, "escapes us." *Id.* Same here. Whether a defendant's collusion was a "cause" of a plaintiff's injuries is an element of an antitrust plaintiff's liability case. *See* ABA Model Civil Antitrust Instr. 6.A.1. But causation is *also* an element of a plaintiff's damages case. *See id.* at 6.B.4. The risk that separate juries might reach inconsistent verdicts in the liability and damages phases is an independent reason to reject the defendants' proposal.

\* \* \*

The defendants urge that evidence of their wealth favoritism is "inflammatory." ECF 1295 at 2. But the defendants themselves have put the issue front and center from the start. They have

7

urged that their missions are "antithetical" to "revenue maximizing." ECF 860 at 31. They have claimed that they "prioritized need-based aid" for "decades before the 568 Group formed." *Id.* at 33. And they have insisted they were "striving for equity" when they colluded to fix prices. *Id.* at 5-6. Evidence that the defendants routinely admitted wealthy, underqualified students in hopes of growing their endowments is essential to rebut those claims. Evidence and argument about the 568 exemption are just as central, giving context to the defendants' decades-long collusion, explaining the name they chose for their group, and showing why students would not have suspected they were victims of a horizontal price-fixing scheme.

While "probative evidence is also prejudicial in a literal sense," that is not the kind of prejudice the rules of evidence are meant to prevent. *United States v. McCaffrey*, 181 F.3d 854, 857 (7th Cir. 1999). That evidence may be harmful—even very harmful—doesn't make it inadmissible. The defendants have not shown—and could not show—that the probative value of the evidence here is so "insignificant compared to its inflammatory nature" as to prejudice them "*unfairly.*" *United States v. Gorman*, 613 F.3d 711, 720-21 (7th Cir. 2010).

If the jury finds the defendants' wealth favoritism offensive, it will be because such evidence exposes the hypocrisy of the story the defendants tell about themselves. There is nothing unfair about that. The defendants formed and joined the 568 Group to give needy students *less* money—in the name of avoiding "bidding wars"—while their endowments grew. The rules of evidence allow courts to shield parties from *undue* prejudice. They are not intended to save parties from sleeping in the beds they made.

## CONCLUSION

The plaintiffs respectfully request that the Court deny the defendants' request to bifurcate.

Dated:  August 3, 2026

By: /s/ Edward J. Normand
Devin "Vel" Freedman
Edward J. Normand
Richard Cipolla
Joseph Delich
FREEDMAN NORMAND FRIEDLAND LLP
10 Grand Central
155 E. 44th Street, Suite 915
New York, NY 10017
Tel: (646) 494-2900
vel@fnf.law
tnormand@fnf.law
rcipolla@fnf.law
jdelich@fnf.law

Ivy Ngo
FREEDMAN NORMAND FRIEDLAND LLP
1 SE 3d Avenue, Suite 1240
Miami, FL 33131
Tel: (786) 924-2900
ingo@fnf.law

*Class Counsel*

Respectfully submitted,

By: /s/ Steven F. Molo
Steven F. Molo
Eugene A. Sokoloff
Lauren Dayton
Matthew E. Gold
MOLOLAMKEN LLP
300 N. LaSalle Street
Chicago, IL 60654
Tel: (312) 450-6707
smolo@mololamken.com
esokoloff@mololamken.com
ldayton@mololamken.com
mgold@mololamken.com

*Lead Class Counsel*

By: /s/ Eric L. Cramer
Eric L. Cramer
David A. Langer
Jeremy Gradwohl
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
ecramer@bergermontague.com
dlanger@bergermontague.com
jgradwohl@bergermontague.com

Richard Schwartz
BERGER MONTAGUE PC
110 N. Wacker Drive
Chicago, IL 60606
Tel: (773) 257-0255
rschwartz@bergermontague.com

Robert E. Litan
BERGER MONTAGUE PC
1001 G Street, NW, Suite 400 East
Washington, DC 20001
Tel: (202) 559-9745
rlitan@bergermontague.com

*Class Counsel*