**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ANDREW CORZO, SIA HENRY, ALEXANDER LEO-GUERRA, MICHAEL MAERLENDER, BRANDON PIYEVSKY, BENJAMIN SHUMATE, BRITTANY TATIANA WEAVER, and CAMERON WILLIAMS, individually and on behalf of all others similarly situated, <br><br> *Plaintiffs*, <br><br> v. <br><br> BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, UNIVERSITY OF CHICAGO, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGETOWN UNIVERSITY, THE JOHNS HOPKINS UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, NORTHWESTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, VANDERBILT UNIVERSITY, and YALE UNIVERSITY, <br><br> *Defendants*. | Case No. 1:22-cv-00125 <br><br> Hon. Matthew F. Kennelly |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR**
**CLARIFICATION OR IN THE ALTERNATIVE FOR BIFURCATION**

**INTRODUCTION**

Plaintiffs' opposition does not meaningfully contest that the Court has definitively resolved the Exemption defense. Instead, plaintiffs train their focus on attempting to explain why they should be entitled to prejudice the jury's consideration of the merits with inflammatory evidence having nothing to do with the alleged antitrust conspiracy. And plaintiffs fundamentally misunderstand defendants' alternative request for bifurcation, which seeks not to bifurcate trial "into separate liability and damages phases," Opp. 6, but rather to bifurcate trial to reserve Exemption-related evidence for a second stage after liability *and* damages have been decided. Across the board, plaintiffs' opposition misses the mark.

First, plaintiffs misfire with their cursory argument that the Court cannot have determined the inapplicability of the Exemption because "plaintiffs never moved for summary judgment on the 568 defense." Opp. 2. Plaintiffs make no attempt to explain what evidence defendants could adduce that would make any difference at this point in light of the Court's legal rulings and the undisputed facts. Instead, plaintiffs feign concern that defendants were not put "on notice" that the Court was ruling on the issue as a matter of law, implicitly contending that the issue must be tried as a matter of fairness to the *defendants*. *Id.* Insincere concerns aside, the Federal Rules enable the Court to do what it appears already to have done, which is why courts routinely exclude already-decided matters from the jury's consideration in the name of efficiency, judicial economy, and fairness. The Court can and should clarify that the applicability of the Exemption has been effectively resolved.

Plaintiffs attempt to keep the Exemption in play for the jury by highlighting examples of the ways the Exemption may come up during a trial on the merits and offering contrived explanations for why that justifies a full presentation of evidence on defendants' eligibility for the

defense. That the 568 Group was named after the Exemption and that schools were required to be need-blind to be members of the group does not establish any need for a presentation of evidence on whether defendants' admissions policies qualified them for the Exemption's protections. Nor does the parties' dispute over whether plaintiffs' claims are barred by the statute of limitations, which does not hinge on whether it was knowable that defendants' affirmative defenses could be overcome, *see* Dkt. 848 (Defs.' MSJ on Statute of Limitations) at 14-18—a point plaintiffs conceded when defendants raised it at summary judgment, *see generally* Dkt. 894 (Pls.' Opp. to MSJ on Statute of Limitations).

Second, plaintiffs previously claimed that so-called "wealth favoritism" evidence would be relevant regardless of the Exemption primarily for purposes of determining the applicability of the *per se* standard. But with that issue also resolved, plaintiffs now focus on manufacturing reasons why such evidence is relevant to the merits. *See* Opp. 4-6. This argument, however, hinges on the false premise that the *admissions* policies plaintiffs cite as proving defendants' ineligibility for the exemption have anything at all to do with the *financial aid* policies that comprise the alleged antitrust conspiracy. There is no evidence that any defendant engaged in admissions practices that in fact undermined the procompetitive benefits of the 568 Group— benefits such as improving the accuracy of individual schools' need analysis calculations, thereby increasing equity and access to education for students who might otherwise not be able to afford to pay for college, and ensuring the long-term viability of aid initiatives and educational programs for students. The link plaintiffs conjure between purported "wealth favoritism" and the procompetitive benefits of the 568 Group is strained.

Finally, plaintiffs attack a strawman in arguing against bifurcating trial into a liability phase and a damages phase. *See* Opp. 6-7. Defendants have not requested separate proceedings for

liability and damages. Rather, defendants request that if the Court permits plaintiffs to present evidence on the availability of the Exemption—the only topic to which supposed "wealth favoritism" evidence bears conceivable relevance—then that presentation should occur only if necessary after the jury has made a finding of liability on the merits and has assessed damages. Plaintiffs' "Seventh Amendment" and "inefficiency" concerns are irrelevant to the relief defendants actually request.

## I. The Court Can Clarify that Its Summary Judgment Order Obviates Any Need for a Trial Presentation on the Applicability of the Exemption.

The Court has held that a university was ineligible for the Exemption if it considered ability to pay in the admissions decisions of waitlisted or transfer students or gave special consideration in admissions to the children of university benefactors. The Court has also held that any *one* 568 Group member's ineligibility for the Exemption rendered *all* members ineligible. Although defendants respectfully disagree with these holdings and have preserved their right to appeal the Court's legal rulings, they are at this point law of the case. *Jarrard v. CDI Telecommunications, Inc.*, 408 F.3d 905, 911-12 (7th Cir. 2005) ("[W]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."). And the Court has found it is undisputed that some schools in the 568 Group considered ability to pay in the admissions decisions of waitlisted or transfer students and some gave special consideration in admissions to the children of university benefactors. That is why defendants have asked the Court for clarification: following the Court's orders on defendants' Motion to Dismiss and Motion for Summary Judgment, and considering the undisputed facts, it is unclear what any presentation of evidence on the Exemption would accomplish.

Plaintiffs erroneously argue (at 2) that the Exemption must still be a live issue simply because plaintiffs elected not to move for summary judgment. But a plaintiff's strategic choice

3

not to move for summary judgment does not permit them to present evidence to the jury on matters as to which there is no material dispute. Instead, a court may preclude any presentation of evidence at trial that would be "a waste of time for both the Court and the jury" considering the court's legal holdings and the undisputed facts. *Sunstar, Inc. v. Alberto-Culver Co.*, 2004 WL 1899927, at \*25 (N.D. Ill. Aug. 23, 2004) (citation omitted). Doing so is consistent with the Federal Rules, which empower the Court to "consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute." Fed. R. Civ. P. 56(f)(3); *see also* Fed. R. Civ. P. 16(c)(2)(A) (providing that a court may "formulat[e] and simplify[] the issues, and eliminat[e] frivolous claims or defenses"). Consequently, courts routinely resolve issues as a matter of law, including *sua sponte* in favor of nonmovants, when a legal question has been decided and material facts are undisputed. *See Goldstein v. Fidelity & Guar. Ins. Underwriters, Inc.*, 86 F.3d 749, 750-51 (7th Cir. 1996); *see also, e.g.*, *Leb's Enterprises, Inc. v. United States*, 2000 WL 139551, at \*7 (N.D. Ill. Jan. 26, 2000); *Bell v. Marseilles Elementary Sch.*, 160 F. Supp. 2d 883, 885-86 (N.D. Ill. 2001); *Dayton Elec. Mfg. Co. v. APCOM, Inc.*, 782 F. Supp. 389, 394-95 (N.D. Ill. 1992).

Plaintiffs dispute none of this. Instead, they disingenuously suggest that the Court cannot have decided defendants' eligibility for the exemption because "defendants do not contend they were on notice," and Rule 56(f) "requires notice." Opp. 2. But the case law is clear that summary judgment movants, by virtue of their having moved for summary judgment, are on notice and "cannot claim unfair surprise." *Dayton Elec. Mfg.*, 782 F. Supp. At 395. In any event, defendants do not claim they lacked notice. Simply put, the absence of a motion by plaintiffs does not

determine whether the Court's ruling established that there is no need for a presentation of evidence on the Exemption.[1]

Plaintiffs' other efforts (at 3) to explain why defendants' eligibility for the Exemption remains at issue in the upcoming trial are meritless. Defendants do not argue that all mention of "568" or the "568 Group" must be excised from the evidence at trial. But the fact that the 568 Group was named after the Exemption does not establish a material dispute of facts about defendants' eligibility for the Exemption under the Court's governing legal rulings. Nor does the fact that members of the 568 Group signed MOUs acknowledging that participation in the 568 Group required members to practice "need blind" admissions since plaintiffs do not challenge an alleged conspiracy among the schools to be need blind. And plaintiffs' argument that a full presentation of evidence on whether defendants qualified for the Exemption is necessary to defeat defendants' statute of limitations defense, *see* Opp. 3, revives a hopeless argument plaintiffs abandoned at summary judgment. Whether a plaintiff could have suspected she had a winnable claim given the Exemption relates to whether defendants could state an affirmative defense—a question that case law firmly establishes is legally irrelevant to the discovery rule. *See* Dkt. 848 at 14-18. At bottom, the Court's ruling that "none of the universities may benefit from the 568 Exemption's protections in this case" because "it is undisputed that some of the 568 Group members did not" "admit all students on a need-blind basis," Dkt. 1210 at 40, leaves nothing to be decided at trial. The Court should clarify as much.

---

[1] In a footnote, plaintiffs cite *Jimenez v. City of Chicago*, 877 F. Supp. 2d 649, 672 (N.D. Ill. 2012) (Kennelly, J.), *aff'd*, 732 F.3d 710 (7th Cir. 2013), for the proposition that "defendants could abandon or stipulate away their defense, but they cannot unilaterally dictate how the plaintiffs try this case." Opp. 2 n.1. That has nothing to do with whether the Court has ruled that undisputed facts definitively resolve an issue that is for the Court, not the jury, to decide.

5

## II. The Jury Should Hear Exemption Evidence Only After Deciding Liability and Damages Because Prejudicial Exemption Evidence Has No Bearing on the Merits.

Plaintiffs attack a strawman in arguing against bifurcation of trial into a liability phase and a damages phase, Opp. 6-7, relief defendants have not requested. What defendants request is that if the jury will decide the applicability of the Exemption, trial be bifurcated so that evidence concerning so-called "wealth favoritism"—evidence relevant only to the question of whether defendants qualify for the Exemption under the Court's interpretation of Section 568—is heard only if necessary after the jury has decided liability and awarded damages. Plaintiffs raise no specific argument against that request.

Nevertheless, implicit in plaintiffs' argument (at 4-6) is the notion that plaintiffs believe bifurcation would be pointless because they contend that evidence of "wealth favoritism" is relevant (or even, as they put it, "integral") to the merits of their antitrust claim. This is a departure from what plaintiffs have tended to argue over the last four years of litigation—namely, that evidence concerning purported "wealth favoritism" in admissions goes primarily to defendants' eligibility for the Exemption and secondarily to whether the Court should apply the "per se" or the "rule of reason" mode of analysis, issues that appear already to have been decided.[2] It is also wrong.

---

[2] *See, e.g.*, Dkt. 297 (Pls.' Opp. to Defs.' Mot. for Protective Order (Jan. 25, 2023)) at 1 (arguing so-called "wealth favoritism" evidence is relevant to the Exemption as well as to "whether (as Plaintiffs assert) the *per se* doctrine applies to Defendants' conduct, or whether the Rule of Reason or *Brown* doctrine applies"); Hr'g Tr. (Feb. 8, 2023) at 28:5-29:1, 53:1-11 (arguing that in addition to bearing on the Exemption, "the admissions decisions and whether it was wealth favoritism applies to whether the *per se* rule or the rule of reason or *Brown* doctrine applies"); Dkt. 331-02 (Pls.' Mot. to Compel (Mar. 21, 2023)) at 8-9 (alleging that "acts of wealth favoritism in admissions" show "the alleged conspiracy and operations of Defendants are revenue-maximizing and non-altruistic in nature" for purposes of determining the applicable mode of analysis); Dkt. 358-01 (Pls.' Mot. to Limit Redaction (May 9, 2023)) at 7-8 (arguing that in addition to going to the Exemption, "evidence regarding donor preferences in admissions and the use of donations and donor preferences to maximize revenue rather than promote social justice cuts to the heart of the case insofar as it contributes to the determination of the standard of review applied at summary judgment and trial and whether Defendants ultimately violated the antitrust laws"); Dkt. 368 (Pls.' Reply ISO Mot. to Limit Redactions (May 24, 2023)) at 5 n.5 ("If the Court were to apply the analysis in *United States v. Brown*

6

As an initial matter, plaintiffs mislead when they contend that evidence of supposed "wealth favoritism" is relevant to the merits because "defendants have consistently argued" that their "supposed altruism excused their conduct." Opp. 4. In the four years that this case has been pending, only plaintiffs have ever described defendants' defense as predicated on "altruism"—defendants have never done so. Rather, defendants have argued that the challenged conduct had procompetitive benefits in light of defendants' missions to provide a world class education to their students. But supposed "wealth favoritism" evidence does not have any tendency to disprove that point. Nor does it undermine the unrefuted testimony of defendants' industry expert, Dr. Bridget Terry Long, that essentially every student who attends a defendant university is subsidized because the average cost for a school to educate a student is greater than the amount of full tuition for that student. Opp. 4 (quoting Dkt. 860 at 31). Dr. Long explains that because the defendant universities effectively subsidize all students, developing financial aid policies means deciding whether some students should be subsidized more than others, and if so, which ones. She observes that financial aid policies engineered to correctly identify the students who require greater subsidies to attend and by how much (i.e., need-based)—rather than to satisfy institutional goals by directing extra subsidies to the students whose credentials make them most desirable (i.e., merit-based)—serve to increase access to higher education for low-income students, in turn improving the educational

---

*Univ.*, 5 F.3d 658 (3d Cir. 1993), for example, the altruistic motives of a school's participation in the horizontal conspiracy goes to whether *per se*, rule of reason, or quick look governs the legal analysis, and to whether the challenged conduct violated the Sherman Act."); Hr'g Tr. (Aug. 24, 2023) at 23:2-4 (asserting that Exemption-related evidence is relevant because "[i]f there is a revenue maximizing purpose in what they're doing, this is a per se case"); Hr'g Tr. (Oct. 5, 2023) at 5-6 (arguing that "donor influence on the admissions process" constitutes "revenue maximization" for purposes of determining the mode of analysis under *Brown*); Dkt. 561 (Pls.' Resp. to Student Objections to FERPA Notices (Dec. 18, 2023)) at 3 (arguing so-called "wealth favoritism" evidence speaks to eligibility for the Exemption and "is also relevant to Plaintiffs' claim that Defendants' price-fixing conspiracy is *per se* illegal under Section 1 of the Sherman Act").

experience for students at a school through "peer effects."  Plaintiffs contend that if the jury can hear this, then it must also hear about "wealth favoritism" admissions policies that the schools "hoped would help grow their endowments."  Opp. 4.  But one thing has nothing to do with the other.

So-called "wealth favoritism" evidence does not rebut defendants' claims that the challenged conduct had procompetitive benefits that outweighed any anticompetitive harm.  For instance, evidence that the challenged conduct had procompetitive benefits because defendants' financial aid policies increased access for low-income students and improved the quality of education is not contradicted by evidence that some schools' admissions offices gave special consideration based on benefaction.  There is no evidence that such policies undermined defendants' efforts to increase access for low-income students, or that such policies stymied any improvements to the quality of the educational experience due to the "peer effects" of students learning alongside students from different walks of life.  Indeed, anyone could manufacture an argument that myriad non-financial-aid policies are not optimally engineered to attract low-income students or improve the educational experience.  That plaintiffs are focused on introducing salacious admissions evidence is telling.

Under the rule of reason, "[t]he antitrust inquiry is confined to a consideration of impact on competitive conditions." *Kraft Foods Glob., Inc. v. United Egg Producers, Inc.*, 2023 WL 6049912, at *9 (N.D. Ill. Sept. 15, 2023) (citation omitted).  Defendants will show at trial that the challenged conduct was procompetitive because it led to more equitable distribution of financial aid, increased overall financial aid spending, and increased access to higher education for students from low-income families, improving the educational product for all students.  So-called "wealth favoritism" evidence is irrelevant to this—plaintiffs have never argued and have no evidence

8

(expert or otherwise) that "wealth favoritism" in admissions made defendants less competitive, or lessened the equitable distribution of financial aid, or decreased overall financial aid spending, or limited access to higher education for low-income students. No evidence connecting "wealth favoritism" to anticompetitive harm exists.

Alternatively, whether particular evidence goes to the merits is a question that could be addressed in the course of the Court's ordinary pretrial proceedings; to address the narrow question defendants present here, the Court need not decide whether in the abstract, evidence of purported "wealth favoritism" in admissions is more probative than prejudicial on the merits.

9

Dated: August 4, 2026

By: */s/ David Gringer*
David Gringer
Alan Schoenfeld
WILMER CUTLER PICKERING HALE
AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel: 212-937-7294
david.gringer@wilmerhale.com
alan.schoenfeld@wilmerhale.com

Seth Waxman
WILMER CUTLER PICKERING HALE
AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
Tel: 202-663-6800
seth.waxman@wilmerhale.com

Edward W. Feldman
Daniel Martin Feeney
MILLER SHAKMAN LEVINE &
    FELDMAN LLP
180 North LaSalle Street
Suite 3600
Chicago, IL 60601
Tel.: 312-263-3700
dfeeney@millershakman.com
efeldman@millershakman.com

*Counsel for The Trustees of the University
of Pennsylvania*

Respectfully submitted,

By: */s/ Norman Armstrong*
Norman Armstrong
COOLEY LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, D.C. 20004
Tel.: 202-389-5000
norman.armstrong@cooley.com

*Counsel for Cornell University*

By: */s/ Britt M. Miller*
Britt M. Miller
Daniel T. Fenske
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Tel: 312-782-0600
bmiller@mayerbrown.com
dfenske@mayerbrown.com

*Counsel for Georgetown University*

By: */s/ Eric Mahr*

Eric Mahr
Jan Rybnicek
Andrew Henderson
FRESHFIELDS US LLP
700 13th Street, NW
Washington, DC 20005
Tel: 202-777-4500
eric.mahr@freshfields.com
jan.rybnicek@freshfields.com
andrew.henderson@freshfields.com

Rami Fakhouri
Jennifer L. Greenblatt
GOLDMAN ISMAIL TOMASELLI BRENNAN &
BAUM LLP
200 South Wacker Drive, Floor 22
Chicago, IL 60604
Tel: (312) 681-6000
rfakhouri@goldmanismail.com
jgreenblatt@goldmanismail.com

*Counsel for Massachusetts Institute of
Technology*

By: */s/ Robert A. Van Kirk*

Robert A. Van Kirk
Jonathan Pitt
Sarah F. Kirkpatrick
Matthew D. Heins
Feyilana Lawoyin
Cole T. Wintheiser
William J. Donnelly
WILLIAMS & CONNOLLY LLP
680 Maine Ave. SW
Washington, D.C. 20024
Tel: 202-434-5000
rvankirk@wc.com
jpitt@wc.com
skirkpatrick@wc.com
mheins@wc.com
flawoyin@wc.com
cwintheiser@wc.com
wdonnelly@wc.com

James Peter Fieweger
MICHAEL BEST & FRIEDRICH LLP
444 West Lake Street
Suite 3200
Chicago, IL 60606
Tel.: 312-222-0800
jpfieweger@michaelbest.com

*Counsel for University of Notre Dame*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 4, 2026, I caused a true and correct copy of the foregoing document to be filed and served electronically via the court's CM/ECF system.  Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

<u>/s/ Matthew D. Heins</u>
Matthew D. Heins

*Counsel for University of Notre Dame*