FILED
10/21/2026
THOMAS G BRUTON
CLERK, U.S. DISTRICT COURT
BC



Case No: 1:22-CV-00125

United States District Court
Northern District of Illinois, Eastern Division
Clerk of Court
219 S. Dearborn Street
Chicago, IL 60604

October 14, 2026

**Henry, et al. v. Brown University, et al.**
**Case No.: 1:22-cv-00125**

**Joint Letter by Yale University (Yale College) Alums on Notice Blackouts, Due Process Deficiencies, and Request for Relief**

Dear Honorable Court,

We are a group of Yale University (Yale College) alums who are writing to this Honorable Court regarding the Henry, et al v. Brown University, et al case (Case No.: 1:22-cv-00125), where due to a combination of factors discussed as follows, there had been a notice blackout on our affected accounts, which had prevented our participation in the First Ten Settlements and ongoing distributions.

Our numbers have reached several dozens of known, affected accounts, and despite our joint efforts to write to and explain the situation to our alma mater (Yale University)'s Office of the General Counsel, who had signed the Yale Settlement and was in charge of exporting the "mailing addresses and email addresses" in our education records under the Notice Plan with Rule 23 requirements; alongside writing to Settlement Admin (Angeion Group) and to Class Counsel (including MoloLamken), there has thus far not been a response from them. Please find enclosed our previous correspondence to the above referenced parties, where we have explained the situation in detail, with several emails and follow-ups as our numbers increased, but from which we have not heard back despite multiple intervening weeks.

Given the ongoing timeline for distributions and the lack of response from the above referenced parties in the chain of custody of our data, we are writing to this Honorable Court to request judicial oversight of the situation, and to request appropriate remedies be made on our collectively affected accounts which had suffered a notice blackout.

**Background Facts and Context**

1. For the ongoing settlements, the eligible class period for the **Settlement Class** was defined as: "For Chicago, Columbia, Cornell, Duke, Georgetown, MIT, Northwestern, Notre Dame, Penn, Rice, Vanderbilt, Yale – from Fall Term 2003 through February 28, 2024."
2. The eligibility requirements to participate in the settlements are stated as:

*All U.S. citizens or permanent residents who have during the Class Period (a) enrolled in one or more of Defendants' full-time undergraduate programs, (b) who received at least some need-based financial aid from one or more Defendants, and (c) whose tuition, fees, room, or board to attend one or more of Defendants' full-time undergraduate programs was not fully covered by the combination of any types of financial aid or merit aid (not including loans) in any undergraduate year. The Class Period is defined as follows:*

1. *For Chicago, Columbia, Cornell, Duke, Georgetown, MIT, Northwestern, Notre Dame, Penn, Rice, Vanderbilt, Yale – from Fall Term 2003 through February 28, 2024.*
2. *For Brown, Dartmouth Emory – from Fall Term 2004 through February 28, 2024.*
3. *For Caltech – from Fall Term 2019 through February 28, 2024.*
4. *For Johns Hopkins – from Fall Term 2021 through February 28, 2024.*

*Excluded from the Class are:*

1. *Any Officers and/or Trustees of Defendants, or any current or former employees holding any of the following positions: Assistant or Associate Vice Presidents or Vice Provosts, Executive Directors, or Directors of Defendants' Financial Aid and Admissions Offices, or any Deans or Vice Deans, or any employees in Defendants' in-house legal offices; and*
2. *the Judge presiding over this action, his or her law clerks, spouse, and any person within the third degree of relationship living in the Judge's household and the spouse of such a person.*

3. **Per the Yale Settlement Agreement and subsequent Order,** Yale has agreed to "undertake in good faith all reasonable steps necessary" to carry out the settlement, including compliance with the **Class Action Fairness Act**, and with the **Federal Rules of Civil Procedure and Rule 23 for due process notice**, including the disclosure of true and faithful representations of mailing addresses and email addresses held by the university in our education records, and provision of $18.5 million, to be deposited into and held in escrow at Huntington National Bank.

4. **Notice Plan**: For the settlements, the Notice Plan involves the Settlement Claims Administrator using "email and mailing addresses for notice" from "mailing addresses and email addresses in educational records" held by defendant universities, to be used for "purposes of providing class notice in this litigation." Based on attestations by Yale in making the Settlement, alongside due process requirements, we understand that the standard is for true and accurate information to be provided on the addresses as held in our education records, including the validated addresses which we have long established a history of

authenticated user actions and two-way correspondence with the university, on file in our education records since our undergraduate student years.

5. **Use of Email Notices by Settlement Admin:** We understand that in the majority of cases, Settlement Admin only used **email notices** to provide notice in this class action, with physical mail attempted only in limited cases.

6. **Primary Addresses including Primary Email Addresses**: At all relevant times, including before, during, and through the ongoing settlement period, Yale has maintained class member records and primary contact information for every class member of our group. These include **primary email addresses** and **primary mailing addresses**, which are concretely established, known, logged, and timestamped on file with Yale in our education records and which we have also saved evidence for. In particular, the primary email addresses refer to the validated addresses we provided to the university, as logged with timestamps in our education records and used for authenticated actions and two-way correspondence, for various functions including central authentication, academic records access, financial/ billing records and inquiries, and other official university correspondence per the multi-year established course of dealing and estoppel by conduct, with documentation. The rosters of Yale class members & student accounts/ education records including our associated primary addresses are maintained on file with the Yale Registrar and university directory, with concretely established class files and evidence logs over time. **Despite this, however, our group suffered a notice blackout to our primary addresses, including primary email addresses on file in our education records, as would have been required by the Settlement, the Notice Plan and Rule 23 due process standards.**

7. **Optional AYA 'YaleMail' inbox:** This is an **optional, secondary Yale-branded alum inbox,** also known as the **AYA/** Association of Yale Alumni **'YaleMail' inbox** with the domain **@aya.yale.edu**. This optional inbox was rolled out as an ancillary benefit in **2016,** years after many of us **had already graduated and left campus**. There had been ongoing IT issues on this inbox, including widespread Yale-documented activation issues since the time of its rollout, which led many alums to not be able to successfully activate or adopt it. **Potentially as a result of flawed data exports in the chain of custody of our data, this optional AYA inbox under Yale IT's purview and control may have been used for our group of affected alums in replacement of all our actual primary addresses (that is, the primary addresses on our education records as required by the Notice Plan) during the execution of this settlement, such that this optional AYA 'YaleMail' inbox ended up as the sole and exclusive destination for delivering legal notice on this settlement for our group of Yale alums.** As explained in following sections, this rerouting of legal notice to the sole repository of the optional AYA 'YaleMail' inbox may have had its problems compounded by the fact that this Yale-branded alum inbox has an ongoing history of IT issues, including Yale-documented widespread **activation issues** that prevented many

alums from activating or adopting this optional inbox, and Yale IT admin-set **spam filters/ quarantine rules** that may have blocked the notice emails from appearing in the frontend view for human users, and/or purged the notice from the backend via automated processes without the user ever being able to have access to it.

8. **Addresses Held in Education Records:** The **Settlement and Notice Plan** for this class action involves the Settlement Administrator receiving "email and mailing addresses for notice" from "mailing addresses and email addresses in education records" provided by Yale. The optional AYA inbox, which was rolled out in **2016**, under Yale IT's purview and control, was offered as an ancillary (never mandatory) benefit, **years after many of us graduated and left campus.** There was never any statement or representation made by the university that the optional AYA inbox would override our **primary email addresses already on file in our education records**. The university has continued to communicate with us in two-way correspondence at our primary email addresses before, during, and through the ongoing settlement period.

**Federal Rule of Civil Procedure Rule 23, Constitutional Due Process Standards with Mullane Baseline, Reasonable Effort on Concretely Established Class Files, Ability to Opt-Out**

1. **Federal Rule of Civil Procedure, Rule 23:** Under Federal Rule of Civil Procedure 23(c)(2)(B), class members must be given "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Our student account records, including names, primary email addresses and physical mailing addresses contained in our education records, financial aid package records, and enrollment records, are held as concretely established class files at Yale.

2. **Constitutional Due Process Standards with Mullane Baseline**: Under constitutional due process standards established by the landmark Supreme Court case in Mullane v. Central Hanover Bank & Trust Co., due process requires notice to be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action." For this case, the Notice Plan involves the Settlement Claims Administrator receiving "email and mailing addresses for notice" from "mailing addresses and email addresses in education records" held by defendant universities, to be used for "purposes of providing class notice in this litigation." It is reasonably interpreted based on due process standards that the addresses to be provided on our records by the university are to include the validated primary addresses where individuals have established a history of two-way correspondence with the university, as held on our education records.

3. **Requirement of Individual Notice**: The Federal Rules of Civil Procedure require **individual notice** must be given to all class members whose names and addresses can be obtained with **reasonable effort**. As established in Eisen v.

Carlisle & Jacquelin (US Supreme Court 1974), this has been true even if there are millions of class members, and even if only small amounts are involved, such as for less than a hundred dollars, such that mere publication notice would not suffice for those class members whose names and addresses are known. In our case, the number of eligible class members held on Yale's records are in the low ten thousands, with **concretely established** university records containing our names and addresses, and the amounts involved for the settlement are in the thousands of dollars per class member.

4. **"Reasonable Effort" Standard:** Since the university continues to use our primary email addresses, as established for years in education records, for central authentication, academic records access, billing/ financial records access, university correspondence and ongoing fundraising, accessing those exact primary addresses requires little additional expense or search effort, and reasonable effort would include correctly linking and exporting the data already present in the active database with our primary addresses for compliance with Rule 23.

5. **Ability to Opt-Out:** In addition to requiring notice in Rule 23(b)(3) classes, Rule 23(c)(2)(B) also requires that Rule 23(b)(3) class members be given an opportunity to opt out from being bound by the settlement. These opt-out rights are also important, because we understand that the failure to opt-out would be taken as implied consent to be bound by the terms of the settlement to release the defendant from future related claims. Our legal rights cannot be extinguished with a binding settlement without us ever receiving valid notice or an opportunity to opt out.

**Further Discussion of Primary Address Blackouts and Optional AYA 'YaleMail' Inbox under Yale IT's Purview and Control with Widespread IT Problems**

1. **Primary addresses,** including primary email addresses and primary mailing addresses for us in our education records at Yale are concretely established, known, logged, and timestamped, and which we have also saved evidence for.

2. Yale maintains timestamped track records of master files including our primary email addresses so there is a timeline of evidence for what our correct primary email addresses are in our education records. We know this as a fact because that is how the university provides central authentication and maintains ongoing verified correspondence with us at our correct primary addresses on file. These primary addresses in our education records are verified, authenticated, and then used on a longstanding, continuing basis with timestamped logs for **university central account authentication, academic records access, billing/ payment/ financial records access, directory information, and other official university correspondence**. The rosters of Yale class members & student accounts/ records including the primary email addresses in our education records are maintained on file with the Yale Registrar and university directory, with timestamped and concretely established evidence logs over time.

3. For our group of Yale alums with affected student accounts, there has been a lack of proper notice to our primary addresses held on file in our education records (as required by the Notice Plan and concomitant Rule 23 requirements), including a total notice blackout to our documented primary email addresses and physical mail addresses on file with Yale.

4. Instead, as the sole & exclusive channel for notice, in instances when actionable communications regarding the settlement was attempted by Settlement Admin for our group, a secondary optional inbox was used as the de facto exclusive route – this inbox, the optional AYA 'YaleMail' inbox was rolled out in 2016, years after many of us had already graduated and left campus, and would not have been contained as primary addresses in our education records, especially as we already had established primary addresses in use with the university, per course of dealing and estoppel by conduct, with said primary addresses being continued to be used from the time we were undergraduate students through to present day.

5. The optional AYA 'YaleMail' inbox rolled out in 2016 is under Yale IT's purview and control, and unfortunately had ongoing IT issues, including widespread Yale-documented activation problems since the time of its rollout, which led many alums who had already graduated years before the time of its rollout in 2016 to never be able to successfully activate or otherwise adopt it. Please refer to **Enclosure 2**, which shows the email from Yale IT acknowledging the widespread activation problems on this optional Yale-branded inbox. Thus, many of us who already graduated did not opt-in to the optional free inbox, or use it in replacement of our primary email inboxes already on file with Yale in our education records. If the AYA 'YaleMail' was created in the server backend as part of an automated update process at some point, but which the human user never opted-in to activate, that is also trackable by timestamped logs because AYA 'YaleMail' runs on **Google backend infrastructure** and Google Workspace's event logs keeps track of all human-user generated actions, to provide information to IT admin on whether a human-user had opted-in to activate the inbox.

6. The optional AYA 'YaleMail' inbox was never presented as mandatory by the university in any way, and there was never any representation for it to replace and override all our actual primary addresses held in our education records with Yale. Thus, even for those who had chosen to activate the inbox, to login and accept its terms and conditions, it was never presented as a mandatory replacement to override primary addresses already on file in our "education records," and there was never statement or representation made for it to become the sole and exclusive repository for legal notice.

7. It is generally accepted that universities cannot force former students to use or check an optional school-branded alumni email address once they have

graduated. Upon graduation, our contractual relationship with the university as an enrolled student terminates. **The primary addresses contained and established in our education records have been maintained and continued to be used by the university, with no representation that the optional subsequently rolled-out alum inbox had ever become mandatory.** There is no obligation to have to activate, maintain, log into, or monitor a secondary alumni account offered to us as an optional ancillary benefit, which was rolled out years after many of us graduated. Even for the alumni who did log in and agree to the Google Workspace / AYA 'YaleMail' ToS (terms of service), those terms only govern the acceptable use of email services, such as rules against illegal cyberactivity. A standard IT terms of service agreement cannot mandate that an individual must surrender the use of valid primary addresses already on file with the university in our education records, nor can it force an alumnus to waive their constitutional or procedural due process rights under federal court rules (such as FRCP Rule 23).

8. Furthermore, with reference to **established course of dealing and estoppel by conduct** standards, the university has continued interfacing with us on our primary addresses already maintained on file in our education records, with said use being timestamped and documented on a continuous ongoing basis, including before the settlement period and through to present day.

9. **Additional IT problems** involving **Yale IT admin-set spam filters** on this optional AYA 'YaleMail' inbox may have further compounded the notice blackout, by blocking or holding the notice emails in **quarantine,** thereby hiding it from view on the inbox's frontend GUI (graphical user interface), so that the human user is never able to physically see or have access to the notice email. In such cases, the system event logs would be able to show that the human user was blocked by Yale IT admin filters/ quarantine rules from being able to physically see or have access to certain bulk-sent emails including the notice. This is because for those Yale alums in our group (that is, for those who had successfully activated the inbox, accepted the terms of service, and been able to login to their secondary, optional AYA 'YaleMail' inboxes), they still did not find the notice on the Settlement. As the optional AYA alum inbox (branded 'YaleMail') runs on **Google Workspace's backend infrastructure**, we referenced information provided by Google, and it appears that depending on some preset filters by Yale systems admin, it is possible that due overly wide or unevenly applied settings for spam prevention and quarantine rules, the human user is not able to actually physically see or have access to certain bulk-sent emails including the notice, so that it is hidden from the frontend inbox even if the human user looks inside spam/ junk folders. **The emails thus held in quarantine never appears in the user's Inbox, 'All Mail,' Spam, or Trash folders, and the user cannot search for it, view it, or know it exists.** The email may then be purged from the backend in automated processes without the human user ever having access to it. The backend event logs for Yale IT would

capture the quarantine activity, to enable tracking on which accounts had been impacted. Please refer to **Enclosure 3** with information provided by Google through its publicly available Google Gemini tool, with details regarding Google Workspace backend infrastructure, on which the optional AYA 'YaleMail' inbox runs.

10. **Notice Schedule in the Email Chain:** It is reported that the notices were sent out in a series of emails in an email chain (dates reproduced below), with a Notice on the First Ten Settlements (including the Yale Settlement), followed by a Notice on the Caltech/ Johns Hopkins Settlements (with smaller payouts), and a Notice of Certified Litigation Class. Due to Yale IT admin-set spam filters/ email quarantine rules that may have been unevenly configured on the backend, resulting in notice emails to be held in quarantine and hidden from view and/or purged before the human user has access, some members of our group – even when they were able to activate and login to regularly use the optional AYA inbox – were nevertheless blocked from receiving earlier, actionable communications regarding the settlement, such that the first-ever email they were able to see regarding the settlement was a message notifying them that the earlier deadlines have passed.

| | |
|---|---|
| Notice of Settlement – First 10 Settlements | 3/26/24 |
| Notice of Claim Form – First 10 Settlements | 9/13/24 |
| Notice of Settlement – Caltech and Johns Hopkins | 2/21/25 |
| Notice of Claim Form – Caltech and Johns Hopkins | 9/24/25 |
| Notice of Certified Litigation Class | 7/9/26 |

**Lack of Proper Notice, Due Process Deficiencies**

1. **Central issue:** The central issue is whether, given the **COMBINATION** of (a) primary addresses held by Yale in our education records (as required by the Settlement and Notice Plan) not being used, for a total blackout to our primary addresses on file, when said primary addresses are concretely held by the university, per the established course of dealing and estoppel by conduct, with timestamped records of the continued two-way use of these primary addresses established in our education records, **AND** (b) the Yale-controlled, optional AYA 'YaleMail' inbox (rolled out by the university years after our graduation with widely documented IT issues) being made without our knowledge or consent into the de facto sole and exclusive, mandatory route for notice on this settlement (in those instances when Settlement Admin attempted to reach us), with said optional AYA inbox – which is under Yale IT's oversight, purview and control – concurrently not being made operationally functional for rendering actionable notice in this settlement for our affected accounts – could there be attestations by various parties including Yale and Settlement Admin of having met Rule 23 requirements under the Mullane standard of notice on our accounts, as required by the Settlement and Notice Plan. Our answer is no.

2. The Settlement and Notice Plan includes Yale providing contact information for class members from "mailing addresses and email addresses in education records" to the Settlement Admin, and the constitutional standard under Mullane requires that notice be reasonably calculated to reach class members. The combination of a total notice blackout at established primary addresses in our education records – while exclusively routing notices to an optional ancillary inbox under Yale IT's purview and control, which had been rolled out years after we graduated (and would not have been contained in our education records) with widespread activation issues and admin spam filters quarantine rules that may have blocked the notice from being rendered for human user-view on the inbox's frontend – creates an unjustifiable barrier to notice under the Mullane standard. The combination of factors results in a systematic notice defect, where through no fault of our own, we were prevented from receiving due process notice.

3. The lack of proper notice for our accounts had impacted our ability to participate as eligible class members, including in the First Ten Settlements. As a reference, one of our Yale alum peers in the Class of 2013 (coinciding in the cost of attendance calculations/ financial aid package terms for members of our group) had reported in writing that she was able to receive a payment of around $2300 (two thousand three hundred dollars), which is in the range of what each of us would have received on our own eligible accounts, had we received proper notice.

4. As we had previously explained to the school, Settlement Admin, and Class Counsel, the antitrust settlement itself is intended to provide fair redress on cost of attendance and financial aid calculations during our enrollment periods, and there should not be structural obstacles/ above-discussed points of notice failure to limit and prevent our participation in the settlement.

5. We note that market rates for Class Counsel and Settlement Admin, as would be billed to the settlement escrow, often exceed $600 per hour for legal and administrative oversight, for performance under strict professional standards of data compliance and Rule 23 accuracy. It is both legally unjustifiable and economically unjust to expect dozens of class members to each forfeit $2,000 to $4,000 (two thousand to four thousand dollars) in monetary recovery due to a breakdown in the administrative handling of our data in the chain of custody, arising from no fault of our own. The Defendant, Settlement Admin and Class Counsel cannot shift the financial cost of a flawed data export and concomitant notice failures onto the class members they are duty-bound to protect.

**Relevant Items for Disclosure and Targeted Discovery**

Given the numbers of affected accounts, in addition to the details, information, and sworn declarations we are providing along with this joint letter in our appended individual worksheets, we believe the following pieces of evidence, which are held by various parties including Yale University and Settlement Admin, would be relevant in the

Court's further review and judicial oversight of the notice blackout impacting our accounts.

We believe that parties in the chain of custody of our data in executing the Notice Plan should be held to the standard to which they attested compliance to Rule 23 requirements. Given the ongoing notice blackout, it is likely there had been flawed data exports and errors or otherwise unjustified deviations from Rule 23 requirements in the execution of the Notice Plan (eg. differences between the court-approved Notice Plan and the execution of it, due to flawed data exports), and our group has jointly notified the university, Settlement Admin, and Class Counsel several times in the previous weeks regarding our findings around the lack of notice, to which no written response has been provided to us.

We respectfully request that the Court consider the following items held by the defendant and Settlement Admin, which may be produced in initial disclosures or targeted discovery, regarding the lack of proper notice on our accounts.

The following items would likely take no more than a few minutes of time per account query (or less if run in a batch retrieval), and the magnitude of benefits for affected class members, who each have thousands of dollars pending in the settlement, likely outweigh the administrative inconvenience of the limited time spent in correctly resolving the notice blackout issue.

Relevant Items

1. **Yale's Records on Our Primary Addresses** – **Original Database Records of Our Primary Addresses Held by Yale**: The original, unedited records from databases or CRM (customer relationship management) files containing all historical primary addresses on file in our education records, with timelines of use, for cross-reference verification against the list that was exported by Yale staff to the Settlement Administrator for notice on this settlement, in item (2) below

2. **Data Transfer** – **Data Exports Sent by Yale to Settlement Admin**, which had included data exports of our contact information, sent by Yale staff to the Settlement Admin for use in executing the Notice Plan, which would show that our primary email addresses and mailing addresses may not have been exported correctly, when compared with the true primary addresses maintained in our education records as held in the university's original, unedited database in item (1) above

3. **Physical Mail Logs:** It is reported that Settlement Admin may have only used email notices in the vast majority of cases. If mail notices were used for any members of our group (per the list filed confidentially under seal), we request that Settlement Admin provide a copy of the USPS (US Postal Service) or private courier mailing logs.

4. **Address Selection – Email Selection Rules by Settlement Admin applied to Our Data to choose contact addresses**: As a party in the chain of custody of our data, Settlement Admin received the Yale-exported files containing our "mailing addresses and email addresses" in our education records from Yale under the Notice Plan with Rule 23 requirements. The address selection rules are relevant, because if Settlement Admin left out primary addresses for the notice, to deliver notices exclusively through defunct/ non-active emails labeled as such in the spreadsheets, the errors would be directly trackable to how the emails used for notice were selected by Settlement Admin from the files they received from Yale containing our data.

5. **Email Logs for notice sent by Settlement Admin to our primary addresses, or lack thereof**
    a) **Email Transmission Logs with Secure Metadata Receipts:** Surface data and attachments are requested alongside **Server-Side Delivery & Bounce Reports,** with Full SMTP (Simple Mail Transfer Protocol) server transmission headers and logs for all settlement notice distributions sent to our primary addresses, or lack thereof
    b) **Metadata records** including transaction email headers (SMTP transmission logs, message IDs, delivery attempt receipts)

    **Evidentiary standards**: For any claim by Settlement Admin that settlement notice was dispatched to our group's verified primary email addresses as held in our "education records," the Settlement Admin is requested to produce native, unedited Outbound Mail Transfer Agent (MTA) transaction logs exported directly via API from the outbound mail system, with immutable transaction fields, and originating from the initial notice dispatch time window, specifically detailing the following:
    i. The exact target email address string present in the outbound dispatch queue, to be examined in cross-reference with our primary addresses;
    ii. The original, immutable UTC (Coordinated Universal Time) dispatch timestamp;
    iii. The cryptographic DKIM (Domain Keys Identified Mail) header hash value
    iv. The unique outbound Envelope Message-ID and TLS (Transport Layer Security) connection handshake; and
    v. The full, unredacted receiving Mail Exchange (MX) server SMTP response string (eg. "250 2.0.0 OK") issued by the recipient inbox provider.

    **Insufficiency of Self-Made Summaries by Settlement Admin:** We respectfully submit that manual spreadsheets, Microsoft Word tables, administrative summaries, or post-hoc status entries marked with "Delivered," or other self-made summaries provided by Settlement Admin, lacking the accompanying native SMTP 250 OK handshake logs should be held insufficient to establish compliance with Rule 23(c)(2)(B) or the Mullane standard. This is because the SMTP response codes are embedded within a cryptographically signed transaction record that is bound across multiple independent systems including

connection handshakes with receiving servers, and thus provide cross-system verification of authenticity. Similarly, any representation by Settlement Admin that a notice may have been delivered to our primary addresses but "redirected to spam" should not be used to rebut our declaration of non-receipt unless supported by authentic receiving-server SMTP delivery logs confirming successful inbox handoff (a '250 OK' response) executed during the court-approved initial notice window.

6. **Email Logs for any notice sent by Settlement Admin to the Optional AYA/ 'YaleMail' inbox for our group, with reasons for selecting the Optional AYA 'YaleMail' inbox overriding primary addresses on file** (with reference to items 4 and 5 above), with similarly authenticated SMTP response receipts as outlined in item (4) above

7. **Optional Alum Inbox Activation vs. Non-Activation – Yale IT Admin logs showing which Optional AYA 'YaleMail' accounts were activated vs. never activated in from the frontend, human-user side (individual details provided on individual worksheets as appended). Google Workspace backend infrastructure's audit logs** allows tracking of which optional AYA 'YaleMail' accounts in our group were opted-in and activated by a human user vs. pre-provisioned solely from the admin side and never opted-in or activated from the human-user side. We understand that Google Workspace (as used by the optional AYA 'YaleMail') maintains immutable log trails that distinguish between **Administrative Creation/ Provisioning** and **End-User Activation/ Login Activity**.
    a) **Admin Log Events/ Batch Provisioning**: When an optional account was generated automatically by administrators or imported via a bulk provisioning tool (e.g. CSV/ comma-separated values upload), there is an **Admin Audit Trail** with the log explicitly recording the 'CREATE_USER' event under **Admin Log Events**. The **Actor Identification** lists the administrator email or API (application programming interface) service account that triggered the creation, along with a timestamp and IP (internet protocol) address. **Lack of Self-Registration**: if there is no corresponding user-initiated sign-up or opt-in workflow log, it would confirm the account was created and provisioned only from the backend.
    b) **User-Side Activation Logs:** Authentication and creation records showing whether an optional AYA 'YaleMail' account was activated, logged into, or accessed by a human user, including prior to the settlement notice date;
    c) **User Setup, Login & Password Creation, and First-Time Authentication Logs for Google Workspace products, including AYA 'YaleMail'**: Google tracks every single authentication attempt for an account. The relevant items/ evidence include:
        - The Google Admin Audit Log and event fields, which include **'last_login_time'** (to show the immutable timestamps for last human interactive session, displaying 'NEVER' for non-activated accounts), **'agreed_to_terms'** (to show 'FALSE' for non-activated accounts

where the user did not login to accept the Google Workspace User Terms of Service). A copy of these system-level logs are also held on Google's cloud infrastructure, for authentication purposes.

- **Zero Login Events**: If a user never logged in or activated the account, the User Log Events and Login Audit Log for that user ID would reflect zero successful logins and zero first-time ToS (Terms of Service) acceptances.
- **Authentication Method**: If a login did occur, the event log would record the exact method, device details, IP address, and location. A total absence of user-driven authentication events would indicate the inbox was never accessed or used by the human user.
- **State Log**: If the system state shows the account is still pending its initial ToS (Terms of Service) acceptance and initial password setup, it provides confirmation that the user never consented to the ToS (Terms of Service) or completed activation to opt-in to the optional account.

8. **Alum Inbox IT Filters & Quarantines – Yale IT Admin-set email quarantine logs showing email quarantine or spam filters on affected accounts (individual details provided on individual worksheets as appended),** which would show how Yale IT admin-set filters/ quarantine rules may have blocked the bulk-sent settlement notices from being rendered into view on the GUI (graphical user interface), so that the human user is never given an opportunity to physically see the notice appearing on the inbox's frontend
   a) **Administrative Spam/Filter Policies:** Documentation detailing server-side inbox rules, admin-level spam filtering, and security quarantines applied by Yale IT towards bulk-sent settlement notices.
   b) **Administrative Quarantine & Routing Rules**: Google Workspace backend infrastructure, as implemented on inboxes such as AYA 'YaleMail' allow admins to create routing and/or quarantine rules above user-level inboxes, which may silently isolate, discard, or reroute incoming emails before they arrive in a user's visible folders, including Inbox and Spam/ Junk folders. **The emails thus held in quarantine never appears in the user's Inbox, 'All Mail', Spam, or Trash folders,** and the user cannot search for it, view it, or know it exists. The email may then be purged from the backend in automated processes without the human user ever having access to it. The backend event logs would capture the quarantine activity.
   c) **AYA 'YaleMail' Admin Audit Logs, Google Workspace Email Log Search (ELS) and authentication checks** that reveal whether the specified email was delivered, quarantined, or dropped; as well as post-delivery interaction tracking, including:
      - **Comparative Email Log Searches (ELS)**: As the admin-set filters may have been unevenly applied/ configured, running an ELS (email log search) across different alumni accounts for the same message ID/ incoming sender would produce contrasting status outputs (eg.

showing 'Delivered to Inbox' for Account A, but 'Quarantined' or 'Dropped by Configured Filter' for Account B)

- **Scope Review in Admin Console**: A domain audit would return the exact admin rule/ filter configurations in the AYA 'YaleMail''s Google Workspace Admin Console that may have held the notice email in quarantine or otherwise prevent it from being viewed
- **Seen/ Unseen by User**: Tracks whether and when the email was ever rendered in the user's view, which would show which users were affected by the Yale IT admin-set filters/ quarantine rules when the settlement notice was coming through.
- **Opened/ Read by User**: Records if the user clicked into the email body
- **Folder/ Label Status**: Identifies the exact system labels in AYA 'YaleMail' Google Workspace (eg. Inbox, Spam, Quarantine) applied onto the bulk-sent notice email.

**Relief Requested**

Given the combination of factors which had resulted in a notice blackout for our group, and as the notice error preventing our earlier participation in the settlement did not originate from us, we respectfully ask the Honorable Court to approve the following remedies to ensure our due process rights are protected – if the parties in the chain of custody of our data in the execution of the notice (university, Settlement Admin, and Class Counsel) are unable to show that they had properly and correctly delivered valid notice, because they had not been able to provide our group with a written explanation despite several joint emails we sent to them regarding the notice blackout:

1. To direct Yale University to provide the corrected data exports relating to our accounts to Settlement Admin, including **our primary addresses (email addresses and mailing addresses), which are the valid and concretely established addresses held in our education records**, per established course of dealing and estoppel by conduct, concomitant Rule 23 compliance standards and requirements in the Notice Plan. Defendant Yale University and the Settlement Administrator shall correctly maintain their primary record databases and data exports to reflect our verified primary email addresses, as thus confirmed again on our attached individual worksheets.

2. To direct the Settlement Administrator to reissue individual notice to our eligible accounts which had suffered a notice blackout earlier, and extend the **claims submission window and opt-out deadlines accordingly for our affected accounts** with a reasonable time frame (eg. 15 to 20 business days) from date of approval on our requested relief by this Honorable Court, to allow us to file timely claims including by electronic submissions (as was offered for earlier claimants).

3. To direct the Settlement Administrator to accept and process our claims, once information and documentation is received, on **full standing for validated**

**claims to receive pari passu payments in the range of $2000 to $4000 based on equitable basis to payment formulas and calculations in the First Ten Settlements and other ongoing distributions,** and granting any further relief as this Court deems just, equitable, and proper.

We have also appended our self-certification statements and individual worksheets for the Court's reference and review, with a Master Roster and personally identifying information to be provisionally filed under seal with a concurrent Motion to Seal.

If additional information or follow-up is needed regarding the details presented in our joint letter or individual worksheets, please let us know. Regarding the severability of individual claims, our group is submitting this joint letter given our similar situations of experiencing a notice blackout, but we request that the subsequent ineligibility, withdrawal, or procedural variance of any individual member in the group should not prejudice, diminish, or affect the validity of the remaining collective or individual due process claims presented herein.

Given ongoing communications across the Yale alumni network, additional similarly situated Yale class members who had suffered notice blackouts to their primary addresses in their education records may be in the process of joining our group. We respectfully request that the Court consider this joint filing on behalf of all current and subsequently joining Yale alums who submit appropriate statements.

Thank you for your time and consideration.

Sincerely,
/s/ Alums Notice Group Members, Pro Se
Alums Notice Group: Group Member Identities in Master Roster and Individual Worksheets with Sworn Declarations Provisionally Submitted Under Seal

Email: alumsnoticegroup@gmail.com
Address:
Alums Notice Group
2501 Chatham Rd, Suite #7062
Springfield, IL 62704
Phone: (732) 474-8525

**Enclosures:**

1. **Diagram** to illustrate potential sources of notice failure for this group of known affected accounts among Yale alums, resulting in notice blackouts and divergence from accuracy and due process standards under Rule 23 requirements
2. **2016 Yale IT email** on rollout of Optional AYA inbox with widespread activation issues

3. **Reference Information Sourced from Google (via Google Gemini Tool) on Google Workspace Backend Instructure**, which is used by the Optional AYA 'YaleMail' Email Servers
4. **9/21/26 Joint Email** to Yale Admin noting potentially defective data exports on our accounts, and IT issues on Yale-administered Optional AYA alum inbox, resulting in lack of notice
5. **9/25/26 Joint Email** to Yale Admin noting potentially defective data exports on our accounts, and IT issues on Yale-administered Optional AYA alum inbox, resulting in lack of notice
6. **9/30/26 Joint Email** to Yale Admin noting potentially defective data exports on our accounts, and IT issues on Yale-administered Optional AYA alum inbox, resulting in lack of notice; alongside Written Documentation of Phone Call made to Yale General Counsel's Office Phone Number on **9/30/26 at 2:12PM ET** to confirm previous joint emails and attachments were received
7. **10/2/26 Joint Email** to Yale Admin noting potentially defective data exports on our accounts, and IT issues on Yale-administered Optional AYA alum inbox, resulting in lack of notice
8. **10/5/26 Joint Email** to Class Counsel, Settlement Admin, and Yale Admin
9. **10/7/26 Joint Email** to Class Counsel, Settlement Admin, and Yale Admin

Confidential Filings Filed Alongside Motion to Seal

1. Motion to Seal Documents: Full unredacted Joint Emails, Master Roster of Group Members and Individual Worksheets
2. Confidential filing alongside motion to seal – Full unredacted Joint Emails
3. Confidential filings alongside motion to seal – Master Roster of Group Members and Individual Worksheets

**Enclosure 1: Diagram** to illustrate potential sources of notice failure for this group of known affected accounts among Yale alums, resulting in notice blackouts and divergence from accuracy and due process standards under Rule 23 requirements



**Enclosure 2: 2016 Yale IT email** on rollout of Optional AYA inbox with widespread activation issues

Gmail [redacted]

**YaleMail - Google Activation Email - password reset**

**Association of Yale Alumni** <aya@yale.edu>
Reply-To: aya@yale.edu
To: [redacted]

Wed, Feb 24, 2016 at 10:38 PM

**Virtual Yale Station Users:**

As of today, February 24, our records indicate your new YaleMail (@aya.yale.edu) account has not been activated in Google. Many alumni have indicated they did not receive the Google activation email with instructions and a temporary password. As a result, we have reset your temporary password, and you will soon receive it by email.

Please check the email account to which your Virtual Yale Startion @aya.yale.edu mail is currently forwarding for a message with the subject line "Password Reset for [your alias]@aya.yale.edu" including your spam and junk folders.

If you cannot locate today's password/activation email, please email aya@yale.edu.

**Please be assured that your @aya.yale.edu email address is not being cutoff or terminated.** Regardless of whether you have activated your YaleMail account yet, when the Virtual Yale Station system is turned off tomorrow (February 25), all messages sent to your @aya.yale.edu address will be delivered to your new Gmail mailbox and will be available to you as soon as you activate.

If you activated your YaleMail account earlier today, please disregard the password reset email.

*Janice Murphy-Wallace*
*Online Services Analyst*
*Jenny Chavira, '89*
*Acting Executive Director*
*AYA – Association of Yale Alumni*
*1201 Chapel Street*
*New Haven, CT*

-

-

-

To unsubscribe from future messages, click here

To view Yale's privacy policy, click here

- Association of Yale Alumni
PO Box 209010
New Haven, CT 06520-9010

Phone: (203)432-2586
Fax: (203)432-0587
Email: aya@yale.edu -

Copyright © 2016-2017 Association of Yale Alumni. All rights reserved.

**Enclosure 3: Reference Information Sourced from Google (via Google Gemini Tool) on Google Workspace Backend Instructure**, which is used by the Optional AYA 'YaleMail' Email Servers



Hi, can you check if it's possible that for an email inbox, because of admin-set filters, the human user is not actually able to physically see or have access to certain emails - eg. not even inside the junk folder, even though the email was supposedly delivered on the backend? Because we have heard from some alum classmates that they never received an email, even when they were able to login to an optional inbox where a notice email was supposedly 'delivered' to their inbox. The email inbox is the AYA YaleMail inbox with Google backend infrastructure

Yes, it is entirely possible for a human user to not see or have access to an email—even in their Spam, Junk, or Trash folders—despite the email showing up as "delivered" or accepted on the sender's side.

MailTester.com

Because **AYA YaleMail** operates on Google Workspace backend infrastructure, administrators have access to central control mechanisms that sit above individual user inboxes.

### How Google Workspace Admins Can Intercept Emails

**1. Administrative Quarantine**

Admins can set up custom spam, security, or compliance rules that divert incoming messages into an **Admin Quarantine** instead of delivering them to the end user's account.

Google Workspace Help

- **Sender Perspective:** The sending server gets a successful `250 OK` SMTP response, meaning the message was accepted by Google's mail transfer agent (MTA) without bouncing back.
- **Recipient Perspective:** The email never lands in the user's Inbox or Spam folder. It sits in a hidden administrative queue awaiting a manual review or automatic purge.

**2. Content & Routing Rules (Discard/Reject)**

Google Workspace allows administrators to set up **Compliance and Routing Rules**. These rules scan incoming emails for specific criteria (e.g., sender domain, specific keywords, attachment types, or bulk mail tags). An admin can configure these rules to:

Google Workspace Help + 1

- **Silently Drop/Discard:** The server accepts the email but immediately deletes it before it reaches the account storage layer.
- **Modify Delivery:** Route the message to a different catch-all or archive address without making a copy in the recipient's personal mailbox.

**3. Spam / Phishing Engine Overrides**

If Google's domain-level security flags an incoming broadcast or notice email as suspected phishing, spoofing, or unauthorized bulk mail (often caused by missing or misconfigured SPF/DKIM/DMARC records on the sender's side), the system may silently drop the message or hold it at the domain gateway level before it ever hits an individual user's storage quota.

MailReach

### What to Check Next

- **Google Admin Audit Log Search:** If you have access to a domain administrator for YaleMail, ask them to run a **Email Log Search** in the Google Admin Console. This tool

will show the exact path of the email, including whether it was Delivered to Inbox, Quarantined, Dropped by Compliance Rule, or Rejected.

**Sender Authentication Check:** Ensure the notice email was sent with valid **SPF, DKIM, and DMARC** alignment. Academic and alumni networks on Google Workspace often automatically filter or quarantine unauthenticated bulk emails to prevent alumni domain spoofing.

ok, and also can you check, if a human user never gets to physically 'see' or open the mail - can this also be tracked and proven with evidence logs?

**Yes, absolutely.** Not only can this be tracked, but Google Workspace leaves behind concrete, timestamped evidence logs that can prove whether a human user ever physically saw, opened, or even had the email rendered in their inbox view.

Because YaleMail uses Google Workspace, administrators have access to detailed log events through the **Google Admin Console** (specifically via Email Log Search and the Audit and Investigation Tool).

### What Logs Show Evidence for the Email

### 1. "Post-Delivery" & Interaction Logs

When an email reaches a Gmail account, the system tracks the state of the email inside that mailbox. An Email Log Search (ELS) or Gmail Audit Log reveals:

**Seen / Unseen:** Indicates whether the message line was ever rendered in the user's view (i.e., listed on their screen when they logged into the web interface or app).

**Opened / Read vs. Unopened:** Records whether the user clicked into the message body to open it.

**Label Status:** Shows which system folder held the message (e.g., `INBOX`, `SPAM`, `TRASH`, or `QUARANTINE`). If filtered out by an admin rule before delivery, it will explicitly show as **Quarantined** or **Dropped**.

### 2. User Sign-In & Activity Audit Logs

Admins can cross-reference email logs with **User Log Events**. This shows:

Exact timestamps of when the user logged into YaleMail.

The IP address, device type, and web browser used during the session.

Whether any mail interaction occurred during that specific session.

And can we check, is it possible that from the admin filters, some alum email accounts were affected in having the notice removed/ hidden from view, even while other accounts were unaffected? that is, can we check if the notice may have been unevenly blocked

Yes. In Google Workspace, administrative filters and routing rules do not have to be applied uniformly across an entire domain. They can easily be configured to target specific accounts, groups, or segments while leaving others completely unaffected.

Google Workspace administrators can scope and target email routing, compliance, and quarantine rules in several ways:

## How Admin Rules Can Block Notice Unevenly

**Targeting Specific Organizational Units (OUs)**
Administrators structure accounts into sub-units (e.g., `Alumni / Active Users` vs. `Alumni / Graduated pre-2015` vs. `Alumni / Opted-In`). Routing and quarantine rules can be enabled for one specific sub-OU while remaining turned off for others.

**Targeting via Google Groups or Inclusion/Exclusion Lists**
Rules can be built to apply only to specific Google Groups (e.g., custom lists of user accounts) or specific email address patterns. An admin can set up a compliance rule to quarantine or discard emails sent to specific recipient accounts while permitting the exact same email to pass through to others.

**Condition-Based Routing Rules**
Rules can be written with specific conditions—such as message size, external sender attributes, subject line keywords, or specific recipient addresses. If individual accounts have custom routing rules applied (or if rules match only specific user attributes), delivery outcome will differ from account to account.

**Account State and Provisioning Differences**
Administrative routing rules interact differently depending on whether an account is active, suspended, redirected via a Recipient Address Map, or configured with split-delivery settings. An incoming email might land in the inbox of an active primary account, but be held in Admin Quarantine or dropped for secondary or legacy accounts.

## How to Prove Uneven or Selective Blocking

Because delivery can be selective, an audit or investigation must examine the delivery pathway across multiple representative accounts rather than relying on a single test account:

**Comparative Email Log Searches (ELS):** Running an ELS across affected vs. unaffected alumni accounts for the same message ID/sender will produce contrasting status outputs (e.g., showing `Delivered to Inbox` for Account A, but `Quarantined` or `Dropped by Compliance Rule` for Account B).

**Scope Review in Admin Console:** A domain audit can pull the exact administrative rule definitions from the Google Workspace Admin Console to verify which Organizational Units, Groups, or individual recipient lists were targeted by the filter when the notice was dispatched.

Ok, and can you check, if a human user never opted in/ activated on an optional alum account such as the AYA YaleMail with Google backend infrastructure, eg. if the optional email was created/ activated only from the admin side without the human user's actual consent, is that trackable on evidence logs too?

Yes. Whether an account was actively set up by a human user or pre-provisioned solely from the admin side without user consent is fully trackable in Google Workspace audit logs.

Google maintains strict, immutable log trails that distinguish between **Administrative Creation/Provisioning** and **End-User Activation/Login Activity**.

### Evidence Logs That Track Account Creation vs. User Activation

#### 1. Admin Log Events ( `CREATE_USER` / Batch Provisioning)

If an optional account was generated automatically by administrators or imported via a bulk provisioning tool (e.g., CSV upload, Google Workspace Admin SDK, or directory sync):

- **Admin Audit Trail:** The log explicitly records the `CREATE_USER` event under **Admin Log Events**.
- **Actor Identification:** It lists the exact administrator email or API service account ( `Actor` ) that triggered the creation, along with a timestamp and IP address.
- **Lack of Self-Registration:** If there is no corresponding user-initiated sign-up or opt-in workflow log, it confirms the account was created unilaterally from the backend.

#### 2. User Login & First-Time Authentication Logs

Google tracks every single authentication attempt for an account:

- **Zero Login Events:** If a user never logged in or activated the account, the **User Log Events** and **Login Audit Log** for that user ID will reflect **zero successful logins** or zero first-time Terms of Service (ToS) acceptances.
- **Authentication Method:** If a login did occur, the log records the exact method (e.g., `Google Password` , `SAML SSO` , or `OIDC token exchange` ), device details, IP address, and location. A total absence of user-driven authentication events serves as concrete proof that the inbox was never accessed or used by the human recipient.

#### 3. User Setup & Password Creation State

- **Initial Password Status:** In Google Workspace, when an admin creates an account, they can enforce "Require password change at next sign-in."
- **State Log:** If the system state shows the account is still pending its initial password setup or initial ToS acceptance, it provides technical confirmation that the human user never completed activation or took ownership of the account.

### Key Takeaway for Notice Audit

If a defendant argues that legal notice was "delivered" because an optional inbox exists:

- **Admin Audit Logs** will show who created the account (e.g., domain admin vs. user opt-in).
- **Login Audit Logs** will show whether the human user ever authenticated or activated the mailbox.
- If logs show the account was admin-created and has zero user login history, it establishes that the mailbox was unactivated infrastructure—strengthening arguments that notice sent there was not reasonably calculated to reach the individual.

**Enclosure 4: 9/21/26 Joint Email** to Yale Admin noting potentially defective data exports on our accounts, and IT issues on Yale-administered Optional AYA alum inbox, resulting in lack of notice – Public redacted version, with Full unredacted version containing individual members' identifying information and individual worksheets with sworn declarations provisionally filed under seal with concurrent motion to seal

**HIGH IMPORTANCE: Attention YALE UNI ADMIN & Officers - GROUP OF YALE COLLEGE Alums with Affected Student Accounts**

[redacted]

Mon, Sep 21, 2026 at 9:15 AM

To: "maurie.mcinnis@yale.edu" <maurie.mcinnis@yale.edu>, "president@yale.edu" <president@yale.edu>, "alexander.dreier@yale.edu" <alexander.dreier@yale.edu>, "pericles.lewis@yale.edu" <pericles.lewis@yale.edu>, "geoff.chatas@yale.edu" <geoff.chatas@yale.edu>, "christopher.hanson@yale.edu" <christopher.hanson@yale.edu>, "john.barden@yale.edu" <john.barden@yale.edu>, "jeremy.rosenberg@yale.edu" <jeremy.rosenberg@yale.edu>, "hadar.call@yale.edu" <hadar.call@yale.edu>
Cc: "mary.magri@yale.edu" <mary.magri@yale.edu>, "daniel.smith@yale.edu" <daniel.smith@yale.edu>, "kari.difonzo@yale.edu" <kari.difonzo@yale.edu>, "alex.muro@yale.edu" <alex.muro@yale.edu>, "claire.sin-clair@yale.edu" <claire.sin-clair@yale.edu>,

[redacted]

To:
**President/ Prof. Maurie McInnis**, maurie.mcinnis@yale.edu, Office of the President, president@yale.edu
**Mr. Alexander Dreier**, Senior VP for Institutional Affairs, General Counsel, alexander.dreier@yale.edu
**Dean/ Prof. Pericles Lewis**, pericles.lewis@yale.edu
**Mr. Geoff Chatas**, Senior VP for Operations & CFO, geoff.chatas@yale.edu
**Mr. Christopher Hanson**, Chief Institutional Risk & Compliance Officer, christopher.hanson@yale.edu
**Mr. John Barden**, VP for Technology & Campus Services & CIO, john.barden@yale.edu
**Mr. Jeremy Rosenberg**, AVP for IT, Chief Info Security Officer, jeremy.rosenberg@yale.edu
**Ms. Hadar Call**, Associate CIO/ Director of Alumni Affairs and Development IT, hadar.call@yale.edu

cc:
**Ms. Mary Magri,** Senior Director of Finance and Administration, mary.magri@yale.edu
**Mr. Daniel Smith**, Director of Finance, daniel.smith@yale.edu
**Ms. Karensa DiFonzo**, Director of Undergraduate Financial Aid, kari.difonzo@yale.edu
**Mr. Alex Muro,** Senior Associate Director of Undergraduate Financial Aid, alex.muro@yale.edu
**Ms. Claire Sin-Clair**, Office Manager & Admin Support for Mr. Dreier, claire.sin-clair@yale.edu

Also cc'ed:
**Yale College Alums with Affected Student Accounts** in the Henry et al Yale Settlement (Alphabetical list by last names appended below main body text)

***

**Dear President McInnis, Mr. Dreier, Dean Lewis, Mr. Chatas, Mr. Hanson, and Officers of Yale,**

We are a group of Yale College alums who are writing to report that our Yale College student accounts had been affected in the Henry et al Yale settlement (Case No. 1:22-cv-00125). **<u>Our numbers of Yale College alums with affected student accounts have been growing, and we think it is prudent for us to reach out to you ASAP for this group report and notice, so that timely remedies can be made with the known discoveries.</u>**

By way of update & brief summary,

- In the ongoing court case **Henry et al v. Brown Uni et al (Case No.: 1:22-cv-00125)**, where a number of top universities are involved, Yale has agreed to provide settlement payments to Yale alumni in multiple class years to address concerns around the cost of attendance/ financial aid package calculation issues in those terms, as the basis for payments back to us now for around $2000-$4000 per student account.
- **Eligible Yale alumni include all past students with US citizenship/ permanent residency who received financial aid in enrollment terms extending from Fall Term 2003 through February 2024.**

For the Yale settlement fund - **per the Yale Settlement Agreement that Mr. Dreier signed on behalf of the university, Yale has provided $18.5 million to disburse, for payments that range around $2000 to $4000 per Yale student depending on individual total contributions/ prior payments made to offset the Yale College financial aid package.**

**We understand that the $18.5 million of the Yale Settlement fund has been deposited and held in escrow at Huntington National Bank.**

**However, the updates show that only a minority of the settlement fund has been claimed, while a majority is unclaimed, and we have reason to believe, with evidentiary support, that this may have directly arisen from errors made by staff around the handling of our Yale student records with the flow-through errors around proper delivery of notice.**

**In particular, we note the following,**

- **By compliance on due process standards & protections under the Federal Rule of Civil Procedure 23(c)(2)(B),** class notice must be "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." - **As the rosters of Yale class members & <u>student accounts/ financial records including associated primary email addresses</u> on file with the Yale Registrar and directory are <u>timestamped & concretely established</u>, we know staff do not have the discretionary right/ are not allowed to suppress or otherwise distort and withhold correspondence to our primary addresses on file for legal notice to provide notification and claims information for our settlement payments**, as doing so would constitute a bad faith misrepresentation of accurate fulfillment on the terms of the Yale Settlement with regards to attested statements of accuracy made to the Court.

- **<u>Our growing group of Yale College alums with affected student accounts had not received proper notice</u>**, as would have been required for us to file claims earlier in the distribution process of the Henry et al settlement to receive our rightful share of the Yale Settlement fund earlier. We understand that usually for class action distributions there is the requirement of due process notice, followed by a distribution, then supplemental claims, then final residual distributions. **The supplemental claims and final round haven't concluded yet because of the ongoing processing.**

- **<u>OPTIONAL AYA INBOX WITH YALE-DOCUMENTED ACTIVATION ISSUES AS SOLE & EXCLUSIVE DESTINATION FOR LEGAL NOTICE</u>: With regards to notice, the external settlement admin in Pennsylvania told us that based on information Yale provided to them on our student accounts, their earlier 'notices' were solely and exclusively delivered to the optional Yale-branded AYA inbox, which is under the university's control, and rolled out as an optional (never mandatory) Yale-branded option years after most of us had already graduated.**

- **<u>TIMELINE GAP & YALE-DOCUMENTED ACTIVATION ISSUES</u>: The optional Yale-branded AYA inbox was rolled out in 2016, years after many of us had already graduated - and furthermore, at the time when it was rolled out, Yale sent out emails to us noting that there have been widespread issues affecting the optional AYA inbox's activation - Please refer to EXHIBIT 1.** Thus, many of us did not opt-in to the optional free inbox, or to use it in replacement of our primary email addresses already on file with Yale. Furthermore, for the Yale-branded AYA inbox, there was never any statement or representation made (a) that the optional inbox would somehow become mandatory; (b) that the optional inbox would become solely & exclusively the only destination for legal notice, to completely override all our primary addresses on file.

- **<u>PRIMARY CONTACT AVAILABILITY:</u> Our primary addresses, including primary email addresses and physical addresses, already on file with the university in the Yale records are timestamped & have longstanding verified use, including before, during Mr. Dreier's entering of the Yale Settlement and through to the ongoing settlement period.**
  1. **<u>The optional inbox being made "server-active" is not a valid defense under Mullane v. Central Hanover Bank</u> -** As the optional AYA inbox is under Yale's control, we note that if and when the optional inbox is made technically able to 'receive mail' on the server side is legally irrelevant, because for federal compliance, notice standards are judged by constitutional due process, not technical possibilities. The landmark constitutional standard under Mullane v. Central Hanover Bank requires notice to be "reasonably calculated, under all the circumstances, to apprise interested parties". **<u>Exclusively</u>** routing emails to an optional Yale-branded inbox under the university's control that the university admitted in writing had experienced severe activation issues - while also overriding our primary addresses on file for a **<u>total blackout to our primary personal addresses on file</u>** (ie. the primary personal addresses with ongoing use by the university for academic records, financial records, central authentication, personalized fundraising, and other official correspondence) - is not "reasonably calculated" to apprise/ inform us of legal notice to receive payment where our property rights are involved.
  2. **<u>Course of Dealing & Estoppel by Conduct</u> -** There wasn't any notice of mandatory replacement of our primary addresses on file with the optional AYA inbox. On the contrary and instead**, the course of dealing & estoppel by conduct shows that Yale had routed ongoing correspondence, such as for diplomas, official academic transcripts, central authentication, financial records, university updates and personalized fundraising to our primary personal emails over the years, including and through the settlement period, including academic and financial records access, and ongoing personalized emails for Yale College fundraising addressed to our primary email addresses on file**. Thus, there is estoppel by conduct in retroactively claiming an optional inbox with documented activation issues was somehow mandatory for legal notice. **We never consented to having the optional AYA inbox with widespread activation issues be the sole mandatory destination for notice, for a total notice blackout to our primary addresses with documented use.**
  3. **<u>No Discretion to Distort the Class List</u>**: Per compliance requirements and applicable rules and regulations, we note that parties do not have discretion to knowingly distort the class list and student account records, when primary, functioning contact fields exist and remain actively used by Yale. Any claim that our primary contact information was "unavailable" or "unknown" for class action notice purposes is disproven by Yale's active, uninterrupted 18-year history of real-time communication with our group (eg. we have retained emails including from 18 years ago through to current day). Yale has seamlessly utilized our primary personal accounts for transcript processing, diploma mailings, central authentication, financial records processing, personalized fundraising and alumni events. For instance, the university actively and often relies on these primary email addresses when seeking financial contributions. eg. On Friday, September 18, 2026, at 3:00 PM, we Yale College alums received another personalized, official email sent directly to our primary personal inboxes from the official yale.edu domain. The communication, titled "From the Dean - A Message from the Dean of Yale College," addressed each of us individually by our last names (e.g., "Dear Mr./ Ms. [Last Name]") and stated: "Yale College is dedicated to seeking exceptionally promising students, educating them, and developing their intellectual, moral, civic, and creative capacities... Thanks to the generosity of alumni like you, your support through the Alumni Fund helps sustain the future of Yale. Sincerely," [bearing the digital scanned signature of the Dean]. Yale cannot maintain a flawless and regularly used database with our primary personal emails while simultaneously claiming that class action notice must be restricted exclusively to an optional inbox with known activation issues.

**Many of us Yale College alums are meticulous people - and our growing group includes scientists/ researchers, lawyers, doctors and healthcare providers, faculty/ teachers, technology and financial/ business professionals, and we have saved and documented extensive, timestamped records going back years; given the high standards of record-keeping we maintain, we know we did not receive proper notice for the earlier distribution.**

We understand that usually for class action distributions there is the requirement of due process notice, followed by a distribution, then supplemental claims, then final residual distributions. **The supplemental claims and final round haven't concluded yet because of the ongoing processing.**

**The updates show that approx. $12 million of the $18.5 million for the Yale Settlement fund remains in escrow currently,** and our supplemental claims of $2000 to $4000 per student account would not pose any logistical challenges.

**From what we read on the settlement terms, it seems ultimately any money remaining in the settlement fund doesn't return to Yale either - as there's a payout category for external admin fees/ expenses to the external parties.** The reports indicate that the original plaintiffs/ the initial group who brought the class action suit are not Yale alums - the 5 original plaintiffs are from Duke (1), Vanderbilt (2) and Northwestern (2), with a group doing litigation financing to help them reach settlements.

**<u>We wish to resolve this matter cooperatively, to secure our rightful share of the Yale Settlement funds. Thus, we are asking for your administrative leadership in providing the following fair remedies:</u>**

1. **As Yale submitted class information on our student accounts & financial records to the external settlement admin and Class Counsel, with attestations of accuracy and diligence, we ask that senior members of the Yale University Admin, Compliance and IT teams conduct a review of the information contained in the earlier spreadsheets/ data exports your staff provided to external parties, including the optional AYA email addresses that were used for sole & exclusive notice. Then, given all our actual primary addresses on file on our student accounts, please send the corrected updates for the full & accurate set of information to the external settlement admin and Class Counsel on our affected student accounts**, so that they are informed of the lack of proper notice earlier because of the inaccurate/ incomplete information that had previously been provided by Yale on our student accounts; and,
2. **As the notice error did not originate from us, and we should have a fair & equal opportunity to participate in the Yale Settlement, we ask that Yale University officially instruct the external settlement admin and Class Counsel to process supplemental claims for our affected student accounts for the Yale Settlement fund**, so that we can receive rightful shares of the Yale Settlement fund, on full and equal standing for the $2000 to $4000 payments due. We understand that usually for class action distributions there is the requirement of due process notice, followed by a distribution, then supplemental claims, then final residual distributions. **The supplemental claims and final round haven't concluded yet because of the ongoing processing.**

**Legal Protections for Student Records, including Financial Records, and Data Accuracy**: We understand that because the settlement involves individualized calculations based on our Yale Financial Aid packages, several strict federal accuracy frameworks apply. The GLBA/ Gramm-Leach-Bliley Act applies to university financial records, as higher education institutions that administer federal student financial aid are regulated under GLBA. Under the GLBA Safeguards Rule, universities are legally required to maintain data integrity and protect the security and accuracy of personal financial information. It does not permit the transmission of corrupted, incomplete, or mismatched files that misallocate or systematically exclude class members out of their property rights and rightful funds.

**Antitrust Settlement Accountability:** Because the Henry et al settlement (Case No. 1:22-cv-00125) is an antitrust settlement regarding financial aid, the accuracy of our student account records directly dictates our share of the settlement pool. An inaccurate data match that prevents notice essentially causes an unlawful deprivation of property rights on the settlement funds without due process.

**Preservation in Writing**: We ask that a copy of important information be provided in writing, lest any miscommunications or misinterpretations occur if only the phone is used.

**Reservation of Individual Rights**: Please note that members of our group continue to retain both collective & individual rights, and may submit additional statements on their own behalf.

Thank you for your attention to this matter.

We look forward to your prompt action on this report of affected student accounts.

Sincerely,
[redacted] on behalf of the Following Group of Yale College Alums with Affected Student Accounts, Everyone Also CC'ed

Alphabetical List by Last Names, Yale College Class Years/ Residential Colleges, Email contact for more info:

1. [redacted]
2.
3.
4.
5.
6.
7.
8.
9.
10.
11.
12.
13.
14.
15.
16.
17.
18.
19.
20.
21.
22.
23.
24.
25.
26.
27.
28.
29.
30.
31.
32.
33.
34.
35.
36.
37.

---

**2 attachments**

**Exhibit 1 - Optional AYA Inbox Widespread Activation Issues.pdf**
312K

**Reference Table - Yale College Alums with Affected Student Accounts.pdf**
94K

**Enclosure 5: 9/25/26 Joint Email** to Yale Admin noting potentially defective data exports on our accounts, and IT issues on Yale-administered Optional AYA alum inbox, resulting in lack of notice – Public redacted version, with Full unredacted version containing individual members' identifying information provisionally filed under seal with concurrent motion to seal, alongside individual worksheets with sworn declarations

**Updates (Sept 25) - Fw: HIGH IMPORTANCE: Attention YALE UNI ADMIN & Officers - GROUP OF YALE COLLEGE Alums with Affected Student Accounts**

[redacted]

Fri, Sep 25, 2026 at 8:07 AM

To: "maurie.mcinnis@yale.edu" <maurie.mcinnis@yale.edu>, "president@yale.edu" <president@yale.edu>, "alexander.dreier@yale.edu" <alexander.dreier@yale.edu>, "pericles.lewis@yale.edu" <pericles.lewis@yale.edu>, "geoff.chatas@yale.edu" <geoff.chatas@yale.edu>, "christopher.hanson@yale.edu" <christopher.hanson@yale.edu>, "john.barden@yale.edu" <john.barden@yale.edu>, "jeremy.rosenberg@yale.edu" <jeremy.rosenberg@yale.edu>, "hadar.call@yale.edu" <hadar.call@yale.edu>
Cc: "mary.magri@yale.edu" <mary.magri@yale.edu>, "daniel.smith@yale.edu" <daniel.smith@yale.edu>, "kari.difonzo@yale.edu" <kari.difonzo@yale.edu>, "alex.muro@yale.edu" <alex.muro@yale.edu>, "claire.sin-clair@yale.edu" <claire.sin-clair@yale.edu>, [redacted]

**Dear Yale Administrators - President McInnis, Mr. Dreier, Dean Lewis, Mr. Chatas, Mr. Hanson, and Officers of Yale,**

This is a follow-up and update message to our previous joint email and report to you on Monday, 9/21/26, forwarded again below for your reference.

The issue of the lack of proper notice regarding the Henry et al Yale settlement has impacted many Yale College alums, now numbering more than 50 individuals in our group, where our primary addresses documented on file at Yale did not receive the notice for us to file earlier claims in the Yale Settlement. **We note that the supplemental claims and final rounds have not yet concluded because of the ongoing processing, and ask for your prompt action & timely measures taken to correct the flawed data exports that Yale sent to external admin on our affected student accounts, which had resulted in lack of proper notice earlier, so as to ensure that we receive fair and rightful shares of the Yale Settlement.**

Please note the **additional Yale alums #38-51** with affected student accounts who have been appended to the list, attached in the current version of the Reference Table (**Exhibit 2**).

In addition to the points & content covered by our joint email to you on Monday, 9/21/26, which addressed due process and notice issues, please note:

- **Flawed Data Exports Provided by Yale to a Federal Proceeding Must Be Cured by the Source** - As the defendant in the Yale Settlement, Yale has a strict, non-delegable duty to provide accurate student records, including primary addresses, student records, and financial records. The university remains responsible for the accuracy of the initial data export, which had then flowed-through to the delivery systems used by the external admin.

- **Primary addresses for us had a total notice blackout, with the optional Yale-branded alum AYA inbox with Yale-documented widespread activation issues being used as sole & exclusive route of 'notice'** - While our primary addresses, including primary email addresses and physical addresses had longstanding, timestamp-documented, and ongoing use by the university, the earlier 'notice,' even when it was supposedly delivered in some but not all cases, was routed solely & exclusively to the optional, Yale-branded alum AYA inbox. This optional inbox was rolled out in 2016, years after many of us had already graduated and left campus, and had widespread activation issues documented by Yale itself (please refer to **Exhibit 1**). **This secondary inbox was never mandatory**; and furthermore, with many individual students, such as with members of our group, **this secondary optional inbox with Yale-documented IT problems was never opted in, adopted, or had consent given for it to replace/ override our primary addresses already continuously maintained on file with the university** (ie. Our primary addresses with longstanding and ongoing use by the university for diplomas, academic records, financial records, central authentication, personalized fundraising, and other official correspondence). **Conduct by dealing and estoppel by conduct shows that Yale had continued to rely on our primary addresses before, during, and through the settlement period, including for academic and financial records processing, ongoing university correspondence and personalized fundraising.**

- **University Administrators have independent, non-delegable regulatory obligations**: We note that under federal policies and applicable regulations/ governance standards, university administrators must take prompt, documented action when they receive written notice of a systemic data mismatch affecting federal court certifications. Operational duties to maintain accurate student records are distinct from any discretionary strategy behind attorney-client privilege. Furthermore, **privilege cannot be used to perpetuate or cover up a continuing misrepresentation**. Because Yale as the defendant in the Henry et al Yale Settlement has previously certified on the accuracy of our student records to the Court, leaving a corrupted dataset in place after being notified on our affected student accounts constitutes a knowing and continuing misrepresentation.

**Documentation in Writing**: Given the nature of the matter, and numbers of Yale account-holders involved, we ask that a copy of important information be provided in writing, lest any miscommunications or misinterpretations occur if only the phone is used.

**Known Discoveries**: Please provide prompt and timely responses to remedy this situation, with regards to the known discoveries of affected student accounts. **The cure for already-known, discovered errors should not be withheld or delayed simply because there might be larger numbers of undetermined, affected student accounts.** This is because the settlement distribution is active currently and funds are being transferred from escrow, and thus any delay in transmitting your corrections/ updated instructions to external admin may cause financial prejudice to members in our group, which would compound the wrong.

**We ask for your timely action in providing the following remedies:**

1. **As Yale submitted class information on our student accounts & financial records to the external settlement admin and Class Counsel, with attestations of accuracy and diligence, we ask that senior members of the Yale University Admin, Compliance and IT teams conduct a review of the information contained in the earlier spreadsheets/ data exports your staff provided to external parties, including the optional AYA email addresses that were used for sole & exclusive notice. The, given all our actual primary addresses on file on our student accounts, please send the corrected updates for the full & accurate set of information to the external settlement admin and Class Counsel on our affected student accounts**, so that they are informed of the lack of proper notice earlier because of the inaccurate/ incomplete information that had previously been provided by Yale on our student accounts; and,

2. **As the notice error did not originate from us, and we should have a fair & equal opportunity to participate in the Yale Settlement, we ask that Yale University officially instruct the external settlement admin and Class Counsel to process supplemental claims for our affected student accounts for the Yale Settlement fund,** so that we can receive rightful shares of the Yale Settlement fund, on full and equal standing for the $2000 to $4000 payments due. We understand that usually for class action distributions there is the requirement of proper due process notice, followed by a distribution, then supplemental claims, then final residual distributions. **The supplemental claims and final round haven't concluded yet because of the ongoing processing**.

Thank you for your attention to this matter.

We look forward to hearing from you on the next steps. Please email everyone as CC'ed here (also as attached on the updated Reference Table - Exhibit 2) to the greatest extent possible when discussing broadly applicable instructions/ procedures as our group would prefer a fair and transparent process on supplemental claims.

Sincerely,
[redacted]
Co-Claimant, on Behalf of CC'ed Yale Alums with Affected Student Accounts,
with the following Reservation of Individual Rights & Continuous Cohort Expansion Mandate

1. **Reservation of Individual Rights, & Severability of Claims:** The administrative and legal rights of each individual on this list remain protected to the fullest extent, including independent and separable rights. The subsequent ineligibility, withdrawal, or procedural variance of any individual signatory shall not prejudice, diminish, or affect the validity of the remaining collective or individual due process claims presented herein.
2. **Right of Continuous Cohort Expansion**: This list remains an open administrative class. More alums with affected student accounts may be appended to this list with their consent as further data mismatches and notice failures are brought to our attention throughout the timeline.

**Enclosure 6: 9/30/26 Joint Email** to Yale Admin noting potentially defective data exports on our accounts, and IT issues on Yale-administered Optional AYA alum inbox, resulting in lack of notice; alongside Written Documentation of Phone Call made to Yale General Counsel's Office Phone Number on **9/30/26 at 2:12PM ET** to confirm previous joint emails and attachments were received – Public redacted version, with Full unredacted version containing individual members' identifying information provisionally filed under seal with concurrent motion to seal, alongside individual worksheets with sworn declarations

**Updates (Sept 30) - Fw: Updates (Sept 25) - Fw: HIGH IMPORTANCE: Attention YALE UNI ADMIN & Officers - GROUP OF YALE COLLEGE Alums with Affected Student Accounts**

[redacted] Wed, Sep 30, 2026 at 2:26 PM

To: "maurie.mcinnis@yale.edu" <maurie.mcinnis@yale.edu>, "president@yale.edu" <president@yale.edu>, "alexander.dreier@yale.edu" <alexander.dreier@yale.edu>, "pericles.lewis@yale.edu" <pericles.lewis@yale.edu>, "geoff.chatas@yale.edu" <geoff.chatas@yale.edu>, "christopher.hanson@yale.edu" <christopher.hanson@yale.edu>, "john.barden@yale.edu" <john.barden@yale.edu>, "jeremy.rosenberg@yale.edu" <jeremy.rosenberg@yale.edu>, "hadar.call@yale.edu" <hadar.call@yale.edu>
Cc: "mary.magri@yale.edu" <mary.magri@yale.edu>, "daniel.smith@yale.edu" <daniel.smith@yale.edu>, "kari.difonzo@yale.edu" <kari.difonzo@yale.edu>, "alex.muro@yale.edu" <alex.muro@yale.edu>, "claire.sin-clair@yale.edu" <claire.sin-clair@yale.edu>, [redacted]

[redacted]

**To:**
**President/ Prof. Maurie McInnis**, maurie.mcinnis@yale.edu, Office of the President, president@yale.edu
**Mr. Alexander Dreier**, Senior VP for Institutional Affairs, General Counsel, alexander.dreier@yale.edu
**Dean/ Prof. Pericles Lewis**, pericles.lewis@yale.edu
**Mr. Geoff Chatas,** Senior VP for Operations & CFO, geoff.chatas@yale.edu
**Mr. Christopher Hanson**, Chief Institutional Risk & Compliance Officer, christopher.hanson@yale.edu
**Mr. John Barden**, VP for Technology & Campus Services & CIO, john.barden@yale.edu
**Mr. Jeremy Rosenberg**, AVP for IT, Chief Info Security Officer, jeremy.rosenberg@yale.edu
**Ms. Hadar Call**, Associate CIO/ Director of Alumni Affairs and Development IT, hadar.call@yale.edu

**cc:**
**Ms. Mary Magri**, Senior Director of Finance and Administration, mary.magri@yale.edu
**Mr. Daniel Smith**, Director of Finance, daniel.smith@yale.edu
**Ms. Karensa DiFonzo**, Director of Undergraduate Financial Aid, kari.difonzo@yale.edu
**Mr. Alex Muro**, Senior Associate Director of Undergraduate Financial Aid, alex.muro@yale.edu
**Ms. Claire Sin-Clair**, Office Manager & Admin Support for Mr. Dreier, claire.sin-clair@yale.edu

**Also cc'ed:**
**Yale College Alums with Affected Student Accounts in the Henry et al Yale Settlement**

***

**Dear Yale Administrators - President McInnis, Mr. Dreier, Dean Lewis, Mr. Chatas, Mr. Hanson, and Officers of Yale,**

This is a follow-up and update message to our previous joint emails and reports to you on 9/21/26 and 9/25/26, forwarded again below for your reference.

Please note the **additional Yale alums #52-70** with affected student accounts who have been appended to the list, attached in the current version of the Reference Table (**Exhibit 2**).

This is also a written confirmation for the record that we spoke on the phone earlier, on today's date **Wednesday 9/30/26, at 2:12 PM ET** with the phone call to Mr. Dreier's Yale office-listed telephone number of **(203) 432-4949**, where I have confirmed with Ms. Sin-Clair who answered the phone at the time of the call referenced above that our previous emails and attachments were received.

The issue of the lack of proper notice regarding the Henry et al Yale settlement has impacted many Yale College alums, now numbering 70 people in our group, where our primary addresses documented on file at Yale did not receive the notice for us to file earlier claims in the Yale Settlement. **We note that the supplemental claims and final rounds have not yet concluded because of the ongoing processing, and ask for your prompt action & timely measures taken to correct the flawed data exports that Yale sent to external admin on our affected student accounts, which had resulted in lack of proper notice earlier, so as to allow us to participate in the Yale Settlement.**

- **Primary addresses for us had a total notice blackout, with the optional Yale-branded alum AYA inbox with Yale-documented widespread activation issues being used as sole & exclusive route of 'notice' -** While our primary addresses, including primary email addresses and physical addresses had longstanding, timestamp-documented, and ongoing use by the university, the earlier 'notice,' even when it was supposedly delivered in some but not all cases, was routed solely & exclusively to the optional, Yale-branded alum AYA inbox. This optional inbox was rolled out in 2016, years after many of us had already graduated and left campus, and had widespread activation issues documented by Yale itself (please refer to **Exhibit 1**). This secondary inbox was never mandatory; and furthermore, with many Yale alums, such as with members of our group, this secondary optional inbox with Yale-documented IT problems was never opted in, adopted, or had consent given for it to replace/ override our primary addresses already continuously maintained on file with the university (ie. Our primary addresses with longstanding and ongoing use by the university for diplomas, academic records, financial records, central authentication, personalized fundraising, and other official correspondence). Course of dealing and estoppel by conduct shows that Yale had continued to rely on our primary addresses before, during, and through the settlement period, including for academic and financial records processing, ongoing university correspondence and personalized fundraising.

**Known Discoveries**: Please provide prompt and timely responses to remedy this situation, with regards to the known discoveries of affected student accounts. **The cure for already-known, discovered errors should not be withheld or delayed simply because there might be larger numbers of undetermined, affected student accounts.** This is because the settlement distribution is active currently and funds are being transferred from escrow, and thus any delay in transmitting your corrections/ updated instructions to external admin may cause financial prejudice to members in our group, which would compound the wrong.

**We ask for your timely action in providing the following remedies:**

1. **As Yale submitted class information on our student accounts & financial records to the external settlement admin and Class Counsel, with attestations of accuracy and diligence, we ask that senior members of the Yale University Admin, Compliance and IT teams conduct a review of the information contained in the earlier spreadsheets/ data exports your staff provided to external parties, including the optional AYA email addresses that were used for sole & exclusive notice. Then, given all our actual primary addresses on file on our student accounts, please send the corrected updates for the full & accurate set of information to the external settlement admin and Class Counsel on our affected student accounts**, so that they are informed of the lack of proper notice earlier because of the inaccurate/ incomplete information that had previously been provided by Yale on our student accounts; and,
2. **As the notice error did not originate from us, and we should have a fair & equal opportunity to participate in the Yale Settlement, we ask that Yale University officially instruct the external settlement admin and Class Counsel to process supplemental claims for our affected student accounts for the Yale Settlement fund,** so that we can receive rightful shares of the Yale Settlement fund, on full and equal standing for the $2000 to $4000 payments due. We understand that usually for class action distributions there is the requirement of proper due process notice, followed by a distribution, then supplemental claims, then final residual distributions. **The supplemental claims and final round haven't concluded yet because of the ongoing processing**.

Thank you for your attention to this matter, and we appreciate your help in resolving this situation.

Sincerely, [redacted]
Co-Claimant, on Behalf of CC'ed Yale Alums with Affected Student Accounts,
with the following Reservation of Individual Rights & Continuous Cohort Expansion Mandate

1. Reservation of Individual Rights, & Severability of Claims: The administrative and legal rights of each individual on this list remain protected to the fullest extent, including independent and separable rights. The subsequent ineligibility, withdrawal, or procedural variance of any individual signatory shall not prejudice, diminish, or affect the validity of the remaining collective or individual due process claims presented herein.
2. Right of Continuous Cohort Expansion: This list remains an open administrative class. More alums with affected student accounts may be appended to this list with their consent as further data mismatches and notice failures are brought to our attention throughout the timeline.

**Enclosure 7: 10/2/26 Joint Email** to Yale Admin noting potentially defective data exports on our accounts, and IT issues on Yale-administered Optional AYA alum inbox, resulting in lack of notice – Public redacted version, with Full unredacted version containing individual members' identifying information provisionally filed under seal with concurrent motion to seal, alongside individual worksheets with sworn declarations

**IMPORTANT - Exhibit 3 - Fw: Updates (Sept 30) - Fw: Updates (Sept 25) - Fw: HIGH IMPORTANCE: Attention YALE UNI ADMIN & Officers - GROUP OF YALE COLLEGE Alums with Affected Student Accounts**

[redacted]

Fri, Oct 2, 2026 at 7:39 AM

To: "maurie.mcinnis@yale.edu" <maurie.mcinnis@yale.edu>, "president@yale.edu" <president@yale.edu>, "alexander.dreier@yale.edu" <alexander.dreier@yale.edu>, "pericles.lewis@yale.edu" <pericles.lewis@yale.edu>, "christopher.hanson@yale.edu" <christopher.hanson@yale.edu>, "john.barden@yale.edu" <john.barden@yale.edu>, "jeremy.rosenberg@yale.edu" <jeremy.rosenberg@yale.edu>, "hadar.call@yale.edu" <hadar.call@yale.edu>
Cc: "mary.magri@yale.edu" <mary.magri@yale.edu>, "daniel.smith@yale.edu" <daniel.smith@yale.edu>, "kari.difonzo@yale.edu" <kari.difonzo@yale.edu>, "alex.muro@yale.edu" <alex.muro@yale.edu>, "claire.sin-clair@yale.edu" <claire.sin-clair@yale.edu>, [redacted]

[redacted]

**To:**
**President/ Prof. Maurie McInnis**, maurie.mcinnis@yale.edu, Office of the President, president@yale.edu
**Mr. Alexander Dreier**, Senior VP for Institutional Affairs, General Counsel, alexander.dreier@yale.edu
**Dean/ Prof. Pericles Lewis**, pericles.lewis@yale.edu
**Mr. Geoff Chatas,** Senior VP for Operations & CFO, geoff.chatas@yale.edu
**Mr. Christopher Hanson**, Chief Institutional Risk & Compliance Officer, christopher.hanson@yale.edu
**Mr. John Barden**, VP for Technology & Campus Services & CIO, john.barden@yale.edu
**Mr. Jeremy Rosenberg**, AVP for IT, Chief Info Security Officer, jeremy.rosenberg@yale.edu
**Ms. Hadar Call**, Associate CIO/ Director of Alumni Affairs and Development IT, hadar.call@yale.edu

**cc:**
**Ms. Mary Magri**, Senior Director of Finance and Administration, mary.magri@yale.edu
**Mr. Daniel Smith**, Director of Finance, daniel.smith@yale.edu
**Ms. Karensa DiFonzo**, Director of Undergraduate Financial Aid, kari.difonzo@yale.edu
**Mr. Alex Muro**, Senior Associate Director of Undergraduate Financial Aid, alex.muro@yale.edu
**Ms. Claire Sin-Clair**, Office Manager & Admin Support for Mr. Dreier, claire.sin-clair@yale.edu

**Also cc'ed:**
**Yale College Alums with Affected Student Accounts in the Henry et al Yale Settlement**

***

**Dear Yale Administrators - President McInnis, Mr. Dreier, Dean Lewis, Mr. Chatas, Mr. Hanson, and Officers of Yale, including Mr. Barden** (Chief Information Officer and Leader for Yale IT),

This is a follow-up message on the Henry et al Yale Settlement, regarding the lack of proper notice to our group of Yale alums with affected student accounts, now numbering 70 people.

As an additional detail to our previous joint emails, some of the Yale College alums in our group had noted that even though they had activated and were able to login to their optional AYA inboxes, they still did not find the notice on the Henry et al Yale settlement.

**As the optional AYA alum inbox (branded 'YaleMail') runs on Google's backend infrastructure, we checked with Google, and it appears that depending on some preset filters by admin, it is possible that due to the admin filters, the human user is not able to actually physically see or have access to certain emails.**

Please refer to **Exhibit 3** as attached from Google, which details the mechanics of how due to admin filters, some emails may be prevented from ever reaching the human user entirely, including being hidden from view/ such that they are never actually shown or displayed on the frontend GUI (graphical user interface). That is, those emails are never made viewable or accessible to human users including not being found inside 'junk' or spam folders, even while they are labeled as 'delivered' on the server backend. You may confirm the information contained herein with Google, including through your system logs, and the Google Gemini tool which is available publicly.

To summarize the issues noted in our joint emails and reports,

1. The Henry et al Yale Settlement has required accurate provision of class members' student records, including primary addresses, contact information, and financial records, under attestations of accuracy and due process to the Court.
2. Our primary addresses had a total notice blackout, despite the primary addresses being on file, and used continuously before, during, and through to the ongoing and current settlement period with course of dealing & estoppel by conduct provisions preventing the retroactive mandatory designation of the optional AYA inbox, which was rolled out in 2016, years after many of us already graduated and left campus.
3. Due to widespread IT issues documented by Yale (**Exhibit 1** from previously), the optional AYA inbox was never successfully opted-in on or adopted by many Yale alums. We never consented to having the optional AYA inbox override our primary addresses on file, or for it to be the sole & exclusive repository for notice.
4. Even for those who had consented and opted-in/ activated the optional AYA Yale-branded alum ('YaleMail') inbox, the optional AYA inbox was never designated as 'primary' or had any indication given that it would become the sole & exclusive repository for notice, overriding all primary addresses on file which has still been used for actual and ongoing access to academic records, financial records, alumni events, and personalized fundraising.
5. For those who had chosen to actively use the optional AYA Yale-branded alum ('YaleMail') inbox, the system event logs would be able to show that the human user was blocked by system/ admin filters from being able to physically see or have access to certain emails.

Due to the above outlined issues, discussed also in our previous emails, we ask that fair remedies please be provided by Yale regarding our affected student accounts, so that we would be able to participate in the Yale Settlement. Your timely action is requested as the supplemental claims process is ongoing.

The previously circulated **Exhibits 1 and 2** are attached again for your reference, along with **Exhibit 3**.

Given that payment distribution is currently ongoing, we request that you act promptly to provide the following remedies:

1. **As Yale submitted class information on our student accounts & financial records to the external settlement admin and Class Counsel, with attestations of accuracy and diligence, we ask that senior members of the Yale University Admin, Compliance and IT teams conduct a review of the information contained in the earlier spreadsheets/ data exports your staff provided to external parties, including the optional AYA email addresses that were used for sole & exclusive notice. Then, given all our actual primary addresses on file on our student accounts, please send the corrected updates for the full & accurate set of information to the external settlement admin and Class Counsel on our affected student accounts**, so that they are informed of the lack of proper notice earlier because of the inaccurate/ incomplete information that had previously been provided by Yale on our student accounts; and,
2. **As the notice error did not originate from us, and we should have a fair & equal opportunity to participate in the Yale Settlement, we ask that Yale University officially instruct the external settlement admin and Class Counsel to process supplemental claims for our affected student accounts for the Yale Settlement fund,** so that we can receive rightful shares of the Yale Settlement fund, on full and equal standing for the $2000 to $4000 payments due. We understand that usually for class action distributions there is the requirement of proper due process notice, followed by a distribution, then supplemental claims, then final residual distributions. **The supplemental claims and final round haven't concluded yet because of the ongoing processing**.

As the distribution is actively proceeding and it has been weeks since we have brought this matter to your attention on the issue of our primary addresses on file with Yale having notice blackouts, please kindly confirm in writing by letting our group of Yale alums with affected student accounts know by **Wednesday, October 7, 2026 by 5pm ET** as to whether you would provide the above fair remedies to the situation.

**The lack of notice is concerning because if unresolved, it would set a precedent as to how legally binding 'notice' can be made to us/ involving our affected Yale student accounts without our knowledge or consent.**

We note that if the matter cannot be resolved fairly and transparently, members of our group may individually or collectively choose to proceed with the following measures:

1. Forwarding the documented joint written correspondence to external enforcement parties including regulatory authorities to report the compliance violations
2. Proceeding with an emergency Confidential Filing as John/Jane Does 1-70 under seal with the presiding judge to protect our constitutional due process rights and seek mandated intervention

Thank you for your attention to this matter.

Sincerely,
[redacted]
Co-Claimant, on Behalf of CC'ed Yale Alums with Affected Student Accounts,
with the following Reservation of Individual Rights & Continuous Cohort Expansion Mandate

1. Reservation of Individual Rights, & Severability of Claims: The administrative and legal rights of each individual on this list remain protected to the fullest extent, including independent and separable rights. The subsequent ineligibility, withdrawal, or procedural variance of any individual signatory shall not prejudice, diminish, or affect the validity of the remaining collective or individual due process claims presented herein.
2. Right of Continuous Cohort Expansion: This list remains an open administrative class. More alums with affected student accounts may be appended to this list with their consent as further data mismatches and notice failures are brought to our attention throughout the timeline.

**Enclosure 8: 10/5/26 Joint Email** to Class Counsel, Settlement Admin, and Yale Admin – Public redacted version, with Full unredacted version containing individual members' identifying information provisionally filed under seal with concurrent motion to seal, alongside individual worksheets with sworn declarations

**IMPORTANT: Notice Issues in Henry et al Yale Settlement for Yale College Alums - Group of over 70 Known Accounts Affected**

[redacted]

Mon, Oct 5, 2026 at 3:28 PM

To: "smolo@mololamken.com" <smolo@mololamken.com>, "smolo2@mololamken.com" <smolo2@mololamken.com>, "jlamken@mololamken.com" <jlamken@mololamken.com>, "ldayton@mololamken.com" <ldayton@mololamken.com>, "esokoloff@mololamken.com" <esokoloff@mololamken.com>, "enitz@mololamken.com" <enitz@mololamken.com>, "mgold@mololamken.com" <mgold@mololamken.com>, "bcarter@angeiongroup.com" <bcarter@angeiongroup.com>, "dburrows@angeiongroup.com" <dburrows@angeiongroup.com>, "eschachter@angeiongroup.com" <eschachter@angeiongroup.com>, "tadessa@angeiongroup.com" <tadessa@angeiongroup.com>, "chris.ritchie@huntington.com" <chris.ritchie@huntington.com>, "liz.lambert@huntington.com" <liz.lambert@huntington.com>, "susan.brizendine@huntington.com" <susan.brizendine@huntington.com>, "tnormand@fnf.law" <tnormand@fnf.law>, "rgilbert@gilbertlitigators.com" <rgilbert@gilbertlitigators.com>, "ecramer@bm.net" <ecramer@bm.net>, "financial.compliance@yale.edu" <financial.compliance@yale.edu>, "information.security@yale.edu" <information.security@yale.edu>, "maurie.mcinnis@yale.edu" <maurie.mcinnis@yale.edu>, "president@yale.edu" <president@yale.edu>, "alexander.dreier@yale.edu" <alexander.dreier@yale.edu>, "pericles.lewis@yale.edu" <pericles.lewis@yale.edu>, "geoff.chatas@yale.edu" <geoff.chatas@yale.edu>, "christopher.hanson@yale.edu" <christopher.hanson@yale.edu>, "john.barden@yale.edu" <john.barden@yale.edu>, "jeremy.rosenberg@yale.edu" <jeremy.rosenberg@yale.edu>, "hadar.call@yale.edu" <hadar.call@yale.edu>
Cc: "mary.magri@yale.edu" <mary.magri@yale.edu>, "daniel.smith@yale.edu" <daniel.smith@yale.edu>, "kari.difonzo@yale.edu" <kari.difonzo@yale.edu>, "alex.muro@yale.edu" <alex.muro@yale.edu>, "claire.sin-clair@yale.edu" <claire.sin-clair@yale.edu>, [redacted]

[redacted]

To:
**MoloLamken, Lead Class Counsel for Henry et al v Brown Uni et al (Case #: 1:22-cv-00125)**
- Mr. Steven Molo: smolo@mololamken.com, smolo2@mololamken.com
- Mr. Jeffrey Lamken: jlamken@mololamken.com
- Ms. Lauren Dayton: ldayton@mololamken.com
- Mr. Eugene Sokoloff: esokoloff@mololamken.com
- Mr. Eric Nitz: enitz@mololamken.com
- Mr. Matt Gold: mgold@mololamken.com

**Angeion Group, Settlement Administrator**
- Officers overseeing Angeion's legal notice and claims operations: Mr. Bill Carter, Mr. Derek Burrows, Mr. Eric Schachter - bcarter@angeiongroup.com, dburrows@angeiongroup.com, eschachter@angeiongroup.com
- Angeion Project manager for Henry et al v Brown Uni et al: Ms. Taylor Adessa - tadessa@angeiongroup.com

**Settlement Custodian/ Escrow Agents**
- Mr. Christopher Ritchie, Executive Managing Director, Huntington National Bank, chris.ritchie@huntington.com
- Ms. Liz Lambert, Senior Managing Director, Huntington National Bank, liz.lambert@huntington.com
- Ms. Susan Brizendine, Trust Officer, Huntington National Bank, susan.brizendine@huntington.com

**Additional Class Counsel of Record**
- Freedman Normand Friedland: Mr. Edward Normand - tnormand@fnf.law
- Gilbert Litigators and Counselors: Mr. Robert Gilbert - rgilbert@gilbertlitigators.com
- Berger Montague: Mr. Eric Cramer - ecramer@bm.net

**Yale Admin, IT and Compliance**
Officers, financial.compliance@yale.edu, information.security@yale.edu
President/ Prof. Maurie McInnis, maurie.mcinnis@yale.edu, Office of the President, president@yale.edu
Mr. Alexander Dreier, Senior VP for Institutional Affairs, General Counsel, alexander.dreier@yale.edu
Dean/ Prof. Pericles Lewis, pericles.lewis@yale.edu
Mr. Geoff Chatas, Senior VP for Operations & CFO, geoff.chatas@yale.edu
Mr. Christopher Hanson, Chief Institutional Risk & Compliance Officer, christopher.hanson@yale.edu
Mr. John Barden, VP for Technology & Campus Services & CIO, john.barden@yale.edu
Mr. Jeremy Rosenberg, AVP for IT, Chief Info Security Officer, jeremy.rosenberg@yale.edu
Ms. Hadar Call, Associate CIO/ Director of Alumni Affairs and Development IT, hadar.call@yale.edu

cc:
**Yale University Undergraduate Financial Aid Officers and Yale College Financial Officers**
Ms. Mary Magri, Senior Director of Finance and Administration, mary.magri@yale.edu
Mr. Daniel Smith, Director of Finance, daniel.smith@yale.edu

Ms. Karensa DiFonzo, Director of Undergraduate Financial Aid, kari.difonzo@yale.edu
Mr. Alex Muro, Senior Associate Director of Undergraduate Financial Aid, alex.muro@yale.edu
Ms. Claire Sin-Clair, Office Manager & Admin Support for Mr. Dreier, claire.sin-clair@yale.edu

**Yale University (Yale College) Alums with Affected Student Accounts -** [redacted]

***

**Dear Class Counsel of Record and Administrative Officers,**

We are writing to you regarding the **Henry et al v. Brown Uni et al case (Case #: 1:22-cv-00125)**, in which a number of top universities including Yale are involved in ongoing settlements around the antitrust class action for cost of attendance and financial aid calculations, with reference to the **Yale University Settlement.** Per the Yale Settlement Agreement and subsequent order, Yale has agreed to "undertake in good faith all reasonable steps necessary" to carry out the settlement, including compliance with the Class Action Fairness Act, and requirements of Federal Rules of Civil Procedure and Rule 23 for due process notice, including the disclosure of true and faithful representations of mailing addresses and email addresses held by the university on our account records, and provision of $18.5 million to disburse, which has been held in escrow at Huntington National Bank.

**We are a group of Yale University (Yale College) alums who did not receive proper notice for the settlement, now numbering over 70 (seventy) people in our group of known individuals whose student accounts are affected.** There may be additional, larger numbers of unknown affected accounts, but given the ongoing distributions, we are bringing this group report to your attention so that you can provide fair remedies on the known discoveries.

We understand that for federal settlements such as this one, there is judicial oversight and regulatory oversight with the settlement being filed and reported under your attested statements of good faith and accuracy to the Court and also respective federal and state agencies under the **Class Action Fairness Act/ CAFA 28 U.S.C. § 1715** (as also stated in the settlement). If there is a defective data export being used at some point in the chain of custody of account records for us as class members, it would be on the record as defects in your compliance of statutory obligations.

**We know that the distribution is ongoing, and as various parties of record continue to file interim updates with the Court overseeing the settlement, including Class Counsel, Settlement Administrator, Settlement Custodian Bank/ Escrow Agents and settling universities' attestations of accuracy and sworn statements of having provided true and correct information, this is to provide a timestamped notification in writing to you regarding our group's notice blackout & to document the issue regarding the lack of proper notice to us, which had prevented our rightful participation in the settlement earlier.**

**As the notice error did not originate from us, we ask to participate on full standing for our rightful claims in the settlement, including in the ongoing supplemental claims and distribution process.**

We ask that the university admin/ IT and compliance teams, and external parties (Settlement Admin, Class Counsel) check and cross-reference the evidence logs in your own chain of custody of our data, which we understand Yale would have exported to external parties as part of the settlement under attestations of accuracy for best known information.

**The enumerated points and details are as follows.**

**(1)**
**Rule 23 Due Process Standard on Notice - Under Federal Rule of Civil Procedure 23(c)(2)(B), which is the mandatory standard for monetary relief cases such as in this settlement, "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." - Individual notice is the mandatory requirement here.** Our student account records, including names, primary email addresses and physical mailing addresses, and financial records/ financial aid packages and enrollment records, are held as concretely established class files at Yale, and which we have saved parallel evidence on. Each and every one of us has the right to individual notice.

**(2)**
**Constitutional Baseline on how our individual notices must be delivered - Due Process Requirement under the Mullane Standard**: As established in Mullane v. Central Hanover Bank, due process requires notice to be "reasonably calculated, under all the circumstances, to apprise interested parties." That is, the standard is that the parties making the legal notice is actually attempting to inform us of the settlement as opposed to enabling obstacles preventing our knowledge and participation.

**(3)**
**Primary addresses, including primary email addresses and primary mailing addresses for us are known, logged, and timestamped on the Yale records and which we have also saved evidence for.**

**Yale maintains timestamped track records of master files including our primary email addresses so there is a timeline of evidence for what our correct primary email addresses are.** We know this as a fact because that is how the university provides central authentication and maintains ongoing verified correspondence with us at our correct primary addresses on file. These primary addresses are verified, authenticated, and then used on a longstanding, continuing basis with timestamped logs for university central account authentication, academic records access, billing/ payment/ financial records access, directory information, personalized fundraising, and other university correspondence. **As the rosters of Yale class members & student accounts/ records including our associated primary email addresses on file with the Yale Registrar and directory are timestamped and concretely established with maintained evidence logs over time, we know staff (throughout the chain of custody of our account data, including the university staff who exported our data, and external staff at the Settlement Administrator and Class Counsel firms) do not have**

**the discretionary right/ are not allowed to suppress or otherwise distort and withhold correspondence to our primary addresses on file with Yale for legal notice.**

**No Discretion to Distort the Class List**: Per compliance requirements and applicable rules and regulations, we note that parties in the chain of custody of our data do not have discretion to knowingly distort the class list and student account records, when primary, functioning contact fields exist and remain actively used by Yale. Any claim that our primary contact information was "unavailable" or "unknown" for class action notice purposes is disproven on the record by Yale's active, uninterrupted 18-year history of real-time communication and interfacing with us (eg. we keep meticulous records and have in our evidence files retained emails including from 18 years ago through to current day). Yale has seamlessly utilized our primary personal accounts for transcript processing, diploma mailings, central authentication, financial records processing, personalized fundraising and alumni events. For instance, the university actively and often relies on these primary email addresses when seeking financial contributions. eg. On Friday, September 18, 2026, at 3:00 PM, we Yale College alums received another personalized, official email sent directly to our primary personal inboxes from the official yale.edu domain. The communication, titled "From the Dean - A Message from the Dean of Yale College," addressed each of us individually by our last names (e.g., "Dear Mr./ Ms. [Last Name]") and stated: "Yale College is dedicated to seeking exceptionally promising students, educating them, and developing their intellectual, moral, civic, and creative capacities... Thanks to the generosity of alumni like you, your support through the Alumni Fund helps sustain the future of Yale. Sincerely," [bearing the digital scanned signature of the Dean]. Yale cannot maintain a flawless and regularly used database with our primary email addresses while simultaneously claiming that class action notice must be restricted exclusively to an optional inbox (rolled out years after we graduated and left campus) under the school's control with known and documented IT/ activation issues.

**(4)**
**For our group of Yale alums with affected student accounts, now numbering over 70 known individuals, there has been a lack of proper notice to our actual primary addresses, including a total notice blackout to our documented primary email addresses and physical mail addresses on file with Yale.**

**Instead, as the sole & exclusive channel, even in instances when 'notice' was ever attempted for our affected accounts, a secondary optional inbox was used as the de facto mandatory route - this inbox, the optional AYA 'YaleMail' inbox is under Yale's control, and had Yale-documented IT problems and was for us either**
**(i) never even activated as Yale IT would have the records for because the AYA inbox is under their purview (ie. the optional inbox never had our knowing consent given for the inbox's activation on the human user side),** and/or
**(ii) never the primary address per longstanding course of dealing & estoppel by conduct with the university interfacing with us on our actual primary addresses,** and/or
**(iii) never consented to for the optional inbox to retroactively become a mandated inbox for us overriding all our primary addresses.**

**Additional IT problems on this optional Yale-labeled optional alum inbox would have further compounded the notice blackout, which can be proven with evidence logs, as discussed below.**

The list of factors that would have been involved in flawed data exports on your side include:

(a) **An optional, secondary Yale-branded alum inbox** (the **AYA/** Association of Yale Alumni inbox, also known as **"YaleMail'**) **under Yale (the party making the settlement)'s control, and with Yale-documented IT issues may have been used as the sole & exclusive destination for delivering legal notice on this settlement for our group of affected student accounts, overriding all our actual primary email addresses on file.** Exclusively routing legal notice emails to an optional Yale-branded alum inbox under the university's control that the university's IT department had documented widespread activation issues on, and which contains IT problems that would have impacted our accounts (as explained below), while also overriding our primary addresses on file for a total blackout to our primary addresses on file, is not "reasonably calculated" under the Mullane standard to actually apprise us of monetary relief and our rightful claims to the settlement.

(b) The optional, Yale-branded alum inbox (the **AYA 'YaleMail'**) had Yale-documented IT problems, including activation problems, when it was rolled out as an optional inbox in 2016, **years** after many of us had already graduated and left campus. Please refer to **Exhibit 1**, which shows the **email from Yale IT acknowledging the widespread activation problems on this optional Yale-branded inbox**. Thus, many of us who already graduated did not opt-in to the optional free inbox, or use it in replacement of our primary email inboxes already on file with Yale.

(c) The optional, Yale-branded alum inbox (the **AYA 'YaleMail'**) was never presented as mandatory in any way for us to accept/ adopt or activate or use. If the AYA 'YaleMail' was created without our knowledge or consent in the server backend as part of an automated update process at some point, but which the human user never consented to activation, that is also trackable by timestamped logs because AYA 'YaleMail' runs on **Google backend infrastructure** and Google keeps track of all human-user generated actions and the evidence logs will show whether a human-user had actually consented/ activated the inbox as opposed to system admin auto-generations (please refer to **Exhibit 3**)

(d) **Even for those who had chosen to activate and use the AYA 'YaleMail' inbox, it was also never presented a mandatory replacement to override primary addresses already on file**, and there was never statement or representation made for it to become the sole & exclusive destination repository for legal notice.

(e) **Course of dealing & Estoppel by Conduct**: Given the widespread documented IT problems on the optional AYA 'YaleMail' account, many of us who had already graduated and left campus years before the optional inbox's rollout in 2016 continued to use and maintain our primary email addresses on file with Yale. **The university also continued to use our primary email addresses already on file for key actions and communications, such as for university central account authentication, academic records access, billing/ payment/ financial records access, directory information, personalized fundraising, and other university correspondence.** This has been the longstanding case before, during, and through to the ongoing settlement period, and by maintaining continuous ongoing use of our primary email addresses without ever designating the optional AYA inbox as somehow mandatory - there is a legal course of dealing established and estoppel by conduct, in any attempt by parties to retroactively claim that the optional AYA inbox was somehow mandatory in any way.

(f) **Yale System Admin-Set Filters on this Optional Secondary Yale-branded Inbox**: Even for those who had chosen to actively use the optional AYA 'YaleMail' inbox, the system event logs would be able to show that the human user was blocked by system/ admin filters from being able to physically see or have access to certain emails including the notice. This is because for those Yale College alums in our group - ie. for those who had successfully activated, and accepted the terms of use, and been actually able to login to their secondary, optional AYA 'YaleMail' inboxes, they still did not find the notice on the Henry et al Yale Settlement.

**As the optional AYA alum inbox (branded 'YaleMail') runs on Google's backend infrastructure, we checked with Google, and it appears that depending on some preset filters by Yale systems admin, it is possible that due to the admin filters (such as due to overly wide or unevenly applied settings for spam prevention), the human user is not able to actually physically see or have access to certain emails including the notice, so that it is hidden even if the human user looks inside spam/ junk folders.**

Please refer to **Exhibit 3** as attached from Google, which details the mechanics of how due to admin filters, some emails may be prevented from ever reaching the human user entirely, including being hidden from view/ such that they are never actually shown or displayed on the frontend GUI (graphical

user interface). That is, those emails are never made viewable or accessible to human users including not being found inside 'junk' or spam folders, even while they are labeled as 'delivered' on the server backend. You may confirm the information contained herein with Google, including through your system logs, and the Google Gemini tool which is available publicly.

Thus to summarize the above points,

- The Henry et al Yale Settlement has required accurate provision of class members' student records, including primary addresses, contact information, and enrollment/ financial aid records, under attestations of accuracy and due process to the Court, and with provisions of the CAFA/ Class Action Fairness Act in place to ensure compliance to state and federal agencies.
- Our primary addresses had a total notice blackout, despite the primary addresses being on file with Yale with timestamped documentation, and used continuously before, during, and through to the ongoing and current settlement period with course of dealing & estoppel by conduct provisions preventing the retroactive mandatory designation of the optional AYA inbox, which was rolled out in 2016, years after many of us already graduated and left campus.
- Due to widespread IT issues documented by Yale (**Exhibit 1**), the optional AYA inbox was never successfully opted-in on or adopted by many Yale alums. We never consented to having the optional AYA inbox override our primary addresses on file, or for it to be the sole & exclusive repository for notice.
- Even for those who had consented and opted-in/ activated the optional AYA Yale-branded alum ('YaleMail') inbox, the optional AYA inbox was never designated as 'primary' or had any indication given that it would become the sole & exclusive repository for notice, overriding all primary addresses on file which has still been used for actual and ongoing access to academic records, financial records, alumni events, and personalized fundraising.
- For those who had chosen to actively use the optional AYA Yale-branded alum ('YaleMail') inbox, the system event logs would be able to show that the human user was blocked by system/ admin filters from being able to physically see or have access to the notice email.

***** Yale Admin, IT and Compliance; Class Counsel & Settlement Administrators: Yale is obligated to ensure the provision of true and good faith representations of our primary email addresses and mailing addresses on file for notice, under attestations of accuracy and mandatory compliance. Class Counsel and Settlement Admin are also obligated to check by cross-reference with Yale that our primary addresses on file with Yale are to be included on your delivery of notice - we understand that email delivery logs with transmission timestamps and server responses are part of the evidence record. The evidence logs would show that our primary addresses on file with Yale had a total notice blackout, due to identifiable flaws in your chain of custody of our data.**

**Furthermore, as we noted for Yale admin, Google's backend infrastructure for the secondary, optional, Yale-controlled AYA 'YaleMail' inbox allows tracking to pull the additional corroborating records, including being preserved for discovery, such as which optional accounts were never consented to/ activated (on the human user side), and the list of accounts that had the email notice blocked from physical view by human users (ie. the accounts which had the notice being pulled out of view by Yale IT filters and hidden entirely even from junk/ spam folders).**

We understand that the admin filters in the Yale-controlled AYA 'YaleMail' inbox causing the notice to be blocked from view are likely unintentional and inadvertent as part of the automated process for spam-prevention, but the resulting effect is still that proper notice was not given earlier, and thus affected Yale alums should have the fair remedy in terms of having full standing for the settlement and supplemental claims accepted.

In addition to the points above, we also note the following,

- **Legal Protections for Student Records, including Financial Records, and Data Accuracy**: We understand that because the settlement involves individualized calculations based on our Yale Financial Aid packages, several strict federal accuracy frameworks apply. The GLBA/ Gramm-Leach-Bliley Act applies to university financial records, as higher education institutions that administer federal student financial aid are regulated under GLBA. Under the GLBA Safeguards Rule, universities are legally required to maintain data integrity and protect the security and accuracy of personal financial information. It does not permit the transmission of corrupted, incomplete, or mismatched files that misallocate or systematically exclude class members out of their property rights and rightful funds.

- **Antitrust Settlement Accountability:** Because the Henry et al settlement (Case No. 1:22-cv-00125) is an antitrust settlement regarding financial aid, the accuracy of our student account records directly dictates our share of the settlement pool. An inaccurate data match that prevents notice essentially causes an unlawful deprivation of property rights on the settlement funds without due process.

- **Preservation in Writing**: We ask that a copy of important information be provided in writing, lest any miscommunications or misinterpretations occur if only the phone is used.

- **Yale's Earlier Confirmed Receipt of our Group Reports from 9/21/26 and 9/25/26**: On Wed 9/30/26, on a sequential batch update of affected accounts to Yale admin as Yale staff would have exported our data, we documented in writing with an email confirmation for the record that we spoke on the phone with Mr. Dreier's office to confirm that our earlier group reports from 9/21/26 and 9/25/26 had been received. The call was made on Wednesday 9/30/26, at 2:12 PM ET with the phone call to Mr. Dreier's Yale office-listed telephone number of (203) 432-4949, where I have confirmed with Ms. Sin-Clair who answered the phone at the time of the call referenced above that our previous emails and attachments were received.

- **Reservation of Individual Rights & Severability of Claims**: Please note that members of our group continue to retain both collective & individual rights, and may submit additional statements. The administrative and legal rights of each individual on this list remain protected to the fullest extent, including independent and separable rights. The subsequent ineligibility, withdrawal, or procedural variance of any individual signatory shall not prejudice, diminish, or affect the validity of the remaining collective or individual due process claims presented herein.

- **Right of Continuous Cohort Expansion:** This list remains an open administrative class. More alums with affected student accounts may be appended to this list with their consent as further data mismatches and notice failures are brought to the group's attention throughout the timeline. The list of Yale alums with affected student accounts as of currently is attached in **Exhibit 2.** Please note the email addresses included here and cc'ed alongside if you need to reach us are simply the preferred inboxes as a point of rapid contact for handling this joint correspondence right now and do not override or limit our primary addresses already on file with Yale with timestamped documentation.

Please note:

**The lack of notice is concerning because if unresolved, it would set a precedent as to how legally binding 'notice' can be made to us/ involving our affected Yale student accounts with primary addresses having a total notice blackout, and the legal notice being rerouted without our knowledge or consent into the sole & exclusive cul-de-sac (backend servers) of a secondary optional university-controlled alum inbox (years after we left campus) not in our control with known and widely documented IT problems.**

**As the notice error did not originate from us, and we should have a fair and equal opportunity to participate in the Yale Settlement, we ask that you, as parties in the chain of custody of our data, to please remedy the notice error and enable our participation on full standing for our rightful claims in the settlement, including in the ongoing supplemental claims and distribution process.**

**The antitrust settlement itself is intended to provide fair redress, and there should not be structural obstacles/ above-discussed points of notice failure to limit and prevent our rightful participation.**

Thank you for your attention to this matter, and we appreciate your help in resolving this situation.

Sincerely,
[redacted]
Co-Claimant, on Behalf of CC'ed Yale Alums with Affected Student Accounts,
with the following Reservation of Individual Rights & Continuous Cohort Expansion Mandate

1. Reservation of Individual Rights, & Severability of Claims: Please note that members of our group continue to retain both collective and individual rights, and may submit additional statements. The administrative and legal rights of each individual on this list remain protected to the fullest extent, including independent and separable rights. The subsequent ineligibility, withdrawal, or procedural variance of any individual member shall not prejudice, diminish, or affect the validity of the remaining collective or individual due process claims presented herein.
2. Right of Continuous Cohort Expansion: This list remains an open administrative class. More alums with affected student accounts may be appended to this list with their consent as further data mismatches and notice failures are brought to our attention throughout the timeline.

---

**3 attachments**

**Exhibit 1 - Optional AYA Inbox Widespread Activation Issues.pdf**
312K

**Exhibit 2 - Reference Table v.10.5.26 - Yale College Alums with Affected Student Accounts.pdf**
203K

**Exhibit 3 - Google Gemini Q&A Email Mechanics Google Infrastructure on AYAYaleMail Backend Servers.pdf**
1614K

**Enclosure 9: 10/7/26 Joint Email** to Class Counsel, Settlement Admin, and Yale Admin – Public redacted version, with Full unredacted version containing individual members' identifying information provisionally filed under seal with concurrent motion to seal, alongside individual worksheets with sworn declarations

**Updates for Admin & Class Counsel - Fw: IMPORTANT: Notice Issues in Henry et al Yale Settlement for Yale College Alums - Group of over 70 Known Accounts Affected**

[redacted]

Wed, Oct 7, 2026 at 1:10 PM

To: "smolo@mololamken.com" <smolo@mololamken.com>, "smolo2@mololamken.com" <smolo2@mololamken.com>, "jlamken@mololamken.com" <jlamken@mololamken.com>, "ldayton@mololamken.com" <ldayton@mololamken.com>, "esokoloff@mololamken.com" <esokoloff@mololamken.com>, "enitz@mololamken.com" <enitz@mololamken.com>, "mgold@mololamken.com" <mgold@mololamken.com>, "bcarter@angeiongroup.com" <bcarter@angeiongroup.com>, "dburrows@angeiongroup.com" <dburrows@angeiongroup.com>, "eschachter@angeiongroup.com" <eschachter@angeiongroup.com>, "tadessa@angeiongroup.com" <tadessa@angeiongroup.com>, "chris.ritchie@huntington.com" <chris.ritchie@huntington.com>, "liz.lambert@huntington.com" <liz.lambert@huntington.com>, "susan.brizendine@huntington.com" <susan.brizendine@huntington.com>, "tnormand@fnf.law" <tnormand@fnf.law>, "rgilbert@gilbertlitigators.com" <rgilbert@gilbertlitigators.com>, "ecramer@bm.net" <ecramer@bm.net>, "financial.compliance@yale.edu" <financial.compliance@yale.edu>, "information.security@yale.edu" <information.security@yale.edu>, "maurie.mcinnis@yale.edu" <maurie.mcinnis@yale.edu>, "president@yale.edu" <president@yale.edu>, "alexander.dreier@yale.edu" <alexander.dreier@yale.edu>, "pericles.lewis@yale.edu" <pericles.lewis@yale.edu>, "geoff.chatas@yale.edu" <geoff.chatas@yale.edu>, "christopher.hanson@yale.edu" <christopher.hanson@yale.edu>, "john.barden@yale.edu" <john.barden@yale.edu>, "jeremy.rosenberg@yale.edu" <jeremy.rosenberg@yale.edu>, "hadar.call@yale.edu" <hadar.call@yale.edu>
Cc: "mary.magri@yale.edu" <mary.magri@yale.edu>, "daniel.smith@yale.edu" <daniel.smith@yale.edu>, "kari.difonzo@yale.edu" <kari.difonzo@yale.edu>, "alex.muro@yale.edu" <alex.muro@yale.edu>, "claire.sin-clair@yale.edu" <claire.sin-clair@yale.edu>, [redacted]

**Dear Class Counsel, Yale Compliance, and Settlement Administrative Officers**,

Please note the attached and updated group list as of today, Wednesday 10/7/26.

**We are also aware that additional other Yale alums, not in our group, have already started informing the court regarding the lack of proper notice on their affected Yale accounts.**
**eg. Please see attached one of their reports.**

Thus, you would have been informed of the situation on lack of proper notice to Yale alums on multiple fronts.

**The chain of custody of our data exports has timestamped evidence logs which would reveal the source of the error.**

**We understand that the market rates for class action runs upwards of $600 (six hundred dollars) per project hour, to be taken by various parties out of the settlement escrow fund, with strict Rule 23 accuracy, fiduciary & compliance requirements. There is no reason why we should ourselves have to eat a loss of $2000 to $4000 (two to four thousand dollars) per class member account for your error in data exports resulting in lack of proper notice.**

We note that federal district courts have broad equitable power to impose sanctions for breach of fiduciary duty and refusal to correct discovered errors, including disgorgement of fees, cost-shifting, and recovery.

We understand you haven't submitted your cumulative fee tally yet for the court to approve, because your fees are released only after our claims are fully paid.
A continued unresolved dispute over notice failure will result in the delay of your own revenue collection.

As you have been informed of the issue on lack of proper notice to us several times, please note that good faith efforts on your side would include addressing the known and discovered deficiencies in your notice process to us, including cross-reference of Yale's primary addresses for us on file (enumerated points and available evidence logs as described in our earlier email, forwarded again below), to enable our participation on full standing as members of the ordered settlement.

Please kindly let us know in writing your response by **Tuesday, 10/13/26 5pm ET** as we know next Monday is Columbus Day.

Individual members of our group continue to have their rights protected and may decide on their own what their follow-up response would be.

As noted before, the settlement itself is intended to provide fair redress for cost of attendance calculations, where many of us had to make added sacrifices during our student years, and there should not be structural obstacles/ noted points of notice failure to limit and prevent our rightful participation.

Thank you,
[redacted]
Co-Claimant, on Behalf of CC'ed Yale Alums with Affected Student Accounts,
with the following Reservation of Individual Rights & Continuous Cohort Expansion Mandate

1. Reservation of Individual Rights, & Severability of Claims: Please note that members of our group continue to retain both collective and individual rights, and may submit additional statements. The administrative and legal rights of each individual on this list remain protected to the fullest extent, including independent and separable rights. The subsequent ineligibility, withdrawal, or procedural variance of any individual member shall not prejudice, diminish, or affect the validity of the remaining collective or individual due process claims presented herein.
2. Right of Continuous Cohort Expansion: This list remains an open administrative class. More alums with affected student accounts may be appended to this list with their consent as further data mismatches and notice failures are brought to the group's attention throughout the timeline.