FILED
11/13/2026
THOMAS G BRUTON
CLERK, U.S. DISTRICT COURT
BC



Case No: 1:22-CV-00125

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| HENRY et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 1:22-cv-00125 |
| v. | ) | |
| | ) | Judge Matthew F. Kennelly |
| BROWN UNIVERSITY et al., | ) | |
| | ) | |
| Defendants. | ) | |

Date: November 13, 2026

**Henry, et al. v. Brown University, et al.**
**Case No.: 1:22-cv-00125**

**Re: Reply to a Response to a Motion – Alums Notice Group's Reply to the Response by Counsel on Notice Blackouts Affecting Yale College Alums, Due Process Deficiencies, and Request for Relief**

Dear Honorable Court,

We refer to the response by Counsel [Document 1358], where the points presented by Counsel (Mr. Molo, Mr. Normand et al) are addressed as follows, along with a discussion of the overall context that the current discussion holds in the analysis of notice defects affecting our group's right to participate in the Yale Settlement (as part of the First Ten Settlements), and ongoing payments, for several dozens of affected Yale University (Yale College) alums who have reported the individual notice deficiencies impacting our accounts with sworn statements.

With regards to the disputed facts cited by Counsel, we note that:

1. Counsel erroneously cited 'thirty-one' Yale alumni (there is a second page with more alums listed on the Master Roster which they may have skipped) who have submitted sworn statements. There are thirty-seven Yale alums who have submitted sworn statements as listed in the original Master Roster and Individual Worksheets, and more similarly situated Yale alums may be in the process of joining, and others who are holding back until their concerns of potential retaliation are counterbalanced by the outcomes of earlier movants in our group. This latter group who contains over fifty other known individuals, for a total of around ninety Yale alums in our previous joint emails to Yale, Settlement Admin, and Class Counsel.
2. Counsel made no reference to the pertinent timelines of class action notice, and their imposed cut-off dates, which is the basis for the current dispute around individual notice. They have flippantly described our concerns as "alums obviously now have notice of the Settlements" (pg. 1) when they are fully aware that the withheld individual notice had limited and prevented our earlier participation in the First Ten Settlements to receive equitable pari passu payments in the range of $2000 to $4000 per Yale class member.
3. Counsel goes on to say that "Alums do not identify any special circumstances for missing the claim submission deadline" (pg. 2) – our Joint Letter expressly discusses all the special circumstances around the **unfair withholding of individual notice to our group of affected, identifiable Yale alum accounts, with our sworn statements for the accuracy**

**of information submitted to assist investigations,** including (a) the primary addresses not being used, with said primary mailing and email addresses being concretely established over years and held on file at Yale with ongoing two-way use per established course of dealing and estoppel by conduct with ongoing, continuous use over a decade, and (b) the secondary optional inbox under Yale IT's purview and control having had a range of documented IT problems, including Yale-documented activation problems and Yale IT admin-set email quarantines that blocked the individual notice from being rendered into view for human users on the frontend user interface.

With regards to the arguments put forth by Counsel, we note that:

1. Counsel has not referenced or discussed adverse authority in the **Supreme Court** case of **Eisen v. Carlisle & Jacquelin**, **417 U.S. 156 (1974**), which we address below.
2. The requirements for notice under **Mullane** [Supreme Court 1950, Mullane v. Central Hanover Tr. Co. 339 U.S. 306 (1950)] and **Eisen** (Supreme Court 1974), as required for Rule 23, pertaining to notice reasonably calculated to reach interested parties, and **individual notice** <u>cannot be conflated</u> with **publication notice.** Under Mullane (1950), publication notice has been held **inadequate**. There is also a prohibition on sham notice, as the Supreme Court in Mullane emphasized that notice cannot be a "mere gesture" – this is relevant in context of the following discussions of how the secondary optional inbox (under Yale's purview and control) may have Yale admin-set email filters and quarantines (part of a host of IT issues with evidentiary records) that effectively blocked the notice from ever appearing in human users' views, in the frontend user interface (even in those instances when notice was attempted). Under Eisen (1974), the Supreme Court held that <u>**individual notice**</u> to <u>**all identifiable**</u> **class members** was required by Rule 23(c)(2) for any class action maintained under subdivision Rule 23(b)(3).
3. Counsel's argument that there was "a variety of methods" (pg. 2) from which class members could conceivably learn about the settlement during the original notice window through general publication, including "internet banner ads," "press releases" and "toll-free telephone support" is inadequate with regards with Rule 23 requirements for individual notice under FRCP Rule 23, Mullane, and Eisen.
4. Their interpretation of Rule 23 compliance having been met simply because there was publication of notice in a general publication at some point in time or that there was 'good enough' coverage of some subset of identifiable class members directly contravenes the requirement for individual notice for all identifiable class members. **Counsel cannot deflect from Mullane and Eisen's standards of notice by pointing to the presence of general publication notice, or individual notice on an 'average' or 'good enough' basis, when Eisen (1974) specifically requires individual notice to all identifiable class members under Rule 23(c)(2) for any class action maintained under subdivision Rule 23(b)(3), including our group of affected Yale alums.**
5. **Counsel attempts to make the straw-man argument that "there is no due process requirement that every class member receive notice" (pg. 4).** There was never any argument by us or anyone else to say the physical act of receipt itself, in the form of class members deciding to open the individual notice once delivered, had to be guaranteed. <u>**Counsel should not conflate or make a false equivalence between the two stages of the delivery process, which are respectively (a) the sending of, and (b) the receiving of, an individual notice**</u>**.** The Defendant, Settlement Admin, and Counsel cannot rely on flawed data exports and incorrect addresses to misdirect individual notice in step (a) [the sending of] the individual notice, while simultaneously interfering with step (b) [the receiving of] the individual notice in secondary optional inboxes under the defendant's purview and control, all while indemnifying themselves against any accuracy or due process

requirements. The process is illustrated in the diagram found in Enclosure 1 of the Joint Letter and reproduced in the following pages.

6. Here, because of likely flawed data exports in our addresses as held by Yale, with the flow-through errors to Settlement Admin staff in charge of sending the individual notices, the sending of individual notices was affected for our affected Yale alum accounts. The evidence record, per the items outlined for disclosure and targeted discovery, would show that incorrect addresses were exported for our accounts when sent from Yale staff to Settlement Admin, with additional evidence from Yale IT's Google Workspace logs showing that the secondary optional inboxes were further rendered operationally defunct for providing individual notice for our affected Yale alum accounts, due to Yale-documented activation problems and IT issues under Yale's purview and control such as email filters holding the notices in backend quarantine and blocking it from view from human users on the frontend interface – this amounts to unjustifiable interference with step (b) [the receiving of] the individual notice given the secondary inbox is under the defendant's purview and control. All these items are recorded as evidence.

7. We note that the Notice Plan itself involves the Settlement Claims Administrator (Angeion Group) using "email and mailing addresses for notice" from "mailing addresses and email addresses in educational records" held by defendant universities (including Yale University), to be used for "purposes of providing class notice in this litigation."

8. **There cannot be unjustifiable deviations from Rule 23 requirements in executing the Notice Plan, particularly relating to flawed data exports and botched handling of selected groups of accounts that effectively block individual notice to identifiable class members, or attempts to cover up the known and discovered errors.**

9. **In the counterfactual case (if one were to follow Counsel's reasoning that any address created by the Defendant itself and associated under our names in flawed data exports could be used for individual notice, with no requirement for accuracy, established course of dealing, estoppel by conduct, or protection from adverse interference in said address and Defendant-set IT quarantines that blocked the notice from human-user view), the precedent it sets would mean that Defendants, Counsel and Settlement Admin would be perversely able and incentivized to circumvent Mullane and Eisen** by simply stuffing individual notices into defunct, defective secondary email inboxes created under the Defendants' own control that prevents the individual notices from ever appearing into human user view through IT spam quarantine filters (and other IT problems under the Defendants' IT departments' own purview and control), to effectively withhold individual notice and block participation by selected class members.

10. Counsel has not provided any concrete specifics relating to evidentiary records involving the flawed data exports and defective handling of individual notice pertaining to our group's affected Yale alum accounts. We note that none of the staff members involved in handling our account data, including from Yale, Settlement Admin, and Counsel involved in the chain of custody of our data have been able to provide any authenticated evidence logs showing proper sending of individual notice to our addresses (concretely established on file with Yale with established course of dealing and estoppel by conduct), nor have any of the staff members involved been willing to submit a declaration of authenticity along with evidence to the Court under penalty of perjury for the actual records pertaining to our group of affected Yale alum accounts as outlined in our Master Roster and Individual worksheets with sworn statements.

A summary table is presented below for the disputed issues, with further discussion to follow.

Summary Table of Issues under Discussion

| | Issue | Joint Letter by Yale College alums in Alums Notice Group / Discovery Items also outlined in Notice to Preserve Evidence, Points of Emphasis here in the Reply to Counsel | Response by Counsel (Mr. Molo, Mr. Normand et al) - Arguments by Counsel |
|---|---|---|---|
| 1 | **Federal Rule of Civil Procedure (FRCP) Rule 23** | Under Federal Rule of Civil Procedure 23(c)(2)(B), class members must be given "**the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort**." [Emphasis added]<br><br>**Reasonable effort**: Since the university continues to use our primary email addresses, as **established for years** per **course of dealing and estoppel by conduct with two-way use between us and Yale,** as the correct addresses held in our records, for central authentication, academic records access, billing/ financial records access, university correspondence and ongoing fundraising, **accessing those correct primary addresses requires little additional expense or search effort, and reasonable effort would include correctly linking and exporting the data already present in the active database with our primary addresses for compliance with Rule 23.** | Counsel cites a variety of methods" (pg. 2) from which class members could conceivably learn about the settlement during the original notice window through general publication, including "internet banner ads," "press releases" and "toll-free telephone support." |
| 2 | Mullane standard of notice for Rule 23: [Mullane v. Central Hanover Tr. Co. 339 U.S. 306 (1950)] | Due process requires notice to be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action."<br><br>We emphasize that publication Notice has been held **inadequate** under Mullane. There is a prohibition on sham notice, as the Supreme Court in Mullane emphasized that notice cannot be a "mere gesture." | Counsel attempts to conflate the sending of, and the receiving of, individual notice.<br><br>The Defendant, Settlement Admin, and Counsel cannot rely on flawed data exports and incorrect addresses to misdirect individual notice in step (a) [the sending of] the individual notice, while simultaneously interfering with step (b) [the receiving of] the individual notice in secondary optional inboxes under the defendant's purview and control, all while indemnifying themselves against any accuracy or due process requirements. |
| 3 | Eisen standard [Eisen v. Carlisle | Individual notice must be given to all class members whose names and addresses can be obtained with reasonable effort. | Adverse authority not addressed or discussed by Counsel |

| | | | |
|---|---|---|---|
| | & Jacquelin, 417 U.S. 156 (1974)] | The Supreme Court in Eisen further held that **<u>individual notice</u>** to **<u>all identifiable</u> class members** was required by Rule 23(c)(2) for any class action maintained under subdivision Rule 23(b)(3).<br><br>This has been true even if there are millions of class members, and even if only small amounts are involved, such as for less than a hundred dollars, such that **mere publication notice would not suffice for those class members whose names and addresses are known**. In our case, the number of eligible class members held on Yale's records are in the low ten thousands, with **concretely established university records containing our identifiable names and addresses,** and the amounts involved for the settlement are in the thousands of dollars per class member. | |
| 4 | **Discovery Evidence** Outlined in Joint Letter, and Notice to Preserve Evidence<br><br>Evidentiary record includes items in the Chain of Custody of Data, which would show Flawed Data Exports & Defects in Execution of Notice Plan | From pgs 10 to 14 of Joint Letter, and also referenced in the Notice to Preserve Evidence:<br><br>Evidence includes:<br>1) **Yale's Records on Our Primary Addresses – Original Database Records of Our Primary Addresses Held by Yale**, given the ongoing two-way use of our addresses by Yale with established course of dealing and estoppel by conduct<br>2) **Data Transfer – Data Exports Sent by Yale to Settlement Admin**, which had included data exports of our contact information, sent by Yale staff to the Settlement Admin for use in executing the Notice Plan<br>3) **Physical Mail Logs by Settlement Admin (or lack thereof)**<br>4) **Email Logs for notice sent by Settlement Admin to our correct primary addresses, or lack thereof - Authenticated Email Transmission Logs with Secure Metadata Receipts**<br>5) **Address Selection – Email Selection Rules by Settlement Admin applied to Our Data to choose contact addresses:** The address selection rules are relevant, because if Settlement Admin left out primary addresses for the notice, to **deliver** | Counsel thus far unwilling or unable to provide any evidence, which we know is available from the records held by various parties which would point to the **defective data exports** on our affected Yale alum accounts |

| | | | |
|---|---|---|---|
| | | **notices exclusively through defunct/ non-active emails labeled as such in the original spreadsheets,** the errors would be directly trackable to how the emails used for notice were selected by Settlement Admin from the files they received from Yale containing our data.<br>6) **Optional Alum Inbox Activation vs. Non-Activation – Yale IT Admin logs showing which Optional AYA 'YaleMail' accounts were activated vs. never activated in from the frontend, human-user side (individual details provided on individual worksheets as appended).**<br>7) **Alum Inbox IT Filters & Quarantines – Yale IT Admin-set email quarantine logs showing email quarantine or spam filters on affected accounts (individual details provided on individual worksheets as appended)** | |
| 5 | **Primary Addresses: Notice withheld** | Individual notice was withheld from our correct primary addresses during the earlier time window, with said primary addresses established through course of dealing and estoppel by conduct with ongoing two-way use between us and the university for central authentication, academic records access, billing/ financial records access, university correspondence and ongoing personalized fundraising<br><br>Correct primary mail and email addresses was NOT used by the defendant and Settlement Admin for sending individual notice during the earlier time window despite Established Course of Dealing and Estoppel by Conduct on our primary addresses used by Yale | Counsel thus far unwilling or unable to provide any evidence, which we know is available from the records held by various parties which would point to the **defective data exports** on our affected Yale alum accounts |
| 6 | **Secondary Optional Inbox under Yale's purview and control with IT activation problems and/or Yale IT admin-set filters blocking the notice from ever being rendered into** | For this **optional secondary inbox** rolled out in 2016, years after many of us graduated and left campus**, a range of IT problems in this inbox under Yale IT's purview and control effectively blocked the notice from ever being rendered into view by human users,** even in those instances when delivery was ever attempted by Settlement Admin.<br><br>Evidence includes:<br>- Logs from Google Workspace showing which optional email inboxes were created by Yale IT in the backend, and never | Defendant, Settlement Admin, and Counsel have yet to explain how sending individual notices to the backend servers of a secondary inbox under the defendant's control, which blocked human users (in our group of affected Yale alum accounts) from ever being able to view or act on the individual notice could fulfill the Mullane and Eisen |

| | | | |
|---|---|---|---|
| | **view by human users** | successfully activated by users, with documented IT problems by Yale in 2016 during the rollout of the optional alum inbox<br>- Logs from Google Workspace showing which Yale alum accounts had the notice filtered out by Yale IT admin-set spam filters and email quarantine rules | standards of notice and FRCP Rule 23 requirements |

**<u>Requirements for Rule 23 Due Process, Mullane (1950), Eisen (1974), Publication Notice cannot be conflated with Individual Notice</u>**

Counsel has cited only Mullane (1950), before going on to discuss how there was no 'blackout' in their view because there was publication notice at some point in time, and individual notices were given to a sizable portion of class members on a 'good enough' or 'average' basis.

We agree that Mullane holds that publication notice is inadequate, in that notice must be "reasonably calculated to reach interested parties."

In addition, Mullane also puts a ban on sham notice, as the Supreme Court in Mullane emphasized that notice cannot be a "mere gesture" – this is relevant in context of the following discussions of how the secondary optional inbox (under Yale's purview and control) may have Yale admin-set email filters and quarantines (part of a host of IT issues with evidentiary records) that effectively blocked the notice from ever appearing in human users' views, in the frontend user interface (even in those instances when notice was attempted).

Further information relevant to Rule 23 and the Mullane standard includes adverse authority not cited by Counsel, in **Eisen v. Carlisle & Jacquelin, 417 U.S. 156 (1974)** which contains guidance relevant to this case: The Supreme Court held that **<u>individual notice</u>** to **<u>all identifiable</u> class members** was required by Rule 23(c)(2) for any class action maintained under subdivision Rule 23(b)(3).

- The then-district court's earlier interpretation that a less costly procedure consisting of publication notice, along with individual notice to only a ***subset*** from among all the identifiable class members (as mirrors what Counsel is trying to argue here when defending their flawed execution of the Notice Plan which has impacted individual notice to our group's affected Yale alum accounts, in their assertions of having provided adequate notice on average through publication notice and notice to a sizable portion of class members), was **vacated**.
- Specifically, the Supreme Court ruled that Rule 23(c)(2) requires **individual notice** to be **<u>sent</u>** to **each class member** who can be **identified through reasonable effort**. – Counsel has not referenced or discussed this ruling in their written response, nor have they addressed the concrete specifics of evidence pertaining to our identifiable class member accounts per established course of dealing and estoppel by conduct in our addresses held by Yale with ongoing use by the defendant (the specifics and Yale's use of said primary addresses as outlined in our Individual Worksheets and sworn declarations submitted under seal).
- The Supreme Court's 1974 ruling in Eisen v. Carlisle & Jacquelin is that the attempted substitution of **<u>sending</u>** individual notice only to a **subset** from among all identifiable class members is unconstitutional for any class action maintained under subdivision (b)(3), in that the subset method fails to comply with the notice requirement of Rule 23(c)(2), and that: "
    - ***(a) The express language and intent of Rule 23 (c) (2) leave no doubt that individual notice must be sent to all class members who can be identified through reasonable effort. Here there was nothing to show that individual notice could not be mailed to each of the two and a quarter***

***million class members whose names and addresses were easily ascertainable, and for these class members individual notice was clearly the "best notice practicable" within the meaning of Rule 23 (c) (2). Pp. 173-175.***

***(b) The facts that the cost of sending individual notices would be prohibitively high to petitioner... or that individual notice might be unnecessary because no prospective class member has a large enough stake to justify separate litigation of his individual claim, do not dispense with the individual-notice requirement, since individual notice to identifiable class members is not a discretionary consideration to be waived in a particular case but an unambiguous requirement of Rule 23. Pp. 175-176.***

***(c) Adequate representation in itself does not satisfy Rule 23 (c) (2), since the Rule speaks to notice as well as to adequacy of representation and requires that both be provided. Otherwise no notice at all, published or otherwise, would be required in this case."***

- **Comments regarding costs/ litigation financing of class action:** In the 1974 verdict in Eisen v. Carlisle & Jacquelin, the Supreme Court ruled that for class action lawsuits, despite the costs of **sending** **individual notice** to **all identifiable class members**, the original plaintiff must "bear the cost of notice to the members of his class" as the cost of class action notice is "part of the ordinary burden of financing his own suit." In this case, we understand that Counsel in the ongoing class action suit has litigation financing arrangements and agreements with external litigation funders, with their fees collected from settlement proceeds. The 3rd party (outside) litigation funder present in this case was reported as having partnered with Counsel earlier, and was the subject of the documented findings and filings pertaining to the case, that has now been disclosed and reported by various news outlets including Reuters (eg. a March 2026 news article by Reuters[1] stating that the litigation financing arrangement was previously not disclosed to the Court, despite the duty of candor and prohibition against misrepresentation by lawyers). Given the business of litigation financing itself, the upfront costs of notice per Rule 23 requirements are part of the costs that must be borne by the parties who entered that agreement, in exchange for a share of proceeds as the economic payoff, as we understand has already reached millions in the settlement. **Given the upside payouts collected by Counsel and litigation funders from the settlement proceeds on issues of cost of attendance calculations ostensibly made on our behalf as alums who paid higher-than-needed out-of-pocket expenses during our undergraduate years (resulting in tangible sacrifices made throughout the duration of our college years, such as extra hours worked at term-time jobs to defray costs, and trade-offs to reduce spending and cut back on other essential items), there cannot be an unfair deprivation of due process on our participation and share of the settlement proceeds, through defective shortcuts or cutting of corners with respect to erroneous staff handling of account records, unjustifiable inaccuracies in data exports and addresses used, and cost savings in due diligence and labor expenses resulting in sub-standard delivery when fulfilling compliance to Rule 23 due process requirements.**
- **The 1974 Supreme Court decision in Eisen v. Carlisle & Jacquelin (an adverse authority which was not referenced or discussed by Counsel) explicitly provides for individual notice to all identifiable class members, and is especially jarring when**

[1] The 3rd party litigation financing arrangement was subsequently revealed: https://www.reuters.com/legal/government/litigation-funding-deal-threatens-class-action-over-us-college-financial-aid-2026-03-19/

**Counsel and Settlement Admin has already opted for the low-cost option of using emails notices in the vast majority of cases, where the marginal cost of sending emails is near-zero**, and there are minimum standards of accuracy and truthful representation. There is no excuse for covering up likely errors relating to flawed data exports and botched file transfers, resulting in the withholding of individual notice from known primary addresses from identifiable class members, as happened with our group of specific, identifiable Yale alums, to misdirect the sending of individual notices (in cases when it was ever attempted) to defunct secondary optional inboxes under the Defendant's purview and control with documented IT problems that blocked the individual notice from ever being rendered into timely, actionable view by human user.

**<u>Flawed Data Exports, Deficiencies in Execution of the Notice Plan</u>**: For the settlements, the Notice Plan involves the Settlement Claims Administrator using "email and mailing addresses for notice" from "mailing addresses and email addresses in educational records" held by defendant universities, to be used for "purposes of providing class notice in this litigation." Based on attestations by Yale in making the Settlement, alongside due process requirements, we understand that the standard is for true and accurate information to be provided on the addresses as held in our education records, including the validated addresses which we have long established a history of authenticated user actions and two-way correspondence with the university, on file in our education records since our undergraduate student years.

- **Counsel cannot deflect from Mullane and Eisen's standards of notice by pointing to the presence of general publication notice, or individual notice on an 'average' or 'good enough' basis, when Eisen (1974) specifically requires individual notice to all identifiable class members under Rule 23(c)(2) for any class action maintained under subdivision Rule 23(b)(3).**
- Counsel's attempt to redirect the discussion towards their interpretation of the word "blackout" and how it relates to publication notice and 'good enough' coverage of a subset of identifiable class members diverts from the core issue of Mullane and Eisen individual notice. Just because there is general publication notice somewhere, sometime during the original time window, as addressed in Counsel's follow-on argument that there is thus no uniform, blanket publication blackout against the entire cohort of all class members, **does not indemnify them** from the fact that that specific groups of class members were harmed by having individual notice actively withheld from them, with **individual notice being required under Mullane and Eisen**.
- Indeed, Mullane itself holds that general publication notice is insufficient when individual class members can be given individual notice, and Eisen requires individual notice for all identifiable class members; and FRCP Rule 23(c)(2)(B) states that class members must be given "**the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort**."
- **<u>Counsel, Settlement Admin, and the Defendant are not given carte blanche to engage in flawed executions of individual notice under the Notice Plan simply because they can point to publication notice somewhere or 'good enough' individual notice on average to cover a subset of identifiable class members, while withholding individual notice from other identifiable class members.</u>**

- Counsel has not provided an explanation to address the lack of individual notice to our group of affected Yale College alums as required under Mullane and Eisen, including the fact that likely due to flawed data exports and botched handling of our data during file transfers from Yale staff to Settlement Admin and resulting defects in the execution of the Notice Plan, individual notice to our specific group of alums was **effectively and actively blocked** by the blackout to our individual primary addresses, with the <u>concomitant secondary route of the</u>

optional Yale-controlled alum inbox also being rendered operationally **defunct** by IT issues under Yale's purview and control for our individual specific accounts.

**We note that none of the staff members, including from Yale, Settlement Admin, and Counsel involved in the handling of data exports in the chain of custody of our data have thus far been able to provide any authenticated evidence logs showing proper delivering of individual notice to our addresses (concretely established on file with Yale with established course of dealing and estoppel by conduct), nor have any of the staff members involved been willing to submit a declaration of authenticity along with evidence to the Court under penalty of perjury for the actual records pertaining to our group of affected Yale alum accounts.**

1. **Addresses Held in Education Records:** The **Settlement and Notice Plan** for this class action involves the Settlement Administrator receiving "email and mailing addresses for notice" from "mailing addresses and email addresses in education records" provided by Yale. The optional AYA inbox, which was rolled out in **2016**, under Yale IT's purview and control, was offered as an ancillary (never mandatory) benefit, **years after many of us graduated and left campus.** There was never any statement or representation made by the university that the optional AYA inbox would override our **primary email addresses already on file in our education records**. The university has continued to communicate with us in two-way correspondence at our primary email addresses before, during, and through the ongoing settlement period.
2. **Identifiable Class Members & Primary addresses:** Primary addresses, including primary email addresses and primary mailing addresses for us in our education records at Yale are concretely established, known, logged, and timestamped, and which we have also saved evidence for. Yale maintains timestamped track records of master files including our primary email addresses so there is a timeline of evidence for what our correct primary email addresses are in our education records. We know this as a fact because that is how the university provides central authentication and maintains ongoing verified correspondence with us at our correct primary addresses on file. These primary addresses in our education records are verified, authenticated, and then used on a longstanding, continuing basis with timestamped logs for **university central account authentication, academic records access, billing/ payment/ financial records access, directory information, and other official university correspondence**. The rosters of Yale class members & student accounts/ records including the primary email addresses in our education records are maintained on file with the Yale Registrar and university directory, with timestamped and concretely established evidence logs over time.
3. **Optional AYA 'YaleMail' Inbox under Yale IT's Purview and Control with Widespread IT Problems:** The optional AYA 'YaleMail' inbox rolled out in 2016 is under Yale IT's purview and control, and unfortunately had ongoing IT issues, including widespread Yale-documented activation problems since the time of its rollout, which led many alums who had already graduated years before the time of its rollout in 2016 to never be able to successfully activate or otherwise adopt it. Please refer to **Appendix 2,** which shows the email from Yale IT acknowledging the **widespread activation problems** on this optional Yale-branded inbox. Thus, many of us who already graduated did not opt-in to the optional free inbox, or use it in replacement of our primary email inboxes already on file with Yale in our education records. If the AYA 'YaleMail' was created in the server backend as part of an automated update process at some point, but which the human user never opted-in to activate, that is also trackable by timestamped logs because AYA 'YaleMail' runs on **Google backend infrastructure** and Google Workspace's event logs keeps track of all human-user generated actions, to provide information to IT admin on whether a human-user had opted-in to activate the inbox.

4. **Additional IT problems** involving **Yale IT admin-set spam filters** on this optional AYA 'YaleMail' inbox may have further compounded the defective sending of individual notice, by blocking or holding the notice emails in **quarantine,** thereby hiding it from view on the inbox's frontend GUI (graphical user interface), so that the human user is never able to physically see or have access to the notice email. In such cases, the system event logs would be able to show that the human user was blocked by Yale IT admin filters/ quarantine rules from being able to physically see or have access to certain bulk-sent emails including the notice. This is because for those Yale alums in our group (that is, for those who had successfully activated the inbox, accepted the terms of service, and been able to login to their secondary, optional AYA 'YaleMail' inboxes), they still did not find the notice on the Settlement. As the optional AYA alum inbox (branded 'YaleMail') runs on **Google Workspace's backend infrastructure**, we referenced information provided by Google, and it appears that depending on some preset filters by Yale systems admin, it is possible that due overly wide or unevenly applied settings for spam prevention and quarantine rules, the human user is not able to actually physically see or have access to certain bulk-sent emails including the notice, so that it is hidden from the frontend inbox even if the human user looks inside spam/ junk folders. **The emails thus held in quarantine never appears in the user's Inbox, 'All Mail,' Spam, or Trash folders, and the user cannot search for it, view it, or know it exists.** The email may then be purged from the backend in automated processes without the human user ever having access to it. The backend event logs for Yale IT would capture the quarantine activity, to enable tracking on which accounts had been impacted. Please refer to **Appendix 3** with information provided by Google through its publicly available Google Gemini tool, with details regarding **Google Workspace backend infrastructure**, on which the optional AYA 'YaleMail' inbox runs. <u>**The evidence logs from Yale's Google Workspace logs tracking the admin-set IT filters, as discussed in the outlined items for initial disclosure and targeted discovery, would show exactly which email inboxes were affected, which would include our group's affected Yale alum accounts.**</u>

**Evidence & Accuracy Standards in Fulfilling Rule 23 Requirements**

1. As discussed in our Joint Letter and Notice to Preserve Evidence (a copy which was sent to referenced parties on 10/30/26, and attached here for reference in Appendix 4), the evidentiary record includes the outlined items for initial disclosure and targeted discovery pertaining to staff members' handling of our accounts in the chain of custody of our data, as **exported in spreadsheets and files of mailing and email addresses by Yale staff for transfer to Settlement Admin, along with the mailing logs used by Settlement Admin (or lack thereof).**
2. This evidence directly pertains to how flaws in the exports and handling of our individual Yale alum accounts would have flowed through to unjustifiable deviations from Rule 23 requirements in the execution of the Notice Plan, which resulted in no individual notice being sent to our identifiable and concretely established accounts at Yale, particularly during the original notice period.
3. Counsel's assertions of publication notice and individual notice on a 'good enough' average basis does not override the harm caused by individual notice being withheld from our group of specifically affected, identifiable accounts, which had resulted from flawed data exports and defective handling of our addresses in the chain of custody of our accounts.
4. For our group of affected Yale College alums, individual notice was withheld from us, which resulted in harm including the preclusion of our earlier participation in the First Ten Settlements and ongoing payments, specifically arising from the <u>**combination**</u> of individual notice being withheld from our primary addresses (including primary mailing and email addresses), **AND** concurrently, the <u>Yale-controlled</u> optional email inbox being **rendered**

**operationally defunct** due to Yale admin-set IT quarantines and spam filters (and other IT problems under Yale's purview and control), in blocking the notices from ever appearing into human user view, effectively blocking actionable individual notice during the earlier time window.

5. The Counsel has yet to answer how does the blackout to our primary addresses, along with the Yale admin-set IT quarantines and unevenly-applied spam filters (and other IT problems in the optional inbox under **Yale's purview and control**) that actively prevented human users in our **specific group** of affected Yale alum accounts from ever being able to view the notice during the earlier time window - could ever be construed as meeting the Mullane and Eisen standards of individual notice as required here. **<u>In the counterfactual case (if one were to follow Counsel's reasoning that any address created by the Defendant and associated with our names could be used for individual notice, with no requirement for accuracy, established course of dealing, estoppel by conduct, or protection from adverse interference in said address and Defendant-set IT quarantines that blocked the notice from human-user view), the precedent it sets would mean that Defendants, Counsel and Settlement Admin would be perversely able and incentivized to circumvent Mullane and Eisen</u> by simply stuffing individual notices into defunct, defective secondary email inboxes under the Defendants' own control that prevents the individual notices from ever appearing into human user view through IT spam quarantine filters (and other IT problems under the Defendants' IT departments' own purview and control), to effectively withhold individual notice and block participation by selected class members.** There is a prohibition on sham notice, as the Supreme Court in Mullane emphasized that notice cannot be a "mere gesture."

6. The defects in the execution of the Notice Plan points to flawed data exports in the chain of custody of our data by the Yale staff members in charge of exporting our group's specific accounts and addresses, and/or Settlement Admin staff members who had relied on the defective data exports, or made concomitant errors in sending emails to those emails labeled as defunct on the original data spreadsheets and files that Yale had sent to Settlement Admin (Angeion Group).

7. **As addressed in the outlined items for initial disclosure and targeted discovery, discussed in specific detail in our Joint Letter and Notice to Preserve Evidence, the evidence directly pointing to the flaws in the data exports and the defects in their execution of the Notice Plan are in the spreadsheets and email/ mailing logs, which thus far Yale, Settlement Admin, and Counsel has refused to provide.**

8. We have every reason to believe that the above-referenced parties are well-aware of the error from their side after we have pointed out the issues to them multiple times as our numbers of known, affected accounts grew over preceding months with no written response from them earlier, and no explanation even now, pertaining to the disclosure and discovery items directly relevant to the defects in their execution of the Notice Plan which has impacted our group's right to recovery and participation in the Settlement.

9. **We understand that in the process of data handling and file exports, to err is human, and we have only asked for a reasonable remedy to the situation given the flawed data exports that affected our right to participate in the Settlement,** with the estimated payments of $2000 to $4000 for each class member in our group of affected alums in the Yale tranche of the Settlement – however, it is unacceptable for the above-referenced parties, once their errors in the chain of custody in handling our data are discovered, to attempt to cover up, hide, and deflect the errors when there is evidentiary record of the file transfers containing likely flawed data exports, IT inboxes' Yale admin-set quarantine rules (logged by Google Workspace), and email logs (or lack thereof in non-performance to accuracy standards), while **collecting multiple millions in professional fees for themselves,** when they are attesting to their proper handling of our account records under

due process requirements, and asserting that looking up the email logs for several dozen affected, identifiable class member accounts is too "burdensome."

10. Under the ABA (American Bar Association)'s Model Rules of Professional Conduct, lawyers must not misrepresent the facts, or make a false statement of material fact or law; or knowingly engage in conduct involving dishonesty, fraud, deceit or misrepresentation to third-parties. It is stated that lawyers also must not unlawfully obstruct another party's access to evidence or unlawfully alter, destroy or conceal a document or other material having potential evidentiary value. We have reiterated the outlined items for initial disclosure and targeted discovery in a Notice to Preserve Evidence sent to Counsel and associated parties in the chain of custody of our data (a copy in Appendix 4).

**Enclosure 1: Diagram** to illustrate potential sources of notice failure for this group of known affected accounts among Yale alums, resulting in notice blackouts and divergence from accuracy and due process standards under Rule 23 requirements
(Reproduced from earlier Joint Letter for reference)




**Central issue:** The central issue is whether, given the **COMBINATION** of (a) primary addresses held by Yale in our education records (as required by the Settlement and Notice Plan) not being used, to withhold individual notice to our primary addresses on file for our identifiable class member accounts, when said primary addresses are concretely held by the university, per the established **course of dealing and estoppel by conduct**, with timestamped records of the continued two-way use of these primary addresses established in our education records, **AND** (b) the Yale-controlled, optional AYA 'YaleMail' inbox (rolled out by the university years after our graduation with widely documented IT issues) being made without our knowledge or consent into the de facto sole and exclusive, mandatory route for individual notice on this settlement (in those instances when Settlement Admin attempted to reach us), with said optional AYA inbox – which is under Yale IT's oversight, purview and control – **concurrently not being made operationally functional by the defendant (Yale) itself via admin-set email filters** (and other IT problems) for rendering any sort of actionable notice for human users in the frontend user interface in this settlement for our affected, identfiable accounts (with relevant evidentiary items outlined in the initial disclosure and targeted discovery outlines) – could there be attestations by various parties including Yale and Settlement

Admin of having met Rule 23 requirements under the Mullane and Eisen standards of individual notice on our accounts, as required by the Settlement and Notice Plan. Our answer is no.

- **<u>In the counterfactual case (if one were to follow Counsel's reasoning that any address created by the Defendant and associated with our names could be used for individual notice, with no requirement for accuracy, established course of dealing, estoppel by conduct, or protection from adverse interference in said address and Defendant-set IT quarantines that blocked the notice from human-user view), the precedent it sets would mean that Defendants, Counsel and Settlement Admin would be perversely able and incentivized to circumvent Mullane and Eisen</u> by simply stuffing individual notices into defunct, defective secondary email inboxes under the Defendants' own control that prevents the individual notices from ever appearing into human user view through IT spam quarantine filters (and other IT problems under the Defendants' IT departments' own purview and control), to effectively withhold individual notice and block participation by selected class members.**
- There is a prohibition on **sham notice**, as the Supreme Court in Mullane emphasized that notice cannot be a "mere gesture."
- The Supreme Court in Eisen further held that **<u>individual notice</u>** to **all <u>identifiable</u> class members** was required by Rule 23(c)(2) for any class action maintained under subdivision Rule 23(b)(3).

**<u>Relevant Evidence Items for Disclosure and Targeted Discovery</u>**
As addressed in our Joint Letter dated 10/14/26, we respectfully request that the Court consider the outlined items (reproduced in **Appendix 1**), held by the defendant, Settlement Admin, and Counsel, which may be produced in initial disclosures or targeted discovery, regarding the lack of proper notice on our group of affected, identifiable Yale alum accounts.

The following items in **Appendix 1** (reproduced from the Joint Letter) would likely take no more than a few minutes of time per account query (or less if run in a batch retrieval), and the magnitude of benefits for affected Yale class members, who each have thousands of dollars pending in the settlement, likely outweigh the administrative inconvenience of the limited time spent in correctly resolving the due process issue, regarding deficiencies to FRCP Rule 23, Mullane and Eisen standards of proper class action notice, and flawed deviations by staff in executing the Notice Plan.

**<u>Relief Requested</u>**
Given the combination of factors which had resulted in FRCP Rule 23, Mullane and Eisen standards of due process and individual notice not having been met for our group of affected, identifiable Yale class member accounts, and as the notice error preventing our earlier participation in the settlement did not originate from us, we respectfully ask the Honorable Court to approve the following remedies to ensure our due process rights are protected – if the parties in the chain of custody of our data in the execution of the notice (the defendant, Settlement Admin, and Class Counsel) are unable or otherwise unwilling to cooperate with the initial disclosure and targeted discovery process relating to evidentiary records directly relevant to showing notice failures affecting our group of Yale alum accounts.

**We note that thus far, none of the staff members, including from Yale, Settlement Admin, and Counsel involved in the handling of data exports in the chain of custody of our data have been able to provide any authenticated evidence logs showing proper sending of individual notice to our addresses (concretely established on file with Yale with established course of dealing and estoppel by conduct), nor have any of the staff members involved been willing to submit a declaration of authenticity along with evidence to the Court under penalty of perjury for the actual records pertaining to our group of affected Yale alum accounts.**

Counsel has argued that looking up the evidentiary records around the flawed data exports impacting several dozens of affected Yale alums would be too "burdensome," while collecting fees in the multiple millions for themselves via settlement proceeds and litigation financing arrangements, and denying our group of identifiable class members due process rights under FRCP Rule 23, Mullane and Eisen standards of individual notice.

We respectfully request the Honorable Court to consider the following remedies after an investigatory review of the evidence for our group's affected Yale accounts:

1. To direct Yale University to provide the corrected data exports relating to our accounts to Settlement Admin, including **our primary addresses (email addresses and mailing addresses), which are the valid and concretely established addresses held in our education records**, per established course of dealing and estoppel by conduct, concomitant Rule 23 compliance standards and requirements in the Notice Plan. Defendant Yale University and the Settlement Administrator shall correctly maintain their primary record databases and data exports to reflect our verified primary email addresses, as thus confirmed again to the various parties on our attached individual worksheets and sworn statements submitted under seal.
2. To direct the Settlement Administrator to reissue individual notice to our eligible accounts, to which the Settlement Admin had not sent proper individual notice earlier due to their use of flawed data exports from Yale and/or flawed address selection rules by Settlement Admin through their sending of notice to defunct addresses labeled as such on the Yale-exported spreadsheets, and extend the **claims submission window and opt-out deadlines accordingly for our affected accounts** with a reasonable time frame (eg. 15 to 20 business days) from date of approval on our requested relief by this Honorable Court, to allow us to file timely claims including by electronic submissions (as was offered for earlier claimants).
3. To direct the Settlement Administrator to accept and process our claims, once information and documentation is received, on **full standing for validated claims to receive pari passu payments in the range of $2000 to $4000 based on equitable basis to payment formulas and calculations in the First Ten Settlements and other ongoing distributions,** and granting any further relief as this Court deems just, equitable, and proper.

We have previously submitted our Individual Worksheets with inbox addresses (as established via established course of dealing and estoppel by conduct with two-way use between us and Yale), along with our sworn declarations filed under seal, and the Counsel and associated parties are aware of our full names from our previous joint emails, the Master Roster and appended pages. If staff members in the chain of custody of our accounts' data and execution of the Notice Plan need further information from us to locate the relevant evidence logs, we ask Counsel to please advise.

Thank you for your time and consideration.

Sincerely,
/s/ Alums Notice Group, Pro Se
Alums Notice Group: Group Member Identities in Master Roster and Individual Worksheets with Sworn Declarations Submitted Under Seal

Email: alumsnoticegroup@gmail.com
Address:
Alums Notice Group
2501 Chatham Rd, Suite #7062
Springfield, IL 62704
Phone: (732) 474-8525

## Appendices

1. **Relevant Evidence Items for Disclosure and Targeted Discovery**
2. **2016 Yale IT email** on rollout of Optional AYA inbox with widespread activation issues – **There was no disputed fact regarding this evidence by Counsel, Settlement Admin, or the university**
3. **Reference Information Sourced from Google (via Google Gemini Tool) on Google Workspace Backend Instructure**, which is used by the Optional AYA 'YaleMail' Email Servers – **There was no disputed fact by Counsel, Settlement Admin, or the university regarding this information on the Optional AYA 'YaleMail' inbox running on Google with Yale-admin set spam filters and quarantine rules that block certain emails from ever being rendered into view by human users on the frontend**
4. **Notice to Preserve Evidence**: Sent to parties of record in the chain of custody of our data on 10/30/2026

## Appendix 1: Relevant Evidence Items for Disclosure and Targeted Discovery

(Reproduced below from Joint Letter dated 10/14/26)

We respectfully request that the Court consider the following items held by the defendant and Settlement Admin, which may be produced in initial disclosures or targeted discovery, regarding the lack of proper notice on our group of affected Yale alum accounts.

The following items would likely take no more than a few minutes of time per account query (or less if run in a batch retrieval), and the magnitude of benefits for affected class members, who each have thousands of dollars pending in the settlement, likely outweigh the administrative inconvenience of the limited time spent in correctly resolving the due process issue with deficiencies to FRCP Rule 23, Mullane and Eisen standards of proper class action notice, and flawed deviations by staff in executing the Notice Plan.

Relevant Items: Reproduced from earlier Joint Letter

1. **Yale's Records on Our Primary Addresses – Original Database Records of Our Primary Addresses Held by Yale**: The original, unedited records from databases or CRM (customer relationship management) files containing all historical primary addresses on file in our education records, with timelines of use, for cross-reference verification against the list that was exported by Yale staff to the Settlement Administrator for notice on this settlement, in item (2) below

2. **Data Transfer – Data Exports Sent by Yale to Settlement Admin**, which had included data exports of our contact information, sent by Yale staff to the Settlement Admin for use in executing the Notice Plan, which would show that our primary email addresses and mailing addresses may not have been exported correctly, when compared with the true primary addresses maintained in our education records as held in the university's original, unedited database in item (1) above

3. **Physical Mail Logs:** It is reported that Settlement Admin may have only used email notices in the vast majority of cases. If mail notices were used for any members of our group (per the list filed confidentially under seal), we request that Settlement Admin provide a copy of the USPS (US Postal Service) or private courier mailing logs.

4. **Address Selection – Email Selection Rules by Settlement Admin applied to Our Data to choose contact addresses**: As a party in the chain of custody of our data, Settlement Admin received the Yale-exported files containing our "mailing addresses and email

addresses" in our education records from Yale under the Notice Plan with Rule 23 requirements. The address selection rules are relevant, because if Settlement Admin left out primary addresses for the notice, to deliver notices exclusively through defunct/ non-active emails labeled as such in the spreadsheets, the errors would be directly trackable to how the emails used for notice were selected by Settlement Admin from the files they received from Yale containing our data.

5. **Email Logs for notice sent by Settlement Admin to our primary addresses, or lack thereof**
    a) **Email Transmission Logs with Secure Metadata Receipts:** Surface data and attachments are requested alongside **Server-Side Delivery & Bounce Reports,** with Full SMTP (Simple Mail Transfer Protocol) server transmission headers and logs for all settlement notice distributions sent to our primary addresses, or lack thereof
    b) **Metadata records** including transaction email headers (SMTP transmission logs, message IDs, delivery attempt receipts)

    **Evidentiary standards**: For any claim by Settlement Admin that settlement notice was dispatched to our group's verified primary email addresses as held in our "education records," the Settlement Admin is requested to produce native, unedited Outbound Mail Transfer Agent (MTA) transaction logs exported directly via API from the outbound mail system, with immutable transaction fields, and originating from the initial notice dispatch time window, specifically detailing the following:
    i. The exact target email address string present in the outbound dispatch queue, to be examined in cross-reference with our primary addresses;
    ii. The original, immutable UTC (Coordinated Universal Time) dispatch timestamp;
    iii. The cryptographic DKIM (Domain Keys Identified Mail) header hash value
    iv. The unique outbound Envelope Message-ID and TLS (Transport Layer Security) connection handshake; and
    v. The full, unredacted receiving Mail Exchange (MX) server SMTP response string (eg. "250 2.0.0 OK") issued by the recipient inbox provider.

    **Insufficiency of Self-Made Summaries by Settlement Admin:** We respectfully submit that manual spreadsheets, Microsoft Word tables, administrative summaries, or post-hoc status entries marked with "Delivered," or other self-made summaries provided by Settlement Admin, lacking the accompanying native SMTP 250 OK handshake logs should be held insufficient to establish compliance with Rule 23(c)(2)(B) or the Mullane standard. This is because the SMTP response codes are embedded within a cryptographically signed transaction record that is bound across multiple independent systems including connection handshakes with receiving servers, and thus provide cross-system verification of authenticity. Similarly, any representation by Settlement Admin that a notice may have been delivered to our primary addresses but "redirected to spam" should not be used to rebut our declaration of non-receipt unless supported by authentic receiving-server SMTP delivery logs confirming successful inbox handoff (a '250 OK' response) executed during the court-approved initial notice window.

6. **Email Logs for any notice sent by Settlement Admin to the Optional AYA/ 'YaleMail' inbox for our group, with reasons for selecting the Optional AYA 'YaleMail' inbox overriding primary addresses on file** (with reference to items 4 and 5 above), with similarly authenticated SMTP response receipts as outlined in item (4) above

7. **Optional Alum Inbox Activation vs. Non-Activation – Yale IT Admin logs showing which Optional AYA 'YaleMail' accounts were activated vs. never activated in from the frontend, human-user side (individual details provided on individual worksheets as**

**appended). Google Workspace backend infrastructure's audit logs** allows tracking of which optional AYA 'YaleMail' accounts in our group were opted-in and activated by a human user vs. pre-provisioned solely from the admin side and never opted-in or activated from the human-user side. We understand that Google Workspace (as used by the optional AYA 'YaleMail') maintains immutable log trails that distinguish between **Administrative Creation/ Provisioning** and **End-User Activation/ Login Activity**.

a) **Admin Log Events/ Batch Provisioning**: When an optional account was generated automatically by administrators or imported via a bulk provisioning tool (e.g. CSV/ comma-separated values upload), there is an **Admin Audit Trail** with the log explicitly recording the 'CREATE_USER' event under **Admin Log Events**. The **Actor Identification** lists the administrator email or API (application programming interface) service account that triggered the creation, along with a timestamp and IP (internet protocol) address. **Lack of Self-Registration**: if there is no corresponding user-initiated sign-up or opt-in workflow log, it would confirm the account was created and provisioned only from the backend.

b) **User-Side Activation Logs:** Authentication and creation records showing whether an optional AYA 'YaleMail' account was activated, logged into, or accessed by a human user, including prior to the settlement notice date;

c) **User Setup, Login & Password Creation, and First-Time Authentication Logs for Google Workspace products, including AYA 'YaleMail'**: Google tracks every single authentication attempt for an account. The relevant items/ evidence include:
   - The Google Admin Audit Log and event fields, which include **'last_login_time'** (to show the immutable timestamps for last human interactive session, displaying 'NEVER' for non-activated accounts), **'agreed_to_terms'** (to show 'FALSE' for non-activated accounts where the user did not login to accept the Google Workspace User Terms of Service). A copy of these system-level logs are also held on Google's cloud infrastructure, for authentication purposes.
   - **Zero Login Events**: If a user never logged in or activated the account, the User Log Events and Login Audit Log for that user ID would reflect zero successful logins and zero first-time ToS (Terms of Service) acceptances.
   - **Authentication Method**: If a login did occur, the event log would record the exact method, device details, IP address, and location. A total absence of user-driven authentication events would indicate the inbox was never accessed or used by the human user.
   - **State Log**: If the system state shows the account is still pending its initial ToS (Terms of Service) acceptance and initial password setup, it provides confirmation that the user never consented to the ToS (Terms of Service) or completed activation to opt-in to the optional account.

8. **Alum Inbox IT Filters & Quarantines** – **Yale IT Admin-set email quarantine logs showing email quarantine or spam filters on affected accounts (individual details provided on individual worksheets as appended),** which would show how Yale IT admin-set filters/ quarantine rules may have blocked the bulk-sent settlement notices from being rendered into view on the GUI (graphical user interface), so that the human user is never given an opportunity to physically see the notice appearing on the inbox's frontend

   a) **Administrative Spam/Filter Policies:** Documentation detailing server-side inbox rules, admin-level spam filtering, and security quarantines applied by Yale IT towards bulk-sent settlement notices.

   b) **Administrative Quarantine & Routing Rules**: Google Workspace backend infrastructure, as implemented on inboxes such as AYA 'YaleMail' allow admins to create routing and/or quarantine rules above user-level inboxes, which may silently isolate, discard, or reroute incoming emails before they arrive in a user's visible folders, including Inbox and Spam/ Junk folders. **The emails thus held in**

**quarantine never appears in the user's Inbox, 'All Mail', Spam, or Trash folders,** and the user cannot search for it, view it, or know it exists. The email may then be purged from the backend in automated processes without the human user ever having access to it. The backend event logs would capture the quarantine activity.

c) **AYA 'YaleMail' Admin Audit Logs, Google Workspace Email Log Search (ELS) and authentication checks** that reveal whether the specified email was delivered, quarantined, or dropped; as well as post-delivery interaction tracking, including:
   - **Comparative Email Log Searches (ELS)**: As the admin-set filters may have been unevenly applied/ configured, running an ELS (email log search) across different alumni accounts for the same message ID/ incoming sender would produce contrasting status outputs (eg. showing 'Delivered to Inbox' for Account A, but 'Quarantined' or 'Dropped by Configured Filter' for Account B)
   - **Scope Review in Admin Console**: A domain audit would return the exact admin rule/ filter configurations in the AYA 'YaleMail''s Google Workspace Admin Console that may have held the notice email in quarantine or otherwise prevent it from being viewed
   - **Seen/ Unseen by User**: Tracks whether and when the email was ever rendered in the user's view, which would show which users were affected by the Yale IT admin-set filters/ quarantine rules when the settlement notice was coming through.
   - **Opened/ Read by User**: Records if the user clicked into the email body
   - **Folder/ Label Status**: Identifies the exact system labels in AYA 'YaleMail' Google Workspace (eg. Inbox, Spam, Quarantine) applied onto the bulk-sent notice email.

**Appendix 2: 2016 Yale IT email** on rollout of Optional AYA 'YaleMail' inbox with widespread activation issues

**– There was no disputed fact regarding this evidence by Counsel, Settlement Admin, or the university**

Gmail [redacted]

**YaleMail - Google Activation Email - password reset**

**Association of Yale Alumni** <aya@yale.edu> Wed, Feb 24, 2016 at 10:38 PM
Reply-To: aya@yale.edu
To: [redacted]

**Virtual Yale Station Users:**

As of today, February 24, our records indicate your new YaleMail (@aya.yale.edu) account has not been activated in Google. Many alumni have indicated they did not receive the Google activation email with instructions and a temporary password. As a result, we have reset your temporary password, and you will soon receive it by email.

Please check the email account to which your Virtual Yale Startion @aya.yale.edu mail is currently forwarding for a message with the subject line "Password Reset for [your alias]@aya.yale.edu" including your spam and junk folders.

If you cannot locate today's password/activation email, please email aya@yale.edu.

**Please be assured that your @aya.yale.edu email address is not being cutoff or terminated.** Regardless of whether you have activated your YaleMail account yet, when the Virtual Yale Station system is turned off tomorrow (February 25), all messages sent to your @aya.yale.edu address will be delivered to your new Gmail mailbox and will be available to you as soon as you activate.

If you activated your YaleMail account earlier today, please disregard the password reset email.

*Janice Murphy-Wallace*
*Online Services Analyst*
*Jenny Chavira, '89*
*Acting Executive Director*
*AYA – Association of Yale Alumni*
*1201 Chapel Street*
*New Haven, CT*

To unsubscribe from future messages, click here

To view Yale's privacy policy, click here

Association of Yale Alumni
PO Box 209010
New Haven, CT 06520-9010

Phone: (203)432-2586
Fax: (203)432-0587
Email: aya@yale.edu

Copyright © 2016-2017 Association of Yale Alumni. All rights reserved.

**Appendix 3: Reference Information Sourced from Google (via Google Gemini Tool) on Google Workspace Backend Instructure**, which is used by the Optional AYA 'YaleMail' Email Servers **– There was no disputed fact by Counsel, Settlement Admin, or the university regarding this information on the Optional AYA 'YaleMail' inbox running on Google with Yale-admin set spam filters and quarantine rules that block certain emails from ever being rendered into view by human users on the frontend**

10/1/26, 9:02 AM Hidden Emails in YaleMail Backend - Google Gemini

Hi, can you check if it's possible that for an email inbox, because of admin-set filters, the human user is not actually able to physically see or have access to certain emails - eg. not even inside the junk folder, even though the email was supposedly delivered on the backend? Because we have heard from some alum classmates that they never received an email, even when they were able to login to an optional inbox where a notice email was supposedly 'delivered' to their inbox. The email inbox is the AYA YaleMail inbox with Google backend infrastructure

Yes, it is entirely possible for a human user to not see or have access to an email—even in their Spam, Junk, or Trash folders—despite the email showing up as "delivered" or accepted on the sender's side.

MailTester.com

Because **AYA YaleMail** operates on Google Workspace backend infrastructure, administrators have access to central control mechanisms that sit above individual user inboxes.

### How Google Workspace Admins Can Intercept Emails

**1. Administrative Quarantine**

Admins can set up custom spam, security, or compliance rules that divert incoming messages into an **Admin Quarantine** instead of delivering them to the end user's account.

Google Workspace Help

- **Sender Perspective:** The sending server gets a successful `250 OK` SMTP response, meaning the message was accepted by Google's mail transfer agent (MTA) without bouncing back.
- **Recipient Perspective:** The email never lands in the user's Inbox or Spam folder. It sits in a hidden administrative queue awaiting a manual review or automatic purge.

**2. Content & Routing Rules (Discard/Reject)**

Google Workspace allows administrators to set up **Compliance and Routing Rules**. These rules scan incoming emails for specific criteria (e.g., sender domain, specific keywords, attachment types, or bulk mail tags). An admin can configure these rules to:

Google Workspace Help + 1

- **Silently Drop/Discard:** The server accepts the email but immediately deletes it before it reaches the account storage layer.
- **Modify Delivery:** Route the message to a different catch-all or archive address without making a copy in the recipient's personal mailbox.

**3. Spam / Phishing Engine Overrides**

If Google's domain-level security flags an incoming broadcast or notice email as suspected phishing, spoofing, or unauthorized bulk mail (often caused by missing or misconfigured SPF/DKIM/DMARC records on the sender's side), the system may silently drop the message or hold it at the domain gateway level before it ever hits an individual user's storage quota.

MailReach

### What to Check Next

- **Google Admin Audit Log Search:** If you have access to a domain administrator for YaleMail, ask them to run a **Email Log Search** in the Google Admin Console. This tool

will show the exact path of the email, including whether it was Delivered to Inbox, Quarantined, Dropped by Compliance Rule, or Rejected.

**Sender Authentication Check:** Ensure the notice email was sent with valid **SPF, DKIM, and DMARC** alignment. Academic and alumni networks on Google Workspace often automatically filter or quarantine unauthenticated bulk emails to prevent alumni domain spoofing.

ok, and also can you check, if a human user never gets to physically 'see' or open the mail - can this also be tracked and proven with evidence logs?

**Yes, absolutely.** Not only can this be tracked, but Google Workspace leaves behind concrete, timestamped evidence logs that can prove whether a human user ever physically saw, opened, or even had the email rendered in their inbox view.

Because YaleMail uses Google Workspace, administrators have access to detailed log events through the **Google Admin Console** (specifically via Email Log Search and the Audit and Investigation Tool).

### What Logs Show Evidence for the Email

### 1. "Post-Delivery" & Interaction Logs

When an email reaches a Gmail account, the system tracks the state of the email inside that mailbox. An Email Log Search (ELS) or Gmail Audit Log reveals:

**Seen / Unseen:** Indicates whether the message line was ever rendered in the user's view (i.e., listed on their screen when they logged into the web interface or app).

**Opened / Read vs. Unopened:** Records whether the user clicked into the message body to open it.

**Label Status:** Shows which system folder held the message (e.g., `INBOX`, `SPAM`, `TRASH`, or `QUARANTINE`). If filtered out by an admin rule before delivery, it will explicitly show as **Quarantined** or **Dropped**.

### 2. User Sign-In & Activity Audit Logs

Admins can cross-reference email logs with **User Log Events**. This shows:

Exact timestamps of when the user logged into YaleMail.

The IP address, device type, and web browser used during the session.

Whether any mail interaction occurred during that specific session.

And can we check, is it possible that from the admin filters, some alum email accounts were affected in having the notice removed/ hidden from view, even while other accounts were unaffected? that is, can we check if the notice may have been unevenly blocked

Yes. In Google Workspace, administrative filters and routing rules do not have to be applied uniformly across an entire domain. They can easily be configured to target specific accounts, groups, or segments while leaving others completely unaffected.

Google Workspace administrators can scope and target email routing, compliance, and quarantine rules in several ways:

## How Admin Rules Can Block Notice Unevenly

**Targeting Specific Organizational Units (OUs)**
Administrators structure accounts into sub-units (e.g., `Alumni / Active Users` vs. `Alumni / Graduated pre-2015` vs. `Alumni / Opted-In`). Routing and quarantine rules can be enabled for one specific sub-OU while remaining turned off for others.

**Targeting via Google Groups or Inclusion/Exclusion Lists**
Rules can be built to apply only to specific Google Groups (e.g., custom lists of user accounts) or specific email address patterns. An admin can set up a compliance rule to quarantine or discard emails sent to specific recipient accounts while permitting the exact same email to pass through to others.

**Condition-Based Routing Rules**
Rules can be written with specific conditions—such as message size, external sender attributes, subject line keywords, or specific recipient addresses. If individual accounts have custom routing rules applied (or if rules match only specific user attributes), delivery outcome will differ from account to account.

**Account State and Provisioning Differences**
Administrative routing rules interact differently depending on whether an account is active, suspended, redirected via a Recipient Address Map, or configured with split-delivery settings. An incoming email might land in the inbox of an active primary account, but be held in Admin Quarantine or dropped for secondary or legacy accounts.

## How to Prove Uneven or Selective Blocking

Because delivery can be selective, an audit or investigation must examine the delivery pathway across multiple representative accounts rather than relying on a single test account:

**Comparative Email Log Searches (ELS):** Running an ELS across affected vs. unaffected alumni accounts for the same message ID/sender will produce contrasting status outputs (e.g., showing `Delivered to Inbox` for Account A, but `Quarantined` or `Dropped by Compliance Rule` for Account B).

**Scope Review in Admin Console:** A domain audit can pull the exact administrative rule definitions from the Google Workspace Admin Console to verify which Organizational Units, Groups, or individual recipient lists were targeted by the filter when the notice was dispatched.

Ok, and can you check, if a human user never opted in/ activated on an optional alum account such as the AYA YaleMail with Google backend infrastructure, eg. if the optional email was created/ activated only from the admin side without the human user's actual consent, is that trackable on evidence logs too?

Yes. Whether an account was actively set up by a human user or pre-provisioned solely from the admin side without user consent is fully trackable in Google Workspace audit logs.

Google maintains strict, immutable log trails that distinguish between **Administrative Creation/Provisioning** and **End-User Activation/Login Activity**.

### Evidence Logs That Track Account Creation vs. User Activation

### 1. Admin Log Events ( `CREATE_USER` / Batch Provisioning)

If an optional account was generated automatically by administrators or imported via a bulk provisioning tool (e.g., CSV upload, Google Workspace Admin SDK, or directory sync):

- **Admin Audit Trail:** The log explicitly records the `CREATE_USER` event under **Admin Log Events**.
- **Actor Identification:** It lists the exact administrator email or API service account ( `Actor` ) that triggered the creation, along with a timestamp and IP address.
- **Lack of Self-Registration:** If there is no corresponding user-initiated sign-up or opt-in workflow log, it confirms the account was created unilaterally from the backend.

### 2. User Login & First-Time Authentication Logs

Google tracks every single authentication attempt for an account:

- **Zero Login Events:** If a user never logged in or activated the account, the **User Log Events** and **Login Audit Log** for that user ID will reflect **zero successful logins** or zero first-time Terms of Service (ToS) acceptances.
- **Authentication Method:** If a login did occur, the log records the exact method (e.g., `Google Password` , `SAML SSO` , or `OIDC token exchange` ), device details, IP address, and location. A total absence of user-driven authentication events serves as concrete proof that the inbox was never accessed or used by the human recipient.

### 3. User Setup & Password Creation State

- **Initial Password Status:** In Google Workspace, when an admin creates an account, they can enforce "Require password change at next sign-in."
- **State Log:** If the system state shows the account is still pending its initial password setup or initial ToS acceptance, it provides technical confirmation that the human user never completed activation or took ownership of the account.

### Key Takeaway for Notice Audit

If a defendant argues that legal notice was "delivered" because an optional inbox exists:

- **Admin Audit Logs** will show who created the account (e.g., domain admin vs. user opt-in).
- **Login Audit Logs** will show whether the human user ever authenticated or activated the mailbox.
- If logs show the account was admin-created and has zero user login history, it establishes that the mailbox was unactivated infrastructure—strengthening arguments that notice sent there was not reasonably calculated to reach the individual.

**Appendix 4: Notice to Preserve Evidence**
(Following Pages)
Sent to parties of record in the chain of custody of our data on 10/30/26

# NOTICE TO PRESERVE EVIDENCE

To:
**MoloLamken, Lead Class Counsel for Henry et al v Brown Uni et al (Case #: 1:22-cv-00125)**
MoloLamken LLP
300 North LaSalle Street
Suite 5350
Chicago, IL 60654
- Mr. Steven Molo: smolo@mololamken.com, smolo2@mololamken.com
- Mr. Jeffrey Lamken: jlamken@mololamken.com
- Ms. Lauren Dayton: ldayton@mololamken.com
- Mr. Eugene Sokoloff: esokoloff@mololamken.com
- Mr. Eric Nitz: enitz@mololamken.com
- Mr. Matt Gold: mgold@mololamken.com

**Angeion Group, Settlement Administrator**
1650 Arch Street, Suite 2210
Philadelphia, PA 19103
- Officers overseeing Angeion's legal notice and claims operations: Mr. Bill Carter, Mr. Derek Burrows, Mr. Eric Schachter - bcarter@angeiongroup.com, dburrows@angeiongroup.com, eschachter@angeiongroup.com
- Angeion Project manager for Henry et al v Brown Uni et al: Ms. Taylor Adessa
- tadessa@angeiongroup.com

**Settlement Custodian/ Escrow Agents**
Huntington National Bank National Settlements Office
650 E. Swedesford Road, Suite 310
Wayne, PA 19087
- Mr. Christopher Ritchie, Executive Managing Director, Huntington National Bank, chris.ritchie@huntington.com
- Ms. Liz Lambert, Senior Managing Director, Huntington National Bank, liz.lambert@huntington.com
- Ms. Susan Brizendine, Trust Officer, Huntington National Bank, susan.brizendine@huntington.com

**Additional Class Counsel of Record**
- Freedman Normand Friedland: Mr. Edward Normand - tnormand@fnf.law, 10 Grand Central, 155 E. 44th Street, Suite 915, New York, NY 10017
- Gilbert Litigators and Counselors: Mr. Robert Gilbert - rgilbert@gilbertlitigators.com, 11 Broadway, Suite 615, New York, NY 10004
- Berger Montague: Mr. Eric Cramer - ecramer@bm.net, 1818 Market Street, Suite 3600, Philadelphia, PA 19103

**Yale Admin, IT and Compliance**
2 Whitney Avenue, 6th Floor
New Haven, CT 06510

Officers, financial.compliance@yale.edu, information.security@yale.edu
President/ Prof. Maurie McInnis, maurie.mcinnis@yale.edu, Office of the President, president@yale.edu
Mr. Alexander Dreier, Senior VP for Institutional Affairs, General Counsel, alexander.dreier@yale.edu
Dean/ Prof. Pericles Lewis, pericles.lewis@yale.edu
Mr. Geoff Chatas, Senior VP for Operations & CFO, geoff.chatas@yale.edu
Mr. Christopher Hanson, Chief Institutional Risk & Compliance Officer, christopher.hanson@yale.edu
Mr. John Barden, VP for Technology & Campus Services & CIO, john.barden@yale.edu
Mr. Jeremy Rosenberg, AVP for IT, Chief Info Security Officer, jeremy.rosenberg@yale.edu
Ms. Hadar Call, Associate CIO/ Director of Alumni Affairs and Development IT, hadar.call@yale.edu

cc:
**Yale University Undergraduate Financial Aid Officers and Yale College Financial Officers**
246 Church Street
New Haven, CT 06510
Ms. Mary Magri, Senior Director of Finance and Administration, mary.magri@yale.edu
Mr. Daniel Smith, Director of Finance, daniel.smith@yale.edu
Ms. Karensa DiFonzo, Director of Undergraduate Financial Aid, kari.difonzo@yale.edu
Mr. Alex Muro, Senior Associate Director of Undergraduate Financial Aid, alex.muro@yale.edu
Ms. Claire Sin-Clair, Office Manager & Admin Support for Mr. Dreier, claire.sin-clair@yale.edu

October 30, 2026

**NOTICE TO PRESERVE EVIDENCE**

Dear Staff Members,

Please be advised this is a notice to preserve evidence and follow-up regarding our group (the Yale alums in the Alums Notice Group)'s previous joint emails to you regarding the notice blackout which had affected our settlement claims in the **Henry et al. v. Brown University et al. case** (Case No.: **1:22-cv-00125**) in the U.S. District Court for the Northern District of Illinois, including joint emails sent on the following dates:

1. **9/21/26 Joint Email** to Yale Admin noting potentially defective data exports on our accounts, and IT issues on Yale-administered Optional AYA alum inbox, resulting in lack of notice
2. **9/25/26 Joint Email** to Yale Admin noting potentially defective data exports on our accounts, and IT issues on Yale-administered Optional AYA alum inbox, resulting in lack of notice
3. **9/30/26 Joint Email** to Yale Admin noting potentially defective data exports on our accounts, and IT issues on Yale-administered Optional AYA alum inbox, resulting in lack of notice; alongside Written Documentation of Phone Call made to Yale General Counsel's Office Phone Number on **9/30/26 at 2:12PM ET** to confirm previous joint emails and attachments were received

4. **10/2/26 Joint Email** to Yale Admin noting potentially defective data exports on our accounts, and IT issues on Yale-administered Optional AYA alum inbox, resulting in lack of notice
5. **10/5/26 Joint Email** to Class Counsel, Settlement Admin, and Yale Admin
6. **10/7/26 Joint Email** to Class Counsel, Settlement Admin, and Yale Admin.

As our group has not received a written response relating to the issues we brought to your attention over the previous weeks, we have filed a Joint Letter to the Court to request judicial oversight of the issue, given the large numbers of Yale class members impacted by the lack of proper notice. We have saved records on our side for further review and investigations.

As there is an active Court proceeding, please take note of this Notice to Preserve Evidence, which includes but is not limited to the following specific items from page 4 to page 7 discussed as follows.

A copy of our Joint Letter as filed with the Court has been enclosed for your reference. Please note that the duty to preserve evidence extends to all evidence within your possession, custody, and control relating to the ongoing dispute over the lack of proper notice affecting our accounts, including but not limited to all listed members on the Master Roster, a copy of which is being sent to you with this Notice to Preserve Evidence. This duty also extends to documents held by third parties over which you have control; if you believe that these third parties may have documents or other evidence in their possession that is relevant to the dispute over the lack of proper notice, you must forward a copy of this letter to them and make certain that these instructions are followed. This means all documents and files relevant to the dispute, including but not limited to the following relevant items, also contained and discussed in the joint letter, which are to be preserved as part of the evidentiary records. Please preserve all ESI/ electronically stored information, copies and backup, as defined by Rule 34 of the Federal Rules of Civil Procedure, along with any paper files that you maintain relevant to the ongoing dispute around the lack of proper notice on our class member accounts (including but not limited to all listed members on the Master Roster, a copy of which has also been sent to you with this Notice), for the duration of the ongoing settlements and case proceedings.

To ensure that all relevant documents and files are preserved, please communicate directly with all employees in your organizations who have possession or control of potentially relevant evidence, including but not limited to personnel who deal with database and/or files retention, deletion, and archiving. Please advise each of the employees to preserve any relevant documents and files in their custody, and advise all such persons that any regularly scheduled and/or automatic deletion of electronic documents and files must be discontinued with respect to any relevant data. **All relevant files, data, tables, spreadsheets, records, and documents, both electronic and paper, must be preserved for the duration of the settlements and case proceedings, and the duty to preserve this documentary evidence extends to records in existence as of the time you had reasonably anticipated the dispute over lack of proper notice when we had first brought it to your attention.**

Evidence including but not limited to the following Relevant Items:

1. **Yale's Records on Our Primary Addresses – Original Database Records of Our Primary Addresses Held by Yale**: The original, unedited records from databases or

CRM (customer relationship management) files containing all historical primary addresses on file in our education records, with timelines of use, including but not limited to records pertaining to cross-reference verification against the list that was exported by Yale staff to the Settlement Administrator for notice on this settlement, in item (2) below

2. **Data Transfer – Data Exports Sent by Yale to Settlement Admin**, which had included data exports of our contact information, sent by Yale staff to the Settlement Admin for use in executing the Notice Plan, which would show that our primary email addresses and mailing addresses may not have been exported correctly, when compared with the true primary addresses maintained in our education records as held in the university's original, unedited database in item (1) above

3. **Physical Mail Logs:** It is reported that Settlement Admin may have only used email notices in the vast majority of cases. If mail notices were used for any members of our group (per the list filed confidentially under seal), we request that Settlement Admin be able to provide a copy of the USPS (US Postal Service) or private courier mailing logs.

4. **Address Selection – Email Selection Rules by Settlement Admin applied to Our Data to choose contact addresses**: As a party in the chain of custody of our data, Settlement Admin received the Yale-exported files containing our "mailing addresses and email addresses" in our education records from Yale under the Notice Plan with Rule 23 requirements. The address selection rules are relevant, because if Settlement Admin left out primary addresses for the notice, to deliver notices exclusively through defunct/ non-active emails labeled as such in the spreadsheets, the errors would be directly trackable to how the emails used for notice were selected by Settlement Admin from the files they received from Yale containing our data.

5. **Email Logs for notice sent by Settlement Admin to our primary addresses, or lack thereof**
    a) **Email Transmission Logs with Secure Metadata Receipts:** Surface data and attachments are requested alongside **Server-Side Delivery & Bounce Reports,** with Full SMTP (Simple Mail Transfer Protocol) server transmission headers and logs for all settlement notice distributions sent to our primary addresses, or lack thereof
    b) **Metadata records** including transaction email headers (SMTP transmission logs, message IDs, delivery attempt receipts)

**Evidentiary standards**: For any claim by Settlement Admin that settlement notice was dispatched to our group's verified primary email addresses as held in our "education records," the Settlement Admin is requested to produce native, unedited Outbound Mail Transfer Agent (MTA) transaction logs exported directly via API from the outbound mail system, with immutable transaction fields, and originating from the initial notice dispatch time window, specifically detailing the following:

i. The exact target email address string present in the outbound dispatch queue, to be examined in cross-reference with our primary addresses;
ii. The original, immutable UTC (Coordinated Universal Time) dispatch timestamp;

iii. The cryptographic DKIM (Domain Keys Identified Mail) header hash value
iv. The unique outbound Envelope Message-ID and TLS (Transport Layer Security) connection handshake; and
v. The full, unredacted receiving Mail Exchange (MX) server SMTP response string (eg. "250 2.0.0 OK") issued by the recipient inbox provider.

**Insufficiency of Self-Made Summaries by Settlement Admin:** We respectfully submit that manual spreadsheets, Microsoft Word tables, administrative summaries, or post-hoc status entries marked with "Delivered," or other self-made summaries provided by Settlement Admin, lacking the accompanying native SMTP 250 OK handshake logs should be held insufficient to establish compliance with Rule 23(c)(2)(B) or the Mullane standard. This is because the SMTP response codes are embedded within a cryptographically signed transaction record that is bound across multiple independent systems including connection handshakes with receiving servers, and thus provide cross-system verification of authenticity. Similarly, any representation by Settlement Admin that a notice may have been delivered to our primary addresses but "redirected to spam" should not be used to rebut our declaration of non-receipt unless supported by authentic receiving-server SMTP delivery logs confirming successful inbox handoff (a '250 OK' response) executed during the court-approved initial notice window.

6. **Email Logs for any notice sent by Settlement Admin to the Optional AYA/ 'YaleMail' inbox for our group, with reasons for selecting the Optional AYA 'YaleMail' inbox overriding primary addresses on file** (with reference to items 4 and 5 above), with similarly authenticated SMTP response receipts as outlined in item (4) above

7. **Optional Alum Inbox Activation vs. Non-Activation – Yale IT Admin logs showing which Optional AYA 'YaleMail' accounts were activated vs. never activated in from the frontend, human-user side (individual details provided on individual worksheets as appended). Google Workspace backend infrastructure's audit logs** allows tracking of which optional AYA 'YaleMail' accounts in our group were opted-in and activated by a human user vs. pre-provisioned solely from the admin side and never opted-in or activated from the human-user side. We understand that Google Workspace (as used by the optional AYA 'YaleMail') maintains immutable log trails that distinguish between **Administrative Creation/ Provisioning** and **End-User Activation/ Login Activity**.
   a) **Admin Log Events/ Batch Provisioning**: When an optional account was generated automatically by administrators or imported via a bulk provisioning tool (e.g. CSV/ comma-separated values upload), there is an **Admin Audit Trail** with the log explicitly recording the 'CREATE_USER' event under **Admin Log Events**. The **Actor Identification** lists the administrator email or API (application programming interface) service account that triggered the creation, along with a timestamp and IP (internet protocol) address. **Lack of Self-Registration**: if there is no corresponding user-initiated sign-up or opt-in workflow log, it would confirm the account was created and provisioned only from the backend.
   b) **User-Side Activation Logs:** Authentication and creation records showing whether an optional AYA 'YaleMail' account was activated, logged into, or accessed by a human user, including prior to the settlement notice date;

c) **User Setup, Login & Password Creation, and First-Time Authentication Logs for Google Workspace products, including AYA 'YaleMail'**: Google tracks every single authentication attempt for an account. The relevant items/ evidence include:
   - The Google Admin Audit Log and event fields, which include **'last_login_time'** (to show the immutable timestamps for last human interactive session, displaying 'NEVER' for non-activated accounts), **'agreed_to_terms'** (to show 'FALSE' for non-activated accounts where the user did not login to accept the Google Workspace User Terms of Service). A copy of these system-level logs are also held on Google's cloud infrastructure, for authentication purposes.
   - **Zero Login Events**: If a user never logged in or activated the account, the User Log Events and Login Audit Log for that user ID would reflect zero successful logins and zero first-time ToS (Terms of Service) acceptances.
   - **Authentication Method**: If a login did occur, the event log would record the exact method, device details, IP address, and location. A total absence of user-driven authentication events would indicate the inbox was never accessed or used by the human user.
   - **State Log**: If the system state shows the account is still pending its initial ToS (Terms of Service) acceptance and initial password setup, it provides confirmation that the user never consented to the ToS (Terms of Service) or completed activation to opt-in to the optional account.

8. **Alum Inbox IT Filters & Quarantines – Yale IT Admin-set email quarantine logs showing email quarantine or spam filters on affected accounts (individual details provided on individual worksheets as appended),** which would show how Yale IT admin-set filters/ quarantine rules may have blocked the bulk-sent settlement notices from being rendered into view on the GUI (graphical user interface), so that the human user is never given an opportunity to physically see the notice appearing on the inbox's frontend
   a) **Administrative Spam/Filter Policies:** Documentation detailing server-side inbox rules, admin-level spam filtering, and security quarantines applied by Yale IT towards bulk-sent settlement notices.
   b) **Administrative Quarantine & Routing Rules**: Google Workspace backend infrastructure, as implemented on inboxes such as AYA 'YaleMail' allow admins to create routing and/or quarantine rules above user-level inboxes, which may silently isolate, discard, or reroute incoming emails before they arrive in a user's visible folders, including Inbox and Spam/ Junk folders. **The emails thus held in quarantine never appears in the user's Inbox, 'All Mail', Spam, or Trash folders,** and the user cannot search for it, view it, or know it exists. The email may then be purged from the backend in automated processes without the human user ever having access to it. The backend event logs would capture the quarantine activity.
   c) **AYA 'YaleMail' Admin Audit Logs, Google Workspace Email Log Search (ELS) and authentication checks** that reveal whether the specified email was delivered, quarantined, or dropped; as well as post-delivery interaction tracking, including:

- **Comparative Email Log Searches (ELS)**: As the admin-set filters may have been unevenly applied/ configured, running an ELS (email log search) across different alumni accounts for the same message ID/ incoming sender would produce contrasting status outputs (eg. showing 'Delivered to Inbox' for Account A, but 'Quarantined' or 'Dropped by Configured Filter' for Account B)
- **Scope Review in Admin Console**: A domain audit would return the exact admin rule/ filter configurations in the AYA 'YaleMail''s Google Workspace Admin Console that may have held the notice email in quarantine or otherwise prevent it from being viewed
- **Seen/ Unseen by User**: Tracks whether and when the email was ever rendered in the user's view, which would show which users were affected by the Yale IT admin-set filters/ quarantine rules when the settlement notice was coming through.
- **Opened/ Read by User**: Records if the user clicked into the email body
- **Folder/ Label Status**: Identifies the exact system labels in AYA 'YaleMail' Google Workspace (eg. Inbox, Spam, Quarantine) applied onto the bulk-sent notice email.

**Per rules and guidelines on the preservation of evidence, we note that failure to adhere to these evidence preservation instructions could result in adverse inferences and sanctions under compliance requirements in the Federal Rules of Civil Procedure (FRCP) against the spoliation of evidence.**

Thank you for your cooperation.

Best regards,

Alums Notice Group
Group Member Identities in Master Roster and Individual Worksheets Submitted Under Seal alongside Sworn Declarations -

** Note: As of October 28, 2026, our Motion to Seal has been granted by the Court, and we will be sending applicable instructions to the authorized personnel on the sealed documents. However, you would already have a copy of all our individual full names and information from all our previous joint emails sent to you with timestamped records. If you have any questions, please let us know.

Email: alumsnoticegroup@gmail.com
Address:
Alums Notice Group
2501 Chatham Rd, Suite #7062
Springfield, IL 62704
Phone: (732) 474-8525